## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC, | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| The Reed Action Judgement Creditors, | ) | Civil Action No. 1:24-cv-00494-GBW |
| | ) | |
| | ) | Bankruptcy BAP No. 23-65 |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Alecto Healthcare Services LLC, | ) | |
| | ) | |
| Appellee. | ) | |

### APPELLANTS' OPENING BRIEF

Dated:  October 15, 2024

**SULLIVAN · HAZELTINE · ALLINSON LLC**
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
　　　　whazeltine@sha-llc.com

and

Bren J. Pomponio, Esq.
Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
Tel: (304) 326-0188
Email:  colten@msjlaw.org
          bren@msjlaw.org

and


John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email:jstember@stembercohn.com
          mdavidsonwelling@stembercohn.com

*Counsel for The Reed Action*
*Judgment Creditors*

## <u>TABLE OF CONTENTS</u>

*Page*

Nature and Stage of Proceedings ................................................................................1

Jurisdictional Statement ..............................................................................................3

Statement of Issues on Appeal ....................................................................................4

     Designation Appeal ...........................................................................................4

     Confirmation Appeal .........................................................................................4

Summary of Argument .................................................................................................5

Statement of Case..........................................................................................................9

I.     The Reed Creditors....................................................................................10

II.    The Designation Appeal ...........................................................................11

III.   Confirmation Appeal ................................................................................17

     A. The Plan.......................................................................................................17

     B. Alecto's Investigation of Potential Claims Against Insiders ..................18

     C. The Reed Creditors' Plan Objection .......................................................20

        1. The Potential Fraudulent Transfer Claim against the
          Alecto Members ...................................................................................20

        2. Evidence Presented at the Confirmation Hearing ..............................21

        3. The Confirmation Ruling ....................................................................25

i

*Page*

ARGUMENT ....................................................................................................26

IV.    This Court Should Review the Designation Order because the
       Bankruptcy Court Erred in Ruling that Alecto was Eligible to be a
       Subchapter V Debtor .......................................................................26

       1.  The Debtor's lack of knowledge is not relevant in determining whether
           the LHP Claim was liquidated as of the Petition Date .............................30

       2.  The plain language of the Leases expressly provides that the common
           area maintenance charges became due and payable monthly .................32

       3.  Whether the Debtor retains a right to dispute its obligation to LHP
           does not make the LHP Claim unliquidated .............................................34

       4.  The 2022 Settlement Agreement between the Debtor and LHP
           has no impact on the liquidated status of the LHP obligation.................35

V.     The Confirmation Order Should Be Reversed because the Court Erred
       in Approving the Release of Claims Against the Released Parties ..............37

       A.  The Applicable Legal Standard for Evaluating fraudulent
           conveyance actions ..................................................................................37

       B.  The Bankruptcy Court erred as a matter of law by placing the
           burden of proof on the Reed Creditors on the solvency issue.................39

       C.  The Bankruptcy Court erred in accepting the testimony of Mr. Balasiano
           that there were no viable causes of action against the Debtor's Insiders.41

       D.  The Bankruptcy Court erred in relying on the evidence the
           Debtor presented to argue it was solvent at the time of the
           Sunrise REH Transfer................................................................................44

       E.  The Bankruptcy Court erred in misapplying the factors for approval
           of a settlement...........................................................................................47

CONCLUSION ....................................................................................................49

<u>**TABLE OF AUTHORITIES**</u>

*Page*

<u>**Cases**</u>

*Barcal v. Laughline (In re Barcal)*, 213 B.R. 1008 (B.A.P. 8th Cir. 1997) .......32, 34

*Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573 (1st Cir. 1980) .....38, 39

*Hasenjeager v. Voth,* 267 P. 146 (Cal. Ct. App. 1928) ...........................................26

*In re Bernadin*, 630 B.R. 787 (Bankr. E.D. Pa. 2019)............................................36

*In re Coram Healthcare, Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004)......6, 8, 39, 47

*In re Fidelity Tube Corp.*, 278 F.2d 776 (3d Cir. 1965) ..........................................36

*In re Fostvedt*, 823 F.2d 302 (9th Cir. 1987) .........................................................28

*In re Fountain*, 612 B.R. 743 (9th Cir. BAP 2020) ...............................................28

*In re Hall*, 650 B.R. 595 (Bankr. M.D. Fla. 2023) ................................30, 32, 34, 35

*In re Jordan*, 166 B.R. 201 (Bankr. D. Me. 1994) .................................................28

*In re Mazzeo*, 131 F/3d 295 (2d Cir. 1997) ...........................................................28

*In re McKenzie Contracting, LLC*, Case No. 8:24-bk-01255-RCT,
    2024 WL 3508375 *1, Colton, J. (Bankr. M.D. Fla. 2024)................................31

*In re Mitchell*, 255 B.R. 246 (Bankr. D. Mass 2000) .............................................28

*In re Spansion, Inc.*, No. 09–10690(KJC), 2009 WL 1531788,
    Carey, J. (Bankr. D. Del. June 2, 2009).........................................................39, 47

*In re Sullivan*, 245 B.R. 416 (N.D. Fla. 1999)...................................................30, 35

*In re Trans World Airlines, Inc.*, 134 F.3d 188 (3d Cir. 1998) ...............................38

*In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ....................39

*In re Zhang Medical P.C.*, 655 B.R. 403 (Bankr. S.D.N.Y. 2023) ........................30

*Mellon Bank, N.A. v. Metro Communications, Inc.,*
   945 F.2d 635 (3d Cir. 1991).................................................................................38

*Myers v. Martin (In re Martin),* 91 F.3d 389 (3d Cir. 1996)).......................................48

*Nicholes v. Johnny Appleseed (In re Nicholes),*
   184 B.R. 82 (B.A.P. 9th Cir. 1995)......................................................................34

*Stearns v. Los Angeles City Sch. Dist.,* 53 Cal. Rptr. 482 (Cal. Ct. App. 1966)......26

*United States v. May*, 211 B.R. 991 (M.D. Fla. 1997).............................................32

*United States v. Speers*, 382 US 266 (1965) ...........................................................36

*Whitehouse v. Six Corp.,* 48 Cal. Rptr. 2d 600 (Cal. Ct. App. 1995),
   *as modified* (Nov. 29, 1995), *as modified on denial of reh'g* (Dec. 19, 1995) ...26

## **Statutes**

11 U.S.C. § 1182(1) ...........................................................................................26, 27

## **Other Authorities**

2 L. King *Collier on Bankruptcy* ¶ 109.06[2][c] (15th ed. rev. 1997))...................28

## <u>Nature and Stage of Proceedings</u>

On June 16, 2023 ("<u>Petition Date</u>"), Appellee Alecto Healthcare Services LLC ("<u>Alecto</u>" or the "<u>Debtor</u>") filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Petition</u>"), 11 U.S.C. §§ 101 *et seq.*, in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). On Line 8 of the Petition, Alecto elected to proceed under subchapter V of chapter 11 and, in doing so, swore to its eligibility as a "debtor" under 11 U.S.C. § 1182(1).

On November 2, 2023, Appellants the Reed Action Judgment Creditors (the "Reed Creditors") timely filed their *Objection of the Reed Action Judgment Creditors to and Motion to Revoke Debtor's Designation as a Subchapter V Debtor* (the "Designation Motion") [Bankr. Ct. DI 204] Appendix Ex. 1, A.0001 – A.0015 with the Bankruptcy Court. The Bankruptcy Court held an evidentiary hearing on the Designation Motion on November 29, 2023, and, on December 1, 2023, the Bankruptcy Court ruled in open court that Alecto is eligible to be a Subchapter V Debtor. Transcript of Hearing held on December 1, 2023 8:14 – 22[1]. See Appendix Ex. 4, A0244 – A0256. On December 4, 2023, the Bankruptcy Court entered its *Order Denying Objection of the Reed Action Judgment Creditors to and Motion to Revoke Debtor's Designation as a Subchapter V Debtor* (the "<u>Designation Order</u>")

---

[1] The Transcript of Hearing held on December 1, 2023 shall hereinafter be referred to as the "12/1/23 Tr."

[Bankr. Ct. DI 243]. The Reed Creditors timely filed a notice of appeal from the Designation Order on December 18, 2023 [Bankr. Ct. DI 257] (the "Designation Appeal").[2]  See Appendix Ex. 6, A0260 – A0266.

On December 19, 2023, Alecto filed its *Small Business Debtor's Plan of Reorganization Proposed by the Debtor* (the "Plan") [Bankr. Ct. DI 261]. On February 22, 2024, the Reed Creditors filed the *Objection of the Reed Action Judgment Creditors to Confirmation of Small Business Debtor's Plan of Reorganization Proposed by the Debtor* (the "Plan Objection") [Bankr. Ct. DI 299]. See Appendix 34, A1013 – A1032.   The Bankruptcy Court held a two-day evidentiary hearing on confirmation of the Plan on March 4 and 5, 2024 and took the matter under advisement.

The Bankruptcy Court issued its *Confirmation Ruling* (the "Confirmation Ruling") [Bankr. Ct. DI 343] on March 20, 2024, at which time the Bankruptcy Court overruled the Reed Creditors' objections raised in the Plan Objection. The Bankruptcy Court entered its *Finding of Facts and Conclusions of Law Confirming Small Business Debtor's Plan of Reorganization* on April 4, 2024 [Bankr. Ct. DI 354] (the "Confirmation Order"). The Reed Creditors timely filed a notice of appeal

---

[2] The appeal of the Designation Order shall hereinafter be referred to as the "Designation Appeal." The District Court case number is 23-cv-01442-GBW.

from the Confirmation Order on April 18, 2024 [Bankr. Ct. DI 257] (the "Confirmation Appeal").[3]

On September 18, 2024, this Court entered an order consolidating the Designation Appeal and the Confirmation Appeal [DI 12-1]. This is the Reed Creditors' consolidated opening brief on the issues raised in the Designation Appeal and the Confirmation Appeal.

## Jurisdictional Statement

The Bankruptcy Court had jurisdiction to enter the Designation Order and the Confirmation Order pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* entered by this Court on February 29, 2012. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a).

The Designation Order and the Confirmation Order appeals were timely filed pursuant to Bankruptcy Rule 8002(1). The Bankruptcy Court entered the Designation Order on December 4, 2023 and the Reed Creditors filed their Notice of Appeal from the Designation Order on December 18, 2023. The Bankruptcy Court entered the Confirmation Order on April 4, 2024 and the Reed Creditors filed their Notice of Appeal from the Confirmation Order on April 18, 2024.

Both the Designation Order and the Confirmation Order are final orders.

---

[3] The appeal of the Confirmation Order shall hereinafter be referred to as the "Confirmation Appeal." The District Court case number is 24-cv-00494-GBW.

## Statement of Issues Presented on Appeal

### Designation Appeal

1.    Whether the Bankruptcy Court erred in ruling that the Debtor was eligible to proceed under Subchapter V of the Bankruptcy Code based on its determination that the claim of LHP Hospital Group, Inc. was unliquidated as of the Petition Date.

**Standard of review**: This issue is a mixed question of law and fact. The Court should accept the Bankruptcy Court's finding of historical or narrative facts unless clearly erroneous, but the Court should exercise plenary review of the Bankruptcy Court's choice and interpretation of legal precepts and its application of those precepts to the historical facts. *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir. 1991).

### Confirmation Appeal

1.    Whether the Bankruptcy Court erred as a matter of law when it ruled that the Reed Creditors bore the burden of proof on the issue of insolvency.

**Standard of Review**: The Court should review this issue *de novo*.

2.    Whether the Bankruptcy Court erred in relying on the testimony of Mr. Balasiano that there were no viable causes of action against the Debtor's insiders.

**Standard of Review**: The Court should review this issue for clear error.

3.      Whether the Bankruptcy Court erred in relying on the Debtor's evidence in ruling that the Debtor was solvent at the time of the Sunrise REH Transfer (defined below).

**Standard of Review**: The Court should review this issue for clear error.

4.      Whether the Bankruptcy Court erred in misapplying the factors for approval of a settlement under Section 1123(b)(3)(A) of the Bankruptcy Code Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Standard of Review**: This issue is a mixed question of law and fact. The Court should accept the Bankruptcy Court's finding of historical or narrative facts unless clearly erroneous, but the Court should exercise plenary review of the Bankruptcy Court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.

## Summary of Argument

This appeal seeks the reversal of two orders of the Bankruptcy Court in Alecto's bankruptcy case.   The first, the Designation Order entered by the Bankruptcy Court on December 4, 2023, permitted Alecto's bankruptcy case to proceed under subchapter V of the Bankruptcy Code, despite clear evidence that Alecto's non-contingent and liquidated claims exceeded the subchapter V eligibility limit of $7,500,000.  The second, the Confirmation Order, approved the settlement and release of fraudulent transfer claims against insiders of the Debtor for $25,000,

which did not meet the standards established in the *Coram Healthcare* decision applicable to such settlements.

The Bankruptcy Court's ruling that Alecto was eligible to proceed as a subchapter V debtor hinged on its determination that the claim filed by LHP (defined below) in the amount of $3.74 million, for obligations of an Alecto affiliate under five leases that Alecto had guaranteed, was unliquidated and did not count toward the $7.5 million eligibility debt limit.   The Court cited two primary reasons for its determination that the LHP claim was unliquidated: (1) it included pro-rated amounts for operating expenses which were subject to reconciliation, and (2) because LHP had not made a demand for the precise amount due prior to the filing of Alecto's bankruptcy petition.

In fact, the LHP claim for reimbursement of sixteen monthly rental payments it made on the five leases falls squarely within the accepted definition of a liquidated claim because the amount due was readily determinable from the applicable lease documents.  These documents were easily accessible to the Debtor, since a Debtor affiliate was the tenant by assignment of the leases.  In addition, the reconciliation process could only affect amounts due for future rent payments; it would not alter the precise amounts due monthly as operating expenses under the leases through the petition date. The fact that LHP had not made a demand for the precise amount due as of the petition date did not impact its claim, which had fully accrued as of the

petition date.  In ignoring this evidence, the Bankruptcy Court erred in its determination that the LHP claim was unliquidated.

With respect to the Confirmation Order, Alecto's own forensic accountant issued a report documenting that the June 23, 2019 Sunrise Transfer (defined subsequently herein) was not made for reasonably equivalent value and that the Debtor's equity holders, including insiders, received a $22 million benefit from the transaction.  At the confirmation hearing, Alecto only argued that the Sunrise Transfer could not constitute a fraudulent transfer because Alecto was not insolvent at the time of or as a result of the transfer.  In accepting the conclusions of Steven Balasiano, the Debtor's purported independent director, that no fraudulent transfer claim could be brought and that settlement of the potential claim against insiders for $25,000 was appropriate based on the Debtor's solvency at the time of the transaction, the Bankruptcy Court committed multiple errors.

First, the Court erroneously held that the Reed Creditors, the Appellants herein, bore the burden of proof on the issue of solvency, even though it was the Debtor that had purported to investigate and settle the claim and had the burden of demonstrating that the $25,000 settlement was appropriate.  Second, the Court accepted Mr. Balasiano's testimony regarding Alecto's solvency despite his failure to conduct *any* independent investigation of it.  Third, the Court relied on factual testimony from Mr. Sarrao, Alecto's vice-president and general counsel—and a

target of the potential fraudulent transfer claims— regarding the equity figures listed on the Debtor's balance sheets and tax returns, despite recognizing that Mr. Sarrao was not qualified to render an opinion on solvency.

The Court ignored the evidence that Alecto's balance sheets relied on the value of its intercompany claims to retain a positive equity value, and those intercompany claims had no value given Alecto's long history of advancing funds to its struggling hospitals. The Court also ignored the evidence that the balance sheets did not account for the substantial obligations Alecto paid, guaranteed or was liable for, simply because the obligations were booked as obligations of a subsidiary. These errors regarding the inadequacy of the Debtor's solvency analysis resulted in the Bankruptcy Court misapplication of the *Coram Healthcare* factors used to approve the Plan settlement that released insider claims.

For the reasons set forth more fully herein, this Court should reverse the Bankruptcy Court's errors in entering the Designation Order and the Confirmation Order and remand the case to the Bankruptcy Court for further proceedings in accordance with its order.

## **Statement of Case**

Alecto was formed in 2012 to serve as a holding company for healthcare-related entities, Plan § III.1 Appendix Ex. 33, A0731.  Alecto then formed various subsidiaries that it used to acquire and operate acute care hospitals, and own and operate businesses affiliated with acute care hospitals held by Debtor's subsidiaries. Plan § III.2 pp. 6 - 7. Appendix Ex. 33, A0731-0732.  Alecto rapidly expanded and, at its peak, Alecto's subsidiaries held the assets of five acute care hospitals across the country, and Alecto provided management services to another acute care hospital owned by an unrelated third-party. *Id.* At its peak, Alecto's subsidiaries operated five acute care hospitals across the country; the Debtor provided management services to an acute care hospital owned by an unrelated third-party; and one of the Debtor's subsidiaries provided management services to Hayward Sisters Hospital dba St. Rose Hospital. *Id.*

Alecto's business model was unsustainable, however, and within just 11 years of formation, the company had not only acquired, but also shuttered and no longer had any interest in three of the five acute care hospitals, while a fourth hospital Sherman/Grayson Hospital LLC filed for bankruptcy.  *Id.* p. 7. Appendix Ex. 33, A0732.

Alecto's mismanagement and rampant failure to pay its debts resulted in multiple lawsuits (and judgments) against it and/or its subsidiaries.[4]  Among these was a class judgment obtained in the Reed Creditor Action, brought by former employees, the Reed Creditors, for wages owed under the WARN Act after Alecto unexpectedly closed a West Virginia hospital and laid off hundreds of workers. *Reed,* 2022 WL 4119367.  After the Reed Creditors sought to execute on that judgment in the California courts where Alecto is headquartered, Alecto responded by filing its Bankruptcy Petition.

## I.    **The Reed Creditors**.

On November 28, 2022 (the "<u>Judgment Date</u>"), seven months prior to the Petition Date, the United States District Court for the Northern District of West Virginia entered a Judgment Order in favor of the Reed Creditors and against Alecto and its affiliate, Alecto Healthcare Services, LLC (which operated the Ohio Valley Medical Center in Wheeling, West Virginia) in the amount of $3,169,745.72 (the "Judgment Amount"). Bankr. Ct. DI 204-3. Appendix Ex. 1, A0001 – A0015 Alecto scheduled the Reed Creditors as having a noncontingent, liquidated and undisputed

---

[4] See, e.g., *Reed v. Alecto Healthcare Servs*., LLC, 2022 WL 4119367, at *1 (N.D.W. Va. Aug. 2, 2022) (granting summary judgment to class of former employees on WARN Act claim for unpaid wages); *Miller v. Alecto Healthcare Servs. Fairmont, LLC*, 2022 WL 949899, at *1 (N.D.W. Va. Mar. 29, 2022) (ERISA lawsuit for failure to pay pension and health contributions for employees); *Snyder Bros., Inc. v. E. Ohio Reg'l Hosp. at Martin's Ferry, Inc.*, 2020 WL 3104056, at *1 (W.D. Pa. June 11, 2020) (breach of contract action against Alecto subsidiary for "not paying for certain quantities of natural gas the Hospital received and used during 2018 and 2019").

claim in the Judgment Amount on Schedule E/F of its *Schedule of Assets and Liabilities*. *See* Plan, Ex. B, Schedule E/F. Appendix Ex.7, A0267 – A0281.

On August 15, 2023, the Reed Creditors filed Claim No. 19 ("the Reed Claim") asserting a general unsecured claim in the amount of $3,275,382.64 against Alecto, which includes (i) the Judgment Amount, (ii) accrued interest at the federal judgment rate in the amount of $82,673.92 for the period from the Judgment Date through the Petition Date, and (iii) collection fees in the amount of $22,963.00 for the period from the Judgment Date through the Petition Date. Appendix Ex. 8, A0282 – A0289.

## II.   <u>**The Designation Appeal**</u>.

Alecto filed its *Schedule of Assets and Liabilities* on June 30, 2023 (the "Schedules"). Appendix Ex. 7, A0267 – A0281.   The Schedules include 17 scheduled creditors, not including affiliates or insiders, holding noncontingent and liquidated claims totaling $3,445,535.47, including the Reed Claim. *Id.*   The total amount of the claims scheduled as non-contingent and liquidated that were not superseded by a filed claim is $274,789.85. *See id.*

The *Notice of Filing of Chapter 11 Bankruptcy Case* [Bankr. Ct. DI 35] set August 15, 2023, as the deadline to file claims. Seven creditors (not including affiliates or insiders of Alecto) timely filed non-contingent, liquidated claims in the total amount of $7,615,746.29. These included (i) the Reed Action Judgment

Creditors, whose filed claim increased their scheduled claim to $3,275,382.64, based on accrued interest and collection fees as set forth above, (ii) Cardinal Health 110, LLC ("Cardinal 110"), whose claim was scheduled as an unliquidated claim, filed a non-contingent and liquidated claim in the amount of $419,842.62, (ii) Cardinal Health 200, LLC ("Cardinal 200"), whose claim was scheduled as an unliquidated claim in the amount of $81,318.11, filed a non-contingent and liquidated claim in the amount of $119,695.80, and (iii) LHP Hospital Group, Inc. ("LHP"), whose claim was scheduled as contingent and unliquidated, filed a non-contingent and liquidated claim in the amount of $3,739,653.77 (the "LHP Claim"). The Reed Creditors determined that the total of the Debtor's scheduled and filed non-contingent and liquidated claims was $7,890,536.14 as of the Petition Date. A list of filed and scheduled claims was attached to the Designation Motion. *See* Appendix Ex. 1, A0015.

Because the total of scheduled and filed non-contingent and liquidated claims exceeded the statutory limit of $7,500,000 under 11 U.S.C. § 1182(1), the Reed Creditors filed the Designation Motion on November 2, 2023. Alecto filed its Preliminary Response in Opposition to the Designation Motion ("Preliminary Response") [Bankr. Ct. DI 226] on November 22, 2023, which focused exclusively on its contention that the LHP Claim was contingent and unliquidated and must therefore be excluded from the calculation. The Reed Creditors filed their Reply in

Response to Alecto's Preliminary Response on November 27, 2023 [Bankr. Ct. DI 227], asserting that the LHP claim was not contingent and was liquidated in the amount of $3,739,635.77, its filed amount.

The Bankruptcy Court held an evidentiary hearing on the Designation Motion on November 29, 2023. On December 1, 2023, the Bankruptcy Court issued a bench ruling denying the Designation Motion. In its ruling, the Court noted that "the LHP debt is the fulcrum and whether that debt is unliquidated or contingent controls the eligibility determination." 12/1/23 Tr. 3:2 – 4. Appendix Ex. 4, A0247 "If [the Reed Creditors] were correct [that the LHP Debt was non-contingent and liquidated] the debtor would exceed the statutory cap and be ineligible to proceed under Subchapter V." *Id*. 2:22 – 24. Appendix Ex. 4, A0246.

The LHP Claim attached documents relating to its basis.[5]  These documents indicate that on August 21, 2012, Sherman/Grayson Health System, LLC, an affiliate

---

[5] A summary of relevant provisions in the documents relating to the LHP Claim is as follows:

- Altera Highland, LLC ("Altera"), as landlord, and Sherman/Grayson Health System, LLC ("Sherman Grayson System"), as tenant, entered into five (5) lease agreements dated August 21, 2012 (the "Leases"). *See* LHP Complaint ¶ 12 Appendix Ex. 32, A0710; Lease Agreements. Appendix Exs. 10 through 14, A0379 through A0604.
- As an inducement for Altera to enter into the Lease Agreements, LHP executed five separate guarantees in favor of Altera, pursuant to which LHP guaranteed to Altera "the full prompt and timely payment of all amounts to be paid by Tenant under the Lease Agreements." *See* LHP Complaint ¶ 14. Appendix Ex. 32, A0711.
- On September 23, 2014, Sherman Grayson System and Alecto Healthcare Services Sherman LLC ("Alecto Sherman"), entered into a purchase agreement (the "Purchase Agreement") pursuant to which Alecto Sherman acquired from Sherman Grayson System all of the membership interests in Sherman/Grayson Hospital, LLC. Purchase Agreement by and among Sherman/Grayson Healthcare System, LLC and Alecto

of the owner and operator of the Texas Health Presbyterian Hospital, located in

Dallas, Texas, entered into 12-year lease agreements with Alterra Highland, LLC

("Landlord") for five office suites in a building adjacent to the hospital (the "Lease

Agreements").  The Landlord required LHP to execute a guarantee for the Lease

Agreements.  Two years later, in the fall of 2014, when Alecto's affiliate Alecto

---

Healthcare Services Sherman LLC dated September 30, 2014 (Ex. B to Preliminary Response). Appendix Ex. 2, A0016 – A0203.

- Sherman Grayson System and Sherman/Grayson Hospital LLC ("Sherman/Grayson") entered into an Assignment and Assumption of Leases dated October 31, 2014 ("Assignment") pursuant to which Sherman Grayson System assigned its interest as tenant under each of the Lease Agreements to Sherman Grayson. LHP Complaint ¶ 15. Appendix Ex. 32, A0711-A0712.

- As part of the Assignment, Altera, Sherman Grayson System and Sherman/Grayson entered into a Consent Agreement, pursuant to which LHP agreed that its obligations under the LHP Guarantees applied to Sherman Grayson's obligations under the Lease Agreements. *Id.* ¶ 16. Appendix Ex. 32, A0712; Appendix Exs. 1- through 14 A0379 – A0604.

- Alecto executed a guarantee on September 23, 2014 (the "Guarantee") pursuant to which Alecto absolutely, unconditionally and irrevocably guaranteed the purchasers' obligations to LHP under the Purchase Agreement. Guarantee (Ex. B to Preliminary Response) ¶ 1. Appendix Ex. 2, A0162 – A0169**.**

- In 2020, LHP sued Alecto Sherman and Alecto (collectively, the Alecto Defendants") for breach of contract under the Operative Agreements. Following mediation, LHP, Alecto and Alecto Sherman entered into a Confidential Settlement Agreement (the "Settlement Agreement"). *See* Settlement Agreement (Ex. C to Preliminary Response). Appendix Ex. 2, A0170 – A0195.

- Paragraph 6 of the Settlement Agreement provides a procedure for the Alecto Defendant's payment of future expenses to LHP. Paragraph 6 provides in pertinent part that

a. LHP would make written demand on the Alecto Defendants for payment of a specified amount.

b. The Alecto Defendants would make payment of the specific amount within fifteen (15) days of such demand.

c. If the Alecto Defendants disputed the amount specified in the demand and/or were unable to make the payment, LHP would be entitled to the entry of a judgment by confession.

d. In the confession of judgment proceeding, the Alecto Defendants could only contest the computation and payment of the principal, interest, fees, and costs of the judgment.

*Id.* ¶ 6. Appendix Ex. 2, A0173 – A0174.

Healthcare Services Sherman LLC ("Alecto Sherman") acquired the entity that owned and operated the Texas Health Presbyterian Hospital, Sherman/Grayson Hospital, LLC ("Sherman/Grayson"), another Alecto affiliate, obtained an assignment of the five Lease Agreements. The Landlord would not release LHP from its guarantee of the Lease Agreements, and accordingly, LHP required Alecto and Alecto Sherman to execute guarantees in its favor, in the event that LHP was required to make any payments to the Landlord on its own guarantee.

At the hearing, the Court was provided with the following evidence regarding LHP's Claim against Alecto:

- On January 20, 2021, LHP sued Alecto Sherman (as indemnitor) and Alecto (as guarantor) for unpaid obligations under the Lease Agreements which it had paid to the Landlord under its guarantee. [204-11]. The Complaint in that action (the "Complaint") alleged that Sherman Grayson (as tenant) had stopped paying rent as of May 1, 2020 (¶ 21) and vacated the premises on October 31, 2020. LHP Complaint ¶ 15.

- The parties settled the LHP litigation on February 16, 2022, resolving all amounts owed by Alecto and Alecto Sherman to LHP through February 28, 2022. *See* Preliminary Response, Ex. 3 [Bankr, Ct. DI 226-3]. Appendix Ex. 2, A0170 – A0195.

- From March 1, 2022 through June 1, 2023, LHP made 16 monthly payments to the Landlord in the amount specified by the Lease Agreements (the 'Payment Confirmations") [Appendix Exs. 15 through 30, A0605 – A0703] totaling $3,708,475.62 paid as of the Petition Date. *See* Summary of Payments Appendix Ex. 31, Appendix A 0704 – A0705.

- On June 28, 2023, LHP made a demand on Alecto Sherman, a non-Debtor entity, for payment of the $3,708,475.62.  Demand pursuant to Confidential Settlement Agreement ("Demand Letter) (Ex. D to Preliminary Response). Appendix Ex. 2, A0196 – A0200.

- The amount asserted in LHP's claim, filed on August 14, 2023, which indicates on its face that it includes interest, is $3,739,635.77, is $31,160.15 higher than the amount sought in the June 28, 2023 Demand Letter. *See* LHP Claim. *Id.*

The Bankruptcy Court found, contrary to the Reed Creditors' argument, that the Settlement Agreement modifies and supersedes the Operative Agreements. 12/1/2023 Tr. 4:22 - 6:18. Appendix Ex. 4, A0248 – 0250. As discussed below, this finding was essential to the Court's ruling that Alecto's debt to LHP was unliquidated. *See id.* 6:17 – 18. Appendix Ex. 4, A0250.

After issuing its ruling on December 1, 2023 that Alecto was eligible to be a Subchapter V debtor because the LHP Claim was unliquidated, the Bankruptcy Court entered the Designation Order on December 4, 2023 [Bankr. DI 243]. Appendix Ex. 5, A0257 – 0259.  The Reed Creditors timely filed a notice of appeal from the Designation Order on December 18, 2023. Appendix Ex. 6, A0260 – A0266.

III. **Confirmation Appeal**

A. **The Plan**.

Alecto filed the Plan on December 19, 2023, which provides for the following

treatment for Class 3 Allowed General Unsecured Claims:

> After payment in full of all Allowed Administrative Claims, all
> Allowed Priority Claims in full, and Allowed Secured Claims (if any),
> Allowed General Unsecured Claims will be paid the Debtor's projected
> disposable income on a pro rata basis. Pro rata Distributions will be
> made to Holders of Allowed General Unsecured Claims on an annual
> basis with the first Distribution to be made twelve months after the
> Effective Date.

Plan § IV.2.d. Appendix Ex. 33, A0746 – A0747. The Confirmation Order modified

the timing of distributions, providing that "pro rata distributions on account of

Allowed General Unsecured Claims shall be made on or about September 30, 2024,

March 31, 2025, September 30, 2025, March 31, 2026, September 30, 2026, and

March 31, 2027." Confirmation Order ¶ 53. Appendix Ex. 52, A1640 – A1641.

In the Plan, Alecto estimated that (i) the total amount of allowed general

unsecured claims will be approximately $11,000,000 and (ii) holders of allowed

general unsecured claims will receive a distribution of from 3% to 10% on account

of their general unsecured claims. Plan § IV.2.d; Appendix Ex. 33, A0746 – A0747.

Section IV.5 of the Plan provides in pertinent part that

> The Plan will be funded by: (1) the Debtor's projected disposable
> income ($848,049) generated by the Debtor's post-confirmation
> operations, and (2) $**25,000 provided by certain of the Released**
> **Parties.** The Debtor expects to have approximately $170,000 in

combined cash on hand and accounts receivable on the Effective Date

….

Plan Section IV.5 (emphasis supplied). Appendix Ex. 31, A0751. On May 4, 2024, Alecto filed its Notice of Filing of Amended Exhibits C and G to the Plan ("Exhibit Notice") [Bankr. Ct. DI 316].  Exhibit 1 to the Exhibit Notice is a revised Income Statement projecting an increased projected disposable income amount of $1,916,510 during the three-year distribution period. *Id.* Exhibit 1.

Pursuant to Section VII.2 the Plan, Alecto proposed to release certain "Released Parties" from all claims Alecto may have against them in exchange for payment of $25,000. Plan §VII.2. Appendix Ex. 33, A0756.  The Released Parties include "(a) the officers and managers of the Debtor; (b) the Debtor's Professionals, and (d) [sic] with respect to each of the foregoing Persons in clauses (a) through (b), such Entities' respective predecessors, successors and assigns, provided, however, that notwithstanding the foregoing, and for the avoidance of doubt, nothing herein shall release any Causes of Action of the Debtor or the Estate against any of the Debtor's representatives that did not serve in such capacity on or after the Petition Date." Plan § I.44. Appendix Ex. 33, A0730.

## B. <u>Alecto's Investigation of Potential Claims Against Insiders</u>.

At the outset of Alecto's bankruptcy case, the Reed Creditors raised a conflict of interest between Alecto and Alecto Sherman, an affiliate which had filed a separate a separate bankruptcy petition, because Alecto was a creditor of Alecto

Sherman as a result of having spent substantial sums supporting Alecto Sherman while not paying its own creditors.[6]  In response, Alecto retained separate counsel for itself and, effective as of August 4, 2023, Alecto retained Steven Balasiano as an independent director to review and advise on issues regarding Alecto's claims against Alecto-Sherman.  Appendix Ex. 38, A1173 – 1176. Mr. Balasiano was subsequently charged with, among other things, determining whether Alecto had any potential claims against its affiliates and insiders and bringing any such claims he believed were valid.  Appendix Ex. 39, A1177 – 1179.

Alecto retained Gould Consulting Services ("GCS") as its Forensic Accounting Investigation Consultant to "conduct a forensic analysis of cash transactions into and out of the Debtor's bank accounts to identify (a) cash payments and loans to, or for the benefit of, officers, directors, shareholders, and related-parties […], and (b) potentially voidable transfers to Insiders, if any." Plan § III.9 p. 15. Appendix Ex. 33, A0740[7]" After conducting its forensic analysis, GCS presented its report to Mr. Balasiano and conferred with Mr. Balasiano in order to provide Mr. Balasiano an opportunity to ask any questions or raise any issues with respect to the estate's potential claims against the Insiders. *Id.* p. 17. Appendix Ex. 33, A0742.  At

---

[6] The Alecto and the Alecto Sherman petitions were both filed by the Shulman Bastian and Rosner Law Group firms.  Alecto retained the firm of Morris James to represent it effective as of August 11, 2023.  Shulman Bastian and Rosner Law Group continued to represent Alecto Sherman.

[7] GCS submitted the Report of Gould Consulting Services (the "GCS Report") to Alecto on or about September 28, 2023. A copy of the GCS Report is attached to the Plan as Exhibit D.

the conclusion of the conference, Mr. Balasiano determined that the estate does not have any valid claims against the Insiders for avoidable transfers." *Id.* This determination was set forth in both the Debtor's original plan filed on October 10, 2023 [Bankr. Ct. DI 170], and its subsequent Plan filed on December 18, 2023.

### C. The Reed Creditors' Plan Objection.

The Reed Creditors filed their Plan Objection on February 22, 2024. One of their arguments against Plan confirmation was the proposed release of all claims against the Released Parties in exchange for a $25,000 payment. In particular, the Reed Creditors objected to the release of a potential fraudulent transfer claim against Alecto's members (the "Alecto Members") of approximately $22,000,000. Plan Objection § I.A, pp. 6-11. Appendix Ex. 34, A1019 – A1024.

### 1. The Potential Fraudulent Transfer Claim against Alecto Members.

On June 19, 2019, Alecto transferred its 100% equity interest in Sunrise Real Estate Holdings, LLC ("Sunrise REH") to the Alecto Members, who formed a new entity named Sunrise MOB Holdings, LLC ("Sunrise MPB") to receive the Sunrise REH equity (the "Sunrise Transfer").[8] The Sunrise REH equity was a valuable acquisition for the Alecto Members because Sunrise REH was the 100% owner of

---

[8] GSC Report, Discussion Section A (p. 7). Appendix Ex. 33, A0831.

Plaza Medical Office Building, LLC ("Plaza MOB"), which owned a medical office building appraised at $50,700,000.[9]

Based on the Gould report, the Reed Creditors understand that Alecto received value from the Sunrise Transfer as a result of (i) the satisfaction of the existing secured loan on the building in the amount of $19,472,350[10] and (ii) a capital contribution from the members in the amount of $8,444,477.81.[11]  Through the loan payoff and capital contributions, the GCS Report states that Alecto received approximately $28 million in value in exchange for its transfer of the ultimate ownership interest in the medical office building, which is $22,700,000 less than the appraised value of the Plaza MOB's medical office building.[12]  The GCS Report acknowledges that Alecto did not receive reasonably equivalent value in the transaction.[13]

GCS was not asked to determine whether Alecto was solvent at the time of the Sunrise Transfer.

### 2. Evidence Presented at the Confirmation Hearing.

The Bankruptcy Court held a two-day evidentiary hearing on confirmation of the Plan on March 4, and 5, 2024.  Alecto did not challenge that it did not receive

---

[9] *Id.*, Discussion Section A. 4, FN 12 (p. 6). Appendix Ex. 33, A0831**.**
[10] GCS Report, Summary of Observations Section A (p. 3). Appendix Ex. 33, A0828 – A0830.
[11] *Id.*, Discussion Section A. 6 (p. 6). Appendix Ex. 33, A0831.
[12] *See id.,* Findings and Observations Section A (p. 2). Appendix Ex. 33, A0827 – A0828.
[13] *See id.*

reasonably equivalent value from the Sunrise Transfer at the Confirmation Hearing, but instead introduced evidence to support its contention that Alecto remained solvent before and after the Sunrise Transfer.

In an attempt to prove solvency, the Debtor offered testimony through Michael Sarrao, the Debtor's Executive Vice President and General Counsel and a member of its Board of Managers.  The Bankruptcy Court recognized that Mr. Sarrao was not an expert on solvency.  Transcript of Hearing held on March 5, 2024 47:15 – 17.[14].Appendix Ex. 50, A1457. Mr. Sarrao testified factually regarding the Debtor's positive equity position as reflected on its balance sheets for 2019, 2020, and 2021. Specifically, he testified that the Debtor's equity was $18.5 million in December 2019,[15] $19.9 million at the end of December 2020,[16] and $19.1 million at the end of 2021[17].  Mr. Sarrao also reviewed the Debtor's 2019 tax return, which on schedule L ("Balance Sheet Per Books") reflected the Debtor's positive equity (based on the value of its partners' capital accounts) of $18.671 million.[18]  Based on Debtor's equity reflected in these four exhibits, Mr. Sarrao testified that the Debtor was not

---

[14] The Transcript of Hearing held on March 5, 2024 shall hereinafter be referred to as the "12/1/23 Tr."

[15] 3/5/2024 Tr. 39:13 – 40:4 Appendix Ex. 50, A1449 – A1450; Alecto 2019 Balance Sheet. Appendix Ex. 41, A1233 - A1226.

[16] 3/5/2024 Tr. 35:16 – 36:13 Appendix Ex. 50, A1145 – A1446; Alecto 2020 Balance Sheet. Appendix Ex. 42, A1227 – A1230.

[17] 3/5/2024 Tr. 43:25 – 44: 7 Appendix Ex. 50, A1453 – A1454; Alecto 2021 Balance Sheet. Appendix Ex. 43, A1231 – A1233.

[18] 3/5/2024 Tr. 45:5 – 46:18 Appendix Ex. 50, A1455 – A1456; Balance sheet for Alecto 2019 Tax Return. Appendix Ex. 4-, A1190

insolvent during this period and that the Sunrise transfer did not cause the Debtor to be insolvent.[19]

On cross examination, Mr. Sarrao acknowledged that the $18.6 million in Debtor's equity reflected on the 2019 Schedule L (the balance sheet in the Alecto 2019 tax return) depended on a $25.5 million intercompany receivable owed to Alecto, and that if the intercompany receivable had no value, the Debtor's equity would be negative.[20]  Mr. Sarrao also acknowledged that the 2019-2021 balance included receivables that may have been uncollectible[21] and did not include Alecto's liabilities for any obligations of its subsidiaries for which Alecto had issued guarantees.[22]

The Reed Creditors introduced evidence of substantial liabilities paid by, guaranteed by, or asserted against Alecto that were not reflected on the balance sheets.  Mr. Sarrao confirmed, for example, that in January 2021, Alecto paid $9.4 million in unpaid federal and state payroll taxes that its Olympia subsidiary and other affiliates had accrued,[23] and in August 2021, it paid an additional $10.5 million in federal and state payroll obligations its affiliates had accrued.[24]  Mr. Sarrao

---

[19] 3/5/2024 Tr. 46:19 – 47:24. Appendix Ex. 50, A1456 – A1457.
[20] 3/5/2024 Tr. 138:13 – 139:19. Appendix Ex. 50,1548 – A1549.
[21] 3/5/2024 Tr. 96:4 – 96:20. Appendix Ex. 50, A1506.
[22] 3/5/2024 Tr. 100:4 – 10 Appendix Ex. 50, A1510 and 109:22–110:8. A1519 - 1520
[23] *See* Summary of the UCLA Transaction p. 4. Appendix Ex. 46, 1246.
[24] *Id.* p. 3. Appendix Ex. 46, A1245.

confirmed that Alecto had also received a demand in September 2020 from its union pension fund for $10.8 million in withdrawal liability relating to obligations of Alecto Healthcare Services Fairmont, for former employees of the Fairmont General Hospital.[25]  Mr. Sarro confirmed that these obligations were being paid quarterly with funding from Alecto.[26]  Mr. Sarrao confirmed that Alecto had also been sued by the Centers for Medicare & Medicaid Services ("CMS"), of the U.S. Depart. of Health and Human Services, for reimbursement of more than $12 million in Medicare advance payments made to its Olympia affiliate.[27]  Mr. Sarrao acknowledged that none of these liabilities was listed on the Alecto balance sheet because the obligations originated with an affiliate or subsidiary.[28]

As for intercompany accounting, Mr. Sarrao acknowledged that all intercompany advances were booked through Alecto.[29]  The intercompany transactions reflected on the balance sheets related to five different Alecto affiliates that operated hospitals.  Mr. Sarrao acknowledged that the Sherman Grayson hospital had been supported by contributions from Alecto since 2014, which are unable to be paid back its advances to Alecto reaching $60 million before Alecto

---

[25] 3/5/2024 Tr. 100:15–101:22. Appendix Ex. 50, A1510 – A1511 (citing JX43); *see also* Summary of the UCLA Transaction p. 4. Appendix Ex. 46, A1246 (reflecting payment of $707,803 booked to Alecto with respect to the Alecto Ohio Valley Pension Plan).
[26] *Id.*
[27] 3/5/2024 Tr. 98:20–100:3, Appendix Ex. 50 , A1508 -A1510. CMS filed a claim in the Alecto bankruptcy case on December 13, 2023 for $29,126,600. Appendix Ex. 48, A 1250 – 1282.
[28] 3/5/2024 Tr. 100:4 – 10 Appendix Ex. 50, A1510 and 107:8 – 25. Appendix Ex. 50, 1517.
[29] 3/5/2024 Tr. 109:4 – 17. Appendix Ex. 50, A1519.

Sherman filed its bankruptcy petition.[30] Three other hospitals are designated on some of the balance sheets as the discontinued entities, having been closed in 2019 (Alecto Ohio Wheeling and Alecto Martins Ferry)[31] and March 2020 (Alecto Fairmont).[32]

**The Confirmation Ruling**

The Bankruptcy Court issued its Confirmation Ruling on March 20, 2024 approving confirmation of the Plan and overruling the Reed Creditors' objection to confirmation. Confirmation Ruling pp. 15 – 16. Appendix Ex. 51, A1622 – A1623.

The Court's key finding in approving the release of the Released Parties was that Alecto was solvent at the time of the Sunrise Transfer. *See* Confirmation Ruling p. 10 Appendix Ex. 51, A1617**.** The Court relied exclusively on Mr. Balasiano's testimony in making this finding:

> [Mr. Balasiano] reviewed the GCS Report, P&L balance sheet, cash flow, and tax returns. Mr. Balasiano relied upon the Debtor's 2019 balance sheet, which reflects the Debtor had an equity value of at least $9.4 million; and the Debtor's 2019 tax returns, which show assets in excess of $18 million. He concluded the Debtor had a positive balance sheet for 2019 (and 2020) and was able to pay its debts as they became due.

---

[30] First Supplemental Declaration of Michael Sarrao in Support of the Debtor's Retention Applications [Bankr. Ct. DI 133 ¶ 27. Appendix Ex. 37, A1074.

[31] Declaration of Michael Sarrao, Executive Vice President, General Counsel, and Secretary of Alecto Healthcare Services LLC, in Support of First Day Motions [Bankr. Ct. DI 3] ¶25. Appendix Ex. 36, A1049.

[32] 3/5/2024 Tr. 101:14 – 15. Appendix Ex. 50, A1511.

*********

Based on his investigation, Mr. Balasiano concluded that "there was no actionable cause of action that could be brought as a result of that transaction [Sunrise Transfer]" because "[t]he company was solvent." He reasoned that: "In order to bring a fraudulent conveyance action there are two factors. One is there has to be a transfer for lack of reasonably equivalent value and, number two, the company has to be insolvent at the time of that transfer. Clearly, the second fact[or] of the test was not satisfied her[e]."

The burden of proving insolvency is on the creditor by a preponderance of the evidence.[33] "As a general rule 'solvency and not insolvency is presumed.'"[34]Here, the Reed Creditors did not carry their burden to prove by a preponderance of the evidence that the Debtor was insolvent at the time of the Sunrise Transfer.

The Court finds that Mr. Balasiano's determination that there is "no actionable cause of action that could be brought" for fraudulent conveyance is a reasonable basis for the settlement.

Confirmation Ruling pp. 9-10. Appendix Ex. 51, A1616 – A1617.

The Bankruptcy Court entered the Confirmation Order on April 4, 2024 [Bankr. DI 354]. Appendix Ex. 52, A1626 – A1951. The Reed Creditors timely filed a notice of appeal from the Designation Order on April 18, 2024. Appendix Ex. 53, A1952 – 1956.

## **ARGUMENT**

## **IV. This Court Should Reverse the Designation Order because the Bankruptcy Court Erred in Ruling that Alecto was Eligible to be a Subchapter V Debtor.**

---

[33] *See Stearns v. Los Angeles City Sch. Dist.,* 53 Cal. Rptr. 482, 509 (Cal. Ct. App. 1966) (citations omitted); *Whitehouse v. Six Corp.,* 48 Cal. Rptr. 2d 600, 606 (Cal. Ct. App. 1995), *as modified* (Nov. 29, 1995), *as modified on denial of reh'g* (Dec. 19, 1995).
[34] *Stearns,* 53 Cal. Rptr. at 509 (citing *Hasenjeager v. Voth,* 267 P. 146, 147 (Cal. Ct. App. 1928)).

As of the Petition Date, Bankruptcy Code Section 1182(1)(A) defined a Subchapter V "debtor" as:

> [A] person engaged in commercial or business activities . . . that has ***aggregate non-contingent liquidated secured and unsecured debts*** as of the date of the filing of the petition or the date of the order for relief in an amount ***not more than $7,500,000***….

11 U.S.C. § 1182(1)(a) (emphasis supplied).  The Reed Creditors submitted evidence that the filed and scheduled claims against the Debtor totaled $7,890,536.14, including the claim filed by LHP Hospital Group ("LHP") for $3,739,653.77. [Bankr. Ct. Dkt 204-2].    In opposing the Eligibility Motion, the Debtor's sole argument was that the LHP claim does not count in the statutory analysis because it was contingent and unliquidated. *See generally* Preliminary Response, App. Ex. 2, A.0016-A.0203 The Bankruptcy Court recognized that whether the LHP debt is unliquidated or contingent it the "fulcrum" that controls the eligibility determination. *See* 12/1/23 Tr. 3:1 - 4. App. Ex. 4, A.0247.

The Bankruptcy Court determined that the LHP debt was unliquidated as of the petition date, and based on that determination, found that the Debtor was eligible to proceed under Subchapter V.  *Id.* 8:14 - 22. A.0252.  As set forth below, the Bankruptcy Court erred in making this finding because (i) the amount owed to LHP by the Debtor was easily determinable from the Lease Agreements and Payment Confirmations, which were readily available to the Debtor, and (ii) the 2022 Settlement Agreement between LHP and the Debtor, to the extent it is even

applicable, did not alter the obligations between LHP and the Debtor a way that rendered the LHP Claim unliquidated as of the Petition Date.

Debtor acknowledges that a claim is liquidated if (i) it is subject to ready determination and precision in computation of the amount due, and (ii) the amount due can be readily ascertained either by reference to an agreement or by simple mathematics. Preliminary Response, App. Ex. 2, ¶ 28 [A.0027], citing *In re Mitchell*, 255 B.R. 246, 360 (Bankr. D. Mass 2000), and *In re Jordan*, 166 B.R. 201. 202 (Bankr. D. Me. 1994) ("[a] claim is liquidated 'if the amount due can be readily ascertained either by reference to an agreement or by simple mathematics.'") (quotation omitted)); s*ee also In re Fostvedt*, 823 F.2d 305, 306 ("the question whether a debt is liquidated turns on whether it is subject to "'ready determination and precision in computation of the amount due.'"  (quotation omitted)); *In re Fountain*, 612 B.R. 743, 749 (9th Cir. BAP 2020) ("[a] debt is liquidated if it is capable of 'ready determination and precision in computation of the amount due.'" (quotation omitted)); *In re Mazzeo*, 131 F.3d 295, 304 (2d Cir. 1997) ("'courts have generally held that a debt is 'liquidated' ... where the claim is determinable by reference to an agreement or by a simple computation.'" (quoting 2 L. King *Collier on Bankruptcy* ¶ 109.06[2][c] (15th ed. rev. 1997)).

The Bankruptcy Court acknowledged these standards in Confirmation Ruling noting that "[a]n unliquidated claim is a claim in which the amount owed has not

been determined. Whether a debt is liquidated turns on whether it is ... subject to ready determination and precision and computation of the amount of debt." 12/1/23 Tr. 7: 4 – 7 A.0251. However, the Bankruptcy Court simply ignored these standards in determining that the LHP Claim was unliquidated. Instead, it focused primarily on the Debtor's alleged lack of knowledge of the actual amount of the LHP claim on the Petition Date.  In so doing, the Bankruptcy Court misapplied the facts of this case to applicable law.

The Bankruptcy Court's ruling that the LHP Claim was unliquidated is based on three factual determinations it made: (1) while the Debtor was aware of its obligations to LHP, it did not know the precise amount owed as of the Petition Date; (2) the monthly operating expenses due under the Lease Agreements, which form the basis for the LHP obligation, were estimated and subject to reconciliation, and (3) the amount payable to LHP remained subject to potential dispute.[35]  12/1/23 Tr.

---

The transcript of the Court's December 1, 2023 ruling includes the following recitations in support of the Court's determinations:

a) Alecto was aware that amounts were owed to LHP but did not know the amount of this liability. 12/1/2023 Tr., App. Ex. 4, 7: 8-10. A.0251.

b) There is no evidence that Alecto received copies of invoices the landlord issued to LHP (showing the amount due for unpaid obligations under the leases). *Id.* 7: 13 – 15. A.0251.

c) Alecto was unaware of whether LHP was making payments to the landlord or the amount of the estimated operating expenses which included, among other things, taxes, CAM, and possible subleases. *Id.* 7: 16 – 19. A.0251

d) Prior to a June 28th, 2023 demand letter from LHP to Alecto Sherman, the debtor's affiliate, the debtor was unaware of the exact amount due to LHP. *Id.* 8: 4 – 7. A.0252

7:8-8:13. A.0251. None of these findings are relevant to whether the LHP Claim was liquidated, which is not dependent on the Debtor's knowledge of the claim amount.

### 1. The Debtor's lack of knowledge is not relevant in determining whether the LHP Claim was liquidated as of the Petition Date.

Because the amount of the LHP obligation was specified in the Lease Agreements and Payment Confirmations, the information necessary to precisely calculate the amount of the LHP Claim existed as of the Petition Date. This information was readily available to the Debtor because the tenant under the leases—Sherman/Grayson—is a Debtor affiliate. Accordingly, the Bankruptcy Court's repeated references to the Debtor's lack of knowledge of the amount due to LHP on the petition date is misplaced.

Eligibility under Subchapter V is determined by what the debtors owe on the petition date, not by what the debtors think they owe. *In re Hall*, 650 B.R. 595 (Bankr. M.D. Fla. 2023). *See also In re Sullivan*, 245 B.R. 416 (N.D. Fla. 1999)(holding that eligibility for Chapter 13 relief is determined based on the total amount of unsecured debt that debtor owes on petition date, not on what a debtor in

---

e) Each lease agreement requires payment of (i) base rent and (ii) the estimated pro rata share of operating expenses, and the amount of estimated monthly operating expenses was not consistent. *Id.* 7: 10 – 13, 19-20. A.0251

f) The landlord would reconcile the estimated operating expenses on a yearly basis and provide LHP with an operating expense reconciliation, which provided LHP with a breakdown of the actual expenses paid for the year and the pro rata share of the operating expenses due or credited. *Id.* 7: 22 – 8:3. A.0251.

good faith thinks he owes on the petition date, and there is nothing to prevent bankruptcy court from looking past a debtor's schedules to other evidence of the correct amount of such debt as of the petition date); *In re Zhang Medical P.C.*, 655 B.R. 403, 409 (Bankr. S.D.N.Y. 2023) (in determining a debtor's total noncontingent liquidated debt, the court may look both to the debtor's schedules and to creditors' proofs of claim); *In re McKenzie Contracting, LLC*, Case No. 8:24-bk-01255-RCT, 2024 WL 3508375 *1, Colton, J. (Bankr. M.D. Fla. 2024) (same). Accordingly, the Bankruptcy Court erred when it based its eligibility determination on the Debtor's lack of knowledge of the amount of the LHP Claim when the petition was filed.

To be clear, the Debtor had full knowledge of the ongoing basis for LHP's claim against it because LHP sued the Debtor in the Delaware Superior Court for the rent obligations to the Landlord for which the Debtor had an obligation to reimburse LHP. The obligations stem from the 5 Lease Agreements assigned to Sherman/ Grayson for premises adjacent to a hospital it acquired in 2014. Landlord permitted the assignment of the Leases Agreements to Sherman/Grayson but required the existing tenant, LHP, to remain obligated on the Lease Agreements. LHP required the Debtor to guarantee Sherman/Grayson's performance under the Lease Agreements. When Sherman/Grayson ceased payments to the Landlord and vacated the office suites subject to the Lease Agreements, LHP obligations to pay these obligations kicked in, as did the Debtor's obligation to reimburse LHP for the

amounts LHP paid to the landlord.  *See* Designation Motion ¶ 20, App. Ex. 1, A.0009-10, and LHP Complaint. App. Ex. 32, A.0706-0719.  Based on these contractual relationships, the Debtor was able to ascertain the amounts asserted against it by LHP simply by reviewing the monthly rent and other financial obligations specified in the leases it guaranteed.

Accordingly, the amount of the LHP Claim (i) was subject to ready determination and precision in computation of the amount due and (ii) the amount due is readily ascertainable by reference to the lease documents and simple mathematics.  *See Hall,* 650 B.R. at 599 ("[C]ourts have generally held that a debt is liquidated if its amount is readily and precisely determinable, where the claim is determinable by reference to an agreement."), quoting *United States v. May*, 211 B.R. 991, 996 (citing Collier on Bankruptcy, 15th Ed. at 1109.06[2][c] (March 1997)).  Ordinarily, debts of a contractual nature are 'subject to ready determination and precision in computation of the amount due' and, therefore, are considered liquidated, even if subject to substantial dispute.  *Barcal v. Laughline (In re Barcal)*, 213 B.R. 1008, 1014 (B.A.P. 8th Cir. 1997)."

### 2. The plain language of the Lease Agreements expressly provides that the common area maintenance charges were due and payable monthly.

In further support of its flawed conclusion that the Debtor did not know the amount of its liability to LHP, the Bankruptcy Court noted that the leases required

monthly payment of estimated pro-rated operating expenses in addition to base rent. 12/1/2023 Tr. 7:16 – 8:3. A.0251. The Bankruptcy Court noted that the amount of the estimated monthly operating expenses varied per suite and was subject to reconciliation annually. *Id.* This procedure for the payment of pro rata operating expenses does not render the amount due under the lease unliquidated, however. Written notice of the amount due annually for pro-rata operating expenses is provided under the terms of each lease, and the Lease Agreements required that that specific amount be paid in monthly increments (one-twelfth of the total) at the same time as base rent is paid.  To the extent that pro-rata operating expenses are revised through the reconciliation process, they result in an additional amount due or credit towards future rent due, and do not affect the prior payments made.[36]  Accordingly,

---

[36] The applicable lease provisions are:

- The Base Rent shall be paid by Tenant in monthly installments to Landlord on or before the first day of each calendar month during the Term hereof. Leases § 3.1(2). Appx. Ex. 10, A.0384.

- Tenant's Pro Rata Share of Operating Expenses for the remainder of the calendar year after the Commencement Date and for each subsequent calendar year shall be estimated by Landlord, and written notice thereof shall be given to Tenant. [.....] For any such remainder of the calendar year after the Commencement Date, Tenant agrees to pay Landlord each month, at the same time the Base Rent Payment is due, an amount equal to the amount of such estimated monthly Pro Rata Share of Operating Expenses for the remainder of such calendar year; and during each calendar year thereafter ***Tenant agrees to pay Landlord each month, at the same time the Base Rent Payments are due, an amount equal to one-twelfth (1/12th) of the estimated annual Pro Rata Share of Operating Expenses due.*** Leases § 3.2(1)). ***(emphasis supplied)****. Id.*, A.0385***.***

- After the end of each calendar year, Landlord shall prepare and deliver to Tenant a statement showing Tenant's Pro Rata Share of the total amount of Operating Expenses.

there is nothing unliquidated about the monthly payment obligations under the lease, and it was plainly error for the Bankruptcy Court to credit the testimony of Michael Serrao that he did not know the amount of the estimated operating expenses.  As noted, his knowledge is not relevant to this analysis. In short, the Debtor's obligation is liquidated because the amount can be ascertained by reference to the Lease Agreements and simple mathematics.

Moreover, the failure to pay the Operating Expenses when due constitutes a default under the Lease Agreements.  Accordingly, the Operating Expenses are not unliquidated because, pursuant to the Leases, they are due and payable on or before the first day of each month, when the Base Rent is due.

### 3. Whether the Debtor retains a right to dispute its obligation to LHP does not make the LHP Claim unliquidated.

The Bankruptcy Court further erred when it concluded that there was no precision to LHP's debt because the Debtor purportedly retained a right to object to the computation of amounts due to LHP under the 2022 Settlement Agreement. 12/1/2023 Tr. 8:7 – 11, A.0252.   Under the plain language of 11 U.S.C. § 1182,

---

Within ten (10) days after receipt of the aforementioned statement, Tenant agrees to pay Landlord the remaining amount owed by Tenant. However, if Tenant has paid more than its Pro Rata Share of the actual Operating Expenses, Landlord shall either pay the amount of such excess to Tenant within ten (10) days after delivery of the aforementioned statement, or, at Landlord's option, apply such excess to any sums due or to become due from Tenant to Landlord. Leases § 3.2(3)).  *Id.*

disputed debts are not excluded from the $7.5 million debt limit. *Hall, 650 B.R.* at 599. The *Barcal* court stated that "the process for determining the claim" dictates whether the claim is liquidated or unliquidated, not the magnitude of the dispute or the length of the trial required to resolve the dispute. *In re Barcal,* 213 B.R. at 1014. *See also Nicholes v. Johnny Appleseed (In re Nicholes),* 184 B.R. 82, 91 (B.A.P. 9th Cir. 1995) ("So long as a debt is subject to computation of the amount due, then it is considered liquidated and included for eligibility purposes under § 109(e), regardless of any dispute.").

### 4. The 2022 Settlement Agreement between the Debtor and LHP has no impact on the liquidated status of the LHP obligation.

The Bankruptcy Court's ruling included an analysis of the 2022 Settlement Agreement between LHP and the Debtor, the terms of which the Court found superseded the prior guarantee that the Debtor had provided to LHP. While the Reed Creditors believe that determination was erroneous, and that the guarantee the Debtor provided to LHP remained in effect, the relevance of that issue from the Bankruptcy Court's perspective was the requirement in the 2022 Settlement Agreement that LHP was to make a written demand for a specified amount to the Debtor, and that absent such demand, the Debtor had no obligation to pay.[37] Even

---

[37] 12/1/2023 Tr. 6:19 – 25. A.0250.

accepting that as true, it has no relevance to determining of whether the claim is liquidated.

LHP filed the LHP Claim in a liquidated amount, and the filed claim amount is appropriate for the Court's consideration in determining whether the claim is liquidated. *Hall*, 650 B.R. at 599; *In re Sullivan*, 245 B.R. at 418.  LHP sent the Demand to Alecto Sherman, a non-debtor, on June 28, 2023, providing notice and making its demand for reimbursement of sixteen monthly payments LHP had made to the Landlord.   And LHP's proof of claim satisfied the notice and demand requirements. *See In re Fidelity Tube Corp.*, 278 F.3d 776 (holding that the IRS's proof of claim was a demand that the debtor pay prepetition taxes pursuant to former section 3670 of the Internal Revenue Code, which provided "that when a person liable to pay a tax neglects or refuses to pay it 'after demand' a lien arises in favor of the United States."), overruled on other grounds, *United States v. Speers*, 382 U.S. 266, 86 S. Ct. 411 (1965); *In re Bernadin*, 630 B.R. 787, 800 (Bankr. E.D. Pa. 2019) (finding that "[t]he purpose of a proof of claim is to demand payment from the debtor's bankruptcy estate based on an existing debt.").   Accordingly, the notice provisions of the 2022 Settlement Agreement have no bearing on the inquiry as to whether the LHP Claim is liquidated.  The Bankruptcy Court acknowledged that "the debtor was aware that amounts were owed to LHP, but the debtor did not know the amount of this liability." 12/1/2023 Tr. 7:8 – 10, A.0251.  As set forth above, the

actual amount of the liability was readily determinable through the leases and related documents, which makes the Bankruptcy Court's determination that it was unliquidated plain error.

## V. THE CONFIRMATION ORDER SHOULD BE REVERSED BECAUSE THE COURT ERRED IN APPROVING THE RELEASE OF CLAIMS <u>AGAINST THE RELEASED PARTIES.</u>

The Bankruptcy Court erred in approving the releases of the Released Parties (the "Plan Releases") (i) when it ruled that the Reed Creditors bore the burden of proof on the insolvency issue; (ii) when it relied on the testimony of Mr. Balasiano that there were no viable causes of action against the Debtor's insiders; (iii) when it relied on the Debtor's evidence that it was solvent at the time of the Sunrise REH Transfer; and (iv) when it misapplied the factors for approval of a settlement.

### A. The applicable legal standard for evaluating fraudulent transfer actions.

The Bankruptcy Court, in its Confirmation Ruling, relied on Steven Balasiano's testimony for the standard for evaluating fraudulent transfer claims:

> Based on his investigation, Mr. Balasiano concluded that "there was no actionable cause of action that could be brought as a result of [the Sunrise Transfer] because "[t]he company was solvent." He reasoned that: "In order to bring a fraudulent conveyance action there are two factors. One is there has to be a transfer for lack of reasonably equivalent value and, number two, the company has to be insolvent at the time of that transfer. Clearly, the second fact[or] of the test was not satisfied her[e]."

<div align="center">*********</div>

The Court finds that Mr. Balasiano's determination that there is "no actionable cause of action that could be brought" for fraudulent conveyance is a reasonable basis for the settlement.

Confirmation Ruling pp. 9-10, A.1606-7.

Section 3439.02(a) of California Uniform Voidable Transfer Act provides in relevant part that "[a] debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets. Cal. Civ. Code § 3439.02(a). A debtor's assets and liabilities must be calculated at fair valuation to determine whether its debts exceed its assets. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 648 (1991) "[A] fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time." *In re Trans World Airlines, Inc.*, 134 F.3d 188, 194 (3d Cir. 1998). If assets are not susceptible to liquidation, and thus cannot be made available for payment of debts, within a reasonable period of time, a reduction in the face value of those assets may be appropriate. *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir. 1980). Courts should consider contingent liabilities when evaluating the solvency of a debtor. *Trans World Airlines*, 134 F.3d. at 197.

Moreover, "[r]eduction in the face value of assets may be appropriate if those assets are not susceptible to liquidation, and thus cannot be made available for payment of debts, within a reasonable period of time." *Constructora Maza*, 616 F.2d at 557.

Thus, for example, accounts receivable need not be taken at face value if circumstances cast doubt on their collectability. The prospects of collection of such assets are evaluated in light of the past record of payment of the obligors, the obligors' current solvency, and the presence or absence of any dispute over the validity of the accounts or debts owed. [] Because the value of such assets may, in certain circumstances, be discounted, it is appropriate for the trier of fact to hear qualified opinion testimony on their fairly realizable value.

*Id.*

### B. The Bankruptcy Court erred as a matter of law by placing the burden of proof on the Reed Creditors on the solvency issue.

In its Confirmation Ruling, the Court held that "the Reed Creditors did not carry their burden to prove by a preponderance of the evidence that the Debtor was insolvent at the time of the Sunrise Transfer." Confirmation Ruling p. 10. A.1616-17.  While the Bankruptcy Court is correct that a plaintiff in a fraudulent transfer action bears the burden of proof on insolvency (Confirmation Ruling p. 10. A.1617), the Reed Creditors were not plaintiffs in a fraudulent transfer action. Rather, the Reed Creditors, as creditors and parties in interest, objected to the Plan releases, which places the burden on the Debtor to prove that the settlement regarding the Plan Releases fall above the lowest range of reasonableness. *See* In re *Spansion, Inc.*, No. 09–10690(KJC), 2009 WL 1531788 *4, Carey, J. (Bankr. D. Del. June 2, 2009); *In re Washington Mutual, Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011).

One of the factors courts consider in determining whether to approve a settlement is the probability of success in the litigation. *In re Coram Healthcare,*

*Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004). In considering the probability of success on the merits, the Debtor, as a fiduciary, was required to carefully consider each of the elements of the possible fraudulent transfer claim against the Released Parties. The record demonstrates that the Debtor did not do that.

Steven Balasiano was appointed as an independent director to evaluate and bring valid causes of action against the Debtor's affiliates and insiders.  GCS, a forensic accounting firm, was retained to examine whether the Debtor had any avoidance actions against the Debtor's Insiders and provide its findings to Mr. Balasiano. Plan § III.9. p. 15, A.0740 Despite their charges, the Debtor never asked GCS to perform a solvency analysis, and GCS did not perform one.

Instead, the Debtor relied on the testimony of Mr. Balasiano and Michael Sarrao, the Debtor's executive vice president and general counsel—and himself a beneficiary of the Plan Releases— to testify factually on the Debtor's solvency based exclusively on the Debtor's balance sheets and tax returns. Neither Mr. Balasiano nor Mr. Sarrao is a financial expert nor qualified to render an opinion on solvency. *See* March 4 Tr. 92:19-22; A.1375.  Transcript of hearing held on March 5, 2024 (the "March 5 Tr.") 129:20-25; A.1539.  In particular, no testimony was presented that either Mr. Balasiano or Mr. Sarrao considered anything other than the facial numbers on the Debtor's balance sheets.

As a result, no competent testimony was submitted to the Bankruptcy Court through which the Debtor could meet its burden of demonstrating that it was solvent, which proof is necessary to prevent the acknowledged transfer to its members for less than equivalent value ($22 million less) from being a fraudulent transfer. Since this was a cause of action purportedly investigated and resolved by the Debtor without input from its creditors, it was the Debtor that failed to meet its burden on the solvency issue. Accordingly, the Court should rule that the Bankruptcy Court erred as a matter of law is in placing the burden of proof on the solvency issue on the Reed Creditors and remand this matter for further proceedings consistent with the Court's ruling.

### C. The Bankruptcy Court erred in accepting the testimony of Mr. Balasiano that there were no viable causes of action against the Debtor's Insiders.

The Bankruptcy Court further erred in accepting Mr. Balasiano's conclusion that there were no viable causes of action against its insiders. Confirmation Ruling pp. 9-10, A.1606-7, as Mr. Balasiano's testimony was unreliable.

At the Confirmation hearing, Mr. Balasiano testified that concluded that the Debtor had no viable causes of action against its insiders by October 9, 2023:

Q All right. And so, between the time that you received the report and the time that the plan was filed, a period of about ten days, that's when the decision -- that's when you reached the determination that there was [sic] no viable causes of action, correct?

A Is that a question?

Q Yeah, with a correct at the end. Is that correct that that's when you reached the conclusion?

A It was an iterative process. It did not happen on [a] particular date, it was a process that happened from the time that I was engaged at the end of August through the time that we receive [sic] Leanne Gould's report. Once I had time to speak to all of the respective professionals in this case, the decision was formulated, correct.

Q But that conclusion was reached by October 9th?

A Correct.

March 4 Tr. 102:10-14, A.1385. But Mr. Balasiano testified earlier during cross-examination that he could not recall (i) when he first determined that the Debtor was solvent at the time of the Sunrise REH transfer or (ii) whether he made that determination on his own or simply accepted what the Debtor told him.

Q Your testimony that the debtor was solvent and that you did an analysis of the debtor's solvency in June of -- as of June 2019 was performed prior to October 9th; is that – I just want to be clear.

A Yeah. I mean, *I'm just -- I'm trying to recount whether I literally, actually saw -- because I want to be careful with what I say -- whether I literally saw the financial statement prior to, the day before, the day after, or it was represented to me that the company was solvent at that time through the analysis.*

Q When you say it was represented to you, that would mean that it was either in writing as part of a memo that you were provided or someone told you that?

A Correct.

Q But it's fair to say that you didn't perform your own analysis to reach your own opinion on solvency up and through October 9th of 2023?

A Well, [........] you're [sic] cutting hairs here. *The question is where -- my opinion is formulated based on the information that I received from the*

*professionals that I hired, retained in this case. So to say when my opinion was formed as opposed to receiving the information and the data and the backup and the conversations, it's very hard to be able to dissect that the way you're asking me to.*

Q Okay.

A I'm sorry.

Q Well, do you recall -- let's put aside --

A *At all time -- let me explain something. At all times in 2019, this company was solvent. I knew that this company was solvent in 2019 because it was represented to me when we knew that we had a bad transaction -- or not a bad transaction -- a transaction that was made for less than reasonable value. I said, hey, guys, were we solvent at this time, because that's the next question you would ask if you're a practicing lawyer in a bankruptcy context, or an independent director or a liquidating trustee. So that was the question I said, were we solvent? The answer was, yes, we were solvent. And when in fact I saw that financial statement, whether it was October 9th, October 7th, October 17th, I can't sit here today and tell you exactly the date.*

*Id.* at 88:9-89:24, A.1371-72 (emphasis added).

Mr. Balasiano's testimony plainly states that rather than make his own determination on solvency based on a review of the Debtor's financials, he relied on representations made to him that the Debtor was solvent. Given that GSC didn't do a solvency analysis, those representations necessarily came from the Debtor. Relying on the Debtor's representation on solvency is antithetical to Mr. Balasiano's role as the Debtor's independent director. His charge was to determine whether the Debtor had any potential claims against its insiders, especially because members of the Debtor's management are themselves beneficiaries of the Plan Releases. Mr. Balasiano abdicated his role as an independent director and a fiduciary of the

Debtor's estates in the determination of whether the Debtor was insolvent at the time of the Sunrise REH Transfer.  He simply let the Debtor decide.

### D. The Bankruptcy Court erred in relying on the Debtor's evidence in arguing it was solvent at the time of the Sunrise REH Transfer.

Lacking a solvency expert, the Debtor relied on a simplistic solvency analysis based on the positive equity values shown on its balance sheets and tax returns, as summarized by the Court:

> [Mr. Balasiano] relied upon the Debtor's 2019 balance sheet, which reflects the Debtor had an equity value of at least $9.4 million; and the Debtor's 2019 tax returns, which show assets in excess of $18 million. He concluded the Debtor had a positive balance sheet for 2019 (and 2020) and was able to pay its debts as they became due.

Conformation Ruling p. 9,A.1615.  While the Bankruptcy Court notes Mr. Balasiano's reliance on the balance sheets and tax returns, this evidence was actually introduced at the Confirmation Hearing by Mr. Sarrao.  The Court's Confirmation Ruling fails to mention any of the evidence presented to Mr. Sarrao of liabilities of Alecto not included in its balance sheets or limitations on the value of intercompany receivables which provided the positive equity value noted on the face of the balance sheets.

The balance sheet numbers in a vacuum do nothing to establish the fair value of Alecto's assets and liabilities and the Debtor makes no attempt to otherwise establish the fair valuation of Alecto's assets and liabilities as of June 19, 2019.  In asking this Court to rely on the face of the balance sheets to prove its solvency, the

Debtor is asking the Court to ignore the very nature of a solvency analysis. At the outset of the case, Mr. Sarrao acknowledged that "advancing funds to its subsidiaries was Alecto's general business practice.[38] Between 2014 and the Petition Date, Alecto had loaned Sherman Grayson in excess of $60 million that it acknowledged could not be paid back.[39] Id., ¶ 27. Two of the four other hospitals were closed in 2019 and a third was closed in 2020. These struggling entities were not in a position to be paying back receivables owed to affiliates in the months before they were closed. In fact, Alecto faced significant liabilities arising from its subsidiaries, and these liabilities were acknowledged by Mr. Sarrao.

In 2021, the Debtor paid more than $19 million in state and federal payroll taxes for its subsidiaries, all of which was booked as a loan to them, entitling the Debtor to an intercompany receivable for the loan amount.[40] Alecto received a payment demand of more than $10 million for withdrawal liability caused by the closing of the hospital operated by Alecto Fairmont; payments toward this liability were made by Alecto. Obligations owed pursuant to any guarantee Alecto issued with respect to an obligation of an affiliate were never booked on its balance sheet, even after claims against Alecto were made—and even after judgments were obtained.[41] Likewise, a claim asserted by a federal agency for repayment of

---

[38] First Supplemental Declaration [Bankr. Ct. DI 133] ¶ 27, A.1074
[39] Id.
[40] See Summary of the UCLA Transaction p. 4, A.1246
[41] 3/5/2024 Tr. 126:20 – 127:7, A.1536-37.

Medicaid advance payment dating back many years, originally asserted in the amount of $12 million, and through the CMS proof of claim increased to $29 million, was fully excluded from the liability section of the Alecto balance sheets. Mr. Sarrao confirmed that Alecto had also been sued by the Centers for Medicare & Medicaid Services ("CMS"), of the U.S. Depart. of Health and Human Services, for reimbursement of more than $12 million in Medicare advance payments made to its Olympia affiliate.[42] Mr. Sarrao acknowledged that none of these liabilities was listed on the Alecto balance sheet because the obligations originated with an affiliate or subsidiary.[43]

Setting aside the value that the Debtor should have attributed to these liabilities, solvency based on the 2019 balance sheet is rebuttable simply by the lack of value of its intercompany receivable. As testified by Mr. Sarrao at the confirmation hearing, the Partner's capital account figure on line 21 of Schedule L of the 2019 tax return ("Balance Sheets per Books") shows $18,671,358, which is the Debtor's equity.[44] But Mr. Sarrao also acknowledged that this equity calculation relies on the intercompany receivable amount of $25,489,819 in line 8 ("other investments", which references Statement 14 ) ("Intercompany Receivables"). Mr.

---

[42] 3/5/2024 Tr. 98:20–100:3,A.1508. CMS filed a claim in the Alecto bankruptcy case on December 13, 2023 for $29,126,600. [App. Ex. 48, A.1250]
[43] 3/5/2024 Tr. 100:4 – 10, A.1510 and 107:8 – 25. A. 1517 .
[44] 3/5/2024 Tr. 39:13 – 40:4, A.1449; Alecto 2019 Balance Sheet, A.1223.

Sarrao further acknowledged that a reduction in the value of the intercompany receivables results in a reduction of the partner's (Debtor's) equity because "it's a sum of numbers. So, just from a mathematical proposition, it would be different."[45] As noted, evidence in the record, including Mr. Sarrao's own testimony, indicate that the substantial sums loaned to Alecto's affiliates' operating hospitals will never be repaid, rendering the intercompany receivable worthless.

Mr. Balasiano ignored all this evidence when he drew his conclusion straight from the face of the 2019 balance sheet and tax return the Debtor provided him.  All of this evidence was ignored by the Court when it accepted Mr. Balasiano's conclusion without further comment.   As a result, the Debtor's limited solvency analysis comes nowhere close to establishing that Alecto was solvent at the time of the Sunrise REH Transaction.

### E.  The Bankruptcy Court erred in misapplying the factors for approval of a settlement.

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate." *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004). Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the

---

[45] 3/5/2024 Tr. 138:16 – 139:19. A.1548.

debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).

As the Bankruptcy Court noted in the Confirmation Ruling, "[t]he Court determines if the released claims fall into the lowest point of reasonableness for a settlement."[46] Confirmation Ruling p. 7, A1604. When determining whether to approve a settlement, the bankruptcy court should consider: (1) the probability of success in the litigation; (2) the complexity, expense, and delay of the litigation involved; (3) the possible difficulties in collection; and (4) the paramount interests of creditors."[47]

While the Bankruptcy Court cited the correct factors for determining whether to approve a settlement, it misapplied the factors. In particular, the Bankruptcy Court erred as a matter of law in ruling that the Reed Creditors bore the burden of proof on insolvency. Having erroneously concluded there was not a probability of success for the fraudulent conveyance litigation, the Bankruptcy Court failed to consider the other factors including the cost of the litigation, the likelihood of collection and the

---

[46] Citing *Coram Healthcare, Corp.*, 315 at 330. The Bankruptcy Court further stated that "Where a compromise is part of a plan of reorganization, however, the court has the duty "to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019, though the court should consider all factors relevant to a "full and fair assessment of the wisdom of the proposed compromise." (citing *Id.* at 334-35).

[47] Citing *id.* at 330; *Myers v. Martin (In re Martin),* 91 F.3d 389, 39 (3d Cir. 1996)).

paramount interest of the creditors. Accordingly, the Bankruptcy Court misapplied the factors for approval of the settlement.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, the Reed Creditors respectfully request that this Court reverse the Confirmation Order and remand this matter to the Bankruptcy Court with instructions that the Bankruptcy Court make further proceedings consistent with this Court's ruling.

Dated:  October 15, 2024

**SULLIVAN · HAZELTINE · ALLINSON LLC**

<u>        /s/ William D. Sullivan        </u>
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
          whazeltine@sha-llc.com

and

Bren J. Pomponio, Esq.
Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
Tel: (304) 326-0188
Email:  bren@msjlaw.org

And

John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email:jstember@stembercohn.com
        mdavidsonwelling@stembercohn.com

*Counsel for The Reed Action*
*Judgment Creditors*