## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC, | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| The Reed Action Judgement Creditors, | ) | Civil Action No. 1:24-cv-00494-GBW |
| | ) | |
| | ) | Bankruptcy BAP No. 23-65 |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Alecto Healthcare Services LLC, | ) | |
| | ) | |
| Appellee. | ) | |

## APPENDIX TO APPELLANTS' OPENING BRIEF

Dated:  October 15, 2024

**SULLIVAN · HAZELTINE · ALLINSON LLC**
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
        whazeltine@sha-llc.com

and

Bren J. Pomponio, Esq.
Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
Tel: (304) 326-0188
Email:  colten@msjlaw.org
          bren@msjlaw.org

and

John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email:jstember@stembercohn.com
          mdavidsonwelling@stembercohn.com

*Counsel for The Reed Action*
*Judgment Creditors*

2

## APPENDIX

| No. | Document Description | Bankr. D.I. | Page Nos. |
|---|---|---|---|
| 1 | Objection of the Reed Action Judgment Creditors to Debtor's Designation of this Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor (w/o exhibits B through L) | 204 | A0001 |
| 2 | Preliminary Response of the Debtor in Opposition to the Objection of the Reed Action Judgment Creditors to Debtor's Designation of this Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor | 226 | A0016 |
| 3 | Reply in Response to Preliminary Response of the Debtor in Opposition to the Objection of the Reed Action Judgment Creditors to Debtor's Designation of this Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor | 227 | A0204 |
| 4 | December 1, 2023 Hearing Transcript | | A0244 |
| 5 | Order Denying Objection of the Reed Action Judgment Creditors to Debtor's Designation of this Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor | 243 | A0257 |
| 6 | Notice of Appeal (Designation Appeal) | 257 | A0260 |
| 7 | Schedules D and E/F (Exhibit B to Plan) | | A0267 |
| 8 | Reed Judgment Creditors Claim No. 19-1 | | A0282 |
| 9 | LHP Hospital Group, Inc. Claim No. 15-1 | | A0290 |
| 10 | Lease Agreement, dated August 21, 2012 (Ambulatory Surgery Center) | - | A0379 |
| 11 | Lease Agreement, dated August 21, 2012 (Existing Physician Suites) | - | A0423 |
| 12 | Lease Agreement, dated August 21, 2012 (Master Lease-Existing Space) | - | A0469 |
| 13 | Lease Agreement, dated August 21, 2012 (Hospital Occupied Common Areas) | - | A0514 |
| 14 | Lease Agreement, dated August 21, 2012 (Master Lease – Shell Space) | - | A0559 |
| 15 | Bates No. 0080-0084 - Altera Highland, LLC Invoice Dated 3/01/2022 | - | A0605 |

| No. | Document Description | Bankr. D.I. | Page Nos. |
|---|---|---|---|
| 16 | Bates No. 0085-0088 - Altera Highland, LLC Invoice Dated 3/28/2022 | - | A0611 |
| 17 | Bates No. 0089-0092 - Altera Highland, LLC Invoice Dated 4/29/2022 | - | A0616 |
| 18 | Bates No. 0093-0097 - Altera Highland, LLC Invoice Dated 5/31/2022 | - | A0621 |
| 19 | Bates No. 0098-0101 - Altera Highland, LLC Invoice Dated 6/28/2022 | - | A0627 |
| 20 | Bates No. 0102-0108 - Altera Highland, LLC Invoice Dated 8/29/2022 | - | A0632 |
| 21 | Bates No. 0109-0113 - Altera Highland, LLC Invoice Dated 9/29/2022 | - | A0640 |
| 22 | Bates No. 0114-0117 - Altera Highland, LLC Invoice Dated 10/20/2022 | - | A0646 |
| 23 | Bates No. 0118-0125 - Altera Highland, LLC Invoice Dated 7/20/2022 | - | A0651 |
| 24 | Bates No. 0126-0129 - Altera Highland, LLC Invoice Dated 11/21/2022 | - | A0660 |
| 25 | Bates No. 0130-0133 - Altera Highland, LLC Invoice Dated 1/19/2023 | - | A0665 |
| 26 | Bates No. 0134-0137 - Altera Highland, LLC Invoice Dated 12/22/2022 | - | A0670 |
| 27 | Bates No. 0138-0131 - Altera Highland, LLC Invoice Dated 2/19/2023 | - | A0675 |
| 28 | Bates No. 0142-0145 - Altera Highland, LLC Invoice Dated 3/19/2023 | - | A0680 |
| 29 | Bates No. 0146-0158 - Altera Highland, LLC Invoice Dated 4/19/2023 | - | A0685 |
| 30 | Bates No. 0159-0162 - Altera Highland, LLC Invoice Dated 5/22/2023 | - | A0699 |
| 31 | Payment Summary (LHP Payments to Altera Highland 2-17-22 to 11-1-23) | - | A0704 |
| 32 | *LHP Hospital Group, Inc. v. Alecto Healthcare Services LLC and Alecto Healthcare Services Sherman LLC,* Case No. N21C-01-146 PJW CCLC | | A0706 |

| No. | Document Description | Bankr. D.I. | Page Nos. |
|---|---|---|---|
| 33 | Small Business Debtor's Plan of Reorganization Proposed by the Debtor | 261 | A0720 |
| 34 | Objection of the Reed Action Judgment Creditors to Confirmation of the Small Business Debtor's Plan of Reorganization Proposed by the Debtor | 299 | A1013 |
| 35 | Supplemental to the Objection of the Reed Action Judgment Creditors to Confirmation of the Small Business Debtor's Plan of Reorganization Proposed by the Debtor | | A1033 |
| 36 | Declaration of Michael Sarrao, Executive Vice President, General Counsel, and Secretary of Alecto Healthcare Services LLC, in Support of First Day Motions (JTX 63) | 3 | A1042 |
| 37 | First Supplemental Declaration of Michael Sarrao in Support of: (I) Application for Entry of an Order Authorizing the Retention and Employment of Shulman Bastian Friedman & Bui LLP as Bankruptcy Counsel to the Debtor Nunc Pro Tunc to the Petition Date Through August 14, 2023, and (II) Application for Entry of an Order Authorizing the Retention and Employment of the Rosner Law Group LLC as Delaware Bankruptcy Counsel to the Debtor Nunc Pro Tunc to the Petition Date Through August 14, 2023 (without exhibits) (JTX 70) | 133 | A1065 |
| 38 | August 7, 2023 Written Consent (JTX 67) | 226 | A1173 |
| 39 | August 19, 2023 Written Consent (JTX 69) | 226 | A1177 |
| 40 | Alecto Healthcare Services LLC Tax Returns for 2019 (JTX 1)(excerpt) | - | A1180 |
| 41 | Alecto Healthcare Services LLC Balance Sheet Summary 12/31/2019 (JTX 41) | - | A1223 |
| 42 | Alecto Healthcare Services LLC Balance Sheet Summary 12/31/2020 (JTX 44) | - | A1227 |
| 43 | Alecto Healthcare Services LLC Balance Sheet Summary 12/31/2021 (JTX 50) | - | A1231 |
| 44 | Alecto Healthcare Services LLC Balance Sheet Summary 12/31/2022 [ALECTO_00005930 – 00005932] (JTX 56) | - | A1234 |
| 45 | Alecto Healthcare Services LLC YTD Income Statement, Balance Sheet and Statement of Cash Flows as of April 30, 2023 [ALECTO_00005933 – 00005935] (JTX 62) | - | A1238 |
| 46 | The UCLA Health Transaction (JTX 113) | | A1243 |

| No. | Document Description | Bankr. D.I. | Page Nos. |
|---|---|---|---|
| 47 | Judgment Order in *Reed v. Alecto Healthcare Services LLC*, Case No. 5:19-CV-263 in the United States District Court for the Northern District of West Virginia (JTX 54) | - | A1247 |
| 48 | Centers for Medicare & Medicaid Services, U.S. Department of Health and Human Services Claim No. 21-1 (JTX 73) | - | A1250 |
| 49 | March 4, 2024 Hearing Transcript | | A1283 |
| 50 | March 5, 2024 Hearing Transcript | | A1410 |
| 51 | Confirmation Ruling | 343 | A1607 |
| 52 | Findings of Fact and Conclusions of Law Confirming Small Business Debtor's Plan of Reorganization | 354 | A1626 |
| 53 | Notice of Appeal (Confirmation Appeal) (w/o exhibits A and B) | 362 | A1952 |

# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC, [1] | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtor. | ) | **Obj. Deadline: November 16, 2023 at 4:00 p.m.** |
| | ) | **Hearing Date: TBD** |

## OBJECTION OF THE REED ACTION JUDGMENT CREDITORS TO DEBTOR'S DESIGNATION OF THIS CASE AS A SUBCHAPTER V CASE AND MOTION TO REVOKE DEBTOR'S DESIGNATION AS A SUBCHAPTER V DEBTOR

The Reed Action Judgment Creditors, by and through undersigned counsel, pursuant to Rule 1020(b) of the Federal Rules of Bankruptcy Procedures, hereby (i) object to the Debtor's designation as a subchapter V debtor and (ii) move to revoke the Debtor's subchapter V designation upon a finding by this Court that the Debtor's statement designating itself as a subchapter V debtor was incorrect (the "Motion"). In support of their Motion, the Reed Action Judgment Creditors respectfully state as follows:

### JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E) and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The Reed Action Judgment Creditors consent to the entry of final orders or judgments of the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.     The statutory predicates for the relief requested herein are 11 U.S.C. § 1182(1) and Rule 1020(b) of the Federal Rules of Bankruptcy Procedure.

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

## FACTUAL BACKGROUND

4.     The Reed Judgment Creditors obtained summary judgment against Alecto Healthcare Services, LLC ("Alecto" or the 'Debtor") and its subsidiary, Alecto Healthcare Services Wheeling, LLC, in September 2022.  A Judgment Order was entered on November 28, 2022, awarding damages, including attorneys' fees and costs, in the amount of $3,169,745.72. The judgment was not appealed and is a final order. Alecto's Schedules of Assets and Liabilities (the "Schedules") [D.I. 48] list the Reed Action Judgment Creditors with a non-contingent, undisputed, and liquidated claim in the amount of the judgment.  The scheduled claim did not include post-judgment interest accruing from November 29, 2022, through the Petition Date, and attorneys' fees.  Accordingly, the Reed Action Judgment creditors filed their claim in the amount of $3,275,382.64.

5.     Alecto filed its petition for relief under chapter 11 of the Bankruptcy Code on June 16, 2023 ("Petition Date").  On Line 8 of the Petition, Alecto elected to proceed under subchapter V of chapter 11 and, in doing so, swore to its eligibility as a "debtor" under 11 U.S.C. § 1182(1).

6.     The Debtor is currently operating its business and managing its estate as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  On June 20, 2023, Jami B. Nimeroff was appointed as the subchapter V trustee in the Debtor's case.

7.     Alecto filed the Schedules on June 30, 2023.  [D.I. 48]. The Schedules include 17 scheduled creditors, not including affiliates or insiders, holding non-contingent and liquidated claims totaling $3,445,535.47.  *Id.*, pp. 24 – 35.  Excluding the scheduled claim of the Reed Action Judgment Creditors, (which was superseded by claim no. 19-1 they filed), the total amount of the claims scheduled as non-contingent and liquidated which have not been superseded by a filed claim is $274,789.85.

8.	The *Notice of Filing of Chapter 11 Bankruptcy Case* [Docket No. 35] set August 15, 2023, as the deadline to file claims. Seven creditors (not including affiliates or insiders of Alecto) timely filed non-contingent, liquidated claims in the total amount of $7,615,746.29.

9.	In addition to the filed claim of the Reed Action Judgment Creditors, (i) Cardinal Health 110, LLC ("Cardinal 110"), whose claims was scheduled as an unliquidated claim, filed a non- contingent and liquidated claim in the amount of $419,842.62, (ii) Cardinal Health 200, LLC ("Cardinal 200"), whose claim was scheduled as an unliquidated claim in the amount of $81,318.11, filed a non-contingent and liquidated claim in the amount of $119,695.80, and (iii) LHP Hospital Group, Inc. ("LHP"), whose claim was scheduled as contingent and unliquidated, filed a non-contingent and liquidated claim in the amount of $3,739,653.77.  Three other creditors whose claims were not scheduled file non-contingent and liquidated claims in the total amount of $61,171.46.

10.	Based on the foregoing, the total of the scheduled and filed non-contingent and liquidated claims is $7,890,536.14.  This total does not include two non-contingent claims for unpaid employee benefit obligations, one filed by the PBGC[2] (which is an estimated claim) and one filed by Alecto Health Care Services Ohio Valley LLC, HP, which was filed by an investigator for the Employee Benefits Security Administration (ESBA), a division of the U.S. Department of Labor.[3]  If the liquidated amounts set forth on these filed claims is accurate, the Debtor's aggregate debts on the Petition Date exceed $9 million.  A list of the scheduled non-contingent and liquidated

---

[2] The PBGC filed Claim 11-1 in the amount of $1,065,847.  Paragraph 6 of the statement supporting the claim states that it is "an estimated claim for contributions that may be owed to the Pension Plan. PBGC estimates the claim to be $1,065,047.  The Pension Plan is the Alecto Healthcare Services Ohio Valley Pension Plan.

[3] The ESBA- filed Claim 18-1 in the liquidated amount of $245,307.  The claim is for unpaid health claims on an ERISA-covered plan.

3

claims which have not been superseded by a filed claim and the filed non-contingent and liquidated

claims (excluding the PBGC and the ESBA-filed ERISA benefits claims) is attached as Exhibit A.

11.     The Debtor's §341(a) meeting of creditors (the "341 Meeting") was initiated on

July 25, 2023 and was continued. The 341 Meeting concluded on October 17, 2023.

## ARGUMENT

### A. Applicable Law.

12.     As is relevant to this case, 11 U.S.C. § 1182(1)(A) defines a "debtor" as:

> . . . a person engaged in commercial or business activities . . . that has aggregate non-contingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $7,500,000 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor[.]

13.     Rule 1020(a) of the Federal Rules of Bankruptcy procedures provides as follows:

(a) SMALL BUSINESS DEBTOR DESIGNATION. In a voluntary chapter 11 case, the debtor shall state in the petition whether the debtor is a small business debtor and, if so, whether the debtor elects to have subchapter V of chapter 11 apply…. The status of the case as a small business case or a case under subchapter V of chapter 11 shall be in accordance with the debtor's statement under this subdivision, unless and until the court enters an order finding that the debtor's statement is incorrect.

Fed. R. Bankr. P 1020 (a). Bankruptcy Rule 1020(b) provides as follows:

(b) OBJECTING TO DESIGNATION. The United States trustee or a party in interest may file an objection to the debtor's statement under subdivision (a) no later than 30 days after the conclusion of the meeting of creditors held under § 341(a) of the Code, or within 30 days after any amendment to the statement, whichever is later.

Fed. R. Bankr. P. 1020(b).

14.     Congress enumerated specific eligibility requirements that Chapter 11 debtors must

satisfy to proceed under Subchapter V, regardless of the potential effects of denying a Subchapter

V election on the bankruptcy estate. *See In re Serendipity Labs, Inc.*, 620 BR 679, 683 (N.D. Ga.

1012). "The benefits of Subchapter V are available to debtors who qualify and are not available to

4

**A0005**

those who do not." *Id.* In order to proceed under Subchapter V, a debtor must meet the requirements of Bankruptcy Code Section 1182(1) and must elect to proceed under Subchapter V. *In re Blue*, 630 B.R. 179, 186 (Bankr. M.D.N.C. 2021). If a debtor's election is challenged, the debtor bears the burden of proof to establish its eligibility to proceed as a Subchapter V debtor. *See, e.g., id.* at 187; *In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233, 235 (Bankr. S.D. Tex. 2021); *In re Fama*, 2023 WL 6131466 at *8, Strong, J. (Bankr. E.D.N.Y. September 15, 2023).

15.  Courts are not limited to an analysis of the debtor's schedules in determining the amount of a debtor's non-contingent and liquidated debt for purposes of determining the debtor's eligibility for Subchapter V. *See In re Hall*, 650 BR 595, 600 (Bankr. M.D. Fla. 2023). "While the schedules offer some probative value, the Court will not restrict its inquiry solely to the schedules." *Id.* "Eligibility is determined by what the Debtors owe on the petition date, not by what the Debtors think they owe." *Id.; see also In re Steffans*, 343 BR 696, (Bankr. M.D. Fla. 2005) (holding that debtors were not eligible to be chapter 13 debtors based on the fact that the total amount of proofs of claim exceeded the statutory limit).

**B. The Non-Contingent and Liquidated Claims against Alecto Exceeded $7,500,000 as of the Petition Date.**

16.  As an initial matter, the Reed Action Judgment Creditors timely filed this Motion. Pursuant to Bankruptcy Rule 1020(b), a party in interest may file an objection to a debtor's statement electing to proceed as a Subchapter V debtor no later than 30 days after the conclusion of the meeting of creditors. The 341 meeting of creditors concluded on October 17, 2023, and this Motion has been filed less than 30 days thereafter.

17.  As noted above, Alecto scheduled 17 creditors (not including affiliates or insiders of Alecto) with non-contingent and liquidated claims. The amount of the scheduled non-contingent and liquidated claims which were not superseded by a filed claim is $274,789.85. A brief summary

**A0006**

of the seven non-insider creditors timely filed non-contingent, liquidated claims in the total amount

of $7,615,746.29 is as follows:

    a.  **Reed Action Judgment Creditors**. Alecto scheduled the Reed Action Judgment Creditors with a non-contingent, liquidated claim in the amount of $3,169,745.72, which is the amount of the judgment entered by the United States District Court for the Northern District of West Virgina against Alecto on November 28, 2022. On August 15, 2023, the Reed Action Judgment Creditors filed claim no. 19-1 in the amount of $3,275,382.64, which equals the judgment amount plus (i) accrued interest from the date of judgment through the Petition Date in the amount of $82,673.93 and (ii) costs of collection from the date of judgment to the Petition Date in the amount of $22,963.00.[4]

    b.  **Cardinal 110**. Alecto scheduled Cardinal 110's claim as an unliquidated secured claim in the amount of $285,299.79. On July 27, 2023, Cardinal 110 filed claim no. 4-1 as a secured claim in the amount of $419,842.62. The claim is based on a judgment entered by the Court of Common Pleas for Franklin County, Ohio in favor of Cardinal 110 and against Alecto in the amount of $285,299.79 plus (i) service charges accruing at the rate of 1.5% per month from November 1, 2020 through the date of collection and (ii) fees and costs in bringing the action, including attorneys' fees.[5]

    c.  **Cardinal 200**. Alecto scheduled Cardinal 200's claim as an unliquidated and contingent claim in the amount of $81,318.11. On July 27, 2023, Cardinal 200 filed claim no. 5-1 in the amount of $119,695.80.[6] The claim is based on a judgment entered by the Court of Common Pleas for Franklin County, Ohio in favor of Cardinal 200 and against Alecto in the amount of $81,318.11 plus (i) service charges accruing at the rate of 1.5% per month from November 1, 2020 through the date of collection and (ii) fees and costs in bringing the action, including attorneys' fees.

    d.  **LHP**. Alecto scheduled LHP's claim as contingent, unliquidated and disputed. On August 14, 2023, LHP filed claim no. 15-1 in the amount of $3,739,653.77. In the Summary of Claim, LHP indicates that Alecto guaranteed certain obligations of its subsidiary, Alecto Sherman, arising out of the Purchase Agreement for the ownership interests in a medical facility, and that Alecto Sherman owed indemnification to LHP for lease obligations with respect to a medical office building. Pre-petition, Alecto and Alecto Sherman had been sued by LHP for breach of their obligations under five leases in the medical office building.[7]

    e.  **California Franchise Tax Board**. On August 1, 2023, the California Franchise Tax Board ("CFTB") filed claim no. 8-1 as a priority claim in the amount of $700.[8] Attached to the

---

[4] A copy of claim no. 19-1 is attached as Exhibit B.
[5] A copy of claim no. 4-1 is attached as Exhibit C.
[6] A copy of claim no. 5-1 is attached as Exhibit D.
[7] A copy of claim no. 15-1 is attached as Exhibit E.
[8] A copy of claim no. 8-1 is attached as Exhibit F.

claim is a statement providing that Alecto owes $700 to CFTB. Alecto did not schedule a claim for CFTB.

f. **De Lage Landen Financial Services**. On August 14, 2023, De Lage Landen Financial Services ("De Lage") filed claim no. 10-1 in the amount of $7,313.70. [9] Attached to the claim is a statement of account showing Alecto owes $7.313.70 to Delage. Alecto did not schedule a claim for De Lage.

g. **Micheal Best & Friedrich LLP**. On August 15, 2023, Michael Best & Friedrich LLP ("MBF") filed claim no. 20-1 in the amount of $53,157.76. [10] Attached to the claim is a list of open invoices to Alecto in the amount of $53,157.76. Alecto did not schedule a claim for MBF.

Each of these claims provides sufficient information to establish the validity of the claims.

18.        Moreover, it is apparent that the Debtor's schedules are not reliable. For example, the Debtor scheduled Cardinal 110's claim as an unliquidated secured claim in the amount of $285,299.79, and Cardinal 200's claim as a contingent claim in the amount of $81,318.11.  There is no basis for scheduling either claim as either unliquidated or contingent, since they are based on a judgment entered in those exact amounts (which judgment is attached to both proofs of claim). Clearly, the Debtor was aware of this judgment but nonetheless scheduled Cardinal 110's claim as unliquidated and Cardinal 200's claim as contingent and failed to include the pre-judgment interest reflected in the judgment.

19.        More significantly, with respect to the LHP Hospital Group claim, Alecto scheduled it as contingent, unliquidated and disputed.  The basis for the claim was stated as "potential claims related to Debtor's guarantee of certain indemnification obligations of a subsidiary and settlement agreement with creditor.  At the continued 341 Meeting on October 17, 2023, Michael Sarrao testified that (i) he was familiar with the claim and the purchase agreement which gave rise to it, (ii) that the summary of claim provided by LHP in its filed claim was accurate,

---

[9] A copy of claim no. 10-1 is attached as Exhibit G.
[10] A copy of claim no. 20-1 is attached as Exhibit H.

7

**A0008**

(iii) that some of LHP's claims are actual and some have not yet come into fruition, (iv) that LHP's claim relates to five office-space leases in an office building owned by Altera Highland LLC, (v) that LHP has continued to pay the rent on those leases, and (vi) that LHP's claim against Alecto is for the period of time after there was a settlement between Alecto and LHP, up to the petition date.[11]

20. The complaint filed by LHP against Alecto and Alecto Sherman in the Delaware Superior Court confirms LHP's claims arise with respect to rent obligations under five leases at a medical office building for which Sherman Grayson has defaulted, and for which Alecto has provided LHP with a guaranty.[12] The docket for the case reflects that the case was settled in January 2022, approximately 17 months prior to the petition date. The Complaint identifies the five leases for space within the medical office located in Sherman, Texas, for which Alecto has obligations under the Alecto Parent Guaranty dated as of September 23, 2014, in favor of LHP, as: (1) the Existing Space Lease, (2) the Existing Physician Suite Lease, (3) the Shell Lease, (4) the Occupied Common Areas (OCC) Lease, and (5) the Ambulatory Surgery Center (ASC) Lease. Ex. J, ¶¶ 12, 18. The Complaint also asserts that Sherman Grayson has consented to the abandonment of the Leased Premises and has released possession of the Leased Premises to the landlord. Ex. J., ¶ 22. The Complaint further indicates that the unpaid rent obligations which Alecto guaranteed totaled $208,178.26 in November 2020 and December 2020. Ex J, ¶ 24. If those monthly obligations remained unchanged and went unpaid for the 17-month period between the resolution of that case in January 2022 and the Petition Date, the accrued obligations under the

---

[11] *See* Transcript of the 341 meeting of creditors held on October 17, 2023 at 15:4—19:5, attached as Exhibit I.

[12] A copy of the LHP complaint is attached as Exhibit J.

LHP guaranty would be $3,538,992, which is within $200,000 of the amount of LHP's filed claim. *See also,* LHP's January 12, 2021 demand letter, attached as Ex. K.

21. Accordingly, documentation available from the Delaware Superior Court case docket supports the liquidated amount set forth in LHP's proof of claim. Based on the foregoing, the Court should not rely solely on the schedules in determining whether the Debtor is eligible to be a Subchapter V Debtor. Rather, the Court should consider both the non-superseded scheduled claims and the filed proofs of claim discussed above to determine the amount of the debts the Debtor actually owed as of the Petition Date. Those debts exceed the $7,500,000 limitation for eligibility as a subchapter V debtor.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Reed Action Judgment Creditors respectfully request that the Court enter an order, in the form substantially in the form attached as Exhibit L:

(i) Finding that the Debtor is not eligible to be a Subchapter V debtor;

(ii) Revoking the Debtor's subchapter V designation; and

(iii) Granting such other relief as is just and proper.

Date: November 2, 2023
Wilmington, DE

**SULLIVAN · HAZELTINE · ALLINSON LLC**

_____*/s/ William D. Sullivan*_____
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
       whazeltine@sha-llc.com

-and-

Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
Tel: (304) 326-0188
Email:  colten@msjlaw.org

-and-

John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email: jstember@stembercohn.com
          mdavidsonwelling@stembercohn.com

*Attorneys for the Reed Action Judgment Creditors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC, [1] | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtors | ) | **Objection Deadline: November 16, 2023** |
| | ) | **Hearing Date: TBD** |

### NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on November 2, 2023, the Reed Action Judgment Creditors (the "Movants"), filed their *Motion of the Reed Action Judgment Creditors to Revoke Debtor's Designation as a Subchapter V Debtor* (the "Motion") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that responses to the Motion, if any, must be filed on or before **November 16, 2023 at 4:00 p.m.** ("Response Deadline") with the United States Bankruptcy Court for the District of Delaware, Clerk's Office, 824 North Market Street, Third Floor, Wilmington, Delaware 19081 and served on the undersigned counsel to the Movants so as to be received on or before the Response Deadline.

**PLEASE TAKE FURTHER NOTICE** that a hearing with respect to the Motion, if required, will be scheduled before the Honorable J. Kate Stickles at the Bankruptcy Court, 5th Floor, Courtroom 6, at a date and time to be determined.

**PLEASE TAKE FURTHER NOTICE THAT IF NO OBJECTION OR OTHER RESPONSE TO THE MOTION IS TIMELY FILED IN ACCORDANCE WITH THE PROCEDURES SET FORTH ABOVE, THE BANKRUPTCY COURT MAY ENTER AN**

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

**A0012**

**ORDER GRANTING THE RELIEF SOUGHT IN THE MOTION WITHOUT FURTHER**

**NOTICE OR A HEARING.**

Date:   November 2, 2023
        Wilmington, DE

SULLIVAN · HAZELTINE · ALLINSON LLC

_/s/ William D. Sullivan_____
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
        whazeltine@sha-llc.com

-and-

Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
Tel: (304) 326-0188
Email:  colten@msjlaw.org

-and-

John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email: jstember@stembercohn.com
        mdavidsonwelling@stembercohn.com

_Attorneys for the Reed Action Judgment Creditors_

A0013

# EXHIBIT A

# Filed and Scheduled Claims

### Filed Claims

| | | |
|---|---|---:|
| #4-1 | Cardinal Health 110, LLC | 419,842.62 |
| #5-1 | Cardinal Health 200, LLC | 119,695.80 |
| #8-1 | California Franchise Tax Board | 700.00 |
| #10-1 | De Lage Landen Financial Services | 7,313.70 |
| #15-1 | LHP Hospital Group | 3,739,653.77 |
| #19-1 | Reed Action Judgment Creditors | 3,275,382.64 |
| #20-1 | Micheal Best & Friedrich LLP | 53,157.76 |

### Scheduled Claims

| | | |
|---|---|---:|
| 3.1 | American Express | 3,399.68 |
| 3.2 | Anthem Blue Cross | 14,478.05 |
| 3.3 | Aon Risk Management | 70,000.00 |
| 3.4 | AT&T | 203.30 |
| 3.5 | Bcal 101 North Brand Property | 195.00 |
| 3.7 | Combined Group Ins. Services | 3,966.10 |
| 3.8 | Evangeline Douglas | 5,455.68 |
| 3.9 | First Ins. Funding | 76,137.36 |
| 3.10 | GRM Information Management Services | 2,149.85 |
| 3.12 | Konica Minolta Premier Finance | 779.66 |
| 3.16 | Moss Adams LLP | 31,666.88 |
| 3.17 | New Horizon Communications | 872.57 |
| 3.18 | Olshan Frome Wolosky LLP | 37,823.00 |
| 3.20 | Panch Jeyakumar MD | 1,888.00 |
| 3.24 | Sylvia Ventura | 2,743.62 |
| 3.25 | Symphony Risk Solutions LLC | 23,031.10 |

| | |
|---|---:|
| **Filed** | **7,615,746.29** |
| **Scheduled** | **274,789.85** |
| **Total** | **7,890,536.14** |

# EXHIBIT 2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC,[1] | Case No. 23-10787 (JKS) |
| Debtor. | **Obj. Deadline:  Nov. 22, 2023 at 4:00 p.m.** (extended for the Debtor) |
| | **Re: Docket No. 204** |

### PRELIMINARY RESPONSE OF THE DEBTOR IN OPPOSITION TO THE OBJECTION OF THE REED ACTION JUDGMENT CREDITORS TO DEBTOR'S DESIGNATION OF THIS CASE AS A SUBCHAPTER V CASE AND MOTION TO REVOKE DEBTOR'S DESIGNATION AS A SUBCHAPTER V DEBTOR

The above-captioned debtor (the "Debtor"), by and through its underlying counsel, submits this preliminary response[2] in opposition to the *Objection of the Reed Action Judgment Creditors* (the "Reed Creditors") *to Debtor's Designation of this Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor* [Docket No. 204] (the "Reed Pleading"), and in opposition to the Reed Pleading, the Debtor respectfully submits as follows:

## INTRODUCTION

The Reed Creditors' assertions in the Reed Pleading are simply incorrect, as a matter of fact and law, with respect to the amount of non-contingent, undisputed claims against the Debtor as of the Petition Date.  The primary claim that serves as the Reed Creditors' basis for the allegation that the total amount of aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition exceeds $7,500,000 is the claim of LHP Hospital Group, Inc.

---

[1]     The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

[2]     The Debtor has made repeated requests for certain documents from LHP Hospital Group, Inc., and the Debtor has not thus far received any documents responsive to those requests.  The Debtor also notes that it reserves the right to depose a representative from LHP with respect to the underlying claim, including the underlying amounts and demands made by LHP on account of such claim.  The Debtor expressly reserves its right to supplement this response at any time prior to or at the hearing to consider the Reed Pleading,

16412904/2

**A0017**

("LHP"). LHP's claim (the "LHP Claim") is based upon a guarantee from the Debtor, as subsequently modified by a settlement agreement between the parties, and was, and remains, both contingent and unliquidated.

## BACKGROUND

1. On June 16, 2023 (the "Petition Date") the Debtor commenced the above-captioned bankruptcy case under subchapter v of Title 11.

2. On June 30, 2023, the Debtor filed its schedules [Docket No. 48] (the "Schedules"). Since the Petition Date, and prior to the August 15, 2023 general bar date, there have been seventeen proofs of claim filed (each a "Proof of Claim"). A copy of the Schedules and the official claims register are attached hereto as **Exhibit A** (collectively, the "Asserted Claims"). Notably, as set forth on **Exhibit A**, not all of the Asserted Claims are noncontingent, liquidated, and undisputed claims.

3. Other than governmental claims, which are each the subject of ongoing litigation and are therefore contingent and unliquidated, the largest Asserted Claims are the claims of the Reed Creditors (which were listed as a total amount of $3,169,745.72 on the Schedules and $3,275,382.64 in the Proof of Claim filed by the Reed Creditors), and the claim of LHP. The Debtor does not dispute that the Reed Creditors have a valid claim through a judgment entered by the District Court for the District of West Virginia, but the Debtor does not concede the interest and fees totaling approximately $105,636.92, as set forth in the Proof of Claim.

4. Since the amount of the LHP Claim and whether the LHP Claim was contingent or unliquidated on the Petition Date are dispositive of the request for relief raised by the Reed Pleading, this response is primarily focused upon the LHP Claim. However, the Debtor reserves the right to dispute any other Proof of Claim.

16412904/2

## The LHP Claim

5.      On or about September 23, 2014, Alecto Healthcare Services Sherman LLC, a affiliate of the Debtor (the "Purchaser"), on the one hand, and Sherman/Grayson Health System, LLC (the "Seller") and LHP (collectively, the "Seller Indemnities"), on the other hand, entered into a purchase agreement (the "Purchase Agreement")[3] pursuant to which the Purchaser acquired 100% of the issued and outstanding membership interests of Sherman/Grayson Hospital, LLC, Sherman/Grayson Health Services, LLC and Sherman/Grayson Sponsor, LLC.  In connection with the Purchase Agreement, the Debtor executed a guarantee (the "Guarantee") in favor of the Seller Indemnities pursuant to which the Debtor unconditionally and irrevocably guaranteed to the guaranteed Parties the due and punctual payment, performance and discharge of each and every of Purchaser's obligations under the Purchase Agreement.  A copy of the Purchase Agreement and the Guarantee are attached hereto as **Exhibit B**.

6.      On or about January 20, 2021, LHP filed a complaint against the Purchaser and the Debtor (collectively with Alecto Sherman, the "Alecto Defendants"),  in the Superior Court of the State of Delaware, captioned *LHP Hospital Group, Inc. v. Alecto Healthcare Services Sherman LLC and Alecto Healthcare Services LLC*, C.A. No. N21C-01-146 PRW (CCLD) (the "Delaware Action"), and on July 21, 2020, LHP filed a Petition against Sherman/Grayson in the 59th Judicial District Court, Grayson County, Texas, captioned *LHP Hospital Group, Inc. v. Sherman/Grayson Hospital, LLC*, No. CV-20-0944 (the "Texas Action").  In the Delaware Action, LHP sought damages from the Alecto Defendants in the amount of $4,638,137.90 (the "Current Damages"),

---

[3]      LHP Hospital Group, Inc., and Texas Health Resources were each parties to the Purchase Agreement solely with respect to Section 612.and Article IX only.

and in the Texas Action, LHP seeks recovery of a portion of the Current Damages from Sherman/Grayson Hospital, LLC ("Sherman/Grayson") arising from an alleged breach of contract.

7.     On February 16, 2022, LHP and the Alecto Defendants and Sherman/Grayson entered into a settlement agreement (the "Settlement Agreement"). A copy of the Settlement Agreement is attached hereto as **Exhibit C**.

8.     Among other things, the Settlement Agreement agreed to a settlement of claims in the Delaware Action and the Texas Action for a total payment of $625,000.  In exchange for the settlement payment, LHP on its behalf and the behalf of other related parties agreed, among other things, not to pursue the Alecto Defendants and other related parties, including Sherman/Grayson, for any amounts arising out of, or relating in any manner directly or indirectly to (i) the Current Damages in the Delaware Action, or (ii) that LHP has, or may have had, against Sherman/Grayson arising out of or relating in any manner directly or indirectly to the Current Damages in the Texas Action.  Settlement Agreement, ¶ 3.  Any future expenses due and owing to LHP, including the future indemnification obligations of the Debtor to LHP under Paragraph 6 of the Settlement Agreement, were expressly excluded from LHP's release.

9.     Paragraph 6 of the Settlement Agreement provides, in relevant part, as follows:

Future Expenses – Alecto Defendants. The Alecto Defendants acknowledge and agree that, absent a resolution with Altera, LHP may continue to accrue expenses in connection with the MOB (as defined below), including without limitation in connection with the Lease Agreements (as defined in the Complaint in the Delaware Action) and the Ground Lease Agreement entered effective as of August 21, 2012 between Sherman/Grayson and Altera ("Ground Lease"). Accordingly, the Alecto Defendants agree to the following procedure for payment of Future Expenses:

a.     LHP shall make written demand upon the Alecto Defendants for a specified amount in accordance with the forbearance schedule set forth in Paragraph 8;

b.     The Alecto Defendants shall make payment of the specific amount within fifteen (15) days of such demand;

4

    c.    To the extent the Alecto Defendants dispute the amount specified in the demand and/or are unable to make such payment, LHP shall be entitled to the entry of a judgment by confession, pursuant to 10 Del. C. 2306, in the form of [Exhibit C to the Settlement Agreement]; and

    d.    The only matter that the Alecto Defendants may contest in connection with such proceeding is the computation and payment of the principal, interest, fees, and costs of the judgment; all other defenses are hereby expressly waived and disclaimed by the Alecto Defendants, including but not limited to, prior material breach, failure to mitigate, unclean hands, off-set, and failure to state a claim.

    e.    In the event that the Alecto Defendants contest the amount owed or assert that they cannot pay the amount owed, they shall produce to LHP a copy of the most recent audited financial statements for both entities, or in the event audited financial statements are not available, a copy of the unaudited financial statements for each entity.

11.    Further, paragraph 8 of the Settlement Agreement, titled "Forbearance on Demand for Future Expenses," provides as follows:

> LHP agrees not to make demand for future expenses, whether against the Alecto Defendants or Sherman/Grayson (or if necessary, commence a proceeding pursuant to Section 2306 for a judgment by confession) until the expiration of one (1) year from the Effective Date. Thereafter, LHP may only seek payment of Future Expenses every six months from the date of the last payment or entry of a confessed judgment, whichever is applicable.

12.    On or about February 24, 2022, the Debtor timely remitted payment of $625,000 to satisfy its obligation. As of the Petition Date, LHP had not made any demand for future expenses pursuant to Section 6 of the Settlement Agreement. Accordingly, on the Petition Date, the Debtor scheduled LHP's claim in the amount of $0 and listed the LHP Claim as both contingent and unliquidated.

13.    On June 28, 2023 (approximately two weeks after the Petition Date), LHP sent a letter to the Purchaser making a formal demand pursuant to Paragraph 6 of the Settlement Agreement for the payment of $3,708,475.62. A copy of the demand is attached hereto as **Exhibit D.** This amount allegedly represents the amount paid by LHP to Altera Highland for expenses in connection with the MOB after February 17, 2022. Further, in its June 28, 2023 letter, LHP made

demand for payment of the amount within 15 days.  The June 28, 2023 letter specifically stated that LHP is not making demand under the Agreement or otherwise on the Debtor or Sherman/Grayson, and LHP cited the respective filings for bankruptcy relief.

14.     On or about August 14, 2023, LHP filed a Proof of Claim docketed as Proof of Claim No. 15 in the amount of $3,739,653.77.

15.     The Debtor has requested that LHP provide an itemization of the amounts due, and a copy of all demands that LHP made on account of its alleged claim.  To date, LHP has not provided the Debtor with any documents responsive to its request.

### BASIS FOR DENIAL OF RELIEF

16.     11 U.S.C. § 1182(1) provides, in relevant part, as follows:

(1) Debtor—The term "debtor" . . . . subject to subparagraph (B),[4] means a person engaged in commercial or business activities (including any affiliate of such person that is also a <u>debtor</u> under this title and excluding a person whose primary activity is the business of owning single asset real estate) that has aggregate noncontingent liquidated secured and unsecured debts **as of the date of the filing of the petition** or the date of the order for relief **in an amount not more than $7,500,000 (excluding debts owed to 1 or more affiliates or insiders)** not less than 50 percent of which arose from the commercial or business activities of the <u>debtor</u>;

(emphasis added).

17.     Determining whether a debtor is eligible under subchapter v requires an analysis similar that taken by courts faced with the issue of whether a debtor is eligible to be a Chapter 13 debtor under 11 U.S.C. § 109(e).  As a preliminary matter, at least one court has held that "if a claim is either contingent or unliquidated *on the petition date* the debtor is eligible" for Chapter 13. *Matter of McGovern*, 122 B.R. 712, 714 (Bankr. N.D. Ind. 1989) (emphasis added).  Further, if there is a dispute as to the amount or contingency of a claim, courts may be more likely to allow

---

[4]     The provisions of 11 U.S.C. § 1182(1)(B) are inapplicable in this case.

6

the classification of the claims on the schedules stand.  As the Sixth Circuit explained, to resolve issues of eligibility for Chapter 13 bankruptcy under 11 U.S.C.A. § 109(e), a Bankruptcy Court should rely primarily upon the debtor's bankruptcy schedules rather than a hearing.  In re Pearson, 773 F.2d 751, 756 (6th Cir. 1985).  Section 109(e) provides that the eligibility computation is based on the petition date and says nothing about computing eligibility after a hearing on the merits of creditors' claims.  Id.  Furthermore, the fact that evidence must be taken to determine the amount of a particular claim indicates that until the time of the hearing the claim was unliquidated and therefore no bar to Chapter 13 eligibility.  Id.

18.     The issue immediately before the Court is whether, as of the Petition Date, the total amount of noncontingent, liquidated debts of the Debtor exceeded $7,500,000 (excluding debts to insiders).  If the LHP Claim is either contingent or unliquidated, it does not count toward the threshold.  Based upon the facts and the law, the noncontingent and liquidated claims of the Debtor on the Petition Date were significantly less than the $7,500,000 threshold for subchapter v eligibility.

### A.     On the Petition Date, the LHP Claim was contingent.

19.     As a prefatory matter, the term "contingent" is not defined in the Bankruptcy Code; however, if a word is not statutorily defined, then the courts are bound to start with the common law meaning of the term.  A court's analysis of statutory text is disciplined by the "fundamental canon" that "words will be interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute." Perrin v. United States, 444 U.S. 37, 42 (1979).

20.     The Bankruptcy Code does not define "contingent," and therefore the Court's analysis is dictated by the common meaning of the term.  Black's Law Dictionary defines "contingent" as, "1. Possible; uncertain; unpredictable <the trust was contingent, and the

16412904/2

contingency never occurred>. 2. Dependent on something that might or might not happen in the future; conditional <her acceptance of the position was contingent upon the firm's agreeing to guarantee her husband a position as well>" <u>See</u> CONTINGENT, Black's Law Dictionary (11th ed. 2019). Black's Law Dictionary defines a "contingent claim" as "[a] claim that has not yet accrued and is dependent on some future event that may never happen." <u>See</u> CLAIM, Black's Law Dictionary (11th ed. 2019). This is consistent with the interpretation of courts that have examined whether a claim is contingent, and concluded that contingent claims are those in which a debtor will be required to pay only upon the occurrence of a future event triggering the debtor's liability. <u>See</u>, <u>e.g.</u>, <u>In re Parks</u>, 281 B.R. 899, 901-02 (Bankr. E.D. Mich.2002); <u>In re Highland Group, Inc.</u>, 136 B.R. 475, 481 (Bankr. N.D. Ohio 1992).

21.    Guaranteed obligations are considered contingent obligations. "[A] contingent obligation, <u>such as a guaranty</u>, arises when it is legally binding, not when the guarantor actually makes good on its promise by paying the party who obtained the guaranty. 5 COLLIER ON BANKRUPTCY P 548.03 (16th 2023) (emphasis added); <u>see also In re Oconee Reg'l Health Sys., Inc.</u>, 621 B.R. 64, 73 (Bankr. M.D. Ga. 2020) ("A guarantor is a contingent creditor because it has "a potential claim for reimbursement against the debtor if it defaults on a loan and the guarantor[ ] [has] to satisfy the debt."); <u>In re Davis</u>, 2016 WL 11696269, at *20 (Bankr. W.D. Tenn. June 15, 2016) ("Because a guarantor is entitled to reimbursement or subrogation from the primary obligor when he pays a guaranteed obligation, courts readily find guarantors to be creditors holding contingent claims under the Bankruptcy Code."); <u>In re Slamdunk Enterprises, Inc.</u>, 2021 WL 389081, at *16 (Bankr. E.D. Tex. Jan. 29, 2021) (same); <u>Kapela v. Newman</u>, 649 F.2d 887, 890 (1st Cir. 1981) (recognizing that guarantors of a loan are "contingent creditor[s]" because they obtain a claim for reimbursement as they pay money to the lender on the basis of their guaranty).

22.     Questions of contingency are not determined upon whether the creditor may extract full repayment from the debtor immediately, but rather if they had a "right to payment" or a "right to an equitable remedy" at the time the debtor filed its petition. In re Cox, 2016 WL 5854214, at *3 (Bankr. E.D. Wash. Oct. 6, 2016). "A debt is deemed contingent if liability relies on a future extrinsic event which may never occur." In re Parking Mgmt., Inc., 620 B.R. 544, 552 (Bankr. D. Md. 2020). "Noncontingent debts are those where 'all events necessary to give rise to liability take place prior to filing the petition.'" Id. Against this backdrop, courts have found that a guarantor's contingent claim arises "from the moment of the execution of the guaranty." In re Helen Gallagher Enterprises, Inc., 126 B.R. 997, 1000 (Bankr. C.D. Ill. 1991); see also In re Oconee Reg'l Health Sys., Inc., 621 B.R. 64, 73 (Bankr. M.D. Ga. 2020) (same).

23.     Courts typically find that claims arising from guaranties become noncontingent and liquidated only if and when the triggering event that gives rise to the liability occurs prepetition. See, e.g., In re Stebbins, 2015 WL 792095, at *4 (Bankr. E.D.N.Y. Feb. 24, 2015) ("If the triggering event that gives rise to the liability in questions occurs prepetition, the debt is no longer contingent; rather, it is noncontingent as of the petition date."); see also In re Mazzeo, 131 F.3d 295, 303 (2d Cir. 1997) (acknowledging that if guarantor's obligation is triggered prepetition the debt is not contingent at the filing of the petition).

24.     The distinction between contingent and noncontingent, and the timing of when a claim pursuant to a guarantee becomes noncontingent is important, and in fact outcome determinative of whether the Debtor's designation as a subchapter v debtor is appropriate. If a claim remains contingent on the petition date, the fact that it may become noncontingent after the petition date does not have any impact on a debtor's designation at the time of filing the bankruptcy petition. As the Court noted in Parking Mgmt., "postpetition events should not be considered in

16412904/2

determining eligibility." 620 B.R. at 554 (analogizing whether a debtor qualifies as a chapter 13 debtor to whether a debtor qualifies as a subchapter v debtor). "Opening up eligibility determinations to post-petition events, even if deemed to apply retroactively, is contrary to the purpose and spirit of Subchapter v, and could nullify the very benefits it is intended to convey." Id. ("Not only does this approach meet the statutory directive to determine debt limits as they exist as of the date of the filing, but it has the very real benefit of providing certainty to the process.").

25.     Here, there is no question that the Debtor had an obligation under the Guarantee, as modified by the Settlement Agreement, however that obligation for reimbursement of expenses remained contingent as of the Petition Date. Specifically, even getting beyond whether there is actually any amount due (which is a contingency by itself and for which the Debtor still has not received any proof), the Debtor's obligation is contingent on two separate things: (i) whether the underlying obligor remitted payment of the amounts, and (ii) LHP making demand as required by the Settlement Agreement. Here, the Debtor did not even learn of LHP's assertion of a right to any amount under the Guarantee until almost two weeks after the Petition Date, and the Debtor expressly reserves its right to object to the LHP Claim on any basis, including whether LHP received any payment on account of the amount allegedly due.

26.     Based upon the foregoing, the LHP Claim was contingent as of the Petition Date.

**B.     On the Petition Date, the LHP Claim was not liquidated.**

27.     Similar to the analysis of whether a claim is contingent (above), the terms "liquidated" and "unliquidated" are not defined in the Bankruptcy Code, so the Court's analysis should be dictated by the common meaning. The common definition of unliquidated is "[n]ot previously specified or determined." See UNLIQUIDATED, Black's Law Dictionary (11th ed. 2019). An unliquidated claim is similarly defined as, "[a] claim in which the amount owed has not

16412904/2

been determined." *See* CLAIM, Black's Law Dictionary (11th ed. 2019). "An unliquidated claim is a 'claim in which the amount owed has not been determined'" In re RNI Wind Down Corp., 369 B.R. 174, 183 (Bankr. D. Del. 2007) (internal citations omitted). Terms such "liquidated" and "unliquidated" typically "refer to a claim's value (and the size of the corresponding debt) and the ease with which that value can be ascertained." In re Mazzeo, 131 F.3d 295, 304 (2d Cir. 1997). If the value of a particular claim depends upon "a future exercise of discretion, not restricted by specific criteria, the claim is unliquidated." Id. (quoting United States v. Verdunn, 89 F.3d 799, 802 (11th Cir. 1996)).

28.     When consider whether or not a claims is an unliquidated, courts appear to take the knowability of claims take into account in determining whether or not they are liquidated.  If a claim is subject to ready determination and precision in computation of the amount due, it is generally viewed as liquidated. See, e.g., In re Mitchell, 255 B.R. 246, 360 (Bankr. D. Mass 2000) (internal citations omitted).  Further, a claim is liquidated "if the amount due can be readily ascertained either by reference to an agreement or by simple mathematics." In re Jordan, 166 B.R. 201. 202 (Bankr. D. Me. 1994); In re Vaughn, 276 B.R. 323, 326 (Bankr. D.N.H. 2002) (Where a debtor was able to determine the value of the ongoing contract dispute claims against him based on the bargain he had struck and other amounts listed on his schedules, the value was liquidated for the purposes of determining his Chapter 13 eligibility).

29.     Again, there is no question that the Debtor had an obligation to LHP under the Guarantee, as modified by the Settlement Agreement, however the amount of that claim was not specified or determined as of the Petition Date (and given that LHP still has not provided any basis for its claim, it still isn't).  Accordingly, LHP Claim was contingent as of the Petition Date.

11

30. Given the foregoing, the LHP Claim cannot be considered as when determining the amount of the Debtor's debts as a noncontingent liquidated debt as of the Petition Date for purposes of determining the Debtor's eligibility 11 U.S.C. § 1182(1), and accordingly, the Debtor's debt as of the Petition Date is below the $7,500,000 limit. Therefore, the relief sought by the Reed Pleading should be denied.

WHEREFORE, the Debtor respectfully requests that the Court (i) deny relief sought by and through the Reed Pleading and (ii) grant to the Debtor such other and further relief as is just and proper.

Dated: November 22, 2023

MORRIS JAMES LLP

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

*Counsel to the Debtor and Debtor in Possession*

16412904/2

# EXHIBIT A

Asserted Claims

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC,[1] | Case No. 23-10787-JKS |
| Debtor. | |

## SCHEDULES OF ASSETS AND LIABILITIES FOR
## ALECTO HEALTHCARE SERVICES LLC (CASE NO. 23-10787-JKS)

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 - Subchapter V |
| ALECTO HEALTHCARE SERVICES LLC, | Case No. 23-10787-JKS |
| Debtor | |

### GLOBAL NOTES, METHODOLOGY, AND SPECIFIC
### DISCLOSURES REGARDING THE DEBTOR'S SCHEDULES OF
### ASSETS AND LIABILITIES AND STATEMENTS OF FINANCIAL AFFAIRS

### Introduction

These *Global Notes, Methodology, and Specific Disclosures Regarding the Debtor's Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "Global Notes") qualify, are incorporated by reference in, and comprise an integral part of, the Schedules of Assets and Liabilities (collectively, the "Schedules") and the Statements of Financial Affairs (collectively, the "Statements" and, together with the Schedules, the "Schedules and Statements") filed by Alecto Healthcare Services LLC ("Debtor" or the "Company") in the above-captioned case filed under Chapter 11, Subchapter V, of title of the United States Code (the "Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Schedules and Statements were prepared pursuant to § 521 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1007 of the Federal Rules of Bankruptcy Procedure by management of the Debtor, with the assistance of the Debtor's advisors, and are unaudited.

In preparing the Schedules and Statements, the Debtor relied on financial data derived from its books and records that was available at the time of such preparation. The Debtor's Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles in the United States ("GAAP"), nor are they intended to be fully reconciled to the financial statements of the Debtor. The Schedules and Statements contain unaudited information that is subject to further review and potential adjustment. The Schedules and Statements reflect the Debtor's reasonable best efforts to report the assets and liabilities of the Debtor. While the Debtor's management has made reasonable efforts to ensure that the Schedules and Statements are as accurate and complete as possible under the circumstances, based on information available at the time of preparation, subsequent information or discovery may result in material changes to these Schedules and Statements. As a result, inadvertent errors or omissions may exist, and there can be no assurance that these Schedules and Statements are complete.

The Debtor reserves all rights to amend or supplement the Schedules and Statements from time to time, in all respects, as may be necessary or appropriate, including, without limitation, the right to (a) amend the Schedules and Statements with respect to a claim (as defined in § 101(5) of the Bankruptcy Code) description, designation, or Debtor against which the claim is asserted, (b) dispute or otherwise assert offsets or defenses to any claim reflected in the Schedules and

Statements as to amount, liability, priority, status, or classification, (c) subsequently designate any claim as "disputed," "contingent," or "unliquidated," or (d) object to the extent, validity, enforceability, priority, or avoidability of any claim. Any failure to designate a claim in the Schedules and Statements as "disputed," "contingent," or "unliquidated" does not constitute an admission by the Debtor that such claim or amount is not "disputed," "contingent," or "unliquidated." Listing a claim does not constitute an admission of liability by the Debtor against which the claim is listed or against the Debtor. Nothing contained in the Schedules and Statements shall constitute a waiver of any right of the Debtor or an admission with respect to its Chapter 11 Case (including, but not limited to, issues involving claims, substantive consolidation, defenses, equitable subordination, characterization or re-characterization of contracts and leases, assumption or rejection of contracts and leases under the provisions of chapter 3 of the Bankruptcy Code, and/or causes of action arising under the provisions of chapter 5 of the Bankruptcy Code and any other relevant non-bankruptcy laws to recover assets or avoid transfers). Any specific reservation of rights contained elsewhere in these Global Notes does not limit in any respect the foregoing reservation of rights.

The Debtor and its agents, attorneys, and financial advisors do not guarantee or warrant the accuracy or completeness of the data that is provided herein, and will not be liable for any loss or injury arising out of or caused in whole or in part by the acts, errors, or omissions, whether negligent or otherwise, in procuring, compiling, collecting, interpreting, reporting, communicating, or delivering the information contained herein. While commercially reasonable efforts have been made to provide accurate and complete information herein, inadvertent errors or omissions may exist. The Debtor and its agents, attorneys and financial advisors expressly do not undertake any obligation to update, modify, revise, or re-categorize the information provided herein, or to notify any third party should the information be updated, modified, revised, or recategorized. In no event will the Debtor or its agents, attorneys, and financial advisors be liable to any third party for any direct, indirect, incidental, consequential, or special damages (including, but not limited to, damages arising from the disallowance of a potential claim against the Debtor or damages to business reputation, lost business, or lost profits), whether foreseeable or not and however caused, even if the Debtor or its agents, attorneys, and financial advisors are advised of the possibility of such damages.

The Schedules and Statements have been signed by Laxman Reddy, President and Chief Executive Officer of the Debtor. Accordingly, in reviewing and signing the Schedules and Statements, Mr. Reddy necessarily relied upon the efforts, statements, and representations of the Debtor and its staff and other personnel and professionals. Mr. Reddy has not (and could not have) personally verified the accuracy of each such statement and representation, including, but not limited to, statements and representations concerning amounts owed to creditors, classification of such amounts, and their addresses.

These Global Notes should be referred to and considered in connection with any review of the Schedules and Statements.[1] Disclosure of information in one or more Schedules, one or more Statements, or one or more exhibits or attachments to the Schedules or Statements, even if incorrectly placed, shall be deemed to be disclosed in the correct Schedules, Statements, exhibits,

2

**A0032**

or attachments. In the event that the Schedules and Statements differ from the Global Notes, the Global Notes shall control.

*Neither the Schedules and Statements, nor the Global Notes, should be relied upon by any persons for information relating to current or future financial conditions, events, or performance of the Debtor.*

## Global Notes and Overview of Methodology

### Description of Case and Information Date

On June 16, 2023 (the "Petition Date"), the Debtor filed a voluntary petition with this Bankruptcy Court for relief under Subchapter V of Chapter 11 of the United States Bankruptcy Code. The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Case is being administered pursuant to Bankruptcy Rule 1015(b). No creditors' committee has been appointed in this case. Other than the appointed Subchapter V Trustee, no trustee or examiner has been appointed. Except as otherwise noted, the information set forth herein is provided as of the close of business on the Petition Date.

### Basis of Presentation

These Schedules and Statements reflect the assets and liabilities of the Debtor, except where otherwise indicated. Information contained in the Schedules and Statements has been derived from the Debtor's books and records and historical financial statements.

These Schedules and Statements represent the Debtor's good faith attempt to comply with the requirements of the Bankruptcy Code and Bankruptcy Rules using commercially reasonable efforts and resources available and are subject to further review and potential adjustment.

### Amendment of Schedules and Statements

While reasonable efforts have been made to prepare and file complete and accurate Schedules and Statements, inadvertent errors or omissions may exist. The Debtor reserves all rights to amend and/or supplement the Schedules and Statements from time to time as is necessary or appropriate.

## General Notes Applicable to Schedules and Statements

1. **Recharacterization**. The Debtor has made reasonable efforts to correctly characterize, classify, categorize, and designate the claims, assets, executory contracts, unexpired leases, and other items reported in the Schedules and Statements. The Debtor reserves all rights to recharacterize, reclassify, recategorize, or redesignate items reported in the Schedules and Statements at a later time as necessary or appropriate, including, without limitation, whether contracts or leases listed herein were deemed executory or unexpired as of the Petition Date and remain executory and unexpired postpetition.

2. **Claim Designations**.  Any failure to designate a claim in the Schedules and Statements as "contingent," "unliquidated," or "disputed" does not constitute an admission by the Debtor that such claim or amount is not "contingent," "unliquidated," or "disputed."  The Debtor reserves all rights to dispute, or to assert offsets or defenses to, any claim reflected on its Schedules or Statements on any grounds, including, but not limited to, amount, liability, priority, status, or classification, or to otherwise subsequently designate any claim as "contingent," "unliquidated," or "disputed."  Moreover, the Debtor reserves all rights to amend its Schedules and Statements as necessary and appropriate.  Listing a claim does not constitute an admission of liability by the Debtor.

3. **Unliquidated Claim Amounts**.  Claim amounts that could not be readily quantified by the Debtor are scheduled as "unliquidated."

4. **Unknown Amounts**.  The description of an amount as "unknown" is not intended to reflect upon the materiality of such amount.

5. **Court Orders**.  Pursuant to certain orders of the Bankruptcy Court entered in the Debtor's Chapter 11 Case entered on or about June 20, 2023 (the "First Day Orders"), the Debtor was authorized (but not directed) to pay, among other things, certain prepetition claims of employees, insurers, and taxing authorities.  Accordingly, these liabilities may have been or may be satisfied in accordance with such orders and therefore may not be listed in the Schedules and Statements.  Regardless of whether such claims are listed in the Schedules and Statements, to the extent such claims are paid pursuant to an order of the Bankruptcy Court (including the First Day Orders), the Debtor reserves all rights to amend or supplement its Schedules and Statements.

6. **Other Paid Claims**.  To the extent the Debtor has reached any postpetition settlement with a vendor or other creditor, the terms of such settlement will prevail, supersede amounts listed in the Debtor's Schedules and Statements, and shall be enforceable by all parties, subject to any necessary Bankruptcy Court approval.  To the extent the Debtor pays any of the claims listed in the Schedules and Statements pursuant to any orders entered by the Bankruptcy Court, the Debtor reserves all rights to amend and supplement the Schedules and Statements and take other action, such as filing claims objections, as is necessary and appropriate to avoid overpayment or duplicate payment for such liabilities.

7. **Liabilities**.  The Debtor has sought to allocate liabilities between the prepetition and postpetition periods based on the information and research that was conducted in connection with the preparation of the Schedules and Statements.  As additional information becomes available and further research is conducted, the allocation of liabilities between prepetition and postpetition periods may change.  The Debtor reserves the right to modify, amend, or supplement the Schedules and Statements as it deems appropriate in this regard.

8. **Excluded Assets and Liabilities**.  The Debtor may have excluded certain categories of assets, tax accruals, and liabilities from the Schedules and Statements, including without limitation, accrued salaries and employee benefit accruals.  In addition, and as set forth above, the Debtor may have excluded amounts for which the Debtor has been granted authority to pay pursuant to a First Day Order or other order that may be entered by the Bankruptcy Court.  The Debtor may also have excluded rejection damage claims of counterparties to executory

contracts and unexpired leases that may be rejected (if any), to the extent such damage claims exist. Also, certain immaterial assets and liabilities may have been excluded.

9. **Confidential or Sensitive Information**. There may be instances in which certain information in the Schedules and Statements intentionally has been redacted due to the nature of an agreement between a Debtor and a third party, concerns about the confidential or commercially sensitive nature of certain information, or concerns for the privacy of an individual based on the Health Insurance Portability and Accountability Act of 1996 or otherwise. The alterations will be limited to only what is necessary to protect the Debtor or third party. In some instances, the redacted information may be available upon request.

10. **Leases**. The Debtor may not have included in the Schedules and Statements the future obligations of any capital or operating leases. To the extent that there was an amount outstanding as of the Petition Date, the creditor has been included on Schedule F of the Schedules. Nothing in the Schedules or Statements (including, without limitation the failure to list leased property or equipment as owned property or equipment) is, or shall be construed as, an admission as to the determination of legal status of any lease (including whether any lease is a true lease or financing arrangement), and the Debtor reserves all rights with respect to such issues.

11. **Guarantees and Other Secondary Liability Claims**. The Debtor has used reasonable efforts to locate and identify guarantees and other secondary liability claims (collectively, "Guarantees") in each of its executory contracts, unexpired leases, secured financings, debt instruments, and other such agreements. However, certain Guarantees embedded in the Debtor's executory contracts, unexpired leases, secured financings, debt instruments, and other such agreements may have been inadvertently omitted. Thus, the Debtor reserves all rights to amend the Schedules to the extent that additional Guarantees are identified.

12. **Executory Contracts**. Although the Debtor has made diligent efforts to attribute an executory contract to its rightful Debtor, in certain instances, the Debtor may have inadvertently failed to do so. Accordingly, the Debtor reserves all rights with respect to the named parties of any and all executory contracts, including the right to amend Schedule G.

13. **Estimates**. To prepare and file the Schedules as close to the Petition Date as possible, management was required to make certain estimates and assumptions that affected the reported amounts of these assets and liabilities. The Debtor reserves all rights to amend the reported amounts of assets and liability to reflect changes in those estimates or assumptions.

14. **Fiscal Year**. The Debtor's fiscal year ends on December 31.

15. **Property and Equipment**. Unless otherwise indicated, owned property and equipment are stated at net book value. The Debtor may lease furniture, fixtures, and equipment from certain third-party lessors. Nothing in the Schedules and Statements is or shall be construed as an admission as to the determination as to the legal status of any lease (including whether any lease is a true lease or a financing arrangement), and the Debtor reserves all of its rights with respect to same.

16. **Credits and Adjustments**. The claims of individual creditors for, among other things, goods, products, services, or taxes are listed as the amounts entered on the Debtor's books

and records and may not reflect credits, allowances, or other adjustments due from such creditors to the Debtor. The Debtor reserves all rights with regard to such credits, allowances, and other adjustments, including the right to assert claims objections and/or setoffs with respect to the same.

17.    **Insiders**.   In the circumstance where the Schedules and Statements require information regarding "insiders" the Debtor has included information with respect to the individuals the Debtor believes are included in the definition of "insider" set forth in § 101(31) of the Bankruptcy Code during the relevant time periods. Such individuals may no longer serve in such capacities. The listing of a party as an insider for purposes of the Schedules and Statements is not intended to be, nor should it be, construed an admission of any fact, right, claim, or defense and all such rights, claims, and defenses are hereby expressly reserved. Information regarding the individuals listed as insiders in the Schedules and Statements has been included for informational purposes only and such information may not be used for: (1) the purposes of determining (a) control of the Debtor; (b) the extent to which any individual exercised management responsibilities or functions; (c) corporate decision-making authority over the Debtor; or (d) whether such individual could successfully argue that he or she is not an insider under applicable law, including the Bankruptcy Code and federal securities laws, or with respect to any theories of liability, or (2) any other purpose.

18.    **Totals**. All totals that are included in the Schedules and Statements represent totals of all known and estimated amounts that are included in the Schedules and Statements. To the extent there are unknown, disputed, contingent, unliquidated, or otherwise undetermined amounts, the actual total may be materially different than the listed total. The description of an amount as "unknown", "disputed", "contingent", "unliquidated", or "undetermined" is not intended to reflect upon the materiality of such amount.

19.    **Exclusions.**   The Debtor may have excluded certain categories of assets and liabilities from the Schedules and Statements, including accrued liabilities such as accrued salaries and employee benefits (including accrued personal time off) and accrued accounts payable, as well as assets with a net book value of zero. Other non-material assets and liabilities may have also been excluded.

<u>**Specific Notes Regarding the Schedules and Statements**</u>

**Specific Notes Regarding the Statements**

1.    **Gross Revenue**. Amounts listed for gross revenue in the Part 1 of the Statements from the beginning of the fiscal year to just before the Petition Date reflect gross revenue from the Debtor's business for the period of January 1, 2023 through and including the Petition Date.

2.    **90 Day Payments.** The dates set forth in the "Dates of Payment" column relate to one of the following: (a) the date of a wire transfer; (b) the date of an "ACH" payment; or (c) the date that a check was issued. Item 3 includes any disbursement or other transfer made by the Debtor within 90 days before the Petition Date except for those made to insiders (which payments appear in response to Item 4).

3.    **Insider Payments**. The Debtor made reasonable, good faith efforts to list all material payments made to or for the benefit of insiders with one year before the filing of the case.

However, it would be unduly burdensome to determine the amount of certain employee benefits provided to insiders by the Debtor, which include, among other things, the employer portion of health insurance premiums. Moreover, the payment of such amounts was authorized by the Employee Wage Order (as defined herein). The Debtor believes that the expenses underlying any employee reimbursements were incurred for the benefit of the Debtor, and not insiders.

4.      **Property held for another.** The Debtor has made reasonable efforts to account for property held for another by relying on the Debtor's books and records.

### Specific Notes Regarding Schedule A/B

1.      **Bank Account Balances**. In the event of any conflict between the Debtor's *Motion for Interim and Final Orders Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code* [Docket No. 6] and the Statements and Schedules, the information contained in the Statements and Schedules shall control.

2.      **Prepayments**. Certain prepayments reflected on the Debtor's balance sheet may not be included because the vendor to which they relate has fully performed the related services and the Debtor has no claims against these vendors.

3.      The Debtor does not believe that the note receivable from Olympia Healthcare, LLC (an indirect subsidiary of the Debtor) is collectible.

4.      The $2,000,000 referenced in Part II, Item 75 is a setoff defense and is not an affirmative claim.

### Specific Notes Regarding Schedule E/F

1.      **Creditors Holding Priority Unsecured Claims**. The listing of any claim on Schedule E/F does not constitute an admission by the Debtor that such claim is entitled to priority treatment under § 507 of the Bankruptcy Code. The Debtor reserves all rights to dispute the amount and/or the priority status of any claim on any basis at any time.

The Bankruptcy Court entered the *Interim Order (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages and Salaries, (II) Authorizing Payment of Certain Employee Benefits and Confirming right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers and (VI) Allowing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments* [Docket No.26], granting authority to the Debtor to pay certain prepetition employee wage and other obligations in the ordinary course (the "Wage Order"). Pursuant to the Wage Order, the Bankruptcy Court granted the Debtor authority to pay or honor certain prepetition obligations for employee wages, payroll deductions, employee benefits, and other benefits and fees. The Debtor has not listed on Schedule E/F any wage or employment-related obligations owed to non-insiders for which the Debtor has been granted authority to pay pursuant to the Employee Wage Order or other order that

may be entered by the Bankruptcy Court. The Debtor believes that all such claims have been, or will be, satisfied in the ordinary course during this case pursuant to the authority granted in the Employee Wage Order or other order that may be entered by the Bankruptcy Court. Likewise, the Debtor has not listed on Statement, Question 3, any transfers to non-insider employees on account of wages or employment-related obligations for which the Debtor has been granted authority to pay pursuant to the Employee Wage Order or other order that may be entered by the Bankruptcy Court.

     2.    **Creditors Holding Non-Priority General Unsecured Claims.**

- Horizon Real Estate Holdings, LLC is an affiliate of the Debtor.

- Olympia Healthcare LLC is an affiliate of the Debtor.

- Plaza Medical Office Building, LLC is an affiliate of the Debtor.

**Specific Notes Regarding Schedule G**

     1.    The Debtor's books and records may not be complete with respect to all unexpired leases and/or executory contracts to which they are a party and that were pending as of the Petition Date. In particular, the Debtor may be party to agreements and understanding that are "oral" or "verbal" in nature; while the Debtor has made reasonable efforts to identify these agreements and disclose them in the Schedules, there may be some that are not yet known or identified. Certain of the executory contracts and unexpired leases listed on Schedule G may contain renewal options, guarantees of payment, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights. Such rights, powers, duties, and obligations are not separately set forth on Schedule G or Schedule B. Omission of a contract, lease or other agreement from Schedule G does not constitute an admission that such omitted contract, lease or agreement is not an executory contract or unexpired lease. The Debtor hereby reserves all of its rights to (i) dispute the validity, status, or enforceability of any contract, agreement or lease set forth in Schedule G and (ii) amend or supplement such Schedule as necessary.

**Specific Notes Regarding Attachment No. 8 to Schedule A/B**

     1.    Certain of the insurance policies provide insurance coverage to affiliates of the Debtor and the Debtor reserves the right to seek reimbursement of an allocated share of such premiums from such affiliates, as appropriate.

\* \* \* \* \* \* \*

**Fill in this information to identify the case and this filing:**

Debtor Name __Alecto Healthcare Services LLC__
__a Delaware limited liability company__

United States Bankruptcy Court for the: _____ District of __Delaware__
(State)

Case number (*If known*): __23-10787-JKS__

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☑ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☑ *Schedule H: Codebtors* (Official Form 206H)

☑ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* _____

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐ Other document that requires a declaration _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __6/30/2023__          ✖ __/s/ Laxman Reddy__
MM / DD / YYYY                         Signature of individual signing on behalf of debtor

__Laxman Reddy__
Printed name

__President and Chief Executive Officer__
Position or relationship to debtor

A0039

**Fill in this information to identify the case:**

Debtor name _Alecto Healthcare Services LLC a Delaware limited liability company_

United States Bankruptcy Court for the: _____ District of _Delaware_
                                                                    (State)

Case number (If known): _23-10787-JKS_

☐ Check if this is an amended filing

Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals
12/15

---

### Part 1: Summary of Assets

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B* .............................................. $ _____ 0.00

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B* ............................................ $ _____ 3,523,846.62

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B* ............................................. $ _____ 3,523,846.62

---

### Part 2: Summary of Liabilities

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D* .......... $ _____ 712,846.79

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F* ................ $ _____ 0.00

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F* ......... + $ _____ 85,496,898.04

4. **Total liabilities** ............................................................
   Lines 2 + 3a + 3b
   $ _____ 86,209,744.83

---

**A0040**

**Fill in this information to identify the case:**

Debtor name  Alecto Healthcare Services LLC a Delaware limited liability company

United States Bankruptcy Court for the: _____ District of  Delaware
(State)

Case number (If known):  23-10787-JKS

☐ Check if this is an amended filing

## Official Form 206A/B

## Schedule A/B: Assets — Real and Personal Property    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

### Part 1:  Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

☐ No. Go to Part 2.
☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand**  $_____

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|---|
| 3.1. | See Attachment No. 3 | | | $ 2.61 |
| 3.2. | | | | $ |

4. **Other cash equivalents** *(Identify all)*

| 4.1. | See Attachment No. 3 | $ 5,493.56 |
|---|---|---|
| 4.2. | | $ |

5. **Total of Part 1**    $ 5,496.17
   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

### Part 2:  Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

☐ No. Go to Part 3.
☑ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

7. **Deposits, including security deposits and utility deposits**

Description, including name of holder of deposit

| 7.1. | NTT America, Inc. – Deposit for Sublease of Office Space Suite 1780 | $ 28,925.00 |
|---|---|---|
| 7.2. | Pacific Global Investment Management Company - deposit for sublease Suite 1920 | $ 12,592.80 |

**A0041**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number *(if known)* | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

---

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

   Description, including name of holder of prepayment

   8.1. See Attachment No. 8          $   1,305,994.29

   8.2. _____          $ _____

9. **Total of Part 2.**

   Add lines 7 through 8. Copy the total to line 81.       $   1,347,512.09

---

## Part 3:   Accounts receivable

10. **Does the debtor have any accounts receivable?**

    ☐ No. Go to Part 4.

    ☑ Yes. Fill in the information below.

    | | Current value of debtor's interest |
    |---|---|

11. **Accounts receivable**

    | | | | | Current value of debtor's interest |
    |---|---|---|---|---|
    | 11a. 90 days old or less: | $1,960,598.88 <br> face amount | – | $1,960,598.88 <br> doubtful or uncollectible accounts | = ........ →   $   0.00 |
    | 11b. Over 90 days old: | $94,531,482.75 <br> face amount | – | $94,531,482.75 <br> doubtful or uncollectible accounts | = ........ →   $   0.00 |

12. **Total of Part 3**

    Current value on lines 11a + 11b = line 12. Copy the total to line 82.       $   0.00

---

## Part 4:   Investments

13. **Does the debtor own any investments?**

    ☐ No. Go to Part 5.

    ☑ Yes. Fill in the information below.

    | | Valuation method used for current value | Current value of debtor's interest |
    |---|---|---|

14. **Mutual funds or publicly traded stocks not included in Part 1**

    Name of fund or stock:

    | | | |
    |---|---|---|
    | 14.1. _____ | _____ | $ _____ |
    | 14.2. _____ | _____ | $ _____ |

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

    | Name of entity: | % of ownership: | | |
    |---|---|---|---|
    | 15.1. See Attachment No. 15 | _____ % | _____ | $   120,000.00 |
    | 15.2. _____ | _____ % | _____ | $ _____ |

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

    Describe:

    | | | |
    |---|---|---|
    | 16.1. _____ | _____ | $ _____ |
    | 16.2. _____ | _____ | $ _____ |

17. **Total of Part 4**

    Add lines 14 through 16. Copy the total to line 83.       $   120,000.00

---

**A0042**

Debtor Alecto Healthcare Services LLC a Delaware limited liability company
Name

Case number *(if known)* 23-10787-JKS

---

| Part 5: | Inventory, excluding agriculture assets |
|---|---|

**18. Does the debtor own any inventory (excluding agriculture assets)?**

☑ No. Go to Part 6.

☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| **19. Raw materials** | ___ MM / DD / YYYY | $ _____ | _____ | $ _____ |
| **20. Work in progress** | ___ MM / DD / YYYY | $ _____ | _____ | $ _____ |
| **21. Finished goods, including goods held for resale** | ___ MM / DD / YYYY | $ _____ | _____ | $ _____ |
| **22. Other inventory or supplies** | ___ MM / DD / YYYY | $ _____ | _____ | $ _____ |

**23. Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

$ _____ 0.00

**24. Is any of the property listed in Part 5 perishable?**

☐ No

☐ Yes

**25. Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value _____ Valuation method _____ Current value _____

**26. Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No

☐ Yes

| Part 6: | Farming and fishing-related assets (other than titled motor vehicles and land) |
|---|---|

**27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28. Crops—either planted or harvested** | $ _____ | _____ | $ _____ |
| **29. Farm animals** *Examples*: Livestock, poultry, farm-raised fish | $ _____ | _____ | $ _____ |
| **30. Farm machinery and equipment** (Other than titled motor vehicles) | $ _____ | _____ | $ _____ |
| **31. Farm and fishing supplies, chemicals, and feed** | $ _____ | _____ | $ _____ |
| **32. Other farming and fishing-related property not already listed in Part 6** | $ _____ | _____ | $ _____ |

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number *(if known)* 23-10787-JKS |
|---|---|---|
| | Name | |

---

**33. Total of Part 6.**

Add lines 28 through 32. Copy the total to line 85.

$ _____0.00

**34. Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

    ☐ No

    ☐ Yes

**35. Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____  Valuation method _____  Current value $_____

**36. Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

**37. Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

| **Part 7:** | **Office furniture, fixtures, and equipment; and collectibles** |
|---|---|

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **39. Office furniture** <br> Reception Desk | $ 4,838.56 | Cost | $ 4,838.36 |
| **40. Office fixtures** <br> | $ | | $ |
| **41. Office equipment, including all computer equipment and communication systems equipment and software** <br> Computer Equipment | $ 25,000.00 | Cost | $ 25,000.00 |
| **42. Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 | $ | | $ |
| 42.2 | $ | | $ |
| 42.3 | $ | | $ |

**43. Total of Part 7.**

Add lines 39 through 42. Copy the total to line 86.

$ _____29,838.36

**44. Is a depreciation schedule available for any of the property listed in Part 7?**

☑ No

☐ Yes

**45. Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☑ No

☐ Yes

---

**A0044**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number *(if known)* | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

---

**Part 8:**    Machinery, equipment, and vehicles

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.

☑ Yes. Fill in the information below.

| General description<br><br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br><br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

| | | | |
|---|---|---|---|
| 47.1   2017 Toyota Highlander<br>VIN 5TDBZRFHIH5452189 | $ 21,000.00 | (Kelly Blue Book)<br>FMV | $ 21,000.00 |
| 47.2 | $ | | $ |
| 47.3 | $ | | $ |
| 47.4 | $ | | $ |

48. **Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

| | | | |
|---|---|---|---|
| 48.1 | $ | | $ |
| 48.2 | $ | | $ |

49. **Aircraft and accessories**

| | | | |
|---|---|---|---|
| 49.1 | $ | | $ |
| 49.2 | $ | | $ |

50. **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

| | | | |
|---|---|---|---|
| | $ | | $ |

51. **Total of Part 8.**

Add lines 47 through 50. Copy the total to line 87.

| | | | $ 21,000.00 |
|---|---|---|---|

52. **Is a depreciation schedule available for any of the property listed in Part 8?**

☑ No

☐ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☑ No

☐ Yes

---

**A0045**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number (if known) | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

| Part 9: | Real property |
|---|---|

54. **Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

55. **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 101 N. Brand, Ste 1920, Glendale, CA | Sublease Interest | $ 0.00 | Debtor Opinion | $ 0.00 |
| 55.2 | | $ | | $ |
| 55.3 | | $ | | $ |
| 55.4 | | $ | | $ |
| 55.5 | | $ | | $ |
| 55.6 | | $ | | $ |

56. **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$ 0.00

57. **Is a depreciation schedule available for any of the property listed in Part 9?**

☑ No

☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☑ No

☐ Yes

| Part 10: | Intangibles and intellectual property |
|---|---|

59. **Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets** | $ | | $ |
| 61. **Internet domain names and websites**<br>www.alectohealthcare.com | $ 0.00 | Debtor Opinion | $ 0.00 |
| 62. **Licenses, franchises, and royalties** | $ | | $ |
| 63. **Customer lists, mailing lists, or other compilations** | $ | | $ |
| 64. **Other intangibles, or intellectual property** | $ | | $ |
| 65. **Goodwill** | $ | | $ |

66. **Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$ 0.00

**A0046**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number *(if known)* | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

---

**67.** **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)?

☑ No
☐ Yes

**68.** **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

☑ No
☐ Yes

**69.** **Has any of the property listed in Part 10 been appraised by a professional within the last year?**

☑ No
☐ Yes

## Part 11: All other assets

**70.** **Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
☑ Yes. Fill in the information below.

|  |  |  | Current value of debtor's interest |
|---|---|---|---|
| **71.** Notes receivable | | | |
| Description (include name of obligor) | | | |
| Olympia Health Care, LLC | 8,944,477.81 <br> Total face amount | 8,944,477.81 <br> doubtful or uncollectible amount = → | $ 0.00 |
| **72.** **Tax refunds and unused net operating losses (NOLs)** | | | |
| Description (for example, federal, state, local) | | | |
| | | Tax year _____ | $_____ |
| | | Tax year _____ | $_____ |
| | | Tax year _____ | $_____ |
| **73.** Interests in insurance policies or annuities | | | $_____ |
| **74.** Causes of action against third parties (whether or not a lawsuit has been filed) | | | $_____ |
| Nature of claim | _____ | | |
| Amount requested | $_____ | | |
| **75.** Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims | | | 2,000,000.00 |
| See Attachment No. 75 | | | $_____ |
| Nature of claim | _____ | | |
| Amount requested | $_____ | | |
| **76.** Trusts, equitable or future interests in property | | | $_____ |
| **77.** Other property of any kind not already listed *Examples:* Season tickets, country club membership | | | $_____ <br> $_____ |
| **78.** **Total of Part 11.** | | | **$ 2,000,000.00** |
| Add lines 71 through 77. Copy the total to line 90. | | | |

**79.** **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

☑ No
☐ Yes

**A0047**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number (if known) | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

## Part 12: Summary

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 5,496.17 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 1,347,512.09 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 120,000.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 29,838.36 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 21,000.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* . → | | $ 0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 2,000,000.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. ............................91a. | $ 3,523,846.62 | + 91b. $ 0.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. ................................................. $ 3,523,846.62

**A0048**

**In re Alecto Healthcare Services LLC**

**Attachment No. 3 to Schedule A/B**

**[Part 1, Item 3 – Checking, savings, money market or financial brokerage accounts]**

| Name of Bank | Account Number | Description | Balance | |
|---|---|---|---|---|
| City National Bank | x3784 | Credit Line Activity | $0.00 | |
| City National Bank | x6065 | A/P | $0.00 | ** |
| City National Bank | x6508 | Payroll | $2.61 | |
| | | Total | $2.61 | |

** Debtor has a check in the amount of $5,493.56 that, subject to Court approval, will be deposited into its x6065 account on Tuesday June 20, 2023.

In re Alecto Healthcare Services LLC
Attachment No. 8 to Schedule A/B
[Part 2, Item 8 – Prepayments]
Alecto Healthcare Services LLC
Prepaid Balance Detail
As of 05/31/2023

**A) Prepaid Business Insurance**

| Insurance Type | Insurance Carrier | Beg Date | End Date | Premiums & Fees Paid/Financed | Premiums & Fees Expensed to Date | Prepaid as of 05/31/23 |
|---|---|---|---|---|---|---|
| 1) Directors & Officers | National Union Fire Insurance Co. 28 Liberty Street, New York, New York 10005; 2) RSUI Indemnity Company, 945 East Paces Ferry Road, Suite 1800, Atlanta, Georgia 30376 | 1/31/2023 | 1/31/2024 | $892,556.40 | $297,516.40 | $595,040.00 |
| 2) Comprehensive Employers Indemnity (TX Non-Subscribe) | Old Republic Union Insurance Co. 307 N. Michigan Avenue, Chicago, IL 60601 | 3/31/2023 | 3/31/2024 | $33,827.82 | $5,637.82 | $28,190.00 |
| 3) Workers Compensation | StarNet Insurance Company, 9301 Innovation Drive, Suite 200, Manassa, VA 20110 | 4/1/2023 | 4/1/2024 | $16,048.00 | $2,678.00 | $13,370.00 |
| 4) Automobile | Vantapro Specialty Insurance Co.; 199 Water Street, New York, NY 10038 | 6/1/2023 | 6/1/2024 | $2,921.76 | $0.00 | $0.00 |
| 5) Excess Medical Professional/General Liability | Magmutual Professional Security Ins Co; P.O. Box 52979, Atlanta, Georgia 30355 | 8/1/2022 | 8/1/2023 | $175,685.58 | $146,405.58 | $29,280.00 |
| 6) "All Risks" Property incl Boiler & Machinery & Flood, excluding CA EM | American Home Assurance Co; 175 Water Street, New York, New York 10038 | 7/1/2022 | 9/30/2023 | $201,399.48 | $157,116.19 | $44,283.29 |
| 7) Environmental Pollution/Storage Tank Liability - WNJ | Ironshore Specialty Insurance Co., 175 Berkeley Street, Boston, MA 02116 | 8/1/2022 | 8/1/2023 | $19,224.12 | $16,024.12 | $3,200.00 |
| 8) Cyber Liability | Coalition Insurance Solutions, 1160 Battery Street, Suite 350, San Francisco, CA 94111 | 8/14/2022 | 8/14/2023 | $48,334.42 | $38,412.42 | $9,922.00 |
| 9) 3 Year Extended Reporting Period Excess Medical Professional/General Liability Coverage for Non TX Exposures | Endurance American Specialty Ins. Co.; 16052 Swingley Ridge Road, Suite 130, St. Louis, Missouri 63017 | 8/1/2022 | 8/1/2025 | $844,558.56 | $234,599.56 | $609,959.00 |
| **Total Prepaid Business Insurance** | | | | | | **$1,333,244.29** |

**B) Prepaid Employee Health Insurance Benefits**

| Insurance Type | Insurance Carrier | Beg Date | End Date | Premiums & Fees Paid/Financed | Premiums & Fees Expensed to Date | Prepaid as of 05/31/23 |
|---|---|---|---|---|---|---|
| Anthem Blue Cross –Health Insurance Premiums | | | | | | $0.00 |
| Unum Life Insurance Company of America - Life Insurance Premiums | | | | | | $0.00 |
| MetLife Ins - Vision & Dental Insurance Premiums | | | | | | $0.00 |
| **Total Prepaid Employee Health Insurance Benefits** | | | | | | **$0.00** |

**C) Other Prepaids**

| Insurance Type | Insurance Carrier | Beg Date | End Date | Premiums & Fees Paid/Financed | Premiums & Fees Expensed to Date | Prepaid as of 05/31/23 |
|---|---|---|---|---|---|---|
| MS Office 365 & Outlook Accounts | Go Daddy | 12/1/2022 | 11/30/2023 | $5,405.28 | $2,705.28 | $2,700.00 |
| **Total Other Prepaids** | | | | | | **$2,700.00** |

**Total Prepaids** $1,335,944.29

**Ending GL Balance** $1,306,005.41

**A0050**

**In re Alecto Healthcare Services LLC**
**Attachment No. 15 to Schedule A/B**
**[Part 4, Item 15 – Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture]**

| Name of Entity | % of Ownership | Valuation Method Used for Current Value | Current Value of Debtor's Interest |
|---|---|---|---|
| Alecto Healthcare Services Hayward, LLC (provides management services to non-profit hospital) | 100% | Debtor's Opinion | $100,000.00 |
| Alecto Healthcare Services Los Angeles, LLC (investment vehicle to hold interests in two LLCs) | 100% | Debtor's Opinion | $0.00 |
| Alecto Healthcare Services Fairmont, LLC (currently in wind down of business and maintaining medical | 100% | Debtor's Opinion | $10,000.00 |
| Acceleron Services, LLC (no business operations - never engaged in business) | 100% | Debtor's Opinion | $0.00 |
| United Medical Management, LLC (no business operations - never engaged in business) | 100% | Debtor's Opinion | $0.00 |
| Sunrise MOB Holdings, LLC (investment vehicle to hold interest in one LLC) | 100% | Debtor's Opinion | $10,000.00 |
| Alecto Healthcare Services Sherman, LLC (investment vehicle that holds interest in three LLCs) | 80% | Debtor's Opinion | $0.00 |
| Alecto Healthcare Services Ohio Valley, LLC (investment vehicle that holds interest in two LLCs and sponser of a defined beneft pension plan) | 100% | Debtor's Opinion | $0.00 |
| Alecto Healthcare Services Real Estate Holdings, LLC (no business operations - never engaged in business) | 100% | Debtor's Opinion | $0.00 |
| M/C Healthcare, LLC (no active operations) | 100% | Debtor's Opinion | $0.00 |
| | | Total | $120,000.00 |

**A0051**

**In re Alecto Healthcare Services LLC**
**Attachment No. 75 to Schedule A/B**
**[Part 11, Item 75 – Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to setoff claims]**

In <u>United States of America v. Olympia Health Care, LLC, et. al.</u>, Olympia Health Care, LLC alleges that the claims asserted by the United States of America on behalf of the Centers for Medicare and Medicaid Services (CMS) against Olympia Health Care, LLC are subject to setoff based on Olympia Health Care, LLC's claims that it has overpaid the amounts due under a settlement reached by Olympia Health Care, LLC and CMS. The claims against Debtor are derivative of the claims against Olympia Health Care, LLC and as such, the Debtor should receive the benefit of any set off.

Contingent Value $2,000,000.00

<table>
<tr><td colspan="2">
<strong>Fill in this information to identify the case:</strong>
</td></tr>
<tr><td>Debtor name</td><td><strong>Alecto Healthcare Services LLC,<br>a Delaware limited liability company</strong></td></tr>
<tr><td colspan="2">United States Bankruptcy Court for the: District of <strong>Delaware</strong></td></tr>
<tr><td colspan="2">Case number <em>(if known):</em> <strong>23-10787-JKS</strong></td></tr>
</table>

☐ Check if this is an amended filing

<u>Official Form 206D</u>

## Schedule D: Creditors Who Have Claims Secured by Property       **12/15**

Be as complete and accurate as possible.

1.  **Do any creditors have claims secured by debtor's property?**
    ☐ No. Check this box and submit page 1 of this form to the court with the debtor's other schedules. Debtor has nothing else to report on this form
    ☒ Yes. Fill in all of the information below.

**Part 1:**    **List Creditors Who Have Secured Claims**

2.  **List in alphabetical order all creditors who have secured claims.**
    **If a creditor has more than one secured claim, list the creditor separately for each claim.**

| | | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.1   Creditor's name**<br><br>**Cardinal Health 110, LLC<br>c/o Porter Wright Morris &<br>Arthur LLC**<br><br>**Creditor's mailing address**<br><br>**Attn Allen Carter Esq<br>41 South High Street, Suite 2900<br>Columbus, Ohio 43215**<br><br>Creditor's email address, if known<br><br>Date debt was incurred   **Various**<br><br>Last four digits of account number<br><br>**Do multiple creditors have an interest in the same property?**<br>☐ No.<br>☐ Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals<br>UCC filed 3/12/2020, filing number 2020 1831975<br>Collateral: All prescription pharmaceutical products, over-the-counter pharmaceutical products, nutritional supplements, first-aid, health and beauty products, home health care products and equipment, medical and surgical supplies, medical products and inventory, general merchandise and supplies, sundries, and any other products supplied by secured party. Note: Debtor has never received any products from the Cardinal Health 110 LLC and none of its cash is the result of proceeds from any of products**<br><br>**Is the creditor an insider or related party?**<br>☒ No.<br>☐ Yes.<br>**Is anyone else liable on this claim?**<br>☒ No.<br>☐ Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>***As of the petition filing date, the claim is:***<br>Check all that apply<br>☐ Contingent.<br>☒ Unliquidated.<br>☐ Disputed | $285,229.79 | $ |

Debtor  **Alecto Healthcare Services LLC a Delaware limited liability company**    Case number *(if known)* 23-10787-JKS

| | | Column A **Amount of claim** Do not deduct the value of collateral | Column B Value of collateral that supports this claim |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **2.2   Creditor's name** **MPT of Fairmont-Alecto Hospital, LLC; MPT of Fairmont – Alecto, LLC, MPT of Wheeling – Alecto Hospital, LLC, and MPT of Martins Ferry – Alecto Hospital, LLC c/o Medical Properties Trust, Inc.** Creditor's mailing address **Attn Larry Portal, SVP Attn Legal Department 1000 Urban Center Drive, Suite 501 Birmingham, AL 35242** Creditor's email address, if known Date debt was incurred  **Various** Last four digits of account number Do multiple creditors have an interest in the same property? ☒No. ☐Yes.  Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien **Contingent claim based on guarantee under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC. UCC filed 9/19/2014, filing number 2014 3774312, continuation filed 3/27/2019, filing number 2019 2109119.  Note: No fees were ever paid or will be paid by Alecto Healthcare Services Fairmont LLC to Debor under the agreement and none of Debtor's cash is the result of any such fees.** Is the creditor an insider or related party? ☒No. ☐Yes. Is anyone else liable on this claim? ☐No. ☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)* *As of the petition filing date, the claim is:* Check all that apply ☒ Contingent ☐ Unliquidated ☐ Disputed | $          .00 | $ |
| **2.3   Creditor's name** **MPT of Los Angeles LP and MPT of Olympia LLC c/o Medical Properties Trust, Inc.** Creditor's mailing address **Attn Larry Portal, SVP Attn Legal Department 1000 Urban Center Drive, Suite 501 Birmingham, AL 35242** Creditor's email address, if known Date debt was incurred  **Various** Last four digits of account number Do multiple creditors have an interest in the same property? ☒No. ☐Yes.  Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien **Contingent claim based on guarantee under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC. UCC filed 12/31/2013, filing number 2013 5184842, continuation filed 7/2/2018, filing number 2018 4541369.  Note: No fees were ever paid or will be paid by Olympia Health Care, LLC to Debtor under the agreement and none of Debtor's cash is the result of any such fees.** Is the creditor an insider or related party? ☒No. ☐Yes. Is anyone else liable on this claim? ☒No. ☐Yes. *Fill out Schedule H: Codebtors (Official Form 206H)* *As of the petition filing date, the claim is:* Check all that apply ☒ Contingent ☐ Unliquidated ☐ Disputed | $          .00 | $ |

Official Form 206D          **Schedule D: Creditors Who Have Claims Secured by Property**

**A0054**

Debtor  **Alecto Healthcare Services LLC a Delaware limited liability company**    Case number *(if known)* 23-10787-JKS

| | | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.4   Creditor's name**<br><br>**MPT of Sherman-Alecto Hospital, LLC; MPT of Sherman – Alecto, LLC**<br>**MPT of Los Angeles LP**<br>**c/o Medical Properties Trust, Inc.**<br><br>Creditor's mailing address<br><br>**Attn Larry Portal, SVP**<br>**Attn Legal Department**<br>**1000 Urban Center Drive, Suite 501**<br>**Birmingham, AL 35242**<br><br>Creditor's email address, if known<br><br>Date debt was incurred **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☒No.<br>☐Yes.  Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Contingent claim based on guarantee re Sherman/Grayson Hospital, LLC obligations to MPT of Sherman-Alecto, LLC for Capital Reserve Deposits.**<br>**UCC filed 10/31/2014, filing number : 2014 4400537; continuation filed 6/10/2019, filing number 2019 3988941.  Note: No fees were ever or will be paid by by Sherman/Grayson Hospital, LLC to Debtor under the agreement and none of Debtor's cash is the result of any such fees,**<br><br>Is the creditor an insider or related party?<br>☒No.<br>☐Yes.<br><br>Is anyone else liable on this claim?<br>☐No.<br>☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent.<br>☐ Unliquidated<br>☐ Disputed | $427,617.00 | $ |
| **2.5   Creditor's name**<br><br>**MPT of Martins Ferry – Alecto Hospital, LLC; MPT of Wheeling – Alecto Hospital, LLC; MPT of Martins Ferry-Alecto, LLC; and MPT of Wheeling-Alecto Hospital, LLC**<br>**c/o Medical Properties Trust, Inc.**<br><br>Creditor's mailing address<br><br>**Attn Larry Portal, SVP**<br>**Attn Legal Department**<br>**1000 Urban Center Drive, Suite 501**<br>**Birmingham, AL 35242**<br><br>Creditor's email address, if known<br><br>Date debt was incurred **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☒No.<br>☐Yes.  Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Contingent claim based on guarantee re under Master Lease Agreement with Alecto Healthcare Services Wheeling LLC and Alecto Healthcare Services Martin's Ferry LLC**<br>**UCC filed 6/6/2017, filing number 2017 3713317 , continuation filed 4/26/2022.  Note: No fees were ever paid or will be paid by Alecto Healthcare Services Wheeling LLC, and Alecto Healthcare Services Martins Ferry LLC to Debtor under agreement and none of Debtor's cash is the result of any such fees.**<br><br>Is the creditor an insider or related party?<br>☒No.<br>☐Yes.<br><br>Is anyone else liable on this claim?<br>☐No.<br>☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent.<br>☐ Unliquidated<br>☐ Disputed | $    .00 | $ |

Debtor  __Alecto Healthcare Services LLC a Delaware limited liability company__    Case number *(if known)* 23-10787-JKS

---

3.  **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any**    **$712,846.79**

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **Alecto Healthcare Services LLC,** |
| | **a Delaware limited liability company** |
| United States Bankruptcy Court for the: District of **Delaware** | |
| Case number *(if known):* **23-10787-JKS** | |

☐ Check if this is an amended filing

## Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims

**12/15**

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on Schedule A/B: Assets - Real and Personal Property (Official Form 206A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

**Part 1:** List Creditors With PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims? (See 11 U.S.C. § 507).**
   ☐ No. Go to Part 2.
   ☒ Yes. Go to line 2.

2. List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part. If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | Total claim | Priority amount |
|---|---|---|

**2.1 Priority creditor's name and mailing address**

**California Franchise Tax Board**
**Bankruptcy Section, MS: A-340**
**PO Box 2952**
**Sacramento, CA 95812-2952**

Date or dates debt was incurred

Last four digits of account
number

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a)(8)

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent.
☐ Unliquidated
☐ Disputed

Basis for the claim

Is the claim subject to setoff?
☐ No.
☐ Yes.

**Notice Purposes**     $

**2.2 Priority creditor's name and mailing address**

**California Department of Tax and Fee**
**Administration**
**PO Box 942879**
**Sacramento, CA 94279-0001**

Date or dates debt was incurred

Last four digits of account
number

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a) (8)

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent.
☐ Unliquidated
☐ Disputed

Basis for the claim

Is the claim subject to setoff?
☐ No.
☐ Yes.

**Notice Purposes**     $

**A0057**

Debtor __Alecto Healthcare Services LLC, a Delaware limited liability company__    Case number *(if known)* **23-10787-JKS**

| | Total claim | Priority amount |
|---|---|---|

**2.3   Priority creditor's name and mailing address**

**Employment Development Dept**
**Bankruptcy Group MIC 92E**
**PO Box 826880**
**Sacramento, CA 94280-0001**

Date or dates debt was incurred

Last four digits of account
number

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a)(8)

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent.
☐ Unliquidated
☐ Disputed

Basis for the claim

Is the claim subject to setoff?
☐ No.
☐ Yes.

**Notice Purposes**    $

---

**2.4   Priority creditor's name and mailing address**

**Internal Revenue Service**
**PO Box 7346**
**Philadelphia, PA 19101-7346**

Date or dates debt was incurred

Last four digits of account
number

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a) (8)

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent.
☐ Unliquidated
☐ Disputed

Basis for the claim

Is the claim subject to setoff?
☐ No.
☐ Yes.

**Notice Purposes**    $

---

**2.5   Priority creditor's name and mailing address**

**Los Angeles County Tax Collector**
**PO Box 54110**
**Los Angeles, CA 90054**

Date or dates debt was incurred

Last four digits of account
number

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a) (8)

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent.
☐ Unliquidated
☐ Disputed

Basis for the claim

Is the claim subject to setoff?
☐ No.
☐ Yes.

**Notice Purposes**    $

---

**A0058**

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number *(if known)* **23-10787-JKS**

| Part 2: | List Creditors With NONPRIORITY Unsecured Claims |
|---|---|

3.  List in alphabetical order all creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

|  | Amount of claim |
|---|---|

**3.1  Nonpriority creditor's name and mailing address**

**American Express**
**Attn President or Manager Agent**
**PO Box 0001**
**Los Angeles, CA 90096**

Date or dates debt was incurred  **5/31/2023 (bill date)**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Expense Reimbursement - Lex Reddy**

Is the claim subject to setoff?
☒ No.
☐ Yes

Amount of claim: **$3,399.68**

---

**3.2  Nonpriority creditor's name and mailing address**

**Anthem Blue Cross**
**Attn President or Manager Agent**
**PO Box 51011**
**Los Angeles, CA 90051**

Date or dates debt was incurred  **6/2/2023**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Employee Health Benefits**

Is the claim subject to setoff?
☒ No.
☐ Yes

Amount of claim: **$14,478.05**

---

**3.3  Nonpriority creditor's name and mailing address**

**AON Risk Consultants**
**Attn L Joe Galusha, President**
**22922 Network Place**
**Chicago, IL 60673**

Date or dates debt was incurred  **11/15/18 & 12/13/18**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☒ Disputed

Basis for the claim   **Actuarial Services - 2018**

Is the claim subject to setoff?
☒ No.
☐ Yes

Amount of claim: **$70,000.00**

---

**3.4  Nonpriority creditor's name and mailing address**

**AT&T**
**Attn President or Manager Agent**
**PO Box 5014**
**Carol Stream, IL 60197**

Date or dates debt was incurred  **6/1/2023**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Internet Services**

Is the claim subject to setoff?
☒ No.
☐ Yes

Amount of claim: **$ 203.30**

---

**A0059**

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**      Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|
| | |

| | | |
|---|---|---|
| **3.5   Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $ 195.00 |
| **Bcal 101 North Brand Property LLC**<br>**Attn President or Manager Agent**<br>**200 State Street 5th Floor**<br>**Boston, MA 02109** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **5/31/2023** | Basis for the claim   **Miscellaneous Building Charge** | |
| Last four digits of account number | Is the claim subject to setoff?<br>☒ No.<br>☐ Yes | |
| **3.6   Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $81,318.11 |
| **Cardinal Health 200, LLC**<br>**c/o Porter Wright Morris & Arthur LLC**<br>**Attn Allen Carter Esq**<br>**41 South High Street, Suite 2900**<br>**Columbus, Ohio 43215** | Check all that apply<br>☐ Contingent<br>☒ Unliquidated<br>☒ Disputed | |
| Date or dates debt was incurred  **Various** | Basis for the claim   **Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsbdiary hospitals** | |
| Last four digits of account number | Is the claim subject to setoff?<br>☒ No.<br>☐ Yes | |
| **3.7   Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $3,966.10 |
| **Combined Group Insurance Services**<br>**Attn President or Manager Agent**<br>**14785 Preston Road Suite 350**<br>**Dallas, TX 75254** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **5/31/2023** | Basis for the claim   **Texas Non-Subscriber Audit** | |
| Last four digits of account number | Is the claim subject to setoff?<br>☒ No.<br>☐ Yes | |
| **3.8   Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $5,455.68 |
| **Evangeline Douglas**<br>**19951 Octillo Way**<br>**Apple Valley, CA 92308** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **5/31/2023** | Basis for the claim   **Expense Reimbursement** | |
| Last four digits of account number | Is the claim subject to setoff?<br>☒ No.<br>☐ Yes | |
| **3.9   Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $76,137.36 |
| **First Insurance Funding**<br>**Attn President or Manager Agent**<br>**450 Skokie Boulevard Suite 1000**<br>**Northbrook, IL 60062** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **6/1/2023** | Basis for the claim   **Insurance Premium Financing** | |
| Last four digits of account number | Is the claim subject to setoff?<br>☒ No.<br>☐ Yes | |

**A0060**

Debtor **Alecto Healthcare Services LLC, a Delaware limited liability company**    Case number *(if known)* **23-10787-JKS**

| | | Amount of claim |
|---|---|---|
| **3.10  Nonpriority creditor's name and mailing address**<br><br>**GRM Information Management Services of San Francisco LLC**<br>**Attn President or Manager Agent**<br>**41099 Boyce Road**<br>**Fremont, CA 94538**<br><br>Date or dates debt was incurred **Various**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim  **Records Storage**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $2,149.85 |
| **3.11  Nonpriority creditor's name and mailing address**<br><br>**Horizon Real Estate Holdings, LLC**<br>**Attn President or Manager Agent**<br>**101 N. Brand Boulevard, Suite 1920**<br>**Glendale, CA 91203**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Affiliate/Intercompany payable**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $23,504,535.00 |
| **3.12  Nonpriority creditor's name and mailing address**<br><br>**Konica Minolta Premier Finance**<br>**Attn President or Manager Agent**<br>**PO Box 41602**<br>**Philadelphia, PA 19101-1602**<br><br>Date or dates debt was incurred  **6/1/2023**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim  **Copier**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $ 779.66 |
| **3.13  Nonpriority creditor's name and mailing address**<br><br>**LHP Hospital Group Inc**<br>**c/o Ardent Health Services**<br>**Attn President or Manager Agent**<br>**Attn Legal Department**<br>**One Burton Hills Blvd Suite 250**<br>**Nashville, TN 37215**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent<br>☒ Unliquidated<br>☒ Disputed<br><br>Basis for the claim   **Potential claims related to Debtor's guarantee of certain indemnification obligations of a subsidary and settlement agreement with creditor**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | **Unknown** |
| **3.14  Nonpriority creditor's name and mailing address**<br><br>**Los Angeles County Treasurer and Tax Collector**<br>**PO Box 54110**<br>**Los Angeles, CA 90054**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim  **Notice Purposes**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $  .00 |

**A0061**

Debtor __Alecto Healthcare Services LLC, a Delaware limited liability company__     Case number *(if known)* **23-10787-JKS**

|  | Amount of claim |
|---|---|

| **3.15** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $28,213.35 |
|---|---|---|

**Michael Sarrao**
**22431 Antonio Parkway, Suite B160-457**
**Rancho Santa Margarita, CA 92688**

Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred  **4/30/2023 (bill date)**

Last four digits of account number

Basis for the claim   **Expense Reimbursement**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.16** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $31,666.88 |
|---|---|---|

**Moss Adams LLP**
**Attn President or Manager Agent**
**2040 Main Street Suite 900**
**Irvine, CA 92614**

Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Last four digits of account number

Basis for the claim   **Tax Preparation Services**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.17** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $ 872.57 |
|---|---|---|

**New Horizon Communications**
**Attn President or Manager Agent**
**PO Box 981073**
**Boston, MA 02298-1073**

Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred  **6/1/2023**

Last four digits of account number

Basis for the claim   **Internet Services**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.18** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $37,823.00 |
|---|---|---|

**Olshan Frome Wolosky LLP**
**Attn Thomas J Fleming Esq**
**1325 Avenue of the Americas**
**New York, NY 10019**

Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred  **Various**

Last four digits of account number

Basis for the claim   **Legal Fees - ERISA Counsel**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.19** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $37,874,526.12 |
|---|---|---|

**Olympia Health Care, LLC**
**Attn President or Manager Agent**
**101 N. Brand Boulevard, Suite 1920**
**Glendale, CA 91203**

Check all that apply
☒ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Last four digits of account number

Basis for the claim   **Affiliate/Intercompany payable**

Is the claim subject to setoff?
☒No.
☐Yes

---

**A0062**

Debtor __Alecto Healthcare Services LLC, a Delaware limited liability company__     Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|

| | | |
|---|---|---|
| **3.20**   **Nonpriority creditor's name and mailing address**<br><br>**Panch Jeyakumar MD**<br>**2248 Pieper Lane**<br>**Tustin, CA 92792**<br><br>Date or dates debt was incurred  **5/31/2023**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Expense Reimbursement**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $1,888.00 |
| **3.21**   **Nonpriority creditor's name and mailing address**<br><br>**Plaintiffs in Reed v. Alecto [Keith Reed, Elizabeth Schenkel, Emily Wines, Mark Garan and August Ullum and Represented Class**<br>**c/o Laura Davidson & Bren Pompomio**<br>**Mountain State Justice, Inc.**<br>**1217 Quarrier Street**<br>**Charleston, WV 25301**<br><br>Date or dates debt was incurred  **11/28/2022**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **WARN Act Class Action**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $3,169,745.72 |
| **3.22**   **Nonpriority creditor's name and mailing address**<br><br>**Plaza Medical Office Building, LLC**<br>**Attn President or Manager Agent**<br>**101 N. Brand Boulevard, Suite 1920**<br>**Glendale, CA 91203**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Affiliate/Intercompany payable**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $8,083,572.10 |
| **3.23**   **Nonpriority creditor's name and mailing address**<br><br>**Sherman/Grayson Health System, LLC**<br>**c/o Ardent Health Services**<br>**Attn President or Manager Agent**<br>**Attn Legal Department**<br>**One Burton Hills Blvd Suite 250**<br>**Nashville, TN 37215**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent<br>☒ Unliquidated<br>☒ Disputed<br><br>Basis for the claim   **Potential claims related to Debtor's guarantee of certain indemnification obligations of a subsidary and settlement agreement with creditor**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | **Unknown** |

**A0063**

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|

| | | |
|---|---|---|
| 3.24   **Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $2,743.62 |
| **Sylvia Ventura** **4742 Ambrazzi Drive** **Cypress, CA 90630** | Check all that apply ☐ Contingent ☐ Unliquidated ☐ Disputed | |
| Date or dates debt was incurred  **5/31/2023 (bill date)** | | |
| Last four digits of account number | Basis for the claim  **Expense Reimbursement** | |
| | Is the claim subject to setoff? ☒No. ☐Yes | |
| 3.25   **Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $23,031.10 |
| **Symphony Risk Solutions LLC** **Attn President or Manager Agent** **2425 N Central Expressway Suite 900** **Richardson, TX 75080** | Check all that apply ☐ Contingent ☐ Unliquidated ☐ Disputed | |
| Date or dates debt was incurred  **6/1/2023** | Basis for the claim  **Insurance Premiums** | |
| Last four digits of account number | | |
| | Is the claim subject to setoff? ☒No. ☐Yes | |
| 3.26   **Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $12,480,197.79 |
| **United States of America** **Brian M Boynton, Principal Deputy Deputy Assit Atty General** **Ruth A Harvey, Director** **Michale J Quinn, Senior Litigation Counsel** **John R Kresse and T. Dietrich Hill, Trial Attys** **United States Department of Justice** **Civil Division, Commerical Litigation Branch** **1100 L Street NW, 7th Floor** **Box 875, Ben Franklin Station** **Washington, DC 20044-9875** | Check all that apply ☒ Contingent ☒ Unliquidated ☒ Disputed | |
| | Basis for the claim  **Lawsuit:  United States of America v. Olympia Health Care, LLC, Alecto Healthcare Services, LLC et al., United States District Court for the Central District of California Case No. 2:23-cv-01783 (complaint asserts amount owed as of 2/28/2023, principal of $11,059,170.17 plus $1,421,027.62 in interest and interest continues to accrue at 10% per annum)** | |
| Date or dates debt was incurred | | |
| Last four digits of account number | Is the claim subject to setoff? ☐No. ☒Yes | |

| | | |
|---|---|---|
| | **Total** | **$85,496,898.04** |

| Debtor | Alecto Healthcare Services LLC, a Delaware limited liability company | Case number (if known) 23-10787-JKS |
|---|---|---|

| **Part 3:** | **List Others to Be Notified About Unsecured Claims** |
|---|---|

**4.** List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 an 2, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and mailing address | On which line in Part 1 or 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4.1<br>**Timothy Cogan**<br>**Cassidy Cogan Shapell & Voeglin, LC**<br>**1413 Eoff Street**<br>**Wheeling, WV 26003** | Line **3.21**<br>**re Plaintiffs in Reed v. Alecto**<br>☐ Not listed. Explain | |
| 4.2<br>**Maureen Davidson-Welling**<br>**Stember Cohn & Davidson-Welling**<br>**425 First Avenue, 7th Floor**<br>**Pittsburgh, PA 15219** | Line **3.21**<br>**re Plaintiffs in Reed v. Alecto**<br>☐ Not listed. Explain | |
| 4.3<br>**F. Alex Risovich**<br>**Risovich Law Offices, PLLC**<br>**3023 Pennsylvania Avenue**<br>**Weirton, WV 26062** | Line **3.21**<br>**re Plaintiffs in Reed v. Alecto**<br>☐ Not listed. Explain | |
| 4.4<br>**AON Risk Consultants Inc**<br>**Attn L Joe Galusha, President**<br>**200 E. Randolph St**<br>**Chicago, IL 60601** | Line **3.3**<br>**re AON Risk Consultants Inc**<br>☐ Not listed. Explain | |
| 4.5<br>**Civil Process Clerk**<br>**United States Attorney's Office**<br>**Federal Building Room 7516**<br>**300 North Los Angeles, Street**<br>**Los Angeles, CA 90012** | Line **3.26**<br>**re United States of America**<br>☐ Not listed. Explain | |
| 4.6<br>**Attorney General**<br>**United States Department of Justice**<br>**Ben Franklin Station**<br>**PO Box 683**<br>**Washington, DC 20044** | Line **3.26**<br>**re United States of America**<br>☐ Not listed. Explain | |
| 4.7 | Line<br>☐ Not listed. Explain | |

Official Form 206E/F  **Schedule E/F: Creditors Who Have Unsecured Claims**

**A0065**

Debtor  Alecto Healthcare Services LLC, a Delaware limited liability company    Case number *(if known)* **23-10787-JKS**

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---|---|

**5.** Add the amounts of priority and nonpriority unsecured claims.

|  |  | | Total of claim amounts |
|---|---|---|---|
| **5a.** | **Total claims from Part 1** | *5a.* | **$0.00** |
| **5b.** | **Total claims from Part 2** | *5b.* + | **$85,496,898.04** |
| **5c.** | **Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | *5c.* | **$85,496,898.04** |

**Fill in this information to identify the case:**

Debtor name  Alecto Healthcare Services LLC
a Delaware limited liability company

United States Bankruptcy Court for the: _____ District of  Delaware
(State)

Case number (If known): 23-10787-JKS    Chapter  11

☐ Check if this is an amended filing

Official Form 206G

## Schedule G: Executory Contracts and Unexpired Leases                    12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

1. **Does the debtor have any executory contracts or unexpired leases?**

   ☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

   ☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with |
|---|---|
| **2.1** State what the contract or lease is for and the nature of the debtor's interest | See Schedule G Attachment |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.2** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.3** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.4** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.5** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |

**A0067**

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule G – Executory Contracts and Unexpired Leases**

| | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.1 | Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals | Cardinal Health 110, LLC<br>c/o Porter Wright Morris & Arthur LLC<br>41 South High Street, Suite 2900<br>Columbus, Ohio 43215 |
| 2.2 | Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals | Cardinal Health 200, LLC<br>c/o Porter Wright Morris & Arthur LLC<br>41 South High Street, Suite 2900<br>Columbus, Ohio 43215 |
| 2.3 | Commercial Insurance Premium Finance and Security Agreement (Quote No. x0380) for Policy No. x8117 - Property Insurance | Bank Direct Capital Finance<br>150 North Field Drive, Suite 190<br>Lake Forest, IL 60045 |
| 2.4 | Commercial Insurance Premium Finance and Security Agreement (Quote No. x2606) for Policy No. x1701 – Extending Reporting Professional Liability Policy | Bank Direct Capital Finance<br>150 North Field Drive, Suite 190<br>Lake Forest, IL 60045 |
| 2.5 | Commercial Insurance Premium Finance and Security Agreement (Quote No. 45720646 for Policy No. 02-462-55-24, 02-462-55-22, NHS703822 | Stetson Insurance Funding, LLC<br>6450 Transit Road<br>Depeur, NY 14043 |
| 2.6 | Medical Insurance Benefits | Anthem Blue Cross<br>PO Box 51011<br>Los Angeles, CA 90051 |
| 2.7 | Dental and Vision Insurance Benefits | Met Life<br>811 Main Street, 7th Floor<br>Kansas City, MO 64105 |
| 2.8 | Life Insurance Benefits | Unum<br>655 N. Central, Suite 900<br>Glendale, CA 91203 |

**A0068**

**In re Alecto Healthcare Services LLC**

**Attachment to Schedule G – Executory Contracts and Unexpired Leases**

| | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.9 | Insurance<br>Directors & Officers<br>Employment Practices<br>Fiduciary & Crime - Primary Layer<br>Term: 1/31/2023 - 1/31/2024<br>Policy No.: 02-462-55-16 | National Union Fire Insurance Co<br>28 Liberty Street<br>New York, NY 10005 |
| 2.10 | Insurance<br>Excess Directors & Officers<br>Employment Practices<br>Term: 1/31/2023 - 1/31/2024<br>Policy No. NHS 703822 | RSUI Indemnity Company<br>945 East Paces Ferry Road Suite 1800<br>Atlanta, GA 30376 |
| 2.11 | Insurance<br>Excess Directors & Officers<br>Employment Practices<br>Term: 1/31/2023 - 1/31/2024<br>Policy No. 02-462-55-24 | National Union Fire Insurance Co<br>28 Liberty Street<br>New York, NY 10005 |
| 2.12 | Insurance<br>Comprehensive Employer Indemnity<br>Term: 3/1/2023 - 3/31/2024<br>Policy No. ORNSOL000039-01 | Old Republic Union Insurance Co<br>307 N Michigan Avenue<br>Chicago, IL 60601 |
| 2.13 | Insurance<br>Workers Compensation<br>Term: 4/1/2023 - 41/2024<br>Policy No. BNUWC0153849 | StarNet Insurance Company<br>9301 Innovation Drive Suite 200<br>Manassa, VA 20110 |
| 2.14 | Insurance<br>Automobile<br>Term: 6/1/2023 - 6/1/2024<br>Policy No. 5087-0849-02 | Vantapro Specialty Insurance Co<br>199 Water Street<br>New York, NY 10038 |

## In re Alecto Healthcare Services LLC
### Attachment to Schedule G – Executory Contracts and Unexpired Leases

| | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.15 | Insurance<br>"All Risks" Property incl Boiler & Machinery & Flood, excluding CA EM<br>Term: 7/1/2022 – 7/1/2023<br>Policy No. 018258117 | American Home Asssurance Co<br>175 Water Street<br>New York, NY 10038 |
| 2.16 | Insurance<br>Excess Medical Professional<br>General Liability for TX (WNJ) Exposure Only<br>Term: 8/1/2022 - 8/1/2023<br>Policy No. HUL 09114235 | Magmutual Professional Security Ins Co<br>PO Box 52979<br>Atlanta, GA 30355 |
| 2.17 | Insurance<br>Environmental Pollution<br>Storage Tank Liability - WNJ<br>Term: 8/1/2022 - 8/1/2023<br>Policy No. PSPIUSCBM76002 | Ironshore Specialty Insurance Co<br>175 Berkeley Street<br>Boston, MA 02116 |
| 2.18 | Insurance<br>Cyber Liability<br>Term: 8/1/42022 - 8/14/2023<br>Policy No. C-4LPY-047551-CYBER-2002 | Coalition Insurance Solutions<br>Arch Specialty - 45%<br>Fireman's Fund - 25%<br>Ascot Specialty - 25%<br>North Amercian Capacity - 5% |
| 2.19 | Insurance<br>3 Year Extended Reporting Period Excess Medical Professional General Liability Coverage for Non TX Exposures<br>Term: 8/1/2022 - 8/1/2025<br>Policy No. x1701 | Endurance American Specialty Ins Co<br>16052 Swingley Ridge Road Suite 130<br>St Louis, MO 63017 |
| 2.20 | Sublease dated 1/31/2023<br>Approximately 2,862 square feet of office space located at 101 N. Brand Boulevard, Suite 1920, Glendale, CA 91203 | Pacific Global Investment Management Group<br>Attn: SVP<br>101 N. Brand Blvd., Suite 1950<br>Glendale, CA 91203 |

A0070

In re Alecto Healthcare Services LLC
Attachment to Schedule G – Executory Contracts and Unexpired Leases

| | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.21 | Prime Vendor Agreement - Distribution Agreement for Pharmaceuticals dated 6/1/2016<br>First Amendment dated 12/5/2016<br>Second Amendment dated 3/7/2017<br>Third Amendment dated 6/20/2017 | Cardinal Health 110, LLC and Cardinal Health, Inc.<br>c/o Porter Wright Morris & Arthur LLC<br>41 South High Street, Suite 2900<br>Columbus, Ohio 43215 |
| 2.22 | Guaranty dated 10/31/2014<br>Guarantee re Sherman/Grayson Hospital, LLC obligations to MPT of Sherman-Alecto, LLC for Capital Reserve Deposits | MPT of Sherman-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| 2.23 | Guaranty dated 9/19/2014<br>Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC | MPT of Fairmont-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| 2.24 | Guaranty dated 6/1/2017<br>Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Wheeling LLC and Alecto Healthcare Services Martin's Ferry LLC | MPT of Wheeling-Alecto Hospital, LLC MPT of Martins Ferry-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| 2.25 | Guaranty dated 9/23/2014 | Sherman/Grayson Health System, LLC<br>LHP Hospital Group, Inc.<br>c/o Ardent Health Services<br>Attn Legal Department<br>One Burton Hills Boulevard Suite 250<br>Nashville, TN 37215 |

**In re Alecto Healthcare Services LLC**

**Attachment to Schedule G – Executory Contracts and Unexpired Leases**

| | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.26 | Record Storage and Data Agreement dated 2/1/2023 | GRM Information Management of San Francisco, LLC<br>40199 Boyce Road<br>Fremont, CA 94538 |
| | | |

**A0072**

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor name | Alecto Healthcare Services LLC<br>a Delaware limited liability company |
| United States Bankruptcy Court for the: | District of Delaware<br>(State) |
| Case number (If known): | 23-10787-JKS |

☐ Check if this is an amended filing

Official Form 206H

## Schedule H: Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

1. **Does the debtor have any codebtors?**

   ☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

   ☑ Yes

2. **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G*.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: Codebtor | | Column 2: Creditor | |
|---|---|---|---|
| Name | Mailing address | Name | Check all schedules that apply: |
| See Schedule H Attachment | | | |
| 2.1 _____ | Street _____<br><br>_____<br>City    State    ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |
| 2.2 _____ | Street _____<br><br>_____<br>City    State    ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |
| 2.3 _____ | Street _____<br><br>_____<br>City    State    ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |
| 2.4 _____ | Street _____<br><br>_____<br>City    State    ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |
| 2.5 _____ | Street _____<br><br>_____<br>City    State    ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |
| 2.6 _____ | Street _____<br><br>_____<br>City    State    ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |

**A0073**

Case 23-11778-JKS   Doc 26-1   Filed 01/22/23   Page 436 of 456

## In re Alecto Healthcare Services LLC
## Attachment to Schedule H - Co-Debtors

| Co-Debtor Name and Address | Creditor |
|---|---|
| Alecto Healthcare Services Wheeling LLC dba Ohio Valley Medical Group OVMC Physicians<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | Plaintiffs in Reed v. Alecto<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Sherman/Grayson Hospital LLC<br>500 N Highland Ave<br>Sherman, TX 75092 | MPT of Sherman-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>Schedule D ☒<br>Schedule E/F ☐<br>Schedule G ☐ |
| Alecto Healthcare Services Wheeling LLC<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | MPT of Wheeling-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>Schedule D ☒<br>Schedule E/F ☐<br>Schedule G ☐ |
| Alecto Healthcare Services Martin's Ferry LLC<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | MPT of Wheeling-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>Schedule D ☒<br>Schedule E/F ☐<br>Schedule G ☐ |

**A0074**

# In re Alecto Healthcare Services LLC
## Attachment to Schedule H - Co-Debtors

| Co-Debtor Name and Address | Creditor |
|---|---|
| Alecto Healthcare Services Fairmont LLC<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | MPT of Fairmont-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>Schedule D   ☒<br>Schedule E/F   ☐<br>Schedule G   ☐ |
| Olympia Health Care, LLC<br>Attn President or Manager Agent<br>101 N. Brand Boulevard Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D   ☐<br>Schedule E/F   ☒<br>Schedule G   ☐ |
| MPT of Los Angeles, LP<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D   ☐<br>Schedule E/F   ☒<br>Schedule G   ☐ |
| MPT of Olympia, LLC<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D   ☐<br>Schedule E/F   ☒<br>Schedule G   ☐ |

A0075

# In re Alecto Healthcare Services LLC
## Attachment to Schedule H - Co-Debtors

| Co-Debtor Name and Address | Creditor |
|---|---|
| MPT Operating Partnership, L.P.<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Medical Properties Trust, Inc.<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Sherman/Grayson Hospital LLC<br>500 N Highland Ave<br>Sherman, TX 75092 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Alecto Healthcare Services Sherman LLC<br>101 N Brand Blvd Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Laxman Reddy<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |

**A0076**

Case 23-10787-KBS Doc 261 Filed 10/02/23 Page 49 of 56

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| Matthew Williams<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Jeremy Redin<br>28372 Steel Lane<br>Valencia, CA 91354 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Sherman/Grayson Hospital LLC<br>500 N. Highland Avenue<br>Sherman, Texas 75092 | LHP Hosptial Group, Inc.<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Sherman/Grayson Hospital LLC<br>500 N. Highland Avenue<br>Sherman, Texas 75092 | Sherman/Grayson Health Systems LLC<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |

# In re Alecto Healthcare Services LLC
## Attachment to Schedule H - Co-Debtors

| Co-Debtor Name and Address | Creditor |
|---|---|
| Alecto Healthcare Services Sherman LLC<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, California 91203 | LHP Hosptial Group, Inc.<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>   Schedule D   ☐<br>   Schedule E/F   ☒<br>   Schedule G   ☐ |
| Alecto Healthcare Services Sherman LLC<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, California 91203 | Sherman/Grayson Health Systems LLC<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>   Schedule D   ☐<br>   Schedule E/F   ☒<br>   Schedule G   ☐ |

A0078

# District of Delaware
# Claims Register

## 23-10787-JKS Alecto Healthcare Services LLC

| | |
|---|---|
| **Bankruptcy Judge:** J Kate Stickles | **Chapter:** 11 |
| **Office:** Delaware | **Last Date to file claims:** 08/15/2023 |
| **Trustee:** Jami B Nimeroff | **Last Date to file (Govt):** 12/13/2023 |

---

*Creditor:* (18292821)
Uline
12575 Uline Dive
Pleasant Prairie, WI 53158

**Claim No: 1**
*Original Filed Date:* 07/07/2023
*Original Entered Date:* 07/07/2023

*Status:* Withdraw 187
*Filed by:* CR
*Entered by:* BJM
*Modified:*

  Amount claimed: $6115.93
  Priority  claimed: $5605.05

*History:*

| | | |
|---|---|---|
| Details | 1-1 | 07/07/2023 Claim #1 filed by Uline, Amount claimed: $6115.93 (BJM) |
| | 187 | 10/20/2023 Withdrawal of Claim Nos. 1 (Uline) (webclaimusr) Status: Withdraw |

*Description:* (1-1) Goods Sold
*Remarks:* (1-1) 3060

---

*Creditor:* (18294303)
Ironshore Specialty Insurance Company
175 Berkeley Street
Boston, MA 02116

**Claim No: 2**
*Original Filed Date:* 07/19/2023
*Original Entered Date:* 07/19/2023

*Status:*
*Filed by:* CR
*Entered by:* EPOC Filer
*Modified:*

  Amount claimed: $0.00

*History:*

| | | |
|---|---|---|
| Details | 2-1 | 07/19/2023 Claim #2 filed by Ironshore Specialty Insurance Company, Amount claimed: $0.00 (EPOC Filer) |

*Description:*
*Remarks:* (2-1) Account Number (last 4 digits):3301 Filer Comment: Contingent and unliquidated

---

*Creditor:* (18471617)
Department of the Treasury
Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

**Claim No: 3**
*Original Filed Date:* 07/21/2023
*Original Entered Date:* 07/21/2023

*Status:*
*Filed by:* CR
*Entered by:* BJM
*Modified:*

  Amount claimed: $160551.00
  Priority  claimed: $160551.00

*History:*

| | | |
|---|---|---|
| Details | 3-1 | 07/21/2023 Claim #3 filed by Department of the Treasury, Amount claimed: $160551.00 (BJM) |

*Description:*
*Remarks:*

---

*Creditor:* (18472447)
Cardinal Health 110, LLC

**Claim No: 4**
*Original Filed Date:* 07/27/2023

*Status:*
*Filed by:* CR

*History:*

| | | |
|---|---|---|
| Details | 4-1 | 07/27/2023 Claim #4 filed by Cardinal Health 110, LLC, Amount claimed: $419842.62 (EPOC Filer) |

*Description:*
*Remarks:*

**A0079**

7000 Cardinal Place
Dublin, OH 43017

*Original Filed Date*: 07/27/2023    *Entered by*: EPOC Filer
*Modified*:

  Amount claimed: $419842.62

*History*:

| | | |
|---|---|---|
| Details | 4-1 | 07/27/2023 Claim #4 filed by Cardinal Health 110, LLC, Amount claimed: $419842.62 (EPOC Filer) |

*Description*:

*Remarks*:

---

*Creditor*:    (18472448)
Cardinal Health 200, LLC
7000 Cardinal Place
Dublin, OH 43017

**Claim No: 5**
*Original Filed Date*: 07/27/2023
*Original Filed Entered Date*: 07/27/2023

*Status*:
*Filed by*: CR
*Entered by*: EPOC Filer
*Modified*:

  Amount claimed: $119695.80

*History*:

| | | |
|---|---|---|
| Details | 5-1 | 07/27/2023 Claim #5 filed by Cardinal Health 200, LLC, Amount claimed: $119695.80 (EPOC Filer) |

*Description*:

*Remarks*:

---

*Creditor*:    (18473050)
U.S. Department of Labor
Julie A. Su, U.S. Secretary of Labor
EBSA - Attn: Padilla
35 N. Lake Ave., Suite 300
Pasadena, CA 91101
*No amounts claimed*

**Claim No: 6**
*Original Filed Date*: 08/01/2023
*Original Filed Entered Date*: 08/01/2023

*Status*:
*Filed by*: CR
*Entered by*: BJM
*Modified*:

*History*:

| | | |
|---|---|---|
| Details | 6-1 | 08/01/2023 Claim #6 filed by U.S. Department of Labor, Amount claimed: (BJM) |

*Description*: (6-1) No Claim Amount Listed

*Remarks*: (6-1) Possible Violations of ERISA/8324

---

*Creditor*:    (18473050)
U.S. Department of Labor
Julie A. Su, U.S. Secretary of Labor
EBSA - Attn: Padilla
35 N. Lake Ave., Suite 300
Pasadena, CA 91101
*No amounts claimed*

**Claim No: 7**
*Original Filed Date*: 08/01/2023
*Original Filed Entered Date*: 08/01/2023

*Status*:
*Filed by*: CR
*Entered by*: BJM
*Modified*:

*History*:

| | | |
|---|---|---|
| Details | 7-1 | 08/01/2023 Claim #7 filed by U.S. Department of Labor, Amount claimed: (BJM) |

*Description*: (7-1) No Claim Amount Listed

*Remarks*: (7-1) Possible Violations of ERISA/8325

---

*Creditor*:    (18245453)
California Franchise Tax Board
Bankruptcy Section MS A-340
PO Box 2952
Sacramento, CA 95812-2952

**Claim No: 8**
*Original Filed Date*: 08/01/2023
*Original Filed Entered Date*: 08/01/2023

*Status*:
*Filed by*: CR
*Entered by*: EPOC Filer
*Modified*:

  Amount claimed: $700.00

  Priority  claimed: $700.00

*History*:

| | | |
|---|---|---|
| Details | 8-1 | 08/01/2023 Claim #8 filed by California Franchise Tax Board, Amount claimed: $700.00 (EPOC Filer) |

*Description*:

*Remarks*: (8-1) Account Number (last 4 digits):0349

**A0080**

*History:*

Details    8-1    08/01/2023 Claim #8 filed by California Franchise Tax Board, Amount claimed: $700.00 (EPOC Filer)

*Description:*

*Remarks:* (8-1) Account Number (last 4 digits):0349

---

| | | |
|---|---|---|
| *Creditor:*    (18513012) | **Claim No: 9** | *Status:* |
| MPT of Sherman-Alecto, LLC and affiliates | *Original Filed Date:* 08/12/2023 | *Filed by:* CR |
| Medical Properties Trust, Inc. | *Original Entered Date*: 08/12/2023 | *Entered by:* EPOC Filer |
| 425 Park Avenue, 36th Floor | | *Modified:* |
| New York, NY 10022 | | |

*No amounts claimed*

*History:*

Details    9-1    08/12/2023 Claim #9 filed by MPT of Sherman-Alecto, LLC and affiliates, Amount claimed: (EPOC Filer)

*Description:*

*Remarks:* (9-1) Filer Comment: Unliquidated (see attachment)

---

| | | |
|---|---|---|
| *Creditor:*    (18513020) | **Claim No: 10** | *Status:* |
| De Lage Landen Financial Services | *Original Filed Date:* 08/14/2023 | *Filed by:* CR |
| 1111 Old eagle School Road | *Original Entered Date*: 08/14/2023 | *Entered by:* EPOC Filer |
| Wayne, PA 19087 | | *Modified:* |

Amount claimed: $7313.70

*History:*

Details    10-1    08/14/2023 Claim #10 filed by De Lage Landen Financial Services, Amount claimed: $7313.70 (EPOC Filer)

*Description:*

*Remarks:* (10-1) Account Number (last 4 digits):8050

---

| | | |
|---|---|---|
| *Creditor:*    (18513049) | **Claim No: 11** | *Status:* |
| Pension Benefit Guaranty | *Original Filed Date:* 08/14/2023 | *Filed by:* CR |
| Corporation | *Original Entered Date*: 08/14/2023 | *Entered by:* Stephanie Thomas |
| | | *Modified:* |

Amount claimed: $1065047.00

*History:*

Details    11-1    08/14/2023 Claim #11 filed by Pension Benefit Guaranty Corporation, Amount claimed: $1065047.00 (Thomas, Stephanie)

*Description:* (11-1) Statutory Liability to the Alecto Healthcare Services Ohio Valley LLC Pension Pension Plan for unpaid minimum funding contributions under 26 U.S.C. §§ 412 and 430, 29 U.S.C. §§ 1082, 1342 and 1362(c). See attached statement.

*Remarks:*

---

| | | |
|---|---|---|
| *Creditor:*    (18513049) | **Claim No: 12** | *Status:* |
| Pension Benefit Guaranty | *Original Filed Date:* 08/14/2023 | *Filed by:* CR |
| Corporation | *Original Entered Date*: 08/14/2023 | *Entered by:* Stephanie Thomas |
| | | *Modified:* |

Amount claimed: $1845012.00

*History:*

Details    12-1    08/14/2023 Claim #12 filed by Pension Benefit Guaranty Corporation, Amount claimed: $1845012.00 (Thomas, Stephanie)

*Description:* (12-1) Statutory Liability under 29 U.S.C. § 1362 and 1368 for unfunded benefit liabilities of the Alecto Healthcare Services Ohio Valley LLC Pension Pension Plan. See attached statement.

*Remarks:*

**A0081**

| | | |
|---|---|---|
| *Creditor:* (18513049) | **Claim No: 13** | *Status:* |
| Pension Benefit Guaranty | *Original Filed Date*: 08/14/2023 | *Filed by:* CR |
| Corporation | *Original Entered Date*: 08/14/2023 | *Entered by:* Stephanie Thomas |
| | | *Modified:* |

Amount claimed: $0.00

Priority claimed: $0.00

*History:*

Details    13-1   08/14/2023 Claim #13 filed by Pension Benefit Guaranty Corporation, Amount claimed: $0.00 (Thomas, Stephanie)

*Description:* (13-1) Statutory Liability under 29 U.S.C. § 1307 on account of the Alecto Healthcare Services Ohio Valley LLC Pension Plan. See attached statement.

*Remarks:* (13-1) Unliquidated priority and total amounts claimed

| | | |
|---|---|---|
| *Creditor:* (18513119) | **Claim No: 14** | *Status:* |
| Snyder Brothers, Inc. | *Original Filed Date*: 08/14/2023 | *Filed by:* CR |
| c/o Ronald W. Crouch | *Original Entered Date*: 08/14/2023 | *Entered by:* Richard W. Riley |
| Counsel of Record | | *Modified:* |
| Whiteford Taylor & Preston, LLP | | |
| 11 Stanwix St., Suite 1400 | | |
| Pittsburgh, PA 15222 | | |

Amount claimed: $173848.49

*History:*

Details    14-1   08/14/2023 Claim #14 filed by Snyder Brothers, Inc., Amount claimed: $173848.49 (Riley, Richard)

*Description:* (14-1) Judgment entered against subsidiary for goods sold (Nautural Gas)

*Remarks:* (14-1) Fraudulent Transfer/Alter Ego - See Attached Consent Judgment and Statement

| | | |
|---|---|---|
| *Creditor:* (18513125) | **Claim No: 15** | *Status:* |
| LHP Hospital Group, Inc. | *Original Filed Date*: 08/14/2023 | *Filed by:* CR |
| c/o Saul Ewing, LLP | *Original Entered Date*: 08/14/2023 | *Entered by:* Eric J Taube |
| Attn: Mark Minuti | | *Modified:* |
| 1201 N. Market St., Suite 2300 | | |
| Wilmington, DE 19801 | | |

Amount claimed: $3739635.77

*History:*

Details    15-1   08/14/2023 Claim #15 filed by LHP Hospital Group, Inc., Amount claimed: $3739635.77 (Taube, Eric)

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (18513146) | **Claim No: 16** | *Status:* |
| AIG Property Casualty, Inc. | *Original Filed Date*: 08/15/2023 | *Filed by:* CR |
| Kevin J. Larner, Esq. | *Original Entered Date*: 08/15/2023 | *Entered by:* Dana Burgagni |
| Authorized Representative | | *Modified:* |
| 28 Liberty Street, Floor 22 | | |
| New York, NY 10005 | | |

Amount claimed: $0.00

*History:*

Details    16-1   08/15/2023 Claim #16 filed by AIG Property Casualty, Inc., Amount claimed: $0.00 (Burgagni, Dana)

*Description:* (16-1) Unliquidated

*Remarks:*

**A0082**

Creditor:        (18513192)
Health Carousel Travel Network, LLC
455 Delta Avenue
Suite 108
Cincinnati, OH 45226

**Claim No: 17**
*Original Filed Date*: 08/15/2023
*Original Entered Date*: 08/15/2023

*Status:*
*Filed by:* CR
*Entered by:* EPOC Filer
*Modified:*

  Amount claimed: $93110.57

*History:*

| Details | 17-1 | 08/15/2023 Claim #17 filed by Health Carousel Travel Network, LLC, Amount claimed: $93110.57 (EPOC Filer) |

*Description:*
*Remarks:*

---

Creditor:        (18513199)
Alecto Health Care Services Ohio Valley
LLC, HP
Kamaljit Bains, EBSA Investigator
1835 Market Street
21st Floor-Mailstop EBSA/21
Philadelphia, PA 19103

**Claim No: 18**
*Original Filed Date*: 08/15/2023
*Original Entered Date*: 08/15/2023
*Last Amendment Filed*: 08/23/2023
*Last Amendment Entered*: 08/23/2023

*Status:*
*Filed by:* CR
*Entered by:* EPOC Filer
*Modified:* 08/23/2023

  Amount claimed: $245307.00

*History:*

| Details | 18-1 | 08/15/2023 Claim #18 filed by Alecto Health Care Services Ohio Valley LLC, HP, Amount claimed: $245307.00 (EPOC Filer) |
| Details | 18-2 | 08/23/2023 Amended Claim #18 filed by Alecto Health Care Services Ohio Valley LLC, HP, Amount claimed: $245307.00 (EPOC Filer) |

*Description:*
*Remarks:*

---

Creditor:        (18513225)
Reed Action Judgment Creditors
Bren J. Pomponio
1217 Quarrier Street
Charleston, WV 25301

**Claim No: 19**
*Original Filed Date*: 08/15/2023
*Original Entered Date*: 08/15/2023

*Status:*
*Filed by:* CR
*Entered by:* EPOC Filer
*Modified:*

  Amount claimed: $3275382.64

*History:*

| Details | 19-1 | 08/15/2023 Claim #19 filed by Reed Action Judgment Creditors, Amount claimed: $3275382.64 (EPOC Filer) |

*Description:*
*Remarks:* (19-1) Filer Comment: See addendum

---

Creditor:        (18513245)
Michael Best & Friedrich LLP
c/o Justin M. Mertz
790 N. Water St., Ste. 2500
Milwaukee, WI 53202

**Claim No: 20**
*Original Filed Date*: 08/15/2023
*Original Entered Date*: 08/15/2023

*Status:*
*Filed by:* CR
*Entered by:* EPOC Filer
*Modified:*

  Amount claimed: $53157.76

*History:*

| Details | 20-1 | 08/15/2023 Claim #20 filed by Michael Best & Friedrich LLP, Amount claimed: $53157.76 (EPOC Filer) |

*Description:*
*Remarks:* (20-1) Account Number (last 4 digits):0995

## Claims Register Summary
## A0083

**Case Name:** Alecto Healthcare Services LLC
**Case Number:** 23-10787-JKS
**Chapter:** 11
**Date Filed:** 06/16/2023
**Total Number Of Claims:** 20

| Total Amount Claimed* | $11204720.28 |
|---|---|
| Total Amount Allowed* | |

*Includes general unsecured claims

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

| | Claimed | Allowed |
|---|---|---|
| Secured | | |
| Priority | $166856.05 | |
| Administrative | | |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 11/22/2023 13:46:42 | | | |
| PACER Login: | MorrisJames1873 | Client Code: | 142859.0002 |
| Description: | Claims Register | Search Criteria: | 23-10787-JKS Filed or Entered From: 11/2/2022 Filed or Entered To: 1/2/2024 |
| Billable Pages: | 2 | Cost: | 0.20 |

**A0084**

# **EXHIBIT B**

Purchase Agreement

---

**PURCHASE AGREEMENT**

**by and among**

**SHERMAN/GRAYSON HEALTH SYSTEM, LLC**

**and**

**ALECTO HEALTHCARE SERVICES SHERMAN LLC**

**and**

**with respect to Section 6.12 and Article IX only,**

**LHP HOSPITAL GROUP, INC.,**

**and**

**TEXAS HEALTH RESOURCES**


**Dated as of September 23, 2014**

---

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ....................................................................................................1

    1.1      Defined Terms ............................................................................................1
    1.2      Interpretation ............................................................................................11

ARTICLE II PURCHASE AND SALE; CLOSING ..............................................................12

    2.1      Sale of the Interests ..................................................................................12
    2.2      Pre-Closing Statement ..............................................................................12
    2.3      Purchase Price ..........................................................................................13
    2.4      Post-Closing Purchase Price Adjustment ................................................13
    2.5      Closing .....................................................................................................15
    2.6      Closing Deliveries ...................................................................................15
    2.7      Allocation of Purchase Price. ..................................................................16

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER....................17

    3.1      Organization and Capitalization of the Target Companies and Sherman MD Provider ................17
    3.2      Authorization ...........................................................................................18
    3.3      No Conflicting Agreements; Consents .....................................................19
    3.4      Financial Statements ................................................................................19
    3.5      Absence of Undisclosed Liabilities .........................................................19
    3.6      Absence of Changes .................................................................................20
    3.7      Contracts ..................................................................................................21
    3.8      Real Property ...........................................................................................22
    3.9      Personal Property .....................................................................................22
    3.10    Employees; Labor Matters; Employee Benefit Plans; ERISA .................23
    3.11    Government Program Participation/Accreditation ...................................24
    3.12    Taxes .......................................................................................................25
    3.13    Intellectual Property ................................................................................26
    3.14    Permits .....................................................................................................26
    3.15    Environmental Conditions .......................................................................27
    3.16    Legal Proceedings, Court Orders ............................................................28
    3.17    Insurance .................................................................................................28
    3.18    Compliance with Laws ............................................................................28
    3.19    Medical Staff ...........................................................................................28
    3.20    Brokers ....................................................................................................29
    3.21    Affiliate Transactions ..............................................................................29
    3.22    No Prior Operations ................................................................................29

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ...........29

    4.1      Organization .............................................................................................29
    4.2      Authorization ...........................................................................................30
    4.3      No Conflicting Agreements; Consents .....................................................30
    4.4      Legal Proceedings ...................................................................................31
    4.5      Brokers ....................................................................................................31
    4.6      Sufficient Resources ................................................................................31
    4.7      Investment Representations .....................................................................31
    4.8      Non-Reliance ...........................................................................................31

ARTICLE V COVENANTS OF THE SELLER ....................................................................32

    5.1      Regulatory Approvals ..............................................................................32

| | 5.2 | Conduct Prior to the Closing | 32 |
| | 5.3 | Employee Matters | 33 |
| | 5.4 | Investigation by the Purchaser | 34 |
| | 5.5 | Closing Conditions | 34 |
| | 5.6 | Consultative Process | 34 |
| | 5.7 | INTENTIONALLY OMITTED | 35 |
| | 5.8 | Transition Services | 35 |

**ARTICLE VI COVENANTS OF THE PURCHASER; CERTAIN ADDITIONAL COVENANTS OF THE PARTIES** ......36

| | 6.1 | Confidentiality | 36 |
| | 6.2 | Regulatory Approvals | 36 |
| | 6.3 | Post-Closing Access | 37 |
| | 6.4 | Treatment of Seller and Seller-Affiliate Intellectual Property | 37 |
| | 6.5 | Employee Matters | 38 |
| | 6.6 | Tax Matters | 39 |
| | 6.7 | Maintenance of Services | 41 |
| | 6.8 | Transfer of Certain Assets | 41 |
| | 6.9 | MOB Obligations | 41 |
| | 6.10 | Meaningful Use Payments | 41 |
| | 6.11 | Closing Conditions | 41 |
| | 6.12 | Covenant Not to Compete; Non-Solicitation | 41 |
| | 6.13 | Additional 501(a) Matters | 43 |

**ARTICLE VII CONDITIONS TO OBLIGATIONS OF THE PURCHASER** ......43

| | 7.1 | Representations and Warranties | 43 |
| | 7.2 | Compliance with Agreement | 43 |
| | 7.3 | Closing Certificates | 43 |
| | 7.4 | Consents and Authorizations | 43 |
| | 7.5 | No Action or Proceeding | 44 |
| | 7.6 | Good Standing Certificates | 44 |
| | 7.7 | Title to Real Property | 44 |
| | 7.8 | Excluded Obligations Release | 44 |
| | 7.9 | Adverse Change | 44 |
| | 7.10 | Waiver of Conditions | 44 |

**ARTICLE VIII CONDITIONS TO OBLIGATIONS OF THE SELLER** ......44

| | 8.1 | Representations and Warranties | 44 |
| | 8.2 | Compliance with Agreement | 45 |
| | 8.3 | Closing Certificates | 45 |
| | 8.4 | Consents and Authorizations | 45 |
| | 8.5 | No Action or Proceeding | 45 |
| | 8.6 | Waiver of Conditions | 45 |

**ARTICLE IX INDEMNIFICATION** ......45

| | 9.1 | Survival | 45 |
| | 9.2 | Indemnification by the Seller | 46 |
| | 9.3 | Indemnification by the Purchaser | 46 |
| | 9.4 | Limitations on Claims | 47 |
| | 9.5 | Claims Procedures | 48 |
| | 9.6 | Subrogation | 49 |
| | 9.7 | Guarantee | 49 |
| | 9.8 | Limitation on Damages | 49 |
| | 9.9 | Exclusive Remedy | 49 |

ARTICLE X TERMINATION ...................................................................................................... 50

    10.1    Termination Events ............................................................................................ 50
    10.2    Effect of Termination ........................................................................................ 50

ARTICLE XI NOTICES ............................................................................................................. 51

    11.1    Notices ................................................................................................................ 51

ARTICLE XII MISCELLANEOUS ............................................................................................ 52

    12.1    Fees and Expenses ............................................................................................. 52
    12.2    Entire Agreement .............................................................................................. 52
    12.3    Waiver ................................................................................................................ 52
    12.4    Amendment ........................................................................................................ 52
    12.5    Counterparts; Facsimile Signatures; Reproductions ....................................... 53
    12.6    No Third Party Beneficiary .............................................................................. 53
    12.7    GOVERNING LAW, CONSTRUCTION ........................................................ 53
    12.8    Binding Effect ................................................................................................... 53
    12.9    No Assignment ................................................................................................... 53
    12.10   Headings, Gender, Etc ...................................................................................... 54
    12.11   Public Announcement ....................................................................................... 54
    12.12   Severability; Invalid Provisions ....................................................................... 54
    12.13   Venue ................................................................................................................. 54
    12.14   WAIVERS OF TRIAL BY JURY ................................................................... 54
    12.15   No Inferences .................................................................................................... 55
    12.16   Tax and Government Program Advice and Reliance ....................................... 55
    12.17   Further Assurance Clause .................................................................................. 55
    12.18   Specific Performance ........................................................................................ 55

**List of Exhibits:**

| | |
|---|---|
| Exhibit A | Form of Excluded Obligations Release |
| Exhibit B | Knowledge Parties |
| Exhibit C | Net Working Capital Methodology |
| Exhibit D | Target Company Ownership Interests |
| Exhibit E | Required Activities |

**List of Schedules:**

| | |
|---|---|
| Schedule 1.1 | Permitted Encumbrances |
| Schedule 1.2 | Space Leases |
| Schedule 5.1 | Seller Governmental Approvals |
| Schedule 5.2 | Operations During the Executory Period |
| Schedule 5.8(b) | Transition Services |
| Schedule 5.8(c) | Service Contracts |
| Schedule 6.2 | Purchaser Governmental Approvals |
| Schedule 6.4 | Certain Intellectual Property |
| Schedule 6.8 | Certain Assets |
| Schedule 6.13 | 501(a) Assigned Agreements |
| Schedule 7.4(a) | Seller Required Consents |
| Schedule 8.4(a) | Purchaser Required Consents |

## PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of September 23, 2014, by and among Sherman/Grayson Health System, LLC, a Texas limited liability company (the "Seller"), and Alecto Healthcare Services Sherman LLC, a Delaware limited liability company (the "Purchaser"), and with respect to Section 6.12 and Article IX only, LHP Hospital Group, Inc., a Delaware corporation ("LHP"), and Texas Health Resources, a Texas non-profit corporation ("THR" and, together with LHP, the "Seller Guarantors").  The Seller and the Purchaser are sometimes referred to herein individually as a "Party" and together as the "Parties."

## R E C I T A L S :

A.     The Seller is the sole member and owner of all of the issued and outstanding membership interests of (i) (a) Sherman/Grayson Hospital, LLC, a Texas limited liability company ("Sherman Hospital"), which owns and operates Texas Health Presbyterian Hospital - WNJ (the "Facility") and (b) Sherman/Grayson Health Services, LLC, a Texas limited liability company ("Sherman Services") (the membership interests of Sherman Hospital and Sherman Services, together, the "Hospital Interests") and (ii) Sherman/Grayson Sponsor, LLC, a Texas limited liability company ("Sherman Sponsor" and, together with the Sherman Hospital and Sherman Services, the "Target Companies") (the membership interests of Sherman Sponsor, the "Sponsor Interests" and, together with the Hospital Interests, the "Interests").

B.     Upon the terms and subject to the conditions set forth herein, the Purchaser desires to purchase from the Seller, and the Seller desires to sell to the Purchaser, all of the Interests.

**NOW, THEREFORE**, in consideration of the foregoing premises, the mutual covenants and other agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Defined Terms.

As used in this Agreement, the following defined terms shall have the meanings indicated below:

"501(a) Assigned Agreements" has the meaning set forth in Section 6.13.

"501(a) Certification Date" means the date two Business Days following the date upon which Seller receives notice that Sherman MD Provider has been certified by the Texas Medical Board as a "501(a)" entity organized pursuant to Section 162.001(b) of the Texas Occupations Code.

"501(a) Certification Time" means 11:59 p.m., Central Time, on the 501(a) Certification Date.

"Accountant" has the meaning set forth in Section 2.4(c).

"Actionable Breach" means, subject to the satisfaction or waiver (by the Party for whom such condition may be waived) of the conditions set forth in Article VII and Article VIII (other than those items that by their terms are to be satisfied at Closing), the failure of either of the Parties to promptly close in accordance with Section 2.5.

"Actual Fraud" means, with respect to a Party, the actual fraud of such Party, with the actual intent to deceive, and, for the avoidance of doubt, shall not include constructive fraud.

"Adjustment Amount" means the net amount (which may be positive or negative) of all increases or decreases to the Closing Date Consideration pursuant to Section 2.4(d).

"Administrative Personnel" has the meaning set forth in Section 6.5(a).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. For the purposes of this definition, "control", when used with respect to any specified Person, means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Affiliation Agreement" means that certain Affiliation Agreement by and between LHP Texas MD Services, Inc., and Sherman/Grayson Hospital, LLC dated September 1, 2014.

"Agreement" has the meaning set forth in the preamble.

"Allocation Dispute Notice" has the meaning set forth in Section 2.7(b).

"Allocation Statement" has the meaning set forth in Section 2.7(b).

"Balance Sheet Date" has the meaning set forth in Section 3.4.

"Base Purchase Price" means $32,500,000.

"Books and Records" means all existing patient, medical staff, employee, accounting, business, marketing, corporate, limited liability company and other files, documents, instruments, papers, books and records, including without limitation, financial statements, budgets, ledgers, journals, deeds, titles, policies, manuals, minute books, stock certificates and books, equity transfer ledgers, contracts, franchises, permits, supplier lists, reports, computer files and data, retrieval programs and operating data or plans.

"Business" means the business and operations conducted by the Target Companies, including the business and operations of the Facility.

"Business Day" means a day other than Saturday, Sunday, or any day on which the principal commercial banks located in the State of Texas are authorized or obligated to close under the Laws of such states.

"<u>Cash and Cash Equivalents</u>" means the sum of (a) without duplication, all of the Target Companies' cash, bank deposits, marketable securities, certificates of deposit, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, plus (b) the aggregate amount of all checks, drafts and other bank deposits received by the Target Companies but not yet credited to the bank accounts of the Target Companies, minus (c) any outstanding checks or transfers at such time.

"<u>Claim</u>" has the meaning set forth in <u>Section 9.5</u>.

"<u>Closing</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Closing Date Consideration</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Closing Date Net Indebtedness</u>" means the Cash and Cash Equivalents of the Target Companies <u>minus</u> the Indebtedness of the Target Companies, in each case measured as of 11:59 pm CT on the day prior to Closing.  For the avoidance of doubt, the resultant amount may be a positive or negative number.

"<u>Closing Statement</u>" has the meaning set forth in <u>Section 2.4(a)</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"<u>Confidentiality Agreement</u>" means that certain Confidentiality Agreement between LHP Hospital Group, Inc. and Alecto Healthcare Services LLC, an affiliate of Purchaser, dated June 20, 2014.

"<u>Constituent Documents</u>" means, for any corporation, partnership, limited partnership, limited liability company or other organization, its charter, articles of incorporation, certificate of incorporation, bylaws, partnership agreement, operating agreement, certificate of limited partnership, certificate of formation or other similar formation and governance documents, as applicable, each as amended to the relevant date.

"<u>Contract</u>" means any agreement, Lease, license, sublicense, promissory note, evidence of Indebtedness, or other contract to which any of the Target Companies is a party, or by which the Target Companies or the assets of either of the Target Companies are bound.

"<u>Counterparty</u>" has the meaning set forth in <u>Section 5.8(c)</u>.

"<u>Court Order</u>" means any judgment, order, award or decree of any federal, state, local or other court or judicial or quasi-judicial tribunal and any award in any binding arbitration proceeding.

"<u>Damages</u>" means any and all losses, damages, claims, costs, fines, fees, penalties, interest obligations and deficiencies (including, without limitation, reasonable attorney's fees and other expenses of litigation).

"Effective Time" has the meaning set forth in Section 2.5.

"EHR Incentive Program" has the meaning set forth in Section 6.10.

"Employee Benefit Plans" has the meaning set forth in Section 3.10(c).

"Employee Lease Agreement" means that certain Employee Lease Agreement by and between LHP Sherman/Grayson, LLC and Sherman/Grayson Hospital, LLC dated May 1, 2010.

"Employees" has the meaning set forth in Section 3.10(i).

"Encumbrance" means any mortgage, pledge, assessment, security interest, lease, sublease, lien, adverse claim, levy, right of way, easement, covenant, charge or other encumbrance of any kind, or any conditional sale contract, title retention contract, or other contract to give or to refrain from giving any of the foregoing.

"Environmental Claim" means any claim, action, suit, order, cause of action, investigation, written notice or other legal proceeding by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or penalties) arising out of, based on or resulting from the violation of any Environmental Law or any obligation arising under any Environmental Law.

"Environmental Laws" means the federal, state, regional, county or local environmental laws, regulations, ordinances, rules and policies and common law in effect on the date hereof and as of the Effective Time relating to the use, refinement, handling, treatment, removal, storage, production, manufacture, transportation or disposal, emission, discharge, release or threatened release of Hazardous Substances, or otherwise relating to protection of human health or safety or the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata), as the same may be amended or modified to the date hereof and as of the Effective Time.

"ERISA" has the meaning set forth in Section 3.10(c).

"ERISA Controlled Group" has the meaning set forth in Section 3.10(d).

"Estimated Closing Date Net Indebtedness" has the meaning set forth in Section 2.2.

"Estimated Net Working Capital" has the meaning set forth in Section 2.2.

"Estimated Unpaid Transaction Expenses" has the meaning set forth in Section 2.2.

"Exchange Act" means the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Obligations" means (i) the liabilities of the Target Companies for any management fees due Seller, the Seller Guarantors, and any Affiliates of Seller and the Seller Guarantors; (ii) the liabilities of the Target Companies for any administrative and royalty fees

due THR or its Affiliates; and (iii) the liabilities of the Target Companies for any intercompany advances, loans, or other amounts due to LHP or its subsidiaries; provided, however, (i) none of the obligations of the Parties or the Seller Guarantors set forth herein shall be deemed "Excluded Obligations", including, without limitation, the obligations of Purchaser pursuant to Section 6.13 and (ii) none of the obligations arising under the Affiliation Agreement or the Employee Lease Agreement, other than obligations for fees for services provided or reimbursement of expenses and losses incurred prior to the Effective Time, shall be deemed "Excluded Obligations."

"Excluded Obligations Release" means the release, substantially in the form attached hereto as Exhibit A, duly executed by Seller and/or the Seller Guarantors (on behalf of itself and its Affiliates), as applicable, that release the Target Companies from the Excluded Obligations.

"Facility" has the meaning set forth in Recital A.

"Final Net Indebtedness" has the meaning set forth in Section 2.4(d).

"Final Net Working Capital" has the meaning set forth in Section 2.4(d).

"Final Purchase Price" has the meaning set forth in Section 2.3.

"Final Unpaid Transaction Expenses" has the meaning set forth in Section 2.4(d).

"Financial Statements" has the meaning set forth in Section 3.4.

"Fundamental Reps Survival Period" has the meaning set forth in Section 9.1.

"Fundamental Representations" means the representations and warranties contained in Sections 3.1, 3.2 and 3.20 of this Agreement.

"GAAP" means generally accepted accounting principles in the United States, as consistently applied by the Target Companies.

"Governmental Authority" means any national, state or local government, any political subdivision thereof or any other governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body, agency, department, bureau, commission or entity, or any arbitrator with authority to bind a party at law.

"Government Programs" has the meaning set forth in Section 3.11(a).

"Ground Lease" means that certain Ground Lease Agreement (300 N. Highland Dr., Sherman, TX), effective as of August 21, 2012, by and between Sherman/Grayson Hospital, LLC and Altera Highland LLC.

"Guarantee" means that certain Guarantee, dated as of the date hereof, by and between Guarantor, the Seller and LHP.

"Guarantor" means Alecto Healthcare Services LLC.

"Hazardous Substances" means any toxic, radioactive, infectious or hazardous waste, pollutants or substances, including, without limitations, friable asbestos, polychlorinated biphenyls, petroleum products, byproducts, or other hydrocarbon substances, substances defined or listed as a "hazardous substance," "extremely hazardous substance," "toxic substance," "toxic pollutant," "medical waste," "special waste," "hazardous waste," "contaminant," or similarly identified substance or mixture, in or pursuant to any Environmental Law.

"Hired Employees" has the meaning set forth in Section 6.5(a)(ii).

"Hospital Interests" has the meaning set forth in Recital A.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indebtedness" shall mean, with respect to the Target Companies, the aggregate amount (including the current portions thereof) of (i) indebtedness for borrowed money or indebtedness issued in substitution or exchange for borrowed money or for the deferred purchase price of property or services (other than trade payables and accrued expenses arising in the ordinary course of business); (ii) indebtedness of the type described in clause (i) above guaranteed in any manner or in effect guaranteed, directly or indirectly, through an agreement, contingent or otherwise, to supply funds to, or in any other manner invest in, the debtor, or to purchase indebtedness, or to purchase and pay for property if not delivered or pay for services if not performed, primarily or exclusively, for the purpose of enabling the debtor to make payment of the indebtedness or to insure the owners of the indebtedness against loss; (iii) all indebtedness of the type described in clauses (i) and (ii) above secured by any Encumbrances upon property and assets owned by a Target Company, even if such Target Company has not in any manner become liable for the payment of such indebtedness; and (iv) obligations of a Target Company to pay rent or other amounts under any lease of (or other arrangement covering the right to use) real or personal property, but only if such obligations are classified and accounted for as capital leases on a balance sheet as of the Balance Sheet Date of such Target Company.  For the avoidance of doubt, no liability associated with the MOB, whether in respect of the Ground Lease, the Space Leases, or otherwise, shall be treated as Indebtedness.

"Indemnifying Party" has the meaning set forth in Section 9.5.

"Indemnitee" has the meaning set forth in Section 9.5.

"Intellectual Property" has the meaning set forth in Section 3.13.

"Interests" has the meaning set forth in Recital A.

"Knowledge of the Seller" (and any similar expression, including, the expression the "Seller's Knowledge") means, as to a particular matter, the actual knowledge of any Person specified with respect to the Seller on Exhibit B.

"Knowledge of the Purchaser" (and any similar expression, including the expression the "Purchaser's Knowledge") means, as to a particular matter, the actual knowledge of any Person specified with respect to the Purchaser on Exhibit B.

"<u>Laws</u>" means all statutes, laws, ordinances, regulations and other pronouncements of any Governmental Authority having the effect of law of the United States, any state or commonwealth of the United States, or any city, county, municipality, department, commission, board, bureau, agency or instrumentality thereof.

"<u>Lease Indemnities</u>" has the meaning set forth in <u>Section 6.9</u>.

"<u>Leased Real Property</u>" has the meaning set forth in <u>Section 3.8(b)</u>.

"<u>Leases</u>" mean (a) all of those leases, subleases and occupancy agreements to which any of the Target Companies is a party as the lessee/tenant or sublessee/subtenant of any portion of the Real Property, and (b) all the following agreements to which any of the Target Companies is a party as the landlord/lessor or sublandlord/sublessor of any portion of the Real Property:  (i) leases of land to third-party developers or owners in connection with the development, construction or ownership of health care related projects at the Facility; (ii) medical office leases, subleases and occupancy agreements; (iii) leases, subleases and occupancy agreements for other medical uses, services or facilities or other uses related to the Business; and (iv)  leases, subleases and occupancy agreements for food services and other ancillary services at the Facility, including as examples and not as limitations, wireless communication services, gift shops, pharmacies or florist shops.

"<u>LHP</u>" has the meaning set forth in the preamble.

"<u>LHP MD Provider</u>" has the meaning set forth in <u>Section 6.5(a)</u>.

"<u>Material Adverse Effect</u>" means any event, change, effect, development, state of facts, condition, circumstance or occurrence (collectively, a "<u>Change</u>") that (a) has or would be reasonably expected to have a material adverse effect upon the financial condition, business, or results of operations of the Target Companies, taken as a whole; <u>provided</u>, <u>however</u>, that any adverse Change arising from or related to the following (by itself or when aggregated or taken together with any and all other Changes) shall not be deemed to be or constitute a Material Adverse Effect and shall not be taken into account in determining whether a Material Adverse Effect has occurred (i) Changes affecting the economy generally or affecting the healthcare industry generally, (ii) any Changes to national or international political conditions, including the engagement or escalation by the United States or any other country in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or escalation of any military or terrorist attack upon the United States or any other country, or any of their respective territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States or any other country, (iii) Changes in weather, meteorological conditions or climate, pandemics, or natural disasters (including hurricanes, storms, tornados, flooding, earthquakes, volcanic eruptions or similar occurrences) affecting the Business of the Target Companies, (iv) Changes in GAAP, (v) Changes in any laws, rules, regulations, orders, or other binding directives issued by any Governmental Authority or any action required to be taken under any law, rule, regulation, order (actual or proposed) applicable to the Target Companies, (vi) the public announcement or pendency of the transactions contemplated by this Agreement (including the public announcement of the identity of Purchaser or its Affiliates), (vii) any failure, in and of itself, by the Target Companies to meet any internal

or published projections, forecasts, predictions or guidance relating to revenues, income, cash position, cash-flow or other financial measure (<u>provided</u> that the exception in this clause (vii) shall not prevent or otherwise affect a determination that any Change underlying such failure not otherwise excluded from the definition of "Material Adverse Effect" has resulted in or contributed to a Material Adverse Effect), (viii) seasonal fluctuations in the Business consistent with prior fiscal years, (ix) any Changes to requirements, reimbursement rates, policies or procedures of third party payors (including Government Programs) or accreditation commissions or organizations that are generally applicable to hospitals or health care facilities, or (x) the taking of any action or omission required by this Agreement and/or the other agreements contemplated hereby or requested or authorized by Purchaser, including the completion of the transactions contemplated hereby and thereby (including the impact thereof on relations (contractual or otherwise) with, or actual, potential or threatened loss or impairment of, physicians, employees, patients, customers, suppliers, distributors or others having relationships with the Target Companies), except to the extent such Change arising from or related to the matters described in clauses (i), (ii) or (iv) disproportionately affects the Target Companies, taken as a whole, as compared to other companies operating in the healthcare industry (but only to the extent of the incremental disproportionate effect on the Target Companies compared to other companies operating in the healthcare industry), or (b) would prevent or materially impede, interfere with, hinder or delay the consummation by the Seller of this Agreement and the other transactions contemplated hereby.

"<u>Material Contracts</u>" has the meaning set forth in <u>Section 3.7(a)</u>.

"<u>Meaningful Use Payments</u>" has the meaning set forth in <u>Section 6.10.</u>

"<u>Medicaid</u>" has the meaning set forth in <u>Section 3.11(a)</u>.

"<u>Medical Personnel</u>" has the meaning set forth in <u>Section 6.5(a)</u>.

"<u>Medicare</u>" has the meaning set forth in <u>Section 3.11(a)</u>.

"<u>MOB</u>" means that certain medical office building located at 300 N. Highland Drive, Sherman, Texas.

"<u>Multi-Site Services Contract</u>" has the meaning set forth in <u>Section 5.8(c)</u>.

"<u>Net Working Capital</u>" means the excess of the Target Companies' current assets (excluding (x) Cash and Cash Equivalents, (y) Tax assets and (z) Meaningful Use Payments) over the Target Companies' current liabilities (excluding (v) Indebtedness, (x) Tax liabilities, (y) any Unpaid Transaction Expenses and (z) any Excluded Obligations), each as determined in accordance with the methodology set forth on <u>Exhibit C</u> as of 11:59 pm CT on the date prior to Closing.

"<u>Net Working Capital Adjustment Amount</u>" shall mean Estimated Net Working Capital <u>minus</u> the Target Net Working Capital.  For the avoidance of doubt, the resultant amount may be a positive or negative number.

"<u>Objection Notice</u>" has the meaning set forth in <u>Section 2.4(c)</u>.

"Optional Termination Date" means November 30, 2014.

"Owned Real Property" has the meaning set forth in Section 3.8(a).

"Party" and "Parties" have the meaning set forth in the preamble.

"Percentage Obligations" means, with respect to LHP, 68%, and with respect to THR, 32%.

"Permits" means all licenses, permits, franchises, rights, registrations, approvals, authorizations, consents, waivers, exemptions, releases, variances or orders of, or filings with, or otherwise issued by, any Governmental Authority.

"Permitted Encumbrance" means any of the following: (i) statutory Encumbrances for Taxes, assessments and governmental charges or levies either not yet due and delinquent or which are being contested in good faith; (ii) statutory mechanics, carriers', workmen's, warehouseman's, repairmen's, materialmen's or other similar Encumbrances or security interests for obligations not yet past due and that do not materially detract from the value or materially interfere with the present use of the property or assets subject thereto or affected thereby; (iii) Encumbrances to secure obligations to landlords, lessors or renters under leases or rental agreements or underlying leased property; (iv) easements and rights of way; (v) any conditions that would be disclosed by a survey or physical inspection of the Real Property; (vi) Encumbrances imposed by Law; (vii) Encumbrances that, individually or in the aggregate, do not, and would not reasonably be expected to materially detract from the value or materially interfere with the present use of the property or asset subject thereto or affected thereby; (viii); and (ix) Encumbrances set forth on Schedule 1.1 of the Schedule of Exceptions.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability company, union, association, court, agency, government, tribunal, instrumentality, commission, arbitrator, board, bureau or other entity or authority.

"Personnel" has the meaning set forth in Section 6.5(a).

"Personnel Providers" has the meaning set forth in Section 6.5(a).

"Post-Closing Covenants Survival Period" has the meaning set forth in Section 9.1.

"Pre-Closing Period" has the meaning set forth in Section 6.6(a)(i).

"Pre-Closing Statement" has the meaning set forth in Section 2.2.

"Proceeding" has the meaning set forth in Section 6.6(d).

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Indemnitee" has the meaning set forth in Section 9.2.

"Real Property" means all real property held by any of the Target Companies that is used in the operation of the Business.

"Returns" means all reports, estimates, declarations, schedules, disclosures, information statements, claims for refunds and returns relating to, or required to be filed in connection with, any Taxes, including any amendments thereto.

"Revised Statements" has the meaning set forth in Section 2.7(b).

"Schedule of Exceptions" means the Schedule of Exceptions accompanying this Agreement.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller Indemnitee" has the meaning set forth in Section 9.3.

"Seller" has the meaning set forth in the preamble.

"Seller Guarantors" has the meaning set forth in the preamble.

"Service Providers" has the meaning set forth in Section 5.8(b).

"Services" has the meaning set forth in Section 5.8(b).

"Services Assignor" has the meaning set forth in Section 5.8(c).

"Services Contracts" has the meaning set forth in Section 5.8(c).

"Services Date" has the meaning set forth in Section 6.7.

"Sherman Hospital" has the meaning set forth in Recital A.

"Sherman MD Provider" means Sherman MD Provider, Inc., a Texas corporation.

"Sherman Services" has the meaning set forth in Recital A.

"Sherman Sponsor" has the meaning set forth in Recital A.

"Space Leases" means those certain leases set forth on Schedule 1.2 by and between Sherman/Grayson Health System, LLC and Altera Highland LLC.

"Sponsor Interests" has the meaning set forth in Recital A.

"Staff Providers" has the meaning set forth in Section 3.10(a).

"Straddle Period" means any taxable period that includes but does not end on the Closing Date.

"Survival Period" has the meaning set forth in Section 9.1.

"Target Companies" has the meaning set forth in Recital A.

"Target Net Working Capital" means $5,565,000.

"Tax" or "Taxes" means any net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, franchise, capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, custom duty, transfer, documentary or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Taxing Authority.

"Tax Return" means any return, report, declaration, form, claim for refund, or information return or statement required to be filed with any Governmental Authority relating to Taxes, including estimated tax returns, income tax returns, information returns, withholding returns, employment tax returns, and any schedule or attachment thereto or any amendment thereto.

"Taxing Authority" means any applicable Governmental Authority responsible for the imposition of Taxes.

"Title Policy" has the meaning set forth in Section 7.7.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other Closing documents entered into or delivered by any Party on or after the date hereof pursuant to the terms of this Agreement.

"Unpaid Transaction Expenses" means, to the extent not paid prior to the Closing, any unpaid costs and expenses (including legal, accounting and investment banking fees and expenses) incurred by or on behalf of the Target Companies in connection with the negotiation, execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby. For the avoidance of doubt, amounts payable by the Seller for which the Target Companies are not liable shall not constitute Unpaid Transaction Expenses.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101 et. seq.

"Willful Breach" means an action or failure to act by one of the parties hereto that constitutes a breach of this Agreement, and such action was taken or such failure occurred with such party's knowledge or intention that such action or failure to act would reasonably be expected to constitute a breach of this Agreement.

1.2    Interpretation. The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this

- 11 -
**A0100**

Agreement unless otherwise specified.   Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."   All terms defined in this Agreement shall have the defined meanings contained herein when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.   The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.  Any reference to this Agreement includes the Agreement, as well as any exhibits or schedules hereto.  Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, qualified or supplemented, including (in the case of agreements and instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.

## ARTICLE II
## PURCHASE AND SALE; CLOSING

2.1    <u>Sale of the Interests</u>.

(a)    On and subject to the terms and conditions set forth in this Agreement, at the Closing, the Seller shall sell, assign, transfer and deliver to the Purchaser, free and clear of any Encumbrances  (other than applicable securities Laws), and the Purchaser shall purchase from the Seller, the Hospital Interests.  At the Closing, title to the Hospital Interests shall pass free and clear of any Encumbrances (other than applicable securities Laws) to the Purchaser. The Purchaser shall then be entitled to all rights, including, without limitation, voting rights, as the sole owner of the Hospital Interests.

(b)    On and subject to the terms and conditions set forth in this Agreement, on the 501(a) Certification Date, the Seller shall sell, assign, transfer and deliver to the Purchaser, free and clear of any Encumbrances  (other than applicable securities Laws), and the Purchaser shall purchase from the Seller, the Sponsor Interests.  On the 501(a) Certification Date, title to the Sponsor Interests shall pass free and clear of any Encumbrances (other than applicable securities Laws) to the Purchaser.  The Purchaser shall then be entitled to all rights, including, without limitation, voting rights, as the sole owner of the Sponsor Interests.

2.2    <u>Pre-Closing Statement</u>.  Not more than five (5) Business Days but in no event less than two (2) Business Days prior to the Closing, the Seller shall deliver to the Purchaser a written statement (the "<u>Pre-Closing Statement</u>"), based upon the books and records of the Target Companies, which shall set forth the Seller's good faith estimate of (i) Net Working Capital (as may be further adjusted pursuant to <u>Section 2.4(a)</u>, "<u>Estimated Net Working Capital</u>"), (ii) the Closing Date Net Indebtedness ("<u>Estimated Closing Date Net Indebtedness</u>"), together with pay-off letters for any Indebtedness to be repaid at Closing ("<u>Pay-Off Letters</u>"), (iii) the Unpaid Transaction Expenses ("<u>Estimated Unpaid Transaction Expenses</u>") (and wire instructions for the payment thereof) and (iv) the Closing Date Consideration, in each case in accordance with the definition thereof.

2.3    Purchase Price.  The consideration to be paid by the Purchaser to Seller at Closing shall be an amount equal to (i) the Base Purchase Price, plus (ii) the Estimated Closing Date Net Indebtedness, plus (iii) the Net Working Capital Adjustment Amount minus (iii) the Unpaid Transaction Expenses (such amount, the "Closing Date Consideration").  The Closing Date Consideration shall be subject to adjustment after the Closing Date pursuant to Section 2.4, and the aggregate amount, as so adjusted (or not adjusted) after application of the provisions of Section 2.4, is referred to herein as the "Final Purchase Price".

2.4    Post-Closing Purchase Price Adjustment.

(a)    As promptly as practicable, but in no event later than forty-five (45) days following the Closing, Purchaser shall in good faith prepare and deliver to the Seller a written statement (the "Closing Statement"), based upon the books and records of the Target Companies, which shall set forth Purchaser's calculation of (i) Net Working Capital (it being understood and agreed that Net Working Capital shall be used to measure changes in Net Working Capital and not as a form of indemnification and in furtherance of the foregoing, to the extent Purchaser asserts there is a current liability under this Section 2.4 that was not reflected in the calculation of the Target Net Working Capital, the Target Net Working Capital shall be recalculated in accordance with the definitions of Net Working Capital and Target Net Working Capital and the methodology set forth on Exhibit C to reflect such current liability to the extent such current liability is included in the calculation of Final Net Working Capital), (ii) the adjustments to the Target Net Working Capital pursuant to clause (i) above and the resultant adjustments to Estimated Net Working Capital (which shall be recalculated to reflect such adjustments), (iii) Closing Date Net Indebtedness, (iv) Unpaid Transaction Expenses, and (v) the Final Purchase Price based upon such items.  No actions taken by Purchaser on its own behalf or on behalf of the Target Companies, at or following the Closing, shall be given effect for purposes of determining the Final Net Working Capital.  Purchaser shall not add items or increase any amounts on the Closing Statement after it is delivered to Seller.

(b)    If Purchaser's calculation of the Adjustment Amount is positive, Purchaser shall immediately pay to the Seller such positive Adjustment Amount.

(c)    After receipt of the Closing Statement, the Seller and its representatives shall have reasonable access to all relevant books and records (including accountant work papers), accountants and employees of the Target Companies solely for the purpose of reviewing the Closing Statement in accordance with this Agreement and to the extent reasonably necessary to complete its review of the Closing Statement in a manner not to interfere unreasonably with the conduct of Purchaser's or the Target Companies' business.  If, within forty-five (45) days following the delivery of the Closing Statement, the Seller has not given Purchaser notice of its objection to any item in the Closing Statement reasonably detailing the basis of such objection (an "Objection Notice"), then the Closing Statement shall be deemed final and binding on Purchaser and Seller.  If the Seller delivers an Objection Notice, then Purchaser and Seller shall consult in good faith to resolve the disputed items set forth in the Objection Notice and, if any disputed items have not been resolved within thirty (30) days following delivery of such notice, from and after such time either the Seller or Purchaser may submit the remaining disputed items to the Dallas, Texas office of Grant Thornton LLP or, if such firm is unable to serve in such capacity, to such other nationally recognized independent accounting firm that is mutually

agreeable to the Seller and Purchaser (the "Accountant") or, if no such agreement can be reached, the Seller and Purchaser each shall, within ten (10) days thereof, select a candidate for the Accountant and the two candidates so selected shall promptly select a third nationally recognized independent accounting firm which shall be appointed as the Accountant.  The scope of the disputes to be resolved by the Accountant shall be limited to fixing mathematical errors and determining whether the items in dispute were determined in accordance with the definitions of Cash and Cash Equivalents, Indebtedness, Net Working Capital and Target Net Working Capital and the methodology set forth on Exhibit C without regard to materiality, and the Accountant is not to make any other determination and shall act as an arbitrator and not as an expert.  If any items in dispute are submitted to the Accountant for resolution: (x) Seller and Purchaser shall use their respective reasonable efforts to cause the Accountant to resolve all remaining disagreements with respect to the Closing Statement as soon as practicable but in any event shall direct the Accountant to render a determination within ninety (90) days after its retention; (y) Seller and Purchaser shall furnish to the Accountant and each other such work papers and other documents and information relating solely to the disputed issues as the Accountant may request and are available to that party (including, in the case of Purchaser, the Target Companies or their accountants), and shall be afforded the opportunity to present to the Accountant any materials relating to the determination and to discuss the determination with the Accountant, provided that copies of all such materials are concurrently provided to the other party and that such discussions may only occur in the presence (including by telephone) of the other party, provided further that the Accountant shall consider only those items and amounts which are identified as being in dispute; and (z) the determination by the Accountant of the disputed items in the Closing Statement, as shall be set forth in a notice delivered to both parties by the Accountant, shall be binding and conclusive on the parties.  In resolving any disputed item, the Accountant may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party. The fees of the Accountant for such determination shall be borne by Purchaser, on the one hand, and the Seller, on the other hand, in proportion to the portion of the aggregate amount in dispute that is finally resolved by the Accountant in a manner adverse to such party.  For example, if Purchaser claims the appropriate adjustments are $1,000, and the Seller contests $500 of the amount claimed by Purchaser, and if the Accountant ultimately resolves the dispute by awarding Purchaser $300 of the $500 contested, then the costs and expenses of the Accountant will be allocated 60% (i.e., 300/500) to the Seller and 40% (i.e., 200/500) to Purchaser.

(d)     The Closing Date Consideration shall be adjusted as follows (without duplication): (i)(A) increased by the amount, if any, by which the Net Working Capital, as finally determined ("Final Net Working Capital"), is greater than 110% of the Estimated Working Capital or (B) reduced by the amount, if any, by which the Final Net Working Capital is less than 90% of the Estimated Working Capital; (ii)(A) reduced by the amount, if any, by which the Closing Date Net Indebtedness, as finally determined ("Final Net Indebtedness") is less than the Estimated Closing Date Net Indebtedness or (B) increased by the amount, if any, by which the Final Net Indebtedness is greater than the Estimated Closing Date Net Indebtedness (for purposes of clarity and the avoidance of doubt, if Final Net Indebtedness is equal to -$500 and Estimated Closing Date Net Indebtedness is -$400, then Closing Date Consideration shall be decreased by $100, and if the Final Net Indebtedness is -$400 and Estimated Close Date Net Indebtedness is -$500, then Closing Date Consideration shall be increased by $100); and/or (iii)(A) reduced by the amount, if any, by which the Unpaid Transaction Expenses, as finally

determined ("Final Unpaid Transaction Expenses") are greater than the Estimated Unpaid Transaction Expenses or (B) increased by the amount, if any, by which the Final Unpaid Transaction Expenses are less than the Estimated Unpaid Transaction Expenses.

(e)     No later than the second Business Day following the final determination of the Adjustment Amount:

(i)     if the Adjustment Amount is greater than the amount (if any) actually paid by the Purchaser pursuant to Section 2.4(b), Purchaser shall pay such difference to Seller; or

(ii)     if the Adjustment Amount is negative, Seller shall pay such negative amount to Purchaser.

For the avoidance of doubt, if the Adjustment Amount is zero then no payment shall be made by either Party pursuant to this Section 2.4 (except as may be required by the penultimate sentence of Section 2.4(c)).

(f)     The Adjustment Amount shall be treated as an adjustment to the Closing Date Consideration for income tax purposes.

2.5     Closing.  The closing of the sale of the Hospital Interests (the "Closing") will take place at the offices of Weil, Gotshal & Manges LLP in Dallas, Texas, or such other place as shall be mutually agreed upon by the parties hereto, at 10:00 a.m., Central Time, on the later of (i) the earliest practicable Business Day following the satisfaction (or due waiver) of the conditions set forth in Articles VII and VIII and (ii) October 31, 2014, or such other date as may be mutually agreed upon by the parties hereto.  The date on which the Closing takes place is referred to herein as the "Closing Date."  The Closing shall be deemed to occur at 11:59 p.m., Central Time, on the Closing Date or at such other time as shall be mutually agreed upon in writing by the parties hereto.  The time at which the transactions contemplated hereby are deemed to become effective is referred to herein as the "Effective Time".

2.6     Closing Deliveries.  At the Closing, the following events will occur:

(a)     The Purchaser shall pay, or cause to be paid, the following amounts:

(i)     The Indebtedness evidenced by Pay-Off Letters to the applicable recipients thereof as set forth on the Pre-Closing Statement;

(ii)     the Estimated Unpaid Transaction Expenses to the applicable recipients thereof as set forth on the Pre-Closing Statement; and

(iii)     the Closing Date Consideration shall be delivered in immediately available funds by wire transfer to the Seller, in accordance with written instructions provided by the Seller to the Purchaser at least two (2) Business Days prior to the Closing Date.

(b)     Closing Certificates and Documents.

- 15 -

(i)     The Seller shall deliver the other certificates and documents required to be delivered by the Seller pursuant to <u>Article VII</u>;

(ii)    The Seller shall deliver an affidavit, in customary form, confirming that the Seller is not a "foreign person" under Section 1445 of the Code; and

(iii)   The Purchaser shall deliver the other certificates and documents required to be delivered by the Purchaser pursuant to <u>Article VIII</u>.

2.7     <u>Allocation of Purchase Price.</u>

(a)     Purchaser and the Seller agree that, for federal income tax purposes, the transactions contemplated by this Agreement shall be treated as a sale by Seller to Purchaser of the assets owned by the Target Companies, and shall report the purchase and sale on all federal income Tax Returns consistent with such treatment.

(b)     Not later than ninety (90) days after the Closing Date, the Seller shall prepare or cause to be prepared and delivered to Purchaser for its review a schedule allocating the Closing Date Consideration, and any liabilities of the Target Companies to the extent such liabilities are required to be treated as part of the purchase price for federal income tax purposes, among the assets of the Target Companies, prepared in accordance with the provisions of Section 1060 of the Code (the "<u>Allocation Statement</u>").  The Allocation Statement shall be modified to reflect any adjustment to the Closing Date Consideration, as reasonably determined by the Seller and Purchaser.  If, within thirty (30) days following the delivery of the Allocation Statement, Purchaser has not given Seller notice of its objection to any item in the Allocation Statement reasonably detailing the basis of such objection (an "<u>Allocation Dispute Notice</u>"), then the Allocation Statement shall be deemed final and binding on Purchaser and the Seller.   If Purchaser delivers an Allocation Dispute Notice, then Purchaser and Seller shall consult in good faith to resolve the disputed items set forth in the Allocation Dispute Notice, and if any disputed items have not been resolved within thirty (30) days following delivery of such notice, then the parties shall resolve their dispute in accordance with the procedures set forth in <u>Section 2.4(c)</u>. Seller shall provide to Purchaser, from time to time, revised copies of the Allocation Statement (the "<u>Revised Statements</u>") so as to report any matters on the Allocation Statement that need updating (including purchase price adjustments pursuant to <u>Section 2.4</u>, if any).  Notwithstanding anything to the contrary in this Section 2.7, the parties agree that $32,500,000 of the Closing Date Consideration, and any liabilities of the Target Companies to the extent such liabilities are required to be treated as part of the purchase price for federal income tax purposes shall be allocated to real property and improvements, subject to any adjustments which may be required by applicable tax regulations.   The parties agree that they will report the transactions contemplated by this Agreement for federal (and applicable state and local) income tax purposes (including, without limitation, the filing of Internal Revenue Service Form 8594) in accordance with the Allocation Statement (or, if applicable, the last Revised Statement), and that no party will take a position inconsistent with the Allocation Statement (or such Revised Statement) on any Tax Return unless otherwise required by applicable law or a good faith settlement of a Tax audit.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser that except as set forth in the Schedule of Exceptions the following statements are true and correct as of the date hereof. The section numbers of the Schedule of Exceptions correspond to the section numbers in this Article III; provided, however, that any information disclosed in the Schedule of Exceptions under any such section shall be deemed to be disclosed with respect to and incorporated in any other section of this Agreement to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other section. The Schedule of Exceptions and the information and disclosures contained therein are intended only to qualify and limit the representations, warranties or covenants contained in this Agreement, and do not, except as expressly set forth in the representations and warranties which they qualify, constitute representations and warranties as to the matters described therein. The listing of any matter in the Schedule of Exceptions shall not constitute an acknowledgement regarding the materiality of such disclosure or undisclosed matters of similar scope or materiality or whether the subject matter of such disclosure or undisclosed matter of similar scope or materiality may have a Material Adverse Effect or whether the subject matter is in the ordinary course of the Business. The Seller shall not be prejudiced in any manner whatsoever, and no presumptions shall be created, by virtue of the disclosure of any matter in the Schedule of Exceptions which otherwise is not required to be disclosed by this Agreement. The inclusion of any item in the Schedule of Exceptions shall not be deemed to be an admission to any third party against the interests of any party to this Agreement.

3.1     Organization and Capitalization of the Target Companies and Sherman MD Provider.

(a)     Each Target Company (i) is a limited liability company duly organized, validly existing and in good standing under the Laws of the state indicated as the state of its organization, as identified on Exhibit D, (ii) has limited liability company power and authority to own or lease and to operate its assets and to conduct business as currently conducted, and (iii) is qualified to transact business as a limited liability company in the jurisdictions specified in Exhibit D and is not required to be so qualified by any Laws in any other jurisdiction in which it has material operations or assets.

(b)     Seller is the sole legal and beneficial owner of the Interests.  As of the Effective Time, (i) the Purchaser will have good and marketable title to, and will own, the Hospital Interests, beneficially and of record, (ii) the Hospital Interests will be free and clear of all Encumbrances (other than those arising under applicable securities Laws), and (iii) the Purchaser will have full voting power over the Hospital Interests, subject to no proxy, voting trust or other agreement relating to the voting of any of the Hospital Interests.  As of the 501(a) Certification Time, (i) the Purchaser will have good and marketable title to, and will own, the Sponsor Interests, beneficially and of record, (ii) the Sponsor Interests will be free and clear of all Encumbrances (other than those arising under applicable securities Laws), and (iii) the Purchaser will have full voting power over the Sponsor Interests, subject to no proxy, voting trust or other agreement relating to the voting of any of the Sponsor Interests.  The Interests have been duly authorized for issuance and validly issued in compliance with all Laws.

- 17 -
**A0106**

(c)     Except for the Interests, there are no outstanding equity securities of the Target Companies, including (i) securities which are convertible into or exchangeable for any membership interest in the Target Companies, (ii) contracts, arrangements, commitments or restrictions relating to the issuance, sale, transfer, purchase or obtaining of equity securities of the Target Companies, or (iii) options, warrants, rights, calls or commitments of any character granted or issued by the Target Companies governing the issuance of units of their membership interests.

(d)     Sherman Sponsor is the sole legal and beneficial owner of all of the outstanding membership interests in Sherman MD Provider.  The membership interests of Sherman MD Provider have been duly authorized for issuance and validly issued in compliance with all Laws.

(e)     Sherman MD Provider (i) is a corporation duly organized, validly existing and in good standing under the Laws of the State of Texas, (ii) has corporate power and authority to own or lease and to operate its assets and to conduct business as currently conducted, and (iii) is qualified to transact business as a corporation in the State of Texas and is not required to be so qualified by any Laws in any other jurisdiction in which it has material operations or assets.

(f)     Except for the membership interests owned by Sherman Sponsor, there are no outstanding membership interests of Sherman MD Provider, including (i) interests which are convertible into or exchangeable for any shares in Sherman MD Provider, (ii) contracts, arrangements, commitments or restrictions relating to the issuance, sale, transfer, purchase or obtaining of membership interests of Sherman MD Provider, or (iii) options, warrants, rights, calls or commitments of any character granted or issued by Sherman MD Provider governing the issuance of membership interests.

3.2     Authorization.

(a)     The consummation by the Seller of the transactions contemplated hereby and by the Transaction Documents is within the powers of the Seller and has been duly authorized and approved by all necessary organizational action of the Seller.  No other organizational proceedings on the part of the Seller are necessary to authorize the performance of this Agreement or the other Transaction Documents.

(b)     This Agreement has been (and upon their execution and delivery, the other Transaction Documents by which the Seller is bound, will be) duly and validly executed and delivered by the Seller.  This Agreement constitutes (and upon their execution and delivery, the other Transaction Documents by which the Seller is bound, will constitute) the legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with its terms (assuming the valid authorization, execution and delivery hereof and thereof by the other parties thereto), subject to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general application relating to or affecting creditors' rights and to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

3.3    <u>No Conflicting Agreements; Consents</u>.  Neither the execution and delivery of this Agreement nor any of the other Transaction Documents nor the consummation of any of the transactions contemplated hereby or thereby will:

(a)    violate, conflict with, result in a breach or termination of the terms, conditions or provisions of, constitute a default under, or entitle any party to terminate or accelerate (i) the respective Constituent Documents of the Target Companies, (ii) any Material Contract, (iii) any Court Order to which the Target Companies or the Seller is a party or by which the Target Companies or the Seller is bound, or (iv) any material requirements of Law affecting the Target Companies or the Seller;

(b)    result in the creation or imposition of any Encumbrance upon any of the assets of any of the Target Companies (except for Permitted Encumbrances); or

(c)    require a permit, approval, consent or authorization from, or the making by the Target Companies or the Seller of any material declaration, filing or registration with, any Governmental Authority, except as provided in <u>Section 5.1</u> or <u>Section 6.2</u> and except for such approvals, consents, authorizations, declarations, filings or registrations, the failure of which to be obtained or made would not materially impair the ability of the Seller to perform its obligations hereunder or under the other agreements contemplated hereby to be entered into by Seller or prevent the consummation of the transactions contemplated hereby or thereby.

3.4    <u>Financial Statements</u>.

(a)    <u>Schedule 3.4(a)</u> contains copies of the following financial statements (collectively, the "<u>Financial Statements</u>"):  (a) audited balance sheets and statements of income and cash flows as of and for the year ended December 31 of 2012 and 2013 of the Seller, (b) unaudited balance sheet and statements of income as of and for the 6-month period ended June 30, 2014 (the "<u>Balance Sheet Date</u>") of the Seller, (c) unaudited, pro forma combined balance sheet and statement of income as of and for the year ended December 31 of 2013 of Sherman Hospital and Sherman Services and (d) unaudited, pro forma combined balance sheet and statement of income as of and for the 6-month period ended June 30, 2014 of Sherman Hospital and Sherman Services.

(b)    The Financial Statements:  (i) were prepared in all material respects in accordance with GAAP, except, in the case of unaudited Financial Statements, for the absence of notes thereto, in the case of interim Financial Statements, normal year-end adjustments, or as described on <u>Schedule 3.4(b)</u>; and (ii) present fairly, in all material respects, the financial position and results of operations and cash flows (when presented) of the applicable companies at the dates and for the periods indicated therein.

3.5    <u>Absence of Undisclosed Liabilities</u>.

(a)    The Business does not have any liabilities of any nature (whether accrued, absolute, contingent or otherwise) that are of a nature or type required to be disclosed or reflected in financial statements in accordance with GAAP, except for (i) liabilities reflected or reserved against in the Financial Statements (including the notes thereto), (ii) liabilities incurred

in the ordinary course of the Target Companies since the Balance Sheet Date and (iii) liabilities set forth in the Schedule of Exceptions.

(b)  Except for liabilities set forth in the Schedule of Exceptions, no Target Company is a party to, or has any commitment to become a party to, any joint venture, off-balance sheet partnership or any similar Contract (including any Contract relating to any transaction or relationship between or among the Target Companies, on the one hand, and any unconsolidated Affiliate, including any structured finance, special purpose or limited purpose entity or person, on the other hand), where the intended effect of such Contract is to avoid disclosure of any material transaction involving, or material liabilities of, the Target Companies in the Financial Statements.

3.6   <u>Absence of Changes</u>.  Between the Balance Sheet Date and the date hereof, there has not been any transaction or occurrence in which any of the Target Companies, has:

(a)  suffered any material damage, destruction or loss with respect to or affecting the Facility;

(b)  made any capital expenditure or commitment outside of the ordinary course for additions to property, plant, equipment, intangible or capital assets for any purpose, other than as required by Law or for urgent repairs;

(c)  sold, transferred or otherwise disposed of any assets of the Business except in the ordinary course of business;

(d)  granted or incurred any obligation for any increase in the compensation of any employee who is employed at the Facility (including any increase pursuant to any bonus, pension, profit-sharing, retirement, or other plan or commitment) except increases in compensation granted generally to all employees in a designed pay grade that are in the ordinary course of business in accordance with Seller's customary personnel practices;

(e)  except as required by GAAP, made any change in any method of accounting or accounting principle, practice, or policy;

(f)  agreed, so as to legally bind the Purchaser or the Target Companies, whether in writing or otherwise, to take any of the actions set forth in this <u>Section 3.6</u> and not otherwise permitted by this Agreement;

(g)  taken any action or omission that would be prohibited by <u>Section 5.2</u> if such action or omission occurred on or after the date hereof and prior to Closing; or

(h)  experienced any event, occurrence, or circumstance having a Material Adverse Effect on the condition, financial or otherwise, of the assets of the Target Companies or in the business or the results of operations of the Facility.

3.7    Contracts.

(a)    Except as set forth in Schedule 3.7(a), none of the Target Companies is a party to or bound by the following (collectively, "Material Contracts"):

(i)    any agreement for the lease of personal property to or from any third party providing for lease payments in excess of $100,000 per annum;

(ii)    any agreement concerning a partnership or joint venture;

(iii)    any agreement under which it has created, incurred, assumed or guaranteed any Indebtedness;

(iv)    any agreement restricting the Target Companies concerning non-competition or non-solicitation (other than agreements with placement or staffing firms for the placement of Personnel);

(v)    any profit sharing, stock option, stock purchase, deferred compensation, severance or other material plan or arrangement for the benefit of its current or former directors, officers and employees;

(vi)    any local collective bargaining agreement;

(vii)    any agreement for the employment of any individual on a full-time or part-time basis providing annual compensation in excess of $100,000;

(viii)    any Contract relating to cleanup, abatement or other actions in connection with environmental liabilities;

(ix)    any other Contract involving or reasonably likely to involve payment or receipt after the date hereof of more than $100,000 in the aggregate in the current or next succeeding fiscal year of any of the Target Companies that is a party to such Contract and not terminable without penalty by any such Target Company on thirty (30) days' or less notice; and

(x)    all contracts with physicians who are actual or potential referral sources or other health care providers or with any immediate family members of any such physician or any entity in which any of the foregoing are equity owners regardless of dollar value and term.

(b)    Each Material Contract is valid and existing, and the applicable Target Company has duly performed in all material respects its obligations under each Material Contract to which it is a party (to the extent that such obligations to perform have accrued).

(c)    None of the Target Companies is in default (nor would they be in default with notice or lapse of time or both as a result of events that have occurred) under any Material Contract.

3.8    Real Property.

(a)    Schedule 3.8(a) sets forth a complete and correct list of all of the Real Property owned by any Target Company and used in the operation of the Business (the "Owned Real Property").  With respect to their physical condition, to the Knowledge of the Seller the Owned Real Property and structures located thereon owned by any Target Company are in all material respects in functional operating condition and repair, suitable for the purpose for which they are intended and there are no material defects, structural or otherwise, in any of the Owned Real Property and structures located thereon owned by any Target Company.

(b)    Schedule 3.8(b) sets forth a complete and correct list of all of the Real Property leased by any Target Company (the "Leased Real Property").

(c)    Schedule 3.8(c) sets forth a complete and correct list of real property used in the operation of the Business that is owned or leased by Seller, the Seller Guarantors or their Affiliates (other than the Target Companies).

(d)    Schedule 3.8(d) sets forth a complete and correct list of real property that is owned by Seller or the Seller Guarantors that is located within a 15 mile radius of the Facility.

(e)    The Owned Real Property, the Leased Real Property, the Space Leases and the lease agreements identified on Schedule 3.8(c) constitute all of the real property used by the Target Companies, Seller, the Seller Guarantor and their Affiliates in the operation of the Business.

(f)    The Target Companies own good and marketable fee simple title to all Owned Real Property, together with all buildings, improvements, and component parts thereon and all appurtenances and rights thereto, free and clear of all Encumbrances (other than Permitted Encumbrances).

(g)    To the Knowledge of the Seller, the plants, structures and equipment owned by the Target Companies are in conformity with prevailing industry standards in the region where located, are in functional operating condition and repair (ordinary wear and tear excepted), are adequate for the uses to which they are being put and are in compliance in all material respects with all building, life safety, zoning and land use regulations, and have complied in all material respects with all requirements and obligations imposed by Governmental Authority with regard to zoning variances, conditional uses, and non-conforming use requirements.  To the extent applicable and to the Knowledge of the Seller, the improvements on the Real Property are in compliance in all material respects with all federal, state, and local legal requirements, including, without limitation, the Americans with Disabilities Act, relative to architectural barriers or accommodations of disabled persons.

3.9    Personal Property.

(a)    The Target Companies have good and valid title to, free and clear of any Encumbrances (other than Permitted Encumbrances), or have valid leasehold interests in or valid rights under contract to use, all of the personal property used by Target Companies in the conduct of the Business, including all personal property reflected on the Financial Statements

and all of the personal property purchased or otherwise acquired for use at or by the Facility since the Balance Sheet Date, other than personal property disposed of since the Balance Sheet Date in the ordinary course of business consistent with past practice. Such personal property in the possession of the Target Companies as of the Effective Time constitutes all necessary personal property for the operation of the Facility as presently conducted.

(b)     There are no outstanding rights (including purchase options, rights of first refusal, rights of first offers, agreements or other commitments made by the Seller or any of its Affiliates) that give any Person a current or future right to require the Target Companies to sell or transfer to a third party any material interests in the personal property owned by them.

(c)     To the Knowledge of the Seller, all of the material personal property is in functional operating condition and repair, suitable, in all material respects, for the purposes for which it is intended, subject to ordinary wear and tear.

3.10   <u>Employees; Labor Matters; Employee Benefit Plans; ERISA.</u>

(a)     Except as provided by <u>Section 3.19</u> or as described or contemplated by <u>Section 6.5(a)</u>, the employees who work at the Facility are leased or provided to the Target Companies by LHP Sherman/Grayson, LLC, LHP IT Services, LLC and LHP Management Services, LLC (the "<u>Staff Providers</u>"), which are Affiliates of LHP. No changes in the basis for remuneration of such employees have been made, promised or authorized since the Balance Sheet Date, except in the ordinary course of business. No Target Company has written employment contracts (other than offer letters creating an at-will employment relationship) nor does any agreement of any nature exist that provides for employment for any particular period of time or that provides any restrictions upon the right to terminate employment without any post-termination payment obligation with any Person whomsoever. No binding agreements have been made or entered into with any employees regarding changes in compensation, promotion or any other change in status.

(b)     There is no pending or, to the Seller's Knowledge, threatened employee strike, work stoppage or labor dispute. To the Seller's Knowledge, no union representation question exists respecting any employees who work at any Target Company, no demand has been made for recognition by a labor organization by or with respect to any employees who work at the Target Companies, no union organizing activities by or with respect to any employees who work at any Target Company are taking place, and none of the employees who work at any of the Target Companies is represented by any labor union or organization. No collective bargaining agreement exists or is currently being negotiated by any Target Company. There is no unfair practice claim against any Target Company before the National Labor Relations Board, or any strike, dispute, slowdown, or stoppage pending or, to the Seller's Knowledge, threatened against or involving the Business or any of the Target Companies. To the Knowledge of the Seller, the Target Companies are in compliance in all material respects with all Laws and contracts respecting employment and employment practices, labor relations, terms and conditions of employment, and wages and hours. There are no pending or, to the Seller's Knowledge, threatened complaints or charges before any Governmental Authority regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like.

(c)     Schedule 3.10(c) contains a true and complete list of all the following agreements, plans or other arrangements, covering any employee who works at any Target Company, which are presently in effect:  (i) employee benefit plans within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and (ii) any other written employee benefit plan, program, policy, or arrangement that the Seller or the Target Companies currently sponsor, or to which they have any outstanding present obligations to contribute or other liability (collectively, the "Employee Benefit Plans").

(d)     None of the assets used or owned by the Target Companies are, and the Seller does not reasonably expect them to become, subject to a lien imposed under the Code or under Title I or Title IV of ERISA including liens arising by virtue of any Target Company being considered to be aggregated with another entity pursuant to Section 414 of the Code ("ERISA Controlled Group").

(e)     Neither the Seller nor any member of the Seller's ERISA Controlled Group has sponsored, contributed to or had an "obligation to contribute" (as defined in ERISA Section 4212) to a "multiemployer plan" (as defined in ERISA Sections 4001(a)(3) or 3(37)(A)) on or after September 26, 1980 on behalf of any employee who works at any of the Target Companies.

(f)     Neither the Seller nor any member of the Seller's ERISA Controlled Group have at any time sponsored or contributed to a "single employer plan" (as defined in ERISA Section 4001(a)(14)) to which at least two or more of the "contributing sponsors" (as defined in ERISA Section 4001(a)(13)) are not part of the same ERISA Controlled Group.

(g)     There are no actions, audits or claims pending or, to the Seller's Knowledge, threatened against any of the Target Companies with respect to maintenance of the Employee Benefit Plans, other than routine claims for benefits and other claims that are not material.

(h)     The LHP Hospital Group, Inc. Welfare Benefits Plan has complied with all of the continuation coverage requirements of Code Section 4980B, as amended, and ERISA Sections 601 through 608, as amended.

(i)     Schedule 3.10(i) contains a list, as of the date hereof, of all of the officers and employees who perform substantially all of their services at the Facility (the "Employees"), their current salary or wage rates, and the department and job title of such employees.  Schedule 3.10(i) also indicates whether such employees are part-time or full-time.

(j)     No employees who work at any of Target Companies have suffered an "employment loss" in the previous twelve (12) months (as such quoted term is defined in the WARN Act).

3.11     Government Program Participation/Accreditation.

(a)     The Facility is eligible to receive payment under Title XVIII of the Social Security Act ("Medicare") and Title XIX of the Social Security Act ("Medicaid") and is a "provider" with valid and current provider agreements and with one or more provider numbers

with the federal Medicare, all applicable state Medicaid and successor programs (the "Government Programs") through intermediaries. A true and correct copy of each of such agreements has been previously provided to the Purchaser by the Seller. The Facility is in compliance with the conditions of participation for the Government Programs in all material respects. There is not pending or, to the Seller's Knowledge, threatened any proceeding or investigation involving the Business or any of the Target Companies that could adversely affect the Target Companies' rights to participate in any Government Program.

(b)     To the Knowledge of the Seller, all cost reports and all other reports with respect to the Facility or any of the Target Companies that are required by Law to have been filed or made with respect to the purchase of services of the Facility by Government Programs have been timely filed and are complete and correct in all material respects. To the Knowledge of the Seller, such cost reports do not claim, and the Facility has not received, payment or reimbursement in excess of the amount permitted by applicable Law, except where excess reimbursement was noted on the cost report and except for normal course claims adjustments. True and correct copies of all such reports for the three (3) most recent fiscal years of the Facility have been provided to the Purchaser. Schedule 3.11(b) indicates which of such cost reports have been audited by the fiscal intermediary and finally settled, and contains a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes, in connection with any audit, review or inquiry with respect to such cost reports.

(c)     To the Knowledge of the Seller, all of the billing practices of each of the Target Companies with respect to the Business to the Government Programs have been and are in compliance in all material respects with all applicable Laws.

(d)     The Facility is duly accredited with no material contingencies by The Joint Commission. The Seller has provided the Purchaser copies of the most recent Joint Commission accreditation survey report and deficiency list for the Facility, if any, together with the Facility's most recent statement of deficiencies and plan of correction. To the Knowledge of the Seller, there are no pending Joint Commission investigations involving the Facility.

(e)     Neither the Facility, nor any of the Target Companies' current officers, directors, governing board members, agents or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)), has been excluded from Medicare or any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C. §1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. §1320a-7b. To the Seller's Knowledge, no other employee who currently works at any of the Target Companies is excluded from participating in any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)).

3.12    Taxes.

(a)     All Tax Returns required to be filed with any Taxing Authority by or on behalf of any of the Target Companies have been filed when due (taking into account applicable extensions). All amounts of Taxes required to be paid by or with respect to the Target Companies have been timely paid.

(b)     As of the date of this Agreement, (i) there is no audit or examination relating to Taxes by any Taxing Authority now pending or threatened in writing against or with respect to any Target Company in respect of any material amount of Tax of such Target Company, (ii) no adjustment has been made, proposed or threatened in writing by a Taxing Authority with respect to any material Tax Return of the Target Companies, which adjustment remains pending, (iii) none of the Target Companies has requested any extension of time within which to file any material Tax Returns of the Target Companies and has not yet filed such Tax Returns, and (iv) none of the Target Companies has granted any extension or waiver of the statute of limitations period applicable to any material Tax Returns of the Target Companies, which period (after giving effect to any such extension or waiver) has not yet expired.

(c)     For U.S. federal income tax purposes, the Target Companies are and always have been treated as entities that are disregarded as separate from the Seller for federal income tax purposes.

(d)     There are no liens for Taxes (other than Permitted Encumbrances) existing upon the Target Companies.

(e)     The Target Companies have complied in all material respects with all applicable Laws relating to the withholding of Taxes.

3.13    <u>Intellectual Property</u>.  Each Target Company owns or has the right to use (or as of the Closing will own or have the right to use) all trademarks, trade names, service marks, trade secrets, copyrights and other intellectual property rights and licenses as are necessary or otherwise are used to conduct its Business as currently conducted (the "<u>Intellectual Property</u>"). To the Knowledge of the Seller, (a) no infringement exists by any of the Target Companies on the intellectual property rights of any other Person, and (b) there is no infringing use of any of the Intellectual Property owned by any Target Company by any other Person.  No Court Orders or proceedings are pending, or to the Knowledge of the Seller, threatened, against any of the Target Companies that challenge the validity of, or such Target Company's ownership of or right to use, any of the Intellectual Property.  No Target Company has any patents, trademarks, service marks or copyrights related to the Business.  No Target Company has been served with process in any suit, action or proceeding which involves a claim of infringement of any patents, trademarks, service marks, copyrights or violation of any trade secret or other proprietary right of any third party related to the business and operation of the Facility.<u>Permits</u>.

(a)     True and complete copies of all material Permits issued or granted by a Governmental Authority and owned or held by or issued to any Target Company in connection with the current operation of the Business have been provided or made available to the Purchaser.  Such Permits constitute all material Permits necessary for the conduct of the Business and the operation of the Facility as currently conducted.  Each Target Company is the duly authorized holder of such Permits.  The Facility's pharmacies, laboratories and all other material ancillary departments located at the Facility or operated for the benefit of the Facility (and which are owned or operated by any Target Company), which are required to be specially licensed, are licensed by the appropriate Governmental Authority.

(b)  To the Knowledge of the Seller, the Facility is in compliance in all material respects with all Permits required by Law.  There are no provisions in, or agreements relating to, any such Permits which preclude or limit in any material respect any Target Company from operating the Facility as it is currently operated.  There is not now pending or, to the Knowledge of the Seller, threatened, any action by or before any Governmental Authority to revoke, cancel, rescind, modify or refuse to renew any of the Permits, and all of the material Permits are and shall be in good standing now and as of the Closing.

3.15  <u>Environmental Conditions</u>.

(a)  To the Knowledge of the Seller, each of Target Companies has materially complied and is and has been at all relevant times in material compliance with all Environmental Laws and the Real Property and all improvements on the Real Property are in material compliance with all Environmental Laws;

(b)  To the Knowledge of the Seller, no Target Company has stored any Hazardous Substances on any of the Real Property, except in material compliance with applicable Environmental Laws;

(c)  To the Knowledge of the Seller, no Target Company has disposed of or released any Hazardous Substances on any of the Real Property, except in material compliance with applicable Environmental Laws;

(d)  No Target Company has received any written communication from a Governmental Authority or any other Person that alleges that such Target Company is not in material compliance with Environmental Laws or is otherwise subject to material liability relating to Environmental Laws; and

(e)  There is no Environmental Claim which is reasonably likely to result in liability in excess of $200,000 pending or, to the Seller's Knowledge, threatened against any Target Company.

(f)  To the Knowledge of the Seller, none of the Target Companies has any liability under any Environmental Law with respect to the Facility or the Real Property, nor are any of them responsible for any liability of any other Person under any Environmental Law with respect to the Facility or the Real Property.  To the Knowledge of the Seller, there are no threatened actions, suits, orders, claims, legal proceedings or other proceedings based on, and the Target Companies have not received any formal or informal written notice of any complaint, order, directive, citation, notice of responsibility, notice of potential responsibility, or information request from any Governmental Authority or any other Person or knows or suspects any fact(s) which would reasonably be expected to form the basis for any such actions or notices arising out of or attributable to any Environmental Laws.

(g)  The Real Property contains no underground improvements, including treatment or storage tanks, or underground piping associated with such tanks, used currently or in the past for the management of Hazardous Materials, and neither the Target Companies nor any of their Affiliates has used any portion of the Real Property as a dump or landfill.

3.16    Legal Proceedings, Court Orders.

(a)    Schedule 3.16 sets forth an accurate written list and summary description of all material litigation with respect to the Facility, the Business and the Target Companies to which any of the Target Companies is a party.  Other than as set forth in Schedule 3.16, there are no material actions, suits, proceedings, audits or investigations pending, or to the Seller's Knowledge, threatened against any of the Target Companies with respect to the Facility or the Business.

(b)    Neither the Seller nor any Target Company is subject to any Court Order with respect to the Facility or the Business.

3.17    Insurance.  Schedule 3.17 includes a list of all insurance policies maintained by or for the benefit of the Facility or any Target Company, including fire and extended coverage and casualty, professional liability, general liability and other forms of insurance, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverages (including applicable deductibles).  All of such policies are now and will be until the Effective Time in full force and effect on an occurrence basis with no premium arrearages.  (i) There is no outstanding written requirement or recommendation by any insurance company that issued any such policy or by any board of fire underwriters or other similar body (including any Governmental Authority) exercising similar functions which requires or recommends any repairs or other work to be done or with respect to any of the assets of the Target Companies, (ii) the holder of each such policy has given to its insurer in a timely manner all notices required to be given under its insurance policies with respect to all  claims and actions covered by insurance with respect to the assets of the Target Companies, and no insurer has denied coverage of any such claims or actions or reserved its rights with respect to or rejected any such claims and (iii) no holder of any such policy has, as of the date of this Agreement (a) received any notice or other written communication from any such insurance company canceling or materially amending any of said insurance policies with respect to the assets of the Target Companies or relating to the reservation of rights on any existing claims under any such insurance policies, and to the Knowledge of the Seller no such cancellation or amendment is threatened, or (b) failed to give any required notice or present any claim which is still outstanding under any of said policies with respect to the assets of the Target Companies.

3.18    Compliance with Laws.  To the Knowledge of the Seller, the Facility at all times since its acquisition by Sherman Hospital and the Target Companies have been in compliance, in all material respects, with all Laws applicable to the Facility and the Target Companies, including, but not limited to, the false claims, false representations, anti-kickback and all other provisions of the Medicare/Medicaid fraud and abuse laws (42 U.S.C. Section 1320a-7 et seq.) and the physician self-referral provisions of the Stark Law (42 U.S.C. Section 1395nn).

3.19    Medical Staff.  As of the date hereof, the Seller has provided to the Purchaser (i) true and correct copies of the blank forms used with respect to medical staff membership and clinical privileges application or delineation of clinical privileges, and (ii) all current medical staff bylaws, rules, and regulations and amendments thereto respecting the Facility.  With regard to the medical staff of the Facility, except as disclosed in Schedule 3.19, which disclosure shall be made on an anonymous basis, to the Knowledge of the Seller, there are no pending or

threatened disciplinary or corrective actions or appeals therefrom involving physician applicants or medical staff members and to the Knowledge of the Seller, there are no disputes, suits, actions, arbitration proceedings, or investigations pending or threatened with applicants, medical staff members, or health professional affiliates.  As of the date hereof, Schedule 3.19 sets forth a true, correct and complete list of description of (a) the name of each member of the medical staff of the Facility, and (b) the specialty, if any, of each medical staff member.  All members of the organized medical staff of the Facility and all other persons providing clinical services to patients have been credentialed in substantial compliance with the applicable bylaws, policies, standards, and procedures of the Facility and the medical staff, and are providing services within the permitted scope of their privileges.  The Facility has operated in material compliance with such by-laws, rules and regulations.  To the Knowledge of the Seller, no member of the medical staff of the Facility has tendered a resignation that would be effective after the date hereof.

3.20   Brokers.  Neither the Seller nor any of its Affiliates has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.  All amounts due and owing with respect to the matters set forth in Schedule 3.20 shall be the sole responsibility of the Seller.

3.21   Affiliate Transactions.  Except for the payment of salaries and benefits to employees in the ordinary course of business or as set forth in Schedule 3.21, (a) none of the Target Companies is, nor have they been during the previous two (2) years, a party to any Contract or arrangement with, or indebted, either directly or indirectly, to any of its officers, directors, managers, members or stockholders, or any of their respective relatives or Affiliates and (b) none of such Persons is (nor have they been during the previous two (2) years) indebted to any of the Target Companies or has at any time during the previous two (2) years any direct or indirect ownership interest in, or any contractual or business relationship with, any Person with which any of the Target Companies has a business relationship or any Person which, directly or indirectly, competes with any of the Target Companies, excluding ownership of securities having no more than two percent (2%) of the outstanding voting power of any company that is listed on any national securities exchange so long as the Person owning such securities has no other connection or relationship with such company.

3.22   No Prior Operations.  Except as contemplated by Section 6.5(a)(i), neither Sherman Sponsor nor Sherman MD Provider has incurred any liabilities or obligations or engaged in any business activities of any type or kind whatsoever, or entered into any agreements or arrangements with any Person, or become subject to or bound by any obligation or undertaking.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

The Purchaser hereby represents and warrants to the Seller that the following statements are true and correct as of the date hereof as follows:

4.1   Organization.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

    4.2   <u>Authorization</u>.

    (a)   The execution, delivery and performance by the Purchaser of this Agreement and the other Transaction Documents to which the Purchaser is a party or is bound, and the consummation by the Purchaser of the transactions contemplated hereby and thereby are within the Purchaser's powers, are not in contravention of the terms of the Purchaser's Constituent Documents, and have been duly authorized and approved by the governing body of the Purchaser. No other organizational proceeding on the part of the Purchaser is necessary to authorize the execution, delivery and performance of this Agreement or the other Transaction Documents by the Purchaser.

    (b)   This Agreement has been duly and validly executed and delivered by the Purchaser, and as of the Closing, the other Transaction Documents to be entered into by the Purchaser will have been duly and validly executed and delivered by the Purchaser. This Agreement constitutes, and upon their execution and delivery, such other Transaction Documents will constitute, the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms (assuming the valid authorization, execution and delivery hereof and thereof by the other parties thereto), subject, in each case, to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general application relating to or affecting creditors' rights and to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

    4.3   <u>No Conflicting Agreements; Consents</u>. Neither the execution and delivery of this Agreement or any of the other Transaction Documents to be entered into by the Purchaser nor the consummation of any of the transactions contemplated hereby or thereby will:

    (a)   violate, conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default under (i) the Constituent Documents of the Purchaser, (ii) any material agreement, lease, sublease, license, sublicense, promissory note, evidence of indebtedness or other contract (whether written or oral) to which assets of the Purchaser is a party or by which Purchaser is bound, except such violations, conflicts, breaches or defaults which would not materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or would not prevent the consummation of the transactions contemplated hereby or thereby, (iii) any Court Order to which the Purchaser is a party or by which the Purchaser is bound, or (iv) any material requirements of Law affecting the Purchaser, except such violations, conflicts, breaches or defaults of such requirements of Laws which would not materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or which would not prevent the consummation of the transactions contemplated hereby or thereby; or

    (b)   require a material Permit, approval, consent or authorization from, or the making by the Purchaser of any material declaration, filing or registration with, any Governmental Authority, except as provided in <u>Section 5.1</u> or <u>Section 6.2</u> and except for such Permits, approvals, consents, authorizations, declarations, filings or registrations, the failure of which to be obtained or made would not materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or prevent the consummation of the transactions contemplated hereby or thereby.

4.4    <u>Legal Proceedings</u>.  There are no material actions, suits or proceedings pending or, to the Knowledge of the Purchaser, threatened against the Purchaser which would materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or could reasonably be expected to delay or prevent the consummation of the transactions contemplated hereby or thereby.

4.5    <u>Brokers</u>.  The Purchaser has not paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

4.6    <u>Sufficient Resources</u>.  The Purchaser has sufficient financial resources (either internally or externally), and at the Closing, the Purchaser will possess sufficient funds, to permit the Purchaser to deliver the all amounts in accordance with <u>Section 2.6(a)</u>, subject to satisfaction of the conditions precedent to its obligations to close the transactions contemplated by this Agreement.

4.7    <u>Investment Representations</u>.

(a)    The Purchaser is acquiring the respective Interests to be acquired by the Purchaser for its own account and not with a view to the distribution thereof within the meaning of the Securities Act.

(b)    The Purchaser is not relying upon any representation or warranty of Seller or any of its Affiliates or any of the officers, directors, employees, agents or representatives thereof, other than those representations and warranties contained in this Agreement.

(c)    The Purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of purchasing the Interests to be acquired by the Purchaser and to understand the risks of, and other considerations relating to, its purchase of the Interests to be acquired by the Purchaser.

(d)    The Purchaser is aware that as of the Closing Date and the 501(a) Certification Date, as applicable, (i) the Interests will not have been registered under the Securities Act or any state's securities laws, and (ii) no securities issued by any of the Target Companies will be subject to the reporting requirements of the Exchange Act.

4.8    <u>Non-Reliance</u>.  Except for the specific representations and warranties expressly made by the Seller in <u>Article III</u> (as modified by the Schedule of Exceptions), (a) Purchaser represents and warrants that (i) Seller is not making and has not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Target Companies, or any of the Target Companies' respective businesses, assets, liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of the business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Target Companies furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in

connection with, the transactions, or in respect of any other matter or thing whatsoever, and (ii) none of the Seller or the members, officers, managers, agents, representatives or employees of the Seller, the Target Companies or their respective Affiliates has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement and subject to the limited remedies herein provided, (b) Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and its Affiliates have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person, (c) Purchaser specifically disclaims any obligation or duty by the Seller or any of its Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in <u>Article III</u>, and (d) Purchaser is entering into the transactions and acquiring the Interests subject only to the specific representations and warranties set forth in <u>Article III</u> as further limited by the specifically bargained for exclusive remedies as set forth in <u>Article IX</u>.

<div align="center">

**ARTICLE V**
**COVENANTS OF THE SELLER**

</div>

5.1     <u>Regulatory Approvals</u>.   The Seller will cause the Target Companies to use commercially reasonable efforts to (i) obtain, as promptly as practicable, each of the Permits, approvals, authorizations and clearances of Governmental Authorities listed in <u>Schedule 5.1</u> hereto, and to make the filings and declarations with Governmental Authorities listed in <u>Schedule 5.1</u> hereto, (ii) provide such information and communications to applicable Governmental Authorities as are necessary in connection with the foregoing or in connection with the Purchaser's obtaining any Permits, approvals, authorizations and clearances of Governmental Authorities or making any filings or declarations with Governmental Authorities in accordance with <u>Section 6.2</u> as such Governmental Authorities or the Purchaser may reasonably request, and (iii) cooperate with the Purchaser in obtaining or making, as soon as practicable, any Permits, approvals, authorizations, clearances, filings and declarations of or with Governmental Authorities that the Purchaser is required to obtain pursuant to <u>Section 6.2</u>.

5.2     <u>Conduct Prior to the Closing</u>.   On or after the date hereof and prior to the Closing, except as set forth on <u>Schedule 5.2</u>, as consented to or approved in writing by the Purchaser, or as contemplated by this Agreement (including, without limitation, <u>Sections 6.5</u> and <u>6.8</u>), the Seller shall not act or omit to act, and shall cause the Target Companies not to act or omit to act, otherwise than in accordance with the following:

(a)     None of the Target Companies shall amend its respective Constituent Documents;

(b)     No change shall be made in the number or amount of authorized or issued membership interests of the Target Companies; nor shall any other equity security of any kind be granted or issued by the Target Companies; nor shall Seller enter into or permit any of the Target Companies to enter into any other agreement with respect to any equity security of the Target Companies;

(c)     The Seller will not make or enter into any commitment to make any capital expenditure at the Facility or otherwise on behalf of either Target Company, other than in the ordinary course of business, consistent with past practices, or as required by Law or for urgent repairs;

(d)     The Seller will not change or permit any change to be made in any accounting policy, practice or method of the Target Companies except any such changes as are required to conform to modifications in GAAP;

(e)     The Seller shall not, and shall not permit the Target Companies to, (a) make, change or revoke any election in respect of Taxes, (b) change any accounting method in respect of Taxes, (c) prepare any Tax Return in a manner which is not consistent with the past practice of the Target Companies, (d) file any amendment to a material Tax Return, (e) incur any liability for a material amount of Taxes other than in the ordinary course of business, or (f) settle any claim or assessment in respect of material Taxes;

(f)     The Target Companies will not (A) assume, guaranty, endorse or otherwise become liable or responsible for the obligations of any Person (other than another Target Company); (B) make any loans, advances or capital contributions to, or investments in, any Person, other than loans to other Target Companies; or (C) make any commitments to do any of the foregoing;

(g)     The operations, activities and practices of the Business shall be conducted consistent with the ordinary course of business and in conformity with past practice;

(h)     The Seller and the Target Companies will use commercially reasonable efforts to ensure that the services of the present employees, agents and representatives of the Business will be kept available for the Purchaser (except with respect to those employees or relationships terminated for cause or in the ordinary course of business consistent with past practices); provided in no event shall Seller or the Target Companies be required to offer or provide any inducements, financial or otherwise, to cause any such Persons to continue to work or provide services for the benefit of the Business;

(i)     The insurance maintained with respect to the Facility and the Business, or comparable insurance, shall be maintained in full force and effect until the Effective Time; and

(j)     The Target Companies will not sell, transfer or otherwise dispose of any properties or assets, except for inventory purchased or sold in the ordinary course of business consistent with past practice; provided, that the foregoing shall in no event preclude the distribution of cash by any of the Target Companies to their respective equity or debt holders so long as at all times prior to the Closing the Target Companies retain sufficient cash as is reasonably necessary to conduct the Business in the ordinary course of business.

5.3     Employee Matters.  Between the date of this Agreement and the Closing, except as otherwise consented to or approved in writing by the Purchaser, the Seller will cause its Affiliates not to (a) make any general increase in the rate of compensation payable to any employees who work in the Business, other than normal and customary increases consistent with past practice or increases that otherwise may be required by obligations pursuant to Contracts or

applicable Law, or (b) increase severance or termination obligations to any employees who work in the Business (except increases that are the result of increases to an employee's underlying compensation that are permitted under this <u>Section 5.3</u>.)

      5.4    <u>Investigation by the Purchaser</u>.  Between the date of this Agreement and the Closing Date, to the extent permitted by Law, the Seller will provide the Purchaser and its counsel, accountants and other representatives with reasonable access during normal business hours, to all of the assets, properties, facilities, employees, agents, accountants and Books and Records of the Business and will furnish or make available to the Purchaser and such representatives during such period all such information and data (including, without limitation, copies of Contracts) concerning the Business in the possession of the Seller or its Affiliates as Purchaser or such representatives reasonably may request; <u>provided</u>, <u>however</u>, such investigation shall be coordinated through such persons as may be designated in writing by the Seller for such purpose.  The Purchaser's right of access and inspection shall be made in such a manner as not to interfere with the operation of the Business or the Target Companies. Notwithstanding the foregoing, the Purchaser understands that (x) with respect to documents and information deemed by the Seller in good faith to be market sensitive, competitive or otherwise confidential in nature, (1) the Seller will identify such documents and information to the Purchaser, (2) if such documents and information are requested by the Purchaser, the Seller will provide such documents and information to the Purchaser's outside attorneys and accountants (who will be bound by confidentiality agreements) for their review, and (3) any report by such attorneys and accountants to the Purchaser with respect to such documents and information will be in writing and subject to prior review and reasonable approval by the Seller to confirm that any specific market sensitive, competitive or otherwise confidential information is not made available to the Purchaser, and (y) litigation and other materials (including internal/external legal audit letters or reviews, patient records and similar patient information, Professional Review Organization information, National Data Bank reports, peer and quality review information and other physician-specific confidential information) that are deemed privileged or confidential by the Seller and materials which the Seller or its Affiliates may not disclose without violating confidentiality agreements with third parties will be made available to the Purchaser only without identifying information.

      5.5    <u>Closing Conditions</u>.  The Seller will use commercially reasonable efforts to cause each of the conditions set forth in <u>Article VII</u> (other than <u>Section 7.7</u>) to be satisfied on or prior to October 31, 2014; <u>provided</u>, if the conditions set forth in <u>Article VII</u> (other than <u>Section 7.7</u>) shall not have been satisfied on or prior to October 31, 2014, Seller shall continue to use its commercially reasonable efforts to satisfy its obligations under this <u>Section 5.5</u> as soon as reasonably practicable thereafter, but in all circumstances prior to the Optional Termination Date; <u>provided further</u>, in no event shall the Seller be obligated to expend any funds in connection with the solicitation or receipt of any consents or approvals from any non-Governmental Authority.  Seller shall reasonably cooperate with Purchaser in connection with Purchaser's efforts to obtain the Title Policy.

      5.6    <u>Consultative Process</u>.  From and after the date hereof and until the Closing, the Purchaser shall designate an individual or individuals whom the Seller's representatives may contact during normal business hours for the purpose of approving actions or transactions for which the consent of the Purchaser is required under this Agreement.  The written approval of a

designated individual as contemplated in this Section 5.6 shall constitute the consent of the Purchaser to the transaction or action so approved. Unless and until the Purchaser gives written notice to the Seller to the contrary, such designated individuals shall be Lex Reddy and Roger Krissman.

5.7   INTENTIONALLY OMITTED.

5.8   Transition Services.  At or prior to Closing:

(a)   Seller shall deliver to Purchaser a schedule of its vendor relationships related to the operation of the Business.

(b)   LHP and/or one of more of its subsidiaries (the "Service Providers") shall provide the services listed on Schedule 5.8(b) (the "Services") to Purchaser or its designee for a period of six (6) months following the Effective Time. Purchaser shall promptly pay LHP for such Services in the amounts set forth on Schedule 5.8(b) at the end of each calendar month following the Closing Date (prorated based on days elapsed for any partial month of service). In no event shall the Service Providers have any obligation to provide such Services after the date that is six (6) months after the Closing Date. The Service Providers shall use their commercially reasonable efforts to provide the Services at consistent levels and with a degree of care as such Services were provided to the Target Companies in the three (3) month period prior to the Closing. Except in the case of a Willful Breach by a Service Provider, no Service Provider shall have liability to Purchaser or its Affiliates in connection with the provision of the Services. Purchaser agrees and acknowledges that (i) the Service Providers are not in the business of providing the Services on a commercial arm's-length basis to independent third parties and (ii) the Services are only required in connection with the transactions contemplated by this Agreement for specific business circumstances on a transitional basis only.

(c)   Set forth on Schedule 5.8(c) are certain contracts (collectively, the "Service Contracts") to which the Seller, the Seller Guarantors and/or their Affiliates, as applicable (a "Services Assignor") are a party and the Business receives the benefit of all or a portion of such Services Contract from a counterparty (the "Counterparty") providing services thereunder. The Services Assignors shall endeavor to (i) assign (to the extent assignable) the Service Contracts to the extent such contact is applicable solely to the Business or (ii) with respect to any Services Contract that involves services provided to the Business and other facilities or businesses owned and/or operated by any Services Assignor or its Affiliates (a "Multi-Site Services Contract"), attempt to arrange for the Counterparty to divide the Services Contract into two contracts, one that relates solely to the Business (which contract shall be reasonably acceptable to the Purchaser) and one that relates to the remaining portions of such Service Contract (which contract shall be reasonably acceptable to the applicable Services Assignor). If any Services Contract cannot be assigned or divided (as described above), the applicable Services Assignor, shall, to the extent permitted under the applicable Services Contract, permit the Purchaser and/or the Target Companies, as applicable, to receive the benefit of the services to be provided thereunder (but only to the extent applicable to the Business), and Purchaser shall promptly pay to the applicable Services Assignor, upon written request, all amounts due under such Services Contract for the provision of the services provided thereunder applicable to the Business and shall indemnify, defend and hold harmless the applicable Services

- 35 -
**A0124**

Assignor in connection with Purchaser's and/or the Target Companies' receipt of such services. With respect to a Multi-Site Services Contract, Purchaser shall pay (i) for services billed based on actual usage, the fees owed in respect of such usage by the Business and (ii) for services billed other than for actual usage, based on the historical allocation of fees between the Business and the other service recipients thereunder, as reasonably determined by the applicable Services Assignor.  Purchaser agrees that it shall, or it shall cause the applicable Target Company, to receive all services to be provided pursuant to the immediately preceding sentence for the term of the applicable Services Contract; provided, Purchaser may cause (to the extent permitted by the applicable Services Contract and upon the notice period required) the earlier termination of that portion of any Services Contract applicable to the Business, in which case Purchaser shall pay any early termination or similar penalty or fee and shall indemnify, defend and hold harmless the applicable Services Assignor in connection with such early termination and/or assignment; provide, further, the early termination right above shall only apply to a Multi-Site Services Contract if  such contract (or the applicable Counterparty) permits a partial termination of only that portion of  such contract that relates to the Business.

## ARTICLE VI
## COVENANTS OF THE PURCHASER; CERTAIN ADDITIONAL COVENANTS OF THE PARTIES

6.1    Confidentiality.  The Purchaser acknowledges and agrees that the Confidentiality Agreement shall survive the execution and delivery of this Agreement by the parties hereto and that all information provided to the Purchaser or its "Representatives" or "Other Recipients" (as such terms are defined in the Confidentiality Agreement) in accordance with this Agreement shall be considered "Evaluation Material" (as such term is defined in the Confidentiality Agreement).

6.2    Regulatory Approvals.

(a)    The Purchaser will use best efforts to (i) obtain, as promptly as practicable, all Permits, approvals, authorizations and clearances of Governmental Authorities listed in Schedule 6.2 hereto and to make the filings and declarations with Governmental Authorities listed in Schedule 6.2 hereto, (ii) provide such information and communications to applicable Governmental Authorities as are necessary in connection with the foregoing or in connection with the Seller or its Affiliates' obtaining any of the Permits, approvals, authorizations and clearances of Governmental Authorities or making any filings or declarations with Governmental Authorities in accordance with Section 5.1, and (iii) cooperate with the Seller and its Affiliates in obtaining or making, as soon as practicable, any Permits, approvals, authorizations, clearances, filings and declarations of or with Governmental Authorities that the Seller or its Affiliates are required to obtain or make pursuant to Section 5.1.

(b)    In furtherance and not in limitation of the terms of Section 5.1 and Section 6.1, if required by applicable Law, the Seller and the Purchaser will promptly (but in no event later than twenty (20) Business Days) after the execution and delivery of this Agreement by all of the parties hereto file a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement.  The Seller and the Purchaser agree to supply promptly any additional information and documentary material that may be requested by any

Governmental Authority (including the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission) pursuant to the HSR Act, and shall cooperate in connection with any filing under applicable antitrust Laws and in connection with resolving any investigation or other inquiry concerning the transactions contemplated by this Agreement commenced by any Governmental Authority, including the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, or the office of any state attorney general. The filing fee with respect to the Notification and Report Form pursuant to the HSR Act, if any, shall be borne fifty percent (50%) by the Seller and fifty percent (50%) by the Purchaser.

(c)    If any state takeover statute or similar statute becomes applicable to this Agreement or any of the transactions contemplated by this Agreement, the parties will use commercially reasonable efforts to ensure that the transactions contemplated by this Agreement may be consummated as promptly as practicable on the terms contemplated by this Agreement and otherwise to minimize the effect of such statute or regulation on this Agreement and the transactions contemplated by this Agreement.

6.3    Post-Closing Access.

(a)    The Purchaser acknowledges that, subsequent to the Closing, the Seller may need access to information, documents or computer data in the control or possession of Purchaser (or its Affiliates), and the Seller may need access to the Facility or other assets of the Target Companies for purposes of concluding the transactions contemplated herein and for the prosecution or defense of third party claims. The Purchaser agrees that, at the sole cost and expense of the Seller, it will, subject to applicable Law, make available to the Seller and its representatives, agents and independent auditors such documents and information as may be in the possession of the Purchaser and its Affiliates relating to periods prior to the Effective Time and will permit the Seller and its representatives, agents and independent auditors to make copies of such documents and information at Seller's sole cost and expense.

(b)    Until six (6) months after the later to occur of (i) the expiration of the period during which any of the Tax Returns of the Target Companies for any Pre-Closing Period are subject to audit by any Governmental Authority or the final adjudication of any dispute or investigation involving Taxes arising out of the business, operations or affairs of the Target Companies before the Effective Time, (ii) the final adjudication of any matter for which the Seller may be required to indemnify or hold harmless any Purchaser Indemnitee pursuant to the terms of this Agreement, or (iii) the running of applicable statutes of limitations, the Purchaser will maintain in their original form all medical and other records (including all documents, electronic data and other compilations of information in any form) of the Target Companies existing as of the Effective Time that relate to the pre-Closing business, operations, assets and properties of the Business, and will give the Seller and its representatives reasonable access to all such Books and Records to the fullest extent reasonably required to enable the Seller and its Affiliates to satisfy their respective obligations hereunder or under applicable Law.

6.4    Treatment of Seller and Seller-Affiliate Intellectual Property. Purchaser agrees and acknowledges that Purchaser shall have no right to use, and shall not use, any of the Intellectual Property set forth on Schedule 6.4, all of which shall remain the sole and exclusive

property of the Person owning such Intellectual Property as reflected on <u>Schedule 6.4</u>. For the avoidance of doubt, from and after the Effective Time, Purchaser shall, and shall cause the Target Companies and Sherman MD Provider to, cease using any of the Intellectual Property set forth on <u>Schedule 6.4</u>.

     6.5   <u>Employee Matters</u>.

     (a)   Certain physicians engaged in the Business (the "<u>Medical Personnel</u>") are currently employed by LHP Texas MD Services, Inc. ("<u>LHP MD Provider</u>"), an Affiliate of LHP, and certain non-medical staff engaged in the Business (the "<u>Administrative Personnel</u>" and, together with the Medical Personnel, the "<u>Personnel</u>") are currently employed by the Staff Providers (the Staff Providers, together with the LHP MD Provider, being referred to herein as the "<u>Personnel Providers</u>").

     (i)   Seller shall use its commercially reasonable efforts to cause (x) Sherman Sponsor to sponsor Sherman MD Provider as a "501(a)" entity organized pursuant to Section 162.001(b) of the Texas Occupations Code, (y) LHP MD Provider to transfer all Medical Personnel, including assigning all Contracts governing the provision of services by the Medical Personnel, to Sherman MD Provider, and (z) Sherman MD Provider to accept all Medical Personnel, including all Contracts governing the provision of services by the Medical Personnel, and to indemnify LHP MD Provider for any claims by the Medical Personnel based on or arising out of any pre-501(a) Certification Time actions; <u>provided</u>, <u>however</u>, the Parties agree and acknowledge that the 501(a) Certification Date is likely to occur after the Closing Date.

     (ii)   Except as otherwise provided by <u>Section 6.5(a)(i)</u>, effective as of the Effective Time, Seller shall cause the Personnel Providers to terminate the Personnel, and Purchaser shall, or shall cause the Target Companies or one of its Affiliates to, offer to employ all of the Personnel as of the Closing Date, including Personnel on military or other types of leave in positions and at compensation levels consistent with those being provided by the Personnel Providers immediately prior to Closing. All such Personnel who accept the Purchaser's offer of employment, or who are transferred to Sherman MD Provider in accordance with <u>Section 6.5(a)(i)</u>, shall be referred to herein as the "<u>Hired Employees</u>". At the Effective Time, and without further action of any party thereto, the term of the Employee Lease Agreement shall expire.

     (b)   For the period beginning on the Closing Date (or, with respect to Medical Personnel transferred to Sherman MD Provider, the 501(a) Certification Date) and ending on the first anniversary of the Closing Date, Purchaser agrees to maintain benefit levels, including nonqualified deferred compensation opportunities, retirement benefits, and health and welfare benefits, for the Hired Employees which are comparable to those that were in effect for the Hired Employees immediately prior to the Closing Date. Purchaser will treat, and cause the appropriate benefit plans to treat, the service of the Hired Employees with LHP and its Affiliates attributable to any period before the Closing Date as service rendered to Purchaser or any Affiliate of Purchaser for purposes of eligibility and vesting under paid time off programs of Purchaser (or its Affiliates), for purposes of the health and welfare plan(s) and cafeteria plan(s) maintained by Purchaser (or its Affiliates) and for purposes of the defined contribution plan(s) of Purchaser (or its Affiliates), except where such credit would result in duplication of benefits.

Without limiting the foregoing, to the extent that any Hired Employee participates in any health or other group welfare benefit plan of Purchaser or its Affiliate following the Closing, (i) Purchaser shall cause any pre-existing conditions or limitations, eligibility waiting periods and required physical examinations under any health or similar welfare plan of Purchaser (or its Affiliates) to be waived with respect to the Hired Employees and their eligible dependents, to the extent waived under the corresponding plan in which the Hired Employee participated immediately prior to the Closing, and (ii) any deductibles paid and flexible spending account balances accumulated by a Hired Employee under any of LHP's (or its Affiliates') health or cafeteria plans in the plan year in which the Closing Date occurs shall be credited towards deductibles and flexible spending account balances under the health plan(s) or cafeteria plan(s), as appropriate, of Purchaser (or its Affiliates).  LHP and the Purchaser shall cooperate to effectuate any rollovers to the Purchaser's 401(k) plan by the Hired Employees, to the extent the Hired Employees elect to rollover any such assets into the Purchaser's 401(k) plan. Notwithstanding any provision in this Agreement to the contrary, nothing in this Section 6.5(b) shall (i) be deemed or construed to be an amendment or other modification of any Employee Benefit Plan or of any of Purchaser's employee benefit plans, or (ii) create any third party rights in any current or former employee, director or other service provider of Purchaser, LHP, the Seller or any of their respective Affiliates (or any beneficiaries or dependents thereof).

(c)    Pursuant to the "Alternate Procedure" provided in section 5 of Revenue Procedure 2004-53, 2004-34 I.R.B. 320 (i) Purchaser and the Personnel Providers shall report on a predecessor/successor basis as set forth therein, (ii) the Personnel Providers shall be relieved from filing a Form W-2 with respect to the Hired Employees and (iii) Purchaser shall undertake to file (or cause to be filed) a Form W-2 for each such Hired Employee for the year that includes the Closing Date (including the portion of such year that such Hired Employee was employed by a Personnel Provider).

(d)    Purchaser will continue to employ a sufficient number of then-current employees at each Target Company and Sherman MD Provider for the period commencing on the Closing Date and ending ninety (90) days after the 501(a) Certification Date so as not to result in the imposition of liability on the Seller or its Affiliates under the WARN Act due to a "plant closing" or "mass layoff" or otherwise under the provisions of the WARN Act, or any similar state or local laws relating to plant closings, with respect to the Target Companies and Sherman MD Provider.  All quoted terms used in this Section 6.5(d) and not defined herein shall have the meanings ascribed to such terms under the WARN Act.

6.6    Tax Matters.

(a)    Filing of Tax Returns.

(i)    The Seller shall prepare and file, or cause to be prepared and filed, all Tax Returns, if any, of the Target Companies (including any amendments thereto) for any taxable period ending at or prior to the Closing Date (a "Pre-Closing Period").  The Purchaser agrees to assist the Seller without any charge in the determination of such Taxes and the preparation of such Tax Returns.

(ii) The Purchaser shall prepare and file, or cause to be prepared and filed, all Tax Returns of the Target Companies for all taxable periods other than a Pre-Closing Period.

(b) <u>Straddle Period Tax Allocation</u>. Any liability for Taxes of a Target Company attributable to a Straddle Period shall be apportioned between the portion of such period ending on or prior to the Closing Date and the portion beginning after the Closing Date (i) in the case of real property, personal property and ad valorem Taxes, by apportioning such Taxes on a per diem basis and (ii) in the case of all other Taxes, on a closing of the books basis, as if the taxable year of such Target Company ended on the Closing Date, <u>provided</u> that exemptions, allowances or deductions that are calculated on an annual basis (including, but not limited to, depreciation and amortization deductions) shall be apportioned on a per diem basis.

(c) <u>Cooperation</u>. The Seller, on the one hand, and the Purchaser and the Target Companies, on the other hand, agree to furnish or cause to be furnished to each other or their respective representatives, upon request, as promptly as practicable, such information and assistance (including access to Books and Records) relating to the Target Companies as is reasonably necessary for the preparation of any Return, claim for refund, audit or similar matter, or the prosecution or defense of any claim, suit or proceeding relating to any proposed adjustment of Taxes.

(d) <u>Post-Closing Audits and Other Proceedings</u>. In the case of any audit, examination or other proceeding ("<u>Proceeding</u>") with respect to Taxes for which a Seller is or may be liable pursuant to this Agreement, the Purchaser shall promptly notify the Seller in writing of any such Proceeding, and the Purchaser shall timely execute or cause to be executed powers of attorney or other documents necessary to enable the Seller to take all actions desired by the Seller with respect to such Proceeding to the extent such Proceeding may affect the amount of Taxes for which the Seller is liable with respect to the Target Companies. The Seller shall have the sole right to control any such Proceedings, including the right to initiate any claim for refund or credit, file any amended Tax Return or take any other action that it deems appropriate with respect to such Taxes (or refunds or credits). If any Proceeding would affect the Tax liability of the Purchaser or an Affiliate (including a Target Company) in any material respect for a taxable period ending after the Closing Date, the Seller will not settle such Proceeding without the Purchaser's prior written consent, such consent not to be unreasonably withheld, conditioned, or delayed. In the event that the Purchaser's consent is withheld, the Purchaser will assume the control, costs and expenses of the Proceeding. If such Proceeding is ultimately resolved by payment of an amount in excess of the amount in the original settlement proposal (or receipt of a refund in an amount less than the amount in the original settlement proposal), the Purchaser will pay the amount of such excess (or shall pay the Seller the amount of such refund shortfall). If such Proceeding is ultimately resolved by payment of an amount less than the amount of the original settlement proposal (or a refund or credit in an amount greater than the original settlement proposal), the Seller will reimburse the Purchaser for their respective costs and expenses to the extent of such difference.

(e) <u>Refunds for Pre-Closing Periods</u>. The amount of any refund of or credits against Taxes relating to a Target Company (including any interest paid or credited with respect thereto) in respect of the Pre-Closing Period or the pre-Closing portion of any Straddle Period

shall be promptly paid by Purchaser to Seller, without set-off or application therefor against any Taxes owed for any period after the Effective Time.

6.7    Maintenance of Services.  Purchaser shall continue to provide the material clinical services and programs currently being provided by the Facility that are described on Exhibit E and shall not discontinue the provision of any such material clinical services and programs prior to April 16, 2015 (the "Services Date"), so long as appropriate levels of clinical quality and patient safety can be maintained with respect to each of such services throughout such period. Any deletion of such services and programs prior to the Services Date shall be based upon the clinical quality and patient safety factors and shall require the prior written approval of Seller. Seller shall have the right to specific performance of Purchaser's obligation set forth in this Section 6.7.

6.8    Transfer of Certain Assets.  Prior to the Closing, Seller shall use its commercially reasonable efforts to transfer and assign, and the Target Companies shall accept and assume, the assets and liabilities set forth on Schedule 6.8.

6.9    MOB Obligations.  Purchaser, Guarantor and Seller shall use their commercially reasonable efforts to cause Seller and LHP to be fully and finally released from any obligations under the Ground Lease and Space Leases.

6.10    Meaningful Use Payments.  The Facility is an acute care inpatient hospital that is a participant in the Medicare and Medicaid Electronic Health Record Incentive Program (the "EHR Incentive Program") and is eligible for incentive payments under the EHR Incentive Program as a meaningful user of certified electronic health record technology (the "Meaningful Use Payments"). Purchaser covenants and agrees to remit promptly to Seller (and in any event within five (5) days following the receipt thereof) any Meaningful Use Payments received by Purchaser, the Target Companies or their Affiliates following the Closing Date (which, for the avoidance of doubt, may be received after December 31, 2014) that relate to the Facility's participation in the EHR Incentive Program during periods ending on or before December 31, 2014.

6.11    Closing Conditions.  The Purchaser will use its commercially reasonable efforts to (i) cause the conditions set forth in Article VIII hereof to be satisfied and (ii) obtain the Title Policy, in each case on or prior to October 31, 2014; provided, if the conditions set forth in Article VIII shall not have been satisfied, or if Purchaser shall have failed to secure the Title Policy, on or prior to October 31, 2014, Purchaser shall continue to use its commercially reasonable efforts to satisfy its obligations under this Section 6.11 as soon as reasonably practicable thereafter, but in all circumstances prior to the Optional Termination Date.

6.12    Covenant Not to Compete; Non-Solicitation.

(a)    For a one (1) year period immediately following the Closing Date (the "Restricted Period"), Seller and the Seller Guarantors shall not, directly or indirectly, except as a consultant or contractor to or of Purchaser (or any Affiliate of Purchaser), own, lease, manage, operate, control, or participate in any manner with the ownership, leasing, management, operation or control of any business which offers services in competition with the Business,

including but not limited to any acute care hospital, specialty hospital, long-term acute care hospital, rehabilitation facility, diagnostic imaging center, inpatient or outpatient psychiatric or substance abuse facility, ambulatory or other type of surgery center, skilled nursing facility, or home health or hospice agency (any of such uses being referred to herein as a "Competing Business"), within a 25-mile radius of the Facility (the "Restricted Area"), without Purchaser's prior written consent; provided, however, that Seller and the Seller Guarantors will not be precluded from participating in activities which they were engaged in as of the September 1, 2014.

(b)     Each of Seller and the Seller Guarantors further agrees that, during the Restricted Period, Seller and the Sellers Guarantors shall not directly or indirectly, in any capacity, either separately, jointly or in association with others, directly or indirectly do any of the following: (i) employ or seek to employ any Hired Employee; or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or other Person having a business relationship with the Purchaser or its Affiliates primarily with respect to the Business, at any time during the Restricted Period, to discontinue or reduce or modify the extent of such relationship with the Purchaser or its Affiliates with respect to the Business; provided, however, with respect to clause (i), such prohibition shall not apply to any solicitation (or hiring as a result thereof) conducted by means of a general solicitations or through the use of hiring firms not directed to target any Hired Employee.

(c)     Seller and the Seller Guarantors agree and acknowledge that Purchaser has legitimate business interests justifying the non-competition and non-solicitation covenants included herein.  Purchaser's legitimate business interests include, without limitation, valuable confidential business and professional information, substantial relationships with specific prospective and existing customers, patients, clients and payors, and also patient and client goodwill associated with Purchaser's specific geographic location and specific marketing area. Seller and the Seller Guarantors acknowledge and agree that the non-competition and non-solicitation covenants included herein are reasonably necessary to protect the legitimate business interests of the Purchaser.

(d)     Seller and the Seller Guarantors acknowledge that satisfaction of the covenants and agreements set forth in this Section 6.12 is necessary to protect the business, goodwill, and other proprietary interests of Purchaser and that a breach of such covenants and agreements will result in irreparable and continuing damage to Purchaser for which there will be no adequate remedy at law, and further agree that this Section 6.12 may be enforced by temporary restraining order, temporary injunction, or permanent injunction restraining violation thereof, or by any another other remedy whether at law or in equity (including, without limitation, monetary damages), pending or following trial on the merits without the necessity of the posting of a bond or other security.  Seller and the Seller Guarantors hereby waive the claim or defense that an adequate remedy at law for such a breach exists. Moreover, in the event any court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth herein are unreasonable, then it is the intention of the parties that such restrictions be enforced to the maximum scope, duration and territory that the court deems reasonable, and this Agreement shall thereby be reformed.

    (e)    All of the provisions of this <u>Section 6.12</u> shall inure to any successor or assign of Purchaser with respect to the Business.  Notwithstanding anything to the contrary herein, the Restricted Period shall immediately terminate with respect to LHP in the event that a Person or group of Persons who are not currently Affiliates of LHP acquire, directly or indirectly, (i) a majority of the voting securities of LHP (whether pursuant to stock purchase, merger, consolidation or otherwise) or (ii) all or substantially all of the assets of LHP and/or its subsidiaries.

    6.13    <u>Additional 501(a) Matters</u>.  On the 501(a) Certification Date, LHP MD Provider shall assign, and Sherman MD Provider shall assume, the agreements set forth on <u>Schedule 6.13</u> (the "<u>501(a) Assigned Agreements</u>"); <u>provided</u>, such assignment shall not relieve Sherman Hospital from any obligations to LHP MD Provider under the 501(a) Assigned Agreements arising out of any events prior to the 501(a) Certification Time.  If the Closing Date occurs prior to the 501(a) Certification Date, Purchaser shall cause Sherman Hospital to perform all of its obligations under the Affiliation Agreement from the Closing Date through the 501(a) Certification Time.  Upon the 501(a) Certification Time, and without further action of any party thereto, the term of the Affiliation Agreement shall expire.  LHP MD Provider shall be an express third party beneficiary of this <u>Section 6.13</u>.

## ARTICLE VII
## CONDITIONS TO OBLIGATIONS OF THE PURCHASER

    Except as may be waived by the Purchaser, the obligations of the Purchaser to purchase the Interests, to pay the Closing Date Consideration on the Closing Date, and to consummate the transactions contemplated hereby shall be subject to the satisfaction on or prior to the Closing Date of the following conditions:

    7.1    <u>Representations and Warranties</u>.  The Fundamental Representations shall be true and correct as of the Closing Date in each case as if made on and as of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, in which case as of such date), other than de minimis inaccuracies.  All other representations and warranties of the Seller set forth in this Agreement shall be true and correct as of the Closing Date in each case as if made on and as of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, in which case as of such date), except to the extent that the occurrences, circumstances or facts giving rise to any such representation or warranty not being true and correct, individually or in the aggregate, have not resulted in a Material Adverse Effect.

    7.2    <u>Compliance with Agreement</u>.  On and as of the Closing Date, the Seller shall have performed and complied in all material respects with each covenant and agreement required by this Agreement to be performed and complied with by it on or before the Closing Date.

    7.3    <u>Closing Certificates</u>.  The Seller shall have delivered to the Purchaser a certificate, dated as of the Closing Date and signed on behalf of the Seller, certifying the fulfillment of the conditions specified in <u>Sections 7.1</u> and <u>7.2</u>.

    7.4    <u>Consents and Authorizations</u>.  The Purchaser shall have obtained documentation or other evidence reasonably satisfactory to the Purchaser that the Seller has:

      (a)     received all Permits, consents or approvals set forth on <u>Schedule 7.4(a)</u>; and

      (b)     complied with all waiting periods under the HSR Act and any similar state Law.

7.5  <u>No Action or Proceeding</u>.  On the Closing Date, no valid judgment, order or decree of any court or other Governmental Authority restraining, enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby shall be in effect.

7.6  <u>Good Standing Certificates</u>.  At the Closing, the Seller shall have delivered to the Purchaser good standing certificates issued with respect to each of the Target Companies by the Secretary of State of the relevant entity's state of organization.  Each such good standing certificate shall be dated as of a date that is not more than sixty (60) days prior to the Closing Date.

7.7  <u>Title to Real Property</u>.  First American Title Insurance Company (or another title company reasonably acceptable to Purchaser) shall have committed to issue to Purchaser (at Purchaser's sole cost and expense) a customary title policy with respect to the Owned Real Property, subject only to the Permitted Encumbrances (the "<u>Title Policy</u>").

7.8  <u>Excluded Obligations Release</u>.  Seller shall have delivered the duly executed Excluded Obligations Release.

7.9  <u>Adverse Change</u>.  No act, change, event, or occurrence shall have occurred that has had a Material Adverse Effect with respect to the Target Companies.

7.10  <u>Waiver of Conditions</u>.  The Purchaser may waive any condition of this <u>Article VII</u> to the extent permitted by applicable law.  Except as otherwise provided herein or agreed to by the parties prior to the Closing, the consequences of any knowing waiver shall be (a) the elimination of the waived condition as a valid basis for the Purchaser to refuse to close the transactions contemplated by this Agreement, and (b) the release of Target and Target Companies from any claim by the Purchaser for any resulting injuries and Damages with respect to that waived condition.

**ARTICLE VIII**
**CONDITIONS TO OBLIGATIONS OF THE SELLER**

Except as may be waived in writing by the Seller, the obligations of the Seller to consummate the sale of the Hospital Interests on the Closing Date and the Sponsor Interests on the 501(a) Certification Date shall be subject to the satisfaction on or prior to the Closing Date of the following conditions:

8.1  <u>Representations and Warranties</u>.  All representations and warranties of the Purchaser set forth in this Agreement shall be true and correct in all material respects (except to the extent that any such representation or warranty is qualified by materiality, in which case it must be true and correct in all respects) as of the Closing Date in each case as if made on and as

of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, in which case as of such date).

8.2     Compliance with Agreement.  On and as of the Closing Date, the Purchaser shall have performed and complied in all material respects with each covenant and agreement required by this Agreement to be performed and complied with by it on or before the Closing Date.

8.3     Closing Certificates.  The Purchaser shall have delivered to the Seller a certificate, dated as of the Closing Date and signed on behalf of the Purchaser, certifying the fulfillment of the conditions specified in Sections 8.1 and 8.2.

8.4     Consents and Authorizations.   The Seller shall have obtained documentation or other evidence reasonably satisfactory to the Seller that the Purchaser and Target Companies have:

(a)     received all Permits, consents or approvals set forth on Schedule 8.4(a); and

(b)     complied with all waiting periods under the HSR Act and any similar state Law.

8.5     No Action or Proceeding.   On the Closing Date, no valid judgment, order or decree of any court or other Governmental Authority restraining, enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby shall be in effect.

8.6     Waiver of Conditions.  The Seller may waive any conditions of this Article VIII to the extent permitted by applicable law.   Except as otherwise provided herein, the consequences of any knowing waiver shall be (a) the elimination of the waived condition as a valid basis for the Seller to refuse to close the transactions contemplated by this Agreement, and (b) the release of the Purchaser from any claim for resulting injuries and Damages with respect to that waived condition.

**ARTICLE IX
INDEMNIFICATION**

9.1     Survival.  Except for (i) the Fundamental Representations and the representations and warranties of Purchaser contained in Article IV, which representations and warranties shall survive until five (5) years after the Closing Date ("Fundamental Reps Survival Period") and (ii) Section 3.5, which shall survive until one (1) year after the Closing Date (the "Section 3.5 Survival Period"), the representations and warranties set forth in this Agreement shall terminate and be extinguished at the Closing and the covenants and agreements contemplated by this Agreement to be performed at or prior to Closing shall terminate and be extinguished at the Closing, and no party shall have any liability or obligation in connection with any such representation, warranty, covenant or agreement following the Closing (and the parties hereto acknowledge and agree that, in the event that Closing occurs, no party may bring any claim for indemnification against the other party hereunder based upon or arising out of a breach of any such representations, warranties, covenants or agreements).   The respective covenants and

agreements of the parties contained in or made pursuant to this Agreement that by their terms are to be performed after the Closing shall survive such Closing in accordance with their terms (the "Post-Closing Covenants Survival Period" and, together with the Fundamental Reps Survival Period and the Section 3.5 Survival Period, each a "Survival Period").  The Parties agree and acknowledge that the Survival Periods set forth herein, to the extent expressly longer than the three (3) year survival period permitted by Title 10, Section 8106(a) of the Delaware Code, are expressly intended to survive for such longer periods as permitted by Title 10, Section 8106(c) of the Delaware Code.

9.2     Indemnification by the Seller.  Subject to the provisions of this Article IX, the Seller shall indemnify and hold harmless the Purchaser, any Affiliate of the Purchaser, and the respective officers, directors, shareholders, employees, agents and representatives of the Purchaser and its Affiliates (each, a "Purchaser Indemnitee") from and after the Effective Time, from and against any Damages actually incurred by the Purchaser Indemnitee as a result of:

(a)     any inaccuracy in any of the Fundamental Representations made herein by the Seller;

(b)     any inaccuracy in Section 3.5;

(c)     any breach of any of the covenants or agreements made herein by the Seller; and

(d)     any Taxes for any Pre-Closing Period (including the pre-Closing portion of any Straddle Period, determined in accordance with Section 6.6(b)).

9.3     Indemnification by the Purchaser.  The Purchaser shall indemnify and hold harmless the Seller, the Seller Guarantors or any Affiliate of the Seller Guarantors, and their respective officers, directors, shareholders, employees, agents and representatives (each a "Seller Indemnitee") from and after the Effective Time from and against any Damages actually incurred by such Seller Indemnitee as a result of:

(a)     any inaccuracy in any of the representations and warranties made herein by the Purchaser;

(b)     any breach of any of the covenants or agreements made herein by the Purchaser;

(c)     (i) any claim by any current or former employee of a Personnel Provider related to such Person's work in the Business or (ii) any claim by a third party against a Seller Indemnitee that relates to any Target Company or the Business, including any claim related to any services provided to any Target Company or the Business by any Seller Indemnitee; provided, no Seller Indemnitee shall be entitled to indemnification pursuant to this Section 9.3(c)(ii) with respect to any services provided to any Target Company or the Business if it is finally determined by a court of competent jurisdiction that such claim principally arose out of such Seller Indemnitee's gross negligence or willful misconduct;

(d)    any Claims, actions, suits, or other proceedings relating to the operations of the Target Companies after the Effective Time; provided, that nothing herein shall relieve the Seller of its indemnification obligations pursuant to Section 9.2; and

(e)    any liabilities related to the MOB in respect of (i) Seller's post-Closing lease obligations under the Space Leases or (ii) LHP's guarantees of the Ground Lease and Space Leases.

9.4    Limitations on Claims.

(a)    Notwithstanding anything in this Article IX to the contrary, the rights of the parties to be indemnified and held harmless under this Article IX shall be limited as follows:

(i)    in no event shall the Purchaser Indemnitees be entitled to recover any Damages with respect to any matter relating to the Target Companies' assets, liabilities or reserves that were included in the calculation of the Final Net Working Capital, to the extent such Damages are reflected therein;

(ii)    Seller will have no obligation to indemnify a Purchaser Indemnitee pursuant to Section 9.2(a) in respect of damages arising from any inaccuracy in any of the Fundamental Representations or Section 3.5 unless and until the aggregate amount of such damages incurred or suffered by all Purchaser Indemnitees exceeds $250,000 (the "Threshold"), and thereafter Seller shall only indemnify a Purchaser Indemnitee in respect of any damages in excess of the Threshold;

(iii)    Purchaser will have no obligation to indemnify a Seller Indemnitee pursuant to Section 9.3(a) in respect of damages arising from any inaccuracy in any of the representations and warranties made herein by Purchaser unless and until the aggregate amount of such damages incurred or suffered by all Seller Indemnitees exceeds the Threshold, and thereafter Purchaser shall only indemnify a Seller Indemnitee in respect of any damages in excess of the Threshold; and

(iv)    the Seller shall not be liable for any Damages pursuant to Section 9.2 in excess of the aggregate dollar amounts paid to the Seller pursuant to any of the provisions of this Agreement; provided, Seller's liability for any Damages pursuant to Section 9.2(b) shall not exceed $1,137,500.

(b)    The liability of a party with respect to any claim for indemnity by an Indemnitee pursuant to this Article IX shall be offset dollar for dollar by (i) any insurance proceeds received by such Indemnitee after the Effective Time in respect of the Damages involved, (ii) any other recovery made by such Indemnitee from any third party on account of the Damages involved, but, in each case, only after Indemnitee first recovers all Damages, including the aggregate amount of all costs and expenses incurred by such Indemnitee in connection with the recovery of such proceeds (including payment of deductibles and self-insured retention amounts) and less the present value of all insurance policy premium increases reasonably anticipated to result therefrom, and (iii) any Tax benefit realized by the Purchaser or an Affiliate in respect of the indemnified matter.

(c)     The right to indemnification with respect to any claim for which notice has been properly and timely given in accordance with Sections 9.1 and 9.5 shall expire on the day after the expiration of the applicable Survival Period, unless an action or suit has been brought with respect to such Claim.

9.5     Claims Procedures.

(a)     If a party seeks indemnification for Damages hereunder, the party seeking indemnification (the "Indemnitee") shall promptly notify the party from whom indemnification is sought (the "Indemnifying Party") in writing of the existence and nature of such Damages (a "Claim"), and shall include in the Claim a reasonably detailed description of all related claims, demands, actions or proceedings, if any, out of which the Damages arise; provided, however, that so long as a Claim is delivered within the applicable Survival Period, failure or delay by the Indemnitee to deliver a Claim in compliance with this provision shall only reduce the obligation of the Indemnifying Party to the extent that such failure impairs the Indemnifying Party's ability to defend the claim or mitigate Damages, in which case the Indemnifying Party shall have no obligation to indemnify the Indemnitee to the extent of Damages caused by such failure.

(b)     In the event of a Claim related to a claim by a third party, the Indemnifying Party may elect to retain counsel of its choice to represent the Indemnitee in connection with such Claim and shall pay the fees, charges and disbursements of such counsel. The Indemnitee may participate, at its own expense and through legal counsel of its choice, provided that (i) the Indemnifying Party may elect to control the defense of the Indemnitee in connection with such Claim and (ii) the Indemnitee and their counsel shall cooperate with the Indemnifying Party and its counsel in connection with such Claim. The Indemnifying Party shall not settle any such Proceeding without the relevant Indemnitees' prior written consent (which shall not be unreasonably withheld). Notwithstanding the foregoing, if the Indemnifying Party elects not to retain counsel and assume control of such defense or if both the Indemnifying Party and any Indemnified Party are parties to or subjects of such proceeding and conflicts of interests exist between the Indemnifying Party and such Indemnitee, then the Indemnitee shall retain counsel reasonably acceptable to the Indemnifying Party in connection with such proceeding and assume control of the defense in connection therewith, and the fees, charges and disbursements of no more than one such counsel per jurisdiction selected by the Indemnitee shall be reimbursed by the Indemnifying Party.

(c)     If the Indemnifying Party shall, within a reasonable time after said notice, fail to defend, the Indemnitee shall have the right, but not the obligation, and without waiving any rights against the Indemnifying Party, to undertake the defense of, and with the consent of the Indemnifying Party (such consent not to be withheld unreasonably), to compromise or settle the Claim on behalf, for the account, and at the risk and expense, of the Indemnifying Party and shall be entitled to collect the amount of any settlement or judgment or decree and all costs and expenses (including, without limitation, reasonable attorney's fees) in connection therewith from the Indemnifying Party. Under no circumstances will the Indemnifying Party have any liability in connection with any settlement of any Proceeding that is entered into without its prior written consent (which shall not be unreasonably withheld). Except as provided in this Section 9.5(c), the Indemnitee shall not compromise or settle any Claim.

(d)    From and after the delivery of a Claim, at the reasonable request of the Indemnifying Party, each Indemnitee shall grant the Indemnifying Party and its counsel, experts and representatives full access, during normal business hours, to the books, records, personnel and properties of the Indemnitee to the extent reasonably related to the Claim at no cost to the Indemnifying Party.

(e)    An Indemnitee shall use commercially reasonable efforts to pursue insurance claims or claims against third parties that may reduce or eliminate any Damages.

9.6    <u>Subrogation</u>.  After any indemnification is made to any Indemnitee pursuant to this <u>Article IX</u>, the Indemnifying Party shall, to the extent of such payment, be subrogated to all rights (if any) of the Indemnitee against any third party in connection with the Damages to which such payment relates (which rights of subrogation shall be junior to any rights of the Indemnitee for any such Damages as to which it did not receive indemnification pursuant to this <u>Article IX</u> as a result of the limitations set forth in <u>Section 9.4</u> or otherwise).

9.7    <u>Guarantee</u>.  The Seller Guarantors, severally to the extent of their Percentage Obligations and not jointly, hereby irrevocably guarantee the prompt performance of all obligations of the Seller arising under <u>Section 2.4(e)(ii)</u> and this <u>Article IX</u>.  The Seller Guarantors, Seller and Purchaser acknowledge that but for these guarantees, Purchaser would not enter into this Agreement and the transactions contemplated herein.

9.8    <u>Limitation on Damages</u>.  NOTWITHSTANDING ANYTHING TO THE CONTRARY ELSEWHERE IN THIS AGREEMENT, NEITHER PARTY (OR ANY OF ITS AFFILIATES) SHALL BE LIABLE TO THE OTHER PARTY (OR ANY OF ITS AFFILIATES) FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, COSTS, EXPENSES, CHARGES OR CLAIMS.

9.9    <u>Exclusive Remedy</u>.  From and after the Closing, the remedies provided for in this <u>Article IX</u> and in the Guarantee shall be exclusive and shall preclude assertion by any Indemnitee of any other rights or the seeking of any and all other remedies against any Indemnitor for claims based on this Agreement, the negotiation thereof or otherwise, other than for (a) actions for specific performance, (b) Damages arising out of or relating to Actual Fraud by any Indemnitor and (c) adjustments to the Closing Date Consideration contemplated by <u>Section 2.4</u>.  Each party hereby waives any provision of applicable Law to the extent that it would limit or restrict the agreement contained in this <u>Section 9.9</u>, and Seller and Purchaser each hereby expressly waives for periods following the Closing any and all other rights or causes of action it or its Affiliates or representatives may have against the other Party or its Affiliates or representatives now or in the future under any applicable Law with respect to any breach of any representation, warranty, covenant or other agreement herein or the subject matter of such indemnification provisions.

## ARTICLE X
## TERMINATION

10.1 <u>Termination Events</u>. This Agreement may be terminated at any time prior to Closing upon prior written notice by the party electing to terminate this Agreement to the other party:

(a) by written agreement executed by the Seller and the Purchaser;

(b) by either the Seller or the Purchaser if any permanent injunction, Court Order or other order, decree or ruling of any court or other Governmental Authority of competent jurisdiction permanently restraining, enjoining or otherwise preventing the consummation of the transactions contemplated hereby shall have been issued and become final and non-appealable;

(c) by either the Seller or the Purchaser if the Closing shall not have occurred by the Optional Termination Date; <u>provided</u>, <u>however</u>, that this <u>Section 10.1(c)</u> shall not be available to any Party (A) whose Willful Breach of any provision of this Agreement results in the failure of the Closing to be consummated on or before the Optional Termination Date, <u>provided</u> that from and after the Optional Termination Date, the non-Willful Breaching party shall have sixty (60) days to commence a legal proceeding for specific performance of this Agreement and (x) if such legal proceeding is not commenced by the end of such sixty (60) day period or (y) there is a final and nonappealable judgment by a Governmental Authority of competent jurisdiction denying a claim for specific performance by the non-Willful Breaching party, the Willful Breaching party shall have the right to terminate this Agreement pursuant to the terms and conditions of this <u>Section 10.1(c)</u> notwithstanding this clause (A)) or (B) during the pendency of any legal proceeding by the other Party for specific performance of this Agreement;

(d) by the Seller upon a breach in any material respect of any covenant or agreement on the part of the Purchaser set forth in this Agreement, and such breach is not cured within thirty (30) days of notice thereof, or if any representation or warranty of the Purchaser shall have been breached or shall have become untrue in any such case that the conditions set forth in <u>Sections 8.1</u> and <u>8.2</u> would be incapable of being satisfied by the Optional Termination Date (or any later date as such date may be otherwise extended by mutual agreement of the parties); or

(e) by the Purchaser upon a breach in any material respect of any covenant or agreement on the part of the Seller set forth in this Agreement, and such breach is not cured within thirty (30) days of notice thereof, or if any representation or warranty of the Seller shall have been breached or shall have become untrue in any such case such that the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> would be incapable of being satisfied by the Optional Termination Date (or any later date as such date may be otherwise extended by mutual agreement of the parties).

10.2 <u>Effect of Termination</u>. In the event of termination of this Agreement pursuant to <u>Section 10.1</u>, all obligations of the parties hereto shall terminate, except the obligations of the parties pursuant to <u>Sections 6.1</u>, <u>10.2</u>, <u>11.1</u>, and <u>Article XII</u> (other than <u>Section 12.18</u>); <u>provided</u>, <u>however</u>, that the foregoing shall in no way release or waive any rights which any party may

have on account of a Willful Breach of any covenant or agreement or Actionable Breach pursuant to this Agreement which occurred prior to such termination.

## ARTICLE XI
## NOTICES

11.1    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person or received by telegraphic or other electronic means (including facsimile, telecopy and telex), when delivered by reputable overnight courier, or if mailed, five days after being deposited in the United States mail, certified or registered mail, first-class postage prepaid, return receipt requested, to the parties at the following addresses or facsimile numbers:

If to the Seller, to:

Sherman/Grayson Health System, LLC
c/o LHP Hospital Group, Inc.
2400 Dallas Parkway, Suite 450
Plano, Texas  75093
Attention: General Counsel
Fax:  (972) 312-9750

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  Harvey Eisenberg, Esq.
Facsimile:  212-310-8007

If to the Purchaser, to:

Alecto Healthcare Services Sherman LLC
c/o Alecto Healthcare Services LLC
16310 Bake Parkway, Suite 200
Irvine, California 92618
Attention: CEO
Facsimile: (949) 878-9458

with a copy (which shall not constitute notice) to:

Law Offices of Michael J. Sarrao
16310 Bake Parkway, Suite 200
Irvine, California 92618
Attention: Michael J. Sarrao, Esq.
Facsimile: (949) 878-9458

Any Party from time to time may change its address or facsimile number for the purpose of receipt of notices to that Party by giving a similar notice specifying a new address or facsimile number to the other notice Parties listed above in accordance with the provisions of this <u>Section 11.1</u>.

## ARTICLE XII
## MISCELLANEOUS

12.1    <u>Fees and Expenses</u>.  Except as otherwise provided in this Agreement, the Seller shall pay its own expenses (including, without limitation, the fees and expenses of Weil, Gotshal & Manges LLP and of the parties reflected in <u>Schedule 3.20</u> in connection with this Agreement and also including those expenses of the Target Companies in connection with this Agreement and the transactions contemplated hereby incurred prior to the Effective Time) and the Purchaser shall pay its own expenses (including, without limitation, the fees and expenses of attorneys, accountants and other representatives in connection with this Agreement, and also including those of the Target Companies in connection with this Agreement and the transactions contemplated hereby incurred after the Effective Time) in connection with this Agreement and the transactions contemplated hereby.  Purchaser shall pay all recording fees, transfer fees, transfer taxes, and documentary or stamp taxes, if any, relating to the sale and the transactions provided for herein.  Except as set forth in the following sentence and in <u>Section 6.2(b)</u>, each party shall pay its own fees and expenses, including for purposes of this <u>Section 12.1</u>, attorney fees, with respect to the preparation of pre-merger report forms under the HSR Act, if applicable.  Further, and notwithstanding the foregoing, the Purchaser will bear all fees and expenses of all parties, resulting from or relating to any investigation or challenge of the transactions contemplated hereby initiated by the United States Federal Trade Commission, the United States Department of Justice or the Attorney General of any state on, prior to or after the Closing under antitrust or similar Laws, including costs and expenses resulting from or relating to any "second request" issued in connection with the parties' HSR Act filings, if any, made in connection with the transactions contemplated hereby.

12.2    <u>Entire Agreement</u>.  Except for documents and agreements executed pursuant hereto, and except for the provisions of the Confidentiality Agreement (which Confidentiality Agreement shall survive the parties' execution and delivery of this Agreement), this Agreement supersedes all prior oral discussions and written agreements between the parties with respect to the subject matter of this Agreement (including any term sheet or similar agreement or document relating to the transactions contemplated hereby).  Except for the Confidentiality Agreement, this Agreement, including the exhibits and schedules hereto and other documents delivered in connection herewith, contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof.

12.3    <u>Waiver</u>.  Any term or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof.  Any such waiver must be in writing and must be duly executed by such party.  A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach, provision or requirement on any other occasion.

12.4    <u>Amendment</u>.  This Agreement may be modified or amended only by a written instrument duly executed by the Seller and the Purchaser.

12.5   <u>Counterparts; Facsimile Signatures; Reproductions</u>.   This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  Facsimile signatures on this Agreement shall be deemed to be original signatures for all purposes.  This Agreement and all documents relating hereto, including (i) consents, waivers and modifications which may hereafter be executed, (ii) the documents delivered at the Closing, and (iii) financial statements, certificates and other information previously or hereafter furnished to the Seller or to the Purchaser, may be reproduced by the Seller and by the Purchaser by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and, unless otherwise required by Law, the Seller and the Purchaser may destroy any original documents so reproduced.  The Seller and the Purchaser agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by the Seller or the Purchaser in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

12.6   <u>No Third Party Beneficiary</u>.  The terms and provisions of this Agreement are intended solely for the benefit of the Seller, the Purchaser and their respective successors or assigns, and it is not the intention of the parties to confer third party beneficiary rights upon any other Person, other than with respect to the provisions of <u>Sections 5.8</u>, <u>6.4</u>, <u>6.5</u>, <u>6.9</u> and <u>6.13</u> and <u>Article IX</u>, which shall inure to the benefit of the Persons who are intended to be third-party beneficiaries thereof.

12.7   <u>GOVERNING LAW, CONSTRUCTION</u>.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO A CONTRACT EXECUTED AND PERFORMED IN SUCH STATE IN ANY EVENT WITHOUT REGARD TO ANY CHOICE OF LAW PRINCIPLE THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  The parties hereto agree that no provisions of this Agreement or any related document shall be construed for or against or interpreted to the advantage or disadvantage of any party hereto by any court or other Governmental Authority by reason of any party's having or being deemed to have structured or drafted such provision, each party having participated equally in the structuring and drafting hereof.

12.8   <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, including successors by merger or otherwise.

12.9   <u>No Assignment</u>.  Neither this Agreement nor any right hereunder or part hereof may be assigned by any party hereto without the prior written consent of the other parties hereto; <u>provided</u>, <u>however</u>, that (a) the Seller, on the one hand, and the Purchaser, on the other hand, may assign their respective rights and obligations under this Agreement to other Persons who (i) are Affiliates of the Seller or the Purchaser, respectively, and (ii) agree to be bound by the terms and conditions of this Agreement; and (b) Purchaser may assign its rights under this Agreement to a real estate investment trust and/or its Affiliates in connection with a sale/leaseback transaction and true operating lease which is used to provide Purchaser with capital   to consummate this Agreement.  Notwithstanding the assignment of this Agreement or any rights or

obligations hereunder, the assignor shall be jointly and severally liable with its assignee with respect to any obligations assigned hereunder.

12.10  <u>Headings, Gender, Etc</u>.  The headings used in this Agreement have been inserted for convenience and do not constitute provisions to be construed or interpreted in connection with this Agreement.  Unless the context of this Agreement otherwise requires, (a) words of any gender will be deemed to include each other gender, (b) words using the singular or plural number also will include the plural or singular number, respectively, (c) the terms "hereof", "herein", "hereby" and derivative or similar words will refer to this entire Agreement, and (d) the terms "Article," "Section," "Schedule" and "Exhibit" will refer to the specified Article or Section of this Agreement or the specified Schedule or Exhibit to this Agreement.

12.11  <u>Public Announcement</u>.  Prior to the Closing, the Parties shall not, and shall cause their respective Affiliates not to, make or issue any public statements or announcements with respect to this Agreement or the transactions contemplated hereby.  In connection with the Closing, the Parties will use good faith efforts to agree on the text of a joint public statement or announcement and/or will use good faith efforts to obtain the other Party's approval of the text of any public statement or announcement to be made solely on behalf of a Party; <u>provided</u> that the foregoing shall not preclude any Party from making such disclosure as may be required by applicable Law.

12.12  <u>Severability; Invalid Provisions</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, (a) such provisions will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms and effect to such illegal, invalid or unenforceable provision as may be possible.

12.13  <u>Venue</u>.  To the fullest extent permitted by applicable law, each party hereto (a) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in any State or Federal court located in Delaware and not in any other State or Federal court in the United States of America or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of such courts located in Delaware for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court or any claim that any such proceeding brought in such a court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

12.14  <u>WAIVERS OF TRIAL BY JURY</u>.  EACH OF THE SELLER AND THE PURCHASER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY

- 54 -
**A0143**

JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTION DOCUMENTS, AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

12.15   <u>No Inferences</u>.  Inasmuch as this Agreement is the result of negotiations between sophisticated parties of equal bargaining power represented by counsel, no inference in favor of, or against, either party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such party.

12.16   <u>Tax and Government Program Advice and Reliance</u>.   Except as expressly provided in this Agreement, none of the Parties (nor any of the Parties' respective counsel, accountants or other representatives) has made or is making any representations to any other Party (or to any other Party's counsel, accountants or other representatives) concerning the consequences of the transactions contemplated hereby under applicable Tax Laws or under the Laws governing any Government Program.  Each Party has relied solely upon the Tax any Government Program advice of its own employees or of representatives engaged by such Party and not on any such advice provided by any other Party hereto.

12.17   <u>Further Assurance Clause</u>.  On and after the Closing Date, the Seller and the Purchaser will take all appropriate action and execute all documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the provisions hereof, including, without limitation, putting the Purchaser in possession and operational control of the Business and the Facility.

12.18   <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur in the event that any of the obligations, undertakings, covenants or agreements of the Parties hereto were not performed in accordance with their specific terms or were otherwise breached and that monetary damages, even if available, would not be an adequate remedy.  It is accordingly agreed that the Seller, on the one hand, and Purchaser, on the other hand, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by the other Party, and to enforce specifically the terms and provisions of this Agreement by a decree of specific performance, without the necessity of proving actual harm or posting a bond or other security therefor, this being in addition to any other remedy to which such Party is entitled at law or in equity, and each Party hereto agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that any other Party hereto has an adequate remedy at law or that any award of specific performance or other equitable remedy is not an appropriate remedy for any reason at law or in equity.  Without limitation of the foregoing, the Parties hereby further acknowledge and agree that prior to the Closing, the Seller shall be entitled to seek specific performance to enforce specifically the terms and provisions of, and to prevent or cure breaches of the covenants required to be performed by Purchaser under this Agreement (including to cause Purchaser to consummate the Closing and to make the payments contemplated by this Agreement, including <u>Section 2.6(a))</u> in addition to any other remedy to which the Seller is entitled at law or in equity, including the Seller's right to terminate this Agreement pursuant to <u>Article X</u> and seek money damages (including damages based on loss of the economic benefits of the transactions contemplated hereby to the Seller).  In the event that the Seller, on the one hand, or Purchaser, on the other hand, brings a legal proceeding for specific performance

pursuant to this Section 12.18, and a court rules that the Seller or Purchaser, as applicable, breached any provision of this Agreement, then the breaching Party shall also pay the non-breaching Party's reasonable costs and expenses (including reasonable attorneys' fees and expenses) in connection with all such legal proceedings to seek specific performance of the Seller's or Purchaser's, as applicable, obligations under this Agreement and all legal proceedings to collect such costs and expenses.  Each of the Parties further agrees that it shall not take any position in any legal proceeding concerning this Agreement that is contrary to the terms of this Section 12.18.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**SELLER:**                                              **PURCHASER:**

**SHERMAN/GRAYSON HEALTH                ALECTO HEALTHCARE SERVICES
SYSTEM, LLC**                                         **SHERMAN LLC**

                                                         By: Alecto Healthcare Services LLC, its sole member

By: _Rebecca Hurley_                           By: _____
Name: REBECCA HURLEY                     Name: _____
Its: EVP                                                  Its: _____


**SELLER GUARANTORS:**

**LHP HOSPITAL GROUP, INC.**

By: _Rebecca Hurley_
Name: REBECCA HURLEY
Its: EVP

**TEXAS HEALTH RESOURCES**

By: _____
Name: _____
Its: _____

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**SELLER:**

**PURCHASER:**

**SHERMAN/GRAYSON HEALTH SYSTEM, LLC**

**ALECTO HEALTHCARE SERVICES SHERMAN LLC**

By: Alecto Healthcare Services LLC, its sole member

By:_____

By:_____

Name:_____

Name:_____

Its:_____

Its:_____

**SELLER GUARANTORS:**

**LHP HOSPITAL GROUP, INC.**

By:_____

Name:_____

Its:_____

**TEXAS HEALTH RESOURCES**

By: _____

Name: _____

Its: _____

[Signature Page to Purchase Agreement]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**SELLER:**                                  **PURCHASER:**

**SHERMAN/GRAYSON HEALTH**              **ALECTO HEALTHCARE SERVICES**
**SYSTEM, LLC**                         **SHERMAN LLC**

By: Alecto Healthcare Services LLC, its sole member

By:_____              By:_____
Name:_____              Name:_____ _Roger Krissman_
Its:_____              Its:_____ _CFO_

**SELLER GUARANTORS:**

**LHP HOSPITAL GROUP, INC.**

By:_____
Name:_____
Its:_____

**TEXAS HEALTH RESOURCES**

By:_____
Name:_____
Its:_____

[Signature Page to Purchase Agreement]

**A0148**

**Exhibit A**

**Form of Excluded Obligations Release**

# RELEASE

THIS RELEASE (the "Release") is entered into as of the [•] day of [•], 2014, by and among Sherman/Grayson Hospital, LLC, a Texas limited liability company ("Hospital"), Sherman/Grayson Health Services, LLC, a Texas limited liability company ("Services") and Sherman/Grayson Sponsor, LLC, a Texas limited liability company ("Sponsor" and, together with Hospital and Services, the "Released Parties"), on the one hand, and Sherman/Grayson Health System, LLC, a Texas limited liability company ("Seller"), LHP Hospital Group, Inc., a Delaware corporation ("LHP"), and Texas Health Resources, a Texas non-profit corporation ("THR", together with Seller and LHP, the "Releasing Parties"), on the other hand.  Capitalized terms not defined herein shall have the meanings ascribed to them in the Purchase Agreement, as defined below.

WHEREAS, Sherman/Grayson Health System, LLC ("Seller"), Alecto Healthcare Services Sherman LLC ("Buyer"), LHP Hospital Group, Inc. and Texas Health Resources entered into that certain Purchase Agreement, dated as of September 23, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), pursuant to which Seller agreed to sell to Buyer all of the outstanding membership interests in the Released Parties; and

WHEREAS, Section 7.8 of the Purchase Agreement provides that the Seller shall deliver at the Closing to the Buyer this Release.

NOW, THEREFORE, in consideration of the foregoing premises and the covenants and agreements set forth herein and in the Purchase Agreement, the parties hereto agree as follows:

1.    Termination.    Except for the Purchase Agreement and the Transaction Documents and the obligations set forth therein, and with effect immediately following consummation of the transactions contemplated by the Purchase Agreement and delivery of all of the Transaction Documents, each of the Releasing Parties for itself, and each of LHP and THR on behalf of its respective Affiliates, fully, finally and forever terminates any agreements or obligations of any kind between and among any of the Released Parties to the extent any such agreement or obligation is an Excluded Obligation, in each case without any liability to the Released Parties.

2.    Release.  Each of the Releasing Parties, for itself, and each of LHP and THR on behalf of its respective Affiliates, fully, finally and forever releases the Released Parties from any and all actions, obligations, costs, expenses, Damages, debts, claims, liabilities, causes of action and demands, known or unknown, actual or contingent, of whatever character, at law or in equity, in each case, relating to the Excluded Obligations (collectively "Claims") which such Releasing Party ever had, now has, or hereafter can, shall or may have based upon actions, omissions, events or circumstances occurring up to the time of the execution of this Release (collectively "Released Claims"); provided, however that Released Claims do not include Claims arising under the Purchase Agreement or the Transaction Documents.

3.    Governing Law.    THIS RELEASE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE

1

APPLICABLE TO A CONTRACT EXECUTED AND PERFORMED IN SUCH STATE IN ANY EVENT WITHOUT REGARD TO ANY CHOICE OF LAW PRINCIPLE THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. The parties hereto agree that no provisions of this Release or any related document shall be construed for or against or interpreted to the advantage or disadvantage of any party hereto by any court or other Governmental Authority by reason of any party's having or being deemed to have structured or drafted such provision, each party having participated equally in the structuring and drafting hereof.

       4.    <u>Submission to Jurisdiction</u>.  To the fullest extent permitted by applicable law, each party hereto (a) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Release or the transactions contemplated hereby shall be brought only in any State or Federal court located in Delaware and not in any other State or Federal court in the United States of America or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of such courts located in Delaware for purposes of all legal proceedings arising out of, or in connection with, this Release or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court or any claim that any such proceeding brought in such a court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

       5.    <u>Assignment; Successors</u>.  Neither this Release nor any of the rights, interests or obligations under this Release may be assigned or delegated, in whole or in part, by operation of law or otherwise, without the prior written consent of the Releasing Parties and the Released Parties, and any such assignment without such prior written consent shall be null and void.

<div align="center">[SIGNATURES APPEAR ON THE FOLLOWING PAGE]</div>

 

      IN WITNESS WHEREOF, the parties hereto have executed this Release as of the date first above written.

 

**RELEASING PARTIES:**         **SHERMAN/GRAYSON HEALTH SYSTEM, LLC**

By: _____
    Name: _____
    Title: _____

 

**LHP HOSPITAL GROUP, INC.**

By: _____
    Name: _____
    Title: _____

 

**TEXAS HEALTH RESOURCES**

By: _____
    Name: _____
    Title: _____

**RELEASED**
**PARTIES:**

**SHERMAN/GRAYSON HOSPITAL, LLC,**

By: _____

    Name:_____

    Title:_____


**SHERMAN/GRAYSON HEALTH SERVICES, LLC,**

By: _____

    Name:_____

    Title:_____


**SHERMAN/GRAYSON SPONSOR, LLC,**

By: _____

    Name:_____

    Title:_____

**Exhibit B**

**Knowledge Parties**

<u>Target Companies</u>

John Holland

John Ehrie

<u>Purchaser</u>

Lex Reddy

Roger Krissman

**A0154**

## Exhibit C

## Net Working Capital Methodology

# Exhibit B
## Net Working Capital Methodology

**Texas Health Presbyterian Hospital - WNJ**

**Net Working Capital Calculation**

**As of July 2014**

*Amounts in $000s*

| | Seller Unaudited Balance Sheet July 2014 | Adjustments to Eliminate Seller | Target Companies' Combined B/S | NWC per Purchase Agreement | Notes |
|---|---|---|---|---|---|
| **Current Assets:** | | | | | |
| Cash | 5 | (5) | - | - | Remove Cash |
| Restricted Cash | | | | | |
| Accounts Receivable, less allowance for doubtful accounts | 13,930 | (313) | 13,617 | 13,617 | Remove Meaningful Use Receivable |
| Inventories | 2,608 | - | 2,608 | 2,608 | |
| Other receivables | 296 | - | 296 | 296 | |
| Other / Prepaids | 466 | - | 466 | 466 | |
| **Total Current Assets** | 17,305 | (318) | 16,987 | 16,987 | |
| **Property and equipment, at cost:** | | | | | |
| Land | - | | - | - | |
| Buildings and improvements | 10,056 | | 10,056 | - | |
| Furniture and equipment | 20,590 | | 20,590 | - | |
| Construction in progress | 1,484 | | 1,484 | - | |
| | 32,129 | | 32,129 | - | |
| Accumulated Depreciation | (24,470) | | (24,470) | - | |
| **Property and equipment, net** | 7,659 | - | 7,659 | - | |
| Investments in and advances to affiliate | 87 | | 87 | - | |
| Notes Receivable | 2 | | 2 | - | |
| Other assets | 468 | (405) | 63 | - | |
| **Total Assets** | 25,521 | (723) | 24,798 | - | |
| **Liabilities and Members' Equity** | | | | | |
| **Current liabilities:** | | | | | |
| Accounts Payable | 6,894 | - | 6,894 | 6,894 | |
| Accrued salaries, wages and benefits | 2,755 | | 2,755 | 2,755 | |
| Other accrued expenses | 12,038 | (10,625) | 1,413 | 1,413 | Remove management fees |
| Interest payable | 448 | (88) | 360 | 360 | Remove interest payable on debt |
| Current portion of long term debt | 2,664 | (2,664) | - | - | Remove current portion of debt |
| Due to corporate | 24,753 | (24,753) | - | - | Remove intercompany due to LHP |
| **Total current liabilities** | 49,552 | (38,130) | 11,422 | 11,422 | |
| **Long term liabilities:** | | | | | |
| Long term debt | 45,337 | (45,337) | - | - | |
| Other | 369 | | 369 | - | |
| **Total long term debt** | 45,705 | (45,337) | 369 | - | |
| Long term obligations | 10,925 | - | 10,925 | - | |
| **Total long term liabilities** | 56,630 | (45,337) | 11,294 | - | |
| **Total liabilities** | 106,182 | (83,466) | 22,716 | - | |
| Total Members equity & retained deficit | (80,660) | 82,743 | 2,083 | - | |
| **Total liabilities and equity** | 25,521 | (723) | 24,798 | - | |
| | | | | | |
| **Target Net Working Capital** | | | | 5,565 | |

*The line items above consist only of the aggregated GL line items attached to this Exhibit B.*

**A0156**

| | | Accounts Receivable, Net | | Accounts Payable |
| | | Inventories | | Accrued salaries, wages and benefits |
| | | Other / Prepaids | | Other accrued expenses |
| | | Other Receivables | | Interest payable |

| FS Line | Statement | CIM Description | DR CR | (SubAcct) Description | GL2014.A7 | Adjustments |
|---|---|---|---|---|---|---|
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000000) Non-desig Payer Type -system account | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000000) Non-desig Payer Type -system account | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000010) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000005) Revenue Accrual Gross AR | 722,129 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000100) Other Patient AR 1417 Clinic | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000101) Other Patient AR Reserve 1417 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000102) Other Patient AR CRNA | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000103) Other Patient AR Reserves CRNA's | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000104) Other Patient AR #3 | (150,955) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000105) Other Patient AR Reserve #3 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000106) Other Patient AR #4 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000300) AR û Credit Balances | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000400) AR û Industrial | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000520) Agency 1 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000860) Return Check Clearing | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000930) Unapplied Cash û Ins (hosp designated) | (221,590) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000980) Refund Clearing | (128) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000981) Refund Clearing #2 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000990) Late charge suspense account | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001000) 1 - MEDICARE IP Gross AR | 8,325,043 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001010) 1 - MEDICARE IP CA | (6,405,410) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001500) 1 - MEDICARE OP Gross AR | 5,389,351 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001510) 1 - MEDICARE OP CA | (1,423,770) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001580) MC bad debt receivable/payable | 33,553 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001590) Bad Debt Pass Through Pmts | (186,197) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001600) MC DSH receivable/payable | 84,265 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001840) MPPS accrued contractual adjustments | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001870) MC Outpatient Allowance | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002000) 2 - MEDICAID IP Gross AR | 777,044 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002010) 2 - MEDICAID IP CA | (3,843,239) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002500) 2 - MEDICAID OP Gross AR | 173,073 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002510) 2 - MEDICAID OP CA | (976,046) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002810) MA Allowance for OP fee-based rec | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002840) Allowance for MA Inpatient | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003000) 8 - WORKMANS COMP IP Gross AR | 144,689 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003010) 8 - WORKMANS COMP IP CA | 52,106 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003500) 8 - WORKMANS COMP OP Gross AR | 188,029 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003510) 8 - WORKMANS COMP OP CA | (112,896) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004010) 4 - COMMERCIAL IP AR | 482,438 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004010) 4 - COMMERCIAL IP CA | (363,613) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004500) 4 - COMMERCIAL OP Gross AR | 876,907 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004510) 4 - COMMERCIAL OP CA | (558,030) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005000) 7 - MNGED CARE - MEDICAID IP Gross AR | 1,337,813 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005010) 7 - MNGED CARE - MEDICAID IP CA | (878,963) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005500) 7 - MNGED CARE - MEDICAID OP Gross AR | 910,782 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005510) 7 - MNGED CARE - MEDICAID OP CA | (466,699) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006000) 3 - OTHER FED/COUNTY/STATE IP Gross AR | 671,040 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006010) 3 - OTHER FED/COUNTY/STATE IP CA | (300,985) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006500) 3 - OTHER FED/COUNTY/STATE OP Gross AR | 353,058 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006510) 3 - OTHER FED/COUNTY/STATE OP CA | (205,681) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007000) 5 - MNGED CARE-COMMERCIAL IP Gross AR | 4,074,477 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007010) 5 - MNGED CARE-COMMERCIAL IP CA | (1,306,581) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007500) 5 - MNGED CARE-COMMERCIAL OP Gross AR | 3,154,650 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007510) 5 - MNGED CARE-COMMERCIAL OP CA | (1,132,165) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008000) 6 - MNGED CARE - MEDICARE IP Gross AR | 1,380,536 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008010) 6 - MNGED CARE - MEDICARE IP CA | (352,249) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008050) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008060) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008500) 6 - MNGED CARE - MEDICARE OP Gross AR | 679,544 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008510) 6 - MNGED CARE - MEDICARE OP CA | (359,882) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11108710) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11090000) 9 - SELF PAY IP Gross AR | 14,217,539 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11090020) Industrial Account û Allowance | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11109100) Charity Discount Program û Allowance | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11095000) 9 - SELF PAY OP Gross AR | 9,157,166 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202000) Allow for Uncollectible Patient Accts | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202000) Allow for Uncollectible Patient Accts | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202050) Allow for Industrial A/R | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202100) Allowance for other patient AR | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202102) Other Patient BD Reserve #2 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202200) Pure Self Pay AFDA | (14,203,875) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202210) Self Pay After Insurance AFDA | (2,469,477) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202220) Insured Aged < 365 days AFDA | (971,915) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202230) Insured Aged >= 365 days AFDA | (620,023) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203000) Year to determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203010) Year to determined | 256,223 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203020) Year to determined | - | - |

| FS Line | Statement | CIM Description | DR CR | (SubAcct) Description | GL2014.A7 | Adjustments |
|---|---|---|---|---|---|---|
| | | Accounts Receivable, Net | | Accounts Payable | | |
| | | Inventories | | Accrued salaries, wages and benefits | | |
| | | Other / Prepaids | | Other accrued expenses | | |
| | | Other Receivables | | Interest payable | | |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203030) Year to be determined | 194,517 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203040) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203070) Medicare due to/from 2013 | 222,792 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204000) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204070) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204080) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204090) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204130) Medicaid due to/from 2013 | 11,515 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11206000) Year to be determined | 13,167 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11206130) Champus due to/from 2013 | 43,844 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11207000) MC MU/HIT 2012 | 312,651 | 312,651 |
| | | | | **Accounts Receivable, Net:** | **$  13,929,571** | **$ 13,616,921** |
| BS - Inventory | BS | Inventories | D | (11306120) Inventory-Medical and Surgical Unit | - | - |
| BS - Inventory | BS | Inventories | D | (11307010) Inventory-Surgery Unit | 1,067,976 | - |
| BS - Inventory | BS | Inventories | D | (11307120) Inventory-Pharmacy-#1 | 733,191 | - |
| BS - Inventory | BS | Inventories | D | (11307120) Inventory-Pharmacy-#1 | - | - |
| BS - Inventory | BS | Inventories | D | (11307180) Inventory-Materials Management | 423,264 | - |
| BS - Inventory | BS | Inventories | D | (11307200) Inventory-Non-Published | - | - |
| BS - Inventory | BS | Inventories | D | (11307360) Inventory-Microbiology lab | 160,244 | - |
| BS - Inventory | BS | Inventories | D | (11307460) Inventory-Non-Published | 2,735 | - |
| BS - Inventory | BS | Inventories | D | (11307460) Inventory-Cardiac Cath Lab | 206,657 | - |
| BS - Inventory | BS | Inventories | D | (11307620) Inventory-Physical Therapy | - | - |
| BS - Inventory | BS | Inventories | D | (11307820) Inventory-Industrial Medicine | - | - |
| BS - Inventory | BS | Inventories | D | (11308000) Inventory-Dietary/Cafeteria#1 | 14,118 | - |
| | | | | **Inventories:** | **$  2,608,184** | **$  2,608,184** |
| BS - Other | BS | Other | D | (11400000) General prepaids | 367,783 | - |
| BS - Other | BS | Other | D | (11400000) General prepaids | - | - |
| BS - Other | BS | Other | D | (11400010) Prepaid General Liability | - | - |
| BS - Other | BS | Other | D | (11400020) Insure | 98,473 | - |
| BS - Other | BS | Other | D | (11400020) Insure | - | - |
| BS - Other | BS | Other | D | (11400510) Taxes | - | - |
| | | | | **Other / Prepaids:** | **$   466,256** | **$   466,256** |
| BS - Other receivables | BS | Other receivables | D | (11500200) Current Non-Patient Receivable FDN | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500200) Current Non-Patient Receivable FDN | 2,281 | - |
| BS - Other receivables | BS | Other receivables | D | (11500200) Current Non-Patient Receivable FDN | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500210) Current Non-Patient A/R - ASC | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500210) Current Non-Patient A/R - ASC | 14,852 | - |
| BS - Other receivables | BS | Other receivables | D | (11500220) Current Non-Patient Receivable #3 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500220) Current Non-Patient Receivable #3 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500230) Current Non-Patient Receivable #4 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500230) Current Non-Patient Receivable #4 | 100 | - |
| BS - Other receivables | BS | Other receivables | D | (11500240) Current Non-Patient Receivable #5 | 10,508 | - |
| BS - Other receivables | BS | Other receivables | D | (11500240) Current Non-Patient Receivable #5 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500250) Vendor Credits Receivable | 10,184 | - |
| BS - Other receivables | BS | Other receivables | D | (11500260) Current Non-Patient AR | 13,475 | - |
| BS - Other receivables | BS | Other receivables | D | (11500270) Current Non-Patient AR | 68,552 | - |
| BS - Other receivables | BS | Other receivables | D | (11501000) Mgmt Fee Receivable PWNJ | - | - |
| BS - Other receivables | BS | Other receivables | D | (11501010) To be determined by facility | 47,672 | - |
| BS - Other receivables | BS | Other receivables | D | (11502010) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502020) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502050) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502070) To be determined by facility | 116,668 | - |
| BS - Other receivables | BS | Other receivables | D | (11502080) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502090) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502100) To be determined by facility | 11,536 | - |
| BS - Other receivables | BS | Other receivables | D | (11503020) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11503020) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11503030) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11503040) To be determined by facility | - | - |
| | | | | **Other Receivables:** | **$   295,828** | **$   295,828** |

| FS Line | Statement | CIM Description | DR CR | (SubAcct) Description | GL2014.A7 | Adjustments |
|---|---|---|---|---|---|---|
| | | Accounts Receivable, Net | | Accounts Payable | | |
| | | Inventories | | Accrued salaries, wages and benefits | | |
| | | Other / Prepaids | | Other accrued expenses | | |
| | | Other Receivables | | Interest payable | | |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100100) Accts Payable System Interface | 3,331,748 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100750) Accts Payable Accrual | 786,034 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100750) Accts Payable Accrual | - | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100760) Manual A/P Accruals | 1,759,253 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100760) Manual A/P Accruals | 1,950 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100760) Manual A/P Accruals | - | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20101770) Misc Accruals | 548,171 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20102020) Medical Fees Payable | 466,857 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20102020) Medical Fees Payable | | |
| | | | | Accounts Payable: $ | 6,894,013 | $ 6,894,013 |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200010) Accrued Payroll | 1,116,542 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200010) Accrued Payroll | - | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200020) Accrued PTO | 1,230,284 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200025) Accrued PTO - Officers | 60,139 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200030) Vision Plan accrual | - | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200050) Payroll Clearing Account | 94,117 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200060) Accrued Incentive Comp-Admin | 112,312 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200070) Accrued Incentive Comp-Dept Directors | 141,358 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200100) For future use | | |
| | | | | Accrued salaries, wages and benefits: $ | 2,754,753 | $ 2,754,753 |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302010) FICA taxes payable employee | 178,547 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302020) Federal withholding taxes payable | 116,978 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302030) State Withholding Taxes Payable | 1,217 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302050) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302060) Other payroll deductions | 1,530 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302080) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302090) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302110) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302120) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302140) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302150) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302160) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302165) Other payroll deductions | 1,291 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302170) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302175) Other payroll deductions | 1,535 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302180) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302185) Other payroll deductions | 1,215 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302190) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302200) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302210) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302220) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302230) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302340) 401(k) deduction payable | 63,417 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302450) Withholding for 401(k) personal loan | 3,541 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302460) Day care spending account deduction | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302460) Health care spending account deduction | 7,557 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302490) Dependent Life Insure deduction | 3,168 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302500) Federal unemployment tax payable | 883 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302510) Life Insure Employee Paid | 10,130 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302540) Voluntary ADD | 1,960 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302600) Short Term Disability | 9,115 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20304430) SUTA Liab-Texas | 6,233 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502000) Audit accrual | 96,221 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502001) Audit Fees Odd Year | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502002) Audit Fees Even Year | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502020) Internal Audit fees all years | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502020) Tax Prep Fees Even Year | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502021) Tax Prep Fees Odd Year | 20,000 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504120) Franchise tax (accrued) | 93,188 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504150) City sales tax (accrued) | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504160) State sales tax (accrued) | 2,888 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504170) Property tax (accrued) | 526,695 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504170) Property tax (accrued) | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504280) Healthplan Reserve-PMC | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504520) For future use | 14,000 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504530) Other accrued expenses | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20505430) Other accrued expenses | 7,073,855 | 7,073,855 |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20505990) Dental Plan Benefit Plan Fees | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20508000) Other accrued expenses | 3,550,798 | 3,550,798 |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20508210) W/C -IBNR-PMC (02/09-01/10) | 903,715 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20508220) W/C -Claims Paid-PMC (02/09-01/10) | (791,943) | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21700000) Commitment Fees payable | 140,262 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21700010) For future use | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21700020) For future use | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21701050) Phy Recruitment Agreement Liabilities | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21701070) Phy Recruitment Agreement Liabilities | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21701090) Phy Recruitment Agreement Liabilities | | |
| | | | | Accrued salaries, wages and benefits: $ | 12,037,995 | $ 1,413,342 |
| BS - Interest payable | BS | Interest payable | C | (21004000) Interest payable | - | - |
| BS - Interest payable | BS | Interest payable | C | (21004000) Interest payable | 88,122 | 88,122 |
| BS - Interest payable | BS | Interest payable | C | (21004000) Interest payable | - | - |
| BS - Interest payable | BS | Interest payable | C | (21004010) Interest payable | 360,219 | - |
| | | | | Accrued salaries, wages and benefits: $ | 448,341 | $ 360,219 |

**Exhibit D**

**Target Company Ownership Interests**

| Target Company | Interests Authorized | Interests Issued | Jurisdiction of Incorporation | Business Qualifications |
|---|---|---|---|---|
| Sherman/Grayson Hospital, LLC | N/A | | Texas | Texas |
| Sherman/Grayson Health Services, LLC | N/A | | Texas | Texas |
| Sherman/Grayson Sponsor, LLC | N/A | | Texas | Texas |

## Exhibit E

## Required Activities

*Medical Services*

- Anesthesiology
- Emergency Services
- General Surgery (inpatient and outpatient)
- Nephrology
- Oncology
- Otolaryngology
- Rehabilitation Medicine
- Radiology
- Cardiology (non-invasive and invasive)
- Family Practice

- Gynecology/Oncology
- Neurology
- Ophthalmology
- Pathology
- Hospitalist
- Medical Office and Clinics
- Gastroenterology
- Internal Medicine
- Obstetrics/Gynecology
- Orthopedics
- Pediatrics
- Urology

*Ancillary and Support Services*

- Audiology/Speech Therapy (inpatient and outpatient)
- Cardiac Catheterization
- Cardiac Rehab
- Cardiopulmonology
- Clinical Laboratory
- Community Education Classes
- Computerized Tomography
- Critical Care Unit
- Diabetes Education
- Dialysis (inpatient)
- Electrocardiology
- Electroencephalography
- Emergency Department/Clinical Decision Unit
- Hematology/Oncology
- Hyperbarics/Enterostomal Therapy/Wound Care
- Interventional Radiology
- Lithotripsy
- Mammography/Bone Density
- MRI
- Nuclear Medicine
- Neuro Diagnostics

- Nursery (Level II)
- Obstetrics/Maternity/Lactation Consults
- Occupational Therapy (inpatient and outpatient)
- Open Heart Surgery
- Pathology
- Physical Therapy (inpatient and outpatient)
- Post-Anesthesia Care Unit
- Pulmonary Function
- Pharmacy
- Radiology
- Rehabilitation Services (outpatient)
- Respiratory Therapy
- Rural Health Clinic
- Same-Day Surgery
- Sleep Lab
- Stress Lab
- Stroke Center
- Transesophageal Echocardiography
- Ultrasound
- WorkMed Occupational Medicine
- X-ray/Fluoroscopy

# GUARANTEE

This Guarantee, dated as of September 23, 2014 (this "Guarantee"), is made by Alecto Healthcare Services LLC, a Delaware limited liability company (the "Guarantor"), in favor of the Seller Indemnitees (each a "Guaranteed Party" and together the "Guaranteed Parties"). Sherman/Grayson Health System, LLC, a Texas limited liability company ("Seller"), and LHP Hospital Group, Inc., a Delaware corporation ("LHP"), are signatories hereto in their capacity as representatives of themselves and the other Seller Indemnitees. Capitalized terms used but not otherwise defined herein shall have the respective meanings given to them in the Purchase Agreement (as defined below).

1.    Guarantee. To induce Seller and LHP to enter into that certain Purchase Agreement, dated as of the date hereof, by and among Alecto Healthcare Services Sherman LLC, a Delaware limited liability company ("Purchaser"), Seller, LHP, and Texas Health Resources, a Texas not-for-profit corporation (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), whereby Purchaser shall acquire 100% of the issued and outstanding membership interests of Sherman/Grayson Hospital, LLC, Sherman/Grayson Health Services, LLC and Sherman/Grayson Sponsor, LLC, the Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Guaranteed Parties the due and punctual payment, performance and discharge of each and every of Purchaser's obligations under the Purchase Agreement (together with any reasonable and documented out-of-pocket fees and expenses, including attorney fees and costs, which the Guaranteed Parties shall incur in enforcing or preserving any rights under this Guarantee if the obligations hereunder are not paid by the Guarantor when due as required herein or if this Guarantee is enforced by suit or through bankruptcy court or other judicial proceedings whatsoever, the "Obligations").

2.    Nature of Guarantee; Changes in Obligations; Certain Waivers.

(a)    This Guarantee is an unconditional guarantee of payment and performance and not of collection. The Guaranteed Parties shall not be obligated to file any claim relating to the Obligations in the event that Purchaser becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Guaranteed Parties to so file shall not affect the Guarantor's Obligations hereunder.

(b)    The Guarantor agrees that the Guaranteed Parties may at any time and from time to time, without notice to or further consent of the Guarantor, extend the time of payment of any of the Obligations, and may also enter into any agreement with Purchaser for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, or for any modification of the Purchase Agreement or of any agreement between the Guaranteed Parties and Purchaser without in any way impairing or affecting the Guarantor's Obligations under this Guarantee. The Guarantor agrees that the Obligations of the Guarantor hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of the Guaranteed Parties to assert any claim or demand or to enforce any right or remedy against, or to join Purchaser to any suit arising under this Guarantee or the Obligations of, Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement; (ii) any change in

the time, place or manner of payment of any of the Obligations or any rescission, waiver, compromise, consolidation or other amendment or modification of any of the terms or provisions of the Purchase Agreement made in accordance with the terms thereof; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement; (iv) the existence of any claim, set-off or other right which the Guarantor may have at any time against Purchaser or the Guaranteed Parties, whether in connection with the Obligations or otherwise; (v) the invalidity, illegality or unenforceability of all or any part of the Obligations or any document or agreement executed in connection with the Obligations, for any reason related to actions by the Purchaser, the Guarantor or their respective Affiliates, including without limitation the fact that the act of creating the Obligations or any part thereof is *ultra vires*, the officers or representatives executing the documentation or otherwise creating the Obligations acted in excess of their authority, or Purchaser or the Guarantor has valid defenses, claims or offsets (other than those expressly provided in the Purchase Agreement) which render the Obligations wholly or partially uncollectible from Purchaser or the Guarantor; or (vi) the adequacy of any other means the Guaranteed Parties may have of obtaining repayment of any of the Obligations.  To the fullest extent permitted by applicable Laws, the Guarantor hereby expressly waives any and all rights or defenses arising by reason of any applicable Law which would otherwise require any election of remedies by the Guaranteed Parties.  The Guarantor waives promptness, diligence, notice of the acceptance of this Guarantee and of the Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Obligations incurred and all other notices of any kind (except for notices to be provided pursuant to this Guarantee or to Purchaser and its counsel in accordance with the Purchase Agreement), all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar applicable Law now or hereafter in effect, any right to require the marshalling of assets of Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement, and all suretyship defenses generally.  The Guarantor acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated by the Purchase Agreement and that the waivers set forth in this Guarantee are knowingly made in contemplation of such benefits.

(c)    Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement that arise from the existence, payment, performance, or enforcement of a Guarantor's Obligations under or in respect of this Guarantee, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Guaranteed Parties against Purchaser or such other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from Purchaser or such other Person, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until the Obligations have been satisfied in full; provided, that the Guarantor shall have the right to cause any other Person to satisfy its Obligations to the Guaranteed Parties hereunder.  If any amount shall be paid to any Guarantor in violation

2

A0163

of the immediately preceding sentence at any time prior to the performance of and payment in full in cash of the Obligations and all other amounts payable under this Guarantee, an amount equal to the lesser of (i) the amount paid to the Guarantor in violation of the immediately preceding sentence, and (ii) all amounts payable under this Guarantee, shall be received and held in trust for the benefit of the Guaranteed Parties, shall be segregated from other property and funds of the Guarantor and shall forthwith be paid or delivered by the Guarantor to the Guaranteed Parties in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Obligations and all other amounts payable under this Guarantee, whether matured or unmatured, or to be held as collateral for any Obligations or other amounts payable under this Guarantee thereafter arising.

3.      Effect on Certain Rights.  No failure on the part of the Guaranteed Parties to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Guaranteed Parties of any right, remedy or power hereunder preclude any other or future exercise of any right, remedy or power hereunder except as explicitly set forth herein or in the Purchase Agreement.  Subject to the terms hereof and of the Purchase Agreement, except as stated therein, each and every right, remedy and power hereby granted to the Guaranteed Parties or allowed to it by applicable Law shall be cumulative and not exclusive of any other, and may be exercised by the Guaranteed Parties at any time or from time to time.

4.      Representations and Warranties.  The Guarantor hereby represents and warrants that:

(a)      the execution, delivery and performance of this Guarantee have been duly authorized by all necessary action and do not and will not contravene any provision of the Guarantor's charter, partnership agreement, operating agreement or similar organizational documents or any applicable Law or material contract binding on the Guarantor or its assets;

(b)      all consents, approvals, authorizations, permits of, filings with and notifications to, any Governmental Authority necessary for the due execution, delivery and performance of this Guarantee by the Guarantor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any Governmental Authority is required in connection with the execution, delivery or performance of this Guarantee;

(c)      this Guarantee constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar applicable Laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law); and

(d)      the Guarantor has the financial capacity to pay and perform its obligations under this Guarantee, and all funds necessary for the Guarantor to fulfill its Obligations

under this Guarantee for so long as this Guarantee shall remain in effect in accordance with <u>Section 7</u>.

5.    <u>Assignment</u>.  The Guarantor shall not assign its rights, interests or obligations hereunder to any other Person (except by operation of law) without the prior written consent of Seller and LHP; <u>provided</u>, that any such permitted assignment shall not relieve the Guarantor of its Obligations hereunder.

6.    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission) or (c) one (1) Business Day following the day sent by reputable, national overnight courier (with written confirmation of receipt), in each case at the following addresses, e-mail addresses or facsimile numbers (or to such other address, e-mail address or facsimile number as a party hereto may have specified by notice given to the all other parties hereto pursuant to this provision):

If to the Guarantor, to:

c/o Alecto Healthcare Services LLC
16310 Bake Parkway, Suite 200
Irvine, California 92618
Attention: CEO
Facsimile: (949) 878-9458

with a copy (which shall not constitute notice) to:

Law Offices of Michael J. Sarrao
16310 Bake Parkway, Suite 200
Irvine, California 92618
Attention: Michael J. Sarrao, Esq.
Facsimile: (949) 878-9458

If to the Guaranteed Parties, to:

c/o LHP Hospital Group, Inc.
2400 Dallas Parkway, Suite 450
Plano, Texas  75093
Attention: General Counsel
Facsimile:  (972) 312-9750

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Harvey Eisenberg
Facsimile: (212) 310-8007

7.    <u>Continuing Guarantee</u>. Unless terminated pursuant to this <u>Section 8</u>, this Guarantee shall remain in full force and effect and shall be binding on the Guarantor, its successors and permitted assigns until the Obligations have been indefeasibly paid, observed, performed or satisfied in full.

8.    <u>Governing Law; Jurisdiction and Forum</u>.    This Guarantee (including, without limitation, the validity, construction, effect or performance hereof and any remedies hereunder or related hereto), and all claims or causes of action of any kind (whether at law, in contract or in tort or otherwise) that may be based upon, arise out of or relate to this Guarantee, or the negotiation, execution or performance hereof (including, without limitation, any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Guarantee or as an inducement to enter into this Guarantee), shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.   Each of the parties hereto irrevocably agrees that any action or proceeding arising out of or relating to this Guarantee and the rights and obligations arising hereunder, and the rights and obligations arising hereunder brought by any other party hereto or its successors or assigns, shall be brought and determined exclusively in the state or federal courts of the State of Delaware; <u>provided</u>, that a judgment rendered by such Delaware courts may be enforced in any court having competent jurisdiction.   Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts in any such action, agrees to take any and all future action necessary to submit to the jurisdiction of such courts, waives, and agrees not assert, by way of motion, as a defense, counterclaim or otherwise, any objection it may now or hereafter have to venue or to convenience of forum (including (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve; (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise); and (c) to the fullest extent permitted by law, any claim that: (i) the action in such court is brought in an inconvenient forum; (ii) the venue of such action is improper; or (iii) this Guarantee, or the subject matter hereof, may not be enforced in or by such courts), agrees that all claims in respect of the action shall be heard and determined only in any such court and agrees not to bring any action arising out of or relating to this Guarantee or any transaction contemplated hereby in any other court.   The parties hereto agree that any of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained agreement between the parties hereto irrevocably to waive any objections to venue or to convenience of forum.   Each of the parties hereto irrevocably consents to the service of process out of the state and federal courts within the State of Delaware in any such action by the mailing of copies thereof by registered mail, postage prepaid, to it at its address set forth herein, such service of process to be effective upon acknowledgment of receipt of such registered mail.  Nothing herein shall affect the right of any party hereto to serve process in any other manner permitted by applicable law.

9.    <u>Waiver of Jury Trial</u>.    EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS GUARANTEE OR THE

TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF THE PARTIES HERETO IN THE NEGOTIATION, EXECUTION, PERFORMANCE AND ENFORCEMENT OF THIS GUARANTEE.

      10.   <u>Entire Agreement</u>. This Guarantee constitutes the entire agreement with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, among the parties hereto.

      11.   <u>Amendments and Waivers</u>. No amendment, waiver, supplement or modification of any provision of this Guarantee will be valid and binding unless it is in writing and signed, in the case of an amendment, supplement or modification, by the Guarantor, Seller and LHP or, in the case of waiver, by the party or parties against whom the waiver is to be effective. No waiver by any party hereto of any breach or violation of, or default under, this Guarantee, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation or default hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence. No delay or omission on the part of any party hereto in exercising any right, power or remedy under this Guarantee will operate as a waiver thereof.

      12.   <u>Severability</u>. If any provision of this Guarantee is held to be illegal, invalid or unenforceable under any present or future Law, (a) such provisions will be fully severable; (b) this Guarantee will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Guarantee will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Guarantee a legal, valid and enforceable provision as similar in terms and effect to such illegal, invalid or unenforceable provision as may be possible.

      13.   <u>Counterparts</u>. This Guarantee may be executed and delivered (including by facsimile transmission or via portable document format (.pdf)) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same instrument.

      14.   <u>No Third Party Beneficiaries</u>. The parties hereto hereby agree that their respective representations, warranties, agreements and covenants set forth herein are solely for the benefit of the other parties hereto (and any Guaranteed Parties not signatories hereto) and their respective successors and permitted assigns, in accordance with and subject to the terms of this Guarantee, and this Guarantee is not intended to, and does not, confer upon any person other than the parties hereto (and any Guaranteed Parties not signatories hereto) and their respective successors and permitted assigns any rights or remedies hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have duly executed and delivered this Guarantee as of the date first written above.

**GUARANTOR**:

**ALECTO HEALTHCARE SERVICES LLC**

By: _____

Name: _____ Roger Krissman _____

Its: _____ CFO _____

**A0168**

**GUARANTEED PARTIES:**

REPRESENTED BY**:**

**SHERMAN/GRAYSON HEALTH SYSTEM, LLC**

By:

Name:  Rebecca Hurley

Its:    EVP

**LHP HOSPITAL GROUP, INC.**

By:

Name:  Rebecca Hurley

Its:    EVP

## EXHIBIT C

Settlement Agreement

## CONFIDENTIAL SETTLEMENT AGREEMENT

This **CONFIDENTIAL SETTLEMENT AGREEMENT** ("Agreement"), dated as of February 16, 2022 (the "Effective Date"), is made and entered into by and between LHP Hospital Group, Inc. ("LHP") and Alecto Healthcare Services Sherman LLC and Alecto Healthcare Services LLC (collectively the "Alecto Defendants"). LHP, and the Alecto Defendants are together referred to herein as the "Parties," or each a "Party." Sherman/Grayson Hospital, LLC ("Sherman/Grayson") is a party to the Agreement where specified and for the purposes of Paragraphs 12-23.

## R E C I T A L S

WHEREAS, on January 20, 2021, LHP filed a Complaint against the Alecto Defendants in the Superior Court of the State of Delaware, captioned *LHP Hospital Group, Inc. v. Alecto Healthcare Services Sherman LLC and Alecto Healthcare Services LLC*, C.A. No. N21C-01-146 PRW (CCLD) (the "Delaware Action");

WHEREAS, in the Delaware Action LHP has asserted claims for breach of contract against the Alecto Defendants in relation to a Purchase Agreement and a related Alecto Parent Guarantee, both dated September 23, 2014 (the "Operative Agreements"), and the Alecto Defendants have asserted defenses to such claims;

WHEREAS, LHP seeks damages from the Alecto Defendants in the Delaware Action in the amount of $4,638,137.90, as of the effective date, plus attorneys' fees, expenses, and costs (the "Current Damages");

WHEREAS, on July 21, 2020, LHP filed a Petition against Sherman/Grayson in the 59th Judicial District Court, Grayson County, Texas, captioned *LHP Hospital Group, Inc. v. Sherman/Grayson Hospital, LLC*, No. CV-20-0944 (the "Texas Action").

WHEREAS, in the Texas Action, LHP seeks recovery of the Current Damages by way of a breach of contract claim against Sherman/Grayson, such claim being assigned to LHP by non-party Altera Highland, LLC ("Altera");

WHEREAS, in the Texas Action, LHP seeks recovery of a portion of the Current Damages from Sherman/Grayson;

WHEREAS, LHP seeks recovery of the Current Damages from the Alecto Defendants and Sherman/Grayson, jointly and severally;

WHEREAS, LHP expects to continue to accrue out-of-pocket expenses payable to Altera for which Alecto Healthcare Services Sherman LLC has an obligation to indemnify LHP under the Operative Agreements and Alecto Healthcare Services, LLC has guaranteed Alecto Healthcare Services Sherman LLC's indemnification obligations (the "Future Expenses");

WHEREAS, LHP may continue to accrue additional claims against Sherman/Grayson by way of assignment from Altera and otherwise, in an amount equal to the Future Expenses;

1

WHEREAS, to avoid the costs and uncertainties of litigation, the Parties have agreed to compromise and settle the claims and controversies that exist between them.

WHEREAS, the foregoing recitals are true and correct and are hereby incorporated into this Agreement by this reference.

**NOW THEREFORE,** in consideration of the mutual promises set forth herein and for other good and valuable consideration and intending to be legally bound, the Parties hereby covenant and agree as follows:

1.     Payment.  In full and final settlement of the Current Damages **only**, the Alecto Defendants shall cause to be paid to LHP, as set forth in this Paragraph 1, the total sum of six hundred twenty-five thousand dollars ($625,000.00) (the "Payment") within ten (10) days of the Effective Date, by wire to the following account:

> Account number:
> Routing Number ACH/EFT
> Routing Number DOM. WIRES 

2.     Dismissal of Delaware Action. Within five (5) business days of LHP receiving the Payment from the Alecto Defendants, the Parties shall file the Stipulation and [Proposed] Order of Dismissal as set forth in Exhibit A hereto.  The terms of the Stipulation and [Proposed] Order of Dismissal are incorporated herein by reference.

3.     LHP Release.  Upon receipt of the Payment by LHP, LHP, on behalf of itself, and its respective agents, partners, employees, directors, officers, managers, affiliates, predecessors, attorneys, successors, representatives, heirs and assigns, and all persons acting by, through, or under it, agrees not to pursue the Alecto Defendants, and their respective agents, partners, employees, directors, officers, managers, affiliates, predecessors, attorneys, successors, representatives, heirs and assigns, including but not limited to Sherman/Grayson and all persons acting by, through, or under each of them, from any and all known or unknown complaints, claims, demands, obligations, promises, agreements, controversies, warranties, damages, costs, sums of money, losses, debts, judgments, penalties, fees, expenses (including attorneys' fees and costs actually incurred) suits, rights, actions, or causes of action that LHP has, or may have had, against the Alecto Defendants arising out of or relating in any manner to, directly or indirectly, the Current Damages in the Delaware Action, or that LHP has, or may have had, against Sherman/Grayson arising out of or relating in any manner to, directly or indirectly, the Current Damages in the Texas Action.  Upon the ninety-first (91st) day following receipt of the Payment by LHP, if none of the Alecto Defendants or Sherman/Grayson have become debtors in bankruptcy, LHP, on behalf of itself, and its respective agents, partners, employees, directors, officers, managers, affiliates, predecessors, attorneys, successors, representatives, heirs and assigns, and all persons acting by, through, or under it, hereby releases and forever discharges, the Alecto Defendants, and their respective agents, partners, employees, directors, officers, managers, affiliates, predecessors, attorneys, successors, representatives, heirs and assigns, including but not limited to Sherman/Grayson and all persons acting by, through, or under each of them, from any and all known or unknown complaints, claims, demands, obligations, promises, agreements, controversies, warranties, damages, costs, sums of money, losses, debts, judgments, penalties, fees,

2

expenses (including attorneys' fees and costs actually incurred) suits, rights, actions, or causes of actions which LHP has, or may have had, against the Alecto Defendants and/or Sherman/Grayson arising out of or relating in any manner to, directly or indirectly, the Delaware Action, the Current Damages, and/or the Texas Action. The Future Expenses rightfully due and owing as addressed in Paragraphs 6 and 7 of this Agreement are specifically excluded from LHP's release.

4.  <u>Alecto Defendants Release</u>.  The Alecto Defendants, on behalf of themselves, and their respective agents, partners, employees, directors, officers, managers, affiliates, predecessors, attorneys, successors, representatives, heirs and assigns, and all persons acting by, through, or under them, hereby release and forever discharge, LHP, and its respective agents, partners, employees, directors, officers, managers, affiliates, predecessors, attorneys, successors, representatives, heirs and assigns, and all persons acting by, through, or under each of them, from any and all known or unknown complaints, claims, demands, obligations, promises, agreements, controversies, warranties, damages, costs, sums of money, losses, debts, judgments, penalties, fees, expenses (including attorneys' fees and costs actually incurred) suits, rights, actions, or causes of actions which they have, or may have had, against LHP arising out of or relating in any manner to, directly or indirectly, the Delaware Action or the Texas Action.

5.  <u>Dismissal of Texas Action</u>.  Within five (5) days of LHP's execution of this Agreement, LHP shall file an agreed motion and proposed order for dismissal with prejudice in the form of Exhibit B, in the Texas Action.

6.  <u>Future Expenses – Alecto Defendants</u>.  The Alecto Defendants acknowledge and agree that, absent a resolution with Altera, LHP may continue to accrue expenses in connection with the MOB (as defined below), including without limitation in connection with the Lease Agreements (as defined in the Complaint in the Delaware Action) and the Ground Lease Agreement entered effective as of August 21, 2012 between Sherman/Grayson and Altera ("Ground Lease").  Accordingly, the Alecto Defendants agree to the following procedure for payment of Future Expenses:

a.  LHP shall make written demand upon the Alecto Defendants for a specified amount in accordance with the forbearance schedule set forth in Paragraph 8;

b.  The Alecto Defendants shall make payment of the specific amount within fifteen (15) days of such demand;

c.  To the extent the Alecto Defendants dispute the amount specified in the demand and/or are unable to make such payment, LHP shall be entitled to the entry of a judgment by confession, pursuant to 10 Del. C. 2306, in the form of Exhibit C hereto; and

d.  The only matter that the Alecto Defendants may contest in connection with such proceeding is the computation and payment of the principal, interest, fees, and costs of the judgment; **all other defenses are hereby expressly waived and disclaimed by the Alecto Defendants, including but not limited to, prior material breach, failure to mitigate, unclean hands, off-set, and failure to state a claim.**

e.  In the event that the Alecto Defendants contest the amount owed or assert that

3

**A0173**

they cannot pay the amount owed, they shall produce to LHP a copy of the most recent audited financial statements for both entities, or in the event audited financial statements are not available, a copy of the unaudited financial statements for each entity.

LHP's obligation to pay Altera expenses only occurs after Sherman/Grayson fails to meet its obligations. Nothing herein shall be interpreted to affect Sherman/Grayson's continuing obligation, if any, to comply with its obligations to Altera under the leases with Altera, including the Ground Lease (the "Altera Leases"), Sherman/Grayson's obligations under the Altera Leases, and/or Altera's obligations, including its obligation to mitigate its damages, under the Altera Leases or applicable law, and/or any defenses the Alecto Defendants and/or Sherman/Grayson may assert in an action brought by Altera.

7.    <u>Future Expenses – Sherman/Grayson</u>.  Sherman/Grayson acknowledges and agrees that, absent a resolution with Altera, Altera may continue to accrue claims against Sherman/Grayson for breach of the Altera Leases. Sherman/Grayson further acknowledges and agrees that Altera may assign some such claims to LHP. Accordingly, Sherman/Grayson agrees to the following procedure for payment of future expenses accrued by LHP (1) without an assignment of claims from Altera, if such expenses arise in connection with Sherman/Grayson's failure to comply with its obligations under the Ground Lease, including without limitation Article XVII and Exhibit C thereunder and (2) by way of assignment from Altera in connection with Sherman/Grayson's failure to comply with its obligations under the other Altera Leases:

a.    LHP shall make written demand upon Sherman/Grayson for a specified amount in accordance with the forbearance schedule set forth in Paragraph 8;

b.    Sherman/Grayson shall make payment of the specific amount within fifteen (15) days of such demand;

c.    To the extent Sherman/Grayson disputes the amount specified in the demand and/or is unable to make such payment, LHP shall be entitled to the entry of a judgment by confession, pursuant to 10 Del. C. 2306, in the Form of Exhibit C hereto; and

d.    The only matter that Sherman/Grayson may contest in connection with such proceeding is the computation and payment of the principal, interest, fees, and costs of the judgment. All other defenses are hereby expressly waived and disclaimed by Sherman/Grayson, including but not limited to, prior material breach, failure to mitigate, unclean hands, offset, and failure to state a claim; and

e.    In the event that Sherman/Grayson contests the amount owed or asserts that it cannot pay the amount owed, it shall produce to LHP a copy of its most recent audited financial statements, or in the event audited financial statements are not available, a copy of unaudited financial statements.

Nothing herein shall be interpreted to affect or waive any defenses Sherman/Grayson may assert against Altera in an action brought by Altera against Sherman/Grayson.

8.    <u>Forbearance on Demand for Future Expenses</u>.  LHP agrees not to make demand for future expenses, whether against the Alecto Defendants or Sherman/Grayson (or if necessary,

4

**A0174**

commence a proceeding pursuant to Section 2306 for a judgment by confession) until the expiration of one (1) year from the Effective Date. Thereafter, LHP may only seek payment of Future Expenses every six months from the date of the last payment or entry of a confessed judgment, whichever is applicable.

9.      POWER TO CONFESS JUDGMENT.  IN THE EVENT THAT THE FUTURE EXPENSES ARE NOT PAID IN FULL WITHIN 15 DAYS OF NOTICE FROM LHP TO THE ALECTO DEFENDANTS AND/OR SHERMAN/GRAYSON OF THE AMOUNT DUE AND SUBJECT TO THE PROVISIONS OF PARAGRAPHS 6-8 OF THIS AGREEMENT, THE ALECTO DEFENDANTS AND SHERMAN/GRAYSON HEREBY EMPOWER ANY ATTORNEY OF ANY COURT OF RECORD, TO APPEAR FOR THE ALECTO DEFENDANTS AND/OR SHERMAN/GRAYSON AND, WITH OR WITHOUT COMPLAINT FILED, CONFESS JUDGMENT, OR A SERIES OF JUDGMENTS, AGAINST THE ALECTO DEFENDANTS AND/OR SHERMAN/GRAYSON, JOINTLY OR SEVERALLY, IN FAVOR OF LHP FOR THE LIABILITY OF THE THEN DUE FUTURE EXPENSES, FURTHER EMPOWER ANY ATTORNEY OF ANY COURT OF RECORD TO FILE A JUDGMENT SUBSTANTIALLY IN THE FORM ATTACHED HERETO AS EXHIBIT C.  THE ALECTO DEFENDANTS AND SHERMAN/GRAYSON HEREBY FOREVER WAIVE AND RELEASE ALL ERRORS IN SAID PROCEEDINGS AND ALL RIGHTS OF APPEAL, STAY OR EXEMPTIONS LAWS.  NOTWITHSTANDING THE FOREGOING, THE ALECTO DEFENDANTS AND SHERMAN/GRAYSON SHALL RETAIN AND BE ENTITLED TO ANY RIGHTS AND REMEDIES AVAILABLE TO THEM UNDER ANY APPLICABLE RULES OF CIVIL PROCEDURE, INCLUDING BUT NOT LIMITED TO RULE 58.1 OF THE DELAWARE SUPERIOR COURT RULES OF CIVIL PROCEDURE.

THE ALECTO DEFENDANTS AND SHERMAN/GRAYSON ACKNOWLEDGE, UNDERSTAND, AND AGREE TO SUCH CONFESSION OF JUDGMENT IN THE EVENT THAT THE FUTURE EXPENSES ARE NOT PAID IN FULL WITHIN 15 DAYS OF NOTICE FROM LHP TO THE ALECTO DEFENDANTS AND/OR SHERMAN/GRAYSON OF THE AMOUNT DUE AND ACKNOWLEDGE, UNDERSTAND, AND VOLUNTARILY AGREE TO THIS PROVISION AND SUCH CONFESSION OF JUDGMENT OR JUDGMENTS.

NO SINGLE EXERCISE OF THE FOREGOING POWER TO CONFESS JUDGMENT, OR A SERIES OF JUDGMENTS, SHALL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT ANY SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, VOIDABLE, OR VOID, BUT THE POWER SHALL CONTINUE UNDIMINISHED AND IT MAY BE EXERCISED FROM TIME TO TIME AS OFTEN AS LHP SHALL ELECT SUBJECT TO PARAGRAPH 8 UNTIL SUCH TIME AS LHP SHALL HAVE RECEIVED PAYMENT IN FULL OF THE FUTURE EXPENSES.

10.      Bankruptcy.  In the event that, pursuant to bankruptcy proceedings involving the Alecto Defendants or any affiliate of the Alecto Defendants, including Sherman/Grayson as a debtor, LHP is required to repay or transfer all or any portion of the $625,000 payment to the Alecto Defendants or any affiliate of Alecto Defendants, including Sherman/Grayson, a trustee, receiver or other party under bankruptcy law, state or federal law, common law or equitable cause pursuant to final and non-appealable order from a court of competent jurisdiction, then this Settlement Agreement will automatically be deemed to be void, the Parties shall be deemed to

5

have reverted to their respective litigation status, and LHP shall be entitled to pursue all rights and claims raised in the Delaware Action against the Alecto Defendants and/or in the Texas Action against Sherman/Grayson.

In the event that the Alecto Defendants or Sherman/Grayson declare bankruptcy within six months of LHP signing this Agreement, the forbearance provision in Paragraph 8 is null and void.

11.    <u>Cooperation</u>.  The Parties agree to cooperate in good faith in an effort to mitigate Sherman/Grayson Hospital, LLC's liability, if any, under the Altera Leases and related to the Medical Office Building located in Sherman, Texas (the "MOB") and LHP's Future Expenses related to the MOB.  Without agreeing to take on affirmative mitigation duties that it does not currently owe, LHP specifically agrees to cooperate and not hinder the Alecto Defendants' and Sherman/Grayson's efforts to release the property, negotiate with Altera regarding amounts due under the Lease, and any other efforts to mitigate expenses related to the MOB.  LHP further agrees to monthly telephone conferences between representatives of LHP and the Alecto Defendants to discuss mitigation efforts and other related matters if the Alecto Defendants request such calls.

12.    <u>Confidentiality; Nondisclosure</u>.  In consideration of this Agreement and the payments to be made pursuant hereto, the Parties agree that the terms of this Agreement, the amount of the Payment to be made in connection herewith and the circumstances and events giving rise to the disputes arising with respect to the Delaware Action shall remain confidential as between the Parties.  Notwithstanding the foregoing, the Parties are permitted to disclose such information: (i) as required to comply with regulatory reporting requirements; (ii) to such Party's attorneys and tax advisors; (iii) in connection with litigation seeking to enforce this Agreement; and (iv) to comply with an order of a court of competent jurisdiction, a regulatory body, or as otherwise required by law.

13.    <u>Sufficiency of Consideration</u>.  The Parties acknowledge the receipt and sufficiency of consideration adequate to support this Agreement in general and, in particular, their respective releases of rights set forth in Paragraphs 3 and 4 herein.

14.    <u>No Assignment of Claims Released</u>.  The Parties represent that they have not assigned, given, or sold any portion of any claim represented to be released in this Agreement to anyone else.

15.    <u>Severability</u>.  Except as otherwise expressly set forth herein, the Parties agree that in the event that any provision of this Agreement should be held to be void, voidable, unlawful, or for any reason unenforceable, the remaining provisions or portions of this Agreement nonetheless shall remain in full force and effect.

16.    <u>Headings</u>. Headings and captions used in the Agreement are used solely for the convenience of the Parties and are not to be used in construing or interpreting the provisions of this Agreement.

17.    <u>Governing Law and Forum Selection</u>.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware (without giving effect to principles

of conflicts of laws) to the extent such laws are not otherwise superseded by the laws of the United States.

18.    <u>Attorney's Fees and Costs</u>.  The Parties shall bear their own attorneys' fees, costs, and expenses in connection with the Delaware Action and the Texas Action and any Paragraph 6 or 7 proceeding in the State of Delaware for Future Damages, except that in any legal action related to the enforcement of this Agreement, the prevailing party shall be entitled to be paid any and all costs including, without limitation, reasonable attorney's fees, whether suit be brought or not, and whether or not incurred in trial, bankruptcy or appellate proceedings, and including attorney's fees incurred in litigating the entitlement to and amount of attorney's fees to which the prevailing party is entitled.

19.    <u>Entire Agreement</u>.  This Agreement and the Exhibits attached hereto set forth the entire agreement between the Parties and fully supersede any and all prior agreements or understandings, written or oral, between the Parties.  This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  A facsimile signature or signatures transmitted in PDF by electronic mail will be binding and enforceable to the same extent as an original signature.  Counterparts may be delivered via electronic mail (including PDF or electronic signature) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes and shall be sufficient to bind the party so executing the Agreement.

20.    <u>Authority</u>.  Each of the undersigned Parties certifies and warrants that such Party is fully authorized to enter into this Agreement.

21.    <u>Future Notices</u>.  Any and all future notices, demands or other communications, including notices pursuant to Rule 58.1, to LHP shall be effective if sent via certified mail, return receipt requested to:

c/o Ardent Health Services
1 Burton Hills Boulevard, Suite 250
Nashville, TN 37215
Attn: General Counsel

With a copy to:

RICHARDS RODRIGUEZ & SKEITH, LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
Attn: Benjamin H. Hathaway, Esq.

or to such other address(es) as LHP shall designate by notice given in accordance with this Agreement.

Any or all future notices, demands or other communications, including notices pursuant to Rule 58.1, to the Alecto Defendants and Sherman/Grayson shall be effective if sent via certified mail, return receipt requested to:

c/o Alecto Healthcare Services LLC
101 N. Brand Boulevard, Suite 1780
Glendale, CA 91203
Attn: General Counsel

HALLETT & PERRIN
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Attn: Michael Alfred, Esq.

or to such other address(es) as the Alecto Defendants and/or Sherman/Grayson shall designate by notice given in accordance with this Agreement.

     22.    <u>No Third-Party Beneficiaries</u>.  The Parties acknowledge that this Agreement is made solely for the benefit of the Parties, and nothing in this Agreement is intended nor will it be deemed, to confer rights or remedies upon any person or legal entity not a party to this Agreement, including but not limited to Altera.

     23.    <u>Modification and Waiver</u>.  No modification, amendment, waiver, termination or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon any of the Parties unless confirmed by a written instrument signed by all Parties.  No waiver by any Party of any term or provision of this Agreement or of any default hereunder shall affect such Party's rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar.

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF,** the Parties have signed and executed this Agreement as of the date set forth above as an expression of their intent to be bound by the foregoing terms of this Agreement.

Stephen C. Petrovich

**LHP HOSPITAL GROUP, INC.**

By: _____

Title: General Counsel

Date: 2/16/22

**ALECTO HEALTHCARE SERVICES SHERMAN LLC**

By: Michael J Sarrao

Title: Executive Vice-President

Date: 2/16/22

**ALECTO HEALTHCARE SERVICES LLC**

By: Michael J Sarrao

Title: Executive Vice-President

Date: 2/16/22

**SHERMAN/GRAYSON HOSPITAL, LLC**

By: Michael J Sarrao

Title: Executive Vice President

Date: 2/16/22

9

A0179

# EXHIBIT A

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| LHP HOSPITAL GROUP, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. N21C-01-146 PRW (CCLD) |
| ALECTO HEALTHCARE | ) |
| SERVICES LLC AND ALECTO | ) |
| HEALTHCARE SERVICES | ) |
| SHERMAN LLC, | ) |
| | ) |
| Defendants. | ) |

## STIPULATION AND [PROPOSED] ORDER OF DISMISSAL

Pursuant to Superior Court Rules of Civil Procedure 41(a)(2) and (c) and the parties' Settlement Agreement, entered into as of February [ ], 2022, it is hereby stipulated and agreed by and between Plaintiff LHP Hospital Group, Inc. ("LHP") Defendants Alecto Healthcare Services LLC and Alecto Healthcare Services Sherman LLC, ("Alecto") and through their undersigned counsel, and subject to the approval of the Court, as follows:

1. All claims, counterclaims and defenses are hereby dismissed; and

2. Each party shall bear its own costs, attorneys' fees and expenses.

3. This Stipulation and Order of Dismissal becomes *with prejudice* ninety days after the date it is "So Ordered" by the Court.

POTTER ANDERSON & CORROON LLP          COOCH AND TAYLOR, P.A.

By: /s/ _____          By: /s/ _____
   Peter J. Walsh, Jr. (#2437)              Carmella P. Keener (#2810)
   Clarissa R. Chenoweth-Shook (#5728)      The Nemours Building
   Hercules Plaza, 6th Floor                1007 North Orange Street, #1120
   1313 North Market Street                 Wilmington, DE  19801
   Wilmington, DE  19801                     (302) 984-3816
   pwalsh@potteranderson.com                 ckeener@coochtaylor.com
   cchenoweth@potteranderson.com

   *Attorneys for Plaintiff*                *Attorney for Defendants*

Dated:

IT IS SO ORDERED this _____ day of _____, 2022.

                              _____
                              The Honorable Paul R. Wallace

# EXHIBIT B

CAUSE NO. CV-20-0944

| | | |
|---|---|---|
| LHP HOSPITAL GROUP, INC., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | OF GRAYSON COUNTY, TEXAS |
| | § | |
| SHERMAN/GRAYSON HOSPITAL, LLC, | § | |
| *Defendant.* | § | 59TH JUDICIAL DISTRICT |

---

## AGREED MOTION TO DISMISS WITH PREJUDICE

---

COME NOW Plaintiff LHP Hospital Group, Inc. ("LHP") and Defendant Sherman/Grayson Hospital, LLC ("Sherman/Grayson") and move this Court for an Order dismissing this case.

The parties have resolved their disputes and this matter has been settled in its entirety. Accordingly, LHP and Sherman/Grayson ask this Court to dismiss with prejudice all claims between them in this case, with all costs and attorneys' fees taxed against the party who incurred them.

Plaintiff and its counsel represent that the parties have resolved the dispute under terms that are fair and reasonable.

WHEREFORE, PREMISES CONSIDERED, LHP and Sherman/Grayson request that this Court enter an Agreed Order dismissing with prejudice all claims between them in this case, with all costs and attorneys' fees taxed against the party who incurred them.

---

**A0184**

Respectfully submitted,

**RICHARDS RODRIGUEZ & SKEITH**

816 Congress Avenue, Suite 1200
Austin, Texas 78701
Telephone: 512-391-8256
Facsimile:  512-476-1513

By: _____
BENJAMIN H. HATHAWAY
State Bar No. 09224500
Email: BHathaway@rrsfirm.com


 -and-

**HALLETT & PERRIN, P.C.**

1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Telephone: 214-953-0053
Facsimile:  214-922-4142


By: _____
MICHAEL S. ALFRED
State Bar No. 24014416
CONDRED C. ROBERTS
State Bar No. 24091493
Email: malfred@hallettperrin.com
Email: croberts@hallettperrin.com

CAUSE NO. CV-20-0944

| | | |
|---|---|---|
| LHP HOSPITAL GROUP, INC., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | OF GRAYSON COUNTY, TEXAS |
| | § | |
| SHERMAN/GRAYSON HOSPITAL, LLC, | § | |
| *Defendant.* | § | 59TH JUDICIAL DISTRICT |

## ORDER GRANTING
## AGREED MOTION TO DISMISS WITH PREJUDICE

The Court, having considered the parties' Agreed Motion to Dismiss with Prejudice, hereby GRANTS the motion in its entirety.

IT IS THEREFORE ORDERED that all claims between the parties herein are hereby dismissed with prejudice to the refiling of same, with each party bearing its respective court costs and attorneys' fees.

IT IS SO ORDERED this _____.

_____

HONORABLE LARRY PHILLIPS

**AGREED AS TO FORM AND SUBSTANCE:**

**RICHARDS RODRIGUEZ & SKEITH**
816 Congress Avenue, Suite 1200
Austin, Texas 78701
Telephone: 512-391-8256
Facsimile: 512-476-1513

By: _____
BENJAMIN H. HATHAWAY
State Bar No. 09224500
Email: BHathaway@rrsfirm.com

**HALLETT & PERRIN, P.C.**
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Telephone: 214-953-0053
Facsimile: 214-922-4142

By: _____
MICHAEL S. ALFRED
State Bar No. 24014416
CONDRED C. ROBERTS
State Bar No. 24091493
Email: malfred@hallettperrin.com
Email: croberts@hallettperrin.com

# EXHIBIT C

**AFFIDAIVT:**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LHP HOSPITAL GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| ALECTO HEALTHCARE SERVICES | ) | **CONFESSION OF JUDGMENT** |
| LLC, ALECTO HEALTHCARE | ) | |
| SERVICES SHERMAN LLC, and | ) | |
| SHERMAN/GRAYSON HOSPITAL, | ) | |
| LLC | ) | |
| Defendants. | | |

NOW COME Defendants Alecto Healthcare Services LLC, Alecto Healthcare Services Sherman LLC, and Sherman/Grayson Hospital, LLC (collectively, "Defendants"), jointly and severally, who confess judgment in favor of Plaintiff LHP Hospital Group, Inc. ("LHP") pursuant to Superior Court Rule of Civil Procedure 58.1 and 10 Del. Code § 2306, being duly sworn, deposes and says:

1.      Defendants, jointly and severally, hereby authorize the immediate entry of judgment against Defendants in favor of LHP and issuance of execution thereon in the principal amount of $_____.

2.      This Confession of Judgment arises from the following facts:

1

**A0188**

(a)    On February __, 2022, LHP and Defendants executed a Settlement Agreement (the "Agreement"), wherein LHP agreed to forbear exercising certain remedies and seeking Future Expenses as defined in the Agreement; and

(b)    This Confession of Judgment is for the purpose of securing LHP against the contingency that Defendants may fail to comply with all terms of the Agreement, and was a material inducement to LHP signing the Agreement.

3.    Defendants hereby confirm their promise to pay LHP pursuant to the terms and conditions of the Agreement. IF DEFENDANTS DEFAULT, DEFENDANTS AGREE THAT LHP MAY EXERCISE ITS RIGHTS UNDER THE AGREEMENT AND/OR PURSUANT TO THIS CONFESSION OF JUDGMENT.

4.    Defendants hereby waive their rights: (i) to a jury trial or any other trial; and (ii) to answer or defend themselves; and hereby (a) confess judgment in favor of LHP for the liability to pay the Confessed Judgment Amount, without the service of process upon Defendants; and (b) consent to an immediate entry of judgment and the issuance of an execution thereon.  Notwithstanding the foregoing, Defendants shall have the following rights:

a.    the right to receive a notice letter, pursuant to Delaware Superior Court Civil Rules 58.1(a)(4) and 58.1(d), which notice letter shall contain,

among other things, the amount of principal, interest, fees, and costs for which

LHP intends to obtain court judgment; and

      b.    the right, at the hearing provided to a debtor under Court Rule

58.1(g)(3), to challenge LHP's computation of the principal, interest, fees, and

costs sought (but not the right to raise any other defenses not otherwise

permitted by Court Rule 58.1).

5.    This Confession of Judgment shall be governed by, construed under,

and enforced in accordance with the laws of the State of Delaware without giving

effect to the principles of conflict of laws therein.  Defendants hereby irrevocably

submit to the exclusive jurisdiction and venue of the state courts of Delaware.

6.    **CONFESSION OF JUDGMENT.** DEFENDANTS, JOINTLY AND

SEVERALLY, HEREBY IRREVOCABLY AUTHORIZE AND EMPOWER ANY

ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE

STATE OF DELAWARE, OR ELSEWHERE, TO APPEAR AT ANY TIME FOR

DEFENDANTS, WITH OR WITHOUT COMPLAINT FILED, AND TO

CONFESS OR ENTER JUDGMENT AGAINST DEFENDANTS FOR THE

FUTURE EXPENSES REQUESTED BY LHP, ON WHICH JUDGMENT OR

JUDGMENTS ONE OR MORE EXECUTIONS MAY ISSUE PURSUANT TO

APPLICABLE DELAWARE LAW AND COURT RULES; AND FOR SO

DOING, THIS CONFESSION OF JUDGMENT, SHALL BE SUFFICIENT

WARRANT. THE AUTHORITY GRANTED IN THIS CONFESSION OF JUDGMENT AGAINST DEFENDANTS SHALL NOT BE EXHAUSTED BY ANY EXERCISE OF THAT AUTHORITY, BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF THE FUTURE AMOUNTS REQUESTED BY LHP. WITH THE EXCEPTION OF THE RIGHTS GUARANTEED TO DEFENDANTS IN THIS CONFESSION OF JUDGMENT, DEFENDANTS HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE DELAWARE LAW, ANY OTHER RIGHT DEFENDANTS MAY HAVE TO NOTICE OR TO A HEARING IN CONNECTION WITH ANY SUCH CONFESSION OF JUDGMENT. DEFENDANTS AGREE THAT ANY AND ALL JUDGMENTS ENTERED IN CONNECTION WITH THIS CONFESSION OF JUDGMENT SHALL BE, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, FINAL AND BINDING.

7. PRIOR TO SIGNING THIS CONFESSION OF JUDGMENT, THE UNDERSIGNED ON BEHALF OF DEFENDANTS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS CONFESSION OF JUDGMENT. DEFENDANTS' ENTRY INTO THIS CONFESSION OF JUDGMENT AND WAIVER OF THEIR RIGHTS HEREUNDER ARE VOLUNTARY, KNOWING AND INTELLIGENT. DEFENDANTS HAVE BEEN REPRESENTED BY

COUNSEL REGARDING THIS CONFESSION OF JUDGMENT, AND HAVE CONSULTED WITH COUNSEL REGARDING THE ENTRY, ENFORCEABILITY, AND FORM OF THIS CONFESSION OF JUDGMENT.

8.      WITHOUT LIMITING THE FOREGOING, DEFENDANTS EXPRESSLY AUTHORIZE COUNSEL FOR LHP, OR ITS ASSIGNEE OR SUCCESSOR-IN-INTEREST, TO APPEAR IN THE SUPERIOR COURT OF THE STATE OF DELAWARE, INCLUDING BEFORE THE PROTHONOTARY IN ORDER TO ENTER THIS CONFESSION OF JUDGMENT AGAINST DEFENDANTS AND IN FAVOR OF LHP IN THE CONFESSED JUDGMENT AMOUNT.

9.      Defendants acknowledge that they have had the opportunity to consult with legal counsel regarding this Confession of Judgment.  Defendants certify that they consent to the entry of judgment by confession and the waivers given above are voluntary, intentional, and knowing consents and waivers given with full understanding and awareness of the legal consequences of such consents.

10.    This Confession of Judgment shall be binding upon Defendants and their successors, assigns, executors, and administrators and shall inure to the benefit of LHP and its successors, assigns, executors, and administrators.

[signature on next page]

This ___ day of _____ 202__.

_____

Alecto Healthcare Services, LLC

By: _____

Sworn to and subscribed before me
this the _____ day of _____, 202__.

Notary Public

My Commission Expires:_____

This ___ day of _____ 202__.

_____

Alecto Healthcare Services Sherman, LLC

By:_____

Sworn to and subscribed before me
this the _____ day of _____, 202__.

Notary Public

My Commission Expires:_____

This ___ day of _____ 202__.

Sherman/Grayson Hospital, LLC

By: _____

Sworn to and subscribed before me
this the _____ day of _____, 202__.

Notary Public

My Commission Expires:_____

**ORDER:**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| LHP HOSPITAL GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| ALECTO HEALTHCARE SERVICES | ) | |
| LLC, ALECTO HEALTHCARE | ) | |
| SERVICES SHERMAN LLC, and | ) | |
| SHERMAN/GRAYSON HOSPITAL, | ) | |
| LLC | ) | |
| Defendants. | | |

## <u>ORDER AND JUDGMENT BY CONFESSION</u>

AND NOW this _____ day of _____, 20__;

JUDGMENT IS HEREBY ENTERED in favor of Plaintiff LHP Hospital Group, Inc. against Defendants Alecto Healthcare Services LLC, Alecto Healthcare Services Sherman LLC, and Sherman/Grayson Hospital, LLC (collectively, "Defendants"), jointly and severally, in the amount of $_____, plus interest from the entry of this judgment until payment in full of the same, plus Court costs.

_____
The Honorable _____

## **EXHIBIT D**

Demand

 **Richards Rodriguez & Skeith**

**Benjamin H. Hathaway**
Phone: (512) 391-8256
E-mail: BHathaway@rrsfirm.com

June 28, 2023

**_Via First Class and Certified Mail:_**

Alecto Healthcare Services Sherman LLC
c/o Alecto Healthcare Services LLC
101 N. Brand Boulevard, Suite 1780
Glendale, CA 91203
Attn: General Counsel
_Receipt No. 7022 2410 0001 2422 1471_

HALLETT & PERRIN
1445 Ross Avenue, Suite 2400
Dallas, TX 75202
Attn: Michael Alfred, Esq.
_Receipt No. 7022 2410 0001 2422 1488_

RE:     Demand pursuant to Confidential Settlement Agreement

Gentlemen:

This firm represents LHP Hospital Group, Inc. ("**LHP**") in connection with its claims against Alecto Healthcare Services Sherman LLC ("**Alecto Sherman**") under the Confidential Settlement Agreement dated as of February 16, 2022 between LHP, Alecto Sherman, and others (the "**Agreement**").

This is a formal demand pursuant to Paragraph 6 of the Agreement for the payment by Alecto Sherman to LHP of the amount of $3,708,475.62 paid by LHP to Altera Highland, LLC for expenses in connection with the MOB (as defined in the Agreement) after February 17, 2022 through the current date. Pursuant to Paragraph 6.b. of the Agreement, Alecto Sherman is to make payment of such amount to LHP within fifteen (15) days of this demand. Should Alecto Sherman not make the required payment of $3,708,475.62 to LHP within fifteen (15) days of this demand, LHP will pursue all remedies available to it under the Agreement and otherwise.

LHP is not by this letter making demand under the Agreement or otherwise on Alecto Healthcare Services, LLC, the Debtor in Case No 23 -10787, or Sherman/Grayson Hospital LLC, the Debtor in Case No. 23-10810, both of which are now pending in the United States Bankruptcy Court for the District of Delaware, or against any other party that has sought relief under Title 11, U.S. Code.

RICHARDS RODRIGUEZ & SKEITH LLP
PAGE 2

Please do not hesitate to contact me if you have any questions.

Sincerely,

Benjamin H. Hathaway



**Richards Rodriguez & Skeith**

Benjamin H. Hathaway
Phone: (512) 391-8256
E-mail: BHathaway@rrsfirm.com

June 28, 2023

*Via First Class and Certified Mail:*

Alecto Healthcare Services Sherman LLC
c/o Alecto Healthcare Services LLC
101 N. Brand Boulevard, Suite 1780
Glendale, CA 91203
Attn: General Counsel
*Receipt No. 7022 2410 0001 2422 1471*

HALLETT & PERRIN
1445 Ross Avenue, Suite 2400
Dallas, TX 75202
Attn: Michael Alfred, Esq.
*Receipt No. 7022 2410 0001 2422 1488*

RE:  Demand pursuant to Confidential Settlement Agreement

Gentlemen:

This firm represents LHP Hospital Group, Inc. ("**LHP**") in connection with its claims against Alecto Healthcare Services Sherman LLC ("**Alecto Sherman**") under the Confidential Settlement Agreement dated as of February 16, 2022 between LHP, Alecto Sherman, and others (the "**Agreement**").

This is a formal demand pursuant to Paragraph 6 of the Agreement for the payment by Alecto Sherman to LHP of the amount of $3,708,475.62 paid by LHP to Altera Highland, LLC for expenses in connection with the MOB (as defined in the Agreement) after February 17, 2022 through the current date. Pursuant to Paragraph 6.b. of the Agreement, Alecto Sherman is to make payment of such amount to LHP within fifteen (15) days of this demand. Should Alecto Sherman not make the required payment of $3,708,475.62 to LHP within fifteen (15) days of this demand, LHP will pursue all remedies available to it under the Agreement and otherwise.

LHP is not by this letter making demand under the Agreement or otherwise on Alecto Healthcare Services, LLC, the Debtor in Case No 23 -10787, or Sherman/Grayson Hospital LLC, the Debtor in Case No. 23-10810, both of which are now pending in the United States Bankruptcy Court for the District of Delaware, or against any other party that has sought relief under Title 11, U.S. Code.

**RICHARDS RODRIGUEZ & SKEITH LLP**
PAGE 2

Please do not hesitate to contact me if you have any questions.

Sincerely,

Benjamin H. Hathaway

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC,[1] | Case No. 23-10787 (JKS) |
| Debtor. | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of November, 2023, I caused to be filed with the Court electronically, and I caused to be served a true and correct copy of the *Preliminary Response of the Debtor in Opposition to the Objection of the Reed Action Judgment Creditors to Debtor's Designation of This Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor* upon the parties that are registered to receive notice via the Court's CM/ECF notification system, and an additional service was completed via electronic mail upon the parties on the attached service list.

/s/ Jeffrey R. Waxman
Jeffrey R. Waxman (DE Bar No. 4159)

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

## Service List

William D. Sullivan, Esq.
William A. Hazeltine, Esq.
Sullivan Hazeltine Allinson Llc
919 North Market Street, Suite 420
Wilmington, DE 19801
E-mail: bsullivan@sha-llc.com
whazeltine@sha-llc.com

-and-

Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
E-mail: colten@msjlaw.org

-and-

John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
E-mail: jstember@stembercohn.com
mdavidsonwelling@stembercohn.com

*Attorneys for the Reed Action Judgment
Creditors*

Cassandra C. Burton, Esq.
Zoe C. Wadge, Esq.
Pension Benefit Guaranty Corporation
Office of the General Counsel
445 12th Street, SW
Washington, D.C. 20024
Email: burton.cassandra@pbgc.gov
wadge.zoe@pbgc.gov
efile@pbgc.gov

*Pension Benefit Guaranty Corporation*

Jami Nimeroff, Esq.,
Brown McGarry Nimeroff LLC
919 N. Market Street, Suite 420
Wilmington, DE 19801
E-mail: JNimeroff@bmnlawyers.com

*Subchapter V Trustee*

Linda Casey, Esq.
Office of the United States Trustee
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
E-mail: Linda.Casey@usdoj.gov

*United States Trustee*

David M. Klauder, Esq.
Melissa M. Hartlipp, Esq.
Bielli & Klauder, LLC
1204 N. King Street
Wilmington, DE 19801
E-mail: dklauder@bk-legal.com
mhartlipp@bk-legal.com

and

Thomas E. Patterson, Esq.
Sasha M. Gurvitz, Esq.
Robert J. Smith, Esq.
N. Tanner Frei, Esq.
KTBS LAW LLP
1801 Century Park East, 26th Floor
Los Angeles, CA 90067-6049
E-mail: TPatterson@ktbslaw.com
SGurvitz@ktbslaw.com
RSmith@ktbslaw.com
TFrei@ktbslaw.com

*Counsel to Medical Properties Trust, Inc.*

16423090/1
**A0202**

Eric J. Taube, Esq.
Trip Nix, Esq.
Holland & Knight LLP
100 Congress Avenue, Suite 1800
Austin, TX 78701
Email: eric.taube@hklaw.com
trip.nix@hklaw.com

and

Mark Minuti, Esq.
Saul Ewing LLP
1201 N. Market Street, Suite 2300
P. O. Box 1266
Wilmington, DE 19899
Email: mark.minuti@saul.com

*Counsel to LHP Hospital Group, Inc.*

Leah V. Lerman, Esq.
U.S. Department of Justice
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, DC 20044-0875
E-mail: Leah.V.Lerman@usdoj.gov

*United States Department of Justice*

Christopher M. Samis, Esq.
Aaron H. Stulman, Esq.
R. Stephen McNeill, Esq.
Potter Anderson & Corroon LLP
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Email: csamis@potteranderson.com
astulman@potteranderson.com
rmcneill@potteranderson.com

*Counsel to Official Committee of
Unsecured Creditors of Sherman/Grayson
Hospital, LLC*

Ronald W. Crouch, Esq.
Whiteford Taylor & Preston, LLP
11 Stanwix Street, Suite 1400
Pittsburgh, Pennsylvania 15222
Email: rcrouch@whitefordlaw.com

and

Richard W. Riley, Esq.
Whiteford Taylor & Preston, LLP
600 North King Street, Suite 300
Wilmington, Delaware 19801
Email: rriley@whitefordlaw.com

*Counsel to Snyder Brothers Energy, LLC*

Scott J. Leonhardt, Esq.
The Rosner Law Group LLC
824 North Market Street, Suite 810
Wilmington, DE 19801
Email: leonhardt@teamrosner.com

and

Leonard M. Shulman, Esq.
Alan J. Friedman, Esq.
Max Casal, Esq.
Shulman Bastian Friedman & Bui LLP
100 Spectrum Center Drive; Suite 600
Irvine, CA 92618
Email: lshulman@shulmanbastian.com
afriedman@shulmanbastian.com
mcasal@shulmanbastian.com

*Counsel to Sherman/Grayson Hospital, LLC*

# EXHIBIT 3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC, [1] | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtor. | ) | **Related Docket Nos. 204 and 226** |

**REPLY IN RESPONSE TO PRELIMINARY RESPONSE OF THE
DEBTOR IN OPPOSITION TO THE OBJECTION OF THE REED
ACTION JUDGMENT CREDITORS TO DEBTOR'S DESIGNATION
OF THIS CASE AS A SUBCHAPTER V CASE AND MOTION TO
REVOKE DEBTOR'S DESIGNATION AS A SUBCHAPTER V DEBTOR**

The Reed Action Judgment Creditors, by and through undersigned counsel, submit their reply in response to the *Preliminary Response of the Debtor to the Objection of the Reed Action Judgment Creditors to Debtor's Designation of this Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor* [Docket No. 226] (the "Response") and respectfully states as follows:

## **REPLY**

1. The Debtor's Response does not challenge the legal standard set forth in the Reed Action Judgment Creditors' Objection/Motion that the Debtor bears the burden of proof to establish its eligibility to proceed as a Subchapter V debtor. [Obj./Mot., ¶ 14, citing to *In re Blue, In re Port Arthur Steam Energy, L.P.,* and *In re Fama*]. The Debtor likewise does not challenge the proposition that this Court is not limited to an analysis of the Debtor's schedules to determine its eligibility under subchapter V of the Bankruptcy Code. [Obj./Mot., ¶ 15, citing to *In re Hall, In re Steffans*]. Rather, the debtor focuses almost exclusively on arguing that Claim no. 15-1 filed by LHP Hospital Group ("LHP") in the amount of $3,739,653.77[2] was contingent and unliquidated

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

[2] A copy of the LHP Claim is attached to the Objection/Motion as Exhibit E.

as of the petition date and cannot count as a debt of the Debtor on the petition date for purposes of determining its eligibility under subchapter V.

2.      LHP's claim arises from a September 23, 2014 transaction whereby Alecto Healthcare Services Sherman LLC, the Debtor's wholly-owned subsidiary ("Purchaser" or "Alecto Sherman") purchased from Sherman/Grayson Health System, LLC (the "Seller") all the membership interests of three entities: Sherman/Grayson Hospital, LLC ("Sherman Grayson Hospital"), Sherman/Grayson Health Services, LLC, and Sherman/Grayson Sponsor, LLC.[3]  As part of that transaction, the Debtor, as guarantor, executed a guarantee in favor of LHP, among others, dated September 23, 2014 (the "Guarantee").[4] Pursuant to the Guarantee, the Debor "absolutely, unconditionally and irrevocably guarantees to the Guaranteed Parties the due and punctual payment, performance and discharge of each and every of Purchaser's obligations under the Purchase Agreement." [Guarantee, ¶ 1, Ex. 1, p.1]. The guaranteed obligations include the Purchaser's lease obligations with respect to certain suites in a medical office building located in Sherman, Texas (the "MOB") leased from Altera Highland, LLC (the "Landlord").

3.      Shortly after the execution of the Purchase Agreement, the Seller executed an Assignment and Assumption of Leases for five leases in a medical office building (MOB), assigning them to Sherman Grayson Hospital, with the consent of the Landlord.[5]  LHP had previously guaranteed Seller's lease obligations to the Landlord, and the Landlord's consent to the assignment of the leases to Sherman Grayson Hospital was expressly conditioned on not releasing LHP's existing guaranty of these obligations.[6]  However, pursuant to Section 9.3(e) of the Purchase

---

[3] The Purchase Agreement is attached to the Debtor's Response as Exhibit B.
[4] A copy of the Guarantee is attached hereto as Exhibit 1.
[5] A copy of the Assignment and Assumption of Leases is attached hereto as Exhibit 2.
[6] A copy of the Landlord's Consent Agreement is attached hereto as Exhibit 3.

Agreement, Alecto Sherman as the Purchaser was required to indemnify LHP and the Seller for any labilities related to these leases. Accordingly, the Debtor's unconditional guaranty of Alecto Sherman's obligations under the Purchase Agreement included a guaranty of LHP's existing obligations to the Landlord under the leases.

4. Debtor's argument that its obligations under its Guarantee were conditional on the petition date ignores the plain terms of the Guarantee. Paragraph 2(a) of the Guarantee provides that "[t]his Guarantee is an unconditional guarantee of payment and performance and not of collection." [Guarantee ¶ 2(a), Ex. 1, p.1]. Paragraph 2(b) of the Guarantee provides that "[t]he Guarantor agrees that the Obligations of the Guarantor hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) *the failure of the Guaranteed Parties to assert any claim or demand* or to enforce any right or remedy against, or to join Purchaser to any suit arising under this Guarantee or the Obligations of, Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement...." *(emphasis supplied)*. *Id.* That paragraph further provides as follows:

> *The Guarantor waives promptness, diligence, notice of the acceptance of this Guarantee and of the Obligations, presentment, demand for payment*, *notice of non-performance, default*, dishonor and protest, notice of any Obligations incurred and all other notices of any kind (except for notices to be provided pursuant to this Guarantee or to Purchaser and its counsel in accordance with the Purchase Agreement), all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar applicable Law now or hereafter in effect, any right to require the marshalling of assets of Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement, and all suretyship defenses generally.

*Id.,* p.2 *(emphasis supplied).*

5. The Guarantee is governed by and construed in accordance with the internal laws of the State of Delaware. *Id., ¶ 8, p. 5.*

3

**A0207**

**A.  LHP's Claim was not contingent as of the Petition Date**

6.      In Delaware, an unconditional guaranty is one "whereby the guarantor agrees to pay or perform a contract on default of the principal without limitation." *Fanatics Retail Group (Dreams), LLC v. Truax*, 2020 WL 7042873 at * 3, Noreika, J. (D. Del. Dec. 1, 2020), citing to *Ajax Rubber Co. v. Gam,* 151 A. 828, 830 (Del. Super. 1923)(quotation omitted).  Such a guaranty constitutes "an absolute undertaking to pay a debt at maturity or perform an agreement if the principal does not pay or perform." *Id.* (quotation omitted).  And "there is no limitation on the right of the creditor to bring an action directly against the guarantor when the principal commits a default. *Id.*; *accord In re Total Containment, Inc.*, 906 F. Supp. 1427, 1430 (D. Colo. 1995); *Ajax Rubber Co. v. Gam, supra*  (stating that in an absolute guaranty, 'the liability of the guarantor is fixed by the failure of the principal debtor to pay at maturity')." *Fanatics Retail, supra* at *3.  The *Ajax* court held that the guarantor's obligations under the guaranty were absolute because it was a guaranty of payment, not collection.  *Ajax Rubber Company v. Gam*, 151 A. 828, 830 (Del. Super. 1923). "[W]here the guaranty is one of payment and not one of collectability, [] it is not necessary for the plaintiff to allege and prove diligence on the part of a creditor against the principal debtor." *Id.*

7.      Here, the Debtor's Guarantee is absolute because it is "an unconditional guarantee of payment and performance and not of collection." [Guarantee ¶ 2(a), Ex. 1, p.1].  As a result, LHP had an absolute, non-contingent right to payment for all past due lease obligations not paid by Sherman Grayson Hospital as of the Petition Date.  LHP's proof of claim constitutes a demand for payment of the accrued liquidated and noncontingent lease obligations which remain in place, and for which the Debtor continues to accrue further obligations going forward.

8.      The Debtor's argument that the demand requirement in paragraph 6 of the Settlement Agreement transforms the Debtor's absolute and unconditional guaranty into a contingent obligation is misplaced. The Debtor's guaranty of payment of the monthly lease obligations became fixed and unconditional each month when Sherman Grayson Hospital, the Assignee for the leases, and Alecto Sherman, the Purchaser, defaulted on payment of the monthly lease obligations. The demand requirement in the Settlement Agreement provides a procedure for Debtor's payment of its guaranty obligations short of LHP's confessed judgment right, but does not make LHP's right to payment contingent.

9.      A plain reading of paragraph 6(b) of the Settlement Agreement demonstrates the limited nature of the demand requirement, which simply gives the Debtor a 15-day window to avoid the filing of a confessed judgment against it.  Under that procedure: (i) LHP must make a demand of the amount due; (ii) the Debtor must make payment of the requested amount within fifteen days after demand; (iii) LHP is entitled to judgment by confession if the Debtor fails to pay or disputes the demand amount; and (iv) the only matter that the Debtor may contest in connection in the judgment by confession proceeding is the computation and payment of the principal, interest, fees, and costs of the judgment.  [Settlement Agreement ¶ 6.b, p.3, Ex. C to Debtor's Response]. Under the Settlement Agreement, the Debtor expressly waived any right to contest its liability for the rent obligations.  This demonstrates that its guaranty obligations are not contingent.    In addition, the inclusion in paragraph 8 of the Settlement Agreement of an initial one-year forbearance period (now expired) and subsequent 6-month forbearance terms does not change the fixing of the Debtor's monthly obligations; these provisions only impact the timing of when those obligations can be pursued outside of bankruptcy.

5

10.     The Debtor also argues that LHP's claim is contingent upon "whether the underlying obligor remitted payments of the amounts…." [Response, ¶ 25]. This argument is specious. The Debtor has not alleged that Sherman Grayson Hospital, the Assignee under the leases, or Sherman Alecto, a guarantor of the lease obligations under the Purchase Agreement, has made any payments. LHP's claim filed in the amount of $3,739,635.77 constitutes *prima facie* evidence that no such payments have been received, regardless of the Debtor's asserted lack of knowledge of whether its wholly-owned subsidiaries made such payments.[7] Moreover, if Sherman Grayson Hospital or Alecto Sherman had paid the lease obligations as of the Petition, LHP's claim would be disputed, not contingent.

**B.  LHP's claim was liquidated as of the Petition Date**

11.     As the Debtor acknowledges, a claim is liquidated (i) if it is subject to ready determination and precision in computation of the amount due [(Objection ¶ 28 (citing *In re Mitchell*, 255 B.R. 246, 360 (Bankr. D. Mass 2000)] and (ii) "if the amount due can be readily ascertained either by reference to an agreement or by simple mathematics." [Objection ¶ 28 (quoting *In re Jordan*, 166 B.R. 201. 202 (Bankr. D. Me. 1994)]. *See also In re Hall*, 650 B.R. 595 at 599 (Bankr. M.D. Fla 2023) (" '[C]ourts have generally held that a debt is liquidated if its amount is readily and precisely determinable, where the claim is determinable by reference to an agreement.' *United States v. May,* 211 B.R. 991, 996 (citing *Collier on Bankruptcy,* 15th Ed. at 1109.06[2][c] (March 1997)). Ordinarily, debts of a contractual nature are 'subject to ready determination and precision in computation of the amount due' and, therefore, are considered

---

[7] Michael Sarrao has served as the Debtor's Executive Vice President, General Counsel and Secretary since January 1, 2013. [D.I. 3]. He has also served as the Executive Vice President for Sherman/Grayson Hospital LLC since November 1, 2014. [Case No. 23-10810 JKS, D.I. 3, ¶ 3].

6

liquidated, even if subject to substantial dispute. *Barcal v. Laughline (In re Barcal)*, 213 B.R. 1008, 1014 (B.A.P. 8th Cir. 1997)."

12. Here, LHP's claim can be readily determined by reference to the terms of applicable leases, including the amount of rent reserved, late fees and interest. If the Debtor disagrees with LHP's calculation of the amount due, LHP's claim is disputed but not unliquidated.

13. Nonetheless, the Debtor argues that "the amount of [LHP's] claim was not specified or determined as of the Petition Date, and given that LHP still has not provided any basis for its claim, it still isn't)." [Response at 11]. This studiously ignores the Debtor's obligations in evaluating its liabilities. On June 30, 2023, the Debtor filed its schedules, and stated that their obligation to LHP on the petition date were contingent and unliquidated. Two days earlier, on June 28, 2023, LHP issued its demand letter to Alecto Sherman that LHP was owed $3,708,475.62 under Alecto Sherman's Purchaser guarantee for the period from February 17, 2022 forward, which period was not covered by the Settlement Agreement. On August 14, 2023, LHP filed its claim against the Debtor in the slightly higher amount of $3,739,635.77, again setting forth the amount that was due to LHP from the Debtor at the Petition Date. The Debtor's professed ignorance of the amount owed on the petition date does not make the claim unliquidated or contingent. There is nothing that the debtor can point to between the petition date and LHP's filing of its proof of claim that caused the claim to move from unliquidated and contingent to liquidated and noncontingent, as the amounts asserted had already accrued as of the Petition Date. The Settlement Agreement recognizes that Sherman Grayson Hospital's nonpayment of the rent is the trigger for LHP's obligations to Alterra, and the Debtor's obligations to LHP, where it states: "LHP's obligation to pay Altera expenses only occurs after Sherman/Grayson fails to meet its obligations." [Settlement Agreement, ¶ 6, p. 4].

14. In *In re Macedon Consulting Inc.*, 652 B.R. 480 (Bankr. E.D. Va. 2023), in evaluating a debtor's eligibility for subchapter V, the Court rejected the Debtor's argument that future obligations under leases that were entered prepetition could be considered contingent. There, the Court found that the full amount of payments due through the end of the leases was to be considered as due and owing as of the petition date, and the Bankruptcy Code's potential cap on rejection damages did not apply because it relied on an event (rejection) that necessarily occurred post-petition. Applied to this case, the *Macedon Consulting* case would permit LHP to assert a claim in excess of its claim asserted in this case. More significantly, however, the analysis of the Debtor's obligations on the Petition Date under its prepetition agreements must be properly analyzed at the time the motion is heard. In conducting its subchapter V analysis of the obligations through the Petition Date, the *Macedon Consulting* Court rejected the Debtor's scheduled damage amount; other Courts have similarly stated that what a Debtor believes it owes on the petition date is not relevant to the analysis. *In re Hall*, 650 BR 595, 600 (Bankr. M. D. Fla. 2023). This Court should do the same.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons and the reasons set forth in the Motion, the Reed Action Judgment Creditors respectfully request that the Court enter an order, in the form substantially in the form attached as Exhibit L to the Motion:

(i)      Finding that the Debtor is not eligible to be a Subchapter V debtor;

(ii)     Revoking the Debtor's subchapter V designation; and

(iii)    Granting such other relief as is just and proper.

Date:   November 27, 2023
        Wilmington, DE

**SULLIVAN · HAZELTINE · ALLINSON LLC**

_____/s/ William D. Sullivan_____
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
          whazeltine@sha-llc.com

Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
Tel: (304) 326-0188
Email:  colten@msjlaw.org

John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email: jstember@stembercohn.com
          mdavidsonwelling@stembercohn.com

*Attorneys for the Reed Action Judgment Creditors*

9

A0213

# EXHIBIT 1

## GUARANTEE

This Guarantee, dated as of September 23, 2014 (this "Guarantee"), is made by Alecto Healthcare Services LLC, a Delaware limited liability company (the "Guarantor"), in favor of the Seller Indemnites (each a "Guaranteed Party" and together the "Guaranteed Parties"). Sherman/Grayson Health System, LLC, a Texas limited liability company ("Seller"), and LHP Hospital Group, Inc., a Delaware corporation ("LHP"), are signatories hereto in their capacity as representatives of themselves and the other Seller Indemnitees. Capitalized terms used but not otherwise defined herein shall have the respective meanings given to them in the Purchase Agreement (as defined below).

1.    Guarantee. To induce Seller and LHP to enter into that certain Purchase Agreement, dated as of the date hereof, by and among Alecto Healthcare Services Sherman LLC, a Delaware limited liability company ("Purchaser"), Seller, LHP, and Texas Health Resources, a Texas not-for-profit corporation (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), whereby Purchaser shall acquire 100% of the issued and outstanding membership interests of Sherman/Grayson Hospital, LLC, Sherman/Grayson Health Services, LLC and Sherman/Grayson Sponsor, LLC, the Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Guaranteed Parties the due and punctual payment, performance and discharge of each and every of Purchaser's obligations under the Purchase Agreement (together with any reasonable and documented out-of-pocket fees and expenses, including attorney fees and costs, which the Guaranteed Parties shall incur in enforcing or preserving any rights under this Guarantee if the obligations hereunder are not paid by the Guarantor when due as required herein or if this Guarantee is enforced by suit or through bankruptcy court or other judicial proceedings whatsoever, the "Obligations").

2.    Nature of Guarantee; Changes in Obligations; Certain Waivers.

(a)    This Guarantee is an unconditional guarantee of payment and performance and not of collection. The Guaranteed Parties shall not be obligated to file any claim relating to the Obligations in the event that Purchaser becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Guaranteed Parties to so file shall not affect the Guarantor's Obligations hereunder.

(b)    The Guarantor agrees that the Guaranteed Parties may at any time and from time to time, without notice to or further consent of the Guarantor, extend the time of payment of any of the Obligations, and may also enter into any agreement with Purchaser for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, or for any modification of the Purchase Agreement or of any agreement between the Guaranteed Parties and Purchaser without in any way impairing or affecting the Guarantor's Obligations under this Guarantee. The Guarantor agrees that the Obligations of the Guarantor hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of the Guaranteed Parties to assert any claim or demand or to enforce any right or remedy against, or to join Purchaser to any suit arising under this Guarantee or the Obligations of, Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement; (ii) any change in

the time, place or manner of payment of any of the Obligations or any rescission, waiver, compromise, consolidation or other amendment or modification of any of the terms or provisions of the Purchase Agreement made in accordance with the terms thereof; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement; (iv) the existence of any claim, set-off or other right which the Guarantor may have at any time against Purchaser or the Guaranteed Parties, whether in connection with the Obligations or otherwise; (v) the invalidity, illegality or unenforceability of all or any part of the Obligations or any document or agreement executed in connection with the Obligations, for any reason related to actions by the Purchaser, the Guarantor or their respective Affiliates, including without limitation the fact that the act of creating the Obligations or any part thereof is *ultra vires*, the officers or representatives executing the documentation or otherwise creating the Obligations acted in excess of their authority, or Purchaser or the Guarantor has valid defenses, claims or offsets (other than those expressly provided in the Purchase Agreement) which render the Obligations wholly or partially uncollectible from Purchaser or the Guarantor; or (vi) the adequacy of any other means the Guaranteed Parties may have of obtaining repayment of any of the Obligations.  To the fullest extent permitted by applicable Laws, the Guarantor hereby expressly waives any and all rights or defenses arising by reason of any applicable Law which would otherwise require any election of remedies by the Guaranteed Parties.  The Guarantor waives promptness, diligence, notice of the acceptance of this Guarantee and of the Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Obligations incurred and all other notices of any kind (except for notices to be provided pursuant to this Guarantee or to Purchaser and its counsel in accordance with the Purchase Agreement), all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar applicable Law now or hereafter in effect, any right to require the marshalling of assets of Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement, and all suretyship defenses generally.  The Guarantor acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated by the Purchase Agreement and that the waivers set forth in this Guarantee are knowingly made in contemplation of such benefits.

(c)    Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement that arise from the existence, payment, performance, or enforcement of a Guarantor's Obligations under or in respect of this Guarantee, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Guaranteed Parties against Purchaser or such other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from Purchaser or such other Person, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until the Obligations have been satisfied in full; provided, that the Guarantor shall have the right to cause any other Person to satisfy its Obligations to the Guaranteed Parties hereunder.  If any amount shall be paid to any Guarantor in violation

2

of the immediately preceding sentence at any time prior to the performance of and payment in full in cash of the Obligations and all other amounts payable under this Guarantee, an amount equal to the lesser of (i) the amount paid to the Guarantor in violation of the immediately preceding sentence, and (ii) all amounts payable under this Guarantee, shall be received and held in trust for the benefit of the Guaranteed Parties, shall be segregated from other property and funds of the Guarantor and shall forthwith be paid or delivered by the Guarantor to the Guaranteed Parties in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Obligations and all other amounts payable under this Guarantee, whether matured or unmatured, or to be held as collateral for any Obligations or other amounts payable under this Guarantee thereafter arising.

3.     <u>Effect on Certain Rights</u>.  No failure on the part of the Guaranteed Parties to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Guaranteed Parties of any right, remedy or power hereunder preclude any other or future exercise of any right, remedy or power hereunder except as explicitly set forth herein or in the Purchase Agreement.  Subject to the terms hereof and of the Purchase Agreement, except as stated therein, each and every right, remedy and power hereby granted to the Guaranteed Parties or allowed to it by applicable Law shall be cumulative and not exclusive of any other, and may be exercised by the Guaranteed Parties at any time or from time to time.

4.     <u>Representations and Warranties</u>.  The Guarantor hereby represents and warrants that:

(a)     the execution, delivery and performance of this Guarantee have been duly authorized by all necessary action and do not and will not contravene any provision of the Guarantor's charter, partnership agreement, operating agreement or similar organizational documents or any applicable Law or material contract binding on the Guarantor or its assets;

(b)     all consents, approvals, authorizations, permits of, filings with and notifications to, any Governmental Authority necessary for the due execution, delivery and performance of this Guarantee by the Guarantor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any Governmental Authority is required in connection with the execution, delivery or performance of this Guarantee;

(c)     this Guarantee constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar applicable Laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law); and

(d)     the Guarantor has the financial capacity to pay and perform its obligations under this Guarantee, and all funds necessary for the Guarantor to fulfill its Obligations

under this Guarantee for so long as this Guarantee shall remain in effect in accordance with <u>Section 7</u>.

5.    <u>Assignment</u>.  The Guarantor shall not assign its rights, interests or obligations hereunder to any other Person (except by operation of law) without the prior written consent of Seller and LHP; <u>provided</u>, that any such permitted assignment shall not relieve the Guarantor of its Obligations hereunder.

6.    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission) or (c) one (1) Business Day following the day sent by reputable, national overnight courier (with written confirmation of receipt), in each case at the following addresses, e-mail addresses or facsimile numbers (or to such other address, e-mail address or facsimile number as a party hereto may have specified by notice given to the all other parties hereto pursuant to this provision):

If to the Guarantor, to:

c/o Alecto Healthcare Services LLC
16310 Bake Parkway, Suite 200
Irvine, California 92618
Attention: CEO
Facsimile: (949) 878-9458

with a copy (which shall not constitute notice) to:

Law Offices of Michael J. Sarrao
16310 Bake Parkway, Suite 200
Irvine, California 92618
Attention: Michael J. Sarrao, Esq.
Facsimile: (949) 878-9458

If to the Guaranteed Parties, to:

c/o LHP Hospital Group, Inc.
2400 Dallas Parkway, Suite 450
Plano, Texas  75093
Attention: General Counsel
Facsimile:  (972) 312-9750

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Harvey Eisenberg
Facsimile: (212) 310-8007

7.   <u>Continuing Guarantee</u>. Unless terminated pursuant to this <u>Section 8</u>, this Guarantee shall remain in full force and effect and shall be binding on the Guarantor, its successors and permitted assigns until the Obligations have been indefeasibly paid, observed, performed or satisfied in full.

8.   <u>Governing Law; Jurisdiction and Forum</u>.  This Guarantee (including, without limitation, the validity, construction, effect or performance hereof and any remedies hereunder or related hereto), and all claims or causes of action of any kind (whether at law, in contract or in tort or otherwise) that may be based upon, arise out of or relate to this Guarantee, or the negotiation, execution or performance hereof (including, without limitation, any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Guarantee or as an inducement to enter into this Guarantee), shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Each of the parties hereto irrevocably agrees that any action or proceeding arising out of or relating to this Guarantee and the rights and obligations arising hereunder, and the rights and obligations arising hereunder brought by any other party hereto or its successors or assigns, shall be brought and determined exclusively in the state or federal courts of the State of Delaware; <u>provided</u>, that a judgment rendered by such Delaware courts may be enforced in any court having competent jurisdiction.  Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts in any such action, agrees to take any and all future action necessary to submit to the jurisdiction of such courts, waives, and agrees not assert, by way of motion, as a defense, counterclaim or otherwise, any objection it may now or hereafter have to venue or to convenience of forum (including (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve; (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise); and (c) to the fullest extent permitted by law, any claim that: (i) the action in such court is brought in an inconvenient forum; (ii) the venue of such action is improper; or (iii) this Guarantee, or the subject matter hereof, may not be enforced in or by such courts), agrees that all claims in respect of the action shall be heard and determined only in any such court and agrees not to bring any action arising out of or relating to this Guarantee or any transaction contemplated hereby in any other court.  The parties hereto agree that any of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained agreement between the parties hereto irrevocably to waive any objections to venue or to convenience of forum.  Each of the parties hereto irrevocably consents to the service of process out of the state and federal courts within the State of Delaware in any such action by the mailing of copies thereof by registered mail, postage prepaid, to it at its address set forth herein, such service of process to be effective upon acknowledgment of receipt of such registered mail.  Nothing herein shall affect the right of any party hereto to serve process in any other manner permitted by applicable law.

9.   <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS GUARANTEE OR THE

TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF THE PARTIES HERETO IN THE NEGOTIATION, EXECUTION, PERFORMANCE AND ENFORCEMENT OF THIS GUARANTEE.

10.    <u>Entire Agreement</u>.  This Guarantee constitutes the entire agreement with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, among the parties hereto.

11.    <u>Amendments and Waivers</u>.  No amendment, waiver, supplement or modification of any provision of this Guarantee will be valid and binding unless it is in writing and signed, in the case of an amendment, supplement or modification, by the Guarantor, Seller and LHP or, in the case of waiver, by the party or parties against whom the waiver is to be effective.  No waiver by any party hereto of any breach or violation of, or default under, this Guarantee, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation or default hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No delay or omission on the part of any party hereto in exercising any right, power or remedy under this Guarantee will operate as a waiver thereof.

12.    <u>Severability</u>.  If any provision of this Guarantee is held to be illegal, invalid or unenforceable under any present or future Law, (a) such provisions will be fully severable; (b) this Guarantee will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Guarantee will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Guarantee a legal, valid and enforceable provision as similar in terms and effect to such illegal, invalid or unenforceable provision as may be possible.

13.    <u>Counterparts</u>. This Guarantee may be executed and delivered (including by facsimile transmission or via portable document format (.pdf)) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same instrument.

14.    <u>No Third Party Beneficiaries</u>.  The parties hereto hereby agree that their respective representations, warranties, agreements and covenants set forth herein are solely for the benefit of the other parties hereto (and any Guaranteed Parties not signatories hereto) and their respective successors and permitted assigns, in accordance with and subject to the terms of this Guarantee, and this Guarantee is not intended to, and does not, confer upon any person other than the parties hereto (and any Guaranteed Parties not signatories hereto) and their respective successors and permitted assigns any rights or remedies hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have duly executed and delivered this Guarantee as of the date first written above.

**GUARANTOR**:

**ALECTO HEALTHCARE SERVICES LLC**

By: _____

Name: _____Roger Krissman_____

Its: _____CFO_____

**GUARANTEED PARTIES:**

REPRESENTED BY**:**

**SHERMAN/GRAYSON HEALTH SYSTEM, LLC**

By: *Rebecca Hurley*

Name: Rebecca Hurley

Its: EVP

**LHP HOSPITAL GROUP, INC.**

By: *Rebecca Hurley*

Name: Rebecca Hurley

Its: EVP

# EXHIBIT 2

## ASSIGNMENT AND ASSUMPTION OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (this "**Assignment**"), is made effective as of the 31st day of October, 2014 (the "**Effective Date**"), by and between **SHERMAN/GRAYSON HEALTH SYSTEM, LLC**, a Texas limited liability company ("**Assignor**"), and **SHERMAN/GRAYSON HOSPITAL, LLC**, a Texas limited liability company ("**Assignee**").

WITNESSETH:

WHEREAS, Assignor is the tenant under certain leases dated as of August 21, 2012, by and between Altera Highland LLC, a Texas limited liability company ("**Landlord**"), as landlord, and Assignor, as tenant (collectively, as amended, the "**Leases**") for certain premises ("**Premises**") more particularly described as items #1-5 on the attached **Exhibit A**, each in the building known as 300 N. Highland Drive, Sherman, Texas;

WHEREAS, Assignor is the sublandlord under certain subleases identified as items #6-14 on the attached **Exhibit A** ("**Subleases**"), by and between Sherman/Grayson Hospital, LLC (under a delegation of authority and as authorized agent for Assignor) and LHP Texas MD Services, Inc. ("LHP MD");

WHEREAS, Assignor desires to assign to Assignee its interest as "tenant" under the Leases and as sublandlord under the Subleases. Assignee desires to accept such assignments on the terms and conditions hereinafter set forth; and

WHEREAS, LHP MD will assign its interest as sublessee under the Subleases to Sherman M.D. Provider, Inc. ("Sherman MD"), on or before December 31, 2014, pursuant to an assignment of subleases to be executed by LHP MD and Sherman MD (the "**Sublease Assignment**").

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged and confessed, Assignor and Assignee agree as follows:

1.    <u>Assignment and Assumption</u>.  Effective as of the Effective Date, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, including without limitation the assumption of obligations provided for herein, the receipt and sufficiency of which are hereby acknowledged, Assignor assigns, sets over and transfers to Assignee all right, title and interest of Assignor in, to and under the Leases and the Subleases, and Assignee assumes and agrees to be bound by and to perform the terms, covenants and conditions to be done, kept and performed by the Assignor under the Leases and Subleases arising, or first becoming due and payable, from and after the Effective Date.

2.    <u>Landlord Consent</u>.  Landlord hereby consents to the assignment of the Leases and Subleases pursuant to the provisions of this Assignment and the Sublease Assignment and acknowledges and agrees that (a) from and after the Effective Date of this Assignment, Assignor shall be released from further liability under the Leases for the applicable unexpired Term (as

3186443 v9 (79402.00004.000)

such term is defined in each of the Leases); and (b) from and after the Effective Date of the Sublease Assignment, LHP MD shall be released from further liability under the Subleases for the applicable unexpired Term (as such term is defined in each of the Subleases); provided, however, Assignor is and shall remain liable for all indemnities, liabilities and obligations of Assignor which accrued under the Leases prior to the Effective Date but have not yet been performed. The consent granted herein should not be construed as consent to any further assignment. The release of Assignor provided herein shall not be deemed a release under Section 15.3 of each of the Leases for purposes of those certain guarantees provided by LHP Hospital Group, Inc., a Delaware corporation ("**LHP**"), made in favor of Landlord in connection with Assignor's entry into each of the Leases which are more particularly described on **Exhibit B** attached hereto (collectively, the "**Guaranties**"), and the Guaranties by LHP shall survive in accordance with its terms.

        3.     <u>Consent and Agreement of Guarantor.</u>

        a.     LHP has executed this Assignment to evidence its consent to the foregoing terms and provisions of this Assignment and to acknowledge that the Guaranties are hereby ratified and in full force and effect, that nothing contained herein will be construed to release or diminish any of LHP's obligations under the Guaranties, and that LHP's obligations under the Guaranties shall continue to apply to the obligations of the "tenant" set forth in the Leases, as assigned hereby, and the obligations of the "landlord" set forth in the Ground Lease and all amendments, modifications, and extensions to the Leases and Ground Lease.

        b.     By execution of this Assignment, LHP represents and warrants that, as of the date of this Assignment, LHP's tangible net worth exceeds $250,000,000.00. If any Annual Financial Statement delivered under paragraph 4 of that certain Consent Agreement dated as of October 31, 2014 between Landlord, Assignor, Assignee, and LHP indicates a failure of LHP to maintain a tangible net worth of at least $100,000,000.00 (the "**Tangible Net Worth Requirement**"), then Assignee shall, within thirty (30) days after the delivery of the Annual Financial Statement, provide Landlord with one (1) of the following credit enhancements as may be selected by Landlord in its sole discretion: (i) a new guarantor which has a tangible net worth of at least $100,000,000.00 (based upon current audited financial statements from the new guarantor), in which case LHP shall be released and discharged from the Guaranties upon execution of an acceptable replacement guaranty or guaranties by new guarantor (provided that nothing shall release LHP from any obligation or liability under the Guaranties that accrues prior to the execution and delivery of the replacement guaranty or guaranties); (ii) a new guarantor which has a tangible net worth less than $100,000,000.00 but in an amount sufficient to result in the aggregate tangible net worth of LHP and the new guarantor being equal to at least $100,000,000.00 has executed and delivered to Landlord a replacement guaranty or guaranties acceptable to Landlord, in which case both LHP and new guarantor shall be jointly and severally liable for the obligations guaranteed by the Guaranties; or (iii) if a new guarantor is unavailable or the combined aggregate tangible net worth of the new guarantor and LHP is less than $100,000,000.00, such additional security (including letters of credit, security deposits

and/or any other security that is reasonably acceptable to Landlord) that is equal to the lesser of (A) the Put Price (as that term is defined in the Ground Lease) if the Put Option (as that term is defined in the Ground Lease) was exercised, or (B) the amount by which the combined aggregate tangible net worth of LHP and the new guarantor is less than $100,000,000.00, for Assignee's obligations under the Leases and the Ground Lease, but in no event will the additional security under this clause (iii) be less than $10,000,000.00. Each replacement guaranty described above shall provide, among other things, that the new guarantor is required to deliver periodic Annual Financial Statements certified by new guarantor's chief financial officer as described in Section 4 of the Consent Agreement referred to above. Assignee's failure to provide such new or additional security as required under this Section 5 constitutes a default under the Leases and Guaranties. The term "tangible net worth" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises. The term "Ground Lease" means the Ground Lease Agreement dated August 21, 2012, between Assignee, as landlord, and Landlord, as tenant.

4. Miscellaneous. This Assignment and the obligations of the parties hereunder shall be governed and construed in accordance with the laws of the State of Texas, without regard to principles of conflicts of laws and may not be modified or amended in any manner other than by a written agreement signed by all of the parties.

5. Counterparts. This Assignment may be executed in multiple counterparts, each of which shall be deemed an original, and all of which shall constitute the same document. Signature delivered by electronic delivery shall be deemed an original for all purposes.

[signatures on page following]

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment to be effective as of the Effective Date.

ASSIGNOR:

**SHERMAN/GRAYSON HEALTH SYSTEM, LLC**, a Texas limited liability company

By: _[signature]_

Name: **REBECCA HURLEY**

Title: **EVP**

ASSIGNEE:

**SHERMAN/GRAYSON HOSPITAL, LLC,**
a Texas limited liability company

By:     Alecto Healthcare Services Sherman LLC
Its:     Sole Member

By: _____

Name: _____

Title: _____

Agreed and accepted as of the Effective Date:

**LHP**:

**LHP HOSPITAL GROUP, INC.,**
a Delaware corporation

By: _[signature]_

Name: **REBECCA HURLEY**

Title: **EVP**

3186443 v9 (79402.00004.000)

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment to be effective as of the Effective Date.

ASSIGNOR:

**SHERMAN/GRAYSON HEALTH SYSTEM, LLC,** a Texas limited liability company

By:_____

Name:_____

Title:_____

ASSIGNEE:

**SHERMAN/GRAYSON HOSPITAL, LLC,**
a Texas limited liability company

By:    Alecto Healthcare Services Sherman LLC
Its:    Sole Member

By:_____

Name:_ Michael J Sarrac _

Title:_ Executive Vice President _

Agreed and accepted as of the Effective Date:

LHP:

**LHP HOSPITAL GROUP, INC.,**
a Delaware corporation

By:_____

Name:_____

Title:_____

3186443 v9 (79402.00004.000)

Consented, accepted and agreed to as of the Effective Date:

**LANDLORD**:

**ALTERA HIGHLAND LLC**, a Texas limited liability company

By:_____

Name:_____TERRY D. QUINN_____

Title:_____PRESIDENT_____

3186443 v9 (79402.00004.000)

## Exhibit A

### Premises

| | LEASE | PREMISES |
|---|---|---|
| 1 | Master Lease – Existing Space | Suites 430, 445, 500, 510 and 545 |
| 2 | Master Lease – Shell Space | Suites 350, 400, 410 and 5th Floor Conference Center |
| 3 | Ambulatory Surgery Center | Suite 200 and 210 |
| 4 | Hospital-Occupied Common Areas | Suites A, B, C, D and E |
| 5 | Existing Physician Suites | Suites 130, 310, 315, 330, 340 and 415 |
| | SUBLEASE | PREMISES |
| 6 | Lease dated November 1, 2011 | Suite 415 |
| 7 | Lease dated July 1, 2011 | Suite 330 |
| 8 | Lease dated January 1, 2012 and as amended by the First Amendment to the Lease Agreement dated October 1, 2012 | Suite 315 |
| 9 | Lease dated September 1, 2012 | Suite 430 |
| 10 | Lease dated January 1, 2012 | Suite 130 |
| 11 | Lease dated February 1, 2012 | Suite 340 |
| 12 | Lease dated June 1, 2012 | Suite 310 |
| 13 | Lease dated August 1, 2013 | Suite 545A |
| 14 | Lease dated September 1, 2013 | Suite 103 |

## **EXHIBIT B**

### **Schedule of Guaranties**

1. Guaranty dated August 20, 2012, executed in connection with the Master Lease – Existing Space identified on <u>Exhibit A</u>.

2. Guaranty dated August 20, 2012, executed in connection with the Master Lease – Shell Space identified on <u>Exhibit A</u>.

3. Guaranty dated August 20, 2012, executed in connection with the Ambulatory Surgery Center Lease identified on <u>Exhibit A</u>.

4. Guaranty dated August 20, 2012, executed in connection with the Hospital – Occupied Common Areas Lease identified on <u>Exhibit A</u>.

5. Guaranty dated August 20, 2012, executed in connection with the Existing Physician Suites Lease identified on <u>Exhibit A</u>.

6. Guaranty dated August 21, 2012, executed in connection with the Ground Lease (as defined above)

# EXHIBIT 3

## CONSENT AGREEMENT

Effective Date:     October 31, 2014

Landlord:           ALTERA HIGHLAND LLC, a Texas limited liability company

Assignor:           SHERMAN/GRAYSON HEALTH SYSTEM LLC, a Delaware limited
                    liability company

Assignee:           SHERMAN/GRAYSON HOSPITAL, LLC, a Texas limited liability
                    company

Guarantor:          LHP HOSPITAL GROUP, INC., a Delaware corporation

Leases:             Lease Agreements (collectively, as amended, the "**Leases**") for certain
                    premises ("**Premises**"), as more particularly described as items #1-5 on
                    the attached **Exhibit A**

Ground Lease:       Ground Lease Agreement dated August 21, 2012, between Assignee, as
                    landlord, and Landlord, as tenant ("Ground Lease"), as more particularly
                    described as item #6 on the attached **Exhibit A**

Subleases:          Sublease Agreements between Assignee and LHP Texas MD Services,
                    Inc. for the Premises, as more particularly described as items #7-15 on the
                    attached **Exhibit A**.

### RECITALS:

A.      Pursuant to one (1) or more purchase agreements, Assignor has agreed to sell and
transfer all of its membership interest in Assignee to Alecto Healthcare Services Sherman LLC, a
Delaware limited liability company (such sale and transfer is referred to herein as the
"**Transfer**").

B.      As part of the Transfer, Assignor seeks to transfer its interest as "tenant" under the
Leases to Assignee (the "Lease Assignment");

C.      On or before December 31, 2014, LHP Texas MD Services, Inc., will assign its
interests as a sublessee under the Subleases to Sherman M.D. Provider, Inc. (the "LHP MD
Assignment" and together with the Lease Assignment, the "Assignments").

D.      Landlord has agreed to consent to the Assignments, subject to the terms and
conditions set forth below:

### AGREEMENT:

1.      Consent to Assignments.  In reliance upon the agreements and representations
contained in this Consent Agreement, Landlord hereby consents to the Assignments.  This
Consent Agreement shall not constitute a waiver of the obligation of Assignee (or its successors

MHDocs 5471403v.2

1                                        3184989 v10 (79402.00004.000)

**A0233**

or assigns) under the Leases to obtain Landlord's consent to any subsequent assignment, sublease, other transfer, or Material Change in Ownership under the Leases, nor shall it constitute a waiver of any existing defaults under the Leases. Unless and until Landlord has executed this Consent Agreement, this Consent Agreement is of no effect, notwithstanding that Landlord may have accepted and may continue to accept rent or the performance of other obligations by Assignee. The consent of Landlord provided herein shall not be deemed a release under any provision of the Leases or the Ground Lease for purposes of certain guarantees provided by Guarantor, made in favor of Landlord in connection with each of the Leases and Ground Lease, that are more particularly described on **Exhibit C** attached hereto (collectively, the "**Guaranties**"), and the Guaranties by Guarantor shall survive the Assignments in accordance with their terms.

2. Representations, Warranties and Covenants of Assignee. Assignee hereby represents warrants, and covenants to Landlord that: (i) the organizational chart attached hereto as **Exhibit B**, relating to Assignee and certain affiliates and other parties, is true, complete, and correct as of the completion of the Assignments; (ii) the Leases are in full force and effect, and the same are hereby ratified, approved and affirmed by Assignee; (iii) Assignee has not previously assigned, sublet, encumbered or otherwise transferred the Leases or its interest therein except as described herein; (iv) Assignee has the requisite power and authority to execute and deliver this Consent Agreement, and the consent or joinder of no other person or entity is required in connection therewith; (v) Assignee is not aware of any current defaults on the part of Landlord under the Leases; (vi) the individual executing and delivering this Consent Agreement on Assignee's behalf, has been authorized to do so, and such execution and delivery shall be binding; and (vii) Assignee is subject to the terms of each Subordination, Non-Disturbance and Attornment Agreement entered into with General Electric Capital Corporation in connection with the Leases.

3. Consent of Guarantor; Ratification. Guarantor has executed this Consent Agreement to evidence its consent to the Assignments and to acknowledge that the Guaranties are hereby ratified and in full force and effect, that nothing contained herein will be construed to release or diminish any of Guarantor's obligations under the Guaranties, and that Guarantor's obligations under the Guaranties shall apply to the obligations Assignee under the Leases and the Ground Lease and all amendments, modifications, and extensions thereto. Guarantor acknowledges and agrees that, if it were not for Guarantor's ratification of the Guaranties as an inducement, Landlord would not grant its consent to the Assignments as provided herein.

4. Guarantor Financial Statements. Guarantor hereby agrees to deliver to Landlord, as soon as available, but in no event later than one hundred eighty (180) days after Guarantor's fiscal year end, audited financial statements (including, without limitation, an income and expense statement, balance sheet and cash flow statements) (the "**Annual Financial Statements**"), together with any other financial information requested by Landlord. Within forty-five (45) days after the end of each calendar quarter, Guarantor shall also deliver to Landlord unaudited quarterly financial statements and other financial information as Landlord may specify certified by Guarantor's Chief Financial Officer.

5. Tangible Net Worth Requirement. By execution of this Assignment, Guarantor represents and warrants that, as of the date of this Assignment, Guarantor's tangible net worth exceeds $250,000,000.00. If any Annual Financial Statement delivered under paragraph 4 above

3184989 v10 (79402.00004.000)

indicates a failure of Guarantor to maintain a tangible net worth of at least $100,000,000.00 (the "**Tangible Net Worth Requirement**"), then Assignee under the Leases shall, within thirty (30) days after the delivery of the Annual Financial Statement, provide Landlord with one (1) of the following credit enhancements as selected by Landlord in its sole discretion: (i) a new guarantor which has a tangible net worth of at least $100,000,000.00 (based upon current audited financial statements from the new guarantor), in which case Guarantor shall be released and discharged from the Guaranties upon execution of an acceptable replacement guaranty or guaranties by new guarantor (provided that nothing shall release Guarantor from any obligation or liability under the Guaranties that accrues prior to the execution and delivery of the replacement guaranty or guaranties); (ii) a new guarantor which has a tangible net worth less than $100,000,000.00 but in an amount sufficient to result in the aggregate tangible net worth of Guarantor and the new guarantor being equal to at least $100,000,000.00 has executed and delivered to Landlord a replacement guaranty acceptable to Landlord, in which case both Guarantor and new guarantor shall be jointly and severally liable for the obligations guaranteed by the Guaranties; or (iii) if a new guarantor is unavailable or the combined aggregate tangible net worth of the new guarantor and Guarantor is less than $100,000,000.00, such additional security (including letters of credit, security deposits and/or any other security that is reasonably acceptable to Landlord) that is equal to the lesser of (A) the Put Price (as that term is defined in the Ground Lease) if the Put Option (as that term is defined in the Ground Lease) was exercised, or (B) the amount by which the combined aggregate tangible net worth of Guarantor and the new guarantor is less than $100,000,000.00, for Assignee's obligations under the Leases and the Ground Lease, but in no event will the additional security under this clause (iii) be less than $10,000,000.00. Each replacement guaranty described above shall provide, among other things, that the new guarantor is required to deliver periodic Annual Financial Statements certified by new guarantor's chief financial officer as described in Section 4 above. Assignee's failure to provide such credit enhancements as required under this Section 5 constitutes a default under the Leases and Guaranties. The term "tangible net worth" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises.

6.  Miscellaneous.  This Consent Agreement and the obligations of the parties hereunder shall be governed and construed in accordance with the laws of the State of Texas, without regard to principles of conflicts of laws and may not be modified or amended in any manner other than by a written agreement signed by all of the parties.

7.  Successors and Assigns.  This Consent shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

8.  Counterparts.  This Consent Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which shall constitute the same document. Signature delivered by electronic delivery shall be deemed an original for all purposes.

[signatures on page following]

IN WITNESS WHEREOF, Landlord, Assignor, Assignee, and Guarantor have executed and delivered this Consent Agreement to be effective as of the Effective Date.

LANDLORD:

**ALTERA HIGHLAND LLC**,
a Texas limited liability company

By: _____

Name: _____TERRY D. QUINN_____

Title: _____President_____


ASSIGNOR:

**SHERMAN/GRAYSON HEALTH SYSTEM LLC**, a Texas limited liability company

By: _____
Name: _____
Title: _____


ASSIGNEE:

**SHERMAN/GRAYSON HOSPITAL, LLC**,
a Texas limited liability company

By:    Alecto Healthcare Services Sherman LLC
Its:    Sole Member

By: _____
Name: _____
Title: _____


GUARANTOR:

**LHP HOSPITAL GROUP, INC.**,
a Delaware corporation

By: _____
Name: _____
Title: _____

4

3184989 v10 (79402.00004.000)

**A0236**

IN WITNESS WHEREOF, Landlord, Assignor, Assignee, and Guarantor have executed and delivered this Consent Agreement to be effective as of the Effective Date.

LANDLORD:

**ALTERA HIGHLAND LLC,**
a Texas limited liability company

By:_____
Name:_____
Title:_____

ASSIGNOR:

**SHERMAN/GRAYSON HEALTH SYSTEM LLC,** a Texas limited liability company

By:_____
Name:_____REBECCA HURLEY_____
Title:_____EVP_____

ASSIGNEE:

**SHERMAN/GRAYSON HOSPITAL, LLC,**
a Texas limited liability company

By:    Alecto Healthcare Services Sherman LLC
Its:    Sole Member

By:_____
Name:_____
Title:_____

GUARANTOR:

**LHP HOSPITAL GROUP, INC.,**
a Delaware corporation

By:_____
Name:_____REBECCA HURLEY_____
Title:_____EVP_____

3184989 v10 (79402.00004.000)

IN WITNESS WHEREOF, Landlord, Assignor, Assignee, and Guarantor have executed and delivered this Consent Agreement to be effective as of the Effective Date.

LANDLORD:

**ALTERA HIGHLAND LLC,**
a Texas limited liability company

By:_____
Name:_____
Title:_____


ASSIGNOR:

**SHERMAN/GRAYSON HEALTH SYSTEM LLC,** a Texas limited liability company

By:_____
Name:_____
Title:_____


ASSIGNEE:

**SHERMAN/GRAYSON HOSPITAL, LLC,**
a Texas limited liability company

By:     Alecto Healthcare Services Sherman LLC
Its:     Sole Member

By:_____
Name: Michael J Sarrao
Title: Executive Vice-President


GUARANTOR:

**LHP HOSPITAL GROUP, INC.,**
a Delaware corporation

By:_____
Name:_____
Title:_____

**A0238**

## EXHIBIT A

### Premises

|   | **LEASE** | **PREMISES** |
|---|---|---|
| 1 | Master Lease – Existing Space | Suites 430, 445, 500, 510 and 545 |
| 2 | Master Lease – Shell Space | Suites 350, 400, 410 and 5th Floor Conference Center |
| 3 | Ambulatory Surgery Center | Suite 200 and 210 |
| 4 | Hospital-Occupied Common Areas | Suites A, B, C, D and E |
| 5 | Existing Physician Suites | Suites 130, 310, 315, 330, 340 and 415 |
| 6 | Ground Lease Agreement between Assignee, as landlord, and Landlord, as tenant | The real property and improvements located at 300 N. Highland Drive, Sherman, Texas |
|   | **SUBLEASE** | **PREMISES** |
| 7 | Lease dated November 1, 2011 | Suite 415 |
| 8 | Lease dated July 1, 2011 | Suite 330 |
| 9 | Lease dated January 1, 2012 and as amended by the First Amendment to the Lease Agreement dated October 1, 2012 | Suite 315 |
| 10 | Lease dated September 1, 2012 | Suite 430 |
| 11 | Lease dated January 1, 2012 | Suite 130 |
| 13 | Lease dated June 1, 2012 | Suite 310 |

| | **LEASE** | **PREMISES** |
|---|---|---|
| 14 | Lease dated August 1, 2013 | Suite 545A |
| 15 | Lease dated September 1, 2013 | Suite 103 |

## EXHIBIT B

### Organizational Chart



Note 1 - Transfer of interests in Sherman/Grayson Sponsor, LLC expected to occur on or about 11/30/14.

3184989 v10 (79402.00004.000)

## EXHIBIT C

### Schedule of Guaranties

1. Guaranty dated August 20, 2012, executed in connection with the Master Lease – Existing Space identified on Exhibit A.

2. Guaranty dated August 20, 2012, executed in connection with the Master Lease – Shell Space identified on Exhibit A.

3. Guaranty dated August 20, 2012, executed in connection with the Ambulatory Surgery Center Lease identified on Exhibit A.

4. Guaranty dated August 20, 2012, executed in connection with the Hospital – Occupied Common Areas Lease identified on Exhibit A.

5. Guaranty dated August 20, 2012, executed in connection with the Existing Physician Suites Lease identified on Exhibit A.

6. Guaranty dated August 21, 2012, executed in connection with the Ground Lease Agreement identified on Exhibit A.

3184989 v10 (79402.00004.000)

## CERTIFICATE OF SERVICE

I, William D. Sullivan, hereby certify that on the 27th day of November 2023, a copy of the foregoing *Reply in Response to Preliminary Response of the Debtor in Opposition to the Objection of the Reed Action Judgment Creditors to Debtor's Designation of This Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor* was electronically filed and served via CM/ECF on all parties requesting electronic notification in this case in accordance with Del. Bankr. L.R. 9036-1(b) and on the parties listed below via Electronic Mail.

| *Counsel for the Debtor:* | *Counsel to the Independent Director:* |
|---|---|
| Jeffrey R. Waxman, Esq. | Justin R. Alberto, Esq. |
| Brya M. Keilson, Esq. | Cole Schotz P.C. |
| Morris James LLP | 500 Delaware Ave., Suite 1410 |
| 500 Delaware Avenue, Suite 1500 | Wilmington, DE 19801 |
| Wilmington, DE 19801 | JAlberto@coleschotz.com |
| jwaxman@morrisjames.com | |
| bkeilson@morrisjames.com | |

| *Subchapter V Trustee:* | *U.S. Trustee:* |
|---|---|
| Jami Nimeroff, Esq., | Linda Casey |
| Brown McGarry Nimeroff LLC | Office of the United States Trustee |
| 919 N. Market Street, Suite 420 | 844 King Street, Suite 2207, Lockbox 35 |
| Wilmington, DE 19801 | Wilmington, DE 19801 |
| JNimeroff@bmnlawyers.com | Linda.Casey@usdoj.gov |

November 27, 2023                              */s/ William D. Sullivan*
Date                                             William D. Sullivan

# EXHIBIT 4

```
 1                 UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                     .  Chapter 11 (Subchapter V)
                                 .
 4   ALECTO HEALTHCARE SERVICES  .  Case No. 23-10787 (JKS)
     LLC,                        .
 5                               .
                                 .
 6                               .  Courtroom No. 6
                                 .  824 Market Street
 7             Debtor.           .  Wilmington, Delaware 19801
                                 .
 8   . . . . . . . . . . . . . . .  Friday, December 1, 2023
                                    11:00 a.m.
 9
                  TRANSCRIPT OF BENCH RULING HEARING
10            BEFORE THE HONORABLE J. KATE STICKLES
                  UNITED STATES BANKRUPTCY JUDGE
11
     APPEARANCES:
12
     For the Debtor:            Jeffrey R. Waxman, Esquire
13                              MORRIS JAMES LLP
                                500 Delaware Avenue
14                              Suite 1500
                                Wilmington, Delaware 19801
15
     For the Subchapter V
16   Trustee:                   Jami Nimeroff, Esquire
                                BROWN MCGARRY NIMEROFF LLC
17                              Two Penn Center, Suite 610
                                1500 John F. Kennedy Boulevard
18                              Philadelphia, Pennsylvania 19102

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Sean Moran, ECRO

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

**A0245**

1        (Proceedings commence at 11:01 a.m.)

2            THE COURT:  Good morning.  This is Judge Stickles.

3    We are on the record in Alecto Healthcare Services LLC; Case

4    No. 23-10787.

5            This is the time set aside for the Court's ruling

6    following Wednesday's evidentiary hearing.  The issue before

7    the Court is the debtor's eligibility to proceed under

8    Subchapter V as a small business debtor and whether the

9    amount of its debt renders it ineligible for such relief.  To

10   be eligible for Subchapter V relief a debtor must have

11   aggregate, non-contingent, liquidated, secured, and unsecured

12   debts as of the date of filing the petition in an amount not

13   more then $7,500,000.

14           The parties agree the debtor bears the burden of

15   proof to establish its eligibility to proceed as a Subchapter

16   V debtor.  The Reed Action Judgment Creditors assert that the

17   debtor is not eligible for Subchapter V because its non-

18   contingent liquidated liabilities exceed $7.5 million.

19   Specifically, the Reed Creditors argue the debtors

20   incorrectly scheduled the debt of LHP Hospital Group, Inc.,

21   as a contingent, unliquidated, and disputed claim.  They

22   contend that the debt is non-contingent and liquidated.  If

23   that were correct the debtor would exceed the statutory cap

24   and be ineligible to proceed under Subchapter V.

25           The debtor disagrees, arguing that LHP's debt was

1  contingent and unliquidated as the petition date.  The

2  parties agree that the LHP debt is the fulcrum and whether

3  that debt is unliquidated or contingent controls the

4  eligibility determination.  Having conducted an evidentiary

5  hearing and based on the factual findings and applicable law

6  the Court concludes that the debtor is eligible to be a

7  Subchapter V debtor.

8        The Court has subject matter jurisdiction to

9  consider this matter pursuant to 28 U.S.C. Sections 157 and

10 1334.  This is a core proceeding pursuant to 28 U.S.C.

11 Section 157(b)(2)(a) and (o).  Venue is proper before this

12 Court pursuant to 28 U.S.C. Sections 1408 and 1409.  The

13 statutory predicate for the relief sought by the Reed

14 Creditors is 11 U.S.C. Section 1182-1 and Bankruptcy Rule

15 1020(b).

16       Bankruptcy Rule 1020(a) provides that a bankruptcy

17 case proceeds in accordance with the debtor's statement of

18 election in the petition unless and until the Court enters an

19 order finding that the debtor's statement is incorrect.

20 Bankruptcy Rule 1020(b) allows the party in interest to

21 challenge the debtor's statement of election no later then 30

22 days after the conclusion of a meeting of creditors held

23 under Section 341 or within 30 days after any amendment to

24 the schedule -- excuse me, statement, whichever is later.

25       Here, the meeting of creditors concluded on October

4

1   17th, 2023.  On November 2nd, 2023 the Reed Creditors

2   objected to the debtor's designation of the cases, a

3   Subchapter V case.  As a result, the challenge to the

4   Subchapter V election is timely.

5        As a preliminary matter the Court reviews the

6   contractual relationship between the parties which serves as

7   the basis for the LHP debt.  In 2014 non-debtor, Alecto

8   Healthcare Services Sherman LLC, Alecto Sherman and LHP

9   entered into a purchase agreement related to underlying

10  leases and the now debtor, Alecto Healthcare Services LLC,

11  entered into an unconditional guarantee with LHP.  The

12  purchase agreement and guaranty are referred to collectively

13  as the "Operative Agreements."

14       In 2020 LHP sued the debtor, Alecto Healthcare

15  Services LLC, and non-debtor, Alecto Healthcare Services

16  Sherman, collectively the "Alecto Defendants", for breach of

17  contract related to the operative agreements and the Alecto

18  Defendants asserted counterclaims.  Following mediation, the

19  parties settled a litigation as memorialized in the

20  settlement agreement.  The settlement agreement is not

21  ambiguous.

22       The recitals, which Black's Law Dictionary defines

23  as a preliminary statement in a contract explaining the

24  reasons for entering into the contract or the background of

25  the transaction refer to the operative agreements and

**A0248**

1   incorporate the recitals, but not the operative agreements

2   themselves into the settlement agreement.  The Reed Creditors

3   assert that the 2014 guarantee remains in full force and

4   effect despite the entry into the 2022 settlement agreement.

5   The debtor asserts the guarantee was fully superseded by the

6   settlement agreement.

7           By their terms the operative agreements and the

8   settlement agreement are governed by and construed in

9   accordance with Delaware law.  The Delaware Supreme Court

10  held in CitiSteel USA that:

11          "Parties to an original contract may agree that a

12  subsequent contract to perform some specified act will be

13  accepted in full performance and satisfaction of the pre-

14  existing duty.  If the parties intend for the new agreement

15  to abrogate the former contract the parties may seek remedies

16  only under the latter agreement.  Determining such intent is

17  usually a question of fact.  If intent cannot be determined

18  expressly or impliedly from the contract provision the Court

19  may consider evidence of the surrounding circumstances."

20          Paragraph 19 of the settlement agreement states:

21          "This agreement and the exhibits attached hereto

22  set forth the entire agreement between the parties and fully

23  supersede any and all prior agreements or understandings,

24  written or oral, between the parties."

25          The Reed Creditors assert that Paragraph 19 is a

**A0249**

6

1  standard contract provision referring to prior discussions

2  and drafts related only to the settlement agreement.  The

3  Court disagrees.  The Court finds the settlement agreement

4  modifies and supersedes the operative agreements.  Here, the

5  parties modified the relationship by including new terms in

6  the settlement agreement.  Additionally, Mr. Sarraos

7  testified as a participant in the settlement negotiations and

8  having reviewed the drafts of the settlement agreement that

9  he understood the settlement agreement superseded all prior

10  agreements between the parties including the guarantee.

11          I find, as a matter of law, that the unambiguous

12  language of the settlement agreement that refers to "Any and

13  all prior agreements" makes plain that it amends the

14  operative agreements.  I further find, as a matter of fact,

15  based on Mr. Sarraos uncontroverted testimony, that this was

16  the parties intent when they entered into the settlement

17  agreement.  With this in mind the Court refused the LHP debt

18  in the context of the settlement agreement.

19          The settlement agreement provides a procedure for

20  payment of future expenses as defined in the settlement

21  agreement from the Alecto Defendants to LHP.  Specifically,

22  the settlement agreement at Paragraph 6(a) provides that LHP

23  "Shall make a written demand upon the Alecto Defendants for a

24  specified amount".  Unless and until LHP made a specific

25  demand the debtor had no obligation to pay.

**A0250**

1          With this background the Court examines whether the

2     debt is unliquidated which is dispositive for this

3     eligibility determination.  An unliquidated claim is a claim

4     in which the amount owed has not been determined.  Whether a

5     debt is liquidated turns on whether it is the subject of --

6     is subject to ready determination and precision and

7     computation of the amount of debt.

8          The evidence establishes that the debtor was aware

9     that amounts were owed to LHP, but the debtor did not know

10    the amount of this liability.  Section 3.1 of each of the

11    lease agreements requires payment of base rent and Section

12    3.2 requires payment of the estimated pro rata share of

13    operating expenses for each lease monthly.  Although LHP

14    received invoices from the landlord, there is no evidence

15    that the debtor received copies of those invoices.

16         Mr. Sarraos testified the debtor was unaware of

17    whether LHP was making payments to the landlord or the amount

18    of the estimated operating expenses which included, among

19    other things, taxes, CAM, and possible subleases.  The amount

20    of estimated monthly operating expenses was not consistent.

21    See, for example, Exhibits 48, 49, 59 and 61 reflecting

22    different monthly CAM charges per suite.  Additionally, on a

23    yearly basis the landlord would reconcile the estimated

24    operating expenses and issue an annual operating expense

25    reconciliation as demonstrated by Exhibits 54 and 62

**A0251**

1   providing that LHP -- providing, excuse me, LHP with a

2   breakdown of the actual expenses paid for the year and the

3   pro rata share of the operating expenses due or credited.

4            According to Mr. Sarraos, prior to the June 28th,

5   2023 demand letter to the non-debtor, Alecto Defendants, at

6   Exhibit 13, the debtor was unaware of the exact amount due to

7   LHP.  Additionally, although the debtor waived certain

8   defenses to LHP's demand for payment the debtor's right to

9   object to computation of such amount, pursuant to Section

10  6(d) of the settlement agreement had not been waived and

11  therefore was retained.  Hence, there was no precision or

12  ability to readily determine LHP's debt as of the petition

13  date.

14           Consequently, the LHP debt was unliquidated as of

15  the petition date.  Section 1182(1)(a) caps non-contingent,

16  liquidated, secured and unsecured debts as of the filing

17  date.  In other words, contingent and unliquidated debts are

18  excluded from the debt cap for purposes of determining

19  eligibility.  As a result, the Court finds that as of the

20  petition date debtor's non-contingent, liquidated, secured,

21  and unsecured debts were under the $7.5 million statutory

22  ceiling.

23           This ruling relates solely to eligibility.  The

24  Court is neither allowing nor disallowing any creditors'

25  claim for purposes of Section 502.  All of the parties rights

**A0252**

9

1    are reserved in their entirety with respect to any potential

2    claims allowance dispute.  The parties should confer on a

3    form of order denying the Reed Creditors motion.  Please

4    circulate the proposed form of order to the United States

5    Trustee, the Subchapter V Trustee, and LHP's counsel, and

6    submit the form of order under certification.

7              With that, let me ask if the debtor wishes to

8    proceed with a status conference this morning with respect to

9    solicitation procedures.

10             MR. WAXMAN:  Good morning, Your Honor.  May it

11   please the Court, Jeff Waxman of Morris James on behalf of

12   the debtor.

13             Your Honor, I would like to, but I think I need to

14   speak with my client with respect to timing.  I don't know --

15   can Your Honor hear me?

16             THE COURT:  I can.

17             MR. WAXMAN:  Sorry about that.  I want to speak

18   with the client and I also want to speak with Ms. Nimeroff,

19   as well as Ms. Casey.  I will certainly speak with Mr.

20   Sullivan also.

21             THE COURT:  Okay.

22             MR. WAXMAN:  Just looking ahead I don't want to put

23   this out too far and I'm not sure when our next omnibus

24   hearing is.  If we can have -- I'm sorry.

25             THE COURT:  Your next omnibus hearing is the 15th.

**A0253**

1          MR. WAXMAN:  I'm just wondering if that gives us

2    enough time to have the hearing at that point.  I think that

3    is fine, Your Honor.  I think we will probably proceed with

4    the solicitation motion at that point.

5          THE COURT:  Well, why don't you confirm with the

6    parties and then if you need an alternative date reach out to

7    Mr. Lugano regarding scheduling.

8          MR. WAXMAN:  Will do, Your Honor. Thank you.

9          THE COURT:  The Court has availability in December

10   after the 15th.

11         MR. WAXMAN:  Okay.  I was actually going to say I

12   know that Your Honor was away for some portion of December,

13   but we would be looking towards the end at any point.

14         THE COURT:  Okay.  Why don't the parties confer and

15   then reach back out with respect to scheduling.

16         Is there anything further for this morning?

17         MR. WAXMAN:  Your Honor, just one question: Is this

18   the last day that Your Honor is in for the next week?

19         THE COURT:  Yes.

20         MR. WAXMAN:  The reason I am asking is just the

21   time sensitivity of the order.

22         THE COURT:  I will have access to look at a form of

23   order.

24         MR. WAXMAN:  Okay. I certainly don't mean to burden

25   Your Honor when you are out of Chambers.

11

1          THE COURT:  I would anticipate that it would be a

2   short form of order referring to the record.

3          MR. WAXMAN:  It will be, Your Honor. I just want to

4   make sure -- I don't know what Ms. Nimeroff's, or Ms.

5   Casey's, or Mr. Sullivan's availability is to look at things

6   today.

7          THE COURT:  Understood.  I am not expecting the

8   parties to have an order before the Court today.

9          MR. WAXMAN:  Okay.  Thank you, Your Honor.

10          THE COURT:  Thank you all very much.  I appreciate

11   you getting on the Zoom this morning.  Have a great

12   afternoon.  We stand adjourned.

13          MR. WAXMAN:  Thank you.

14      (Proceedings commenced at 11:17 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2              I certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of my

5      knowledge and ability.

6

7      <u>/s/ William J. Garling</u>                    <u>December 1, 2023</u>

8      William J. Garling, CET-543

9      Certified Court Transcriptionist

10     For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A0256**

# EXHIBIT 5

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC,[1] | Case No. 23-10787 (JKS) |
| Debtor. | **D.I. 204, 219, 226, and 227** |

## ORDER DENYING OBJECTION OF THE REED ACTION JUDGMENT CREDITORS TO DEBTOR'S DESIGNATION OF THIS CASE AS A SUBCHAPTER V CASE AND MOTION TO REVOKE DEBTOR'S DESIGNATION AS A SUBCHAPTER V DEBTOR

The Court having considered the Objection of the Reed Action Judgment Creditors (the "Reed Creditors") to the Designation by the Debtor (the "Debtor") of this Case as a Subchapter V Case and Motion to Revoke the Debtor's Designation as a Subchapter V Debtor [Docket No. 204] (the "Objection"), the Debtor's response in opposition to the Objection [Docket No. 226], and the Reed Creditor's reply in support of the Objection [Docket No. 227], and the Court having conducted an evidentiary hearing on November 29, 2023, to consider the Objection and response in opposition thereto; this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and venue being proper pursuant to 28 U.S.C. § 1409, and this Court having issued its oral ruling at a hearing on December 1, 2023 (the "Hearing") at which time the Court ruled that the Debtor is eligible for relief as a debtor under subchapter v of the Bankruptcy Code as an eligible debtor as set forth in 11 U.S.C. § 1182, it is hereby

ORDERED THAT for the reasons set forth on the record at the Hearing, the relief sought by the Objection is DENIED; and it is further

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

ORDERED THAT the Court's ruling relates to the Objection only and is without prejudice to the claims of any creditor; and it is further

ORDERED THAT the Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation or interpretation of this Order.

**Dated: December 4th, 2023**
**Wilmington, Delaware**

**J. KATE STICKLES**
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT 6

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC, [1] | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtor. | ) | **Related Docket Nos. 243** |

## NOTICE OF APPEAL

The Reed Action Judgment Creditors, by and through their undersigned counsel, hereby appeal to the United States District Court for the District of Delaware, pursuant to 28 U.S.C. § 158(a) and Rules 8002 and 8003 of the Federal Rules of Bankruptcy Procedure, from the Order of the U.S. Bankruptcy Court for the District of Delaware (Stickles, J.) dated December 4, 2023 (Doc No. 243) (the "**Order**") Denying Objection of the Reed Action Judgment Creditors to Debtor's Designation of This Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor.

A copy of the Order is annexed hereto as **Exhibit A**.

The parties to the Order appealed from, and the names, addresses, and telephone numbers of their respective attorneys are as follows:

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

**A0261**

| Party | Attorneys |
|---|---|
| The Reed Action Judgment Creditors | **Sᴜʟʟɪᴠᴀɴ · Hᴀᴢᴇʟᴛɪɴᴇ · Aʟʟɪɴsᴏɴ LLC** <br> William D. Sullivan (No. 2820) <br> William A. Hazeltine (No. 3294) <br> 919 North Market Street, Suite 420 <br> Wilmington, DE 19801 <br> Tel: (302) 428-8191 <br> Email: bsullivan@sha-llc.com <br>        whazeltine@sha-llc.com <br><br> Bren J. Pomponio, Es. <br> Colten L. Fleu, Esq. <br> Mountain State Justice, Inc. <br> 1217 Quarrier St. <br> Charleston, WV 25301 <br> Tel: (304) 326-0188 <br> Email: bren@msjlaw.org <br>        colten@msjlaw.org <br><br> John Stember, Esq. <br> Maureen Davidson-Welling, Esq. <br> Stember Cohn & Davidson-Welling, LLC <br> The Harley Rose Building <br> 425 First Avenue, 7th Floor <br> Pittsburgh, PA 15219 <br> Tel: 412-338-1445 <br> Email: jstember@stembercohn.com <br>        mdavidsonwelling@stembercohn.com |
| Alecto Healthcare Services LLC | **Morris James LLP** <br> Jeffrey R. Waxman, Esq. <br> Brya M. Keilson, Esq. <br> 500 Delaware Avenue, Suite 1500 <br> Wilmington, DE 19801 <br> Tel: 302-658-9200 <br> jwaxman@morrisjames.com <br> bkeilson@morrisjames.com |
| Steven Balasiano, Independent Director | **Cole Schotz P.C.** <br> Justin R. Alberto, Esq. <br> 500 Delaware Ave., Suite 1410 <br> Wilmington, DE 19801 <br> Tel. 302-652-3131 <br> JAlberto@coleschotz.com |

| Party | Attorneys |
|---|---|
| Subchapter V Trustee | **Brown McGarry Nimeroff LLC**<br>Jami Nimeroff, Esq.,<br>919 N. Market Street, Suite 420<br>Wilmington, DE 19801<br>Tel: 402-428-8142<br>JNimeroff@bmnlawyers.com |
| Office of the United States Trustee | Linda Casey<br>Office of the United States Trustee<br>844 King Street, Suite 2207, Lockbox 35<br>Wilmington, DE 19801<br>Tel: 302-573-6491<br>Linda.Casey@usdoj.gov |

Dated: December 18, 2023
    Wilmington, Delaware

**SULLIVAN · HAZELTINE · ALLINSON LLC**

 _/s/ William D. Sullivan_
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
        whazeltine@sha-llc.com

Bren J. Pomponio, Esq.
Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
Tel: (304) 326-0188
Email: colten@msjlaw.org

John Stember, Esq.
Maureen Davidson-Welling, Esq.
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email: jstember@stembercohn.com
        mdavidsonwelling@stembercohn.com

*Counsel for The Reed Action Judgment Creditors*

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC,[1] | Case No. 23-10787 (JKS) |
| Debtor. | **D.I. 204, 219, 226, and 227** |

## ORDER DENYING OBJECTION OF THE REED ACTION JUDGMENT CREDITORS TO DEBTOR'S DESIGNATION OF THIS CASE AS A SUBCHAPTER V CASE AND MOTION TO REVOKE DEBTOR'S DESIGNATION AS A SUBCHAPTER V DEBTOR

The Court having considered the Objection of the Reed Action Judgment Creditors (the "Reed Creditors") to the Designation by the Debtor (the "Debtor") of this Case as a Subchapter V Case and Motion to Revoke the Debtor's Designation as a Subchapter V Debtor [Docket No. 204] (the "Objection"), the Debtor's response in opposition to the Objection [Docket No. 226], and the Reed Creditor's reply in support of the Objection [Docket No. 227], and the Court having conducted an evidentiary hearing on November 29, 2023, to consider the Objection and response in opposition thereto; this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and venue being proper pursuant to 28 U.S.C. § 1409, and this Court having issued its oral ruling at a hearing on December 1, 2023 (the "Hearing") at which time the Court ruled that the Debtor is eligible for relief as a debtor under subchapter v of the Bankruptcy Code as an eligible debtor as set forth in 11 U.S.C. § 1182, it is hereby

ORDERED THAT for the reasons set forth on the record at the Hearing, the relief sought by the Objection is DENIED; and it is further

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

ORDERED THAT the Court's ruling relates to the Objection only and is without prejudice to the claims of any creditor; and it is further

ORDERED THAT the Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation or interpretation of this Order.

Dated: December 4th, 2023
Wilmington, Delaware

J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE

2

# Exhibit 7

| Fill in this information to identify the case: | |
|---|---|
| Debtor name **Alecto Healthcare Services LLC,** **a Delaware limited liability company** | |
| United States Bankruptcy Court for the: District of **Delaware** | |
| Case number (*If known*): **23-10787-JKS** | ☐ Check if this is an amended filing |

Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property    12/15

Be as complete and accurate as possible.

1. **Do any creditors have claims secured by debtor's property?**
   ☐ No. Check this box and submit page 1 of this form to the court with the debtor's other schedules. Debtor has nothing else to report on this form
   ☒ Yes. Fill in all of the information below.

| **Part 1:** | List Creditors Who Have Secured Claims |
|---|---|

2. **List in alphabetical order all creditors who have secured claims.**
   **If a creditor has more than one secured claim, list the creditor separately for each claim.**

| | | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.1   Creditor's name**<br><br>**Cardinal Health 110, LLC c/o Porter Wright Morris & Arthur LLC**<br><br>**Creditor's mailing address**<br><br>**Attn Allen Carter Esq**<br>**41 South High Street, Suite 2900 Columbus, Ohio 43215**<br><br>Creditor's email address, if known<br><br>Date debt was incurred **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☐ No.<br>☐ Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals**<br>**UCC filed 3/12/2020, filing number 2020 1831975**<br>**Collateral: All prescription pharmaceutical products, over-the-counter pharmaceutical products, nutritional supplements, first-aid, health and beauty products, home health care products and equipment, medical and surgical supplies, medical products and inventory, general merchandise and supplies, sundries, and any other products supplied by secured party. Note: Debtor has never received any products from the Cardinal Health 110 LLC and none of its cash is the result of proceeds from any of products**<br><br>**Is the creditor an insider or related party?**<br>☒ No.<br>☐ Yes.<br>**Is anyone else liable on this claim?**<br>☒ No.<br>☐ Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent.<br>☒ Unliquidated.<br>☐ Disputed | $285,229.79 | $ |

**A0268**

Debtor __Alecto Healthcare Services LLC a Delaware limited liability company__    Case number *(if known)* 23-10787-JKS

| | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral | Column B<br>Value of collateral that supports this claim |
|---|---|---|

**2.2  Creditor's name**

**MPT of Fairmont-Alecto Hospital, LLC; MPT of Fairmont – Alecto, LLC, MPT of Wheeling – Alecto Hospital, LLC, and MPT of Martins Ferry – Alecto Hospital, LLC**
**c/o Medical Properties Trust, Inc.**

Creditor's mailing address

**Attn Larry Portal, SVP**
**Attn Legal Department**
**1000 Urban Center Drive, Suite 501**
**Birmingham, AL 35242**

Creditor's email address, if known

Date debt was incurred  **Various**

Last four digits of account number

Do multiple creditors have an interest in the same property?
☒No.
☐Yes. Specify each creditor, including this creditor, and its relative priority

Describe debtor's property that is subject to a lien and describe the lien

**Contingent claim based on guarantee under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC. UCC filed 9/19/2014, filing number 2014 3774312, continuation filed 3/27/2019, filing number 2019 2109119.  Note: No fees were ever paid or will be paid by Alecto Healthcare Services Fairmont LLC to Debor under the agreement and none of Debtor's cash is the result of any such fees.**

Is the creditor an insider or related party?
☒No.
☐Yes.

Is anyone else liable on this claim?
☐No.
☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*

*As of the petition filing date, the claim is:*
Check all that apply
☒ Contingent
☐ Unliquidated
☐ Disputed

$    .00        $

---

**2.3  Creditor's name**

**MPT of Los Angeles LP and MPT of Olympia LLC**
**c/o Medical Properties Trust, Inc.**

Creditor's mailing address

**Attn Larry Portal, SVP**
**Attn Legal Department**
**1000 Urban Center Drive, Suite 501**
**Birmingham, AL 35242**

Creditor's email address, if known

Date debt was incurred  **Various**

Last four digits of account number

Do multiple creditors have an interest in the same property?
☒No.
☐Yes. Specify each creditor, including this creditor, and its relative priority

Describe debtor's property that is subject to a lien and describe the lien

**Contingent claim based on guarantee under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC. UCC filed 12/31/2013, filing number 2013 5184842, continuation filed 7/2/2018, filing number 2018 4541369.  Note: No fees were ever paid or will be paid by Olympia Health Care, LLC to Debtor under the agreement and none of Debtor's cash is the result of any such fees.**

Is the creditor an insider or related party?
☒No.
☐Yes.

Is anyone else liable on this claim?
☒No.
☐Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*

*As of the petition filing date, the claim is:*
Check all that apply
☒ Contingent
☐ Unliquidated
☐ Disputed

$    .00        $

---

Official Form 206D          **Schedule D: Creditors Who Have Claims Secured by Property**

Debtor  **Alecto Healthcare Services LLC a Delaware limited liability company**          Case number *(if known)* 23-10787-JKS

|  |  | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.4   Creditor's name**<br><br>**MPT of Sherman-Alecto Hospital, LLC; MPT of Sherman – Alecto, LLC**<br>**MPT of Los Angeles LP**<br>**c/o Medical Properties Trust, Inc.**<br><br>Creditor's mailing address<br><br>**Attn Larry Portal, SVP**<br>**Attn Legal Department**<br>**1000 Urban Center Drive, Suite 501**<br>**Birmingham, AL 35242**<br><br>Creditor's email address, if known<br><br>Date debt was incurred  **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☒No.<br>☐Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Contingent claim based on guarantee re Sherman/Grayson Hospital, LLC obligations to MPT of Sherman-Alecto, LLC for Capital Reserve Deposits.**<br>**UCC filed 10/31/2014, filing number : 2014 4400537; continuation filed 6/10/2019, filing number 2019 3988941.  Note: No fees were ever or will be paid by by Sherman/Grayson Hospital, LLC to Debtor under the agreement and none of Debtor's cash is the result of any such fees,**<br><br>Is the creditor an insider or related party?<br>☒No.<br>☐Yes.<br><br>Is anyone else liable on this claim?<br>☐No.<br>☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent.<br>☐ Unliquidated<br>☐ Disputed | $427,617.00 | $ |
| **2.5   Creditor's name**<br><br>**MPT of Martins Ferry – Alecto Hospital, LLC; MPT of Wheeling – Alecto Hospital, LLC; MPT of Martins Ferry-Alecto, LLC; and MPT of Wheeling-Alecto Hospital, LLC**<br>**c/o Medical Properties Trust, Inc.**<br><br>Creditor's mailing address<br><br>**Attn Larry Portal, SVP**<br>**Attn Legal Department**<br>**1000 Urban Center Drive, Suite 501**<br>**Birmingham, AL 35242**<br><br>Creditor's email address, if known<br><br>Date debt was incurred  **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☒No.<br>☐Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Contingent claim based on guarantee re under Master Lease Agreement with Alecto Healthcare Services Wheeling LLC and Alecto Healthcare Services Martin's Ferry LLC**<br>**UCC filed 6/6/2017, filing number 2017 3713317 , continuation filed 4/26/2022.  Note: No fees were ever paid or will be paid by Alecto Healthcare Services Wheeling LLC, and Alecto Healthcare Services Martins Ferry LLC to Debtor under agreement and none of Debtor's cash is the result of any such fees.**<br><br>Is the creditor an insider or related party?<br>☒No.<br>☐Yes.<br><br>Is anyone else liable on this claim?<br>☐No.<br>☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent.<br>☐ Unliquidated<br>☐ Disputed | $    .00 | $ |

**A0270**

Debtor __Alecto Healthcare Services LLC a Delaware limited liability company__     Case number *(if known)* 23-10787-JKS

---

3. Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional       **$712,846.79**
   Page, if any

**A0271**

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **Alecto Healthcare Services LLC,** **a Delaware limited liability company** |
| United States Bankruptcy Court for the: District of **Delaware** | |
| Case number (*If known*): **23-10787-JKS** | ☐ Check if this is an amended filing |

Official Form 206E/F

## Schedule E/F: Creditors Who Have Unsecured Claims

**12/15**

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on Schedule A/B: Assets - Real and Personal Property (Official Form 206A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

| **Part 1:** | **List Creditors With PRIORITY Unsecured Claims** |
|---|---|

1.  **Do any creditors have priority unsecured claims? (See 11 U.S.C. § 507).**
    ☐ No. Go to Part 2.
    ☒ Yes. Go to line 2.

2.  **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part. If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.**

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1 Priority creditor's name and mailing address**<br><br>**California Franchise Tax Board**<br>**Bankruptcy Section, MS: A-340**<br>**PO Box 2952**<br>**Sacramento, CA 95812-2952**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number<br><br>Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a)(8) | **As of the petition filing date, the claim is:**<br>Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim**<br><br>**Is the claim subject to setoff?**<br>☐ No.<br>☐ Yes. | **Notice Purposes** | $ |
| **2.2 Priority creditor's name and mailing address**<br><br>**California Department of Tax and Fee Administration**<br>**PO Box 942879**<br>**Sacramento, CA 94279-0001**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number<br><br>Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8) | **As of the petition filing date, the claim is:**<br>Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim**<br><br>**Is the claim subject to setoff?**<br>☐ No.<br>☐ Yes. | **Notice Purposes** | $ |

**A0272**

Debtor  __Alecto Healthcare Services LLC, a Delaware limited liability company__     Case number *(if known)* **23-10787-JKS**

| | Total claim | Priority amount |
|---|---|---|
| | | |

| 2.3  Priority creditor's name and mailing address | As of the petition filing date, the claim is: | **Notice Purposes** | $ |
|---|---|---|---|
| **Employment Development Dept**<br>**Bankruptcy Group MIC 92E**<br>**PO Box 826880**<br>**Sacramento, CA 94280-0001** | Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed | | |
| **Date or dates debt was incurred** | | | |
| **Last four digits of account number** | **Basis for the claim** | | |
| | **Is the claim subject to setoff?** | | |
| **Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a)(8)** | ☐ No.<br>☐ Yes. | | |

| 2.4  Priority creditor's name and mailing address | As of the petition filing date, the claim is: | **Notice Purposes** | $ |
|---|---|---|---|
| **Internal Revenue Service**<br>**PO Box 7346**<br>**Philadelphia, PA 19101-7346** | Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed | | |
| **Date or dates debt was incurred** | | | |
| **Last four digits of account number** | **Basis for the claim** | | |
| | **Is the claim subject to setoff?** | | |
| **Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8)** | ☐ No.<br>☐ Yes. | | |

| 2.5  Priority creditor's name and mailing address | As of the petition filing date, the claim is: | **Notice Purposes** | $ |
|---|---|---|---|
| **Los Angeles County Tax Collector**<br>**PO Box 54110**<br>**Los Angeles, CA 90054** | Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed | | |
| **Date or dates debt was incurred** | | | |
| **Last four digits of account number** | **Basis for the claim** | | |
| | **Is the claim subject to setoff?** | | |
| **Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8)** | ☐ No.<br>☐ Yes. | | |

**A0273**

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number *(if known)* **23-10787-JKS**

| Part 2: | List Creditors With NONPRIORITY Unsecured Claims |
|---|---|

3.   List in alphabetical order all creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

|  | Amount of claim |
|---|---|

| **3.1   Nonpriority creditor's name and mailing address**<br><br>**American Express**<br>**Attn President or Manager Agent**<br>**PO Box 0001**<br>**Los Angeles, CA 90096**<br><br>Date or dates debt was incurred  **5/31/2023 (bill date)**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Expense Reimbursement -**<br>**Lex Reddy**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $3,399.68 |
|---|---|---|
| **3.2   Nonpriority creditor's name and mailing address**<br><br>**Anthem Blue Cross**<br>**Attn President or Manager Agent**<br>**PO Box 51011**<br>**Los Angeles, CA 90051**<br><br>Date or dates debt was incurred  **6/2/2023**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Employee Health Benefits**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $14,478.05 |
| **3.3   Nonpriority creditor's name and mailing address**<br><br>**AON Risk Consultants**<br>**Attn L Joe Galusha, President**<br>**22922 Network Place**<br>**Chicago, IL 60673**<br><br>Date or dates debt was incurred  **11/15/18 & 12/13/18**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☒ Disputed<br><br>Basis for the claim   **Actuarial Services - 2018**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $70,000.00 |
| **3.4   Nonpriority creditor's name and mailing address**<br><br>**AT&T**<br>**Attn President or Manager Agent**<br>**PO Box 5014**<br>**Carol Stream, IL 60197**<br><br>Date or dates debt was incurred  **6/1/2023**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Internet Services**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $ 203.30 |

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**          Case number *(if known)* **23-10787-JKS**

|  | Amount of claim |
|---|---|
| **3.5   Nonpriority creditor's name and mailing address**<br><br>**Bcal 101 North Brand Property LLC**<br>**Attn President or Manager Agent**<br>**200 State Street 5th Floor**<br>**Boston, MA 02109**<br><br>Date or dates debt was incurred  **5/31/2023**<br><br>Last four digits of account number | $ 195.00 |

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Miscellaneous Building Charge**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.6   Nonpriority creditor's name and mailing address**<br><br>**Cardinal Health 200, LLC**<br>**c/o Porter Wright Morris & Arthur LLC**<br>**Attn Allen Carter Esq**<br>**41 South High Street, Suite 2900**<br>**Columbus, Ohio 43215**<br><br>Date or dates debt was incurred  **Various**<br><br>Last four digits of account number | $81,318.11 |

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☒ Unliquidated
☒ Disputed

Basis for the claim   **Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsbdiary hospitals**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.7   Nonpriority creditor's name and mailing address**<br><br>**Combined Group Insurance Services**<br>**Attn President or Manager Agent**<br>**14785 Preston Road Suite 350**<br>**Dallas, TX 75254**<br><br>Date or dates debt was incurred  **5/31/2023**<br><br>Last four digits of account number | $3,966.10 |

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Texas Non-Subscriber Audit**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.8   Nonpriority creditor's name and mailing address**<br><br>**Evangeline Douglas**<br>**19951 Octillo Way**<br>**Apple Valley, CA 92308**<br><br>Date or dates debt was incurred  **5/31/2023**<br><br>Last four digits of account number | $5,455.68 |

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Expense Reimbursement**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.9   Nonpriority creditor's name and mailing address**<br><br>**First Insurance Funding**<br>**Attn President or Manager Agent**<br>**450 Skokie Boulevard Suite 1000**<br>**Northbrook, IL 60062**<br><br>Date or dates debt was incurred  **6/1/2023**<br><br>Last four digits of account number | $76,137.36 |

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Insurance Premium Financing**

Is the claim subject to setoff?
☒No.
☐Yes

---

**A0275**

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**    Case number *(if known)* **23-10787-JKS**

| | | Amount of claim |
|---|---|---|

| | | |
|---|---|---|
| **3.10   Nonpriority creditor's name and mailing address**<br><br>**GRM Information Management Services of San Francisco LLC**<br>**Attn President or Manager Agent**<br>**41099 Boyce Road**<br>**Fremont, CA 94538**<br><br>Date or dates debt was incurred **Various**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Records Storage**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $2,149.85 |
| **3.11   Nonpriority creditor's name and mailing address**<br><br>**Horizon Real Estate Holdings, LLC**<br>**Attn President or Manager Agent**<br>**101 N. Brand Boulevard, Suite 1920**<br>**Glendale, CA 91203**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Affiliate/Intercompany payable**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $23,504,535.00 |
| **3.12   Nonpriority creditor's name and mailing address**<br><br>**Konica Minolta Premier Finance**<br>**Attn President or Manager Agent**<br>**PO Box 41602**<br>**Philadelphia, PA 19101-1602**<br><br>Date or dates debt was incurred  **6/1/2023**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Copier**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $ 779.66 |
| **3.13   Nonpriority creditor's name and mailing address**<br><br>**LHP Hospital Group Inc**<br>**c/o Ardent Health Services**<br>**Attn President or Manager Agent**<br>**Attn Legal Department**<br>**One Burton Hills Blvd Suite 250**<br>**Nashville, TN 37215**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent<br>☒ Unliquidated<br>☒ Disputed<br><br>Basis for the claim   **Potential claims related to Debtor's guarantee of certain indemnification obligations of a subsidary and settlement agreement with creditor**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | **Unknown** |
| **3.14   Nonpriority creditor's name and mailing address**<br><br>**Los Angeles County Treasurer and Tax Collector**<br>**PO Box 54110**<br>**Los Angeles, CA 90054**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Notice Purposes**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $  .00 |

**A0276**

Debtor **Alecto Healthcare Services LLC, a Delaware limited liability company**       Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|

| | | |
|---|---|---|
| **3.15**   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $28,213.35 |
| **Michael Sarrao**<br>**22431 Antonio Parkway, Suite B160-457**<br>**Rancho Santa Margarita, CA 92688** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **4/30/2023 (bill date)** | | |
| Last four digits of account number | Basis for the claim   **Expense Reimbursement** | |
| | Is the claim subject to setoff?<br>☒No.<br>☐Yes | |

| | | |
|---|---|---|
| **3.16**   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $31,666.88 |
| **Moss Adams LLP**<br>**Attn President or Manager Agent**<br>**2040 Main Street Suite 900**<br>**Irvine, CA 92614** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred | | |
| Last four digits of account number | Basis for the claim   **Tax Preparation Services** | |
| | Is the claim subject to setoff?<br>☒No.<br>☐Yes | |

| | | |
|---|---|---|
| **3.17**   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $ 872.57 |
| **New Horizon Communications**<br>**Attn President or Manager Agent**<br>**PO Box 981073**<br>**Boston, MA 02298-1073** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **6/1/2023** | | |
| Last four digits of account number | Basis for the claim   **Internet Services** | |
| | Is the claim subject to setoff?<br>☒No.<br>☐Yes | |

| | | |
|---|---|---|
| **3.18**   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $37,823.00 |
| **Olshan Frome Wolosky LLP**<br>**Attn Thomas J Fleming Esq**<br>**1325 Avenue of the Americas**<br>**New York, NY 10019** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **Various** | | |
| Last four digits of account number | Basis for the claim   **Legal Fees - ERISA Counsel** | |
| | Is the claim subject to setoff?<br>☒No.<br>☐Yes | |

| | | |
|---|---|---|
| **3.19**   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $37,874,526.12 |
| **Olympia Health Care, LLC**<br>**Attn President or Manager Agent**<br>**101 N. Brand Boulevard, Suite 1920**<br>**Glendale, CA 91203** | Check all that apply<br>☒ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred | | |
| Last four digits of account number | Basis for the claim   **Affiliate/Intercompany payable** | |
| | Is the claim subject to setoff?<br>☒No.<br>☐Yes | |

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**        Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|
| | |

| | | |
|---|---|---|
| **3.20** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $1,888.00 |
| **Panch Jeyakumar MD**<br>**2248 Pieper Lane**<br>**Tustin, CA 92792** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **5/31/2023** | **Basis for the claim   Expense Reimbursement** | |
| Last four digits of account number | Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| **3.21** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $3,169,745.72 |
| **Plaintiffs in Reed v. Alecto [Keith Reed, Elizabeth Schenkel, Emily Wines, Mark Garan and August Ullum and Represented Class**<br>**c/o Laura Davidson & Bren Pompomio**<br>**Mountain State Justice, Inc.**<br>**1217 Quarrier Street**<br>**Charleston, WV 25301** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim   WARN Act Class Action** | |
| Date or dates debt was incurred  **11/28/2022** | Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| Last four digits of account number | | |
| **3.22** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $8,083,572.10 |
| **Plaza Medical Office Building, LLC**<br>**Attn President or Manager Agent**<br>**101 N. Brand Boulevard, Suite 1920**<br>**Glendale, CA 91203** | Check all that apply<br>☒ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred | **Basis for the claim   Affiliate/Intercompany payable** | |
| Last four digits of account number | Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| **3.23** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | **Unknown** |
| **Sherman/Grayson Health System, LLC**<br>**c/o Ardent Health Services**<br>**Attn President or Manager Agent**<br>**Attn Legal Department**<br>**One Burton Hills Blvd Suite 250**<br>**Nashville, TN 37215** | Check all that apply<br>☒ Contingent<br>☒ Unliquidated<br>☒ Disputed<br><br>**Basis for the claim   Potential claims related to Debtor's guarantee of certain indemnification obligations of a subsidary and settlement agreement with creditor** | |
| Date or dates debt was incurred | Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| Last four digits of account number | | |

**A0278**

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**      Case number (*if known*) **23-10787-JKS**

| | Amount of claim |
|---|---|

| | | |
|---|---|---|
| 3.24  **Nonpriority creditor's name and mailing address**<br><br>**Sylvia Ventura**<br>**4742 Ambrazzi Drive**<br>**Cypress, CA 90630**<br><br>Date or dates debt was incurred  **5/31/2023 (bill date)**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim  **Expense Reimbursement**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $2,743.62 |
| 3.25  **Nonpriority creditor's name and mailing address**<br><br>**Symphony Risk Solutions LLC**<br>**Attn President or Manager Agent**<br>**2425 N Central Expressway Suite 900**<br>**Richardson, TX 75080**<br><br>Date or dates debt was incurred  **6/1/2023**<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim  **Insurance Premiums**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | $23,031.10 |
| 3.26  **Nonpriority creditor's name and mailing address**<br><br>**United States of America**<br>**Brian M Boynton, Principal Deputy Assit Atty General**<br>**Ruth A Harvey, Director**<br>**Michale J Quinn, Senior Litigation Counsel**<br>**John R Kresse and T. Dietrich Hill, Trial Attys**<br><br>**United States Department of Justice**<br>**Civil Division, Commerical Litigation Branch**<br>**1100 L Street NW, 7th Floor**<br>**Box 875, Ben Franklin Station**<br>**Washington, DC 20044-9875**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | *As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent<br>☒ Unliquidated<br>☒ Disputed<br><br>Basis for the claim  **Lawsuit:  United States of America v. Olympia Health Care, LLC, Alecto Healthcare Services, LLC et al., United States District Court for the Central District of California Case No. 2:23-cv-01783 (complaint asserts amount owed as of 2/28/2023, principal of $11,059,170.17 plus $1,421,027.62 in interest and interest continues to accrue at 10% per annum)**<br><br>Is the claim subject to setoff?<br>☐No.<br>☒Yes | $12,480,197.79 |

| | | |
|---|---|---|
| | **Total** | **$85,496,898.04** |

| Debtor | Alecto Healthcare Services LLC, a Delaware limited liability company | Case number *(if known)* 23-10787-JKS |
|---|---|---|

| **Part 3:** | **List Others to Be Notified About Unsecured Claims** |
|---|---|

**4.** List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 an 2, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and mailing address | On which line in Part 1 or 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4.1<br>Timothy Cogan<br>Cassidy Cogan Shapell & Voeglin, LC<br>1413 Eoff Street<br>Wheeling, WV 26003 | Line **3.21**<br>**re Plaintiffs in Reed v. Alecto**<br>☐ Not listed. Explain | |
| 4.2<br>Maureen Davidson-Welling<br>Stember Cohn & Davidson-Welling<br>425 First Avenue, 7th Floor<br>Pittsburgh, PA 15219 | Line **3.21**<br>**re Plaintiffs in Reed v. Alecto**<br>☐ Not listed. Explain | |
| 4.3<br>F. Alex Risovich<br>Risovich Law Offices, PLLC<br>3023 Pennsylvania Avenue<br>Weirton, WV 26062 | Line **3.21**<br>**re Plaintiffs in Reed v. Alecto**<br>☐ Not listed. Explain | |
| 4.4<br>AON Risk Consultants Inc<br>Attn L Joe Galusha, President<br>200 E. Randolph St<br>Chicago, IL 60601 | Line **3.3**<br>**re AON Risk Consultants Inc**<br>☐ Not listed. Explain | |
| 4.5<br>Civil Process Clerk<br>United States Attorney's Office<br>Federal Building Room 7516<br>300 North Los Angeles, Street<br>Los Angeles, CA 90012 | Line **3.26**<br>**re United States of America**<br>☐ Not listed. Explain | |
| 4.6<br>Attorney General<br>United States Department of Justice<br>Ben Franklin Station<br>PO Box 683<br>Washington, DC 20044 | Line **3.26**<br>**re United States of America**<br>☐ Not listed. Explain | |
| 4.7 | Line<br>☐ Not listed. Explain | |

Official Form 206E/F            Schedule E/F: Creditors Who Have Unsecured Claims

**A0280**

Debtor  Alecto Healthcare Services LLC, a Delaware limited liability company          Case number *(if known)* **23-10787-JKS**

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---------|---------------------------------------------------------------|

**5.  Add the amounts of priority and nonpriority unsecured claims.**

|   |   |   | Total of claim amounts |
|---|---|---|------------------------|
| **5a.  Total claims from Part 1** | *5a.* | | **$0.00** |
| **5b.  Total claims from Part 2** | *5b.* + | | **$85,496,898.04** |
| **5c.  Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | *5c.* | | **$85,496,898.04** |

**A0281**

# EXHIBIT 8

**Fill in this information to identify the case:**

Debtor 1    Alecto Healthcare Services LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court    District of Delaware

Case number: 23-10787

FILED
U.S. Bankruptcy Court
District of Delaware

8/15/2023

Una O'Boyle, Clerk

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers **must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:    Identify the Claim

**1. Who is the current creditor?**

Reed Action Judgment Creditors

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

See addendum for definition.

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Reed Action Judgment Creditors

Name

Bren J. Pomponio
1217 Quarrier Street
Charleston, WV 25301

Contact phone   304-344-3144

Contact email   bren@msjlaw.org

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**Where should payments to the creditor be sent? (if different)**

Name

Contact phone

Contact email

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
                MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

Official Form 410

Proof of Claim

page 1

Case 23-10787-JKS    Claim 19-1    Filed 08/15/23    Desc Main Document    Page 1 of 3

A0283

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
| 7. **How much is the claim?** | $ 3275382.64    **Does this amount include interest or other charges?**<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Judgment, post–judgment interest, and attorneys' fees − see addendum |

9. **Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate.    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed
☐ Variable

10. **Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

11. **Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Official Form 410                Proof of Claim                page 2

**A0284**

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. *Check all that apply:* | | **Amount entitled to priority** |

| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
|---|---|---|
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | $ _____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
**18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date     8/15/2023

MM / DD / YYYY

/s/ Bren Joseph Pomponio

Signature

Print the name of the person who is completing and signing this claim:

Name     Bren Joseph Pomponio

First name     Middle name     Last name

Title     Litigation Director

Company     Mountain State Justice, Inc.

Identify the corporate servicer as the company if the authorized agent is a servicer

Address     1217 Quarrier Street

Number   Street

Charleston, WV 35301

City   State   ZIP Code

Contact phone     304–344–3144     Email     bren@msjlaw.com

Official Form 410      Proof of Claim      page 3

**A0285**

**Addendum to Proof of Claim filed by the Reed Action Judgment Creditors**

Plaintiffs in the action titled **Keith Reed, Lisa Dolence, Elizabeth Schenkel, Emily Wines, Mark Garan, Christna Lucas, and August Ullum, II**, individually and on behalf of others similarly situated v. **Alecto Healthcare Services, LLC**, and **Alecto Healthcare Services Wheeling, LLC**, d/b/a Ohio Valley Medical Group d/b/a OVMC Physicians, Civil Action No. 5:19-CV-363, filed in the United States District Court for the Northern District of West Virginia, Wheeling, (hereinafter, the "Reed Action Judgment Creditors") submit the following claim:

1.      The Reed Action Judgment creditors obtained a Judgment Order on November 28, 2022, in the amount of **$3,169,745.72**.[1]  This Judgment Order was not appealed and is a final order.  The Debtor listed the Reed Action Judgment Creditors as having a claim in this amount on schedule E/F (D.I. 48) and the amount is **not** listed as contingent, unliquidated or disputed (the 'Scheduled Claim').

**2.**      However, the Scheduled Claim did not include post-judgment interest accruing between November 28, 2022, the date of entry of the judgment, and June 16, 2023, the petition date.  The federal judgment rate applicable to judgments entered in the week ending December 2, 2022 is 4.73%.  Interest on the judgment which accrued at that rate through the petition date is **$82,673.92.**  Interest continues to accrue post-petition at $413.37 per day.

3.      The Reed Action Judgment Creditors are also entitled to additional attorney's fees incurred in the execution/collection of the judgment, which are provided by 29 U.S.C. §2104(a)(6) upon which the judgment was obtained.  Fees associated with

---

[1] A copy of the Judgment Order is attached hereto.

efforts to collect on the judgment through the petition date are **$22,963.00**.  Those fees are ongoing.

4.　　　Accordingly, the Reed Action Judgment Creditors claim is for no less than **$3,275,382.64,** plus additional attorneys fees incurred post-petition, which are ongoing, and post-petition interest, if payable, at $413.37 per day.

The Reed Action Judgment Creditors do not waive, but rather expressly reserve, all of their rights and remedies in connection with their Claim, including, without limitation, the following:  (i) to fix, increase, amend and/or supplement the Claim, the addendum thereto, and/or any supporting documentation (ii) to assert that the Claim, or any portion thereof, is secured, including by issuance of the writ on May 11, 2023 in the United States District Court for the Middle District of California,  (iii) to assert that the Claim, or any portion thereof, including the claim for post-petition attorneys fees is an administrative expense of the Debtor's estate, (iv) to assert any other basis or legal theory of its Claim, and (v) to seek other relief from the Court, as appropriate.

All notices issued in connection with the Claim should be sent to the address listed on the proof of claim form with a copy to the following:

SULLIVAN · HAZELTINE · ALLINSON LLC
William D. Sullivan (2820)
William A. Hazeltine (3294)
919 N. Market Street, Suite 420
Wilmington, DE  19801

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### Wheeling

**KEITH REED, LISA DOLENCE,**
**ELIZABETH SCHENKEL,**
**EMILY WINES, MARK GARAN**
**CHRISTINA LUCAS,** and **AUGUST ULLUM, II,**
individually and on behalf of others similarly
situated,

        Plaintiffs,

v.

        **CIVIL ACTION NO. 5:19-CV-263**
        Judge Bailey

**ALECTO HEALTHCARE SERVICES, LLC,** and
**ALECTO HEALTHCARE SERVICES**
**WHEELING, LLC,** d/b/a Ohio Valley Medical
Group d/b/a OVMC Physicians,

        Defendants.

### <u>JUDGMENT ORDER</u>

On November 7, 2022, a Fairness/Status Hearing was held in the above-styled case. This Court took up the issues addressed by the parties in their November 5, 2022 Joint Status Report [Doc. 226], and the pending Motion for Service Award and Civil Penalties [Doc. 223] and Motion for Attorney Fees [Doc. 214]. This Court directed the parties to file a Joint Status Report following the hearing to finalize class damages calculations.

After hearing argument from both sides and reviewing the Joint Status Report [Doc. 229], this Court held the following:

1

- Plaintiffs' Motion for Service Awards and Civil Penalties Pursuant to 29 U.S.C. § 2104(a)(3) [**Doc. 223**] is **DENIED**;

- Plaintiffs' Motion for Attorney's Fees and Costs [**Doc. 214**] is **GRANTED IN PART AND DENIED IN PART**. The total for attorney's fees and costs is: **$483,388.61**; and

- Damages are entered against defendants in the amount of **$2,686,357.11**.

The Clerk is hereby **DIRECTED** to **STAY** the above-styled case pending distribution of class payments.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record.

**DATED**: November 28, 2022.

**JOHN PRESTON BAILEY**
**UNITED STATES DISTRICT JUDGE**

2

**A0289**

# EXHIBIT 9

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact information** that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**
LHP Hospital Group, Inc.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**
☒ No  ☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**
Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Name: Mark Minuti, Saul Ewing, LLP
Number Street: 1201 N. Market St., Suite 2300
City: Wilmington  State: DE  ZIP Code: 19801
Contact phone: 301 421 6840
Contact email: mark.minuti@saul.com

Where should payments to the creditor be sent? (if different)

Name: Ardent Health Services - Glynda McDaniel
Number Street: 340 Seven Springs Way, Suite 100
City: Brentwood  State: Tn  ZIP Code: 37027
Contact phone: 615 513 6871
Contact email: Glynda.McDaniel@ardenthealth.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____

**4. Does this claim amend one already filed?**
☒ No  ☐ Yes. Claim number on court claims registry (if known) _____  Filed on ___/___/_____ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☒ No  ☐ Yes. Who made the earlier filing? _____

---

Fill in this information to identify the case:

Debtor 1: Alecto Healthcare Services, LLC
Debtor 2 (Spouse, if filing): _____
United States Bankruptcy Court for the: District of Delaware
Case number: 23-10787

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

| 6. | Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ _____ _____ _____ |
|---|---|---|

| 7. | How much is the claim? | $ _____ 3,739,635.77 . Does this amount include interest or other charges?<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
|---|---|---|

| 8. | What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>contract - _____ |
|---|---|---|

| 9. | Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property: $ _____<br>Amount of the claim that is secured: $ _____<br><br>Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition: $ _____<br><br>Annual Interest Rate (when case was filed) _____ %<br>☐ Fixed<br>☐ Variable |
|---|---|---|

| 10. | Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____ |
|---|---|---|

| 11. | Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |
|---|---|---|

**A0292**

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| | ☐ Yes. Check one: | Amount entitled to priority |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.  $_____

* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  08/14/2023
MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

Name  Ashley   M.   Crabtree
First name   Middle name   Last name

Title  authorized signatory

Company  LHP Hospital Group, Inc.
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  340 Seven Springs Way, Suite 100
Number   Street

Brentwood   Tn   37027
City   State   ZIP Code

Contact phone  _____   Email  _____

## A0293

Official Form 410   Proof of Claim   page 3

SUMMARY OF CLAIM

Alecto Healthcare Services Sherman, LLC ("Alecto Sherman") entered into a Purchase Agreement pursuant to which it acquired all of the membership interests in certain entities that owned and operated a medical facility in Sherman, Texas. Under the terms of the Purchase Agreement, Alecto Sherman agreed to indemnify and hold harmless LHP Hospital Group, Inc. ("LHP") for any damages that it suffered in connection with a variety of circumstances described in the Purchase Agreement, including certain obligations associated with the Medical Office Building. Alecto Healthcare Services, LLC ("Debtor") executed a guarantee in favor of LHP pursuant to which it guaranteed Alecto Sherman's obligations under the Purchase Agreement, including the indemnification provisions of it.

---

**PURCHASE AGREEMENT**

**by and among**

**SHERMAN/GRAYSON HEALTH SYSTEM, LLC**

**and**

**ALECTO HEALTHCARE SERVICES SHERMAN LLC**

**and**

**with respect to Section 6.12 and Article IX only,**

**LHP HOSPITAL GROUP, INC.,**

**and**

**TEXAS HEALTH RESOURCES**

**Dated as of September 23, 2014**

---

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...........................................................................................................1

    1.1    Defined Terms ..........................................................................................................1
    1.2    Interpretation .........................................................................................................11

ARTICLE II PURCHASE AND SALE; CLOSING ...................................................................12

    2.1    Sale of the Interests ...............................................................................................12
    2.2    Pre-Closing Statement ...........................................................................................12
    2.3    Purchase Price ........................................................................................................13
    2.4    Post-Closing Purchase Price Adjustment ..............................................................13
    2.5    Closing ...................................................................................................................15
    2.6    Closing Deliveries .................................................................................................15
    2.7    Allocation of Purchase Price. ................................................................................16

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER........................17

    3.1    Organization and Capitalization of the Target Companies and Sherman MD Provider ................17
    3.2    Authorization .........................................................................................................18
    3.3    No Conflicting Agreements; Consents ...................................................................19
    3.4    Financial Statements ..............................................................................................19
    3.5    Absence of Undisclosed Liabilities .......................................................................19
    3.6    Absence of Changes ..............................................................................................20
    3.7    Contracts ................................................................................................................21
    3.8    Real Property .........................................................................................................22
    3.9    Personal Property ...................................................................................................22
    3.10    Employees; Labor Matters; Employee Benefit Plans; ERISA ...............................23
    3.11    Government Program Participation/Accreditation ..................................................24
    3.12    Taxes .....................................................................................................................25
    3.13    Intellectual Property ..............................................................................................26
    3.14    Permits ...................................................................................................................26
    3.15    Environmental Conditions .....................................................................................27
    3.16    Legal Proceedings, Court Orders ..........................................................................28
    3.17    Insurance ................................................................................................................28
    3.18    Compliance with Laws ..........................................................................................28
    3.19    Medical Staff .........................................................................................................28
    3.20    Brokers ..................................................................................................................29
    3.21    Affiliate Transactions ............................................................................................29
    3.22    No Prior Operations ...............................................................................................29

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ...............29

    4.1    Organization ..........................................................................................................29
    4.2    Authorization .........................................................................................................30
    4.3    No Conflicting Agreements; Consents ...................................................................30
    4.4    Legal Proceedings .................................................................................................31
    4.5    Brokers ..................................................................................................................31
    4.6    Sufficient Resources ..............................................................................................31
    4.7    Investment Representations ....................................................................................31
    4.8    Non-Reliance .........................................................................................................31

ARTICLE V COVENANTS OF THE SELLER .........................................................................32

    5.1    Regulatory Approvals ............................................................................................32

| | 5.2 | Conduct Prior to the Closing | 32 |
|---|---|---|---|
| | 5.3 | Employee Matters | 33 |
| | 5.4 | Investigation by the Purchaser | 34 |
| | 5.5 | Closing Conditions | 34 |
| | 5.6 | Consultative Process | 34 |
| | 5.7 | INTENTIONALLY OMITTED | 35 |
| | 5.8 | Transition Services | 35 |

**ARTICLE VI COVENANTS OF THE PURCHASER; CERTAIN ADDITIONAL  COVENANTS OF THE PARTIES** ......... 36

| | 6.1 | Confidentiality | 36 |
|---|---|---|---|
| | 6.2 | Regulatory Approvals | 36 |
| | 6.3 | Post-Closing Access | 37 |
| | 6.4 | Treatment of Seller and Seller-Affiliate Intellectual Property | 37 |
| | 6.5 | Employee Matters | 38 |
| | 6.6 | Tax Matters | 39 |
| | 6.7 | Maintenance of Services | 41 |
| | 6.8 | Transfer of Certain Assets | 41 |
| | 6.9 | MOB Obligations | 41 |
| | 6.10 | Meaningful Use Payments | 41 |
| | 6.11 | Closing Conditions | 41 |
| | 6.12 | Covenant Not to Compete; Non-Solicitation | 41 |
| | 6.13 | Additional 501(a) Matters | 43 |

**ARTICLE VII CONDITIONS TO OBLIGATIONS OF THE PURCHASER** ......... 43

| | 7.1 | Representations and Warranties | 43 |
|---|---|---|---|
| | 7.2 | Compliance with Agreement | 43 |
| | 7.3 | Closing Certificates | 43 |
| | 7.4 | Consents and Authorizations | 43 |
| | 7.5 | No Action or Proceeding | 44 |
| | 7.6 | Good Standing Certificates | 44 |
| | 7.7 | Title to Real Property | 44 |
| | 7.8 | Excluded Obligations Release | 44 |
| | 7.9 | Adverse Change | 44 |
| | 7.10 | Waiver of Conditions | 44 |

**ARTICLE VIII CONDITIONS TO OBLIGATIONS OF THE SELLER** ......... 44

| | 8.1 | Representations and Warranties | 44 |
|---|---|---|---|
| | 8.2 | Compliance with Agreement | 45 |
| | 8.3 | Closing Certificates | 45 |
| | 8.4 | Consents and Authorizations | 45 |
| | 8.5 | No Action or Proceeding | 45 |
| | 8.6 | Waiver of Conditions | 45 |

**ARTICLE IX INDEMNIFICATION** ......... 45

| | 9.1 | Survival | 45 |
|---|---|---|---|
| | 9.2 | Indemnification by the Seller | 46 |
| | 9.3 | Indemnification by the Purchaser | 46 |
| | 9.4 | Limitations on Claims | 47 |
| | 9.5 | Claims Procedures | 48 |
| | 9.6 | Subrogation | 49 |
| | 9.7 | Guarantee | 49 |
| | 9.8 | Limitation on Damages | 49 |
| | 9.9 | Exclusive Remedy | 49 |

ARTICLE X TERMINATION ...............................................................................................................50

     10.1    Termination Events .................................................................................................50
     10.2    Effect of Termination .............................................................................................50

ARTICLE XI NOTICES .....................................................................................................................51

     11.1    Notices ....................................................................................................................51

ARTICLE XII MISCELLANEOUS .......................................................................................................52

     12.1    Fees and Expenses ..................................................................................................52
     12.2    Entire Agreement ....................................................................................................52
     12.3    Waiver .....................................................................................................................52
     12.4    Amendment .............................................................................................................52
     12.5    Counterparts; Facsimile Signatures; Reproductions ..............................................53
     12.6    No Third Party Beneficiary .....................................................................................53
     12.7    GOVERNING LAW, CONSTRUCTION ..............................................................53
     12.8    Binding Effect .........................................................................................................53
     12.9    No Assignment ........................................................................................................53
     12.10   Headings, Gender, Etc ............................................................................................54
     12.11   Public Announcement .............................................................................................54
     12.12   Severability; Invalid Provisions .............................................................................54
     12.13   Venue ......................................................................................................................54
     12.14   WAIVERS OF TRIAL BY JURY ..........................................................................54
     12.15   No Inferences ..........................................................................................................55
     12.16   Tax and Government Program Advice and Reliance ..............................................55
     12.17   Further Assurance Clause .......................................................................................55
     12.18   Specific Performance .............................................................................................55

**List of Exhibits:**

| | |
|---|---|
| Exhibit A | Form of Excluded Obligations Release |
| Exhibit B | Knowledge Parties |
| Exhibit C | Net Working Capital Methodology |
| Exhibit D | Target Company Ownership Interests |
| Exhibit E | Required Activities |

**List of Schedules:**

| | |
|---|---|
| Schedule 1.1 | Permitted Encumbrances |
| Schedule 1.2 | Space Leases |
| Schedule 5.1 | Seller Governmental Approvals |
| Schedule 5.2 | Operations During the Executory Period |
| Schedule 5.8(b) | Transition Services |
| Schedule 5.8(c) | Service Contracts |
| Schedule 6.2 | Purchaser Governmental Approvals |
| Schedule 6.4 | Certain Intellectual Property |
| Schedule 6.8 | Certain Assets |
| Schedule 6.13 | 501(a) Assigned Agreements |
| Schedule 7.4(a) | Seller Required Consents |
| Schedule 8.4(a) | Purchaser Required Consents |

# PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of September 23, 2014, by and among Sherman/Grayson Health System, LLC, a Texas limited liability company (the "Seller"), and Alecto Healthcare Services Sherman LLC, a Delaware limited liability company (the "Purchaser"), and with respect to Section 6.12 and Article IX only, LHP Hospital Group, Inc., a Delaware corporation ("LHP"), and Texas Health Resources, a Texas non-profit corporation ("THR" and, together with LHP, the "Seller Guarantors"). The Seller and the Purchaser are sometimes referred to herein individually as a "Party" and together as the "Parties."

## R E C I T A L S :

A. The Seller is the sole member and owner of all of the issued and outstanding membership interests of (i) (a) Sherman/Grayson Hospital, LLC, a Texas limited liability company ("Sherman Hospital"), which owns and operates Texas Health Presbyterian Hospital - WNJ (the "Facility") and (b) Sherman/Grayson Health Services, LLC, a Texas limited liability company ("Sherman Services") (the membership interests of Sherman Hospital and Sherman Services, together, the "Hospital Interests") and (ii) Sherman/Grayson Sponsor, LLC, a Texas limited liability company ("Sherman Sponsor" and, together with the Sherman Hospital and Sherman Services, the "Target Companies") (the membership interests of Sherman Sponsor, the "Sponsor Interests" and, together with the Hospital Interests, the "Interests").

B. Upon the terms and subject to the conditions set forth herein, the Purchaser desires to purchase from the Seller, and the Seller desires to sell to the Purchaser, all of the Interests.

**NOW, THEREFORE**, in consideration of the foregoing premises, the mutual covenants and other agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Defined Terms.

As used in this Agreement, the following defined terms shall have the meanings indicated below:

"501(a) Assigned Agreements" has the meaning set forth in Section 6.13.

"501(a) Certification Date" means the date two Business Days following the date upon which Seller receives notice that Sherman MD Provider has been certified by the Texas Medical Board as a "501(a)" entity organized pursuant to Section 162.001(b) of the Texas Occupations Code.

"501(a) Certification Time" means 11:59 p.m., Central Time, on the 501(a) Certification Date.

"Accountant" has the meaning set forth in Section 2.4(c).

"Actionable Breach" means, subject to the satisfaction or waiver (by the Party for whom such condition may be waived) of the conditions set forth in Article VII and Article VIII (other than those items that by their terms are to be satisfied at Closing), the failure of either of the Parties to promptly close in accordance with Section 2.5.

"Actual Fraud" means, with respect to a Party, the actual fraud of such Party, with the actual intent to deceive, and, for the avoidance of doubt, shall not include constructive fraud.

"Adjustment Amount" means the net amount (which may be positive or negative) of all increases or decreases to the Closing Date Consideration pursuant to Section 2.4(d).

"Administrative Personnel" has the meaning set forth in Section 6.5(a).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. For the purposes of this definition, "control", when used with respect to any specified Person, means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Affiliation Agreement" means that certain Affiliation Agreement by and between LHP Texas MD Services, Inc., and Sherman/Grayson Hospital, LLC dated September 1, 2014.

"Agreement" has the meaning set forth in the preamble.

"Allocation Dispute Notice" has the meaning set forth in Section 2.7(b).

"Allocation Statement" has the meaning set forth in Section 2.7(b).

"Balance Sheet Date" has the meaning set forth in Section 3.4.

"Base Purchase Price" means $32,500,000.

"Books and Records" means all existing patient, medical staff, employee, accounting, business, marketing, corporate, limited liability company and other files, documents, instruments, papers, books and records, including without limitation, financial statements, budgets, ledgers, journals, deeds, titles, policies, manuals, minute books, stock certificates and books, equity transfer ledgers, contracts, franchises, permits, supplier lists, reports, computer files and data, retrieval programs and operating data or plans.

"Business" means the business and operations conducted by the Target Companies, including the business and operations of the Facility.

"Business Day" means a day other than Saturday, Sunday, or any day on which the principal commercial banks located in the State of Texas are authorized or obligated to close under the Laws of such states.

"Cash and Cash Equivalents" means the sum of (a) without duplication, all of the Target Companies' cash, bank deposits, marketable securities, certificates of deposit, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, plus (b) the aggregate amount of all checks, drafts and other bank deposits received by the Target Companies but not yet credited to the bank accounts of the Target Companies, minus (c) any outstanding checks or transfers at such time.

"Claim" has the meaning set forth in Section 9.5.

"Closing" has the meaning set forth in Section 2.5.

"Closing Date" has the meaning set forth in Section 2.5.

"Closing Date Consideration" has the meaning set forth in Section 2.3.

"Closing Date Net Indebtedness" means the Cash and Cash Equivalents of the Target Companies minus the Indebtedness of the Target Companies, in each case measured as of 11:59 pm CT on the day prior to Closing.  For the avoidance of doubt, the resultant amount may be a positive or negative number.

"Closing Statement" has the meaning set forth in Section 2.4(a).

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Confidentiality Agreement" means that certain Confidentiality Agreement between LHP Hospital Group, Inc. and Alecto Healthcare Services LLC, an affiliate of Purchaser, dated June 20, 2014.

"Constituent Documents" means, for any corporation, partnership, limited partnership, limited liability company or other organization, its charter, articles of incorporation, certificate of incorporation, bylaws, partnership agreement, operating agreement, certificate of limited partnership, certificate of formation or other similar formation and governance documents, as applicable, each as amended to the relevant date.

"Contract" means any agreement, Lease, license, sublicense, promissory note, evidence of Indebtedness, or other contract to which any of the Target Companies is a party, or by which the Target Companies or the assets of either of the Target Companies are bound.

"Counterparty" has the meaning set forth in Section 5.8(c).

"Court Order" means any judgment, order, award or decree of any federal, state, local or other court or judicial or quasi-judicial tribunal and any award in any binding arbitration proceeding.

"Damages" means any and all losses, damages, claims, costs, fines, fees, penalties, interest obligations and deficiencies (including, without limitation, reasonable attorney's fees and other expenses of litigation).

- 3 -
**A0301**

"Effective Time" has the meaning set forth in Section 2.5.

"EHR Incentive Program" has the meaning set forth in Section 6.10.

"Employee Benefit Plans" has the meaning set forth in Section 3.10(c).

"Employee Lease Agreement" means that certain Employee Lease Agreement by and between LHP Sherman/Grayson, LLC and Sherman/Grayson Hospital, LLC dated May 1, 2010.

"Employees" has the meaning set forth in Section 3.10(i).

"Encumbrance" means any mortgage, pledge, assessment, security interest, lease, sublease, lien, adverse claim, levy, right of way, easement, covenant, charge or other encumbrance of any kind, or any conditional sale contract, title retention contract, or other contract to give or to refrain from giving any of the foregoing.

"Environmental Claim" means any claim, action, suit, order, cause of action, investigation, written notice or other legal proceeding by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or penalties) arising out of, based on or resulting from the violation of any Environmental Law or any obligation arising under any Environmental Law.

"Environmental Laws" means the federal, state, regional, county or local environmental laws, regulations, ordinances, rules and policies and common law in effect on the date hereof and as of the Effective Time relating to the use, refinement, handling, treatment, removal, storage, production, manufacture, transportation or disposal, emission, discharge, release or threatened release of Hazardous Substances, or otherwise relating to protection of human health or safety or the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata), as the same may be amended or modified to the date hereof and as of the Effective Time.

"ERISA" has the meaning set forth in Section 3.10(c).

"ERISA Controlled Group" has the meaning set forth in Section 3.10(d).

"Estimated Closing Date Net Indebtedness" has the meaning set forth in Section 2.2.

"Estimated Net Working Capital" has the meaning set forth in Section 2.2.

"Estimated Unpaid Transaction Expenses" has the meaning set forth in Section 2.2.

"Exchange Act" means the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Obligations" means (i) the liabilities of the Target Companies for any management fees due Seller, the Seller Guarantors, and any Affiliates of Seller and the Seller Guarantors; (ii) the liabilities of the Target Companies for any administrative and royalty fees

due THR or its Affiliates; and (iii) the liabilities of the Target Companies for any intercompany advances, loans, or other amounts due to LHP or its subsidiaries; provided, however, (i) none of the obligations of the Parties or the Seller Guarantors set forth herein shall be deemed "Excluded Obligations", including, without limitation, the obligations of Purchaser pursuant to Section 6.13 and (ii) none of the obligations arising under the Affiliation Agreement or the Employee Lease Agreement, other than obligations for fees for services provided or reimbursement of expenses and losses incurred prior to the Effective Time, shall be deemed "Excluded Obligations."

"Excluded Obligations Release" means the release, substantially in the form attached hereto as Exhibit A, duly executed by Seller and/or the Seller Guarantors (on behalf of itself and its Affiliates), as applicable, that release the Target Companies from the Excluded Obligations.

"Facility" has the meaning set forth in Recital A.

"Final Net Indebtedness" has the meaning set forth in Section 2.4(d).

"Final Net Working Capital" has the meaning set forth in Section 2.4(d).

"Final Purchase Price" has the meaning set forth in Section 2.3.

"Final Unpaid Transaction Expenses" has the meaning set forth in Section 2.4(d).

"Financial Statements" has the meaning set forth in Section 3.4.

"Fundamental Reps Survival Period" has the meaning set forth in Section 9.1.

"Fundamental Representations" means the representations and warranties contained in Sections 3.1, 3.2 and 3.20 of this Agreement.

"GAAP" means generally accepted accounting principles in the United States, as consistently applied by the Target Companies.

"Governmental Authority" means any national, state or local government, any political subdivision thereof or any other governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body, agency, department, bureau, commission or entity, or any arbitrator with authority to bind a party at law.

"Government Programs" has the meaning set forth in Section 3.11(a).

"Ground Lease" means that certain Ground Lease Agreement (300 N. Highland Dr., Sherman, TX), effective as of August 21, 2012, by and between Sherman/Grayson Hospital, LLC and Altera Highland LLC.

"Guarantee" means that certain Guarantee, dated as of the date hereof, by and between Guarantor, the Seller and LHP.

"Guarantor" means Alecto Healthcare Services LLC.

"Hazardous Substances" means any toxic, radioactive, infectious or hazardous waste, pollutants or substances, including, without limitations, friable asbestos, polychlorinated biphenyls, petroleum products, byproducts, or other hydrocarbon substances, substances defined or listed as a "hazardous substance," "extremely hazardous substance," "toxic substance," "toxic pollutant," "medical waste," "special waste," "hazardous waste," "contaminant," or similarly identified substance or mixture, in or pursuant to any Environmental Law.

"Hired Employees" has the meaning set forth in Section 6.5(a)(ii).

"Hospital Interests" has the meaning set forth in Recital A.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indebtedness" shall mean, with respect to the Target Companies, the aggregate amount (including the current portions thereof) of (i) indebtedness for borrowed money or indebtedness issued in substitution or exchange for borrowed money or for the deferred purchase price of property or services (other than trade payables and accrued expenses arising in the ordinary course of business); (ii) indebtedness of the type described in clause (i) above guaranteed in any manner or in effect guaranteed, directly or indirectly, through an agreement, contingent or otherwise, to supply funds to, or in any other manner invest in, the debtor, or to purchase indebtedness, or to purchase and pay for property if not delivered or pay for services if not performed, primarily or exclusively, for the purpose of enabling the debtor to make payment of the indebtedness or to insure the owners of the indebtedness against loss; (iii) all indebtedness of the type described in clauses (i) and (ii) above secured by any Encumbrances upon property and assets owned by a Target Company, even if such Target Company has not in any manner become liable for the payment of such indebtedness; and (iv) obligations of a Target Company to pay rent or other amounts under any lease of (or other arrangement covering the right to use) real or personal property, but only if such obligations are classified and accounted for as capital leases on a balance sheet as of the Balance Sheet Date of such Target Company. For the avoidance of doubt, no liability associated with the MOB, whether in respect of the Ground Lease, the Space Leases, or otherwise, shall be treated as Indebtedness.

"Indemnifying Party" has the meaning set forth in Section 9.5.

"Indemnitee" has the meaning set forth in Section 9.5.

"Intellectual Property" has the meaning set forth in Section 3.13.

"Interests" has the meaning set forth in Recital A.

"Knowledge of the Seller" (and any similar expression, including, the expression the "Seller's Knowledge") means, as to a particular matter, the actual knowledge of any Person specified with respect to the Seller on Exhibit B.

"Knowledge of the Purchaser" (and any similar expression, including the expression the "Purchaser's Knowledge") means, as to a particular matter, the actual knowledge of any Person specified with respect to the Purchaser on Exhibit B.

"Laws" means all statutes, laws, ordinances, regulations and other pronouncements of any Governmental Authority having the effect of law of the United States, any state or commonwealth of the United States, or any city, county, municipality, department, commission, board, bureau, agency or instrumentality thereof.

"Lease Indemnities" has the meaning set forth in Section 6.9.

"Leased Real Property" has the meaning set forth in Section 3.8(b).

"Leases" mean (a) all of those leases, subleases and occupancy agreements to which any of the Target Companies is a party as the lessee/tenant or sublessee/subtenant of any portion of the Real Property, and (b) all the following agreements to which any of the Target Companies is a party as the landlord/lessor or sublandlord/sublessor of any portion of the Real Property: (i) leases of land to third-party developers or owners in connection with the development, construction or ownership of health care related projects at the Facility; (ii) medical office leases, subleases and occupancy agreements; (iii) leases, subleases and occupancy agreements for other medical uses, services or facilities or other uses related to the Business; and (iv) leases, subleases and occupancy agreements for food services and other ancillary services at the Facility, including as examples and not as limitations, wireless communication services, gift shops, pharmacies or florist shops.

"LHP" has the meaning set forth in the preamble.

"LHP MD Provider" has the meaning set forth in Section 6.5(a).

"Material Adverse Effect" means any event, change, effect, development, state of facts, condition, circumstance or occurrence (collectively, a "Change") that (a) has or would be reasonably expected to have a material adverse effect upon the financial condition, business, or results of operations of the Target Companies, taken as a whole; provided, however, that any adverse Change arising from or related to the following (by itself or when aggregated or taken together with any and all other Changes) shall not be deemed to be or constitute a Material Adverse Effect and shall not be taken into account in determining whether a Material Adverse Effect has occurred (i) Changes affecting the economy generally or affecting the healthcare industry generally, (ii) any Changes to national or international political conditions, including the engagement or escalation by the United States or any other country in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or escalation of any military or terrorist attack upon the United States or any other country, or any of their respective territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States or any other country, (iii) Changes in weather, meteorological conditions or climate, pandemics, or natural disasters (including hurricanes, storms, tornados, flooding, earthquakes, volcanic eruptions or similar occurrences) affecting the Business of the Target Companies, (iv) Changes in GAAP, (v) Changes in any laws, rules, regulations, orders, or other binding directives issued by any Governmental Authority or any action required to be taken under any law, rule, regulation, order (actual or proposed) applicable to the Target Companies, (vi) the public announcement or pendency of the transactions contemplated by this Agreement (including the public announcement of the identity of Purchaser or its Affiliates), (vii) any failure, in and of itself, by the Target Companies to meet any internal

or published projections, forecasts, predictions or guidance relating to revenues, income, cash position, cash-flow or other financial measure (<u>provided</u> that the exception in this clause (vii) shall not prevent or otherwise affect a determination that any Change underlying such failure not otherwise excluded from the definition of "Material Adverse Effect" has resulted in or contributed to a Material Adverse Effect), (viii) seasonal fluctuations in the Business consistent with prior fiscal years, (ix) any Changes to requirements, reimbursement rates, policies or procedures of third party payors (including Government Programs) or accreditation commissions or organizations that are generally applicable to hospitals or health care facilities, or (x) the taking of any action or omission required by this Agreement and/or the other agreements contemplated hereby or requested or authorized by Purchaser, including the completion of the transactions contemplated hereby and thereby (including the impact thereof on relations (contractual or otherwise) with, or actual, potential or threatened loss or impairment of, physicians, employees, patients, customers, suppliers, distributors or others having relationships with the Target Companies), except to the extent such Change arising from or related to the matters described in clauses (i), (ii) or (iv) disproportionately affects the Target Companies, taken as a whole, as compared to other companies operating in the healthcare industry (but only to the extent of the incremental disproportionate effect on the Target Companies compared to other companies operating in the healthcare industry), or (b) would prevent or materially impede, interfere with, hinder or delay the consummation by the Seller of this Agreement and the other transactions contemplated hereby.

"<u>Material Contracts</u>" has the meaning set forth in <u>Section 3.7(a)</u>.

"<u>Meaningful Use Payments</u>" has the meaning set forth in <u>Section 6.10.</u>

"<u>Medicaid</u>" has the meaning set forth in <u>Section 3.11(a)</u>.

"<u>Medical Personnel</u>" has the meaning set forth in <u>Section 6.5(a)</u>.

"<u>Medicare</u>" has the meaning set forth in <u>Section 3.11(a)</u>.

"<u>MOB</u>" means that certain medical office building located at 300 N. Highland Drive, Sherman, Texas.

"<u>Multi-Site Services Contract</u>" has the meaning set forth in <u>Section 5.8(c)</u>.

"<u>Net Working Capital</u>" means the excess of the Target Companies' current assets (excluding (x) Cash and Cash Equivalents, (y) Tax assets and (z) Meaningful Use Payments) over the Target Companies' current liabilities (excluding (v) Indebtedness, (x) Tax liabilities, (y) any Unpaid Transaction Expenses and (z) any Excluded Obligations), each as determined in accordance with the methodology set forth on <u>Exhibit C</u> as of 11:59 pm CT on the date prior to Closing.

"<u>Net Working Capital Adjustment Amount</u>" shall mean Estimated Net Working Capital <u>minus</u> the Target Net Working Capital. For the avoidance of doubt, the resultant amount may be a positive or negative number.

"<u>Objection Notice</u>" has the meaning set forth in <u>Section 2.4(c)</u>.

"Optional Termination Date" means November 30, 2014.

"Owned Real Property" has the meaning set forth in Section 3.8(a).

"Party" and "Parties" have the meaning set forth in the preamble.

"Percentage Obligations" means, with respect to LHP, 68%, and with respect to THR, 32%.

"Permits" means all licenses, permits, franchises, rights, registrations, approvals, authorizations, consents, waivers, exemptions, releases, variances or orders of, or filings with, or otherwise issued by, any Governmental Authority.

"Permitted Encumbrance" means any of the following: (i) statutory Encumbrances for Taxes, assessments and governmental charges or levies either not yet due and delinquent or which are being contested in good faith; (ii) statutory mechanics, carriers', workmen's, warehouseman's, repairmen's, materialmen's or other similar Encumbrances or security interests for obligations not yet past due and that do not materially detract from the value or materially interfere with the present use of the property or assets subject thereto or affected thereby; (iii) Encumbrances to secure obligations to landlords, lessors or renters under leases or rental agreements or underlying leased property; (iv) easements and rights of way; (v) any conditions that would be disclosed by a survey or physical inspection of the Real Property; (vi) Encumbrances imposed by Law; (vii) Encumbrances that, individually or in the aggregate, do not, and would not reasonably be expected to materially detract from the value or materially interfere with the present use of the property or asset subject thereto or affected thereby; (viii); and (ix) Encumbrances set forth on Schedule 1.1 of the Schedule of Exceptions.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability company, union, association, court, agency, government, tribunal, instrumentality, commission, arbitrator, board, bureau or other entity or authority.

"Personnel" has the meaning set forth in Section 6.5(a).

"Personnel Providers" has the meaning set forth in Section 6.5(a).

"Post-Closing Covenants Survival Period" has the meaning set forth in Section 9.1.

"Pre-Closing Period" has the meaning set forth in Section 6.6(a)(i).

"Pre-Closing Statement" has the meaning set forth in Section 2.2.

"Proceeding" has the meaning set forth in Section 6.6(d).

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Indemnitee" has the meaning set forth in Section 9.2.

"Real Property" means all real property held by any of the Target Companies that is used in the operation of the Business.

"Returns" means all reports, estimates, declarations, schedules, disclosures, information statements, claims for refunds and returns relating to, or required to be filed in connection with, any Taxes, including any amendments thereto.

"Revised Statements" has the meaning set forth in Section 2.7(b).

"Schedule of Exceptions" means the Schedule of Exceptions accompanying this Agreement.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller Indemnitee" has the meaning set forth in Section 9.3.

"Seller" has the meaning set forth in the preamble.

"Seller Guarantors" has the meaning set forth in the preamble.

"Service Providers" has the meaning set forth in Section 5.8(b).

"Services" has the meaning set forth in Section 5.8(b).

"Services Assignor" has the meaning set forth in Section 5.8(c).

"Services Contracts" has the meaning set forth in Section 5.8(c).

"Services Date" has the meaning set forth in Section 6.7.

"Sherman Hospital" has the meaning set forth in Recital A.

"Sherman MD Provider" means Sherman MD Provider, Inc., a Texas corporation.

"Sherman Services" has the meaning set forth in Recital A.

"Sherman Sponsor" has the meaning set forth in Recital A.

"Space Leases" means those certain leases set forth on Schedule 1.2 by and between Sherman/Grayson Health System, LLC and Altera Highland LLC.

"Sponsor Interests" has the meaning set forth in Recital A.

"Staff Providers" has the meaning set forth in Section 3.10(a).

"Straddle Period" means any taxable period that includes but does not end on the Closing Date.

"Survival Period" has the meaning set forth in Section 9.1.

"Target Companies" has the meaning set forth in Recital A.

"Target Net Working Capital" means $5,565,000.

"Tax" or "Taxes" means any net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, franchise, capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, custom duty, transfer, documentary or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Taxing Authority.

"Tax Return" means any return, report, declaration, form, claim for refund, or information return or statement required to be filed with any Governmental Authority relating to Taxes, including estimated tax returns, income tax returns, information returns, withholding returns, employment tax returns, and any schedule or attachment thereto or any amendment thereto.

"Taxing Authority" means any applicable Governmental Authority responsible for the imposition of Taxes.

"Title Policy" has the meaning set forth in Section 7.7.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other Closing documents entered into or delivered by any Party on or after the date hereof pursuant to the terms of this Agreement.

"Unpaid Transaction Expenses" means, to the extent not paid prior to the Closing, any unpaid costs and expenses (including legal, accounting and investment banking fees and expenses) incurred by or on behalf of the Target Companies in connection with the negotiation, execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.  For the avoidance of doubt, amounts payable by the Seller for which the Target Companies are not liable shall not constitute Unpaid Transaction Expenses.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101 et. seq.

"Willful Breach" means an action or failure to act by one of the parties hereto that constitutes a breach of this Agreement, and such action was taken or such failure occurred with such party's knowledge or intention that such action or failure to act would reasonably be expected to constitute a breach of this Agreement.

1.2     Interpretation.  The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this

Agreement unless otherwise specified. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." All terms defined in this Agreement shall have the defined meanings contained herein when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms. Any reference to this Agreement includes the Agreement, as well as any exhibits or schedules hereto. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, qualified or supplemented, including (in the case of agreements and instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors and assigns.

<div align="center">

**ARTICLE II**
**PURCHASE AND SALE; CLOSING**

</div>

2.1    <u>Sale of the Interests</u>.

(a)    On and subject to the terms and conditions set forth in this Agreement, at the Closing, the Seller shall sell, assign, transfer and deliver to the Purchaser, free and clear of any Encumbrances  (other than applicable securities Laws), and the Purchaser shall purchase from the Seller, the Hospital Interests.  At the Closing, title to the Hospital Interests shall pass free and clear of any Encumbrances (other than applicable securities Laws) to the Purchaser. The Purchaser shall then be entitled to all rights, including, without limitation, voting rights, as the sole owner of the Hospital Interests.

(b)    On and subject to the terms and conditions set forth in this Agreement, on the 501(a) Certification Date, the Seller shall sell, assign, transfer and deliver to the Purchaser, free and clear of any Encumbrances  (other than applicable securities Laws), and the Purchaser shall purchase from the Seller, the Sponsor Interests.  On the 501(a) Certification Date, title to the Sponsor Interests shall pass free and clear of any Encumbrances (other than applicable securities Laws) to the Purchaser.  The Purchaser shall then be entitled to all rights, including, without limitation, voting rights, as the sole owner of the Sponsor Interests.

2.2    <u>Pre-Closing Statement</u>.  Not more than five (5) Business Days but in no event less than two (2) Business Days prior to the Closing, the Seller shall deliver to the Purchaser a written statement (the "<u>Pre-Closing Statement</u>"), based upon the books and records of the Target Companies, which shall set forth the Seller's good faith estimate of (i) Net Working Capital (as may be further adjusted pursuant to <u>Section 2.4(a)</u>, "<u>Estimated Net Working Capital</u>"), (ii) the Closing Date Net Indebtedness ("<u>Estimated Closing Date Net Indebtedness</u>"), together with pay-off letters for any Indebtedness to be repaid at Closing ("<u>Pay-Off Letters</u>"), (iii) the Unpaid Transaction Expenses ("<u>Estimated Unpaid Transaction Expenses</u>") (and wire instructions for the payment thereof) and (iv) the Closing Date Consideration, in each case in accordance with the definition thereof.

<div align="center">

- 12 -
**A0310**

</div>

2.3    <u>Purchase Price</u>.  The consideration to be paid by the Purchaser to Seller at Closing shall be an amount equal to (i) the Base Purchase Price, <u>plus</u> (ii) the Estimated Closing Date Net Indebtedness, <u>plus</u> (iii) the Net Working Capital Adjustment Amount <u>minus</u> (iii) the Unpaid Transaction Expenses (such amount, the "<u>Closing Date Consideration</u>").  The Closing Date Consideration shall be subject to adjustment after the Closing Date pursuant to <u>Section 2.4</u>, and the aggregate amount, as so adjusted (or not adjusted) after application of the provisions of <u>Section 2.4</u>, is referred to herein as the "<u>Final Purchase Price</u>".

2.4    <u>Post-Closing Purchase Price Adjustment</u>.

(a)    As promptly as practicable, but in no event later than forty-five (45) days following the Closing, Purchaser shall in good faith prepare and deliver to the Seller a written statement (the "<u>Closing Statement</u>"), based upon the books and records of the Target Companies, which shall set forth Purchaser's calculation of (i) Net Working Capital (it being understood and agreed that Net Working Capital shall be used to measure changes in Net Working Capital and not as a form of indemnification and in furtherance of the foregoing, to the extent Purchaser asserts there is a current liability under this <u>Section 2.4</u> that was not reflected in the calculation of the Target Net Working Capital, the Target Net Working Capital shall be recalculated in accordance with the definitions of Net Working Capital and Target Net Working Capital and the methodology set forth on <u>Exhibit C</u> to reflect such current liability to the extent such current liability is included in the calculation of Final Net Working Capital), (ii) the adjustments to the Target Net Working Capital pursuant to clause (i) above and the resultant adjustments to Estimated Net Working Capital (which shall be recalculated to reflect such adjustments), (iii) Closing Date Net Indebtedness, (iv) Unpaid Transaction Expenses, and (v) the Final Purchase Price based upon such items.  No actions taken by Purchaser on its own behalf or on behalf of the Target Companies, at or following the Closing, shall be given effect for purposes of determining the Final Net Working Capital.  Purchaser shall not add items or increase any amounts on the Closing Statement after it is delivered to Seller.

(b)    If Purchaser's calculation of the Adjustment Amount is positive, Purchaser shall immediately pay to the Seller such positive Adjustment Amount.

(c)    After receipt of the Closing Statement, the Seller and its representatives shall have reasonable access to all relevant books and records (including accountant work papers), accountants and employees of the Target Companies solely for the purpose of reviewing the Closing Statement in accordance with this Agreement and to the extent reasonably necessary to complete its review of the Closing Statement in a manner not to interfere unreasonably with the conduct of Purchaser's or the Target Companies' business.  If, within forty-five (45) days following the delivery of the Closing Statement, the Seller has not given Purchaser notice of its objection to any item in the Closing Statement reasonably detailing the basis of such objection (an "<u>Objection Notice</u>"), then the Closing Statement shall be deemed final and binding on Purchaser and Seller.  If the Seller delivers an Objection Notice, then Purchaser and Seller shall consult in good faith to resolve the disputed items set forth in the Objection Notice and, if any disputed items have not been resolved within thirty (30) days following delivery of such notice, from and after such time either the Seller or Purchaser may submit the remaining disputed items to the Dallas, Texas office of Grant Thornton LLP or, if such firm is unable to serve in such capacity, to such other nationally recognized independent accounting firm that is mutually

agreeable to the Seller and Purchaser (the "Accountant") or, if no such agreement can be reached, the Seller and Purchaser each shall, within ten (10) days thereof, select a candidate for the Accountant and the two candidates so selected shall promptly select a third nationally recognized independent accounting firm which shall be appointed as the Accountant. The scope of the disputes to be resolved by the Accountant shall be limited to fixing mathematical errors and determining whether the items in dispute were determined in accordance with the definitions of Cash and Cash Equivalents, Indebtedness, Net Working Capital and Target Net Working Capital and the methodology set forth on Exhibit C without regard to materiality, and the Accountant is not to make any other determination and shall act as an arbitrator and not as an expert. If any items in dispute are submitted to the Accountant for resolution: (x) Seller and Purchaser shall use their respective reasonable efforts to cause the Accountant to resolve all remaining disagreements with respect to the Closing Statement as soon as practicable but in any event shall direct the Accountant to render a determination within ninety (90) days after its retention; (y) Seller and Purchaser shall furnish to the Accountant and each other such work papers and other documents and information relating solely to the disputed issues as the Accountant may request and are available to that party (including, in the case of Purchaser, the Target Companies or their accountants), and shall be afforded the opportunity to present to the Accountant any materials relating to the determination and to discuss the determination with the Accountant, provided that copies of all such materials are concurrently provided to the other party and that such discussions may only occur in the presence (including by telephone) of the other party, provided further that the Accountant shall consider only those items and amounts which are identified as being in dispute; and (z) the determination by the Accountant of the disputed items in the Closing Statement, as shall be set forth in a notice delivered to both parties by the Accountant, shall be binding and conclusive on the parties. In resolving any disputed item, the Accountant may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party. The fees of the Accountant for such determination shall be borne by Purchaser, on the one hand, and the Seller, on the other hand, in proportion to the portion of the aggregate amount in dispute that is finally resolved by the Accountant in a manner adverse to such party. For example, if Purchaser claims the appropriate adjustments are $1,000, and the Seller contests $500 of the amount claimed by Purchaser, and if the Accountant ultimately resolves the dispute by awarding Purchaser $300 of the $500 contested, then the costs and expenses of the Accountant will be allocated 60% (i.e., 300/500) to the Seller and 40% (i.e., 200/500) to Purchaser.

(d) The Closing Date Consideration shall be adjusted as follows (without duplication): (i)(A) increased by the amount, if any, by which the Net Working Capital, as finally determined ("Final Net Working Capital"), is greater than 110% of the Estimated Working Capital or (B) reduced by the amount, if any, by which the Final Net Working Capital is less than 90% of the Estimated Working Capital; (ii)(A) reduced by the amount, if any, by which the Closing Date Net Indebtedness, as finally determined ("Final Net Indebtedness") is less than the Estimated Closing Date Net Indebtedness or (B) increased by the amount, if any, by which the Final Net Indebtedness is greater than the Estimated Closing Date Net Indebtedness (for purposes of clarity and the avoidance of doubt, if Final Net Indebtedness is equal to -$500 and Estimated Closing Date Net Indebtedness is -$400, then Closing Date Consideration shall be decreased by $100, and if the Final Net Indebtedness is -$400 and Estimated Close Date Net Indebtedness is -$500, then Closing Date Consideration shall be increased by $100); and/or (iii)(A) reduced by the amount, if any, by which the Unpaid Transaction Expenses, as finally

determined ("Final Unpaid Transaction Expenses") are greater than the Estimated Unpaid Transaction Expenses or (B) increased by the amount, if any, by which the Final Unpaid Transaction Expenses are less than the Estimated Unpaid Transaction Expenses.

(e) No later than the second Business Day following the final determination of the Adjustment Amount:

(i) if the Adjustment Amount is greater than the amount (if any) actually paid by the Purchaser pursuant to Section 2.4(b), Purchaser shall pay such difference to Seller; or

(ii) if the Adjustment Amount is negative, Seller shall pay such negative amount to Purchaser.

For the avoidance of doubt, if the Adjustment Amount is zero then no payment shall be made by either Party pursuant to this Section 2.4 (except as may be required by the penultimate sentence of Section 2.4(c)).

(f) The Adjustment Amount shall be treated as an adjustment to the Closing Date Consideration for income tax purposes.

2.5 Closing. The closing of the sale of the Hospital Interests (the "Closing") will take place at the offices of Weil, Gotshal & Manges LLP in Dallas, Texas, or such other place as shall be mutually agreed upon by the parties hereto, at 10:00 a.m., Central Time, on the later of (i) the earliest practicable Business Day following the satisfaction (or due waiver) of the conditions set forth in Articles VII and VIII and (ii) October 31, 2014, or such other date as may be mutually agreed upon by the parties hereto. The date on which the Closing takes place is referred to herein as the "Closing Date." The Closing shall be deemed to occur at 11:59 p.m., Central Time, on the Closing Date or at such other time as shall be mutually agreed upon in writing by the parties hereto. The time at which the transactions contemplated hereby are deemed to become effective is referred to herein as the "Effective Time".

2.6 Closing Deliveries. At the Closing, the following events will occur:

(a) The Purchaser shall pay, or cause to be paid, the following amounts:

(i) The Indebtedness evidenced by Pay-Off Letters to the applicable recipients thereof as set forth on the Pre-Closing Statement;

(ii) the Estimated Unpaid Transaction Expenses to the applicable recipients thereof as set forth on the Pre-Closing Statement; and

(iii) the Closing Date Consideration shall be delivered in immediately available funds by wire transfer to the Seller, in accordance with written instructions provided by the Seller to the Purchaser at least two (2) Business Days prior to the Closing Date.

(b) Closing Certificates and Documents.

- 15 -

**A0313**

(i)     The Seller shall deliver the other certificates and documents required to be delivered by the Seller pursuant to <u>Article VII</u>;

(ii)    The Seller shall deliver an affidavit, in customary form, confirming that the Seller is not a "foreign person" under Section 1445 of the Code; and

(iii)   The Purchaser shall deliver the other certificates and documents required to be delivered by the Purchaser pursuant to <u>Article VIII</u>.

2.7     <u>Allocation of Purchase Price.</u>

(a)     Purchaser and the Seller agree that, for federal income tax purposes, the transactions contemplated by this Agreement shall be treated as a sale by Seller to Purchaser of the assets owned by the Target Companies, and shall report the purchase and sale on all federal income Tax Returns consistent with such treatment.

(b)     Not later than ninety (90) days after the Closing Date, the Seller shall prepare or cause to be prepared and delivered to Purchaser for its review a schedule allocating the Closing Date Consideration, and any liabilities of the Target Companies to the extent such liabilities are required to be treated as part of the purchase price for federal income tax purposes, among the assets of the Target Companies, prepared in accordance with the provisions of Section 1060 of the Code (the "<u>Allocation Statement</u>"). The Allocation Statement shall be modified to reflect any adjustment to the Closing Date Consideration, as reasonably determined by the Seller and Purchaser. If, within thirty (30) days following the delivery of the Allocation Statement, Purchaser has not given Seller notice of its objection to any item in the Allocation Statement reasonably detailing the basis of such objection (an "<u>Allocation Dispute Notice</u>"), then the Allocation Statement shall be deemed final and binding on Purchaser and the Seller. If Purchaser delivers an Allocation Dispute Notice, then Purchaser and Seller shall consult in good faith to resolve the disputed items set forth in the Allocation Dispute Notice, and if any disputed items have not been resolved within thirty (30) days following delivery of such notice, then the parties shall resolve their dispute in accordance with the procedures set forth in <u>Section 2.4(c)</u>. Seller shall provide to Purchaser, from time to time, revised copies of the Allocation Statement (the "<u>Revised Statements</u>") so as to report any matters on the Allocation Statement that need updating (including purchase price adjustments pursuant to <u>Section 2.4</u>, if any). Notwithstanding anything to the contrary in this Section 2.7, the parties agree that $32,500,000 of the Closing Date Consideration, and any liabilities of the Target Companies to the extent such liabilities are required to be treated as part of the purchase price for federal income tax purposes shall be allocated to real property and improvements, subject to any adjustments which may be required by applicable tax regulations. The parties agree that they will report the transactions contemplated by this Agreement for federal (and applicable state and local) income tax purposes (including, without limitation, the filing of Internal Revenue Service Form 8594) in accordance with the Allocation Statement (or, if applicable, the last Revised Statement), and that no party will take a position inconsistent with the Allocation Statement (or such Revised Statement) on any Tax Return unless otherwise required by applicable law or a good faith settlement of a Tax audit.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser that except as set forth in the Schedule of Exceptions the following statements are true and correct as of the date hereof. The section numbers of the Schedule of Exceptions correspond to the section numbers in this Article III; provided, however, that any information disclosed in the Schedule of Exceptions under any such section shall be deemed to be disclosed with respect to and incorporated in any other section of this Agreement to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other section. The Schedule of Exceptions and the information and disclosures contained therein are intended only to qualify and limit the representations, warranties or covenants contained in this Agreement, and do not, except as expressly set forth in the representations and warranties which they qualify, constitute representations and warranties as to the matters described therein. The listing of any matter in the Schedule of Exceptions shall not constitute an acknowledgement regarding the materiality of such disclosure or undisclosed matters of similar scope or materiality or whether the subject matter of such disclosure or undisclosed matter of similar scope or materiality may have a Material Adverse Effect or whether the subject matter is in the ordinary course of the Business. The Seller shall not be prejudiced in any manner whatsoever, and no presumptions shall be created, by virtue of the disclosure of any matter in the Schedule of Exceptions which otherwise is not required to be disclosed by this Agreement. The inclusion of any item in the Schedule of Exceptions shall not be deemed to be an admission to any third party against the interests of any party to this Agreement.

3.1     Organization and Capitalization of the Target Companies and Sherman MD Provider.

(a)     Each Target Company (i) is a limited liability company duly organized, validly existing and in good standing under the Laws of the state indicated as the state of its organization, as identified on Exhibit D, (ii) has limited liability company power and authority to own or lease and to operate its assets and to conduct business as currently conducted, and (iii) is qualified to transact business as a limited liability company in the jurisdictions specified in Exhibit D and is not required to be so qualified by any Laws in any other jurisdiction in which it has material operations or assets.

(b)     Seller is the sole legal and beneficial owner of the Interests. As of the Effective Time, (i) the Purchaser will have good and marketable title to, and will own, the Hospital Interests, beneficially and of record, (ii) the Hospital Interests will be free and clear of all Encumbrances (other than those arising under applicable securities Laws), and (iii) the Purchaser will have full voting power over the Hospital Interests, subject to no proxy, voting trust or other agreement relating to the voting of any of the Hospital Interests. As of the 501(a) Certification Time, (i) the Purchaser will have good and marketable title to, and will own, the Sponsor Interests, beneficially and of record, (ii) the Sponsor Interests will be free and clear of all Encumbrances (other than those arising under applicable securities Laws), and (iii) the Purchaser will have full voting power over the Sponsor Interests, subject to no proxy, voting trust or other agreement relating to the voting of any of the Sponsor Interests. The Interests have been duly authorized for issuance and validly issued in compliance with all Laws.

(c)     Except for the Interests, there are no outstanding equity securities of the Target Companies, including (i) securities which are convertible into or exchangeable for any membership interest in the Target Companies, (ii) contracts, arrangements, commitments or restrictions relating to the issuance, sale, transfer, purchase or obtaining of equity securities of the Target Companies, or (iii) options, warrants, rights, calls or commitments of any character granted or issued by the Target Companies governing the issuance of units of their membership interests.

(d)     Sherman Sponsor is the sole legal and beneficial owner of all of the outstanding membership interests in Sherman MD Provider.  The membership interests of Sherman MD Provider have been duly authorized for issuance and validly issued in compliance with all Laws.

(e)     Sherman MD Provider (i) is a corporation duly organized, validly existing and in good standing under the Laws of the State of Texas, (ii) has corporate power and authority to own or lease and to operate its assets and to conduct business as currently conducted, and (iii) is qualified to transact business as a corporation in the State of Texas and is not required to be so qualified by any Laws in any other jurisdiction in which it has material operations or assets.

(f)     Except for the membership interests owned by Sherman Sponsor, there are no outstanding membership interests of Sherman MD Provider, including (i) interests which are convertible into or exchangeable for any shares in Sherman MD Provider, (ii) contracts, arrangements, commitments or restrictions relating to the issuance, sale, transfer, purchase or obtaining of membership interests of Sherman MD Provider, or (iii) options, warrants, rights, calls or commitments of any character granted or issued by Sherman MD Provider governing the issuance of membership interests.

3.2     <u>Authorization</u>.

(a)     The consummation by the Seller of the transactions contemplated hereby and by the Transaction Documents is within the powers of the Seller and has been duly authorized and approved by all necessary organizational action of the Seller.  No other organizational proceedings on the part of the Seller are necessary to authorize the performance of this Agreement or the other Transaction Documents.

(b)     This Agreement has been (and upon their execution and delivery, the other Transaction Documents by which the Seller is bound, will be) duly and validly executed and delivered by the Seller.  This Agreement constitutes (and upon their execution and delivery, the other Transaction Documents by which the Seller is bound, will constitute) the legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with its terms (assuming the valid authorization, execution and delivery hereof and thereof by the other parties thereto), subject to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general application relating to or affecting creditors' rights and to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

3.3    <u>No Conflicting Agreements; Consents</u>.  Neither the execution and delivery of this Agreement nor any of the other Transaction Documents nor the consummation of any of the transactions contemplated hereby or thereby will:

(a)    violate, conflict with, result in a breach or termination of the terms, conditions or provisions of, constitute a default under, or entitle any party to terminate or accelerate (i) the respective Constituent Documents of the Target Companies, (ii) any Material Contract, (iii) any Court Order to which the Target Companies or the Seller is a party or by which the Target Companies or the Seller is bound, or (iv) any material requirements of Law affecting the Target Companies or the Seller;

(b)    result in the creation or imposition of any Encumbrance upon any of the assets of any of the Target Companies (except for Permitted Encumbrances); or

(c)    require a permit, approval, consent or authorization from, or the making by the Target Companies or the Seller of any material declaration, filing or registration with, any Governmental Authority, except as provided in <u>Section 5.1</u> or <u>Section 6.2</u> and except for such approvals, consents, authorizations, declarations, filings or registrations, the failure of which to be obtained or made would not materially impair the ability of the Seller to perform its obligations hereunder or under the other agreements contemplated hereby to be entered into by Seller or prevent the consummation of the transactions contemplated hereby or thereby.

3.4    <u>Financial Statements</u>.

(a)    <u>Schedule 3.4(a)</u> contains copies of the following financial statements (collectively, the "<u>Financial Statements</u>"):  (a) audited balance sheets and statements of income and cash flows as of and for the year ended December 31 of 2012 and 2013 of the Seller, (b) unaudited balance sheet and statements of income as of and for the 6-month period ended June 30, 2014 (the "<u>Balance Sheet Date</u>") of the Seller, (c) unaudited, pro forma combined balance sheet and statement of income as of and for the year ended December 31 of 2013 of Sherman Hospital and Sherman Services and (d) unaudited, pro forma combined balance sheet and statement of income as of and for the 6-month period ended June 30, 2014 of Sherman Hospital and Sherman Services.

(b)    The Financial Statements:  (i) were prepared in all material respects in accordance with GAAP, except, in the case of unaudited Financial Statements, for the absence of notes thereto, in the case of interim Financial Statements, normal year-end adjustments, or as described on <u>Schedule 3.4(b)</u>; and (ii) present fairly, in all material respects, the financial position and results of operations and cash flows (when presented) of the applicable companies at the dates and for the periods indicated therein.

3.5    <u>Absence of Undisclosed Liabilities</u>.

(a)    The Business does not have any liabilities of any nature (whether accrued, absolute, contingent or otherwise) that are of a nature or type required to be disclosed or reflected in financial statements in accordance with GAAP, except for (i) liabilities reflected or reserved against in the Financial Statements (including the notes thereto), (ii) liabilities incurred

- 19 -
**A0317**

in the ordinary course of the Target Companies since the Balance Sheet Date and (iii) liabilities set forth in the Schedule of Exceptions.

(b)     Except for liabilities set forth in the Schedule of Exceptions, no Target Company is a party to, or has any commitment to become a party to, any joint venture, off-balance sheet partnership or any similar Contract (including any Contract relating to any transaction or relationship between or among the Target Companies, on the one hand, and any unconsolidated Affiliate, including any structured finance, special purpose or limited purpose entity or person, on the other hand), where the intended effect of such Contract is to avoid disclosure of any material transaction involving, or material liabilities of, the Target Companies in the Financial Statements.

3.6     <u>Absence of Changes</u>.  Between the Balance Sheet Date and the date hereof, there has not been any transaction or occurrence in which any of the Target Companies, has:

(a)     suffered any material damage, destruction or loss with respect to or affecting the Facility;

(b)     made any capital expenditure or commitment outside of the ordinary course for additions to property, plant, equipment, intangible or capital assets for any purpose, other than as required by Law or for urgent repairs;

(c)     sold, transferred or otherwise disposed of any assets of the Business except in the ordinary course of business;

(d)     granted or incurred any obligation for any increase in the compensation of any employee who is employed at the Facility (including any increase pursuant to any bonus, pension, profit-sharing, retirement, or other plan or commitment) except increases in compensation granted generally to all employees in a designed pay grade that are in the ordinary course of business in accordance with Seller's customary personnel practices;

(e)     except as required by GAAP, made any change in any method of accounting or accounting principle, practice, or policy;

(f)     agreed, so as to legally bind the Purchaser or the Target Companies, whether in writing or otherwise, to take any of the actions set forth in this <u>Section 3.6</u> and not otherwise permitted by this Agreement;

(g)     taken any action or omission that would be prohibited by <u>Section 5.2</u> if such action or omission occurred on or after the date hereof and prior to Closing; or

(h)     experienced any event, occurrence, or circumstance having a Material Adverse Effect on the condition, financial or otherwise, of the assets of the Target Companies or in the business or the results of operations of the Facility.

3.7     <u>Contracts</u>.

      (a)     Except as set forth in Schedule <u>3.7(a)</u>, none of the Target Companies is a party to or bound by the following (collectively, "<u>Material Contracts</u>"):

        (i)     any agreement for the lease of personal property to or from any third party providing for lease payments in excess of $100,000 per annum;

        (ii)     any agreement concerning a partnership or joint venture;

        (iii)     any agreement under which it has created, incurred, assumed or guaranteed any Indebtedness;

        (iv)     any agreement restricting the Target Companies concerning non-competition or non-solicitation (other than agreements with placement or staffing firms for the placement of Personnel);

        (v)     any profit sharing, stock option, stock purchase, deferred compensation, severance or other material plan or arrangement for the benefit of its current or former directors, officers and employees;

        (vi)     any local collective bargaining agreement;

        (vii)     any agreement for the employment of any individual on a full-time or part-time basis providing annual compensation in excess of $100,000;

        (viii)     any Contract relating to cleanup, abatement or other actions in connection with environmental liabilities;

        (ix)     any other Contract involving or reasonably likely to involve payment or receipt after the date hereof of more than $100,000 in the aggregate in the current or next succeeding fiscal year of any of the Target Companies that is a party to such Contract and not terminable without penalty by any such Target Company on thirty (30) days' or less notice; and

        (x)     all contracts with physicians who are actual or potential referral sources or other health care providers or with any immediate family members of any such physician or any entity in which any of the foregoing are equity owners regardless of dollar value and term.

      (b)     Each Material Contract is valid and existing, and the applicable Target Company has duly performed in all material respects its obligations under each Material Contract to which it is a party (to the extent that such obligations to perform have accrued).

      (c)     None of the Target Companies is in default (nor would they be in default with notice or lapse of time or both as a result of events that have occurred) under any Material Contract.

3.8    Real Property.

(a)    Schedule 3.8(a) sets forth a complete and correct list of all of the Real Property owned by any Target Company and used in the operation of the Business (the "Owned Real Property").  With respect to their physical condition, to the Knowledge of the Seller the Owned Real Property and structures located thereon owned by any Target Company are in all material respects in functional operating condition and repair, suitable for the purpose for which they are intended and there are no material defects, structural or otherwise, in any of the Owned Real Property and structures located thereon owned by any Target Company.

(b)    Schedule 3.8(b) sets forth a complete and correct list of all of the Real Property leased by any Target Company (the "Leased Real Property").

(c)    Schedule 3.8(c) sets forth a complete and correct list of real property used in the operation of the Business that is owned or leased by Seller, the Seller Guarantors or their Affiliates (other than the Target Companies).

(d)    Schedule 3.8(d) sets forth a complete and correct list of real property that is owned by Seller or the Seller Guarantors that is located within a 15 mile radius of the Facility.

(e)    The Owned Real Property, the Leased Real Property, the Space Leases and the lease agreements identified on Schedule 3.8(c) constitute all of the real property used by the Target Companies, Seller, the Seller Guarantor and their Affiliates in the operation of the Business.

(f)    The Target Companies own good and marketable fee simple title to all Owned Real Property, together with all buildings, improvements, and component parts thereon and all appurtenances and rights thereto, free and clear of all Encumbrances (other than Permitted Encumbrances).

(g)    To the Knowledge of the Seller, the plants, structures and equipment owned by the Target Companies are in conformity with prevailing industry standards in the region where located, are in functional operating condition and repair (ordinary wear and tear excepted), are adequate for the uses to which they are being put and are in compliance in all material respects with all building, life safety, zoning and land use regulations, and have complied in all material respects with all requirements and obligations imposed by Governmental Authority with regard to zoning variances, conditional uses, and non-conforming use requirements.  To the extent applicable and to the Knowledge of the Seller, the improvements on the Real Property are in compliance in all material respects with all federal, state, and local legal requirements, including, without limitation, the Americans with Disabilities Act, relative to architectural barriers or accommodations of disabled persons.

3.9    Personal Property.

(a)    The Target Companies have good and valid title to, free and clear of any Encumbrances (other than Permitted Encumbrances), or have valid leasehold interests in or valid rights under contract to use, all of the personal property used by Target Companies in the conduct of the Business, including all personal property reflected on the Financial Statements

and all of the personal property purchased or otherwise acquired for use at or by the Facility since the Balance Sheet Date, other than personal property disposed of since the Balance Sheet Date in the ordinary course of business consistent with past practice. Such personal property in the possession of the Target Companies as of the Effective Time constitutes all necessary personal property for the operation of the Facility as presently conducted.

(b)     There are no outstanding rights (including purchase options, rights of first refusal, rights of first offers, agreements or other commitments made by the Seller or any of its Affiliates) that give any Person a current or future right to require the Target Companies to sell or transfer to a third party any material interests in the personal property owned by them.

(c)     To the Knowledge of the Seller, all of the material personal property is in functional operating condition and repair, suitable, in all material respects, for the purposes for which it is intended, subject to ordinary wear and tear.

3.10    <u>Employees; Labor Matters; Employee Benefit Plans; ERISA.</u>

(a)     Except as provided by <u>Section 3.19</u> or as described or contemplated by <u>Section 6.5(a)</u>, the employees who work at the Facility are leased or provided to the Target Companies by LHP Sherman/Grayson, LLC, LHP IT Services, LLC and LHP Management Services, LLC (the "<u>Staff Providers</u>"), which are Affiliates of LHP. No changes in the basis for remuneration of such employees have been made, promised or authorized since the Balance Sheet Date, except in the ordinary course of business. No Target Company has written employment contracts (other than offer letters creating an at-will employment relationship) nor does any agreement of any nature exist that provides for employment for any particular period of time or that provides any restrictions upon the right to terminate employment without any post-termination payment obligation with any Person whomsoever. No binding agreements have been made or entered into with any employees regarding changes in compensation, promotion or any other change in status.

(b)     There is no pending or, to the Seller's Knowledge, threatened employee strike, work stoppage or labor dispute. To the Seller's Knowledge, no union representation question exists respecting any employees who work at any Target Company, no demand has been made for recognition by a labor organization by or with respect to any employees who work at the Target Companies, no union organizing activities by or with respect to any employees who work at any Target Company are taking place, and none of the employees who work at any of the Target Companies is represented by any labor union or organization. No collective bargaining agreement exists or is currently being negotiated by any Target Company. There is no unfair practice claim against any Target Company before the National Labor Relations Board, or any strike, dispute, slowdown, or stoppage pending or, to the Seller's Knowledge, threatened against or involving the Business or any of the Target Companies. To the Knowledge of the Seller, the Target Companies are in compliance in all material respects with all Laws and contracts respecting employment and employment practices, labor relations, terms and conditions of employment, and wages and hours. There are no pending or, to the Seller's Knowledge, threatened complaints or charges before any Governmental Authority regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like.

(c)     Schedule 3.10(c) contains a true and complete list of all the following agreements, plans or other arrangements, covering any employee who works at any Target Company, which are presently in effect:  (i) employee benefit plans within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and (ii) any other written employee benefit plan, program, policy, or arrangement that the Seller or the Target Companies currently sponsor, or to which they have any outstanding present obligations to contribute or other liability (collectively, the "Employee Benefit Plans").

(d)     None of the assets used or owned by the Target Companies are, and the Seller does not reasonably expect them to become, subject to a lien imposed under the Code or under Title I or Title IV of ERISA including liens arising by virtue of any Target Company being considered to be aggregated with another entity pursuant to Section 414 of the Code ("ERISA Controlled Group").

(e)     Neither the Seller nor any member of the Seller's ERISA Controlled Group has sponsored, contributed to or had an "obligation to contribute" (as defined in ERISA Section 4212) to a "multiemployer plan" (as defined in ERISA Sections 4001(a)(3) or 3(37)(A)) on or after September 26, 1980 on behalf of any employee who works at any of the Target Companies.

(f)     Neither the Seller nor any member of the Seller's ERISA Controlled Group have at any time sponsored or contributed to a "single employer plan" (as defined in ERISA Section 4001(a)(14)) to which at least two or more of the "contributing sponsors" (as defined in ERISA Section 4001(a)(13)) are not part of the same ERISA Controlled Group.

(g)     There are no actions, audits or claims pending or, to the Seller's Knowledge, threatened against any of the Target Companies with respect to maintenance of the Employee Benefit Plans, other than routine claims for benefits and other claims that are not material.

(h)     The LHP Hospital Group, Inc. Welfare Benefits Plan has complied with all of the continuation coverage requirements of Code Section 4980B, as amended, and ERISA Sections 601 through 608, as amended.

(i)     Schedule 3.10(i) contains a list, as of the date hereof, of all of the officers and employees who perform substantially all of their services at the Facility (the "Employees"), their current salary or wage rates, and the department and job title of such employees.  Schedule 3.10(i) also indicates whether such employees are part-time or full-time.

(j)     No employees who work at any of Target Companies have suffered an "employment loss" in the previous twelve (12) months (as such quoted term is defined in the WARN Act).

3.11    Government Program Participation/Accreditation.

(a)     The Facility is eligible to receive payment under Title XVIII of the Social Security Act ("Medicare") and Title XIX of the Social Security Act ("Medicaid") and is a "provider" with valid and current provider agreements and with one or more provider numbers

- 24 -

with the federal Medicare, all applicable state Medicaid and successor programs (the "Government Programs") through intermediaries. A true and correct copy of each of such agreements has been previously provided to the Purchaser by the Seller. The Facility is in compliance with the conditions of participation for the Government Programs in all material respects. There is not pending or, to the Seller's Knowledge, threatened any proceeding or investigation involving the Business or any of the Target Companies that could adversely affect the Target Companies' rights to participate in any Government Program.

(b)    To the Knowledge of the Seller, all cost reports and all other reports with respect to the Facility or any of the Target Companies that are required by Law to have been filed or made with respect to the purchase of services of the Facility by Government Programs have been timely filed and are complete and correct in all material respects. To the Knowledge of the Seller, such cost reports do not claim, and the Facility has not received, payment or reimbursement in excess of the amount permitted by applicable Law, except where excess reimbursement was noted on the cost report and except for normal course claims adjustments. True and correct copies of all such reports for the three (3) most recent fiscal years of the Facility have been provided to the Purchaser. Schedule 3.11(b) indicates which of such cost reports have been audited by the fiscal intermediary and finally settled, and contains a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes, in connection with any audit, review or inquiry with respect to such cost reports.

(c)    To the Knowledge of the Seller, all of the billing practices of each of the Target Companies with respect to the Business to the Government Programs have been and are in compliance in all material respects with all applicable Laws.

(d)    The Facility is duly accredited with no material contingencies by The Joint Commission. The Seller has provided the Purchaser copies of the most recent Joint Commission accreditation survey report and deficiency list for the Facility, if any, together with the Facility's most recent statement of deficiencies and plan of correction. To the Knowledge of the Seller, there are no pending Joint Commission investigations involving the Facility.

(e)    Neither the Facility, nor any of the Target Companies' current officers, directors, governing board members, agents or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)), has been excluded from Medicare or any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C. §1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. §1320a-7b. To the Seller's Knowledge, no other employee who currently works at any of the Target Companies is excluded from participating in any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)).

3.12    Taxes.

(a)    All Tax Returns required to be filed with any Taxing Authority by or on behalf of any of the Target Companies have been filed when due (taking into account applicable extensions). All amounts of Taxes required to be paid by or with respect to the Target Companies have been timely paid.

(b)     As of the date of this Agreement, (i) there is no audit or examination relating to Taxes by any Taxing Authority now pending or threatened in writing against or with respect to any Target Company in respect of any material amount of Tax of such Target Company, (ii) no adjustment has been made, proposed or threatened in writing by a Taxing Authority with respect to any material Tax Return of the Target Companies, which adjustment remains pending, (iii) none of the Target Companies has requested any extension of time within which to file any material Tax Returns of the Target Companies and has not yet filed such Tax Returns, and (iv) none of the Target Companies has granted any extension or waiver of the statute of limitations period applicable to any material Tax Returns of the Target Companies, which period (after giving effect to any such extension or waiver) has not yet expired.

(c)     For U.S. federal income tax purposes, the Target Companies are and always have been treated as entities that are disregarded as separate from the Seller for federal income tax purposes.

(d)     There are no liens for Taxes (other than Permitted Encumbrances) existing upon the Target Companies.

(e)     The Target Companies have complied in all material respects with all applicable Laws relating to the withholding of Taxes.

3.13    Intellectual Property.  Each Target Company owns or has the right to use (or as of the Closing will own or have the right to use) all trademarks, trade names, service marks, trade secrets, copyrights and other intellectual property rights and licenses as are necessary or otherwise are used to conduct its Business as currently conducted (the "Intellectual Property"). To the Knowledge of the Seller, (a) no infringement exists by any of the Target Companies on the intellectual property rights of any other Person, and (b) there is no infringing use of any of the Intellectual Property owned by any Target Company by any other Person.  No Court Orders or proceedings are pending, or to the Knowledge of the Seller, threatened, against any of the Target Companies that challenge the validity of, or such Target Company's ownership of or right to use, any of the Intellectual Property.  No Target Company has any patents, trademarks, service marks or copyrights related to the Business.  No Target Company has been served with process in any suit, action or proceeding which involves a claim of infringement of any patents, trademarks, service marks, copyrights or violation of any trade secret or other proprietary right of any third party related to the business and operation of the Facility.Permits.

(a)     True and complete copies of all material Permits issued or granted by a Governmental Authority and owned or held by or issued to any Target Company in connection with the current operation of the Business have been provided or made available to the Purchaser.  Such Permits constitute all material Permits necessary for the conduct of the Business and the operation of the Facility as currently conducted.  Each Target Company is the duly authorized holder of such Permits.  The Facility's pharmacies, laboratories and all other material ancillary departments located at the Facility or operated for the benefit of the Facility (and which are owned or operated by any Target Company), which are required to be specially licensed, are licensed by the appropriate Governmental Authority.

(b)     To the Knowledge of the Seller, the Facility is in compliance in all material respects with all Permits required by Law.  There are no provisions in, or agreements relating to, any such Permits which preclude or limit in any material respect any Target Company from operating the Facility as it is currently operated.  There is not now pending or, to the Knowledge of the Seller, threatened, any action by or before any Governmental Authority to revoke, cancel, rescind, modify or refuse to renew any of the Permits, and all of the material Permits are and shall be in good standing now and as of the Closing.

3.15    <u>Environmental Conditions</u>.

(a)     To the Knowledge of the Seller, each of Target Companies has materially complied and is and has been at all relevant times in material compliance with all Environmental Laws and the Real Property and all improvements on the Real Property are in material compliance with all Environmental Laws;

(b)     To the Knowledge of the Seller, no Target Company has stored any Hazardous Substances on any of the Real Property, except in material compliance with applicable Environmental Laws;

(c)     To the Knowledge of the Seller, no Target Company has disposed of or released any Hazardous Substances on any of the Real Property, except in material compliance with applicable Environmental Laws;

(d)     No Target Company has received any written communication from a Governmental Authority or any other Person that alleges that such Target Company is not in material compliance with Environmental Laws or is otherwise subject to material liability relating to Environmental Laws; and

(e)     There is no Environmental Claim which is reasonably likely to result in liability in excess of $200,000 pending or, to the Seller's Knowledge, threatened against any Target Company.

(f)     To the Knowledge of the Seller, none of the Target Companies has any liability under any Environmental Law with respect to the Facility or the Real Property, nor are any of them responsible for any liability of any other Person under any Environmental Law with respect to the Facility or the Real Property.  To the Knowledge of the Seller, there are no threatened actions, suits, orders, claims, legal proceedings or other proceedings based on, and the Target Companies have not received any formal or informal written notice of any complaint, order, directive, citation, notice of responsibility, notice of potential responsibility, or information request from any Governmental Authority or any other Person or knows or suspects any fact(s) which would reasonably be expected to form the basis for any such actions or notices arising out of or attributable to any Environmental Laws.

(g)     The Real Property contains no underground improvements, including treatment or storage tanks, or underground piping associated with such tanks, used currently or in the past for the management of Hazardous Materials, and neither the Target Companies nor any of their Affiliates has used any portion of the Real Property as a dump or landfill.

3.16    Legal Proceedings, Court Orders.

(a)    Schedule 3.16 sets forth an accurate written list and summary description of all material litigation with respect to the Facility, the Business and the Target Companies to which any of the Target Companies is a party.  Other than as set forth in Schedule 3.16, there are no material actions, suits, proceedings, audits or investigations pending, or to the Seller's Knowledge, threatened against any of the Target Companies with respect to the Facility or the Business.

(b)    Neither the Seller nor any Target Company is subject to any Court Order with respect to the Facility or the Business.

3.17    Insurance.  Schedule 3.17 includes a list of all insurance policies maintained by or for the benefit of the Facility or any Target Company, including fire and extended coverage and casualty, professional liability, general liability and other forms of insurance, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverages (including applicable deductibles).  All of such policies are now and will be until the Effective Time in full force and effect on an occurrence basis with no premium arrearages.  (i) There is no outstanding written requirement or recommendation by any insurance company that issued any such policy or by any board of fire underwriters or other similar body (including any Governmental Authority) exercising similar functions which requires or recommends any repairs or other work to be done or with respect to any of the assets of the Target Companies, (ii) the holder of each such policy has given to its insurer in a timely manner all notices required to be given under its insurance policies with respect to all  claims and actions covered by insurance with respect to the assets of the Target Companies, and no insurer has denied coverage of any such claims or actions or reserved its rights with respect to or rejected any such claims and (iii) no holder of any such policy has, as of the date of this Agreement (a) received any notice or other written communication from any such insurance company canceling or materially amending any of said insurance policies with respect to the assets of the Target Companies or relating to the reservation of rights on any existing claims under any such insurance policies, and to the Knowledge of the Seller no such cancellation or amendment is threatened, or (b) failed to give any required notice or present any claim which is still outstanding under any of said policies with respect to the assets of the Target Companies.

3.18    Compliance with Laws.  To the Knowledge of the Seller, the Facility at all times since its acquisition by Sherman Hospital and the Target Companies have been in compliance, in all material respects, with all Laws applicable to the Facility and the Target Companies, including, but not limited to, the false claims, false representations, anti-kickback and all other provisions of the Medicare/Medicaid fraud and abuse laws (42 U.S.C. Section 1320a-7 et seq.) and the physician self-referral provisions of the Stark Law (42 U.S.C. Section 1395nn).

3.19    Medical Staff.  As of the date hereof, the Seller has provided to the Purchaser (i) true and correct copies of the blank forms used with respect to medical staff membership and clinical privileges application or delineation of clinical privileges, and (ii) all current medical staff bylaws, rules, and regulations and amendments thereto respecting the Facility.  With regard to the medical staff of the Facility, except as disclosed in Schedule 3.19, which disclosure shall be made on an anonymous basis, to the Knowledge of the Seller, there are no pending or

threatened disciplinary or corrective actions or appeals therefrom involving physician applicants or medical staff members and to the Knowledge of the Seller, there are no disputes, suits, actions, arbitration proceedings, or investigations pending or threatened with applicants, medical staff members, or health professional affiliates. As of the date hereof, <u>Schedule 3.19</u> sets forth a true, correct and complete list of description of (a) the name of each member of the medical staff of the Facility, and (b) the specialty, if any, of each medical staff member. All members of the organized medical staff of the Facility and all other persons providing clinical services to patients have been credentialed in substantial compliance with the applicable bylaws, policies, standards, and procedures of the Facility and the medical staff, and are providing services within the permitted scope of their privileges. The Facility has operated in material compliance with such by-laws, rules and regulations. To the Knowledge of the Seller, no member of the medical staff of the Facility has tendered a resignation that would be effective after the date hereof.

3.20    <u>Brokers</u>.  Neither the Seller nor any of its Affiliates has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement. All amounts due and owing with respect to the matters set forth in <u>Schedule 3.20</u> shall be the sole responsibility of the Seller.

3.21    <u>Affiliate Transactions</u>.  Except for the payment of salaries and benefits to employees in the ordinary course of business or as set forth in <u>Schedule 3.21</u>, (a) none of the Target Companies is, nor have they been during the previous two (2) years, a party to any Contract or arrangement with, or indebted, either directly or indirectly, to any of its officers, directors, managers, members or stockholders, or any of their respective relatives or Affiliates and (b) none of such Persons is (nor have they been during the previous two (2) years) indebted to any of the Target Companies or has at any time during the previous two (2) years any direct or indirect ownership interest in, or any contractual or business relationship with, any Person with which any of the Target Companies has a business relationship or any Person which, directly or indirectly, competes with any of the Target Companies, excluding ownership of securities having no more than two percent (2%) of the outstanding voting power of any company that is listed on any national securities exchange so long as the Person owning such securities has no other connection or relationship with such company.

3.22    <u>No Prior Operations</u>.  Except as contemplated by <u>Section 6.5(a)(i)</u>, neither Sherman Sponsor nor Sherman MD Provider has incurred any liabilities or obligations or engaged in any business activities of any type or kind whatsoever, or entered into any agreements or arrangements with any Person, or become subject to or bound by any obligation or undertaking.

<div align="center">

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

</div>

The Purchaser hereby represents and warrants to the Seller that the following statements are true and correct as of the date hereof as follows:

4.1    <u>Organization</u>.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

4.2    <u>Authorization</u>.

(a)    The execution, delivery and performance by the Purchaser of this Agreement and the other Transaction Documents to which the Purchaser is a party or is bound, and the consummation by the Purchaser of the transactions contemplated hereby and thereby are within the Purchaser's powers, are not in contravention of the terms of the Purchaser's Constituent Documents, and have been duly authorized and approved by the governing body of the Purchaser.  No other organizational proceeding on the part of the Purchaser is necessary to authorize the execution, delivery and performance of this Agreement or the other Transaction Documents by the Purchaser.

(b)    This Agreement has been duly and validly executed and delivered by the Purchaser, and as of the Closing, the other Transaction Documents to be entered into by the Purchaser will have been duly and validly executed and delivered by the Purchaser.  This Agreement constitutes, and upon their execution and delivery, such other Transaction Documents will constitute, the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms (assuming the valid authorization, execution and delivery hereof and thereof by the other parties thereto), subject, in each case, to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general application relating to or affecting creditors' rights and to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

4.3    <u>No Conflicting Agreements; Consents</u>.  Neither the execution and delivery of this Agreement or any of the other Transaction Documents to be entered into by the Purchaser nor the consummation of any of the transactions contemplated hereby or thereby will:

(a)    violate, conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default under (i) the Constituent Documents of the Purchaser, (ii) any material agreement, lease, sublease, license, sublicense, promissory note, evidence of indebtedness or other contract (whether written or oral) to which assets of the Purchaser is a party or by which the Purchaser is bound, except such violations, conflicts, breaches or defaults which would not materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or would not prevent the consummation of the transactions contemplated hereby or thereby, (iii) any Court Order to which the Purchaser is a party or by which the Purchaser is bound, or (iv) any material requirements of Law affecting the Purchaser, except such violations, conflicts, breaches or defaults of such requirements of Laws which would not materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or which would not prevent the consummation of the transactions contemplated hereby or thereby; or

(b)    require a material Permit, approval, consent or authorization from, or the making by the Purchaser of any material declaration, filing or registration with, any Governmental Authority, except as provided in <u>Section 5.1</u> or <u>Section 6.2</u> and except for such Permits, approvals, consents, authorizations, declarations, filings or registrations, the failure of which to be obtained or made would not materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or prevent the consummation of the transactions contemplated hereby or thereby.

4.4     Legal Proceedings.  There are no material actions, suits or proceedings pending or, to the Knowledge of the Purchaser, threatened against the Purchaser which would materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or could reasonably be expected to delay or prevent the consummation of the transactions contemplated hereby or thereby.

4.5     Brokers.  The Purchaser has not paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

4.6     Sufficient Resources.  The Purchaser has sufficient financial resources (either internally or externally), and at the Closing, the Purchaser will possess sufficient funds, to permit the Purchaser to deliver the all amounts in accordance with Section 2.6(a), subject to satisfaction of the conditions precedent to its obligations to close the transactions contemplated by this Agreement.

4.7     Investment Representations.

(a)     The Purchaser is acquiring the respective Interests to be acquired by the Purchaser for its own account and not with a view to the distribution thereof within the meaning of the Securities Act.

(b)     The Purchaser is not relying upon any representation or warranty of Seller or any of its Affiliates or any of the officers, directors, employees, agents or representatives thereof, other than those representations and warranties contained in this Agreement.

(c)     The Purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of purchasing the Interests to be acquired by the Purchaser and to understand the risks of, and other considerations relating to, its purchase of the Interests to be acquired by the Purchaser.

(d)     The Purchaser is aware that as of the Closing Date and the 501(a) Certification Date, as applicable, (i) the Interests will not have been registered under the Securities Act or any state's securities laws, and (ii) no securities issued by any of the Target Companies will be subject to the reporting requirements of the Exchange Act.

4.8     Non-Reliance.  Except for the specific representations and warranties expressly made by the Seller in Article III (as modified by the Schedule of Exceptions), (a) Purchaser represents and warrants that (i) Seller is not making and has not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Target Companies, or any of the Target Companies' respective businesses, assets, liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of the business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Target Companies furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in

- 31 -

**A0329**

connection with, the transactions, or in respect of any other matter or thing whatsoever, and (ii) none of the Seller or the members, officers, managers, agents, representatives or employees of the Seller, the Target Companies or their respective Affiliates has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement and subject to the limited remedies herein provided, (b) Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and its Affiliates have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person, (c) Purchaser specifically disclaims any obligation or duty by the Seller or any of its Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in Article III, and (d) Purchaser is entering into the transactions and acquiring the Interests subject only to the specific representations and warranties set forth in Article III as further limited by the specifically bargained for exclusive remedies as set forth in Article IX.

## ARTICLE V
## COVENANTS OF THE SELLER

5.1     Regulatory Approvals.   The Seller will cause the Target Companies to use commercially reasonable efforts to (i) obtain, as promptly as practicable, each of the Permits, approvals, authorizations and clearances of Governmental Authorities listed in Schedule 5.1 hereto, and to make the filings and declarations with Governmental Authorities listed in Schedule 5.1 hereto, (ii) provide such information and communications to applicable Governmental Authorities as are necessary in connection with the foregoing or in connection with the Purchaser's obtaining any Permits, approvals, authorizations and clearances of Governmental Authorities or making any filings or declarations with Governmental Authorities in accordance with Section 6.2 as such Governmental Authorities or the Purchaser may reasonably request, and (iii) cooperate with the Purchaser in obtaining or making, as soon as practicable, any Permits, approvals, authorizations, clearances, filings and declarations of or with Governmental Authorities that the Purchaser is required to obtain pursuant to Section 6.2.

5.2     Conduct Prior to the Closing.  On or after the date hereof and prior to the Closing, except as set forth on Schedule 5.2, as consented to or approved in writing by the Purchaser, or as contemplated by this Agreement (including, without limitation, Sections 6.5 and 6.8), the Seller shall not act or omit to act, and shall cause the Target Companies not to act or omit to act, otherwise than in accordance with the following:

(a)     None of the Target Companies shall amend its respective Constituent Documents;

(b)     No change shall be made in the number or amount of authorized or issued membership interests of the Target Companies; nor shall any other equity security of any kind be granted or issued by the Target Companies; nor shall Seller enter into or permit any of the Target Companies to enter into any other agreement with respect to any equity security of the Target Companies;

(c)     The Seller will not make or enter into any commitment to make any capital expenditure at the Facility or otherwise on behalf of either Target Company, other than in the ordinary course of business, consistent with past practices, or as required by Law or for urgent repairs;

(d)     The Seller will not change or permit any change to be made in any accounting policy, practice or method of the Target Companies except any such changes as are required to conform to modifications in GAAP;

(e)     The Seller shall not, and shall not permit the Target Companies to, (a) make, change or revoke any election in respect of Taxes, (b) change any accounting method in respect of Taxes, (c) prepare any Tax Return in a manner which is not consistent with the past practice of the Target Companies, (d) file any amendment to a material Tax Return, (e) incur any liability for a material amount of Taxes other than in the ordinary course of business, or (f) settle any claim or assessment in respect of material Taxes;

(f)     The Target Companies will not (A) assume, guaranty, endorse or otherwise become liable or responsible for the obligations of any Person (other than another Target Company); (B) make any loans, advances or capital contributions to, or investments in, any Person, other than loans to other Target Companies; or (C) make any commitments to do any of the foregoing;

(g)     The operations, activities and practices of the Business shall be conducted consistent with the ordinary course of business and in conformity with past practice;

(h)     The Seller and the Target Companies will use commercially reasonable efforts to ensure that the services of the present employees, agents and representatives of the Business will be kept available for the Purchaser (except with respect to those employees or relationships terminated for cause or in the ordinary course of business consistent with past practices); provided in no event shall Seller or the Target Companies be required to offer or provide any inducements, financial or otherwise, to cause any such Persons to continue to work or provide services for the benefit of the Business;

(i)     The insurance maintained with respect to the Facility and the Business, or comparable insurance, shall be maintained in full force and effect until the Effective Time; and

(j)     The Target Companies will not sell, transfer or otherwise dispose of any properties or assets, except for inventory purchased or sold in the ordinary course of business consistent with past practice; provided, that the foregoing shall in no event preclude the distribution of cash by any of the Target Companies to their respective equity or debt holders so long as at all times prior to the Closing the Target Companies retain sufficient cash as is reasonably necessary to conduct the Business in the ordinary course of business.

5.3     Employee Matters.  Between the date of this Agreement and the Closing, except as otherwise consented to or approved in writing by the Purchaser, the Seller will cause its Affiliates not to (a) make any general increase in the rate of compensation payable to any employees who work in the Business, other than normal and customary increases consistent with past practice or increases that otherwise may be required by obligations pursuant to Contracts or

applicable Law, or (b) increase severance or termination obligations to any employees who work in the Business (except increases that are the result of increases to an employee's underlying compensation that are permitted under this <u>Section 5.3</u>.)

     5.4    <u>Investigation by the Purchaser</u>.  Between the date of this Agreement and the Closing Date, to the extent permitted by Law, the Seller will provide the Purchaser and its counsel, accountants and other representatives with reasonable access during normal business hours, to all of the assets, properties, facilities, employees, agents, accountants and Books and Records of the Business and will furnish or make available to the Purchaser and such representatives during such period all such information and data (including, without limitation, copies of Contracts) concerning the Business in the possession of the Seller or its Affiliates as Purchaser or such representatives reasonably may request; <u>provided</u>, <u>however</u>, such investigation shall be coordinated through such persons as may be designated in writing by the Seller for such purpose.  The Purchaser's right of access and inspection shall be made in such a manner as not to interfere with the operation of the Business or the Target Companies. Notwithstanding the foregoing, the Purchaser understands that (x) with respect to documents and information deemed by the Seller in good faith to be market sensitive, competitive or otherwise confidential in nature, (1) the Seller will identify such documents and information to the Purchaser, (2) if such documents and information are requested by the Purchaser, the Seller will provide such documents and information to the Purchaser's outside attorneys and accountants (who will be bound by confidentiality agreements) for their review, and (3) any report by such attorneys and accountants to the Purchaser with respect to such documents and information will be in writing and subject to prior review and reasonable approval by the Seller to confirm that any specific market sensitive, competitive or otherwise confidential information is not made available to the Purchaser, and (y) litigation and other materials (including internal/external legal audit letters or reviews, patient records and similar patient information, Professional Review Organization information, National Data Bank reports, peer and quality review information and other physician-specific confidential information) that are deemed privileged or confidential by the Seller and materials which the Seller or its Affiliates may not disclose without violating confidentiality agreements with third parties will be made available to the Purchaser only without identifying information.

     5.5    <u>Closing Conditions</u>.  The Seller will use commercially reasonable efforts to cause each of the conditions set forth in <u>Article VII</u> (other than <u>Section 7.7</u>) to be satisfied on or prior to October 31, 2014; <u>provided</u>, if the conditions set forth in <u>Article VII</u> (other than <u>Section 7.7</u>) shall not have been satisfied on or prior to October 31, 2014, Seller shall continue to use its commercially reasonable efforts to satisfy its obligations under this <u>Section 5.5</u> as soon as reasonably practicable thereafter, but in all circumstances prior to the Optional Termination Date; <u>provided further</u>, in no event shall the Seller be obligated to expend any funds in connection with the solicitation or receipt of any consents or approvals from any non-Governmental Authority.  Seller shall reasonably cooperate with Purchaser in connection with Purchaser's efforts to obtain the Title Policy.

     5.6    <u>Consultative Process</u>.  From and after the date hereof and until the Closing, the Purchaser shall designate an individual or individuals whom the Seller's representatives may contact during normal business hours for the purpose of approving actions or transactions for which the consent of the Purchaser is required under this Agreement.  The written approval of a

designated individual as contemplated in this <u>Section 5.6</u> shall constitute the consent of the Purchaser to the transaction or action so approved.  Unless and until the Purchaser gives written notice to the Seller to the contrary, such designated individuals shall be Lex Reddy and Roger Krissman.

5.7    <u>INTENTIONALLY OMITTED</u>.

5.8    <u>Transition Services</u>.  At or prior to Closing:

(a)    Seller shall deliver to Purchaser a schedule of its vendor relationships related to the operation of the Business.

(b)    LHP and/or one of more of its subsidiaries (the "<u>Service Providers</u>") shall provide the services listed on <u>Schedule 5.8(b)</u> (the "<u>Services</u>") to Purchaser or its designee for a period of six (6) months following the Effective Time.  Purchaser shall promptly pay LHP for such Services in the amounts set forth on <u>Schedule 5.8(b)</u> at the end of each calendar month following the Closing Date (prorated based on days elapsed for any partial month of service).  In no event shall the Service Providers have any obligation to provide such Services after the date that is six (6) months after the Closing Date.  The Service Providers shall use their commercially reasonable efforts to provide the Services at consistent levels and with a degree of care as such Services were provided to the Target Companies in the three (3) month period prior to the Closing.  Except in the case of a Willful Breach by a Service Provider, no Service Provider shall have liability to Purchaser or its Affiliates in connection with the provision of the Services.  Purchaser agrees and acknowledges that (i) the Service Providers are not in the business of providing the Services on a commercial arm's-length basis to independent third parties and (ii) the Services are only required in connection with the transactions contemplated by this Agreement for specific business circumstances on a transitional basis only.

(c)    Set forth on <u>Schedule 5.8(c)</u> are certain contracts (collectively, the "<u>Service Contracts</u>") to which the Seller, the Seller Guarantors and/or their Affiliates, as applicable (a "<u>Services Assignor</u>") are a party and the Business receives the benefit of all or a portion of such Services Contract from a counterparty (the "<u>Counterparty</u>") providing services thereunder. The Services Assignors shall endeavor to (i) assign (to the extent assignable) the Service Contracts to the extent such contact is applicable solely to the Business or (ii) with respect to any Services Contract that involves services provided to the Business and other facilities or businesses owned and/or operated by any Services Assignor or its Affiliates (a "<u>Multi-Site Services Contract</u>"), attempt to arrange for the Counterparty to divide the Services Contract into two contracts, one that relates solely to the Business (which contract shall be reasonably acceptable to the Purchaser) and one that relates to the remaining portions of such Service Contract (which contract shall be reasonably acceptable to the applicable Services Assignor).  If any Services Contract cannot be assigned or divided (as described above), the applicable Services Assignor, shall, to the extent permitted under the applicable Services Contract, permit the Purchaser and/or the Target Companies, as applicable, to receive the benefit of the services to be provided thereunder (but only to the extent applicable to the Business), and Purchaser shall promptly pay to the applicable Services Assignor, upon written request, all amounts due under such Services Contract for the provision of the services provided thereunder applicable to the Business and shall indemnify, defend and hold harmless the applicable Services

Assignor in connection with Purchaser's and/or the Target Companies' receipt of such services. With respect to a Multi-Site Services Contract, Purchaser shall pay (i) for services billed based on actual usage, the fees owed in respect of such usage by the Business and (ii) for services billed other than for actual usage, based on the historical allocation of fees between the Business and the other service recipients thereunder, as reasonably determined by the applicable Services Assignor. Purchaser agrees that it shall, or it shall cause the applicable Target Company, to receive all services to be provided pursuant to the immediately preceding sentence for the term of the applicable Services Contract; provided, Purchaser may cause (to the extent permitted by the applicable Services Contract and upon the notice period required) the earlier termination of that portion of any Services Contract applicable to the Business, in which case Purchaser shall pay any early termination or similar penalty or fee and shall indemnify, defend and hold harmless the applicable Services Assignor in connection with such early termination and/or assignment; provide, further, the early termination right above shall only apply to a Multi-Site Services Contract if such contract (or the applicable Counterparty) permits a partial termination of only that portion of such contract that relates to the Business.

## ARTICLE VI
## COVENANTS OF THE PURCHASER; CERTAIN ADDITIONAL COVENANTS OF THE PARTIES

6.1     Confidentiality.  The Purchaser acknowledges and agrees that the Confidentiality Agreement shall survive the execution and delivery of this Agreement by the parties hereto and that all information provided to the Purchaser or its "Representatives" or "Other Recipients" (as such terms are defined in the Confidentiality Agreement) in accordance with this Agreement shall be considered "Evaluation Material" (as such term is defined in the Confidentiality Agreement).

6.2     Regulatory Approvals.

(a)     The Purchaser will use best efforts to (i) obtain, as promptly as practicable, all Permits, approvals, authorizations and clearances of Governmental Authorities listed in Schedule 6.2 hereto and to make the filings and declarations with Governmental Authorities listed in Schedule 6.2 hereto, (ii) provide such information and communications to applicable Governmental Authorities as are necessary in connection with the foregoing or in connection with the Seller or its Affiliates' obtaining any of the Permits, approvals, authorizations and clearances of Governmental Authorities or making any filings or declarations with Governmental Authorities in accordance with Section 5.1, and (iii) cooperate with the Seller and its Affiliates in obtaining or making, as soon as practicable, any Permits, approvals, authorizations, clearances, filings and declarations of or with Governmental Authorities that the Seller or its Affiliates are required to obtain or make pursuant to Section 5.1.

(b)     In furtherance and not in limitation of the terms of Section 5.1 and Section 6.1, if required by applicable Law, the Seller and the Purchaser will promptly (but in no event later than twenty (20) Business Days) after the execution and delivery of this Agreement by all of the parties hereto file a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement.  The Seller and the Purchaser agree to supply promptly any additional information and documentary material that may be requested by any

Governmental Authority (including the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission) pursuant to the HSR Act, and shall cooperate in connection with any filing under applicable antitrust Laws and in connection with resolving any investigation or other inquiry concerning the transactions contemplated by this Agreement commenced by any Governmental Authority, including the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, or the office of any state attorney general. The filing fee with respect to the Notification and Report Form pursuant to the HSR Act, if any, shall be borne fifty percent (50%) by the Seller and fifty percent (50%) by the Purchaser.

          (c)     If any state takeover statute or similar statute becomes applicable to this Agreement or any of the transactions contemplated by this Agreement, the parties will use commercially reasonable efforts to ensure that the transactions contemplated by this Agreement may be consummated as promptly as practicable on the terms contemplated by this Agreement and otherwise to minimize the effect of such statute or regulation on this Agreement and the transactions contemplated by this Agreement.

     6.3    <u>Post-Closing Access</u>.

          (a)     The Purchaser acknowledges that, subsequent to the Closing, the Seller may need access to information, documents or computer data in the control or possession of Purchaser (or its Affiliates), and the Seller may need access to the Facility or other assets of the Target Companies for purposes of concluding the transactions contemplated herein and for the prosecution or defense of third party claims. The Purchaser agrees that, at the sole cost and expense of the Seller, it will, subject to applicable Law, make available to the Seller and its representatives, agents and independent auditors such documents and information as may be in the possession of the Purchaser and its Affiliates relating to periods prior to the Effective Time and will permit the Seller and its representatives, agents and independent auditors to make copies of such documents and information at Seller's sole cost and expense.

          (b)     Until six (6) months after the later to occur of (i) the expiration of the period during which any of the Tax Returns of the Target Companies for any Pre-Closing Period are subject to audit by any Governmental Authority or the final adjudication of any dispute or investigation involving Taxes arising out of the business, operations or affairs of the Target Companies before the Effective Time, (ii) the final adjudication of any matter for which the Seller may be required to indemnify or hold harmless any Purchaser Indemnitee pursuant to the terms of this Agreement, or (iii) the running of applicable statutes of limitations, the Purchaser will maintain in their original form all medical and other records (including all documents, electronic data and other compilations of information in any form) of the Target Companies existing as of the Effective Time that relate to the pre-Closing business, operations, assets and properties of the Business, and will give the Seller and its representatives reasonable access to all such Books and Records to the fullest extent reasonably required to enable the Seller and its Affiliates to satisfy their respective obligations hereunder or under applicable Law.

     6.4    <u>Treatment of Seller and Seller-Affiliate Intellectual Property</u>. Purchaser agrees and acknowledges that Purchaser shall have no right to use, and shall not use, any of the Intellectual Property set forth on <u>Schedule 6.4</u>, all of which shall remain the sole and exclusive

property of the Person owning such Intellectual Property as reflected on <u>Schedule 6.4</u>. For the avoidance of doubt, from and after the Effective Time, Purchaser shall, and shall cause the Target Companies and Sherman MD Provider to, cease using any of the Intellectual Property set forth on <u>Schedule 6.4</u>.

      6.5   <u>Employee Matters</u>.

      (a)   Certain physicians engaged in the Business (the "<u>Medical Personnel</u>") are currently employed by LHP Texas MD Services, Inc. ("<u>LHP MD Provider</u>"), an Affiliate of LHP, and certain non-medical staff engaged in the Business (the "<u>Administrative Personnel</u>" and, together with the Medical Personnel, the "<u>Personnel</u>") are currently employed by the Staff Providers (the Staff Providers, together with the LHP MD Provider, being referred to herein as the "<u>Personnel Providers</u>").

      (i)   Seller shall use its commercially reasonable efforts to cause (x) Sherman Sponsor to sponsor Sherman MD Provider as a "501(a)" entity organized pursuant to Section 162.001(b) of the Texas Occupations Code, (y) LHP MD Provider to transfer all Medical Personnel, including assigning all Contracts governing the provision of services by the Medical Personnel, to Sherman MD Provider, and (z) Sherman MD Provider to accept all Medical Personnel, including all Contracts governing the provision of services by the Medical Personnel, and to indemnify LHP MD Provider for any claims by the Medical Personnel based on or arising out of any pre-501(a) Certification Time actions; <u>provided</u>, <u>however</u>, the Parties agree and acknowledge that the 501(a) Certification Date is likely to occur after the Closing Date.

      (ii)   Except as otherwise provided by <u>Section 6.5(a)(i)</u>, effective as of the Effective Time, Seller shall cause the Personnel Providers to terminate the Personnel, and Purchaser shall, or shall cause the Target Companies or one of its Affiliates to, offer to employ all of the Personnel as of the Closing Date, including Personnel on military or other types of leave in positions and at compensation levels consistent with those being provided by the Personnel Providers immediately prior to Closing. All such Personnel who accept the Purchaser's offer of employment, or who are transferred to Sherman MD Provider in accordance with <u>Section 6.5(a)(i)</u>, shall be referred to herein as the "<u>Hired Employees</u>". At the Effective Time, and without further action of any party thereto, the term of the Employee Lease Agreement shall expire.

      (b)   For the period beginning on the Closing Date (or, with respect to Medical Personnel transferred to Sherman MD Provider, the 501(a) Certification Date) and ending on the first anniversary of the Closing Date, Purchaser agrees to maintain benefit levels, including nonqualified deferred compensation opportunities, retirement benefits, and health and welfare benefits, for the Hired Employees which are comparable to those that were in effect for the Hired Employees immediately prior to the Closing Date. Purchaser will treat, and cause the appropriate benefit plans to treat, the service of the Hired Employees with LHP and its Affiliates attributable to any period before the Closing Date as service rendered to Purchaser or any Affiliate of Purchaser for purposes of eligibility and vesting under paid time off programs of Purchaser (or its Affiliates), for purposes of the health and welfare plan(s) and cafeteria plan(s) maintained by Purchaser (or its Affiliates) and for purposes of the defined contribution plan(s) of Purchaser (or its Affiliates), except where such credit would result in duplication of benefits.

Without limiting the foregoing, to the extent that any Hired Employee participates in any health or other group welfare benefit plan of Purchaser or its Affiliate following the Closing, (i) Purchaser shall cause any pre-existing conditions or limitations, eligibility waiting periods and required physical examinations under any health or similar welfare plan of Purchaser (or its Affiliates) to be waived with respect to the Hired Employees and their eligible dependents, to the extent waived under the corresponding plan in which the Hired Employee participated immediately prior to the Closing, and (ii) any deductibles paid and flexible spending account balances accumulated by a Hired Employee under any of LHP's (or its Affiliates') health or cafeteria plans in the plan year in which the Closing Date occurs shall be credited towards deductibles and flexible spending account balances under the health plan(s) or cafeteria plan(s), as appropriate, of Purchaser (or its Affiliates).  LHP and the Purchaser shall cooperate to effectuate any rollovers to the Purchaser's 401(k) plan by the Hired Employees, to the extent the Hired Employees elect to rollover any such assets into the Purchaser's 401(k) plan. Notwithstanding any provision in this Agreement to the contrary, nothing in this <u>Section 6.5(b)</u> shall (i) be deemed or construed to be an amendment or other modification of any Employee Benefit Plan or of any of Purchaser's employee benefit plans, or (ii) create any third party rights in any current or former employee, director or other service provider of Purchaser, LHP, the Seller or any of their respective Affiliates (or any beneficiaries or dependents thereof).

(c)     Pursuant to the "Alternate Procedure" provided in section 5 of Revenue Procedure 2004-53, 2004-34 I.R.B. 320 (i) Purchaser and the Personnel Providers shall report on a predecessor/successor basis as set forth therein, (ii) the Personnel Providers shall be relieved from filing a Form W-2 with respect to the Hired Employees and (iii) Purchaser shall undertake to file (or cause to be filed) a Form W-2 for each such Hired Employee for the year that includes the Closing Date (including the portion of such year that such Hired Employee was employed by a Personnel Provider).

(d)     Purchaser will continue to employ a sufficient number of then-current employees at each Target Company and Sherman MD Provider for the period commencing on the Closing Date and ending ninety (90) days after the 501(a) Certification Date so as not to result in the imposition of liability on the Seller or its Affiliates under the WARN Act due to a "plant closing" or "mass layoff" or otherwise under the provisions of the WARN Act, or any similar state or local laws relating to plant closings, with respect to the Target Companies and Sherman MD Provider.  All quoted terms used in this <u>Section 6.5(d)</u> and not defined herein shall have the meanings ascribed to such terms under the WARN Act.

6.6     <u>Tax Matters</u>.

(a)     <u>Filing of Tax Returns</u>.

(i)     The Seller shall prepare and file, or cause to be prepared and filed, all Tax Returns, if any, of the Target Companies (including any amendments thereto) for any taxable period ending at or prior to the Closing Date (a "<u>Pre-Closing Period</u>").  The Purchaser agrees to assist the Seller without any charge in the determination of such Taxes and the preparation of such Tax Returns.

(ii)    The Purchaser shall prepare and file, or cause to be prepared and filed, all Tax Returns of the Target Companies for all taxable periods other than a Pre-Closing Period.

(b)    Straddle Period Tax Allocation.    Any liability for Taxes of a Target Company attributable to a Straddle Period shall be apportioned between the portion of such period ending on or prior to the Closing Date and the portion beginning after the Closing Date (i) in the case of real property, personal property and ad valorem Taxes, by apportioning such Taxes on a per diem basis and (ii) in the case of all other Taxes, on a closing of the books basis, as if the taxable year of such Target Company ended on the Closing Date, provided that exemptions, allowances or deductions that are calculated on an annual basis (including, but not limited to, depreciation and amortization deductions) shall be apportioned on a per diem basis.

(c)    Cooperation.    The Seller, on the one hand, and the Purchaser and the Target Companies, on the other hand, agree to furnish or cause to be furnished to each other or their respective representatives, upon request, as promptly as practicable, such information and assistance (including access to Books and Records) relating to the Target Companies as is reasonably necessary for the preparation of any Return, claim for refund, audit or similar matter, or the prosecution or defense of any claim, suit or proceeding relating to any proposed adjustment of Taxes.

(d)    Post-Closing Audits and Other Proceedings.    In the case of any audit, examination or other proceeding ("Proceeding") with respect to Taxes for which a Seller is or may be liable pursuant to this Agreement, the Purchaser shall promptly notify the Seller in writing of any such Proceeding, and the Purchaser shall timely execute or cause to be executed powers of attorney or other documents necessary to enable the Seller to take all actions desired by the Seller with respect to such Proceeding to the extent such Proceeding may affect the amount of Taxes for which the Seller is liable with respect to the Target Companies.  The Seller shall have the sole right to control any such Proceedings, including the right to initiate any claim for refund or credit, file any amended Tax Return or take any other action that it deems appropriate with respect to such Taxes (or refunds or credits).  If any Proceeding would affect the Tax liability of the Purchaser or an Affiliate (including a Target Company) in any material respect for a taxable period ending after the Closing Date, the Seller will not settle such Proceeding without the Purchaser's prior written consent, such consent not to be unreasonably withheld, conditioned, or delayed.  In the event that the Purchaser's consent is withheld, the Purchaser will assume the control, costs and expenses of the Proceeding.  If such Proceeding is ultimately resolved by payment of an amount in excess of the amount in the original settlement proposal (or receipt of a refund in an amount less than the amount in the original settlement proposal), the Purchaser will pay the amount of such excess (or shall pay the Seller the amount of such refund shortfall).  If such Proceeding is ultimately resolved by payment of an amount less than the amount of the original settlement proposal (or a refund or credit in an amount greater than the original settlement proposal), the Seller will reimburse the Purchaser for their respective costs and expenses to the extent of such difference.

(e)    Refunds for Pre-Closing Periods.  The amount of any refund of or credits against Taxes relating to a Target Company (including any interest paid or credited with respect thereto) in respect of the Pre-Closing Period or the pre-Closing portion of any Straddle Period

shall be promptly paid by Purchaser to Seller, without set-off or application therefor against any Taxes owed for any period after the Effective Time.

6.7    <u>Maintenance of Services</u>.  Purchaser shall continue to provide the material clinical services and programs currently being provided by the Facility that are described on <u>Exhibit E</u> and shall not discontinue the provision of any such material clinical services and programs prior to April 16, 2015 (the "<u>Services Date</u>"), so long as appropriate levels of clinical quality and patient safety can be maintained with respect to each of such services throughout such period. Any deletion of such services and programs prior to the Services Date shall be based upon the clinical quality and patient safety factors and shall require the prior written approval of Seller. Seller shall have the right to specific performance of Purchaser's obligation set forth in this <u>Section 6.7</u>.

6.8    <u>Transfer of Certain Assets</u>.  Prior to the Closing, Seller shall use its commercially reasonable efforts to transfer and assign, and the Target Companies shall accept and assume, the assets and liabilities set forth on <u>Schedule 6.8</u>.

6.9    <u>MOB Obligations</u>.  Purchaser, Guarantor and Seller shall use their commercially reasonable efforts to cause Seller and LHP to be fully and finally released from any obligations under the Ground Lease and Space Leases.

6.10    <u>Meaningful Use Payments</u>.  The Facility is an acute care inpatient hospital that is a participant in the Medicare and Medicaid Electronic Health Record Incentive Program (the "<u>EHR Incentive Program</u>") and is eligible for incentive payments under the EHR Incentive Program as a meaningful user of certified electronic health record technology (the "<u>Meaningful Use Payments</u>").  Purchaser covenants and agrees to remit promptly to Seller (and in any event within five (5) days following the receipt thereof) any Meaningful Use Payments received by Purchaser, the Target Companies or their Affiliates following the Closing Date (which, for the avoidance of doubt, may be received after December 31, 2014) that relate to the Facility's participation in the EHR Incentive Program during periods ending on or before December 31, 2014.

6.11    <u>Closing Conditions</u>.  The Purchaser will use its commercially reasonable efforts to (i) cause the conditions set forth in <u>Article VIII</u> hereof to be satisfied and (ii) obtain the Title Policy, in each case on or prior to October 31, 2014; <u>provided</u>, if the conditions set forth in <u>Article VIII</u> shall not have been satisfied, or if Purchaser shall have failed to secure the Title Policy, on or prior to October 31, 2014, Purchaser shall continue to use its commercially reasonable efforts to satisfy its obligations under this <u>Section 6.11</u> as soon as reasonably practicable thereafter, but in all circumstances prior to the Optional Termination Date.

6.12    <u>Covenant Not to Compete; Non-Solicitation</u>.

(a)    For a one (1) year period immediately following the Closing Date (the "<u>Restricted Period</u>"), Seller and the Seller Guarantors  shall not, directly or indirectly, except as a consultant or contractor to or of Purchaser (or any Affiliate of Purchaser), own, lease, manage, operate, control, or participate in any manner with the ownership, leasing, management, operation or control of any business which offers services in competition with the Business,

including but not limited to any acute care hospital, specialty hospital, long-term acute care hospital, rehabilitation facility, diagnostic imaging center, inpatient or outpatient psychiatric or substance abuse facility, ambulatory or other type of surgery center, skilled nursing facility, or home health or hospice agency (any of such uses being referred to herein as a "<u>Competing Business</u>"), within a 25-mile radius of the Facility (the "<u>Restricted Area</u>"), without Purchaser's prior written consent; <u>provided</u>, <u>however</u>, that Seller and the Seller Guarantors will not be precluded from participating in activities which they were engaged in as of the September 1, 2014.

   (b) Each of Seller and the Seller Guarantors further agrees that, during the Restricted Period, Seller and the Sellers Guarantors shall not directly or indirectly, in any capacity, either separately, jointly or in association with others, directly or indirectly do any of the following: (i) employ or seek to employ any Hired Employee; or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or other Person having a business relationship with the Purchaser or its Affiliates primarily with respect to the Business, at any time during the Restricted Period, to discontinue or reduce or modify the extent of such relationship with the Purchaser or its Affiliates with respect to the Business; <u>provided</u>, <u>however</u>, with respect to clause (i), such prohibition shall not apply to any solicitation (or hiring as a result thereof) conducted by means of a general solicitations or through the use of hiring firms not directed to target any Hired Employee.

   (c) Seller and the Seller Guarantors agree and acknowledge that Purchaser has legitimate business interests justifying the non-competition and non-solicitation covenants included herein. Purchaser's legitimate business interests include, without limitation, valuable confidential business and professional information, substantial relationships with specific prospective and existing customers, patients, clients and payors, and also patient and client goodwill associated with Purchaser's specific geographic location and specific marketing area. Seller and the Seller Guarantors acknowledge and agree that the non-competition and non-solicitation covenants included herein are reasonably necessary to protect the legitimate business interests of the Purchaser.

   (d) Seller and the Seller Guarantors acknowledge that satisfaction of the covenants and agreements set forth in this <u>Section 6.12</u> is necessary to protect the business, goodwill, and other proprietary interests of Purchaser and that a breach of such covenants and agreements will result in irreparable and continuing damage to Purchaser for which there will be no adequate remedy at law, and further agree that this <u>Section 6.12</u> may be enforced by temporary restraining order, temporary injunction, or permanent injunction restraining violation thereof, or by any another other remedy whether at law or in equity (including, without limitation, monetary damages), pending or following trial on the merits without the necessity of the posting of a bond or other security. Seller and the Seller Guarantors hereby waive the claim or defense that an adequate remedy at law for such a breach exists. Moreover, in the event any court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth herein are unreasonable, then it is the intention of the parties that such restrictions be enforced to the maximum scope, duration and territory that the court deems reasonable, and this Agreement shall thereby be reformed.

(e)    All of the provisions of this Section 6.12 shall inure to any successor or assign of Purchaser with respect to the Business.  Notwithstanding anything to the contrary herein, the Restricted Period shall immediately terminate with respect to LHP in the event that a Person or group of Persons who are not currently Affiliates of LHP acquire, directly or indirectly, (i) a majority of the voting securities of LHP (whether pursuant to stock purchase, merger, consolidation or otherwise) or (ii) all or substantially all of the assets of LHP and/or its subsidiaries.

6.13    Additional 501(a) Matters.  On the 501(a) Certification Date, LHP MD Provider shall assign, and Sherman MD Provider shall assume, the agreements set forth on Schedule 6.13 (the "501(a) Assigned Agreements"); provided, such assignment shall not relieve Sherman Hospital from any obligations to LHP MD Provider under the 501(a) Assigned Agreements arising out of any events prior to the 501(a) Certification Time.  If the Closing Date occurs prior to the 501(a) Certification Date, Purchaser shall cause Sherman Hospital to perform all of its obligations under the Affiliation Agreement from the Closing Date through the 501(a) Certification Time.  Upon the 501(a) Certification Time, and without further action of any party thereto, the term of the Affiliation Agreement shall expire.  LHP MD Provider shall be an express third party beneficiary of this Section 6.13.

## ARTICLE VII
## CONDITIONS TO OBLIGATIONS OF THE PURCHASER

Except as may be waived by the Purchaser, the obligations of the Purchaser to purchase the Interests, to pay the Closing Date Consideration on the Closing Date, and to consummate the transactions contemplated hereby shall be subject to the satisfaction on or prior to the Closing Date of the following conditions:

7.1    Representations and Warranties.  The Fundamental Representations shall be true and correct as of the Closing Date in each case as if made on and as of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, in which case as of such date), other than de minimis inaccuracies.  All other representations and warranties of the Seller set forth in this Agreement shall be true and correct as of the Closing Date in each case as if made on and as of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, in which case as of such date), except to the extent that the occurrences, circumstances or facts giving rise to any such representation or warranty not being true and correct, individually or in the aggregate, have not resulted in a Material Adverse Effect.

7.2    Compliance with Agreement.  On and as of the Closing Date, the Seller shall have performed and complied in all material respects with each covenant and agreement required by this Agreement to be performed and complied with by it on or before the Closing Date.

7.3    Closing Certificates.  The Seller shall have delivered to the Purchaser a certificate, dated as of the Closing Date and signed on behalf of the Seller, certifying the fulfillment of the conditions specified in Sections 7.1 and 7.2.

7.4    Consents and Authorizations.  The Purchaser shall have obtained documentation or other evidence reasonably satisfactory to the Purchaser that the Seller has:

      (a)      received all Permits, consents or approvals set forth on <u>Schedule 7.4(a)</u>; and

      (b)      complied with all waiting periods under the HSR Act and any similar state Law.

    7.5   <u>No Action or Proceeding</u>.  On the Closing Date, no valid judgment, order or decree of any court or other Governmental Authority restraining, enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby shall be in effect.

    7.6   <u>Good Standing Certificates</u>.  At the Closing, the Seller shall have delivered to the Purchaser good standing certificates issued with respect to each of the Target Companies by the Secretary of State of the relevant entity's state of organization.  Each such good standing certificate shall be dated as of a date that is not more than sixty (60) days prior to the Closing Date.

    7.7   <u>Title to Real Property</u>.  First American Title Insurance Company (or another title company reasonably acceptable to Purchaser) shall have committed to issue to Purchaser (at Purchaser's sole cost and expense) a customary title policy with respect to the Owned Real Property, subject only to the Permitted Encumbrances (the "<u>Title Policy</u>").

    7.8   <u>Excluded Obligations Release</u>.  Seller shall have delivered the duly executed Excluded Obligations Release.

    7.9   <u>Adverse Change</u>.  No act, change, event, or occurrence shall have occurred that has had a Material Adverse Effect with respect to the Target Companies.

    7.10   <u>Waiver of Conditions</u>.  The Purchaser may waive any condition of this <u>Article VII</u> to the extent permitted by applicable law.  Except as otherwise provided herein or agreed to by the parties prior to the Closing, the consequences of any knowing waiver shall be (a) the elimination of the waived condition as a valid basis for the Purchaser to refuse to close the transactions contemplated by this Agreement, and (b) the release of Target and Target Companies from any claim by the Purchaser for any resulting injuries and Damages with respect to that waived condition.

**ARTICLE VIII**
**CONDITIONS TO OBLIGATIONS OF THE SELLER**

    Except as may be waived in writing by the Seller, the obligations of the Seller to consummate the sale of the Hospital Interests on the Closing Date and the Sponsor Interests on the 501(a) Certification Date shall be subject to the satisfaction on or prior to the Closing Date of the following conditions:

    8.1   <u>Representations and Warranties</u>.  All representations and warranties of the Purchaser set forth in this Agreement shall be true and correct in all material respects (except to the extent that any such representation or warranty is qualified by materiality, in which case it must be true and correct in all respects) as of the Closing Date in each case as if made on and as

of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, in which case as of such date).

       8.2    <u>Compliance with Agreement</u>.  On and as of the Closing Date, the Purchaser shall have performed and complied in all material respects with each covenant and agreement required by this Agreement to be performed and complied with by it on or before the Closing Date.

       8.3    <u>Closing Certificates</u>.  The Purchaser shall have delivered to the Seller a certificate, dated as of the Closing Date and signed on behalf of the Purchaser, certifying the fulfillment of the conditions specified in <u>Sections 8.1</u> and <u>8.2</u>.

       8.4    <u>Consents and Authorizations</u>.  The Seller shall have obtained documentation or other evidence reasonably satisfactory to the Seller that the Purchaser and Target Companies have:

       (a)    received all Permits, consents or approvals set forth on <u>Schedule 8.4(a)</u>; and

       (b)    complied with all waiting periods under the HSR Act and any similar state Law.

       8.5    <u>No Action or Proceeding</u>.  On the Closing Date, no valid judgment, order or decree of any court or other Governmental Authority restraining, enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby shall be in effect.

       8.6    <u>Waiver of Conditions</u>.  The Seller may waive any conditions of this <u>Article VIII</u> to the extent permitted by applicable law.  Except as otherwise provided herein, the consequences of any knowing waiver shall be (a) the elimination of the waived condition as a valid basis for the Seller to refuse to close the transactions contemplated by this Agreement, and (b) the release of the Purchaser from any claim for resulting injuries and Damages with respect to that waived condition.

## ARTICLE IX
## INDEMNIFICATION

       9.1    <u>Survival</u>.  Except for (i) the Fundamental Representations and the representations and warranties of Purchaser contained in <u>Article IV</u>, which representations and warranties shall survive until five (5) years after the Closing Date ("<u>Fundamental Reps Survival Period</u>") and (ii) <u>Section 3.5</u>, which shall survive until one (1) year after the Closing Date (the "<u>Section 3.5 Survival Period</u>"), the representations and warranties set forth in this Agreement shall terminate and be extinguished at the Closing and the covenants and agreements contemplated by this Agreement to be performed at or prior to Closing shall terminate and be extinguished at the Closing, and no party shall have any liability or obligation in connection with any such representation, warranty, covenant or agreement following the Closing (and the parties hereto acknowledge and agree that, in the event that Closing occurs, no party may bring any claim for indemnification against the other party hereunder based upon or arising out of a breach of any such representations, warranties, covenants or agreements).  The respective covenants and

agreements of the parties contained in or made pursuant to this Agreement that by their terms are to be performed after the Closing shall survive such Closing in accordance with their terms (the "Post-Closing Covenants Survival Period" and, together with the Fundamental Reps Survival Period and the Section 3.5 Survival Period, each a "Survival Period").  The Parties agree and acknowledge that the Survival Periods set forth herein, to the extent expressly longer than the three (3) year survival period permitted by Title 10, Section 8106(a) of the Delaware Code, are expressly intended to survive for such longer periods as permitted by Title 10, Section 8106(c) of the Delaware Code.

9.2     Indemnification by the Seller.  Subject to the provisions of this Article IX, the Seller shall indemnify and hold harmless the Purchaser, any Affiliate of the Purchaser, and the respective officers, directors, shareholders, employees, agents and representatives of the Purchaser and its Affiliates (each, a "Purchaser Indemnitee") from and after the Effective Time, from and against any Damages actually incurred by the Purchaser Indemnitee as a result of:

(a)     any inaccuracy in any of the Fundamental Representations made herein by the Seller;

(b)     any inaccuracy in Section 3.5;

(c)     any breach of any of the covenants or agreements made herein by the Seller; and

(d)     any Taxes for any Pre-Closing Period (including the pre-Closing portion of any Straddle Period, determined in accordance with Section 6.6(b)).

9.3     Indemnification by the Purchaser.  The Purchaser shall indemnify and hold harmless the Seller, the Seller Guarantors or any Affiliate of the Seller Guarantors, and their respective officers, directors, shareholders, employees, agents and representatives (each a "Seller Indemnitee") from and after the Effective Time from and against any Damages actually incurred by such Seller Indemnitee as a result of:

(a)     any inaccuracy in any of the representations and warranties made herein by the Purchaser;

(b)     any breach of any of the covenants or agreements made herein by the Purchaser;

(c)     (i) any claim by any current or former employee of a Personnel Provider related to such Person's work in the Business or (ii) any claim by a third party against a Seller Indemnitee that relates to any Target Company or the Business, including any claim related to any services provided to any Target Company or the Business by any Seller Indemnitee; provided, no Seller Indemnitee shall be entitled to indemnification pursuant to this Section 9.3(c)(ii) with respect to any services provided to any Target Company or the Business if it is finally determined by a court of competent jurisdiction that such claim principally arose out of such Seller Indemnitee's gross negligence or willful misconduct;

(d)    any Claims, actions, suits, or other proceedings relating to the operations of the Target Companies after the Effective Time; provided, that nothing herein shall relieve the Seller of its indemnification obligations pursuant to Section 9.2; and

(e)    any liabilities related to the MOB in respect of (i) Seller's post-Closing lease obligations under the Space Leases or (ii) LHP's guarantees of the Ground Lease and Space Leases.

9.4    Limitations on Claims.

(a)    Notwithstanding anything in this Article IX to the contrary, the rights of the parties to be indemnified and held harmless under this Article IX shall be limited as follows:

(i)    in no event shall the Purchaser Indemnitees be entitled to recover any Damages with respect to any matter relating to the Target Companies' assets, liabilities or reserves that were included in the calculation of the Final Net Working Capital, to the extent such Damages are reflected therein;

(ii)    Seller will have no obligation to indemnify a Purchaser Indemnitee pursuant to Section 9.2(a) in respect of damages arising from any inaccuracy in any of the Fundamental Representations or Section 3.5 unless and until the aggregate amount of such damages incurred or suffered by all Purchaser Indemnitees exceeds $250,000 (the "Threshold"), and thereafter Seller shall only indemnify a Purchaser Indemnitee in respect of any damages in excess of the Threshold;

(iii)    Purchaser will have no obligation to indemnify a Seller Indemnitee pursuant to Section 9.3(a) in respect of damages arising from any inaccuracy in any of the representations and warranties made herein by Purchaser unless and until the aggregate amount of such damages incurred or suffered by all Seller Indemnitees exceeds the Threshold, and thereafter Purchaser shall only indemnify a Seller Indemnitee in respect of any damages in excess of the Threshold; and

(iv)    the Seller shall not be liable for any Damages pursuant to Section 9.2 in excess of the aggregate dollar amounts paid to the Seller pursuant to any of the provisions of this Agreement; provided, Seller's liability for any Damages pursuant to Section 9.2(b) shall not exceed $1,137,500.

(b)    The liability of a party with respect to any claim for indemnity by an Indemnitee pursuant to this Article IX shall be offset dollar for dollar by (i) any insurance proceeds received by such Indemnitee after the Effective Time in respect of the Damages involved, (ii) any other recovery made by such Indemnitee from any third party on account of the Damages involved, but, in each case, only after Indemnitee first recovers all Damages, including the aggregate amount of all costs and expenses incurred by such Indemnitee in connection with the recovery of such proceeds (including payment of deductibles and self-insured retention amounts) and less the present value of all insurance policy premium increases reasonably anticipated to result therefrom, and (iii) any Tax benefit realized by the Purchaser or an Affiliate in respect of the indemnified matter.

(c) The right to indemnification with respect to any claim for which notice has been properly and timely given in accordance with Sections 9.1 and 9.5 shall expire on the day after the expiration of the applicable Survival Period, unless an action or suit has been brought with respect to such Claim.

9.5 <u>Claims Procedures</u>.

(a) If a party seeks indemnification for Damages hereunder, the party seeking indemnification (the "<u>Indemnitee</u>") shall promptly notify the party from whom indemnification is sought (the "<u>Indemnifying Party</u>") in writing of the existence and nature of such Damages (a "<u>Claim</u>"), and shall include in the Claim a reasonably detailed description of all related claims, demands, actions or proceedings, if any, out of which the Damages arise; <u>provided</u>, <u>however</u>, that so long as a Claim is delivered within the applicable Survival Period, failure or delay by the Indemnitee to deliver a Claim in compliance with this provision shall only reduce the obligation of the Indemnifying Party to the extent that such failure impairs the Indemnifying Party's ability to defend the claim or mitigate Damages, in which case the Indemnifying Party shall have no obligation to indemnify the Indemnitee to the extent of Damages caused by such failure.

(b) In the event of a Claim related to a claim by a third party, the Indemnifying Party may elect to retain counsel of its choice to represent the Indemnitee in connection with such Claim and shall pay the fees, charges and disbursements of such counsel. The Indemnitee may participate, at its own expense and through legal counsel of its choice, <u>provided</u> that (i) the Indemnifying Party may elect to control the defense of the Indemnitee in connection with such Claim and (ii) the Indemnitee and their counsel shall cooperate with the Indemnifying Party and its counsel in connection with such Claim. The Indemnifying Party shall not settle any such Proceeding without the relevant Indemnitees' prior written consent (which shall not be unreasonably withheld). Notwithstanding the foregoing, if the Indemnifying Party elects not to retain counsel and assume control of such defense or if both the Indemnifying Party and any Indemnified Party are parties to or subjects of such proceeding and conflicts of interests exist between the Indemnifying Party and such Indemnitee, then the Indemnitee shall retain counsel reasonably acceptable to the Indemnifying Party in connection with such proceeding and assume control of the defense in connection therewith, and the fees, charges and disbursements of no more than one such counsel per jurisdiction selected by the Indemnitee shall be reimbursed by the Indemnifying Party.

(c) If the Indemnifying Party shall, within a reasonable time after said notice, fail to defend, the Indemnitee shall have the right, but not the obligation, and without waiving any rights against the Indemnifying Party, to undertake the defense of, and with the consent of the Indemnifying Party (such consent not to be withheld unreasonably), to compromise or settle the Claim on behalf, for the account, and at the risk and expense, of the Indemnifying Party and shall be entitled to collect the amount of any settlement or judgment or decree and all costs and expenses (including, without limitation, reasonable attorney's fees) in connection therewith from the Indemnifying Party. Under no circumstances will the Indemnifying Party have any liability in connection with any settlement of any Proceeding that is entered into without its prior written consent (which shall not be unreasonably withheld). Except as provided in this <u>Section 9.5(c)</u>, the Indemnitee shall not compromise or settle any Claim.

(d) From and after the delivery of a Claim, at the reasonable request of the Indemnifying Party, each Indemnitee shall grant the Indemnifying Party and its counsel, experts and representatives full access, during normal business hours, to the books, records, personnel and properties of the Indemnitee to the extent reasonably related to the Claim at no cost to the Indemnifying Party.

(e) An Indemnitee shall use commercially reasonable efforts to pursue insurance claims or claims against third parties that may reduce or eliminate any Damages.

9.6 <u>Subrogation</u>. After any indemnification is made to any Indemnitee pursuant to this <u>Article IX</u>, the Indemnifying Party shall, to the extent of such payment, be subrogated to all rights (if any) of the Indemnitee against any third party in connection with the Damages to which such payment relates (which rights of subrogation shall be junior to any rights of the Indemnitee for any such Damages as to which it did not receive indemnification pursuant to this <u>Article IX</u> as a result of the limitations set forth in <u>Section 9.4</u> or otherwise).

9.7 <u>Guarantee</u>. The Seller Guarantors, severally to the extent of their Percentage Obligations and not jointly, hereby irrevocably guarantee the prompt performance of all obligations of the Seller arising under <u>Section 2.4(e)(ii)</u> and this <u>Article IX</u>. The Seller Guarantors, Seller and Purchaser acknowledge that but for these guarantees, Purchaser would not enter into this Agreement and the transactions contemplated herein.

9.8 <u>Limitation on Damages</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY ELSEWHERE IN THIS AGREEMENT, NEITHER PARTY (OR ANY OF ITS AFFILIATES) SHALL BE LIABLE TO THE OTHER PARTY (OR ANY OF ITS AFFILIATES) FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, COSTS, EXPENSES, CHARGES OR CLAIMS.

9.9 <u>Exclusive Remedy</u>. From and after the Closing, the remedies provided for in this <u>Article IX</u> and in the Guarantee shall be exclusive and shall preclude assertion by any Indemnitee of any other rights or the seeking of any and all other remedies against any Indemnitor for claims based on this Agreement, the negotiation thereof or otherwise, other than for (a) actions for specific performance, (b) Damages arising out of or relating to Actual Fraud by any Indemnitor and (c) adjustments to the Closing Date Consideration contemplated by <u>Section 2.4</u>. Each party hereby waives any provision of applicable Law to the extent that it would limit or restrict the agreement contained in this <u>Section 9.9</u>, and Seller and Purchaser each hereby expressly waives for periods following the Closing any and all other rights or causes of action it or its Affiliates or representatives may have against the other Party or its Affiliates or representatives now or in the future under any applicable Law with respect to any breach of any representation, warranty, covenant or other agreement herein or the subject matter of such indemnification provisions.

# ARTICLE X
# TERMINATION

10.1    <u>Termination Events</u>.  This Agreement may be terminated at any time prior to Closing upon prior written notice by the party electing to terminate this Agreement to the other party:

(a)    by written agreement executed by the Seller and the Purchaser;

(b)    by either the Seller or the Purchaser if any permanent injunction, Court Order or other order, decree or ruling of any court or other Governmental Authority of competent jurisdiction permanently restraining, enjoining or otherwise preventing the consummation of the transactions contemplated hereby shall have been issued and become final and non-appealable;

(c)    by either the Seller or the Purchaser if the Closing shall not have occurred by the Optional Termination Date; <u>provided</u>, <u>however</u>, that this <u>Section 10.1(c)</u> shall not be available to any Party (A) whose Willful Breach of any provision of this Agreement results in the failure of the Closing to be consummated on or before the Optional Termination Date, <u>provided</u> that from and after the Optional Termination Date, the non-Willful Breaching party shall have sixty (60) days to commence a legal proceeding for specific performance of this Agreement and (x) if such legal proceeding is not commenced by the end of such sixty (60) day period or (y) there is a final and nonappealable judgment by a Governmental Authority of competent jurisdiction denying a claim for specific performance by the non-Willful Breaching party, the Willful Breaching party shall have the right to terminate this Agreement pursuant to the terms and conditions of this <u>Section 10.1(c)</u> notwithstanding this clause (A)) or (B) during the pendency of any legal proceeding by the other Party for specific performance of this Agreement;

(d)    by the Seller upon a breach in any material respect of any covenant or agreement on the part of the Purchaser set forth in this Agreement, and such breach is not cured within thirty (30) days of notice thereof, or if any representation or warranty of the Purchaser shall have been breached or shall have become untrue in any such case that the conditions set forth in <u>Sections 8.1</u> and <u>8.2</u> would be incapable of being satisfied by the Optional Termination Date (or any later date as such date may be otherwise extended by mutual agreement of the parties); or

(e)    by the Purchaser upon a breach in any material respect of any covenant or agreement on the part of the Seller set forth in this Agreement, and such breach is not cured within thirty (30) days of notice thereof, or if any representation or warranty of the Seller shall have been breached or shall have become untrue in any such case such that the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> would be incapable of being satisfied by the Optional Termination Date (or any later date as such date may be otherwise extended by mutual agreement of the parties).

10.2    <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to <u>Section 10.1</u>, all obligations of the parties hereto shall terminate, except the obligations of the parties pursuant to <u>Sections 6.1</u>, <u>10.2</u>, <u>11.1</u>, and <u>Article XII</u> (other than <u>Section 12.18</u>); <u>provided</u>, <u>however</u>, that the foregoing shall in no way release or waive any rights which any party may

have on account of a Willful Breach of any covenant or agreement or Actionable Breach
pursuant to this Agreement which occurred prior to such termination.

<div align="center">

**ARTICLE XI**
**NOTICES**

</div>

     11.1   <u>Notices</u>.  All notices and other communications hereunder shall be in writing and
shall be deemed to have been duly given when delivered in person or received by telegraphic or
other electronic means (including facsimile, telecopy and telex), when delivered by reputable
overnight courier, or if mailed, five days after being deposited in the United States mail, certified
or registered mail, first-class postage prepaid, return receipt requested, to the parties at the
following addresses or facsimile numbers:

     If to the Seller, to:

     Sherman/Grayson Health System, LLC
     c/o LHP Hospital Group, Inc.
     2400 Dallas Parkway, Suite 450
     Plano, Texas  75093
     Attention: General Counsel
     Fax:  (972) 312-9750

     with a copy (which shall not constitute notice) to:

     Weil, Gotshal & Manges LLP
     767 Fifth Avenue
     New York, New York 10153
     Attention:  Harvey Eisenberg, Esq.
     Facsimile:  212-310-8007

     If to the Purchaser, to:

     Alecto Healthcare Services Sherman LLC
     c/o Alecto Healthcare Services LLC
     16310 Bake Parkway, Suite 200
     Irvine, California 92618
     Attention: CEO
     Facsimile: (949) 878-9458

     with a copy (which shall not constitute notice) to:

     Law Offices of Michael J. Sarrao
     16310 Bake Parkway, Suite 200
     Irvine, California 92618
     Attention: Michael J. Sarrao, Esq.
     Facsimile: (949) 878-9458

Any Party from time to time may change its address or facsimile number for the purpose of receipt of notices to that Party by giving a similar notice specifying a new address or facsimile number to the other notice Parties listed above in accordance with the provisions of this <u>Section 11.1</u>.

## ARTICLE XII
## MISCELLANEOUS

12.1 <u>Fees and Expenses</u>. Except as otherwise provided in this Agreement, the Seller shall pay its own expenses (including, without limitation, the fees and expenses of Weil, Gotshal & Manges LLP and of the parties reflected in <u>Schedule 3.20</u> in connection with this Agreement and also including those expenses of the Target Companies in connection with this Agreement and the transactions contemplated hereby incurred prior to the Effective Time) and the Purchaser shall pay its own expenses (including, without limitation, the fees and expenses of attorneys, accountants and other representatives in connection with this Agreement, and also including those of the Target Companies in connection with this Agreement and the transactions contemplated hereby incurred after the Effective Time) in connection with this Agreement and the transactions contemplated hereby. Purchaser shall pay all recording fees, transfer fees, transfer taxes, and documentary or stamp taxes, if any, relating to the sale and the transactions provided for herein. Except as set forth in the following sentence and in <u>Section 6.2(b)</u>, each party shall pay its own fees and expenses, including for purposes of this <u>Section 12.1</u>, attorney fees, with respect to the preparation of pre-merger report forms under the HSR Act, if applicable. Further, and notwithstanding the foregoing, the Purchaser will bear all fees and expenses of all parties, resulting from or relating to any investigation or challenge of the transactions contemplated hereby initiated by the United States Federal Trade Commission, the United States Department of Justice or the Attorney General of any state on, prior to or after the Closing under antitrust or similar Laws, including costs and expenses resulting from or relating to any "second request" issued in connection with the parties' HSR Act filings, if any, made in connection with the transactions contemplated hereby.

12.2 <u>Entire Agreement</u>. Except for documents and agreements executed pursuant hereto, and except for the provisions of the Confidentiality Agreement (which Confidentiality Agreement shall survive the parties' execution and delivery of this Agreement), this Agreement supersedes all prior oral discussions and written agreements between the parties with respect to the subject matter of this Agreement (including any term sheet or similar agreement or document relating to the transactions contemplated hereby). Except for the Confidentiality Agreement, this Agreement, including the exhibits and schedules hereto and other documents delivered in connection herewith, contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof.

12.3 <u>Waiver</u>. Any term or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof. Any such waiver must be in writing and must be duly executed by such party. A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach, provision or requirement on any other occasion.

12.4 <u>Amendment</u>. This Agreement may be modified or amended only by a written instrument duly executed by the Seller and the Purchaser.

12.5    Counterparts; Facsimile Signatures; Reproductions.  This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  Facsimile signatures on this Agreement shall be deemed to be original signatures for all purposes.  This Agreement and all documents relating hereto, including (i) consents, waivers and modifications which may hereafter be executed, (ii) the documents delivered at the Closing, and (iii) financial statements, certificates and other information previously or hereafter furnished to the Seller or to the Purchaser, may be reproduced by the Seller and by the Purchaser by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and, unless otherwise required by Law, the Seller and the Purchaser may destroy any original documents so reproduced.  The Seller and the Purchaser agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by the Seller or the Purchaser in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

12.6    No Third Party Beneficiary.  The terms and provisions of this Agreement are intended solely for the benefit of the Seller, the Purchaser and their respective successors or assigns, and it is not the intention of the parties to confer third party beneficiary rights upon any other Person, other than with respect to the provisions of Sections 5.8, 6.4, 6.5, 6.9 and 6.13 and Article IX, which shall inure to the benefit of the Persons who are intended to be third-party beneficiaries thereof.

12.7    GOVERNING LAW, CONSTRUCTION.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO A CONTRACT EXECUTED AND PERFORMED IN SUCH STATE IN ANY EVENT WITHOUT REGARD TO ANY CHOICE OF LAW PRINCIPLE THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  The parties hereto agree that no provisions of this Agreement or any related document shall be construed for or against or interpreted to the advantage or disadvantage of any party hereto by any court or other Governmental Authority by reason of any party's having or being deemed to have structured or drafted such provision, each party having participated equally in the structuring and drafting hereof.

12.8    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, including successors by merger or otherwise.

12.9    No Assignment.  Neither this Agreement nor any right hereunder or part hereof may be assigned by any party hereto without the prior written consent of the other parties hereto; provided, however, that (a) the Seller, on the one hand, and the Purchaser, on the other hand, may assign their respective rights and obligations under this Agreement to other Persons who (i) are Affiliates of the Seller or the Purchaser, respectively, and (ii) agree to be bound by the terms and conditions of this Agreement; and (b) Purchaser may assign its rights under this Agreement to a real estate investment trust and/or its Affiliates in connection with a sale/leaseback transaction and true operating lease which is used to provide Purchaser with capital  to consummate this Agreement.  Notwithstanding the assignment of this Agreement or any rights or

obligations hereunder, the assignor shall be jointly and severally liable with its assignee with respect to any obligations assigned hereunder.

12.10 <u>Headings, Gender, Etc.</u> The headings used in this Agreement have been inserted for convenience and do not constitute provisions to be construed or interpreted in connection with this Agreement. Unless the context of this Agreement otherwise requires, (a) words of any gender will be deemed to include each other gender, (b) words using the singular or plural number also will include the plural or singular number, respectively, (c) the terms "hereof", "herein", "hereby" and derivative or similar words will refer to this entire Agreement, and (d) the terms "Article," "Section," "Schedule" and "Exhibit" will refer to the specified Article or Section of this Agreement or the specified Schedule or Exhibit to this Agreement.

12.11 <u>Public Announcement.</u> Prior to the Closing, the Parties shall not, and shall cause their respective Affiliates not to, make or issue any public statements or announcements with respect to this Agreement or the transactions contemplated hereby. In connection with the Closing, the Parties will use good faith efforts to agree on the text of a joint public statement or announcement and/or will use good faith efforts to obtain the other Party's approval of the text of any public statement or announcement to be made solely on behalf of a Party; <u>provided</u> that the foregoing shall not preclude any Party from making such disclosure as may be required by applicable Law.

12.12 <u>Severability; Invalid Provisions.</u> If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, (a) such provisions will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms and effect to such illegal, invalid or unenforceable provision as may be possible.

12.13 <u>Venue.</u> To the fullest extent permitted by applicable law, each party hereto (a) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in any State or Federal court located in Delaware and not in any other State or Federal court in the United States of America or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of such courts located in Delaware for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court or any claim that any such proceeding brought in such a court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

12.14 <u>WAIVERS OF TRIAL BY JURY.</u> EACH OF THE SELLER AND THE PURCHASER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY

JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTION DOCUMENTS, AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

12.15    <u>No Inferences</u>.  Inasmuch as this Agreement is the result of negotiations between sophisticated parties of equal bargaining power represented by counsel, no inference in favor of, or against, either party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such party.

12.16    <u>Tax and Government Program Advice and Reliance</u>.  Except as expressly provided in this Agreement, none of the Parties (nor any of the Parties' respective counsel, accountants or other representatives) has made or is making any representations to any other Party (or to any other Party's counsel, accountants or other representatives) concerning the consequences of the transactions contemplated hereby under applicable Tax Laws or under the Laws governing any Government Program.  Each Party has relied solely upon the Tax any Government Program advice of its own employees or of representatives engaged by such Party and not on any such advice provided by any other Party hereto.

12.17    <u>Further Assurance Clause</u>.  On and after the Closing Date, the Seller and the Purchaser will take all appropriate action and execute all documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the provisions hereof, including, without limitation, putting the Purchaser in possession and operational control of the Business and the Facility.

12.18    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur in the event that any of the obligations, undertakings, covenants or agreements of the Parties hereto were not performed in accordance with their specific terms or were otherwise breached and that monetary damages, even if available, would not be an adequate remedy.  It is accordingly agreed that the Seller, on the one hand, and Purchaser, on the other hand, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by the other Party, and to enforce specifically the terms and provisions of this Agreement by a decree of specific performance, without the necessity of proving actual harm or posting a bond or other security therefor, this being in addition to any other remedy to which such Party is entitled at law or in equity, and each Party hereto agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that any other Party hereto has an adequate remedy at law or that any award of specific performance or other equitable remedy is not an appropriate remedy for any reason at law or in equity.  Without limitation of the foregoing, the Parties hereby further acknowledge and agree that prior to the Closing, the Seller shall be entitled to seek specific performance to enforce specifically the terms and provisions of, and to prevent or cure breaches of the covenants required to be performed by Purchaser under this Agreement (including to cause Purchaser to consummate the Closing and to make the payments contemplated by this Agreement, including <u>Section 2.6(a)</u>) in addition to any other remedy to which the Seller is entitled at law or in equity, including the Seller's right to terminate this Agreement pursuant to <u>Article X</u> and seek money damages (including damages based on loss of the economic benefits of the transactions contemplated hereby to the Seller).  In the event that the Seller, on the one hand, or Purchaser, on the other hand, brings a legal proceeding for specific performance

pursuant to this Section 12.18, and a court rules that the Seller or Purchaser, as applicable, breached any provision of this Agreement, then the breaching Party shall also pay the non-breaching Party's reasonable costs and expenses (including reasonable attorneys' fees and expenses) in connection with all such legal proceedings to seek specific performance of the Seller's or Purchaser's, as applicable, obligations under this Agreement and all legal proceedings to collect such costs and expenses.  Each of the Parties further agrees that it shall not take any position in any legal proceeding concerning this Agreement that is contrary to the terms of this Section 12.18.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**SELLER:**                                    **PURCHASER:**

**SHERMAN/GRAYSON HEALTH**          **ALECTO HEALTHCARE SERVICES**
**SYSTEM, LLC**                        **SHERMAN LLC**

                                       By: Alecto Healthcare Services LLC, its sole member

By: _Rebecca Hurley_                   By: _____
Name: _REBECCA HURLEY_                 Name: _____
Its: _EVP_                             Its: _____

**SELLER GUARANTORS:**

**LHP HOSPITAL GROUP, INC.**

By: _Rebecca Hurley_
Name: _REBECCA HURLEY_
Its: _EVP_

**TEXAS HEALTH RESOURCES**

By: _____
Name: _____
Its: _____

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**SELLER:**                                            **PURCHASER:**

**SHERMAN/GRAYSON HEALTH**          **ALECTO HEALTHCARE SERVICES**
**SYSTEM, LLC**                                   **SHERMAN LLC**

By: Alecto Healthcare Services LLC, its sole member

By:_____          By:_____
Name:_____          Name:_____
Its:_____          Its:_____

**SELLER GUARANTORS:**

**LHP HOSPITAL GROUP, INC.**

By:_____
Name:_____
Its:_____

**TEXAS HEALTH RESOURCES**

By: _____
Name: _____*TIMOTHY E FELDAN*_____
Its: _____*CEO*_____

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of
the date first above written.

**SELLER:**                          **PURCHASER:**


**SHERMAN/GRAYSON HEALTH**        **ALECTO HEALTHCARE SERVICES**
**SYSTEM, LLC**                   **SHERMAN LLC**

By: Alecto Healthcare Services LLC, its sole member

By:_____     By:_____
Name:_____     Name:_____Roger Krissman_____
Its:_____    Its:_____CFo_____


**SELLER GUARANTORS:**

**LHP HOSPITAL GROUP, INC.**


By:_____
Name:_____
Its:_____


**TEXAS HEALTH RESOURCES**


By:_____
Name:_____
Its:_____


[Signature Page to Purchase Agreement]

**A0357**

**Exhibit A**

**Form of Excluded Obligations Release**

# RELEASE

THIS RELEASE (the "Release") is entered into as of the [•] day of [•], 2014, by and among Sherman/Grayson Hospital, LLC, a Texas limited liability company ("Hospital"), Sherman/Grayson Health Services, LLC, a Texas limited liability company ("Services") and Sherman/Grayson Sponsor, LLC, a Texas limited liability company ("Sponsor" and, together with Hospital and Services, the "Released Parties"), on the one hand, and Sherman/Grayson Health System, LLC, a Texas limited liability company ("Seller"), LHP Hospital Group, Inc., a Delaware corporation ("LHP"), and Texas Health Resources, a Texas non-profit corporation ("THR", together with Seller and LHP, the "Releasing Parties"), on the other hand.  Capitalized terms not defined herein shall have the meanings ascribed to them in the Purchase Agreement, as defined below.

WHEREAS, Sherman/Grayson Health System, LLC ("Seller"), Alecto Healthcare Services Sherman LLC ("Buyer"), LHP Hospital Group, Inc. and Texas Health Resources entered into that certain Purchase Agreement, dated as of September 23, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), pursuant to which Seller agreed to sell to Buyer all of the outstanding membership interests in the Released Parties; and

WHEREAS, Section 7.8 of the Purchase Agreement provides that the Seller shall deliver at the Closing to the Buyer this Release.

NOW, THEREFORE, in consideration of the foregoing premises and the covenants and agreements set forth herein and in the Purchase Agreement, the parties hereto agree as follows:

1.    Termination.    Except for the Purchase Agreement and the Transaction Documents and the obligations set forth therein, and with effect immediately following consummation of the transactions contemplated by the Purchase Agreement and delivery of all of the Transaction Documents, each of the Releasing Parties for itself, and each of LHP and THR on behalf of its respective Affiliates, fully, finally and forever terminates any agreements or obligations of any kind between and among any of the Released Parties to the extent any such agreement or obligation is an Excluded Obligation, in each case without any liability to the Released Parties.

2.    Release.  Each of the Releasing Parties, for itself, and each of LHP and THR on behalf of its respective Affiliates, fully, finally and forever releases the Released Parties from any and all actions, obligations, costs, expenses, Damages, debts, claims, liabilities, causes of action and demands, known or unknown, actual or contingent, of whatever character, at law or in equity, in each case, relating to the Excluded Obligations (collectively "Claims") which such Releasing Party ever had, now has, or hereafter can, shall or may have based upon actions, omissions, events or circumstances occurring up to the time of the execution of this Release (collectively "Released Claims"); provided, however that Released Claims do not include Claims arising under the Purchase Agreement or the Transaction Documents.

3.    Governing Law.    THIS RELEASE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE

1

APPLICABLE TO A CONTRACT EXECUTED AND PERFORMED IN SUCH STATE IN ANY EVENT WITHOUT REGARD TO ANY CHOICE OF LAW PRINCIPLE THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. The parties hereto agree that no provisions of this Release or any related document shall be construed for or against or interpreted to the advantage or disadvantage of any party hereto by any court or other Governmental Authority by reason of any party's having or being deemed to have structured or drafted such provision, each party having participated equally in the structuring and drafting hereof.

    4.    <u>Submission to Jurisdiction</u>.  To the fullest extent permitted by applicable law, each party hereto (a) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Release or the transactions contemplated hereby shall be brought only in any State or Federal court located in Delaware and not in any other State or Federal court in the United States of America or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of such courts located in Delaware for purposes of all legal proceedings arising out of, or in connection with, this Release or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court or any claim that any such proceeding brought in such a court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

    5.    <u>Assignment; Successors</u>.  Neither this Release nor any of the rights, interests or obligations under this Release may be assigned or delegated, in whole or in part, by operation of law or otherwise, without the prior written consent of the Releasing Parties and the Released Parties, and any such assignment without such prior written consent shall be null and void.

<div align="center">[SIGNATURES APPEAR ON THE FOLLOWING PAGE]</div>

IN WITNESS WHEREOF, the parties hereto have executed this Release as of the date first above written.

**RELEASING
PARTIES:**

    **SHERMAN/GRAYSON HEALTH SYSTEM, LLC**

By: _____

    Name:_____

    Title:_____

**LHP HOSPITAL GROUP, INC.**

By: _____

    Name:_____

    Title:_____

**TEXAS HEALTH RESOURCES**

By: _____

    Name:_____

    Title:_____

**RELEASED
PARTIES:**

**SHERMAN/GRAYSON HOSPITAL, LLC,**

By: _____
    Name:_____
    Title:_____

**SHERMAN/GRAYSON HEALTH SERVICES, LLC,**

By: _____
    Name:_____
    Title:_____

**SHERMAN/GRAYSON SPONSOR, LLC,**

By: _____
    Name:_____
    Title:_____

**<u>Exhibit B</u>**

**<u>Knowledge Parties</u>**

<u>Target Companies</u>

John Holland

John Ehrie

<u>Purchaser</u>

Lex Reddy

Roger Krissman

# Exhibit C

## Net Working Capital Methodology

# Exhibit B
## Net Working Capital Methodology

**Texas Health Presbyterian Hospital - WNJ**

**Net Working Capital Calculation**

**As of July 2014**

*Amounts in $000s*

| | Seller Unaudited Balance Sheet July 2014 | Adjustments to Eliminate Seller | Target Companies' Combined B/S | NWC per Purchase Agreement | Notes |
|---|---|---|---|---|---|
| **Current Assets:** | | | | | |
| Cash | 5 | (5) | - | - | Remove Cash |
| Restricted Cash | | | | | |
| Accounts Receivable, less allowance for doubtful accounts | 13,930 | (313) | 13,617 | 13,617 | Remove Meaningful Use Receivable |
| Inventories | 2,608 | - | 2,608 | 2,608 | |
| Other receivables | 296 | - | 296 | 296 | |
| Other / Prepaids | 466 | - | 466 | 466 | |
| **Total Current Assets** | **17,305** | **(318)** | **16,987** | **16,987** | |
| **Property and equipment, at cost:** | | | | | |
| Land | - | | - | - | |
| Buildings and improvements | 10,056 | | 10,056 | - | |
| Furniture and equipment | 20,590 | | 20,590 | - | |
| Construction in progress | 1,484 | | 1,484 | - | |
| | 32,129 | | 32,129 | - | |
| Accumulated Depreciation | (24,470) | | (24,470) | - | |
| **Property and equipment, net** | **7,659** | **-** | **7,659** | **-** | |
| Investments in and advances to affiliate | 87 | | 87 | - | |
| Notes Receivable | 2 | | 2 | - | |
| Other assets | 468 | (405) | 63 | - | |
| **Total Assets** | **25,521** | **(723)** | **24,798** | **-** | |
| | | | | | |
| **Liabilities and Members' Equity** | | | | | |
| **Current liabilities:** | | | | | |
| Accounts Payable | 6,894 | - | 6,894 | 6,894 | |
| Accrued salaries, wages and benefits | 2,755 | | 2,755 | 2,755 | |
| Other accrued expenses | 12,038 | (10,625) | 1,413 | 1,413 | Remove management fees |
| Interest payable | 448 | (88) | 360 | 360 | Remove interest payable on debt |
| Current portion of long term debt | 2,664 | (2,664) | - | - | Remove current portion of debt |
| Due to corporate | 24,753 | (24,753) | - | - | Remove intercompany due to LHP |
| **Total current liabilities** | **49,552** | **(38,130)** | **11,422** | **11,422** | |
| **Long term liabilities:** | | | | | |
| Long term debt | 45,337 | (45,337) | - | - | |
| Other | 369 | | 369 | - | |
| **Total long term debt** | **45,705** | **(45,337)** | **369** | **-** | |
| Long term obligations | 10,925 | - | 10,925 | - | |
| **Total long term liabilities** | **56,630** | **(45,337)** | **11,294** | **-** | |
| **Total liabilities** | **106,182** | **(83,466)** | **22,716** | **-** | |
| Total Members equity & retained deficit | (80,660) | 82,743 | 2,083 | - | |
| **Total liabilities and equity** | **25,521** | **(723)** | **24,798** | **-** | |
| | | | | | |
| **Target Net Working Capital** | | | | **5,565** | |

*The line items above consist only of the aggregated GL line items attached to this Exhibit B.*

FINAL PWNJ Adj Net Working Capital Calc and Support.xlsx

| FS Line | Statement | CIM Description | DR CR | (SubAcct) Description | GL2014.A7 | Adjustments |
|---|---|---|---|---|---|---|
| | | Accounts Receivable, Net | | Accounts Payable | | |
| | | Inventories | | Accrued salaries, wages and benefits | | |
| | | Other / Prepaids | | Other accrued expenses | | |
| | | Other Receivables | | Interest payable | | |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000000) Non-desig Payer Type -system account | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000000) Non-desig Payer Type -system account | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000005) Revenue Accrual Gross AR | 722,129 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000010) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000100) Other Patient AR 1417 Clinic | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000101) Other Patient AR Reserve 1417 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000102) Other Patient AR CRNA | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000103) Other Patient AR Reserves CRNA's | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000104) Other Patient AR #3 | (150,955) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000105) Other Patient AR Reserve #3 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000106) Other Patient AR #4 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000300) AR û Credit Balances | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000400) AR û Industrial | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000860) Agency 1 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000860) Return Check Clearing | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000930) Unapplied Cash û Ins (hosp designated) | (221,590) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000980) Refund Clearing | (128) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000981) Refund Clearing #2 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000990) Late charge suspense account | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001000) 1 - MEDICARE IP Gross AR | 8,325,043 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001010) 1 - MEDICARE IP CA | (6,405,410) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001500) 1 - MEDICARE OP Gross AR | 3,289,351 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001510) 1 - MEDICARE OP CA | (1,423,770) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001580) MC bad debt receivable/payable | 33,553 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001590) Bad Debt Pass Through Pmts | (186,197) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001600) MC DSH receivable/payable | 84,265 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001840) MPPS accrued contractual adjustments | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001870) MC Outpatient  Allowance | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002000) 2 - MEDICAID IP Gross AR | 777,044 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002010) 2 - MEDICAID IP CA | (3,843,239) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002500) 2 - MEDICAID OP Gross AR | 173,073 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002510) 2 - MEDICAID OP CA | (976,046) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002810) MA Allowance for OP fee-based rec | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002840) Allowance for MA Inpatient | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003000) 8 - WORKMANS COMP IP Gross AR | 144,689 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003010) 8 - WORKMANS COMP IP CA | 52,106 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003500) 8 - WORKMANS COMP OP Gross AR | 188,029 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003510) 8 - WORKMANS COMP OP CA | (112,896) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004000) 4 - COMMERCIAL IP Gross AR | 482,438 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004010) 4 - COMMERCIAL IP CA | (363,613) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004500) 4 - COMMERCIAL OP Gross AR | 876,907 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004510) 4 - COMMERCIAL OP CA | (558,030) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005000) 7 - MNGED CARE - MEDICAID IP Gross AR | 1,337,813 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005010) 7 - MNGED CARE - MEDICAID IP CA | (878,963) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005500) 7 - MNGED CARE - MEDICAID OP Gross AR | 910,782 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005510) 7 - MNGED CARE - MEDICAID OP CA | (466,699) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006000) 3 - OTHER FED/COUNTY/STATE IP Gross AR | 671,040 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006010) 3 - OTHER FED/COUNTY/STATE IP CA | (300,985) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006500) 3 - OTHER FED/COUNTY/STATE OP Gross AR | 353,058 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006510) 3 - OTHER FED/COUNTY/STATE OP CA | (205,681) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007000) 5 - MNGED CARE-COMMERCIAL IP Gross AR | 4,074,477 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007010) 5 - MNGED CARE-COMMERCIAL IP CA | (1,306,581) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007500) 5 - MNGED CARE-COMMERCIAL OP Gross AR | 3,154,650 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007510) 5 - MNGED CARE-COMMERCIAL OP CA | (1,132,165) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008000) 6 - MNGED CARE - MEDICARE IP Gross AR | 1,380,536 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008010) 6 - MNGED CARE - MEDICARE IP CA | (352,249) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008050) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008060) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008500) 6 - MNGED CARE - MEDICARE OP Gross AR | 679,544 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008510) 6 - MNGED CARE - MEDICARE OP CA | (359,882) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11108710) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11099000) 9 - SELF PAY IP Gross AR | 14,217,539 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11099020) Industrial Account û Allowance | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11109100) Charity Discount Program û Allowance | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11099500) 9 - SELF PAY OP Gross AR | 9,157,166 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202000) Allow for Uncollectible Patient Accts | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202000) Allow for Uncollectible Patient Accts | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202050) Allowance for Industrial A/R | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202100) Allowance for other patient AR | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202102) Other Patient BD Reserve #2 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202200) Pure Self Pay AFDA | (14,203,875) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202210) Self Pay After Insurance AFDA | (2,469,477) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202220) Insured Aged < 365 days AFDA | (971,915) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202230) Insured Aged >= 365 days AFDA | (620,023) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203000) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203010) Year to be determined | 256,223 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203020) Year to be determined | - | - |

| FS Line | Statement | CIM Description | DR CR | (SubAcct) Description | GL2014.A7 | Adjustments |
|---|---|---|---|---|---|---|
| | | Accounts Receivable, Net | | Accounts Payable | | |
| | | Inventories | | Accrued salaries, wages and benefits | | |
| | | Other / Prepaids | | Other accrued expenses | | |
| | | Other Receivables | | Interest payable | | |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203030) Year to be determined | 194,517 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203040) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203070) Medicare due to/from 2013 | 222,792 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204000) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204070) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204080) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204090) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204130) Medicaid due to/from 2013 | 11,515 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11206000) Year to be determined | 13,167 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11206130) Champus due to/from 2013 | 43,844 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11207000) MC MU/HIT 2012 | 312,651 | 312,651 |
| | | | | **Accounts Receivable, Net:** | **$ 13,929,571** | **$ 13,616,921** |
| BS - Inventory | BS | Inventories | D | (11306120) Inventory-Medical and Surgical Unit | - | - |
| BS - Inventory | BS | Inventories | D | (11307010) Inventory-Surgery Unit | 1,067,976 | - |
| BS - Inventory | BS | Inventories | D | (11307120) Inventory-Pharmacy-#1 | 733,191 | - |
| BS - Inventory | BS | Inventories | D | (11307120) Inventory-Pharmacy-#1 | - | - |
| BS - Inventory | BS | Inventories | D | (11307180) Inventory-Materials Management | 423,264 | - |
| BS - Inventory | BS | Inventories | D | (11307200) Inventory-Non-Published | - | - |
| BS - Inventory | BS | Inventories | D | (11307360) Inventory-Microbiology lab | 160,244 | - |
| BS - Inventory | BS | Inventories | D | (11307460) Inventory-Cardiac Cath Lab | 2,735 | - |
| BS - Inventory | BS | Inventories | D | (11307620) Inventory-Physical Therapy | 206,657 | - |
| BS - Inventory | BS | Inventories | D | (11307820) Inventory-Industrial Medicine | - | - |
| BS - Inventory | BS | Inventories | D | (11308000) Inventory-Dietary/Cafeteria#1 | 14,118 | - |
| | | | | **Inventories:** | **$ 2,608,184** | **$ 2,608,184** |
| BS - Other | BS | Other | D | (11400000) General prepaids | 367,783 | - |
| BS - Other | BS | Other | D | (11400000) General prepaids | - | - |
| BS - Other | BS | Other | D | (11400010) Prepaid General Liability | - | - |
| BS - Other | BS | Other | D | (11400020) Insure | 98,473 | - |
| BS - Other | BS | Other | D | (11400020) Insure | - | - |
| BS - Other | BS | Other | D | (11400510) Taxes | - | - |
| | | | | **Other / Prepaids:** | **$ 466,256** | **$ 466,256** |
| BS - Other receivables | BS | Other receivables | D | (11500200) Current Non-Patient Receivable FDN | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500200) Current Non-Patient Receivable FDN | 2,281 | - |
| BS - Other receivables | BS | Other receivables | D | (11500200) Current Non-Patient Receivable FDN | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500210) Current Non-Patient A/R - ASC | 14,852 | - |
| BS - Other receivables | BS | Other receivables | D | (11500210) Current Non-Patient A/R - ASC | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500220) Current Non-Patient Receivable #3 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500220) Current Non-Patient Receivable #3 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500230) Current Non-Patient Receivable #4 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500230) Current Non-Patient Receivable #4 | 100 | - |
| BS - Other receivables | BS | Other receivables | D | (11500240) Current Non-Patient Receivable #5 | 10,508 | - |
| BS - Other receivables | BS | Other receivables | D | (11500240) Current Non-Patient Receivable #5 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500250) Vendor Credits Receivable | 10,184 | - |
| BS - Other receivables | BS | Other receivables | D | (11500260) Current Non-Patient AR | 13,475 | - |
| BS - Other receivables | BS | Other receivables | D | (11500270) Current Non-Patient AR | 68,552 | - |
| BS - Other receivables | BS | Other receivables | D | (11510000) Mgmt Fee Receivable PWNI | - | - |
| BS - Other receivables | BS | Other receivables | D | (11501010) To be determined by facility | 47,672 | - |
| BS - Other receivables | BS | Other receivables | D | (11502010) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502020) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502050) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502070) To be determined by facility | 116,668 | - |
| BS - Other receivables | BS | Other receivables | D | (11502080) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502090) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502100) To be determined by facility | 11,536 | - |
| BS - Other receivables | BS | Other receivables | D | (11503020) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11503020) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11503030) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11503040) To be determined by facility | - | - |
| | | | | **Other Receivables:** | **$ 295,828** | **$ 295,828** |

| FS Line | Statement | CIM Description | DR CR | (SubAcct) Description | GL2014.A7 | Adjustments |
|---|---|---|---|---|---|---|
| | | Accounts Receivable, Net | | Accounts Payable | | |
| | | Inventories | | Accrued salaries, wages and benefits | | |
| | | Other / Prepaids | | Other accrued expenses | | |
| | | Other Receivables | | Interest payable | | |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100100) Accts Payable System Interface | 3,331,748 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100750) Accts Payable Accrual | 786,034 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100750) Accts Payable Accrual | - | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100760) Manual A/P Accruals | 1,759,253 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100760) Manual A/P Accruals | 1,950 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100760) Manual A/P Accruals | - | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20101770) Misc Accruals | 548,171 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20102010) Medical Fees Payable | 466,857 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20102020) Medical Fees Payable | | |
| | | | | | Accounts Payable: $ 6,894,013 | $ 6,894,013 |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200010) Accrued Payroll | 1,116,542 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200010) Accrued Payroll | - | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200020) Accrued PTO | 1,230,284 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200025) Accrued PTO - Officers | 60,139 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200030) Vision Plan accrual | - | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200050) Payroll Clearing Account | 94,117 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200060) Accrued Incentive Comp-Admin | 112,312 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200070) Accrued Incentive Comp-Dept Directors | 141,358 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200100) For future use | | |
| | | | | | Accrued salaries, wages and benefits: $ 2,754,753 | $ 2,754,753 |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302010) FICA taxes payable employee | 178,547 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302020) Federal withholding taxes payable | 116,978 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302030) State Withholding Taxes Payable | 1,217 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302050) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302060) Other payroll deductions | 1,530 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302090) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302110) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302120) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302140) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302150) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302160) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302165) Other payroll deductions | 1,291 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302170) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302175) Other payroll deductions | 1,535 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302180) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302185) Other payroll deductions | 1,215 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302190) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302200) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302210) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302220) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302230) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302340) 401(k) deduction payable | 63,417 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302450) Withholding for 401(k) personal loan | 3,541 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302460) Day care spending account deduction | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302460) Health care spending account deduction | 7,557 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302490) Dependent Life Insure deduction | 3,168 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302500) Federal unemployment tax deduction | 883 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302510) Life Insure Employee Paid | 10,130 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302540) Voluntary ADD | 1,960 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302600) Short Term Disability | 9,115 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20304430) SUTA Liab-Texas | 6,233 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502000) Audit accrual | 96,221 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502001) Audit Fees Odd Year | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502002) Audit Fees Even Year | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502003) Internal Audit fees all years | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502020) Tax Prep Fees Even Year | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502021) Tax Prep Fees Odd Year | 20,000 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504120) Franchise tax (accrued) | 93,188 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504150) City sales tax (accrued) | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504160) State sales tax (accrued) | 2,888 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504170) Property tax (accrued) | 526,695 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504170) Property tax (accrued) | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504280) Healthplan Reserve-PMC | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504520) For future use | 14,000 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504530) Other accrued expenses | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20505530) Other accrued expenses | 7,073,855 | 7,073,855 |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20505990) Dental Plan Benefit Plan Fees | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20508000) Other accrued expenses | 3,550,798 | 3,550,798 |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20508210) W/C -IBNR-PMC (02/09-01/10) | 903,715 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20508220) W/C -Claims Paid-PMC (02/09-01/10) | (791,943) | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21700000) Commitment Fees payable | 140,262 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21700010) For future use | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21700020) For future use | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21701050) Phy Recruitment Agreement Liabilities | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21701070) Phy Recruitment Agreement Liabilities | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21701090) Phy Recruitment Agreement Liabilities | - | - |
| | | | | | Accrued salaries, wages and benefits: $ 12,037,995 | $ 1,413,342 |
| BS - Interest payable | BS | Interest payable | C | (21004000) Interest payable | - | - |
| BS - Interest payable | BS | Interest payable | C | (21004000) Interest payable | 88,122 | 88,122 |
| BS - Interest payable | BS | Interest payable | C | (21004000) Interest payable | - | - |
| BS - Interest payable | BS | Interest payable | C | (21004010) Interest payable | 360,219 | - |
| | | | | | Accrued salaries, wages and benefits: $ 448,341 | $ 360,219 |

## Exhibit D

## Target Company Ownership Interests

| Target Company | Interests Authorized | Interests Issued | Jurisdiction of Incorporation | Business Qualifications |
|---|---|---|---|---|
| Sherman/Grayson Hospital, LLC | N/A | | Texas | Texas |
| Sherman/Grayson Health Services, LLC | N/A | | Texas | Texas |
| Sherman/Grayson Sponsor, LLC | N/A | | Texas | Texas |

## Exhibit E

## Required Activities

*Medical Services*

- Anesthesiology
- Emergency Services
- General Surgery (inpatient and outpatient)
- Nephrology
- Oncology
- Otolaryngology
- Rehabilitation Medicine
- Radiology
- Cardiology (non-invasive and invasive)
- Family Practice

- Gynecology/Oncology
- Neurology
- Ophthalmology
- Pathology
- Hospitalist
- Medical Office and Clinics
- Gastroenterology
- Internal Medicine
- Obstetrics/Gynecology
- Orthopedics
- Pediatrics
- Urology

*Ancillary and Support Services*

- Audiology/Speech Therapy (inpatient and outpatient)
- Cardiac Catheterization
- Cardiac Rehab
- Cardiopulmonology
- Clinical Laboratory
- Community Education Classes
- Computerized Tomography
- Critical Care Unit
- Diabetes Education
- Dialysis (inpatient)
- Electrocardiology
- Electroencephalography
- Emergency Department/Clinical Decision Unit
- Hematology/Oncology
- Hyperbarics/Enterostomal Therapy/Wound Care
- Interventional Radiology
- Lithotripsy
- Mammography/Bone Density
- MRI
- Nuclear Medicine
- Neuro Diagnostics

- Nursery (Level II)
- Obstetrics/Maternity/Lactation Consults
- Occupational Therapy (inpatient and outpatient)
- Open Heart Surgery
- Pathology
- Physical Therapy (inpatient and outpatient)
- Post-Anesthesia Care Unit
- Pulmonary Function
- Pharmacy
- Radiology
- Rehabilitation Services (outpatient)
- Respiratory Therapy
- Rural Health Clinic
- Same-Day Surgery
- Sleep Lab
- Stress Lab
- Stroke Center
- Transesophageal Echocardiography
- Ultrasound
- WorkMed Occupational Medicine
- X-ray/Fluoroscopy

# GUARANTEE

This Guarantee, dated as of September 23, 2014 (this "Guarantee"), is made by Alecto Healthcare Services LLC, a Delaware limited liability company (the "Guarantor"), in favor of the Seller Indemnitees (each a "Guaranteed Party" and together the "Guaranteed Parties"). Sherman/Grayson Health System, LLC, a Texas limited liability company ("Seller"), and LHP Hospital Group, Inc., a Delaware corporation ("LHP"), are signatories hereto in their capacity as representatives of themselves and the other Seller Indemnitees. Capitalized terms used but not otherwise defined herein shall have the respective meanings given to them in the Purchase Agreement (as defined below).

1.    Guarantee. To induce Seller and LHP to enter into that certain Purchase Agreement, dated as of the date hereof, by and among Alecto Healthcare Services Sherman LLC, a Delaware limited liability company ("Purchaser"), Seller, LHP, and Texas Health Resources, a Texas not-for-profit corporation (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), whereby Purchaser shall acquire 100% of the issued and outstanding membership interests of Sherman/Grayson Hospital, LLC, Sherman/Grayson Health Services, LLC and Sherman/Grayson Sponsor, LLC, the Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Guaranteed Parties the due and punctual payment, performance and discharge of each and every of Purchaser's obligations under the Purchase Agreement (together with any reasonable and documented out-of-pocket fees and expenses, including attorney fees and costs, which the Guaranteed Parties shall incur in enforcing or preserving any rights under this Guarantee if the obligations hereunder are not paid by the Guarantor when due as required herein or if this Guarantee is enforced by suit or through bankruptcy court or other judicial proceedings whatsoever, the "Obligations").

2.    Nature of Guarantee; Changes in Obligations; Certain Waivers.

(a)    This Guarantee is an unconditional guarantee of payment and performance and not of collection. The Guaranteed Parties shall not be obligated to file any claim relating to the Obligations in the event that Purchaser becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Guaranteed Parties to so file shall not affect the Guarantor's Obligations hereunder.

(b)    The Guarantor agrees that the Guaranteed Parties may at any time and from time to time, without notice to or further consent of the Guarantor, extend the time of payment of any of the Obligations, and may also enter into any agreement with Purchaser for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, or for any modification of the Purchase Agreement or of any agreement between the Guaranteed Parties and Purchaser without in any way impairing or affecting the Guarantor's Obligations under this Guarantee. The Guarantor agrees that the Obligations of the Guarantor hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of the Guaranteed Parties to assert any claim or demand or to enforce any right or remedy against, or to join Purchaser to any suit arising under this Guarantee or the Obligations of, Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement; (ii) any change in

the time, place or manner of payment of any of the Obligations or any rescission, waiver, compromise, consolidation or other amendment or modification of any of the terms or provisions of the Purchase Agreement made in accordance with the terms thereof; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement; (iv) the existence of any claim, set-off or other right which the Guarantor may have at any time against Purchaser or the Guaranteed Parties, whether in connection with the Obligations or otherwise; (v) the invalidity, illegality or unenforceability of all or any part of the Obligations or any document or agreement executed in connection with the Obligations, for any reason related to actions by the Purchaser, the Guarantor or their respective Affiliates, including without limitation the fact that the act of creating the Obligations or any part thereof is *ultra vires*, the officers or representatives executing the documentation or otherwise creating the Obligations acted in excess of their authority, or Purchaser or the Guarantor has valid defenses, claims or offsets (other than those expressly provided in the Purchase Agreement) which render the Obligations wholly or partially uncollectible from Purchaser or the Guarantor; or (vi) the adequacy of any other means the Guaranteed Parties may have of obtaining repayment of any of the Obligations.  To the fullest extent permitted by applicable Laws, the Guarantor hereby expressly waives any and all rights or defenses arising by reason of any applicable Law which would otherwise require any election of remedies by the Guaranteed Parties.  The Guarantor waives promptness, diligence, notice of the acceptance of this Guarantee and of the Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Obligations incurred and all other notices of any kind (except for notices to be provided pursuant to this Guarantee or to Purchaser and its counsel in accordance with the Purchase Agreement), all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar applicable Law now or hereafter in effect, any right to require the marshalling of assets of Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement, and all suretyship defenses generally.  The Guarantor acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated by the Purchase Agreement and that the waivers set forth in this Guarantee are knowingly made in contemplation of such benefits.

(c)     Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement that arise from the existence, payment, performance, or enforcement of a Guarantor's Obligations under or in respect of this Guarantee, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Guaranteed Parties against Purchaser or such other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from Purchaser or such other Person, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until the Obligations have been satisfied in full; provided, that the Guarantor shall have the right to cause any other Person to satisfy its Obligations to the Guaranteed Parties hereunder.  If any amount shall be paid to any Guarantor in violation

of the immediately preceding sentence at any time prior to the performance of and payment in full in cash of the Obligations and all other amounts payable under this Guarantee, an amount equal to the lesser of (i) the amount paid to the Guarantor in violation of the immediately preceding sentence, and (ii) all amounts payable under this Guarantee, shall be received and held in trust for the benefit of the Guaranteed Parties, shall be segregated from other property and funds of the Guarantor and shall forthwith be paid or delivered by the Guarantor to the Guaranteed Parties in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Obligations and all other amounts payable under this Guarantee, whether matured or unmatured, or to be held as collateral for any Obligations or other amounts payable under this Guarantee thereafter arising.

3.      <u>Effect on Certain Rights</u>.  No failure on the part of the Guaranteed Parties to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Guaranteed Parties of any right, remedy or power hereunder preclude any other or future exercise of any right, remedy or power hereunder except as explicitly set forth herein or in the Purchase Agreement.  Subject to the terms hereof and of the Purchase Agreement, except as stated therein, each and every right, remedy and power hereby granted to the Guaranteed Parties or allowed to it by applicable Law shall be cumulative and not exclusive of any other, and may be exercised by the Guaranteed Parties at any time or from time to time.

4.      <u>Representations and Warranties</u>.  The Guarantor hereby represents and warrants that:

(a)      the execution, delivery and performance of this Guarantee have been duly authorized by all necessary action and do not and will not contravene any provision of the Guarantor's charter, partnership agreement, operating agreement or similar organizational documents or any applicable Law or material contract binding on the Guarantor or its assets;

(b)      all consents, approvals, authorizations, permits of, filings with and notifications to, any Governmental Authority necessary for the due execution, delivery and performance of this Guarantee by the Guarantor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any Governmental Authority is required in connection with the execution, delivery or performance of this Guarantee;

(c)      this Guarantee constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar applicable Laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law); and

(d)      the Guarantor has the financial capacity to pay and perform its obligations under this Guarantee, and all funds necessary for the Guarantor to fulfill its Obligations

under this Guarantee for so long as this Guarantee shall remain in effect in accordance with Section 7.

5.    Assignment.  The Guarantor shall not assign its rights, interests or obligations hereunder to any other Person (except by operation of law) without the prior written consent of Seller and LHP; provided, that any such permitted assignment shall not relieve the Guarantor of its Obligations hereunder.

6.    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission) or (c) one (1) Business Day following the day sent by reputable, national overnight courier (with written confirmation of receipt), in each case at the following addresses, e-mail addresses or facsimile numbers (or to such other address, e-mail address or facsimile number as a party hereto may have specified by notice given to the all other parties hereto pursuant to this provision):

If to the Guarantor, to:

c/o Alecto Healthcare Services LLC
16310 Bake Parkway, Suite 200
Irvine, California 92618
Attention: CEO
Facsimile: (949) 878-9458

with a copy (which shall not constitute notice) to:

Law Offices of Michael J. Sarrao
16310 Bake Parkway, Suite 200
Irvine, California 92618
Attention: Michael J. Sarrao, Esq.
Facsimile: (949) 878-9458

If to the Guaranteed Parties, to:

c/o LHP Hospital Group, Inc.
2400 Dallas Parkway, Suite 450
Plano, Texas  75093
Attention: General Counsel
Facsimile:  (972) 312-9750

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Harvey Eisenberg
Facsimile: (212) 310-8007

7.  <u>Continuing Guarantee</u>. Unless terminated pursuant to this <u>Section 8</u>, this Guarantee shall remain in full force and effect and shall be binding on the Guarantor, its successors and permitted assigns until the Obligations have been indefeasibly paid, observed, performed or satisfied in full.

8.  <u>Governing Law; Jurisdiction and Forum</u>.  This Guarantee (including, without limitation, the validity, construction, effect or performance hereof and any remedies hereunder or related hereto), and all claims or causes of action of any kind (whether at law, in contract or in tort or otherwise) that may be based upon, arise out of or relate to this Guarantee, or the negotiation, execution or performance hereof (including, without limitation, any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Guarantee or as an inducement to enter into this Guarantee), shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Each of the parties hereto irrevocably agrees that any action or proceeding arising out of or relating to this Guarantee and the rights and obligations arising hereunder, and the rights and obligations arising hereunder brought by any other party hereto or its successors or assigns, shall be brought and determined exclusively in the state or federal courts of the State of Delaware; <u>provided</u>, that a judgment rendered by such Delaware courts may be enforced in any court having competent jurisdiction.  Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts in any such action, agrees to take any and all future action necessary to submit to the jurisdiction of such courts, waives, and agrees not assert, by way of motion, as a defense, counterclaim or otherwise, any objection it may now or hereafter have to venue or to convenience of forum (including (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve; (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise); and (c) to the fullest extent permitted by law, any claim that: (i) the action in such court is brought in an inconvenient forum; (ii) the venue of such action is improper; or (iii) this Guarantee, or the subject matter hereof, may not be enforced in or by such courts), agrees that all claims in respect of the action shall be heard and determined only in any such court and agrees not to bring any action arising out of or relating to this Guarantee or any transaction contemplated hereby in any other court.  The parties hereto agree that any of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained agreement between the parties hereto irrevocably to waive any objections to venue or to convenience of forum.  Each of the parties hereto irrevocably consents to the service of process out of the state and federal courts within the State of Delaware in any such action by the mailing of copies thereof by registered mail, postage prepaid, to it at its address set forth herein, such service of process to be effective upon acknowledgment of receipt of such registered mail.  Nothing herein shall affect the right of any party hereto to serve process in any other manner permitted by applicable law.

9.  <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS GUARANTEE OR THE

TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF THE PARTIES HERETO IN THE NEGOTIATION, EXECUTION, PERFORMANCE AND ENFORCEMENT OF THIS GUARANTEE.

10. <u>Entire Agreement</u>.  This Guarantee constitutes the entire agreement with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, among the parties hereto.

11. <u>Amendments and Waivers</u>.  No amendment, waiver, supplement or modification of any provision of this Guarantee will be valid and binding unless it is in writing and signed, in the case of an amendment, supplement or modification, by the Guarantor, Seller and LHP or, in the case of waiver, by the party or parties against whom the waiver is to be effective.  No waiver by any party hereto of any breach or violation of, or default under, this Guarantee, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation or default hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No delay or omission on the part of any party hereto in exercising any right, power or remedy under this Guarantee will operate as a waiver thereof.

12. <u>Severability</u>.  If any provision of this Guarantee is held to be illegal, invalid or unenforceable under any present or future Law, (a) such provisions will be fully severable; (b) this Guarantee will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Guarantee will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Guarantee a legal, valid and enforceable provision as similar in terms and effect to such illegal, invalid or unenforceable provision as may be possible.

13. <u>Counterparts</u>. This Guarantee may be executed and delivered (including by facsimile transmission or via portable document format (.pdf)) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same instrument.

14. <u>No Third Party Beneficiaries</u>.  The parties hereto hereby agree that their respective representations, warranties, agreements and covenants set forth herein are solely for the benefit of the other parties hereto (and any Guaranteed Parties not signatories hereto) and their respective successors and permitted assigns, in accordance with and subject to the terms of this Guarantee, and this Guarantee is not intended to, and does not, confer upon any person other than the parties hereto (and any Guaranteed Parties not signatories hereto) and their respective successors and permitted assigns any rights or remedies hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have duly executed and delivered this Guarantee as of the date first written above.

**GUARANTOR**:

**ALECTO HEALTHCARE SERVICES LLC**

By: _____

Name: _____

Its: _____

**GUARANTEED PARTIES:**

REPRESENTED BY:

**SHERMAN/GRAYSON HEALTH SYSTEM, LLC**

By: *Rebecca Hurley*

Name: Rebecca Hurley

Its: EVP


**LHP HOSPITAL GROUP, INC.**

By: *Rebecca Hurley*

Name: Rebecca Hurley

Its: EVP

# EXHIBIT 10

*Ambulatory Surgery Center*

## LEASE AGREEMENT

This Lease ("**Lease**") is made as of August 21, 2012 (the "**Effective Date**"), by and between ALTERA HIGHLAND LLC, a Texas limited liability company ("**Landlord**"), and SHERMAN/GRAYSON HEALTH SYSTEM, a Texas limited liability company ("**Tenant**").

## RECITALS:

Landlord, as tenant, has entered into that certain Ground Lease Agreement dated as of the Effective Date (the "**Ground Lease**") with Tenant, as landlord, for the land upon which the Building (as defined below) is located.  Contemporaneously with the Ground Lease, (i) Landlord purchased one (1) medical office building, from Tenant, and (ii) Tenant, as "**Declarant**", filed of record a Declaration of Covenants, Restrictions and Easements (the "**Declaration**") covering the one (1) medical office building, the Hospital commonly known as Texas Health Presbyterian Hospital - WNJ (the "**Hospital**") owned by Tenant located in proximity to the medical office building and the parking  and other common areas  dedicated for use by persons occupying, using or visiting the medical office building, the Hospital and other facilities related thereto.  The Ground Lease and this Lease are subject to the terms and provisions of the Declaration. Tenant, as "Declarant" under the Ground Lease and "Landlord" under the Ground Lease, is familiar with the terms and provisions of each of the Declaration and the Ground Lease.

As part of Tenant's purchase of the Building commonly called "300 N. Highland Drive, Sherman, Texas", Tenant agreed to enter into this Lease.

Simultaneously herewith, Landlord and Tenant are also entering into corresponding leases (each, a "**Related Lease**") for vacant, shell and existing space of the Building and for the common areas of the Building occupied by the Hospital.

## 1.    DEFINITIONS AND BASIC PROVISIONS.

1.1    Parties and Addresses. The parties hereto and their respective addresses are as follows:

| | | |
|---|---|---|
| (1) | Landlord's Address: | 5910 North Central Expressway<br>Suite 800<br>Dallas, TX 75206. |
| (2) | Tenant's Address: | 2400 North Dallas Parkway, Suite 450<br>Plano, Texas 75093<br>Attention: Executive Vice President – Administration |
| (3) | Ground Lessor Address: | 2400 North Dallas Parkway, Suite 450<br>Plano, Texas 75093<br>Attention: Executive Vice President –<br>Administration |

| (4) | <u>Guarantor</u>: | LHP Hospital Group, Inc.,<br>a Delaware corporation |
|---|---|---|
| (5) | <u>Guarantor's Address</u>: | 2400 North Dallas Parkway, Suite 450<br>Plano, Texas 75093<br>Attention: Executive Vice President – Administration |

1.2   <u>Defined Terms</u>: In addition to the capitalized terms elsewhere defined in this Lease, the following terms shall be deemed to be defined terms of this Lease for all purposes.  Each of the following definitions and basic provisions shall be construed in conjunction with and limited by the reference thereto in other provisions of this Lease:

(1)   <u>Additional Rent</u>: All rent and other sums payable hereunder from Tenant to Landlord, other than Base Rent.

(2)   <u>Base Rent</u>: An annual Base Rent of $22.55 per RSF in the Premises, subject to adjustment as provided in Section 3.1.  As of the Commencement Date, the monthly Base Rent is $34,076.25.

(3)   <u>Broker(s)</u>: None.

(4)   <u>Building</u>: The building in which the Premises are situated, being generally known as 300 N. Highland Drive, Sherman, Texas.

(5)   <u>Commencement Date</u>:  The Effective Date.

(6)   <u>Common Areas</u>: Those parts of the Building, Land and related facilities designated from time to time by Landlord for the common use of all doctors, physicians, tenants, visitors, patients and employees, including among other facilities, parking areas, sidewalks, landscaping, curbs, loading docks and areas, private streets and alleys, automobile entrances, exits and driveways, entranceways (open, enclosed or otherwise), lighting facilities, drinking fountains, public toilets, signs, service areas, common utility lines, pipes, and/or conduits, and the like.

(7)   <u>Declarant</u>: means the Declarant under the Declaration, Sherman/Grayson Hospital, LLC, a Texas limited liability company, and its successors under the Declaration.

(8)   <u>Declaration</u>: has the meaning set forth in the Recitals.

(9)   <u>Expiration Date</u>: The last day of the Term hereof, which date is contemplated as being one hundred eighty (180) full months after the Commencement Date.  Notwithstanding any other provision of this Lease to the contrary, if the Expiration Date would otherwise occur on a date other than the last day of a calendar month, then the Term shall be automatically extended to include the last day of such calendar month.

(10)   <u>Floor Plan</u>: The outline of the Premises as depicted in <u>Exhibit B</u> attached hereto and made a part hereof for all purposes.

(11)   <u>Guarantor</u>:  has the meaning set forth in Section 1.1.

(12)    <u>Highest Lawful Rate</u>:  The maximum nonusurious interest rate, if any, that at any time, or from time to time, legally may be contracted for, taken, reserved, charged, or received on the indebtedness owed to Landlord under this Lease under the laws which are presently in effect of the United States of America and the State of Texas applicable to Landlord and such indebtedness.

(13)    <u>Hospital</u>:  The Hospital defined in the Recitals of this Lease, and its successors and assigns.

(14)    <u>Interior of the Premises</u>: Standard office front and entrance (including without limitation, all plate glass and exterior doors), all of the interior wall framing, floors and floor covering, ceiling and interior staining and finishes, all interior doors and hardware, all interior electrical conduits and appurtenances, mechanical machinery and equipment, all interior electrical fixtures, interior plumbing and plumbing fixtures, Tenants' trade fixtures, and all other parts in the interior of the Premises.

(15)    <u>Land</u>: The lot, tract or parcel of land upon which the Building is situated, in Grayson County, Texas as more particularly described by metes and bounds on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes, plus any contiguous parcels or strips of land leased or licensed to Landlord under the Ground Lease or by the Declaration, and are used in connection with or to service the Building or any part thereof.

(16)    <u>Late Charge</u>: Tenant shall pay $100.00 as a late fee to cover Landlord's administrative costs.  Additionally, all unpaid amounts Tenant fails to pay by the fifth (5th) day after the date due shall bear interest from the first day due until paid in full at the lesser of ten percent (10%) per annum or the Highest Lawful Rate.  In no event, however, shall the late fees and/or charges permitted under this Section or elsewhere in this Lease, to the extent the same are considered to be interest under applicable law, exceed the amount of interest that Landlord lawfully could have charged, received or collected on the indebtedness in question at the Highest Lawful Rate.

(17)    <u>Lease</u>: This Lease Agreement.

(18)    <u>Lease Year</u>: Each twelve (12) consecutive month period commencing on the Commencement Date or any anniversary thereof; provided that, if the Commencement Date is other than the first day of a calendar month, then the first Lease Year shall include such partial month together with the next succeeding twelve (12) consecutive months, and each succeeding Lease Year shall begin on the first day of the calendar month that corresponds to the first day of the calendar month following the Commencement Date.

(19)    <u>Operating Expenses</u>: All expenses, costs and disbursements of every kind and nature that Landlord or any of its Affiliates directly or indirectly pays or becomes obligated to pay, whether under the Ground Lease, the Declaration, any Related Lease or otherwise, in respect of the Ground Lease, the ownership, management, maintenance, repair, replacement and operation of the Building, the Common Areas and related facilities of the Building or arising in connection with any Related Lease.  Notwithstanding the foregoing, Operating Expenses shall exclude capital costs associated with the replacement of the roof, foundation, and exterior walls.

(20)    <u>Permitted Use</u>:  Ambulatory surgery center and any other use related thereto, including without limitation diagnostic and laboratory services and all current uses.

(21)  <u>Premises</u>: The premises known, as of the Effective Date, Suite 200 and the ambulatory surgery center in the Building (Suite 210), containing approximately 18,174 RSF (as defined herein).  The Premises are substantially depicted on the attached Floor Plan shown on <u>Exhibit B</u> and being located in the Building.

(22)  <u>Pro Rata Share or Tenant's Pro Rata Share</u>: 15.447%, provided that if the Building is expanded or contracted, Tenant's Pro Rata Share shall increase or decrease, as the case may be, such that Tenant's Pro Rata Share will equal a fraction, the numerator of which is the net rentable area of the Premises, and the denominator of which is the net rentable area of the Building, which is approximately 117,655 RSF as of the Effective Date.

(23)  <u>Rent</u>: All Base Rent and Additional Rent.

(24)  <u>RSF</u>: means the rentable square feet in the Premises, Building or other area in question, as determined by an architect using ANSI/BOMA Standards.

(25)  <u>Security Deposit</u>: None.

(26)  <u>Tenant Improvement Allowance</u>:  Means that amount, if any, set forth in <u>Section 2.3</u>.

(27)  <u>Tenant Improvements</u>:  Means those improvements and alterations Tenant may elect to construct or install in the Premises, subject to the provisions of this Lease.

(28)  <u>Term</u>: Fifteen (15) years (one hundred eighty (180) full months) from the Commencement Date, unless earlier terminated pursuant to the provisions of this Lease.

## 2.  <u>GRANTING CLAUSE; TENDER OF POSSESSION.</u>

2.1  <u>Granting Clause</u>.  In consideration of the Rent reserved and the covenants and agreements herein contained on the part of the Tenant to be observed and performed, and subject to the terms and provisions of the Declaration and Ground Lease, Landlord hereby demises, lets and leases unto Tenant, and Tenant hereby accepts, leases and rents from Landlord, the Premises.

2.2  <u>Tender and Acceptance of Possession</u>.  Landlord hereby tenders, and Tenant hereby accepts, possession of the Premises on the Effective Date.  Tenant hereby accepts the Premises in their "AS-IS" condition, and Landlord shall have no obligation to perform any work therein (including demolition of any improvements existing therein or construction of any tenant finish-work or other improvements therein), and shall not be obligated to reimburse Tenant or provide an allowance for any costs related to the demolition or construction of improvements therein.  Tenant has reviewed, and hereby accepts, the condition and capacity of the Building's existing electrical systems and HVAC.  Tenant acknowledges that Landlord does not have any obligation, express or implied, to modify or increase the capacity of such systems.  Before Tenant may occupy the Premises to conduct its business therein, Tenant shall, at its expense, obtain and deliver to Landlord a certificate of occupancy from the appropriate governmental authority for the Premises.

3.   **RENT.**

    3.1   Base Rent.

       (1)   This is a pure "net lease," and Base Rent, Additional Rent, Operating Expenses and all other sums payable hereunder by Tenant shall be paid without notice, demand, setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense. It is intended that the Base Rent provided for in this Lease shall be absolutely net to Landlord throughout the Term, and, accordingly, Tenant covenants and agrees to pay, as they become due and payable and before they become delinquent, all operating and capital expenses in connection with the operation, maintenance, repair, restoration, use or occupation of the Premises including, without limitation, the costs, charges and assessments related to taxes, impositions, utilities and insurance. Tenant shall pay all such taxes and impositions even though the taxing statue or ordinance may purport to impose such taxes or impositions on Landlord.

       (2)   The Base Rent shall be paid by Tenant in monthly installments to Landlord on or before the first day of each calendar month during the Term hereof. The monthly Base Rent for any fractional month at the beginning or the end of the Term shall be prorated based upon the actual number of days in such month.

       (3)   The Base Rent will be adjusted and increased on each anniversary of a Lease Year (the "**Adjustment Date**") by an amount equal to the greater of (i) 103% of then-effective Base Rent (i.e., as it may have been adjusted pursuant to this Section 3.1(3)) and (ii) subject to the limitation set forth below in this Section 3.1(3), any increase in the Consumer Price Index for "All Urban Consumers, U.S. City Average, All Items," issued by the Bureau of Labor Statistics of the United States Department of Labor (the "**Index**"). The adjustments in the Base Rent will be determined by multiplying the then-effective Base Rent (i.e., as it may have been adjusted pursuant to this Section 3.1(3)) by a fraction, the numerator of which is the Index number for the date one month prior to the Adjustment Date and the denominator of which is the Index number for the first month of the first year of the Term. When the adjusted rent for the Adjustment Date has been determined, Landlord shall give Tenant written notice of such adjusted rent; and, upon adjustment of the rent, any underpayment of rent from the Adjustment Date to the date Tenant is notified of the adjustment shall be immediately due and payable by Tenant. Landlord's failure or delay to notify Tenant of said rent adjustment shall not constitute a waiver of the right to any adjustment provided for in this Lease. In the event that the Index shall be discontinued, then Landlord shall use an index substantially similar to the Index to calculate future adjustments. Notwithstanding any other provision of this Section 3.1(3) to the contrary, the Base Rent in any Lease Year shall not increase by more than five percent (5%) of the Base Rent in the immediately preceding Lease Year.

       (4)   Landlord and Tenant are knowledgeable and experienced in commercial transactions and agree that the provisions of this Lease for determining charges, amounts, Operating Expenses and Additional Rent are commercially reasonable and valid even though such methods may not state a precise mathematical formula for determining such charges. ACCORDINGLY, TENANT VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS OF TENANT UNDER SECTION 93.012 OF THE TEXAS PROPERTY CODE, AS IT MAY BE AMENDED OR REPLACED.

3.2     Operating Expenses.

(1)     Tenant's Pro Rata Share of Operating Expenses for the remainder of the calendar year after the Commencement Date and for each subsequent calendar year shall be estimated by Landlord, and written notice thereof shall be given to Tenant. Upon receipt of said written notice from Landlord, the estimated Operating Expenses shall be due and payable as herein provided. For any such remainder of the calendar year after the Commencement Date, Tenant agrees to pay Landlord each month, at the same time the Base Rent Payment is due, an amount equal to the amount of such estimated monthly Pro Rata Share of Operating Expenses for the remainder of such calendar year; and during each calendar year thereafter Tenant agrees to pay Landlord each month, at the same time the Base Rent Payments are due, an amount equal to one-twelfth (1/12th) of the estimated annual Pro Rata Share of Operating Expenses due.

(2)     If any portion of Operating Expenses increase during a calendar year, Landlord may revise the estimated Operating Expenses during such year by giving Tenant written notice to that effect, and thereafter Tenant agrees to pay Landlord, in each of the remaining months of such calendar year, an additional amount equal to the amount of such annual increase in the estimated Pro Rata Share of Operating Expenses divided by the number of months remaining in such calendar year.

(3)     After the end of each calendar year, Landlord shall prepare and deliver to Tenant a statement showing Tenant's Pro Rata Share of the total amount of Operating Expenses. Within ten (10) days after receipt of the aforementioned statement, Tenant agrees to pay Landlord the remaining amount owed by Tenant. However, if Tenant has paid more than its Pro Rata Share of the actual Operating Expenses, Landlord shall either pay the amount of such excess to Tenant within ten (10) days after delivery of the aforementioned statement, or, at Landlord's option, apply such excess to any sums due or to become due from Tenant to Landlord.

(4)     Notwithstanding anything herein to the contrary, in no event will the Base Rent provided for in this Lease ever be reduced.

3.3     Payment For Other Services. Tenant agrees to pay Landlord as Additional Rent all charges for any services, goods, or materials furnished at Tenant's request which are not required to be furnished by Landlord under this Lease, immediately upon demand, plus an administrative fee not to exceed five percent (5%) of the cost of the requested services, good or materials.

3.4     Late Charge. If Landlord does not receive any payment due on or before the 5th day of the calendar month when such payment is due, the Late Charge shall be due and payable (in addition thereto). Said Late Charge is for the purpose of reimbursing Landlord for the extra administrative costs and expenses incurred in connection with the handling and processing of such delinquent payment.

3.5     No Offsets or Demands.  All Base Rent, Additional Rent and other amounts due from Tenant to Landlord under this Lease shall be paid without notice, demand, offset, abatement or deduction. This Lease and the rights of Landlord and obligations of Tenant hereunder shall not be affected by any event or for any reason or cause whatsoever foreseen or unforeseen.  The obligations of Tenant under this Lease shall be separate and independent covenants and agreements and all monetary obligations shall continue to be payable in all events.

4.    __SECURITY DEPOSIT.__  Tenant is not required to make any security deposit in connection with this Lease.

5.    __COMMON AREAS.__

5.1    <u>Parking Facilities and Other Common Areas</u>. During the Term, Tenant shall be entitled to the nonexclusive use (in common with others entitled thereto) of the Common Areas outside the Building designated from time to time by Landlord as the parking areas of the Building.  As of the Effective Date, the parking areas designated by Landlord for use by Tenant are depicted on <u>Exhibit C</u>.  In such parking areas, Tenant shall be entitled to use a number of parking spaces equal to 5 parking spaces for every 1,000 RSF of space in the Premises.  Tenant shall not conduct, solicit business or display or place any signs or advertising on or within the Common Areas, or distribute handbills therein, or take any action which would interfere with the rights of other persons to use the Common Areas.

5.2    <u>Parking Regulations</u>. Tenant understands and agrees that the Declarant shall have the right to maintain and operate lighting facilities on all of the parking areas and to police all of the parking and other Common Areas, including, without limitation, the right to discourage non-tenant parking, to designate and regulate parking areas, and to do and perform such other acts with respect to said Common Areas as in the judgment of the Declarant may be legally necessary to prevent a dedication thereof to the public.

6.    __MAINTENANCE AND REPAIRS.__

6.1    <u>Landlord's Obligations</u>.  As part of the Operating Expenses, Landlord shall maintain or cause to be maintained the elevators, public restrooms and other Common Areas within the Building, the structural elements building systems of the Building (including the HVAC system which serves the Building and the Premises).  Landlord shall, at its own cost and expense, maintain or cause to be maintained the foundation, the exterior walls (but excluding the interior glass or doors that are part of the Premises) and roof of the Building in good condition or repair.  However, if any repair is required by reason of the negligence or intentional misconduct of Tenant or any of its agents, employees, invitees or Affiliates, Landlord may add the cost thereof to the next installment of Rent thereafter coming due, but only to the extent that the cost thereof is not covered by insurance proceeds actually received by Landlord.  Except as herein provided, Landlord shall have no obligation to repair, maintain, alter, replace, or modify the Premises or any part thereof.  Any failure by Landlord to furnish, or delay in furnishing, any maintenance or services that are required of Landlord under this Section or otherwise under this Lease, when such failure is caused by acts of God or any other condition beyond Landlord's reasonable control, shall not constitute a default by Landlord under this Lease and shall not permit Tenant to abate any Rent or relieve Tenant from any of its obligations under this Lease.

6.2    <u>Tenant's Obligations</u>.  Tenant shall maintain the interior of the Premises, including all interior glass and doors that are a part of the Premises and any improvements done by or on behalf of Tenant, in good condition and clean and attractive appearance, performing all janitorial services and making all repairs at its own cost and expense, and using materials and labor of a kind and quality equal to the original work.  Tenant shall maintain the Premises in accordance with all requirements of law, including (without limitation) the Americans with Disabilities Act (as the same may be amended) and similar state or local laws, rules or regulations.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises in a broom clean condition and otherwise in the same condition as received by Tenant on the Commencement Date upon initial completion of the interior improvements, reasonable wear and tear excepted.  If Tenant shall neglect and/or fail to observe, keep or perform any of its obligations to maintain and repair and Premises in the time and manner provided in this Article and if such neglect and/or failure shall continue for ten (10) days after notice thereof, Landlord shall have the right to perform said maintenance and repairs.  In the event Landlord does so perform Tenant's responsibilities for said

maintenance and repairs, Landlord shall furnish Tenant a statement of the actual cost thereof, plus an administration fee not to exceed ten percent (10%) of the actual costs, which statement shall be immediately payable by Tenant. All alterations and modifications of or to the Premises shall be in accordance with the terms and provisions of <u>Section 11.2</u> below.

**7.    <u>TAXES ON TENANT'S PROPERTY.</u>**

Tenant shall be responsible for and shall pay, before same becomes delinquent, all federal, state, county, and local taxes levied or assessed upon any and all personal property of any kind owned by or placed in, on or about the Premises by Tenant during the Term, and all taxes and assessments on trade fixtures, furniture, and all sales, excise and other taxes on Tenant's business shall be paid entirely by Tenant. If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property, or if the assessed value of Landlord's property is increased by inclusion of personal property, furniture or fixtures placed by Tenant in the Premises, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

**8.    <u>INSURANCE.</u>**

8.1    <u>Hold Harmless</u>. Tenant covenants and agrees to indemnify and save each of Landlord, and Landlord's members, managers, partners, agents, employees and representatives, harmless from and against any and all costs, liability or expense arising out of any claims of any person or persons on account of any occurrence in, upon or at the Premises, resulting from the occupancy or use thereof by Tenant, or by any person or persons holding or using the Premises thereunder, occasioned in whole or in part by reason of the improper and/or lack of control and supervision throughout the Common Areas of property owned or controlled by Tenant, or by reason of the use or misuse of the parking area or any other Common Areas by Tenant or by any person or persons holding or using the Premises, or any part thereof, under Tenant, including without limitation, Tenant's clients, invites, agents, contractors, employees, servants, subtenants, assignees or licensees, and without limiting the generality of the foregoing, Tenant further covenants and agrees to indemnify and save each of Landlord and Landlord's partners, agents, employees and representatives harmless from and against any penalty, damage or charge incurred or imposed by reason of any violation of law or ordinance by Tenant or any person or persons holding under Tenant and from any cost, damage or expense arising out of the death of or injury to any person or persons holding under Tenant and from any cost, damage or expense arising out of the death of or injury to any person or persons holding under Tenant. In case any action or claim to which Landlord (or Landlord's partners, members, managers, agents, employees or representatives) are entitled to indemnification shall be brought or asserted in any way against Landlord (or Landlord's members, managers, partners, agents, employees or representatives) or Tenant, Tenant shall immediately notify Landlord of the same and shall furnish Landlord with all relative information. Landlord shall be entitled, at Tenant's expense, to participate in, and to the extent that it wishes, to assume the defense thereof.

8.2    <u>Tenant's Liability Insurance</u>. Tenant agrees to maintain in force during the Term a policy or policies of comprehensive public liability insurance, including property damage, written by one or more responsible insurance companies approved by Landlord and licensed to do business in Texas, which insurance companies shall be rated not less than X by Best Guide Rating, insuring Tenant and naming as additional named insureds, Landlord, Landlord's property management company as agent, each Mortgagee and such other persons, firms, or corporations as are designated by Landlord, against loss of life, bodily injury and property damages in which the limit of public liability shall be not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) single limit bodily injury and in which the limit of property damage liability shall be not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) and an umbrella coverage of not less than TWO MILLION AND NO/100 DOLLARS ($2,000,000.00). Additionally, Tenant shall maintain a comprehensive automobile liability insurance policy of ONE

HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00). Each such policy shall be non-cancellable for any cause without first giving Landlord thirty (30) days prior written notice. Subject to all of the foregoing, the insurance coverage required to be furnished by Tenant pursuant to this Section may be in the form of a blanket policy covering all of Tenant's operations.

8.3    Tenant's Fire Insurance. Tenant agrees to maintain in force during the Term a policy or policies of fire and extended coverage insurance in the case of fire sprinkler leakage, malicious mischief, vandalism and other extended coverage perils, for the full insurable replacement value of all additions and of all office furniture, office equipment, merchandise, and other items of Tenants' property within or on the Premises. Coverage in this paragraph shall be in an amount not less than one hundred percent (100%) of the replacement costs of Tenant's improvements to the Premises.

8.4    Tenant's Workers Compensation. If required by law, Tenant agrees to maintain in force during the Term workers compensation and employers liability insurance with a waiver or subrogation endorsement, in a form and amount satisfactory to Landlord.

8.5    Evidence of Insurance. A copy of each such policy or a certificate of such insurance required to be maintained by Tenant shall be delivered to Landlord upon the Commencement Date of this Lease and annually thereafter upon the first day of each Lease Year throughout the Term. If Tenant fails to procure said insurance or deliver to Landlord, such evidence thereof, Landlord may procure same and Tenant shall reimburse Landlord for the cost thereof plus an administrative fee not to exceed ten percent (10%) of the actual cost immediately upon demand.

8.6    Landlord's Liability Insurance. Landlord agrees to maintain in force during the Term a policy or policies of comprehensive public liability insurance, including property damage, written by one or more responsible insurance companies licensed to do business in Texas and insuring Landlord against loss of life, bodily injury and/or property damage with respect to the operation of the Building, the policy limits of which to be in amount satisfactory to Landlord. In addition, Landlord may maintain in force such umbrella policy or policies of public liability insurance as Landlord, in its sole discretion, may deem appropriate. Landlord's failure to procure any such insurance shall not invalidate this Lease or lessen Tenant's liability hereunder. Landlord's insurance hereunder shall include loss of rent coverage.

8.7    Landlord's Fire Insurance. Landlord agrees to procure and keep in effect during the Term a policy or policies of fire and extended coverage insurance covering the Building, including rent abatement, vandalism and malicious mischief coverage, written by an insurance company authorized to do business within the State of Texas, and in an amount at the full replacement cash of the Building. Such insurance shall provide protection against losses so insured against for the sole and exclusive benefit of Landlord. The full amount of any proceeds payable thereunder shall be payable to Landlord, and Tenant shall not be entitled to, and shall have no interest in, such proceeds or any part thereof. Tenant is advised to procure such insurance as Tenant deems appropriate to protect its interest.

8.8    Waiver of Subrogation. To the extent permitted by the laws and insurance regulations of the State of Texas, the respective parties hereto hereby waive and release any and all claims, demands and causes of action which each might have against the other party, either for damage to or loss of any part of the Premises or of any adjoining premises belonging to Landlord, arising from perils ordinarily insured against under a standard fire and extended coverage insurance policy issued in the State of Texas, regardless of whether such damage or loss is occasioned by the negligence of the respective parties, or either of them, their agents, servants or employees.

9.    **UTILITIES AND SERVICES.**

Provided Tenant is not in default of any term, condition or covenant of this Lease, Landlord agrees to furnish or cause to be furnished to the Premises gas, water (for drinking, cleaning and lavatory purposes only), and electricity during the Term. Landlord shall furnish tempered and refrigerated water at those points of supply designated by Landlord in the Common Areas of the Building, heated and refrigerated air conditioning in season (at temperatures, in amounts and at times considered by Landlord to be standard or in compliance with any governmental regulations; such service after hours, on Saturday afternoons, Sundays and holidays will be furnished only upon 24 hours' prior written request of Tenant who shall bear the entire cost thereof). Landlord shall furnish janitorial service, in the manner and to the extent deemed standard by Landlord during the periods and hours as such services are normally furnished to all tenants. Tenant shall not hinder the work of the Building janitor. Landlord shall furnish routine maintenance, painting and lighting service for all Common Areas within the Building in the manner and to the extent deemed by Landlord to be standard. Tenant will pay all telephone charges. Landlord shall not be liable in damages or otherwise for failure, stoppage or interruption of any such service nor shall the same be construed as an eviction of Tenant, work an abatement of Rent, or relieve Tenant from the operation of any covenant or agreement set forth herein; but in the event of any failure, stoppage or interruption thereof not caused by Tenant or Tenant's agents, employees, contractors, clients or invites, Landlord shall use reasonable diligence to resume service promptly.

Landlord reserves the right to separately meter usage of any utility service included in Operating Expenses and charge Tenant and other tenants of the Building based on such usage.  Further, Landlord reserves the right from time to time to charge to Tenant and other tenants of the Building applicable costs with respect to usage of Building services and utilities at times other than during standard business hours, on such basis as Landlord may reasonably determine for the purpose of properly allocating the costs of such services and utilities in accordance with the usage thereof.

Notwithstanding anything hereinabove to the contrary, Landlord reserves the right from time to time to make reasonable modifications to the above standards for services and utilities.

10.    **INTENTIONALLY DELETED**.

11.    **PROPERTY OBLIGATIONS.**

11.1    Tenant's Property. Landlord shall not be liable for any damage to or loss of personal property placed in or about the Premises by Tenant or Tenant's agents, employees, clients, guests, invites or others, resulting from fire, theft, explosion, flood, windstorm or other casualty caused by Acts of God or by the acts or omissions of other occupants of other space in the Building or caused by operations during construction of any public or quasi public work. All property kept or stored within the Premises shall be kept or stored at the risk of Tenant only, and Tenant shall hold Landlord harmless from any claims arising out of damage to the same, including subrogation claims by Tenant's insurer, if any, unless such damage shall be caused by the gross negligence of Landlord.

11.2    Tenant Fixtures, Alterations and Personal Property. Tenant shall not make or allow to be made any alterations, modifications or physical additions in or to the Premises without the prior written consent of Landlord which consent shall not be unreasonably withheld or delayed.  Tenant may proceed with the construction of the approved alterations, modifications or physical additions, but only so long as they are in strict compliance with the plans and specifications and with the provisions of this Section 11.2. All alterations shall be made at Tenant's expense, either by Tenant's contractors, which previously have been approved in writing by Landlord, or at Landlord's option, by Landlord's contractors on terms reasonably satisfactory to Tenant, including a fee of five percent (5%) of Landlord's actual cost of the work

to cover Landlord's overhead. None of Tenant's construction, alterations, modifications or physical additions shall (i) alter the exterior appearance of the Building or Premises in any manner, (ii) adversely affect the structure or safety of the Building or Premises or any portion thereof, (iii) fail to comply with all building, safety, fire and other codes and governmental and insurance requirements, or (iv) fail to be completed promptly and in a good and workmanlike manner. All trade fixtures installed by Tenant shall be new or completely reconditioned. At Landlord's option, any such approved additions, alterations, modifications, improvements and/or fixtures furnished or installed by Tenant which are sufficiently affixed or annexed to the Premises so as to become a part thereof, other than unaffixed movable trade fixtures, shall upon the expiration or earlier termination of this Lease, become the property of Landlord. Any damage to the Premises caused by such installation and/or removal of Tenant's fixtures and equipment shall be repaired at Tenant's sole cost and expense. The provisions of this Section shall expressly survive the expiration or earlier termination of this Lease.

11.3    Liens. Tenant shall neither permit nor suffer an involuntary lien to be filed or affixed against the Building, the Premises, the fee simple title of the Land or Landlord's leasehold estate therein, or any part thereof, and shall not voluntarily grant any lien or security interest therein. In the event any such involuntary or voluntary lien, including without limitation, mechanic's lien or tax lien, is filed and/or affixed against the Building, the Premises the fee simple title of the Land or Landlord's leasehold estate therein, or any part thereof, or against any fixtures, equipment, furnishings therein or all types of work and improvements comprising the Interior of the Premises and Tenant has not caused the same to be released and discharged of record within ten (10) days after notice thereof, same shall constitute a default hereunder. Upon such default, in addition to any other remedies available to Landlord herein, Landlord may cause the release and discharge of such lien, Tenant shall repay to Landlord immediately upon demand as Additional Rent hereunder all such sums disbursed or deposited by Landlord plus an administrative fee not to exceed five percent (5%) of the sums disbursed or deposited. Nothing contained herein, however, shall imply any consent or agreement on the part of Landlord or anyone holding under Landlord to subject Landlord's interest to liability under any mechanic's or other lien law, regardless of whether the performance or the furnishing of such work, labor, services or materials to Tenant or anyone holding under Tenant shall have been consented to by Landlord.

## 12.    **SUBORDINATION/ATTORNMENT.**

12.1    Subordination. Tenant covenants and agrees promptly upon request of Landlord to execute and deliver, in a recordable form provided by Landlord, an acknowledgment of the subordination of this Lease to any mortgage, deed of trust, security agreement or other lien or encumbrance resulting from any method of financing or refinancing, presently or henceforth placed upon the Landlord's leasehold estate in the Land and/or fee interest in the Building and any future expansion thereof or additions thereto, and to all advances of money or other value heretofore or hereafter made upon the security thereof. Notwithstanding anything to the contrary contained herein, Landlord agrees to obtain a subordination, non-disturbance and attornment agreement ("**SNDA**") from its current lender in a form reasonably acceptable to Tenant which shall provide, among other things, that this Lease shall be recognized and Tenant's rights and occupancy under this Lease shall not be disturbed in the event Tenant is not in default hereunder beyond any applicable notice and cure periods. In addition, Tenant shall not be required to subordinate its rights under this Lease to the interest of any future lender unless Landlord has first delivered an SNDA to Tenant executed by such future lender in a form reasonable acceptable to Tenant and containing a similar non-disturbance right.

12.2    Collateral Assignment by Landlord. Subject to the foregoing provisions of this Article, Landlord reserves the right, without notice to or consent of Tenant, to assign this Lease and/or any and all Rent hereunder as security for the payment of any mortgage loan, deed of trust loan, or other method of financing or refinancing.

12.3   <u>Attornment</u>. In the event any such mortgage is foreclosed, or in the event of the exercise of the power of sale under any such deed of trust, Tenant shall consider the purchaser at the foreclosure trustee's sale to be the Landlord hereunder, and Tenant will attorn to the purchaser and will recognize the purchaser as the owner and Landlord under this Lease.

## 13.   <u>USE AND OPERATION.</u>

13.1   <u>Use of Premises</u>. The Premises shall be used and occupied by Tenant solely for the Permitted Use and Tenant expressly agrees that no use shall be made or permitted or acts done by Tenant and/or any agents, employees, subtenants, or assignees of Tenant, which shall increase the existing rate of insurance coverage or cause cancellation of such insurance coverage. Tenant shall not (i) permit any objectionable or unpleasant odors to emanate from the Premises; nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside of the Premises or where the same can be seen or heard from outside the Premises; (ii) place any antenna, awning or other projection on the exterior of the Premises; (iii) take any other action which would constitute a nuisance or would disturb or endanger other tenants of the Building or unreasonably interfere with their use of their respective premises; or (iv) do anything which would tend to injure the reputation of the Building.  Tenant shall at all times comply with all terms and provisions of the Ground Lease and Declaration applicable to Tenant, or Tenant's use of the Premises and Common Areas.

13.2   <u>Suitability of Premises</u>. Tenant warrants to Landlord that it has, prior to the execution hereof, fully inspected the Building, the Common Areas, the property and all items related thereto, and that Tenant has made, performed, obtained and received all studies, inspections, reports, diagnoses and tests that Tenant desires relative to the Building, the Common Areas, the property and all items related thereto and Tenant's proposed business use of the Premises. Tenant further warrants to Landlord that Tenant has inspected, or will thoroughly inspect, the Plans and Specifications agreed and to be agreed with Landlord for Landlord's construction of the shell of the Premises and will be fully satisfied with such inspections and Plans and Specifications for the Premises. Tenant understands and agrees that Tenant is accepting the Building, the Common Areas, the property and all items related thereto, and will be accepting the Premises, in their "AS-IS", "WHERE-IS" condition, "WITH ALL FAULTS" and without any warranty or guarantee whatsoever.  Tenant warrants that it used or will use all due diligence in conducting all studies inspections, diagnoses and tests on the Premises the Building, the Common Areas, the property and all items related thereto that Tenant deemed necessary or appropriate. Tenant acknowledges that Landlord has not made and does not make, and Landlord hereby disclaims, any and all warranties, express or implied, which in any way relate to the Premises the Building, the Common Areas, the property and all items related thereto or the condition thereof, including without limitation any implied warranty of suitability or habitability. Tenant further understands that Landlord has relied and will rely upon Tenant's having made all inspections Tenant desired, and that but for such inspections by Tenant, Landlord would not have leased the Premises to Tenant. Additionally, the parties agree that the obligation of Tenant to pay all Rent and other sums hereunder provided to be paid by Tenant, and the obligation of Landlord to perform Landlord's other covenants and duties hereunder, constitutes independent, separate and unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is expressly provided for herein and not otherwise. It is agreed that in the event Landlord commences any proceedings against Tenant for nonpayment of Rent or any other sum due and payable by Tenant hereunder, Tenant shall not interpose any counterclaim or other claim against Landlord of whatever nature or description in any such proceedings; and in the event Tenant interposes any such counterclaim or other claim against Landlord in any such proceeding, Landlord and Tenant stipulate and agree that, in addition to any other lawful remedy of Landlord, upon motion of Landlord, such counterclaim or other claim asserted by Tenant shall be severed out of the proceedings instituted by Landlord and Landlord may proceed to final judgment separately and apart from and without consolidation with or reference to the status of such counterclaim or any other claim asserted by Tenant.

14.    **HAZARDOUS MATERIALS.**

14.1    Tenant, and all of Tenant's partners, officers, directors, employees, representatives, agents, contractors, subcontractors, successors, assigns, lessees, sublessees, concessionaires, invitees and any other occupants of the Premises (collectively, "**Tenant's Representatives**"), shall abide by all Federal, state and local statutes, ordinances, codes and regulations, now existing or hereinafter enacted (collectively, "**Hazardous Materials Laws**"), governing the use, handling, depositing or disposal of hazardous or toxic substances, and medical wastes (collectively, "**Hazardous Materials**").  Landlord has no obligation to provide or make provision for disposal facilities for Hazardous Materials or other medical wastes, and Tenant shall not deposit or dispose of any Hazardous Materials or other medical wastes into the general waste disposal facilities provided by Landlord.  Tenant shall, at Tenant's expense, employ or engage private waste management services to dispose of any and all waste of Tenant which must be handled in any manner other than general waste collection provided by Landlord through public or private waste collection service.  Landlord may direct the manner of disposal and location of any containers, collection boxes or other storage facilities, which may be required by Hazardous Materials Laws.

14.2    The term "**Hazardous Materials**" shall not include (i) pharmaceuticals, cleaning agents of the types and in the quantities and concentrations normally stocked by health care providers located in medical office buildings similar to the Building, (b) oil in the minimal amounts typically associated with the use of certain portions of the Building for driving and parking motor vehicles or (c) medical wastes generated at the Building; however, Tenant shall use, store, transport and dispose of the foregoing in accordance with all laws including (without limitation) all Hazardous Materials Laws.

14.3    Tenant shall indemnify, defend and hold harmless Landlord, the "**Hospital**" and the holder ("**Mortgagee**") of any mortgage encumbering all or any portion of the Building or the real property upon which the Building is situated or Landlord's leasehold estate in the Land ("**Mortgage**"), and their respective members, managers, partners, shareholders, directors, officers, agents and employees (all collectively referred to as the "**Indemnified Parties**") from and against any and all costs, expenses and claims arising from or in connection with any act, omission or negligence of Tenant or any Tenant's Representatives relating to or arising out of the use, handling, depositing or disposal of Hazardous Materials with respect to the Premises or the Building, such indemnity to include all costs, expenses and liabilities associated with the remediation thereof or incurred in connection with each claim, action or proceeding with respect thereto, including, without limitation, all attorney's fees and expenses.

14.4    Tenant shall immediately notify Landlord in writing of:  (i) any enforcement, clean-up, removal or other governmental or regulatory action instituted, contemplated or threatened concerning the Premises pursuant to any Hazardous Materials Laws; (ii) any claim made or threatened by any person against Tenant or the Premises relating to damage contribution, cost recovery, compensation, loss or injury resulting from or claimed to result from any Hazardous Materials on or about the Premises; and (iii) any reports made to any environmental agency arising out of or in connection with any Hazardous Materials in or removed from the Premises, including any complaints, notices, warnings or asserted violations in connection therewith, all upon receipt by Tenant of actual knowledge of any of the foregoing matters.  Tenant shall also supply to Landlord a promptly as possible and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating to Hazardous Materials associated with the Premises.

14.5    Without limiting any other provision of this Lease, Tenant shall not create or permit to exist in or about the Premises any "**Mold Condition**" unless caused by Landlord.  As used herein, the term Mold Condition shall include the presence or suspected presence of "**Mold**" or any condition(s) that reasonably can be expected to give rise to or indicate the presence of Mold, including observed or suspected instances of water damage or intrusion, the presence of wet or damp wood, cellular wallboard, floor

coverings or other materials, inappropriate climate control, discoloration of walls, ceilings or floors, complaints of respiratory ailment or eye irritation by Tenant's employees or any other occupants or invitees in the Premises, or any notice from a governmental agency of complaints regarding the indoor air quality at the Premises.  As used herein, the term Mold shall include mold, mildew, fungus or other potentially dangerous organisms.  In the event of suspected or actual Mold or Mold Conditions at the Premises, Tenant shall immediately notify Landlord in writing of the same and the precise location thereof.  Tenant acknowledges the control of moisture and Mold prevention are material obligations of Tenant under this Lease, and Tenant shall, at its sole costs and expense, regularly monitor the Premises for the presence of Mold and Mold Conditions.  If any Mold or Mold Conditions in or about the Premises are a result of the actions or omissions of Tenant or any Tenant's Representatives, Tenant shall promptly, at Tenant's sole cost and expense, hire a licensed and experienced Mold remediation contractor to completely clean-up and remove from the Premises all Mold or Mold Conditions.  All such clean-up, removal and remediation shall, in each instance, be conducted to the satisfaction of Landlord and any governmental authority with jurisdiction and otherwise in strict compliance with all applicable laws.  Such clean-up, removal and remediation shall also include removal and replacement of any infected host materials as well as any repairs and refinishing required as the result of such removal and replacement.  There shall be no abatement of Rent on account of any clean-up, removal or remediation of any such Mold or Mold Condition.  Tenant waives, releases and discharges Landlord and all Indemnified Parties for, from and against all claims, demands, causes of action, suits, judgments, liabilities, losses, damages and expenses (including attorneys' fees) for personal injury, bodily injury or property damages in any way arising from or relating to or associated with moisture or the growth of or the presence of Mold or Mold Conditions.

## 15.    ASSIGNING, MORTGAGING, SUBLETTING.

15.1    Prohibitions.  Except as otherwise permitted pursuant to Section 15.1 or 15.2, Tenant shall not (i) transfer, assign or hypothecate this Lease, (ii) sublet any portion of the Premises, (iii) enter into any license, concession or other right of occupancy of any portion of the Premises, (iv) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization, (v) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant that results in a Material Change in Ownership (defined below) (each, a "**Transfer**"), without first procuring the written consent of the Landlord, which consent may not be unreasonably withheld or delayed.  Any Transfer, whether voluntary or involuntary, by operation of the law or otherwise, without the prior written consent of Landlord first had and obtained therefor, shall be null and void, at the option of Landlord, and Landlord may declare a default and exercise all remedies available to Landlord under this Lease or at law.  Notwithstanding the foregoing provisions of this Section 15.1 to the contrary, Tenant may sublet the Premises to Professionals and/or Physicians associated with the Hospital.

15.2    Material Change in Ownership.  If Tenant is an entity of any type, then the sale, transfer or other change of 49.9% or greater of the ownership interests of Tenant shall constitute a "**Material Change in Ownership**", in which event Landlord shall consent to the resulting Transfer provided that Tenant provides to Landlord (i) at least thirty (30) days' prior written notice of such anticipated Material Change in Ownership, (ii) all relevant details of the proposed Material Change in Ownership, including updated financial statements reflecting the financial condition of the proposed assignee post Material Change in Ownership ("**Post Material Change in Ownership Financial Statements**"), and (iii) the Post Material Change in Ownership Financial Statements reflecting a minimum Tangible Net Worth of $150,000,000.  As used herein, "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the determination of total assets all assets that would be classified as intangible assets under GAAP including, goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises.

15.3    Liability; Release.  Tenant shall not be released from any liability or obligation under this Lease as a result of any Transfer or Landlord's consent to any Transfer; provided, however, if (i) Landlord consents to a proposed Transfer that would occur as a result of (A) any other entity becoming Tenant hereunder by merger, consolidation, or other reorganization, (B) any transfer of an ownership interest in Tenant that results in a Material Change in Ownership or (C) any assignment of this Lease for the remainder of the Term, and (ii) the entity comprising Tenant after such Transfer has a Tangible Net Worth together with any new guarantor that is equal to or greater than (1) the aggregate Tangible Net Worth of Tenant and Guarantor at the time of this Lease and (2) a minimum Tangible Net Worth of $150,000,000, then Tenant shall be released from further liability under this Lease for the unexpired Term following such Transfer. Tenant shall provide to Landlord any information reasonably requested by Landlord to evaluate the satisfaction of any Tangible Net Worth requirements contemplated in this Section 15.

15.4    Conditions to Consent. Landlord may condition its consent to any assignment or subletting (i) upon Tenant's agreement to termination of this Lease and simultaneous creation of a new lease between Landlord and the proposed successor, or (ii) upon Tenant's agreement simultaneously with the execution of any sublease or assignment approved by Landlord, to name Landlord its agent for purposes of collection of rental from the subtenant approved by Landlord under any such sublease or assignment (in order to enable Landlord to maintain its collection and other relationships).

15.5    Transactions Consented To. Each Transfer to which there has been consent shall be by an instrument in writing in form satisfactory to Landlord and shall be executed by the transferor, assignor, sublandlord, licensor, concessionaire, hypothecator or mortgagor and the transferee, assignee, subtenant, licensee concessionaire or mortgagee in each instance, as the case may be, and each transferee, assignee, subtenant, licensee, concessionaire or mortgagee shall agree in writing for the benefit of the Landlord herein to assume, to be bound by, and to perform the terms, covenants and conditions of this Lease to be done, kept and performed by the Tenant. One (or more, if required by Landlord) executed copy of such written instrument shall be delivered to Landlord.  Failure to first obtain in writing Landlord's consent or failure to comply with the provisions of this Article shall operate to prevent any such transfer, assignment, subletting, license, concession agreement or hypothecation from becoming effective.

15.6    Excess Rental.  If the rental due and payable by any assignee or subtenant under any such permitted assignment or sublease (or a combination of the rental payable under such assignment or sublease plus any bonus or other consideration therefor or any payment incident thereto) for the Premises (or any portion thereof) exceeds the rent payable under this Lease for the Premises (or any portion thereof), Tenant shall be bound and obligated to pay to Landlord fifty percent (50%) of all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant from such assignee or subtenant, as the case may be.

## 16.    WASTE, NUISANCE, APPLICABLE LAWS.

16.1    Waste and Nuisance. Tenant shall not commit or suffer to be committed any waste in or upon the Premises and shall not commit or suffer to be committed therein any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant in the Building, or which may disturb the quiet enjoyment of any person within the immediate vicinity of the Building.

16.2    Tenant's Compliance with Laws. Tenant shall, at Tenant's sole cost and expense, comply with all the requirements of all federal, state, county, municipal and other applicable authorities, now in force or which may hereafter be in force in connection with Tenant's use of the Premises.

## 17.    **DESTRUCTION.**

17.1    Notice of Loss. Tenant shall give immediate notice to Landlord in the event of fire or other accidents or casualties within the Premises or in or around the Building, and such other notice as prescribed by the fire and extended coverage insurance policy required herein to be carried thereon, and further, Tenant shall give immediate notice to Landlord of any defect in any of the fixtures or equipment located within the Premises or in or around the Building.

17.2    Premises Useable. In the event the Premises shall be damaged by fire or other casualty, but shall not be rendered wholly or partially unusable, regardless of the time remaining in the Term, Landlord shall cause such damage to be repaired, and the Base Rent shall not be reduced or abated unless the repairs are delayed beyond ninety (90) days after commencement of such repairs, and thereafter, only if Landlord is not diligently pursuing such repairs, and then only to the extent as may be equitable based upon the amount of damage.

17.3    Premises Unusable. If the Premises shall be rendered partially or wholly unusable, Landlord shall cause such damage to be repaired and the Base Rent shall be reduced in proportion to Tenant's loss of effective use of the Premises during such repair.

17.4    Building Damaged. In the event all or part of the Building, other than the Premises, shall be damaged or destroyed by fire or other casualty, and regardless of the time remaining in the Term, Landlord shall cause such damage to be repaired. Neither Base Rent nor any other sums due hereunder shall be abated or reduced.

17.5    Scope of Repair. In the event Landlord elects or shall be obligated to repair or restore any damage or destruction as aforesaid, the scope of the work shall be limited to the shell of the Building and Lease Premises. Landlord shall not be required to make repairs or replacements of any panels, decoration, trade fixtures, railings, floor covering, partitions or other parts of the Interior of the Premises or any other property installed or placed in the Premises by Tenant.

17.6    Commencement of Repairs.  Anything to the contrary herein notwithstanding, Landlord shall not be required to commence repairs and/or restoration prior to the expiration of sixty (60) days following the occurrence or the receipt by Landlord of the insurance proceeds covering said damage, whichever event shall first occur.

## 18.    **CONDEMNATION.**

18.1    Total Taking. If all of the Premises should be taken for any public or quasi public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, then this Lease shall terminate and the Rent shall be abated during the unexpired portion of the Term, effective on the date physical possession is taken by the condemning authority.

18.2    Partial Taking. If any part (but not all) of the Building, Common Areas or the Premises should be so taken, Landlord may terminate this Lease if Landlord, in its sole discretion, so elects. Any election to terminate this Lease in accordance with this provision shall be evidenced by written notice of termination to Tenant within thirty (30) days after the date physical possession is taken by the condemning authority. If this Lease is not so terminated, the Base Rent payable hereunder during the unexpired portion of the term shall be reduced in proportion to the area of the Premises taken, effective on the date physical possession is taken by the condemning authority.

18.3    Award.  All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Building, the Premises or the Common Areas shall be the property of Landlord and Tenant hereby assigns its interests in any such award to Landlord

## 19.    QUIET ENJOYMENT.

So long as Tenant shall pay all Rent and other payments due hereunder and shall observe and perform all of the covenants on Tenant's part to be observed and performed hereunder, and Tenant is not in default hereunder (beyond any applicable notice or cure periods), Tenant shall peaceably and quietly hold and enjoy the Premises (including easement rights) for the entire Term hereof without interruption by Landlord or person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to all of the terms and provisions of this Lease and to the reservations, encumbrances and limitations affecting the title to the premises upon which the Building is situated.

## 20.    DEFAULT AND REMEDIES.

20.1    Default. The following events shall be deemed to be the events of default by Tenant under this Lease:

(1)    Tenant shall fail to pay any installment of the Base Rent or any Additional Rent within five (5) business days after receipt of written notice of such failure from Landlord. Notwithstanding the foregoing, Landlord shall not be obligated to provide written notice more than twice in any twelve (12) month period.

(2)    Tenant shall fail to comply with any term, provision or covenant of this Lease, other than the payment of any sums due Landlord, including but not limited to, the Base Rent or any Additional Rent, and Tenant shall not cure such failure within thirty (30) days after written notice thereof of Tenant (or such shorter notice period as may be provided elsewhere in this Lease for specific events of default); provided, however, that if such failure cannot be reasonably cured within thirty (30) days, then Tenant shall have such additional time to cure as is reasonable under the circumstances provided that Tenant diligently continues to pursue such cure.

(3)    An event of default shall occur and remain uncured within the time stated for such cure under any Related Lease.

(4)    Tenant or any guarantor of Tenants' obligations hereunder shall become insolvent in any chapter of the United States Bankruptcy Code, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(5)    Tenant or any guarantor shall file a petition under any section or chapter of the United States Bankruptcy Code, or under any similar law or statute of the United States or any state thereof; or Tenant shall be adjudged bankrupt or insolvent as defined in any chapter of the United States Bankruptcy Code in proceedings filed against Tenant or any guarantor of Tenant's obligations under this Lease.

(6)    A receiver or trustee shall be appointed for the Premises or for all or substantially all of the assets of Tenant or any guarantor and such receiver or trustee shall not be discharged within thirty (30) days following such appointment.

(7)    The discovery by Landlord that any financial statement given by Tenant or any of its assignees, subtenants or successors-in-interest, or any guarantor of Tenant's obligations hereunder to Landlord, was materially false.

20.2    Remedies.

(1)    Upon the occurrence of any event of default hereunder, and notwithstanding the fact that the termination or cancellation of this Lease by Landlord may substantially interfere with the ability of Tenant to conduct a non-liquidation proceeding under any chapter of the United States Bankruptcy Code, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever.

(i)    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, without being liable for prosecution or any claim for damages therefor and Tenant agrees to pay Landlord, on demand, the amount of all losses, expenses and damages, including attorneys' fees, which Landlord may suffer by reason of such termination; and/or

(ii)    Enter upon the Premises and correct such default or otherwise do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to pay Landlord, on demand, the amount of all  losses, expenses and damages, including attorneys' fees which Landlord may incur in connection with attempts to effect compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for prosecution or any claim for damages resulting to Tenant from such action, and/or

(iii)    Enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, without being liable for prosecution or any claim for damages therefor, and if Landlord so elects, relet the Premises on such terms as Landlord may deem advisable and receive rental therefor.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any other remedies herein provided or provided by law, or at equity, nor shall pursuit of any other such remedy constitute a forfeiture or waiver of any Rent or other sums due to Landlord hereunder or of any damages accruing to the Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default. In determining the amount of loss or damage which Landlord may suffer by reason of termination of this Lease or the deficiency arising by reason of any reletting by Landlord as above provided, allowance shall be made for the expense of repossession and any repairs or remodeling undertaken by Landlord following repossession.

(2)    Exercise by Landlord of any one or more remedies herein granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises by Tenant, whether by agreement or by operation of law it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. No removal or other exercise of dominion by

Landlord over the property of Tenant or others at the Premises shall be deemed unauthorized or constitute a conversion. Tenant hereby consenting, after any event of default, to the aforesaid exercise of dominion over Tenant's property within the Building. All claims for damages by reason of such reentry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. Tenant agrees that any reentry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings, as Landlord may elect and Landlord shall not be liable in trespass or otherwise,(after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant as provided in this paragraph may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease Term.

(3)    In the event Landlord elects to terminate this Lease by reason of event or default, then notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord, at Landlords Address as defined in <u>Section 1</u> herein, the sum of all Rent, Additional Rent and other indebtedness accrued to the date of such termination, plus, as damages, an amount equal to the present value of the Rent and any and all other sums reserved hereunder for the remaining unexpired portion of the Lease Term (had the Lease not been so terminated by Landlord), less the then present value of the then fair rental value of the Premises.

(4)    In the event Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord at Landlords Address as defined in <u>Section 1</u> hereinabove, all Rent and other indebtedness accrued to date of such repossession, plus all Rent and any and all other sums required to be paid by Tenant to Landlord during the remainder of the Lease Term until the date of expiration of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during Period (after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant as provided in the paragraph may be brought from time to time, on one or more occasions, without necessity of Landlord's waiting until expiration of the Lease Term.

(5)    In the event of termination or repossession of the Premises for an event of default, Landlord shall have an obligation to attempt to relet the Premises, or any portion thereof. However, in the event of reletting Landlord may relet the whole or any portion of the Premises for any period, to any tenant, and for any use and purpose. Should Landlord choose to relet the Premises, or any portion thereof, for the remainder of the Term provided for herein, and if the rental received through reletting does not at least equal the Rent provided for herein, Tenant shall pay and satisfy the deficiency between the amount of the Rent so provided for and that received through reletting, including, but not limited to, the cost of renovating, altering, and decorating for a new occupant. Further, Tenant shall not in any event ever be entitled to any excess rental and other sums provided for herein, and the same shall belong solely to Landlord. Nothing herein shall be construed as in any way denying Landlord the right, in the event of abandonment of said Premises or other breach of this Lease by Tenant, to treat the same as an entire breach and at Landlord's option to terminate this Lease and/or immediately seek recovery for the entire breach of this Lease and any and all damages which Landlord suffers thereby.

(6)    If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of

Tenant (and enter the Premises for such purpose), and thereupon Tenant shall be obligated and hereby agrees, to pay Landlord, upon demand, all costs, expenses and disbursements (including reasonable attorneys' fees) incurred by Landlord in taking such remedial action.

(7)    In the event of the breach or the attempted or threatened breach of any covenant or provision contained in this Lease by Tenant, Landlord shall have, in addition to all other remedies provided it hereunder or by law or at equity, the right to obtain an injunction prohibiting such breach or attempted breach without the necessity for proof of inadequacy of legal remedy, irreparable harm or probable right of recovery.

20.3    Expenses/Attorneys' Fees. In the case of an event of default hereunder, Tenant shall also be liable for and shall pay to Landlord, at Landlords Address as defined in Section 1 herein, in addition to any sum provided to be paid above: broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in enforcing Landlord's rights or remedies, including reasonable attorneys' fees and court costs until the expiration of the Term.  Tenant shall permit the Landlord to exhibit the Premises to prospective tenants and to place notices upon the Premises advertising "For Lease".  Landlord may at any time, exhibit the Premises to prospective purchasers. and place notices, upon the Building or the Premises advertising "For Sale."

20.4    Landlord's Breach.  In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rental due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have thirty (30) days in which to cure any such default. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Building and not thereafter.

20.5    Limitation on Landlord's Personal Liability. Tenant specifically agrees to look solely to Landlord's interest in the Building for the recovery for any judgment from Landlord, it being agreed that Landlord, its agents, employees, shareholders, officers, directors, and limited partners, shall never be personally liable hereunder for anything whatsoever.

## 21.    ACCESS.

Landlord or its agents shall have the right to enter the Premises at all reasonable times, and whenever necessary because of emergencies, to inspect the same, and to make such repairs, replacements, alterations, improvements or additions as Landlord may deem necessary or desirable, including alterations, repairs, improvements or additions to the space adjacent to Premises and/or to the Building, without the same constituting an eviction of Tenant in whole or in part, and the Rent reserved shall in no way abate while said repairs, replacements, alterations, improvements or additions are being made, by reason of loss or interruption of Tenant's business or otherwise. During the ninety (90) days prior to the expiration of the Term, Tenant shall permit the Landlord to exhibit the Premises to prospective tenants and to place notices upon the Premises advertising "For Lease".  Landlord may, at any time, exhibit the Premises to prospective purchasers, and place notices, upon the Building or the Premises advertising "For Sale."

## 22.    **SURRENDER AND REMOVAL OF PROPERTY.**

22.1    Surrender of Premises. Promptly upon the expiration or earlier termination of the Term, Tenant shall surrender the Premises in the same condition as received by Tenant on the Commencement Date reasonable wear and tear and damage by unavoidable casualty or Act of God only excepted. Further, Tenant shall surrender all keys to the Premises at the place then fixed for the payments of Base Rent due hereunder. All items of work and improvements comprising the Interior of the Premises, shall constitute a part of the fee estate remainder subject to this Lease, notwithstanding that Tenant may construct or cause to be constructed all or any part of said improvements or may contribute to the cost thereof, and notwithstanding that Tenant may or might be required to maintain, repair and/or replace same or some part thereof pursuant to some other provisions in this Lease. Subject to the provisions of this Section, Tenant shall remove all of Tenant's trade fixtures, operation equipment and other personal property before surrendering the Premises as aforesaid and shall repair at Tenant's expense any damage to the Premises caused thereby.

22.2    Failure to Remove Property. If Tenant shall neglect to remove Tenant's personally as herein provided, Landlord shall have the right (i) to remove said property and cause it to be stored in a public warehouse or elsewhere, at the cost of and for the account of Tenant, or (ii) in the alternative, if said property shall not be removed within thirty (30) days after said termination, to dispose of said property in a manner deemed suitable to Landlord, all without service of notice or resort to legal process and without becoming liable for any loss damage which may be occasioned thereby, and any proceeds of such disposition shall be retained by Landlord without liability to Tenant, Tenant hereby waiving any interest in such proceeds.

22.3    Survival of Covenants. Tenant's obligations to observe or perform the covenants contained in this Article shall expressly survive the expiration or earlier termination of the Term.

## 23.    **HOLDING OVER.**

Any holding over without the consent of Landlord after the expiration or earlier termination of the Term shall be construed to be and shall constitute a tenancy at the will of Landlord, and Tenant agrees to pay as rents and liquidated damages for such holding over a sum equivalent to the Rent herein specified and reserved plus fifty percent (50%) of the Base Rent (prorated on a monthly basis) and shall otherwise be on the same terms and conditions herein, as far as applicable.

## 24.    **ESTOPPEL/MEMORANDUM.**

24.1    Estoppel Certificate.  Within ten (10) days after request therefore by Landlord, Ground Lessor or any Mortgagee, Tenant shall deliver in recordable form (and signed by Tenant, if an individual, or a duly authorized representative of Tenant if Tenant is not an individual) a statement to Landlord, Ground Lessor any Mortgagee, or any proposed Mortgagee or transferee of the Project (as the case may be), certifying (if such be the case) that this Lease is in full force and effect, that Tenant is in possession of the Premises, that Tenant has commenced the payment of Rent, that there are no defenses or offsets to this Lease claimed by Tenant, as well as any other information reasonably requested.  If Tenant fails or refuses to give a certificate hereunder within the time period herein specified, then the information contained on such certificate as submitted by Landlord shall be deemed correct for all purposes, but Landlord shall have the right to treat such failure or refusal as a default by Tenant.

24.2    Memorandum of Lease. Promptly after the Commencement Date, Landlord and Tenant, if requested by Landlord, shall execute and acknowledge and deliver a memorandum or short form of this Lease, in recordable form, acknowledging Tenant's acceptance of the Premises for all purposes herein

provided and specifying the Commencement Date and the termination date of this Lease in accordance with the provisions hereof, and said memorandum may be recorded by Landlord only, but this Lease Agreement itself shall not be recorded. In the event Tenant records a memorandum of this Lease, or this Lease, Tenant shall be in default under this Lease and Landlord may terminate this Lease upon five (5) days written notice to Tenant at Tenant's address set forth in Section 1.1 hereof.

## 25.  <u>NOTICES.</u>

All notices required or permitted to be given hereunder by either party hereto to the other party shall be deemed sufficiently given or made on the day of receipt thereof or three (3) business days after the date when mailed by United States Registered or Certified Mail, adequate postage paid, to their respective addresses as specified in Section 1.1 hereof. Each party hereto may notify the other party of any change in its mailing address by notice in the manner herein above provided, which new address shall thereafter be deemed the proper address for notice hereunder.

## 26.  <u>TENANT'S PAYMENTS.</u>

26.1   <u>Payments</u>. Tender of Rent and/or any other payment due hereunder shall be considered to have been made on the date such payments received by Landlord and not on the date mailed by Tenant. For purposes hereof, the office of Landlord is the office presently or henceforth designated pursuant to the provisions of Section 1.1 hereof. Checks or drafts tendered will constitute payment only when duly paid by the drawers bank promptly upon presentment, properly endorsed, for payment.

26.2   <u>Interest</u>. All sums due and owing by Tenant to Landlord under this Lease shall bear interest at the Prime Rate (as defined in the *Wall Street Journal*) plus four percent (4%) from the date due until paid.

## 27.  <u>LANDLORD'S LIEN.</u>

To secure the payment of all Base Rent, and Additional Rent reserved herein, and all other payments due Landlord hereunder, or to become due hereunder and the faithful performance of all covenants, agreements and stipulations herein contained to be performed by Tenant, Tenant hereby grants to Landlord an express first and prior contract lien and security interest on all property (including fixtures, equipment, inventory, goods, wares, furniture, office equipment, supplies and merchandise) which may be placed in the Premises, and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction of or damage to any such property. Tenant hereby waives all exemption laws in favor of said lien and security interest. This lien and security interest is given in addition to the Landlord's statutory lien and shall be cumulative thereof. Tenant shall not remove any property from the Premises until all of Tenant's obligations under this Lease are satisfied. This lien may be foreclosed with or without court proceedings by public or private sale, provided Landlord gives Tenant at least ten (10) days notice of the time, place and terms of said sale, and Landlord shall have the right to become the purchaser of such property, upon being the highest bidder therefor at said sale. The notice referred to in the preceding sentence may (but needs not) be given by Landlord to Tenant contemporaneously with any other notice from Landlord to Tenant which may be given in accordance herewith. At the time of the execution of this Lease, and if requested thereafter by Landlord, Tenant shall execute and deliver to Landlord financing statement instruments in form deemed sufficient by Landlord to reflect the security interest herein granted and any proper amendment of, assignment of, modification in or extension of the aforesaid contract lien and security interest hereby granted. Tenant hereby grants to Landlord a power of attorney to sign, in place and stead of Tenant, any and all such instruments. Said power of attorney is irrevocable and coupled with an interest.

28.   **RULES AND REGULATIONS.**

      Such reasonable rules and regulations applying to all tenants in the Building as may be adopted by Landlord for the safety, care, cleanliness, preservation of good order or operation of the Premises, the Building, the Property and the Common Areas, are hereby made a part hereof and Tenant agrees to comply with all such rules and regulations, immediately upon receipt of a copy of same. Landlord shall have the right at all times to change any of the rules and regulations or to amend them in any manner deemed reasonable by Landlord. All changes and amendments will be sent by Landlord to Tenant in writing and shall be thereafter carried out and observed by Tenant.  As of the Effective Date, the rules and regulations are set forth on Exhibit D.

29.   **BROKERS.**

      None.

30.   **AUTHORITY.**

      Each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has been and is qualified to do business in the state in which the Building is located, that the Tenant Entity has full right and authority to enter into this Lease, and that all persons signing on behalf of the Tenant Entity were authorized to do so by all appropriate actions required of such entity.  If Tenant signs as a partnership, trust or other legal entity, each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has complied with all applicable laws, rules and governmental regulations relative to its right to do business in the state in which the Building is located, and that each of the persons or entities acting on behalf of the Tenant was authorized to do so by any and all appropriate partnership, trust or other actions.

31.   **LIABILITY OF LANDLORD.**

      Tenant shall look solely to Landlord's interest in the Building, including revenue derived from the Project, and Landlord's personal property used in connection with the Project for the satisfaction of any judgment or decree requiring the payment of money by Landlord, based upon any default hereunder, and no other property or asset of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of such judgment or decree.  **IN NO EVENT SHALL LANDLORD BE LIABLE OR RESPONSIBLE FOR ANY CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES.**

32.   **SCOPE AND INTERPRETATION OF AGREEMENT; CONFIDENTIALITY.**

      This Lease and all Exhibits set forth including all of the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, conditions, or understandings, either oral or written, other than as set forth herein.  No subsequent alteration, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.  This Lease shall not be more strictly enforced against either party regardless of who was more responsible for its preparation.  Except at Landlord's option, no part of this Lease or any memorandum thereof may be recorded in the public records of any municipality or county.  Tenant will maintain the confidentiality of this Lease and will not divulge the economic or other terms of this Lease, whether verbally or in writing, to any person, other than Tenant's officers, directors, partners or shareholders; Tenant's attorneys, accountants and other professional consultants; any governmental agencies; and pursuant to subpoena or other legal process.  If any provision of this Lease shall be determined to be void by any court of competent jurisdiction or by any law enacted subsequent to the

Effective Date, then such determination shall not affect any other provisions hereof, all of which other provisions shall remain in full force and effect.

**33.** **LANDLORD'S CONSENT.**

Without limiting any other provision of this Lease, in the event that Landlord's consent is required by the terms hereof for any purpose whatsoever, it is understood and agreed that (a) Landlord's consent may be subject to the consent of the Ground Lessor, Declarant and/or the holder of any Mortgage encumbering the Building to the extent that such consents are required under the terms of the Ground Lease, Declaration or the applicable financing documents (which consents Landlord shall seek to obtain) and (b) notwithstanding anything to the contrary set forth herein, it shall not be deemed unreasonable for Landlord to withhold its consent in any given circumstance based upon Landlord's inability to obtain any required consent from the Ground Lessor, Declarant or the holder of any Mortgage encumbering the Building.

**34.** **USE OF PREMISES.**

Tenant shall use and occupy the Premises only for the Permitted Use, and for no other purpose, without the prior written consent of Landlord.

**35.** **GUARANTY.**

As material consideration for Landlord to enter this Lease, Tenant shall cause Guarantor to execute the Guaranty attached as Exhibit E (the "**Guaranty**"), and Tenant shall deliver the Guaranty to Landlord contemporaneously with Tenant's execution hereof.

**36.** **WAIVER OF JURY TRIAL.**

LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LEASE OR THE OBLIGATIONS EVIDENCED HEREBY, OR ANY OTHER DOCUMENT OR INSTRUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT TO EACH OF LANDLORD AND TENANT IN ENTERING INTO THIS LEASE.

**37.** **MISCELLANEOUS.**

37.1    Successors and Assigns. All rights and liabilities herein granted to or imposed upon the respective parties hereto shall extend to and jointly and severally bind the several respective heirs, legal representatives, successors and assigns of the respective parties hereto, an if there shall be more than one Landlord or Tenant, all shall be bound jointly and severally the terms, conditions and agreements herein contained. No rights, however, shall inure to the benefit of any assignee of Tenant unless Landlord has approved the assignment to such assignee in writing as provided herein.

37.2    Waivers. One or more waivers of any breach or violation of any agreement, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent violation or breach of the same or any other agreement, covenant, or condition herein contained, and the consent or approval by either party of any act by the other, which act requires the approval or consent of the other party, shall not be deemed to waive or render unnecessary the future requirements of consent or approval of the same or

similar act; and the subsequent acceptance of Rent or other payment due hereunder shall not be deemed to be a waiver of any preceding breach by Tenant, other than failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of the acceptance of said Rent. No express covenant, term or condition of this Lease shall be deemed to have been waived by either party, unless such waiver is in writing.

37.3    Accord and Satisfaction. No payment made by Tenant or received by Landlord in an amount less than the amount herein stipulated shall be deemed to be other than on account of the earliest received payment, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such amount or to pursue any other remedy in this Lease or by law provided Landlord.

37.4    Entire Agreement. This Lease, together with the exhibit or exhibits aforesaid and the rider or riders, if any, attached hereto and forming a part hereof, contains and sets forth the entire agreement and understandings between the parties hereto concerning the Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between said parties other than as herein expressly set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon either party hereto, unless reduced to writing and signed by both parties.

37.5    Partnership. Landlord does not become a partner of Tenant in the conduct of its business or otherwise, or a joint venturer or a member of a joint enterprise with Tenant by virtue of this Lease.

37.6    Force Majeure.  In the event Landlord shall be delayed, hindered or prevented from the performance of any act required hereunder by reason of strikes, fire, explosions, lock-outs, failure of electrical power, governmental restrictions or regulations, unavailability of suitable financing, materials and/or labor, riots, insurrection, war or on account of any other condition or occurrence not the fault of Landlord, then the performance of any such act shall be extended for a period equivalent to the period of such delay.

37.7    Captions and Numbers.  The captions, section numbers and article numbers appearing in this Lease are inserted only as a matter of convenience and in no wise define, limit, construe or describe the scope or intent of such sections or articles, nor in any wise affect this Lease.

37.8    Tenant, Defined Use of Pronouns. The word "**Tenant**" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more and if there shall be more than one Tenant. Any notice required or permitted by the terms of this of Lease may be given by or to any one thereof and shall have the same force and effect as if given by or to all thereof. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, and a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or one Tenant, and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

37.9    Severability. If any provisions covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, there reminder of this Lease, or the application of such provision, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each provision,

covenant or condition of this Lease shall be valid and shall be enforced to the fullest extent permitted by Law.

      37.10   <u>Survival</u>. Landlord and Tenant expressly agree that all provisions of this Lease which contemplate performance after the expiration or earlier termination hereof shall survive such expiration or earlier termination of this Lease.

      37.11   <u>Governing law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Texas.  Venue for any legal actions hereunder shall be in the Courts of Grayson County, Texas.

      37.12   <u>Other documents</u>. The parties agree to execute all other documents or instruments necessary to effect the transfers of property set forth herein and otherwise to implement the provisions of this Agreement.

## 38.    EXHIBITS

      The following exhibits are a part of this Lease and are incorporated herein by reference:

Exhibit A – Legal Description
Exhibit B – Floor Plan of the Premises
Exhibit C – Parking Areas
Exhibit D – Rules and Regulations
Exhibit E – Guaranty

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

EXECUTED as of the date first set forth above in multiple counterparts each of which shall be deemed to be an original.

**LANDLORD**:

ALTERA HIGHLAND LLC,
a Texas limited liability company

By:_____

Name:  Terry D. Quinn
Its:      President

**TENANT**:

SHERMAN/GRAYSON HEALTH SYSTEM, LLC,
a Texas limited liability company

By:_____
Name:_____
Its:_____

LEASE AGREEMENT
SIGNATURE PAGE

**A0406**

EXECUTED as of the date first set forth above in multiple counterparts each of which shall be deemed to be an original.

**LANDLORD:**

ALTERA HIGHLAND LLC,
a Texas limited liability company

By:_____
Name:   Terry D. Quinn
Its:      President

**TENANT:**

SHERMAN/GRAYSON HEALTH SYSTEM, LLC,
a Texas limited liability company

By:_____
Name:   Thomas J. Frazier, Jr.
Its:      Executive Vice President

LEASE AGREEMENT
SIGNATURE PAGE

**A0407**

EXHIBIT A

LEGAL DESCRIPTION

BEING a 3.0894 acre tract of land situated in the County of Grayson, State of Texas out of the J.B. McAnair Survey, Abstract No. 763 and being all of Block No. 7, and a portion of Lots 7-8, and all of Lots 9-12, Block 12 of Green Mount Addition to the City of Sherman, Grayson County, Texas, as shown by Plat of record in Volume 193, Page 21, Deed Record, Grayson County, Texas,  together with that  portion of vacated Pecan Street, and being more particularly described by meets and bounds as follow:

BEGINNING at a "X" cut in concrete found for corner at the intersection of the north line of Laurel Street (a 60 foot wide public right-of-way) and the east line of Bryant Avenue (a 60 foot wide public right-of-way);

THENCE North 15 degrees 40 minutes 01 seconds West (Reference for Basis of Bearings) along said east right-of-way line, a distance of 467.78 feet to a 5/8 inch iron rod set with cap stamped BGT for corner;

THENCE North 73 degrees 42 minutes 45 seconds East, a distance of 286.25 feet to a 5/8 inch iron rod set with cap stamped BGT for corner in the west right-of-way line of Highland Avenue;

THENCE South 16 degrees 01 minutes 19 seconds East along said west right-of-way line, a distance of 467.76 feet to a 1/2 inch iron rod with cap found for corner at the intersection of the west right-of-way line of said Highland Avenue and the north right-of-way line of said Laurel Street;

THENCE South 73 degrees 42 minutes 45 seconds West along said north right-of-way line, a distance of 289.15 feet to the POINT OF BEGINNING and containing 134,573 square feet or 3.0894 acres of land, more or less.

<u>EXHIBIT B</u>

FLOOR PLAN OF THE PREMISES

[ATTACHED]



2nd FLOOR PLAN

scale: 1/8" = 1'-0"

Ambulatory Surgery Center
St 200 - 210

St 215 - Grace Pharmacy

19699 SF

EXHIBIT C

PARKING AREAS

[ATTACHED]



TRACT FIFTEEN:

Being a part of Block No. Eight (8), of G. Y. Gray's Second Addition to the City of Sherman, Texas, and further described as follows:

BEGINNING at the intersection of the South line of Laurel Street with the West line of Highland Avenue as now opened;
THENCE West 140 feet with the South line of Laurel Street to a stake, for the Northwest corner;
THENCE South parallel with Highland Avenue 75 feet to a stake;
THENCE East parallel with Laurel Street 140 feet to a stake in the West line of Highland Avenue;
THENCE North with said line of Highland Avenue 75 feet to the place of beginning, containing a tract of 140 x 75 feet.

TRACT SIXTEEN of the County of Grayson, State of Texas, all that certain tract or parcel of land situated in the City of Sherman, Grayson County, Texas, being a part of the survey originally granted to John B. McAnair, and being a part of Block Eight (8) of Gray's Second Addition, as shown by the map or plat thereof, recorded in Volume 134, page 113, of the Deed Records of Grayson County, Texas, and being more particularly described as follows:

BEGINNING at a point on the West line of Highland Avenue, 125 feet South of the intersection of the West line of Highland Avenue, and the South line of Laurel Street;
THENCE Southward with the West line of Highland Avenue, 45 feet;
THENCE Westward and parallel with the South line of Laurel Street, 140 feet;
THENCE Northward and parallel with the West line of Highland Avenue, 45 feet;
THENCE Eastward, parallel with the South line of Laurel Street, 140 feet to the place of beginning; this being the South 45 by 140 feet of the tract 95 by 140 feet, in size conveyed by Frank Reece and wife, Mrs. Minnie Reece, to Bob Richardson by deed dated March 5, 1924, and recorded in Volume 303, Page 153 of the Deed Records of Grayson County, Texas.

TRACT SEVENTEEN:

SITUATED in the City of Sherman, County of Grayson, Texas and being part of Block No. 8 of G. Y. Gray's Second Addition to the City of Sherman, Texas, out of J. B. McAnair Survey, Grayson County, Texas on the waters of Post Oak Creek, and described as follows:
And being the North 62 feet of the following described piece of property;
BEGINNING at the intersection of West line of Highland Ave. and the North line of Houston Street.
THENCE in a westerly direction with the North line of Houston Street 87 feet a stake.
THENCE in a Northerly direction and parallel with the West line of Highland Avenue 150 feet to a stake.
THENCE in an Easterly direction parallel with the North line of Houston Street, 87 feet to the West line of Highland Ave.
THENCE in a Southerly direction with the West line of said Highland Ave. 150 feet to the place of beginning, containing 87 x 150 feet of land.  Being the same land described in a deed from J. W. Hollingsworth and wife, Florence Hollingsworth to W. W. Craig, dated January 9, 1915, and

recorded in Volume 239, page 272, Deed Records of Grayson County, Texas.

TRACT TWENTY-FOUR:

BEING that certain tract, lot or parcel of land situated in the City of Sherman, Grayson County, Texas, in the J. B. McAnair Survey, part of Block Eight (8) of the G. Y. Gray Second Addition to the said City of Sherman;

BEGINNING at the Southwest corner of the lot conveyed by J. P. Mills and wife, to M. H. Andrews by deed recorded in Volume 57, page 107 of the Deed Records of Grayson County, Texas, a stake on the North line of West Houston Street;
THENCE North at right angles to the North line of West Houston Street 150 feet to a stake for corner;
THENCE East parallel with the North line of West Houston Street 60 feet to a stake for corner;
THENCE South at right angles to the North line of West Houston Street 150 feet to the North line of West Houston Street;
THENCE West along said line 60 feet to the Place of Beginning.

TRACT TWENTY-FIVE:

All that certain tract or parcel of land situated in Grayson County, Texas, and being more particularly described as follows: SITUATED in the City of Sherman, Grayson County, Texas, on the waters of Post Oak Creek, being a part of a survey or patent to J. B. McAnair Survey, and described as follows, to-wit:

BEGINNING at the Southeast corner of the tract described in the deed from L. M. Tuck, Receiver, to Clyde Jackson and wife, of record in Book 367, Page 344, Grayson County Deed Records;
THENCE West with the North line of Houston Street, 80 feet to the Southeast corner of a lot sold to L. V. Butler;
THENCE North with the East line of the Butler lot, 150 feet to the South line of a lot sold to Cecil J. Rodgers;
THENCE East with the South line of said Rodgers tract, 80 feet to the southeast corner or same, a stake in the East line of the tract sold to Clyde Jackson above referred to;
THENCE South with the East line of the Clyde Jackson tract, 150 feet to the place of beginning, being a lot 80 feet by 150 feet out of the Southeast corner of a tract sold by L. M. Tuck, Receiver, to Clyde Jackson and wife referred to.

Also being described as 80' x 150' our of Block 8 of G.Y. Gray's Addition to the City of Sherman.

TRACT TWENTY-SIX:

BEING all that certain lot or parcel of land, situated in the City of Sherman, Grayson County, Texas, a part of Block No. EIGHT (8) of G. Y. GRAY'S ADDITION to the City of Sherman and

being more particularly described as follows:

BEGINNING at the point of intersection of the North line of West Houston Street and the East line of Bryant Street;
THENCE North with the East line of Bryant Street for a distance of 150 feet;
THENCE East parallel with the North line of Houston Street for a distance of 70 feet;
THENCE South, parallel with the East line of Bryant Street for a distance of 150 feet to the North line of Houston Street;
THENCE West with said line for a distance of 70 feet to the Place of Beginning and containing 70 x 150 feet of land, more or less and being the same property conveyed by Alton R. Hill and wife, Laura Hill to J. B. Revell and wife, Willie B. Revell by deed dated November 10, 1952 and of record in Volume 705, Page 457 of the Deed Records of Grayson County, Texas.

TRACT TWENTY-SEVEN:

SITUATED in Sherman, Grayson County, Texas, and being a part of the J. B. McAnair Survey, and being also a part of Block 8 of G. Y. Gray's Second Addition to Sherman, Texas, and being a part of a tract of 150 x 250 feet of land sold by L. M. Tuck, receiver, to Clyde Jackson, et ux., by deed recorded in Volume 367, page 344, Deed Records of Grayson County, Texas, and described as follows, to-wit:

BEGINNING at a stake on the east line of what is known as Bryant Street at a point 50 feet south of the NW corner of the above mentioned tract of 150 x 250 feet, said point being the SW corner of a tract sold by Clyde Jackson, et al., to Cecil J. Rodgers, et ux.;
THENCE South 50 feet to a stake, the NW corner of a tract now owned by L. V. Butler, et ux., as described in deed of record in Volume 506, Page 407, Deed Records of Grayson County, Texas;
THENCE East parallel with the north line of the 150 x 250 foot tract 150 feet to a stake;
THENCE North 50 feet to the SE corner of the Cecil J. Rodgers, et ux., tract;
THENCE West with the south line of the said Rodgers tract 150 feet to the place of beginning, containing 50 x 150 feet of land.

TRACT TWENTY-EIGHT:

All that certain tract or parcel of land situated in the City of Sherman, Grayson County, Texas, being a part of the Survey originally granted to J. B. McANAIR, and being a part of BLOCK NO. EIGHT (8) of GRAY'S SECOND ADDITION to said City of Sherman, as shown by the map or plat thereof, recorded in Volume 134, at Page 113, Deed Records of Grayson County, Texas, and as shown by the 1908 Plat Book of Grayson County, Texas, and being more particularly described as follows:

BEGINNING at the intersection of the West line of Highland Avenue and the North line of Houston Street;
THENCE West with the North line of Houston Street, a distance of 87 feet;
THENCE North on a line parallel with the West line of Highland Avenue, a distance of 88 feet to the Southwest corner of a tract of land deeded to Elmer L. Anderson;

THENCE East on a line parallel with the North line of Houston Street and with the South line of the Elmer L. Anderson tract, a distance of 87 feet to a point in the West line of Highland Avenue;

THENCE South with the West line of Highland Avenue, a distance of 88 feet to the Place of Beginning and Containing 87 ft. by 88 ft. of land and being the same property conveyed by Floydell Akridge, a widow, to George Melvin Hammock, et ux., by Deed dated January 12, 1972, recorded in Volume 1208, at Page 433, Deed Records of Grayson County, Texas.

TRACT TWENTY-NINE:

BEING all that certain tract or parcel of land, situated in the County of Grayson, State of Texas, being a part of survey originally granted to J. B. McAnair and described as follows, to-wit:

BEGINNING at a point on the West line of Highland Avenue, seventy-five (75) feet South of the intersection of the West line of Highland Avenue and the South line of Laurel Street in the City of Sherman;

THENCE Southward with the West line of Highland Avenue fifty (50) feet;

THENCE Westward and parallel with the South line of Laurel Street, one hundred forty (140) feet;

THENCE Northward and parallel with the West line of Highland Avenue, fifty (50) feet;

THENCE Eastward and parallel with the South line of Laurel Street, one hundred forty (140) feet to the Place of Beginning; this being the North fifty (50) feet by one hundred forty (140) feet of the tract ninety-five (95) feet by one hundred forty (140) feet in size conveyed by Frank Reese and wife, Mrs. Minnie Reese, to Bob Richardson, by deed dated March 5, 1924, and recorded in Volume 303, page 153 of the Deed Records, Grayson County, Texas; and being Lot Eight (8), Block Eight (8), of Gray's Second Addition to the City of Sherman, Grayson County, Texas.

BEING a 3.0894 acre tract of land situated in the County of Grayson, State of Texas out of the J.B. McAnair Survey, Abstract No. 763 and being all of Block No. 7, and a portion of Lots 7-8, and all of Lots 9-12, Block 12 of Green Mount Addition to the City of Sherman, Grayson County, Texas, as shown by Plat of record in Volume 193, Page 21, Deed Record, Grayson County, Texas, together with that portion of vacated Pecan Street, and being more particularly described by meets and bounds as follow:

BEGINNING at a "X" cut in concrete found for corner at the intersection of the north line of Laurel Street (a 60 foot wide public right-of-way) and the east line of Bryant Avenue (a 60 foot wide public right-of-way);

THENCE North 15 degrees 40 minutes 01 seconds West (Reference for Basis of Bearings) along said east right-of-way line, a distance of 467.78 feet to a 5/8 inch iron rod set with cap stamped BGT for corner;

THENCE North 73 degrees 42 minutes 45 seconds East, a distance of 286.25 feet to a 5/8 inch iron rod set with cap stamped BGT for corner in the west right-of-way line of Highland Avenue;

THENCE South 16 degrees 01 minutes 19 seconds East along said west right-of-way line, a distance of 467.76 feet to a 1/2 inch iron rod with cap found for corner at the intersection of the west right-of-way line of said Highland Avenue and the north right-of-way line of said Laurel Street;

THENCE South 73 degrees 42 minutes 45 seconds West along said north right-of-way line, a distance of 289.15 feet to the POINT OF BEGINNING and containing 134,573 square feet or 3.0894 acres of land, more or less.

EXHIBIT D

RULES AND REGULATIONS

1.      All tenants will refer all contractor's representatives and installation technicians who are to perform any work within the Building, grounds, and Parking Area to Landlord for Landlord's supervision, approval and control before the performance of any such work. This provision shall apply to all work performed in the Building, grounds and Parking Area including, but not limited to, installations of telephones, telegraph equipment, electrical devices and attachments, and any and all installations of every nature effecting floors, walls, woodwork, trim, window, ceilings, equipment and any other physical portion of the Building, grounds, and Parking Area. Tenant shall not mark, paint, drill into, or in any way deface any part of the Building or the Premises without Landlord's written consent. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of the Landlord, and as the Landlord may direct.

2.      The work of the janitorial or cleaning personnel shall not be hindered by Tenant after 5:30 pm and such work may be done at any time when the Premises are vacant. The windows doors and fixtures in the Premises and Building may be cleaned at any time. Tenant shall provide adequate waste and rubbish receptacles, cabinets, books cases, map cases, etc., necessary to prevent unreasonable hardship to Landlord in discharging its cleaning obligations.

3.      Movement in or out of the Building or through the Building entrances or lobbies of furniture or office equipment, or dispatch or receipt by Tenant of any heavy equipment, bulky material merchandise or other item which requires use of elevators or stairways, shall be restricted to such hours as Landlord shall designate. The method of such movement, routing of such movement, safety precautions associated with such movement and the prohibition of Tenant bringing any dangerous items into the Building shall be subject to the Landlord's discretion and control. Any hand trucks, carryalls, or similar appliances used for the delivery or receipt of merchandise or equipment shall be equipped with rubber tires, side guards and such other safeguards as the Landlord shall require. Although Landlord or its personnel may participate in or assist in the supervision of such movement, Tenant assumes final responsibility for all risks as to damage to property and injury to persons that may result from such participation or assistance and Tenant shall indemnify and hold harmless Landlord and Landlord's employees and agents, and reimburse Landlord and Landlord's employees and agents with respect to any and all claims, demands, causes of action and liability arising as a result of any assistance or supervision or exercise of control over Tenant's movement of items in and out of the Building.

4.      No sign, advertisement or notice shall be displayed, painted or affixed by Tenant or Tenant's employees, agents or contractors in or on any part of the outside or inside of the Building or Premises without prior written consent of Landlord, and then only of such color, size, character, style and material and in such places as shall be approved and designated by Landlord. Signs on doors and entrances to the Premises and outside of the Premises within the Building, grounds or Parking Area shall be placed thereon by a contractor approved by Landlord.

5.      Tenant shall not place, install or operate on the Premises or in any part of the Building any engine, refrigerating, heating or air conditioning apparatus, stove or machinery, or conduct mechanical operations or place or use in or about the Premises or the Building any explosives, gasoline, kerosene, oil, acids, caustics or any other inflammable, explosive, hazardous or odorous material without the prior written consent of Landlord. No portion of the Premises shall at any time be used for cooking, sleeping or lodging quarters.

6.      Tenant shall not make or permit any nuisance or improper noises in the Building or otherwise interfere in any way with other tenants or persons doing business in the Building or with Landlord's operation of the Building.

7.      Landlord will not be responsible for any fixtures, personal property, equipment, jewelry or money lost in or stolen from the Premises or public areas of the Building, grounds or Parking Area. Landlord shall not be responsible for damages to or theft of motor vehicles or other items from any Parking Areas used in connection with the Building.

8.      No maintenance or repair work shall be done on any vehicles in the Parking Area. No disabled vehicles shall be parked or stored in the Parking Area. All vehicles in the Parking Area shall be parked within the designated spaces and not in more than one (1) space or across spaces. At Landlord's option, all disabled vehicles, recreational vehicles, boats and vehicles improperly parked in spaces designated for handicapped persons and all other improperly parked vehicles may be towed or otherwise removed from the Parking Area at the owner's expense. In the event any vehicle or boat is towed, Landlord will not be liable or responsible for the loss, damage or theft of any property located in the vehicle or boat or for any damage to the vehicle or boat.

9.      Neither Tenant or Tenant's employees, agents, invitees or licensees shall at any time leave or discard any rubbish, paper, articles or objects of any kind whatsoever outside the doors of the Premises or in any other area within the Building or on the grounds or in the Parking Area. No birds, animals, bicycles or vehicles shall be brought into or kept in or about the Building.

10.     None of the entries passages, doors, hallways, or stairways in the Building shall be blocked or obstructed by Tenant Such areas shall not be used by Tenant at any time except for ingress or egress to the Premises by Tenant's, Tenant's employees, agents and invitees.

11.     Landlord shall have the right to determine and prescribe the weight and proper position of any usually heavy equipment, including but not limited to copying equipment, computer equipment, safes and large files that are to be placed in the Building. Only those items which in the exclusive judgment of the Landlord will not do damage to the floors, structure and elevators may be moved into the Building. Tenant shall pay for any damage resulting from moving or installing such articles in the Building or the existence of same in the Building.

12.     All Christmas and other decorations in the Building must be flame retardant.

13.     After hours air conditioning and heating on Monday through Saturday and all day Sunday and holidays determined by Landlord must be requested in writing by noon of a regular work day prior to the day for which additional air conditioning is requested. Tenant shall be charged at the prevailing hourly rate for the use of such air conditioning and heating.

14.     Any request by Tenant to place or remove names from the directory board in the lobby of the Building shall be furnished to Landlord in writing on Tenant's letterhead.

15.     Any services which Tenant requests Landlord to perform which Landlord is not required to perform under this Lease shall, if performed by Landlord, be billed to Tenant at Landlord's cost plus a 15% fee to cover Landlord's overhead costs. Landlord shall have the right to refuse to perform any such services.

16.     If Landlord's maintenance engineer or any of Landlord's other personnel do any work after normal business hours at the request of Tenant, Tenant shall pay for the cost of such work.

17.    All doors leading from public corridors to the Premises are to be kept closed when not in use.

18.    Canvassing, soliciting or peddling in the Building is prohibited and Tenant shall cooperate with Landlord to prevent such activities.

19.    Tenant shall give Landlord immediate notice in the event that any defects or dangerous conditions arise or exist in the Premises or in the Building or if any accidents or emergencies occur in the Premises or Building.

20.    Tenant shall not use the Premises or permit the Premises to be used for photographic, multilith or multigraph reproductions for sale to the general public. All photographic, multilith or multigraph reproductions in the Premises shall be produced for Tenant in the ordinary course of Tenant's business.

21.    All requests for services made by Tenant shall be made directly to Landlord or Landlord's designated agents. Employees of Landlord or Landlord's designated agents shall not perform any work or do anything outside of their regular duties unless directed to do so by Landlord or Landlord's designated agents. Tenant will make no requests directly to Landlord's employees.

<u>EXHIBIT E</u>

GUARANTY

Landlord, Tenant and Guarantor (as herein defined) acknowledge that if it were not for this guaranty (the "**Guaranty**") as an inducement, Landlord would not execute the Lease.  Therefore, for $10.00 and other value received, and in consideration for, as a condition of, and an inducement to ALTERA HIGHLAND LLC, a Texas limited liability company ("**Landlord**") entering into that certain Lease Agreement dated as of August 21, 2012, with SHERMAN/GRAYSON HEALTH SYSTEM, LLC, a Texas limited liability company ("**Tenant**"), for certain premises being Suite 200 and the ambulatory surgery center in a medical office building located at 300 N. Highland Drive, Sherman, Texas, on real property owned by an affiliate of Tenant and ground leased to Landlord, as ground lessee (the "**Lease**"), the undersigned officer of LHP HOSPITAL GROUP, INC., a Delaware corporation (the "**Guarantor**"), on behalf of such entity, its legal representatives, heirs, successors, and assigns, hereby irrevocably guarantees to Landlord, Landlord's successors and assigns, absolutely and unconditionally, the full prompt and timely payment, performance and observance of all amounts to be paid and provisions of the Lease to be performed and observed by Tenant, including (without limitation) the rules and regulations incorporated into the Lease, as if Guarantor had executed the Lease as the tenant thereunder.  The Guarantor expressly agrees that the validity of this Guaranty and the obligations of the Guarantor hereunder shall not be terminated, affected or impaired by reason of the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.  The Guarantor further agrees that this Guaranty shall remain and continue in full force and effect notwithstanding any assignment, renewal, modification, extension or waiver of the Lease or any provisions thereof.  The laws of Texas shall apply hereto.

The Guarantor hereby waives, to the fullest extent permitted by law:

(A)    Any right that the Guarantor may have to require Landlord to proceed against Tenant, proceed against or exhaust any security held from Tenant, or pursue any other remedy in Landlord's power to pursue, including, without limitation, re-letting the Premises following a default;

(B)    Any defense based on any claim that the Guarantor's obligations exceed or are more burdensome than those of Tenant;

(C)    Any defenses given to sureties other than actual payment or performance;

(D)    Any defense based on: (i) any legal disability of Tenant; (ii) any release, discharge, modification, impairment or limitation of the liability of Tenant to Landlord  from any cause, whether consented to by Landlord or arising by operation of law or from any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the adjustment of debtor-creditor relationships (an "**Insolvency Proceeding**"), and/or (iii) any rejection or disaffirmance of the Lease, or any part of it, or any security held for it, in any such Insolvency Proceeding;

(E)    Any defense based on any action taken or omitted by Landlord in any Insolvency Proceeding involving Tenant, including any election to have Landlord's claim allowed as being secured, partially secured or unsecured, any extension of credit by Landlord to Tenant in any Insolvency Proceeding, and the taking and holding by Landlord of any security for any such extension of credit; and

(F)    The Guarantor agrees to jurisdiction and venue in Grayson and Dallas Counties, Texas, and waives any objection to such venue on the grounds of forum non conveniens.  **The Guarantor knowingly, voluntarily and intentionally waives the right to a trial by jury in respect of any litigation based**

**hereon or arising out of, under, or in connection with this Guaranty.** In the event Landlord incurs any fees and/or expenses in the enforcement of this Guaranty, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings, the Guarantor agrees to be liable for same (including reasonable attorney's fees and costs) and to pay same promptly on demand by Landlord.

      The Guarantor acknowledges liability for every obligation of Tenant under the Lease. Any capitalized term used herein and not otherwise defined shall have the same meaning as defined in the Lease. Each provision of this Guaranty shall be considered severable, and if for any reason and provision is determined to be invalid under current or future law, such invalidity shall not impair the operation of or otherwise affect the valid portions of this Guaranty.

<u>**GUARANTOR**</u>:

LHP HOSPITAL GROUP, INC.,
a Delaware corporation


By:_____
Name:_____
Title:_____

Date:_____

# EXHIBIT 11

## LEASE AGREEMENT

This Lease ("**Lease**") is made as of August 21, 2012 (the "**Effective Date**"), by and between ALTERA HIGHLAND LLC, a Texas limited liability company ("**Landlord**"), and SHERMAN/GRAYSON HEALTH SYSTEM, a Texas limited liability company ("**Tenant**").

## RECITALS:

Landlord, as tenant, has entered into that certain Ground Lease Agreement dated as of the Effective Date (the "**Ground Lease**") with Tenant, as landlord, for the land upon which the Building (as defined below) is located. Contemporaneously with the Ground Lease, (i) Landlord purchased one (1) medical office building, from Tenant, and (ii) Tenant, as "**Declarant**", filed of record a Declaration of Covenants, Restrictions and Easements (the "**Declaration**") covering the one (1) medical office building, the Hospital commonly known as Texas Health Presbyterian Hospital - WNJ (the "**Hospital**") owned by Tenant located in proximity to the medical office building and the parking and other common areas dedicated for use by persons occupying, using or visiting the medical office building, the Hospital and other facilities related thereto. The Ground Lease and this Lease are subject to the terms and provisions of the Declaration. Tenant, as "Declarant" under the Ground Lease and "Landlord" under the Ground Lease, is familiar with the terms and provisions of each of the Declaration and the Ground Lease.

As part of Tenant's purchase of the Building commonly called "300 N. Highland Drive, Sherman, Texas", Tenant agreed to enter into this Lease.

Simultaneously herewith, Landlord and Tenant are also entering into corresponding leases (each, a "**Related Lease**") for vacant and shell space of the Building, for the common areas of the Building occupied by the Hospital, and for the Ambulatory Surgery Center in the Building.

1.     **DEFINITIONS AND BASIC PROVISIONS.**

    1.1    <u>Parties and Addresses</u>. The parties hereto and their respective addresses are as follows:

    (1)    <u>Landlord's Address</u>:    5910 North Central Expressway
Suite 800
Dallas, TX 75206.

    (2)    <u>Tenant's Address</u>:    2400 North Dallas Parkway, Suite 450
Plano, Texas 75093
Attention: Executive Vice President – Administration

    (3)    <u>Ground Lessor Address</u>: 2400 North Dallas Parkway, Suite 450
Plano, Texas 75093
Attention: Executive Vice President –
Administration

|       |                       |                                                          |
|-------|-----------------------|----------------------------------------------------------|
| (4)   | Guarantor:            | LHP Hospital Group, Inc.,                                |
|       |                       | a Delaware corporation                                   |
| (5)   | Guarantor's Address:  | 2400 North Dallas Parkway, Suite 450                     |
|       |                       | Plano, Texas 75093                                       |
|       |                       | Attention: Executive Vice President – Administration     |

    1.2    <u>Defined Terms</u>: In addition to the capitalized terms elsewhere defined in this Lease, the following terms shall be deemed to be defined terms of this Lease for all purposes.  Each of the following definitions and basic provisions shall be construed in conjunction with and limited by the reference thereto in other provisions of this Lease:

    (1)    <u>Additional Rent</u>: All rent and other sums payable hereunder from Tenant to Landlord, other than Base Rent.

    (2)    <u>Base Rent</u>: An annual Base Rent of $12.05 per RSF in the Premises, subject to adjustment as provided in Section 3.1.  As of the Commencement Date, the monthly Base Rent is $24,446.44.

    (3)    <u>Broker(s)</u>: None.

    (4)    <u>Building</u>: The building in which the Premises are situated, being generally known as 300 N. Highland Drive, Sherman, Texas.

    (5)    <u>Commencement Date</u>:  The Effective Date.

    (6)    <u>Common Areas</u>: Those parts of the Building, Land and related facilities designated from time to time by Landlord for the common use of all doctors, physicians, tenants, visitors, patients and employees, including among other facilities, parking areas, sidewalks, landscaping, curbs, loading docks and areas, private streets and alleys, automobile entrances, exits and driveways, entranceways (open, enclosed or otherwise), lighting facilities, drinking fountains, public toilets, signs, service areas, common utility lines, pipes, and/or conduits, and the like.

    (7)    <u>Declarant</u>: means the Declarant under the Declaration, Sherman/Grayson Hospital, LLC, a Texas limited liability company, and its successors under the Declaration.

    (8)    <u>Declaration</u>: has the meaning set forth in the Recitals.

    (9)    <u>Expiration Date</u>: The last day of the Term hereof, which date is contemplated as being one hundred eighty (180) full months after the Commencement Date.  Notwithstanding any other provision of this Lease to the contrary, if the Expiration Date would otherwise occur on a date other than the last day of a calendar month, then the Term shall be automatically extended to include the last day of such calendar month.

    (10)    <u>Floor Plan</u>: The outline of the Premises as depicted in <u>Exhibit B</u> attached hereto and made a part hereof for all purposes.

    (11)    <u>Guarantor</u>:  has the meaning set forth in Section 1.1.

(12)    Highest Lawful Rate:  The maximum nonusurious interest rate, if any, that at any time, or from time to time, legally may be contracted for, taken, reserved, charged, or received on the indebtedness owed to Landlord under this Lease under the laws which are presently in effect of the United States of America and the State of Texas applicable to Landlord and such indebtedness.

(13)    Hospital:  The Hospital defined in the Recitals of this Lease, and its successors and assigns.

(14)    Interior of the Premises: Standard office front and entrance (including without limitation, all plate glass and exterior doors), all of the interior wall framing, floors and floor covering, ceiling and interior staining and finishes, all interior doors and hardware, all interior electrical conduits and appurtenances, mechanical machinery and equipment, all interior electrical fixtures, interior plumbing and plumbing fixtures, Tenants' trade fixtures, and all other parts in the interior of the Premises.

(15)    Land: The lot, tract or parcel of land upon which the Building is situated, in Grayson County, Texas as more particularly described by metes and bounds on Exhibit A attached hereto and made a part hereof for all purposes, plus any contiguous parcels or strips of land leased or licensed to Landlord under the Ground Lease or by the Declaration, and are used in connection with or to service the Building or any part thereof.

(16)    Late Charge: Tenant shall pay $100.00 as a late fee to cover Landlord's administrative costs.  Additionally, all unpaid amounts Tenant fails to pay by the fifth (5th) day after the date due shall bear interest from the first day due until paid in full at the lesser of ten percent (10%) per annum or the Highest Lawful Rate.  In no event, however, shall the late fees and/or charges permitted under this Section or elsewhere in this Lease, to the extent the same are considered to be interest under applicable law, exceed the amount of interest that Landlord lawfully could have charged, received or collected on the indebtedness in question at the Highest Lawful Rate.

(17)    Lease: This Lease Agreement.

(18)    Lease Year: Each twelve (12) consecutive month period commencing on the Commencement Date or any anniversary thereof; provided that, if the Commencement Date is other than the first day of a calendar month, then the first Lease Year shall include such partial month together with the next succeeding twelve (12) consecutive months, and each succeeding Lease Year shall begin on the first day of the calendar month that corresponds to the first day of the calendar month following the Commencement Date.

(19)    Operating Expenses: All expenses, costs and disbursements of every kind and nature that Landlord or any of its Affiliates directly or indirectly pays or becomes obligated to pay, whether under the Ground Lease, the Declaration, any Related Lease or otherwise, in respect of the Ground Lease, the ownership, management, maintenance, repair, replacement and operation of the Building, the Common Areas and related facilities of the Building or arising in connection with any Related Lease.  Notwithstanding the foregoing, Operating Expenses shall exclude capital costs associated with the replacement of the roof, foundation, and exterior walls.

(20)    Permitted Use:  General Medical Offices.

(21)    Premises: The premises known, as of the Effective Date, as Suites 130, 310, 315, 330, 340, and 415 of the Building, containing approximately 24,345 RSF (as defined herein). The Premises are substantially depicted on the attached Floor Plan shown on Exhibit B and being located in the Building.

(22)    Pro Rata Share or Tenant's Pro Rata Share: 20.69%, provided that if the Building is expanded or contracted, Tenant's Pro Rata Share shall increase or decrease, as the case may be, such that Tenant's Pro Rata Share will equal a fraction, the numerator of which is the net rentable area of the Premises, and the denominator of which is the net rentable area of the Building, which is approximately 117,655 RSF as of the Effective Date.

(23)    Rent: All Base Rent and Additional Rent.

(24)    RSF: means the rentable square feet in the Premises, Building or other area in question, as determined by an architect using ANSI/BOMA Standards.

(25)    Security Deposit: None.

(26)    Tenant Improvement Allowance:   Means that amount, if any, set forth in Section 2.3.

(27)    Tenant Improvements:   Means those improvements and alterations Tenant may elect to construct or install in the Premises, subject to the provisions of this Lease.

(28)    Term: Fifteen (15) years (one hundred eighty (180) full months) from the Commencement Date, unless earlier terminated pursuant to the provisions of this Lease.

## 2.    GRANTING CLAUSE; TENDER OF POSSESSION.

2.1    Granting Clause.  In consideration of the Rent reserved and the covenants and agreements herein contained on the part of the Tenant to be observed and performed, and subject to the terms and provisions of the Declaration and Ground Lease, Landlord hereby demises, lets and leases unto Tenant, and Tenant hereby accepts, leases and rents from Landlord, the Premises.

2.2    Tender and Acceptance of Possession.  Landlord hereby tenders, and Tenant hereby accepts, possession of the Premises on the Effective Date.  Tenant hereby accepts the Premises in their "AS-IS" condition, and Landlord shall have no obligation to perform any work therein (including demolition of any improvements existing therein or construction of any tenant finish-work or other improvements therein), and shall not be obligated to reimburse Tenant or provide an allowance for any costs related to the demolition or construction of improvements therein.  Tenant has reviewed, and hereby accepts, the condition and capacity of the Building's existing electrical systems and HVAC.  Tenant acknowledges that Landlord does not have any obligation, express or implied, to modify or increase the capacity of such systems.  Before Tenant may occupy the Premises to conduct its business therein, Tenant shall, at its expense, obtain and deliver to Landlord a certificate of occupancy from the appropriate governmental authority for the Premises.

3.    **RENT**.

    3.1    Base Rent.

        (1)    This is a pure "net lease," and Base Rent, Additional Rent, Operating Expenses and all other sums payable hereunder by Tenant shall be paid without notice, demand, setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.  It is intended that the Base Rent provided for in this Lease shall be absolutely net to Landlord throughout the Term, and, accordingly, Tenant covenants and agrees to pay, as they become due and payable and before they become delinquent, all operating and capital expenses in connection with the operation, maintenance, repair, restoration, use or occupation of the Premises including, without limitation, the costs, charges and assessments related to taxes, impositions, utilities and insurance.  Tenant shall pay all such taxes and impositions even though the taxing statue or ordinance may purport to impose such taxes or impositions on Landlord.

        (2)    The Base Rent shall be paid by Tenant in monthly installments to Landlord on or before the first day of each calendar month during the Term hereof.  The monthly Base Rent for any fractional month at the beginning or the end of the Term shall be prorated based upon the actual number of days in such month.

        (3)    The Base Rent will be adjusted and increased on each anniversary of a Lease Year (the "**Adjustment Date**") by an amount equal to the greater of (i) 103% of then-effective Base Rent (i.e., as it may have been adjusted pursuant to this Section 3.1(3)) and (ii) subject to the limitation set forth below in this Section 3.1(3), any increase in the Consumer Price Index for "All Urban Consumers, U.S. City Average, All Items," issued by the Bureau of Labor Statistics of the United States Department of Labor (the "**Index**").  The adjustments in the Base Rent will be determined by multiplying the then-effective Base Rent (i.e., as it may have been adjusted pursuant to this Section 3.1(3)) by a fraction, the numerator of which is the Index number for the date one month prior to the Adjustment Date and the denominator of which is the Index number for the first month of the first year of the Term.  When the adjusted rent for the Adjustment Date has been determined, Landlord shall give Tenant written notice of such adjusted rent; and, upon adjustment of the rent, any underpayment of rent from the Adjustment Date to the date Tenant is notified of the adjustment shall be immediately due and payable by Tenant.  Landlord's failure or delay to notify Tenant of said rent adjustment shall not constitute a waiver of the right to any adjustment provided for in this Lease.  In the event that the Index shall be discontinued, then Landlord shall use an index substantially similar to the Index to calculate future adjustments.  Notwithstanding any other provision of this Section 3.1(3) to the contrary, the Base Rent in any Lease Year shall not increase by more than five percent (5%) of the Base Rent in the immediately preceding Lease Year.

        (4)    Landlord and Tenant are knowledgeable and experienced in commercial transactions and agree that the provisions of this Lease for determining charges, amounts, Operating Expenses and Additional Rent are commercially reasonable and valid even though such methods may not state a precise mathematical formula for determining such charges.  ACCORDINGLY, TENANT VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS OF TENANT UNDER SECTION 93.012 OF THE TEXAS PROPERTY CODE, AS IT MAY BE AMENDED OR REPLACED.

3.2    Operating Expenses.

(1)    Tenant's Pro Rata Share of Operating Expenses for the remainder of the calendar year after the Commencement Date and for each subsequent calendar year shall be estimated by Landlord, and written notice thereof shall be given to Tenant. Upon receipt of said written notice from Landlord, the estimated Operating Expenses shall be due and payable as herein provided. For any such remainder of the calendar year after the Commencement Date, Tenant agrees to pay Landlord each month, at the same time the Base Rent Payment is due, an amount equal to the amount of such estimated monthly Pro Rata Share of Operating Expenses for the remainder of such calendar year; and during each calendar year thereafter Tenant agrees to pay Landlord each month, at the same time the Base Rent Payments are due, an amount equal to one-twelfth (1/12th) of the estimated annual Pro Rata Share of Operating Expenses due.

(2)    If any portion of Operating Expenses increase during a calendar year, Landlord may revise the estimated Operating Expenses during such year by giving Tenant written notice to that effect, and thereafter Tenant agrees to pay Landlord, in each of the remaining months of such calendar year, an additional amount equal to the amount of such annual increase in the estimated Pro Rata Share of Operating Expenses divided by the number of months remaining in such calendar year.

(3)    After the end of each calendar year, Landlord shall prepare and deliver to Tenant a statement showing Tenant's Pro Rata Share of the total amount of Operating Expenses. Within ten (10) days after receipt of the aforementioned statement, Tenant agrees to pay Landlord the remaining amount owed by Tenant. However, if Tenant has paid more than its Pro Rata Share of the actual Operating Expenses, Landlord shall either pay the amount of such excess to Tenant within ten (10) days after delivery of the aforementioned statement, or, at Landlord's option, apply such excess to any sums due or to become due from Tenant to Landlord.

(4)    Notwithstanding anything herein to the contrary, in no event will the Base Rent provided for in this Lease ever be reduced.

3.3    Payment For Other Services. Tenant agrees to pay Landlord as Additional Rent all charges for any services, goods, or materials furnished at Tenant's request which are not required to be furnished by Landlord under this Lease, immediately upon demand, plus an administrative fee not to exceed five percent (5%) of the cost of the requested services, good or materials.

3.4    Late Charge. If Landlord does not receive any payment due on or before the 5th day of the calendar month when such payment is due, the Late Charge shall be due and payable (in addition thereto). Said Late Charge is for the purpose of reimbursing Landlord for the extra administrative costs and expenses incurred in connection with the handling and processing of such delinquent payment.

3.5    No Offsets or Demands.  All Base Rent, Additional Rent and other amounts due from Tenant to Landlord under this Lease shall be paid without notice, demand, offset, abatement or deduction. This Lease and the rights of Landlord and obligations of Tenant hereunder shall not be affected by any event or for any reason or cause whatsoever foreseen or unforeseen.  The obligations of Tenant under this Lease shall be separate and independent covenants and agreements and all monetary obligations shall continue to be payable in all events.

4.    **SECURITY DEPOSIT.**  Tenant is not required to make any security deposit in connection with this Lease.

5.    **COMMON AREAS.**

    5.1    <u>Parking Facilities and Other Common Areas</u>. During the Term, Tenant shall be entitled to the nonexclusive use (in common with others entitled thereto) of the Common Areas outside the Building designated from time to time by Landlord as the parking areas of the Building.  As of the Effective Date, the parking areas designated by Landlord for use by Tenant are depicted on <u>Exhibit C</u>.  In such parking areas, Tenant shall be entitled to use a number of parking spaces equal to 5 parking spaces for every 1,000 RSF of space in the Premises.  Tenant shall not conduct, solicit business or display or place any signs or advertising on or within the Common Areas, or distribute handbills therein, or take any action which would interfere with the rights of other persons to use the Common Areas.

    5.2    <u>Parking Regulations</u>. Tenant understands and agrees that the Declarant shall have the right to maintain and operate lighting facilities on all of the parking areas and to police all of the parking and other Common Areas, including, without limitation, the right to discourage non-tenant parking, to designate and regulate parking areas, and to do and perform such other acts with respect to said Common Areas as in the judgment of the Declarant may be legally necessary to prevent a dedication thereof to the public.

6.    **MAINTENANCE AND REPAIRS.**

    6.1    <u>Landlord's Obligations</u>.  As part of the Operating Expenses, Landlord shall maintain or cause to be maintained the elevators, public restrooms and other Common Areas within the Building, the structural elements building systems of the Building (including the HVAC system which serves the Building and the Premises).  Landlord shall, at its own cost and expense, maintain or cause to be maintained the foundation, the exterior walls (but excluding the interior glass or doors that are part of the Premises) and roof of the Building in good condition or repair.  However, if any repair is required by reason of the negligence or intentional misconduct of Tenant or any of its agents, employees, invitees or Affiliates, Landlord may add the cost thereof to the next installment of Rent thereafter coming due, but only to the extent that the cost thereof is not covered by insurance proceeds actually received by Landlord.  Except as herein provided, Landlord shall have no obligation to repair, maintain, alter, replace, or modify the Premises or any part thereof.  Any failure by Landlord to furnish, or delay in furnishing, any maintenance or services that are required of Landlord under this Section or otherwise under this Lease, when such failure is caused by acts of God or any other condition beyond Landlord's reasonable control, shall not constitute a default by Landlord under this Lease and shall not permit Tenant to abate any Rent or relieve Tenant from any of its obligations under this Lease.

    6.2    <u>Tenant's Obligations</u>.  Tenant shall maintain the interior of the Premises, including all interior glass and doors that are a part of the Premises and any improvements done by or on behalf of Tenant, in good condition and clean and attractive appearance, performing all janitorial services and making all repairs at its own cost and expense, and using materials and labor of a kind and quality equal to the original work.  Tenant shall maintain the Premises in accordance with all requirements of law, including (without limitation) the Americans with Disabilities Act (as the same may be amended) and similar state or local laws, rules or regulations.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises in a broom clean condition and otherwise in the same condition as received by Tenant on the Commencement Date upon initial completion of the interior improvements, reasonable wear and tear excepted.  If Tenant shall neglect and/or fail to observe, keep or perform any of its obligations to maintain and repair and Premises in the time and manner provided in this Article and if such neglect and/or failure shall continue for ten (10) days after notice thereof, Landlord shall have the

right to perform said maintenance and repairs. In the event Landlord does so perform Tenant's responsibilities for said maintenance and repairs, Landlord shall furnish Tenant a statement of the actual cost thereof, plus an administration fee not to exceed ten percent (10%) of the actual costs, which statement shall be immediately payable by Tenant.  All alterations and modifications of or to the Premises shall be in accordance with the terms and provisions of <u>Section 11.2</u> below.

## 7.    <u>TAXES ON TENANT'S PROPERTY.</u>

Tenant shall be responsible for and shall pay, before same becomes delinquent, all federal, state, county, and local taxes levied or assessed upon any and all personal property of any kind owned by or placed in, on or about the Premises by Tenant during the Term, and all taxes and assessments on trade fixtures, furniture, and all sales, excise and other taxes on Tenant's business shall be paid entirely by Tenant. If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property, or if the assessed value of Landlord's property is increased by inclusion of personal property, furniture or fixtures placed by Tenant in the Premises, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

## 8.    <u>INSURANCE.</u>

8.1    <u>Hold Harmless</u>. Tenant covenants and agrees to indemnify and save each of Landlord, and Landlord's members, managers, partners, agents, employees and representatives, harmless from and against any and all costs, liability or expense arising out of any claims of any person or persons on account of any occurrence in, upon or at the Premises, resulting from the occupancy or use thereof by Tenant, or by any person or persons holding or using the Premises thereunder, occasioned in whole or in part by reason of the improper and/or lack of control and supervision throughout the Common Areas of property owned or controlled by Tenant, or by reason of the use or misuse of the parking area or any other Common Areas by Tenant or by any person or persons holding or using the Premises, or any part thereof, under Tenant, including without limitation, Tenant's clients, invites, agents, contractors, employees, servants, subtenants, assignees or licensees, and without limiting the generality of the foregoing, Tenant further covenants and agrees to indemnify and save each of Landlord and Landlord's partners, agents, employees and representatives harmless from and against any penalty, damage or charge incurred or imposed by reason of any violation of law or ordinance by Tenant or any person or persons holding under Tenant and from any cost, damage or expense arising out of the death of or injury to any person or persons holding under Tenant and from any cost, damage or expense arising out of the death of or injury to any person or persons holding under Tenant. In case any action or claim to which Landlord (or Landlord's partners, members, managers, agents, employees or representatives) are entitled to indemnification shall be brought or asserted in any way against Landlord (or Landlord's members, managers, partners, agents, employees or representatives) or Tenant, Tenant shall immediately notify Landlord of the same and shall furnish Landlord with all relative information. Landlord shall be entitled, at Tenant's expense, to participate in, and to the extent that it wishes, to assume the defense thereof.

8.2    <u>Tenant's Liability Insurance</u>. Tenant agrees to maintain in force during the Term a policy or policies of comprehensive public liability insurance, including property damage, written by one or more responsible insurance companies approved by Landlord and licensed to do business in Texas, which insurance companies shall be rated not less than X by Best Guide Rating, insuring Tenant and naming as additional named insureds, Landlord, Landlord's property management company as agent, each Mortgagee and such other persons, firms, or corporations as are designated by Landlord, against loss of life, bodily injury and property damages in which the limit of public liability shall be not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) single limit bodily injury and in which the limit of property damage liability shall be not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) and an umbrella coverage of not less than TWO MILLION AND NO/100 DOLLARS

($2,000,000.00). Additionally, Tenant shall maintain a comprehensive automobile liability insurance policy of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00). Each such policy shall be non-cancellable for any cause without first giving Landlord thirty (30) days prior written notice. Subject to all of the foregoing, the insurance coverage required to be furnished by Tenant pursuant to this Section may be in the form of a blanket policy covering all of Tenant's operations.

8.3    Tenant's Fire Insurance. Tenant agrees to maintain in force during the Term a policy or policies of fire and extended coverage insurance in the case of fire sprinkler leakage, malicious mischief, vandalism and other extended coverage perils, for the full insurable replacement value of all additions and of all office furniture, office equipment, merchandise, and other items of Tenants' property within or on the Premises. Coverage in this paragraph shall be in an amount not less than one hundred percent (100%) of the replacement costs of Tenant's improvements to the Premises.

8.4    Tenant's Workers Compensation. If required by law, Tenant agrees to maintain in force during the Term workers compensation and employers liability insurance with a waiver or subrogation endorsement, in a form and amount satisfactory to Landlord.

8.5    Evidence of Insurance. A copy of each such policy or a certificate of such insurance required to be maintained by Tenant shall be delivered to Landlord upon the Commencement Date of this Lease and annually thereafter upon the first day of each Lease Year throughout the Term. If Tenant fails to procure said insurance or deliver to Landlord, such evidence thereof, Landlord may procure same and Tenant shall reimburse Landlord for the cost thereof plus an administrative fee not to exceed ten percent (10%) of the actual cost immediately upon demand.

8.6    Landlord's Liability Insurance. Landlord agrees to maintain in force during the Term a policy or policies of comprehensive public liability insurance, including property damage, written by one or more responsible insurance companies licensed to do business in Texas and insuring Landlord against loss of life, bodily injury and/or property damage with respect to the operation of the Building, the policy limits of which to be in amount satisfactory to Landlord. In addition, Landlord may maintain in force such umbrella policy or policies of public liability insurance as Landlord, in its sole discretion, may deem appropriate. Landlord's failure to procure any such insurance shall not invalidate this Lease or lessen Tenant's liability hereunder. Landlord's insurance hereunder shall include loss of rent coverage.

8.7    Landlord's Fire Insurance. Landlord agrees to procure and keep in effect during the Term a policy or policies of fire and extended coverage insurance covering the Building, including rent abatement, vandalism and malicious mischief coverage, written by an insurance company authorized to do business within the State of Texas, and in an amount at the full replacement cash of the Building. Such insurance shall provide protection against losses so insured against for the sole and exclusive benefit of Landlord. The full amount of any proceeds payable thereunder shall be payable to Landlord, and Tenant shall not be entitled to, and shall have no interest in, such proceeds or any part thereof. Tenant is advised to procure such insurance as Tenant deems appropriate to protect its interest.

8.8    Waiver of Subrogation. To the extent permitted by the laws and insurance regulations of the State of Texas, the respective parties hereto hereby waive and release any and all claims, demands and causes of action which each might have against the other party, either for damage to or loss of any part of the Premises or of any adjoining premises belonging to Landlord, arising from perils ordinarily insured against under a standard fire and extended coverage insurance policy issued in the State of Texas, regardless of whether such damage or loss is occasioned by the negligence of the respective parties, or either of them, their agents, servants or employees.

9.     **UTILITIES AND SERVICES.**

Provided Tenant is not in default of any term, condition or covenant of this Lease, Landlord agrees to furnish or cause to be furnished to the Premises gas, water (for drinking, cleaning and lavatory purposes only), and electricity during the Term. Landlord shall furnish tempered and refrigerated water at those points of supply designated by Landlord in the Common Areas of the Building, heated and refrigerated air conditioning in season (at temperatures, in amounts and at times considered by Landlord to be standard and in compliance with any governmental regulations; such service after hours, on Saturday afternoons, Sundays and holidays will be furnished only upon 24 hours' prior written request of Tenant who shall bear the entire cost thereof). Landlord shall furnish janitorial service, in the manner and to the extent deemed standard by Landlord during the periods and hours as such services are normally furnished to all tenants. Tenant shall not hinder the work of the Building janitor. Landlord shall furnish routine maintenance, painting and lighting service for all Common Areas within the Building in the manner and to the extent deemed by Landlord to be standard. Tenant will pay all telephone charges. Landlord shall not be liable in damages or otherwise for failure, stoppage or interruption of any such service nor shall the same be construed as an eviction of Tenant, work an abatement of Rent, or relieve Tenant from the operation of any covenant or agreement set forth herein; but in the event of any failure, stoppage or interruption thereof not caused by Tenant or Tenant's agents, employees, contractors, clients or invites, Landlord shall use reasonable diligence to resume service promptly.

Landlord reserves the right to separately meter usage of any utility service included in Operating Expenses and charge Tenant and other tenants of the Building based on such usage.  Further, Landlord reserves the right from time to time to charge to Tenant and other tenants of the Building applicable costs with respect to usage of Building services and utilities at times other than during standard business hours, on such basis as Landlord may reasonably determine for the purpose of properly allocating the costs of such services and utilities in accordance with the usage thereof.

Notwithstanding anything hereinabove to the contrary, Landlord reserves the right from time to time to make reasonable modifications to the above standards for services and utilities.

10.    **INTENTIONALLY DELETED**.

11.    **PROPERTY OBLIGATIONS.**

11.1    Tenant's Property. Landlord shall not be liable for any damage to or loss of personal property placed in or about the Premises by Tenant or Tenant's agents, employees, clients, guests, invites or others, resulting from fire, theft, explosion, flood, windstorm or other casualty caused by Acts of God or by the acts or omissions of other occupants of other space in the Building or caused by operations during construction of any public or quasi public work. All property kept or stored within the Premises shall be kept or stored at the risk of Tenant only, and Tenant shall hold Landlord harmless from any claims arising out of damage to the same, including subrogation claims by Tenant's insurer, if any, unless such damage shall be caused by the gross negligence of Landlord.

11.2    Tenant Fixtures, Alterations and Personal Property. Tenant shall not make or allow to be made any alterations, modifications or physical additions in or to the Premises without the prior written consent of Landlord which consent shall not be unreasonably withheld or delayed.  Tenant may proceed with the construction of the approved alterations, modifications or physical additions, but only so long as they are in strict compliance with the plans and specifications and with the provisions of this Section 11.2. All alterations shall be made at Tenant's expense, either by Tenant's contractors, which previously have been approved in writing by Landlord, or at Landlord's option, by Landlord's contractors on terms reasonably satisfactory to Tenant, including a fee of five percent (5%) of Landlord's actual cost of the

work to cover Landlord's overhead. None of Tenant's construction, alterations, modifications or physical additions shall (i) alter the exterior appearance of the Building or Premises in any manner, (ii) adversely affect the structure or safety of the Building or Premises or any portion thereof, (iii) fail to comply with all building, safety, fire and other codes and governmental and insurance requirements, or (iv) fail to be completed promptly and in a good and workmanlike manner. All trade fixtures installed by Tenant shall be new or completely reconditioned. At Landlord's option, any such approved additions, alterations, modifications, improvements and/or fixtures furnished or installed by Tenant which are sufficiently affixed or annexed to the Premises so as to become a part thereof, other than unaffixed movable trade fixtures, shall upon the expiration or earlier termination of this Lease, become the property of Landlord. Any damage to the Premises caused by such installation and/or removal of Tenant's fixtures and equipment shall be repaired at Tenant's sole cost and expense. The provisions of this Section shall expressly survive the expiration or earlier termination of this Lease.

11.3    <u>Liens</u>. Tenant shall neither permit nor suffer an involuntary lien to be filed or affixed against the Building, the Premises, the fee simple title of the Land or Landlord's leasehold estate therein, or any part thereof, and shall not voluntarily grant any lien or security interest therein. In the event any such involuntary or voluntary lien, including without limitation, mechanic's lien or tax lien, is filed and/or affixed against the Building, the Premises the fee simple title of the Land or Landlord's leasehold estate therein, or any part thereof, or against any fixtures, equipment, furnishings therein or all types of work and improvements comprising the Interior of the Premises and Tenant has not caused the same to be released and discharged of record within ten (10) days after notice thereof, same shall constitute a default hereunder. Upon such default, in addition to any other remedies available to Landlord herein, Landlord may cause the release and discharge of such lien, Tenant shall repay to Landlord immediately upon demand as Additional Rent hereunder all such sums disbursed or deposited by Landlord plus an administrative fee not to exceed five percent (5%) of the sums disbursed or deposited. Nothing contained herein, however, shall imply any consent or agreement on the part of Landlord or anyone holding under Landlord to subject Landlord's interest to liability under any mechanic's or other lien law, regardless of whether the performance or the furnishing of such work, labor, services or materials to Tenant or anyone holding under Tenant shall have been consented to by Landlord.

## 12.    <u>SUBORDINATION/ATTORNMENT</u>.

12.1    <u>Subordination</u>. Tenant covenants and agrees promptly upon request of Landlord to execute and deliver, in a recordable form provided by Landlord, an acknowledgment of the subordination of this Lease to any mortgage, deed of trust, security agreement or other lien or encumbrance resulting from any method of financing or refinancing, presently or henceforth placed upon the Landlord's leasehold estate in the Land and/or fee interest in the Building and any future expansion thereof or additions thereto, and to all advances of money or other value heretofore or hereafter made upon the security thereof. Notwithstanding anything to the contrary contained herein, Landlord agrees to obtain a subordination, non-disturbance and attornment agreement ("**SNDA**") from its current lender in a form reasonably acceptable to Tenant which shall provide, among other things, that this Lease shall be recognized and Tenant's rights and occupancy under this Lease shall not be disturbed in the event Tenant is not in default hereunder beyond any applicable notice and cure periods. In addition, Tenant shall not be required to subordinate its rights under this Lease to the interest of any future lender unless Landlord has first delivered an SNDA to Tenant executed by such future lender in a form reasonable acceptable to Tenant and containing a similar non-disturbance right.

12.2    <u>Collateral Assignment by Landlord</u>. Subject to the foregoing provisions of this Article, Landlord reserves the right, without notice to or consent of Tenant, to assign this Lease and/or any and all Rent hereunder as security for the payment of any mortgage loan, deed of trust loan, or other method of financing or refinancing.

12.3    Attornment. In the event any such mortgage is foreclosed, or in the event of the exercise of the power of sale under any such deed of trust, Tenant shall consider the purchaser at the foreclosure trustee's sale to be the Landlord hereunder, and Tenant will attorn to the purchaser and will recognize the purchaser as the owner and Landlord under this Lease.

## 13.    USE AND OPERATION.

13.1    Use of Premises. The Premises shall be used and occupied by Tenant solely for the Permitted Use and Tenant expressly agrees that no use shall be made or permitted or acts done by Tenant and/or any agents, employees, subtenants, or assignees of Tenant, which shall increase the existing rate of insurance coverage or cause cancellation of such insurance coverage. Tenant shall not (i) permit any objectionable or unpleasant odors to emanate from the Premises; nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside of the Premises or where the same can be seen or heard from outside the Premises; (ii) place any antenna, awning or other projection on the exterior of the Premises; (iii) take any other action which would constitute a nuisance or would disturb or endanger other tenants of the Building or unreasonably interfere with their use of their respective premises; or (iv) do anything which would tend to injure the reputation of the Building.  Tenant shall at all times comply with all terms and provisions of the Ground Lease and Declaration applicable to Tenant, or Tenant's use of the Premises and Common Areas.

13.2    Suitability of Premises. Tenant warrants to Landlord that it has, prior to the execution hereof, fully inspected the Building, the Common Areas, the property and all items related thereto, and that Tenant has made, performed, obtained and received all studies, inspections, reports, diagnoses and tests that Tenant desires relative to the Building, the Common Areas, the property and all items related thereto and Tenant's proposed business use of the Premises. Tenant further warrants to Landlord that Tenant has inspected, or will thoroughly inspect, the Plans and Specifications agreed and to be agreed with Landlord for Landlord's construction of the shell of the Premises and will be fully satisfied with such inspections and Plans and Specifications for the Premises. Tenant understands and agrees that Tenant is accepting the Building, the Common Areas, the property and all items related thereto, and will be accepting the Premises, in their "AS-IS", "WHERE-IS" condition, "WITH ALL FAULTS" and without any warranty or guarantee whatsoever.  Tenant warrants that it used or will use all due diligence in conducting all studies inspections, diagnoses and tests on the Premises the Building, the Common Areas, the property and all items related thereto that Tenant deemed necessary or appropriate. Tenant acknowledges that Landlord has not made and does not make, and Landlord hereby disclaims, any and all warranties, express or implied, which in any way relate to the Premises the Building, the Common Areas, the property and all items related thereto or the condition thereof, including without limitation any implied warranty of suitability or habitability. Tenant further understands that Landlord has relied and will rely upon Tenant's having made all inspections Tenant desired, and that but for such inspections by Tenant, Landlord would not have leased the Premises to Tenant. Additionally, the parties agree that the obligation of Tenant to pay all Rent and other sums hereunder provided to be paid by Tenant, and the obligation of Landlord to perform Landlord's other covenants and duties hereunder, constitutes independent, separate and unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is expressly provided for herein and not otherwise. It is agreed that in the event Landlord commences any proceedings against Tenant for nonpayment of Rent or any other sum due and payable by Tenant hereunder, Tenant shall not interpose any counterclaim or other claim against Landlord of whatever nature or description in any such proceedings; and in the event Tenant interposes any such counterclaim or other claim against Landlord in any such proceeding, Landlord and Tenant stipulate and agree that, in addition to any other lawful remedy of Landlord, upon motion of Landlord, such counterclaim or other claim asserted by Tenant shall be severed out of the proceedings instituted by Landlord and Landlord may proceed to final judgment

separately and apart from and without consolidation with or reference to the status of such counterclaim or any other claim asserted by Tenant.

14.    **HAZARDOUS MATERIALS.**

14.1    Tenant, and all of Tenant's partners, officers, directors, employees, representatives, agents, contractors, subcontractors, successors, assigns, lessees, sublessees, concessionaires, invitees and any other occupants of the Premises (collectively, "**Tenant's Representatives**"), shall abide by all Federal, state and local statutes, ordinances, codes and regulations, now existing or hereinafter enacted (collectively, "**Hazardous Materials Laws**"), governing the use, handling, depositing or disposal of hazardous or toxic substances, and medical wastes (collectively, "**Hazardous Materials**").  Landlord has no obligation to provide or make provision for disposal facilities for Hazardous Materials or other medical wastes, and Tenant shall not deposit or dispose of any Hazardous Materials or other medical wastes into the general waste disposal facilities provided by Landlord.  Tenant shall, at Tenant's expense, employ or engage private waste management services to dispose of any and all waste of Tenant which must be handled in any manner other than general waste collection provided by Landlord through public or private waste collection service.  Landlord may direct the manner of disposal and location of any containers, collection boxes or other storage facilities, which may be required by Hazardous Materials Laws.

14.2    The term "**Hazardous Materials**" shall not include (i) pharmaceuticals, cleaning agents of the types and in the quantities and concentrations normally stocked by health care providers located in medical office buildings similar to the Building, (b) oil in the minimal amounts typically associated with the use of certain portions of the Building for driving and parking motor vehicles or (c) medical wastes generated at the Building; however, Tenant shall use, store, transport and dispose of the foregoing in accordance with all laws including (without limitation) all Hazardous Materials Laws.

14.3    Tenant shall indemnify, defend and hold harmless Landlord, the "**Hospital**" and the holder ("**Mortgagee**") of any mortgage encumbering all or any portion of the Building or the real property upon which the Building is situated or Landlord's leasehold estate in the Land ("**Mortgage**"), and their respective members, managers, partners, shareholders, directors, officers, agents and employees (all collectively referred to as the "**Indemnified Parties**") from and against any and all costs, expenses and claims arising from or in connection with any act, omission or negligence of Tenant or any Tenant's Representatives relating to or arising out of the use, handling, depositing or disposal of Hazardous Materials with respect to the Premises or the Building, such indemnity to include all costs, expenses and liabilities associated with the remediation thereof or incurred in connection with each claim, action or proceeding with respect thereto, including, without limitation, all attorney's fees and expenses.

14.4    Tenant shall immediately notify Landlord in writing of:  (i) any enforcement, clean-up, removal or other governmental or regulatory action instituted, contemplated or threatened concerning the Premises pursuant to any Hazardous Materials Laws; (ii) any claim made or threatened by any person against Tenant or the Premises relating to damage contribution, cost recovery, compensation, loss or injury resulting from or claimed to result from any Hazardous Materials on or about the Premises; and (iii) any reports made to any environmental agency arising out of or in connection with any Hazardous Materials in or removed from the Premises, including any complaints, notices, warnings or asserted violations in connection therewith, all upon receipt by Tenant of actual knowledge of any of the foregoing matters.  Tenant shall also supply to Landlord a promptly as possible and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating to Hazardous Materials associated with the Premises.

14.5    Without limiting any other provision of this Lease, Tenant shall not create or permit to exist in or about the Premises any "**Mold Condition**" unless caused by Landlord.  As used herein, the term Mold Condition shall include the presence or suspected presence of "**Mold**" or any condition(s) that reasonably can be expected to give rise to or indicate the presence of Mold, including observed or suspected instances of water damage or intrusion, the presence of wet or damp wood, cellular wallboard, floor coverings or other materials, inappropriate climate control, discoloration of walls, ceilings or floors, complaints of respiratory ailment or eye irritation by Tenant's employees or any other occupants or invitees in the Premises, or any notice from a governmental agency of complaints regarding the indoor air quality at the Premises.  As used herein, the term Mold shall include mold, mildew, fungus or other potentially dangerous organisms.  In the event of suspected or actual Mold or Mold Conditions at the Premises, Tenant shall immediately notify Landlord in writing of the same and the precise location thereof.  Tenant acknowledges the control of moisture and Mold prevention are material obligations of Tenant under this Lease, and Tenant shall, at its sole costs and expense, regularly monitor the Premises for the presence of Mold and Mold Conditions.  If any Mold or Mold Conditions in or about the Premises are a result of the actions or omissions of Tenant or any Tenant's Representatives, Tenant shall promptly, at Tenant's sole cost and expense, hire a licensed and experienced Mold remediation contractor to completely clean-up and remove from the Premises all Mold or Mold Conditions.  All such clean-up, removal and remediation shall, in each instance, be conducted to the satisfaction of Landlord and any governmental authority with jurisdiction and otherwise in strict compliance with all applicable laws.  Such clean-up, removal and remediation shall also include removal and replacement of any infected host materials as well as any repairs and refinishing required as the result of such removal and replacement.  There shall be no abatement of Rent on account of any clean-up, removal or remediation of any such Mold or Mold Condition.  Tenant waives, releases and discharges Landlord and all Indemnified Parties for, from and against all claims, demands, causes of action, suits, judgments, liabilities, losses, damages and expenses (including attorneys' fees) for personal injury, bodily injury or property damages in any way arising from or relating to or associated with moisture or the growth of or the presence of Mold or Mold Conditions.

## 15.    ASSIGNING, MORTGAGING, SUBLETTING.

15.1    Prohibitions. Except as otherwise permitted pursuant to Section 15.1 or 15.2, Tenant shall not (i) transfer, assign or hypothecate this Lease, (ii) sublet any portion of the Premises, (iii) enter into any license, concession or other right of occupancy of any portion of the Premises, (iv) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization, (v) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant that results in a Material Change in Ownership (defined below) (each, a "**Transfer**"), without first procuring the written consent of the Landlord, which consent may not be unreasonably withheld or delayed.  Any Transfer, whether voluntary or involuntary, by operation of the law or otherwise, without the prior written consent of Landlord first had and obtained therefor, shall be null and void, at the option of Landlord, and Landlord may declare a default and exercise all remedies available to Landlord under this Lease or at law.  Notwithstanding the foregoing provisions of this Section 15.1 to the contrary, Tenant may sublet the Premises to Professionals and/or Physicians associated with the Hospital.

15.2    Material Change in Ownership.  If Tenant is an entity of any type, then the sale, transfer or other change of 49.9% or greater of the ownership interests of Tenant shall constitute a "**Material Change in Ownership**", in which event Landlord shall consent to the resulting Transfer provided that Tenant provides to Landlord (i) at least thirty (30) days' prior written notice of such anticipated Material Change in Ownership, (ii) all relevant details of the proposed Material Change in Ownership, including updated financial statements reflecting the financial condition of the proposed assignee post Material Change in Ownership ("**Post Material Change in Ownership Financial Statements**"), and (iii) the Post Material Change in Ownership Financial Statements reflecting a minimum Tangible Net Worth of

Case 1:24-cv-00494-GBW    Document 14    Filed 10/15/24    Page 444 of 1070 PageID #:
**Page 85 of 45**

$150,000,000. As used herein, "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the determination of total assets all assets that would be classified as intangible assets under GAAP including, goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises.

15.3 <u>Liability; Release</u>. Tenant shall not be released from any liability or obligation under this Lease as a result of any Transfer or Landlord's consent to any Transfer; provided, however, if (i) Landlord consents to a proposed Transfer that would occur as a result of (A) any other entity becoming Tenant hereunder by merger, consolidation, or other reorganization, (B) any transfer of an ownership interest in Tenant that results in a Material Change in Ownership or (C) any assignment of this Lease for the remainder of the Term, and (ii) the entity comprising Tenant after such Transfer has a Tangible Net Worth together with any new guarantor that is equal to or greater than (1) the aggregate Tangible Net Worth of Tenant and Guarantor at the time of this Lease and (2) a minimum Tangible Net Worth of $150,000,000, then Tenant shall be released from further liability under this Lease for the unexpired Term following such Transfer. Tenant shall provide to Landlord any information reasonably requested by Landlord to evaluate the satisfaction of any Tangible Net Worth requirements contemplated in this Section 15.

15.4 <u>Conditions to Consent</u>. Landlord may condition its consent to any assignment or subletting (i) upon Tenant's agreement to termination of this Lease and simultaneous creation of a new lease between Landlord and the proposed successor, or (ii) upon Tenant's agreement simultaneously with the execution of any sublease or assignment approved by Landlord, to name Landlord its agent for purposes of collection of rental from the subtenant approved by Landlord under any such sublease or assignment (in order to enable Landlord to maintain its collection and other relationships).

15.5 <u>Transactions Consented To</u>. Each Transfer to which there has been consent shall be by an instrument in writing in form satisfactory to Landlord and shall be executed by the transferor, assignor, sublandlord, licensor, concessionaire, hypothecator or mortgagor and the transferee, assignee, subtenant, licensee concessionaire or mortgagee in each instance, as the case may be, and each transferee, assignee, subtenant, licensee, concessionaire or mortgagee shall agree in writing for the benefit of the Landlord herein to assume, to be bound by, and to perform the terms, covenants and conditions of this Lease to be done, kept and performed by the Tenant. One (or more, if required by Landlord) executed copy of such written instrument shall be delivered to Landlord. Failure to first obtain in writing Landlord's consent or failure to comply with the provisions of this Article shall operate to prevent any such transfer, assignment, subletting, license, concession agreement or hypothecation from becoming effective.

## 16. <u>WASTE, NUISANCE, APPLICABLE LAWS.</u>

16.1 <u>Waste and Nuisance</u>. Tenant shall not commit or suffer to be committed any waste in or upon the Premises and shall not commit or suffer to be committed therein any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant in the Building, or which may disturb the quiet enjoyment of any person within the immediate vicinity of the Building.

16.2 <u>Tenant's Compliance with Laws</u>. Tenant shall, at Tenant's sole cost and expense, comply with all the requirements of all federal, state, county, municipal and other applicable authorities, now in force or which may hereafter be in force in connection with Tenant's use of the Premises.

## 17.    DESTRUCTION.

17.1    <u>Notice of Loss</u>. Tenant shall give immediate notice to Landlord in the event of fire or other accidents or casualties within the Premises or in or around the Building, and such other notice as prescribed by the fire and extended coverage insurance policy required herein to be carried thereon, and further, Tenant shall give immediate notice to Landlord of any defect in any of the fixtures or equipment located within the Premises or in or around the Building.

17.2    <u>Premises Useable</u>. In the event the Premises shall be damaged by fire or other casualty, but shall not be rendered wholly or partially unusable, regardless of the time remaining in the Term, Landlord shall cause such damage to be repaired, and the Base Rent shall not be reduced or abated unless the repairs are delayed beyond ninety (90) days after commencement of such repairs, and thereafter, only if Landlord is not diligently pursuing such repairs, and then only to the extent as may be equitable based upon the amount of damage.

17.3    <u>Premises Unusable</u>. If the Premises shall be rendered partially or wholly unusable, Landlord shall cause such damage to be repaired and the Base Rent shall be reduced in proportion to Tenant's loss of effective use of the Premises during such repair.

17.4    <u>Building Damaged</u>. In the event all or part of the Building, other than the Premises, shall be damaged or destroyed by fire or other casualty, and regardless of the time remaining in the Term, Landlord shall cause such damage to be repaired. Neither Base Rent nor any other sums due hereunder shall be abated or reduced.

17.5    <u>Scope of Repair</u>. In the event Landlord elects or shall be obligated to repair or restore any damage or destruction as aforesaid, the scope of the work shall be limited to the shell of the Building and Lease Premises. Landlord shall not be required to make repairs or replacements of any panels, decoration, trade fixtures, railings, floor covering, partitions or other parts of the Interior of the Premises or any other property installed or placed in the Premises by Tenant.

17.6    <u>Commencement of Repairs</u>.  Anything to the contrary herein notwithstanding, Landlord shall not be required to commence repairs and/or restoration prior to the expiration of sixty (60) days following the occurrence or the receipt by Landlord of the insurance proceeds covering said damage, whichever event shall first occur.

## 18.    CONDEMNATION.

18.1    <u>Total Taking</u>. If all of the Premises should be taken for any public or quasi public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, then this Lease shall terminate and the Rent shall be abated during the unexpired portion of the Term, effective on the date physical possession is taken by the condemning authority.

18.2    <u>Partial Taking</u>. If any part (but not all) of the Building, Common Areas or the Premises should be so taken, Landlord may terminate this Lease if Landlord, in its sole discretion, so elects. Any election to terminate this Lease in accordance with this provision shall be evidenced by written notice of termination to Tenant within thirty (30) days after the date physical possession is taken by the condemning authority. If this Lease is not so terminated, the Base Rent payable hereunder during the unexpired portion of the term shall be reduced in proportion to the area of the Premises taken, effective on the date physical possession is taken by the condemning authority.

18.3    Award.  All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Building, the Premises or the Common Areas shall be the property of Landlord and Tenant hereby assigns its interests in any such award to Landlord

## 19.    **QUIET ENJOYMENT.**

So long as Tenant shall pay all Rent and other payments due hereunder and shall observe and perform all of the covenants on Tenant's part to be observed and performed hereunder, and Tenant is not in default hereunder (beyond any applicable notice or cure periods), Tenant shall peaceably and quietly hold and enjoy the Premises (including easement rights) for the entire Term hereof without interruption by Landlord or person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to all of the terms and provisions of this Lease and to the reservations, encumbrances and limitations affecting the title to the premises upon which the Building is situated.

## 20.    **DEFAULT AND REMEDIES.**

20.1    Default. The following events shall be deemed to be the events of default by Tenant under this Lease:

(1)    Tenant shall fail to pay any installment of the Base Rent or any Additional Rent within five (5) business days after receipt of written notice of such failure from Landlord. Notwithstanding the foregoing, Landlord shall not be obligated to provide written notice more than twice in any twelve (12) month period.

(2)    Tenant shall fail to comply with any term, provision or covenant of this Lease, other than the payment of any sums due Landlord, including but not limited to, the Base Rent or any Additional Rent, and Tenant shall not cure such failure within thirty (30) days after written notice thereof of Tenant (or such shorter notice period as may be provided elsewhere in this Lease for specific events of default); provided, however, that if such failure cannot be reasonably cured within thirty (30) days, then Tenant shall have such additional time to cure as is reasonable under the circumstances provided that Tenant diligently continues to pursue such cure.

(3)    An event of default shall occur and remain uncured within the time stated for such cure under any Related Lease.

(4)    Tenant or any guarantor of Tenants' obligations hereunder shall become insolvent in any chapter of the United States Bankruptcy Code, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(5)    Tenant or any guarantor shall file a petition under any section or chapter of the United States Bankruptcy Code, or under any similar law or statute of the United States or any state thereof; or Tenant shall be adjudged bankrupt or insolvent as defined in any chapter of the United States Bankruptcy Code in proceedings filed against Tenant or any guarantor of Tenant's obligations under this Lease.

(6)    A receiver or trustee shall be appointed for the Premises or for all or substantially all of the assets of Tenant or any guarantor and such receiver or trustee shall not be discharged within thirty (30) days following such appointment.

(7)    The discovery by Landlord that any financial statement given by Tenant or any of its assignees, subtenants or successors-in-interest, or any guarantor of Tenant's obligations hereunder to Landlord, was materially false.

20.2    Remedies.

(1)    Upon the occurrence of any event of default hereunder, and notwithstanding the fact that the termination or cancellation of this Lease by Landlord may substantially interfere with the ability of Tenant to conduct a non-liquidation proceeding under any chapter of the United States Bankruptcy Code, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever.

(i)    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, without being liable for prosecution or any claim for damages therefor and Tenant agrees to pay Landlord, on demand, the amount of all losses, expenses and damages, including attorneys' fees, which Landlord may suffer by reason of such termination; and/or

(ii)    Enter upon the Premises and correct such default or otherwise do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to pay Landlord, on demand, the amount of all  losses, expenses and damages, including attorneys' fees which Landlord may incur in connection with attempts to effect compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for prosecution or  any claim for damages resulting to Tenant from such action, and/or

(iii)    Enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, without being liable for prosecution or any claim for damages therefor, and if Landlord so elects, relet the Premises on such terms as Landlord may deem advisable and receive rental therefor.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any other remedies herein provided or provided by law, or at equity, nor shall pursuit of any other such remedy constitute a forfeiture or waiver of any Rent or other sums due to Landlord hereunder or of any damages accruing to the Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default. In determining the amount of loss or damage which Landlord may suffer by reason of termination of this Lease or the deficiency arising by reason of any reletting by Landlord as above provided, allowance shall be made for the expense of repossession and any repairs or remodeling undertaken by Landlord following repossession.

(2)    Exercise by Landlord of any one or more remedies herein granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises by Tenant, whether by agreement or by operation of law it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. No removal or other exercise of

dominion by Landlord over the property of Tenant or others at the Premises shall be deemed unauthorized or constitute a conversion. Tenant hereby consenting, after any event of default, to the aforesaid exercise of dominion over Tenant's property within the Building. All claims for damages by reason of such reentry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. Tenant agrees that any reentry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings, as Landlord may elect and Landlord shall not be liable in trespass or otherwise,(after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant as provided in this paragraph may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease Term.

(3)     In the event Landlord elects to terminate this Lease by reason of event or default, then notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord, at Landlords Address as defined in <u>Section 1</u> herein, the sum of all Rent, Additional Rent and other indebtedness accrued to the date of such termination, plus, as damages, an amount equal to the present value of the Rent and any and all other sums reserved hereunder for the remaining unexpired portion of the Lease Term (had the Lease not been so terminated by Landlord), less the then present value of the then fair rental value of the Premises.

(4)     In the event Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord at Landlords Address as defined in <u>Section 1</u> hereinabove, all Rent and other indebtedness accrued to date of such repossession, plus all Rent and any and all other sums required to be paid by Tenant to Landlord during the remainder of the Lease Term until the date of expiration of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during Period (after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant as provided in the paragraph may be brought from time to time, on one or more occasions, without necessity of Landlord's waiting until expiration of the Lease Term.

(5)     In the event of termination or repossession of the Premises for an event of default, Landlord shall have an obligation to attempt to relet the Premises, or any portion thereof. However, in the event of reletting Landlord may relet the whole or any portion of the Premises for any period, to any tenant, and for any use and purpose. Should Landlord choose to relet the Premises, or any portion thereof, for the remainder of the Term provided for herein, and if the rental received through reletting does not at least equal the Rent provided for herein, Tenant shall pay and satisfy the deficiency between the amount of the Rent so provided for and that received through reletting, including, but not limited to, the cost of renovating, altering, and decorating for a new occupant. Further, Tenant shall not in any event ever be entitled to any excess rental and other sums provided for herein, and the same shall belong solely to Landlord. Nothing herein shall be construed as in any way denying Landlord the right, in the event of abandonment of said Premises or other breach of this Lease by Tenant, to treat the same as an entire breach and at Landlord's option to terminate this Lease and/or immediately seek recovery for the entire breach of this Lease and any and all damages which Landlord suffers thereby.

(6)     If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without

thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Premises for such purpose), and thereupon Tenant shall be obligated and hereby agrees, to pay Landlord, upon demand, all costs, expenses and disbursements (including reasonable attorneys' fees) incurred by Landlord in taking such remedial action.

(7)    In the event of the breach or the attempted or threatened breach of any covenant or provision contained in this Lease by Tenant, Landlord shall have, in addition to all other remedies provided it hereunder or by law or at equity, the right to obtain an injunction prohibiting such breach or attempted breach without the necessity for proof of inadequacy of legal remedy, irreparable harm or probable right of recovery.

20.3    Expenses/Attorneys' Fees. In the case of an event of default hereunder, Tenant shall also be liable for and shall pay to Landlord, at Landlords Address as defined in Section 1 herein, in addition to any sum provided to be paid above: broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in enforcing Landlord's rights or remedies, including reasonable attorneys' fees and court costs until the expiration of the Term.  Tenant shall permit the Landlord to exhibit the Premises to prospective tenants and to place notices upon the Premises advertising "For Lease".  Landlord may at any time, exhibit the Premises to prospective purchasers. and place notices, upon the Building or the Premises advertising "For Sale."

20.4    Landlord's Breach.  In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rental due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have thirty (30) days in which to cure any such default. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Building and not thereafter.

20.5    Limitation on Landlord's Personal Liability. Tenant specifically agrees to look solely to Landlord's interest in the Building for the recovery for any judgment from Landlord, it being agreed that Landlord, its agents, employees, shareholders, officers, directors, and limited partners, shall never be personally liable hereunder for anything whatsoever.

## 21.    ACCESS.

Landlord or its agents shall have the right to enter the Premises at all reasonable times, and whenever necessary because of emergencies, to inspect the same, and to make such repairs, replacements, alterations, improvements or additions as Landlord may deem necessary or desirable, including alterations, repairs, improvements or additions to the space adjacent to Premises and/or to the Building, without the same constituting an eviction of Tenant in whole or in part, and the Rent reserved shall in no way abate while said repairs, replacements, alterations, improvements or additions are being made, by reason of loss or interruption of Tenant's business or otherwise. During the ninety (90) days prior to the expiration of the Term, Tenant shall permit the Landlord to exhibit the Premises to prospective tenants and to place notices upon the Premises advertising "For Lease".  Landlord may, at any time, exhibit the Premises to prospective purchasers, and place notices, upon the Building or the Premises advertising "For Sale."

22. **SURRENDER AND REMOVAL OF PROPERTY**.

22.1    Surrender of Premises. Promptly upon the expiration or earlier termination of the Term, Tenant shall surrender the Premises in the same condition as received by Tenant on the Commencement Date reasonable wear and tear and damage by unavoidable casualty or Act of God only excepted. Further, Tenant shall surrender all keys to the Premises at the place then fixed for the payments of Base Rent due hereunder. All items of work and improvements comprising the Interior of the Premises, shall constitute a part of the fee estate remainder subject to this Lease, notwithstanding that Tenant may construct or cause to be constructed all or any part of said improvements or may contribute to the cost thereof, and notwithstanding that Tenant may or might be required to maintain, repair and/or replace same or some part thereof pursuant to some other provisions in this Lease. Subject to the provisions of this Section, Tenant shall remove all of Tenant's trade fixtures, operation equipment and other personal property before surrendering the Premises as aforesaid and shall repair at Tenant's expense any damage to the Premises caused thereby.

22.2    Failure to Remove Property. If Tenant shall neglect to remove Tenant's personally as herein provided, Landlord shall have the right (i) to remove said property and cause it to be stored in a public warehouse or elsewhere, at the cost of and for the account of Tenant, or (ii) in the alternative, if said property shall not be removed within thirty (30) days after said termination, to dispose of said property in a manner deemed suitable to Landlord, all without service of notice or resort to legal process and without becoming liable for any loss damage which may be occasioned thereby, and any proceeds of such disposition shall be retained by Landlord without liability to Tenant, Tenant hereby waiving any interest in such proceeds.

22.3    Survival of Covenants. Tenant's obligations to observe or perform the covenants contained in this Article shall expressly survive the expiration or earlier termination of the Term.

23. **HOLDING OVER**.

Any holding over without the consent of Landlord after the expiration or earlier termination of the Term shall be construed to be and shall constitute a tenancy at the will of Landlord, and Tenant agrees to pay as rents and liquidated damages for such holding over a sum equivalent to the Rent herein specified and reserved plus fifty percent (50%) of the Base Rent (prorated on a monthly basis) and shall otherwise be on the same terms and conditions herein, as far as applicable.

24. **ESTOPPEL/MEMORANDUM**.

24.1    Estoppel Certificate. Within ten (10) days after request therefore by Landlord, Ground Lessor or any Mortgagee, Tenant shall deliver in recordable form (and signed by Tenant, if an individual, or a duly authorized representative of Tenant if Tenant is not an individual) a statement to Landlord, Ground Lessor any Mortgagee, or any proposed Mortgagee or transferee of the Project (as the case may be), certifying (if such be the case) that this Lease is in full force and effect, that Tenant is in possession of the Premises, that Tenant has commenced the payment of Rent, that there are no defenses or offsets to this Lease claimed by Tenant, as well as any other information reasonably requested.  If Tenant fails or refuses to give a certificate hereunder within the time period herein specified, then the information contained on such certificate as submitted by Landlord shall be deemed correct for all purposes, but Landlord shall have the right to treat such failure or refusal as a default by Tenant.

24.2    Memorandum of Lease. Promptly after the Commencement Date, Landlord and Tenant, if requested by Landlord, shall execute and acknowledge and deliver a memorandum or short form of this Lease, in recordable form, acknowledging Tenant's acceptance of the Premises for all purposes herein

provided and specifying the Commencement Date and the termination date of this Lease in accordance with the provisions hereof, and said memorandum may be recorded by Landlord only, but this Lease Agreement itself shall not be recorded. In the event Tenant records a memorandum of this Lease, or this Lease, Tenant shall be in default under this Lease and Landlord may terminate this Lease upon five (5) days written notice to Tenant at Tenant's address set forth in Section 1.1 hereof.

## 25.   NOTICES.

All notices required or permitted to be given hereunder by either party hereto to the other party shall be deemed sufficiently given or made on the day of receipt thereof or three (3) business days after the date when mailed by United States Registered or Certified Mail, adequate postage paid, to their respective addresses as specified in Section 1.1 hereof. Each party hereto may notify the other party of any change in its mailing address by notice in the manner herein above provided, which new address shall thereafter be deemed the proper address for notice hereunder.

## 26.   TENANT'S PAYMENTS.

26.1   Payments. Tender of Rent and/or any other payment due hereunder shall be considered to have been made on the date such payments received by Landlord and not on the date mailed by Tenant. For purposes hereof, the office of Landlord is the office presently or henceforth designated pursuant to the provisions of Section 1.1 hereof. Checks or drafts tendered will constitute payment only when duly paid by the drawers bank promptly upon presentment, properly endorsed, for payment.

26.2   Interest. All sums due and owing by Tenant to Landlord under this Lease shall bear interest at the Prime Rate (as defined in the *Wall Street Journal*) plus four percent (4%) from the date due until paid.

## 27.   LANDLORD'S LIEN.

To secure the payment of all Base Rent, and Additional Rent reserved herein, and all other payments due Landlord hereunder, or to become due hereunder and the faithful performance of all covenants, agreements and stipulations herein contained to be performed by Tenant, Tenant hereby grants to Landlord an express first and prior contract lien and security interest on all property (including fixtures, equipment, inventory, goods, wares, furniture, office equipment, supplies and merchandise) which may be placed in the Premises, and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction of or damage to any such property. Tenant hereby waives all exemption laws in favor of said lien and security interest. This lien and security interest is given in addition to the Landlord's statutory lien and shall be cumulative thereof. Tenant shall not remove any property from the Premises until all of Tenant's obligations under this Lease are satisfied. This lien may be foreclosed with or without court proceedings by public or private sale, provided Landlord gives Tenant at least ten (10) days notice of the time, place and terms of said sale, and Landlord shall have the right to become the purchaser of such property, upon being the highest bidder therefor at said sale. The notice referred to in the preceding sentence may (but needs not) be given by Landlord to Tenant contemporaneously with any other notice from Landlord to Tenant which may be given in accordance herewith. At the time of the execution of this Lease, and if requested thereafter by Landlord, Tenant shall execute and deliver to Landlord financing statement instruments in form deemed sufficient by Landlord to reflect the security interest herein granted and any proper amendment of, assignment of, modification in or extension of the aforesaid contract lien and security interest hereby granted. Tenant hereby grants to Landlord a power of attorney to sign, in place and stead of Tenant, any and all such instruments. Said power of attorney is irrevocable and coupled with an interest.

28.    **RULES AND REGULATIONS.**

Such reasonable rules and regulations applying to all tenants in the Building as may be adopted by Landlord for the safety, care, cleanliness, preservation of good order or operation of the Premises, the Building, the Property and the Common Areas, are hereby made a part hereof and Tenant agrees to comply with all such rules and regulations, immediately upon receipt of a copy of same. Landlord shall have the right at all times to change any of the rules and regulations or to amend them in any manner deemed reasonable by Landlord. All changes and amendments will be sent by Landlord to Tenant in writing and shall be thereafter carried out and observed by Tenant.  As of the Effective Date, the rules and regulations are set forth on Exhibit D.

29.    **BROKERS.**

None.

30.    **AUTHORITY.**

Each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has been and is qualified to do business in the state in which the Building is located, that the Tenant Entity has full right and authority to enter into this Lease, and that all persons signing on behalf of the Tenant Entity were authorized to do so by all appropriate actions required of such entity.  If Tenant signs as a partnership, trust or other legal entity, each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has complied with all applicable laws, rules and governmental regulations relative to its right to do business in the state in which the Building is located, and that each of the persons or entities acting on behalf of the Tenant was authorized to do so by any and all appropriate partnership, trust or other actions.

31.    **LIABILITY OF LANDLORD.**

Tenant shall look solely to Landlord's interest in the Building, including revenue derived from the Project, and Landlord's personal property used in connection with the Project for the satisfaction of any judgment or decree requiring the payment of money by Landlord, based upon any default hereunder, and no other property or asset of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of such judgment or decree.  **IN NO EVENT SHALL LANDLORD BE LIABLE OR RESPONSIBLE FOR ANY CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES.**

32.    **SCOPE AND INTERPRETATION OF AGREEMENT; CONFIDENTIALITY.**

This Lease and all Exhibits set forth including all of the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, conditions, or understandings, either oral or written, other than as set forth herein. No subsequent alteration, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.  This Lease shall not be more strictly enforced against either party regardless of who was more responsible for its preparation.  Except at Landlord's option, no part of this Lease or any memorandum thereof may be recorded in the public records of any municipality or county.  Tenant will maintain the confidentiality of this Lease and will not divulge the economic or other terms of this Lease, whether verbally or in writing, to any person, other than Tenant's officers, directors, partners or shareholders; Tenant's attorneys, accountants and other professional consultants; any governmental agencies; and pursuant to subpoena or other legal process.  If any provision of this Lease shall be determined to be void by any court of competent jurisdiction or by any

law enacted subsequent to the Effective Date, then such determination shall not affect any other provisions hereof, all of which other provisions shall remain in full force and effect.

33. **LANDLORD'S CONSENT.**

Without limiting any other provision of this Lease, in the event that Landlord's consent is required by the terms hereof for any purpose whatsoever, it is understood and agreed that (a) Landlord's consent may be subject to the consent of the Ground Lessor, Declarant and/or the holder of any Mortgage encumbering the Building to the extent that such consents are required under the terms of the Ground Lease, Declaration or the applicable financing documents (which consents Landlord shall seek to obtain) and (b) notwithstanding anything to the contrary set forth herein, it shall not be deemed unreasonable for Landlord to withhold its consent in any given circumstance based upon Landlord's inability to obtain any required consent from the Ground Lessor, Declarant or the holder of any Mortgage encumbering the Building.

34. **USE OF PREMISES.**

Tenant shall use and occupy the Premises only for the Permitted Use, and for no other purpose, without the prior written consent of Landlord.

35. **GUARANTY.**

As material consideration for Landlord to enter this Lease, Tenant shall cause Guarantor to execute the Guaranty attached as Exhibit E (the "**Guaranty**"), and Tenant shall deliver the Guaranty to Landlord contemporaneously with Tenant's execution hereof.

36. **WAIVER OF JURY TRIAL.**

LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LEASE OR THE OBLIGATIONS EVIDENCED HEREBY, OR ANY OTHER DOCUMENT OR INSTRUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT TO EACH OF LANDLORD AND TENANT IN ENTERING INTO THIS LEASE.

37. **MISCELLANEOUS.**

37.1    Successors and Assigns. All rights and liabilities herein granted to or imposed upon the respective parties hereto shall extend to and jointly and severally bind the several respective heirs, legal representatives, successors and assigns of the respective parties hereto, an if there shall be more than one Landlord or Tenant, all shall be bound jointly and severally the terms, conditions and agreements herein contained. No rights, however, shall inure to the benefit of any assignee of Tenant unless Landlord has approved the assignment to such assignee in writing as provided herein.

37.2    Waivers. One or more waivers of any breach or violation of any agreement, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent violation or breach of the same or any other agreement, covenant, or condition herein contained, and the consent or approval by either party of any act by the other, which act requires the approval or consent of the other party, shall not

be deemed to waive or render unnecessary the future requirements of consent or approval of the same or similar act; and the subsequent acceptance of Rent or other payment due hereunder shall not be deemed to be a waiver of any preceding breach by Tenant, other than failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of the acceptance of said Rent. No express covenant, term or condition of this Lease shall be deemed to have been waived by either party, unless such waiver is in writing.

      37.3   <u>Accord and Satisfaction</u>. No payment made by Tenant or received by Landlord in an amount less than the amount herein stipulated shall be deemed to be other than on account of the earliest received payment, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such amount or to pursue any other remedy in this Lease or by law provided Landlord.

      37.4   <u>Entire Agreement</u>. This Lease, together with the exhibit or exhibits aforesaid and the rider or riders, if any, attached hereto and forming a part hereof, contains and sets forth the entire agreement and understandings between the parties hereto concerning the Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between said parties other than as herein expressly set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon either party hereto, unless reduced to writing and signed by both parties.

      37.5   <u>Partnership</u>. Landlord does not become a partner of Tenant in the conduct of its business or otherwise, or a joint venturer or a member of a joint enterprise with Tenant by virtue of this Lease.

      37.6   <u>Force Majeure</u>.  In the event Landlord shall be delayed, hindered or prevented from the performance of any act required hereunder by reason of strikes, fire, explosions, lock-outs, failure of electrical power, governmental restrictions or regulations, unavailability of suitable financing, materials and/or labor, riots, insurrection, war or on account of any other condition or occurrence not the fault of Landlord, then the performance of any such act shall be extended for a period equivalent to the period of such delay.

      37.7   <u>Captions and Numbers</u>.  The captions, section numbers and article numbers appearing in this Lease are inserted only as a matter of convenience and in no wise define, limit, construe or describe the scope or intent of such sections or articles, nor in any wise affect this Lease.

      37.8   <u>Tenant, Defined Use of Pronouns</u>. The word "**Tenant**" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more and if there shall be more than one Tenant. Any notice required or permitted by the terms of this of Lease may be given by or to any one thereof and shall have the same force and effect as if given by or to all thereof. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, and a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or one Tenant, and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

      37.9   <u>Severability</u>. If any provisions covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, there reminder of this Lease, or the application of such provision, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each provision,

covenant or condition of this Lease shall be valid and shall be enforced to the fullest extent permitted by Law.

      37.10 <u>Survival</u>. Landlord and Tenant expressly agree that all provisions of this Lease which contemplate performance after the expiration or earlier termination hereof shall survive such expiration or earlier termination of this Lease.

      37.11 <u>Governing law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Texas.  Venue for any legal actions hereunder shall be in the Courts of Grayson County, Texas.

      37.12 <u>Other documents</u>. The parties agree to execute all other documents or instruments necessary to effect the transfers of property set forth herein and otherwise to implement the provisions of this Agreement.

**38.**    **<u>EXHIBITS</u>**

      The following exhibits are a part of this Lease and are incorporated herein by reference:

Exhibit A – Legal Description
Exhibit B – Floor Plan of the Premises
Exhibit C – Parking Areas
Exhibit D – Rules and Regulations
Exhibit E – Guaranty

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

EXECUTED as of the date first set forth above in multiple counterparts each of which shall be deemed to be an original.

**LANDLORD**:

ALTERA HIGHLAND LLC,
a Texas limited liability company

By:_____

Name:   Terry D. Quinn
Its:       President

**TENANT**:

SHERMAN/GRAYSON HEALTH SYSTEM, LLC,
a Texas limited liability company

By:_____
Name:_____
Its:_____

LEASE AGREEMENT
SIGNATURE PAGE

**A0450**

EXECUTED as of the date first set forth above in multiple counterparts each of which shall be deemed to be an original.

**LANDLORD**:

ALTERA HIGHLAND LLC,
a Texas limited liability company

By:_____
Name:  Terry D. Quinn
Its:      President

**TENANT**:

SHERMAN/GRAYSON HEALTH SYSTEM, LLC,
a Texas limited liability company

By:_____
Name:  Thomas J. Frazier, Jr.
Its:      Executive Vice President

EXHIBIT A

LEGAL DESCRIPTION

BEING a 3.0894 acre tract of land situated in the County of Grayson, State of Texas out of the J.B. McAnair Survey, Abstract No. 763 and being all of Block No. 7, and a portion of Lots 7-8, and all of Lots 9-12, Block 12 of Green Mount Addition to the City of Sherman, Grayson County, Texas, as shown by Plat of record in Volume 193, Page 21, Deed Record, Grayson County, Texas,  together with that  portion of vacated Pecan Street, and being more particularly described by meets and bounds as follow:

BEGINNING at a "X" cut in concrete found for corner at the intersection of the north line of Laurel Street (a 60 foot wide public right-of-way) and the east line of Bryant Avenue (a 60 foot wide public right-of-way);

THENCE North 15 degrees 40 minutes 01 seconds West (Reference for Basis of Bearings) along said east right-of-way line, a distance of 467.78 feet to a 5/8 inch iron rod set with cap stamped BGT for corner;

THENCE North 73 degrees 42 minutes 45 seconds East, a distance of 286.25 feet to a 5/8 inch iron rod set with cap stamped BGT for corner in the west right-of-way line of Highland Avenue;

THENCE South 16 degrees 01 minutes 19 seconds East along said west right-of-way line, a distance of 467.76 feet to a 1/2 inch iron rod with cap found for corner at the intersection of the west right-of-way line of said Highland Avenue and the north right-of-way line of said Laurel Street;

THENCE South 73 degrees 42 minutes 45 seconds West along said north right-of-way line, a distance of 289.15 feet to the POINT OF BEGINNING and containing 134,573 square feet or 3.0894 acres of land, more or less.

EXHIBIT B

FLOOR PLAN OF THE PREMISES

[ATTACHED]





St 345
Karim

St 350
Shell Space

St 315A
Sublease - EP Drs.

St 315
Drs Joshi - Tocatjian Engleman

St 315A

Dan Burbine Associates
Architects & Project Managers
12532 Renoir Lane    Dallas, Texas 75230

St 340
Gregory - Clarke

St 330
Anjum - Crawford

St 320
Cernero

St 310 - DaSilva

3rd FLOOR PLAN
s c a l e :  1/8" = 1'-0"

north
n
e
s
w
plan
orientation

5    20
0    10

22 539

P R O J E C T
WNJ    Wilson N. Jones

MEDICAL
OFFICE
BUILDING

REVISIONS

DATE
11 MAY 2005

A-3
3 of 5



<u>EXHIBIT C</u>

<u>PARKING AREAS</u>

[ATTACHED]



TRACT FIFTEEN:

Being a part of Block No. Eight (8), of G. Y. Gray's Second Addition to the City of Sherman, Texas, and further described as follows:

BEGINNING at the intersection of the South line of Laurel Street with the West line of Highland Avenue as now opened;
THENCE West 140 feet with the South line of Laurel Street to a stake, for the Northwest corner;
THENCE South parallel with Highland Avenue 75 feet to a stake;
THENCE East parallel with Laurel Street 140 feet to a stake in the West line of Highland Avenue;
THENCE North with said line of Highland Avenue 75 feet to the place of beginning, containing a tract of 140 x 75 feet.

TRACT SIXTEEN of the County of Grayson, State of Texas, all that certain tract or parcel of land situated in the City of Sherman, Grayson County, Texas, being a part of the survey originally granted to John B. McAnair, and being a part of Block Eight (8) of Gray's Second Addition, as shown by the map or plat thereof, recorded in Volume 134, page 113, of the Deed Records of Grayson County, Texas, and being more particularly described as follows:

BEGINNING at a point on the West line of Highland Avenue, 125 feet South of the intersection of the West line of Highland Avenue, and the South line of Laurel Street;
THENCE Southward with the West line of Highland Avenue, 45 feet;
THENCE Westward and parallel with the South line of Laurel Street, 140 feet;
THENCE Northward and parallel with the West line of Highland Avenue, 45 feet;
THENCE Eastward, parallel with the South line of Laurel Street, 140 feet to the place of beginning; this being the South 45 by 140 feet of the tract 95 by 140 feet, in size conveyed by Frank Reece and wife, Mrs. Minnie Reece, to Bob Richardson by deed dated March 5, 1924, and recorded in Volume 303, Page 153 of the Deed Records of Grayson County, Texas.

TRACT SEVENTEEN:

SITUATED in the City of Sherman, County of Grayson, Texas and being part of Block No. 8 of G. Y. Gray's Second Addition to the City of Sherman, Texas, out of J. B. McAnair Survey, Grayson County, Texas on the waters of Post Oak Creek, and described as follows:
And being the North 62 feet of the following described piece of property;
BEGINNING at the intersection of West line of Highland Ave. and the North line of Houston Street.
THENCE in a westerly direction with the North line of Houston Street 87 feet a stake.
THENCE in a Northerly direction and parallel with the West line of Highland Avenue 150 feet to a stake.
THENCE in an Easterly direction parallel with the North line of Houston Street, 87 feet to the West line of Highland Ave.
THENCE in a Southerly direction with the West line of said Highland Ave. 150 feet to the place of beginning, containing 87 x 150 feet of land.  Being the same land described in a deed from J. W. Hollingsworth and wife, Florence Hollingsworth to W. W. Craig, dated January 9, 1915, and

recorded in Volume 239, page 272, Deed Records of Grayson County, Texas.

TRACT TWENTY-FOUR:

BEING that certain tract, lot or parcel of land situated in the City of Sherman, Grayson County, Texas, in the J. B. McAnair Survey, part of Block Eight (8) of the G. Y. Gray Second Addition to the said City of Sherman;

BEGINNING at the Southwest corner of the lot conveyed by J. P. Mills and wife, to M. H. Andrews by deed recorded in Volume 57, page 107 of the Deed Records of Grayson County, Texas, a stake on the North line of West Houston Street;
THENCE North at right angles to the North line of West Houston Street 150 feet to a stake for corner;
THENCE East parallel with the North line of West Houston Street 60 feet to a stake for corner;
THENCE South at right angles to the North line of West Houston Street 150 feet to the North line of West Houston Street;
THENCE West along said line 60 feet to the Place of Beginning.

TRACT TWENTY-FIVE:

All that certain tract or parcel of land situated in Grayson County, Texas, and being more particularly described as follows: SITUATED in the City of Sherman, Grayson County, Texas, on the waters of Post Oak Creek, being a part of a survey or patent to J. B. McAnair Survey, and described as follows, to-wit:

BEGINNING at the Southeast corner of the tract described in the deed from L. M. Tuck, Receiver, to Clyde Jackson and wife, of record in Book 367, Page 344, Grayson County Deed Records;
THENCE West with the North line of Houston Street, 80 feet to the Southeast corner of a lot sold to L. V. Butler;
THENCE North with the East line of the Butler lot, 150 feet to the South line of a lot sold to Cecil J. Rodgers;
THENCE East with the South line of said Rodgers tract, 80 feet to the southeast corner or same, a stake in the East line of the tract sold to Clyde Jackson above referred to;
THENCE South with the East line of the Clyde Jackson tract, 150 feet to the place of beginning, being a lot 80 feet by 150 feet out of the Southeast corner of a tract sold by L. M. Tuck, Receiver, to Clyde Jackson and wife referred to.

Also being described as 80' x 150' our of Block 8 of G.Y. Gray's Addition to the City of Sherman.

TRACT TWENTY-SIX:

BEING all that certain lot or parcel of land, situated in the City of Sherman, Grayson County, Texas, a part of Block No. EIGHT (8) of G. Y. GRAY'S ADDITION to the City of Sherman and

being more particularly described as follows:

BEGINNING at the point of intersection of the North line of West Houston Street and the East line of Bryant Street;
THENCE North with the East line of Bryant Street for a distance of 150 feet;
THENCE East parallel with the North line of Houston Street for a distance of 70 feet;
THENCE South, parallel with the East line of Bryant Street for a distance of 150 feet to the North line of Houston Street;
THENCE West with said line for a distance of 70 feet to the Place of Beginning and containing 70 x 150 feet of land, more or less and being the same property conveyed by Alton R. Hill and wife, Laura Hill to J. B. Revell and wife, Willie B. Revell by deed dated November 10, 1952 and of record in Volume 705, Page 457 of the Deed Records of Grayson County, Texas.

<u>TRACT TWENTY-SEVEN</u>:

SITUATED in Sherman, Grayson County, Texas, and being a part of the J. B. McAnair Survey, and being also a part of Block 8 of G. Y. Gray's Second Addition to Sherman, Texas, and being a part of a tract of 150 x 250 feet of land sold by L. M. Tuck, receiver, to Clyde Jackson, et ux., by deed recorded in Volume 367, page 344, Deed Records of Grayson County, Texas, and described as follows, to-wit:

BEGINNING at a stake on the east line of what is known as Bryant Street at a point 50 feet south of the NW corner of the above mentioned tract of 150 x 250 feet, said point being the SW corner of a tract sold by Clyde Jackson, et al., to Cecil J. Rodgers, et ux.;
THENCE South 50 feet to a stake, the NW corner of a tract now owned by L. V. Butler, et ux., as described in deed of record in Volume 506, Page 407, Deed Records of Grayson County, Texas;
THENCE East parallel with the north line of the 150 x 250 foot tract 150 feet to a stake;
THENCE North 50 feet to the SE corner of the Cecil J. Rodgers, et ux., tract;
THENCE West with the south line of the said Rodgers tract 150 feet to the place of beginning, containing 50 x 150 feet of land.

<u>TRACT TWENTY-EIGHT</u>:

All that certain tract or parcel of land situated in the City of Sherman, Grayson County, Texas, being a part of the Survey originally granted to J. B. McANAIR, and being a part of BLOCK NO. EIGHT (8) of GRAY'S SECOND ADDITION to said City of Sherman, as shown by the map or plat thereof, recorded in Volume 134, at Page 113, Deed Records of Grayson County, Texas, and as shown by the 1908 Plat Book of Grayson County, Texas, and being more particularly described as follows:

BEGINNING at the intersection of the West line of Highland Avenue and the North line of Houston Street;
THENCE West with the North line of Houston Street, a distance of 87 feet;
THENCE North on a line parallel with the West line of Highland Avenue, a distance of 88 feet to the Southwest corner of a tract of land deeded to Elmer L. Anderson;

THENCE East on a line parallel with the North line of Houston Street and with the South line of the Elmer L. Anderson tract, a distance of 87 feet to a point in the West line of Highland Avenue;

THENCE South with the West line of Highland Avenue, a distance of 88 feet to the Place of Beginning and Containing 87 ft. by 88 ft. of land and being the same property conveyed by Floydell Akridge, a widow, to George Melvin Hammock, et ux., by Deed dated January 12, 1972, recorded in Volume 1208, at Page 433, Deed Records of Grayson County, Texas.

TRACT TWENTY-NINE:

BEING all that certain tract or parcel of land, situated in the County of Grayson, State of Texas, being a part of survey originally granted to J. B. McAnair and described as follows, to-wit:

BEGINNING at a point on the West line of Highland Avenue, seventy-five (75) feet South of the intersection of the West line of Highland Avenue and the South line of Laurel Street in the City of Sherman;

THENCE Southward with the West line of Highland Avenue fifty (50) feet;

THENCE Westward and parallel with the South line of Laurel Street, one hundred forty (140) feet;

THENCE Northward and parallel with the West line of Highland Avenue, fifty (50) feet;

THENCE Eastward and parallel with the South line of Laurel Street, one hundred forty (140) feet to the Place of Beginning; this being the North fifty (50) feet by one hundred forty (140) feet of the tract ninety-five (95) feet by one hundred forty (140) feet in size conveyed by Frank Reese and wife, Mrs. Minnie Reese, to Bob Richardson, by deed dated March 5, 1924, and recorded in Volume 303, page 153 of the Deed Records, Grayson County, Texas; and being Lot Eight (8), Block Eight (8), of Gray's Second Addition to the City of Sherman, Grayson County, Texas.

BEING a 3.0894 acre tract of land situated in the County of Grayson, State of Texas out of the J.B. McAnair Survey, Abstract No. 763 and being all of Block No. 7, and a portion of Lots 7-8, and all of Lots 9-12, Block 12 of Green Mount Addition to the City of Sherman, Grayson County, Texas, as shown by Plat of record in Volume 193, Page 21, Deed Record, Grayson County, Texas, together with that portion of vacated Pecan Street, and being more particularly described by meets and bounds as follow:

BEGINNING at a "X" cut in concrete found for corner at the intersection of the north line of Laurel Street (a 60 foot wide public right-of-way) and the east line of Bryant Avenue (a 60 foot wide public right-of-way);

THENCE North 15 degrees 40 minutes 01 seconds West (Reference for Basis of Bearings) along said east right-of-way line, a distance of 467.78 feet to a 5/8 inch iron rod set with cap stamped BGT for corner;

THENCE North 73 degrees 42 minutes 45 seconds East, a distance of 286.25 feet to a 5/8 inch iron rod set with cap stamped BGT for corner in the west right-of-way line of Highland Avenue;

THENCE South 16 degrees 01 minutes 19 seconds East along said west right-of-way line, a distance of 467.76 feet to a 1/2 inch iron rod with cap found for corner at the intersection of the west right-of-way line of said Highland Avenue and the north right-of-way line of said Laurel Street;

THENCE South 73 degrees 42 minutes 45 seconds West along said north right-of-way line, a distance of 289.15 feet to the POINT OF BEGINNING and containing 134,573 square feet or 3.0894 acres of land, more or less.

<u>EXHIBIT D</u>

RULES AND REGULATIONS

1.     All tenants will refer all contractor's representatives and installation technicians who are to perform any work within the Building, grounds, and Parking Area to Landlord for Landlord's supervision, approval and control before the performance of any such work. This provision shall apply to all work performed in the Building, grounds and Parking Area including, but not limited to, installations of telephones, telegraph equipment, electrical devices and attachments, and any and all installations of every nature effecting floors, walls, woodwork, trim, window, ceilings, equipment and any other physical portion of the Building, grounds, and Parking Area. Tenant shall not mark, paint, drill into, or in any way deface any part of the Building or the Premises without Landlord's written consent. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of the Landlord, and as the Landlord may direct.

2.     The work of the janitorial or cleaning personnel shall not be hindered by Tenant after 5:30 pm and such work may be done at any time when the Premises are vacant. The windows doors and fixtures in the Premises and Building may be cleaned at any time. Tenant shall provide adequate waste and rubbish receptacles, cabinets, books cases, map cases, etc., necessary to prevent unreasonable hardship to Landlord in discharging its cleaning obligations.

3.     Movement in or out of the Building or through the Building entrances or lobbies of furniture or office equipment, or dispatch or receipt by Tenant of any heavy equipment, bulky material merchandise or other item which requires use of elevators or stairways, shall be restricted to such hours as Landlord shall designate. The method of such movement, routing of such movement, safety precautions associated with such movement and the prohibition of Tenant bringing any dangerous items into the Building shall be subject to the Landlord's discretion and control. Any hand trucks, carryalls, or similar appliances used for the delivery or receipt of merchandise or equipment shall be equipped with rubber tires, side guards and such other safeguards as the Landlord shall require. Although Landlord or its personnel may participate in or assist in the supervision of such movement, Tenant assumes final responsibility for all risks as to damage to property and injury to persons that may result from such participation or assistance and Tenant shall indemnify and hold harmless Landlord and Landlord's employees and agents, and reimburse Landlord and Landlord's employees and agents with respect to any and all claims, demands, causes of action and liability arising as a result of any assistance or supervision or exercise of control over Tenant's movement of items in and out of the Building.

4.     No sign, advertisement or notice shall be displayed, painted or affixed by Tenant or Tenant's employees, agents or contractors in or on any part of the outside or inside of the Building or Premises without prior written consent of Landlord, and then only of such color, size, character, style and material and in such places as shall be approved and designated by Landlord. Signs on doors and entrances to the Premises and outside of the Premises within the Building, grounds or Parking Area shall be placed thereon by a contractor approved by Landlord.

5.     Tenant shall not place, install or operate on the Premises or in any part of the Building any engine, refrigerating, heating or air conditioning apparatus, stove or machinery, or conduct mechanical operations or place or use in or about the Premises or the Building any explosives, gasoline, kerosene, oil, acids, caustics or any other inflammable, explosive, hazardous or odorous material without the prior written consent of Landlord. No portion of the Premises shall at any time be used for cooking, sleeping or lodging quarters.

6.     Tenant shall not make or permit any nuisance or improper noises in the Building or otherwise interfere in any way with other tenants or persons doing business in the Building or with Landlord's operation of the Building.

7.     Landlord will not be responsible for any fixtures, personal property, equipment, jewelry or money lost in or stolen from the Premises or public areas of the Building, grounds or Parking Area. Landlord shall not be responsible for damages to or theft of motor vehicles or other items from any Parking Areas used in connection with the Building.

8.     No maintenance or repair work shall be done on any vehicles in the Parking Area. No disabled vehicles shall be parked or stored in the Parking Area. All vehicles in the Parking Area shall be parked within the designated spaces and not in more than one (1) space or across spaces. At Landlord's option, all disabled vehicles, recreational vehicles, boats and vehicles improperly parked in spaces designated for handicapped persons and all other improperly parked vehicles may be towed or otherwise removed from the Parking Area at the owner's expense. In the event any vehicle or boat is towed, Landlord will not be liable or responsible for the loss, damage or theft of any property located in the vehicle or boat or for any damage to the vehicle or boat.

9.     Neither Tenant or Tenant's employees, agents, invitees or licensees shall at any time leave or discard any rubbish, paper, articles or objects of any kind whatsoever outside the doors of the Premises or in any other area within the Building or on the grounds or in the Parking Area. No birds, animals, bicycles or vehicles shall be brought into or kept in or about the Building.

10.     None of the entries passages, doors, hallways, or stairways in the Building shall be blocked or obstructed by Tenant Such areas shall not be used by Tenant at any time except for ingress or egress to the Premises by Tenant's, Tenant's employees, agents and invitees.

11.     Landlord shall have the right to determine and prescribe the weight and proper position of any usually heavy equipment, including but not limited to copying equipment, computer equipment, safes and large files that are to be placed in the Building. Only those items which in the exclusive judgment of the Landlord will not do damage to the floors, structure and elevators may be moved into the Building. Tenant shall pay for any damage resulting from moving or installing such articles in the Building or the existence of same in the Building.

12.     All Christmas and other decorations in the Building must be flame retardant.

13.     After hours air conditioning and heating on Monday through Saturday and all day Sunday and holidays determined by Landlord must be requested in writing by noon of a regular work day prior to the day for which additional air conditioning is requested. Tenant shall be charged at the prevailing hourly rate for the use of such air conditioning and heating.

14.     Any request by Tenant to place or remove names from the directory board in the lobby of the Building shall be furnished to Landlord in writing on Tenant's letterhead.

15.     Any services which Tenant requests Landlord to perform which Landlord is not required to perform under this Lease shall, if performed by Landlord, be billed to Tenant at Landlord's cost plus a 15% fee to cover Landlord's overhead costs. Landlord shall have the right to refuse to perform any such services.

16.     If Landlord's maintenance engineer or any of Landlord's other personnel do any work after normal business hours at the request of Tenant, Tenant shall pay for the cost of such work.

17.     All doors leading from public corridors to the Premises are to be kept closed when not in use.

18.     Canvassing, soliciting or peddling in the Building is prohibited and Tenant shall cooperate with Landlord to prevent such activities.

19.     Tenant shall give Landlord immediate notice in the event that any defects or dangerous conditions arise or exist in the Premises or in the Building or if any accidents or emergencies occur in the Premises or Building.

20.     Tenant shall not use the Premises or permit the Premises to be used for photographic, multilith or multigraph reproductions for sale to the general public. All photographic, multilith or multigraph reproductions in the Premises shall be produced for Tenant in the ordinary course of Tenant's business.

21.     All requests for services made by Tenant shall be made directly to Landlord or Landlord's designated agents. Employees of Landlord or Landlord's designated agents shall not perform any work or do anything outside of their regular duties unless directed to do so by Landlord or Landlord's designated agents. Tenant will make no requests directly to Landlord's employees.

<u>EXHIBIT E</u>

GUARANTY

Landlord, Tenant and Guarantor (as herein defined) acknowledge that if it were not for this guaranty (the "**Guaranty**") as an inducement, Landlord would not execute the Lease.  Therefore, for $10.00 and other value received, and in consideration for, as a condition of, and an inducement to ALTERA HIGHLAND LLC, a Texas limited liability company ("**Landlord**") entering into that certain Lease Agreement dated as of August 21, 2012, with SHERMAN/GRAYSON HEALTH SYSTEM, LLC, a Texas limited liability company ("**Tenant**"), for certain premises being Suites 315, 330, 415 and 550 of a medical office building located at 300 N. Highland Drive, Sherman, Texas, on real property owned by an affiliate of Tenant and ground leased to Landlord, as ground lessee (the "**Lease**"), the undersigned officer of LHP HOSPITAL GROUP, INC., a Delaware corporation (the "**Guarantor**"), on behalf of such entity, its legal representatives, heirs, successors, and assigns, hereby irrevocably guarantees to Landlord, Landlord's successors and assigns, absolutely and unconditionally, the full prompt and timely payment, performance and observance of all amounts to be paid and provisions of the Lease to be performed and observed by Tenant, including (without limitation) the rules and regulations incorporated into the Lease, as if Guarantor had executed the Lease as the tenant thereunder.  The Guarantor expressly agrees that the validity of this Guaranty and the obligations of the Guarantor hereunder shall not be terminated, affected or impaired by reason of the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.  The Guarantor further agrees that this Guaranty shall remain and continue in full force and effect notwithstanding any assignment, renewal, modification, extension or waiver of the Lease or any provisions thereof.  The laws of Texas shall apply hereto.

The Guarantor hereby waives, to the fullest extent permitted by law:

(A)     Any right that the Guarantor may have to require Landlord to proceed against Tenant, proceed against or exhaust any security held from Tenant, or pursue any other remedy in Landlord's power to pursue, including, without limitation, re-letting the Premises following a default;

(B)     Any defense based on any claim that the Guarantor's obligations exceed or are more burdensome than those of Tenant;

(C)     Any defenses given to sureties other than actual payment or performance;

(D)     Any defense based on: (i) any legal disability of Tenant; (ii) any release, discharge, modification, impairment or limitation of the liability of Tenant to Landlord  from any cause, whether consented to by Landlord or arising by operation of law or from any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the adjustment of debtor-creditor relationships (an "**Insolvency Proceeding**"), and/or (iii) any rejection or disaffirmance of the Lease, or any part of it, or any security held for it, in any such Insolvency Proceeding;

(E)     Any defense based on any action taken or omitted by Landlord in any Insolvency Proceeding involving Tenant, including any election to have Landlord's claim allowed as being secured, partially secured or unsecured, any extension of credit by Landlord to Tenant in any Insolvency Proceeding, and the taking and holding by Landlord of any security for any such extension of credit; and

(F)     The Guarantor agrees to jurisdiction and venue in Grayson and Dallas Counties, Texas, and waives any objection to such venue on the grounds of forum non conveniens.  **The Guarantor knowingly, voluntarily and intentionally waives the right to a trial by jury in respect of any**

**litigation based hereon or arising out of, under, or in connection with this Guaranty.**  In the event Landlord incurs any fees and/or expenses in the enforcement of this Guaranty, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings, the Guarantor agrees to be liable for same (including reasonable attorney's fees and costs) and to pay same promptly on demand by Landlord.

The Guarantor acknowledges liability for every obligation of Tenant under the Lease.  Any capitalized term used herein and not otherwise defined shall have the same meaning as defined in the Lease.  Each provision of this Guaranty shall be considered severable, and if for any reason and provision is determined to be invalid under current or future law, such invalidity shall not impair the operation of or otherwise affect the valid portions of this Guaranty.

<u>**GUARANTOR**</u>:

LHP HOSPITAL GROUP, INC.,
a Delaware corporation


By:_____
Name:_____
Title:_____

Date:_____

# EXHIBIT 12

**LEASE AGREEMENT**

This Lease ("**Lease**") is made as of August 21, 2012 (the "**Effective Date**"), by and between ALTERA HIGHLAND LLC, a Texas limited liability company ("**Landlord**"), and SHERMAN/GRAYSON HEALTH SYSTEM, a Texas limited liability company ("**Tenant**").

**RECITALS:**

Landlord, as tenant, has entered into that certain Ground Lease Agreement dated as of the Effective Date (the "**Ground Lease**") with Tenant, as landlord, for the land upon which the Building (as defined below) is located.  Contemporaneously with the Ground Lease, (i) Landlord purchased one (1) medical office building, from Tenant, and (ii) Tenant, as "**Declarant**", filed of record a Declaration of Covenants, Restrictions and Easements (the "**Declaration**") covering the one (1) medical office building, the Hospital commonly known as Texas Health Presbyterian Hospital - WNJ (the "**Hospital**") owned by Tenant located in proximity to the medical office building and the parking  and other common areas  dedicated for use by persons occupying, using or visiting the medical office building, the Hospital and other facilities related thereto.  The Ground Lease and this Lease are subject to the terms and provisions of the Declaration. Tenant, as "Declarant" under the Ground Lease and "Landlord" under the Ground Lease, is familiar with the terms and provisions of each of the Declaration and the Ground Lease.

As part of Tenant's purchase of the Building commonly called "300 N. Highland Drive, Sherman, Texas", Tenant agreed to enter into this Lease.

Simultaneously herewith, Landlord and Tenant are also entering into corresponding leases (each, a "**Related Lease**") for existing and shell space of the Building, for the common areas of the Building used by the Hospital, and for the Ambulatory Surgery Center in the Building.

1.    **DEFINITIONS AND BASIC PROVISIONS.**

    1.1    Parties and Addresses. The parties hereto and their respective addresses are as follows:

        (1)    Landlord's Address:    5910 North Central Expressway
                                        Suite 800
                                        Dallas, TX 75206.

        (2)    Tenant's Address:    2400 North Dallas Parkway, Suite 450
                                          Plano, Texas 75093
                                        Attention: Executive Vice President – Administration

        (3)    Ground Lessor Address:2400 North Dallas Parkway, Suite 450
                                          Plano, Texas 75093
                                        Attention: Executive Vice President –
                                            Administration

1

|       |                      |                                                        |
|-------|----------------------|--------------------------------------------------------|
| (4)   | Guarantor:           | LHP Hospital Group, Inc., a Delaware corporation       |
| (5)   | Guarantor's Address: | 2400 North Dallas Parkway, Suite 450 Plano, Texas 75093 Attention: Executive Vice President – Administration |

     1.2    <u>Defined Terms</u>: In addition to the capitalized terms elsewhere defined in this Lease, the following terms shall be deemed to be defined terms of this Lease for all purposes. Each of the following definitions and basic provisions shall be construed in conjunction with and limited by the reference thereto in other provisions of this Lease:

     (1)    <u>Additional Rent</u>: All rent and other sums payable hereunder from Tenant to Landlord, other than Base Rent.

     (2)    <u>Base Rent</u>: An annual Base Rent of $12.05 per RSF in the Premises, subject to adjustment as provided in Sections 3.1 and 15.6. As of the Commencement Date, the monthly Base Rent is $14,721.08.

     (3)    <u>Broker(s)</u>: None.

     (4)    <u>Building</u>: The building in which the Premises are situated, being generally known as 300 N. Highland Drive, Sherman, Texas.

     (5)    <u>Commencement Date</u>: The Effective Date.

     (6)    <u>Common Areas</u>: Those parts of the Building, Land and related facilities designated from time to time by Landlord for the common use of all doctors, physicians, tenants, visitors, patients and employees, including among other facilities, parking areas, sidewalks, landscaping, curbs, loading docks and areas, private streets and alleys, automobile entrances, exits and driveways, entranceways (open, enclosed or otherwise), lighting facilities, drinking fountains, public toilets, signs, service areas, common utility lines, pipes, and/or conduits, and the like.

     (7)    <u>Declarant</u>: means the Declarant under the Declaration, Sherman/Grayson Hospital, LLC, a Texas limited liability company, and its successors under the Declaration.

     (8)    <u>Declaration</u>: has the meaning set forth in the Recitals.

     (9)    <u>Expiration Date</u>: The last day of the Term hereof, which date is contemplated as being one hundred forty four (144) full months after the Commencement Date. Notwithstanding any other provision of this Lease to the contrary, if the Expiration Date would otherwise occur on a date other than the last day of a calendar month, then the Term shall be automatically extended to include the last day of such calendar month.

     (10)    <u>Floor Plan</u>: The outline of the Premises as depicted in <u>Exhibit B</u> attached hereto and made a part hereof for all purposes.

     (11)    <u>Guarantor</u>: has the meaning set forth in Section 1.1.

(12)    Highest Lawful Rate:  The maximum nonusurious interest rate, if any, that at any time, or from time to time, legally may be contracted for, taken, reserved, charged, or received on the indebtedness owed to Landlord under this Lease under the laws which are presently in effect of the United States of America and the State of Texas applicable to Landlord and such indebtedness.

(13)    Hospital:  The Hospital defined in the Recitals of this Lease, and its successors and assigns.

(14)    Interior of the Premises: Standard office front and entrance (including without limitation, all plate glass and exterior doors), all of the interior wall framing, floors and floor covering, ceiling and interior staining and finishes, all interior doors and hardware, all interior electrical conduits and appurtenances, mechanical machinery and equipment, all interior electrical fixtures, interior plumbing and plumbing fixtures, Tenants' trade fixtures, and all other parts in the interior of the Premises.

(15)    Land: The lot, tract or parcel of land upon which the Building is situated, in Grayson County, Texas as more particularly described by metes and bounds on Exhibit A attached hereto and made a part hereof for all purposes, plus any contiguous parcels or strips of land leased or licensed to Landlord under the Ground Lease or by the Declaration, and are used in connection with or to service the Building or any part thereof.

(16)    Late Charge: Tenant shall pay $100.00 as a late fee to cover Landlord's administrative costs.  Additionally, all unpaid amounts Tenant fails to pay by the fifth (5th) day after the date due shall bear interest from the first day due until paid in full at the lesser of ten percent (10%) per annum or the Highest Lawful Rate.  In no event, however, shall the late fees and/or charges permitted under this Section or elsewhere in this Lease, to the extent the same are considered to be interest under applicable law, exceed the amount of interest that Landlord lawfully could have charged, received or collected on the indebtedness in question at the Highest Lawful Rate.

(17)    Lease: This Lease Agreement.

(18)    Lease Year: Each twelve (12) consecutive month period commencing on the Commencement Date or any anniversary thereof; provided that, if the Commencement Date is other than the first day of a calendar month, then the first Lease Year shall include such partial month together with the next succeeding twelve (12) consecutive months, and each succeeding Lease Year shall begin on the first day of the calendar month that corresponds to the first day of the calendar month following the Commencement Date.

(19)    Operating Expenses: All expenses, costs and disbursements of every kind and nature that Landlord or any of its Affiliates directly or indirectly pays or becomes obligated to pay, whether under the Ground Lease, the Declaration, any Related Lease or otherwise, in respect of the Ground Lease, the ownership, management, maintenance, repair, replacement and operation of the Building, the Common Areas and related facilities of the Building or arising in connection with any Related Lease.  Notwithstanding the foregoing, Operating Expenses shall exclude capital costs associated with the replacement of the roof, foundation, and exterior walls.

(20)    Permitted Use:  General Medical Offices.

3

(21)   <u>Premises</u>: Suites 430, 445, 500, 510, and 545 in the Building as of the Effective Date, containing approximately 14,660 RSF (as defined herein), subject to adjustment as provided in Section 2.4.  The Premises are substantially depicted on the attached Floor Plan shown on <u>Exhibit B</u> and being located in the Building.

(22)   <u>Pro Rata Share or Tenant's Pro Rata Share</u>: 12.460%, provided that if the Building is expanded or contracted, Tenant's Pro Rata Share shall increase or decrease, as the case may be, such that Tenant's Pro Rata Share will equal a fraction, the numerator of which is the net rentable area of the Premises, and the denominator of which is the net rentable area of the Building, which is approximately 117,655 RSF as of the Effective Date.

(23)   <u>Rent</u>: All Base Rent and Additional Rent.

(24)   <u>RSF</u>: means the rentable square feet in the Premises, Building or other area in question, as determined by an architect using ANSI/BOMA Standards.

(25)   <u>Security Deposit</u>: None.

(26)   <u>Tenant Improvement Allowance</u>:  Means that amount, if any, set forth in <u>Section 2.3</u>.

(27)   <u>Tenant Improvements</u>:  Means those improvements and alterations Tenant may elect to construct or install in the Premises, subject to the provisions of this Lease.

(28)   <u>Term</u>: Twelve (12) years (one hundred forty four (144) full months) from the Commencement Date, unless earlier terminated pursuant to the provisions of this Lease.

## 2.   **GRANTING CLAUSE; TENDER OF POSSESSION.**

2.1   <u>Granting Clause</u>.  In consideration of the Rent reserved and the covenants and agreements herein contained on the part of the Tenant to be observed and performed, and subject to the terms and provisions of the Declaration and Ground Lease, Landlord hereby demises, lets and leases unto Tenant, and Tenant hereby accepts, leases and rents from Landlord, the Premises.

2.2   <u>Tender and Acceptance of Possession</u>.  Landlord hereby tenders, and Tenant hereby accepts, possession of the Premises on the Effective Date.  Tenant hereby accepts the Premises in their "AS-IS" condition, and Landlord shall have no obligation to perform any work therein (including demolition of any improvements existing therein or construction of any tenant finish-work or other improvements therein), and, except as otherwise provided in Section 2.3, shall not be obligated to reimburse Tenant or provide an allowance for any costs related to the demolition or construction of improvements therein.  Tenant has reviewed, and hereby accepts, the condition and capacity of the Building's existing electrical systems and HVAC.  Tenant acknowledges that Landlord does not have any obligation, express or implied, to modify or increase the capacity of such systems.  Before Tenant may occupy the Premises to conduct its business therein, Tenant shall, at its expense, obtain and deliver to Landlord a certificate of occupancy from the appropriate governmental authority for the Premises.

2.3   <u>Tenant Improvement Allowance</u>.  Landlord shall provide Tenant an improvement allowance not to exceed $10.00 per RSF in the Premises (the "**Tenant Improvement Allowance**").  If Tenant performs any alterations, modifications or physical additions in or to the Premises that are permitted under this Lease and otherwise approved by Landlord, then Tenant may request advances of the Tenant

Improvement Allowance to reimburse Tenant for the hard costs of such work.  Landlord shall make disbursements of the Tenant Improvement Allowance to reimburse Tenant for such costs upon Landlord's receipt, review and approval of a draw request, with supporting documentation, that is reasonably acceptable to Landlord.

      2.4    <u>Adjustment to Premises</u>.  If Tenant or any of its affiliates relocates any physicians or other tenants of the Building directly or indirectly employed by Tenant or any of its affiliates from a premises in the Building not contained in the Premises into any portion of the Premises, then the premises vacated by such physician or other tenant shall automatically, as of the date of such relocation, be added to the Premises upon the same terms as provided in this Lease, and the RSF, Base Rent, Tenant's Pro Rata Share and other terms of this Lease dependent upon the size of the Premises shall be adjusted.  The foregoing shall apply notwithstanding the fact that the lease to such relocated physician or other use may constitute a Qualified Lease.

**3.**    <u>**RENT.**</u>

      3.1    <u>Base Rent</u>.

      (1)    This is a pure "net lease," and Base Rent, Additional Rent, Operating Expenses and all other sums payable hereunder by Tenant shall be paid without notice, demand, setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.  It is intended that the Base Rent provided for in this Lease shall be absolutely net to Landlord throughout the Term, and, accordingly, Tenant covenants and agrees to pay, as they become due and payable and before they become delinquent, all operating and capital expenses in connection with the operation, maintenance, repair, restoration, use or occupation of the Premises including, without limitation, the costs, charges and assessments related to taxes, impositions, utilities and insurance.  Tenant shall pay all such taxes and impositions even though the taxing statue or ordinance may purport to impose such taxes or impositions on Landlord.

      (2)    The Base Rent shall be paid by Tenant in monthly installments to Landlord on or before the first day of each calendar month during the Term hereof.  The monthly Base Rent for any fractional month at the beginning or the end of the Term shall be prorated based upon the actual number of days in such month.

      (3)    The Base Rent will be adjusted and increased on each anniversary of a Lease Year (the "**Adjustment Date**") by an amount equal to the greater of (i) 103% of then-effective Base Rent (i.e., as it may have been adjusted pursuant to this Section 3.1(3)) and (ii) subject to the limitation set forth below in this Section 3.1(3), any increase in the Consumer Price Index for "All Urban Consumers, U.S. City Average, All Items," issued by the Bureau of Labor Statistics of the United States Department of Labor (the "**Index**").  The adjustments in the Base Rent will be determined by multiplying the then-effective Base Rent (i.e., as it may have been adjusted pursuant to this Section 3.1(3)) by a fraction, the numerator of which is the Index number for the date one month prior to the Adjustment Date and the denominator of which is the Index number for the first month of the first year of the Term.  When the adjusted rent for the Adjustment Date has been determined, Landlord shall give Tenant written notice of such adjusted rent; and, upon adjustment of the rent, any underpayment of rent from the Adjustment Date to the date Tenant is notified of the adjustment shall be immediately due and payable by Tenant.  Landlord's failure or delay to notify Tenant of said rent adjustment shall not constitute a waiver of the right to any adjustment provided for in this Lease.  In the event that the Index shall be discontinued, then Landlord shall use an index substantially similar to the Index to calculate future adjustments.  Notwithstanding any other

provision of this Section 3.1(3) to the contrary, the Base Rent in any Lease Year shall not increase by more than five percent (5%) of the Base Rent in the immediately preceding Lease Year.

(4)     Landlord and Tenant are knowledgeable and experienced in commercial transactions and agree that the provisions of this Lease for determining charges, amounts, Operating Expenses and Additional Rent are commercially reasonable and valid even though such methods may not state a precise mathematical formula for determining such charges. ACCORDINGLY, TENANT VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS OF TENANT UNDER SECTION 93.012 OF THE TEXAS PROPERTY CODE, AS IT MAY BE AMENDED OR REPLACED.

3.2     Operating Expenses.

(1)     Tenant's Pro Rata Share of Operating Expenses for the remainder of the calendar year after the Commencement Date and for each subsequent calendar year shall be estimated by Landlord, and written notice thereof shall be given to Tenant. Upon receipt of said written notice from Landlord, the estimated Operating Expenses shall be due and payable as herein provided. For any such remainder of the calendar year after the Commencement Date, Tenant agrees to pay Landlord each month, at the same time the Base Rent Payment is due, an amount equal to the amount of such estimated monthly Pro Rata Share of Operating Expenses for the remainder of such calendar year; and during each calendar year thereafter Tenant agrees to pay Landlord each month, at the same time the Base Rent Payments are due, an amount equal to one-twelfth (1/12th) of the estimated annual Pro Rata Share of Operating Expenses due.

(2)     If any portion of Operating Expenses increase during a calendar year, Landlord may revise the estimated Operating Expenses during such year by giving Tenant written notice to that effect, and thereafter Tenant agrees to pay Landlord, in each of the remaining months of such calendar year, an additional amount equal to the amount of such annual increase in the estimated Pro Rata Share of Operating Expenses divided by the number of months remaining in such calendar year.

(3)     After the end of each calendar year, Landlord shall prepare and deliver to Tenant a statement showing Tenant's Pro Rata Share of the total amount of Operating Expenses. Within ten (10) days after receipt of the aforementioned statement, Tenant agrees to pay Landlord the remaining amount owed by Tenant. However, if Tenant has paid more than its Pro Rata Share of the actual Operating Expenses, Landlord shall either pay the amount of such excess to Tenant within ten (10) days after delivery of the aforementioned statement, or, at Landlord's option, apply such excess to any sums due or to become due from Tenant to Landlord.

(4)     Notwithstanding anything herein to the contrary, in no event will the Base Rent provided for in this Lease ever be reduced.

3.3     Payment For Other Services. Tenant agrees to pay Landlord as Additional Rent all charges for any services, goods, or materials furnished at Tenant's request which are not required to be furnished by Landlord under this Lease, immediately upon demand, plus an administrative fee not to exceed five percent (5%) of the cost of the requested services, good or materials.

3.4     Late Charge. If Landlord does not receive any payment due on or before the 5th day of the calendar month when such payment is due, the Late Charge shall be due and payable (in addition thereto). Said Late Charge is for the purpose of reimbursing Landlord for the extra administrative costs and expenses incurred in connection with the handling and processing of such delinquent payment.

6

3.5    No Offsets or Demands.  All Base Rent, Additional Rent and other amounts due from Tenant to Landlord under this Lease shall be paid without notice, demand, offset, abatement or deduction.  This Lease and the rights of Landlord and obligations of Tenant hereunder shall not be affected by any event or for any reason or cause whatsoever foreseen or unforeseen.  The obligations of Tenant under this Lease shall be separate and independent covenants and agreements and all monetary obligations shall continue to be payable in all events.

**4.    SECURITY DEPOSIT.**  Tenant is not required to make any security deposit in connection with this Lease.

**5.    COMMON AREAS.**

5.1    Parking Facilities and Other Common Areas. During the Term, Tenant shall be entitled to the nonexclusive use (in common with others entitled thereto) of the Common Areas outside the Building designated from time to time by Landlord as the parking areas of the Building.  As of the Effective Date, the parking areas designated by Landlord for use by Tenant are depicted on Exhibit C.  In such parking areas, Tenant shall be entitled to use a number of parking spaces equal to 5 parking spaces for every 1,000 RSF of space in the Premises.  Tenant shall not conduct, solicit business or display or place any signs or advertising on or within the Common Areas, or distribute handbills therein, or take any action which would interfere with the rights of other persons to use the Common Areas.

5.2    Parking Regulations. Tenant understands and agrees that the Declarant shall have the right to maintain and operate lighting facilities on all of the parking areas and to police all of the parking and other Common Areas, including, without limitation, the right to discourage non-tenant parking, to designate and regulate parking areas, and to do and perform such other acts with respect to said Common Areas as in the judgment of the Declarant may be legally necessary to prevent a dedication thereof to the public.

**6.    MAINTENANCE AND REPAIRS.**

6.1    Landlord's Obligations.  As part of the Operating Expenses, Landlord shall maintain or cause to be maintained the elevators, public restrooms and other Common Areas within the Building, the structural elements building systems of the Building (including the HVAC system which serves the Building and the Premises).  Landlord shall, at its own cost and expense, maintain or cause to be maintained the foundation, the exterior walls (but excluding the interior glass or doors that are part of the Premises) and roof of the Building in good condition or repair.  However, if any repair is required by reason of the negligence or intentional misconduct of Tenant or any of its agents, employees, invitees or Affiliates, Landlord may add the cost thereof to the next installment of Rent thereafter coming due, but only to the extent that the cost thereof is not covered by insurance proceeds actually received by Landlord.  Except as herein provided, Landlord shall have no obligation to repair, maintain, alter, replace, or modify the Premises or any part thereof.  Any failure by Landlord to furnish, or delay in furnishing, any maintenance or services that are required of Landlord under this Section or otherwise under this Lease, when such failure is caused by acts of God or any other condition beyond Landlord's reasonable control, shall not constitute a default by Landlord under this Lease and shall not permit Tenant to abate any Rent or relieve Tenant from any of its obligations under this Lease.

6.2    Tenant's Obligations.    Tenant shall maintain the interior of the Premises, including all interior glass and doors that are a part of the Premises and any improvements done by or on behalf of Tenant, in good condition and clean and attractive appearance, performing all janitorial services and making all repairs at its own cost and expense, and using materials and labor of a kind and quality equal to the original work.  Tenant shall maintain the Premises in accordance with all requirements of law, including (without limitation) the Americans with Disabilities Act (as the same may be amended) and similar state or local laws, rules or regulations.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises in a broom clean condition and otherwise in the same condition as received by Tenant on the Commencement Date upon initial completion of the interior improvements, reasonable wear and tear excepted.  If Tenant shall neglect and/or fail to observe, keep or perform any of its obligations to maintain and repair and Premises in the time and manner provided in this Article and if such neglect and/or failure shall continue for ten (10) days after notice thereof, Landlord shall have the right to perform said maintenance and repairs.  In the event Landlord does so perform Tenant's responsibilities for said maintenance and repairs, Landlord shall furnish Tenant a statement of the actual cost thereof, plus an administration fee not to exceed ten percent (10%) of the actual costs, which statement shall be immediately payable by Tenant.  All alterations and modifications of or to the Premises shall be in accordance with the terms and provisions of Section 11.2 below.

7.    **TAXES ON TENANT'S PROPERTY.**

Tenant shall be responsible for and shall pay, before same becomes delinquent, all federal, state, county, and local taxes levied or assessed upon any and all personal property of any kind owned by or placed in, on or about the Premises by Tenant during the Term, and all taxes and assessments on trade fixtures, furniture, and all sales, excise and other taxes on Tenant's business shall be paid entirely by Tenant. If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property, or if the assessed value of Landlord's property is increased by inclusion of personal property, furniture or fixtures placed by Tenant in the Premises, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

8.    **INSURANCE.**

8.1    Hold Harmless. Tenant covenants and agrees to indemnify and save each of Landlord, and Landlord's members, managers, partners, agents, employees and representatives, harmless from and against any and all costs, liability or expense arising out of any claims of any person or persons on account of any occurrence in, upon or at the Premises, resulting from the occupancy or use thereof by Tenant, or by any person or persons holding or using the Premises thereunder, occasioned in whole or in part by reason of the improper and/or lack of control and supervision throughout the Common Areas of property owned or controlled by Tenant, or by reason of the use or misuse of the parking area or any other Common Areas by Tenant or by any person or persons holding or using the Premises, or any part thereof, under Tenant, including without limitation, Tenant's clients, invites, agents, contractors, employees, servants, subtenants, assignees or licensees, and without limiting the generality of the foregoing, Tenant further covenants and agrees to indemnify and save each of Landlord and Landlord's partners, agents, employees and representatives harmless from and against any penalty, damage or charge incurred or imposed by reason of any violation of law or ordinance by Tenant or any person or persons holding under Tenant and from any cost, damage or expense arising out of the death of or injury to any person or persons holding under Tenant and from any cost, damage or expense arising out of the death of or injury to any person or persons holding under Tenant. In case any action or claim to which Landlord (or Landlord's partners, members, managers, agents, employees or representatives) are entitled to indemnification shall be brought or asserted in any way against Landlord (or Landlord's members, managers, partners, agents, employees or representatives) or Tenant, Tenant shall immediately notify Landlord of the same and shall furnish Landlord with all relative

8

information. Landlord shall be entitled, at Tenant's expense, to participate in, and to the extent that it wishes, to assume the defense thereof.

8.2    Tenant's Liability Insurance. Tenant agrees to maintain in force during the Term a policy or policies of comprehensive public liability insurance, including property damage, written by one or more responsible insurance companies approved by Landlord and licensed to do business in Texas, which insurance companies shall be rated not less than X by Best Guide Rating, insuring Tenant and naming as additional named insureds, Landlord, Landlord's property management company as agent, each Mortgagee and such other persons, firms, or corporations as are designated by Landlord, against loss of life, bodily injury and property damages in which the limit of public liability shall be not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) single limit bodily injury and in which the limit of property damage liability shall be not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) and an umbrella coverage of not less than TWO MILLION AND NO/100 DOLLARS ($2,000,000.00). Additionally, Tenant shall maintain a comprehensive automobile liability insurance policy of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00). Each such policy shall be non-cancellable for any cause without first giving Landlord thirty (30) days prior written notice. Subject to all of the foregoing, the insurance coverage required to be furnished by Tenant pursuant to this Section may be in the form of a blanket policy covering all of Tenant's operations.

8.3    Tenant's Fire Insurance. Tenant agrees to maintain in force during the Term a policy or policies of fire and extended coverage insurance in the case of fire sprinkler leakage, malicious mischief, vandalism and other extended coverage perils, for the full insurable replacement value of all additions and of all office furniture, office equipment, merchandise, and other items of Tenants' property within or on the Premises. Coverage in this paragraph shall be in an amount not less than one hundred percent (100%) of the replacement costs of Tenant's improvements to the Premises.

8.4    Tenant's Workers Compensation. If required by law, Tenant agrees to maintain in force during the Term workers compensation and employers liability insurance with a waiver or subrogation endorsement, in a form and amount satisfactory to Landlord.

8.5    Evidence of Insurance. A copy of each such policy or a certificate of such insurance required to be maintained by Tenant shall be delivered to Landlord upon the Commencement Date of this Lease and annually thereafter upon the first day of each Lease Year throughout the Term. If Tenant fails to procure said insurance or deliver to Landlord, such evidence thereof, Landlord may procure same and Tenant shall reimburse Landlord for the cost thereof plus an administrative fee not to exceed ten percent (10%) of the actual cost immediately upon demand.

8.6    Landlord's Liability Insurance. Landlord agrees to maintain in force during the Term a policy or policies of comprehensive public liability insurance, including property damage, written by one or more responsible insurance companies licensed to do business in Texas and insuring Landlord against loss of life, bodily injury and/or property damage with respect to the operation of the Building, the policy limits of which to be in amount satisfactory to Landlord. In addition, Landlord may maintain in force such umbrella policy or policies of public liability insurance as Landlord, in its sole discretion, may deem appropriate. Landlord's failure to procure any such insurance shall not invalidate this Lease or lessen Tenant's liability hereunder. Landlord's insurance hereunder shall include loss of rent coverage.

8.7    Landlord's Fire Insurance. Landlord agrees to procure and keep in effect during the Term a policy or policies of fire and extended coverage insurance covering the Building, including rent abatement, vandalism and malicious mischief coverage, written by an insurance company authorized to do business within the State of Texas, and in an amount at the full replacement cash of the Building. Such insurance shall provide protection against losses so insured against for the sole and exclusive benefit of Landlord. The

9

full amount of any proceeds payable thereunder shall be payable to Landlord, and Tenant shall not be entitled to, and shall have no interest in, such proceeds or any part thereof. Tenant is advised to procure such insurance as Tenant deems appropriate to protect its interest.

       8.8     <u>Waiver of Subrogation</u>. To the extent permitted by the laws and insurance regulations of the State of Texas, the respective parties hereto hereby waive and release any and all claims, demands and causes of action which each might have against the other party, either for damage to or loss of any part of the Premises or of any adjoining premises belonging to Landlord, arising from perils ordinarily insured against under a standard fire and extended coverage insurance policy issued in the State of Texas, regardless of whether such damage or loss is occasioned by the negligence of the respective parties, or either of them, their agents, servants or employees.

## 9.      <u>UTILITIES AND SERVICES.</u>

       Provided Tenant is not in default of any term, condition or covenant of this Lease, Landlord agrees to furnish or cause to be furnished to the Premises gas, water (for drinking, cleaning and lavatory purposes only), and electricity during the Term. Landlord shall furnish tempered and refrigerated water at those points of supply designated by Landlord in the Common Areas of the Building, heated and refrigerated air conditioning in season (at temperatures, in amounts and at times considered by Landlord to be standard or in compliance with any governmental regulations; such service after hours, on Saturday afternoons, Sundays and holidays will be furnished only upon 24 hours' prior written request of Tenant who shall bear the entire cost thereof). Landlord shall furnish janitorial service, in the manner and to the extent deemed standard by Landlord during the periods and hours as such services are normally furnished to all tenants. Tenant shall not hinder the work of the Building janitor. Landlord shall furnish routine maintenance, painting and lighting service for all Common Areas within the Building in the manner and to the extent deemed by Landlord to be standard. Tenant will pay all telephone charges. Landlord shall not be liable in damages or otherwise for failure, stoppage or interruption of any such service nor shall the same be construed as an eviction of Tenant, work an abatement of Rent, or relieve Tenant from the operation of any covenant or agreement set forth herein; but in the event of any failure, stoppage or interruption thereof not caused by Tenant or Tenant's agents, employees, contractors, clients or invites, Landlord shall use reasonable diligence to resume service promptly.

       Landlord reserves the right to separately meter usage of any utility service included in Operating Expenses and charge Tenant and other tenants of the Building based on such usage.  Further, Landlord reserves the right from time to time to charge to Tenant and other tenants of the Building applicable costs with respect to usage of Building services and utilities at times other than during standard business hours, on such basis as Landlord may reasonably determine for the purpose of properly allocating the costs of such services and utilities in accordance with the usage thereof.

       Notwithstanding anything hereinabove to the contrary, Landlord reserves the right from time to time to make reasonable modifications to the above standards for services and utilities.

## 10.     <u>INTENTIONALLY DELETED</u>.

## 11.     <u>PROPERTY OBLIGATIONS.</u>

       11.1    <u>Tenant's Property</u>. Landlord shall not be liable for any damage to or loss of personal property placed in or about the Premises by Tenant or Tenant's agents, employees, clients, guests, invites or others, resulting from fire, theft, explosion, flood, windstorm or other casualty caused by Acts of God or by the acts or omissions of other occupants of other space in the Building or caused by operations during construction of any public or quasi public work. All property kept or stored within the Premises shall be

kept or stored at the risk of Tenant only, and Tenant shall hold Landlord harmless from any claims arising out of damage to the same, including subrogation claims by Tenant's insurer, if any, unless such damage shall be caused by the gross negligence of Landlord.

11.2    <u>Tenant Fixtures, Alterations and Personal Property</u>. Tenant shall not make or allow to be made any alterations, modifications or physical additions in or to the Premises without the prior written consent of Landlord which consent shall not be unreasonably withheld or delayed. Tenant may proceed with the construction of the approved alterations, modifications or physical additions, but only so long as they are in strict compliance with the plans and specifications and with the provisions of this <u>Section 11.2</u>. All alterations shall be made at Tenant's expense, either by Tenant's contractors, which previously have been approved in writing by Landlord, or at Landlord's option, by Landlord's contractors on terms reasonably satisfactory to Tenant, including a fee of five percent (5%) of Landlord's actual cost of the work to cover Landlord's overhead. None of Tenant's construction, alterations, modifications or physical additions shall (i) alter the exterior appearance of the Building or Premises in any manner, (ii) adversely affect the structure or safety of the Building or Premises or any portion thereof, (iii) fail to comply with all building, safety, fire and other codes and governmental and insurance requirements, or (iv) fail to be completed promptly and in a good and workmanlike manner. All trade fixtures installed by Tenant shall be new or completely reconditioned. At Landlord's option, any such approved additions, alterations, modifications, improvements and/or fixtures furnished or installed by Tenant which are sufficiently affixed or annexed to the Premises so as to become a part thereof, other than unaffixed movable trade fixtures, shall upon the expiration or earlier termination of this Lease, become the property of Landlord. Any damage to the Premises caused by such installation and/or removal of Tenant's fixtures and equipment shall be repaired at Tenant's sole cost and expense. The provisions of this Section shall expressly survive the expiration or earlier termination of this Lease.

11.3    <u>Liens</u>. Tenant shall neither permit nor suffer an involuntary lien to be filed or affixed against the Building, the Premises, the fee simple title of the Land or Landlord's leasehold estate therein, or any part thereof, and shall not voluntarily grant any lien or security interest therein. In the event any such involuntary or voluntary lien, including without limitation, mechanic's lien or tax lien, is filed and/or affixed against the Building, the Premises the fee simple title of the Land or Landlord's leasehold estate therein, or any part thereof, or against any fixtures, equipment, furnishings therein or all types of work and improvements comprising the Interior of the Premises and Tenant has not caused the same to be released and discharged of record within ten (10) days after notice thereof, same shall constitute a default hereunder. Upon such default, in addition to any other remedies available to Landlord herein, Landlord may cause the release and discharge of such lien, Tenant shall repay to Landlord immediately upon demand as Additional Rent hereunder all such sums disbursed or deposited by Landlord plus an administrative fee not to exceed five percent (5%) of the sums disbursed or deposited. Nothing contained herein, however, shall imply any consent or agreement on the part of Landlord or anyone holding under Landlord to subject Landlord's interest to liability under any mechanic's or other lien law, regardless of whether the performance or the furnishing of such work, labor, services or materials to Tenant or anyone holding under Tenant shall have been consented to by Landlord.

## 12.    <u>SUBORDINATION/ATTORNMENT</u>.

12.1    <u>Subordination</u>. Tenant covenants and agrees promptly upon request of Landlord to execute and deliver, in a recordable form provided by Landlord, an acknowledgment of the subordination of this Lease to any mortgage, deed of trust, security agreement or other lien or encumbrance resulting from any method of financing or refinancing, presently or henceforth placed upon the Landlord's leasehold estate in the Land and/or fee interest in the Building and any future expansion thereof or additions thereto, and to all advances of money or other value heretofore or hereafter made upon the security thereof. Notwithstanding anything to the contrary contained herein, Landlord agrees to obtain a subordination, non-disturbance and

11

attornment agreement ("**SNDA**") from its current lender in a form reasonably acceptable to Tenant which shall provide, among other things, that this Lease shall be recognized and Tenant's rights and occupancy under this Lease shall not be disturbed in the event Tenant is not in default hereunder beyond any applicable notice and cure periods. In addition, Tenant shall not be required to subordinate its rights under this Lease to the interest of any future lender unless Landlord has first delivered an SNDA to Tenant executed by such future lender in a form reasonable acceptable to Tenant and containing a similar non-disturbance right.

 12.2 <u>Collateral Assignment by Landlord</u>. Subject to the foregoing provisions of this Article, Landlord reserves the right, without notice to or consent of Tenant, to assign this Lease and/or any and all Rent hereunder as security for the payment of any mortgage loan, deed of trust loan, or other method of financing or refinancing.

 12.3 <u>Attornment</u>. In the event any such mortgage is foreclosed, or in the event of the exercise of the power of sale under any such deed of trust, Tenant shall consider the purchaser at the foreclosure trustee's sale to be the Landlord hereunder, and Tenant will attorn to the purchaser and will recognize the purchaser as the owner and Landlord under this Lease.

## 13. <u>USE AND OPERATION</u>.

 13.1 <u>Use of Premises</u>. The Premises shall be used and occupied by Tenant solely for the Permitted Use and Tenant expressly agrees that no use shall be made or permitted or acts done by Tenant and/or any agents, employees, subtenants, or assignees of Tenant, which shall increase the existing rate of insurance coverage or cause cancellation of such insurance coverage. Tenant shall not (i) permit any objectionable or unpleasant odors to emanate from the Premises; nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside of the Premises or where the same can be seen or heard from outside the Premises; (ii) place any antenna, awning or other projection on the exterior of the Premises; (iii) take any other action which would constitute a nuisance or would disturb or endanger other tenants of the Building or unreasonably interfere with their use of their respective premises; or (iv) do anything which would tend to injure the reputation of the Building. Tenant shall at all times comply with all terms and provisions of the Ground Lease and Declaration applicable to Tenant, or Tenant's use of the Premises and Common Areas.

 13.2 <u>Suitability of Premises</u>. Tenant warrants to Landlord that it has, prior to the execution hereof, fully inspected the Building, the Common Areas, the property and all items related thereto, and that Tenant has made, performed, obtained and received all studies, inspections, reports, diagnoses and tests that Tenant desires relative to the Building, the Common Areas, the property and all items related thereto and Tenant's proposed business use of the Premises. Tenant further warrants to Landlord that Tenant has inspected, or will thoroughly inspect, the Plans and Specifications agreed and to be agreed with Landlord for Landlord's construction of the shell of the Premises and will be fully satisfied with such inspections and Plans and Specifications for the Premises. Tenant understands and agrees that Tenant is accepting the Building, the Common Areas, the property and all items related thereto, and will be accepting the Premises, in their "AS-IS", "WHERE-IS" condition, "WITH ALL FAULTS" and without any warranty or guarantee whatsoever. Tenant warrants that it used or will use all due diligence in conducting all studies inspections, diagnoses and tests on the Premises the Building, the Common Areas, the property and all items related thereto that Tenant deemed necessary or appropriate. Tenant acknowledges that Landlord has not made and does not make, and Landlord hereby disclaims, any and all warranties, express or implied, which in any way relate to the Premises the Building, the Common Areas, the property and all items related thereto or the condition thereof, including without limitation any implied warranty of suitability or habitability. Tenant further understands that Landlord has relied and will rely upon Tenant's having made all inspections Tenant desired, and that but for such inspections by Tenant, Landlord would not have leased the Premises to Tenant. Additionally, the parties agree that the obligation of Tenant to pay all Rent and other sums

12

hereunder provided to be paid by Tenant, and the obligation of Landlord to perform Landlord's other covenants and duties hereunder, constitutes independent, separate and unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is expressly provided for herein and not otherwise. It is agreed that in the event Landlord commences any proceedings against Tenant for nonpayment of Rent or any other sum due and payable by Tenant hereunder, Tenant shall not interpose any counterclaim or other claim against Landlord of whatever nature or description in any such proceedings; and in the event Tenant interposes any such counterclaim or other claim against Landlord in any such proceeding, Landlord and Tenant stipulate and agree that, in addition to any other lawful remedy of Landlord, upon motion of Landlord, such counterclaim or other claim asserted by Tenant shall be severed out of the proceedings instituted by Landlord and Landlord may proceed to final judgment separately and apart from and without consolidation with or reference to the status of such counterclaim or any other claim asserted by Tenant.

## 14.    <u>HAZARDOUS MATERIALS.</u>

14.1    Tenant, and all of Tenant's partners, officers, directors, employees, representatives, agents, contractors, subcontractors, successors, assigns, lessees, sublessees, concessionaires, invitees and any other occupants of the Premises (collectively, "**Tenant's Representatives**"), shall abide by all Federal, state and local statutes, ordinances, codes and regulations, now existing or hereinafter enacted (collectively, "**Hazardous Materials Laws**"), governing the use, handling, depositing or disposal of hazardous or toxic substances, and medical wastes (collectively, "**Hazardous Materials**").  Landlord has no obligation to provide or make provision for disposal facilities for Hazardous Materials or other medical wastes, and Tenant shall not deposit or dispose of any Hazardous Materials or other medical wastes into the general waste disposal facilities provided by Landlord.  Tenant shall, at Tenant's expense, employ or engage private waste management services to dispose of any and all waste of Tenant which must be handled in any manner other than general waste collection provided by Landlord through public or private waste collection service. Landlord may direct the manner of disposal and location of any containers, collection boxes or other storage facilities, which may be required by Hazardous Materials Laws.

14.2    The term "**Hazardous Materials**" shall not include (i) pharmaceuticals, cleaning agents of the types and in the quantities and concentrations normally stocked by health care providers located in medical office buildings similar to the Building, (b) oil in the minimal amounts typically associated with the use of certain portions of the Building for driving and parking motor vehicles or (c) medical wastes generated at the Building; however, Tenant shall use, store, transport and dispose of the foregoing in accordance with all laws including (without limitation) all Hazardous Materials Laws.

14.3    Tenant shall indemnify, defend and hold harmless Landlord, the "**Hospital**" and the holder ("**Mortgagee**") of any mortgage encumbering all or any portion of the Building or the real property upon which the Building is situated or Landlord's leasehold estate in the Land ("**Mortgage**"), and their respective members, managers, partners, shareholders, directors, officers, agents and employees (all collectively referred to as the "**Indemnified Parties**") from and against any and all costs, expenses and claims arising from or in connection with any act, omission or negligence of Tenant or any Tenant's Representatives relating to or arising out of the use, handling, depositing or disposal of Hazardous Materials with respect to the Premises or the Building, such indemnity to include all costs, expenses and liabilities associated with the remediation thereof or incurred in connection with each claim, action or proceeding with respect thereto, including, without limitation, all attorney's fees and expenses.

14.4    Tenant shall immediately notify Landlord in writing of:  (i) any enforcement, clean-up, removal or other governmental or regulatory action instituted, contemplated or threatened concerning the Premises pursuant to any Hazardous Materials Laws; (ii) any claim made or threatened by any person against Tenant or the Premises relating to damage contribution, cost recovery, compensation, loss or injury

resulting from or claimed to result from any Hazardous Materials on or about the Premises; and (iii) any reports made to any environmental agency arising out of or in connection with any Hazardous Materials in or removed from the Premises, including any complaints, notices, warnings or asserted violations in connection therewith, all upon receipt by Tenant of actual knowledge of any of the foregoing matters. Tenant shall also supply to Landlord a promptly as possible and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating to Hazardous Materials associated with the Premises.

14.5    Without limiting any other provision of this Lease, Tenant shall not create or permit to exist in or about the Premises any "**Mold Condition**" unless caused by Landlord.  As used herein, the term Mold Condition shall include the presence or suspected presence of "**Mold**" or any condition(s) that reasonably can be expected to give rise to or indicate the presence of Mold, including observed or suspected instances of water damage or intrusion, the presence of wet or damp wood, cellular wallboard, floor coverings or other materials, inappropriate climate control, discoloration of walls, ceilings or floors, complaints of respiratory ailment or eye irritation by Tenant's employees or any other occupants or invitees in the Premises, or any notice from a governmental agency of complaints regarding the indoor air quality at the Premises.  As used herein, the term Mold shall include mold, mildew, fungus or other potentially dangerous organisms.  In the event of suspected or actual Mold or Mold Conditions at the Premises, Tenant shall immediately notify Landlord in writing of the same and the precise location thereof.  Tenant acknowledges the control of moisture and Mold prevention are material obligations of Tenant under this Lease, and Tenant shall, at its sole costs and expense, regularly monitor the Premises for the presence of Mold and Mold Conditions.  If any Mold or Mold Conditions in or about the Premises are a result of the actions or omissions of Tenant or any Tenant's Representatives, Tenant shall promptly, at Tenant's sole cost and expense, hire a licensed and experienced Mold remediation contractor to completely clean-up and remove from the Premises all Mold or Mold Conditions.  All such clean-up, removal and remediation shall, in each instance, be conducted to the satisfaction of Landlord and any governmental authority with jurisdiction and otherwise in strict compliance with all applicable laws.  Such clean-up, removal and remediation shall also include removal and replacement of any infected host materials as well as any repairs and refinishing required as the result of such removal and replacement.  There shall be no abatement of Rent on account of any clean-up, removal or remediation of any such Mold or Mold Condition.  Tenant waives, releases and discharges Landlord and all Indemnified Parties for, from and against all claims, demands, causes of action, suits, judgments, liabilities, losses, damages and expenses (including attorneys' fees) for personal injury, bodily injury or property damages in any way arising from or relating to or associated with moisture or the growth of or the presence of Mold or Mold Conditions.

## 15.    ASSIGNING, MORTGAGING, SUBLETTING.

15.1    Prohibitions.  Except as otherwise permitted pursuant to Section 15.1 or 15.2, Tenant shall not (i) transfer, assign or hypothecate this Lease, (ii) sublet any portion of the Premises, (iii) enter into any license, concession or other right of occupancy of any portion of the Premises, (iv) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization, (v) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant that results in a Material Change in Ownership (defined below) (each, a "**Transfer**"), without first procuring the written consent of the Landlord, which consent may not be unreasonably withheld or delayed. Any Transfer, whether voluntary or involuntary, by operation of the law or otherwise, without the prior written consent of Landlord first had and obtained therefor, shall be null and void, at the option of Landlord, and Landlord may declare a default and exercise all remedies available to Landlord under this Lease or at law.  Notwithstanding the foregoing provisions of this Section 15.1 to the contrary, Tenant may sublet the Premises to Professionals and/or Physicians associated with the Hospital.

15.2    Material Change in Ownership. If Tenant is an entity of any type, then the sale, transfer or other change of 49.9% or greater of the ownership interests of Tenant shall constitute a "**Material Change in Ownership**", in which event Landlord shall consent to the resulting Transfer provided that Tenant provides to Landlord (i) at least thirty (30) days' prior written notice of such anticipated Material Change in Ownership, (ii) all relevant details of the proposed Material Change in Ownership, including updated financial statements reflecting the financial condition of the proposed assignee post Material Change in Ownership ("**Post Material Change in Ownership Financial Statements**"), and (iii) the Post Material Change in Ownership Financial Statements reflecting a minimum Tangible Net Worth of $150,000,000. As used herein, "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the determination of total assets all assets that would be classified as intangible assets under GAAP including, goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises.

15.3    Liability; Release.  Tenant shall not be released from any liability or obligation under this Lease as a result of any Transfer or Landlord's consent to any Transfer; provided, however, if (i) Landlord consents to a proposed Transfer that would occur as a result of (A) any other entity becoming Tenant hereunder by merger, consolidation, or other reorganization, (B) any transfer of an ownership interest in Tenant that results in a Material Change in Ownership or (C) any assignment of this Lease for the remainder of the Term, and (ii) the entity comprising Tenant after such Transfer has a Tangible Net Worth together with any new guarantor that is equal to or greater than (1) the aggregate Tangible Net Worth of Tenant and Guarantor at the time of this Lease and (2) a minimum Tangible Net Worth of $150,000,000, then Tenant shall be released from further liability under this Lease for the unexpired Term following such Transfer. Tenant shall provide to Landlord any information reasonably requested by Landlord to evaluate the satisfaction of any Tangible Net Worth requirements contemplated in this Section 15.

15.4    Conditions to Consent. Landlord may condition its consent to any assignment or subletting (i) upon Tenant's agreement to termination of this Lease and simultaneous creation of a new lease between Landlord and the proposed successor, or (ii) upon Tenant's agreement simultaneously with the execution of any sublease or assignment approved by Landlord, to name Landlord its agent for purposes of collection of rental from the subtenant approved by Landlord under any such sublease or assignment (in order to enable Landlord to maintain its collection and other relationships).

15.5    Transactions Consented To. Each Transfer to which there has been consent shall be by an instrument in writing in form satisfactory to Landlord and shall be executed by the transferor, assignor, sublandlord, licensor, concessionaire, hypothecator or mortgagor and the transferee, assignee, subtenant, licensee concessionaire or mortgagee in each instance, as the case may be, and each transferee, assignee, subtenant, licensee, concessionaire or mortgagee shall agree in writing for the benefit of the Landlord herein to assume, to be bound by, and to perform the terms, covenants and conditions of this Lease to be done, kept and performed by the Tenant. One (or more, if required by Landlord) executed copy of such written instrument shall be delivered to Landlord.  Failure to first obtain in writing Landlord's consent or failure to comply with the provisions of this Article shall operate to prevent any such transfer, assignment, subletting, license, concession agreement or hypothecation from becoming effective.

## 16.    WASTE, NUISANCE, APPLICABLE LAWS.

16.1    Waste and Nuisance. Tenant shall not commit or suffer to be committed any waste in or upon the Premises and shall not commit or suffer to be committed therein any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant in the Building, or which may disturb the quiet enjoyment of any person within the immediate vicinity of the Building.

15

16.2    Tenant's Compliance with Laws. Tenant shall, at Tenant's sole cost and expense, comply with all the requirements of all federal, state, county, municipal and other applicable authorities, now in force or which may hereafter be in force in connection with Tenant's use of the Premises.

## 17.    DESTRUCTION.

17.1    Notice of Loss. Tenant shall give immediate notice to Landlord in the event of fire or other accidents or casualties within the Premises or in or around the Building, and such other notice as prescribed by the fire and extended coverage insurance policy required herein to be carried thereon, and further, Tenant shall give immediate notice to Landlord of any defect in any of the fixtures or equipment located within the Premises or in or around the Building.

17.2    Premises Useable. In the event the Premises shall be damaged by fire or other casualty, but shall not be rendered wholly or partially unusable, regardless of the time remaining in the Term, Landlord shall cause such damage to be repaired, and the Base Rent shall not be reduced or abated unless the repairs are delayed beyond ninety (90) days after commencement of such repairs, and thereafter, only if Landlord is not diligently pursuing such repairs, and then only to the extent as may be equitable based upon the amount of damage.

17.3    Premises Unusable. If the Premises shall be rendered partially or wholly unusable, Landlord shall cause such damage to be repaired and the Base Rent shall be reduced in proportion to Tenant's loss of effective use of the Premises during such repair.

17.4    Building Damaged. In the event all or part of the Building, other than the Premises, shall be damaged or destroyed by fire or other casualty, and regardless of the time remaining in the Term, Landlord shall cause such damage to be repaired. Neither Base Rent nor any other sums due hereunder shall be abated or reduced.

17.5    Scope of Repair. In the event Landlord elects or shall be obligated to repair or restore any damage or destruction as aforesaid, the scope of the work shall be limited to the shell of the Building and Lease Premises. Landlord shall not be required to make repairs or replacements of any panels, decoration, trade fixtures, railings, floor covering, partitions or other parts of the Interior of the Premises or any other property installed or placed in the Premises by Tenant.

17.6    Commencement of Repairs.  Anything to the contrary herein notwithstanding, Landlord shall not be required to commence repairs and/or restoration prior to the expiration of sixty (60) days following the occurrence or the receipt by Landlord of the insurance proceeds covering said damage, whichever event shall first occur.

## 18.    CONDEMNATION.

18.1    Total Taking. If all of the Premises should be taken for any public or quasi public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, then this Lease shall terminate and the Rent shall be abated during the unexpired portion of the Term, effective on the date physical possession is taken by the condemning authority.

18.2    Partial Taking. If any part (but not all) of the Building, Common Areas or the Premises should be so taken, Landlord may terminate this Lease if Landlord, in its sole discretion, so elects. Any election to terminate this Lease in accordance with this provision shall be evidenced by written notice of termination to Tenant within thirty (30) days after the date physical possession is taken by the condemning

16

authority. If this Lease is not so terminated, the Base Rent payable hereunder during the unexpired portion of the term shall be reduced in proportion to the area of the Premises taken, effective on the date physical possession is taken by the condemning authority.

18.3   Award.  All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Building, the Premises or the Common Areas shall be the property of Landlord and Tenant hereby assigns its interests in any such award to Landlord

## 19.   QUIET ENJOYMENT.

So long as Tenant shall pay all Rent and other payments due hereunder and shall observe and perform all of the covenants on Tenant's part to be observed and performed hereunder, and Tenant is not in default hereunder (beyond any applicable notice or cure periods), Tenant shall peaceably and quietly hold and enjoy the Premises (including easement rights) for the entire Term hereof without interruption by Landlord or person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to all of the terms and provisions of this Lease and to the reservations, encumbrances and limitations affecting the title to the premises upon which the Building is situated.

## 20.   DEFAULT AND REMEDIES.

20.1   Default. The following events shall be deemed to be the events of default by Tenant under this Lease:

(1)   Tenant shall fail to pay any installment of the Base Rent or any Additional Rent within five (5) business days after receipt of written notice of such failure from Landlord. Notwithstanding the foregoing, Landlord shall not be obligated to provide written notice more than twice in any twelve (12) month period.

(2)   Tenant shall fail to comply with any term, provision or covenant of this Lease, other than the payment of any sums due Landlord, including but not limited to, the Base Rent or any Additional Rent, and Tenant shall not cure such failure within thirty (30) days after written notice thereof of Tenant (or such shorter notice period as may be provided elsewhere in this Lease for specific events of default); provided, however, that if such failure cannot be reasonably cured within thirty (30) days, then Tenant shall have such additional time to cure as is reasonable under the circumstances provided that Tenant diligently continues to pursue such cure.

(3)   An event of default shall occur and remain uncured within the time stated for such cure under any Related Lease.

(4)   Tenant or any guarantor of Tenants' obligations hereunder shall become insolvent in any chapter of the United States Bankruptcy Code, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(5)   Tenant or any guarantor shall file a petition under any section or chapter of the United States Bankruptcy Code, or under any similar law or statute of the United States or any state thereof; or Tenant shall be adjudged bankrupt or insolvent as defined in any chapter of the United States Bankruptcy Code in proceedings filed against Tenant or any guarantor of Tenant's obligations under this Lease.

17

(6)     A receiver or trustee shall be appointed for the Premises or for all or substantially all of the assets of Tenant or any guarantor and such receiver or trustee shall not be discharged within thirty (30) days following such appointment.

(7)     The discovery by Landlord that any financial statement given by Tenant or any of its assignees, subtenants or successors-in-interest, or any guarantor of Tenant's obligations hereunder to Landlord, was materially false.

20.2    <u>Remedies</u>.

(1)     Upon the occurrence of any event of default hereunder, and notwithstanding the fact that the termination or cancellation of this Lease by Landlord may substantially interfere with the ability of Tenant to conduct a non-liquidation proceeding under any chapter of the United States Bankruptcy Code, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever.

(i)     Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, without being liable for prosecution or any claim for damages therefor and Tenant agrees to pay Landlord, on demand, the amount of all losses, expenses and damages, including attorneys' fees, which Landlord may suffer by reason of such termination; and/or

(ii)     Enter upon the Premises and correct such default or otherwise do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to pay Landlord, on demand, the amount of all  losses, expenses and damages, including attorneys' fees which Landlord may incur in connection with attempts to effect compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for prosecution or any claim for damages resulting to Tenant from such action, and/or

(iii)     Enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, without being liable for prosecution or any claim for damages therefor, and if Landlord so elects, relet the Premises on such terms as Landlord may deem advisable and receive rental therefor.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any other remedies herein provided or provided by law, or at equity, nor shall pursuit of any other such remedy constitute a forfeiture or waiver of any Rent or other sums due to Landlord hereunder or of any damages accruing to the Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default. In determining the amount of loss or damage which Landlord may suffer by reason of termination of this Lease or the deficiency arising by reason of any reletting by Landlord as above provided, allowance shall be made for the expense of repossession and any repairs or remodeling undertaken by Landlord following repossession.

(2)    Exercise by Landlord of any one or more remedies herein granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises by Tenant, whether by agreement or by operation of law it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. No removal or other exercise of dominion by Landlord over the property of Tenant or others at the Premises shall be deemed unauthorized or constitute a conversion. Tenant hereby consenting, after any event of default, to the aforesaid exercise of dominion over Tenant's property within the Building. All claims for damages by reason of such reentry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. Tenant agrees that any reentry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings, as Landlord may elect and Landlord shall not be liable in trespass or otherwise,(after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant as provided in this paragraph may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease Term.

(3)    In the event Landlord elects to terminate this Lease by reason of event or default, then notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord, at Landlords Address as defined in <u>Section 1</u> herein, the sum of all Rent, Additional Rent and other indebtedness accrued to the date of such termination, plus, as damages, an amount equal to the present value of the Rent and any and all other sums reserved hereunder for the remaining unexpired portion of the Lease Term (had the Lease not been so terminated by Landlord), less the then present value of the then fair rental value of the Premises.

(4)    In the event Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord at Landlords Address as defined in <u>Section 1</u> hereinabove, all Rent and other indebtedness accrued to date of such repossession, plus all Rent and any and all other sums required to be paid by Tenant to Landlord during the remainder of the Lease Term until the date of expiration of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during Period (after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant as provided in the paragraph may be brought from time to time, on one or more occasions, without necessity of Landlord's waiting until expiration of the Lease Term.

(5)    In the event of termination or repossession of the Premises for an event of default, Landlord shall have an obligation to attempt to relet the Premises, or any portion thereof. However, in the event of reletting Landlord may relet the whole or any portion of the Premises for any period, to any tenant, and for any use and purpose. Should Landlord choose to relet the Premises, or any portion thereof, for the remainder of the Term provided for herein, and if the rental received through reletting does not at least equal the Rent provided for herein, Tenant shall pay and satisfy the deficiency between the amount of the Rent so provided for and that received through reletting, including, but not limited to, the cost of renovating, altering, and decorating for a new occupant. Further, Tenant shall not in any event ever be entitled to any excess rental and other sums provided for herein, and the same shall belong solely to Landlord. Nothing herein shall be construed as in any way denying Landlord the right, in the event of abandonment of said Premises or other breach of this Lease by Tenant, to treat the same as an entire breach and at Landlord's option to terminate this Lease and/or immediately seek recovery for the entire breach of this Lease and any and all damages which Landlord suffers thereby.

19

(6)    If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Premises for such purpose), and thereupon Tenant shall be obligated and hereby agrees, to pay Landlord, upon demand, all costs, expenses and disbursements (including reasonable attorneys' fees) incurred by Landlord in taking such remedial action.

(7)    In the event of the breach or the attempted or threatened breach of any covenant or provision contained in this Lease by Tenant, Landlord shall have, in addition to all other remedies provided it hereunder or by law or at equity, the right to obtain an injunction prohibiting such breach or attempted breach without the necessity for proof of inadequacy of legal remedy, irreparable harm or probable right of recovery.

20.3    Expenses/Attorneys' Fees. In the case of an event of default hereunder, Tenant shall also be liable for and shall pay to Landlord, at Landlords Address as defined in Section 1 herein, in addition to any sum provided to be paid above: broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in enforcing Landlord's rights or remedies, including reasonable attorneys' fees and court costs until the expiration of the Term.  Tenant shall permit the Landlord to exhibit the Premises to prospective tenants and to place notices upon the Premises advertising "For Lease".  Landlord may at any time, exhibit the Premises to prospective purchasers. and place notices, upon the Building or the Premises advertising "For Sale."

20.4    Landlord's Breach.  In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rental due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have thirty (30) days in which to cure any such default. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Building and not thereafter.

20.5    Limitation on Landlord's Personal Liability. Tenant specifically agrees to look solely to Landlord's interest in the Building for the recovery for any judgment from Landlord, it being agreed that Landlord, its agents, employees, shareholders, officers, directors, and limited partners, shall never be personally liable hereunder for anything whatsoever.

## 21.    ACCESS.

Landlord or its agents shall have the right to enter the Premises at all reasonable times, and whenever necessary because of emergencies, to inspect the same, and to make such repairs, replacements, alterations, improvements or additions as Landlord may deem necessary or desirable, including alterations, repairs, improvements or additions to the space adjacent to Premises and/or to the Building, without the same constituting an eviction of Tenant in whole or in part, and the Rent reserved shall in no way abate while said repairs, replacements, alterations, improvements or additions are being made, by reason of loss or interruption of Tenant's business or otherwise. During the ninety (90) days prior to the expiration of the Term, Tenant shall permit the Landlord to exhibit the Premises to prospective tenants and to place notices upon the Premises advertising "For Lease".  Landlord may, at any time, exhibit the Premises to prospective purchasers, and place notices, upon the Building or the Premises advertising "For Sale."

## 22. SURRENDER AND REMOVAL OF PROPERTY.

22.1    Surrender of Premises. Promptly upon the expiration or earlier termination of the Term, Tenant shall surrender the Premises in the same condition as received by Tenant on the Commencement Date reasonable wear and tear and damage by unavoidable casualty or Act of God only excepted. Further, Tenant shall surrender all keys to the Premises at the place then fixed for the payments of Base Rent due hereunder. All items of work and improvements comprising the Interior of the Premises, shall constitute a part of the fee estate remainder subject to this Lease, notwithstanding that Tenant may construct or cause to be constructed all or any part of said improvements or may contribute to the cost thereof, and notwithstanding that Tenant may or might be required to maintain, repair and/or replace same or some part thereof pursuant to some other provisions in this Lease. Subject to the provisions of this Section, Tenant shall remove all of Tenant's trade fixtures, operation equipment and other personal property before surrendering the Premises as aforesaid and shall repair at Tenant's expense any damage to the Premises caused thereby.

22.2    Failure to Remove Property. If Tenant shall neglect to remove Tenant's personally as herein provided, Landlord shall have the right (i) to remove said property and cause it to be stored in a public warehouse or elsewhere, at the cost of and for the account of Tenant, or (ii) in the alternative, if said property shall not be removed within thirty (30) days after said termination, to dispose of said property in a manner deemed suitable to Landlord, all without service of notice or resort to legal process and without becoming liable for any loss damage which may be occasioned thereby, and any proceeds of such disposition shall be retained by Landlord without liability to Tenant, Tenant hereby waiving any interest in such proceeds.

22.3    Survival of Covenants. Tenant's obligations to observe or perform the covenants contained in this Article shall expressly survive the expiration or earlier termination of the Term.

## 23. HOLDING OVER.

Any holding over without the consent of Landlord after the expiration or earlier termination of the Term shall be construed to be and shall constitute a tenancy at the will of Landlord, and Tenant agrees to pay as rents and liquidated damages for such holding over a sum equivalent to the Rent herein specified and reserved plus fifty percent (50%) of the Base Rent (prorated on a monthly basis) and shall otherwise be on the same terms and conditions herein, as far as applicable.

## 24. ESTOPPEL/MEMORANDUM.

24.1    Estoppel Certificate. Within ten (10) days after request therefore by Landlord, Ground Lessor or any Mortgagee, Tenant shall deliver in recordable form (and signed by Tenant, if an individual, or a duly authorized representative of Tenant if Tenant is not an individual) a statement to Landlord, Ground Lessor any Mortgagee, or any proposed Mortgagee or transferee of the Project (as the case may be), certifying (if suche be the case) that this Lease is in full force and effect, that Tenant is in possession of the Premises, that Tenant has commenced the payment of Rent, that there are no defenses or offsets to this Lease claimed by Tenant, as well as any other information reasonably requested. If Tenant fails or refuses to give a certificate hereunder within the time period herein specified, then the information contained on such certificate as submitted by Landlord shall be deemed correct for all purposes, but Landlord shall have the right to treat such failure or refusal as a default by Tenant.

24.2    Memorandum of Lease. Promptly after the Commencement Date, Landlord and Tenant, if requested by Landlord, shall execute and acknowledge and deliver a memorandum or short form of this Lease, in recordable form, acknowledging Tenant's acceptance of the Premises for all purposes herein

21

provided and specifying the Commencement Date and the termination date of this Lease in accordance with the provisions hereof, and said memorandum may be recorded by Landlord only, but this Lease Agreement itself shall not be recorded. In the event Tenant records a memorandum of this Lease, or this Lease, Tenant shall be in default under this Lease and Landlord may terminate this Lease upon five (5) days written notice to Tenant at Tenant's address set forth in Section 1.1 hereof.

## 25.   NOTICES.

All notices required or permitted to be given hereunder by either party hereto to the other party shall be deemed sufficiently given or made on the day of receipt thereof or three (3) business days after the date when mailed by United States Registered or Certified Mail, adequate postage paid, to their respective addresses as specified in Section 1.1 hereof. Each party hereto may notify the other party of any change in its mailing address by notice in the manner herein above provided, which new address shall thereafter be deemed the proper address for notice hereunder.

## 26.   TENANT'S PAYMENTS.

26.1   Payments. Tender of Rent and/or any other payment due hereunder shall be considered to have been made on the date such payments received by Landlord and not on the date mailed by Tenant. For purposes hereof, the office of Landlord is the office presently or henceforth designated pursuant to the provisions of Section 1.1 hereof. Checks or drafts tendered will constitute payment only when duly paid by the drawers bank promptly upon presentment, properly endorsed, for payment.

26.2   Interest. All sums due and owing by Tenant to Landlord under this Lease shall bear interest at the Prime Rate (as defined in the *Wall Street Journal*) plus four percent (4%) from the date due until paid.

## 27.   LANDLORD'S LIEN.

To secure the payment of all Base Rent, and Additional Rent reserved herein, and all other payments due Landlord hereunder, or to become due hereunder and the faithful performance of all covenants, agreements and stipulations herein contained to be performed by Tenant, Tenant hereby grants to Landlord an express first and prior contract lien and security interest on all property (including fixtures, equipment, inventory, goods, wares, furniture, office equipment, supplies and merchandise) which may be placed in the Premises, and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction of or damage to any such property. Tenant hereby waives all exemption laws in favor of said lien and security interest. This lien and security interest is given in addition to the Landlord's statutory lien and shall be cumulative thereof. Tenant shall not remove any property from the Premises until all of Tenant's obligations under this Lease are satisfied. This lien may be foreclosed with or without court proceedings by public or private sale, provided Landlord gives Tenant at least ten (10) days notice of the time, place and terms of said sale, and Landlord shall have the right to become the purchaser of such property, upon being the highest bidder therefor at said sale. The notice referred to in the preceding sentence may (but needs not) be given by Landlord to Tenant contemporaneously with any other notice from Landlord to Tenant which may be given in accordance herewith. At the time of the execution of this Lease, and if requested thereafter by Landlord, Tenant shall execute and deliver to Landlord financing statement instruments in form deemed sufficient by Landlord to reflect the security interest herein granted and any proper amendment of, assignment of, modification in or extension of the aforesaid contract lien and security interest hereby granted. Tenant hereby grants to Landlord a power of attorney to sign, in place and stead of Tenant, any and all such instruments. Said power of attorney is irrevocable and coupled with an interest.

28.    **RULES AND REGULATIONS.**

Such reasonable rules and regulations applying to all tenants in the Building as may be adopted by Landlord for the safety, care, cleanliness, preservation of good order or operation of the Premises, the Building, the Property and the Common Areas, are hereby made a part hereof and Tenant agrees to comply with all such rules and regulations, immediately upon receipt of a copy of same. Landlord shall have the right at all times to change any of the rules and regulations or to amend them in any manner deemed reasonable by Landlord. All changes and amendments will be sent by Landlord to Tenant in writing and shall be thereafter carried out and observed by Tenant.  As of the Effective Date, the rules and regulations are set forth on Exhibit D.

29.    **BROKERS.**

None.

30.    **AUTHORITY.**

Each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has been and is qualified to do business in the state in which the Building is located, that the Tenant Entity has full right and authority to enter into this Lease, and that all persons signing on behalf of the Tenant Entity were authorized to do so by all appropriate actions required of such entity.  If Tenant signs as a partnership, trust or other legal entity, each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has complied with all applicable laws, rules and governmental regulations relative to its right to do business in the state in which the Building is located, and that each of the persons or entities acting on behalf of the Tenant was authorized to do so by any and all appropriate partnership, trust or other actions.

31.    **LIABILITY OF LANDLORD.**

Tenant shall look solely to Landlord's interest in the Building, including revenue derived from the Project, and Landlord's personal property used in connection with the Project for the satisfaction of any judgment or decree requiring the payment of money by Landlord, based upon any default hereunder, and no other property or asset of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of such judgment or decree.  **IN NO EVENT SHALL LANDLORD BE LIABLE OR RESPONSIBLE FOR ANY CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES.**

32.    **SCOPE AND INTERPRETATION OF AGREEMENT; CONFIDENTIALITY.**

This Lease and all Exhibits set forth including all of the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, conditions, or understandings, either oral or written, other than as set forth herein.  No subsequent alteration, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.  This Lease shall not be more strictly enforced against either party regardless of who was more responsible for its preparation.  Except at Landlord's option, no part of this Lease or any memorandum thereof may be recorded in the public records of any municipality or county.  Tenant will maintain the confidentiality of this Lease and will not divulge the economic or other terms of this Lease, whether verbally or in writing, to any person, other than Tenant's officers, directors, partners or shareholders; Tenant's attorneys, accountants and other professional consultants; any governmental agencies; and pursuant to subpoena or other legal process.  If any provision of this Lease shall be determined to be void by any court of competent jurisdiction or by any law enacted subsequent to the

23

Effective Date, then such determination shall not affect any other provisions hereof, all of which other provisions shall remain in full force and effect.

## 33.     LANDLORD'S CONSENT.

Without limiting any other provision of this Lease, in the event that Landlord's consent is required by the terms hereof for any purpose whatsoever, it is understood and agreed that (a) Landlord's consent may be subject to the consent of the Ground Lessor, Declarant  and/or the holder of any Mortgage encumbering the Building to the extent that such consents are required under the terms of the Ground Lease, Declaration or the applicable financing documents (which consents Landlord shall seek to obtain) and (b) notwithstanding anything to the contrary set forth herein, it shall not be deemed unreasonable for Landlord to withhold its consent in any given circumstance based upon Landlord's inability to obtain any required consent from the Ground Lessor, Declarant or the holder of any Mortgage encumbering the Building.

## 34.     USE OF PREMISES.

Tenant shall use and occupy the Premises only for the Permitted Use, and for no other purpose, without the prior written consent of Landlord.

## 35.     GUARANTY.

As material consideration for Landlord to enter this Lease, Tenant shall cause Guarantor to execute the Guaranty attached as Exhibit E (the "**Guaranty**"), and Tenant shall deliver the Guaranty to Landlord contemporaneously with Tenant's execution hereof.

## 36.     WAIVER OF JURY TRIAL.

LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LEASE OR THE OBLIGATIONS EVIDENCED HEREBY, OR ANY OTHER DOCUMENT OR INSTRUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT TO EACH OF LANDLORD AND TENANT IN ENTERING INTO THIS LEASE.

## 37.     MISCELLANEOUS.

37.1     Successors and Assigns. All rights and liabilities herein granted to or imposed upon the respective parties hereto shall extend to and jointly and severally bind the several respective heirs, legal representatives, successors and assigns of the respective parties hereto, an if there shall be more than one Landlord or Tenant, all shall be bound jointly and severally the terms, conditions and agreements herein contained. No rights, however, shall inure to the benefit of any assignee of Tenant unless Landlord has approved the assignment to such assignee in writing as provided herein.

37.2     Waivers. One or more waivers of any breach or violation of any agreement, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent violation or breach of the same or any other agreement, covenant, or condition herein contained, and the consent or approval by either party of any act by the other, which act requires the approval or consent of the other party, shall not be deemed to waive or render unnecessary the future requirements of consent or approval of the same or

A0493

similar act; and the subsequent acceptance of Rent or other payment due hereunder shall not be deemed to be a waiver of any preceding breach by Tenant, other than failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of the acceptance of said Rent. No express covenant, term or condition of this Lease shall be deemed to have been waived by either party, unless such waiver is in writing.

      37.3   <u>Accord and Satisfaction</u>. No payment made by Tenant or received by Landlord in an amount less than the amount herein stipulated shall be deemed to be other than on account of the earliest received payment, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such amount or to pursue any other remedy in this Lease or by law provided Landlord.

      37.4   <u>Entire Agreement</u>. This Lease, together with the exhibit or exhibits aforesaid and the rider or riders, if any, attached hereto and forming a part hereof, contains and sets forth the entire agreement and understandings between the parties hereto concerning the Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between said parties other than as herein expressly set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon either party hereto, unless reduced to writing and signed by both parties.

      37.5   <u>Partnership</u>. Landlord does not become a partner of Tenant in the conduct of its business or otherwise, or a joint venturer or a member of a joint enterprise with Tenant by virtue of this Lease.

      37.6   <u>Force Majeure</u>.  In the event Landlord shall be delayed, hindered or prevented from the performance of any act required hereunder by reason of strikes, fire, explosions, lock-outs, failure of electrical power, governmental restrictions or regulations, unavailability of suitable financing, materials and/or labor, riots, insurrection, war or on account of any other condition or occurrence not the fault of Landlord, then the performance of any such act shall be extended for a period equivalent to the period of such delay.

      37.7   <u>Captions and Numbers</u>.  The captions, section numbers and article numbers appearing in this Lease are inserted only as a matter of convenience and in no wise define, limit, construe or describe the scope or intent of such sections or articles, nor in any wise affect this Lease.

      37.8   <u>Tenant, Defined Use of Pronouns</u>. The word "**Tenant**" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more and if there shall be more than one Tenant. Any notice required or permitted by the terms of this of Lease may be given by or to any one thereof and shall have the same force and effect as if given by or to all thereof. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, and a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or one Tenant, and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

      37.9   <u>Severability</u>. If any provisions covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, there reminder of this Lease, or the application of such provision, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each provision,

covenant or condition of this Lease shall be valid and shall be enforced to the fullest extent permitted by Law.

37.10    <u>Survival</u>. Landlord and Tenant expressly agree that all provisions of this Lease which contemplate performance after the expiration or earlier termination hereof shall survive such expiration or earlier termination of this Lease.

37.11    <u>Governing law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Texas.  Venue for any legal actions hereunder shall be in the Courts of Grayson County, Texas.

37.12    <u>Other documents</u>. The parties agree to execute all other documents or instruments necessary to effect the transfers of property set forth herein and otherwise to implement the provisions of this Agreement.

## 38.    <u>EXHIBITS</u>

The following exhibits are a part of this Lease and are incorporated herein by reference:

Exhibit A – Legal Description
Exhibit B – Floor Plan of the Premises
Exhibit C – Parking Areas
Exhibit D – Rules and Regulations
Exhibit E – Guaranty

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

EXECUTED as of the date first set forth above in multiple counterparts each of which shall be deemed to be an original.

**LANDLORD**:

ALTERA HIGHLAND LLC,
a Texas limited liability company

By:_____

Name:   Terry D. Quinn
Its:      President

**TENANT**:

SHERMAN/GRAYSON HEALTH SYSTEM, LLC,
a Texas limited liability company

By:_____
Name:_____
Its:_____

LEASE AGREEMENT
SIGNATURE PAGE

**A0496**

EXECUTED as of the date first set forth above in multiple counterparts each of which shall be deemed to be an original.

**LANDLORD**:

ALTERA HIGHLAND LLC,
a Texas limited liability company

By:_____
Name:  Terry D. Quinn
Its:    President

**TENANT**:

SHERMAN/GRAYSON HEALTH SYSTEM, LLC,
a Texas limited liability company

By:_____
Name:  Thomas J. Frazier, Jr.
Its:    Executive Vice President

LEASE AGREEMENT
SIGNATURE PAGE

**A0497**

EXHIBIT A

LEGAL DESCRIPTION

BEING a 3.0894 acre tract of land situated in the County of Grayson, State of Texas out of the J.B. McAnair Survey, Abstract No. 763 and being all of Block No. 7, and a portion of Lots 7-8, and all of Lots 9-12, Block 12 of Green Mount Addition to the City of Sherman, Grayson County, Texas, as shown by Plat of record in Volume 193, Page 21, Deed Record, Grayson County, Texas, together with that portion of vacated Pecan Street, and being more particularly described by meets and bounds as follow:

BEGINNING at a "X" cut in concrete found for corner at the intersection of the north line of Laurel Street (a 60 foot wide public right-of-way) and the east line of Bryant Avenue (a 60 foot wide public right-of-way);

THENCE North 15 degrees 40 minutes 01 seconds West (Reference for Basis of Bearings) along said east right-of-way line, a distance of 467.78 feet to a 5/8 inch iron rod set with cap stamped BGT for corner;

THENCE North 73 degrees 42 minutes 45 seconds East, a distance of 286.25 feet to a 5/8 inch iron rod set with cap stamped BGT for corner in the west right-of-way line of Highland Avenue;

THENCE South 16 degrees 01 minutes 19 seconds East along said west right-of-way line, a distance of 467.76 feet to a 1/2 inch iron rod with cap found for corner at the intersection of the west right-of-way line of said Highland Avenue and the north right-of-way line of said Laurel Street;

THENCE South 73 degrees 42 minutes 45 seconds West along said north right-of-way line, a distance of 289.15 feet to the POINT OF BEGINNING and containing 134,573 square feet or 3.0894 acres of land, more or less.

EXHIBIT B

FLOOR PLAN OF THE PREMISES

[ATTACHED]



St 455
Zwirigat - Kable

St 445
ENT Space
VACAnt

St 415
Buckingham - Schrank - Lucchese

St 410
Shell Space

St 430
UrbanC24K

St 400
Shell Space

north

**4th FLOOR PLAN**
s c a l e: 1/8" = 1'- 0"

5    20
0   10

plan
orientation

23404 SF

Dan Burbine Associates
Architects & Project Managers
12532 Renoir Lane    Dallas, Texas    75230

PROJECT

WNJ Wilson N. Jones

MEDICAL
OFFICE
BUILDING

REVISIONS

DATE
11 MAY 2005

SHEET
A-4



St 545
VAcant

St 550
Shaw-Breeze

St 500
VAcant

Dan Burbine Associates
Architects & Project Managers
12532 Renoir Lane    Dallas, Texas  75230

St 542
Gajda

St 540
Davies

St 530
Rue

St 510
Sr Passport

Shell
Space

north
e
s
w
plan
orientation

5th FLOOR PLAN
s c a l e : 1/8" = 1'-0"

5        20
0    10

22726

PROJECT
Wilson N. Jones

MEDICAL
OFFICE
BUILDING

REVISIONS

DATE
11 MAY 2005

SHEET
A-5

A0501

<u>EXHIBIT C</u>

<u>PARKING AREAS</u>

[ATTACHED]



TRACT FIFTEEN:

Being a part of Block No. Eight (8), of G. Y. Gray's Second Addition to the City of Sherman, Texas, and further described as follows:

BEGINNING at the intersection of the South line of Laurel Street with the West line of Highland Avenue as now opened;
THENCE West 140 feet with the South line of Laurel Street to a stake, for the Northwest corner;
THENCE South parallel with Highland Avenue 75 feet to a stake;
THENCE East parallel with Laurel Street 140 feet to a stake in the West line of Highland Avenue;
THENCE North with said line of Highland Avenue 75 feet to the place of beginning, containing a tract of 140 x 75 feet.

TRACT SIXTEEN of the County of Grayson, State of Texas, all that certain tract or parcel of land situated in the City of Sherman, Grayson County, Texas, being a part of the survey originally granted to John B. McAnair, and being a part of Block Eight (8) of Gray's Second Addition, as shown by the map or plat thereof, recorded in Volume 134, page 113, of the Deed Records of Grayson County, Texas, and being more particularly described as follows:

BEGINNING at a point on the West line of Highland Avenue, 125 feet South of the intersection of the West line of Highland Avenue, and the South line of Laurel Street;
THENCE Southward with the West line of Highland Avenue, 45 feet;
THENCE Westward and parallel with the South line of Laurel Street, 140 feet;
THENCE Northward and parallel with the West line of Highland Avenue, 45 feet;
THENCE Eastward, parallel with the South line of Laurel Street, 140 feet to the place of beginning; this being the South 45 by 140 feet of the tract 95 by 140 feet, in size conveyed by Frank Reece and wife, Mrs. Minnie Reece, to Bob Richardson by deed dated March 5, 1924, and recorded in Volume 303, Page 153 of the Deed Records of Grayson County, Texas.

TRACT SEVENTEEN:

SITUATED in the City of Sherman, County of Grayson, Texas and being part of Block No. 8 of G. Y. Gray's Second Addition to the City of Sherman, Texas, out of J. B. McAnair Survey, Grayson County, Texas on the waters of Post Oak Creek, and described as follows:
And being the North 62 feet of the following described piece of property;
BEGINNING at the intersection of West line of Highland Ave. and the North line of Houston Street.
THENCE in a westerly direction with the North line of Houston Street 87 feet a stake.
THENCE in a Northerly direction and parallel with the West line of Highland Avenue 150 feet to a stake.
THENCE in an Easterly direction parallel with the North line of Houston Street, 87 feet to the West line of Highland Ave.
THENCE in a Southerly direction with the West line of said Highland Ave. 150 feet to the place of beginning, containing 87 x 150 feet of land.  Being the same land described in a deed from J. W. Hollingsworth and wife, Florence Hollingsworth to W. W. Craig, dated January 9, 1915, and

recorded in Volume 239, page 272, Deed Records of Grayson County, Texas.

TRACT TWENTY-FOUR:

BEING that certain tract, lot or parcel of land situated in the City of Sherman, Grayson County, Texas, in the J. B. McAnair Survey, part of Block Eight (8) of the G. Y. Gray Second Addition to the said City of Sherman;

BEGINNING at the Southwest corner of the lot conveyed by J. P. Mills and wife, to M. H. Andrews by deed recorded in Volume 57, page 107 of the Deed Records of Grayson County, Texas, a stake on the North line of West Houston Street;
THENCE North at right angles to the North line of West Houston Street 150 feet to a stake for corner;
THENCE East parallel with the North line of West Houston Street 60 feet to a stake for corner;
THENCE South at right angles to the North line of West Houston Street 150 feet to the North line of West Houston Street;
THENCE West along said line 60 feet to the Place of Beginning.

TRACT TWENTY-FIVE:

All that certain tract or parcel of land situated in Grayson County, Texas, and being more particularly described as follows: SITUATED in the City of Sherman, Grayson County, Texas, on the waters of Post Oak Creek, being a part of a survey or patent to J. B. McAnair Survey, and described as follows, to-wit:

BEGINNING at the Southeast corner of the tract described in the deed from L. M. Tuck, Receiver, to Clyde Jackson and wife, of record in Book 367, Page 344, Grayson County Deed Records;
THENCE West with the North line of Houston Street, 80 feet to the Southeast corner of a lot sold to L. V. Butler;
THENCE North with the East line of the Butler lot, 150 feet to the South line of a lot sold to Cecil J. Rodgers;
THENCE East with the South line of said Rodgers tract, 80 feet to the southeast corner or same, a stake in the East line of the tract sold to Clyde Jackson above referred to;
THENCE South with the East line of the Clyde Jackson tract, 150 feet to the place of beginning, being a lot 80 feet by 150 feet out of the Southeast corner of a tract sold by L. M. Tuck, Receiver, to Clyde Jackson and wife referred to.

Also being described as 80' x 150' our of Block 8 of G.Y. Gray's Addition to the City of Sherman.

TRACT TWENTY-SIX:

BEING all that certain lot or parcel of land, situated in the City of Sherman, Grayson County, Texas, a part of Block No. EIGHT (8) of G. Y. GRAY'S ADDITION to the City of Sherman and

being more particularly described as follows:

BEGINNING at the point of intersection of the North line of West Houston Street and the East line of Bryant Street;
THENCE North with the East line of Bryant Street for a distance of 150 feet;
THENCE East parallel with the North line of Houston Street for a distance of 70 feet;
THENCE South, parallel with the East line of Bryant Street for a distance of 150 feet to the North line of Houston Street;
THENCE West with said line for a distance of 70 feet to the Place of Beginning and containing 70 x 150 feet of land, more or less and being the same property conveyed by Alton R. Hill and wife, Laura Hill to J. B. Revell and wife, Willie B. Revell by deed dated November 10, 1952 and of record in Volume 705, Page 457 of the Deed Records of Grayson County, Texas.

TRACT TWENTY-SEVEN:

SITUATED in Sherman, Grayson County, Texas, and being a part of the J. B. McAnair Survey, and being also a part of Block 8 of G. Y. Gray's Second Addition to Sherman, Texas, and being a part of a tract of 150 x 250 feet of land sold by L. M. Tuck, receiver, to Clyde Jackson, et ux., by deed recorded in Volume 367, page 344, Deed Records of Grayson County, Texas, and described as follows, to-wit:

BEGINNING at a stake on the east line of what is known as Bryant Street at a point 50 feet south of the NW corner of the above mentioned tract of 150 x 250 feet, said point being the SW corner of a tract sold by Clyde Jackson, et al., to Cecil J. Rodgers, et ux.;
THENCE South 50 feet to a stake, the NW corner of a tract now owned by L. V. Butler, et ux., as described in deed of record in Volume 506, Page 407, Deed Records of Grayson County, Texas;
THENCE East parallel with the north line of the 150 x 250 foot tract 150 feet to a stake;
THENCE North 50 feet to the SE corner of the Cecil J. Rodgers, et ux., tract;
THENCE West with the south line of the said Rodgers tract 150 feet to the place of beginning, containing 50 x 150 feet of land.

TRACT TWENTY-EIGHT:

All that certain tract or parcel of land situated in the City of Sherman, Grayson County, Texas, being a part of the Survey originally granted to J. B. McANAIR, and being a part of BLOCK NO. EIGHT (8) of GRAY'S SECOND ADDITION to said City of Sherman, as shown by the map or plat thereof, recorded in Volume 134, at Page 113, Deed Records of Grayson County, Texas, and as shown by the 1908 Plat Book of Grayson County, Texas, and being more particularly described as follows:

BEGINNING at the intersection of the West line of Highland Avenue and the North line of Houston Street;
THENCE West with the North line of Houston Street, a distance of 87 feet;
THENCE North on a line parallel with the West line of Highland Avenue, a distance of 88 feet to the Southwest corner of a tract of land deeded to Elmer L. Anderson;

THENCE East on a line parallel with the North line of Houston Street and with the South line of the Elmer L. Anderson tract, a distance of 87 feet to a point in the West line of Highland Avenue;

THENCE South with the West line of Highland Avenue, a distance of 88 feet to the Place of Beginning and Containing 87 ft. by 88 ft. of land and being the same property conveyed by Floydell Akridge, a widow, to George Melvin Hammock, et ux., by Deed dated January 12, 1972, recorded in Volume 1208, at Page 433, Deed Records of Grayson County, Texas.

TRACT TWENTY-NINE:

BEING all that certain tract or parcel of land, situated in the County of Grayson, State of Texas, being a part of survey originally granted to J. B. McAnair and described as follows, to-wit:

BEGINNING at a point on the West line of Highland Avenue, seventy-five (75) feet South of the intersection of the West line of Highland Avenue and the South line of Laurel Street in the City of Sherman;

THENCE Southward with the West line of Highland Avenue fifty (50) feet;

THENCE Westward and parallel with the South line of Laurel Street, one hundred forty (140) feet;

THENCE Northward and parallel with the West line of Highland Avenue, fifty (50) feet;

THENCE Eastward and parallel with the South line of Laurel Street, one hundred forty (140) feet to the Place of Beginning; this being the North fifty (50) feet by one hundred forty (140) feet of the tract ninety-five (95) feet by one hundred forty (140) feet in size conveyed by Frank Reese and wife, Mrs. Minnie Reese, to Bob Richardson, by deed dated March 5, 1924, and recorded in Volume 303, page 153 of the Deed Records, Grayson County, Texas; and being Lot Eight (8), Block Eight (8), of Gray's Second Addition to the City of Sherman, Grayson County, Texas.

BEING a 3.0894 acre tract of land situated in the County of Grayson, State of Texas out of the J.B. McAnair Survey, Abstract No. 763 and being all of Block No. 7, and a portion of Lots 7-8, and all of Lots 9-12, Block 12 of Green Mount Addition to the City of Sherman, Grayson County, Texas, as shown by Plat of record in Volume 193, Page 21, Deed Record, Grayson County, Texas,  together with that  portion of vacated Pecan Street, and being more particularly described by meets and bounds as follow:

BEGINNING at a "X" cut in concrete found for corner at the intersection of the north line of Laurel Street (a 60 foot wide public right-of-way) and the east line of Bryant Avenue (a 60 foot wide public right-of-way);

THENCE North 15 degrees 40 minutes 01 seconds West (Reference for Basis of Bearings) along said east right-of-way line, a distance of 467.78 feet to a 5/8 inch iron rod set with cap stamped BGT for corner;

THENCE North 73 degrees 42 minutes 45 seconds East, a distance of 286.25 feet to a 5/8 inch iron rod set with cap stamped BGT for corner in the west right-of-way line of Highland Avenue;

THENCE South 16 degrees 01 minutes 19 seconds East along said west right-of-way line, a distance of 467.76 feet to a 1/2 inch iron rod with cap found for corner at the intersection of the west right-of-way line of said Highland Avenue and the north right-of-way line of said Laurel Street;

THENCE South 73 degrees 42 minutes 45 seconds West along said north right-of-way line, a distance of 289.15 feet to the POINT OF BEGINNING and containing 134,573 square feet or 3.0894 acres of land, more or less.

<u>EXHIBIT D</u>

RULES AND REGULATIONS

1.      All tenants will refer all contractor's representatives and installation technicians who are to perform any work within the Building, grounds, and Parking Area to Landlord for Landlord's supervision, approval and control before the performance of any such work. This provision shall apply to all work performed in the Building, grounds and Parking Area including, but not limited to, installations of telephones, telegraph equipment, electrical devices and attachments, and any and all installations of every nature effecting floors, walls, woodwork, trim, window, ceilings, equipment and any other physical portion of the Building, grounds, and Parking Area. Tenant shall not mark, paint, drill into, or in any way deface any part of the Building or the Premises without Landlord's written consent. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of the Landlord, and as the Landlord may direct.

2.      The work of the janitorial or cleaning personnel shall not be hindered by Tenant after 5:30 pm and such work may be done at any time when the Premises are vacant. The windows doors and fixtures in the Premises and Building may be cleaned at any time. Tenant shall provide adequate waste and rubbish receptacles, cabinets, books cases, map cases, etc., necessary to prevent unreasonable hardship to Landlord in discharging its cleaning obligations.

3.      Movement in or out of the Building or through the Building entrances or lobbies of furniture or office equipment, or dispatch or receipt by Tenant of any heavy equipment, bulky material merchandise or other item which requires use of elevators or stairways, shall be restricted to such hours as Landlord shall designate. The method of such movement, routing of such movement, safety precautions associated with such movement and the prohibition of Tenant bringing any dangerous items into the Building shall be subject to the Landlord's discretion and control. Any hand trucks, carryalls, or similar appliances used for the delivery or receipt of merchandise or equipment shall be equipped with rubber tires, side guards and such other safeguards as the Landlord shall require. Although Landlord or its personnel may participate in or assist in the supervision of such movement, Tenant assumes final responsibility for all risks as to damage to property and injury to persons that may result from such participation or assistance and Tenant shall indemnify and hold harmless Landlord and Landlord's employees and agents, and reimburse Landlord and Landlord's employees and agents with respect to any and all claims, demands, causes of action and liability arising as a result of any assistance or supervision or exercise of control over Tenant's movement of items in and out of the Building.

4.      No sign, advertisement or notice shall be displayed, painted or affixed by Tenant or Tenant's employees, agents or contractors in or on any part of the outside or inside of the Building or Premises without prior written consent of Landlord, and then only of such color, size, character, style and material and in such places as shall be approved and designated by Landlord. Signs on doors and entrances to the Premises and outside of the Premises within the Building, grounds or Parking Area shall be placed thereon by a contractor approved by Landlord.

5.      Tenant shall not place, install or operate on the Premises or in any part of the Building any engine, refrigerating, heating or air conditioning apparatus, stove or machinery, or conduct mechanical operations or place or use in or about the Premises or the Building any explosives, gasoline, kerosene, oil, acids, caustics or any other inflammable, explosive, hazardous or odorous material without the prior written consent of Landlord. No portion of the Premises shall at any time be used for cooking, sleeping or lodging quarters.

6.      Tenant shall not make or permit any nuisance or improper noises in the Building or otherwise interfere in any way with other tenants or persons doing business in the Building or with Landlord's operation of the Building.

7.      Landlord will not be responsible for any fixtures, personal property, equipment, jewelry or money lost in or stolen from the Premises or public areas of the Building, grounds or Parking Area. Landlord shall not be responsible for damages to or theft of motor vehicles or other items from any Parking Areas used in connection with the Building.

8.      No maintenance or repair work shall be done on any vehicles in the Parking Area. No disabled vehicles shall be parked or stored in the Parking Area. All vehicles in the Parking Area shall be parked within the designated spaces and not in more than one (1) space or across spaces. At Landlord's option, all disabled vehicles, recreational vehicles, boats and vehicles improperly parked in spaces designated for handicapped persons and all other improperly parked vehicles may be towed or otherwise removed from the Parking Area at the owner's expense. In the event any vehicle or boat is towed, Landlord will not be liable or responsible for the loss, damage or theft of any property located in the vehicle or boat or for any damage to the vehicle or boat.

9.      Neither Tenant or Tenant's employees, agents, invitees or licensees shall at any time leave or discard any rubbish, paper, articles or objects of any kind whatsoever outside the doors of the Premises or in any other area within the Building or on the grounds or in the Parking Area. No birds, animals, bicycles or vehicles shall be brought into or kept in or about the Building.

10.     None of the entries passages, doors, hallways, or stairways in the Building shall be blocked or obstructed by Tenant Such areas shall not be used by Tenant at any time except for ingress or egress to the Premises by Tenant's, Tenant's employees, agents and invitees.

11.     Landlord shall have the right to determine and prescribe the weight and proper position of any usually heavy equipment, including but not limited to copying equipment, computer equipment, safes and large files that are to be placed in the Building. Only those items which in the exclusive judgment of the Landlord will not do damage to the floors, structure and elevators may be moved into the Building. Tenant shall pay for any damage resulting from moving or installing such articles in the Building or the existence of same in the Building.

12.     All Christmas and other decorations in the Building must be flame retardant.

13.     After hours air conditioning and heating on Monday through Saturday and all day Sunday and holidays determined by Landlord must be requested in writing by noon of a regular work day prior to the day for which additional air conditioning is requested. Tenant shall be charged at the prevailing hourly rate for the use of such air conditioning and heating.

14.     Any request by Tenant to place or remove names from the directory board in the lobby of the Building shall be furnished to Landlord in writing on Tenant's letterhead.

15.     Any services which Tenant requests Landlord to perform which Landlord is not required to perform under this Lease shall, if performed by Landlord, be billed to Tenant at Landlord's cost plus a 15% fee to cover Landlord's overhead costs. Landlord shall have the right to refuse to perform any such services.

16.     If Landlord's maintenance engineer or any of Landlord's other personnel do any work after normal business hours at the request of Tenant, Tenant shall pay for the cost of such work.

17.    All doors leading from public corridors to the Premises are to be kept closed when not in use.

18.    Canvassing, soliciting or peddling in the Building is prohibited and Tenant shall cooperate with Landlord to prevent such activities.

19.    Tenant shall give Landlord immediate notice in the event that any defects or dangerous conditions arise or exist in the Premises or in the Building or if any accidents or emergencies occur in the Premises or Building.

20.    Tenant shall not use the Premises or permit the Premises to be used for photographic, multilith or multigraph reproductions for sale to the general public. All photographic, multilith or multigraph reproductions in the Premises shall be produced for Tenant in the ordinary course of Tenant's business.

21.    All requests for services made by Tenant shall be made directly to Landlord or Landlord's designated agents. Employees of Landlord or Landlord's designated agents shall not perform any work or do anything outside of their regular duties unless directed to do so by Landlord or Landlord's designated agents. Tenant will make no requests directly to Landlord's employees.

EXHIBIT E

GUARANTY

Landlord, Tenant and Guarantor (as herein defined) acknowledge that if it were not for this guaranty (the "**Guaranty**") as an inducement, Landlord would not execute the Lease.  Therefore, for $10.00 and other value received, and in consideration for, as a condition of, and an inducement to ALTERA HIGHLAND LLC, a Texas limited liability company ("**Landlord**") entering into that certain Lease Agreement dated as of August 21, 2012, with SHERMAN/GRAYSON HEALTH SYSTEM, LLC, a Texas limited liability company ("**Tenant**"), for certain premises being Suites 210, 310, 340, 430 and 545 of a medical office building located at 300 N. Highland Drive, Sherman, Texas, on real property owned by an affiliate of Tenant and ground leased to Landlord, as ground lessee (the "**Lease**"), the undersigned officer of LHP HOSPITAL GROUP, INC., a Delaware corporation (the "**Guarantor**"), on behalf of such entity, its legal representatives, heirs, successors, and assigns, hereby irrevocably guarantees to Landlord, Landlord's successors and assigns, absolutely and unconditionally, the full prompt and timely payment, performance and observance of all amounts to be paid and provisions of the Lease to be performed and observed by Tenant, including (without limitation) the rules and regulations incorporated into the Lease, as if Guarantor had executed the Lease as the tenant thereunder.  The Guarantor expressly agrees that the validity of this Guaranty and the obligations of the Guarantor hereunder shall not be terminated, affected or impaired by reason of the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.  The Guarantor further agrees that this Guaranty shall remain and continue in full force and effect notwithstanding any assignment, renewal, modification, extension or waiver of the Lease or any provisions thereof.  The laws of Texas shall apply hereto.

The Guarantor hereby waives, to the fullest extent permitted by law:

(A)     Any right that the Guarantor may have to require Landlord to proceed against Tenant, proceed against or exhaust any security held from Tenant, or pursue any other remedy in Landlord's power to pursue, including, without limitation, re-letting the Premises following a default;

(B)     Any defense based on any claim that the Guarantor's obligations exceed or are more burdensome than those of Tenant;

(C)     Any defenses given to sureties other than actual payment or performance;

(D)     Any defense based on: (i) any legal disability of Tenant; (ii) any release, discharge, modification, impairment or limitation of the liability of Tenant to Landlord  from any cause, whether consented to by Landlord or arising by operation of law or from any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the adjustment of debtor-creditor relationships (an "**Insolvency Proceeding**"), and/or (iii) any rejection or disaffirmance of the Lease, or any part of it, or any security held for it, in any such Insolvency Proceeding;

(E)     Any defense based on any action taken or omitted by Landlord in any Insolvency Proceeding involving Tenant, including any election to have Landlord's claim allowed as being secured, partially secured or unsecured, any extension of credit by Landlord to Tenant in any Insolvency Proceeding, and the taking and holding by Landlord of any security for any such extension of credit; and

(F)     The Guarantor agrees to jurisdiction and venue in Grayson and Dallas Counties, Texas, and waives any objection to such venue on the grounds of forum non conveniens. **The Guarantor knowingly, voluntarily and intentionally waives the right to a trial by jury in respect of any litigation based hereon or arising out of, under, or in connection with this Guaranty.**  In the event Landlord incurs any

Exhibits-7

**A0512**

fees and/or expenses in the enforcement of this Guaranty, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings, the Guarantor agrees to be liable for same (including reasonable attorney's fees and costs) and to pay same promptly on demand by Landlord.

The Guarantor acknowledges liability for every obligation of Tenant under the Lease.  Any capitalized term used herein and not otherwise defined shall have the same meaning as defined in the Lease. Each provision of this Guaranty shall be considered severable, and if for any reason and provision is determined to be invalid under current or future law, such invalidity shall not impair the operation of or otherwise affect the valid portions of this Guaranty.

<div align="center">

**<u>GUARANTOR</u>**:

LHP HOSPITAL GROUP, INC.,
a Delaware corporation

</div>

By:_____
Name:_____
Title:_____

Date:_____

# EXHIBIT 13

## LEASE AGREEMENT

This Lease ("**Lease**") is made as of August 21, 2012 (the "**Effective Date**"), by and between ALTERA HIGHLAND LLC, a Texas limited liability company ("**Landlord**"), and SHERMAN/GRAYSON HEALTH SYSTEM, a Texas limited liability company ("**Tenant**").

## RECITALS:

Landlord, as tenant, has entered into that certain Ground Lease Agreement dated as of the Effective Date (the "**Ground Lease**") with Tenant, as landlord, for the land upon which the Building (as defined below) is located.  Contemporaneously with the Ground Lease, (i) Landlord purchased one (1) medical office building, from Tenant, and (ii) Tenant, as "**Declarant**", filed of record a Declaration of Covenants, Restrictions and Easements (the "**Declaration**") covering the one (1) medical office building, the Hospital commonly known as Texas Health Presbyterian Hospital - WNJ (the "**Hospital**") owned by Tenant located in proximity to the medical office building and the parking  and other common areas  dedicated for use by persons occupying, using or visiting the medical office building, the Hospital and other facilities related thereto.  The Ground Lease and this Lease are subject to the terms and provisions of the Declaration. Tenant, as "Declarant" under the Ground Lease and "Landlord" under the Ground Lease, is familiar with the terms and provisions of each of the Declaration and the Ground Lease.

As part of Tenant's purchase of the Building commonly called "300 N. Highland Drive, Sherman, Texas", Tenant agreed to enter into this Lease.

Simultaneously herewith, Landlord and Tenant are also entering into corresponding leases (each, a "**Related Lease**") for vacant, shell and existing space of the Building, and for the Ambulatory Surgery Center in the Building.

1.    **DEFINITIONS AND BASIC PROVISIONS.**

1.1    Parties and Addresses. The parties hereto and their respective addresses are as follows:

(1)    Landlord's Address:    5910 North Central Expressway
Suite 800
Dallas, TX 75206.

(2)    Tenant's Address:    2400 North Dallas Parkway, Suite 450
Plano, Texas 75093
Attention: Executive Vice President – Administration

(3)    Ground Lessor Address: 2400 North Dallas Parkway, Suite 450
Plano, Texas 75093
Attention: Executive Vice President –
Administration

1

| (1) | Guarantor: | LHP Hospital Group, Inc., a Delaware corporation |
|---|---|---|
| (2) | Guarantor's Address: | 2400 North Dallas Parkway, Suite 450 Plano, Texas 75093 Attention: Executive Vice President – Administration |

    1.2    <u>Defined Terms</u>: In addition to the capitalized terms elsewhere defined in this Lease, the following terms shall be deemed to be defined terms of this Lease for all purposes. Each of the following definitions and basic provisions shall be construed in conjunction with and limited by the reference thereto in other provisions of this Lease:

    (1)    <u>Additional Rent</u>: All rent and other sums payable hereunder from Tenant to Landlord, other than Base Rent.

    (2)    <u>Base Rent</u>: An annual Base Rent of $12.05 per RSF in the Premises, subject to adjustment as provided in Section 3.1. As of the Commencement Date, the monthly Base Rent is $14,450.96.

    (3)    <u>Broker(s)</u>: None.

    (4)    <u>Building</u>: The building in which the Premises are situated, being generally known as 300 N. Highland Drive, Sherman, Texas.

    (5)    <u>Commencement Date</u>: The Effective Date.

    (6)    <u>Common Areas</u>: Those parts of the Building, Land and related facilities designated from time to time by Landlord for the common use of all doctors, physicians, tenants, visitors, patients and employees, including among other facilities, parking areas, sidewalks, landscaping, curbs, loading docks and areas, private streets and alleys, automobile entrances, exits and driveways, entranceways (open, enclosed or otherwise), lighting facilities, drinking fountains, public toilets, signs, service areas, common utility lines, pipes, and/or conduits, and the like.

    (7)    <u>Declarant</u>: means the Declarant under the Declaration, Sherman/Grayson Hospital, LLC, a Texas limited liability company, and its successors under the Declaration.

    (8)    <u>Declaration</u>: has the meaning set forth in the Recitals.

    (9)    <u>Expiration Date</u>: The last day of the Term hereof, which date is contemplated as being one hundred eighty (180) full months after the Commencement Date. Notwithstanding any other provision of this Lease to the contrary, if the Expiration Date would otherwise occur on a date other than the last day of a calendar month, then the Term shall be automatically extended to include the last day of such calendar month.

    (10)    <u>Floor Plan</u>: The outline of the Premises as depicted in <u>Exhibit B</u> attached hereto and made a part hereof for all purposes.

    (11)    <u>Guarantor</u>: has the meaning set forth in Section 1.1.

<div align="center">2</div>

(12)    <u>Highest Lawful Rate</u>:  The maximum nonusurious interest rate, if any, that at any time, or from time to time, legally may be contracted for, taken, reserved, charged, or received on the indebtedness owed to Landlord under this Lease under the laws which are presently in effect of the United States of America and the State of Texas applicable to Landlord and such indebtedness.

(13)    <u>Hospital</u>:  The Hospital defined in the Recitals of this Lease, and its successors and assigns.

(14)    <u>Interior of the Premises</u>: Standard office front and entrance (including without limitation, all plate glass and exterior doors), all of the interior wall framing, floors and floor covering, ceiling and interior staining and finishes, all interior doors and hardware, all interior electrical conduits and appurtenances, mechanical machinery and equipment, all interior electrical fixtures, interior plumbing and plumbing fixtures, Tenants' trade fixtures, and all other parts in the interior of the Premises.

(15)    <u>Land</u>: The lot, tract or parcel of land upon which the Building is situated, in Grayson County, Texas as more particularly described by metes and bounds on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes, plus any contiguous parcels or strips of land leased or licensed to Landlord under the Ground Lease or by the Declaration, and are used in connection with or to service the Building or any part thereof.

(16)    <u>Late Charge</u>: Tenant shall pay $100.00 as a late fee to cover Landlord's administrative costs.  Additionally, all unpaid amounts Tenant fails to pay by the fifth (5th) day after the date due shall bear interest from the first day due until paid in full at the lesser of ten percent (10%) per annum or the Highest Lawful Rate.  In no event, however, shall the late fees and/or charges permitted under this Section or elsewhere in this Lease, to the extent the same are considered to be interest under applicable law, exceed the amount of interest that Landlord lawfully could have charged, received or collected on the indebtedness in question at the Highest Lawful Rate.

(17)    <u>Lease</u>: This Lease Agreement.

(18)    <u>Lease Year</u>: Each twelve (12) consecutive month period commencing on the Commencement Date or any anniversary thereof; provided that, if the Commencement Date is other than the first day of a calendar month, then the first Lease Year shall include such partial month together with the next succeeding twelve (12) consecutive months, and each succeeding Lease Year shall begin on the first day of the calendar month that corresponds to the first day of the calendar month following the Commencement Date.

(19)    <u>Operating Expenses</u>: All expenses, costs and disbursements of every kind and nature that Landlord or any of its Affiliates directly or indirectly pays or becomes obligated to pay, whether under the Ground Lease, the Declaration, any Related Lease or otherwise, in respect of the Ground Lease, the ownership, management, maintenance, repair, replacement and operation of the Building, the Common Areas and related facilities of the Building or arising in connection with any Related Lease.  Notwithstanding the foregoing, Operating Expenses shall exclude capital costs associated with the replacement of the roof, foundation, and exterior walls.

(20)    <u>Permitted Use</u>:  General Medical Offices.

(21)    <u>Premises</u>: Suites A, B, C, D and E, comprised of radiology and common areas of the Building occupied or used by Tenant as of the Effective Date, containing approximately 14,391 RSF (as defined herein).  The Premises are substantially depicted on the attached Floor Plan shown on <u>Exhibit B</u> and being located in the Building.

(22)    <u>Pro Rata Share or Tenant's Pro Rata Share</u>: 12.232%, provided that if the Building is expanded or contracted, Tenant's Pro Rata Share shall increase or decrease, as the case may be, such that Tenant's Pro Rata Share will equal a fraction, the numerator of which is the net rentable area of the Premises, and the denominator of which is the net rentable area of the Building, which is approximately 117,655 RSF as of the Effective Date.

(23)    <u>Rent</u>: All Base Rent and Additional Rent.

(24)    <u>RSF</u>: means the rentable square feet in the Premises, Building or other area in question, as determined by an architect using ANSI/BOMA Standards.

(25)    <u>Security Deposit</u>: None.

(26)    <u>Tenant Improvement Allowance</u>:  Means that amount, if any, set forth in <u>Section 2.3</u>.

(27)    <u>Tenant Improvements</u>:  Means those improvements and alterations Tenant may elect to construct or install in the Premises, subject to the provisions of this Lease.

(28)    <u>Term</u>: Fifteen (15) years (one hundred eighty (180) full months) from the Commencement Date, unless earlier terminated pursuant to the provisions of this Lease.

## 2.    <u>GRANTING CLAUSE; TENDER OF POSSESSION.</u>

2.1    <u>Granting Clause</u>.  In consideration of the Rent reserved and the covenants and agreements herein contained on the part of the Tenant to be observed and performed, and subject to the terms and provisions of the Declaration and Ground Lease, Landlord hereby demises, lets and leases unto Tenant, and Tenant hereby accepts, leases and rents from Landlord, the Premises.

2.2    <u>Tender and Acceptance of Possession</u>.  Landlord hereby tenders, and Tenant hereby accepts, possession of the Premises on the Effective Date.  Tenant hereby accepts the Premises in their "AS-IS" condition, and Landlord shall have no obligation to perform any work therein (including demolition of any improvements existing therein or construction of any tenant finish-work or other improvements therein), and shall not be obligated to reimburse Tenant or provide an allowance for any costs related to the demolition or construction of improvements therein.  Tenant has reviewed, and hereby accepts, the condition and capacity of the Building's existing electrical systems and HVAC.  Tenant acknowledges that Landlord does not have any obligation, express or implied, to modify or increase the capacity of such systems.  Before Tenant may occupy the Premises to conduct its business therein, Tenant shall, at its expense, obtain and deliver to Landlord a certificate of occupancy from the appropriate governmental authority for the Premises.

4

**A0518**

3.    **RENT.**

3.1    Base Rent.

(1)    This is a pure "net lease," and Base Rent, Additional Rent, Operating Expenses and all other sums payable hereunder by Tenant shall be paid without notice, demand, setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense. It is intended that the Base Rent provided for in this Lease shall be absolutely net to Landlord throughout the Term, and, accordingly, Tenant covenants and agrees to pay, as they become due and payable and before they become delinquent, all operating and capital expenses in connection with the operation, maintenance, repair, restoration, use or occupation of the Premises including, without limitation, the costs, charges and assessments related to taxes, impositions, utilities and insurance. Tenant shall pay all such taxes and impositions even though the taxing statue or ordinance may purport to impose such taxes or impositions on Landlord.

(2)    The Base Rent shall be paid by Tenant in monthly installments to Landlord on or before the first day of each calendar month during the Term hereof. The monthly Base Rent for any fractional month at the beginning or the end of the Term shall be prorated based upon the actual number of days in such month.

(3)    The Base Rent will be adjusted and increased on each anniversary of a Lease Year (the "**Adjustment Date**") by an amount equal to the greater of (i) 103% of then-effective Base Rent (i.e., as it may have been adjusted pursuant to this Section 3.1(3)) and (ii) subject to the limitation set forth below in this Section 3.1(3), any increase in the Consumer Price Index for "All Urban Consumers, U.S. City Average, All Items," issued by the Bureau of Labor Statistics of the United States Department of Labor (the "**Index**"). The adjustments in the Base Rent will be determined by multiplying the then-effective Base Rent (i.e., as it may have been adjusted pursuant to this Section 3.1(3)) by a fraction, the numerator of which is the Index number for the date one month prior to the Adjustment Date and the denominator of which is the Index number for the first month of the first year of the Term. When the adjusted rent for the Adjustment Date has been determined, Landlord shall give Tenant written notice of such adjusted rent; and, upon adjustment of the rent, any underpayment of rent from the Adjustment Date to the date Tenant is notified of the adjustment shall be immediately due and payable by Tenant. Landlord's failure or delay to notify Tenant of said rent adjustment shall not constitute a waiver of the right to any adjustment provided for in this Lease. In the event that the Index shall be discontinued, then Landlord shall use an index substantially similar to the Index to calculate future adjustments. Notwithstanding any other provision of this Section 3.1(3) to the contrary, the Base Rent in any Lease Year shall not increase by more than five percent (5%) of the Base Rent in the immediately preceding Lease Year.

(4)    Landlord and Tenant are knowledgeable and experienced in commercial transactions and agree that the provisions of this Lease for determining charges, amounts, Operating Expenses and Additional Rent are commercially reasonable and valid even though such methods may not state a precise mathematical formula for determining such charges. ACCORDINGLY, TENANT VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS OF TENANT UNDER SECTION 93.012 OF THE TEXAS PROPERTY CODE, AS IT MAY BE AMENDED OR REPLACED.

5

3.2    Operating Expenses.

(1)    Tenant's Pro Rata Share of Operating Expenses for the remainder of the calendar year after the Commencement Date and for each subsequent calendar year shall be estimated by Landlord, and written notice thereof shall be given to Tenant. Upon receipt of said written notice from Landlord, the estimated Operating Expenses shall be due and payable as herein provided. For any such remainder of the calendar year after the Commencement Date, Tenant agrees to pay Landlord each month, at the same time the Base Rent Payment is due, an amount equal to the amount of such estimated monthly Pro Rata Share of Operating Expenses for the remainder of such calendar year; and during each calendar year thereafter Tenant agrees to pay Landlord each month, at the same time the Base Rent Payments are due, an amount equal to one-twelfth (1/12th) of the estimated annual Pro Rata Share of Operating Expenses due.

(2)    If any portion of Operating Expenses increase during a calendar year, Landlord may revise the estimated Operating Expenses during such year by giving Tenant written notice to that effect, and thereafter Tenant agrees to pay Landlord, in each of the remaining months of such calendar year, an additional amount equal to the amount of such annual increase in the estimated Pro Rata Share of Operating Expenses divided by the number of months remaining in such calendar year.

(3)    After the end of each calendar year, Landlord shall prepare and deliver to Tenant a statement showing Tenant's Pro Rata Share of the total amount of Operating Expenses. Within ten (10) days after receipt of the aforementioned statement, Tenant agrees to pay Landlord the remaining amount owed by Tenant. However, if Tenant has paid more than its Pro Rata Share of the actual Operating Expenses, Landlord shall either pay the amount of such excess to Tenant within ten (10) days after delivery of the aforementioned statement, or, at Landlord's option, apply such excess to any sums due or to become due from Tenant to Landlord.

(4)    Notwithstanding anything herein to the contrary, in no event will the Base Rent provided for in this Lease ever be reduced.

3.3    Payment For Other Services. Tenant agrees to pay Landlord as Additional Rent all charges for any services, goods, or materials furnished at Tenant's request which are not required to be furnished by Landlord under this Lease, immediately upon demand, plus an administrative fee not to exceed five percent (5%) of the cost of the requested services, good or materials.

3.4    Late Charge. If Landlord does not receive any payment due on or before the 5th day of the calendar month when such payment is due, the Late Charge shall be due and payable (in addition thereto). Said Late Charge is for the purpose of reimbursing Landlord for the extra administrative costs and expenses incurred in connection with the handling and processing of such delinquent payment.

3.5    No Offsets or Demands.  All Base Rent, Additional Rent and other amounts due from Tenant to Landlord under this Lease shall be paid without notice, demand, offset, abatement or deduction. This Lease and the rights of Landlord and obligations of Tenant hereunder shall not be affected by any event or for any reason or cause whatsoever foreseen or unforeseen.  The obligations of Tenant under this Lease shall be separate and independent covenants and agreements and all monetary obligations shall continue to be payable in all events.

6

4.    **SECURITY DEPOSIT.**  Tenant is not required to make any security deposit in connection with this Lease.

5.    **COMMON AREAS.**

    5.1    <u>Parking Facilities and Other Common Areas</u>. During the Term, Tenant shall be entitled to the nonexclusive use (in common with others entitled thereto) of the Common Areas outside the Building designated from time to time by Landlord as the parking areas of the Building.  As of the Effective Date, the parking areas designated by Landlord for use by Tenant are depicted on <u>Exhibit C</u>.  In such parking areas, Tenant shall be entitled to use a number of parking spaces equal to 5 parking spaces for every 1,000 RSF of space in the Premises.  Tenant shall not conduct, solicit business or display or place any signs or advertising on or within the Common Areas, or distribute handbills therein, or take any action which would interfere with the rights of other persons to use the Common Areas.

    5.2    <u>Parking Regulations</u>. Tenant understands and agrees that the Declarant shall have the right to maintain and operate lighting facilities on all of the parking areas and to police all of the parking and other Common Areas, including, without limitation, the right to discourage non-tenant parking, to designate and regulate parking areas, and to do and perform such other acts with respect to said Common Areas as in the judgment of the Declarant may be legally necessary to prevent a dedication thereof to the public.

6.    **MAINTENANCE AND REPAIRS.**

    6.1    <u>Landlord's Obligations</u>.  As part of the Operating Expenses, Landlord shall maintain or cause to be maintained the elevators, public restrooms and other Common Areas within the Building, the structural elements building systems of the Building (including the HVAC system which serves the Building and the Premises).  Landlord shall, at its own cost and expense, maintain or cause to be maintained the foundation, the exterior walls (but excluding the interior glass or doors that are part of the Premises) and roof of the Building in good condition or repair.  However, if any repair is required by reason of the negligence or intentional misconduct of Tenant or any of its agents, employees, invitees or Affiliates, Landlord may add the cost thereof to the next installment of Rent thereafter coming due, but only to the extent that the cost thereof is not covered by insurance proceeds actually received by Landlord.  Except as herein provided, Landlord shall have no obligation to repair, maintain, alter, replace, or modify the Premises or any part thereof.  Any failure by Landlord to furnish, or delay in furnishing, any maintenance or services that are required of Landlord under this Section or otherwise under this Lease, when such failure is caused by acts of God or any other condition beyond Landlord's reasonable control, shall not constitute a default by Landlord under this Lease and shall not permit Tenant to abate any Rent or relieve Tenant from any of its obligations under this Lease.

    6.2    <u>Tenant's Obligations</u>.  Tenant shall maintain the interior of the Premises, including all interior glass and doors that are a part of the Premises and any improvements done by or on behalf of Tenant, in good condition and clean and attractive appearance, performing all janitorial services and making all repairs at its own cost and expense, and using materials and labor of a kind and quality equal to the original work.  Tenant shall maintain the Premises in accordance with all requirements of law, including (without limitation) the Americans with Disabilities Act (as the same may be amended) and similar state or local laws, rules or regulations.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises in a broom clean condition and otherwise in the same condition as received by Tenant on the Commencement Date upon initial completion of the interior improvements, reasonable wear and tear excepted.  If Tenant shall neglect and/or fail to observe, keep or perform any of its obligations to maintain and repair and Premises in the time and manner provided in this Article and if such neglect and/or failure shall continue for ten (10) days after notice thereof, Landlord shall have the right to perform said maintenance and repairs.  In the event Landlord does so perform Tenant's responsibilities for said

7

maintenance and repairs, Landlord shall furnish Tenant a statement of the actual cost thereof, plus an administration fee not to exceed ten percent (10%) of the actual costs, which statement shall be immediately payable by Tenant.  All alterations and modifications of or to the Premises shall be in accordance with the terms and provisions of Section 11.2 below.

**7.     TAXES ON TENANT'S PROPERTY.**

Tenant shall be responsible for and shall pay, before same becomes delinquent, all federal, state, county, and local taxes levied or assessed upon any and all personal property of any kind owned by or placed in, on or about the Premises by Tenant during the Term, and all taxes and assessments on trade fixtures, furniture, and all sales, excise and other taxes on Tenant's business shall be paid entirely by Tenant. If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property, or if the assessed value of Landlord's property is increased by inclusion of personal property, furniture or fixtures placed by Tenant in the Premises, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

**8.     INSURANCE.**

8.1     Hold Harmless. Tenant covenants and agrees to indemnify and save each of Landlord, and Landlord's members, managers, partners, agents, employees and representatives, harmless from and against any and all costs, liability or expense arising out of any claims of any person or persons on account of any occurrence in, upon or at the Premises, resulting from the occupancy or use thereof by Tenant, or by any person or persons holding or using the Premises thereunder, occasioned in whole or in part by reason of the improper and/or lack of control and supervision throughout the Common Areas of property owned or controlled by Tenant, or by reason of the use or misuse of the parking area or any other Common Areas by Tenant or by any person or persons holding or using the Premises, or any part thereof, under Tenant, including without limitation, Tenant's clients, invites, agents, contractors, employees, servants, subtenants, assignees or licensees, and without limiting the generality of the foregoing, Tenant further covenants and agrees to indemnify and save each of Landlord and Landlord's partners, agents, employees and representatives harmless from and against any penalty, damage or charge incurred or imposed by reason of any violation of law or ordinance by Tenant or any person or persons holding under Tenant and from any cost, damage or expense arising out of the death of or injury to any person or persons holding under Tenant and from any cost, damage or expense arising out of the death of or injury to any person or persons holding under Tenant. In case any action or claim to which Landlord (or Landlord's partners, members, managers, agents, employees or representatives) are entitled to indemnification shall be brought or asserted in any way against Landlord (or Landlord's members, managers, partners, agents, employees or representatives) or Tenant, Tenant shall immediately notify Landlord of the same and shall furnish Landlord with all relative information. Landlord shall be entitled, at Tenant's expense, to participate in, and to the extent that it wishes, to assume the defense thereof.

8.2     Tenant's Liability Insurance. Tenant agrees to maintain in force during the Term a policy or policies of comprehensive public liability insurance, including property damage, written by one or more responsible insurance companies approved by Landlord and licensed to do business in Texas, which insurance companies shall be rated not less than X by Best Guide Rating, insuring Tenant and naming as additional named insureds, Landlord, Landlord's property management company as agent, each Mortgagee and such other persons, firms, or corporations as are designated by Landlord, against loss of life, bodily injury and property damages in which the limit of public liability shall be not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) single limit bodily injury and in which the limit of property damage liability shall be not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) and an umbrella coverage of not less than TWO MILLION AND NO/100 DOLLARS ($2,000,000.00). Additionally, Tenant shall maintain a comprehensive automobile liability insurance policy of ONE

8

HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00). Each such policy shall be non-cancellable for any cause without first giving Landlord thirty (30) days prior written notice. Subject to all of the foregoing, the insurance coverage required to be furnished by Tenant pursuant to this Section may be in the form of a blanket policy covering all of Tenant's operations.

8.3    Tenant's Fire Insurance. Tenant agrees to maintain in force during the Term a policy or policies of fire and extended coverage insurance in the case of fire sprinkler leakage, malicious mischief, vandalism and other extended coverage perils, for the full insurable replacement value of all additions and of all office furniture, office equipment, merchandise, and other items of Tenants' property within or on the Premises.  Coverage in this paragraph shall be in an amount not less than one hundred percent (100%) of the replacement costs of Tenant's improvements to the Premises.

8.4    Tenant's Workers Compensation. If required by law, Tenant agrees to maintain in force during the Term workers compensation and employers liability insurance with a waiver or subrogation endorsement, in a form and amount satisfactory to Landlord.

8.5    Evidence of Insurance. A copy of each such policy or a certificate of such insurance required to be maintained by Tenant shall be delivered to Landlord upon the Commencement Date of this Lease and annually thereafter upon the first day of each Lease Year throughout the Term. If Tenant fails to procure said insurance or deliver to Landlord, such evidence thereof, Landlord may procure same and Tenant shall reimburse Landlord for the cost thereof plus an administrative fee not to exceed ten percent (10%) of the actual cost immediately upon demand.

8.6    Landlord's Liability Insurance. Landlord agrees to maintain in force during the Term a policy or policies of comprehensive public liability insurance, including property damage, written by one or more responsible insurance companies licensed to do business in Texas and insuring Landlord against loss of life, bodily injury and/or property damage with respect to the operation of the Building, the policy limits of which to be in amount satisfactory to Landlord. In addition, Landlord may maintain in force such umbrella policy or policies of public liability insurance as Landlord, in its sole discretion, may deem appropriate. Landlord's failure to procure any such insurance shall not invalidate this Lease or lessen Tenant's liability hereunder.  Landlord's insurance hereunder shall include loss of rent coverage.

8.7    Landlord's Fire Insurance. Landlord agrees to procure and keep in effect during the Term a policy or policies of fire and extended coverage insurance covering the Building, including rent abatement, vandalism and malicious mischief coverage, written by an insurance company authorized to do business within the State of Texas, and in an amount at the full replacement cash of the Building.  Such insurance shall provide protection against losses so insured against for the sole and exclusive benefit of Landlord. The full amount of any proceeds payable thereunder shall be payable to Landlord, and Tenant shall not be entitled to, and shall have no interest in, such proceeds or any part thereof. Tenant is advised to procure such insurance as Tenant deems appropriate to protect its interest.

8.8    Waiver of Subrogation. To the extent permitted by the laws and insurance regulations of the State of Texas, the respective parties hereto hereby waive and release any and all claims, demands and causes of action which each might have against the other party, either for damage to or loss of any part of the Premises or of any adjoining premises belonging to Landlord, arising from perils ordinarily insured against under a standard fire and extended coverage insurance policy issued in the State of Texas, regardless of whether such damage or loss is occasioned by the negligence of the respective parties, or either of them, their agents, servants or employees.

9

9.      **UTILITIES AND SERVICES.**

Provided Tenant is not in default of any term, condition or covenant of this Lease, Landlord agrees to furnish or cause to be furnished to the Premises gas, water (for drinking, cleaning and lavatory purposes only), and electricity during the Term. Landlord shall furnish tempered and refrigerated water at those points of supply designated by Landlord in the Common Areas of the Building, heated and refrigerated air conditioning in season (at temperatures, in amounts and at times considered by Landlord to be standard or in compliance with any governmental regulations; such service after hours, on Saturday afternoons, Sundays and holidays will be furnished only upon 24 hours' prior written request of Tenant who shall bear the entire cost thereof). Landlord shall furnish janitorial service, in the manner and to the extent deemed standard by Landlord during the periods and hours as such services are normally furnished to all tenants. Tenant shall not hinder the work of the Building janitor. Landlord shall furnish routine maintenance, painting and lighting service for all Common Areas within the Building in the manner and to the extent deemed by Landlord to be standard. Tenant will pay all telephone charges. Landlord shall not be liable in damages or otherwise for failure, stoppage or interruption of any such service nor shall the same be construed as an eviction of Tenant, work an abatement of Rent, or relieve Tenant from the operation of any covenant or agreement set forth herein; but in the event of any failure, stoppage or interruption thereof not caused by Tenant or Tenant's agents, employees, contractors, clients or invites, Landlord shall use reasonable diligence to resume service promptly.

Landlord reserves the right to separately meter usage of any utility service included in Operating Expenses and charge Tenant and other tenants of the Building based on such usage.  Further, Landlord reserves the right from time to time to charge to Tenant and other tenants of the Building applicable costs with respect to usage of Building services and utilities at times other than during standard business hours, on such basis as Landlord may reasonably determine for the purpose of properly allocating the costs of such services and utilities in accordance with the usage thereof.

Notwithstanding anything hereinabove to the contrary, Landlord reserves the right from time to time to make reasonable modifications to the above standards for services and utilities.

10.     **INTENTIONALLY DELETED**.

11.     **PROPERTY OBLIGATIONS.**

11.1    Tenant's Property. Landlord shall not be liable for any damage to or loss of personal property placed in or about the Premises by Tenant or Tenant's agents, employees, clients, guests, invites or others, resulting from fire, theft, explosion, flood, windstorm or other casualty caused by Acts of God or by the acts or omissions of other occupants of other space in the Building or caused by operations during construction of any public or quasi public work. All property kept or stored within the Premises shall be kept or stored at the risk of Tenant only, and Tenant shall hold Landlord harmless from any claims arising out of damage to the same, including subrogation claims by Tenant's insurer, if any, unless such damage shall be caused by the gross negligence of Landlord.

11.2    Tenant Fixtures, Alterations and Personal Property. Tenant shall not make or allow to be made any alterations, modifications or physical additions in or to the Premises without the prior written consent of Landlord which consent shall not be unreasonably withheld or delayed.  Tenant may proceed with the construction of the approved alterations, modifications or physical additions, but only so long as they are in strict compliance with the plans and specifications and with the provisions of this Section 11.2. All alterations shall be made at Tenant's expense, either by Tenant's contractors, which previously have been approved in writing by Landlord, or at Landlord's option, by Landlord's contractors on terms reasonably satisfactory to Tenant, including a fee of five percent (5%) of Landlord's actual cost of the work

10

**A0524**

to cover Landlord's overhead. None of Tenant's construction, alterations, modifications or physical additions shall (i) alter the exterior appearance of the Building or Premises in any manner, (ii) adversely affect the structure or safety of the Building or Premises or any portion thereof, (iii) fail to comply with all building, safety, fire and other codes and governmental and insurance requirements, or (iv) fail to be completed promptly and in a good and workmanlike manner. All trade fixtures installed by Tenant shall be new or completely reconditioned. At Landlord's option, any such approved additions, alterations, modifications, improvements and/or fixtures furnished or installed by Tenant which are sufficiently affixed or annexed to the Premises so as to become a part thereof, other than unaffixed movable trade fixtures, shall upon the expiration or earlier termination of this Lease, become the property of Landlord.  Any damage to the Premises caused by such installation and/or removal of Tenant's fixtures and equipment shall be repaired at Tenant's sole cost and expense. The provisions of this Section shall expressly survive the expiration or earlier termination of this Lease.

    11.3    Liens. Tenant shall neither permit nor suffer an involuntary lien to be filed or affixed against the Building, the Premises, the fee simple title of the Land or Landlord's leasehold estate therein, or any part thereof, and shall not voluntarily grant any lien or security interest therein. In the event any such involuntary or voluntary lien, including without limitation, mechanic's lien or tax lien, is filed and/or affixed against the Building, the Premises the fee simple title of the Land or Landlord's leasehold estate therein, or any part thereof, or against any fixtures, equipment, furnishings therein or all types of work and improvements comprising the Interior of the Premises and Tenant has not caused the same to be released and discharged of record within ten (10) days after notice thereof, same shall constitute a default hereunder. Upon such default, in addition to any other remedies available to Landlord herein, Landlord may cause the release and discharge of such lien, Tenant shall repay to Landlord immediately upon demand as Additional Rent hereunder all such sums disbursed or deposited by Landlord plus an administrative fee not to exceed five percent (5%) of the sums disbursed or deposited. Nothing contained herein, however, shall imply any consent or agreement on the part of Landlord or anyone holding under Landlord to subject Landlord's interest to liability under any mechanic's or other lien law, regardless of whether the performance or the furnishing of such work, labor, services or materials to Tenant or anyone holding under Tenant shall have been consented to by Landlord.

## 12.    SUBORDINATION/ATTORNMENT.

    12.1    Subordination. Tenant covenants and agrees promptly upon request of Landlord to execute and deliver, in a recordable form provided by Landlord, an acknowledgment of the subordination of this Lease to any mortgage, deed of trust, security agreement or other lien or encumbrance resulting from any method of financing or refinancing, presently or henceforth placed upon the Landlord's leasehold estate in the Land and/or fee interest in the Building and any future expansion thereof or additions thereto, and to all advances of money or other value heretofore or hereafter made upon the security thereof.  Notwithstanding anything to the contrary contained herein, Landlord agrees to obtain a subordination, non-disturbance and attornment agreement ("**SNDA**") from its current lender in a form reasonably acceptable to Tenant which shall provide, among other things, that this Lease shall be recognized and Tenant's rights and occupancy under this Lease shall not be disturbed in the event Tenant is not in default hereunder beyond any applicable notice and cure periods.  In addition, Tenant shall not be required to subordinate its rights under this Lease to the interest of any future lender unless Landlord has first delivered an SNDA to Tenant executed by such future lender in a form reasonable acceptable to Tenant and containing a similar non-disturbance right.

    12.2    Collateral Assignment by Landlord. Subject to the foregoing provisions of this Article, Landlord reserves the right, without notice to or consent of Tenant, to assign this Lease and/or any and all Rent hereunder as security for the payment of any mortgage loan, deed of trust loan, or other method of financing or refinancing.

12.3    <u>Attornment</u>. In the event any such mortgage is foreclosed, or in the event of the exercise of the power of sale under any such deed of trust, Tenant shall consider the purchaser at the foreclosure trustee's sale to be the Landlord hereunder, and Tenant will attorn to the purchaser and will recognize the purchaser as the owner and Landlord under this Lease.

## 13.    <u>USE AND OPERATION.</u>

13.1    <u>Use of Premises</u>. The Premises shall be used and occupied by Tenant solely for the Permitted Use and Tenant expressly agrees that no use shall be made or permitted or acts done by Tenant and/or any agents, employees, subtenants, or assignees of Tenant, which shall increase the existing rate of insurance coverage or cause cancellation of such insurance coverage. Tenant shall not (i) permit any objectionable or unpleasant odors to emanate from the Premises; nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside of the Premises or where the same can be seen or heard from outside the Premises; (ii) place any antenna, awning or other projection on the exterior of the Premises; (iii) take any other action which would constitute a nuisance or would disturb or endanger other tenants of the Building or unreasonably interfere with their use of their respective premises; or (iv) do anything which would tend to injure the reputation of the Building.  Tenant shall at all times comply with all terms and provisions of the Ground Lease and Declaration applicable to Tenant, or Tenant's use of the Premises and Common Areas.

13.2    <u>Suitability of Premises</u>. Tenant warrants to Landlord that it has, prior to the execution hereof, fully inspected the Building, the Common Areas, the property and all items related thereto, and that Tenant has made, performed, obtained and received all studies, inspections, reports, diagnoses and tests that Tenant desires relative to the Building, the Common Areas, the property and all items related thereto and Tenant's proposed business use of the Premises. Tenant further warrants to Landlord that Tenant has inspected, or will thoroughly inspect, the Plans and Specifications agreed and to be agreed with Landlord for Landlord's construction of the shell of the Premises and will be fully satisfied with such inspections and Plans and Specifications for the Premises. Tenant understands and agrees that Tenant is accepting the Building, the Common Areas, the property and all items related thereto, and will be accepting the Premises, in their "AS-IS", "WHERE-IS" condition, "WITH ALL FAULTS" and without any warranty or guarantee whatsoever.  Tenant warrants that it used or will use all due diligence in conducting all studies inspections, diagnoses and tests on the Premises the Building, the Common Areas, the property and all items related thereto that Tenant deemed necessary or appropriate. Tenant acknowledges that Landlord has not made and does not make, and Landlord hereby disclaims, any and all warranties, express or implied, which in any way relate to the Premises the Building, the Common Areas, the property and all items related thereto or the condition thereof, including without limitation any implied warranty of suitability or habitability. Tenant further understands that Landlord has relied and will rely upon Tenant's having made all inspections Tenant desired, and that but for such inspections by Tenant, Landlord would not have leased the Premises to Tenant. Additionally, the parties agree that the obligation of Tenant to pay all Rent and other sums hereunder provided to be paid by Tenant, and the obligation of Landlord to perform Landlord's other covenants and duties hereunder, constitutes independent, separate and unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is expressly provided for herein and not otherwise. It is agreed that in the event Landlord commences any proceedings against Tenant for nonpayment of Rent or any other sum due and payable by Tenant hereunder, Tenant shall not interpose any counterclaim or other claim against Landlord of whatever nature or description in any such proceedings; and in the event Tenant interposes any such counterclaim or other claim against Landlord in any such proceeding, Landlord and Tenant stipulate and agree that, in addition to any other lawful remedy of Landlord, upon motion of Landlord, such counterclaim or other claim asserted by Tenant shall be severed out of the proceedings instituted by Landlord and Landlord may proceed to final judgment separately and apart from and without consolidation with or reference to the status of such counterclaim or any other claim asserted by Tenant.

14.    **HAZARDOUS MATERIALS.**

14.1    Tenant, and all of Tenant's partners, officers, directors, employees, representatives, agents, contractors, subcontractors, successors, assigns, lessees, sublessees, concessionaires, invitees and any other occupants of the Premises (collectively, "**Tenant's Representatives**"), shall abide by all Federal, state and local statutes, ordinances, codes and regulations, now existing or hereinafter enacted (collectively, "**Hazardous Materials Laws**"), governing the use, handling, depositing or disposal of hazardous or toxic substances, and medical wastes (collectively, "**Hazardous Materials**").  Landlord has no obligation to provide or make provision for disposal facilities for Hazardous Materials or other medical wastes, and Tenant shall not deposit or dispose of any Hazardous Materials or other medical wastes into the general waste disposal facilities provided by Landlord.  Tenant shall, at Tenant's expense, employ or engage private waste management services to dispose of any and all waste of Tenant which must be handled in any manner other than general waste collection provided by Landlord through public or private waste collection service.  Landlord may direct the manner of disposal and location of any containers, collection boxes or other storage facilities, which may be required by Hazardous Materials Laws.

14.2    The term "**Hazardous Materials**" shall not include (i) pharmaceuticals, cleaning agents of the types and in the quantities and concentrations normally stocked by health care providers located in medical office buildings similar to the Building, (b) oil in the minimal amounts typically associated with the use of certain portions of the Building for driving and parking motor vehicles or (c) medical wastes generated at the Building; however, Tenant shall use, store, transport and dispose of the foregoing in accordance with all laws including (without limitation) all Hazardous Materials Laws.

14.3    Tenant shall indemnify, defend and hold harmless Landlord, the "**Hospital**" and the holder ("**Mortgagee**") of any mortgage encumbering all or any portion of the Building or the real property upon which the Building is situated or Landlord's leasehold estate in the Land ("**Mortgage**"), and their respective members, managers, partners, shareholders, directors, officers, agents and employees (all collectively referred to as the "**Indemnified Parties**") from and against any and all costs, expenses and claims arising from or in connection with any act, omission or negligence of Tenant or any Tenant's Representatives relating to or arising out of the use, handling, depositing or disposal of Hazardous Materials with respect to the Premises or the Building, such indemnity to include all costs, expenses and liabilities associated with the remediation thereof or incurred in connection with each claim, action or proceeding with respect thereto, including, without limitation, all attorney's fees and expenses.

14.4    Tenant shall immediately notify Landlord in writing of:  (i) any enforcement, clean-up, removal or other governmental or regulatory action instituted, contemplated or threatened concerning the Premises pursuant to any Hazardous Materials Laws; (ii) any claim made or threatened by any person against Tenant or the Premises relating to damage contribution, cost recovery, compensation, loss or injury resulting from or claimed to result from any Hazardous Materials on or about the Premises; and (iii) any reports made to any environmental agency arising out of or in connection with any Hazardous Materials in or removed from the Premises, including any complaints, notices, warnings or asserted violations in connection therewith, all upon receipt by Tenant of actual knowledge of any of the foregoing matters.  Tenant shall also supply to Landlord a promptly as possible and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating to Hazardous Materials associated with the Premises.

14.5    Without limiting any other provision of this Lease, Tenant shall not create or permit to exist in or about the Premises any "**Mold Condition**" unless caused by Landlord.  As used herein, the term Mold Condition shall include the presence or suspected presence of "**Mold**" or any condition(s) that reasonably can be expected to give rise to or indicate the presence of Mold, including observed or suspected instances of water damage or intrusion, the presence of wet or damp wood, cellular wallboard, floor

13

coverings or other materials, inappropriate climate control, discoloration of walls, ceilings or floors, complaints of respiratory ailment or eye irritation by Tenant's employees or any other occupants or invitees in the Premises, or any notice from a governmental agency of complaints regarding the indoor air quality at the Premises. As used herein, the term Mold shall include mold, mildew, fungus or other potentially dangerous organisms. In the event of suspected or actual Mold or Mold Conditions at the Premises, Tenant shall immediately notify Landlord in writing of the same and the precise location thereof. Tenant acknowledges the control of moisture and Mold prevention are material obligations of Tenant under this Lease, and Tenant shall, at its sole costs and expense, regularly monitor the Premises for the presence of Mold and Mold Conditions. If any Mold or Mold Conditions in or about the Premises are a result of the actions or omissions of Tenant or any Tenant's Representatives, Tenant shall promptly, at Tenant's sole cost and expense, hire a licensed and experienced Mold remediation contractor to completely clean-up and remove from the Premises all Mold or Mold Conditions. All such clean-up, removal and remediation shall, in each instance, be conducted to the satisfaction of Landlord and any governmental authority with jurisdiction and otherwise in strict compliance with all applicable laws. Such clean-up, removal and remediation shall also include removal and replacement of any infected host materials as well as any repairs and refinishing required as the result of such removal and replacement. There shall be no abatement of Rent on account of any clean-up, removal or remediation of any such Mold or Mold Condition. Tenant waives, releases and discharges Landlord and all Indemnified Parties for, from and against all claims, demands, causes of action, suits, judgments, liabilities, losses, damages and expenses (including attorneys' fees) for personal injury, bodily injury or property damages in any way arising from or relating to or associated with moisture or the growth of or the presence of Mold or Mold Conditions.

## 15. ASSIGNING, MORTGAGING, SUBLETTING.

15.1    Prohibitions.  Except as otherwise permitted pursuant to Section 15.1 or 15.2, Tenant shall not (i) transfer, assign or hypothecate this Lease, (ii) sublet any portion of the Premises, (iii) enter into any license, concession or other right of occupancy of any portion of the Premises, (iv) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization, (v) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant that results in a Material Change in Ownership (defined below) (each, a "**Transfer**"), without first procuring the written consent of the Landlord, which consent may not be unreasonably withheld or delayed. Any Transfer, whether voluntary or involuntary, by operation of the law or otherwise, without the prior written consent of Landlord first had and obtained therefor, shall be null and void, at the option of Landlord, and Landlord may declare a default and exercise all remedies available to Landlord under this Lease or at law. Notwithstanding the foregoing provisions of this Section 15.1 to the contrary, Tenant may sublet the Premises to Professionals and/or Physicians associated with the Hospital.

15.2    Material Change in Ownership.  If Tenant is an entity of any type, then the sale, transfer or other change of 49.9% or greater of the ownership interests of Tenant shall constitute a "**Material Change in Ownership**", in which event Landlord shall consent to the resulting Transfer provided that Tenant provides to Landlord (i) at least thirty (30) days' prior written notice of such anticipated Material Change in Ownership, (ii) all relevant details of the proposed Material Change in Ownership, including updated financial statements reflecting the financial condition of the proposed assignee post Material Change in Ownership ("**Post Material Change in Ownership Financial Statements**"), and (iii) the Post Material Change in Ownership Financial Statements reflecting a minimum Tangible Net Worth of $150,000,000. As used herein, "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the determination of total assets all assets that would be classified as intangible assets under GAAP including, goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises.

14

15.3 _Liability; Release_.  Tenant shall not be released from any liability or obligation under this Lease as a result of any Transfer or Landlord's consent to any Transfer; provided, however, if (i) Landlord consents to a proposed Transfer that would occur as a result of (A) any other entity becoming Tenant hereunder by merger, consolidation, or other reorganization, (B) any transfer of an ownership interest in Tenant that results in a Material Change in Ownership or (C) any assignment of this Lease for the remainder of the Term, and (ii) the entity comprising Tenant after such Transfer has a Tangible Net Worth together with any new guarantor that is equal to or greater than (1) the aggregate Tangible Net Worth of Tenant and Guarantor at the time of this Lease and (2) a minimum Tangible Net Worth of $150,000,000, then Tenant shall be released from further liability under this Lease for the unexpired Term following such Transfer. Tenant shall provide to Landlord any information reasonably requested by Landlord to evaluate the satisfaction of any Tangible Net Worth requirements contemplated in this Section 15.

15.4 _Conditions to Consent_. Landlord may condition its consent to any assignment or subletting (i) upon Tenant's agreement to termination of this Lease and simultaneous creation of a new lease between Landlord and the proposed successor, or (ii) upon Tenant's agreement simultaneously with the execution of any sublease or assignment approved by Landlord, to name Landlord its agent for purposes of collection of rental from the subtenant approved by Landlord under any such sublease or assignment (in order to enable Landlord to maintain its collection and other relationships).

15.5 _Transactions Consented To_. Each Transfer to which there has been consent shall be by an instrument in writing in form satisfactory to Landlord and shall be executed by the transferor, assignor, sublandlord, licensor, concessionaire, hypothecator or mortgagor and the transferee, assignee, subtenant, licensee concessionaire or mortgagee in each instance, as the case may be, and each transferee, assignee, subtenant, licensee, concessionaire or mortgagee shall agree in writing for the benefit of the Landlord herein to assume, to be bound by, and to perform the terms, covenants and conditions of this Lease to be done, kept and performed by the Tenant. One (or more, if required by Landlord) executed copy of such written instrument shall be delivered to Landlord.  Failure to first obtain in writing Landlord's consent or failure to comply with the provisions of this Article shall operate to prevent any such transfer, assignment, subletting, license, concession agreement or hypothecation from becoming effective.

## 16.   **WASTE, NUISANCE, APPLICABLE LAWS.**

16.1 _Waste and Nuisance_. Tenant shall not commit or suffer to be committed any waste in or upon the Premises and shall not commit or suffer to be committed therein any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant in the Building, or which may disturb the quiet enjoyment of any person within the immediate vicinity of the Building.

16.2 _Tenant's Compliance with Laws_. Tenant shall, at Tenant's sole cost and expense, comply with all the requirements of all federal, state, county, municipal and other applicable authorities, now in force or which may hereafter be in force in connection with Tenant's use of the Premises.

## 17.   **DESTRUCTION.**

17.1 _Notice of Loss_. Tenant shall give immediate notice to Landlord in the event of fire or other accidents or casualties within the Premises or in or around the Building, and such other notice as prescribed by the fire and extended coverage insurance policy required herein to be carried thereon, and further, Tenant shall give immediate notice to Landlord of any defect in any of the fixtures or equipment located within the Premises or in or around the Building.

17.2 _Premises Useable_. In the event the Premises shall be damaged by fire or other casualty, but shall not be rendered wholly or partially unusable, regardless of the time remaining in the Term, Landlord

shall cause such damage to be repaired, and the Base Rent shall not be reduced or abated unless the repairs are delayed beyond ninety (90) days after commencement of such repairs, and thereafter, only if Landlord is not diligently pursuing such repairs, and then only to the extent as may be equitable based upon the amount of damage.

17.3    Premises Unusable. If the Premises shall be rendered partially or wholly unusable, Landlord shall cause such damage to be repaired and the Base Rent shall be reduced in proportion to Tenant's loss of effective use of the Premises during such repair.

17.4    Building Damaged. In the event all or part of the Building, other than the Premises, shall be damaged or destroyed by fire or other casualty, and regardless of the time remaining in the Term, Landlord shall cause such damage to be repaired. Neither Base Rent nor any other sums due hereunder shall be abated or reduced.

17.5    Scope of Repair. In the event Landlord elects or shall be obligated to repair or restore any damage or destruction as aforesaid, the scope of the work shall be limited to the shell of the Building and Lease Premises. Landlord shall not be required to make repairs or replacements of any panels, decoration, trade fixtures, railings, floor covering, partitions or other parts of the Interior of the Premises or any other property installed or placed in the Premises by Tenant.

17.6    Commencement of Repairs.  Anything to the contrary herein notwithstanding, Landlord shall not be required to commence repairs and/or restoration prior to the expiration of sixty (60) days following the occurrence or the receipt by Landlord of the insurance proceeds covering said damage, whichever event shall first occur.

## 18.    CONDEMNATION.

18.1    Total Taking. If all of the Premises should be taken for any public or quasi public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, then this Lease shall terminate and the Rent shall be abated during the unexpired portion of the Term, effective on the date physical possession is taken by the condemning authority.

18.2    Partial Taking. If any part (but not all) of the Building, Common Areas or the Premises should be so taken, Landlord may terminate this Lease if Landlord, in its sole discretion, so elects. Any election to terminate this Lease in accordance with this provision shall be evidenced by written notice of termination to Tenant within thirty (30) days after the date physical possession is taken by the condemning authority. If this Lease is not so terminated, the Base Rent payable hereunder during the unexpired portion of the term shall be reduced in proportion to the area of the Premises taken, effective on the date physical possession is taken by the condemning authority.

18.3    Award.  All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Building, the Premises or the Common Areas shall be the property of Landlord and Tenant hereby assigns its interests in any such award to Landlord

## 19.    QUIET ENJOYMENT.

So long as Tenant shall pay all Rent and other payments due hereunder and shall observe and perform all of the covenants on Tenant's part to be observed and performed hereunder, and Tenant is not in default hereunder (beyond any applicable notice or cure periods), Tenant shall peaceably and quietly hold and enjoy the Premises (including easement rights) for the entire Term hereof without interruption by Landlord or person or persons lawfully or equitably claiming by, through or under Landlord, subject,

16

nevertheless, to all of the terms and provisions of this Lease and to the reservations, encumbrances and limitations affecting the title to the premises upon which the Building is situated.

20.    **DEFAULT AND REMEDIES.**

20.1    Default. The following events shall be deemed to be the events of default by Tenant under this Lease:

(1)    Tenant shall fail to pay any installment of the Base Rent or any Additional Rent within five (5) business days after receipt of written notice of such failure from Landlord. Notwithstanding the foregoing, Landlord shall not be obligated to provide written notice more than twice in any twelve (12) month period.

(2)    Tenant shall fail to comply with any term, provision or covenant of this Lease, other than the payment of any sums due Landlord, including but not limited to, the Base Rent or any Additional Rent, and Tenant shall not cure such failure within thirty (30) days after written notice thereof of Tenant (or such shorter notice period as may be provided elsewhere in this Lease for specific events of default); provided, however, that if such failure cannot be reasonably cured within thirty (30) days, then Tenant shall have such additional time to cure as is reasonable under the circumstances provided that Tenant diligently continues to pursue such cure.

(3)    An event of default shall occur and remain uncured within the time stated for such cure under any Related Lease.

(4)    Tenant or any guarantor of Tenants' obligations hereunder shall become insolvent in any chapter of the United States Bankruptcy Code, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(5)    Tenant or any guarantor shall file a petition under any section or chapter of the United States Bankruptcy Code, or under any similar law or statute of the United States or any state thereof; or Tenant shall be adjudged bankrupt or insolvent as defined in any chapter of the United States Bankruptcy Code in proceedings filed against Tenant or any guarantor of Tenant's obligations under this Lease.

(6)    A receiver or trustee shall be appointed for the Premises or for all or substantially all of the assets of Tenant or any guarantor and such receiver or trustee shall not be discharged within thirty (30) days following such appointment.

(7)    The discovery by Landlord that any financial statement given by Tenant or any of its assignees, subtenants or successors-in-interest, or any guarantor of Tenant's obligations hereunder to Landlord, was materially false.

20.2    Remedies.

(1)    Upon the occurrence of any event of default hereunder, and notwithstanding the fact that the termination or cancellation of this Lease by Landlord may substantially interfere with the ability of Tenant to conduct a non-liquidation proceeding under any chapter of the United States Bankruptcy Code, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever.

17

(i)      Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, without being liable for prosecution or any claim for damages therefor and Tenant agrees to pay Landlord, on demand, the amount of all losses, expenses and damages, including attorneys' fees, which Landlord may suffer by reason of such termination; and/or

(ii)     Enter upon the Premises and correct such default or otherwise do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to pay Landlord, on demand, the amount of all  losses, expenses and damages, including attorneys' fees which Landlord may incur in connection with attempts to effect compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for prosecution or  any claim for damages resulting to Tenant from such action, and/or

(iii)    Enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, without being liable for prosecution or any claim for damages therefor, and if Landlord so elects, relet the Premises on such terms as Landlord may deem advisable and receive rental therefor.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any other remedies herein provided or provided by law, or at equity, nor shall pursuit of any other such remedy constitute a forfeiture or waiver of any Rent or other sums due to Landlord hereunder or of any damages accruing to the Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default. In determining the amount of loss or damage which Landlord may suffer by reason of termination of this Lease or the deficiency arising by reason of any reletting by Landlord as above provided, allowance shall be made for the expense of repossession and any repairs or remodeling undertaken by Landlord following repossession.

(2)      Exercise by Landlord of any one or more remedies herein granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises by Tenant, whether by agreement or by operation of law it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. No removal or other exercise of dominion by Landlord over the property of Tenant or others at the Premises shall be deemed unauthorized or constitute a conversion. Tenant hereby consenting, after any event of default, to the aforesaid exercise of dominion over Tenant's property within the Building. All claims for damages by reason of such reentry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. Tenant agrees that any reentry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings, as Landlord may elect and Landlord shall not be liable in trespass or otherwise,(after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant as provided in this paragraph may be brought from time to time,

18

on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease Term.

(3)     In the event Landlord elects to terminate this Lease by reason of event or default, then notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord, at Landlords Address as defined in <u>Section 1</u> herein, the sum of all Rent, Additional Rent and other indebtedness accrued to the date of such termination, plus, as damages, an amount equal to the present value of the Rent and and all other sums reserved hereunder for the remaining unexpired portion of the Lease Term (had the Lease not been so terminated by Landlord), less the then present value of the then fair rental value of the Premises.

(4)     In the event Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord at Landlords Address as defined in <u>Section 1</u> hereinabove, all Rent and other indebtedness accrued to date of such repossession, plus all Rent and any and all other sums required to be paid by Tenant to Landlord during the remainder of the Lease Term until the date of expiration of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during Period (after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant as provided in the paragraph may be brought from time to time, on one or more occasions, without necessity of Landlord's waiting until expiration of the Lease Term.

(5)     In the event of termination or repossession of the Premises for an event of default, Landlord shall have an obligation to attempt to relet the Premises, or any portion thereof. However, in the event of reletting Landlord may relet the whole or any portion of the Premises for any period, to any tenant, and for any use and purpose. Should Landlord choose to relet the Premises, or any portion thereof, for the remainder of the Term provided for herein, and if the rental received through reletting does not at least equal the Rent provided for herein, Tenant shall pay and satisfy the deficiency between the amount of the Rent so provided for and that received through reletting, including, but not limited to, the cost of renovating, altering, and decorating for a new occupant. Further, Tenant shall not in any event ever be entitled to any excess rental and other sums provided for herein, and the same shall belong solely to Landlord. Nothing herein shall be construed as in any way denying Landlord the right, in the event of abandonment of said Premises or other breach of this Lease by Tenant, to treat the same as an entire breach and at Landlord's option to terminate this Lease and/or immediately seek recovery for the entire breach of this Lease and any and all damages which Landlord suffers thereby.

(6)     If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Premises for such purpose), and thereupon Tenant shall be obligated and hereby agrees, to pay Landlord, upon demand, all costs, expenses and disbursements (including reasonable attorneys' fees) incurred by Landlord in taking such remedial action.

(7)     In the event of the breach or the attempted or threatened breach of any covenant or provision contained in this Lease by Tenant, Landlord shall have, in addition to all other remedies provided it hereunder or by law or at equity, the right to obtain an injunction prohibiting such breach or attempted breach without the necessity for proof of inadequacy of legal remedy, irreparable harm or probable right of recovery.

19

20.3    Expenses/Attorneys' Fees. In the case of an event of default hereunder, Tenant shall also be liable for and shall pay to Landlord, at Landlords Address as defined in Section 1 herein, in addition to any sum provided to be paid above: broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in enforcing Landlord's rights or remedies, including reasonable attorneys' fees and court costs until the expiration of the Term.  Tenant shall permit the Landlord to exhibit the Premises to prospective tenants and to place notices upon the Premises advertising "For Lease".  Landlord may at any time, exhibit the Premises to prospective purchasers. and place notices, upon the Building or the Premises advertising "For Sale."

20.4    Landlord's Breach.  In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rental due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have thirty (30) days in which to cure any such default. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Building and not thereafter.

20.5    Limitation on Landlord's Personal Liability. Tenant specifically agrees to look solely to Landlord's interest in the Building for the recovery for any judgment from Landlord, it being agreed that Landlord, its agents, employees, shareholders, officers, directors, and limited partners, shall never be personally liable hereunder for anything whatsoever.

## 21.    ACCESS.

Landlord or its agents shall have the right to enter the Premises at all reasonable times, and whenever necessary because of emergencies, to inspect the same, and to make such repairs, replacements, alterations, improvements or additions as Landlord may deem necessary or desirable, including alterations, repairs, improvements or additions to the space adjacent to Premises and/or to the Building, without the same constituting an eviction of Tenant in whole or in part, and the Rent reserved shall in no way abate while said repairs, replacements, alterations, improvements or additions are being made, by reason of loss or interruption of Tenant's business or otherwise. During the ninety (90) days prior to the expiration of the Term, Tenant shall permit the Landlord to exhibit the Premises to prospective tenants and to place notices upon the Premises advertising "For Lease".  Landlord may, at any time, exhibit the Premises to prospective purchasers, and place notices, upon the Building or the Premises advertising "For Sale."

## 22.    SURRENDER AND REMOVAL OF PROPERTY.

22.1    Surrender of Premises. Promptly upon the expiration or earlier termination of the Term, Tenant shall surrender the Premises in the same condition as received by Tenant on the Commencement Date reasonable wear and tear and damage by unavoidable casualty or Act of God only excepted. Further, Tenant shall surrender all keys to the Premises at the place then fixed for the payments of Base Rent due hereunder. All items of work and improvements comprising the Interior of the Premises, shall constitute a part of the fee estate remainder subject to this Lease, notwithstanding that Tenant may construct or cause to be constructed all or any part of said improvements or may contribute to the cost thereof, and notwithstanding that Tenant may or might be required to maintain, repair and/or replace same or some part thereof pursuant to some other provisions in this Lease. Subject to the provisions of this Section, Tenant shall remove all of Tenant's trade fixtures, operation equipment and other personal property before

20

surrendering the Premises as aforesaid and shall repair at Tenant's expense any damage to the Premises caused thereby.

22.2    <u>Failure to Remove Property</u>. If Tenant shall neglect to remove Tenant's personally as herein provided, Landlord shall have the right (i) to remove said property and cause it to be stored in a public warehouse or elsewhere, at the cost of and for the account of Tenant, or (ii) in the alternative, if said property shall not be removed within thirty (30) days after said termination, to dispose of said property in a manner deemed suitable to Landlord, all without service of notice or resort to legal process and without becoming liable for any loss damage which may be occasioned thereby, and any proceeds of such disposition shall be retained by Landlord without liability to Tenant, Tenant hereby waiving any interest in such proceeds.

22.3    <u>Survival of Covenants</u>. Tenant's obligations to observe or perform the covenants contained in this Article shall expressly survive the expiration or earlier termination of the Term.

## 23.    <u>HOLDING OVER.</u>

Any holding over without the consent of Landlord after the expiration or earlier termination of the Term shall be construed to be and shall constitute a tenancy at the will of Landlord, and Tenant agrees to pay as rents and liquidated damages for such holding over a sum equivalent to the Rent herein specified and reserved plus fifty percent (50%) of the Base Rent (prorated on a monthly basis) and shall otherwise be on the same terms and conditions herein, as far as applicable.

## 24.    <u>ESTOPPEL/MEMORANDUM.</u>

24.1    <u>Estoppel Certificate</u>.  Within ten (10) days after request therefore by Landlord, Ground Lessor or any Mortgagee, Tenant shall deliver in recordable form (and signed by Tenant, if an individual, or a duly authorized representative of Tenant if Tenant is not an individual) a statement to Landlord, Ground Lessor any Mortgagee, or any proposed Mortgagee or transferee of the Project (as the case may be), certifying (if such be the case) that this Lease is in full force and effect, that Tenant is in possession of the Premises, that Tenant has commenced the payment of Rent, that there are no defenses or offsets to this Lease claimed by Tenant, as well as any other information reasonably requested.  If Tenant fails or refuses to give a certificate hereunder within the time period herein specified, then the information contained on such certificate as submitted by Landlord shall be deemed correct for all purposes, but Landlord shall have the right to treat such failure or refusal as a default by Tenant.

24.2    <u>Memorandum of Lease</u>. Promptly after the Commencement Date, Landlord and Tenant, if requested by Landlord, shall execute and acknowledge and deliver a memorandum or short form of this Lease, in recordable form, acknowledging Tenant's acceptance of the Premises for all purposes herein provided and specifying the Commencement Date and the termination date of this Lease in accordance with the provisions hereof, and said memorandum may be recorded by Landlord only, but this Lease Agreement itself shall not be recorded. In the event Tenant records a memorandum of this Lease, or this Lease, Tenant shall be in default under this Lease and Landlord may terminate this Lease upon five (5) days written notice to Tenant at Tenant's address set forth in <u>Section 1.1</u> hereof.

## 25.    <u>NOTICES.</u>

All notices required or permitted to be given hereunder by either party hereto to the other party shall be deemed sufficiently given or made on the day of receipt thereof or three (3) business days after the date when mailed by United States Registered or Certified Mail, adequate postage paid, to their respective addresses as specified in <u>Section 1.1</u> hereof. Each party hereto may notify the other party of any change in

21

its mailing address by notice in the manner herein above provided, which new address shall thereafter be deemed the proper address for notice hereunder.

## 26. **TENANT'S PAYMENTS.**

26.1  Payments. Tender of Rent and/or any other payment due hereunder shall be considered to have been made on the date such payments received by Landlord and not on the date mailed by Tenant. For purposes hereof, the office of Landlord is the office presently or henceforth designated pursuant to the provisions of Section 1.1 hereof. Checks or drafts tendered will constitute payment only when duly paid by the drawers bank promptly upon presentment, properly endorsed, for payment.

26.2  Interest. All sums due and owing by Tenant to Landlord under this Lease shall bear interest at the Prime Rate (as defined in the *Wall Street Journal*) plus four percent (4%) from the date due until paid.

## 27. **LANDLORD'S LIEN.**

To secure the payment of all Base Rent, and Additional Rent reserved herein, and all other payments due Landlord hereunder, or to become due hereunder and the faithful performance of all covenants, agreements and stipulations herein contained to be performed by Tenant, Tenant hereby grants to Landlord an express first and prior contract lien and security interest on all property (including fixtures, equipment, inventory, goods, wares, furniture, office equipment, supplies and merchandise) which may be placed in the Premises, and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction of or damage to any such property. Tenant hereby waives all exemption laws in favor of said lien and security interest. This lien and security interest is given in addition to the Landlord's statutory lien and shall be cumulative thereof. Tenant shall not remove any property from the Premises until all of Tenant's obligations under this Lease are satisfied. This lien may be foreclosed with or without court proceedings by public or private sale, provided Landlord gives Tenant at least ten (10) days notice of the time, place and terms of said sale, and Landlord shall have the right to become the purchaser of such property, upon being the highest bidder therefor at said sale. The notice referred to in the preceding sentence may (but needs not) be given by Landlord to Tenant contemporaneously with any other notice from Landlord to Tenant which may be given in accordance herewith. At the time of the execution of this Lease, and if requested thereafter by Landlord, Tenant shall execute and deliver to Landlord financing statement instruments in form deemed sufficient by Landlord to reflect the security interest herein granted and any proper amendment of, assignment of, modification in or extension of the aforesaid contract lien and security interest hereby granted. Tenant hereby grants to Landlord a power of attorney to sign, in place and stead of Tenant, any and all such instruments. Said power of attorney is irrevocable and coupled with an interest.

## 28. **RULES AND REGULATIONS.**

Such reasonable rules and regulations applying to all tenants in the Building as may be adopted by Landlord for the safety, care, cleanliness, preservation of good order or operation of the Premises, the Building, the Property and the Common Areas, are hereby made a part hereof and Tenant agrees to comply with all such rules and regulations, immediately upon receipt of a copy of same. Landlord shall have the right at all times to change any of the rules and regulations or to amend them in any manner deemed reasonable by Landlord. All changes and amendments will be sent by Landlord to Tenant in writing and shall be thereafter carried out and observed by Tenant.  As of the Effective Date, the rules and regulations are set forth on Exhibit D.

29.    **BROKERS**.

None.

30.    **AUTHORITY**.

Each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has been and is qualified to do business in the state in which the Building is located, that the Tenant Entity has full right and authority to enter into this Lease, and that all persons signing on behalf of the Tenant Entity were authorized to do so by all appropriate actions required of such entity.  If Tenant signs as a partnership, trust or other legal entity, each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has complied with all applicable laws, rules and governmental regulations relative to its right to do business in the state in which the Building is located, and that each of the persons or entities acting on behalf of the Tenant was authorized to do so by any and all appropriate partnership, trust or other actions.

31.    **LIABILITY OF LANDLORD**.

Tenant shall look solely to Landlord's interest in the Building, including revenue derived from the Project, and Landlord's personal property used in connection with the Project for the satisfaction of any judgment or decree requiring the payment of money by Landlord, based upon any default hereunder, and no other property or asset of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of such judgment or decree.  **IN NO EVENT SHALL LANDLORD BE LIABLE OR RESPONSIBLE FOR ANY CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES.**

32.    **SCOPE AND INTERPRETATION OF AGREEMENT; CONFIDENTIALITY**.

This Lease and all Exhibits set forth including all of the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, conditions, or understandings, either oral or written, other than as set forth herein.  No subsequent alteration, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.  This Lease shall not be more strictly enforced against either party regardless of who was more responsible for its preparation.  Except at Landlord's option, no part of this Lease or any memorandum thereof may be recorded in the public records of any municipality or county.  Tenant will maintain the confidentiality of this Lease and will not divulge the economic or other terms of this Lease, whether verbally or in writing, to any person, other than Tenant's officers, directors, partners or shareholders; Tenant's attorneys, accountants and other professional consultants; any governmental agencies; and pursuant to subpoena or other legal process.  If any provision of this Lease shall be determined to be void by any court of competent jurisdiction or by any law enacted subsequent to the Effective Date, then such determination shall not affect any other provisions hereof, all of which other provisions shall remain in full force and effect.

33.    **LANDLORD'S CONSENT**.

Without limiting any other provision of this Lease, in the event that Landlord's consent is required by the terms hereof for any purpose whatsoever, it is understood and agreed that (a) Landlord's consent may be subject to the consent of the Ground Lessor, Declarant  and/or the holder of any Mortgage encumbering the Building to the extent that such consents are required under the terms of the Ground Lease, Declaration or the applicable financing documents (which consents Landlord shall seek to obtain) and (b) notwithstanding anything to the contrary set forth herein, it shall not be deemed unreasonable for Landlord

23

to withhold its consent in any given circumstance based upon Landlord's inability to obtain any required consent from the Ground Lessor, Declarant or the holder of any Mortgage encumbering the Building.

**34.    USE OF PREMISES.**

Tenant shall use and occupy the Premises only for the Permitted Use, and for no other purpose, without the prior written consent of Landlord.

**35.    GUARANTY.**

As material consideration for Landlord to enter this Lease, Tenant shall cause Guarantor to execute the Guaranty attached as <u>Exhibit E</u> (the "**Guaranty**"), and Tenant shall deliver the Guaranty to Landlord contemporaneously with Tenant's execution hereof.

**36.    WAIVER OF JURY TRIAL.**

LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LEASE OR THE OBLIGATIONS EVIDENCED HEREBY, OR ANY OTHER DOCUMENT OR INSTRUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT TO EACH OF LANDLORD AND TENANT IN ENTERING INTO THIS LEASE.

**37.    MISCELLANEOUS.**

37.1    <u>Successors and Assigns</u>. All rights and liabilities herein granted to or imposed upon the respective parties hereto shall extend to and jointly and severally bind the several respective heirs, legal representatives, successors and assigns of the respective parties hereto, an if there shall be more than one Landlord or Tenant, all shall be bound jointly and severally the terms, conditions and agreements herein contained. No rights, however, shall inure to the benefit of any assignee of Tenant unless Landlord has approved the assignment to such assignee in writing as provided herein.

37.2    <u>Waivers</u>. One or more waivers of any breach or violation of any agreement, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent violation or breach of the same or any other agreement, covenant, or condition herein contained, and the consent or approval by either party of any act by the other, which act requires the approval or consent of the other party, shall not be deemed to waive or render unnecessary the future requirements of consent or approval of the same or similar act; and the subsequent acceptance of Rent or other payment due hereunder shall not be deemed to be a waiver of any preceding breach by Tenant, other than failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of the acceptance of said Rent. No express covenant, term or condition of this Lease shall be deemed to have been waived by either party, unless such waiver is in writing.

37.3    <u>Accord and Satisfaction</u>. No payment made by Tenant or received by Landlord in an amount less than the amount herein stipulated shall be deemed to be other than on account of the earliest received payment, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept any such check

or payment without prejudice to Landlord's right to recover the balance of such amount or to pursue any other remedy in this Lease or by law provided Landlord.

      37.4   <u>Entire Agreement</u>. This Lease, together with the exhibit or exhibits aforesaid and the rider or riders, if any, attached hereto and forming a part hereof, contains and sets forth the entire agreement and understandings between the parties hereto concerning the Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between said parties other than as herein expressly set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon either party hereto, unless reduced to writing and signed by both parties.

      37.5   <u>Partnership</u>. Landlord does not become a partner of Tenant in the conduct of its business or otherwise, or a joint venturer or a member of a joint enterprise with Tenant by virtue of this Lease.

      37.6   <u>Force Majeure</u>.  In the event Landlord shall be delayed, hindered or prevented from the performance of any act required hereunder by reason of strikes, fire, explosions, lock-outs, failure of electrical power, governmental restrictions or regulations, unavailability of suitable financing, materials and/or labor, riots, insurrection, war or on account of any other condition or occurrence not the fault of Landlord, then the performance of any such act shall be extended for a period equivalent to the period of such delay.

      37.7   <u>Captions and Numbers</u>.  The captions, section numbers and article numbers appearing in this Lease are inserted only as a matter of convenience and in no wise define, limit, construe or describe the scope or intent of such sections or articles, nor in any wise affect this Lease.

      37.8   <u>Tenant, Defined Use of Pronouns</u>. The word "**Tenant**" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more and if there shall be more than one Tenant. Any notice required or permitted by the terms of this of Lease may be given by or to any one thereof and shall have the same force and effect as if given by or to all thereof. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, and a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or one Tenant, and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

      37.9   <u>Severability</u>. If any provisions covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, there reminder of this Lease, or the application of such provision, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each provision, covenant or condition of this Lease shall be valid and shall be enforced to the fullest extent permitted by Law.

      37.10  <u>Survival</u>. Landlord and Tenant expressly agree that all provisions of this Lease which contemplate performance after the expiration or earlier termination hereof shall survive such expiration or earlier termination of this Lease.

      37.11  <u>Governing law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Texas.  Venue for any legal actions hereunder shall be in the Courts of Grayson County, Texas.

37.12  <u>Other documents</u>. The parties agree to execute all other documents or instruments necessary to effect the transfers of property set forth herein and otherwise to implement the provisions of this Agreement.

**38.**   **<u>EXHIBITS</u>**

The following exhibits are a part of this Lease and are incorporated herein by reference:

Exhibit A – Legal Description
Exhibit B – Floor Plan of the Premises
Exhibit C – Parking Areas
Exhibit D – Rules and Regulations
Exhibit E – Guaranty

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

EXECUTED as of the date first set forth above in multiple counterparts each of which shall be deemed to be an original.

**LANDLORD**:

ALTERA HIGHLAND LLC,
a Texas limited liability company

By:_____

Name:  Terry D. Quinn
Its:      President

**TENANT**:

SHERMAN/GRAYSON HEALTH SYSTEM, LLC,
a Texas limited liability company

By:_____
Name:_____
Its:_____

EXECUTED as of the date first set forth above in multiple counterparts each of which shall be deemed to be an original.

**LANDLORD**:

ALTERA HIGHLAND LLC,
a Texas limited liability company

By:_____
Name:  Terry D. Quinn
Its:     President

**TENANT**:

SHERMAN/GRAYSON HEALTH SYSTEM, LLC,
a Texas limited liability company

By:_____
Name:  Thomas J. Frazier, Jr.
Its:     Executive Vice President

<u>EXHIBIT A</u>

LEGAL DESCRIPTION

BEING a 3.0894 acre tract of land situated in the County of Grayson, State of Texas out of the J.B. McAnair Survey, Abstract No. 763 and being all of Block No. 7, and a portion of Lots 7-8, and all of Lots 9-12, Block 12 of Green Mount Addition to the City of Sherman, Grayson County, Texas, as shown by Plat of record in Volume 193, Page 21, Deed Record, Grayson County, Texas,  together with that  portion of vacated Pecan Street, and being more particularly described by meets and bounds as follow:

BEGINNING at a "X" cut in concrete found for corner at the intersection of the north line of Laurel Street (a 60 foot wide public right-of-way) and the east line of Bryant Avenue (a 60 foot wide public right-of-way);

THENCE North 15 degrees 40 minutes 01 seconds West (Reference for Basis of Bearings) along said east right-of-way line, a distance of 467.78 feet to a 5/8 inch iron rod set with cap stamped BGT for corner;

THENCE North 73 degrees 42 minutes 45 seconds East, a distance of 286.25 feet to a 5/8 inch iron rod set with cap stamped BGT for corner in the west right-of-way line of Highland Avenue;

THENCE South 16 degrees 01 minutes 19 seconds East along said west right-of-way line, a distance of 467.76 feet to a 1/2 inch iron rod with cap found for corner at the intersection of the west right-of-way line of said Highland Avenue and the north right-of-way line of said Laurel Street;

THENCE South 73 degrees 42 minutes 45 seconds West along said north right-of-way line, a distance of 289.15 feet to the POINT OF BEGINNING and containing 134,573 square feet or 3.0894 acres of land, more or less.

EXHIBIT B

FLOOR PLAN OF THE PREMISES

[ATTACHED]



Dan Burbine Associates
Architects & Project Managers
12532 Renoir Lane    Dallas, Texas   75230

**2nd FLOOR PLAN**
s c a l e : 1/8" = 1' - 0"

Ambulatory Surgery Center
St 200 - 210

St 215- Grace Pharmacy

19699 SF

north
e
s
w
plan
orientation

5     20
0    10

PROJECT

WNJ  Wilson N. Jones

MEDICAL
OFFICE
BUILDING

REVISIONS

DATE
11 MAY 2003

SHEET
A-2
2 of 4

EXHIBIT C

PARKING AREAS

[ATTACHED]



TRACT FIFTEEN:

Being a part of Block No. Eight (8), of G. Y. Gray's Second Addition to the City of Sherman, Texas, and further described as follows:

BEGINNING at the intersection of the South line of Laurel Street with the West line of Highland Avenue as now opened;
THENCE West 140 feet with the South line of Laurel Street to a stake, for the Northwest corner;
THENCE South parallel with Highland Avenue 75 feet to a stake;
THENCE East parallel with Laurel Street 140 feet to a stake in the West line of Highland Avenue;
THENCE North with said line of Highland Avenue 75 feet to the place of beginning, containing a tract of 140 x 75 feet.

TRACT SIXTEEN of the County of Grayson, State of Texas, all that certain tract or parcel of land situated in the City of Sherman, Grayson County, Texas, being a part of the survey originally granted to John B. McAnair, and being a part of Block Eight (8) of Gray's Second Addition, as shown by the map or plat thereof, recorded in Volume 134, page 113, of the Deed Records of Grayson County, Texas, and being more particularly described as follows:

BEGINNING at a point on the West line of Highland Avenue, 125 feet South of the intersection of the West line of Highland Avenue, and the South line of Laurel Street;
THENCE Southward with the West line of Highland Avenue, 45 feet;
THENCE Westward and parallel with the South line of Laurel Street, 140 feet;
THENCE Northward and parallel with the West line of Highland Avenue, 45 feet;
THENCE Eastward, parallel with the South line of Laurel Street, 140 feet to the place of beginning; this being the South 45 by 140 feet of the tract 95 by 140 feet, in size conveyed by Frank Reece and wife, Mrs. Minnie Reece, to Bob Richardson by deed dated March 5, 1924, and recorded in Volume 303, Page 153 of the Deed Records of Grayson County, Texas.

TRACT SEVENTEEN:

SITUATED in the City of Sherman, County of Grayson, Texas and being part of Block No. 8 of G. Y. Gray's Second Addition to the City of Sherman, Texas, out of J. B. McAnair Survey, Grayson County, Texas on the waters of Post Oak Creek, and described as follows:
And being the North 62 feet of the following described piece of property;
BEGINNING at the intersection of West line of Highland Ave. and the North line of Houston Street.
THENCE in a westerly direction with the North line of Houston Street 87 feet a stake.
THENCE in a Northerly direction and parallel with the West line of Highland Avenue 150 feet to a stake.
THENCE in an Easterly direction parallel with the North line of Houston Street, 87 feet to the West line of Highland Ave.
THENCE in a Southerly direction with the West line of said Highland Ave. 150 feet to the place of beginning, containing 87 x 150 feet of land. Being the same land described in a deed from J. W. Hollingsworth and wife, Florence Hollingsworth to W. W. Craig, dated January 9, 1915, and

recorded in Volume 239, page 272, Deed Records of Grayson County, Texas.

TRACT TWENTY-FOUR:

BEING that certain tract, lot or parcel of land situated in the City of Sherman, Grayson County, Texas, in the J. B. McAnair Survey, part of Block Eight (8) of the G. Y. Gray Second Addition to the said City of Sherman;

BEGINNING at the Southwest corner of the lot conveyed by J. P. Mills and wife, to M. H. Andrews by deed recorded in Volume 57, page 107 of the Deed Records of Grayson County, Texas, a stake on the North line of West Houston Street;
THENCE North at right angles to the North line of West Houston Street 150 feet to a stake for corner;
THENCE East parallel with the North line of West Houston Street 60 feet to a stake for corner;
THENCE South at right angles to the North line of West Houston Street 150 feet to the North line of West Houston Street;
THENCE West along said line 60 feet to the Place of Beginning.

TRACT TWENTY-FIVE:

All that certain tract or parcel of land situated in Grayson County, Texas, and being more particularly described as follows: SITUATED in the City of Sherman, Grayson County, Texas, on the waters of Post Oak Creek, being a part of a survey or patent to J. B. McAnair Survey, and described as follows, to-wit:

BEGINNING at the Southeast corner of the tract described in the deed from L. M. Tuck, Receiver, to Clyde Jackson and wife, of record in Book 367, Page 344, Grayson County Deed Records;
THENCE West with the North line of Houston Street, 80 feet to the Southeast corner of a lot sold to L. V. Butler;
THENCE North with the East line of the Butler lot, 150 feet to the South line of a lot sold to Cecil J. Rodgers;
THENCE East with the South line of said Rodgers tract, 80 feet to the southeast corner or same, a stake in the East line of the tract sold to Clyde Jackson above referred to;
THENCE South with the East line of the Clyde Jackson tract, 150 feet to the place of beginning, being a lot 80 feet by 150 feet out of the Southeast corner of a tract sold by L. M. Tuck, Receiver, to Clyde Jackson and wife referred to.

Also being described as 80' x 150' our of Block 8 of G.Y. Gray's Addition to the City of Sherman.

TRACT TWENTY-SIX:

BEING all that certain lot or parcel of land, situated in the City of Sherman, Grayson County, Texas, a part of Block No. EIGHT (8) of G. Y. GRAY'S ADDITION to the City of Sherman and

being more particularly described as follows:

BEGINNING at the point of intersection of the North line of West Houston Street and the East line of Bryant Street;
THENCE North with the East line of Bryant Street for a distance of 150 feet;
THENCE East parallel with the North line of Houston Street for a distance of 70 feet;
THENCE South, parallel with the East line of Bryant Street for a distance of 150 feet to the North line of Houston Street;
THENCE West with said line for a distance of 70 feet to the Place of Beginning and containing 70 x 150 feet of land, more or less and being the same property conveyed by Alton R. Hill and wife, Laura Hill to J. B. Revell and wife, Willie B. Revell by deed dated November 10, 1952 and of record in Volume 705, Page 457 of the Deed Records of Grayson County, Texas.

TRACT TWENTY-SEVEN:

SITUATED in Sherman, Grayson County, Texas, and being a part of the J. B. McAnair Survey, and being also a part of Block 8 of G. Y. Gray's Second Addition to Sherman, Texas, and being a part of a tract of 150 x 250 feet of land sold by L. M. Tuck, receiver, to Clyde Jackson, et ux., by deed recorded in Volume 367, page 344, Deed Records of Grayson County, Texas, and described as follows, to-wit:

BEGINNING at a stake on the east line of what is known as Bryant Street at a point 50 feet south of the NW corner of the above mentioned tract of 150 x 250 feet, said point being the SW corner of a tract sold by Clyde Jackson, et al., to Cecil J. Rodgers, et ux.;
THENCE South 50 feet to a stake, the NW corner of a tract now owned by L. V. Butler, et ux., as described in deed of record in Volume 506, Page 407, Deed Records of Grayson County, Texas;
THENCE East parallel with the north line of the 150 x 250 foot tract 150 feet to a stake;
THENCE North 50 feet to the SE corner of the Cecil J. Rodgers, et ux., tract;
THENCE West with the south line of the said Rodgers tract 150 feet to the place of beginning, containing 50 x 150 feet of land.

TRACT TWENTY-EIGHT:

All that certain tract or parcel of land situated in the City of Sherman, Grayson County, Texas, being a part of the Survey originally granted to J. B. McANAIR, and being a part of BLOCK NO. EIGHT (8) of GRAY'S SECOND ADDITION to said City of Sherman, as shown by the map or plat thereof, recorded in Volume 134, at Page 113, Deed Records of Grayson County, Texas, and as shown by the 1908 Plat Book of Grayson County, Texas, and being more particularly described as follows:

BEGINNING at the intersection of the West line of Highland Avenue and the North line of Houston Street;
THENCE West with the North line of Houston Street, a distance of 87 feet;
THENCE North on a line parallel with the West line of Highland Avenue, a distance of 88 feet to the Southwest corner of a tract of land deeded to Elmer L. Anderson;

THENCE East on a line parallel with the North line of Houston Street and with the South line of the Elmer L. Anderson tract, a distance of 87 feet to a point in the West line of Highland Avenue;

THENCE South with the West line of Highland Avenue, a distance of 88 feet to the Place of Beginning and Containing 87 ft. by 88 ft. of land and being the same property conveyed by Floydell Akridge, a widow, to George Melvin Hammock, et ux., by Deed dated January 12, 1972, recorded in Volume 1208, at Page 433, Deed Records of Grayson County, Texas.

<u>TRACT TWENTY-NINE</u>:

BEING all that certain tract or parcel of land, situated in the County of Grayson, State of Texas, being a part of survey originally granted to J. B. McAnair and described as follows, to-wit:

BEGINNING at a point on the West line of Highland Avenue, seventy-five (75) feet South of the intersection of the West line of Highland Avenue and the South line of Laurel Street in the City of Sherman;

THENCE Southward with the West line of Highland Avenue fifty (50) feet;

THENCE Westward and parallel with the South line of Laurel Street, one hundred forty (140) feet;

THENCE Northward and parallel with the West line of Highland Avenue, fifty (50) feet;

THENCE Eastward and parallel with the South line of Laurel Street, one hundred forty (140) feet to the Place of Beginning; this being the North fifty (50) feet by one hundred forty (140) feet of the tract ninety-five (95) feet by one hundred forty (140) feet in size conveyed by Frank Reese and wife, Mrs. Minnie Reese, to Bob Richardson, by deed dated March 5, 1924, and recorded in Volume 303, page 153 of the Deed Records, Grayson County, Texas; and being Lot Eight (8), Block Eight (8), of Gray's Second Addition to the City of Sherman, Grayson County, Texas.

BEING a 3.0894 acre tract of land situated in the County of Grayson, State of Texas out of the J.B. McAnair Survey, Abstract No. 763 and being all of Block No. 7, and a portion of Lots 7-8, and all of Lots 9-12, Block 12 of Green Mount Addition to the City of Sherman, Grayson County, Texas, as shown by Plat of record in Volume 193, Page 21, Deed Record, Grayson County, Texas, together with that portion of vacated Pecan Street, and being more particularly described by meets and bounds as follow:

BEGINNING at a "X" cut in concrete found for corner at the intersection of the north line of Laurel Street (a 60 foot wide public right-of-way) and the east line of Bryant Avenue (a 60 foot wide public right-of-way);

THENCE North 15 degrees 40 minutes 01 seconds West (Reference for Basis of Bearings) along said east right-of-way line, a distance of 467.78 feet to a 5/8 inch iron rod set with cap stamped BGT for corner;

THENCE North 73 degrees 42 minutes 45 seconds East, a distance of 286.25 feet to a 5/8 inch iron rod set with cap stamped BGT for corner in the west right-of-way line of Highland Avenue;

THENCE South 16 degrees 01 minutes 19 seconds East along said west right-of-way line, a distance of 467.76 feet to a 1/2 inch iron rod with cap found for corner at the intersection of the west right-of-way line of said Highland Avenue and the north right-of-way line of said Laurel Street;

THENCE South 73 degrees 42 minutes 45 seconds West along said north right-of-way line, a distance of 289.15 feet to the POINT OF BEGINNING and containing 134,573 square feet or 3.0894 acres of land, more or less.

EXHIBIT D

RULES AND REGULATIONS

1.      All tenants will refer all contractor's representatives and installation technicians who are to perform any work within the Building, grounds, and Parking Area to Landlord for Landlord's supervision, approval and control before the performance of any such work. This provision shall apply to all work performed in the Building, grounds and Parking Area including, but not limited to, installations of telephones, telegraph equipment, electrical devices and attachments, and any and all installations of every nature effecting floors, walls, woodwork, trim, window, ceilings, equipment and any other physical portion of the Building, grounds, and Parking Area. Tenant shall not mark, paint, drill into, or in any way deface any part of the Building or the Premises without Landlord's written consent. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of the Landlord, and as the Landlord may direct.

2.      The work of the janitorial or cleaning personnel shall not be hindered by Tenant after 5:30 pm and such work may be done at any time when the Premises are vacant. The windows doors and fixtures in the Premises and Building may be cleaned at any time. Tenant shall provide adequate waste and rubbish receptacles, cabinets, books cases, map cases, etc., necessary to prevent unreasonable hardship to Landlord in discharging its cleaning obligations.

3.      Movement in or out of the Building or through the Building entrances or lobbies of furniture or office equipment, or dispatch or receipt by Tenant of any heavy equipment, bulky material merchandise or other item which requires use of elevators or stairways, shall be restricted to such hours as Landlord shall designate. The method of such movement, routing of such movement, safety precautions associated with such movement and the prohibition of Tenant bringing any dangerous items into the Building shall be subject to the Landlord's discretion and control. Any hand trucks, carryalls, or similar appliances used for the delivery or receipt of merchandise or equipment shall be equipped with rubber tires, side guards and such other safeguards as the Landlord shall require. Although Landlord or its personnel may participate in or assist in the supervision of such movement, Tenant assumes final responsibility for all risks as to damage to property and injury to persons that may result from such participation or assistance and Tenant shall indemnify and hold harmless Landlord and Landlord's employees and agents, and reimburse Landlord and Landlord's employees and agents with respect to any and all claims, demands, causes of action and liability arising as a result of any assistance or supervision or exercise of control over Tenant's movement of items in and out of the Building.

4.      No sign, advertisement or notice shall be displayed, painted or affixed by Tenant or Tenant's employees, agents or contractors in or on any part of the outside or inside of the Building or Premises without prior written consent of Landlord, and then only of such color, size, character, style and material and in such places as shall be approved and designated by Landlord. Signs on doors and entrances to the Premises and outside of the Premises within the Building, grounds or Parking Area shall be placed thereon by a contractor approved by Landlord.

5.      Tenant shall not place, install or operate on the Premises or in any part of the Building any engine, refrigerating, heating or air conditioning apparatus, stove or machinery, or conduct mechanical operations or place or use in or about the Premises or the Building any explosives, gasoline, kerosene, oil, acids, caustics or any other inflammable, explosive, hazardous or odorous material without the prior written consent of Landlord. No portion of the Premises shall at any time be used for cooking, sleeping or lodging quarters.

6.     Tenant shall not make or permit any nuisance or improper noises in the Building or otherwise interfere in any way with other tenants or persons doing business in the Building or with Landlord's operation of the Building.

7.     Landlord will not be responsible for any fixtures, personal property, equipment, jewelry or money lost in or stolen from the Premises or public areas of the Building, grounds or Parking Area. Landlord shall not be responsible for damages to or theft of motor vehicles or other items from any Parking Areas used in connection with the Building.

8.     No maintenance or repair work shall be done on any vehicles in the Parking Area. No disabled vehicles shall be parked or stored in the Parking Area. All vehicles in the Parking Area shall be parked within the designated spaces and not in more than one (1) space or across spaces. At Landlord's option, all disabled vehicles, recreational vehicles, boats and vehicles improperly parked in spaces designated for handicapped persons and all other improperly parked vehicles may be towed or otherwise removed from the Parking Area at the owner's expense. In the event any vehicle or boat is towed, Landlord will not be liable or responsible for the loss, damage or theft of any property located in the vehicle or boat or for any damage to the vehicle or boat.

9.     Neither Tenant or Tenant's employees, agents, invitees or licensees shall at any time leave or discard any rubbish, paper, articles or objects of any kind whatsoever outside the doors of the Premises or in any other area within the Building or on the grounds or in the Parking Area. No birds, animals, bicycles or vehicles shall be brought into or kept in or about the Building.

10.     None of the entries passages, doors, hallways, or stairways in the Building shall be blocked or obstructed by Tenant Such areas shall not be used by Tenant at any time except for ingress or egress to the Premises by Tenant's, Tenant's employees, agents and invitees.

11.     Landlord shall have the right to determine and prescribe the weight and proper position of any usually heavy equipment, including but not limited to copying equipment, computer equipment, safes and large files that are to be placed in the Building. Only those items which in the exclusive judgment of the Landlord will not do damage to the floors, structure and elevators may be moved into the Building. Tenant shall pay for any damage resulting from moving or installing such articles in the Building or the existence of same in the Building.

12.     All Christmas and other decorations in the Building must be flame retardant.

13.     After hours air conditioning and heating on Monday through Saturday and all day Sunday and holidays determined by Landlord must be requested in writing by noon of a regular work day prior to the day for which additional air conditioning is requested. Tenant shall be charged at the prevailing hourly rate for the use of such air conditioning and heating.

14.     Any request by Tenant to place or remove names from the directory board in the lobby of the Building shall be furnished to Landlord in writing on Tenant's letterhead.

15.     Any services which Tenant requests Landlord to perform which Landlord is not required to perform under this Lease shall, if performed by Landlord, be billed to Tenant at Landlord's cost plus a 15% fee to cover Landlord's overhead costs. Landlord shall have the right to refuse to perform any such services.

16.     If Landlord's maintenance engineer or any of Landlord's other personnel do any work after normal business hours at the request of Tenant, Tenant shall pay for the cost of such work.

17.    All doors leading from public corridors to the Premises are to be kept closed when not in use.

18.    Canvassing, soliciting or peddling in the Building is prohibited and Tenant shall cooperate with Landlord to prevent such activities.

19.    Tenant shall give Landlord immediate notice in the event that any defects or dangerous conditions arise or exist in the Premises or in the Building or if any accidents or emergencies occur in the Premises or Building.

20.    Tenant shall not use the Premises or permit the Premises to be used for photographic, multilith or multigraph reproductions for sale to the general public. All photographic, multilith or multigraph reproductions in the Premises shall be produced for Tenant in the ordinary course of Tenant's business.

21.    All requests for services made by Tenant shall be made directly to Landlord or Landlord's designated agents. Employees of Landlord or Landlord's designated agents shall not perform any work or do anything outside of their regular duties unless directed to do so by Landlord or Landlord's designated agents. Tenant will make no requests directly to Landlord's employees.

<u>EXHIBIT E</u>

GUARANTY

Landlord, Tenant and Guarantor (as herein defined) acknowledge that if it were not for this guaranty (the "**Guaranty**") as an inducement, Landlord would not execute the Lease.  Therefore, for $10.00 and other value received, and in consideration for, as a condition of, and an inducement to ALTERA HIGHLAND LLC, a Texas limited liability company ("**Landlord**") entering into that certain Lease Agreement dated as of August 21, 2012, with SHERMAN/GRAYSON HEALTH SYSTEM, LLC, a Texas limited liability company ("**Tenant**"), for certain premises being Suites A, B, C, D and E, comprised of radiology and common areas, of a medical office building located at 300 N. Highland Drive, Sherman, Texas, on real property owned by an affiliate of Tenant and ground leased to Landlord, as ground lessee (the "**Lease**"), the undersigned officer of LHP HOSPITAL GROUP, INC., a Delaware corporation (the "**Guarantor**"), on behalf of such entity, its legal representatives, heirs, successors, and assigns, hereby irrevocably guarantees to Landlord, Landlord's successors and assigns, absolutely and unconditionally, the full prompt and timely payment, performance and observance of all amounts to be paid and provisions of the Lease to be performed and observed by Tenant, including (without limitation) the rules and regulations incorporated into the Lease, as if Guarantor had executed the Lease as the tenant thereunder.  The Guarantor expressly agrees that the validity of this Guaranty and the obligations of the Guarantor hereunder shall not be terminated, affected or impaired by reason of the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.  The Guarantor further agrees that this Guaranty shall remain and continue in full force and effect notwithstanding any assignment, renewal, modification, extension or waiver of the Lease or any provisions thereof.  The laws of Texas shall apply hereto.

The Guarantor hereby waives, to the fullest extent permitted by law:

(A)    Any right that the Guarantor may have to require Landlord to proceed against Tenant, proceed against or exhaust any security held from Tenant, or pursue any other remedy in Landlord's power to pursue, including, without limitation, re-letting the Premises following a default;

(B)    Any defense based on any claim that the Guarantor's obligations exceed or are more burdensome than those of Tenant;

(C)    Any defenses given to sureties other than actual payment or performance;

(D)    Any defense based on: (i) any legal disability of Tenant; (ii) any release, discharge, modification, impairment or limitation of the liability of Tenant to Landlord  from any cause, whether consented to by Landlord or arising by operation of law or from any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the adjustment of debtor-creditor relationships (an "**Insolvency Proceeding**"), and/or (iii) any rejection or disaffirmance of the Lease, or any part of it, or any security held for it, in any such Insolvency Proceeding;

(E)    Any defense based on any action taken or omitted by Landlord in any Insolvency Proceeding involving Tenant, including any election to have Landlord's claim allowed as being secured, partially secured or unsecured, any extension of credit by Landlord to Tenant in any Insolvency Proceeding, and the taking and holding by Landlord of any security for any such extension of credit; and

(F)    The Guarantor agrees to jurisdiction and venue in Grayson and Dallas Counties, Texas, and waives any objection to such venue on the grounds of forum non conveniens.  **The Guarantor knowingly, voluntarily and intentionally waives the right to a trial by jury in respect of any litigation based**

hereon or arising out of, under, or in connection with this Guaranty.  In the event Landlord incurs any fees and/or expenses in the enforcement of this Guaranty, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings, the Guarantor agrees to be liable for same (including reasonable attorney's fees and costs) and to pay same promptly on demand by Landlord.

The Guarantor acknowledges liability for every obligation of Tenant under the Lease.  Any capitalized term used herein and not otherwise defined shall have the same meaning as defined in the Lease. Each provision of this Guaranty shall be considered severable, and if for any reason and provision is determined to be invalid under current or future law, such invalidity shall not impair the operation of or otherwise affect the valid portions of this Guaranty.

**GUARANTOR**:

LHP HOSPITAL GROUP, INC.,
a Delaware corporation

By:_____
Name:_____
Title:_____

Date:_____

# EXHIBIT 14

## LEASE AGREEMENT

This Lease ("**Lease**") is made as of August 21, 2012 (the "**Effective Date**"), by and between ALTERA HIGHLAND LLC, a Texas limited liability company ("**Landlord**"), and SHERMAN/GRAYSON HEALTH SYSTEM, a Texas limited liability company ("**Tenant**").

## RECITALS:

Landlord, as tenant, has entered into that certain Ground Lease Agreement dated as of the Effective Date (the "**Ground Lease**") with Tenant, as landlord, for the land upon which the Building (as defined below) is located.  Contemporaneously with the Ground Lease, (i) Landlord purchased one (1) medical office building, from Tenant, and (ii) Tenant, as "**Declarant**", filed of record a Declaration of Covenants, Restrictions and Easements (the "**Declaration**") covering the one (1) medical office building, the Hospital commonly known as Texas Health Presbyterian Hospital - WNJ (the "**Hospital**") owned by Tenant located in proximity to the medical office building and the parking  and other common areas  dedicated for use by persons occupying, using or visiting the medical office building, the Hospital and other facilities related thereto.  The Ground Lease and this Lease are subject to the terms and provisions of the Declaration.  Tenant, as "Declarant" under the Ground Lease and "Landlord" under the Ground Lease, is familiar with the terms and provisions of each of the Declaration and the Ground Lease.

As part of Tenant's purchase of the Building commonly called "300 N. Highland Drive, Sherman, Texas", Tenant agreed to enter into this Lease.

Simultaneously herewith, Landlord and Tenant are also entering into corresponding leases (each, a "**Related Lease**") for vacant, existing space of the Building, for the common areas of the Building used by the Hospital, and for the Ambulatory Surgery Center in the Building.

1.    **DEFINITIONS AND BASIC PROVISIONS.**

    1.1    Parties and Addresses. The parties hereto and their respective addresses are as follows:

    (1)    Landlord's Address:    5910 North Central Expressway
Suite 800
Dallas, TX 75206.

    (2)    Tenant's Address:    2400 North Dallas Parkway, Suite 450
Plano, Texas 75093
Attention: Executive Vice President – Administration

    (3)    Ground Lessor Address:    2400 North Dallas Parkway, Suite 450
Plano, Texas 75093
Attention: Executive Vice President –
Administration

1

    (4)   <u>Guarantor</u>:           LHP Hospital Group, Inc.,
a Delaware corporation

    (5)   <u>Guarantor's Address</u>:   2400 North Dallas Parkway, Suite 450
Plano, Texas 75093
Attention: Executive Vice President – Administration

    1.2   <u>Defined Terms</u>: In addition to the capitalized terms elsewhere defined in this Lease, the following terms shall be deemed to be defined terms of this Lease for all purposes. Each of the following definitions and basic provisions shall be construed in conjunction with and limited by the reference thereto in other provisions of this Lease:

    (1)   <u>Additional Rent</u>: All rent and other sums payable hereunder from Tenant to Landlord, other than Base Rent.

    (2)   <u>Base Rent</u>: An annual Base Rent of $12.05 per RSF in the Premises, subject to adjustment as provided in Sections 3.1 and 15.6. As of the Commencement Date, the monthly Base Rent is $19,870.45.

    (3)   <u>Broker(s)</u>: None.

    (4)   <u>Building</u>: The building in which the Premises are situated, being generally known as 300 N. Highland Drive, Sherman, Texas.

    (5)   <u>Commencement Date</u>: The Effective Date.

    (6)   <u>Common Areas</u>: Those parts of the Building, Land and related facilities designated from time to time by Landlord for the common use of all doctors, physicians, tenants, visitors, patients and employees, including among other facilities, parking areas, sidewalks, landscaping, curbs, loading docks and areas, private streets and alleys, automobile entrances, exits and driveways, entranceways (open, enclosed or otherwise), lighting facilities, drinking fountains, public toilets, signs, service areas, common utility lines, pipes, and/or conduits, and the like.

    (7)   <u>Declarant</u>: means the Declarant under the Declaration, Sherman/Grayson Hospital, LLC, a Texas limited liability company, and its successors under the Declaration.

    (8)   <u>Declaration</u>: has the meaning set forth in the Recitals.

    (9)   <u>Expiration Date</u>: The last day of the Term hereof, which date is contemplated as being one hundred forty four (144) full months after the Commencement Date. Notwithstanding any other provision of this Lease to the contrary, if the Expiration Date would otherwise occur on a date other than the last day of a calendar month, then the Term shall be automatically extended to include the last day of such calendar month.

    (10)   <u>Floor Plan</u>: The outline of the Premises as depicted in <u>Exhibit B</u> attached hereto and made a part hereof for all purposes.

    (11)   <u>Guarantor</u>: has the meaning set forth in Section 1.1.

(12)    Highest Lawful Rate:  The maximum nonusurious interest rate, if any, that at any time, or from time to time, legally may be contracted for, taken, reserved, charged, or received on the indebtedness owed to Landlord under this Lease under the laws which are presently in effect of the United States of America and the State of Texas applicable to Landlord and such indebtedness.

(13)    Hospital:  The Hospital defined in the Recitals of this Lease, and its successors and assigns.

(14)    Interior of the Premises: Standard office front and entrance (including without limitation, all plate glass and exterior doors), all of the interior wall framing, floors and floor covering, ceiling and interior staining and finishes, all interior doors and hardware, all interior electrical conduits and appurtenances, mechanical machinery and equipment, all interior electrical fixtures, interior plumbing and plumbing fixtures, Tenants' trade fixtures, and all other parts in the interior of the Premises.

(15)    Land: The lot, tract or parcel of land upon which the Building is situated, in Grayson County, Texas as more particularly described by metes and bounds on Exhibit A attached hereto and made a part hereof for all purposes, plus any contiguous parcels or strips of land leased or licensed to Landlord under the Ground Lease or by the Declaration, and are used in connection with or to service the Building or any part thereof.

(16)    Late Charge: Tenant shall pay $100.00 as a late fee to cover Landlord's administrative costs.  Additionally, all unpaid amounts Tenant fails to pay by the fifth (5th) day after the date due shall bear interest from the first day due until paid in full at the lesser of ten percent (10%) per annum or the Highest Lawful Rate.  In no event, however, shall the late fees and/or charges permitted under this Section or elsewhere in this Lease, to the extent the same are considered to be interest under applicable law, exceed the amount of interest that Landlord lawfully could have charged, received or collected on the indebtedness in question at the Highest Lawful Rate.

(17)    Lease: This Lease Agreement.

(18)    Lease Year: Each twelve (12) consecutive month period commencing on the Commencement Date or any anniversary thereof; provided that, if the Commencement Date is other than the first day of a calendar month, then the first Lease Year shall include such partial month together with the next succeeding twelve (12) consecutive months, and each succeeding Lease Year shall begin on the first day of the calendar month that corresponds to the first day of the calendar month following the Commencement Date.

(19)    Operating Expenses: All expenses, costs and disbursements of every kind and nature that Landlord or any of its Affiliates directly or indirectly pays or becomes obligated to pay, whether under the Ground Lease, the Declaration, any Related Lease or otherwise, in respect of the Ground Lease, the ownership, management, maintenance, repair, replacement and operation of the Building, the Common Areas and related facilities of the Building or arising in connection with any Related Lease.  Notwithstanding the foregoing, Operating Expenses shall exclude capital costs associated with the replacement of the roof, foundation, and exterior walls.

(20)    Permitted Use:  General Medical Offices.

(21)    Premises: Suites 350, 400, 410 and 5ᵗʰ Floor Conference Center in the Building, which are comprised of shell space in the Building as of the Effective Date, containing approximately 19,788 RSF (as defined herein), subject to adjustment as provided in Section 2.4. The Premises are substantially depicted on the attached Floor Plan shown on Exhibit B and being located in the Building.

(22)    Pro Rata Share or Tenant's Pro Rata Share: 16.819%, provided that if the Building is expanded or contracted, Tenant's Pro Rata Share shall increase or decrease, as the case may be, such that Tenant's Pro Rata Share will equal a fraction, the numerator of which is the net rentable area of the Premises, and the denominator of which is the net rentable area of the Building, which is approximately 117,655 RSF as of the Effective Date.

(23)    Rent: All Base Rent and Additional Rent.

(24)    RSF: means the rentable square feet in the Premises, Building or other area in question, as determined by an architect using ANSI/BOMA Standards.

(25)    Security Deposit: None.

(26)    Tenant Improvement Allowance:  Means that amount, if any, set forth in Section 2.3.

(27)    Tenant Improvements:  Means those improvements and alterations Tenant may elect to construct or install in the Premises, subject to the provisions of this Lease.

(28)    Term: Twelve (12) years (one hundred forty four (144) full months) from the Commencement Date, unless earlier terminated pursuant to the provisions of this Lease.

## 2.    GRANTING CLAUSE; TENDER OF POSSESSION.

2.1    Granting Clause.  In consideration of the Rent reserved and the covenants and agreements herein contained on the part of the Tenant to be observed and performed, and subject to the terms and provisions of the Declaration and Ground Lease, Landlord hereby demises, lets and leases unto Tenant, and Tenant hereby accepts, leases and rents from Landlord, the Premises.

2.2    Tender and Acceptance of Possession.  Landlord hereby tenders, and Tenant hereby accepts, possession of the Premises on the Effective Date.  Tenant hereby accepts the Premises in their "AS-IS" condition, and Landlord shall have no obligation to perform any work therein (including demolition of any improvements existing therein or construction of any tenant finish-work or other improvements therein), and, except as otherwise provided in Section 2.3, shall not be obligated to reimburse Tenant or provide an allowance for any costs related to the demolition or construction of improvements therein.  Tenant has reviewed, and hereby accepts, the condition and capacity of the Building's existing electrical systems and HVAC.  Tenant acknowledges that Landlord does not have any obligation, express or implied, to modify or increase the capacity of such systems.  Before Tenant may occupy the Premises to conduct its business therein, Tenant shall, at its expense, obtain and deliver to Landlord a certificate of occupancy from the appropriate governmental authority for the Premises.

2.3    Tenant Improvement Allowance.  Landlord shall provide Tenant an improvement allowance not to exceed $50.00 per RSF in the Premises (the "**Tenant Improvement Allowance**").  If Tenant performs any alterations, modifications or physical additions in or to the Premises that are permitted

under this Lease and otherwise approved by Landlord, then Tenant may request advances of the Tenant Improvement Allowance to reimburse Tenant for the hard costs of such work.  Landlord shall make disbursements of the Tenant Improvement Allowance to reimburse Tenant for such costs upon Landlord's receipt, review and approval of a draw request, with supporting documentation, that is reasonably acceptable to Landlord.

       2.4    <u>Adjustment to Premises</u>.  If Tenant or any of its affiliates relocates any physicians or other tenants of the Building directly or indirectly employed by Tenant or any of its affiliates from a premises in the Building not contained in the Premises into any portion of the Premises, then the premises vacated by such physician or other tenant shall automatically, as of the date of such relocation, be added to the Premises upon the same terms as provided in this Lease, and the RSF, Base Rent, Tenant's Pro Rata Share and other terms of this Lease dependent upon the size of the Premises shall be adjusted.  The foregoing shall apply notwithstanding the fact that the lease to such relocated physician or other use may constitute a Qualified Lease.

**3.**    **<u>RENT</u>.**

       3.1    <u>Base Rent</u>.

       (1)    This is a pure "net lease," and Base Rent, Additional Rent, Operating Expenses and all other sums payable hereunder by Tenant shall be paid without notice, demand, setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.  It is intended that the Base Rent provided for in this Lease shall be absolutely net to Landlord throughout the Term, and, accordingly, Tenant covenants and agrees to pay, as they become due and payable and before they become delinquent, all operating and capital expenses in connection with the operation, maintenance, repair, restoration, use or occupation of the Premises including, without limitation, the costs, charges and assessments related to taxes, impositions, utilities and insurance.  Tenant shall pay all such taxes and impositions even though the taxing statue or ordinance may purport to impose such taxes or impositions on Landlord.

       (2)    The Base Rent shall be paid by Tenant in monthly installments to Landlord on or before the first day of each calendar month during the Term hereof.  The monthly Base Rent for any fractional month at the beginning or the end of the Term shall be prorated based upon the actual number of days in such month.

       (3)    The Base Rent will be adjusted and increased on each anniversary of a Lease Year (the "**Adjustment Date**") by an amount equal to the greater of (i) 103% of then-effective Base Rent (i.e., as it may have been adjusted pursuant to this Section 3.1(3)) and (ii) subject to the limitation set forth below in this Section 3.1(3), any increase in the Consumer Price Index for "All Urban Consumers, U.S. City Average, All Items," issued by the Bureau of Labor Statistics of the United States Department of Labor (the "**Index**").  The adjustments in the Base Rent will be determined by multiplying the then-effective Base Rent (i.e., as it may have been adjusted pursuant to this Section 3.1(3)) by a fraction, the numerator of which is the Index number for the date one month prior to the Adjustment Date and the denominator of which is the Index number for the first month of the first year of the Term.  When the adjusted rent for the Adjustment Date has been determined, Landlord shall give Tenant written notice of such adjusted rent; and, upon adjustment of the rent, any underpayment of rent from the Adjustment Date to the date Tenant is notified of the adjustment shall be immediately due and payable by Tenant.  Landlord's failure or delay to notify Tenant of said rent adjustment shall not constitute a waiver of the right to any adjustment provided for in this Lease.  In the event that the Index shall be discontinued, then Landlord shall use an index substantially similar to the Index to calculate future adjustments.  Notwithstanding any other

provision of this Section 3.1(3) to the contrary, the Base Rent in any Lease Year shall not increase by more than five percent (5%) of the Base Rent in the immediately preceding Lease Year.

(4)     Landlord and Tenant are knowledgeable and experienced in commercial transactions and agree that the provisions of this Lease for determining charges, amounts, Operating Expenses and Additional Rent are commercially reasonable and valid even though such methods may not state a precise mathematical formula for determining such charges. ACCORDINGLY, TENANT VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS OF TENANT UNDER SECTION 93.012 OF THE TEXAS PROPERTY CODE, AS IT MAY BE AMENDED OR REPLACED.

3.2     Operating Expenses.

(1)     Tenant's Pro Rata Share of Operating Expenses for the remainder of the calendar year after the Commencement Date and for each subsequent calendar year shall be estimated by Landlord, and written notice thereof shall be given to Tenant. Upon receipt of said written notice from Landlord, the estimated Operating Expenses shall be due and payable as herein provided. For any such remainder of the calendar year after the Commencement Date, Tenant agrees to pay Landlord each month, at the same time the Base Rent Payment is due, an amount equal to the amount of such estimated monthly Pro Rata Share of Operating Expenses for the remainder of such calendar year; and during each calendar year thereafter Tenant agrees to pay Landlord each month, at the same time the Base Rent Payments are due, an amount equal to one-twelfth (1/12th) of the estimated annual Pro Rata Share of Operating Expenses due.

(2)     If any portion of Operating Expenses increase during a calendar year, Landlord may revise the estimated Operating Expenses during such year by giving Tenant written notice to that effect, and thereafter Tenant agrees to pay Landlord, in each of the remaining months of such calendar year, an additional amount equal to the amount of such annual increase in the estimated Pro Rata Share of Operating Expenses divided by the number of months remaining in such calendar year.

(3)     After the end of each calendar year, Landlord shall prepare and deliver to Tenant a statement showing Tenant's Pro Rata Share of the total amount of Operating Expenses. Within ten (10) days after receipt of the aforementioned statement, Tenant agrees to pay Landlord the remaining amount owed by Tenant. However, if Tenant has paid more than its Pro Rata Share of the actual Operating Expenses, Landlord shall either pay the amount of such excess to Tenant within ten (10) days after delivery of the aforementioned statement, or, at Landlord's option, apply such excess to any sums due or to become due from Tenant to Landlord.

(4)     Notwithstanding anything herein to the contrary, in no event will the Base Rent provided for in this Lease ever be reduced.

3.3     Payment For Other Services. Tenant agrees to pay Landlord as Additional Rent all charges for any services, goods, or materials furnished at Tenant's request which are not required to be furnished by Landlord under this Lease, immediately upon demand, plus an administrative fee not to exceed five percent (5%) of the cost of the requested services, good or materials.

3.4     Late Charge. If Landlord does not receive any payment due on or before the 5th day of the calendar month when such payment is due, the Late Charge shall be due and payable (in addition thereto). Said Late Charge is for the purpose of reimbursing Landlord for the extra administrative costs and expenses incurred in connection with the handling and processing of such delinquent payment.

6

**A0565**

3.5     No Offsets or Demands.  All Base Rent, Additional Rent and other amounts due from Tenant to Landlord under this Lease shall be paid without notice, demand, offset, abatement or deduction. This Lease and the rights of Landlord and obligations of Tenant hereunder shall not be affected by any event or for any reason or cause whatsoever foreseen or unforeseen.  The obligations of Tenant under this Lease shall be separate and independent covenants and agreements and all monetary obligations shall continue to be payable in all events.

4.     **SECURITY DEPOSIT.**  Tenant is not required to make any security deposit in connection with this Lease.

5.     **COMMON AREAS.**

5.1     Parking Facilities and Other Common Areas. During the Term, Tenant shall be entitled to the nonexclusive use (in common with others entitled thereto) of the Common Areas outside the Building designated from time to time by Landlord as the parking areas of the Building.  As of the Effective Date, the parking areas designated by Landlord for use by Tenant are depicted on Exhibit C.  In such parking areas, Tenant shall be entitled to use a number of parking spaces equal to 5 parking spaces for every 1,000 RSF of space in the Premises.  Tenant shall not conduct, solicit business or display or place any signs or advertising on or within the Common Areas, or distribute handbills therein, or take any action which would interfere with the rights of other persons to use the Common Areas.

5.2     Parking Regulations. Tenant understands and agrees that the Declarant shall have the right to maintain and operate lighting facilities on all of the parking areas and to police all of the parking and other Common Areas, including, without limitation, the right to discourage non-tenant parking, to designate and regulate parking areas, and to do and perform such other acts with respect to said Common Areas as in the judgment of the Declarant may be legally necessary to prevent a dedication thereof to the public.

6.     **MAINTENANCE AND REPAIRS.**

6.1     Landlord's Obligations.  As part of the Operating Expenses, Landlord shall maintain or cause to be maintained the elevators, public restrooms and other Common Areas within the Building, the structural elements building systems of the Building (including the HVAC system which serves the Building and the Premises).  Landlord shall, at its own cost and expense, maintain or cause to be maintained the foundation, the exterior walls (but excluding the interior glass or doors that are part of the Premises) and roof of the Building in good condition or repair.  However, if any repair is required by reason of the negligence or intentional misconduct of Tenant or any of its agents, employees, invitees or Affiliates, Landlord may add the cost thereof to the next installment of Rent thereafter coming due, but only to the extent that the cost thereof is not covered by insurance proceeds actually received by Landlord.  Except as herein provided, Landlord shall have no obligation to repair, maintain, alter, replace, or modify the Premises or any part thereof.  Any failure by Landlord to furnish, or delay in furnishing, any maintenance or services that are required of Landlord under this Section or otherwise under this Lease, when such failure is caused by acts of God or any other condition beyond Landlord's reasonable control, shall not constitute a default by Landlord under this Lease and shall not permit Tenant to abate any Rent or relieve Tenant from any of its obligations under this Lease.

7

**A0566**

6.2    Tenant's Obligations.   Tenant shall maintain the interior of the Premises, including all interior glass and doors that are a part of the Premises and any improvements done by or on behalf of Tenant, in good condition and clean and attractive appearance, performing all janitorial services and making all repairs at its own cost and expense, and using materials and labor of a kind and quality equal to the original work.  Tenant shall maintain the Premises in accordance with all requirements of law, including (without limitation) the Americans with Disabilities Act (as the same may be amended) and similar state or local laws, rules or regulations.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises in a broom clean condition and otherwise in the same condition as received by Tenant on the Commencement Date upon initial completion of the interior improvements, reasonable wear and tear excepted.  If Tenant shall neglect and/or fail to observe, keep or perform any of its obligations to maintain and repair and Premises in the time and manner provided in this Article and if such neglect and/or failure shall continue for ten (10) days after notice thereof, Landlord shall have the right to perform said maintenance and repairs.  In the event Landlord does so perform Tenant's responsibilities for said maintenance and repairs, Landlord shall furnish Tenant a statement of the actual cost thereof, plus an administration fee not to exceed ten percent (10%) of the actual costs, which statement shall be immediately payable by Tenant.  All alterations and modifications of or to the Premises shall be in accordance with the terms and provisions of Section 11.2 below.

## 7.    TAXES ON TENANT'S PROPERTY.

Tenant shall be responsible for and shall pay, before same becomes delinquent, all federal, state, county, and local taxes levied or assessed upon any and all personal property of any kind owned by or placed in, on or about the Premises by Tenant during the Term, and all taxes and assessments on trade fixtures, furniture, and all sales, excise and other taxes on Tenant's business shall be paid entirely by Tenant. If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property, or if the assessed value of Landlord's property is increased by inclusion of personal property, furniture or fixtures placed by Tenant in the Premises, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

## 8.    INSURANCE.

8.1    Hold Harmless. Tenant covenants and agrees to indemnify and save each of Landlord, and Landlord's members, managers, partners, agents, employees and representatives, harmless from and against any and all costs, liability or expense arising out of any claims of any person or persons on account of any occurrence in, upon or at the Premises, resulting from the occupancy or use thereof by Tenant, or by any person or persons holding or using the Premises thereunder, occasioned in whole or in part by reason of the improper and/or lack of control and supervision throughout the Common Areas of property owned or controlled by Tenant, or by reason of the use or misuse of the parking area or any other Common Areas by Tenant or by any person or persons holding or using the Premises, or any part thereof, under Tenant, including without limitation, Tenant's clients, invites, agents, contractors, employees, servants, subtenants, assignees or licensees, and without limiting the generality of the foregoing, Tenant further covenants and agrees to indemnify and save each of Landlord and Landlord's partners, agents, employees and representatives harmless from and against any penalty, damage or charge incurred or imposed by reason of any violation of law or ordinance by Tenant or any person or persons holding under Tenant and from any cost, damage or expense arising out of the death of or injury to any person or persons holding under Tenant and from any cost, damage or expense arising out of the death of or injury to any person or persons holding under Tenant. In case any action or claim to which Landlord (or Landlord's partners, members, managers, agents, employees or representatives) are entitled to indemnification shall be brought or asserted in any way against Landlord (or Landlord's members, managers, partners, agents, employees or representatives) or Tenant, Tenant shall immediately notify Landlord of the same and shall furnish Landlord with all relative

information. Landlord shall be entitled, at Tenant's expense, to participate in, and to the extent that it wishes, to assume the defense thereof.

8.2    Tenant's Liability Insurance. Tenant agrees to maintain in force during the Term a policy or policies of comprehensive public liability insurance, including property damage, written by one or more responsible insurance companies approved by Landlord and licensed to do business in Texas, which insurance companies shall be rated not less than X by Best Guide Rating, insuring Tenant and naming as additional named insureds, Landlord, Landlord's property management company as agent, and Mortgagee and such other persons, firms, or corporations as are designated by Landlord, against loss of life, bodily injury and property damages in which the limit of public liability shall be not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) single limit bodily injury and in which the limit of property damage liability shall be not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) and an umbrella coverage of not less than TWO MILLION AND NO/100 DOLLARS ($2,000,000.00). Additionally, Tenant shall maintain a comprehensive automobile liability insurance policy of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00). Each such policy shall be non-cancellable for any cause without first giving Landlord thirty (30) days prior written notice. Subject to all of the foregoing, the insurance coverage required to be furnished by Tenant pursuant to this Section may be in the form of a blanket policy covering all of Tenant's operations.

8.3    Tenant's Fire Insurance. Tenant agrees to maintain in force during the Term a policy or policies of fire and extended coverage insurance in the case of fire sprinkler leakage, malicious mischief, vandalism and other extended coverage perils, for the full insurable replacement value of all additions and of all office furniture, office equipment, merchandise, and other items of Tenants' property within or on the Premises. Coverage in this paragraph shall be in an amount not less than one hundred percent (100%) of the replacement costs of Tenant's improvements to the Premises.

8.4    Tenant's Workers Compensation. If required by law, Tenant agrees to maintain in force during the Term workers compensation and employers liability insurance with a waiver or subrogation endorsement, in a form and amount satisfactory to Landlord.

8.5    Evidence of Insurance. A copy of each such policy or a certificate of such insurance required to be maintained by Tenant shall be delivered to Landlord upon the Commencement Date of this Lease and annually thereafter upon the first day of each Lease Year throughout the Term. If Tenant fails to procure said insurance or deliver to Landlord, such evidence thereof, Landlord may procure same and Tenant shall reimburse Landlord for the cost thereof plus an administrative fee not to exceed ten percent (10%) of the actual cost immediately upon demand.

8.6    Landlord's Liability Insurance. Landlord agrees to maintain in force during the Term a policy or policies of comprehensive public liability insurance, including property damage, written by one or more responsible insurance companies licensed to do business in Texas and insuring Landlord against loss of life, bodily injury and/or property damage with respect to the operation of the Building, the policy limits of which to be in amount satisfactory to Landlord. In addition, Landlord may maintain in force such umbrella policy or policies of public liability insurance as Landlord, in its sole discretion, may deem appropriate. Landlord's failure to procure any such insurance shall not invalidate this Lease or lessen Tenant's liability hereunder. Landlord's insurance hereunder shall include loss of rent coverage.

8.7    Landlord's Fire Insurance. Landlord agrees to procure and keep in effect during the Term a policy or policies of fire and extended coverage insurance covering the Building, including rent abatement, vandalism and malicious mischief coverage, written by an insurance company authorized to do business within the State of Texas, and in an amount at the full replacement cash of the Building. Such insurance shall provide protection against losses so insured against for the sole and exclusive benefit of Landlord. The

9

**A0568**

full amount of any proceeds payable thereunder shall be payable to Landlord, and Tenant shall not be entitled to, and shall have no interest in, such proceeds or any part thereof. Tenant is advised to procure such insurance as Tenant deems appropriate to protect its interest.

8.8     <u>Waiver of Subrogation</u>. To the extent permitted by the laws and insurance regulations of the State of Texas, the respective parties hereto hereby waive and release any and all claims, demands and causes of action which each might have against the other party, either for damage to or loss of any part of the Premises or of any adjoining premises belonging to Landlord, arising from perils ordinarily insured against under a standard fire and extended coverage insurance policy issued in the State of Texas, regardless of whether such damage or loss is occasioned by the negligence of the respective parties, or either of them, their agents, servants or employees.

## 9.     <u>UTILITIES AND SERVICES.</u>

Provided Tenant is not in default of any term, condition or covenant of this Lease, Landlord agrees to furnish or cause to be furnished to the Premises gas, water (for drinking, cleaning and lavatory purposes only), and electricity during the Term. Landlord shall furnish tempered and refrigerated water at those points of supply designated by Landlord in the Common Areas of the Building, heated and refrigerated air conditioning in season (at temperatures, in amounts and at times considered by Landlord to be standard or in compliance with any governmental regulations; such service after hours, on Saturday afternoons, Sundays and holidays will be furnished only upon 24 hours' prior written request of Tenant who shall bear the entire cost thereof). Landlord shall furnish janitorial service, in the manner and to the extent deemed standard by Landlord during the periods and hours as such services are normally furnished to all tenants. Tenant shall not hinder the work of the Building janitor. Landlord shall furnish routine maintenance, painting and lighting service for all Common Areas within the Building in the manner and to the extent deemed by Landlord to be standard. Tenant will pay all telephone charges. Landlord shall not be liable in damages or otherwise for failure, stoppage or interruption of any such service nor shall the same be construed as an eviction of Tenant, work an abatement of Rent, or relieve Tenant from the operation of any covenant or agreement set forth herein; but in the event of any failure, stoppage or interruption thereof not caused by Tenant or Tenant's agents, employees, contractors, clients or invites, Landlord shall use reasonable diligence to resume service promptly.

Landlord reserves the right to separately meter usage of any utility service included in Operating Expenses and charge Tenant and other tenants of the Building based on such usage.  Further, Landlord reserves the right from time to time to charge to Tenant and other tenants of the Building applicable costs with respect to usage of Building services and utilities at times other than during standard business hours, on such basis as Landlord may reasonably determine for the purpose of properly allocating the costs of such services and utilities in accordance with the usage thereof.

Notwithstanding anything hereinabove to the contrary, Landlord reserves the right from time to time to make reasonable modifications to the above standards for services and utilities.

## 10.     <u>INTENTIONALLY DELETED</u>.

## 11.     <u>PROPERTY OBLIGATIONS.</u>

11.1     <u>Tenant's Property</u>. Landlord shall not be liable for any damage to or loss of personal property placed in or about the Premises by Tenant or Tenant's agents, employees, clients, guests, invites or others, resulting from fire, theft, explosion, flood, windstorm or other casualty caused by Acts of God or by the acts or omissions of other occupants of other space in the Building or caused by operations during construction of any public or quasi public work. All property kept or stored within the Premises shall be

10

**A0569**

kept or stored at the risk of Tenant only, and Tenant shall hold Landlord harmless from any claims arising out of damage to the same, including subrogation claims by Tenant's insurer, if any, unless such damage shall be caused by the gross negligence of Landlord.

     11.2   <u>Tenant Fixtures, Alterations and Personal Property</u>. Tenant shall not make or allow to be made any alterations, modifications or physical additions in or to the Premises without the prior written consent of Landlord which consent shall not be unreasonably withheld or delayed.  Tenant may proceed with the construction of the approved alterations, modifications or physical additions, but only so long as they are in strict compliance with the plans and specifications and with the provisions of this <u>Section 11.2</u>. All alterations shall be made at Tenant's expense, either by Tenant's contractors, which previously have been approved in writing by Landlord, or at Landlord's option, by Landlord's contractors on terms reasonably satisfactory to Tenant, including a fee of five percent (5%) of Landlord's actual cost of the work to cover Landlord's overhead. None of Tenant's construction, alterations, modifications or physical additions shall (i) alter the exterior appearance of the Building or Premises in any manner, (ii) adversely affect the structure or safety of the Building or Premises or any portion thereof, (iii) fail to comply with all building, safety, fire and other codes and governmental and insurance requirements, or (iv) fail to be completed promptly and in a good and workmanlike manner. All trade fixtures installed by Tenant shall be new or completely reconditioned. At Landlord's option, any such approved additions, alterations, modifications, improvements and/or fixtures furnished or installed by Tenant which are sufficiently affixed or annexed to the Premises so as to become a part thereof, other than unaffixed movable trade fixtures, shall upon the expiration or earlier termination of this Lease, become the property of Landlord.  Any damage to the Premises caused by such installation and/or removal of Tenant's fixtures and equipment shall be repaired at Tenant's sole cost and expense. The provisions of this Section shall expressly survive the expiration or earlier termination of this Lease.

     11.3   <u>Liens</u>. Tenant shall neither permit nor suffer an involuntary lien to be filed or affixed against the Building, the Premises, the fee simple title of the Land or Landlord's leasehold estate therein, or any part thereof, and shall not voluntarily grant any lien or security interest therein. In the event any such involuntary or voluntary lien, including without limitation, mechanic's lien or tax lien, is filed and/or affixed against the Building, the Premises the fee simple title of the Land or Landlord's leasehold estate therein, or any part thereof, or against any fixtures, equipment, furnishings therein or all types of work and improvements comprising the Interior of the Premises and Tenant has not caused the same to be released and discharged of record within ten (10) days after notice thereof, same shall constitute a default hereunder. Upon such default, in addition to any other remedies available to Landlord herein, Landlord may cause the release and discharge of such lien, Tenant shall repay to Landlord immediately upon demand as Additional Rent hereunder all such sums disbursed or deposited by Landlord plus an administrative fee not to exceed five percent (5%) of the sums disbursed or deposited. Nothing contained herein, however, shall imply any consent or agreement on the part of Landlord or anyone holding under Landlord to subject Landlord's interest to liability under any mechanic's or other lien law, regardless of whether the performance or the furnishing of such work, labor, services or materials to Tenant or anyone holding under Tenant shall have been consented to by Landlord.

## 12.    <u>SUBORDINATION/ATTORNMENT.</u>

     12.1   <u>Subordination</u>. Tenant covenants and agrees promptly upon request of Landlord to execute and deliver, in a recordable form provided by Landlord, an acknowledgment of the subordination of this Lease to any mortgage, deed of trust, security agreement or other lien or encumbrance resulting from any method of financing or refinancing, presently or henceforth placed upon the Landlord's leasehold estate in the Land and/or fee interest in the Building and any future expansion thereof or additions thereto, and to all advances of money or other value heretofore or hereafter made upon the security thereof.  Notwithstanding anything to the contrary contained herein, Landlord agrees to obtain a subordination, non-disturbance and

<div align="center">11</div>

attornment agreement ("**SNDA**") from its current lender in a form reasonably acceptable to Tenant which shall provide, among other things, that this Lease shall be recognized and Tenant's rights and occupancy under this Lease shall not be disturbed in the event Tenant is not in default hereunder beyond any applicable notice and cure periods.  In addition, Tenant shall not be required to subordinate its rights under this Lease to the interest of any future lender unless Landlord has first delivered an SNDA to Tenant executed by such future lender in a form reasonable acceptable to Tenant and containing a similar non-disturbance right.

12.2   <u>Collateral Assignment by Landlord</u>. Subject to the foregoing provisions of this Article, Landlord reserves the right, without notice to or consent of Tenant, to assign this Lease and/or any and all Rent hereunder as security for the payment of any mortgage loan, deed of trust loan, or other method of financing or refinancing.

12.3   <u>Attornment</u>. In the event any such mortgage is foreclosed, or in the event of the exercise of the power of sale under any such deed of trust, Tenant shall consider the purchaser at the foreclosure trustee's sale to be the Landlord hereunder, and Tenant will attorn to the purchaser and will recognize the purchaser as the owner and Landlord under this Lease.

## 13.   <u>USE AND OPERATION.</u>

13.1   <u>Use of Premises</u>. The Premises shall be used and occupied by Tenant solely for the Permitted Use and Tenant expressly agrees that no use shall be made or permitted or acts done by Tenant and/or any agents, employees, subtenants, or assignees of Tenant, which shall increase the existing rate of insurance coverage or cause cancellation of such insurance coverage. Tenant shall not (i) permit any objectionable or unpleasant odors to emanate from the Premises; nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside of the Premises or where the same can be seen or heard from outside the Premises; (ii) place any antenna, awning or other projection on the exterior of the Premises; (iii) take any other action which would constitute a nuisance or would disturb or endanger other tenants of the Building or unreasonably interfere with their use of their respective premises; or (iv) do anything which would tend to injure the reputation of the Building.  Tenant shall at all times comply with all terms and provisions of the Ground Lease and Declaration applicable to Tenant, or Tenant's use of the Premises and Common Areas.

13.2   <u>Suitability of Premises</u>. Tenant warrants to Landlord that it has, prior to the execution hereof, fully inspected the Building, the Common Areas, the property and all items related thereto, and that Tenant has made, performed, obtained and received all studies, inspections, reports, diagnoses and tests that Tenant desires relative to the Building, the Common Areas, the property and all items related thereto and Tenant's proposed business use of the Premises. Tenant further warrants to Landlord that Tenant has inspected, or will thoroughly inspect, the Plans and Specifications agreed and to be agreed with Landlord for Landlord's construction of the shell of the Premises and will be fully satisfied with such inspections and Plans and Specifications for the Premises. Tenant understands and agrees that Tenant is accepting the Building, the Common Areas, the property and all items related thereto, and will be accepting the Premises, in their "AS-IS", "WHERE-IS" condition, "WITH ALL FAULTS" and without any warranty or guarantee whatsoever.  Tenant warrants that it used or will use all due diligence in conducting all studies inspections, diagnoses and tests on the Premises the Building, the Common Areas, the property and all items related thereto that Tenant deemed necessary or appropriate. Tenant acknowledges that Landlord has not made and does not make, and Landlord hereby disclaims, any and all warranties, express or implied, which in any way relate to the Premises the Building, the Common Areas, the property and all items related thereto or the condition thereof, including without limitation any implied warranty of suitability or habitability. Tenant further understands that Landlord has relied and will rely upon Tenant's having made all inspections Tenant desired, and that but for such inspections by Tenant, Landlord would not have leased the Premises to Tenant. Additionally, the parties agree that the obligation of Tenant to pay all Rent and other sums

hereunder provided to be paid by Tenant, and the obligation of Landlord to perform Landlord's other covenants and duties hereunder, constitutes independent, separate and unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is expressly provided for herein and not otherwise. It is agreed that in the event Landlord commences any proceedings against Tenant for nonpayment of Rent or any other sum due and payable by Tenant hereunder, Tenant shall not interpose any counterclaim or other claim against Landlord of whatever nature or description in any such proceedings; and in the event Tenant interposes any such counterclaim or other claim against Landlord in any such proceeding, Landlord and Tenant stipulate and agree that, in addition to any other lawful remedy of Landlord, upon motion of Landlord, such counterclaim or other claim asserted by Tenant shall be severed out of the proceedings instituted by Landlord and Landlord may proceed to final judgment separately and apart from and without consolidation with or reference to the status of such counterclaim or any other claim asserted by Tenant.

## 14.    **HAZARDOUS MATERIALS.**

14.1    Tenant, and all of Tenant's partners, officers, directors, employees, representatives, agents, contractors, subcontractors, successors, assigns, lessees, sublessees, concessionaires, invitees and any other occupants of the Premises (collectively, "**Tenant's Representatives**"), shall abide by all Federal, state and local statutes, ordinances, codes and regulations, now existing or hereinafter enacted (collectively, "**Hazardous Materials Laws**"), governing the use, handling, depositing or disposal of hazardous or toxic substances, and medical wastes (collectively, "**Hazardous Materials**").  Landlord has no obligation to provide or make provision for disposal facilities for Hazardous Materials or other medical wastes, and Tenant shall not deposit or dispose of any Hazardous Materials or other medical wastes into the general waste disposal facilities provided by Landlord.  Tenant shall, at Tenant's expense, employ or engage private waste management services to dispose of any and all waste of Tenant which must be handled in any manner other than general waste collection provided by Landlord through public or private waste collection service. Landlord may direct the manner of disposal and location of any containers, collection boxes or other storage facilities, which may be required by Hazardous Materials Laws.

14.2    The term "**Hazardous Materials**" shall not include (i) pharmaceuticals, cleaning agents of the types and in the quantities and concentrations normally stocked by health care providers located in medical office buildings similar to the Building, (b) oil in the minimal amounts typically associated with the use of certain portions of the Building for driving and parking motor vehicles or (c) medical wastes generated at the Building; however, Tenant shall use, store, transport and dispose of the foregoing in accordance with all laws including (without limitation) all Hazardous Materials Laws.

14.3    Tenant shall indemnify, defend and hold harmless Landlord, the "**Hospital**" and the holder ("**Mortgagee**") of any mortgage encumbering all or any portion of the Building or the real property upon which the Building is situated or Landlord's leasehold estate in the Land ("**Mortgage**"), and their respective members, managers, partners, shareholders, directors, officers, agents and employees (all collectively referred to as the "**Indemnified Parties**") from and against any and all costs, expenses and claims arising from or in connection with any act, omission or negligence of Tenant or any Tenant's Representatives relating to or arising out of the use, handling, depositing or disposal of Hazardous Materials with respect to the Premises or the Building, such indemnity to include all costs, expenses and liabilities associated with the remediation thereof or incurred in connection with each claim, action or proceeding with respect thereto, including, without limitation, all attorney's fees and expenses.

14.4    Tenant shall immediately notify Landlord in writing of:  (i) any enforcement, clean-up, removal or other governmental or regulatory action instituted, contemplated or threatened concerning the Premises pursuant to any Hazardous Materials Laws; (ii) any claim made or threatened by any person against Tenant or the Premises relating to damage contribution, cost recovery, compensation, loss or injury

A0572

resulting from or claimed to result from any Hazardous Materials on or about the Premises; and (iii) any reports made to any environmental agency arising out of or in connection with any Hazardous Materials in or removed from the Premises, including any complaints, notices, warnings or asserted violations in connection therewith, all upon receipt by Tenant of actual knowledge of any of the foregoing matters. Tenant shall also supply to Landlord a promptly as possible and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating to Hazardous Materials associated with the Premises.

14.5    Without limiting any other provision of this Lease, Tenant shall not create or permit to exist in or about the Premises any "**Mold Condition**" unless caused by Landlord.  As used herein, the term Mold Condition shall include the presence or suspected presence of "**Mold**" or any condition(s) that reasonably can be expected to give rise to or indicate the presence of Mold, including observed or suspected instances of water damage or intrusion, the presence of wet or damp wood, cellular wallboard, floor coverings or other materials, inappropriate climate control, discoloration of walls, ceilings or floors, complaints of respiratory ailment or eye irritation by Tenant's employees or any other occupants or invitees in the Premises, or any notice from a governmental agency of complaints regarding the indoor air quality at the Premises.  As used herein, the term Mold shall include mold, mildew, fungus or other potentially dangerous organisms.  In the event of suspected or actual Mold or Mold Conditions at the Premises, Tenant shall immediately notify Landlord in writing of the same and the precise location thereof.  Tenant acknowledges the control of moisture and Mold prevention are material obligations of Tenant under this Lease, and Tenant shall, at its sole costs and expense, regularly monitor the Premises for the presence of Mold and Mold Conditions.  If any Mold or Mold Conditions in or about the Premises are a result of the actions or omissions of Tenant or any Tenant's Representatives, Tenant shall promptly, at Tenant's sole cost and expense, hire a licensed and experienced Mold remediation contractor to completely clean-up and remove from the Premises all Mold or Mold Conditions.  All such clean-up, removal and remediation shall, in each instance, be conducted to the satisfaction of Landlord and any governmental authority with jurisdiction and otherwise in strict compliance with all applicable laws.  Such clean-up, removal and remediation shall also include removal and replacement of any infected host materials as well as any repairs and refinishing required as the result of such removal and replacement.  There shall be no abatement of Rent on account of any clean-up, removal or remediation of any such Mold or Mold Condition.  Tenant waives, releases and discharges Landlord and all Indemnified Parties for, from and against all claims, demands, causes of action, suits, judgments, liabilities, losses, damages and expenses (including attorneys' fees) for personal injury, bodily injury or property damages in any way arising from or relating to or associated with moisture or the growth of or the presence of Mold or Mold Conditions.

## 15.    ASSIGNING, MORTGAGING, SUBLETTING.

15.1    Prohibitions.  Except as otherwise permitted pursuant to Section 15.1 or 15.2, Tenant shall not (i) transfer, assign or hypothecate this Lease, (ii) sublet any portion of the Premises, (iii) enter into any license, concession or other right of occupancy of any portion of the Premises, (iv) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization, (v) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant that results in a Material Change in Ownership (defined below) (each, a "**Transfer**"), without first procuring the written consent of the Landlord, which consent may not be unreasonably withheld or delayed.  Any Transfer, whether voluntary or involuntary, by operation of the law or otherwise, without the prior written consent of Landlord first had and obtained therefor, shall be null and void, at the option of Landlord, and Landlord may declare a default and exercise all remedies available to Landlord under this Lease or at law.  Notwithstanding the foregoing provisions of this Section 15.1 to the contrary, Tenant may sublet the Premises to Professionals and/or Physicians associated with the Hospital.

14

15.2    Material Change in Ownership. If Tenant is an entity of any type, then the sale, transfer or other change of 49.9% or greater of the ownership interests of Tenant shall constitute a "**Material Change in Ownership**", in which event Landlord shall consent to the resulting Transfer provided that Tenant provides to Landlord (i) at least thirty (30) days' prior written notice of such anticipated Material Change in Ownership, (ii) all relevant details of the proposed Material Change in Ownership, including updated financial statements reflecting the financial condition of the proposed assignee post Material Change in Ownership ("**Post Material Change in Ownership Financial Statements**"), and (iii) the Post Material Change in Ownership Financial Statements reflecting a minimum Tangible Net Worth of $150,000,000. As used herein, "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the determination of total assets all assets that would be classified as intangible assets under GAAP including, goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises.

15.3    Liability; Release. Tenant shall not be released from any liability or obligation under this Lease as a result of any Transfer or Landlord's consent to any Transfer; provided, however, if (i) Landlord consents to a proposed Transfer that would occur as a result of (A) any other entity becoming Tenant hereunder by merger, consolidation, or other reorganization, (B) any transfer of an ownership interest in Tenant that results in a Material Change in Ownership or (C) any assignment of this Lease for the remainder of the Term, and (ii) the entity comprising Tenant after such Transfer has a Tangible Net Worth together with any new guarantor that is equal to or greater than (1) the aggregate Tangible Net Worth of Tenant and Guarantor at the time of this Lease and (2) a minimum Tangible Net Worth of $150,000,000, then Tenant shall be released from further liability under this Lease for the unexpired Term following such Transfer. Tenant shall provide to Landlord any information reasonably requested by Landlord to evaluate the satisfaction of any Tangible Net Worth requirements contemplated in this Section 15.

15.4    Conditions to Consent. Landlord may condition its consent to any assignment or subletting (i) upon Tenant's agreement to termination of this Lease and simultaneous creation of a new lease between Landlord and the proposed successor, or (ii) upon Tenant's agreement simultaneously with the execution of any sublease or assignment approved by Landlord, to name Landlord its agent for purposes of collection of rental from the subtenant approved by Landlord under any such sublease or assignment (in order to enable Landlord to maintain its collection and other relationships).

15.5    Transactions Consented To. Each Transfer to which there has been consent shall be by an instrument in writing in form satisfactory to Landlord and shall be executed by the transferor, assignor, sublandlord, licensor, concessionaire, hypothecator or mortgagor and the transferee, assignee, subtenant, licensee concessionaire or mortgagee in each instance, as the case may be, and each transferee, assignee, subtenant, licensee, concessionaire or mortgagee shall agree in writing for the benefit of the Landlord herein to assume, to be bound by, and to perform the terms, covenants and conditions of this Lease to be done, kept and performed by the Tenant. One (or more, if required by Landlord) executed copy of such written instrument shall be delivered to Landlord. Failure to first obtain in writing Landlord's consent or failure to comply with the provisions of this Article shall operate to prevent any such transfer, assignment, subletting, license, concession agreement or hypothecation from becoming effective.

## 16.    WASTE, NUISANCE, APPLICABLE LAWS.

16.1    Waste and Nuisance. Tenant shall not commit or suffer to be committed any waste in or upon the Premises and shall not commit or suffer to be committed therein any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant in the Building, or which may disturb the quiet enjoyment of any person within the immediate vicinity of the Building.

15

16.2   <u>Tenant's Compliance with Laws</u>. Tenant shall, at Tenant's sole cost and expense, comply with all the requirements of all federal, state, county, municipal and other applicable authorities, now in force or which may hereafter be in force in connection with Tenant's use of the Premises.

## 17.   <u>DESTRUCTION.</u>

17.1   <u>Notice of Loss</u>. Tenant shall give immediate notice to Landlord in the event of fire or other accidents or casualties within the Premises or in or around the Building, and such other notice as prescribed by the fire and extended coverage insurance policy required herein to be carried thereon, and further, Tenant shall give immediate notice to Landlord of any defect in any of the fixtures or equipment located within the Premises or in or around the Building.

17.2   <u>Premises Useable</u>. In the event the Premises shall be damaged by fire or other casualty, but shall not be rendered wholly or partially unusable, regardless of the time remaining in the Term, Landlord shall cause such damage to be repaired, and the Base Rent shall not be reduced or abated unless the repairs are delayed beyond ninety (90) days after commencement of such repairs, and thereafter, only if Landlord is not diligently pursuing such repairs, and then only to the extent as may be equitable based upon the amount of damage.

17.3   <u>Premises Unusable</u>. If the Premises shall be rendered partially or wholly unusable, Landlord shall cause such damage to be repaired and the Base Rent shall be reduced in proportion to Tenant's loss of effective use of the Premises during such repair.

17.4   <u>Building Damaged</u>. In the event all or part of the Building, other than the Premises, shall be damaged or destroyed by fire or other casualty, and regardless of the time remaining in the Term, Landlord shall cause such damage to be repaired. Neither Base Rent nor any other sums due hereunder shall be abated or reduced.

17.5   <u>Scope of Repair</u>. In the event Landlord elects or shall be obligated to repair or restore any damage or destruction as aforesaid, the scope of the work shall be limited to the shell of the Building and Lease Premises. Landlord shall not be required to make repairs or replacements of any panels, decoration, trade fixtures, railings, floor covering, partitions or other parts of the Interior of the Premises or any other property installed or placed in the Premises by Tenant.

17.6   <u>Commencement of Repairs</u>.  Anything to the contrary herein notwithstanding, Landlord shall not be required to commence repairs and/or restoration prior to the expiration of sixty (60) days following the occurrence or the receipt by Landlord of the insurance proceeds covering said damage, whichever event shall first occur.

## 18.   <u>CONDEMNATION.</u>

18.1   <u>Total Taking</u>. If all of the Premises should be taken for any public or quasi public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, then this Lease shall terminate and the Rent shall be abated during the unexpired portion of the Term, effective on the date physical possession is taken by the condemning authority.

18.2   <u>Partial Taking</u>. If any part (but not all) of the Building, Common Areas or the Premises should be so taken, Landlord may terminate this Lease if Landlord, in its sole discretion, so elects. Any election to terminate this Lease in accordance with this provision shall be evidenced by written notice of termination to Tenant within thirty (30) days after the date physical possession is taken by the condemning

16

**A0575**

authority. If this Lease is not so terminated, the Base Rent payable hereunder during the unexpired portion of the term shall be reduced in proportion to the area of the Premises taken, effective on the date physical possession is taken by the condemning authority.

18.3   <u>Award</u>.  All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Building, the Premises or the Common Areas shall be the property of Landlord and Tenant hereby assigns its interests in any such award to Landlord

## 19.   <u>QUIET ENJOYMENT.</u>

So long as Tenant shall pay all Rent and other payments due hereunder and shall observe and perform all of the covenants on Tenant's part to be observed and performed hereunder, and Tenant is not in default hereunder (beyond any applicable notice or cure periods), Tenant shall peaceably and quietly hold and enjoy the Premises (including easement rights) for the entire Term hereof without interruption by Landlord or person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to all of the terms and provisions of this Lease and to the reservations, encumbrances and limitations affecting the title to the premises upon which the Building is situated.

## 20.   <u>DEFAULT AND REMEDIES.</u>

20.1   <u>Default</u>. The following events shall be deemed to be the events of default by Tenant under this Lease:

(1)   Tenant shall fail to pay any installment of the Base Rent or any Additional Rent within five (5) business days after receipt of written notice of such failure from Landlord. Notwithstanding the foregoing, Landlord shall not be obligated to provide written notice more than twice in any twelve (12) month period.

(2)   Tenant shall fail to comply with any term, provision or covenant of this Lease, other than the payment of any sums due Landlord, including but not limited to, the Base Rent or any Additional Rent, and Tenant shall not cure such failure within thirty (30) days after written notice thereof of Tenant (or such shorter notice period as may be provided elsewhere in this Lease for specific events of default); provided, however, that if such failure cannot be reasonably cured within thirty (30) days, then Tenant shall have such additional time to cure as is reasonable under the circumstances provided that Tenant diligently continues to pursue such cure.

(3)   An event of default shall occur and remain uncured within the time stated for such cure under any Related Lease.

(4)   Tenant or any guarantor of Tenants' obligations hereunder shall become insolvent in any chapter of the United States Bankruptcy Code, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(5)   Tenant or any guarantor shall file a petition under any section or chapter of the United States Bankruptcy Code, or under any similar law or statute of the United States or any state thereof; or Tenant shall be adjudged bankrupt or insolvent as defined in any chapter of the United States Bankruptcy Code in proceedings filed against Tenant or any guarantor of Tenant's obligations under this Lease.

(6)     A receiver or trustee shall be appointed for the Premises or for all or substantially all of the assets of Tenant or any guarantor and such receiver or trustee shall not be discharged within thirty (30) days following such appointment.

(7)     The discovery by Landlord that any financial statement given by Tenant or any of its assignees, subtenants or successors-in-interest, or any guarantor of Tenant's obligations hereunder to Landlord, was materially false.

20.2    Remedies.

(1)     Upon the occurrence of any event of default hereunder, and notwithstanding the fact that the termination or cancellation of this Lease by Landlord may substantially interfere with the ability of Tenant to conduct a non-liquidation proceeding under any chapter of the United States Bankruptcy Code, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever.

(i)      Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, without being liable for prosecution or any claim for damages therefor and Tenant agrees to pay Landlord, on demand, the amount of all losses, expenses and damages, including attorneys' fees, which Landlord may suffer by reason of such termination; and/or

(ii)     Enter upon the Premises and correct such default or otherwise do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to pay Landlord, on demand, the amount of all  losses, expenses and damages, including attorneys' fees which Landlord may incur in connection with attempts to effect compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for prosecution or any claim for damages resulting to Tenant from such action, and/or

(iii)    Enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, without being liable for prosecution or any claim for damages therefor, and if Landlord so elects, relet the Premises on such terms as Landlord may deem advisable and receive rental therefor.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any other remedies herein provided or provided by law, or at equity, nor shall pursuit of any other such remedy constitute a forfeiture or waiver of any Rent or other sums due to Landlord hereunder or of any damages accruing to the Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default. In determining the amount of loss or damage which Landlord may suffer by reason of termination of this Lease or the deficiency arising by reason of any reletting by Landlord as above provided, allowance shall be made for the expense of repossession and any repairs or remodeling undertaken by Landlord following repossession.

18

(2)     Exercise by Landlord of any one or more remedies herein granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises by Tenant, whether by agreement or by operation of law it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. No removal or other exercise of dominion by Landlord over the property of Tenant or others at the Premises shall be deemed unauthorized or constitute a conversion. Tenant hereby consenting, after any event of default, to the aforesaid exercise of dominion over Tenant's property within the Building. All claims for damages by reason of such reentry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. Tenant agrees that any reentry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings, as Landlord may elect and Landlord shall not be liable in trespass or otherwise,(after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant as provided in this paragraph may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease Term.

(3)     In the event Landlord elects to terminate this Lease by reason of event or default, then notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord, at Landlords Address as defined in <u>Section 1</u> herein, the sum of all Rent, Additional Rent and other indebtedness accrued to the date of such termination, plus, as damages, an amount equal to the present value of the Rent and any and all other sums reserved hereunder for the remaining unexpired portion of the Lease Term (had the Lease not been so terminated by Landlord), less the then present value of the then fair rental value of the Premises.

(4)     In the event Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord at Landlords Address as defined in <u>Section 1</u> hereinabove, all Rent and other indebtedness accrued to date of such repossession, plus all Rent and any and all other sums required to be paid by Tenant to Landlord during the remainder of the Lease Term until the date of expiration of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during Period (after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant as provided in the paragraph may be brought from time to time, on one or more occasions, without necessity of Landlord's waiting until expiration of the Lease Term.

(5)     In the event of termination or repossession of the Premises for an event of default, Landlord shall have an obligation to attempt to relet the Premises, or any portion thereof. However, in the event of reletting Landlord may relet the whole or any portion of the Premises for any period, to any tenant, and for any use and purpose. Should Landlord choose to relet the Premises, or any portion thereof, for the remainder of the Term provided for herein, and if the rental received through reletting does not at least equal the Rent provided for herein, Tenant shall pay and satisfy the deficiency between the amount of the Rent so provided for and that received through reletting, including, but not limited to, the cost of renovating, altering, and decorating for a new occupant. Further, Tenant shall not in any event ever be entitled to any excess rental and other sums provided for herein, and the same shall belong solely to Landlord. Nothing herein shall be construed as in any way denying Landlord the right, in the event of abandonment of said Premises or other breach of this Lease by Tenant, to treat the same as an entire breach and at Landlord's option to terminate this Lease and/or immediately seek recovery for the entire breach of this Lease and any and all damages which Landlord suffers thereby.

19

**Page 20 of 45**

(6)    If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Premises for such purpose), and thereupon Tenant shall be obligated and hereby agrees, to pay Landlord, upon demand, all costs, expenses and disbursements (including reasonable attorneys' fees) incurred by Landlord in taking such remedial action.

(7)    In the event of the breach or the attempted or threatened breach of any covenant or provision contained in this Lease by Tenant, Landlord shall have, in addition to all other remedies provided it hereunder or by law or at equity, the right to obtain an injunction prohibiting such breach or attempted breach without the necessity for proof of inadequacy of legal remedy, irreparable harm or probable right of recovery.

20.3    <u>Expenses/Attorneys' Fees</u>. In the case of an event of default hereunder, Tenant shall also be liable for and shall pay to Landlord, at Landlords Address as defined in <u>Section 1</u> herein, in addition to any sum provided to be paid above: broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in enforcing Landlord's rights or remedies, including reasonable attorneys' fees and court costs until the expiration of the Term. Tenant shall permit the Landlord to exhibit the Premises to prospective tenants and to place notices upon the Premises advertising "For Lease". Landlord may at any time, exhibit the Premises to prospective purchasers. and place notices, upon the Building or the Premises advertising "For Sale."

20.4    <u>Landlord's Breach</u>.  In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rental due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have thirty (30) days in which to cure any such default. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Building and not thereafter.

20.5    <u>Limitation on Landlord's Personal Liability</u>. Tenant specifically agrees to look solely to Landlord's interest in the Building for the recovery for any judgment from Landlord, it being agreed that Landlord, its agents, employees, shareholders, officers, directors, and limited partners, shall never be personally liable hereunder for anything whatsoever.

## 21.    <u>ACCESS.</u>

Landlord or its agents shall have the right to enter the Premises at all reasonable times, and whenever necessary because of emergencies, to inspect the same, and to make such repairs, replacements, alterations, improvements or additions as Landlord may deem necessary or desirable, including alterations, repairs, improvements or additions to the space adjacent to Premises and/or to the Building, without the same constituting an eviction of Tenant in whole or in part, and the Rent reserved shall in no way abate while said repairs, replacements, alterations, improvements or additions are being made, by reason of loss or interruption of Tenant's business or otherwise. During the ninety (90) days prior to the expiration of the Term, Tenant shall permit the Landlord to exhibit the Premises to prospective tenants and to place notices upon the Premises advertising "For Lease". Landlord may, at any time, exhibit the Premises to prospective purchasers, and place notices, upon the Building or the Premises advertising "For Sale."

**A0579**

22.    **SURRENDER AND REMOVAL OF PROPERTY.**

22.1    <u>Surrender of Premises</u>. Promptly upon the expiration or earlier termination of the Term, Tenant shall surrender the Premises in the same condition as received by Tenant on the Commencement Date reasonable wear and tear and damage by unavoidable casualty or Act of God only excepted. Further, Tenant shall surrender all keys to the Premises at the place then fixed for the payments of Base Rent due hereunder. All items of work and improvements comprising the Interior of the Premises, shall constitute a part of the fee estate remainder subject to this Lease, notwithstanding that Tenant may construct or cause to be constructed all or any part of said improvements or may contribute to the cost thereof, and notwithstanding that Tenant may or might be required to maintain, repair and/or replace same or some part thereof pursuant to some other provisions in this Lease. Subject to the provisions of this Section, Tenant shall remove all of Tenant's trade fixtures, operation equipment and other personal property before surrendering the Premises as aforesaid and shall repair at Tenant's expense any damage to the Premises caused thereby.

22.2    <u>Failure to Remove Property</u>. If Tenant shall neglect to remove Tenant's personally as herein provided, Landlord shall have the right (i) to remove said property and cause it to be stored in a public warehouse or elsewhere, at the cost of and for the account of Tenant, or (ii) in the alternative, if said property shall not be removed within thirty (30) days after said termination, to dispose of said property in a manner deemed suitable to Landlord, all without service of notice or resort to legal process and without becoming liable for any loss damage which may be occasioned thereby, and any proceeds of such disposition shall be retained by Landlord without liability to Tenant, Tenant hereby waiving any interest in such proceeds.

22.3    <u>Survival of Covenants</u>. Tenant's obligations to observe or perform the covenants contained in this Article shall expressly survive the expiration or earlier termination of the Term.

23.    **HOLDING OVER.**

Any holding over without the consent of Landlord after the expiration or earlier termination of the Term shall be construed to be and shall constitute a tenancy at the will of Landlord, and Tenant agrees to pay as rents and liquidated damages for such holding over a sum equivalent to the Rent herein specified and reserved plus fifty percent (50%) of the Base Rent (prorated on a monthly basis) and shall otherwise be on the same terms and conditions herein, as far as applicable.

24.    **ESTOPPEL/MEMORANDUM.**

24.1    <u>Estoppel Certificate</u>.  Within ten (10) days after request therefore by Landlord, Ground Lessor or any Mortgagee, Tenant shall deliver in recordable form (and signed by Tenant, if an individual, or a duly authorized representative of Tenant if Tenant is not an individual) a statement to Landlord, Ground Lessor any Mortgagee, or any proposed Mortgagee or transferee of the Project (as the case may be), certifying (if such be the case) that this Lease is in full force and effect, that Tenant is in possession of the Premises, that Tenant has commenced the payment of Rent, that there are no defenses or offsets to this Lease claimed by Tenant, as well as any other information reasonably requested.  If Tenant fails or refuses to give a certificate hereunder within the time period herein specified, then the information contained on such certificate as submitted by Landlord shall be deemed correct for all purposes, but Landlord shall have the right to treat such failure or refusal as a default by Tenant.

24.2    <u>Memorandum of Lease</u>. Promptly after the Commencement Date, Landlord and Tenant, if requested by Landlord, shall execute and acknowledge and deliver a memorandum or short form of this Lease, in recordable form, acknowledging Tenant's acceptance of the Premises for all purposes herein

21

provided and specifying the Commencement Date and the termination date of this Lease in accordance with the provisions hereof, and said memorandum may be recorded by Landlord only, but this Lease Agreement itself shall not be recorded. In the event Tenant records a memorandum of this Lease, or this Lease, Tenant shall be in default under this Lease and Landlord may terminate this Lease upon five (5) days written notice to Tenant at Tenant's address set forth in Section 1.1 hereof.

## 25. <u>NOTICES.</u>

All notices required or permitted to be given hereunder by either party hereto to the other party shall be deemed sufficiently given or made on the day of receipt thereof or three (3) business days after the date when mailed by United States Registered or Certified Mail, adequate postage paid, to their respective addresses as specified in Section 1.1 hereof. Each party hereto may notify the other party of any change in its mailing address by notice in the manner herein above provided, which new address shall thereafter be deemed the proper address for notice hereunder.

## 26. <u>TENANT'S PAYMENTS.</u>

26.1   <u>Payments</u>. Tender of Rent and/or any other payment due hereunder shall be considered to have been made on the date such payments received by Landlord and not on the date mailed by Tenant. For purposes hereof, the office of Landlord is the office presently or henceforth designated pursuant to the provisions of Section 1.1 hereof. Checks or drafts tendered will constitute payment only when duly paid by the drawers bank promptly upon presentment, properly endorsed, for payment.

26.2   <u>Interest</u>. All sums due and owing by Tenant to Landlord under this Lease shall bear interest at the Prime Rate (as defined in the *Wall Street Journal*) plus four percent (4%) from the date due until paid.

## 27. <u>LANDLORD'S LIEN.</u>

To secure the payment of all Base Rent, and Additional Rent reserved herein, and all other payments due Landlord hereunder, or to become due hereunder and the faithful performance of all covenants, agreements and stipulations herein contained to be performed by Tenant, Tenant hereby grants to Landlord an express first and prior contract lien and security interest on all property (including fixtures, equipment, inventory, goods, wares, furniture, office equipment, supplies and merchandise) which may be placed in the Premises, and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction of or damage to any such property. Tenant hereby waives all exemption laws in favor of said lien and security interest. This lien and security interest is given in addition to the Landlord's statutory lien and shall be cumulative thereof. Tenant shall not remove any property from the Premises until all of Tenant's obligations under this Lease are satisfied. This lien may be foreclosed with or without court proceedings by public or private sale, provided Landlord gives Tenant at least ten (10) days notice of the time, place and terms of said sale, and Landlord shall have the right to become the purchaser of such property, upon being the highest bidder therefor at said sale. The notice referred to in the preceding sentence may (but needs not) be given by Landlord to Tenant contemporaneously with any other notice from Landlord to Tenant which may be given in accordance herewith. At the time of the execution of this Lease, and if requested thereafter by Landlord, Tenant shall execute and deliver to Landlord financing statement instruments in form deemed sufficient by Landlord to reflect the security interest herein granted and any proper amendment of, assignment of, modification in or extension of the aforesaid contract lien and security interest hereby granted. Tenant hereby grants to Landlord a power of attorney to sign, in place and stead of Tenant, any and all such instruments. Said power of attorney is irrevocable and coupled with an interest.

28.   **RULES AND REGULATIONS.**

Such reasonable rules and regulations applying to all tenants in the Building as may be adopted by Landlord for the safety, care, cleanliness, preservation of good order or operation of the Premises, the Building, the Property and the Common Areas, are hereby made a part hereof and Tenant agrees to comply with all such rules and regulations, immediately upon receipt of a copy of same. Landlord shall have the right at all times to change any of the rules and regulations or to amend them in any manner deemed reasonable by Landlord. All changes and amendments will be sent by Landlord to Tenant in writing and shall be thereafter carried out and observed by Tenant.  As of the Effective Date, the rules and regulations are set forth on Exhibit D.

29.   **BROKERS.**

None.

30.   **AUTHORITY.**

Each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has been and is qualified to do business in the state in which the Building is located, that the Tenant Entity has full right and authority to enter into this Lease, and that all persons signing on behalf of the Tenant Entity were authorized to do so by all appropriate actions required of such entity.  If Tenant signs as a partnership, trust or other legal entity, each of the persons executing this Lease on behalf of Tenant represents and warrants that Tenant has complied with all applicable laws, rules and governmental regulations relative to its right to do business in the state in which the Building is located, and that each of the persons or entities acting on behalf of the Tenant was authorized to do so by any and all appropriate partnership, trust or other actions.

31.   **LIABILITY OF LANDLORD.**

Tenant shall look solely to Landlord's interest in the Building, including revenue derived from the Project, and Landlord's personal property used in connection with the Project for the satisfaction of any judgment or decree requiring the payment of money by Landlord, based upon any default hereunder, and no other property or asset of Landlord shall be subject to levy, execution, or other enforcement procedure for the satisfaction of such judgment or decree.  **IN NO EVENT SHALL LANDLORD BE LIABLE OR RESPONSIBLE FOR ANY CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES.**

32.   **SCOPE AND INTERPRETATION OF AGREEMENT; CONFIDENTIALITY.**

This Lease and all Exhibits set forth including all of the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, conditions, or understandings, either oral or written, other than as set forth herein.  No subsequent alteration, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.  This Lease shall not be more strictly enforced against either party regardless of who was more responsible for its preparation.  Except at Landlord's option, no part of this Lease or any memorandum thereof may be recorded in the public records of any municipality or county.  Tenant will maintain the confidentiality of this Lease and will not divulge the economic or other terms of this Lease, whether verbally or in writing, to any person, other than Tenant's officers, directors, partners or shareholders; Tenant's attorneys, accountants and other professional consultants; any governmental agencies; and pursuant to subpoena or other legal process.  If any provision of this Lease shall be determined to be void by any court of competent jurisdiction or by any law enacted subsequent to the

23

Effective Date, then such determination shall not affect any other provisions hereof, all of which other provisions shall remain in full force and effect.

**33.  LANDLORD'S CONSENT.**

Without limiting any other provision of this Lease, in the event that Landlord's consent is required by the terms hereof for any purpose whatsoever, it is understood and agreed that (a) Landlord's consent may be subject to the consent of the Ground Lessor, Declarant  and/or the holder of any Mortgage encumbering the Building to the extent that such consents are required under the terms of the Ground Lease, Declaration or the applicable financing documents (which consents Landlord shall seek to obtain) and (b) notwithstanding anything to the contrary set forth herein, it shall not be deemed unreasonable for Landlord to withhold its consent in any given circumstance based upon Landlord's inability to obtain any required consent from the Ground Lessor, Declarant or the holder of any Mortgage encumbering the Building.

**34.  USE OF PREMISES.**

Tenant shall use and occupy the Premises only for the Permitted Use, and for no other purpose, without the prior written consent of Landlord.

**35.  GUARANTY.**

As material consideration for Landlord to enter this Lease, Tenant shall cause Guarantor to execute the Guaranty attached as Exhibit E (the "**Guaranty**"), and Tenant shall deliver the Guaranty to Landlord contemporaneously with Tenant's execution hereof.

**36.  WAIVER OF JURY TRIAL.**

LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LEASE OR THE OBLIGATIONS EVIDENCED HEREBY, OR ANY OTHER DOCUMENT OR INSTRUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT TO EACH OF LANDLORD AND TENANT IN ENTERING INTO THIS LEASE.

**37.  MISCELLANEOUS.**

37.1    Successors and Assigns. All rights and liabilities herein granted to or imposed upon the respective parties hereto shall extend to and jointly and severally bind the several respective heirs, legal representatives, successors and assigns of the respective parties hereto, an if there shall be more than one Landlord or Tenant, all shall be bound jointly and severally the terms, conditions and agreements herein contained. No rights, however, shall inure to the benefit of any assignee of Tenant unless Landlord has approved the assignment to such assignee in writing as provided herein.

37.2    Waivers. One or more waivers of any breach or violation of any agreement, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent violation or breach of the same or any other agreement, covenant, or condition herein contained, and the consent or approval by either party of any act by the other, which act requires the approval or consent of the other party, shall not be deemed to waive or render unnecessary the future requirements of consent or approval of the same or

similar act; and the subsequent acceptance of Rent or other payment due hereunder shall not be deemed to be a waiver of any preceding breach by Tenant, other than failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of the acceptance of said Rent. No express covenant, term or condition of this Lease shall be deemed to have been waived by either party, unless such waiver is in writing.

37.3    Accord and Satisfaction. No payment made by Tenant or received by Landlord in an amount less than the amount herein stipulated shall be deemed to be other than on account of the earliest received payment, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such amount or to pursue any other remedy in this Lease or by law provided Landlord.

37.4    Entire Agreement. This Lease, together with the exhibit or exhibits aforesaid and the rider or riders, if any, attached hereto and forming a part hereof, contains and sets forth the entire agreement and understandings between the parties hereto concerning the Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between said parties other than as herein expressly set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon either party hereto, unless reduced to writing and signed by both parties.

37.5    Partnership. Landlord does not become a partner of Tenant in the conduct of its business or otherwise, or a joint venturer or a member of a joint enterprise with Tenant by virtue of this Lease.

37.6    Force Majeure.  In the event Landlord shall be delayed, hindered or prevented from the performance of any act required hereunder by reason of strikes, fire, explosions, lock-outs, failure of electrical power, governmental restrictions or regulations, unavailability of suitable financing, materials and/or labor, riots, insurrection, war or on account of any other condition or occurrence not the fault of Landlord, then the performance of any such act shall be extended for a period equivalent to the period of such delay.

37.7    Captions and Numbers.  The captions, section numbers and article numbers appearing in this Lease are inserted only as a matter of convenience and in no wise define, limit, construe or describe the scope or intent of such sections or articles, nor in any wise affect this Lease.

37.8    Tenant, Defined Use of Pronouns. The word "**Tenant**" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more and if there shall be more than one Tenant. Any notice required or permitted by the terms of this of Lease may be given by or to any one thereof and shall have the same force and effect as if given by or to all thereof. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, and a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or one Tenant, and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

37.9    Severability. If any provisions covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, there reminder of this Lease, or the application of such provision, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each provision,

25

covenant or condition of this Lease shall be valid and shall be enforced to the fullest extent permitted by Law.

37.10   <u>Survival</u>. Landlord and Tenant expressly agree that all provisions of this Lease which contemplate performance after the expiration or earlier termination hereof shall survive such expiration or earlier termination of this Lease.

37.11   <u>Governing law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Texas.  Venue for any legal actions hereunder shall be in the Courts of Grayson County, Texas.

37.12   <u>Other documents</u>. The parties agree to execute all other documents or instruments necessary to effect the transfers of property set forth herein and otherwise to implement the provisions of this Agreement.

## 38.   <u>EXHIBITS</u>

The following exhibits are a part of this Lease and are incorporated herein by reference:

Exhibit A – Legal Description
Exhibit B – Floor Plan of the Premises
Exhibit C – Parking Areas
Exhibit D – Rules and Regulations
Exhibit E – Guaranty

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

EXECUTED as of the date first set forth above in multiple counterparts each of which shall be deemed to be an original.

**LANDLORD**:

ALTERA HIGHLAND LLC,
a Texas limited liability company

By:_____

Name:   Terry D. Quinn
Its:     President

**TENANT**:

SHERMAN/GRAYSON HEALTH SYSTEM, LLC,
a Texas limited liability company

By:_____
Name:_____
Its:_____

LEASE AGREEMENT
SIGNATURE PAGE

EXECUTED as of the date first set forth above in multiple counterparts each of which shall be deemed to be an original.

**LANDLORD**:

ALTERA HIGHLAND LLC,
a Texas limited liability company

By:_____
Name:   Terry D. Quinn
Its:      President

**TENANT**:

SHERMAN/GRAYSON HEALTH SYSTEM, LLC,
a Texas limited liability company

By:_____
Name:   Thomas J. Frazier, Jr.
Its:      Executive Vice President

<u>EXHIBIT A</u>

LEGAL DESCRIPTION

BEING a 3.0894 acre tract of land situated in the County of Grayson, State of Texas out of the J.B. McAnair Survey, Abstract No. 763 and being all of Block No. 7, and a portion of Lots 7-8, and all of Lots 9-12, Block 12 of Green Mount Addition to the City of Sherman, Grayson County, Texas, as shown by Plat of record in Volume 193, Page 21, Deed Record, Grayson County, Texas,  together with that  portion of vacated Pecan Street, and being more particularly described by meets and bounds as follow:

BEGINNING at a "X" cut in concrete found for corner at the intersection of the north line of Laurel Street (a 60 foot wide public right-of-way) and the east line of Bryant Avenue (a 60 foot wide public right-of-way);

THENCE North 15 degrees 40 minutes 01 seconds West (Reference for Basis of Bearings) along said east right-of-way line, a distance of 467.78 feet to a 5/8 inch iron rod set with cap stamped BGT for corner;

THENCE North 73 degrees 42 minutes 45 seconds East, a distance of 286.25 feet to a 5/8 inch iron rod set with cap stamped BGT for corner in the west right-of-way line of Highland Avenue;

THENCE South 16 degrees 01 minutes 19 seconds East along said west right-of-way line, a distance of 467.76 feet to a 1/2 inch iron rod with cap found for corner at the intersection of the west right-of-way line of said Highland Avenue and the north right-of-way line of said Laurel Street;

THENCE South 73 degrees 42 minutes 45 seconds West along said north right-of-way line, a distance of 289.15 feet to the POINT OF BEGINNING and containing 134,573 square feet or 3.0894 acres of land, more or less.

EXHIBIT B

FLOOR PLAN OF THE PREMISES

[ATTACHED]



3rd FLOOR PLAN

scale: 1/8" = 1'-0"



St 455
Zwiegat-Kable

St 445
ENT Space
VACANT

St 415
Buckingham-Schrank-Lucchese

St 410
Shell Space

St 430
UrbanC24K

St 400
Shell Space

Dan Burbine Associates
Architects & Project Managers
12532 Renoir Lane    Dallas, Texas   75230

PROJECT
WNJ  Wilson N. Jones
MEDICAL
OFFICE
BUILDING

REVISIONS

DATE
11 MAY 2005

SHEET
A-4

4th FLOOR PLAN
s c a l e : 1/8" = 1'-0"

23404 SF

north

plan
orientation

5        20
0   10



St 545
VAcant

St 550
Shaw-Breeze

St 500
VAcant

Dan Burbine Associates
Architects & Project Managers
12532 Renoir Lane    Dallas, Texas    75230

St 542
Gajda

St 540
Davies

St 530
Rue

St 510
Sr Passport

Shell
Space

PROJECT
Wilson N. Jones
MEDICAL
OFFICE
BUILDING

REVISIONS

DATE
11 MAY 2005
SHEET
A-5

north

plan
orientation

5th FLOOR PLAN
scale: 1/8" = 1'-0"

5    20
0   10

22726

EXHIBIT C

PARKING AREAS

[ATTACHED]



TRACT FIFTEEN:

Being a part of Block No. Eight (8), of G. Y. Gray's Second Addition to the City of Sherman, Texas, and further described as follows:

BEGINNING at the intersection of the South line of Laurel Street with the West line of Highland Avenue as now opened;
THENCE West 140 feet with the South line of Laurel Street to a stake, for the Northwest corner;
THENCE South parallel with Highland Avenue 75 feet to a stake;
THENCE East parallel with Laurel Street 140 feet to a stake in the West line of Highland Avenue;
THENCE North with said line of Highland Avenue 75 feet to the place of beginning, containing a tract of 140 x 75 feet.

TRACT SIXTEEN of the County of Grayson, State of Texas, all that certain tract or parcel of land situated in the City of Sherman, Grayson County, Texas, being a part of the survey originally granted to John B. McAnair, and being a part of Block Eight (8) of Gray's Second Addition, as shown by the map or plat thereof, recorded in Volume 134, page 113, of the Deed Records of Grayson County, Texas, and being more particularly described as follows:

BEGINNING at a point on the West line of Highland Avenue, 125 feet South of the intersection of the West line of Highland Avenue, and the South line of Laurel Street;
THENCE Southward with the West line of Highland Avenue, 45 feet;
THENCE Westward and parallel with the South line of Laurel Street, 140 feet;
THENCE Northward and parallel with the West line of Highland Avenue, 45 feet;
THENCE Eastward, parallel with the South line of Laurel Street, 140 feet to the place of beginning; this being the South 45 by 140 feet of the tract 95 by 140 feet, in size conveyed by Frank Reece and wife, Mrs. Minnie Reece, to Bob Richardson by deed dated March 5, 1924, and recorded in Volume 303, Page 153 of the Deed Records of Grayson County, Texas.

TRACT SEVENTEEN:

SITUATED in the City of Sherman, County of Grayson, Texas and being part of Block No. 8 of G. Y. Gray's Second Addition to the City of Sherman, Texas, out of J. B. McAnair Survey, Grayson County, Texas on the waters of Post Oak Creek, and described as follows:
And being the North 62 feet of the following described piece of property;
BEGINNING at the intersection of West line of Highland Ave. and the North line of Houston Street.
THENCE in a westerly direction with the North line of Houston Street 87 feet a stake.
THENCE in a Northerly direction and parallel with the West line of Highland Avenue 150 feet to a stake.
THENCE in an Easterly direction parallel with the North line of Houston Street, 87 feet to the West line of Highland Ave.
THENCE in a Southerly direction with the West line of said Highland Ave. 150 feet to the place of beginning, containing 87 x 150 feet of land.  Being the same land described in a deed from J. W. Hollingsworth and wife, Florence Hollingsworth to W. W. Craig, dated January 9, 1915, and

recorded in Volume 239, page 272, Deed Records of Grayson County, Texas.

TRACT TWENTY-FOUR:

BEING that certain tract, lot or parcel of land situated in the City of Sherman, Grayson County, Texas, in the J. B. McAnair Survey, part of Block Eight (8) of the G. Y. Gray Second Addition to the said City of Sherman;

BEGINNING at the Southwest corner of the lot conveyed by J. P. Mills and wife, to M. H. Andrews by deed recorded in Volume 57, page 107 of the Deed Records of Grayson County, Texas, a stake on the North line of West Houston Street;

THENCE North at right angles to the North line of West Houston Street 150 feet to a stake for corner;

THENCE East parallel with the North line of West Houston Street 60 feet to a stake for corner;

THENCE South at right angles to the North line of West Houston Street 150 feet to the North line of West Houston Street;

THENCE West along said line 60 feet to the Place of Beginning.

TRACT TWENTY-FIVE:

All that certain tract or parcel of land situated in Grayson County, Texas, and being more particularly described as follows: SITUATED in the City of Sherman, Grayson County, Texas, on the waters of Post Oak Creek, being a part of a survey or patent to J. B. McAnair Survey, and described as follows, to-wit:

BEGINNING at the Southeast corner of the tract described in the deed from L. M. Tuck, Receiver, to Clyde Jackson and wife, of record in Book 367, Page 344, Grayson County Deed Records;

THENCE West with the North line of Houston Street, 80 feet to the Southeast corner of a lot sold to L. V. Butler;

THENCE North with the East line of the Butler lot, 150 feet to the South line of a lot sold to Cecil J. Rodgers;

THENCE East with the South line of said Rodgers tract, 80 feet to the southeast corner or same, a stake in the East line of the tract sold to Clyde Jackson above referred to;

THENCE South with the East line of the Clyde Jackson tract, 150 feet to the place of beginning, being a lot 80 feet by 150 feet out of the Southeast corner of a tract sold by L. M. Tuck, Receiver, to Clyde Jackson and wife referred to.

Also being described as 80' x 150' our of Block 8 of G.Y. Gray's Addition to the City of Sherman.

TRACT TWENTY-SIX:

BEING all that certain lot or parcel of land, situated in the City of Sherman, Grayson County, Texas, a part of Block No. EIGHT (8) of G. Y. GRAY'S ADDITION to the City of Sherman and

being more particularly described as follows:

BEGINNING at the point of intersection of the North line of West Houston Street and the East line of Bryant Street;
THENCE North with the East line of Bryant Street for a distance of 150 feet;
THENCE East parallel with the North line of Houston Street for a distance of 70 feet;
THENCE South, parallel with the East line of Bryant Street for a distance of 150 feet to the North line of Houston Street;
THENCE West with said line for a distance of 70 feet to the Place of Beginning and containing 70 x 150 feet of land, more or less and being the same property conveyed by Alton R. Hill and wife, Laura Hill to J. B. Revell and wife, Willie B. Revell by deed dated November 10, 1952 and of record in Volume 705, Page 457 of the Deed Records of Grayson County, Texas.

TRACT TWENTY-SEVEN:

SITUATED in Sherman, Grayson County, Texas, and being a part of the J. B. McAnair Survey, and being also a part of Block 8 of G. Y. Gray's Second Addition to Sherman, Texas, and being a part of a tract of 150 x 250 feet of land sold by L. M. Tuck, receiver, to Clyde Jackson, et ux., by deed recorded in Volume 367, page 344, Deed Records of Grayson County, Texas, and described as follows, to-wit:

BEGINNING at a stake on the east line of what is known as Bryant Street at a point 50 feet south of the NW corner of the above mentioned tract of 150 x 250 feet, said point being the SW corner of a tract sold by Clyde Jackson, et al., to Cecil J. Rodgers, et ux.;
THENCE South 50 feet to a stake, the NW corner of a tract now owned by L. V. Butler, et ux., as described in deed of record in Volume 506, Page 407, Deed Records of Grayson County, Texas;
THENCE East parallel with the north line of the 150 x 250 foot tract 150 feet to a stake;
THENCE North 50 feet to the SE corner of the Cecil J. Rodgers, et ux., tract;
THENCE West with the south line of the said Rodgers tract 150 feet to the place of beginning, containing 50 x 150 feet of land.

TRACT TWENTY-EIGHT:

All that certain tract or parcel of land situated in the City of Sherman, Grayson County, Texas, being a part of the Survey originally granted to J. B. McANAIR, and being a part of BLOCK NO. EIGHT (8) of GRAY'S SECOND ADDITION to said City of Sherman, as shown by the map or plat thereof, recorded in Volume 134, at Page 113, Deed Records of Grayson County, Texas, and as shown by the 1908 Plat Book of Grayson County, Texas, and being more particularly described as follows:

BEGINNING at the intersection of the West line of Highland Avenue and the North line of Houston Street;
THENCE West with the North line of Houston Street, a distance of 87 feet;
THENCE North on a line parallel with the West line of Highland Avenue, a distance of 88 feet to the Southwest corner of a tract of land deeded to Elmer L. Anderson;

THENCE East on a line parallel with the North line of Houston Street and with the South line of the Elmer L. Anderson tract, a distance of 87 feet to a point in the West line of Highland Avenue;

THENCE South with the West line of Highland Avenue, a distance of 88 feet to the Place of Beginning and Containing 87 ft. by 88 ft. of land and being the same property conveyed by Floydell Akridge, a widow, to George Melvin Hammock, et ux., by Deed dated January 12, 1972, recorded in Volume 1208, at Page 433, Deed Records of Grayson County, Texas.

TRACT TWENTY-NINE:

BEING all that certain tract or parcel of land, situated in the County of Grayson, State of Texas, being a part of survey originally granted to J. B. McAnair and described as follows, to-wit:

BEGINNING at a point on the West line of Highland Avenue, seventy-five (75) feet South of the intersection of the West line of Highland Avenue and the South line of Laurel Street in the City of Sherman;

THENCE Southward with the West line of Highland Avenue fifty (50) feet;

THENCE Westward and parallel with the South line of Laurel Street, one hundred forty (140) feet;

THENCE Northward and parallel with the West line of Highland Avenue, fifty (50) feet;

THENCE Eastward and parallel with the South line of Laurel Street, one hundred forty (140) feet to the Place of Beginning; this being the North fifty (50) feet by one hundred forty (140) feet of the tract ninety-five (95) feet by one hundred forty (140) feet in size conveyed by Frank Reese and wife, Mrs. Minnie Reese, to Bob Richardson, by deed dated March 5, 1924, and recorded in Volume 303, page 153 of the Deed Records, Grayson County, Texas; and being Lot Eight (8), Block Eight (8), of Gray's Second Addition to the City of Sherman, Grayson County, Texas.

BEING a 3.0894 acre tract of land situated in the County of Grayson, State of Texas out of the J.B. McAnair Survey, Abstract No. 763 and being all of Block No. 7, and a portion of Lots 7-8, and all of Lots 9-12, Block 12 of Green Mount Addition to the City of Sherman, Grayson County, Texas, as shown by Plat of record in Volume 193, Page 21, Deed Record, Grayson County, Texas, together with that portion of vacated Pecan Street, and being more particularly described by meets and bounds as follow:

BEGINNING at a "X" cut in concrete found for corner at the intersection of the north line of Laurel Street (a 60 foot wide public right-of-way) and the east line of Bryant Avenue (a 60 foot wide public right-of-way);

THENCE North 15 degrees 40 minutes 01 seconds West (Reference for Basis of Bearings) along said east right-of-way line, a distance of 467.78 feet to a 5/8 inch iron rod set with cap stamped BGT for corner;

THENCE North 73 degrees 42 minutes 45 seconds East, a distance of 286.25 feet to a 5/8 inch iron rod set with cap stamped BGT for corner in the west right-of-way line of Highland Avenue;

THENCE South 16 degrees 01 minutes 19 seconds East along said west right-of-way line, a distance of 467.76 feet to a 1/2 inch iron rod with cap found for corner at the intersection of the west right-of-way line of said Highland Avenue and the north right-of-way line of said Laurel Street;

THENCE South 73 degrees 42 minutes 45 seconds West along said north right-of-way line, a distance of 289.15 feet to the POINT OF BEGINNING and containing 134,573 square feet or 3.0894 acres of land, more or less.

EXHIBIT D

RULES AND REGULATIONS

1.      All tenants will refer all contractor's representatives and installation technicians who are to perform any work within the Building, grounds, and Parking Area to Landlord for Landlord's supervision, approval and control before the performance of any such work. This provision shall apply to all work performed in the Building, grounds and Parking Area including, but not limited to, installations of telephones, telegraph equipment, electrical devices and attachments, and any and all installations of every nature effecting floors, walls, woodwork, trim, window, ceilings, equipment and any other physical portion of the Building, grounds, and Parking Area. Tenant shall not mark, paint, drill into, or in any way deface any part of the Building or the Premises without Landlord's written consent. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of the Landlord, and as the Landlord may direct.

2.      The work of the janitorial or cleaning personnel shall not be hindered by Tenant after 5:30 pm and such work may be done at any time when the Premises are vacant. The windows doors and fixtures in the Premises and Building may be cleaned at any time. Tenant shall provide adequate waste and rubbish receptacles, cabinets, books cases, map cases, etc., necessary to prevent unreasonable hardship to Landlord in discharging its cleaning obligations.

3.      Movement in or out of the Building or through the Building entrances or lobbies of furniture or office equipment, or dispatch or receipt by Tenant of any heavy equipment, bulky material merchandise or other item which requires use of elevators or stairways, shall be restricted to such hours as Landlord shall designate. The method of such movement, routing of such movement, safety precautions associated with such movement and the prohibition of Tenant bringing any dangerous items into the Building shall be subject to the Landlord's discretion and control. Any hand trucks, carryalls, or similar appliances used for the delivery or receipt of merchandise or equipment shall be equipped with rubber tires, side guards and such other safeguards as the Landlord shall require. Although Landlord or its personnel may participate in or assist in the supervision of such movement, Tenant assumes final responsibility for all risks as to damage to property and injury to persons that may result from such participation or assistance and Tenant shall indemnify and hold harmless Landlord and Landlord's employees and agents, and reimburse Landlord and Landlord's employees and agents with respect to any and all claims, demands, causes of action and liability arising as a result of any assistance or supervision or exercise of control over Tenant's movement of items in and out of the Building.

4.      No sign, advertisement or notice shall be displayed, painted or affixed by Tenant or Tenant's employees, agents or contractors in or on any part of the outside or inside of the Building or Premises without prior written consent of Landlord, and then only of such color, size, character, style and material and in such places as shall be approved and designated by Landlord. Signs on doors and entrances to the Premises and outside of the Premises within the Building, grounds or Parking Area shall be placed thereon by a contractor approved by Landlord.

5.      Tenant shall not place, install or operate on the Premises or in any part of the Building any engine, refrigerating, heating or air conditioning apparatus, stove or machinery, or conduct mechanical operations or place or use in or about the Premises or the Building any explosives, gasoline, kerosene, oil, acids, caustics or any other inflammable, explosive, hazardous or odorous material without the prior written consent of Landlord. No portion of the Premises shall at any time be used for cooking, sleeping or lodging quarters.

6.    Tenant shall not make or permit any nuisance or improper noises in the Building or otherwise interfere in any way with other tenants or persons doing business in the Building or with Landlord's operation of the Building.

7.    Landlord will not be responsible for any fixtures, personal property, equipment, jewelry or money lost in or stolen from the Premises or public areas of the Building, grounds or Parking Area. Landlord shall not be responsible for damages to or theft of motor vehicles or other items from any Parking Areas used in connection with the Building.

8.    No maintenance or repair work shall be done on any vehicles in the Parking Area. No disabled vehicles shall be parked or stored in the Parking Area. All vehicles in the Parking Area shall be parked within the designated spaces and not in more than one (1) space or across spaces. At Landlord's option, all disabled vehicles, recreational vehicles, boats and vehicles improperly parked in spaces designated for handicapped persons and all other improperly parked vehicles may be towed or otherwise removed from the Parking Area at the owner's expense. In the event any vehicle or boat is towed, Landlord will not be liable or responsible for the loss, damage or theft of any property located in the vehicle or boat or for any damage to the vehicle or boat.

9.    Neither Tenant or Tenant's employees, agents, invitees or licensees shall at any time leave or discard any rubbish, paper, articles or objects of any kind whatsoever outside the doors of the Premises or in any other area within the Building or on the grounds or in the Parking Area. No birds, animals, bicycles or vehicles shall be brought into or kept in or about the Building.

10.    None of the entries passages, doors, hallways, or stairways in the Building shall be blocked or obstructed by Tenant Such areas shall not be used by Tenant at any time except for ingress or egress to the Premises by Tenant's, Tenant's employees, agents and invitees.

11.    Landlord shall have the right to determine and prescribe the weight and proper position of any usually heavy equipment, including but not limited to copying equipment, computer equipment, safes and large files that are to be placed in the Building. Only those items which in the exclusive judgment of the Landlord will not do damage to the floors, structure and elevators may be moved into the Building. Tenant shall pay for any damage resulting from moving or installing such articles in the Building or the existence of same in the Building.

12.    All Christmas and other decorations in the Building must be flame retardant.

13.    After hours air conditioning and heating on Monday through Saturday and all day Sunday and holidays determined by Landlord must be requested in writing by noon of a regular work day prior to the day for which additional air conditioning is requested. Tenant shall be charged at the prevailing hourly rate for the use of such air conditioning and heating.

14.    Any request by Tenant to place or remove names from the directory board in the lobby of the Building shall be furnished to Landlord in writing on Tenant's letterhead.

15.    Any services which Tenant requests Landlord to perform which Landlord is not required to perform under this Lease shall, if performed by Landlord, be billed to Tenant at Landlord's cost plus a 15% fee to cover Landlord's overhead costs. Landlord shall have the right to refuse to perform any such services.

16.    If Landlord's maintenance engineer or any of Landlord's other personnel do any work after normal business hours at the request of Tenant, Tenant shall pay for the cost of such work.

17.    All doors leading from public corridors to the Premises are to be kept closed when not in use.

18.    Canvassing, soliciting or peddling in the Building is prohibited and Tenant shall cooperate with Landlord to prevent such activities.

19.    Tenant shall give Landlord immediate notice in the event that any defects or dangerous conditions arise or exist in the Premises or in the Building or if any accidents or emergencies occur in the Premises or Building.

20.    Tenant shall not use the Premises or permit the Premises to be used for photographic, multilith or multigraph reproductions for sale to the general public. All photographic, multilith or multigraph reproductions in the Premises shall be produced for Tenant in the ordinary course of Tenant's business.

21.    All requests for services made by Tenant shall be made directly to Landlord or Landlord's designated agents. Employees of Landlord or Landlord's designated agents shall not perform any work or do anything outside of their regular duties unless directed to do so by Landlord or Landlord's designated agents. Tenant will make no requests directly to Landlord's employees.

<u>EXHIBIT E</u>

GUARANTY

Landlord, Tenant and Guarantor (as herein defined) acknowledge that if it were not for this guaranty (the "**Guaranty**") as an inducement, Landlord would not execute the Lease. Therefore, for $10.00 and other value received, and in consideration for, as a condition of, and an inducement to ALTERA HIGHLAND LLC, a Texas limited liability company ("**Landlord**") entering into that certain Lease Agreement dated as of August 21, 2012, with SHERMAN/GRAYSON HEALTH SYSTEM, LLC, a Texas limited liability company ("**Tenant**"), for certain premises being Suites 100, 375, 475 and 480 of a medical office building located at 300 N. Highland Drive, Sherman, Texas, on real property owned by an affiliate of Tenant and ground leased to Landlord, as ground lessee (the "**Lease**"), the undersigned officer of LHP HOSPITAL GROUP, INC., a Delaware corporation (the "**Guarantor**"), on behalf of such entity, its legal representatives, heirs, successors, and assigns, hereby irrevocably guarantees to Landlord, Landlord's successors and assigns, absolutely and unconditionally, the full prompt and timely payment, performance and observance of all amounts to be paid and provisions of the Lease to be performed and observed by Tenant, including (without limitation) the rules and regulations incorporated into the Lease, as if Guarantor had executed the Lease as the tenant thereunder. The Guarantor expressly agrees that the validity of this Guaranty and the obligations of the Guarantor hereunder shall not be terminated, affected or impaired by reason of the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease. The Guarantor further agrees that this Guaranty shall remain and continue in full force and effect notwithstanding any assignment, renewal, modification, extension or waiver of the Lease or any provisions thereof. The laws of Texas shall apply hereto.

The Guarantor hereby waives, to the fullest extent permitted by law:

(A)    Any right that the Guarantor may have to require Landlord to proceed against Tenant, proceed against or exhaust any security held from Tenant, or pursue any other remedy in Landlord's power to pursue, including, without limitation, re-letting the Premises following a default;

(B)    Any defense based on any claim that the Guarantor's obligations exceed or are more burdensome than those of Tenant;

(C)    Any defenses given to sureties other than actual payment or performance;

(D)    Any defense based on: (i) any legal disability of Tenant; (ii) any release, discharge, modification, impairment or limitation of the liability of Tenant to Landlord from any cause, whether consented to by Landlord or arising by operation of law or from any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the adjustment of debtor-creditor relationships (an "**Insolvency Proceeding**"), and/or (iii) any rejection or disaffirmance of the Lease, or any part of it, or any security held for it, in any such Insolvency Proceeding;

(E)    Any defense based on any action taken or omitted by Landlord in any Insolvency Proceeding involving Tenant, including any election to have Landlord's claim allowed as being secured, partially secured or unsecured, any extension of credit by Landlord to Tenant in any Insolvency Proceeding, and the taking and holding by Landlord of any security for any such extension of credit; and

(F)    The Guarantor agrees to jurisdiction and venue in Grayson and Dallas Counties, Texas, and waives any objection to such venue on the grounds of forum non conveniens. **The Guarantor knowingly, voluntarily and intentionally waives the right to a trial by jury in respect of any litigation based hereon or arising out of, under, or in connection with this Guaranty.** In the event Landlord incurs any

fees and/or expenses in the enforcement of this Guaranty, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings, the Guarantor agrees to be liable for same (including reasonable attorney's fees and costs) and to pay same promptly on demand by Landlord.

      The Guarantor acknowledges liability for every obligation of Tenant under the Lease.  Any capitalized term used herein and not otherwise defined shall have the same meaning as defined in the Lease. Each provision of this Guaranty shall be considered severable, and if for any reason and provision is determined to be invalid under current or future law, such invalidity shall not impair the operation of or otherwise affect the valid portions of this Guaranty.

<u>**GUARANTOR**</u>:

LHP HOSPITAL GROUP, INC.,
a Delaware corporation


By:_____
Name:_____
Title:_____

Date:_____

# EXHIBIT 15

Bank of America

# NON REPETITIVE WIRE FORM

DATE       03/01/2022

Account
Number    ███████████

State

Amount     226,526.68

Description    Altera Highland - Lease Payment

Wiring Instructions:

Bank Name     Wells Fargo

ABA #      121000248

Account #    ██████████

Description    Sherman/Grayson Health System - Lease Payment

Beneficiary    Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0606**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**

    Sherman/Grayson Health System
    300 N Highland Avenue
    Sherman, TX 75092

**Date:** 03/01/2022
**Total Due:** 226,526.68

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 3/01/2022 | Rent Ste 100A | 19,221.35 | | 19,221.35 |
| 3/01/2022 | Estimated CAM Ste 100A | 13,296.50 | | 32,517.85 |
| 3/01/2022 | Rent Ste 200 | 45,325.11 | | 77,842.96 |
| 3/01/2022 | Estimated CAM Ste 200 | 16,548.79 | | 94,391.75 |
| 3/01/2022 | Rent Ste 350 | 26,429.86 | | 120,821.61 |
| 3/01/2022 | Estimated CAM Ste 350 | 18,043.79 | | 138,865.40 |
| 3/01/2022 | Rent Ste 415 | 32,516.41 | | 171,381.81 |
| 3/01/2022 | Estimated CAM Ste 415 | 22,196.89 | | 193,578.70 |
| 3/01/2022 | Rent Ste 500 | 19,580.62 | | 213,159.32 |
| 3/01/2022 | Estimated CAM Ste 500 | 13,367.36 | | 226,526.68 |

ACH Payment instructions:

| | |
|---|---|
| Bank Name: | WELLS FARGO |
| Bank Address: | PO BOX 63020 |
| | SAN FRANCISCO, CA 94163 |
| Bank ABA/Routing#: | 121000248 |
| Beneficiary Account #: | ▮▮▮▮▮▮ |
| Beneficiary Account Name: | Altera Highland LLC |

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0607**

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Tuesday, March 1, 2022 9:28 AM |
| **To:** | Frank Murphy |
| **Cc:** | Petra Pedine |
| **Subject:** | FW: 02.2022 Wilson Jones Statement |

Approval.

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Tuesday, March 1, 2022 9:27 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: 02.2022 Wilson Jones Statement

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Tuesday, March 1, 2022 9:26:34 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 02.2022 Wilson Jones Statement

Please approve the March 1st rent ($226,526.68) for Altera.

Thanks,
Glynda

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Tuesday, March 1, 2022 9:25 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: 02.2022 Wilson Jones Statement

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

Please see the attached.

1

**A0608**

**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.831.0833
aurumpropertypartners.com    **avs**@aurumpropertypartners.com
West Palm Beach, FL | Middletown, NJ

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Tuesday, March 1, 2022 9:52 AM
**To:** Andria Santos <avs@aurumpropertypartners.com>
**Subject:** FW: 02.2022 Wilson Jones Statement

Good morning,
We have not received the invoice due on March 1st. Could you please forward ASAP?

Thanks,
Glynda

**From:** Glynda Mcdaniel
**Sent:** Tuesday, January 25, 2022 9:40 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 02.2022 Wilson Jones Statement

Good morning Steve,
Please approve the Altera rent due 2/1/22 for $226,526.68.

Thanks,
Glynda

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Tuesday, January 25, 2022 9:23 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; jenny.penland@wnj.org
**Subject:** 02.2022 Wilson Jones Statement

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

Please see the attached Tenant statement for February 2022.

Thank you,

**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608

2

A0609

West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.831.0833

aurumpropertypartners.com    **avs**@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

DISCLAIMER: This communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing or saving in any manner. Please consider the environment before printing this e-mail.

3

**A0610**

# EXHIBIT 16

Bank of America

# NON REPETITIVE WIRE FORM

DATE                 04/01/2022

Account
Number          ████████████

State

Amount            226,526.68

Description      Altera Highland - Lease Payment



Wiring Instructions:
Bank Name       Wells Fargo

ABA #              121000248

Account #         ████████

Description      Sherman/Grayson Health System - Lease Payment

Beneficiary      Altera Highland LLC


Bene Address

Bene City/ST

Bene Zip


Sequence Number

Approved By:


2nd Approval:


**A0612**

LHP_0000085

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**

    Sherman/Grayson Health System
    300 N Highland Avenue
    Sherman, TX 75092

**Date:** 03/28/2021
**Total Due:** 226,526.68

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 4/01/2022 | Rent Ste 100A | 19,221.35 | | 19,221.35 |
| 4/01/2022 | Estimated CAM Ste 100A | 13,296.50 | | 32,517.85 |
| 4/01/2022 | Rent Ste 200 | 45,325.11 | | 77,842.96 |
| 4/01/2022 | Estimated CAM Ste 200 | 16,548.79 | | 94,391.75 |
| 4/01/2022 | Rent Ste 350 | 26,429.86 | | 120,821.61 |
| 4/01/2022 | Estimated CAM Ste 350 | 18,043.79 | | 138,865.40 |
| 4/01/2022 | Rent Ste 415 | 32,516.41 | | 171,381.81 |
| 4/01/2022 | Estimated CAM Ste 415 | 22,196.89 | | 193,578.70 |
| 4/01/2022 | Rent Ste 500 | 19,580.62 | | 213,159.32 |
| 4/01/2022 | Estimated CAM Ste 500 | 13,367.36 | | 226,526.68 |

ACH Payment instructions:

Bank Name:      WELLS FARGO
Bank Address:      PO BOX 63020
               SAN FRANCISCO, CA 94163
Bank ABA/Routing#:      121000248
Beneficiary Account #:
Beneficiary Account Name:      Altera Highland LLC

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0613**

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Monday, March 28, 2022 12:58 PM |
| **To:** | Frank Murphy |
| **Cc:** | Petra Pedine |
| **Subject:** | FW: 04.2022 Tenant Statement |

Here is the approval for the rent payment.

Thanks,
Glynda

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Monday, March 28, 2022 12:56 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: 04.2022 Tenant Statement

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Monday, March 28, 2022 12:51:28 PM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 04.2022 Tenant Statement

Steve,
Please approve the attached invoice for the Altera lease rent due on April 1st ($226,526.68).

Thanks,
Glynda

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Monday, March 28, 2022 12:47 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; jenny.penland@wnj.org
**Subject:** 04.2022 Tenant Statement

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

Please see the attached April 2022 Tenant statement.

Thank you,

1

**A0614**

LHP_0000087

**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.831.0833
aurumpropertypartners.com    **avs**@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

2

**A0615**

LHP_0000088

# EXHIBIT 17

Bank of America

# NON REPETITIVE WIRE FORM

DATE              05/02/2022

Account
Number            ███████████

State

Amount            226,526.68

Description       Altera Highland - Lease Payment

Wiring Instructions:
Bank Name         Wells Fargo

ABA #             121000248

Account #         ████████

Description       Sherman/Grayson Health System - Lease Payment

Beneficiary       Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0617**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**

    Sherman/Grayson Health System
    300 N Highland Avenue
    Sherman, TX 75092

| | | |
|---|---|---|
| **Date:** | | 04/29/2022 |
| **Total Due:** | | 226,526.68 |

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| 5/01/2022 | Rent Ste 100A | 19,221.35 | | 19,221.35 |
| 5/01/2022 | Estimated CAM Ste 100A | 13,296.50 | | 32,517.85 |
| 5/01/2022 | Rent Ste 200 | 45,325.11 | | 77,842.96 |
| 5/01/2022 | Estimated CAM Ste 200 | 16,548.79 | | 94,391.75 |
| 5/01/2022 | Rent Ste 350 | 26,429.86 | | 120,821.61 |
| 5/01/2022 | Estimated CAM Ste 350 | 18,043.79 | | 138,865.40 |
| 5/01/2022 | Rent Ste 415 | 32,516.41 | | 171,381.81 |
| 5/01/2022 | Estimated CAM Ste 415 | 22,196.89 | | 193,578.70 |
| 5/01/2022 | Rent Ste 500 | 19,580.62 | | 213,159.32 |
| 5/01/2022 | Estimated CAM Ste 500 | 13,367.36 | | 226,526.68 |

ACH Payment instructions:

| | |
|---|---|
| Bank Name: | WELLS FARGO |
| Bank Address: | PO BOX 63020 |
| | SAN FRANCISCO, CA 94163 |
| Bank ABA/Routing#: | 121000248 |
| Beneficiary Account #: | ▮▮▮▮▮▮ |
| Beneficiary Account Name: | Altera Highland LLC |

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0618**

**Frank Murphy**

| | |
|---|---|
| **From:** | Steve Hinkle |
| **Sent:** | Monday, May 2, 2022 9:14 AM |
| **To:** | Glynda Mcdaniel |
| **Cc:** | Frank Murphy; Petra Pedine |
| **Subject:** | Re: 05.22 Wilson Jones Tenant Statement |

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Monday, May 2, 2022 9:11:45 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Cc:** Frank Murphy <Frank.Murphy@ardenthealth.com>; Petra Pedine <Petra.Pedine2@ardenthealth.com>
**Subject:** FW: 05.22 Wilson Jones Tenant Statement

Good morning Steve,
Please approve the May rent for Altera for $226,526.68.

Thanks,
Glynda

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Friday, April 29, 2022 8:09 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; jenny.penland@wnj.org
**Subject:** 05.22 Wilson Jones Tenant Statement

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

Please see the attached May 2022 rent statement.

Thank you,



**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.831.0833

aurumpropertypartners.com   avs@aurumpropertypartners.com

1

**A0619**

West Palm Beach, FL | Middletown, NJ

LHP_0000092

# EXHIBIT 18

Bank of America

# NON REPETITIVE WIRE FORM

DATE                06/01/2022

Account
Number          ███████████████

State

Amount          225,416.35

Description     Altera Highland - Lease Payment

Wiring Instructions:
Bank Name      Wells Fargo

ABA #              121000248

Account #       ███████████

Description     Sherman/Grayson Health System - Lease Payment

Beneficiary     Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0622**

LHP_0000093

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**
Sherman/Grayson Health System
300 N Highland Avenue
Sherman, TX 75092

| | |
|---|---|
| **Date:** | 05/31/2022 |
| **Total Due:** | 225,416.35 |

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 6/01/2022 | Rent Ste 100A | 19,221.35 | | 19,221.35 |
| 6/01/2022 | Estimated CAM Ste 100A | 12,174.00 | | 31,395.35 |
| 6/01/2022 | Rent Ste 200 | 45,325.11 | | 76,720.46 |
| 6/01/2022 | Estimated CAM Ste 200 | 16,569.00 | | 93,289.46 |
| 6/01/2022 | Rent Ste 350 | 26,429.86 | | 119,719.32 |
| 6/01/2022 | Estimated CAM Ste 350 | 18,040.00 | | 137,759.32 |
| 6/01/2022 | Rent Ste 415 | 32,516.41 | | 170,275.73 |
| 6/01/2022 | Estimated CAM Ste 415 | 22,195.00 | | 192,470.73 |
| 6/01/2022 | Rent Ste 500 | 19,580.62 | | 212,051.35 |
| 6/01/2022 | Estimated CAM Ste 500 | 13,365.00 | | 225,416.35 |

ACH Payment instructions:

Bank Name:            WELLS FARGO
Bank Address:         PO BOX 63020
                     SAN FRANCISCO, CA 94163
Bank ABA/Routing#:   121000248
Beneficiary Account #:
Beneficiary Account Name:   Altera Highland LLC

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0623**

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Wednesday, June 1, 2022 8:17 AM |
| **To:** | Frank Murphy |
| **Cc:** | Petra Pedine |
| **Subject:** | FW: 05.22 Wilson Jones Tenant Statement |

Approval.

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Wednesday, June 1, 2022 8:13 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: 05.22 Wilson Jones Tenant Statement

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Wednesday, June 1, 2022 8:10:50 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 05.22 Wilson Jones Tenant Statement

Steve,
Please approve the attached $225,416.35 invoice for the Altera Rent.

Thanks,
Glynda

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Wednesday, June 1, 2022 8:05 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: 05.22 Wilson Jones Tenant Statement

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello Glynda,

Please see the attached Tenant statement for June.

Thank you,

*"We've expanded, please note our new suite number"*

1

**A0624**



**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.861.0833

aurumpropertypartners.com     avs@aurumpropertypartners.com

West Palm Beach, FL. | Middletown, NJ

---

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Tuesday, May 31, 2022 11:50 AM
**To:** Andria Santos <avs@aurumpropertypartners.com>
**Subject:** FW: 05.22 Wilson Jones Tenant Statement

Good morning,
Do you have the June invoice ready? We were receiving these mid-month which gave us plenty of time to get them approved. Not receiving until the last day is cutting it pretty tight for us.

Thanks,

Glynda McDaniel
Director, Treasury Operations
p 615.296.3308 | f 615.296.6308



---

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Friday, April 29, 2022 8:09 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; jenny.penland@wnj.org
**Subject:** 05.22 Wilson Jones Tenant Statement

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

 Please see the attached May 2022 rent statement.

Thank you,

2

**A0625**

**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.831.0833

aurumpropertypartners.com    **avs**@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

DISCLAIMER: This communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing or saving in any manner. Please consider the environment before printing this e-mail.

3

**A0626**

# EXHIBIT 19

Bank of America

# NON REPETITIVE WIRE FORM

DATE                07/01/2022

Account
Number

State

Amount              225,416.35

Description         Altera Highland - Lease Payment

Wiring Instructions:
Bank Name       Wells Fargo

ABA #               121000248

Account #

Description         Sherman/Grayson Health System - Lease Payment

Beneficiary         Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0628**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**
Sherman/Grayson Health System
300 N Highland Avenue
Sherman, TX 75092

**Date:** 06/28/2022
**Total Due:** 225,416.35

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 7/01/2022 | Rent Ste 100A | 19,221.35 | | 19,221.35 |
| 7/01/2022 | Estimated CAM Ste 100A | 12,174.00 | | 31,395.35 |
| 7/01/2022 | Rent Ste 200 | 45,325.11 | | 76,720.46 |
| 7/01/2022 | Estimated CAM Ste 200 | 16,569.00 | | 93,289.46 |
| 7/01/2022 | Rent Ste 350 | 26,429.86 | | 119,719.32 |
| 7/01/2022 | Estimated CAM Ste 350 | 18,040.00 | | 137,759.32 |
| 7/01/2022 | Rent Ste 415 | 32,516.41 | | 170,275.73 |
| 7/01/2022 | Estimated CAM Ste 415 | 22,195.00 | | 192,470.73 |
| 7/01/2022 | Rent Ste 500 | 19,580.62 | | 212,051.35 |
| 7/01/2022 | Estimated CAM Ste 500 | 13,365.00 | | 225,416.35 |

ACH Payment instructions:

Bank Name:               WELLS FARGO
Bank Address:            PO BOX 63020
                         SAN FRANCISCO, CA 94163
Bank ABA/Routing#:       121000248
Beneficiary Account #:   ▮▮▮▮▮▮▮▮
Beneficiary Account Name: Altera Highland LLC

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0629**

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Tuesday, June 28, 2022 1:14 PM |
| **To:** | Frank Murphy |
| **Cc:** | Petra Pedine |
| **Subject:** | FW: 07.2022 Tenant Statement |

---

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Tuesday, June 28, 2022 11:55 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: 07.2022 Tenant Statement

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Tuesday, June 28, 2022 11:50:04 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 07.2022 Tenant Statement

Steve,
Please approve the attached Altera rent payment for July ($225,416.35).

Thanks,
Glynda

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Tuesday, June 28, 2022 11:45 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** 07.2022 Tenant Statement

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

Please see your July 2022 Tenant Statement.

Thanks,

*"We've expanded, please note our new suite number"*

1

**A0630**

LHP_0000100



**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.861.0833

aurumpropertypartners.com    avs@aurumpropertypartners.com

West Palm Beach, FL. | Middletown, NJ

2

**A0631**

LHP_0000101

# EXHIBIT 20

Bank of America

# NON REPETITIVE WIRE FORM

DATE              09/01/2022

Account
Number            ███████████

State

Amount            232,570.02

Description       Altera Highland - Lease Payment

Wiring Instructions:
Bank Name         Wells Fargo

ABA #             121000248

Account #         ████████

Description       Sherman/Grayson Health System - Lease Payment

Beneficiary       Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0633**

# TENANT STATEMENT

Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070



**Prepared For:**

Sherman/Grayson Health System
300 N Highland Avenue
Sherman, TX 75092

**Date:** 08/29/2022
**Total Due:** 232,570.02

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 9/01/2022 | Rent Ste 100A | 20,182.42 | | 20,182.42 |
| 9/01/2022 | Estimated CAM Ste 100A | 12,174.00 | | 32,356.42 |
| 9/01/2022 | Rent Ste 200 | 47,591.37 | | 79,947.79 |
| 9/01/2022 | Estimated CAM Ste 200 | 16,569.00 | | 96,516.79 |
| 9/01/2022 | Rent Ste 350 | 27,751.35 | | 124,268.14 |
| 9/01/2022 | Estimated CAM Ste 350 | 18,040.00 | | |
| 9/01/2022 | Rent Ste 415 | 34,142.23 | | 142,308.14 |
| 9/01/2022 | Estimated CAM Ste 415 | 22,195.00 | | 176,450.37 |
| 9/01/2022 | Rent Ste 500 | 20,559.65 | | 219,205.02 |
| 9/01/2022 | Estimated CAM Ste 500 | 13,365.00 | | 232,570.02 |

ACH Payment instructions:

Bank Name:                    WELLS FARGO
Bank Address:                 PO BOX 63020
                              SAN FRANCISCO, CA 94163
Bank ABA/Routing#:            121000248
Beneficiary Account #:        ███████████
Beneficiary Account Name:     Altera Highland LLC

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

A0634

**Frank Murphy**

---

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Monday, August 29, 2022 1:14 PM |
| **To:** | Frank Murphy |
| **Cc:** | Petra Pedine |
| **Subject:** | FW: 09.2022 Rent Statement |

Please put with the wire for Altera for approval.

---

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Monday, August 29, 2022 11:54 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Cc:** Steve Petrovich <Stephen.Petrovich@ardenthealth.com>
**Subject:** Re: 09.2022 Rent Statement

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

---

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Monday, August 29, 2022 4:40:45 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Cc:** Steve Petrovich <Stephen.Petrovich@ardenthealth.com>
**Subject:** FW: 09.2022 Rent Statement

Good morning Steve,
Please approve the attached Altera rent invoice for $232,570.02.

Copying Petro since Hinkle is on PTO.

Thanks,
Glynda

---

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Monday, August 29, 2022 8:56 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** 09.2022 Rent Statement

---

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

---

Hello,

Please see the attached September 2022 Rent statement.

1

**A0635**

Thanks,

*"We've expanded, please note our new suite number"*



**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.861.0833

aurumpropertypartners.com    avs@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

2

**A0636**

LHP_0000105



August 22, 2022

Sherman/Grayson Health System
300 N Highland Avenue
Sherman, TX 75092

Re:     CPI Increase 09-2021
        300 N Highland Avenue
        Sherman, TX 75092

Dear Physician and Fellow Tenant:,

Your lease for the above captioned Premises calls for an Annual Rent Adjustment based on the Consumer Price Index for All Urban Consumers, U.S. City Average, All Items, as issued by the Bureau of Labor Statistics.

**Effective September 1, 2022, your new monthly rent amount will increase as indicated below.**
Please contact us should you have any questions or need anything further.

| | |
|---|---|
| CPI August 2012 | 230.379 |
| CPI July 2022 | 296.276 |
| Change | 65.897 |
| % Increase | 28.60% |
| % Increase - Actual with 3% minimum, Capped at 5% | 5% |

| Unit | Tenant | Current Base Rent | New Base Rent |
|---|---|---|---|
| 100A | Sherman/Grayson - Hosp Occupied Common Areas | 19,221.35 | 20,182.42 |
| 200 | Sherman/Grayson- ASC Kitty Richardson | 45,325.11 | 47,591.37 |
| 350 | Sherman/Grayson- Shell Kitty Richardson | 26,429.86 | 27,751.35 |
| 415 | Sherman/Grayson- Phys Suites Kitty Richardson | 32,516.41 | 34,142.23 |
| 500 | Sherman/Grayson- ASC Existing 4 & 5 | 19,580.62 | 20,559.65 |
| | Total | 143,073.35 | 150,227.02 |

With best regards,

*Property Management Team*

Aurum Property Partners
As agent for Altera Highland, LLC

**A0637**

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Monday, August 22, 2022 4:48 PM |
| **To:** | Frank Murphy |
| **Cc:** | Petra Pedine |
| **Subject:** | FW: 09.2022 Rent Increase letter |

His approval for the increase.

---

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Monday, August 22, 2022 4:10 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** RE: 09.2022 Rent Increase letter

Yes, this is approved.

Steve Hinkle
VP and Chief Compliance Officer
p 615.296.3378 c 615.268.3822
www.ardenthealth.com



---

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Monday, August 22, 2022 9:03 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 09.2022 Rent Increase letter

Please see attached letter. Please let me know if you are ok with the changes.

---

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Monday, August 22, 2022 8:55 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** 09.2022 Rent Increase letter

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

Please see the attached rent increase letter. Let me know if you have any questions.

Thanks,

**A0638**

LHP_0000107

*"We've expanded, please note our new suite number"*



**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.861.0833

aurumpropertypartners.com      avs@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

**A0639**

LHP_0000108

# EXHIBIT 21

Bank of America

# NON REPETITIVE WIRE FORM

DATE          10/03/2022

Account
Number       ███████████

State

Amount       232,570.02

Description    Altera Highland - Lease Payment

Wiring Instructions:
Bank Name     Wells Fargo

ABA #          121000248

Account #      ██████████

Description    Sherman/Grayson Health System - Lease Payment

Beneficiary    Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0641**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**
    Sherman/Grayson Health System
    300 N Highland Avenue
    Sherman, TX 75092

**Date:** 09/29/2022
**Total Due:** 232,570.02

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| 10/01/2022 | Rent Ste 100A | 20,182.42 | | 20,182.42 |
| 10/01/2022 | Estimated CAM Ste 100A | 12,174.00 | | 32,356.42 |
| 10/01/2022 | Rent Ste 200 | 47,591.37 | | 79,947.79 |
| 10/01/2022 | Estimated CAM Ste 200 | 16,569.00 | | 96,516.79 |
| 10/01/2022 | Rent Ste 350 | 27,751.35 | | 124,268.14 |
| 10/01/2022 | Estimated CAM Ste 350 | 18,040.00 | | 142,308.14 |
| 10/01/2022 | Rent Ste 415 | 34,142.23 | | 176,450.37 |
| 10/01/2022 | Estimated CAM Ste 415 | 22,195.00 | | 219,205.02 |
| 10/01/2022 | Rent Ste 500 | 20,559.65 | | 232,570.02 |
| 10/01/2022 | Estimated CAM Ste 500 | 13,365.00 | | |

ACH Payment instructions:

| | |
|---|---|
| Bank Name: | WELLS FARGO |
| Bank Address: | PO BOX 63020 |
| | SAN FRANCISCO, CA 94163 |
| Bank ABA/Routing#: | 121000248 |
| Beneficiary Account #: | ▓▓▓▓▓▓ |
| Beneficiary Account Name: | Altera Highland LLC |

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0642**

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Thursday, September 29, 2022 1:41 PM |
| **To:** | Frank Murphy |
| **Cc:** | Petra Pedine |
| **Subject:** | FW: 09.2022 Rent Statement |

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Thursday, September 29, 2022 1:41 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** RE: 09.2022 Rent Statement

Approved.

Steve Hinkle
VP and Chief Compliance Officer
p 615.296.3378 c 615.268.3822
www.ardenthealth.com



**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Thursday, September 29, 2022 1:39 PM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 09.2022 Rent Statement

Hi Steve,
Please approve the October rent for Altera ($232,570.02).

Thanks,
Glynda

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Thursday, September 29, 2022 1:36 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: 09.2022 Rent Statement

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hi Glynda,

1

A0643

LHP_0000111

Please see the attached tenant statement for October 2022.

Thanks,

*"We've expanded, please note our new suite number"*



**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.861.0833

aurumpropertypartners.com    avs@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

---

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Thursday, September 29, 2022 2:21 PM
**To:** Andria Santos <avs@aurumpropertypartners.com>
**Subject:** RE: 09.2022 Rent Statement

Good afternoon Andria,
Do you have the October rent statement? I don't believe we have received it.

Thanks,

Glynda McDaniel
Director, Treasury Operations
p 615.296.3308 | f 615.296.6308



---

**From:** Andria Santos <avs@aurumpropertypartners.com>
**Sent:** Monday, August 29, 2022 8:56 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** 09.2022 Rent Statement

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

Please see the attached September 2022 Rent statement.

Thanks,

*"We've expanded, please note our new suite number"*



**Andria Santos**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.861.0833

aurumpropertypartners.com        avs@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

DISCLAIMER: This communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing or saving in any manner. Please consider the environment before printing this e-mail.

LHP_0000113

# EXHIBIT 22

Bank of America

# NON REPETITIVE WIRE FORM

DATE         11/01/2022

Account
Number    █████████████

State

Amount      232,570.02

Description    Altera Highland - Lease Payment

Wiring Instructions:

Bank Name    Wells Fargo

ABA #      121000248

Account #    ████████

Description    Sherman/Grayson Health System - Lease Payment

Beneficiary    Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0647**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**

| | |
|---|---|
| Sherman/Grayson Health System | **Date:** 10/20/2022 |
| 300 N Highland Avenue | **Total Due:** 232,570.02 |
| Sherman, TX 75092 | |

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| 11/01/2022 | Rent Ste 100A | 20,182.42 | | 20,182.42 |
| 11/01/2022 | Estimated CAM Ste 100A | 12,174.00 | | 32,356.42 |
| 11/01/2022 | Rent Ste 200 | 47,591.37 | | 79,947.79 |
| 11/01/2022 | Estimated CAM Ste 200 | 16,569.00 | | 96,516.79 |
| 11/01/2022 | Rent Ste 350 | 27,751.35 | | 124,268.14 |
| 11/01/2022 | Estimated CAM Ste 350 | 18,040.00 | | 142,308.14 |
| 11/01/2022 | Rent Ste 415 | 34,142.23 | | 176,450.37 |
| 11/01/2022 | Estimated CAM Ste 415 | 22,195.00 | | 198,645.37 |
| 11/01/2022 | Rent Ste 500 | 20,559.65 | | 219,205.02 |
| 11/01/2022 | Estimated CAM Ste 500 | 13,365.00 | | 232,570.02 |

ACH Payment instructions:

| | |
|---|---|
| Bank Name: | WELLS FARGO |
| Bank Address: | PO BOX 63020 |
| | SAN FRANCISCO, CA 94163 |
| Bank ABA/Routing#: | 121000248 |
| Beneficiary Account #: | ▉▉▉▉▉ |
| Beneficiary Account Name: | Altera Highland LLC |

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0648**

**Frank Murphy**

---

**From:** Glynda Mcdaniel
**Sent:** Tuesday, November 1, 2022 10:41 AM
**To:** Frank Murphy
**Subject:** FW: 11.2022 Tenant Statement - Wilson - Sherman Grayson Consolidated

Here you go.

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Tuesday, November 1, 2022 10:40 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** RE: 11.2022 Tenant Statement - Wilson - Sherman Grayson Consolidated

Approved.

Steve Hinkle
VP and Chief Compliance Officer
p 615.296.3378 c 615.268.3822
www.ardenthealth.com



**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Tuesday, November 1, 2022 10:37 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 11.2022 Tenant Statement - Wilson - Sherman Grayson Consolidated

Good morning Steve,
Please approve the Altera rent payment for $232,570.02.

Thanks,
Glynda

**From:** Jayson DeSimone <jcd@aurumpropertypartners.com>
**Sent:** Tuesday, November 1, 2022 10:26 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; jenny.penland@wnj.org
**Cc:** Andria Santos <avs@aurumpropertypartners.com>
**Subject:** 11.2022 Tenant Statement - Wilson - Sherman Grayson Consolidated

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

LHP_0000116

Hello,

Please see the attached Consolidated Sherman Grayson Tenant Statement for 11.2022.

Thank you,

*"We've expanded, please note our new suite number"*



**Jayson DeSimone**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 561.542.6138
aurumpropertypartners.com    jcd@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

2

**A0650**

LHP_0000117

# Exhibit 23

Bank of America

# NON REPETITIVE WIRE FORM

DATE       08/01/2022

Account
Number     ███████████

State

Amount     236,107.08

Description     Altera Highland - Lease Payment

Wiring Instructions:
Bank Name     Wells Fargo

ABA #     121000248

Account #     ██████████

Description     Sherman/Grayson Health System - Lease Payment

Beneficiary     Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0652**

# TENANT STATEMENT



AURUM
PROPERTY PARTNERS

Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**

Sherman/Grayson Health System
300 N Highland Avenue
Sherman, TX 75092

| | |
|---|---|
| **Date:** | 07/20/2022 |
| **Total Due:** | 225,416.35 |

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 08/01/2022 | Rent Ste 100A | 19,221.35 | | 19,221.35 |
| 08/01/2022 | Estimated CAM Ste 100A | 12,174.00 | | 31,395.35 |
| 08/01/2022 | Rent Ste 200 | 45,325.11 | | 76,720.46 |
| 08/01/2022 | Estimated CAM Ste 200 | 16,569.00 | | 93,289.46 |
| 08/01/2022 | Rent Ste 350 | 26,429.86 | | 119,719.32 |
| 08/01/2022 | Estimated CAM Ste 350 | 18,040.00 | | 137,759.32 |
| 08/01/2022 | Rent Ste 415 | 32,516.41 | | 170,275.73 |
| 08/01/2022 | Estimated CAM Ste 415 | 22,195.00 | | 192,470.73 |
| 08/01/2022 | Rent Ste 500 | 19,580.62 | | 212,051.35 |
| 08/01/2022 | Estimated CAM Ste 500 | 13,365.00 | | 225,416.35 |

ACH Payment instructions:

| | |
|---|---|
| Bank Name: | WELLS FARGO |
| Bank Address: | PO BOX 63020 |
| | SAN FRANCISCO, CA 94163 |
| Bank ABA/Routing#: | 121000248 |
| Beneficiary Account #: | ▓▓▓▓▓▓ |
| Beneficiary Account Name: | Altera Highland LLC |

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0653**



July 7, 2022

Sherman/Grayson Health System
300 N Highland Avenue
Sherman, TX 75092

**RE:  2021 Annual Operating Expense Reconciliation**
**Altera Highland, LLC**

Dear Physician and Fellow Tenant:

We have completed the 2021 annual operating expenses reconciliation. We have enclosed a reconciliation invoice that pertains to your suite and lease agreement. The invoice provides a breakdown of the actual operating expenses paid in 2021. The amount due for your suite is based upon your proportionate share of the 2021 operating expenses.

Your proportionate share of operating expenses for 2021 is as follows:

| | | |
|---|---|---:|
| Your share | $ | 965,989.09 |
| Less charged | $ | 955,298.36 |
| Total due | $ | 10,690.73 |

Please make checks payable to Altera Highland, LLC, Attn: Lockbox, P.O. Box 206147, Dallas TX, 75320

If you should have any questions, please contact us.

Sincerely,

*Property Management Team*

Altera Highland, LLC Property Management Team
Aurum Property Partners

Investments | Operations | Consulting | Brokerage
319 Clematis Street, Suite 608 | West Palm Beach, Florida 33401
p: 561.293.3070 | f: 561.855.3484
aurumpropertypartners.com
A0654

LHP_0000120

**Altera Highland, LLC**
**2021 Operating Expense Recoveries**

| | |
|---|---|
| **Tenant Name:** | Sherman/Grayson Health System |
| **Suite #:** | 100A, 200, 350, 415, 500 |
| **Suite Sqft:** | 90,321 |
| **Lease From:** | 8/21/2012 |
| **Lease Expire:** | 8/31/2027 |
| **Tenant's Share %:** | 77.648% |
| **Occupancy:** | 100% |
| **Total Building Footage:** | 117,655 |

| Operating Expenses | 2021 Actuals |
|---|---|
| Administrative | 81,906.20 |
| Utilities | 190,138.94 |
| Insurance | 37,744.08 |
| Janitorial | 44,295.96 |
| Management Fees | 160,530.12 |
| Property Taxes | 383,146.50 |
| Maintenance | 260,707.03 |
| Security | 47,912.46 |
| Ground Lease | 37,680.48 |
| **Total** | **1,244,061.77** |

| | |
|---|---|
| **Total 2021 CAM Expenses** | **1,244,061.77** |
| Tenant Pro Rata share | 77.648% |
| Tenant's CAM Share | 965,989.09 |
| Tenant's CAM Billed | 955,298.36 |
| **2021 CAM Due / (Credit)** | **10,690.73** |

**A0655**

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Thursday, July 28, 2022 10:57 AM |
| **To:** | Frank Murphy |
| **Cc:** | Petra Pedine |
| **Subject:** | FW: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue |

Approval.

I believe there was a bill earlier this month for the annual CAM true-up. Did I forward the approval to you? If so, you can just pay them together.

Thanks,
Glynda

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Thursday, July 28, 2022 9:56 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** RE: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

Approved.

Steve Hinkle
VP and Chief Compliance Officer
p 615.296.3378 c 615.268.3822
www.ardenthealth.com



**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Thursday, July 28, 2022 9:56 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

Steve,
Please approve the August rent ($225,416.35).

Thanks,
Glynda

**From:** David McDonald <dwm@aurumpropertypartners.com>
**Sent:** Wednesday, July 20, 2022 7:42 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; Jennifer Penland <jenny.penland@wnj.org>
**Subject:** Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

1

**A0656**

LHP_0000122

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Dear Physician and Fellow Tenant:

I have attached a copy of your monthly statement for your location at 300 N Highland Ave in Sherman, Texas.

If you have any questions please let me know

Thanks,

*"We've expanded, please note our new suite number"*



**David McDonald**
Director of Accounting

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 732.397.1038

aurumpropertypartners.com        dwm@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

A0657

LHP_0000123

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Thursday, July 28, 2022 12:23 PM |
| **To:** | Frank Murphy |
| **Cc:** | Petra Pedine |
| **Subject:** | FW: Tenant Statement and Annual Reconciliation - 300 N Highland Avenue, Sherman, TX 75092 |

This needs to be paid on the 1st with the Altera rent.

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Thursday, July 7, 2022 4:06 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: Tenant Statement and Annual Reconciliation - 300 N Highland Avenue, Sherman, TX 75092

Ok to pay.

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Thursday, July 7, 2022 2:49:05 PM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: Tenant Statement and Annual Reconciliation - 300 N Highland Avenue, Sherman, TX 75092

Steve,
See attached Altera CAM adjustment invoice. If you agree with the calculation of $10,690.73, please approve and we will get it paid.

Thanks,
Glynda

**From:** David McDonald <dwm@aurumpropertypartners.com>
**Sent:** Thursday, July 7, 2022 2:19 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; jenny.penland@wnj.org
**Subject:** Tenant Statement and Annual Reconciliation - 300 N Highland Avenue, Sherman, TX 75092

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Dear Physician and Fellow Tenant:

We have completed the 2021 annual operating expenses reconciliation. Please see attached letter and support.

If you have any questions please let me know.

1

**A0658**

LHP_0000124

Thanks,

*"We've expanded, please note our new suite number"*



**David McDonald**
Director of Accounting

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070

aurumpropertypartners.com    dwm@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

2

**A0659**

LHP_0000125

# EXHIBIT 24

Bank of America

# NON REPETITIVE WIRE FORM

DATE                12/01/2022

Account
Number          ████████████████

State

Amount          232,570.02

Description     Altera Highland - Lease Payment


Wiring Instructions:
Bank Name       Wells Fargo

ABA #            121000248

Account #       ███████████

Description     Sherman/Grayson Health System - Lease Payment

Beneficiary     Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:


**A0661**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**
  Sherman/Grayson Health System
  300 N Highland Avenue
  Sherman, TX 75092

| | | |
|---|---|---|
| **Date:** | 11/21/2022 |
| **Total Due:** | 232,570.02 |

| Date | Description | Charges | Payments | Balance |
|------|-------------|--------:|---------:|--------:|
| 12/01/2022 | Rent Ste 100A | 20,182.42 | | 20,182.42 |
| 12/01/2022 | Estimated CAM Ste 100A | 12,174.00 | | 32,356.42 |
| 12/01/2022 | Rent Ste 200 | 47,591.37 | | 79,947.79 |
| 12/01/2022 | Estimated CAM Ste 200 | 16,569.00 | | 96,516.79 |
| 12/01/2022 | Rent Ste 350 | 27,751.35 | | 124,268.14 |
| 12/01/2022 | Estimated CAM Ste 350 | 18,040.00 | | 142,308.14 |
| 12/01/2022 | Rent Ste 415 | 34,142.23 | | 176,450.37 |
| 12/01/2022 | Estimated CAM Ste 415 | 22,195.00 | | 198,645.37 |
| 12/01/2022 | Rent Ste 500 | 20,559.65 | | 219,205.02 |
| 12/01/2022 | Estimated CAM Ste 500 | 13,365.00 | | 232,570.02 |

ACH Payment instructions:

| | |
|---|---|
| Bank Name: | WELLS FARGO |
| Bank Address: | PO BOX 63020 |
| | SAN FRANCISCO, CA 94163 |
| Bank ABA/Routing#: | 121000248 |
| Beneficiary Account #: | ▬▬▬▬ |
| Beneficiary Account Name: | Altera Highland LLC |

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0662**

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Tuesday, November 22, 2022 9:44 AM |
| **To:** | Frank Murphy |
| **Subject:** | FW: 12.2022 Tenant Statement - Wilson - Sherman Grayson Consolidated |

Approval.

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Tuesday, November 22, 2022 9:31 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: 12.2022 Tenant Statement - Wilson - Sherman Grayson Consolidated

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Tuesday, November 22, 2022 9:06:34 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 12.2022 Tenant Statement - Wilson - Sherman Grayson Consolidated

Steve,
Please approve the Altera rent payment due on 12/1 for $232,570.02.

Thanks,
Glynda

**From:** Jayson DeSimone <jcd@aurumpropertypartners.com>
**Sent:** Tuesday, November 22, 2022 8:49 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; jenny.penland@wnj.org
**Subject:** 12.2022 Tenant Statement - Wilson - Sherman Grayson Consolidated

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

Please see the attached Consolidated Sherman Grayson Tenant Statement for 12.2022.

Thank you,

1

**A0663**

*"We've expanded, please note our new suite number"*



**Jayson DeSimone**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 561.542.6138

aurumpropertypartners.com    jcd@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

2

**A0664**

# EXHIBIT 25

Bank of America

# NON REPETITIVE WIRE FORM

DATE        02/01/2023

Account
Number      ███████████

State

Amount      232,570.02

Description      Altera Highland - Lease Payment

Wiring Instructions:
Bank Name      Wells Fargo

ABA #      121000248

Account #      ████████

Description      Sherman/Grayson Health System - Lease Payment

Beneficiary      Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0666**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**
    Sherman/Grayson Health System
    300 N Highland Avenue
    Sherman, TX 75092

**Date:** 01/19/2023
**Total Due:** 232,570.02

| Date | Description | Charges | Payments | Balance |
|------|-------------|--------:|---------:|--------:|
| 02/01/2023 | Rent Ste 100A | 20,182.42 | | 20,182.42 |
| 02/01/2023 | Estimated CAM Ste 100A | 12,174.00 | | 32,356.42 |
| 02/01/2023 | Rent Ste 200 | 47,591.37 | | 79,947.79 |
| 02/01/2023 | Estimated CAM Ste 200 | 16,569.00 | | 96,516.79 |
| 02/01/2023 | Rent Ste 350 | 27,751.35 | | 124,268.14 |
| 02/01/2023 | Estimated CAM Ste 350 | 18,040.00 | | 142,308.14 |
| 02/01/2023 | Rent Ste 415 | 34,142.23 | | 176,450.37 |
| 02/01/2023 | Estimated CAM Ste 415 | 22,195.00 | | 198,645.37 |
| 02/01/2023 | Rent Ste 500 | 20,559.65 | | 219,205.02 |
| 02/01/2023 | Estimated CAM Ste 500 | 13,365.00 | | 232,570.02 |

ACH Payment instructions:

| | |
|---|---|
| Bank Name: | WELLS FARGO |
| Bank Address: | PO BOX 63020 |
| | SAN FRANCISCO, CA 94163 |
| Bank ABA/Routing#: | 121000248 |
| Beneficiary Account #: | ███████ |
| Beneficiary Account Name: | Altera Highland LLC |

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0667**

**Frank Murphy**

**From:** Glynda Mcdaniel
**Sent:** Thursday, January 19, 2023 3:21 PM
**To:** Frank Murphy
**Subject:** FW: 02.2023 Tenant Statement - Wilson - Sherman Grayson Consolidated

Thanks.

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Thursday, January 19, 2023 2:44 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: 02.2023 Tenant Statement - Wilson - Sherman Grayson Consolidated

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Thursday, January 19, 2023 2:40:19 PM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 02.2023 Tenant Statement - Wilson - Sherman Grayson Consolidated

Hi Steve,
Please approve the invoice for Feb ($232,570.02).

Thanks,
Glynda

**From:** Jayson DeSimone <jcd@aurumpropertypartners.com>
**Sent:** Thursday, January 19, 2023 2:29 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; jenny.penland@wnj.org
**Subject:** 02.2023 Tenant Statement - Wilson - Sherman Grayson Consolidated

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

Please see the attached Consolidated Sherman Grayson Tenant Statement for 02.2023.

Thank you,

1

**A0668**

LHP_0000132

*"We've expanded, please note our new suite number"*



**Jayson DeSimone**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 561.542.6138

aurumpropertypartners.com    jcd@aurumpropertypartners.com

West Palm Beach, FL │ Middletown, NJ

2

**A0669**

LHP_0000133

# EXHIBIT 26

Bank of America

# NON REPETITIVE WIRE FORM

DATE            01/03/2023

Account
Number          ███████████

State

Amount          232,570.02

Description     Altera Highland - Lease Payment

Wiring Instructions:
Bank Name       Wells Fargo

ABA #           121000248

Account #       █████████

Description     Sherman/Grayson Health System - Lease Payment

Beneficiary     Altera Highland LLC

Bene Address    _____

Bene City/ST    _____

Bene Zip        _____

Sequence Number _____

Approved By:    _____

2nd Approval:   _____

**A0671**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**
    Sherman/Grayson Health System
    300 N Highland Avenue
    Sherman, TX 75092

| | |
|---|---|
| **Date:** | 12/22/2022 |
| **Total Due:** | 232,570.02 |

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| 01/01/2023 | Rent Ste 100A | 20,182.42 | | 20,182.42 |
| 01/01/2023 | Estimated CAM Ste 100A | 12,174.00 | | 32,356.42 |
| 01/01/2023 | Rent Ste 200 | 47,591.37 | | 79,947.79 |
| 01/01/2023 | Estimated CAM Ste 200 | 16,569.00 | | 96,516.79 |
| 01/01/2023 | Rent Ste 350 | 27,751.35 | | 124,268.14 |
| 01/01/2023 | Estimated CAM Ste 350 | 18,040.00 | | 142,308.14 |
| 01/01/2023 | Rent Ste 415 | 34,142.23 | | 176,450.37 |
| 01/01/2023 | Estimated CAM Ste 415 | 22,195.00 | | 198,645.37 |
| 01/01/2023 | Rent Ste 500 | 20,559.65 | | 219,205.02 |
| 01/01/2023 | Estimated CAM Ste 500 | 13,365.00 | | 232,570.02 |

ACH Payment instructions:

| | |
|---|---|
| Bank Name: | WELLS FARGO |
| Bank Address: | PO BOX 63020 |
| | SAN FRANCISCO, CA 94163 |
| Bank ABA/Routing#: | 121000248 |
| Beneficiary Account #: | ▮▮▮▮▮▮ |
| Beneficiary Account Name: | Altera Highland LLC |

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0672**

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Thursday, December 29, 2022 8:39 AM |
| **To:** | Frank Murphy |
| **Subject:** | FW: 01.2023 Tenant Statement - Wilson - Sherman Grayson Consolidated |

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Thursday, December 29, 2022 8:23 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Re: 01.2023 Tenant Statement - Wilson - Sherman Grayson Consolidated

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Thursday, December 29, 2022 8:10:43 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: 01.2023 Tenant Statement - Wilson - Sherman Grayson Consolidated

Good morning Steve,
Please approve the Altera lease payment for January ($232,570.02). We will pay on Jan 3rd, 2023.

Thanks,
Glynda

**From:** Jayson DeSimone <jcd@aurumpropertypartners.com>
**Sent:** Thursday, December 29, 2022 8:06 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; jenny.penland@wnj.org
**Subject:** 01.2023 Tenant Statement - Wilson - Sherman Grayson Consolidated

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Hello,

Please see the attached Consolidated Sherman Grayson Tenant Statement for 01.2023.

Thank you,

1

**A0673**

*"We've expanded, please note our new suite number"*



**Jayson DeSimone**
Senior Property Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 561.542.6138

aurumpropertypartners.com    jcd@aurumpropertypartners.com

West Palm Beach, FL │ Middletown, NJ

2

**A0674**

# EXHIBIT 27

Bank of America

# NON REPETITIVE WIRE FORM

DATE      03/06/2023

Account
Number      ██████████████

State

Amount      232,570.02

Description      Altera Highland - Lease Payment

Wiring Instructions:

Bank Name      Wells Fargo

ABA #      121000248

Account #      ██████████

Description      Sherman/Grayson Health System - Lease Payment

Beneficiary      Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0676**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**
    Sherman/Grayson Health System
    300 N Highland Avenue
    Sherman, TX 75092

**Date:** 02/19/2023
**Total Due:** 232,570.02

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 03/01/2023 | Rent Ste 100A | 20,182.42 | | 20,182.42 |
| 03/01/2023 | Estimated CAM Ste 100A | 12,174.00 | | 32,356.42 |
| 03/01/2023 | Rent Ste 200 | 47,591.37 | | 79,947.79 |
| 03/01/2023 | Estimated CAM Ste 200 | 16,569.00 | | 96,516.79 |
| 03/01/2023 | Rent Ste 350 | 27,751.35 | | 124,268.14 |
| 03/01/2023 | Estimated CAM Ste 350 | 18,040.00 | | 142,308.14 |
| 03/01/2023 | Rent Ste 415 | 34,142.23 | | 176,450.37 |
| 03/01/2023 | Estimated CAM Ste 415 | 22,195.00 | | 198,645.37 |
| 03/01/2023 | Rent Ste 500 | 20,559.65 | | 219,205.02 |
| 03/01/2023 | Estimated CAM Ste 500 | 13,365.00 | | 232,570.02 |

ACH Payment instructions:

Bank Name:    WELLS FARGO
Bank Address:    PO BOX 63020
    SAN FRANCISCO, CA 94163
Bank ABA/Routing#:  121000248
Beneficiary Account #:  ██████
Beneficiary Account Name:  Altera Highland LLC

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

A0677

LHP_0000139

**Frank Murphy**

| | |
|---|---|
| **From:** | Glynda Mcdaniel |
| **Sent:** | Friday, March 3, 2023 12:55 PM |
| **To:** | Frank Murphy |
| **Subject:** | FW: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue |

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Friday, March 3, 2023 12:54 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** RE: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

Approved.

Steve Hinkle
VP and Chief Compliance Officer
p 615.296.3378 c 615.268.3822
www.ardenthealth.com



**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Friday, March 3, 2023 12:41 PM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Subject:** FW: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

Steve,
We got it. Please approve the attached invoice for March ($232,570.02) and we will pay on Monday.

Thanks,
Glynda

**From:** Stacy Malkasian <smm@aurumpropertypartners.com>
**Sent:** Friday, March 3, 2023 11:54 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>; Jennifer Penland <jenny.penland@wnj.org>
**Subject:** Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Dear Physician and Fellow Tenant:

1

**A0678**

I have attached a copy of your monthly statement for your location at 300 N Highland Ave in Sherman, Texas.

If you have any questions please let me know.

Thank you,



**Stacy Malkasian**
Senior Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 561.389.8671
aurumpropertypartners.com        smm@aurumpropertypartners.com
West Palm Beach, FL | Middletown, NJ

2

**A0679**

# EXHIBIT 28

Bank of America

# NON REPETITIVE WIRE FORM

DATE        04/03/2023

Account
Number     ███████████

State

Amount      235,956.70

Description    Altera Highland - Lease Payment

Wiring Instructions:

Bank Name    Wells Fargo

ABA #        121000248

Account #     ████████

Description    Sherman/Grayson Health System - Lease Payment

Beneficiary    Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0681**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**
Sherman/Grayson Health System
300 N Highland Avenue
Sherman, TX 75092

| | |
|---|---|
| **Date:** | 03/19/2023 |
| **Total Due:** | 235,956.70 |

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 04/01/2023 | Rent Ste 100A | 20,182.42 | | 20,182.42 |
| 04/01/2023 | Estimated CAM Ste 100A | 12,675.17 | | 32,857.59 |
| 04/01/2023 | Rent Ste 200 | 47,591.37 | | 80,448.96 |
| 04/01/2023 | Estimated CAM Ste 200 | 17,250.16 | | 97,699.12 |
| 04/01/2023 | Rent Ste 350 | 27,751.35 | | 125,450.47 |
| 04/01/2023 | Estimated CAM Ste 350 | 18,782.11 | | 144,232.58 |
| 04/01/2023 | Rent Ste 415 | 34,142.23 | | 178,374.81 |
| 04/01/2023 | Estimated CAM Ste 415 | 23,107.46 | | 201,482.27 |
| 04/01/2023 | Rent Ste 500 | 20,559.65 | | 222,041.92 |
| 04/01/2023 | Estimated CAM Ste 500 | 13,914.78 | | 235,956.70 |

ACH Payment instructions:

| | |
|---|---|
| Bank Name: | WELLS FARGO |
| Bank Address: | PO BOX 63020 |
| | SAN FRANCISCO, CA 94163 |
| Bank ABA/Routing#: | 121000248 |
| Beneficiary Account #: | ▬▬▬▬▬ |
| Beneficiary Account Name: | Altera Highland LLC |

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0682**

**Frank Murphy**

| | |
|---|---|
| **From:** | Steve Hinkle |
| **Sent:** | Thursday, March 23, 2023 3:20 PM |
| **To:** | Glynda Mcdaniel |
| **Cc:** | Frank Murphy |
| **Subject:** | Re: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue |

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Thursday, March 23, 2023 4:06:50 PM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Cc:** Frank Murphy <Frank.Murphy@ardenthealth.com>
**Subject:** FW: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

Steve,
Please approve the April 1st rent payment of $235,956.70 for Altera. It does include the updated CAM rates.

Thanks,
Glynda

**From:** Stacy Malkasian <smm@aurumpropertypartners.com>
**Sent:** Thursday, March 23, 2023 1:36 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Dear Physician and Fellow Tenant:

I have attached a copy of your monthly statement for your location at 300 N Highland Ave in Sherman, Texas.

If you have any questions please let me know.

Thank you,

LHP_0000144



**Stacy Malkasian**
Senior Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 561.389.8671
aurumpropertypartners.com    smm@aurumpropertypartners.com
West Palm Beach, FL | Middletown, NJ

**A0684**

LHP_0000145

# EXHIBIT 29

Bank of America

# NON REPETITIVE WIRE FORM

DATE              05/01/2023

Account
Number            ███████████

State

Amount            246,116.70

Description       Altera Highland - Lease Payment

Wiring Instructions:
Bank Name         Wells Fargo

ABA #             121000248

Account #         ████████

Description       Sherman/Grayson Health System - Lease Payment

Beneficiary       Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0686**

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**
    Sherman/Grayson Health System
    300 N Highland Avenue
    Sherman, TX 75092

**Date:** 04/19/2023
**Total Due:** 235,956.70

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 05/01/2023 | Rent Ste 100A | 20,182.42 | | 20,182.42 |
| 05/01/2023 | Estimated CAM Ste 100A | 12,675.17 | | 32,857.59 |
| 05/01/2023 | Rent Ste 200 | 47,591.37 | | 80,448.96 |
| 05/01/2023 | Estimated CAM Ste 200 | 17,250.16 | | 97,699.12 |
| 05/01/2023 | Rent Ste 350 | 27,751.35 | | 125,450.47 |
| 05/01/2023 | Estimated CAM Ste 350 | 18,782.11 | | 144,232.58 |
| 05/01/2023 | Rent Ste 415 | 34,142.23 | | 178,374.81 |
| 05/01/2023 | Estimated CAM Ste 415 | 23,107.46 | | 201,482.27 |
| 05/01/2023 | Rent Ste 500 | 20,559.65 | | 222,041.92 |
| 05/01/2023 | Estimated CAM Ste 500 | 13,914.78 | | 235,956.70 |

ACH Payment instructions:

Bank Name:      WELLS FARGO
Bank Address:      PO BOX 63020
                 SAN FRANCISCO, CA 94163
Bank ABA/Routing#:      121000248
Beneficiary Account #:      ████████
Beneficiary Account Name:      Altera Highland LLC

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0687**



**AURUM**
PROPERTY PARTNERS

March 21, 2023

Sherman/Grayson
300 N Highland Avenue
Units 100A, 200, 350, 415, 500
Sherman, TX 75092

**RE:   2023 Estimated Common Area Costs**
      Wilson Jones MOB, 300 N Highland Avenue, Sherman, TX 75092

Dear Sherman/Grayson

We have completed the 2023 budget for Wilson Jones MOB and have attached a copy for your review. The new estimated CAM rate for your suite is **$85,729.68**/month. This new amount is effective January 1, 2023, and is due on the 1st of the month, each month, for the remainder of the year.

We have also reconciled the estimated CAM, which was previously billed, to this new rate and have either processed an additional billing or issued a credit to the account. We have attached an invoice with the details.

Here is a summary:

**CAM**

|                          | Jan-23    | Feb-23    | Mar-23    | Total       |
|--------------------------|-----------|-----------|-----------|-------------|
| Previously Billed        | 82,343.00 | 82,343.00 | 82,343.00 | 247,029.00  |
| New Rate                 | 85,729.68 | 85,729.68 | 85,729.68 | 257,189.04  |
| **Remaining Balance Due** | **3,386.68** | **3,386.68** | **3,386.68** | **10,160.04** |

If you have any questions, please contact us.

Sincerely,

*Property Management Team*

Aurum Property Partners
As representative for FMC Medical Mall

Investments | Operations | Consulting | Brokerage
319 Clematis Street, Suite 608 | West Palm Beach, Florida 33401
p: 561.293.3070 | f: 561.855.3484
aurumpropertypartners.com
A0688

LHP_0000148

# INVOICE

Altera Highland, LLC
PO Box 206147
Attn: Lockbox
Dallas, TX 75320
(561) 293-3070



**AURUM**
PROPERTY PARTNERS

| | |
|---|---|
| **Prepared For** | **Property:** |
| Sherman/Grayson - Hosp Occupied Common Areas | Wilson Jones MOB |
| 300 N Highland Avenue | 300 N Highland Avenue |
| Unit 100A | Sherman, TX 75092 |
| Sherman, TX 75092 | |

| | |
|---|---|
| **Invoice Date** | 03/01/2023 |
| **Invoice No.** | 28838 |
| **Unit** | 100A |

**Billing Information:**

| Description | Amount |
|---|---:|
| Revised Estimated CAM (01/2023) | 12,675.17 |
| Revised Estimated CAM (02/2023) | 12,675.17 |
| Revised Estimated CAM (03/2023) | 12,675.17 |
| Reverse Estimated CAM (01/2023) | -12,174.00 |
| Reverse Estimated CAM (02/2023) | -12,174.00 |
| Reverse Estimated CAM (03/2023) | -12,174.00 |
| **Grand Total** | 1,503.51 |

| Notes |
|---|
| |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## Remittance Advice

(please detach and return)

| Tenant Information | | Invoice Information | |
|---|---|---|---|
| **Name:** | Sherman/Grayson - Hosp Occupied Common Areas | **Unit** | 100A |
| **Address:** | 300 N Highland Avenue Unit 100A | **Payment Date** | |
| **City/State/Zip** | Sherman, TX 75092 | **Payment Amount** | |

**Thank you for your prompt payment**

A0689

# INVOICE

Altera Highland, LLC
PO Box 206147
Attn: Lockbox
Dallas, TX 75320
(561) 293-3070



**AURUM**
PROPERTY PARTNERS

**Prepared For**
Sherman/Grayson- ASC Kitty Richardson
300 N Highland Avenue
Unit 200
Sherman, TX 75092

**Property:**
Wilson Jones MOB
300 N Highland Avenue
Sherman, TX 75092

| | |
|---|---|
| **Invoice Date** | 03/01/2023 |
| **Invoice No.** | 28787 |
| **Unit** | 200 |

**Billing Information:**

| Description | Amount |
|---|---:|
| Revised Estimated CAM (01/2023) | 17,250.16 |
| Revised Estimated CAM (02/2023) | 17,250.16 |
| Revised Estimated CAM (03/2023) | 17,250.16 |
| Reverse Estimated CAM (01/2023) | -16,569.00 |
| Reverse Estimated CAM (02/2023) | -16,569.00 |
| Reverse Estimated CAM (03/2023) | -16,569.00 |
| **Grand Total** | 2,043.48 |

| Notes |
|---|
| |

------------------------------------------------------------------------------------------

## Remittance Advice

(please detach and return)

| Tenant Information | | Invoice Information | |
|---|---|---|---|
| **Name:** | Sherman/Grayson- ASC Kitty Richardson | **Unit** | 200 |
| **Address:** | 300 N Highland Avenue Unit 200 | **Payment Date** | |
| **City/State/Zip** | Sherman, TX 75092 | **Payment Amount** | |

**Thank you for your prompt payment**

A0690

# INVOICE

Altera Highland, LLC
PO Box 206147
Attn: Lockbox
Dallas, TX 75320
(561) 293-3070



**Prepared For**
Sherman/Grayson- Shell Kitty Richardson
300 N Highland Avenue
Unit 350
Sherman, TX 75092

**Property:**
Wilson Jones MOB
300 N Highland Avenue
Sherman, TX 75092

| | |
|---|---|
| **Invoice Date** | 03/01/2023 |
| **Invoice No.** | 28796 |
| **Unit** | 350 |

**Billing Information:**

| Description | Amount |
|---|---:|
| Revised Estimated CAM (01/2023) | 18,782.11 |
| Revised Estimated CAM (02/2023) | 18,782.11 |
| Revised Estimated CAM (03/2023) | 18,782.11 |
| Reverse Estimated CAM (01/2023) | -18,040.00 |
| Reverse Estimated CAM (02/2023) | -18,040.00 |
| Reverse Estimated CAM (03/2023) | -18,040.00 |
| **Grand Total** | 2,226.33 |

| Notes |
|---|
| |

-------------------------------------------------------------------------------

## Remittance Advice

<span style="float:right">(please detach and return)</span>

| Tenant Information | | Invoice Information | |
|---|---|---|---|
| **Name:** | Sherman/Grayson- Shell Kitty Richardson | **Unit** | 350 |
| **Address:** | 300 N Highland Avenue Unit 350 | **Payment Date** | |
| **City/State/Zip** | Sherman, TX 75092 | **Payment Amount** | |

**Thank you for your prompt payment**

A0691

# INVOICE

Altera Highland, LLC
PO Box 206147
Attn: Lockbox
Dallas, TX 75320
(561) 293-3070



**Prepared For**

Sherman/Grayson- Phys Suites Kitty Richardson
300 N Highland Avenue
Unit 415
Sherman, TX 75092

**Property:**

Wilson Jones MOB
300 N Highland Avenue
Sherman, TX 75092

| Invoice Date | 03/01/2023 |
|---|---|
| Invoice No. | 28808 |
| Unit | 415 |

**Billing Information:**

| Description | Amount |
|---|---|
| Revised Estimated CAM (01/2023) | 23,107.46 |
| Revised Estimated CAM (02/2023) | 23,107.46 |
| Revised Estimated CAM (03/2023) | 23,107.46 |
| Reverse Estimated CAM (01/2023) | -22,195.00 |
| Reverse Estimated CAM (02/2023) | -22,195.00 |
| Reverse Estimated CAM (03/2023) | -22,195.00 |
| **Grand Total** | 2,737.38 |

| Notes |
|---|
|  |

---------------------------------------------------------------------------------------

## Remittance Advice

(please detach and return)

| Tenant Information | | Invoice Information | |
|---|---|---|---|
| **Name:** | Sherman/Grayson- Phys Suites Kitty Richardson | **Unit** | 415 |
| **Address:** | 300 N Highland Avenue Unit 415 | **Payment Date** | |
| **City/State/Zip** | Sherman, TX 75092 | **Payment Amount** | |

**Thank you for your prompt payment**

**A0692**

LHP_0000152

# INVOICE

Altera Highland, LLC
PO Box 206147
Attn: Lockbox
Dallas, TX 75320
(561) 293-3070



**AURUM**
PROPERTY PARTNERS

**Prepared For**
Sherman/Grayson- ASC Existing 4 & 5
300 N Highland Avenue
Unit 500
Sherman, TX 75092

**Property:**
Wilson Jones MOB
300 N Highland Avenue
Sherman, TX 75092

| Invoice Date | 03/01/2023 |
|---|---|
| Invoice No. | 28814 |
| Unit | 500 |

**Billing Information:**

| Description | Amount |
|---|---|
| Revised Estimated CAM (01/2023) | 13,914.78 |
| Revised Estimated CAM (02/2023) | 13,914.78 |
| Revised Estimated CAM (03/2023) | 13,914.78 |
| Reverse Estimated CAM (01/2023) | -13,365.00 |
| Reverse Estimated CAM (02/2023) | -13,365.00 |
| Reverse Estimated CAM (03/2023) | -13,365.00 |
| **Grand Total** | 1,649.34 |

| Notes |
|---|
|  |

--------------------------------------------------------------------------------

## Remittance Advice

<span style="float:right">(please detach and return)</span>

| Tenant Information | | Invoice Information | |
|---|---|---|---|
| **Name:** | Sherman/Grayson- ASC Existing 4 & 5 | **Unit** | 500 |
| **Address:** | 300 N Highland Avenue Unit 500 | **Payment Date** | |
| **City/State/Zip** | Sherman, TX 75092 | **Payment Amount** | |

**Thank you for your prompt payment**

A0693

LHP_0000153

**Altera Highland, LLC - Wilson**
**300 N Highland, Sherman, TX**
**2023 Budget**

| Estimated 2023 Operating Expenses | TOTAL |
|---|---|
| **Operating Expenses** | |
| Administrative | **69,600** |
| Repairs & Maintenance | **134,074** |
| Cleaning & Janitorial | **51,954** |
| Elevator | **33,286** |
| HVAC | **38,708** |
| Fire & Life Safety | **13,359** |
| Security | **35,295** |
| Landscaping | **1,200** |
| Utilities | **259,620** |
| Property Management Fees | **160,530** |
| Insurance | **37,800** |
| Real Estate Taxes | **403,974** |
| Ground Rent | **37,680** |
| **Total Operating Expenses** | **1,277,081** |

**A0694**

**Frank Murphy**

| | |
|---|---|
| **From:** | Steve Hinkle |
| **Sent:** | Thursday, April 20, 2023 3:43 PM |
| **To:** | Glynda Mcdaniel |
| **Cc:** | Frank Murphy |
| **Subject:** | Re: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue |

Yes, approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Thursday, April 20, 2023 3:42:56 PM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Cc:** Frank Murphy <Frank.Murphy@ardenthealth.com>
**Subject:** RE: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

So you approve the May 1st invoice of $235,956.70 and the CAM adjustment for Q1 of $10,160.04? I need an email approval so that we can attach to the wire.

Thanks,
Glynda

**From:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Sent:** Thursday, April 20, 2023 3:32 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Cc:** Frank Murphy <Frank.Murphy@ardenthealth.com>
**Subject:** Re: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

As far as I know it's ok.

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Thursday, April 20, 2023 3:27:56 PM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Cc:** Frank Murphy <Frank.Murphy@ardenthealth.com>
**Subject:** FW: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

Hi Steve,
The Altera leas invoice is attached for May 1st ($235,956.70). Please approve.

They have also attached the CAM invoice. Are you good with it or are we still waiting for an adjustment?

1

**A0695**

LHP_0000155

Thanks,
Glynda

**From:** Stacy Malkasian <smm@aurumpropertypartners.com>
**Sent:** Thursday, April 20, 2023 3:00 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Dear Physician and Fellow Tenant:

I have attached a copy of your monthly statement for your location at 300 N Highland Ave in Sherman, Texas.

I have also attached the 2023 CAM estimate invoice for the months of January-March that are outstanding.

If you have any questions please let me know.

Thank you,



**Stacy Malkasian**
Senior Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 561.389.8671
aurumpropertypartners.com      smm@aurumpropertypartners.com
West Palm Beach, FL | Middletown, NJ

2

**A0696**

**Frank Murphy**

| | |
|---|---|
| **From:** | Steve Hinkle |
| **Sent:** | Monday, May 1, 2023 10:00 AM |
| **To:** | Glynda Mcdaniel |
| **Cc:** | Frank Murphy |
| **Subject:** | Re: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue |

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Monday, May 1, 2023 9:47:40 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Cc:** Frank Murphy <Frank.Murphy@ardenthealth.com>
**Subject:** FW: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

Steve,
We received updated CAM information from Sherman Grayson. According to the attached, we owe $246,116.70 (which is rent of $235,956.70 and the CAM adjustment of $10,160.04).

I am not sure if the calculation is correct but I did go back and confirm what we paid in Q1 (it matches their information).

Please approve and we will get them paid today.

Thanks,
Glynda

**From:** Stacy Malkasian <smm@aurumpropertypartners.com>
**Sent:** Thursday, April 20, 2023 3:00 PM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

---

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

---

Dear Physician and Fellow Tenant:

I have attached a copy of your monthly statement for your location at 300 N Highland Ave in Sherman, Texas.

I have also attached the 2023 CAM estimate invoice for the months of January-March that are outstanding.

If you have any questions please let me know.

1

**A0697**

Thank you,



**Stacy Malkasian**
Senior Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 561.389.8671
aurumpropertypartners.com          smm@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

2

**A0698**

# EXHIBIT 30

Bank of America

# NON REPETITIVE WIRE FORM

DATE                06/01/2023

Account
Number              ███████████████

State

Amount              231,892.26

Description         Altera Highland - Lease Payment

Wiring Instructions:
Bank Name           Wells Fargo

ABA #               121000248

Account #           ███████████

Description         Sherman/Grayson Health System - Lease Payment

Beneficiary         Altera Highland LLC

Bene Address

Bene City/ST

Bene Zip

Sequence Number

Approved By:

2nd Approval:

**A0700**

LHP_0000159

# TENANT STATEMENT



Altera Highland, LLC
c/o Aurum Property Partners
319 Clematis Street, Suite 608
West Palm Beach, FL 33401
(561) 293-3070

**Prepared For:**

Sherman/Grayson Health System
300 N Highland Avenue
Sherman, TX 75092

**Date:**        05/22/2023
**Total Due:**   231,892.26

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 06/01/2023 | Rent Ste 100A | 20,182.42 | | 20,182.42 |
| 06/01/2023 | Estimated CAM Ste 100A | 12,074.24 | | 32,256.66 |
| 06/01/2023 | Rent Ste 200 | 47,591.37 | | 79,848.03 |
| 06/01/2023 | Estimated CAM Ste 200 | 16,432.33 | | 96,280.36 |
| 06/01/2023 | Rent Ste 350 | 27,751.35 | | 124,031.71 |
| 06/01/2023 | Estimated CAM Ste 350 | 17,891.65 | | 141,923.36 |
| 06/01/2023 | Rent Ste 415 | 34,142.23 | | 176,065.59 |
| 06/01/2023 | Estimated CAM Ste 415 | 22,011.94 | | 198,077.53 |
| 06/01/2023 | Rent Ste 500 | 20,559.65 | | 218,637.18 |
| 06/01/2023 | Estimated CAM Ste 500 | 13,255.08 | | 231,892.26 |

ACH Payment instructions:

| | |
|---|---|
| Bank Name: | WELLS FARGO |
| Bank Address: | PO BOX 63020 |
| | SAN FRANCISCO, CA 94163 |
| Bank ABA/Routing#: | 121000248 |
| Beneficiary Account #: | ▓▓▓▓▓ |
| Beneficiary Account Name: | Altera Highland LLC |

Notes: Please make check payable to: Altera Highland, LLC, Attn: Lockbox PO Box 206147, Dallas, TX 75320.
For billing questions, please call (561) 293-3070.

**A0701**

LHP_0000160

**Frank Murphy**

| | |
|---|---|
| **From:** | Steve Hinkle |
| **Sent:** | Tuesday, May 30, 2023 8:57 AM |
| **To:** | Glynda Mcdaniel |
| **Cc:** | Frank Murphy |
| **Subject:** | Re: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue |

Approved

Steve Hinkle
VP & Chief Compliance Officer
Ardent Health Services
Outlook for iOS

**From:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Sent:** Tuesday, May 30, 2023 8:54:14 AM
**To:** Steve Hinkle <Steve.Hinkle@ArdentHealth.com>
**Cc:** Frank Murphy <Frank.Murphy@ardenthealth.com>
**Subject:** FW: Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

Good morning Steve,
Please approve the June Altera rent statement for $231,892.26.

Thanks,
Glynda

**From:** Stacy Malkasian <smm@aurumpropertypartners.com>
**Sent:** Monday, May 22, 2023 8:56 AM
**To:** Glynda Mcdaniel <glynda.mcdaniel@ardenthealth.com>
**Subject:** Tenant Statement Sherman Grayson- Wilson Jones 300 N Highland Avenue

**Security Warning - External Message. Please use PhishAlert button to report suspicious messages.**

Dear Physician and Fellow Tenant:

I have attached a copy of your monthly statement for your location at 300 N Highland Ave in Sherman, Texas.

If you have any questions please let me know.

Thank you,

LHP_0000161



**Stacy Malkasian**
Senior Accountant

**Aurum Property Partners**
319 Clematis Street, Suite 608
West Palm Beach, Florida 33401
o: 561.293.3070  c: 561.389.8671

aurumpropertypartners.com        smm@aurumpropertypartners.com

West Palm Beach, FL | Middletown, NJ

**A0703**

LHP_0000162

# EXHIBIT 31

**LHP Payments Altera Highland**
**2/17/22-11/1/23**

| Bates # | Date | Amount | Subtotal |
|---|---|---|---|
| LHP 80-84 | 3/1/2022 | $ 226,526.68 | |
| LHP 85-88 | 4/1/2022 | $ 226,526.68 | |
| LHP 89-92 | 5/2/2022 | $ 226,526.68 | |
| LHP 93-97 | 6/1/2022 | $ 225,416.35 | |
| LHP 98-101 | 7/1/2022 | $ 225,416.35 | |
| LHP 118-125 | 8/1/2022 | $ 236,107.08 | |
| LHP 102-108 | 9/1/2022 | $ 232,570.02 | |
| LHP 109-113 | 10/3/2022 | $ 232,570.02 | |
| LHP 114-117 | 11/1/2022 | $ 232,570.02 | |
| LHP 126-129 | 12/1/2022 | $ 232,570.02 | |
| LHP 134-137 | 1/3/2023 | $ 232,570.02 | |
| LHP 130-133 | 2/1/2023 | $ 232,570.02 | |
| LHP 138-141 | 3/6/2023 | $ 232,570.02 | |
| LHP 142-145 | 4/3/2023 | $ 235,956.70 | *Subtotal thru* |
| LHP 146-158 | 5/1/2023 | $ 246,116.70 | *petition date:* |
| LHP159-162 | 6/1/2023 | $ 231,892.26 | **$ 3,708,475.62** |
| LHP 163-173 | 7/3/2023 | $ 198,906.46 | |
| LHP 174-177 | 8/1/2023 | $ 231,892.26 | |
| LHP 178-180 | 9/1/2023 | $ 219,081.46 | |
| LHP 181-184 | 10/2/2023 | $ 239,403.62 | |
| LHP 185-188 | 11/1/2023 | $ 239,403.62 | |
| | **Total:** | **$ 4,837,163.04** | |

# EXHIBIT 32

EFiled: Jan 20 2021 02:19PM EST
Transaction ID 66269699
Case No. N21C-01-146 PRW CCLD

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| LHP HOSPITAL GROUP, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. _____(CCLD) |
| ALECTO HEALTHCARE | ) |
| SERVICES LLC AND ALECTO | ) |
| HEALTHCARE SERVICES | ) |
| SHERMAN LLC, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff LHP Hospital Group, Inc. ("LHP"), by and through its undersigned counsel, and as for its Complaint against Defendants Alecto Healthcare Services LLC ("Alecto Parent") and Alecto Healthcare Services Sherman LLC ("Alecto Sherman") (collectively "Defendants"), alleges and states as follows:

## NATURE OF THE ACTION

1.     LHP seeks redress for Defendants' failure to honor their guarantor obligation with respect to lease payments on a medical office building located in Sherman, Texas ("the MOB").

2.     Defendants' affiliate, Sherman/Grayson Hospital LLC ("Sherman Grayson") became the tenant under five leases covering the MOB effective October 31, 2014. Sherman Grayson has defaulted in its obligations under those leases, and

LHP has been forced to pay the delinquent rent and other charges owing to the building's landlord.

3.    Alecto Sherman, however, is contractually obligated under a purchase agreement dated as of September 23, 2014 ("Purchase Agreement") to indemnify and hold LHP harmless for any liabilities related to LHP's guarantees of the MOB leases. Alecto Parent has guaranteed those indemnity obligations pursuant to a guarantee dated as of September 23, 2014 in favor of LHP ("Alecto Parent Guarantee").[1] LHP has made demand upon Defendants to honor their contractual obligations, but they have failed and refused to indemnify and reimburse LHP.

4.    To date, LHP has paid $1,909,831.83 in delinquent rent and other charges owing to the building's landlord. LHP now brings this Complaint to recover damages suffered as a direct and proximate result of Defendants' breaches of the operative agreements.

## PARTIES

5.    LHP is a Delaware corporation formed under the laws of the State of Delaware with its principal place of business located in the State of Tennessee.

6.    Defendant Alecto Healthcare Services LLC is a limited liability company formed under the laws of the State of Delaware, with its principal place of

---

[1] True and correct copies of the Purchase Agreement and Alecto Parent Guarantee are attached as Exhibits 1 and 2, respectively.

business, upon information and belief, located in the State of California. Alecto Parent may be served with process by serving The Corporation Trust Company, its registered agent, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

7.    Defendant Alecto Healthcare Services Sherman LLC is a limited liability company formed under the laws of the State of Delaware, with its principal place of business, upon information and belief, in the State of California. Alecto Sherman may be served with process herein by serving Cogency Global Inc., its registered agent, at 850 New Burton Road, Suite 201, Dover, Delaware 19904.

<u>**JURSIDCTION AND VENUE**</u>

8.    This Court has personal jurisdiction over Alecto Parent and Alecto Sherman because they are limited liability companies organized under the laws of the State of Delaware.

9.    Pursuant to Section 12.13 of the Purchase Agreement, Alecto Sherman voluntarily submitted to the exclusive jurisdiction of the courts of the State of Delaware for disputes arising thereunder. Ex. 1 at Section 12.13. Pursuant to Section 8 of the Alecto Parent Guarantee, Alecto Parent submitted to the exclusive jurisdiction of the courts of the State of Delaware for disputes arising thereunder. Ex. 2 at Section 8.

10.     This Court has jurisdiction over this dispute pursuant to Article IV, Section 7 of the State of Delaware Constitution and 10 *Del. C.* § 541.

11.     Assignment to this Court's Complex Commercial Litigation Division is appropriate because the amount in controversy exceeds $1 million.

## **FACTUAL BACKGROUND**

12.     Altera Highland, LLC ("Altera"), as landlord, and Sherman/Grayson Health System, LLC ("Sherman Grayson System"), as tenant, entered into five (5) lease agreements dated August 21, 2012 relating to: (1) existing, vacant, and shell space of the MOB; (2) the common areas of the MOB occupied by or used by Wilson N. Jones Regional Medical Center f/k/a Texas Health Presbyterian Hospital—WNJ (the "Hospital"); and (3) the ambulatory surgery center located in the MOB. These lease agreements are subtitled Master Lease—Existing Space ("Existing Space Lease"), Existing Physician Suites ("Existing Physician Suite Lease"), Master Lease—Shell Space ("Shell Lease"), Hospital—Occupied Common Areas, ("OCC Lease"), and Ambulatory Surgery Center ("ASC Lease") and are collectively referred to herein as the "Lease Agreements." True and correct copies of the Lease Agreements are attached as Exhibits 3-7 and are incorporated herein by reference.

13.     By the terms of the Lease Agreements, Altera leased to Sherman Grayson System the "Leased Premises," including (1) existing, vacant, and shell space of the MOB; (2) the common areas of the MOB occupied by or used by the

4

Hospital; and (3) the ambulatory surgery center located in the MOB. The Leased Premises also specifically includes Suites 100A, 100B, 100C, 100D, 100E, 130, 200, 210, 310, 315, 330, 340, 350, 400, 410, 415, 430, 445, 500, 510, and 545 in the MOB. The physical address of the Leased Premises is 300 N. Highland Drive, Sherman, Texas.

14.    As an inducement for Altera to enter into the Lease Agreements, LHP executed five separate guarantees in favor of Altera, true and correct copies of which are attached as Exhibits 8-12 and incorporated herein by reference (the "LHP Guarantees"). Under the terms of the LHP Guarantees, LHP guaranteed to Altera "the full prompt and timely payment …of all amounts to be paid…by Tenant" under the Lease Agreements.

15.    Sherman Grayson System, as assignor, and Sherman Grayson, as assignee, subsequently executed an Assignment and Assumption of Leases dated October 31, 2014 ("Assignment"), a true and correct copy of which is attached as Exhibit 13 and incorporated herein by reference. Pursuant to the Assignment, Sherman Grayson System assigned its interest as tenant under each of the Lease Agreements to Sherman Grayson. Altera, as landlord, consented to the Assignment and executed (along with Sherman Grayson System and Sherman Grayson) a Consent Agreement dated October 31, 2014 ("Consent Agreement"), a true and correct copy of which is attached as Exhibit 14 and incorporated herein by reference.

Under the terms of the Consent Agreement, LHP agreed that its obligations under the LHP Guarantees applied to Sherman Grayson's obligations under the Lease Agreements. Sherman Grayson occupied the Leased Premises as the tenant from October 31, 2014 through October 31, 2020.

16.    As part of the transaction underlying the execution of the Consent Agreement, Alecto Sherman executed the Purchase Agreement dated as of September 23, 2014. Under Section 6.9 of the Purchase Agreement, Alecto Sherman agreed that it would use its "commercially reasonable efforts to cause…LHP to be fully and finally released from any obligations under the …[Lease Agreements]." Alecto Sherman further agreed in Section 9.3 of the Purchase Agreement that it would "indemnify and hold harmless…[LHP]…from and against any Damages actually incurred by [LHP] as a result of…any breach of the covenants or agreements made herein by [Alecto Sherman]…and…any liabilities related to the MOB in respect of…LHP's guarantees of the …[Lease Agreements]." Ex. 1.

17.    Finally, Alecto Parent, as part of the transaction underlying the execution of the Consent Agreement, executed the Alecto Parent Guarantee dated as of September 23, 2014 in favor of LHP. Under the terms of the Alecto Parent Guarantee, Alecto Parent agreed that it would guarantee to LHP "the due and punctual payment, performance, and discharge…of each and every of [Alecto Sherman's] obligations under the Purchase Agreement" which includes "attorney

6

fees and costs, which [LHP] shall incur in enforcing or preserving any rights under th[e] Guarantee." Ex. 2 at Section 1.

18.    The terms of the Lease Agreements require Sherman Grayson to pay Base Rent (as defined in the Lease Agreements) to Altera in monthly installments in the amounts of: (1) $12.05 per RSF[2] (subject to adjustments as provided in Sections 3.1 and 15.6) with respect to the portion of the Leased Premises covered by the Existing Space Lease; (2) $12.05 per RSF (subject to adjustments as provided in Section 3.1) with respect to the portion of the Leased Premises covered by the Existing Physician Suite Lease; (3) $12.05 per RSF (subject to adjustments as provided in Sections 3.1 and 15.6) with respect to the portion of the Leased Premises covered by the Shell Lease; (4) $12.05 per RSF (subject to adjustments as provided in Section 3.1) with respect to the portion of the Leased Premises covered by the OCC Lease; and (5) $22.55 per RSF (subject to adjustments as provided in Section 3.1) with respect to the portion of the Leased Premises covered by the ASC Lease.

19.    Section 3.2(1) of the Lease Agreements further requires Sherman Grayson to pay Altera a Pro Rata Share of Operating Expenses (as defined in the Lease Agreements) on a monthly basis at the same time as the Base Rent. Exs. 3-7.

---

[2] As defined by the Lease Agreements, RSF "means the rentable square feet in the Premises, Building or other area in question, as determined by an architect using ANSI/BOMA Standards."

7

A0713

20.    Section 3.4 of the Lease Agreements further provides that if Altera does not receive Base Rent or the Pro Rata Share of Operating Expenses on or before the 5th day of the calendar month when the payments are due, Sherman Grayson must pay a Late Charge (as defined in the Lease Agreements) of $100 plus interest on all unpaid amounts to accrue at a rate of six percent (6%) per annum from the first day payment is due.  Exs. 3-7.

21.    Upon information and belief, Sherman Grayson did not pay Altera the full monthly payment of Base Rent for May 1, 2020 ($132,291.59 past due and payable), the full monthly Pro Rata Share of Operating Expenses for May 1, 2020 ($71,917.93 past due and payable), or the full amount of Late Charges for April and May 2020 ($3,097.53 past due and payable). A true and correct copy of a letter from Altera to Sherman Grayson dated May 14, 2020 demanding payment is attached as Exhibit 15 and is incorporated herein by reference.

22.    Upon information and belief, Sherman Grayson did not pay Altera the full monthly payment of Base Rent, the full monthly Pro Rata Share of Operating Expenses, the full amount of Late Charges, and additional charges due under the Lease Agreements for subsequent months. Sherman Grayson thus defaulted under the terms of the Lease Agreements by failing to timely pay the above obligations. Altera subsequently sued Sherman Grayson in the Texas state courts for possession of the Leased Premises. Upon information and belief, Sherman Grayson has

8

consented to the abandonment of the Leased Premises to Altera and has released possession of the Leased Premises to Altera.

23.    As a result of Sherman Grayson's defaults under the Lease Agreements, Altera made a demand on LHP for the payment of the past due sums due under the Lease Agreements and threatened to sue LHP if such payments were not made. True and correct copies of correspondence from Altera to LHP evidencing such demands are attached as Exhibits 16 and 17 and incorporated herein by reference. After Sherman Grayson continued its defaults under the Lease Agreements, Altera filed suit against Sherman Grayson and LHP in an action styled *Altera Highland, LLC v Sherman/Grayson Hospital, LLC and LHP Hospital Group, Inc.*, Cause No. CV-20-1381 in the 59th Judicial District Court of Grayson County, Texas. Altera dismissed that suit after LHP paid the amounts then due and delinquent under the Lease Agreements.

24.    As a result of Sherman Grayson's defaults under the Lease Agreements and Alecto Sherman's breaches of the Purchase Agreement, LHP has been required to pay Altera the following sums as of January 13, 2021:

| Months Paid | Amount |
| --- | --- |
| May 2020, June 2020, July 2020 | $633,881.96 |
| August 2020, September 2020, October 2020 | $801,415.09 |
| November 2020 | $208,178.26 |
| December 2020 | $208,178.26 |
| January 2021 | $58,178.26 |

9

25.    LHP has made demand on Alecto Sherman and Alecto Parent for reimbursement of and indemnification in connection with such payments to Altera, but Defendants have failed and refused to provide such reimbursement and indemnification. A true and correct copy of LHP's most recent demand to Defendants is attached as Exhibit 18 and incorporated herein by reference.

## COUNT I

## BREACH OF CONTRACT BY ALECTO SHERMAN

26.    LHP incorporates the preceding paragraphs as if fully set forth herein.

27.    The Purchase Agreement is a valid, existing, and enforceable contract between Alecto Sherman and LHP. All conditions precedent to LHP's rights to enforce such contract and to recover thereunder have been fulfilled or have occurred. Alecto Sherman has breached the Purchase Agreement, by, among other things, failing and refusing to use commercially reasonable efforts to cause LHP to be fully and finally released from any obligations under the Lease Agreements and by failing and refusing to indemnify and hold LHP harmless from and against (1) the damages incurred by LHP as a result of the breach of the covenants or agreements made in the Purchase Agreement by Alecto Sherman and (2) liabilities related to the MOB in respect of LHP's guarantees of the Lease Agreements. LHP has been damaged by such breaches in an amount equal to at least $1,909,831.83 as of the date of the filing

of this action and may suffer additional and continuing damages as the result of subsequent breaches of the Purchase Agreement by Alecto Sherman.

## COUNT II

### BREACH OF CONTRACT BY ALECTO PARENT

28.    LHP incorporates the preceding paragraphs as if fully set forth herein.

29.    The Alecto Parent Guarantee is a valid, existing, and enforceable contract between Alecto Parent and LHP. All conditions precedent to LHP's rights to enforce such contract and to recover thereunder have been fulfilled or have occurred. Alecto Parent has breached the Alecto Parent Guarantee, by, among other things, failing and refusing to guarantee and pay to LHP the due and punctual payment, performance, and discharge of Alecto Sherman's obligations under the Purchase Agreement. LHP has been damaged by such breaches in an amount equal to at least $1,909,831.83 as of the date of the filing of this action and may suffer additional and continuing damages as the result of subsequent breaches of the Alecto Parent Guarantee by Alecto Parent.

## COUNT III

### ATTORNEYS' FEES AND EXPENSES

30.    LHP incorporates the preceding paragraphs as if fully set forth herein.

31.    Section 9.3 of the Purchase Agreement provides that Alecto Sherman, as purchaser shall indemnify LHP against "any Damages" resulting from the events

11

identified in Section 9.3(a)-(e). The Purchase Agreement defines "Damages" as "any and all losses, damages, claims, costs, fines, fees, penalties, interest obligations and deficiencies (including, without limitation, reasonable attorney's fees and other expenses of litigation)." Ex. 13 at p. 3.

32.    The Alecto Parent Guarantee provides:

> [Alecto Parent] hereby absolutely, unconditionally and irrevocably guarantees to the Guaranteed Parties [including LHP] the due and punctual payment, performance and discharge of each and every of Purchaser's obligations under the Purchase Agreement (together with any reasonable and documented out-of-pocket fees and expenses, including attorney fees and costs, which the Guaranteed Parties shall incur in enforcing or preserving any rights under this Guarantee if the obligations hereunder are not paid by the Guarantor [Alecto Parent] when due as required herein or if this Guarantee is enforced by suit or through bankruptcy court or other judicial proceedings whatsoever, the "Obligations").

33.    LHP has been required to retain the undersigned counsel to protect and enforce its rights under the agreements. LHP consequently has incurred and will continue to incur reasonable and necessary attorneys' fees, other fees, and costs.

34.    Defendants are liable for such fees and costs under the provisions of the Purchase Agreement, Alecto Parent Guarantee, and applicable law.

**PRAYER FOR RELIEF**

WHEREFORE, LHP respectfully requests that the Court enter an order and judgment for LHP and against Defendants granting the following relief:

12

(1)   Awarding LHP money damages for Alecto Sherman's breaches of the Purchase Agreement in an amount to be determined at trial;

(2)   Awarding LHP money damages for Alecto Parent's breaches of the Alecto Parent Guarantee in an amount to be determined at trial;

(3)   Awarding LHP its costs and expenses incurred in enforcing its indemnification rights, including its attorneys' fees and costs in this litigation; and

(4)   Granting LHP such other further relief as the Court deems just and proper.


                                        POTTER ANDERSON & CORROON LLP

                                        By:  */s/ Peter J. Walsh, Jr.*
OF COUNSEL:                                  Peter J. Walsh, Jr. (No. 2437)
                                             Clarissa R. Chenoweth-Shook (No. 5728)
Benjamin H. Hathaway                         Hercules Plaza, Sixth Floor
RICHARDS RODRIGUEZ &                         1313 North Market Street
SKEITH, LLP                                  P.O. Box 1150
816 Congress Avenue, Suite 1200              Wilmington, DE 19801
Austin, TX 78701                             (302) 984-6000
(512) 391-8256
                                        *Attorneys for Plaintiff LHP Hospital Group,*
Dated: January 20, 2021                 *Inc.*
7003835

13

**A0719**

# EXHIBIT 33

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC., | Case No. 23-10787 (JKS) |
| Debtor.[1] | |

**SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION
PROPOSED BY THE DEBTOR**

You are encouraged to carefully review the full text of this document, including all exhibits and attachments. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**THE DEBTOR IS NOT SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN, HOWEVER IF YOU WISHTO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY JANUARY 24, 2024 AT 4:00 P.M. (EASTERN TIME) ("Plan Objection Deadline").**

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR FEBRUARY 6, 2024 AT 10:00 A.M. IN COURTROOM NO. 6 AT THE U.S. BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 N. MARKET STREET, WILMINGTON, DELAWARE 19801.**

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

16452692/2

**YOUR RIGHTS MAY BE AFFECTED BY THIS PLAN. YOU SHOULD CONSIDER DISCUSSING THIS DOCUMENT WITH AN ATTORNEY.**

Dated: December 19, 2023

**MORRIS JAMES LLP**

/s/ *Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

*Counsel to the Debtor and Debtor in Possession*

16452692/2

# TABLE OF CONTENTS

Page

SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION .........................................1

ARTICLE I - DEFINITIONS ......................................................................................1

ARTICLE II - SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS .....5

ARTICLE III - HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR ..........6

1. Nature of the Debtor's Business. ...........................................................................6

2. History of Business Operations of the Debtor. ......................................................6

3. Filing of the Debtor's Chapter 11 Case. ...............................................................7

4. Legal Structure and Ownership. ...........................................................................8

5. Events Leading to the Filing of the Bankruptcy Case. ........................................8

6. The Debtor's Assets and Liabilities. .....................................................................9

7. Current and Historical Financial Conditions. ....................................................11

8. Significant Events During the Bankruptcy Case. ...............................................11

9. Projected Recovery of Avoidable Transfers Against Insiders ...........................15

ARTICLE IV - THE PLAN ......................................................................................17

1. Unclassified Claims. ............................................................................................18

    a. Administrative Expenses ...............................................................................18

    b. Post-Confirmation Professional Fee Claims .................................................19

    c. Priority Tax Claims. ......................................................................................20

2. Classes of Claims and Equity Interests. ..............................................................20

    a. Classes of Other Priority Claims. ..................................................................20

    b. Class of Priority Non-Tax Claims. .................................................................20

    c. Class of Secured Claims. ...............................................................................21

    d. Class of General Unsecured Claims. .............................................................21

    e. Class of Equity Interest Holders. ...................................................................22

3. Treatment of Claims and Claims Objections. .....................................................22

    a. Allowance of Claims......................................................................................22

    b. Claims Administration Responsibilities ........................................................23

    c. Estimation of Claims. ....................................................................................23

    d. Adjustment to Claims ....................................................................................23

    e. Disallowance of Claims .................................................................................23

      f. Amendments to Claims ........................................................................24

      g. De Minimis Distributions ...................................................................24

      h. No Distributions Pending Allowance ................................................24

      i. Duplicative Claims .............................................................................24

    4. Treatment of Executory Contracts and Unexpired Leases. ...................24

    5. Means for Implementation and Funding of the Plan .............................26

    6. Payments. ...............................................................................................26

      a. Responsibility for Making Payments .................................................26

      b. Disputed Claims. ...............................................................................27

      c. Unclaimed Payments. ........................................................................27

      d. Payment Dates and Locations. ..........................................................27

      e. Undeliverable Distribution Reserve. .................................................28

      f. Tax Requirements. ..............................................................................28

    7. Post-Confirmation Management and Insiders Retained by the Debtor. ..............28

    8. Preservation of Causes of Action. .........................................................29

    9. Tax Consequences of the Plan ..............................................................29

**ARTICLE V - FEASIBILITY OF PLAN** ...........................................................**30**

    1. Ability to Initially Fund Plan .................................................................30

    2. Ability to Make Plan Payments And Operate Without Further Reorganization. ...............30

**ARTICLE VI - LIQUIDATION ANALYSIS** ....................................................**31**

**ARTICLE VII - DISCHARGE, RELEASES AND INJUNCTIONS** ..................**31**

    1. Discharge. ..............................................................................................31

    2. Debtor Releases. ....................................................................................31

    3. Exculpation and Limitation of Liability. ...............................................31

    4. Injunction. ..............................................................................................32

    5. Remedies Upon Default. ........................................................................32

**ARTICLE VIII - GENERAL PROVISIONS** .....................................................**33**

    1. Title to Assets. .......................................................................................33

    2. Binding Effect. .......................................................................................33

    3. Severability. ...........................................................................................33

    4. Retention of Jurisdiction by the Bankruptcy Court. ..............................33

    5. Headings. ...............................................................................................34

    6. Successors and Assigns. ........................................................................34

    7. No Fourteen Day Stay. ..........................................................................34

16452692/2

ii

**A0724**

8. Incorporation of Agreements Entered Into by the Debtor. ....................................34

9. Modification of Plan. ........................................................................................34

10. Reservation of Rights. .......................................................................................35

11. Filing of Notice of Substantial Consummation ...................................................35

12. Post-Effective Date Service List .......................................................................35

13. Changes in Rates Not Subject to Regulatory Commission Approval. ................35

14. Final Decree. .....................................................................................................35

**ARTICLE IX - CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE............36**

1. Conditions Precedent to Confirmation. ..............................................................36

2. Conditions Precedent to the Effective Date. .......................................................36

3. Waiver of Conditions. ........................................................................................37

4. Effect of Failure of Conditions. .........................................................................37

5. Filing of Notice of the Effective Date. ...............................................................37

**ARTICLE X - EXHIBITS ..........................................................................................37**

1. Rules of Interpretation. ......................................................................................37

2. Computation of Time. ........................................................................................38

3. Governing Law. .................................................................................................38

4. Reference to Monetary Figures. .........................................................................39

5. Controlling Document. .......................................................................................39

iii

## ARTICLE I - DEFINITIONS

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in the Plan. The definitions that follow that are found in the Bankruptcy Code are for convenience of reference only, and are superseded by the definitions found in the Bankruptcy Code.

1. **Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Bankruptcy Code and allowed under § 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent owed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

2. **Administrative Tax Claim**: Any tax incurred pursuant to § 503(b)(1)(B) of the Code.

3. **Allowed:** With respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a proof of claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court; provided that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Equity Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. "Allow" and "Allowing" shall have correlative meanings.

4. **Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the

1

Confirmation Date.

5.  **Allowed Secured Claim**: Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.

6.  **Avoidance Actions**: Any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtor, the Estate, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

7.  **Bankruptcy Code**: The Bankruptcy Reform Act of 1978, as amendedand codified as Title 11 of the United States Code.

8.  **Bankruptcy Court**: The United States Bankruptcy Court for the District of Delaware.

9.  **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

10. **Bar Date:** August 15, 2023, the date by which Proofs of Claim are required to be filed by Creditors.

11. **Business Day**: Any day of the year, other than a Saturday or Sunday, on which national banking institutions in Wilmington, Delaware are open to the public for conducting business and are not required or authorized by Law to close.

12. **Cash**: Cash, cash equivalents and other readily marketable securities orinstruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issuedby banks and commercial paper of any entity, including interest accrued or earned thereon.

13. **Causes of Action**: All Claims, actions, causes of action, choses in action, Avoidance Actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims of the Debtor and/or the Estate that are or may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date against any entity, based in law or equity, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date with respect to matters arising on or before the Effective Date. For the avoidance of doubt, Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (d)

2

any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

14. **Chapter 11 Case**: This case under chapter 11 of the Bankruptcy Code in which Alecto Healthcare Services LLC is the debtor in possession, Case No. 23-10787.

15. **Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

16. **Claims Objection Bar Date:** The last day for objecting to a Claim, which shall be the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed or extended by the Court, the Debtor or the Reorganized Debtor, or by an order of the Bankruptcy Court for objecting to Claims.

17. **Claims Register**: The register of Claims maintained by the Bankruptcy Court.

18. **Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

19. **Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

20. **Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be theentry of the Final Order vacating such stay or the date on which such stay expires and is nolonger in effect.

21. **Confirmation Hearing**: The hearing to be held on November 15, 2023 at 11:00 a.m. (ET) to consider confirmation of the Plan.

22. **Confirmation Order**: An order of the Bankruptcy Court or any amendmentthereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

23. **Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

24. **Debtor** and **Debtor-in-Possession**: Alecto Healthcare Services LLC, the debtor in possession in this Chapter 11 Case.

25. **Disputed Claim:** Any claim against the Debtor pursuant to § 502 of the Bankruptcy Code that is not yet Allowed.

3

26. **Distribution**: The property required by the Plan to be distributed to the holders of Allowed Claims.

27. **Effective Date**: The first Business Day following the date upon which (a) the Confirmation Date has occurred, or (b) the Confirmation Order is a Final Order, unless, at the Debtor's option, the Debtor desires the Plan go effective regardless of any pending appeal, so long as no stay pending appeal has been granted.

28. **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

29. **Equity Interest**: An ownership interest in the Debtor.

30. **Estate:** The estate of the Debtor created on the Petition Date by Section 541 of the Bankruptcy Code.

31. **Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

32. **File, Filed** or **Filing**: File, filed, or filing in the Chapter 11 Case with the Bankruptcy Court, including with respect to the filing of a Proof of Claim or proof of Equity Interest.

33. **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

34. **General Unsecured Claim:** any Claim other than: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Secured Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; or (f) an Equity Interest.

35. **Governmental Unit**: As defined by 11 U.S.C. § 101(27), the term "governmental unit" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

36. **Holder**: an Entity holding a Claim or Equity Interest, as applicable.

37. **Other Priority Claim:** Any Claim entitled to priority in payment under Sections 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code.

38. **Petition Date**: June 16, 2023, the date the chapter 11 petition for relief was filed.

39. **Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

4

40. **Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

41. **Professional**: A person or Entity employed pursuant to a Final Order in accordance with Sections 327, 328, or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to and including the Effective Date pursuant to Sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

42. **Professional Fee Claims**: A Claim of a Professional for professional services rendered or costs incurred on or after the Petition Date through the Effective Date.

43. **Proof of Claim**: A proof of Claim Filed in the Chapter 11 Case.

44. **Released Parties:** All of the following, and in each case in its capacity as such: (a) the officers and managers of the Debtor; (b) the Debtor's Professionals, and (d) with respect to each of the foregoing Persons in clauses (a) through (b), such Entities' respective predecessors, successors and assigns, provided, however, that notwithstanding the foregoing, and for the avoidance of doubt, nothing herein shall release any Causes of Action of the Debtor or the Estate against any of the Debtor's representatives that did not serve in such capacity on or after the Petition Date.

45. **Reorganized Debtor**: The Debtor after the Effective Date.

46. **Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets [Docket Nos. 48 and 49].

47. **Secured Creditor**: Any creditor that holds a Claim that is secured by property of the Debtor.

48. **Subchapter v Trustee**: Jami Nimeroff, the Subchapter V trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. § 1183(b), the Plan, or the order confirming the Plan.

49. **United States Trustee Fees**: All fees due under 28 U.S.C. § 1930.

## ARTICLE II - SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

The Plan is a reorganization Plan. The Plan will be funded with available Cash on hand on the Effective Date and the Debtor's projected disposable income generated by the ongoing operations of the Debtor. For a period of three (3) years, the Debtor will contribute (i) its entire projected disposable income, in an aggregate amount of no less than $635,549, (ii) any residual value received by the Debtor on account of the Debtor's direct and indirect subsidiaries including the claim filed in the bankruptcy case of Sherman/Grayson Hospital, LLC, and (iii) the proceeds of any Cause of Action, including any settlement proceeds received on account of such claims. Such amounts will be used to fund Distributions provided under the Plan on an annual basis.

The chart below reflects the proposed treatment of Allowed Claims and Equity Interests

5

under the Plan:

- o Allowed Administrative Claims will be paid on a monthly pro rata basis, until such claims are paid in full or, alternatively, upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.

- o Allowed Priority Tax Claims, if any, will be paid in full on the Effective Date. It is anticipated that that there will be no Priority Tax Claims owed.

- o Allowed Priority Non-Tax Claims, if any, will be paid in full on the Effective Date. It is anticipated that that there will be no Priority Non-Tax Claims owed.

- o Allowed Secured Claims, if any, will be paid in accordance with the existing loan documents or other agreements with the Debtor that existed prior to the Petition Date which govern the payment of Debtor's obligations to the holder of the Allowed Secured Claim. Each holder of an Allowed Secured Claim shall retain its lien on its collateral in the same validity and priority as it held prior to the Petition Date until the Allowed Secured Claim amount has been paid. Alternatively, the Allowed Secured Claim amount shall be paid in full through a sale of the collateral or other means, withouts penalty or premium.

- o Allowed General Unsecured Claims will be paid the Debtor's projected disposable income on a pro rata basis, after payment of all Allowed Administrative Claims, Allowed Priority Tax Claims, if any, Allowed Priority Non-Tax Claims, if any, and Allowed Secured Claims. Pro rata Distributions will be made to Holders of Allowed General Unsecured Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date.

- o Upon entry of the Confirmation Order, all existing Equity Interests in the Debtor shall be retained.

## ARTICLE III - HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1. Nature of the Debtor's Business.

The Debtor was formed in 2012 to serve as a holding company for healthcare-related entities.

In the ordinary course of business, the Debtor's employees provide management services through the Debtor's subsidiaries and are engaged in the winddown of hospitals formerly operated by the Debtor's subsidiaries. The winddown of such hospitals consists of responding to requests for patient records and services provided, completing various regulatory requirements, and assisting in the defense of certain litigation matters. An organizational chart of the Debtor and its subsidiaries is attached hereto as **Exhibit A**.

### 2. History of Business Operations of the Debtor.

Historically, the Debtor formed various subsidiaries for the purposes of (a) acquiring distressed acute care hospitals; (b) operating acute care hospitals; (c) providing management services to acute care hospitals that are not owned by the Debtor or its subsidiaries; and (d) owning and operating businesses affiliated with acute care hospitals operated by the Debtor's subsidiaries.

6

16452692/2

At its peak, the Debtor's subsidiaries operated five (5) acute care hospitals across the country, the Debtor provided management services to an acute care hospital owned by an unrelated third-party, and  one of the Debtor's subsidiaries provided management services to an acute care hospital owned by an unrelated third-party.

As of the Petition Date, the Debtor had an ownership interest in two operating subsidiaries, Sherman/Grayson Hospital, LLC ("Sherman/Grayson") and Alecto Healthcare Services Hayward LLC ("Alecto Hayward")

As of the Petition Date, however, the Debtor's primary source of income relates to the services it provides through its Employees to its subsidiary Alecto Hayward.  Alecto Hayward is a party to an Amended Management Services Agreement with Hayward Sisters Hospital dba St. Rose Hospital ("St. Rose") pursuant to which Alecto Hayward provides management services to St. Rose in exchange for a management services fee equal to 3.75% of St. Rose's net revenue with the net revenue being subject to certain adjustments (the "Management Services Fee").  Such management services include the provision of qualified individuals to serve as the Chief Executive Officer and Chief Financial Officer of St. Rose.  Alecto Hayward's contract with St. Rose currently runs through May 2025, subject to renewal for an additional period of 2 years.  The contract can be terminated without cause on 365 days advance written notice.

To facilitate Alecto Hayward's provision of management services, the Debtor provides its Employees to Alecto Hayward to fulfill Alecto Hayward's responsibilities under the management services agreement including having two of its Employees serve as the Chief Executive Officer and Chief Financial Officer of St. Rose.  In return, Alecto Hayward pays a portion of the Management Services Fee each month to the Debtor. The Debtor also receives reimbursement from St. Rose for certain expenses primarily related to the Debtor's Employees other than those who serve as the CEO and CFO that provide services at St. Rose.

Sherman/Grayson is the operator of Wilson N. Jones Regional Medical Center ("WNJ"), a 207-bed acute care hospital located in Sherman, Texas. Sherman has a population of around 45,000 people and is located within Grayson County, Texas which is approximately 75 miles from Dallas, Texas. Among other things, WNJ contains an emergency department, medical surgical units, an intensive care unit, and a behavioral health unit. As discussed below, Sherman/Grayson filed for Chapter 11 relief in Case No. 23-10810 and the Sherman Sale Order (defined below) provides for the sale of substantially all of Sherman/Grayson's assets.

Sherman/Grayson has faced significant financial challenges both during and after the COVID-19 pandemic. As a result of such challenges, during the year prior to filing, Sherman/Grayson was operating at a loss of over $1 million per month.

### 3.      Filing of the Debtor's Chapter 11 Case.

On June 16, 2023, the Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy case. On the Petition Date, the Debtor filed the Declaration of Michael Sarrao, Executive Vice President General Counsel, and Secretary of the Debtor, in Support of First Day Motions [Docket No. 3] (the "Sarrao Declaration").  A copy of the Sarrao Declaration is incorporated as if fully set forth

7

herein.[2]

On June 20, 2023, the Jami Nimeroff was appointed as the Subchapter v Trustee in the Chapter 11 Case.

4.    **Legal Structure and Ownership.**

The Debtor is a Delaware limited liability company.

The following entities and individuals hold ownership interests in the Debtor:

| Name of Entity/Individual | % of Ownership |
|---------------------------|----------------|
| The Reddy Investment Trust | 60.08% |
| The Krissman Family Trust | 10.60% |
| The Sarrao Family Trust | 7.42% |
| The Jeyakumar Inter-Vivos Trust | 3.5% |
| The Hayes Irrevocable Trust | 3.80% |
| Steven Kay | 5.3% |
| Matthew Williams | 5.30% |
| Aman Dhuper | 2.50% |
| Comstock Investment Trust | 1.50% |

5.    **Events Leading to the Filing of the Bankruptcy Case.**

The hospitals acquired by the Debtor's subsidiaries were independent community hospitals that were in some form of financial distress when they were acquired by the Debtor's subsidiaries and faced stiff competition (and in some cases, unfair competition) from nearby hospitals. Despite the best efforts of the Debtor and its subsidiaries, the hospitals acquired by the Debtor's subsidiaries continued to suffer from financial distress which ultimately resulted in two (2) of the hospitals closing in 2019 and one (1) hospital closing in March 2020.

After the closure of the three (3) hospitals described above, the remaining hospitals were faced with significant financial challenges associated with the COVID-19 pandemic including decreased revenue and out of control costs. The significant adverse effect of the pandemic forced one of the Debtor's subsidiaries to sell the real estate associated with an acute care hospital in 2021 to pay off secured lenders and satisfy other priority claims.

The closure of each of these hospitals placed a significant financial burden on the Debtor as the Debtor has been forced to spend time and resources on the winddown of the operations of each of these hospitals and litigate claims by parties seeking to hold the Debtor liable for the debts

---

[2]    A copy of all pleadings in the Chapter 11 Case are available for a fee on the Bankruptcy Court's website, https://ecf.deb.uscourts.gov/.

8

of its subsidiaries.

As of the Petition Date, the Debtor's subsidiaries continued to operate only one hospital, which has subsequently filed for bankruptcy. However, this hospital has faced, and continues to face, significant financial challenges as a result of the pandemic and has not been able to recover financially. In the two years immediately prior to the Petition Date, the Debtor made significant investments in the form of advances to and the payment of expenses on behalf of Sherman/Grayson in an effort to ensure that this hospital could continue operating as a going concern thereby maximizing the value of the subsidiary while meeting the healthcare needs of the community and avoiding additional costs and expense to Debtor if the hospital was to close. Additionally, the Debtor was a guarantor on Sherman/Grayson's lease with MPT of Sherman-Alecto, LLC, which required that (a) Sherman/Grayson maintain its insurance, and in the event that Sherman/Grayson's insurance lapsed, such lapse would be an event of default for which the Debtor would be liable for under the guaranty as obligations under the lease, and (b) that Sherman/Grayson indemnify MPT of Sherman-Alecto, LLC was required to purchase an office building for more than $10 Million pursuant to the terms of a ground lease which may require MPT of Sherman-Alecto, LLC as the ground lessor, to purchase the office building if a healthcare facility is not operated at the location of Wilson N. Jones Regional Medical Center for twelve (12) consecutive months and Sherman/Grayson's failure to perform would constitute an event of default for which the Debtor would be liable for under the guaranty. Accordingly, the Debtor provided significant advances to Sherman/Grayson's during the two (2) years immediately prior to the Petition Date which placed a financial burden on the Debtor and has resulted in a significant decrease in the Debtor's liquidity.

The pandemic further affected patient volumes and revenue at St. Rose which resulted in decreases in the Management Services Fee paid to Alecto Hayward since the fee is based on a percentage of net revenue.

While the Debtor has been able to maintain the business operations outlined above, on May 11, 2023, a judgment was entered against the Debtor in the amount of $2,686,357.11 in plus interest and fees in the legal action *Reed, et. al. v. Alecto Healthcare Services LLC, et. al.* in United States District Court for Northern District of West Virginia, Civil Action No. 5:19-cv-263 (the "Reed Judgment"). On June 1, 2023, the plaintiffs (the "Reed Creditors") in this action obtained a writ of execution against the Debtor in the total amount of $3,242,498.77.

Enforcement of the Reed Judgment against the Debtor would cause a liquidity crisis whereby the Debtor will no longer be able to pay the expenses necessary to continue to operate

**6.      The Debtor's Assets and Liabilities.**

The Debtor's assets and liabilities are detailed in the Schedules filed on June 30, 2022 [Docket Nos. 48 and 49] (the "Schedules").

By operation of General Order of the Delaware Bankruptcy Court dated September 14, 2020, the deadline for all parties other than governmental entities to the file a proof of claims was August 15, 2023, and the deadline for governmental entities to the file a proof of claims was set for December 13, 2013. A copy of the claims register maintained by the Bankruptcy Court and

9

the Schedules are attached hereto as **Exhibit B.**

Additionally, on March 9, 2023, the United States commenced a civil suit against the Debtor, seven of its direct or indirect subsidiaries and three individuals to recover approximately $14,211,115 in alleged overpayments made to Defendant Olympia Health Care, LLC by the Centers for Medicare and Medicaid Services, part of the Department of Health and Human Services, in 2005 (Civil Action No. 2:23-cv-01783). The Debtor was named as a defendant because it allegedly controlled Olympia during the relevant period. The Debtor does not believe that it (or any of the defendants) has any liability to the United States for the alleged overpayments.

On the Petition Date, the Debtor had two operating subsidiaries: (i) Sherman/Grayson which, as discussed below, filed its own voluntary Chapter 11 bankruptcy during which its assets were sold and the Debtor may realize some value on account of its claim, and (ii) Alecto Hayward. The projected income and expenses of the Debtor for the next three years is attached hereto as **Exhibit C**.

The Debtor also some miscellaneous assets, including a vehicle and office furniture and equipment. The Debtor does not expect that, if the Chapter 11 case were to convert to Chapter 7 that these miscellaneous assets would generate much money, if any.

In addition to those two entities, the Debtor may realize some value from other direct and indirect subsidiaries but which may have some remnant value.

Alecto Healthcare Services Fairmont LLC ("Alecto Fairmont"), may have residual income due from West Virginia Medicaid of as much as $3 million[3] and from Medicare of as much as $2.8 Million if Alecto Fairmont's appeals related to Medicare's denial of Alecto Fairmont's requests for a Volume Decrease Adjustment of $1,406,332 for 2016 and $1,408,524 for 2017 are successful. The Debtor cannot predict the likelihood or timing for recovery related to these appeals. Before the any payment can be upstreamed to the Debtor, Alecto Fairmont will need to pay all of the liabilities to its own creditors, which include certain outstanding trade claims, payroll taxes, and the payment of certain liabilities related to Alecto Fairmont's withdrawal from a multi-employer pension plan sponsored by the Retail, Wholesale and Department Store International Union and Industry Benefit and Pension Funds, which may be as much as $20 million and Alecto Fairmont's contingent liability as a member of the control group with respect to a defined benefit pension plan sponsored by Alecto Healthcare Services Ohio Valley LLC (the "Alecto Ohio Valley Pension Plan"). The Debtor anticipates that that the liabilities of Alecto Fairmount will significantly exceed any of its residual assets.

Alecto Healthcare Services Wheeling, LLC, an indirect subsidiary of the Debtor, may have some residual income due from West Virginia Medicaid of as much as $900,000, but it also has significant liabilities, including the Reed Creditor's judgment and other judgments entered against it. Those liabilities include payroll taxes, judgments, and contingent liabilities associated with the Alecto Ohio Valley Pension Plan . The Debtor anticipates that that the liabilities of Alecto

---

[3] This money due to Alecto Fairmount has been outstanding for more than two years and it is unclear how much or when such amounts will be paid.

16452692/2

**A0735**

Wheeling will significant exceed any of its residual assets.

Sunrise MOB Holdings, LLC ("Sunrise MOB"), a direct subsidiary, is also an indirect parent of Plaza Medical Office Building, LLC ("Plaza"). Plaza recently received $3 million from an indemnity reserve from a sale of certain of its real estate assets. Even though Plaza received these funds, it has contingent liabilities as a member of the control group with respect to the withdrawal liability of Alecto Fairmont, which may be as much as $20 million, and as a member of the control group with respect to the Alecto Ohio Valley Pension Plan. Accordingly, the Debtor does not anticipate that its interest in either Sunrise MOB or Plaza will have any value for the benefit of the Debtor's creditors

7. **Current and Historical Financial Conditions.**

In 2021, gross revenues were approximately $3,426,000 with net loss of approximately $810,000; and in 2022, gross revenues were approximately $3,559,929 with net profit of approximately $135,767.

In 2023, through May 31, 2023, gross revenues were $1,559,149.56 with net income of $84,474.62.

Since the Petition Date, the Debtor has filed monthly operating reports reflecting the Debtor's ongoing finances [Docket Nos 83 and 122].

8. **Significant Events During the Bankruptcy Case.**

A.  Significant Events During the Bankruptcy Case.

On or about the Petition Date, the Debtor filed certain motions and applications seeking relief from the Bankruptcy Court designed to minimize the potential disruption of the Chapter 11 filing on the Debtor's business affairs and facilitate the orderly administration of the Chapter 11 Case. On, or shortly after the Petition Date, the Bankruptcy Court entered various orders. The final hearing on the below motions is set for July 14, 2023. These include:

(a)  Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages and Salaries, (II) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers, and (VI) Allowing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments [Docket No. 4]. On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 26].

(b)  Motion Pursuant to Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor, (II) Determining that the Utility Companies are Adequately Assured of Postpetition Payment and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance [Docket No. 5]. On June 20, 2023, the

11

Bankruptcy Court entered an Interim Order granting the motion [Docket No. 27].

(c)     Debtor's Motion for Interim and Final Orders Authorizing: (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code [Docket No. 6].  On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 28].

(d)     Motion of the Debtor for an Order Under Sections §§105(a), 363(b), 363(c), and 503(b) of the Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 6003 Authorizing Debtor to (A) Maintain Existing Insurance Policies; and (B) Pay All Obligations in Respect Thereof [Docket No. 7].  On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 29].

B.     Retention of Professionals

During the Chapter 11 Case, the Bankruptcy Court entered various orders authorizing the employment of various professionals to assist with the conduct and administration of the Chapter 11 Case and reorganization efforts, including but not limited to the following:

a.     On July 7, 2023, the Debtor filed (i) an application for entry of an order authorizing the retention and employment of Shulman Bastian Friedman & Bui LLP as bankruptcy counsel to the Debtor *nunc pro tunc* to the Petition Date [Docket No. 67], and (ii) an Application for Entry of an Order Authorizing the Retention and Employment of The Rosner Law Group LLC as Delaware counsel to the Debtor *nunc pro tunc* to the Petition Date [Docket No. 68] (collectively, the "Shulman/Rosner Applications").  On August 7, 2023, the United States Trustee filed an objection to the Shulman/Rosner Applications [Docket No. 89] (the "UST Objection"), and based upon the UST Objection as well as comments made by the Court at the July 13, 2023 hearing to consider the Shulman/Rosner Applications, the Debtor and Sherman/Grayson elected to have substitute counsel for the Debtor.

On August 16, 2023, the Court held a hearing on the Application at which the Court requested additional evidentiary support.  On August 23, 2023, the Debtor filed the First Supplemental Declaration of Michael Sarrao in support of the Shulman/Rosner Applications [Docket No. 133], and on August 24, 2023, the Debtor filed the Second Supplemental Declaration of Michael Sarrao in support of the Shulman/Rosner Applications [Docket No 136].  On August 28, 2023, the Court held a hearing on the Application.. Based on the record at the Hearing, the Court approved the Application subject to certain revisions, and on August 31, 2023, this Court entered an Orders approving the Shulman/Rosner Applications *nunc pro tunc* to the Petition Date through and including August 2, 2023 [Docket Nos.  146 and 147].

b.     Due to the possibility of a perceived conflict due to potential claims against the Debtors' insiders, on August 9, 2023, the Debtor filed an application to employ Steven Balasiano as independent director/manager to the Debtor *nunc pro tunc*, to August 4, 2023 [Docket No. 93] (the "Balasiano Application").  The purpose of Mr. Balasiano's retention was to make decisions on behalf of the Debtor related to: (i) the Claim of Alecto against Sherman/Grayson arising from intercompany advances made by the Debtor to Sherman/Grayson and certain expenses paid by the

Debtor on behalf of Sherman/Grayson, including any settlement of the Alecto Claim; and (ii) potential estate claims against the Debtor's insiders, and (iii) any other conflict that may arise as and between the Debtor and Sherman/Grayson/ On August 16, 2023, the Bankruptcy Court entered an Order approving the Balasiano Application [Docket No. 118].

      c.     On August 16, 2023, the Debtor filed an Application to Employ Morris James as counsel to the Debtor *nunc pro tunc*, to August 11, 2023 [Docket No. 115] (the "Morris James Application"). On September 1, 2023, the Bankruptcy Court entered an Order approving the Morris James Application [Docket No. 149].

      d.     On August 27, 2023, the Debtor filed an Application to Employ Gould Consulting Services as Forensic Investigation Consultant to the Debtor, *nunc pro tunc*, to August 25, 2023 [Docket No. 138].

      C.     <u>Filing of the Sherman/Grayson Bankruptcy Case</u>

On June 23, 2023, Sherman/Grayson, one of the Debtor's remaining two operating subsidiaries, filed for Chapter 11 relief in the United States Bankruptcy Court for the District of Delaware at Case No. 23-10810 (the "Sherman Bankruptcy Case"). When Sherman/Grayson filed its bankruptcy petition, the Debtor was the largest creditor of Sherman/Grayson, with a general claim of approximately $60.1 million.

On July 5, 2023, Sherman/Grayson filed a Motion for Entry of an Order (I) Authorizing the Private Sale of Substantially All Assets Free And Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment Of Executory Contracts and Unexpired Leases, and (III) Granting Other Related Relief [Docket No. 60] (the "Sherman Sale Motion"). By and through the Sherman Sale Motion, the Debtor sought to sell its substantially all of its assets to AHS Sherman, LLC (the "Purchaser") for $100,000 in cash, plus the assumption of certain liabilities. Significantly, the Purchaser also agreed to fund all of the Debtor's operations and other administrative obligations of the hospital and its bankruptcy case, including estate professional fees irrespective of whether the closing is ultimately consummated. Prior to the hearing to consider the Sherman Sale Motion, the Official Committee of Unsecured Creditors of Sherman/Grayson (the "Sherman Committee") entered into a term sheet with the Purchaser by and through which the Purchaser agreed to fund $250,000 to be placed into an escrow account to be held solely for the benefit of general unsecured creditors (the "Sherman GUC Fund"). Additionally, the term sheet between the Purchaser and the Sherman Committee provided that the Debtor would release all claims against the Sherman/Grayson estate and the Debtor would not participate in any distribution from the Sherman GUC Fund. On August 15, 2023, the Debtor filed a limited objection and reservation of rights with respect to the Sale Motion to address the Debtor's right to participate in the Sherman GUC Fund. At the hearing to consider the Sherman Sale Motion, the Debtor again expressly reserved its rights with respect to the proceeds of the sale and the waiver of any right of the Debtor. The Sherman Committee announced that it would file a motion under Bankruptcy Rule 9019 for approval of the term sheet, including the waiver of the Debtor's right to a distribution from the Sherman GUC Fund. The Committee has not yet filed the motion for approval of the settlement. On August 31, 2023, the Bankruptcy Court entered an Order approving the Sale Motion [Docket No. 167] (the "Sherman Sale Order"). The sale has not closed as Sherman/Grayson and the Purchaser attempt to address the regulatory issues.

16452692/2

Significantly, the Debtor has been paying certain expenses of Sherman/Grayson, including its virtue. By virtue of the Sherman Sale Order, the Debtor has received repayment on account of the costs of insurance on behalf of Sherman/Grayson for the prorated month of June and for July that were paid by the Debtor. The Debtor expects that the Purchaser will continue to provide funds to Sherman/Grayson so that it will continue to remit payment to the Debtor until the sale closes.

Additionally, at a hearing on August 16, 2023, the Bankruptcy Court orally granted a request by Sherman/Grayson to remit payment to the Debtor on account of certain insurance obligations for the benefit of Sherman/Grayson under the doctrine of necessity. An Order granting the request has not yet been entered.

As set forth above, as part of the sale to the Purchaser, the Sherman Committee negotiated to provide that the Purchaser would fund $250,000 to be placed into an escrow account to be held solely for the benefit of general unsecured creditors. Based solely upon the schedules filed by Sherman/Grayson, the Debtor's unsecured claim is approximately 75% of all unsecured claims. Notably, the Sherman Committee has asserted that the Debtor has liability to Sherman/Grayson on account of avoidable transfers in an amount up to $150,000, and therefore the Debtor is not entitled to a distribution by operation of 11 U.S.C. § 502(d). The Debtor does not agree with the Sherman Committee's analysis, and barring settlement, the Debtor will likely object to any motion filed by Sherman/Grayson or the Sherman Committee which would deny the Debtor's right to any distribution from the Sherman GUC Fund..

D.    Motion for Appointment of an Official Committee of Unsecured Creditors

On August 11, 2023, the Reed Creditors filed a motion to Appoint Creditors' Committee [Docket No. 100] (the "Committee Appointment Motion"). Another creditor, Snyder Brothers, Inc., filed a joinder to the Committee Appointment Motion [Docket No. 111]. On August 22, 2023, the Debtor filed an objection to the Committee Appointment Motion [Docket No. 127], and the United States Trustee filed a statement in response to the Committee Appointment Motion [Docket No. 128].

On August 28, 2023, the Court conducted an evidentiary hearing to consider the Committee Appointment Motion and objection thereto. At the conclusion of the hearing, the Court denied the Committee Appointment Motion, and ruled that the Debtor did not have to provide work product to creditors or the Subchapter v Trustee. On September 11, 2023, the Court entered an Order denying the Committee Appointment Motion [Docket No. 152].

E.    Reed Creditors' Motion for Revoke Designation of the Bankruptcy Case under Subchapter V

On November 2, 2023, the Reed Action Judgment Creditors filed a pleading titled "Objection of the Reed Action Judgment Creditors to Debtor's Designation of This Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor" (the "Designation Motion") [Docket No. 204]. By and through the Designation Motion, the Reed Creditors sought to revoke the Debtor's designation as a subchapter v debtor based upon the amount of noncontingent and liquidated claims against the Debtor as of the Petition Date. On

November 22, 2023, the Debtor filed a response in opposition to the Designation Motion [Docket No. 226], and on November 27, 2023, the Reed Creditors filed a reply in support of the Designation Motion [Docket No. 227].

On November 29, 2023, the Court conducted an evidentiary hearing to consider the Designation Motion and objection thereto, and on December 1, 2023, the Court issued its bench decision in which it denied the Designation Motion.

On December 18, 2023, the Reed Creditors filed a notice of appeal of the Court's decision to deny the Designation Motion.

### 9. Projected Recovery of Avoidable Transfers Against Insiders

A forensic investigation is defined by the scope of the engagement and/or issues in question and may include the analysis of entire sets of data based on the focus of the investigation.[4] The Debtor requested that Gould Consulting Services ("GCS") conduct a forensic analysis of cash transactions into and out of the Debtor's bank accounts to identify a) cash payments and loans to, or for the benefit of, officers, director, shareholders, and related-parties ("Insiders"), and b) potentially voidable transfers to Insiders, if any. Since its retention on August 25, 2023, GCS received approximately 1,950 documents during the course of our examination has performed the following analyses:[5]

1. Reviewed certain filings with the Bankruptcy Court.

2. Conducted interviews with Michael Sarrao, Alecto's Executive Vice President,

---

[4] Forensic investigations are iterative, meaning that the analytical techniques used are not performed in isolation since observations made using one technique generally provide insight into other areas of the investigation.

[5] The scope of work performed by GCS did not include, among others, a) verification of trade accounts receivable or payable, b) examination of deposits into Alecto bank accounts and the source of such deposits unless discussed herein, c) analysis of vendor invoices and related payments, d) analysis of copies of checks, e) identification of payees by ACH or check described in the bank statements as preauthorized debits, identification of payees by ACH or check where no name was identified, or the transaction listed as, or included in, a journal entry, f) detailed examination of invoices and funding request packages used to allocate funds to Affiliates, nor g) examination of email and other internal data/documents unless discussed herein.

While GCS examined transfers into and out of the Alecto bank accounts to CNH Finance and Affiliates and traced the recording of such transfers into Alecto's general ledger, GCS did not reconcile the Affiliates' intercompany accounts.

GCS did not perform an audit, review or compilation as those terms are defined in the AICPA's Statements on Standards for Accounting and Review Services or generally accepted auditing standards.

16452692/2

General Counsel and Secretary and Matt Williams, Alecto's Chief Financial Officer.

3.     Analyzed cash sources and uses based on the analysis, categorization, and summarization of 1,296 bank statements containing 116,850 transactions included in 26 bank accounts held by Alecto and certain of its Affiliates for the four (4) year Examination Period June 17, 2019, through June 30, 2023, as discussed below.

    a.    Bank statements were received for the Examination Period for the following entities:

        i.      Alecto Healthcare Services LLC (3 accounts)

        ii.     Alecto Healthcare Services Hayward LLC (1 account)

        iii.    Sherman/Grayson Hospital LLC (7 accounts)

        iv.    Sherman MD Provider, Inc., a subsidiary of Alecto Sherman (5 accounts)

        v.     Sherman Anesthesia, Inc., a subsidiary of Alecto Sherman (2 accounts)

        vi.    Olympia Health Care LLC (6 accounts)

        vii.   Plaza Medical Office Building LLC (2 accounts)

b.    Identified deposits, payments made by check, direct debit, internal transfer, or wire transfer, and categorized the data by transaction category and payee, if identified in the bank statements.

c.    Electronically tied Alecto payments by check and ACH Transfer (Bill Payment) to Alecto's general ledger to identify payees.

d.    Traced advances from the CNH Revolving Facility per electronic statements into Alecto's primary disbursement account *3874 and subsequent transfers from Alecto's account *3874 to bank accounts held by Affiliates.

e.    Tied advances to Affiliates per bank statements to the LOC Reconciliations, calculated estimated over/under advances to Affiliates, and sampled the recording of such transactions in Alecto's general ledger.

f.    Calculated total advances retained by Alecto for operating expenses and other purposes and tied to Alecto bank statements.

g.    Analyzed transfers to/from accounts not included in lists of Alecto and/or Affiliate held accounts.

4.     Examined Alecto's general ledger, including 1,208 separate disbursements by

check, ACH, or wire transfer to identify payments to, or for the benefit of, Insiders, of $10,000 or more, if any.

     5.     Examined Alecto's year end payroll records for the years 2020 – 2022 and the 6-month period ended June 16, 2023, to identify payments to Insiders.

     6.     Analyzed cash flows into/out of the credit facility utilized under the 2018 Promissory Note and payoff by Plaza MOB.

     7.     Examined supporting documentation for interest payments related to the Plaza MOB Loan.

     8.     Analyzed cash flows and certain closing documents, including settlement and funds flow statements, related to the June 20, 2019 Plaza MOB Refinance and the 2021 UCLA Asset Sale.

After conducting its forensic analysis, GCS presented its report to Mr. Balasiano and conferred with Mr. Balasiano in order to provide Mr. Balasiano an opportunity to ask any questions or raise any issues with respect to the estate's potential claims against the Insiders. A copy of GCS report is attached hereto as **Exhibit D**. At the conclusion of the conference, Mr. Balasiano determined that the estate does not have any valid claims against the Insiders for avoidable transfers.

## <u>ARTICLE IV - THE PLAN</u>

The Plan must describe how Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment. For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Bankruptcy Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Creditors are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Pursuant to section 1191(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even if no impaired Class of Claims votes to accept the Plan. Specifically, section 1191(b) of the Bankruptcy Code provides that the Plan may be confirmed if the applicable requirements of section 1129(a) are satisfied, other than sections 1129(a)(8), (10), and (15), if the Bankruptcy Court finds that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan. Thus, the Plan may be confirmed even if no impaired Class votes to accept the Plan.

17

Based upon the foregoing, and based upon the statements of counsel for the Reed Creditors stating that they will object to confirmation and indicating that the Reed Creditors will not vote to support the Plan, the Debtor has elected to proceed without soliciting votes of creditors, and will seek approval of the Plan pursuant to Section 1191 of the Bankruptcy Code.

1.    **Unclassified Claims.**

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, however they may, however, object if, in their view, their treatment under the Plan does not comply withthat required by the Bankruptcy Code. As such, the Plan does not place the following Claims in any class:

a.    **Administrative Expenses**

The Debtor must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Effective Date will be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Creditor or Bankruptcy Court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

- If the Debtor continues to operate in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.

- Administrative Expenses also include any post-petition fees and expenses allowed to Professionals, including the allowed claim of the Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 Case. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses, andtheir proposed treatment under the Plan:

18

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | $0.00 (All amounts paid on ongoing basis) | Payment through the Plan as follows: Payment in full on the Effective Date. |
| Administrative Tax Claims | $0.00 | The Debtor does not expect any but if there are any Administrative Tax Claims, payment through the Plan as follows: Payment in full on the Effective Date, except to the extent otherwise agreed to by the Debtor and the Claimant. |
| United States Trustee fees | $2,500 | Payment through the Plan as follows: Payment in full on the Effective Date. |
| Professional Fee Claims, including the fees of the Independent Director as approved by the Bankruptcy Court | $700,000 | After Bankruptcy Court approval, Payment through the Plan as follows: Payment in full. |
| Subchapter V Trustee | $50,000 | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows: Payment in full. |
| **TOTAL** | **$752,500** | |

**b.    Post-Confirmation Professional Fee Claims**

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtor shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

19

16452692/2

**A0744**

c. **Priority Tax Claims.**

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Bankruptcy Code. Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor agrees to a less favorable treatment, pursuant to section 1129(a)(9) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter).

The Debtor anticipates that there will be no Priority Tax Claims.

2. **Classes of Claims and Equity Interests.**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

a. **Classes of Other Priority Claims**

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in classes. The Bankruptcy Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim.

It is anticipated that there will be no Other Priority Claims owed. In the event that there are Other Priority Claims owed, such claims will be paid in full on the Effective Date.

b. **Class of Priority Non-Tax Claims**

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|---|---|---|
| 1 | Priority Non-Tax Claims. Each Holder of an Allowed Priority Non-Tax Claim at the option of the Reorganized Debtor shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Reorganized Debtor and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | Approx. $0<br><br>Recovery: 100% |

20

c.    **Class of Secured Claims.**

Allowed Secured Claims are Claims secured by property of the Estate (or that are subject to setoff) to the extent allowed as secured Claimsunder § 506 of the Bankruptcy Code. If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim.

The Debtor does not believe that there are any secured Claims as the Debtor does not have any assets that are currently encumbered by security interests, and any party that previously had a security interest in the Debtor's assets is entitled to a general Unsecured Claim due have unsecured deficiency Claim, however in the event that a Holder of an Allowed secured Claim has a valid security interest such Holder of an Allowed secured Claim at the option of the Reorganized Debtor shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed secured claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Reorganized Debtor and the Holder of such secured Claim have agreed upon in writing.

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|---|---|---|
| 2 | Secured Claims.  Each Holder of an Allowed secured Claim, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed secured Claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Reorganized Debtor and the Holder of such secured Claim have agreed upon in writing. | Approx. $0<br><br>Recovery: 100% |

d.    **Class of General Unsecured Claims.**

General Unsecured Claims are not secured by property of the Estate and are not entitled to priority under § 507(a) of the Bankruptcy Code.

21

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|---|---|---|
| 3 | After payment in full of all Allowed Administrative Claims, all Allowed Priority Claims in full, and Allowed Secured Claims (if any), Allowed General Unsecured Claims will be paid the Debtor's projected disposable income on a pro rata basis. Pro rata Distributions will be made to Holders of Allowed General Unsecured Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date. | Approx. **$11,000,000** <br><br> Recovery: 3% - 10% |

### e. Class of Equity Interest Holders.

Equity Interest holders are parties who hold an ownership interest (*i.e.*, equity interest)in the Debtor. The following chart sets forth the Plan's proposed treatment of the class of Equity Interest holders:

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|---|---|---|
| 4 | Equity Interest Holders in Class 4 will retain their equity ownership interest in the Debtor. | Unimpaired |

### 3. Treatment of Claims and Claims Objections.

The Debtor or the Reorganized Debtor, as applicable, and the Subchapter v Trustee may object to the amount or validity of any Claim by the Claims Objection Bar Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan. Nothing in this Section shall in any way limit the Trustee's rights to object to Claims as provided for in the Bankruptcy Code.

### a. Allowance of Claims

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim immediately before the Effective Date. Further, the Reorganized Debtor shall succeed to the right to any objection to a Claim pending on the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Case allowing such Claim.

22

16452692/2

### b.   Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtor shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtor shall have the sole authority to: (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; and (2) from and after the Effective Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent the Reorganized Debtor elects to withdraw any such objection, or the Debtor and the Creditor elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.  For the avoidance of doubt, nothing set forth herein shall limit in any way the Trustee's rights to object to Claims as provided for in the Bankruptcy Code.

### c.   Estimation of Claims

Before, on, or after the Effective Date, the Debtor or the Reorganized Debtor may (but is not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been disallowed, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtor, or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim, unless otherwise ordered by the Bankruptcy Court. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### d.   Adjustment to Claims

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register after the Debtor or the Reorganized Debtor, as applicable, files a notice of satisfaction with the Bankruptcy Court and serves such notice of satisfaction on the affected Claimant on ten (10) days' negative notice if no objection having been filed.  If an objection is filed to the notice of satisfaction, an evidentiary hearing will be scheduled before the Bankruptcy Court.

### e.   Disallowance of Claims

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to

23

section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtor by that Entity have been turned over or paid to the Debtor or the Reorganized Debtor. All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

**f.     Amendments to Claims**

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor. Unless such prior authorization is granted, any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court to the maximum extent provided by applicable law.

**g.     De Minimis Distributions**

If any Distribution under the Plan to the Holder of an Allowed Claim would be less than $25.00, the Reorganized Debtor may withhold such distribution until a final distribution is made to such Holder. If any final Distribution under the Plan to the Holder of an Allowed Claim would be less than $25.00, the Reorganized Debtor may cancel such distribution. Any unclaimed Distributions pursuant to this Section shall be treated as unclaimed property under Article IV(6)(f) of the Plan.

**h.     No Distributions Pending Allowance**

If an objection to a Claim or portion thereof is Filed, no payment or Distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtor. Any distribution to be made on account of such Claim shall be reserved by the Reorganized Debtor, pending Allowance or Disallowance of the Claim that is the subject of an objection. In the event that a Claim is Disallowed in whole or in part, the Debtor will make Distributions to the Holder of the Claim on account of the Allowed portion of the Claim, and the balance will be distributed on a pro rata basis to Holders of Allowed Claims

**i.     Duplicative Claims**

If a Class 3 Creditor filed duplicate Proofs of Claim, the earlier filed Proof of Claim will be deemed Disallowed without the need for any further motion, objection or Bankruptcy Court order, such that the Class 3 Creditor receives only one payment under the Plan based on the later filed Proof of Claim.

**4.     Treatment of Executory Contracts and Unexpired Leases.**

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party to the contract. The Debtor has the right to reject, assume

24

(i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

Check all that apply:

☒ Assumption of Executory Contracts.

The Executory Contracts shown on **Exhibit E** shall be assumed by the Debtor. Assumption means that the Debtor has elected to continue to perform the obligations undersuch contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.

The Debtor shall give any party to an Executory Contract that the Debtor seeks to assume fourteen (14) days' notice of the Debtor's intent to assume such Executory Contract along with a proposed cure of any defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

Unless otherwise provided in the Plan, each Executory Contract that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and Executory Contracts related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

☒ Rejection of Executory Contracts.

The Executory Contracts shown on **Exhibit F** shall be rejected by the Debtor.

Except for the Executory Contracts and Unexpired Leases being assumed in Exhibit E, the Debtor rejects the remaining Executory Contracts and Unexpired Leases listed in the Debtor's Schedule G on file with the Court, including but not limited to those listed in Exhibit F.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject a contract or lease, the other party to the contract or lease will be treated as a General Unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

16452692/2

Neither the exclusion nor inclusion of any Executory Contract on Exhibits E or F, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or that the Debtor or Reorganized Debtor has any liability thereunder.

Further, it is important to note that contracts between the Debtor and non-debtor parties that are included on Exhibits E or F may not be executory. The inclusion of contracts is premised upon the inclusion of those contracts in the Debtor's Schedules. **In the event, and to the extent, that any party objects to the inclusion and proposed treatment of a contract as proposed herein, the party must timely file an objection to such treatment. Absent such any objection, all contracts listed on Exhibits E and F will be treated as set forth herein.**

### 5. <u>Means for Implementation and Funding of the Plan.</u>

The Plan will be funded by: (1) the Debtor's projected disposable income ($848,049) generated by the Debtor's post-confirmation operations, and (2) $25,000 provided by certain of the Released Parties. The Debtor expects to have approximately $170,000 in combined cash on hand and accounts receivable on the Effective Date, however the cash and accounts receivable will not be available for distribution to creditors under the Chapter 11 Plan as these amounts are necessary for payment of incurred and ongoing expenses (and which would otherwise be administrative expenses) and are already included in the calculus of disposable income in Year 1. The Debtor or the Reorganized Debtor, as applicable, will have all the rights and duties to implement the provisions of the Plan, including the right to make Distributions to Creditors provided for under this Plan.

On the Effective Date of the Plan, all property of the Debtor, tangible and intangible, including, without limitation, licenses, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equity Interests except as provided in the Plan, to the Reorganized Debtor and all funds not expressly provided for in Plan will remain property of the Estate. The Debtor expects to have sufficient Cash on hand to make the payments required on the Effective Date.

### 6. <u>Payments.</u>

### a. <u>Responsibility for Making Payments.</u>

Prior to the Effective date, the Debtor shall remit all payments due for United States Trustee Fees. Upon the Effective Date, the Reorganized Debtor shall make all Plan Distributions to Creditors in accordance with the terms of the Plan.

The Reorganized Debtor shall only be required to act and make Distributions in accordance with the terms of the Plan. Except on account of gross negligence, fraud, illegality or willful misconduct, the Reorganized Debtor shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for Distributions under the Plan to any party who does not hold a Claim against the Debtor on any date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

16452692/2

Any required payments to the Holders of Allowed Claims or Equity Interests shall be made by the Reorganized Debtor: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank by first-class mail (or by other equivalent or superior means as determined by the Reorganized Debtor), or (b) by wire transfer from a domestic bank.

**b.      Disputed Claims.**

Notwithstanding anything herein to the contrary: (a) no Distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Reorganized Debtor, no Distribution shall be made to any Entity that holds both an Allowed Claim and a Disputed Claim until such Entity's Disputed Claims have been resolved by settlement or Final Order.

**c.      Unclaimed Payments.**

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within 180 days after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against the Debtor, the Estate, the Reorganized Debtor, or its properties or assets.  In such cases, any Cash or other property held by the Reorganized Debtor in the Undeliverable Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Reorganized Debtor, notwithstanding any federal or state escheat laws to the contrary, and shall promptly be transferred to the Reorganized Debtor to be distributed according to the priority set forth in the Plan without any further action or order of the Bankruptcy Court.

**d.      Payment Dates and Locations.**

Distributions shall be made by the Reorganized Debtor twice a year, and such Distributions shall be on a pro rata basis to Holders of Allowed Claims based upon their priority. Accordingly, the first Distributions shall be remitted on a pro rata basis to Holders of Allowed Administrative Expenses (including United States Trustee Fees) until all Allowed Administrative Expenses are paid in full. Once Allowed Administrative Expenses have been paid in full, the Reorganized Debtor shall remit payments on a pro rata basis to Holders of Allowed Priority Claims until all Allowed Priority Claims are paid in full, including interest to the extent applicable.  Once Allowed Priority Expenses have been paid in full, the Reorganized Debtor shall remit payment on a pro rata basis to Holders of general unsecured claims.  After each Distribution, the Reorganized Debtor shall provide the Subchapter v Trustee a list of parties to whom payments were remitted.

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed; (b) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date

27

of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtor and Reorganized Debtor have not received a written notice of a change of address prior to the Effective Date.

The Reorganized Debtor shall make one attempt to make the Distributions contemplated hereunder in accordance with the procedures set forth herein. The Reorganized Debtor, in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable distributions. Any Distributions returned to the Reorganized Debtor as undeliverable or otherwise shall remain in the possession of the Reorganized Debtor until such time as a Distribution becomes deliverable, and no further Distributions shall be made to such Holder unless such Holder notifies the Reorganized Debtor of its then current address.

Nothing contained in this Plan shall constitute a waiver or release by the Reorganized Debtor of any rights in respect of legal and equitable objections, defenses, setoffs, or recoupment. To the extent permitted by applicable law, the Reorganized Debtor may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Estate, or the Reorganized Debtor may have against the Holder of such Claim or Equity Interest.

### e.    Undeliverable Distribution Reserve.

If a Distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtor as undeliverable or is otherwise unclaimed, such Distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable or is claimed or is deemed to have been forfeited.

### f.    Tax Requirements.

Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a Distribution under the Plan shall have responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such Distribution. The Reorganized Debtor reserves the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

### 7.    Post-Confirmation Management and Insiders Retained by the Debtor.

The managers and officers of the Debtor immediately prior to the Effective Date shall serve as the initial managers and officers of the Debtor on and after the Effective Date. Each off the managers and officers being retained are insiders of the Debtor. The post-confirmation officers and managers of the Debtor, and their compensation, shall be as follows:

28

16452692/2

| Name | Position | Compensation |
|---|---|---|
| Laxman Reddy | President & CEO | $750,000 |
| Matt Williams | CFO | $300,000 |
| Michael Sarrao | EVP & General Counsel | $0[6] |

## 8.  Preservation of Causes of Action.

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, including the Claims and Causes of Action specifically discussed in Article 5 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in the Reorganized Debtor's sole discretion. No Entity may rely on the absence of a specific reference in the Plan to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it. The Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtor or Reorganized Debtor, as applicable, expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

## 9.  Tax Consequences of the Plan.

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their*

---

[6] Mr. Sarrao is not paid compensation other than: (1) medical, dental and vision insurance (approximate value of $33,000); and (2) certain expense reimbursements.

16452692/2

*Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.*

There may be a number of material income tax considerations, risks and uncertainties associated with the implementation of the Plan. The Debtor does not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OR OTHER PLAN RECIPIENTS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE V - FEASIBILITY OF PLAN

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

**1.    Ability to Initially Fund Plan.**

The Debtor believes that it will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date.

**2.    Ability to Make Plan Payments And Operate Without Further Reorganization.**

For a period of three (3) years, the Debtor will contribute its entire projected disposable income, in an aggregate amount of $635,549, plus (ii) any residual value received by the Reorganized Debtor on account of the Debtor's direct and indirect subsidiaries including the claim filed in the bankruptcy case of Sherman/Grayson Hospital, LLC, and (iii) the proceeds of any Cause of Action, including any settlement of such claims, to fund distributions under the Plan on an annual basis. Once a year, the Debtor shall file a certified statement about money received by the Debtor on account of its interest from direct and indirect affiliates.[7] Further, to the extent that the Independent Director determines that there are any valid Causes of Action, the Debtor may create a liquidating trust with an independent third party to pursue such claims with all costs of pursuing such claim(s) coming from the Debtor's projected disposable income that would otherwise be distributions on account of Allowed Claims.

---

[7]    In accordance with applicable non-bankruptcy law, any amounts received by the Debtor's direct or indirect subsidiaries must first be paid to those subsidiaries' creditors and Debtor's direct and indirect subsidiaries must maintain adequate reserves to address contingent liabilities before such money can be transferred to the Debtor as a distribution on account of the Debtor's equity interest.

30

The Debtor will have sufficient operating income to make such payments as indicated in the projections attached hereto as **Exhibit A.**

<div align="center">

## ARTICLE VI - LIQUIDATION ANALYSIS

</div>

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Creditors and Equity Interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached hereto as **Exhibit G.**

<div align="center">

## ARTICLE VII - DISCHARGE, RELEASES AND INJUNCTIONS

</div>

1. **Discharge.**

Assuming the Plan is consensual, pursuant to section 1191(a) of the Bankruptcy Code, on the Effective Date, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt imposed by this Plan or to the extent provided in section 1141(d)(6) of the Bankruptcy Code.

If the Plan is confirmed under section 1191(b), as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Court approves a written waiver of discharge executed by the Debtor after the order for relief under the Bankruptcy Code, the Court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of the Bankruptcy Code, and all other debt allowed under section 503 of the Bankruptcy Code and provided for in this Plan, except any debt – (1) on which the last payment is due after the first 3 years of the Plan, or such other time not to exceed 5 years fixed by the Court; or (2) if applicable, of the kind specified in section 523(a) of the Bankruptcy Code.

2. **Debtor Releases.**

Subject to the occurrence of the Effective Date, and in consideration of the services provided and a total of $25,000 to be remitted by certain of the Debtor's insiders, on the Effective Date, the Debtor and its Estate shall release, waive, and discharge unconditionally the Released Parties from any and all claims, causes of action, and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: in connection with or arising from the Debtor's Chapter 11 Case, the pursuit of confirmation of the Plan, the Consummation thereof, the administration thereof or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any causes of action resulting from the willful misconduct, actual fraud, or gross negligence

3. **Exculpation and Limitation of Liability.**

Except as otherwise specifically provided in the Plan, no Released Party shall have or incur, and each Released Party is hereby released and exculpated from any Cause of Action arising

<div align="center">31</div>

<div align="center">**A0756**</div>

between the Petition Date and the Effective Date related to any act or omission in connection with, relating to, or arising out of: (i) the Chapter 11 Case, (ii) the Plan, or any contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, (iii) the pursuit of Confirmation, (iv) the administration and implementation of the Plan, or (v) the distribution of property under the Plan or any other related agreement.  The Released Parties have, and upon closing of the Chapter 11 Case or the Effective Date shall be deemed to have, with respect to all actions arising on or after the Petition Date, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; provided that in no event shall anything in this Article 5.3 be construed as a release of any person's gross negligence, fraud, or willful misconduct, each as determined by a Final Order.

### 4. **Injunction.**

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been discharged, released or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Released Parties on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Released Parties or the property of the Released Parties on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Released Parties or against the property of the Released Parties on account of or in connection with or with respect to any such claims or interests unless the Released Parties has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that the Released Parties asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PROPERTY TO BE DISTRIBUTED PURSUANT TO THIS PLAN ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### 5. **Remedies Upon Default.**

32

16452692/2

The Debtor expects to be able to make all payments under the Plan. In the event of a default, however, pursuant to § 1191(c)(3) of the Bankruptcy Code, if the Reorganized Debtor defaults in payments under the Plan, the affected creditor shall notify the Reorganized Debtor, who shall have fifteen (15) days to cure the default. If the Reorganized Debtor does not cure within the 15 days, the creditor may file a notice of the default with the Bankruptcy Court and request a hearing to consider appropriate remedies.

## ARTICLE VIII - GENERAL PROVISIONS

### 1.    Title to Assets

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the Estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Equity Interests of Creditors, equity security holders, and of general partners in the Debtor.

 If a plan is confirmed under § 1191(b), property of the Estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case in § 1185 of the Bankruptcy Code, the Plan, or the order confirming the Plan, the Debtor shall remain in possession of all property of the Estate.

### 2.    Binding Effect

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

### 3.    Severability

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 4.    Retention of Jurisdiction by the Bankruptcy Court

The Bankruptcy Court shall retain jurisdiction of this case with regard to all matters to the fullest extent allowed pursuant to applicable law, including the following: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan and to remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order; (ii) to rule on any modification of the Plan proposed under § 1193; (iii) to hear and allow all applications for compensation to Professionals and other Administrative Expenses; (iv) to allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Equity Interest; (v) to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan; (vi) to determine any and all

33

applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract; (vii) to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any entity's obligations in connection with the Plan, or to defend any of the rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof; (viii) to consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor and the Estate; (ix) to decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtor, or the Estate that may be pending on the Effective Date or that may be brought by the Debtor or the Reorganized Debtor, and to enter and enforce any default judgment on any of the foregoing; (x) to decide issues concerning the federal or state tax liability of the Debtor which may arise in connection with the confirmation of the Plan, including but not limited to the issuance of Form 1099s (or similar forms); (xi) to interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Case; (xii) to enforce the release, exculpation and injunction provisions contained in Article 5 herein; and (xiii) to enter an order closing the Chapter 11 Case when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

## 5.     Headings

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

## 6.     Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## 7.     No Fourteen Day Stay

Notwithstanding the requirements set forth by Federal Rules of Bankruptcy Procedure, Rules 3020(e), 6004(h), and 6006(d), the Debtor has the right to elect for the Plan to go effective upon entry of the Confirmation Order so long as no stay is in place.

## 8.     Incorporation of Agreements Entered Into by the Debtor

The Debtor may enter into certain agreements or stipulations with certain Creditors regarding the treatment of their Claim so long as such agreements or stipulations do not violate the Bankruptcy Code. The Plan may be amended to reflect such agreements or stipulations. Such amendments shall not reopen any notice or objection periods regarding the Plan.

## 9.     Modification of Plan

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a).

16452692/2

If the Plan is confirmed under § 1191(a), the Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under § 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Effective Date, or such longer time not to exceed 5 years as fixed by the Bankruptcy Court and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 10.     Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

### 11.     Filing of Notice of Substantial Consummation

Not later than fourteen (14) days after the Plan of is substantially consummated, the Debtor shall file with the Bankruptcy Court and serve upon the Trustee, the United States Trustee, and all parties in interest notice of such substantial consummation.

### 12.     Post-Effective Date Service List

Pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Debtors, counsel for the Liquidating Trustee, and all persons on the Bankruptcy Rule 2002 service list.  With the exception of the Debtors, Cerberus, and the U.S. Trustee, any Person desiring to remain on the Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Liquidating Trustee within thirty (30) days subsequent to the Effective Date.  Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order. **Persons who do not file a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Bankruptcy Rule 2002 service list.**

### 13.     Changes in Rates Not Subject to Regulatory Commission Approval

The Debtor is not subject to governmental regulatory approval of rate. The Debtor is not regulated by a governmental commission.

### 14.     Final Decree

Unless otherwise ordered by the Bankruptcy Court, once the Estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Reorganized Debtor or other party in interest shall file a motion with the Bankruptcy Court to obtain

16452692/2

a final decree to close the case.

## ARTICLE IX - CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

1.    **Conditions Precedent to Confirmation.**

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Article 7.3:

(a)    The Plan and the Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor.

2.    **Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Article 7.3:

(a)    All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtor.

(b)    The Bankruptcy Court shall have entered a Final Order, in form and substance reasonably acceptable to the Debtor confirming the Plan pursuant to section 1191 of the Bankruptcy Code.

(c)    All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(d)    No order of a court shall have been entered and remain in effect restraining the Debtor from consummating the Plan and the transactions contemplated therein, and the Confirmation Order shall be in full force and effect.

(e)    All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance acceptable to the Debtors.

36

3.      **Waiver of Conditions.**

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article 7 may be waived at any time by the Debtor.

4.      **Effect of Failure of Conditions.**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or Claims against the Debtor or any of the Released Parties; (ii) prejudice in any manner the rights of the Debtor, any Holders of a Claim or Equity Interest or any other entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Creditors or Equity Interest Holders or any other entity in any respect.  In addition, the Debtor and all Holders of Claims against or Equity Interests in the Debtor shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

5.      **Filing of Notice of the Effective Date.**

On the Effective Date or as shortly thereafter as reasonably practicable, the Debtor shall file a notice of the Effective Date with the Bankruptcy Court.

## ARTICLE X - EXHIBITS

The following documents accompany the Plan:

| Attached | Description | Exhibit |
|---|---|---|
| X | Organizational Chart | A |
| X | Claims Register and Schedules | B |
| X | Projected Income and Expenses | C |
| X | Report of Gould Consulting Services | D |
| X | Executory Contracts and Unexpired Leases to be Assumed | E |
| X | Executory Contracts and Unexpired Leases to be Rejected | F |
| X | Liquidation Analysis | G |

## ARTICLE XI - RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

1.      **Rules of Interpretation.**

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular

37

or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Debtor, the Reorganized Debtor, or the Trustee in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; and (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor or to the Reorganized Debtor shall mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

**2.**     __Computation of Time.__

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

**3.**     __Governing Law.__

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of California, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtor or the Reorganized Debtor, as

applicable, shall be governed by the laws of the state of incorporation or formation of the Debtor or Reorganized Debtor, as applicable.

**4.    Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

**5.    Controlling Document.**

In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

Dated: December 19, 2023                    **MORRIS JAMES LLP**

/s/ *Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

*Counsel to the Debtor and Debtor in Possession*

39

# **EXHIBIT A**

Organizational Chart

**Alecto Healthcare Services, LLC**
**Organizational Chart**



**EXHIBIT B**

Schedules and Claims Register

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC,[1] | Case No. 23-10787-JKS |
| Debtor. | |

SCHEDULES OF ASSETS AND LIABILITIES FOR
ALECTO HEALTHCARE SERVICES LLC (CASE NO. 23-10787-JKS)

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 - Subchapter V |
| ALECTO HEALTHCARE SERVICES LLC, | Case No. 23-10787-JKS |
| Debtor | |

## GLOBAL NOTES, METHODOLOGY, AND SPECIFIC
## DISCLOSURES REGARDING THE DEBTOR'S SCHEDULES OF
## ASSETS AND LIABILITIES AND STATEMENTS OF FINANCIAL AFFAIRS

### Introduction

These *Global Notes, Methodology, and Specific Disclosures Regarding the Debtor's Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "Global Notes") qualify, are incorporated by reference in, and comprise an integral part of, the Schedules of Assets and Liabilities (collectively, the "Schedules") and the Statements of Financial Affairs (collectively, the "Statements" and, together with the Schedules, the "Schedules and Statements") filed by Alecto Healthcare Services LLC ("Debtor" or the "Company") in the above-captioned case filed under Chapter 11, Subchapter V, of title of the United States Code (the "Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Schedules and Statements were prepared pursuant to § 521 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1007 of the Federal Rules of Bankruptcy Procedure by management of the Debtor, with the assistance of the Debtor's advisors, and are unaudited.

In preparing the Schedules and Statements, the Debtor relied on financial data derived from its books and records that was available at the time of such preparation. The Debtor's Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles in the United States ("GAAP"), nor are they intended to be fully reconciled to the financial statements of the Debtor. The Schedules and Statements contain unaudited information that is subject to further review and potential adjustment. The Schedules and Statements reflect the Debtor's reasonable best efforts to report the assets and liabilities of the Debtor. While the Debtor's management has made reasonable efforts to ensure that the Schedules and Statements are as accurate and complete as possible under the circumstances, based on information available at the time of preparation, subsequent information or discovery may result in material changes to these Schedules and Statements. As a result, inadvertent errors or omissions may exist, and there can be no assurance that these Schedules and Statements are complete.

The Debtor reserves all rights to amend or supplement the Schedules and Statements from time to time, in all respects, as may be necessary or appropriate, including, without limitation, the right to (a) amend the Schedules and Statements with respect to a claim (as defined in § 101(5) of the Bankruptcy Code) description, designation, or Debtor against which the claim is asserted, (b) dispute or otherwise assert offsets or defenses to any claim reflected in the Schedules and

Statements as to amount, liability, priority, status, or classification, (c) subsequently designate any claim as "disputed," "contingent," or "unliquidated," or (d) object to the extent, validity, enforceability, priority, or avoidability of any claim. Any failure to designate a claim in the Schedules and Statements as "disputed," "contingent," or "unliquidated" does not constitute an admission by the Debtor that such claim or amount is not "disputed," "contingent," or "unliquidated." Listing a claim does not constitute an admission of liability by the Debtor against which the claim is listed or against the Debtor. Nothing contained in the Schedules and Statements shall constitute a waiver of any right of the Debtor or an admission with respect to its Chapter 11 Case (including, but not limited to, issues involving claims, substantive consolidation, defenses, equitable subordination, characterization or re-characterization of contracts and leases, assumption or rejection of contracts and leases under the provisions of chapter 3 of the Bankruptcy Code, and/or causes of action arising under the provisions of chapter 5 of the Bankruptcy Code and any other relevant non-bankruptcy laws to recover assets or avoid transfers). Any specific reservation of rights contained elsewhere in these Global Notes does not limit in any respect the foregoing reservation of rights.

The Debtor and its agents, attorneys, and financial advisors do not guarantee or warrant the accuracy or completeness of the data that is provided herein, and will not be liable for any loss or injury arising out of or caused in whole or in part by the acts, errors, or omissions, whether negligent or otherwise, in procuring, compiling, collecting, interpreting, reporting, communicating, or delivering the information contained herein. While commercially reasonable efforts have been made to provide accurate and complete information herein, inadvertent errors or omissions may exist. The Debtor and its agents, attorneys and financial advisors expressly do not undertake any obligation to update, modify, revise, or re-categorize the information provided herein, or to notify any third party should the information be updated, modified, revised, or recategorized. In no event will the Debtor or its agents, attorneys, and financial advisors be liable to any third party for any direct, indirect, incidental, consequential, or special damages (including, but not limited to, damages arising from the disallowance of a potential claim against the Debtor or damages to business reputation, lost business, or lost profits), whether foreseeable or not and however caused, even if the Debtor or its agents, attorneys, and financial advisors are advised of the possibility of such damages.

The Schedules and Statements have been signed by Laxman Reddy, President and Chief Executive Officer of the Debtor. Accordingly, in reviewing and signing the Schedules and Statements, Mr. Reddy necessarily relied upon the efforts, statements, and representations of the Debtor and its staff and other personnel and professionals. Mr. Reddy has not (and could not have) personally verified the accuracy of each such statement and representation, including, but not limited to, statements and representations concerning amounts owed to creditors, classification of such amounts, and their addresses.

These Global Notes should be referred to and considered in connection with any review of the Schedules and Statements.[1] Disclosure of information in one or more Schedules, one or more Statements, or one or more exhibits or attachments to the Schedules or Statements, even if incorrectly placed, shall be deemed to be disclosed in the correct Schedules, Statements, exhibits,

---

or attachments. In the event that the Schedules and Statements differ from the Global Notes, the Global Notes shall control.

*Neither the Schedules and Statements, nor the Global Notes, should be relied upon by any persons for information relating to current or future financial conditions, events, or performance of the Debtor.*

## Global Notes and Overview of Methodology

### Description of Case and Information Date

On June 16, 2023 (the "Petition Date"), the Debtor filed a voluntary petition with this Bankruptcy Court for relief under Subchapter V of Chapter 11 of the United States Bankruptcy Code. The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Case is being administered pursuant to Bankruptcy Rule 1015(b). No creditors' committee has been appointed in this case. Other than the appointed Subchapter V Trustee, no trustee or examiner has been appointed. Except as otherwise noted, the information set forth herein is provided as of the close of business on the Petition Date.

### Basis of Presentation

These Schedules and Statements reflect the assets and liabilities of the Debtor, except where otherwise indicated. Information contained in the Schedules and Statements has been derived from the Debtor's books and records and historical financial statements.

These Schedules and Statements represent the Debtor's good faith attempt to comply with the requirements of the Bankruptcy Code and Bankruptcy Rules using commercially reasonable efforts and resources available and are subject to further review and potential adjustment.

### Amendment of Schedules and Statements

While reasonable efforts have been made to prepare and file complete and accurate Schedules and Statements, inadvertent errors or omissions may exist. The Debtor reserves all rights to amend and/or supplement the Schedules and Statements from time to time as is necessary or appropriate.

## General Notes Applicable to Schedules and Statements

1.      **Recharacterization**. The Debtor has made reasonable efforts to correctly characterize, classify, categorize, and designate the claims, assets, executory contracts, unexpired leases, and other items reported in the Schedules and Statements. The Debtor reserves all rights to recharacterize, reclassify, recategorize, or redesignate items reported in the Schedules and Statements at a later time as necessary or appropriate, including, without limitation, whether contracts or leases listed herein were deemed executory or unexpired as of the Petition Date and remain executory and unexpired postpetition.

2. **Claim Designations**. Any failure to designate a claim in the Schedules and Statements as "contingent," "unliquidated," or "disputed" does not constitute an admission by the Debtor that such claim or amount is not "contingent," "unliquidated," or "disputed." The Debtor reserves all rights to dispute, or to assert offsets or defenses to, any claim reflected on its Schedules or Statements on any grounds, including, but not limited to, amount, liability, priority, status, or classification, or to otherwise subsequently designate any claim as "contingent," "unliquidated," or "disputed." Moreover, the Debtor reserves all rights to amend its Schedules and Statements as necessary and appropriate. Listing a claim does not constitute an admission of liability by the Debtor.

3. **Unliquidated Claim Amounts**. Claim amounts that could not be readily quantified by the Debtor are scheduled as "unliquidated."

4. **Unknown Amounts**. The description of an amount as "unknown" is not intended to reflect upon the materiality of such amount.

5. **Court Orders**. Pursuant to certain orders of the Bankruptcy Court entered in the Debtor's Chapter 11 Case entered on or about June 20, 2023 (the "First Day Orders"), the Debtor was authorized (but not directed) to pay, among other things, certain prepetition claims of employees, insurers, and taxing authorities. Accordingly, these liabilities may have been or may be satisfied in accordance with such orders and therefore may not be listed in the Schedules and Statements. Regardless of whether such claims are listed in the Schedules and Statements, to the extent such claims are paid pursuant to an order of the Bankruptcy Court (including the First Day Orders), the Debtor reserves all rights to amend or supplement its Schedules and Statements.

6. **Other Paid Claims**. To the extent the Debtor has reached any postpetition settlement with a vendor or other creditor, the terms of such settlement will prevail, supersede amounts listed in the Debtor's Schedules and Statements, and shall be enforceable by all parties, subject to any necessary Bankruptcy Court approval. To the extent the Debtor pays any of the claims listed in the Schedules and Statements pursuant to any orders entered by the Bankruptcy Court, the Debtor reserves all rights to amend and supplement the Schedules and Statements and take other action, such as filing claims objections, as is necessary and appropriate to avoid overpayment or duplicate payment for such liabilities.

7. **Liabilities**. The Debtor has sought to allocate liabilities between the prepetition and postpetition periods based on the information and research that was conducted in connection with the preparation of the Schedules and Statements. As additional information becomes available and further research is conducted, the allocation of liabilities between prepetition and postpetition periods may change. The Debtor reserves the right to modify, amend, or supplement the Schedules and Statements as it deems appropriate in this regard.

8. **Excluded Assets and Liabilities**. The Debtor may have excluded certain categories of assets, tax accruals, and liabilities from the Schedules and Statements, including without limitation, accrued salaries and employee benefit accruals. In addition, and as set forth above, the Debtor may have excluded amounts for which the Debtor has been granted authority to pay pursuant to a First Day Order or other order that may be entered by the Bankruptcy Court. The Debtor may also have excluded rejection damage claims of counterparties to executory

contracts and unexpired leases that may be rejected (if any), to the extent such damage claims exist. Also, certain immaterial assets and liabilities may have been excluded.

9. **Confidential or Sensitive Information**. There may be instances in which certain information in the Schedules and Statements intentionally has been redacted due to the nature of an agreement between a Debtor and a third party, concerns about the confidential or commercially sensitive nature of certain information, or concerns for the privacy of an individual based on the Health Insurance Portability and Accountability Act of 1996 or otherwise. The alterations will be limited to only what is necessary to protect the Debtor or third party. In some instances, the redacted information may be available upon request.

10. **Leases**. The Debtor may not have included in the Schedules and Statements the future obligations of any capital or operating leases. To the extent that there was an amount outstanding as of the Petition Date, the creditor has been included on Schedule F of the Schedules. Nothing in the Schedules or Statements (including, without limitation the failure to list leased property or equipment as owned property or equipment) is, or shall be construed as, an admission as to the determination of legal status of any lease (including whether any lease is a true lease or a financing arrangement), and the Debtor reserves all rights with respect to such issues.

11. **Guarantees and Other Secondary Liability Claims**. The Debtor has used reasonable efforts to locate and identify guarantees and other secondary liability claims (collectively, "Guarantees") in each of its executory contracts, unexpired leases, secured financings, debt instruments, and other such agreements. However, certain Guarantees embedded in the Debtor's executory contracts, unexpired leases, secured financings, debt instruments, and other such agreements may have been inadvertently omitted. Thus, the Debtor reserves all rights to amend the Schedules to the extent that additional Guarantees are identified.

12. **Executory Contracts**. Although the Debtor has made diligent efforts to attribute an executory contract to its rightful Debtor, in certain instances, the Debtor may have inadvertently failed to do so. Accordingly, the Debtor reserves all rights with respect to the named parties of any and all executory contracts, including the right to amend Schedule G.

13. **Estimates**. To prepare and file the Schedules as close to the Petition Date as possible, management was required to make certain estimates and assumptions that affected the reported amounts of these assets and liabilities. The Debtor reserves all rights to amend the reported amounts of assets and liability to reflect changes in those estimates or assumptions.

14. **Fiscal Year**. The Debtor's fiscal year ends on December 31.

15. **Property and Equipment**. Unless otherwise indicated, owned property and equipment are stated at net book value. The Debtor may lease furniture, fixtures, and equipment from certain third-party lessors. Nothing in the Schedules and Statements is or shall be construed as an admission as to the determination as to the legal status of any lease (including whether any lease is a true lease or a financing arrangement), and the Debtor reserves all of its rights with respect to same.

16. **Credits and Adjustments**. The claims of individual creditors for, among other things, goods, products, services, or taxes are listed as the amounts entered on the Debtor's books

and records and may not reflect credits, allowances, or other adjustments due from such creditors to the Debtor. The Debtor reserves all rights with regard to such credits, allowances, and other adjustments, including the right to assert claims objections and/or setoffs with respect to the same.

17.    **Insiders.**    In the circumstance where the Schedules and Statements require information regarding "insiders" the Debtor has included information with respect to the individuals the Debtor believes are included in the definition of "insider" set forth in § 101(31) of the Bankruptcy Code during the relevant time periods. Such individuals may no longer serve in such capacities. The listing of a party as an insider for purposes of the Schedules and Statements is not intended to be, nor should it be, construed an admission of any fact, right, claim, or defense and all such rights, claims, and defenses are hereby expressly reserved. Information regarding the individuals listed as insiders in the Schedules and Statements has been included for informational purposes only and such information may not be used for: (1) the purposes of determining (a) control of the Debtor; (b) the extent to which any individual exercised management responsibilities or functions; (c) corporate decision-making authority over the Debtor; or (d) whether such individual could successfully argue that he or she is not an insider under applicable law, including the Bankruptcy Code and federal securities laws, or with respect to any theories of liability, or (2) any other purpose.

18.    **Totals**. All totals that are included in the Schedules and Statements represent totals of all known and estimated amounts that are included in the Schedules and Statements. To the extent there are unknown, disputed, contingent, unliquidated, or otherwise undetermined amounts, the actual total may be materially different than the listed total. The description of an amount as "unknown", "disputed", "contingent", "unliquidated", or "undetermined" is not intended to reflect upon the materiality of such amount.

19.    **Exclusions.**    The Debtor may have excluded certain categories of assets and liabilities from the Schedules and Statements, including accrued liabilities such as accrued salaries and employee benefits (including accrued personal time off) and accrued accounts payable, as well as assets with a net book value of zero. Other non-material assets and liabilities may have also been excluded.

<u>**Specific Notes Regarding the Schedules and Statements**</u>

**Specific Notes Regarding the Statements**

1.    **Gross Revenue**. Amounts listed for gross revenue in the Part 1 of the Statements from the beginning of the fiscal year to just before the Petition Date reflect gross revenue from the Debtor's business for the period of January 1, 2023 through and including the Petition Date.

2.    **90 Day Payments.** The dates set forth in the "Dates of Payment" column relate to one of the following: (a) the date of a wire transfer; (b) the date of an "ACH" payment; or (c) the date that a check was issued. Item 3 includes any disbursement or other transfer made by the Debtor within 90 days before the Petition Date except for those made to insiders (which payments appear in response to Item 4).

3.    **Insider Payments**. The Debtor made reasonable, good faith efforts to list all material payments made to or for the benefit of insiders with one year before the filing of the case.

However, it would be unduly burdensome to determine the amount of certain employee benefits provided to insiders by the Debtor, which include, among other things, the employer portion of health insurance premiums. Moreover, the payment of such amounts was authorized by the Employee Wage Order (as defined herein). The Debtor believes that the expenses underlying any employee reimbursements were incurred for the benefit of the Debtor, and not insiders.

4. **Property held for another.** The Debtor has made reasonable efforts to account for property held for another by relying on the Debtor's books and records.

**Specific Notes Regarding Schedule A/B**

1. **Bank Account Balances**. In the event of any conflict between the Debtor's *Motion for Interim and Final Orders Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code* [Docket No. 6] and the Statements and Schedules, the information contained in the Statements and Schedules shall control.

2. **Prepayments**. Certain prepayments reflected on the Debtor's balance sheet may not be included because the vendor to which they relate has fully performed the related services and the Debtor has no claims against these vendors.

3. The Debtor does not believe that the note receivable from Olympia Healthcare, LLC (an indirect subsidiary of the Debtor) is collectible.

4. The $2,000,000 referenced in Part II, Item 75 is a setoff defense and is not an affirmative claim.

**Specific Notes Regarding Schedule E/F**

1. **Creditors Holding Priority Unsecured Claims**. The listing of any claim on Schedule E/F does not constitute an admission by the Debtor that such claim is entitled to priority treatment under § 507 of the Bankruptcy Code. The Debtor reserves all rights to dispute the amount and/or the priority status of any claim on any basis at any time.

The Bankruptcy Court entered the *Interim Order (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages and Salaries, (II) Authorizing Payment of Certain Employee Benefits and Confirming right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers and (VI) Allowing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments* [Docket No.26], granting authority to the Debtor to pay certain prepetition employee wage and other obligations in the ordinary course (the "Wage Order"). Pursuant to the Wage Order, the Bankruptcy Court granted the Debtor authority to pay or honor certain prepetition obligations for employee wages, payroll deductions, employee benefits, and other benefits and fees. The Debtor has not listed on Schedule E/F any wage or employment-related obligations owed to non-insiders for which the Debtor has been granted authority to pay pursuant to the Employee Wage Order or other order that

may be entered by the Bankruptcy Court. The Debtor believes that all such claims have been, or will be, satisfied in the ordinary course during this case pursuant to the authority granted in the Employee Wage Order or other order that may be entered by the Bankruptcy Court. Likewise, the Debtor has not listed on Statement, Question 3, any transfers to non-insider employees on account of wages or employment-related obligations for which the Debtor has been granted authority to pay pursuant to the Employee Wage Order or other order that may be entered by the Bankruptcy Court.

      2.      **Creditors Holding Non-Priority General Unsecured Claims.**

- Horizon Real Estate Holdings, LLC is an affiliate of the Debtor.

- Olympia Healthcare LLC is an affiliate of the Debtor.

- Plaza Medical Office Building, LLC is an affiliate of the Debtor.

**Specific Notes Regarding Schedule G**

      1.      The Debtor's books and records may not be complete with respect to all unexpired leases and/or executory contracts to which they are a party and that were pending as of the Petition Date. In particular, the Debtor may be party to agreements and understanding that are "oral" or "verbal" in nature; while the Debtor has made reasonable efforts to identify these agreements and disclose them in the Schedules, there may be some that are not yet known or identified. Certain of the executory contracts and unexpired leases listed on Schedule G may contain renewal options, guarantees of payment, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights. Such rights, powers, duties, and obligations are not separately set forth on Schedule G or Schedule B. Omission of a contract, lease or other agreement from Schedule G does not constitute an admission that such omitted contract, lease or agreement is not an executory contract or unexpired lease. The Debtor hereby reserves all of its rights to (i) dispute the validity, status, or enforceability of any contract, agreement or lease set forth in Schedule G and (ii) amend or supplement such Schedule as necessary.

**Specific Notes Regarding Attachment No. 8 to Schedule A/B**

      1.      Certain of the insurance policies provide insurance coverage to affiliates of the Debtor and the Debtor reserves the right to seek reimbursement of an allocated share of such premiums from such affiliates, as appropriate.

<p style="text-align:center">* * * * * * *</p>

**Fill in this information to identify the case and this filing:**

Debtor Name: Alecto Healthcare Services LLC
a Delaware limited liability company

United States Bankruptcy Court for the: _____ District of Delaware
(State)

Case number (*If known*): 23-10787-JKS

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors          12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☑ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☑ *Schedule H: Codebtors* (Official Form 206H)
- ☑ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐ Amended *Schedule* _____
- ☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☐ *Other document that requires a declaration* _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   6/30/2023          ✗ /s/ Laxman Reddy
              MM / DD / YYYY              Signature of individual signing on behalf of debtor

                                         Laxman Reddy
                                         Printed name

                                         President and Chief Executive Officer
                                         Position or relationship to debtor

A0777

**Fill in this information to identify the case:**

Debtor name  Alecto Healthcare Services LLC a Delaware limited liability company

United States Bankruptcy Court for the: _____ District of  Delaware
(State)

Case number (If known):  23-10787-JKS

☐ Check if this is an amended filing

Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals

12/15

### Part 1:  Summary of Assets

1. *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B* .................................................

   $ _____ 0.00

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B* ...............................................

   $ 3,523,846.62

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B* .................................................

   $ 3,523,846.62

### Part 2:  Summary of Liabilities

2. *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D* ...............

   $ 712,846.79

3. *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F* ..............................

   $ _____ 0.00

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F* ..............

   + $ 85,496,898.04

4. **Total liabilities** ................................................................
   Lines 2 + 3a + 3b

   $ 86,209,744.83

**A0778**

**Fill in this information to identify the case:**

Debtor name  Alecto Healthcare Services LLC a Delaware limited liability company

United States Bankruptcy Court for the: _____ District of  Delaware
(State)

Case number (if known):  23-10787-JKS

☐ Check if this is an amended filing

## Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

### Part 1:   Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand**    $_____

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|
| 3.1. See Attachment No. 3 | | | $ 2.61 |
| 3.2. | | | $ |

4. **Other cash equivalents** *(Identify all)*

| 4.1. See Attachment No. 3 | $ 5,493.56 |
|---|---|
| 4.2. | $ |

5. **Total of Part 1**    $ 5,496.17

   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

### Part 2:   Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

   ☐ No. Go to Part 3.
   ☑ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

7. **Deposits, including security deposits and utility deposits**

Description, including name of holder of deposit

| 7.1. NTT America, Inc. – Deposit for Sublease of Office Space Suite 1780 | $ 28,925.00 |
|---|---|
| 7.2. Pacific Global Investment Management Company - deposit for sublease Suite 1920 | $ 12,592.80 |

A0779

Debtor Alecto Healthcare Services LLC a Delaware limited liability company

Name

Case number (if known) 23-10787-JKS

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

8.1. See Attachment No. 8 _____ $ 1,305,994.29

8.2. _____ $ _____

9. **Total of Part 2.**

Add lines 7 through 8. Copy the total to line 81. $ 1,347,512.09

---

### Part 3: Accounts receivable

10. **Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.

☑ Yes. Fill in the information below.

Current value of debtor's interest

11. **Accounts receivable**

11a. 90 days old or less: $1,960,598.88 – $1,960,598.88 = ........→ $ 0.00
face amount          doubtful or uncollectible accounts

11b. Over 90 days old: $94,531,482.75 – $94,531,482.75 = ........→ $ 0.00
face amount          doubtful or uncollectible accounts

12. **Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82. $ 0.00

---

### Part 4: Investments

13. **Does the debtor own any investments?**

☐ No. Go to Part 5.

☑ Yes. Fill in the information below.

| | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

14. **Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1. _____ _____ $ _____

14.2. _____ _____ $ _____

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity:                    % of ownership:

15.1. See Attachment No. 15 _____ _____ % _____ $ 120,000.00

15.2. _____ _____ % _____ $ _____

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1. _____ _____ $ _____

16.2. _____ _____ $ _____

17. **Total of Part 4**

Add lines 14 through 16. Copy the total to line 83. $ 120,000.00

---

A0780

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number *(if known)* | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

---

## Part 5: Inventory, excluding agriculture assets

**18. Does the debtor own any inventory (excluding agriculture assets)?**

☑ No. Go to Part 6.

☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| **19. Raw materials** | | | | |
| _____ | MM / DD / YYYY | $_____ | _____ | $_____ |
| **20. Work in progress** | | | | |
| _____ | MM / DD / YYYY | $_____ | _____ | $_____ |
| **21. Finished goods, including goods held for resale** | | | | |
| _____ | MM / DD / YYYY | $_____ | _____ | $_____ |
| **22. Other inventory or supplies** | | | | |
| _____ | MM / DD / YYYY | $_____ | _____ | $_____ |

**23. Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

$ _____ 0.00

**24. Is any of the property listed in Part 5 perishable?**

☐ No

☐ Yes

**25. Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value _____ Valuation method_____ Current value_____

**26. Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

**27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28. Crops—either planted or harvested** | | | |
| _____ | $_____ | _____ | $_____ |
| **29. Farm animals** *Examples*: Livestock, poultry, farm-raised fish | | | |
| _____ | $_____ | _____ | $_____ |
| **30. Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| _____ | $_____ | _____ | $_____ |
| **31. Farm and fishing supplies, chemicals, and feed** | | | |
| _____ | $_____ | _____ | $_____ |
| **32. Other farming and fishing-related property not already listed in Part 6** | | | |
| _____ | $_____ | _____ | $_____ |

A0781

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number (if known) 23-10787-JKS |
|---|---|---|
| | Name | |

33. **Total of Part 6.**

Add lines 28 through 32. Copy the total to line 85.

$ _____ 0.00

34. **Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

    ☐ No

    ☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $ _____ Valuation method _____ Current value $ _____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

**Part 7:    Office furniture, fixtures, and equipment; and collectibles**

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** Reception Desk | $ 4,838.56 | Cost | $ 4,838.36 |
| 40. **Office fixtures** | $ _____ | _____ | $ _____ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** Computer Equipment | $ 25,000.00 | Cost | $ 25,000.00 |
| 42. **Collectibles** Examples: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 _____ | $ _____ | _____ | $ _____ |
| 42.2 _____ | $ _____ | _____ | $ _____ |
| 42.3 _____ | $ _____ | _____ | $ _____ |

43. **Total of Part 7.**

Add lines 39 through 42. Copy the total to line 86.

$ 29,838.36

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

☑ No

☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☑ No

☐ Yes

**A0782**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number (if known) | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

---

<table>
<tr><td colspan="4"><strong>Part 8:</strong> Machinery, equipment, and vehicles</td></tr>
</table>

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.

☑ Yes. Fill in the information below.

| General description<br><br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

| | | | |
|---|---|---|---|
| 47.1 2017 Toyota Highlander<br>VIN 5TDBZRFHIH5452189 | $ 21,000.00 | (Kelly Blue Book)<br>FMV | $ 21,000.00 |
| 47.2 _____ | $_____ | _____ | $_____ |
| 47.3 _____ | $_____ | _____ | $_____ |
| 47.4 _____ | $_____ | _____ | $_____ |

48. **Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

| | | | |
|---|---|---|---|
| 48.1 _____ | $_____ | _____ | $_____ |
| 48.2 _____ | $_____ | _____ | $_____ |

49. **Aircraft and accessories**

| | | | |
|---|---|---|---|
| 49.1 _____ | $_____ | _____ | $_____ |
| 49.2 _____ | $_____ | _____ | $_____ |

50. **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

| | | | |
|---|---|---|---|
| _____ | $_____ | | $_____ |

51. **Total of Part 8.**

Add lines 47 through 50. Copy the total to line 87.

| | |
|---|---|
| | $ 21,000.00 |

52. **Is a depreciation schedule available for any of the property listed in Part 8?**

☑ No

☐ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☑ No

☐ Yes

---

**A0783**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number (if known) | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

## Part 9: Real property

**54. Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

**55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 101 N. Brand, Ste 1920, Glendale, CA | Sublease Interest | $ 0.00 | Debtor Opinion | $ 0.00 |
| 55.2 | | $ | | $ |
| 55.3 | | $ | | $ |
| 55.4 | | $ | | $ |
| 55.5 | | $ | | $ |
| 55.6 | | $ | | $ |

**56. Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$ 0.00

**57. Is a depreciation schedule available for any of the property listed in Part 9?**

☑ No

☐ Yes

**58. Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☑ No

☐ Yes

## Part 10: Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **60. Patents, copyrights, trademarks, and trade secrets** | $ | | $ |
| **61. Internet domain names and websites** www.alectohealthcare.com | $ 0.00 | Debtor Opinion | $ 0.00 |
| **62. Licenses, franchises, and royalties** | $ | | $ |
| **63. Customer lists, mailing lists, or other compilations** | $ | | $ |
| **64. Other intangibles, or intellectual property** | $ | | $ |
| **65. Goodwill** | $ | | $ |

**66. Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$ 0.00

A0784

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number *(if known)* | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)?

☑ No
☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

☑ No
☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**

☑ No
☐ Yes

---

**Part 11:** **All other assets**

70. **Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
☑ Yes. Fill in the information below.

| | | | | Current value of debtor's interest |
|---|---|---|---|---|

71. **Notes receivable**

Description (include name of obligor)

Olympia Health Care, LLC       8,944,477.81 _       8,944,477.81       = →       $ _____ 0.00

Total face amount       doubtful or uncollectible amount

72. **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

_____       Tax year _____       $ _____
_____       Tax year _____       $ _____
_____       Tax year _____       $ _____

73. **Interests in insurance policies or annuities**

_____       $ _____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

_____       $ _____

Nature of claim       _____
Amount requested       $ _____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

See Attachment No. 75       $ _____ 2,000,000.00

Nature of claim       _____
Amount requested       $ _____

76. **Trusts, equitable or future interests in property**

_____       $ _____

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

_____       $ _____
_____       $ _____

78. **Total of Part 11.**

Add lines 71 through 77. Copy the total to line 90.       $ **2,000,000.00**

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

☑ No
☐ Yes

**A0785**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | | Case number *(if known)* | 23-10787-JKS |
|--------|------|---|---|---|
| | Name | | | |

---

## Part 12: Summary

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 5,496.17 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 1,347,512.09 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 120,000.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 29,838.36 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 21,000.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* ............ ➔ | | $ 0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 2,000,000.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. ...........91a. | $ 3,523,846.62  91b. | + $ 0.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. ...........................  $ 3,523,846.62

**In re Alecto Healthcare Services LLC**
**Attachment No. 3 to Schedule A/B**
**[Part 1, Item 3 – Checking, savings, money market or financial brokerage accounts]**

| Name of Bank | Account Number | Description | Balance | |
|---|---|---|---|---|
| City National Bank | x3784 | Credit Line Activity | $0.00 | |
| City National Bank | x6065 | A/P | $0.00 | ** |
| City National Bank | x6508 | Payroll | $2.61 | |
| | | Total | $2.61 | |

** Debtor has a check in the amount of $5,493.56 that, subject to Court approval, will be deposited into its x6065 account on Tuesday June 20, 2023.

**A0787**

In re Alecto Healthcare Services LLC
Attachment No. 8 to Schedule A/B
[Part 2, Item 8 – Prepayments]

**Alecto Healthcare Services LLC**
**Prepaid Balance Detail**
**As of 05/31/2023**

**A) Prepaid Business Insurance**

| Insurance Type | Insurance Carrier | Beg Date | End Date | Premiums & Fees Paid/Financed | Premiums & Fees Expensed to Date | Prepaid as of 05/31/23 |
|---|---|---|---|---|---|---|
| 1) Directors & Officers | National Union Fire Insurance Co. 28 Liberty Street, New York, New York 10005; 2) RSUI Indemnity Company, 945 East Paces Ferry Road, Suite 1800, Atlanta, Georgia 30376 | 1/31/2023 | 1/31/2024 | $892,556.40 | $297,516.40 | $595,040.00 |
| 2) Comprehensive Employers Indemnity (TX Non-Subscribe) | Old Republic Union Insurance Co. 307 N. Michigan Avenue, Chicago, IL 60601 | 3/31/2023 | 3/31/2024 | $33,827.82 | $5,637.82 | $28,190.00 |
| 3) Workers Compensation | StarNet Insurance Company, 9301 Innovation Drive, Suite 200, Manassa, VA 20110 | 4/1/2023 | 4/1/2024 | $16,048.00 | $2,678.00 | $13,370.00 |
| 4) Automobile | Vantapro Specialty Insurance Co.; 199 Water Street, New York, NY 10038 | 6/1/2023 | 6/1/2024 | $2,921.76 | $0.00 | $0.00 |
| 5) Excess Medical Professional/General Liability | Magmutual Professional Security Ins Co; P.O. Box 52979, Atlanta, Georgia 30355 | 8/1/2022 | 8/1/2023 | $175,685.58 | $146,405.58 | $29,280.00 |
| 6) "All Risks" Property incl Boiler & Machinery & Flood, excluding CA EM | American Home Assurance Co; 175 Water Street, New York, New York 10038 | 7/1/2022 | 9/30/2023 | $201,399.48 | $157,116.19 | $44,283.29 |
| 7) Environmental Pollution/Storage Tank Liability - WNJ | Ironshore Specialty Insurance Co., 175 Berkeley Street, Boston, MA 02116 | 8/1/2022 | 8/1/2023 | $19,224.12 | $16,024.12 | $3,200.00 |
| 8) Cyber Liability | Coalition Insurance Solutions, 1160 Battery Street, Suite 350, San Francisco, CA 94111 | 8/14/2022 | 8/14/2023 | $48,334.42 | $38,412.42 | $9,922.00 |
| 9) 3 Year Extended Reporting Period Excess Medical Professional/General Liability Coverage for Non TX Exposures | Endurance American Specialty Ins Co.; 16052 Swingley Ridge Road, Suite 130, St. Louis, Missouri 63017 | 8/1/2022 | 8/1/2025 | $844,558.56 | $234,599.56 | $609,959.00 |
| **Total Prepaid Business Insurance** | | | | | | **$1,333,244.29** |

**B) Prepaid Employee Health Insurance Benefits**

| | | | | | | |
|---|---|---|---|---|---|---|
| Anthem Blue Cross -Health Insurance Premiums | | | | | | $0.00 |
| Unum Life Insurance Company of America - Life Insurance Premiums | | | | | | $0.00 |
| MetLife Ins - Vision & Dental Insurance Premiums | | | | | | $0.00 |
| **Total Prepaid Employee Health Insurance Benefits** | | | | | | **$0.00** |

**C) Other Prepaids**

| | | | | | | |
|---|---|---|---|---|---|---|
| MS Office 365 & Outlook  Accounts | Go Daddy | 12/1/2022 | 11/30/2023 | $5,405.28 | $2,705.28 | $2,700.00 |
| **Total Other Prepaids** | | | | | | **$2,700.00** |

| | |
|---|---|
| **Total Prepaids** | **$1,335,944.29** |
| **Ending GL Balance** | **$1,306,005.41** |

**A0788**

**In re Alecto Healthcare Services LLC**
**Attachment No. 15 to Schedule A/B**
**[Part 4, Item 15 – Non-publicly traded stock and interests in**
**incorporated and unincorporated businesses, including any**
**interest in an LLC, partnership, or joint venture]**

| Name of Entity | % of Ownership | Valuation Method Used for Current Value | Current Value of Debtor's Interest |
|---|---|---|---|
| Alecto Healthcare Services Hayward, LLC (provides management services to non-profit hospital) | 100% | Debtor's Opinion | $100,000.00 |
| Alecto Healthcare Services Los Angeles, LLC (investment vehicle to hold interests in two LLCs) | 100% | Debtor's Opinion | $0.00 |
| Alecto Healthcare Services Fairmont, LLC (currently in wind down of business and maintaining medical ...) | 100% | Debtor's Opinion | $10,000.00 |
| Acceleron Services, LLC (no business operations - never engaged in business) | 100% | Debtor's Opinion | $0.00 |
| United Medical Management, LLC (no business operations - never engaged in business) | 100% | Debtor's Opinion | $0.00 |
| Sunrise MOB Holdings, LLC (investment vehicle to hold interest in one LLC) | 100% | Debtor's Opinion | $10,000.00 |
| Alecto Healthcare Services Sherman, LLC (investment vehicle that holds interest in three LLCs) | 80% | Debtor's Opinion | $0.00 |
| Alecto Healthcare Services Ohio Valley, LLC (investment vehicle that holds interest in two LLCs and sponser of a defined beneft pension plan) | 100% | Debtor's Opinion | $0.00 |
| Alecto Healthcare Services Real Estate Holdings, LLC (no business operations - never engaged in business) | 100% | Debtor's Opinion | $0.00 |
| M/C Healthcare, LLC (no active operations) | 100% | Debtor's Opinion | $0.00 |
| | | Total | $120,000.00 |

**In re Alecto Healthcare Services LLC**
**Attachment No. 75 to Schedule A/B**
**[Part 11, Item 75 – Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to setoff claims]**


In <u>United States of America v. Olympia Health Care, LLC, et. al.</u>, Olympia Health Care, LLC alleges that the claims asserted by the United States of America on behalf of the Centers for Medicare and Medicaid Services (CMS) against Olympia Health Care, LLC are subject to setoff based on Olympia Health Care, LLC's claims that it has overpaid the amounts due under a settlement reached by Olympia Health Care, LLC and CMS.  The claims against Debtor are derivative of the claims against Olympia Health Care, LLC and as such, the Debtor should receive the benefit of any set off.

Contingent Value $2,000,000.00

**Fill in this information to identify the case:**

Debtor name **Alecto Healthcare Services LLC,**
**a Delaware limited liability company**

United States Bankruptcy Court for the: District of **Delaware**

Case number (*if known*): **23-10787-JKS**

☐ Check if this is an amended filing

Official Form 206D

## Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible.

1.  **Do any creditors have claims secured by debtor's property?**
    ☐ No. Check this box and submit page 1 of this form to the court with the debtor's other schedules. Debtor has nothing else to report on this form
    ☒ Yes. Fill in all of the information below.

| Part 1: | List Creditors Who Have Secured Claims |
|---------|----------------------------------------|

2.  **List in alphabetical order all creditors who have secured claims.**
    **If a creditor has more than one secured claim, list the creditor separately for each claim.**

|  | | Column A **Amount of claim** Do not deduct the value of collateral | Column B Value of collateral that supports this claim |
|---|---|---|---|
| **2.1 Creditor's name** <br><br>**Cardinal Health 110, LLC c/o Porter Wright Morris & Arthur LLC**<br><br>**Creditor's mailing address**<br><br>**Attn Allen Carter Esq**<br>**41 South High Street, Suite 2900**<br>**Columbus, Ohio 43215**<br><br>**Creditor's email address, if known**<br><br>Date debt was incurred **Various**<br><br>Last four digits of account number<br><br>**Do multiple creditors have an interest in the same property?**<br>☐ No.<br>☐ Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals**<br>**UCC filed 3/12/2020, filing number 2020 1831975**<br>**Collateral: All prescription pharmaceutical products, over-the-counter pharmaceutical products, nutritional supplements, first-aid, health and beauty products, home health care products and equipment, medical and surgical supplies, medical products and inventory, general merchandise and supplies, sundries, and any other products supplied by secured party. Note: Debtor has never received any products from the Cardinal Health 110 LLC and none of its cash is the result of proceeds from any of products** | $285,229.79 | $ |

**Is the creditor an insider or related party?**
☒ No.
☐ Yes.

**Is anyone else liable on this claim?**
☒ No.
☐ Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent.
☒ Unliquidated.
☐ Disputed

A0791

Debtor  **Alecto Healthcare Services LLC a Delaware limited liability company**        Case number *(if known)* 23-10787-JKS

| | | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **2.2  Creditor's name**<br><br>**MPT of Fairmont-Alecto Hospital, LLC; MPT of Fairmont – Alecto, LLC, MPT of Wheeling – Alecto Hospital, LLC, and MPT of Martins Ferry – Alecto Hospital, LLC c/o Medical Properties Trust, Inc.**<br><br>Creditor's mailing address<br><br>**Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242**<br><br>Creditor's email address, if known<br><br>Date debt was incurred  **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☒No.<br>☐Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Contingent claim based on guarantee under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC. UCC filed 9/19/2014, filing number 2014 3774312, continuation filed 3/27/2019, filing number 2019 2109119. Note: No fees were ever paid or will be paid by Alecto Healthcare Services Fairmont LLC to Debor under the agreement and none of Debtor's cash is the result of any such fees.**<br><br>Is the creditor an insider or related party?<br>☒No.<br>☐Yes.<br><br>Is anyone else liable on this claim?<br>☐No.<br>☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent.<br>☐ Unliquidated<br>☐ Disputed | $          .00 | $ |
| **2.3  Creditor's name**<br><br>**MPT of Los Angeles LP and MPT of Olympia LLC c/o Medical Properties Trust, Inc.**<br><br>Creditor's mailing address<br><br>**Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242**<br><br>Creditor's email address, if known<br><br>Date debt was incurred  **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☒No.<br>☐Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Contingent claim based on guarantee under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC. UCC filed 12/31/2013, filing number 2013 5184842, continuation filed 7/2/2018, filing number 2018 4541369.  Note: No fees were ever paid or will be paid by Olympia Health Care, LLC to Debtor under the agreement and none of Debtor's cash is the result of any such fees.**<br><br>Is the creditor an insider or related party?<br>☒No.<br>☐Yes.<br><br>Is anyone else liable on this claim?<br>☒No.<br>☐Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent.<br>☐ Unliquidated<br>☐ Disputed | $          .00 | $ |

Official Form 206D                **Schedule D: Creditors Who Have Claims Secured by Property**

Debtor **Alecto Healthcare Services LLC a Delaware limited liability company**   Case number *(if known)* 23-10787-JKS

| | | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.4 Creditor's name**<br><br>**MPT of Sherman-Alecto Hospital, LLC; MPT of Sherman – Alecto, LLC**<br>**MPT of Los Angeles LP**<br>**c/o Medical Properties Trust, Inc.**<br><br>Creditor's mailing address<br><br>**Attn Larry Portal, SVP**<br>**Attn Legal Department**<br>**1000 Urban Center Drive, Suite 501**<br>**Birmingham, AL 35242**<br><br>Creditor's email address, if known<br><br>Date debt was incurred **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☒No.<br>☐Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Contingent claim based on guarantee re Sherman/Grayson Hospital, LLC obligations to MPT of Sherman-Alecto, LLC for Capital Reserve Deposits.**<br>**UCC filed 10/31/2014, filing number : 2014 4400537; continuation filed 6/10/2019, filing number 2019 3988941. Note: No fees were ever or will be paid by by Sherman/Grayson Hospital, LLC to Debtor under the agreement and none of Debtor's cash is the result of any such fees,**<br><br>Is the creditor an insider or related party?<br>☒No.<br>☐Yes.<br><br>Is anyone else liable on this claim?<br>☐No.<br>☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent.<br>☐ Unliquidated<br>☐ Disputed | $427,617.00 | $ |
| **2.5 Creditor's name**<br><br>**MPT of Martins Ferry – Alecto Hospital, LLC; MPT of Wheeling – Alecto Hospital, LLC; MPT of Martins Ferry-Alecto, LLC; and MPT of Wheeling-Alecto Hospital, LLC**<br>**c/o Medical Properties Trust, Inc.**<br><br>Creditor's mailing address<br><br>**Attn Larry Portal, SVP**<br>**Attn Legal Department**<br>**1000 Urban Center Drive, Suite 501**<br>**Birmingham, AL 35242**<br><br>Creditor's email address, if known<br><br>Date debt was incurred **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☒No.<br>☐Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Contingent claim based on guarantee re under Master Lease Agreement with Alecto Healthcare Services Wheeling LLC and Alecto Healthcare Services Martin's Ferry LLC**<br>**UCC filed 6/6/2017, filing number 2017 3713317 , continuation filed 4/26/2022. Note: No fees were ever paid or will be paid by Alecto Healthcare Services Wheeling LLC, and Alecto Healthcare Services Martins Ferry LLC to Debtor under agreement and none of Debtor's cash is the result of any such fees.**<br><br>Is the creditor an insider or related party?<br>☒No.<br>☐Yes.<br><br>Is anyone else liable on this claim?<br>☐No.<br>☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent.<br>☐ Unliquidated<br>☐ Disputed | $ .00 | $ |

Debtor **Alecto Healthcare Services LLC a Delaware limited liability company**    Case number *(if known)* 23-10787-JKS

---

3.  **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any**    **$712,846.79**

**A0794**

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor name | **Alecto Healthcare Services LLC, a Delaware limited liability company** |
| United States Bankruptcy Court for the: District of **Delaware** | |
| Case number (*If known*): **23-10787-JKS** | |

☐ Check if this is an amended filing

## Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims 12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on Schedule A/B: Assets - Real and Personal Property (Official Form 206A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

| Part 1: | List Creditors With PRIORITY Unsecured Claims |
|---|---|

1. **Do any creditors have priority unsecured claims? (See 11 U.S.C. § 507).**
   ☐ No. Go to Part 2.
   ☒ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part. If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.**

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1 Priority creditor's name and mailing address**<br><br>**California Franchise Tax Board Bankruptcy Section, MS: A-340 PO Box 2952 Sacramento, CA 95812-2952**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number<br><br>Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a)(8) | **As of the petition filing date, the claim is:**<br>Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim**<br><br>**Is the claim subject to setoff?**<br>☐ No.<br>☐ Yes. | **Notice Purposes** | $ |
| **2.2 Priority creditor's name and mailing address**<br><br>**California Department of Tax and Fee Administration PO Box 942879 Sacramento, CA 94279-0001**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number<br><br>Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8) | **As of the petition filing date, the claim is:**<br>Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim**<br><br>**Is the claim subject to setoff?**<br>☐ No.<br>☐ Yes. | **Notice Purposes** | $ |

Debtor **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number *(if known)* **23-10787-JKS**

| | Total claim | Priority amount |
|---|---|---|

| | | |
|---|---|---|
| **2.3   Priority creditor's name and mailing address**<br><br>**Employment Development Dept**<br>**Bankruptcy Group MIC 92E**<br>**PO Box 826880**<br>**Sacramento, CA 94280-0001**<br><br>**Date or dates debt was incurred**<br><br>**Last four digits of account number**<br><br>**Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a)(8)** | *As of the petition filing date, the claim is:* Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim**<br><br>**Is the claim subject to setoff?**<br>☐No.<br>☐Yes. | **Notice Purposes**     $ |
| **2.4   Priority creditor's name and mailing address**<br><br>**Internal Revenue Service**<br>**PO Box 7346**<br>**Philadelphia, PA 19101-7346**<br><br>**Date or dates debt was incurred**<br><br>**Last four digits of account number**<br><br>**Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8)** | *As of the petition filing date, the claim is:* Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim**<br><br>**Is the claim subject to setoff?**<br>☐No.<br>☐Yes. | **Notice Purposes**     $ |
| **2.5   Priority creditor's name and mailing address**<br><br>**Los Angeles County Tax Collector**<br>**PO Box 54110**<br>**Los Angeles, CA 90054**<br><br>**Date or dates debt was incurred**<br><br>**Last four digits of account number**<br><br>**Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8)** | *As of the petition filing date, the claim is:* Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim**<br><br>**Is the claim subject to setoff?**<br>☐No.<br>☐Yes. | **Notice Purposes**     $ |

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number *(if known)* **23-10787-JKS**

| Part 2: | List Creditors With NONPRIORITY Unsecured Claims |
|---|---|

3.  List in alphabetical order all creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

| | Amount of claim |
|---|---|

**3.1  Nonpriority creditor's name and mailing address**

**American Express**
**Attn President or Manager Agent**
**PO Box 0001**
**Los Angeles, CA 90096**

Date or dates debt was incurred  **5/31/2023 (bill date)**

Last four digits of account number

*As of the petition filing date, the claim is:*

Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim  **Expense Reimbursement - Lex Reddy**

Is the claim subject to setoff?
☒ No.
☐ Yes

Amount of claim: **$3,399.68**

---

**3.2  Nonpriority creditor's name and mailing address**

**Anthem Blue Cross**
**Attn President or Manager Agent**
**PO Box 51011**
**Los Angeles, CA 90051**

Date or dates debt was incurred  **6/2/2023**

Last four digits of account number

*As of the petition filing date, the claim is:*

Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim  **Employee Health Benefits**

Is the claim subject to setoff?
☒ No.
☐ Yes

Amount of claim: **$14,478.05**

---

**3.3  Nonpriority creditor's name and mailing address**

**AON Risk Consultants**
**Attn L Joe Galusha, President**
**22922 Network Place**
**Chicago, IL 60673**

Date or dates debt was incurred  **11/15/18 & 12/13/18**

Last four digits of account number

*As of the petition filing date, the claim is:*

Check all that apply
☐ Contingent
☐ Unliquidated
☒ Disputed

Basis for the claim  **Actuarial Services - 2018**

Is the claim subject to setoff?
☒ No.
☐ Yes

Amount of claim: **$70,000.00**

---

**3.4  Nonpriority creditor's name and mailing address**

**AT&T**
**Attn President or Manager Agent**
**PO Box 5014**
**Carol Stream, IL 60197**

Date or dates debt was incurred  **6/1/2023**

Last four digits of account number

*As of the petition filing date, the claim is:*

Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim  **Internet Services**

Is the claim subject to setoff?
☒ No.
☐ Yes

Amount of claim: **$ 203.30**

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**      Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|

| | | |
|---|---|---|
| **3.5   Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $ 195.00 |
| **Bcal 101 North Brand Property LLC**<br>**Attn President or Manager Agent**<br>**200 State Street 5th Floor**<br>**Boston, MA 02109** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **5/31/2023** | **Basis for the claim   Miscellaneous Building Charge** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒ No.<br>☐ Yes | |
| **3.6   Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $81,318.11 |
| **Cardinal Health 200, LLC**<br>**c/o Porter Wright Morris & Arthur LLC**<br>**Attn Allen Carter Esq**<br>**41 South High Street, Suite 2900**<br>**Columbus, Ohio 43215** | Check all that apply<br>☐ Contingent<br>☒ Unliquidated<br>☒ Disputed | |
| Date or dates debt was incurred  **Various** | **Basis for the claim   Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsbdiary hospitals** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒ No.<br>☐ Yes | |
| **3.7   Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $3,966.10 |
| **Combined Group Insurance Services**<br>**Attn President or Manager Agent**<br>**14785 Preston Road Suite 350**<br>**Dallas, TX 75254** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **5/31/2023** | **Basis for the claim   Texas Non-Subscriber Audit** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒ No.<br>☐ Yes | |
| **3.8   Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $5,455.68 |
| **Evangeline Douglas**<br>**19951 Octillo Way**<br>**Apple Valley, CA 92308** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **5/31/2023** | **Basis for the claim   Expense Reimbursement** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒ No.<br>☐ Yes | |
| **3.9   Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $76,137.36 |
| **First Insurance Funding**<br>**Attn President or Manager Agent**<br>**450 Skokie Boulevard Suite 1000**<br>**Northbrook, IL 60062** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **6/1/2023** | **Basis for the claim   Insurance Premium Financing** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒ No.<br>☐ Yes | |

Official Form 206E/F                    Schedule E/F: Creditors Who Have Unsecured Claims

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|

| | | |
|---|---|---|
| **3.10**  Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $2,149.85 |
| **GRM Information Management Services of San Francisco LLC**<br>**Attn President or Manager Agent**<br>**41099 Boyce Road**<br>**Fremont, CA 94538** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **Various** | **Basis for the claim   Records Storage** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒No.<br>☐Yes | |
| **3.11**  Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $23,504,535.00 |
| **Horizon Real Estate Holdings, LLC**<br>**Attn President or Manager Agent**<br>**101 N. Brand Boulevard, Suite 1920**<br>**Glendale, CA 91203** | Check all that apply<br>☒ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred | **Basis for the claim   Affiliate/Intercompany payable** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒No.<br>☐Yes | |
| **3.12**  Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $ 779.66 |
| **Konica Minolta Premier Finance**<br>**Attn President or Manager Agent**<br>**PO Box 41602**<br>**Philadelphia, PA 19101-1602** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **6/1/2023** | **Basis for the claim   Copier** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒No.<br>☐Yes | |
| **3.13**  Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | **Unknown** |
| **LHP Hospital Group Inc**<br>**c/o Ardent Health Services**<br>**Attn President or Manager Agent**<br>**Attn Legal Department**<br>**One Burton Hills Blvd Suite 250**<br>**Nashville, TN 37215** | Check all that apply<br>☒ Contingent<br>☒ Unliquidated<br>☒ Disputed | |
| Date or dates debt was incurred | **Basis for the claim   Potential claims related to Debtor's guarantee of certain indemnification obligations of a subsidary and settlement agreement with creditor** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒No.<br>☐Yes | |
| **3.14**  Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $  .00 |
| **Los Angeles County Treasurer and Tax Collector**<br>**PO Box 54110**<br>**Los Angeles, CA 90054** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred | **Basis for the claim   Notice Purposes** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒No.<br>☐Yes | |

Debtor **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|

| | | |
|---|---|---|
| 3.15   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $28,213.35 |
| **Michael Sarrao** <br> **22431 Antonio Parkway, Suite B160-457** <br> **Rancho Santa Margarita, CA 92688** | Check all that apply <br> ☐ Contingent <br> ☐ Unliquidated <br> ☐ Disputed | |
| Date or dates debt was incurred  **4/30/2023 (bill date)** | | |
| Last four digits of account number | Basis for the claim   **Expense Reimbursement** | |
| | Is the claim subject to setoff? <br> ☒ No. <br> ☐ Yes | |
| 3.16   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $31,666.88 |
| **Moss Adams LLP** <br> **Attn President or Manager Agent** <br> **2040 Main Street Suite 900** <br> **Irvine, CA 92614** | Check all that apply <br> ☐ Contingent <br> ☐ Unliquidated <br> ☐ Disputed | |
| Date or dates debt was incurred | | |
| Last four digits of account number | Basis for the claim   **Tax Preparation Services** | |
| | Is the claim subject to setoff? <br> ☒ No. <br> ☐ Yes | |
| 3.17   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $ 872.57 |
| **New Horizon Communications** <br> **Attn President or Manager Agent** <br> **PO Box 981073** <br> **Boston, MA 02298-1073** | Check all that apply <br> ☐ Contingent <br> ☐ Unliquidated <br> ☐ Disputed | |
| Date or dates debt was incurred  **6/1/2023** | Basis for the claim   **Internet Services** | |
| Last four digits of account number | Is the claim subject to setoff? <br> ☒ No. <br> ☐ Yes | |
| 3.18   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $37,823.00 |
| **Olshan Frome Wolosky LLP** <br> **Attn Thomas J Fleming Esq** <br> **1325 Avenue of the Americas** <br> **New York, NY 10019** | Check all that apply <br> ☐ Contingent <br> ☐ Unliquidated <br> ☐ Disputed | |
| Date or dates debt was incurred  **Various** | Basis for the claim   **Legal Fees - ERISA Counsel** | |
| Last four digits of account number | Is the claim subject to setoff? <br> ☒ No. <br> ☐ Yes | |
| 3.19   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $37,874,526.12 |
| **Olympia Health Care, LLC** <br> **Attn President or Manager Agent** <br> **101 N. Brand Boulevard, Suite 1920** <br> **Glendale, CA 91203** | Check all that apply <br> ☒ Contingent <br> ☐ Unliquidated <br> ☐ Disputed | |
| Date or dates debt was incurred | Basis for the claim   **Affiliate/Intercompany payable** | |
| Last four digits of account number | Is the claim subject to setoff? <br> ☒ No. <br> ☐ Yes | |

**A0800**

Debtor **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|

| | | |
|---|---|---|
| **3.20** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $1,888.00 |
| **Panch Jeyakumar MD**<br>**2248 Pieper Lane**<br>**Tustin, CA 92792**<br><br>Date or dates debt was incurred **5/31/2023**<br><br>Last four digits of account number | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Expense Reimbursement**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| **3.21** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $3,169,745.72 |
| **Plaintiffs in Reed v. Alecto [Keith Reed, Elizabeth Schenkel, Emily Wines, Mark Garan and August Ullum and Represented Class**<br>**c/o Laura Davidson & Bren Pompomio**<br>**Mountain State Justice, Inc.**<br>**1217 Quarrier Street**<br>**Charleston, WV 25301**<br><br>Date or dates debt was incurred **11/28/2022**<br><br>Last four digits of account number | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **WARN Act Class Action**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| **3.22** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $8,083,572.10 |
| **Plaza Medical Office Building, LLC**<br>**Attn President or Manager Agent**<br>**101 N. Brand Boulevard, Suite 1920**<br>**Glendale, CA 91203**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | Check all that apply<br>☒ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim   **Affiliate/Intercompany payable**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| **3.23** Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | **Unknown** |
| **Sherman/Grayson Health System, LLC**<br>**c/o Ardent Health Services**<br>**Attn President or Manager Agent**<br>**Attn Legal Department**<br>**One Burton Hills Blvd Suite 250**<br>**Nashville, TN 37215**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | Check all that apply<br>☒ Contingent<br>☒ Unliquidated<br>☒ Disputed<br><br>Basis for the claim   **Potential claims related to Debtor's guarantee of certain indemnification obligations of a subsidary and settlement agreement with creditor**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | |

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**          Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|
| **3.24   Nonpriority creditor's name and mailing address**<br><br>**Sylvia Ventura**<br>**4742 Ambrazzi Drive**<br>**Cypress, CA 90630**<br><br>Date or dates debt was incurred  **5/31/2023 (bill date)**<br><br>Last four digits of account number | **As of the petition filing date, the claim is:**<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim   Expense Reimbursement**<br><br>**Is the claim subject to setoff?**<br>☒ No.<br>☐ Yes |
| | $2,743.62 |
| **3.25   Nonpriority creditor's name and mailing address**<br><br>**Symphony Risk Solutions LLC**<br>**Attn President or Manager Agent**<br>**2425 N Central Expressway Suite 900**<br>**Richardson, TX 75080**<br><br>Date or dates debt was incurred  **6/1/2023**<br><br>Last four digits of account number | **As of the petition filing date, the claim is:**<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim   Insurance Premiums**<br><br>**Is the claim subject to setoff?**<br>☒ No.<br>☐ Yes |
| | $23,031.10 |
| **3.26   Nonpriority creditor's name and mailing address**<br><br>**United States of America**<br>**Brian M Boynton, Principal Deputy Assit Atty General**<br>**Ruth A Harvey, Director**<br>**Michale J Quinn, Senior Litigation Counsel**<br>**John R Kresse and T. Dietrich Hill, Trial Attys**<br><br>**United States Department of Justice**<br>**Civil Division, Commerical Litigation Branch**<br>**1100 L Street NW, 7th Floor**<br>**Box 875, Ben Franklin Station**<br>**Washington, DC 20044-9875**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | **As of the petition filing date, the claim is:**<br>Check all that apply<br>☒ Contingent<br>☒ Unliquidated<br>☒ Disputed<br><br>**Basis for the claim   Lawsuit:  United States of America v. Olympia Health Care, LLC, Alecto Healthcare Services, LLC et al., United States District Court for the Central District of California Case No. 2:23-cv-01783 (complaint asserts amount owed as of 2/28/2023, principal of $11,059,170.17 plus $1,421,027.62 in interest and interest continues to accrue at 10% per annum)**<br><br>**Is the claim subject to setoff?**<br>☐ No.<br>☒ Yes | $12,480,197.79 |

|  | **Total** | **$85,496,898.04** |
|---|---|---|

Debtor  Alecto Healthcare Services LLC, a Delaware limited liability company    Case number *(if known)* **23-10787-JKS**

| Part 3: | List Others to Be Notified About Unsecured Claims |
|---|---|

**4.** List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 an 2, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and mailing address | On which line in Part 1 or 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4.1 Timothy Cogan, Cassidy Cogan Shapell & Voeglin, LC, 1413 Eoff Street, Wheeling, WV 26003 | Line **3.21** **re Plaintiffs in Reed v. Alecto** ☐ Not listed. Explain | |
| 4.2 Maureen Davidson-Welling, Stember Cohn & Davidson-Welling, 425 First Avenue, 7th Floor, Pittsburgh, PA 15219 | Line **3.21** **re Plaintiffs in Reed v. Alecto** ☐ Not listed. Explain | |
| 4.3 F. Alex Risovich, Risovich Law Offices, PLLC, 3023 Pennsylvania Avenue, Weirton, WV 26062 | Line **3.21** **re Plaintiffs in Reed v. Alecto** ☐ Not listed. Explain | |
| 4.4 AON Risk Consultants Inc, Attn L Joe Galusha, President, 200 E. Randolph St, Chicago, IL 60601 | Line **3.3** **re AON Risk Consultants Inc** ☐ Not listed. Explain | |
| 4.5 Civil Process Clerk, United States Attorney's Office, Federal Building Room 7516, 300 North Los Angeles, Street, Los Angeles, CA 90012 | Line **3.26** **re United States of America** ☐ Not listed. Explain | |
| 4.6 Attorney General, United States Department of Justice, Ben Franklin Station, PO Box 683, Washington, DC 20044 | Line **3.26** **re United States of America** ☐ Not listed. Explain | |
| 4.7 | Line ☐ Not listed. Explain | |

Debtor  Alecto Healthcare Services LLC, a Delaware limited liability company        Case number *(if known)* **23-10787-JKS**

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---|---|

**5.** Add the amounts of priority and nonpriority unsecured claims.

|  |  | Total of claim amounts |
|---|---|---|
| **5a.**  **Total claims from Part 1** | *5a.* | **$0.00** |
| **5b.**  **Total claims from Part 2** | *5b.* + | **$85,496,898.04** |
| **5c.**  **Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | *5c.* | **$85,496,898.04** |

Official Form 206E/F                    Schedule E/F: Creditors Who Have Unsecured Claims

**A0804**

Case 23-10787-JKS Doc 261-2 Filed 10/12/23 Page 830 of 970

**Fill in this information to identify the case:**

Debtor name ___Alecto Healthcare Services LLC___
___a Delaware limited liability company___

United States Bankruptcy Court for the: _____ District of ___Delaware___
(State)

Case number (If known): ___23-10787-JKS___ Chapter ___11___

☐ Check if this is an amended filing

Official Form 206G

## Schedule G: Executory Contracts and Unexpired Leases
12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

**1. Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with |
|---|---|
| **2.1** State what the contract or lease is for and the nature of the debtor's interest — See Schedule G Attachment | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.2** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.3** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.4** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.5** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |

**A0805**

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  G – Executory Contracts and Unexpired Leases**

|  | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.1 | Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsbdiary hospitals | Cardinal Health 110, LLC c/o Porter Wright Morris & Arthur LLC 41 South High Street, Suite 2900 Columbus, Ohio 43215 |
| 2.2 | Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsbdiary hospitals | Cardinal Health 200, LLC c/o Porter Wright Morris & Arthur LLC 41 South High Street, Suite 2900 Columbus, Ohio 43215 |
| 2.3 | Commercial Insurance Premium Finance and Security Agreement (Quote No. x0380) for Policy No. x8117  - Property Insurance | Bank Direct Capital Finance 150 North Field Drive, Suite 190 Lake Forest, IL 60045 |
| 2.4 | Commercial Insurance Premium Finance and Security Agreement (Quote No. x2606) for Policy No. x1701 – Extending Reporting Professional Liability Policy | Bank Direct Capital Finance 150 North Field Drive, Suite 190 Lake Forest, IL 60045 |
| 2.5 | Commercial Insurance Premium Finance and Security Agreement (Quote No. 45720646 for Policy No. 02-462-55-24, 02-462-55-22, NHS703822 | Stetson Insurance Funding, LLC 6450 Transit Road Depeur, NY 14043 |
| 2.6 | Medical Insurance Benefits | Anthem Blue Cross PO Box 51011 Los Angeles, CA 90051 |
| 2.7 | Dental and Vision Insurance Benefits | Met Life 811 Main Street, 7th Floor Kansas City, MO 64105 |
| 2.8 | Life Insurance Benefits | Unum 655 N. Central, Suite 900 Glendale, CA 91203 |

**A0806**

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule G – Executory Contracts and Unexpired Leases**

|  | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.9 | Insurance<br>Directors & Officers<br>Employment Practices<br>Fiduciary & Crime - Primary Layer<br>Term: 1/31/2023 - 1/31/2024<br>Policy No.: 02-462-55-16 | National Union Fire Insurance Co<br>28 Liberty Street<br>New York, NY 10005 |
| 2.10 | Insurance<br>Excess Directors & Officers<br>Employment Practices<br>Term: 1/31/2023 - 1/31/2024<br>Policy No. NHS 703822 | RSUI Indemnity Company<br>945 East Paces Ferry Road Suite 1800<br>Atlanta, GA 30376 |
| 2.11 | Insurance<br>Excess Directors & Officers<br>Employment Practices<br>Term: 1/31/2023 - 1/31/2024<br>Policy No. 02-462-55-24 | National Union Fire Insurance Co<br>28 Liberty Street<br>New York, NY 10005 |
| 2.12 | Insurance<br>Comprehensive Employer Indemnity<br>Term: 3/1/2023 - 3/31/2024<br>Policy No. ORNSOL000039-01 | Old Republic Union Insurance Co<br>307 N Michigan Avenue<br>Chicago, IL 60601 |
| 2.13 | Insurance<br>Workers Compensation<br>Term: 4/1/2023 - 41/2024<br>Policy No. BNUWC0153849 | StarNet Insurance Company<br>9301 Innovation Drive Suite 200<br>Manassa, VA 20110 |
| 2.14 | Insurance<br>Automobile<br>Term: 6/1/2023 - 6/1/2024<br>Policiy No. 5087-0849-02 | Vantapro Specialty Insurance Co<br>199 Water Street<br>New York, NY 10038 |

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  G – Executory Contracts and Unexpired Leases**

|  | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.15 | Insurance<br>"All Risks" Property incl Boiler & Machinery & Flood, excluding CA EM<br>Term: 7/1/2022 – 7/1/2023<br>Policy No. 018258117 | American Home Asssurance Co<br>175 Water Street<br>New York, NY 10038 |
| 2.16 | Insurance<br>Excess Medical Professional<br>General Liability for TX (WNJ) Exposure Only<br>Term: 8//1/2022 - 8/1/2023<br>Policy No. HUL 09114235 | Magmutual Professional Security Ins Co<br>PO Box 52979<br>Atlanta, GA 30355 |
| 2.17 | Insurance<br>Environmental Pollution<br>Storage Tank Liability - WNJ<br>Term: 8/1/2022 - 8/1/2023<br>Policy No. PSPIUSCBM76002 | Ironshore Specialty Insurance Co<br>175 Berkeley Street<br>Boston, MA 02116 |
| 2.18 | Insurance<br>Cyber Liability<br>Term: 8/1/42022 - 8/14/2023<br>Policy No. C-4LPY-047551-CYBER-2002 | Coalition Insurance Solutions<br>  Arch Specialty - 45%<br>  Fireman's Fund - 25%<br>  Ascot Specialty - 25%<br>  North Amercian Capacity - 5% |
| 2.19 | Insurance<br>3 Year Extended Reporting Period Excess Medical Professional General Liability Coverage for Non TX Exposures<br>Term: 8/1/2022 - 8/1/2025<br>Policy No. x1701 | Endurance American Specialty Ins Co<br>16052 Swingley Ridge Road Suite 130<br>St Louis, MO 63017 |
| 2.20 | Sublease dated 1/31/2023<br>Approximately 2,862 square feet of office space located at 101 N. Brand Boulevard, Suite 1920, Glendale, CA 91203 | Pacific Global Investment Management Group<br>Attn: SVP<br>101 N. Brand Blvd., Suite 1950<br>Glendale, CA 91203 |

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  G – Executory Contracts and Unexpired Leases**

|  | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.21 | Prime Vendor Agreement - Distribution Agreement for Pharmaceuticals dated 6/1/2016<br>First Amendment dated 12/5/2016<br>Second Amendment dated 3/7/2017<br>Third Amendment dated 6/20/2017 | Cardinal Health 110, LLC and Cardinal Health, Inc.<br>c/o Porter Wright Morris & Arthur LLC<br>41 South High Street, Suite 2900<br>Columbus, Ohio 43215 |
| 2.22 | Guaranty dated 10/31/2014<br>Guarantee re Sherman/Grayson Hospital, LLC obligations to MPT of Sherman-Alecto, LLC for Capital Reserve Deposits | MPT of Sherman-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| 2.23 | Guaranty dated 9/19/2014<br>Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC | MPT of Fairmont-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| 2.24 | Guaranty dated 6/1/2017<br>Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Wheeling LLC and Alecto Healthcare Services Martin's Ferry LLC | MPT of Wheeling-Alecto Hospital, LLC  MPT of Martins Ferry-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| 2.25 | Guaranty dated 9/23/2014 | Sherman/Grayson Health System, LLC<br>LHP Hospital Group, Inc.<br>c/o Ardent Health Services<br>Attn Legal Department<br>One Burton Hills Boulevard Suite 250<br>Nashville, TN 37215 |

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule G – Executory Contracts and Unexpired Leases**

|  | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.26 | Record Storage and Data Agreement dated 2/1/2023 | GRM Information Management of San Francisco, LLC<br>40199 Boyce Road<br>Fremont, CA 94538 |
|  |  |  |

**Fill in this information to identify the case:**

Debtor name: Alecto Healthcare Services LLC
a Delaware limited liability company

United States Bankruptcy Court for the: _____ District of Delaware
(State)

Case number (If known): 23-10787-JKS

☐ Check if this is an amended filing

Official Form 206H
## Schedule H: Codebtors
12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

**1. Does the debtor have any codebtors?**
☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.
☑ Yes

**2.** In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G*. Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: Codebtor | | Column 2: Creditor | |
|---|---|---|---|
| Name | Mailing address | Name | Check all schedules that apply: |

See Schedule H Attachment

2.1 ... ☐ D ☐ E/F ☐ G
2.2 ... ☐ D ☐ E/F ☐ G
2.3 ... ☐ D ☐ E/F ☐ G
2.4 ... ☐ D ☐ E/F ☐ G
2.5 ... ☐ D ☐ E/F ☐ G
2.6 ... ☐ D ☐ E/F ☐ G

**A0811**

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| Alecto Healthcare Services Wheeling LLC dba Ohio Valley Medical Group<br>OVMC Physicians<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | Plaintiffs in Reed v. Alecto<br><br>Schedules that apply:<br>    Schedule D   ☐<br>    Schedule E/F   ☒<br>    Schedule G   ☐ |
| Sherman/Grayson Hospital LLC<br>500 N Highland Ave<br>Sherman, TX 75092 | MPT of Sherman-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>    Schedule D   ☒<br>    Schedule E/F   ☐<br>    Schedule G   ☐ |
| Alecto Healthcare Services Wheeling LLC<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | MPT of Wheeling-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>    Schedule D   ☒<br>    Schedule E/F   ☐<br>    Schedule G   ☐ |
| Alecto Healthcare Services Martin's Ferry LLC<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | MPT of Wheeling-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>    Schedule D   ☒<br>    Schedule E/F   ☐<br>    Schedule G   ☐ |

**A0812**

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| Alecto Healthcare Services Fairmont LLC<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | MPT of Fairmont-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>Schedule D ☒<br>Schedule E/F ☐<br>Schedule G ☐ |
| Olympia Health Care, LLC<br>Attn President or Manager Agent<br>101 N. Brand Boulevard Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| MPT of Los Angeles, LP<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| MPT of Olympia, LLC<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| MPT Operating Partnership, L.P.<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D  ☐<br>Schedule E/F  ☒<br>Schedule G  ☐ |
| Medical Properties Trust, Inc.<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D  ☐<br>Schedule E/F  ☒<br>Schedule G  ☐ |
| Sherman/Grayson Hospital LLC<br>500 N Highland Ave<br>Sherman, TX 75092 | United States of America<br><br>Schedules that apply:<br>Schedule D  ☐<br>Schedule E/F  ☒<br>Schedule G  ☐ |
| Alecto Healthcare Services Sherman LLC<br>101 N Brand Blvd Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D  ☐<br>Schedule E/F  ☒<br>Schedule G  ☐ |
| Laxman Reddy<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D  ☐<br>Schedule E/F  ☒<br>Schedule G  ☐ |

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| Matthew Williams<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Jeremy Redin<br>28372 Steel Lane<br>Valencia, CA 91354 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Sherman/Grayson Hospital LLC<br>500 N. Highland Avenue<br>Sherman, Texas 75092 | LHP Hosptial Group, Inc.<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Sherman/Grayson Hospital LLC<br>500 N. Highland Avenue<br>Sherman, Texas 75092 | Sherman/Grayson Health Systems LLC<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| Alecto Healthcare Services Sherman LLC<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, California 91203 | LHP Hosptial Group, Inc.<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>    Schedule D  ☐<br>    Schedule E/F  ☒<br>    Schedule G  ☐ |
| Alecto Healthcare Services Sherman LLC<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, California 91203 | Sherman/Grayson Health Systems LLC<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>    Schedule D  ☐<br>    Schedule E/F  ☒<br>    Schedule G  ☐ |

**A0816**

# Claims Activity Report

## U.S. Bankruptcy Court -- District of Delaware

## Report Period: 6/16/2023 - 12/19/2023

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $6115.93 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | Priority claimed: $5605.05 | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: 1 | | Filed by: Creditor |
| Filed: 07/07/2023 | | Entered by: BJM |
| Entered: 07/07/2023 | | Status: Withdraw 187 |
| Amends No: | | Last date to file claims: 08/15/2023 |
| | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Uline, 12575 Uline Dive, Pleasant Prairie, WI 53158

Description: Goods Sold
Remarks: 3060

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $0.00 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: 2 | | Filed by: Creditor |
| Filed: 07/19/2023 | | Entered by: EPOC Filer |
| Entered: 07/19/2023 | | Status: |
| Amends No: | | Last date to file claims: 08/15/2023 |
| | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Ironshore Specialty Insurance Company, 175 Berkeley Street, Boston, MA 02116

Remarks: Account Number (last 4 digits):3301 Filer Comment: Contingent and unliquidated

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $160551.00 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | Priority claimed: $160551.00 | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: 3 | | Filed by: Creditor |
| Filed: 07/21/2023 | | Entered by: BJM |
| Entered: 07/21/2023 | | Status: |
| Amends No: | | Last date to file claims: 08/15/2023 |
| | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Department of the Treasury, Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $419842.62 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: 4 | | Filed by: Creditor |
| Attachment 1 | | Entered by: EPOC Filer |
| Filed: 07/27/2023 | | Status: |
| Entered: 07/27/2023 | | Last date to file claims: 08/15/2023 |
| Amends No: | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Cardinal Health 110, LLC, 7000 Cardinal Place, Dublin, OH 43017

# A0817

Case: 23-10787-JKS                  Amount claimed: $119695.80        Chapter: 11
Title: Alecto Healthcare Services LLC                                 Judge: Stickles
Office: 1                                                             Trustee: Nimeroff
Claim No: **5**                                                       Filed by: Creditor
**Attachment 1**                                                      Entered by: EPOC Filer
Filed: 07/27/2023                                                     Status:
Entered: 07/27/2023                                                   Last date to file claims: 08/15/2023
Amends No:                                                            Last date to file (Govt): 12/13/2023

Creditor name/address: Cardinal Health 200, LLC, 7000 Cardinal Place, Dublin, OH 43017


Case: 23-10787-JKS                  No amounts claimed                Chapter: 11
Title: Alecto Healthcare Services LLC                                 Judge: Stickles
Office: 1                                                             Trustee: Nimeroff
Claim No: **6**                                                       Filed by: Creditor
Filed: 08/01/2023                                                     Entered by: BJM
Entered: 08/01/2023                                                   Status:
Amends No:                                                            Last date to file claims: 08/15/2023
                                                                      Last date to file (Govt): 12/13/2023

Creditor name/address: U.S. Department of Labor, Julie A. Su, U.S. Secretary of Labor, EBSA - Attn: Padilla, 35 N. Lake Ave., Suite 300, Pasadena, CA 91101
Description: No Claim Amount Listed
Remarks: Possible Violations of ERISA/8324


Case: 23-10787-JKS                  No amounts claimed                Chapter: 11
Title: Alecto Healthcare Services LLC                                 Judge: Stickles
Office: 1                                                             Trustee: Nimeroff
Claim No: **7**                                                       Filed by: Creditor
Filed: 08/01/2023                                                     Entered by: BJM
Entered: 08/01/2023                                                   Status:
Amends No:                                                            Last date to file claims: 08/15/2023
                                                                      Last date to file (Govt): 12/13/2023

Creditor name/address: U.S. Department of Labor, Julie A. Su, U.S. Secretary of Labor, EBSA - Attn: Padilla, 35 N. Lake Ave., Suite 300, Pasadena, CA 91101
Description: No Claim Amount Listed
Remarks: Possible Violations of ERISA/8325


Case: 23-10787-JKS                  Amount claimed: $700.00           Chapter: 11
Title: Alecto Healthcare Services LLC   Priority claimed: $700.00     Judge: Stickles
Office: 1                                                             Trustee: Nimeroff
Claim No: **8**                                                       Filed by: Creditor
**Attachment 1**                                                      Entered by: EPOC Filer
Filed: 08/01/2023                                                     Status:
Entered: 08/01/2023                                                   Last date to file claims: 08/15/2023
Amends No:                                                            Last date to file (Govt): 12/13/2023

Creditor name/address: California Franchise Tax Board, Bankruptcy Section MS A-340, PO Box 2952, Sacramento, CA 95812-2952
Remarks: Account Number (last 4 digits):0349


Case: 23-10787-JKS                  No amounts claimed                Chapter: 11
Title: Alecto Healthcare Services LLC                                 Judge: Stickles
Office: 1                                                             Trustee: Nimeroff
Claim No: **9**                                                       Filed by: Creditor

**A0818**

**Attachment 1**
**Attachment 2**
**Attachment 3**
Filed: 08/12/2023
Entered: 08/12/2023
Amends No:

Entered by: EPOC Filer
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: MPT of Sherman-Alecto, LLC and affiliates, Medical Properties Trust, Inc., 425 Park Avenue, 36th Floor, New York, NY 10022

Remarks: Filer Comment: Unliquidated (see attachment)

---

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **10**
**Attachment 1**
**Attachment 2**
Filed: 08/14/2023
Entered: 08/14/2023
Amends No:

Amount claimed: $7313.70

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: EPOC Filer
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: De Lage Landen Financial Services, 1111 Old eagle School Road, Wayne, PA 19087

Remarks: Account Number (last 4 digits):8050

---

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **11**
**Statement In Support**
Filed: 08/14/2023
Entered: 08/14/2023
Amends No:

Amount claimed: $1065047.00

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: S. Thomas
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Pension Benefit Guaranty Corporation

Description: Statutory Liability to the Alecto Healthcare Services Ohio Valley LLC Pension Pension Plan for unpaid minimum funding contributions under 26 U.S.C. §§ 412 and 430, 29 U.S.C. §§ 1082, 1342 and 1362(c). See attached statement.

---

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **12**
**Statement in Support**
Filed: 08/14/2023
Entered: 08/14/2023
Amends No:

Amount claimed: $1845012.00

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: S. Thomas
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Pension Benefit Guaranty Corporation

Description: Statutory Liability under 29 U.S.C. § 1362 and 1368 for unfunded benefit liabilities of the Alecto Healthcare Services Ohio Valley LLC Pension Pension Plan. See attached statement.

---

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **13**
**Statement in Support**
Filed: 08/14/2023
Entered: 08/14/2023
Amends No:

Amount claimed: $0.00
Priority claimed: $0.00

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: S. Thomas
Status:
Last date to file claims: 08/15/2023

**A0819**

Creditor name/address: Pension Benefit Guaranty Corporation
Description: Statutory Liability under 29 U.S.C. § 1307 on account of the Alecto Healthcare Services Ohio Valley LLC Pension Plan. See attached statement.
Remarks: Unliquidated priority and total amounts claimed

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $173848.49 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **14** | | Filed by: Creditor |
| Filed: 08/14/2023 | | Entered by: R.W. Riley |
| Entered: 08/14/2023 | | Status: |
| Amends No: | | Last date to file claims: 08/15/2023 |
| | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Snyder Brothers, Inc., c/o Ronald W. Crouch, Counsel of Record, Whiteford Taylor & Preston, LLP, 11 Stanwix St., Suite 1400, Pittsburgh, PA 15222
Description: Judgment entered against subsidiary for goods sold (Nautural Gas)
Remarks: Fraudulent Transfer/Alter Ego - See Attached Consent Judgment and Statement

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $3739635.77 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **15** | | Filed by: Creditor |
| **Summary of Claim and Supporting Documentation** | | Entered by: E.J Taube |
| | | Status: |
| Filed: 08/14/2023 | | Last date to file claims: 08/15/2023 |
| Entered: 08/14/2023 | | Last date to file (Govt): 12/13/2023 |
| Amends No: | | |

Creditor name/address: LHP Hospital Group, Inc., c/o Saul Ewing, LLP, Attn: Mark Minuti, 1201 N. Market St., Suite 2300, Wilmington, DE 19801

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $5107726.81 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **15** | | Filed by: Creditor |
| **Attachment 1** | | Entered by: EPOC Filer |
| Filed: 12/15/2023 | | Status: |
| Entered: 12/15/2023 | | Last date to file claims: 08/15/2023 |
| Amends No: 15 | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: LHP Hospital Group, Inc., c/o Saul Ewing, LLP, Attn: Mark Minuti, 1201 N. Market St., Suite 2300, Wilmington, DE 19801

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $0.00 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **16** | | Filed by: Creditor |
| **POC Attachment** | | Entered by: D. Burgagni |
| **Policy List** | | Status: |
| Filed: 08/15/2023 | | Last date to file claims: 08/15/2023 |
| Entered: 08/15/2023 | | Last date to file (Govt): 12/13/2023 |
| Amends No: | | |

Creditor name/address: AIG Property Casualty, Inc., Kevin J. Larner, Esq., Authorized Representative, 28 Liberty Street, Floor 22, New York, NY 10005

**A0820**

Description: Unliquidated

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **17**
**Attachment 1**
Filed: 08/15/2023
Entered: 08/15/2023
Amends No:

Amount claimed: $93110.57

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: EPOC Filer
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Health Carousel Travel Network, LLC, 455 Delta Avenue, Suite 108, Cincinnati, OH 45226

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **18**
Filed: 08/15/2023
Entered: 08/15/2023
Amends No:

Amount claimed: $245307.00

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: EPOC Filer
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Alecto Health Care Services Ohio Valley LLC, HP, Kamaljit Bains, EBSA Investigator, 1835 Market Street, 21st Floor-Mailstop EBSA/21, Philadelphia, PA 19103

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **18**
**Attachment 1**
Filed: 08/23/2023
Entered: 08/23/2023
Amends No: 18

Amount claimed: $245307.00

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: EPOC Filer
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Alecto Health Care Services Ohio Valley LLC, HP, Kamaljit Bains, EBSA Investigator, 1835 Market Street, 21st Floor-Mailstop EBSA/21, Philadelphia, PA 19103

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **19**
**Attachment 1**
Filed: 08/15/2023
Entered: 08/15/2023
Amends No:

Amount claimed: $3275382.64

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: EPOC Filer
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Reed Action Judgment Creditors, Bren J. Pomponio, 1217 Quarrier Street, Charleston, WV 25301
Remarks: Filer Comment: See addendum

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **20**
**Attachment 1**
Filed: 08/15/2023

Amount claimed: $53157.76

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: EPOC Filer
Status:

**A0821**

Entered: 08/15/2023
Amends No:

Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Michael Best & Friedrich LLP, c/o Justin M. Mertz, 790 N. Water St., Ste. 2500, Milwaukee, WI 53202
Remarks: Account Number (last 4 digits):0995

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **21**
**Exhibit Exhibit A**
**Exhibit Exhibit B**
**Exhibit Exhibit C**
Filed: 12/13/2023
Entered: 12/13/2023
Amends No:

Amount claimed: $29126600.90

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: L.Victoria Lerman
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Centers for Medicare & Medicaid Services, U.S. Dep, 7500 Security Blvd., Baltimore, MD 21244

### Claim entries selected: 23

| Selection Criteria | |
|---|---|
| **Run date and time:** | Tue Dec 19 18:36:53 2023 |
| **By:** | Jeffrey R. Waxman |
| **Chapter:** | All |
| **Office:** | All |
| **Creditor name:** | All |
| **Case:** | 1:23-bk-10787 |
| **Trustee:** | All |
| **Sort key1:** | Case Number |
| **Sort key2:** | Claim Number |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/19/2023 18:36:53 | | | |
| **PACER Login:** | jwaxmanpacerng | **Client Code:** | 142408.0001 |
| **Description:** | Claims Activity Report | **Search Criteria:** | 23-10787-JKS Office: All Ch: All Creditor: All From: 6/16/2023 To: 12/19/2023 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

## A0822

# EXHIBIT C

Projected Income

**ALECTO HEALTHCARE SERVICES LLC**
**INCOME STATEMENT**
**3-YEAR PROJECTION (11/1/23 to 10/31/26)**

| AHS | Year 1<br>11/1/23 to 10/31/24 | Year 2<br>11/1/24 to 10/31/25 | Year 3<br>11/1/25 to 10/31/26 |
|---|---|---|---|
| Operating Revenues | 3,415,430 | 3,319,235 | 3,287,182 |
| | | | |
| **OPERATING EXPENSES** | | | |
| Salaries & Wages | 1,874,268 | 1,874,268 | 1,874,268 |
| Benefits | 199,788 | 211,775 | 224,482 |
| Payroll Taxes | 138,228 | 138,228 | 138,228 |
| PTO | 124,848 | 124,848 | 124,848 |
| Labor Subtotal | 2,337,132 | 2,349,119 | 2,361,826 |
| | | | |
| Supplies | 5,055 | 5,207 | 5,363 |
| Purchased Services | 41,000 | 42,230 | 43,497 |
| Legal Fees | 75,600 | 75,600 | 75,600 |
| Tax Preparation Fees | 99,172 | 90,000 | 90,000 |
| Repairs & Maintenance | 468 | 468 | 468 |
| Rents & Leases | 90,000 | 92,700 | 93,627 |
| Insurance | 423,129 | 346,997 | 364,347 |
| Utilities | 6,780 | 6,983 | 7,123 |
| Taxes and Licenses | 3,000 | 3,090 | 3,121 |
| Dues, Subscriptions, and Software | 4,800 | 4,944 | 5,092 |
| Outside Training Sessions | 2,400 | 2,400 | 2,400 |
| Travel | 73,200 | 60,000 | 60,000 |
| Meals | 4,200 | 3,600 | 3,600 |
| Bank Fees & Charges | 6,000 | 6,000 | 6,000 |
| Depreciation | 1,280 | 960 | 720 |
| Interest Expense | 0 | 0 | 0 |
| **Total Operating Expenses** | 3,173,216 | 3,090,298 | 3,122,784 |
| | | | |
| **NET INCOME (LOSS)** | **242,214** | **228,937** | **164,398** |

**A0824**

**EXHIBIT D**

Report of Gould Consulting Services

September 28, 2023

Steven Balasiano, Independent Director
Alecto Healthcare Services, LLC
c/o Jeffrey Waxman, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801-1494

**In Re: Alecto Healthcare Services, LLC (Case No. 23-10787 (JKS))**
**Forensic Investigation Consulting**

Dear Mr. Balasiano,

You asked me to prepare this letter report to describe our findings, procedures employed, and data and transactions analyzed in the forensic investigation of transactions by and between Alecto Healthcare Services, LLC ("Alecto" or "Debtor") and its Affiliates[1] and/or any current or former officers, directors, or equity holders ("Insiders")[2] performed by Gould Consulting Services ("GCS").

The forensic investigation covered the four (4) year period June 17, 2019, through June 16, 2023, the date Alecto filed for bankruptcy protection under chapter 11, subchapter V (the "Examination Period").

Section I of this letter report sets forth our observations based on work performed during our retention. Specifically, this letter report will discuss the following transactions:



[1] Alecto Healthcare Services Sherman LLC ("Alecto Sherman") and its subsidiary, Sherman/Grayson Hospital, LLC, d/b/a Wilson N. Jones Regional Medical Center ("Sherman/Grayson"), Alecto Healthcare Services Hayward, LLC ("Alecto Hayward"), Alecto Healthcare Services Los Angeles LLC ("Alecto LA") and its subsidiary, Olympia Health Care d/b/a Olympia Medical Center ("Olympia HC" or "OMC"), Alecto Healthcare Services Fairmont LLC ("Alecto Fairmont"), Alecto Healthcare Services Ohio Valley, LLC ("Alecto Ohio Valley"), Alecto Sunrise MOB Holdings LLC ("Sunrise MOB"), its subsidiaries Sunrise Real Estate Holdings LLC (Sunrise REH") and Plaza Medical Office Building LLC ("Plaza MOB"), and Alecto Healthcare Services Real Estate Holdings LLC ("Alecto REH"), (collectively, and including unnamed subsidiary entities, the "Affiliates"). See GCS Diagram 1 – Organization Chart.
[2] Alecto's officers and directors are Lex Reddy, Michael Sarrao. The Alecto equity holders are Lex Reddy, Richard Hayes, The Reddy Investment Trust, Roger Krissman, The Krissman Family Trust, Michael Sarrao, The Sarrao Family Trust, Panch Jeyakumar, M.D., The Jeyakumar Inter-Vivos Trust, Martha Hayes, the Hayes Irrevocable Trust, Matthew C. Hayes, Comstock Investment Trust, Steven Kay, Matthew Williams, Aman Dhuper, (collectively, the "Alecto Members") (Alecto Healthcare Services LLC 2022 Partnership Tax Return).

**A0826**

GCS understands that as of the date of this letter report the statute of limitations for avoidance actions under U.S. Bankruptcy Code §548 and the Uniform Voidable Transactions Act ("UVTA") has passed with respect to the June 19, 2019 Transfer except for the Debtor's ability to bring such actions. This letter report is provided to you with respect to potential avoidance actions that may be pursued by the Debtor.

Section II outlines the scope of our work and analysis performed under the limitations listed in Section III.

## I.  FINDINGS AND OBSERVATIONS

GCS examined documents and data produced by Alecto to identify potentially voidable transfers during the Examination Period. Our examination was focused in the following areas:

- Transactions involving the transfer of 1) Sunrise REH, and effectively, Plaza MOB, by Alecto in 2019 to Sunrise MOB, an organization formed by the Alecto Members, and 2) the transfer of Sunrise MOB, and effectively Plaza MOB, to Alecto in 2021.

  **Findings:** Although the June 2019 transfer of Sunrise REH and Plaza MOB was completed without receiving reasonably equivalent value in exchange (appraised value of over $50 million was greater than the loan payoff and capital contribution received of over $28 million), the assets were transferred back by assignment to Alecto by the Alecto Members in January 2021 for no consideration and those assets were sold later that year for over $58 million, an increase in value of approximately $8 million. No consideration was given to the Alecto Members for the transfer and Alecto received proceeds from the sale of over $15 million. (*See Sections A and C of the Summary of Observations and discussion below*).

- Inter-company transfers and allocation of advances by Alecto.

  **Findings:** Generally, and in aggregate, lockbox deposits exceeded advances allocated to the Affiliates. The excess deposits to advances were either retained by Alecto for payroll, expenses, additional transfers to Affiliates, or used to reduce Alecto's revolving credit facility with its lender. GCS identified other inter-company transfers between Affiliates and/or Alecto. In the instances where funds were transferred from an Affiliate to Alecto, these funds were subsequently transferred to another Affiliate or used by Alecto for payroll and other expenses. Essentially, Alecto acted as a conduit for funding to Affiliates. *(See Section E of the Summary of Observations and discussion below.)*

- Transfers to/from Insiders including transfers to/from Plaza MOB, 1) in the gap period between the 2019 transfer of Sunrise REH and Plaza MOB by Alecto to Sunrise MOB, and the 2021 transfer by assignment of Sunrise MOB, and Plaza MOB back to Alecto,[3] and 2) after the January 2021 assignment of Sunrise MOB and Plaza MOB.

  **Findings:** Transfers to Alecto and Affiliates from Plaza MOB exceeded transfers to Plaza MOB in the "Plaza MOB Gap Period" and post-assignment. *(See Sections B and D of the Summary of Observations and discussion below).*

  Specifically, regarding direct payments to Insiders, based on our analysis of the data and supporting documentation produced, payments to Insiders were reimbursements of business-

---

[3] The "Plaza MOB Gap Period" is the period from June 19, 2019, through December 31, 2020.

related expenses and advances for the benefit of Alecto and/or payroll and benefits provided as compensation for services to Alecto and/or Affiliates.  *(See Section F and G of the Summary of Observations and discussion below.)*

## Summary of Observations

A. June 19, 2019 Transfer of Sunrise REH to Sunrise MOB and the Alecto Members

- Plaza MOB appraised market value at June 1, 2019: $50,700,000
- New loan amount: $30,000,000
- Net proceeds of refinance to Plaza MOB: $9,185,830 ($8,565,154 plus $620,676)
- Payoff amount: $19,472,350 (Wells Fargo and Berkadia Commercial Mortgage)
- Capital contribution to Alecto per general ledger: $8,944,477
- Total payoff and capital contribution to Alecto: $28,416,827

The transfer of Sunrise REH to Sunrise MOB was for less than reasonably equivalent value as the appraised value of the assets exceeded the loan payoff and capital contribution received by Alecto.

B. Transfers to/from Plaza MOB in the "Plaza MOB Gap Period"[4]

- Net transfers of $2,749,226 to Alecto and/or Affiliates
- $3,789,966 to "REAM, as Trustee for Various Investors" for Plaza MOB Loan interest

Alecto and/or Affiliates received more cash from Plaza MOB than transferred to Plaza MOB.

C. January 1, 2021 Sunrise MOB Assignment to Alecto and the UCLA Asset Sale

- Asset sale price at August 31, 2021 (agreed to January 1, 2021): $58,500,000
- No consideration paid by Alecto to the Alecto Members on January 2, 2021
- Net proceeds of sale to Plaza MOB on August 31, 2021: $15,769,770
- Payoff amount $42,087,433 (Wells Fargo and MPT Operating Partnership)[5]

Alecto received more than reasonably equivalent value in the exchange as no consideration was paid to Sunrise MOB or the Alecto Members for the Sunrise MOB assets.

D. Post-Assignment Transfers to/from Plaza MOB

- $30,559,770 to, or for the benefit of, Alecto and/or Affiliates
  - Transfers to Alecto: $13,917,603
  - Transfer to Alecto of $15,770,214 proceeds from the UCLA Asset Sales (Plaza MOB) equals total transfers to Alecto: $29,687,817
  - Transfers to Olympia HC/OMC: $871,953
- $3,807,251 to, of for the benefit of Plaza MOB
  - $2,709,449 from Alecto
  - $1,097,803 from OMC

Alecto and/or Affiliates received more cash from Plaza MOB than transferred to Plaza MOB.

---

[4] Payees of Plaza MOB payments by check could not be determined based on information produced to GCS.
[5] Alecto was a borrower on the MPT Operating Partnership Loan.

E. Inter-company Transfers and the CNH Revolving Facility

- Advances from the CNH Revolving Facility and Affiliate allocations tracked by Alecto Management in an Excel spreadsheet tie, for the most part, to wire transfers into/out of Alecto's disbursements account *3784.
- In any month, an Affiliate may have been under or over funded, meaning deposit sweeps from an Affiliate's lockbox may be more or less than allocated advances. As such, funds deposited by one Affiliate may have been allocated to another Affiliate or Alecto itself.
- In 2020, advances allocated to Affiliates were less than the Affiliates' lockbox deposits. It appears Alecto retained funds through the 2020 COVID crisis maintaining an average bank balance of $20 million through the end of 2020.

Based on our analysis, Alecto acted as a conduit for funding Affiliates and any excess funds from the Affiliates or its credit facility was used to fund Alecto's payroll, expenses, or additional Affiliate funding.

F. Transfers to Insiders of $10,000 or more

- GCS extracted payments by check or "Bill Payment"/ACH Transfer from Alecto's general ledger and identified payments to Insiders of $10,000; a threshold amount agreed to by you and GCS as sufficient for our examination.
- GCS examined 40 payments of $10,000 or more totaling $1,416,763; 92% of identified payments to Insiders.
- Approximately 59% or $835,320 in payments, were supported as business expenses paid by M. Sarrao and/or his law firm for the benefit of Alecto and/or its Affiliates. The remaining payments to A. Dhuper, R. Krissman, S. Kay and American Express were also supported as business expenses.
- A $77,000 and a $30,000 payment to L. Reddy and R. Krissman, respectively, were identified as the reimbursement of advances to Alecto. Additional payments to L. Reddy of $50,000 and $380,000 were identified by GCS' examination of journal entries in Alecto's general ledger and were verified as reimbursement of advances as well.
- Payments to the Cooperative of American Physicians, Inc., for the benefit of Dr. P. Jeyakumar, were verified as professional dues and insurance.
- L. Reddy, A. Dhuper, Dr. P. Jeyakumar, and M. Sarrao received compensation and benefits as employees.

The transfers examined were reimbursements of Alecto business expenses, advances, payroll, and professional dues and insurance and were determined to be appropriately supported.

G. Transactions Related to the 2018 Promissory Note

- Payments by, or for the benefit of, Alecto and advances to Alecto through a Wells Fargo line of credit under the 2018 Promissory Note were verified through an examination of bank statements, loan statements, and the Alecto general ledger.
- Plaza MOB paid off the loan, on behalf of Alecto, on January 6, 2022.

The payoff of the Wells Fargo line of credit by Plaza MOB increased the inter-company amounts due Plaza MOB. Reconciliation of inter-company accounts by Alecto resulting in the

reclassification of Plaza MOB's inter-company account balance to a loan payable (due to Plaza MOB) in Alecto's general ledger.

H.  Transfers to Holders of Previously Unidentified Accounts

- ▪ 113 transfers from Alecto totaling, in aggregate, less than $214,000
- ▪ 76 of those transfers were for less than $1,000

Transfers to unidentified accounts were below the agreed to research threshold of $10,000. Based on Alecto's general ledger, the majority of transfers were to OMC HSA Account *3709.

## Discussion

### A.  June 19, 2019 Transfer of Sunrise REH to the Alecto Members

On June 19, 2019, Alecto transferred Sunrise REH to the Alecto Members (the "Sunrise REH Transfer") in order to enable the refinancing of Plaza MOB (the "Plaza MOB Refinancing"), a subsidiary of Sunrise REH, to "take advantage of interest rate opportunities and cash out the equity that had been developed."[6] It is our understanding that the proposed lender, Wells Fargo Bank, N.A., ("Wells Fargo") required Sunrise REH not be owned by Alecto in order to complete the refinancing.[7]

Prior to the Sunrise REH Transfer, on June 12, 2019, the Alecto Members formed Sunrise MOB[8] to facilitate the refinancing of Plaza MOB and a subsequent loan from Alecto to Olympia HC, Alecto LA's hospital operating company.

The following transactions (as shown in GCS Diagram 2) were effectuated to comply with Wells Fargo's refinancing conditions:

1. 6/12/2019: Formation of Sunrise MOB by the Alecto Members; cash contributions to capital were not identified in the Sunrise MOB Operating Agreement;[9]

2. 6/19/2019: Alecto transferred Sunrise REH, and effectively its subsidiaries, Plaza MOB and Olympia Plaza Management, Inc. ("OPM") to the Alecto Members; the Sunrise REH amended operating agreement memorializing the transfer does not identify any consideration in return for the transfer;[10]

3. 6/19/2019: The Alecto Members transferred Sunrise REH to Sunrise MOB; the second amendment to the Sunrise REH amended operating agreement memorializing the transfer does not identify any consideration in return for the transfer;[11]

---

[6] Plaza MOB Summary prepared by Alecto Management ("Plaza MOB Summary), ¶2 [GCS Exhibit 1].  With reference to this letter report and analysis, Alecto Management is represented by M. Sarrao and M. Williams.
[7] Plaza MOB Summary, ¶3.
[8] Plaza MOB Summary, ¶4.
[9] Sunrise MOB Holdings LLC Operating Agreement [Plaza MOB Summary, Exhibit A].
[10] First Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC [Plaza MOB Summary, Exhibit B].
[11] Second Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC [Plaza MOB Summary, Exhibit C].

4. 6/20/2019: Plaza MOB was refinanced for $30,000,000[12] (the "Plaza MOB Loan") resulting in net proceeds before loan payoff of $28,235,111.[13] After loan payoff, Net Proceeds deposited in Plaza MOB's bank account totaled $8,565,153.79.[14]

    a. The Funds Flow Agreement directed the Net Proceeds of the Plaza MOB Loan to be transferred to the Richard A. Hayes, Inc. Client Trust Account ("Hayes Trust Account")[15] and distributed to Sunrise REH in two (2) distributions; the $8,444,477.81 "Plaza MOB Distribution" and the $120,235.98 "Plaza MOB Second Distribution."[16]

    b. The Funds Flow Agreement also contemplated distributions to the Alecto Members of "up to $500,000 from the Additional Insurance Reserve Funds and up to $355,002 from the Rent Concession Reserve Funds (the "Reserve Funds Distributions");[17] the Plaza MOB Second Distribution and Reserve Funds Distributions were to be deposited in the Hayes Trust Account.[18]

5. 6/20/2019: Plaza MOB transferred $8,444,477.81 to the Hayes Trust Account.[19]

6. 6/20/2019: According to the Funds Flow Agreement, the $8,444,477.81 was to be "transferred" to the Alecto Members through a series of "paper distributions" consummating in a capital contribution by the Alecto Members to Alecto and the disbursement of the $8,444,477.81 from the Hayes Trust Account directly to Alecto. The "paper distributions" are described as follows:

    a. Plaza MOB distributed $8,444,477.81 to Sunrise REH.[20]

    b. Sunrise REH distributed $8,444,477.81 to Sunrise MOB.[21]

    c. Sunrise MOB distributed $8,444,477.81 to the Alecto Members;[22]

7. 6/20/2019: The Alecto Members directed the disbursement of the $8,444,477.81 from the Hayes Trust Account to Alecto as a capital contribution (the "Plaza MOB Distribution").[23] The Plaza

---

[12] The property owned by Plaza MOB, Olympia Medical Plaza, held a Market Value As-Is (Stabilized) of $50,700,000 as of June 1, 2019, per an appraisal by Cushman & Wakefield Western, Inc.
[13] "Funds Flow Agreement" dated June 20, 2019, by and between Plaza MOB, Sunrise REH, Sunrise MOB, Alecto and the Alecto Members [Plaza MOB Summary, Exhibit D], Recital E. See also Promissory Note dated June 20, 2019, Borrower's Estimated Settlement Statement, and Lender Closing Statement
[14] Funds Flow Agreement, Recital E. Net Proceeds included the $8,444,477.81, the "Plaza MOB Distribution" and a remaining balance of $120,235.98, the "Plaza MOB Second Distribution." Per the Borrower's Estimated Settlement Statement, estimated cash to Plaza MOB was $8,446,479.89. The difference from the $8,565,153.79 deposit amount and the estimate is primarily the $120,235.98 estimated future payment to Berkadia Commercial Mortgage LLC due July 6, 2019.
[15] Funds Flow Agreement, Recital J.
[16] Funds Flow Agreement, Recitals F and K.
[17] Funds Flow Agreement, Recital L.
[18] Funds Flow Agreement, Recital M.
[19] Plaza MOB Account *2120, June 2019.
[20] Funds Flow Agreement, Recital F.
[21] Funds Flow Agreement, ¶2.
[22] Funds Flow Agreement, ¶3.
[23] Funds Flow Agreement, ¶4.

**A0831**

MOB Distribution was received into Alecto's operating account *6065 [24] and recorded in Alecto's general ledger as a capital contribution.[25]

8. 6/20/2019: Alecto loaned $8,444,477.81 to Olympia HC, a subsidiary of Alecto LA (the "2019 Olympia HC Loan").[26] The loan was received into Olympia HC's Cash Management Account (CMA) *7573 [27] and recorded as "Loan to Olympia" in Alecto's general ledger.[28]

9. 7/31/2019: Plaza MOB transferred $620,675.98 to the Hayes Trust Account (the "July 2019 Plaza MOB Distribution").[29]

    a. The 7/31/2019 deposit included the "Plaza MOB Second Distribution" of $120,235.98,[30] $440 from First American Title Insurance Company, and $500,000 from Wells Fargo; amounts received by Plaza MOB on 6/21/2019 and 7/17/2019, respectively.[31]

10. 7/31/2019: The $620,675.98 July 2019 Plaza MOB Distribution was disbursed from the Hayes Trust Account into Alecto's operating account *6065 and transferred to Olympia HC's account *7573 on the same day (the "July 2019 Olympia Transfer").[32]

    a. The Funds Flow Agreement directed additional deposits from the Hayes Trust Account be contributed to the capital of Alecto by the Alecto Members through the same series of distributions as the $8,444,477.81 Plaza MOB Distribution.[33]

    b. The Second Capital Contribution was not recorded in Alecto's general ledger as a capital contribution.

    c. The July 2019 Olympia Transfer was not recorded as a "Loan to Olympia" in Alecto's general ledger.

11. 9/26/2019: Plaza MOB transferred $500,000 to the Hayes Trust Account (the "September 2019 Plaza MOB Distribution"). This transfer, and a Plaza MOB Loan interest payment of $152,680 to "Ream, as Trustee for Various Invest," reduced the balance in Plaza MOB's operating account to $2,377.98.[34]

    a. The $500,000 September 2019 Plaza MOB Distribution was disbursed from the Hayes Trust Account into Alecto's operating account *6065 and transferred that same day to Alecto's Acct *3784, an account used to receive advances from a revolving credit facility

---

[24] Alecto Account *6065, June 2019.
[25] Alecto general ledger:

| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | wire received on 06/19/19 now accounted as paid in capital surplus set up in COA | 8,444,477.81 |

[26] Olympia Promissory Note. The Olympia Promissory Note was entered into subject to a consent agreement dated June 19, 2019, by and among MPT of Los Angeles, L.P, MPT of Olympia, LLC, Alecto, Alecto LA, Olympia HC, Horizon Real Estate Holdings LLC, Sunrise REH, Sunrise MOB and Plaza MOB.
[27] Olympia HC Account *7573, June 2019.
[28] Alecto general ledger:

| Loan to Olympia | Journal Entry | 9/30/2019 | wire received on 06/19/19 - receivable from OMC | 8,444,477.81 |

[29] Plaza MOB Account *2120, July 2019.
[30] Funds Flow Agreement, Recital K.
[31] Plaza MOB Account *2120, July 2019. GCS assumes the $500,000 from Wells Fargo were the Additional Reserve Funds, a "Reserve Funds Distribution." Two (2) $500,000 distributions were deposited into the Hayes Trust Account by Plaza MOB: $500,000 on 7/31/2019 and $500,000 on 9/26/2019 (Plaza MOB Account *2120, September 2019).
[32] Alecto Account *6065, July 2019 and Olympia HC Account *7573, July 2019. The Amended and Restated Promissory Note dated September 26, 2019.
[33] Funds Flow Agreement, ¶5.
[34] Plaza MOB Account *2120, September 2019.

with CNH Finance Fund I, L.P. ("CNH Finance") and utilized to allocate and distribute funds to Affiliates.[35]

    b.   The $500,000 transfer was recorded in Alecto's general ledger as a capital contribution.[36]

    c.   On 9/26/2019, a total of $935,000 was transferred from Alecto's Account *3784 to Olympia HC's account *7573 (the "September 2019 Olympia Transfer").[37] However, only $500,000 was recorded as a "Loan to Olympia" in Alecto's general ledger.[38]

12.   The July 2019 Olympia Transfer and $500,000 of the $935,000 September 2019 Olympia Transfer were documented in an Amended and Restated Promissory Note dated September 26, 2019, as additional advances on the 2019 Olympia HC Loan such that the principal amount on the Olympia HC Loan was $9,565,153.79 at that date.[39]

    a.   However, Alecto's general ledger reflects a "Loan to Olympia" of $8,944,477.81; the total of the $8,444,477.81 Plaza MOB Distribution and $500,000 of the September 2019 Olympia Transfer.[40] No additional advances were recorded after September 30, 2019.

    b.   Alecto's general ledger reflects a total $8,944,477.81 in "Paid-in-capital or Surplus."[41] No additional capital contributions were recorded after September 30, 2019.

## B. Transfers to/from Plaza MOB in the "Plaza MOB Gap Period"

From June 19, 2019, through December 31, 2020 (the "Plaza MOB Gap Period"), Sunrise REH and its subsidiaries, Plaza MOB, and Olympia Plaza Management, Inc. were owned by Sunrise MOB (the Alecto Members) not Alecto. According to Plaza MOB's bank statements, during the Plaza MOB Gap Period, the following cash transfers were made between Alecto and Plaza MOB, resulting in a net amount transferred to Alecto of $2,624,225.[42]

1.   Plaza MOB transferred $3,011,226 to Alecto's operating account[43]

    a.   $2,751,226 on 7/10/2019 originating from an "over counter deposit" of the same amount into Plaza MOB's Acct *2120 on 7/8/2019. Also on 7/10/2019, Alecto transferred the same amount to Olympia HC Acct *7573;[44]

---

[35] Alecto Account *6065, September 2019 and Alecto Account *3784, September 2019.

[36] Alecto general ledger:

| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | Wire received on 09/26/19 from Richard Hayes Attorney Client trust account | 500,000.00 |
|---|---|---|---|---|

[37] Alecto Account *3784, September 2019 and Olympia HC Account *7573, September 2019.

[38] Alecto general ledger:

| Loan to Olympia | Journal Entry | 9/30/2019 | To record Loan receivable from OMC - Sun Rise MOB LLC contribution | 500,000.00 |
|---|---|---|---|---|

[39] Amended and Restated Promissory Note dated September 26, 2019 by an between Alecto and Olympia HC.

[40] Alecto general ledger:

| Loan to Olympia | | | | |
|---|---|---|---|---|
| Loan to Olympia | Journal Entry | 9/30/2019 | wire received on 06/19/19 - receivable from OMC | 8,444,477.81 |
| Loan to Olympia | Journal Entry | 9/30/2019 | To record Loan receivable from OMC - Sun Rise MOB LLC contribution | 500,000.00 |
| Total for Loan to Olympia | | | | 8,944,477.81 |

[41] Alecto general ledger:

| Paid-In Capital or Surplus | | | | |
|---|---|---|---|---|
| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | Wire received on 09/26/19 from Richard Hayes Attorney Client trust account | 500,000.00 |
| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | wire received on 06/19/19 now accounted as paid in capital surplus set up in COA | 8,444,477.81 |
| Total for Paid-In Capital or Surplus | | | | 8,944,477.81 |

[42] Bank transaction summary for Plaza MOB's Account *2120 (GCS Schedule A.7.3.1).

[43] Plaza MOB Account *2120, July 2019, December 2019, January 2020.

[44] Olympia HC Account *7573, July 2019.

      b.    $160,000 on 12/13/2019; $160,000 was subsequently transferred to Plaza MOB from Alecto on 12/30/2019; and

      c.    $280,000 on 1/14/2020; this transfer was received by Alecto and originally recorded as an intercompany liability due to Olympia HC by Alecto.  However, a cash transfer from Alecto to Olympia HC was not identified in either entity's bank statements.  The transaction was reclassified in Alecto's general ledger on June 30, 2020, as an intercompany liability due to Plaza MOB.[45]

2.    In February 2020, Alecto transferred $277,000 from Alecto Account *3784 to Alecto Account *6065 and then via wire to Plaza MOB; $97,000 on 2/5/2020 and $130,000 on 2/10/2020.[46]  These transfers were originally recorded as an offset to intercompany amounts due to Olympia HC by Alecto.  These transactions were reclassified in Alecto's general ledger on June 30, 2020, as an offset to intercompany amounts due to Plaza MOB by Alecto with the journal entry description "refer JE 1061 02/28/2018 Re-class to PMOB."[47]

In addition to the cash transfers, transactions for the benefit of Plaza MOB and/or Sunrise REH were recorded as follows:

1.    On June 30, 2020, Alecto recorded a journal entry reclassifying $150,000 recorded as an intercompany amount due to Olympia HC by Alecto to and intercompany amount due to Plaza MOB with the journal entry description "refer JE 795 09/28/2018 Re-class to PMOB."[48]

2.    During the Plaza MOB Gap Period, Alecto made payments for lien searches and taxes totaling $7,670 to, or for the benefit of, Plaza MOB and/or its parent company Sunrise REH.[49]

Alecto's 2020 general ledger reflects an intercompany liability due to Plaza MOB of $224,353.97.[50]

---

[45] Alecto general ledger:

| | | | | |
|---|---|---|---|---|
| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer 1047 01/31/2020-Re-class to PMOB | -280,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer 1047 01/31/2020-Re-class to PMOB | 280,000.00 |

[46] Alecto Account *3784, February 2020, Alecto Account *6065, February 2020 and Plaza MOB Account *2120, February 2020.  See also GCS Schedules A.0.1, A.0.3 and A.7.3.1.

[47] Alecto general ledger:

| | | | | |
|---|---|---|---|---|
| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | 130,000.00 |
| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | 97,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | -130,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | -97,000.00 |

[48] Alecto general ledger:

| | | | | |
|---|---|---|---|---|
| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer JE 795 09/28/2018-Re-class to PMOB | -150,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer JE 795 09/28/2018-Re-class to PMOB | 150,000.00 |

[49] Ibid. June 1, 2020 tax expenses (transaction numbers PMOB 2020, SREH 2020 TX) and a July 31, 2020 lien search expense (transaction number July 2020) paid by M. Sarrao in July and August 2020 and reimbursed to M. Sarrao on September 4, 2020.

| | | | | | |
|---|---|---|---|---|---|
| Inter-Co – Plaza MOB | Bill | 7/31/2020 | July 2020 | Michael J. Sarrao | Paracorp Inc UCC Lien | -70.00 |
| Inter-Co – Plaza MOB | Bill | 6/1/2020 | PMOB 2020 | Franchise Tax Board | PMOB 2020 Estimated Tax | -6,000.00 |
| Inter-Co – Plaza MOB | Bill | 6/1/2020 | PMOB 2020 | Franchise Tax Board | PMOB 2020 TX | -800.00 |
| Inter-Co – Plaza MOB | Bill | 6/1/2020 | SREH 2020 TX | Franchise Tax Board | SREH 2020 TX | -800.00 |

[50] Alecto general ledger:

Also, during the Plaza MOB Gap Period, Plaza MOB transferred $3,789,966 in monthly payments to "REAM, Trustee for Various Invest." These monthly payments were verified as interest payments on the Plaza MOB Loan.[51]

## C.  The January 1, 2021 Sunrise MOB Assignment to Alecto and the UCLA Asset Sale

Olympia HC owned and operated Olympia Medical Center (the "Hospital" or "OMC") on land (the "Hospital Real Property") owned by Horizon Real Estate Holdings LLC ("Horizon"), a subsidiary of Alecto LA. Plaza MOB owned property adjacent to the Hospital including a medical office building and parking structure (the "Plaza Real Property").[52] UCLA entered into an agreement with Olympia HC, Horizon and Plaza MOB to purchase the Hospital assets, Hospital Real Property, Plaza Real Property, and certain other assets in a two (2) phase asset sale (the "UCLA Asset Sale) for an aggregate purchase price of $128,500,000.[53]

On January 1, 2021, the Initial Closing Date, UCLA acquired the Hospital assets and Hospital Real Estate for $75,850,000.[54] Proceeds from the sale were used by Olympia and Horizon to pay obligations to lenders resulting in net proceeds of $23,506,100[55] which were deposited into Alecto's operating account *6065 on January 4, 2021, via wire transfer.[56] On January 19, 2021, Alecto transferred the net proceeds to Alecto Account *3784 and used the cash, in part, to fund its operating expenses and Affiliates through May 2022.[57]

On the same day, January 1, 2021 (the "Assignment Date"), the members of Sunrise MOB assigned their interest in Sunrise MOB, and therefore Plaza MOB, to Alecto.[58] No consideration was given by Alecto for the transfer.

On August 31, 2021, the Final Closing Date, the Plaza Real Property was sold to UCLA for $58,500,000.[59] Proceeds from the sale were used to pay Plaza MOB's mortgage with Wells Fargo, N.A., and the loan

| | | | | | |
|---|---|---|---|---|---|
| Inter-Co – Plaza MOB | Journal Entry | 1/31/2020 | Re class Escrow refunds on Sunrise Holdings -MOB & PL for Ex. liab policy | | 27,021.89 |
| Inter-Co – Plaza MOB | Journal Entry | 1/31/2020 | Re class Escrow refunds on Sunrise Holdings -MOB & PL for Ex. liab policy | | 2,002.08 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to PMOB | | -130,000.00 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to PMOB | | -97,000.00 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer JE 795 09/28/2018-Re-class to PMOB | | 150,000.00 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer 1047 01/31/2020-Re-class to PMOB | | 280,000.00 |
| Inter-Co – Plaza MOB | | | | | |
| Total for Inter-Co – | | | | | 224,353.97 |

[51] Wells Fargo Payment Coupon/Billing Statements for the period July 2019 – August 2021. (GCS Schedule A.7.3.1)

[52] Plaza MOB Summary.

[53] Asset Purchase Agreement dated December 4, 2020, among Olympia Health Care, LLC, Horizon Real Estate Holdings, LLC, Plaza Medical Office Building, LLC and The Regents of the University of California, on behalf of UCLA Health (the "UCLA APA"). The UCLA APA contemplated the closing of the purchase of assets from Plaza MOB to occur on March 31, 2021 (the "Initial Outside Closing Date"). The Regents of the University of California together with UCLA Health are referred to herein as "UCLA." See also Plaza MOB Summary, ¶15.

[54] The Initial Closing Purchase Price of $70 million less a $3 million Indemnity Holdback Amount, or $67 million was delivered to First American Title Insurance Company.

[55] Seller's Final Settlement Statement listed "Cash to Seller" of $23,507,202 (includes credit for Independent Consideration of $100).

[56] Alecto Account *6065, January 2021. GCS noted the net proceeds were not deposited into Olympia HC's bank accounts. GCS did not receive Horizon's bank statements and therefore, the original recipient of the net proceeds, if not Alecto, is unknown.

[57] Alecto Account *3784, January 2021.

[58] Plaza MOB Summary, Exhibit E, Assignment of Membership Interests. See also GCS – Diagram 3 – Plaza MOB Assignment and UCLA Asset Sale (Plaza MOB).

[59] Seller's Estimated Settlement Statement.

obligations of Alecto and certain Affiliates to MPT Operating Partnership, LP.[60] Net proceeds of $15,769,770.21 were deposited into Plaza MOB's bank account *2120.[61]

## D. Post-Assignment Transfers to/from Plaza MOB

Between the Assignment Date, January 1, 2021, and the Final Closing Date on August 31, 2021, Plaza MOB made payments by check of $874,797[62] and transferred a total of $1,278,196 to a) third-parties ($41,076), OMC ($8,517), and "REAM, Trustee for Various Invest" for Plaza MOB Loan interest ($1,222,447).[63]

From August 31, 2021, through June 30, 2023, $2,709,449 was transferred by Plaza MOB to Alecto and $1,097,803 was transferred to Olympia HC.[64]

From August 31, 2021, through June 30, 2023, Plaza MOB transferred $13,917,603 to Alecto and $871,953 to Olympia HC. Including the proceeds from the sale of Plaza MOB's assets to UCLA, $29,687,817 was deposited into Alecto's bank accounts through June 30, 2023.[65] As of June 30, 2023, Plaza MOB had approximately $22,000 in its bank account.[66]

On January 6, 2022, Plaza MOB wired $3,892,489.92 to First Clearing for payment to The Reddy Investment Trust.[67] At that time, The Reddy Investment Trust held a $4,039,463.75 unsecured Promissory Note issued by Alecto in October of 2018 (the "2018 Promissory Note").[68] Alecto Management represented that this payment was made by Plaza MOB as a condition to The Reddy Investment Trust consenting to sale of Plaza MOB's assets to UCLA.[69]

---

[60] Seller's Estimated Settlement Statement. The Seller's Escrow Instructions include a payoff letter from MPT of Los Angeles, L.P. related to a Secured Promissory Note issued on January 1, 2021, by Sunrise REH, Plaza MOB, Alecto LA, Olympia HC, Horizon and Alecto. The $8,004,800 loan and subsequent payoff was and recorded in Alecto's general ledger as a Loan Payable to Plaza MOB:

| Inter-Co - WNJ | Journal Entry | 8/31/2021 | UCLA Transaction # 2 - PMOB - MPT | -8,004,800.00 |
| Loans Payable Account | Journal Entry | 8/31/2021 | UCLA Transaction # 2 - PMOB - MPT | 8,004,800.00 |
| Total for Loans Payable Account | | | | 8,004,800.00 |

See also Plaza MOB Summary, ¶15.

[61] Plaza MOB Account *2120, August 2021.

[62] Payees of payments by check and preauthorized debits could not be determined based on information produced to GCS.

[63] GCS Schedule A.7.3.1. Alecto Management represented, and GCS verified, monthly payments to "REAM, Trustee for Various Investors" were for interest payments on the Plaza MOB Loan. Monthly payments to "REAM, Trustee for Various Investors" were made from Plaza MOB's bank account beginning in August 2019 through August 2021.

[64] GCS Schedule A.7.3.1., Schedule A.0.1., Schedule A.0.3., Schedule A.3.1.1. and Schedule A.3.1.2.

[65] GCS Schedule A.7.3.1., Schedule A.0.1., Schedule A.0.3., Schedule A.3.1.1. and Schedule A.3.1.2.

[66] Plaza MOB Account *2120, June 2023.

[67] Plaza MOB Account *2021, January 2022. GCS Schedule A.7.3.1. See also Summary of Loans prepared by Alecto Management.

[68] Promissory Note dated October 9, 2018, by and between Alecto Healthcare Services, LLC and The Reddy Investment Trust matured October 31, 2021. GCS has not received any documentation that the 2018 Promissory Note was amended or restated. It is our understanding, per a discussion with Alecto Management, that in October 2018, "Alecto had a direct loan with Wells Fargo which Wells Fargo was ready to call" and Lex Reddy personally paid the loan, and the 2018 Promissory Note was entered into. See Section G.

[69] Summary of Loans (a)(2). The UCLA APA Schedule 4.4(f)(ix) Consents to Final Closing to the sale of the Plaza Real Property does not specifically list The Reddy Investment Trust or Alecto. However, the schedule does refer to "Consent of the Members of Sunrise MOB Holdings LLC pursuant to the Sunrise Holdings LLC Agreement." As of the Final Closing Date, August 31, 2021, Sunrise MOB Holdings was owned by Alecto. The 2018 Promissory Note was not listed on the UCLA APA Schedule 5.6 Transactions with Affiliates although the Olympia HC Loan resulting from the Plaza MOB Refinancing in 2019 was listed. GCS notes that Alecto Management represented that the lender,

### E. Inter-company Transfers and the CNH Revolving Facility[70]

On July 8, 2019, CNH Finance refinanced Alecto's revolving credit facility with White Oaks Healthcare Finance, LLC after numerous events of default.[71]  The CNH Revolving Facility was secured by accounts receivable and initially capped at $30 million.[72]  The CNH Revolving Facility was entered into between CNH Finance, Alecto, and the following Affiliates:[73]

- Alecto Hayward
- Alecto Sherman
- Sherman/Grayson Sponsor
- Sherman/Grayson Hospital
- Sherman/Grayson Health Services
- Sherman MD Provider
- Sherman Anesthesia
- Alecto Fairmont
- FRMC Physicians
- Alecto Ohio Valley
- Alecto Wheeling
- Alecto Martin's Ferry
- Alecto East Ohio Physicians (listed as inactive)
- Alecto Los Angeles
- Olympia Health Care
- Horizon Real Estate Holdings

Controlled deposit accounts of the borrower Affiliates were swept on a daily basis to offset Alecto's obligations under the facility.[74]  Advances were funded under the CNH Revolving Facility and deposited into Alecto's Account *3784.  Funds were then allocated and transferred to borrower Affiliates or utilized by Alecto to fund payroll and other expenses.[75]

On March 2, 2021, Alecto requested the cap on the CNH Revolving Facility be reduced to $12 million.  In addition, changes to certain covenants were instituted, retroactive as of December 1, 2020, recognizing Alecto's failure to maintain the required minimum Current Ratio and Minimum EBITDAR in 2020.[76]

---

Wells Fargo, was not notified of the transfer of Sunrise MOB Holdings to Alecto as the lender was to be paid in full from proceeds of the Plaza MOB asset sale.  GCS has not seen documentation to verify whether or not notice of the transfer and Alecto's consent was given to UCLA prior to, or on, the Final Closing Date.  GCS notes that UCLA APA Schedule 4.4(e)(vii) Consents to Initial Closing includes the consent of Alecto and Alecto's members to the sale of the Hospital assets and the Hospital Real Property.

[70] Amended and Restated Credit and Security Agreement between Alecto Healthcare Services LLC, and those entities listed on Schedule 1 hereto and CNH Finance Fund I, L.P. dated July 8, 2019 (the "CNH Revolving Facility")

[71] CNH Revolving Facility, Schedule 8.1 White Oak Loan Defaults.  Defaults under the White Oak Loan Agreement, the MPT Lease Agreements, and the MPT Debt Agreements, generally included breach of financial covenants, failure to make base rent payments, failure to make reserve deposits, failure to make principal and interest payments, failure to deliver required financial statements, failure to make timely payments of payroll taxes and sales and use taxes, and other items.

[72] CNH Revolving Facility. See "Facility Cap" definition.

[73] CNH Revolving Facility, Schedule 1 – List of Borrowers.

[74] CNH Revolving Facility, Schedule 2 – Borrowers' Deposit Accounts.  See also GCS Exhibit 2 – List of Accts.

[75] Certain advanced funds were transferred to Alecto's Payroll Account *6508 or Operating Account *6065.

[76] First Amendment to Amended and Restated Credit and Security Agreement and Waiver dated March 1, 2021.

On November 1, 2021, Alecto requested and were granted a further reduction of the Facility Cap to $6 million.[77]

On August 1, 2022, Alecto requested the term of the CNH Revolving Facility be extended to December 31, 2022, and the Alecto account *3784 was converted to a springing deposit account.[78]  The CNH Revolving Facility was terminated and activity ceased by September 30, 2022.[79]

During the term of the CNH Revolving Facility, Alecto tracked deposits or "sweeps" from the Affiliates, advances, and allocations to Affiliates and reconciled these transactions to downloaded electronic statements and tracked fees, interest payments and availability under the CNH Revolving Facility.[80]

GCS compared the recorded "sweeps" and advances against wire transfers into and out of Alecto's Account *3784 and found advances recorded in the LOC Reconciliations matched wire transfers into Account *3784.[81] As shown on GCS Exhibit 3 – Allocation Summary, GCS found, for the most part, wire transfers out of Alecto's Account *3784 matched the recorded allocation of advances to Affiliates.[82]

In any month, an Affiliate may have been under or over funded, meaning deposit sweeps from an Affiliate's lockbox may be more or less than allocated advances.  As such, funds deposited by one Affiliate may have been allocated to another Affiliate or Alecto itself.

In 2020, advances allocated to Affiliates were less than the Affiliates' lockbox deposits.  It appears Alecto retained funds through the 2020 COVID crisis maintaining an average bank balance of $20 million through the end of 2020.

Although Alecto had entered into management services agreements with the Affiliate hospitals,[83] it is our understanding that Alecto did not collect any management fees from the Affiliate hospitals.[84]

## F.  Transfers to Insiders of $10,000 or more

GCS identified 1,208 payments by check, ACH and wire transfer from Alecto's bank accounts in the Examination Period.[85]  These payments were aggregated and grouped by payee. GCS identified 40

---

[77] Second Amendment to Amended and Restated Credit and Security Agreement dated November 1, 2021. At December 31, 2021, Alecto's bank balances totaled $11,438,741 and the availability on the CNH Revolving Facility was $2,696,427.
[78] Third Amendment to Amended and Restated Credit and Security Agreement dated August 1, 2022.  The principal balance at July 28, 2022 was $4,342,720.03.
[79] GCS Exhibit 3 – Allocation Summary.  See also Summary of Loans prepared by Alecto Management. At September 30, 2022, Alecto's bank balances totaled $120,096.27.
[80] GCS Exhibit 4 – Allocations by Entity prepared, in part, based on Alecto Management produced Excel spreadsheets: "2019 LOC of AHS with CNH," "2020 LOC of AHS with CNH," "Year 2021 LOC of AHS with CNHF" and "Year 2022 LOC of AHS with CNH" (the "LOC Reconciliations").
[81] GCS Exhibit 3 – Allocation Summary.
[82] GCS reconciled differences as noted on GCS Exhibit 3 – Allocation Summary.
[83] Alecto Fairmont, Alecto Healthcare Services Wheeling, LLC ("Alecto Wheeling," a subsidiary of Alecto Ohio Valley), Alecto Healthcare Martin's Ferry LLC ("Alecto Martin's Ferry," a subsidiary of Alecto Ohio Valley), Olympia HC, and Sherman/Grayson (collectively, the "Management Agreements").  The Management Services Agreement with Sherman/Grayson included specified insurance conditions.  Under the various Management Agreements, Alecto was to receive monthly management fees equal to 4% of monthly "Collected Net Revenues," as defined in the Management Agreements, unless such fees were deferred, discounted, or waived by Alecto.  In addition, Alecto was entitled to reimbursement of actual out-of-pocket costs incurred in providing such services.
[84] Summary of Management Services Agreement prepared by Alecto Management.
[85] GCS Exhibit 5 – Payment Analysis. Examined 1,322 payments including those dated January 1, 2019 – June 16, 2019.

individual cash transfers of $10,000 or more to Insiders (32), entities owned by Insiders (1) and American Express (7).[86]   GCS reviewed documentation supporting the transfers.   The transfers appeared to be reimbursement of Alecto business-related expenses and the reimbursement of a $77,000 advance of funds by Lex Reddy in October 2019 applied as a payment on the 2018 Promissory Note held by The Reddy Investment Trust (see Section G below).

GCS also identified a $380,000 payment to Lex Reddy recorded as a reimbursement of advances to Alecto on Alecto's general ledger.   The advances occurred on December 19, 2018 ($300,000) and January 25, 2019 ($80,000) with deposits into Alecto's Account *6065 and were reimbursed to Lex Reddy on July 27, 2020, from Alecto Account *6508.[87]

Three (3) transfers totaling $48,345 to Cooperative of American Physicians, Inc. in January 2021, January 2022, and January 2023, were made for the benefit of Dr. P. Jeyakumar for professional dues and insurance.

| 1/4/2021 | 3322 | Cooperative of American Phys Inc. | -15,602.00 |
| 1/3/2022 | 3429 | Cooperative of American Phys Inc. | -16,058.00 |
| 1/5/2023 | 3466 | Cooperative of American Phys Inc. | -16,685.00 |

In addition to cash transfers, GCS examined Alecto's year end payroll reports for the years 2020 – 2022 and the period beginning January 1, 2023, through June 16, 2023.[88]  The following Insiders received payroll during this period:

|  | A. Dhuper | | | | | |  | L. Reddy | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Regular | Regular Hrs | Bonus | PTO | PTO Hrs |  |  | Regular | Regular Hrs | Bonus | PTO | PTO Hrs |
| 2020 | 284,998.48 | 1,976 | 20,000.00 | 14,999.92 | 104.00 |  | Q4 2020 | 750,000.16 | 2,080 |  |  |  |
| 2021 | 284,998.48 | 1,976 | 25,000.00 | 26,538.32 | 184.00 |  | 2021 | 778,846.32 | 2,160 |  |  |  |
| Q1 2022 | 28,846.00 | 200 |  | 34,734.91 | 240.83 |  | Q3 Q4 2022 | 750,000.16 | 2,080 | (1,520 Hrs Q3, 560 Hrs Q4) |  |  |
| 6 mos 2023 |  |  |  |  |  |  | 6 mos 2023 | 346,153.92 | 960.00 |  |  |  |
| Total | $598,842.96 |  | $45,000.00 | $76,273.15 |  |  | Total | $2,625,000.56 |  | $ - | $ - |  |

|  | P. Jeyakumar | | | | | |  | M. Sarrao | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Regular | Regular Hrs | Bonus | PTO | PTO Hrs |  |  | Regular | Regular Hrs | Bonus | PTO | PTO Hrs |
| 2020 | 178,853.76 | 1,952 |  | 18,750.24 | 128.00 |  | 2020 |  |  |  |  |  |
| Q1-Q3 2021 | 80,774.40 | 1,120 |  | 21,786.23 | 135.24 |  | Q3 2021 | 1,218.00 | 87 |  |  |  |
| 2022 |  |  |  |  |  |  | 2022 |  |  |  |  |  |
| 6 mos 2023 |  |  |  |  |  |  | 6 mos 2023 |  |  |  |  |  |
| Total | $259,628.16 |  | $ - | $40,536.47 |  |  | Total | $ 1,218.00 |  | $ - | $ - |  |

As a result of our analysis of Alecto's general ledger, GCS also identified a payroll payment to Lex Reddy of $16,851.85 from Alecto Hayward on June 16, 2023 which was cashed on June 20, 2023.

**G.  Transactions related to the 2018 Promissory Note (GCS Exhibit 6.1)**

As discussed in Section D above, Alecto entered into the 2018 Promissory Note in the amount of $4,039,463.75 with The Reddy Investment Trust in order to satisfy a loan with Wells Fargo.[89]

---

[86] Total payments to Insiders, entities owned by Insiders, and to American Express are shown in GCS Exhibit 5 – Payment Analysis.  GCS Exhibit 6 – Insider Payments lists payments of $10,000 or more reviewed.
[87] Excerpt of the Alecto transfers in reimbursement of the $380,000 in advances.

| 07/27/2020 | Account Transfer Dr. TO ACC | 6065 |  | 380,000.00 | (380,000.00) |  | 3784 | TRANSFER TO | 6065 |
| 07/27/2020 | Account Transfer Dr. TO ACC | 6508 |  | 380,000.00 | (380,000.00) |  | 6065 | TRANSFER TO | 6508 |
| 07/27/2020 | Preauthorized Debit 76508 ALECTO HEA PAYMENTS ACH OFFSET ALECTO CCD | | 380,000.00 | | (380,000.00) | | 6508 | ACH | ALECTO HEA OFFSET ALECTO CCD |

[88] Processed through Olympia Medical Center; Olympia Medical Center YTD Payroll Registers.
[89] As mentioned previously, the Plaza MOB Summary prepared by Alecto Management states that in October 2018, "Alecto had a direct loan with Wells Fargo which Wells Fargo was ready to call" and Lex Reddy personally paid the loan as shown on his October 2019 Wells Fargo Priority Credit Line Statement. GCS verified transactions related to the 2018 Promissory Note through examination of Reddy Credit Line statements, Alecto's general ledger and Alecto's bank statements.

Funds provided to Alecto under the 2018 Promissory Note originated from a margin account credit line held by Lex Reddy ("Reddy Credit Line"). The 2018 Promissory Note was dated October 9, 2018, with a maturity date of October 31, 2021. Although GCS has not received any documentation that the 2018 Promissory Note was amended or restated, additional advances totaling $960,000 were issued to Alecto in the period January 17, 2019, through January 22, 2020. During that period, two (2) payments totaling $107,000 were made such that the outstanding balance at January 30, 2020, was $5,084,973.33.[90]

Soon thereafter, the stock market plummeted as a result of the COVID crisis, margin calls were made on the "Reddy Credit Line." A total of $459,404 was transferred by Alecto to the Reddy Credit Line to cover the margin calls. These transfers were booked as loan payments against the balance on the 2018 Promissory Note. Subsequent payments on the 2018 Promissory Note were made on April 13, 2021 ($792,683.49), and nine (9) months of interest payments beginning April 30, 2021, through January 2, 2022. On January 31, 2022, the 2018 Promissory Note was paid in full by Plaza MOB through First Clearing.[91]

GCS verified that all advances from the Reddy Credit Line under the 2018 Promissory Note were received by Alecto and all payments from, or on behalf of Alecto, were applied to reduce the balance of the Reddy Credit Facility or pay interest and fees.

## H. Transfers to Accounts of Previously Unidentified Holders

Our review of the bank statements produced identified four (4) accounts of previously unidentified holders receiving transfers from Alecto and/or its Affiliates. The 113 transfers from Alecto to these accounts totaled less than $214,000[92] and 76 of those transfers were for less than $1,000. Transfers to previously unidentified accounts were below the agreed to research threshold of $10,000. However, based on Alecto's general ledger, the majority of the transfers were to OMC HSA Account *3709, the remaining transfers related to entities previously owned or operated by Alecto; M/C Healthcare and Chesterfield.

## II.    SCOPE AND ANALYSIS

A forensic investigation is defined by the scope of the engagement and/or issues in question and may include the analysis of entire sets of data based on the focus of the investigation.[93] In this case, the investigation performed by GCS focused on cash transactions into and out of Alecto's bank accounts to identify a) cash payments and loans to, or for the benefit of, officers, director, shareholders, and related-parties ("Insiders"), and b) potentially voidable transfers to Insiders, if any. GCS received approximately 1,950 documents during the course of our examination has performed the following analyses:

1.  Reviewed certain filings with the Bankruptcy Court.
2.  Conducted interviews with Michael Sarrao, Alecto's Executive Vice President, General Counsel and Secretary and Matt Williams, Alecto's Chief Financial Officer.
3.  Analyzed cash sources and uses based on the analysis, categorization, and summarization of 1,296 bank statements containing 116,850 transactions included in 26 bank accounts held by Alecto and

---

[90] Payments included a payment of $30,000 on May 16, 2019, and payment of $77,000 on October 2, 2019, originating from the aforementioned advance from Lex Reddy.
[91] Plaza MOB Account *2120, January 2022.
[92] See GCS Exhibit 7 – Bank Account Summary Schedules.
[93] Forensic investigations are iterative, meaning that the analytical techniques used are not performed in isolation since observations made using one technique generally provide insight into other areas of the investigation.

certain of its Affiliates for the four (4) year Examination Period June 17, 2019, through June 30, 2023, as discussed below.

    a. Bank statements were received for the Examination Period for the following entities:[94]

        i. Alecto Healthcare Services LLC (3 accounts)

        ii. Alecto Healthcare Services Hayward LLC (1 account)[95]

        iii. Sherman/Grayson Hospital LLC (7 accounts)

        iv. Sherman MD Provider, Inc., a subsidiary of Alecto Sherman (5 accounts)

        v. Sherman Anesthesia, Inc., a subsidiary of Alecto Sherman (2 accounts)

        vi. Olympia Health Care LLC (6 accounts)

        vii. Plaza Medical Office Building LLC (2 accounts)

    b. Identified deposits, payments made by check, direct debit, internal transfer, or wire transfer, and categorized the data by transaction category and payee, if identified in the bank statements.

    c. Electronically tied Alecto payments by check and ACH Transfer (Bill Payment) to Alecto's general ledger to identify payees.

    d. Traced advances from the CNH Revolving Facility per electronic statements into Alecto's primary disbursement account *3874 and subsequent transfers from Alecto's account *3874 to bank accounts held by Affiliates.

    e. Tied advances to Affiliates per bank statements to the LOC Reconciliations, calculated estimated over/under advances to Affiliates, and sampled the recording of such transactions in Alecto's general ledger.

    f. Calculated total advances retained by Alecto for operating expenses and other purposes and tied to Alecto bank statements.

    g. Analyzed transfers to/from accounts not included in lists of Alecto and/or Affiliate held accounts.

4. Examined Alecto's general ledger, including 1,208 separate disbursements by check, ACH, or wire transfer to identify payments to, or for the benefit of, Insiders, of $10,000 or more, if any.

5. Examined Alecto's year end payroll records for the years 2020 – 2022 and the 6-month period ended June 16, 2023, to identify payments to Insiders.

6. Analyzed cash flows into/out of the credit facility utilized under the 2018 Promissory Note and payoff by Plaza MOB.

7. Examined supporting documentation for interest payments related to the Plaza MOB Loan.

8. Analyzed cash flows and certain closing documents, including settlement and funds flow statements, related to the June 20, 2019 Plaza MOB Refinance and the 2021 UCLA Asset Sale.

[94] Bank statements were requested for Alecto Fairmont, LLC, FRMC Physicians, Inc., a subsidiary of Alecto Fairmont, Alecto Wheeling, Alecto Martin's Ferry, however, these statements were not received by the date of this summary. It is our understanding that Alecto Fairmont ceased operations in March 2020. It is also our understanding that Alecto Wheeling and Alecto Martin's Ferry ceased operations in October 2019.

It is also our understanding that the following entities did not have bank accounts: Sherman/Grayson Sponsor LLC (subsidiary of Alecto Sherman), Horizon Real Estate Holdings LLC, Sunrise Real Estate Holdings LLC, Olympia Plaza Management, Inc.

[95] Under a springing lockbox agreement with CNH Finance.

## III.    LIMITATIONS

The scope of work performed by GCS did not include, among others, a) verification of trade accounts receivable or payable, b) examination of deposits into Alecto bank accounts and the source of such deposits unless discussed herein, c) analysis of vendor invoices and related payments, d) analysis of copies of checks, e) identification of payees by ACH or check described in the bank statements as preauthorized debits, identification of payees by ACH or check where no name was identified, or the transaction listed as, or included in, a journal entry, f) detailed examination of invoices and funding request packages used to allocate funds to Affiliates, nor g) examination of email and other internal data/documents unless discussed herein.

While GCS examined transfers into and out of the Alecto bank accounts to CNH Finance and Affiliates and traced the recording of such transfers into Alecto's general ledger, GCS did not reconcile the Affiliates' intercompany accounts.

GCS did not perform an audit, review or compilation as those terms are defined in the AICPA's Statements on Standards for Accounting and Review Services or generally accepted auditing standards.

The procedures were performed solely for use in this bankruptcy matter and the use of this letter report and supporting schedules is restricted to Mr. Balasiano, as Independent Director of Alecto Healthcare Services LLC, Debtor's counsel and the Bankruptcy Court.  This letter and supporting exhibits are not to be reproduced, distributed, disclosed, or used for any other purpose without prior written consent of Gould Consulting Services.  This letter is not intended for general circulation or publication other than as required by the Bankruptcy Court.

Leanne Gould, CPA/ABV/CFF, ASA
GOULD Consulting Services

GCS Diagram 1
Organizational Chart

**Alecto Healthcare Services, LLC**
**Organizational Chart**



GCS Diagram 2
Plaza MOB Refinancing
2019 Sunrise MOB Transaction

**A0845**

GOULD Consulting Services



**Alecto Healthcare Services, LLC**
**2019 Sunrise MOB Transaction**
*Refer to Plaza MOB Summary for paragraph references [#] below*

GCS Diagram 3
Horizon
UCLA Asset Sale

Alecto Partners

**Alecto Healthcare Services LLC**



GOULD Consulting Services

**A0848**

GCS Diagram 4
Plaza MOB Assignment
And UCLA Asset Sale

**A0849**

**Alecto Healthcare Services, LLC**
**2021 Sunrise MOB Transaction**
*Refer to Plaza MOB Summary for paragraph references [#] below*



January 6, 2022 Plaza MOB wired $3,892,489.92 to First Clearing. GCS assumes this transfer was for payment of the 2018 Promissory Note to The Reddy Investment Trust

$7,500,000 of proceeds from Plaza MOB asset sale used to pay off of Note to MPT of Sherman-Alecto Hospital LLC, Borrower Sherman Grayson Hospital and Sherman/Grayson Health Services, Guarantor, Alecto

Exhibits

# Exhibit 1
# Plaza MOB Summary

## Prepared by Alecto Management

## Plaza Medical Office Building

(1)     Plaza Medical Office Building, LLC ("Plaza MOB") is a California limited liability company which owned and operated a medical office building and parking garage located at 5901 W. Olympic Boulevard, Los Angeles, California 90036, and 5975 W. Olympic Boulevard, Los Angeles, California 90036.  Plaza MOB owners were and are: (a) Sunrise Real Estate Holdings, LLC (99.5%) and Olympia Plaza Management, Inc. ("OPM").  Prior to June 19, 2019, Alecto Healthcare Services LLC owned 100% of Sunrise Real Estate Holdings, LLC.

(2)     In the late spring of 2019, Plaza MOB sought to refinance its existing mortgage to take advantage of interest rate opportunities and cash out the equity that had been developed. Except for the mortgage, Plaza MOB had no creditors.

(3)     Wells Fargo Bank, N.A., the proposed lender for the refinance required that Sunrise Real Estate Holdings, LLC not be owned by Alecto Healthcare Services LLC in order to complete the refinancing.

(4)     On June 12, 2019, Sunrise MOB Holdings, LLC, a Delaware limited liability company was formed.  As of June 12, 2019, Sunrise MOB Holdings, LLC members were as follows:

| Members | Units |
|---|---|
| Class A Members | |
| The Krissman Family Trust | 10,000 |
| The Reddy Investment Trust | 5,000 |
| The Jeyakumar Inter-Vivos Trust | 7,000 |
| The Sarrao Family Trust | 7,000 |
| The Hayes Irrevocable Trust | 5,000 |
| Steven Kay | 5,000 |
| Matthew Williams | 5,000 |
| Aman Dhuper | 5,000 |
| Class A Totals | 49,000 |
| | |
| Class B Members | |
| The Reddy Investment Trust | 51,000 |
| Class B Totals | 51,000 |
| | |
| Total Units | 100,000 |

Attached hereto as **Exhibit A** is the Operating Agreement for Sunrise MOB Holdings LLC.

1

(5)     On June 19, 2019, Alecto Healthcare Services LLC transferred 100% of the membership interests in Sunrise Real Estate Holdings to the following persons:

| Members | % Ownership |
|---|---|
| The Reddy Investment Trust | 56% |
| The Krissman Family Trust | 10% |
| The Jeyakumar Inter-Vivos Trust | 7% |
| The Sarrao Family Trust | 7% |
| The Hayes Irrevocable Trust | 5% |
| Steven Kay | 5% |
| Matthew Williams | 5% |
| Aman Dhuper | 5% |

Attached hereto as **Exhibit B** is the First Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC.

(6)     On June 19, 2019, the Members of Sunrise Real Estate Holdings, LLC transferred their interests in Sunrise Real estate Holdings, LLC to Sunrise MOB Holdings LLC.  Attached hereto as **Exhibit C** is the Second Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC.

(7)     On June 20, 2019, Plaza MOB completed the refinancing and received net proceeds of $8,444,477.81.

(8)     On June 20, 2019, Plaza MOB made a distribution of $8,444,477.81 to Sunrise Real Estate Holdings LLC.  Attached hereto as **Exhibit D** is the Funds Flow Agreement.

(9)     On June 20, 2019, Sunrise Real Estate Holdings LLC made a distribution to Sunrise MOB Holdings LLC.

(10)     On June 20, 2019, Sunrise MOB Holdings LLC made a distribution of $8,444,477.81 to the Sunrise MOB Members as follows:

| Members | % | Amount of Distribution |
|---|---|---|
| The Reddy Investment Trust | 56% | $4,728,904.21 |
| The Krissman Family Trust | 10% | $844,447.18 |
| The Jeyakumar Inter-Vivos Trust | 7% | $591,113.03 |
| The Sarrao Family Trust | 7% | $591,113.03 |
| The Hayes Irrevocable Trust | 5% | $422,223.59 |
| Steven Kay | 5% | $422,223.59 |
| Matthew Williams | 5% | $422,223.59 |
| Aman Dhuper | 5% | $422,223.59 |

2

(11)     On June 20, 2019, each of the Sunrise MOB Members made a capital contribution to Alecto Healthcare Services LLC in the following amounts:

| Members | % | Amount of Capital Contribution |
|---|---|---|
| The Reddy Investment Trust | 56% | $4,728,904.21 |
| The Krissman Family Trust | 10% | $844,447.18 |
| The Jeyakumar Inter-Vivos Trust | 7% | $591,113.03 |
| The Sarrao Family Trust | 7% | $591,113.03 |
| The Hayes Irrevocable Trust | 5% | $422,223.59 |
| Steven Kay | 5% | $422,223.59 |
| Matthew Williams | 5% | $422,223.59 |
| Aman Dhuper | 5% | $422,223.59 |

(12)     On June 20, 2019, Alecto Healthcare Services LLC made a loan equal to $8,444,477.81 to Olympia Health Care, LLC.

(13)     On December 31, 2019, Aman Dhuper transferred his membership in Sunrise MOB Holdings LLC to The Reddy Investment Trust and The Jeyakumar Inter-Vivos Trust transferred its membership interests in Sunrise MOB Holdings LLC to The Reddy Investment Trust.

(14)     On January 1, 2021, each of the members of Sunrise MOB Holdings LLC transferred their interests in Sunrise MOB Holdings LLC to Alecto Healthcare Services LLC. Attached hereto as **Exhibit E** is the Assignment of Membership Interests.

(15)     Effective August 31, 2021, Plaza MOB sold the medical office building and parking garage to The Regents of the University of California for the benefit of UCLA Health.  Except for obligations to Wells Fargo Bank, N.A., MPT of Olympia, L.P., and obligations as the lessor under office leases, including security deposits, Plaza MOB has no creditors or liabilities as of August 31, 2021.  Wells Fargo Bank, N.A. and MPT of Olympia, L.P., were paid in full through escrow on August 31, 2021 and The Regents of the University of California assumed the leases and obligations thereunder effective August 31, 2019.  Plaza MOB has had no creditors since August 31, 2021.

3

A0855

EXHIBIT A

## SUNRISE MOB HOLDINGS LLC

**A Delaware Limited Liability Company**

## OPERATING AGREEMENT

## SUNRISE MOB HOLDINGS LLC

### OPERATING AGREEMENT

This Operating Agreement (this "Agreement") is entered into and effective as of June 14, 2019, by and among the Persons identified as Members (each a "Member" and collectively the "Members") in **Exhibit A** which is incorporated herein by reference. Except as otherwise provided, the capitalized terms used in this Agreement shall have the meanings set forth in Article I hereof.

**WHEREAS**, Sunrise MOB Holdings LLC (the "Company"), was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation with the Delaware Secretary of State on June 12, 2019 (the "Effective Date"); and

**WHEREAS**, the Company was formed to own one hundred percent (100%) of the membership interests of Sunrise Real Estate Holdings, LLC; and

**WHEREAS**, the Members desire to enter into this Agreement to create two classes of Membership, to provide for their respective rights, obligations and duties, and to set forth the provisions for the management and governance of the Company; and

**NOW, THEREFORE**, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I
### Definitions

The following defined terms used in this Agreement shall have the meanings specified below:

"Act" shall mean the Delaware Limited Liability Company Act, in effect at the time of the initial filing of the Articles, and as thereafter amended from time to time.

"Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's aggregate Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(a)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)     Debit to such Capital Account the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1

**A0858**

"Adverse Terminating Event" shall have the meaning set forth in Section 4.3.

"Affiliated Person" or "Affiliate" shall mean, with reference to a specified Person, (a) any member of such Person's Immediate Family, (b) any Person who owns directly or indirectly ten percent (10%) or more of the beneficial ownership in such Person, (c) any one or more Legal Representatives of such Person and/or any Persons referred to in the preceding clauses (a) or (b); and (d) any entity in which any one or more of such Person and/or the Persons referred to in the preceding clauses (a), (b) or (c) owns directly or indirectly ten percent (10%) or more of the beneficial ownership.

"Agreement" shall mean this Operating Agreement as it may be amended, supplemented, or restated from time to time.

"Applicable Federal Rate" shall mean the Applicable Federal Rate as that term is defined in Code Section 1274(d)(1), whether the short-term, mid-term or long-term rate, as the case may be, as published from time to time by the Secretary of the Treasury.

"Approval of the Board" or "Board Acting by Approval" and any grammatical variation thereof, shall mean consent, approval or vote of a majority of the Managers then in office.

"Articles" shall mean the Certificate of Formation creating the Company, and as may, from time to time, be amended in accordance with the Act.

"Bankruptcy" shall mean any of the following:

(a)     If any Member shall file a voluntary petition in bankruptcy, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors, or shall file any answer or other pleading admitting or failing to contest the material allegations of any petition in bankruptcy or any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief filed against such Member, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator of such Member or of all or any substantial part of his or her properties or his or her interest in the Company (the term "acquiesce" as used herein includes but is not limited to the failure to file a petition or motion to vacate or discharge any order, judgment, or decree within thirty days after such order, judgment or decree);

(b)     If a court of competent jurisdiction shall enter in an order, judgment or decree approving a petition filed against any Member seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors and such Member shall acquiesce in the entry of such order, judgment, or decree, or if any Member shall suffer the entry of an order for relief under Title 11 of the United States Code and such order, judgment, or decree shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or if any trustee, receiver, conservator, or liquidator of any Member or of all or any substantial part of his or her properties or his or her interest in the Company shall be

appointed without the consent or acquiescence of such Member and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); or

       (c)    If any Member shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

"Board" or "Board of Managers" shall refer collectively to the Persons named to be the Managers in this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity on the Board of Managers of the Company.

"Book Value" shall mean, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes, except that:

       (a)    The initial Book Value of any asset contributed by a Member of the Company shall be the gross fair market value of such asset (reduced for any liabilities to which it is subject or which the Company assumes), as such value is determined by Approval of the Board, and for which credit is given to the contributing Member under this Agreement;

       (b)    The Book Values of all assets of the Company shall be adjusted to equal their respective gross fair market values, as determined by Approval of the Board, at and as of the following times:

       (i)    The acquisition of an additional or new interest in the Company by a new or existing Member in exchange for other than a de minimis Capital Contribution by such Member, if the Board, acting by Approval, reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members;

       (ii)    The distribution by the Company to a Member of more than a de minimis amount of any asset of the Company (including cash or cash equivalents) as consideration for all or any portion of an interest in the Company, if the Board, acting by Approval, reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members; and

       (iii)    The liquidation of the Company within the meaning of Regulations Section 1.704 1(b)(2)(ii)(g).

       (c)    The Book Value of the assets of the Company shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704 1(b)(2)(iv)(m); provided, however, that Book Value shall not be adjusted pursuant to this clause (c) to the extent that the Managers, acting by Approval, determines that an adjustment pursuant to the immediately preceding clause (b) is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment pursuant to this clause (c).

If the Book Value of an asset has been determined or adjusted pursuant to the preceding clauses (a), (b) or (c), such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits or Losses.

"Capital Account" shall mean a capital account maintained and adjusted in accordance with the Code and the Regulations, including the Regulations under Section 704(b) and (c) of the Code. The Capital Account of each Member shall be:

(a)      Credited with all payments made to the Company by such Member on account of Capital Contributions (and as to any property other than cash or a promissory note of the contributing Member, the agreed (as indicated by the Approval of the Board) fair market value of such property, net of liabilities secured by such property and assumed by the Company or subject to which such contributed property is taken) and by such Member's allocable share of Profits and items in the nature of income and gain of the Company;

(b)      Charged with the amount of any distributions to such Member (and as to any distributions of property other than cash or a promissory note of a Member or the Company, by the agreed fair market value of such property, net of liabilities secured by such property and assumed by such Member or subject to which such distributed property is taken), and by such Member's allocable share of Losses and items in the nature of Losses and deductions of the Company;

(c)      Adjusted simultaneously with the making of any adjustment to the Book Value of the Company's assets pursuant to the definition thereof, to reflect the aggregate net adjustments to such Book Value as if the Company recognized Profit or Loss equal to the respective amount of such aggregate net adjustments immediately before the event causing such adjustments; and

(d)      Otherwise appropriately adjusted to reflect transactions of the Company and the Members.

"Capital Contribution" shall mean the amount of cash and the value of any other property contributed to the Company by a Member.

"Class A Member" shall mean any Member holding Class A Units in the Company, in each such Member's capacity as a holder of Class A Units.

"Class B Member" shall mean initially Lex Reddy, and shall include any Member subsequently holding Class B Units in the Company.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Consent of the Class B Members" shall mean the written consent or approval of the Class B Members.

"Depreciation" shall mean, for each year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Book Value of an

asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same relationship to the Book Value of such asset as the depreciation, amortization or other cost recovery deduction computed for tax purposes with respect to such asset for such period bears to the adjusted tax basis for such asset, or if such asset has a zero adjusted tax basis, Depreciation shall be determined with reference to the initial Book Value of such asset using any reasonable method selected by Approval of the Board, but not less than depreciation allowable for tax purposes for such year.

"Immediate Family" with respect to any individual, shall mean his or her ancestors, spouse, issue, spouses of issue, any trust principally for the benefit of any one or more of such individuals, his or her estate, and any entity beneficially owned by such individuals or trusts for their principal benefit.

"Legal Representative" shall mean, with respect to any individual, a duly appointed executor, administrator, guardian, conservator, trustee, personal representative or other legal representative appointed as a result of the death, minority or incompetency of such individual.

"Losses" shall have the meaning provided below under the heading "Profits and Losses."

"Manager" shall refer to each Person named as a Manager by the Members pursuant to this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the Company. "Managers" or "Board" shall refer collectively to the Persons named as Managers by the Members pursuant to this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the Company.

"Member" shall mean any Person named as a Member in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in each such Person's capacity as a Member of the Company.

"Member Minimum Gain" shall mean "partner nonrecourse debt minimum gain" as that term is defined in Regulations Section 1.704-2(i)(2).

"Member Nonrecourse Debt" shall mean "partner nonrecourse debt" or "partner nonrecourse liability" as those terms are defined in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall mean "partner nonrecourse deductions" as that term is defined in Regulations Section 1.704 2(i)(1).

"Minimum Gain" shall have the meaning given in Regulations Section 1.704-2(d).

"Non-Adverse Terminating Event" shall have the meaning set forth in Section 4.3.

"Nonrecourse Deductions" shall have the meaning given in Regulations Section 1.704-2(b)(1).

"Person" or "Party" shall mean any natural person, partnership (whether general or limited), limited liability company, trust, estate, association or corporation.

"Profits and Losses" shall mean, for each year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this provision shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this provision, shall be subtracted from such taxable income or added to such loss;

(c)     Gain or loss from a disposition of property of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, rather than its adjusted tax basis;

(d)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account the Depreciation on the assets for such fiscal year or other period; and

(e)     Any items which are separately allocated pursuant to Sections 6.5 and/or 6.6 which otherwise would have been taken into account in calculating Profits and Losses pursuant to the above provisions shall not be taken into account and, as the case may be, shall be added to or deducted from such amounts so as to be not part of the calculation of the Profits or Losses.

If the Company's taxable income or loss for such year, as adjusted in the manner provided above, is a positive amount, such amount shall be the Company's Profits for such year; and if negative, such amount shall be the Company's Losses for such year.

"Reasonable Reserves" shall mean such amount as the Board acting by Approval, shall deem reasonably necessary to meet the foreseeable liabilities or obligations of the Company taking into consideration historic costs as well as reasonably projected cash flow, and including, but not limited to, (i) the normal expenses of the operation and management of its activities, as such liabilities and obligations become due and payable, and (ii) the expenses of any redemptions pursuant to the provisions of this Agreement.

"Redemption Price" shall mean the fair market value of the Company taken as a whole taking into account the Company's book value, the value of any real property and improvements owned by the Company's subsidiaries, and the amount of any debt secured by such real property and improvements, and not taking into account the value of goodwill, trade names, or other intangible assets.

"Regulations" shall mean the Regulations promulgated under the Code, and any successor provisions to such Regulations, as such Regulations may be amended from time to time.

"Supermajority Approval" shall mean the written consent or approval of the Members holding a majority of the Class A Units then issued and outstanding and the Consent of the Class B Members.

"Terminating Capital Transaction" shall mean a sale or other disposition of all or substantially all of the assets of the Company.

"Transfer" and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way as to any interest of a Member. Transfer shall specifically, without limitation of the above, include assignments and distributions resulting from death, incompetency, Bankruptcy, liquidation and dissolution.

"Unit" shall mean a unit or share of interest in the Company. The interest of each Unit in the Company shall be equal to one (1) divided by the total number of Units then authorized and outstanding (including, but not limited to, Class A Units and Class B Units).

"Unit Proportion" shall mean the number of Units held by a Member divided by all Units then issued and outstanding.

The definitions set forth in the Act shall be applicable, to the extent not inconsistent herewith, to define terms not defined herein and to supplement definitions contained herein.

## ARTICLE II
## Organizational Powers and Membership

2.1     Organization. The Board of Managers shall file such articles, certificates and documents as appropriate to comply with the applicable requirements for the operation of a limited liability company in accordance with the laws of any jurisdictions in which the Company shall conduct business and shall continue to do so as long as the Company conducts business therein. By Approval of the Board, the Company may establish places of business within and without the State of Delaware, as and when required by its business and in furtherance of its purposes set forth in Section 2.2 hereof, and may appoint agents for service of process in all jurisdictions in which the Company shall conduct business.

2.2     Purposes and Powers of the Company. The Company is organized for the general purposes of (i) owning one hundred percent (100%) of the membership interests of Sunrise Real Estate Holdings, LLC, a Delaware limited liability company, (ii) engaging in other activities in connection therewith which are necessary or beneficial to the Business, and (iii) engaging in any other lawful business activity permitted under the Act consistent with the foregoing. To that end, the Company, subject to the terms of this Agreement, may enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to the accomplishment of, the purposes of the Company, so long as said activities and contracts may

7
**A0864**

be lawfully carried on or performed by a limited liability company under the laws of the State of Delaware.

2.3     Regulatory Regulations. The Members understand that the Company's and the Business operations may subject to various state and federal laws regulating permissible relationships with entities such as the Company. It is the intent of the parties that the Company operate in a manner consistent with all applicable laws. Accordingly, each Member represents and warrants and covenants as of the date hereof and while the Member is a Member, that such Member has not been barred or suspended from participation in any state or federal governmental healthcare program, including, but not limited to, the Medicare or Medicaid programs.

2.4     Membership.

(a)     There shall be two (2) authorized classes of Members of the Company: Class A Members and Class B Members. All Members shall have (based on Units held) the same economic rights. The Members, acting as Members, shall have no right to act for or bind the Company. The initial Class A Members and the initial Class B Member are identified in Exhibit A hereto.

2.5     Investment Through Asset Protection Vehicle. Notwithstanding anything herein to the contrary, a Member ("Entity Owner") may invest through a pension plan, trust, limited liability company or other similar entity ("Entity Investor") as long as the following conditions are met: (i) the Entity Investor is owned by a Member and/or his or her Immediate Family; (ii) any breach of this Agreement by the Entity Investor or the Entity Owner, or the occurrence of a Terminating Event related to the Entity Owner or the Entity Investor, shall be treated as a Terminating Event under this Agreement; (iii) if a Terminating Event occurs with respect to the Entity Owner, the Entity Investor's Units will be redeemed in accordance with Section 4.3 of this Agreement; (iv) the Entity Owner agrees to be bound by each of the covenants contained in this Agreement, including, without limitation, all confidentiality and non-competition covenants, and agrees to abide by the requirements of aMember in this Section 2.3 hereof, as if such Entity Owner were a direct owner of the Company; and (v) the Entity Owner agrees to sign a counterpart signature page to this Agreement, as such other documents as the Company may reasonably require.

## ARTICLE III
## Capital Contributions and Liability of Members

3.1     Capital Accounts. A separate Capital Account shall be maintained for each Member, including any Member who shall hereafter acquire an interest in the Company.

3.2     Capital Contributions.

(a)     Capital Contributions. The Members have made or shall make the Capital Contributions in the amounts set forth in Exhibit A. The Class A Members shall initially own forty nine thousand (49,000) Units and shall collectively at all times hold forty nine percent (49%) interest in the Company, and the Class B Members shall initially own fifty one thousand Units and shall collectively at all times hold fifty one percent (51%) interest in the Company. Additional issuances of Units shall be solely of Class A Units, with the resulting dilution of their percentage interests in the Company, it being expressly understood that no additional Class B Units are to be

8
**A0865**

issued without the approval of all Class B Members. No Member shall have preemptive rights to acquire any Units to be issued by the Company after the date of this Agreement.

(b)     <u>Loans</u>. Except as set forth in this Article III, and except with Supermajority Approval pursuant to Section 7.4 hereof, no Member or Manager shall be entitled, obligated or required to make any loan to or guarantee a loan for the Company or make any Capital Contribution to the Company in addition to such Member's Capital Contribution made pursuant to Section 3.2(a) hereof. No loan made to the Company by any Member or Manager shall constitute a Capital Contribution to the Company for any purpose.

(c)     <u>Additional Capital Contributions</u>. Additional Capital Contributions may be required only with the Supermajority Approval pursuant to Section 7.4 hereof and otherwise in accordance with Article V below.

3.3     <u>No Withdrawal of or Interest on Capital</u>. Except as otherwise provided in this Agreement, (i) no Member shall have any right to demand and receive property of the Company in exchange for all or any portion of such Member's Capital Contribution or Capital Account, and (ii) no interest or preferred return shall accrue or be paid on any Capital Contribution or Capital Account.

3.4     <u>Liability of Members</u>. No Member, in his, her or its capacity as a Member, shall have any liability to restore any negative balance of such Member's Capital Account or to contribute to, or in respect of, the liabilities or the obligations of the Company, or to restore any amounts distributed from the Company, except as may be required specifically under this Agreement, the Act or other applicable law. Except to the extent otherwise provided in this Agreement or otherwise agreed to, or as required by law, in no event shall any Member, in such Member's capacity as a Member, be personally liable for any liabilities or obligations of the Company or any of its Members.

3.5     <u>Managers as Members</u>. No Manager is required to hold any Units in the Company in order to serve as a Manager.

3.6     <u>Additional Members</u>. Additional Members may be admitted to the Company only upon Supermajority Approval, including the terms of admission, and the Approval of the Board of Managers in accordance with the terms of Article VII hereof and upon execution and delivery by the new Member of a counterpart of this Agreement, delivery of the required Capital Contribution (as determined by the Board of Managers) and execution and delivery of such other documents, instruments and items as the Managers may require. Issuance of Units to new Members shall be subject to compliance with Section 3.2 hereof. All such issuances shall be structured such that the amount paid for Units is not less than fair market value, payments are made in cash or such other consideration as is approved by the Board of Managers.

**ARTICLE IV**
**Members And Units**

4.1     Classification of Members.  There shall be two (2) classes of Members of the Company: a Class A Member Class and Class B Member Class. All Members shall have (based on Units held) the same economic rights.

4.2     Withdrawal of a Class A Member.  No Class A Member has the right to withdraw or resign from the Company at any time, except upon Supermajority Approval.  If a Class A Member withdraws or resigns as a Member in violation of this Section 4.2, or through such Member's action causes such Member to fail to satisfy the conditions of Membership, such Member hereby agrees that such withdrawal, resignation or action will constitute a breach of this Agreement.  The Company may offset any damages due to such a breach against any amounts otherwise distributable to such Member.  In the event that the Act or a final court ruling entitles the Class A Member to receive a distribution upon withdrawal in violation of this Section 4.2, such distribution shall be equal to the Member's Capital Account.  The foregoing represents the parties' reasonable best efforts to determine the damages that would stem from a Class A Member's breach of this Section 4.2.

4.3     Redemption of a Member.

(a)     Terminating Events are categorized as either Adverse Terminating Events or Non-Adverse Terminating Events for purposes of differentiating the Company's redemption obligations to the Member to whom or which an event occurs.

(b)     For purposes of this Section, an "Adverse Terminating Event" means:

(i)     with respect to any Member:

A.     the improper Transfer (or attempt to Transfer) of Units;

B.     the conviction of any felony;

C.     any uncured material breach of a provision of this Agreement;

D.     any event of Bankruptcy; or

E.     the failure to make guaranties or any capital contribution required pursuant to Section 5.1.

(c)     For purposes of this Section, a "Non-Adverse Terminating Event" means any event not specified in Section 4.3(b) including a request by a Member's heirs, after a Member's death, that the Company purchase the deceased Member's interest in the Company from his estate or heirs.

10

(d)     Each Terminating Event, if subject to cure within thirty (30) days, shall trigger termination only after written notice is provided and if a cure has not been made of the Terminating Event within such thirty (30) day period.

(e)     If a Terminating Event (whether Adverse or Non-Adverse) shall occur with respect to any Member, the Company may elect, at the Company's sole option and upon written notice to such Member within six (6) months after the Company has received actual knowledge of the Terminating Event (meaning knowledge of a majority of the Board of Managers without knowledge being imputed from one Manager to another), to purchase the Member's Units and the Member must sell such Units to the Company at a price as determined as follows:

(i)     Subject to Section 4.3(f), if any Member's Units are purchased by the Company because of the occurrence of an Adverse Terminating Event, the amount the Company shall pay for the Units owned by such Member shall be the Redemption Price determined as of the date of the Terminating Event multiplied by the Member's Unit Proportion, discounted by twenty percent (20%) (the "Adverse Purchase Price").

(ii)     Subject to Section 4.3(f), if any Member's Units are purchased by the Company because of the occurrence of a Non-Adverse Terminating Event, the amount the Company shall pay for the Units owned by such Member shall be the Redemption Price multiplied by the Member's Unit Proportion (the "Non-Adverse Purchase Price"). The "Adverse Purchase Price," and the "Non-Adverse Purchase Price" may be referred to collectively as the "Valuation Price."

(f)     For purposes of this Section 4.3, the Redemption Price (as defined in Article I) is intended as a means of approximating fair market value while minimizing disputes and appraisal-related costs and expenses regarding valuation of Units for purposes of redemption.

(i)     All calculations used to determine the Redemption Price shall be performed by the Company's regularly retained accountants and such calculations shall be final and binding upon all parties to this Agreement. All Members acknowledge and agree that the Redemption Price may be an inexact approximation of fair market value, and all Members waive any and all rights to contest the use of the Redemoption Price for any and all purposes in lieu of an appraisal or other method.

Payments for Units hereunder shall be made as follows: twenty percent (20%) on the initial payment date, which shall be within ninety (90) days after the determination of the Valuation Price (the "Purchase Date") (which in no event shall be more than six (6) months after the Terminating Event, and twenty percent (20%) of the Valuation Price on each of the anniversaries of the Purchase Date with interest on the outstanding principal balance accruing at the Prime Rate shown in the Money Rates Section of the Wall Street Journal on the Purchase Date until the principal is paid in full. Notwithstanding any delay in the payment of amounts due, a Member's rights as a Member shall cease on the Purchase Date. Aggregate payments to be made in connection with all redemptions shall not exceed seven and one-half percent (7.5%) of the Company's collected revenues in any year. If payments are so restricted, payments shall be made in proportion to amounts owed to all Members being redeemed. In sum, notwithstanding the provisions of this Article, the Company shall not be required to make payments to former Members pursuant to this

Section 4.3 which, in the aggregate, would exceed seven and one-half percent (7.5%) of the aggregate collections of the Company for any such period. If the aggregate amount of payments otherwise due to former Members pursuant to this Section would reasonably be expected to exceed this limitation in any calendar year or portion thereof, the Company, with the Approval of the Board, shall pay such former Members, on a pro rata basis, based on the amount still owed such Members, quarterly payments totaling seven and one-half percent (7.5%) of the Company's anticipated aggregate collections for such period, and the balance of that period's payment obligations to such former Members shall be deferred to the following calendar year or years, until such amounts can be paid without violating such limitation with respect to any such year or years. Within sixty (60) days following the end of each calendar year, the Company shall make a pro rata adjusted payment to the former Members if and to the extent that actual aggregate collections during the prior year (or relevant portion thereof) have exceeded the anticipated amount.

## ARTICLE V
## Additional Capital

5.1     Funding Capital Requirements.

(a)     In the event that the Company requires additional funds to carry out its purposes, to conduct its business, or to meet its obligations, the Company may borrow funds from such lender(s), including Members and Managers, on such terms and conditions as are Approved by the Board of Managers, all on such terms as reflect fair market value. It is specifically provided that (except as set forth in Section 3.2 and 5.1(c)) no such terms or conditions shall impose any personal liability on any Member without the prior written consent of such Member.

(b)     No Member or Manager shall be obligated to make any Capital Contributions or loans to the Company (except as provided in Sections 3.2 and 7.4 of this Agreement), or otherwise supply or make available any funds to the Company, even if the failure to do so would result in a default of any of the Company's obligations or the loss or termination of all or any part of the Company's assets or business.

(c)     The Company may require that additional Capital Contributions be made by the Members upon Supermajority Approval pursuant to Section 7.4 hereof. If a Member fails to deliver to the Company such an additional requested Capital Contribution within ten (10) business days of a request by the Board to do so, the Company, after giving thirty (30) days notice of such failure, may elect (i) to subordinate such Member's Unit Proportion to that of all non-defaulting Members for the amount of the additional Capital Contribution, plus interest of 12% per annum, compounded annually, or, if lower, the highest rate allowed by law (the "Applicable Interest Rate"); (ii) to borrow on behalf of such Member that amount necessary to meet such Member's commitment and the charging of interest thereon of up to the Applicable Interest Rate, with repayments of such indebtedness made from the first distributions related to such Member's Membership interest; (iii) allow the remaining Members to make contributions in excess of their proportionate shares, on a pro rata basis, to the extent such Members desire to make such contributions, with a corresponding adjustment to such contributing Members' Unit Proportion in the Company to reflect their relative Capital Contributions; or (iv) dilute such Member's Unit Proportion by issuing to those Members that have made the required additional Capital Contribution a number of Units equal to the Diluted Issuance Amount. The "*Diluted Issuance Amount*" for each

12

**A0869**

contributing Member shall mean a number of Units equal to: (1) the total amount of the additional Capital Contribution made by the particular Member with respect to the specific additional Capital Contribution required, *divided by* (2) the Deemed Unit Value. The "*Deemed Unit Value*" shall mean an amount equal to: (I) the Formula Amount as of the time of the additional Capital Contribution *divided by* (II) the total number of Units outstanding in the Company prior to the additional Capital Contribution, then discounted by forty percent (40%). Any Member who fails to make the required additional Capital Contribution shall not be issued any additional Units under this subsection 5.1(c)(iv).

5.2     Third Party Liabilities. The provisions of this Article and of Section 3.2 hereof are not intended to be for the benefit of any creditor or other Person (other than a Member in his, her or its capacity as a Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members. Moreover, notwithstanding anything contained in this Agreement, including specifically but without limitation this Article, no such creditor or other Person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any Member.

## ARTICLE VI
## Distributions; Profits and Losses

6.1     Distribution of Company Funds - In General. Except as necessary to comply with the Sections of this Article VI, distribution of Company funds to the Members shall be subject to Approval of the Board, taking into account future cash needs of the Conpany, Reasonable Reserves and such other factors as are considered by the Board of Managers, within their sole and absolute discretion. All distributions approved by the Board of Managers shall be distributed among the Members on a pro rata basis based on each Member's Unit Proportion.

6.2     Distribution Upon Dissolution. Proceeds from a Terminating Capital Transaction and/or other amounts or assets available upon dissolution, and after payment of, or adequate provision for, the debts and obligations of the Company, shall be distributed and applied in the following priority:

(a)     First, to fund reserves for liabilities not then due and owing and for contingent liabilities to the extent deemed reasonable by Approval of the Board, provided that, upon the expiration of such period of time as the Board, acting by Approval, shall deem advisable, the balance of such reserves remaining after payment of such contingencies shall be distributed in the manner hereinafter set forth in this Section; and

(b)     Second, to the Members, an amount sufficient to reduce the Members' Capital Accounts to zero, in proportion to the positive balances in such Capital Accounts after reflecting in such Capital Accounts all adjustments thereto necessitated by (i) all other Company transactions (distributions and allocations of Profits and Losses and items of income, gain, deduction and loss) and (ii) such Terminating Capital Transaction; and

(c)     Finally, to the extent funds remain, to the Members of the Company on a pro rata basis based on each Member's Unit Proportion.

13
**A0870**

6.3     Distribution of Assets in Kind.  No Member shall have the right to require any distribution of any assets of the Company in kind.  If any assets of the Company are distributed in kind, such assets shall be distributed on the basis of their respective fair market values as determined by the Approval of the Board.  Any Member entitled to any interest in such assets shall, unless otherwise determined by the Approval of the Board, receive separate assets of the Company and not an interest as tenant-in-common, with other Members so entitled, in each asset being distributed.

6.4     Allocation of Profits and Losses.  After giving effect to the allocations set forth in Sections 6.5 and 6.6 which affect the Members' distributive shares, Profits and Losses shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.

6.5     Required Regulatory Allocations.

(a)     Limitation on and Reallocation of Losses.  At no time shall any allocations of Losses, or any item of loss or deduction, be made to a Member if and to the extent such allocation would cause such Member to have, or would increase the deficit in, any Adjusted Capital Account Deficit of such Member at the end of any fiscal year.  To the extent any Losses or items are not allocated to one or more Members pursuant to the preceding sentence, such Losses shall be allocated to the Members to which such losses or items may be allocated without violation of this Section 6.5(a).

(b)     Minimum Gain Chargeback.  If there is a net decrease in the Minimum Gain of the Company during any fiscal year, then items of income or gain of the Company for such fiscal year (and, if necessary, subsequent fiscal years) shall be allocated to each Member in an amount equal to such Member's share of the net decrease in the Minimum Gain, determined in accordance with Regulations Section 1.704-2(d)(1).  A Member's share of the net decrease in the Minimum Gain of the Company shall be determined in accordance with Regulations Section 1.704-2(g).  The items of income and gain to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(2)(i).

(c)     Nonrecourse Deductions.  Nonrecourse Deductions for any fiscal year or other period (not including any Member Nonrecourse Deductions allocated pursuant to Section 6.5(d)) shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.  Solely for purposes of determining each Member's proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Regulations Section 1.752-3(a)(3), the Company Profits shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.  The items of losses, deductions and Code Section 705(a)(2)(B) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(d)     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears the economic risk of loss with respect to the nonrecourse liability, as determined and defined under Regulations Section 1.704-2(b)(4), to which such Member Nonrecourse Deductions are attributable in

14
**A0871**

accordance with Regulations Section 1.704-2(i)(1). The items of losses, deductions and Code Section 705(a)(2)(b) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(e) <u>Member Minimum Gain Chargeback</u>. Notwithstanding any contrary provisions of this Article VI, other than Section 6.5(b) above, if there is a net decrease in Member Minimum Gain attributable to Member Nonrecourse Debt during any fiscal year, then each Member who has a share of such Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i), shall be allocated items of income and gain of the Company, determined in accordance with Regulations Section 1.704-2(j)(2)(ii), for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to each such Member's share of the net decrease in such Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(3) and 2(i)(5).

(f) <u>Qualified Income Offset</u>. If any Member unexpectedly receives an item described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to each such Member in an amount and manner sufficient to eliminate, as quickly as possible and to the extent required by Regulations Section 1.704-1(b)(2)(ii)(d), the Adjusted Capital Account Deficit of such Member, provided that an allocation pursuant to this Section 6.5(f) shall only be made if and to the extent that such Member would have an Adjusted Capital Account Deficit after accounting for all other allocations provided for in this Article VI other than that described in this Section 6.5(f).

(g) <u>Basis Adjustment</u>. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to either of Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to said Section of the Regulations.

(h) <u>Gross Income Allocation</u>. If at the end of any Company fiscal year any Member has a Capital Account deficit which is in excess of the sum of the items to be credited to a Member's Capital Account under clause (a) of the definition of Adjusted Capital Account Deficit, then each such Member shall be allocated items of income and gain in the amount of such excess as quickly as possible provided that an allocation pursuant to this Section 6.5(h) shall only be made if and to the extent that such Member would have a Capital Account deficit in excess of such sum after accounting for all other allocations provided for in this Article VI other than that described in this Section 6.5(h). As among Members having such excess, if there are not sufficient items of income and gain to eliminate all such excess, such allocations shall be made in proportion to the amount of each Member's respective excess.

(i) <u>Curative Allocations</u>. The allocations set forth in this Section 6.5 are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently therewith. Such allocations may not be consistent with the manner in which the Members intend to divide Company distributions and to make Profit and Loss

allocations. Accordingly, by the Approval of the Board, after effecting the allocations required pursuant to this Section 6.5, other allocations of Profits, Losses and items thereof shall be divided among the Members so as to prevent the allocations in this Section 6.5 from distorting the manner in which Company distributions will be divided among the Members pursuant to Sections 6.1 and 6.2 hereof. In general, the Members anticipate that this will be accomplished by specifically allocating other Profits, Losses and items of income, gain, loss and deduction among the Members so that the net amount of allocations under this Section 6.5 and allocations under this Section 6.6 to each such Member is zero. However, the Board shall have discretion to accomplish this result in any reasonable manner.

      6.6    <u>Tax Allocations and Book Allocations</u>.

      (a)    Except as otherwise provided in this Section 6.6, for federal income tax purposes, each item of income, gain, loss and deduction shall, to the extent appropriate, be allocated among the Members in the same manner as its correlative item of "book" income, gain, loss or deduction has been allocated pursuant to the other provisions of this Article VI.

      (b)    In accordance with Code Section 704(c) and the Regulations thereunder, depreciation, amortization, gain and loss, as determined for tax purposes, with respect to any property whose Book Value differs from its adjusted basis for federal income tax purposes shall, for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value, such allocation to be made by the Approval of the Managers in any manner which is permissible under said Code Section 704(c) and the Regulations thereunder and the Regulations under Code Section 704(b).

      (c)    In the event the Book Value of any property of the Company is subsequently adjusted, subsequent allocations of income, gain, loss and deduction with respect to any such property shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its respective Book Value in the manner provided under Section 704(c) of the Code and the Regulations thereunder.

      (d)    Allocations pursuant to this Section 6.6 are solely for federal, state, and local income tax purposes, and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

      6.7    <u>General Allocation and Distribution Rules</u>.

      (a)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Approval of the Board of Managers using any permissible method under Code Section 706 and the Regulations thereunder. Except as otherwise provided in this Agreement, all items of income, gain, loss, and deduction shall be allocated among the Members in the same proportions as the allocations of Profits or Losses for the fiscal year in which such items are to be allocated.

(b)     Upon the admission of a new Member or the Transfer of an interest, the new and old Members or the transferor and transferee shall be allocated shares of Profits and Losses and other allocations and shall receive distributions, if any, based on the portion of the fiscal year that the new or transferred Company interest was held by the new and old Members, or the transferor and transferee, respectively. For the purpose of allocating Profits and Losses and other allocations and distributions, (i) such admission or Transfer shall be deemed to have occurred on the first day of the month in which it occurs, or if such date shall not be permitted for allocation purposes under the Code or the Regulations, on the nearest date otherwise permitted under the Code or the Regulations, and (ii) if required by the Code or the Regulations, the Company shall close its books on an interim basis on the last day of the previous calendar month.

6.8     Tax Withholding. If the Company incurs a withholding tax obligation with respect to the share of income allocated to any Member, (a) any amount which is (i) actually withheld from a distribution that would otherwise have been made to such Member and (ii) paid over in satisfaction of such withholding tax obligation shall be treated for all purposes under this Agreement as if such amount had been distributed to such Member, and (b) any amount which is so paid over by the Company, but which exceeds the amount, if any, actually withheld from a distribution which would otherwise have been made to such Member, shall be treated as an interest-free advance to such Member. Amounts treated as advanced to any Member pursuant to this Section shall be repaid by such Member to the Company within thirty (30) days after the Board, acting by Approval of the Board of Managers, give notice to such Member making demand therefore. Any amounts so advanced and not timely repaid by such Member shall bear interest, commencing on the expiration of said 30-day period, compounded monthly on unpaid balances, at an annual rate equal to the lowest Applicable Federal Rate as of such expiration date. The Company shall collect any unpaid amounts so advanced from any Company distributions that would otherwise be made to such Member.

6.9     Tax Matters Partner. The Class B Member, and if more than one Class B Member the one holding the largest number of Unit, shall be the "Tax Matters Partner" (as defined in Code Section 6231) of the Company. The Tax Matters Partner is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings (collectively, "Audits"), and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings. The Company shall indemnify and hold harmless the Tax Matters Partner and if applicable the Tax Matters Partner's directors, officers, employees and agents from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of his, hers or its activities on behalf of the Company as Tax Matters Partner absent the gross negligence of the Tax Matter Partner. The Members specifically acknowledge that the Tax Matters Partner shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member with respect to any action taken by the Tax Matters Partner with respect to an Audit absent the gross negligence of the Tax Matter Partner. The Tax Matters Partner shall take such action as may be necessary to cause each Member to be entitled to notice as set forth in Code Section 6223. The Tax Matters Partner shall not take any action contemplated by Code Section 6224 through 6230 without the prior authorization of the Members.

## ARTICLE VII
## Management

7.1     Management of the Company.  The overall management and control of the business and affairs of the Company shall be vested in the Board of Managers, acting by Approval of the Board of Managers, but subject to the Member protections as set forth in Section 7.4 hereof or as otherwise provided in this Agreement.  All management and other responsibilities not specifically reserved to the Members in this Agreement, or specifically requiring Class A Member and/or Class B Member Consent, shall be vested in the Board of Managers, and the Members shall have no voting rights except as specifically provided in this Agreement.  Each Manager shall devote such time to the affairs of the Company as is reasonably necessary for performance by such Manager of his, her or its duties, provided such Manager shall not be required to devote full time to such affairs.  Moreover, each Manager shall act in good faith with the care an ordinary, prudent person in a like position would exercise under similar circumstances and in the best interest of the Company.

7.2     Board of Managers.  The business and affairs of the Company shall be managed by the Board of Managers.

(a)     Number, Term, Election, and Qualifications.  The Company shall have a panel of three (3) Managers, comprised initially of the following: Lex Reddy, Roger A. Krissman and Michael J. Sarrao.  The number of Managers comprising the panel of Managers of the Company may be changed from time to time by the Supermajority Approval, provided that in no instance shall there be less than three (3) Managers.  The Managers shall he elected and hold office until such time as a new slate of Managers are elected at a meeting of the Members held pursuant to a written request for such meeting by Members holding a majority of the Units then outstanding.  At the meeting for the election of Managers "cumulative voting" shall apply.  Cumulative voting shall permit each Member to cast a number of votes for Managers equal to such Member's number of Units multiplied by the number of Managers to be elected at such time.  Each Member shall be entitled to cast one or more and up to all of such Member's votes for one candidate for Manager, or may allocate votes among the various candidates for Manager in whatever manner the Member so chooses.  For example, if three Managers are to be elected, and if a Member has 10,000 Units, the Member shall be entitled to vote 30,000 votes (10,000, which is the number of votes respecting the election of a single Manager, times 3, which is the number of Managers to be elected), and may allocate his, her or its 30,000 votes to one Manager candidate or allocate such votes equally or unequally among all the Manager candidates, as the Member so chooses.  A Manager need not be a Member, an individual, a resident of any particular State, or a citizen of the United States.  The powers of the Board shall be exercised subject to the Member protections set forth in Section 7.4 hereof.

(b)     Meetings of the Board of Managers and the Members may be called and scheduled by the President of the Company, the Class B Member and/or by two (2) Managers.  At least four (4) days prior written notice of the time, place and purpose of the Board of Manager meetings shall be provided to all Managers, and at least ten (10) days prior written notice of the time, place and purpose of the Member meetings shall be provided to all Members.

(c)     Special meetings of the Members also may be called at the written request of any two (2) Members delivered to the President. Upon receipt of such written request the President shall schedule a meeting of the Members within no later than thirty (30) days, and shall send advance written notice to the Members at least ten (10) days prior to the date of the meeting. The time, place and purpose or purposes for such special meeting shall be stated in the notice of such meeting.

(d)     Managers representing a majority of Units shall constitute a quorum at any meeting of the Board of Managers. Members representing a majority of Units shall constitute a quorum at any meeting of the Members.

(e)     Regarding Board meetings, Managers may provide a proxy to attend a Board meeting who shall have powers to vote as a Manager. For Class A Members, such proxy to attend a meeting of the Members must be a Member. Members and Managers may also attend their respective Member and Board meetings by phone or video conference.

(f)     Any action required or permitted to be taken by the Managers may be taken by unanimous consent without a meeting. Any writing executed by all of the Managers shall be conclusive evidence of such action and consent.

(g)     A Manager may resign from, retire from, abandon or otherwise terminate his, her or its status as a Manager upon ten (10) days prior written notice to the Board, unless the Board otherwise consents in writing.

7.3     <u>Manner of Exercise of Board's Authority</u>. All responsibilities granted to the Board under this Agreement shall be exercised by the Board as a body, and no Manager, acting alone and without prior Approval of the Board, shall have the authority to act on behalf of the Board. Unless otherwise expressly provided in this Agreement, all actions of the Board of Managers shall act by Approval of the Board. None of the following actions shall be taken by the Company except upon Approval of the Board of Managers, subject to the requirements of Section 7.4 hereof:

(a)     Borrow money and otherwise obtain credit and other financial accommodations in the ordinary course of the business of the Company;

(b)     Enter into management agreements, leases, asset purchase agreements, financing agreements and loans in any amounts, and any other agreements wherein the financial obligations of the Company exceed on an annual basis the sum of One Hundred Thousand Dollars ($100,000.00);

(c)     Employ, engage, retain or deal with any Persons to act as agents, brokers, accountants or lawyers or outside professionals in such other capacity as may be necessary or desirable;

(d)     Appoint individuals to act as officers of the Company and delegate to such individuals such authority to act on behalf of the Company and such duties and functions as would normally be delegated to officers of a corporation holding similar offices;

(e)     Adjust, compromise, settle or refer to arbitration any claim in favor of or against the Company or any of its assets;

(f)     Make elections in connection with the preparation of any federal, state and local tax returns of the Company and to institute, prosecute, and defend any legal action or any arbitration proceeding;

(g)     Acquire and enter into any contract of insurance necessary or proper for the protection of the Company and/or any Member and/or any Manager, including without limitation to provide the indemnity described in Section 7.8 or any portion thereof;

(h)     Approve technical amendments to this Agreement or the Articles;

(i)     Approve the Transfer of Class A Units to another Class A Member;

(j)     Establish a record date for any distribution to be made under Article VI;

(k)     Enter into, renew, amend or terminate any arrangement or agreement with any Company executive or employee who is also a Manager or Member; and

(l)     Perform any other act which the Managers may deem necessary or desirable for the Company as well as the Business.

7.4     Restrictions.    Notwithstanding any other provision in this Agreement to the contrary, the Company shall not take any of the following actions without Supermajority Approval:

(a)     Authorize, create, designate, determine or issue any new class of Units or issue new Units, or securities convertible into Units or issue options or warrants to purchase Units or authorize the merger, consolidation or similar combination with any other entity, or authorize the sale of all or substantially all the assets of the Company or the dissolution or liquidation of the Company;

(b)     Except as contemplated by Article IV hereof, authorize, or set aside any sums for, the purchase, repurchase, redemption or other acquisition by the Company of any Member's Units of any class or make loans or distributions to Members;

(c)     Effect any Bankruptcy event with regard to the Company;

(d)     Require a Member to make an additional Capital Contribution or guarantee an obligation of the Company; provided, the aggregate debt to which such personal liabilities relate may not exceed One Million Five Hundred Thousand Dollars ($1,500,000);

(e)     Approve any decision to not enforce the Company's rights set forth in Article X; and

(f)     Except for technical amendments, amend this Agreement or the Articles.

7.5     Binding the Company.  Subject to the provisions of Sections 7.3 and 7.4 hereof, any action taken by a Manager, with Approval of the Board or, where so required, with Supermajority Approval, shall bind the Company and any other Managers and shall be deemed to be the action of the Company.

7.6     Compensation of Managers and Members.  No direct or indirect payment shall be made by the Company to any Manager, Member, or officer of the Company or to any Affiliate of any Manager, Member, or officer of the Company, for such Manager's, Member's, or officer's services as a Manager, Member, or officer, except by Approval of the Board.  Each Manager and officer shall be entitled to reimbursement from the Company for all reasonable expenses incurred by such Manager or officer in managing and conducting the business and affairs of the Company.

7.7     Contracts with Affiliated Persons.  Subject to Section 7.4 hereof, the Company may enter into one or more agreements, leases, contracts or other arrangements for the furnishing to or by the Company of goods, services or space with any Member, Manager or Affiliated Person, and may pay compensation thereunder for such goods, services or space, provided in each case the amounts payable thereunder are reasonably comparable to those which would be payable to unaffiliated Persons under similar agreements, and if the determination of such amounts is made in good faith it shall be conclusive absent manifest error.

7.8     Indemnification.

(a)     Notwithstanding any provision of this Agreement, common law or the Act, no member of the Board, principal officer of the Company or the Tax Matters Member (the "Covered Persons") shall be liable to the Members or to the Company for any loss suffered which arises out of an act or omission of such person, if, in good faith, it was determined by such persons that such act or omission was in the best interests of the Company and such act or omission did not constitute gross negligence or fraud. The Covered Persons shall be indemnified by the Company against any and all claims, demands and losses whatsoever if: (i) the indemnitee conducted himself in good faith; (ii) the indemnitee was not grossly negligent and the loss was not caused by the indemnitee's willful misconduct; (iii) reasonably believed (x) in the case of conduct in his, her or its official capacity with the Company, that the conduct was in its best interests and (y) in all other cases, that the conduct was at least not opposed to its best interests; and (iv) in the case of any criminal proceeding, the Covered Person had no reasonable cause to believe the conduct was unlawful. The payment of any amounts for indemnification shall be made before any distribution are made by the Company.  No Member shall have any obligation to provide funds for any indemnification obligation hereunder.

(b)     The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article VII shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Articles, provision of this Agreement, vote of Members or otherwise.

(c)     The Company may maintain insurance, at its expense, to protect itself and any Member, the Board, Board committees, officer, employee or agent of the Company against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under Delaware law.

21
**A0878**

(d)     Any amendment, repeal or modification of any provision of this Section 7.8 shall not adversely affect any right or protection of a Member, the Board, Board committee, officer, employee or agent of the Company existing at the time of such amendment, repeal or modification.

7.9     Other Activities.  Subject to any other restrictions set forth in this Agreement, the Members, Managers and any Affiliates of any of them may engage in and possess interests in other investment opportunities of every kind and description other than those that are similar to the Business of the Company, independently or with others as long as they do not violate Article X hereof.

7.10    Financial Statements.   The Board shall authorize and cause to be prepared reviewed, but not audited, financial statements on an annual basis within ninety (90) days after the end of each fiscal year of the Company.

## ARTICLE VIII
### Officers

8.1     Number; Election; Resignation.  The Company shall have a President (who may also be referred to as the CEO), a Chief Financial Officer, a Secretary, and such other officers as the Board may in its discretion create.  All officers shall be elected by the Board, acting by Approval, at any duly convened meeting of the Board or by written consent in lieu of a meeting. In selecting officers, the Board shall consider the skill, qualifications, dedication, and loyalty of officer candidates, and with respect to such officers, the Board shall select only those individuals who, in the Board's sole opinion, shall best promote and advance the interests of the Company. Each officer shall hold office until his or her successor is chosen and qualified, unless terminated earlier and except as otherwise provided at the meetings respectively at which he or she is elected or appointed.  Any officer may resign by delivering written resignation to the Company at its office, or to the Board, and such resignation shall be effective upon receipt, unless it is specified to be effective at some other time or upon the happening of some other event.

8.2     Same Person Holding Two or More Offices.  To the extent permitted by the Act, any two or more of the offices referred to in this Section may be filled by the same person.

8.3     Officers Need Not Be Members or Managers.  Except as otherwise provided by the Act, any person shall be eligible for election to be an officer of the Company without the necessity of being a Member or Manager.

8.4     Removal of Officers.  Any officer may be removed by the Board, acting by Approval, with or without cause.

8.5     Vacancies.  In case a vacancy in any office shall occur due to any cause, the Board of Managers, acting by Approval, may elect a person to fill such vacancy who shall hold office until the date on which the office would ordinarily be filled, and until a successor is chosen and qualified.

8.6     President.  The President shall be the chief executive officer of the Company and shall, subject to the provisions set forth hereinafter, have the authority to oversee such administrative activities and to take such administrative actions as shall be customary for a chief

executive officer. The President shall perform such additional duties as may be delegated to the President by the Board or as may be imposed by law. It shall be the duty of the President, and the President shall have the power to see to it, that all orders and resolutions of the Board are carried into effect. The President shall, from time to time, report to the Board all matters within his or her knowledge which the interests of the Company may require to be brought to its notice.

8.7    Chief Financial Officer.    The Chief Financial Officer shall, subject to the supervision and control of the Board, have custody of the funds and of all the valuable papers of the Company. The Chief Financial Officer shall keep the accounts of the Company in a clear manner, and shall, at all times, when requested by the Board, exhibit a true statement of the affairs of the Company. The Chief Financial Officer shall, if required by the Board, give a bond for the faithful discharge of his or her duties, at the expense of the Company, with satisfactory sureties in such penal sum as the Board may determine, if so required by the Board. Except as the Board may otherwise order, the Chief Financial Officer shall sign and/or endorse all promissory notes, bills, checks, drafts, trade acceptances, and bankers' acceptances, and may execute all deeds, mortgages, reports, contracts, agreements, and other legal documents of the Company, but the Board may authorize any other officer or officers, or agent or agents, to sign any obligations, instruments, or papers on behalf of the Company, and/or may limit the authority of the Chief Financial Officer in any of said matters. The Chief Financial Officer shall perform such other duties as may be delegated to him or her by the Board or as may be imposed by law.

When the Chief Financial Officer shall be absent or for any other reason unable to perform his or her duties, the Chief Financial Officer may appoint any other officer of the Company to act as Treasurer, and said Treasurer shall have all the duties herein delegated to the Chief Financial Officer during the term of his or her appointment.

8.8    Secretary.    The Secretary shall keep the records of the Company, of its Members, and of the Board, and shall perform such duties and have such powers additional to the foregoing as the Board shall designate.

## ARTICLE IX
## Fiscal Matters

9.1    Books and Records.    The Chief Financial Officer shall oversee the day to day bookkeeping for the Company and all of its operations and facilities and shall keep complete and accurate records of the same. The Company shall keep reviewed, but not audited financial statements that are prepared on an annual basis. Upon Approval of the Board, the Company may engage the services of a certified public accounting firm ("Accounting Firm") to audit the Company's books and records using the same methods of accounting which are used in preparing the federal income tax returns of the Company to the extent applicable and otherwise in accordance with generally accepted accounting principles consistently applied. The Company's books and records shall be maintained and updated monthly, and shall be available, in addition to any documents and information required to be furnished to the Members under the Act, at an office of the Company or the Accounting Firm (as applicable) for examination and copying by any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member. Alternately, copies of such books, records, documents and information shall be sent by the Company to any Member, or the Member's duly authorized representative,

upon reasonable request therefore and at the expense of such Member. The Company shall keep at its principal office all items required pursuant to the Act. Within ninety (90) days after the end of each fiscal year of the Company, each Member shall be furnished with financial statements which shall contain a balance sheet as of the end of the fiscal year and statements of income and cash flows for such fiscal year. Any Member may, at any time, at the Member's own expense, cause an audit or review of the Company books to be made by a certified public accountant of the Member's own selection.

9.2     Bank Accounts.  Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or other financial institution(s) as shall be selected by Approval of the Board, and withdrawals shall be made and other activity conducted on such signature or signatures as determined by Approval of the Board. Any and all records with respect to such bank accounts and/or other accounts, including, but not limited to, copies of any checks written on such account or records or other withdrawal activity, shall be available at an office of the Company or the Accounting Firm for examination and copying by any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member. Alternately, copies of such records shall be sent by the Company to any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member.

9.3     Fiscal Year.  The fiscal year of the Company shall end on December 31 of each year, unless otherwise Approved by the Board.

## ARTICLE X
## Transfer of Interests and Admission of Transferees

10.1     Restriction on Transfers.

(a)     Except as indicated below, no Class A Member may sell, Transfer, pledge, hypothecate, gift or otherwise dispose of or encumber all or any portion of his, her or its Units without Approval of the Board. Any Transfer in violation hereof shall be treated as an Adverse Terminating Event. The Units of a Member and any interest of such Member's spouse in such Units, shall remain subject to this Agreement regardless of the termination, for any reason, of the marital relationship of any Member and the Member's spouse. During the marriage of the Member and such Member's spouse, such Member's obligations to sell or offer to sell Units pursuant to this Agreement shall include any interest of such Member's spouse in the Units. Any Units transferred in contravention of this Section shall be void of all voting, inspection and other rights with respect to the pledgee/transferee and any such transfer shall be null and void ab initio and shall be subject to purchase by the Company as an Adverse Terminating Event. Each spouse of a Member shall sign a Consent of Spouse form, substantially in the form of Exhibit B, agreeing to be bound by the terms hereof including, without limitation, the term providing that ownership by a spouse is not permitted. Any transferee must sign a counterpart to this Agreement agreeing to be bound by all terms hereof prior to such Transfer being deemed effective.

(b)     Notwithstanding anything else to the contrary in this Agreement, a Class B Member may Transfer his, her or its Units to an Affiliate or to such other Person as is approved

by the affirmative vote of the holders of a majority of the outstanding Class B Units, so long as the transferor and the transferee agree to remain bound by all of the terms hereof.

(c)     No Member may pledge his, her or its Units to a bank, financial institution, creditor or other lender.

(d)     Notwithstanding the foregoing, a Member may transfer his or her interest to an Entity Investor in accordance with Section 2.5 hereof.

(e)     Notwithstanding the foregoing, a Member may transfer his or her interest by will, by laws if descent or distribution, and *inter vivos*, in each case to the Member's heirs.

10.2    Irreparable Harm.   Each Member specifically acknowledges that a breach of Section 10.1 would cause the Company and the Members to suffer immediate and irreparable harm, which could not be remedied by the payment of money.   In the event of a breach or threatened breach by a Member of the provisions of Section 10.1, the Company or other Members shall be entitled to injunctive relief to prevent or end such breach, without the requirement to post bond or prove damages.   Nothing herein shall be construed to prevent the Company or other Members from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages, reasonable attorneys' fees and expenses.

10.3    Assignee of a Member's Units.   If, notwithstanding the prohibitions in Section 10.1, a Member Transfers all or any portion of his, her or its Units and a Person acquires such Units, (but is not admitted as a substituted Member pursuant to the terms of this Agreement) such Person shall:

(a)     be treated as an assignee of a Member's Units, as provided in the Act, and not as a Member of the Company;

(b)     have no right to participate in the business and affairs of the Company or to exercise any rights of a Member under this Agreement or the Act;

(c)     share in distributions from the Company with respect to the transferred Units on the same basis as the transferring Member previously had; and

(d)     be required to transfer the Units to the Company in accordance with the redemption provisions hereof relating to Adverse Terminating Events.

10.4    Obligations of Permitted Transferees.   In the case of any approved Transfer or disposition of Units, the transferee shall execute and deliver an appropriate instrument agreeing to be bound by this Agreement as a Member and such additional agreements or instruments as the Board may require. Any permitted transferee of Units shall receive and hold such Units subject to this Agreement and all of the restrictions, obligations and rights created hereunder, and the Members and each transferee shall be bound by their obligations under this Agreement with respect to each subsequent transferee.

10.5    Preemptive Rights.   No Member shall have any preemptive rights to purchase or otherwise acquire New Units proposed to be issued by the Company, it being expressly understood

that additional Units are contemplated to be issued to Eligible Employees hired by the Company after the date of this Agreement, the terms and conditions of such subsequent issuances being subject to Approval of the Board. For purposes of applying this Section, "New Units" shall mean any Units (irrespective of class) which the Company proposes to issue on or after the date hereof, any rights or options which the Company proposes to grant for the purchase of any Units (irrespective of class), any bonds, securities or obligations of the Company which are convertible into or exchangeable for, or which carry any rights, to acquire Units (irrespective of class), whether now or hereafter authorized or created, whether issued or unissued, and whether the proposed issue, transfer or grant is for cash, property, services or any other lawful consideration, and including any issuance otherwise provided for in this Agreement.

10.6   Noncompetition. During the term of a Member's membership in the Company, and for a period of five (5) years thereafter, other than through the Company, no Member, nor any of their Affiliates, except as provided below, shall, without the prior written Approval of the Board and the Class B Members, directly or indirectly own, manage, operate, control or participate in any manner in the ownership, management, operation or control of, or serve as a partner, employee, principal, agent, consultant or otherwise contract with, or have any financial interest in, or aid or assist any other person or entity that operates a business that is similar to or competitive with the Business of the Company, whether or not the Company is then doing business in the same State. The preceding sentence shall not be construed to prevent a Member or any of their Affiliates from owning stock of one percent (1%) or less of any publicly traded company that engages in any of the restricted activities set forth herein so long as the Member does not activitely participate in any aspect of the operations and business of such publicly traded company.

Each party understands and acknowledges that the provisions of this Section 10.6 are designed to preserve the goodwill of the parties and that the Multiple used in the Formula Amount set forth in Section 4.3 takes into consideration some allocation of such goodwill. Accordingly, each party hereby acknowledges and agrees that any breach or threatened breach of the provisions of this Section 10.6 hereof binding on a party will result in irreparable harm and injury to the other party and that monetary damages will not provide an adequate remedy to a party. Accordingly, each Member hereby agrees that in the event of a breach or threatened breach of the provisions of this Section 10.6, the non-breaching party shall be entitled to:  (a) a temporary restraining order, preliminary injunction and permanent injunction to enjoin such breach or threatened breach without the requirement of the posting of a bond; (b) an accounting for any and all monies, earnings, profits and other benefits that the breaching party has derived or received, directly or indirectly, as a result of such breach or threatened breach; (c) recover from the breaching party the reasonable attorneys' fees and costs incurred by the non-breaching party in enforcing the provisions of this Section 10.6; and (d) all deferred payments due to the Member shall be suspended until final resolution of the dispute. The breaching party further agrees that in the event of a breach or threatened breach of the provisions of this Section 10.6, the restrictions set forth in this Section 10.6 shall be extended during the period of any breach or threatened breach by the breaching party. The rights and remedies set forth herein are cumulative and shall be in addition to any other rights or remedies to which a party may be entitled.

Each party hereby acknowledges that the restrictions set forth in this Section 10.6 are minimal, reasonable in scope and duration and are necessary to protect the legitimate interests of the parties and that any breach or threatened breach of these restrictions will result in irreparable

harm to the non-breaching party. In the event that any of the restrictions are found by a court of competent jurisdiction to be too broad to permit enforcement to its full extent, then such restrictions shall be enforced to the maximum extent allowable by law and the parties hereby consent to and authorize the court to modify the restrictions in a manner to permit their enforcement. Notwithstanding any other provision of this Agreement, the Class B Members shall have the right to enforce, on behalf of the Company and at the Company's expense, the provisions of this Section 10.6 against any Member without relying on the Approval of the Board therefore.

10.7    Confidential Information.    Each Member acknowledges that the Confidential Information is valuable property of the Company and undertakes that for so long as he, she or it is a Member, and thereafter until such information otherwise becomes publicly available other than through breach of this Section 10.7, he, she or it shall:

(a)    treat the Confidential Information as secret and confidential;

(h)    not disclose (directly or indirectly, in whole or in part) the Confidential Information to any third Party except with the prior written consent of Company;

(c)    not use (or in any way appropriate) the Confidential Information for any purpose other than the performance of the business of the Company and otherwise in accordance with the provisions of this Agreement;

(d)    recognize and acknowledge that the Company's trade secrets and other confidential or proprietary information, as they may exist from time to time, are valuable, special and unique assets of the Company's business. Accordingly, during the term of the Company, each Member shall hold in strict confidence and shall not, directly or indirectly, disclose or reveal to any person, or use for its own personal benefit or for the benefit of anyone else, any trade secrets, confidential dealings or other confidential or proprietary information of any kind, nature or description (whether or not acquired, learned, obtained or developed by a Member alone or in conjunction with others) belonging to or concerning the Company, or any of its customers or clients or others with whom they now or hereafter have a business relationship, except: (i) with the prior written consent of all the other Members; (ii) in the course of the proper performance of the Member's duties hereunder; or (iii) as required by applicable law or legal process. Each Member confirms that all such information constitutes the exclusive property of the Company.

(e)    Given the secretive and competitive environment in which the Company does business and the fiduciary relationship that the Members have with the Company, each Member agrees to promptly deliver to the Company, at any time when the Company so requests, all memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) in any way relating to the business or affairs of the Company or any of its customers and clients, whether made or compiled by such Member or furnished to it by the Company or any of its employees, customers, clients, consultants or agents, which such Member may then possess or have under its control. Each Member confirms that all such memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) constitute the exclusive property of the Company. Notwithstanding the foregoing paragraph or any other provision of this Agreement, each Member shall be entitled to retain any written materials received by such Member in its capacity as a Member, and limit the dissemination of and access to the

27

**A0884**

Confidential Information to such of the Company's and the Member's officers, directors, managers, employees, agents, attorneys, consultants, professional advisors or representatives as may reasonably require such information for the performance of Company business and ensure that any and all such persons observe all the obligations of confidentiality contained in this Section.

(f)     "Confidential Information" means any and all policies, procedures, quality assurance techniques, plans, projections, pro formas, financial, statistical and other information of the Company, including (but not limited to) information embodied on magnetic tape, computer software or any other medium for the storage of information, together with all notes, analyses, compilations, studies or other documents prepared by the Company or others on behalf of the Company containing or reflecting such information.  Confidential Information does not include information which:

(i)     was lawfully made available to or known by third person on a non-confidential basis prior to disclosure by a Member;

(ii)     is or becomes publicly known through no wrongful act of a Member; or

(iii)     is received by a Member from a third party other than in breach of confidence.

10.8     Additional Covenants.

(a)     If a court of competent jurisdiction should declare this Article X, or any provision hereof, unenforceable because of any unreasonable restriction of duration, activity and/or geographical area, then the Parties hereby acknowledge and agree that such court shall have the express authority to reform this Agreement to provide for reasonable restrictions and/or grant the Company such other relief at law or in equity, reasonably necessary to protect the interests of the Company.

(b)     Each Member specifically acknowledges that a breach of this Article X would cause the Company and other Members to suffer immediate and irreparable harm, which could not be remedied by the payment of money. In the event of a breach or threatened breach by a Member of any of the provisions of this Article X, the Company and other Members shall be entitled to injunctive relief to prevent or end such breach, without the requirement to post bond, and shall be entitled to recover reasonable attorneys' fees and expenses. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages.

(c)     Each Member warrants and represents that he, she or it:

(i)     Is familiar with the confidentiality and non competition agreements contained herein.

(ii)     Is acquiring such Units solely for investment and not resale, is an accredited investor, has experience and sophistication in financial matters sufficient to evaluate the merits and risks of the investment, and can afford to lose his, her or its entire investment and

28
**A0885**

has not learned of this investment through any general solicitation or advertising. The Company has relied upon the fact that the Units in the Company are to be held by the Members solely for investment and on each of the representations made hereby.

(iii)    Has concluded that his, her or its obligations and the Company's rights and remedies described herein, including, without limitation, the right to equitable relief contained herein, are reasonable.

(iv)    Is fully aware of the duties, responsibilities, obligations and liabilities imposed upon him, her or it by this Article.

(v)    Acknowledges that the covenants contained herein are fair, reasonable and just, under the circumstances, and are not a penalty.

(vi)    Acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to any Units in the Company, and the Company has no obligation or current intention to register such Units under the Federal Securities Act 1933 ("33 Act").

(vii)    Acknowledges that the Units have not been registered under the 33 Act because the Company is issuing such Units in the belief that such Units are being issued in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Delaware Securities Act.

(viii)    Acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Units in the Company were acquired by a Member with a view to distribution.

(ix)    Acknowledges that this Agreement does not conflict with or violate any other agreement to which the Member is party.

(x)    Agrees to be substantially involved in the operation of the Company and does not expect a return on his, her or its investment due to the efforts of others.

(xi)    Is aware that there are numerous risk factors associated with the holding of the Units, all of which each Member is aware exists and has expressly agreed to assume.

## ARTICLE XI
## Dissolution and Termination

11.1    Events Causing Dissolution.  The Company shall be dissolved and its affairs wound up upon the first to occur of the following events:

(a)    The sale or other disposition of all or substantially all of the assets of the Company, unless the disposition is a transfer of assets of the Company in return for consideration other than cash and, by Approval of the Board, a determination is made not to distribute any such non-cash items to the Members;

(b)    The election for any reason to dissolve the Company made by Supermajority Approval;

(c)    When there are no remaining Members, unless the holders of all of the financial rights in the Company agree in writing, within ninety (90) days after the cessation of membership of the last Member, to continue the legal existence and business of the Company and to appoint one or more new Members;

(d)    Any consolidation or merger of the Company with or into any entity unless the Company is the resulting or surviving entity; or

(e)    Entry of a decree of judicial dissolution.

11.2    Procedures on Dissolution.  Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Articles shall be canceled in the manner set forth in the Act.  Notwithstanding the dissolution of the Company, prior to the termination of the Company, as aforesaid, the business and the affairs of the Company shall be conducted so as to maintain the continuous operation of the Company pursuant to the terms of this Agreement.  Upon dissolution of the Company and subject to the Supermajority Approval required by Section 7.4 hereof, the Board, acting by Approval, or, if none, a liquidator elected by Supermajority Approval, shall liquidate the assets of the Company, apply and distribute the proceeds thereof under Article VI, and cause the termination of this Agreement.

## ARTICLE XII
## General Provisions

12.1    Notices.  Any and all notices under this Agreement shall be effective (a) on the fifth (5th) business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (b) on the first business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery.  All such notices in order to be effective shall be addressed, if to the Company at its principal office, if to a Member at the last address of record on the Company books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.  A Member may change its address for purposes of this Agreement by giving the Board notice of such change in the manner heretofore provided for the giving of notices.

**A0887**

12.2    Word Meanings. The words "herein," "hereinafter," "hereinbefore," "hereof" and "hereunder" as used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. All section references, except as otherwise provided herein, are to sections of this Agreement.

12.3    Binding Provisions. Subject to the restrictions on transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, Legal Representatives, successors and assigns.

12.4    Applicable Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, including the Act, as interpreted by the courts of the State of Delaware, notwithstanding any rules regarding choice of law to the contrary.

12.5    Counterparts. This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all of the parties have not signed the original or the same counterpart.

12.6    Separability of Provisions. Each provision of this Agreement shall be considered separable. If for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, and if for any reason any provision or provisions herein would cause the Members to be liable for or bound by the obligations of the Company, such provision or provisions shall be deemed void and of no effect.

12.7    Section Titles. Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

12.8    Amendments. This Agreement may be amended or modified only in accordance with Sections 7.3 and 7.4 hereof.

12.9    Entire Agreement. This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

12.10    Waiver of Partition. Each Member agrees that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, each Member agrees that he or she shall not, either directly or indirectly, take any action to require partition or appraisement of the Company or of any of the assets or properties of the Company, and notwithstanding any provisions of this Agreement to the contrary, each Member (and his or her successors and assigns) accepts the provisions of this Agreement as his or her sole entitlement on termination, dissolution and/or liquidation of the Company and hereby irrevocably waives any and all rights to maintain any action for partition or to compel any sale or other liquidation with respect to his or her interest, in or with respect to, any assets or properties of the Company. Each Member further agrees that he or she or it will not petition a court for the dissolution, termination or liquidation of the Company.

    12.11  <u>Survival of Certain Provisions</u>.  The Members acknowledge and agree that this Agreement contains certain terms and conditions which are intended to survive the dissolution and termination of the Company, including, but without limitation, the provisions of Sections 10.6 and 10.7.  The Members agree that such provisions of this Agreement which by their terms require, given their context, that they survive the dissolution and termination of the Company so as to effectuate the intended purposes and agreements of the Members hereunder shall survive notwithstanding that such provisions had not been specifically identified as surviving and notwithstanding the dissolution and termination of the Company or the execution of any document terminating this Agreement, unless such document specifically provides for nonsurvival by reference to this Section 12.11 and to the specific provisions hereof which are intended not to survive.

    12.12  <u>No Impairment</u>.  Except as expressly contemplated by this Agreement, the Company shall not amend, modify or repeal any provision of the Articles or this Agreement in any manner which would alter or change the rights, preferences, privileges or powers of, or the restrictions provided for the benefit of, the Members, without the express prior written consent of the holders of a majority of the Units of the class so impacted in each and every such instance; nor shall the Company, through any reorganization, transfer of assets, merger, dissolution, issue, sale or distribution of Units or any other voluntary action, avoid or seek to avoid the observance or performance of any terms of this Agreement for the benefit of the Members, without the express prior written consent of the majority of the holders of the majority of the Class so impacted in each and every such instance, as limited by Section 7.4.  The Company shall in good faith take any and all actions which are necessary or appropriate in order to protect the rights of the Members.

    12.13  <u>Specific Performance or Injunctive Relief</u>.  The Members and the Company hereby declare that it is impossible to measure in money the damages which may accrue to one or more of them by reason of the failure of a Party to perform any of its obligations hereunder. Therefore, if any Party hereto shall institute any action or proceeding to enforce the provisions of this Agreement, any person (including the Company) against whom such action or proceeding is brought hereby waives the claim or defense therein that such Party has or may have an adequate remedy at law and agrees not to urge in any such action or proceeding that such a remedy exists. Furthermore, any Party seeking to enforce the provisions of this Agreement shall have the right to specific performance, injunctive or other equitable relief without the requirement to post bond.

    12.14  <u>Dispute Resolution; Limited Renegotiation; Arbitration</u>. Except for disputes relating to breaches of Sections 10.6 through 10.9 in which the Company is seeking injunctive relief and the Arbitrator (as defined below) does not have authority to grant preliminary, temporary and/or permanent injunctive relief, all disputes shall be resolved under the following provisions of this Agreement.

    This Agreement shall be construed to be in accordance with any and all federal and state statutes, rules, regulations, principles and interpretations applicable to the Company and the Members, and the relationships among them.  It is the intent of this Section to set forth a procedure so that if certain legal developments occur, a dispute arises, or certain circumstances arise in which the Board of Managers should become internally deadlocked (provided, however, that a deadlock shall not be deemed to occur due to the withholding of Supermajority Approval), a procedure will be in place that will bring the terms of this Agreement back into legal compliance and/or resolve

a Board deadlock while preserving, to the extent possible, the economic and governance relationships set forth here.

In the event there is any dispute among the parties or there is any legal development, including without limitation, a change in (or the interpretation of) federal or state statutes, rules, regulations, principles or interpretations, that renders any of the material terms of this Agreement unlawful or unenforceable (including any services rendered or compensation to be paid hereunder), or a definitive judicial or State of Delaware interpretation of Delaware law that substantially affects the business, governance, or economics of the Company in an adverse manner (collectively a "Negative Legal Development"), or any circumstance in which the Board itself is deadlocked in its decision making hereunder and cannot take action (a "Deadlock Event"), any Member affected by such Negative Legal Development or such Deadlock Event shall have the immediate right upon notice to the other Members (the "Notice") to initiate the renegotiation of the affected term or terms of this Agreement, so as to remedy the impacts of the Negative Legal Development or to seek resolution of the Deadlock Event, each in a manner that substantially maintains the then existing economic and governance relationships of the Members, if it is legal to accomplish the change while maintaining substantially such economic and governance relationship.

If the Parties are not able to renegotiate the affected terms of the Agreement or resolve the Deadlock Event or dispute on a mutually satisfactory basis within forty-five (45) days after the Notice, the Parties must submit the issues (the "Dispute") to mediation and arbitration pursuant to the procedure set forth below. The arbitrator selected in accordance with the provisions set forth below (the "Arbitrator") will be asked to determine whether there is a bona fide Negative Legal Development or Deadlock Event, and if so, the Arbitrator will decide the matter as set forth in Section 12.14 C. of this Agreement.

A.   Right to Mediate or Arbitrate.  Any dispute between the Parties relating to this Agreement must first be submitted to non-binding mediation in accordance with procedures agreed upon by the Parties.  If the dispute is not resolved through mediation within forty-five (45) days of the initial request for mediation or within a time frame mutually agreed upon by the Parties, the dispute must then be submitted for binding arbitration in accordance with procedures set forth by the American Health Lawyers Association.

B.   Pre-Arbitration Procedure.

1.   Any dispute shall be submitted to arbitration by notifying the other Party or Parties, as the case may be, hereto in writing of the submission of such dispute to arbitration (the "Arbitration Notice"). The Party delivering the Arbitration Notice shall specify therein, to the fullest extent then possible, its version of the facts surrounding the dispute and the amount of any damages and/or the nature of any injunctive or other relief such Party claims.

2.   The Party (or Parties, as the case may be) receiving such Arbitration Notice shall respond within sixty (60) days after receipt thereof in writing (the "Arbitration Response"), stating its version of the facts to the fullest extent then possible and, if applicable, its position as to damages or other relief sought by the Party initiating arbitration.

33
**A0890**

3.       The Parties shall then endeavor, in good faith, to resolve the dispute outlined in the Arbitration Notice and Arbitration Response. In the event the Parties are unable to resolve such dispute within sixty (60) days after receipt of the Arbitration Response, the Parties shall initiate the arbitration procedure outlined below.

C.       Arbitration Procedure.

1.       If the Parties hereto are unable to resolve the dispute within sixty (60) days after receipt of the Arbitration Response as set forth above, then the Parties must submit the dispute to binding arbitration in accordance with the American Health Lawyers arbitration program. If the Parties are unable to agree on an arbitrator within sixty (60) days after receipt of the Arbitration Response, each of the Parties shall, within sixty (60) days after receipt of the Arbitration Response, choose an arbitrator selector ("Selector"). The Selectors shall then have forty (40) days to select an arbitrator who shall serve as the final arbitrator for the dispute. (The arbitrator chosen by the Parties hereto or by the Selectors, as the case may be, shall hereinafter be as the "Arbitrator"). The Arbitrator shall not be an Affiliate of any of the Parties hereto.

2.       The arbitration shall be held in Los Angeles County, California. The Parties shall submit to the Arbitrator the Arbitration Notice and the Arbitration Response and any other facts regarding the dispute of which any Party desires.

3.       The Arbitrator shall apply the arbitration rules set forth below in making his or her decision. After the Arbitrator has heard the case of each Party in accordance with Section 12.14 D., the Arbitrator shall request that each Party submit an Order to resolve all matters in dispute. The Arbitrator shall then execute one of the Orders submitted by the Parties. The Arbitrator shall not be allowed to modify or amend any Orders submitted by the Parties. The decision of the Arbitrator shall be rendered within sixty (60) days of the close of the hearing record.

D.       Arbitration Rules.

1.       The Arbitrator shall allow reasonable discovery, which he determines is necessary for determination of the issues presented.

2.       The Arbitrator shall be guided by, and shall substantially comply with, the then applicable Federal Rules of Evidence.

3.       Should any Party refuse or neglect to appear or participate in the arbitration proceedings, including the procedures relating to the selection of an Arbitrator, the participating Party may select the Arbitrator and the Arbitrator is empowered to decide the controversy in accordance with whatever evidence is presented.

E.       Arbitrator's Award.  The award of the Arbitrator shall be binding on the Parties and may be entered as a final judgment in a court of competent jurisdiction.

F.       Other Disputes.  All disputes relating to breaches of Sections 10.6 through 10.9 in which the Company is seeking injunctive relief shall be resolved by a court of law with the site of venue in Los Angeles County, California if the Arbitrator does not have authority to grant preliminary, temporary and/or permanent injunctive relief.

34
**A0891**

12.15  <u>Waiver of Trial by Jury</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN CONNECTION WITH ANY ACTION OR PROCEEDING INSTITUTED UNDER OR RELATING TO THIS AGREEMENT, OR ANY OTHER DOCUMENT EXECUTED PURSUANT HERETO, OR IN CONNECTION WITH ANY COUNTERCLAIM RESULTING FROM ANY SUCH ACTION OR PROCEEDING.

12.16  <u>Counsel to the Company</u>.  Each of the Members acknowledges that Michael J. Sarrao has prepared this Agreement as attorney for the Company and not as attorney for any Member.  The Members acknowledge that (i) they have each been advised to seek review of this Amendment and all of the other documents pertaining to the formation of the Company, and advice concerning same, from an attorney independently and separately representing each such Member, (ii) they have been informed that Michael J. Sarrao has performed legal services for certain Members and other entities in which the Members have differing interests, and (iii) they are aware that Michael J. Sarrao is a trustee and beneficiary of The Sarrao Family Trust.  Each Member hereby waives any conflict that may exist in Michael J. Sarrao preparing this Agreement and all other Company documents previously prepared and as may be prepared in the future, and consents to his representation of the Company.

*[Signatures Appear on Next Page]*

**IN WITNESS WHEREOF**, the the undersigned have executed this Agreement as of the day and year first above written.

CLASS A MEMBERS:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

**A0893**

IN WITNESS WHEREOF, the the undersigned have executed this Agreement as of the day and year first above written.

CLASS A MEMBERS:

THE REDDY INVESTMENT TRUST    THE KRISSMAN FAMILY TRUST

By: _____    By: _____
    Lex Reddy, Trustee                     Roger M. Krissman, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST    THE SARRAO FAMILY TRUST

By: _____    By: _____
    Panch Jeyakumar, Trustee               Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST    _____
                                          Matthew Williams

By: _____    _____
    Martha M. Hayes, Trustee               Steven Kay

                                          _____
                                        Aman Dhuper

36

A0894

**IN WITNESS WHEREOF**, the the undersigned have executed this Agreement as of the day and year first above written.

CLASS A MEMBERS:

THE REDDY INVESTMENT TRUST            THE KRISSMAN FAMILY TRUST

By: _____               By: _____
    Lex Reddy, Trustee                      Roger A. Krissman, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST       THE SARRAO FAMILY TRUST

By: _____               By: _____
    Panch Jeyakumar, Trustee                Michael J. Sarrao, Trustee

 

THE HAYES IRREVOCABLE TRUST           _____
                                       Matthew Williams

By: _____
    Martha M. Hayes, Trustee            _____
                                       Steven Kay

 

                                       _____
                                       Aman Dhuper

36

**A0895**

IN WITNESS WHEREOF, the the undersigned have executed this Agreement as of the day and year first above written.

CLASS A MEMBERS:

THE REDDY INVESTMENT TRUST                    THE KRISSMAN FAMILY TRUST


By:                                           By:
    Lex Reddy, Trustee                            Roger A. Krissman, Trustee


By:
    Richard A. Hayes, Trustee


THE JEYAKUMAR INTER-VIVOS TRUST      THE SARRAO FAMILY TRUST


By:                                           By:
    Panch Jeyakumar, Trustee                      Michael J. Sarrao, Trustee


THE HAYES IRREVOCABLE TRUST          Matthew Williams


By:                                           Steven Kay
    Martha M. Hayes, Trustee                  Steven Kay


                                              Aman Dhuper


36

**A0896**

**IN WITNESS WHEREOF**, the the undersigned have executed this Agreement as of the day and year first above written.

CLASS A MEMBERS:

THE REDDY INVESTMENT TRUST

By: _____
Lex Reddy, Trustee

By: _____
Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
Roger N. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

36

**A0897**

**IN WITNESS WHEREOF**, the the undersigned have executed this Agreement as of the day and year first above written.

<u>CLASS A MEMBERS</u>:

THE REDDY INVESTMENT TRUST

THE KRISSMAN FAMILY TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Roger A. Krissman, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

THE SARRAO FAMILY TRUST

By: _____
    Panch Jeyakumar, Trustee

By: _____
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

_____
Matthew Williams

By: _____
    Martha M. Hayes, Trustee

_____
Steven Kay

_____
Aman Dhuper

CLASS B MEMBER:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE COMPANY:

SUNRISE MOB HOLDINGS LLC

By: _____
    Lex Reddy, CEO

**A0899**

CLASS B MEMBER:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By _____
    Richard A. Hayes, Trustee

THE COMPANY:

SUNRISE MOB HOLDINGS LLC

By: _____
    Lex Reddy, CEO

37

**A0900**

EXHIBIT A

MEMBERS, CAPTIAL CONTRIBUTIONS AND UNITS

| NAMES OF MEMBERS | TOTAL UNITS |
|---|---|
| CLASS A MEMBERS: | |
| | |
| | |
| The Krissman Family Trust | 10,000 |
| The Reddy Investment Trust | 5,000 |
| The Jeyakumar Inter-Vivos Trust | 7,000 |
| The Sarrao Family Trust | 7,000 |
| The Hayes Irrevocable Trust | 5,000 |
| Steven Kay | 5,000 |
| Matthew Williams | 5,000 |
| Aman Dhuper | 5,000 |
| | |
| CLASS A TOTALS | 49,000 |
| | |
| CLASS B MEMBER: | |
| | |
| | |
| The Reddy Investment Trust | 51,000 |
| | |
| CLASS B TOTALS | 51,000 |
| | |
| | |
| TOTALS | 100,000 |

## EXHIBIT B

### CONSENT OF SPOUSE

I acknowledge that I have read the foregoing Agreement and that I understand its contents. I am aware that such Agreement contains provisions whereby my spouse agrees to sell all his/her interest, of any form, in Sunrise MOB Holdings LLC (the "Company"), including, if any, our community interest in it, upon the occurrence of certain events, and that such Agreement also impose restrictions on the transfer of such ownership interest. I hereby consent to any sale of my spouse's interest in the Company pursuant to the Agreement, approve of the provisions of the Agreement, and agree that our community property interest, if any, is subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement in relation to that interest. Further, in the event of dissolution of my marriage or other event which necessitates the division of marital community property, I will assert no right, claim or other entitlement to the interest of my spouse in the Company so that full ownership of the interest therein shall thereafter remain with my spouse as his/her separate property notwithstanding that it may be subject to valuation for the purpose of achieving a fair and equitable division of our community property.

I AM AWARE THAT THE LEGAL, FINANCIAL AND OTHER MATTERS CONTAINED IN THE AGREEMENTS ARE COMPLEX AND I AM FREE TO SEEK ADVICE WITH RESPECT THERETO FROM INDEPENDENT COUNSEL. I HAVE EITHER SOUGHT SUCH ADVICE OR DETERMINED AFTER CAREFULLY REVIEWING THE AGREEMENT THAT I WILL WAIVE SUCH RIGHT.

Dated: _____, 2019.

Name of Member: _____

Name of Spouse: _____

Signature of Spouse: _____

**A0902**

EXHIBIT B

A0903

SUNRISE REAL ESTATE HOLDINGS, LLC

A Delaware Limited Liability Company

FIRST AMENDMENT TO

AMENDED AND RESTATED

OPERATING AGREEMENT

SUNRISE REAL ESTATE HOLDINGS, LLC
FIRST AMENDMENT TO
AMENDED AND RESTATED
OPERATING AGREEMENT

This First Amendment to Amended and Restated Operating Agreement (this "Amendment") is entered into and effective as of June 19, 2019 by and among the Persons who execute this Amendment (each a "Member" and collectively the "Members"). Except as otherwise provided, the capitalized terms used in this Amendment shall have the meanings set forth in Article I of the Restated Agreement (as hereinafter defined).

WHEREAS, Sunrise Real Estate Holdings, LLC (the "Company"), was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation with the Delaware Secretary of State on March 5, 2014 (the "Effective Date"); and

WHEREAS, Alecto Healthcare Services LLC, a Delaware limited liability companu ("Alecto"), as the Company's sole member, entered into an Amended and Restated Operating Agreement dated March 5, 2014 (the "Operating Agreement") providing for the organization and operation of the Company; and

WHEREAS, immediately prior to the effectiveness of this Amendment, Alecto owned one hundred percent of the Company's membership interests (the "Interests")

WHEREAS, Alecto desires to transfer and assign all of its right, title, and interest in and to the Interests to The Reddy Investment Trust (56%), The Krissman Family Trust (10%), The Jeyakumar Inter-Vivos Trust (7%), The Sarrao Family Trust (7%), The Hayes Irrevocable Trust (5%), Steven Kay (5%), Matthew Williams (5%), and Aman Dhuper (5%) (collectively, the "New Members") in proportion to the percenatages in the parenthetical immediately following each entity or person; and

WHEREAS, the Company desires to evidence their approval of the transfer of all of Alecto's right, title, and interest in and to the Interests to the New Members (the "New Members Transfer") subject to the execution of this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.   Approval of Transfer and Admission of New Members. Upon full execution of this Amendment by the New Members and the Company, (i) the transfer by the Alecto of all of its interest in the Company to the New Members is hereby approved, (ii) this Amendment shall be deemed to amend the Operating Agreement and shall become valid and binding on all Members of the Company, and (iii) the New Members are confirmed as Members of the Company under the Operating Agreement. The New Members acknowledge having received a copy of the Operating Agreement and hereby agree to be bound by all of the representations, warranties, restrictions, agreements, terms and conditions as are set forth in the Operating

**A0905**

Agreement and this Amendment, as the Operating Agreement may be further amended from time to time, and as otherwise applicable under Delaware law governing limited liability companies.

      2.      <u>Representations of New Member</u>. Each New Member warrants and represents that it:

      (a)      Is acquiring the Interests solely for investment and not resale, is an accredited investor, has experience and sophistication in financial matters sufficient to evaluate the merits and risks of the investment, and can afford to lose its entire investment and has not learned of this investment through any general solicitation or advertising. The Company has relied upon the fact that the Interests in the Company are to be held by each New Member solely for investment and on each of the representations made hereby.

      (b)      Has concluded that its obligations and the Company's rights and remedies described in the Operating Agreement are reasonable.

      (c)      Is fully aware of the duties, responsibilities, obligations and liabilities imposed upon it by the Operating Agreement.

      (d)      Acknowledges that the restrictive covenants contained in the Operating Agreement are fair, reasonable and just, under the circumstances, and are not a penalty.

      (e)      Acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to the Interests, and the Company has no obligation or current intention to register the Interests under the Federal Securities Act 1933 (the "33 Act").

      (f)      Acknowledges that the Interests have not been registered under the 33 Act because the Company issued the Interests in the belief that the Interests were issued in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Delaware Securities Act.

      (g)      Acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Interests were acquired by a Member with a view to distribution.

      (h)      Acknowledges that the Operating Agreement does not conflict with or violate any other agreement to which it is party.

      (i)      Is aware that there are numerous risk factors associated with the holding of the Interests, all of which it is aware exists and has expressly agreed to assume.

      3.      <u>Exhibit A</u>. Exhibit A attached hereto sets forth all of the Members of the Company and their respective interest in the Company after giving effect to the transfer approved in this Amendment.

**A0906**

    4.    <u>Counterparts</u>. This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same document. In addition, the signatures to this Amendment may be exchanged by fax and/or email transmission, and any such transmitted signature may be attached to this Amendment as if it was an original.

    5.    <u>Counsel to the Company</u>. Each of the Members acknowledges that Michael J. Sarrao has prepared this Amendment as attorney for the Company and not as attorney for any Members. The Members acknowledge that (i) they have each been advised to seek review of this Amendment and all of the other documents pertaining to the formation of the Company, and advice concerning same, from an attorney independently and separately representing each such Member, and (ii) they have been informed that Michael J. Sarrao has performed legal services for certain Members and other entities in which the Members have differing interests. Each Member hereby waives any conflict that may exist in Michael J. Sarrao preparing this Amendment and all other Company documents previously prepared and as may be prepared in the future, and consents to his representation of the Company.

    6.    <u>Remaining Restated Agreement Terms</u>. In all other respects, the terms and conditions of the Restated Agreement shall remain in full force and effect.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
      Lex Reddy, Trustee

By: _____
      Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
      Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
      Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
      Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
      Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

**A0908**

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

_____
Matthew Williams

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Steven Kay

_____
Aman Dhuper

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

**A0910**

IN WITNESS WHERFOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

Matthew Williams

Steven Kay

Aman Dhuper

**A0911**

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: ______________________
Lex Reddy, Trustee

By: ______________________
Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: ______________________
Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: ______________________
Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: ______________________
Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: ______________________
Martha M. Hayes, Trustee

______________________
Matthew Williams

______________________
Steven Kay

______________________
Aman Dhuper

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST          THE KRISSMAN FAMILY TRUST

By: _____          By: _____
    Lex Reddy, Trustee                              Roger A. Krissman, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST     THE SARRAO FAMILY TRUST

By: _____          By: _____
    Panch Jeyakumar, Trustee                    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST          _____
                                            Matthew Williams

By: _____          _____
    Martha M. Hayes, Trustee                    Steven Kay

                                            _____
                                            Aman Dhuper

**A0913**

**THE COMPANY**:

Sunrise Real Estate Holdings, LLC, a
Delaware limited liability company

By:

Lex Reddy
President & CEO

EXHIBIT A

MEMBERSHIP INTERESTS

| Name of Member | Percentage Interest |
|---|---|
| The Reddy Investment Trust | 56% |
| The Krissman Family Trust | 10% |
| The Jeyakumar Inter-Vivos Trust | 7% |
| The Sarrao Family Trust | 7% |
| The Hayes Irrevocable Trust | 5% |
| Steven Kay | 5% |
| Matthew Williams | 5% |
| Aman Dhuper | 5% |

EXHIBIT C

SUNRISE REAL ESTATE HOLDINGS, LLC

A Delaware Limited Liability Company

SECOND AMENDMENT TO

AMENDED AND RESTATED

OPERATING AGREEMENT

SUNRISE REAL ESTATE HOLDINGS, LLC
SECOND AMENDMENT TO
AMENDED AND RESTATED
OPERATING AGREEMENT

This Second Amendment to Amended and Restated Operating Agreement (this "Amendment") is entered into and effective as of June 19, 2019 by and among the Persons who execute this Amendment (each a "Member" and collectively the "Members"). Except as otherwise provided, the capitalized terms used in this Amendment shall have the meanings set forth in Article I of the Restated Agreement (as hereinafter defined).

WHEREAS, Sunrise Real Estate Holdings, LLC (the "Company"), was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation with the Delaware Secretary of State on March 5, 2014 (the "Effective Date"); and

WHEREAS, Alecto Healthcare Services LLC, a Delaware limited liability company ("Alecto"), as the Company's sole member, entered into an Amended and Restated Operating Agreement dated March 5, 2014 (the "Operating Agreement") providing for the organization and operation of the Company; and

WHEREAS, immediately prior to the effectiveness of this Amendment, Alecto transferred one hundred percent of the Company's membership interests (the "Interests") to The Reddy Investment Trust (56%), The Krissman Family Trust (10%), The Jeyakumar Inter-Vivos Trust (7%), The Sarrao Family Trust (7%), The Hayes Irrevocable Trust (5%), Steven Kay (5%), Matthew Williams (5%), and Aman Dhuper (5%) (collectively, the Trust/Individual Members") in proportion to the percenatages in the parenthetical immediately following each entity or person; and

WHEREAS, the Trust/Individual Members desire to transfer and assign all of their right, title, and interest in and to the Interests to Sunrise MOB Holdings LLC, a Delaware limited liability company; and

WHEREAS, the Company desires to evidence their approval of the transfer of all of Alecto's right, title, and interest in and to the Interests to Sunrise MOB Holdings LLC subject to the execution of this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Approval of Transfer and Admission of New Member. Upon full execution of this Amendment by Sunrise MOB Holdings LLC and the Company, (i) the transfer by the Trust/Individual Members of all of their interests in the Company to Sunrise MOB Holdings LLC is hereby approved, (ii) this Amendment shall be deemed to amend the Operating Agreement and shall become valid and binding on all Members of the Company, and (iii) Sunrise MOB Holdings LLC is confirmed as a Member of the Company under the Operating Agreement. Sunrise MOB Holdings LLC acknowledges having received a copy of the Operating

Agreement and hereby agrees to be bound by all of the representations, warranties, restrictions, agreements, terms and conditions as are set forth in the Operating Agreement and this Amendment, as the Operating Agreement may be further amended from time to time, and as otherwise applicable under Delaware law governing limited liability companies.

      2.    <u>Representations of Sunrise MOB Holdings LLC</u>. Sunrise MOB Holdings LLC warrants and represents that it:

      (a)    Is acquiring the Interests solely for investment and not resale, is an accredited investor, has experience and sophistication in financial matters sufficient to evaluate the merits and risks of the investment, and can afford to lose its entire investment and has not learned of this investment through any general solicitation or advertising. The Company has relied upon the fact that the Interests in the Company are to be held by Sunrise MOB Holsdings solely for investment and on each of the representations made hereby.

      (b)    Has concluded that its obligations and the Company's rights and remedies described in the Operating Agreement are reasonable.

      (c)    Is fully aware of the duties, responsibilities, obligations and liabilities imposed upon it by the Operating Agreement.

      (d)    Acknowledges that the restrictive covenants contained in the Operating Agreement are fair, reasonable and just, under the circumstances, and are not a penalty.

      (e)    Acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to the Interests, and the Company has no obligation or current intention to register the Interests under the Federal Securities Act 1933 (the "33 Act").

      (f)    Acknowledges that the Interests have not been registered under the 33 Act because the Company issued the Interests in the belief that the Interests were issued in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Delaware Securities Act.

      (g)    Acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Interests were acquired by a Member with a view to distribution.

      (h)    Acknowledges that the Operating Agreement does not conflict with or violate any other agreement to which it is party.

      (i)    Is aware that there are numerous risk factors associated with the holding of the Interests, all of which it is aware exists and has expressly agreed to assume.

      3.    <u>Exhibit A</u>. Exhibit A attached hereto sets forth all of the Members of the Company and their respective interest in the Company after giving effect to the transfer approved in this Amendment.

4.     Counterparts.  This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same document.  In addition, the signatures to this Amendment may be exchanged by fax and/or email transmission, and any such transmitted signature may be attached to this Amendment as if it was an original.

5.     Counsel to the Company.  The Member acknowledges that Michael J. Sarrao has prepared this Amendment as attorney for the Company and not as attorney for any Members. The Member acknowledges that it has each been advised to seek review of this Amendment and all of the other documents pertaining to the formation of the Company, and advice concerning same, from an attorney independently and separately representing the Member.  The Member hereby waives any conflict that may exist in Michael J. Sarrao preparing this Amendment and all other Company documents previously prepared and as may be prepared in the future, and consents to his representation of the Company.

6.     Remaining Restated Agreement Terms.  In all other respects, the terms and conditions of the Restated Agreement shall remain in full force and effect.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBER**:

SUNRISE MOB HOLDINGS LLC

By: _____

Lex Reddy
President & CEO

**COMPANY**:

SUNRISE REAL ESTATE HOLDINGS LLC

By: Sunrise MOB Holdings LLC
Its: Sole Member

By: _____

Lex Reddy
President & CEO

**A0921**

EXHIBIT A

MEMBERSHIP INTERESTS

| Name of Member | Percentage Interest |
|---|---|
| Sunrise MOB Holdings LLC | 100% |

EXHIBIT D

## FUNDS FLOW AGREEMENT

This Funds Flow Agreement (this "Agreement") is made and entered into as of June 20, 2019 by and among, Plaza Medical Office Building, LLC, a California limited liability company ("Plaza MOB"), Sunrise Real Estate Holdings, LLC, a Delaware limited liability company ("Sunrise Real Estate"), Sunrise MOB Holdings LLC, a Delaware limited liability company ("Sunrise MOB"), Alecto Healthcare Services LLC, a Delaware limited liability company ("Alecto"), The Reddy Investment Trust ("Reddy Trust"), The Krissman Family Trust ("Krissman Trust"), The Jeyakumar Inter-Vivos Trust ("Jeyakumar Trust"), The Sarrao Family Trust ("Sarrao Trust"), The Hayes Irrevocable Trust ("Hayes Trust"), Matthew Williams ("Williams"), Steven Kay ("Kay"), and Aman Dhuper ("Dhuper") . Plaza MOB, Sunrise Real Estate, Sunrise MOB, Alecto, Reddy Trust, Krissman Trust, Jeyakumar Trust, Sarrao Trust, Hayes Trust, Williams, Kay, and Dhuper are sometimes referred to herein individually as a "Party" and collectively as the "Parties." The Reddy Trust, Krissman Trust, Jeyakumar Trust, Sarrao Trust, Hayes Trust, Williams, Kay, and Dhuper are collectively referred to herein as the "Members".

### RECITALS:

A.      Plaza MOB owns and operates a medical office building and parking garage located at 5901 and 5975 W. Olympic Boulevard, Los Angeles, California 90036 (the "Property").

B.      Sunrise Real Estate is a member of Plaza MOB.

C.      Sunrise MOB is the sole member of Sunrise Real Estate.

D.      The Memhers are the memhers of Sunrise MOB.

E.      Effective June 20, 2019, Plaza MOB entered into a Loan Agreement with Wells Fargo Bank, National Association, pursuant to which Plaza MOB borrowed Thirty Million Dollars ($30,000,000.00) from Wells Fargo Bank (the "Loan Proceeds"). After setting aside funds for reserves and closing costs, Wells Fargo Bank deposited $28,235,111.00 into escrow with First American Title Company ("Escrow"). After deducting its costs and fees and subtracting such funds as were necessary to defease the existing loan on the Property, Escrow transferred $8,565,153.79 (the "Net Proceeds") to Plaza MOB on June 20, 2019.

F.      On June 20, 2019, Plaza MOB's members elected to distribute $8,444,477.81 to Sunrise Real Estate (the "Plaza MOB Distribution").

G.      On June 20, 2019, Sunrise Real Estate's member elected to distribute an amount equal to the Plaza MOB Distribution to Sunrise MOB ("Sunrise Real Estate Distribution").

H.      On June 20, 2019, Sunrise MOB's members elected to distribute an amount equal to the Sunrise Real Estate Distributions to the Members in proportion to their percentage ownership interest in Sunrise MOB (the "Member Distribution").

I.      On June 20, 2019, each of the Members elected to contribute capital to Alecto in an amount equal to their respective percentage of the Member Distribution (the "Alecto Capital Contribution").

1

**A0924**

J. In order to facilitate the flow of funds described in Recitals G to I, Sunrise Real Estate, Sunrise MOB, and the Members have directed Plaza MOB to cause the Net Proceeds to be deposited in the Richard A. Hayes, Inc. Client Trust Account ("**Hayes Client Trust Account**") and have requested that Richard A. Hayes, Inc., distribute the Net Proceeds in accordance with the terms of this Agreement.

K. In addition to the Plaza MOB Distribution, it is anticipated that there will be an additional $120,675.98 distribution from the Net Proceeds from Plaza MOB to Sunrise Real Estate and then to the Members ("the Plaza MOB Second Distribution").

L. In addition to the Plaza MOB Distribution and the Plaza MOB Second Distribution, it is anticipated that there will be additional funds received by Plaza MOB from the Loan Proceeds attributable to distributions of up to $500,000.00 from the Additional Insurance Reserve Funds (as defined in the Loan Agreement with Wells Fargo Bank) and up to $355,002.00 from the Rent Concession Reserve Funds (as defined in the Loan Agreement with Wells Fargo Bank) (collectively the "Reserve Funds Distributions").

M. In order to facilitate the flow of funds described in Recitals K and L, Sunrise Real Estate, Sunrise MOB, and the Members desire to direct Plaza MOB to cause the Plaza MOB Second Distribution and the Reserve Funds Distributions funds to be deposited in the Hayes Client Trust Account as such funds are received from time to time, and direct that Richard A. Hayes, Inc., distribute such funds in accordance with the terms of this Agreement.

N. The Parties seek to enter into this Agreement to document the terms and conditions under which the Net Proceeds were distributed and transferred.

**Now, Therefore,** for and in consideration of the recitals and the covenants contained herein, the Parties agree as follows:

**AGREEMENT:**

1. **Plaza MOB Distribution**. The Parties acknowledge and agree that the members of Plaza MOB elected to distribute 8,444,477.81 to Sunrise Real Estate on June 20, 2019, that Plaza MOB transferred $8,441,477.81 to the Hayes Client Trust Account on June 20, 2019, and that the transfer of the $8,444,477.81 constitutes the Plaza MOB Distribution. Sunrise Real Estate acknowledges receipt of the Plaza MOB Distribution in the amount of $8,441,471.81.

2. **Sunrise Real Estate Distribution**. The Parties acknowledge and agree that the members of Sunrise Real Estate elected to distribute $8,444,477.81 to Sunrise MOB on June 20, 2019, that Sunrise MOB received a distribution equal to $8,444,477.81 on June 20, 2019, and that Sunrise MOB directed Richard A. Hayes to not make a disbursement from the Hayes Client Trust Account in an amount equal to $8,444,477.81 but instead directed Richard A. Hayes to retain the $8,444,477.81 to facilitate a distribution to the members of Sunrise MOB.

3. **Distribution to Members**. The Parties acknowledge and agree that the members of Sunrise MOB elected to distribute $8,444,477.81 to the Members on June 20, 2019 in proportion to their percentage interests in Sunrise MOB, that the Members received a distribution equal to $8,444,477.81, and that the Members directed Richard A. Hayes to not make a

2

**A0925**

disbursement from the Hayes Client Trust Account to the Members but instead to retain the $8,444,477.81 to facilitate a capital contribution from the Members to Alecto.

4.    **CAPITAL CONTRIBUTION TO ALECTO**. The Parties acknowledge and agree that each Member elected to make a capital contribution to Alecto in an amount equal to the amount their respective percentage of the Member Distribution on June 20, 2019, that the Members directed Richard A. Hayes to disburse $8,444,477.81 from the Hayes Client Trust Account to make the Alecto Capital Contributions, that Alecto received $8,444,477.81 on June 20, 2019, and that the amount of the capital contributions made by each Member is set forth on **Exhibit** A.

5.    **ADDITIONAL DISTRIBUTIONS**. The Parties acknowledge and agree that (i) the Plaza MOB Second Distribution, and (ii) the Reserve Funds Distributions as received from time to time, shall he deposited in the Hayes Client Trust Account and contributed to the capital of Alecto through distributions to Sunrise Real Estate and Sunrise MOB consistent with and under the same terms and conditions as the Plaza MOB Distribution.

6.    **CONFIDENTIALITY**. Except for disclosure to their legal counsel, accountant or financial advisors, the Parties shall not disclose the terms of this Agreement to any person who is not a party or signatory to this Agreement, unless disclosure thereof is required by law or otherwise authorized by this Agreement or consented to by the parties. Unauthorized disclosure of the terms of this Agreement shall be a material breach of this Agreement.

7.    **ARBITRATION**. Any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by arbitration in the County of Los Angeles, State of California before a mutually agreed upon arbitrator in accordance the commercial rules of Judicial Arbitration and Mediation Services (JAMS) and applying the laws of the State of California. In the event the Parties cannot agree on the selection of an arbitrator, an arbitrator will be appointed in accordance with JAMS' rules. The arbitrator shall have no authority to award special, indirect, consequential or punitive damages and the Parties expressly waive any right to recover any special, indirect, consequential or punitive damages. Any award rendered by the arbitrator shall be final and binding upon each of the Parties, and judgment thereon may be entered in any court having jurisdiction thereof. The costs shall be borne equally by both parties. The provisions of this Section 8 shall survive expiration or termination of this Agreement regardless of the cause of such termination.

IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

8.    **ENTIRE AGREEMENT; MODIFICATION**. This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, and all other communications between the Parties relating to such subject matter. This Agreement may not be amended or modified except by mutual written

3

**A0926**

agreement. Any reference to this Agreement shall include each and every exhibit, each of which is fully incorporated into this Agreement where referenced.

9. **GOVERNING LAW**. This Agreement shall be construed in accordance with the laws of the State of California. The provisions of this Section 9 shall survive expiration or termination of this Agreement regardless of the cause of such termination.

10. **COUNTERPARTS**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Signatures of the Parties on this Agreement or any document delivered pursuant to this Agreement may be transmitted by facsimile (or other electronic transmission including email of a PDF signature) shall be deemed to be original signatures for all purposes. At the request of a Party, the Parties will confirm facsimile transmitted (or other electronic transmission including email of a PDF signature) signatures by signing an original document.

11. **WAIVER**. A waiver by either Party of a breach or failure to perform hereunder shall not constitute a waiver of any subsequent breach or failure.

12. **CAPTIONS**. The captions contained herein are used solely for convenience and shall not be deemed to define or limit the provisions of this Agreement.

13. **ASSIGNMENT; BINDING EFFECT**. No Party shall assign or transfer this Agreement in whole or in part, or assign or delegate any of its rights, duties or obligations under this Agreement, in each case without the prior written consent of the other party, and any assignment, transfer or delegation without such consent shall be null and void. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and permitted assigns.

14. **WAIVER OF CONFLICTS OF INTEREST**. Each Party acknowledges that Richard A. Hayes agreed to facilitate the disbursement of funds through the Hayes Client Trust Account to allow the efficient transfer of funds and not as an attorney for any Party. Each Party hereby waives any conflict that may exist with respect to Richard A. Hayes facilitating the transfer of funds, Richard A. Hayes serving as a Co-Trustee of The Reddy Investment Trust, and Richard A. Hayes being a beneficiary of The Hayes Irrevocable Trust.

[*Signatures Appear in Next Page*]

4

**A0927**

**THE PARTIES HERETO** have executed this Agreement as of the day and year first above written.

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

5

**A0928**

**EXHIBIT A**
**CAPITAL CONTRIBUTIONS TO ALECTO**

| Member | % Interest | Capital Contribution |
|---|---|---|
| The Reddy Investment Trust | 56.00% | $4,728,904.21 |
| The Krissman Family Trust | 10.00% | $844,447.18 |
| The Jeyakumar Inter-Vivos Trust | 7.00% | $591,113.03 |
| The Sarrao Family Trust | 7.00% | $591,113.03 |
| The Hayes Irrevocable Trust | 5.00% | $422,223.59 |
| Matthew Williams | 5.00% | $422,223.59 |
| Steven Kay | 5.00% | $422,223.59 |
| Aman Dhuper | 5.00% | $422,223.59 |
| | 100.00% | $8,444,471.81 |

EXHIBIT E

## ASSIGNMENT OF MEMBERSHIP INTERESTS
## OF
## SUNRISE MOB HOLDINGS LLC

This Assignment of Membership Interests (this "**Assignment**") is executed and effective as of the opening of business on January 1, 2021 (the "**Effective Date**"), by and between The Reddy Investment Trust, The Krissman Family Trust, The Sarrao Family Trust, The Hayes Irrevocable Trust, Steven Kay, and Matthew Williams (each a "**Transferor**" and collectively, the "**Transferors**") and Alecto Healthcare Services LLC, a Delaware limited liability company ("**Transferee**").

### RECITALS

A.      The Reddy Investment Trust is a Class A Member of Sunrise MOB Holdings LLC, a Delaware limited liability company (the "**Company**") and owns Seventeen Thousand (17,000) Class A Membership Units of the Company and a Class B Member of the Company and owns Fifty One Thousand (51,000) Class B Units of the Company; The Krissman Family Trust is a Class A Member of the Company and owns Ten Thousand (10,000) Class A Units of the Company, The Sarrao Family Trust is a Class A Member of the Company and owns Seven Thousand (7,000) Class A Units of the Company, The Hayes Irrevocable Trust is a Class A Member of the Company and owns Five Thousand (5,000) Class A Units of the Company, Steven Kay is a Class A Member of the Company and owns Five Thousand (5,000) Class A Units of the Company, and Matthew Williams is a Class A Member of the Company and owns Five Thousand (5,000) Class A Units of the Company. The Class A and Class B Membership Interests owned by The Reddy Investment Trust, The Krissman Family Trust, The Sarrao Family Trust, The Hayes Irrevocable Trust, Steven Kay, and Matthew Williams constitute one hundred percent (100%) of the outstanding and issued Membership Units of the Company and hereinafter shall be referred to herein as the "**Transferred Interests**"

B.      Transferors have agreed to transfer, convey, assign and deliver to Transferee, and Transferee has agreed to accept, the Transferred Interests.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

### ASSIGNMENT

1.      **Assignment**. Transferors hereby irrevocably transfer, convey, assign and deliver to Transferee the Transferred Interests, together with all of Transferors' right, title, interest and benefit in and to the properties (real and personal), capital, cash flow, distributions, dividends, profits and losses, and all other economic benefits of the Transferred Interests accruing to or distributable with respect to the Transferred Interest and the interests in the Company represented thereby or associated therewith from and after opening of business on January 1, 2021 (the "**Effective Time**").

2.      **Acceptance, Assumption and Acknowledgment**.  Transferee hereby accepts Transferors' assignment of the Transferred Interests pursuant to Section 1 and acknowledges and agrees that it shall continue to be bound by all of the terms and conditions of the Amended and Restated Operating Agreement of the Company, as amended from time to time (the "**Operating Agreement**").

3.      **Effect of Assignment**.  As of the Effective Time, (a) Transferee shall be the owner of the Transferred Interests in accordance with this Assignment, (b) Transferee shall succeed to the rights and obligations of Transferors in respect of the Transferred Interests and such transfer shall be included in the books and records of the Company to reflect such transfer, and (c) Transferors hereby resign as members of the Company, and shall have no further rights, powers or obligations with respect to the Transferred Interests or otherwise under the Operating Agreement.

4.      **Survival of Indemnification Provisions**.  Notwithstanding the transfer, Transferors' resignation as a member of the Company, or any other provision of this Agreement, the indemnification provisions set forth in Section 7.8 of the Operating Agreement for the benefit of Transferors and other indemnified persons described therein shall survive the transfer of the Transferred Interests.

5.      **Binding Effect**. This Assignment is binding on and shall inure to the benefit of the signatories hereto and their respective successors and assigns.

6.      **Counterparts**. This Assignment may be executed (including by facsimile or electronic transmission) in multiple counterparts, each of which shall be deemed an original and all of which taken together shall constitute one instrument binding on all the parties hereto, notwithstanding that all the parties hereto are not signatories to the original or the same counterpart.

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the Effective Date.

**TRANSFERORS**:

**THE REDDY INVESTMENT TRUST**

By: _____
   Lex Reddy, Trustee

By: _____
   Richard A. Hayes, Trustee

**THE KRISSMAN FAMILY TRUST**

By: _____
   Roger Krissman
   Trustee

**THE SARRAO FAMILY TRUST**

By: _____
   Michael Sarrao, Trustee

**THE HAYES IRREVOCABLE TRUST**

By: _____
   Martha M. Hayes, Trustee

**STEVEN KAY**

By: _____
   Steven Kay

**MATTHEW WILLIAMS**

By: _____
   Matthew Williams

[Signature Page to Assignment of Membership Interests]

**TRANSFEREE**:

**ALECTO HEALTHCARE SERVICES LLC**

By: _____

      Lex Reddy
      President & CEO

**Exhibit 2**
**List of Bank Accounts**

**Alecto Healthcare Services LLC**

**Lockbox Accounts - Daily Sweeps to CNH Finance**

CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Entity Abrev. | Acct | Description of Account |
|---|---|---|---|---|---|
| Alecto Healthcare Services Hayward | City National Bank | 1.0 | Alecto | 7509 | Deposit Account |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 5572 | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 4404 | Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8205 | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8191 | Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 7324 | Non-Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 3717 | Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8264 | Non-Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8248 | Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9210 | Non-Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9202 | Government Receivables |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7780 | Non-Government Receivables |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 2995 | Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4951 | Non-Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4948 | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5073 | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5057 | Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0165 | Non-Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0152 | Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0217 | Non-Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0204 | Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0262 | Non-Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0259 | Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | 9280 | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank., Inc. | 8.4 | | 9584 | Government Receivables |

**Alecto Healthcare Services LLC**

**Disbursement Accounts - Receipt of Advances from CNH Finance**

CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Acct | Entity Abrev. | Description of Account |
|---|---|---|---|---|---|
| Alecto Healthcare Services LLC | City National Bank | | 3784 | Alecto | Primary Disbursement Acct |
| Alecto Healthcare Services LLC | City National Bank | | 6065 | Alecto | Operating Acct |
| | | | 6508 | | Payroll Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | 9152 | WNJ | A/P Acct |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | | WNJ MD | |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | | n/a | |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | 7573 | OMC | CMA |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | 2115 | FRMC | |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | | FRMC PHY | |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | 0194 | OVMC | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | | EORH | |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | | |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | | |

**A0937**

## Alecto Healthcare Services LLC

**Lockbox Accounts - Account # Order**

CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Entity Abrev. | Acct | Acct Type | Description of Account |
|---|---|---|---|---|---|---|
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0152 | Lockbox | Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0165 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0194 | Disbursement | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0204 | Lockbox | Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0217 | Lockbox | Non-Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | n/a | 0259 | Lockbox | Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | n/a | 0262 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 1646 | Other | Payroll Acct |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 2115 | Disbursement | |
| Plaza MOB | | 7.3 | n/a | 2120 | Other | Operating |
| Plaza MOB | | 7.3 | n/a | 2210 | Other | Depository |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 2995 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 3717 | Lockbox | Government Receivables |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 3784 | Disbursement | Primary Disbursement Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 4404 | Lockbox | Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 4538 | Other | Care Credit Acct |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 4799 | Other | Non-Govt A/P |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4948 | Lockbox | Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4951 | Lockbox | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5057 | Lockbox | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5073 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 5572 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6065 | Disbursement | Operating Acct |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6508 | Disbursement | Payroll Acct |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 7324 | Lockbox | Non-Government Receivables |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7329 | Other | A/P Acct |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7343 | Other | Payroll Acct |
| Alecto Healthcare Services Hayward | City National Bank | 1.0 | Alecto | 7509 | Lockbox | Deposit Account |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7573 | Disbursement | CMA |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7780 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 7798 | Other | Payroll Acct |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8191 | Lockbox | Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8205 | Lockbox | Non-Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8248 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8264 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 9017 | Other | Disbursement A/P Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 9152 | Disbursement | A/P Acct |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9202 | Lockbox | Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9210 | Lockbox | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | n/a | 9280 | Lockbox | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank., Inc. | 8.4 | n/a | 9584 | Lockbox | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | | | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | | | |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | | | |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | | | |

**A0938**

# Alecto Healthcare Services LLC

**Lockbox Accounts - Entity Order**

CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Entity Abrev. | Acct | Acct Type | Description of Account |
|---|---|---|---|---|---|---|
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 3784 | Disbursement | Primary Disbursement Acct |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6065 | Disbursement | Operating Acct |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6508 | Disbursement | Payroll Acct |
| Alecto Healthcare Services Hayward | City National Bank | 1.0 | Alecto | 7509 | Lockbox | Deposit Account |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 1646 | Other | Payroll Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 4404 | Lockbox | Government Receivables |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 4799 | Other | Non-Govt A/P |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 5572 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8191 | Lockbox | Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8205 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 9152 | Disbursement | A/P Acct |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 3717 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 7324 | Lockbox | Non-Government Receivables |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7392 | Other | A/P Acct |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7343 | Other | Payroll Acct |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8248 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8264 | Lockbox | Non-Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9202 | Lockbox | Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9210 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 2995 | Lockbox | Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 4538 | Other | Care Credit Acct |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7573 | Disbursement | CMA |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7780 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 7798 | Other | Payroll Acct |
| Olympia Health Care, LLC | | 3.1 | OMC | 9017 | Other | Disbursement A/P Acct |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 2115 | Disbursement | |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4948 | Lockbox | Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4951 | Lockbox | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5057 | Lockbox | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5073 | Lockbox | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | | Disbursement | |
| Plaza MOB | | 7.3 | n/a | 2120 | Other | Operating |
| Plaza MOB | | 7.3 | n/a | 2210 | Other | Depository |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0152 | Lockbox | Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0165 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0194 | Disbursement | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0204 | Lockbox | Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0217 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | | Disbursement | |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0259 | Lockbox | Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0262 | Lockbox | Non-Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | | Disbursement | |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | 9280 | Lockbox | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank., Inc. | 8.4 | | 9584 | Lockbox | Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | | Disbursement | |

**A0939**

**Exhibit 3**
**Allocation Summary**

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Advances from CNH to Alecto *3784**

### 2019

| | Values | | | Alecto *3784 | | |
| | Affiliate Lockbox | Advances from CNH to Alecto | Wire In (CNH) | Wire Out | Net Advances per Bank Statement | |
| Months (Mo) | Deposits | *3784 | (per Bank Stmnts) *less wires <7/8* | (per Bank Stmnts) *less wires <7/8* | to Alecto | |
|---|---|---|---|---|---|---|
| Jul | 19,363,308.50 | (18,334,880.31) | 18,334,880.31 | 17,593,000.00 | 741,880.31 | |
| Aug | 22,723,750.18 | (28,281,600.00) | 28,281,600.00 | 27,151,000.00 | 1,130,600.00 | *Alecto Advance vs. Net Advances per Bank Statement* |
| Sep | 21,590,109.79 | (17,472,000.00) | 17,472,000.00 | 18,957,000.00 | (1,485,000.00) | 945,000.00 (540,000.00) |
| Oct | 18,317,818.60 | (16,193,100.00) | 16,193,100.00 | 15,839,000.00 | 354,100.00 | OMC 500,000.00  9/26/2019 |
| Nov | 15,074,972.12 | (13,921,500.00) | 13,921,500.00 | 12,769,000.00 | 1,152,500.00 | EORH 40,000.00  9/4/2019 |
| Dec | 16,650,340.82 | (16,653,900.00) | 16,653,900.00 | 15,740,500.00 | 913,400.00 | |
| **Grand Total** | **113,720,300.01** | **(110,856,980.31)** | **$110,856,980.31** | **$108,049,500.00** | **$2,807,480.31** | |

Lockbox Deposits in Excess of Affiliate Advances:    -    $5,670,800.01

(2,492,901.81) Less Net Transfers To *6065/*6508
$314,578.50 Advances retained by Alecto

### 2020

| | Values | | | Alecto *3784 | | |
| | Affiliate Lockbox | Advances from CNH to Alecto | Wire In (CNH) | Wire Out/Bsuite Wire Out | Net Advances per Bank Statement | |
| Months (Mo) | Deposits | *3784 | (per Bank Stmnts) | (per Bank Stmnts) | to Alecto | |
|---|---|---|---|---|---|---|
| Jan | 13,294,989.39 | (13,987,600.00) | 13,987,400.00 | (13,889,262.18) | 98,137.82 | |
| Feb | 12,264,749.43 | (10,993,900.00) | 10,993,900.00 | (9,929,700.00) | 1,064,200.00 | |
| Mar | 16,029,431.59 | (14,249,880.00) | 14,249,880.00 | (11,752,100.00) | 2,497,780.00 | |
| Apr | 44,750,504.64 | (30,711,100.00) | 30,711,100.00 | (16,583,000.00) | 14,128,100.00 | |
| May | 7,726,047.19 | (10,507,400.00) | 10,507,400.00 | (10,393,200.00) | 114,200.00 | |
| Jun | 23,550,415.01 | (33,095,551.00) | 33,095,551.00 | (26,022,901.00) | 7,072,650.00 | |
| Jul | 30,619,036.72 | (18,016,600.00) | 18,016,600.00 | (15,054,500.00) | 2,962,100.00 | |
| Aug | 8,251,126.20 | (13,168,000.00) | 13,168,000.00 | (12,150,000.00) | 1,018,000.00 | |
| Sep | 8,335,576.17 | (8,452,300.00) | 8,452,300.00 | (8,295,000.00) | 157,300.00 | |
| Oct | 13,301,780.05 | (11,583,800.00) | 11,583,800.00 | (10,275,000.00) | 1,308,800.00 | |
| Nov | 10,639,712.03 | (14,482,500.00) | 14,482,500.00 | (11,352,000.00) | 3,130,500.00 | |
| Dec | 12,040,041.51 | (10,639,400.00) | 10,639,400.00 | (17,286,000.00) | (6,646,600.00) | |
| **Grand Total** | **200,803,409.93** | **(189,887,831.00)** | **$189,887,831.00** | **-$162,982,663.18** | **$26,905,167.82** | |

Lockbox Deposits in Excess of Affiliate Advances:    -    $37,820,746.75

(13,870,734.38) Less Net Transfers To *6065/*6508
$13,034,433.44 Advances retained by Alecto
(to maintain avg bank balance at ~$20MM)

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Advances from CNH to Alecto *3784**

**2021**

| Months (Mo) | Affiliate Lockbox Deposits | Advances from CNH to Alecto *3784 | Wire In (CNH) (per Bank Stmnts) | Wire Out (per Bank Stmnts) | Net Advances per Bank Statement to Alecto |
|---|---|---|---|---|---|
| | Values | | Alecto *3784 | | |
| Jan | 10,368,948.45 | (10,026,500.00) | 10,026,500.00 | (10,330,500.00) | (304,000.00) |
| Feb | 9,694,104.65 | (7,383,900.00) | 7,383,900.00 | (9,655,000.00) | (2,271,100.00) |
| Mar | 8,939,904.71 | (11,130,900.00) | 11,130,900.00 | (9,925,000.00) | 1,205,900.00 |
| Apr | 5,696,386.02 | (3,254,900.00) | 3,254,900.00 | (4,622,000.00) | (1,367,100.00) |
| May | 4,411,225.44 | (4,003,600.00) | 4,003,600.00 | (4,092,000.00) | (88,400.00) |
| Jun | 4,907,861.76 | (5,091,400.00) | 5,091,400.00 | (4,549,900.00) | 541,500.00 |
| Jul | 4,044,677.94 | (4,086,800.00) | 4,086,800.00 | (3,758,500.00) | 328,300.00 |
| Aug | 3,974,868.59 | (3,867,300.00) | 3,867,300.00 | (7,179,700.00) | (3,312,400.00) |
| Sep | 5,453,242.00 | (5,283,500.00) | 5,283,500.00 | (5,529,100.00) | (245,600.00) |
| Oct | 4,390,949.45 | (3,801,500.00) | 3,801,500.00 | (6,397,000.00) | (2,595,500.00) |
| Nov | 4,341,372.77 | (5,248,800.00) | 5,248,800.00 | (6,134,000.00) | (885,200.00) |
| Dec | 4,136,252.07 | (3,740,300.00) | 3,740,300.00 | (5,562,000.00) | (1,821,700.00) |
| **Grand Total** | **70,359,793.85** | **(66,919,400.00)** | **$66,919,400.00** | **-$77,734,700.00** | **-$10,815,300.00** |

Oct — *Alecto Advance vs. Net Advances per Bank Statement*

Nov — 254,200.00   (631,000.00)
Nov — OMC   231,000.00   11/18/2021
Dec — OVMC   400,000.00   11/29/2021

Advances in Excess of Affiliate Lockbox Deposits: - | -$7,374,906.15

8,114,913.38 Less Net Transfers From *6065/*6508   (1)
($2,700,386.62) Advances used by Alecto for expenses/Affiliates

(1) 1/1/2021 UCLA Asset Sale proceeds of $23,506,100 deposited in Alecto *6065 and transferred to Alecto *3784

**2022**

| Months (Mo) | Affiliate Lockbox Deposits | Advances from CNH to Alecto *3784 | Wire In (CNH) (per Bank Stmnts) | Wire Out (per Bank Stmnts) | Net Advances per Bank Statement to Alecto |
|---|---|---|---|---|---|
| | Values | | Alecto *3784 | | |
| Jan | 3,648,832.46 | (4,053,000.00) | 4,053,000.00 | (8,305,374.00) | (4,252,374.00) |
| Feb | 4,083,099.59 | (3,804,800.00) | 3,804,800.00 | (6,367,000.00) | (2,562,200.00) |
| Mar | 4,443,269.65 | (3,525,600.00) | 3,525,600.00 | (4,100,000.00) | (574,400.00) |
| Apr | 3,342,283.08 | (4,478,600.00) | 4,478,600.00 | (5,853,000.00) | (1,374,400.00) |
| May | 3,586,838.94 | (4,030,200.00) | 3,465,500.00 | (3,465,000.00) | 500.00 |
| Jun | 4,602,345.47 | (4,189,500.00) | 4,754,200.00 | (4,851,500.00) | (97,300.00) |
| Jul | 3,258,787.49 | (3,542,900.00) | 3,542,900.00 | (4,740,600.00) | (1,197,700.00) |
| Aug | 9,451,140.27 | (5,234,394.11) | 5,107,641.83 | (4,683,150.00) | 424,491.83 |
| Sep | 1,653,063.06 | (1,526,126.78) | 1,653,063.06 | (2,233,902.86) | (580,839.80) |
| **Grand Total** | **38,069,660.01** | **(34,385,120.89)** | **$34,385,304.89** | **-$44,599,526.86** | **-$10,214,221.97** |

Aug — *Alecto Advance vs. Net Advances per Bank Statement*

Sep — 581,023.80   184.00
Grand Total — OVERDRAW FOR WNJ   72.00   9/21/2022

Advances in Excess of Affiliate Lockbox Deposits: 184.00 | -$6,529,866.85   OVERDRAFT CLOSE ACCT   112.00   9/30/2022

3,508,678.74 Less Net Transfers From *6065/*6508
($6,705,543.23) Advances used by Alecto for expenses/Affiliates

**Exhibit 4**
**Allocations by Entity**

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto *3784**

### 2019 Lockbox Deposit Sweeps

| Months (Mo) | Values Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Total Deposits |
|---|---|---|---|---|---|---|
| Jul | 4,309,043.52 | 7,433,896.73 | 4,487,463.83 | 3,132,754.42 | 150.00 | 19,363,308.50 |
| Aug | 5,124,775.10 | 7,856,299.90 | 4,983,138.17 | 4,438,452.44 | 321,084.57 | 22,723,750.18 |
| Sep | 6,608,391.69 | 7,018,583.11 | 4,458,294.87 | 3,267,731.03 | 237,109.09 | 21,590,109.79 |
| Oct | 4,882,037.95 | 2,774,247.18 | 5,435,350.73 | 4,983,656.25 | 242,526.49 | 18,317,818.60 |
| Nov | 5,140,091.21 | 798,722.81 | 4,599,025.16 | 4,216,639.53 | 320,493.41 | 15,074,972.12 |
| Dec | 5,291,428.49 | 495,337.83 | 5,188,552.07 | 5,395,135.71 | 279,886.72 | 16,650,340.82 |
| **Grand Total** | **31,355,767.96** | **26,377,087.56** | **29,151,824.83** | **25,434,369.38** | **1,401,250.28** | **113,720,300.01** |

### 2019 Advances

| Months (Mo) | Values Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Total Advances |
|---|---|---|---|---|---|---|
| Jul | (5,663,000.00) | (5,295,000.00) | (2,395,000.00) | (4,240,000.00) | (741,880.31) | (18,334,880.31) |
| Aug | (8,183,000.00) | (9,110,000.00) | (5,160,000.00) | (4,698,000.00) | (1,130,600.00) | (28,281,600.00) |
| Sep | (6,041,000.00) | (5,746,000.00) | (2,615,000.00) | (4,015,000.00) | 945,000.00 | (17,472,000.00) |
| Oct | (5,022,000.00) | (3,487,000.00) | (3,355,000.00) | (3,975,000.00) | (354,100.00) | (16,193,100.00) |
| Nov | (4,654,000.00) | (1,075,000.00) | (3,395,000.00) | (3,645,000.00) | (1,152,500.00) | (13,921,500.00) |
| Dec | (5,964,000.00) | (474,500.00) | (4,076,000.00) | (5,226,000.00) | (913,400.00) | (16,653,900.00) |
| **Grand Total** | **(35,527,000.00)** | **(25,187,500.00)** | **(20,996,000.00)** | **(25,799,000.00)** | **(3,347,480.31)** | **(110,856,980.31)** |

### 2019 Total Advance (Over)/Under

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jul | (1,353,956.48) | 2,138,896.73 | 2,092,463.83 | (1,107,245.58) | | 1,770,158.50 |
| Aug | (3,058,224.90) | (1,253,700.10) | (176,861.83) | (259,547.56) | | (4,748,334.39) |
| Sep | 567,391.69 | 1,272,583.11 | 1,843,294.87 | (747,268.97) | | 2,936,000.70 |
| Oct | (139,962.05) | (712,752.82) | 2,080,350.73 | 1,008,656.25 | | 2,236,292.11 |
| Nov | 486,091.21 | (276,277.19) | 1,204,025.16 | 571,639.53 | | 1,985,478.71 |
| Dec | (672,571.51) | 20,837.83 | 1,112,552.07 | 169,135.71 | | 629,954.10 |
| **Grand Total** | **(4,171,232.04)** | **1,189,587.56** | **8,155,824.83** | **(364,630.62)** | **-** | **4,809,549.73** |

**A0944**

**Alecto Healthcare Services LLC**

**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto *378**4

### 2020 Lockbox Deposit Sweeps

| Months (Mo) | Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Total Deposits |
|---|---|---|---|---|---|---|
| Jan | 5,166,146.93 | 300,221.43 | 4,438,520.13 | 3,134,963.35 | 255,137.55 | 13,294,989.39 |
| Feb | 4,090,888.47 | 189,748.53 | 4,568,259.33 | 3,116,625.04 | 299,228.06 | 12,264,749.43 |
| Mar | 4,962,445.42 | 84,845.34 | 7,281,072.46 | 3,478,068.25 | 223,000.12 | 16,029,431.59 |
| Apr | 17,046,716.00 | 1,245,454.17 | 21,492,726.90 | 4,532,034.55 | 433,573.02 | 44,750,504.64 |
| May | 1,680,218.48 | 251,874.65 | 4,380,980.44 | 416,566.66 | 996,406.96 | 7,726,047.19 |
| Jun | 12,622,210.49 | 115,175.72 | 4,653,709.57 | 5,766,251.01 | 393,068.22 | 23,550,415.01 |
| Jul | 4,576,052.63 | 86,357.53 | 25,413,062.92 | 217,047.56 | 326,516.08 | 30,619,036.72 |
| Aug | 3,151,092.19 | 154,931.50 | 4,632,064.78 | 31,545.16 | 281,492.57 | 8,251,126.20 |
| Sep | 3,638,002.43 | 159,428.62 | 4,231,011.73 | 118,631.96 | 188,501.43 | 8,335,576.17 |
| Oct | 8,313,560.13 | 32,640.62 | 4,698,904.30 | 37,784.18 | 218,890.82 | 13,301,780.05 |
| Nov | 5,825,935.54 | 15,826.13 | 4,495,833.31 | 38,888.29 | 263,228.76 | 10,639,712.03 |
| Dec | 5,711,982.05 | 26,560.82 | 5,340,656.44 | 636,118.39 | 324,723.81 | 12,040,041.51 |
| **Grand Total** | **76,785,250.76** | **2,663,065.06** | **95,626,802.31** | **21,524,524.40** | **4,203,767.40** | **200,803,409.93** |

### 2020 Advances

| Months (Mo) | Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Total Advances |
|---|---|---|---|---|---|---|
| Jan | (5,744,227.18) | (405,035.00) | (4,510,000.00) | (3,230,000.00) | (98,137.82) | (13,987,400.00) |
| Feb | (3,570,000.00) | (58,700.00) | (3,411,000.00) | (2,890,000.00) | (1,064,200.00) | (10,993,900.00) |
| Mar | (5,021,000.00) | (25,100.00) | (4,170,000.00) | (2,536,000.00) | (2,497,780.00) | (14,249,880.00) |
| Apr | (7,361,000.00) | (5,000.00) | (5,217,000.00) | (4,000,000.00) | (14,128,100.00) | (30,711,100.00) |
| May | (4,880,000.00) | (11,200.00) | (4,257,000.00) | (1,245,000.00) | (114,200.00) | (10,507,400.00) |
| Jun | (6,616,000.00) | (6,250.00) | (17,531,251.00) | (1,869,400.00) | (7,072,650.00) | (33,095,551.00) |
| Jul | (8,950,000.00) | (6,500.00) | (5,953,000.00) | (145,000.00) | (2,962,100.00) | (18,016,600.00) |
| Aug | (5,500,000.00) | - | (6,450,000.00) | (200,000.00) | (1,018,000.00) | (13,168,000.00) |
| Sep | (4,650,000.00) | - | (3,600,000.00) | (45,000.00) | (157,300.00) | (8,452,300.00) |
| Oct | (5,020,000.00) | - | (4,950,000.00) | (305,000.00) | (1,308,800.00) | (11,583,800.00) |
| Nov | (5,171,000.00) | (4,000.00) | (6,000,000.00) | (177,000.00) | (3,130,500.00) | (14,482,500.00) |
| Dec | (5,778,000.00) | (5,000.00) | (11,230,000.00) | (273,000.00) | 6,646,600.00 | (10,639,400.00) |
| **Grand Total** | **(68,261,227.18)** | **(526,785.00)** | **(77,279,251.00)** | **(16,915,400.00)** | **(26,905,167.82)** | **(189,887,831.00)** |

### 2020 Total Advance (Over)/Under

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jan | (578,080.25) | (104,813.57) | (71,479.87) | (95,036.65) | | (849,410.34) |
| Feb | 520,888.47 | 131,048.53 | 1,157,259.33 | 226,625.04 | | 2,035,821.37 |
| Mar | (58,554.58) | 59,745.34 | 3,111,072.46 | 942,068.25 | | 4,054,331.47 |
| Apr | 9,685,716.00 | 1,240,454.17 | 16,275,726.90 | 532,034.55 | | 27,733,931.62 |
| May | (3,199,781.52) | 240,674.65 | 123,980.44 | (828,433.34) | | (3,663,559.77) |
| Jun | 6,006,210.49 | 108,925.72 | (12,877,541.43) | 3,896,851.01 | | (2,865,554.21) |
| Jul | (4,373,947.37) | 79,857.53 | 19,460,062.92 | 72,047.56 | | 15,238,020.64 |
| Aug | (2,348,907.81) | 154,931.50 | (1,817,935.22) | (168,454.84) | | (4,180,366.37) |
| Sep | (1,011,997.57) | 159,428.62 | 631,011.73 | 73,631.96 | | (147,925.26) |
| Oct | 3,293,560.13 | 32,640.62 | (251,095.70) | (267,215.82) | | 2,807,889.23 |
| Nov | 654,935.54 | 11,826.13 | (1,504,166.69) | (138,111.71) | | (975,516.73) |
| Dec | (66,017.95) | 21,560.82 | (5,889,343.56) | 363,118.39 | | (5,570,682.30) |
| **Grand Total** | **8,524,023.58** | **2,136,280.06** | **18,347,551.31** | **4,609,124.40** | **-** | **33,616,979.35** |

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto *3784**

### 2021 Lockbox Deposit Sweeps
Values

| Months (Mo) | Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Total Deposits |
|---|---|---|---|---|---|---|
| Jan | 4,767,903.28 | 19,207.59 | 5,154,121.98 | 36,521.53 | 391,194.07 | 10,368,948.45 |
| Feb | 4,434,551.72 | 26,118.81 | 4,946,294.79 | 26,496.04 | 260,643.29 | 9,694,104.65 |
| Mar | 5,257,109.18 | 17,796.00 | 3,055,330.03 | 332,774.29 | 276,895.21 | 8,939,904.71 |
| Apr | 3,810,031.18 | 15,660.77 | 1,473,382.79 | 18,446.18 | 378,865.10 | 5,696,386.02 |
| May | 3,186,709.34 | 18,587.17 | 841,357.77 | 32,824.86 | 331,746.30 | 4,411,225.44 |
| Jun | 3,467,902.13 | 28,787.49 | 1,196,297.86 | 12,883.14 | 201,991.14 | 4,907,861.76 |
| Jul | 3,327,232.72 | 15,935.01 | 378,473.19 | 46,637.73 | 276,399.29 | 4,044,677.94 |
| Aug | 3,376,505.07 | 17,976.59 | 375,982.36 | 20,713.47 | 183,691.10 | 3,974,868.59 |
| Sep | 3,335,395.23 | 14,412.33 | 203,693.95 | 1,668,959.73 | 230,780.76 | 5,453,242.00 |
| Oct | 3,586,247.64 | 13,291.74 | 610,997.33 | 12,184.40 | 168,228.34 | 4,390,949.45 |
| Nov | 3,846,521.08 | 10,595.84 | 176,178.62 | 3,238.93 | 304,838.30 | 4,341,372.77 |
| Dec | 3,764,875.80 | 6,205.41 | 104,690.94 | 19,364.89 | 241,115.03 | 4,136,252.07 |
| **Grand Total** | **46,160,984.37** | **204,574.75** | **18,516,801.61** | **2,231,045.19** | **3,246,387.93** | **70,359,793.85** |

### 2021 Advances
Values

| Months (Mo) | Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Total Advances |
|---|---|---|---|---|---|---|
| Jan | (5,200,000.00) | (5,500.00) | (4,850,000.00) | (275,000.00) | 304,000.00 | (10,026,500.00) |
| Feb | (4,345,000.00) | (5,000.00) | (5,100,000.00) | (205,000.00) | 2,271,100.00 | (7,383,900.00) |
| Mar | (5,025,000.00) | (59,000.00) | (4,750,000.00) | (91,000.00) | (1,205,900.00) | (11,130,900.00) |
| Apr | (2,525,000.00) | (12,000.00) | (2,000,000.00) | (85,000.00) | 1,367,100.00 | (3,254,900.00) |
| May | (3,586,000.00) | (5,000.00) | (475,000.00) | (26,000.00) | 88,400.00 | (4,003,600.00) |
| Jun | (4,113,000.00) | (4,900.00) | (350,000.00) | (82,000.00) | (541,500.00) | (5,091,400.00) |
| Jul | (3,040,000.00) | (6,500.00) | (650,000.00) | (62,000.00) | (328,300.00) | (4,086,800.00) |
| Aug | (6,575,000.00) | (8,700.00) | (495,000.00) | (101,000.00) | 3,312,400.00 | (3,867,300.00) |
| Sep | (5,050,000.00) | (53,100.00) | (290,000.00) | (136,000.00) | 245,600.00 | (5,283,500.00) |
| Oct | (5,250,000.00) | (5,000.00) | (601,000.00) | (541,000.00) | 2,595,500.00 | (3,801,500.00) |
| Nov | (5,350,000.00) | (5,000.00) | (100,000.00) | (48,000.00) | 254,200.00 | (5,248,800.00) |
| Dec | (5,150,000.00) | (6,000.00) | (330,000.00) | (76,000.00) | 1,821,700.00 | (3,740,300.00) |
| **Grand Total** | **(55,209,000.00)** | **(175,700.00)** | **(19,991,000.00)** | **(1,728,000.00)** | **10,184,300.00** | **(66,919,400.00)** |

### 2021 Total Advance (Over)/Under

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jan | (432,096.72) | 13,707.59 | 304,121.98 | (238,478.47) | | (352,745.62) |
| Feb | 89,551.72 | 21,118.81 | (153,705.21) | (178,503.96) | | (221,538.64) |
| Mar | 232,109.18 | (41,204.00) | (1,694,669.97) | 241,774.29 | | (1,261,990.50) |
| Apr | 1,285,031.18 | 3,660.77 | (526,617.21) | (66,553.82) | | 695,520.92 |
| May | (399,290.66) | 13,587.17 | 366,357.77 | 6,824.86 | | (12,520.86) |
| Jun | (645,097.87) | 23,887.49 | 846,297.86 | (69,116.86) | | 155,970.62 |
| Jul | 287,232.72 | 9,435.01 | (271,526.81) | (15,362.27) | | 9,778.65 |
| Aug | (3,198,494.93) | 9,276.59 | (119,017.64) | (80,286.53) | | (3,388,522.51) |
| Sep | (1,714,604.77) | (38,687.67) | (86,306.05) | 1,532,959.73 | | (306,638.76) |
| Oct | (1,663,752.36) | 8,291.74 | 9,997.33 | (528,815.60) | | (2,174,278.89) |
| Nov | (1,503,478.92) | 5,595.84 | 76,178.62 | (44,761.07) | | (1,466,465.53) |
| Dec | (1,385,124.20) | 205.41 | (225,309.06) | (56,635.11) | | (1,666,862.96) |
| **Grand Total** | **(9,048,015.63)** | **28,874.75** | **(1,474,198.39)** | **503,045.19** | **-** | **(9,990,294.08)** |

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto *378**4

### 2022 Lockbox Deposit Sweeps

| | Values | | | | | |
|---|---|---|---|---|---|---|
| Months (Mo) | Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Total Deposits |
| Jan | 3,165,457.59 | 5,622.07 | 156,450.13 | 3,880.57 | 317,422.10 | 3,648,832.46 |
| Feb | 3,308,890.58 | 5,147.32 | 487,321.75 | 8,276.74 | 273,463.20 | 4,083,099.59 |
| Mar | 4,029,192.13 | 6,706.20 | 37,299.90 | 13,769.47 | 356,301.95 | 4,443,269.65 |
| Apr | 2,763,385.40 | 5,566.61 | 297,102.78 | 8,516.59 | 267,711.70 | 3,342,283.08 |
| May | 3,233,785.82 | 7,131.05 | 12,020.71 | 4,696.01 | 329,205.35 | 3,586,838.94 |
| Jun | 4,031,234.46 | 4,265.31 | 13,257.03 | 11,427.84 | 542,160.77 | 4,602,345.47 |
| Jul | 3,054,433.24 | 10,211.29 | 5,261.20 | 4,072.04 | 184,809.72 | 3,258,787.49 |
| Aug | 9,213,788.56 | 5,508.73 | 7,026.14 | - | 224,816.84 | 9,451,140.27 |
| Sep | 1,650,660.17 | 2,402.89 | - | - | - | 1,653,063.06 |
| Grand Total | 34,450,827.95 | 52,561.53 | 1,015,739.64 | 54,639.26 | 2,495,891.63 | 38,069,660.01 |

### 2022 Advances

| | Values | | | | | |
|---|---|---|---|---|---|---|
| Months (Mo) | Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Total Advances |
| Jan | (8,056,374.00) | (8,000.00) | (200,000.00) | (41,000.00) | 4,252,374.00 | (4,053,000.00) |
| Feb | (6,230,000.00) | (5,000.00) | (120,000.00) | (12,000.00) | 2,562,200.00 | (3,804,800.00) |
| Mar | (3,997,000.00) | (6,000.00) | (85,000.00) | (12,000.00) | 574,400.00 | (3,525,600.00) |
| Apr | (5,645,000.00) | (5,000.00) | (115,000.00) | (88,000.00) | 1,374,400.00 | (4,478,600.00) |
| May | (3,332,000.00) | (5,000.00) | (85,000.00) | (43,000.00) | (565,200.00) | (4,030,200.00) |
| Jun | (4,820,000.00) | (3,500.00) | (10,000.00) | (18,000.00) | 662,000.00 | (4,189,500.00) |
| Jul | (4,592,000.00) | (2,600.00) | (73,000.00) | (73,000.00) | 1,197,700.00 | (3,542,900.00) |
| Aug | (4,562,500.00) | (5,650.00) | (108,000.00) | (7,000.00) | (551,244.11) | (5,234,394.11) |
| Sep | (2,200,902.86) | - | (30,000.00) | (3,000.00) | 707,776.08 | (1,526,126.78) |
| Grand Total | (43,435,776.86) | (40,750.00) | (826,000.00) | (297,000.00) | 10,214,405.97 | (34,385,120.89) |

### 2022 Total Advance (Over)/Under

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jan | (4,890,916.41) | (2,377.93) | (43,549.87) | (37,119.43) | | (4,973,963.64) |
| Feb | (2,921,109.42) | 147.32 | 367,321.75 | (3,723.26) | | (2,557,363.61) |
| Mar | 32,192.13 | 706.20 | (47,700.10) | 1,769.47 | | (13,032.30) |
| Apr | (2,881,614.60) | 566.61 | 182,102.78 | (79,483.41) | | (2,778,428.62) |
| May | (98,214.18) | 2,131.05 | (72,979.29) | (38,303.99) | | (207,366.41) |
| Jun | (788,765.54) | 765.37 | 3,257.03 | (6,572.16) | | (791,315.30) |
| Jul | (1,537,566.76) | 7,611.29 | (67,738.80) | (68,927.96) | | (1,666,622.23) |
| Aug | 4,651,288.56 | (141.27) | (100,973.86) | (7,000.00) | | 4,543,173.43 |
| Sep | (550,242.69) | 2,402.89 | (30,000.00) | (3,000.00) | | (580,839.80) |
| Grand Total | (8,984,948.91) | 11,811.53 | 189,739.64 | (242,360.74) | - | (9,025,758.48) |

**A0947**

**Exhibit 5**
**Payment Analysis**

**Alecto Healthcare Services, LLC**
Payments by Check/ACH Transfer

I. Checks

| Name | Values Count of | Sum of Original |
|---|---|---|
| American Express | 43 | (124,463.54) x |
| Anthem Blue Cross | 10 | (140,695.70) |
| Arent Fox LLP | 1 | (750.00) |
| Arnett Carbis Toothman LLP | 3 | (31,110.20) |
| Bandwidth Simplified | 1 | (125.00) |
| Bank Direct | 4 | (1,226,270.13) |
| BCal 101 North Brand Property, LLC | 1 | (150.52) |
| Berkley Net Underwriters | 4 | (103,073.00) |
| ▪▪▪▪ | 4 | (148.98) |
| Brighthouse Life Insurance Company | 4 | (11,376.00) |
| Clark Hill P.L.C. | 2 | (4,042.68) |
| Cogency Global | 2 | (940.00) |
| Cooperative of American Phys Inc. | 7 | (60,915.00) |
| Corporation Service Company | 2 | (2,335.00) |
| Cox Communications | 31 | (43,440.18) |
| CT Corporation | 2 | (1,427.36) |
| Datarooms.com, LLC | 1 | (4,207.50) |
| Delaware Secretary of State | 2 | (9,300.00) |
| Department of Treasury | 8 | (7,711.51) |
| ▪▪▪▪ | 2 | (79.18) |
| ▪▪▪▪ | 1 | (3,006.57) |
| Fifth Third Bank | 1 | (200.82) |
| Flaherty Sensabaugh Bonasso PLLC | 1 | (83,348.88) |
| Fontis | 2 | (392.84) |
| Franchise Tax Board | 20 | (77,673.77) |
| ▪▪▪▪ | 1 | (287.74) |
| Hallett & Perrin P.C. | 1 | (60,341.06) |
| Haubert For Supervisor | 1 | (1,000.00) |
| Holtz Slavett & Drabkin | 3 | (32,405.70) |
| Intralinks, Inc. | 1 | (14,666.68) |
| Iron Mountain | 34 | (4,394.03) |
| Iyer Demirovic Chinchoy LLP | 1 | (4,600.00) |
| Jatheon | 1 | (3,690.00) |
| ▪▪▪▪ | 1 | (200.97) |
| ▪▪▪▪ | 1 | (1,089.38) |
| Kieckhafer Schiffer LLP | 1 | (9,000.00) |
| King & Spalding | 1 | (5,248.50) |
| Koenig Jacobsen LLP | 13 | (71,568.25) |
| Konica Minolta Premier Finance | 19 | (10,481.90) |
| Kutak Rock LLP | 1 | (1,400.50) |
| Los Angeles County Tax Collector | 1 | (470.42) |
| ▪▪▪▪ | 2 | (2,545.66) |
| ▪▪▪▪ | 1 | (463.26) |
| Medhost of Tennessee | 1 | (41,481.99) |
| MetLife Ins | 2 | - |
| Michael J. Sarrao | 1 | (22,895.97) x |
| Michael K. Nunley & Associates, Inc. | 1 | (15,100.05) |
| Modern Parking, Inc. | 1 | - |
| ▪▪▪▪ | 1 | (549.75) |
| ▪▪▪▪ | 1 | (164.07) |
| North American Speciality | 1 | (863.00) |
| NTT America, Inc. | 2 | (86,775.00) |
| Ohio Dept. Of Taxation | 2 | (45,818.17) |
| Ohio Valley Medical | 8 | (6,941.98) |
| Olshan Frome Wolosky | 1 | (52,673.52) |
| One Time Vendor | 8 | (65,940.57) |
| Pacific Global Investment Management Company | 1 | (18,316.80) |
| PaperlessPay, Corp | 1 | (535.00) |
| ▪▪▪▪ | 2 | (842.77) |
| Protective Life Insurance Company | 7 | (86,999.38) |
| Roger Krissman | 1 | (27,102.79) x |
| Ruthrauff Service LLC. | 1 | (45,000.00) |
| Shulman Bastian Friedman & Bui LLP | 5 | (38,216.95) |

**A0949**

**Alecto Healthcare Services, LLC**
**Payments by Check/ACH Transfer**

| | | |
|---|---|---|
| Singer Associates Inc. | 1 | (630.00) |
| St. Rose Medical Staff Hosp | 1 | (150.00) |
| | 1 | (749.51) |
| Steven Kay Esq | 1 | (10,300.00) x |
| | 2 | (2,038.10) |
| The Kullman Firm | 1 | (1,053.00) |
| U.S. Department of Homeland Security | 4 | (4,210.00) |
| U.S. Department of Labor | 1 | (49,116.76) |
| United States Postal Service | 1 | (681.00) |
| Unlimited Services Bldg Maint | 29 | (8,625.08) |
| | 1 | (5,000.00) |
| VeriyStream | 1 | (25,805.25) |
| | 1 | (1,029.99) |
| Woodruff-Sawyer & Co. | 3 | (65,553.11) |
| Zurich Services Corporation | 3 | (10,458.00) |
| **Grand Total** | **342** | **(2,902,655.97)** |

**II. Bill Payments/ACH Transfers**

| | Values | |
|---|---|---|
| **Name** | **Count of** | **Sum of Original** |
| AIG Claims Inc | 13 | (1,057,527.34) |
| Aman Dhuper | 10 | (107,272.04) x |
| American Express | 7 | (337,326.03) x |
| Anthem Blue Cross | 19 | (271,375.70) |
| AT&T | 23 | (1,832.40) |
| Bank Direct | 57 | (8,700,227.68) |
| BCal 101 North Brand Property, LLC | 7 | (45,909.42) |
| | 18 | (5,171.36) |
| | 5 | (47,536.84) |
| City National Bank | 46 | (200,858.54) |
| Clampett Industries LLC dba EMG | 1 | (14,850.00) |
| Cogency Global | 2 | (2,632.00) |
| Cooperative of American Phys Inc. | 1 | (3,417.00) |
| Corporation Service Company | 4 | (13,456.50) |
| Department of Treasury | 3 | (46,726.78) |
| Dexter Hofing LLC | 1 | (7,000.00) |
| Economists Incorporated | 1 | (9,026.00) |
| Evangeline Douglass | 47 | (168,312.31) |
| Exclusive Modular Installation Inc. | 1 | (14,200.00) |
| First Insurance Funding | 4 | (304,549.44) |
| Franchise Tax Board | 48 | (78,891.10) |
| | 2 | (660.04) |
| | 3 | (130,000.00) |
| Gordon & Rees | 1 | (8,535.00) |
| GRM Information Management Services of San Francisco, LLC | 1 | (14,900.69) |
| Hemanth P Mohanadas | 17 | (108,173.78) |
| | 10 | (31,307.05) |
| Holtz Slavett & Drabkin | 15 | (8,889,593.54) |
| | 2 | (431.21) |
| | 41 | (58,549.98) |
| King & Spalding | 1 | (6,935.00) |
| Koenig Jacobsen LLP | 7 | (44,482.18) |
| Konica Minolta Premier Finance | 43 | (22,675.39) |
| Kutak Rock LLP | 1 | (5,545.95) |
| Lex Reddy | 5 | (88,360.74) x |
| | 2 | (1,131.88) |
| Medhost of Tennessee | 3 | (128,012.39) |
| MedPro | 9 | (818,799.93) |
| Merrill Lynch, Pierce, Fenner & Smith, Inc. | 2 | (105,000.00) |
| MetLife Ins | 27 | (41,302.08) |
| Michael J. Sarrao | 53 | (960,052.31) x |
| Michael K. Nunley & Associates, Inc. | 12 | (71,245.02) |
| Modern Parking, Inc. | 27 | (31,290.00) |
| Moss Adams LLP | 41 | (747,474.76) |
| | 6 | (2,000.65) |
| Navex Global, Inc. | 3 | (18,085.28) |

**A0950**

**Alecto Healthcare Services, LLC**
**Payments by Check/ACH Transfer**

| | | |
|---|---|---|
| New Horizon Communications | 20 | (19,051.70) |
| ██████████████ | 1 | (1,448.76) |
| NTT America, Inc. | 20 | (289,250.00) |
| Olshan Frome Wolosky | 15 | (803,967.47) |
| Pacific Global Investment Management Company | 1 | (5,724.00) |
| Panch Jeyakumar M.D. | 3 | (3,139.00) |
| ████████ | 3 | (3,383.86) |
| Protective Life Insurance Company | 2 | (25,916.53) |
| Quadax, Inc. | 1 | (2,200.00) |
| Roger Krissman | 1 | (30,000.00) x |
| ███████ | 3 | (3,726.10) |
| | 4 | (4,155.51) |
| Shulman Bastian Friedman & Bui LLP | 1 | (15,388.95) |
| Snell & Wilmer | 1 | (13,630.10) |
| Spilman Thomas & Battle | 18 | (1,096,421.19) |
| St. Rose Hospital 1 | 1 | (5,868.95) |
| ████████ | 39 | (95,046.37) |
| Symphony Risk Solutions, LLC | 22 | (1,301,740.67) |
| Tech Guys | 1 | (3,300.00) |
| Unum Life Insurance Company of America | 30 | (108,490.76) |
| VerityStream | 2 | (51,610.51) |
| ████████ | 6 | (15,070.00) |
| Woodruff-Sawyer & Co. | 19 | (1,305,415.48) |
| **Grand Total** | **866** | **(28,976,589.24)** |
| | | |
| **Grand Total Check and Bill Payments (ACH Transfer)** | **1208** | **(31,879,245.21)** |

**A0951**

**Alecto Healthcare Services, LLC**
**Payments by Check/ACH Transfer**

**III. GCS Examination**

**III.A. Checks**

| Name | Values | | GCS Examination | |
|---|---|---|---|---|
| | Count | Amount | Count | Amount |
| American Express | 43 | (124,463.54) x | 1 | (12,763.60) |
| Michael J. Sarrao | 1 | (22,895.97) x | 1 | (22,895.97) |
| ▮▮▮▮▮▮▮ | 1 | (549.75) | | |
| Roger Krissman | 1 | (27,102.79) x | 1 | (27,102.79) |
| Steven Kay Esq | 1 | (10,300.00) x | 1 | (10,300.00) |
| **Grand Total** | **47** | **(185,312.05)** | **4** | **(73,062.36)** |

**III.B. Bill Payments/ACH Transfers**

| Name | Values | | GCS Review | |
|---|---|---|---|---|
| | Count | Amount | Count | Amount |
| Aman Dhuper | 10 | (107,272.04) x | 6 | (88,429.47) |
| American Express | 7 | (337,326.03) x | 6 | (335,846.67) |
| Lex Reddy | 5 | (88,360.74) x | 1 | (77,000.00) |
| Michael J. Sarrao | 53 | (960,052.31) x | 22 | (812,424.52) |
| ▮▮▮▮▮▮▮ | 6 | (2,000.65) | | |
| Panch Jeyakumar M.D. | 3 | (3,139.00) | | |
| Roger Krissman | 1 | (30,000.00) x | 1 | (30,000.00) |
| **Grand Total** | **85** | **(1,528,150.77)** | **36** | **(1,343,700.66)** |
| | | | | |
| **Grand Total Check and Bill Payments (ACH/Wire)** | **132** | **(1,713,462.82)** | **40** | **(1,416,763.02)** |
| | | | | **83%** |

Exhibit 6
Insider Payments

**Alecto Healthcare Services, LLC**
**Transfers to Insiders of $10,000 or more (excl. 2018 Promissory Note)**

| Type | Date | Num | Name | Memo | Amount | Count |
|---|---|---|---|---|---|---|
| Bill Payment | 4/11/2023 | ACH PMT | Michael J. Sarrao | Pmt of Forvis Invoice - FRMC Volume Decrease Adjustment preparation & OOS | -41,250.00 | 20 |
| Bill Payment | 1/12/2023 | ACH PMT | Michael J. Sarrao | Dec 2022 - MJS expense reimbursement | -13,826.13 | 19 |
| Bill Payment | 10/5/2022 | ACH PMT | Michael J. Sarrao | OVMC & EORH - Forvis invoices 07/28/2022 FRMC Settlement - Moran v. FRMC | -110,000.00 | 18 |
| Bill Payment | 8/3/2022 | ACH PMT | Michael J. Sarrao | OVMC - ST Of WV - Dept. of H&HR letter 07/05/22 | -149,743.00 | 17 |
| Bill Payment | 8/3/2022 | ACH PMT | Michael J. Sarrao | OVMC - DHG ▮ 8062 04/21/2022 | -10,000.00 | 16 |
| Bill Payment | 6/9/2022 | ACH PMT | Michael J. Sarrao | OVMC - DHG ▮ 9695 05/06/22 EORH - DHG ▮ 9698 05/06/22 | -20,000.00 | 15 |
| Bill Payment | 6/9/2022 | ACH PMT | Michael J. Sarrao | May 2022 - MJS expense reimbursement | -12,110.31 | 14 |
| Bill Payment | 12/29/2021 | ACH PMT | Michael J. Sarrao | Flaherty Legal - Christensen v. OVMC - Septic shock | -27,472.14 | 21 |
| Bill Payment | 12/17/2021 | ACH PMT | Michael J. Sarrao | Moore & Biser FS, Moore & Biser 1358, Moore & Biser 1388;  Wright, James R v. OVMC | -35,000.00 | 12 |
| Bill Payment | 12/13/2021 | ACH PMT | Michael J. Sarrao | Moore & Biser - Wright, James R v. OVMC | -91,632.34 | 11 |
| Bill Payment | 10/29/2021 | ACH PMT | Michael J. Sarrao | Kieckhafer Schiffer - OVMC Pension Plan - Inv 624348 10/18/21 | -17,110.01 | 22 |
| Bill Payment | 10/20/2021 | ACH PMT | Michael J. Sarrao | | -11,567.50 | 23 |
| Bill Payment | 10/1/2021 | ACH PMT | Michael J. Sarrao | | -55,736.10 | 10 |
| Bill Payment | 7/22/2021 | ACH PMT | Michael J. Sarrao | Flaherty Sensabaugh Inv 220132 04/19 - OVMC Christensen v. OVMC | -26,458.70 | 13 |
| Bill Payment | 7/1/2021 | ACH PMT | Michael J. Sarrao | | -15,500.00 | 9 |
| Bill Payment | 5/11/2021 | ACH PMT | Michael J. Sarrao | | -13,690.76 | 8 |
| Bill Payment | 1/20/2021 | ACH PMT | Michael J. Sarrao | | -24,608.17 | 7 |
| Bill Payment | 1/6/2021 | ACH PMT | Michael J. Sarrao | | -17,156.78 | 6 |
| Bill Payment | 11/24/2020 | ACH PMT | Michael J. Sarrao | | -17,130.45 | 5 |
| Bill Payment | 11/5/2020 | ACH PMT | Michael J. Sarrao | | -17,016.95 | 4 |
| Bill Payment | 4/14/2020 | ACH PMT | Michael J. Sarrao | | -70,790.89 | 3 |
| Bill Payment | 2/7/2020 | ACH PMT | Michael J. Sarrao | | -14,624.29 | 2 |
| Check | 8/30/2019 | 3163 | Michael J. Sarrao | | -22,895.97 | 1 |
| | | | Michael J. Sarrao | | -835,320.49 | |
| | | | | | | |
| Bill Payment | 1/20/2021 | ACH PMT | Lex Reddy | WF Margin call money advanced, now refunded | -77,000.00 | 1 |
| | | | Lex Reddy See [1] | | -77,000.00 | |
| | | | | | | |
| Bill Payment | 3/31/2022 | ACH PMT | Aman Dhuper | 2021 Year Final bill | -12,388.61 | 1 |
| Bill Payment | 1/19/2022 | ACH PMT | Aman Dhuper | 2020-2021 SRH expense | -11,139.77 | 2 |
| Bill Payment | 6/8/2021 | ACH PMT | Aman Dhuper | Dec 20-Feb 2021, Mar 21 - Apr 2021 | -11,532.01 | 3 |
| Bill Payment | 12/1/2020 | ACH PMT | Aman Dhuper | June - Sept 2020 | -14,717.63 | 4 |
| Bill Payment | 8/5/2020 | ACH PMT | Aman Dhuper | Jan - May 2020, OV-EO & FRMC | -20,318.66 | 5 |
| Bill Payment | 6/17/2020 | ACH PMT | Aman Dhuper | March thru May 2020 | -18,332.79 | 6 |
| | | | Aman Dhuper | | -88,429.47 | |
| | | | | | | |
| Bill Payment | 4/13/2020 | WIRE PMT | American Express | | -150,000.00 | 1 |
| Bill Payment | 3/20/2020 | WIRE PMT | American Express | | -60,000.00 | 2 |
| Bill Payment | 2/10/2020 | WIRE | American Express | | -40,000.00 | 3 |
| Bill Payment | 4/24/2020 | WIRE PMT | American Express | | -35,345.68 | 4 |
| Bill Payment | 6/15/2020 | WIRE PMT | American Express | | -25,500.99 | 5 |
| Bill Payment | 5/13/2020 | WIRE PMT | American Express | | -25,000.00 | 6 |
| Check | 11/2/2021 | 3417 | American Express | | -12,763.60 | 8 |
| | | | American Express | | -348,610.27 | |
| | | | | | | |
| Check | 4/14/2020 | 3235 | Roger Krissman | | -27,102.79 | 1 |
| Bill Payment | 12/22/2020 | ACH PMT | Roger Krissman | | -30,000.00 | 2 |
| | | | Roger Krissman | | -57,102.79 | |
| | | | | | | |
| Check | 4/24/2020 | 3240 | Steven Kay Esq | | -10,300.00 | 1 |
| | | | Steven Kay Esq | | -10,300.00 | |
| | | | | Payments Examined: | -1,416,763.02 | 40 |

[1] See Ex. 6.1 for analysis of payments related to the 2018 Promissory Note.

GOULD Consulting Services

**Exhibit 7**
**Bank Account**
**Summary Schedules**

Schedules A.0 – A.3, A.7

**Schedules A.0.1 – A.0.4**
**Alecto Bank Account Summaries**

**Schedule A.0.1 – Account *3784 Disbursement**
**Schedule A.0.2 – Account *3784 (2019 monthly)**
**Schedule A.0.3 – Account *6065 Operating**
**Schedule A.0.4 – Account *6508 Payroll**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis - July 2019 - December 2019**
**Analysis of Transfers under the CNH Revolving Facility**
**Alecto Disbursements Acct *3784**

**I. Deposits: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| **Transaction Type** | **7** | **8** | **9** | **10** | **11** | **12** | |
| BANK FEE | | | | | $280 | | $280 |
| TRANSFER FROM | | $900,000 | $715,600 | $252,000 | $418,000 | $185,000 | $2,470,600 |
| WIRE IN | $23,574,880 | $28,281,600 | $17,472,000 | $16,193,100 | $13,921,500 | $16,653,900 | $116,096,980 |
| **Grand Total** | **$23,574,880** | **$29,181,600** | **$18,187,600** | **$16,445,100** | **$14,339,780** | **$16,838,900** | **$118,567,860** |

**I.A. Transfers received into Acct *3784: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | | Yr | Mo | | | | |
|---|---|---|---|---|---|---|---|
| | | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| **Transaction Type** | **Acct** | **8** | **9** | **10** | **11** | **12** | |
| **TRANSFER FROM** | 3709 | | $9,400 | $6,000 | | | $15,400 |
| **TRANSFER FROM** | 6065 | $900,000 | $704,200 | $246,000 | $416,000 | $185,000 | $2,451,200 |
| **TRANSFER FROM** | 6508 | | $2,000 | | $2,000 | | $4,000 |
| **Grand Total** | | **$900,000** | **$715,600** | **$252,000** | **$418,000** | **$185,000** | **$2,470,600** |

**A0958**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis - July 2019 - December 2019**
**Analysis of Transfers under the CNH Revolving Facility**
**Alecto Disbursements Acct *3784**

**II.  Withdrawals: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| **Transaction Type** | **7** | **8** | **9** | **10** | **11** | **12** | |
| ACH FEE | | | | | -$20 | -$20 | -$40 |
| BANK FEE | | | | | -$140 | | -$140 |
| TRANSFER TO | -$879,930 | -$785,962 | -$424,300 | -$657,122 | -$1,275,024 | -$1,090,000 | -$5,112,338 |
| WIRE FEE | -$1,149 | -$1,242 | -$996 | -$1,038 | -$813 | -$1,047 | -$6,285 |
| WIRE OUT | -$22,758,000 | -$27,151,000 | -$18,957,000 | -$15,839,000 | -$12,769,000 | -$15,740,500 | -$113,214,500 |
| **Grand Total** | **-$23,639,079** | **-$27,938,204** | **-$19,382,296** | **-$16,497,160** | **-$14,044,997** | **-$16,831,567** | **-$118,333,303** |

**II.A.  Withdrawals: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | Mo | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| **Transaction Type** | **Acct** | **7** | **8** | **9** | **10** | **11** | **12** | |
| **TRANSFER TO** | 3709 | | | -$9,000 | -$6,000 | | | -$15,000 |
| **TRANSFER TO** | 6065 | -$556,730 | -$401,000 | -$264,000 | -$491,000 | -$943,857 | -$805,000 | -$3,461,587 |
| **TRANSFER TO** | 6508 | -$322,900 | -$384,315 | -$151,300 | -$160,000 | -$331,000 | -$285,000 | -$1,634,515 |
| **TRANSFER TO** | 7067 | -$200 | | | | | | -$200 |
| **TRANSFER TO** | 7509 | -$100 | -$647 | | -$122 | -$167 | | -$1,036 |
| **Grand Total** | | **-$879,930** | **-$785,962** | **-$424,300** | **-$657,122** | **-$1,275,024** | **-$1,090,000** | **-$5,112,338** |

**A0959**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis - July 8, 2019 - July 31, 2019**
**Analysis of Transfers under the CNH Revolving Facility**
**Alecto Disbursements Acct *3784**

**II.B. 2019 Transfers under the CNH Revolving Facility (beginning 7/8/2019)**

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| | | | 2019 Transfers to Alecto *6065/*6508 after 2019 Plaza MOB Refinance | -$4,947,802 |
|---|---|---|---|---|
| | | | 2019 Wire Transfers to Affiliates after 2019 Plaza MOB Refinance: | -$108,049,500 |
| | | | Total Transfers in 2019 "Plaza MOB Gap Period": | -$113,013,538 |

| Sum of Amount | | | Yr |
|---|---|---|---|
| | | | **2019** |
| **Transaction Type** | **Acct Transfer To / From** | **Date** | **7** |
| TRANSFER TO | 6065 | 7/12/2019 | -$320,000 |
| TRANSFER TO | 6065 | 7/15/2019 | -$56,000 |
| TRANSFER TO | 6065 | 7/16/2019 | -$2,000 |
| TRANSFER TO | 6065 | 7/19/2019 | -$43,100 |
| TRANSFER TO | 6065 | 7/23/2019 | -$5,000 |
| TRANSFER TO | 6065 | 7/25/2019 | -$50,000 |
| TRANSFER TO | 6065 | 7/26/2019 | -$13,630 |
| TRANSFER TO | 6065 | 7/31/2019 | -$6,000 |
| **TRANSFER TO 6065 Total** | | | **-$495,730** |
| TRANSFER TO | 6508 | 7/10/2019 | -$85,000 |
| TRANSFER TO | 6508 | 7/15/2019 | -$16,900 |
| TRANSFER TO | 6508 | 7/18/2019 | -$134,000 |
| **TRANSFER TO 6508 Total** | | | **-$235,900** |
| **TRANSFER TO Total** | | | **-$731,630** |
| WIRE OUT | (blank) | 7/8/2019 | -$1,050,000 |
| WIRE OUT | (blank) | 7/9/2019 | -$100,000 |
| WIRE OUT | (blank) | 7/10/2019 | -$1,985,000 |
| WIRE OUT | (blank) | 7/11/2019 | -$200,000 |
| WIRE OUT | (blank) | 7/12/2019 | -$1,450,000 |
| WIRE OUT | (blank) | 7/15/2019 | -$700,000 |
| WIRE OUT | (blank) | 7/16/2019 | -$928,000 |
| WIRE OUT | (blank) | 7/17/2019 | -$335,000 |
| WIRE OUT | (blank) | 7/18/2019 | -$2,695,000 |
| WIRE OUT | (blank) | 7/19/2019 | -$1,050,000 |
| WIRE OUT | (blank) | 7/22/2019 | -$960,000 |
| WIRE OUT | (blank) | 7/23/2019 | -$510,000 |
| WIRE OUT | (blank) | 7/24/2019 | -$1,585,000 |
| WIRE OUT | (blank) | 7/25/2019 | -$705,000 |
| WIRE OUT | (blank) | 7/26/2019 | -$990,000 |
| WIRE OUT | (blank) | 7/29/2019 | -$750,000 |
| WIRE OUT | (blank) | 7/30/2019 | -$1,105,000 |
| WIRE OUT | (blank) | 7/31/2019 | -$495,000 |
| **WIRE OUT (blank) Total** | | | **-$17,593,000** |
| **WIRE OUT Total** | | | **-$17,593,000** |
| **Grand Total** | | | **-$18,324,630** |

A0960

**Alecto Healthcare Services LLC**
**Bank Statement Analysis: January 2019 - June 2023**
**Alecto Disbursements Acct *3784**

Significant transfers greater than $2.5 million:

| | | | | |
|---|---|---|---|---|
| (1) | 01/19/2021 | $23,506,100 | Account Transfer Cr. FR ACC■■■6065 | Proceeds of the UCLA Asset Sale (OMC/Horizon) |
| (2) | 01/20/2021 | ($7,534,870) | Account Transfer Dr. TO ACC■■■6065 | Internal Payroll Tax payment |
| (3) | 08/06/2020 | ($2,500,000) | Account Transfer Dr. TO ACC■■■6065 | Internal Payroll transfer |

**I. Deposits: STMNT Processed_3784**

| GCS Acct | (Multiple Items) |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK FEE | $280 | | | | | $280 |
| DEPOSIT | | | $16,503 | | | $16,503 |
| (1) TRANSFER FROM | $6,748,300 | $836,518 | $23,506,100 | $8,880,111 | $3,562,594 | $43,533,623 |
| WIRE IN | $275,632,620 | $189,887,831 | $66,919,400 | $34,391,109 | | $566,830,960 |
| **Grand Total** | **$282,381,200** | **$190,724,349** | **$90,442,003** | **$43,271,219** | **$3,562,594** | **$610,381,366** |

Wire transfers into account from CNH Revolving Facility greater than $5 million:

| | | | | |
|---|---|---|---|---|
| 04/16/2020 | Incoming Wire-Dom | $13,474,200 various --> | (a) | $13,469,200 AHS |
| 06/15/2020 | Incoming Wire-Dom | $13,500,000 various --> | (b) | $9,536,600 AHS |
| 06/25/2020 | Incoming Wire-Dom | $11,579,251 OMC | | |
| 07/21/2020 | Incoming Wire-Dom | $6,504,300 AHS | (c) | |

**I.A. Transfers received into Acct *3784: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER FROM | 3709 | | $55,400 | | | | | $55,400 |
| (1) TRANSFER FROM | 6065 | 2018 LOAN | $740,000 | $170,000 | | | | $910,000 |
| TRANSFER FROM | 6065 | | $5,948,900 | $643,018 | $23,506,100 | $8,880,079 | $3,562,572 | $42,540,669 |
| TRANSFER FROM | 6508 | | $4,000 | $19,100 | | | | $23,100 |
| TRANSFER FROM | 7067 | | | $4,400 | | | | $4,400 |
| TRANSFER FROM | 7509 | | | | | $32 | $22 | $54 |
| **Grand Total** | | | **$6,748,300** | **$836,518** | **$23,506,100** | **$8,880,111** | **$3,562,594** | **$43,533,623** |

Note:

(a) Advance by Alecto to increase bank balance from $670,000 to an average of $14 million through mid-June 2020 during COVID crisis.

(b) Advance by Alecto to increase bank balance to approximately $20 million through end of 2020 during COVID crisis.

(c) Balance dropped to $15 million, advance increased average balance to $20 million.

**Alecto Healthcare Services LLC**
Bank Statement Analysis: January 2019 - June 2023
Alecto Disbursements Acct *3784

**II. Withdrawals: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH BATCH OFFSET W/O | | | | -$1,521,467 | | -$1,521,467 |
| ACH FEE | -$40 | | | | | -$40 |
| BANK FEE | -$140 | -$948 | -$1,967 | -$1,374 | -$218 | -$4,647 |
| (2)(3) TRANSFER TO | -$10,144,602 | -$14,733,853 | -$15,391,187 | -$5,371,400 | -$20 | -$45,641,061 |
| WIRE FEE | -$13,512 | -$5,121 | -$780 | -$1,035 | | -$20,448 |
| (d) WIRE OUT | -$272,006,065 | -$103,624,663 | -$4,000 | | | -$375,634,728 |
| (d) WIRE OUT BSUITE | | -$59,358,000 | -$77,730,700 | -$47,002,027 | -$3,562,622 | -$187,653,111 |
| Grand Total | -$282,164,359 | -$177,722,585 | -$93,128,634 | -$53,897,303 | -$3,562,622 | -$610,475,501 |

Wire transfers out of account to Affiliates greater than $5 million:

| | 06/25/2020 | Tnet Wire Out- | ($11,579,251) OMC |
|---|---|---|---|

Wire transfers related to the 2019 Olympia Loan:

| | 09/26/2019 | Account Transfer Cr. FR ACC ████ 6065 | $500,000 |
|---|---|---|---|
| | 09/26/2019 | Tnet Wire Out- *(Incl. in $935,000 transfer w/ $435,000 Advance funding)* | ($500,000) |

**II.A. Transfers out of Account: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER TO** | 3709 | | -$71,000 | -$25,759 | | | | -$96,759 |
| (2) **TRANSFER TO** | 6065 | 2018 LOAN - $792K COVER | | | -$1,000,000 | | | -$1,000,000 |
| (3) **TRANSFER TO** | 6065 | 2018 LOAN - CALL | | -$336,132 | | | | -$336,132 |
| **TRANSFER TO** | 6065 | | -$7,034,292 | -$13,527,589 | -$13,981,187 | -$4,803,800 | -$20 | -$39,346,887 |
| **TRANSFER TO** | 6508 | | -$3,036,824 | -$839,131 | -$410,000 | -$567,600 | | -$4,853,556 |
| **TRANSFER TO** | 7067 | | -$900 | -$5,016 | | | | -$5,916 |
| **TRANSFER TO** | 7509 | | -$1,586 | -$225 | | | | -$1,811 |
| **Grand Total** | | | -$10,144,602 | -$14,733,853 | -$15,391,187 | -$5,371,400 | -$20 | -$45,641,061 |

Note:
(d) Change in transaction description on bank statement, confirmed to be transfers to Affiliates. See Sections I.B. and I.C.

**A0962**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis: January 2019 - June 2023**
Alecto Disbursements Acct *3784

**I.B. Monthly Advances from CNH Revolving Facility: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Transaction Type | WIRE IN |
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | |
|---|---|---|---|---|---|
| Mo | | 2019 | 2020 | 2021 | 2022 Grand Total |
| 1 | | $27,836,000 | $13,987,400 | $10,026,500 | $4,053,000 $55,902,900 |
| 2 | | $24,871,000 | $10,993,900 | $7,383,900 | $3,804,800 $47,053,600 |
| 3 | | $28,287,000 | $14,249,880 | $11,130,900 | $3,525,600 $57,193,380 |
| 4 | | $28,965,640 | $30,711,100 | $3,254,900 | $4,478,600 $67,410,240 |
| 5 | | $26,625,000 | $10,507,400 | $4,003,600 | $3,465,500 $44,601,500 |
| 6 | | $22,951,000 | $33,095,551 | $5,091,400 | $4,754,200 $65,892,151 |
| 7 | | $23,574,880 | $18,016,600 | $4,086,800 | $3,542,900 $49,221,180 |
| 8 | | $28,281,600 | $13,168,000 | $3,867,300 | $5,107,642 $50,424,542 |
| 9 | | $17,472,000 | $8,452,300 | $5,283,500 | $1,653,063 $32,860,863 |
| 10 | | $16,193,100 | $11,583,800 | $3,801,500 | $2,745 $31,581,145 |
| 11 | | $13,921,500 | $14,482,500 | $5,248,800 | $3,059 $33,655,859 |
| 12 | | $16,653,900 | $10,639,400 | $3,740,300 | $31,033,600 |
| **Grand Total** | | **$275,632,620** | **$189,887,831** | **$66,919,400** | **$34,391,109 $566,830,960** |

**I.C. Monthly Wire Transfers to Affiliates: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Transaction Type | (Multiple Items) |
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Mo | | 2019 | 2020 | 2021 | 2022 | 2023 Grand Total |
| 1 | | -$29,157,500 | -$13,889,262 | -$10,330,500 | -$8,305,374 | -$1,611,734 -$63,294,370 |
| 2 | | -$23,201,000 | -$9,929,700 | -$9,655,000 | -$6,367,000 | -$485,650 -$49,638,350 |
| 3 | | -$29,454,427 | -$11,752,100 | -$9,925,000 | -$4,100,000 | -$1,100,000 -$56,331,527 |
| 4 | | -$28,374,637 | -$16,583,000 | -$4,622,000 | -$5,853,000 | -$290,000 -$55,722,637 |
| 5 | | -$26,511,000 | -$10,393,200 | -$4,092,000 | -$3,465,000 | -$75,000 -$44,536,200 |
| 6 | | -$22,093,000 | -$26,022,901 | -$4,549,900 | -$4,851,500 | -$57,517,301 |
| 7 | | -$22,758,000 | -$15,054,500 | -$3,758,500 | -$4,740,600 | -$46,311,600 |
| 8 | | -$27,151,000 | -$12,150,000 | -$7,179,700 | -$4,683,150 | -$51,163,850 |
| 9 | | -$18,957,000 | -$8,295,000 | -$5,529,100 | -$2,233,903 | -$35,015,003 |
| 10 | | -$15,839,000 | -$10,275,000 | -$6,397,000 | -$794,500 | -$33,305,500 |
| 11 | | -$12,769,000 | -$11,352,000 | -$6,134,000 | -$433,000 | -$30,688,000 |
| 12 | | -$15,740,500 | -$17,286,000 | -$5,562,000 | -$1,175,000 | -$39,763,500 |
| **Grand Total** | | **-$272,006,065** | **-$162,982,663** | **-$77,734,700** | **-$47,002,027** | **-$3,562,384 -$563,287,839** |

**A0963**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct *6065**

Significant transfers greater than $2.5 million:

| | | | | |
|---|---|---|---|---|
| (1) | 6/20/2019 | $8,444,478 | Incoming Wire-Dom | Contribution from Alecto Members (Plaza MOB Refinancing) |
| (2) | 6/20/2019 | ($8,444,478) | Tnet Wire Out-Dom | 2019 Olympia HC Loan |
| (3) | 1/4/2021 | $23,506,100 | Incoming Wire-Dom | UCLA Asset Sale Proceeds (OMC/Horizon) |
| (4) | 1/19/2021 | ($23,506,100) | Account Transfer Dr. TO ACC ███ 3784 | to Alecto Disbursements Account |
| (5) | 1/20/2021 | $7,534,870 | Account Transfer Cr. FR ACC ███ 3784 | from Alecto Disbursements Account |
| (6) | 1/20/2021 | ($7,534,870) | Bsuite Wire Out-Dom | Payroll Tax payment through Holtz Slavett & Drabkin |

**I. Deposits: STMNT Processed_6065**

| GCS Acct | 6065 |
|---|---|
| Credit | (Multiple Items) |
| Description | (All) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK FEE | | | $5 | | | $5 |
| CREDIT MEMO | $80,000 | $74 | | $2,522 | | $82,596 |
| DEPOSIT | $2,422,568 | $277,004 | $2,550,116 | $1,038,848 | $3,319,299 | $9,607,835 |
| FILE INPUT CREDIT | | | | $140 | | $140 |
| INTERCO TRNX IN | $38,963 | $55,624 | | | | $94,587 |
| ST. ROSE INTERCO ALLOC | $293,890 | $505,058 | $124,508 | $244,558 | $251,799 | $1,419,813 |
| TRANSFER FROM | $7,707,634 | $13,868,721 | $14,611,189 | $5,874,228 | $1,617,905 | $43,679,677 |
| (1) (3) WIRE IN | $16,546,448 | $1,986,251 | $24,041,002 | $10,766,656 | $4,502,048 | $57,842,405 |
| **Grand Total** | **$27,089,503** | **$16,692,732** | **$41,326,820** | **$17,926,951** | **$9,691,052** | **$112,727,057** |

Wire transfers into account greater than $5 million:

| | | | | |
|---|---|---|---|---|
| (1) | 06/20/2019 | $8,444,478 | Incoming Wire-Dom | Contribution from Alecto Members (Plaza MOB Refinancing) |
| (3) | 01/04/2021 | $23,506,100 | Incoming Wire-Dom | UCLA Asset Sale Proceeds (OMC/Horizon) |

Transfers into/out of account related to the Plaza MOB Refinancing and 2019 Olympia HC Loan

| | | | | |
|---|---|---|---|---|
| (1) | 06/20/2019 | $8,444,478 | Incoming Wire-Dom | Contribution from Alecto Members (Plaza MOB Refinancing) |
| (2) | 06/20/2019 | ($8,444,478) | Tnet Wire Out-Dom | 2019 Olympia HC Loan |
| | 07/31/2019 | $620,576 | Incoming Wire-Dom | Additional distributions from Plaza MOB Refinancing |
| | 07/31/2019 | ($620,576) | Tnet Wire Out-Dom | Transfer to OMC |
| | 09/26/2019 | ($500,000) | Account Transfer Dr. TO ACC ███ 3784 | To Alecto *3784 then to OMC for 2019 Olympia Loan |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct *6065**

    **I.A.  Transfers received into Acct *6065: STMNT Processed_6065**

| GCS Acct | 6065 |
|---|---|
| Credit | (Multiple Items) |
| Description | (All) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER FROM | 3709 | | $6,000 | | | $6 | | $6,006 |
| TRANSFER FROM | 3762 | | | | $30 | | | $30 |
| (5) TRANSFER FROM | 3784 | 2018 LOAN - $792K COVER | | | $1,000,000 | | | $1,000,000 |
| TRANSFER FROM | 3784 | 2018 LOAN - CALL | | $336,132 | | | | $336,132 |
| TRANSFER FROM | 3784 | | $7,034,292 | $13,527,589 | $13,601,137 | $4,803,800 | $20 | $38,966,837 |
| TRANSFER FROM | 6508 | | | $5,000 | $10,000 | $26,000 | $19,092 | $60,092 |
| TRANSFER FROM | 7509 | | $667,343 | | $22 | $1,044,422 | $1,598,793 | $3,310,580 |
| Grand Total | | | $7,707,634 | $13,868,721 | $14,611,189 | $5,874,228 | $1,617,905 | $43,679,677 |

<u>Direct transfers out of account greater than $5 million:</u>

(5)    01/20/2021   $7,534,870  Account Transfer Cr. FR ACC ▮▮▮▮ 3784    from Alecto Disbursements Account

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct *6065**

**II. Withdrawals: STMNT Processed_6065**

| GCS Acct | 6065 |
|---|---|
| Debit | (Multiple Items) |
| Description | (All) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH | -$52,230 | -$21,771 | | | | -$74,001 |
| ACH FEE | -$1,347 | -$2,841 | -$3,222 | -$2,820 | -$1,604 | -$11,835 |
| BANK FEE | -$1,828 | -$1,491 | -$1,281 | -$1,208 | -$510 | -$6,318 |
| CC PYMNT | | | -$5,000 | | | -$5,000 |
| CHECK | -$4,069,955 | -$551,473 | -$534,767 | -$189,708 | -$121,980 | -$5,467,883 |
| CNB CC PYMNT 71026418 | | -$22,085 | -$118,819 | -$11,562 | -$3,520 | -$155,986 |
| DEBIT MEMO | | | -$62,250 | | | -$62,250 |
| DEPOSIT RETURN ITEM FEE | | -$12 | -$36 | | | -$48 |
| FRANCH TAX | | | -$32,606 | -$38,185 | -$8,100 | -$78,891 |
| IRS TAX OLYMPIA PLAZA MGT | -$2,000 | -$2,000 | | -$36,777 | | -$40,777 |
| RETURN ITEM | | | -$90 | | | -$5,090 |
| (4) TRANSFER TO | -$7,280,932 | -$5,426,964 | -$28,942,782 | -$13,828,305 | -$7,453,246 | -$62,932,229 |
| WIRE FEE | | -$834 | -$780 | -$105 | -$315 | -$225 | -$2,259 |
| (2) WIRE OUT | -$15,695,254 | -$5,732,322 | | | | -$21,427,576 |
| (6) WIRE OUT BSUITE | | -$4,669,805 | -$12,047,312 | -$4,445,895 | -$2,130,382 | -$23,293,394 |
| WITHDRAWAL | | -$245,441 | -$516 | -$146,299 | -$482 | -$392,737 |
| **Grand Total** | **-$27,104,381** | **-$16,681,985** | **-$41,748,786** | **-$18,701,073** | **-$9,720,048** | **-$113,956,274** |

Wire transfers out of account greater than $5 million:

| | | | | |
|---|---|---|---|---|
| (2) | 06/20/2019 | ($8,444,478) | Tnet Wire Out-Dom | |
| (6) | 01/20/2021 | ($7,534,858) | Bsuite Wire Out-Dom | Holtz Slavett & Drabkin |

**A0966**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct *6065**

**II.A.  Transfers out of Acct *6065: STMNT Processed_6065**

| GCS Acct | 6065 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER TO | 3709 | | -$29,466 | -$34,672 | -$40,654 | -$488 | | -$105,280 |
| TRANSFER TO | 3762 | | | | -$60 | | | -$60 |
| (4) TRANSFER TO | 3784 | | -$5,948,900 | -$643,018 | -$23,506,100 | -$8,880,079 | -$3,562,572 | -$42,540,669 |
| TRANSFER TO | 3784 | 2018 LOAN | -$740,000 | -$170,000 | | | | -$910,000 |
| TRANSFER TO | 6508 | | -$559,839 | -$4,577,166 | -$5,393,986 | -$4,946,290 | -$3,850,869 | -$19,328,151 |
| TRANSFER TO | 7067 | | -$1,500 | -$329 | -$196 | -$242 | -$66 | -$2,333 |
| TRANSFER TO | 7423 | | | | -$22 | | | -$22 |
| TRANSFER TO | 7509 | | -$1,227 | -$1,779 | -$1,764 | -$1,206 | -$39,738 | -$45,714 |
| Grand Total | | | -$7,280,932 | -$5,426,964 | -$28,942,782 | -$13,828,305 | -$7,453,246 | -$62,932,229 |

Direct transfers out of account greater than $5 million:

(4)          01/19/2021   ($23,506,100)  Account Transfer Dr. TO ACC ▮▮▮▮ 3784   UCLA Asset Sale (OMC/Horizon)

**Alecto Healthcare Services LLC**
Bank Statement Analysis
Alecto Payroll Acct *6508

**I. Deposits: STMNT Processed_6508**

| GCS Acct | 6508 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| RETURN ITEM | | $51,882 | $4,711 | | | $56,593 |
| TRANSFER FROM | $3,596,663 | $5,416,297 | $5,567,986 | $5,513,890 | $3,876,712 | $23,971,549 |
| **Grand Total** | **$3,596,663** | **$5,468,179** | **$5,572,697** | **$5,513,890** | **$3,876,712** | **$24,028,141** |

**I.A. Transfers received into Acct *6508: STMNT Processed_6508**

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER FROM** | 3784 | $3,036,824 | $839,131 | $310,000 | $567,600 | | $4,753,556 |
| **TRANSFER FROM** | 6065 | $559,839 | $4,577,166 | $5,257,986 | $4,946,290 | $3,850,869 | $19,192,151 |
| **TRANSFER FROM** | 7509 | | | | | $25,842 | $25,842 |
| **Grand Total** | | **$3,596,663** | **$5,416,297** | **$5,567,986** | **$5,513,890** | **$3,876,712** | **$23,971,549** |

**II. Withdrawals: STMNT Processed_6508**

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| (1) | 2018 LOAN | -$30,000 | | | | | -$30,000 |
| | 2018 LOAN INT | | | -$96,947 | -$12,118 | | -$109,066 |
| | ACH | -$186,209 | -$2,563,734 | -$2,695,342 | -$2,883,803 | -$2,755,429 | -$11,084,516 |
| | ACH FEE | -$40 | -$24 | -$12 | | | -$76 |
| | BANK FEE | | -$185 | | | | -$185 |
| | IRS TAX ALECTO | | -$7,950 | | | | -$7,950 |
| | P/R RETIREMNT PLN | -$146,700 | -$125,790 | -$84,325 | | | -$356,815 |
| | P/R TAX | -$886,745 | -$949,386 | -$896,928 | -$928,859 | -$367,123 | -$4,029,041 |
| | PAYROLL | -$2,089,147 | -$1,689,129 | -$1,499,701 | -$1,505,846 | -$637,489 | -$7,421,311 |
| | TAX CAL | -$249,973 | -$80,534 | | | | -$330,507 |
| | TRANSFER TO | -$4,000 | -$25,700 | -$10,000 | -$26,000 | -$19,092 | -$84,792 |
| | WITHDRAWAL | | -$10,364 | -$52,759 | -$157,987 | -$92,003 | -$313,113 |
| | **Grand Total** | **-$3,592,814** | **-$5,452,797** | **-$5,336,013** | **-$5,514,613** | **-$3,871,135** | **-$23,767,372** |

(1) 2019: $30,000 loan payment on 2018 Promissory Note to The Reddy Investment Trust
2021-2022: Nine (9) nterest payments of $12,118.

**II.A. Transfers out of Acct *6508: STMNT Processed_6508**

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER TO** | 3709 | | -$1,600 | | | | -$1,600 |
| **TRANSFER TO** | 3784 | -$4,000 | -$19,100 | | | | -$23,100 |
| **TRANSFER TO** | 6065 | | -$5,000 | -$10,000 | -$26,000 | -$19,092 | -$60,092 |
| **Grand Total** | | **-$4,000** | **-$25,700** | **-$10,000** | **-$26,000** | **-$19,092** | **-$84,792** |

# Schedule A.1
# Alecto Hayward Bank Account Summary

## Schedule A.1 – Account *7509

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Hayward Acct *7509**

**I. Deposits: STMNT Processed_7509**

| GCS Acct | 7509 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK FEE | | $25 | | $30 | | $55 |
| ST. ROSE MGMT FEE | $3,213,798 | $3,980,667 | $3,005,273 | $3,540,401 | $1,602,494 | $15,342,633 |
| TRANSFER FROM | $2,813 | $2,004 | $1,764 | $1,206 | $39,738 | $47,525 |
| WIRE IN | $719,737 | $222,937 | | | $450,743 | $1,393,417 |
| Grand Total | $3,936,348 | $4,205,633 | $3,007,037 | $3,541,637 | $2,092,975 | $16,783,631 |

**II. Withdrawals: STMNT Processed_7509**

| GCS Acct | 7509 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH FEE | -$40 | | | | | -$40 |
| BANK FEE | -$1,795 | -$1,751 | -$1,698 | -$1,188 | -$128 | -$6,560 |
| CHECK | | | | | -$47,280 | -$47,280 |
| TRANSFER TO | -$667,343 | | -$22 | -$1,044,476 | -$1,624,702 | -$3,336,542 |
| WIRE FEE | -$30 | -$15 | | | -$30 | -$75 |
| WIRE OUT | | | | -$411,426 | | -$411,426 |
| WIRE OUT REPET | -$3,267,640 | -$4,203,767 | -$3,005,273 | -$2,495,892 | | -$12,972,572 |
| WITHDRAWAL | | | | | -$9,198 | -$9,198 |
| Grand Total | -$3,936,848 | -$4,205,533 | -$3,006,993 | -$3,541,556 | -$2,092,765 | -$16,783,695 |

Note: No single wire transfer transaction greater than $600,000.

**II.A. Transfers out of account: STMNT Processed_7509**

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER TO** | 3784 | | | -$32 | -$22 | -$54 |
| **TRANSFER TO** | 6065 | -$667,343 | -$22 | -$1,044,422 | -$1,598,793 | -$3,310,580 |
| **TRANSFER TO** | 6508 | | | | -$25,842 | -$25,842 |
| **TRANSFER TO** | 7067 | | | -$22 | -$44 | -$66 |
| Grand Total | | -$667,343 | -$22 | -$1,044,476 | -$1,624,702 | -$3,336,542 |

Note: No single direct transfer transaction greater than $600,000.

# Schedules A.2.1.1 – A.2.1.5
## Sherman/Grayson Hospital Bank Account Summaries

**Schedule A.2.1.1 – Account *5772**
**Schedule A.2.1.2 – Account *8191**
**Schedule A.2.1.3 – Account *8205**
**Schedule A.2.1.4 – Account *9152**
**Schedule A.2.1.5 – Account *1646**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I.  Deposits: STMNT Processed_5772**

| GCS Acct | 5572 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK ADJ | | | $749 | | | $749 |
| CLAIM DEPOSIT | $1,186,627 | $1,031,913 | $924,280 | $1,727,503 | $532,802 | $5,403,124 |
| COLLECTIONS | $324,119 | $172,525 | $138,342 | | | $634,987 |
| DEPOSIT | $1,203,904 | $731,567 | $527,696 | $4,886,880 | $1,315,625 | $8,665,673 |
| GOVT INS DEPOSIT | $4,841,555 | $2,595,173 | $2,507,420 | $1,559,408 | $878,378 | $12,381,933 |
| LOCKBOX IN | $8,116,149 | $7,846,703 | $6,086,137 | $3,117,211 | $866,286 | $26,032,487 |
| PMT WILSON | $1,050,104 | $11,292,351 | $1,868,226 | $1,006,313 | $433,659 | $15,650,654 |
| SQUARE DEP | $34 | | | | | $34 |
| (1) TRANSFER IN | | | | $5,353,551 | | $5,353,551 |
| UMR | $11,834 | $18,037 | | | | $29,871 |
| WIRE IN | | | | | $450,213 | $450,213 |
| **Grand Total** | **$16,734,327** | **$23,689,018** | **$12,052,102** | **$17,650,866** | **$4,476,963** | **$74,603,275** |

(1)        08/05/2022 ACCOUNT TRANSFER TRSF FROM █████9152        5,353,551   Acct *9152

**I.A.  Wire transfers into account: STMNT Processed_5772**

| GCS Acct | 5572 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Name | 2023 | Grand Total |
| **WIRE IN** | SHERMAN ANESTHE | $7,081 | $7,081 |
| **WIRE IN** | SHERMAN GRAYSON | $412,390 | $412,390 |
| **WIRE IN** | SHERMAN MD PROV | $30,742 | $30,742 |
| **Grand Total** | | **$450,213** | **$450,213** |

**A0972**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**II. Withdrawals: STMNT Processed_5772**

| GCS Acct | 5572 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | -$110 | -$36 | -$2,753 | -$3,576 | -$94 | -$6,570 |
| BANK FEE | -$113,294 | -$106,350 | -$103,367 | -$102,101 | -$40,236 | -$465,348 |
| CHRGBK | -$36,569 | -$18,408 | -$22,083 | -$2,269 | | -$79,329 |
| DEBIT | | -$58 | | | | -$58 |
| PAYMENT | | | | | -$33,141 | -$33,141 |
| TRANSFER OUT | | | | -$3,335,700 | -$4,368,727 | -$7,704,427 |
| WIRE OUT | -$17,055,076 | -$23,544,420 | -$11,954,161 | -$14,219,653 | | -$66,773,310 |
| **Grand Total** | **-$17,205,049** | **-$23,669,272** | **-$12,082,363** | **-$17,663,299** | **-$4,442,198** | **-$75,062,182** |

**II.A. Transfers out of account: STMNT Processed_5772**

| GCS Acct | 5572 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER OUT | 1646 | | | | | -$770,136 | -$2,081,398 | -$2,851,533 |
| TRANSFER OUT | 7324 | | | | | | -$32,600 | -$32,600 |
| TRANSFER OUT | 7329 | | | | | | -$32,000 | -$32,000 |
| TRANSFER OUT | 7343 | | | | | -$30,000 | -$209,040 | -$239,040 |
| TRANSFER OUT | 9152 | | | | | -$2,535,564 | -$2,013,690 | -$4,549,254 |
| WIRE OUT | | ALECTO | -$5,574,197 | -$23,544,420 | -$11,954,161 | -$14,219,653 | | -$55,292,431 |
| WIRE OUT | | WHITE OAK | -$11,480,878 | | | | | -$11,480,878 |
| **Grand Total** | | | **-$17,055,076** | **-$23,544,420** | **-$11,954,161** | **-$17,555,353** | **-$4,368,727** | **-$74,477,737** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I.  Deposits: STMNT Processed_8191**

| GCS Acct | 8191 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH CREDIT | $679 | | | | | $679 |
| (1) TRANSFER IN | | | | | $68,000 | $68,000 |
| HC CLAIM CR | $20,371,879 | $27,551,834 | $11,409,893 | $7,309,797 | $2,566,333 | $69,209,736 |
| **Grand Total** | **$20,372,559** | **$27,551,834** | **$11,409,893** | **$7,309,797** | **$2,634,333** | **$69,278,415** |

| (1) | 02/27/2023 | Book transfer credit FROM ...8205 | | 68,000.00 | |
|---|---|---|---|---|---|

**II.  Withdrawals: STMNT Processed_8191**

| GCS Acct | 8191 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| Acct *8205 TRANSFER OUT | -$20,372,559 | -$27,551,834 | -$11,409,893 | -$6,159,797 | -$2,023,538 | -$67,517,621 |
| WIRE OUT | | | | | -$25,635 | -$25,635 |
| WIRE TRFR WDRWL | | | | -$1,150,000 | -$585,159 | -$1,735,159 |
| **Grand Total** | **-$20,372,559** | **-$27,551,834** | **-$11,409,893** | **-$7,309,797** | **-$2,634,333** | **-$69,278,415** |

**A0974**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I. Deposits: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| Acct* 8191 | ACH CREDIT | $24,611,984 | $20,557,577 | $19,757,600 | $21,343,331 | $8,878,194 | $95,148,686 |
| | DEPOSIT | $12,087 | $6,374 | $18,185 | $371 | | $37,017 |
| | FUNDING | $18,702,627 | $27,551,834 | $11,409,893 | $6,159,797 | $1,448,083 | $65,272,234 |
| | LOCKBOX IN | $201,963 | $175,218 | $176,337 | $8,162 | $1,936 | $563,616 |
| | TRANSFER IN | | | | | $921,994 | $921,994 |
| | **Grand Total** | **$43,528,662** | **$48,291,003** | **$31,362,015** | **$27,511,660** | **$11,250,207** | **$161,943,548** |

**I.A. Transfers received into account: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Acct | 2023 | Grand Total |
| **TRANSFER IN** | 8191 | $575,455 | $575,455 |
| **TRANSFER IN** | 8248 | $128,786 | $128,786 |
| **TRANSFER IN** | 8264 | $113,676 | $113,676 |
| **TRANSFER IN** | 9202 | $78,865 | $78,865 |
| **TRANSFER IN** | 9210 | $25,211 | $25,211 |
| **TRANSFER IN Total** | | **$921,994** | **$921,994** |
| **Grand Total** | | **$921,994** | **$921,994** |

**A0975**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**II.  Withdrawals: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | | -$74 | | | | -$74 |
| BANK FEE | -$54,601 | -$60,616 | -$58,968 | -$56,576 | -$25,597 | -$256,358 |
| CHRGBK | -$1,319 | -$10 | -$50 | -$25 | | -$1,404 |
| PMT WILSON | | | | -$1,908 | | -$1,908 |
| TRANSFER CNH | -$18,375,921 | -$48,410,802 | -$31,312,380 | -$20,509,455 | | -$118,608,557 |
| TRANSFER OUT | -$24,996,412 | | | | -$68,000 | -$25,064,412 |
| WIRE TRFR WDRWL | | | | -$6,915,852 | -$11,047,394 | -$17,963,246 |
| Grand Total | -$43,428,254 | -$48,471,502 | -$31,371,397 | -$27,483,816 | -$11,140,991 | -$161,895,960 |

**II.A.  Transfers out of account: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Name | Acct | 2019 | 2022 | 2023 | Grand Total |
| TRANSFER OUT | ALECTO HEALTHCA | | -$24,996,412 | | | -$24,996,412 |
| TRANSFER OUT | | 8191 | | | -$68,000 | -$68,000 |
| WIRE TRFR WDRW | (blank) | | | -$6,915,852 | -$11,047,394 | -$17,963,246 |
| Grand Total | | | -$24,996,412 | -$6,915,852 | -$11,115,394 | -$43,027,659 |

A0976

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I. Deposits: STMNT Processed_9152**

| GCS Acct | 9152 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| CLAIM DEPOSIT | | $14,234 | | | | $14,234 |
| CREDIT MEMO | | | $500 | | | $500 |
| DEPOSIT | $1,665,630 | $1,638,073 | $1,822,459 | $6,931,887 | $516,686 | $12,574,735 |
| GOVT INS DEPOSIT | | | | $97,313 | $51,359 | $148,672 |
| INS DEPOSIT | | | $953 | $1,739 | | $2,692 |
| LEASOR DEPOSIT | | | | | $453,803 | $453,803 |
| LOAN DEPOSIT | | | $5,953,722 | | | $5,953,722 |
| LOCKBOX IN | | | | | $1,530 | $1,530 |
| PMT WILSON | $69,727 | $4,750 | $6,913 | $6,006 | $2,528 | $89,924 |
| RETURNED CK | $1,348,341 | $266,704 | | | | $1,615,045 |
| SQUARE DEP | $70,472 | $48,977 | $52,607 | $73,065 | $40,529 | $285,651 |
| TRANSFER IN | $268,625 | $375,916 | $427,983 | $2,550,564 | $2,284,165 | $5,907,253 |
| UMR | $2,646 | $23,621 | $452 | | | $26,719 |
| WIRE IN | $73,180,791 | $60,354,957 | $56,566,678 | $51,744,011 | $9,622,949 | $251,469,387 |
| **Grand Total** | **$76,606,232** | **$62,727,231** | **$64,832,268** | **$61,404,585** | **$12,973,550** | **$278,543,867** |

**I.A. Transfers received into account: STMNT Processed_9152**

| GCS Acct | 9152 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER IN | 1646 | $2,000 | $375,916 | $427,983 | | | $805,898 |
| TRANSFER IN | 5572 | | | | $2,535,564 | $1,943,690 | $4,479,254 |
| TRANSFER IN | 7324 | | | | $15,000 | $340,475 | $355,475 |
| TRANSFER IN | 7329 | $89,300 | | | | | $89,300 |
| TRANSFER IN | 7343 | $177,325 | | | | | $177,325 |
| **TRANSFER IN Total** | | **$268,625** | **$375,916** | **$427,983** | **$2,550,564** | **$2,284,165** | **$5,907,253** |
| **Grand Total** | | **$268,625** | **$375,916** | **$427,983** | **$2,550,564** | **$2,284,165** | **$5,907,253** |

**A0977**

# Alecto Healthcare Services LLC
**Bank Statement Analysis**
**Sherman/Grayson Hospital**
(1) "Summarized Debit", no detail

## II. Withdrawals: STMNT Processed_9152

| GCS Acct | 9152 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | -$1 | -$713 | -$19,673 | -$63 | | -$20,449 |
| CHECK | -$385,989 | -$714,468 | -$372,475 | -$283,182 | -$126,888 | -$1,883,002 |
| CHRGBK | -$1,566 | | -$9,036 | | | -$10,602 |
| (1) DEBIT | -$25,476,656 | -$17,437,042 | -$27,045,184 | -$24,485,397 | -$6,560,080 | -$101,004,359 |
| INS PMT | | | -$5,826 | -$28,952 | -$43,910 | -$78,689 |
| PAYMENT | -$25,348 | -$63,963 | -$102,603 | -$48,603 | -$330,438 | -$570,956 |
| PMT WILSON | -$29,580 | -$29,906 | -$22,814 | -$43,165 | -$28,209 | -$153,674 |
| SQUARE DEBIT | $0 | | | | | $0 |
| TAX | -$145,454 | -$116,520 | -$183,000 | -$151 | | -$445,125 |
| TRANSFER OUT | -$33,787,044 | -$23,528,297 | -$22,420,755 | -$24,498,384 | -$2,964,544 | -$107,199,023 |
| UMR | -$5,839,804 | -$1,930,128 | -$500 | | | -$7,770,432 |
| WIRE OUT | -$11,558,808 | -$18,121,158 | -$14,508,799 | -$12,218,516 | -$3,674,334 | -$60,081,616 |
| WIRE OUT - INTL | | | -$6,000 | | | -$6,000 |
| **Grand Total** | **-$77,250,250** | **-$61,951,231** | **-$64,687,629** | **-$61,606,413** | **-$13,728,404** | **$(279,223,926)** |

## II.A. Transfers out of account: STMNT Processed_9152

| GCS Acct | 9152 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER OUT** | 1646 | -$26,695,910 | -$19,781,252 | -$21,168,391 | -$18,062,753 | -$2,839,444 | -$88,547,750 |
| **TRANSFER OUT** | 5572 | | | | -$5,353,551 | | -$5,353,551 |
| **TRANSFER OUT** | 7329 | -$2,192,167 | -$561,323 | -$159,595 | -$109,000 | -$21,100 | -$3,043,184 |
| **TRANSFER OUT** | 7343 | -$4,898,968 | -$3,185,721 | -$1,092,769 | -$973,080 | -$104,000 | -$10,254,537 |
| **Grand Total** | | **-$33,787,044** | **-$23,528,297** | **-$22,420,755** | **-$24,498,384** | **-$2,964,544** | **-$107,199,023** |

**A0978**

**II.B. Wire Transfers out of account: STMNT Processed_9152**

| GCS Acct | 9152 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Ty | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | MANAGEMENT HEALTH SYSTEM | | | | -$314,206 | -$150,653 | -$464,859 |
| WIRE OUT | ABBOTT LABS | -$600,848 | -$239,833 | -$984,889 | | -$39,011 | -$1,864,581 |
| WIRE OUT | AIRGAS USA, LLC | | -$11,094 | | | | -$11,094 |
| WIRE OUT | ALECTO | -$1,328,000 | | | | -$154,000 | -$1,482,000 |
| WIRE OUT | ALTERA HIGHLAND LLC | | -$576,930 | | | | -$576,930 |
| WIRE OUT | AMERICAN BARCOD | | | -$2,236 | | | -$2,236 |
| WIRE OUT | APEX PROSPERITY BANK | -$2,154,026 | -$1,619,075 | -$640,239 | -$651,865 | -$404,389 | -$5,469,594 |
| WIRE OUT | APPLIED MEDICAL | | | -$2,057 | | | -$2,057 |
| WIRE OUT | ARTHREX INC | | | -$576 | | | -$576 |
| WIRE OUT | ARTHREX INC | | | -$874 | | | -$874 |
| WIRE OUT | BECKMAN COULTER | -$47,999 | -$153,796 | -$9,341 | | | -$211,136 |
| WIRE OUT | BHG HEALTH, LLC | | -$40,000 | | | -$4,000 | -$44,000 |
| WIRE OUT | BRACCO DIAGNOST | | | | | -$2,159 | -$2,159 |
| WIRE OUT | BREEZY HR | | | | -$5,400 | | -$5,400 |
| WIRE OUT | CANON COPIER LEASE | | -$95,936 | | | | -$95,936 |
| WIRE OUT | CARDINAL HEALTH | -$2,181,333 | -$1,775,923 | -$1,671,000 | -$1,310,794 | -$305,000 | -$7,244,050 |
| WIRE OUT | CARDIOVASCULAR | | | | | -$11,548 | -$11,548 |
| WIRE OUT | CROTHALL HC | | -$143,338 | -$75,000 | | | -$218,338 |
| WIRE OUT | CROWN STAPLE | | | -$17,500 | | | -$17,500 |
| WIRE OUT | CURBELL INC | | | -$1,807 | | | -$1,807 |
| WIRE OUT | DAVIS AND JONES | -$22,023 | | | | | -$22,023 |
| WIRE OUT | DELAWARE ADR | | | | -$15,525 | | -$15,525 |
| WIRE OUT | ERBE USA | | | | -$5,118 | | -$5,118 |
| WIRE OUT | FISHER SCIENTIFIC | | | | -$125,000 | | -$125,000 |
| WIRE OUT | FORVIS, LLP ID: | | | | -$69,497 | -$45,370 | -$114,867 |
| WIRE OUT | FRANK A VITELLO SOLE PROP | | | -$332,000 | -$142,000 | | -$474,000 |
| WIRE OUT | FRY CONSTRUCTION | | | -$148,247 | | | -$148,247 |
| WIRE OUT | FS COMM INC | | | -$875 | | | -$875 |
| WIRE OUT | FUTURE HEALTH C | -$20,000 | | | | | -$20,000 |
| WIRE OUT | GETINGE | | | | -$433 | | -$433 |
| WIRE OUT | GRAYSON CTY TREAS | -$1,973,318 | | -$3,058,111 | -$1,019,370 | | -$6,050,799 |
| WIRE OUT | GREENBERG GRANT RICHARDS | | -$176,238 | -$4,222 | | | -$180,461 |
| WIRE OUT | HEALTH CARE LOG | | | -$734 | | | -$734 |
| WIRE OUT | HEARST COMM | | | | -$25,057 | | -$25,057 |
| WIRE OUT | HHS 1 LLC | | -$2,562,500 | -$3,375,000 | -$3,240,000 | -$945,000 | -$10,122,500 |
| WIRE OUT | HNI HEALTHCARE | | -$50,000 | | | | -$50,000 |
| WIRE OUT | HODGES-MACE LLC | | | -$61,611 | | | -$61,611 |
| WIRE OUT | HOSPITAL HOUSEK | | -$25,000 | | | | -$25,000 |
| WIRE OUT | INFINITT NORTH | | -$58,455 | | | | -$58,455 |
| WIRE OUT | JOHNSON & JOHNSON | -$21,186 | -$208,091 | -$263,630 | -$24,400 | | -$517,307 |
| WIRE OUT | JSD MANAGEMENT, | | -$9,015 | | | | -$9,015 |
| WIRE OUT | KUSTOM KOATINGS | | -$24,072 | | | | -$24,072 |
| WIRE OUT | LHP MGT SVCS | | | | -$625,000 | | -$625,000 |
| WIRE OUT | LIFENET HEALTH | -$2,415 | | | | | -$2,415 |
| WIRE OUT | LIFESAVERS PREV | | -$953 | -$35,565 | | | -$36,518 |
| WIRE OUT | LIGHTFLOWER, LT | | -$40,000 | | | | -$40,000 |
| WIRE OUT | LIQUIDATION SOL | | | -$14,038 | | | -$14,038 |
| WIRE OUT | LUMINANT ENERGY | | -$7,154 | | -$75,174 | -$32,475 | -$114,803 |
| WIRE OUT | MASIMO AMERICAS | -$6,495 | | | | | -$6,495 |
| WIRE OUT | MATHIS LEGAL | | -$10,402 | | | | -$10,402 |
| WIRE OUT | MAURICIO MURCIA | | | -$4,500 | | | -$4,500 |
| WIRE OUT | MEDAILLIANCE PTNRS | -$294,799 | -$99,967 | | | | -$394,766 |
| WIRE OUT | MEDELY INC | | | -$344,892 | -$320,501 | | -$665,393 |
| WIRE OUT | MEDLINE IND | -$450,040 | | | -$180,000 | -$515,000 | -$1,145,040 |
| WIRE OUT | MEDTRONIC CA | | | | -$1,483 | | -$1,483 |
| WIRE OUT | MEDTRONIC CASH POOL LLC | | -$12,000 | -$3,476 | -$1,049 | | -$16,525 |
| WIRE OUT | MELLON FNCL BoNY | -$225,003 | -$5,386,728 | -$336,397 | -$50,000 | | -$5,998,128 |
| WIRE OUT | MPT OPERATING PSHIP | | | | -$2,143,492 | -$289,699 | -$2,433,191 |
| WIRE OUT | MUNTERS CORPORA | | | -$3,800 | | | -$3,800 |
| WIRE OUT | MUTUAL OF OMAHA | | | | | -$68,630 | -$68,630 |
| WIRE OUT | MXR IMAGING | | | | -$10,825 | | -$10,825 |
| WIRE OUT | NES SOUTHWEST MED SVC | | | | | -$20,381 | -$20,381 |
| WIRE OUT | NTHRIVE, INC. I | -$22,378 | -$40,000 | | | | -$62,378 |
| WIRE OUT | OM PERFORMANCE | | | | -$4,000 | | -$4,000 |

| | | | | | | | |
|---|---|--:|--:|--:|--:|--:|--:|
| WIRE OUT | PEDI CALL CARE | | | -$133 | | | -$133 |
| WIRE OUT | PERRY BAROMEDICAL | | | | -$26,387 | | -$26,387 |
| WIRE OUT | PPS OPERATING I | | | -$31,305 | | | -$31,305 |
| WIRE OUT | PRECISION HC | | | -$183,178 | | | -$183,178 |
| WIRE OUT | RAUCH-MILLIKEN | | -$200,000 | | | | -$200,000 |
| WIRE OUT | RESTORIX HEALTH | -$347,227 | -$124,531 | | | | -$471,758 |
| WIRE OUT | REVINT SOLUTION | | | -$30,000 | | | -$30,000 |
| WIRE OUT | RICHMAR CONSULTING | -$104,000 | | | | | -$104,000 |
| WIRE OUT | RS FUNDING INC | | -$22,770 | | | | -$22,770 |
| WIRE OUT | SAGE SERVICES G | | | -$3,480 | | | -$3,480 |
| WIRE OUT | Sanders, Motley, Young Gallardo IOLTA | | -$55,343 | | | | -$55,343 |
| WIRE OUT | SCHEEF AND STON | -$12,000 | | | | | -$12,000 |
| WIRE OUT | SHARP ELECTRONI | | | -$6,203 | | | -$6,203 |
| WIRE OUT | SHERMAN GRAYSON HOSP | | -$1,229 | | | | -$1,229 |
| WIRE OUT | SHI INTERNATION | | | | -$1,559 | | -$1,559 |
| WIRE OUT | SHULMAN BASTIAN FRIEDMAN | | | | | -$200,000 | -$200,000 |
| WIRE OUT | SIEMENS HC | -$9,159 | | -$1,985 | | | -$11,144 |
| WIRE OUT | SIESTA SOLUTIONS | -$1,617,556 | -$1,439,092 | -$1,386,583 | -$1,386,583 | -$351,646 | -$6,181,460 |
| WIRE OUT | SIGNET HEALTH | | -$328,710 | | | | -$328,710 |
| WIRE OUT | SMITHS MEDICAL | | | -$927 | -$778 | | -$1,705 |
| WIRE OUT | SPBS, INC | | | -$5,954 | | | -$5,954 |
| WIRE OUT | SSD ALARM | | | -$1,574 | | | -$1,574 |
| WIRE OUT | ███████ | | | -$23,547 | | | -$23,547 |
| WIRE OUT | STRYKER | | -$83,943 | -$460,083 | -$411,947 | -$67,566 | -$1,023,538 |
| WIRE OUT | SURGICAL PRODUC | | -$4,036 | | | | -$4,036 |
| WIRE OUT | TEAM NORTH TEXAS | | | -$453,869 | | | -$453,869 |
| WIRE OUT | TELEFLEX FUNDIN | | | -$3,922 | | | -$3,922 |
| WIRE OUT | THE BRANDT COMP | | -$33,200 | | | | -$33,200 |
| WIRE OUT | TK ELEVATOR CORP | | | -$403,803 | | | -$403,803 |
| WIRE OUT | UHS RECEIVABLES CORP | | -$800,000 | | | | -$800,000 |
| WIRE OUT | UMR INC | | -$1,634,946 | -$4,535 | | | -$1,639,481 |
| WIRE OUT | US FOODS INC ID | | | | | -$61,757 | -$61,757 |
| WIRE OUT | VERATHON, INC I | | -$1,158 | -$1,665 | | | -$2,823 |
| WIRE OUT | WAGNER FALCONER AND JUDD | | | -$141,362 | | | -$141,362 |
| WIRE OUT | WESTCMR | | | | | -$6,049 | -$6,049 |
| WIRE OUT | WORKTERRA | -$22,879 | | | | | -$22,879 |
| WIRE OUT | ZIMMER INC | -$96,125 | -$25,571 | -$3,280 | | | -$124,976 |
| WIRE OUT - I | POP PMT OF SETTLEMENT | | | -$6,000 | | | -$6,000 |
| **Grand Total** | | -$11,558,808 | -$18,121,158 | -$14,514,799 | -$12,218,516 | -$3,674,334 | -$60,087,616 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I. Deposits: STMNT Processed_1646**

| GCS Acct | 1646 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH CREDIT | | | $31,436 | | | $31,436 |
| ACH RETURNS SETT EXCEPTIONS | $11,271 | $5,440 | $5,975 | $8,547 | $1,689 | $32,923 |
| DEPOSIT | | | | | $28,276 | $28,276 |
| PAYROLL CR | | | $448 | | | $448 |
| TRANSFER IN | $28,413,148 | $20,618,072 | $21,168,391 | $18,832,889 | $5,116,177 | $94,148,677 |
| TRNX REVERSAL | | $541,770 | $9,293 | $1,041 | | $552,104 |
| WIRE IN | | $1,229 | | $2,622,852 | $5,734,601 | $8,358,682 |
| **Grand Total** | **$28,424,419** | **$21,166,511** | **$21,215,544** | **$21,465,329** | **$10,880,743** | **$103,152,545** |

**I.A. Wire transfers into account: STMNT Processed_1646**

| GCS Acct | 1646 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Name | 2020 | 2022 | 2023 | Grand Total |
| **WIRE IN** | SHERMAN ANESTHE | | $50,000 | $17,800 | $67,800 |
| **WIRE IN** | SHERMAN GRAYSON | $1,229 | $2,572,852 | $5,716,801 | $8,290,882 |
| **Grand Total** | | **$1,229** | **$2,622,852** | **$5,734,601** | **$8,358,682** |

**I.B. Wire transfers into account: STMNT Processed_1646**

| GCS Acct | 1646 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER IN** | 5572 | | | | $770,136 | $2,081,398 | $2,851,533 |
| **TRANSFER IN** | 7324 | | | | | $142,943 | $142,943 |
| **TRANSFER IN** | 7329 | $71,119 | | | | $3,637 | $74,756 |
| **TRANSFER IN** | 7343 | $1,646,119 | $836,819 | | | $48,757 | $2,531,695 |
| **TRANSFER IN** | 9152 | $26,695,910 | $19,781,252 | $21,168,391 | $18,062,753 | $2,839,444 | $88,547,750 |
| **Grand Total** | | **$28,413,148** | **$20,618,072** | **$21,168,391** | **$18,832,889** | **$5,116,177** | **$94,148,677** |

A0981

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**II. Withdrawals: STMNT Processed_1646**

| GCS Acct | 1646 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH RETURNS SETT EXCEPTIONS | | -$17,829 | -$1,785 | | | -$19,614 |
| CHECK | -$64,325 | -$55,505 | -$74,496 | -$97,274 | -$28,494 | -$320,094 |
| CHILD SUPP | -$75,531 | -$55,660 | -$25,130 | -$18,095 | -$8,686 | -$183,102 |
| DEBIT | -$70,986 | -$32,433 | -$42,884 | -$30,506 | -$53,832 | -$230,642 |
| PAYMENT | | | -$325,353 | -$623,840 | -$277,750 | -$1,226,943 |
| PAYROLL | -$23,545,348 | -$16,619,022 | -$15,228,281 | -$15,361,145 | -$8,129,460 | -$78,883,256 |
| TAX | -$4,680,701 | -$4,010,415 | -$5,046,475 | -$5,384,149 | -$2,386,049 | -$21,507,788 |
| TRANSFER OUT | -$8,000 | -$378,800 | -$427,983 | | | -$814,783 |
| WIRE OUT | -$1,672 | | | | | -$1,672 |
| Grand Total | -$28,446,563 | -$21,169,663 | -$21,172,387 | -$21,515,009 | -$10,884,270 | -$103,187,893 |

**II.A. Transfers out of account: STMNT Processed_1646**

| GCS Acct | 1646 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | Grand Total |
| TRANSFER OUT | 7329 | -$6,000 | -$2,093 | | -$8,093 |
| TRANSFER OUT | 7343 | | -$792 | | -$792 |
| TRANSFER OUT | 9152 | -$2,000 | -$375,916 | -$427,983 | -$805,898 |
| TRANSFER OUT Total | | -$8,000 | -$378,800 | -$427,983 | -$814,783 |
| Grand Total | | -$8,000 | -$378,800 | -$427,983 | -$814,783 |

**A0982**

# Schedules A.2.3.1 – A.2.3.4
# Sherman MD Bank Account Summaries

### Schedule A.2.3.1 – Account *7324
### Schedule A.2.3.2 – Account *7329
### Schedule A.2.3.3 – Account *7343
### Schedule A.2.3.4 – Account *8248

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**I. Deposits: STMNT Processed_7324**

| GCS Acct | 7324 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | | $16 | $25 | | | $41 |
| DEPOSIT | $1,381,504 | $752,689 | $189,758 | $256,608 | $146,284 | $2,726,843 |
| GOVT INS | $15,327 | $11,708 | $7,672 | $1,639 | | $36,346 |
| HC CLAIM | $1,147,686 | $788,323 | $336,428 | $272,577 | $120,826 | $2,665,840 |
| INS PMT RCVD | | | | $3,559 | $6,471 | $10,030 |
| MPS RECON DEPOSIT | $141,852 | $198,340 | $35,727 | $36,830 | $15,344 | $428,094 |
| (1) TRANSFER IN | | | | | $32,600 | $32,600 |
| WIRE IN | | | | $9,500 | $237,072 | $246,572 |
| Grand Total | $2,686,370 | $1,751,075 | $569,610 | $580,713 | $558,598 | $6,146,365 |

**I.A. Wire transfers received into account: STMNT Processed_7324**

| GCS Acct | 7324 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | |
|---|---|---|---|
| Transaction Ty | 2022 | 2023 | Grand Total |
| **WIRE IN** SHERMAN ANESTHE | | $3,000 | $3,000 |
| **WIRE IN** SHERMAN GRAYSON | | $212,000 | $212,000 |
| **WIRE IN** SHERMAN MD PROV | $9,500 | $22,072 | $31,572 |
| **Grand Total** | **$9,500** | **$237,072** | **$246,572** |

(1)  01/04/2023    10,000.00 ████ 5965 10,000.00 AUTOMATIC TRANSFER CREDITS ████ 1612 ACCOUNT TRANSFER TRSF FROM ████ 5572
     03/01/2023    22,600.00 AUTOMATIC TRANSFER CREDITS ████ 1801 ACCOUNT TRANSFER TRSF FROM

**II. Withdrawals: STMNT Processed_7324**

| GCS Acct | 7324 |
|---|---|
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | -$514 | | -$25 | -$102 | | -$640 |
| BANK CHRG | -$45,836 | -$43,067 | -$35,855 | -$26,549 | -$2,978 | -$154,285 |
| CHRGBK | -$1,875 | | -$468 | -$60 | | -$2,403 |
| TRANSFER OUT | | | | -$173,500 | -$536,178 | -$709,678 |
| WIRE OUT | -$2,643,590 | -$1,712,929 | -$538,501 | -$376,725 | -$18,538 | -$5,290,283 |
| Grand Total | -$2,691,814 | -$1,756,463 | -$574,441 | -$576,876 | -$557,694 | -$6,157,288 |

**II.A. Transfers out of account: STMNT Processed_7324**

| GCS Acct | 7324 |
|---|---|
| Break | DR |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct Transfer T | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER OUT** | 1646 | | | | | | -$142,943 | -$142,943 |
| **TRANSFER OUT** | 7329 | | | | | -$52,000 | -$34,500 | -$86,500 |
| **TRANSFER OUT** | 7343 | | | | | -$106,500 | -$88,260 | -$194,760 |
| **TRANSFER OUT** | 9152 | | | | | -$15,000 | -$270,475 | -$285,475 |
| **WIRE OUT** | | APEX | | | | | -$18,538 | -$18,538 |
| **WIRE OUT** | | CNH FINANCE | -$1,039,982 | -$1,712,929 | -$538,501 | -$376,725 | | -$3,668,137 |
| **WIRE OUT** | | WHITE OAK HEALT | -$1,603,608 | | | | | -$1,603,608 |
| **Grand Total** | | | -$2,643,590 | -$1,712,929 | -$538,501 | -$550,225 | -$554,715 | -$5,999,961 |

**A0984**

**Alecto Healthcare Services LLC**
Bank Statement Analysis
Sherman MD Provider, Inc.

**I. Deposits: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | $2,000 | | | | | $2,000 |
| DEPOSIT | $60,852 | $40,125 | $20,249 | $25,244 | $93,203 | $239,673 |
| MERCH FEES | $1 | | | | | $1 |
| TRANSFER IN | $2,198,167 | $791,131 | $164,595 | $161,000 | $87,600 | $3,402,492 |
| WIRE IN | $992,000 | $50,000 | | $25,000 | $170,000 | $1,237,000 |
| CHECK REVRSL | $1,332 | | | | | $1,332 |
| **Grand Total** | **$3,254,352** | **$881,256** | **$184,844** | **$211,244** | **$350,803** | **$4,882,498** |

**I.A. Wire transfers received into account: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | CR |

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2022 | 2023 | Grand Total |
| **WIRE IN** | ALECTO HEA | $992,000 | $50,000 | | | $1,042,000 |
| **WIRE IN** | SHERMAN GRAYSON | | | | $170,000 | $170,000 |
| **WIRE IN** | SHERMAN MD PROV | | | $25,000 | | $25,000 |
| **Grand Total** | | **$992,000** | **$50,000** | **$25,000** | **$170,000** | **$1,237,000** |

**I.B. Transfers received into account: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | CR |

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Acct Transf | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER IN** | 1646 | $6,000 | $2,093 | | | | $8,093 |
| **TRANSFER IN** | 5572 | | | | $32,000 | | $32,000 |
| **TRANSFER IN** | 7324 | | | | $52,000 | $34,500 | $86,500 |
| **TRANSFER IN** | 7343 | | $75,847 | $5,000 | | | $80,847 |
| **TRANSFER IN** | 9152 | $2,192,167 | $713,191 | $159,595 | $109,000 | $21,100 | $3,195,052 |
| **Grand Total** | | **$2,198,167** | **$791,131** | **$164,595** | **$161,000** | **$87,600** | **$3,402,492** |

A0985

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**II. Withdrawals: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| CHECK | -$2,174,260 | -$674,322 | -$178,470 | -$166,067 | -$189,825 | -$3,382,943 |
| DEBIT | -$94 | | | | | -$94 |
| MERCH FEES | -$476 | | | | | -$476 |
| PAYMENT | -$26,670 | -$20,799 | -$17,982 | -$17,594 | -$36,138 | -$119,182 |
| TRANSFER OUT | -$1,125,646 | -$7,614 | -$37,848 | | -$35,637 | -$1,206,745 |
| WIRE OUT | -$80,595 | -$123,984 | | -$20,608 | -$100,000 | -$325,187 |
| WITHDRAWAL | -$1,467 | | | | | -$1,467 |
| Grand Total | -$3,409,208 | -$826,719 | -$234,300 | -$204,268 | -$361,599 | -$5,036,094 |

**II.A. Transfers out of account: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | DR |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2023 |
| TRANSFER OUT | 1646 | -$71,119 | | | -$3,637 |
| TRANSFER OUT | 7343 | -$965,227 | -$1,433 | -$37,848 | -$32,000 |
| TRANSFER OUT | 9152 | -$89,300 | -$6,181 | | |
| Grand Total | | -$1,125,646 | -$7,614 | -$37,848 | -$35,637 |

**II.B. Wire transfers out of account: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | DR |

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2022 | 2023 | Grand Total |
| WIRE OUT | APEX | -$77,180 | -$74,902 | -$20,608 | | -$172,690 |
| WIRE OUT | CARDINAL HEALTH | | -$49,082 | | | -$49,082 |
| WIRE OUT | MEDELY INC | | | | -$100,000 | -$100,000 |
| WIRE OUT | QUALITY MED, IN | -$3,415 | | | | -$3,415 |
| WIRE OUT Total | | -$80,595 | -$123,984 | -$20,608 | -$100,000 | -$325,187 |
| Grand Total | | -$80,595 | -$123,984 | -$20,608 | -$100,000 | -$325,187 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**I. Deposits: STMNT Processed_7343**

| GCS Acct | 7343 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| DEPOSIT | $47,076 | | | | | $47,076 |
| EXPERTPAY DEBIT | $0 | | | | | $0 |
| TRANSFER IN | $5,864,195 | $3,740,147 | $1,130,616 | $1,109,580 | $422,540 | $12,267,078 |
| TRANSFER OUT | | | | | $10,760 | $10,760 |
| WIRE IN | | $1,062,227 | | $146,087 | $431,600 | $1,639,914 |
| **Grand Total** | **$5,911,271** | **$4,802,374** | **$1,130,616** | **$1,255,667** | **$864,900** | **$13,964,828** |

**I.A. Wire transfers received into account: STMNT Processed_7343**

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Name | 2020 | 2022 | 2023 | Grand Total | |
| **WIRE IN** | ALECTO HEALTHCA | $1,062,227 | | | $1,062,227 | |
| **WIRE IN** | SHERMAN GRAYSON | | | $356,500 | $356,500 | |
| **WIRE IN** | SHERMAN MD PROV | | $146,087 | $75,100 | $221,187 | |
| **Grand Total** | | **$1,062,227** | **$146,087** | **$431,600** | **$1,639,914** | |

**II. Withdrawals: STMNT Processed_7343**

| GCS Acct | 7343 |
|---|---|
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| CHILD SUPP | -$46,767 | | | | | -$46,767 |
| DEBIT | -$657 | | -$706 | -$191 | -$156 | -$1,710 |
| EXPERTPAY DEBIT | -$6,523 | -$45,646 | | | | -$52,169 |
| PAYROLL | -$2,805,538 | -$2,574,609 | -$781,141 | -$874,144 | -$530,113 | -$7,565,545 |
| TAX | -$1,228,497 | -$1,147,503 | -$357,441 | -$383,317 | -$284,697 | -$3,401,454 |
| TRANSFER OUT | -$1,823,444 | -$955,138 | -$5,000 | | -$48,757 | -$2,832,339 |
| REVERSE WIRE | | -$61,227 | | | | -$61,227 |
| **Grand Total** | **-$5,911,426** | **-$4,784,122** | **-$1,144,288** | **-$1,257,652** | **-$863,723** | **-$13,961,211** |

Alecto Wire (label at left of TRANSFER OUT / REVERSE WIRE rows)

**II.A. Transfers out of account: STMNT Processed_7343**

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2023 | Grand Total |
| **TRANSFER OUT** | 1646 | -$1,646,119 | -$836,819 | | -$48,757 | -$2,531,695 |
| **TRANSFER OUT** | 7329 | | -$75,847 | -$5,000 | | -$80,847 |
| **TRANSFER OUT** | 9152 | -$177,325 | -$42,472 | | | -$219,797 |
| **Grand Total** | | **-$1,823,444** | **-$955,138** | **-$5,000** | **-$48,757** | **-$2,832,339** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**I. Deposits: STMNT Processed_8248**

| GCS Acct | 8248 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | $9,323 | $2,008 | $4,036 | $1,325 | $596 | $17,289 |
| DEPOSIT | $194,272 | $527 | $1,330 | $7,034 | $3,261 | $206,424 |
| HC CLAIM | $2,056,623 | $1,669,391 | $653,128 | $503,410 | $221,951 | $5,104,503 |
| (1) TRANSFER IN | | | | | $7,574 | $7,574 |
| **Grand Total** | **$2,260,219** | **$1,671,926** | **$658,494** | **$511,769** | **$233,382** | **$5,335,791** |

| (1) | 06/28/2023 | Book transfer credit FROM …8264 | 5,396.54 |
|---|---|---|---|
| | 06/28/2023 | Book transfer credit FROM …9202 | 1,416.04 |
| | 06/28/2023 | Book transfer credit FROM …9210 | 761.76 |

**II. Withdrawals: STMNT Processed_8248**

| GCS Acct | 8248 |
|---|---|
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER OUT | -$2,260,219 | -$1,671,926 | -$658,494 | -$486,769 | -$211,592 | -$5,289,001 |
| (1) WIRE OUT | | | | -$25,000 | -$20,737 | -$45,737 |
| **Grand Total** | **-$2,260,219** | **-$1,671,926** | **-$658,494** | **-$511,769** | **-$232,329** | **-$5,334,738** |

| (1) | 10/06/2022 | Wire transfer withdrawal Sherman MD Provi der Inc 100622 ▮▮▮▮9704 | 25,000.00 |
|---|---|---|---|
| | 02/15/2023 | Wire transfer withdrawal Sherman Grayson Hospital L 021523 ▮▮▮▮3947 | 2,665.00 |
| | 02/17/2023 | Wire transfer withdrawal Sherman Grayson Hospital L 021723 ▮▮▮▮6738 | 5,000.00 |
| | 06/28/2023 | Wire transfer withdrawal Sherman MD  Provi der INC 062823 ▮▮▮▮5294 | 13,072.16 |

**II.A. Transfers out of account: STMNT Processed_8248**

| GCS Acct | 8248 |
|---|---|
| Break | DR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER OUT** | 8205 | | | | | -$128,786 | -$128,786 |
| **TRANSFER OUT** | 8264 | -$2,260,219 | -$1,671,926 | -$658,494 | -$486,769 | -$82,806 | -$5,160,215 |
| **Grand Total** | | **-$2,260,219** | **-$1,671,926** | **-$658,494** | **-$486,769** | **-$211,592** | **-$5,289,001** |

**A0988**

# Schedule A.2.4
# Sherman Anesthetics Bank Account Summaries

## Schedule A.2.4 – Accounts *9202 and *9210

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman Anesthetics, Inc.**

**I. Deposits: STMNT Processed_9202**

| GCS Acct | 9202 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | $733,113 | $486,885 | $300,149 | $324,561 | $129,316 | $1,974,024 |
| DEPOSIT | $8,609 | $14,129 | $3,680 | $2,803 | | $29,221 |
| LOCKBOX DEPOSIT | $149,862 | $62,205 | $38,844 | $41,490 | $7,513 | $299,913 |
| **Grand Total** | **$891,584** | **$563,219** | **$342,672** | **$368,854** | **$136,829** | **$2,303,158** |

**II. Withdrawals: STMNT Processed_9202**

| GCS Acct | 9202 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK CHRG | -$36,727 | -$35,593 | -$34,717 | -$31,063 | -$4,034 | -$142,134 |
| CHRGBK | | -$2,028 | | -$186 | | -$2,214 |
| TRANSFER OUT | | | | | -$80,481 | -$80,481 |
| WIRE OUT | -$852,801 | -$528,554 | -$307,931 | -$334,309 | -$55,281 | -$2,078,875 |
| **Grand Total** | **-$891,556** | **-$564,147** | **-$342,648** | **-$365,558** | **-$139,797** | **-$2,303,705** |

**II.A. Wire transfers out of account: STMNT Processed_9202**

| GCS Acct | 9202 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **WIRE OUT** | SHERMAN ANESTH | -$852,801 | -$528,554 | -$307,931 | -$320,209 | | -$2,009,494 |
| **WIRE OUT** | SHERMAN GRAYSON | | | | -$14,100 | -$55,281 | -$69,381 |
| **WIRE OUT Total** | | **-$852,801** | **-$528,554** | **-$307,931** | **-$334,309** | **-$55,281** | **-$2,078,875** |
| **Grand Total** | | **-$852,801** | **-$528,554** | **-$307,931** | **-$334,309** | **-$55,281** | **-$2,078,875** |

**II.B. Transfers out of account: STMNT Processed_9202**

| GCS Acct | 9202 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Acct | 2023 | Grand Total |
| **TRANSFER OUT** | 8205 | -$78,865 | -$78,865 |
| **TRANSFER OUT** | 8248 | -$1,416 | -$1,416 |
| **TRANSFER OUT** | 9210 | -$200 | -$200 |
| **TRANSFER OUT Total** | | **-$80,481** | **-$80,481** |
| **Grand Total** | | **-$80,481** | **-$80,481** |

**A0990**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman Anesthetics, Inc.**

### I. Deposits: STMNT Processed_9210

| GCS Acct | 9210 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | $97,694 | $69,326 | $61,556 | $84,878 | $30,881 | $344,335 |
| DEPOSIT | $902,434 | $540,219 | $315,488 | $320,537 | $66 | $2,078,743 |
| LOCKBOX DEPOSIT | | | | $448 | $7,130 | $7,578 |
| TRANSFER IN | | | | | $200 | $200 |
| **Grand Total** | **$1,000,128** | **$609,544** | **$377,044** | **$405,863** | **$38,276** | **$2,430,855** |

### II. Withdrawals: STMNT Processed_9210

| GCS Acct | 9210 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | | | | -$556 | | -$556 |
| ACH WITHDRAWAL | -$4,796 | -$4,286 | -$4,172 | -$5,025 | -$1,256 | -$19,534 |
| ADJ | | | | | -$417 | -$417 |
| TRANSFER OUT | | | | | -$25,973 | -$25,973 |
| WIRE OUT | -$996,030 | -$605,396 | -$372,939 | -$402,626 | -$10,100 | -$2,387,091 |
| **Grand Total** | **-$1,000,826** | **-$609,682** | **-$377,112** | **-$407,650** | **-$38,302** | **-$2,433,571** |

### II.A. Wire transfers out of account: STMNT Processed_9210

| GCS Acct | 9210 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **WIRE OUT** | CNH FINANCE | -$400,809 | -$605,396 | -$372,939 | -$305,626 | | -$1,684,770 |
| **WIRE OUT** | SHERMAN GRAYSON | | | | -$97,000 | -$10,100 | -$107,100 |
| **WIRE OUT** | WHITE OAK | -$595,221 | | | | | -$595,221 |
| **WIRE OUT Total** | | **-$996,030** | **-$605,396** | **-$372,939** | **-$402,626** | **-$10,100** | **-$2,387,091** |
| **Grand Total** | | **-$996,030** | **-$605,396** | **-$372,939** | **-$402,626** | **-$10,100** | **-$2,387,091** |

### II.B. Transfers out of account: STMNT Processed_9210

| GCS Acct | 9210 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Acct | 2023 | Grand Total |
| **TRANSFER OUT** | 8205 | -$25,211 | -$25,211 |
| **TRANSFER OUT** | 8248 | -$762 | -$762 |
| **TRANSFER OUT Total** | | **-$25,973** | **-$25,973** |
| **Grand Total** | | **-$25,973** | **-$25,973** |

**A0991**

# Schedules A.3.1.1 − A.3.1.4
# Olympia HC Bank Account Statement Summaries

**Schedule A.3.1.1 − Account *7573**
**Schedule A.3.1.2 − Account *7780**
**Schedule A.3.1.3 − Account *7798**
**Schedule A.3.1.4 − Account *9017**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**I. Deposits: STMNT Processed_7573**

| GCS Acct | 7573 |
|---|---|
| Credit | (All) |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT/RETURN | | | $5,225 | | | $5,225 |
| ADJ | $192 | | $176 | | | $368 |
| COVER 401K CONTRIB | | | | | $5,547 | $5,547 |
| DEPOSIT | $6,743,475 | $3,093,074 | $2,050,042 | $180,566 | $34,632 | $12,101,788 |
| MERCH DEPOSIT | $3,216,164 | $3,319,355 | $1,282,645 | $17,906 | $78 | $7,836,149 |
| WIRE IN | $60,464,280 | $78,299,121 | $22,003,042 | $1,336,111 | $204,906 | $162,307,459 |
| ZBA FUNDING IN | $516,779 | $90,474 | | | | $607,252 |
| **Grand Total** | **$70,940,889** | **$84,802,024** | **$25,341,130** | **$1,534,583** | **$245,163** | **$182,863,788** |

Acct *2995

**I.A. Wire transfers received into account: STMNT Processed_7573**

| GCS Acct | 7573 |
|---|---|
| Credit | (All) |
| Break | CR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE IN | Alecto Healthcare | $48,418,000 | $45,049,251 | | $15,000 | | $93,482,251 |
| WIRE IN | CNB Alecto Healthcare | $11,756,280 | $32,230,000 | $20,312,000 | $611,000 | | $64,909,280 |
| WIRE IN | Deanco Healthcare | | | $524,520 | | | $524,520 |
| WIRE IN | Global Financia | | $54,465 | | | | $54,465 |
| WIRE IN | Key Health Medical | | $127,662 | $77,655 | | | $205,317 |
| WIRE IN | Medical Debt Resolution | | | $247,302 | | | $247,302 |
| WIRE IN | Medlegal Solutions | | $767,208 | $772,427 | | | $1,539,635 |
| WIRE IN | Olympia Health | | | | $41,237 | $16,500 | $57,737 |
| WIRE IN | Plaza MOB | $290,000 | $125,000 | $14,673 | $668,874 | $188,406 | $1,286,953 |
| **Grand Total** | | **$60,464,280** | **$78,299,121** | **$22,003,042** | **$1,336,111** | **$204,906** | **$162,307,459** |

**Alecto Healthcare Services LLC**
Bank Statement Analysis
Olympia Health Care LLC

**II. Withdrawals: STMNT Processed_7573**

| GCS Acct | 7573 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | | | -$30 | | | -$30 |
| B TO B ACH DEBIT | | -$11,579,251 | | | | -$11,579,251 |
| CASH OUT | -$21,406 | -$27,469 | -$4,890 | | | -$53,765 |
| DEPOSIT UNPAID | -$282 | -$965 | -$105,955 | -$45 | | -$107,247 |
| LEGAL ORDER | -$1,046 | | -$38,072 | | | -$39,119 |
| MERCH DEPOSIT | -$109,984 | -$108,062 | -$55,047 | -$2,025 | | -$275,118 |
| MERCH FEES | | | | -$79 | -$651 | -$730 |
| PAYMENT | -$252 | -$385 | -$29 | | | -$666 |
| TRANSFER OUT | -$66,018,487 | -$69,376,984 | -$28,671,761 | -$1,051,814 | -$282,755 | -$165,401,801 |
| WIRE OUT | -$4,811,770 | -$109,032 | -$390,188 | -$492,221 | -$1,000 | -$5,804,210 |
| **Grand Total** | **-$70,963,227** | **-$81,202,147** | **-$29,265,972** | **-$1,546,184** | **-$284,406** | **$ (183,261,936)** |

Acct *2995

**II.A. Wire transfers out of account: STMNT Processed_7573**

| GCS Acct | 7573 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER OUT** | 4538 | | -$239 | -$40 | | | -$279 |
| **TRANSFER OUT** | 7798 | -$34,954,436 | -$35,951,443 | -$14,769,303 | -$41,377 | -$5,547 | -$85,722,106 |
| **TRANSFER OUT** | 9017 | -$31,063,811 | -$33,425,501 | -$13,902,458 | -$1,010,437 | -$277,208 | -$79,679,416 |
| **Grand Total** | | **-$66,018,487** | **-$69,376,984** | **-$28,671,761** | **-$1,051,814** | **-$282,755** | **$ (165,401,801)** |

**A0994**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**II.B. Wire transfers out of account: STMNT Processed_7573**

| GCS Acct | 7573 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | Aitken Aitken and Cohn | | | | -$447,708 | | -$447,708 |
| WIRE OUT | Alecto Healthca | -$1,000,000 | | -$35,000 | | | -$1,035,000 |
| WIRE OUT | Anthem Blue Cro | | | -$11,138 | | | -$11,138 |
| WIRE OUT | Global Financia | | | -$51,275 | | | -$51,275 |
| WIRE OUT | Medical Debt Re | | | -$20,015 | | | -$20,015 |
| WIRE OUT | Meditech | | | -$2,850 | | | -$2,850 |
| WIRE OUT | Medline Industr | -$543,498 | | | | | -$543,498 |
| WIRE OUT | Mpt Development | -$2,817,747 | | | | | -$2,817,747 |
| WIRE OUT | Ntt Data Servic | | | -$223,415 | | | -$223,415 |
| WIRE OUT | Olympia Health | | | | -$5,164 | -$1,000 | -$6,164 |
| WIRE OUT | Olympia Lockbox | | | | -$3,199 | | -$3,199 |
| WIRE OUT | Plaza MOB | -$245,000 | | | -$35,560 | | -$280,560 |
| WIRE OUT | United Physicia | -$205,525 | -$109,032 | -$46,495 | | | -$361,052 |
| WIRE OUT | Wells Fargo | | | | -$590 | | -$590 |
| **WIRE OUT Total** | | **-$4,811,770** | **-$109,032** | **-$390,188** | **-$492,221** | **-$1,000** | **-$5,804,210** |
| **Grand Total** | | **-$4,811,770** | **-$109,032** | **-$390,188** | **-$492,221** | **-$1,000** | **$ (5,804,210)** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

### I. Deposits: STMNT Processed_7780

| Sum of Amount | Yr | | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | | $22,033 | $1,546 | $2,497 | | | $26,076 |
| CARES ACT STIMULUS | | | $7,989,883 | | | | $7,989,883 |
| CLAIM DEPOSIT | | $21,881,113 | $20,873,936 | $9,815,507 | $1,881,642 | | $54,452,199 |
| DEPOSIT | | $1,522,971 | $920,380 | $903,184 | $104,359 | | $3,450,894 |
| GOVT INS | | $214,244 | $95,097 | $1,360 | $59 | | $310,761 |
| LOCKBOX IN | | $13,592,769 | $9,608,488 | $3,503,139 | $64,975 | $3,078 | $26,772,449 |
| WIRE IN | | $869,262 | $782,700 | $514,901 | $85,100 | $18,131 | $2,270,093 |
| Acct *2995 ZBA FUNDING IN | | $30,754,690 | $55,305,520 | $3,397,966 | | | $89,458,176 |
| **Grand Total** | | **$68,857,082** | **$95,577,550** | **$18,138,555** | **$2,136,135** | **$21,209** | **$184,730,530** |

### I.A. Wire transfers received into account: STMNT Processed_7780

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **WIRE IN** | California Business Bureau | $869,262 | $782,700 | $514,901 | $76,146 | $17,131 | $2,260,140 |
| **WIRE IN** | Olympia Health | | | | $8,954 | $1,000 | $9,954 |
| **Grand Total** | | **$869,262** | **$782,700** | **$514,901** | **$85,100** | **$18,131** | **$2,270,093** |

### II. Withdrawals: STMNT Processed_7780

| Sum of Amount | Yr | | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK CHRG | | -$21,825 | -$21,232 | -$15,862 | -$7,690 | -$1,551 | -$68,160 |
| CASH OUT | | | -$570 | | | | -$570 |
| DEPOSIT UNPAID | | -$26,425 | -$14,271 | -$20,000 | -$82 | | -$60,779 |
| Acct *2995 TRANSFER OUT | | | -$792 | -$11,738 | -$10,345 | -$3,687 | -$26,562 |
| WIRE OUT | | -$68,508,763 | -$95,626,802 | -$18,516,802 | -$2,119,220 | -$16,500 | -$184,788,086 |
| **Grand Total** | | **-$68,557,013** | **-$95,663,668** | **-$18,564,402** | **-$2,137,336** | **-$21,738** | **-$184,944,157** |

### II. Wire Transfers out of account: STMNT Processed_7780

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **WIRE OUT** | CNH Finance Fund | -$26,590,799 | -$95,626,802 | -$18,516,802 | -$1,008,714 | | -$141,743,116 |
| **WIRE OUT** | Ecapital Healthcare | | | | -$7,026 | | -$7,026 |
| **WIRE OUT** | Olympia Health | | | | | -$5,000 | -$5,000 |
| **WIRE OUT** | OMC CMA Acct | | | | -$41,237 | -$11,500 | -$52,737 |
| **WIRE OUT** | Plaza MOB | | | | -$1,062,243 | | -$1,062,243 |
| **WIRE OUT** | WO HEALTHCO | -$41,917,964 | | | | | -$41,917,964 |
| **WIRE OUT Total** | | **-$68,508,763** | **-$95,626,802** | **-$18,516,802** | **-$2,119,220** | **-$16,500** | **-$184,788,086** |
| **Grand Total** | | **-$68,508,763** | **-$95,626,802** | **-$18,516,802** | **-$2,119,220** | **-$16,500** | **$ (184,788,086)** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**I. Deposits: STMNT Processed_7798**

| GCS Acct | 7798 |
|---|---|
| Credit | (All) |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH BATCH ADJ | $1,760 | $2,593 | | | | $4,353 |
| PAYROLL | | $1,727 | | | | $1,727 |
| RETURNED CK | $9,482 | $14,726 | | | | $24,208 |
| TAX | $382,352 | | | | | $382,352 |
| ZBA BAL TRNSFR IN (Acct *2995) | $34,954,436 | $35,951,443 | $14,769,303 | $45,203 | $5,547 | $85,725,932 |
| **Grand Total** | **$35,348,030** | **$35,970,489** | **$14,769,303** | **$45,203** | **$5,547** | **$86,138,572** |

**II. Withdrawals: STMNT Processed_7798**

| GCS Acct | 7798 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH BATCH OUT | -$24,594,140 | -$24,494,213 | -$5,768,278 | -$1,633 | | -$54,858,263 |
| B TO B ACH DEBIT | | | -$1,977,577 | -$791 | -$5,547 | -$1,983,915 |
| CHECK | -$1,844,243 | -$1,609,656 | -$1,514,667 | -$818 | | -$4,969,384 |
| LEGAL ORDER (Acct *2995) | -$558,985 | | | | | -$558,985 |
| PAYMENT | | | -$286,820 | | | -$286,820 |
| PAYROLL | -$1,648,646 | -$1,588,811 | -$585,160 | | | -$3,822,617 |
| TAX | -$6,323,488 | -$8,277,810 | -$4,276,117 | -$41,961 | | -$18,919,376 |
| TRANSFER OUT (Acct *7573) | -$315,084 | | | | | -$315,084 |
| WIRE OUT | -$63,445 | | -$360,684 | | | -$424,129 |
| **Grand Total** | **-$35,348,030** | **-$35,970,489** | **-$14,769,303** | **-$45,203** | **-$5,547** | **-$86,138,572** |

**II.A. Wire transfers out of account: STMNT Processed_7798**

| GCS Acct | 7798 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Name | 2019 | 2021 |
| **WIRE OUT** | | -$3,640 | |
| **WIRE OUT** | | -$2,816 | |
| **WIRE OUT** | | -$2,105 | |
| **WIRE OUT** | | -$2,929 | |
| **WIRE OUT** | Dcg&T AS Truste | | -$360,684 |
| **WIRE OUT** | | -$3,025 | |
| **WIRE OUT** | | -$2,771 | |
| **WIRE OUT** | | -$1,982 | |
| **WIRE OUT** | | -$3,551 | |
| **WIRE OUT** | | -$2,756 | |
| **WIRE OUT** | Matthew William | -$6,197 | |
| **WIRE OUT** | | -$3,522 | |
| **WIRE OUT** | | -$3,001 | |
| **WIRE OUT** | | -$3,805 | |
| **WIRE OUT** | | -$3,063 | |
| **WIRE OUT** | | -$2,373 | |
| **WIRE OUT** | | -$3,142 | |
| **WIRE OUT** | | -$3,009 | |
| **WIRE OUT** | | -$4,562 | |
| **WIRE OUT** | | -$3,178 | |
| **WIRE OUT** | | -$2,020 | |
| **WIRE OUT Total** | | **-$63,445** | **-$360,684** |
| **Grand Total** | | **-$63,445** | **-$360,684** |

**A0997**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**I. Deposits: STMNT Processed_9017**

| GCS Acct | 9017 |
|---|---|
| Credit | (All) |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT/RETURN | $8,809 | $2,192 | $181 | | | $11,182 |
| CHRGBK | | $5,200 | | | | $5,200 |
| NSF CHRGBK | $527,183 | | | | | $527,183 |
| RETURNED CK | $8,401 | $301,405 | $76,399 | $2,488 | $104 | $388,796 |
| TAX | $5,895 | | $349 | | | $6,243 |
| ZBA BAL TRNSFR IN | $31,063,811 | $33,425,501 | $13,902,458 | $1,272,229 | $277,208 | $79,941,207 |
| **Grand Total** | **$31,614,099** | **$33,734,298** | **$13,979,387** | **$1,274,717** | **$277,312** | **$80,879,811** |

Acct *7573

**II. Withdrawals: STMNT Processed_9017**

| GCS Acct | 9017 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH RETURN | -$1,892 | | | | | -$1,892 |
| B TO B ACH DEBIT | | | -$1,000 | | | -$1,000 |
| BANK CHRG | -$82,911 | -$63,301 | -$53,980 | -$24,666 | -$12,107 | -$236,965 |
| CHECK | -$25,710,545 | -$26,455,396 | -$13,387,143 | -$1,247,451 | -$264,609 | -$67,065,144 |
| GCS RESEARCH | -$25 | | | | | -$25 |
| PAYMENT | -$13,046 | | | | | -$13,046 |
| TAX | -$21,342 | -$14,312 | -$6,005 | -$2,599 | -$595 | -$44,853 |
| TRANSFER OUT | -$198,849 | -$88,842 | | | | -$287,691 |
| WIRE OUT | -$5,585,489 | -$7,112,448 | -$531,259 | | | -$13,229,195 |
| **Grand Total** | **-$31,614,099** | **-$33,734,298** | **-$13,979,387** | **-$1,274,717** | **-$277,312** | **$ (80,879,811)** |

Acct *7573

**A0998**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**II.A. Wire transfers out of account: STMNT Processed_9017**

| GCS Acct | 9017 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | Grand Total |
| **WIRE OUT** | ████4658 | -$124,615 | | | -$124,615 |
| **WIRE OUT** | AIG | -$127,320 | | | -$127,320 |
| **WIRE OUT** | Almazan & Finneman | | | -$31,500 | -$31,500 |
| **WIRE OUT** | AMA | -$123 | | | -$123 |
| **WIRE OUT** | Bridgeport Capi | | -$126,084 | | -$126,084 |
| **WIRE OUT** | California Stra | | -$20,000 | | -$20,000 |
| **WIRE OUT** | Cardinal Health | -$1,540,156 | -$1,540,223 | -$185,000 | -$3,265,379 |
| **WIRE OUT** | Centinel Spine, | | | -$11,500 | -$11,500 |
| **WIRE OUT** | Change Healthca | | | -$26,211 | -$26,211 |
| **WIRE OUT** | Cnc Contractrs | -$183,775 | | | -$183,775 |
| **WIRE OUT** | Cse-Capro,LLC S | -$28,750 | | | -$28,750 |
| **WIRE OUT** | Emerald Los Ang | | | -$40,000 | -$40,000 |
| **WIRE OUT** | Hss Inc | -$45,000 | | | -$45,000 |
| **WIRE OUT** | ████ | -$306,845 | | | -$306,845 |
| **WIRE OUT** | Medline Industr | -$2,487,478 | -$5,010,908 | | -$7,498,386 |
| **WIRE OUT** | Medtronic USA, | -$75,692 | | | -$75,692 |
| **WIRE OUT** | Metlife | -$68,214 | | | -$68,214 |
| **WIRE OUT** | Pipeline Health | | | -$48,000 | -$48,000 |
| **WIRE OUT** | Plaza MOB | -$60,000 | | | -$60,000 |
| **WIRE OUT** | Restorixhealth, | -$328,389 | -$355,270 | | -$683,659 |
| **WIRE OUT** | Stryker Corpora | | | -$107,345 | -$107,345 |
| **WIRE OUT** | U.S. Bank Equip | -$13,500 | | | -$13,500 |
| **WIRE OUT** | Vitello Consult | | -$25,000 | | -$25,000 |
| **WIRE OUT** | Wells Fargo Comm Mortg | -$37,500 | | | -$37,500 |
| **WIRE OUT** | Windham Profess | | | -$42,031 | -$42,031 |
| **WIRE OUT** | Woodruff-Sawyer | | | -$14,673 | -$14,673 |
| **WIRE OUT** | Workterra | -$15,531 | | | -$15,531 |
| **WIRE OUT** | Zimmer US, Inc | -$142,601 | -$59,962 | | -$202,563 |
| **Grand Total** | | **-$5,585,489** | **-$7,112,448** | **-$531,259** | **$ (13,229,195)** |

**A0999**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**I. Deposits: STMNT Processed_9017**

| GCS Acct | 9017 |
| Credit | (All) |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT/RETURN | $8,809 | $2,192 | $181 | | | $11,182 |
| CHRGBK | | $5,200 | | | | $5,200 |
| NSF CHRGBK | $527,183 | | | | | $527,183 |
| RETURNED CK | $8,401 | $301,405 | $76,399 | $2,488 | $104 | $388,796 |
| TAX | $5,895 | | $349 | | | $6,243 |
| Acct *7573 ZBA BAL TRNSFR IN | $31,063,811 | $33,425,501 | $13,902,458 | $1,272,229 | $277,208 | $79,941,207 |
| **Grand Total** | **$31,614,099** | **$33,734,298** | **$13,979,387** | **$1,274,717** | **$277,312** | **$80,879,811** |

**II. Withdrawals: STMNT Processed_9017**

| GCS Acct | 9017 |
| Debit | (All) |
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH RETURN | -$1,892 | | | | | -$1,892 |
| B TO B ACH DEBIT | | | -$1,000 | | | -$1,000 |
| BANK CHRG | -$82,911 | -$63,301 | -$53,980 | -$24,666 | -$12,107 | -$236,965 |
| CHECK | -$25,710,545 | -$26,455,396 | -$13,387,143 | -$1,247,451 | -$264,609 | -$67,065,144 |
| GCS RESEARCH | -$25 | | | | | -$25 |
| PAYMENT | -$13,046 | | | | | -$13,046 |
| TAX | -$21,342 | -$14,312 | -$6,005 | -$2,599 | -$595 | -$44,853 |
| Acct *7573 TRANSFER OUT | -$198,849 | -$88,842 | | | | -$287,691 |
| WIRE OUT | -$5,585,489 | -$7,112,448 | -$531,259 | | | -$13,229,195 |
| **Grand Total** | **-$31,614,099** | **-$33,734,298** | **-$13,979,387** | **-$1,274,717** | **-$277,312** | **$ (80,879,811)** |

**II.A. Wire transfers out of account: STMNT Processed_9017**

| GCS Acct | 9017 |
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| | Transaction Type Name | 2019 | 2020 | 2021 | Grand Total |
| 12/16/2019 | WIRE OUT 2000045334658 | -$124,615 | | | -$124,615 |
| | WIRE OUT AIG | -$127,320 | | | -$127,320 |
| | WIRE OUT Almazan & Finneman | | | -$31,500 | -$31,500 |
| | WIRE OUT AMA | -$123 | | | -$123 |
| | WIRE OUT Bridgeport Capi | | -$126,084 | | -$126,084 |
| | WIRE OUT California Stra | | -$20,000 | | -$20,000 |
| | WIRE OUT Cardinal Health | -$1,540,156 | -$1,540,223 | -$185,000 | -$3,265,379 |
| | WIRE OUT Centinel Spine, | | | -$11,500 | -$11,500 |
| | WIRE OUT Change Healthca | | -$26,211 | | -$26,211 |
| | WIRE OUT Cnc Contractrs | -$183,775 | | | -$183,775 |
| | WIRE OUT Cse-Capro,LLC S | -$28,750 | | | -$28,750 |
| | WIRE OUT Emerald Los Ang | | | -$40,000 | -$40,000 |
| | WIRE OUT Hss Inc | -$45,000 | | | -$45,000 |
| | WIRE OUT Lewis Brisbois | -$306,845 | | | -$306,845 |
| | WIRE OUT Medline Industr | -$2,487,478 | -$5,010,908 | | -$7,498,386 |
| | WIRE OUT Medtronic USA, | -$75,692 | | | -$75,692 |
| | WIRE OUT Metlife | -$68,214 | | | -$68,214 |
| | WIRE OUT Pipeline Health | | | -$48,000 | -$48,000 |
| | WIRE OUT Plaza MOB | -$60,000 | | | -$60,000 |
| | WIRE OUT Restorixhealth, | -$328,389 | -$355,270 | | -$683,659 |
| | WIRE OUT Stryker Corpora | | | -$107,345 | -$107,345 |
| | WIRE OUT U.S. Bank Equip | -$13,500 | | | -$13,500 |
| | WIRE OUT Vitello Consult | | -$25,000 | | -$25,000 |
| | WIRE OUT Wells Fargo Comm Mortg | -$37,500 | | | -$37,500 |
| | WIRE OUT Windham Profess | | | -$42,031 | -$42,031 |
| | WIRE OUT Woodruff-Sawyer | | -$14,673 | | -$14,673 |
| | WIRE OUT Workterra | -$15,531 | | | -$15,531 |
| | WIRE OUT Zimmer US, Inc | -$142,601 | -$59,962 | | -$202,563 |
| **Grand Total** | | **-$5,585,489** | **-$7,112,448** | **-$531,259** | **$ (13,229,195)** |

**A1000**

# Schedules A.7.3.1 – A.7.3.2
# Plaza MOB Bank Account Summaries

**Schedule A.7.3.1 – Account *2120**
**Schedule A.7.3.2 – Account *2210**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

**I. Deposits: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | | | $272 | | | $272 |
| DEPOSIT | $3,883,566 | $3,124,420 | $2,169,454 | $16,790 | $239,779 | $9,434,010 |
| INV PYMT RCVD | | $196,664 | $190,268 | | | $386,932 |
| LOAN 9223 PMT REVRS | $143,676 | | | | | $143,676 |
| NSF CHRGBK | | | | $1,521,467 | $1,593,175 | $3,114,642 |
| RENT PYMNT RCVD | | $74,553 | $76,218 | | | $150,770 |
| RETURNED CK | $1,516 | | $300 | | | $1,816 |
| WIRE IN | $3,133,683 | $472,897 | $918,583 | $3,573,687 | $233,565 | $8,332,414 |
| (1) WIRE IN - 2019 REFI | $8,565,154 | | | | | $8,565,154 |
| (2) WIRE IN - 2021 SALE | | | $15,770,214 | | | $15,770,214 |
| Grand Total | $15,727,595 | $3,868,534 | $19,125,309 | $5,111,944 | $2,066,519 | $45,899,901 |

(1)

| | |
|---|---|
| 06/20/2019 WT Fed#00884 First American Tru /Org=First American Title Insurance Comp Srf# 20191710274000 Trn#190620077757 Rfb# | $8,444,478 |
| 06/20/2019 WT Fed#01490 First American Tru /Org=First American Title Insurance Comp Srf# 20191710467300 Trn#190620104850 Rfb# | $120,236 |
| 06/21/2019 WT Fed#02501 First American Tru /Org=First American Title Insurance Comp Srf# 20191720074200 Trn#190621128333 Rfb# | $440 |
| | $8,565,154 |

(2)

| | |
|---|---|
| 08/31/2021 WT Fed#05028 First American Tru /Org=First American Title Insurance Comp Srf# 20212431446700 Trn#210831194681 Rfb# | $15,769,770 |
| 09/02/2021 WT Fed#02074 First American Tru /Org=First American Title Insurance Comp Srf# 20212450620800 Trn#210902124089 Rfb# | $444 |
| | $15,770,214 |

**I.A. Wire transfers received into account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE IN | ALECTO HEALTHCA | $160,000 | $227,000 | | $2,475,884 | $233,565 | $3,096,449 |
| WIRE IN | OLYMPIA MEDICAL | $305,000 | | | $1,097,803 | | $1,402,803 |
| WIRE IN | PLAZA MOB 2210 | $2,026,578 | | | | | $2,026,578 |
| WIRE IN | Richmar Consult | $28,000 | | | | | $28,000 |
| WIRE IN | WELLS FARGO BANK | $614,105 | $245,897 | $918,335 | | | $1,778,337 |
| WIRE IN | Woodruff-Sawyer | | | $248 | | | $248 |
| WIRE IN Total | | $3,133,683 | $472,897 | $918,583 | $3,573,687 | $233,565 | $8,332,414 |
| Grand Total | | $3,133,683 | $472,897 | $918,583 | $3,573,687 | $233,565 | $8,332,414 |

**A1002**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

### II.  Withdrawals: STMNT Processed_2120

| GCS Acct | 2120 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| CHECK | -$1,111,256 | -$1,192,111 | -$874,797 | | | -$3,178,163 |
| LOAN 9223 PAYMENT | -$1,025,732 | | | | | -$1,025,732 |
| PAYMENT | -$103 | | | | | -$103 |
| UNPAID DEPOSIT | -$3,889 | | | | | -$3,889 |
| (1) WIRE OUT | -$3,985,106 | -$2,387,835 | -$1,278,196 | -$19,637,298 | -$4,975,820 | -$32,264,255 |
| (2) WIRE OUT - 2019 REFI | -$9,565,154 | | | | | -$9,565,154 |
| Grand Total | -$15,691,238 | -$3,579,946 | -$2,152,993 | -$19,637,298 | -$4,975,820 | -$46,037,295 |

(2)

| | | |
|---|---|---|
| 06/20/2019 WT Fed#04645 City National Bank /Ftr/Bnf=Richard A. Hayes, Inc., Client Trus Srf# Gw00000025652401 Trn#190620114876 Rfb# 4030 | | ($8,444,478) |
| 07/31/2019 WT FED#04959 CITY NATIONAL BANK /FTR/BNF=RICHARD A. HAYES, INC., SRF# GW00000026630089 TRN#190731148701 RFB# 4049 | | ($620,676) |
| 09/26/2019 WT Fed#04787 City National Bank /Ftr/Bnf=Richard A. Hayes, Inc Srf# Gw00000027989004 Trn#190926149692 Rfb# 4072 | | ($500,000) |
| | | ($9,565,154) |

### II.A. Wire transfers out of account: STMNT Processed_2120

| GCS Acct | 2120 | | =Transfers during "Plaza MOB Gap Period" |
|---|---|---|---|
| Debit | (Multiple Items) | | |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | ALECTO HEALTHCA | -$2,731,226 | -$280,000 | | -$9,245,189 | -$4,672,414 | -$16,928,829 |
| WIRE OUT | Davis-Dyer-Max, | | | -$32,559 | | | -$32,559 |
| WIRE OUT | Dilworth Paxson | | -$20,000 | | | | -$20,000 |
| WIRE OUT | FIRST CLEARING, | | | | -$3,892,499 | | -$3,892,499 |
| WIRE OUT | HOLTZ, SLAVETT | | | | -$5,795,236 | | -$5,795,236 |
| WIRE OUT | MUFG Union Bank 2932 | -$155,830 | | | | | -$155,830 |
| WIRE OUT | OLYMPIA CMA | | | | -$548,025 | | -$548,025 |
| WIRE OUT | OLYMPIA MEDICAL | -$290,000 | -$125,000 | -$14,673 | -$120,848 | -$188,406 | -$738,927 |
| WIRE OUT | Ream, Trustee for Various Invest | -$755,150 | -$1,812,369 | -$1,222,447 | | | -$3,789,966 |
| WIRE OUT | Richmar Consult | -$28,000 | | | | | -$28,000 |
| WIRE OUT | Shulman Bastian | | | | | -$115,000 | -$115,000 |
| WIRE OUT | Vitello Consult | | | | -$35,500 | | -$35,500 |
| WIRE OUT | Woodruff-Sawyer | | -$170,466 | -$8,517 | | | -$178,983 |
| WIRE OUT | Commercial Due Diligence | -$4,900 | | | | | -$4,900 |
| WIRE OUT Total | | -$3,985,106 | -$2,387,835 | -$1,278,196 | -$19,637,298 | -$4,975,820 | -$32,264,255 |
| Grand Total | | -$3,985,106 | -$2,387,835 | -$1,278,196 | -$19,637,298 | -$4,975,820 | -$32,264,255 |

| Net wire transfers to Alecto "Post-Assignment" | | Net wire transfers to Affiliates "Post-Assignment" | |
|---|---|---|---|
| $2,709,449 | from Alecto | $1,097,803 | from Olympia HC/OMC |
| ($13,917,603) | to Alecto | ($871,953) | to Olympia HC/OMC |
| ($11,208,155) | Net wire transfers to Alecto | $225,850 | Net wire transfers to Olympia HC/OMC |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

**I.A.2019 Wire transfers into account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | Mo | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 Grand Total | |
| Transaction Type | Name | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| WIRE IN | ALECTO HEALTHCA | | | | | | | $160,000 | $160,000 |
| WIRE IN | PLAZA MOB 2210 | $210,454 | $310,025 | $350,087 | | | | | $870,566 |
| WIRE IN | Richmar Consult | | | | | | $28,000 | | $28,000 |
| WIRE IN | WELLS FARGO BANK | | $500,000 | $25,330 | $24,263 | $46,249 | $18,263 | | $614,105 |
| WIRE IN - 2019 REFI | First American | $8,565,154 | | | | | | | $8,565,154 |
| Grand Total | | $8,775,608 | $810,025 | $375,417 | $24,263 | $46,249 | $46,263 | $160,000 | $10,237,824 |

**I.A.2020 Wire transfers into account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (All) |

| Sum of Amount | | Yr | Mo | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 Grand Total |
| Transaction Type | Name | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| WIRE IN | ALECTO HEALTHCA | | $227,000 | | | | | | $227,000 |
| WIRE IN | WELLS FARGO BANK | $48,918 | $38,017 | $32,800 | $35,699 | $43,233 | $20,000 | $12,500 | $14,730 | $245,897 |
| Grand Total | | $48,918 | $265,017 | $32,800 | $35,699 | $43,233 | $20,000 | $12,500 | $14,730 | $472,897 |

**I.A.2021 Wire transfers into account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (All) |

| Sum of Amount | | Yr | Mo | | |
|---|---|---|---|---|---|
| | | 2021 | 2021 | 2021 | 2021 Grand Total |
| Transaction Type | Name | 5 | 8 | 9 | |
| WIRE IN | WELLS FARGO BANK | | | $918,335 | $918,335 |
| WIRE IN | Woodruff-Sawyer | $248 | | | $248 |
| WIRE IN - 2021 SALE | First American | | $15,769,770 | $444 | $15,770,214 |
| Grand Total | | $248 | $15,769,770 | $918,779 | $16,688,797 |

| Net wire transfers to Alecto in "Plaza MOB Gap Period" | | Net wire transfers to Affiliates in "Plaza MOB Gap Period" | |
|---|---|---|---|
| $160,000 | from Alecto 2019 | ($125,000) | to Olympia Medical |
| $227,000 | from Alecto 2020 | | |
| ($2,731,226) | to Alecto 2019 | | |
| ($280,000) | to Alecto 2020 | | |
| ($2,624,226) | Net wire transfers to Alecto | | |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

**II.A. 2019 Wire transfers out of account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| Transaction 1 Name | | 7 | 8 | 9 | 10 | 11 | 12 | |
| WIRE OUT ALECTO HEALTHCA | | -$2,571,226 | | | | | -$160,000 | -$2,731,226 |
| WIRE OUT MUFG Union Bank 2932 | | | -$155,830 | | | | | -$155,830 |
| WIRE OUT Ream, Trustee for Various Invest | | | -$152,680 | -$152,680 | -$148,555 | -$152,680 | -$148,555 | -$755,150 |
| WIRE OUT Richman Consult | | | | | | -$28,000 | | -$28,000 |
| WIRE OUT Total | | -$2,571,226 | -$308,510 | -$152,680 | -$148,555 | -$180,680 | -$308,555 | -$3,670,206 |
| Grand Total | | -$2,571,226 | -$308,510 | -$152,680 | -$148,555 | -$180,680 | -$308,555 | -$3,670,206 |

**II.A. 2020 Wire transfers out of account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | | | | | | | 2020 Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 |
| Transaction 1 Name | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| WIRE OUT ALECTO HEALTHCA | | -$280,000 | | | | | | | | | | | -$280,000 |
| WIRE OUT OLYMPIA MEDICAL | | | -$125,000 | | | | | | | | | | -$125,000 |
| WIRE OUT Ream, Trustee for Various Invest | | -$152,680 | -$160,314 | -$144,430 | -$152,680 | -$148,555 | -$152,680 | -$148,555 | -$152,145 | -$152,145 | -$148,020 | -$152,145 | -$148,020 | -$1,812,369 |
| WIRE OUT Woodruff-Sawyer | | | | | | | | -$170,466 | | | | | -$170,466 |
| WIRE OUT Total | | -$432,680 | -$285,314 | -$144,430 | -$152,680 | -$148,555 | -$152,680 | -$319,021 | -$152,145 | -$152,145 | -$148,020 | -$152,145 | -$148,020 | -$2,387,835 |
| Grand Total | | -$432,680 | -$285,314 | -$144,430 | -$152,680 | -$148,555 | -$152,680 | -$319,021 | -$152,145 | -$152,145 | -$148,020 | -$152,145 | -$148,020 | -$2,387,835 |

**II.A. 2021 Wire transfers out of account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | | | 2021 Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| | | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 |
| Transaction 1 Name | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| WIRE OUT Davis-Dyer-Max, | | | | | | | | | -$32,559 | -$32,559 |
| WIRE OUT OLYMPIA MEDICAL | | | | | | | | -$14,673 | | -$14,673 |
| WIRE OUT Ream, Trustee for Various Invest | | -$152,145 | -$152,145 | -$139,770 | -$152,145 | -$173,020 | -$152,145 | -$148,020 | -$153,058 | -$1,222,447 |
| WIRE OUT Woodruff-Sawyer | | | | | | | -$8,517 | | | -$8,517 |
| WIRE OUT Total | | -$152,145 | -$152,145 | -$139,770 | -$152,145 | -$173,020 | -$160,662 | -$162,693 | -$185,617 | -$1,278,196 |
| Grand Total | | -$152,145 | -$152,145 | -$139,770 | -$152,145 | -$173,020 | -$160,662 | -$162,693 | -$185,617 | -$1,278,196 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

**I. Deposits: STMNT Processed_2210**

| GCS Acct | 2210 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | |
|---|---|---|
| Transaction Type | 2019 | Grand Total |
| DEPOSIT | $2,017,168 | $2,017,168 |
| **Grand Total** | **$2,017,168** | **$2,017,168** |

**II. Withdrawals: STMNT Processed_2210**

| GCS Acct | 2210 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Name | 2019 | Grand Total |
| **PAYMENT** | | -$93 | -$93 |
| **WIRE OUT** | PLAZA MOB 2120 | -$2,031,578 | -$2,031,578 |
| **Grand Total** | | **-$2,031,671** | **-$2,031,671** |

**A1006**

**Exhibit E**
Contracts to be Assumed

| List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|
| Commercial Insurance Premium Finance and Security Agreement (Quote No. x0380) for Policy No. x8117 - Property Insurance | Bank Direct Capital Finance 150 North Field Drive, Suite 190 Lake Forest, IL 60045 |
| Commercial Insurance Premium Finance and Security Agreement (Quote No. x2606) for Policy No. x1701 – Extending Reporting Professional Liability Policy | Bank Direct Capital Finance 150 North Field Drive, Suite 190 Lake Forest, IL 60045 |
| Commercial Insurance Premium Finance and Security Agreement (Quote No. 45720646 for Policy No. 02-462-55-24, 02-462-55-22, NHS703822 | Stetson Insurance Funding, LLC 6450 Transit Road Depeur, NY 14043 |
| Medical Insurance Benefits | Anthem Blue Cross PO Box 51011 Los Angeles, CA 90051 |
| Dental and Vision Insurance Benefits | Met Life 811 Main Street, 7th Floor Kansas City, MO 64105 |
| Life Insurance Benefits | Unum 655 N. Central, Suite 900 Glendale, CA 91203 |
| Insurance Directors & Officers Employment Practices Fiduciary & Crime - Primary Layer Term: 1/31/2023 - 1/31/2024 Policy No.: 02-462-55-16 | National Union Fire Insurance Co 28 Liberty Street New York, NY 10005 |
| Insurance Excess Directors & Officers Employment Practices Term: 1/31/2023 - 1/31/2024 Policy No. NHS 703822 | RSUI Indemnity Company 945 East Paces Ferry Road Suite 1800 Atlanta, GA 30376 |
| Insurance Excess Directors & Officers Employment Practices Term: 1/31/2023 - 1/31/2024 Policy No. 02-462-55-24 | National Union Fire Insurance Co 28 Liberty Street New York, NY 10005 |
| Insurance Comprehensive Employer Indemnity Term: 3/1/2023 - 3/31/2024 Policy No. ORNSOL000039-01 | Old Republic Union Insurance Co 307 N Michigan Avenue Chicago, IL 60601 |

1

| Insurance<br>Workers Compensation Term: 4/1/2023 - 41/2024 Policy No. BNUWC0153849 | StarNet Insurance Company<br>9301 Innovation Drive Suite 200<br>Manassa, VA 20110 |
|---|---|
| InsuranceAutomobile<br>Term: 6/1/2023 - 6/1/2024 Policy No. 5087-0849-02 | Vantapro Specialty Insurance Co<br>199 Water Street<br>New York, NY 10038 |
| Insurance<br>"All Risks" Property incl Boiler & Machinery & Flood, excluding CA EM<br>Term: 7/1/2022 – 7/1/2023 Policy No. 018258117 | American Home Assurance Co<br>175 Water Street<br>New York, NY 10038 |
| Insurance<br>Excess Medical Professional General Liability for TX (WNJ) Exposure Only<br>Term: 8//1/2022 -<br>8/1/2023<br>Policy No. HUL 09114235 | Magmutual Professional Security Ins Co<br>PO Box 52979<br>Atlanta, GA 30355 |
| InsuranceEnvironmental Pollution Storage Tank Liability - WNJ Term: 8/1/2022 - 8/1/2023 Policy No. PSPIUSCBM76002 | Ironshore Specialty Insurance Co<br>175 Berkeley Street<br>Boston, MA 02116 |
| InsuranceCyber Liability<br>Term: 8/1/42022 - 8/14/2023<br>Policy No. C-4LPY-047551-CYBER-2002 | Coalition Insurance Solutions Arch Specialty - 45% Fireman's Fund - 25% Ascot Specialty - 25%<br>North American Capacity - 5% |
| Insurance<br>3 Year Extended Reporting Period Excess Medical Professional General Liability Coverage for Non TX Exposures<br>Term: 8/1/2022 - 8/1/2025 Policy No. x1701 | Endurance American Specialty Ins Co<br>16052 Swingley Ridge Road Suite 130<br>St Louis, MO 63017 |
| Sublease dated 1/31/2023<br>Approximately 2,862 square feet of office space located at 101 N. Brand Boulevard, Suite 1920, Glendale, CA 91203 | Pacific Global<br>Investment<br>Management Group<br>Attn: SVP<br>101 N. Brand Blvd., Suite 1950<br>Glendale, CA 91203 |
| Record Storage and Data Agreement dated 2/1/2023 | GRM Information Management of San Francisco, LLC 40199 Boyce Road<br>Fremont, CA 94538 |

2

**Exhibit F**

Contracts to be Rejected[1]

| List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|
| Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals | Cardinal Health 110, LLC c/o Porter Wright Morris & Arthur LLC 41 South High Street, Suite 2900 Columbus, Ohio 43215 |
| Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals | Cardinal Health 200, LLC c/o Porter Wright Morris & Arthur LLC 41 South High Street, Suite 2900 Columbus, Ohio 43215 |
| Prime Vendor Agreement - Distribution Agreement for Pharmaceuticals dated 6/1/2016 First Amendment dated 12/5/2016 Second Amendment dated 3/7/2017 Third Amendment dated 6/20/2017 | Cardinal Health 110, LLC and Cardinal Health, Inc. c/o Porter Wright Morris & Arthur LLC 41 South High Street, Suite 2900 Columbus, Ohio 43215 |
| Guaranty dated 10/31/2014 Guarantee re Sherman/Grayson Hospital, LLC obligations to MPT of Sherman-Alecto, LLC for Capital Reserve Deposits | MPT of Sherman-Alecto Hospital, LLC Attn Larry Portal, SVP Attn Legal Department 1000 Urban Center Drive, Suite 501 Birmingham, AL 35242 |
| Guaranty dated 9/19/2014 Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC | MPT of Fairmont-Alecto Hospital, LLC Attn Larry Portal, SVP Attn Legal Department 1000 Urban Center Drive, Suite 501 Birmingham, AL 35242 |
| Guaranty dated 6/1/2017 Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Wheeling LLC and Alecto Healthcare Services Martin's Ferry LLC | MPT of Wheeling-Alecto Hospital, LLC MPT of Martins Ferry-Alecto Hospital, LLC Attn Larry Portal, SVP Attn Legal Department 1000 Urban Center Drive, Suite 501 Birmingham, AL 35242 |
| Guaranty dated 9/23/2014 | Sherman/Grayson Health System, LLC LHP Hospital Group, Inc. c/o Ardent Health Services Attn Legal Department One Burton Hills Boulevard Suite 250 Nashville, TN 37215 |

---

[1] Certain contracts listed herein may not be executory contracts, as defined by Section 365 of the Bankruptcy Code, but have been included because they were included on Schedule G of the Debtor's schedules are included herein solely for the purposes of ensuring notice to the non-debtor parties to such contracts that such contracts are being terminated on the effective date.

**<u>EXHIBIT G</u>**

Liquidation Analysis

**Alecto Healthcare**
**LIQUIDATION ANALYSIS**
**as of October 4, 2023**

|  | CHAPTER 11 | | CHAPTER 7 | |
|---|---|---|---|---|
| Cash and Accounts Receivable [1] |  |  | $ | 170,000 |
| Year 1 disposable income [2] | $ | 339,163.00 | $ | - |
| Year 2 disposable income [2] | $ | 533,763.00 | $ | - |
| Year 3 disposable income [2] | $ | 489,332.00 | $ | - |
| Other assets [3] |  |  |  |  |
| Distributions from subsidiaries [4] | $ | 187,500.00 | $ | 187,500.00 |
| Furniture and Equipment [5] | $ | - |  | $29,838.36 |
| Vehicles [6] |  |  |  | $21,000.00 |
| Causes of Action [7] | $ | 25,000 | $ | - |
| **Total Assets** | **$** | **1,574,758** | **$** | **408,338** |
| Postconfirmation attorneys fees [8] |  | $150,000.00 |  |  |
| Chapter 7 Trustee Fee [9] |  |  |  | $16,000.00 |
| Chapter 7 Trustee Counsel [10] |  |  |  | $75,000.00 |
| **Total Fees** | **$** | **150,000** | **$** | **91,000** |
| **Available for Payment of Claims** | **$** | **1,424,758** | **$** | **317,338** |

NOTES

(1) - The Debtor estimates that as of the Effective Date, the estate will have $170,000 of cash and accounts receivable. Note that the amounts depends upon the timing of payments made/received, and is the estimate is premised upon an Effective Date of December 7, 2023. Note that this amount is not available for distribution to creditors under the Chapter 11 Plan as these amounts are necessary for payment of incurred and ongoing expenses (and which would otherwise be administrative expenses) and are already included in the calculus of disposable income in Year 1.

(2) - See Projected Income and Expenses attached as Exhibit C to Plan. In the event of liquidation, the Debtor's estate would not receive any income received from the Debtor's subsdiary, Alecto Healthcare Services Hayward LLC, on account of services provided to St. Rose Hospital.

**A1011**

(3) - This is intended to include all other assets of the Debtor available for distribution to creditors.

(4) - This includes distributions expected to be received from the estate of Sherman/Grayson Hospital, LLC on account of the Debtor's claim, which may be the subject of a compromise. As more fully set forth in the Plan, the Debtor does not believe, based upon the assets and liabilities of other direct and indirect subsidiaries of the Debtor, that there will be any value to be received by the Debtor on account of its interests in those entities.

(5) - See Schedule A.39 and A.41.

(6) - See Schedule A.47.

(7) - See the report attached as Exhibit D to the Plan. As more fully set forth therein, as determined by the Independent Director, the insiders have no liability for avoidable transfers. Notwithstanding the foregoing, the insiders have agreed to provide the estate with $25,000 for the benefit of creditors in order to get releases from the estate. The insiders have not agreed to remit any payment to the estate in the event that the case converts to Chapter 7.

(8) - The Debtor anticipates that after confirmation, the estate will continue to incurr signfiicant fees in connection with the Reed Creditors' appeal(s). Further, there may be other matters left to address after confirmation, although the Debtor may object to certain claims, and other matters necessary to administer the estate prior to closing the bankruptcy case.

(9) - See 11 U.S.C. S 326.

(10) - The primarily differences between the professional fees of the reorganized debtors and those of a Chapter 7 trustee include the following: (i) the need for the Chapter 7 Trustee and its counsel to become familiar with the underlying facts of the case, (ii) the need to prepare for and attend a 341 meeting, (iii) the preparation and filing of retention application(s) for the Chapter 7 Trustee's professionals, and (iv) other costs which would not be necessary for a confirmed Chapter 11 case.

**A1012**

# Exhibit 34

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC, [1] | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtors | ) | **Related Docket No. 261** |

## OBJECTION OF THE REED ACTION JUDGMENT CREDITORS
## TO CONFIRMATION OF THE SMALL BUSINESS DEBTOR'S
## PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR

The Reed Action Judgment Creditors (the "Reed Creditors"), by and through undersigned counsel, hereby object to confirmation of the *Small Business Debtor's Plan of Reorganization Proposed by f the Debtor* [Docket No. 261] (the "Plan"). In support of their Objection, the Reed Creditors respectfully state as follows:

## PRELIMINARY STATEMENT

1. The primary infirmity with the Plan is the Debtor's proposal to release certain of its insiders from all claims for a payment of $25,000. Plan §VII.2. The Reed Creditors have expressed concern about the Debtor pursuing causes of action against its insiders in various filings with the Court beginning with the *Motion of the Reed Action Judgment Creditors for Entry of an Order Appointing an Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 1102(a)(3)* [D.I. 100] (the "Committee Motion").[2] The Debtor's objection to the Committee Motion made clear that Steve Balasiano, the Debtor's newly-appointed independent director "is specifically charged

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

[2] *See* Committee Motion ¶¶ 3 and 19; *Reply of the Reed Action Judgment Creditors in Support of their Committee Motion for Entry of an Order Appointing an Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 1102(a)(3)* [D.I. 134] ¶¶ 4 and 8; *Objection of the Reed Action Judgment Creditors Motion of the Debtor for an Order (i) Scheduling a Hearing on Plan Confirmation and Deadlines Related Thereto; and (ii) Approving the Solicitation, Notice and Tabulation Procedures and the Forms Related Thereto* [D.I. 169] ¶¶ 9, 10 and 12.

**A1014**

with sole and absolute discretion … to investigate potential claims against the Company's affiliates and insiders, and to bring any such action as he believes in his sole discretion are valid. [D.I. 127, ¶ 15].

      2.      The Debtor retained Gould Consulting Services (GCS") to investigate potential estate causes of action. GCS submitted the Report of Gould Consulting Services (the "GCS Report") to Alecto on or about September 28, 2023.  The purpose of the GCS Report was "to describe [GCS's] findings, procedures employed, and data and transactions analyzed in the forensic investigation of transactions by and between Alecto Healthcare Services, LLC … and its Affiliates and/or any current or former officers, directors, or equity holders …."[3] Alecto publicly filed the GCS Report as Exhibit D to the *Small Business Debtor's Chapter 11 Plan of Reorganization* dated September 14, 2023 [D.I. 154].  The Debtor states in the Plan that "GCS presented its report to Mr. Balasiano and conferred with Mr. Balasiano in order to provide Mr. Balasiano an opportunity to ask any questions or raise any issues with respect to the estate's potential claims against the Insiders.  At the conclusion of the conference, Mr. Balasiano determined that the estate does not have any valid claims against the Insiders for avoidable transfers". Plan § III.9.

      3.      Based on their review of the GCS Report and the relevant case documents, the Reed Creditors have identified at least two potential causes of action against the Alecto Members and its officers and directors.[4]  The first potential cause of action is a fraudulent transfer claim involving the Debtor's transfer of Sunrise Real Estate Holdings, LLC ("Sunrise REH) to the Debtor's

---

[3] *See* first paragraph of GCS Report.

[4] The Reed Creditors served document requests on the Debtor requesting the production of documents necessary for the Reed Creditors to test the conclusions reached by GCS in the GCS Report and Mr. Balasiano's determination that the estate does not have any valid claims against insiders for avoidable transfers. To date, the Debtor has produced 26,608 pages of documents purportedly responsive to the document requests and the Reed Creditors are in the process of reviewing those documents.

members (the "Alecto Members"). At the time of the transfer, Plaza Medical Office Building, LLC ("Plaza MOB"), a wholly owned subsidiary of Sunrise REH, was appraised at $50,700,000. In exchange for the transfer of Sunrise REH, the Debtor received consideration in the amount of $28,416,827, which consisted of (i) the payoff of $19,472,350 of the Debtor's secured debt and (ii) capital contributions from the Alecto Members totaling $8,944,477. The $28,416,827 consideration the Debtor received was more than $22 million less than the appraised value of Plaza MOB. The GCS Report acknowledges, as it must, that reasonably equivalent value was received in that transaction. Other transactions purporting to return value to the Debtor have no bearing on this fraudulent transfer claim.

4.     The second potential cause of action is a breach of fiduciary duty claim against Alecto's officers and directors arising from Alecto's advancement of funds to affiliates while it was insolvent or in the zone of insolvency instead of making payment to its creditors. By authorizing transfers to affiliates, well in excess of the amounts owed to its creditors, the Debtor's officers and directors breached their fiduciary duty to Alecto and its residual claimants.

5.     The Reed Creditors also object to Section VII.4 of the Plan. Although this section is captioned "Injunction", it is really a non-consensual third-party release because it enjoins creditors from pursuing the Released Parties. There is no basis in law or fact why the Released Parties are entitled to nonconsensual third-party releases.

6.     In addition, the Reed Creditors object to the compensation the Debtor proposes to pay to the Debtor's officers. Pursuant to the Plan, the Debtor proposes to pay (i) $750,000 to Laxman Reddy, the Debtor's President and CEO and (ii) $300,000 to Matt Williams, the Debtor's

CFO. Plan § IV.7.[5] This is more than the Debtor's three-year projected income of $848,049 for distribution to creditors. *See* Plan § 4.5.[6]

## **BACKGROUND**

7.      The Reed Creditors hold a liquidated, non-contingent and undisputed claim against the Debtor in the amount of $3,274,861.58, which is the largest liquidated and undisputed claim listed on the Debtor's schedules, other than intercompany claims.

8.      Alecto Healthcare Services, LLC ("Alecto" or the "Debtor") filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on June 16, 2023, and elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code pursuant to the Small Business Debtor Reorganization Act, as amended.  The Debtor filed the Plan on December 19, 2023.  On December 21, 2023, the Court entered its *Order (i) Scheduling a Hearing on Plan Confirmation and Deadlines Related Thereto; and (ii) Approving the Notice and the Forms Related Thereto* [Docket No. 267] (the "Plan Order").  In the Plan Order, the Court scheduled February 6, 2024 as the date for the hearing on confirmation of the Plan.  The confirmation hearing has since been rescheduled for March 4, 2024, at 10:00 a.m.

9.      According to the Debtor's *Schedules of Assets and Liabilities* [Docket No. 48], the Debtor has nonpriority unsecured claims in the amount of approximately $16 million, including the claims of governmental entities but not including the claims of affiliated entities.  The Plan provides the following treatment for Class 3 Allowed General Unsecured Claims:

> After payment in full of all Allowed Administrative Claims, all Allowed Priority Claims in full, and Allowed Secured Claims (if any), Allowed General Unsecured Claims will be paid the Debtor's projected disposable income on a pro rata basis. Pro rata Distributions will be made to Holders of Allowed General Unsecured

---

[5] While it is not clear from the Plan, the Reed Creditors believe that these amounts represent yearly salaries.

[6] The Plan also states that the Debtor's projected disposal income is $635,549 (Plan § IV.5) and $1,362,258 (Liquidation Analysis).

Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date.

Plan § IV.2.d. The Debtor estimates that (i) the total amount of allowed general unsecured claims will be approximately $11,000,000 and (ii) holders of allowed general unsecured claims will receive a distribution of from 3% to 10% on account of their general unsecured claims. *Id.* But based on the passage of time and the continued accrual of obligations, it is not clear what funds, if any, will be made available to unsecured creditors.

      10.      Section IV.5 of the Plan provides that

> The Plan will be funded by: (1) the Debtor's projected disposable income ($848,049) generated by the Debtor's post-confirmation operations, and (2) $25,000 provided by certain of the Released Parties. The Debtor expects to have approximately $170,000 in combined cash on hand and accounts receivable on the Effective Date, however the cash and accounts receivable will not be available for distribution to creditors under the Chapter 11 Plan as these amounts are necessary for payment of incurred and ongoing expenses (and which would otherwise be administrative expenses) and are already included in the calculus of disposable income in Year 1. The Debtor or the Reorganized Debtor, as applicable, will have all the rights and duties to implement the provisions of the Plan, including the right to make Distributions to Creditors provided for under this Plan.

Plan Section IV.5. The Reed Action Judgment Creditors understand that the $848,049 projected disposable income is the aggregate amount for the proposed three-year distribution period. This amount is net of the costs to fund its operations, including the payment of (i) $750,000 per year to Laxman Reddy, the Debtor's President and CEO, (ii) $300,000 per year to Matt Williams, the Debtor's CFO, and (iii) the cost of medical, dental and vision insurance for Michael Sarrao, the Debtor's EVP and General Counsel. Plan § IV.7.

      11.      At the time of the Plan's filing the Debtor projected that administrative expense claims will total $752,500 as of the effective date of the Plan. Plan, § IV.1.a. The Debtor has since hired an additional expert. Allowed administrative expense claims will be paid in full under the

Plan, as they must. It is not clear what the source of funding for payment of allowed administrative claims will be. The Debtors will also have to pay post-effective date legal fees. *Id.*

12.     The Plan proposes that the Debtors will release certain Released Parties from all claims the Debtor may have against them in exchange for payment of $25,000. Plan §VII.2. The Released Parties include "(a) the officers and managers of the Debtor; (b) the Debtor's Professionals, and (d) with respect to each of the foregoing Persons in clauses (a) through (b), such Entities' respective predecessors, successors and assigns, provided, however, that notwithstanding the foregoing, and for the avoidance of doubt, nothing herein shall release any Causes of Action of the Debtor or the Estate against any of the Debtor's representatives that did not serve in such capacity on or after the Petition Date." Plan § I.44.

## **OBJECTION**

### I.   **Release of Insiders.**

13.     The Reed Creditors object to the release of the Debtor's insiders in consideration for payment of $25,000, a paltry sum that will yield no benefit to creditors. As noted above, the Reed Creditors have identified at least two significant causes of action that should be pursued against (i) the Alecto Members related to Alecto's transfer of Sunrise REH to the Alecto Members and (ii) Alecto's officers and directors, for their breach of their fiduciary duties to Creditors.[7]

A.   Fraudulent Transfer of Alecto's equity interest in Sunrise Real Estate Holdings, LLC to Alecto's Members.

14.     On June 19, 2019, Alecto transferred its 100% equity interest in Sunrise Real Estate Holdings to the Alecto members, who apparently formed a new entity named Sunrise MOB to receive the Sunrise REH equity (the "Sunrise REH Transaction")[8]. The Sunrise REH equity was

---

[7] The Reed Creditors reserve the right to supplement this Objection following completion of its review.

[8] GSC Report, Discussion Section A (p. 7).

a valuable acquisition for the Alecto Members because Sunrise REH was the 100% owner of Plaza MOB, which owned a medical office building appraised at $50,700,000.[9]

15.    Based on the Gould report, the Reed Creditors understand that Alecto received value from the Sunrise REH Transaction as a result of the re-financing loan which Sunrise MOB obtained on the medical office building in the amount of $30 million, from which (i) the existing loan on the building was satisfied, in the amount of $19,472,350,[10] and (ii) Alecto received a capital contribution from the members in the amount of $8,444,477.81.[11] As such, through the loan payoff and capital contributions, the GCS Report states that Alecto received approximately $28 million for its transfer of the ultimate ownership interest in the medical office building.[12] The GCS Report acknowledges that Alecto did not receive reasonably equivalent value in the transaction.[13]

16.    Eighteen months later, in a separate transaction, the interests in Sunrise MOB were assigned to Alecto to be included as part of a larger, two-part transaction with UCLA, for no consideration to Sunrise MOB (the "Sunrise MOB Transaction").[14] UCLA entered into a transaction to acquire (i) the Olympia Medical Center, (ii) the real estate that the hospital occupied, and (iii) the medical office building owned by Plaza MOB, for a total of $128,500,000.[15] In the first part of the transaction, UCLA acquired the Olympia Medical Center and the real estate the hospital occupied on January 1, 2021. On August 31, 2021, Sunrise MOB sold the Plaza medical office building to UCLA in the second part of the transaction for $58,500,000.[16] The Gould Report states that proceeds from the sale of the medical office building were used to pay off loan

---

[9] *Id.*, Discussion Section A. 4, FN 12 (p. 6).
[10] GCS Report, Summary of Observations Section A (p. 3).
[11] *Id.*, Discussion Section A. 6 (p. 6).
[12] *See id.*, Findings and Observations Section A (p. 2).
[13] *See id.*
[14] *Id.*, Discussion Section C (p. 10).
[15] *Id.*
[16] *Id.* (pp. 10-11).

obligations of Alecto and certain Affiliates to MPT Operating Partnership, LP., and the remaining $15,769,770.21 was deposited into a Plaza MOB bank account.[17]

17.     The Gould report attempts to document numerous other transfers relating to the Plaza MOB transactions for the benefit of Alecto, under the mistaken assumption that the Alecto Members can set off the 2019 Sunrise REH Transaction against claims the Alecto Members may have arising from the 2021 Sunrise MOB Transaction in order to determine whether Alecto received reasonably equivalent value for the Plaza MOB assets.[18]  In such effort, the Gould report appears to state that a total of $29,687,817 was deposited into Alecto's bank accounts through June 30, 2023.  It doesn't indicate whether that money was subsequently transferred back out to other affiliates or insiders, as Alecto appeared to freely do.  But more importantly, an analysis of these transfers for the benefit of Alecto is not even necessary.

18.     The fraudulent transfers by Alecto to its members (through the Sunrise REH Transaction) cannot be set off against any claims the Alecto members may have against Alecto arising from the Sunrise MOB transaction or otherwise, as a matter of law.  Bankruptcy courts have repeatedly held that prepetition claims cannot be set off against fraudulent transfer claims. *See, e.g.*, *Security Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC (In*

---

[17] *Id.,* Summary of Observations Section C (p. 3).

[18] As stated in the GCS Report—

"Although the June 2019 transfer of Sunrise REH and Plaza MOB was completed without receiving reasonably equivalent value in exchange (appraised value of over $50 million was greater than the loan payoff and capital contribution received of over $28 million), the assets were transferred back by assignment to Alecto by the Alecto Members in January 2021 for no consideration and those assets were sold later that year for over $58 million, an increase in value of approximately $8 million. No consideration was given to the Alecto Members for the transfer and Alecto received proceeds from the sale of over $15 million."

*Id.,* Findings and Observations Section A (p. 2).

*re Madoff)*, 654 B.R. 224, 234-35 (S.D.N.Y 2023) (holding that defendant could not set off a prepetition debt against a fraudulent transfer claim because there was no mutuality); *Kramer v. Sooklall (In re Singh)*, 434 B.R. 298, 308 (Bankr. E.D.N.Y. 2010) (same); *In re McConnell*, 934 F.2d 662 (5th Cir. 1991) (holding that "[s]ection 553(a) setoffs … do not apply to actions by [a trustee] to recover fraudulent transfers: 'It would defeat the purpose of the Bankruptcy Act's provisions relating to fraudulent transfers to allow [creditors] to offset the value of the property thus transferred to them by the amount of their unsecured claim against [the debtor]. '" (quoting *Mack v. Newton,* 737 F.2d 1343, 1366 (5th Cir. 1984))); *Pereira v. Urthbox Inc. (In re: Try the World, Inc.)*, No. 18-11764 (JLG), 2023 WL 5537564, at *13 (Bankr. S.D.N.Y. Aug. 28, 2023) (holding that defendant could not set off funds he gave or loaned to debtor after the transfer at issue against his fraudulent transfer liability to the debtor's estate); *In re Brooke Corp.,* 485 B.R. 650, 664 (Bankr. D. Kan. 2013) (recognizing that "[c]ourts generally hold that a prepetition claim against the debtor may not be set off against a trustee's preferential transfer or fraudulent transfer claim…." ).

19.     While Bankruptcy Code Section 553 preserves any rights of setoff available under applicable non-bankruptcy law, to be eligible for setoff (i) the amounts owed by the debtor must be a prepetition debt, (ii) the debtor's claim against the creditor must be a prepetition claim, and (iii) and the debts and claims must be mutual. *Id.* at 234.

> [D]ebts are mutual only if "they are due to and from the same persons in the same capacity." It is also widely accepted that "mutuality is strictly construed against the party seeking setoff." The effect of this narrow construction is that "each party must own his claim in his own right severally, with the right to collect in his own name against the debtor in his own right and severally."

*In re Am. Home Mortg., Holdings, Inc.*, 501 B.R. 44, 56 (Bankr. D. Del. 2013) (quoting *In re SemCrude*, 399 B.R. at 393 (Bankr. D. Del 2009) *aff'd,* 428 B.R. 590 (D. Del. 2010).

> It is well established that a party will be unable to assert a setoff where the party is
> being sued for fraudulent transfers. This is because where the party seeking to set
> off is being sued for fraudulent transfer, there is no mutuality of obligations, which
> is required under Code Section 553(a).

*Kramer v. Sooklall (In re Singh)*, 434 B.R. 298, 308 (Bankr. E.D.N.Y. 2010).

20.     There is no mutuality when the defendant attempts to set off its fraudulent-transfer liability with a prepetition claim "because they are not in the same right and between the same parties, standing in the same capacity." *Try the World*, 2023 WL 5537564, at *13. The "claims are not in the same right and between the same parties, standing in the same capacity" where the claims underlying the purported right to setoff accrued prepetition and the "liability for the fraudulent-transfer claim is held by the Trustee as a post-petition obligation…. Therefore, the claims are not in the same right and between the same parties, standing in the same capacity." *Id.*

21.     Here, under the Bankruptcy Code, Alecto has a $22 million fraudulent transfer claim against its members for the transfer of the ownership of Sunrise REH equity in 2019 to Sunrise MOB. Sunrise MOB's claim against Alecto for the transfer of Plaza MOB back to Alecto in 2021, for no consideration, entitles Sunrise MOB to a prepetition claim in such amount as may be determinable from the analysis of the Alecto books and records. Any prepetition claims, to the extent allowable, would be payable in the same percentage as other unsecured claims against Alecto.

22.     The claims are not mutual because they are not in the same right and between the same parties, standing in the same capacity. The Alecto Members' claims, if any, are against Alecto. In contrast, Alecto's fraudulent transfer claims are claims that Alecto can bring only as a debtor-in-possession. As a result, the Alecto Members cannot set off any claims they may have as a result of the Sunrise MOB Transaction, or otherwise, against Alecto's fraudulent transfer claim against the Alecto Members arising from the Sunrise REH Transaction.

23.     Moreover, the Debtor's fraudulent transfer claim against the Alecto Members arising from the Sunrise REH Transaction is not barred by the applicable statute of limitations. The statute of limitations for fraudulent transfer claims under both California[19] and Delaware[20] law is four years.[21]  The fraudulent transfer occurred on June 19, 2019, the date of the Sunrise REH transaction.  The statute of limitations would have expired on June 18, 2023 if Alecto had not filed its bankruptcy petition by that date. But Alecto filed its bankruptcy petition on June 13, 2023.  As a result, Bankruptcy Code Section 108 extended the time within which Alecto may commence its fraudulent transfer claim through June 12, 2025.  *See* 11 U.S.C. § 108(a).[22] Accordingly, the Debtor's fraudulent transfer claim against the Alecto Members is not time-barred.

B.     Breach of Fiduciary Duty Claim against Officers and Directors.

24.     The Debtor's Statement of Financial Affairs (SOFA) identifies substantial intercompany transfers to Debtor affiliates in  the year prior to the Petition Date [D.I. 175, pp. 28-35], including advances of $19,303,563.37 to affiliate Sherman/Grayson Hospital, LLC ("Sherman/Grayson"), an insolvent entity which relied on such transfers to sustain operations. [See Ex. A, attached].  During this time period, Alecto advanced funds to other affiliates as well. Meanwhile, Alecto was also insolvent or in the zone of insolvency and was not timely paying its

---

[19] Alecto's headquarters and primary place of business is in California and the Sunrise REH Transaction involved real property located in California.

[20] Alecto, Sunrise REH, Plaza MOB and Sunrise MOB are all entities formed under the laws of the State of Delaware.

[21] *See* Cal. Civ. Code § 3439.09; 6 Del. C. § 1309.

[22] Section 108(a) provides as follows:

(a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

debts due to creditors. Alecto's 2022 U.S. Tax Return reported a net loss of $36.4 million. [D.I. 1, page 20].

25.     The Debtor has a breach of fiduciary duty claim against its officers, directors and/or other persons in control of Alecto who authorized and directed Alecto to make these advances to affiliates instead of paying its creditors. Persons in control of a Delaware limited liability company owe fiduciary duties to maximize the value of the company for the benefit of all residual claimants, including creditors, when the company is in the zone of insolvency. *See Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited*, 2021 WL 3184591 *18 (Del. Ch. July 28, 2021); *see also Quadrant Structured Products Co. v. Vertin*, 102 A.3d 155, 172 (Del. Ch. 2014) ("When a corporation is insolvent, its creditors become the beneficiaries of any initial increase in the corporation's value."); see also *In re Scott Acquistion Corp.*, 344 B.R. 283 (Del. Bankr. 2006)(rejecting motion to dismiss Chapter 7 trustee's breach of fiduciary duty claims against insiders, holding that fiduciary duties owed to creditors of an insolvent corporation similarly apply to any wholly owned subsidiary).

26.     Here, Alecto's officers, directors and/or control persons breached their fiduciary duties to Alecto and its residual claimants by advancing more than $19 million to Sherman/Grayson during the year prior to the Petition Date when Alecto was insolvent or in the zone of insolvency, rather than paying its creditors. Of this amount, more than $5 million was advanced to Sherman/Grayson after the Reed Creditors obtained their approximately $3.2 million judgment against Alecto on November 28, 2022, and before the Petition Date. The Court should not grant releases to the Released Parties because a liquidating trustee should have the opportunity to evaluate and pursue such breach of fiduciary claims against the Released Parties. The Debtor

maintained D&O Insurance which provides a further source of recovery for such breach of fiduciary duty claims.

27.    The Reed Creditors review of transactions identified in the Gould Report and documents produced by the Debtor relating to such transactions is ongoing.  The Reed Creditors reserve their right to supplement the record with respect to additional potential fraudulent transfer claims at the confirmation hearing.

28.    Based on the foregoing, this Court should prohibit the Debtor from granting a release to the Released Parties.

## II.  Excessive Compensation for Officers

29.    As noted above, the Debtor proposes to pay a total of $1,050,000 in annual compensation to its officers, which consists of (i) $750,000 to Laxman Reddy, the Debtor's President and CEO and (ii) $300,000 to Matt Williams, the Debtor's CFO. Plan § IV.7.  This proposed compensation is unreasonably excessive given that the Debtor proposes to make distributions to creditors from its three-year projected disposable income in the total amount of $848,049. See Plan § 4.5.  This is especially so given that holders of general unsecured claims will receive an estimated distribution of from 3% to 10% on account of their claims.  The Court should not permit the Debtor to pay a total of $3,150,000 to its two officers over three years while it distributes less than 25% of that amount to its creditors over that same time period.

## III.  Nonconsensual Third-Party Releases

30.    Section VII.4 of the Plan provides in pertinent part that

all Entities that held, hold, or may hold claims or interests that have been discharged, released or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or

recovering by any manner or means any judgment, award, decree, or order against the Released Parties on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Released Parties or the property of the Released Parties on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Released Parties or against the property of the Released Parties on account of or in connection with or with respect to any such claims or interests unless the Released Parties has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that the Released Parties asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

Plan § VII.4. While this section is captioned "Injunction," it is in effect a third-party release in favor of the Released Parties because it enjoins creditors from pursuing any claims against the Released Parties related to claims dealt with by the Plan. Moreover, the release is nonconsensual because it does not provide creditors with the opportunity to opt-out of the releases.

31. The hallmarks of permissible non-consensual releases are fairness, necessity to the reorganization, and specific factual findings to support these conclusions. *In re Continental Airlines, Inc.,* 203 F.3d 203, 214 (3d Cir. 2000), None of these hallmarks are present here. The Debtor will not be able to present specific factual findings to support an argument that the nonconsensual third-party releases are either fair or necessary to the Debtor's reorganization. Accordingly, the Court should not permit nonconsensual third-party releases in favor of the Released Parties.

### IV. **Disclosure Issues**

32. The Reed Creditors also objects to the Plan because it contains inconsistent information. First, as noted above, the Plan states three different amounts as its projected three-year disposable income; (i) $635,549 (Plan Art. II and §V.2), (ii) $848,049 (Plan § IV.5) and

$1,362,258 (Liquidation Analysis). The Court should require the Debtor to clarify this discrepancy.

33. Second, the Liquidation Analysis provides that the projected disposable income will be $339,163 in year one, $533,763 in year two, and $489,332, but does not address why these amounts vary significantly. The Court should require the Debtor to explain how it calculated in projected disposable income.

34. Third, the Plan provides for the payment of $752,500 of administrative expense claims but does identify the source of the payments. The Court should require the Debtor to state whether holders of administrative expense claims will be paid from the Debtor's projected disposable income or from some other source.

### **CONCLUSION**

WHEREFORE, for the foregoing reasons, the Reed Action Judgment Creditors respectfully request that this Honorable Court enter an order denying confirmation of the Plan and granting such other and further relief as is just and proper.

Date: February 22, 2024
Wilmington, DE

**SULLIVAN · HAZELTINE · ALLINSON LLC**

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
whazeltine@sha-llc.com

-and-
Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
Tel: (304) 326-0188
Email: colten@msjlaw.org

-and-

John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email: jstember@stembercohn.com
        mdavidsonwelling@stembercohn.com

*Attorneys for the Reed Action Judgment Creditors*

# EXHIBIT A

**Transfers to Sherman Grayson Hospital LLC**
**(1 yr. prior to the Petition Date)**

| Date | Insider Recipient | Memo/Description | Amount |
|---|---|---|---|
| 6/29/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $1,670,000.00 |
| 7/6/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $920,000.00 |
| 7/13/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $790,000.00 |
| 7/20/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $964,000.00 |
| 7/20/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $418,000.00 |
| 7/27/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $1,500,000.00 |
| 8/3/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $1,017,500.00 |
| 8/10/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $760,000.00 |
| 8/17/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $985,000.00 |
| 8/24/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $900,000.00 |
| 8/31/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $900,000.00 |
| 9/7/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $200,000.00 |
| 9/8/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $114,000.00 |
| 9/12/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $190,000.00 |
| 9/14/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $650,000.00 |
| 9/21/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $796,902.86 |
| 9/29/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $250,000.00 |
| 10/27/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $700,000.00 |
| 11/23/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $430,000.00 |
| 12/8/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $575,000.00 |
| 12/21/2022 | Sherman Grayson Hospital LLC | Cash Transfer | $600,000.00 |
| 1/5/2023 | Sherman Grayson Hospital LLC | Cash Transfer | $1,000,000.00 |
| 1/30/2023 | Sherman Grayson Hospital LLC | Cash Transfer | $611,734.06 |
| 2/3/2023 | Sherman Grayson Hospital LLC | Cash Transfer | $485,000.00 |
| 3/1/2023 | Sherman Grayson Hospital LLC | Cash Transfer | $450,000.00 |
| 3/30/2023 | Sherman Grayson Hospital LLC | Cash Transfer | $650,000.00 |
| 4/14/2023 | Sherman Grayson Hospital LLC | Cash Transfer | $100,000.00 |
| 4/27/2023 | Sherman Grayson Hospital LLC | Cash Transfer | $190,000.00 |
| 5/25/2023 | Sherman Grayson Hospital LLC | Cash Transfer | $75,000.00 |
| 6/8/2023 | Sherman Grayson Hospital LLC | Cash Transfer | $411,426.45 |
| | | | |
| | | Total: | $19,303,563.37 |
| | | Subtotal after 11/30/22: | $5,148,160.51 |

**A1031**

## CERTIFICATE OF SERVICE

I, William D. Sullivan, hereby certify that on the 22nd of February 2024, a copy of the foregoing *Objection of the Reed Action Judgment Creditors to Confirmation of the Small Business Debtor's Plan of Reorganization Proposed by the Debtor* was electronically filed and served via CM/ECF on all parties requesting electronic notification in this case in accordance with Del. Bankr. L.R. 9036-1(b) and on the parties listed below via Electronic Mail.

*Counsel for the Debtor:*

Jeffrey R. Waxman, Esq.
Brya M. Keilson, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
jwaxman@morrisjames.com
bkeilson@morrisjames.com

*Counsel to the Independent Director:*

Justin R. Alberto, Esq.
Cole Schotz P.C.
500 Delaware Ave., Suite 1410
Wilmington, DE 19801
JAlberto@coleschotz.com

*Subchapter V Trustee:*

Jami Nimeroff, Esq.,
Brown McGarry Nimeroff LLC
919 N. Market Street, Suite 420
Wilmington, DE 19801
JNimeroff@bmnlawyers.com

*U.S. Trustee:*

Linda Casey
Office of the United States Trustee
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
Linda.Casey@usdoj.gov

*Counsel for the United States:*

Leah V. Lerman, Esq.
Civil Division
U. S. Department of Justice
P. O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
Leah.V.Lerman@usdoj.gov

February 22, 2024
Date

*/s/ William D. Sullivan*
William D. Sullivan

# Exhibit 35

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC, [1] | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtors | ) | **Related Docket No. 261** |

### SUPPLEMENT TO THE OBJECTION OF THE REED ACTION JUDGMENT CREDITORS TO CONFIRMATION OF THE SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR

The Reed Action Judgment Creditors (the "Reed Creditors"), by and through undersigned counsel, hereby Supplemental Objection to confirmation of the *Small Business Debtor's Plan of Reorganization Proposed by f the Debtor* [Docket No. 261] (the "Plan") and respectfully state as follows:

1.        As set forth fully in *the Objection of the Reed Action Judgment Creditors to Confirmation* of the *Small Business Debtor's Plan of Reorganization Proposed by the Debtor* (the "Objection"),[2] the Reed Creditors identified a colorable fraudulent transfer claim arising from the Sunrise REH Transaction pursuant to Section 544(b) and applicable state law.[3] Specifically, by the Sunrise REH Transaction, and as confirmed by the GCS Report, Alecto transferred its 100% membership interest in Sunrise REH to the Alecto Members and received consideration in the amount of $28,416,827.18 consisting of (i) the payoff of an existing loan in the amount of

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

[2] Capitalized terms not defined herein shall have the meanings given to those terms in the Objection.

[3] In its *Memorandum of Law in Support of Confirmation* of the *Small Business Debtor's Plan of Reorganization Proposed by off the Debtor and Omnibus Reply to Objections to Confirmation* [Docket No. 310] (the "MOL"), the Debtor appears to assume that the applicable state law is California's Uniform Voidable Transactions Act. (the "UVTA"). *See* MOL, ¶¶ 98 – 100. For purposes of confirmation, the Reed Creditors do not dispute that the UVTA is the applicable law.

$19,472,350[4]$ and an equity contributions from the Alecto Members totaling $8,944,477.81.[5] At the time of the transfer, Plaza Medical Office Building, LLC ("Plaza MOB"), a wholly owned subsidiary of Sunrise REH, was appraised at $50,700,000.[6] The GCS Report acknowledges that Alecto did not receive reasonably equivalent value in the transaction.[7] The deficiency in value is $22,283,173.

2.      Section 3439.04(a) of the UVTA provides that:

**(a)**      A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

**(1)**      With actual intent to hinder, delay, or defraud any creditor of the debtor.

**(2)**  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Cal. Civ. C. § 3439.04(a). Section 3439.05(a) of the UVTA provides that:

(a)      A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Cal. Civ. C. § 3439.05(a). Insolvency is defined in section 3439.02, in relevant part, as follows:

(a) A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets.

---

[4] GCS Report, Summary of Observations Section A (p. 3).

[5] *Id.*, Discussion Section A. 6 (p. 6).

[6] *Id.*, Discussion Section A. 4, FN 12 (p. 6).

[7] *See id.,* Findings and Observations Section A (p. 2).

(b) A debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent. The presumption imposes on the party against which the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence.

(c) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.

Cal. Civ. C. § 3439.02.

3.     In the Confirmation Objection, the Debtor does not argue (i) that the transfer of the Sunrise REH membership interests was not a transfer of Alecto's property or (ii) that Alecto received reasonably equivalent value in exchange for the Sunrise REH membership interests. Rather the only argument the Debtor actually raises is that the Sunrise REH Transaction was not a fraudulent transfer because Alecto was solvent at the time of the transaction. Confirmation Objection ¶¶ 101 -105. The primary bases for this argument are that (i) Alecto's Balance Statement shows that, during 2019, Alecto never had equity with a value of less that $9.4 million, (ii) in June 2019, the total equity in the Debtor was $9,500,557, and (iii) Alecto's 2019 tax return shows that Alecto's assets were valued at $16,708,684 in the beginning of 2019 and increased to $26,796,334 by the end of 2019. Confirmation Objection ¶ 103. The Debtor also states, without documentary evidence, that "common sense" evidences that the Debtor was on sound financial footing" because

- approximately one month after the Sunrise Transfer, Alecto was able to refinance its line of credit at a lower interest rate;

- Alecto paying its obligations as they became due from June 2019 through at least the end of 2022; and

- From mid-April 2020 through the Debtor maintained cash in its bank accounts of over $12,000,000.

Confirmation Objection ¶¶ 104 -105.

4.     This "evidence" is woefully insufficient to establish that Alecto was solvent following the closing of the Sunrose REH Transaction on June 19, 2019. As set forth above, Section 3439.02(a) provides that "[a] debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." UVTA § 3439.02(a). The Debtor's reliance on raw and unsupported numbers on a balance sheet and a tax return and statements without documentary evidence do not in any way establish fair valuations of the Debtor's assets and liabilities as of July 19, 2019.

5.     A debtor's assets and liabilities must be calculated at fair valuation to determine whether its debts exceed its assets. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 648 (1991) "[A] fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time." *In re Trans World Airlines, Inc.*, 134 F.3d 188, 194 (3d Cir. 1998). If assets are not susceptible to liquidation, and thus cannot be made available for payment of debts, within a reasonable period of time, a reduction in the face value of those assets may be appropriate. *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir. 1980). Courts should consider contingent liabilities when evaluating the solvency of a debtor. *Trans World Airlines*, 134 F.3d. at 197.

6.     Moreover, "[r]eduction in the face value of assets may be appropriate if those assets are not susceptible to liquidation, and thus cannot be made available for payment of debts, within a reasonable period of time." *Constructora Maza*, 616 F.2d at 557.

> Thus, for example, accounts receivable need not be taken at face value if circumstances cast doubt on their collectability. The prospects of collection of such assets are evaluated in light of the past record of payment of the obligors, the obligors' current solvency, and the presence or absence of any dispute over the validity of the accounts or debts owed. [] Because the value of such assets may, in certain circumstances, be discounted, it is appropriate for the trier of fact to hear qualified opinion testimony on their fairly realizable value.

*Id.*

7.      The Debtor's simplistic solvency analysis relies primarily on raw and unsupported numbers on the 2019 balance sheet and tax return. These numbers in a vacuum do nothing to establish the fair value of Alecto's assets and liabilities and the Debtor makes no attempt to otherwise establish the fair valuation of Alecto's assets and liabilities as of June 19, 2019. As a result, the Debtor's limited solvency analysis does not come anywhere close to establishing that Alecto was solvent at the time of the Sunrise REH Transaction consistent with applicable Third Circuit precedent.

8.      Moreover, the Debtor's assertion of a solvency defense at the eleventh hour is procedurally improper. The GCS Report analyzed multiple transactions between Alecto and its insiders to determine whether Alecto may have avoidance claims against its insiders. GSC did not provide any solvency analysis with respect to any transaction. The GCS Report concludes that Alecto did not receive reasonably equivalent value in the Sunrise REH Transaction.[8]  Nonetheless, Mr. Balasiano "determined that the estate does not have any valid claims against the Insiders for avoidable transfers."[9]

9.      Mr. Balasiano's appointment as an independent director was expanded on August 19, 2023, for the specific purpose of investigating and evaluating whether the debtor had valid causes of action to bring against its insiders or fiduciaries.  Following his receipt of the Gould Report on September 28, 2023, Mr. Balasiano's conclusion that there were no valid causes of action against the Debtor's insiders and fiduciaries was incorporated into the Debtor's original plan filed on October 9, 2023 [D.I. 170, p. 17].  In reaching his conclusions, Mr. Balasiano testified at deposition that he relied on a (i) the transaction analyses set forth in the Gould Report and (ii) a

---

[8] *See* GCS Report., Findings and Observations Section A (p. 2).

[9] Plan, Art. III, § 9 at p. 17.

legal memorandum provided by Debtor's counsel analyzing potential causes of action. [Balasiano Transcript, pp. 36-37; Transcript lodged at D.I. 313].

10.     With respect to the memorandum prepared by Debtor's counsel, Mr. Balasiano refused to identify any of the bases on which he relied for his determination that causes of action did not exist, based on attorney client privilege objections lodged by his counsel. [Balasiano Transcript, pp. 55-59]. He further testified that he did not have an opinion on whether the Debtor was solvent when the Reed Creditors obtained their judgment, that he had not done a solvency analysis, and that no one had done a solvency analysis for him. [Balasiano Transcript, pp. 47-48]. He also refused to provide an opinion on the Debtor's solvency when he was asked to review one of the Debtor's balance sheets. [Balasiano Transcript, pp. 59-62].

11.     With no articulated basis to support the proposed release of the Debtor's causes of action for a payment of $25,000 provided by Mr. Balasiano, the Debtor pivoted in a matter of 24 hours to having Michael Sarrao provide evidence and testimony of the Debtor's solvency to defeat the fraudulent transfer claims.[10] In addition to being the Debtor's Executive Vice President and General Counsel, Mr. Sarrao's family trust is one of the Alecto members who received the benefit of the June 2019 Sunrise REH transaction. The appointment of Mr. Balasiano as an independent director was supposed to eliminate this inherent conflict but has now utterly failed in that regard.

12.     More importantly, having apparently not considered solvency when the determination was made that there are no causes of action against insiders or affiliates in the fall of 2023, the Debtor now wants to present solvency at the time of the Sunrise REH transaction as

---

[10] *Declaration of Michael Sarro, Executive Vice President, General Counsel, and Secretary of Alecto Healthcare Services LLC in Support of Confirmation of the Small Business Debtor's Plan of Reorganization Proposed by the Debtor* [Docket No. 307] (the "Sarrao Decl.")

the <u>only</u> basis the Court needs to consider with respect to whether there is a viable fraudulent transfer claim as a result of it.

13.    Mr. Balasiano, for his part, submitted a declaration the day following his deposition testimony that he determined that "there are no valid claims against insiders for avoidance of fraudulent conveyances" because, among other reasons, "the claims of alleged fraudulent conveyances relate to a transfer that occurred when the Debtor was solvent."[11] While Mr. Balasiano did not state when he reached this conclusion, it apparently relies on Mr. Sarrao's incompetent and conflicted testimony given that the solvency issued had not been raised prior to the filing of the Sarrao Declaration. Under these circumstances, the Court should not give any weight to Mr. Sarrao's solvency analysis.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, as well as for the reasons set forth in the Objection, the Reed Creditors respectfully request that this Honorable Court enter an order denying confirmation of the Plan and granting such other and further relief as is just and proper.

Date:   March 4, 2024
        Wilmington, DE

                                    SULLIVAN • HAZELTINE • ALLINSON LLC

                                     /s/ William D. Sullivan
                                    William D. Sullivan (No. 2820)
                                    William A. Hazeltine (No. 3294)
                                    919 North Market Street, Suite 420
                                    Wilmington, DE 19801
                                    Tel: (302) 428-8191
                                    Email: bsullivan@sha-llc.com
                                           whazeltine@sha-llc.com

                                    -and-

---

[11] *Declaration of Steven Balasiano, Independent Director/Manager in Support of Confirmation of the Small Business Debtor's Plan of Reorganization Proposed by the Debtor* [Docket No. 308], ¶ 19.

Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
Tel: (304) 326-0188
Email: colten@msjlaw.org

-and-

John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email: jstember@stembercohn.com
        mdavidsonwelling@stembercohn.com

*Attorneys for the Reed Action Judgment Creditors*

# EXHIBIT 36

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>ALECTO HEALTHCARE SERVICES LLC,[1]<br><br>Debtor. | Chapter 11 (Subchapter V)<br><br>Case No. 23-10787 (__) |

## DECLARATION OF MICHAEL SARRAO, EXECUTIVE VICE PRESIDENT, GENERAL COUNSEL, AND SECRETARY OF ALECTO HEALTHCARE SERVICES LLC, IN SUPPORT OF FIRST DAY MOTIONS

I, Michael Sarrao, declare and state as follows:

1.     I am the Executive Vice President, General Counsel, and Secretary for Alecto Healthcare Services LLC, a Delaware limited liability company (the "Debtor") that has filed a voluntary petition (the "Chapter 11 Petition") under Chapter 11, Subchapter V of title 11 of the United States Code (the "Bankruptcy Code"), commencing this Chapter 11 case (the "Case").

2.     To minimize the adverse effects of filing the Chapter 11 Petition while at the same time maximizing value for the benefit of stakeholders, the Debtor has filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings"). I submit this Declaration in support of the Chapter 11 Petition and the First Day Pleadings. I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption; (b) is critical to the Debtor's efforts to preserve value and maximize recoveries; and (c) best serves the Debtor's estate and creditors' interests. Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of this Chapter 11 Case.

---

[1]  The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

3.     I have served as the Debtor's Executive Vice President, General Counsel, and Secretary since January 1, 2013.  Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtor's management or the Debtor's professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If called upon to testify, I could and would testify to the facts set forth in this Declaration.  The Debtor has authorized me to submit this Declaration.

4.     I am also personally familiar with the Debtor's records submitted in support of the First Day Pleadings.  The Debtor's records are made by employees or agents of the Debtor who report to me and who have a business duty to enter the records of the Debtor accurately and at or near the time of the event which they record.  In general, the Debtor retains its files electronically in its computer system which is backed up regularly.

5.     This Declaration is divided into three parts.  Part I provides an overview of the Debtor's business, its corporate structure, its recent financial performance and its prepetition indebtedness.  Part II discusses the circumstances surrounding the commencement of this Chapter 11 case and what the Debtor views as the path forward.  Finally, Part III sets forth relevant facts in support of the First Day Pleadings.

## I.    OVERVIEW OF THE DEBTOR'S BUSINESS

### A.    Organizational Structure

6.     The Debtor is a Delaware limited liability company with its headquarters in Glendale, California.

7.     The following entities and individuals hold ownership interests in the Debtor:

| Name of Entity/Individual | % of Ownership |
| --- | --- |
| The Reddy Investment Trust | 60.08% |
| The Krissman Family Trust | 10.60% |
| The Sarrao Family Trust | 7.42% |
| The Jeyakumar Inter-Vivos Trust | 3.5% |

| The Hayes Irrevocable Trust | 3.80% |
|---|---|
| Steven Kay | 5.3% |
| Matthew Williams | 5.30% |
| Aman Dhuper | 2.50% |
| Comstock Investment Trust | 1.50% |

## B.    The Debtor's Business Operations

<u>Historical Overview</u>

8.    The Debtor was formed in 2012 to serve as a holding company for healthcare-related entities.

9.    Since its inception, the Debtor has formed various subsidiaries for the purposes of (a) acquiring distressed acute care hospitals; (b) operating acute care hospitals; (c) providing management services to acute care hospitals that are not owned by the Debtor or its subsidiaries; and (d) owning and operating businesses affiliated with acute care hospitals operated by the Debtor's subsidiaries.

10.    The following is a list of entities for which the Debtor holds a direct ownership interest:

| Name of Entity | % of Ownership | Current Value of Debtor's Interest |
|---|---|---|
| Alecto Healthcare Services Hayward LLC | 100% | $100,000.00 |
| United Medical Management, LLC | 100% | $0.00 |
| Alecto Healthcare Services Sherman LLC | 80% | $0.00 |
| Alecto Healthcare Services Los Angeles LLC | 100% | $0.00 |
| Alecto Healthcare Services Ohio Valley, LLC | 100% | $0.00 |
| Alecto Healthcare Services Real Estate Holdings LLC | 100% | $0.00 |
| Sunrise MOB Holdings LLC | 100% | $10,000.00 |
| Alecto Healthcare Services Fairmont LLC | 100% | $10,000.00 |
| Acceleron Services LLC | 100% | $0.00 |

| M/C Healthcare LLC | 100% | $0.00 |
|---|---|---|

Current Business Operations

11.     In the ordinary course of business, the Debtor's employees (the "Employees") provide management services through the Debtor's subsidiaries and are engaged in the winddown of hospitals formerly operated by the Debtor's subsidiaries. The winddown of such hospitals consists of responding to requests for patient records and services provided, completing various regulatory requirements, and assisting in the defense of the litigation matters outlined below.

12.     The Debtor has thirteen (13) Employees. The table below summarizes how this population is distributed across the Debtor's operations:

| *Role* | *Approx. Number of Employees* |
|---|---|
| CEO | 1 |
| CFO | 1 |
| VP of Clinical Operations & Nursing | 1 |
| VP of Laboratory Services | 1 |
| Accounting Manager | 1 |
| Records Clerks | 2 |
| Accounts Payable | 3 |
| IT | 1 |
| HR Manager (Per Diem) | 1 |
| Finance (Per Diem) | 1 |
| **TOTAL:** | **13** |

13.     As of the Petition Date, the Debtor's primary source of income relates to the services it provides through its Employees to its subsidiary Alecto Healthcare Services Hayward LLC ("Alecto Hayward"). Alecto Hayward is a party to an amended management services agreement with Hayward Sisters Hospital dba St. Rose Hospital ("St. Rose") pursuant to which Alecto Hayward provides management services to St. Rose in exchange for a management services fee equal to 3.75% of St. Rose's net revenue with the net revenue being subject to certain adjustments (the "Management Services Fee"). Such management services include the provision of qualified individuals to serve as the Chief Executive Officer and Chief Financial Officer of St. Rose.

14.     To facilitate Alecto Hayward's provision of management services, the Debtor provides its Employees to Alecto Hayward to fulfill Alecto Hayward's responsibilities under the management services agreement including having two of its Employees serve as the Chief Executive Officer and Chief Financial Officer of St. Rose.  In return, Alecto Hayward pays a portion of the Management Services Fee each month to the Debtor. The Debtor also receives reimbursement from St. Rose for certain expenses primarily related to the Debtor's Employees other than those who serve as the CEO and CFO that provide services at St. Rose.

15.     The Debtor also generates a de minimis amount of income from collecting fees for producing medical records and other similar items.

**C.     Recent Financial Performance**

16.     In 2021, gross revenues were approximately $3,426,000 with net loss of approximately $810,000; and in 2022, gross revenues were approximately $3,559,929 with net profit of approximately $135,767.

17.     In 2023, through May 31, 2023, gross revenues were $1,559,149.56 with net income of $84,474.62.

**D.     The Debtor's Prepetition Indebtedness**

Secured Debt

18.     The Debtor has a secured debt obligation to Cardinal Health 110, LLC, as the agent on account of agreements with Cardinal Health 100, LLC and Cardinal Health 200, LLC (collectively, "Cardinal Health") related to the provision of pharmaceuticals and other supplies provided to hospitals operated by the Debtor's subsidiaries.  Cardinal Health claims it is owed approximately $366,547 for pharmaceuticals and supplies provided to the Debtor's subsidiaries. The debt owed to Cardinal Health is secured by the pharmaceuticals and supplies provided to the Debtor's subsidiaries.

19.     When the Debtor's subsidiaries acquired acute care hospitals across the country, the Debtor's subsidiaries entered into mortgage loans or sale/leaseback transactions with affiliates of Medical Properties Trust, a publicly traded real estate investment trust ("MPT").  Except for

one acquisition, all of the transactions with MPT were sale/leaseback transaction whereby the Debtor's subsidiaries sold certain real estate and improvements to affiliates of MPT and subsequently leased them back from affiliates of MPT such that the affiliates of MPT served as the landlord for the Debtor's subsidiaries.  The Debtor guaranteed certain obligations of its subsidiaries to MPT and its affiliates including: (a) a mortgage loan from MPT of Los Angeles, L.P., secured by the real estate and improvements associated with an acute care hospital in Los Angeles, California which has been paid in full, (b) a lease agreement with MPT of Fairmont-Alecto Hospital, LLC related to an acute care hospital located in Fairmont, West Virginia which has been terminated, (c) a lease agreement with MPT of Wheeling-Alecto Hospital, LLC and MPT of Martins Ferry-Alecto Hospital, LLC, related to acute care hospitals in Wheeling, West Virginia and Martins Ferry, Ohio which has been terminated; and (d) a lease agreement with MPT of Sherman-Alecto related to an acute care hospital in Sherman, Texas currently operated by one of Debtor's subsidiaries.   The Debtor's obligations to the MPT Entities are secured by the fees, if any, paid by the Debtor's subsidiaries to the Debtor under management services agreements between the Debtor and the Debtor's subsidiaries.

20.    No fees were ever paid to the Debtor on account of the foregoing agreements between the Debtor and its subsidiaries and none of the Debtor's cash was generated by such agreements. Accordingly, the Debtor has no cash collateral issues.

Unsecured Debt

21.    The Debtor has approximately 30 unsecured creditors totaling approximately $85,937,786.72 of which approximately $ $3,916,390.65 is liquidated, non-contingent and undisputed.

22.    The total of the claims of the twenty largest unsecured claims is approximately $16,000,000 including disputed, contingent, and unliquidated claims that are subject to defenses and counterclaims of and by the estate.

23.    There are currently six (6)  formal legal actions pending as of the Petition Date: (1) *Hall v. Olympia Medical Center, et al*,. in Los Angeles Superior Court, Case No. 21STCV31953;

(2) *Booe v. Alecto Healthcare Services*, in United States District Court for Eastern District of Texas, Sherman Division. Civil Action No. 4:22-CV-00110-ALM; (3) *Cardinal Health 110, LLC, et. al. v. Alecto Healthcare Services LLC*, in Franklin County (Ohio) Court of Common Pleas Civil Division, Case No. 22-CV-000272; (4) *Snyder Brothers, Inc., v. Alecto Healthcare Services LLC*, in United States District Court for Western District of Pennsylvania, Civil Action No. 2:20-00-1974; (5) *Health Carousel Travel Network, LLC v. Alecto Healthcare Services Wheeling LLC, et. al.*, in Court of Common Please Hamilton County Ohio, Case No. A1903955; and (6) *United States of America v. Olympia Health Care, LLC, Alecto Healthcare Services, LLC et. al.*, in United States District Court for Central District of California, Case No. 2:23-cv-01783.

## II.  EVENTS LEADING TO THE CHAPTER 11 CASE AND PATH FORWARD

24.     At its peak, the Debtor's subsidiaries operated five (5) acute care hospitals across the country, the Debtor provided management services to an acute care hospital owned by an unrelated third-party, and  one of the Debtor's subsidiaries provided management services to an acute care hospital owned by a unrelated third-party.

25.     The hospitals acquired by the Debtor's subsidiaries were independent community hospitals that were in some form of financial distress when they were acquired by the Debtor's subsidiaries and faced stiff competition (and in some cases, unfair competition) from nearby hospitals.  Despite the best efforts of the Debtor and its subsidiaries, the hospitals acquired by the Debtor's subsidiaries continued to suffer from financial distress which ultimately resulted in two (2) of the hospitals closing in 2019 and one (1) hospital closing in March 2020.

26.     After the closure of the three (3) hospitals described above, the remaining hospitals were faced with significant financial challenges associated with the COVID-19 pandemic including decreased revenue and out of control costs. The significant adverse effect of the pandemic forced one of the Debtor's subsidiaries to sell the real estate associated with an acute care hospital in 2021 to pay off secured lenders and satisfy other priority claims.

27.     The closure of each of these hospitals placed a significant financial burden on the Debtor as the Debtor has been forced to spend time and resources on the winddown of the

operations of each of these hospitals and litigate claims by parties seeking to hold the Debtor liable for the debts of its subsidiaries.

28.     As of the Petition Date, the Debtor's subsidiaries continue to operate only one hospital. However, this hospital has faced, and continues to face, significant financial challenges as a result of the pandemic and has not been able to recover financially.  In an effort to ensure that this hospital could meet the healthcare needs of the community and attempt a financial recovery, the Debtor has provided advances to this subsidiary during the past two (2) years which has placed a financial burden on the Debtor and has resulted in a significant decrease in the Debtor's liquidity.

29.     The pandemic further affected patient volumes and revenue at St. Rose which resulted in decreases in the Management Services Fee paid to Alecto Hayward since the fee is based on a percentage of net revenue.

30.     While the Debtor has been able to maintain the business operations outlined above and is actively seeking to dispose of the remaining hospital operated by its subsidiary, on May 11, 2023, a judgment was entered against the Debtor in the amount of $2,686,357.11 plus interest and fees in the legal action *Reed, et. al. v. Alecto Healthcare Services LLC, et. al.* in United States District Court for Northern District of West Virginia, Civil Action No. 5:19-cv-263 (the "Reed Judgment"). On June 1, 2023, the plaintiffs in this action obtained a writ of execution against the Debtor in the total amount of $3,242,498.77.

31.     Enforcement of the Reed Judgment against the Debtor would cause a liquidity crisis whereby the Debtor will no longer be able to pay the expenses necessary to continue to operate.

32.     Consequently, the Debtor filed for bankruptcy relief to stay enforcement of the Reed Judgment and all outstanding litigation in order to propose a path forward that will enable the Debtor to continue operating while providing for fair and equitable treatment of all parties in interest.

## III.     FIRST DAY PLEADINGS

33.     In addition to this Declaration , the Debtor filed the First Day Pleadings seeking relief related to the administration of this Case, the Debtor's operations, and the Debtor's creditors. Below is a list of the First Day Pleadings:

       a.     Motion for an Order Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code (the "Cash Management Motion");

       b.     Motion for Order Authorizing Payment of Prepetition Employee Wages, Benefits and Associated Expenses and Granting Related Relief (the "Wage Motion");

       c.     Motion for Order Under Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or discriminating against, the Debtor, (II) Determining that the Utility Companies are Adequately Assured of Postpetition Payment and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance (the "Utilities Motion"); and

       d.     Motion for an Order Under Sections 105(a), 363(b), 363(c) and 503(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6003 Authorizing Debtor to (A) Assume Existing Insurance Policies; and (b) Pay All Obligations in Respect Thereof (the "Insurance Motion").

34.     The Debtor has narrowly tailored the First Day Pleadings to meet its goals of: (a) continuing its operations in Chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of its key constituencies during the bankruptcy process; and (c) establishing procedures for the efficient administration of this Case.

35.     I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate

reliance on the Debtor's employees and advisors. I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

36.     It is my belief that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Debtor's efforts to maximize the recovery to its creditors.

37.     The success of this Case depends upon the Debtor's ability to maintain its operations to the extent necessary to effectuate and confirm the Plan. The relief requested in the First Day Pleadings is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

38.     Accordingly, I respectfully request that all of the relief requested in the First Day Pleadings, and such other and further relief as may be just and proper, be granted based upon the following:

**The Cash Management Motion**

39.     Pursuant to 11 U.S.C. §§ 105(a), 345(b), and 363(c), the Debtor seeks authorization to maintain its existing Cash Management System (as defined in the Cash Management Motion).

40.     The Debtor maintains the following three Bank Accounts at the Bank: (1) a depository account (ending in 6065) ("Depository Account"); (2) a payroll account (ending in 6508) ("Disbursement Account"); and (3) a checking account which is no longer active (ending in 3784) ("Inactive Account"). The Inactive Account has no balance and will be closed as soon as possible.

41.     The Cash Management System was implemented to facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's day-to-day business operations. The Cash Management System facilitates reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the Depository Account and Disbursement Account to effectuate the collection, disbursement, and movement of cash. Because of the nature of the Debtor's business and the disruption that would result if it was forced to close its existing Bank Accounts and establish a

new cash management system, it is critical that the existing Cash Management System remain in place.

42.     The Cash Management System preserves the orderly flow of cash and also permits the Debtor to accurately track deposits and disbursements. The Cash Management System facilitates the Debtor's cash monitoring, forecasting, accounting and reporting, and enables the Debtor to maintain control over the administration of its Bank Accounts. The Bank Accounts are already set up to receive funds electronically and pay bills electronically. Therefore, if the Bank Accounts had to be closed and new ones re-opened, the Debtor's business operations would be disrupted and the Debtor and its estate would incur a significant increase of administrative expenses.

43.     In addition, closing the Bank Accounts would cause a severe adverse impact in the Debtor's cash flow.  All payments made to the Debtor are paid to the Depository Account. Closing the Depository Account would require responsible parties to reset to a new bank account and would harm the Debtor's ability to collect cash in a timely and complete manner. The funds within the Depository Account are then transferred to the Disbursement Account to meet critical expenses. The Debtor clearly relies on the Bank Accounts for its operations and closing the Bank Accounts would result in irreparable harm and decline to the liquidity to the Debtor.

44.     To protect against the unauthorized payment of prepetition obligations, the Debtor represents that, if it is authorized to continue to use the Bank Accounts, it will not pay, and the Bank will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

45.     Requiring the Debtor to close the Bank Accounts and to open new accounts will disrupt the Debtor's operations and materially distract the Debtor's management. It will disrupt the Debtor's operations because (a) any changes to the Depository Account will slow down payment of amounts due to the Debtor, (b) any changes to the Disbursement Account will slow down the payment to crucial vendors as many are paid through electronic fund transfers and would disrupt and delay payment for payroll, administrative fees, and related taxes; (c) any changes to

the Depository Account could inhibit the Debtor's ability to receive amounts owed to it by one or more of its subsidiaries; (d) it would increase the work of the Debtor's accounting personnel, who are already dealing with the many complex and varied issues related to this Case; and (e) it would needlessly cost the Debtor time and money and would result in no discernable benefit to the Debtor's bankruptcy estate or its creditors and other parties in interest.

46.     In addition, the Debtor requests that the Bank be permitted to debit the Debtor's accounts in the ordinary course of business without the need for further order of this Court for all checks drawn on the Bank Accounts which are cashed at the Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date. The Debtor further requests that the Bank be restrained from honoring any check, draft, wire, or electronic funds transfer presented, issued, or drawn on the Bank Accounts on account of a prepetition claim unless: (a) authorized in an order of this Court, as represented to the Bank by the Debtor as set forth below; (b) not otherwise prohibited by a "stop payment" request received by the Bank from the Debtor; and (c) supported by sufficient funds in the Bank Account in question.

47.     In the ordinary course of the operation and maintenance of the Cash Management System, the Debtor has and will continue to incur fees and other charges (collectively, all such fees and charges, the "Cash Management Claims") in connection with (i) Bank services (the "Service Charges"), (ii) checks deposited with the Bank which have been dishonored or returned for insufficient funds in the applicable amount, and (iii) any reimbursement or other payment obligations, such as overdrafts, arising under agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements. The Debtor incurs an average of approximately $500.00 per month in fees owed related to Service Charges.  The Debtor seeks authority, in its sole discretion, to pay: (i) all undisputed prepetition Cash Management Claims; and (ii) any such routine Cash Management Claims that accrue to the Bank post-petition, in a monthly aggregate amount not to exceed $600.00. As with the Cash Management System, payment of the Cash Management Claims will minimize disruption to the Debtor's operations and is therefore in the best interest of the estate.

48.     In the ordinary course of business, the Debtor uses business letterhead, invoices, envelopes, promotional materials, and a number of other business forms and correspondence (collectively, the "Existing Forms").  Because the Existing Forms were used prepetition, they do not reference the Debtor's current status as a debtor in possession. The Debtor is seeking authorization to continue using all Existing Forms in the forms existing immediately prior to the Petition Date.

49.     I believe that most parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor in possession as a result of the notice of the commencement of the Case being given to creditors and other parties-in-interest. Changing the Debtor's Existing Forms would be expensive, unnecessary, and burdensome to the Debtor's estate. Further, such changes would be disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor.

50.     In sum, the Bank Accounts and Cash Management System facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's business. Because of the disruption to the business that would result if the Debtor were forced to close these Bank Accounts, I believe it is critical that the Debtor maintain its Cash Management System and the Bank Accounts.

**The Wage Motion**

51.     The Debtor filed the Wage Motion seeking the entry of an interim and final order, authorizing but not directing, the Debtor, in its discretion, to pay, continue, or otherwise honor various prepetition employee-related obligations (collectively, the "Prepetition Obligations") to or for the benefit of their current employees (individually, an "Employee"  or collectively,  the "Employees") for wages, compensation, benefits, and expense reimbursements under all plans, programs, and policies maintained or contributed to, and agreements entered into, by the Debtor prior to the Petition Date (as described below, individually, "Employee Program" or collectively, "Employee Programs") and have applicable banks and other financial institutions receive, process, honor, and pay certain checks presented for payment and honor certain fund transfer requests.

52.     I discussed and summarized above the Debtor's Employees. I believe that it is absolutely critical that the Debtor be able to assure the Employees that their wages, compensation and salaries ("Wages") and the Employee Programs will continue unaffected by their chapter 11 filings in order to effectuate a successful outcome in the Case. Moreover, if the Debtor fails to pay the Prepetition Obligations and fails to continue the Employee Programs in the ordinary course, the Employees will suffer extreme personal hardship. Such a result would have a highly negative impact on workforce morale and would likely result in unmanageable turnover, resulting in immediate and irreparable harm to the Debtor and its estate.

53.     As set forth above, the Employees are all very important to the success of the Debtor's business, including the Debtor's ability to maximize the value of the Debtor's estate. The primary source of the Debtor's revenue comes from the provision of hospital management services by one of the Debtor's subsidiaries to Hayward Sisters Hospital dba St. Rose Hospital ("St. Rose"). The Debtor provides the services of its Employees to deliver such management services to St. Rose in exchange for payments from its subsidiary.  Without the availability of the Employees, the Debtor's subsidiary could not provide the management services and the primary source of the Debtor's revenue would be eliminated.  Therefore, if the Employees were to leave the Debtor's employment, the Debtor would lose the valuable revenue generated through these  Employees.

54.     The Debtor paid payroll to the Employees on June 16, 2023 for the two (2) week period ending June 10, 2023.  The Employees will accrue wages and other Pre-Petition Obligations for the periods of June 11, 2023 through the Petition Date for which the Debtor seeks authority to pay post-petition in the ordinary course on  June 30, 2023.  None of the Employees will receive more than the maximum amount provided for in § 507(a)(4).

55.     The Prepetition Payroll Obligations owed by the Debtor are summarized below[2]:

| Category | Amount Owed Prepetition |
|---|---|
| | |

---

[2] The amounts included are approximate amounts, and may fluctuate. In addition, for certain of the categories, the Debtor does not believe they owe any amounts prepetition. However, the Debtor includes these categories to the extent it is discovered that amounts are, in fact, due prepetition.

| Employee Wages (accrued but unpaid) | $ 17,000 |
|---|---|
| Employee Medical Insurance | $ 400 |
| Employee Vision Insurance | $ 10 |
| Employee Dental Insurance | $ 160 |
| Life, Accidental Death and Dismemberment | $ 500 |
| PTO, Vacation, Sick Time | $ 2,500 |
| 401k – Employee Contribution | $ 2,500 |
| Federal Tax – Employee Contribution | $ 5,500 |
| CA State and SDI Tax – Employee Contribution | $ 2,200 |
| FICA Tax – Employee Contribution | $ 1,800 |
| FICA Tax- Employer Contribution | $ 1,400 |
| Expense Reimbursement | $ 18,300 |
| Miscellaneous Expenses | $ 5,000 |
| Total Employee Compensation Owed | $ 57,270 |

56.     The Debtor expects that there will be  outstanding checks for Pre-Petition Obligations for Wages that have not yet cleared the Debtor's bank accounts. Consequently, the Debtor seeks authority through this Motion for any checks for Pre-Petition Obligations that have not yet cleared the Debtor's bank accounts to be honored post-petition.  In the event there are any outstanding checks, the Debtor estimates the amount of such checks will total less than $42,000.

57.     The Employees are paid bi-weekly, each approximately one week in arrears. Bi-weekly payroll averages between $70,000 and $80,000.  The Debtor funds and disburses payroll payments internally.

58.     As of the Petition Date, the Debtor made deductions from the Employees' paychecks for payments on behalf of the Employees for various federal, state, and local income, FICA, and other taxes, as well as for garnishments, support payments and tax levies, savings programs, benefit plans, flexible savings accounts, insurance programs, credit unions, and other similar programs on account of which the Debtor deducts a sum of money from an Employee's paycheck and pay that amount to a third party (collectively, the "Deductions").

59.     By virtue of the timing of the filing of the Case, the Employees have not been paid all their compensation earned through the Petition Date.  The Debtor estimates that as of the Petition Date, accrued but unpaid wages for the Employees is approximately $17,000.  In addition, the applicable Deductions may not have yet been taken. To the extent Deductions have been taken,

however, the Debtor may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions. The Debtor estimates that, as of the Petition Date, they are holding Deductions already taken aggregating approximately $16,970 which the Debtor seeks to pay to third parties in accordance with their prepetition practice.

60. The Debtor estimates that, as of the Petition Date, accrued but unpaid compensation, including the Deductions, totals approximately $57,270. The Debtor seeks authority to pay, continue, or otherwise honor their Prepetition Obligations in the ordinary course of their businesses. None of the amounts to be paid to the Employees for pre-petition wages will exceed the $15,150.00 cap set forth in Bankruptcy Code § 507(a)(4). The Debtor believes that the costs associated with paying such amounts are relatively minimal compared with the damage to the Debtor's estate that would follow if employee morale and patient care were harmed by the Debtor's failure to meet its payroll obligations.

61. The Debtor, in the ordinary course of its business, reimburses the Employees for certain business related expenses that the Employees incur. These include expenses for travel, supplies and other incidental expenses. The monthly reimbursable expense is fairly small but it is essential to the continued operation of the Debtor's business that the Debtor be permitted to continue reimbursing the Employees for such business expenses.

62. The Debtor requires that, to be reimbursed for business expenses, an Employee must submit expense reports, together with appropriate supporting documentation. The Debtor expects that the total amount of unreimbursed business expenses as of the Petition Date will be $16,300 , but certainly will not exceed $18,300.

63. As part of their overall compensation, Employees are entitled to receive a certain number of days of paid time off ("PTO"). PTO starts to accrue immediately upon employment.

64. The Debtor estimates that, as of the Petition Date, total accrued but unpaid PTO is approximately $105,000.00. By this Motion, the Debtor is not seeking to pay such sums to the Employees but does seek authority for the Employees to use their accrued PTO in the ordinary

course of business pursuant to the Debtor's policies and procedures regardless of the maximum amount provided for in §507(a)(4).

65.    The Debtor offers health benefits through two plan options offered by Anthem Blue Cross ("Blue Cross") for medical insurance ("Medical Plan").    As of the Petition Date, approximately 7 Employees and 1 non-employee officer were participating in one of the medical insurance plans.  The Debtor pays approximately 80% of the premiums for those Employees.  The cost per month to the Debtor for the Medical Plan is approximately $9,800.

66.    The Debtor offers dental insurance through Met Life ("Dental Plan").  The Debtor pays 20% of the premiums for those Employees and the 1 non-employee officer.  As of the Petition Date, approximately 7 Employees and 1 non-employee officer were participating in the Dental Plan.   The cost per month to the Debtor for the Dental Plan is approximately $211.

67.    The Debtor offers vision insurance through Met Life (the "Vision Plan" and collectively with the Medical Plan and the Dental Plan, the "Health Benefits").  The Debtor pays 80% of the premiums for those Employees.  As of the Petition Date, approximately 7 Employees and 1 non-employee officer were participating in the Vision Plan.  The cost per month to the Debtor for the Vision Plan is approximately $124.

68.    The Debtor provides Employees with a policy for life insurance and accidental death and dismemberment through Unum (the "Life Plan") with an option for the Employee to purchase an additional amount.  The cost per month for the Life Plan is $350.

69.    As required by statute, the Debtor provides the Employees a workers' compensation benefit program for income protection, medical services, and rehabilitation services to employees with job-related injuries and illnesses (the "WC Insurance").  The WC Insurance is provided through StarNet Insurance Company.  The annual cost of the WC Insurance is approximately $16,025.00.

70.    The Debtor offers voluntary short-term, long-term, critical illness, and accident insurance through Mutual of Omaha. These programs are 100% Employee funded.

71.     Employees may also participate in a 401(k) plan. The Debtor does not match any contributions.

72.     The Debtor seeks to honor and continue all of the Employee Programs described above.

73.     The Debtor also requests confirmation of its right to continue to perform its obligations with respect to these Employee Programs on a postpetition basis. The Employee Programs are an important component of the total compensation offered to the Employees, and are essential to the Debtor's efforts to maintain Employee morale and minimize operation disruption. I believe that the expenses associated with the Employee Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, and loss of productivity that would occur if the Employee Programs were discontinued.

74.     Prior to the Petition Date, the Debtor paid certain of its Prepetition Obligations with checks that had not been presented for payment as of the Petition Date. In order to ensure the orderly payment of the Prepetition Obligations, the Debtor requests that the Court enter an order requiring the Debtor's banks to honor any such checks which are drawn on the Debtor's accounts, and authorizing the banks to rely on the representations of the Debtor as to which checks are subject to the Motion. To the extent that any such checks are refused payment, the Debtor additionally requests authority to issue replacement checks and to reimburse the Employees for any loss resulting from the dishonoring.

75.     The Debtor represents that: (a) it will not distribute any amounts over $15,150.00 directly to any individual Employee on account of the sum of unpaid: (i) prepetition Wages or (ii) any other compensation due to an Employee; (b) will not make contributions to any employee benefit plan on account of unpaid prepetition amounts in excess of (i) the number of Employees covered by such plan multiplied by $15,150.00, less (ii) the aggregate amount of prepetition Wages and ordinary course bonus payments, plus the aggregate amount paid by the Debtor on behalf of such Employees to any other employee benefit plan, as provided under § 507(a)(5) of the Bankruptcy Code; and (c) it will not pay any amounts in excess of the estimated outstanding

prepetition cap amounts for each category of prepetition claims identified in the chart above and in the proposed interim order without further order from this Court, except to the extent required under state law.

76.     The Debtor's Employees may rely exclusively on receiving their full compensation and/or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare related problems if the Debtor is not permitted to pay and/or honor the Wages and Employee Programs, and the expenses associated therewith, in the ordinary course of the Debtor's business. Moreover, I believe that if it is unable to honor accrued Wages and the Employee Programs described above, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. I believe that any uncertainty with regard to continuation of Wages and the Employee Programs will cause significant disruption and will harm the Debtor's ability to successfully navigate the Case and reorganize. As stated above, the Employees are composed of revenue-generating Employees (whom would be difficult, if not impossible, to replace) and staff that ensure that the Debtor is able to operate and provide such management services. If the Employees were to leave the Debtor's employment, the Debtor could be unable to provide management services and lose the valuable revenue generated by those services.  Consequently, it is absolutely imperative that the Debtor's Employees remain satisfied with their employment, which means their Wages and Employment Programs must be maintained.

77.     Additionally, the Debtor submits that the Deductions do not constitute property of the Debtor's estate and principally represent Employee earnings that governments (in the case of taxes), employees (in the case of voluntary Deductions), and judicial authorities (in the case of involuntary Deductions), have designated for deduction from employee paychecks.

78.     The failure to transfer these withheld funds could result in hardship to certain Employees.  Moreover, if the Debtor cannot remit these amounts, the Employees may face legal action due to the Debtor's failure to submit these payments.

79.     The Debtor's failure to pay employee-related taxes could have a material adverse financial impact on their Employees and thus, on the Debtor's ability to operate in the ordinary course of business and continue to generate revenue.  The Employees must continue to provide services in order to ensure the Debtor continues to generate revenue to fund a plan.

80.     Finally, the Employees are absolutely necessary to the Debtor's continued operations.  The loss of both the revenue-generating Employees and the Debtor's support staff would adversely impact the Debtor and its ability to successfully reorganize and emerge from Chapter 11. Consequently, I believe that satisfaction of the Wages and Employee Programs, as described herein, is necessary to ensure continued, efficient operation and  to maximize value for all creditors.

### The Utilities Motion

81.     In the normal course of its business, the Debtor obtains Utility Services provided by  a number of entities  (each  a  "Utility  Company"  and  collectively,  the  "Utility Companies"). The Debtor pays the Utility Companies, on average, approximately $1,115 per month for services rendered.  To the best of my knowledge, prior to the commencement of this case, the Debtor was current with respect to undisputed invoices for Utility Services.  Moreover, I expect that on the Petition Date, there will be  no  outstanding  balances  owed  to  the  Utility Companies.

82.     Based upon cash flow from operations, the Debtor expects to have ample liquidity to pay timely all postpetition obligations owed to the Utility Companies.

83.     However, to provide adequate assurance to the Utility Companies as required under section 366(c) of the Bankruptcy Code, the Debtor proposes to deposit on account of each Utility Company listed on the Utilities List (as may be amended) an amount equal to the value of two (2) weeks of Utility Services provided by the Utility Company, based upon the Debtor's estimated average monthly bill as set forth in more detail in the Utilities Motion.

84.     If the Motion is not approved, the Debtor could be forced to address requests by its Utility Companies in a disorganized manner during the critical first weeks of this case. Moreover,

the Debtor could be blindsided by a Utility Company unilaterally deciding on or after the 30th day following the Petition Date that it is not adequately protected and subsequently discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of Utility Services could potentially shut down operations, and any significant disruption of operations could put this chapter 11 case in jeopardy.

**<u>Insurance Motion</u>**

85.     In the ordinary course of the Debtor's business, the Debtor maintains numerous insurance policies providing coverage for, *inter alia*: general liability, property, auto, cyber, environmental pollution, umbrella, workers compensation, management liability including directors and officers liability (the "<u>D&O Policies</u>") and medical malpractices liability set forth in <u>Exhibit A</u> to the Insurance Motion (collectively, the "<u>Insurance Policies</u>").

86.     By the Insurance Motion, the Debtor seeks explicit authority to maintain its insurance policies with National Union Fire Insurance Company (Directors & Officers and Employment Practices), RSUI Indemnity Company (Directors & Officers and Employment Practices), StarNet Insurance Company (Workers Compensation), Coalition Insurance Services (Cyber Liability), Vanetpro Specialty Insurance Company (Auto), Magmutual Professional Security Insurance Company (Professional and General Liability), and Endurance American Specialty Insurance Company (Professional and General Liability) (the "<u>Insurance Carriers</u>").

87.     The Insurance Policies protect the Debtor from various losses incurred in the ordinary course of business. For example, the D&O Policies protect the Debtor's directors and officers and are essential in order to retain the Debtors' qualified and dedicated senior management.  All of the Insurance Policies are held in the name of the Debtor, including policies that solely cover certain of the Debtor's subsidiaries.

88.     The Debtor pays total annual Insurance Premiums of approximately $1,300,000 with the majority of such amounts being premium financed and paid in monthly installments.

89.     The nature of the Debtor's business and the extent of its operations make it essential for the Debtor to maintain its Insurance Policies on an ongoing and uninterrupted basis. The

nonpayment of any Insurance Premiums or related fees under the Insurance Policies could result in the Insurance Carrier terminating the existing policies, declining to renew their Insurance Policies, or refusing to enter into new insurance agreements with the Debtor in the future.

90.    I believe that the continuation and renewal of the Insurance Policies, on an uninterrupted basis, and the payment of all prepetition and postpetition Insurance Obligations arising under the Insurance Policies, is essential to preserve the Debtor's business and the value of the Debtor's estate for all creditors.

91.    If the Debtor is unable to enter into new arrangements to pay the premiums under any renewed Insurance Policies, the Debtor would be required to pay lump- sum premiums for the Insurance Policies in advance, thus negatively affecting the Debtor's cash flow in the infancy of this chapter 11 case.  In view of the importance of maintaining insurance coverage with respect to its business activities and the preservation of the Debtor's estate by financing the Insurance Premiums, I believe it is in the best interests of its estate to authorize the Debtor to enter into new insurance premium financing arrangements in the ordinary course of business.

92.    The Debtor submits that payment of obligations due or arising under or related to the Insurance Policies will be paid in the ordinary course of business and in accordance with the terms of the Insurance Policies and in a manner consistent with prepetition practices.

## F.    CONCLUSION

93.    For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  6/16/2023

_____

Michael Sarrao
Executive Vice President, General Counsel,
and Secretary