# Exhibit 37

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC, a Delaware limited liability company,[1] | Case No. 23-10787 (JKS) |
| | **Re: D.I. 67 & 68** |
| Debtor. | |

### FIRST SUPPLEMENTAL DECLARATION OF MICHAEL SARRAO IN SUPPORT OF: (I) APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF SHULMAN BASTIAN FRIEDMAN & BUI LLP AS BANKRUPTCY COUNSEL TO THE DEBTOR NUNC PRO TUNC TO THE PETITION DATE THROUGH AUGUST 14, 2023, AND (II) APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF THE ROSNER LAW GROUP LLC AS DELAWARE BANKRUPTCY COUNSEL TO THE DEBTOR NUNC PRO TUNC TO THE PETITION DATE <u>THROUGH AUGUST 14, 2023</u>

I, Michael Sarrao, declare and state as follows:

1.　　I am the Executive Vice President, General Counsel, and Secretary for Alecto Healthcare Services LLC, a Delaware limited liability company ("<u>Alecto</u>") that has filed a voluntary petition under Chapter 11, Subchapter V of title 11 of the United States Code, commencing this Chapter 11 case (the "<u>Alecto Case</u>").

2.　　I am also the Executive Vice President and Secretary for Sherman/Grayson Hospital, LLC, a Delaware limited liability company ("<u>Sherman/Grayson</u>") that has filed a voluntary petition under Chapter 11 of title 11 of the United States Code, commencing Case No. 23-10810 (JKS) (the "<u>Sherman/Grayson Case</u>"). Alecto and Sherman/Grayson shall collectively be referred to as the "Debtors."

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N. Brand Boulevard, Suite 1780, Glendale, CA 91203.

3.      The facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, information provided to me or verified by counsel, and my personal opinion based upon my experience, knowledge, and information provided to me.  I am authorized to submit this Declaration on behalf of Alecto, and if called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      I submit this Declaration in support of: (I) *Application for Entry of an Order Authorizing the Retention and Employment of Shulman Bastian Friedman & Bui LLP[2] as Bankruptcy Counsel to the Debtor Nunc Pro Tunc to the Petition Date* [D.I. 67], and (II) *Application for Entry of an Order Authorizing the Retention and Employment of The Rosner Law Group LLC as Delaware Bankruptcy Counsel to the Debtor Nunc Pro Tunc to the Petition Date* [D.I. 68] (collectively, the "Applications").[3]

5.      On August 16, 2023, a hearing on the Applications was held in this Court (the "Hearing"). At the Hearing, and in regard  to the Alecto retention applications, the Court requested that the parties address: (1) the $15,000 intercompany insurance reimbursement issue (the "Insurance Issue"); (2) the $60,041,067.02 claim related to the intercompany advances made by Alecto to Sherman/Grayson; (3) the $20,000,000 transferred from Alecto to Sherman/Grayson one year prior to the Alecto Petition Date (defined below); and (4) the $1,500,000 in payments from Alecto to Sherman/Grayson ninety days prior to the Alecto Petition Date (collectively, the "Issues").  A true and correct copy of the  transcript of the Hearing is attached hereto as **Exhibit "A."**

---

[2] Shulman Bastian Friedman & Bui LLP ("SBFB") and The Rosner Law Group LLC ("Rosner") are collectively referred to as "Counsel."

[3] On August 7, 2023, the Office of the United States Trustee (the "UST") filed an objection to the Applications [D.I. 89]. On or about August 10, 2023, the Debtors and the UST reached a resolution on the UST's objection to the Applications.

6.    As set forth in further detail below, neither Alecto nor Sherman/Grayson perceived that an actual conflict existed by virtue of the representation by Counsel of both Debtors. Prior to June 21, 2023, the Debtors did not know if Sherman/Grayson would file for bankruptcy relief. Accordingly, prior to June 21, 2023, the Debtors did not seek advice from Counsel regarding the Issues. Even after Sherman/Grayson executed the APA (defined below) for the sale of substantially all of its assets (the "Assets"), and the decision was made to consummate said sale through a chapter 11 process, the Debtors did not expect there would be any recovery for unsecured creditors in the Sherman/Grayson Case. Therefore, I did not ask Counsel about the Issues because the Debtors believed that Alecto's claims against Sherman/Grayson were worthless and any potential conflicts were rendered moot.

### Relevant Background

7.    Alecto filed its voluntary petition for relief under Chapter 11 of title 11 of the United States Code on June 16, 2023 (the "Alecto Petition Date").  At the time of the Alecto Petition Date, the Debtors were actively seeking to dispose of the Wilson N. Jones Medical Center (the "Hospital") operated by Sherman/Grayson. However, the situation was fluid and it was unclear if Sherman/Grayson would file for bankruptcy relief or be able to conduct a sale of its assets prior to entering into the asset purchase agreement ("APA") and interim management agreement ("IMA") with AHS Sherman, LLC ("AHS-Sherman")[4] on June 21, 2023. Consequently, prior to the Alecto Petition Date, no advice was sought or obtained by the Debtors regarding the Issues.

8.    Alecto's and Sherman/Grayson's interest were aligned in seeking a buyer for the

---

[4] References to "AHS-Sherman" shall include AHS-Sherman's ultimate parent company American Healthcare Systems Co, LLC.

assets (primarily the Hospital) of Sherman/Grayson. If Sherman/Grayson was unable to sell its assets, Sherman/Grayson would have been forced to cease operations and immediately shut down the Hospital, leaving approximately four-hundred healthcare workers unemployed and the Sherman, Texas community with diminished access to healthcare. Thereafter, Alecto would have been tasked with the winddown of the Hospital. I have personal experience in the winddown process, having taken four hospitals through that process over the past four years. Such winddown process would be extremely costly to Alecto. First, Alecto would be forced to spend substantial money on the winddown process and the shutdown of the Hospital. For example, Alecto would be liable for the costs of transferring patients and the costs of keeping the Hospital open while doing so. Second, Alecto's employees would need to devote significant time to dealing with any issues related to the closure of the Hospital at the expense of devoting their time to Alecto's other business operations. Finally, Alecto would need to deal with all regulatory issues and/or litigation resulting from the closure of the Hospital. Based upon my experience, these issues can take years to resolve.

9.     On November 3, 2022, Laxman Reddy and I met with SBFB to discuss bankruptcy options for Alecto in light of the legal action *Reed, et. al. v. Alecto Healthcare Services LLC, et. al.* in United States District Court for Northern District of West Virginia, Civil Action No. 5:19-cv-263 (the "Reed Action"). At the time of this meeting, there was no contemplation that Sherman/Grayson would conduct a sale of its assets or file for bankruptcy relief. We did not seek, and were not provided, advice regarding any of the Issues.

10.     From November 2022 to February 2023, SBFB was involved in settlement discussions with the creditors in the Reed Action which included the provision of a draft petition. No advice was sought or obtained from SBFB regarding the Issues in the drafting of the draft

petition.

11.     In or about February 2023, interest began to increase in acquiring the assets of Sherman/Grayson. Consequently, on February 9, 2023, I met with SBFB to understand what would be involved in a potential bankruptcy sale process for Sherman/Grayson. At this meeting, I did not seek, nor was I provided advice, on the Issues.

12.     On or about May 16, 2023, Sherman/Grayson judgment creditor Medley, Inc. ("Medley") filed a writ of garnishment in the District Court of Grayson County, Texas against Sherman/Grayson's bank accounts. At that time, I sought the assistance of SBFB to help reach a resolution with Medley and to prepare an emergency petition in the event that a resolution could not be reached with Medley. On or about May 24, 2023, Sherman/Grayson and Medley entered into a forbearance agreement (the "Forbearance Agreement") whereby Medley agreed to forbear from collection until and including June 25, 2023 (the "Forbearance Period").

13.     At the time of entering into the Forbearance Agreement with Medley, it was understood that the Debtors would continue their efforts to identify a purchaser for the Assets and file for bankruptcy relief for Sherman/Grayson prior to the expiration of the Forbearance Period if a purchaser was identified and an agreement was reached with the purchaser to acquire the Assets.

14.     On May 31, 2023, I began discussions with AHS-Sherman regarding a potential sale of the Assets and on June 5, 2023, I circulated drafts of the APA and IMA to AHS-Sherman. I drafted such documents myself without the assistance of Counsel.

15.     On June 12, 2023, AHS-Sherman first advised the Debtors that AHS-Sherman was prepared to purchase the Assets subject to certain terms and conditions.  One of the conditions set by AHS-Sherman was that Alecto and Sherman/Grayson would need to fund

Sherman/Grayson's payroll due on June 23, 2023 because AHS-Sherman was unwilling to fund Sherman/Grayson's payroll due on June 23, 2023. Without the ability to fund such payroll, the Debtors would not be able to effectuate the sale of the Assets to AHS-Sherman. As of the Alecto Petition Date, the Debtors did not have the funding necessary to meet the June 23, 2023 payroll and, as such, did not know if Sherman/Grayson would file for bankruptcy relief.

16. On June 16, 2023, SBFB and I had a call with MPT of Sherman-Alecto, LLC's ("MPT") counsel to explain the tentative agreement with AHS-Sherman and the funding that was required to meet payroll. Absent funding from MPT, Sherman/Grayson was likely to close the Hospital and potentially file for relief under Chapter 7 of the Bankruptcy Code because neither Alecto nor Sherman/Grayson had the funding necessary to meet the June 23, 2023 payroll and such funding was a condition precedent to AHS-Sherman's willingness to acquire the Hospital.

17. On June 19, 2023, MPT agreed to provide the necessary funding and circulated a "Restructuring Term Sheet" which reflected the integrated transaction of the APA, IMA, and DIP financing. All three transactions needed to be completed in order to effectuate the sale of the Assets to AHS-Sherman. The Restructuring Term Sheet did not contemplate any distributions to Sherman/Grayson's unsecured creditors.

18. On June 21, 2023, the Restructuring Term Sheet, APA and IMA were entered into between Sherman/Grayson, MPT and AHS-Sherman.[5]

19. On June 23, 2023, Sherman/Grayson filed its petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code (the "Sherman/Grayson Petition Date").

---

[5] Although the APA is dated June 19, 2023, it did not become effective until June 21, 2023 when the Restructuring Term Sheet was executed.

## The Insurance Issue

20. Prior to the Alecto Petition Date, Alecto never sought nor obtained advice regarding the Insurance Issue from Counsel.

21. In the ordinary course of business, Alecto maintains numerous insurance policies providing coverage for Alecto and its subsidiaries (each, an "Insurance Policy" and collectively, the "Insurance Policies"). Alecto pays for the premiums (the "Insurance Premiums") for the Insurance Policies and records the amount allocated to each subsidiary as an intercompany receivable. These Insurance Policies are not severable.[6] This means Alecto must pay the entire Insurance Premium for the entire Insurance Policy or risk losing coverage for itself. Historically, Alecto's subsidiaries have largely been unable to reimburse Alecto for their portions of the Insurance Premiums.

22. At the time of the Alecto Petition Date and the filing of Alecto's insurance motion [D.I. 7] (the "Insurance Motion"), Alecto had no expectation that Sherman/Grayson would be able to reimburse Alecto for its share of the Insurance Premiums. The Insurance Motion was filed to maintain the status quo and to ensure that Alecto could maintain the Insurance Policies and pay all obligations in respect thereof.

23. Until June 20, 2023, the date of Alecto's first day hearing, Alecto and Counsel were unaware of any issues relating to the Insurance Policies or the Insurance Motion. Prior to the hearing, SBFB alerted me that Jami Nimeroff, Alecto's subchapter v trustee, had inquired whether Alecto's insurance policies covered Alecto's subsidiaries. At that time, I advised Counsel

---

[6] There are three policies which are specific to Sherman/Grayson: (a) the Excess PL/GL Policy which is specific to Texas exposures; (b) the Environmental Pollution policy which provides coverage for the underground storage tank at the Hospital and (c) the Texas Non-Subscriber Employer's Indemnity Policy which is specific to Texas employees. Alecto is also a named insured under each of these policies. Each of these policies are required under Sherman/Grayson's lease with MPT and Alecto has guaranteed Sherman/Grayson's performance under the lease.

that: (1) except for the three (3) policies specific to Texas, the Insurance Policies cover all of Alecto's subsidiaries; (2) the subsidiaries have not reimbursed Alecto for such amounts because of a lack of funds; (3) the Insurance Policies were necessary to protect Alecto from indemnity claims by its subsidiaries; and (4) in my business judgment, the payment of the Insurance Premiums was in the best interest of Alecto and its estate notwithstanding the subsidiaries inability to repay the portion of the Insurance Premiums allocable to their coverage.

24.    Until the IMA was entered into on June 21, 2023, Alecto never had any expectation of being reimbursed by Sherman/Grayson for the Insurance Premiums and never sought advice from Counsel regarding such reimbursement.

25.    Immediately prior to the Initial Debtor Interview scheduled for July 7, 2023, I first discussed with Counsel whether Alecto could seek reimbursement for the Insurance Premiums from AHS-Sherman. Pursuant to the IMA, AHS-Sherman was responsible for Sherman/Grayson's insurance costs beginning on June 21, 2023.

26.    I do not believe that an actual conflict existed arising from Counsels' representation of both Debtors related to the Insurance Issue as there was no practical avenue for Alecto to be reimbursed by Sherman/Grayson for the Insurance Premiums arising between the Alecto Petition Date and June 21, 2023. Prior to June 21, 2023, Sherman/Grayson lacked sufficient funds to reimburse Alecto for the Insurance Premiums. I believed that Alecto would have a prepetition claim in the Sherman/Grayson Case for the Insurance Premiums arising between the Alecto Petition Date and June 21, 2023. Moreover, pursuant to the IMA, AHS-Sherman has the right to utilize all of the Hospital's revenues to pay the on-going costs of running the Hospital.   In my business judgment, the payment of the Insurance Premiums was in the best interest of Alecto and its estate notwithstanding the subsidiaries inability to repay the portion of

the Insurance Premium allocable to their coverage. Alecto needed to maintain its own insurance and the most economical and practical means to accomplish that was to pay the Insurance Premiums. In addition, Sherman/Grayson's lease with MPT required it to maintain the Insurance Policies and Alecto guaranteed Sherman/Grayson's obligations under the lease.

**The Intercompany Advances**

27.     Alecto, through a subsidiary, acquired Sherman/Grayson on or about October 31, 2014. Since 2014, Alecto has loaned substantial funds to Sherman/Grayson that have not been, and except to a very limited degree are unable to be, paid back. Such advances were made to allow Sherman/Grayson to meet the healthcare needs of its community and attempt a financial recovery. From 2014 until the Alecto Petition Date, Alecto advanced approximately $60,041,067.02 to Sherman/Grayson in the form of cash transfers and the payment of certain expenses on behalf of Sherman/Grayson (the "Advances").

28.     As advancing funds to its subsidiaries was Alecto's general business practice, the Debtors never sought nor obtained advice from Counsel regarding the Advances prior to the Alecto Petition Date and Sherman/Grayson Petition Date.

29.     While Alecto filed its petition on June 16, 2023, the petition only identified payments made to Sherman/Grayson in the ninety (90) days prior to the Alecto Petition Date. Further, while Alecto filed its Statement of Financial Affairs on June 30, 2023 [D.I. 49], Alecto did not include transfers to Alecto's subsidiaries because I believed that the term "insiders" included Alecto's members, officers, and shareholders and did not include Alecto's subsidiaries.[7]

30.     The Advances first became an issue while preparing responses to the UST's initial

---

[7] At the telephonic meeting of creditors held on July 25, 2023, the UST requested that Alecto amend its schedules to include transfers to Alecto's subsidiaries.

document request for Sherman/Grayson on July 5, 2023. In response to request number 9, I provided to SBFB a copy of Sherman/Grayson's trial balance which disclosed the $60,041,067.02 owed by Sherman/Grayson to Alecto. This is the first time I discussed the amount and scope of the Advances with Counsel.

31.     At this point, I did not anticipate that the Advances would give rise to any actual conflicts. Although the APA was entered into on June 19, 2023, the Debtors did not anticipate that there would be any distribution to unsecured creditors in the Sherman/Grayson Case. Accordingly, Alecto believed that its claims against Sherman/Grayson were worthless as Alecto did not anticipate receiving anything from the Sherman/Grayson Case.

32.     On or about July 22, 2023, I was advised by AHS-Sherman that the Official Committee of Unsecured Creditors in the Sherman/Grayson Case (the "Committee") sought a settlement payment from AHS-Sherman in exchange for the Committee withdrawing its potential objection to the proposed sale of the Assets.

33.     On or around August 3, 2023, I was advised by SBFB that the Committee offered to resolve its potential objection to the sale motion in the Sherman/Grayson Case [Sherman/Grayson Case; D.I. 60] in exchange for: (1) a $250,000.00 total cash settlement distribution to general unsecured creditors in the Sherman/Grayson Case; and (2) Alecto waiving its claims against Sherman/Grayson.  I was advised by SBFB that it could not provide advice to Alecto regarding the waiver of its claims against Sherman/Grayson.

34.     I am informed and believe that Counsel advised the Committee that Counsel could not provide advice to Alecto regarding the waiver of its claims against Sherman/Grayson.

35.     After receiving the settlement demand from the Committee, Counsel and I discussed whether to appoint an independent director at Alecto to evaluate the Advances and the

Insurance Issue. On August 7, 2023, the board of managers of Alecto approved a resolution to appoint Steven Balasiano as an independent director and on August 9, 2023, Alecto filed its *Application for Entry of an Order Authorizing the Retention and Employment of Steven Balasiano as Independent Director/Manager Nunc Pro Tunc* [D.I. 93]. Alecto entered into this resolution and filed this application to have an independent director make decisions on behalf of Alecto for any inter-debtor disputes.

36.　　I do not believe that there was any actual conflict arising from Counsels' representations of both Alecto and Sherman/Grayson prior to the Committee's settlement demand that Alecto waive its claim against Sherman/Grayson.

### Transfers within Ninety Days and One Year Before the Alecto Petition Date

37.　　In the year prior to the Alecto Petition Date, Alecto transferred $20,797,030.11 to Sherman/Grayson to fund operating expenses, including payroll. In the ninety (90) days prior to the Alecto Petition Date, Alecto made the following transfers to Sherman/Grayson to fund operating expenses: (1) 3/30/2023: $650,000.00; (2) 4/18/2023: $100,000; (3) 4/27/2023: $190,000.00; (4) 5/25/2023: $75,000.00; (5) 6/8/2023: $411,426.45; and (6) 6/14/2023: $79,000.00 (collectively, the "Transfers").

38.　　The $60,041,067.02 worth of Advances are inclusive of the Transfers.

39.　　At the time each of the Transfers were made, Alecto did not seek, nor obtain, advice from Counsel regarding the Transfers. The Transfers were made by Alecto to Sherman/Grayson to help fund operating and payroll expenses and allow efforts to secure a purchaser for the Hospital to continue so that Alecto could avoid the costs and liabilities associated with shutting down the Hospital. The Transfers were made in the ordinary course of Alecto's business.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, that the foregoing statements are true and correct.

Dated: August 23, 2023

/s/ _____

Michael Sarrao

**EXHIBIT A**

```
 1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
 2
    IN RE:                          .  Chapter 11 (Subchapter V)
 3                                  .  Case No. 23-10787 (JKS)
    ALECTO HEALTHCARE               .
 4  SERVICES, LLC,                  .  Courtroom No. 6
                                    .  824 Market Street
 5                                  .  Wilmington, Delaware 19801
                                    .
 6                    Debtor.       .  Wednesday, August 16, 2023
                                    .  11:00 a.m.
 7  . . . . . . . . . . . . . . .
    IN RE:                          .
 8                                  .
    SHERMAN/GRAYSON HOSPITAL,       .  Chapter 11
 9  LLC, a Delaware limited         .  Case No. 23-10810 (JKS)
    liability company,              .
10                                  .
    . . . . . . . . . . . . . . .
11
                 TRANSCRIPT OF ZOOM HEARING
12        BEFORE THE HONORABLE J. KATE STICKLES
               UNITED STATES BANKRUPTCY JUDGE
13
    APPEARANCES:
14  For the Debtor:          Scott J. Leonhardt, Esquire
                             THE ROSNER LAW GROUP, LLC
15                           824 North Market Street
                             Suite 810
16                           Wilmington, Delaware 19801

17                           -and-

18                           Max Casal, Esquire
                             SHULMAN BASTIAN FRIEDMAN & BUI, LLP
19                           100 Spectrum Center Drive
                             Suite 600
20                           Irvine, California 92618

21  Audio Operator:          Sean Moran, ECRO

22  Transcription Company:   Reliable
                             The Nemours Building
23                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
24                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
25
    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.
```

**A1079**

```
 1  APPEARANCES (CONTINUED):

 2                              -and-

 3                              Jeffrey Waxman, Esquire
                                Brya M. Keilson, Esquire
 4                              MORRIS JAMES
                                500 Delaware Avenue
 5                              Suite 1500
                                Wilmington, Delaware 19801
 6
     For the U.S. Trustee:     Linda J. Casey, Esquire
 7                              UNITED STATES DEPARTMENT OF JUSTICE
                                OFFICES OF THE UNITED STATES TRUSTEE
 8                              J. Caleb Boggs Federal Building
                                844 King Street
 9                              Suite 2207, Lockbox 35
                                Wilmington, Delaware 19801
10
     For the Subchapter V
11   Trustee:                   Jami Nimeroff, Esquire
                                BROWN MCGARRY NIMEROFF, LLC
12                              Two Penn Center
                                John F. Kennedy Boulevard
13                              Suite 1030, 1500
                                Philadelphia, Pennsylvania 19102
14

15   For the U.S. Trustee:     John H. Schanne II, Esquire
                                UNITED STATES DEPARTMENT OF JUSTICE
16                              OFFICES OF THE UNITED STATES TRUSTEE
                                J. Caleb Boggs Federal Building
17                              844 King Street
                                Suite 2207, Lockbox 35
18                              Wilmington, Delaware 19801

19   For Medical Properties    Jeffrey K. Garfinkle, Esquire
     Trust, Inc.:               BUCHALTER
20                              18400 Von Karman Avenue
                                Suite 800
21                              Irvine, California 92612

22   For the Sherman           Chris Samis, Esquire
     Committee:                 R. Stephen McNeill, Esquire
23                              POTTER ANDERSON & CORROON, LLP
                                Hercules Plaza
24                              13 North Market Street, 6th Floor
                                P.O. Box 951
25                              Wilmington, Delaware 19801
```

**A1080**

```
 1   For the Sherman          David Klauder, Esquire
     DIP Lender:              BIELLI & KLAUDER, LLC
 2                            1204 North King Street
                             Wilmington, Delaware 19801
 3
     For AHS Sherman:         Jonathan Burket, Esquire
 4                            AMERICAN HEALTHCARE SYSTEMS
                             505 North Brand Boulevard
 5                            Suite 1110
                             Glendale, California 91203
 6
     For Reed Action          William Sullivan, Esquire
 7   Judgment Creditors:     SULLIVAN HAZELINE ALLINSON
                             901 North Market Street
 8                            Suite 1300
                             Wilmington, Delaware 19801
 9

10   For Dan McMurray, PCO:   Raymond Lemisch, Esquire
                             KLEHR HARRISON Harvey & Branzburg
11                            919 Market Street
                             Suite 1000
12                            Wilmington, DE 19801-3062

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**A1081**

1                              INDEX

2    MOTIONS:                                              PAGE

3    Application for Entry of an Order Authorizing the Retention
     and Employment of Shulman Bastian Friedman & Bui LLP as
4    Bankruptcy Counsel to the Debtor Nunc Pro Tunc to the
     Petition Date [D.I. 67; filed 7/12/23]
5
     Application for Entry of an Order Authorizing the Retention
6    and Employment of The Rosner Law Group LLC as Delaware
     Counsel to the Debtor Nunc Pro Tunc to the Petition Date
7    [D.I. 68; filed 7/12/23]

8    Debtor's Application for Entry of an Order Authorizing the
     Retention and Employment of Steven Balasiano as Independent
9    Director/Manager Nunc Pro Tunc [D.I. 93; filed 8/9/23]

10   Motion of the Debtor for an Order Under Sections §§105(A),
     363(B), 363(C), and 503(B) of the Bankruptcy Code and Federal
11   Rule of Bankruptcy Procedure 6003 Authorizing Debtor to (A)
     Maintain Existing Insurance Policies; and (B) Pay All
12   Obligations in Respect Thereof [D.I. 7; filed 6/16/23]

13   Motion to Shorten with Respect to the Motion of the Reed
14   Action Judgment Creditors for Entry of an Order Appointing an
     Official Committee of Unsecured Creditors Pursuant to 11
15   U.S.C. § 1102(a)(3) [D.I. 101; filed 8/11/23]

16

17                            EXHIBITS

18   DECLARATIONS:                                        PAGE

19   1) Declaration of Michael Sarrao                       40

20
     Transcriptionist's Certificate                         93
21

22

23

24

25

**A1082**

1                 (Proceedings commenced at 11:00 a.m.)

2          THE COURT:  Good afternoon.   Please be seated.

3  This is Judge Stickles.  We're on the record in Sherman

4  Grayson Hospital, Case Number 23-10810, and also on the

5  record in Alecto Healthcare Services, LLC, Case Number 23-

6  10787.

7          Good morning.

8          MR. LEONHARDT:  Hey, good morning, Your Honor.

9  For the record, Scott Leonhardt, from the Rosner Law Group,

10  appearing on behalf of the Sherman Grayson Hospital, LLC.,

11  Debtor.

12          Your Honor, joining me at counsel table is Max

13  Casal, from Shulman Bastian Friedman & Bui, and we also have

14  our declarant, Mike Sarrao, in the courtroom today.

15          Your Honor, also appearing at counsel table for

16  Alecto is Jeff Waxman, from the firm Morris James.

17          Your Honor, I'd just like to proceed by setting

18  out what we perceive to be a roadmap for today's hearing and

19  see if that makes sense to the Court.

20          At the last hearing, in Alecto, Your Honor left

21  off an instructive that the parties should begin with the

22  retention of Professionals, so we would like to begin with

23  that in both the Alecto case and the Sherman case.

24          After that's resolved, we propose moving to the

25  Sherman Sale Order, followed by the Sherman debt, and then we

**A1083**

1   would yield the podium to Mr. Waxman to present the Alecto

2   matters.

3          THE COURT:  Okay.  Well, I was actually thinking

4   about things a little differently.

5          I want to address the retention application in

6   Alecto.

7          The U.S. Trustee objected to the retention of the

8   debtor's proposed Professionals based on intercompany

9   conflicts of interest between Alecto and Sherman Grayson and,

10  although the U.S. Trustee's objection appears to be resolved

11  by the party, the Court needs to make its own determination

12  of whether these applications are in the best interest of the

13  debtor.

14         The presence of the intercompany claims between

15  the debtors, represented by the same counsel, does not

16  automatically warrant the disqualification of counsel.

17         The Third Circuit, however, has held that the

18  Bankruptcy Court must exercise sound discretion in

19  determining a conflict.  This Court is required to analyze

20  the factors present in the case to determine whether the

21  efficiency and economy which may favor multiple

22  representations must yield to competing concerns affecting

23  fairness to all parties involved and protection of the

24  integrity of the bankruptcy process.

25         So, here, in determining whether there's an actual

**A1084**

1  conflict, factors to be considered include whether the

2  interests of the related estate are parallel or conflicting

3  and the nature of the interdebtor claims made.  So, in order

4  for me to ensure there's been proper review, those factors

5  underlying the exercises of discretion must be factually

6  substantiated by the evidentiary record.

7          So, despite the fact that there's been filed

8  certifications, the Court requires evidence regarding the

9  following issues to determine whether an actual potential

10 conflict exists before considering the revised proposed

11 order.

12         So the parties will need to address the $15,000

13 intercompany insurance reimbursement issue that was raised at

14 the last hearing, the 60 million contingent disputed

15 unliquidated claim related to the intercompany advances made

16 by Alecto to Sherman Grayson, which are proposed to be

17 waived, the $20 million transfer one year prior to the

18 petition date, and also the 1.5 million in payments to

19 Sherman 90 days prior to the petition date.  I understand as

20 part of the sale that the release issue has been resolved.

21 That's no longer an issue, is that correct?

22         MR. LEONHARDT:  Yes.  And I don't want to steal

23 Mr. Casal's thunder, but, yes, that's been resolved.  There's

24 going to be a separate 9019 motion for certain aspects of the

25 settlement term sheet.  But I think it's appropriate for me

**A1085**

1    to yield --

2                 THE COURT:  Okay.

3                 MR. LEONHARDT:  -- to Mr. Casal.  I'm certainly

4    happy to answer the Court's questions.

5                 THE COURT:  No.  But so those are the issues that

6    I'm going to need evidence on today.

7                 And also, I just want to alert to the parties I am

8    concerned about the mechanism in the proposed retention

9    order, which shifts the burden to determine conflicts onto

10   the fee application process and I just want to make clear

11   that fees and expenses associated with defending conflict

12   analysis are not going to be borne by this estate.

13                So if the parties are prepared to present

14   evidence, we can proceed forward with the retention issues,

15   and I don't know if you want to present by proffer or --

16                MR. WAXMAN:  Your Honor, could we have one second

17   just to discuss?

18                THE COURT:  Certainly.

19                MR. WAXMAN:  Okay.

20                THE COURT:  Yes.  I'll leave the room and you can

21   have -- knock on the door when you're ready.

22                MR. LEONHARDT:  Great.  Thank you, Your Honor.

23                MR. WAXMAN:  Well, Your Honor, I don't think it'll

24   take that long if --

25                THE COURT:  Okay.

**A1086**

1        (Participants confer)

2            MR. WAXMAN:  Your Honor?

3            THE COURT:  Yes, Mr. Waxman?

4            MR. WAXMAN:  Good morning, Your Honor.  May it

5    please the Court?  Jeff Waxman, of Morris James, on behalf of

6    the Alecto debtor.

7            Your Honor, a couple of housekeeping matters, just

8    to make clear what the record is.

9            Morris James has replaced counsel for the Alecto

10   debtor in its totality.  So I am rising to address Your

11   Honor's concerns with how to proceed today with respect to

12   the two retention applications.

13           Your Honor, I don't believe that we necessarily

14   need to go forward with the retention applications today.

15   The sale and the DIP can go forward without it.  It would be

16   my recommendation that we continue it so that we can discuss

17   how best to present the evidentiary record as Your Honor has

18   requested at the next omnibus hearing, unless Your Honor has

19   other thoughts as to how to best get this moving forward.

20           THE COURT:  No.  I -- all the retentions can be

21   adjourned to a future date to address these issues.

22           MR. WAXMAN:  Okay.

23           THE COURT:  I will -- Mr. Waxman, perhaps it's

24   premature, but I just want to put the parties on notice that

25   -- and I don't want to hold up Alecto, anybody who's here for

1   Alecto only.

2            The next issue on the agenda I believe is the

3   Alecto insurance issue.

4            MR. WAXMAN:  It is, Your Honor.

5            THE COURT:  And I -- I'm surprised, given my

6   comments at the last hearing, that that matter has not

7   resolved and so I look to the parties as to what is still

8   open with respect to that issue.

9            MR. WAXMAN:  Well, Your Honor, if you'd like me

10  -- for me to address that now?

11           First, we were retained on Friday, so we've been

12  drinking from a firehose.

13           THE COURT:  Understood.

14           MR. WAXMAN:  We are getting up to speed.  I will

15  tell you that Management has provided me with copies of the

16  underlying lease, real property, which require that the

17  debtor -- that the Sherman debtor, excuse me, maintain

18  insurance and Alecto, as the parent company, is a guarantor.

19  So we're aware of those obligations.

20           We've also looked at the allocation between the

21  parties.  I've spoken with Mr. Sullivan at significant length

22  and I will tell you that there are certain things that I

23  agree with Mr. Sullivan about with respect to allocation and

24  the amounts.  It may actually be slightly higher than

25  $15,000.  But, that having been said, we haven't had a chance

1   to work through the issue.  I do know that the Sherman debtor

2   has made requests for payment of those amounts from the

3   purchaser, who I understand is obligated for the

4   administrative expenses of the estate, the Sherman estate.

5   Excuse me.  I just want to be clear on that.

6          So I don't believe that there is a live issue

7   right now that should be adjudicated, so much as

8   conversations between the parties.

9          So if Your Honor has concerns still, and there are

10  certain dollar amount allocation issues --

11         THE COURT:  Right.

12         MR. WAXMAN:  -- that -- it -- I believe have to be

13  fleshed out.  For that, we can move this.  I don't know that

14  there's a need for a further interim order.

15         THE COURT:  Well, I'm curious, because it said

16  it's going forward on a contested basis and, candidly, from

17  my perspective, not knowing the accounting, which I --

18  obviously, you, as counsel, now need to become familiar with

19  that issue, but, based on what I heard at the last hearing, I

20  was willing to entertain an oral motion that the Sherman

21  Grayson debtor moved this Court under the doctrine of

22  necessary to pay the pre-petition insurance amount owed to

23  Alecto.

24         MR. WAXMAN:  Your Honor, that is what I intended

25  to speak with the Sherman debtor about.  If they want to move

1    that today, I certainly have no issue with that whatsoever.

2             THE COURT:  I mean my concern here is I'm looking

3    at the Sherman Grayson debtor, who is moving quickly towards

4    the path of a sale, and then a process, which I'm not sure I

5    completely understand under a term sheet, and so I want to

6    ensure that the Alecto debtor's rights are preserved before

7    this Sherman Grayson debtor is dismissed.

8             MR. WAXMAN:  Your Honor, I appreciate that and I

9    certainly agree.  I don't want money to escape from the

10   Alecto estate without recourse.  So, Your Honor, I would

11   certainly be happy, if the debtors would so move for payment

12   of those amounts, in an amount to be determined after

13   discussion of what the underlying policies are, the timing of

14   those policies in place, and the allocation between the

15   respective estate under those policies, I absolutely would

16   support that, Your Honor, and by I, I certainly mean the

17   Alecto debtor, not me personally.

18            THE COURT:  Understood.  I see Mr. Sullivan has --

19            MR. SULLIVAN:  Good morning, Your Honor.

20            THE COURT:  Good morning.

21            MR. SULLIVAN:  Bill Sullivan, on behalf of the

22   Reed Action Judgement Creditors.

23            Your Honor, I rise to I guess confirm that I did

24   have a detailed conversation with Mr. Waxman yesterday

25   afternoon regarding what amounts we viewed were necessary to

1    be reimbursed based on the allocation of percentages that the

2    debtors represented it had included in its declaration and so

3    we did speak about that.

4         We do have concerns about the timing of any

5    reimbursement because of things proceeding and the mechanism.

6    So we're happy for Mr. Waxman to propose what he's proposing

7    or any other method, but I've certainly spoken to the

8    Subchapter V Trustee because she was participating -- I

9    believe she's on by telephone because --

10        THE COURT:  Okay.

11        MR. SULLIVAN:  -- she's traveling, but she was

12   participating in the First Day Hearing and relayed the

13   information to me about that.

14        So we are -- you know, I didn't -- I wouldn't have

15   expected Mr. Waxman to be able to act based on our call of

16   yesterday, but, hopefully, we can get there shortly.  And we

17   have not discussed the terms of the final order, which I know

18   Your Honor asked how could we have an administrative claim in

19   this order.  Maybe this --

20        THE COURT:  Right.

21        MR. SULLIVAN:  -- issue is going to solve it.  We

22   have other ideas as to what would be included, but we do want

23   to make sure that that money gets returned before anything

24   happens in the Sherman Grayson case that might inhibit that,

25   so.

1          THE COURT:  Understood.

2          MR. SULLIVAN:  Thanks.

3          THE COURT:  Thank you, Mr. Sullivan.

4          Ms. Nimeroff, did you want to be heard?

5          MS. NIMEROFF:  Your Honor, can you hear me?

6          THE COURT:  Yes I can.

7          MS. NIMEROFF:  And, my apologies, I'm currently in

8     an airport and I am trying to navigate being on the telephone

9     for my audio and -- but be on camera.

10          THE COURT:  I can hear and see you.

11          MS. NIMEROFF:  So, hopefully, this -- well, thank

12     you.  I guess technology has not completely eluded me at this

13     point.

14          Your Honor, I am more than happy with people

15     continuing to work in a way that resolves this.  I think part

16     of the issue was the last time -- when we were in court last

17     week, there was a concern about getting further authority

18     from the Court for payments for insurance by the Alecto

19     debtor before the end of the month, and so I guess I'm not

20     really sure that the comments to date on this issue really

21     address that point and whether -- you know, whether Your

22     Honor needs to be acting, you know, perhaps sooner than when

23     the Alecto parties at least are intending to be back before

24     the Court.

25          I, you know, continue to be concerned, again,

**A1092**

1   about having the payment come back.  There's been a number of

2   discussions with the Shulman Bastian firm about that the

3   money -- it's in process and, you know, even as to the

4   amounts that there's agreement need to come back, I'm not

5   sure why those monies have not come back yet.

6          So, to Mr. Sullivan's point, there's some concerns

7   that the Sherman Grayson case will sort of go where it will

8   go and not wanting this to get lost in the shuffle.

9          But, Your Honor, as long as the debtor, the Alecto

10  debtor, is not put in a precarious position by not having

11  authority or, you know, not needing to make insurance

12  payments to keep insurance in place that is necessary for

13  that debtor, I'm perfectly fine with Mr. Waxman, Mr.

14  Sullivan, and all other interested parties continuing to try

15  to work through the issue.

16         THE COURT:  Yeah.  As I recall from the prior

17  hearing, payment needs to be issued by the 31st of August.  So

18  --

19         MR. WAXMAN:  Your Honor?

20         MS. NIMEROFF:  That was my recollection as well,

21  Your Honor.

22         THE COURT:  Yes?

23         MR. WAXMAN:  If I may approach for a second?

24         THE COURT:  Certainly.

25         MR. WAXMAN:  I want to show you something that I

**A1093**

1   received yesterday from the debtor's principal.

2               THE COURT:  Okay.

3               MR. WAXMAN:  From the Sherman debtor's principal.

4               THE COURT:  Principal.

5               MR. WAXMAN:   Your Honor, I -- those, what I've

6   passed up, and I just briefly showed it to the parties there

7   at counsel table and I previously showed it to Mr. Sullivan,

8   are what I understand are requests for payments that had been

9   requested by the Alecto debtor of the Sherman debtor for

10  insurance for a certain period of June and a certain period

11  -- and all of July.  I understand the payment for August has

12  not yet been made, so the demand has not yet been made for

13  the payment.

14              So the debtor is not -- the Alecto debtor, is not

15  sitting idly and not requesting payments.  There's active

16  discussion about the amounts due and, hopefully, I will cede

17  the podium momentarily to the Sherman debtor's counsel to

18  make the request for payment as a critical vendor, or however

19  they would choose to style it, for payment of those pre-

20  petition amounts.  But, certainly, there's no intention by

21  the Alecto debtor to allow assets of the estate to be

22  uncollected and, frankly, I'm not sure why anybody would

23  think that the Alecto debtor would not seek payment.

24              Unless Your Honor has any questions about this,

25  I'll cede the podium --

**A1094**

```
 1                THE COURT:  No.  And, Mr. Waxman --

 2                MR. WAXMAN:  Okay.

 3                THE COURT:  -- let me be clear.  I do appreciate

 4   that you're new to this case so, if the parties need time,

 5   I'm happy to find time on my calendar for you.  But if the

 6   parties can take a break here and work out something, I also

 7   appreciate.  So --

 8                MR. WAXMAN:  I don't know that we're going to be

 9   able to sit down around the table --

10                THE COURT:  Okay.

11                MR. WAXMAN:  -- in a half-hour and go through the

12   allocations under each policy.

13                I've discussed, as Mr. Sullivan noted, as I stated

14   earlier, I discussed it with Mr. Sullivan.  I do agree with

15   him about some points, not all.  But, certainly, Mr. Sullivan

16   and I will have discussions with the other parties about

17   whatever the appropriate amount is.  If Your Honor grants the

18   -- an oral motion for payment under the doctrine of

19   necessity, then it's just a question of filling in the blanks

20   --

21                THE COURT:  Right.

22                MR. WAXMAN:  -- as to what the appropriate amount

23   is.

24                THE COURT:  Good morning, Mr. --

25                MR. CASAL:  Good morning, Your Honor.  Max Casal,
```

**A1095**

1  Shulman Bastian Friedman & Bui, for the debtor -- for the

2  Sherman Grayson debtor.

3          On behalf of the Sherman Grayson debtor, we feel

4  comfortable making that motion to pay out the insurance

5  reimbursement for that month of June.  It's the $15,000

6  number.  To be clear, the remaining amounts are being paid by

7  the interim manager at Sherman Grayson, pursuant to the

8  interim management agreement.  But, as Mr. Waxman said, we

9  will -- we're -- we will make that oral motion, whether it be

10  through the doctrine of necessity or as treated as a critical

11  vendor.

12          THE COURT:  Okay.  In light of all the discussion

13  that's been had on the record today and at the private --

14  prior hearing, I will authorize, under the doctrine of

15  necessity, the payment of the pre-petition insurance amount.

16          Mr. Sullivan?

17          MR. SULLIVAN:  Thank you, Your Honor.

18          THE COURT:  And let me just ask, did anybody

19  object to that before I ruled?  I did not -- Mr. Sullivan was

20  --

21          MR. WAXMAN:  I just have comment to that, Your

22  Honor.

23          Just to clear up Mr. Casal's comment, the debtor

24  -- the Alecto debtor doesn't necessarily agree that it's

25  15,000.  It's whatever the amount is.

**A1096**

 1            THE COURT:  I see the debtor's -- the Grayson

 2   debtor, counsel shaking his head.  Understood.  Yes.

 3            MR. SULLIVAN:  That was my issue as well, Your

 4   Honor.  We believe the number is higher and I won't put it on

 5   the record at this point in time --

 6            THE COURT:  Okay.

 7            MR. SULLIVAN:  -- but, what I understand, is

 8   they're making a motion for whatever the number is, and maybe

 9   we'll get to it.

10            MR. CASAL:  Your Honor, just as -- Max Casal,

11   again.

12            Just for a point of clarification, we're talking

13   about the -- it's just the --

14            THE COURT:  Well --

15            MR. CASAL:  -- whenever the payments due between

16   the --

17            THE COURT:  It's four days, I believe.

18            MR. CASAL:  Yes.  June 16th through June 20th,

19   right?  That's -- we feel comfortable with that.  That's my

20   understanding.

21            THE COURT  Okay.  Is there any objection to that?

22   Mr. Waxman is conferring with Committee counsel, so I think

23   you might want to wait a second.

24            MR. WAXMAN:  Judge, just to be clear, the Alecto

25   -- excuse me, the Sherman Committee counsel, not -- I'm

1    beating up my -- which there is none.

2            THE COURT:  Okay.

3            MR. WAXMAN:  Just to be clear.  I'm sorry, Your

4    Honor.  Did --

5            THE COURT:  No.  Take your time and then let's get

6    a clean record.

7            MR. WAXMAN:  Okay.

8        (Participants confer)

9            MR. WAXMAN:  While they're conferring, let me ask

10   Your Honor a question, although I suppose that this is really

11   Mr. Casal and Mr. Samis' issue more than our issue.

12           With respect to the Doctrine of Necessity Order,

13   do you actually want a written form of order from the

14   parties, or how would Your Honor like this to be done from a

15   procedural posture from this side of the podium?

16           THE COURT:  I would like a form of order, but I

17   think you're going to have to work out the dollar number to

18   put in the form of the order before I sign it.  Otherwise, I

19   think it's a rather ambiguous order.

20           MR. WAXMAN:  Well, I think one of the other

21   issues, Your Honor, and this is what caused the minor caucus

22   --

23           THE COURT:  It's okay.

24           MR. WAXMAN:  -- as opposed to the major caucus,

25   which will go on later, is whether or not this is a pre-

1    petition claim or whether this is an administrative expense,

2    and I'm not asking Your Honor to weigh in at this moment, as

3    I understand Mr. Casal is addressing that issue, at least in

4    part, but that will have to be addressed, I believe, as part

5    of the overall resolution in the Court's order.

6            THE COURT:  Well, I definitely want it in an order

7    and so if we have to come back and visit what exactly we're

8    characterizing it as -- is this something the parties are

9    going to be able to resolve in the next week?

10           MR. WAXMAN:  I certainly hope so.  I will make --

11           THE COURT:  Do I need to set aside a hearing time

12   right now for it?

13           MR. WAXMAN:  No.  Although, Your Honor, we will be

14   asking for hearing dates from your chamber staff later, so

15   perhaps we can revisit that.

16           THE COURT:  But you need this before the 31st --

17           MR. WAXMAN:  Yes.

18           THE COURT:  -- I understand.

19           MR. WAXMAN:  Yes.

20           THE COURT:  I understood, based on prior

21   discussions, this was a pre-petition amount; hence the reason

22   under the doctrine of necessity.

23           Obviously, if it's post-petition, that's very

24   different treatment.

25           MR. WAXMAN:  It's a pre-petition amount, Your

1   Honor, as I understand it, and I certainly don't want to step

2   on anybody's toes here.  I understand it's a pre-petition

3   amount but, Your Honor, it is necessary for the continuation

4   of the lease and, because of that, I believe that there are

5   implications for post-petition necessity, since they are

6   continuing to serve, and that would be a breach of the

7   underlying ground lease.  There's apparently six pages of

8   requirements for insurance in the lease.

9           THE COURT:  Okay.  Does it make sense for the

10  parties to caucus and return to the Court on this issue on

11  Zoom?

12          MR. WAXMAN:  I think Zoom would work, particularly

13  since it would save Mr. Casal from earning more frequent

14  flyer miles from California.

15          THE COURT:  Let's plan that because, at this

16  juncture, while I'm prepared to order it under the doctrine

17  of necessity if it's pre-petition, but if we don't even know

18  that issue, I'm not going to just enter an order to enter an

19  order.  So let's have the parties caucus and figure out

20  what's going on and we'll confer.  And if we're going to need

21  another hearing-hearing with evidence, then we'll do that in

22  person.  But if we can resolve it and submit a form of order,

23  we can do that under Zoom.

24          MR. WAXMAN:  Your Honor, we may end up -- if the

25  parties can agree on the fill-in-the-blank amount, we may end

**A1100**

1  up requiring an evidentiary hearing, but I think as a

2  prefatory matter, I think a zoom hearing to see whether the

3  parties can agree and maybe address legal issues, to the

4  extent that there are some, that may be very helpful for all

5  of the parties.

6         THE COURT:  Yeah, I think so too.  From a business

7  perspective, is your payment due by the 31st or issued by the

8  31st?

9         MR. WAXMAN:  If I can have a moment, Your Honor?

10     (Participants confer)

11        MR. WAXMAN:  Your Honor, I understand that it's

12  due on the 31st, but I'm not sure of what the date of the --

13  what day of the week the 31st is.  I believe that --

14        THE COURT:  It's a Thursday.

15     (Participants confer)

16        MR. WAXMAN:  The Sherman debtor can pay on the

17  30th, Your Honor, or the Alecto debtor can pay on the 30th.

18        THE COURT:  Pay on it?  Okay.  Let's table this to

19  give the parties an opportunity to see if they can't resolve

20  this and, in the meantime, I'm going to look for a hearing

21  date.

22        I think I've made myself clear.  This is really

23  just a matter of getting this paid and whose pocket it's

24  coming out of.

25        MR. WAXMAN:  I agree, Your Honor, and I certainly

1 appreciate Your Honor's accommodation with respect to time

2 and forethought about the issue.

3           THE COURT:  Okay.  All right.  Since we are three-

4 quarters of the way done the agenda in Alecto, can we proceed

5 forward with the final agenda item in Alecto, and you already

6 have the podium?

7           MR. WAXMAN:  That's fine with me, Your Honor.  We

8 have one matter for which a COC was filed last night to

9 address Mr. Sullivan's objection, limited objection, with

10 respect to Mr. Balasiano's declaration, so I believe that

11 that order can be entered approving his retention

12 application.

13           THE COURT:  Okay.  Does anyone wish to be heard on

14 that retention application?

15      (No verbal response)

16           THE COURT:  Okay.

17           MR. WAXMAN:  And just to be clear, Mr. Balasiano

18 is in the courtroom today, as well as my colleague, Ms.

19 Keilson.

20           THE COURT:  Okay.

21           MR. WAXMAN:  And I apologize for not introducing

22 them earlier.

23           THE COURT:  Okay.  Welcome.

24           I -- I've looked at that order, but I need to look

25 at it again.  I don't believe there are any objections to it,

**A1102**

1   is that correct?

2       (No verbal response).

3           THE COURT:  Okay.  I will get that order entered

4   shortly after the hearing.

5           MR. WAXMAN:  Thank you, Your Honor.

6           THE COURT:  I just want to refresh my recollection

7   on it.

8           MR. WAXMAN:  That's perfectly fine, Your Honor.

9           THE COURT:  There's been a lot of paper in a short

10  period of time.

11          MR. WAXMAN:  There has, and I think that that --

12  the blame for that --

13          THE COURT:  No.  No blame.

14          MR. WAXMAN:  -- rests on me.

15          THE COURT:  No.  It's important that the right

16  process be followed and the parties have an opportunity to

17  review matters.  Okay.

18          MR. WAXMAN:  Understood, Your Honor.  We're just

19  trying to get up to speed and file what's necessary to move

20  everything forward, as appropriate.

21          THE COURT:  Okay.  Mr. Samis?

22          MR. SAMIS:  Good morning, Your Honor.

23          THE COURT:  Good morning.

24          MR. SAMIS:  Chris Samis, from Potter Anderson,

25  here for the Sherman debtor Committee.

**A1103**

1          Your Honor, I only rise to say that, at first, we

2     had our concerns about the -- you know, the governance

3     relationships between the entities in this case as well.

4          THE COURT:  Right.

5          MR. SAMIS:  We think that the appointment of Mr.

6     Balasiano at the Alecto level, along with his receipt of able

7     counsel from Mr. Alberto, and now Mr. Waxman, who has swapped

8     in to be counsel for the debtor, is enough to cure our

9     concerns.

10         Indeed, as Your Honor probably saw, Mr. Balasiano

11    will be passing on a relatively important piece of our

12    proposed settlement, which is not up for today.  That's the

13    other reason I wanted to --

14         THE COURT:  Okay.

15         MR. SAMIS:  -- rise, just to explain, Your Honor,

16    this is a rubric that we have used in a couple of other cases

17    that were very vast like this.  Independent Peck (phonetic)

18    was one, although that did end in a liquidating Plan, rather

19    than a structured dismissal.

20         But Sharper Bruce (phonetic) is another example

21    where we were building up kind of funds over time and then we

22    did a staged structure dismissal and ultimate settlement that

23    resulted in an ultimate resolution of the cases.

24         So, point being is though I didn't want Your Honor

25    to be spilling over these documents as we discuss them over

1    the course of the remainder of the hearing, thinking that

2    you're going to be needing to make findings or to consider

3    our settlement in a real way -- it will be brought before the

4    Court in an appropriate --

5            THE COURT:  It will be a --

6            MR. SAMIS:  Yes.

7            THE COURT:  -- separate 9019.

8            MR. SAMIS:  Correct.  That's right.

9            THE COURT:  But it's so integrated into the DIP

10   and the sale, it's a little bit cart before the horse, but --

11           MR. SAMIS:  It --

12           THE COURT:  -- that being said --

13           MR. SAMIS:  It --

14           THE COURT:  -- I have some questions about it

15   generally, but we can deal with them when we get there.

16           MR. SAMIS:  Certainly.  And, Your Honor, we can

17   handle those in the context of this hearing.  We can handle

18   those in the context of a 9019 once you see the

19   justifications for some of the things that we're doing in the

20   settlement.  All of that is fine.  You know, I just wanted to

21   be clear that we will be seeking both the approval of this

22   settlement and then, ultimately, the -- you know, the

23   structured dismissal mechanic by separate motion.

24           THE COURT:  Okay.

25           MR. SAMIS:  This is not something that we're

1   trying to hit Your Honor with on no notice.

2                THE COURT:  Understood.

3                MR. SAMIS:  Okay.

4                THE COURT:  And I do appreciate the Committee

5   being transparent.

6                MR. SAMIS:  Very good.  Thank you, Your Honor.

7                THE COURT:  Thank you.  Mr. Waxman?

8                MR. WAXMAN:  Hello again, Your Honor, and I think

9   that takes us to the final motion, which is actually Mr.

10  Sullivan's motion --

11               THE COURT:  Okay.

12               MR. WAXMAN:  -- to shorten time or I guess to

13  schedule a hearing on it on short time.

14               MR. SULLIVAN:  Good morning, Your Honor.  Bill

15  Sullivan for the Reed Action Judgment Creditors.

16               Your Honor, the motion to shorten is really just a

17  scheduling issue.

18               THE COURT:  Okay.

19               MR. SULLIVAN:  And none of this do we ask for it

20  to be heard today.  However, we filed the motion to appoint a

21  Creditor's Committee on Friday and I believe, when I spoke to

22  Ms. Casey, she suggested that it might be a good idea to

23  discuss scheduling today, which I agreed with, given that

24  Friday afternoon, lots of things were influx.

25               THE COURT:  All right.

**A1106**

1    MR. SULLIVAN:  And things developed and, by the

2  end of the day, I was speaking to Mr. Waxman, so I knew that

3  certain restructural changes were in place with respect to

4  debtor's representation.

5         So this is really just an issue now.  I wasn't

6  aware of the Court having a date and I figured we could

7  address it --

8         THE COURT:  No.  I think it's perfect time to

9  address it.

10        MR. SULLIVAN:  Okay.

11        THE COURT:  How does August 29th at 2:00 work, and

12  perhaps we could deal with the insurance at the same time,

13  although I don't know because I don't know how many -- how

14  much evidence there'll be on the Committee appointment

15  motion.

16        MR. SULLIVAN:  Your Honor, from my perspective, I

17  think that's fine and I think we could do both at the same

18  time.

19        THE COURT:  Okay.  Does anyone else wish to be

20  heard regarding scheduling on August 29th at 2:00?

21        MR. WAXMAN:  Your Honor, I've got a 341 meeting,

22  but I anticipate that I'll be able to have somebody from my

23  firm cover that without me, so that works.  From -- if I

24  could just have one moment?

25        THE COURT:  What time is your 341 meeting?

**A1107**

1    MR. WAXMAN:  2:00, but it's in a different case

2  and, again, I've got colleagues that are much smarter than me

3  who can handle it.

4    If I can just have one moment --

5    THE COURT:  Certainly.

6    MR. WAXMAN:  -- to confer with --

7    (Participants confer)

8    MR. WAXMAN:  Your Honor, there's an issue.

9    THE COURT:  Okay.

10    MR. WAXMAN:  Mr. Balasiano is the independent

11  director.  He is one of the reasons why the motion is now

12  moot and, frankly, it would just be a waste of an estate

13  asset.

14    I don't know if his testimony will be necessary at

15  the hearing.  I do not want to --

16    THE COURT:  Okay.  That's okay.

17    MR. WAXMAN:  Yeah.  Well, if I can find out when

18  can we be back?  I mean I'm fine with starting the hearing,

19  but to the extent that his testimony is necessary, we'd ask

20  for an adjournment so that his testimony can be considered.

21    (Participants confer)

22    MR. WAXMAN:  Mr. Balasiano will be back in the

23  country on September 5th.  He's out of the country from, I

24  think he said, from the 28th until September 5th.

25    THE COURT:  So you want to -- you propose starting

**A1108**

1    the hearing and then --

2             MR. WAXMAN:  I would prefer to start it after he

3    returns or before he leaves, one of the two.

4             THE COURT:  When does he leave?

5             MR. WAXMAN:  28th?

6             MR. BALASIANO:  28th in the evening.

7             MR. WAXMAN:  The evening of the 28th.

8             THE COURT:  Could we do the 28th at 11:00?  You

9    have another matter at 1:00, Mr. Waxman.

10            MR. WAXMAN:  If I could just have one moment, Your

11   Honor.  I do have another matter before Your Honor at 1:00,

12   as does Mr. Casal.

13            I suppose that's fine, although I don't know what

14   time he is leaving and, obviously, I don't want anybody to

15   miss an international flight.  So if I can have another

16   moment?

17            THE COURT:  Yes.

18        (Participants confer)

19            MR. WAXMAN:  Your Honor, the 28th just isn't going

20   to work.

21            THE COURT:  Okay.

22            MR. WAXMAN:  The flight is at the end of the

23   business day.  He can't come to Delaware that day.  I'm sorry

24   to be overly difficult and tax Your Honor's calendar, anymore

25   than I usually do.

**A1109**

```
 1            THE COURT:  The motion was filed the 11th, correct?

 2            MR. SULLIVAN:  Yes, Your Honor.  Your Honor, can I

 3  be heard briefly on this?

 4            THE COURT:  Yes, of course.

 5            MR. SULLIVAN:  So, many times, you know, the

 6  issues we're hearing are framed by the objection and so I

 7  think we should set an objection deadline and then perhaps we

 8  can either have -- if we don't need his testimony, we can

 9  have a hearing, or we can -- if we do need his testimony, we

10  can have a status conference or work something out in the

11  meantime.  But, certainly, we need an objection deadline.

12            THE COURT:  Right.  What about the 25th at 10:00

13  a.m.?  My calendar is filling up, but I'm afraid if I don't

14  get a date on the calendar, you're looking at the middle of

15  September.

16       (Participants confer)

17            MR. WAXMAN:  That doesn't work either for either

18  of the debtors, respective debtors and principals.

19            THE COURT:  I can set an objection deadline and we

20  can then move from there for a hearing date.

21            MR. WAXMAN:  That sounds fine, Your Honor.  I'm --

22            THE COURT:  But it's going to be tight.  So let's

23  set your objection deadline for 4:00 p.m. on the 21st.

24            MR. WAXMAN:  That's fine, Your Honor.

25            THE COURT:  And then let's preserve 10:00 a.m. on
```

**A1110**

1   the 28th and the parties need to confer and let me know if

2   that's a go, depending on whether or not you're going to

3   require testimony.

4           MR. WAXMAN:  That's fine, Your Honor.  I mean

5   that's --

6           THE COURT:  It's a little awkward, but --

7           MR. WAXMAN:  That's -- Your Honor, I appreciate

8   that work.  I am dancing through raindrops here in terms of

9   finding appropriate days immediately before, you know, the

10  Labor Day holiday and I will try to work with Mr. Sullivan to

11  see what accommodations can be reached with respect to the

12  necessity of testimony.

13          THE COURT:  Okay.  Let me hear from Ms. Casey.

14          MS. CASEY:  Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MS. CASEY:  May it please the Court?  Linda Casey,

17  on behalf of the U.S. Trustee in the Alecto debtor's case.

18          I would ask your indulgence to have the objection

19  deadline be the 22nd, the Tuesday, which would be before the

20  agenda deadline.  Even though it's been filed since August

21  11th, people don't know the objection deadline and, as a

22  government, we don't work that quickly, so we'd like --

23          THE COURT:  That's fine.

24          MS. CASEY:  -- the extra time.  Thank you.

25          THE COURT:  Mr. Sullivan, is that okay with you?

**A1111**

```
 1              MR. SULLIVAN:  That's fine, Your Honor.

 2              THE COURT:  And, Mr. Sullivan, if they have the

 3    22nd until 4:00 p.m., your agenda is due the 24th at noon, you

 4    can file your objection prior to filing the agenda, a reply,

 5    if you have a reply.

 6              MR. SULLIVAN:  Yes.

 7              THE COURT:  Okay.  So we're on for the -- for

 8    10:00 a.m. on the 28th, and that will include the insurance

 9    issue.  But I'm going to have a hard stop because I have a

10    1:00 p.m. hearing on that same day that will be going

11    forward.

12              MR. WAXMAN:  It will be going forward, although I

13    anticipate that that will be a short hearing.

14              THE COURT:  Pardon?  A what hearing?

15              MR. WAXMAN:  I anticipate that that will be a

16    short hearing, Your Honor.

17              THE COURT:  And then I have something after that,

18    so.

19              MR. WAXMAN:  Oh, okay.  So we're going to start at

20    10:00, and, I'm sorry, the objection deadline is now the 22nd?

21              THE COURT:  22nd at 4:00 p.m.  The reply deadline

22    is the 24th, prior to noon, and the agenda is due at noon on

23    the 24th.

24              MR. WAXMAN:  Okay.

25              THE COURT:  Is --
```

**A1112**

1      MR. WAXMAN:  And, again, that applies to the

2  insurance and the Committee motion, both, for the 28th at

3  10:00?

4      THE COURT:  Yes.

5      MR. WAXMAN:  Okay.  SO that gives --

6      THE COURT:  And we will try to get through them.

7      MR. WAXMAN:  We'll do our best to expedite things

8  and stipulate to as much as we can, to the extent that

9  there's not an agreement on any other thing.

10      THE COURT:  Okay.  Is that it for Alecto with

11  respect to the Alecto hearing?

12      MR. WAXMAN:  I believe --

13      THE COURT:  I'm sure you're going to want to be

14  heard on other things, but?

15      MR. WAXMAN:  Yes, Your Honor.  I will want to be

16  heard with respect to the sale and the DIP, but, with respect

17  to our agenda, that is all that I have, Your Honor.

18      THE COURT:  Okay.  So -- thank you.  Anyone who's

19  present for the Alecto only hearing, can leave if they'd like

20  and we'll turn the podium over to the Sherman Grayson

21  debtors.

22      MR. CASAL:  Thank you, Your Honor.  Again, this is

23  Max Casal.

24      Before jumping into the sale motion, I did want to

25  take a step back and go back to the retention issue.  I don't

1  believe that we set a hearing date for the retention issue.

2  Does -- is the 28ᵗʰ at 10:00 a.m., can we fit into that

3  hearing date?

4        THE COURT:  We can try.  I mean it depends how

5  other things -- you know, what transcribes [sic], but I am

6  going to require evidence.  Happy to put it on for that date,

7  but we're just going to have limited time.  So, to the extent

8  parties can work through issues, we'll do that.  If not,

9  we'll have to look for another date for that.

10        But it seems to me that the insurance is a

11  priority because you have a deadline you're dealing with.  If

12  we have to, we'll bring you back on the retention issue.

13        MR. CASAL:  Okay.  I mean, alternatively, I mean

14  if another date -- if we could just set another date, that'd

15  be fine.

16        THE COURT:  Okay.  We'll look for another date

17  while we proceed with the hearing.

18        MR. CASAL:  Okay.  Okay.  So, and with that, Your

19  Honor, we will go to the sale motion of Sherman Grayson,

20  debtor.

21        As a preliminary matter, we do have Mr. Sarrao in

22  the building who is both the First Day declarant and also

23  filed as the declarant in support of a sale motion.  So,

24  subject to cross-examination, I'd like to admit his

25  declarations into evidence.

**A1114**

```
 1              THE COURT:  Okay.  Does anyone object to the

 2   admission into evidence of the declaration of Mr. Sarrao at

 3   Docket Number -- are you referring to the First Day

 4   declaration, as well as his declaration in support of the

 5   sale?

 6              MR. CASAL:  Yes.  So I believe it's Dockets 3 and

 7   62.

 8              THE COURT:  61.

 9              MR. CASAL:  61.

10              THE COURT:  6-1.  Does anyone have any objection

11   to the admission of those declarations?

12              MR. POWELL:  Good morning, Your Honor.  May it

13   please the Court?  Jason Powell, from the Powell firm, on

14   behalf of Altera Digital Health.

15              My client has filed an objection to this.  We do

16   not have an objection to the admission of the declaration

17   and, obviously, he would be subject to cross-examination,

18   which I'm prepared to do.

19              I should also let the Court know that Jeff

20   Garfinkle, from Buchalter, is available on Zoom and may have

21   limited argument, if Your Honor allows, this afternoon --

22   excuse me, this morning, as well.

23              But as to the direct question, we have no

24   objection to the admission of the declaration, subject to

25   cross-examination.
```

**A1115**

1     Whether we have cross-examination depends upon

2  whether we have a resolution of our objection, which I think

3  we have and I hope we have, and when Your Honor is ready, I

4  can address that point, but I would like to address that

5  before the actual presentation should start so I know whether

6  I need to provide an evidentiary presentation and/or cross-

7  examination.

8     THE COURT:  Okay.  All right.

9     MR. POWELL:  I can address it now or --

10    THE COURT:  I'm going to --

11    MR. POWELL:  -- I can --

12    THE COURT:  I want you to wait one minute.

13    Let me ask, other than Mr. Powell, is there anyone

14 else appearing today who wishes to cross-examine the

15 declarant regarding the content of his declarations?

16    (No verbal response)

17    THE COURT:  Okay.  Hearing none, the declaration

18 is admitted, subject to Mr. Powell's potential cross-

19 examination.

20    So let me hear from the debtors as to where you

21 stand with respect to this objection.

22    MR. CASAL:  So I believe that Mr. Powell asked

23 that we address the Altera piece first.

24    So, as Your Honor knows, there was an objection

25 filed by Altera.  It went really to -- as to the cure amount.

**A1116**

1   The debtor then withdrew its request to assume and assign the

2   Altera agreements as part of the sale motion and order.

3            In response, Altera did file a motion, basically

4   seeking to object to the motion, to the extent that the

5   debtor was attempting to (1) transfer its use rights to the

6   buyer; or (2) transfer any claims it had against the --

7   against Altera to the buyer.

8            To be clear, the debtor was not trying to do

9   either of those things and those assets are not being

10  acquired by the buyer as part of this sale, so I believe that

11  we reached a resolution and my guess is that we'll

12  memorialize the language and revise the order accordingly and

13  my understanding is that that should be fine for both the

14  debtor and for Altera.

15           THE COURT:  Mr. Powell?

16           MR. POWELL:  Thank you, Your Honor.

17           To provide an appropriate landscape for where we

18  are today, the answer is it's correct.  We did file an

19  initial objection and it was a cure objection.

20           Altera has a master service agreement with the

21  debtor, with the hospital, and it's for EHR, electronic

22  health records, and Your Honor may have seen that this

23  service, this product is being referred to as the umbilical

24  cord of the hospital, the backbone of the hospital.  It's an

25  essential part of the hospital's operation and, presumably,

1  that is why that was the only contract that was initially to

2  be assumed and assigned and so this was a cure objection

3  initially and Altera has not been paid since April of 2022

4  and it's owed nearly in excess of $900,000 and part of that

5  incorporates post-petition amounts that also have not been

6  paid.

7      So the cure amount, pushing forward with that, in

8  a meet and confer, we're informed that it's now not going to

9  be assumed and assigned and that is the current position of

10 the debtor that it's not going to be assumed and assigned.

11      So that raises a host of other issues.  We did not

12 file a subsequent motion; we filed a supplemental objection,

13 given that landscape.

14      So there's three parts, generally speaking, to

15 Altera's issues with the sale order today which, again, I

16 believe the two that are germane for Your Honor's

17 consideration today have been resolved.

18      Number one is as follows.  Is what is being

19 included, what are the assets as defined under the APA,

20 because our property, Altera's property, the operating

21 systems, the software, the equipment, cannot be transferred,

22 and I think that is understood.

23      Second, as Your Honor may have seen, in leading up

24 to what would've been the initial hearing, there was a

25 supplemental declaration by Mr. Sarrao; I believe that's how

**A1118**

41

1   you pronounce his name, and, for the first time, the Court

2   was made aware of these alleged claims against Altera and,

3   you know, obviously, those are vehemently disputed and my

4   client significantly agrees with those claims but,

5   nevertheless, those causes of action cannot be transferred to

6   the buyer.  That's issue number two.  And those are the two

7   main issues that need to be addressed, we believe, for Your

8   Honor to enter a sale order today.

9          The third issue is payment.  As Your Honor knows,

10  there is an interim services agreement that has been approved

11  by this Court as of -- and I believe the operative effective

12  date is June 23rd; it was approved in August, and no payments

13  have been made to Altera.

14         And the more practical issue is is that Altera's

15  operating system is not like a lightbulb that can simply be

16  unscrewed, handed back to Altera, and then the hospital

17  continues with a new lightbulb.

18         We believe that if this order is approved, there

19  is a period of time between the approval and the closing,

20  maybe 100, 150 days.  There's a litany of conditions

21  precedent, including regulatory and licensing, that the buyer

22  now has to go -- that's going to take a time period.  And all

23  the meanwhile, our system, our property, under the master

24  services agreement, is being utilized by the debtor and has

25  to be paid pursuant to the interim operating agreement.  Now,

**A1119**

1   that may be another issue for another time and we may be back

2   before the Court, but we cannot release our rights to seek

3   payments that are due to Altera.

4           Those are the three issues.  Now, my understanding

5   is that we proposed a paragraph in the order.  The buyer has

6   agreed to that paragraph and the debtor has agreed to that

7   paragraph, and I can read it now and if we have confirmation

8   of that language, then there is no need for us to cross-

9   examine or prevent -- present evidence today.

10          THE COURT:  Okay.  I have not seen that language,

11  correct?

12          MR. POWELL:  That's correct, Your Honor.

13          THE COURT:  Okay.

14          MR. POWELL:  And I can read that into the record.

15  I just want to be clear so I know --

16          THE COURT:  No.  I --

17          MR. POWELL:  -- my marching orders.

18          THE COURT:  I want to make sure the record is

19  clear and unambiguous.

20          MR. POWELL:  Thank you, Your Honor.

21          Altera Digital Health, Inc., I'll define term,

22  Altera, for the avoidance of doubt.  Nothing in this sale

23  order authorizes the debtor to transfer to the buyer:  (1)

24  The debtor's rights under the Master Client Agreement, dated

25  September 28th, 2021, between the debtor and Altera and the

**A1120**

1  related agreements between the parties (collectively, the

2  Altera agreements), including any rights to use or access the

3  software for debtor's electronic health records (E.H.R.)

4  system, the "Altera software" and (2) Any claims the debtor

5  has or may have against Altera under the Altera agreements,

6  notwithstanding any contrary language in the asset purchase

7  agreement, the rights of the debtor to use or access the

8  Altera software and any claims of the debtor against Altera,

9  are excluded assets under the asset purchase agreement and

10  are not being transferred to the buyer.

11         With that paragraph in any order that is put

12  before the Court for consideration, I believe my presentation

13  is minimized, if not eliminated today.

14         THE COURT:  Okay.  Mr. Powell, why don't you stay

15  there.  Let me hear from others regarding this proposed

16  language; the debtor, the Committee, the Alecto debtor, the

17  United States Trustee.

18         MR. CASAL:  Sure, Your Honor.  I -- from the

19  Sherman side, like I said, I would -- we agree to that

20  language.  We have no problem with it, and just relating to

21  those first two points, it's fine.

22         I do want to address the third point that Mr.

23  Powell raised, but I don't know if you want to hear first on

24  the --

25         THE COURT:  Well, can I see a copy of the

**A1121**

1   language?  I mean I was listening to Mr. Powell, but do you

2   have an extra copy that I can look at while you're referring

3   to it?

4         MR. POWELL:  Yes.

5         THE COURT:  Thank you.

6         MR. POWELL:  I will just represent to Your Honor

7   that this is an email -- I don't think there's any --

8         THE COURT:  That's okay.  Thank you, Mr. Powell.

9         MR. POWELL:  Sure.

10         THE COURT:  So it's the third that's in dispute?

11         MR. CASAL:  No.  So, the -- Mr. Powell raised

12   three points.  It's the use rights.  It's the transfer of

13   claims.  Those two things will be dealt with in the order.

14         Mr. Powell raised a third point about the post-

15   petition payment and that's not being dealt with through the

16   order and I would agree with Mr. Powell that that's not

17   really the issue before the Court today.

18         But the debtor, nor the interim manager, ever

19   received the invoices from Altera post-petition.  I believe

20   that Mr. Garfinkle sent it to me -- sent me the post-petition

21   invoices just mid-last week, right before the original sale

22   hearing scheduled.

23         THE COURT:  Okay.  I did read that in the

24   declaration and I do see Mr. Garfinkle is on screen and I

25   didn't know if he wanted to be heard?

**A1122**

 1            MR. GARFINKLE:  Your Honor, Mr. Powell is doing a

 2    fine job and I don't want to step on his toes and the

 3    limitations of Zoom appearances, I do want to emphasize a

 4    point that I don't think has been made very clear in any of

 5    the moving papers.

 6            This is a process for the debtor to sell the

 7    hospital.  We get the Court order and then they have to go to

 8    the different regulatory authorities and it's going to take,

 9    based on my long experience doing healthcare bankruptcy

10    cases, upwards to a 100 to 150 days.

11            The debtor will remain -- as I understand it, and

12    Mr. Casal can tell me if I'm wrong, the debtor is going to

13    remain in bankruptcy, in the Bankruptcy Court, during that

14    transition period until the different regulatory agencies

15    approve the sale, during which time the debtor is still going

16    to be operating under its interim management agreement and

17    the interim manager, the buyer, who is not paying any money

18    to buy this hospital, has to cover the operating expenses and

19    if those operating expenses are not paid, including my

20    client, in the next 150 days, we're going to be back in front

21    of this Court on either relief from stay or an administrative

22    claim against the debtor's estate, which is not going to have

23    any money because there's no consideration being paid to the

24    debtor's estate.

25            Just so the Court's aware of this dynamic.  Again,

**A1123**

1    as I understand it, the debtor is going to stay in

2    bankruptcy.  This Chapter 11 case is going to remain open

3    until the different state regulatory agencies and federal

4    government on CMS approves the transaction, just so

5    everybody's aware of this.  So to enter the order today is

6    not the end of our presence before the Bankruptcy Court.

7            THE COURT:  Thank you, Mr. Garfinkle.  Others?

8    And I do have a couple of questions in that regard, but I'd

9    like to hear from the debtors.

10           MR. CASAL:  Okay.  Just on that point, I -- the

11   debtor doesn't estimate that is going to take 100 to 150

12   days.  Our best guess is that it's going to be within 30 days

13   and I would say that his -- that the understanding is

14   correct, right, that this will stay before the Bankruptcy

15   Court until the appropriate licenses are transferred.  But I

16   think we just disagree on the amount of time.  My

17   understanding is that it's a faster process in Texas than it

18   would be in the State of California.

19           THE COURT:  So, just to be clear, and this is not

20   part of the sale order that I reviewed, but that the debtor

21   does intend to stay open until those -- or the bankruptcy

22   case will remain open until those license are transferred.

23           MR. CASAL:  That's my understanding, Your Honor.

24           THE COURT:  Okay.  And that the purchaser will be

25   paying the United States Trustee fees that are associated

**A1124**

1  with that period of time that the case is open, whether it be

2  30 days or 400 days.

3          MR. CASAL:  Right, as done through the

4  administrative expenses, right, which -- the interim

5  management agreement.  Again, that's my understanding.  I

6  mean I don't know if that's everything.  I don't know if --

7          THE COURT:  Okay.  Well, I'm going to ask for

8  confirmation because I also want to know if the Committee's

9  term sheet contemplated that period of time as well.  And I

10 understand nobody has a crystal ball here so nobody knows how

11 long it's going to take.  But I've had cases with medical

12 institutions that have taken significant time.  So I just

13 want to make sure that everybody is on the same page.

14         MR. STAMIS:  Your Honor, just to confirm again,

15 Chris Samis, from Potter Anderson, for the Sherman Committee.

16         Your Honor, we did understand that there was going

17 to be some sort of apparent interim management period, you

18 know, that the interim management agreement contemplates.

19 Indeed, it's how we would be planning to effectuate our

20 settlement.  Obviously, we'd be moving during that period in

21 order to both get approval under 9019 of the settlement and

22 also to structure the dismissal of the cases.  You know, that

23 will also involve the setting of a bar date, by necessity, so

24 we can figure out who to distribute to.  That was done.  It

25 was a mechanic we employed in Charlotte Russe, the case that

**A1125**

1    I referenced previously.

2           So we figure that this period of time will give us

3    what we need in order to do those things.

4           THE COURT:  Okay.

5           MR. SAMIS:  So we understand that's happening and

6    it's also our understanding that the purchaser will live up

7    to its obligations under the interim management agreement.

8           THE COURT:  Okay.

9           MR. SAMIS:  All right.

10          THE COURT:  Thank you.

11          MR. SAMIS:  Thank you, Your Honor.

12          THE COURT:  Does the purchaser want to be heard?

13          MR. BURKET:  Good afternoon, Your Honor.  Jonathan

14   Burket, for American Healthcare Systems.

15          THE COURT:  Good afternoon.

16          MR. BURKET:  Everything that has been stated is

17   correct.  We are planning to operate under the interim

18   management agreement and the fees and -- that are associated

19   with that would be paid under that agreement.

20          And to go back to the previous comment about the

21   sale order, the proposed terms of that had passed around.  We

22   have reviewed them and we are comfortable with them, with the

23   two points on the sale order.

24          THE COURT:  Including Mr. Powell's points?

25          MR. BURKET:  That is a continued negotiation that

**A1126**

1 my understanding is we were going to meet with Altera after

2 this to iron out those details but we are very aware of that

3 and we both have agreed to good faith negotiations on

4 settling that up.

5         THE COURT: Okay. Well, I think the Altera issue

6 is a gating issue here today, so let me hear from Mr. Powell

7 because I'm hearing two different conflicting views.

8         MR. POWELL: And I appreciate that, Your Honor.

9 Jason Powell.

10         A third issue, we would submit for efficiency, is

11 separate and distinct from the first two, meaning that what

12 discussions take place with the buyer, what happens, what

13 agreements are reached on whether it's assumed, assigned

14 later, what the cure amounts are, and whether there's a new

15 operating agreement with this purchaser going forth. That's

16 separate and distinct.

17         For today's purposes, issues one and two are

18 addressed by the paragraph that we submitted to Your Honor.

19 The debtor has indicated that they are -- it is agreeable to

20 them.

21         To the extent that it's agreeable to the buyer, I

22 think we need to hear that today and I think we've kind of

23 heard that, but if it's conditioned on reaching an agreement

24 which still needs to be negotiated, then it's not -- that's

25 not our understanding.

**A1127**

 1          THE COURT:  Okay.  Well, I'm going to take a 10-

 2   minute recess for the debtor and the buyer and Alecta --

 3          MR. POWELL:  Altera.

 4          THE COURT:  -- Altera; I'm sorry, excuse me, to

 5   confer and tell me if this provision is acceptable in the

 6   form of order and, if not, I suspect we're proceeding with an

 7   evidentiary hearing.

 8          MR. POWELL:  Yes, Your Honor.

 9          THE COURT:  So let's -- you know what, I'm going

10   to let people have a comfort break, so let's break until

11   12:15.  Okay?  We'll stand in recess.

12       (Recess taken at 12:05 p.m.)

13       (Proceedings resumed at 12:16 p.m.)

14          THE COURT:  Okay.  We are back on the record in

15   Sherman Grayson.

16          MR. CASAL:  Thank you, Your Honor.  Again, this is

17   Max Casal, Shulman Bastian Friedman & Bui, for the debtor.

18          To be clear, the -- all the parties, the debtor,

19   the buyer, and Altera are all in agreement on the language.

20   We understand it's not a -- there was no condition to it.  We

21   will submit a revised order with that paragraph after the

22   conclusion of this hearing.

23          THE COURT:  Okay.  All right.  Thank you.

24          MR. GARFINKLE:  Your Honor, there is one just

25   procedural point now that we've resolved the language.

**A1128**

1          It is possible, I am hopeful that, not only for

2     Altera's purposes that we reach agreement with the buyer and

3     the debtor over the go-forward relationship with our client,

4     what I don't want to see happen is the debtor to have to file

5     a new 365 motion.  They have -- typically, the way this is

6     done in this DIP hearing, in any other DIP hearings, is a

7     designation right that will be language that's in the order

8     that allows the debtor pre-closing to designate additional

9     contracts that could be assumed, either consensually or by

10    notice to the counterparts, that language is not currently

11    present in the debtor's proposed order and we would ask that

12    the debtor include such customary language such that they not

13    have to file a new 365 motion, not only for Altera, but

14    perhaps other parties, should the buyer wish to take their

15    contracts pre-closing.

16         Anyway, that's our suggestion to the Court and to

17    the debtor and buyer's counsel.

18         MR. CASAL:  Again, Your Honor, this is Max Casal.

19    That's fine with the debtor.  We're okay with adding that

20    language.

21         THE COURT:  Okay.  All right.  So I'll look for a

22    revised order with that, assuming the sale is approved.

23         MR. CASAL:  Right.

24         THE COURT:  So are there any other preliminary

25    matters before we proceed?

**A1129**

1    MR. CASAL:  I think that's it.  So, unless Your

2    Honor has any questions, we'll jump into the motion itself.

3         THE COURT:  Okay.

4         MR. CASAL:  So through this motion, Your Honor,

5    the debtor seeks the approval of the private sale and

6    substantially all of its assets to AHS Sherman.  It also

7    seeks the authority to assume and assign the debtor's

8    unexpired leases, which would really just be the MPT leases.

9         So, as set forth in the Sarrao declaration, Your

10   Honor, and as I've told the Court before, the debtor has

11   spent significant time, energy, and effort over the last

12   three years trying to locate a buyer.  On the eve of closing

13   its doors and furloughing each of its 400 healthcare

14   employees and limiting the access within the Sherman

15   community, the debtor was not only able to find a purchaser,

16   but also one that was willing to fund the shortfalls for the

17   debtor's operations to keep it operating, as well as fund the

18   administrative expenses of the estate.  So it is in the

19   debtor's best business judgment -- we believe that there is

20   -- that it's proper to approve a private sale and that it's

21   in the best interest of the debtor and each of its creditors.

22        We have received several objections, Your Honor,

23   which have been resolved in the context of a sale motion --

24   or the revised sale order.  I don't know if Your Honor would

25   like to, I guess, go change-by-change in the revised sale

1  order, as filed?

2          THE COURT:  Well, let me ask, before we proceed to

3  the order, does anyone wish to be heard with respect to the

4  motion?  Are there any objectors who would like to be heard?

5      (No verbal response)

6          THE COURT:  Okay.  Let me hear from the Committee.

7  I see Mr. Samis.

8          MR. SAMIS:  Your Honor, now good afternoon.  Chris

9  Samis, for the --

10          THE COURT:  Good afternoon.

11          MR. SAMIS:  -- Sherman Committee.

12          Your Honor, I only rise to say that, you know, in

13  the beginning of these cases, both the Alecta cases and the

14  Sherman cases, and I guess, more accurately, you know, the

15  Alecta case proceeded the Sherman case and then we entered in

16  as the -- as Committee counsel.

17          We, obviously, had our issues, not only with

18  respect to the sale motion, but also the DIP motion and the

19  interrelationship between these two cases.  We spent a

20  significant amount of time looking at the issues as between

21  the parent and subdebtors, the differences in their cases;

22  one having to be brought as a Subchapter V case; obviously,

23  the other being -- having been brought as standard 11, the

24  transfers between the entities that proceeding the filings,

25  and also, you know, our own constituency's interest at the

1  Sherman level with respect to the closing of this sale

2  transaction and the go-forward business relationships between

3  many of the general unsecured creditors and the hospital on

4  the other side.

5       We've looked at all of that holistically and I

6  think the Committee membership in this case has done an

7  excellent job, you know, drilling down on what is an

8  appropriate resolution.  It was not an easy case by any

9  stretch of the imagination.  You know, we have a very kind of

10  unique financing regime here by -- split as between the DIP

11  lender and the purchaser.  It's not like you see all the

12  time.  But we've been in cases like this before.  It was part

13  of the reason the Committee selected us as counsel.  And we

14  are satisfied that this is the best resolution at the Sherman

15  level for our constituency.

16       You know, our efforts are basically memorialized

17  in the settlement agreement that's been appended to both the

18  DIP and the sale order and, during the break, I was looking

19  at, Your Honor -- Mr. McNeill was having a conversation with

20  Mr. Leonhardt.  It actually is an older version of the

21  settlement agreement.  There are a ton of changes but there

22  is a couple of items that are missing one important piece, so

23  we will get that filed later on.

24       THE COURT:  Should that be a -- the settlement, is

25  that -- should that be addressed in the context of the sale

1  or the financing?

2         MR. SAMIS:  So, Your Honor, I think it gets

3  addressed in the context of a standalone motion.  I think

4  that's the best way to respond.  I think -- you're right.  It

5  obviously resolved our objections with respect to both the

6  sale and the financing.  Hence, the staging that you're

7  looking at here.

8         THE COURT:  Right.

9         MR. SAMIS:  But, you know, again, we're not

10 seeking approval of its terms today.  I think they rise or

11 fall on the 9019 motion and, you know, what we argue in

12 connection with that motion and the evidentiary presentation

13 in connection with that motion.

14        THE COURT:  Well, not to be negative or -- and I

15 mean nothing by this question.  I have not, obviously, seen a

16 9019 motion.

17        MR. SAMIS:  Um-hum.

18        THE COURT:  But by approving the sale and the DIP,

19 can the Court -- what -- aren't -- isn't approval of the sale

20 and the DIP precedent for the 9019?

21        MR. SAMIS:  So I think they're all related.  I

22 think that that's right.  I think, you know, obviously, you

23 know, Your Honor seen the settlement agreement, at least the

24 version that we filed.

25        THE COURT:  Right.

**A1133**

1          MR. SAMIS:  And it has representations and

2    warranties in there about us not challenging certain things,

3    us being supportive of certain things, you know, the DIP

4    lenders --

5          THE COURT:  Right.

6          MR. SAMIS:  -- and the debtors being supportive of

7    certain other things.  And the one missing piece, this is

8    probably as good of a time to address --

9          THE COURT:  Yes.

10          MR. SAMIS:  -- it as any other time.  There is a

11    provision where if the Court ultimately denies the relief

12    that's requested in the term sheet, the challenge period does

13    spring back into existence for 30 days, so there's a little

14    bit shmuck insurance there --

15          THE COURT:  Okay.

16          MR. SAMIS:  -- you know, from that perspective,

17    which I think may be where Your Honor's question is going to

18    because it does look like we're kind of locked in at this

19    point --

20          THE COURT:  Yeah.

21          MR. SAMIS:  -- to the extent that, you know, that

22    these motions are approved.  And we've discussed that with

23    the Committee.  It was a risk that the Committee was willing

24    to take, subject to that addition that I just made.  You

25    know, we are confident that the parties are going to live up

1   to their obligations here and that, you know, with an

2   appropriate structure that will include a bar date, because I

3   think that that is an important piece of this, you know, that

4   we can get these cases, you know, resolved.

5              There were three key elements, really, to this

6   settlement, right?  One was the GUC Fund --

7              THE COURT:  Right.

8              MR. SAMIS:  -- that would be going to general

9   unsecured creditors.

10             THE COURT:  And what I was concerned about with

11  respect to that -- and not concerned, just curious --

12             MR. SAMIS:  Um-hum.

13             THE COURT:  -- because I'm looking at a term

14  sheet.  Your -- controlled the narrative, as the Committee

15  and the debtor should, but I was curious about this

16  resolution mechanism and what that meant and would there be a

17  bar date because there are, as I've read, $85 million worth

18  of GUC claims for 300 claimants -- 350 claimants.  How does

19  that play out?

20             MR. SAMIS:  Yeah.  And, Your Honor, that's -- so

21  we looked at it from that economic perspective as well and

22  it's kind of funny, again, when you talk about how odd this

23  case is.  The Committee was the only party that actually had

24  a financial advisor.  But, as we engaged along those lines,

25  you know, it became clear, obviously, yes.  We started out

**A1135**

1  with about $85 million or so of general unsecured debt at

2  that Sherman debtor level.  You know, if we're successful

3  ultimately in getting the parent to waive or subordinate its

4  claim, that decreases that amount by about $40 million.

5          You know, we're also, in the context of the sale,

6  being -- we've been talking about assumptions in the

7  neighborhood of somewhere between 10 and 15 million.  So

8  you're bringing your --

9          THE COURT:  Okay.

10         MR. SAMIS:  -- denominator down, you know,

11 markedly, I think, as we, you know, kind of work our way

12 through that process and, look, you know, the -- again, Mr.

13 Balasiano is a trusted fiduciary.  He's going to do his job.

14 He's represented by able counsel.  Mr. Watson is now in at

15 the company level.  I trust that they're going to look at our

16 arguments and look at our position in that regard and they're

17 going to pass on it, one way or the other.

18         THE COURT:  Okay.

19         MR. SAMIS:  And we're going to be prepared to deal

20 with that as it develops.  But that is the -- the other -- so

21 the one piece of this was, obviously, the GUC Fund.

22         The other thing that was a huge piece of our

23 settlement agreement is, you know, with the prospect of where

24 this case was headed originally, which was essentially going

25 to be an unfunded conversion to Chapter 7, you know, we --

1    you faced the potential threat as a general unsecured

2    creditor or suffering the indignity, obviously, of having an

3    unfunded general and unsecured claim and then a -- and then a

4    preference suit on the other side, to the extent that the

5    Chapter 7 Trustee were to be able to find counsel --

6                THE COURT:  Right.

7                MR. SAMIS:  -- to be able to pursue them and

8    financing to be able to pursue those.  But the -- that it was

9    important to the Committee membership as we did a review of

10   what the potential liabilities were that were out there, from

11   a preference perspective, that people don't suffer, you know,

12   both getting it basically going and coming.  So now the

13   purchaser is picking up those actions underneath -- as a term

14   of the sale in the settlement agreement.

15               The other big, you know --

16               THE COURT:  Without pursuing?

17               MR. SAMIS:  Without pursuing, correct.

18               And then, you know, the other major piece of this

19   is, obviously, the parent claim, right, to the extent that

20   we're able to get over that hump.

21               But those really -- it really doesn't get more

22   complicated than that, Your Honor.  This was a settlement

23   that was struck quickly, by necessity, but also one that we

24   think results in the best possible outcome for general

25   unsecured creditors at the Sherman level.

**A1137**

1          THE COURT:  Okay.  Thank you.

2          MR. SAMIS:  Thank you, Your Honor.

3          THE COURT:  Mr. Waxman --

4          MR. WAXMAN:  Your Honor --

5          THE COURT:  -- you filed an objection.

6          MR. WAXMAN:  We filed a very limited objection, a

7    reservation of rights.

8          Your Honor, I want to make this response as global

9    as I can, meaning with respect to both the DIP and with

10   respect to the sale motion.  So I know we're only on the sale

11   motion, but perhaps I'll save some time by -- from

12   reiterating the position later.

13         The Alecto debtor is not -- has not agreed to

14   waive any of its rights at this point.  The debtor certainly

15   understands the need for the sale motion to go forward and I

16   certainly appreciate Your Honor's concern about doesn't this

17   -- doesn't the entry of the order today set a preclusive

18   issue with respect to the underlying term sheet.  The Alecto

19   debtor does not believe that it does.  I understand that the

20   Creditor's Committee, and, by that, I mean the Sherman

21   Committee, believes that they need to file a separate motion.

22   We agree.

23         I anticipate that there are going to be issues

24   about what consideration the Alecto debtor is receiving on

25   account of its waiver of claim and it may be that you have a

**A1138**

1   debtor-on-debtor battle with respect to that.  We'll be

2   prepared to go forward with that as need be.  Perhaps Mr.

3   Samis or his brethren or Mr. Casale and his brethren can show

4   that there is a benefit to Alecto.  I don't know what that is

5   at this point.  Again, we're still drinking from a firehose.

6              We do not intend to impede the sale today.  We

7   recognize the importance of it.  But with respect to both the

8   sale and with respect to the DIP, the Alecto debtor's

9   position is simply this.  As long as every penny that is owed

10  to Alecto for post-petition obligations, whether it's a joint

11  obligation or anything else, is paid by Sherman, then we have

12  no issue, other than the term sheet, and we respect the fact

13  that they need to go forward.  As long as all of our rights

14  are expressly preserved to address whatever issues there may

15  be with respect to the Committee settlement, then we are not

16  going to take an adverse position today, but it is clearly

17  premised upon the reservation of that rights.  And if Your

18  Honor has concerns, then maybe this does need to be adjourned

19  --

20              THE COURT:  Okay.

21              MR. WAXMAN:  -- because we're certainly not in a

22  position today to waive that.  But, again, the Alecto debtor

23  does not believe that that's the case.

24              THE COURT:  Okay.  Thank you, Mr. Waxman.

25              Mr. Schanne, good morning -- good afternoon.

**A1139**

1          MR. SCHANNE:  Good afternoon, Your Honor.  May it

2    please the Court?  For the record, John Schanne, on behalf of

3    the United States Trustee.

4          Your Honor, with respect to the settlement term

5    sheet, we had many of the same concerns that have already

6    been addressed today.  All of the answers we've received have

7    been encouraging; the need to set a bar date, so we know what

8    the claims universe is; the need for a 9019 motion,

9    certainly, in Sherman, but to the extent the new Alecto

10   counsel and independent director also compromise claims, the

11   need for a 9019 in that case.

12         One of the issues I have not heard addressed is

13   that the term sheet makes clear that administrative claims

14   will be picked up by the buyer.  There's a GUC Fund set aside

15   for general unsecured claimants.  It's not quite sure where

16   priority claims fit in that picture and it's unclear in the

17   DIP budget whether there's amounts allocated for them.  So

18   our understanding is the same that everyone else has said.

19   The term sheet is not before the Court today.  It seems to

20   just memorialize why the Committee's objections are resolved

21   and all this will go out on notice for future consideration,

22   but that Jevic issue is potentially out there, depending on

23   how this case resolves itself.

24         With respect to the sale itself, Your Honor, I

25   believe, saw the inclusion of new paragraph 57, which makes

**A1140**

1    clear that the Sherman affiliates, such as Alecto, are not

2    providing releases.  So that addressed our one comment to the

3    sale order.

4              And, unless Your Honor, has any questions.

5              THE COURT:  Otherwise, the United States Trustee

6    has signed off on the sale order?

7              MR. SCHANNE:  We have no objection with all rights

8    reserved with respect to the Committee term sheet.

9              THE COURT:  Okay.

10             MR. SCHANNE:  Thank you, Your Honor.

11             THE COURT:  Thank you.  Mr. Samis?

12             MR. SAMIS:  Your Honor, Chris Samis, from Potter

13   Anderson, for the Sherman Committee.

14             If I could just respond both to Mr. Waxman and Mr.

15   Schanne, just very briefly --

16             THE COURT:  Yeah.

17             MR. SAMIS:  -- to give everybody a little bit of

18   additional comfort.

19             Number one, I agree with Mr. Waxman.  The reason

20   that the settlement term sheet is drafted the way that it is

21   with respect to the waiver of the Alecto claim is because we

22   want to give Mr. Balasiano time to do -- investigate, pass on

23   it, confer with his counsel, and with the company's counsel

24   as to how to best address that.

25             So you will not find me showing up at the next

1   hearing screaming about how Mr. Waxman was bound by the term

2   sheet.  Again, you know, I stand by the comments that I made

3   before that will be out on separate notice and we will have a

4   discussion in that regard.

5            THE COURT:  Okay.

6            MR. SAMIS:  With respect to Mr. Schanne's right,

7   the -- this -- we went with the best information that we had

8   with respect to the classes of creditors in this case, you

9   know, both from our discussions with the debtors, but also

10   from a review of their schedules and their statements.  So we

11   don't believe there is significant, or really any, priority

12   liability out there.  However, the bar date will smoke that

13   out and if it ends up happening and that's what happens,

14   we're going to have to live with our lumps because we

15   understand how Jevic works, so.

16           THE COURT:  Okay.

17           MR. SAMIS:  Okay.

18           THE COURT:  Thank you.

19           MR. SAMIS:  Thank you, Your Honor.

20           THE COURT:  Mr. Sullivan -- and let me just say I

21   would like to hear from the Patient Care Ombudsman today

22   before we close.

23           Mr. Sullivan?

24           MR. SULLIVAN:  Good afternoon, Your Honor.  Bill

25   Sullivan, for the Reed Action Judgment Creditors.

1          Your Honor, we had filed a Notice of Appearance

2    in this case because we believe we are parties in interest

3    with respect to the fact that the Alecto debtor had

4    transferred significant sums to Sherman Grayson, including at

5    least $1.5 million in the 90-day period before the filing.

6          Your Honor, we are satisfied then with Mr.

7    Waxman's comments that there has not been an agreement by the

8    Alecto debtors with respect to the provision of the term

9    sheet waiver claim.  And we're satisfied with Mr. Samis'

10   comments that, from a procedural perspective, if that is not

11   upheld, so be it; that your hands aren't bound by approving

12   the sale order to approve the (indiscernible) provisions of

13   the term sheet, but I don't have anything further to add,

14   Your Honor.

15         THE COURT:  Okay.  Thank you.  Okay.  I'd like to

16   hear from the Patient Care Ombudsman.

17         MR. LEMISCH:  Your Honor, Ray Lemisch, Klehr

18   Harrison, on behalf of the Patient Care Ombudsman.

19         THE COURT:  Good afternoon, Mr. Lemisch.

20         MR. LEMISCH:  I didn't really expect to be

21   speaking, which is one of the reasons that I'm not in the

22   courtroom, since our objection was just a reservation of

23   rights and we weren't planning on pursuing it.

24         I have communicated with the Ombudsman today and

25   he has, in fact, been at the site to look at things --

**A1143**

1          THE COURT:  Okay.

2          MR. LEMISCH:  -- to check things out.  He did not

3   indicate to me that he had any issues, but that does not mean

4   that he doesn't.  I just didn't ask that specific question.

5          He is -- I think, overall, he would agree that to

6   transfer licenses probably takes more than 30 days.  That was

7   his initial thought process when we had our initial

8   discussion.  I think Mr. Casal can remember from way before

9   the filing -- not before the filing, but before there was an

10  appointment of the Patient Care Ombudsman, but I suppose that

11  will all be -- we'll see what it takes and the timing

12  involved in transferring of the licenses, et cetera.

13         But, in terms of the sale order, the Ombudsman did

14  not have any objections in terms of -- that he wanted to

15  pursue at this point.

16         THE COURT:  Okay.  I just wanted to make sure,

17  since a reservation had been filed, that the Patient Care

18  Ombudsman had no objection to the -- proceeding with the

19  sale.

20         MR. LEMISCH:  No.  That is -- it -- he does not.

21  Thank you.

22         THE COURT:  Thank you very much, Mr. Lemisch.

23         Okay.  Does anyone else wish to be heard regarding

24  this sale?

25         (No verbal response).

1    THE COURT:  Okay.  I'm going to ask the debtor now

2 to go through the various resolutions, if you would.  Thank

3 you.

4    MR. CASAL:  Thank you, Your Honor.  Again, this is

5 Max Casal, Shulman Bastian Friedman & Bui, for the debtor.

6 Bear with me for a second while I flip through these pages.

7    So I think the vast majority of the changes will

8 be -- we'll be seeing that it's a removal of the assumption

9 of the executory contract language that's basically

10 throughout the entire document.  Sorry, Your Honor.

11    THE COURT:  Nope.

12    MR. CASAL:  I'm trying to find the redline that we

13 wrote it in.  Okay.

14    THE COURT:  Are you looking at Docket 136?

15    MR. CASAL:  Yeah.

16    THE COURT:  Okay.  Just want to make sure we're on

17 the same page.

18    MR. CASAL:  So, the vast majority of the

19 objections are all resolved by separate paragraphs towards

20 the end.  I'm trying to flip through it and see where it

21 begins.

22    So, for example, the paragraph 49, the United

23 States requested a paragraph just making it clear that the --

24 it was really just protective language I added.  The debtor

25 had no issue with the requests, just that we're not seeking

1   to, I guess, transfer the Medicare license numbers.  That was

2   the real purpose.  That was the conversation.

3           Moving on to the City of Sherman, so, the

4   paragraph 50 really deals with two entities.  It's the City

5   of Sherman and Grayson County.  The debtor owes personal

6   property taxes to both entities and both of those entities,

7   both wanted clarification on what -- how it was that their

8   claims were being treated and how they were going to be paid

9   post-closing and the City of Sherman wanted to make it clear

10  that, while before it was -- the outstanding balances due by

11  Sherman Grayson Hospital, LLC, to Grayson County, the City of

12  Sherman wanted us to amend it to say to all local taxing

13  entities within Grayson County.

14          Paragraph 51 was just to incorporate the Committee

15  term sheet.  As Mr. Samis mentioned, we will file a revised

16  term sheet.

17          Paragraph 52, it's kind of -- it's similar.  It's

18  those --

19          THE COURT:  And let me ask, in paragraph 51, do we

20  want to make it clear in this order that the term sheet is

21  subject to a 9019 motion and approval by the Court, given the

22  comments that have been raised today?

23          MR. CASAL:  Your Honor, I believe that we -- it's

24  in a footnote here.  It's like -- I think it's footnote 7.

25          THE COURT:  Oh, okay.  Okay.  Understood.

1    MR. SAMIS:  Your Honor, just to be clear.  Chris

2  Samis here.  We will reconfirm, we are definitely going to be

3  filing that motion.

4    THE COURT:  I see it in the footnote now.

5    MR. SAMIS:  Yeah.

6    MR. CASAL:  Paragraph 52 is -- the State of Texas

7  filed an objection, requesting that this language be

8  included.  We basically just talked -- some of the language

9  had to do with a Plan and there was a lot of things that

10  didn't fit in, but, otherwise, it's just customary language,

11  reservation of rights for Texas, that we are fine with.

12    53 was also -- again, it has to do with the

13  executory contracts.  We just wanted to make it clear that no

14  executory contracts were being assumed and assigned, pursuant

15  to this order.  I think, originally, our hope was that this

16  would resolve the Altera piece of it, but we now have a

17  separate paragraph dealing strictly with Altera.

18    57 is the paragraph that modifies the language in

19  the APA about the release of the affiliates to the buyer.  We

20  made that revision based on the -- our conversations with the

21  Office of the United States Trustee, as well as the comments

22  of the Court.

23    THE COURT:  Okay.  Great.

24    MR. CASAL:  And I think that's, substantively, all

25  of the revisions to the sale order.

1    THE COURT:  Okay.  Let me ask, before I rule, does

2  anyone else want to be heard with respect to the sale motion?

3    (No verbal response).

4    THE COURT:  Okay.  I see no one on Zoom.  I hear

5  no one in Court.

6    The sale was objected to Altera Digital Health,

7  Texas HHSC and TCEQ and Oracle, the Patient Care Ombudsman,

8  and Alecto Healthcare Services filed reservation of rights.

9  The United States Trustee and the City of Sherman raised

10  informal objections.  All formal and informal objections and

11  the reservations of right have been resolved.

12    The parties have had a full opportunity to present

13  evidence and testimony in support of their respective

14  positions.

15    The Court has reviewed the sale under the <u>Abbotts</u>

16  <u>Dairy</u> and finds that the debtors have met their burden and

17  the Court will approve the sale.

18    First, with respect to purchase price, the Sarrao

19  declarations at Docket 3 and Docket 61 establish that the

20  debtor conducted a three-year search for a buyer, operator of

21  WNJ.  The debtor has not received any offers for the assets,

22  other than the buyer, despite significant efforts to locate a

23  buyer or operator of WNJ.  The proposed buyer is the only

24  party interested in purchasing the assets.

25    In addition to the $100,000 cash payment, buyer

1  has agreed to assume liabilities, totaling more than $16

2  million.

3          Mr. Sarrao also testified.  The debtor has

4  determined, in the exercise of its business judgment, that

5  entering into the APA is in the best interest of the debtor

6  and believes the purchase price is the highest and best price

7  that could be achieved for the assets.

8          So, based on the record, the Court finds that

9  consideration is fair and reasonable under the circumstances.

10          Next, the Court considers whether the sale is in

11  the best interests of the estate.  There's no doubt that the

12  debtors are in financial distress.  The sale of the assets to

13  the buyer allows the acute care hospital to remain open and

14  serve -- and provides a valuable service to the Sherman

15  community and preserve job.

16          And, finally, the Court considers whether the sale

17  and purchase is conducted in good faith and, based on the

18  uncontroverted declaration of Mr. Sarrao, it provides that

19  the debtor and the buyer were both actively involved,

20  including their Professionals, when they entered into the APA

21  without collusion, in good faith, after extensive arm-length

22  negotiations.

23          So, I will enter -- and let me just add that the

24  -- I put significant weight on the Committee's review of this

25  transaction and the Patient Care Ombudsman review of this

1   matter.  So I will enter the sale order.  I do have a couple

2   of modifications to the proposed form of order.

3              THE COURT:  In paragraph (F), you reference these

4   certificates of service that were filed with the Court,

5   evidencing service of this.  I would just ask that you

6   include the docket numbers when you reference that.

7              In paragraph (K), I would ask that you strike the

8   second sentence.  This states, the facts and circumstances

9   stated in the sale motion.  I don't rely on counsel's

10  statements in a motion for evidence in support of the motion.

11  Here, I'm relying on the evidence provided through the

12  declarations.  So I would ask that you strike that sentence,

13  and it's duplicative of what's already been put in here, in

14  terms of finding, based on the evidence.

15             MR. CASAL:  Your Honor, just to confirm.  It's the

16  facts and circumstances stated in the sale motion to

17  demonstrate the exigent nature?  That sentence?

18             THE COURT:  Yes.

19             MR. CASAL:  Okay.

20             THE COURT:  I don't believe it was admitted into

21  evidence, and I apologize probably for the mispronunciation

22  of his names, but Mr. Sarian's declaration provided support,

23  not only to the negotiations, but to adequate assurances

24  references in paragraph (R), and I'll just state that for the

25  record.

**A1150**

1      What does paragraph (U) mean in this order?  I

2  think what you're driving at is similar to paragraph (X), but

3  I'm not sure what's meant by (U).

4           MR. CASAL:  I think it is the same (X).  Based off

5  my read of it, I think it's just saying that the time is of

6  the essence until the -- there is no stay under 6004 and

7  6006.

8           THE COURT:  That's what the request is, correct.

9           MR. CASAL:  Right.

10          THE COURT:  So is a stay required in this case?

11  I'm hearing evidence or testimony -- not testimony, excuse

12  me, counsel's representations that the debtor thinks it's

13  going to require 30 days to get your licenses and I'm hearing

14  conflicting comments from counsel saying it's going to take

15  100 to 150 days, I believe.  So it doesn't seem to me that a

16  stay is required in this case.

17          MR. CASAL:  It's that you believe a stay is not

18  required in this case?

19          THE COURT:  Yeah.  That you could -- there's --

20  you don't require a waiver of the stay.

21          MR. CASAL:  Okay.

22          THE COURT:  So I guess that plays out in two

23  places.  First of all, in paragraph (X), it says,

24  accordingly, there is cause to determine inapplicable, the

25  stays, well, first of all, I think the -- that statutory --

**A1151**

1   that statute is always applicable.  I can't say it's not

2   applicable.  It would be a waiver, but I don't think you need

3   a waiver here, so I don't think that time is of the essence.

4   I don't think that's been established.

5           MR. CASAL:  Okay.  So remove paragraph (X)?

6           THE COURT:  Yes.  And that is also -- that concept

7   plays through a couple places, so it should be (U), (X), and

8   there's actually a finding -- I mean an ordered paragraph,

9   paragraph 55.

10          MR. CASAL:  Paragraph 55.

11          THE COURT:  I'm sure that you all anticipate that

12  you want this to occur as quickly as possible but it does --

13  no one has suggested that you need a waiver of the stay to do

14  it.

15          MR. CASAL:  Okay.

16          THE COURT:  I think those are my only comments.

17  So if you revise it, include the provision, your

18  resolutions,, and file it under certification with it clean

19  and a blackline that a representation that the parties,

20  Committee, the United States Trustee, Alecto, and the

21  objectors have signed off, we'll get that entered.

22          MR. CASAL:  Thank you, Your Honor.  So, now moving

23  on to the final item of the agenda, it's the debtor's DIP

24  motion.

25          To be clear, this motion is not contested and

**A1152**

 1  nobody's contested the order.  I did just want to find for

 2  Your Honor that we did increase the amount from $1 million to

 3  $1,125,000.  We're not seeking authority to fund that amount

 4  today.  It's just in the event that the settlement agreement

 5  with the Committee that's put in.

 6          With that, I don't think there's anything else you

 7  need to find and so we ask that Your Honor enter the final

 8  order approving the DIP financing.

 9          THE COURT:  Okay.  I believe Mr. Waxman would like

10  to be heard.

11          MR. WAXMAN:  Your Honor, as long as every cent

12  that is owed to my client is paid timely through the DIP, we

13  have no objection at all.

14          THE COURT:  Okay.

15          MR. SCHANNE:  Your Honor, John Schanne, on behalf

16  of the U.S.T.  On a similar point, there are only three items

17  included in the DIP budget, none of them seem to be the

18  insurance amount.  So if it's not coming through there, I'm

19  not sure where the funds are in the estate.  I don't know if

20  it's an issue that needs to be solved right now, but if

21  there's -- if there are no funds available to pay that claim,

22  perhaps we need a different budget.

23          THE COURT:  Yeah.  I think there's a couple of

24  issues.  I appreciate the brevity of the budget here, but I

25  also think there's a U.S. Trustee fee issue too that I don't

**A1153**

1  see them in here.

2          MR. WAXMAN:  Your Honor, I also understand the

3  insurance is paid through the management agreement, so as --

4  again, same feed.  As long as everything's paid --

5          THE COURT:  Maybe.  I understand that, under the

6  interim management agreement, the manager wouldn't be

7  responsible for a pre-petition period, correct, Mr. Casal?

8          MR. CASAL:  May I just -- this is Max Casal.  The

9  interim manager, they're responsible for the post-petition,

10  for all expenses post 6/21.

11          THE COURT:  Okay.

12          MR. CASAL:  That's the date.

13          MR. WAXMAN:  And that's what Mr. Sarrao -- that's

14  what Mr. Sarrao just informed me also, which gets back to the

15  issue of whether there's a post-petition --

16          THE COURT:  Right.

17          MR. WAXMAN:  -- benefit or not, so whether it's an

18  administrative expense, and that's the issue that we'll

19  address on the 28th.

20          THE COURT:  Right.

21          MR. WAXMAN:  And, just to be clear -- I'm sorry

22  for hogging the podium, is the 28th by Zoom, Your Honor?  We

23  had discussed that and I think that might've changed.

24          THE COURT:  Well, we did but then it may become

25  evidentiary and, to the extent it's contested, it will be in

**A1154**

 1   person.

 2             MR. WAXMAN:  Okay.  Mr. --

 3             MR. KLAUDER:  Good afternoon, Your Honor.  David

 4   Klauder, on behalf of the DIP lender.  Just to be clear, the

 5   only funding available remaining under the DIP is for the GUC

 6   Fund, assuming that is approved for the term sheet.

 7             As has been reflected, all the admin costs will be

 8   picked up by the purchaser, but I want to make that clear

 9   because there was some representations about payments made

10   under the DIP, but that's the only funding available.

11             THE COURT:  Okay.  So I'm a little concerned here

12   about what -- Mr. Samis, I think you're probably anticipating

13   my question, but what are we doing with this insurance issue?

14             MR. SAMIS:  So, Your Honor -- Chris Samis, from

15   Potter Anderson, on behalf of the Sherman Committee.

16             I was rising for a couple of different reasons,

17   but one of them is that reason.  I guess when I sit there and

18   I conceptualize this issue, there's really only three sources

19   of potential funding, right?

20             There's the DIP, which we've heard is not going to

21   be a source of potential funding for the insurance piece.

22   There is --

23             THE COURT:  If they want their DIP approved, maybe

24   it will be.

25             MR. SAMIS:  Correct.  There is -- there's,

**A1155**

1  obviously, operating revenue of the hospital as it continues

2  to do what it does.  And then there's also, obviously, the

3  purchaser contribution of what they're picking up under the

4  interim management agreement.

5       To Mr. Waxman's point, I agree.  I think it's

6  going to rise or fall on a determination of whether or not

7  it's a pre- a post-petition obligation under the estate as to

8  what the source of funding is.  You know, there are other

9  ways to skin the cat.  I don't like to be the guy who just

10  starts to, you know, to brainstorm at the podium but, for

11  example, if there was room under some sort of critical vendor

12  relief, to fund this, that would be another way to do it and,

13  perhaps, under that kind of arrangement, you know, it would

14  be something that the purchaser would pick up, as opposed to

15  the DIP lender or someone else.

16       So there are different ways to conceptualize this.

17  I think the parties just need to discuss it and come to an

18  agreement as to, you know, what it's going to be.

19       My only interest is making sure that it doesn't

20  come out of my $250,000 fund.  But I do think that it is an

21  issue that was going to require some discussion with the

22  professionals.

23       The only other reasons that I stood, Your Honor,

24  were, number one, to just indicate that we support the DIP.

25  We are -- you know, our objections again are resolved in the

**A1156**

1  term sheet that was appended to both the sale and the DIP

2  order, so I won't reiterate that presentation.

3         But the only other thing that I would note, Your

4  Honor, is -- and this -- I skipped over it or glazed over it

5  in my presentation on the term sheet.  One thing that the

6  Committee's negotiations with the parties in interest did

7  produce is confirmation that these estates are at least going

8  to be administratively solvent and so I think in the context

9  of both, you know, the interim management agreement and what

10  the DIP lender funded from the perspective of the bridge

11  financing they provided to get us here, I just didn't want

12  that to be lost.

13         THE COURT:  Okay.

14         MR. SAMIS:  So the point being is though is we are

15  supportive of the DIP.  Granted, the financing in this case

16  has been a little non-traditional but you work with what you

17  got and that's kind of where we are.

18         THE COURT:  Understood.  Understood.  I think that

19  before me are very talented lawyers who will figure out how

20  to resolve these issues.  If not, you know where to reach me.

21         MR. SAMIS:  Understood, Your Honor.

22         THE COURT:  But I think I've made my position

23  pretty clear.

24         MR. SAMIS:  I agree.  Thank you, Your Honor.

25         THE COURT:  Thank you.  Does anyone else wish to

1   be heard with respect to the DIP?

2       (No verbal response)

3           THE COURT:  Mr. Casal, I had a question, and this

4   is a provision that was modified in conjunction with the

5   Committee's resolution or term sheet, and this has to do with

6   Section 9.1 and the challenge period for parties other than

7   the Committee, and I was curious why it was stricken from the

8   local rule provision requiring 75 days from the interim order

9   to -- limited to 60 days for appointment of the Committee and

10  I haven't gotten out a calendar to check that timing and I

11  wanted to confer with the U.S. Trustee and the Committee on

12  that point as well.

13          MR. CASAL:  I believe, Your Honor, I think it's

14  just -- I think the original language said that either 75

15  days -- either 60 days after the Committee was appointed, or

16  75 days otherwise, and I think that this were -- I think

17  that's the information gap if it's touching 1.2 but --

18          THE COURT:  Well, it was -- prior, it was 75 days

19  from the entry of the interim order, which is the local rule,

20  or, in the event of no Committee, within 75 days of the

21  interim order.  So I just wondered how we got to 60, and I

22  don't know when the Committee was appointed.

23          MR. CASAL:  I think my understanding, and Mr.

24  Samis or -- and counsel for M&T can correct me if I'm wrong,

25  but correct me if I'm wrong, but I believe it's effectively

1  the same.  I believe that we didn't really change the

2  deadline.  It's that -- I'll cede the podium to Mr. McNeill.

3          THE COURT:  Good afternoon, Mr. McNeill.

4          MR. MCNEILL:  Good afternoon, Your Honor.  Steve

5  McNeill, from Potter Anderson, here on behalf of the Sherman

6  Committee.

7          My understanding -- I actually raised that very

8  point, Your Honor.  My understanding is that the original

9  proposal in the language was 60 days from the appointment of

10  the Committee or 75 days from the entry of the interim order

11  if no committee was appointed.  Counsel -- outside counsel

12  for the DIP lender told me that, basically, because the

13  Committee was appointed in 60 days, the 75-day alternative

14  was only in the event a Committee was not appointed and

15  that's how they got to 60 days.

16          I was ultimately okay with that reading,

17  notwithstanding the fact that it's inconsistent with the

18  local rule.  That was -- they had proposed a deadline short

19  of -- that was not consistent with the local rule in the

20  first place and, as part of the resolution, we were standing

21  down on that and I think that -- I think it can be read that

22  way, but that's my understanding of how we got there, Your

23  Honor.

24          THE COURT:  Okay.  I just -- that is not how I

25  read what was blacklined out of here, but let me ask, does

**A1159**

1   the U.S. Trustee have any objection?

2           MR. SCHANNE:  Your Honor, for the record, John

3   Schanne, on behalf of the U.S.T.  This case has been around a

4   while.  There have been a lot of parties in interest.  Nobody

5   else has appeared, kind of pressing this claim, so we have no

6   objection within the context of this case.

7           THE COURT:  Okay.

8           MR. SCHANNE:  Thank you, Your Honor.

9           THE COURT:  Thank you.  Does anyone else wish to

10  be heard with respect to the DIP motion before I rule?

11      (No verbal response).

12          THE COURT:  Okay.  Based on the record before me,

13  including the First Day declaration, and the fact that all

14  objections to the motion have been resolved, I'm prepared to

15  enter the final DIP Order.

16      The debtors have established that they have an

17  immediate need to access funds under the DIP facility and to

18  use cash collateral.

19          According to the First Day declaration, the debtor

20  has been unable to procure financing terms or more favorable

21  terms in the proposed financing, the DIP loan documents were

22  negotiated at arms-length and good faith between the parties

23  and the declarant believes the terms and condition of the DIP

24  are fair and reasonable under the circumstances, reflect the

25  debtor's prudent business judgment, consistent with its

**A1160**

1   fiduciary duties, and is supported by reasonably equivalent

2   and fair value and is in the best interest of the debtor's

3   estates and creditors.

4           So I will enter the revised proposed order with

5   the modifications we discussed.  If you'll submit it under

6   certification, counsel, with a clean and blackline reflecting

7   that the parties who have raised issues with respect to the

8   DIP have signed off.

9           Is there anything further for today?

10          MR. CASAL:  Max Casal, again, from Shulman Bastion

11  Friedman & Bui, Your Honor.

12          That's it for the Sherman Grayson matters and we

13  already resolved the Alecto matters ahead of time.  So that's

14  --

15          THE COURT:  Okay.

16          MR. CASAL:  -- it for us.

17          THE COURT:  Let me just circle back around in

18  terms of scheduling.  We'll need to get you a hearing date

19  for retention.  It's probably going to be closer to the

20  second week of September.  Is there any issue with that?

21          We'll do the Alecto retention --

22          MR. WAXMAN:  I'm sorry.  That -- is that directed

23  towards --

24          THE COURT:  No, but can you get on a mic so I --

25  please introduce yourselves for the record.  Unfortunately, I

1    can see you, but the record can.

2              MR. WAXMAN:  Jeff Waxman, of Morris James, on

3    behalf of the Alecto debtor.

4              I'm sorry.  Was that directed towards us with

5    respect to a hearing date on --

6              THE COURT:  No.  You are scheduled for the 28th at

7    10:00 a.m.

8              MR. WAXMAN:  Okay.

9              THE COURT:  For Alecto retention issues.  Right?

10             MR. WAXMAN:  Okay.

11             THE COURT:  But I want to know -- Grayson has its

12   retentions, so I also know that Mr. Samis is going to be

13   filing some things and I don't know how soon they'll be

14   ready.  If -- I want to give some instruction to the

15   courtroom deputy in order to give you guys fair time in

16   September.  So do you want to confer on that and reach out,

17   or do we need to do that before we leave today?

18             And I will say, before the 28th, I would ask that

19   you contact chambers and give us a sense of what all is going

20   to go forward on the 28th and how much time.

21             MR. SAMIS:  Your Honor, Chris Samis, for the

22   record, of Potter Anderson.  I'm just going to confer with

23   Mr. Waxman --

24             THE COURT:  Certainly.

25             MR. SAMIS:  -- for just a moment.

**A1162**

1        (Participants confer)

2        MR. SAMIS:  Your Honor, well, I see Mr. Friedman's

3   face on the monitor.  I assume that means he has something to

4   say.

5        THE COURT:  Mr. Friedman?

6        MR. FRIEDMAN:  Good afternoon, Your Honor.

7        THE COURT:  Good afternoon.

8        MR. FRIEDMAN:  I just wanted -- I wanted to weigh

9   in on the retention issue briefly.  I'm actually also going

10  to be in Delaware on the 28th.  I'll be handling the Agway

11  hearing, which I believe is going forward at 1:00 p.m.

12        And Your Honor raised a number of issues a couple

13  of hours ago about the retention and it seems to me what

14  we're going to be filing would be probably one or two

15  additional declarations.  We would proceed by a proffer of

16  those, subject to I believe it would almost be Your Honor's

17  questions.  No other party had raised any issues and we had

18  resolved things with the U.S. Trustee.  So I anticipate that

19  we can answer the Court's questions via declaration and I

20  believe, if possible, we could -- I don't think the hearing

21  on the -- if held on the 28th with respect to retention will

22  not take much time at all.

23        THE COURT:  Okay.  Well, I think I've laid out

24  pretty clearly, in part, based on United States Trustee's

25  objection what the competing concerns are for the parties to

1    address.  So I'm -- look, if the parties prefer to proceed by

2    proffer, declaration -- I don't want to tell the parties how

3    to proceed with their case, but -- so we have the 28th.  We

4    have the retentions, we have the insurance issue, and -- bear

5    with me.  There's a third thing.  And the Committee.  Sorry,

6    Mr. Sullivan.  The Committee motion in Alecto.  So that's

7    three things.

8          MR. WAXMAN:  Well, the question I think is whether

9    the two retention applications should travel together so that

10   they're heard in Sherman and Alecto at the same time I think

11   is -- I mean I imagine Your Honor is going to have the same

12   concerns with respect to both, but I'm agnostic as to it and

13   --

14          THE COURT:  Understood.  I mean --

15          MR. WAXMAN:  -- Mr. Friedman will be here that

16   day, so it may make sense --

17          THE COURT:  In terms if we can --

18          MR. WAXMAN:  -- from a logistical standpoint.

19          MR. FRIEDMAN:  And, Your Honor, the testimony will

20   be -- it's the flips by the same coin, right?

21          THE COURT:  Understood.

22          MR. FRIEDMAN:  What advice is given and so we're

23   going to address both retentions in connection with the same

24   evidence, so to speak.

25          THE COURT:  Three hours for three issues?  Can we

1  get it down?

2        MR. FRIEDMAN:  I'll be shocked, Your Honor, if it

3  takes that long.

4        THE COURT:  Okay.

5        MR. WAXMAN:  I'm hopeful that the retention issues

6  will be relatively short, and I don't know what the other two

7  look like, but we'll have a much better idea before then and,

8  certainly, we'll apprise Your Honor as we get closer with

9  respect to what we think is going forward and expectations of

10  time.

11        THE COURT:  Understood.  Okay.  Mr. Samis,

12  scheduling for purposes of the Committee?

13        MR. SAMIS:  Yes, Your Honor.  Chris Samis, from

14  Potter Anderson.

15        I just wanted to respond to Your Honor's comment

16  on that earlier.  I think we weren't contemplating filing

17  this on short notice.

18        THE COURT:  Okay.

19        MR. SAMIS:  I think it probably is something that

20  warrants regular notice --

21        THE COURT:  Right.

22        MR. SAMIS:  -- especially since Mr. Balasiano is

23  going to need some time to render his conclusion anyway.

24        THE COURT:  Right.

25        MR. SAMIS:  And we may be dealing, to the United

**A1165**

1  States Trustee's point, with two 9019 motions that are, you

2  know, happening in both cases, to the extent that that goes

3  the way that we're hoping that it goes.

4         So I would say that, you know, just to give us

5  time to draft what I think is a relatively simply motion and

6  then have it heard on regular notice.  We'd be looking for a

7  hearing probably sometime in mid-to-late September.

8              THE COURT:  Okay.

9              MR. SAMIS:  If that works.

10             THE COURT:  All right.  So you just want to reach

11 out, because I didn't know if you had a bar date you wanted

12 to get on then and --

13             MR. SAMIS:  So, we're going to start to bake that

14 in as well, Your Honor.

15             THE COURT:  Yeah.

16             MR. SAMIS:  That's exactly right.  So maybe what

17 we'll do is get our drafting process.  We'll reach out and

18 then try to --

19             THE COURT:  And will reach out?

20             MR. SAMIS:  Yeah.

21             THE COURT:  Okay.  Terrific.

22             MR. SAMIS:  Awesome.

23             THE COURT:  Is there anything else for today?

24 Okay.

25             MR. WAXMAN:  Your Honor, I do have one

 1   housekeeping matter, just to ask, because these cases are not

 2   jointly administered, but they've been traveling on the same

 3   path.  I assume that there's no issue, as it was not with

 4   Webstone (phonetic) with two what I'll call related cases,

 5   but not jointly administered cases, continuing to be

 6   scheduled at the same time.  I don't see an issue but I

 7   wanted to just raise that issue to Your Honor.

 8          THE COURT:  Well, let me say, this is the First

 9   Day.  They have been scheduled together because it became

10   clear at our last hearing that we were talking about a case

11   where no one was present to express their views.

12          So, unless anybody objects going forward, I think

13   it best that they be scheduled together.

14          MR. WAXMAN:  That's what my assumption was as

15   well, but I just wanted to confirm, since we are going to be

16   reaching out to Your Honor's chambers with respect to omnibus

17   hearing dates going forward.

18          THE COURT:  Just please make sure, to the extent

19   it's scheduling only, that you copy the other parties so

20   there's not ex-parte communications regarding scheduling.

21          MR. WAXMAN:  Of course, Your Honor.

22          THE COURT:  Okay?  And let me just thank the

23   parties.  I know I had a lot of questions.  This is an

24   unusual two cases that aren't jointly administered and I

25   certainly appreciate everybody participating, everybody

1  making their views known and working together and it's been

2  very helpful and it's been -- it makes for a much cleaner

3  hearing today.  So I appreciate it.

4          Everyone have a great day and we stand adjourned.

5  Thank you.

6          COUNSEL:  Thank you, Your Honor.

7      (Proceedings concluded at 1:09 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      CERTIFICATION

2           I certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of my

5  knowledge and ability.

6

7  /s/ Tammy Kelly_____                    August 18, 2023

8  William J. Garling

9  Transcriptionist

10  For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

ALECTO HEALTHCARE SERVICES LLC,[1]

Debtor.

Chapter 11 (Subchapter V)

Case No. 23-10787 (JKS)

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of August, 2023, I caused to be filed with the Court electronically, and I caused to be served a true and correct copy of the *First Supplemental Declaration of Michael Sarrao in Support of: (I) Application for Entry of an Order Authorizing the Retention and Employment of Shulman Bastian Friedman & Bui LLP as Bankruptcy Counsel to the Debtor Nunc Pro Tunc to the Petition Date through August 14, 2023, and (II) Application for Entry of an Order Authorizing the Retention and Employment of the Rosner Law Group LLC as Delaware Bankruptcy Counsel to the Debtor Nunc Pro Tunc to the Petition Date through August 14, 2023* upon the parties that are registered to receive notice via the Court's CM/ECF notification system, An additional service was completed via electronic mail on the parties on the attached service list.

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)

---

[1]  The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

16274754/1

**A1170**

## Service List

William D. Sullivan, Esq.
William A. Hazeltine, Esq.
Sullivan Hazeltine Allinson Llc
919 North Market Street, Suite 420
Wilmington, DE 19801
E-mail: bsullivan@sha-llc.com
whazeltine@sha-llc.com

-and-

Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
E-mail: colten@msjlaw.org

-and-

John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
E-mail: jstember@stembercohn.com
mdavidsonwelling@stembercohn.com

*Attorneys for the Reed Action Judgment Creditors*

Cassandra C. Burton, Esq.
Zoe C. Wadge, Esq.
Pension Benefit Guaranty Corporation
Office of the General Counsel
445 12th Street, SW
Washington, D.C. 20024
Email: burton.cassandra@pbgc.gov
wadge.zoe@pbgc.gov
efile@pbgc.gov

*Pension Benefit Guaranty Corporation*

Jami Nimeroff, Esq.,
Brown McGarry Nimeroff LLC
919 N. Market Street, Suite 420
Wilmington, DE 19801
E-mail: JNimeroff@bmnlawyers.com

*Subchapter V Trustee*

Linda Casey, Esq.
Office of the United States Trustee
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
E-mail: Linda.Casey@usdoj.gov

*United States Trustee*

David M. Klauder, Esq.
Melissa M. Hartlipp, Esq.
Bielli & Klauder, LLC
1204 N. King Street
Wilmington, DE 19801
E-mail: dklauder@bk-legal.com
mhartlipp@bk-legal.com

and

Thomas E. Patterson, Esq.
Sasha M. Gurvitz, Esq.
Robert J. Smith, Esq.
N. Tanner Frei, Esq.
KTBS LAW LLP
1801 Century Park East, 26th Floor
Los Angeles, CA 90067-6049
E-mail: TPatterson@ktbslaw.com
SGurvitz@ktbslaw.com
RSmith@ktbslaw.com
TFrei@ktbslaw.com

*Counsel to Medical Properties Trust, Inc.*

2

Eric J. Taube, Esq.
Trip Nix, Esq.
Holland & Knight LLP
100 Congress Avenue, Suite 1800
Austin, TX 78701
Email: eric.taube@hklaw.com
trip.nix@hklaw.com

and

Mark Minuti, Esq.
Saul Ewing LLP
1201 N. Market Street, Suite 2300
P. O. Box 1266
Wilmington, DE 19899
Email: mark.minuti@saul.com

*Counsel to LHP Hospital Group, Inc.*

Leah V. Lerman, Esq.
U.S. Department of Justice
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, DC 20044-0875
E-mail: Leah.V.Lerman@usdoj.gov

*United States Department of Justice*

Christopher M. Samis, Esq.
Aaron H. Stulman, Esq.
R. Stephen McNeill, Esq.
Potter Anderson & Corroon LLP
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Email: csamis@potteranderson.com
astulman@potteranderson.com
rmcneill@potteranderson.com

*Counsel to Official Committee of
Unsecured Creditors of Sherman/Grayson
Hospital, LLC*

Ronald W. Crouch, Esq.
Whiteford Taylor & Preston, LLP
11 Stanwix Street, Suite 1400
Pittsburgh, Pennsylvania 15222
Email: rcrouch@whitefordlaw.com

and

Richard W. Riley, Esq.
Whiteford Taylor & Preston, LLP
600 North King Street, Suite 300
Wilmington, Delaware 19801
Email: rriley@whitefordlaw.com

*Counsel to Snyder Brothers Energy, LLC*

Scott J. Leonhardt, Esq.
The Rosner Law Group LLC
824 North Market Street, Suite 810
Wilmington, DE 19801
Email: leonhardt@teamrosner.com

and

Leonard M. Shulman, Esq.
Alan J. Friedman, Esq.
Max Casal, Esq.
Shulman Bastian Friedman & Bui LLP
100 Spectrum Center Drive; Suite 600
Irvine, CA 92618
Email: lshulman@shulmanbastian.com
afriedman@shulmanbastian.com
mcasal@shulmanbastian.com

*Counsel to Sherman/Grayson Hospital, LLC*

16274754/1

# EXHIBIT 38

**WRITTEN CONSENT OF THE**

**BOARD OF MANAGERS OF ALECTO HEALTHCARE SERVICES LLC**

**AUGUST 7, 2023**

The undersigned, constituting the Board of Managers of Alecto Healthcare Services LLC, a Delaware limited liability company (the "Company"), hereby adopt the following resolutions by written consent in lieu of a special meeting and hereby consent to and adopt the following resolutions:

**WHEREAS**, the Company filed a voluntary petition for relief under Chapter 11, Subchapter V of the United States Bankruptcy Court on June 16, 2023 in United States Bankruptcy Court for the District of Delaware Case No. 23-10787 (JKS) (the "Alecto Bankruptcy");

**WHEREAS**, the Company has an indirect interest in Sherman/Grayson Hospital, LLC, a Delaware limited liability company ("SG Hospital") and SG Hospital filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Court on June 23, 2023 in United States Bankruptcy Court for the District of Delaware Case No. 23-10810 (JKS) (the "Sherman Bankruptcy");

**WHEREAS**, the Company is an unsecured creditor in the Sherman Bankruptcy in the amount of $60,186,975.93 related to certain intercompany advances made by the Company to SG Hospital and certain expenses paid by the Company on behalf of SG Hospital (the "Alecto Claim");

**WHEREAS**, certain disputes have arisen between the Company and the Official Committee of Unsecured Creditors (the "Committee") regarding the proper treatment of the Alecto Claim in the Sherman Bankruptcy and a potential settlement with the Committee with respect to the Alecto Claim. In addition, the Office of the United States Trustee overseeing the Alecto Bankruptcy and the Sherman Bankruptcy have raised concerns regarding potential conflicts arising between the Company and SG Hospital;

**WHEREAS**, the Company and the Board of Managers seek to appoint an independent director/manager to make decisions on behalf of the Company related to the Alecto Claim, any settlement of the Alecto Claim, and any other conflict that may arise as and between the Company and SG Hospital (collectively, the "Issues") so as to avoid any conflict of interest that the Company's officers and bankruptcy counsel may have with respect to such matters given their roles at both the Company and SG Hospital; and

**WHEREAS**, Steven Balasiano of MHR Advisory Group is an experienced attorney and advisor with sufficient education, training, and experience to make independent decisions on behalf of the Company related to the Issues.

**NOW, THEREFORE, BE IT RESOLVED**, that Steven Balasiano is hereby appointed as an independent director of the Company. Steven Balasiano, subject to Bankruptcy Court approval shall be compensated at the rate of $25,000 per month, and shall be entitled to hire counsel with such counsel fees being reimbursed by the Company; and

**A1174**

**BE IT FURTHER RESOLVED**, that Steven Balasiano shall, subject to any approvals required as a result of the Alecto Bankruptcy, have the authority, in his sole and absolute discretion to (a) evaluate the Alecto Claim including the proper treatment of the Alecto Claim, (b) to make decisions regarding the Alecto Claim including, without limitation, whether the Alecto Claim should be subordinated or waived, (c) to enter into a settlement agreement with the Committee which provides for an agreed upon treatment of the Alecto Claim; and (d) resolve any other Issues that may arise during the course of the Alecto Bankruptcy and

**BE IT FURTHER RESOLVED**, that the Company's Board of Managers, officers, and employees shall provide Steven Balasiano with such information and documents as he may request from time to time and shall not interfere or impede Steven Balasiano's performance of his duties as an independent director/manager; and

**BE IT FURTHER RESOLVED**, that the officers of the Company, and each of them, are hereby authorized and directed to take all actions necessary and desirable to implement the resolutions set forth herein.

[*Signatures Appear on Next Page*]

**A1175**

**IN WITNESS WHEREOF**, the undersigned, constituting the Board of Managers of the Company have executed this Written Consent as of the date hereof.

**BOARD OF MANAGERS**

By: _____

Lex Reddy

By: _____

Michael Sarrao

**A1176**

# EXHIBIT 39

DocuSign Envelope ID: 8CC47198-E5B1-4E91-AA98-E874AD57E46B

## WRITTEN CONSENT OF THE

## BOARD OF MANAGERS OF ALECTO HEALTHCARE SERVICES LLC

### AUGUST 19, 2023

The undersigned, constituting the Board of Managers of Alecto Healthcare Services LLC, a Delaware limited liability company (the "Company"), hereby adopt the following resolutions by written consent in lieu of a special meeting and hereby consent to and adopt the following resolutions:

**WHEREAS**, the Company filed a voluntary petition for relief under Chapter 11, Subchapter V of the United States Bankruptcy Court on June 16, 2023 in United States Bankruptcy Court for the District of Delaware Case No. 23-10787 (JKS) (the "Alecto Bankruptcy Case");

**WHEREAS**, the Company has an indirect interest in Sherman/Grayson Hospital, LLC, a Delaware limited liability company ("SG Hospital") and SG Hospital filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Court on June 23, 2023 in United States Bankruptcy Court for the District of Delaware Case No. 23-10810 (JKS) (the "Sherman Bankruptcy");

**WHEREAS**, the Company is an unsecured creditor in the Sherman Bankruptcy in the amount of $60,186,975.93 related to certain intercompany advances made by the Company to SG Hospital and certain expenses paid by the Company on behalf of SG Hospital (the "Alecto Claim");

**WHEREAS**, certain disputes have arisen between the Company and the Official Committee of Unsecured Creditors (the "Committee") regarding the proper treatment of the Alecto Claim in the Sherman Bankruptcy and a potential settlement with the Committee with respect to the Alecto Claim. In addition, the Office of the United States Trustee overseeing the Alecto Bankruptcy and the Sherman Bankruptcy have raised concerns regarding potential conflicts arising between the Company and SG Hospital;

**WHEREAS**, on August 7, the Company and the Board of Managers authorized the appointment of Steven Balasiano ("Mr. Balasiano") of MHR Advisory Group as an independent director/manager, subject to Bankruptcy Court approval, to make decisions on behalf of the Company related to the Alecto Claim, any settlement of the Alecto Claim, and any other conflict that may arise as and between the Company and SG Hospital (collectively, the "Issues") so as to avoid any conflict of interest that the Company's officers and bankruptcy counsel may have with respect to such matters given their roles at both the Company and SG Hospital;

**WHEREAS**, on August 8, 2023, the Company filed an application in the Alecto Bankruptcy Case to employ Mr. ("Mr. Balasiano") as independent director; and

**WHEREAS**, the Company understands that certain creditors of the Company have alleged that the Company may have potentially significant causes of action against its affiliates and insiders;

NOW, THEREFORE, BE IT RESOLVED, that, to the extent not already provided, Mr. Balasiano's appointment as an independent director of the Company shall include authority to investigate potential claims against the Company's affiliates and insiders, and to bring any such actions as he believes in his sole discretion are valid;

BE IT FURTHER RESOLVED, that the Company's Board of Managers, officers, and employees shall provide Mr.  Balasiano with such information and documents as he may request from time to time and shall not interfere or impede Mr. Balasiano's performance of his duties as an independent director/manager; and

BE IT FURTHER RESOLVED, that the officers of the Company, and each of them, are hereby authorized and directed to take all actions necessary and desirable to implement the resolutions set forth herein.

IN WITNESS WHEREOF, the undersigned, constituting the Board of Managers of the Company have executed this Written Consent as of the date hereof.

**BOARD OF MANAGERS**

By: _____
Lex Reddy

By: _____
Michael Sarrao