# EXHIBIT 40

 MOSSADAMS

T (949) 221-4000
F (949) 221-4001

2040 Main Street
Suite 900
Irvine, CA 92614

September 4, 2020

Mr. Jeremy Redin
Alecto Healthcare Services LLC
16310 Bake Parkway Suite 200
Irvine, CA  92618

Dear Jeremy:

We have prepared and enclosed your 2019 Limited Liability Company returns for the year ended December 31, 2019.

The federal return has qualified for electronic filing.  After you have reviewed your return for completeness and accuracy, please sign, date, and return Form 8879-PE to our office.  We will then submit your electronic return to the IRS. Return federal Form 8879-PE to us by September 15, 2020.

No payment is required with this return when filed.

The California Form 568 return has qualified for electronic filing. After you have reviewed your return for completeness and accuracy, please sign, date and return Form 8453-LLC to our office.  We will then transmit your return electronically to the FTB.  Do not mail a paper copy of the return to the FTB. Return Form 8453-LLC to us by October 15, 2020.

No payment is required as you are to receive a refund in the amount of $23,580.

The West Virginia Form SPF-100 return has qualified for electronic filing.  Please review your return for completeness and accuracy.  We will then transmit your return electronically to the WV Tax Dept.  Do not mail the paper copy of the return to the WV Tax Dept. Return federal Form 8879-PE to us by September 15, 2020.

No payment is required with this return when filed.

The Ohio Form IT-4708 return has qualified for electronic filing. Please review your return for completeness and accuracy. We will then transmit your return electronically to the OHDOT . Do not mail the paper copy of the return to the OHDOT. Return federal Form 8879-PE to us as soon as possible.

No payment is required with this return when filed.

Attached are Schedules K-1 for all members indicating their share of income, deductions and credits to be reported on their respective tax returns. These schedules should be immediately forwarded to each of the members.

We have prepared the returns from information you provided to us without verification in accordance with the terms of the Master Services Agreement (MSA) and Statement of Work that we have in place with you.  In addition, we have relied on you to alert us if you participated in any "reportable transaction," including a "listed transaction" or a "transaction of interest" as defined in IRC Section 6011, Treasury Reg. Section 1.6011-4 and other related IRS Rulings/Notices. Please contact us if you have engaged in any such transaction, or substantially similar transaction, or in a listed transaction as identified by any state in which you conduct business.

Upon examination of the returns by taxing authorities, requests may be made for underlying data.  We therefore recommend that you preserve all records which you may be called upon to produce in connection with such possible examinations.

JX1

Assurance, tax, and consulting offered through Moss Adams LLP. Wealth management offered through Moss Adams Wealth Advisors LLC. Investment banking offered through Moss Adams Capital LLC.

**A1181**

The 2017 tax reform reconciliation act, also known as the Tax Cuts and Jobs Act, contained sweeping changes to the tax law. While the IRS, Treasury Department, and state taxing authorities have issued some guidance, questions remain. We've prepared your return using published guidance to date, but it is subject to change as additional guidance becomes available. Importantly, the current tax environment, including the potential for guidance to be issued with retroactive applicability, could increase your risk of penalties and the likelihood you may want or need to file amended returns.

We appreciate the opportunity to serve you.  Please contact us if you have any questions concerning the tax returns or if we may be of further assistance.

Very truly yours,

*Dustin Marciniak*
for Moss Adams LLP

**A1182**

ALECTO_00027110

| Form **8879-PE** | **IRS e-file Signature Authorization for Form 1065** | | OMB No. 1545-0123 |
|---|---|---|---|
| Department of the Treasury Internal Revenue Service | ► ERO must obtain and retain completed Form 8879-PE. ► Go to www.irs.gov/Form8879PE for the latest information. For calendar year 2019, or tax year beginning _____, 2019, ending _____, 20___ | | **2019** |

| Name of partnership | | Employer identification number |
|---|---|---|
| ALECTO HEALTHCARE SERVICES LLC | | 46-0829723 |

**Part I**  Tax Return Information  (Whole dollars only)

| | | |
|---|---|---|
| 1 Gross receipts or sales less returns and allowances (Form 1065, line 1c) | **1** | 4,284,619. |
| 2 Gross profit (Form 1065, line 3) | **2** | 4,284,619. |
| 3 Ordinary business income (loss) (Form 1065, line 22) | **3** | -49,100,099. |
| 4 Net rental real estate income (loss) (Form 1065, Schedule K, line 2) | **4** | |
| 5 Other net rental income (loss) (Form 1065, Schedule K, line 3c) | **5** | |

**Part II**  Declaration and Signature Authorization of Partner or Member
(Be sure to get a copy of the partnership's return)

Under penalties of perjury, I declare that I am a partner or member of the above partnership and that I have examined a copy of the partnership's 2019 electronic return of partnership income and accompanying schedules and statements and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts shown on the copy of the partnership's electronic return of partnership income. I consent to allow my electronic return originator (ERO), transmitter, or intermediate service provider to send the partnership's return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission and **(b)** the reason for any delay in processing the return. I have selected a personal identification number (PIN) as my signature for the partnership's electronic return of partnership income.

**Partner or Member's PIN: check one box only**

[X] I authorize  MOSS ADAMS LLP  to enter my PIN  **29723**
ERO firm name                                                    Don't enter all zeros
as my signature on the partnership's 2019 electronically filed return of partnership income.

[ ] As a partner or member of the partnership, I will enter my PIN as my signature on the partnership's 2019 electronically filed return of partnership income.

Partner or member's signature ► _____

Title ► **MEMBER**                                                Date ► _____

**Part III**  Certification and Authentication

ERO's EFIN/PIN. Enter your six-digit EFIN followed by your five-digit self-selected PIN.  | 33665412345 |
Don't enter all zeros

I certify that the above numeric entry is my PIN, which is my signature on the 2019 electronically filed return of partnership income for the partnership indicated above. I confirm that I am submitting this return in accordance with the requirements of **Pub. 3112**, IRS *e-file* Application and Participation, and **Pub. 4163**, Modernized e-File (MeF) Information for Authorized IRS *e-file* Providers for Business Returns.

ERO's signature ► _____                        Date ► 09/04/20

**ERO Must Retain This Form – See Instructions**
**Don't Submit This Form to the IRS Unless Requested To Do So**

For Paperwork Reduction Act Notice, see instructions.                        Form **8879-PE** (2019)
LHA

921031 01-13-20

022

Date Accepted _____

**DO NOT MAIL THIS FORM TO FTB**

| TAXABLE YEAR | California e-file Return Authorization for | FORM |
|---|---|---|
| **2019** | **Limited Liability Companies** | **8453-LLC** |

Limited liability company name

California Secretary of State (SOS) file number or FEIN
46-0829723

ALECTO HEALTHCARE SERVICES LLC

**Part I    Tax Return Information** (whole dollars only)

| | | | |
|---|---|---|---|
| 1 | Total income (Form 568, Schedule B, line 12 or Form 568, line 1 for Single Member LLCs) | 1 | -48,179,304 |
| 2 | Ordinary income (Form 568, Schedule B, line 23 or Form 568, line 1 for Single Member LLCs) | 2 | -52,944,241 |
| 3 | Tax and fee due (Form 568, line 14) | 3 | |
| 4 | Overpayment (Form 568, line 15) | 4 | 24,380 |
| 5 | Total amount due (Form 568, line 19) | 5 | |

**Part II    Settle Your Account Electronically for Taxable Year 2019.**

| 6 | ☐ Electronic funds withdrawal | **6a** Amount | **6b** Withdrawal date (mm/dd/yyyy) |
|---|---|---|---|

**Part III    Make Annual Tax or Estimated Fee Payment for Taxable Year 2020**  This is NOT an installment payment for the current amount the LLC owes.

| | Annual Tax Payment | Estimated Fee Payment | |
|---|---|---|---|
| 7 Amount | 0 | 0 | |
| 8 Withdrawal date | | | |

**Part IV    Banking Information** (Have you verified the LLC's banking information?)

9 Routing number _____

10 Account number _____    11 Type of account:  ☐ Checking    ☐ Savings

**Part V    Declaration of Authorized Member or Manager**

I authorize the limited liability company account to be settled as designated in Parts II, III, and IV. If I check Box 6, I authorize an electronic funds withdrawal for the amount listed on line 6a and for the 2020 annual tax or estimated fee payment amount listed on line 7 from the bank account specified in Part IV.

Under penalties of perjury, I declare that I am an authorized member or manager of the above limited liability company and that the information I provided to my electronic return originator (ERO), transmitter, or intermediate service provider and the amounts in Part I above agree with the amounts on the corresponding lines of the limited liability company's 2019 California income tax return. To the best of my knowledge and belief, the limited liability company's return is true, correct, and complete. If the limited liability company is filing a balance due return, I understand that if the Franchise Tax Board (FTB) does not receive full and timely payment of the limited liability company's tax liability, the limited liability company will remain liable for the tax liability and all applicable interest and penalties. I authorize the limited liability company return and accompanying schedules and statements be transmitted to the FTB by my ERO, transmitter, or intermediate service provider. **If the processing of the limited liability company's return or refund is delayed, I authorize the FTB to disclose to my ERO or intermediate service provider the reason(s) for the delay or the date when the refund was sent.**

| Sign | ► | | ► **MEMBER** |
|---|---|---|---|
| Here | Signature of authorized member or manager | Date | Title |

**Part VI    Declaration of Electronic Return Originator (ERO) and Paid Preparer.**

I declare that I have reviewed the above limited liability company's return and that the entries on form FTB 8453-LLC are complete and correct to the best of my knowledge. (If I am only an intermediate service provider, I understand that I am not responsible for reviewing the limited liability company's return. I declare, however, that form FTB 8453-LLC accurately reflects the data on the return.) I have obtained the signature from the limited liability company authorized member or manager on form FTB 8453-LLC before transmitting this return to the FTB; I have provided the limited liability company authorized member or manager with a copy of all forms and information that I will file with the FTB, and I have followed all other requirements described in FTB Pub. 1345, 2019 Handbook for Authorized e-file Providers. I will keep form FTB 8453-LLC on file for **four** years from the due date of the return or **four** years from the date the limited liability company return is filed, whichever is later, and I will make a copy available to the FTB upon request. If I am also the paid preparer, under penalties of perjury, I declare that I have examined the above limited liability company's return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. I make this declaration based on all information of which I have knowledge.

| | ERO's signature ► | [signature] | Date 09/04/20 | Check if also paid preparer | Check if self-employed ☒ | ERO's PTIN P00309414 |
|---|---|---|---|---|---|---|
| **ERO** | | | | | | |
| **Must Sign** | Firm's name (or yours if self-employed) and address | MOSS ADAMS LLP  2040 MAIN STREET  SUITE 900  IRVINE, CA | | | | FEIN 91-0189318  ZIP code 92614 |

Under penalties of perjury, I declare that I have examined the above limited liability company's return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. I make this declaration based on all information of which I have knowledge.

| | Paid preparer's signature ► | | Date | Check if self-employed ☐ | Paid preparer's PTIN |
|---|---|---|---|---|---|
| **Paid Preparer** | | | | | |
| **Must Sign** | Firm's name (or yours if self-employed) and address ► | | | | FEIN  ZIP code |

**For Privacy Notice, get FTB 1131 ENG/SP.**

FTB 8453-LLC 2019

939111  11-05-19

# 2019 TAX RETURN FILING INSTRUCTIONS
## U.S. RETURN OF PARTNERSHIP INCOME

**FOR THE YEAR ENDING**
December 31, 2019

---

**Prepared For:**

Alecto Healthcare Services LLC
16310 Bake Parkway Suite 200
Irvine, CA  92618

---

**Prepared By:**

Moss Adams LLP
2040 Main Street  Suite 900
Irvine, CA 92614

---

**To Be Signed and Dated By:**

A member of the LLC

---

**Amount of Tax:**

Not applicable

---

**Mail Tax Return To:**

This return has qualified for electronic filing.  After you have reviewed your return for completeness and accuracy, please sign, date and return Form 8879-PE to our office. We will then submit your electronic return to the IRS.

---

**Forms to be Distributed to Partners:**

Enclosed are copies of Schedule K-1 to be distributed to the members.

---

**Return Must be Mailed On or Before:**

Return federal Form 8879-PE to us by September 15, 2020.

---

**Special Instructions:**

Do not mail the paper copy of the return to the IRS.

CONFIDENTIAL

ALECTO_00027113

EXTENSION GRANTED TO 09/15/20

Form **1065**

**U.S. Return of Partnership Income**

OMB No. 1545-0123

Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year beginning _____ , ending _____

▶ Go to www.irs.gov/Form1065 for instructions and the latest information.

**2019**

| | | | |
|---|---|---|---|
| **A** Principal business activity | Name of partnership | | **D** Employer identification number |
| HOLDING COMPANY | ALECTO HEALTHCARE SERVICES LLC | Type or Print | 46-0829723 |
| **B** Principal product or service | Number, street, and room or suite no. If a P.O. box, see instructions. | | **E** Date business started |
| HOLDING COMPANY | 16310 BAKE PARKWAY SUITE 200 | | 08/13/2012 |
| **C** Business code number | City or town, state or province, country, and ZIP or foreign postal code | | **F** Total assets |
| 622000 | IRVINE                CA 92618 | | $26,796,334. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 8

**J** Check if Schedules C and M-3 are attached ........................................ ▶ ☐

**K** Check if partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| | | | | |
|---|---|---|---:|---:|
| **Income** | **1a** Gross receipts or sales | **1a** 4,284,619. | | |
| | **b** Returns and allowances | **1b** | | |
| | **c** Balance. Subtract line 1b from line 1a | | **1c** | 4,284,619. |
| | **2** Cost of goods sold (attach Form 1125-A) | | **2** | |
| | **3** Gross profit. Subtract line 2 from line 1c | | **3** | 4,284,619. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement)   STMT 1 | | **4** | -48,824,332. |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040 or 1040-SR)) | | **5** | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | **6** | |
| | **7** Other income (loss) (attach statement)   SEE STATEMENT 2 | | **7** | 20,980. |
| | **8** **Total income (loss).** Combine lines 3 through 7 | | **8** | -44,518,733. |
| **Deductions (see instructions for limitations)** | **9** Salaries and wages (other than to partners) (less employment credits) | | **9** | 3,338,982. |
| | **10** Guaranteed payments to partners | | **10** | |
| | **11** Repairs and maintenance | | **11** | 3,240. |
| | **12** Bad debts | | **12** | |
| | **13** Rent | | **13** | 68,414. |
| | **14** Taxes and licenses   SEE STATEMENT 3 | | **14** | 157,810. |
| | **15** Interest (see instructions) | | **15** | 88. |
| | **16a** Depreciation (if required, attach Form 4562) | **16a** 1,178. | | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | **16c** | 1,178. |
| | **17** Depletion **(Do not deduct oil and gas depletion.)** | | **17** | |
| | **18** Retirement plans, etc. | | **18** | |
| | **19** Employee benefit programs | | **19** | 259,280. |
| | **20** Other deductions (attach statement)   SEE STATEMENT 4 | | **20** | 752,374. |
| | **21** **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | | **21** | 4,581,366. |
| | **22** **Ordinary business income (loss).** Subtract line 21 from line 8 | | **22** | -49,100,099. |
| **Tax and Payments** | **23** Interest due under the look-back method-completed long-term contracts (attach Form 8697) | | **23** | |
| | **24** Interest due under the look-back method-income forecast method (attach Form 8866) | | **24** | |
| | **25** BBA AAR imputed underpayment (see instructions) | | **25** | |
| | **26** Other taxes (see instructions) | | **26** | |
| | **27** **Total balance due.** Add lines 23 through 26 | | **27** | |
| | **28** Payment (see instructions) | | **28** | |
| | **29** **Amount owed.** If line 28 is smaller than line 27, enter amount owed | | **29** | |
| | **30** **Overpayment.** If line 28 is larger than line 27, enter overpayment | | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____ Signature of partner or limited liability company member    ▶ _____ Date

May the IRS discuss this return with the preparer shown below? See instr. ☒ Yes ☐ No

| | | | | |
|---|---|---|---|---|
| **Paid Preparer Use Only** | Print/Type preparer's name  DUSTIN MARCINIAK | Preparer's signature  DUSTIN MARCINIAK | Date 09/04/20 | Check ☐ if self-employed | PTIN P00309414 |
| | Firm's name ▶ MOSS ADAMS LLP | | | Firm's EIN ▶ 91-0189318 |
| | Firm's address ▶ 2040 MAIN STREET   SUITE 900   IRVINE, CA 92614 | | | Phone no. 949-221-4000 |

LHA  **For Paperwork Reduction Act Notice, see separate instructions.**   911001 12-30-19   Form **1065** (2019)

CONFIDENTIAL

A1186

ALECTO_00027114

Form 1065 (2019)    ALECTO HEALTHCARE SERVICES LLC    46-0829723    Page **2**

| **Schedule B** | **Other Information** | | | |
|---|---|---|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| **1** | What type of entity is filing this return?  Check the applicable box: | | | |
| **a** | ☐ Domestic general partnership    **b** ☐ Domestic limited partnership | | | |
| **c** | ☒ Domestic limited liability company    **d** ☐ Domestic limited liability partnership | | | |
| **e** | ☐ Foreign partnership    **f** ☐ Other ▶ | | | |
| **2** | At the end of the tax year: | | | |
| **a** | Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization, or any foreign government own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership | | | X |
| **b** | Did any individual or estate own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership | | X | |
| **3** | At the end of the tax year, did the partnership: | | | |
| **a** | Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (iv) below | | X | |

| **(i)** Name of Corporation | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Incorporation | **(iv)** Percentage Owned in Voting Stock |
|---|---|---|---|
| OLYMPIA PLAZA MANAGEMENT INC | 45-2658339 | UNITED STATES | 100.00 |
| FRMC PHYSICIANS INC | 47-1693245 | UNITED STATES | 80.00 |
| SHERMAN MD PROVIDER INC | 47-2194631 | UNITED STATES | 80.00 |
| SHERMAN ANESTHESIA, INC. | 81-4037665 | UNITED STATES | 80.00 |
| ALECTO EAST OHIO PHYSICIANS, INC. | 82-0677410 | UNITED STATES | 80.00 |

| | | | | | |
|---|---|---|---|---|---|
| **b** | Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below | | | | X |

| **(i)** Name of Entity | **(ii)** Employer Identification Number (if any) | **(iii)** Type of Entity | **(iv)** Country of Organization | **(v)** Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| SEE STATEMENT 5 | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | Yes | No |
|---|---|---|---|
| **4** | Does the partnership satisfy **all four** of the following conditions? | | |
| **a** | The partnership's total receipts for the tax year were less than $250,000. | | |
| **b** | The partnership's total assets at the end of the tax year were less than $ 1 million. | | |
| **c** | Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. | | |
| **d** | The partnership is not filing and is not required to file Schedule M-3 | | X |
| | If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; item F on page 1 of Form 1065; or item L on Schedule K-1. | | |
| **5** | Is this partnership a publicly traded partnership, as defined in section 469(k)(2)? | | X |
| **6** | During the tax year, did the partnership have any debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? | | X |
| **7** | Has this partnership filed, or is it required to file, Form 8918, Material Advisor Disclosure Statement, to provide information on any reportable transaction? | | X |
| **8** | At any time during calendar year 2019, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). If "Yes," enter the name of the foreign country  ▶ | | X |
| **9** | At any time during the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. See instructions | | X |
| **10 a** | Is the partnership making, or had it previously made (and not revoked), a section 754 election? | | X |
| | See instructions for details regarding a section 754 election. | | |
| **b** | Did the partnership make for this tax year an optional basis adjustment under section 743(b) or 734(b)? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions | | X |

911011  12-30-19

Form **1065** (2019)

10340904 146892 629917                    2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

CONFIDENTIAL                    A1187                    ALECTO_00027115

Form 1065 (2019)    ALECTO HEALTHCARE SERVICES LLC                                46-0829723    Page **3**

| **Schedule B** | **Other Information** *(continued)* | | Yes | No |
|---|---|---|---|---|
| c | Is the partnership required to adjust the basis of partnership assets under section 743(b) or 734(b) because of a substantial built-in loss (as defined under section 743(d)) or substantial basis reduction (as defined under section 734(d))? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions ............ | | | X |
| 11 | Check this box if, during the current or prior tax year, the partnership distributed any property received in a like-kind exchange or contributed such property to another entity (other than disregarded entities wholly owned by the partnership throughout the tax year) ................................................................... ▶ ☐ | | | |
| 12 | At any time during the tax year, did the partnership distribute to any partner a tenancy-in-common or other undivided interest in partnership property? | | | X |
| 13 | If the partnership is required to file Form 8858, Information Return of U.S. Persons With Respect To Foreign Disregarded Entities (FDEs) and Foreign Branches (FBs), enter the number of Forms 8858 attached. See instructions ▶ | | | |
| 14 | Does the partnership have any foreign partners? If "Yes," enter the number of Forms 8805, Foreign Partner's Information Statement of Section 1446 Withholding Tax, filed for this partnership | | | X |
| 15 | Enter the number of Forms 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to this return ▶ | | | |
| 16 a | Did you make any payments in 2019 that would require you to file Form(s) 1099? See instructions ............ | | X | |
| b | If "Yes," did you or will you file required Form(s) 1099? | | X | |
| 17 | Enter the number of Forms 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, attached to this return ▶ | | | |
| 18 | Enter the number of partners that are foreign governments under section 892 ▶ | | | |
| 19 | During the partnership's tax year, did the partnership make any payments that would require it to file Form 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474)? | | | X |
| 20 | Was the partnership a specified domestic entity required to file Form 8938 for the tax year? See the Instructions for Form 8938 | | | X |
| 21 | Is the partnership a section 721(c) partnership, as defined in Regulations section 1.721(c)-1T(b)(14)? | | | X |
| 22 | During the tax year, did the partnership pay or accrue any interest or royalty for which the deduction is not allowed under section 267A? See instructions | | | X |
| | If "Yes," enter the total amount of the disallowed deductions ▶ $ | | | |
| 23 | Did the partnership have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year? See instructions | | | X |
| 24 | Does the partnership satisfy one or more of the following? See instructions ............................ | | | X |
| a | The partnership owns a pass-through entity with current, or prior year carryover, excess business interest expense. | | | |
| b | The partnership's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year are more than $26 million and the partnership has business interest. | | | |
| c | The partnership is a tax shelter (see instructions) and the partnership has business interest expense. | | | |
| | If "Yes" to any, complete and attach Form 8990. | | | |
| 25 | Is the partnership electing out of the centralized partnership audit regime under section 6221(b)? See instructions .................... | | | X |
| | If "Yes," the partnership must complete Schedule B-2 (Form 1065). Enter the total from Schedule B-2, Part III, line 3 ▶ | | | |
| | If "No," complete Designation of Partnership Representative below. | | | |

**Designation of Partnership Representative** (see instructions)

Enter below the information for the partnership representative (PR) for the tax year covered by this return.

Name of PR ▶ MIKE SARRAO

| U.S. address of PR ▶ | 16310 BAKE PARKWAY SUITE 200 IRVINE, CA 92618 | U.S. phone number of PR ▶ | 949-783-3976 |
|---|---|---|---|

If the PR is an entity, name of the designated individual for the PR ▶

| U.S. address of designated individual ▶ | | U.S. phone number of designated individual ▶ | |
|---|---|---|---|

| 26 | Is the partnership attaching Form 8996 to certify as a Qualified Opportunity Fund? | | | X |
|---|---|---|---|---|
| | If "Yes," enter the amount from Form 8996, line 14 ▶ $ | | | |
| 27 | Enter the number of foreign partners subject to section 864(c)(8) as a result of transferring all or a portion of an interest in the partnership or of receiving a distribution from the partnership ▶ | | | |
| 28 | At any time during the tax year, were there any transfers between the partnership and its partners subject to the disclosure requirements of Regulations section 1.707-8? | | | X |

Form **1065** (2019)

911021 12-30-19

3

10340904 146892 629917                    2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

Form 1065 (2019)   ALECTO HEALTHCARE SERVICES LLC                    46-0829723   Page **4**

| Schedule K | Partners' Distributive Share Items | | Total amount |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| **Income (Loss)** | **1** Ordinary business income (loss) (page 1, line 22) | | **1** | −49,100,099. |
| | **2** Net rental real estate income (loss) (attach Form 8825) | | **2** | |
| | **3a** Other gross rental income (loss) | 3a | | |
| | **b** Expenses from other rental activities (attach statement) | 3b | | |
| | **c** Other net rental income (loss). Subtract line 3b from line 3a | | **3c** | |
| | **4** Guaranteed payments:  **a** Services | 4a | **b** Capital | 4b | |
| | **c** Total. Add lines 4a and 4b | | **4c** | |
| | **5** Interest income                          SEE STATEMENT 6 | | **5** | 232,271. |
| | **6** Dividends and dividend equivalents:  **a** Ordinary dividends | | **6a** | |
| | **b** Qualified dividends | 6b | **c** Dividend equivalents | 6c | |
| | **7** Royalties | | **7** | |
| | **8** Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | | **8** | |
| | **9a** Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | | **9a** | |
| | **b** Collectibles (28%) gain (loss) | 9b | | |
| | **c** Unrecaptured section 1250 gain (attach statement) | 9c | | |
| | **10** Net section 1231 gain (loss) (attach Form 4797) | | **10** | −1,918. |
| | **11** Other income (loss) (see instructions) Type ▶ | | **11** | |
| **Deductions** | **12** Section 179 deduction (attach Form 4562) | | **12** | |
| | **13a** Contributions                          SEE STATEMENT 7 | | **13a** | 24,690. |
| | **b** Investment interest expense | | **13b** | |
| | **c** Section 59(e)(2) expenditures: **(1)** Type ▶ _____ **(2)** Amount ▶ | | **13c(2)** | |
| | **d** Other deductions (see instructions) Type ▶      SEE STATEMENT 8 | | **13d** | 187,193. |
| **Self-Employ-ment** | **14a** Net earnings (loss) from self-employment | | **14a** | −44,190,084. |
| | **b** Gross farming or fishing income | | **14b** | |
| | **c** Gross nonfarm income | | **14c** | |
| **Credits** | **15a** Low-income housing credit (section 42(j)(5)) | | **15a** | |
| | **b** Low-income housing credit (other) | | **15b** | |
| | **c** Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) | | **15c** | |
| | **d** Other rental real estate credits (see instructions) Type ▶ | | **15d** | |
| | **e** Other rental credits (see instructions)       Type ▶ | | **15e** | |
| | **f** Other credits (see instructions)           Type ▶ | | **15f** | |
| **Foreign Transactions** | **16a** Name of country or U.S. possession ▶ | | | |
| | **b** Gross income from all sources | | **16b** | |
| | **c** Gross income sourced at partner level | | **16c** | |
| | Foreign gross income sourced at partnership level | | | |
| | **d** Reserved for future use ▶          **e** Foreign branch category          ▶ | | **16e** | |
| | **f** Passive category          **g** General category ▶          **h** Other ... ▶ | | **16h** | |
| | Deductions allocated and apportioned at partner level | | | |
| | **i** Interest expense ▶          **j** Other | | **16j** | |
| | Deductions allocated and apportioned at partnership level to foreign source income | | | |
| | **k** Reserved for future use ▶          **l** Foreign branch category          ▶ | | **16l** | |
| | **m** Passive category          **n** General category ▶          **o** Other ... ▶ | | **16o** | |
| | **p** Total foreign taxes (check one): ▶    Paid ☐   Accrued ☐ | | **16p** | |
| | **q** Reduction in taxes available for credit (attach statement) | | **16q** | |
| | **r** Other foreign tax information (attach statement) | | | |
| **Alternative Minimum Tax (AMT) Items** | **17a** Post-1986 depreciation adjustment | | **17a** | −47,855. |
| | **b** Adjusted gain or loss                     SEE STATEMENT 9 | | **17b** | −1,030. |
| | **c** Depletion (other than oil and gas) | | **17c** | |
| | **d** Oil, gas, and geothermal properties - gross income | | **17d** | |
| | **e** Oil, gas, and geothermal properties - deductions | | **17e** | |
| | **f** Other AMT items (attach statement) | | **17f** | |
| **Other Information** | **18a** Tax-exempt interest income | | **18a** | |
| | **b** Other tax-exempt income | | **18b** | |
| | **c** Nondeductible expenses                    SEE STATEMENT 10 | | **18c** | 158,989. |
| | **19a** Distributions of cash and marketable securities | | **19a** | 0. |
| | **b** Distributions of other property | | **19b** | |
| | **20a** Investment income | | **20a** | 232,271. |
| | **b** Investment expenses | | **20b** | |
| | **c** Other items and amounts (attach statement)           STMT 11 | | | |

911041 12-30-19                                             4                                          Form **1065** (2019)

10340904 146892 629917              2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

Form 1065 (2019)    **ALECTO HEALTHCARE SERVICES LLC**    46-0829723    Page **5**

## Analysis of Net Income (Loss)

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 16p | | | | | **1** | -49,081,629. |

| 2 Analysis by partner type: | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt Organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|
| a General partners | | | | | | |
| b Limited partners | | -44173412. | -2,454,021. | | | -2,454,196. |

## Schedule L    Balance Sheets per Books

| Assets | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|
| | (a) | (b) | (c) | (d) |
| 1 Cash | | 107,203. | | 356,458. |
| 2a Trade notes and accounts receivable | 1,364,490. | | 1,296,349. | |
| b Less allowance for bad debts | 1,000,000. | 364,490. | 1,000,000. | 296,349. |
| 3 Inventories | | | | |
| 4 U.S. government obligations | | | | |
| 5 Tax-exempt securities | | | | |
| 6 Other current assets (attach statement) | STATEMENT 13 | 548,440. | | 652,960. |
| 7a Loans to partners (or persons related to partners) | | | | |
| b Mortgage and real estate loans | | | | |
| 8 Other investments (attach statement) | STATEMENT 14 | 15,670,881. | | 25,489,819. |
| 9a Buildings and other depreciable assets | 13,467. | | 13,467. | |
| b Less accumulated depreciation | 8,230. | 5,237. | 12,719. | 748. |
| 10a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 11 Land (net of any amortization) | | | | |
| 12a Intangible assets (amortizable only) | 12,433. | | | |
| b Less accumulated amortization | | 12,433. | | |
| 13 Other assets (attach statement) | | | | |
| 14 Total assets | | 16,708,684. | | 26,796,334. |
| **Liabilities and Capital** | | | | |
| 15 Accounts payable | | 1,679,150. | | 2,139,683. |
| 16 Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 Other current liabilities (attach statement) | STATEMENT 15 | 894,891. | | 1,235,770. |
| 18 All nonrecourse loans | | | | |
| 19a Loans from partners (or persons related to partners) | | | | |
| b Mortgages, notes, bonds payable in 1 year or more | | 4,039,464. | | 4,749,523. |
| 20 Other liabilities (attach statement) | | | | |
| 21 Partners' capital accounts | | 10,095,179. | | 18,671,358. |
| 22 Total liabilities and capital | | 16,708,684. | | 26,796,334. |

## Schedule M-1    Reconciliation of Income (Loss) per Books With Income (Loss) per Return

**Note:** The partnership may be required to file Schedule M-3. See instructions.

| | | | |
|---|---|---|---|
| 1 Net income (loss) per books | | 6 Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | |
| 2 Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | | a Tax-exempt interest $ | |
| 3 Guaranteed payments (other than health insurance) | | 7 Deductions included on Schedule K, lines 1 through 13d, and 16p, not charged against book income this year (itemize): | |
| 4 Expenses recorded on books this year not included on Schedule K, lines 1 through 13d and 16p (itemize): | | a Depreciation $ | |
| a Depreciation $ | | 8 Add lines 6 and 7 | |
| b Travel and entertainment $ | | 9 Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | |
| 5 Add lines 1 through 4 | | | |

## Schedule M-2    Analysis of Partners' Capital Accounts    STMT 12

| | | | |
|---|---|---|---|
| 1 Balance at beginning of year | 10,095,179. | 6 Distributions: a Cash | 2,238,651. |
| 2 Capital contributed: a Cash    STMT 17 | 11,183,129. | b Property | |
| b Property | | 7 Other decreases (itemize): | |
| 3 Net income (loss) per books | -368,299. | | |
| 4 Other increases (itemize): | | 8 Add lines 6 and 7 | 2,238,651. |
| 5 Add lines 1 through 4 | 20,910,009. | 9 Balance at end of year. Subtract line 8 from line 5 | 18,671,358. |

911042 12-30-19    5    Form **1065** (2019)

10340904 146892 629917                    2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

**SCHEDULE B-1**
**(Form 1065)**
(Rev. August 2019)
Department of the Treasury
Internal Revenue Service

# Information on Partners Owning 50% or More of the Partnership
▶ Attach to Form 1065.
▶ **Go to www.irs.gov/Form1065 for the latest information.**

OMB No. 1545-0123

| Name of partnership | Employer identification number |
|---|---|
| ALECTO HEALTHCARE SERVICES LLC | 46-0829723 |

**Part I**  **Entities Owning 50% or More of the Partnership**   (Form 1065, Schedule B, Question 2a (Question 3a for 2009 through 2017))

Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, tax-exempt organization, or any foreign government that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Part II**  **Individuals or Estates Owning 50% or More of the Partnership**   (Form 1065, Schedule B, Question 2b (Question 3b for 2009 through 2017))

Complete columns (i) through (iv) below for any individual or estate that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| LAXMAN REDDY | ██████████ | UNITED STATES | 56.00 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

LHA  **For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**          **Schedule B-1 (Form 1065) (Rev. 8-2019)**

924551 11-13-19

6

CONFIDENTIAL      A1191      ALECTO_00027119

**SCHEDULE M-3**
(Form 1065)

Department of the Treasury
Internal Revenue Service

# Net Income (Loss) Reconciliation for Certain Partnerships

▶ Attach to Form 1065.
▶ Go to www.irs.gov/Form1065 for instructions and the latest information.

OMB No. 1545-0123

**2019**

Name of partnership

ALECTO HEALTHCARE SERVICES LLC

Employer identification number

46-0829723

**This Schedule M-3 is being filed because (check all that apply):**

A [X] The amount of the partnership's total assets at the end of the tax year is equal to $10 million or more.

B [X] The amount of the partnership's adjusted total assets for the tax year is equal to $10 million or more. If box B is checked, enter the amount of adjusted total assets for the tax year   247,808,992.  .

C [ ] The amount of total receipts for the tax year is equal to $35 million or more. If box C is checked, enter the total receipts for the tax year _____

D [ ] An entity that is a reportable entity partner with respect to the partnership owns or is deemed to own an interest of 50% or more in the partnership's capital, profit, or loss on any day during the tax year of the partnership.

| Name of Reportable Entity Partner | Identifying Number | Maximum Percentage Owned or Deemed Owned |
|---|---|---|
| | | |
| | | |
| | | |

E [ ]  Voluntary Filer.

## Part I   Financial Information and Net Income (Loss) Reconciliation

**1a** Did the partnership file SEC Form 10-K for its income statement period ending with or within this tax year?

    [ ] **Yes.** Skip lines 1b and 1c and complete lines 2 through 11 with respect to that SEC Form 10-K.

    [X] **No.** Go to line 1b. See instructions if multiple non-tax-basis income statements are prepared.

**b** Did the partnership prepare a certified audited non-tax-basis income statement for that period?

    [ ] **Yes.** Skip line 1c and complete lines 2 through 11 with respect to that income statement.

    [X] **No.** Go to line 1c.

**c** Did the partnership prepare a non-tax-basis income statement for that period?

    [X] **Yes.** Complete lines 2 through 11 with respect to that income statement.

    [ ] **No.** Skip lines 2 through 3b and enter the partnership's net income (loss) per its books and records on line 4a.

**2** Enter the income statement period: Beginning 01/01/2019   Ending 12/31/2019

**3a** Has the partnership's income statement been restated for the income statement period on line 2?

    [ ] **Yes.** (If "Yes," attach a statement and the amount of each item restated.)

    [X] **No.**

**b** Has the partnership's income statement been restated for any of the five income statement periods immediately preceding the period on line 2?

    [ ] **Yes.** (If "Yes," attach a statement and the amount of each item restated.)

    [X] **No.**

| | | | |
|---|---|---|---|
| **4a** Worldwide consolidated net income (loss) from income statement source identified in Part I, line 1 | | **4a** | -368,299. |
| **b** Indicate accounting standard used for line 4a (see instructions): | | | |
|   **1** [X] GAAP    **2** [ ] IFRS    **3** [ ] Section 704(b) | | | |
|   **4** [ ] Tax-basis    **5** [ ] Other (Specify) ▶ | | | |
| **5a** Net income from nonincludible foreign entities (attach statement) | | **5a** | ( ) |
| **b** Net loss from nonincludible foreign entities (attach statement and enter as a positive amount) | | **5b** | |
| **6a** Net income from nonincludible U.S. entities (attach statement) | | **6a** | ( ) |
| **b** Net loss from nonincludible U.S. entities (attach statement and enter as a positive amount) | | **6b** | |
| **7a** Net income (loss) of other foreign disregarded entities (attach statement) | | **7a** | |
| **b** Net income (loss) of other U.S. disregarded entities (attach statement) | | **7b** | |
| **8** Adjustment to eliminations of transactions between includible entities and nonincludible entities (attach stmt.) | | **8** | |
| **9** Adjustment to reconcile income statement period to tax year (attach statement) | | **9** | |
| **10** Other adjustments to reconcile to amount on line 11 (attach statement) | | **10** | |
| **11** Net income (loss) per income statement of the partnership. Combine lines 4a through 10 | | **11** | -368,299. |

**Note:** Part I, line 11, must equal Part II, line 26, column (a), or Schedule M-1, line 1. See instructions.

**12** Enter the total amount (not just the partnership's share) of the assets and liabilities of all entities included or removed on the following lines.

| | | Total Assets | Total Liabilities |
|---|---|---|---|
| **a** | Included on Part I, line 4 | 26,796,334. | 8,124,976. |
| **b** | Removed on Part I, line 5 | | |
| **c** | Removed on Part I, line 6 | | |
| **d** | Included on Part I, line 7 | | |

For Paperwork Reduction Act Notice, see the instructions for your return.

Schedule M-3 (Form 1065) 2019

910991 01-13-20    LHA

7

10340904 146892 629917                2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

Schedule M-3 (Form 1065) 2019

Page **2**

| Name of partnership | Employer identification number |
|---|---|
| ALECTO HEALTHCARE SERVICES LLC | 46-0829723 |

**Part II**    Reconciliation of Net Income (Loss) per Income Statement of Partnership with Income (Loss) per Return

| | **Income (Loss) Items** | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
|---|---|---|---|---|---|
| | Attach statements for lines 1 through 10. | | | | |
| 1 | Income (loss) from equity method foreign corporations | | | | |
| 2 | Gross foreign dividends not previously taxed | | | | |
| 3 | Subpart F, QEF, and similar income inclusions | | | | |
| 4 | Gross foreign distributions previously taxed | | | | |
| 5 | Income (loss) from equity method U.S. corporations | | | | |
| 6 | U.S. dividends | | | | |
| 7 | Income (loss) from U.S. partnerships  STMT 18 | | -48,732,356. | 127,749. | -48,604,607. |
| 8 | Income (loss) from foreign partnerships | | | | |
| 9 | Income (loss) from other pass-through entities | | | | |
| 10 | Items relating to reportable transactions | | | | |
| 11 | Interest income (see instructions) | 88. | | | 88. |
| 12 | Total accrual to cash adjustment | | | | |
| 13 | Hedging transactions | | | | |
| 14 | Mark-to-market income (loss) | | | | |
| 15 | Cost of goods sold (see instructions) | ( ) | | | ( ) |
| 16 | Sale versus lease (for sellers and/or lessors) | | | | |
| 17 | Section 481(a) adjustments | | | | |
| 18 | Unearned/deferred revenue | | | | |
| 19 | Income recognition from long-term contracts | | | | |
| 20 | Original issue discount and other imputed interest | | | | |
| 21a | Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b | Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c | Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d | Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e | Abandonment losses | | | | |
| f | Worthless stock losses (attach statement) | | | | |
| g | Other gain/loss on disposition of assets other than inventory | | | | |
| 22 | Other income (loss) items with differences (attach statement) | | | | |
| 23 | **Total income (loss) items.** Combine lines 1 through 22 | 88. | -48,732,356. | 127,749. | -48,604,519. |
| 24 | **Total expense/deduction items.** (From Part III, line 31) (see instructions) | -3,447,775. | -139,963. | 31,240. | -3,556,498. |
| 25 | Other items with no differences  STMT 19 | 3,079,388. | | | 3,079,388. |
| 26 | **Reconciliation totals.** Combine lines 23 through 25 | -368,299. | -48,872,319. | 158,989. | -49,081,629. |

**Note:** Line 26, column (a), must equal Part I, line 11, and column (d) must equal Form 1065, Analysis of Net Income (Loss), line 1.

Schedule M-3 (Form 1065) 2019

Schedule M-3 (Form 1065) 2019                                                           Page **3**

| Name of partnership | Employer identification number |
|---|---|
| ALECTO HEALTHCARE SERVICES LLC | 46-0829723 |

**Part III**   **Reconciliation of Net Income (Loss) per Income Statement of Partnership With Income (Loss) per Return - Expense/Deduction Items**

| | Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | State and local current income tax expense | 3,200. | 1,600. | | 4,800. |
| 2 | State and local deferred income tax expense | | | | |
| 3 | Foreign current income tax expense (other than foreign withholding taxes) | | | | |
| 4 | Foreign deferred income tax expense | | | | |
| 5 | Equity-based compensation | | | | |
| 6 | Meals and entertainment STMT 21 | 10,806. | | -5,403. | 5,403. |
| 7 | Fines and penalties | | | | |
| 8 | Judgments, damages, awards, and similar costs | | | | |
| 9 | Guaranteed payments | | | | |
| 10 | Pension and profit-sharing | | | | |
| 11 | Other post-retirement benefits | | | | |
| 12 | Deferred compensation | | | | |
| 13 | Charitable contribution of cash and tangible property STMT 22 | 14,150. | | | 14,150. |
| 14 | Charitable contribution of intangible property | | | | |
| 15 | Organizational expenses as per Regulations section 1.709-2(a) | | | | |
| 16 | Syndication expenses as per Regulations section 1.709-2(b) | | | | |
| 17 | Current year acquisition/reorganization investment banking fees | | | | |
| 18 | Current year acquisition/reorganization legal and accounting fees | | | | |
| 19 | Amortization/impairment of goodwill | | | | |
| 20 | Amortization of acquisition, reorganization, and start-up costs | | | | |
| 21 | Other amortization or impairment write-offs STMT 23 | 12,433. | -7,729. | | 4,704. |
| 22 | Reserved | | | | |
| 23a | Depletion - Oil & Gas | | | | |
| b | Depletion - Other than Oil & Gas | | | | |
| 24 | Intangible drilling & development costs | | | | |
| 25 | Depreciation | 4,489. | -3,311. | | 1,178. |
| 26 | Bad debt expense | | | | |
| 27 | Interest expense (see instructions) | 187,281. | -187,193. | | 88. |
| 28 | Purchase versus lease (for purchasers and/or lessees) | | | | |
| 29 | Research and development costs | | | | |
| 30 | Other expense/deduction items with differences (attach statement) STMT 24 | 3,215,416. | 336,596. | -25,837. | 3,526,175. |
| 31 | **Total expense/deduction items**. Combine lines 1 through 30. Enter here and on Part II, line 24, reporting positive amounts as negative and negative amounts as positive | 3,447,775. | 139,963. | -31,240. | 3,556,498. |

Schedule M-3 (Form 1065) 2019

910993
01-13-20

9

CONFIDENTIAL            **A1194**            ALECTO_00027122

| Form **4562** | **Depreciation and Amortization** (Including Information on Listed Property) OTHER 1 | OMB No. 1545-0172 **2019** |
|---|---|---|

Department of the Treasury
Internal Revenue Service   (99)

▶ Attach to your tax return.
▶ Go to www.irs.gov/Form4562 for instructions and the latest information.

Attachment
Sequence No. **179**

| Name(s) shown on return | Business or activity to which this form relates | Identifying number |
|---|---|---|
| ALECTO HEALTHCARE SERVICES LLC | | 46-0829723 |

**Part I**  **Election To Expense Certain Property Under Section 179** **Note:** If you have any listed property, complete Part V before you complete Part I.

| | | |
|---|---|---|
| **1** Maximum amount (see instructions) | **1** | |
| **2** Total cost of section 179 property placed in service (see instructions) | **2** | |
| **3** Threshold cost of section 179 property before reduction in limitation | **3** | |
| **4** Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | **4** | |
| **5** Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | **5** | |

| **6** | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| **7** Listed property. Enter the amount from line 29 | **7** | | |
| **8** Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | **8** | | |
| **9** Tentative deduction. Enter the **smaller** of line 5 or line 8 | **9** | | |
| **10** Carryover of disallowed deduction from line 13 of your 2018 Form 4562 | **10** | | |
| **11** Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | **11** | | |
| **12** Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | **12** | | |
| **13** Carryover of disallowed deduction to 2020. Add lines 9 and 10, less line 12 ▶ | **13** | | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

**Part II**  **Special Depreciation Allowance and Other Depreciation (Don't** include listed property**.)**

| | | |
|---|---|---|
| **14** Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year | **14** | |
| **15** Property subject to section 168(f)(1) election | **15** | |
| **16** Other depreciation (including ACRS) | **16** | |

**Part III**  **MACRS Depreciation (Don't** include listed property. See instructions.)

**Section A**

| | | |
|---|---|---|
| **17** MACRS deductions for assets placed in service in tax years beginning before 2019 | **17** | 1,178. |
| **18** If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ▶ ☐ | | |

**Section B - Assets Placed in Service During 2019 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| **19a** 3-year property | | | | | | |
| **b** 5-year property | | | | | | |
| **c** 7-year property | | | | | | |
| **d** 10-year property | | | | | | |
| **e** 15-year property | | | | | | |
| **f** 20-year property | | | | | | |
| **g** 25-year property | | | 25 yrs. | | S/L | |
| **h** Residential rental property | / | | 27.5 yrs. | MM | S/L | |
| | / | | 27.5 yrs. | MM | S/L | |
| **i** Nonresidential real property | / | | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | |

**Section C - Assets Placed in Service During 2019 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| **20a** Class life | | | | | S/L | |
| **b** 12-year | | | 12 yrs. | | S/L | |
| **c** 30-year | / | | 30 yrs. | MM | S/L | |
| **d** 40-year | / | | 40 yrs. | MM | S/L | |

**Part IV**  **Summary** (See instructions.)

| | | |
|---|---|---|
| **21** Listed property. Enter amount from line 28 | **21** | |
| **22** **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instr. | **22** | 1,178. |
| **23** For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** | |

916251 12-12-19   LHA  **For Paperwork Reduction Act Notice, see separate instructions.** Form **4562** (2019)

10340904 146892 629917                2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

Form 4562 (2019)    **ALECTO HEALTHCARE SERVICES LLC**    46-0829723   Page **2**

| Part V | Listed Property (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.) |

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles.)

24a Do you have evidence to support the business/investment use claimed? ☐ **Yes** ☐ **No**   24b If "Yes," is the evidence written? ☐ **Yes** ☐ **No**

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| 25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use | | | | | | | 25 | |
| 26 Property used more than 50% in a qualified business use: | | | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| | : : | % | | | | | | |
| 27 Property used 50% or less in a qualified business use: | | | | | | | | |
| | : : | % | | | S/L - | | | |
| | : : | % | | | S/L - | | | |
| | : : | % | | | S/L - | | | |
| 28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 | | | | | | 28 | | |
| 29 Add amounts in column (i), line 26. Enter here and on line 7, page 1 | | | | | | | 29 | |

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | | (a) Vehicle | | (b) Vehicle | | (c) Vehicle | | (d) Vehicle | | (e) Vehicle | | (f) Vehicle | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | Total business/investment miles driven during the year (**don't** include commuting miles) | | | | | | | | | | | | |
| 31 | Total commuting miles driven during the year | | | | | | | | | | | | |
| 32 | Total other personal (noncommuting) miles driven | | | | | | | | | | | | |
| 33 | Total miles driven during the year. Add lines 30 through 32 | | | | | | | | | | | | |
| 34 | Was the vehicle available for personal use during off-duty hours? | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 35 | Was the vehicle used primarily by a more than 5% owner or related person? | | | | | | | | | | | | |
| 36 | Is another vehicle available for personal use? | | | | | | | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons.

| | | Yes | No |
|---|---|---|---|
| 37 | Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | |
| 38 | Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners | | |
| 39 | Do you treat all use of vehicles by employees as personal use? | | |
| 40 | Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? | | |
| 41 | Do you meet the requirements concerning qualified automobile demonstration use? | | |

**Note:** If your answer to 37, 38, 39, 40, or 41 is "Yes," don't complete Section B for the covered vehicles.

| Part VI | Amortization |

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| 42 Amortization of costs that begins during your 2019 tax year: | | | | | |
| | : : | | | | |
| | : : | | | | |
| 43 Amortization of costs that began before your 2019 tax year | | | | 43 | 4,704. |
| 44 **Total.** Add amounts in column (f). See the instructions for where to report | | | | 44 | 4,704. |

916252 12-12-19                       Form **4562** (2019)

10340904 146892 629917          2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

CONFIDENTIAL          A1196          ALECTO_00027124

**2019 DEPRECIATION AND AMORTIZATION REPORT**

OTHER    1

| Asset No. | Description | Date Acquired | Method | Life | C o n v | Line No. | Unadjusted Cost Or Basis | Bus % Excl | Section 179 Expense | * Reduction In Basis | Basis For Depreciation | Beginning Accumulated Depreciation | Current Sec 179 Expense | Current Year Deduction | Ending Accumulated Depreciation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | LOAN COSTS | 08/31/16 | 197 | 36M | | 43 | 21,173. | | | | 21,173. | 16,469. | | 4,704. | 21,173. |
| 7 | FURNITURE | 07/01/17 | 200DB | 7.00 | HY | 17 | 13,467. | | | 6,734. | 6,733. | 2,611. | | 1,178. | 3,789. |
| | * TOTAL OTHER DEPRECIATION & AMORT | | | | | | 34,640. | | | 6,734. | 27,906. | 19,080. | | 5,882. | 24,962. |

928111 04-01-19

(D) · Asset disposed                    * ITC, Salvage, Bonus, Commercial Revitalization Deduction, GO Zone

12

**CONFIDENTIAL**                    **A1197**                    **ALECTO_00027125**

| Form **4797** | **Sales of Business Property** | OMB No. 1545-0184 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | (Also Involuntary Conversions and Recapture Amounts Under Sections 179 and 280F(b)(2))<br>▶ **Attach to your tax return.**<br>▶ **Go to www.irs.gov/Form4797 for instructions and the latest information.** | **2019**<br>Attachment Sequence No. **27** |

| Name(s) shown on return | Identifying number |
|---|---|
| ALECTO HEALTHCARE SERVICES LLC | 46-0829723 |

| 1 | Enter the gross proceeds from sales or exchanges reported to you for 2019 on Form(s) 1099-B or 1099-S (or substitute statement) that you are including on line 2, 10, or 20. See instructions | 1 | |
|---|---|---|---|

### Part I — Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft - Most Property Held More Than 1 Year (see instructions)

| (a) Description of property | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Gross sales price | (e) Depreciation allowed or allowable since acquisition | (f) Cost or other basis, plus improvements and expense of sale | (g) Gain or (loss) Subtract (f) from the sum of (d) and (e) |
|---|---|---|---|---|---|---|
| 2 PASSTHROUGH FROM ALECTO HEALTHCARE SERVICES FAIRMONT LLC | | | | | | -1,918. |
| | | | | | | |
| | | | | | | |

| 3 | Gain, if any, from Form 4684, line 39 | 3 | |
|---|---|---|---|
| 4 | Section 1231 gain from installment sales from Form 6252, line 26 or 37 | 4 | |
| 5 | Section 1231 gain or (loss) from like-kind exchanges from Form 8824 | 5 | |
| 6 | Gain, if any, from line 32, from other than casualty or theft | 6 | |
| 7 | Combine lines 2 through 6. Enter the gain or (loss) here and on the appropriate line as follows | 7 | -1,918. |

**Partnerships and S corporations.** Report the gain or (loss) following the instructions for Form 1065, Schedule K, line 10, or Form 1120-S, Schedule K, line 9. Skip lines 8, 9, 11, and 12 below.

**Individuals, partners, S corporation shareholders, and all others.** If line 7 is zero or a loss, enter the amount from line 7 on line 11 below and skip lines 8 and 9. If line 7 is a gain and you didn't have any prior year section 1231 losses, or they were recaptured in an earlier year, enter the gain from line 7 as a long-term capital gain on the Schedule D filed with your return and skip lines 8, 9, 11, and 12 below.

| 8 | Nonrecaptured net section 1231 losses from prior years. See instructions | 8 | |
|---|---|---|---|
| 9 | Subtract line 8 from line 7. If zero or less, enter -0-. If line 9 is zero, enter the gain from line 7 on line 12 below. If line 9 is more than zero, enter the amount from line 8 on line 12 below and enter the gain from line 9 as a long-term capital gain on the Schedule D filed with your return. See instructions | 9 | |

### Part II — Ordinary Gains and Losses (see instructions)

| 10 | Ordinary gains and losses not included on lines 11 through 16 (include property held 1 year or less): | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 11 | Loss, if any, from line 7 | 11 | ( ) |
|---|---|---|---|
| 12 | Gain, if any, from line 7 or amount from line 8, if applicable | 12 | |
| 13 | Gain, if any, from line 31 | 13 | |
| 14 | Net gain or (loss) from Form 4684, lines 31 and 38a | 14 | |
| 15 | Ordinary gain from installment sales from Form 6252, line 25 or 36 | 15 | |
| 16 | Ordinary gain or (loss) from like-kind exchanges from Form 8824 | 16 | |
| 17 | Combine lines 10 through 16 | 17 | |

| 18 | For all except individual returns, enter the amount from line 17 on the appropriate line of your return and skip lines a and b below. For individual returns, complete lines a and b below. | | |
|---|---|---|---|
| **a** | If the loss on line 11 includes a loss from Form 4684, line 35, column (b)(ii), enter that part of the loss here. Enter the loss from income-producing property on Schedule A (Form 1040 or Form 1040-SR), line 16. (Do not include any loss on property used as an employee.) Identify as from "Form 4797, line 18a." See instructions | 18a | |
| **b** | Redetermine the gain or (loss) on line 17 excluding the loss, if any, on line 18a. Enter here and on Schedule 1 (Form 1040 or Form 1040-SR), Part I, line 4 | 18b | |

LHA **For Paperwork Reduction Act Notice, see separate instructions.** Form **4797** (2019)

918001
12-04-19

ALECTO HEALTHCARE SERVICES LLC                                                    46-0829723

Form 4797 (2019)                                                                          Page **2**

| Part III | Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255 (see instructions) | | |
|---|---|---|---|

| | | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) |
|---|---|---|---|
| **19 (a)** Description of section 1245, 1250, 1252, 1254, or 1255 property: | | | |
| A | | | |
| B | | | |
| C | | | |
| D | | | |

| These columns relate to the properties on lines 19A through 19D. ▶ | | Property A | Property B | Property C | Property D |
|---|---|---|---|---|---|
| **20** Gross sales price (**Note:** See line 1 before completing.) | 20 | | | | |
| **21** Cost or other basis plus expense of sale | 21 | | | | |
| **22** Depreciation (or depletion) allowed or allowable | 22 | | | | |
| **23** Adjusted basis. Subtract line 22 from line 21 | 23 | | | | |
| **24** Total gain. Subtract line 23 from line 20 | 24 | | | | |
| **25** **If section 1245 property:** | | | | | |
| **a** Depreciation allowed or allowable from line 22 | 25a | | | | |
| **b** Enter the **smaller** of line 24 or 25a | 25b | | | | |
| **26** **If section 1250 property:** If straight line depreciation was used, enter -0- on line 26g, except for a corporation subject to section 291. | | | | | |
| **a** Additional depreciation after 1975 | 26a | | | | |
| **b** Applicable percentage multiplied by the **smaller** of line 24 or line 26a | 26b | | | | |
| **c** Subtract line 26a from line 24. If residential rental property **or** line 24 isn't more than line 26a, skip lines 26d and 26e | 26c | | | | |
| **d** Additional depreciation after 1969 and before 1976 | 26d | | | | |
| **e** Enter the **smaller** of line 26c or 26d | 26e | | | | |
| **f** Section 291 amount (corporations only) | 26f | | | | |
| **g** Add lines 26b, 26e, and 26f | 26g | | | | |
| **27** **If section 1252 property:** Skip this section if you didn't dispose of farmland or if this form is being completed for a partnership. | | | | | |
| **a** Soil, water, and land clearing expenses | 27a | | | | |
| **b** Line 27a multiplied by applicable percentage | 27b | | | | |
| **c** Enter the **smaller** of line 24 or 27b | 27c | | | | |
| **28** **If section 1254 property:** | | | | | |
| **a** Intangible drilling and development costs, expenditures for development of mines and other natural deposits, mining exploration costs, and depletion | 28a | | | | |
| **b** Enter the **smaller** of line 24 or 28a | 28b | | | | |
| **29** **If section 1255 property:** | | | | | |
| **a** Applicable percentage of payments excluded from income under section 126 | 29a | | | | |
| **b** Enter the **smaller** of line 24 or 29a | 29b | | | | |

**Summary of Part III Gains.** Complete property columns A through D through line 29b before going to line 30.

| | | | |
|---|---|---|---|
| **30** Total gains for all properties. Add property columns A through D, line 24 | | 30 | |
| **31** Add property columns A through D, lines 25b, 26g, 27c, 28b, and 29b. Enter here and on line 13 | | 31 | |
| **32** Subtract line 31 from line 30. Enter the portion from casualty or theft on Form 4684, line 33. Enter the portion from other than casualty or theft on Form 4797, line 6 | | 32 | |

| Part IV | Recapture Amounts Under Sections 179 and 280F(b)(2) When Business Use Drops to 50% or Less (see instructions) | |
|---|---|---|

| | | | (a) Section 179 | (b) Section 280F(b)(2) |
|---|---|---|---|---|
| **33** Section 179 expense deduction or depreciation allowable in prior years | 33 | | | |
| **34** Recomputed depreciation. See instructions | 34 | | | |
| **35** Recapture amount. Subtract line 34 from line 33. See the instructions for where to report | 35 | | | |

918002
12-04-19

Form **4797** (2019)

ALTERNATIVE MINIMUM TAX

**Sales of Business Property**

(Also Involuntary Conversions and Recapture Amounts Under Sections 179 and 280F(b)(2))

Form **4797**

Department of the Treasury
Internal Revenue Service

► **Attach to your tax return.**
► **Go to www.irs.gov/Form4797 for instructions and the latest information.**

OMB No. 1545-0184

**2019**

Attachment
Sequence No. **27**

| Name(s) shown on return | Identifying number |
|---|---|
| ALECTO HEALTHCARE SERVICES LLC | 46-0829723 |

**1** Enter the gross proceeds from sales or exchanges reported to you for 2019 on Form(s) 1099-B or 1099-S (or substitute statement) that you are including on line 2, 10, or 20. See instructions **| 1 |**

**Part I**  **Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft - Most Property Held More Than 1 Year** (see instructions)

| (a) Description of property | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Gross sales price | (e) Depreciation allowed or allowable since acquisition | (f) Cost or other basis, plus improvements and expense of sale | (g) Gain or (loss) Subtract (f) from the sum of (d) and (e) |
|---|---|---|---|---|---|---|
| 2 PASSTHROUGH FROM ALECTO HEALTHCARE SERVICES FAIRMONT LLC | | | | | | -1,918. |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| **3** Gain, if any, from Form 4684, line 39 | | **3** | |
| **4** Section 1231 gain from installment sales from Form 6252, line 26 or 37 | | **4** | |
| **5** Section 1231 gain or (loss) from like-kind exchanges from Form 8824 | | **5** | |
| **6** Gain, if any, from line 32, from other than casualty or theft | | **6** | |
| **7** Combine lines 2 through 6. Enter the gain or (loss) here and on the appropriate line as follows | | **7** | -1,918. |

**Partnerships and S corporations.** Report the gain or (loss) following the instructions for Form 1065, Schedule K, line 10, or Form 1120-S, Schedule K, line 9. Skip lines 8, 9, 11, and 12 below.

**Individuals, partners, S corporation shareholders, and all others.** If line 7 is zero or a loss, enter the amount from line 7 on line 11 below and skip lines 8 and 9. If line 7 is a gain and you didn't have any prior year section 1231 losses, or they were recaptured in an earlier year, enter the gain from line 7 as a long-term capital gain on the Schedule D filed with your return and skip lines 8, 9, 11, and 12 below.

| | | | |
|---|---|---|---|
| **8** Nonrecaptured net section 1231 losses from prior years. See instructions | | **8** | |
| **9** Subtract line 8 from line 7. If zero or less, enter -0-. If line 9 is zero, enter the gain from line 7 on line 12 below. If line 9 is more than zero, enter the amount from line 8 on line 12 below and enter the gain from line 9 as a long-term capital gain on the Schedule D filed with your return. See instructions | | **9** | |

**Part II**  **Ordinary Gains and Losses** (see instructions)

**10** Ordinary gains and losses not included on lines 11 through 16 (include property held 1 year or less):

| | | | | | | |
|---|---|---|---|---|---|---|
| PASSTHROUGH FROM ALECTO HEALTHCARE SERVICES FAIRMONT LLC | | | | | | -1,030. |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| **11** Loss, if any, from line 7 | | **11** ( ) |
| **12** Gain, if any, from line 7 or amount from line 8, if applicable | | **12** | |
| **13** Gain, if any, from line 31 | | **13** | |
| **14** Net gain or (loss) from Form 4684, lines 31 and 38a | | **14** | |
| **15** Ordinary gain from installment sales from Form 6252, line 25 or 36 | | **15** | |
| **16** Ordinary gain or (loss) from like-kind exchanges from Form 8824 | | **16** | |
| **17** Combine lines 10 through 16 | | **17** | -1,030. |

**18** For all except individual returns, enter the amount from line 17 on the appropriate line of your return and skip lines a and b below. For individual returns, complete lines a and b below.

**a** If the loss on line 11 includes a loss from Form 4684, line 35, column (b)(ii), enter that part of the loss here. Enter the loss from income-producing property on Schedule A (Form 1040 or Form 1040-SR), line 16. (Do not include any loss on property used as an employee.) Identify as from "Form 4797, line 18a." See instructions **| 18a |**

**b** Redetermine the gain or (loss) on line 17 excluding the loss, if any, on line 18a. Enter here and on Schedule 1 (Form 1040 or Form 1040-SR), Part I, line 4 **| 18b |**

LHA **For Paperwork Reduction Act Notice, see separate instructions.**

Form **4797** (2019)

918001
12-04-19

CONFIDENTIAL

A1200

ALECTO_00027128

ALECTO HEALTHCARE SERVICES LLC                                        46-0829723

Form 4797 (2019)                  **ALTERNATIVE MINIMUM TAX**                        Page **2**

| **Part III** | Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255 (see instructions) | | |
|---|---|---|---|

| 19 (a) Description of section 1245, 1250, 1252, 1254, or 1255 property: | | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) |
|---|---|---|---|
| A | | | |
| B | | | |
| C | | | |
| D | | | |

| These columns relate to the properties on lines 19A through 19D. ▶ | | Property A | Property B | Property C | Property D |
|---|---|---|---|---|---|
| 20 | Gross sales price (**Note:** See line 1 before completing.) | 20 | | | | |
| 21 | Cost or other basis plus expense of sale | 21 | | | | |
| 22 | Depreciation (or depletion) allowed or allowable | 22 | | | | |
| 23 | Adjusted basis. Subtract line 22 from line 21 | 23 | | | | |
| 24 | Total gain. Subtract line 23 from line 20 | 24 | | | | |
| 25 | If section 1245 property: | | | | | |
| a | Depreciation allowed or allowable from line 22 | 25a | | | | |
| b | Enter the **smaller** of line 24 or 25a | 25b | | | | |
| 26 | If section 1250 property: If straight line depreciation was used, enter -0- on line 26g, except for a corporation subject to section 291. | | | | | |
| a | Additional depreciation after 1975 | 26a | | | | |
| b | Applicable percentage multiplied by the **smaller** of line 24 or line 26a | 26b | | | | |
| c | Subtract line 26a from line 24. If residential rental property **or** line 24 isn't more than line 26a, skip lines 26d and 26e | 26c | | | | |
| d | Additional depreciation after 1969 and before 1976 | 26d | | | | |
| e | Enter the **smaller** of line 26c or 26d | 26e | | | | |
| f | Section 291 amount (corporations only) | 26f | | | | |
| g | Add lines 26b, 26e, and 26f | 26g | | | | |
| 27 | If section 1252 property: Skip this section if you didn't dispose of farmland or if this form is being completed for a partnership. | | | | | |
| a | Soil, water, and land clearing expenses | 27a | | | | |
| b | Line 27a multiplied by applicable percentage | 27b | | | | |
| c | Enter the **smaller** of line 24 or 27b | 27c | | | | |
| 28 | If section 1254 property: | | | | | |
| a | Intangible drilling and development costs, expenditures for development of mines and other natural deposits, mining exploration costs, and depletion | 28a | | | | |
| b | Enter the **smaller** of line 24 or 28a | 28b | | | | |
| 29 | If section 1255 property: | | | | | |
| a | Applicable percentage of payments excluded from income under section 126 | 29a | | | | |
| b | Enter the **smaller** of line 24 or 29a | 29b | | | | |

**Summary of Part III Gains.** Complete property columns A through D through line 29b before going to line 30.

| | | | |
|---|---|---|---|
| 30 | Total gains for all properties. Add property columns A through D, line 24 | 30 | |
| 31 | Add property columns A through D, lines 25b, 26g, 27c, 28b, and 29b. Enter here and on line 13 | 31 | |
| 32 | Subtract line 31 from line 30. Enter the portion from casualty or theft on Form 4684, line 33. Enter the portion from other than casualty or theft on Form 4797, line 6 | 32 | |

| **Part IV** | Recapture Amounts Under Sections 179 and 280F(b)(2) When Business Use Drops to 50% or Less (see instructions) | | |
|---|---|---|---|

| | | | (a) Section 179 | (b) Section 280F(b)(2) |
|---|---|---|---|---|
| 33 | Section 179 expense deduction or depreciation allowable in prior years | 33 | | |
| 34 | Recomputed depreciation. See instructions | 34 | | |
| 35 | Recapture amount. Subtract line 34 from line 33. See the instructions for where to report | 35 | | |

918002
12-04-19                                                                   Form **4797** (2019)

Form **8308**
(Rev. September 2018)
Department of the Treasury
Internal Revenue Service

## Report of a Sale or Exchange of Certain Partnership Interests

▶ Go to www.irs.gov/Form8308 for the latest information.

OMB No. 1545-0123

| Name of partnership | Phone number | Employer identification number |
|---|---|---|
| ALECTO HEALTHCARE SERVICES LLC | 323-932-5963 | 46-0829723 |

Number, street, and room or suite no. If a P.O. box, see instructions.
16310 BAKE PARKWAY SUITE 200

City or town, state or province, country, and ZIP or foreign postal code
IRVINE, CA  92618

**Part I**   **Transferor Information**  (Beneficial owner of the partnership interest immediately before the transfer of that interest)

| Name | Identifying number |
|---|---|
| PANCH JEYAKUMAR | ▮▮▮▮▮▮ |

Number and street (including apt. no.)
▮▮▮▮▮▮

City or town, state or province, country, and ZIP or foreign postal code
TUSTIN, CA  92782

**Notice to Transferors:** *The information on this form has been supplied to the Internal Revenue Service. The transferor in a section 751(a) exchange is required to treat a portion of the gain realized from the exchange as ordinary income. For more details, see Pub. 541, Partnerships.*

**Statement by Transferor:** *The transferor in a section 751(a) exchange is required under Regulations section 1.751-1(a)(3) to attach a statement relating to the sale or exchange to his or her return.*

**Part II**   **Transferee Information**  (Beneficial owner of the partnership interest immediately after the transfer of that interest)

| Name | Identifying number |
|---|---|
| LAXMAN REDDY | ▮▮▮▮▮▮ |

Number and street (including apt. no.)
▮▮▮▮▮▮

City or town, state or province, country, and ZIP or foreign postal code
CALABASAS, CA  91302

**Part III**   **Date of Sale or Exchange of Partnership Interest**  ▶   12/31/19

| **Sign here only if you are filing this form by itself and not with Form 1065** | Under penalties of perjury, I declare that I have examined this return, including accompanying attachments, and to the best of my knowledge and belief, it is true, correct, and complete. | |
|---|---|---|
| | ▶  Signature of partnership representative or partner or limited liability company member | ▶  Date |

LHA
9 199 71
04-01-19

Form **8308** (Rev. 9-2018)

17

CONFIDENTIAL                    **A1202**                    ALECTO_00027130

Form **8308**
(Rev. September 2018)
Department of the Treasury
Internal Revenue Service

### Report of a Sale or Exchange of Certain Partnership Interests

▶ Go to www.irs.gov/Form8308 for the latest information.

OMB No. 1545-0123

| Name of partnership | Phone number | Employer identification number |
|---|---|---|
| ALECTO HEALTHCARE SERVICES LLC | 323-932-5963 | 46-0829723 |

Number, street, and room or suite no. If a P.O. box, see instructions.
16310 BAKE PARKWAY SUITE 200

City or town, state or province, country, and ZIP or foreign postal code
IRVINE, CA  92618

**Part I**  **Transferor Information**  (Beneficial owner of the partnership interest immediately before the transfer of that interest)

Name
AMAN DHUPER

Identifying number ▮▮▮▮▮

Number and street (including apt. no.)
▮▮▮▮▮

City or town, state or province, country, and ZIP or foreign postal code
RANCHO CUCAMONGA, CA  91739

**Notice to Transferors:** *The information on this form has been supplied to the Internal Revenue Service. The transferor in a section 751(a) exchange is required to treat a portion of the gain realized from the exchange as ordinary income. For more details, see Pub. 541, Partnerships.*

**Statement by Transferor:** *The transferor in a section 751(a) exchange is required under Regulations section 1.751-1(a)(3) to attach a statement relating to the sale or exchange to his or her return.*

**Part II**  **Transferee Information**  (Beneficial owner of the partnership interest immediately after the transfer of that interest)

Name
LAXMAN REDDY

Identifying number ▮▮▮▮▮

Number and street (including apt. no.)
▮▮▮▮▮

City or town, state or province, country, and ZIP or foreign postal code
CALABASAS, CA  91302

**Part III**  **Date of Sale or Exchange of Partnership Interest**  ▶    12/31/19

| Sign here only if you are filing this form by itself and not with Form 1065 | Under penalties of perjury, I declare that I have examined this return, including accompanying attachments, and to the best of my knowledge and belief, it is true, correct, and complete. | |
|---|---|---|
| | ▶ Signature of partnership representative or partner or limited liability company member | ▶ Date |

LHA
919971
04-01-19

Form **8308** (Rev. 9-2018)

18

10340904 146892 629917                    2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

CONFIDENTIAL                    A1203                    ALECTO_00027131

Form **8916-A**
(Rev. November 2019)
Department of the Treasury
Internal Revenue Service

## Supplemental Attachment to Schedule M-3

▶ Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120-S.
▶ Go to www.irs.gov/Form1120 for the latest information.

OMB No. 1545-0123

| Name of common parent | Employer identification number |
|---|---|
| ALECTO HEALTHCARE SERVICES LLC | 46-0829723 |
| Name of subsidiary | Employer identification number |

### Part I   Cost of Goods Sold

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1 Amounts attributable to cost flow assumptions | | | | |
| 2 Amounts attributable to: | | | | |
| a Stock option expense | | | | |
| b Other equity-based compensation | | | | |
| c Meals and entertainment | | | | |
| d Parachute payments | | | | |
| e Compensation with section 162(m) limitation | | | | |
| f Pension and profit sharing | | | | |
| g Other post-retirement benefits | | | | |
| h Deferred compensation | | | | |
| i Reserved | | | | |
| j Amortization | | | | |
| k Depletion | | | | |
| l Depreciation | | | | |
| m Corporate-owned life insurance premiums | | | | |
| n Other section 263A costs | | | | |
| 3 Inventory shrinkage accruals | | | | |
| 4 Excess inventory and obsolescence reserves | | | | |
| 5 Lower of cost or market write-downs | | | | |
| 6 Other items with differences (attach statement) | | | | |
| 7 Other items with no differences | | | | |
| 8 **Total cost of goods sold.** Add lines 1 through 7 in columns a, b, c, and d. Enter totals on the applicable Schedule M-3. See instructions | | | | |

LHA   **For Paperwork Reduction Act Notice, see instructions.**

Form **8916-A** (Rev. 11-2019)

913315
12-11-19

19

CONFIDENTIAL

A1204

ALECTO_00027132

Form 8916-A (Rev. 11-2019)  **ALECTO HEALTHCARE SERVICES LLC**                46-0829723  Page **2**

| Part II | Interest Income | | | | |
|---|---|---|---|---|---|
| | Interest Income Item | (a) Income (Loss) per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Income (Loss) per Tax Return |
| 1 | Tax-exempt interest income | | | | |
| 2 | Interest income from hybrid securities | | | | |
| 3 | Sale/lease interest income | | | | |
| 4a | Intercompany interest income - From outside tax affiliated group | | | | |
| 4b | Intercompany interest income - From tax affiliated group | | | | |
| 5 | Other interest income           STMT 26 | 88. | | | 88. |
| 6 | Total interest income. Add lines 1 through 5 in columns a, b, c, and d. Enter total on the applicable Schedule M-3. See instructions. | 88. | | | 88. |

| Part III | Interest Expense | | | | |
|---|---|---|---|---|---|
| | Interest Expense Item | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
| 1 | Interest expense from hybrid securities | | | | |
| 2 | Lease/purchase interest expense | | | | |
| 3a | Intercompany interest expense - Paid to outside tax affiliated group | | | | |
| 3b | Intercompany interest expense - Paid to tax affiliated group | | | | |
| 4 | Other interest expense          STMT 27 | 187,281. | -187,193. | | 88. |
| 5 | Total interest expense. Add lines 1 through 4 in columns a, b, c, and d. Enter total on the applicable Schedule M-3. See instructions. | 187,281. | -187,193. | | 88. |

Form **8916-A**  (Rev. 11-2019)

913316
12-11-19

10340904 146892 629917          2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

CONFIDENTIAL                    **A1205**                    ALECTO_00027133

Form **8925**

(Rev. September 2017)

Department of the Treasury
Internal Revenue Service (99)

## Report of Employer-Owned Life Insurance Contracts

▶ Attach to the policyholder's tax return. See instructions.
▶ Go to www.irs.gov/Form8925 for the latest information.

OMB No. 1545-2089

Attachment
Sequence No. **160**

| Name(s) shown on return | Identifying number |
|---|---|
| ALECTO HEALTHCARE SERVICES LLC | 46-0829723 |

| Name of policyholder, if different from above | Identifying number, if different from above |
|---|---|
| 2 | |

Type of business

| | | | |
|---|---|---|---|
| **1** | Enter the number of employees the policyholder had at the end of the tax year .............. | **1** | 11. |
| **2** | Enter the number of employees included on line 1 who were insured at the end of the tax year under the policyholder's employer-owned life insurance contract(s) issued after August 17, 2006. See *Section 1035 exchanges* for an exception ...................... | **2** | 2. |
| **3** | Enter the total amount of employer-owned life insurance in force at the end of the tax year for employees who were insured under the contract(s) specified on line 2 ...................... | **3** | 5,500,000. |
| **4a** | Does the policyholder have a valid consent for each employee included on line 2? See instructions ...................... [X] Yes [ ] No | | |
| **b** | If "No," enter the number of employees included on line 2 for whom the policyholder does not have a valid consent ...................... | **4b** | |

920591 04-01-19    LHA    **For Paperwork Reduction Act Notice, see instructions.**

Form **8925** (Rev. 9-2017)

21

10340904 146892 629917                    2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

CONFIDENTIAL

A1206

ALECTO_00027134

Form **8990**
(Rev. May 2020)
Department of the Treasury
Internal Revenue Service

# Limitation on Business Interest Expense Under Section 163(j)

▶ **Attach to your tax return.**

▶ **Go to www.irs.gov/Form8990 for instructions and the latest information.**

OMB No. 1545-0123

| Taxpayer name(s) shown on tax return | Identification number |
|---|---|
| ALECTO HEALTHCARE SERVICES LLC | 46-0829723 |

If Form 8990 relates to an information return for a foreign entity (for example, Form 5471), enter:

Name of foreign entity ▶ _____

Employer identification number, if any ▶ _____

Reference ID number ▶ _____

**Part I** | **Computation of Allowable Business Interest Expense**

*Part I is completed by all taxpayers subject to section 163(j). Schedule A and Schedule B need to be completed before Part I when the taxpayer is a partner or shareholder of a pass-through entity subject to section 163(j).*

## Section I - Business Interest Expense

| | | | |
|---|---|---|---|
| 1 | Current year business interest expense (not including floor plan financing interest expense), before the section 163(j) limitation | 1 | 187,281. |
| 2 | Disallowed business interest expense carryforwards from prior years. (Does not apply to a partnership) | 2 | |
| 3 | Partner's excess business interest expense treated as paid or accrued in current year (Schedule A, line 44, column (h)) | 3 | |
| 4 | Floor plan financing interest expense. See instructions | 4 | |
| 5 | **Total business interest expense.** Add lines 1 through 4 ▶ | 5 | 187,281. |

## Section II - Adjusted Taxable Income

### Taxable Income

| | | | |
|---|---|---|---|
| 6 | **Taxable income.** See instructions | 6 | -49,081,629. |

### Additions (adjustments to be made if amounts are taken into account on line 6)

| | | | |
|---|---|---|---|
| 7 | Any item of loss or deduction that is not properly allocable to a trade or business of the taxpayer. See instructions | 7 | |
| 8 | Any business interest expense not from a pass-through entity. See instructions | 8 | 187,281. |
| 9 | Amount of any net operating loss deduction under section 172 | 9 | |
| 10 | Amount of any qualified business income deduction allowed under section 199A | 10 | |
| 11 | Deduction allowable for depreciation, amortization, or depletion attributable to a trade or business. See instructions | 11 | 5,882. |
| 12 | Amount of any loss or deduction items from a pass-through entity. See instructions | 12 | 48,836,790. |
| 13 | Other additions. See instructions | 13 | |
| 14 | Total current year partner's excess taxable income (Schedule A, line 44, column (f)) | 14 | |
| 15 | Total current year S corporation shareholder's excess taxable income (Schedule B, line 46, column (c)) | 15 | |
| 16 | **Total.** Add lines 7 through 15 ▶ | 16 | 49,029,953. |

### Reductions (adjustments to be made if amounts are taken into account on line 6)

| | | | |
|---|---|---|---|
| 17 | Any item of income or gain that is not properly allocable to a trade or business of the taxpayer. See instructions | 17 | ( ) |
| 18 | Any business interest income not from a pass-through entity. See instructions | 18 | ( 88.) |
| 19 | Amount of any income or gain items from a pass-through entity. See instructions | 19 | ( 232,183.) |
| 20 | Other reductions. See instructions | 20 | ( ) |
| 21 | **Total.** Combine lines 17 through 20 ▶ | 21 | 232,271.) |
| 22 | **Adjusted taxable income.** Combine lines 6, 16, and 21. (If zero or less, enter -0-.) ▶ | 22 | |

LHA  **For Paperwork Reduction Act Notice, see the instructions.**

Form **8990** (Rev. 5-2020)

923211 06-29-20

22

10340904 146892 629917                    2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

CONFIDENTIAL

ALECTO_00027135

Form 8990 (Rev. 5-2020)                                                                                                          Page **2**

## Section III - Business Interest Income

| | | | | | |
|---|---|---|---|---|---|
| 23 | Current year business interest income. See instructions ......................... | 23 | 88. | | |
| 24 | Excess business interest income from pass-through entities (total of Schedule A, line 44, column (g), and Schedule B, line 46, column (d)) ........... | 24 | | | |
| 25 | **Total.** Add lines 23 and 24 ..................................................................... ▶ | | | 25 | 88. |

## Section IV - Section 163(j) Limitation Calculations

### Limitation on Business Interest Expense

| | | | | | |
|---|---|---|---|---|---|
| 26 | Multiply adjusted taxable income (line 22) by the applicable percentage. See instructions .............................................................................. | 26 | | | |
| 27 | Business interest income (line 25) ................................................. | 27 | 88. | | |
| 28 | Floor plan financing interest expense (line 4) ................................. | 28 | | | |
| 29 | **Total.** Add lines 26, 27, and 28 .......................................................... ▶ | | | 29 | 88. |

### Allowable Business Interest Expense

| | | | |
|---|---|---|---|
| 30 | **Total current year business interest expense deduction.** See instructions ............................. | 30 | 88. |

### Carryforward

| | | | |
|---|---|---|---|
| 31 | **Disallowed business interest expense.** Subtract line 29 from line 5. (If zero or less, enter -0-.) .................. | 31 | 187,193. |

| Part II | Partnership Pass-Through Items |
|---|---|

*Part II is only completed by a partnership that is subject to section 163(j). The partnership items below are allocated to the partners and are not carried forward by the partnership. See the instructions for more information.*

### Excess Business Interest Expense

| | | | |
|---|---|---|---|
| 32 | **Excess business interest expense.** Enter amount from line 31 ..................................... | 32 | 187,193. |

### Excess Taxable Income   (If you entered an amount on line 32, skip lines 33 through 37.)

| | | | |
|---|---|---|---|
| 33 | Subtract the sum of lines 4 and 25 from line 5. (If zero or less, enter -0-.) ........................... | 33 | |
| 34 | Subtract line 33 from line 26. (If zero or less, enter -0-.) ............................................. | 34 | |
| 35 | Divide line 34 by line 26. Enter the result as a decimal. (If line 26 is zero, enter -0-.) ................. | 35 | |
| 36 | **Excess taxable income.** Multiply line 35 by line 22 ................................................. | 36 | |

### Excess Business Interest Income

| | | | |
|---|---|---|---|
| 37 | **Excess business interest income.** Subtract the sum of lines 1, 2, and 3 from line 25. (If zero or less, enter -0-.) | 37 | |

| Part III | S Corporation Pass-Through Items |
|---|---|

*Part III is only completed by S corporations that are subject to section 163(j). The S corporation items below are allocated to the shareholders. See the instructions for more information.*

### Excess Taxable Income

| | | | |
|---|---|---|---|
| 38 | Subtract the sum of lines 4 and 25 from line 5. (If zero or less, enter -0-.) ........................... | 38 | |
| 39 | Subtract line 38 from line 26. (If zero or less, enter -0-.) ............................................. | 39 | |
| 40 | Divide line 39 by line 26. Enter the result as a decimal. (If line 26 is zero, enter -0-.) ................. | 40 | |
| 41 | **Excess taxable income.** Multiply line 40 by line 22 ................................................. | 41 | |

### Excess Business Interest Income

| | | | |
|---|---|---|---|
| 42 | **Excess business interest income.** Subtract the sum of lines 1, 2, and 3 from line 25. (If zero or less, enter -0-.) | 42 | |

Form **8990** (Rev. 5-2020)

923212 06-29-20

10340904 146892 629917                    2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

CONFIDENTIAL                    **A1208**                    ALECTO_00027136

Form 8990 (Rev. 5-2020)                                                                                                    Page **3**

**SCHEDULE A    Summary of Partner's Section 163(j) Excess Items**

Any taxpayer that owns an interest in a partnership subject to section 163(j) should complete Schedule A before completing Part I.

| (a) Name of partnership | (b) EIN | Excess Business Interest Expense (c) Current year | (d) Prior year carryforward | (e) Total ((c) plus (d)) | (f) Current year excess taxable income | (g) Current year excess business interest income | (h) Excess business interest expense treated as paid or accrued (see instructions) | (i) Current year excess business interest expense carryforward ((e) minus (h)) |
|---|---|---|---|---|---|---|---|---|
| 43 ALECTO HEALTHCARE SERVICES LOS ANGELES | 90-0999512 | 2,728,405. | 2,412,792. | 5,141,197. | 0. | 0. | 0. | 5,141,197. |
| ALECTO HEALTHCARE SERVICES FAIRMONT LLC | 35-2507149 | 1,856,996. | | 0. | 1,856,996. | 0. | 0. | 1,856,996. |
| ALECTO HEALTHCARE SERVICES SHERMAN LLC | 37-1760423 | 1,607,374. | 1,324,556. | 2,931,930. | 0. | 0. | 0. | 2,931,930. |
| ALECTO HEALTHCARE SERVICES OHIO VALLEY, LLC | 36-4857044 | 1,597,701. | 1,120,897. | 2,718,598. | 0. | 0. | 0. | 2,718,598. |
| | | | | | | | | |
| | | | | | | | | |
| **44  Total** ▶ | | | | | 0. | 0. | 0. | |

**SCHEDULE B    Summary of S Corporation Shareholder's Excess Taxable Income and Excess Business Interest Income**

Any taxpayer that is required to complete Part I and is a shareholder in an S corporation that has excess taxable income or excess business interest income should complete Schedule B before completing Part I.

| (a) Name of S corporation | (b) EIN | (c) Current year excess taxable income | (d) Current year excess business interest income |
|---|---|---|---|
| 45 | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **46  Total** ▶ | | 0. | 0. |

Form **8990** (Rev. 5-2020)

923213 06-29-20

24

**CONFIDENTIAL**

**A1209**

**ALECTO_00027137**

Section 1.263(a)-1(f) De Minimis Safe Harbor Election

Alecto Healthcare Services LLC
16310 Bake Parkway Suite 200
Irvine, CA  92618

Employer Identification Number:  46-0829723

For the Year Ending December 31, 2019

Alecto Healthcare Services LLC is making the de minimis safe harbor election under Reg. Sec. 1.263(a)-1(f).

CONFIDENTIAL

A1210

ALECTO_00027138

ALECTO HEALTHCARE SERVICES LLC                                          46-0829723

---

| FORM 1065 | INCOME (LOSS) FROM OTHER PARTNERSHIPS, ETC. | | STATEMENT 1 |
|---|---|---|---|

| NAME AND ADDRESS | EMPLOYER ID | AMOUNT |
|---|---|---|
| ALECTO HEALTHCARE SERVICES LOS ANGELES | | |
| 5000 E SPRING ST STE 400 | | |
| LONG BEACH, CA 90815 | 90-0999512 | -2,122,748. |
| ALECTO HEALTHCARE SERVICES FAIRMONT LLC | | |
| 1325 LOCUST AVENUE | | |
| FAIRMONT, WV 26554 | 35-2507149 | -5,386,507. |
| ALECTO HEALTHCARE SERVICES SHERMAN LLC | | |
| 500 N. HIGHLAND AVENUE | | |
| SHERMAN, TX 75092 | 37-1760423 | -3,852,294. |
| ALECTO HEALTHCARE SERVICES OHIO VALLEY, LLC | | |
| 16310 BAKE PARKWAY SUITE 200 | | |
| IRVINE, CA 92618 | 36-4857044 | -37,462,783. |
| | | |
| TOTAL TO FORM 1065, LINE 4 | | -48,824,332. |

---

| FORM 1065 | OTHER INCOME | STATEMENT 2 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| OTHER INCOME | 20,980. |
| TOTAL TO FORM 1065, LINE 7 | 20,980. |

---

| FORM 1065 | TAX EXPENSE | STATEMENT 3 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| CALIFORNIA TAXES - BASED ON INCOME | 4,800. |
| PAYROLL TAXES | 145,810. |
| TAXES AND LICENSES | 7,200. |
| TOTAL TO FORM 1065, LINE 14 | 157,810. |

CONFIDENTIAL                        A1211                        ALECTO_00027139

ALECTO HEALTHCARE SERVICES LLC                                    46-0829723

---

FORM 1065                    OTHER DEDUCTIONS                    STATEMENT 4

---

| DESCRIPTION | AMOUNT |
|---|---|
| AMORTIZATION EXPENSE | 4,704. |
| AUTOMOBILE EXPENSE | 22,998. |
| BANK SERVICE CHARGES | 21,466. |
| COMPUTER AND INTERNET EXPENSES | 12,593. |
| DUES AND SUBSCRIPTIONS | 13,537. |
| INSURANCE | 102,537. |
| MEALS | 5,403. |
| PROFESSIONAL FEES | 227,313. |
| PURCHASED SERVICES | 202,802. |
| SUPPLIES AND OTHER | 11,651. |
| TRAVEL EXPENSES | 97,427. |
| UTILITIES | 29,943. |
| TOTAL TO FORM 1065, LINE 20 | 752,374. |

10340904 146892 629917        2019.04020 ALECTO HEALTHCARE SERVICE 629917_1

CONFIDENTIAL                    **A1212**                    ALECTO_00027140

ALECTO HEALTHCARE SERVICES LLC                                46-0829723

---

|  | THE ENTITY OWNS 20% OR MORE DIRECTLY OR 50% OR MORE OVERALL OF PARTNERSHIPS OR TRUSTS | STATEMENT 5 |

| NAME OF ENTITY | EIN NUMBER | |
| --- | --- | --- |
|  | COUNTRY OF ORGANIZATION | PCT OWNED |
| SPAULDING MANAGMENT LLC | 27-4025215 | |
|  | UNITED STATES | 100.00 |
| ALECTO HEALTHCARE SERVICES LOS ANGELES | 90-0999512 | |
|  | UNITED STATES | 100.00 |
| ACCELERON SERVICES LLC | 90-0987801 | |
|  | UNITED STATES | 100.00 |
| ALECTO HEALTHCARE SERVICES HAYWARD LLC | 36-4743580 | |
|  | UNITED STATES | 100.00 |
| ALECTO HEALTHCARE SERVICES INDIANA LLC | | |
|  | UNITED STATES | 100.00 |
| UNITED MEDICAL MANAGEMENT LLC | 38-3933131 | |
|  | UNITED STATES | 100.00 |
| OLYMPIA HEALTH CARE LLC | 42-1643090 | |
|  | UNITED STATES | 64.00 |
| ALECTO HEALTHCARE SERVICES FAIRMONT LLC | 35-2507149 | |
|  | UNITED STATES | 80.00 |
| ALECTO HEALTHCARE SERVICES SHERMAN LLC | 37-1760423 | |
|  | UNITED STATES | 80.00 |
| SHERMAN/GRAYSON HOSPITAL LLC | 27-2025690 | |
|  | UNITED STATES | 80.00 |
| SHERMAN/GRAYSON HEALTH SERVICES LLC | 27-2025835 | |
|  | UNITED STATES | 80.00 |
| SHERMAN/GRAYSON SPONSOR LLC | 35-2518088 | |
|  | UNITED STATES | 80.00 |
| ALECTO HEALTHCARE SERVICES FAIRMONT HOSPI | 47-1310470 | |
|  | UNITED STATES | 80.00 |
| HORIZON REAL ESTATE HOLDINGS LLC | 57-1226547 | |
|  | UNITED STATES | 80.00 |
| ALECTO HEALTHCARE SERVICES OHIO VALLEY | 36-4857044 | |
|  | UNITED STATES | 80.00 |
| ALECTO HEALTHCARE SERVICES WHEELING, LLC | 37-1848845 | |
|  | UNITED STATES | 80.00 |
| ALECTO HEALTHCARE SERVICES MARTINS FERRY | 37-1848949 | |
|  | UNITED STATES | 80.00 |

CONFIDENTIAL                          A1213                          ALECTO_00027141

ALECTO HEALTHCARE SERVICES LLC                                    46-0829723

| SCHEDULE K | INTEREST INCOME | STATEMENT 6 |
|---|---|---|

| DESCRIPTION | U.S. BONDS | OTHER |
|---|---|---|
| INTEREST - ALECTO HEALTHCARE SERVICES LOS ANGELES | | 169,969. |
| INTEREST - ALECTO HEALTHCARE SERVICES OHIO VALLEY, LLC | | 48. |
| INTEREST - ALECTO HEALTHCARE SERVICES SHERMAN LLC | | 62,166. |
| INTEREST INCOME | | 88. |
| TOTAL TO SCHEDULE K, LINE 5 | | 232,271. |

| SCHEDULE K | CHARITABLE CONTRIBUTIONS | STATEMENT 7 |
|---|---|---|

| DESCRIPTION | TYPE | AMOUNT |
|---|---|---|
| CONTRIBUTIONS - ALECTO HEALTHCARE SERVICES FAIRMONT LLC | CASH (60%) | 5,740. |
| CONTRIBUTIONS - ALECTO HEALTHCARE SERVICES LOS ANGELES | CASH (60%) | 4,800. |
| CHARITABLE CONTRIBUTIONS | CASH (60%) | 14,150. |
| TOTALS TO SCHEDULE K, LINE 13A | | 24,690. |

| SCHEDULE K | OTHER DEDUCTIONS | STATEMENT 8 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| EXCESS BUSINESS INTEREST EXPENSE | 187,193. |
| TOTAL INCLUDED IN SCHEDULE K, LINE 13D | 187,193. |

CONFIDENTIAL                    A1214                    ALECTO_00027142

ALECTO HEALTHCARE SERVICES LLC                                      46-0829723

| SCHEDULE K | ADJUSTED GAIN OR LOSS | STATEMENT 9 |
| --- | --- | --- |

| DESCRIPTION | AMOUNT |
| --- | --- |
| AMT BASIS ADJUSTMENT FROM PASSTHROUGH | -1,030. |
| TOTAL TO SCHEDULE K, LINE 17B | -1,030. |

| | SUBJECT TO SPECIAL RATES | AMOUNT |
| --- | --- | --- |
| ADJUSTED GAIN OR LOSS ALLOCABLE TO: | | |
| ORDINARY GAIN OR LOSS | | -1,030. |
| SHORT-TERM CAPITAL GAIN OR LOSS | | |
| LONG-TERM CAPITAL GAIN OR LOSS | | |
| SECTION 1231 GAIN OR LOSS | | |
| COLLECTIBLES - 28% RATE | | |
| UNRECAPTURED SECTION 1250 GAIN - 25% RATE | | |

| SCHEDULE K | NONDEDUCTIBLE EXPENSE | STATEMENT 10 |
| --- | --- | --- |

| DESCRIPTION | AMOUNT |
| --- | --- |
| EXCLUDED MEALS AND ENTERTAINMENT EXPENSES | 5,403. |
| NONDEDUCTIBLE EXPENSE FROM PASSTHROUGH | 127,749. |
| OFFICER'S LIFE INSURANCE | 25,837. |
| TOTAL TO SCHEDULE K, LINE 18C | 158,989. |

| SCHEDULE K | OTHER ITEMS | STATEMENT 11 |
| --- | --- | --- |

| DESCRIPTION | AMOUNT |
| --- | --- |
| SECTION 199A - ORDINARY INCOME (LOSS) | -49,258,702. |
| SECTION 199A W-2 WAGES | 113,913,392. |
| SECTION 199A UNADJUSTED BASIS OF ASSETS | 43,971,941. |
| BEGINNING TAX CAPITAL | -31,853,158. |
| ENDING TAX CAPITAL | -72,149,298. |

CONFIDENTIAL                          A1215                      ALECTO_00027143

ALECTO HEALTHCARE SERVICES LLC                                              46-0829723

| SCHEDULE M-2 | DISTRIBUTIONS | STATEMENT 12 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| TRANSFERRED CAPITAL | 2,238,651. |
| TOTAL TO SCHEDULE M-2, LINE 6A | 2,238,651. |

| SCHEDULE L | OTHER CURRENT ASSETS | STATEMENT 13 |
|---|---|---|

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| DUE FROM AFFILIATE | 50,000. | 50,000. |
| OTHER CURRENT ASSETS | 46,356. | 79,756. |
| OTHER RECEIVABLES | 0. | 34,704. |
| PREPAID EXPENSES | 452,084. | 488,500. |
| TOTAL TO SCHEDULE L, LINE 6 | 548,440. | 652,960. |

| SCHEDULE L | OTHER INVESTMENTS | STATEMENT 14 |
|---|---|---|

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| INTERCOMPANY RECEIVABLE | 15,670,881. | 25,489,819. |
| TOTAL TO SCHEDULE L, LINE 8 | 15,670,881. | 25,489,819. |

| SCHEDULE L | OTHER CURRENT LIABILITIES | STATEMENT 15 |
|---|---|---|

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| ACCRUED PAYROLL | 158,472. | 88,910. |
| ACCRUED PTO | 132,997. | 99,470. |
| OTHER ACCRUED EXPENSES | 603,422. | 1,047,390. |
| TOTAL TO SCHEDULE L, LINE 17 | 894,891. | 1,235,770. |

CONFIDENTIAL                           A1216                           ALECTO_00027144

ALECTO HEALTHCARE SERVICES LLC                                      46-0829723

---

FORM 1065              PARTNERS' CAPITAL ACCOUNT SUMMARY            STATEMENT 16

---

| PARTNER NUMBER | BEGINNING CAPITAL | CAPITAL CONTRIBUTED | SCHEDULE M-2 LNS 3, 4 & 7 | WITH-DRAWALS | ENDING CAPITAL |
|---|---|---|---|---|---|
| 1 | 5,606,788. | 7,247,559. | -206,248. | | 12,648,099. |
| 2 | 1,038,816. | 894,448. | -36,827. | | 1,896,437. |
| 3 | 727,207. | 626,113. | -25,786. | | 1,327,534. |
| 4 | 727,229. | 626,113. | -25,778. | 1,327,564. | 0. |
| 6 | 504,568. | 447,224. | -18,414. | | 933,378. |
| 7 | 488,857. | 447,224. | -18,415. | | 917,666. |
| 8 | 519,434. | 447,224. | -18,414. | | 948,244. |
| 9 | 482,280. | 447,224. | -18,417. | 911,087. | 0. |
| TOTAL | 10,095,179. | 11,183,129. | -368,299. | 2,238,651. | 18,671,358. |

CONFIDENTIAL                              A1217                         ALECTO_00027145

ALECTO HEALTHCARE SERVICES LLC                                    46-0829723

---

| SCHEDULE M-2 | CONTRIBUTIONS | STATEMENT 17 |

---

| DESCRIPTION | AMOUNT |
|---|---|
| TRANSFERRED CAPITAL | 2,238,651. |
| CONTRIBUTIONS TO CAPITAL | 8,944,478. |
| TOTAL TO SCHEDULE M-2, LINE 2 | 11,183,129. |

---

| SCHEDULE M-3 | INCOME (LOSS) FROM U.S. PARTNERSHIPS | STATEMENT 18 |

NAME

| EIN | END OF YEAR PERCENTAGE | | INCOME (LOSS) PER INCOME STATEMENT | TEMPORARY DIFFERENCE | PERMANENT DIFFERENCE | INCOME (LOSS) PER TAX RETURN |
|---|---|---|---|---|---|---|
| | PROFIT-SHARING | LOSS-SHARING | | | | |
| ALECTO HEALTHCARE SERVICES LOS ANGELES 90-0999512 | | | 0. | -2,081,276. | 123,697. | -1,957,579. |
| ALECTO HEALTHCARE SERVICES FAIRMONT LLC 35-2507149 | | | 0. | -5,395,363. | 1,198. | -5,394,165. |
| ALECTO HEALTHCARE SERVICES SHERMAN LLC 37-1760423 | | | 0. | -3,791,689. | 1,561. | -3,790,128. |
| ALECTO HEALTHCARE SERVICES OHIO VALLEY, LLC 36-4857044 | | | 0. | -37,464,028. | 1,293. | -37,462,735. |
| TOTAL TO M-3, PART II, LINE 7 | | | 0. | -48,732,356. | 127,749. | -48,604,607. |

---

| SCHEDULE M-3 | OTHER INCOME (LOSS) AND EXPENSE / DEDUCTION ITEMS WITH NO DIFFERENCES | STATEMENT 19 |

| DESCRIPTION | PER INCOME STATEMENT | PER TAX RETURN |
|---|---|---|
| OTHER INCOME (LOSS) - SEE STATEMENT | 4,305,599. | 4,305,599. |
| OTHER EXPENSE / DEDUCTION - SEE STATEMENT | -1,226,211. | -1,226,211. |
| TOTAL TO SCHEDULE M-3, PART II, LINE 25 | 3,079,388. | 3,079,388. |

---

CONFIDENTIAL                                    A1218                              ALECTO_00027146

ALECTO HEALTHCARE SERVICES LLC                                    46-0829723

---

SCHEDULE M-3        OTHER INCOME (LOSS) ITEMS WITH NO DIFFERENCES   STATEMENT 20

---

| DESCRIPTION | INCOME (LOSS) PER INCOME STATEMENT | INCOME (LOSS) PER TAX RETURN |
|---|---|---|
| OTHER INCOME | 20,980. | 20,980. |
| SALES | 4,284,619. | 4,284,619. |
| TOTAL TO SCHEDULE M-3, PART II, LINE 25 | 4,305,599. | 4,305,599. |

---

SCHEDULE M-3                    MEALS AND ENTERTAINMENT              STATEMENT 21

---

| DESCRIPTION | EXPENSE PER INCOME STATEMENT | TEMPORARY DIFFERENCE | PERMANENT DIFFERENCE | DEDUCTION PER TAX RETURN |
|---|---|---|---|---|
| MEALS AND ENTERTAINMENT FROM TRADE OR BUSINESS | 10,806. | | -5,403. | 5,403. |
| TOTAL | 10,806. | | -5,403. | 5,403. |

---

SCHEDULE M-3              CHARITABLE CONTRIBUTION OF CASH           STATEMENT 22
                            AND TANGIBLE PROPERTY

---

| DESCRIPTION | EXPENSE/ DEDUCTION PER INCOME STATEMENT | TEMPORARY DIFFERENCE | PERMANENT DIFFERENCE | EXPENSE/ DEDUCTION PER TAX RETURN |
|---|---|---|---|---|
| CHARITABLE CONTRIBUTIONS | 14,150. | | 0. | 14,150. |
| TOTAL | 14,150. | | 0. | 14,150. |

CONFIDENTIAL                            A1219                        ALECTO_00027147

ALECTO HEALTHCARE SERVICES LLC                                    46-0829723

---

| SCHEDULE M-3 | OTHER AMORTIZATION OR IMPAIRMENT WRITE-OFFS | STATEMENT 23 |

| DESCRIPTION | EXPENSE PER INCOME STATEMENT | TEMPORARY DIFFERENCE | PERMANENT DIFFERENCE | DEDUCTION PER TAX RETURN |
|---|---|---|---|---|
| LOAN COSTS | 4,704. | | 0. | 4,704. |
| OTHER AMORTIZATION | 7,729. | -7,729. | 0. | 0. |
| TOTAL | 12,433. | -7,729. | 0. | 4,704. |

---

| SCHEDULE M-3 | OTHER EXPENSE/DEDUCTION ITEMS WITH DIFFERENCES | STATEMENT 24 |

| DESCRIPTION | EXPENSE/ DEDUCTION PER INCOME STATEMENT | TEMPORARY DIFFERENCE | PERMANENT DIFFERENCE | EXPENSE/ DEDUCTION PER TAX RETURN |
|---|---|---|---|---|
| EXCESS BUSINESS INTEREST EXPENSE | 0. | 187,193. | 0. | 187,193. |
| OFFICER'S LIFE INSURANCE | 25,837. | | -25,837. | 0. |
| SALARIES AND WAGES | 3,189,579. | 149,403. | 0. | 3,338,982. |
| TOTAL TO M-3, PART III, LINE 30 | 3,215,416. | 336,596. | -25,837. | 3,526,175. |

CONFIDENTIAL                        A1220                        ALECTO_00027148

ALECTO HEALTHCARE SERVICES LLC                                    46-0829723

SCHEDULE M-3              OTHER EXPENSE/DEDUCTION ITEMS           STATEMENT 25
                              WITH NO DIFFERENCES

| DESCRIPTION | EXPENSE/ DEDUCTION PER INCOME STATEMENT | EXPENSE/ DEDUCTION PER TAX RETURN |
|---|---|---|
| AUTOMOBILE EXPENSE | 22,998. | 22,998. |
| BANK SERVICE CHARGES | 21,466. | 21,466. |
| COMPUTER AND INTERNET EXPENSES | 12,593. | 12,593. |
| DUES AND SUBSCRIPTIONS | 13,537. | 13,537. |
| EMPLOYEE BENEFIT PROGRAMS | 259,280. | 259,280. |
| INSURANCE | 102,537. | 102,537. |
| PAYROLL TAXES | 145,810. | 145,810. |
| PROFESSIONAL FEES | 227,313. | 227,313. |
| PURCHASED SERVICES | 202,802. | 202,802. |
| RENT EXPENSE | 68,414. | 68,414. |
| REPAIRS | 3,240. | 3,240. |
| SUPPLIES AND OTHER | 11,651. | 11,651. |
| TAXES AND LICENSES | 7,200. | 7,200. |
| TRAVEL EXPENSES | 97,427. | 97,427. |
| UTILITIES | 29,943. | 29,943. |
| TOTAL TO SCHEDULE M-3, PART II, LINE 25 | 1,226,211. | 1,226,211. |

FORM 8916-A               OTHER INTEREST INCOME                  STATEMENT 26

| DESCRIPTION | PER INCOME STATEMENT | TEMPORARY DIFFERENCE | PERMANENT DIFFERENCE | PER TAX RETURN |
|---|---|---|---|---|
| INTEREST INCOME | 88. | 0. | 0. | 88. |
| TOTAL TO PART II, LINE 5 | 88. | 0. | 0. | 88. |

FORM 8916-A               OTHER INTEREST EXPENSE                 STATEMENT 27

| DESCRIPTION | PER INCOME STATEMENT | TEMPORARY DIFFERENCE | PERMANENT DIFFERENCE | PER TAX RETURN |
|---|---|---|---|---|
| INTEREST EXPENSE | 187,281. | -187,193. | 0. | 88. |
| TOTAL TO PART III, LINE 4 | 187,281. | -187,193. | 0. | 88. |

CONFIDENTIAL                           A1221                         ALECTO_00027149

**ALTERNATIVE MINIMUM TAX DEPRECIATION REPORT**

| Asset No. | Description | Date Acquired | AMT Method | AMT Life | AMT Cost Or Basis | AMT Accumulated | Regular Depreciation | AMT Depreciation | AMT Adjustment |
|---|---|---|---|---|---|---|---|---|---|
| 7 | FURNITURE | 070117 | 200DB | 7.00 | 13,467. | 2,611. | 1,178. | 1,178. | 0. |
|  | TOTALS |  |  |  | 13,467. | 2,611. | 1,178. | 1,178. | 0. |

928104
04-01-19

37

**CONFIDENTIAL**

**A1222**

ALECTO_00027150

# EXHIBIT 41

JX41

**Alecto Healthcare Services**
**Balance Sheet Summary (in millions)**
**12/31/2019**

| | OLYMPIA | | | | FAIRMONT | | | | WILSON N JONES | | | | OHIO VALLEY | | | | | ALECTO | GRAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | WNJ | WNJ MG | Anesthesia | Total | OVMC | OV MG | EORH | EO MG | Total | Total | TOTAL |
| **ASSETS:** | | | | | | | | | | | | | | | | | | | |
| Cash and Equivalents | 0.1 | - | 0.1 | 0.1 | 0.9 | 0.0 | 0.0 | 1.0 | (0.3) | 0.2 | 0.0 | (0.1) | 0.1 | - | 0.1 | - | 0.2 | 0.4 | 1.5 |
| Accounts Receivable | 128.6 | - | - | 128.6 | 37.5 | 19.1 | - | 56.6 | 88.0 | 0.9 | 0.7 | 89.6 | 18.5 | 10.8 | 13.7 | 3.7 | 46.6 | - | 321.4 |
| Allowance for Bad Debt | (14.8) | - | - | (14.8) | (5.8) | (18.6) | - | (24.3) | (44.8) | (0.1) | (0.0) | (44.9) | (6.1) | (0.8) | (4.8) | (0.4) | (12.1) | - | (96.0) |
| Allowance for Contractuals & Oth Adj | (98.9) | - | - | (98.9) | (22.7) | - | - | (22.7) | (28.9) | (0.5) | (0.3) | (29.7) | (11.5) | (9.7) | (8.7) | (3.0) | (32.9) | - | (184.2) |
| Supplemental A/R | 16.9 | - | - | 16.9 | 5.5 | - | - | 5.5 | - | - | - | - | 1.8 | - | - | - | 1.8 | - | 24.3 |
| Patient Accounts Receivable | 31.9 | - | - | 31.9 | 14.5 | 0.6 | - | 15.1 | 14.4 | 0.3 | 0.3 | 15.0 | 2.8 | 0.2 | 0.2 | 0.3 | 3.4 | - | 65.4 |
| Other Receivables | 3.1 | - | - | 3.1 | 0.0 | - | - | 0.0 | 0.7 | - | - | 0.7 | 0.4 | - | 0.5 | - | 0.9 | 9.3 | 14.1 |
| Inventories | 1.0 | - | - | 1.0 | 0.8 | - | - | 0.8 | 1.7 | - | - | 1.7 | - | - | - | - | - | - | 3.5 |
| Other Current Assets | 0.5 | - | - | 0.5 | 0.4 | - | - | 0.4 | 1.7 | - | - | 1.7 | 0.3 | - | 3.3 | - | 3.6 | 0.1 | 6.4 |
| Prepaid Insurance | - | - | - | - | - | - | - | - | 0.0 | - | - | 0.0 | - | - | - | - | - | - | 0.0 |
| Other Pre-Paid Expenses | 0.7 | - | - | 0.7 | 0.2 | 0.0 | - | 0.2 | 0.3 | - | - | 0.3 | 0.2 | - | 0.0 | - | 0.2 | 0.5 | 1.9 |
| Total Current Assets | 37.3 | - | 0.1 | 37.4 | 16.9 | 0.6 | 0.0 | 17.5 | 18.6 | 0.4 | 0.4 | 19.4 | 3.8 | 0.2 | 4.1 | 0.3 | 8.4 | 10.3 | 92.9 |
| Land and Improvements | 4.7 | - | - | 4.7 | 3.5 | - | - | 3.5 | 1.7 | - | - | 1.7 | 1.9 | - | 3.2 | - | 5.1 | - | 15.1 |
| Buildings and Improvements | 3.2 | - | - | 3.2 | 8.4 | - | - | 8.4 | 27.8 | - | - | 27.8 | 73.7 | - | 39.8 | - | 113.5 | - | 153.0 |
| Leaseholds | 13.9 | - | - | 13.9 | - | - | - | - | 0.0 | - | - | 0.0 | - | - | - | - | - | - | 14.0 |
| Equipment | 17.3 | - | - | 17.3 | 13.2 | - | - | 13.2 | 13.6 | 0.2 | - | 13.8 | 53.7 | 0.1 | 24.6 | 0.1 | 78.6 | 0.0 | 122.9 |
| Construction-In-Progress | 4.9 | - | - | 4.9 | 0.1 | - | - | 0.1 | 0.0 | - | - | 0.0 | 0.2 | - | 0.1 | - | 0.3 | - | 5.3 |
| Property and Equipment | 44.1 | - | - | 44.1 | 25.2 | - | - | 25.2 | 43.1 | 0.2 | - | 43.4 | 129.6 | 0.1 | 67.7 | 0.1 | 197.6 | 0.0 | 310.3 |
| Less: Accumulated Depreciation | (16.2) | - | - | (16.2) | (11.0) | - | - | (11.0) | (21.2) | (0.2) | - | (21.5) | (99.7) | (0.1) | (62.3) | (0.1) | (162.2) | (0.0) | (210.9) |
| Net Property and Equipment | 27.9 | - | - | 27.9 | 14.2 | - | - | 14.2 | 21.9 | 0.0 | - | 21.9 | 29.9 | - | 5.4 | 0.0 | 35.4 | 0.0 | 99.4 |
| Net goodwill | 2.5 | - | - | 2.5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2.5 |
| Other intangible assets | (0.0) | - | - | (0.0) | - | - | - | - | (0.1) | - | - | (0.1) | - | - | - | - | - | - | (0.1) |
| Total Long-Term Assets | 30.4 | - | - | 30.4 | 14.2 | - | - | 14.2 | 21.8 | 0.0 | - | 21.8 | 29.9 | - | 5.4 | 0.0 | 35.4 | 0.0 | 101.8 |
| **TOTAL ASSETS** | 67.7 | - | 0.1 | 67.7 | 31.1 | 0.6 | 0.0 | 31.7 | 40.4 | 0.5 | 0.4 | 41.2 | 33.7 | 0.2 | 9.5 | 0.3 | 43.7 | 10.3 | 194.7 |
| **LIABILITIES:** | | | | | | | | | | | | | | | | | | | |
| Accounts Payable | 19.9 | - | - | 19.9 | 16.9 | 0.0 | - | 16.9 | 22.1 | 0.7 | (0.0) | 22.8 | 26.8 | 0.5 | 5.7 | 0.3 | 33.4 | 3.2 | 96.1 |
| Notes Payable | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Leases | - | - | - | - | - | - | - | - | - | - | - | - | 0.3 | - | 0.2 | - | 0.4 | - | 0.4 |
| Accrued Payroll | 1.8 | - | 0.0 | 1.8 | 1.0 | 0.1 | - | 1.1 | 0.8 | 0.4 | - | 1.2 | 0.2 | - | - | - | 0.2 | 0.1 | 4.5 |
| Accrued PTO | 1.4 | - | 0.0 | 1.5 | 1.4 | 0.1 | - | 1.5 | 1.0 | - | - | 1.0 | 0.1 | - | - | - | 0.1 | 0.1 | 4.1 |
| Accrued Payroll Taxes | 6.8 | - | 0.1 | 6.8 | 4.0 | 0.2 | - | 4.2 | 3.5 | 0.1 | - | 3.6 | 4.8 | - | 0.0 | - | 4.8 | - | 19.4 |
| Insurance Reserve | 3.7 | - | - | 3.7 | 2.5 | - | - | 2.5 | 1.9 | - | - | 1.9 | 3.6 | - | 2.0 | - | 5.6 | - | 13.6 |
| Other Accrued Expenses | 32.4 | - | - | 32.4 | 0.3 | 0.0 | - | 0.3 | 3.3 | 0.0 | - | 3.4 | 2.8 | - | 0.0 | - | 2.8 | - | 38.9 |
| Third-Party Settlements | 10.2 | - | - | 10.2 | (0.4) | - | - | (0.4) | (0.1) | - | - | (0.1) | (0.1) | - | - | - | (0.1) | - | 9.6 |
| Lines of Credit & Other Short-Term Debt | (31.4) | - | - | (31.4) | 2.0 | (0.0) | - | 2.0 | 26.4 | - | - | 26.4 | 18.8 | - | - | - | 18.8 | - | 15.8 |
| Current Portion of Long-Term Debt | 0.1 | - | - | 0.1 | 0.1 | - | - | 0.1 | - | - | - | - | - | - | - | - | - | - | 0.2 |
| Other Liabilities | 0.4 | - | - | 0.4 | - | - | - | - | 0.2 | 0.0 | - | 0.2 | - | - | - | - | - | - | 0.6 |
| Total Current Liabilities | 45.3 | - | 0.1 | 45.4 | 27.9 | 0.3 | - | 28.3 | 59.2 | 1.2 | (0.0) | 60.3 | 57.3 | 0.5 | 7.9 | 0.3 | 65.9 | 3.4 | 203.3 |
| Mortgages and Long-Term Notes Payable | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Payables/(Receivables) | (7.0) | 4.2 | 1.2 | (1.7) | (1.4) | 3.1 | (0.0) | 1.6 | (19.2) | 26.7 | 3.9 | 11.4 | 7.4 | - | (0.1) | - | 7.3 | (16.4) | 2.3 |
| Deferred Credits | 0.0 | - | - | 0.0 | (0.1) | - | - | (0.1) | 0.8 | - | - | 0.8 | 9.3 | - | 0.1 | - | 9.4 | - | 10.2 |
| Deferred Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Long-Term Liabilities | 30.1 | - | - | 30.1 | 21.1 | - | - | 21.1 | 52.3 | - | - | 52.3 | 24.4 | - | 8.3 | - | 32.7 | 4.7 | 141.0 |
| Total Long-Term Liabilities | 23.1 | 4.2 | 1.2 | 28.5 | 19.6 | 3.1 | (0.0) | 22.6 | 33.9 | 26.7 | 3.9 | 64.5 | 41.1 | - | 8.3 | - | 49.4 | (11.6) | 153.4 |
| **TOTAL LIABILITIES** | 68.5 | 4.2 | 1.3 | 73.9 | 47.5 | 3.4 | (0.0) | 50.9 | 93.0 | 27.9 | 3.9 | 124.9 | 98.4 | 0.5 | 16.2 | 0.3 | 115.4 | (8.3) | 356.7 |
| **EQUITY:** | | | | | | | | | | | | | | | | | | | |
| Common Stock | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Additional Paid-in Capital | - | (6.7) | - | (6.7) | 0.0 | - | - | 0.0 | 0.0 | 0.0 | - | 0.0 | 0.0 | - | 0.0 | - | 0.0 | 18.9 | 12.2 |
| Other Equity | 10.1 | - | - | 10.1 | 4.8 | (0.1) | 0.0 | 4.7 | (3.5) | (0.2) | - | (3.7) | 5.3 | - | 3.0 | - | 8.3 | - | 19.4 |
| Retained Earnings PY | (10.0) | 3.7 | (1.0) | (7.3) | (12.5) | (2.6) | 0.0 | (15.2) | (39.3) | (23.8) | (2.2) | (65.3) | (11.6) | (13.7) | (7.0) | (5.3) | (37.6) | - | (125.4) |
| Distributions | (0.0) | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (0.0) |
| Net Income | (0.9) | (1.1) | (0.2) | (2.2) | (8.6) | (0.1) | (0.0) | (8.7) | (9.9) | (3.5) | (1.3) | (14.7) | (58.4) | 13.4 | (2.6) | 5.3 | (42.4) | (0.4) | (68.4) |
| **TOTAL EQUITY** | (0.8) | (4.2) | (1.2) | (6.2) | (16.4) | (2.8) | 0.0 | (19.1) | (52.7) | (27.5) | (3.5) | (83.7) | (64.7) | (0.0) | (6.7) | (0.0) | (71.6) | 18.5 | (162.1) |
| **TOTAL LIABILITIES AND EQUITY** | 67.7 | - | 0.1 | 67.7 | 31.1 | 0.6 | 0.0 | 31.7 | 40.4 | 0.5 | 0.4 | 41.2 | 33.7 | 0.2 | 9.5 | 0.3 | 43.7 | 10.3 | 194.7 |

**A1224**

ALECTO_00005922

**Alecto Healthcare Services**
**Statement of Cash Flows (in '000's)**
**12/31/2019**

| | OLYMPIA | | | | FAIRMONT | | | | WILSON N JONES | | | | OHIO VALLEY | | | | | ALECTO | GRAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | WNJ | WNJ MG | Anesthesia | Total | OVMC | OV MG | EORH | EO MG | Total | Total | TOTAL |
| **Cash Flows from Operating Activities:** | | | | | | | | | | | | | | | | | | | |
| Change in Net Income | (0.9) | (1.1) | (0.2) | (2.2) | (8.6) | (0.1) | (0.0) | (8.7) | (9.9) | (3.5) | (1.3) | (14.7) | (58.4) | 13.4 | (2.6) | 5.3 | (42.4) | (0.4) | (68.4) |
| **Adj from Operating Activities:** | | | | | | | | | | | | | | | | | | | |
| Depreciation and Amortization | 1.5 | (8.6) | - | (7.1) | 2.1 | - | - | 2.1 | 2.8 | 0.0 | - | 2.8 | 4.3 | 0.1 | 2.4 | 0.0 | 6.9 | 0.0 | 4.6 |
| Other Deferred Income/Expense | - | - | - | - | (0.3) | - | - | (0.3) | (0.0) | 0.0 | - | (0.0) | (0.2) | - | (0.1) | - | (0.2) | - | (0.6) |
| **(Increase)/Decrease in Assets:** | | | | | | | | | | | | | | | | | | | |
| Patient Accounts Receivable | 0.3 | - | - | 0.3 | (0.7) | (0.5) | - | (1.2) | (3.8) | 0.6 | 0.0 | (3.2) | 8.4 | 3.2 | 4.8 | 1.3 | 17.8 | - | 13.7 |
| Supplies Inventory | 0.0 | - | - | 0.0 | (0.2) | - | - | (0.2) | 0.7 | - | - | 0.7 | 2.3 | - | 0.9 | - | 3.2 | - | 3.8 |
| Pre-Paid Expenses & Oth Current Assets | (0.1) | - | - | (0.1) | (0.0) | (0.0) | - | (0.0) | 0.0 | 0.0 | - | 0.0 | 0.7 | - | 0.3 | - | 1.0 | - | 0.9 |
| Other Receivables | 0.0 | 7.3 | - | 7.3 | 0.2 | 0.0 | - | 0.3 | (0.4) | - | - | (0.4) | 0.4 | - | 0.1 | - | 0.5 | (8.9) | (1.2) |
| **Increase/(Decrease) in Liabilities:** | | | | | | | | | | | | | | | | | | | |
| Accounts and Notes Payable | 1.5 | (0.0) | - | 1.5 | 5.5 | (0.1) | - | 5.4 | 6.4 | 0.2 | (0.0) | 6.6 | (6.4) | (0.1) | 2.3 | 0.2 | (3.9) | 0.9 | 10.5 |
| Accrued Payroll Costs | 5.2 | - | 0.1 | 5.2 | 3.0 | 0.1 | - | 3.1 | 2.0 | 0.1 | - | 2.1 | (0.4) | - | (0.0) | - | (0.4) | (0.1) | 9.8 |
| IBNR | (0.0) | - | - | (0.0) | (0.1) | - | - | (0.1) | - | - | - | - | (1.0) | - | (0.2) | - | (1.2) | - | (1.4) |
| Other Accrued Liabilities | 4.4 | (0.3) | - | 4.1 | (0.5) | 0.0 | - | (0.5) | 0.9 | 0.0 | - | 0.9 | 2.7 | - | (0.0) | - | 2.7 | (0.0) | 7.3 |
| Estimated 3rd Party Settlements | (1.3) | - | - | (1.3) | - | - | - | - | 0.3 | - | - | 0.3 | (0.3) | - | 0.4 | - | 0.1 | - | (0.9) |
| **Net Cash From (For) Operating Activities** | 10.7 | (2.7) | (0.1) | 7.8 | 0.4 | (0.5) | (0.0) | (0.1) | (1.0) | (2.6) | (1.3) | (5.0) | (47.9) | 16.6 | 8.4 | 6.8 | (16.1) | (8.5) | (21.9) |
| **Cash Flows from Investing Activities:** | | | | | | | | | | | | | | | | | | | |
| Capital Expenditures | (0.7) | 27.3 | - | 26.6 | (0.4) | - | - | (0.4) | (0.1) | - | - | (0.1) | (0.4) | - | (0.1) | - | (0.5) | - | 25.6 |
| Payments to Acquire Other Assets | 0.0 | - | - | 0.0 | 0.1 | - | - | 0.1 | 0.5 | - | - | 0.5 | - | - | - | - | - | 0.0 | 0.6 |
| **Net Cash From (For) Investing Activities** | (0.7) | 27.3 | - | 26.6 | (0.3) | - | - | (0.3) | 0.4 | - | - | 0.4 | (0.4) | - | (0.1) | - | (0.5) | 0.0 | 26.2 |
| **Cash Flows from Financing Activities:** | | | | | | | | | | | | | | | | | | | |
| Funds Provided (to) from Intercompany | 0.1 | 0.1 | 0.2 | 0.4 | (2.0) | 0.6 | - | (1.5) | (5.2) | 2.8 | 1.3 | (1.0) | 39.7 | (16.6) | (7.9) | (6.8) | 8.3 | (0.9) | 5.4 |
| Borrow (Re-Payment) of Debt | (10.0) | (18.0) | - | (28.0) | 2.1 | (0.0) | - | 2.1 | 4.8 | - | - | 4.8 | 8.4 | - | (0.1) | - | 8.3 | 0.7 | (12.1) |
| Capital Lease Obligations (Re-Payment) | - | - | - | - | - | - | - | - | (0.0) | - | - | (0.0) | (0.0) | - | (0.3) | - | (0.3) | - | (0.3) |
| Parent Contributions / (Distributions) | (0.0) | (6.7) | (0.0) | (6.7) | - | - | - | - | - | - | - | - | - | - | - | - | - | 8.9 | 2.2 |
| **Net Cash From (For) Financing Activities** | (9.9) | (24.6) | 0.2 | (34.3) | 0.1 | 0.6 | - | 0.6 | (0.4) | 2.8 | 1.3 | 3.8 | 48.0 | (16.6) | (8.3) | (6.8) | 16.3 | 8.8 | (4.7) |
| **Net Change in Cash and Cash Equivalents** | 0.1 | (0.0) | 0.1 | 0.1 | 0.2 | 0.0 | (0.0) | 0.2 | (1.0) | 0.2 | 0.0 | (0.8) | (0.3) | - | 0.0 | - | (0.3) | 0.3 | (0.4) |

CONFIDENTIAL

**A1225**

ALECTO_00005923

**Alecto Healthcare Services**
**Income Statement (in millions)**
**Dec-2020 YTD**

| | OLYMPIA | | | | FAIRMONT | | | | WILSON N JONES | | | | OHIO VALLEY | | | | | ALECTO | GRAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | WNJ | WNJ MG | Anesthesia | Total | OVMC | OV MG | EORH | EO MG | Total | Total | TOTAL |
| **REVENUES** | | | | | | | | | | | | | | | | | | | |
| Inpatient Revenue - Routine | 124.3 | - | - | 124.3 | 9.6 | - | - | 9.6 | 50.9 | - | - | 50.9 | - | - | - | - | - | - | 184.8 |
| Inpatient Revenue - Ancillary | 255.6 | - | - | 255.6 | 4.7 | - | - | 4.7 | 131.3 | 0.4 | 2.5 | 134.3 | - | - | - | - | - | - | 394.6 |
| **Total IP Revenue** | 380.0 | - | - | 380.0 | 14.3 | - | - | 14.3 | 182.2 | 0.4 | 2.5 | 185.2 | - | - | - | - | - | - | 579.4 |
| Outpatient Revenue | 135.0 | - | - | 135.0 | 25.2 | 1.3 | - | 26.4 | 105.7 | 7.3 | 1.8 | 114.8 | 0.0 | - | (0.0) | - | 0.0 | - | 276.2 |
| **Total Patient Revenue** | 514.9 | - | - | 514.9 | 39.4 | 1.3 | - | 40.7 | 288.0 | 7.7 | 4.3 | 300.0 | 0.0 | - | (0.0) | - | 0.0 | - | 855.6 |
| Revenue Deductions | (453.2) | - | - | (453.2) | (34.6) | (1.2) | - | (35.8) | (197.0) | (4.0) | (3.1) | (204.1) | 0.1 | (0.3) | (0.4) | (0.2) | (0.8) | - | (693.8) |
| Bad Debt | 4.9 | - | - | 4.9 | 0.1 | 0.0 | - | 0.1 | (39.3) | (0.6) | (0.5) | (40.4) | (0.2) | 0.1 | 0.5 | (0.0) | 0.4 | - | (34.9) |
| **Total Deductions from Revenue** | (448.3) | - | - | (448.3) | (34.5) | (1.2) | - | (35.7) | (236.3) | (4.6) | (3.6) | (244.4) | (0.0) | (0.2) | 0.2 | (0.3) | (0.4) | - | (728.7) |
| **Total Net Patient Revenue (Excl. Suppl.)** | 66.6 | - | - | 66.6 | 4.9 | 0.0 | - | 5.0 | 51.7 | 3.1 | 0.7 | 55.5 | (0.0) | (0.2) | 0.1 | (0.3) | (0.4) | - | 126.8 |
| **SUPPLEMENTAL NET PATIENT REVENUE** | | | | | | | | | | | | | | | | | | | |
| WV Directed Payment Plan (DPP) | - | - | - | - | 4.4 | - | - | 4.4 | - | - | - | - | (0.3) | - | - | - | (0.3) | - | 4.1 |
| WV Direct Medical Education (DME) | - | - | - | - | - | - | - | - | - | - | - | - | (0.0) | - | - | - | (0.0) | - | (0.0) |
| OH Upper Payment Limit (UPL) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| OH Hospital Care Assurance Program (HCAP) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TX LPPF | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medicaid DSH | - | - | - | - | 0.1 | - | - | 0.1 | 2.0 | - | - | 2.0 | (0.1) | - | - | - | (0.1) | - | 2.1 |
| Medicare Settlements | 8.1 | - | - | 8.1 | - | - | - | - | 9.2 | - | - | 9.2 | - | - | - | - | - | - | 17.3 |
| **Total Supplemental Revenue** | 8.1 | - | - | 8.1 | 4.5 | - | - | 4.5 | 11.3 | - | - | 11.3 | (0.4) | - | - | - | (0.4) | - | 23.4 |
| **Net Patient Revenue** | 74.7 | - | - | 74.7 | 9.4 | 0.0 | - | 9.5 | 63.0 | 3.1 | 0.7 | 66.8 | (0.5) | (0.2) | 0.1 | (0.3) | (0.8) | - | 150.2 |
| Other Operating Revenues | 0.5 | - | - | 0.5 | 1.1 | 0.0 | - | 1.1 | 1.9 | 0.1 | - | 1.9 | (0.1) | - | (2.4) | - | (2.6) | 5.8 | 6.8 |
| **TOTAL NET REVENUES** | 75.2 | - | - | 75.2 | 10.5 | 0.1 | - | 10.6 | 64.8 | 3.2 | 0.7 | 68.7 | (0.6) | (0.2) | (2.3) | (0.3) | (3.4) | 5.8 | 157.0 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | |
| Salaries and Wages | 33.5 | - | 0.1 | 33.6 | 5.1 | 0.4 | - | 5.5 | 20.4 | 3.6 | - | 24.0 | 0.1 | - | - | - | 0.1 | 2.6 | 65.8 |
| Benefits | 3.2 | - | 0.0 | 3.2 | 2.5 | 0.1 | - | 2.6 | 5.7 | 0.0 | - | 5.8 | (6.2) | (0.0) | (0.1) | - | (6.3) | 0.3 | 5.6 |
| Payroll Taxes | 2.9 | - | 0.0 | 2.9 | 0.7 | 0.0 | - | 0.7 | 1.7 | 0.2 | - | 1.9 | 0.1 | - | - | - | 0.1 | 0.1 | 5.7 |
| PTO | 3.6 | - | 0.0 | 3.6 | 0.8 | 0.0 | - | 0.9 | 1.4 | 0.0 | - | 1.4 | (0.1) | - | - | - | (0.1) | 0.1 | 5.9 |
| Contract Labor | 0.8 | - | - | 0.8 | (0.1) | - | - | (0.1) | 0.1 | - | - | 0.1 | - | - | - | - | - | - | 0.8 |
| Labor Sub-Total | 44.0 | - | 0.1 | 44.1 | 9.0 | 0.5 | - | 9.6 | 29.3 | 3.8 | - | 33.1 | (6.0) | (0.0) | (0.1) | - | (6.1) | 3.2 | 83.9 |
| Supplies Billable | 8.1 | - | - | 8.1 | 1.3 | - | - | 1.3 | 7.4 | 0.3 | - | 7.7 | - | - | (0.0) | - | (0.0) | - | 17.0 |
| Supplies Non-Billable | 1.8 | - | - | 1.8 | 0.5 | - | - | 0.5 | 0.9 | 0.0 | 0.0 | 0.9 | 0.0 | - | 0.0 | - | 0.0 | 0.1 | 3.3 |
| Total Supplies | 9.9 | - | - | 9.9 | 1.8 | - | - | 1.8 | 8.3 | 0.3 | 0.0 | 8.5 | 0.0 | - | (0.0) | - | 0.0 | 0.1 | 20.3 |
| Purchased Services | 7.6 | - | - | 7.6 | 1.1 | - | - | 1.1 | 5.5 | 1.9 | 0.1 | 7.4 | 0.6 | 0.0 | 0.0 | - | 0.6 | 0.4 | 17.2 |
| Professional Fees | 2.2 | - | 0.0 | 2.2 | 0.4 | 0.2 | - | 0.6 | 4.0 | (0.1) | 2.1 | 6.0 | 1.8 | (0.0) | 0.1 | - | 1.8 | 0.3 | 11.0 |
| Repairs and Maintenance | 0.3 | - | - | 0.3 | 0.1 | - | - | 0.1 | 0.6 | 0.0 | - | 0.6 | - | - | - | - | - | 0.0 | 1.0 |
| Rents and leases | 1.7 | - | - | 1.7 | 0.1 | (0.0) | - | 0.1 | 3.0 | 0.4 | - | 3.4 | - | - | - | - | - | 0.1 | 5.3 |
| Insurance | 1.5 | - | - | 1.5 | (0.7) | - | - | (0.7) | 0.6 | 0.0 | - | 0.6 | (1.2) | - | (1.3) | - | (2.6) | 0.0 | (1.1) |
| Utilities | 1.3 | - | - | 1.3 | 0.7 | - | - | 0.7 | 1.6 | 0.1 | - | 1.6 | - | (0.0) | 0.0 | - | (0.0) | 0.0 | 3.6 |
| Taxes and Licenses | 1.0 | - | - | 1.0 | 0.1 | 0.0 | - | 0.1 | 1.3 | 0.0 | - | 1.3 | 0.0 | - | - | - | 0.0 | 0.0 | 2.5 |
| Other Operating Expenses | (1.0) | - | 0.0 | (1.0) | 1.8 | 0.0 | 0.0 | 1.9 | 0.7 | 0.1 | 0.0 | 0.8 | (0.3) | (0.5) | (0.4) | (0.3) | (1.5) | 0.1 | 0.4 |
| Hospital Fees/Taxes | - | - | - | - | 0.3 | - | - | 0.3 | 1.0 | - | - | 1.0 | 0.1 | - | - | - | 0.1 | - | 1.3 |
| **Total Operating Expenses** | 68.4 | - | 0.1 | 68.5 | 14.7 | 0.8 | 0.0 | 15.5 | 55.8 | 6.5 | 2.2 | 64.4 | (5.1) | (0.5) | (1.8) | (0.3) | (7.6) | 4.3 | 145.2 |
| **EBITDAR** | 6.8 | - | (0.1) | 6.7 | (4.1) | (0.7) | (0.0) | (4.9) | 9.1 | (3.3) | (1.5) | 4.3 | 4.5 | 0.3 | (0.5) | 0.0 | 4.2 | 1.5 | 11.8 |
| **NON-OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | |
| Depreciation | 2.6 | - | - | 2.6 | 1.6 | - | - | 1.6 | 2.6 | 0.0 | - | 2.6 | 1.2 | - | 0.7 | 0.0 | 1.9 | 0.0 | 8.7 |
| Interest Income | - | - | - | - | (0.0) | - | - | (0.0) | (0.1) | - | - | (0.1) | - | - | - | - | - | - | (0.1) |
| Interest Expense | 2.0 | - | 0.0 | 2.0 | 1.5 | 0.1 | - | 1.6 | 0.3 | - | - | 0.3 | (0.1) | - | 0.0 | - | (0.0) | 0.1 | 4.0 |
| MPT Building Lease / Interest | 3.4 | - | - | 3.4 | 2.0 | - | - | 2.0 | 4.7 | - | - | 4.7 | 0.3 | - | 0.1 | - | 0.4 | - | 10.6 |
| Other Non-Operating Expense / (Revenue) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Gain (Loss) on Asset Sales | - | - | - | - | 1.5 | - | - | 1.5 | (0.0) | - | - | (0.0) | 17.2 | - | 3.7 | 0.0 | 20.9 | - | 22.4 |
| **Total Non-Operating Expenses** | 8.0 | - | 0.0 | 8.0 | 6.7 | 0.1 | - | 6.7 | 7.5 | 0.0 | - | 7.5 | 18.6 | - | 4.5 | 0.0 | 23.1 | 0.1 | 45.5 |
| **NET INCOME (LOSS)** | (1.2) | - | (0.1) | (1.3) | (10.8) | (0.8) | (0.0) | (11.6) | 1.5 | (3.3) | (1.5) | (3.2) | (14.1) | 0.3 | (5.0) | 0.0 | (18.9) | 1.4 | (33.7) |

A1226

ALECTO_00005924

# EXHIBIT 42

JX44

**Alecto Healthcare Services**
**Balance Sheet Summary (in millions)**
**12/31/2020**

| | OLYMPIA | | | | FAIRMONT | | | | WILSON N JONES | | | | OHIO VALLEY | | | | | ALECTO | GRAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | WNJ | WNJ MG | Anesthesia | Total | OVMC | OV MG | EORH | EO MG | Total | Total | TOTAL |
| **ASSETS:** | | | | | | | | | | | | | | | | | | | |
| Cash and Equivalents | 3.7 | - | 0.0 | 3.7 | 0.1 | 0.0 | 0.0 | 0.1 | 1.7 | (0.3) | 0.0 | 1.5 | - | - | - | - | - | 13.4 | 18.7 |
| Accounts Receivable | 126.3 | - | - | 126.3 | - | - | - | - | 119.1 | (0.1) | 0.8 | 119.8 | - | - | - | - | - | - | 246.1 |
| Allowance for Bad Debt | (14.9) | - | - | (14.9) | - | - | - | - | (43.0) | (0.2) | (0.0) | (43.3) | - | - | - | - | - | - | (58.2) |
| Allowance for Contractuals & Oth Adj | (99.0) | - | - | (99.0) | - | - | - | - | (62.1) | (0.4) | (0.3) | (62.8) | - | - | - | - | - | - | (161.8) |
| Supplemental A/R | 11.7 | - | - | 11.7 | 4.6 | - | - | 4.6 | - | - | - | - | - | - | - | - | - | - | 16.3 |
| Patient Accounts Receivable | 24.1 | - | - | 24.1 | 4.6 | - | - | 4.6 | 14.0 | (0.6) | 0.4 | 13.7 | - | - | - | - | - | - | 42.4 |
| Other Receivables | 1.2 | - | - | 1.2 | (0.0) | - | - | (0.0) | 0.4 | - | - | 0.4 | 0.1 | - | - | - | 0.1 | 9.4 | 11.1 |
| Inventories | 1.0 | - | - | 1.0 | - | - | - | - | 1.4 | - | - | 1.4 | - | - | - | - | - | - | 2.4 |
| Other Current Assets | 0.6 | - | - | 0.6 | - | - | - | - | 0.3 | - | - | 0.3 | 0.1 | - | - | - | 0.1 | 0.3 | 1.2 |
| Prepaid Insurance | - | - | - | - | - | - | - | - | 0.0 | 0.0 | - | 0.0 | - | - | - | - | - | - | 0.0 |
| Other Pre-Paid Expenses | 0.7 | - | - | 0.7 | - | - | - | - | 0.3 | - | - | 0.3 | - | - | - | - | - | 0.4 | 1.4 |
| Total Current Assets | 31.3 | - | 0.0 | 31.3 | 4.7 | 0.0 | 0.0 | 4.7 | 18.0 | (0.9) | 0.4 | 17.6 | 0.2 | - | - | - | 0.2 | 23.5 | 77.3 |
| Land and Improvements | 4.7 | - | - | 4.7 | 3.2 | - | - | 3.2 | 1.7 | - | - | 1.7 | 1.9 | - | 3.2 | - | 5.1 | - | 14.7 |
| Buildings and Improvements | 3.2 | - | - | 3.2 | 8.3 | - | - | 8.3 | 27.8 | - | - | 27.8 | 73.7 | - | 39.8 | - | 113.5 | - | 152.9 |
| Leaseholds | 13.9 | - | - | 13.9 | - | - | - | - | 0.0 | - | - | 0.0 | - | - | - | - | - | - | 13.9 |
| Equipment | 17.3 | - | - | 17.3 | 4.5 | - | - | 4.5 | 13.7 | 0.2 | - | 13.9 | - | - | - | - | - | - | 35.7 |
| Construction-In-Progress | 6.7 | - | - | 6.7 | - | - | - | - | 0.2 | - | - | 0.2 | - | - | - | - | - | 0.0 | 6.9 |
| Property and Equipment | 45.8 | - | - | 45.8 | 16.0 | - | - | 16.0 | 43.4 | 0.2 | - | 43.7 | 75.6 | - | 43.0 | - | 118.7 | 0.0 | 224.2 |
| Less: Accumulated Depreciation | (17.9) | - | - | (17.9) | (5.3) | - | - | (5.3) | (23.8) | (0.2) | - | (24.0) | (64.1) | - | (42.1) | - | (106.2) | (0.0) | (153.4) |
| Net Property and Equipment | 27.9 | - | - | 27.9 | 10.7 | - | - | 10.7 | 19.6 | 0.0 | - | 19.6 | 11.6 | - | 0.9 | - | 12.5 | - | 70.8 |
| Net goodwill | 2.5 | - | - | 2.5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2.5 |
| Other intangible assets | (0.0) | - | - | (0.0) | - | - | - | - | 0.0 | - | - | 0.0 | - | - | - | - | - | - | 0.0 |
| Total Long-Term Assets | 30.4 | - | - | 30.4 | 10.7 | - | - | 10.7 | 19.6 | 0.0 | - | 19.7 | 11.6 | - | 0.9 | - | 12.5 | - | 73.3 |
| **TOTAL ASSETS** | 61.8 | - | 0.0 | 61.8 | 15.4 | 0.0 | 0.0 | 15.4 | 37.7 | (0.9) | 0.4 | 37.2 | 11.8 | - | 0.9 | - | 12.7 | 23.5 | 150.7 |
| **LIABILITIES:** | | | | | | | | | | | | | | | | | | | |
| Accounts Payable | 18.3 | - | - | 18.3 | 14.7 | 0.1 | - | 14.8 | 21.0 | 0.1 | (0.1) | 21.1 | 30.2 | 0.0 | 2.0 | 0.0 | 32.3 | 0.6 | 87.1 |
| Notes Payable | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Leases | - | - | - | - | - | - | - | - | - | - | - | - | 0.4 | - | 0.3 | - | 0.7 | - | 0.7 |
| Accrued Payroll | 1.9 | - | 0.0 | 1.9 | 0.0 | - | - | 0.0 | 1.5 | 0.1 | - | 1.5 | 0.0 | - | - | - | 0.0 | 0.0 | 3.5 |
| Accrued PTO | 1.7 | - | - | 1.7 | - | - | - | - | 0.8 | - | - | 0.8 | - | - | - | - | - | 0.1 | 2.6 |
| Accrued Payroll Taxes | 10.3 | - | (0.0) | 10.3 | 4.2 | 0.3 | - | 4.5 | 1.5 | 0.1 | - | 1.6 | 4.3 | - | - | - | 4.3 | - | 20.6 |
| Insurance Reserve | 4.1 | - | - | 4.1 | - | - | - | - | 1.9 | - | - | 1.9 | - | - | - | - | - | - | 6.0 |
| Other Accrued Expenses | 23.6 | - | - | 23.6 | 0.0 | 0.0 | - | 0.0 | (0.4) | 0.0 | - | (0.4) | 1.2 | - | 1.1 | - | 2.3 | - | 25.6 |
| Third-Party Settlements | 20.9 | - | - | 20.9 | 3.4 | - | - | 3.4 | 11.9 | 0.2 | - | 12.1 | 0.6 | - | 0.6 | - | 1.2 | - | 37.6 |
| Lines of Credit & Other Short-Term Debt | (49.2) | - | - | (49.2) | (2.4) | 0.0 | - | (2.4) | 18.4 | - | - | 18.4 | 16.6 | - | (0.6) | - | 16.1 | - | (17.1) |
| Current Portion of Long-Term Debt | 0.1 | - | - | 0.1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.1 |
| Other Liabilities | 0.4 | - | - | 0.4 | - | - | - | - | 0.6 | 0.0 | - | 0.6 | - | - | - | - | - | 22.7 | 23.7 |
| Total Current Liabilities | 32.0 | - | 0.0 | 32.0 | 20.0 | 0.3 | - | 20.3 | 57.2 | 0.6 | (0.1) | 57.7 | 53.3 | 0.0 | 3.4 | 0.0 | 56.8 | 23.5 | 190.4 |
| Mortgages and Long-Term Notes Payable | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Payables/(Receivables) | 0.2 | 4.2 | 1.3 | 5.7 | 1.4 | 3.3 | - | 4.6 | (21.0) | 29.2 | 5.5 | 13.8 | 10.0 | - | 0.9 | - | 10.9 | (24.7) | 10.4 |
| Deferred Credits | 0.0 | - | - | 0.0 | 0.1 | - | - | 0.1 | 0.5 | - | - | 0.5 | 2.8 | - | - | - | 2.8 | - | 3.5 |
| Other Long-Term Liabilities | 31.5 | - | - | 31.5 | 21.1 | - | - | 21.1 | 52.1 | - | - | 52.1 | 24.4 | - | 8.3 | - | 32.7 | 4.7 | 142.2 |
| Total Long-Term Liabilities | 31.7 | 4.2 | 1.3 | 37.2 | 22.6 | 3.3 | - | 25.9 | 31.6 | 29.2 | 5.5 | 66.4 | 37.2 | - | 9.2 | - | 46.4 | (19.9) | 156.0 |
| **TOTAL LIABILITIES** | 63.8 | 4.2 | 1.3 | 69.3 | 42.6 | 3.6 | - | 46.2 | 88.8 | 29.9 | 5.5 | 124.1 | 90.6 | 0.0 | 12.6 | 0.0 | 103.2 | 3.6 | 346.4 |
| **EQUITY:** | | | | | | | | | | | | | | | | | | | |
| Additional Paid-in Capital | - | (6.7) | - | (6.7) | 0.0 | - | - | 0.0 | 0.0 | 0.0 | - | 0.0 | 0.0 | - | 0.0 | - | 0.0 | 18.5 | 11.8 |
| Other Equity | 10.1 | - | - | 10.1 | 4.8 | (0.1) | 0.0 | 4.7 | (3.5) | (0.2) | - | (3.7) | 5.3 | - | 3.0 | - | 8.3 | - | 19.4 |
| Retained Earnings PY | (10.9) | 2.6 | (1.2) | (9.5) | (21.2) | (2.7) | 0.0 | (23.9) | (49.2) | (27.3) | (3.5) | (80.0) | (70.0) | (0.3) | (9.6) | (0.0) | (80.0) | - | (193.4) |
| Distributions | (0.0) | - | - | (0.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (0.0) |
| Net Income | (1.2) | (0.0) | (0.1) | (1.3) | (10.8) | (0.8) | (0.0) | (11.6) | 1.5 | (3.3) | (1.5) | (3.2) | (14.1) | 0.3 | (5.0) | 0.0 | (18.9) | 1.4 | (33.7) |
| **TOTAL EQUITY** | (2.0) | (4.2) | (1.3) | (7.5) | (27.2) | (3.6) | 0.0 | (30.8) | (51.1) | (30.8) | (5.0) | (86.9) | (78.8) | (0.0) | (11.7) | (0.0) | (90.5) | 19.9 | (195.7) |
| **TOTAL LIABILITIES AND EQUITY** | 61.8 | - | 0.0 | 61.8 | 15.4 | 0.0 | 0.0 | 15.4 | 37.7 | (0.9) | 0.4 | 37.2 | 11.8 | - | 0.9 | - | 12.7 | 23.5 | 150.7 |

A1228

ALECTO_00005925

**Alecto Healthcare Services**
**Statement of Cash Flows (in '000's)**
**Dec-2020 YTD**

| | OLYMPIA | | | | FAIRMONT | | | | WILSON N JONES | | | | OHIO VALLEY | | | | | ALECTO | GRAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | WNJ | WNJ MG | Anesthesia | Total | OVMC | OV MG | EORH | EO MG | Total | Total | TOTAL |
| **Cash Flows from Operating Activities:** | | | | | | | | | | | | | | | | | | | |
| Change in Net Income | (1.2) | (0.0) | (0.1) | (1.3) | (10.8) | (0.8) | (0.0) | (11.6) | 1.5 | (3.3) | (1.5) | (3.2) | (14.1) | 0.3 | (5.0) | 0.0 | (18.9) | 1.4 | (33.7) |
| **Adj from Operating Activities:** | | | | | | | | | | | | | | | | | | | |
| Depreciation and Amortization | 1.7 | - | - | 1.7 | (5.7) | - | - | (5.7) | 2.6 | 0.0 | - | 2.6 | (35.6) | (0.1) | (20.2) | (0.1) | (56.0) | 0.0 | (57.5) |
| Other Deferred Income/Expense | - | - | - | - | 0.2 | - | - | 0.2 | (0.3) | - | - | (0.3) | (6.5) | - | (0.1) | - | (6.6) | - | (6.7) |
| **(Increase)/Decrease in Assets:** | | | | | | | | | | | | | | | | | | | |
| Patient Accounts Receivable | 7.8 | - | - | 7.8 | 9.9 | 0.6 | - | 10.5 | 0.4 | 0.9 | (0.1) | 1.3 | 2.8 | 0.2 | 0.2 | 0.3 | 3.4 | - | 23.0 |
| Supplies Inventory | (0.0) | - | - | (0.0) | 0.8 | - | - | 0.8 | 0.3 | - | - | 0.3 | - | - | - | - | - | - | 1.1 |
| Pre-Paid Expenses & Oth Current Assets | (0.1) | - | - | (0.1) | 0.6 | - | - | 0.6 | 1.5 | (0.0) | - | 1.5 | 0.5 | - | 3.3 | - | 3.8 | - | 5.7 |
| Other Receivables | 1.9 | - | - | 1.9 | 0.0 | - | - | 0.0 | 0.4 | - | - | 0.4 | 0.3 | - | 0.5 | - | 0.7 | (0.1) | 2.9 |
| **Increase/(Decrease) in Liabilities:** | | | | | | | | | | | | | | | | | | | |
| Accounts and Notes Payable | (1.6) | - | - | (1.6) | (2.1) | 0.0 | - | (2.1) | (1.1) | (0.5) | (0.1) | (1.7) | 3.4 | (0.5) | (3.7) | (0.3) | (1.1) | (2.6) | (9.1) |
| Accrued Payroll Costs | 3.9 | - | (0.1) | 3.8 | (2.3) | (0.0) | - | (2.3) | (1.6) | (0.3) | - | (1.9) | (0.8) | - | (0.0) | - | (0.8) | (0.0) | (1.2) |
| IBNR | 0.4 | - | - | 0.4 | (2.5) | - | - | (2.5) | 0.0 | - | - | 0.0 | (3.6) | - | (2.0) | - | (5.6) | - | (7.7) |
| Other Accrued Liabilities | (8.8) | - | - | (8.8) | (0.3) | (0.0) | - | (0.3) | (3.3) | (0.0) | - | (3.3) | (1.6) | - | 1.1 | - | (0.4) | 22.7 | 9.8 |
| Estimated 3rd Party Settlements | 10.7 | - | - | 10.7 | 3.8 | - | - | 3.8 | 12.0 | 0.2 | - | 12.2 | 0.7 | - | 0.6 | - | 1.3 | - | 28.0 |
| **Net Cash From (For) Operating Activities** | 14.6 | (0.0) | (0.2) | 14.4 | (8.3) | (0.2) | (0.0) | (8.6) | 12.4 | (2.9) | (1.6) | 7.8 | (54.6) | (0.1) | (25.3) | (0.1) | (80.2) | 21.3 | (45.2) |
| **Cash Flows from Investing Activities:** | | | | | | | | | | | | | | | | | | | |
| Capital Expenditures | (1.7) | - | - | (1.7) | 9.2 | - | - | 9.2 | (0.3) | - | - | (0.3) | 54.0 | 0.1 | 24.7 | 0.1 | 78.9 | - | 86.1 |
| Payments to Acquire Other Assets | 0.0 | - | - | 0.0 | - | - | - | - | (0.1) | - | - | (0.1) | - | - | - | - | - | - | (0.1) |
| **Net Cash From (For) Investing Activities** | (1.7) | - | - | (1.7) | 9.2 | - | - | 9.2 | (0.4) | - | - | (0.4) | 54.0 | 0.1 | 24.7 | 0.1 | 78.9 | - | 85.9 |
| **Cash Flows from Financing Activities:** | | | | | | | | | | | | | | | | | | | |
| Funds Provided (to) from Intercompany | 7.2 | - | 0.1 | 7.3 | 2.8 | 0.2 | 0.0 | 3.0 | (1.8) | 2.5 | 1.6 | 2.4 | 2.6 | - | 1.0 | - | 3.6 | (8.3) | 8.1 |
| Borrow (Re-Payment) of Debt | (16.5) | - | - | (16.5) | (4.6) | 0.0 | - | (4.5) | (8.2) | - | - | (8.2) | (2.1) | - | (0.6) | - | (2.7) | (0.0) | (31.9) |
| Capital Lease Obligations (Re-Payment) | - | - | - | - | - | - | - | - | - | - | - | - | 0.1 | - | 0.1 | - | 0.2 | - | 0.2 |
| Parent Contributions / (Distributions) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (0.0) | (0.0) |
| **Net Cash From (For) Financing Activities** | (9.2) | - | 0.1 | (9.1) | (1.7) | 0.2 | 0.0 | (1.5) | (9.9) | 2.5 | 1.6 | (5.8) | 0.6 | - | 0.5 | - | 1.1 | (8.3) | (23.6) |
| **Net Change in Cash and Cash Equivalents** | 3.7 | (0.0) | (0.1) | 3.6 | (0.8) | (0.0) | (0.0) | (0.9) | 2.0 | (0.4) | (0.0) | 1.6 | (0.1) | (0.0) | (0.1) | 0.0 | (0.2) | 13.0 | 17.2 |

**A1229**

ALECTO_00005926

**Alecto Healthcare Services**
**Income Statement (in millions)**
**Dec-2021 YTD**

| | OLYMPIA | | | | FAIRMONT | | | | WILSON N JONES | | | | OHIO VALLEY | | | | | ALECTO | GRAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | WNJ | WNJ MG | Anesthesia | Total | OVMC | OV MG | EORH | EO MG | Total | Total | TOTAL |
| **REVENUES** | | | | | | | | | | | | | | | | | | | |
| Inpatient Revenue - Routine | 21.4 | - | - | 21.4 | - | - | - | - | 49.1 | - | - | 49.1 | - | - | - | - | - | - | 70.5 |
| Inpatient Revenue - Ancillary | 39.6 | - | - | 39.6 | - | - | - | - | 116.2 | 0.1 | 2.0 | 118.4 | - | - | - | - | - | - | 158.1 |
| **Total IP Revenue** | 61.0 | - | - | 61.0 | - | - | - | - | 165.3 | 0.1 | 2.0 | 167.5 | - | - | - | - | - | - | 228.5 |
| Outpatient Revenue | 23.3 | - | - | 23.3 | - | - | - | - | 91.8 | 2.9 | 1.2 | 95.9 | - | - | - | - | - | - | 119.2 |
| **Total Patient Revenue** | 84.3 | - | - | 84.3 | - | - | - | - | 257.1 | 3.0 | 3.3 | 263.4 | - | - | - | - | - | - | 347.7 |
| Revenue Deductions | (102.7) | - | - | (102.7) | (0.6) | - | - | (0.6) | (206.1) | (0.6) | (2.8) | (209.6) | - | - | 0.0 | - | 0.0 | - | (312.9) |
| Bad Debt | 27.1 | - | - | 27.1 | 0.3 | 0.0 | - | 0.3 | (14.8) | (0.1) | (0.4) | (15.3) | 0.4 | - | - | - | 0.4 | - | 12.5 |
| **Total Deductions from Revenue** | (75.6) | - | - | (75.6) | (0.2) | 0.0 | - | (0.2) | (220.9) | (0.8) | (3.2) | (225.0) | 0.4 | - | 0.0 | - | 0.4 | - | (300.4) |
| **Total Net Patient Revenue (Excl. Suppl.)** | 8.7 | - | - | 8.7 | (0.2) | 0.0 | - | (0.2) | 36.2 | 2.3 | 0.0 | 38.5 | 0.4 | - | 0.0 | - | 0.4 | - | 47.4 |
| **SUPPLEMENTAL NET PATIENT REVENUE** | | | | | | | | | | | | | | | | | | | |
| WV Directed Payment Plan (DPP) | - | - | - | - | 1.2 | - | - | 1.2 | - | - | - | - | - | - | - | - | - | - | 1.2 |
| TX LPPF | - | - | - | - | - | - | - | - | 0.1 | - | - | 0.1 | - | - | - | - | - | - | 0.1 |
| Medicaid DSH | - | - | - | - | - | - | - | - | 2.3 | - | - | 2.3 | - | - | - | - | - | - | 2.3 |
| Medicare Settlements | - | - | - | - | (0.2) | - | - | (0.2) | 0.4 | - | - | 0.4 | - | - | - | - | - | - | 0.3 |
| **Total Supplemental Revenue** | - | - | - | - | 1.0 | - | - | 1.0 | 2.9 | - | - | 2.9 | - | - | - | - | - | - | 3.9 |
| **Net Patient Revenue** | 8.7 | - | - | 8.7 | 0.8 | 0.0 | - | 0.8 | 39.1 | 2.3 | 0.0 | 41.4 | 0.4 | - | 0.0 | - | 0.4 | - | 51.3 |
| Other Operating Revenues | 0.2 | - | - | 0.2 | 0.0 | - | - | 0.0 | 8.6 | 0.0 | - | 8.6 | - | - | - | - | - | 3.4 | 12.2 |
| **TOTAL NET REVENUES** | 8.9 | - | - | 8.9 | 0.8 | 0.0 | - | 0.8 | 47.7 | 2.3 | 0.0 | 50.0 | 0.4 | - | 0.0 | - | 0.4 | 3.4 | 63.5 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | |
| Salaries and Wages | 7.7 | - | 0.0 | 7.7 | 0.0 | - | - | 0.0 | 18.4 | 1.1 | - | 19.5 | - | - | - | - | - | 2.5 | 29.7 |
| Benefits | 1.1 | - | 0.0 | 1.1 | (0.2) | - | - | (0.2) | 1.6 | 0.0 | - | 1.6 | - | - | - | - | - | 0.2 | 2.7 |
| Payroll Taxes | 0.8 | - | 0.0 | 0.8 | 0.0 | - | - | 0.0 | 1.7 | 0.1 | - | 1.8 | - | - | - | - | - | 0.1 | 2.7 |
| PTO | 0.9 | - | 0.0 | 0.9 | (0.0) | - | - | (0.0) | 1.2 | - | - | 1.2 | - | - | - | - | - | 0.2 | 2.3 |
| Contract Labor | 1.5 | - | - | 1.5 | 0.1 | - | - | 0.1 | 7.5 | 0.5 | - | 8.0 | - | - | - | - | - | - | 9.5 |
| **Labor Sub-Total** | 11.9 | - | 0.0 | 11.9 | (0.0) | - | - | (0.0) | 30.4 | 1.7 | - | 32.1 | - | - | - | - | - | 3.0 | 47.0 |
| Supplies Billable | 1.1 | - | - | 1.1 | (0.0) | - | - | (0.0) | 6.3 | 0.1 | - | 6.3 | - | - | - | - | - | - | 7.4 |
| Supplies Non-Billable | 0.4 | - | - | 0.4 | (0.0) | - | - | (0.0) | 1.2 | 0.0 | 0.0 | 1.2 | - | - | - | - | - | 0.0 | 1.6 |
| **Total Supplies** | 1.5 | - | - | 1.5 | (0.1) | - | - | (0.1) | 7.5 | 0.1 | 0.0 | 7.6 | - | - | - | - | - | 0.0 | 9.0 |
| Purchased Services | 3.1 | - | - | 3.1 | 0.1 | - | - | 0.1 | 4.1 | 0.1 | 0.0 | 4.3 | (0.2) | - | - | - | (0.2) | 0.1 | 7.4 |
| Professional Fees | 1.3 | - | - | 1.3 | 0.2 | - | - | 0.2 | 5.7 | - | 1.5 | 7.3 | 0.7 | - | 0.0 | - | 0.7 | 0.2 | 9.6 |
| Repairs and Maintenance | 0.1 | - | - | 0.1 | (0.0) | - | - | (0.0) | 1.8 | 0.0 | - | 1.8 | - | - | - | - | - | 0.0 | 1.9 |
| Rents and leases | 0.4 | - | - | 0.4 | (0.0) | - | - | (0.0) | (2.3) | 0.1 | - | (2.3) | - | - | - | - | - | 0.2 | (1.6) |
| Insurance | 1.1 | - | - | 1.1 | 0.1 | - | - | 0.1 | 0.2 | - | - | 0.2 | 0.1 | - | 0.1 | - | 0.2 | 0.2 | 1.7 |
| Utilities | 0.6 | - | - | 0.6 | 0.0 | - | - | 0.0 | 1.2 | 0.0 | - | 1.2 | - | - | - | - | - | 0.0 | 1.9 |
| Taxes and Licenses | 0.6 | - | - | 0.6 | (0.2) | 0.0 | - | (0.2) | (0.1) | 0.0 | - | (0.1) | 0.0 | - | 0.0 | - | 0.0 | 0.0 | 0.3 |
| Other Operating Expenses | 0.5 | - | - | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 | 0.1 | 0.0 | 0.6 | (0.4) | - | 0.1 | - | (0.2) | 0.2 | 1.1 |
| Hospital Fees/Taxes | | | | | 0.0 | | | 0.0 | 2.3 | - | - | 2.3 | | | | | | | 2.3 |
| **Total Operating Expenses** | 21.0 | - | 0.0 | 21.1 | 0.1 | 0.0 | 0.0 | 0.1 | 51.2 | 2.1 | 1.6 | 55.0 | 0.3 | - | 0.2 | - | 0.5 | 4.1 | 80.7 |
| **EBITDAR** | (12.1) | - | (0.0) | (12.1) | 0.7 | (0.0) | (0.0) | 0.7 | (3.6) | 0.2 | (1.6) | (5.0) | 0.1 | - | (0.2) | - | (0.1) | (0.6) | (17.1) |
| **NON-OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | |
| Depreciation | 1.5 | - | - | 1.5 | 0.5 | - | - | 0.5 | 2.4 | 0.0 | - | 2.4 | - | - | - | - | - | 0.0 | 4.4 |
| Interest Income | - | - | - | - | - | - | - | - | (0.0) | - | - | (0.0) | - | - | - | - | - | (0.0) | (0.0) |
| Interest Expense | 0.3 | - | 0.0 | 0.3 | (0.0) | - | - | (0.0) | (0.2) | - | - | (0.2) | 0.0 | - | - | - | 0.0 | 0.2 | 0.2 |
| MPT Building Lease / Interest | (0.2) | - | - | (0.2) | 0.0 | - | - | 0.0 | (1.0) | - | - | (1.0) | - | - | - | - | - | - | (1.2) |
| Other Non-Operating Expense / (Revenue) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (Gain)/Loss on Asset Sales | (48.6) | - | - | (48.6) | 1.1 | - | - | 1.1 | (21.8) | - | - | (21.8) | (0.3) | - | - | - | (0.3) | - | (69.6) |
| **Total Non-Operating Expenses** | (47.0) | - | 0.0 | (47.0) | 1.6 | - | - | 1.6 | (20.6) | 0.0 | - | (20.6) | (0.3) | - | - | - | (0.3) | 0.2 | (66.2) |
| **NET INCOME (LOSS)** | 35.0 | - | (0.0) | 34.9 | (0.9) | (0.0) | (0.0) | (0.9) | 17.1 | 0.2 | (1.6) | 15.6 | 0.4 | - | (0.2) | - | 0.2 | (0.8) | 49.1 |

**A1230** ALECTO_00005927

# EXHIBIT 43

JX50

**Alecto Healthcare Services**
**Balance Sheet Summary (in millions)**
**12/31/2021**

| | OLYMPIA | | | | FAIRMONT | | | | WILSON N JONES | | | | OHIO VALLEY | | | | | ALECTO | GRAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | WNJ | WNJ MG | Anesthesia | Total | OVMC | OV MG | EORH | EO MG | Total | Total | TOTAL |
| **ASSETS:** | | | | | | | | | | | | | | | | | | | |
| Cash and Equivalents | 17.3 | - | 0.0 | 17.3 | 0.0 | 0.0 | 0.0 | 0.0 | 1.6 | 0.0 | 0.0 | 1.6 | - | - | - | - | - | 11.4 | 30.4 |
| Accounts Receivable | 49.8 | - | - | 49.8 | - | - | - | - | 82.5 | 0.2 | 0.3 | 83.0 | - | - | - | - | - | - | 132.8 |
| Allowance for Bad Debt | (11.9) | - | - | (11.9) | - | - | - | - | (21.2) | (0.0) | (0.1) | (21.3) | - | - | - | - | - | - | (33.2) |
| Allowance for Contractuals & Oth Adj | (37.9) | - | - | (37.9) | - | - | - | - | (52.6) | (0.0) | (0.2) | (52.8) | - | - | - | - | - | - | (90.7) |
| Supplemental A/R | - | - | - | - | 3.0 | - | - | 3.0 | - | - | - | - | - | - | - | - | - | - | 3.0 |
| Patient Accounts Receivable | 0.0 | - | - | 0.0 | 3.0 | - | - | 3.0 | 8.7 | 0.2 | 0.1 | 8.9 | - | - | - | - | - | - | 11.9 |
| Other Receivables | 8.3 | - | - | 8.3 | (0.0) | - | - | (0.0) | 0.1 | - | - | 0.1 | - | - | - | - | - | 9.3 | 17.7 |
| Inventories | 0.0 | - | - | 0.0 | - | - | - | - | 1.7 | - | - | 1.7 | - | - | - | - | - | - | 1.7 |
| Other Current Assets | 3.7 | - | - | 3.7 | - | - | - | - | 0.3 | - | - | 0.3 | 0.1 | - | - | - | 0.1 | 0.7 | 4.8 |
| Prepaid Insurance | 0.0 | - | - | 0.0 | - | - | - | - | 0.0 | 0.0 | - | 0.0 | - | - | - | - | - | - | 0.0 |
| Other Pre-Paid Expenses | 0.2 | - | - | 0.2 | - | - | - | - | 1.5 | - | - | 1.5 | - | - | - | - | - | 0.7 | 2.3 |
| Total Current Assets | 29.5 | - | 0.0 | 29.5 | 3.0 | 0.0 | 0.0 | 3.0 | 14.0 | 0.2 | 0.1 | 14.2 | 0.1 | - | - | - | 0.1 | 22.1 | 68.9 |
| Land and Improvements | - | - | - | - | 3.2 | - | - | 3.2 | 1.8 | - | - | 1.8 | 1.9 | - | 3.2 | - | 5.1 | - | 10.1 |
| Buildings and Improvements | - | - | - | - | 8.3 | - | - | 8.3 | 22.5 | - | - | 22.5 | 73.7 | - | 39.8 | - | 113.5 | - | 144.3 |
| Leaseholds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equipment | - | - | - | - | - | - | - | - | 13.9 | 0.2 | - | 14.2 | - | - | - | - | - | 0.0 | 14.2 |
| Construction-In-Progress | - | - | - | - | - | - | - | - | 0.3 | - | - | 0.3 | - | - | - | - | - | - | 0.3 |
| Property and Equipment | - | - | - | - | 11.5 | - | - | 11.5 | 38.5 | 0.2 | - | 38.7 | 75.6 | - | 43.0 | - | 118.7 | 0.0 | 168.9 |
| Less: Accumulated Depreciation | - | - | - | - | (2.5) | - | - | (2.5) | (17.9) | (0.2) | - | (18.1) | (64.1) | - | (42.1) | - | (106.2) | (0.0) | (126.8) |
| Net Property and Equipment | - | - | - | - | 8.9 | - | - | 8.9 | 20.6 | 0.0 | - | 20.6 | 11.6 | - | 0.9 | - | 12.5 | 0.0 | 42.1 |
| Net goodwill | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other intangible assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Long-Term Assets | - | - | - | - | 8.9 | - | - | 8.9 | 20.6 | 0.0 | - | 20.6 | 11.6 | - | 0.9 | - | 12.5 | 0.0 | 42.1 |
| **TOTAL ASSETS** | 29.5 | - | 0.0 | 29.5 | 12.0 | 0.0 | 0.0 | 12.0 | 34.6 | 0.2 | 0.1 | 34.8 | 11.7 | - | 0.9 | - | 12.6 | 22.1 | 111.0 |
| **LIABILITIES:** | | | | | | | | | | | | | | | | | | | |
| Accounts Payable | 9.6 | - | - | 9.6 | 10.6 | 0.1 | - | 10.7 | 8.1 | 0.1 | (0.0) | 8.2 | 29.8 | 0.0 | 2.0 | 0.0 | 31.9 | 0.1 | 60.5 |
| Notes Payable | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.5 | 0.5 |
| Capital Leases | - | - | - | - | - | - | - | - | - | - | - | - | 0.4 | - | 0.3 | - | 0.7 | - | 0.7 |
| Accrued Payroll | 0.0 | - | - | 0.0 | 0.0 | - | - | 0.0 | 1.5 | 0.1 | - | 1.7 | 0.0 | - | - | - | 0.0 | 0.0 | 1.7 |
| Accrued PTO | 0.1 | - | 0.0 | 0.1 | - | - | - | - | 0.7 | - | - | 0.7 | - | - | - | - | - | 0.2 | 1.0 |
| Accrued Payroll Taxes | 0.0 | - | 0.0 | 0.0 | 4.2 | 0.0 | - | 4.2 | 0.1 | 0.1 | - | 0.2 | 4.2 | - | - | - | 4.2 | - | 8.7 |
| Insurance Reserve | 2.5 | - | - | 2.5 | - | - | - | - | 0.4 | - | - | 0.4 | - | - | - | - | - | - | 2.9 |
| Other Accrued Expenses | 14.3 | - | - | 14.3 | 0.0 | 0.0 | - | 0.0 | 3.2 | 0.0 | - | 3.2 | 1.2 | - | 1.1 | - | 2.3 | - | 19.9 |
| Third-Party Settlements | 19.9 | - | - | 19.9 | 4.2 | - | - | 4.2 | 8.7 | 0.2 | - | 8.9 | 0.6 | - | 0.6 | - | 1.2 | - | 34.3 |
| Lines of Credit & Other Short-Term Debt | 3.5 | - | - | 3.5 | 3.2 | - | - | 3.2 | 3.2 | - | - | 3.2 | 3.2 | - | 3.2 | - | 6.5 | - | 16.5 |
| Current Portion of Long-Term Debt | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Liabilities | (0.1) | - | - | (0.1) | - | - | - | - | 0.0 | 0.0 | - | 0.0 | - | - | - | - | - | - | (0.1) |
| Total Current Liabilities | 49.8 | - | 0.0 | 49.8 | 22.3 | 0.1 | - | 22.4 | 26.0 | 0.6 | (0.0) | 26.6 | 39.5 | 0.0 | 7.2 | 0.0 | 46.8 | 0.8 | 146.4 |
| Mortgages and Long-Term Notes Payable | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Payables/(Receivables) | (86.6) | 4.2 | 1.3 | (81.1) | 1.3 | 3.5 | - | 4.8 | 18.3 | 30.1 | 6.7 | 55.1 | 23.2 | - | (2.7) | - | 20.6 | (9.8) | (10.4) |
| Deferred Credits | 0.0 | - | - | 0.0 | 0.7 | - | - | 0.7 | 0.1 | - | - | 0.1 | 2.8 | - | - | - | 2.8 | - | 3.6 |
| Other Long-Term Liabilities | 9.6 | - | - | 9.6 | 16.1 | - | - | 16.1 | 24.3 | - | - | 24.3 | 24.4 | - | 8.3 | - | 32.7 | 12.0 | 94.6 |
| Total Long-Term Liabilities | (77.0) | 4.2 | 1.3 | (71.5) | 18.1 | 3.5 | - | 21.6 | 42.7 | 30.1 | 6.7 | 79.5 | 50.5 | - | 5.6 | - | 56.1 | 2.2 | 87.9 |
| **TOTAL LIABILITIES** | (27.2) | 4.2 | 1.3 | (21.7) | 40.4 | 3.6 | - | 44.0 | 68.6 | 30.8 | 6.7 | 106.1 | 90.0 | 0.0 | 12.8 | 0.0 | 102.9 | 3.0 | 234.4 |
| **EQUITY:** | | | | | | | | | | | | | | | | | | | |
| Additional Paid-in Capital | 6.7 | (6.7) | - | - | 0.0 | - | - | 0.0 | 0.0 | 0.0 | - | 0.0 | 0.0 | - | 0.0 | - | 0.0 | 8.9 | 9.0 |
| Other Equity | - | - | - | - | 4.8 | (0.1) | 0.0 | 4.7 | (3.5) | (0.2) | - | (3.7) | 5.3 | - | 3.0 | - | 8.3 | - | 9.3 |
| Retained Earnings PY | (12.6) | 2.6 | (1.3) | (11.4) | (32.4) | (3.5) | (0.0) | (35.9) | (47.6) | (30.6) | (5.0) | (83.2) | (84.1) | (0.0) | (14.7) | (0.0) | (98.8) | 11.0 | (218.4) |
| Distributions | (9.6) | - | - | (9.6) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (9.6) |
| Net Income | 72.1 | (0.0) | (0.0) | 72.1 | (0.9) | (0.0) | (0.0) | (0.9) | 17.1 | 0.2 | (1.6) | 15.6 | 0.4 | 0.0 | (0.2) | 0.0 | 0.2 | (0.8) | 86.2 |
| **TOTAL EQUITY** | 56.7 | (4.2) | (1.3) | 51.2 | (28.5) | (3.6) | 0.0 | (32.0) | (34.1) | (30.6) | (6.6) | (71.3) | (78.3) | (0.0) | (11.9) | (0.0) | (90.3) | 19.1 | (123.4) |
| **TOTAL LIABILITIES AND EQUITY** | 29.5 | - | 0.0 | 29.5 | 12.0 | 0.0 | 0.0 | 12.0 | 34.6 | 0.2 | 0.1 | 34.8 | 11.7 | - | 0.9 | - | 12.6 | 22.1 | 111.0 |

**Alecto Healthcare Services**
**Statement of Cash Flows (in '000's)**
**Dec-2021 YTD**

| | OLYMPIA | | | | FAIRMONT | | | | WILSON N JONES | | | | OHIO VALLEY | | | | | ALECTO | GRAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | WNJ | WNJ MG | Anesthesia | Total | OVMC | OV MG | EORH | EO MG | Total | Total | TOTAL |
| **Cash Flows from Operating Activities:** | | | | | | | | | | | | | | | | | | | |
| Change in Net Income | 72.1 | - | (0.0) | 72.1 | (0.9) | (0.0) | (0.0) | (0.9) | 17.1 | 0.2 | (1.6) | 15.6 | 0.4 | - | (0.2) | - | 0.2 | (0.8) | 86.2 |
| **Adj from Operating Activities:** | | | | | | | | | | | | | | | | | | | |
| Depreciation and Amortization | (28.3) | - | - | (28.3) | (2.8) | - | - | (2.8) | (5.9) | 0.0 | - | (5.9) | - | - | - | - | - | 0.0 | (37.0) |
| Other Deferred Income/Expense | - | - | - | - | 0.5 | - | - | 0.5 | (0.4) | - | - | (0.4) | 0.0 | - | - | - | 0.0 | - | 0.2 |
| **(Increase)/Decrease in Assets:** | | | | | | | | | | | | | | | | | | | |
| Patient Accounts Receivable | 24.1 | - | - | 24.1 | 1.6 | - | - | 1.6 | 5.3 | (0.8) | 0.4 | 4.8 | - | - | - | - | - | - | 30.5 |
| Supplies Inventory | 1.0 | - | - | 1.0 | - | - | - | - | (0.3) | - | - | (0.3) | - | - | - | - | - | - | 0.7 |
| Pre-Paid Expenses & Oth Current Assets | (2.4) | - | - | (2.4) | - | - | - | - | (1.2) | 0.0 | - | (1.2) | - | - | - | - | - | (0.7) | (4.3) |
| Other Receivables | (6.0) | - | - | (6.0) | - | - | - | - | 0.2 | - | - | 0.2 | 0.1 | - | - | - | 0.1 | 0.1 | (5.6) |
| **Increase/(Decrease) in Liabilities:** | | | | | | | | | | | | | | | | | | | |
| Accounts and Notes Payable | (7.7) | - | - | (7.7) | (4.1) | - | - | (4.1) | (12.9) | (0.0) | - | (12.9) | (0.4) | - | - | - | (0.4) | (0.0) | (25.1) |
| Accrued Payroll Costs | (13.8) | - | (0.0) | (13.8) | (0.0) | (0.2) | - | (0.3) | (1.4) | 0.1 | - | (1.4) | (0.0) | - | - | - | (0.0) | 0.0 | (15.4) |
| IBNR | (1.6) | - | - | (1.6) | - | - | - | - | (1.5) | - | - | (1.5) | - | - | - | - | - | - | (3.1) |
| Other Accrued Liabilities | (10.0) | - | - | (10.0) | (0.0) | 0.0 | - | (0.0) | 3.0 | (0.0) | - | 3.0 | - | - | - | - | - | (22.7) | (29.8) |
| Estimated 3rd Party Settlements | (1.0) | - | - | (1.0) | 0.4 | - | - | 0.4 | (3.2) | (0.0) | - | (3.2) | - | - | - | - | - | - | (3.8) |
| **Net Cash From (For) Operating Activities** | 26.4 | - | (0.1) | 26.4 | (5.2) | (0.2) | (0.0) | (5.5) | (1.3) | (0.6) | (1.2) | (3.0) | 0.1 | - | (0.2) | - | (0.1) | (24.1) | (6.3) |
| | | | | | | | | | | | | | | | | | | | |
| **Cash Flows from Investing Activities:** | | | | | | | | | | | | | | | | | | | |
| Capital Expenditures | 73.4 | - | - | 73.4 | 4.5 | - | - | 4.5 | 4.9 | - | - | 4.9 | - | - | - | - | - | (0.0) | 82.8 |
| Payments to Acquire Other Assets | 2.5 | - | - | 2.5 | - | - | - | - | 0.0 | - | - | 0.0 | - | - | - | - | - | - | 2.5 |
| **Net Cash From (For) Investing Activities** | 75.9 | - | - | 75.9 | 4.5 | - | - | 4.5 | 4.9 | - | - | 4.9 | - | - | - | - | - | (0.0) | 85.4 |
| | | | | | | | | | | | | | | | | | | | |
| **Cash Flows from Financing Activities:** | | | | | | | | | | | | | | | | | | | |
| Funds Provided (to) from Intercompany | (79.8) | - | 0.0 | (79.8) | (0.1) | 0.2 | - | 0.2 | 39.3 | 0.9 | 1.1 | 41.3 | 13.2 | - | (3.6) | - | 9.6 | 14.9 | (13.8) |
| Borrow (Re-Payment) of Debt | 0.8 | - | - | 0.8 | 0.7 | (0.0) | - | 0.7 | (43.0) | - | - | (43.0) | (13.4) | - | 3.8 | - | (9.6) | 7.3 | (43.8) |
| Capital Lease Obligations (Re-Payment) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parent Contributions / (Distributions) | (10.1) | - | - | (10.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (10.1) |
| **Net Cash From (For) Financing Activities** | (89.2) | - | 0.0 | (89.1) | 0.6 | 0.2 | - | 0.9 | (3.8) | 0.9 | 1.1 | (1.8) | (0.1) | - | 0.2 | - | 0.1 | 22.2 | (67.8) |
| | | | | | | | | | | | | | | | | | | | |
| **Net Change in Cash and Cash Equivalents** | 13.1 | - | (0.0) | 13.1 | (0.1) | 0.0 | (0.0) | (0.1) | (0.1) | 0.3 | (0.0) | 0.1 | 0.0 | - | (0.0) | - | (0.0) | (1.9) | 11.3 |

**A1233**

ALECTO_00005929

# EXHIBIT 44

**ALECTO HEALTHCARE SERVICES**
**YTD INCOME STATEMENT**
**December 31, 2022**

| | WNJ | Sherman MD | Anesthesia | WNJ Total | Alecto Healthcare Services | Discontinued Operations | Grand Total |
|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | |
| Inpatient Revenue - Routine | 40,199,355 | - | - | 40,199,355 | - | - | 40,199,355 |
| Inpatient Revenue - Ancillary | 81,769,635 | - | 1,393,063 | 83,162,697 | - | - | 83,162,697 |
| **Total IP Revenue** | 121,968,989 | - | 1,393,063 | 123,362,052 | - | - | 123,362,052 |
| Outpatient Revenue | 89,216,865 | 2,766,148 | 1,425,615 | 93,408,628 | - | - | 93,408,628 |
| **Total Patient Revenue** | 211,185,855 | 2,766,148 | 2,818,678 | 216,770,680 | - | - | 216,770,680 |
| Revenue Deductions | (164,542,986) | (1,382,055) | (2,134,942) | (168,059,982) | - | 799,149 | (167,260,833) |
| Bad Debt | (9,420,132) | (36,117) | (259,409) | (9,715,658) | - | (585,988) | (10,301,646) |
| **Total Deductions from Revenue** | (173,963,118) | (1,418,172) | (2,394,351) | (177,775,640) | - | 213,161 | (177,562,479) |
| **Total Net Patient Revenue (Excl. Suppl.)** | 37,222,737 | 1,347,976 | 424,327 | 38,995,040 | - | 213,161 | 39,208,201 |
| **SUPPLEMENTAL NET PATIENT REVENUE** | | | | | | | |
| TX LPPF | 2,385,740 | - | - | 2,385,740 | - | - | 2,385,740 |
| Medicaid DSH | (159,735) | - | - | (159,735) | - | - | (159,735) |
| Medicare Settlements | 1,472,977 | - | - | 1,472,977 | - | - | 1,472,977 |
| **Total Supplemental Revenue** | 3,698,981 | - | - | 3,698,981 | - | - | 3,698,981 |
| **Net Patient Revenue** | 40,921,719 | 1,347,976 | 424,327 | 42,694,021 | - | 213,161 | 42,907,183 |
| Other Operating Revenues | 1,591,511 | 41,929 | - | 1,633,440 | 3,559,929 | 86,549 | 5,279,918 |
| **TOTAL NET REVENUES** | 42,513,229 | 1,389,905 | 424,327 | 44,327,461 | 3,559,929 | 299,711 | 48,187,100 |
| **OPERATING EXPENSES** | | | | | | | |
| Salaries and Wages | 19,223,801 | 1,177,119 | - | 20,400,919 | 2,346,221 | 15,499 | 22,762,639 |
| Benefits | 2,703,359 | - | - | 2,703,359 | 195,880 | 76,632 | 2,975,872 |
| Payroll Taxes | 1,637,676 | 176,175 | - | 1,813,852 | 124,725 | 4,048 | 1,942,625 |
| PTO | 1,199,601 | - | - | 1,199,601 | 141,314 | (132,637) | 1,208,279 |
| Contract Labor | 7,953,146 | 589,008 | - | 8,542,153 | - | 51,823 | 8,593,976 |
| Labor Sub-Total | 32,717,584 | 1,942,301 | - | 34,659,885 | 2,808,141 | 15,365 | 37,483,391 |
| Supplies Billable | 5,967,097 | 81,251 | - | 6,048,349 | - | 3,568 | 6,051,917 |
| Supplies Non-Billable | 1,293,399 | 3,630 | 1,120 | 1,298,149 | 35,121 | 29,589 | 1,362,859 |
| Total Supplies | 7,260,496 | 84,881 | 1,120 | 7,346,497 | 35,121 | 33,158 | 7,414,776 |
| Purchased Services | 5,879,451 | 158,776 | 47,953 | 6,086,180 | 7,960 | 544,514 | 6,638,654 |
| Professional Fees | 4,193,745 | - | 1,444,809 | 5,638,554 | 202,583 | 962,479 | 6,803,616 |
| Repairs and Maintenance | 1,344,155 | 4,958 | - | 1,349,113 | 2,098 | 1,693 | 1,352,904 |
| Rents and leases | 112,054 | 87,965 | - | 200,019 | 203,632 | 338,784 | 742,436 |
| Insurance | 915,583 | 3,511 | - | 919,095 | 144,931 | 790,510 | 1,854,536 |
| Utilities | 1,577,748 | 18,672 | - | 1,596,420 | 8,457 | (119,109) | 1,485,768 |
| Taxes and Licenses | 826,856 | 8,429 | - | 835,285 | 12,605 | 277,854 | 1,125,744 |
| Other Operating Expenses | 1,258,868 | 52,743 | 36,088 | 1,347,699 | 129,484 | 442,659 | 1,919,842 |
| Hospital Fees/Taxes | 2,567,892 | - | - | 2,567,892 | - | 886 | 2,568,777 |
| **Total Operating Expenses** | 58,654,432 | 2,362,236 | 1,529,970 | 62,546,639 | 3,555,011 | 3,288,794 | 69,390,444 |
| **EBITDAR** | (16,141,203) | (972,332) | (1,105,643) | (18,219,178) | 4,918 | (2,989,083) | (21,203,343) |
| **NON-OPERATING EXPENSES** | | | | | | | |
| Depreciation | 1,812,207 | 6,692 | - | 1,818,899 | 3,871 | 440,731 | 2,263,501 |
| Interest Income | (28,343) | - | - | (28,343) | - | - | (28,343) |
| Interest Expense | 565,150 | - | - | 565,150 | (134,720) | 3,752,555 | 4,182,985 |
| MPT Building Lease / Interest | 1,075,496 | - | - | 1,075,496 | - | - | 1,075,496 |
| Other Non-Operating Expense / (Revenue) | (1,869,393) | - | - | (1,869,393) | - | (3,704,298) | (5,573,691) |
| (Gain)/Loss on Asset Sales | 248,272 | (250,327) | - | (2,055) | - | (4,318,790) | (4,320,846) |
| **Total Non-Operating Expenses** | 1,803,389 | (243,635) | - | 1,559,753 | (130,849) | (3,829,802) | (2,400,898) |
| **NET INCOME (LOSS)** | (17,944,591) | (728,696) | (1,105,643) | (19,778,931) | 135,767 | 840,719 | (18,802,445) |

JX56

**ALECTO HEALTHCARE SERVICES**
**BALANCE SHEET**
**December 31, 2022**

| | WNJ | Sherman MD | Anesthesia | WNJ Total | Alecto Healthcare Services | Discontinued Operations | Grand Total |
|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | |
| Cash and Equivalents | (134,034) | (1,267) | 3,365 | (131,936) | 33,401 | 18,904 | (79,631) |
| Accounts Receivable | 71,841,105 | 243,450 | 273,496 | 72,358,052 | - | (943) | 72,357,110 |
| Allowance for Bad Debt | (13,277,503) | (17,242) | (42,186) | (13,336,931) | - | | (13,336,931) |
| Allowance for Contractuals & Oth Adj | (52,198,959) | (53,961) | (207,610) | (52,460,530) | - | | (52,460,530) |
| Supplemental A/R | - | | | - | - | 3,008,311 | 3,008,311 |
| Patient Accounts Receivable | 6,364,643 | 172,248 | 23,700 | 6,560,591 | - | 3,007,368 | 9,567,960 |
| Other Receivables | 127,772 | - | - | 127,772 | 9,169,117 | 13,173,433 | 22,470,322 |
| Inventories | 1,339,489 | - | - | 1,339,489 | - | - | 1,339,489 |
| Other Current Assets | 495,861 | - | - | 495,861 | 151,038 | 2,553,541 | 3,200,440 |
| Prepaid Insurance | 11,923 | 2,398 | - | 14,321 | - | | 14,321 |
| Other Pre-Paid Expenses | 687,075 | 200 | - | 687,275 | 983,806 | 9,099 | 1,680,180 |
| Total Current Assets | 8,892,729 | 173,578 | 27,066 | 9,093,373 | 10,337,362 | 18,762,345 | 38,193,080 |
| Land and Improvements | 1,701,859 | 116,558 | - | 1,818,417 | - | 8,294,830 | 10,113,247 |
| Buildings and Improvements | 22,333,717 | 74,496 | - | 22,408,213 | - | 121,872,100 | 144,280,313 |
| Equipment | 13,432,146 | 231,741 | - | 13,663,887 | 11,613 | - | 13,675,501 |
| Construction-In-Progress | 295,016 | 27,649 | - | 322,665 | - | - | 322,665 |
| Property and Equipment | 37,762,738 | 450,445 | - | 38,213,183 | 11,613 | 130,166,929 | 168,391,725 |
| Less: Accumulated Depreciation | (19,714,404) | (144,788) | - | (19,859,192) | (5,161) | (109,144,648) | (129,009,001) |
| Net Property and Equipment | 18,048,334 | 305,657 | - | 18,353,991 | 6,452 | 21,022,281 | 39,382,724 |
| **TOTAL ASSETS** | **26,941,063** | **479,235** | **27,066** | **27,447,364** | **10,343,814** | **39,784,626** | **77,575,804** |
| **LIABILITIES:** | | | | | | | |
| Accounts Payable | 11,972,337 | 126,493 | (2,300) | 12,096,530 | 120,853 | 49,340,138 | 61,557,522 |
| Notes Payable | - | - | - | - | 71,416 | - | 71,416 |
| Capital Leases | - | - | - | - | - | 268,802 | 268,802 |
| Accrued Payroll | 657,589 | 299,460 | - | 957,049 | 34,537 | 5,762 | 997,348 |
| Accrued PTO | 745,540 | - | - | 745,540 | 109,842 | 95 | 855,477 |
| Accrued Payroll Taxes | 1,596,482 | 166,830 | - | 1,763,312 | - | 5,781,619 | 7,544,931 |
| Insurance Reserve | 425,000 | - | - | 425,000 | - | 1,991,952 | 2,416,952 |
| Other Accrued Expenses | 8,030,990 | 7,771 | - | 8,038,761 | - | 18,472,686 | 26,511,447 |
| Third-Party Settlements | 5,049,548 | 184,133 | - | 5,233,681 | - | 25,313,148 | 30,546,829 |
| Lines of Credit & Other Short-Term Debt | - | - | - | - | - | - | - |
| Current Portion of Long-Term Debt | - | - | - | - | - | - | - |
| Other Liabilities | 8,948 | 8,733 | - | 17,681 | (89,203) | (129,307) | (200,829) |
| Total Current Liabilities | 28,486,434 | 793,420 | (2,300) | 29,277,554 | 247,447 | 101,044,895 | 130,569,896 |
| Mortgages and Long-Term Notes Payable | 8,022,859 | - | - | 8,022,859 | - | 6,293,347 | 14,316,206 |
| Intercompany Payables/(Receivables) | 18,170,151 | 30,993,542 | 7,758,716 | 56,922,409 | (32,323,436) | (24,598,974) | (1) |
| Deferred Credits | 10,795,724 | - | - | 10,795,724 | - | 1,599,818 | 12,395,542 |
| Other Long-Term Liabilities | 13,500,000 | - | - | 13,500,000 | 23,182,608 | 58,312,819 | 94,995,428 |
| Total Long-Term Liabilities | 50,488,734 | 30,993,542 | 7,758,716 | 89,240,992 | (9,140,828) | 41,607,011 | 121,707,175 |
| **TOTAL LIABILITIES** | **78,975,168** | **31,786,962** | **7,756,416** | **118,518,546** | **(8,893,382)** | **142,651,906** | **252,277,070** |
| **EQUITY:** | | | | | | | |
| Additional Paid-in Capital | 10,000 | 4,150 | - | 14,150 | 8,944,478 | (6,695,364) | 2,263,264 |
| Other Equity | (3,535,827) | (151,305) | - | (3,687,132) | - | 13,033,635 | 9,346,503 |
| Retained Earnings PY | (30,563,687) | (30,431,876) | (6,623,707) | (67,619,270) | 10,156,951 | (110,046,271) | (167,508,589) |
| Net Income | (17,944,591) | (728,696) | (1,105,643) | (19,778,931) | 135,767 | 840,719 | (18,802,445) |
| **TOTAL EQUITY** | **(52,034,105)** | **(31,307,727)** | **(7,729,351)** | **(91,071,183)** | **19,237,196** | **(102,867,280)** | **(174,701,267)** |

**ALECTO HEALTHCARE SERVICES**
**STATEMENT OF CASH FLOWS**
**December 31, 2022**

| | WNJ | Sherman MD | Anesthesia | WNJ Total | Alecto Healthcare Services | Discontinued Operations | Grand Total |
|---|---|---|---|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | | | | | |
| Change in Net Income | (17,944,591) | (728,696) | (1,105,643) | (19,778,931) | 135,767 | 840,719 | (18,802,445) |
| **Adj from Operating Activities:** | | | | | | | |
| Depreciation and Amortization | 1,819,247 | (81,844) | - | 1,737,403 | (9,596) | 440,731 | 2,168,538 |
| Other Deferred Income/Expense | (105,899) | - | - | (105,899) | - | (1,927,741) | (2,033,640) |
| **(Increase)/Decrease in Assets:** | | | | | | | |
| Patient Accounts Receivable | 2,331,701 | (13,272) | 28,146 | 2,346,575 | - | 1,092 | 2,347,667 |
| Supplies Inventory | 409,979 | - | - | 409,979 | - | 19 | 409,998 |
| Pre-Paid Expenses & Oth Current Assets | 566,219 | (800) | - | 565,419 | 276,255 | 385,130 | 1,226,804 |
| Other Receivables | 7,340 | - | - | 7,340 | 124,419 | (13,030,863) | (12,899,104) |
| Long-Term Receivables | - | - | - | - | - | - | - |
| **Increase/(Decrease) in Liabilities:** | | | | | | | |
| Accounts and Notes Payable | 3,851,278 | 13,359 | - | 3,864,637 | (426,445) | (2,819,547) | 618,646 |
| Accrued Payroll Costs | 721,401 | 208,372 | - | 929,773 | (37,924) | (2,863,287) | (1,971,438) |
| IBNR | (14,618) | - | - | (14,618) | - | (474,679) | (489,297) |
| Other Accrued Liabilities | 4,837,069 | 5,225 | - | 4,842,294 | (89,203) | 1,766,571 | 6,519,662 |
| Estimated 3rd Party Settlements | (3,652,197) | (51,438) | - | (3,703,635) | - | (1,131) | (3,704,766) |
| **Net Cash From (For) Operating Activities** | **(7,173,070)** | **(649,094)** | **(1,077,498)** | **(8,899,662)** | **(26,727)** | **(17,682,985)** | **(26,609,375)** |
| | | | | | | | |
| **Cash Flows from Investing Activities:** | | | | | | | |
| Capital Expenditures | 730,402 | (218,703) | - | 511,698 | 13,467 | - | 525,165 |
| Payments to Acquire Other Assets | - | - | - | - | - | - | - |
| **Net Cash From (For) Investing Activities** | **730,402** | **(218,703)** | **-** | **511,698** | **13,467** | **-** | **525,165** |
| | | | | | | | |
| **Cash Flows from Financing Activities:** | | | | | | | |
| Funds Provided (to) from Intercompany | (80,145) | 851,858 | 1,079,026 | 1,850,739 | (22,525,137) | 25,115,138 | 4,440,740 |
| Borrow (Re-Payment) of Debt | 4,773,024 | - | - | 4,773,024 | 11,138,344 | (6,936,993) | 8,974,375 |
| Capital Lease Obligations (Re-Payment) | - | - | - | - | - | (390,767) | (390,767) |
| Parent Contributions / (Distributions) | - | - | - | - | (320) | - | (320) |
| **Net Cash From (For) Financing Activities** | **4,692,879** | **851,858** | **1,079,026** | **6,623,763** | **(11,387,112)** | **17,787,378** | **13,024,028** |
| | | | | | | | |
| **Net Change in Cash and Cash Equivalents** | **(1,749,789)** | **(15,940)** | **1,528** | **(1,764,201)** | **(11,400,372)** | **104,392** | **(13,060,181)** |

# EXHIBIT 45

**ALECTO HEALTHCARE SERVICES**
**YTD INCOME STATEMENT**
**April 30, 2023**

| | WNJ | Sherman MD | Anesthesia | WNJ Total | Alecto Healthcare Services | Discontinued Operations | Grand Total | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | OVMC | OV MG | EORH | EO MG | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | (OHIO VALLEY) |
| **REVENUES** | | | | | | | | | | | | | | | | | | | | |
| Inpatient Revenue - Routine | 10,452,512 | - | - | 10,452,512 | - | - | 10,452,512 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Inpatient Revenue - Ancillary | 21,227,798 | 4,298 | 309,436 | 21,541,532 | - | - | 21,541,532 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total IP Revenue | 31,680,310 | 4,298 | 309,436 | 31,994,044 | - | - | 31,994,044 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Outpatient Revenue | 25,164,601 | 931,873 | 504,567 | 26,601,041 | - | - | 26,601,041 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Patient Revenue | 56,844,910 | 936,171 | 814,004 | 58,595,085 | - | - | 58,595,085 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Revenue Deductions | (46,088,042) | (460,975) | (528,307) | (47,077,324) | - | (104,281) | (47,181,605) | 603 | - | - | 603 | (104,884) | - | - | (104,884) | - | - | - | - | - |
| Bad Debt | (745,511) | 3,508 | (69,723) | (811,726) | - | 28,239 | (783,487) | 19,313 | - | - | 19,313 | 8,926 | - | - | 8,926 | - | - | - | - | - |
| Total Deductions from Revenue | (46,833,553) | (457,468) | (598,030) | (47,889,050) | - | (76,042) | (47,965,092) | 19,916 | - | - | 19,916 | (95,959) | - | - | (95,959) | - | - | - | - | - |
| **Total Net Patient Revenue (Excl. Suppl.)** | 10,011,358 | 478,704 | 215,974 | 10,706,035 | - | (76,042) | 10,629,993 | 19,916 | - | - | 19,916 | (95,959) | - | - | (95,959) | - | - | - | - | - |
| **SUPPLEMENTAL NET PATIENT REVENUE** | | | | | | | | | | | | | | | | | | | | |
| TX LPPF | 802,457 | - | - | 802,457 | - | - | 802,457 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medicaid DSH | 15,014 | - | - | 15,014 | - | - | 15,014 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medicare Settlements | 66,208 | - | - | 66,208 | - | 541,416 | 607,624 | - | - | - | - | 541,416 | - | - | 541,416 | - | - | - | - | - |
| Total Supplemental Revenue | 883,680 | - | - | 883,680 | - | 541,416 | 1,425,096 | - | - | - | - | 541,416 | - | - | 541,416 | - | - | - | - | - |
| **Net Patient Revenue** | 10,895,037 | 478,704 | 215,974 | 11,589,715 | - | 465,374 | 12,055,089 | 19,916 | - | - | 19,916 | 445,458 | - | - | 445,458 | - | - | - | - | - |
| Other Operating Revenues | 2,610,306 | 1,525 | - | 2,611,831 | 1,228,295 | 12,687 | 3,852,813 | 12,204 | - | - | 12,204 | 483 | - | - | 483 | - | - | - | - | - |
| **TOTAL NET REVENUES** | 13,505,343 | 480,229 | 215,974 | 14,201,546 | 1,228,295 | 478,061 | 15,907,902 | 32,120 | - | - | 32,120 | 445,940 | - | - | 445,940 | - | - | - | - | - |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | | |
| Salaries and Wages | 6,718,414 | 249,931 | - | 6,968,346 | 707,047 | 6,158 | 7,681,550 | - | - | - | - | 6,158 | - | - | 6,158 | - | - | - | - | - |
| Benefits | 1,116,672 | 4,810 | - | 1,121,482 | 70,885 | 14,566 | 1,206,933 | (10,352) | - | - | (10,352) | 24,918 | - | - | 24,918 | - | - | - | - | - |
| Payroll Taxes | 555,547 | 37,612 | - | 593,159 | 55,392 | 760 | 649,310 | - | - | - | - | 760 | - | - | 760 | - | - | - | - | - |
| PTO | 362,638 | - | - | 362,638 | 46,249 | - | 408,887 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contract Labor | 917,567 | 184,282 | - | 1,101,849 | - | 4,066 | 1,105,915 | - | - | - | - | 4,066 | - | - | 4,066 | - | - | - | - | - |
| Labor Sub-Total | 9,670,839 | 476,635 | - | 10,147,474 | 879,573 | 25,550 | 11,052,596 | (10,352) | - | - | (10,352) | 35,902 | - | - | 35,902 | - | - | - | - | - |
| Supplies Billable | 1,497,464 | 19,972 | - | 1,517,436 | - | 658 | 1,518,094 | 658 | - | - | 658 | - | - | - | - | - | - | - | - | - |
| Supplies Non-Billable | 383,870 | 28,655 | 165 | 412,691 | 6,681 | 8,403 | 427,774 | 8,403 | - | - | 8,403 | - | - | - | - | - | - | - | - | - |
| Total Supplies | 1,881,334 | 48,627 | 165 | 1,930,127 | 6,681 | 9,061 | 1,945,868 | 9,061 | - | - | 9,061 | - | - | - | - | - | - | - | - | - |
| Purchased Services | 1,518,249 | 64,013 | 14,567 | 1,596,829 | 443 | 94,350 | 1,691,623 | 40,198 | - | - | 40,198 | 44,219 | - | - | 44,219 | 4,967 | - | 4,967 | - | 9,934 |
| Professional Fees | 1,493,975 | - | 462,194 | 1,956,169 | 125,668 | 64,745 | 2,146,582 | 40,792 | - | - | 40,792 | 8,483 | - | - | 8,483 | 15,470 | - | - | - | 15,470 |
| Repairs and Maintenance | 207,365 | - | - | 207,365 | - | - | 207,365 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rents and leases | 65,452 | 30,184 | - | 95,635 | 67,595 | 64,084 | 227,314 | 64,084 | - | - | 64,084 | - | - | - | - | - | - | - | - | - |
| Insurance | 283,329 | 1,370 | - | 284,699 | 104,203 | 182,490 | 571,392 | 108,517 | - | - | 108,517 | 40,901 | - | - | 40,901 | 16,536 | - | 16,536 | - | 33,072 |
| Utilities | 565,494 | 7,132 | - | 572,626 | 2,214 | - | 574,840 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes and Licenses | 137,100 | (2,741) | - | 134,359 | 4,100 | 7,437 | 145,896 | 5,888 | - | - | 5,888 | 1,549 | - | - | 1,549 | - | - | - | - | - |
| Other Operating Expenses | 65,341 | 16,849 | 4,209 | 86,399 | 32,644 | 296,674 | 415,717 | (853) | - | - | (853) | 293,258 | 297 | - | 293,556 | 3,351 | - | 621 | - | 3,972 |
| Hospital Fees/Taxes | - | - | - | - | - | 53 | 53 | - | - | - | - | 53 | - | - | 53 | - | - | - | - | - |
| Total Operating Expenses | 15,888,478 | 642,068 | 481,135 | 17,011,682 | 1,223,121 | 744,443 | 18,979,245 | 257,334 | - | - | 257,334 | 424,364 | 297 | - | 424,661 | 40,324 | - | 22,124 | - | 62,448 |
| **EBITDAR** | (2,383,135) | (161,839) | (265,162) | (2,810,136) | 5,174 | (266,382) | (3,071,344) | (225,214) | - | - | (225,214) | 21,577 | (297) | - | 21,280 | (40,324) | - | (22,124) | - | (62,448) |
| **NON-OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | | |
| Depreciation | 739,600 | 25,394 | - | 764,994 | 1,290 | 146,400 | 912,684 | - | - | - | - | 146,400 | - | - | 146,400 | - | - | - | - | - |
| Interest Income | 659 | - | - | 659 | - | - | 659 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Expense | 25,868 | - | - | 25,868 | - | 26,779 | 52,647 | 13,030 | - | - | 13,030 | 13,749 | - | - | 13,749 | - | - | - | - | - |
| MPT Building Lease / Interest | 386,266 | - | - | 386,266 | - | 4,967 | 391,233 | - | - | - | - | 4,967 | - | - | 4,967 | - | - | - | - | - |
| Other Non-Operating Expense / (Revenue) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (Gain)/Loss on Asset Sales | 32,463 | (6,400) | - | 26,063 | - | - | 26,063 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Non-Operating Expenses | 1,184,855 | 18,994 | - | 1,203,849 | 1,290 | 178,146 | 1,383,286 | 13,030 | - | - | 13,030 | 165,116 | - | - | 165,116 | - | - | - | - | - |
| **NET INCOME (LOSS)** | (3,567,991) | (180,833) | (265,162) | (4,013,985) | 3,884 | (444,529) | (4,454,630) | (238,244) | - | - | (238,244) | (143,540) | (297) | - | (143,837) | (40,324) | - | (22,124) | - | (62,448) |
| prior month | (2,341,742) | (101,766) | (201,988) | (2,645,495) | (37,726) | (290,579) | (2,973,801) | (180,256) | - | - | (180,256) | (82,351) | (297) | - | (82,648) | (14,653) | - | (13,023) | - | (27,676) |
| check | - | - | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - |

CONFIDENTIAL

JX62

ALECTO_00005817

**A1239**

**ALECTO HEALTHCARE SERVICES**
**MONTHLY INCOME STATEMENT**
**April 30, 2023**

|  | WNJ | Sherman MD | Anesthesia | WNJ Total | Alecto Healthcare Services | Discontinued Operations | Grand Total | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | OVMC | OV MG | EORH | EO MG | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | | | | | | | | | | | | | | |
| Inpatient Revenue - Routine | 2,334,303 | - | - | 2,334,303 | - | - | 2,334,303 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Inpatient Revenue - Ancillary | 5,004,657 | - | 66,167 | 5,070,824 | - | - | 5,070,824 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total IP Revenue** | 7,338,960 | - | 66,167 | 7,405,127 | - | - | 7,405,127 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Outpatient Revenue | 5,768,846 | 266,479 | 221,865 | 6,257,190 | - | - | 6,257,190 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Patient Revenue** | 13,107,806 | 266,479 | 288,032 | 13,662,317 | - | - | 13,662,317 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Revenue Deductions | (10,066,951) | (133,239) | (196,242) | (10,396,432) | - | 317 | (10,396,115) | 317 | - | - | 317 | - | - | - | - | - | - | - | - | - |
| Bad Debt | (343,934) | (1,835) | (34,594) | (380,363) | - | 2,671 | (377,692) | (253) | - | - | (253) | 2,924 | - | - | 2,924 | - | - | - | - | - |
| **Total Deductions from Revenue** | (10,410,885) | (135,074) | (230,836) | (10,776,795) | - | 2,988 | (10,773,808) | 63 | - | - | 63 | 2,924 | - | - | 2,924 | - | - | - | - | - |
| **Total Net Patient Revenue (Excl. Suppl.)** | 2,696,921 | 131,405 | 57,196 | 2,885,521 | - | 2,988 | 2,888,509 | 63 | - | - | 63 | 2,924 | - | - | 2,924 | - | - | - | - | - |
| **SUPPLEMENTAL NET PATIENT REVENUE** | | | | | | | | | | | | | | | | | | | | |
| TX LPPF | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medicaid DSH | 15,014 | - | - | 15,014 | - | - | 15,014 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medicare Settlements | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Supplemental Revenue** | 15,014 | - | - | 15,014 | - | - | 15,014 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Patient Revenue** | 2,711,936 | 131,405 | 57,196 | 2,900,536 | - | 2,988 | 2,903,523 | 63 | - | - | 63 | 2,924 | - | - | 2,924 | - | - | - | - | - |
| Other Operating Revenues | 26,603 | - | - | 26,603 | 349,906 | 3,348 | 379,858 | 2,865 | - | - | 2,865 | 483 | - | - | 483 | - | - | - | - | - |
| **TOTAL NET REVENUES** | 2,738,539 | 131,405 | 57,196 | 2,927,139 | 349,906 | 6,336 | 3,283,381 | 2,929 | - | - | 2,929 | 3,407 | - | - | 3,407 | - | - | - | - | - |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | | |
| Salaries and Wages | 1,690,755 | 110,569 | - | 1,801,324 | 208,959 | 1,459 | 2,011,742 | - | - | - | - | 1,459 | - | - | 1,459 | - | - | - | - | - |
| Benefits | 287,185 | - | - | 287,185 | 16,446 | - | 303,631 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll Taxes | 132,948 | 8,507 | - | 141,455 | 14,380 | 175 | 156,010 | - | - | - | - | 175 | - | - | 175 | - | - | - | - | - |
| PTO | 92,297 | - | - | 92,297 | 7,179 | - | 99,476 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contract Labor | 228,335 | 49,190 | - | 277,525 | - | 738 | 278,263 | - | - | - | - | 738 | - | - | 738 | - | - | - | - | - |
| Labor Sub-Total | 2,431,521 | 168,266 | - | 2,599,787 | 246,963 | 2,372 | 2,849,122 | - | - | - | - | 2,372 | - | - | 2,372 | - | - | - | - | - |
| Supplies Billable | 220,879 | 9,663 | - | 230,541 | - | - | 230,541 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Supplies Non-Billable | 73,855 | 459 | 63 | 74,377 | 1,497 | 1,062 | 76,936 | 1,062 | - | - | 1,062 | - | - | - | - | - | - | - | - | - |
| Total Supplies | 294,733 | 10,122 | 63 | 304,918 | 1,497 | 1,062 | 307,477 | 1,062 | - | - | 1,062 | - | - | - | - | - | - | - | - | - |
| Purchased Services | 295,001 | 13,271 | 3,642 | 311,913 | - | 21,206 | 333,119 | 9,992 | - | - | 9,992 | 1,280 | - | - | 1,280 | 4,967 | - | 4,967 | - | 9,934 |
| Professional Fees | 321,446 | - | 115,549 | 436,994 | 14,692 | 23,295 | 474,982 | 100 | - | - | 100 | 7,725 | - | - | 7,725 | 15,470 | - | - | - | 15,470 |
| Repairs and Maintenance | 20,714 | - | - | 20,714 | - | - | 20,714 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rents and leases | 17,811 | 8,057 | - | 25,868 | 15,423 | 15,566 | 56,856 | 15,566 | - | - | 15,566 | - | - | - | - | - | - | - | - | - |
| Insurance | 71,329 | 343 | - | 71,672 | 19,533 | 44,931 | 136,136 | 26,048 | - | - | 26,048 | 10,615 | - | - | 10,615 | 4,134 | - | 4,134 | - | 8,268 |
| Utilities | 140,323 | 1,618 | - | 141,941 | 556 | - | 142,497 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes and Licenses | 54,883 | - | - | 54,883 | 4,100 | 3,200 | 62,183 | 3,200 | - | - | 3,200 | - | - | - | - | - | - | - | - | - |
| Other Operating Expenses | 18,407 | 7,666 | 1,116 | 27,190 | 5,210 | 2,167 | 34,566 | - | - | - | - | 1,067 | - | - | 1,067 | 1,100 | - | - | - | 1,100 |
| Hospital Fees/Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Expenses** | 3,666,168 | 209,342 | 120,370 | 3,995,880 | 307,974 | 113,798 | 4,417,652 | 55,968 | - | - | 55,968 | 23,059 | - | - | 23,059 | 25,671 | - | 9,101 | - | 34,772 |
| **EBITDAR** | (927,629) | (77,938) | (63,174) | (1,068,741) | 41,933 | (107,463) | (1,134,271) | (53,039) | - | - | (53,039) | (19,652) | - | - | (19,652) | (25,671) | - | (9,101) | - | (34,772) |
| **NON-OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | | | |
| Depreciation | 183,072 | 1,129 | - | 184,202 | 323 | 36,571 | 221,095 | - | - | - | - | 36,571 | - | - | 36,571 | - | - | - | - | - |
| Interest Income | (115) | - | - | (115) | - | - | (115) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Expense | 19,097 | - | - | 19,097 | - | 4,949 | 24,046 | 4,949 | - | - | 4,949 | - | - | - | - | - | - | - | - | - |
| MPT Building Lease / Interest | 96,566 | - | - | 96,566 | - | 4,967 | 101,533 | - | - | - | - | 4,967 | - | - | 4,967 | - | - | - | - | - |
| Other Non-Operating Expense / (Revenue) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (Gain)/Loss on Asset Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Non-Operating Expenses** | 298,620 | 1,129 | - | 299,749 | 323 | 46,487 | 346,559 | 4,949 | - | - | 4,949 | 41,537 | - | - | 41,537 | - | - | - | - | - |
| **NET INCOME (LOSS)** | (1,226,249) | (79,067) | (63,174) | (1,368,490) | 41,610 | (153,949) | (1,480,829) | (57,989) | - | - | (57,989) | (61,189) | - | - | (61,189) | (25,671) | - | (9,101) | - | (34,772) |

The top column groupings are: **OLYMPIA** (OMC, Sunrise RE, UPG, Total), **FAIRMONT** (FRMC, FPHY, FFP, Total), **OHIO VALLEY** (OVMC, OV MG, EORH, EO MG, Total).

CONFIDENTIAL

ALECTO_00005816

**ALECTO HEALTHCARE SERVICES**
**STATEMENT OF CASH FLOWS**
**April 30, 2023**

|  | WNJ | Sherman MD | Anesthesia | WNJ Total | Alecto Healthcare Services | Discontinued Operations | Grand Total | OLYMPIA | | | | FAIRMONT | | | | OHIO VALLEY | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  | OMC | Sunrise RE | UPG | Total | FRMC | FPHY | FFP | Total | OVMC | OV MG | EORH | EO MG | Total |
| **Cash Flows from Operating Activities:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Change in Net Income | (3,567,991) | (180,833) | (265,162) | (4,013,985) | 3,884 | (444,529) | (4,454,630) | (238,244) | - | - | (238,244) | (143,540) | (297) | - | (143,837) | (40,324) | - | (22,124) | - | (62,448) |
| **Adj from Operating Activities:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Depreciation and Amortization | 736,229 | 185,524 | - | 921,754 | 1,290 | 146,400 | 1,069,444 | - | - | - | - | 146,400 | - | - | 146,400 | - | - | - | - | - |
| Other Deferred Income/Expense | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **(Increase)/Decrease in Assets:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Patient Accounts Receivable | 1,710,378 | (47,208) | (87,164) | 1,576,006 | - | 667,326 | 2,243,332 | 1,167 | - | - | 1,167 | 666,159 | - | - | 666,159 | - | - | - | - | - |
| Supplies Inventory | 127,308 | - | - | 127,308 | - | - | 127,308 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Paid Expenses & Oth Current Assets | (262,991) | 1,370 | - | (261,621) | (481,330) | 6,464 | (736,486) | 6,464 | - | - | 6,464 | - | - | - | - | - | - | - | - | - |
| Other Receivables | (45,592) | - | - | (45,592) | (145,738) | 188,406 | (2,924) | 188,406 | - | - | 188,406 | - | - | - | - | - | - | - | - | - |
| Long-Term Receivables | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Increase/(Decrease) in Liabilities:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Accounts and Notes Payable | 1,262,682 | 49,926 | 10,925 | 1,323,533 | 650,479 | (191,729) | 1,782,284 | (64,259) | - | - | (64,259) | (127,470) | 0 | - | (127,470) | - | - | - | - | - |
| Accrued Payroll Costs | (256,917) | (49,846) | - | (306,763) | 32,879 | (801,659) | (1,075,542) | - | - | (1,456) | (1,456) | (800,203) | - | - | (800,203) | - | - | - | - | - |
| IBNR | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Accrued Liabilities | (813,543) | (6,068) | - | (819,610) | - | 1,261 | (818,350) | (59) | - | - | (59) | 1,319 | - | - | 1,319 | - | - | - | - | - |
| Estimated 3rd Party Settlements | (381,679) | (26,767) | - | (408,446) | - | - | (408,446) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash From (For) Operating Activities** | (1,492,114) | (73,901) | (341,400) | (1,907,416) | 61,464 | (428,058) | (2,274,010) | (106,524) | - | (1,456) | (107,979) | (257,334) | (297) | - | (257,631) | (40,324) | - | (22,124) | - | (62,448) |
| | | | | | | | | | | | | | | | | | | | | |
| **Cash Flows from Investing Activities:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Capital Expenditures | (95,833) | (80,706) | - | (176,539) | - | - | (176,539) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payments to Acquire Other Assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash From (For) Investing Activities** | (95,833) | (80,706) | - | (176,539) | - | - | (176,539) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | | | | | |
| **Cash Flows from Financing Activities:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Funds Provided (to) from Intercompany | 1,792,599 | 180,306 | 339,620 | 2,312,525 | (2,719,706) | 401,768 | (5,413) | 105,779 | - | 1,257 | 107,037 | 232,121 | 163 | - | 232,284 | 40,324 | - | 22,124 | - | 62,448 |
| Borrow (Re-Payment) of Debt | - | - | - | - | 2,655,415 | - | 2,655,415 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Lease Obligations (Re-Payment) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parent Contributions / (Distributions) | - | - | - | - | - | (48) | (48) | - | - | - | - | - | - | (48) | (48) | - | - | - | - | - |
| **Net Cash From (For) Financing Activities** | 1,792,599 | 180,306 | 339,620 | 2,312,525 | (64,291) | 401,720 | 2,649,954 | 105,779 | - | 1,257 | 107,037 | 232,121 | 163 | (48) | 232,236 | 40,324 | - | 22,124 | - | 62,448 |
| | | | | | | | | | | | | | | | | | | | | |
| **Net Change in Cash and Cash Equivalents** | 204,651 | 25,699 | (1,780) | 228,570 | (2,827) | (26,338) | 199,405 | (744) | - | (198) | (943) | (25,213) | (135) | (48) | (25,395) | 0 | - | 0 | - | 0 |
| | | | | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | (134,034) | (1,267) | 3,365 | (131,936) | 33,401 | 18,952 | (79,583) | (5,974) | - | 198 | (5,776) | 20,543 | 135 | 4,050 | 24,728 | - | - | - | - | - |
| | | | | | | | | | | | | | | | | | | | | |
| Ending Cash Balance | 70,617 | 24,432 | 1,585 | 96,634 | 30,574 | (7,386) | 119,822 | (6,719) | - | - | (6,719) | (4,669) | - | 4,002 | (667) | - | - | - | - | - |
| | | | | | | | | | | | | | | | | | | | | |
| check | 0 | 0 | (0) | 0 | (0) | 0 | 0 | 0 | - | (0) | 0 | (0) | (0) | - | (0) | (0) | - | (0) | - | (0) |

CONFIDENTIAL

ALECTO_00005819

# Exhibit 46

**The UCLA Health Transaction**

Contrary to media reports, Alecto Healthcare Services LLC ("Alecto") did not sell Olympia Medical Center ("OMC") to UCLA Health and OMC was not sold to UCLA Health. The facts are as follows:

(1)    Alecto was not a party to the transaction and did not retain any of the proceeds of the transaction.

(2)    Horizon Real Estate Holdings, LLC ("Horizon") owned the real property and improvements that were leased to and used by Olympia Health Care, LLC to operate OMC (the "Hospital Real Estate").

(3)    Horizon sold the Hospital Real Estate to The Regents of the University of California for the benefit of UCLA Health (the "Horizon/UCLA Transaction") effective as of January 1, 2021 and assigned the lease, as amended, between Horizon and Olympia Health Care, LLC to The Regents of the University of California for the benefit of UCLA Health effective as of January 1, 2021.

(4)    Olympia Health Care, LLC leased the Hospital Real Estate from UCLA Health for the period of January 1, 2021 to March 31, 2022 for purposes of operating OMC for a period of 90-days from January 1, 2021 to March 31, 2021 as required by statute and to complete certain seismic improvements and other projects open with the State of California's Office of Statewide Health Planning & Development. OMC ceased patient care operations on March 31, 2022.

(5)    Plaza Medical Office Building, LLC ("Plaza MOB") owned a medical office building and parking garage across the street from OMC.

(6)    Plaza MOB sold the medical office building and parking garage it owned to The Regents of the University of California for the benefit of UCLA Health effective as of August 31, 2021.

(7)    Horizon received net proceeds from the transaction totaling $23,507,202.00 which were used to pay $9,429,880.08 in federal and state payroll taxes, subsidy Olympia's losses, and make certain intercompany advances to Sherman/Grayson Hospital, LLC so it could continue to operate Wilson N. Jones Regional Medical Center in Sherman, Texas and meet its basic obligations.

(8)    Plaza MOB received net proceeds from the transaction totaling $15,769,770.21 which were used to pay federal payroll taxes owed by certain of its affiliates, made certain intercompany advances to Sherman/Grayson Hospital, LLC so it could continue to operate Wilson N. Jones Regional Medical Center in Sherman, Texas and meet its basic obligations, make certain intercompany advances to Alecto Healthcare Services Fairmont LLC so it could meet its basic expenses including pension obligations for which Plaza MOB is part of the controlled group, make certain intercompany advances to Alecto Healthcare Services Wheeling LLC so it could meet its basic expenses including payment of employee medical claims, and make legally required contributions to the Alecto Healthcare Services Ohio Valley Pension Plan.

JX113

A1243

(9)    Detailed schedules of proceeds and use of proceeds are attached hereto.

Proceeds/Use of Proceeds
Horizon Real Estate Holdings LLC

| | | | |
|---|---|---|---|
| Gross Sales Price | | $70,000,000.00 | |
| Independent Consideration | | $100.00 | |
| Indemnity Reserve | | -$3,000,000.00 | For Benefit of Horizon Real Estate Holdings, LLC and Plaza Medical Office Building, LLC |
| Security Deposit | | -$450,000.00 | For Benefit of Olympia Health Care, LLC under Lease - Offset by disputed Rent |
| Payoff of MPT Secured Debt | | -$43,000,000.00 | Cross-Collateralized Secured Debt - Payment Required to Release Liens on Hospital Property |
| Escrow/Title Charges | | -$42,898.00 | Title Charges and Escrow Costs |
| **Net Proceeds** | | $23,507,202.00 | |
| | | | |
| **Use of Net Proceeds** | | | |
| Federal and State Payroll Taxes (Olympia) | | -$9,202,356.34 | Past Due Federal and State Payroll Taxes - Balances Remain - Intercompany Advance to AHS |
| Federal and State Payroll Taxes (Affiliates) | | -$227,523.74 | Past Due Federal and State Payroll Taxes - Balances Remain - Intercompany Advance to AHS |
| Subsidy of Olympia Operations/Losses - 1/1/21 - 3/31/21 | | -$1,544,253.20 | Intercompany Advance to AHS |
| Subsidy of Olympia Operations/Losses - 4/1/21 - 12/31/21 | | -$160,945.49 | Intercompany Advance to AHS |
| Intercompany Advances/Support for Sherman/Grayson Hospital 1/1/21 - 12/31/21 | | -$9,048,015.63 | Intercompany Advance to AHS |
| Intercompany Advances/Support for Sherman/Grayson Hospital 1/1/22 - 6/30/22 | | -$3,324,107.60 | Intercompany Advance to AHS |
| | | $0.00 | |

**A1245**

Proceeds and Uses of Proceeds
Plaza Medical Office Building LLC

| | | | |
|---|---|---|---|
| Gross Sales Price | $58,500,000.00 | | |
| Assign Tenant Security Deposits | -$220,779.27 | | |
| Other Buyer Credits | -$293,269.84 | | |
| Prorations | -$45,805.57 | | |
| Payoff of MPT Secured Debt | -$8,004,800.00 | Recorded as Intercompany Advance from Plaza MOB to AHS | |
| Payoff of Wells Fargo Mortgage | -$34,129,520.11 | | |
| Escrow/Title Charges | -$35,611.00 | | |
| Disbursement of Excess Recording Fees | -$444.00 | | |
| **Net Proceeds** | $15,769,770.21 | | |
| | | | |
| Federal Payroll Taxes (Affiliates) | -$10,468,025.21 | Past Due Federal and State Payroll Taxes - Balances Remain - Intercompany Advance to AHS | |
| Intercompany Advances/Support for Sherman/Grayson Hospital 1/1/22 - 6/30/22 | -$3,067,495.42 | Intercompany Advance to AHS | |
| Intercompany Advances/Support for Alecto Healthcare Services Fairmont LLC - 1/1/21-12/31/21 | -$1,155,321.33 | Intercompany Advance to AHS | |
| Intercompany Advances/Support for Alecto Healthcare Services Wheeling LLC - 1/1/21-12/31/21 | -$371,125.25 | Intercompany Advance to AHS | |
| Pension Payments - Alecto Ohio Valley Pension Plan | -$707,803.00 | Intercompany Advance to AHS | |
| | $0.00 | | |

# EXHIBIT 47

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

**KEITH REED, LISA DOLENCE,
ELIZABETH SCHENKEL,
EMILY WINES, MARK GARAN
CHRISTINA LUCAS,** and **AUGUST ULLUM, II,**
individually and on behalf of others similarly
situated,

                Plaintiffs,

v.                          **CIVIL ACTION NO. 5:19-CV-263**
                                      Judge Bailey

**ALECTO HEALTHCARE SERVICES, LLC,** and
**ALECTO HEALTHCARE SERVICES
WHEELING, LLC,** d/b/a Ohio Valley Medical
Group d/b/a OVMC Physicians,

                Defendants.

## <u>JUDGMENT ORDER</u>

On November 7, 2022, a Fairness/Status Hearing was held in the above-styled case. This Court took up the issues addressed by the parties in their November 5, 2022 Joint Status Report [Doc. 226], and the pending Motion for Service Award and Civil Penalties [Doc. 223] and Motion for Attorney Fees [Doc. 214]. This Court directed the parties to file a Joint Status Report following the hearing to finalize class damages calculations.

After hearing argument from both sides and reviewing the Joint Status Report [Doc. 229], this Court held the following:

1

JX54

**A1248**

- Plaintiffs' Motion for Service Awards and Civil Penalties Pursuant to 29 U.S.C. § 2104(a)(3) [**Doc. 223**] is **DENIED**;

- Plaintiffs' Motion for Attorney's Fees and Costs [**Doc. 214**] is **GRANTED IN PART AND DENIED IN PART**.  The total for attorney's fees and costs is: **$483,388.61**; and

- Damages are entered against defendants in the amount of **$2,686,357.11**.

The Clerk is hereby **DIRECTED** to **STAY** the above-styled case pending distribution of class payments.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record.

**DATED**: November 28, 2022.

**JOHN PRESTON BAILEY**
**UNITED STATES DISTRICT JUDGE**

2

**A1249**

# EXHIBIT 48

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Alecto Healthcare Services LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | District of Delaware |
| Case number | 23-10787-JKS |

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Centers for Medicare & Medicaid Services, U.S. Department of Health and Human Services
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Leah Lerman
Name

1100 L Street NW, Room 7002
Number        Street

Washington          DC          20005
City                State          ZIP Code

Contact phone  (202) 307-0452

Contact email  leah.v.lerman@usdoj.gov

**Where should payments to the creditor be sent?** (if different)

Name _____

Number        Street

City                State          ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $_____29,126,600.90____ **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Exhibits A, B, and C._____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                     $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property: All monies due the Debtor from the United States of America._____

**A1252**

Official Form 410                     **Proof of Claim**                     page 2

<table>
<tr><td><strong>12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?</strong><br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.</td><td>☑ No<br>☐ Yes. <em>Check one:</em><br><br>☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).<br><br>☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).<br><br>☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).<br><br>☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).<br><br>☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).<br><br>☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.</td><td><strong>Amount entitled to priority</strong><br><br>$_____<br><br>$_____<br><br>$_____<br><br>$_____<br><br>$_____<br><br>$_____</td></tr>
</table>

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  12/13/2023
                 MM / DD / YYYY

Olivia L. Williams -S        Digitally signed by Olivia L. Williams -S
                             Date: 2023.12.13 13:44:30 -05'00'

Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Olivia Williams |
| | First name          Middle name          Last name |
| Title | Group Director, Financial Services Group, Office of Financial Management |
| Company | Centers for Medicare & Medicaid Services, U.S. Dep't of Health & Human Services |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 7500 Security Blvd. |
| | Number    Street |
| | Baltimore                     MD          21244 |
| | City                          State       ZIP Code |
| Contact phone | (410) 786-6565          Email Olivia.Williams@cms.hhs.gov |

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE:<br><br>Alecto Healthcare Services LLC,[1]<br><br>Debtor. | Chapter 11 (Subchapter V)<br><br>Case No. 23-10787 (JKS) |

## DECLARATION OF OLIVIA WILLIAMS

I, Olivia Williams, of Baltimore County and the City of Baltimore, Maryland, declare and state as follows:

1.      I am the Group Director, Financial Services Group, Office of Financial Management, Centers for Medicare & Medicaid Services ("CMS"), United States Department of Health and Human Services ("HHS"), and I am duly authorized to make this claim and file this proof of claim ("Proof of Claim") on behalf of the United States of America (the "United States").

2.      On June 16, 2023, Alecto Healthcare Services LLC ("Alecto" or "Debtor") filed for bankruptcy protection in the District of Delaware under Title 11 of the United States Code and is docketed as *In re Alecto Healthcare Services LLC,* No. 23-10787-JKS (Bankr. D. Del.).

3.      Alecto is a corporate owner of Olympia Health Care LLC ("Olympia").  Alecto and Olympia are Defendants in *United States v. Olympia Health Care LLC, et al.*, No. 2:23-1783-ODW-PVC (C.D. Cal.), pertaining to the Medicare debts owed by Olympia to CMS.

4.      This claim represents the total debt owed by Olympia to CMS.  Olympia is justly and truly indebted to the United States in the sum of $29,126,600.90, inclusive of pre-petition interest.  Alecto is justly and truly indebted to the United States for the same amount.  *See* Declaration of John Kresse, attached as Exhibit B (alleging alter-ego and fraudulent-transfer liability against Alecto for Olympia's debts to CMS).

5.      Olympia participated in the Medicare program pursuant to a Part A provider agreement with the Secretary of HHS (the "Secretary").  The Medicare program is governed by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395lll, and its implementing regulations and policies.

---

[1] The last four digits of the Debtor's federal tax identification number is 9723.  The Debtor's address is 101 N. Brand Boulevard, Suite 1920, Glendale, CA 91203.

-1-

6.      The Secretary contracts with Medicare Administrative Contractors ("MACs") to administer payment to providers for Medicare covered services.  42 U.S.C. § 1395kk-1; 42 C.F.R.  §§ 421.400–421.404.  From time to time during a provider's fiscal year, a provider submits claims for payment to its MAC.

7.      If the MAC determines that the claims meet conditions for coverage and payment under Title XVIII and Medicare regulations, the MAC pays them after adjustments for prior overpayments and subject to potential further review in the future.  Medicare regulations provide for prior final payment determinations to be reopened.  *See* 42 C.F.R. § 405.980.  Thus, after initial payments have been made, claim overpayments may be identified as a result of system adjustments to individual claims to account for errors reported by the provider, for audits, appeals, and reopenings.

8.      For claims made under Medicare Part A, the MAC makes estimated interim payments of Medicare funds to the provider.  42 U.S.C. § 1395g(a); 42 C.F.R. Part 412.  After the end of each fiscal year, the provider must submit financial information in the form of a cost report verifying the actual amount of reimbursement owed to it for the past fiscal year. 42 C.F.R. §§ 412.52, 413.20; *see* 42 U.S.C. §§ 1395g,1395hh (giving the Secretary authority to require submission of cost reports).  If the provider's cost report shows that the provider was overpaid by Medicare for the prior fiscal year, this as-filed cost report constitutes a final overpayment determination, and the overpayment is due to Medicare.  42 C.F.R. § 405.378(c)(iv).  In addition, after the cost report has been submitted, the MAC audits the cost report for that year and determines the provider's actual, rather than estimated, reimbursement amount for the year.  42 U.S.C. §§ 1395g, 1395x(v)(1)(A)(ii); 42 C.F.R. §§ 412.112–412.130. 413.20, 413.60.

9.      When the actual reimbursement amount is determined, the MAC calculates an overpayment (or underpayment) based on the difference between the amount of actual interim payments to the provider and the amount of reimbursement determined to be due for the fiscal year.  42 C.F.R. § 413.64(f).  The MAC then issues a "Notice of Amount of Medicare Program Reimbursement" ("NPR"), which determines whether the provider was overpaid or underpaid for that fiscal year.  42 C.F.R. §§ 413.60, 405.1803.  The NPR determination is final unless it is revised by the payment contractor or appealed to the Provider Reimbursement Review Board. 42 C.F.R. § 405.1807.

10.      Following final determination of an overpayment, interest accrues on unpaid overpayment amounts at the applicable federal rate set forth in statutes and regulations, which changes periodically.  42 U.S.C. § 1395g(d); 42 C.F.R. § 405.378.

11.      Medicare overpayment debts may arise at the level of reimbursement determinations and adjustments on individual Medicare claims for services, or at the broader Medicare cost report level.

12.      During the COVID-19 Public Health Emergency ("PHE"), the MACs were authorized to issue to providers and suppliers COVID-19 Accelerated or Advance Payments ("CAAP") in accordance with the Coronavirus Aid, Relief, and Economic Security Act

("CARES Act"), Pub. L. 116-136, § 3719, 134 Stat. 281, 426–27 (2020).  These payments were issued to help ease the financial strain due to a disruption in claims submission and/or claims processing related to the PHE.  The Continuing Appropriations Act, 2021, and Other Extensions Act, Pub. L. No. 116-159, § 2501, 134 Stat 709, 733–35 (2020), requires the repayment of accelerated or advance payment(s) to begin one year from the issuance date of the accelerated or advance payments.

13.     Following Olympia's closing on March 31, 2021, CMS revoked Olympia's Medicare privileges effective May 26, 2021, due to cessation of business.

14.     Olympia owes CMS $14,060,576.76 for its failure to repay CAAP.  The CAAP payment totaling $13,695,367 was issued to Olympia on April 16, 2020, and has not been repaid.  The CAAP debt balance totals $14,060,576.76 and comprises $13,695,367 in principal and $365,209.76 in pre-petition interest.

15.     Olympia owes CMS $15,060,431.05 for Olympia's cost report overpayment determinations for as-filed cost report for the year ending on August 9, 2021, and for final settlements/NPRs for the years ending December 31, 2005; December 31, 2017, through December 31, 2020; and August 9, 2021.  The cost report overpayment balance totaling $15,060,431.05 comprises $13,105,331.17 in principal and $1,955,099.88 in pre-petition interest (see table below).

| Year Ending Date | Transaction Type | Principal Overpayment Amt | Pre-petition Interest Amt | Total Balance Due |
|---|---|---|---|---|
| 12/31/2005 | Final Settlement | $11,059,170.17 | $1,843,195.00 | $12,902,365.17 |
| 12/31/2017 | Final Settlement | $466,033.00 | $84,856.89 | $550,889.89 |
| 12/31/2018 | Final Settlement | $142,116.00 | $9,326.34 | $151,442.34 |
| 12/31/2019 | Final Settlement | $351,567.00 | $3,369.18 | $354,936.18 |
| 12/31/2020 | Final Settlement | $787,215.00 | $0.00 | $787,215.00 |
| 08/09/2021 | As Filed | $167,011.00 | $14,352.47 | $181,363.47 |
| 08/09/2021 | Final Settlement | $132,219.00 | $0.00 | $132,219.00 |
| Total Amount | | **$13,105,331.17** | **$1,955,099.88** | **$15,060,431.05** |

16.     Olympia owes CMS $487,501.09 for Olympia's claim overpayments.  This current claim overpayment debt comprises $415,422.58 in principal and $72,078.51 in pre-petition interest (see table below).

-3-

**A1257**

| Letter Number | Letter Date | Principal Balance Amt | Interest Remaining Balance | Total Remaining Balance |
|---|---|---|---|---|
| 29523383 | 25-Nov-20 | $134,231.77 | $31,070.98 | $165,302.75 |
| 29523385 | 25-Nov-20 | $32,123.13 | $7,435.54 | $39,558.67 |
| 28314156 | 09-Mar-21 | $23,734.58 | $2,184.29 | $25,918.87 |
| 28324445 | 11-Mar-21 | $2,493.95 | $540.00 | $3,033.95 |
| 28331321 | 12-Mar-21 | $13,009.95 | $2,817.45 | $15,827.40 |
| 28337492 | 15-Mar-21 | $8,249.38 | $1,786.59 | $10,035.97 |
| 28848655 | 23-Jun-21 | $6,101.00 | $1,110.90 | $7,211.90 |
| 29037471 | 03-Aug-21 | $11,997.44 | $2,117.06 | $14,114.50 |
| 29523387 | 25-Aug-21 | $27,430.96 | $4,620.42 | $32,051.38 |
| 29523389 | 25-Aug-21 | $6,511.53 | $1,096.83 | $7,608.36 |
| 29205188 | 03-Sep-21 | $2,361.56 | $284.10 | $2,645.66 |
| 29345489 | 01-Oct-21 | $39,734.75 | $6,374.20 | $46,108.95 |
| 29721232 | 17-Dec-21 | $11,349.16 | $1,596.06 | $12,945.22 |
| 29726953 | 20-Dec-21 | $13,038.92 | $1,731.79 | $14,770.71 |
| 29817606 | 10-Jan-22 | $10,958.03 | $1,455.37 | $12,413.40 |
| 29916558 | 31-Jan-22 | $7,440.29 | $905.28 | $8,345.57 |
| 30143930 | 22-Mar-22 | $1,402.21 | $149.24 | $1,551.45 |
| 30336774 | 02-May-22 | $14,934.98 | $1,516.84 | $16,451.82 |
| 30566414 | 21-Jun-22 | $12,299.08 | $1,056.99 | $13,356.07 |
| 30794782 | 08-Aug-22 | $7,528.80 | $549.00 | $8,077.80 |
| 30883038 | 25-Aug-22 | $1,337.72 | $87.75 | $1,425.47 |
| 30883039 | 25-Aug-22 | $307.27 | $20.16 | $327.43 |
| 30992367 | 15-Sep-22 | $14,236.27 | $830.48 | $15,066.75 |
| 31162485 | 19-Oct-22 | $10,136.55 | $598.64 | $10,735.19 |
| 31167964 | 20-Oct-22 | $2,263.35 | $133.70 | $2,397.05 |
| 31575030 | 15-Dec-22 | $209.95 | $8.85 | $218.80 |
| **Total Owed** | | **$415,422.58** | **$72,078.51** | **$487,501.09** |

17.     As a result of Olympia's pre-petition overpayments, the Secretary has frozen a total of **$481,908.00** in Olympia's cost report underpayments.  The United States reserves the right to set-off the frozen amounts against Olympia's pre-petition overpayments.

18.     Based on the facts set forth above, as of this date, the Secretary has identified pre-petition overpayments totaling $**29,126,600.90** owed by Olympia, summarized in the table below

**A1258**

| Debt Type | Principal Balance | Pre-petition Interest Amount | Balance Due |
|---|---|---|---|
| CAAP Overpayment | $   13,695,367.00 | $      365,209.76 | $14,060,576.76 |
| Cost Report Overpayments | $   13,105,331.17 | $   1,955,099.88 | $15,060,431.05 |
| Claim Overpayments | $        415,422.58 | $        72,078.51 | $487,501.09 |
| **Total Claim** | $   27,216,120.75 | $   2,392,388.15) | $29,608,508.90 |
| Reimbursement in administrative freeze | | | ($481,908.00) |
| **Net Amount Due/Owed** | | | **$29,126,600.90** |

19.     This claim reflects the known pre-petition debts of Olympia to the United States. Alecto owes the United States the entirety of this claim. *See* Kresse Decl. (providing the legal basis for the Proof of Claim against Alecto).  The United States reserves the right to amend this Proof of Claim to assert subsequently discovered debts.

20.     The United States does not hold, and has not held, nor has any person by its order, or for its use, held or received, any security or securities for the described claim.

21.     No note or other negotiable instrument has been received for the described claim or for any part thereof, and no judgment has been rendered thereon.

22.     The filing of this Proof of Claim is not:  (a) a waiver or release of the United States' rights, claims or defenses against any person, entity, or property; (b) a waiver or release of any right, claim or defense of the United States, of any nature whatsoever, under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, to follow any property, or proceeds thereof, into the hands of whoever the same may be, including the receiver or trustee in bankruptcy; (c) an election of any remedy to the exclusion, express or implied, of any other remedy; (d) a consent that this claim is a debt that is subject to discharge in this or any other bankruptcy proceeding; (e) a ratification or consent to any obligation or debt based upon or arising out of any transaction between the United States and Olympia; (f) a waiver or release of any right of the United States to have any and all final orders in any and all noncore matters entered only after de novo review by a United States District Court; or (g) a waiver or release of any right of the United States to trial by jury in any proceeding as to any and all matters so triable.  All such rights, claims and defenses are hereby expressly reserved by the United States without exception and with no purpose of confessing or conceding any right or claim by this filing or by any other participation in the case.

In accordance with 28 U.S.C. §1746,
I declare under penalty of perjury that
the foregoing is true and correct.

Executed on _____12/13/2023_____ by

Olivia L.
Williams -S

Digitally signed by Olivia L.
Williams -S
Date: 2023.12.13 14:15:20
-05'00'

Olivia Williams
Group Director, Financial Services Group
Office of Financial Management
Centers for Medicare & Medicaid Services
United States Department of Health and Human Services

**A1260**

# EXHIBIT B

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE:<br><br>Alecto Healthcare Services LLC,[1]<br><br>Debtor. | Chapter 11 (Subchapter V)<br><br>Case No. 23-10787 (JKS) |

## DECLARATION OF JOHN R. KRESSE

I, John R. Kresse, of the City of Mesa in Maricopa County, Arizona, declare and state as follows:

    1.    I am a Trial Attorney in the Corporate/Financial Litigation Section, Commercial Litigation Branch, Civil Division, United States Department of Justice, and I am duly authorized to make this declaration in support of the proof of claim ("Proof of Claim") filed in this case by the Centers for Medicare & Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services ("HHS"), on behalf of the United States of America (the "United States"), against debtor Alecto Healthcare Services LLC ("Alecto"). This declaration supplements the Declaration of Olivia Williams ("Williams Declaration") (Exhibit A to Proof of Claim), who is CMS's Group Director, Financial Services Group, Office of Financial Management.

    2.    Alecto is a corporate owner of Medicare Part A provider Olympia Health Care LLC ("Olympia") and is liable for the Medicare debts Olympia owes to CMS. Olympia, which operated as a hospital in California and closed on March 31, 2021, owes CMS over $27 million (excluding interest) for Medicare overpayments. To collect some of Olympia's debt, the United States sued Alecto, along with Olympia, in *United States v. Olympia Health Care LLC*, No. 2:23-1783-ODW-PVC (C.D. Cal.). Complaint (Mar. 9, 2023, ECF 1) ("Complaint") (Exhibit C to Proof of Claim). In that litigation, which is stayed against Alecto by this bankruptcy proceeding, the United States alleges alter-ego and fraudulent-transfer liability against Alecto. Complaint ¶¶ 1-3, 5, 8-10, 15-16, 20-45, 49-53, 56-64, 74-77, 79-82.

    3.    Specifically, the Complaint seeks recovery of the 2005 overpayment debt in the principal amount of $11,059,170.17. Complaint ¶ 53; Williams Declaration ¶ 15. Adding pre-petition interest of $1,843,195.00 brings the total debt to $12,902,365.17. Williams Declaration ¶ 15. That debt is one of the CMS debts included in the Proof of Claim.

    4.    While the Complaint seeks recovery of just a portion of Olympia's Medicare debts, the Complaint's allegations and theories of recovery against Alecto also apply to the other

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N. Brand Boulevard, Suite 1920, Glendale, CA 91203.

debts owed by Olympia identified and described in the Williams Declaration, meaning Alecto owes the entire $29,126,600.90 sought in CMS's Proof of Claim. Specifically, Alecto is liable for the entire $29,126,600.90 described in the Proof of Claim because Alecto was Olympia's alter ego. *See* Complaint ¶¶ 56-64. Alecto is also liable for that amount as direct or indirect transferee of fraudulent transfers of Olympia's funds under 28 U.S.C. § 3304(a)(1), (b)(1)(B) and § 3307. *See* Complaint ¶¶ 74-77, 79-82.

5.     The only significant difference between the relief sought against Alecto in the Complaint and in the Proof of Claim is the amount Alecto owes the United States. The Complaint did not include: (a) the April 2020 COVID-19 Accelerated or Advance Payments ("CAAP") made to Olympia in accordance with the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in the principal amount of $13.69 million; and (b) Olympia's 2017-2021 Medicare overpayments in the principal amount of $2.04 million. Williams Declaration ¶¶ 12, 14-15. The alter-ego and fraudulent-transfer allegations in the Complaint apply to Alecto's improper use of these additional Medicare funds totaling $15.6 million, plus pre-petition interest of $1.95 million.

6.     In sum, Alecto is liable to the United States, as the alter ego of Olympia and transferee of fraudulent transfers, for the entire amount sought in the Proof of Claim—including pre-petition interest of $2,392,388.15—of $29,126,600.90. Williams Declaration ¶ 18 (table).

7.     The United States reserves all rights to amend the Proof of Claim and all rights, claims and defenses of setoff and recoupment.

In accordance with 28 U.S.C. § 1746,
I declare under penalty of perjury that
the foregoing is true and correct.

Executed on December 13, 2023

By: */s/ John R. Kresse*
John R. Kresse
Trial Attorney
Corporate/Financial Litigation Section
Commercial Litigation Branch, Civil Division
United States Department of Justice

# EXHIBIT C

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
RUTH A. HARVEY
Director
MICHAEL J. QUINN
Senior Litigation Counsel
JOHN R. KRESSE
John.Kresse@usdoj.gov
Direct 202-598-3811 / Fax 202-514-9163
T. DIETRICH HILL
Trial Attorneys
United States Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street NW, 7th Floor
Box 875, Ben Franklin Station
Washington, DC 20044-0875
*Attorneys for Plaintiff United States of America*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:23-cv-01783** |
| | ) | |
| **OLYMPIA HEALTH CARE LLC,** | ) | **COMPLAINT** |
| **ALECTO HEALTHCARE SERVICES, LLC,** | ) | |
| **MPT OF LOS ANGELES, L.P.,** | ) | |
| **MPT OF OLYMPIA, LLC,** | ) | |
| **MPT OPERATING PARTNERSHIP, L.P.,** | ) | |
| **MEDICAL PROPERTIES TRUST, INC.,** | ) | |
| **SHERMAN/GRAYSON HOSPITAL, LLC,** | ) | |
| **ALECTO HEALTHCARE SERVICES** | ) | |
| **SHERMAN, LLC,** | ) | |
| **LAXMAN REDDY, MATTHEW WILLIAMS,** | ) | |
| **and JEREMY REDIN,** | ) | |
| Defendants. | ) | |

The United States of America brings this action against Defendants, on behalf of the Centers for Medicare and Medicaid Services, to recover money owed to the United States and pleads:

## **INTRODUCTION**

1.      The United States seeks to recover overpayments made to Defendant Olympia Health Care, LLC ("Olympia") by the Centers for Medicare and Medicaid Services ("CMS"), part of the Department of Health and Human Services, in 2005. Olympia has never disputed

this debt. Instead, Olympia has contended that it lacks the financial resources to satisfy the debt. But while continuing to owe the United States over $10 million, Olympia paid a wide variety of other creditors and made multiple transfers of several times that sum to others, including to its own affiliates.

2.    Defendant Alecto Healthcare Services, LLC ( "Alecto") controlled Olympia during the relevant period. In operating Olympia, Alecto effectively treated Olympia as if it were part of Alecto, administering Olympia's operations and funds as its own, including directing the transfer of Olympia's funds to other Alecto-owned companies to support their operations. At the time Alecto directed these transfers, Olympia was insolvent. Alecto itself also appears to have been a beneficiary of Olympia's transfers of its funds—again, all while Olympia continued to owe millions to the United States.

3.    The officers who controlled Alecto and Olympia during this period and directed these transfers knew, or should have known, of Olympia's debt to the United States. They nevertheless directed Olympia to keep paying Olympia's long- and short-term debts even when Olympia was insolvent, before paying its debt to the United States. After Olympia made all these transfers, but still without paying its debt to the United States, Alecto closed Olympia's business and sold the associated properties.

4.    Defendant MPT of Olympia ("MPT Olympia") held a substantial interest in Olympia and was also its mortgage lender, through its subsidiary MPT of Los Angeles, LLC ("MPT LA"). When Olympia went out of business, MPT LA and MPT Olympia received proceeds from the sale of the associated real estate and other assets—an amount much greater than Olympia's debt to the United States—while Olympia continued to claim that it was unable to pay. MPT LA, MPT Olympia, and their parent companies thus obtained money that should have gone to the United States.

5.    The United States now seeks to recover the undisputed sum owed to it from all those legally responsible for the debt, including not only Alecto and Olympia, but (1) all individuals and entities responsible, in whole or in part, for Olympia's failure to repay the

United States, and (2) all entities that benefitted from Olympia's transfers when Olympia should have first been satisfying its debt to the United States.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. § 1345 because the United States is the plaintiff.

7. Venue is proper in this district because a substantial part of the events giving rise to the claims occurred in the district.

## PARTIES

8. Plaintiff the United States of America is the sovereign. During the events relevant here, the United States acted through CMS.

9. Defendant Olympia is a limited liability company formed under the laws of California, with its principal place of business in Los Angeles, California. For most of the relevant time period, it owned and operated Olympia Medical Center, a hospital that provided healthcare services in Los Angeles, including services covered by Medicare.

10. Defendant Alecto is a limited liability company formed under the laws of Delaware, with its principal place of business in Irvine, California. Alecto indirectly holds a controlling interest in Olympia through an intermediary, Alecto Healthcare Services Los Angeles, LLC ("Alecto LA").

11. Defendant MPT LA is a limited partnership formed under the laws of Delaware, with its principal place of business in Birmingham, Alabama. MPT LA was a lender to Olympia and other Alecto-owned entities and mortgagee of certain associated real property.

12. Defendant MPT Olympia is a limited liability company formed under the laws of Delaware, with its principal place of business in Birmingham, Alabama. MPT Olympia owns 100% of MPT LA and a non-controlling interest in Alecto LA.

13. Defendant MPT Operating Partnership, L.P. ("MPT Partnership") is a limited partnership formed under the laws of Delaware, with its principal place of business in Birmingham, Alabama. MPT Partnership owns a controlling interest in MPT Olympia.

14. Defendant Medical Properties Trust, Inc. ("MPT Parent") is a corporation formed under the laws of Delaware, with its principal place of business in Birmingham, Alabama. MPT Parent indirectly wholly owns and controls MPT Partnership and therefore indirectly wholly owns and controls MPT LA and MPT Olympia as well (all four, collectively, the "MPT Entities").

15. Defendant Sherman/Grayson Hospital, LLC ("Sherman Hospital") is a limited liability company formed under the laws of Delaware, with its principal place of business in Sherman, Texas. Sherman Hospital owns and operates Wilson N. Jones Regional Medical Center, a hospital in Sherman, Texas.

16. Defendant Alecto Healthcare Services Sherman, LLC ("Alecto Sherman") is a limited liability company formed under the laws of Delaware, with its principal place of business in Irvine, California. Alecto owns a controlling interest in Alecto Sherman, and Alecto Sherman owns a controlling interest in Sherman Hospital.

17. Defendant Laxman (a/k/a "Lex") Reddy is a co-founder of Alecto and has served as its chief executive officer ("CEO") from its founding until the present. Reddy has also served on Alecto's board of managers. On information and belief, Reddy is a resident of California.

18. Defendant Matthew Williams served as CEO and chief financial officer ("CFO") of Olympia from approximately 2014 to 2021. On information and belief, Williams is a resident of California.

19. Defendant Jeremy Redin has served as Alecto's CFO from approximately 2018 until the present. On information and belief, Redin is a resident of California.

## GENERAL ALLEGATIONS

### *Olympia's Debt to CMS*

20. CMS is the federal agency charged with administering the Medicare program. Medicare includes four parts—Parts A, B, C, and D—that encompass different types of health care and consequently require different procedures for payment from CMS to healthcare providers. Medicare Part A is part of the traditional or original Medicare program, and covers

in-patient hospital treatments and other institutional care. In administering this Part, CMS makes payments directly to the healthcare providers. For certain kinds of providers, CMS typically pays the provider before all of the claims are made, using an estimate of the amount that CMS will owe the provider for services over the course of the year. This estimate is based on the ratio between a hospital's expenses and what it charges. At the end of each year, CMS compares its payments to the provider's actual Medicare claims and determines whether CMS underpaid, and owes an additional amount to the provider, or overpaid, in which case the provider owes CMS the amount of the overpayments.

21.     In 2005, CMS substantially overpaid Olympia, then a new Medicare provider, for Medicare services. Because Olympia was a new provider, CMS estimated its payments based on the state-wide average cost ratio rather than historical data about Olympia's actual cost ratios. But Olympia's actual cost ratio was substantially lower, causing CMS's payments to exceed the amount actually owed to Olympia for Medicare Part A services. In 2011, CMS notified Olympia of the estimated overpayments. After full review, CMS's contractor Noridian Healthcare Solutions made a final determination in 2016 that Olympia owed $14,211,115 for the 2005 overpayments.

22.     Olympia did not challenge this determination. Instead, acknowledging the debt, Olympia asserted that it would be unable to pay CMS and requested a compromise that would allow it to pay far less than $14 million. While the Department of Justice was considering whether to authorize the Department of Health and Human Services to compromise the debt, Olympia continued to make payments on the debt, mostly interest but some principal payments as well. CMS also recouped some funds from Medicare payments that would otherwise have gone to Olympia. As a result, Olympia owes the United States approximately $11 million in principal and  approximately $1.4 million in accrued interest, and continues to accrue interest.

### *Alecto's Acquisition and Operation of Olympia*

23.     During the relevant period, Alecto's business model was to acquire healthcare providers in financial difficulty and provide management services to the acquired company, with the goal of turning them into profitable enterprises. In 2013, as part of this strategy,

Alecto acquired a majority interest in Olympia. An Alecto subsidiary, Alecto LA, acquired 80% of Olympia, with the remaining 20% owned by an individual. Alecto, in turn, owned 80% of Alecto LA; the other 20% of Alecto LA was owned by MPT Olympia, one of the MPT Entities that helped finance the acquisition.[1] As part of the same transaction, Alecto also acquired a 100% interest in non-party Horizon Real Estate Holdings LLC ("Horizon"), which owned the hospital property, and Alecto LA indirectly acquired a medical office building and parking garage used by Olympia through two non-party subsidiaries, Plaza Medical Office Building, LLC ("Plaza") and Sunrise Real Estate Holdings, LLC ("Sunrise"). In total, Alecto paid $10 million to acquire these interests.

24. As part of the same transaction, MPT Olympia's affiliate MPT LA loaned Alecto $20 million, with Olympia and Horizon as co-obligors. This loan was secured by, among other things, a mortgage on Olympia and Horizon's real property, and Alecto LA's ownership interests in both Olympia and Horizon. The loan was intended partly to pay off existing debt, and partly to finance the $10 million acquisition payment.

25. Alecto and the MPT Entities knew or should have known that they were acquiring Olympia subject to its liabilities for Medicare overpayments. The merger agreement explicitly noted that Alecto, Alecto LA, and Olympia understood that Olympia had outstanding Medicare repayment debts. In its own financial statements, Alecto stated that as part of the acquisition, *both* Alecto and Olympia "assumed a $15,300,000 third-party liability related to the 2005 Medicare cost report."

26. Simultaneously with the acquisition, Alecto and Olympia entered into a Management Services Agreement. In this agreement, the parties agreed that Alecto would provide management services as an "independent contractor," and that Olympia would retain control over its own assets and the operation of the hospital. In exchange for Alecto's services, Olympia agreed to pay a set management fee (4% of its net revenues).

---

[1] Although Alecto holds a controlling interest in Alecto LA, MPT Olympia had priority in receiving profits.

27.     Despite this agreement, Alecto promptly acted in ways that disregarded the corporate distinction between Alecto and Olympia. Alecto's board, rather than Olympia's, exercised direct control over Olympia's finances. Olympia's board did not hold its own financial board meetings, and Olympia's CEO involved Alecto's officers directly in financial decisionmaking. Olympia never paid management fees to Alecto; Alecto's officers provided their services without charge to Olympia, functioning as de facto officers of Olympia rather than employees of an independent contractor. Alecto likewise appears to have ignored the distinctions between and among Alecto, Alecto LA, Plaza, Horizon, and Sunrise.

28.     Alecto's officers also elided the distinction between Alecto and Olympia when, in 2014, they directed Alecto to make an interest-free loan of $7 million to Olympia to cover Olympia's operating expenses. Alecto made the loan with no formal documentation; Olympia's CEO simply emailed Alecto's CFO, who directed Alecto to wire the money to Olympia's account. Olympia apparently paid off this loan by early 2017. This loan was part of a pattern of Alecto and Olympia's officers using the financial resources of the two entities as though they were a single company.

### *Olympia's Line of Credit and Tranfers of Funds to Other Alecto Hospitals*

29.     Starting in 2015, Olympia obtained lines of credit for at least $15 million from a series of lenders. As common in these transactions, the line of credit was secured by Olympia's receivables. The line of credit also had an important feature: it was a joint line of credit shared by all of Alecto's hospitals.

30.     Olympia was not the only financially challenged hospital that Alecto acquired as part of its business. Alecto also acquired Fairmont Regional Medical Center in Fairmont, West Virginia; Ohio Valley Medical Center in Wheeling, West Virginia; East Ohio Regional Hospital in Martins Ferry, Ohio; and Wilson N. Jones Regional Medical Center in Sherman, Texas. Alecto acquired the Sherman and Fairmont hospitals in 2014, and the Wheeling and Martins Ferry hospitals in 2017. After failing to turn around their financial condition, Alecto closed all of these hospitals in 2019 and 2020, except the hospital in Sherman, Texas.[2]

---

[2] East Ohio Regional Hospital appears to have since reopened under new ownership.

31.     As with Olympia, Alecto acquired and owned these hospitals through a web of intermediate entities. Alecto owns the Sherman hospital, the only one remaining open, through defendants Sherman Hospital and Alecto Sherman.

32.     Having these troubled Alecto hospitals as co-borrowers on the shared line of credit became problematic. Beginning in 2018, Alecto used the line of credit as a conduit to transfer funds financed by Olympia to the other Alecto hospitals. Because the Alecto hospitals were co-borrowers, one hospital could borrow against the line of credit while another paid off the balance. As pertinent here, when another of Alecto's hospitals borrowed money, Olympia would pay down the credit balance, and that would make more credit available for another hospital to borrow against. After another of Alecto's hospitals again borrowed against the line of credit, Olympia would then pay down the new balance by transferring more funds to the lender, and the cycle would continue. Thus, although the credit limit was approximately $15 million, so long as Olympia had more receivables, that income stream could be repeatedly redistributed from Olympia to Alecto's other hospitals.

33.     Initially, Olympia used the line of credit,  simply drawing on funds as necessary and repaying the lenders for amounts Olympia borrowed. At the end of 2016, Alecto's financial statements show that Olympia had a liability of approximately $2.8 million on the shared line of credit. At that time, Sherman Hospital was using the line of credit as well, recording a liability of over $10 million on the line of credit. Other Alecto hospitals did not record any liability on the line of credit—they had either not used the line of credit or repaid fully any funds they received through the line of credit. Thus, at the end of 2016, Olympia had received slightly more funds from the line of credit than it had repaid. It had not yet begun to use the line of credit to funnel money to the other Alecto hospitals.

34.     During 2017, other Alecto hospitals began to borrow significantly more from the line of credit than they repaid. The Fairmont hospital received $3.1 million more from the line of credit, the Ohio Valley hospital received $4.7 million more, and Sherman Hospital recorded a liability of $13.9 million (meaning that during 2017 it had accrued approximately $3 million more in liability on the line of credit). By contrast, Olympia now recorded a

negative "liability" of $100,000 on the line of credit, meaning that it had paid more funds into the line of credit than it had borrowed, enabling other Alecto-owned hospitals to draw more funds from the line of credit.

35.     In 2018, Olympia began to pay even more to the line-of-credit lender than it borrowed, paying down the debt incurred by other Alecto hospitals and effectively transferring its own funds indirectly to those hospitals as those hospitals drew repeatedly on the line of credit. By the end of 2018, Olympia had, on net, paid $11.6 million into the line of credit; Fairmont hospital and Sherman Hospital then drew on that newly available credit, recording line-of-credit liabilities of $10.1 million and $21.5 million, respectively. Alecto's funneling of Olympia's funds to the other Alecto-owned hospitals had no benefit to Olympia. Nor, apparently, did Alecto ever expect that Olympia would be repaid.

36.     Olympia's subsidizing of the other hospitals accelerated in 2019 and 2020. In 2019 alone, Olympia poured almost $20 million more into the other Alecto-owned hospitals via the line of credit, meaning Olympia had transferred in total $31.4 million to the other hospitals. But Olympia's balance sheet at the end of 2019 recorded that $31.4 million as a credit, thus making Olympia look financially far better than it was. Even with that distortion, Olympia's total equity—i.e., its value as a company—was still negative $800,000. Olympia was nominally valueless, and actually far in debt. These transfers continued in 2020; in June 2020, Olympia recorded that it had transferred an additional $7.4 million during the first half of 2020. And now even with a $38.8 million credit on its balance sheet, Olympia's recorded equity value of Olympia still fell to negative $3.8 million.

37.     In sum, between 2018 and 2020, Alecto siphoned Olympia's cash flow to subsidize its other, nominally independent, struggling hospitals—a largely failed effort that led to three of those four hospitals closing by March 2020. Those closures ensured that Olympia would never recover the funds that Alecto diverted to support the other hospitals. By June 2020, Alecto acknowledged in its consolidated financial statements that Olympia would never recover the funds it had indirectly transferred to other Alecto hospitals; Olympia anticipated writing off the entire amount transferred up to that point, over $38 million.

38.     Nevertheless, Alecto *continued* to diminish Olympia's value by transferring its funds to other entities via the line of credit. During the second half of 2020, Olympia paid over $10 million more into the credit facility, increasing the total amount transferred to $49 million. And at least some of the total $49 million appears to have gone directly to Alecto, rather than being used to support other Alecto-owned hospitals. Indeed, little or none of the total $17.8 million Olympia paid into the credit facility during 2020 was used to keep other hospitals open; two closed in 2019, a third closed in March 2020, and Sherman Hospital's financial statements do not show that it benefitted from Olympia's 2020 "intercompany" transfers. Records and correspondence from Alecto indicate that Alecto itself was retaining these funds.

39.     All of these transfers took place in the face of Olympia's unpaid debt to CMS of well over $10 million—and even as Olympia claimed to CMS that it had an inability to pay its debt.

### Olympia's Insolvency and Closure

40.     As early as 2013, when Alecto acquired Olympia, Olympia was insolvent. Olympia's financial statements for 2013 and 2014 show that Olympia's liabilities exceeded its assets. Alecto's undocumented $7 million loan to Olympia in 2014, apparently to meet payroll, also indicates that Olympia was unable to pay its debts in the ordinary course of business.

41.     Olympia's financial statements for 2015 through 2020 also failed to reflect certain liabilities that rendered Olympia insolvent. For example, in 2015, Olympia's statements represent that it had slight net positive equity, of just over $3 million. But Olympia failed to recognize, at the very least, Alecto's management fees, which had been accumulating since 2013 and already amounted to about $7 million. This unrecorded liability exceeded the stated value of the company. In succeeding years, Olympia never accounted for this growing liability, which rendered Olympia increasingly insolvent.

42.     Olympia's books also failed to reflect the true nature of its intercompany transfers to Alecto's other, nominally independent hospitals. Olympia's balance sheets recorded its excess transfers as negative balances under the line of credit entry for 2017 through 2020. Thus, on paper, these amounts were owed to Olympia by its co-borrowers. But

Olympia acknowledged in its own financial statements that Alecto's other hospitals were unable to return or repay Olympia's transfers. Recording its transfers as debt owed to Olympia—effectively, an asset—misrepresented the nature of these transfers. Had they properly been recorded, either as bad debt or, more accurately, transfers of Olympia's funds for the benefit of Alecto, Olympia would not have been solvent in any year from 2018 through 2020 (even ignoring the unbooked management fees owed to Alecto and the undocumented loan from Alecto, which independently rendered Olympia insolvent in prior years).

43. Throughout 2014 through 2020, despite apparently never becoming profitable, Olympia continued to pay other debts, such as payroll and vendors, while declining to pay its debt to CMS. Olympia's financial statements reflect that these operating expenses totaled tens of millions of dollars each year. In 2014, Olympia's expenses totaled approximately $97 million; in 2015, $110 million; in 2016, $96 million; in 2017, $77 million; in 2018, $73 million; in 2019, $71 million; and in the first six months of 2020, $35 million. But Olympia never made more than modest payments on its CMS debt of $14.2 million.

44. Olympia also made payments on debt held by affiliates, including mortgages held by MPT LA and MPT Olympia. Based on Olympia's financial statements and other Olympia documents, Olympia made the full payments on its mortgage to affiliate MPT LA, about $2.2 million per year, from 2014 through 2020. In 2014, MPT Olympia (the part-owner of Alecto LA) had also made an additional $10 million loan to Olympia and Horizon, providing for interest-only payments totalling $1.1 million for three years, followed by repayment of principal in 2017. Thus, Olympia was repaying debt to both MPT Olympia and MPT LA during these periods, while still not paying the CMS debt.

45. In early 2021, Alecto sold Alecto LA's indirectly owned real property to UCLA Health and announced that Olympia would close its doors in March 2021. Approximately $51 million of proceeds from this sale were used to pay debts owed to MPT entities, ultimately benefitting MPT Partnership and MPT Parent. None of the proceeds were used to pay CMS.

### *The Individual Defendants*

46.     The individual defendants, Reddy, Williams, and Redin, were officers at Alecto or Olympia who at relevant times had control over Olympia's finances, including its payments of debts in the ordinary course of business and its transfers of funds to other entities through the line of credit.

47.     Two of these defendants worked at Alecto. Reddy was a founder of Alecto who served as its CEO at all relevant times. Because Alecto ignored the distinction between Alecto and Olympia as separate entities, on information and belief as Alecto's CEO Reddy exercised control over Olympia's finances. Redin served as Alecto's CFO beginning in approximately 2018 and, like Reddy, on information and belief exercised control over Olympia's finances.

48.     Williams served as CEO of Olympia at all relevant times. He also served as Olympia's CFO up until early 2019. As such, Williams directly controlled Olympia's finances, including its payments to vendors and employees, and its transfers of funds through the line of credit.

## CLAIMS FOR RELIEF

### First Claim for Relief – Final Administrative Determination of Medicare Overpayments
#### Against Defendant Olympia

49.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

50.     The United States, through CMS, paid Olympia for Medicare services under the relevant Medicare Part A regulations.

51.     CMS, through its contractor, determined that in 2005, CMS had overpaid Olympia, and issued a notice of program reimbursement to Olympia directing Olympia to repay $14,211.115, plus 10% interest. *See* 42 C.F.R. § 413.62(f) (retroactive adjustment of reimbursements); 42 C.F.R. § 405.1803(c) (contractor determination of retroactive adjustment and notice of program reimbursement).

52.     Olympia did not challenge this determination by requesting an administrative hearing or otherwise. The contractor's determination that Olympia owed CMS $14,211.115,

plus 10% interest, is therefore final. *See* 42 U.S.C. § 405.1807 (contractor determination is final unless properly challenged in accordance with regulations).

53.    After some payments from Olympia and recoupment by CMS of certain funds that would otherwise have been paid to Olympia, Olympia owes the United States reimbursement of $11,059,170.17 in principal, plus $1,421,027.62 in interest as of February 28, 2023, and interest continues to accrue at 10% per annum.

54.    The United States is therefore entitled to recover damages from Olympia in an amount to be determined.

## Second Claim for Relief – Alter Ego Liability for Olympia's Debt Owed to CMS

### Against Defendant Alecto

55.    The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

56.    The United States, through CMS, paid Olympia for Medicare services under the relevant Medicare Part A regulations.

57.    CMS, through its contractor, determined that in 2005, CMS had overpaid Olympia, and issued a notice of program reimbursement to Olympia directing Olympia to repay $14,211.115, plus 10% interest. *See* 42 C.F.R. § 413.62(f) (retroactive adjustment of reimbursements); 42 C.F.R. § 405.1803(c) (contractor determination of retroactive adjustment and notice of program reimbursement).

58.    Olympia did not challenge this determination by requesting an administrative hearing or otherwise. The contractor's determination that Olympia owed CMS $14,211.115, plus 10% interest, is therefore final. *See* 42 U.S.C. § 405.1807 (contractor determination is final unless properly challenged in accordance with regulations).

59.    After some payments from Olympia and recoupment by CMS of certain funds that would otherwise have been paid to Olympia, Olympia owes the United States reimbursement of $11,059,170.17 in principal, plus $1,421,027.62 in interest as of February 28, 2023, and interest continues to accrue at 10% per annum.

60.     Alecto is also liable for this debt because at all relevant times it acted as the alter ego of Olympia.

61.     Alecto failed to respect corporate formalities, including by governing Olympia's financial operations while Olympia's board failed to hold finance-related board meetings. Alecto also failed to respect corporate formalities when Alecto's own officers managed Olympia without payment of contractually required management service fees or any other consideration to Alecto.

62.     Alecto operated Olympia for its own benefit at the expense of Olympia, including by siphoning Olympia's funds to itself or other Alecto-owned entities without any benefit to Olympia, and did so when Olympia was insolvent.

63.     Holding Alecto responsible for Olympia's debt is fair, equitable, and—given the importance of the Medicare program—in the public interest.

64.     The United States is therefore entitled to recover damages from Alecto in an amount to be determined.

**<u>Third Claim for Relief – Violation of the Federal Priority Statute, 31 U.S.C. § 3713</u>**

**Against Defendants Reddy, Williams, and Redin**

65.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

66.     During the relevant period, Reddy, Williams, and Redin were officers and representatives of Olympia or of Alecto (which disregarded the distinctions between Alecto and Olympia). Each one of the three named defendants, during part or all of the relevant period, were responsible for the finances of Olympia, and had control over payments made by Olympia.

67.     During the relevant period, Olympia was insolvent. Under proper accounting methods, at all times Olympia's debts exceeded its assets. Olympia was also insolvent because it lacked sufficient assets to pay its debts in the ordinary course of business.

68.     During the relevant period, Olympia committed acts of bankruptcy under the Federal Priority Statute by, among other things, making preferential transfers to affiliated

entities while insolvent. These transfers included payments to MPT LA and MPT Olympia to repay loans made by those companies, repayment of a loan made by Alecto to Olympia, and transfers to other Alecto-owned hospitals via the shared line of credit.

69. Throughout the entire relevant period, Olympia owed a debt to the United States. Reddy, Williams, and Redin knew or should have known of this debt.

70. Reddy, Williams, and Redin, during the periods in which they controlled Olympia's finances, directed Olympia to pay other debts, including those incurred in the ordinary course of business, before paying Olympia's debt to the United States. Each of them directed payment of other debts that exceeded the amount of Olympia's debt to the United States.

71. Reddy, Williams, and Redin are therefore individually, jointly, and severally liable to the United States for the full amount of Olympia's debt to the United States.

72. The United States is therefore entitled to recover damages in an amount to be determined.

### Fourth Claim for Relief – Fraudulent Transfers under 28 U.S.C. § 3304(a)(1)

#### Against Defendants Alecto, Sherman Hospital, and Alecto Sherman

73. The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

74. During the relevant period, at various times, Olympia made direct or indirect transfers of funds to Defendants Alecto, Sherman Hospital, and Alecto Sherman that were not given for reasonably equivalent value.

75. At the times it made these transfers, Olympia either was insolvent or became insolvent as a result of the transfers.

76. To the extent Alecto, Sherman Hospital, or Alecto Sherman received transfers from Olympia indirectly rather than directly, they are liable under 28 U.S.C. § 3307 as subsequent transferees of fraudulently transferred assets, or as persons for whose benefit the fraudulent transfers were made.

77. The United States is therefore entitled to damages from Alecto, Sherman Hospital, and Alecto Sherman, in the amount of the lesser of (a) Olympia's debt to the United States or (b) the transfers received by that defendant, directly or indirectly, from Olympia. The United States is also entitled to avoidance of these transfers to the extent necessary to satisfy Olympia's debt to the United States.

### Fifth Claim for Relief – Fraudulent Transfers under 28 U.S.C. § 3304(b)(1)(B)

### Against Defendants Alecto, Sherman Hospital, and Alecto Sherman

78. The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

79. During the relevant period, at various times, Olympia made direct or indirect transfers of funds to Defendants Alecto, Sherman Hospital, and Alecto Sherman that were not given for reasonably equivalent value.

80. While it made these transfers, Olympia was engaged in a business for which its remaining assets were unreasonably small, and Olympia also believed or reasonably should have believed that it would continue to incur debts beyond its ability to repay as they became due.

81. Defendants Alecto, Sherman Hospital, and Alecto Sherman were either (a) the first transferees of these fraudulent transfers, (b) the entities for whose benefit those transfers were made, or (c) subsequent transferees that were not good faith transferees that took for value. *See* 28 U.S.C. § 3307(b).

82. The United States is therefore entitled to damages from Alecto, Sherman Hospital, Alecto Sherman, in the amount of the lesser of (a) Olympia's debt to the United States or (b) the transfers received by that defendant, directly or indirectly, from Olympia. The United States is also entitled to avoidance of these transfers to the extent necessary to satisfy Olympia's debt to the United States.

**Sixth Claim for Relief – Fraudulent Transfers under 28 U.S.C. § 3304(a)(2)**

**Against Defendants MPT LA, MPT Olympia, MPT Partnership, MPT Parent**

83.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

84.     At times described above, Olympia transferred funds, directly or indirectly, to Defendants MPT LA, MPT Olympia, MPT Partnership, and MPT Parent. These transfers were made for antecedent debts.

85.     MPT LA, MPT Olympia, MPT Partnership, and MPT Parent were insiders of Olympia within the meaning of 28 U.S.C. § 3301(5).

86.     At the time these transfers were made, Olympia was insolvent, and MPT LA, MPT Olympia, MPT Partnership, and MPT Parent had reasonable cause to believe that Olympia was insolvent.

87.     Defendants MPT LA, MPT Olympia, MPT Partnership, and MPT Parent were either (a) the first transferees of these fraudulent transfers, (b) the entities for whose benefit those transfers were made, or (c) subsequent transferees that were not good faith transferees that took for value. *See* 28 U.S.C. § 3307(b).

88.     The United States is therefore entitled to damages from MPT LA, MPT Olympia, MPT Partnership, and MPT Parent in the amount of the lesser of (a) Olympia's debt to the United States or (b) the transfers received by that defendant, directly or indirectly, from Olympia. The United States is also entitled to avoidance of these transfers to the extent necessary to satisfy Olympia's debt to the United States.

**PRAYER FOR RELIEF**

The United States therefore requests entry of judgment in its favor against the defendants, jointly and severally, as follows:

a.     For actual monetary damages against all defendants in an amount to be determined;

b.     For avoidance of all fraudulent transfers from Olympia, directly or indirectly, to other defendants in an amount necessary to pay Olympia's debt to CMS;

c.    For recovery of the United States' costs, including investigative, accounting, collection, and administrative costs;

d.    For all other applicable costs, fees, and interest; and

e.    For such other and further relief as the Court deems appropriate.

Dated: March 9, 2023                    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

/s/ *John R. Kresse*
**RUTH A. HARVEY**
Director
**MICHAEL J. QUINN**
Senior Litigation Counsel
**JOHN R. KRESSE**
Trial Attorney
**T. DIETRICH HILL**
Trial Attorney
United States Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street NW, 7th Floor
Box 875, Ben Franklin Station
Washington, DC 20044
John.Kresse@usdoj.gov
Direct 202-598-3811 / Fax 202-514-9163

*Attorneys for Plaintiff United States of America*

# EXHIBIT 49

```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11 (Subchapter V)
                                   .  Case No. 23-10787 (JKS)
 4   ALECTO HEALTHCARE             .
     SERVICES, LLC,                .
 5                                 .
                                   .  Courtroom No. 6
 6                                 .  824 Market Street
                        Debtor.    .  Wilmington, Delaware 19801
 7                                 .
                                   .  Monday, March 4, 2024
 8   . . . . . . . . . . . . . . . .  1:00 p.m.

 9                        TRANSCRIPT OF HEARING
                  BEFORE THE HONORABLE J. KATE STICKLES
10                   UNITED STATES BANKRUPTCY JUDGE

11

     APPEARANCES:
12

13   For the Debtor:            Jeffrey R. Waxman, Esquire
                                Tara C. Pakrouh, Esquire
14                              MORRIS JAMES, LLP
                                500 Delaware Avenue
                                Suite 1500
15                              Wilmington, Delaware 19801

16   For Steven Balasiano:      Justin R. Alberto, Esquire
                                COLE SCHOTZ, P.C.
17                              500 Delaware Avenue
                                Suite 1410
18                              Wilmington, Delaware 19801

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Sean Moran, ECRO

21   Transcription Company:    Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

**A1284**

2

1  APPEARANCES (CONTINUED):

2  For the U.S. Trustee:      Linda J. Casey, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
3                             OFFICE OF THE UNITED STATES TRUSTEE
                              J. Caleb Boggs Federal Building
4                             844 King Street
                              Suite 2207, Lockbox 35
5                             Wilmington, Delaware 19801

6  For the Subchapter V
   Trustee:                   Jami Nimeroff, Esquire
7                             BROWN MCGARRY NIMEROFF, LLC
                              Two Penn Center
8                             John F. Kennedy Boulevard
                              Suite 1030, 1500
9                             Philadelphia, Pennsylvania 19102

10 For the Reed Action
   Judgment Creditors:        William D. Sullivan, Esquire
11                            SULLIVAN HAZELTINE ALLINSON, LLC
                              919 North Market Street
12                            Suite 420
                              Wilmington, Delaware 19801
13
   For the United States
14 of America:               Leah V. Lerman, Esquire
                             UNITED STATES DEPARTMENT OF JUSTICE
15                             CIVIL DIVISION
                             1100 L Street, NW
16                           Suite 7002
                             Washington, DC 20005

17

18

19

20

21

22

23

24

25

**A1285**

3

1                                    INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 1:    Small Business Debtor's Plan of Reorganization    5
4               Proposed by the Debtor
                [Filed December 19, 2023; Docket No. 261]
5
                Court's Ruling:
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

WITNESSES CALLED
3  BY THE DEBTORS:                                              PAGE

4

5          JEFFREY MCCUTCHEON

6          Direct examination by Ms. Pakrouh                    22

7

8          LEANNA GOULD

9          Direct examination by Ms. Pakrouh                    40

10         Cross-examination by Mr. Sullivan                    51

11         Redirect examination by Ms. Pakrouh                  65

12

13         STEVEN BALASIANO

14         Direct examination by Mr. Waxman                     70

15         Cross-examination by Mr. Sullivan                    86

16         Redirect examination by Mr. Waxman                   121

17

18

19                                  EXHIBITS

20  JOINT EXHIBITS:                                             PAGE

21  JX-96 Letter Report of Gould Consulting Services           45

22

23  Transcriptionists' Certificate                             126

24

25

**A1287**

1          (Proceedings commenced at 1:00 p.m.)

2               THE COURT:  Please be seated.

3               This is Judge Stickles.  We're on the record in

4    Alecto Healthcare Services, LLC, Case Number 23-10787.

5               Mr. Waxman?

6               MR. WAXMAN:  Good afternoon, Your Honor.

7               THE COURT:  Good afternoon.

8               MR. WAXMAN:  May I please the Court?  Jeff Waxman,

9    on behalf of the debtor.  With me today in court is Tara

10   Pakrouh of Morris James and Chris Donnelly of Morris James.

11              Also with us today is Samantha Rodriguez, a third-

12   year, at Northeastern Law School.  She's currently interning

13   at Morris James and we believe she has a very great future

14   ahead of her and we're excited she could join us today.

15              THE COURT:  Welcome.

16              MR. WAXMAN:  Also today are Mr. Sarrao, who you're

17   familiar with, the debtor's chief executive vice president,

18   general counsel and secretary; Steven Balasiano, to the left,

19   is an independent director, and his counsel, Justin Alberto

20   of Cole Schotz --

21              THE COURT:  Good afternoon.

22              MR. WAXMAN:  -- Leanne Gould of Gould Consulting

23   Services, the debtor's forensic accountant; and Jeff

24   McCutcheon, an expert on executive compensation.

25              THE COURT:  Good afternoon.

**A1288**

1          MR. WAXMAN:  We're here today for confirmation of

2    the debtor's small business plan.  To refresh Your Honor's

3    recollection, it's a plan for which the debtors do not

4    solicit a (indiscernible) and is pursuing confirmation

5    pursuant to Section 1191(b) of the Bankruptcy Code.

6          There were three formal objections received to the

7    plan, as well as a reservation of rights filed by the

8    Subchapter V Trustee.  The formal objections were by the Reed

9    Creditors, the United States Trustee, and the United States.

10   There were also a number of informal objections by the U.S.

11   Trustee, United States, and Subchapter V Trustee.

12          The order has been modified to reflect a number of

13   those changes.  There are probably still going to be some

14   technical issues while we work through the language, but a

15   number of them have also been resolved.

16          While we don't have a consensual plan today, Your

17   Honor, I am pleased to report that the debtor was able to

18   reach a resolution with the United States.

19          Mr. Reddy has agreed to reduce his salary to

20   $550,000 a year.  That's a two-hundred-thousand-dollar-a-year

21   reduction.  Separately -- additionally and separately,

22   Mr. Reddy, Mr. Roesch, and Mr. Sarrao all agreed that they

23   would not increase their compensation in the next three

24   years.

25          THE COURT:  Okay.  Who all?  Reddy?

**A1289**

 1              MR. WAXMAN:  Mr. Sarrao --

 2              THE COURT:  Uh-huh.

 3              MR. WAXMAN:  -- Mr. Reddy and Mr. Roesch for three

 4  years from the end of the confirmation, they will not

 5  increase their salaries.

 6              So there remain two objections --

 7              THE COURT:  Is Mr. Sarrao's compensation in the

 8  record?

 9              MR. WAXMAN:  Yes, it is, Your Honor.  It is in, I

10  believe, Section 5 of the plan, and he does not receive any

11  money.  He does have benefits that he receives from the

12  debtor.  So he will not increase it to give himself a salary.

13  He will maintain the same benefits as he currently receives

14  them.

15              So there remain two objections, Your Honor, the

16  United States Trustee and the Reed Creditors and, again, as

17  well as the technical issues with (indiscernible), and that

18  was filed on Thursday at Docket 309.  But again, Your Honor,

19  we do anticipate further changes, clarifications, et cetera.

20              There were a few filings that were made earlier

21  today.  First, was (indiscernible) the list of exhibits.  The

22  Reed Creditors filed a supplemental objection this morning.

23  I don't know if Your Honor received that.

24              THE COURT:  I did.

25              MR. WAXMAN:  Also, Your Honor, and this is

8

1  significant -- substantive and significant, this morning, the

2  debtor filed completed versions of Exhibit C and G.  That was

3  largely to effect the settlement with the United States.

4       Obviously, the decrease of $200,000 a year

5  materially changes objections.  To be clear, and I do want to

6  be clear at the outset, whatever the changes are between now

7  and the end of the period, the three-year period, all of the

8  disposable income is (indiscernible), so that makes a

9  material difference.  Also, significantly, there are taxes

10 that are due on account of that additional income, so there

11 are additional savings on top of that.

12      There were some other things that also changed in

13 there.  A blackline was filed today when (indiscernible)

14 filed with the Court.  So you can see the changes that are

15 reflected on Exhibit C.

16      The debtor has four witnesses, most of whom I am

17 certain will be the subject of cross-examination, so I

18 anticipate that we're going to have a full day and a half.  I

19 know from past experience that Your Honor has read

20 everything, but I --

21      THE COURT:  I can't guarantee you I've read what's

22 been filed in the last hour.

23      MR. WAXMAN:  I don't think we filed anything in

24 the last hour, but that might be cutting it close.

25      Did Your Honor at least receive the amended

**A1291**

1    agenda?

2              THE COURT:  No, I don't -- when was it filed?

3              MR. WAXMAN:  That actually might have been within

4    the hour.

5              If I may approach?

6              THE COURT:  Yes, please.  Thank you.

7              MR. WAXMAN:  Thank you.

8              Again, I know from experience that Your Honor has

9    read everything, but I thought it might be helpful if Your

10   Honor heard from the parties' brief opening statements so

11   Your Honor would understand what the frame of the issues are

12   at this point, but if Your Honor already understands where

13   everything is and wants to jump into evidence, we're prepared

14   to do so, Your Honor.

15             THE COURT:  No, I was actually going to ask, did

16   the debtor have an opportunity to speak with the objectors to

17   how they intended to proceed today.

18             MR. WAXMAN:  We've spoken with the objectors.

19             Certainly, Mr. Sullivan can speak for himself, as

20   can Ms. Casey, and the U.S. -- and, certainly,

21   (indiscernible), also.  We do -- we intend to call four

22   witnesses.  I don't know what Your Honor's schedule is like

23   today, in terms of how far we can go, how many witnesses we

24   can do today versus coming back tomorrow at 10 o'clock.

25             Does Your Honor have a hard stop?

**A1292**

1          THE COURT:  I have to converse with some other

2    people.  I didn't check with court staff, so I will do that

3    at a break.

4          MR. WAXMAN:  Okay.  And with that, if Your Honor

5    would like to hear from Mr. Sullivan, we are prepared to go

6    forward starting off with Mr. McCutcheon.  I have confirmed

7    with Mr. Sullivan and I do not believe he intends to cross-

8    examine Mr. McCutcheon.  He is the executive compensation

9    expert.

10          Mr. McCutcheon has a flight at 4:30, we wanted to

11    get him done as quickly as possible, plus, he's also, I

12    believe, not the subjects of any pending objections

13    (indiscernible).

14          THE COURT:  Okay.  Let me ask, then -- and I

15    wasn't clear whether you wanted to do opening statements --

16    so I'll hear from Mr. Sullivan and Ms. Casey and anyone else

17    who wants to be heard.

18          MR. SULLIVAN:  Good afternoon, Your Honor.  Thank

19    you.

20          THE COURT:  Thank you.

21          MR. SULLIVAN:  Bill Sullivan from Sullivan

22    Hazeltine Allinson on behalf of the Reed Creditors.  My

23    partner Bill Hazeltine is in court with me.

24          Your Honor, I did want to make a few brief

25    comments with respect to --

**A1293**

```
 1              THE COURT:  Well, let me ask -- and I apologize
 2    for interrupting you, Mr. Sullivan -- are these brief
 3    comments in the form of opening or just comments to how
 4    you're proceeding?
 5              MR. SULLIVAN:  In the form of an opening.
 6              THE COURT:  Okay.  All right.
 7              Are you making an opening, Mr. Waxman, or was that
 8    your opening?
 9              MR. WAXMAN:  I -- we are prepared to, Your Honor,
10    but, certainly, I --
11              THE COURT:  Okay.  So --
12              MR. WAXMAN:  -- understand if Your Honor would
13    like to get into the witnesses --
14              THE COURT:  It's okay.  So the parties intend to
15    make openings today?
16              MR. SULLIVAN:  I came prepared to do --
17              THE COURT:  Okay.  That's fine.
18              MR. SULLIVAN:  -- literally, it'll be five
19    minutes.
20              THE COURT:  Okay.  No, no, no, that's fine.
21              Did you want to add anything else in terms of
22    process before we actually get started?
23              MR. SULLIVAN:  No, I don't have anything to add,
24    not as to process.
25              THE COURT:  Okay.  All right.
```

**A1294**

1        I didn't mean to cut you off, and let's start with

2   openings, unless somebody else wants to be heard, with

3   respect to process.

4        (No verbal response)

5            THE COURT:  Okay.

6            MR. SULLIVAN:  Your Honor, I'll continue --

7            THE COURT:  Okay.

8            MR. SULLIVAN:  -- and if Mr. Waxman wants to

9   comment -- I have a space blank here to comment on his

10  comments, but we can probably save that for later this

11  hearing.

12           Your Honor, this debtor was created to acquire,

13  manage, and operate an acute-care hospitals in the United

14  States.  It created a centralized cash management system that

15  was money for their operations flowed to and from it,

16  including through a revolving credit facility.  It tracked

17  intercompany transfers and filed its tax return on a

18  consolidated basis.  The entities that owned the individual

19  hospitals were managed at the local level, but it has filed

20  for bankruptcy on individual basis.

21           Having made that choice, Alecto should not be

22  surprised to find that its filing has implications for the

23  transfer to and from affiliated entities, as those entities

24  have now decided (indiscernible).  The Reed Creditors were

25  paid a $3.2 million judgment against the debtor on

1  November 28th, 2022, which the debtor ended up filing for

2  bankruptcy instead of paying.

3       The Reed Creditors have raised the issue of

4  fraudulent transfers to affiliates or insiders and breaches

5  of fiduciary duties by the debtor's officers and directors

6  since the outset of the case.  We believe the evidence will

7  show that these claims, which are claims that the debtor may

8  bring, are colorable and viable and that the proposed payment

9  of $25,000 to release all of those claims is woefully

10  inadequate.

11       More significantly, the procedures by which the

12  debtor purported to evaluate those claims through the

13  appointment of an independent director was also woefully

14  inadequate.  The independent director failed to evaluate the

15  potential causes of action independently and is unable to

16  articulate why he determined those claims were not viable

17  when he made that determination in early October 2023.

18       Accordingly, the debtor cannot meet the standards

19  for approval of the releases of his insiders and affiliates

20  from claims assertible by the estate and as long as the

21  proposed releases are part of the plan, the Court must deny

22  confirmation of the plan.

23       That's my brief opening, Your Honor, and I will

24  tell Your Honor, I also -- we also -- I did want to say we

25  filed a short supplemental objection this morning.  I

1    recognize that we did not file a motion for leave with it.

2    We were all scrambling.  I know the debtor (indiscernible).

3    We did it for the purpose of trying to frame the issues which

4    we think Your Honor will be faced with at the end of the day

5    tomorrow.  So I wasn't necessarily asking you to read it

6    today, but we wanted to get it there so you could have it

7    during the post-trial briefing.

8                THE COURT:  Thank you, Mr. Sullivan.

9                MR. WAXMAN:  Your Honor, I can't promise the

10   brevity of Mr. Sullivan.  I do want to make a longer

11   statement because I think there are a number of issues that

12   they've indicated.  Before I can get started with that, one

13   of the statements that was made by Mr. Sullivan right now,

14   just now, is just incorrect.  There were no consolidated tax

15   returns.  There were K-1s that were filed by subsidiaries.

16   Alecto LA and Alecto Sherman each filed their own tax return,

17   but these are not consolidated tax returns.

18                You're going to hear about potential claims.

19   That's really, I think, where the issues are today.  A

20   fraudulent conveyance claim is alleged and a claim against

21   the debtor's managers and officers.  Both of these claims

22   were considered -- were investigated and considered by an

23   independent director that you was approved by the Court.

24   Everybody knew that Mr. Balasiano was being retained.  It was

25   filed on the docket.

**A1297**

1      Part of his charge, specifically, was value -- was

2 investigating and bringing claims (indiscernible) and

3 remaining over such investigation and bringing a claim.  The

4 board of directors hired him on the 4th.  There were written

5 consents on the 7th and the 19th.  The one on the 19th

6 specifically expands his duty to the extent it wasn't in

7 there already, with respect to those duties.

8      Mr. Balasiano conducted his investigation and

9 determined as an exercise of his business judgment, that

10 there were no valid claims.  Notwithstanding the business

11 judgment, the Reed Creditors object because they believe that

12 the two claims have greater value to the estate.  As a matter

13 of law and as a matter of fact, the Reed Creditors are simply

14 wrong.

15      They would have the estate bring a claim that had

16 no value with no chance of success, without accounting for

17 the post-petition expenses that would be incurred in

18 connection with those claims, including the indemnification

19 of those insiders, all of which would, quite possibly

20 significantly erode the amount available for unsecured

21 creditors.

22      With respect to the fraudulent conveyance claim,

23 Gould Consulting Services performed an extensive forensic

24 accounting; reviewed over 1400 transactions in the four years

25 leading up to the bankruptcy and identified just what that

**A1298**

1  could be a fraudulent conveyance.  That's the Sunrise

2  transfer.  The Reed Creditors state that the Sunrise transfer

3  was not for reasonably equivalent value.

4         And putting aside whether that's true or not --

5  and there's a basis, as a matter of law and fact for finding

6  that there was reasonably equivalent value -- the Reed

7  Creditors had never argued that the debtor was insolvent in

8  June of 2019 and that's because they can't.  There are

9  financials that were made in the ordinary course of business.

10  There's a tax return.  Even beyond the cold numbers, all of

11  which are correct and all of which we'll hear testimony to

12  address, a month later, the debtor was able to refinance at a

13  lower interest rate.  They were solvent at the time of that

14  transfer, whether you look at the UFTA or whether you call it

15  that or the UVTA or a 548.

16         Insolvency, whether measured by balance sheet or

17  paying your bill when it becomes due, that was not an issue;

18  in fact, the debtor was insolvent in 2020 and in 2021.  It's

19  simply not an issue and this was not raised for the first

20  time in the memo.  We've been seeing that the whole time.  I

21  don't know if anybody's been listening, but we have.

22         Even getting beyond that, there's still an issue

23  of damages.  California law expressly preserves the

24  principles of equity.  Here, the property was transferred

25  back in January of 2021.  There was no -- and Alecto,

```
 1  incidentally, received more value than what was transferred
 2  out.  There's no damage here.
 3         With respect to the breach of fiduciary duty
 4  claims, Delaware law is clear.  Insolvency, whether
 5  (indiscernible) insolvency, can expand a creditor's standing
 6  to bring a derivative action on behalf of an entity.  That's
 7  clear.  It does not change the underlying fiduciary duties.
 8         And, Your Honor, I'm happy to cite to a string
 9  cite of cases, including Quadrant, Gheewalla, et cetera, but
10  that's uncontrovertible what Delaware law is, with respect to
11  fiduciary duties.  There's a duty of care and a duty of
12  loyalty.
13         You're going to hear evidence.  There are no
14  issues, with respect to that, Mr. Balasiano, conducted his
15  investigation and concluded that there are no breach of
16  fiduciary duty claims as against the (indiscernible).
17         You will hear, as with Mr. Balasiano, that
18  deciding to continue funding the subsidiaries, the managers
19  considered a number of facts, including necessary to avoid
20  what I'll call springing obligation, had (indiscernible).
21  Those include among many, many other things, the obligation
22  to purchase a property guaranteed under a lease agreement,
23  pension guaranties, or -- I shouldn't say "guaranties" --
24  obligations for which Alecto would be liable.  But had the
25  hospital shut down -- and when I say this, I mean the
```

**A1300**

1  Sherman/Grayson Hospital, which Your Honor is certainly

2  familiar with -- there would have been excessive costs with

3  respect to securing the patient records, securing the

4  computers, securing the drugs, WARN Act claims, real estate

5  taxes, all of which would have gone out, also, paid time off.

6  All of these total at least $30 million.

7         I found the Reed Creditors' brief interesting.

8  The first sentence at paragraph 25, there was a statement

9  that the debtor should have paid the Reed Creditors rather

10  than continuing to fund Sherman/Grayson while it was in its

11  sale process.  What that means is the Reed Creditors would

12  have the debtor trade the payment to them, rather than the

13  WARN Act claim that would arise from Sherman/Grayson, as well

14  as all the other creditors.  This was an informed decision by

15  the insiders to continue funding to maintain the going-

16  concern value and avoid springing obligation of $30 million.

17         Admittedly, $25,000 doesn't sound like that much.

18  When the claim is worth nothing, $25,000 is a lot more than

19  it's worth, in addition, which there's the avoidance of

20  liability for the indemnification under the operating

21  agreement.

22         Your Honor, I'm not going to get into the Reddy

23  and Williams salary issue.  You will certainly hear that.  I

24  won't get into the two legal arguments that the U.S. Trustee

25  and the debtor had.  You will certainly hear more from that.

**A1301**

1        I have taken a fair amount of time outlining what

2   I think the factual and legal issues are with respect to the

3   releases, which I believe are in focus of the hearing to

4   approve confirmation.

5        Does Your Honor have any questions?

6        THE COURT:  I do not.

7        MR. WAXMAN:  With that, Your Honor, I believe --

8   and unless Your Honor wants to prepare -- wants to ask to go

9   forward differently, I believe that Ms. Pakrouh is going to

10  call the first witness, Mr. McCutcheon, to address the issue

11  of the executive compensation.

12       THE COURT:  Okay.  Well, before we do that, I want

13  to make sure that the Subchapter V Trustee or U.S. Trustee or

14  United States Government didn't have any comment?

15       MS. NIMEROFF:  Good afternoon, Your Honor.  Jami

16  Nimeroff, Subchapter V Trustee.

17       THE COURT:  Good afternoon.

18       MS. NIMEROFF:  Your Honor, I believe it's best for

19  me to reserve my comments for the (indiscernible).

20       THE COURT:  Okay.  That's fine.

21       MS. NIMEROFF:  Thank you.

22       THE COURT:  I just wanted to make sure you had the

23  opportunity.

24       MS. CASEY:  Good afternoon, Your Honor.

25       THE COURT:  Good afternoon.

**A1302**

1          MS. CASEY:  Linda Casey on behalf of the United

2   States Trustee.

3          As debtor's counsel had indicated, our remaining

4   issues are purely legal issues.  I do not anticipate asking

5   any questions of the witnesses.  I do reserve the right to

6   make comments based on the factual record, but other than

7   that, we can discuss that at the end.

8          THE COURT:  Okay.  Terrific.  Thank you.

9          Anyone else?

10          MS. LERMAN:  Good morning, Your Honor.  Leah

11   Lerman on behalf of the United States of America.

12          THE COURT:  Good afternoon.

13          MS. LERMAN:  Your Honor, with me in the courtroom

14   is my colleague Stanton McManus.

15          THE COURT:  Welcome.

16          MS. LERMAN:  We -- the resolution that Mr. Waxman

17   put on the record is correct.  We'll just be looking to

18   review the confirmation order (indiscernible).

19          Does Your Honor have any questions for me?

20          THE COURT:  I do not, thank you.

21          MS. LERMAN:  Thank you, Your Honor.

22          MS. PAKROUH:  Good afternoon, Your Honor.

23          THE COURT:  Good afternoon.

24          MS. PAKROUH:  Tara Pakrouh on behalf of Morris

25   James, on behalf of the Alecto debtor.

**A1303**

1          Our first witness is Jeff McCutcheon.  I would

2     like to call him to the stand if that's all right with Your

3     Honor?

4          THE COURT:  Yes, please.

5          THE CLERK:  Parties on Zoom, due to our court's

6     broadcast policy, if you're listening in audio only, you're

7     going to be placed in the waiting room for the duration of

8     the witness testimony.

9          MS. PAKROUH:  Your Honor, we have witness binders.

10    May I approach and hand them out?

11         THE COURT:  Yes, please.

12         And once the binders are handed out, would you

13    swear in the witness, please.  Thank you.

14         Thank you.

15         THE CLERK:  Sir, please raise your right hand.

16         JEFFREY MCCUTCHEON, DEBTOR'S WITNESS, AFFIRMED

17         THE WITNESS:  Yes.

18         THE CLERK:  Can you please state your full name

19    and spell your last name for the record.

20         THE WITNESS:  Jeffrey Collier McCutcheon, M-c-C-u-

21    t-c-h-e-o-n.

22         THE CLERK:  Okay.  Thank you, sir.

23         THE COURT:  Sir, in order for the recording to

24    pick you up, could use please move the microphone closer to

25    you.  Thank you.

1          THE WITNESS:  Good?

2          THE CLERK:  You're good.

3                    DIRECT EXAMINATION

4     BY MS. PAKROUH:

5     Q     Good afternoon, sir.

6          Please introduce yourself to the Court.

7     A     My name is Jeff McCutcheon.

8     Q     Please describe your education.

9     A     I have a bachelor's degree in business administration

10    from Michigan State University in 1979, then a master's in

11    labor and industrial relations from the same institution in

12    1981.

13    Q     And tell us about your experience.

14    A     For the past 40 years, I've been involved in one form

15    or another of dealing with employee compensation both, as an

16    employee in corporations and as an advisor.

17    Q     Can you please describe the positions you've held and

18    when you held them.

19    A     Starting in 1983, I was a labor relations and employee

20    compensation analyst for Hughes Aircraft Company.  In 1988, I

21    became a compensation director for Coca-Cola Enterprises,

22    served as their top compensation person.  From there, I went

23    to Federated Department Stores in 1992 as the head of

24    compensation.  And then Barnett Banks, the same type of role

25    in 1996.  And, finally, after a stint in consulting for two

**A1305**

1  years with Simpson, I returned as the senior-most

2  compensation and benefits person for CSX before becoming

3  their head of HR.

4       After that, I formed McCutcheon LLC in 2004, addressing

5  compensation issues, typically executive compensation issues,

6  and in 2007, co-founded Board Advisory, which works

7  exclusively with boards of directors and investor groups

8  addressing executive compensation issues.

9  Q    Have you experience, previous experience providing

10 these types of reports and conducting similar analysis?

11 A    Yes, both as an employee and as an advisor, I've

12 conducted hundreds of these analyses over the years.

13 Q    Do you have experience working with companies in

14 bankruptcy?

15 A    I was involved with Federated Department Stores as they

16 emerged from bankruptcy and then did the hostile takeover and

17 bankruptcy of the Macy's Corporation and the institution was

18 renamed Macy's, and I've had some client involvement with

19 clients in bankruptcy.

20 Q    Do you have experience advising companies on the types

21 of issues on which you provided opinions here?

22 A    Yes.

23 Q    Okay.  Would you please describe your experience in

24 evaluating compensation for executives.

25 A    I've been involved for the past 35 years addressing.

**A1306**

24

 1      Out of the 40 years in compensation, 35 of them have

 2   been with dealing with executive compensation and in just

 3   about every instance at one point or another, it involves

 4   valuing the job, looking at market data, and coming up with a

 5   range of pay that's reasonable for a role.

 6   Q    Have you previously provided expert reports and/or

 7   testimony on the sorts of issues you've provided opinions in

 8   this matter?

 9   A    I have provided reports dealing with the career

10   valuation of earnings with the valuation of the job at a

11   point in time with treatment of executive and employee

12   programs in the event of change of control and similar types.

13   Q    Okay.  Has the Court always accepted your reports?

14   A    To the best of my knowledge, yes.

15   Q    Has a Court ever disagreed with it?

16   A    Not to the best of my knowledge.

17           MS. PAKROUH:  Your Honor, we would proffer

18   Mr. McCutcheon as an expert in this case on executive

19   compensation.

20           THE COURT:  Okay.

21           MR. SULLIVAN:  No objection, Your Honor.

22           THE COURT:  Anyone else?

23       (No verbal response)

24           THE COURT:  So proffered.

25   //

**A1307**

25

```
 1  BY MS. PAKROUH:
 2  Q    Mr. McCutcheon, what is the nature of your involvement
 3  in this case?
 4  A    I was asked by Morris James to test for the reasonable
 5  pay of the CEO and CFO.
 6  Q    And what did you do to conduct your analysis?
 7  A    I ruled the credentials of the executives and I also
 8  conducted a market assessment looking at both, peer data and
 9  commercial survey data.
10  Q    Okay.  Did you also review the CVs of those executives?
11  A    Yes.
12          MS. PAKROUH:  Okay.  Let's pull up JX-94.
13  BY MS. PAKROUH:
14  Q    All right.  Is this a report that you wrote in this
15  case that starts on JX-94.005?
16  A    Yes, it is.
17  Q    Are there two reports here?
18  A    Yes, there are.
19  Q    Why is that?
20  A    Initially, I was asked to do the analysis just for the
21  CEO role.  As I understand it, there was a subsequent
22  objection, so the assignment was expanded to include the CFO.
23  Q    Okay.  If I refer to both of these reports as your
24  "collective report," will you understand me?
25  A    Yes.
```

**A1308**

1    Q      Okay.  All right.

2          So, we're at -- I'd direct you to JX-94.005.  Do you

3    have two opinions in this case?

4    A      Yes, I do.

5    Q      And what are they?

6    A      First, that Mr. Reddy is qualified for, and meets all

7    the qualifications for the role of a CEO of a hospital the

8    size of St. Rose, and second, that his compensation is

9    reasonable.

10   Q      How would you define reasonable?

11   A      Well, interesting question.

12         The inverse would be, it is not unreasonable.  His pay

13   is not an outlier.  In general terms, we could come up with a

14   number of criteria, but if we could narrow it down here to be

15   conservative, we would say, well, is his pay within the

16   middle fiftieth -- the middle 50 percent of companies?

17         So if we look at a distribution between the twenty-

18   fifth and seventy-fifth percentile, that might be a

19   conservative definition of reasonable.

20   Q      And is $750,000 a reasonable?

21   A      Yes, it generally reflects the median of hospital

22   compensation --

23   Q      Okay.

24   A      -- for a hospital of that size.

25   Q      Okay.  So let's discuss your first opinion that

1   Mr. Reddy is qualified as a CEO.  How did you arrive at that

2   conclusion?

3   A     I reviewed the CV.

4           MS. PAKROUH:  Okay.  Let's pull up JX-105.

5   BY MS. PAKROUH:

6   Q     Is this the document that you reviewed?

7   A     Yes, it is.

8   Q     And what does it show?

9   A     It shows that he has a history within healthcare in

10  executive management, specifically, as CEO twice for

11  St. Rose, but also prior to that with PrimeCare Medical.

12  Q     And does it show anything, with respect to his

13  education?

14  A     Yes, he has, I believe, two bachelor's degrees and two

15  master's degrees, all within business and healthcare.

16  Q     So is it your view that based on Mr. Reddy's

17  experience, that he is a qualified CEO?

18  A     Yes.

19  Q     All right.  Before we discuss your second main opinion,

20  can you explain how Mr. Reddy was compensated?

21  A     He received a base salary of $750,000 per year.

22  Q     And who paid that?

23  A     That was paid by Alecto.  It was paid under a

24  management services agreement that was approved by the

25  St. Rose Board and by the California Attorney General.

```
 1              MS. PAKROUH:  Okay.  Let's go back to JX-94 at 13.
 2    BY MS. PAKROUH:
 3    Q      And we'll get to this stuff in a minute, but would you
 4    please simply list the main reasons for your opinion that
 5    that compensation here was reasonable for Mr. Reddy.
 6    A      First, I selected a peer group of comparable-sized
 7    hospitals in the California market.  I calculated the pay on
 8    that group, but then validated that information using an
 9    independent source, the Watson Towers Wyatt healthcare
10    survey.  It's a commercial survey of 161 hospitals on
11    nationwide basis, and calculated on a size-adjusted basis,
12    the expected median pay and the distribution of pay for a CEO
13    of a hospital that size.
14    Q      Did you review against a smaller peer group, as well?
15    A      Yes, from the 16 hospitals that ranged in size from, I
16    believe, 32 million to 232 million, I narrowed the window
17    down and came up with a 10-company subset that was more
18    closely aligned with that of St. Rose.  I believe it was
19    between 50 percent of the revenue of St. Rose and 129 percent
20    of the revenue of St. Rose.
21    Q      Did you review based on regional bias, as well?
22    A      The regional bias was calculated, yes.  That is a
23    function of the community that someone would live in.
24           We know that it's more expensive to operate or to live
25    in New York City than it is to live in Mission, Texas and the
```

**A1311**

1    Bureau of Labor Statistics calculates statistics on what the

2    cost-of-living is.

3        There's also a bod of knowledge around the cost of

4    labor.  So in simple terms, for an identical job, it pays

5    more in New York City than it does in Mission, Texas, to use

6    two examples.

7    A    company, ERI, calculates this statement calculating it

8    for over 30 years.  I subscribe to their proprietary software

9    and I did an analysis specifically for the income level we're

10   speaking of to see what the adjustment between the national

11   average and Hayward, California, would be, and that's

12   included in the report.

13   Q    So let's examine these reasons one at a time.  You

14   mention that you reviewed 16 hospital peer groups.

15       Why did you do that?

16   A    There is a very well-accepted technique here when

17   looking at pay to provide an objective view, to avoid any

18   manipulation of the data.  So this is a process that's used

19   in public and private companies.  It's endorsed by the SEC,

20   shareholder activists, proxy advisory firms like

21   Institutional Shareholder Services, have written complete

22   volumes on how to select a peer group and the criteria to be

23   used and that's essentially what I follow.  It is a well-

24   accepted path.

25           MS. PAKROUH:  Let's go to JX-94 at 7.

**A1312**

1    BY MS. PAKROUH:

2    Q    Specifically, (indiscernible), is this the peer group

3    that you were referring to?

4    A    Yes, it is.

5    Q    Okay.  Where does St. Rose fall within the peer group?

6    A    St. Rose at 123 million is about 16 percent above the

7    $106 million median of the peer group.

8    Q    And what do you conclude about Mr. Reddy's

9    compensation, as compared to the peer group?

10   A    Compared to the peer group, Mr. Reddy's compensation is

11   slightly higher.  He would be at the fifty-ninth percentile

12   of the peer group on an unadjusted basis.

13   Q    Okay.  Can you describe for us how you prepared -- how

14   you statistically analyzed this list in reaching that

15   conclusion?

16   A    Well, it's laid out on Exhibit 3 of my report, dated on

17   the 18th.  We have the actual data reported by the firms,

18   then to make an adjustment based upon the revenue difference

19   between St. Rose and the median of the group, I did a

20   statistical smoothing, which allowed us to say, well, were it

21   not for the size difference, you know, what would be the

22   median pay of the group if we took size into consideration.

23   It's a well-recognized statistical technique.  It's used in a

24   lot of surveys and in a lot of economic analyses.

25   Q    You mentioned earlier that you reviewed a subset of the

**A1313**

1   16-company peer group.

2       Why did you do that?

3   A    Well, there's also value in seeing just a small group

4   of very comparable-sized organizations.  So in this case, one

5   half of the revenue to, we'll call it 130 percent of the

6   revenue, there were 10 hospitals we can do a direct

7   comparison without the need for adjustment.

8   Q    And what did you conclude about the compensation as

9   compared to the smaller peer group with respect to Mr. Reddy?

10  A    In both of these instances, the 16-company peer group,

11  the 10-company subset, Mr. Reddy's compensation was, on an

12  adjusted basis, just under the median.

13          MS. PAKROUH:  And let's turn to JX-94 at 11,

14  Exhibit 6.

15  BY MS. PAKROUH:

16  Q    Does this illustrate your point?

17  A    Yes.

18  Q    Did you use statistical adjustments that you had

19  testified to earlier, with respect to this peer group?

20  A    No, I didn't.

21  Q    And why's that?

22  A    Well, because of the fairly narrow range in revenue,

23  there was no statistically valid correlation between revenue

24  and pay.  So, in effect, everyone within that peer group paid

25  the same, the smaller, as well as the larger firms.

**A1314**

1    Q      Okay.  You mentioned earlier that you reviewed a larger

2    dataset.

3           Do you recall that?

4    A      Yes.

5    Q      Why did you do that?

6    A      A large dataset is good.  You can use it to validate

7    the findings from the peer group.  In this case, I used the

8    very well-respected survey, the Watson Towers Wyatt

9    healthcare survey.  It involved 161 hospitals across the

10   United States.

11   Q      Okay.  And what did you conclude about Mr. Reddy's

12   $750,000 compensation, as compared to this dataset?

13   A      Well, adjusted for the size of the hospital, but not

14   adjusted for the geography, Mr. Reddy's compensation was

15   above the median.

16            MS. PAKROUH:  All right.  And let's go to

17   Exhibit 7 on that same page.

18   BY MS. PAKROUH:

19   Q      Does this illustrate your point?

20   A      Yes, it shows that on a statistical basis, he was at

21   the fifty-ninth percentile.

22   Q      I see you have represented here (indiscernible) square

23   value.  Can you describe what that is and how it's relevant?

24   A      Yeah, the inner square is also known as the coefficient

25   of correlation and what it does is it's a numerical

1   representation of the degree to which one variable moves in

2   relation to the other; simply put, looking at total pay, we

3   would say that 46.9 percent of the change in pay between

4   executives can be explained by the change in revenue of the

5   underlying hospital.  And in our world of pay, that's

6   considered a strong relationship.

7   Q    You testified earlier that you reviewed for regional

8   pay differences.

9        Do you recall that?

10  A    Yes.

11  Q    What did you conclude, based on Mr. Reddy's $750,000

12  compensation after adjusting for that?

13  A    Yeah, after adjusting for the Hayward, California, cost

14  of labor, if you will, again, Mr. Reddy falls just a few

15  percentage points below the median.

16  Q    So, Mr. McCutcheon, if we pull together all your

17  analyses, what is your opinion, with respect to Mr. Reddy's

18  compensation?

19  A    Well, because this represents multiple data sources and

20  there's a fairly consistent outcome, I would say that beyond

21  a doubt, his pay is, by definition, reasonable; it's right in

22  the middle of the pack.

23  Q    And are you aware there has been a deal reached whereby

24  Mr. Reddy has agreed to reduce his compensation by $150,000 a

25  year?

**A1316**

1    A      Yes.

2    Q      Okay.  Using the metrics that you have discussed, how

3    does this new amount compare with respect to the market

4    rates?

5    A      This would effectively move him to about the twenty-

6    fifth percentile of the market.

7    Q      Are you aware that Mr. Reddy has agreed not to increase

8    his compensation for the next three years?

9    A      Yes.

10   Q      Would that change your analysis?

11   A      It does.

12          Executive pay, if we look at the past 44 years, oddly

13   enough, an exhaustive study was done and the annualized rate

14   of adjustment for CEOs has been about 5.8 percent.  So if we

15   back that out three years, Mr. Reddy will effectively be in

16   the fifteenth percentile of the peer group.  He will be

17   probably tied for the lowest paid in the 10-company subset

18   and then, similarly, with the national data, as adjusted.  So

19   the question would remain, you know, is that really, in

20   itself, an unreasonable pay level?  You know, it's outside --

21   by our definition, it's outside the normal range of behavior.

22   Q      Okay.  Let's move on to Mr. Williams and discuss your

23   opinions, with respect to him.

24          Did you provide two opinions with respect to

25   Mr. Williams?

**A1317**

1    A      Yes, I did.

2    Q      And what was your first one?

3    A      The first one dealt with whether or not he was

4    qualified to be a CFO.

5    Q      And what did you conclude?

6    A      After reviewing the CV for Mr. Williams, I concluded

7    that he would be qualified.  He has an entire career that was

8    spent in healthcare finance.

9              MS. PAKROUH:  Let's pull up JX-118.  It's the last

10   document in the binder.

11   BY MS. PAKROUH:

12   Q      What is this document?

13   A      Yes.

14   Q      I'm sorry, what is the document?

15   A      This is Matthew Williams' CV.

16   Q      Okay.  And what does it show?

17   A      It shows that he has a bachelor's degree and continued

18   on his entire career in finances and as a controller, as a

19   CFO, a director of finance, and then CFO again.

20   Q      All right.  Did you consider anything else in reaching

21   a conclusion that Mr. Williams is qualified as a CFO?

22   A      No.

23             MS. PAKROUH:  Let's turn to your second and final

24   page and -- I apologize, flipping back to JX-94 at 766.  It's

25   towards the end, a little bit further in this document.

**A1318**

1  BY MS. PAKROUH:

2  Q    Would you please simply list the main reasons for your

3  opinion that Mr. Williams' compensation (indiscernible)?

4  A    Using the same process I just described for the CEO, I

5  ran the same process with the CFO.  That includes the 16-

6  hospital peer group, the 10-hospital subset, the national

7  survey data, using the same adjustments, and I found that he

8  consistently at or below the twenty-fifth percentile of the

9  peer group.

10 Q    You testified earlier that you used a statistical

11 smoothing technique to review some of this information.

12      Did you apply that here?

13 A    I did not.

14      The data itself didn't have a strong correlation;

15 effectively, everyone in the 16-company group was paying

16 their executives the same amount, independent of size, and

17 that's presented on Exhibit 3, just graphically.

18 Q    Okay.  Thank you.

19      In your report, you state that Mr. Williams'

20 compensation is only 40 percent of Mr. Reddy's.  Why do you

21 say that?

22 A    Well, here's an interesting thing.  If we look at the

23 CEO and the CFO in companies, independent industry geography,

24 we find that the CFO will typically have their pay shaped by

25 the pay level of the CEO.  It's a (indiscernible) indicator.

1      We would expect in a situation like this that the CFO

2  would be paid 50, 60, maybe even 65 percent of what the CEO

3  makes.  And if I could go back and look at the 16 hospitals,

4  the 10 hospitals and the national survey data, I find that

5  relationship.  There's a high correlation, in fact, of CFO

6  pay to the CEO.

7      In this particular instance, $300,000 out of $750,000

8  is 40 percent, so it's noticeably lower as a percent of pay.

9  Had he been paid just for the sake of example, at the 50

10  percent of the CEO pay, $375,000, his pay would have

11  approximated, it would be getting close to the median.  So I

12  throw that in as just an observation; again, a validation

13  that the numbers we find are, indeed, what we would expect to

14  find.

15  Q    So Mr. McCutcheon, if we pulled together all of your

16  analyses, what is your opinion, with respect to Mr. Williams'

17  compensation?

18  A    That he is paid at or below the twenty-fifth

19  percentile.

20          MS. PAKROUH:  No further questions.

21          THE COURT:  Cross-examination?

22          MR. SULLIVAN:  Nothing, Your Honor.

23          THE COURT:  Anyone wish to cross-examine the

24  witness?

25      (No verbal response)

**A1320**

1              THE COURT:  Okay.  I hear no one.

2              Sir, you're excused -- now, is he a rebuttal

3    witness?

4              MR. WAXMAN:  I was actually going to say, Your

5    Honor, Mr. McCutcheon as a flight at 4:30.  I believe

6    (indiscernible), so unless somebody would like to say that

7    they intend to call him, I would ask that he be excused.

8              THE COURT:  Does anyone anticipate calling him or

9    intend to call him?

10             MR. SULLIVAN:  No, Your Honor.

11             THE COURT:  United States Trustee?  Subchapter V

12   Trustee?  U.S.?

13        (No verbal response)

14             THE COURT:  Okay.  You're excused, sir.  Thank you

15   for your time today.

16             THE WITNESS:  Thank you.

17        (Witness excused)

18             MR. WAXMAN:  Your Honor, could we have a five-

19   minute break before we call Ms. Gould?

20             THE COURT:  Yes.  Why don't we convene at 1:55.

21             We'll stand in recess.

22             MR. WAXMAN:  I'm sorry, 1:55?

23             THE COURT:  Yes.

24             MR. WAXMAN:  Okay.  Thank you, Your Honor.

25             THE COURT:  I believe that clock is correct.

**A1321**

1          We'll base it on that clock.

2          We're in recess.

3     (Recess taken at 1:51 p.m.)

4     (Proceedings resumed at 1:56 p.m.)

5          MR. WAXMAN:  The debtor's next witness will be

6    Leanne Gould with Gould Consulting Services, which will be

7    handled by my colleague Ms. Pakrouh.

8          THE COURT:  Excuse me, before you begin, is the

9    broadcast policy still in effect?

10          THE CLERK:  Correct.

11          THE COURT:  Okay.  You may proceed.  Sorry.

12          MS. PAKROUH:  Your Honor, we'll direct the record

13    that Tara Pakrouh with Morris James on behalf of Alecto, our

14    first witness is Leanne Gould.  She may take the stand?

15          THE COURT:  Yes.

16          MS. PAKROUH:  We also have witness binders

17    (indiscernible).  May I distribute them?

18          THE COURT:  Yes, please.

19          MS. PAKROUH:  Thank you very much.

20          THE COURT:  Can you wait until the binders are

21    distributed?

22     (Pause)

23          THE COURT:  Thank you.

24          THE CLERK:  Please raise your right hand.

25    //

40

1                    LEEANNE GOULD, DEBTOR'S WITNESS, AFFIRMED

2                    THE WITNESS:  Yes.

3                    THE CLERK:  Please state your full name and spell

4    your last name for the record.

5                    THE WITNESS:  My name is Leanne Gould, G-o-u-l-d.

6                    THE CLERK:  Thank you.

7                    DIRECT EXAMINATION

8    BY MS. PAKROUH:

9    Q    Good afternoon, ma'am.

10        Please introduce yourself to the Court.

11   A    Good afternoon, Your Honor.

12                   THE COURT:  Good afternoon.

13                   THE WITNESS:  My name is Leanne Gould with Gould

14   Consulting Services.

15   BY MS. PAKROUH:

16   Q    Please describe your education.

17   A    I have a Bachelor of Science and a Master's in Business

18   Administration from the State University of New York at

19   Buffalo.  I'm also a CPA, licensed in the State of Georgia.

20        I have a certification in financial forensics by the

21   AICPA.  I am also an accredited senior appraiser for the

22   American Association of Appraisers.  And I am accredited in

23   business valuation by the AICPA.

24   Q    Would you please describe the positions you've held in

25   the past 20 years.

**A1323**

1  A     I started my consulting career, actually, back in 1997

2  with a company called PENTA Advisory Services.  That was

3  turned into Navigant Consulting.  After that, I worked for

4  the financial advisory Services Group of Ernst & Young for

5  several years.  In 2005, I joined GlassRatner, which is now B

6  Riley, and worked with them for about eight years, including

7  the period of the financial crisis, where I did quite a bit

8  of work in avoidable transfers and insolvency.

9        After that, I joined a valuation advisory group as

10  their practice leader for commercial litigation.  Did a brief

11  stint with a regional accounting firm prior to starting my

12  business school of consulting services in February of 2018.

13  Q     Would you please describe, generally, the types of

14  engagements you've worked on in your career?

15  A     Throughout my career, I've worked on a lot of financial

16  forensics cases doing analysis of transactions, such like I

17  am doing here.  I also have examined avoidable transfers,

18  solvency issues, economic damages, and business valuation,

19  and I also do data analytics in wage-and-hour cases and

20  various other disputes.

21  Q     How often do you perform an analysis of transactions

22  similar to what you've done in this case?

23  A     Probably, a majority of my work is in the area of bank

24  statement analysis, transaction analysis, like I did in this

25  case.

**A1324**

1  Q    Do you have experience advising companies on the sorts

2  of issues on which you've provided findings and observations

3  here?

4  A    Yes, I have provided expert reports and testified in

5  forensic accounting matters for Chapter 7, 11, and 13

6  Trustees' Creditors' Committees, as well as plaintiffs and

7  defendants in various disputes.

8  Q    How many times has the Court admitted your testimony?

9  A    I have testified in five jury trials and two hearings,

10 one of which was in the Bankruptcy Court in the Northern

11 District of Georgia.

12 Q    Has anyone ever successfully challenged your testimony

13 on a proffer?

14 A    No.

15        MS. PAKROUH:  Your Honor, we proffer Ms. Gould as

16 an expert in this case on forensic accounting

17 (indiscernible).

18        THE COURT:  Any objection?

19        MR. SULLIVAN:  Your Honor, no objection to the

20 qualifications.  We may have an issue as to the scope of

21 opinion that would be subject to that, but in terms of her

22 qualifications for forensic accounting, there are no

23 objections.

24        THE COURT:  Okay.  Thank you.

25 //

1  BY MS. PAKROUH:

2  Q    Ms. Gould, what is the nature of your involvement in

3  this case?

4  A    I was asked to review cash transactions of Alecto

5  between Alecto and its affiliates and insiders.

6  Q    Who hired you?

7  A    Mr. Balasiano.

8  Q    When did he hire you?

9  A    In August of 2023.

10  Q    Why did he hire you?

11  A    He wanted me to conduct an analysis of the cash

12  transactions of the debtor and affiliates and insiders to

13  identify any potential voidable transfers.

14  Q    What did you do to conduct a forensic investigation?

15  A    I first received bank statements for 26 different bank

16  accounts for the debtor and its affiliates.  I reviewed those

17  statements, which included over 116,000 transactions over the

18  four-year period, prior to the petition date.  From that

19  analysis, I also looked at transfers between affiliates

20  through a revolving credit line and compared that information

21  to line of credit reconciliations that had been prepared by

22  the debtor's management.

23      After looking at that and analyzing that, I also looked

24  at the general ledger in combination with the bank statements

25  to identify transfers to insiders and, as well, I looked at

**A1326**

1  the cash flow from two transactions that were identified, one

2  being a transfer of Sunrise Real Estate Holdings to the

3  Alecto members and the other being a transfer from Sunrise

4  MOB, which was owner of Plaza MOB, back to Alecto, and I

5  looked at the cash flows surrounding that.

6  Q    Did you speak with anyone?

7  A    I interviewed Mr. Sarrao and Mr. Williams, and after my

8  report, I spoke with Mr. Balasiano, as well as, obviously,

9  counsel.  And I also looked at -- I forgot to mention -- I

10  looked at various pleadings in this matter, including the

11  first day motion of Mr. Sarrao, as well as tax returns and

12  financial statements.

13  Q    Were there any limitations on your forensic

14  investigation?

15  A    Yes, there were.

16         MS. PAKROUH:  Let's go to JX-96 -- JX-96.2.

17  BY MS. PAKROUH:

18  Q    Is this the report that you mentioned you wrote?

19  A    It appears so, yes.

20  Q    So what were the limitations on your forensic

21  investigation?

22  A    I didn't -- as far as bank statement transaction

23  information, I did not do an examination of the front and

24  backs of checks.  I did not verify vendor invoices and

25  payments.  I did not do any reconciliations of the

**A1327**

1   intercompany accounts or a general ledger, and I did not do

2   an audit review or compilation of any financials.

3        MS. PAKROUH:  Your Honor, I would ask that this

4   report be admitted into evidence.

5        THE COURT:  Any objection to the admission of

6   JX-96?

7        MS. PAKROUH:  Correct.

8        MR. SULLIVAN:  No objection, Your Honor.

9        THE COURT:  JX-96 is admitted into evidence.

10       (Exhibit JX-96 received into evidence)

11       MS. PAKROUH:  All right.  Ms. Gould, let's please

12  go to JX-96 at 3, otherwise, page 2 of the report.

13  BY MS. PAKROUH:

14  Q    What are your findings, Ms. Gould?

15  A    There are, essentially, three findings.  One -- the

16  first one relates to transactions involving Sunrise Real

17  Estate Holdings, Plaza MOB and also Sunrise MOB.  The first

18  piece of that is that in June of 2019 Sunrise Real Estate

19  Holdings, which owned Plaza MOB, was transferred to the

20  Alecto members without consideration.  Later, one day later,

21  the Plaza MOB was refinanced and the appraised value of the

22  property was $50,700,000 and the value received back was the

23  payoff of the mortgage that was on that building as well as

24  $8.9 million in capital contribution to Alecto.

25  Q    And was your second finding, does it go through?

**A1328**

1  A    So that was the first part that there was less then

2  reasonably equivalent value received for the transfer of

3  Sunrise Real Estate Holdings and the second observation was

4  18 months later Sunrise MOB, again at that time the owner of

5  Plaza MOB, transferred Plaza MOB back to Alecto for no

6  consideration.  Plaza MOB was then later sold in the second

7  of a two-part transaction for $58,500,000.

8  Q    Did you make any findings with respect to intercompany

9  transfers?

10 A    Yes.  So, the second observation, category of

11 observations I made, was that intercompany transfers to

12 Alecto were more than the transfers out of Alecto.  And,

13 basically, Alecto acted as a conduit for funding for its

14 affiliates.  The final observation I made was in regard to

15 transfers to insiders and those transfers were identified

16 through the general ledger and through the bank statements.

17 I looked at the support for those various payments and found

18 that those payments were made for business expense

19 reimbursements and/or payroll and benefits.

20 Q    Ms. Gould, let's go to JX-96 at 4, otherwise page 3 of

21 your report, and we will get to this in a minute, but could

22 you please simply list the main reason for your opinion that

23 the Sunrise transaction was not for reasonably equivalent

24 value in 2019?

25 A    Yeah, I think I mentioned that.  The appraised value of

1    the building that was part of the Plaza MOB transaction in

2    2019 and the Sunrise Real Estate Holdings transaction was

3    appraised for $50,700,000.  They refinanced the note on that

4    building for $30 million.  The proceeding mortgage was paid

5    off and capital contribution in the amount of about $8.9

6    million was made to Alecto from the proceeds.  Those were the

7    entire proceeds in cash that were received.

8         So, if you look at the capital contribution of $8.9

9    million and the payoff of the mortgage the total was $28

10   million in cash transferred versus $50,700,000 value of the

11   building.

12   Q    So, you say your conclusion was based on cash

13   transactions.  Can other items be considered in evaluating

14   reasonably equivalent value?

15   A    Other items may be considered non-monetary or some

16   intangible benefit that could be received by the buyer and so

17   those kinds of things would be looked at.

18   Q    Did you evaluate if any non-monetary value or

19   intangible benefits from the transaction were received?

20   A    No, I didn't.  My focus was on cash transactions.

21   Q    Let's pull up JX-119.  What is this document?

22   A    This is an organizational chart.

23   Q    119, JX-119?

24   A    Oh, 119.  I'm sorry.  It's a settlement statement that

25   is for the Plaza MOB office building selling to the Regents

1   of the University of California.

2   Q      Did you review this in connection with your report?

3   A      Yes, I did.

4          THE COURT:  I'm sorry, what number did you say?

5          MS. PAKROUH:  Sorry, Your Honor, JX-119, 1-1-9.

6   It should be the last document in the witness binder.

7          THE COURT:  Thank you.  Sorry, I was on the wrong

8   page.

9   BY MS. PAKROUH:

10  Q      How were the proceeds of the sale used, Ms. Gould?

11  A      So, as I mentioned previously, the assets that were

12  sold in this August 31st, 2021 transaction was $58,500,000.

13  And $34 million and change was used to pay off the mortgage

14  that was on that building.  Then there was also an additional

15  $8 million that was paid for loan obligations of Alecto and

16  its affiliates.  The cash proceeds to Plaza MOB were

17  $15,769,770.21.

18  Q      For your second finding you observed that intercompany

19  transfers to and from Alecto demonstrated that Alecto was a

20  conduit for funding affiliates, is that right?

21  A      Yes.

22  Q      How did you go about determining this?

23  A      That was part of the analysis of the bank statements as

24  well as review of internal line of credit reconciliations

25  that were done by management.  So, what happened was that

1  deposits under the C&H credit facility deposits would go into

2  lockboxes, they would then be swept and C&H would then

3  provide advances on the revolver to allow for Alecto to

4  allocate funds to the various affiliates based on their

5  needs.

6       So, I looked at those transactions versus the bank

7  statements and found that the reconciliations tied to the

8  bank statements and that the funds that were coming in to the

9  lockbox and being advanced on were less than the amounts that

10  were allocated in most instances.  Any excess was then used

11  by Alecto for operations, for payroll, and in some instances,

12  particularly in 2020 when the balance in the bank account was

13  over approximately $20 million, the excess funds were used to

14  draw down the revolver.

15  Q    So, what did you conclude from your analysis?

16  A    That Alecto acted as a conduit and that the funds come

17  into the revolver and that Alecto would then allocate the

18  funds based on request.  Again, the amount of the transfers

19  to Alecto were generally less than the transfers from Alecto.

20  Q    Now let's go to your final main finding.  Did you

21  evaluate transfers to insiders of $10,000 or more?

22  A    Yes.

23  Q    And what did you conclude?

24  A    I concluded that the transfers -- there were 40

25  payments that were made to insiders. I looked at the support

1  for those payments and found that the payments were for

2  reimbursement of business expenses or for payroll and

3  benefits.

4  Q    And how did you conclude that?

5  A    My analysis of the bank statements and certain items in

6  the general ledger.

7  Q    Did you present these findings and observations?

8  A    Yes.

9  Q    To whom did you present?

10 A    To Mr. Balasiano.

11 Q    When did that happen?

12 A    I believe in the beginning of October.

13 Q    Ms. Gould, taking together all your analysis what do

14 you find concerning the company's transactions?

15 A    So, the 2019 transaction involving Sunrise Real Estate

16 Holdings and Plaza MOB, and that transfer from Alecto to the

17 Alecto members, was done for less than reasonably equivalent

18 value.  The subsequent transaction of Plaza MOB back from

19 Sunrise MOB to Alecto was done with no consideration given to

20 Sunrise MOB.  The second is that Alecto was a conduit for

21 funding of its affiliates and that transfers into Alecto were

22 generally less than the transfers out to the affiliates.  The

23 third is that for payments of $10,000 or more to insiders

24 that those payments were for business expense reimbursement

25 and/or payroll and benefits.

1      MS. PAKROUH:  Thank you.  Nothing more at this

2 time.

3      THE COURT:  Thank you.  Cross-examination.

4                CROSS-EXAMINATION

5 BY MR. SULLIVAN:

6 Q     Good afternoon, Ms. Gould.

7 A     Good afternoon.

8 Q     For the record Bill Sullivan for the Reed creditors.

9      Ms. Gould, in connection with your analysis, your

10 forensic accounting analysis, I think you indicated that you

11 did it to analyze the cash transactions of Alecto and its

12 affiliates.

13 A     Correct.

14 Q     You did that primarily by examining more than 1,800

15 bank statements?

16 A     I don't recall the number of the bank statements, but

17 there were 26 accounts in five years.

18 Q     I'm not trying to trick you. I am estimating as well.

19      And you did the report and you reported to Mr.

20 Balasiano, and that is the report you sent September 28th,

21 2023, correct?

22 A     Correct.

23 Q     And he spoke with you and discussed the contents of

24 your report at or around that time, correct?

25 A     I believe it was after because there was a weekend in

**A1334**

1  there.

2  Q    Okay.  And in connection with your report, you

3  interviewed Mr. Sarrao and got information from him, correct?

4  A    Correct.

5  Q    And so, for example, Exhibit 1 to your report is

6  something called "Plaza MOB Summary," are you familiar with

7  that?

8  A    That is the name that I gave to it.

9  Q    Okay.  So, you put the title on Exhibit 1 and by that

10  we're at JX-96.  On the docketed page its page 28 of 182 at

11  the top.  Then it says: "prepared by Alecto management,"

12  correct?

13  A    Correct.

14  Q    So, this three-page report, Paragraph 1 to 15, is all

15  information that Alecto management provided to you?

16  A    It was produced to counsel, to debtor's counsel, and

17  then I received it.

18  Q    Did you have any discussions with Mr. Sarrao about the

19  contents of this three-page summary?

20  A    I'm sure I did, yes.

21  Q    And the heading on the first is "Plaza Medical Office

22  Building" and I think there's 15 paragraphs, correct?

23  A    Yes.

24  Q    And then you attached some of the supporting

25  documentation that was all attached to the report when it was

1  provided to you?

2  A    I believe this was one document, but I don't recall.

3  It was all from JX-96029 forward.  I don't believe there is

4  anything int here that I created.

5  Q    Okay.  And this Plaza Medical office building summary

6  includes both transactions involving the building, correct,

7  the Sunrise REH transaction in June of 2019 and then the

8  transfer back in 2021?

9  A    Yes.

10  Q    Okay.  So, you talked earlier about the initial

11  transfer when Alecto transferred the equity in Sunrise REH,

12  which at the bottom of the chain had a valuable property

13  which was a medical office building appraised at $50,700,000.

14  You testified earlier that Alecto transferred that to its

15  members for less than equivalent value.

16  A    Correct.

17  Q    And so on page 3 of your report you identified two

18  pieces of value that Alecto received; the first being a

19  payoff of a loan to Wells Fargo and Berkadia of

20  $19,472,000 -- yeah, $472,350.  Then the second piece was an

21  equity contribution from the members back to Alecto of -- you

22  indicated its $8,944,477, correct?

23  A    Correct.

24  Q    And you added those up to be $28,416 -- apologies,

25  $28,416,827.

**A1336**

1   A     Correct.

2   Q     So, that is the value that Alecto received.

3   A     That is the cash value that they received, yes.

4   Q     I think you testified that you had not identified any

5   non-monetary value associated with that transaction, but you

6   recognized that sometimes those things exist, correct?

7   A     I recognize sometimes those things exist.  I did not do

8   any analysis to identify.

9   Q     Right.  So, with respect to the cash component your

10   report doesn't do the math, but if we subtract the

11   $28,416,827 from the $50,700,000, and we did this at your

12   deposition, I think you get roughly $22.3 million, correct?

13   A     Correct.

14   Q     So, that is the deficiency in the value that Alecto

15   received back from the transfer in June of 2019.

16   A     That is the difference in the cash that was received

17   versus the appraised value of the property.

18   Q     Okay.  Now your report, in the findings on page 2, also

19   notes that there was no consideration given to the Alecto

20   members when they transferred the property (indiscernible).

21   A     When the Alecto members --

22   Q     Yes, in 2021.  Let's snap forward to 2021.

23   A     Yeah, I think in the case the Alecto members were also

24   the Sunrise MOB members.  That is why I asked you that

25   question.

1   Q      Right.

2   A      So, can you restate the question again?  I'm sorry.

3   Q      So, you spoke briefly about the transaction in 2021

4   where the equity for the property transferred back to Alecto.

5   A      There was assignment of Sunrise MOB to Alecto in 2021,

6   yes.

7   Q      And the property was sold at that time?

8   A      The property was sold in 2021, yes.

9   Q      And that was sold in the transaction of UCLA, correct?

10  A      Correct.

11  Q      And you identified that you discussed that transaction

12  at page 10 or 11 of your report in particular, correct?

13  A      Yes.

14  Q      At the bottom of page 10 your report says: "On

15  August 31st the Plaza property was sold to UCLA for

16  $58,500,000."

17  A      Generally that is what it says, yes.

18  Q      And then you indicate that proceeds from the sale were

19  used to pay Plaza MOB's mortgage with Wells Fargo NA and the

20  loan obligations of Alecto and certain affiliates of MPT

21  Operating Partnership LP, correct?

22  A      Correct.

23  Q      Then your report says net proceeds of $15,769,770.21

24  were deposited in a Plaza MOB credit account (indiscernible).

25  Do you see that?

**A1338**

1    A    Yes.

2    Q    So, your report, in the first bullet point of findings

3    and observations on page 2, you state: "No consideration was

4    given to the Alecto members for the transfer and Alecto

5    received proceeds from the sale of over $15 million."  Do you

6    see that?

7    A    Can you direct me again where you are reading that?

8    Q    Page 2.

9    A    What section?

10   Q    Findings and observations.

11   A    Sorry.  Yes.  I was on the wrong page.

12   Q    So, the first bullet point and then there is a subpart

13   finding on the last sentence.

14   A    Correct.

15   Q    And your report indicates that the value received was

16   over $15 million and by that you mean $15,769,000, right?

17   A    Correct.

18   Q    And were you asked to analyze the application of

19   fraudulent transfer laws to those transactions?

20   A    No, I was not.

21   Q    Were you asked to determine whether in reviewing

22   whether a fraudulent transfer of claim could arise from the

23   initial transaction whether the second transaction could be

24   set off against the first transaction?

25   A    Can you say that again?

**A1339**

1  Q     Were you asked to evaluate that if a fraudulent

2  transfer claim was made with respect to the first transaction

3  whether the Alecto members could assert setoff in the second

4  transaction against that claim?

5            MR. WAXMAN:  Your Honor, I want to rise, if Mr.

6  Sullivan is asking if we asked Ms. Gould, who is not an

7  attorney, to make a -- to determine whether or not a legal

8  cause of action occurs I don't believe that that is an

9  appropriate question and I don't think she was ever asked.

10           THE COURT:  Are you stipulating in response to his

11  question or you are objecting?

12           MR. WAXMAN:  I am objecting on two basis.  First,

13  to the extent that its privileged.  Second, that she is being

14  asked a legal question.  But if she can answer…

15           MR. SULLIVAN:  Your Honor, it's a yes or no

16  question if she was asked. It has nothing to do with

17  privilege.

18           THE COURT:  He just conceded you can answer.

19           THE WITNESS:  No, I was not asked to do that.

20  BY MR. SULLIVAN:

21  Q     With respect to the funds that were deposited in the

22  bank account of Plaza MOB were you asked to make a

23  determination as to whether Alecto was the ultimate recipient

24  of the value of those funds?

25  A     Was I asked, no.

**A1340**

1  Q    Did you perform an analysis as to whether all the

2  $15,769,770.21 was all used for the benefit of Alecto?

3  A    When I looked at the transfers that came out of Plaza

4  MOB and went into Plaza MOB, I could see the $15,700,000

5  going into that bank account.  Then also on the flipside

6  coming out of that bank account over the next three years

7  there were primarily all transactions out of that account to

8  or for the benefit of Alecto and its affiliates.

9  Q    Did you draw a conclusion as to whether the entirety of

10 the $15,769,770 went to Alecto?

11 A    I did not trace the use of that $15.7 million because

12 it was deposited in with other funds into that account. What

13 I did note was that in 2021 through 2023 there were

14 approximately $26 million that came into the Plaza MOB

15 account and during that same period there was approximately

16 $25 and a half million that went out of that account and

17 those transfers appeared to be to Alecto or for the benefit

18 of Alecto and/or its affiliates.

19 Q    So, the Plaza MOB account was used for more than just

20 the proceeds from the sale of the medical office building,

21 correct?

22 A    That was the operating account for Plaza MOB.

23 Q    And so even after the sale of the medical office

24 building that account was used by Alecto, correct?

25 A    It was used by Plaza MOB.

1    Q    I'm sorry, it was used by Plaza MOB, but Alecto sent

2    funds to Plaza MOB in 2022 and 2023 after the sale, correct?

3    A    Plaza -- I'm sorry, Alecto transferred funds in and

4    received funds back, yes.

5    Q    And so would it be fair to say that in order to

6    evaluate whether funds that were paid out were paid to Alecto

7    or for the benefit of Alecto you would need to look to their

8    treatment on the general ledger accounts that Alecto

9    maintained for Plaza MOB?

10   A    Not necessarily because many of the transactions were

11   direct into an Alecto account or an account of one of the

12   affiliates. For others I did look at the general ledger to

13   see who the recipient was and if I could ascertain what was

14   being paid for.

15   Q    So, if there was a transfer that Plaza MOB made and it

16   was to the benefit of Alecto you would expect it to appear on

17   the general ledger, correct, as money being -- value being

18   received by Alecto.

19   A    Well, the general ledger is sometimes not specific as

20   to, or any general ledger, exactly every transaction.

21   Sometimes transactions are grouped together into one journal

22   entry.  So, I don't recall how any of those transfers were

23   booked in the general ledger.

24   Q    My question is if it doesn't appear in the general

25   ledger as an intercompany transfer between Plaza and Alecto

**A1342**

1   does that mean that another entity was the beneficiary of the

2   payment reflected out of the Plaza MOB account?

3   A    Can you state that question again?

4   Q    If a transfer leaves a Plaza MOB account and is not

5   reported as an intercompany transfer for the benefit of

6   Alecto is that an indication that the transfer went to the

7   benefit of another entity?

8   A    I don't think I can say that generally.

9   Q    Okay.  You testified a minute ago that the transfers,

10  about the value of the transfers as between Alecto and Plaza

11  MOB as reflected by the analysis of that account in the range

12  of $25 million over three years, is that right?

13  A    Correct.

14  Q    Okay.  And there --

15  A    I'm sorry, to Alecto and/or its affiliates, is that

16  what you said?

17  Q    And/or affiliates.

18  A    Correct.

19  Q    So, the $25 million isn't specific as to Alecto?

20  A    No.

21  Q    Did you analyze the Alecto general ledger accounts for

22  Plaza MOB to determine the overall value of the transfers to

23  and from Alecto and Plaza MOB during the time period from

24  (indiscernible).

25  A    I did do a reconciliation of bank statement

**A1343**

1  transactions to the general ledger.

2  Q    And in general you didn't try to analyze or reconcile

3  the general ledger at all, correct?

4  A    Correct.

5  Q    You limited your review to the bank statements and then

6  used the general ledger as a resource to evaluate certain

7  individual transactions, correct?

8  A    Correct.

9  Q    I want to refer your report to at the bottom of page 3

10  there is a section titled "Post Assignment Transfers to and

11  from Plaza MOB." Do you see that?

12  A    Yes.

13  Q    And you indicated an amount in your report of

14  $30,559,770 to or for the benefit of Alecto and/or

15  affiliates.  Underneath you write transfers to Alecto of $13

16  million and then $15 million proceeds from the assets,

17  correct?

18  A    Yes, that is how it is indicated.  I did look after my

19  deposition to get a better understanding of what you were

20  asking me there and I did find that the $30 million is

21  overstated, it should be $26.7, but $26 million because that

22  is the amount that -- I'm sorry, $25.5 million because that

23  is the amount that was transferred to Alecto or to or for the

24  benefit of Alecto and its affiliates out of the Plaza MOB

25  account in '21 through '23.

**A1344**

1    Q      Did you do a calculation specific to Alecto alone, not

2    the other affiliates?

3    A      So, Alecto received, as it says here, $13.9 million in

4    cash transactions.  There was also the payment of the 2018

5    promissory note in the amount of $3.8 million that was paid

6    on behalf of Alecto. I believe the other transactions were to

7    or for the benefit of affiliates.

8    Q      Okay.  So, the $13,917,603 is that a net number for the

9    benefit of Alecto?

10   A      That is the cash that was transferred into Alecto's

11   account in 2022 and 2023.

12   Q      What about cash coming back from Alecto?

13   A      So, cash coming back -- so during that same period

14   there was over $2 million, I don't remember off the top of my

15   head, that was transferred from Alecto into Plaza MOB's

16   account during that same period.

17   Q      And you haven't tried to net those?

18   A      I haven't -- I mean --

19   Q      In your report.  Your report doesn't try to net those

20   out?

21   A      In one of the exhibits at the back there was a small

22   calculation that showed transfers in from Alecto and

23   transfers of cash back to Alecto.

24   Q      I understand that you put together elaborate charts

25   showing your work, but in terms of a finding of conclusion

**A1345**

1    you have not tried to calculate and net as between the

2    transfers to and from and provide a number in your report?

3    A    I consider my exhibits part of my report.  So, it is --

4    there is a calculation.

5    Q    That is not the question I asked.  You haven't put a

6    number, as a finding, of the net benefit to Alecto in this

7    section of your report in writing.

8    A    In this section of my report in writing the numbers are

9    there. I did not subtract one from the other.

10   Q    Okay.  And then -- and so in addition to the $13.9 you

11   said the other amount was $3.8 million payment on a note,

12   right?

13   A    Correct.

14   Q    And then the issue that we got into at your deposition

15   was the $13.9 and the $15.77 million net proceeds those could

16   be the same to be double counted and so that is why we're

17   talking just about the $13.9 and the $3.8, correct?

18   A    That is why I went back to see if it was double counted

19   and that is when I found that because I didn't trace the

20   exact use of the $15 million I found that there was $26

21   million that came into the account during that '21 to '23

22   period and there was $25 that came out of the account to or

23   for the benefit of Alecto.  That is the difference.

24   Q    Okay.  You testified about the fact that at some point

25   in time, and I believe you said it was due to COVID, that

1   Alecto began holding more money in its account, up to $20

2   million, do you remember that testimony?

3   A     Yes.

4   Q     And you wrote about that in the section when you talked

5   about the mechanism that Alecto used to "sweep deposits" and

6   send money back to its credit facility.  Do you recall that?

7   A     I believe that is where it is discussed, yes.

8   Q     Right.  Then in your report you had a section on that,

9   Section E, intercompany transfers and the C&H revolving

10  facility, do you see that?

11  A     Yes.

12  Q     And that is on page 12 and it continues onto page 13,

13  correct?

14  A     Yes.

15  Q     I want to focus on the second to last paragraph of that

16  section and you write: "In 2020, advances allocated to

17  affiliates were less than the affiliates lockbox deposits."

18  A     Correct.

19  Q     And that is how they managed to obtain an account

20  balance of $20 million was they didn't send as much back to

21  their affiliates, correct?

22  A     Yes.  It's my understanding that the primary source of

23  that $20 million were government advances to the hospitals

24  which were not then used or requested by the hospitals for

25  their operations and funding.  So, those were maintained in

**A1347**

1    that account through December of 2020.

2              MR. SULLIVAN:  Your Honor, that concludes my

3    questions.

4              THE COURT:  Thank you.  Any redirect?

5              MS. PAKROUH:  Yes, Your Honor, briefly.  Tara

6    Pakrouh of Morris James on behalf of Alecto.

7                    REDIRECT EXAMINATION

8    BY MS. PAKROUH:

9    Q    You testified earlier that you reviewed the subsequent

10   transaction as after the 2019 Sunrise transaction.  Why did

11   you do that?

12   A    I looked at -- I wanted to look at whether Alecto was

13   funneling money to Plaza MOB when Plaza MOB was not owned by

14   Alecto as part of the review for potentially avoidable

15   transfers.

16   Q    And what did you conclude?

17   A    During that time between the 2019 transaction and the

18   2021 transaction more funds were going from Plaza MOB to

19   Alecto then Alecto was transferring to Plaza MOB.

20   Q    And by the January 2021 transfer did Alecto ultimately

21   receive more then it transferred out?

22   A    I'm sorry, can you ask that question again?

23   Q    Yes.  On 5/2021, the bookend of the transactions, did

24   Alecto ultimately receive more then it transferred?

25   A    More from Plaza MOB?

**A1348**

1    Q      Correct.

2    A      Yes.

3    Q      And why is that?

4    A      I looked at the bank statements and that's what my

5    findings were.

6    Q      You testified that there was an error in your report,

7    is that right?

8    A      Yes.

9    Q      Does it change your analysis?

10   A      The change of the fixing of the error?

11   Q      Changing the import of your conclusion that Alecto was

12   seeking more.

13   A      Okay.  Can you direct me to where you are asking that

14   question?

15   Q      Give me one second.

16          (Pause)

17   Q      So, in the report when you are discussing Plaza MOB

18   post UCLA sale, I believe you testified that there was an

19   error in your report with respect to a double count in

20   connection with that, is that right?

21   A      It was found not to be a double count, but there was an

22   error, yes.

23   Q      Oh, all right.  My question is, your error here, does

24   it change anything other than the fact that it occurred?

25   A      Alecto still received more from Plaza MOB in the post

 1  assignment period then it gave to Plaza MOB.

 2  Q    And how much money did Alecto -- did Plaza transfer to

 3  Alecto after the Sunrise transfer?

 4  A    Which Sunrise transfer?

 5  Q    The 2019 Sunrise transfer.

 6              THE COURT:  Counsel, I just ask that if you are

 7  referring to a page can you just put it on the record so we

 8  can all follow.

 9              MS. PAKROUH:  Sure.  So for this question, Your

10  Honor, I don't have a page necessarily in mind, but I am

11  referring to starting on page 8 and then thereafter.  It's

12  the period of time after 2019.

13              MR. SULLIVAN:  I am going to object to the

14  question (indiscernible).

15              THE COURT:  I'm sorry, Mr. Sullivan, I can't hear

16  you.

17              MR. SULLIVAN:  I am going to object to the

18  question that it lacks (indiscernible).

19              THE COURT:  Can you rephrase the question?

20              MS. PAKROUH:  Sure.  You know, I'll move on.  I

21  actually don't have anything more after this.  So, if it's

22  all right with Your Honor I would like to reserve the right

23  to recall Ms. Gould if necessary.

24              THE COURT:  Okay. Any objection?

25              MR. SULLIVAN:  I guess it would depend on the

**A1350**

1  reason.

2          THE COURT:  I believe you have also reserved the

3  right as well, as I recall.

4          Ms. Gould, let me just ask, there was no one else,

5  right?  You are excused for now, but you cannot speak to

6  anyone regarding your testimony until the conclusion of this

7  hearing in its entirety.

8          THE WITNESS:  Understood.

9      (Witness excused)

10          MR. WAXMAN:  Good afternoon, Your Honor.  May I

11  please the Court, Jeff Waxman of Morris James on behalf of

12  the debtor.

13          I don't know if Your Honor would like to take a

14  five-minute break.  The next witness will be Mr. Balasiano.

15          THE COURT:  How long do you think Mr. Balasiano

16  will be on the stand?

17          MR. WAXMAN:  Well, I think his direct will be

18  relatively short. I don't know how long he will be on the

19  stand on cross-examination and, of course, we reserve the

20  right to redirect.

21          THE COURT:  Okay.  Well, why don't we take a ten-

22  minute break until 3:05 and then we will reconvene.

23          MR. WAXMAN:  Okay.  Thank you.

24      (Recess taken at 2:56 p.m.)

25      (Proceedings resumed at 3:07 p.m.)

**A1351**

1          THE COURT:  Please be seated.

2          MR. WAXMAN:  Good afternoon, Your Honor.  Jeff

3     Waxman from Morris James. I would like to call Steven

4     Balasiano to the stand.

5          THE COURT:  Thank you.  Can you confirm we are

6     still complying with the broadcast policy?

7          MR. WAXMAN:  Your Honor, may we approach the

8     witness with binders.

9          THE COURT:  Yes. And we will swear him in as soon

10    as everybody has binders.

11         MR. WAXMAN:  Your Honor, I understand that you and

12    your clerk both have copies of the binders.

13         THE COURT:  I'm sorry, these are what?

14         MR. WAXMAN:  These are the entire JX binders.

15         THE COURT:  Okay.  Any particular volume or…

16         MR. WAXMAN:  Its one and two are the sole binders.

17    And I do apologize, Your Honor, I am more old school with big

18    binders rather than (indiscernible) binders.

19         THE COURT:  Okay.  Could you swear the witness in

20    please.

21       STEVEN BALASIANO, DEBTOR'S WITNESS, AFFIRMED

22         THE CLERK:  Please state your full name and spell

23    your last name for the record.

24         THE WITNESS:  Steven Balasiano, B-A-L-A-S-I-A-N-O.

25         THE CLERK:  Thank you.

**A1352**

1                          DIRECT EXAMINATION

2    BY MR. WAXMAN:

3    Q     Mr. Balasiano, can you introduce yourself for the Court

4    please?

5    A     My name is Steven Balasiano.

6    Q     And what is your highest level of education, sir?

7    A     I graduated college SUNY Binghamton in 1984 and then I

8    went onto St. Johns Law School, graduated St. Johns Law

9    School in 1987.

10   Q     As an attorney are you barred in any state?

11   A     I am admitted to practice in the states of New York,

12   New Jersey, I am admitted in the Eastern District of New York

13   Federal Court, Southern District of New York, and the

14   District of New Jersey.

15   Q     What experience do you have that is relevant to your

16   serving as the independent director of Alecto?

17   A     The beginning of my career, I started my career at the

18   law firm of Kelley Drye & Warren and then went to Stroock &

19   Stroock & Lavan.  I was a bankruptcy associate for my first

20   eight, nine years.

21         Subsequent to that I went in house to a company called

22   The Children's Place where I joined as the general counsel

23   and secretary.  I was at that company for a dozen years, was

24   part of the growth and the team that grew the company from

25   $70 million in sales in 1995 till 2007 where we were doing

**A1353**

1    $2.5 billion in sales. I transitioned over the course of time

2    where I got more business roles and business responsibilities

3    ultimately was the chief administrative officer overseeing

4    real estate, store design, construction, non-merchandise

5    procurement, human resources, and store design, I believe.

6        Subsequent to that I went overseas, I pivoted and I was

7    running businesses. I had P&O responsibility for large

8    manufacturing companies located in China, Southeast Asia and

9    Jakarta and Vietnam.  I manufactured third-party

10   manufacturing for multiple retailers in the United States and

11   wholesale in the power companies.

12       After that I resettled back in, relaunched my law

13   practice.  That is over about ten years ago now I relaunched

14   my law practice.  My practices primarily focus on corporate

15   transactional work and, of course, bankruptcy.  With that I

16   have been and am appointed the plan administration and

17   liquidating trustee in a number of cases throughout the

18   United States.

19       I have probably active, at least, a dozen liquidating

20   trustee and/or plan administration roles in the United States

21   in this District maybe before Your Honor.  I am the

22   liquidating trustee in FFO, Furniture Factory Outlets, in

23   this District.  I am the liquidating trustee in Vital

24   Pharmaceuticals in Florida.  I am the liquidating trustee in

25   the Modell's case in New Jersey amongst many others, I won't

 1  cite all of them today.

 2       In addition, and finally, which I think is very

 3  important for my role today, is the fact that I sit on

 4  multiple trade creditors.  I represent many trade creditors

 5  in retail and other bankruptcies.  And as we all know, one of

 6  the charges in every retail case or every case, as the case

 7  may be, that gets filed is an examination of the directors

 8  and officers counsel to the creditors committee and/or their

 9  financial advisors generally do a deep dive into that. So, I

10  am privy and I'm part of those discussions.

11  Q    So, from those experiences are you generally familiar

12  with fraudulent conveyance claims?

13  A    Yes.

14  Q    And are you generally familiar with the laws regarding

15  D&O claims in your experience?

16  A    Yes.

17  Q    And have you brought any claims?

18  A    Yes. I am actually the avoidance trustee in the <u>True</u>

19  <u>Religion</u> bankruptcy where we brought multiple -- I was in

20  charge and responsible for the bringing of multiple

21  fraudulent conveyance actions. My firm has been retained in

22  the <u>ADPI</u> bankruptcy doing the same and other cases as well.

23  And as well as the liquidating trustee, I have initiated

24  myself as plaintiff fraudulent conveyance, D&O liability

25  cases in the <u>Modell's</u> in the District of New Jersey.  We just

**A1355**

1   commenced litigation in Florida in the <u>Vital Pharmaceuticals</u>

2   bankruptcy and there is an action pending currently in this

3   Court in <u>Furniture Factory Outlets</u>, as well as some other

4   ones that they're not public yet.

5   Q     Are you familiar with your declaration submitted in

6   support of confirmation?

7   A     Yes, I am.

8   Q     Are the facts in your declaration true and correct to

9   the best of my knowledge?

10  A     They are.

11  Q     When were you initially retained by the debtors?

12  A     Beginning of August 2023.

13  Q     And what were your responsibilities as independent

14  director when you were initially retained?

15  A     I was initially retained to perform an analysis of a

16  settlement between Sherman/Grayson and Alecto.  Alecto has a

17  $60 million claim at the Sherman/Grayson level.  And there

18  was a settlement agreement in connection with the sale of the

19  property and it was suggested or proffered as part of the APA

20  was that Alecto should waive its $60 million claim as part of

21  the settlement. I got involved in order opine in that

22  transaction and make a determination as to whether, in fact,

23  Alecto should waive that claim.

24  Q     And are you aware of whether a 9019 motion was filed

25  with respect to that settlement?

1    A      Yeah, I'm not sure exactly when the 9019 motion was

2    filed, but I am aware that a settlement was made where Alecto

3    stayed or received, I think, approximately $150,000 -- I

4    think $137,500 actually in connection with --

5            THE COURT:  Can you say that amount again?  I'm

6    sorry.

7            THE WITNESS:  $137,500 in connection with the

8    distributions that are going to be made in that case.  I will

9    note the total pot available for distribution in that case is

10   $250,000.  So, a significant piece of the distributions in

11   the Sherman/Grayson case is going to the Alecto estate and

12   the Alecto creditors.

13   BY MR. WAXMAN:

14   Q      How did your responsibilities as independent director

15   expand after (indiscernible)?

16   A      Later in August, it might be a week or two weeks later,

17   it was recommended to me -- not recommended to me, I was --

18   my charge expanded to review the Alecto bankruptcy and in

19   particular look at potential fraudulent conveyance actions

20   and director and officer or any type of breach of fiduciary

21   duties that the directors or officers may have acted with

22   during the course prior to the bankruptcy.

23   Q      Aren't you, in fact, the person charged with bringing

24   that action?

25   A      Correct.  I have been charged with the duty of

**A1357**

1  investigation or have the investigation performed as well as

2  to the extent there are findings of malfeasance in any way,

3  shape or form that I would commence that litigation.

4  Q    In the course of your duties have you reviewed the

5  debtor's plan?

6  A    Yes.

7  Q    Now, didn't you testify during your deposition you

8  hadn't seen the plan?

9  A    I testified that I hadn't seen the exact plan that was

10 being discussed in front of me.  Of course, I saw the terms

11 of the plan. I knew what the constructs of the plan were in

12 this case.

13 Q    Have we spoken throughout the case, yourself and

14 debtor's counsel?

15 A    Absolutely.

16       THE COURT:  Mr. Waxman, before you proceed further

17 I am hearing you are not being picked up on the mic.  So, can

18 you please speak louder or speak closer to the mic.

19       MR. WAXMAN:  (Indiscernible), Your Honor.  It's

20 very unusual for somebody to say they don't hear me, but I

21 will do my best.

22 BY MR. WAXMAN:

23 Q    Again, I don't want you to divulge what was said as you

24 are director of the company and its subject to privilege, but

25 any guess on the number of times we have spoken about this

1  case?

2  A    Multiple, multiple times.  Well in excess of 10, 15, 20

3  times.

4  Q    And as part of your retention were you entitled to have

5  your own counsel?

6  A    Correct.

7  Q    And, again, I am not asking you to divulge what was

8  said.  Have you spoken with your counsel in this case?

9  A    Yes.

10  Q    And any guess on the number of times you have spoken

11  with your counsel about this?

12  A    In excess of 20 times as well. That counsel is Justin

13  Alberto at Cole Schotz who has been involved throughout the

14  inception of my appointment as independent director.

15  Q    And in the course of your duties as an independent

16  director have you spoken with anybody else about this case?

17  A    Yes, I have.

18  Q    With whom have you spoken?

19  A    Well, first and foremost to Leanne Gould who we

20  retained in connection with performing the analysis of the

21  transactions going back four years, prior to the filing of

22  the bankruptcy.  In addition, I spoke to Mike Sarrao, the

23  executive vice president, general counsel, and secretary at

24  the company.

25  Q    As part of your responsibilities as the independent

**A1359**

1  director have you conducted an investigation as to potential

2  claims with respect to fraudulent conveyances?

3  A    Yes.

4  Q    And what were the issues that you focused -- first of

5  all, with whom did you speak about the issues of fraudulent

6  conveyance claims including (indiscernible)?

7  A    Again, those are the four people that I just mentioned:

8  Leanne Gould, yourself, debtor's counsel, and Justin Alberto,

9  my counsel.

10  Q    And during those conferences did you have the

11  opportunity to ask any questions?

12  A    Absolutely.

13  Q    Did you avail yourself of the opportunity to ask

14  questions?

15  A    Absolutely.

16  Q    Did your counsel have the opportunity to ask questions?

17  A    Absolutely.

18  Q    Did you (indiscernible) those conferences and did you

19  believe the questions were satisfactorily addressed?

20  A    Yes.  In fact, Ms. Gould shared with us an initial --

21  after we gave her the direction of what we wanted her to look

22  at and examine Ms. Gould shared with us a draft of her

23  analysis. We met, I am going to say met via Zoom, it was

24  virtually, multiple times to review her analysis, her initial

25  analysis.  I had the opportunity at that time to ask multiple

**A1360**

1  questions, as did my attorney.  Certain things were refined

2  and finalized into a final report that I received on

3  September 28th.

4  Q    And what documents did you receive with respect to

5  fraudulent conveyance claims?

6  A    First and foremost her report which did an analysis or

7  review of all the transactions that occurred over the

8  previous four years which highlighted one particular

9  transaction which was for less than reasonably equivalent

10 value, which was discussed earlier today which was the

11 transfer of Plaza MOB from Alecto to a separate entity prior

12 to a refinance in 2019.  In addition to that I reviewed the

13 financial statements of the company in 2019, the P&L balance

14 sheet, cash flow, as well as the tax returns.

15 Q    All right. I am going to ask you to turn to Exhibit 96.

16 I can save everybody trouble; I am also going to ask about

17 Exhibit 1 and 41.

18            THE COURT:  Did you say 1 and 41?

19            MR. WAXMAN:  Yes, Your Honor.

20            THE WITNESS:  Okay.  I have JX-96 in front of me.

21 BY MR. WAXMAN:

22 Q    Is that the report that you were referencing?

23 A    Yes.

24 Q    And you reviewed?

25 A    Yes.

1   Q    Okay.  And you said you looked at the -- what were the

2   other documents you reviewed?

3   A    The 2019 financials and the 2019 tax returns.

4   Q    Okay.  Can you pull up the JX-1.

5   A    Yes.

6   Q    Is this the document that you were just referencing?

7   A    Correct.

8   Q    And you had an opportunity to look through all this and

9   can you pull up JX-41?

10       Sorry, Your Honor, I'm going to hop around.

11  A    Yes.

12  Q    You identified this as the document that you reviewed?

13  A    Correct.  This is the balance sheet, cash flow, and

14  income statement, correct.

15  Q    Okay.  And what conclusion did you draw, if any, from

16  the balance sheet and other financials and tax returns did

17  you review?

18  A    That the company, Alecto, was solvent at the time of

19  the 2019 transfer.

20  Q    And you are referring to the Sunrise transfers it's

21  come to be known as?

22  A    Correct.

23  Q    Based upon your review of the documents, your

24  conversations with Mr. Sarrao, Ms. Gould, and counsel did you

25  reach a decision as to whether or not there was any validity

1  to the avoidance of the Sunrise transfer?

2  A    Ask the question again, I'm sorry.

3  Q    Based upon your review of the documents that you have

4  identified as having reviewed, the conversations of

5  Mr. Sarrao, Ms. Gould, counsel for the debtor, as well as

6  your own counsel did you reach a decision whether there was

7  any validity to the avoidance of the Sunrise transfer?

8  A    There was no actionable cause of action that could be

9  brought as a result of that transaction.

10 Q    And what is the reason for that?

11 A    The company was solvent. In order to bring a fraudulent

12 conveyance action there are two factors.  One is there has to

13 be a transfer for lack of reasonably equivalent value and,

14 number two, the company has to be insolvent at the time of

15 that transfer.  Clearly, the second fact of the test was not

16 satisfied her.  So, there is no ability to bring an action.

17 Q    Let's move on to the D&O claim.  Are you familiar with

18 the alleged D&O claims?

19 A    Yes.

20 Q    And with whom did you speak about the issues of

21 potential D&O claims (indiscernible)?

22 A    I spoke with debtor's counsel, yourself, and your

23 associates.  I spoke with my counsel, as well as availed

24 myself of conversations with Mike Sarrao.

25 Q    And during those conferences did you ask any questions?

**A1363**

 1  A      Yes.

 2  Q      And was your counsel present for those conferences as

 3  well?

 4  A      Yes, he was.

 5  Q      And did both of you have the opportunity to ask

 6  questions?

 7  A      Yes.

 8  Q      And at the end -- at the -- did you ask them questions?

 9  A      Yes.

10  Q      At the conclusion of those conferences, did you believe

11  your questions were satisfactorily addressed?

12  A      Absolutely.

13  Q      What documents did you review with respect to the

14  potential D&O claims?

15  A      I looked at the operating agreement.  I looked at a

16  memo which was prepared as well, which was codified -- I

17  won't say prepared because at the time it was only in

18  draft  -- conversations.  I looked at declarations and

19  documents that were provided in the underlying bankruptcy,

20  the Sherman/Grayson bankruptcy, and in this case as well, as

21  well as -- as well as other documents that were transpiring

22  at the time, especially in connection with the Sherman/

23  Grayson Hospital itself.

24  Q      And you looked at the documents that were filed in

25  Sherman/Grayson in particular?

1  A    Yes.

2  Q    Let me ask you to turn to Exhibit 41 -- I'm sorry,

3  that's not the right -- excuse me.

4         MR. WAXMAN:  Excuse me, Your Honor.

5     (Pause)

6  BY MR. WAXMAN:

7  Q    I'd ask you to turn to Exhibit 65.

8     (Pause)

9  A    Yes.

10 Q    Are you familiar with that document?

11 A    Yes.

12 Q    And I'd ask that you turn to Exhibit 66.

13    (Pause)

14 A    Yes.

15        MR. WAXMAN:  For the record, Your Honor, 65 is the

16 motion for a sale in Sherman/Grayson, and 66 is Mr. Sarrao's

17 declaration.

18 BY MR. WAXMAN:

19 Q    Are those two of the documents that you reviewed in

20 connection with your investigation?

21 A    Yeah, I definitely reviewed these in connection -- you

22 know, I reviewed a lot of the pleadings in the matter, but

23 most importantly the bulk of my analysis came from the

24 multiple, multiple conversations and investigations and

25 conversations, which allowed me to work through these

1    documents with Mr. Sarrao.

2    Q    So what conclusion did you reach with respect to the

3    D&O claims?

4    A    I reached the conclusion that there would be no breach

5    of fiduciary duties, no breach of duty -- no breach of

6    loyalty, and no breach of duty of care by the directors and

7    the officers in this case.  All of the activities that were

8    done, all the funds that were allocated to the different

9    subsidiaries, especially to the Sherman/Grayson, which I

10   believe is the biggest issue in the case right here, right

11   now, especially to Sherman/Grayson were allocated in a

12   fashion with the appropriate judicious business judgment.

13   The actions that the business members took were daily

14   conversations, daily decisions that were undertaken in order

15   to keep Sherman/Grayson Hospital afloat to enable to sell it

16   as a going concern.

17        We all know, all of us in the restructuring world, we

18   all know that selling a company or an entity as a going

19   concern is much, much better than the company having to

20   dissolve, close, or just, you know, file a Chapter 11.  What

21   they were doing over that time period that we were looking at

22   all the analysis and the transactions, they were propping up

23   this company, they were keeping it alive, so that it would

24   able to sustain itself, maintain itself, and have the ability

25   to sell it, which in fact they were able to do that.  And, by

1   doing that, the save to this estate was tremendous.  There

2   was probably close to $30 million in unsecured claims that

3   would have hit this Alecto bankruptcy had not been for the

4   sale of Sherman/Grayson.

5   Q    And by that, do you have any examples of expenses that

6   would have accrued, just by way of example?

7   A    There was -- there was pension liabilities that would

8   have hit Alecto as a control group.  There was a put on a

9   piece of property that the owner of that -- the owner of a

10  lessee - lease could put to Alecto -- to Sherman to have to

11  purchase, which would -- was guaranteed by Alecto, the

12  parent.  Other wind-down costs just of moving hospital

13  patients, records, medical records, pharmaceuticals, it would

14  have been astronomical.

15  Q    Are you familiar with the debtor's operating agreement?

16  A    Yes.

17  Q    Can you turn to Exhibit 13, please?

18  A    I'm sorry, which --

19  Q    Thirteen.

20       (Pause)

21  A    Okay.

22  Q    And what is the document?

23  A    It's the Alecto Healthcare Services amended and

24  restated operating agreement.

25  Q    How, if at all, did the operating agreement affect your

**A1367**

1    analysis of likely distributions to creditors under the

2    debtor's plan?

3    A    As in most operating agreements of an LLC, there's an

4    indemnification provision.  The indemnification provision

5    would have required Alecto to have indemnified the members,

6    the directors and the officers, for any actions that would be

7    brought against them.  And to the extent that there was a

8    feudal action, it would have been wasting of corporate

9    assets.

10   Q    So, in connection with the plan, do you believe, in

11   light of your analysis of potential claims and the costs of

12   indemnification, that the responses are appropriate?

13   A    Correct, yes.

14          MR. WAXMAN:  Your Honor, I have no further

15   questions for Mr. Balasiano.

16          THE COURT:  Okay.  Thank you.

17          Cross-examination?

18       (Pause)

19          THE COURT:  Mr. Sullivan, can you just wait one

20   second?

21          Let me just ask, before you start, did anybody

22   else wish to cross-examine this witness?

23       (No verbal response)

24          THE COURT:  Okay.

25   //

**A1368**

1                          CROSS-EXAMINATION

2    BY MR. SULLIVAN:

3    Q      Good afternoon, Mr. Balasiano.

4    A      Good afternoon.

5    Q      The first amended plan was filed on October 9th of

6    2023, and you're aware, aren't you, that it includes the

7    conclusion that you reached that there are no viable causes

8    of action?

9    A      I'm aware.

10   Q      Okay.  And so I believe you testified at deposition

11   that you had some significant discussions with Ms. Gould

12   about her report and relied on her report, and you also

13   relied on a memo that the debtor's counsel provided you

14   regarding potential breaches of fiduciary duty of care and

15   loyalty, correct?

16   A      Correct.

17   Q      All right.  And so, between the time that you received

18   the report and the time that the plan was filed, a period of

19   about ten days, that's when the decision -- that's when you

20   reached the determination that there was no viable causes of

21   action, correct?

22   A      Is that a question?

23   Q      Yeah, with a correct at the end.  Is that correct that

24   that's when you reached the conclusion?

25   A      It was an iterative process.  It did not happen on a

**A1369**

87

1  particular date, it was a process that happened from the time

2  that I was engaged at the end of August through the time that

3  we receive Leanne Gould's report.  Once I had time to speak

4  to all of the respective professionals in this case, the

5  decision was formulated, correct.

6  Q    But that conclusion was reached by October 9th?

7  A    Correct.

8  Q    Okay.  All right.

9         THE COURT:  Let me just -- sir, when you speak,

10 just get a little closer to the mike.

11        THE WITNESS:  Oh, I'm sorry.

12        THE COURT:  This courtroom has poor acoustics.

13 BY MR. SULLIVAN:

14 Q    So the -- you indicated that you reviewed 2019

15 financials and a 2019 tax return.

16 A    Correct.

17 Q    And do you have a recollection as to when those two

18 documents were reviewed?  Was it yesterday or since --

19 A    No, it was during the investigation.

20 Q    And how do you know you reviewed those two documents?

21 A    Because, to do a thorough analysis on a fraudulent

22 conveyance action of a less than reasonably equivalent value

23 transfer that occurred at a particular time period, you would

24 have to analyze solvency at that time period.  So to be able

25 to analyze solvency -- to be able to analyze a June '19

**A1370**

1   transaction, which was made without reasonable consideration,

2   you would have to look at solvency at that same time.

3   Q      So your testimony is that your review of the solvency

4   of the debtor in June '19 occurred before you made the

5   conclusion that there were causes of action that were

6   published in a plan on October 9th?

7   A      Say again?  I'm sorry.  I don't know follow you.

8   Repeat again?  I apologize.

9   Q      Your testimony that the debtor was solvent and that you

10  did an analysis of the debtor's solvency in June of -- as of

11  June 2019 was performed prior to October 9th; is that -- I

12  just want to be clear.

13  A      Yeah.  I mean, I'm just -- I'm trying to recount

14  whether I literally, actually saw -- because I want to be

15  careful with what I say -- whether I literally saw the

16  financial statement prior to, the day before, the day after,

17  or it was represented to me that the company was solvent at

18  that time through the analysis.

19  Q      When you say it was represented to you, that would mean

20  that it was either in writing as part of a memo that you were

21  provided or someone told you that?

22  A      Correct.

23  Q      But it's fair to say that you didn't perform your own

24  analysis to reach your own opinion on solvency up and through

25  October 9th of 2023?

**A1371**

1    A      Well, you're -- you're cutting hairs here.  The

2    question is where -- my opinion is formulated based on the

3    information that I received from the professionals that I

4    hired, retained in this case.  So to say when my opinion was

5    formed as opposed to receiving the information and the data

6    and the backup and the conversations, it's very hard to be

7    able to dissect that the way you're asking me to.

8    Q      Okay.

9    A      I'm sorry.

10   Q      Well, do you recall -- let's put aside --

11   A      At all time -- let me explain something.  At all times

12   in 2019, this company was solvent.  I knew that this company

13   was solvent in 2019 because it was represented to me when we

14   knew that we had a bad transaction -- or not a bad

15   transaction -- a transaction that was made for less than

16   reasonable value.  I said, hey, guys, were we solvent at this

17   time, because that's the next question you would ask if

18   you're a practicing lawyer in a bankruptcy context, or an

19   independent director or a liquidating trustee.  So that was

20   the question I said, were we solvent?  The answer was, yes,

21   we were solvent.  And when in fact I saw that financial

22   statement, whether it was October 9th, October 7th,

23   October 17th, I can't sit here today and tell you exactly the

24   date.

25   Q      Okay.  Let's put aside June 2019.  Do you recall me

1    asking you if you understood whether the debtor was solvent

2    between the period of time when the Reed creditors got their

3    judgment on November 28th, 2022 and the petition date, do you

4    recall that?  And your answer --

5    A    Yes --

6    Q    -- was --

7    A    -- yeah.

8    Q    -- that you couldn't opine on that, correct?

9    A    I didn't do a solvency analysis for that time period,

10   but presumably the company was insolvent.

11   Q    Okay.  Well, just to be clear, at your deposition you

12   said you were not aware of whether they were solvent from

13   November 28th, 2022 through the petition date?

14   A    Are we pivoting now?  We're asking me questions about

15   2022 or are we back on --

16   Q    That's what I said.

17   A    -- 2019?

18   Q    Earlier I said, put aside 2019 --

19   A    Okay, I'm putting aside 2019.

20   Q    -- let's go to 2022.

21   A    2022.

22   Q    Right?

23   A    Uh-huh.

24   Q    You're not aware of whether the debtor was solvent?

25   A    You asked me whether I did a solvency analysis, I

1  believe -- I don't recall sitting here, I don't have the

2  transcript in front of me, but you asked me whether I

3  performed a solvency analysis post -- you showed me all the

4  transfers that happened between the debtor and Sherman/

5  Grayson over the course since the judgment was entered, and

6  you asked me whether any of -- did I know about those

7  transfers, and then you said were they solvent at this time,

8  and I said I didn't do -- I think I said I didn't do a

9  solvency analysis because that wasn't the -- we knew we

10 weren't -- we understood the company was insolvent.  The

11 focus for the fraudulent transfer that we were looking at was

12 connected to a transfer that happened in 2019, that's why.

13 Q     Okay, but with -- when I asked you at the deposition, I

14 asked you about -- question -- and I'm going to read to you

15 from page 48 of your deposition -- "Have you done any

16 solvency analysis of the debtor for the time period from

17 November 28th, 2022 to the petition date?"

18       Do you recall your answer was, "No."

19 A     Yeah.

20 Q     Yes?

21 A     Yeah.

22 Q     That's still correct, right, that testimony is --

23 you're not changing that testimony?  Okay.

24       And then, question, "Has anyone done a solvency

25 analysis for you?"

**A1374**

1        Your answer was, "No."

2        Question:  "Has anyone provided you with conclusions

3   about the solvency from the debtor from the entry of the

4   judgment to the petition date that you have relied on?"

5        And your answer was again, "No."

6        Do you recall those?

7   A    Yes.

8   Q    Okay.  All right.  So we're clear that you didn't do it

9   for the period from November 28th to the --

10            MR. SULLIVAN:  -- I said 2022 five times -- no,

11   I'm on November '22 the petition date, I shifted.  He got it.

12            UNIDENTIFIED SPEAKER:  Okay.

13            MR. SULLIVAN:  All right?

14   BY MR. SULLIVAN:

15   Q    All right.  So we're clear that you didn't do it from

16   November '22 to the petition date.  Do you recall that I then

17   asked you to do it and gave you a balance sheet from 2022?

18   A    Correct.

19   Q    And you said, "I'm not a financial expert -- although I

20   can read a balance sheet and a P&L, I'm not a financial

21   expert and I will not opine on that."  Correct?

22   A    I didn't know -- yeah.

23   Q    All right.

24   A    Yes.

25   Q    All right.  So -- but you're clear that someone told

**A1375**

93

1    you that the debtor was solvent in 2019, and you asked

2    follow-up questions -- back in August, September, October,

3    and you asked follow-up questions, and that was part of your

4    thinking when you made your determination that there were no

5    viable fraudulent transfer causes of action --

6    A    Okay.

7    Q    -- correct?

8    A    Yes.

9    Q    All right.  And we looked at the Gould report earlier,

10   that was one of the things that you spent a lot of time

11   reviewing, but is it a fair statement that the Gould report

12   does not contain a solvency analysis?

13   A    Yes.

14   Q    Okay.  So do you recall when we spoke at your

15   deposition about reviewing the 2019 transaction?

16   A    That's where there needs to be a clarification.  When

17   you asked me that question on my deposition, I assumed -- you

18   asked many pointed questions on my deposition regarding 2022;

19   you asked me whether I reviewed financials in 2022, you asked

20   me whether I viewed this -- the tax return from 2022, and I

21   said I did not.  I assumed the answer was going to be no, and

22   then I assumed, like most depositions, you were going to go

23   down and ask me specifically about 2021, 2020, 2019, to build

24   the point that the guy didn't review any financials.

25            So I was not answering on the first question, which

1    was -- the way I heard it was related to 2022 and was going

2    to wait until you got me to 2019 and say, yes, I reviewed

3    those, but you never went there.

4    Q    But you never volunteered that you --

5    A    I didn't --

6    Q    -- that you had -- you had -- you had opinions about

7    solvency in 2019, but not in 20 --

8    A    I was not asked the question --

9    Q    Okay.

10   A    -- to answer that.

11   Q    I hear you.  How about if you -- let me ask the

12   question now.  We can keep a lid on it, okay?

13        But you agree that when I gave you a balance sheet from

14   2022, you said you're not going to opine on that?

15   A    Correct.

16   Q    Okay.  All right.

17            THE COURT:  That meaning insolvency?

18            MR. SULLIVAN:  Yes.

19            THE COURT:  Okay.

20   BY MR. SULLIVAN:

21   Q    Okay.  So let's go further because the fraudulent

22   transfer cause of action that we talked about relates to the

23   Sunrise REH transaction.  And do you recall that we looked at

24   the Gould report and what it said about that Sunrise REH

25   transaction --

1   A     Yes.

2   Q     -- correct?  And is it fair to say that the Gould

3   report does not reach a conclusion as to whether greater

4   value was attained by the members in the 2019 transaction

5   than was returned to Alecto in the 2021 transaction?

6               MR. WAXMAN:  Your Honor, the report speaks for

7   itself, whether or not what the relevant amounts are, are in

8   Ms. Gould's report.

9               MR. SULLIVAN:  I'm allowed to ask him about

10  Ms. Gould's report because he relied on it.  He said he

11  relied on the report and --

12              THE COURT:  I'm going to allow it.

13              MR. SULLIVAN:  Okay.

14              THE WITNESS:  I don't believe --

15  BY MR. SULLIVAN:

16  Q     I need you to answer my question.

17  A     Repeat -- can someone --

18  Q     Does the Gould report contain a conclusion that says

19  that the Alecto members received more from the 2019

20  transaction than they gave back in the 2021 transaction or

21  not?

22  A     Ask the question again?

23  Q     Does the Gould report reach a conclusion on that issue

24  as to which transfer provided greater value?

25  A     I believe it does.

1    Q    Okay.  Well -- and when did you reach that conclusion?

2    A    I guess I'm not understanding the question,

3    Mr. Sullivan.

4         MR. WAXMAN:  A clarification, Your Honor -- a

5    clarification, Your Honor, is he asking when he reached the

6    conclusion that Ms. Gould concluded in her report?

7         MR. SULLIVAN:  Yes.  It's because the answer has

8    become a second question.

9         MR. WAXMAN:  Well, in that case, he should have

10   the opportunity to review the report to refresh his

11   recollection --

12        MR. SULLIVAN:  I'm happy to do that.

13        MR. WAXMAN:  -- if he doesn't recall.

14        THE WITNESS:  I don't understand -- honestly,

15   you've got to take me a step back, Mr. Sullivan.

16        MR. SULLIVAN:  Okay.

17        THE COURT:  Okay --

18        THE WITNESS:  I really don't understand where

19   you're going, so it's really hard for me to answer this

20   question.

21   BY MR. SULLIVAN:

22   Q    Let's put the deposition aside.  Okay?  I'll re-ask the

23   question directly.

24        The Reed creditors have objected and said that there's

25   a fraudulent transfer that has value that has not been

1  pursued related to the 2019 Sunrise REH transaction.  You've

2  obviously looked at that because you just testified that the

3  reason there isn't is because of solvency in 2019?

4  A      Correct.

5  Q      Okay.  So you're aware of the transaction?

6  A      Correct.

7  Q      Okay.  What I'm trying to understand is if you have an

8  opinion beyond solvency about that transaction, or is it just

9  limited to solvency?  Do you have an opinion as to whether

10  the members received greater value in 2019 than they gave

11  back in 2021 --

12  A      When you say --

13  Q      -- do you have an opinion?

14  A      When you say members, are you talking about the whole

15  family, all --

16  Q      No, Alecto members, that means the membership interest

17  holders who received the stock in the 2019 transaction.

18  A      What I recall from Ms. Gould's report and from her

19  testimony today that all funds that were generated from the

20  transaction either went to the Alecto members and/or to

21  affiliate companies, that no money, from what I understand,

22  was distributed to the members as a result of those

23  transactions.  So to say it and to maybe pivot to the breach

24  of fiduciary duty, and the duty of loyalty and care, the

25  funds were always used and stayed in the system, the

**A1380**

1  ecosystem that I'll call Alecto and its subsidiaries its

2  family.

3  Q    Okay.  Let's be more specific, okay?  I need you to

4  look at JX-96.

5           MR. WAXMAN:  I'm sorry, what --

6           MR. SULLIVAN:  It's the Gould report.

7           MR. WAXMAN:  (Indiscernible) that's where you're

8  going?

9           MR. SULLIVAN:  No, 96.  It's the Gould report,

10  JX-96.

11           THE WITNESS:  Yes.  What page?

12           MR. SULLIVAN:  Page 2.

13  BY MR. SULLIVAN:

14  Q    And you were in the courtroom when I reviewed this

15  section with Ms. Gould, correct?

16  A    I might have walked out to the bathroom, but --

17  Q    Okay.

18  A    -- I was here most of the day, yes.

19  Q    All right.  And so I'm looking at the first bullet

20  point and the finding, right?  And Ms. Gould reports on the

21  2019 transaction and she says there was -- it had an

22  appraised value of over $50 million, and that is

23  significantly greater than the loan payoff and capital

24  contributions received of over $28 million.  Do you see that?

25  A    Uh-huh.

**A1381**

1  Q     And we confirmed with Ms. Gould that it was a $22.3

2  million deficiency in value with respect to that transfer?

3  A     What do you mean by deficiency in value?

4  Q     Alecto -- the Alecto members got $50 million in the

5  form of ownership of a $50 million property --

6  A     Uh-huh.

7  Q     -- and they gave back $28 million in terms of payoff of

8  the loan and an $8.9 million capital contribution.

9  A     Okay.

10 Q     And the difference between that is the value that they

11 didn't receive for what they transferred, $22 million.  Okay?

12 A     Okay.

13 Q     Do you have an opinion as to whether the transfer back

14 of that property in 2021 was for value that exceeded $22

15 million?

16       (Pause)

17 A     I'm not sure.

18 Q     Would you agree that this section of the Gould report

19 does not reach a conclusion on that (indiscernible) --

20 A     I don't --

21 Q     It provides numbers, but it doesn't say anything about

22 a conclusion; would you agree with that?

23 A     I agree with that.

24 Q     Okay.

25 A     Because it's not relevant.

**A1382**

1    Q    Okay.

2    A    It's not relevant if when that initial transfer was

3    transferred at a time the company was solvent, it's

4    irrelevant what happened downstream --

5    Q    If it --

6    A    -- that's the reason -- or it is a reason.

7    Q    That's fine.  I just need to know if that's the only

8    reason.  So you just said you don't have an opinion about the

9    relative value, so we can move on.  Okay?

10    A    Okay.

11    Q    All right?  Do you have an opinion as to whether in

12    defending a fraudulent transfer claim the Alecto members can

13    claim setoff for the amount they gave back to Alecto in 2021,

14    do you have an opinion on that today?

15    A    I believe that's a legal opinion and I'm not sure that

16    I'm here today to give a legal opinion.

17    Q    Okay.  And it's fair to say that you also declined to

18    give that opinion at your deposition last week, right?

19    A    I'm staying in the lane that I'm here to --

20    Q    Okay.

21    A    -- act in.

22    Q    All right.  The question is, did you consider that at

23    the time that you reached the -- in the summer and fall of

24    2023, did you consider the right of setoff and the relative

25    transfer when you evaluated the transaction and indicated

1   that it had no value, or was it just solvent, did you

2   consider those other two points?

3   A    I mean, without discussing attorney-client privilege,

4   I'm not sure that I can answer that question.

5   Q    Okay.  You don't have to -- you don't have to breach

6   attorney-client privilege to say what you considered.

7   A    All factors of determining a fraudulent conveyance

8   action and all defenses thereto, you can imagine, were all

9   discussed, analyzed, and considered in connection herewith.

10  Q    All right.  When I asked you that question about

11  whether setoff applies at your deposition, your answer was,

12  "I don't have an independent understanding other than

13  providing a legal conclusion, which I'm not here to do

14  today."  And are you standing by that test --

15  A    I just said that right now, I think.

16  Q    Okay, okay.

17  A    But I think I expounded a bit more today than I did

18  during the deposition, upon the advice of counsel during the

19  deposition.

20  Q    All right.  So the documents that you remember

21  reviewing from 2019 -- let's go back to 2019, okay?

22  A    Yes.

23  Q    You have an opinion that the debtor was solvent in

24  2019 --

25  A    Correct.

**A1384**

1   Q    -- and you referenced the 2019 financials and the 2019

2   tax return.  Did you have --

3         MR. WAXMAN:  Excuse me, he's mischaracterizing his

4   testimony with what other documents as well and his

5   (indiscernible) reviewed, including the Sherman/Grayson

6   documents, as well as (indiscernible) --

7         THE COURT:  So, Mr. Sullivan, can you rephrase the

8   question?

9   BY MR. SULLIVAN:

10  Q    With respect to determining solvency in 2019, you

11  indicated in response to the direct questions asked by Mr.

12  Waxman that you reviewed the 2019 financials, and you also

13  recall reviewing the 2019 tax return?

14  A    Yes, I did.

15  Q    Do you recall asking for --

16        UNIDENTIFIED SPEAKER:  (Indiscernible) --

17        THE COURT:  Pardon?

18     (Laughter)

19        MR. SULLIVAN:  All of us -- excuse me, Your

20  Honor -- all of us who have been before Judge (indiscernible)

21  react quickly.

22     (Laughter)

23        UNIDENTIFIED SPEAKER:  Actually, it would be worse

24  if (indiscernible) --

25        THE COURT:  There is a humming behind me and so

**A1385**

1  that's why you have to constantly speak loud in here.  So

2  somebody was saved by the hum of something in the ceiling.

3          MR. SULLIVAN:  I thought it was my phone ringing,

4  that's why I reacted, so okay.

5          THE COURT:  You said -- well, go ahead.  I'm

6  sorry.

7  BY MR. SULLIVAN:

8  Q    The 2019 financials and tax return.

9  A    Correct.

10  Q    Did you ask for backup documentation relating to the

11  balance sheet to review in connection with agreeing that

12  solvency was there in front of you?

13  A    No, I didn't.  There was multiple conversations when we

14  walked through the balance sheet, the P&L, and the cash flow

15  where I had the opportunity to ask questions to Michael

16  Sarrao, and I was satisfied with the answers I got.  I looked

17  at the cash flow.  There was no reason to believe that there

18  was anything askew with the documents that I was receiving

19  because they were kept in the ordinary course of business,

20  which was one of the things that I asked them when we

21  reviewed those documents.

22  Q    Okay.  So it's fair to say that looking at the balance

23  sheet and asking questions is what got you comfortable then

24  with the solvency -- of the professionals and the debtor in

25  conversations, right, it was a colloquy?  Okay.

**A1386**

1        (Pause)

2   Q    So, with respect to the breach of fiduciary duty

3   claims, the -- at your deposition, you testified that they

4   were discussed in the memo that debtor's counsel provided

5   you?

6   A    One of the places.

7   Q    Okay.  And with respect to the breach of deposition

8   claims, is it fair to say that you don't have an independent

9   opinion and you didn't perform an independent analysis, you

10  reviewed their analysis to reach that conclusion?

11  A    No, I have an independent opinion.

12  Q    Okay.  When did you develop that independent opinion?

13  A    The independent opinion was acquired or developed over

14  time from my engagement, I think I said earlier, from the

15  time that I was engaged to the filing of the plan, the first

16  version of the plan.

17  Q    And can you say why it is that there is no breach of

18  fiduciary duty?

19  A    In addition to what I said on direct?

20  Q    Yes.  Refresh me as to what your reason -- what your

21  conclusion was as to why there's no breach of fiduciary duty.

22  A    Do you have a question?

23  Q    Okay.  Well, the -- as I recall, what you said was that

24  there are springing duty -- or there are duties with respect

25  to Sherman/Grayson, and there's also an indemnification

**A1387**

1  obligation.

2  A    Well, I think I said --

3        MR. WAXMAN:  Your Honor, that's mischaracterizing

4  Mr. Balasiano's testimony.

5        THE WITNESS:  There was a bit more.

6  BY MR. SULLIVAN:

7  Q    Okay.  Well, I asked you --

8        THE COURT:  I'm going to sustain the objection,

9  but you can obviously refer to transcripts.

10        MR. SULLIVAN:  Okay.

11  BY MR. SULLIVAN:

12  Q    Mr. Balasiano, with respect to the breach of fiduciary

13  duty and breach of the duty of loyalty claims, is it fair to

14  say that at your deposition you did not articulate any reason

15  why those breaches did not occur other than was set forth in

16  the memo?

17  A    I was at the deposition, I was concerned about

18  breaching attorney-client privilege, and I was concerned

19  about that I would answer the question accurately and within

20  the confines of what I was supposed -- or allowed to be able

21  to discuss.  So I was cautioned by --

22        MR. WAXMAN:  Excuse me, I do want to just add, at

23  the deposition, counsel directed Mr. Balasiano not to answer

24  to the extent it would be breach of privilege.

25        THE COURT:  Okay.  You can answer the question.

**A1388**

1  Counsel hasn't objected here today.

2         MR. WAXMAN:  No, and we're -- as soon as he starts

3  to discuss any communications between counsel and

4  Mr. Balasiano, we will remind him that it's privileged and he

5  should not be (indiscernible) --

6         THE WITNESS:  So when you asked me the question

7  during my deposition, I was trying very carefully to stay

8  within the confines of my obligations and consulted with

9  counsel, and counsel during the deposition guided me how to

10  answer accordingly.

11  BY MR. SULLIVAN:

12  Q    All right.  And with respect to the questions about

13  breach of fiduciary duty, I'm going to read to you from

14  page 55 of your deposition.  And you say, "Again, that

15  counsel, debtor's counsel did a thorough analysis and review,

16  and issued a report and findings to me in determining that

17  there was no breach of fiduciary duty or loyalty.  And I

18  can't discuss more than that without breaching attorney-

19  client privilege."

20         Do you recall that testimony?

21  A    Yes.

22  Q    Okay.  So now, today, in your direct testimony, you

23  added to that and you've added to the fact that because you

24  represent trade creditors and you recognize that there are --

25  there's better value in selling and so, with respect to

1  Sherman/Grayson, you're aware that there could be increased

2  costs if that facility is closed as opposed to being sold

3  when it's operating.  Do you recall that testimony?

4  A    Yes.

5  Q    And that wasn't testimony that you provided last week

6  at your deposition, correct?

7  A    Yes.

8  Q    All right.  You also mentioned that the closure could

9  give rise to indemnification provisions, correct?

10  A    The closure?  No.

11  Q    What?

12  A    That would be a D&O litigation would -- could -- not

13  the closure of the hospital.  The D&O litigation could give

14  rise to indemnification provisions, which would be triggered

15  under the operating agreement, which would further deplete

16  the assets at Alecto.

17  Q    So bringing the claims would further deplete the

18  assets; is that what you're saying?

19  A    That's not the reason.  That would be a tangentially

20  additional reason to not bring a claim that you don't believe

21  is viable.

22  Q    All right.  And are you aware if there's D&O coverage?

23  A    Yes, I'm aware.

24  Q    And did you consider that when reaching your conclusion

25  that indemnification claims were relevant to this analysis?

 1  A      Yes.

 2  Q      Okay.  And so how did that factor into a conclusion?

 3  A      It was just another factor, it was just another factor

 4  in the concoction of factors in determining whether there was

 5  a breach of fiduciary duty here by the directors and

 6  officers.

 7  Q      And with respect to D&O coverage, that would prevent --

 8  if the D&O coverage is applicable, that would prevent any

 9  further drain on the estate, correct?

10  A      No, there would still be personal expenses and others

11  that might be triggered in connection with the

12  indemnification provisions until they pay.  There are a lot

13  of factors in D&O coverage.  It's not an automatic that you

14  have a D&O coverage and automatically they're just going to

15  accept the tender and pay your fees.  In the meantime, during

16  that interim, the estate would have to be compensating the

17  directors and officers until that all gets determined.

18  Q      Bear with me one second.  I want to review your

19  declaration for a minute.

20      (Pause)

21  Q      The declaration that you filed on February 29th, which

22  was last Thursday, at paragraph 22 says, I have been advised

23  with respect to applicable law governing the alleged claims,

24  including the California Uniform Fraudulent Transfer Act and

25  Delaware corporate law, and the standards for fiduciary

1   duties by managers, including the implications of the

2   debtor's business judgment (indiscernible) do you recall

3   that --

4   A     Yes.

5   Q     -- from your -- okay.  And when you're talking you've

6   been advised, that includes receiving a memo that you could

7   then follow up and ask questions about, correct?

8          MR. WAXMAN:  Your Honor, I -- we're bordering on

9   the issue of violating privilege, if (indiscernible) but I

10  don't think we're at that point --

11         THE COURT:  I think he just asked him if he got a

12  memo.

13         MR. WAXMAN:  Yes.

14         THE WITNESS:  Yes, I received multiple memos

15  during the iterative process, yes.

16  BY MR. SULLIVAN:

17  Q     Well, you testified you received the Gould report and a

18  memo from debtor's counsel --

19  A     Well, ultimately, like there were drafts of the Gould

20  report, right, the same way there are drafts of counsel's

21  memo.

22  Q     Okay, but we're talking about up through --

23  A     At the end of the day, there was a final memo; at the

24  end of the day, there was a final Gould memo, yes.

25  Q     Okay.  And did the memo include --

1  A      Let him --

2               MR. WAXMAN:  Ask your question.

3               MR. SULLIVAN:  I'm making a record.

4               MR. WAXMAN:  I understand.

5  BY MR. SULLIVAN:

6  Q      Did the memo include application of the law to the

7  facts in this case?

8               MR. WAXMAN:  Objection, Your Honor.  This is

9  clearly privileged.  I'm instructing the witness not to

10 answer.

11              THE COURT:  Give me your argument.

12              MR. WAXMAN:  This is a privileged communication.

13 He's a director of the company.  This was a memo that was

14 provided by counsel to a director in connection with not only

15 the (indiscernible) litigation, but actual litigation that's

16 happening here today.  There's also a common interest

17 privilege on top of that.  The memo, the subject matter of

18 the memo (indiscernible) --

19              THE COURT:  Mr. Sullivan?

20              MR. SULLIVAN:  Your Honor, the debtor waived the

21 privilege when it gave the memo to Mr. Balasiano.

22 Mr. Balasiano was retained to be adverse to the debtor and to

23 investigate claims against the debtor.  To the extent the

24 debtor wants to provide him with a memo, which he adopts,

25 that's fine, but they lose the privilege because they hired

**A1393**

1  him to be adverse.  This is the same situation that arises in

2  Chancery Court, shareholder litigation, there's a fiduciary

3  exception when you are evaluating breach of fiduciary duty

4  claims as an adverse entity.

5         MR. WAXMAN:  Your Honor, that is not accurate.

6  He's not bringing claims against the debtor; he would be

7  bringing claims for the debtor against insiders.  He is

8  clearly acting in his fiduciary capacity.  There is a body of

9  case law about privilege for directors.  We're happy to give

10 you a list of citations, but he is a director of a company

11 requesting information from counsel for the debtor.

12        MR. ALBERTO:  Your Honor, Justin Alberto, Cole

13 Schotz, on behalf of Mr. Balasiano.  This is completely

14 unlike the situation where Mr. Balasiano was hired as an

15 adverse party.  He was hired as a director of this company,

16 Your Honor, the debtor.  He was to investigate estate claims

17 and causes of action.  This is no different than any memo

18 prepared by an independent director prepetition, when the

19 committee -- I've represented dozens of committees in my

20 career, Your Honor -- we never get the memo; it's always

21 privileged, we're not allowed to get it, it's very simple.

22 This is a completely different situation.  He was not hired

23 as an adverse party; he was hired by the debtor as a director

24 of the company.

25        THE COURT:  Mr. Sullivan?

**A1394**

1          MR. SULLIVAN:  It's not a prepetition situation,

2   it's a post-petition situation.  The debtors retained him to

3   investigate causes of action against them.  If he adopts

4   conclusions in a memo that they provide him, then those

5   conclusions are therefore -- and reaches a settlement on

6   behalf of the estate, what the argument fails to distinguish

7   is between the debtor's estate and the debtor.  The debtor is

8   continuing to operate in Chapter 11, the debtor's estate has

9   these claims to bring against the very people who manage the

10  debtor, and that's why, in the circumstances that we have

11  here, the fiduciary exception to privilege rule applies.

12          He can't rely on the memo and not say what

13  conclusions the memo reached or identify the -- because a

14  pure legal memo would say here's what the law is, that's one

15  thing, but he has said that there's application of law to

16  facts that's helping him reach his conclusions and, if he

17  adopts them and they become the basis for the resolution of

18  the settlement, then they're no longer privileged.

19          MR. ALBERTO:  Your Honor, again, Justin Alberto.

20  By using the prepetition example, I did not mean to say that

21  that was the exclusive and only example.  Independent

22  directors oftentimes conduct their investigations on a post-

23  petition basis.

24          I would also say that in this situation it just

25  does not -- he's still a director of the company.  That would

1    be like me giving my client a memo and then Mr. Sullivan

2    wanting it.  The contents of that document are completely

3    privileged and they're not discoverable in any way, shape, or

4    form, Your Honor.

5          MR. WAXMAN:  Your Honor, I would again

6    articulate -- for the record, Jeff Waxman of Morris James --

7    again I would articulate, this is not a claim that he is

8    bringing against the debtor, this would be a derivative claim

9    on behalf of the debtor.  So this is information that was

10   provided, a memorandum that was provided that was produced

11   for Mr. Balasiano at his request, which would help him with

12   respect to claims against insiders on behalf of the debtor.

13         Further, Your Honor, I note that there's also

14   common interest issues.  And I would cite the Buttonwood True

15   Value Partners case by the Delaware Chancery Court, there's

16   the Twitter case noting the attorney-client privilege extends

17   to attorney communications with corporate agents, provided

18   the information to be privileged was, one, a communication,

19   which is -- two, that it's confidential; three, which is for

20   the purpose of facilitating the rendition of professional

21   service to the client, or between the corporation and its

22   attorneys.

23         He is an independent director, Your Honor, and

24   that's the -- and that is the role in which it was given.  To

25   allow somebody to breach privilege would chill all

**A1396**

1   communications between the independent director and counsel

2   for the (indiscernible) --

3            MR. ALBERTO:  Your Honor, I have one more

4   sentence.  I'm sorry for coming before you multiple times.

5            It's my understanding that all of the information

6   that was used to do our analysis was provided to Mr.

7   Sullivan.  So the basis for the conclusions in that memo have

8   all been provided to Mr. Sullivan and his colleagues.  If I'm

9   incorrect, Mr. Waxman can correct me, but I'm pretty certain

10  that that's the case.  Our conclusions are not --

11           MR. SULLIVAN:  Your Honor --

12           MR. ALBERTO:  Sorry.

13           MR. SULLIVAN:  -- there were no conclusions

14  provided at the deposition.  There was 15 examples of

15  attorney-client privilege and unable to state any conclusions

16  other than what was in the memo.

17           Your Honor, the case that I would cite --

18           THE COURT:  Yeah.

19           MR. SULLIVAN:  -- and rely on is <u>Zirn v. VLI</u>

20  <u>Corporation</u>, 621 A.2d 773, it's a Delaware Supreme Court

21  decision from 1993.

22           THE COURT:  627 A.2d 773?

23           MR. SULLIVAN:  621 --

24           THE COURT:  Oh, sorry.

25           MR. SULLIVAN:  -- A.2d 773.  And the most

**A1397**

1    significant holding from that case, which involved partial

2    disclosure of communications waiving privilege in the context

3    of an investigation of fiduciaries, says the purpose of the

4    underlying rule of partial disclosure is one of fairness to

5    discourage the use of the privilege as a litigation weapon.

6    A party should not be permitted to assert the privilege to

7    prevent inquiry by an opposing party where the professional

8    advice itself is tendered as a defense or explanation for

9    disputed conduct.  That's what we have here.

10          We have a release that's being provided that

11   there's no valid cause of action, the Reed creditors dispute

12   that.  Mr. Balasiano was specifically retained to investigate

13   and bring causes of action.  The written consent that was

14   provided -- or that the debtor executed August 19th, 2023

15   includes a provision that says the debtor can provide him

16   information to help its decision.  There's no problem with

17   that, but the assertion of privilege when that memo is what

18   conclusions are reached on is lost.

19          And, Your Honor, we would request that the answers

20   be made and the memo be produced.

21          THE COURT:  Mr. --

22          MR. WAXMAN:  Your Honor, while I certainly

23   appreciate Mr. Sullivan's deep dive into the '90s for an

24   applicable case, I would just note that the Buttonwood case

25   is a 2021 case from the Chancery Court.  The Twitter case

1    is --

2                THE COURT:  Give me the cites, Mr. Waxman, please.

3                MR. WAXMAN:  Actually, Your Honor, and if

4    Mr. Sullivan doesn't mind, I'll hand up the letter that we

5    sent to you in response to your request for (indiscernible)

6    or I can read it into the record --

7                THE COURT:  You can read it --

8                MR. WAXMAN:  -- whatever Your Honor --

9                THE COURT:  -- into the record.

10               MR. WAXMAN:  2021 WL 3237114, and that's in

11   Delaware Chancery Court, July 31st, 2021.  <u>Twitter, Inc. v.</u>

12   <u>Musk</u>, and that's 2022 Delaware Chancery Court LEXIS 277, and

13   that's from September 2022.

14               There's the <u>Glassman v. Crossfit</u> case, and that's

15   2012 WL 4859125.  And these are all addressing common

16   interests, Your Honor.  As well as the <u>Leslie Controls</u> case,

17   which has a little bit of -- a little bit of dust on it --

18          (Laughter)

19               MR. WAXMAN:  -- but that's only from 2010, Your

20   Honor.  So it's only half as old as the case that

21   Mr. Sullivan has cited, and that's 437 B.R. 493.

22               I would also note again, Your Honor, these are --

23   this is a memorandum that was produced for an independent

24   director by the debtor.  The independent director was charged

25   with bringing actions on behalf of the estate to the extent

1    applicable.  This is not a case of him suing the debtor; this

2    would be suing third parties.  And so it's entirely

3    appropriate that he is able to rely upon conversations that

4    he's had with counsel for the debtor, as well as his own

5    counsel, and the communications between myself,

6    Mr. Balasiano, and his counsel are all common interest

7    communications.

8              THE COURT:  Okay, we're going to take a break and

9    we'll come back.

10             Mr. Sullivan, how much more examination do you

11   think you have?

12             MR. SULLIVAN:  Your Honor, I'm --

13             THE COURT:  I mean, I'm not pressuring you.

14             MR. SULLIVAN:  No, no, I'm --

15             THE COURT:  I want to talk to the court security

16   officers to see how long we can stay here.

17             MR. SULLIVAN:  I'm nearing the end, so --

18             THE COURT:  All right, not that that -- I just

19   want to make sure we have availability.

20             So let me just -- I'm going to take a break

21   until -- let's take a break until 4:45, and then we'll come

22   back in.  I'll just remind the witness that you cannot talk

23   to anyone about your testimony here today, you're still under

24   oath.

25             So we're going to recess.

**A1400**

1          (Recess taken at 4:24 p.m.)

2          (Proceedings resumed at 5:08 p.m.)

3              THE COURT:  Please be seated.  Thank you all very

4    much for your patience.  I've reviewed the case law.

5              In this instance, the independent director was

6    retained to investigate a breach of fiduciary duty claim,

7    among other causes of action.  He reached out to the debtor's

8    counsel for legal advice.  Debtor's counsel rendered a memo

9    to its independent director, that communication is

10   privileged.

11             I'll note that Zirn is factually distinguishable.

12   In that case, it involved some partial disclosure, and that

13   was a shareholder action against the company.

14             So, with that, Mr. Sullivan.

15             MR. SULLIVAN:  Thank you, Your Honor.  I just want

16   to go over one more question that I asked.

17   BY MR. SULLIVAN:

18   Q    Mr. Balasiano, can I get you to look at your deposition

19   transcript, which is JX-93?

20             THE COURT:  Mr. Sullivan, did you say 93?

21             MR. SULLIVAN:  Ninety three.

22             THE COURT:  Okay.  Thank you.

23             MR. SULLIVAN:  I think it's -- that's what I wrote

24   down.

25         (Pause)

**A1401**

1          MR. SULLIVAN:  Page 61.

2          THE COURT:  Mr. Sullivan, can you bear with me a

3    second.

4          MR. SULLIVAN:  Of course.

5       (Pause)

6          THE COURT:  Thank you very much for your patience.

7    I was in the wrong binder.

8    BY MR. SULLIVAN:

9    Q    All right, Mr. Balasiano, do you have the deposition?

10   A    Yes, I do.

11   Q    All right.  So I just want to confirm your prior

12   testimony.  I want to refer you to page 61 of your

13   deposition.  Are you there?

14   A    Yes, I'm there.

15   Q    Okay.  So, starting at page 13, I asked you a

16   question --

17   A    Thirteen?

18   Q    I'm sorry, line 13.

19   A    Oh.

20   Q    "Are you able to evaluate whether Alecto was solvent or

21   insolvent as of December 31st, 2022 from the balance sheet?"

22       Did I read that correctly?

23   A    Yes.

24   Q    Okay.  And then there's a colloquy between me and

25   Mr. Alberto, and then there's a clarification and Mr. Alberto

**A1402**

1   says, "Go ahead."  We're on page 62, line 3.

2        And then the transcript says that you say, at line 4,

3   "There are other tests to determine solvency, ability to pay

4   credit, debits as they come due.  There are other tests and

5   factors in determining solvency, so I'm not -- again, I'm not

6   opining on whether it's solvent or not."

7        Okay.  And this -- did I read that correctly?

8   A    Yes.

9   Q    And this is in connection with the balance sheet in

10  2022.

11       And then skipping down line 14, the question is, "And

12  you've never been asked to opine on that?"

13       And your answer was, "No."

14       Did I read that correctly?

15  A    Yes.

16  Q    Okay.

17            MR. SULLIVAN:  Your Honor, that's all the

18  questions I have.

19            THE COURT:  Thank you, Mr. Sullivan.

20            MR. WAXMAN:  Your Honor, could we just have a

21  moment (indiscernible) --

22            THE COURT:  Yes.

23       (Pause)

24            MR. ALBERTO:  Your Honor, may I ask one question?

25  I'm sorry.  May I ask one redirect question?

 1                  THE COURT:  In what capacity?

 2                  MR. ALBERTO:  To the last question that

 3  Mr. Sullivan had and in my capacity as Mr. Balasiano's

 4  counsel.  If it's --

 5                  MR. WAXMAN:  If you'd rather have me ask --

 6                  MR. ALBERTO:  Mr. Waxman can do it.

 7                      REDIRECT EXAMINATION

 8  BY MR. WAXMAN:

 9  Q     When you were asked the question with respect to 2022,

10  had you seen the 2022 financials prior to that, what was

11  shown to you?

12  A     I'm sorry?

13  Q     Have you --

14  A     I didn't hear you.  Sorry.

15  Q     Had you seen the materials that Mr. Sullivan had showed

16  to you, the 2022 financials that he was trying to get you to

17  opine about?

18  A     No, that was the first time I saw them at the

19  deposition.

20  Q     Okay.

21                  MR. WAXMAN:  No further questions, Your Honor.

22                  THE COURT:  Okay.  Let me ask, is anyone reserving

23  their right to call --

24                  MR. WAXMAN:  I can't hear you, Your Honor.

25                  THE COURT:  Is anyone reserving the right to

**A1404**

1  recall this witness?

2           MR. WAXMAN:  I don't believe so, Your Honor.

3           THE COURT:  Okay, you're excused.  Thank you.

4           THE WITNESS:  Thank you, Your Honor.

5           MR. WAXMAN:  Let's talk about tomorrow, Your

6  Honor, and I'll keep it very short.

7           THE COURT:  No, no, no.  We have court security

8  until 6:00 p.m.

9           MR. WAXMAN:  I do feel secure.  Thank you.  We

10  have Mr. Sarrao's testimony tomorrow; I anticipate that that

11  will take some time to work through.  I anticipate --

12           THE COURT:  What does that mean?

13           MR. WAXMAN:  It will take --

14           THE COURT:  Attorney time?  What does --

15           MR. WAXMAN:  What's that?

16           THE COURT:  -- what does that mean in attorney

17  time?

18           MR. WAXMAN:  Oh, God, now you're asking attorney

19  time, I can't do the conversion in my head.  I'm guessing

20  that that's going to take at least an hour, my guess.

21           THE COURT:  Your direct, okay.

22           MR. WAXMAN:  My direct.  And then of course he'll

23  be subject to cross-examination, I don't know how long

24  Mr. Sullivan will take, and then we'll have oral argument.

25           I will tell you candidly --

**A1405**

1              THE COURT:  Well, I think there are legal

2    arguments to be made.

3              MR. WAXMAN:  That's correct.

4              THE COURT:  Okay.

5              MR. WAXMAN:  Yeah, there are legal arguments that

6    will be addressed.  There is, to be certain, as I gave you

7    the fair warning ahead of time, there are going to be some

8    issues with respect to the order.  I am going to try and work

9    through --

10             THE COURT:  I'm not worried about an order right

11   now.

12             MR. WAXMAN:  I understand that.  So I do not

13   anticipate that tomorrow will be over by noon.  That was a

14   long way of me saying that.

15             THE COURT:  Oh, okay.   I didn't anticipate that.

16             MR. WAXMAN:  Okay.  I just wanted to give you my

17   thoughts, and certainly I welcome Mr. Sullivan's, if he has

18   any thoughts about how long tomorrow will take.

19             THE COURT:  I also note the -- I think the only

20   exhibit that's been admitted into evidence is Exhibit 96,

21   JX-96.

22             MR. WAXMAN:  I will tell you that my colleague

23   Mr. Donnelly has been keeping track of the exhibits.  If you

24   would like us to move them in right now --

25             THE COURT:  Or at least before we close with

**A1406**

1  witnesses tomorrow, if the parties can confer.

2          MR. WAXMAN:  Absolutely.  We'll certainly confer

3  with Mr. Sullivan and any other party who has a question.

4          THE COURT:  Okay.  Mr. Sullivan?

5          MR. SULLIVAN:  Your Honor, the -- I don't disagree

6  with sort of the overall estimate.  So --

7          THE COURT:  Okay.

8          MR. SULLIVAN:  -- I don't think I have anything to

9  add.

10          MR. WAXMAN:  I'm getting angry looks from my

11  colleague.  I believe that Mr. McCutcheon's expert report was

12  moved in as well.

13          THE COURT:  I don't think so.  At least my pink

14  piece of paper doesn't say it.

15          MR. WAXMAN:  Okay.

16          THE COURT:  So --

17          MR. WAXMAN:  All right, we'll --

18          THE COURT:  -- but you can confer --

19          MR. WAXMAN:  -- we'll do all of them tomorrow,

20  we'll do all of them tomorrow.  That's the least of the

21  issues is Mr. McCutcheon's testimony.

22          THE COURT:  Okay.  Let me -- we're starting

23  at 10:00 tomorrow?

24          MR. WAXMAN:  We are, Your Honor.

25          THE COURT:  Okay.

**A1407**

1          MR. WAXMAN:  I'm not sure that we'll need the

2   entire day, if Your Honor would like to --

3          THE COURT:  No, no, I just want to manage

4   expectations.

5          MR. WAXMAN:  Okay.

6          THE COURT:  So --

7          MR. WAXMAN:  I do not anticipate that it will be a

8   full day.  I don't think it will be over by noon, but I can't

9   imagine that we're going to be here the same time tomorrow.

10          THE COURT:  Okay.  All right.  Thank you all for

11   your presentation today.  We'll see you tomorrow morning at

12   10:00.  We stand adjourned.

13          MR. WAXMAN:  Thank you, Your Honor.

14       (Proceedings concluded at 5:18 p.m.)

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                        CERTIFICATION

 2          We certify that the foregoing is a correct

 3   transcript from the electronic sound recording of the

 4   proceedings in the above-entitled matter to the best of our

 5   knowledge and ability.

 6

 7   /s/ William J. Garling                 March 6, 2024

 8   William J. Garling, CET-543

 9   Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                 March 6, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                  March 6, 2024

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25
</pre>

**A1409**

# EXHIBIT 50

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11 (Subchapter V)
                                   .  Case No. 23-10787 (JKS)
 4   ALECTO HEALTHCARE             .
     SERVICES, LLC,                .
 5                                 .
                                   .  Courtroom No. 6
 6                                 .  824 Market Street
                          Debtor.  .  Wilmington, Delaware 19801
 7                                 .
                                   .  Tuesday, March 5, 2024
 8   . . . . . . . . . . . . . . . .  10:03 a.m.

 9                 TRANSCRIPT OF CONTINUED HEARING
                 BEFORE THE HONORABLE J. KATE STICKLES
10                  UNITED STATES BANKRUPTCY JUDGE

11

     APPEARANCES:
12

13   For the Debtor:             Jeffrey R. Waxman, Esquire
                                  Tara C. Pakrouh, Esquire
14                                MORRIS JAMES, LLP
                                  500 Delaware Avenue
                                  Suite 1500
15                                Wilmington, Delaware 19801

16   For Steven Balasiano:       Justin R. Alberto, Esquire
                                  COLE SCHOTZ, P.C.
17                                500 Delaware Avenue
                                  Suite 1410
18                                Wilmington, Delaware 19801

19   (APPEARANCES CONTINUED)

20   Audio Operator:             Madaline Dungey, ECRO

21   Transcription Company:      Reliable
                                  The Nemours Building
22                                1007 N. Orange Street, Suite 110
                                  Wilmington, Delaware 19801
23                                Telephone: (302)654-8080
                                  Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

**A1411**

1  APPEARANCES (CONTINUED):

2  For the U.S. Trustee:        Linda J. Casey, Esquire
                                 UNITED STATES DEPARTMENT OF JUSTICE
3                                OFFICE OF THE UNITED STATES TRUSTEE
                                 J. Caleb Boggs Federal Building
4                                844 King Street
                                 Suite 2207, Lockbox 35
5                                Wilmington, Delaware 19801

6  For the Subchapter V
   Trustee:                      Jami Nimeroff, Esquire
7                                BROWN MCGARRY NIMEROFF, LLC
                                 Two Penn Center
8                                John F. Kennedy Boulevard
                                 Suite 1030, 1500
9                                Philadelphia, Pennsylvania 19102

10 For the Reed Action
   Judgment Creditors:           William D. Sullivan, Esquire
11                               SULLIVAN HAZELTINE ALLINSON, LLC
                                 919 North Market Street
12                               Suite 420
                                 Wilmington, Delaware 19801
13
   For the United States
14 of America:                   Leah V. Lerman, Esquire
                                 UNITED STATES DEPARTMENT OF JUSTICE
15                                 CIVIL DIVISION
                                 1100 L Street, NW
16                               Suite 7002
                                 Washington, DC 20005

17

18

19

20

21

22

23

24

25

**A1412**

1                                    INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 1:     Small Business Debtor's Plan of Reorganization    6
4                Proposed by the Debtor
                 [Filed December 19, 2023; Docket No. 261]
5
                 Court's Ruling:
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A1413**

1                                    INDEX

2

WITNESSES CALLED
3   BY THE DEBTOR:                                              PAGE

4

5          MICHAEL SARRAO

6          Direct examination by Mr. Waxman              9

7          Cross-examination by Ms. Nimeroff            77

8          Redirect examination by Mr. Waxman           80

9          Recross-examination by Mr. Sullivan          81

10         Further redirect examination by Mr. Waxman   178

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A1414**

1                          EXHIBITS

2    DEBTOR'S EXHIBITS:                                    PAGE

3    DX-44      2020 Balance Sheet Summaries              43

4

5    JOINT EXHIBITS:                                       PAGE

6    JX-2       2019 Financial Statements                 35

7    JX-4       2020 Financial Statements                 36

8    JX-10      Ground lease agreement                    56

9    JX-12      MSA Alecto Haywood/St. Rose Hospital      14

10   JX-13      Indemnification provision                 68

11   JX-18      Lease agreement                           54

12   JX-19      Assignment and Assumption of MOB Ground lease   57

13   JX-20      Guaranty                                  57

14   JX-25      First Amended MSA                         14

15   JX-34      Second Amended MSA                        14

16   JX-41      2019 Balance Sheet Summaries              40

17   JX-42      Letter re demand for payment              62

18   JX-43      Letter re demand for payment              62

19   JX-45      Sunrise MOB Transfer Documents            32

20   JX-50      2021 Balance Sheet Summaries              44

21

22   EXHIBITS:                                            PAGE

23   1 - Amended Plan and exhibits                        76

24   2 - Declaration of Michael Sarrao                    76

25   Transcriptionists' Certificate                       196

**A1415**

6

1          (Proceedings commence at 10:03 a.m.)

2          (Call to order of the Court)

3          THE COURT:  Good morning, everyone.  This is Judge

4    Stickles.  We're on the record in Alecto Healthcare Services,

5    Case Number 23-10787.

6          Good morning, Mr. Waxman.

7          (No Recording Microphones at Counsel Table and Lectern)

8          MR. WAXMAN:  Good morning, Your Honor.  May it

9    please the Court, Jeff Waxman of Morris James on behalf of

10   the debtor.

11         We are here -- oh, that's putting it too close, I

12   think.  We are here for day two of the confirmation hearing.

13   Today, we have Mr. Sarrao's testimony, and I believe that

14   that is it for the evidentiary portion of the program.  And

15   then we'll go into the issues of closing and specific issues

16   addressed under the plan.

17         Unless Your Honor has any question, we're ready to

18   get started with Mr. Sarrao on the stand.

19         THE COURT:  I just want to make sure Mr. Sullivan

20   doesn't want to be heard.

21         MR. WAXMAN:  Oh, I'm sorry.

22         MR. SULLIVAN:  No, Your Honor.  I'm fine to

23   proceed.  Mr. Hazeltine is going out to retrieve a binder

24   that didn't make it over, so he'll be coming in, in one

25   minute.

**A1416**

```
 1                    THE COURT:  Okay.

 2                    MR. SULLIVAN:  We can start.  I just wanted to let

 3    you know there will be a slight interruption.

 4                    MR. WAXMAN:  We're fine waiting for

 5    Mr. Hazeltine --

 6                    THE COURT:  Okay.

 7                    MR. WAXMAN:  -- if Mr. Sullivan believes he needs

 8    the binder, absolutely.

 9                    THE COURT:  Thank you.

10                    MR. WAXMAN:  Should we get Mr. Sarrao to the

11    stand --

12                    THE COURT:  Yes, I --

13                    MR. WAXMAN:  -- with the --

14                    THE COURT:  -- think that's --

15                    MR. WAXMAN:  -- binders?

16                    THE COURT:  -- a good idea.

17                    And I want to just check with the ECRO to make

18    sure we're complying with the broadcast policy.  Thank you.

19          (Participants confer)

20                    THE WITNESS:  Your Honor, can I go ahead and sit

21    down or should I --

22                    THE COURT:  Yes, you --

23                    THE WITNESS:  Okay.

24                    THE COURT:  -- can sit down.  We'll just have you

25    stand back up.
```

```
 1                  THE WITNESS:  Perfect.  No problem.

 2                  THE COURT:  Excuse me.  Could you remove those

 3  binders from --

 4                  THE WITNESS:  Yeah, there's a bunch of them.

 5                  THE COURT:  -- so he has room?

 6  (Pause in proceedings - participants confer 10:05 a.m.)

 7        (At 10:07 a.m.)

 8                  MR. SULLIVAN:  Your Honor, Mr. Hazeltine is still

 9  waiting.  We can proceed and --

10                  THE COURT:  Okay.  Are you sure?

11                  MR. SULLIVAN:  -- he'll just --

12                  THE COURT:  Okay.

13                  MR. SULLIVAN:  -- come in and it's fine.

14                  THE COURT:  Okay.

15                  MR. SULLIVAN:  Yes.

16                  THE COURT:  All right.  Thank you.

17                  Mr. Waxman.

18                  Oh, first -- excuse me -- can you swear the

19  witness?

20                  THE ECRO:  Please raise your right hand.

21         MICHAEL SARRAO, WITNESS FOR THE DEBTOR, AFFIRMED

22                  THE ECRO:  And could you please state your full

23  name and spell your last name for the record?

24                  THE WITNESS:  Michael Sarrao, S-a-r-r-a-o.

25                  THE ECRO:  Thank you.
```

**A1418**

```
 1                    DIRECT EXAMINATION

 2  BY MR. WAXMAN:

 3  Q      Good morning, Mr. Sarrao.

 4  A      Good morning.

 5  Q      What is your education (indiscernible)

 6  A      I have a Bachelor's Degree in Quantitative Economics,

 7  and I have a J.D., a law degree.

 8  Q      And where did you get your J.D. from?

 9  A      University of Sand Diego School of Law.

10  Q      As an attorney, are you barred in any states?

11  A      Yes, I'm licensed to practice in the State of

12  California.

13  Q      How long have you been with the debtor?

14  A      Since January 1, 2013.

15  Q      And what are your current positions with the debtor?

16  A      I serve as -- since January 1, 2013, I've been the

17  Executive Vice President and General Counsel and Corporate

18  Secretary.  And then, since February 1st of 2017, I've been

19  member of the board of managers of the debtor.

20  Q      Are you familiar with the debtor's business operations

21  and finances?

22  A      I am.

23  Q      Are you familiar with the hospital and healthcare

24  industry, generally?

25  A      I am.
```

1   Q      And what types of things -- what's the basis for your

2   familiarity?

3   A      Well, since 2001, about 80 to 85 -- from 2001 to 2006,

4   about 85 percent of my practice was devoted to healthcare,

5   and it was for Prime Healthcare, which was a large health

6   system.

7          From 2006 to 2012, I was the -- I think, initially the

8   Vice President and General Counsel, then Senior Vice

9   President and General Counsel of Prime Healthcare from 2006

10  to 2012, and went from 2 to, I believe, 22 or 23 hospitals.

11         And then, since 2013, I've been with the debtor, and

12  been involved with both the legal and the operational aspects

13  of the debtor.

14  Q      Do you attend conferences, speak at conferences, write

15  anything on the healthcare industry --

16  A      Yeah.

17  Q      -- (indiscernible)

18  A      Yes.  I regularly attend -- I'm a member of the

19  California Society for Healthcare Attorneys.  I regularly

20  attend those conferences.

21         There's an entity called the California Hospital

22  Association.  They have what's called the Hospital

23  Association of Southern California.  I attend those

24  conferences.

25         I've given MCLE presentations about healthcare and

1    healthcare M&A -- M&A and healthcare-related things.  And

2    most of my MCLE -- in California, we have certain specialized

3    MCLE, but the general MCLE stuff I take is related to

4    healthcare, as well.  Like I said, I've -- I've given two or

5    three MCLE courses.

6          I've spoken at Pepperdine School of Law on healthcare

7    matters, as well.

8          And I've served as -- as an expert in at least one case

9    involving a healthcare -- a hospital acquisition.

10   Q    Before we go on, are you familiar with the debtor's

11   plan of reorganization, dated December 19th, 2023?

12   A    I am.

13   Q    And are you familiar with the declarations submitted in

14   connection with confirmation of the plan?

15   A    I am.

16   Q    Are the facts therein true and correct to the best of

17   your knowledge?

18   A    Correct.  Except the projections in the plan have

19   changed, have been updated -- I believe you filed it with the

20   Court -- based on the reduction in Mr. Reddy's salary, the

21   savings on the payroll taxes because of that.  And we had

22   some real numbers for insurance, rather than the projections,

23   because we have insurance for the current year.

24   Q    Are the exhibits to your declaration true and correct

25   copies?

**A1421**

1   A      Yes.

2   Q      So what's the primary source of the debtor's income,

3   currently?

4   A      It is related to the -- so Alecto Healthcare Services

5   Hayward has a management services agreement with St. Rose

6   Hospital.  It generates a management fee.  So the debtor's

7   primary source of income is that management fee that gets

8   paid to Alecto Hayward and then gets disbursed to Alecto, the

9   debtor.

10  Q      And are you familiar with the debtor's contract with

11  St. Rose Hospital?

12  A      I'm very familiar with it.

13  Q      Will you please turn to Exhibit 12 in your binder?

14  A      Okay.

15  Q      Are you familiar --

16          THE COURT:  Mr. Waxman, can you wait a minute --

17          MR. WAXMAN:  Oh, I'm sorry, Your Honor.

18          THE COURT:  -- please?

19          MR. WAXMAN:  I apologize.

20          THE COURT:  Sorry.  I think I ...

21      (Pause in proceedings)

22          THE COURT:  My apologies.  Okay.

23  BY MR. WAXMAN:

24  Q      Are you familiar with that document?

25  A      I am.

1  Q      What is that document?

2  A      That is the base management services agreement between

3  Alecto Hayward, and then the legal name for St. Rose Hospital

4  is Hayward Sisters Hospital, and then its subsidiary is St.

5  Rose Medical Building, Inc., which owns a few of the --

6  there's office buildings on the campus, which are owned by

7  St. Rose Medical Building, Inc.  And that's the base contract

8  that was approved by -- I guess now Vice President Kamala

9  Harris, when she was the Attorney General of the State of

10  California.

11  Q      And can you turn to Exhibit 25, please?

12  A      Okay.

13  Q      And do you recognize that document?

14  A      Yes.  This is the first amendment to the management

15  services agreement.

16  Q      And can you turn -- and what does that do?

17  A      It extends the term and it -- it tweaks some of the

18  language as to -- because Alecto Hayward is paid based on the

19  net operating revenue, and there are certain carveouts to

20  that, so that was addressing that.

21  Q      And can you turn to Exhibit 34, please?

22  A      Okay.

23  Q      And what is that document, sir?

24  A      It is the second amendment to the management services

25  agreement.

1      And I should have said the first amendment was also

2  approved by the Attorney General, as well.

3  Q     And are those -- are all three of those documents true

4  and correct copies of the documents you recognize?

5  A     Yes, they are.

6           MR. WAXMAN:  Your Honor, just to save time later,

7  we'd like to have those identified as debtor's exhibits and

8  have them admitted.

9           THE COURT:  Any objection to the admission into

10  evidence of JX-12, JX-25, or JX-34?

11           MR. SULLIVAN:  No objection, Your Honor.

12           THE COURT:  The exhibits are admitted.

13      (Exhibit JX-12 received in evidence)

14      (Exhibit JX-25 received in evidence)

15      (Exhibit JX-34 received in evidence)

16  BY MR. WAXMAN:

17  Q     Can you describe the St. Rose contract?

18  A     Yes.  So, under the management services agreement,

19  Alecto Hayward provides management services to the hospital.

20  Included with that is Alecto Hayward is obligated to provide

21  a CEO for the hospital, as well as a CFO for the hospital,

22  and also management services.  So Aleco Hayward manages the

23  day-to-day operations of the hospital subject to the approval

24  or ultimate approval of -- St. Rose is a nonprofit hospital

25  that has an independent board of directors.  So, subject to

1    their approval for certain items, non-ordinary course items,

2    Alecto Hayward manages the hospital from a -- on a day-to-day

3    basis.

4        And currently, Mr. Reddy and Mr. Williams are the

5    appointed CEO and CFO of the hospital.

6    Q    Are there are any other support services that are

7    required under the contract?

8    A    Well, the overall oversight and management of the

9    hospital.  So other people provide support services,

10   radiology, lab.  If like a manager is gone, someone will fill

11   in for them to help.  But we're supporting the hospital nuts

12   to bolts and providing management services from nuts to

13   bolts.

14   Q    So what employees of Alecto work for St. Rose?

15   A    Currently, the primary employees are Mr. Reddy and

16   Mr. Williams.

17   Q    And do you regularly communicate with those two

18   employees?

19   A    I speak to Mr. Reddy at least once, if not multiple

20   times, a day.  And I speak to Mr. Williams usually every day,

21   but he just had a baby, so maybe two or three times a week

22   now, but generally every day with Mr. Williams, as well.

23   Q    Just as long as we're talking about that, has that been

24   your custom -- or have you regularly spoken with Mr. Reddy

25   throughout your relationship?

1    A       Since 2001, I've spoken to Mr. Reddy almost every --

2    every day, unless I was on vacation or he was on vacation.

3    And since 2013, I think -- you know, I'm sure there's a day

4    here or there, a Saturday I don't speak to him.  But on many

5    days, I speak to Mr. Reddy multiple times a day.

6    Q       So, based upon your conversations with Mr. Reddy and

7    Mr. Williams, do you have any idea how many hours a week they

8    work at St. Rose?

9    A       Mr. Reddy spends, I would say at least 40 to 50 hours

10   on St. Rose matters.  Sometimes, it's a call -- he may not be

11   at the hospital, but there will be a call at 2 -- at 2 in the

12   morning because a piece of equipment broke down or a doctor

13   didn't show up and there's an issue about transferring a

14   patient or accepting a patient.  Say 40 to 50 hours at least,

15   some weeks are more, but at least 40 hours a week.

16           Mr. Williams is probably 30 to 35 hours a week at

17   saint -- on St. Rose stuff.  He's not always at St. Rose, but

18   he's working on St. Rose matters.

19   Q       And based on your conversations with them, do you have

20   any idea how much time they spend working on Alecto matters?

21   A       So I would say Mr. Reddy now spends less time,

22   probably 5 to 10 hours a week.  Mr. Williams probably

23   spends 15 hours a week.

24           And again, it's cyclical, some of the stuff, because

25   there's a lot of reporting requirements still left for the

1    Alecto subsidiaries, or like, right now, we're in tax season,

2    so Mr. Williams is spending more time on that kind of stuff.

3    But he spends at least 10 to 15 hours.  He supervises the --

4    some Alecto employees.  He does the finances and stuff for

5    Alecto.  Probably 10 to 15 hours.  Maybe some weeks more;

6    some weeks no less than 10 hours.

7    Q    What's the current duration of the St. Rose contract?

8    A    The current contract runs through May 31st of 2025,

9    subject to a two-year renewal through May 31st of 2027, and

10   that either party can terminate it, one-year termination

11   without cause.

12   Q    And what about termination (indiscernible)

13   A    There's a standard termination for breach provision.  I

14   think it's 60 or 90 days.  I'd have to go back and look at

15   the original contract.

16   Q    Do you have any reason to believe that the contract

17   (indiscernible) extended?

18   A    No.  I believe it will be extended through 2027.

19   Beyond 2027, I'm not sure what will happen beyond 2027

20   because that would require new approval from the Attorney

21   General.

22   Q    Does the debtor have any other sources of revenue --

23   A    It has some --

24   Q    -- other than St. Rose?

25   A    It has some miscellaneous income, if -- medical records

1  requests.  The debtor processes medical records requests for

2  Olympia Medical Center.  So, if things come in for that, I

3  think, in California, it's a fifteen-dollar fee you get when

4  you get served with a subpoena, so there's some miscellaneous

5  income.  Miscellaneous rebates will come in.  But the -- the

6  vast majority of the revenue is through the management

7  contract with St. Rose.

8         (Participants confer)

9             MR. WAXMAN:  Your Honor, if I may approach the

10  witness, as well as Your Honor?

11             THE COURT:  Thank you.

12             THE WITNESS:  Thank you.

13  BY MR. WAXMAN:

14  Q    I've shown you a document that is listed as Docket

15  Number 316, if you look at the top.

16  A    Okay.

17  Q    The title is:

18             "Notice of Filing of Amended Exhibit C and G of

19  Small Business Debtor's Plan of Reorganization Proposed by

20  the Debtor."

21  A    Yes.

22  Q    Do you recognize this document?

23  A    I do.

24  Q    And what is this document?

25  A    Well, the document is the revised projected income

1  based on the changes, including the reduction to Mr. Reddy's

2  salary, some reductions in salaries and wages prior to that,

3  actual insurance -- actual insurance numbers, and there's a

4  few other changes, as well.  But it's the updated -- the most

5  updated projection.

6      (Participants confer)

7  Q    It's probably easier to walk through the blackline,

8  which is 316-2, Page 2 of 2.

9  A    Okay.

10  Q    Can you walk through the changes in the -- in your

11  projection from what was originally filed with the plan?

12  A    Yes.  So, if we start -- the revenues are the same.

13  But if we start at operating expenses, you see a reduction in

14  the salaries and wages, and that's driven by really three

15  items:

16      One item is the reduction of Mr. Reddy's salary that he

17  agreed to, from seven fifty to five fifty;

18      A person named Sylvia Ventura, she retired at the end

19  of 2023, so it's a reduction from her salary.  She's still

20  helping on a per diem basis very minimally.

21      And then we -- there was a couple of other people that

22  were working on things that we laid off or terminated at the

23  end of 2023.  That's why the salaries and wages and then the

24  benefits went down.  Like, for example, Ms. Ventura received

25  benefits; so, when she left, the benefit cost went down.

1    The payroll costs go down because the payroll -- or

2  payroll taxes go down because the payroll taxes are based on

3  the salaries and wages paid.

4    And the PTO went down because, although Mr. Reddy

5  doesn't accrue PTO, some of those other individuals accrue

6  PTO.  So that's -- that increases the labor -- the labor

7  subtotal has decreased.

8    And then, if you look at the other change, if you look

9  at expenses, the bankruptcy professional item, I believe it

10  was one fifty, we increased that to three hundred.  We're

11  cognizant of there's appeals and stuff going on in -- in this

12  case.

13    The insurance number -- well, we reduced tax

14  preparation fees.  I know Ms. Nimeroff, as the Subchapter V

15  Trustee, had asked questions about that.  We reduced those in

16  the projections in outer years because we've started to

17  eliminate entities that aren't operating.  We have a court

18  order for a couple of those.

19    The insurance went down because, with the sale of

20  Sherman/Grayson, they have their own insurance now and we're

21  not paying for that.  And those are actual -- the 2024

22  numbers are actual, all except for cyber liability because we

23  actually have new policies in place, so we have the actual

24  numbers.

25    And the travel decreased, as well, with Ms. Ventura

**A1430**

1    retiring, because she had some of those travel expenses.

2        And then we added in the control group reserve related

3    to a pension plan that is sponsored by Alecto Healthcare

4    Services Ohio Valley.

5        So you see the net income increase pretty dramatically

6    when you reflect these revisions and you take into account

7    these revisions.

8    Q    Let's talk about that control group reserve at the end

9    of the document.

10   A    Okay.

11   Q    What is your understanding of Alecto's liability for

12   pension obligations?

13   A    It's a -- it's a contingent liability.  So Alecto

14   Healthcare Services Ohio Valley took over and sponsors a

15   defined -- frozen defined benefit pension plan, now called

16   the "Alecto Healthcare Services Ohio Valley, LLC Pension

17   Plan."

18       Alecto, the debtor, is a member of the control or

19   controlled group -- I've seen it referred to both ways --

20   related -- related to that plan that is sponsored by Alecto

21   Ohio Valley.

22       So, if Alecto Ohio Valley was -- that pension plan was

23   to be terminated or didn't pay its obligations, then, in

24   theory, the PBGC, Pension Benefit Guaranty Corporation, then

25   would -- could pursue recovery against the controlled group,

**A1431**

1  and Alecto is part of that controlled group.

2      And so that number reflects those are the expected

3  contributions for Alecto Ohio Valley in 2024, as determined

4  by the pension plan's actuaries.

5  Q    So this is a reserve.

6      Do you anticipate that the debtor will have to pay that

7  $352,000?

8  A    I certainly don't know -- don't think the debtor will

9  have to pay all of that $352,000.  It may have -- there's a

10 chance it could pay some, but not all of it, because there is

11 an expectation that Alecto Ohio Valley is owed money from the

12 State of West Virginia that would help fund that.  And we are

13 proactively working PBGC to address, hopefully, the voluntary

14 termination of that pension plan and all those obligations

15 would go away.

16 Q    You are familiar with the plan of reorganization,

17 right?

18 A    I am.

19 Q    And what's your understanding of the debtor's disposal

20 income in the three years following the effective date?

21 A    So it's all of the debtor's disposable income.  So

22 like, in the case of this, if we didn't have to pay, the

23 disposable income would increase, it would be more.  So it's

24 whatever the disposal income is.

25 Q    So 3 times 352,000, that's over a million dollars, if

1  my math is correct, 1,056,000?

2  A      It is.

3  Q      That would be added to the bottom line of additional

4  disposal income?

5  A      It would.

6  Q      If I can ask you to turn to Exhibit G.

7              MR. WAXMAN:  And I would suggest to everybody that

8  looking at the blackline, which is 3 of 4, starting 3 of 4 on

9  316-4, is probably easier than looking at the new version.

10              THE WITNESS:  And Mr. Waxman, I have 2 of 4 is

11  where the blackline starts.  Maybe I'm looking at the

12  wrong --

13              MR. WAXMAN:  I'm sorry.

14              THE WITNESS:  I have it as 2 of 4 as where the

15  blackline --

16              MR. WAXMAN:  Yes.

17              THE WITNESS:  Okay.  I thought you said 3.  I'm

18  sorry.

19              MR. WAXMAN:  No, I -- if I did, I apologize.

20  BY MR. WAXMAN:

21  Q      As you can see in the top, there's the Chapter 11 and

22  then there's Chapter 7.  There are two columns.  Is that

23  correct?

24  A      That's correct.

25  Q      Okay.  Can you explain how the debtor was able to

1    derive the disposable income for years one, two, and three?

2    A    So, for years one, two, and three for the disposable

3    income, it's from the projections -- the projections that we

4    just looked at.

5    Q    And what would happen if the case converted to

6    Chapter 7?

7    A    I think very little, if anything, would be distributed

8    to the creditors if there was a Chapter 7.

9    Q    Now I note, in Chapter 11, there is no money -- it's --

10   there's 160,000 in Chapter 7 and there's nothing in the

11   Chapter 11.  Why is that?

12   A    Where -- I'm sorry.  Where are you looking at a hundred

13   and --

14   Q    I'm sorry.  The top line, "cash in accounts

15   receivable."

16   A    Oh, there's nothing there because, one, we have cash,

17   but we have a payroll due and we have administrative expenses

18   to pay, as well.

19   Q    What was the change for distributions from

20   subsidiaries.  That's under "other assets."  There's a

21   reduction from (indiscernible)

22   A    It was a reduction from 187,500 to 137,500, as we --

23   things got updated to look and see what it would be at.

24   Q    I'm -- rather than going through this line by line, do

25   you believe that this is true and correct to the best of your

**A1434**

1    knowledge?

2    A    Yes.

3    Q    And just to put a --

4    A    Well, and can I just go back for a sec?

5    Q    Yeah.

6    A    In the -- because this blackline is kind of hard to

7    read.  In the prior one, we expected $170,000 of cash and

8    versus $168,000 in cash, so it wasn't zero.  I was reading it

9    wrong.  It just went down $2,000 because that's the actual

10   cash number as of like yesterday.

11   Q    Okay.  Is it your testimony that creditors will receive

12   more, as set forth on this exhibit, Exhibit G, in Chapter 11

13   than they would in Chapter 7?

14   A    Yes.

15   Q    And what is the basis for that?

16   A    Based -- based on the project -- the projections, which

17   we spent a long time preparing.  The projections, what may be

18   the projected net disposal income paid out over three years

19   versus what the projected proceeds from the -- a liquidation

20   would be.

21   Q    And again, it's your testimony that that's not even

22   included in the 352,000 times 3 that's in the reserve,

23   correct?

24   A    Correct.

25   Q    So it could actually be over $3 million of

1   distributable (indiscernible)?

2   A    It could be, yes.

3   Q    And what's your understanding of if, for example,

4   Alecto entered into a new contract with another hospital for

5   similar services and received the benefit?  What's your

6   understanding with respect to how the likely disposable

7   income would be received by creditors under the plan?

8   A    My understanding is, under the plan, whatever the

9   disposable income is the disposable income.  So, if the

10  disposable income goes up, there would be more distributions

11  to the creditors.  So it all -- it all goes -- whatever that

12  disposable income is, is what the disposable income is.

13       So, in your scenario, if there was a new contract, new

14  management fees, the net profit from that, so to speak, would

15  be more disposable income.

16  Q    Do any of the debtor's employees, including you and

17  Mr. Reddy, have non-compete agreements with the debtor?

18  A    I am not an employee, so I don't have a -- I'm not an

19  employee.  Mr. Reddy does not have a non-compete agreement as

20  an employee of Alecto.  In the operating agreement, there are

21  some non-competition provisions for members and Mr. Reddy is

22  a member.  His trust is a member.  But no, no non-compete

23  agreements.

24  Q    So, if this case converted to Chapter 7, could St. Rose

25  declare a termination.

1  A    They could and they -- I -- they would consider that a

2  breach and they would -- and they would likely terminate the

3  contract if there as a Chapter 7, yes.

4  Q    And what, if anything, would stop Mr. Reddy from being

5  able to open a new business and engage in a contract with St.

6  Rose or any other hospital?

7  A    Other than market, that you have to have two people to

8  agree to it, I don't think there would be anything because

9  there wouldn't be anything to compete with, as it relates to

10  Alecto or the debtor or the operating agreement.

11  Q    And in that situation, would there be anything that

12  would stop or prevent Mr. Reddy from receiving the

13  compensation he was (indiscernible) receive at the beginning

14  of this case?

15  A    There would not be, as far as I know.

16  Q    All right.  I want to switch gears a little bit.

17      And let's talk about -- you're familiar with the Reed

18  Creditors' objection?

19  A    I am familiar with it, yes.

20  Q    And you're familiar with the allegations of fraudulent

21  conveyances and directors and officers claims?

22  A    I am.

23  Q    Okay.  Let's first talk about the Sunrise transfer and

24  let's go back to 2019 for a second.

25      What was the debtor's business in 2019?

1  A    In 2019, in June of 2019, the debtor had a number of

2  subsidiaries or affiliates that op -- owned and operated

3  hospitals, and it also had the management agreement with

4  respect to St. Rose Hospital.  And then one of its

5  subsidiaries held the equity interest in a company called

6  Plaza Medical Office Building, which owned an office building

7  and parking garage across from Olympia Medical Center.

8          MR. WAXMAN:  I would ask (indiscernible)

9      (Participants confer)

10 BY MR. WAXMAN:

11 Q    Do you have Exhibit 74 in front of you in one of your

12 binders?

13 A    No.  My binder goes from 71 to 96.

14          MR. WAXMAN:  We'll skip over that and possibly

15 come back to it later, Your Honor.

16 BY MR. WAXMAN:

17 Q    How has the -- how has the debtor's business changed

18 from 2019 through today?

19 A    Well, as of today, the debtor still has subsidiaries

20 with the small exception that the Judge is aware of with

21 Sherman/Grayson because of the interim management period and

22 a gap period.  But it doesn't own or operate any hospitals

23 and its primary business is winding down those entities, and

24 then the management agreement with St. Rose.

25 Q    So let's focus on June 2019 for a moment.

**A1438**

1     Do you understand the term "Sunrise transfer"?

2  A     I do.  I was here yesterday.  And I understand when

3  people refer to it as a "Sunrise transfer," I'm very familiar

4  with that.

5  Q     And can you explain what the "Sunrise transfer" is?

6  A     Yeah.  So, in June of 2019, Plaza Medical Office

7  Building, Plaza MOB, owned a parking garage and a medical

8  office building that had a loan on it with Citigroup, and it

9  was a securitized loan.  It -- Plaza MOB was owned,

10  effectively, by Sunrise Real Estate Holdings.  Sunrise Real

11  Estate Holdings owned 99 and a half percent of it; Olympia

12  Plaza Management owned .5 percent.  But then Sunrise Real

13  Estate Holdings owned Olympia Plaza Management.  So Sunrise

14  Real Estate Holdings owned, directly or indirectly, 100

15  percent of Plaza MOB.

16     And then, prior to June 18th, I believe, Alecto

17  Healthcare Services, the debtor, owned 100 percent of Sunrise

18  Real Estate Holdings.  That structure was all inherited prior

19  to 2013.  And at the time, there was a loan on it.  We had a

20  loan balance of right around $20 million at that time.

21     And then there was a refinancing and a transfer and re-

22  transfer, but let me know where -- do you want me to go

23  through all of that?

24  Q     Yeah.  If you can -- if you can go through what the

25  transfer was, and specifically why was the transfer made

1    (indiscernible)

2    A      So, in May of 2019, early June of 2019, we looked to

3    refinance the -- the loan on the medical office building, the

4    Plaza MOB loan, because the building had a better tenant

5    base, we had improved the tenants and the building.  And we

6    thought, with the interest rates, there was an opportunity to

7    access -- refinance it, have cash out, and put that cash back

8    out into Olympia.  So we went with Wells Fargo, Wells Fargo

9    was the lender.

10          When we were going through the refinance, Wells Fargo

11   was underwriting it as a real estate transaction and told us

12   that we needed to spin out Plaza MOB from the Alecto group

13   because they didn't want it connected to hospital operations.

14   We didn't want to do that.  They said we had to as a

15   condition to the loan.  And between Wells Fargo and then

16   their attorneys, which was Holland & Knight, we agreed to

17   that.

18          And we transferred -- so it was kind of a multi-step

19   transfer.  So the interests in Sunrise were transferred to

20   the individual Alecto members.  Then we created Sunrise MOB

21   Holdings.  Then those interests were transferred into Sunrise

22   MOB Holdings.  And then the net proceeds from the refinance,

23   which were about $9 million, came up and then got contributed

24   as capital back into Alecto.

25          But we did it because we wanted to have access to that

1  capital for Olympia because Olympia was important, and the

2  lender required us to do that.  The lend -- that was a

3  condition to the loan, that Sunrise be spun out from Alecto.

4  Q    What ever happened to that property that was

5  transferred out?

6  A    So the property, the equity interest in -- on

7  January 1, 2021, those equity interests -- so, at that --

8  after all that happened in June of '19, Sunrise MOB Holdings

9  owned Sunrise Real Estate, which then, how I explained, owned

10 Plaza MOB.  So January 1, 2021, the members of Sunrise MOB

11 Holdings, which were like myself, there's other people that

12 were members, we transferred those interests back to Alecto.

13 So, as of January 1, 2021, the debtor owned a hundred percent

14 of Sunrise MOB Holdings, which owned a hundred percent of

15 Sunrise Real Estate, effectively Plaza MOB.

16      And then, in August of '21, August 31st of '21, the

17 property was sold.  The technical buyer was the Regents of

18 the University of California, but the practical buyer was

19 UCLA Health.  They bought -- they bought that real estate.

20 Q    What was the consideration that the debtor paid to have

21 the transfer done?

22 A    The -- the debtor didn't pay anything.  We transferred

23 it back to push it back -- to move it back into Alecto.  We

24 didn't receive anything in consideration.  And during that

25 period, we -- as Members of Sunrise MOB Holdings, we didn't

1  get anything.

2  Q     I would ask you to turn to Exhibit 45.

3  A     Okay.

4  Q     Do you recognize that document?

5  A     I do recognize it.

6  Q     And is that a true and correct copy of the document?

7  A     It is.

8  Q     And what is that document?

9  A     This is the document that effectuated the transfer back

10  of the interest in Sunrise MOB Holdings back to Alecto,

11  effectively bringing the MOB, Sunrise, back under the Alecto

12  umbrella by the Members of Sunrise MOB Holdings.

13          MR. WAXMAN:  Your Honor, I'd seek to have that

14  admitted.

15          THE COURT:  Any objection to the admission of JX-

16  45 into evidence?

17          MR. SULLIVAN:  No objection, Your Honor.

18          THE COURT:  The exhibit is admitted.

19      (Exhibit JX-45 received in evidence)

20  BY MR. WAXMAN:

21  Q     So how much money did the debtor ultimately -- what

22  was the value of the transfer that was made from Alecto in

23  June of 2019?

24  A     So, in June of 2019, there was an appraisal on the

25  building for just over $50 million.  I'm sure somebody will

1   have the appraisal, but it was just over $50 million, which a

2   loan of about just under $20 million on it in June of 2019.

3   Q     And what was the value (indiscernible)

4   A     Well, let me -- and then --

5   Q     Sorry.

6   A     -- as part of that, too, then the proceeds from the

7   refinance, that 9 million, got put back into Alecto.

8   Q     Okay.  And what was the value of the property in

9   January of 2021, when the property was transferred back

10  (indiscernible)

11  A     At least 58.5 million.

12  Q     And so, doing the math, what was the increase in value

13  through this transaction, the aggregate amount that the

14  debtor received?

15  A     So, when it got transferred back, it had a thirty-

16  million-dollar mortgage on it and -- and was worth 58 and a

17  half million dollars, so $28.5 million.

18  Q     If I can ask you to turn to Exhibit 2, please.

19        (Pause in proceedings)

20  A     Okay.

21            MR. WAXMAN:  Your Honor, are you okay?

22            THE COURT:  Yep.

23  BY MR. WAXMAN:

24  Q     Do you recognize this document?

25  A     Yes.  This is the -- these are the month-to-month

1    financial statements for the debtor only in 2019, fiscal year

2    2019.  And the debtor's fiscal year was always the calendar

3    year.

4    Q    And do you know whether these were maintained in the

5    ordinary course of the debtor's business?

6    A    I do.  They were maintained in the ordinary course of

7    business.

8    Q    And you know this because of your position with the

9    debtor?

10   A    My position in the debtor, seeing the monthly balance

11   sheets, knowing who prepared them, knowing how they were

12   prepared, but my day-to-day involvement with the debtor, yes.

13   Q    Are you able to discern -- or how are you able to

14   discern the debtor's financial condition in June of 2019?

15   A    Well, yes, I would look at the -- I would look at the

16   financial statements, the income statement, and the balance

17   sheet.

18   Q    All right.  Where on this income statement would you

19   find -- or balance sheet would you find the debtor's

20   financial wherewithal in June of 2019?

21   A    I would look on the balance sheet, which is JX.004

22   and -- well, JX-2.004 and JX-2.005.  And I would look at the

23   total equity in the company as of June -- as of June '19.

24   I'd also look at September of '19 because that's when the

25   Sunrise transfer transactions were booked and the additional

1  paid-in capital is reflected.

2  Q    And what ware those respective amounts?

3  A    In June of 2019, the equity was 9 million --

4  $9,557,000, and in September of '19, it was 18.573 million of

5  equity.

6       MR. WAXMAN:  Your Honor, we'd seek to have those

7  admitted, exhibit (indiscernible)

8       THE COURT:  Any -- pardon?  I'm sorry.

9       MR. WAXMAN:  We'd seek to have Exhibit 2 admitted.

10      THE COURT:  Any objection to the admission of

11  Exhibit 2 into evidence?

12      MR. SULLIVAN:  No objection, Your Honor.

13      THE COURT:  The exhibit is admitted.

14      (Exhibit JX-2 received in evidence)

15  BY MR. WAXMAN:

16  Q    I would ask that you turn to Exhibit 4, please.

17  A    Okay.

18  Q    And what is this document?

19  A    This is similar to what we just looked at, but it is

20  the -- for the time period, the fiscal year 2020, which would

21  be -- because that was the fiscal year.  But it's the same

22  income statement, balance sheet, and statement of cash flows

23  for 2020.

24  Q    And I would ask you whether, based upon -- and --

25  excuse me.

1        Was this maintained in the ordinary course of the

2    debtor's business?

3    A       It was.

4    Q       And I would ask:  Are you able to discern from this

5    document whether or not the debtor was solvent throughout

6    2020?

7    A       Yes, because we had equity in January 2020 of $18.827

8    million.  And by the end of the year, that equity was $19.911

9    million.  And the cash balances went up tremendously.

10   Q       And so this was the company actually grew during 2020?

11   A       Well, the company's equity position grew during 2020.

12   It didn't -- the company didn't grow, but the equity position

13   grew.

14   Q       Thank you for that clarification.

15           I would ask that you turn to --

16              MR. WAXMAN:  Your Honor, I'd seek to admit

17   Exhibit 4.

18              THE COURT:  Any objection to the admission of

19   Exhibit 4?

20              MR. SULLIVAN:  No objection, Your Honor.

21              THE COURT:  The exhibit is admitted.

22       (Exhibit JX-4 received in evidence)

23   BY MR. WAXMAN:

24   Q       I would ask you to turn to Exhibit 41, please.

25   A       Okay.

**A1446**

1  Q     And can you identify this document?

2  A     Yeah.  This is a -- it's similar -- it has some of the

3  same information we just looked at.  But this is the balance

4  sheet summary and it's broken down by the different -- at the

5  top, those are the different hospitals or -- hospitals.  And

6  then there's a -- in the far-right column, there's the Alecto

7  only line.

8              THE COURT:  Could -- I'm going to stop you right

9  there.  I don't have Exhibit 41.  My binder stops at 39.  I

10 have two binders.

11             MR. WAXMAN:  Your Honor, there's a second binder.

12        (Participants confer)

13             THE COURT:  My second binder goes from 34 to 39.

14             MR. WAXMAN:  Are you looking at a binder with the

15 right cover, Your Honor?

16             THE COURT:  Yeah, Sarrao, Volume 2.

17             MR. SULLIVAN:  Mine has the same thing, Your

18 Honor.

19        (Participants confer)

20             MR. SULLIVAN:  Oh, you know what?  39 is at the

21 back and 41 is (indiscernible)

22             THE COURT:  39 is what?

23             MR. WAXMAN:  Thirty --

24             MR. SULLIVAN:  39 is at the back, but there are

25 other higher ones between 34 and 39.

1              MR. WAXMAN:  Your Honor, if I may approach?  You

2    can have my binder.

3              THE COURT:  I go from 29 to 39.

4              MR. WAXMAN:  Your Honor (indiscernible)

5              THE COURT:  Okay.  Unless you want to show me --

6              MR. WAXMAN:  May I approach?

7              THE COURT:  -- Mr. Waxman, what I'm missing.

8    Sorry.  Can we go off the record a second?

9              THE ECRO:  Sure.

10        (Off the record at 10:48:16)

11        (Proceedings resume at 10:48:53)

12             MR. WAXMAN:  Your Honor, I approach the witness?

13   He may have the same issue that --

14             THE COURT:  Yeah.

15             MR. WAXMAN:  -- Your Honor had.

16             THE COURT:  I -- it's a bit confusing.

17             MR. WAXMAN:  I do apologize.

18             THE COURT:  No.  I'm just saying that would be

19   great.

20   BY MR. WAXMAN:

21   Q    Were you able to find it?

22   A    Yeah, I have it, right.

23   Q    Oh, okay.

24   A    Yeah, I have it.

25             THE COURT:  All right.  Maybe I'm the only

**A1448**

 1  confused one.

 2        MR. WAXMAN:  Judge, you wear the robe, you are

 3  always right.

 4        THE COURT:  I just want to make sure I'm on the

 5  same page.

 6        MR. WAXMAN:  That is --

 7        THE COURT:  Okay.

 8        MR. WAXMAN:  That is perfectly fine.  Literally on

 9  the same page.

10        (Participants confer)

11  BY MR. WAXMAN:

12  Q    What is Exhibit 41, Mr. Sarrao?

13  A    So 41 is a compilation of -- the first page of is a

14  balance sheet summary, and then it's broken down how we refer

15  to the different locations and what each of the locations had

16  with -- within them, so -- and then far-right column is the

17  debtor's only balance sheet.

18  Q    And were these maintained in the ordinary -- was this

19  document maintained in the ordinary course of business?

20  A    It was.

21  Q    And what was the debtor's equity at the end of 2019?

22  A    It was $18.5 million.

23  Q    And how can you tell from this?

24  A    If you look at the -- and it's like the second-to-far-

25  right column, so there's a -- a thing called "Alecto," and

 1  then there's "grand total."  If you look at "Alecto" and you

 2  go to the bottom, like two lines up it says "confidential,"

 3  and then two lines up where it says, "total equity," that

 4  $18.5 million.

 5          MR. WAXMAN:  Your Honor, we'd seek to admit this

 6  document, as well.

 7          THE COURT:  Any objection to the admission of

 8  docket JX-41?

 9          MR. SULLIVAN:  No objection, Your Honor.

10          THE COURT:  41 is admitted.

11      (Exhibit JX-41 received in evidence)

12  BY MR. WAXMAN:

13  Q    Can I ask you to turn to Exhibit 50, please?

14  A    I'm not sure I have 50 in my notebook, Mr. Waxman.

15      (Participants confer)

16          MR. WAXMAN:  Your Honor, there are white binders

17  over there and those have Exhibits 44 and 50, which probably

18  did not make it into (indiscernible)

19      (Participants confer)

20          MR. WAXMAN:  Yeah.  Your Honor, maybe it would be

21  easier if we took a couple-minute break and then we can get

22  the exhibits.

23          THE COURT:  Okay.  We're in recess.

24          MR. WAXMAN:  Thank you, Your Honor.  And my

25  apologies.

```
 1          (Recess taken at 10:51 a.m.)

 2          (Proceedings resume at 10:57 a.m.)

 3          (Call to order of the Court)

 4              THE COURT:  Okay.  Please be seated.

 5              Mr. Waxman.

 6              MR. WAXMAN:  Thank you, Your Honor.  I think that

 7     we managed to get through and make sure that all of the

 8     binders are in place.

 9              THE COURT:  Okay.  So we're working off of the two

10     you handed up earlier?

11              MR. WAXMAN:  No.  Exhibit 44, those are in the big

12     binders, unless my colleague replaced your binder.

13              MS. PAKROUH:  Yes, there are -- I don't mean to

14     interrupt you.  Just so we're clear, Your Honor, these will

15     be in the JXs.  It's the white binders --

16              THE COURT:  Okay.

17              MS. PAKROUH:  -- that I believe that you had.

18     It's a four-set group.

19          (Court and court personnel confer)

20              THE COURT:  Excuse me a second.  Can we go off the

21     record?

22          (Off the record at 10:58:16)

23          (Proceedings resume at 10:58:34)

24              MR. WAXMAN:  I apologize, Your Honor.

25              THE COURT:  No problem.
```

**A1451**

42

 1              MR. WAXMAN:  Exhibit 44, Your Honor.  Are you

 2   ready?

 3              THE COURT:  Yes.

 4              MR. WAXMAN:  Back on the record?

 5   BY MR. WAXMAN:

 6   Q     Mr. Sarrao, what is Exhibit 44?

 7   A     001 of Exhibit 44 is the balance sheet, again, like we

 8   looked for '19, with different groupings, then Alecto on the

 9   far -- on the far-right corner.

10   Q     And are you familiar with this document?

11   A     I am.

12   Q     Was it maintained in the ordinary course of business,

13   Mr. Sarrao?

14   A     It was.

15   Q     And can you discern from that exhibit what the value of

16   the debtor was in the end of 2020?

17   A     At the end of 2020, the equity position was 19.9

18   million for the debtor.

19              MR. WAXMAN:  We'd seek to have 44 admitted, Your

20   Honor.

21              THE COURT:  Any objection to the admission into

22   evidence of DX-44?

23              MR. SULLIVAN:  No, Your Honor.

24              THE COURT:  It is admitted.

25         (Exhibit DX-44 received in evidence)

**A1452**

1  BY MR. WAXMAN:

2  Q    Can you please turn to Exhibit 50?

3  A    Okay.

4  Q    Do you recognize this document?

5  A    I do.

6  Q    Is that a true and correct copy?

7  A    It is.

8  Q    And this maintained in the ordinary course of the

9  debtor's business?

10 A    It was.

11 Q    Are you able to discern from this document what the

12 debtor's financial position was at the end of 2021?

13 A    Yeah.  The equity position of the debtor is $19.1

14 million.

15 Q    And I'm sorry --

16        THE COURT:  I'm sorry.  You should have him repeat

17 that because we're having difficulty picking you up.

18        THE WITNESS:  I'm sorry, Your Honor.  I was --

19        THE COURT:  Just move the mic closer --

20        THE WITNESS:  I will.

21        THE COURT:  -- Mr. Sarrao, please.  Thank you.

22        MR. SULLIVAN:  What number (indiscernible)

23        MR. WAXMAN:  I'm sorry.  Number 50.

24 BY MR. WAXMAN:

25 Q    And I -- excuse me.  I did forget to -- can you

44

1  identify what that document is?

2  A    Yes.  Exhibit 50, what we're looking at in 001 is the

3  balance sheet for the fiscal year ending 12/31/2021.

4  Q    And what, from that document, was the debtor's

5  financial position at the end of 2021?

6  A    The equity position at the end of 2021 was -- for the

7  debtor, was $19.1 million.

8         MR. WAXMAN:  Your Honor, we'd seek to have Exhibit

9  50 admitted.

10        THE COURT:  Any objection to the admission into

11 evidence of JX-50?

12        MR. SULLIVAN:  No, Your Honor.

13        THE COURT:  The exhibit is admitted.

14     (Exhibit JX-50 received in evidence)

15 BY MR. WAXMAN:

16 Q    Can you please turn to Exhibit 1?

17 A    Yes.

18        THE COURT:  Did you say 1?

19        MR. WAXMAN:  1, yes, Your Honor.  That should be

20 in the red binder, Your Honor.

21        THE COURT:  The binder from today.  Okay.

22        MR. WAXMAN:  Yes, Your Honor.  And again, my

23 apologies for --

24        THE COURT:  No.  I just want to make sure we're

25 all looking at the same thing.

**A1454**

1          MR. WAXMAN:  All right.

2          THE COURT:  Okay.

3     (Pause in proceedings)

4  BY MR. WAXMAN:

5  Q     Do you recognize this document?

6  A     Yes, I do.  It's the -- well, the first page is the

7  cover letter from Moss Adams, which is the accounting firm

8  that prepared the debtor's taxes.  And then all of the

9  subsequent pages are the federal tax return, the various

10 state tax returns, and then a copy of the federal tax return.

11 Q     And is this true and correct, to the best of your

12 knowledge?

13 A     It is.

14 Q     Let's go to the first page.

15       You did not prepare this yourself, correct?

16 A     Correct.

17 Q     Who is Moss Adams?

18 A     Moss Adams is a -- is an accounting and auditing firm.

19 I believe they're like one of the top ten firms in the

20 country.  And they have prepared the taxes for the debtor, I

21 think since at least 2015, maybe 2014.

22 Q     I'd ask that you turn to page 5 of the document, and by

23 that, I mean the (indiscernible) number 5 -- 105, I believe.

24 A     So where it says JX-1005?

25 Q     JX-1010.

1    A      Okay.  I know -- I see what you mean.  Okay.

2          So it's page 5 of the --

3    Q      Hold on for one second.

4                MR. WAXMAN:  Your Honor, are you --

5                THE COURT:  You said JX-1010.

6                MR. WAXMAN:  Correct.  It has a "5" at the bottom

7    of the page and in the upper-right hand --

8                THE COURT:  Yeah.  Well, yes, I see it.

9                MR. WAXMAN:  Okay.

10   BY MR. WAXMAN:

11   Q      Are you able to discern from this document the

12   financial condition of the debtor in 2019?

13   A      I am, because you have a balance sheet here on Schedule

14   L, which shows the partners capital account, which is the

15   equity, of 18.671 million on the balance sheet and then

16   there's an analysis of the partners capital accounts, which

17   were replicated somewhat from that, which shows $20.9

18   million.

19   Q      Did the Sunrise transfer cause Alecto to be insolvent?

20   A      No.

21   Q      In June of 2019, was Alecto paying its debts as they

22   became due?

23   A      It was.

24   Q      So based upon your review of the debtor's financials,

25   the tax records, your own independent knowledge that's not

**A1456**

 1   included here, what is your conclusion about the debtor's

 2   solvency at the time of the transfer in June 2019?

 3            MR. SULLIVAN:  Objection to the question.  The

 4   question is phrased as a question that would be phrased to an

 5   expert.  He's not been qualified as an expert.  He's not an

 6   expert.  He's not qualified to give an expert opinion on the

 7   solvency, so I object to the question.

 8            THE COURT:  Rephrase the question.

 9            MR. WAXMAN:  I'm not asking a question as an

10   expert.  I'm asking it as somebody who's familiar with the

11   debtor's finances from documents that were taken in the

12   ordinary course of business and a tax return that was filed

13   under penalty of perjury by one of the top-10 accounting

14   firms in the country.

15            THE COURT:  You can ask him about the form, but

16   you cannot ask him the form of question as you phrased it.

17   He's not an expert on solvency.

18            MR. WAXMAN:  I'm not --

19   BY MR. WAXMAN:

20   Q    What is your understanding, based upon all these

21   documents, with respect to whether or not the debtor was

22   solvent?

23   A    My understanding was the debtor was solvent in June of

24   2019.

25   Q    And upon which do you base that understanding?

1    A      The -- well, my knowledge of the day-to-day operations

2    of the debtor, the balance sheets that we looked at for 2019,

3    including the month-to-month -- the exhibit had the month-to-

4    month balance sheet, the year-to-date balance sheet, and the

5    tax return.

6    Q      And I think I may have asked this, but I just want to

7    make perfectly clear.

8           In June of 2019, was Alecto paying its debts as they

9    came due?

10   A      The debtor was, yes.

11   Q      I want to switch topics with you and go to

12   (indiscernible).

13          Are you familiar with the Reed Creditors' allegations

14   of breaches of fiduciary duty by the debtor's members and

15   officers?

16   A      I am.

17   Q      And how many managers does Alecto have?

18   A      Currently, it has two, and since August of 2019, it's

19   had two managers.

20   Q      Who's the other manager?

21   A      Lex Reddy.  It's myself and Mr. Reddy since 2019 --

22   August of 2019.

23   Q      And I know we touched on this, but how regularly in the

24   last three years do you anticipate that you've spoken with

25   Mr. Reddy?

1  A    Other than likely on Saturdays, usually at one -- at

2  least -- or if I was out on vacation or he was, which is

3  unusual for both of us, at least once, but on most days,

4  multiple times a day.

5  Q    And you are general counsel, so I want to caution you,

6  I'm not asking you to go into privilege or anything like

7  that, but what were, generally, the topics of conversation on

8  the part of yourself and Mr. Reddy?

9          MR. SULLIVAN:  I'm going to object on hearsay

10  grounds (inaudible).

11          MR. WAXMAN:  I'm not sure how that's hearsay.  He

12  was a party to the conversations and he's addressing that he

13  spoke with the other member regularly, with respect to, you

14  know, what they were doing.

15          THE COURT:  I think he's asked for topics.

16          Am I correct?

17          MR. WAXMAN:  Yes, Your Honor.

18          THE COURT:  He's asked for topics of

19  conversation --

20          MR. SULLIVAN:  Okay.

21          THE COURT:  -- not specific conversation.

22          MR. WAXMAN:  I'm not asking for specific

23  conversation.

24  BY MR. WAXMAN:

25  Q    What were the general topics of your conversation with

1   Mr. Reddy?

2   A    The general topics of the conversations were the

3   operations, financial performance of the hospitals that were

4   owned by a subsidiary or affiliates.  I would say in June

5   of '19, we spoke a lot about the Sunrise transfer, and then

6   various issues, including issues that were going on at

7   St. Rose, as well.

8   Q    I'm not -- and forgive me, let me back up.

9        Is it fair to say that after the Reed Creditors

10  received their judgement in November of 2022, that the debtor

11  was at least in the zone of insolvency?

12  A    That would be fair to say, yes.

13  Q    If not, outright insolvent?

14  A    Yeah, correct.

15       I mean, they got a judgment.  The judgment hadn't been

16  paid.  The judgment was entered, end of November 2022.

17  Q    All right.  I want to focus now, we'll call it the

18  second half of 2022 through the petition date.

19            THE COURT:  Mr. Waxman, can you stay close to the

20  mic --

21            MR. WAXMAN:  I apologize, Your Honor.

22            THE COURT:  -- because I'm sorry, I couldn't hear

23  you.

24            You're focusing when?

25            MR. WAXMAN:  For the second half of June -- for

1  the second half of 2022 through the petition date.

2  BY MR. WAXMAN:

3  Q    So what were the general topics of conversation between

4  yourself and Mr. Reddy during that period of time?

5  A    During that period of time, it was the operational

6  performance of Wilson & Jones Regional Medical Center, which

7  is owned by Sherman/Grayson Hospital, the efforts to sell

8  that hospital or find a partner with respect to that

9  hospital, and what would happen if the hospital just simply

10 closed and the implications on a let-go if the hospital

11 simply closed.

12     And then it would be the cash flows coming in, the cash

13 needs of Alecto, and then, again, Wilson & Jones Regional

14 Medical Center.  I call it W&J.  I think we've been calling

15 it Sherman/Grayson.  Sherman/Grayson (indiscernible).

16 Q    So let's talk about the sale process, since you raised

17 that, and that was a topic of your conversation.

18     When did -- when, if any, did Alecto start the

19 marketing process for Sherman/Grayson Hospital?

20 A    We gave Bank of America and Merrill Lynch, in the

21 beginning of 2019, to market Sherman/Grayson.  And then for

22 the period you're talking about, it was ongoing during that

23 entire period.  The period of the kind of second half of 2022

24 through the petition date, like, it ended right before the

25 petition date because we found a buyer.

1  Q      So during this period, and, again, we'll talk about

2  from the middle of 2022 through the petition date, was the

3  debtor continuing to fund Sherman/Grayson?

4  A      The debtor acted as a conduit for fundraising for

5  Sherman/Grayson.  So I think Ms. Gould talked of this

6  yesterday, Plaza and Horizon's -- Horizon's funds were at the

7  debtor.  Plaza's funds would go to the debtor.  And then

8  those funds would go out from the debtor to Sherman/Grayson.

9         There was a credit line through August of 2022, so then

10 that was funds coming in, funds going out.  So I don't know

11 if it was the debtor's own funds, other than more so acting

12 as a conduit for those funds.  But funds left the debtor's

13 bank accounts and went to Sherman/Grayson's bank accounts.

14 Q      Did the Board consider the amount of funds that were

15 going out to Sherman/Grayson?

16 A      Yes.

17 Q      Was Sherman/Grayson negative cash flow at that point?

18 A      They were negative cash flow at that point, yes.

19 Q      So if they were negative cash flow, what would be the

20 reason why Alecto would continue to (inaudible)?

21 A      Because of the negative implications of Sherman/Grayson

22 was to close on Alecto, based on Alecto guaranties and Alecto

23 obligations, and we believed there was a buyer to be found

24 for Sherman/Grayson that would eliminate a lot of those

25 obligations and eliminate potential litigation and all kinds

1   of things.  And it's almost impossible to find a buyer,

2   especially in Texas, for a hospital that shuts down and is

3   closed, to get someone to buy an empty building.

4   Q    So what were some of those what I'll just call

5   springing obligations that may have become obligations of

6   Alecto had Sherman/Grayson closed down?

7   A    So the first one would be Sherman/Grayson had a lease

8   with MPT of Sherman.  There's a -- MPT of Sherman Alecto

9   Hospital, LLC had a lease and if those -- it would have shut

10  down.  The lease obligations alone, the remaining lease

11  payments that were due and the capital reserve payments would

12  be rights around $7.2 million.  I think MPT thinks the number

13  would be a bit higher because the rent gets adjusted every

14  year.  So that would be the first issue:  the MPT lease

15  obligations going forward for the remaining term of the

16  lease.

17       The second issue --

18  Q    Well, before we move on, can you turn to Exhibit 18,

19  please.

20  A    Okay.

21  Q    Is that the lease document that you're referring to?

22  A    That's the lease agreement.  It was modified to reduce

23  the lease space in 2021, but that is the lease agreement,

24  yes.

25  Q    Can you hold on a second (inaudible).

```
 1          (Pause)

 2               MR. WAXMAN:  (Inaudible.)

 3   BY MR. WAXMAN:

 4   Q    Okay.  Is this the -- is that a true and correct

 5   copy -- first of all, can you identify what that is?

 6   A    Yes, it's the lease agreement between the MPT entity

 7   and Sherman/Grayson Hospital, LLC, which at the time was a

 8   Texas limited liability company, but became a Delaware

 9   limited liability company, and Sherman/Grayson Health

10   Services, which was merged into Sherman/Grayson Hospital for

11   the real estate that comprises Wilson & Jones Regional

12   Medical Center and --

13   Q    And --

14   A    -- a ground lease, as well.

15   Q    -- is that a true and correct copy to the best of your

16   knowledge?

17   A    It is.

18               MR. WAXMAN:  Your Honor, I would seek to have that

19   admitted.

20               THE COURT:  Any objection to the admission of

21   JX-18 into evidence?

22        MR. SULLIVAN:  No objection, Your Honor.

23               THE COURT:  JX-18 is admitted.

24          (Exhibit JX-18 received into evidence)

25   BY MR. WAXMAN:
```

**A1464**

1    Q      All right.  I'm sorry.

2          You were talking about the lease obligations when I

3    stopped you.  What other obligations would have "sprung," in

4    my words, had Sherman/Grayson closed down?

5    A      So, immediately adjacent to the hospital building is

6    what we call the POB or "Professional Office Building."  The

7    building is actually owned by a group called Altera Highland,

8    LLC.  The ground was owned by Sherman/Grayson Hospital in

9    2014.  That dirt was transferred to the MPT entity and

10   there's a ground lease between MPT as the assignee of the

11   ground lessor and Altera Highland as the ground lessee.

12         That ground lease was entered into in, I believe, 2012.

13   That provides a put option to Altera Highland that if

14   Wilson & Jones, if there was no healthcare facility operated

15   at that location for 12 consecutive months, they have the

16   right to put the obligation to buy the medical office

17   building to MPT for what's called "hypothetical fair market

18   value."  So if MPT had an obligation to buy the building,

19   under the lease with Sherman/Grayson, Sherman/Grayson then

20   had an obligation to pay MPT or effectively buy the building,

21   and that obligation was guarantied by Alecto.

22   Q      Okay.  Before we move on to that, can you turn to

23   Exhibit 10, please.

24   A      Yes.

25   Q      And what is that document?

**A1465**

56

1  A     That is the grown lease agreement that I was referring

2  to between, at the time, Sherman/Grayson Hospital, LLC and

3  Altera Highland, LLC.

4  Q    Is that a true and correct copy, to the best of your

5  knowledge, of that ground lease?

6  A     It is.

7          MR. WAXMAN:  Your Honor, we'd seek to have that

8  admitted.

9          THE COURT:  Any objection to the admission into

10 evidence of JX-10?

11         MR. SULLIVAN:  No, Your Honor.

12         THE COURT:  It is admitted.

13     (Exhibit JX-10 received into evidence)

14 BY MR. WAXMAN:

15 Q    I would ask that you turn to Exhibit 18, which I

16 believe is the last --

17 A     18 was the lease between --

18 Q    Oh, I'm sorry, 19.  Thank you.

19 A     Okay.

20 Q    And what is that?

21 A     -- that is -- so that ground lease interest we looked

22 at was held by Sherman/Grayson Hospital and this is Sherman/

23 Grayson Hospital transferring that interest in the ground

24 lease, as landlord, to MPT in 2014 when the W&J transaction

25 occurred.

1    Q    And this is a true and correct copy?

2    A    It is.  This is the recorded copy from the County Clerk

3    in Grayson County, Texas.

4    Q    And can you turn to Exhibit 20, please.

5    A    Okay.

6    Q    And what is that?

7    A    That is the guaranty provided by the debtor in 2014 to

8    MPT.

9              MR. WAXMAN:  Can you give me a moment, Your Honor?

10             THE COURT:  No, let him answer his question about

11   JX-20.

12   BY MR. WAXMAN:

13   Q    Are those true and correct copies of Exhibits 19 and 20

14   of the guaranty and the assumption and assignment?

15   A    19 was the assumption and assignment, 20 is the

16   guarantee.  Yes, those are true and correct copies of the

17   assignment, assumption, and guarantee.

18             MR. WAXMAN:  We would seek to have those admitted,

19   Your Honor.

20             THE COURT:  Any objection to the admission into

21   evidence of JX-19 and JX-20?

22             MR. SULLIVAN:  No objection, Your Honor.

23             THE COURT:  They are admitted.

24        (Exhibits JX-19 and JX-20 received into evidence)

25   BY MR. WAXMAN:

**A1467**

1  Q      I'm sorry, you were addressing the put option when I

2  (indiscernible).

3  A      So, if the put option had been exercised they, Altera

4  Highland, would have made MPT, acquired the building for the

5  hypothetical fair market value, and MPT would then have had a

6  right to make Sherman/Grayson, and by the guarantee, Alecto,

7  pay for that.  We thought that was, at least, $13 million but

8  it could be as high as $15 or $16 million of exposure.

9  Q      By at least $13 million.

10  A      Yeah, my understanding in 2012 is they paid $12 million

11  for the building, Altera Highland.  So, it would be no less

12  the that. It's the finest hypothetical fair market value. So,

13  you don't get the benefit of an empty building or the empty

14  hospital.

15  Q      What other obligations would there be at

16  Sherman/Grayson?

17  A      So, Sherman/Grayson had received -- we heard about the

18  CAAP, C-A-A-P, program which is the Medicare Advance Payments

19  during COVID.  CMS provided for six months of advanced

20  payments to providers.  Sherman/Grayson got advanced

21  payments.  As of October 2022, those advance payments -- they

22  had been paying back, that is as of October 2022, right

23  around $5.7 million owed and by May of 2023 it was right

24  around $4.2 million that was owed.

25        We had gone through the calculations and that was CMS.

**A1468**

1  $4.2 million that was owed on those Medicare advanced

2  payment.  We had no question and I don't have any question

3  now that CMS would pursue recovery of those payments from the

4  debtor if Sherman/Grayson didn't pay those.

5  Q     Do you have an estimate of what the amount would be if,

6  at the time of the Reed creditors judgment, Sherman/Grayson

7  what the CAAP amount would be?

8  A     It was $5.7 million at the end of October 2022.  So, it

9  would have been -- I think the payment plan is like $100

10  something thousand dollars a month. So, maybe $5.5, $5.6,

11  $5.5 million.

12  Q     Any other obligations that would have been liabilities

13  for Alecto?

14  A     Yeah, you had accrued payroll, which is about $800,000

15  at any one time.  I suspect that if the payroll wasn't paid,

16  and we certainly believe that the payroll wasn't paid, people

17  would come looking for Alecto to get paid for that.  We had

18  accrued paid time off of about $775,000.  Again, if that paid

19  time off wasn't paid, we believe that someone would come

20  looking for Alecto to pay that.

21        THE COURT:  Excuse me, Mr. Sarrao, what number did

22  you say for paid time off?

23        THE WITNESS:  Paid time off was $775,000.  That

24  was the estimate.  We also had -- so MPT owned the real

25  property, but under the lease with MPT we were obligated to

**A1469**

60

1    pay those real property taxes.  So, there are about $520,000

2    a year at any one time.  So, there would be -- and how Texas

3    works you pay an arrears.  So, you pay, like for example

4    taxes for -- real property taxes for 2023 are due in January

5    2024.  So, depending on when the -- if the hospital closed

6    there could be up to $500,000 in real property taxes.

7           There is also the winddown cost, so when a

8    hospital shuts down you just don't lock the doors.  There is

9    computer systems, equipment all over the hospital with

10   protected health information in them that you have to secure.

11   There is paper medical records that have to be secured.

12   There is pharmaceuticals that have to be secured.  There is

13   radioactive material, there is equipment, if it closed with

14   no notice, you have patients in the hospital that you would

15   have to move and find a new home for.  You just can't put

16   them on the street.  That costs money.

17          We believe that that cost would have been about $3

18   million to do the winddown based on what we experienced at

19   Ohio Valley Medical Center, East Ohio, and Fairmont Regional

20   especially if it's just a complete closure.  MPT would also

21   have winddown costs.  They would put security there and real

22   estate people that we would be obligated to pay under the

23   guarantee.

24          There was also personal property taxes due by

25   Sherman/Grayson to Grayson County of about a million dollars

**A1470**

1  that we believe that if Sherman/Grayson -- it was under a

2  payment plan. If Sherman/Grayson didn't pay those Grayson

3  County would seek payment from Alecto because everyone seemed

4  to think they could seek payment from Alecto.  There were

5  also some payroll taxes that were owed, non-trust fund

6  payroll taxes, of about a million dollars that there was a

7  payment plan on.

8  BY MR. WAXMAN:

9  Q    Let me ask you, as we're keeping track, did you --

10  could you also talk about potential WARN Acts?

11  A    Well there would be -- I mean WARN Act requires 60

12  days.  That is the basis of the Reed creditors judgment, the

13  timing of the notice, and how much notice.  Payroll is

14  roughly $800,000 a payroll every two weeks. And so, if we

15  didn't give notice the WARN Act claims would be about $3,

16  $3.2 million.  And based on the success the Reed creditors

17  had I suspect if we didn't do the WARN Act and close down

18  immediately someone would pursue a claim for WARN Act

19  violations against Alecto.

20  Q    Would that be under the same theory that if a WARN Act

21  claim is about a judgment against Alecto in the first

22  instance?

23  A    I think so.  The facts are a little bit different for

24  the Reed creditors, but the general joint employer theory,

25  I'm sure somebody would pursue a joint employer theory which

1    was one of the things the Reed creditors were successful in,

2    in the West Virginia case.

3    Q     Can I ask you to turn to Exhibits 42 and 43?

4    A     Okay.

5    Q     Can you identify what 42 is?

6    A     42 is a demand letter from, I'll say it because I can't

7    of another way, the Retail, Wholesale and Department Store

8    International Union and Industry Benefit and Pension Funds

9    for withdraw liability.

10   Q     What are -- what is Exhibit 43?

11   A     Exhibit 43 is a revised notice from the same pension

12   fund, multi-employer pension fund, with an updated number.

13   Q     How did those -- first of all, we seek to have those

14   admitted into evidence, Your Honor.

15            THE COURT:  Any objection to the admission of

16   Exhibits 42 and 43?

17               MR. SULLIVAN:  No objection, Your Honor.

18               THE COURT:  They are admitted.

19        (Exhibit JX-42 and JX-43 received into evidence)

20   BY MR. WAXMAN:

21   Q     What is the relationship between these documents and

22   potential liabilities of Alecto in the event that Sherman/

23   Grayson shut down?

24   A     They are not necessarily related to Sherman/Grayson.

25   Alecto Healthcare Services Fairmont, which was a subsidiary

1    of Alecto, the debtor, operated a hospital that was called

2    Fairmont General Hospital and became Fairmont Regional

3    Medical Center. It contributed to a multi-employer pension

4    plan.  When that hospital closed there was a withdrawal from

5    that multi-employer pension plan and there is statutory

6    liability of over $10 million.  But you are giving an option

7    of making quarterly payments to avoid that statutory

8    liability.  So, the debtor has provided funding to Fairmont

9    to make those quarterly contributions.

10   Q    I probably got a little bit over my skis, what

11   conclusion do you draw from those two letters as it relates

12   to Sherman/Grayson's closure and potential obligations?

13   A    They are unrelated.  This is just another obligation of

14   why the debtor needed to provide -- as I understand the Reed

15   creditors judgment or Reed creditors objection is the debtor

16   was providing funding to Sherman/Grayson and other entities.

17   One of the entities that provided funding was Alecto Fairmont

18   so these contributions could be made because the debtor is

19   part of the control group here, and if they're not made the

20   Union Trust Fund will come after the debtor for the $10

21   million.

22   Q    And what would the potential liabilities be for the

23   pension obligations?

24   A    Over $10 million.

25   Q    Okay.  So, are you able to, just by your own estimate,

**A1473**

1  looking at all of the categories that you have gone into,

2  which by my account are the MPT lease obligations, the put

3  option, CAAP program, new property taxes, personal property,

4  pension liabilities, shutdown costs including

5  (indiscernible), WARN Act claims, and accrued PTO.  Can you

6  give an estimate of what the aggregate amount of those claims

7  are?

8  A    Well, if we just focus on Sherman/Grayson and exclude

9  the Fairmont that we just looked at my estimate is between

10 $32 and $35 million. That is what we were operating at in

11 2022.

12 Q    Okay.

13 A    Then if you add if no funding is provided to Fairmont,

14 it's another $10 million.

15 Q    So, in your business judgment and in the business

16 judgement of the board of managers, was maintaining Sherman/

17 Grayson as a going concern important (indiscernible)?

18 A    Yes.  And especially because ultimately, we found a

19 buyer for Sherman/Grayson who took over a lot of those

20 liabilities or avoided a lot of those liabilities for Alecto

21 including MPT obligations, the put option, and all those

22 things.

23 Q    And you are familiar with the Sherman/Grayson

24 bankruptcy case?

25 A    I am very familiar with the case.

**A1474**

1  Q     Just for the record where was that bankruptcy case

2  filed?

3  A     It was filed in Delaware and its assigned to Judge

4  Stickles.

5  Q     And was that sale ultimately closed?

6  A     It closed on December 31st.  There was a couple, not

7  wrinkles, but they're waiting for a hospital license.  So,

8  it's still Sherman/Grayson's hospital license, but the last

9  update I got is that is likely in the week or 10 days.  They

10 took over, effectively, funding operations in June.  Yeah, in

11 my mind its closed, but there is some remaining items out

12 there.

13 Q     You testified that Sherman/Grayson was cash flow

14 negative.  Were there any improvements that you're aware that

15 were trying to be done to increase the positivity or get it

16 back to cash flow neutral?

17 A     Yes.  So, Sherman/Grayson had a behavioral health unit,

18 a psych unit, 16-bed psych unit.  It closed during COVID and

19 then the behavioral health unit was being reopened.  It had

20 some construction related to that, some more modernizing to

21 that, but that -- there is a huge need for psych beds

22 especially where we were in Grayson County Texas.  So, we

23 expected those beds to be filled, would generate additional

24 revenue and generally the psych care costs less than the

25 acute care to provide.  So, that would generate top-line

1   revenue or net income for Sherman/Grayson.

2       Sherman/Grayson was also rolling out an occupational

3   medicine clinic.  There are a lot of big employers in

4   Sherman, a lot of projects going on to add more employers in

5   Sherman.  So, we would, effectively, do their Worker's Comp.

6   It's done a little bit different in Texas, but occupational

7   medicine. So, we were opening that.  We successfully

8   recruited a nurse practitioner from another hospital that was

9   running the program in Grayson County.  So, we had done that

10  and we thought there was opportunities.

11      Grayson County suggested there might be opportunities

12  to get ARPA Funds, which was some more funds provided during

13  COVID, to help.  Sherman was growing tremendously.  They were

14  building a new Texas Instrument Plant there.  So, we thought

15  Sherman could be on the upswing.

16  Q    Did you or Mr. Reddy receive any personal benefit from

17  the transfers made from Alecto to Sherman/Grayson in keeping

18  (indiscernible)?

19  A    No.

20  Q    Are you familiar with the debtors' operating agreement?

21  A    I am.

22  Q    Are you familiar with the indemnification provisions?

23  A    I am.

24  Q    And what is your understanding of the rights of

25  indemnification with respect to the managers and members in

**A1476**

 1   the event that either was sued for fraudulent conveyance or a

 2   D&O claim?

 3   A     They would have a right to indemnity under the

 4   operating agreement. I know I would and I fully expect

 5   everybody else would seek indemnity under the operating

 6   agreement.  I believe its Section 7, 8, 9, something like

 7   that.

 8   Q     If I can ask you to turn to Exhibit 13.

 9   A     Okay.

10   Q     Are you familiar with this document?

11   A     I am.

12   Q     All right.  Can you identify this document?

13   A     This is the amended and restated operating agreement of

14   the debtor which was effective January 1, 2013.

15   Q     Before we go on, this had been (indiscernible), right?

16   A     There were amendments.  I think one of the seventh

17   amendments as members were added or changed.  There were

18   amendments to address -- to update who the members are.  But

19   the substance of the operating agreement has not been

20   changed.

21   Q     All right.  I'm going to ask you to turn to Section 728

22   please, and that's at the JX-13-424.

23   A     Okay.

24   Q     Is that that the indemnification provision for which

25   you were just referencing?

**A1477**

1  A      It is.

2  Q      And has that changed during the various iterations and

3  amendments, updates of the operating agreement?

4  A      That has not changed.

5          MR. WAXMAN:  Your Honor, I would ask that Exhibit

6  13 be admitted.

7          THE COURT:  Any objection to the admission into

8  evidence of Exhibit 13?

9          MR. SULLIVAN:  No objection, Your Honor.

10         THE COURT:  It is admitted.

11         (Exhibit JX-13 received into evidence)

12  BY MR. WAXMAN:

13  Q      I want to move on from the subject of the potential D&O

14  claims for a second.  I know that you were here for Mr.

15  McCutcheon's testimony (indiscernible).

16  A      Yes.

17  Q      And you're familiar with his report?

18  A      I am.

19  Q      As supplemented?

20  A      As supplemented.  I read the supplement and I read his

21  report.

22  Q      All right.  What services does Mr. Reddy in particular

23  provide (indiscernible)?

24  A      He is the appointed president chief executive officer

25  of Hayward Sisters Hospital d/b/a St. Rose and then its

69

 1    subsidiaries St. Rose Medical Office Building.  But he is the

 2    day-to-day CEO and runs the data and the operations of that

 3    hospital.  He had several direct reports.  He also has

 4    several departments that report directly to him.  So, he's

 5    responsible for everything that happens in that hospital.

 6    Q    And do you regularly speak with people at St. Rose

 7    Hospital?

 8    A    Yes.  I'm usually present at St. Rose Hospital several

 9    times a month and I speak to people at St. Rose Hospital at

10    least every day.

11    Q    So, based upon your conversations with other people who

12    work or who run the hospital, what's you're understanding

13    about whether or not Mr. Reddy is essential to the contract

14    between the debtors and St. Rose.

15    A    He is essential to the contract --

16            MR. SULLIVAN:  Your Honor, I'm going to object.

17    It calls for speculation about what are the people doing

18    (indiscernible) and it's based on testimony -- apparent

19    conversations (indiscernible).  I think (indiscernible).

20            MR. WAXMAN:  This is his impression and

21    understanding.  This isn't asking for the what people said.

22            THE COURT:  Can you rephrase the question?

23    BY MR. WAXMAN:

24    Q    What is your understanding of whether Mr. Reddy is

25    essential to the contract between the debtor and St. Rose?

**A1479**

1  A      So, my understanding is that he is essential because we

2  need an individual to serve as the CEO of the hospital.  Mr.

3  Reddy has been instrumental and I've been involved in these

4  meetings in securing a supplemental funding for St. Rose.

5  And St. Rose has a number of day-to-day challenges that you

6  need an experienced CEO to deal with including equipment,

7  physicians, patients.  There's a lot of challenges at St.

8  Rose hospital, like there are at a lot of hospitals, but we

9  have lots of challenges at St. Rose Hospital.

10 Q      Could St. Rose terminate the contract for cause if Mr.

11 Reddy were (indiscernible)

12 A      They could.  They could do that and I think they would.

13 And the state of California also ensures the debt of St. Rose

14 Hospital, and that agency would have a right to object as

15 well.  And they were the ones that brought Mr. Reddy in in

16 the beginning in 2012, so that would complicate things as

17 well.

18 Q      And you are familiar with the settlement between the

19 company and the United States with respect to Mr. Reddy's

20 salary?

21 A      I am.

22 Q      And just to refresh everybody's recollection, what is

23 the amount that you understand Mr. Reddy's salary to be for

24 the three-years following confirmation?

25 A      It will be $550,000 and it won't change during the

**A1480**

1   three years.

2   Q    Okay.  You have familiarity in the medical industry.

3   Based upon that and anything else what is your belief about

4   how difficult it would be or whether the debtor would easily

5   be able to hire a new CEO that St. Rose (indiscernible)

6   approved of for $550,000?

7         MR. SULLIVAN:  Objection.  Calls for speculation.

8   Mr. McCutcheon is the expert (indiscernible).

9         MR. WAXMAN:  Mr. McCutcheon was worried about the

10  reasonableness and his conclusion was they had $550 with no

11  increase Mr. Reddy was in the 25th percentile.  This is a

12  question of, whether in light of all the factors including

13  the length of the contract, whether or not the debtor would

14  be able to hire somebody.  And this is Mr. Sarrao's belief

15  whether they would have an issue hiring somebody at that

16  compensation level.

17        MR. SULLIVAN:  Same objection, Your Honor.  Calls

18  for speculation.

19        THE COURT:  Look, he can -- I'm going to allow him

20  to answer.  I'll give it the weight it deserves.  He can

21  answer it as a lay person.

22        THE WITNESS:  It would be difficult based on the

23  salary, the market, the challenges that St. Rose faces, the

24  politics in the area, as well as the remaining term of the

25  contract going through 2027 at best.  So, it would be

1  difficult to find an experienced CEO at that salary from my

2  experience.

3  BY MR. WAXMAN:

4  Q    I'm going to move over and, again, I'll try to do this

5  quickly since I don't know if there are any objections of

6  this point.  But what services does Mr. Williams in

7  particular provide to St. Rose?

8  A    Mr. Williams is the unduly appointed chief financial

9  officer of Hayward Sisters Hospital and then St. Rose Medical

10 Office Building.  He acts as the CFO, so he's in charge of

11 all the finances and financial reporting.  He also has,

12 obviously, finance and accounting reports to him.  What we

13 call patient financial services which is billion in

14 collections.  They report to him.  And what we call heath

15 information services or health information management, which

16 is medical records and coding, they report to him as well.

17      So, he serves as the CFO at St. Rose so he's

18 responsible for -- there's all sorts of reports that have to

19 be submitted, financial utilization.  He's responsible for

20 all that and serves as the CFO.  And he works with the

21 auditors, tax preparers, all that kind of stuff.

22 Q    Would you -- and again, you heard Mr. McCutcheon's

23 expert testimony.  Would you agree with the conclusion that

24 Mr. McCutcheon did show support with respect to Mr. William's

25 salary?

**A1482**

1   A     I did.  And I think Mr. William's salary is probably

2   somewhat under market.  I think that's what Mr. McCutcheon

3   said as well.

4   Q     All right.  I want to go back to a separate matter that

5   we discussed briefly.  Is Alecto directly liable for any

6   pension benefits?

7   A     No.  It doesn't have any have direct liabilities.  So,

8   Alecto sponsors a 401-K, but there's never -- currently

9   there's no required employer match.  I think other than at

10  Olympia a couple years ago for a union, there has been no

11  employer match.  It is part of a controlled group of the

12  Alecto Healthcare Services Ohio Valley pension plan.  And we

13  talked about the Alecto Fairmont (indiscernible) employer

14  withdrawal liability, but that's contingent liability.  If

15  those other entities don't meet those liabilities, in theory,

16  there could be, but there's no direct liability.

17  Q     Are the releases injunction and exculpation each an

18  integral part of the debtors plan?

19  A     From my view, yes.

20  Q     And has the board considered whether to proceed with

21  the plan if each of those provisions is not approved?

22  A     It has.

23  Q     And what would the Court do if these were not approved?

24  A     It would likely not proceed with the plan as it's

25  structured right now.

**A1483**

74

1   Q      And again, just going back to the projections.  Are

2   creditors better served (indiscernible) distributions to be

3   received from Chapter 7 or Chapter 11?

4                MR. SULLIVAN:  Objection.  Calls for speculation.

5                MR. WAXMAN:  Your Honor, this is Exhibit G in the

6   liquidation --

7                THE COURT:  I think he already testified about

8   this.

9                MR. WAXMAN:  That's correct.  I won't repeat

10  myself again, and again, and again.

11  BY MR. WAXMAN:

12  Q      Finally, is the plan, as filed, feasible; that is to

13  say would the debtor be able to provide all its disposable

14  income (indiscernible) for the next three years?

15  A      Yes.

16  Q      Has the debtor committed that even if it gets new

17  contracts, which would significantly increase the amount of

18  income, that it will provide all disposable income for

19  distribution to creditors according to the plan?

20  A      Yes.  We understand it's all net disposable income of

21  whatever that amount is.  We understand that it could be

22  more, yes.

23  Q      Is the debtor prepared to file reports with the

24  company's income and expenses after confirmation?

25  A      Yes.

**A1484**

```
 1              MR. WAXMAN:  Your Honor, I believe that's all I
 2   have for Mr. Sarrao.
 3              THE COURT:  Okay.  Thank you.
 4              MR. WAXMAN:  I'm sorry.  One of other thing before
 5   I leave the podium.  I would like to have Mr. Sarrao's
 6   declaration admitted into evidence.
 7              THE COURT:  What is the docket number of that?
 8              MR. WAXMAN:  It's 307, Your Honor.
 9              MR. SULLIVAN:  Your Honor, Mr. Sarrao is here to
10   testify.  I'm not sure why his declaration (indiscernible).
11              MR. WAXMAN:  He has testified that everything in
12   there is true and correct to the best of his knowledge.  It
13   certainly can be admitted to the extent that there are any
14   doubts between the testimony that I adduced; otherwise, I
15   would simply have to go through the entirety of his
16   testimony, through his declaration, one paragraph by two
17   paragraphs getting him to testify to that.
18              MR. SULLIVAN:  I'm not looking for that.
19              THE COURT:  Okay.  You're right.  Well, you're
20   going to withdraw your objection.
21              MR. SULLIVAN:  Yes.  My objection really goes to
22   the factual issues which will be addressed.
23              THE COURT:  I was going to say you have every
24   right to cross-examine on the entirety of the declaration.
25              MR. WAXMAN:  Of course.  We're happy to
```

**A1485**

1    (indiscernible) subject to their right to cross-examine.

2              THE COURT:  Okay.  Anyone else wish to comment on

3    the admissibility of the Sarrao declaration?

4         (No verbal response)

5              THE COURT:  Okay.  That declaration is admitted

6    reserving the Reed judgement creditors opportunity and anyone

7    else who wishes to cross-examine.

8           (Sarrao declaration received into evidence)

9              MR. WAXMAN:  And Your Honor, just to tidy things

10   up, to the extent that I did not have this admitted, Docket

11   Number 316 which are the amended plan exhibits and the plan

12   that Mr. Sarrao has identified as well should both be

13   admitted.

14             THE COURT:  Any objection?

15             MR. SULLIVAN:  No objection.

16             THE COURT:  They are admitted.

17        (Docket No. 316 received into evidence)

18             THE COURT:  Who, all, would like to cross-examine

19   Mr. Sarrao?

20             MS. NIMEROFF:  Your Honor, I have just a couple of

21   questions.

22             THE COURT:  Okay.  So, let me ask: Would you like

23   to take a lunch break before or after cross-examination?  I

24   can keep going so I have no issue.  Whatever you prefer.

25             MR. SULLIVAN:  I need to take a short break now.

77

1          THE COURT:  Would it be better to just take a

2    lunch break now for an hour and start back here at quarter of

3    one?

4          MR. SULLIVAN:  That probably sounds good.

5          THE COURT:  Okay.  All right.  We'll start back

6    and we'll power through at quarter of one.  So, we stand in

7    recess.

8          (Recess taken at 11:47 a.m.)

9          (Proceedings resumed at 12:49 p.m.)

10         (Call to Order of the Court)

11         THE COURT:  Please be seated.  We're back on the

12    record in Alecto.

13         MR. WAXMAN:  Your Honor, I don't know if you want

14    this on the record or not, but do you have JX-1 as admitted?

15         THE COURT:  Yes.

16         MR. WAXMAN:  Thank you.

17         THE COURT:  We're off the record for now.

18         (Recess taken at 12:52 p.m.)

19         (Proceedings resumed at 12:53 p.m.)

20         MS. NIMEROFF:  Are we on the record?

21         THE COURT:  We're back on the record.

22         MS. NIMEROFF:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24    BY MS. NIMEROFF:

25    Q    Good afternoon, Mr. Sarrao.

**A1487**

1    A    Good afternoon.

2    Q    I know that during the case the debtor had obtained

3    authority to, I guess, close out certain of its subsidiaries

4    that were no longer operating or were no longer needed,

5    correct?

6    A    Correct.

7    Q    But there remaining in the corporate org chart, there

8    remains still many subsidiaries and affiliates or Alecto at

9    this time, correct?

10    A    Correct.

11    Q    And what is the debtors -- assume the plan gets

12    confirmed, what is the debtors plan, and I mean

13    (indiscernible) plan, for dealing with the remaining

14    subsidiaries and affiliates that are currently in the org

15    chart?

16    A    So, there's a number of subsidiaries.  Like we talked

17    about, Plaza MOB and all these different entities.  Subject

18    to any kind of comments from the tax accountants to avoid any

19    unintended tax consequences would be to dissolve those.

20    Those entities that still operate the hospitals, it would be

21    to wind those down.  Exactly how we wind those down -- some

22    of those have their own independent liability.  What we would

23    do with that, we haven't figured out.

24        But the goal would be to certainly streamline the

25    organization to have less entities.  Frankly, it's just less

1   for me to keep track of.  I use, like, Plaza as an example,

2   there's Sunrise MOB Holdings, Sunrise Real Estate Holdings,

3   and Olympia Plaza Management and then Plaza MOB.  So, again,

4   subject to talking to the folks at Moss Adams so there's no

5   unintended tax consequences the goal would be to wind those

6   down one way or the other.

7   Q    And do you think that -- well, do you have any sort of

8   estimate of time in terms of how long a process may be to go

9   through that?

10  A    I think it's probably six to nine months, but it just

11  depends as it relates to taxes.  And, I just don't know

12  enough about the tax consequences of dissolving some of those

13  entities.  The actual dissolution is -- some states are a

14  little more complicated, like Delaware I literally follow a

15  one-page certificate of cancelation.  They process it in a

16  couple days and they give it back.

17  Q    Do you have an opinion on what impact there might be,

18  if any, on the ongoing projected expenses of Alecto?  If you

19  are able to streamline or dissolve some of the entities in

20  (indiscernible).

21  A    I don't think it would be a significant impact.  I

22  think the actual annual fees or (indiscernible) fees and the

23  corporate fees you pay are on $6 or $700.  So, if we can get

24  rid of ten entities then it'd be $7,000.  It'd be kind of a

25  one time, that year gain.  The tax account, and we projected

80

1  to go down because we'll have less entities.  But I don't

2  think it will be a huge impact one way or the other.

3              MS. NIMEROFF:  Thank you.  That's all I have.

4              THE COURT:  Thank you.  Any redirect?

5              MR. WAXMAN:  Yes. (indiscernible).

6                    REDIRECT-EXAMINATION

7  BY MR. WAXMAN:

8  Q    Are any of these subsidiaries or affiliates still

9  receiving income or projected to receive income in some

10  amount?

11  A    Yes.  Well, for example, Alecto Health Services

12  Fairmont is owed money by the state of West Virginia.  And on

13  a pretty regulation basis from collections, it receives

14  between $5 to $7,000 a month comes in.  But that will wind up

15  and go away.  Those are old collections.

16  Q    And will any of that money eventually work its way up

17  to the parent or will that stay at the subsidiary level if

18  you had to estimate?

19  A    I believe it will stay at subsidiary level because the

20  subsidiaries owe – there's money owed by the subsidiaries.

21  Q    Okay.  But as long as money is being owed, you're not

22  going to try to close those?

23  A    Correct.  Like for example, some of them like, again,

24  Alecto Fairmont, we have a claim for additional payment from

25  Medicare and if I close it, I can't pursue that.  And so,

**A1490**

1    it's not costing the entity, it's just me doing it.  It's not

2    costing the entity anything to do it.  And if I close it, it

3    will go away.  That potential, it may be 50/50.  But if it

4    doesn't cost us anything to do, we would continue to pursue

5    that.

6            MR. WAXMAN:  Okay.  I have no further questions on

7    redirect.

8            THE COURT:  Okay.  Thank you.

9            MR. WAXMAN:  (indiscernible).

10            THE COURT:  Pardon?

11            MR. WAXMAN:  At least as it relates to Ms.

12    Nimeroff.  Obviously, Mr. Sullivan has questions.

13            THE COURT:  Understood.

14            MR. SULLIVAN:  Your Honor, for the record, Bill

15    Sullivan on behalf of the Reed Creditors.  I do have a small

16    witness binder with some of the exhibits that I'm going to

17    refer to, that if I can hand up. I have copies for the Court

18    as well.

19            THE COURT:  Okay.  Thank you, Mr. Sullivan.

20            MR. SULLIVAN:  Your Honor, I'm ready to proceed.

21            THE COURT:  Okay.  You may begin.

22                        RECROSS-EXAMINATION

23    BY MR. SULLIVAN:

24    Q    Good afternoon, Mr. Sarrao.  My name is Bill Sullivan

25    and I represent the Reed Creditors in this matter as you

1  know.

2      I want to start with the end of your testimony.  You

3  went through sort of a list of obligations that -- to be

4  incurred by the debtor if Sherman/Grayson closed prior to a

5  sale.  Do you recall that?

6  A    I recall that, yes.

7  Q    Okay.  And you referred to some leases and some

8  guarantees and some other exhibits to go through all that,

9  correct?

10  A    Correct.

11  Q    So, did you ever -- there was no list presented here

12  into evidence.  Did you ever prepare a list of those

13  expenses?

14  A    In the sale motion or my declaration of the sale

15  motion, one of the issues that got addressed was what the

16  buyer was taking on in terms of liabilities.  And some of

17  those were included in that -- I think it was my declaration

18  where the sale motion -- in the Sherman/Grayson case like,

19  for example, the buyer, by assuming the Medicare provider

20  number, took on the Medicare advanced payment liability.  And

21  I think it's 3.9 in that declaration; they accrued PTO, they

22  accrued payrolls referenced in there.  And it's either the

23  sale motion or my declaration, but I remember there was a

24  chart in there that includes some of those but certainly not

25  all of them.

1    Q    Okay.  But for example, with respect to the declaration

2   that was filed on Friday -- I'm sorry, Thursday the 29th late

3   in the evening, you didn't attach a list of all of those

4   expenses that you feel the debtor could be -- could avoid or

5   the liabilities the debtor could avoid if a sale goes

6   through, correct?

7   A    I don't believe there's an attachment that lists that.

8   You're correct.  You have the declaration.  If it's not

9   there, it's not there.  I don't it in front of me.

10   Q    Okay.  And so, is it fair to say that back -- and

11   you've never prepared one other than in terms of preparing

12   your declaration, right?  A list of all of those expenses.  I

13   know you said you identified some of them from your

14   declaration in connection with Sherman/Grayson.  The question

15   is did you ever prepare a list (indiscernible) if

16   Sherman/Grayson (indiscernible).

17   A    Yes.  I did prepare a list in 2021 and 2022.  We had a

18   running list and we knew what those obligations were.  And I

19   prepared to end this case and their contingent obligations.

20   But we were thinking about that when we were making decisions

21   to fund Sherman and we knew what those were.

22   Q    Did you ever provide that list to Mr. Balasiano?

23   A    I had a discussion with Mr. Balasiano about that, but I

24   don't believe I gave him a list.  But we certainly talked

25   about what those items were.

84

1   Q      Okay.  Now, the problems that Sherman/Grayson had in

2   terms of requiring support from Alecto.  They didn't just

3   happen after the Reed creditors got the judgment, right?

4   A      No.  It struggled before -- I think the judgements

5   ended in November 2022.  It certainly had cash flow issues or

6   funding issues prior to that as well.  Yes.

7   Q      All the way back to 2014, correct?

8   A      In different severities, different levels, but yes.

9   Q      In looking at -- and did you know at the time of the

10  petition what the total balance of the intercompany

11  receivable from Sherman/Grayson to Alecto was?

12  A      I believe it was right around $60 million.

13  Q      And do you recall that you submitted a declaration in

14  connection with the conflicts that arose in this case?

15  A      I do recall submitting a declaration.  I don't recall

16  whether it was in this case or the Sherman/Grayson case, Mr.

17  Sullivan, but I do recall submitting a declaration.

18  Q      I'm trying to find the exhibit number for that so it

19  may take me a minute.  So, let me just refer you to

20  (indiscernible), Exhibit 68.

21  A      Okay.  Give me one second.  I got it, I think.  I have

22  it.

23  Q      Okay.  So, Exhibit 68 is the supplemental declaration

24  you prepared on August 8th or filed on August 8th in the

25  Sherman/Grayson case, correct?

1  A     That's correct.  This deals with the EMR System as I

2  look at it.

3           MR. SULLIVAN:  Your Honor, I just need to get the

4  (indiscernible).

5           THE COURT:  Take your time.

6  BY MR. SULLIVAN:

7  Q     All right.  So, Exhibit 7.

8  A     Okay.

9  Q     All right.  So, in this declaration that you filed on

10  August 23rd in this case, not in the Sherman/Grayson case,

11  it's Docket Number 133.  You discussed the intercompany

12  advances at Paragraph 27.  Can you take a look at that?

13  A     Sure.  Okay.

14  Q     Okay.  And so, the first sentence of Paragraph 27

15  indicates that Alecto acquired Sherman/Grayson on or about

16  October 31st of 2014.  Correct?

17  A     Well, Alecto through a subsidiary acquired

18  Sherman/Grayson.  But yes.

19  Q     All right.  And the second sentence indicates that

20  Alecto has loans substantial funds with Sherman/Grayson that

21  have not been, except to a very limited degree, unable to be

22  paid back.  Did I read that correctly?

23  A     You did read it correctly.

24  Q     And since that -- this was filed after the

25  Sherman/Grayson bankruptcy was filed, correct?

**A1495**

86

1  A      Yes.

2  Q      And the amount that's been advanced from 2014 to the

3  petition date is $60,041,067.02, correct?

4  A      That's correct.

5  Q      And then just to follow up in Paragraph 28, the first

6  sentence says as advancing funds to its subsidiaries was

7  Alecto's general business practice, the debtors never saw who

8  obtained the (indiscernible) counsel regarding the advances

9  prior to the petition date.  Correct?  I read that correctly?

10 A      That's correct.  Yes, that's correct.  As counsel, I

11 think -- who we're talking about.  And I'm the general

12 counsel of Alecto but we didn't seek advice about that.

13 Q      Okay.

14 A      But you read it correctly.

15 Q      So, I want to refer -- skip for a minute to the exhibit

16 that you identified.  You talked about the -- I'm looking at

17 the three-year projected income statement that you've

18 reviewed with your counsel today that was filed yesterday at

19 Docket 316-2.  Do you recall that testimony today?

20 A      I recall going through this.  Yes.

21 Q      And I'm looking at 316-2, Page 202 which is the

22 blackline of the projected income for the debtor.  And it

23 shows that your --

24 A      Can you hold on just one second.  I want to make sure

25 I'm on the same page.  So, it's Exhibit 2 blackline projected

1    income 316-2, 202?

2    Q    I don't know where you got that from.

3    A    From the docket number up on top.

4    Q    316-2.  Yes.  Page 202.

5    A    Okay.  I got it in front of me.

6    Q    And that's the income statement that has a shaded area

7    two-thirds of the way down for control through preserve.  Do

8    you see that?

9    A    Yes.  I think it's picked up in the blackline.  But

10    yes.  I see that.

11    Q    Okay.  And so, you indicated that the debtor was

12    reserving $352,000 a year for the next three years as a

13    potential liability payment that has to be made with respect

14    to the Alecto Ohio Valley pension, correct?

15    A    Correct.  It's the (indiscernible) contributions,

16    correct.

17    Q    Well, has the pension been terminated so that this is a

18    withdrawal liability or has the pension not been terminated?

19    A    It's not been terminated.  It's not withdrawal

20    liability because it's not a multi-employer plan.  The

21    pension is still active and has not been terminated.

22    Q    Okay.  All right.  And so -- but you indicated, I

23    think, that you're negotiating to get some federal help for

24    that.  Is that right?

25    A    No.  I think what I said was -- so, the pension benefit

**A1497**

1  guarantee corporation, we're in regular communication with

2  them.   The plan is funded over 80 percent.   We also believe

3  that Alecto Ohio Valley owed some money by the state of West

4  Virginia.   So, if that money was to come in, there may be a

5  possibility to voluntarily terminate the plan which would

6  mean taking the funds in the plan now -- they had a good year

7  last year from an investment return -- and then buying, you

8  know, buying annuities and then voluntarily terminating the

9  plan.

10 Q    Okay.   And these numbers are based on that?

11 A    No.   These numbers are the principle group, the

12 principle (indiscernible).   Principle is the (indiscernible)

13 for the plan.   So, each year, they're required to come up

14 with the quarterly contributions to the plan.   So, for 2024,

15 they're saying there should be four quarterly contributions

16 to fund the pension plan at $88,000 a quarter.   I think it's

17 88 thousand.   That's what that number is, Mr. Sullivan.   If

18 nothing happens with the plan, you're supposed to make

19 quarterly contributions and that's what those contributions

20 would be.

21 Q    So, your actuaries provided you with that number?   You

22 didn't estimate the number yourself?

23 A    Correct.   They prepare -- I forget the exact name of

24 the report.   They prepare a report every year and they figure

25 out what the -- in 2023 there were no required contributions,

1   and 2024.  But they do whatever they do as actuaries and

2   figure that out.  It's not my number.

3   Q    Okay.  Thank you for that.  On your direct testimony,

4   you reviewed some financials with your counsel and those

5   financials include JX2 which is the 2019 financial.  JX-4 and

6   JX-44, I think, both of those are the 2020 financials.  And

7   JX-50 are the 2021 financials.  Do you recall that?

8   A    I recall that.

9   Q    Okay.  And let's just start, for example, with the 2020

10  financials if you would.

11  A    What number is that, Mr. Sullivan?

12  Q    JX-44.

13  A    Okay.  Give me just a second.  I'm going to move the

14  notebooks around.  Okay.  I have it in front of me, Mr.

15  Sullivan.

16  Q    Okay.  So, who prepared -- I'm looking at the -- just

17  to be clear, I'm looking at the balance sheet which is JX-

18  44.001.  So, I want to make sure you're on the balance sheet.

19  A    I'm on the balance sheet page.  Yes.

20  Q    Okay.  And this is dated 12/31/2020, correct?

21  A    It's the balance sheet as of 12/31/2020.  Correct.

22  Q    Okay.  And who prepares the balance sheets that have

23  been submitted into evidence for Alecto?

24  A    In 2020 -- so, this would've been prepared in January

25  2021.  That would've been (indiscernible).  But we all see

**A1499**

1  the balance sheets before they get finalized.

2  Q    Do you have any input into what gets put on the balance

3  sheet?

4  A    In some instances, yes, I do have input.

5  Q    And do you have an understanding of what is captured

6  with respect to the individual items that are listed on the

7  balance sheet?

8  A    I do.

9  Q    Okay.  So, let's just look at this balance sheet for a

10  minute and start with -- there's a line item under assets.

11  It's about the seventh item.  It says other receivables.

12  A    Yes.

13  Q    So, that's not a -- there's accounts receivables up top

14  that is 13.4 million and there's other receivables that are

15  9.4 million.  Does everything in here -- it's in a whole

16  number as millions, right?

17  A    It's millions.  Correct.  Yes.

18  Q    So, tell me what -- do you have an understanding of

19  what the distinction is between those two (indiscernible).

20  A    Between the accounts receivable and other receivables?

21  Q    Yes.

22  A    Accounts receivable would be accounts like, for

23  example, on the Alecto receivables, the accounts receivable

24  are generally the St. Rose management fee because that's an

25  account.  For the other hospitals, it's actually patient

1    accounts receivable.  The other receivables -- I mean, I know

2    what the $9.4 million is.  It's the loan from Alecto to

3    Olympia from the capital contributions.  But it distinguishes

4    between -- generally accounts receivable are the patient

5    accounts receivable or the St. Rose AR.

6    Q     Okay.  So, the capital contribution, that's the capital

7    contribution that -- and, again, let's talk about the other

8    receivable.  That's the capital contribution that came in to

9    Alecto as a result of the Sunrise (indiscernible) transfer in

10   June of 2019, correct?

11   A     It's the result of the refinance proceeds being

12   contributed to -- back from the members, back to Alecto, and

13   then it was loaned to Olympia.  Yes.

14   Q     Okay.  So, as I understand the sequence of events, the

15   transaction occurred on June 20th when the actual equity at

16   Sunrise (indiscernible) was assigned to the Alecto members

17   who had signed it to Sunrise MOB, a new entity they created

18   to (indiscernible), right?

19   A     As required by the lender.  Yes.

20   Q     And then, as I understand it, the Sunrise MOB

21   refinanced for about $30 million?

22   A     Correct.

23   Q     And a loan was paid off for about $20 million, right?

24   A     Correct.

25   Q     So, in terms of equity that was actually transferred,

**A1501**

1  the (indiscernible) was value $15,700,000 minus the loan

2  (indiscernible).  So, roughly $30 million in equities was

3  transferred to (indiscernible), right?

4  A    I would disagree with that because at the same time the

5  equity was transferred, more than $9 million went back.  So,

6  I think of it more like $21, I think.  Someone sometime today

7  or yesterday said $22 million.  I haven't done the exact

8  math.

9  Q    I haven't gotten to that part, but before the capital

10 contribution payment the equity transfer was $30 million.

11 When you subtract the capital contribution that the members

12 made back in the amount of $8.9 million that is how you get

13 to the number that we discussed with Ms. Gould at $22.3.

14 A    If all you are doing is comparing the numbers, the $50

15 minus $20, and there's closing costs and all that, but those

16 rough numbers -- if all you are doing is comparing numbers, I

17 think there is other value there, but all you are doing is

18 comparing numbers. I am not disagreeing with $50 minus $20 is

19 $30. I am not disagreeing with that math.  We can both do the

20 math.

21 Q    Okay. And then subtracting the other capital

22 contribution got us to $22.3 was the value that wasn't

23 recovered by Alecto.

24 A    Again, I disagree that the value wasn't recovered by

25 Alecto, but I understand where the number comes from and if

**A1502**

1   we add the numbers up.

2   Q    So, the $9.4 million that is reflected on the balance

3   sheet was received on the 20th of June, as I recall, and then

4   it was transferred either that day or the very next day to

5   Olympia.

6   A    Yeah, I don't know.  So, the funds were received from

7   the Reed financing through escrow, they went into Richard

8   Hayes's client trust account.  He is a lawyer.  He then

9   transferred that money, then that money was transferred to

10  Alecto.  I forget if it was the same day or a different day,

11  but its in the bank statements.

12  Q    Okay.  Well, let's -- I guess, I just want to make sure

13  that we have this clear.  So, can I refer you in Tab H in the

14  same exhibit binder that I handed you.

15  A    Okay.

16  Q    Now the first page of Tab H, and this is marked as JX-

17  96, but its only a portion of JX-96 which I think you know is

18  the Gould report.

19  A    If you tell me JX-96 is the Gould report, I am not

20  disagreeing with you on that.

21  Q    When Ms. Gould was on the stand yesterday, I reviewed

22  with her this document called "Plaza MOB Summary" and she

23  said that was her name for it, but it was prepared and

24  provided to her through debtor's counsel.

25  A    I don't remember Ms. Gould's exact report or her exact

1  testimony, but the fact she didn't prepare the summary I

2  remember that, yes.

3  Q     And is it fair to say that you prepared this summary

4  and provided it to counsel?

5  A     I don't think by myself I prepared the summary, but I

6  certainly took part in the preparation of the summary.

7  Q     And you made sure it was accurate, correct?

8  A     I would make sure it was accurate to the best of my

9  knowledge, yes.

10  Q     Okay.  All right, so turning to the next page it says,

11  "Plaza Medical Office Building" and if I look at it there's

12  15 paragraphs and over three pages, correct?

13  A     Let me look at it.  Yes.

14  Q     Okay.  So, I want to walk -- I don't want to read all

15  15 of them, but I want to walk through a few of them.  So,

16  starting with Paragraph 5 that is the paragraph that confirms

17  that on June 19th of 2019 Alecto transferred 100 percent of

18  the membership interest in Sunrise Real Estate Holdings to

19  the following persons.  And it lists the members of Alecto,

20  correct?

21  A     You are reading that correct, yes.

22  Q     So, then lets skip down to Paragraph 7 which says on

23  June 20th, 2019 Plaza MOB completed the refinancing and

24  received net proceeds of $8,444,477.81, correct?

25  A     That is what it says, yes.

1   Q      All right. Then in Paragraph 10 it says that Sunrise

2   received those funds and made a distribution to the Sunrise

3   MOB members which are, essentially, the Alecto members.  And

4   in Paragraph 11 the members transferred it to the Alecto

5   members, right?

6   A      Yeah, but what I think you are missing is none of us

7   saw that money.  It wasn't like the money hit my bank account

8   and I wrote a check to Alecto. It was all handled pursuant to

9   the funds flow agreement and to Mr. Hayes's client trust

10  account.  We never saw -- the money referenced in the Sarrao

11  Family Trust here that money never hit any of my bank

12  accounts.

13  Q      Totally understand.  It went to Alecto's bank account

14  and one day later it left Alecto's bank account and went to

15  Olympia, right?

16  A      I believe that is correct.

17  Q      And that is Paragraph 12, right?

18  A      Correct.

19  Q      Okay.  So --

20  A      But I would add on this there was additional money that

21  came in after that day that had the same treatment per the

22  funds program.

23  Q      Right.  There was at least $500,000 that was escrowed

24  at the real estate closing and another small amount.

25  A      Yeah, the $500,000 is related to making sure the

**A1505**

96

1    insurance was in place and once the insurance was in place,

2    they released that money.  Then later on the old lender

3    released some money back that was being held as a reserve.

4    Q    Okay.  So, going back to the balance sheet that we are

5    looking at, JX-44, that transfer to Olympia is what is

6    captured in the $9.4 million of the receivables on December

7    31st, 2020, correct?

8    A    Correct. And I believe that also included -- it would

9    include that St. Rose -- the expected St. Rose payment for

10   December 2020 because remember this is as of December 31st,

11   2020, and then it would have been paid.  It's usually paid

12   the first few days of the month.

13   Q    Okay.  And if that receivable from Olympia is

14   uncollectable then that asset really has no value, correct?

15   A    Yeah, but I don't believe it was uncollectable in 2020.

16   Q    Okay.  Let's go to a couple of other of these.  There

17   is one about prepaid expenses.

18   A    Okay.

19   Q    I guess that is about five lines down. Do you know what

20   that is?

21   A    Yeah, generally it relates to the insurance because we

22   were premium financing the insurance.  So, you booked the

23   liability of the premium financing and then it was prepaid,

24   then they booked it as a prepaid expense.

25   Q    Okay.  And so for this balance sheet it says the total

**A1506**

1   assets is $23.5 million, correct?

2   A    Correct.

3   Q    All right.  So, then let's skip down to the liability

4   section and there's other liabilities and its identified as

5   $22.7 million. Do you see that?

6   A    I see that.

7   Q    Okay.  And do you know how that number is arrived at

8   and what it consists of?

9   A    It includes some of the intercompany liabilities, I

10  believe, as it relates to Olympia because how Olympia booked

11  the intercompany and how Alecto booked it were -- Olympia

12  booked it differently then the other hospitals, plus

13  in 2020 -- let me take that back.  In 2020 that relates to

14  the cash debt.  So, there was Medicare advanced payments

15  received by Olympia and Sherman of about $23 million, but

16  because how it -- they're just Medicare payments so they hit

17  the lockbox, they would get swept to CNH, and they got swept

18  back.  So, that is part of that liability there.

19  Q    Okay.  So, you have some understanding of what goes

20  into it.  Do you specifically recall the components that make

21  up the $22.7 million for the balance sheet at the end of

22  2020?

23  A    That specific $22.7 I would have to look.  We have the

24  month to month. I want to see the month to month on that, but

25  I generally know what is in there, yes.

**A1507**

1   Q    Okay.  Can we get -- is the month to month an exhibit

2   here?  So, I'm told its Exhibit 4.

3   A    I don't have it.

4        MR. WAXMAN:  I believe it's the first red binder.

5        THE WITNESS:  I have it, Mr. Sullivan.

6   BY MR. SULLIVAN:

7   Q    So, I have it as JX-4, page 004.

8   A    I have it as the same.

9   Q    Okay.  So, tell me if this helps you identify what the

10  $22 million consists of?

11  A    It does help me identify it because I know that Olympia

12  and Sherman/Grayson received Medicare advanced payments in

13  April and May of 2020, and late May, early June.  So, you

14  will see the cash goes up significantly from March 2020 to

15  April 2020.  At the same time the other liabilities go up

16  significantly from March 2020 to April 2020.  So, I know that

17  the cash received from those Medicare advanced payments that

18  were cycled through the credit line relates to those other

19  liabilities.

20  Q    Okay.  Now have those liabilities been resolved or are

21  they part of the claim with the federal government?

22  A    There's two sets of liabilities.  So, with Sherman/

23  Grayson there is about, I think, $4.2 million remaining that

24  the buyer and Sherman/Grayson has assumed a Medicare provider

25  number.  There is an extended repayment plan.

1    CMS has agreed to allow them to accept that extended

2    repayment plan.  So, that will be paid off.  It was a 36-

3    month extended repayment plan.  I forget how many months are

4    left.  So, that part, when it goes away, will go away.  I

5    don't know if it necessarily means that goes off the balance

6    sheet because someone else is taking care of that.

7    The Olympia one hasn't.  CMS filed a proof of claim in

8    this case where they believe that Alecto is responsible for

9    those Medicare advanced payments from Olympia. I disagree

10   with that. I think they are wrong. I think they made a couple

11   giant leaps to get to that point, but the Olympia Medicare

12   advanced payments have not been resolved and CMS's position

13   certainly is that that should be a liability of Alecto

14   through a number of their different theories.

15   Q    Okay.  And so with respect to this $22 million that $22

16   million includes both of those Olympia and Sherman/Grayson

17   obligations for the Medicare, right?

18   A    Medicare advanced payment, correct.

19   Q    And those have carried through on the balance sheet

20   until the petition date because they haven't resolved yet,

21   right?

22   A    Well, not necessarily.  The Medicare advanced -- I

23   would have to look at each of the months or each of the

24   balance sheets, but generally yes because some of the

25   Medicare advanced -- the Sherman Medicare advanced payments

**A1509**

1  are lower now because the government had a way to collect

2  back from the Sherman ones, but by the time they did that in

3  Olympia, Olympia had suspended operations.

4  Q    Okay.  Is it -- does that other liability number

5  include any calculation or numerical obligation associated

6  with any guarantees that Alecto has issued?

7  A    I don't believe so, no.

8  Q    Does it include any number for either contingent or

9  disputed liabilities that may be either as a lawsuit or

10  demand letter made to Alecto?

11  A    Made to Alecto, no it would not.

12  Q    So, let me take a look at this.  Looking at Exhibit 43

13  in the large white binder --

14  A    Yeah, give me one second.  Exhibit 43, yes.

15  Q    So, I think you looked at this with you counsel

16  earlier.  This is a demand letter that was issued by the

17  Retail, Wholesale and Department Store International Union

18  and Industry Benefit & Pension Funds for withdrawal liability

19  relating to the Fairmont General Hospital, correct?

20  A    That is correct.  Demand letters for Fairmont General

21  Hospital which is really Fairmont Regional Medical Center.

22  Q    Okay.  And that demand letter on the first page in the

23  second paragraph demands $10.8 million of withdrawal

24  liability to be paid by Alecto as a member of the control

25  agreement, correct?

1   A    No, it doesn't demand that. It's a demand to Fairmont

2   General Hospital which is really Alecto Healthcare Services

3   Fairmont. That is who the demand is made to, not Alecto.

4   Q    Okay.  Does Alecto have any liability with respect to

5   that (indiscernible)?

6   A    As of right now, no because Alecto Fairmont has been

7   making the quarterly payments allowed by statute.

8   Q    Alecto Fairmont has been making those?

9   A    Has been making those.  Those quarterly payments have

10  been made.  It gets reduced if you make the quarterly – there

11  is a very complicated statutory scheme for that, but there is

12  a way you can pay payments over time that end up being less

13  than the $10 million.

14  Q    Now when was Alecto Fairmont closed?

15  A    Alecto Fairmont suspended operations March of 2020.

16  Q    And how does Alecto Fairmont make the quarterly payment

17  obligations?

18  A    It initially made the quarterly contributions from the

19  collections in the AR that it received post-closing and the

20  equipment that it sold to the state of West Virginia.  I

21  think at least a couple of those have been made by funding

22  from Alecto.

23  Q    Okay.  And to the extent that there are further

24  payments made they will need to come from Alecto, correct?

25  A    Correct, except with the proviso that we believe that

1  like Ohio Valley, Alecto Fairmont is owed money from the

2  state of West Virginia and we have a pending claim for

3  additional payments from Medicare that if I prevail on that

4  that will generate revenue for Alecto Fairmont.  Then Alecto

5  Fairmont generates between $5 and $10,000 lately in

6  collections on AR.

7  Q    All right.  With respect to the demand letter that was

8  sent to Alecto Fairmont on November 9th, 2020, it was

9  actually addressed to Alecto Healthcare Services if you see

10 that, but I understand what you have told me.

11 A    Well, it's not addressed to Alecto Healthcare Services

12 LLC, its to Alecto Healthcare Service which is wrong. Its to

13 Mr. Bradshaw who was an in-house attorney and it relates to

14 Fairmont.

15 Q    Okay.  But with respect to the receipt of this letter,

16 and this is the second letter, right?  There was an earlier

17 letter in September?

18 A    Yeah.

19 Q    It was a prior exhibit that we looked at?

20 A    Yeah, there were some conversations back and forth how

21 did you calculate the stuff and things like that, yes.

22 Q    But the other liability column on the 2020 balance

23 sheet does not include any accounting for any payment that

24 Alecto may be obligated to make for that demand, correct?

25 A    That would be --

**A1512**

1     MR. WAXMAN:  Your Honor, I just want to object.  I

2  am fine with the question.  Its just a question of is Mr.

3  Sarrao being asked to answer with respect to Alecto's

4  liabilities as a matter of law as opposed to simply his

5  understanding of what the liability may be.  We call it the

6  (indiscernible).

7     THE COURT:  I thought he asked him what appeared

8  on the balance sheet.

9     MR. WAXMAN:  Okay.  Well, he's starting to move

10  into liability issues and (indiscernible) saying

11  understanding versus determination of what Alecto's ultimate

12  liability would be arising (indiscernible).

13     THE COURT:  Okay.  Well, I am going to allow his

14  answer to that question because he asked him what the balance

15  sheet was. I hear where you are going, you're preserving

16  future objections.

17     MR. WAXMAN:  Correct.  Thank you.

18     THE WITNESS:  And I would just note, Mr. Sullivan

19  it's the $10 million here, but within the letter it talks

20  about you can make quarterly payments and the quarterly

21  payments end up being a lot less then $10 million.  There is

22  a statutory scheme that allows for the multi-employer

23  withdrawal.

24  BY MR. SULLIVAN:

25  Q     The clear thing is that there is nothing in the $22

1    million of other liabilities relating to that obligation?

2    A    Yes, that is correct.

3    Q    So, then let's go -- I want to turn your attention to

4    Exhibit I in my binder.

5    A    In your notebook?

6    Q    In my binder.  The Reed creditors binder, I should say.

7    A    Okay.

8    Q    And there is a document, JX-113, and it's a document

9    that was produced to the Reed creditors in connection with

10   the West Virginia litigation.

11   A    I don't believe it was produced in connection with the

12   litigation. It was produced in connection with settlement

13   discussions with the Reed creditors, but it was certainly

14   provided to the Reed creditors.

15   Q    And then after it was provided to the Reed creditors

16   you are aware that the Reed creditors filed a motion with the

17   West Virginia District Court to have the protective order

18   lifted as to these documents?

19   A    I know there was an order filed, I think it was agreed

20   upon. I forget exactly what documents. There was a lot of

21   documents produced in the litigation too.  My only

22   distinction was the litigation was over, so to speak -- not

23   over, but there was already a judgement, I believe, when

24   these documents were provided.

25   Q    Well, it was over except for the collection?

**A1514**

1   A      Correct.

2   Q      And when they filed the motion to get this relief, they

3   said we could get it in post-judgment discovery and nobody

4   opposed, right?

5   A      My point was it wasn't like a discovery request and we

6   responded to discovery requests. It was voluntary

7   (indiscernible).

8   Q      And this was given to them by Alecto, right?

9   A      I don't believe it was given to Alecto. It was given by

10  bankruptcy counsel that was representing and Alecto

11  (indiscernible).

12  Q      Alecto wasn't in bankruptcy when this was provided in

13  February or January of 2023, right?

14  A      We had retained counsel to try to work on the

15  settlement with the Reed creditors.

16  Q      Okay.  So, the document is called the "UCLA Health

17  Transaction" and in it's a document that was provided by

18  Alecto to the Reed creditors, right?

19  A      The Reed creditors got it from our site, to so speak.

20  So, yeah, I wouldn't disagree with that.

21  Q      Who prepared it?

22  A      I'm not sure who prepared the whole thing. I think I

23  took part of the preparation. I am not sure about the

24  spreadsheets.  It went through our counsel and I think our

25  counsel was the one that actually provided it to Reed

1  creditors counsel.

2  Q    You were involved in overseeing it (indiscernible),

3  correct?

4  A    Some of it, yes.

5  Q    All right.  You were aware that it was provided to

6  counsel (indiscernible)?

7  A    And we provided a bunch of information to the Reed

8  creditors, yes.

9  Q    Okay.  So, I want to turn your attention to Paragraph 3

10  of Exhibit 113 which says that the sale of the Horizon owned

11  portion of the assets that were sold in a large transaction

12  to UCLA occurred effective as of January 1st, 2021.  That is

13  Paragraph 3, right?

14  A    That is what Paragraph 3 says, yes.

15  Q    Okay.  Then on or about that time Paragraph 7 says

16  arise and received net proceeds from the transaction totaling

17  $23.5 million, correct?

18  A    Correct.

19  Q    And then it says it used that $23 million to pay

20  $9.429 -- pardon me, $9,429,880.08, correct?

21  A    That's what it says, yes.

22  Q    And that is in federal and state payroll taxes, and to

23  subsidize Olympia's lawsuits and make -- I'm sorry, but the

24  $9.4 million is just for the federal and state payroll taxes,

25  correct?

1    A      Correct, but I believe those are actually paid from the

2    Medicare advanced payment funds, the cash on balance

3    (indiscernible), but $9.4 million in federal state payroll

4    taxes for Olympia were paid, yes.

5    Q      Okay.  And those were overdue as of January 1st, 2021,

6    correct?

7    A      For Olympia, correct.

8    Q      But with respect to any liability the number that we

9    have, and again going back to the balance sheet, which we

10   were looking at, is the 2020 balance sheet and that is JX-44.

11   The number of other liabilities on that balance sheet for

12   Alecto of $22.7 million does not include any liability for

13   payroll taxes, correct?

14   A      It would not include those liabilities because they

15   were liabilities of Olympia, not Alecto.

16   Q      Okay.

17   A      Two separate entities.

18   Q      Okay.  So, let's go to the use of proceeds for Horizon.

19   And that is on page 3 of Exhibit 113, do you see that?

20   A      I see that.

21   Q      And it says $9.2 -- the one entry, I am looking

22   directly under use of net proceeds.

23   A      Yes.

24   Q      $9.2 million and a net of $227,000.  It says past due

25   federal and state payroll taxes balances remain, intercompany

1  advance to AHS for both of those, right?

2  A    I see that, yes.

3  Q    All right.  So, Olympia's past due federal and state

4  payroll taxes were paid by Alecto and that payment was booked

5  to Alecto as an intercompany payment, right?

6  A    No.  They weren't paid by Alecto, they were paid by

7  Olympia through an advance from Alecto.  The actual check to

8  the IRS, and it came from our tax lawyers, but Alecto did not

9  pay them.  Olympia paid them with the Horizon proceeds.  So,

10  we would have advanced the money and that is why they're

11  booked as an advance.

12  Q    Okay.  So, it was booked as an intercompany advance to

13  Olympia which means that it was -- the money was provided by

14  Alecto for that purpose?

15  A    No. The money was provided by Horizon for that purpose.

16  You are conflating the different entities.  That money we are

17  talking about Horizon sold its real estate to UCLA.  That

18  money, the proceeds it got after it paid MPT, all these MPT

19  guarantee obligations, those net proceeds, Horizon -- those

20  Horizon funds were used to pay that.  Alecto was the conduit.

21  I disagree with your saying Alecto paid it.  Horizon paid it

22  with the proceeds that Horizon received.

23  Q    Well, didn't Alecto view the $23 million that was the

24  net proceeds as the value that Alecto received with respect

25  to that Horizon sale?

**A1518**

109

1    A       No, Horizon received, which was a subsidiary of Alecto,

2    just like Sunrise on January 1st, 2021 was a subsidiary of

3    Alecto.

4    Q       Okay.  And as a subsidiary of Alecto there's a

5    transaction that pays off all creditors and its holding $23

6    million then those funds are distributable as equity to

7    Alecto, correct?

8    A       Could be, but Horizon has the right to make advances to

9    other affiliates as well.

10   Q       Okay.  And in this case, they made a $9.4 million

11   payment for the benefit of Olympia which booked the

12   obligations to Alecto?

13   A       Alecto booked it -- had an obligation to Horizon

14   because Horizon advanced those funds to the conduit, to

15   Alecto, and Alecto made that payment.  Then Alecto took the

16   credit on the intercompany advance.  That is to my

17   recollection how that occurred.

18   Q       Let's move to the next page.  So, the next page -- I'm

19   sorry, lets go back to the transaction summary, Paragraph 8

20   on page 1 of Exhibit 113.  Do you see that?

21   A       Give one second to get it to it.  Okay.

22   Q       So, Paragraph 8 says Plaza MOB received net proceeds

23   from the transaction totaling $15.77 million, correct?

24   A       Yeah, the actual net proceeds were higher then that

25   because $8 million from escrow was paid to MPT to pay off

1  Alecto guaranteed obligations.

2  Q    And is it fair to say that if $8 million was used to

3  pay off an Alecto guarantee obligation owed to MPT that

4  obligation was not listed on other liabilities of $22.7

5  million in the 2020 balance sheet?

6  A    Correct because we wouldn't book guaranteed obligations

7  that are contingent obligations. Those obligations were

8  booked to the subsidiaries that have leases with MPT.

9  Q    Okay.  So, the $15.77 million that Plaza MOB received

10  there is a chart regarding use of proceeds for that as well,

11  right?

12  A    There is and I think this one there are some mistakes

13  in it.

14  Q    So, this says net proceeds of $15.77 million, right?

15        MR. WAXMAN:  I'm sorry, where are you looking?

16        MR. SULLIVAN:  JX-113, page 4.

17        THE WITNESS:  Yeah, I think its $15.769 in change.

18  You are right, Mr. Sullivan.  I see that.

19  BY MR. SULLIVAN:

20  Q    And the heading for this chart is proceeds or uses of

21  proceeds Plaza Medical Office Building LLC, right?

22  A    That is what it says, yes.

23  Q    Okay.  And that $15 million in proceeds was -- the net

24  proceeds was booked as -- was booked to Alecto, correct?

25  A    No, the net proceeds would have been booked to Plaza

1   Medical Office Building LLC.  That is the entity that sold

2   the real estate.

3   Q    Okay.  And from those funds that Plaza Medical Office

4   Building LLC received $10.5 million of that was paid for past

5   due federal and state payroll taxes, balancing remaining,

6   intercompany (indiscernible).

7   A    Yeah, I think that was the one, when I looked at this

8   again, and because CMS had questions, I think those were paid

9   from the Medicare advanced payments that were received rather

10  than this, but the money goes into one or the other that they

11  were using.  There is Sherman/Grayson or pay those

12  (indiscernible).  That would be the one question I have.

13  Q    So, is it fair to say that the $10 million obligation

14  that was paid from the proceeds received by Plaza MOB in

15  August of 2021 did not arise entirely in 2021?

16  A    That is correct, yes.

17  Q    But the balance sheet that we marked as Exhibit 44

18  wouldn't have that obligation listed as an obligation of

19  Alecto?

20  A    Correct. It was not an obligation of Alecto -- it is

21  not an obligation of Alecto, correct.

22  Q    All right.  And then you recall that in January of 2021

23  Alecto was sued by Altera?

24  A    Yeah, the Altera -- I am not sure if they were sued by

25  Altera or LHP, but they were sued by one of those two

**A1521**

1   entities, yes.

2   Q    I am looking for my copy of the complaint.  Hold on one

3   second.

4        So, you're right, LHP Hospital Group was the plaintiff

5   and it sued Alecto and Alecto Healthcare Services Sherman. I

6   believe this was one of the -- and this related to a lease

7   for Sherman/Grayson, right?

8   A    No. It didn't relate to the lease for Sherman/Grayson.

9   It related to office leases for Sherman/Grayson and the POB

10  owned by Altera Highland that LHP had guaranteed, it relates

11  to those leases.  But for Sherman/Grayson, Sherman/Grayson

12  Hospital is the primary obligor.

13  Q    And this was -- I believe that we reviewed this

14  complaint and obligations relating to it when we reviewed the

15  LHP claim in some detail back in December of 2023.  Do you

16  remember that?

17  A    That was the Subchapter V eligibility motion and we

18  spent a long time with the LHP claim, yes.

19  Q    So --

20  A    But that isn't -- the LHP claim doesn't relate to that

21  because that lawsuit was settled for significantly less then

22  what was alleged.

23  Q    So, you settled the lawsuit in 2022, is that right?

24  A    I forget. We spent a long time in December 2023.  I

25  forget when that settlement agreement was entered into.

**A1522**

113

1  Q      I believe it was in January of 2022, but as of -- this

2  lawsuit was filed in the Superior Court of the State of

3  Delaware January 20th, 2021, and in Paragraph 4 it alleges

4  two date LHP has paid $1.9 million in delinquent rent and

5  other charges owing to the buildings management.  LHP now

6  brings this complaint to recover damages suffered as a direct

7  and proximate result in defendant breaching the operative

8  agreement.  I am reading that from the agreement.

9       So, roughly $2 million was owed as of January 1st,

10 2020, but we can confirm that none of that obligation would

11 be shown on the balance sheet under other liabilities,

12 correct?

13 A      Because it was owed by Sherman/Grayson Hospital. Its in

14 Sherman/Grayson Hospital's balance sheet, but not Alecto's

15 balance sheet as it was a contingent liability.

16 Q      But when it was settled in 2022 the payment was made by

17 Alecto, correct?

18 A      No.  The settlement payment was actually made by

19 Sherman/Grayson Hospital is my recollection.  Again, it was

20 either with Plaza or Horizon that Alecto acted as the

21 conduit.

22 Q      Okay.  And Alecto -- it would have been booked on

23 Alecto's general ledger at some point, right?

24 A      It would have been booked as an intercompany advance I

25 believe because the money comes through Alecto's bank

**A1523**

114

1   account.  It would have been booked as –– we didn't book it

2   as an intercompany advance from Plaza or Horizon to Sherman.

3   All the intercompany advances were booked through Alecto.

4   Q    Okay.  So, just doing a little math here with respect

5   to the 2022 other –– I mean the 2020 other liabilities it

6   doesn't include the $19 million that was paid back

7   (indiscernible).

8   A    Yeah, because it wasn't a liability of Alecto.

9   Q    Those include the $2 million that LHP claims it was

10  owed and it doesn't include any of the $10.8 million that

11  remained with respect to (indiscernible).

12  A    Okay. Let's go to the last one first.  So, the

13  withdrawal liability was $10.8 million, but if you read the

14  letter, it specifically says you can pay it over time and its

15  like $2.8 million present value.  Again, that was an Alecto

16  Fairmont liability. The payroll taxes were not an Alecto

17  liability. So, they wouldn't be booked on Alecto balance

18  sheet.  Alecto is different then the other entities. And LHP

19  was disputed.

20  Q    Right.  But none of those things were included on the

21  Alecto balance sheet.

22  A    Correct.  Sherman/Grayson had a cross complaint against

23  LHP for all kinds of parade of horrors.

24  Q    So, I want to also focus on further down there's a

25  line ––

**A1524**

1   A      What number are you looking at, Mr. Sullivan?  I'm

2   sorry.

3   Q      I'm looking at JX-44, still the 2020 balance sheet.

4   A      Okay. If that is what you are looking at, yes.

5           THE COURT:  I'm sorry, Mr. Sullivan, can you say

6   that again?

7           MR. SULLIVAN:  It's the 2020 balance sheet.

8           THE COURT:  Okay.

9           MR. SULLIVAN:  Exhibit 44 and I am asking about

10  the intercompany payable receivables, Your Honor.  Do you see

11  that?

12          THE WITNESS:  I see that, yes.

13  BY MR. SULLIVAN:

14  Q      Do you see that?

15  A      I see that, yes.

16  Q      And do you see for Alecto, at the end of December 2020,

17  the number is $24.7 million, correct?

18  A      Yeah, that is owed to Alecto is $24.7 million.

19  Q      That is owed to Alecto.  And if we look over there is a

20  number for Wilson N. Jones of $13.8 that is owed, right?

21  A      Yeah, but you have to look at Wilson N. Jones as a

22  little bit different to look at because part of that

23  intercompany of Wilson N. Jones is the intercompany between

24  WNJ which is Sherman/Grayson Hospital, then WNJ MD which is

25  Sherman MD Provider and anesthesia which is Sherman

**A1525**

116

1   Anesthesia.  So, money would flow between those entities.  A

2   part of that intercompany is there.  So, I am not sure that

3   $13.8 to me is the net between those numbers on this balance

4   sheet, not overall number owed to Alecto.

5   Q    That is your belief?

6   A    That is my understanding.  I just can look at it from

7   the math because I know what happened and why there was three

8   entities there.

9   Q    So, because its in parentheses that means that is a

10  receivable owed to Alecto and totals $24.7 million.

11  A    Correct.

12  Q    And based on that receivable the calculation of the

13  total liabilities is $3.6 million.  Do you see that?

14  A    Yeah, when you add the numbers up in the liability

15  column, one being a negative number, you get $3.6 million.

16  Yes, I see that.

17  Q    So, I take it that the $3.6 is the difference when you

18  add up the $23.5 million for total current liabilities and

19  the $19.9 million that is listed as receivables for long term

20  liabilities.  You got $3.6 million as your number, right?

21  A    Your math sounds correct, yes.

22  Q    Okay. Now is it fair to say that if the $24.7 million

23  in receivables is entirely uncollectable then you would

24  add -- that would go to zero in terms of valuation and you

25  would add $24.7 million to the $3 to get $27 or $28.3 million

1    in total liabilities, correct?

2    A    No. Its not fair to say that's not correct because you

3    are assuming something that I don't think is fair to assume.

4    That $24.7 is a net number. It was out of the math -- I'm

5    sure your math was right.  I'm not disputing your math, but

6    the assumption in your question is not fair to say.

7    Q    Okay.  Let's take a look at a different balance sheet.

8    Let's start with the one closest to the petition date and

9    that is at Tab K of the binder.

10   A    Okay.  Give me one second.  You said K, Mr. Sullivan?

11   Q    Yes.  And if its hard to read the binder actually has a

12   legal sized version tucked in the folder if that helps.

13              THE COURT:  Thank you.

14              THE WITNESS:  Yeah, let me pull it out because it

15   is kind of small.

16              MR. SULLIVAN:  Your Honor, that is very old

17   school, but that is the best I can do.

18              THE COURT:  I appreciate it.

19              MR. SULLIVAN:  Okay.

20              THE WITNESS:  So, the pullout, Mr. Sullivan, is

21   the enlargement of this one?

22              MR. SULLIVAN:  Yes, it is.

23              THE WITNESS:  Okay.

24              THE COURT:  Just to be clear, its 5818?

25              MR. SULLIVAN:  Its 5818, yes.

**A1527**

 1              THE COURT:  Okay.

 2              MR. SULLIVAN:  Your Honor, for the record I worked

 3  with plaintiff's counsel, I guess the version that we

 4  submitted of 62 of page 5816 in the original joint exhibit we

 5  have -- I realized this and I communicated and we have a

 6  revised version in here. We just need to make sure that the

 7  record is clear that JX-62 should be 5818, not -- because

 8  5816 is not a balance sheet.

 9              So, I don't know whether Your Honor, in the master

10  set of exhibits, has a corrected version of not, but we can

11  take care of that.

12              THE COURT:  Well, bear with me just one second.

13  Its correct in the binder that you handed up today.

14              MR. SULLIVAN:  Yes.

15              MR. WAXMAN:  Your Honor, I don't have 5816 in

16  ours. I do have it in the larger binder, the white binder.

17              THE COURT:  Its 62, correct?

18              MR. SULLIVAN:  Yes.

19              THE COURT:  Bear with me one second.  It should

20  not be what number, 581…

21              MR. SULLIVAN:  It should be 5818.

22              THE COURT:  Correct.

23              MR. SULLIVAN:  5818 is the balance sheet.

24              THE COURT:  Correct.  And not 5816.

25              MR. SULLIVAN:  And not 5816 which is not a balance

 1  sheet.

 2         THE COURT:  Okay.

 3  BY MR. SULLIVAN:

 4  Q    All right. So, Mr. Sarrao, do you have page 2 of Joint

 5  Exhibit 62 in the expanded version in your hand?

 6  A    Yeah, it's the 5818 and I do have that in my hand.

 7  Q    So, this is Alecto's balance sheet as of April 30th,

 8  2023, correct?

 9  A    That is correct.

10  Q    All right.  And I just want to focus entirely for a

11  minute on the intercompany payables and receivables line.  Do

12  you see that?

13  A    I do.

14  Q    All right. So, there is, on the left-hand side of this

15  chart, a WNJ total which is the fourth column in. Do you see

16  that?

17  A    I see that.

18  Q    And is that intended to be the total of the first three

19  columns all relating to the Wilson N. Jones or otherwise

20  known as the Sherman/Grayson Hospital?

21  A    Yeah, the hospital and the two medical groups. If

22  you -- it totals those three numbers together, correct.

23  Q    Okay.  And so the number on April 30th, 2023 is

24  $59,234,935, correct?

25  A    No, I don't -- again, you got to take into account that

**A1529**

1    is intercompany between Sherman/Grayson and Sherman MD.  The

2    number is probably pretty close to that, but less than that

3    because I think at the petition date it was right around $60

4    million. So, I know there was money advanced in May. I don't

5    know the exact number, but that is the one where there is

6    intercompany between the three, but I know that as of the

7    petition date Sherman owed, on the intercompany side, Alecto

8    $60 million.

9    Q    And that is what we just looked at in Exhibit 70,

10   Paragraph 27 of your declaration?

11   A    Correct.

12   Q    This is pretty close.

13   A    Yeah, but I just don't know if they are the exact

14   numbers. I am not disputing the $60 million.

15   Q    I just want you to look at this document.

16   A    Okay.

17   Q    As of April 30th that is what the number is?

18   A    No, I don't think that is what the number was as of

19   April 30th.

20   Q    You think this number is wrong?

21   A    No, I don't think this number is wrong.  What you are

22   asking me is how much did Sherman/Grayson owe Alecto on the

23   intercompany. How we did this conduit thing, how we booked

24   it.  What I am saying is that number includes the

25   intercompany between Sherman MD and WNJ. It's a pretty close

121

1   number, but I don't believe it's the same number.  This

2   number is correct for how they booked intercompany as between

3   themselves, but I don't think its necessarily the same number

4   that Alecto booked on its balance sheet for those advances

5   that it acted as the conduit.

6   Q     All right. I am going to break it down as quickly as I

7   can.  But as I look at the number it was $59.2 million, let's

8   just round it to $59.2 million --

9   A     Okay.

10  Q     -- my understanding is that number is the sum of the

11  three numbers that preceded.

12  A     Correct.

13  Q     And so $31.2, $19.9, and $8 or $8.1, correct?

14  A     Correct.

15  Q     Rough justice -- rough math we get to $59.2, right?

16  A     Correct.

17  Q     Okay.  So, then the next number is the receivable owed

18  to Alecto as of April 30th, 2023, correct?

19  A     Receivable owed to Alecto by all the entities not just

20  WNJ.

21  Q     Right. And that is $35 million, right?

22  A     Correct.

23  Q     All right.  Then the next number is the receivable in a

24  column called "Discontinued Entities," correct?

25  A     Correct.

**A1531**

1   Q     and the three discontinued entities have their own

2   numbers on the right, right?

3   A     Yes.

4   Q     Okay.  And so, the first is Olympia and that is the LA

5   hospital, right?

6   A     Correct.

7   Q     And that is owed $62 million, right?

8   A     That is how its booked, yes.  Correct.

9   Q     And then Fairmont is the West Virginia hospital and

10  Fairmont owed $4.8 million.

11  A     Correct.  Well, again, there is that caveat of they

12  have the intercompany between, but I believe that is correct,

13  yes.

14  Q     And then Ohio Valley owes $33 million, right?

15  A     Correct.  You are reading this chart correctly.

16  Q     But all of those are closed, so those numbers aren't

17  likely to change, right?

18  A     No, not necessarily because Fairmont still has some

19  potential claims for Medicare payments and from the state of

20  West Virginia.  So, does Ohio Valley.  So that could change.

21  Q     And those potential claims assets are they listed

22  anywhere?

23  A     No, they are not -- actually, I think for Fairmont

24  yeah. If you look up supplemental AR for Fairmont.  You see

25  the supplemental AR line in the assets that is what that

1  talks about.  Those are the BEA adjustments.

2  Q     Where is that?

3  A     If you go to assets at the top under Fairmont --

4  Q     Yeah.

5  A     -- and you go to the last line before it says patient

6  accounts receivable --

7  Q     Yeah.

8  A     -- it says supplemental AR.

9  Q     So, that is in the order of $2.3 million.

10  A     $2.3 million, correct.

11  Q     All right. But is it fair to say that the $24.2 million

12  in discontinued operations is simply the sum of the three

13  numbers for the three hospitals that are closed?

14  A     It looks like that is the sum, yes.  I am not -- I

15  don't have a calculator in front of me, but rough math it

16  looks like that is the sum, yes.

17  Q     Okay.  And so, if we are looking at sums, we have three

18  of them: we have $59 million that Sherman/Grayson owes, and

19  Alecto is owed $35 million, and the other hospitals are owed

20  an aggregate of $24 million which adds to $59 million, right,

21  between Alecto and the discontinued operations.  That is what

22  they are owed.

23  A     That total is correct, yes.

24  Q     Right. And all of that is coming from Sherman/Grayson

25  which isn't going to pay anything, right?

1  A     Well, they are going to pay something, but its not all

2  coming from Sherman/Grayson because you have receivables due

3  from Fairmont as well and Ohio Valley.

4  Q     Okay.  But in terms of if the $59 million that

5  Sherman/Grayson owes is actually worth zero then the value of

6  the receivables booked by Alecto and by the discontinued

7  operations of the three hospitals are not what are stated on

8  the balance sheet.

9  A     Well, on April 30th, 2023, if they were zero -- they're

10 not zero, we are going to get something out of that claim,

11 but a lot less than $60 million.  On April 30th, 2023, I

12 think I follow your question, but I'm not sure I exactly

13 follow your question.

14 Q     Okay.  Let's -- let me move to one other exhibit, the

15 prior exhibit in the binder, Exhibit J.

16 A     Okay.

17 Q     So, Exhibit J of the financials for December 31st,

18 2022, which is (indiscernible) got their judgment.  Do you

19 see that?

20 A     I see that.

21 Q     Okay.  And the same format as before, correct.  Look at

22 page 2 of Exhibit 56 and that's the balance sheet for

23 December 31st, 2022.

24 A     Okay.

25 Q     All right.  And is it fair to say that the intercompany

1    payable that the Sherman/Grayson entities owed two other

2    entities at the end of December 2022 was $56.9 million,

3    right?

4    A    Yeah, again, how those numbers are added up it was in

5    that range. I am not saying that's the number, that's what

6    that is reflective, but it was in that range, yes.

7    Q    All right. Then if we flip back to Exhibit 62 it will

8    indicate that that number went form $56.9 to $59.2 in the

9    four months from December 31st to April (indiscernible),

10   right?

11   A    Those two numbers -- your numbers are right, if that

12   number represents.  I know there was money advanced to

13   Sherman, some money came back from Sherman in the period of

14   January 1st, 2022, until the petition date.

15   Q    So, Alecto shows a payable, an intercompany payable, of

16   $32.3 million at the end of December 2022, correct?

17   A    That is correct.

18   Q    And the --

19   A    Actually, it shows an intercompany receivable.  The

20   parens means receivable.

21   Q    I'm sorry.  Thank you.  So, it has an intercompany

22   receivable of $32.3 million which is a couple million dollars

23   less then it became four months later at the end of April of

24   $35 million, right?

25   A    I'd have to go back and look at the end of April, but a

1    little bit less, yes, in December 31st of 2022.

2    Q    And so, again, with respect to Alecto at the end of

3    December 2022, on Exhibit 56, page 2, the balance sheet for

4    the period ending December 31st, 2022, to the extent that the

5    $32.2 million receivable there is due from Sherman/Grayson,

6    that's unlikely to be paid, correct?

7    A    Well, as we sit here today, it's unlikely to be paid;

8    it was less unlikely to be paid on December 31st of 2022.

9    Q    And why is that?

10   A    Because as of December 31st, 2022, it was still

11   operating, we were talking to several different interested

12   parties and we hadn't finalized a transaction with any one of

13   them.  And different parties were talking about different

14   things, including who would keep the AR and, if the AR was

15   kept by Sherman/Grayson, that could have generated revenue to

16   pay down some of that intercompany receivable.

17       The ultimate transaction that was approved by Judge

18   Stickles in the other case doesn't provide for that, but

19   there was a possibility of that in December 31st, 2022.

20   Q    Okay, but you've acknowledged earlier in your testimony

21   that effectively, after the Reed creditors got their

22   judgment, Alecto was insolvent?

23   A    Yeah.  I mean, they got a judgment in the end of

24   November, the judgment wasn't paid in November or December,

25   and the judgment was, I think -- I don't know what the number

```
 1   is now, but it was like 2.9 or $3 million in the end of
 2   December 2022.  And so it wouldn't -- that was a debt that
 3   became due that it didn't pay in November -- whenever the
 4   date of the judgment was.
 5   Q    And do you know if the judgment is included on the
 6   balance sheet for December 31st, 2022?
 7   A    The judgment is not included on the balance sheet.
 8   Q    Okay.  All right.  So can we go back to Exhibit 2,
 9   which is not in my binder?
10   A    Yeah, give me one second because I've got to open --
11           THE COURT:  It is not in your binder?
12           MR. SULLIVAN:  No.
13           THE COURT:  Okay.
14           MR. SULLIVAN:  This is the 2019 balance sheet and
15   financials that Mr. Waxman reviewed with the witness in the
16   morning session.
17           THE WITNESS:  You said Exhibit 2, right,
18   Mr. Sullivan?
19           MR. SULLIVAN:  I did say that.
20           THE WITNESS:  Okay, I have it in front of me.
21           MR. SULLIVAN:  Okay.
22           THE COURT:  Wait, Mr. Sullivan, can you hold on
23   one second?
24       (Pause)
25           THE COURT:  Thank you.  Sorry.
```

**A1537**

128

1           MR. WAXMAN:  Your Honor, as you're finding it in

2  the binder, I would just ask if Mr. Sarrao needs a break to

3  get --

4           THE COURT:  Is now a good time to take a comfort

5  break?

6           MR. WAXMAN:  I'd ask Mr. Sarrao, if he feels

7  comfortable going on, I just wanted to give him the

8  opportunity.

9           MR. SULLIVAN:  I would suggest about ten more

10  minutes and I'll be through this section of this document.

11           THE COURT:  Okay.

12           THE WITNESS:  And I'm fine --

13           THE COURT:  Are you okay?

14           THE WITNESS:  -- I'm fine, that's fine, Your

15  Honor.

16           THE COURT:  Okay.

17           THE WITNESS:  Thank you.

18           THE COURT:  Mr. Sarrao, if you need to stop and

19  need a break, let me know.

20           THE WITNESS:  I'll let you know.  Thank you, Your

21  Honor.

22           MR. WAXMAN:  I mean --

23           MR. SULLIVAN:  No, I appreciate it.

24           THE COURT:  Do you need a break, Mr. Waxman, or

25  can you wait ten minutes?

**A1538**

 1          MR. WAXMAN:  I'm fine.  I just wanted --

 2          THE COURT:  Okay.

 3          MR. WAXMAN:  -- to be sure -- I'm fine.  Thank

 4  you, Your Honor.

 5  BY MR. SULLIVAN:

 6  Q    Okay.  So if we wanted to figure out whether the debtor

 7  was solvent on the day that it transferred the equity of

 8  Sunrise REH to members, that date was June 19th, 2019, right?

 9  That's what it says in paragraph 5 of the Plaza MOB memo that

10  was attached to --

11  A    Yeah, I don't remember without looking at that memo, it

12  was June 18th or June 19th, one of those two days.

13  Q    I'm looking at it right now because I have the benefit,

14  since I'm asking the questions.  I'm looking at Exhibit 96,

15  page 30, June 19th, 2019, Alecto Healthcare Services, LLC

16  transferred 100 percent of the membership interests in

17  Sunrise Real Estate Holdings to the following persons.  Okay?

18  A    If that's what the -- what it's reading and what it

19  says, then that sounds accurate, yes.

20  Q    Okay.  So if we want to determine whether Alecto was

21  solvent on that date, we'd have to look at the column that is

22  headed 19 underscore 6, right?

23  A    Well, yeah, that's what I would look at.  I think you

24  said earlier I wasn't an expert on solvency, but that's what

25  I would look at is 19 underscore 6 is June of 2019.

130

1  Q      Okay.  And so if we skip to the bottom as to all the

2  assets, now that we understand the various categories, it

3  says total assets of 741 million 633 dollars, correct?

4  A      These aren't millions.  These are the actual numbers,

5  Mr. Sullivan.

6  Q      Oh, thank you.

7  A      So 741,000.

8  Q      Okay, 741,633.  Okay.  And then, if we skip down to the

9  bottom, it says total liabilities is 8.75 to the positive,

10 right?

11 A      Correct.

12 Q      And that's based on two things, a positive other

13 liability of 1.36 million, which is on page 4, right?  Do you

14 see that?

15 A      Yes.

16 Q      Do you know what that is?

17 A      I don't.  I'm trying to think of what that is.  It may

18 be some advances to other entities or booked as other

19 liabilities as opposed to intercompany.  I don't know, Mr.

20 Sullivan.

21 Q      Okay.  And then also it's got an intercompany

22 receivable listed as $15.7 million, approximately, right?

23 A      That's correct.

24 Q      Okay.  And so, if that 15.7 receivable number,

25 intercompany receivable number has no value, that would

**A1540**

1   impact solvency analysis, correct?

2   A    You'd have to tell me that, but, yes, it would

3   change  -- it would change the equity number, but I would

4   note that the 8.9 million in capital contributions weren't

5   booked until September of '19, even though they were received

6   in June of '19.

7   Q    All right.  But the 15.7 million, you would agree with

8   me that the $15.7 million number for the intercompany

9   receivables is more -- almost twice what the positive value

10  is for the total liabilities of 8.8 million, right?

11  A    I'm trying to think what -- 8.7 times two would

12  be 17.4?  So whatever that math works out to be.

13  Q    Okay.  So the total equity listed here that you

14  referenced is 9.5 million, right?

15  A    Correct.

16  Q    All right.  But if the $15.7 million number, the

17  intercompany receivable number is of no value then the total

18  equity is actually less than zero?

19  A    No, I would disagree with that.  One, your assumption

20  that it has no value I think is an incorrect assumption.

21  Plus, if you're actually looking in June '19, we booked the

22  transaction in September of '19, but we know in June of '19

23  that Alecto received those capital contributions.  So you

24  would have to add that back into the number.

25  Q    Okay, but the number doesn't include any other

1    contingent liabilities that Alecto may be liable for under

2    guaranties, it doesn't include any liabilities that Alecto

3    may have to pay for unpaid payroll taxes, it doesn't

4    include -- the other liabilities column doesn't include any

5    of those things, right?

6    A    Well, a lot of what you just referred to were

7    liabilities of other entities, not Alecto, and you have the

8    guaranty obligations that are contingent and they hadn't --

9    they didn't need to be booked because they weren't at risk of

10   being payable on those guaranties.

11   Q    And that's -- you didn't book them because, to the

12   extent that you had guaranties, you weren't booking any

13   liabilities of the subsidiaries regardless of whether they

14   could pay or not pay?

15   A    We didn't book the liabilities of subsidiaries on

16   Alecto's books because they were separate legal entities.

17   Q    Okay.

18   A    The likelihood of the guaranties -- many of the

19   guaranties were minimal, if at all, in June of '19.

20          MR. SULLIVAN:  Your Honor, this is probably a good

21   time to take a short break.

22          THE COURT:  Okay, let's take a ten-minute break.

23   Mr. Sarrao, please do not speak to anyone about your

24   testimony, and we'll resume when we come back in.

25          So we'll start back up at 2:32; is that

**A1542**

 1  sufficient?

 2              MR. SULLIVAN:  Yes, Your Honor.

 3              THE COURT:  We're in recess.

 4        (Recess taken at 2:22 p.m.)

 5        (Proceedings resumed at 2:31 p.m.)

 6              THE COURT:  Please be seated.

 7              MR. WAXMAN:  Your Honor, I've spoken with the

 8  other parties and nobody intends -- including the debtors

 9  intends to recall Ms. Gould.

10              THE COURT:  Okay.

11              MR. WAXMAN:  So, unless Your Honor has any

12  questions, I would ask that she be dismissed.

13              THE COURT:  I do not.  Ms. Gould, you are

14  dismissed.

15              MR. WAXMAN:  Thank you, Your Honor.

16  BY MR. SULLIVAN:

17  Q    Mr. Sarrao, before we move off of the issues of -- that

18  related to the debtor's financial condition, can we take a

19  look at JX-1, which is the 2019 tax return?

20  A    Yes.  Is there a particular page, Mr. Sullivan?  I know

21  it's really thick.

22  Q    Yeah, I want you to start on page 6 of the exhibit.

23  A    So the JX-1.006?

24  Q    Yes.

25  A    Okay.

1    Q      So the -- I want to refer you to line 22 of the

2    Form 1065, that is JX-1, and that's the line that says

3    ordinary business income or, in parentheses, loss, correct?

4    A      Yes.

5    Q      All right.  And the number listed there is $49,100,099,

6    in the negative, meaning a loss, right?

7    A      That's correct.

8    Q      All right.  And that's not an individual loss as to

9    Alecto, is it?

10   A      No, that includes the K-1s that Alecto would receive

11   from its subsidiaries, which are line -- which are up in line

12   item 4 under income.

13   Q      Okay.  So the subsidiary portion of that is identified

14   on line 4 as negative 48 million and the debtor's portion is

15   negative 49 -- or the total portion is negative 49 million,

16   including the debtor, right?

17   A      Correct.

18   Q      Okay.

19   A      From a tax perspective, yes --

20   Q      Understood.

21   A      -- but it's not really the debtor's income because it

22   gets passed through to the members.

23   Q      I understand.  So can I then turn you to paragraph -- I

24   mean page 9, JX-1.009.

25   A      Okay.

1  Q     And this is Schedule K and it says partner's

2  distributed share items.  Do you see that?

3  A     I see that.

4  Q     And after certain items at row 14-A, there's net

5  earnings or loss from self-employment, and that's negative 44

6  million.  Do you see that?

7  A     Yeah, that negative 44,190,084 is what shows up in the

8  K-1 to the members.

9  Q     All right.

10 A     That's what gets passed through.

11 Q     Okay.  And so for the K-1, can we take a look at the

12 K-1 for Alecto itself, and that's at page JX-1.010.

13 A     Okay.

14 Q     And do you see that?  That says, at the bottom left,

15 current year net income or loss, and it says negative

16 $2,454,021, correct?

17 A     Yeah, but this isn't for Alecto itself, this is for Mr.

18 Duper (phonetic).  And there's a mistake there that was

19 corrected in 2020 because, in 2019, the expectation was that

20 Mr. Duper was going to withdraw his interest in Alecto.  But,

21 yeah, you take the percentage Mr. Duper had times that 48

22 million.

23 Q     Okay.  So then -- I'm sorry, is there a different K-1

24 for Alecto itself?

25 A     No.  Each of the members get a K-1.  So --

1   Q      Okay.

2   A      -- if you look -- like we can look at my K-1.  Let me

3   just go back.

4          (Pause)

5   A      Give me one second, Mr. Sullivan.

6          (Pause)

7   A      So my K-1 is at JX-1.063.

8   Q      Okay.  So your K-1 shows a loss of negative 3.45

9   million?

10  A      Yeah, which is generally -- my percentage interest is

11  seven percent times that overall loss, and then there's

12  certain reconciliations that get added back in or taken away.

13  Q      Okay.  Now, earlier you looked at the balance sheet

14  contained within the tax return with your counsel; do you

15  recall that?

16  A      Yeah, I'm just trying to find the page -- yeah, okay,

17  JX --

18  Q      Page 10.

19  A      Yes.

20  Q      All right.  And so I think you referred to the number

21  of the partners' capital accounts $18,671,358.  Do you see

22  that?

23  A      I see that.

24  Q      And that's what you referred to when you said the

25  debtor was solvent, right?

1   A       One of the things, yes.

2   Q       So the difference between the prior year and the

3   current year for the capital accounts is roughly 8.5

4   million -- 18.5 million, right?  It's at the end of 2018, it

5   was 10,095,179, and then, at the end of 2019, it was

6   $18,671,358, right?

7   A       So I view that as roughly 8.4 million and change.

8   Q       All right.  And is that the equivalent of the capital

9   contribution that the members made to Alecto as a result of

10  the Sunrise REH transaction in June of 2019?

11  A       I don't know if it's the exact number, but the capital

12  contributions in '19 were that 8.477 million, I think was the

13  number.

14  Q       Right.  And so that's the capital contribution that

15  came in to Alecto and the next day was transferred to

16  Olympia -- to Olympia (indiscernible) --

17  A       Correct, assuming what you're saying is correct on the

18  bank statements, that it came in to Alecto, then got

19  transferred to Olympia, which I believe is correct, rather

20  than just getting transferred directly to Olympia, but that's

21  that 8.477 million.

22  Q       Okay.

23  A       And, again, I haven't done the math, but it looks

24  roughly to be that number.

25  Q       All right.  So then let's go up to line 8, it says

**A1547**

138

1 other investments, and it says in parentheses, attach

2 statement.  Do you see that?

3 A    I see that.

4 Q    And it says statement 14 and, with respect to other

5 investments, from the end of 2018 to the end of 2019, that

6 number jumped from 15.67 million to 25.48 million, correct?

7 A    That number went up, yes.

8 Q    In the amounts that I've just stated, roughly?

9 A    Yeah, it went from 15.67 million to 25.48 million, yes.

10 Q    Okay.  So let's take a look at what statement 14 is,

11 and if you can refer to JX-1.036, please.

12 A    Yes.

13 Q    Do you see in the middle of that page it says, Schedule

14 L, other investments, statement 14, right?

15 A    I see that, yes.

16 Q    All right.  And that's the section of the tax return

17 that records the intercompany receivable owed to Alecto,

18 right?

19 A    I'm not sure it's the section of the tax return, but

20 statement 14 for Alecto's tax return references the

21 intercompany receivable.

22 Q    That's what it says on the left, description of

23 intercompany receivable, right?

24 A    Agreed.

25 Q    And at the end of the tax year that intercompany

**A1548**

1  receivable was $25,489,819, right?

2  A    That's what's reported here, yes.

3  Q    And that's what's also reported back on JX-1, page 10,

4  row 8, right --

5  A    That's --

6  Q    -- the same number?

7  A    The same number, yep.

8  Q    All right.  And that number exceeds the value set forth

9  for the partner's capital account in line 21 at the end of

10 2019 by approximately $7 million, right?

11 A    Twenty -- that seven million sounds about right, I

12 haven't done the math.

13 Q    Okay.  So if the $25.4 million number turns out to be

14 not valued at that level that would impact the partner's

15 capital accounts, correct?

16 A    If that number is -- if it was higher or less, there

17 would be a difference because those numbers -- it's a sum of

18 numbers.  So, just from a mathematical proposition, it would

19 be different.

20 Q    Okay.  Let's move, mercifully, to a different topic.

21 A    Okay.

22 Q    Earlier, we referenced the Plaza MOB summary that was

23 attached to the Gould report as Exhibit 1, the Gould report

24 being JX-96.  Do you remember that?

25 A    Yeah, that was the -- it had like the 15 paragraphs in

**A1549**

1   it, Mr. Sullivan?

2   Q     That's correct.

3   A     Okay.

4   Q     And you were in court during the testimony yesterday,

5   correct?

6   A     I was.

7   Q     And Ms. Gould testified that she conversed with you in

8   connection with preparing her report.  Do you recall that?

9   A     I recall conversing with Ms. Gould and I recall her

10  saying that, yes.

11  Q     And you recall conversing with Mr. Balasiano about the

12  Gould report, correct?

13  A     Yes.

14  Q     All right.  Did you have an opportunity to review a

15  draft of the Gould report before it was presented to Mr.

16  Balasiano?

17  A     I don't believe so, no.

18  Q     Okay.  So, once it was provided to Mr. Balasiano, were

19  you provided a copy to aid in the conversations that you had

20  with Ms. Gould and Mr. Balasiano about it?

21  A     Ms. Gould asked me questions about different things

22  that ultimately made it into the Gould report.  Mr. Balasiano

23  asked me different questions that were in that report.  I

24  don't think it was like a line-by-item -- line-by-line -- and

25  I don't know when I received the Gould report, but I do know

1   that they asked me questions and subsequently, looking at it

2   now, that were in the report, but that was between

3   Mr. Balasiano and Ms. Gould.  I gave them all the information

4   we had and I answered all their questions, but I tried to

5   stay out of that process.

6   Q    Well, when Mr. Balasiano said he had conversations, the

7   conversations, to the extent it wasn't with his own counsel,

8   it would have been with you, right?

9   A    I had conversations with Mr. Balasiano -- I think I'm

10  saying his name right -- yes.

11  Q    Okay.  And do you recall that the Gould report was

12  attached to the plan that was filed on October 9th?

13  A    I do recall that.

14  Q    And is it fair to say that you reviewed the Gould

15  report before it was filed on the docket as an attachment to

16  the plan?

17  A    I would have reviewed the plan when it was filed and I

18  probably reviewed the Gould report, but I don't think I went

19  line-by-line through the report.

20  Q    Did you ever have any comments or did you ever contact

21  Ms. Gould to say that she made an error in her report?

22  A    I had a disagreement about her reasonably equivalent

23  value conclusion because I think it misses -- omits some

24  other facts, but I didn't have any disagreement -- I didn't

25  go through like the numbers of her thing.  I think there was

1  one minor error.  It makes it sound like I earned wages from

2  Alecto and it was actually my 18-year-old son worked for the

3  summer for like a month, that kind of thing, but I don't

4  think I substantively went through line-by-line.  Again, I

5  didn't see that was my role.

6  Q     Okay.  And the Gould report has never been amended,

7  right?

8  A     I don't believe it's ever been amended, no.

9  Q     So, to the extent that you had a disagreement with her,

10 she declined to change the report?

11 A     Yeah.  I didn't really disagree with her.  I think I

12 pointed out that there's a reference to wages in the report

13 and it says M. Sarrao, like $1400 or $1800, and I kind of

14 laughed because it wasn't me and I know it's my son, who has

15 the same first initial.  I think I mentioned that to her.  It

16 was more of a joking thing than anything.

17 Q     Okay.  So earlier we went through the sequence of

18 events with respect to the Plaza MOB transfer -- I should say

19 Sunrise MOB transfer, and then the transfer of the asset back

20 to Alecto.  Do you recall that?

21 A     I recall going through it, yes.

22 Q     All right.  So the Gould report indicated that the

23 Plaza MOB property had an appraised value of $50,700,000,

24 right?

25 A     Yes, taken from an appraisal that I gave to Ms. Gould.

143

1   Q    Okay.  And you don't disagree with that value?

2   A    Well, it's an appraisal, appraisals are never perfect.

3   So --

4   Q    Okay.  All right.  And then with respect to the

5   transfer itself in June of 2019, Ms. Gould indicates -- and

6   let's -- why don't we refer to her report so that we can be

7   clear.

8   A    What number is it, Mr. Sullivan?

9   Q    96.

10       (Pause)

11  Q    Page 2.

12       (Pause)

13  A    You said 96, Mr. Sullivan?

14  Q    Yes, Joint Exhibit 96.

15  A    Give me one second because I grabbed the wrong number

16  here.  And what page was it?  I'm sorry.

17  Q    Page 2.

18  A    So JX-96.002?

19  Q    Yes.

20  A    Okay.

21  Q    Well, I should say this, I'm sorry.  The copy I'm

22  holding doesn't have the JX numbers at the bottom, but --

23  A    Page 2 of the report?

24  Q    Page 2 of the report, findings and observations, the

25  first bullet point, and then findings, right?

**A1553**

1   A      I see that.

2   Q      And the first finding that Ms. Gould makes with respect

3   to the June 2019 transfer of Sunrise REH and Plaza MOB she

4   says was completed without receiving reasonably equivalent

5   value based on the fact that there was an appraised value of

6   over 50 million, and that was greater than the loan payoff

7   and capital contributions received of over 28 million.  Do

8   you see that?

9   A      I do see that.

10  Q      All right.  And that's where we came up with the $22

11  million figure as to the value that was not received?

12  A      Yeah, and I disagree with that, but I know that's how

13  you came up with the numbers, yes.

14  Q      Well, it's not me that came up with the numbers, she

15  came up with the numbers, right?

16  A      Yeah, and you went through it with her yesterday, yes.

17  I disagree with the value part of it.

18  Q      Okay.  And then, with respect to the transfer back, she

19  says the assets were sold in 2021 for over 58 million, which

20  is an increase in value of approximately eight million,

21  correct?

22  A      They were actually sold for 58.5 million, so it would

23  be an increase in value of 8.5 million.

24  Q      Okay.  But at the time the property was transferred,

25  the mortgage on it was $20 million and at the time it was

1  sold it was $30 million, correct?

2  A    Yeah, and in between that time, Alecto got back $9

3  million, so they got -- but I agree, at the time it was

4  transferred back, the mortgage was $30 million, yes.

5  Q    So the equity, which is the purchase -- or the sale

6  price, less the mortgage, that was transferred back was 28.5,

7  right?

8  A    If you just took those two numbers, correct, yes.

9  Q    And when it was transferred, it was 50,700,000, less 20

10 million on the loan, so it was $30,700,000 --

11 A    But you're forgetting about --

12 Q    I'm talking about value above mortgage; that's all I'm

13 talking about.

14 A    If all you're doing is adding two numbers together,

15 subtracting one number from another, your math is right, but

16 you're omitting an important fact.

17 Q    Okay.  I'm not interested in what I'm omitting.  I need

18 you to answer my question.

19     If you're talking about the value of the equity

20 transfer -- equity in the property that was transferred to

21 Sunrise REH, that value was 30 -- approximately 30.7 million

22 and when it was transferred back, it was approximately 28

23 million.

24 A    If you're calculating that based on your two

25 calculations, your math is correct.  I disagree with it, but

1  your math is correct.

2  Q    Okay.  So let's go.

3          MR. SULLIVAN:  I think when we reviewed the Plaza

4  MOB summary, we stopped short of the transfer back.  We just

5  reviewed the transfer there.  So can we go to the Plaza MOB

6  summary that's provided (indiscernible).

7          THE WITNESS:  Is that in your notebook,

8  Mr. Sullivan?

9  BY MR. SULLIVAN:

10  Q    Yeah, Tab H, and it's a subset of the Exhibit 1, but

11  it's probably easier if you look at it in my notebook at

12  Tab H.

13  A    Okay.

14  Q    So we're going back, Joint Exhibit 96, and this is the

15  three-page Plaza Medical Office Building summary.

16      Do you see that?

17  A    I see that, yes.

18  Q    So, I think the important paragraph here is

19  paragraph 15.

20  A    Okay.

21  Q    So let's start with paragraph 14.  Paragraph 14

22  indicates that the interest in Sunrise MOB Holdings, which

23  was the ultimate owner of the Plaza MOB, was transferred back

24  to Alecto on January 1st, 2021, right?

25  A    That's correct.

1   Q      And then the Plaza MOB sold the medical office building

2   and parking garage to a reseller, effective August 31st,

3   2021, eight months later?

4   A      That's correct.

5   Q      All right.  And that's paragraphs 14 and 15, right?

6   A      That's correct.

7   Q      Okay.  And the second sentence of paragraph 15 says:

8             "Except for obligations to Wells Fargo Bank NA,

9   MPT Olympia and obligations of the lessor under office

10  leases, including two security deposits."

11            Plaza MOB has no creditors or liabilities as of

12  August 31st, 2021, correct?

13  A      Correct, that's what it says.

14  Q      All right.  And then it says that Wells Fargo Bank and

15  MPT Olympia were paid in full through escrow and based on the

16  Regent's assumption of the leases, effective August 31st,

17  2019, Plaza MOB has had no creditors since August 31st, 2021,

18  right?

19  A      Yeah, there's a typo there; it should say "2021,"

20  instead of "2019," but yes, that's what it says.  It's just a

21  typo.

22  Q      Well, yes.

23  A      It should say "2021"; it's a typo.

24  Q      The assumption of the leases occurred in 2021?

25  A      At the closing, yes; August 31st, 2021.

1   Q     Okay.  Now, with respect to that transaction, Ms. Gould

2   says back on page 2, the first bullet point under "findings

3   and observations," findings, it says:

4               "No consideration was given to the Alecto members

5   for the transfer and Alecto received proceeds from the sale

6   of over 15 million."

7         Right?

8   A     Correct.  They actually received more than that, but

9   okay, yes.

10  Q     Well, that's what she reports?

11  A     That's what she says.  You read it right, correct.

12  Q     Okay.  And if we want to be specific about it we can go

13  to page 10 of the report, right?

14  A     Okay.

15  Q     Page 10 of the report at the bottom of this paragraph,

16  it says:

17              "On August 31st, 2021, the final closing date, the

18  Plaza real property was sold to UCLA for $58,500,000."

19        Right?

20  A     Yes, that's what it says.

21  Q     And then it talks about what was done with the proceeds

22  from the sale in the next sentence.

23  A     Yes.

24  Q     And the following sentence says:

25              "Net proceeds of $15,769,770.21 were deposited

**A1558**

1    into Plaza MOB bank account Number 2120."

2        Correct?

3    A    That's what it says, yes.

4    Q    Okay.  Now let's take a look at the bank account that

5    she references in her Footnote 61.

6    A    Okay.  What exhibit number, Mr. Sullivan?

7    Q    Go to my index, Tab B.  So it's Exhibit 102.

8    A    So the statements starting July 1 of 2021?

9    Q    Yes.

10   A    Okay.

11   Q    So the first page marked JX-102, page 1, shows at the

12   end of July 2021, the Plaza MOB account had $852,097.34,

13   right?

14   A    That's correct.

15   Q    And if you turn to page 3, you have the first page of

16   the statement from August of 2021 and it shows at the bottom,

17   a deposit on August 31st, of $15,769,770.21, correct?

18   A    That's correct.

19   Q    And the transaction details says it's from First

20   American Title Insurance Company, which is the title agent

21   for the closing, right?

22   A    They were the escrow and title agent for the closing,

23   yes.

24   Q    And so any balance at the end of August on the Plaza

25   MOB account is $16,711,742.40, right?

1    A    That's what the statement says, yes.

2    Q    Now, let's turn to page 5.  It looks like there was

3    some further funds added to the Plaza MOB account on

4    September 9th and you have $918,000, correct?

5    A    That's correct.

6    Q    And so the ending balance at the end of September is

7    $17,478,932.28?

8    A    That's correct.

9    Q    And with the additional $918,435.35, was that related

10   to the closing, as well?

11   A    Yeah, my recollection is that's related to the old

12   lender had a reserve on the old loan and when it got paid off

13   and it got processed and it got released.  It's related to

14   the loan being -- that's not the old lender -- but the lender

15   that Wells Fargo, there was reserves and they returned those

16   reserves because the loan had been paid off.

17   Q    Okay.  And let's look to the last page at 102, page 10,

18   and it shows an ending balance of $17,456,778.05, right?

19   A    That's right what the statement says, yes.

20   Q    Okay.  And that's an indication that the proceeds that

21   Plaza MOB had received had not yet been distributed out of

22   the Plaza MOB account, right?

23   A    Yeah, it shows that the -- that's what the balance was

24   at the end of the year, which including the 15 million, plus

25   receipts.  But I would say, the proceeds that Plaza MOB would

**A1560**

1   have received, that 8 million that's paid through escrow,

2   have benefited Alecto.

3   Q    Okay.  That's not in this account.  We're not talking

4   about anything, other than what's in this account?

5   A    Okay.  That's fine.

6        In this account at the end of December 31st, there was

7   a $17,456,000-plus number you referenced.

8   Q    Okay.  And let's turn to the next exhibit at Tab C,

9   which is the bank statements for 2022.

10  A    Okay.

11  Q    And that's JX-101, and I'm on page 1.

12       Do you see that?

13  A    I do.

14  Q    Okay.  And do you see it starts with the same beginning

15  balance, but there are two large payments that were made on

16  January 6th of 2022.

17       Do you see that?

18  A    I see that.

19  Q    Okay.  And there was one payment in the amount of

20  $5,795,235.92; do you see that?

21  A    I do.

22  Q    And then the same day, there was another payment of

23  $3,892,498.92, right?

24  A    Yes.

25  Q    And the recipient of that second payment was Mr. Reddy,

1    correct?

2    A      He was not the recipient of that payment.

3           Wells Fargo was the recipient of that payment to pay

4    off the loan that Mr. Reddy had made to the debtor, but it

5    was paying off his credit line at Wells Fargo, which is where

6    the funds came to provide the loan to the debtor.

7    Q      Okay.  So I guess, if you want it be technical, the

8    funds went to Wells Fargo in an account that belonged to

9    Mr. Reddy?

10   A      No, they went to Wells Fargo to pay down a line of

11   credit that Mr. Reddy had with Wells Fargo.

12   Q      Okay.  So it was Mr. Reddy's line of credit that got

13   the payment?

14   A      Well, Wells Fargo got the payment that was credited to

15   Mr. Reddy's line of credit.

16   Q      Okay.  And let's take a look at how that payment was

17   recorded on the general ledger.

18   A      Okay.

19   Q      So I want to refer you to Tab F --

20   A      Tab F?

21   Q      -- of this binder.

22   A      Okay.

23   Q      And if you see there's an expanded 11-and-a-half-by-17,

24   so you can actually see the individual entities.

25          Do you have that?

**A1562**

1    A      I see that.

2    Q      Okay.  So this is a blowup of JX-110 and the reference

3    in the bottom, left-hand corner is to the 2022 general

4    ledger.  It's an excerpt and it identifies the rows and it

5    was produced by Alecto as Alecto 59070; do you see that?

6    A      I see it's an excerpt and I see the reference there.  I

7    don't see the whole general ledger, but okay.

8    Q      Right.  Did you have an opportunity to review this

9    exhibit before today?

10   A      I looked at it last night, but I haven't compared it to

11   the full general ledger, so I don't know if your excerpt is

12   correct or not.

13   Q      Okay.  Do you know if your counsel did that?

14   A      Well, whatever I talk to my counsel about would be

15   privileged, so you'd have to ask my counsel.

16   Q      I didn't ask for conversation --

17   A      Well --

18   Q      -- I asked if you know your counsel reviewed this,

19   whether this is accurate or inaccurate?

20   A      Any knowledge that I would have about what my counsel

21   reviewed would be from communications with my counsel, so

22   that would be privileged.

23   Q      Are you aware if your counsel objected to this excerpt

24   as not being what it purports to be?

25   A      I think Mr. Waxman would have to respond to that,

154

1  Mr. Sullivan.

2  Q    No, I asked if you were aware if Mr. Waxman had raised

3  an issue?

4  A    Any -- my awareness of what Mr. Waxman may or may have

5  not done, other than in this courtroom, is through privileged

6  communication with Mr. Waxman.  I'm not waiving the

7  privilege.

8           MR. WAXMAN:  Your Honor, this is just not going

9  anywhere.  It's argumentative.  I would just ask that we move

10  past this.  I'm not sure where Mr. Sullivan is going with

11  this.

12           MR. SULLIVAN:  Well, what I'm trying to do is make

13  sure that some -- at the end of the testimony, I'm not going

14  to get a contention that this exhibit is inaccurate.  So let

15  me just reference for the record that, so that we're clear,

16  looking at -- we're looking at JX-110, Exhibit F, the

17  rows 2232 to 2256 of the general ledger are --

18           MR. WAXMAN:  I'm sorry, did you say JX-110 or

19  (indiscernible)?

20           MR. SULLIVAN:  JX-110, we're looking at 2022,

21  okay.

22           MR. WAXMAN:  I have it.

23           MR. SULLIVAN:  So the line item rows that are

24  included on this excerpt are directly from what's here on the

25  ledger.  The summary at the bottom is not from the general

**A1564**

1  ledger, but was added by my firm, so for purposes of this,

2  we're going to ignore that.

3          MR. WAXMAN:  Your Honor, I think we need the

4  opportunity to look at what was actually produced to

5  Mr. Sullivan and confirm.  If this is accurate and came in

6  from what was produced by the debtor, we certainly are not

7  going to stand on ceremony and argue, but we certainly need

8  to look at what the underlying document was.

9          THE COURT:  Do you have the underlying document to

10 look at?

11         MR. WAXMAN:  I think we have a backup in our

12 office.  I don't have the underlying document with me here

13 today, but certainly, we'll take a look, and if it's correct,

14 we're certainly not going to argue about it.

15         MR. SULLIVAN:  Your Honor, then, what I would

16 suggest is that I continue with the testimony.  This excerpt

17 was provided last Friday.  There's been plenty of time to

18 look at the excerpt and do a quick comparison.  If they want

19 to do it after fact and comment, that's fine, but I need to

20 be able to continue my testimony, my questions here.

21         MR. WAXMAN:  We're going to have a copy, so we'll

22 take a look at it.

23         MR. SULLIVAN:  I have a computer with a copy of

24 it, if you don't object.

25         MR. WAXMAN:  Can we take a five-minute break?

1              THE COURT:  Five minutes?  Okay.

2              Let's take until a quarter after 3:00.

3              And Mr. Sarrao, again, your --

4              MR. SULLIVAN:  You know what?  I'm sorry, Your

5     Honor.  On the computer, I have a PDF, so I don't have the

6     full general ledger on my computer (indiscernible).

7              MR. WAXMAN:  Then why don't we take 10 minutes and

8     we'll get somebody to send it over from our office?

9              THE COURT:  Okay.  All right.

10             And you are under oath.  You're not to speak to

11    anybody about your testimony.

12             THE WITNESS:  I understand, Your Honor.  Thank

13    you.

14        (Recess taken at 3:07 p.m.)

15        (Proceedings resumed at 3:22 p.m.)

16             THE CLERK:  All rise.

17             THE COURT:  Please be seated.

18             MR. WAXMAN:  Your Honor, we haven't had a chance

19    to review them, but we're willing to proceed.  We don't want

20    to hold things up and we want to be able to close today, Your

21    Honor.  With that, (indiscernible) give you and I'm sorry for

22    the interruption.

23             THE COURT:  No worries.

24             Mr. Sullivan?  We're on JX-110.

25             MR. SULLIVAN:  Thank you.

**A1566**

157

```
 1                    RECROSS-EXAMINATION (Continued)

 2  BY MR. SULLIVAN:

 3  Q      So, getting back to where we were, let's orient

 4  ourselves.

 5         You're familiar with the debtor's general ledger?

 6  A      I am familiar with the debtor's general ledger, yes.

 7  Q      And are you familiar that in 2022, the debtor included

 8  a subledger, headed "Intercompany Plaza MOB"?

 9  A      Yeah, we had intercompanies for the different entities.

10  I believe one was Plaza MOB, yes.

11  Q      Okay.  All right.

12         And so, do you see where it says Intercompany Plaza MOB

13  on the upper left, about six rows down from the top?

14  A      I do see that.

15  Q      And is it fair to say that the general ledger that is

16  maintained by Alecto in the ordinary course of its business,

17  also includes columns account name, date, transaction type, I

18  don't know what "number" is -- check number, name, memo

19  description, split, amount, and balance?

20  A      Yeah, the "number" is referring to journal entry

21  numbers, Mr. Sullivan, so...

22  Q      Okay.  All right.

23         And so with respect to the subledger for intercompany

24  obligations as between Alecto Plaza MOB for 2022, Exhibit 110

25  indicates that the amount that Alecto owed to Plaza MOB was
```

**A1567**

1    $216,400.97, correct?

2    A      Well, I would -- for that specific account, but as you

3    know, kind of almost at the bottom, there's also that loan

4    for the 8 million.  But for that specific Intercompany Plaza

5    MOB account, the balance, assuming this tracks the numbers on

6    the full general ledger, it reads $216,400.97.

7    Q      Okay.  And that's what my questions are going to refer

8    right now to the Plaza MOB intercompany (indiscernible)?

9    A      What I'm looking at; yes, I understand that.

10   Q      Okay.  And we can check the continuation from the

11   general ledger that was produced for the prior year

12   at JX-109, do you see that, it's the prior tab, Tab E?

13   A      Well, yeah, for that specific account, yes.  It carries

14   through as $216,497 and then it starts in the following year,

15   yes.

16   Q      Okay.  All right.

17          So the first entry on the general ledger for 2022 for

18   the subledger Intercompany Plaza MOB is a journal entry dated

19   1/31/2022 in the amount of $3,892,498.92.

20          Do you see that?

21   A      I see that, yes.

22   Q      Okay.  And the reference to that is "WF," which I

23   understand to be Wells Fargo, loans paid off by Plaza MOB on

24   1/6/22, right?

25   A      That's correct.

**A1568**

1    Q    Okay.  And that's the item that we referenced on the

2    bank statement, which we looked at just before we started

3    looking at the general ledger of the payment to Wells Fargo

4    for Mr. Reddy's line of credit, right?

5    A    Well, yeah.  It was paid -- the payment was to pay off

6    the loan that Mr. Reddy had made to Alecto or the Reddy

7    Investment Trust had made to Alecto, and that was paid off by

8    paying off the line of credit.

9        But that's the same thing we're referring to on the

10   bank -- this entry on the general ledger and the bank

11   statement are referring to the same thing.

12   Q    Right.

13       And so the bank statement, for the record, that we were

14   looking at was Exhibit 101, page 1, and that's at Tab C of

15   the binder.

16       So Alecto got benefit from that payment because when

17   that payment was made by Plaza MOB, Alecto no longer owed

18   Mr. Reddy those funds that Alecto had borrowed from

19   Mr. Reddy?

20   A    Correct.

21   Q    Okay.  Now, I want to refer back to Exhibit 101, page 1

22   for the other payment in the amount of $5.79 million or

23   roughly $5.8 million.

24       Do you see that?

25   A    I see that.

**A1569**

1  Q     Okay.  Now, refer to Exhibit 110, you see there's no

2  corresponding entry on the Intercompany Plaza MOB subledger.

3        Do you see that?

4  A     From what I'm looking at, yes; I would agree there's no

5  entry for that.  I know what that is for and there's no entry

6  for that.

7  Q     Okay.  So according to the intercompany ledger that

8  Alecto maintained in the ordinary course of business, that

9  payment was not -- did not create a payable by Alecto to

10 Plaza MOB?

11 A     Well, that's what I'm not sure about the excerpt of the

12 general ledger, because I think I saw an entry for that,

13 maybe in a different account.

14       I know what that payment is for and that should create

15 a payable from either the affiliates that it was paid for the

16 benefit of or for Alecto.  So that's why I had a question

17 about the excerpt, Mr. Sullivan.

18 Q     Okay.  So you're indicating, though, that those funds

19 were paid for the benefit of affiliates?

20 A     Correct.

21       Those were -- I know who Holtz, Slavett & Drabkin is; I

22 know who they are and I know what the payment was made for

23 and I know it's a law firm and I know where that money went

24 after they received it.

25 Q     Okay.  And where -- what are the answers to those

**A1570**

1  questions?

2  A    Well, Holtz, Slavett & Drabkin was tax attorneys and

3  that was used -- that money, I believe -- well, I don't

4  believe, I know, paid certain payroll taxes owed by Ohio

5  Valley Medical Center and Fairmont Regional Medical Center.

6        So they were applied correctly, but Holtz, Slavett &

7  Drabkin actually issued the payments from their client trust

8  account, so they were applied correctly to the balances.  If

9  you just send the money to the IRS, they don't apply it

10 correctly.

11 Q    Okay.  And -- but does either company account as

12 between Alecto and Plaza MOB does not show that that payment

13 was for the benefit of Alecto?

14 A    What you're showing me right now, it doesn't show that.

15 I believe someplace in the general ledger of that account,

16 that payment is reflected, but from what you're showing me, I

17 agree, there's no entry for that on this JX-110.

18 Q    Okay.  So the -- when we're looking at the entries on

19 this general ledger of JX-110, you see that there are some

20 entries that are listed in parentheses as negative numbers,

21 correct?

22 A    I see that.

23 Q    And those negative numbers work to reduce the balance

24 of this ledger, right?

25 A    Yes, it does.  If it's negative, it would mean money

1  coming into Plaza and then there'd be a benefit from that.

2  Q     All right.  And so with respect to, for example,

3  there's an entry, a couple of entries in April for registered

4  agent fees, do you see those, about six lines down?

5  A     Yeah, the payment -- there's a payment, I think.

6  Q     And those are payments made to the Corporation Service

7  Company, actually, it's June 3rd and June 21st?

8  A     Yeah, I see those two payments.

9  Q     Okay.  And those are in the negative and they reduced

10 the balance that Alecto owed to Plaza MOB, right?

11 A     Correct.

12       They were -- those payments were made by Alecto from

13 the one statement for those two entities and then they got a

14 credit against the balance they owed Plaza MOB.

15 Q     Okay.  And then in -- I want to refer you to an entry,

16 July 31st of 2022.

17       Do you see that entry?  The description of the entry is

18 "funds wired to PMOB on 7/22/22"; do you see that?

19 A     I see that.

20 Q     And it's even, the amount of a million dollars,

21 correct?

22 A     Yes.

23 Q     And is it fair to say that in July of 2022, Alecto

24 began using the Plaza MOB bank account as a place to transfer

25 excess funds?

**A1572**

1    A      No, that's not fair to say.

2    Q      Okay.  But what was the purpose of, at the time in July

3    of '22, Plaza MOB had no assets, correct?

4    A      No, it has assets; it had cash.

5    Q      It had a bank account?

6    A      It had a bank account and it had receivables -- it had

7    a receivable, so it had assets, yes.

8    Q      Okay.  It was -- the parking garage that -- or, I'm

9    sorry -- the medical -- the medical office building entity

10   had been sold the year before?

11   A      Correct, it did not own the parking garage or the

12   medical office building.  But you said, "no assets."  It had

13   assets.

14   Q      All right.  So the assets that -- and we looked at the

15   fact that, obviously, it had a bank account -- it received

16   proceeds -- but this entry shows Alecto sending another

17   million dollars to that bank account, correct?

18   A      Paying back the balance that was owed from Plaza MOB,

19   yes.

20   Q      Okay.  And so that reduces the balance on this

21   intercompany ledger, the 3.9 million, right?  That payment?

22   A      Yes, it reduced it to 3.9 million, then the money went

23   back out and it increased back up.

24   Q      Right.

25          And so when the money went back out, the next entry for

**A1573**

1   1.5 million, it went to Sherman/Grayson, right?

2   A    It was for the purpose of Sherman/Grayson, yeah, WNJ as

3   Sherman/Grayson.  It didn't go directly from Plaza to

4   Sherman/Grayson that we talked about earlier.  And I think

5   Ms. Gould talked about, to keep track of everything, it went

6   from Plaza to Alecto, Alecto to Sherman/Grayson.

7   Q    Okay.  And, again, on August 31st of 2022, there's

8   another entry that says, "Funds wired to Plaza MOB on

9   August 9th, 2022, in the amount of $1,475,883.85."

10       Correct?

11  A    Correct.

12  Q    All right.

13  A    And the date references the journal entry date and then

14  the description includes the date of the transfer, like you

15  said.

16  Q    Okay.  And then the next three entries show funds wired

17  back from Plaza MOB, correct?

18  A    That's correct.

19  Q    All right.  And so, then, there's a third entry of

20  funds wired to Plaza MOB, October 15th, 2022.  It says, "WNJ

21  Funding deposited in Plaza MOB 10/14/22."

22       Do you see that?

23  A    I see that.

24  Q    All right.  And that's another 1.521 million, right?

25  A    Correct.

1    Q    All right.  Now -- but all this time, Plaza MOB had no

2    creditors, right?

3    A    Had no creditors, correct.

4    Q    Right.  Okay.

5         So, the --

6    A    Well, let me step back.

7         They had, like, the $200 owing to the Secretary of

8    State every year, but that kind of thing, but no creditors.

9    Q    Right.

10        The entry at the bottom says -- there's a couple of

11   entries dated November 30th, 2022, but I want to refer you to

12   one, in particular, the second one.  It says, "Funds received

13   from Plaza MOB on November 28th, 2022."

14        Do you see that?

15   A    Yes.

16   Q    Okay.  And that's $186,000 that Alecto received from

17   Plaza MOB on that date, right?

18   A    Correct.

19   Q    All right.  And that's the date -- and so after Alecto

20   received those funds, the balance of the intercompany account

21   with Plaza MOB, as reflected on this general ledger, is

22   $8,083,572, right?

23   A    That's correct.

24   Q    All right.  And you're familiar that the date that the

25   Reed Creditors got their judgment in this case was

1  November 28th, 2022, right?

2  A    I'm familiar that's the day that judgment was entered,

3  yes.

4  Q    All right.  And that's reflected at Joint Exhibit 54.

5  I don't need you to refer to that --

6  A    Yeah, I generally know it's the end of November, so I'm

7  not disputing that.

8  Q    You know it's that's date, okay.

9      Now, the date that the Reed Creditors got summary

10  judgment, but without the amount fixed was August 2nd of

11  2022, correct?

12  A    I know it was before the amount got fixed.  I don't

13  know the exact date.  I'm sure you have an exhibit, but --

14  Q    Well, it's Exhibit 53 that's in the record and it's a

15  copy of the summary judgment order dated August 2nd, 2022.

16  So --

17          THE COURT:  That was Exhibit 53?

18          MR. SULLIVAN:  53.

19          THE COURT:  Okay.

20          MR. SULLIVAN:  It's not in my individual binder,

21  Your Honor; it's just in a general, joint exhibit list.

22  BY MR. SULLIVAN:

23  Q    Okay.  So the last entry at the end of this 2022

24  general ledger, the subledger for Intercompany Plaza MOB

25  says -- and it's dated 12/5/2022 with the description "Move

167

1  account balance as of November 30th, 2022, to long-term

2  liabilities."

3       Right?

4  A    That's what it says, correct.

5  Q    All right.  And so that zeros out the intercompany

6  balance and moves that $8,083,000 balance to someplace else

7  on the general ledger?

8  A    And on the balance sheet, correct.

9  Q    Okay.  And who directed that that occur?

10 A    Mr. Redin, Jeremy Redin, who was the CFO at the time,

11 in discussions with me, we decided that it would be better to

12 reflect that -- we were trying to keep Plaza MOB separate

13 from all the other intercompanies, kind of a wash to the

14 other intercompanies with the CNH Finance line, and that's

15 why we did it.  We knew it'd still be reflected on the

16 balance sheet, so it wouldn't -- it'd still be on the balance

17 sheet, so we weren't taking it off the balance sheet.

18 Q    So let me -- just to be clear, it was you and

19 Mr. Redin?

20 A    Myself and Mr. Redin.  I'm sure we consulted with

21 Mr. Reddy, as well.

22 Q    Okay.  All right.

23      And so the effect of that is shown on the next exhibit.

24 Please take a look at Joint Exhibit 111.

25 A    Okay.

**A1577**

168

1   Q    And for the general ledger of 2023 and the period from

2   January 1st to June 30th of 2023, there is no intercompany

3   ledger for Alecto and Plaza MOB, but it's now titled "PMOB

4   loan."

5   A   That's what you were telling me.  I don't have the

6   general ledger in front of me, but remember, we had a PMOB

7   loan before, for the 8 million and then that changed, made it

8   all part of the PMOB loan.

9   Q   Okay.  And so Exhibit 110 actually has a reference to

10   the PMOB loan, right, if you look at the bottom?

11   A   Yeah, at the bottom of 110, there were two items,

12   right.  There was an account for the PMOB loan, loan-payable

13   account, which was the 8 million, and then there was the

14   general ledger for the PMOB loan, so those two things, yes.

15   Q   Okay.  And so at the end of 2022, the loan amount

16   that's listed is $8 million and then at the beginning of

17   actually January 31st of 2023, it comes in with a balance of

18   $15,177,108.

19       Do you see that?

20   A   I see the two numbers, yes.

21   Q   Okay.  And is it fair to say that the increase in the

22   loan balance is attributable to the entry dated December 5th,

23   2022, to move the account balance between Alecto and Plaza

24   MOB to long-term liability?

25   A   I don't know if anything it fair to say, but that is

**A1578**

1    the result of why the PMOB loan went up and the intercompany

2    balance went down.  The two of those are connected.

3    Q     And after that occurred and the intercompany balance,

4    as between Plaza MOB and Alecto, was converted to a long-term

5    loan, the debtor continued to send funds to Plaza MOB by

6    wire, correct, to the bank account?

7    A     There's at least one transfer related to the Winter

8    Storm claim that went to PMOB and there's some transfers at

9    the end.  There's a couple transfers, yes, from the

10   general -- from looking at the general ledger, yes.

11   Q     So there's a transfer February 28th, 2023, for the

12   Winter Storm claim in the amount of $1,466,798 and then two

13   transfers entered on June 15th, 2023, which is the date that

14   the debtor filed bankruptcy, and those are for $126,377 and

15   $232,562, correct?

16   A     That's correct.

17   Q     Okay.  And so, with respect to the PMOB loan, these

18   transfers were considered payments on the loan balance?

19   A     They reduced the loan balance, yes.

20   Q     On the books, okay.

21         And so if we look at going back to Exhibit 110, after

22   the Reed Creditors obtained their judgment, there's three

23   large transfers from Alecto to PMOB that are recorded on the

24   general ledger, with respect to Plaza MOB.  So there's one on

25   August 31st, 2022, the $1,475,882.  There's one on

**A1579**

1   October 15th, 2022, for another $1.5 million.  And then

2   there's a third one on February 28th, 2022, for almost

3   $1.5 million.

4        Right?

5   A    Yeah, but on the first couple, you said it was after

6   they got their judgment.

7        Judgment wasn't entered until the end of November.  It

8   was after, I think, the summary judgment motion was granted,

9   but it was before a judgment was entered.

10  Q    Yeah, so that's after the summary judgment order was

11  entered on August 2nd.  I think I referenced the date --

12  A    Yeah, yeah, the date -- but you said after the judgment

13  was entered and that was in your question and that was wrong.

14  Q    Okay.  All right.

15       So those three --

16  A    But again, I just want to clarify, it's really acting

17  as a conduit, because the Winter Storm claim was a claim

18  related to WNJ money coming in and, really, Alecto was acting

19  as a conduit during all this time.

20  Q    Okay.  But in 2023, first of all, do you know what the

21  account balance in the Plaza MOB bank account was when the

22  Reed judgment was entered on November 28th, 2022?

23  A    I think you have the bank statements in here, but I'd

24  have to look at it and see.

25  Q    Let's take a look at it.

1          So looking at Exhibit 101, Tab C --

2   A      Yes.

3   Q      -- it's page 17.  So that's the statement from

4   November 1st to November 30th.

5          Do you see that?

6   A      I see that.

7   Q      And the end balance on November 30th is $4,267,712.58,

8   correct?

9   A      I think it's 287, if I'm reading it right,

10  versus 267 -- it's hard to read -- but yes.

11  Q      Okay.  Four million, two hundred and eighty-seven,

12  you're right.  So, we're almost $4.3 million, right?

13  A      Correct.

14  Q      And isn't it correct that funds held by Plaza MOB that

15  are treated as a loan are different than funds held by Plaza

16  MOB that are treated as money received as an intercompany

17  transfer?

18  A      I don't think so for our purposes on the books, and

19  there wasn't a change for that.  I don't think there is, but

20  I'm not an accountant here, so...

21  Q      Well, if Plaza MOB has no creditors and it's holding

22  $4.2 million, then the money it's holding constitutes equity

23  distributable upstream, correct?

24  A      No, I would disagree that it constitutes equity that's

25  distributable upstream because Plaza MOB is also part of the

1    control group for the Ohio Valley Pension Plan and is also

2    part of the control group for the Alecto Fairmont

3    multiemployer withdrawal liability.

4    Q    Okay.  But if it has no creditors, then the money is

5    distributable upstream.

6         If you want to add that there are creditors, then --

7    A    No, I don't think they're creditors, but it's simple to

8    say, Oh, just distribute the money upstream, but the

9    different entities within Plaza MOB would have to make that

10   election.  Plus, if we did that and then the PBC (phonetic)

11   would come in and say, Well, why did you distribute that

12   money upstream?

13        So, I don't think it's just necessarily distributable

14   upstream.  I disagree with you on that.

15   Q    You'll agree with me that on the general ledger that

16   Alecto maintained in 2023, payments or funds that were

17   transferred to Plaza MOB were treated as paydown of the loan?

18   A    They reduced the other long-term liability; yes, we

19   treated it as a loan on the books and it reduced the other

20   long-term liability on the books, yes.

21   Q    Okay.  So the long-term liability, getting to the end

22   of questions on this, on JX-111, the long-term liabilities

23   that Alecto owed to Plaza MOB for funds that it received on

24   Plaza MOB is identified as $18,137,682 --

25   A    Well, I'm not there yet, so hold on a second.

**A1582**

1  Q      Okay.

2  A      This notebook has lot of things in it.

3         You said JX-111?

4  Q      Yes.

5  A      Oh, this is your demonstrative exhibit.

6  Q      It's Tab G --

7  A      Yeah, I'm sorry, I thought you were looking at --

8         So, I'm sorry, what was your question again?

9  Q      What's the -- as of June 30th, 2023, what is the

10 balance identified on the general ledger as owed by equity to

11 Plaza MOB?

12 A      Well, the balance on JX-111, your excerpt, is,

13 what, 18,137,682.12.

14 Q      Okay.  And that amount includes -- I'm sorry.

15        At the end of 2021 -- I'm sorry -- let's go back to the

16 balance that existed before any of the transfers were made

17 into the Sunrise REH equity.

18        Can you turn to JX-109.

19 A      Okay.

20 Q      And referring specifically to the entry dated June 1st,

21 2021 --

22 A      Okay.

23 Q      -- there was a payment made for $165 for the UCLA

24 closing for the title search?

25 A      Yes.

174

```
 1   Q      And so the -- I'm sorry -- it was a franchise tax
 2   payment for June 1st, 2021, and that left a balance of
 3   $216,565.97, right?
 4   A      Correct.
 5   Q      So the change between that time, which was the last
 6   entry before the initial transfer to Sunrise HEH equity and
 7   June 30th, 2023, would be the $18,137,000 minus the
 8   $216,565.97, right?
 9   A      No, you're wrong.
10   Q      Why's that?
11   A      Because you're not included the eight million four --
12   $8.004 million, because when you're looking at 2023, you're
13   looking at the loan payable account, so you'd have to back
14   out the $8 million that's reflected on JX-109 from your 18
15   number, and then you'd have to subtract that number from 216.
16   Q      Okay.  So, but what you're saying is that the eighteen-
17   million-dollar number includes loan payable amount shown on
18   the 2021/2022 general ledgers in the amount of $8 million?
19   A      Yeah, that $8 million benefited Alecto, yes.
20   Q      Okay.  So when the intercompany account is turned into
21   the Plaza MOB loan at the end of 2022, that $18 million
22   includes the original $8 million listed from 2021
23   (indiscernible)?
24   A      Because the 8 million was already in that loan account;
25   yes, that's what I'm saying.
```

**A1584**

1   Q      Okay.  All right.  Thank you.

2          Let's go back to one more topic.

3   A      Okay.

4   Q      Mister -- there were some discussions about the

5   reduction in Mr. Reddy's salary?

6   A      Yes.

7   Q      And, first of all, with respect to salary payments, how

8   often does Alecto pay Mr. Reddy?

9   A      Every two weeks.  So there's 26 pay periods, generally,

10  in the year.  One year, I think, in 2021, there was 27, but

11  every two weeks.

12  Q      Okay.

13  A      Bi-weekly, I think.

14  Q      Twenty-six pay periods, okay.

15  A      And I think in 2021, there were 27 pay periods, however

16  the pay periods fall.

17  Q      So let's use $25,000 as an example for a bi-weekly

18  payment.

19  A      Okay.

20  Q      If you multiply that by the 26 pay periods that Alecto

21  has, that would give you a salary of $650,000, correct?

22  A      I'm assuming you're math -- 25 times 25 is 625.  I

23  think you're right, but my math -- I don't have a calculator

24  on me.

25  Q      650.

**A1585**

176

1       So Mr. Reddy started with a salary of $750,000.  He now

2  receives $100,000 over the $25,000 per pay period, and he's

3  now $550,000, based on the resolution with the government,

4  and that's $100,000 under $25,000 per pay period.

5  A    I think you've lost me on some of that math.

6       But it's 650 -- I agree that 550 is $100,000 less than

7  650, I agree with you there, and that 550 is $200,000 less

8  than 750, but I wasn't sure where you were going.  You lost

9  me.  I was trying to do the math in my head and you lost me.

10 Q    Well, I'm just trying to do the comparison.

11      The amount that has been proposed with a release of

12 liability of insiders and affiliates is $25,000, which is,

13 roughly, a little bit more than one, two-week salary payment

14 to Mr. Reddy, correct?

15 A    Again, if that's your math -- that sounds like an

16 argument to me -- but that sounds like your math.  That's

17 your argument, I understand that.

18      I can't do the math in my head.

19 Q    Okay.

20      MR. SULLIVAN:  Your Honor, I don't have any

21 further questions at this time.

22      THE COURT:  Okay.  Redirect?

23      MR. WAXMAN:  Your Honor, could I just have a

24 couple minutes to look at my notes?

25      THE COURT:  We are not going to do closings today.

**A1586**

```
 1              MR. WAXMAN:  I actually was over here
 2   (indiscernible) thinking --
 3              THE COURT:  I hate to say that, because I know I'm
 4   looking out at people that have been waiting for two days to
 5   speak, but I think we need to do closings fresh.
 6              But at any rate, why don't you do your redirect
 7   and then we can talk.
 8              MR. WAXMAN:  Okay.  Can I have five minutes, Your
 9   Honor, or -- five minutes --
10              THE COURT:  Of course.
11              MR. WAXMAN:  -- to look over my notes?
12              Okay.  Thank you --
13              THE COURT:  Do you want -- yes, we'll stand in
14   recess --
15              MR. WAXMAN:  -- thank you, Your Honor.
16              THE COURT:  -- until 4:01.
17          (Recess taken at 3:56 p.m.)
18          (Proceedings resumed at 4:02 p.m.)
19              THE COURT:  Okay.  Please be seated.
20              MR. WAXMAN:  Good morning -- good afternoon --
21   good evening, Your Honor -- good night -- wherever we are at
22   this point, Judge.  I (indiscernible).  I'm going to try to
23   keep this really short.
24   //
25                    FURTHER REDIRECT EXAMINATION
```

**A1587**

178

1    BY MR. WAXMAN:

2    Q    Mr. Sarrao, we've spent a lot of time -- you've spent a

3    lot of time talking about 2022 (indiscernible).  I want to

4    kind of give the Court an overview.

5         Can you explain what happened in March of 2000 [sic].

6    A    In March of 2000 [sic], the COVID-19 pandemic came in

7    the full storm and it especially affected hospitals.

8    Q    All right.  So can you explain what I'll call the

9    evolution from the beginning to the ending (indiscernible)

10   what that did in terms of finances from patient intake,

11   various departments closing, money coming in, labor, et

12   cetera, through what's considered the end of the pandemic,

13   which I believe was late 2023.

14   A    So, initially, when the pandemic started, there was a

15   lot of federal funds coming in under the CARES Act and then

16   there were also the Medicare advanced payments and your labor

17   expenses were going up and up, radically up, and you had a

18   lot more patients, but at the same time, they were limiting

19   what kinds of cases you could do.  So, like, they weren't

20   letting you do elective surgeries.  Texas was a little bit

21   different, because Texas is a little bit different.  But,

22   generally, you couldn't do elective surgeries, except for

23   certain exceptions in Texas.  In California, you pretty much

24   couldn't do any elective surgeries and both, Olympia and

25   Sherman, that's where those hospitals make money, was

**A1588**

179

1   elective surgeries, and that helped on cash flow, especially

2   Sherman, so you had that.  Also, at Sherman, because they

3   (indiscernible) group things was the psych unit.  That unit

4   got closed, as well.

5        So you had a lot of things changing, where your revenue

6   is being going down from your patients.  You're seeing less

7   patients for the stuff you made money on, but more patients

8   that were sick with COVID and filling ERs and you buy all the

9   PPE and all that, so your expenses were going up.

10       But, initially, in 2020, there were CARES Act grants

11  that helped with that.  Some of the States even had their own

12  grants, and then you had the Medicare advanced payments.

13       But as we evolved through COVID, then what happened is

14  your expenses went up, especially on the labor side because

15  all the --

16  Q    Can I ask you to pause right there and explain the

17  labor side and (indiscernible)?

18  A    So what happened on the labor side is the travel nurse

19  agencies got very popular and they realized people needed

20  nurses and they could charge a lot more for a nurse as a

21  travel nurse than you would pay your regular employees.  So

22  if you were paying your regular nurse $55, you were paying

23  your travel nurses, like, $110.

24       So, we especially saw it as Sherman where people went

25  out and became -- they left Sherman and they became travel

**A1589**

1 nurses and to have the same nurses, we were paying -- because

2 you have to have nurses to care for the patients -- we were

3 paying $100, $110 an hour, where before we were paying $40,

4 because these nurses became travel nurses.  We saw that at

5 Olympia, as well.

6      You couldn't get staff, but you have to have staff to

7 care for patients, and so you were paying through the roof on

8 travel nurses.  In California, they even had a program set up

9 through the State where they were trying to contract with the

10 travel nurse companies and get a better deal.

11      So our labor costs went really high because of the

12 travel nurses.  And, primarily, nurses, but some of the other

13 services, like respiratory therapists, went up.

14      The CARES Act grants started to slow down, so you were

15 getting less of that, but your labor costs still stayed high

16 and then you didn't see the -- when the CARES Act grants ran

17 out, you didn't see the return of patient volumes that you

18 had before COVID, including on the surgery either.  And they

19 see this on the insurance company side, too; their profits

20 went way up, because they were charging the same premiums and

21 not paying claims.  So, we saw that happen as well.

22      So, again, everyone initially was kind of fat and

23 happy; they were getting all this free money.  But the free

24 money ran out, your expenses had gone way up, and your

25 revenue wasn't going up enough to catch the expenses, because

1  you weren't getting paid more from the HMOs and insurance

2  companies or Medicare and Medicaid.  You were getting paid

3  the same, but your expenses had gone up because your labor

4  costs had gone up so much, and then supply costs went up and

5  everything went up.

6        And then once that ran out -- and then the other part

7  is you had to start paying back -- like at Sherman, we had to

8  start paying back the Medicare advanced payments and they

9  withheld 25 percent of your payments every week to pay back

10 the Medicare advanced payment loan, so that affected cash

11 flow, as well.

12 Q    All right.  So is it fair to say that there was almost

13 a curve in terms of the money that was being received and

14 finances of the hospital and then as it hit a certain point

15 and labor went down and patient numbers went down, the

16 finances of the hospitals, including Alecto's hospitals,

17 dropped off?

18 A    Correct, because the expenses weren't going down as

19 quick as the revenue was going down, so the gap was getting

20 bigger.

21 Q    So let me ask you, what did that change in the dynamic

22 to, in terms of a likelihood of collectibles from hospitals

23 such as Sherman/Grayson and the other hospitals owned by

24 Alecto that had intercompany receivables?

25 A    When you started to see that, the COVID -- the effect

**A1591**

1    of COVID, the likelihood of those collectibles went down over

2    time.  We still thought there was some potential if you found

3    the right buyer for Sherman.

4    Q    But certainly -- and, again, I'm just trying to get

5    clarity -- that definitely -- did that affect the

6    collectability of the receivables?

7    A    Yeah, it affected the financials of Sherman, so then it

8    would affect the collectability.

9    Q    And I know you said you're not an accountant.

10        Are you familiar with the collectibles and why they

11   weren't continued or when they were discounted, if at all?

12   A    I am familiar with it, yes.

13   Q    And what's your understanding?

14   A    Because at different periods of time -- well, part of

15   the reason it hasn't been discounted now is because of the

16   bankruptcy.  I'm not sure exactly how it works, but over

17   time, there was still a possibility, like, for Ohio Valley

18   Medical Center East Ohio, there was people talking about

19   buying those hospitals.  There was discussions with the

20   Catholic Diocese, because they had owned another hospital

21   that got sued.  And with the governor of West Virginia, there

22   were discussions.  There was the possibilities of those

23   things -- something happening that would generate revenue to

24   address things.

25   Q    And let me -- but you believe that your financials for

**A1592**

1    2019 and 2020 and 2021 are accurate (indiscernible) the

2    accounting for those accounts receivable?

3    A    Yes.

4    Q    I'm trying to bring you back to Mr. Sullivan's question

5    about the Sunrise equity transfer.  And there was some

6    colloquy between you two with respect to the accounting for

7    how much there was.  And you said, Well, you're omitting

8    something from your calculation.  If you take a pure

9    mathematical, there is something that you're omitting.

10        I want to give you a chance to actually explains that

11   calculus.

12   A    So, what's being omitted is, if you just do it without

13   the numbers, there was value because -- so, we had signed --

14   we knew we were talking to UCLA and other people about

15   potentially doing something with Olympia.  We had signed an

16   NDA shortly after the June 19.  I think the NDA was

17   August '19 or October of '19.  So there was a possibility.

18        But Olympia needed to continue operating to make that

19   transaction with other people.  There were other people

20   interested, too.  To make that work, Olympia needed to

21   continue to operate.

22        The $9 million in capital contributions alone to

23   Olympia allowed them to do that.  So that refinance added

24   value, which ultimately resulted in, you know, January 2021,

25   then August 2021, this big deal with UCLA, which was a very

184

 1  good, substantial price above market.  But none of that would

 2  have happened if Olympia went away.

 3      UCLA ultimately decided to do something else, but it

 4  was critical that we maintained our license for that

 5  hospital, because they took over the license.  So that $9

 6  million that came in kept Olympia going and allowed it to be

 7  an operating hospital that was attractive for a buyer, and in

 8  this case, specifically, UCLA Health.

 9  Q    So, you were recognizing that there is additional value

10  beyond the dollars and cents, insofar as it added enterprise

11  value for the debtor overall; is that a fair statement?

12          MR. SULLIVAN:  Objection; leading.

13          THE COURT:  Rephrase the question.

14  BY MR. WAXMAN:

15  Q    What additional value do you believe that's added, if

16  it's not numerical, then it should be included in the

17  calculus of the Sunrise transfer that isn't in the simple

18  dollars and cents that Mr. Sullivan would (indiscernible)?

19  A    The benefit of the $9 million loan to Olympia and how

20  that increased the overall enterprise value for Olympia, the

21  Horizon assets, and the Plaza assets, because without an

22  operating hospital, that would not have occurred.  And a

23  condition to the transaction was that it was an operating

24  hospital with an active license.

25  Q    But even getting beyond that, at the time of the

**A1594**

1  Sunrise transfer, is it your understanding that the debtor

2  was solvent?

3  A     Yes, that's my understanding.

4           MR. WAXMAN:  Your Honor, I think that's all I

5  have.

6           THE COURT:  Okay.  Let's -- is there any more

7  evidence that needs to come in?

8           MR. WAXMAN:  Did you have any questions?

9           MS. PAKROUH:  Yes, Your Honor.

10           MR. SULLIVAN:  No, nothing.

11           MR. WAXMAN:  Recross?

12           MR. SULLIVAN:  We had the same purpose.

13           THE COURT:  Exhibits?

14           MS. PAKROUH:  Your Honor, yes.

15           MR. SULLIVAN:  Yes.

16           THE COURT:  Okay.  I was going to --

17           MS. PAKROUH:  Your Honor, Tara Pakrouh with Morris

18  James on behalf of Alecto.

19           We just wanted to read in, after meeting and

20  conferring with the other side on some of the exhibits.

21           THE COURT:  Okay.  I'm going to ask you to file a

22  list of the exhibits so that it's on the docket for purposes

23  of the record in this case.

24           MS. PAKROUH:  That's fine.

25           THE COURT:  Not that I don't want to hear you; I

**A1595**

 1  don't mean it that way.  But it makes a cleaner record if

 2  it's actually filed.

 3          MR. SULLIVAN:  Your Honor, then I would just

 4  simply say that for the record, the parties jointly would ask

 5  to have the Court admit the exhibits that we identified on

 6  the list filed on the docket.  And I know that --

 7          THE COURT:  Can you just tell me what this

 8  afternoon was added, in addition?  I know what we talked

 9  about this morning and I have highlighted certain exhibits,

10  with respect to Mr. Sarrao's testimony, but rather than

11  having to read the whole list, if you can just tell me what,

12  so that I know that it coincides with what I have down.

13          MR. SULLIVAN:  Yes.  So that afternoon, the

14  exhibits that we relied on to ask questions and want

15  admitted, those Exhibits are:  1, 2, 4, 42, 43, 44, 53, 54,

16  56, 62, 70, 101, 102, 109, 110, 111, and 113.

17          THE COURT:  Okay.  And if you could just file a

18  list with the Court, okay, and represent in a notice or

19  certification that the parties are in agreement.

20          MS. PAKROUH:  Your Honor, we can do that.

21          THE COURT:  Is there -- okay, is there any reason

22  Mr. Sarrao needs to be on the stand?

23          MR. SULLIVAN:  No, Your Honor, I don't believe --

24          THE COURT:  Okay.  Sir, thank you very much.

25          THE WITNESS:  Thank you.

```
 1                 THE COURT:  You're excused.
 2                 THE WITNESS:  Do you want me to just leave and
 3   they'll pick all this stuff up, the exhibits and --
 4         (Witness excused)
 5                 THE COURT:  Yes, Mr. Waxman is going to take it
 6   all back.
 7         (Laughter)
 8                 THE COURT:  So, any further evidence or is
 9   evidence closed?
10                 MR. WAXMAN:  I believe evidence is closed, Your
11   Honor.  I don't think we have anything further.
12                 If I could just confer with my client for a
13   moment?
14                 THE COURT:  Certainly.
15                 MR. SULLIVAN:  Your Honor, the only other thing I
16   want to add is I believe that counsel watched the depositions
17   of Mr. Balasiano and Ms. Gould.  I think they're also listed
18   on the exhibit list.
19                 THE COURT:  Okay.
20                 MR. SULLIVAN:  And I would like to have those
21   admitted as evidence, as well.
22                 MS. PAKROUH:  We don't have any objection to that.
23                 We can just add them on the list --
24                 THE COURT:  Add them on the list.
25                 MS. PAKROUH:  -- the JX list, which we'll get done
```

**A1597**

1   by the end of the day.

2            THE COURT:  Okay.  You'll file it by the end of

3   today?

4            MS. PAKROUH:  I don't see why --

5            THE COURT:  Well, you can file it by tomorrow.

6            MS. PAKROUH:  Tomorrow?  Okay.  That's fine.

7            THE COURT:  Okay.  Is that the closing of --

8            MR. WAXMAN:  Your Honor?

9            THE COURT:  No, go right ahead.

10           MR. WAXMAN:  What I was going to say, it's subject

11  to -- because you mentioned the exhibits from today, we also

12  need to get in a couple of exhibits from yesterday, as well,

13  but other than that, I think the debtor is done with its

14  evidentiary record.

15           THE COURT:  Okay.  So we can close the record as

16  to evidence?

17           MR. WAXMAN:  Yeah, subject to admission of

18  documents, yes.

19           THE COURT:  Okay.  So, we, then, are going to move

20  forward to arguments.  When are we going to do this, because

21  I know before we had trouble scheduling in this case.

22           MR. WAXMAN:  Well, Your Honor, I think Your

23  Honor's calendar -- and not to complain -- Your Honor's

24  calendar was busy with other matters (indiscernible).

25           THE COURT:  I recall that there was actually

**A1598**

1  multiple people, who will not remain named, but I also

2  understand it's timier when people are traveling, but I know

3  at least three people were unavailable the rest of this

4  month.

5          MR. WAXMAN:  Yeah, okay.  That was me.

6          THE COURT:  No, we don't need to name names, but I

7  just want to make sure -- and it's not relevant -- we just

8  need to pick a time to continue this.

9          And I don't know if people's schedules have

10 changed since then?

11         MR. SULLIVAN:  So, Your Honor, it seems to me that

12 we're talking about an hour?

13         THE COURT:  I don't think that's accurate --

14      (Laughter)

15         THE COURT:  -- and no offense.  Well, perhaps,

16 maybe the issues have shortened from the list of issues that

17 I have, but I know for a fact the United States Trustee

18 hasn't had an opportunity to argue at all yet.

19         MR. SULLIVAN:  Then that --

20         THE COURT:  And I'll be looking to a

21 recommendation from the Subchapter V Trustee.  I don't know

22 if the United States wants to make any statements on the

23 record and I think the Reed Judgment Creditors probably want

24 to be heard.

25         MR. SULLIVAN:  We definitely want to be heard.

**A1599**

1    THE COURT:  So I don't think that, in all due

2    respect, that all could be heard in an hour.

3    MR. WAXMAN:  Your Honor, I would respectfully

4    submit that Mr. Sullivan is wildly optimistic if he thinks

5    that we're going to get it in, in an hour.  I will try to get

6    over my shyness and stay under an hour myself, but I can't

7    give any promises.

8    THE COURT:  Okay.  So I want to make sure that

9    there's sufficient time and I know there's a lot of evidence

10   that you all may want to review in your closings, so let me

11   ask, what do parties -- do parties have any time the

12   remainder of this month?

13   I will say that I have problems the last two weeks

14   of March.

15   MR. SULLIVAN:  Your Honor, for me, there's

16   probably only four days or five days that are bad, but

17   tomorrow is (indiscernible).

18   THE COURT:  I think tomorrow is a bad day.

19   And I would propose that we limit -- well, I hate

20   to -- I can't -- to the extent that you're -- is there a way

21   that the parties could confer about argument time; although,

22   like I said, the U.S. Trustee hasn't even been heard and the

23   U.S. Trustee has multiple arguments.

24   I mean, are we -- I hate -- are we looking at the

25   beginning of April?

**A1600**

1          MR. WAXMAN:  Your Honor, I will be unavailable

2    from the 23rd until the end of the month.  I will make myself

3    available as best I can earlier.

4          Let me see if we have an omnibus hearing date that

5    maybe we could work through that if there's time before or an

6    after.

7          THE COURT:  Let me see.

8       (Pause)

9          THE COURT:  You have an omnibus hearing April 17th

10   and May 16th.

11         MR. WAXMAN:  Okay.  We definitely want to get in

12   before that.

13         I do know that there's a Sherman/Grayson on

14   the 20th.

15         THE COURT:  I'm -- we schedule omnibus for an

16   hour, so --

17         MR. WAXMAN:  Tell me what Your Honor has after

18   that.  I was just thinking, because I assume that Mr. Sarrao

19   would be here for that, if there's something that

20   (indiscernible) going forward, for which he would be needed.

21         And, of course, I'll need to confer with

22   Mr. Sarrao, as well, but I'll get to that later.

23       (Pause)

24         THE COURT:  Is there any possibility the parties

25   are available March 13th?  That's next Wednesday.

**A1601**

1        I know, Ms. Nimeroff, you had some conflicts and I

2   don't --

3        MS. NIMEROFF:  If I could appear remotely, Your

4   Honor, that would be my ask (indiscernible).

5        MR. WAXMAN:  I am available on the 13th.

6        If I may confer with my client?

7        THE COURT:  Okay.

8      (Pause)

9        MR. SULLIVAN:  I believe (indiscernible).

10        MR. WAXMAN:  It works for my client and I

11   understand from the head nods that I received from the U.S.

12   Trustee, that that works for the U.S. Trustee, as well, for a

13   motions hearing (indiscernible).

14        THE COURT:  I guess the other option -- and I'm

15   just throwing this out -- I could do the afternoon of

16   the 12th, but it would be the afternoon.  That would be --

17   that's another possibility.

18        MR. WAXMAN:  I think I'd rather do the 13th, Your

19   Honor, if --

20        THE COURT:  Okay.

21        MR. WAXMAN:  That's fine with my client.

22        How much time are we talking about?

23        THE COURT:  Okay.  All right.

24        Presenting by Zoom, is that problematic for you?

25        MS. NIMEROFF:  Not for me, Your Honor, as long as

**A1602**

1    it's acceptable to the Court.

2            THE COURT:  Under the circumstances, I'm going

3    to -- because scheduling is so hard in this case -- I will

4    allow the Subchapter V Trustee to present more than -- I

5    forget what the limited argument.  You can proceed by Zoom.

6            MS. NIMEROFF:  I appreciate that very much, Your

7    Honor.

8            THE COURT:  Does the United States wish to be

9    heard at this hearing?

10            MR. WAXMAN:  I believe the United States is

11    resolved with all the issues that they raised and I think

12    they (indiscernible) on the record yesterday.

13            We want to listen to that, but --

14            THE COURT:  Okay.  All right.

15            All right.  Let's schedule for March 13th.

16            MR. WAXMAN:  And a time, Your Honor?

17            THE COURT:  I'm looking.

18        (Pause)

19            THE COURT:  Let's schedule -- bear with me just a

20    second -- how long -- do the parties think they'll be done

21    within three hours?

22            UNIDENTIFIED SPEAKER:  (Indiscernible.)

23        (Laughter)

24            THE COURT:  I'm sorry (indiscernible).

25            MR. WAXMAN:  I will endeavor, Your Honor, but

**A1603**

1  remember, I need to respond to the U.S. Trustee and to the

2  Reed Creditors.  The debtor will do its best to not

3  (indiscernible).

4            THE COURT:  Okay.  Let's start at 10 o'clock on

5  the 13th.

6            Let me just confirm for the record, I should not

7  be anticipating any supplemental briefing.

8            MR. WAXMAN:  I do not intend to do so, Your Honor.

9            THE COURT:  Okay.  All right.

10            MR. SULLIVAN:  Not unless you ask for them, Your

11  Honor.

12            THE COURT:  Mr. Waxman -- not at this time, I'll

13  wait for argument -- Mr. Waxman, can you please file a notice

14  on the docket?

15            MR. WAXMAN:  We will do so.

16            THE COURT:  Okay.  Is there anything further for

17  today?

18            MR. WAXMAN:  Are we schlepping back all the

19  binders, Your Honor?

20            THE COURT:  Okay.  Let me just say that March 13th

21  is limited to closing argument.  We're not having anything

22  else heard on March 13th, with respect to this matter.

23            MR. WAXMAN:  Your Honor, I think we only have one

24  motion going forward at that point -- actually, two:  an

25  application and a 9019, and I think they're both scheduled

1   for the next omnibus.

2           THE COURT:  Okay.  I just want to make it clear,

3   because I want to make sure that there's time.

4           All right.  And if you could, please remove the

5   witness binders from the courtroom.  That would be most

6   helpful.

7           Is there anything else for today?

8       (No verbal response)

9           THE COURT:  Okay.  Thank you all very much.  I

10  appreciate your time, particularly, my thanks to those who've

11  sat through and did not get a chance to argue yet.  I hope

12  you all have a good evening, and we stand adjourned.

13          COUNSEL:  Thank you, Your Honor.

14      (Proceedings concluded at 4:26 p.m.)

15

16

17

18

19

20

21

22

23

24

25

**A1605**

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                March 11, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams               March 11, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                 March 11, 2024

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22   /s/ Coleen Rand                       March 11, 2024

23   Coleen Rand, CET-341

24   Certified Court Transcriptionist

25   For Reliable

**A1606**