# EXHIBIT 51



**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

J. KATE STICKLES
JUDGE

824 N. MARKET STREET
WILMINGTON, DELAWARE
(302) 252-3820

March 20, 2024

RE:   *In re Alecto Healthcare Services, LLC*, Case No. 23-10787
      **Confirmation Ruling**

Dear Counsel:

This is the Court's ruling following the March 4, 5, and 13, 2024 hearing[1] (the "Confirmation Hearing") on confirmation of the *Small Business Debtor's Plan of Reorganization* (the "Plan").[2] The Court is writing for the benefit of the parties and assumes familiarity with the facts as well as the bankruptcy case.

The Debtor commenced this bankruptcy case under subchapter V of Title 11 on June 16, 2023 (the "Petition Date"). On September 14, 2023, the Debtor filed its Plan,[3] which was subsequently modified.[4] The Plan provides that Classes 1 (Priority Non-Tax Claims), 2 (Secured Claims), and 4 (Equity Interests) are unimpaired, and Class 3 (General Unsecured Claims) is impaired. The Debtor forwent solicitation of votes on the Plan and seeks confirmation pursuant to 11 U.S.C. § 1191(b).

**A. Record and Evidence Presented**

In preparation for the Confirmation Hearing, the Court reviewed and considered, among other things, the Plan, including the exhibits, the reservation of rights filed by the Subchapter V Trustee and the United States Trustee (the "U.S. Trustee"),[5] the objection and amended objection filed by the United States of America,[6] and the objection and supplemental objection filed by the

---

[1] The Transcripts of the March 4, 5, and 13, 2024 proceedings are docketed at D.I. 330, 331, and 342, respectively. The Transcripts are cited herein as "Date Tr. page:line (witness)."

[2] D.I. 261 (the "Plan").

[3] D.I. 154.

[4] D.I. 261.

[5] D.I. 295 and 298.

[6] D.I. 279 and 297.

Reed Action Judgment Creditors (the "Reed Creditors").[7]  The Court also reviewed the declarations of Michael Sarrao and Steven Balasiano in support of the confirmation of the Plan,[8] as well as the Debtor's memorandum in support of confirmation.[9]

At the Confirmation Hearing, the Court listened to the witnesses, who were subject to cross-examination, and reviewed the documents admitted into evidence.[10]  Witnesses in support of confirmation of the Plan included: (i) Jeff McCutcheon, Debtor's executive compensation expert; (ii) Leanne Gould, Gould Consulting Services ("GCS"), Debtor's forensic investigation consultant; (iii) Steven Balasiano, Debtor's independent director/manager,[11] and (iv) Michael Sarrao, Debtor's Vice President, General Counsel, and Secretary.

Following the close of evidence, on March 13, 2024, the Court heard arguments presented by counsel for the Debtor, the Reed Creditors, the U.S. Trustee, and the United States of America, as well as the recommendation of the Subchapter V Trustee.[12]

## B.  The Confirmation Standards

The Plan is non-consensual and does not satisfy sections 1129(a)(8) and (10) of the Bankruptcy Code.  Section 1191(b) of the Bankruptcy Code, however, allows a plan to be confirmed on a non-consensual basis, provided that, the requirements of section 1129(a), other than subsections (8), (10), and (15), are satisfied, and the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

Under section 1191(c), the fair and equitable requirement imposes a projected disposable income requirement, a feasibility finding, and appropriate remedies if payments are not made.  Here, as discussed below, the Plan satisfies those requirements.

---

[7] D.I. 299 and 315.

[8] D.I. 307 and 308, respectively.  The Balasiano Declaration was not admitted into evidence.  *See* D.I. 329.

[9] D.I. 310.

[10] D.I. 329.

[11] 03/04/2024 Tr. 70:10-73:4 (Balasiano); 03/04/2024 Tr. 73:15-16 (Balasiano) ("I was initially retained to perform an analysis of a settlement between Sherman/Grayson and Alecto."); 03/04/2024 Tr. 74:16-22 (Balasiano) ("Later in August, it might be a week or two weeks later . . . my charge expanded to review the Alecto bankruptcy and in particular look at potential fraudulent conveyance actions and director and officer or any type of breach of fiduciary duties that the directors or officers may have acted with during the course prior to the bankruptcy."); 03/04/2024 Tr. 74:25-75:4 (Balasiano) ("I have been charged with the duty of investigation or have the investigation performed as well as to the extent there are findings of malfeasance in any way, shape or form that I would commence that litigation.").

[12] The Subchapter V Trustee supports confirmation under section 1191(b), however, does not take a position with respect to the proposed Debtor Releases or the best interests of creditors.  The Court views the Subchapter V Trustee's recommendation as neutral.

The Debtor bears the burden of establishing the Plan's compliance with 11 U.S.C. §§ 1129(a) and 1191 by a preponderance of the evidence, whereas the objectors to the Plan bear the burden of producing evidence to support their objections.[13]

1. **Projected Disposable Income**

The projected disposable income requirement in section 1191(c)(2) requires that the Plan provide that all of the projected disposable income of the debtor to be received in the three-year period after the first payment under the plan is due, or such longer period not to exceed 5 years as the Court may fix, will be applied to make payments under the plan. Alternatively, the plan may provide that the value of property to be distributed under the plan within the plan period is not less than the projected disposable income of the debtor.

The Plan, including the revised Income Statement[14] at Exhibit C (the "Income Statement"), satisfies the projected disposable income requirement. The Plan provides that all of the Debtor's disposable income in the three-year period following the Effective Date of the Plan will be applied to make payments under the Plan in accordance with section 1191(c)(2).[15] Mr. Sarrao also testified that payments will include any excess disposable income beyond projections[16] and the Debtor is prepared to file post-confirmation reports reflecting the Debtor's income and expenses.[17]

2. **Feasibility**

Section 1191(c)(3) of Bankruptcy Code sets forth the subchapter V feasibility requirement that "(A) [t]he debtor will be able to make all payments under the plan; or (B)(i) there is a reasonable likelihood that the debtor will be able to make all payments under the plan . . . ."[18]

The feasibility requirement of section 1191(c)(3) "fortifies the more relaxed feasibility test that section 1129(a)(11) contains."[19] The feasibility test set forth in section 1129(a)(11) requires only

---

[13] *See In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003).

[14] D.I. 316 (Notice of Filing of Amended Exhibits C and G to Small Business Debtor's Plan of Reorganization Proposed by the Debtor) at Exs. 1 (Clean) and 2 (Blackline).

[15] 03/05/2024 Tr. 22:22-25 (Sarrao) (the Plan provides for "all of the debtor's disposable income.").

[16] 03/05/2024 Tr. 22:22-25 (Sarrao) ("[I]t's all of the debtor's disposable income. … [I]n the case of this, if we didn't have to pay, the disposable income would increase, it would be more. … [I]t's whatever the disposal income is.").

[17] 03/05/2024 Tr. 74:24-75:1 (Sarrao) (Q: "Is the debtor prepared to file reports with the company's income and expenses after confirmation?" A: "Yes.").

[18] 11 U.S.C. § 1191(c)(3)(A-B(i)) (emphasis added).

[19] *In re Samurai Martial Sports, Inc.*, 644 B.R. 667, 698 (Bankr. S.D. Tex. 2022) (footnote omitted); *see also In re Pearl Res. LLC*, 622 B.R. 236, 269 (Bankr. S.D. Tex. 2020) (footnotes and citations omitted) ("Section 1191(c)(3) adds two additional factors to the "fair and equitable" analysis. First, § 1191(c)(3)(A) requires that the debtor be able to make all payments under the plan, or that there is a reasonable likelihood that the debtor will be able to make all payments under the plan. The new requirement fortifies the more relaxed feasibility test that § 1129(a)(11) contains.) Section 1129(a)(11) requires only that confirmation is not likely to be followed by liquidation or the need

that the Bankruptcy Court determine that the Plan may be implemented and has a "reasonable assurance of success."[20] "[I]t is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous."[21]

The Debtor's Income Statement[22] projects Debtor's net income in years 1, 2 and 3 of the Plan, in the amount of $463,913, $748,514, and $704,083, respectively. Mr. Sarrao testified the vast majority of Debtor's revenue comes from the management contract with St. Rose Hospital that runs through May 31, 2025, subject to a two-year renewal through May 31, 2027.[23] He believes the contract will be extended through 2027.[24]

Mr. Sarrao also explained that the Income Statement reflects more available income than initially projected as a result of certain reduced operating expenses, including: Dr. Reddy's reduced salary;[25] reduced payroll taxes, salary, and PTO due to the termination and/or retirement of employees; reduced tax preparation fees due to eliminated entities; and reduced insurance expenses due to the closing of the sale of the Wilson N. Jones Hospital ("WNJ") operated by Sherman/Grayson Hospital, LLC, an affiliate of the Debtor.[26]

In addition, Mr. Sarrao testified that the Income Statement reflects an increase in bankruptcy professional fees and the addition of a control group reserve, a contingent liability, related to a pension plan that is sponsored by Alecto Healthcare Services Ohio Valley.[27] He explained that any contingent liability not paid becomes disposable income to be distributed under the Plan.[28]

The Court finds, based on the Plan, Income Statement, and Mr. Sarrao's testimony, the Debtor has, by a preponderance of the evidence, carried its burden of demonstrating that there is a

---

for further reorganization unless the plan proposes it. … The feasibility requirement for confirmation requires a showing that the debtor can realistically carry out its plan. Though a guarantee of success is not required, the bankruptcy court should be satisfied that the reorganized debtor can stand on its own two feet.")

[20] *In re Indianapolis Downs LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (citing *Kane v. Johns-Manville Corp.* (*In re Johns–Manville Corp.*), 843 F.2d 636, 649 (2d Cir. 1988)),

[21] *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) (citations omitted).

[22] D.I. 316 (Notice of Filing of Amended Exhibits C and G to Small Business Debtor's Plan of Reorganization Proposed by the Debtor) at Exs. 1 (Clean) and 2 (Blackline).

[23] JX12 (Amended Management Services Agreement St. Rose Hospital, Hayward, CA); 03/05/2024 Tr. 18:6-8 (Sarrao).

[24] 03/05/2024 Tr. 17:7-22 (Sarrao).

[25] The Reed Creditors and the U.S. Trustee objected to the proposed compensation of the Debtor's post-confirmation officers, as set forth in Art. VIII.7 of the Plan. At the commencement of the Confirmation Hearing, the Debtor announced that the CEO's proposed salary had been reduced from $750,000 to $550,000 per year and that Messrs. Reddy and Williams would not receive any salary increase in the next 3 years.

[26] 03/05/2024 Tr. 19:11-21:2 (Sarrao). Sherman/Grayson Hospital, LLC ("Sherman/Grayson") is also in bankruptcy in this Court. Case No. 23-10810. In that case, the sale of WNJ closed on January 1, 2024; however, prior to closing, the purchaser operated WNJ. *See* Del. Bankr. Case No. 23-10810, D.I. 60, 161, and 314.

[27] 03/05/2024 Tr. 20:9-13; 21:3-22:16 (Sarrao).

[28] 03/05/2024 Tr. 22:20-25 (Sarrao).

4

reasonable likelihood that the Debtor will be able to make all payments under the Plan. Thus, the Plan meets the feasibility requirements of sections 1129(a)(11) and 1191(c)(3)(A).

### 3. **Remedies**

Section 1191(c)(3)(B) requires that the plan provide appropriate remedies if the debtor does not make required payments under a plan. Article VII.5 of the Plan provides remedies upon default in satisfaction of section 1191(c)(3)(B).

### 4. **Unfair Discrimination**

Under the Plan, Class 1 (Allowed Priority Non-Tax Claims) and Class 2 (Allowed Secured Claims) will receive a 100% recovery; Class 3 (Allowed General Unsecured Claims) will receive a pro rata share of the Debtor's projected disposable income, an approximate 3–10% recovery of the total general unsecured claims; and Class 4 (Equity Interest Holders) will retain their equity ownership interest in the Debtor. The Plan's treatment of Claims and Equity Interests is proper because all similarly situated holders of Claims and Equity Interests will receive substantially similar treatment. No party has challenged the proposed classification and/or treatment under the Plan. The Court finds that the Plan does not discriminate unfairly and meets the requirements of 11 U.S.C. §§ 1191(b) and 1129(b)(1).

## C. **Best Interests of Creditors - 11 U.S.C. § 1129(a)(7)**

A plan satisfies the best interest of creditors when, "with respect to each impaired class of claims or interests . . . each holder of a claim or interest of such class . . . will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 . . . ."[29]

Exhibit G to the Plan, the Revised Liquidation Analysis,[30] dated March 3, 2023 (the "Liquidation Analysis"), projects that $265,338 will be available for payment of claims in chapter 7, while $2,079,010 will be available for payment of claims under the Plan.[31] No evidence has been presented to refute the Debtor's projections. Mr. Sarrao testified creditors would receive more in a chapter 11 than chapter 7, stating: "I think very little, if anything, would be distributed to the creditors if there was a Chapter 7."[32] Moreover, no credible evidence validates a finding that conversion to chapter 7 would be in the best interests of creditors.

---

[29] 11 U.S.C. § 1129(a)(7)(A)(ii).

[30] D.I. 316 (Notice of Filing of Amended Exhibits C and G to Small Business Debtor's Plan of Reorganization Proposed by the Debtor) at Exs. 3 (Clean) and 4 (Blackline).

[31] *Id.*

[32] 3/5/2024 Tr. 24:6-9; 25:12-21 (Sarrao).

## D. Confirmation Objections

Numerous Plan objections have been resolved and those resolutions are included in a revised proposed confirmation order (the "Proposed Confirmation Order")[33] or noted on the record at the Confirmation Hearing. Below is the Court's ruling with respect to each pending objection.

### 1. U.S. Trustee Objection to the Process Regarding Amended Proofs of Claim

The U.S. Trustee objects to Article IV.3.f. of the Plan and paragraph 50 of the Proposed Confirmation Order that prohibit amendments to claims and automatically disallows post-Effective Date amendments to claims. Paragraph 50 of the Proposed Confirmation Order[34] provides, in part: "Any amendment to a proof of Claim filed after the Effective Date shall be ineffective unless approved by the Bankruptcy Court after notice and an opportunity for hearing."

The U.S. Trustee argues that the proposed language violates 11 U.S.C. § 502 because a claim is deemed allowed until objected to and it is a debtor's responsibility to object to late-filed amended claims. The U.S. Trustee contends that replacing the phrase "disallowed in full and expunged" with the term "ineffective," does not resolve the procedural deficiency.

The Debtor argues against an unlimited right to file and/or amend a claim and maintains that finality is required in the claims administration process. The Debtor further contends that while the issue is procedural; it could have a substantive impact because "real money" is spent to defend claims and late filed claims could increase the claims pool and cause disgorgement of claims already paid. The Debtor cites various cases in support of its position.

The cases cited in support of the Debtor's position, which bar the filing of an amended claim post-Effective Date, are inapposite. In *Holstein v. Brill*[35] and *IRT Partners, L.P. v. Winn-Dixie Stores, Inc.*,[36] the Seventh and Eleventh Circuits, respectively, held that *res judicata* should preclude post-confirmation amendment of claims absent some compelling reason. Likewise, in *Kaiser Group International*,[37] the debtor sought to estimate a claim and cited to the *Holstein* holding in a footnote. None of those cases involved a procedure or addressed a plan provision that automatically expunged, disallowed, or deemed "ineffective" an amended claim filed after the Effective Date.

A properly filed proof of claim is deemed allowed unless a party in interest objects, at which point the court must determine the amount of the claim to be allowed.[38] Section 502(b) requires

---

[33] D.I. 334.

[34] *Id.*

[35] *Holstein v. Brill*, 987 F.2d 1268 (7th Cir.1993).

[36] *IRT Partners, L.P. v. Winn-Dixies Stores, Inc. (In re Winn-Dixie Stores, Inc.)*, 639 F.3d 1053, 1056 (11th Cir. 2011).

[37] *In re Kaiser Grp. Int'l, Inc.*, 289 B.R. 597 (Bankr. D. Del. 2003).

[38] 11 U.S.C.A. § 502(a), (b).

6

"notice and a hearing" prior to the disallowance of a claim. The language at issue in paragraph 50 is inconsistent with the Bankruptcy Code. For these reasons, the Court sustains the U.S. Trustee's objection.

### 2. Reed Creditors

The Reed Creditors object to the proposed Debtor Releases and Injunction provisions in the Plan and assert that the Plan was not filed in good faith. Each issue will be addressed.

#### a. Debtor Releases

The Reed Creditors object to the proposed Debtor Releases, Plan Art. VII.2, that release Debtor's insiders in consideration for payment of $25,000 (the "Settlement Consideration"), a sum they argue will yield no benefit to creditors. They argue that they have identified at least two potential causes of action against the members of Alecto Healthcare Services, LLC (the "Alecto Members"): (1) a $22 million fraudulent conveyance claim involving the Debtor's transfer of Sunrise Real Estate Holdings, LLC to the Alecto Members while the Debtor was insolvent, for which GCS acknowledges in its report (the "GCS Report") that reasonably equivalent value was not received in that transaction; and (2) breach of fiduciary duty claims against Alecto Members arising from Alecto's advancement of funds to affiliates while it was insolvent or in the zone of insolvency instead of making payment to Alecto's creditors.

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[39] Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[40]

The Court determines if the released claims fall into the lowest point of reasonableness for a settlement.[41] "When determining whether to approve a settlement, the bankruptcy court should consider: (1) the probability of success in the litigation; (2) the complexity, expense, and delay of the litigation involved; (3) the possible difficulties in collection; and (4) the paramount interests of creditors."[42] "The court does not have to be convinced that the settlement is the best possible

---

[39] *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004).

[40] *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (footnote and citation omitted).

[41] *Coram Healthcare Corp.*, 315 B.R. at 330 (citations omitted).

> Where a compromise is part of a plan of reorganization, however, the court has the duty "to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019, though the court should consider all factors relevant to a "full and fair assessment of the wisdom of the proposed compromise."

*Id.* at 334–35 (citations omitted).

[42] *Coram Healthcare Corp.*, 315 B.R. at 330 (citations omitted); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996)).

compromise, but only that the settlement falls within a reasonable range of litigation possibilities."[43] Courts generally defer to a trustee's business judgment when there is a legitimate business justification for the trustee's decision.[44]

In determining the reasonableness of the settlement, the Court reviews the underlying claims alleged by the Reed Creditors that were investigated by the independent director.

## 1) Fraudulent Conveyance Action[45]

The Reed Creditors assert that the June 2019 transfer of Sunrise REH and Plaza MOB (the "Sunrise Transfer") was a fraudulent conveyance. The GCS Report concludes that the Sunrise Transfer was completed "without receiving reasonably equivalent value in exchange."[46]

The Debtor responds that *even if* there was not reasonably equivalent value for the Sunrise Transfer, it does not matter because the Debtor was not insolvent in June 2019, as required by California law.

The California Fraudulent Transfer Act contains two possible applications in determining whether the Sunrise Transfer was a fraudulent conveyance. California Civil Code section 3439.04 applies to present and future creditors and section 3439.05 applies only to present creditors. The parties did not distinguish between the two statutes in their papers or arguments. The Court reviews both.

Section 3439.04, provides that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . .[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[47] No evidence was presented indicating that the Debtor intended or, in fact, would become insolvent as a result of the Sunrise Transfer.[48]

Section 3439.05 states a fraudulent transfer is "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without

---

[43] *In re Wash. Mut, Inc.*, 442 B.R. 314, 338 (Bankr. D. Del. 2011) (citations omitted).

[44] *Martin*, 91 F.3d at 3953.

[45] The Debtor argued that only the California Uniform Fraudulent Transfer Act could be applicable to the Reed Creditors' assertion, and the Reed Creditors argue solvency under the Uniform Fraudulent Transfer Act applies. California Civil Code 3439.05 and the Uniform Fraudulent Transfer Act, for the purposes of the Court's analysis are substantially similar. As validity of the claim hinges on solvency, under either statute, the result would be the same.

[46] JX96.003.

[47] Cal. Civ. Code § 3439.04.

[48] 03/04/2024 Tr. 29:3-31:34 (Sarrao).

receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."[49]  Under California law:

> (a) A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.
> ...
> (c) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.
> (d) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.[50]

Mr. Balasiano, the Debtor's independent director responsible for examining the transaction, testified that he conducted an investigation as to potential fraudulent conveyance claims, including discussions with Ms. Gould (who had performed an analysis of the transactions going back four years prior to the bankruptcy filing),[51] his counsel, and Debtor's counsel.[52] He also reviewed the GCS Report, P&L balance sheet, cash flow, and tax returns.[53] Mr. Balasiano relied upon the Debtor's 2019 balance sheet, which reflects the Debtor had an equity value of at least $9.4 million;[54] and the Debtor's 2019 tax returns, which show assets in excess of $18 million.[55] He concluded the Debtor had a positive balance sheet for 2019 (and 2020) and was able to pay its debts as they became due.[56]  Both the balance sheet reflecting assets in excess of liabilities and the payment of debts as they become due are acceptable methods for calculating solvency under the California fraudulent conveyance statute.[57]

Based on his investigation, Mr. Balasiano concluded that "there was no actionable cause of action that could be brought as a result of that transaction [Sunrise Transfer]" because "[t]he company was solvent."[58]  He reasoned that: "In order to bring a fraudulent conveyance action

---

[49] Cal. Civ. Code § 3439.05(a).

[50] Cal. Civ. Code § 3439.02.  *See also In re Beverly*, 374 B.R. 221, 238 n. 18 (B.A.P. 9th Cir. 2007), *aff'd in part, dismissed in part*, 551 F.3d 1092 (9th Cir. 2008) (applying this statute to a fraudulent transfer analysis).

[51] JX96.002 (GCS Report).

[52] 03/04/2024 Tr. 76:25-77:20 (Balasiano).

[53] 03/04/2024 Tr. 78:4-14 (Balasiano).

[54] 03/04/2024 Tr. 89:11-24 (Balasiano); 03/05/2024 Tr. 33:22-35:5; 44:17-46:21 (Sarrao); JX2 (Alecto Healthcare Services, LLC Income Statement FY19).

[55] JX1.010 (2019 Tax Return for Alecto Healthcare Services LLC prepared by MossAdams) and JX41 (Alecto Healthcare Services Balance Sheet Summary (in millions), dated 12/31/2019).

[56] 03/04/2024 Tr. 80:11 (Balasiano).

[57] Cal. Civ. Code § 3439.02.  *See also In re Beverly*, 374 B.R. at 238.

[58] 03/04/2024 Tr. 80:3-16 (Balasiano).

there are two factors.  One is there has to be a transfer for lack of reasonably equivalent value and, number two, the company has to be insolvent at the time of that transfer.  Clearly, the second fact[or] of the test was not satisfied her[e]."[59]

The burden of proving insolvency is on the creditor by a preponderance of the evidence.[60]  "As a general rule 'solvency and not insolvency is presumed.'"[61]  Here, the Reed Creditors did not carry their burden to prove by a preponderance of the evidence that the Debtor was insolvent at the time of the Sunrise Transfer.

The Court finds that Mr. Balasiano's determination that there is "no actionable cause of action that could be brought" for fraudulent conveyance is a reasonable basis for the settlement.[62]

### 2) Breach of Fiduciary Duties

Next, the Reed Creditors assert that the Debtor is releasing viable claims against the Alecto Members for Breach of Fiduciary Duties arising from Alecto's advancement of funds to its affiliates while Alecto was allegedly insolvent or in the zone of insolvency instead of making payment to its creditors.  The crux of this allegation is that more than $5 million was advanced to Sherman/Grayson after the Reed Creditors obtained their approximately $3.2 million judgment against Alecto in November 2022, and before the Petition Date.  Essentially, the Reed Creditors allege that the Debtor favored propping-up Sherman/Grayson, it's affiliate, over the Reed Creditors, it's creditor.

In Delaware, "limited liability company managers owe fiduciary duties akin to those owed by directors of a corporation."[63]  "Without language in an LLC agreement to the contrary, the managers of a Delaware LLC owe traditional fiduciary duties of care and loyalty."[64]

"The fiduciary duty of due care requires that directors of a Delaware corporation both: (1) use that amount of care which ordinarily careful and prudent men would use in similar

---

[59] 03/04/2024 Tr. 80:11-16 (Balasiano).  The Debtor asserted that *even if* the Sunrise Transfer was a fraudulent conveyance, the property was transferred back to the Debtor in 2021.  And, as the 2021 transfer resulted in more equity for the Debtor than the 2019 Sunrise Transfer, such transfer should be "set off" against the 2021 transfer back to the Debtor.  The Court is *not* assessing the merits of the Sunrise Transfer (nor the 2021 return transfer).  Here, the Court is determining whether the settlement of the causes of action in the Releases (in exchange for the Settlement Consideration) is in "the lowest point in the range of reasonableness." *Wash. Mut., Inc.*, 442 B.R. at 328 (citations omitted).  As a result, the Court need not address the "set off" argument.

[60] *See Stearns v. Los Angeles City Sch. Dist.*, 53 Cal. Rptr. 482, 509 (Cal. Ct. App. 1966) (citations omitted); *Whitehouse v. Six Corp.*, 48 Cal. Rptr. 2d 600, 606 (Cal. Ct. App. 1995), *as modified* (Nov. 29, 1995), *as modified on denial of reh'g* (Dec. 19, 1995).

[61] *Stearns*, 53 Cal. Rptr. at 509 (citing *Hasenjeager v. Voth*, 267 P. 146, 147 (Cal. Ct. App. 1928)).

[62] 03/04/2024 Tr. 80:3-9 (Balasiano); *Wash. Mut., Inc.*, 442 B.R. at 328 (citations omitted).

[63] *Mehra v. Teller*, No. CV 2019-0812-KSJM, 2021 WL 300352, at *28 (Del. Ch. Jan. 29, 2021) (footnote omitted).

[64] *77 Charters, Inc. v. Gould*, No. CV 2019-0127-JRS, 2020 WL 2520272, at *9 (Del. Ch. May 18, 2020) (citations omitted).

10

circumstances; and (2) consider all material information reasonably available."[65]  The business judgment standard is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[66]  A court will not disturb the business decisions of loyal and informed directors "if they can be attributed to any rational business purpose."[67]

The fiduciary duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[68]  A director is "being independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations."[69]

Mr. Balasiano also investigated the breach of fiduciary duty claims[70] and concluded:

> [there were] no breach of fiduciary duties, no breach of duty -- no
> breach of loyalty, and no breach of duty of care by the directors
> and the officers in this case.  All of the activities that were done, all
> the funds that were allocated to the different subsidiaries,
> especially to the Sherman/Grayson, which I believe is the biggest
> issue in the case right here, right now, especially to
> Sherman/Grayson were allocated in a fashion with the appropriate
> judicious business judgment.  The actions that the business
> members took were daily conversations, daily decisions that were
> undertaken in order to keep Sherman/Grayson Hospital afloat to
> enable to sell it as a going concern.[71]

After speaking with his counsel, the Debtor's counsel, and officers and employees of the Debtor; examining documents, including those related to Sherman/Grayson;[72] and reviewing the decisions made by the Alecto Members, Mr. Balasiano determined that the Alecto Members acted within their business judgment.[73]  He reasoned that a going concern sale is typically better for a company than a liquidation or closure, and in this case, the Alecto Members were cognizant of approximately $30 million in collateral liabilities (such "Springing Liabilities" are discussed

---

[65] *Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 568 (Bankr. D. Del. 2008) (citation omitted).

[66] *Gantler v. Stephens*, 965 A.2d 695, 705–06 (Del. 2009) (footnote omitted).

[67] *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971).

[68] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994) (citations omitted).

[69] *Id.* at 364 (citations omitted).

[70] 03/04/2024 Tr. 74:14-75:3 (Balasiano).

[71] 03/04/2024 Tr. 83:4-16 (Balasiano).

[72] 03/04/2024 Tr. 80:20-82:1 (Balasiano).

[73] 03/04/2024 Tr. 83:2-16 (Balasiano).

11

below) from the potential closure of WNJ.[74]  The Alecto Member's determined that supporting WNJ would allow a purchaser to assume many, if not all, of these Springing Liabilities.[75]  Based on his investigation, Mr. Balasiano concluded that the Alecto Members acted within their fiduciary duties and pursuant to their business judgment.  Mr. Balasiano concluded that there was no valid cause of action for breach of fiduciary duties and the release of such claims appropriate.[76]

In addition, Mr. Balasiano testified about the costs of potential litigation.  He said litigation could give rise to indemnification under the Operating Agreement which would further deplete assets of Alecto.[77]  Although there is insurance, the insurer would be entitled to review for coverage.[78]  Mr. Balasiano concluded the financial resources of the Debtor could be drained.[79]

Mr. Balasiano's reasoning is supported by Mr. Sarrao who testified that Alecto Managers spoke nearly every business day regarding the oversight and management of the business[80] and were aware of the potential harm to Alecto if it stopped funding the affiliates.[81]  He explained the following Springing Liabilities were considered in the Alecto Members' decision-making process:

- Alecto guaranteed the real estate lease at the WNJ facility.  This lease obligation would be an approximate $7.2 million liability of Alecto.[82]

- Alecto, as guarantor, would be liable under a "put option" for the hypothetical fair market value of a facility adjacent to WNJ if it did not operate for 12 months.[83]  Mr. Sarrao estimates this liability between $13-15 million.[84]

---

[74] 03/04/2024 Tr. 83:17-84:14 (Balasiano).

[75] 03/05/2024 Tr. 52:20-53:2 (Sarrao).

[76] 03/04/2024 Tr. 83:2-84:4 (Balasiano).

[77] 03/04/2024 Tr. 107:12-16 (Balasiano).

[78] 03/04/2024 Tr. 107:22-108:17 (Balasiano).

[79] 03/04/2024 Tr. 85:3-9 (Balasiano).

[80] 03/05/2024 Tr. 15:17-16:5 (Sarrao).

[81] *See, e.g.,* 03/05/2024 Tr. 52:20-53:17 (Sarrao) (describing obligations from Sherman/Grayson that the Debtor would become liable for without providing funding to Sherman/Grayson); *see also Asmussen v. Quaker City Corp.*, 156 A. 180, 181 (Del. Ch. 1931) (holding that directors of insolvent corporations may appropriately prefer particular creditors); *Pennsylvania Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.*, 174 A. 112, 115-16 (Del. Ch.1934) (finding that the board's preference of one creditor over another could be a breach of fiduciary duty if motivated by self-interest).  *See also Nelson v. Emerson*, No. CIV.A. 2937-VCS, 2008 WL 1961150, at *9 n. 59 (Del. Ch. May 6, 2008).

[82] 03/05/2024 Tr. 53:8-17 (Sarrao).  JX18 (Lease Agreement between MPT of Sherman Alecto Hospital, LLC and Sherman/Grayson Hospital, LLC dated Oct. 31, 2014).

[83] 03/05/2024 Tr. 55:13-22 (Sarrao).

[84] 03/05/2024 Tr. 55:3-22; 58:2-15 (Sarrao). 03/04/2024 Tr. 84:7-12 (Balasiano).  JX10 (Ground Lease Agreement for 300 N. Highland Dr., Sherman, TX); JX19 (Assumption and Assignment of MOB Ground Lease); JX20 (Guaranty).

- During the COVID-19 pandemic, WNJ was a recipient of Medicare advance payments under the CAAP program from CMS.[85] Mr. Sarrao believes CMS would pursue Alecto for return of these advance payments if WNJ did not pay them.[86] Mr. Sarrao estimates this liability to be over $5 million if WNJ closed.[87]

- Mr. Sarrao testified that, at any given time, there is approximately $800,000 of accrued payroll at WNJ and that such payroll would become the responsibility of Alecto if WNJ did not pay the accrued payroll.[88]

- Mr. Sarrao believes that there is approximately $1 million of accrued pay roll taxes that would become the responsibility of Alecto.[89]

- Mr. Sarrao testified that WNJ accrued approximately $775,000 in PTO (paid time off) for its employees that would become the responsibility of Alecto if WNJ closed.[90]

- Mr. Sarrao testified that Alecto would be liable for up to $500,000 in accrued real estate taxes if WNJ closed and did not pay its taxes.[91]

- Mr. Sarrao testified if WNJ closed (i) there would be wind-down costs associated with the computer systems and paper records at WNJ which contain protected health records; (ii) pharmaceuticals, including radioactive materials, would have to be handled in accordance with applicable law; (iii) WNJ patients would have to be transferred to other facilities; and (iv) WNJ's facility secured and equipment disposed of during closure. Mr. Sarrao estimates these expenses would be approximately $3 million.[92]

- Mr. Sarrao testified approximately $1 million of personal property taxes would be due and owning and would become the responsibility of Alecto.[93]

- Mr. Sarrao testified Alecto would face approximately $3-3.2 million of possible WARN Act claims if WNJ closed without any advance notice to employees.[94]

---

[85] 03/05/2024 Tr. 58:16-22 (Sarrao). Referring to the "COVID-19 Accelerated and Advance Payment" from the Centers for Medicare & Medicaid Services. *See* https://www.cms.gov/medicare/payment/covid-19/covid-19-accelerated-and-advance-payments/covid-19-accelerated-and-advance-payment-caap-and-repayment-reporting.

[86] 03/05/2024 Tr. 59:3-5 (Sarrao).

[87] 03/05/2024 Tr. 58:18-59:12 (Sarrao).

[88] 03/05/2024 Tr. 59:15-21 (Sarrao).

[89] 03/05/2024 Tr. 61:5-8 (Sarrao).

[90] 03/05/2024 Tr. 59:18-21 (Sarrao).

[91] 03/05/2024 Tr. 59:25-60:7 (Sarrao).

[92] 03/05/2024 Tr. 60:8-24 (Sarrao).

[93] 03/05/2024 Tr. 60:25-61:5 (Sarrao).

[94] 03/05/2024 Tr. 61:10-62:3 (Sarrao).

13

**A1620**

Mr. Sarrao testified that in his business judgment, and the business judgment of the board of managers, when Alecto found a buyer for WNJ, the sale would absorb many of the Springing Liabilities[95] (which indeed occurred in the Sherman/Grayson bankruptcy case).

Mr. Sarrao further testified about the negative impact of the COVID-19 pandemic on hospital operations and profits, including (i) increased labor and supply costs (particularly, traveling nurses and respiratory therapist); (ii) static reimbursement rates from insurance and Medicare; (iii) decreased patients; (iv) closure of more profitable hospital departments, such as the psychiatric in-patient ward and elective surgeries.[96] These COVID-related pressures, and resulting decline in profits, were considered and impacted the Alecto Managers' exercise of their business judgment in determining how to expend limited financial resources.[97]

There is no evidence that the Alecto Managers did not consider all information reasonably available to them, or that they were negligent in determining whether to make transfers to Sherman/Grayson. Similarly, no evidence was presented that the managers acted in their own self-interests rather than the interests of Debtor.

### 3) *Zenith* Factors

In addition to analyzing the Debtor Releases under the business judgment standard, some courts within the Third Circuit assess the propriety of a debtor release under the five *Zenith* factors:

> (1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.[98]

No one *Zenith* factor is dispositive, nor is a plan proponent required to establish each factor for the release to be approved.[99] Applying *Zenith*, two factors are neutral. Factor 1, whether there is an identity of interest between the Debtor and non-debtors, is neutral because it is subject to debate[100] and the parties have not provided sufficient evidence on the issue. Similarly, factor 4 is neutral because no creditors voted to accept or reject the Plan.

---

[95] 03/05/2024 Tr. 64:16-23 (Sarrao). The Sherman/Grayson sale of the WNJ hospital closed on January 1, 2024. Del. Bankr. Case No. 23-19810, D.I. 314.

[96] 03/05/2024 Tr. 178:15-81:12 (Sarrao).

[97] 03/05/2024 Tr. 178:6-183:4 (Sarrao).

[98] *Coram Healthcare Corp.*, 315 B.R. at 335 (*citing In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)).

[99] *In re Wash. Mut. Inc.*, 442 B.R. at 346.

[100] JX13 (Alecto Healthcare Services LLC Amended and Restated Operating Agreement, § 7.8) (specifying certain indemnification obligations that the Debtor has in relation to the Released Parties).

Two factors weigh in favor of releases. Factor 2, the substantial contribution factor, weighs in favor because the "Released Parties" are contributing the Settlement Consideration for distribution to the creditors under the Plan.[101] Mr. Balasiano, the independent director tasked with reviewing claims, determined in his business judgment that the alleged claims were not actionable;[102] under the circumstances, the Court finds the contribution to be substantial. Factor 3, the uncontroverted testimony established that, absent the releases, the Debtor would not proceed with the Plan.[103] If this case is converted to Chapter 7, the Liquidation Analysis reflects no recovery for unsecured creditors.[104]

Factor 5 weighs against releases. All claim holders will be paid in full except those in Class 3 who will receive a pro rata recovery over a three-year plan period.[105]

On balance, the *Zenith* factors favor approval of the Debtor Releases.

### 4) Conclusion Regarding Debtor Releases

In sum, Mr. Balasiano, the Debtor's independent director, determined in his business judgment and based on his independent investigation, that there was not an actionable claim for fraudulent conveyance or breach of fiduciary duties, and that the release of such claims was appropriate. No contrary evidence was presented.

Based on the evidence, and considering the *Zenith* standard, the Court finds that the proposed settlement falls within a reasonable range of litigation possibility. Under the *Martin* factors, the claims have very little probability of success on the merits, if any.[106] Absent the settlement, the Debtor would face increased expense, inconvenience and delay attending to litigation.[107] These are complex claims that could cause delay in the distribution of any assets to the creditors. Additionally, the creditors will receive the Settlement Consideration as part of the disposable income of the Debtor. There was no evidence regarding the possibility of collection on any

---

[101] Plan (D.I. 261) at Art. IV.5; Sarrao Declaration (D.I. 307) at ¶ 69; 03/04/2024 Tr. 80:3-9, 83:2-7 (Balasiano); 03/05/2024 Tr. 176:2-4 (Sarrao).

[102] 03/04/2024 Tr. 80:3-9; 83:2-7.

[103] 03/05/2024 Tr. 73:18-74:1 (Sarrao) ("Q. Are the releases in conjunction and exculpation each an (indiscernible) part of the debtor[']s plan? A. From my view, yes. Q. And has the board considered whether to proceed with the plan if each of those provisions is not approved? A. It has. Q. And what would the [board] do if these were not approved? A. It would likely not proceed with the plan as it's structured right now.").

[104] Plan (D.I. 261) at Art. IV.5; *see also* 03/05/2024 Tr. 22:20-25 (Sarrao).

[105] Plan (D.I. 261) at Art. IV.1-2.

[106] *See* generally *In re World Health Alts., Inc.*, 344 B.R. 291, 302 (Bankr. D. Del. 2006) ("Factor one favors settlement because there is a low probability of litigation success. A sufficient degree of uncertainty exists as to whether the Committee, or a chapter 7 trustee, could prevail on any of the potential causes of action against CapSource. Moreover, the Court finds that the probability of successfully challenging CapSource's liens is low.")

[107] *Id.* ("Substantial expenditure of money may not be warranted in light of the low probability of success and the estate's limited resources.")

judgment, so this factor is neutral. The other three *Martin* factors weigh in favor of approving the settlement.

The Settlement Consideration is a substantial contribution because there are no actionable causes of action that could be brought based on these purported claims. As a result, the Debtor Releases are a valid exercise of the Debtor's business judgment, are fair, reasonable, and in the best interest of the Debtor's estate. The sole remaining objection to the Debtor Releases is overruled.

### b. Injunction

The Reed Creditors object to the Injunction in Section VII.4 of the Plan. They argue the Injunction creates the equivalent of non-consensual third-party release because it enjoins creditors from pursuing the Released Parties.[108] Paragraph 69 of the Proposed Confirmation Order, which was revised to resolve certain objections, states: "Nothing in the Plan or herein shall be interpreted to provide any third-party releases, however no party may bring a derivative claim of the Debtor or its estate against any of the Released Parties for any Claim arising prior to the Effective Date."[109]

As a general matter, creditors, such as the Reed Creditors, of an insolvent corporation (or a corporation operating in the zone of insolvency) cannot bring direct causes of action (including fraudulent conveyance and breach of fiduciary duty claims) against such corporation's officers and directors.[110] Such claims must be brought derivatively.[111]

As the Court finds that the Debtor's settlement by release of the above-described claims is appropriate and the only way for the Reed Creditors to bring such claims is derivatively (i.e., standing in the shoes of the Debtor), the objection to the proposed injunction is overruled.

### c. Good Faith - 11 U.S.C. §1129(a)(3)

Section 1129(a)(3) requires a plan to be "proposed in good faith and not by any means forbidden by law." At the Confirmation Hearing, the Reed Creditors argued the Debtor cannot satisfy the good faith requirement.

First, the Reed Creditors argue that this case involves process, evidence, and legal failures in the Debtor's efforts to obtain releases through the Plan in favor of its insiders. They assert that the independent director could not fulfill his role as a fiduciary to creditors because he failed to evaluate the potential causes of action independently, engaged in a "cursory" analysis, and was unable to articulate why he determined those claims were not viable. They also argue that Mr. Sarrao is not an expert on solvency and is conflicted as a potential target of a possible breach of fiduciary duty claim. As detailed above, Mr. Balasiano, an independent director, with fiduciary

---

[108] Plan (D.I. 261) at Art. VII.4.

[109] D.I. 334.

[110] *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 100–01 (Del. 2007).

[111] *Id.* at 101.

duties, investigated and analyzed the potential claims and concluded there were no actionable causes of actions that could be brought.[112]  Likewise, Mr. Sarrao relied upon documents prepared in the ordinary course of business and his experience with the Debtor's business.  The Court found both Messrs. Balasiano's and Sarrao's testimony to be credible.

Second, the Reed Creditors argue the $25,000 consideration for the release of claims will "yield no benefit to creditors."  They argue this recovery is "paltry" compared to a potential $1.9 million recovery if the fraudulent conveyance and breach of fiduciary duty claims were successfully prosecuted.  Again, considering Mr. Balasiano's determination regarding the claims, $25,000 for the release of the purported claims is substantial and yields a recovery to creditors.

Finally, the Reed Creditors argue that preserving causes of action for the Reorganized Debtor amounts to benefitting the insiders.  However, the Reed Creditors never presented any evidence or otherwise explained how the plan fails to satisfy section 1129(a)(3).  In contrast, the evidence shows that the Plan "comports with . . . [the] principal purpose of the Bankruptcy Code," which "is to grant a fresh start to debtors."[113]

For these reasons, the Court finds that the Plan "has been proposed in good faith and not by any means forbidden by law."[114]  The Reed Creditors' objection is overruled.

## E. Conclusion

Based on the record before the Court, and as explained above, the Court finds that the Plan satisfies the requirements of the Bankruptcy Code.  The Court will confirm the Plan, subject to modification of the Proposed Confirmation Order.  A hearing will be held on **March 25, 2024, at 11:00 am (Prevailing Eastern Time)** to discuss the language of the Proposed Confirmation Order.[115]

Regards,

J. Kate Stickles
United States Bankruptcy Judge

cc: Counsel on attached Service List via E-mail

---

[112]  Mr. Balasiano, an attorney, serves as trustee and independent director in bankruptcy cases, including evaluating potential causes of action.

[113]  *See City of Chicago v. Fulton*, 141 S. Ct. 585, 593 (2021) (citation omitted).

[114]  11 U.S.C. § 1129(a)(3).

[115]  To the extent unresolved, the Court will address the objection of the United States of America and the U.S. Trustee to Article VI.c. of the Plan and paragraph 53 of the Proposed Confirmation Order relating to forfeiture of undeliverable or unclaimed distributions.

**A1624**

## Service List

**Counsel to the Debtor**
Jeffrey R. Waxman, Esquire
Tara C. Pakrouh, Esquire
Christopher M. Donnelly, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
jwaxman@morrisjames.com
tpakrouh@morrisjames.com
cdonnelly@morrisjames.com

**Counsel for Debtor's Independent
Director/Manager**
Justin R. Alberto, Esquire
Cole Schotz P.C.
500 Delaware Ave., Suite 1410
Wilmington, DE 19801
JAlberto@coleschotz.com

**Subchapter V Trustee**
Jami Nimeroff, Esquire
Brown McGarry Nimeroff LLC
919 N. Market Street, Suite 420
Wilmington, DE 19801
JNimeroff@bmnlawyers.com

**United States Trustee**
Linda Casey, Esquire
Office of the United States Trustee
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
Linda.Casey@usdoj.gov

**Counsel for the United States of America**
Brian M. Boynton, Esquire
Kirk T. Manhardt, Esquire
Marc S. Sacks, Esquire
Stanton C. Mcmanus, Esquire
U.S. Department of Justice –
    Civil Division Commercial
Litigation Branch
P.O. Box 875, Ben Franklin Station
Washington, DC 20044
stanton.c.mcmanus@usdoj.gov

-and-

Leah V. Lerman, Esquire
U.S. Department of Justice Civil Division
P.O. Box 875 Ben Franklin Station
Washington, DC 20044-0875
Leah.V.Lerman@usdoj.gov

**Counsel for the Reed Action Judgment Creditors**
William D. Sullivan, Esquire
William A. Hazeltine, Esquire
Sullivan Hazeltine Allinson LLC
919 North Market Street, Suite 420
Wilmington, DE 19801
bsullivan@sha-llc.com
whazeltine@sha-llc.com

-and-

Colten L. Fleu, Esquire
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
colten@msjlaw.org

-and-

John Stember, Esquire
Maureen Davidson-Welling, Esquire
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
jstember@stembercohn.com
mdavidsonwelling@stembercohn.com

**A1625**

# EXHIBIT 52

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC, | Case No. 23-10787 (JKS) |
| Debtor.[1] | **Re: D.I. 261, 303, 307, 264, 270, 285, and 308** |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW CONFIRMING SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION

The Small Business Debtor's Plan of Reorganization dated December 19, 2023 [Docket No. 261] (as amended, modified, or supplemented, the "Plan")[2] having been filed with this Court (the "Court") by Alecto Healthcare Services LLC, the debtor and debtor in possession herein (the "Debtor"); in the above-captioned bankruptcy case (the "Bankruptcy Case"). a copy of the Plan and notice of the confirmation hearing having been served upon all creditors and parties in interest in accordance with this Court's Order Scheduling a Hearing on Plan Confirmation and Deadlines Related Thereto; and (II) Approving the Notice and the Forms Related Thereto [Docket Nos. 267 and 284] (the "Scheduling Order"), and notice of the confirmation hearing (the "Confirmation Hearing Notice") having been served upon all creditors and parties in interest; an evidentiary hearing to consider the approval of the Plan having commenced before the Court on March 4, 5, and 13, 2024 (the "Confirmation Hearing"), after due notice to holders of Claims and Interests and other parties in interest, pursuant to the United States Bankruptcy Code found at Title 11 of the United States Code (the "Bankruptcy Code") and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and upon all of the proceedings held before the Court, and after full consideration of (i) the Declaration of Michael Sarrao, Executive Vice President,

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

[2] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Plan.

General Counsel and Secretary of Alecto Healthcare Services LLC, in Support of First Day Motions [Docket No. 3] (the "First Day Declaration"); (ii) the Declaration of Michael Sarrao in support of Confirmation of the Plan (the "Sarrao Declaration") [Docket No. 307], (iii) the Declaration of Steven Balasiano in Support of Confirmation of the Plan (the "Balasiano Declaration") [Docket No. 308];[3] (iv) the expert report of Jeff McCutcheon [Docket No. 303], and (v) the certifications of service (collectively, the "Plan Service Certification") [Docket Nos. 264, 270, and 285]; and (vi) all other evidence proffered or adduced, memoranda and objections filed in connection with, and arguments of counsel made at, the Confirmation Hearing; and after due deliberation and sufficient cause appearing therefor,

It hereby is DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.    Findings and Conclusions.    Consistent with the Court's Letter Ruling re: confirmation dated March 20, 2024 [Docket No. 343] (the "Confirmation Opinion"), the findings and conclusions set forth herein and on the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.    Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a)).    The Court has jurisdiction over this Chapter 11 Case pursuant to sections 157 and 1334 of title 28 of

---

[3] The Balasiano Declaration was not admitted into evidence.

the United States Code and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. Venue of this Chapter 11 Case is proper pursuant to sections 1408 and 1409 of title 28 of the United States Code. Confirmation of the Plan is a core proceeding pursuant to section 157(b)(2)(L) of title 28 of the United States Code, and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

3. <u>Commencement of the Chapter 11 Case.</u> On June 16, 2023 (the "<u>Petition Date</u>"), the Debtor filed a voluntary bankruptcy petition (the "<u>Petition</u>"), thereby commencing a case under Chapter 11, Subchapter V of the Bankruptcy Code. The Debtor has operated its business and managed its property as a debtor in possession pursuant to Sections[4] 1107(a) and 1108. Other than Jami Nimeroff, the Subchapter V trustee, no trustee or examiner has been appointed in this Chapter 11 Case.

4. <u>Judicial Notice.</u> The Court takes judicial notice of the docket of the Chapter 11 Case maintained by the Clerk of the Court, including, without limitation, all pleadings and other documents filed and orders entered thereon, including but not limited to the Petition, bankruptcy schedules, and statement of financial affairs filed by the Debtor.

5. <u>Burden of Proof.</u> The Debtor has the burden of proving the elements of Section 1191(b) by a preponderance of the evidence, and it has met that burden as further found and determined herein.

---

[4] Unless otherwise noted, any use of the capitalized "Section" herein shall refer to the applicable section in the Bankruptcy Code found at Title 11 of the United States Code.

3

16497261/7

**A1629**

6.     Notice; Transmittal and Mailing of Materials.

(a)     The Court conducted one or more hearings with respect to the service of the Plan, including service of the exhibits to the Plan and the Confirmation Hearing Notice on certain holders of Claims and Interests and parties in interest, as well as scheduling of the confirmation Hearing, and on January 25, 2024, the Court entered the Scheduling Order;

(b)     As evidenced by the Plan Service Certification, due, adequate and sufficient notice of the Plan and the Confirmation Hearing, along with the deadlines for filing objections to the Plan, has been given to all known holders of Claims and Interests, as applicable, and no other or further notice is or shall be required;

(c)     A copy of the Plan was transmitted and served in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and such transmittal and service were adequate and sufficient, and no further notice is or shall be required;

(d)     Adequate and sufficient notice of the Confirmation Hearing and other deadlines described in the Plan have been given in compliance with the Bankruptcy Code and the Bankruptcy Rules, and no other or further notice is or shall be required; and

(e)     The filing with the Court and service of the Plan, and the disclosure of any further modifications on the record of the Confirmation Hearing, constitute due and sufficient notice of the Plan.

7.     Proper Classification (Sections 1122 and 1123(a)(1)).     In addition to Administrative Claims and Priority Tax Claims that need not be classified, the Plan classifies four (4) Classes of Claims and Interests.  The Claims and Interests placed in each Class are substantially similar to other Claims or Interests, as the case may be, in each such Class.  Valid business, factual and/or legal reasons exist for separately classifying the various Classes of

4

Claims and Interests created under the Plan, the classifications were not done for any improper purpose, and such Classes do not unfairly discriminate between or among holders of Claims or Interests. Accordingly, the Plan satisfies Sections 1122 and 1123(a)(1).

8.     Specified Treatment of Impaired Classes (Section 1123(a)(3)). Article IV of the Plan designates Class 3 (General Unsecured Claims) as impaired and specifies the treatment of this Class of Claims under the Plan. Accordingly, the Plan satisfies Section 1123(a)(3).

9.     No Discrimination (Section 1123(a)(4)). The Plan provides for the same treatment by the Debtor for each Claim or Interest in each respective Class, unless the holder of a Claim or Interest has agreed to a less favorable treatment. Accordingly, the Plan satisfies Section 1123(a)(4).

10.    Implementation of Plan (Section 1123(a)(5)). The Plan provides adequate and proper means for the Plan's implementation. Accordingly, the Plan satisfies Section 1123(a)(5).

11.    Nonvoting Equity Securities (Section 1123(a)(6)). Section 1123(a)(6) requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities. The Plan does not contemplate the issuance of non-voting equity securities and as such, Section 1123(a)(6) is inapplicable.

12.    Designation of Officers and Directors (Section 1123(a)(7)). The Plan provides that the Board of Managers of the Debtor immediately prior to the Effective Date shall serve as the initial Board of Managers of the Reorganized Debtor on and after the Effective Date. Such compensation was subsequently reduced as part of a settlement, as set forth in Paragraph 41 herein and the Confirmation Opinion. The identities of the Managers and their compensation are set forth in the Plan. The manner of selection is consistent with the interests of creditors and

5

public policy as the current Board of Managers will serve as the initial Board of Managers after the Effective Date.  Accordingly, the Plan satisfies Section 1123(a)(7).

13.     <u>Impairment/Unimpairment of Classes of Claims and Equity Interests (Section 1123(b)(1))</u>.  The Plan provides that Class 3 is impaired and Classes 1, 2, and 4 are unimpaired, as contemplated by Section 1123(b)(1).

14.     <u>Assumption, Assignment, and Rejection (Section 1123(b)(2))</u>.  As contemplated by Section 1123(b)(2), Article IV.4 and Exhibits E and F of the Plan provides for which Executory Contracts will be assumed or rejected as of the Effective Date.

15.     <u>Additional Plan Provisions (Section 1123(b)(6))</u>.  The Plan's additional provisions, including, without limitation, Debtor release and exculpation provisions, are fair, appropriate and consistent with the applicable provisions of the Bankruptcy Code.

16.     <u>Good Faith Disclosure and Service (Section 1125(e))</u>.  Based on the record before this Court in this Chapter 11 Case, the Debtor, its officers, directors, members, managers and their respective counsel and advisors have acted in "good faith" within the meaning of Section 1125(e) and in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules in connection with all of their respective activities relating to the disclosures set forth in the Plan and, to the extent applicable,  they are entitled to the protections afforded by Section 1125(e) and the exculpation provisions set forth in Article VII of the Plan.

17.     <u>Compliance with Bankruptcy Code (Section 1129(a)(1))</u>.  The Plan complies with the applicable provisions of the Bankruptcy Code.  Accordingly, the Plan satisfies Section 1129(a)(1).

18.     <u>Compliance with Bankruptcy Code (Section 1129(a)(2))</u>.  The Debtor has complied with the applicable provisions of the Bankruptcy Code, including the Bankruptcy

6

Rules, and the Local Rules, including but not limited to transmitting the Plan and related documents and notices in accordance with the Scheduling Order.  Accordingly, the Plan satisfies Section 1129(a)(2).

19.    Plan Proposed in Good Faith (Section 1129(a)(3)).  The Debtor proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying Section 1129(a)(3).  The Debtor's good faith is evident from the facts and records of the Chapter 11 Case and the record of the Confirmation Hearing and other proceedings held in this Chapter 11 Case, The Plan was proposed with the legitimate purpose of making distributions to creditors and continuing the Debtor's operations.

20.    Payments for Services or Costs and Expenses (Section 1129(a)(4)).  Any payment made or to be made by the Debtor for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved by, or is subject to the approval of, the Court as reasonable, or was paid in the ordinary course of business, or will be paid in accordance with the terms of the Plan.  Accordingly, the Plan satisfies Section 1129(a)(4).

21.    Directors, Officers and Insiders (Section 1129(a)(5)).   Article IV.7 lists the Debtor's officers, directors and insiders and their compensation.   Such compensation was subsequently reduced as part of a settlement, as set forth in Paragraph 41 herein and the Confirmation Opinion Accordingly, Section 1129(a)(5) is satisfied.

22.    No Rate Changes (Section 1129(a)(6)).   The Plan does not provide for any changes in any regulated rates.  Accordingly, the Plan satisfies Section 1129(a)(6).

23.    Best Interests of Creditors (Section 1129(a)(7)).   The Plan satisfies Section 1129(a)(7).  The Liquidation Analysis, the Sarrao Declaration, and other evidence proffered or

7

adduced at the Confirmation Hearing: (a) are persuasive and credible; (b) have not been controverted by other evidence; and (c) establish that each holder of an impaired Claim or Interest will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date. Accordingly, the Plan satisfies Section 1129(a)(7).

24. <u>Treatment of Administrative, Priority Tax, and Other Priority Claims (Section 1129(a)(9))</u>. The treatment of Administrative Claims pursuant to Article IV.1 of the Plan satisfies the requirements of section 1129(a)(9)(A) of the Bankruptcy Code. The treatment of Priority Tax Claims pursuant to Article IV.1.C of the Plan satisfies the requirements of Section 1129(a)(9)(C). Accordingly, the Plan satisfies the requirements of Section 1129(a)(9).

25. <u>Feasibility (Section 1129(a)(11))</u>. The Sarrao Declaration, the Income Statement, and such other evidence proffered or adduced at the Confirmation Hearing regarding feasibility of the Plan: (a) is persuasive and credible; (b) has not been controverted by other evidence; and (c) establishes that the Reorganized Debtor will have sufficient funds to administer and consummate the Plan and to close the Chapter 11 Case. Accordingly, the Plan satisfies the requirements of Section 1129(a)(11).

26. <u>Payment of Fees (Section 1129(a)(12))</u>. As provided in Article IV.6 of the Plan, all clerk's office fees and other fees payable under section 1930 of title 28, incurred by the Estate prior to the Effective Date, if any, shall be paid in Cash on the Effective Date. Accordingly, the Plan satisfies the requirements of Section 1129(a)(12).

27. <u>Continuation of Retiree Benefits (Section 1129(a)(13))</u>. Section 1129(a)(13) does not apply in this Chapter 11 Case because the Debtor is not obligated to pay any retiree benefits.

8

28. <u>Payment of Domestic Support Obligations (Section 1129(a)(14))</u>. Section 1129(a)(14) does not apply in this Chapter 11 Case because the Debtor is not required to pay any domestic support obligations.

29. <u>Transfers of Property by Nonprofit Entities (Section 1129(a)(16))</u>. Section 1129(a)(16) does not apply in this Chapter 11 Case because the Debtor is a moneyed, business or commercial corporation.

30. <u>Only One Plan (Section 1129(c))</u>. The Plan is the only chapter 11 plan filed in this Chapter 11 Case. Accordingly, Section 1129(c) is inapplicable.

31. <u>Principal Purpose of the Plan (Section 1129(d))</u>. The principal purpose of the Plan, as evidenced by its terms, is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

32. <u>Satisfaction of Confirmation Requirements</u>. The Court finds that all of the applicable requirements of section 1129(a) of this title, other than paragraphs (8), (10), and (15) of that section, are met with respect to the Plan, and the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in Section 1191(b).

33. <u>No Unfair Discrimination or Inequitable Treatment</u>. With respect to each class of Claims or Interests impaired by the Plan, The Plan does not discriminate unfairly, and is fair and equitable, and accordingly, Section 1191(b) of the Bankruptcy Code is satisfied.

34. <u>Bankruptcy Rule 3016(a)</u>. The Plan reflects the date it was filed with the Court and identifies the entity submitting it as the plan proponent. Accordingly, the Plan satisfies Bankruptcy Rule 3016(a).

<div align="center">9</div>

<div align="center">**A1635**</div>

35. [Omitted]

36. Good Faith. The Plan was proposed in good faith, and the Plan Proponent will be acting in good faith if it proceeds to: (a) consummate the Plan and the settlement agreement set forth in Paragraph 41 herein and the transactions and transfers contemplated thereby, and (b) takes the actions authorized and directed by this Confirmation Order.

37. Assumption or Rejection of Executory Contracts and Unexpired Leases. The Debtor has exercised reasonable business judgment in determining whether to assume or reject each of its executory contracts and unexpired leases as set forth in Article IV.4 and Exhibits E and F of the Plan.

38. Conditions to Confirmation. The conditions to Confirmation set forth in Article IX of the Plan have been satisfied, waived or will be satisfied by entry of this Confirmation Order.

39. Conditions to Effective Date. The conditions to the Effective Date are set forth in Article X.2 of the Plan. Such conditions may be waived by the Debtor.

40. Retention of Jurisdiction. The Court shall retain jurisdiction over the matters set forth in Article VIII.4 of the Plan.

41. Injunction, Exculpation and Limitation of Liability and Releases. As evidenced by the documentary and testimonial evidence, the injunction, exculpation and limitation of liability and release provisions set forth in Article VII of the Plan, are approved because, among other things, such releases do not contain releases of any third party claims, the Released Parties have agree to provide consideration to the Debtor and its estate, including (i) consideration of $25,000 in cash, which shall go toward the disposable income for distribution to creditors under the Plan; (ii) the reduction of compensation by Laxman Reddy to $550,000 for three years

following the Effective Date; and (iii) agreement of the Debtor's current management not to increase their compensation from the amounts set forth the Article IV.7 of the Plan for three (3) years immediately following the entry of this Order confirming the Plan.[5] Further, based upon the record, including all documentary and testimonial evidence and the investigation of the Debtor's independent director/manager regarding the likelihood of success of potential claims against the Released Parties and the likely costs of indemnification due to the Debtor's managers, members, and owners to the Reorganized Debtor and their effects upon the Reorganized Debtor's disposable income, the Court concludes that such releases constitute good faith compromises and settlements of the matters covered thereby and are in the best interests of the Debtor, its Estate, and holders of Claims and Interests, are fair, equitable, reasonable, and are integral elements of the resolution of this Chapter 11 Case in accordance with the Plan. Solely for clarification, nothing herein shall provide any releases of any claims arising after the Effective Date.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

42. Confirmation. The Plan, a copy of which is attached hereto as Exhibit A, is approved and confirmed under Section 1191(b). Except as otherwise set forth herein, the terms of the Plan are incorporated by reference into and are an integral part of this Confirmation Order.

43. Objections. Any objections to the Plan or to Confirmation of the Plan that have not been withdrawn, waived or settled, and all reservations of rights pertaining to Confirmation

[5] Items (ii) and (iii) are addressed in the Confirmation Opinion.

of the Plan, are overruled on the merits, other than the objection of the United States Trustee, which is sustained and is addressed by paragraph 50 herein.

44.  <u>Service and Notice of Confirmation</u>.  Notice of the Confirmation Hearing was appropriate and satisfactory based on the circumstances of the Chapter 11 Case and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.  The service of the Plan and Confirmation Hearing Notice was appropriate and satisfactory based upon the circumstances of the Chapter 11 Case and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

45.  <u>Plan Classifications Controlling</u>.  The classification of Claims and Interests for purposes of distributions made under the Plan shall be governed solely by the terms of the Plan.

46.  <u>Implementation of the Plan</u>.  The Plan will be implemented by the Reorganized Debtor in a manner consistent with the terms and conditions set forth in the Plan and this Confirmation Order.

47.  <u>Plan Funding</u>.  The funds utilized to make Cash payments under the Plan have been and/or will be generated from all of the Debtor's disposable income for the three (3) years immediately following the Effective Date, including but not limited to all money received from any subsidiary or affiliate of the Debtor and any current or future contracts.

48.  <u>Vesting of Assets in the Debtor.</u>  Except as expressly provided in the Plan, all property of the Estate vests in the Reorganized Debtor free and clear of all Claims, liens and interests as of the entry of the final decree and closure of the case.  After entry of the final decree and closure of the case, all of the property of the Reorganized Debtor Estate shall be free and clear of all Claims, liens, and interests.

12

49. <u>Setoffs</u>.  Nothing contained in the Plan shall constitute a waiver or release by the Reorganized Debtor or any creditor of any rights in respect of legal and equitable objections, defenses, setoffs, or recoupment.  To the extent permitted by applicable law, the Reorganized Debtor may, but shall not be required to, set off or recoup against any Claim and the payments or other distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Estate, or the Reorganized Debtor may have against the Holder of such Claim or Equity Interest.

50. <u>Amendment to Proofs of Claim</u>.  Notwithstanding anything in the Plan to the contrary, any attempt to amend a proof of Claim shall not cause the disallowance or expungement of a timely filed proof of Claim, and any creditor may amend its proof of Claim through the Effective Date so long as it relates back to its timely filed proof of Claim.  Any amendment to a proof of Claim filed after the Effective Date shall be subject to disallowance by objection after notice and an opportunity for hearing.

51. <u>Plan Distributions</u>.  The Reorganized Debtor, and not the Subchapter v Trustee, shall be responsible for making Distributions under the Plan, unless the Debtor chooses to engage a third party, as its agent, to make such distributions.

52. <u>Disputed Claims</u>.  No distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim.  Any pro rata distribution to be made on account of a Disputed Claim shall be held in reserve subject to resolution by settlement or Final Order of the Bankruptcy Court. Upon such resolution, except as otherwise agreed by the parties, the Reorganized Debtor as soon as reasonably practicable shall release to the holder of such Claim all money held in reserve necessary for a pro rata distribution on account of such Claim.

13

53.   <u>Delivery of Plan Distributions</u>.   Except as otherwise provided in the Plan, all distributions on account of Allowed Claims shall be made in order of their priority under the Bankruptcy Code.   Subject to prior payment of Allowed Administrative Expenses and Allowed Priority Claims in full, and subject to a pro rata reserve on account of Disputed Claims, pro rata distributions on account of Allowed General Unsecured Claims shall be made on or about September 30, 2024, March 31, 2025, September 30, 2025, March 31, 2026, September 30, 2026, and March 31, 2027.

The Reorganized Debtor shall make distributions: (a) to the address of payment set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed; (b) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no Proof of Claim had been Filed and the Debtor and Reorganized Debtor have not received a written notice of a change of address prior to the Effective Date.   The Reorganized Debtor shall make one attempt to make the distributions contemplated hereunder in accordance with the procedures set forth herein, and upon receipt of notice that such distribution was not delivered, the Reorganized Debtor shall conduct a reasonable search for a new address, such as, for example, checking the mailing label to ensure accuracy however, to the extent that the Reorganized Debtor cannot determine another address, the Reorganized Debtor shall not have any obligation to make subsequent distributions to holders of Claims for which distributions were returned.   Any Holder of an Allowed Claim that does not contact the Reorganized Debtor about an undelivered or unclaimed distribution within 180 days after the first distribution to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed

14

distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against the Debtor, the Estate, the Reorganized Debtor, or its properties or assets, and such distribution shall be deemed unclaimed property unless the holder of the Claim contacts the Reorganized Debtor. Any such unclaimed property shall be made available for distributions on account of Allowed General Unsecured Claims on a pro rata basis during the next distribution. In the event that a holder of a Claim contacts the Reorganized Debtor after forfeiting a distribution, the holder of the Claim shall be entitled to future pro rata distributions under the Plan.

Distributions with respect to the judgment obtained by the Reed Creditors shall be made to counsel for the Reed Creditors ("Class Counsel"), who will hold such distributions in trust until the release of such funds to the Reed Creditors is approved by the District Court for the Northern District of West Virginia where the judgment was entered. The Debtor, its managers, members, officers and directors, and professionals, shall have no liability for the distributions to the Reed Creditors after delivery of the same to Class Counsel. Class Counsel may seek reimbursement out of the proceeds of distributions to the Reed Class Members made to Class Counsel of all costs attendant to the distribution to the Reed Class Members from the District Court for the Northern District of West Virginia, in connection with that Court's approval of distributions to Class Members and Class Counsel.

54. Cash Distributions. If any Distribution under the Plan to the Holder of an Allowed Claim would be less than $50.00, the Debtor may hold such distribution until the time of a subsequent or final distribution. If the final distribution under the Plan to the Holder of an Allowed Claim would be less than $25.00, the Debtor may cancel such distribution.

15

55. <u>Distributions to Holders as of the Confirmation Date</u>. As of 5:00 p.m. (prevailing Eastern Time) on the Effective Date, the transfer registers for Claims shall be closed. The Reorganized Debtor shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make distributions only to those Holders who are Holders of Claims as of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date. Except as otherwise provided in a Final Order of this Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

56. <u>Indefeasibility of Distributions</u>. All distributions provided for under the Plan shall be indefeasible.

57. <u>Saturday, Sunday, or Legal Holiday</u>. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day.

58. <u>Final Order</u>. Any requirement in the Plan for a Final Order may be waived by the Debtor.

59. <u>Assumption or Rejection of Executory Contracts</u>. Other than as set forth in Article IV.4 and Exhibit F of the Plan, effective on and as of the Effective Date, all Executory Contracts set forth in Exhibit E of the Plan are hereby specifically assumed by the Debtor on or before the Effective Date. Any monetary amounts needed to cure any default under an Executory Contract that is assumed shall be paid on the Effective Date, or as soon as reasonably

16

practicable thereafter. Any Claim for rejection damages must be filed within forty-five (45) days after the Effective Date. As of the Effective Date, all Executory Contracts set forth in Exhibit F of the Plan are hereby specifically rejected by the Debtor on the Effective Date, and all claims for rejection damages must be filed by the deadline set forth in Paragraph 83 herein.

60. <u>Allowed Claims</u>. Notwithstanding anything in the Plan to the contrary, the definition of an "Allowed" shall is as follows: With respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a proof of claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court; provided that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Equity Interest is or has been Filed, is not considered Allowed and shall be expunged without further action by the Debtor and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section

17

16497261/7

**A1643**

502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. "Allow" and "Allowing" shall have correlative meanings."

61.   <u>Disputed Claims</u>.   The provisions of Article IV.3 of the Plan, including, without limitation, the provisions governing procedures for the prosecution and settlement of Disputed Claims, are fair and reasonable and are approved.

62.   <u>Modification of Plan</u>.   The Debtor may further alter, amend or modify the Plan pursuant to Section 1193(a).   The Debtor may also seek to modify the Plan at any time after confirmation only if the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

63.   <u>Revocation or Withdrawal of Plan</u>.   The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.   If the Debtor revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void, and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

64.   <u>Retention of Jurisdiction</u>.   Following the Effective Date, the Court will retain exclusive jurisdiction of the Chapter 11 Case to interpret the Plan or the Confirmation Order, and the Court shall retain jurisdiction for all other matters arising under title 11, or arising in or related to the Debtor's Bankruptcy Case to the maximum extent permitted by law under 28 U.S.C. §§ 157 and 1334.

65.   <u>Post-Confirmation Operating Reports</u>.   The Debtor shall file all monthly operating reports due prior to the Effective Date.   After the Effective Date, the Reorganized Debtor shall file quarterly post-confirmation reports, served on the U.S. Trustee, the Subchapter V Trustee,

18

and the United States (to the attention of Leah Lerman, Esquire) on or before the 20th day after the end of the calendar quarter. The reporting shall include at least the following information:  a) the bank name & account type of the Reorganized Debtor's bank accounts; b) the name of the person with signatory authority over the accounts; c) any investments (general type), if any, and where those investments are located; d) Plan disbursements during the reporting period (by class); and e) cumulative Plan disbursements to date.  Additionally, quarterly reports filed immediately after distributions made pursuant to Paragraph 53 herein, shall include an income statement for the relevant period showing the calculation of the actual disposable income available for distribution during such relevant period using the same categories of revenue and expenses contained in the Debtors' calculation of projected disposable income as set forth in Exhibit C to the Plan.

66.    <u>Remedies Upon Default</u>. Pursuant to Bankruptcy Code § 1191(c)(3), if the Reorganized Debtor defaults in payments under the Plan, the affected creditor shall notify the Reorganized Debtor, who shall have fifteen (15) days to cure the default.  If the Reorganized Debtor does not cure within the 15 days, the creditor may file a notice of the default with the Court and request a hearing to consider appropriate remedies.

67.    <u>Discharge</u>.  As soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Court approves a written waiver of discharge executed by the Debtor after the order for relief under the Bankruptcy Code, the Debtor shall be entitled to receive a discharge of all debts provided in section 1141(d)(1)(A) of the Bankruptcy Code, and all other debt allowed under section 503 of the Bankruptcy Code and provided for in this Plan, except any debt – (1) on which the last payment is due after the first 3 years of the Plan, or (2) if applicable, of the kind specified in section 523(a) of the Bankruptcy Code.

19

**A1645**

68.  <u>Injunction</u>.  Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been discharged, released or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind on account of or in connection with or with respect to any such claims or interests unless the discharged, released or exculpated party timely asserts a setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Further, all entities shall be precluded from asserting against the property to be distributed pursuant to this plan any other claims or equity interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

69.  <u>Third Party Release</u>.  Nothing in the Plan or herein shall be interpreted to provide any third-party releases, however no party may bring a derivative claim of the Debtor or its estate against any of the Released Parties for any Claim arising prior to the Effective Date.

20

16497261/7

**A1646**

70. <u>Exculpation and Limitation of Liability</u>. The exculpation and limitation of liability provision set forth in Article VI.3 of the Plan are hereby approved. Further, nothing in the Plan or this Order shall affect or impair any the rights of any insider of the Debtor to exculpation under applicable nonbankruptcy law.

71. <u>Reports</u>. Until a final decree closing the Chapter 11 Case is entered, the Reorganized Debtor shall comply with any requisite reporting requirements established pursuant to the guidelines of the U.S. Trustee.

72. <u>Governing Law</u>. Except to the extent the Bankruptcy Code, the Bankruptcy Rules, or other federal laws are applicable, the laws of the State of Delaware shall govern the construction and implementation of the Plan and all rights and obligations arising under the Plan.

73. <u>Withholding and Reporting Requirements</u>. Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a distribution under the Plan shall have responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such distribution. The Reorganized Debtor reserves the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

74. <u>Postconfirmation Service List</u>: Notwithstanding anything in the Plan to the contrary, pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Reorganized Debtor, and all persons on the Bankruptcy Rule 2002 service list as well as any parties who may be affected by the relief sought.. With the exception of the U.S. Trustee and the Subchapter v Trustee, any Person

21

desiring to remain on the Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Debtor within thirty (30) days subsequent to the Effective Date.  Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order.  Persons who do not file a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Bankruptcy Rule 2002 service list, however nothing herein shall affect any party's right to receive electronic notice of pleadings from CM/ECF.

75.     Section 1146 Exemption.  To the extent applicable, and subject to paragraph 82 of this Confirmation Order, any issuance, transfer, or exchange of any security under the Plan; or the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan; or the vesting, transfer, or sale of any real property of the Debtor pursuant to, in implementation of or as contemplated by the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee pursuant to Section 1146(a) of the Bankruptcy Code.

76.     Severability.  In the event that any provision in the Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

77.     Binding Effect; Counterparts.  The provisions of the Plan shall bind all holders of Claims against the Debtor.  The rights and obligations of any entity named or referred to in the Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity. The Plan may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which counterparts, when so executed and delivered, shall be

22

deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Plan.

78. <u>Effectuating Documents; Further Transaction</u>. The Debtor and/or the Reorganized Debtor are authorized to take all actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

79. <u>Effectiveness of All Actions</u>. All actions authorized to be taken pursuant to the Plan shall be effective on or after the Effective Date pursuant to this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors or interest holders of the Debtor and with the effect that such actions had been taken by unanimous action of such officers, managers, members, directors or interest holders.

80. <u>Approval of Consents</u>. Subject to paragraph 82 of this Confirmation Order, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan and any related documents, instruments or agreements, and any amendments or modifications thereto.

81. <u>Claims Objection Bar Date.</u> All objections to Claims shall be filed by the later of (a) 180 days after the Effective Date by the Reorganized Debtor or (b) 60 days after the Effective Date by a creditor or the Subchapter v trustee. Such deadlines may be specifically fixed or extended by an order of this Court.

82. <u>Reservations of Rights of the United States of America</u>. Notwithstanding anything in the Plan, the Plan Supplement, this Confirmation Order or any implementing Plan

23

**A1649**

documents (collectively, the "Documents"): As to the United States of America (the "United States"), nothing in the Documents shall: (1) discharge, release, enjoin, bar, impair or otherwise preclude (a) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code, (b) any claim of the United States arising after the Effective Date, or (c) any liability of any entity or person under police or regulatory statutes or regulations to any Governmental Unit (as defined by section 101(27) of the Bankruptcy Code) as the owner, lessor, lessee or operator of property or rights to property that such entity owns, operates or leases after the Confirmation Date; (2) release, nullify, preclude, bar or enjoin the enforcement of any police or regulatory power; (3) affect any setoff or recoupment rights or defenses of the United States and the Debtor, which are preserved; (4) require the United States to file an administrative claim in order to receive payment for any liability described in Section 503(b)(1)(B) and (C) pursuant to Section 503(b)(1)(D) of the Bankruptcy Code; (5) constitute an approval or consent by the United States of any entity's action without such entity's compliance with all applicable legal requirements and approvals under non-bankruptcy law; (6) release, exculpate, or discharge any non-Debtor from any claim, suit, right or cause of action of the United States, or any debt, liability or obligation owed to the United States by any non-Debtor, or enjoin, bar, impair or otherwise preclude the United States from taking any action to investigate, litigate, prosecute or otherwise pursue any claim, debt, liability, obligation, suit, right or cause of action against any non-Debtor; (7) be construed as a compromise or settlement of any liability, claim, debt, suit, cause of action or interest of the United States; (8) modify the scope of Section 502 or 505 of the Bankruptcy Code with respect to the claims of the United States including, without limitation, authorizing the refusal to make distributions on any claim of the United States because of any dispute of any other claim of the United States; or (9) cause the

24

automatic disallowance or expungement of any United States claim filed or amended after the Effective Date.

Liens securing claims of the United States shall be retained until the claim, with interest, is paid in full. Administrative expense claims of the United States allowed pursuant to the Plan or the Bankruptcy Code shall be paid in accordance with section 1191(e) of the Bankruptcy Code or section 1129(a)(9)(A), to the extent applicable, and accrue interest and penalties as provided by non-bankruptcy law until paid in full. Priority Tax Claims of the United States allowed pursuant to the Plan or the Bankruptcy Code will be paid in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. To the extent allowed Priority Tax Claims (including any penalties, interest or additions to tax entitled to priority under the Bankruptcy Code) are not paid in full in cash on the Effective Date, then such Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate set forth in Section 511 of the Bankruptcy Code. Moreover, nothing shall affect a release, injunction or otherwise preclude any claim whatsoever against any Debtor or the Debtor's Estate by or on behalf of the United States for any liability arising a) out of pre-petition or post-petition tax periods for which a return has not been filed or b) as a result of a pending audit or audit that may be performed with respect to any pre-petition or post-petition tax period. Further, nothing shall enjoin the United States from amending any claim against any Debtor the Debtor's Estate with respect to any tax liability a) arising out of pre-petition or post-petition tax periods for which a tax return has not been filed or b) from a pending audit or audit that may be performed with respect to any pre-petition or post-petition tax period. Any liability arising a) out of pre-petition or post-petition tax periods for which a return has not been filed or b) as a result of a pending audit or audit which may be performed with respect to any pre-petition or post-petition tax period shall be paid in accordance with

25

1129(a)(9)(A) and (C) of the Bankruptcy Code. Without limiting the foregoing but for the avoidance of doubt, the Reorganized Debtor and any Third-Party Administrator (as the case may be) shall comply with all applicable law with respect to the issuance of any Form 1099 (or similar form) and will perform any back-up withholding in connection with any Plan distributions in accordance with applicable law. Nothing contained in the Documents shall be deemed to bind the United States to any characterization of any transaction for tax purposes or to determine the tax liability of any person or entity, including, but not limited to, the Debtor and the Debtor's estate, nor shall the Documents be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in the Documents be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under Section 505 of the Bankruptcy Code. The Debtor agrees to file all outstanding tax returns within thirty days of the Confirmation Date.

83.    <u>Bar Date for Rejection Claims</u>. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court by 5:00 pm. (prevailing Eastern time) on the date that is 30 days after the Effective Date. Any such rejection Claim will be forever barred and will not be enforceable against the Debtor or its estate, unless a Proof of Claim is Filed or unless otherwise expressly allowed by the Bankruptcy Court.

84.    <u>Administrative Claim Bar Date Provisions</u>. Unless previously filed or as otherwise governed by an order of the Court or pursuant to the Plan, requests for payment of Administrative Claims must be filed with the Court by the Administrative Claim Bar Date,

<div align="center">26</div>

<div align="center">**A1652**</div>

which shall be the first Business Day that is thirty (30) days after the Effective Date. Subject to further order of the Court, Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims and that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred from asserting such Administrative Claims against the Debtor or its estate. Objections to any requests for payment of Administrative Claims must be asserted by the Claims Objection Bar Date.

85. <u>Professional Compensation</u>. Each Professional shall file an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Case, for the period through the Effective Date, no later than forty-five (45) days after the Effective Date. Objections to applications of professionals for compensation or reimbursement of expenses must be filed and served on the Debtor, the U.S. Trustee, the Subchapter v Trustee, and the professionals to whose application the objections are addressed no later than twenty-one (21) days after the date the application is filed, or the Bankruptcy Court may enter an order authorizing the fees without a hearing. Any professional fees and reimbursements or expenses incurred by the Reorganized Debtor subsequent to the Effective Date may be paid without application to the Bankruptcy Court.

86. <u>Notice of Entry of Confirmation Order and Effective Date</u>. No later than seven (7) days after the Plan's substantial consummation, the Debtor shall file and serve the notice required under Section 1183(c)(2) combined with notice of entry of this Confirmation Order and occurrence of the Effective Date pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c), substantially in the form attached as **Exhibit B** hereto (the "<u>Notice of Confirmation</u>") on all holders of Claims and Interests, the United States Trustee for the District of Delaware, and other parties in interest by causing the Notice of Confirmation to be delivered to such parties by e-mail

27

**A1653**

only, if an e-mail is known, or by first-class mail, postage prepaid, within ten business days after the Effective Date except that the Debtor shall have no obligation to serve the Notice of Distribution upon the Reed Creditors, and service upon the Class Counsel shall be deemed effective service.

87.     <u>References to Plan Provisions</u>.  The failure to include or specifically describe or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be approved and confirmed in its entirety.

88.     <u>Conflicts Between Confirmation Order and Plan</u>.  The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; provided, however, that if there is determined to be any inconsistency between any Plan provision and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern and any such provision of this Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

89.     <u>Final Order</u>.  This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

**Dated: April 4th, 2024**
**Wilmington, Delaware**

28

**J. KATE STICKLES**
**UNITED STATES BANKRUPTCY JUDGE**

16497261/7

**A1654**

# EXHIBIT A

**SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION**

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC., | Case No. 23-10787 (JKS) |
| Debtor.[1] | |

**SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION**
**PROPOSED BY THE DEBTOR**

You are encouraged to carefully review the full text of this document, including all exhibits and attachments. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**THE DEBTOR IS NOT SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN, HOWEVER IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY JANUARY 24, 2024 AT 4:00 P.M. (EASTERN TIME) ("Plan Objection Deadline").**

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR FEBRUARY 6, 2024 AT 10:00 A.M. IN COURTROOM NO. 6 AT THE U.S. BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 N. MARKET STREET, WILMINGTON, DELAWARE 19801.**

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

16452692/2

**YOUR RIGHTS MAY BE AFFECTED BY THIS PLAN. YOU SHOULD CONSIDER DISCUSSING THIS DOCUMENT WITH AN ATTORNEY.**

Dated: December 19, 2023           **MORRIS JAMES LLP**

                                          /s/ *Jeffrey R. Waxman*

                                          Jeffrey R. Waxman (DE Bar No. 4159)
                                          Brya M. Keilson (DE Bar No. 4643)
                                          500 Delaware Avenue, Suite 1500
                                          Wilmington, DE 19801
                                          Tel: (302) 888-6800
                                          Fax: (302) 571-1750
                                          E-mail: jwaxman@morrisjames.com
                                          E-mail: bkeilson@morrisjames.com

                                          *Counsel to the Debtor and Debtor in Possession*

2

# TABLE OF CONTENTS

Page

SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION ...........................................1

ARTICLE I - DEFINITIONS ............................................................................1

ARTICLE II - SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS .....5

ARTICLE III - HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR ..........6

1. Nature of the Debtor's Business. ................................................................6

2. History of Business Operations of the Debtor. ................................................6

3. Filing of the Debtor's Chapter 11 Case. .......................................................7

4. Legal Structure and Ownership. .................................................................8

5. Events Leading to the Filing of the Bankruptcy Case. .......................................8

6. The Debtor's Assets and Liabilities. ............................................................9

7. Current and Historical Financial Conditions. ...............................................11

8. Significant Events During the Bankruptcy Case. ...........................................11

9. Projected Recovery of Avoidable Transfers Against Insiders............................15

ARTICLE IV - THE PLAN .............................................................................17

1. Unclassified Claims. ...............................................................................18

   a. Administrative Expenses ...................................................................18

   b. Post-Confirmation Professional Fee Claims ..........................................19

   c. Priority Tax Claims. ........................................................................20

2. Classes of Claims and Equity Interests. .......................................................20

   a. Classes of Other Priority Claims. ........................................................20

   b. Class of Priority Non-Tax Claims. .......................................................20

   c. Class of Secured Claims. ..................................................................21

   d. Class of General Unsecured Claims. .....................................................21

   e. Class of Equity Interest Holders. .........................................................22

3. Treatment of Claims and Claims Objections. ................................................22

   a. Allowance of Claims........................................................................22

   b. Claims Administration Responsibilities .................................................23

   c. Estimation of Claims. ......................................................................23

   d. Adjustment to Claims ......................................................................23

   e. Disallowance of Claims ....................................................................23

i

|   |   |   |
|---|---|---|
| f. | Amendments to Claims | 24 |
| g. | De Minimis Distributions | 24 |
| h. | No Distributions Pending Allowance | 24 |
| i. | Duplicative Claims | 24 |
| 4. | Treatment of Executory Contracts and Unexpired Leases. | 24 |
| 5. | Means for Implementation and Funding of the Plan | 26 |
| 6. | Payments. | 26 |
| a. | Responsibility for Making Payments. | 26 |
| b. | Disputed Claims. | 27 |
| c. | Unclaimed Payments. | 27 |
| d. | Payment Dates and Locations. | 27 |
| e. | Undeliverable Distribution Reserve. | 28 |
| f. | Tax Requirements. | 28 |
| 7. | Post-Confirmation Management and Insiders Retained by the Debtor. | 28 |
| 8. | Preservation of Causes of Action. | 29 |
| 9. | Tax Consequences of the Plan. | 29 |
| **ARTICLE V - FEASIBILITY OF PLAN** | | **30** |
| 1. | Ability to Initially Fund Plan. | 30 |
| 2. | Ability to Make Plan Payments And Operate Without Further Reorganization. | 30 |
| **ARTICLE VI - LIQUIDATION ANALYSIS** | | **31** |
| **ARTICLE VII - DISCHARGE, RELEASES AND INJUNCTIONS** | | **31** |
| 1. | Discharge. | 31 |
| 2. | Debtor Releases. | 31 |
| 3. | Exculpation and Limitation of Liability. | 31 |
| 4. | Injunction. | 32 |
| 5. | Remedies Upon Default. | 32 |
| **ARTICLE VIII - GENERAL PROVISIONS** | | **33** |
| 1. | Title to Assets. | 33 |
| 2. | Binding Effect. | 33 |
| 3. | Severability. | 33 |
| 4. | Retention of Jurisdiction by the Bankruptcy Court. | 33 |
| 5. | Headings. | 34 |
| 6. | Successors and Assigns. | 34 |
| 7. | No Fourteen Day Stay. | 34 |

ii

8. Incorporation of Agreements Entered Into by the Debtor. ................................................34

9. Modification of Plan. ................................................................................................34

10. Reservation of Rights. ..............................................................................................35

11. Filing of Notice of Substantial Consummation ...........................................................35

12. Post-Effective Date Service List ..............................................................................35

13. Changes in Rates Not Subject to Regulatory Commission Approval. ...........................35

14. Final Decree. ...........................................................................................................35

**ARTICLE IX - CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE............36**

1. Conditions Precedent to Confirmation. ....................................................................36

2. Conditions Precedent to the Effective Date. .............................................................36

3. Waiver of Conditions. ...............................................................................................37

4. Effect of Failure of Conditions. ...............................................................................37

5. Filing of Notice of the Effective Date. ......................................................................37

**ARTICLE X - EXHIBITS .......................................................................................37**

1. Rules of Interpretation. ............................................................................................37

2. Computation of Time. ..............................................................................................38

3. Governing Law. .......................................................................................................38

4. Reference to Monetary Figures. ..............................................................................39

5. Controlling Document. ............................................................................................39

iii

**A1660**

## ARTICLE I - DEFINITIONS

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in the Plan. The definitions that follow that are found in the Bankruptcy Code are for convenience of reference only, and are superseded by the definitions found in the Bankruptcy Code.

1.   **Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Bankruptcy Code and allowed under § 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent owed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

2.   **Administrative Tax Claim**: Any tax incurred pursuant to § 503(b)(1)(B) of the Code.

3.   **Allowed:** With respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a proof of claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court; provided that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Equity Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. "Allow" and "Allowing" shall have correlative meanings.

4.   **Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the

16452692/2

Confirmation Date.

5. **Allowed Secured Claim**: Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.

6. **Avoidance Actions**: Any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtor, the Estate, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

7. **Bankruptcy Code**: The Bankruptcy Reform Act of 1978, as amendedand codified as Title 11 of the United States Code.

8. **Bankruptcy Court**: The United States Bankruptcy Court for the District of Delaware.

9. **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

10. **Bar Date:** August 15, 2023, the date by which Proofs of Claim are required to be filed by Creditors.

11. **Business Day**: Any day of the year, other than a Saturday or Sunday, on which national banking institutions in Wilmington, Delaware are open to the public for conducting business and are not required or authorized by Law to close.

12. **Cash**: Cash, cash equivalents and other readily marketable securities orinstruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issuedby banks and commercial paper of any entity, including interest accrued or earned thereon.

13. **Causes of Action**: All Claims, actions, causes of action, choses in action, Avoidance Actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims of the Debtor and/or the Estate that are or may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date against any entity, based in law or equity, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date with respect to matters arising on or before the Effective Date. For the avoidance of doubt, Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (d)

2

any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

14. **Chapter 11 Case**: This case under chapter 11 of the Bankruptcy Code in which Alecto Healthcare Services LLC is the debtor in possession, Case No. 23-10787.

15. **Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

16. **Claims Objection Bar Date:** The last day for objecting to a Claim, which shall be the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed or extended by the Court, the Debtor or the Reorganized Debtor, or by an order of the Bankruptcy Court for objecting to Claims.

17. **Claims Register**: The register of Claims maintained by the Bankruptcy Court.

18. **Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

19. **Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

20. **Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

21. **Confirmation Hearing**: The hearing to be held on November 15, 2023 at 11:00 a.m. (ET) to consider confirmation of the Plan.

22. **Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

23. **Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

24. **Debtor** and **Debtor-in-Possession**: Alecto Healthcare Services LLC, the debtor in possession in this Chapter 11 Case.

25. **Disputed Claim:** Any claim against the Debtor pursuant to § 502 of the Bankruptcy Code that is not yet Allowed.

3

**A1663**

26. **Distribution**: The property required by the Plan to be distributed to the holders of Allowed Claims.

27. **Effective Date**: The first Business Day following the date upon which (a) the Confirmation Date has occurred, or (b) the Confirmation Order is a Final Order, unless, at the Debtor's option, the Debtor desires the Plan go effective regardless of any pending appeal, so long as no stay pending appeal has been granted.

28. **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

29. **Equity Interest**: An ownership interest in the Debtor.

30. **Estate:** The estate of the Debtor created on the Petition Date by Section 541 of the Bankruptcy Code.

31. **Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

32. **File, Filed** or **Filing**: File, filed, or filing in the Chapter 11 Case with the Bankruptcy Court, including with respect to the filing of a Proof of Claim or proof of Equity Interest.

33. **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

34. **General Unsecured Claim:** any Claim other than: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Secured Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; or (f) an Equity Interest.

35. **Governmental Unit**: As defined by 11 U.S.C. § 101(27), the term "governmental unit" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

36. **Holder**: an Entity holding a Claim or Equity Interest, as applicable.

37. **Other Priority Claim:** Any Claim entitled to priority in payment under Sections 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code.

38. **Petition Date**: June 16, 2023, the date the chapter 11 petition for relief was filed.

39. **Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

4

**A1664**

40. **Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

41. **Professional**: A person or Entity employed pursuant to a Final Order in accordance with Sections 327, 328, or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to and including the Effective Date pursuant to Sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

42. **Professional Fee Claims**: A Claim of a Professional for professional services rendered or costs incurred on or after the Petition Date through the Effective Date.

43. **Proof of Claim**: A proof of Claim Filed in the Chapter 11 Case.

44. **Released Parties:** All of the following, and in each case in its capacity as such: (a) the officers and managers of the Debtor; (b) the Debtor's Professionals, and (d) with respect to each of the foregoing Persons in clauses (a) through (b), such Entities' respective predecessors, successors and assigns, provided, however, that notwithstanding the foregoing, and for the avoidance of doubt, nothing herein shall release any Causes of Action of the Debtor or the Estate against any of the Debtor's representatives that did not serve in such capacity on or after the Petition Date.

45. **Reorganized Debtor**: The Debtor after the Effective Date.

46. **Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets [Docket Nos. 48 and 49].

47. **Secured Creditor**: Any creditor that holds a Claim that is secured by property of the Debtor.

48. **Subchapter v Trustee**: Jami Nimeroff, the Subchapter V trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. § 1183(b), the Plan, or the order confirming the Plan.

49. **United States Trustee Fees**: All fees due under 28 U.S.C. § 1930.

## ARTICLE II - SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

The Plan is a reorganization Plan. The Plan will be funded with available Cash on hand on the Effective Date and the Debtor's projected disposable income generated by the ongoing operations of the Debtor. For a period of three (3) years, the Debtor will contribute (i) its entire projected disposable income, in an aggregate amount of no less than $635,549, (ii) any residual value received by the Debtor on account of the Debtor's direct and indirect subsidiaries including the claim filed in the bankruptcy case of Sherman/Grayson Hospital, LLC, and (iii) the proceeds of any Cause of Action, including any settlement proceeds received on account of such claims. Such amounts will be used to fund Distributions provided under the Plan on an annual basis.

The chart below reflects the proposed treatment of Allowed Claims and Equity Interests

5

16452692/2

**A1665**

under the Plan:

- o Allowed Administrative Claims will be paid on a monthly pro rata basis, until such claims are paid in full or, alternatively, upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.

- o Allowed Priority Tax Claims, if any, will be paid in full on the Effective Date. It is anticipated that that there will be no Priority Tax Claims owed.

- o Allowed Priority Non-Tax Claims, if any, will be paid in full on the Effective Date. It is anticipated that that there will be no Priority Non-Tax Claims owed.

- o Allowed Secured Claims, if any, will be paid in accordance with the existing loan documents or other agreements with the Debtor that existed prior to the Petition Date which govern the payment of Debtor's obligations to the holder of the Allowed Secured Claim. Each holder of an Allowed Secured Claim shall retain its lien on its collateral in the same validity and priority as it held prior to the Petition Date until the Allowed Secured Claim amount has been paid. Alternatively, the Allowed Secured Claim amount shall be paid in full through a sale of the collateral or other means, withouts penalty or premium.

- o Allowed General Unsecured Claims will be paid the Debtor's projected disposable income on a pro rata basis, after payment of all Allowed Administrative Claims, Allowed Priority Tax Claims, if any, Allowed Priority Non-Tax Claims, if any, and Allowed Secured Claims. Pro rata Distributions will be made to Holders of Allowed General Unsecured Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date.

- o Upon entry of the Confirmation Order, all existing Equity Interests in the Debtor shall be retained.

## ARTICLE III - HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1. Nature of the Debtor's Business.

The Debtor was formed in 2012 to serve as a holding company for healthcare-related entities.

In the ordinary course of business, the Debtor's employees provide management services through the Debtor's subsidiaries and are engaged in the winddown of hospitals formerly operated by the Debtor's subsidiaries. The winddown of such hospitals consists of responding to requests for patient records and services provided, completing various regulatory requirements, and assisting in the defense of certain litigation matters. An organizational chart of the Debtor and its subsidiaries is attached hereto as **Exhibit A**.

### 2. History of Business Operations of the Debtor.

Historically, the Debtor formed various subsidiaries for the purposes of (a) acquiring distressed acute care hospitals; (b) operating acute care hospitals; (c) providing management services to acute care hospitals that are not owned by the Debtor or its subsidiaries; and (d) owning and operating businesses affiliated with acute care hospitals operated by the Debtor's subsidiaries.

6

At its peak, the Debtor's subsidiaries operated five (5) acute care hospitals across the country, the Debtor provided management services to an acute care hospital owned by an unrelated third-party, and  one of the Debtor's subsidiaries provided management services to an acute care hospital owned by an unrelated third-party.

As of the Petition Date, the Debtor had an ownership interest in two operating subsidiaries, Sherman/Grayson Hospital, LLC ("Sherman/Grayson") and Alecto Healthcare Services Hayward LLC ("Alecto Hayward")

As of the Petition Date, however, the Debtor's primary source of income relates to the services it provides through its Employees to its subsidiary Alecto Hayward.  Alecto Hayward is a party to an Amended Management Services Agreement with Hayward Sisters Hospital dba St. Rose Hospital ("St. Rose") pursuant to which Alecto Hayward provides management services to St. Rose in exchange for a management services fee equal to 3.75% of St. Rose's net revenue with the net revenue being subject to certain adjustments (the "Management Services Fee"). Such management services include the provision of qualified individuals to serve as the Chief Executive Officer and Chief Financial Officer of St. Rose.  Alecto Hayward's contract with St. Rose currently runs through May 2025, subject to renewal for an additional period of 2 years.  The contract can be terminated without cause on 365 days advance written notice.

To facilitate Alecto Hayward's provision of management services, the Debtor provides its Employees to Alecto Hayward to fulfill Alecto Hayward's responsibilities under the management services agreement including having two of its Employees serve as the Chief Executive Officer and Chief Financial Officer of St. Rose.  In return, Alecto Hayward pays a portion of the Management Services Fee each month to the Debtor. The Debtor also receives reimbursement from St. Rose for certain expenses primarily related to the Debtor's Employees other than those who serve as the CEO and CFO that provide services at St. Rose.

Sherman/Grayson is the operator of Wilson N. Jones Regional Medical Center ("WNJ"), a 207-bed acute care hospital located in Sherman, Texas. Sherman has a population of around 45,000 people and is located within Grayson County, Texas which is approximately 75 miles from Dallas, Texas. Among other things, WNJ contains an emergency department, medical surgical units, an intensive care unit, and a behavioral health unit. As discussed below, Sherman/Grayson filed for Chapter 11 relief in Case No. 23-10810 and the Sherman Sale Order (defined below) provides for the sale of substantially all of Sherman/Grayson's assets.

Sherman/Grayson has faced significant financial challenges both during and after the COVID-19 pandemic. As a result of such challenges, during the year prior to filing, Sherman/Grayson was operating at a loss of over $1 million per month.

3.      **Filing of the Debtor's Chapter 11 Case.**

On June 16, 2023, the Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy case. On the Petition Date, the Debtor filed the Declaration of Michael Sarrao, Executive Vice President General Counsel, and Secretary of the Debtor, in Support of First Day Motions [Docket No. 3] (the "Sarrao Declaration").  A copy of the Sarrao Declaration is incorporated as if fully set forth

7

herein.[2]

On June 20, 2023, the Jami Nimeroff was appointed as the Subchapter v Trustee in the Chapter 11 Case.

### 4.    Legal Structure and Ownership.

The Debtor is a Delaware limited liability company.

The following entities and individuals hold ownership interests in the Debtor:

| Name of Entity/Individual | % of Ownership |
|---|---|
| The Reddy Investment Trust | 60.08% |
| The Krissman Family Trust | 10.60% |
| The Sarrao Family Trust | 7.42% |
| The Jeyakumar Inter-Vivos Trust | 3.5% |
| The Hayes Irrevocable Trust | 3.80% |
| Steven Kay | 5.3% |
| Matthew Williams | 5.30% |
| Aman Dhuper | 2.50% |
| Comstock Investment Trust | 1.50% |

### 5.    Events Leading to the Filing of the Bankruptcy Case.

The hospitals acquired by the Debtor's subsidiaries were independent community hospitals that were in some form of financial distress when they were acquired by the Debtor's subsidiaries and faced stiff competition (and in some cases, unfair competition) from nearby hospitals. Despite the best efforts of the Debtor and its subsidiaries, the hospitals acquired by the Debtor's subsidiaries continued to suffer from financial distress which ultimately resulted in two (2) of the hospitals closing in 2019 and one (1) hospital closing in March 2020.

After the closure of the three (3) hospitals described above, the remaining hospitals were faced with significant financial challenges associated with the COVID-19 pandemic including decreased revenue and out of control costs. The significant adverse effect of the pandemic forced one of the Debtor's subsidiaries to sell the real estate associated with an acute care hospital in 2021 to pay off secured lenders and satisfy other priority claims.

The closure of each of these hospitals placed a significant financial burden on the Debtor as the Debtor has been forced to spend time and resources on the winddown of the operations of each of these hospitals and litigate claims by parties seeking to hold the Debtor liable for the debts

---

[2]    A copy of all pleadings in the Chapter 11 Case are available for a fee on the Bankruptcy Court's website, https://ecf.deb.uscourts.gov/.

8

of its subsidiaries.

As of the Petition Date, the Debtor's subsidiaries continued to operate only one hospital, which has subsequently filed for bankruptcy. However, this hospital has faced, and continues to face, significant financial challenges as a result of the pandemic and has not been able to recover financially. In the two years immediately prior to the Petition Date, the Debtor made significant investments in the form of advances to and the payment of expenses on behalf of Sherman/Grayson in an effort to ensure that this hospital could continue operating as a going concern thereby maximizing the value of the subsidiary while meeting the healthcare needs of the community and avoiding additional costs and expense to Debtor if the hospital was to close. Additionally, the Debtor was a guarantor on Sherman/Grayson's lease with MPT of Sherman-Alecto, LLC, which required that (a) Sherman/Grayson maintain its insurance, and in the event that Sherman/Grayson's insurance lapsed, such lapse would be an event of default for which the Debtor would be liable for under the guaranty as obligations under the lease, and (b) that Sherman/Grayson indemnify MPT of Sherman-Alecto, LLC was required to purchase an office building for more than $10 Million pursuant to the terms of a ground lease which may require MPT of Sherman-Alecto, LLC as the ground lessor, to purchase the office building if a healthcare facility is not operated at the location of Wilson N. Jones Regional Medical Center for twelve (12) consecutive months and Sherman/Grayson's failure to perform would constitute an event of default for which the Debtor would be liable for under the guaranty. Accordingly, the Debtor provided significant advances to Sherman/Grayson's during the two (2) years immediately prior to the Petition Date which placed a financial burden on the Debtor and has resulted in a significant decrease in the Debtor's liquidity.

The pandemic further affected patient volumes and revenue at St. Rose which resulted in decreases in the Management Services Fee paid to Alecto Hayward since the fee is based on a percentage of net revenue.

While the Debtor has been able to maintain the business operations outlined above, on May 11, 2023, a judgment was entered against the Debtor in the amount of $2,686,357.11 in plus interest and fees in the legal action *Reed, et. al. v. Alecto Healthcare Services LLC, et. al.* in United States District Court for Northern District of West Virginia, Civil Action No. 5:19-cv-263 (the "Reed Judgment"). On June 1, 2023, the plaintiffs (the "Reed Creditors") in this action obtained a writ of execution against the Debtor in the total amount of $3,242,498.77.

Enforcement of the Reed Judgment against the Debtor would cause a liquidity crisis whereby the Debtor will no longer be able to pay the expenses necessary to continue to operate

### 6. The Debtor's Assets and Liabilities.

The Debtor's assets and liabilities are detailed in the Schedules filed on June 30, 2022 [Docket Nos. 48 and 49] (the "Schedules").

By operation of General Order of the Delaware Bankruptcy Court dated September 14, 2020, the deadline for all parties other than governmental entities to the file a proof of claims was August 15, 2023, and the deadline for governmental entities to the file a proof of claims was set for December 13, 2013. A copy of the claims register maintained by the Bankruptcy Court and

9

the Schedules are attached hereto as **Exhibit B.**

Additionally, on March 9, 2023, the United States commenced a civil suit against the Debtor, seven of its direct or indirect subsidiaries and three individuals to recover approximately $14,211,115 in alleged overpayments made to Defendant Olympia Health Care, LLC by the Centers for Medicare and Medicaid Services, part of the Department of Health and Human Services, in 2005 (Civil Action No. 2:23-cv-01783). The Debtor was named as a defendant because it allegedly controlled Olympia during the relevant period. The Debtor does not believe that it (or any of the defendants) has any liability to the United States for the alleged overpayments.

On the Petition Date, the Debtor had two operating subsidiaries: (i) Sherman/Grayson which, as discussed below, filed its own voluntary Chapter 11 bankruptcy during which its assets were sold and the Debtor may realize some value on account of its claim, and (ii) Alecto Hayward. The projected income and expenses of the Debtor for the next three years is attached hereto as **Exhibit C**.

The Debtor also some miscellaneous assets, including a vehicle and office furniture and equipment. The Debtor does not expect that, if the Chapter 11 case were to convert to Chapter 7 that these miscellaneous assets would generate much money, if any.

In addition to those two entities, the Debtor may realize some value from other direct and indirect subsidiaries but which may have some remnant value.

Alecto Healthcare Services Fairmont LLC ("Alecto Fairmont"), may have residual income due from West Virginia Medicaid of as much as $3 million[3] and from Medicare of as much as $2.8 Million if Alecto Fairmont's appeals related to Medicare's denial of Alecto Fairmont's requests for a Volume Decrease Adjustment of $1,406,332 for 2016 and $1,408,524 for 2017 are successful. The Debtor cannot predict the likelihood or timing for recovery related to these appeals. Before the any payment can be upstreamed to the Debtor, Alecto Fairmont will need to pay all of the liabilities to its own creditors, which include certain outstanding trade claims, payroll taxes, and the payment of certain liabilities related to Alecto Fairmont's withdrawal from a multi-employer pension plan sponsored by the Retail, Wholesale and Department Store International Union and Industry Benefit and Pension Funds, which may be as much as $20 million and Alecto Fairmont's contingent liability as a member of the control group with respect to a defined benefit pension plan sponsored by Alecto Healthcare Services Ohio Valley LLC (the "Alecto Ohio Valley Pension Plan"). The Debtor anticipates that that the liabilities of Alecto Fairmount will significantly exceed any of its residual assets.

Alecto Healthcare Services Wheeling, LLC, an indirect subsidiary of the Debtor, may have some residual income due from West Virginia Medicaid of as much as $900,000, but it also has significant liabilities, including the Reed Creditor's judgment and other judgments entered against it. Those liabilities include payroll taxes, judgments, and contingent liabilities associated with the Alecto Ohio Valley Pension Plan . The Debtor anticipates that that the liabilities of Alecto

---

[3]     This money due to Alecto Fairmount has been outstanding for more than two years and it is unclear how much or when such amounts will be paid.

Wheeling will significant exceed any of its residual assets.

Sunrise MOB Holdings, LLC ("Sunrise MOB"), a direct subsidiary, is also an indirect parent of Plaza Medical Office Building, LLC ("Plaza"). Plaza recently received $3 million from an indemnity reserve from a sale of certain of its real estate assets. Even though Plaza received these funds, it has contingent liabilities as a member of the control group with respect to the withdrawal liability of Alecto Fairmont, which may be as much as $20 million, and as a member of the control group with respect to the Alecto Ohio Valley Pension Plan. Accordingly, the Debtor does not anticipate that its interest in either Sunrise MOB or Plaza will have any value for the benefit of the Debtor's creditors

### 7. Current and Historical Financial Conditions.

In 2021, gross revenues were approximately $3,426,000 with net loss of approximately $810,000; and in 2022, gross revenues were approximately $3,559,929 with net profit of approximately $135,767.

In 2023, through May 31, 2023, gross revenues were $1,559,149.56 with net income of $84,474.62.

Since the Petition Date, the Debtor has filed monthly operating reports reflecting the Debtor's ongoing finances [Docket Nos 83 and 122].

### 8. Significant Events During the Bankruptcy Case.

A. First Day Motions and Orders

On or about the Petition Date, the Debtor filed certain motions and applications seeking relief from the Bankruptcy Court designed to minimize the potential disruption of the Chapter 11 filing on the Debtor's business affairs and facilitate the orderly administration of the Chapter 11 Case. On, or shortly after the Petition Date, the Bankruptcy Court entered various orders. The final hearing on the below motions is set for July 14, 2023. These include:

(a)     Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages and Salaries, (II) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers, and (VI) Allowing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments [Docket No. 4]. On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 26].

(b)     Motion Pursuant to Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor, (II) Determining that the Utility Companies are Adequately Assured of Postpetition Payment and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance [Docket No. 5]. On June 20, 2023, the

11

Bankruptcy Court entered an Interim Order granting the motion [Docket No. 27].

    (c)    Debtor's Motion for Interim and Final Orders Authorizing: (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code [Docket No. 6].  On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 28].

    (d)    Motion of the Debtor for an Order Under Sections §§105(a), 363(b), 363(c), and 503(b) of the Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 6003 Authorizing Debtor to (A) Maintain Existing Insurance Policies; and (B) Pay All Obligations in Respect Thereof [Docket No. 7].  On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 29].

    B.    <u>Retention of Professionals</u>

During the Chapter 11 Case, the Bankruptcy Court entered various orders authorizing the employment of various professionals to assist with the conduct and administration of the Chapter 11 Case and reorganization efforts, including but not limited to the following:

    a.    On July 7, 2023, the Debtor filed (i) an application for entry of an order authorizing the retention and employment of Shulman Bastian Friedman & Bui LLP as bankruptcy counsel to the Debtor *nunc pro tunc* to the Petition Date [Docket No. 67], and (ii) an Application for Entry of an Order Authorizing the Retention and Employment of The Rosner Law Group LLC as Delaware counsel to the Debtor *nunc pro tunc* to the Petition Date [Docket No. 68] (collectively, the "<u>Shulman/Rosner Applications</u>").  On August 7, 2023, the United States Trustee filed an objection to the Shulman/Rosner Applications [Docket No. 89] (the "UST Objection"), and based upon the UST Objection as well as comments made by the Court at the July 13, 2023 hearing to consider the Shulman/Rosner Applications, the Debtor and Sherman/Grayson elected to have substitute counsel for the Debtor.

On August 16, 2023, the Court held a hearing on the Application at which the Court requested additional evidentiary support.  On August 23, 2023, the Debtor filed the First Supplemental Declaration of Michael Sarrao in support of the Shulman/Rosner Applications [Docket No. 133], and on August 24, 2023, the Debtor filed the Second Supplemental Declaration of Michael Sarrao in support of the Shulman/Rosner Applications [Docket No 136].  On August 28, 2023, the Court held a hearing on the Application.. Based on the record at the Hearing, the Court approved the Application subject to certain revisions, and on August 31, 2023, this Court entered an Orders approving the Shulman/Rosner Applications *nunc pro tunc* to the Petition Date through and including August 2, 2023 [Docket Nos.  146 and 147].

    b.    Due to the possibility of a perceived conflict due to potential claims against the Debtors' insiders, on August 9, 2023, the Debtor filed an application to employ Steven Balasiano as independent director/manager to the Debtor *nunc pro tunc*, to August 4, 2023 [Docket No. 93] (the "<u>Balasiano Application</u>").  The purpose of Mr. Balasiano's retention was to make decisions on behalf of the Debtor related to: (i) the Claim of Alecto against Sherman/Grayson arising from intercompany advances made by the Debtor to Sherman/Grayson and certain expenses paid by the

<div align="center">12</div>

<div align="center">**A1672**</div>

Debtor on behalf of Sherman/Grayson, including any settlement of the Alecto Claim; and (ii) potential estate claims against the Debtor's insiders, and (iii) any other conflict that may arise as and between the Debtor and Sherman/Grayson/ On August 16, 2023, the Bankruptcy Court entered an Order approving the Balasiano Application [Docket No. 118].

     c.    On August 16, 2023, the Debtor filed an Application to Employ Morris James as counsel to the Debtor *nunc pro tunc*, to August 11, 2023 [Docket No. 115] (the "Morris James Application"). On September 1, 2023, the Bankruptcy Court entered an Order approving the Morris James Application [Docket No. 149].

     d.    On August 27, 2023, the Debtor filed an Application to Employ Gould Consulting Services as Forensic Investigation Consultant to the Debtor, *nunc pro tunc*, to August 25, 2023 [Docket No. 138].

     C.    Filing of the Sherman/Grayson Bankruptcy Case

On June 23, 2023, Sherman/Grayson, one of the Debtor's remaining two operating subsidiaries, filed for Chapter 11 relief in the United States Bankruptcy Court for the District of Delaware at Case No. 23-10810 (the "Sherman Bankruptcy Case"). When Sherman/Grayson filed its bankruptcy petition, the Debtor was the largest creditor of Sherman/Grayson, with a general claim of approximately $60.1 million.

On July 5, 2023, Sherman/Grayson filed a Motion for Entry of an Order (I) Authorizing the Private Sale of Substantially All Assets Free And Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment Of Executory Contracts and Unexpired Leases, and (III) Granting Other Related Relief [Docket No. 60] (the "Sherman Sale Motion"). By and through the Sherman Sale Motion, the Debtor sought to sell its substantially all of its assets to AHS Sherman, LLC (the "Purchaser") for $100,000 in cash, plus the assumption of certain liabilities. Significantly, the Purchaser also agreed to fund all of the Debtor's operations and other administrative obligations of the hospital and its bankruptcy case, including estate professional fees irrespective of whether the closing is ultimately consummated. Prior to the hearing to consider the Sherman Sale Motion, the Official Committee of Unsecured Creditors of Sherman/Grayson (the "Sherman Committee") entered into a term sheet with the Purchaser by and through which the Purchaser agreed to fund $250,000 to be placed into an escrow account to be held solely for the benefit of general unsecured creditors (the "Sherman GUC Fund"). Additionally, the term sheet between the Purchaser and the Sherman Committee provided that the Debtor would release all claims against the Sherman/Grayson estate and the Debtor would not participate in any distribution from the Sherman GUC Fund. On August 15, 2023, the Debtor filed a limited objection and reservation of rights with respect to the Sale Motion to address the Debtor's right to participate in the Sherman GUC Fund. At the hearing to consider the Sherman Sale Motion, the Debtor again expressly reserved its rights with respect to the proceeds of the sale and the waiver of any right of the Debtor. The Sherman Committee announced that it would file a motion under Bankruptcy Rule 9019 for approval of the term sheet, including the waiver of the Debtor's right to a distribution from the Sherman GUC Fund. The Committee has not yet filed the motion for approval of the settlement. On August 31, 2023, the Bankruptcy Court entered an Order approving the Sale Motion [Docket No. 167] (the "Sherman Sale Order"). The sale has not closed as Sherman/Grayson and the Purchaser attempt to address the regulatory issues.

13

16452692/2

**A1673**

Significantly, the Debtor has been paying certain expenses of Sherman/Grayson, including its insurance. By virtue of the Sherman Sale Order, the Debtor has received repayment on account of the costs of insurance on behalf of Sherman/Grayson for the prorated month of June and for July that were paid by the Debtor. The Debtor expects that the Purchaser will continue to provide funds to Sherman/Grayson so that it will continue to remit payment to the Debtor until the sale closes.

Additionally, at a hearing on August 16, 2023, the Bankruptcy Court orally granted a request by Sherman/Grayson to remit payment to the Debtor on account of certain insurance obligations for the benefit of Sherman/Grayson under the doctrine of necessity. An Order granting the request has not yet been entered.

As set forth above, as part of the sale to the Purchaser, the Sherman Committee negotiated to provide that the Purchaser would fund $250,000 to be placed into an escrow account to be held solely for the benefit of general unsecured creditors. Based solely upon the schedules filed by Sherman/Grayson, the Debtor's unsecured claim is approximately 75% of all unsecured claims. Notably, the Sherman Committee has asserted that the Debtor has liability to Sherman/Grayson on account of avoidable transfers in an amount up to $150,000, and therefore the Debtor is not entitled to a distribution by operation of 11 U.S.C. § 502(d). The Debtor does not agree with the Sherman Committee's analysis, and barring settlement, the Debtor will likely object to any motion filed by Sherman/Grayson or the Sherman Committee which would deny the Debtor's right to any distribution from the Sherman GUC Fund..

D.    Motion for Appointment of an Official Committee of Unsecured Creditors

On August 11, 2023, the Reed Creditors filed a motion to Appoint Creditors' Committee [Docket No. 100] (the "Committee Appointment Motion"). Another creditor, Snyder Brothers, Inc., filed a joinder to the Committee Appointment Motion [Docket No. 111]. On August 22, 2023, the Debtor filed an objection to the Committee Appointment Motion [Docket No. 127], and the United States Trustee filed a statement in response to the Committee Appointment Motion [Docket No. 128].

On August 28, 2023, the Court conducted an evidentiary hearing to consider the Committee Appointment Motion and objection thereto. At the conclusion of the hearing, the Court denied the Committee Appointment Motion, and ruled that the Debtor did not have to provide work product to creditors or the Subchapter v Trustee. On September 11, 2023, the Court entered an Order denying the Committee Appointment Motion [Docket No. 152].

E.    Reed Creditors' Motion for Revoke Designation of the Bankruptcy Case under Subchapter V

On November 2, 2023, the Reed Action Judgment Creditors filed a pleading titled "Objection of the Reed Action Judgment Creditors to Debtor's Designation of This Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor" (the "Designation Motion") [Docket No. 204]. By and through the Designation Motion, the Reed Creditors sought to revoke the Debtor's designation as a subchapter v debtor based upon the amount of noncontingent and liquidated claims against the Debtor as of the Petition Date. On

14

November 22, 2023, the Debtor filed a response in opposition to the Designation Motion [Docket No. 226], and on November 27, 2023, the Reed Creditors filed a reply in support of the Designation Motion [Docket No. 227].

On November 29, 2023, the Court conducted an evidentiary hearing to consider the Designation Motion and objection thereto, and on December 1, 2023, the Court issued its bench decision in which it denied the Designation Motion.

On December 18, 2023, the Reed Creditors filed a notice of appeal of the Court's decision to deny the Designation Motion.

### 9.    Projected Recovery of Avoidable Transfers Against Insiders

A forensic investigation is defined by the scope of the engagement and/or issues in question and may include the analysis of entire sets of data based on the focus of the investigation.[4]   The Debtor requested that Gould Consulting Services ("GCS") conduct a forensic analysis of cash transactions into and out of the Debtor's bank accounts to identify a) cash payments and loans to, or for the benefit of, officers, director, shareholders, and related-parties ("Insiders"), and b) potentially voidable transfers to Insiders, if any.  Since its retention on August 25, 2023, GCS received approximately 1,950 documents during the course of our examination has performed the following analyses:[5]

1.    Reviewed certain filings with the Bankruptcy Court.

2.    Conducted interviews with Michael Sarrao, Alecto's Executive Vice President,

---

[4]    Forensic investigations are iterative, meaning that the analytical techniques used are not performed in isolation since observations made using one technique generally provide insight into other areas of the investigation.

[5]    The scope of work performed by GCS did not include, among others, a) verification of trade accounts receivable or payable, b) examination of deposits into Alecto bank accounts and the source of such deposits unless discussed herein, c) analysis of vendor invoices and related payments, d) analysis of copies of checks, e) identification of payees by ACH or check described in the bank statements as preauthorized debits, identification of payees by ACH or check where no name was identified, or the transaction listed as, or included in, a journal entry, f) detailed examination of invoices and funding request packages used to allocate funds to Affiliates, nor g) examination of email and other internal data/documents unless discussed herein.

While GCS examined transfers into and out of the Alecto bank accounts to CNH Finance and Affiliates and traced the recording of such transfers into Alecto's general ledger, GCS did not reconcile the Affiliates' intercompany accounts.

GCS did not perform an audit, review or compilation as those terms are defined in the AICPA's Statements on Standards for Accounting and Review Services or generally accepted auditing standards.

15

16452692/2

**A1675**

General Counsel and Secretary and Matt Williams, Alecto's Chief Financial Officer.

3.      Analyzed cash sources and uses based on the analysis, categorization, and summarization of 1,296 bank statements containing 116,850 transactions included in 26 bank accounts held by Alecto and certain of its Affiliates for the four (4) year Examination Period June 17, 2019, through June 30, 2023, as discussed below.

   a.      Bank statements were received for the Examination Period for the following entities:

      i.      Alecto Healthcare Services LLC (3 accounts)

      ii.      Alecto Healthcare Services Hayward LLC (1 account)

      iii.      Sherman/Grayson Hospital LLC (7 accounts)

      iv.      Sherman MD Provider, Inc., a subsidiary of Alecto Sherman (5 accounts)

      v.      Sherman Anesthesia, Inc., a subsidiary of Alecto Sherman (2 accounts)

      vi.      Olympia Health Care LLC (6 accounts)

      vii.      Plaza Medical Office Building LLC (2 accounts)

   b.      Identified deposits, payments made by check, direct debit, internal transfer, or wire transfer, and categorized the data by transaction category and payee, if identified in the bank statements.

   c.      Electronically tied Alecto payments by check and ACH Transfer (Bill Payment) to Alecto's general ledger to identify payees.

   d.      Traced advances from the CNH Revolving Facility per electronic statements into Alecto's primary disbursement account *3874 and subsequent transfers from Alecto's account *3874 to bank accounts held by Affiliates.

   e.      Tied advances to Affiliates per bank statements to the LOC Reconciliations, calculated estimated over/under advances to Affiliates, and sampled the recording of such transactions in Alecto's general ledger.

   f.      Calculated total advances retained by Alecto for operating expenses and other purposes and tied to Alecto bank statements.

   g.      Analyzed transfers to/from accounts not included in lists of Alecto and/or Affiliate held accounts.

4.      Examined Alecto's general ledger, including 1,208 separate disbursements by

16

check, ACH, or wire transfer to identify payments to, or for the benefit of, Insiders, of $10,000 or more, if any.

     5.      Examined Alecto's year end payroll records for the years 2020 – 2022 and the 6-month period ended June 16, 2023, to identify payments to Insiders.

     6.      Analyzed cash flows into/out of the credit facility utilized under the 2018 Promissory Note and payoff by Plaza MOB.

     7.      Examined supporting documentation for interest payments related to the Plaza MOB Loan.

     8.      Analyzed cash flows and certain closing documents, including settlement and funds flow statements, related to the June 20, 2019 Plaza MOB Refinance and the 2021 UCLA Asset Sale.

After conducting its forensic analysis, GCS presented its report to Mr. Balasiano and conferred with Mr. Balasiano in order to provide Mr. Balasiano an opportunity to ask any questions or raise any issues with respect to the estate's potential claims against the Insiders. A copy of GCS report is attached hereto as **Exhibit D**. At the conclusion of the conference, Mr. Balasiano determined that the estate does not have any valid claims against the Insiders for avoidable transfers.

## <u>ARTICLE IV - THE PLAN</u>

The Plan must describe how Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment.  For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Bankruptcy Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired.  A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Creditors are otherwise entitled.  If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Pursuant to section 1191(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even if no impaired Class of Claims votes to accept the Plan.  Specifically, section 1191(b) of the Bankruptcy Code provides that the Plan may be confirmed if the applicable requirements of section 1129(a) are satisfied, other than sections 1129(a)(8), (10), and (15), if the Bankruptcy Court finds that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan. Thus, the Plan may be confirmed even if no impaired Class votes to accept the Plan.

17

Based upon the foregoing, and based upon the statements of counsel for the Reed Creditors stating that they will object to confirmation and indicating that the Reed Creditors will not vote to support the Plan, the Debtor has elected to proceed without soliciting votes of creditors, and will seek approval of the Plan pursuant to Section 1191 of the Bankruptcy Code.

### 1. Unclassified Claims.

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, however they may, however, object if, in their view, their treatment under the Plan does not comply withthat required by the Bankruptcy Code. As such, the Plan does not place the following Claims in any class:

#### a. Administrative Expenses

The Debtor must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Effective Date will be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Creditor or Bankruptcy Court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

- If the Debtor continues to operate in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.

- Administrative Expenses also include any post-petition fees and expenses allowed to Professionals, including the allowed claim of the Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 Case. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses, andtheir proposed treatment under the Plan:

18

**A1678**

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | $0.00 (All amounts paid on ongoing basis) | Payment through the Plan as follows: Payment in full on the Effective Date. |
| Administrative Tax Claims | $0.00 | The Debtor does not expect any but if there are any Administrative Tax Claims, payment through the Plan as follows: Payment in full on the Effective Date, except to the extent otherwise agreed to by the Debtor and the Claimant. |
| United States Trustee fees | $2,500 | Payment through the Plan as follows: Payment in full on the Effective Date. |
| Professional Fee Claims, including the fees of the Independent Director as approved by the Bankruptcy Court | $700,000 | After Bankruptcy Court approval, Payment through the Plan as follows: Payment in full. |
| Subchapter V Trustee | $50,000 | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows: Payment in full. |
| **TOTAL** | **$752,500** | |

### b.  Post-Confirmation Professional Fee Claims

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtor shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

19

16452692/2

**A1679**

### c. Priority Tax Claims.

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Bankruptcy Code. Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor agrees to a less favorable treatment, pursuant to section 1129(a)(9) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter).

The Debtor anticipates that there will be no Priority Tax Claims.

### 2. Classes of Claims and Equity Interests.

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

### a. Classes of Other Priority Claims

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in classes. The Bankruptcy Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim.

It is anticipated that there will be no Other Priority Claims owed. In the event that there are Other Priority Claims owed, such claims will be paid in full on the Effective Date.

### b. Class of Priority Non-Tax Claims

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|-------|----------------|------------------------------------------|
| 1 | Priority Non-Tax Claims. Each Holder of an Allowed Priority Non-Tax Claim at the option of the Reorganized Debtor shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Reorganized Debtor and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | Approx. $0<br><br>Recovery: 100% |

16452692/2

**A1680**

c.      **Class of Secured Claims.**

Allowed Secured Claims are Claims secured by property of the Estate (or that are subject to setoff) to the extent allowed as secured Claimsunder § 506 of the Bankruptcy Code. If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim.

The Debtor does not believe that there are any secured Claims as the Debtor does not have any assets that are currently encumbered by security interests, and any party that previously had a security interest in the Debtor's assets is entitled to a general Unsecured Claim due have unsecured deficiency Claim, however in the event that a Holder of an Allowed secured Claim has a valid security interest such Holder of an Allowed secured Claim at the option of the Reorganized Debtor shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed secured claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Reorganized Debtor and the Holder of such secured Claim have agreed upon in writing.

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|---|---|---|
| 2 | Secured Claims.  Each Holder of an Allowed secured Claim, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed secured Claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Reorganized Debtor and the Holder of such secured Claim have agreed upon in writing. | Approx. $0<br><br>Recovery: 100% |

d.      **Class of General Unsecured Claims.**

General Unsecured Claims are not secured by property of the Estate and are not entitled to priority under § 507(a) of the Bankruptcy Code.

16452692/2

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|-------|----------------|------------------------------------------|
| 3 | After payment in full of all Allowed Administrative Claims, all Allowed Priority Claims in full, and Allowed Secured Claims (if any), Allowed General Unsecured Claims will be paid the Debtor's projected disposable income on a pro rata basis. Pro rata Distributions will be made to Holders of Allowed General Unsecured Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date. | Approx. **$11,000,000** Recovery: 3% - 10% |

     **e.**      **Class of Equity Interest Holders.**

Equity Interest holders are parties who hold an ownership interest (*i.e.*, equity interest)in the Debtor. The following chart sets forth the Plan's proposed treatment of the class of Equity Interest holders:

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|-------|----------------|------------------------------------------|
| 4 | Equity Interest Holders in Class 4 will retain their equity ownership interest in the Debtor. | Unimpaired |

     **3.**      **Treatment of Claims and Claims Objections.**

The Debtor or the Reorganized Debtor, as applicable, and the Subchapter v Trustee may object to the amount or validity of any Claim by the Claims Objection Bar Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan. Nothing in this Section shall in any way limit the Trustee's rights to object to Claims as provided for in the Bankruptcy Code.

     **a.**      **Allowance of Claims**

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim immediately before the Effective Date. Further, the Reorganized Debtor shall succeed to the right to any objection to a Claim pending on the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Case allowing such Claim.

16452692/2

### b.     Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtor shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtor shall have the sole authority to: (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; and (2) from and after the Effective Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent the Reorganized Debtor elects to withdraw any such objection, or the Debtor and the Creditor elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court. For the avoidance of doubt, nothing set forth herein shall limit in any way the Trustee's rights to object to Claims as provided for in the Bankruptcy Code.

### c.     Estimation of Claims

Before, on, or after the Effective Date, the Debtor or the Reorganized Debtor may (but is not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been disallowed, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtor, or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim, unless otherwise ordered by the Bankruptcy Court. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### d.     Adjustment to Claims

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register after the Debtor or the Reorganized Debtor, as applicable, files a notice of satisfaction with the Bankruptcy Court and serves such notice of satisfaction on the affected Claimant on ten (10) days' negative notice if no objection having been filed. If an objection is filed to the notice of satisfaction, an evidentiary hearing will be scheduled before the Bankruptcy Court.

### e.     Disallowance of Claims

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to

23

section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtor by that Entity have been turned over or paid to the Debtor or the Reorganized Debtor. All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

### f.     Amendments to Claims

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor. Unless such prior authorization is granted, any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court to the maximum extent provided by applicable law.

### g.     De Minimis Distributions

If any Distribution under the Plan to the Holder of an Allowed Claim would be less than $25.00, the Reorganized Debtor may withhold such distribution until a final distribution is made to such Holder. If any final Distribution under the Plan to the Holder of an Allowed Claim would be less than $25.00, the Reorganized Debtor may cancel such distribution. Any unclaimed Distributions pursuant to this Section shall be treated as unclaimed property under Article IV(6)(f) of the Plan.

### h.     No Distributions Pending Allowance

If an objection to a Claim or portion thereof is Filed, no payment or Distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtor. Any distribution to be made on account of such Claim shall be reserved by the Reorganized Debtor, pending Allowance or Disallowance of the Claim that is the subject of an objection. In the event that a Claim is Disallowed in whole or in part, the Debtor will make Distributions to the Holder of the Claim on account of the Allowed portion of the Claim, and the balance will be distributed on a pro rata basis to Holders of Allowed Claims.

### i.     Duplicative Claims

If a Class 3 Creditor filed duplicate Proofs of Claim, the earlier filed Proof of Claim will be deemed Disallowed without the need for any further motion, objection or Bankruptcy Court order, such that the Class 3 Creditor receives only one payment under the Plan based on the later filed Proof of Claim.

### 4.     Treatment of Executory Contracts and Unexpired Leases.

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party to the contract. The Debtor has the right to reject, assume

24

(i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

Check all that apply:

☒ Assumption of Executory Contracts.

The Executory Contracts shown on **Exhibit E** shall be assumed by the Debtor. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.

The Debtor shall give any party to an Executory Contract that the Debtor seeks to assume fourteen (14) days' notice of the Debtor's intent to assume such Executory Contract along with a proposed cure of any defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

Unless otherwise provided in the Plan, each Executory Contract that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and Executory Contracts related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

☒ Rejection of Executory Contracts.

The Executory Contracts shown on **Exhibit F** shall be rejected by the Debtor.

Except for the Executory Contracts and Unexpired Leases being assumed in Exhibit E, the Debtor rejects the remaining Executory Contracts and Unexpired Leases listed in the Debtor's Schedule G on file with the Court, including but not limited to those listed in Exhibit F.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject a contract or lease, the other party to the contract or lease will be treated as a General Unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

16452692/2

**A1685**

Neither the exclusion nor inclusion of any Executory Contract on Exhibits E or F, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or that the Debtor or Reorganized Debtor has any liability thereunder.

Further, it is important to note that contracts between the Debtor and non-debtor parties that are included on Exhibits E or F may not be executory. The inclusion of contracts is premised upon the inclusion of those contracts in the Debtor's Schedules. **In the event, and to the extent, that any party objects to the inclusion and proposed treatment of a contract as proposed herein, the party must timely file an objection to such treatment. Absent such any objection, all contracts listed on Exhibits E and F will be treated as set forth herein.**

5.     <u>**Means for Implementation and Funding of the Plan.**</u>

The Plan will be funded by: (1) the Debtor's projected disposable income ($848,049) generated by the Debtor's post-confirmation operations, and (2) $25,000 provided by certain of the Released Parties. The Debtor expects to have approximately $170,000 in combined cash on hand and accounts receivable on the Effective Date, however the cash and accounts receivable will not be available for distribution to creditors under the Chapter 11 Plan as these amounts are necessary for payment of incurred and ongoing expenses (and which would otherwise be administrative expenses) and are already included in the calculus of disposable income in Year 1. The Debtor or the Reorganized Debtor, as applicable, will have all the rights and duties to implement the provisions of the Plan, including the right to make Distributions to Creditors provided for under this Plan.

On the Effective Date of the Plan, all property of the Debtor, tangible and intangible, including, without limitation, licenses, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equity Interests except as provided in the Plan, to the Reorganized Debtor and all funds not expressly provided for in Plan will remain property of the Estate. The Debtor expects to have sufficient Cash on hand to make the payments required on the Effective Date.

6.     <u>**Payments.**</u>

a.     <u>**Responsibility for Making Payments.**</u>

Prior to the Effective date, the Debtor shall remit all payments due for United States Trustee Fees. Upon the Effective Date, the Reorganized Debtor shall make all Plan Distributions to Creditors in accordance with the terms of the Plan.

The Reorganized Debtor shall only be required to act and make Distributions in accordance with the terms of the Plan. Except on account of gross negligence, fraud, illegality or willful misconduct, the Reorganized Debtor shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for Distributions under the Plan to any party who does not hold a Claim against the Debtor on any date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

Any required payments to the Holders of Allowed Claims or Equity Interests shall be made by the Reorganized Debtor: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank by first-class mail (or by other equivalent or superior means as determined by the Reorganized Debtor), or (b) by wire transfer from a domestic bank.

### b.  Disputed Claims.

Notwithstanding anything herein to the contrary: (a) no Distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Reorganized Debtor, no Distribution shall be made to any Entity that holds both an Allowed Claim and a Disputed Claim until such Entity's Disputed Claims have been resolved by settlement or Final Order.

### c.  Unclaimed Payments.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within 180 days after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against the Debtor, the Estate, the Reorganized Debtor, or its properties or assets.  In such cases, any Cash or other property held by the Reorganized Debtor in the Undeliverable Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Reorganized Debtor, notwithstanding any federal or state escheat laws to the contrary, and shall promptly be transferred to the Reorganized Debtor to be distributed according to the priority set forth in the Plan without any further action or order of the Bankruptcy Court.

### d.  Payment Dates and Locations.

Distributions shall be made by the Reorganized Debtor twice a year, and such Distributions shall be on a pro rata basis to Holders of Allowed Claims based upon their priority.  Accordingly, the first Distributions shall be remitted on a pro rata basis to Holders of Allowed Administrative Expenses (including United States Trustee Fees) until all Allowed Administrative Expenses are paid in full. Once Allowed Administrative Expenses have been paid in full, the Reorganized Debtor shall remit payments on a pro rata basis to Holders of Allowed Priority Claims until all Allowed Priority Claims are paid in full, including interest to the extent applicable.  Once Allowed Priority Expenses have been paid in full, the Reorganized Debtor shall remit payment on a pro rata basis to Holders of general unsecured claims.  After each Distribution, the Reorganized Debtor shall provide the Subchapter v Trustee a list of parties to whom payments were remitted.

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed; (b) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date

16452692/2

**A1687**

of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtor and Reorganized Debtor have not received a written notice of a change of address prior to the Effective Date.

The Reorganized Debtor shall make one attempt to make the Distributions contemplated hereunder in accordance with the procedures set forth herein. The Reorganized Debtor, in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable distributions. Any Distributions returned to the Reorganized Debtor as undeliverable or otherwise shall remain in the possession of the Reorganized Debtor until such time as a Distribution becomes deliverable, and no further Distributions shall be made to such Holder unless such Holder notifies the Reorganized Debtor of its then current address.

Nothing contained in this Plan shall constitute a waiver or release by the Reorganized Debtor of any rights in respect of legal and equitable objections, defenses, setoffs, or recoupment. To the extent permitted by applicable law, the Reorganized Debtor may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Estate, or the Reorganized Debtor may have against the Holder of such Claim or Equity Interest.

### e.      Undeliverable Distribution Reserve.

If a Distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtor as undeliverable or is otherwise unclaimed, such Distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable or is claimed or is deemed to have been forfeited.

### f.      Tax Requirements.

Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a Distribution under the Plan shall have responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such Distribution. The Reorganized Debtor reserves the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

### 7.      Post-Confirmation Management and Insiders Retained by the Debtor.

The managers and officers of the Debtor immediately prior to the Effective Date shall serve as the initial managers and officers of the Debtor on and after the Effective Date. Each off the managers and officers being retained are insiders of the Debtor. The post-confirmation officers and managers of the Debtor, and their compensation, shall be as follows:

28

| Name | Position | Compensation |
| --- | --- | --- |
| Laxman Reddy | President & CEO | $750,000 |
| Matt Williams | CFO | $300,000 |
| Michael Sarrao | EVP & General Counsel | $0[6] |

### 8. Preservation of Causes of Action.

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, including the Claims and Causes of Action specifically discussed in Article 5 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in the Reorganized Debtor's sole discretion. No Entity may rely on the absence of a specific reference in the Plan to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it. The Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtor or Reorganized Debtor, as applicable, expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

### 9. Tax Consequences of the Plan.

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their***

---

[6] Mr. Sarrao is not paid compensation other than: (1) medical, dental and vision insurance (approximate value of $33,000); and (2) certain expense reimbursements.

29

16452692/2

**A1689**

*Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.*

There may be a number of material income tax considerations, risks and uncertainties associated with the implementation of the Plan. The Debtor does not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OR OTHER PLAN RECIPIENTS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE V - FEASIBILITY OF PLAN

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

### 1. Ability to Initially Fund Plan.

The Debtor believes that it will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date.

### 2. Ability to Make Plan Payments And Operate Without Further Reorganization.

For a period of three (3) years, the Debtor will contribute its entire projected disposable income, in an aggregate amount of $635,549, plus (ii) any residual value received by the Reorganized Debtor on account of the Debtor's direct and indirect subsidiaries including the claim filed in the bankruptcy case of Sherman/Grayson Hospital, LLC, and (iii) the proceeds of any Cause of Action, including any settlement of such claims, to fund distributions under the Plan on an annual basis. Once a year, the Debtor shall file a certified statement about money received by the Debtor on account of its interest from direct and indirect affiliates.[7] Further, to the extent that the Independent Director determines that there are any valid Causes of Action, the Debtor may create a liquidating trust with an independent third party to pursue such claims with all costs of pursuing such claim(s) coming from the Debtor's projected disposable income that would otherwise be distributions on account of Allowed Claims.

---

[7] In accordance with applicable non-bankruptcy law, any amounts received by the Debtor's direct or indirect subsidiaries must first be paid to those subsidiaries' creditors and Debtor's direct and indirect subsidiaries must maintain adequate reserves to address contingent liabilities before such money can be transferred to the Debtor as a distribution on account of the Debtor's equity interest.

30

16452692/2

**A1690**

The Debtor will have sufficient operating income to make such payments as indicated in the projections attached hereto as **Exhibit A.**

## ARTICLE VI - LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Creditors and Equity Interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached hereto as **Exhibit G.**

## ARTICLE VII - DISCHARGE, RELEASES AND INJUNCTIONS

### 1.  **Discharge.**

Assuming the Plan is consensual, pursuant to section 1191(a) of the Bankruptcy Code, on the Effective Date, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt imposed by this Plan or to the extent provided in section 1141(d)(6) of the Bankruptcy Code.

If the Plan is confirmed under section 1191(b), as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Court approves a written waiver of discharge executed by the Debtor after the order for relief under the Bankruptcy Code, the Court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of the Bankruptcy Code, and all other debt allowed under section 503 of the Bankruptcy Code and provided for in this Plan, except any debt – (1) on which the last payment is due after the first 3 years of the Plan, or such other time not to exceed 5 years fixed by the Court; or (2) if applicable, of the kind specified in section 523(a) of the Bankruptcy Code.

### 2.  **Debtor Releases.**

Subject to the occurrence of the Effective Date, and in consideration of the services provided and a total of $25,000 to be remitted by certain of the Debtor's insiders, on the Effective Date, the Debtor and its Estate shall release, waive, and discharge unconditionally the Released Parties from any and all claims, causes of action, and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: in connection with or arising from the Debtor's Chapter 11 Case, the pursuit of confirmation of the Plan, the Consummation thereof, the administration thereof or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any causes of action resulting from the willful misconduct, actual fraud, or gross negligence

### 3.  **Exculpation and Limitation of Liability.**

Except as otherwise specifically provided in the Plan, no Released Party shall have or incur, and each Released Party is hereby released and exculpated from any Cause of Action arising

31

between the Petition Date and the Effective Date related to any act or omission in connection with, relating to, or arising out of: (i) the Chapter 11 Case, (ii) the Plan, or any contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, (iii) the pursuit of Confirmation, (iv) the administration and implementation of the Plan, or (v) the distribution of property under the Plan or any other related agreement. The Released Parties have, and upon closing of the Chapter 11 Case or the Effective Date shall be deemed to have, with respect to all actions arising on or after the Petition Date, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; provided that in no event shall anything in this Article 5.3 be construed as a release of any person's gross negligence, fraud, or willful misconduct, each as determined by a Final Order.

4. **Injunction.**

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been discharged, released or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Released Parties on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Released Parties or the property of the Released Parties on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Released Parties or against the property of the Released Parties on account of or in connection with or with respect to any such claims or interests unless the Released Parties has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that the Released Parties asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PROPERTY TO BE DISTRIBUTED PURSUANT TO THIS PLAN ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

5. **Remedies Upon Default.**

16452692/2

The Debtor expects to be able to make all payments under the Plan. In the event of a default, however, pursuant to § 1191(c)(3) of the Bankruptcy Code, if the Reorganized Debtor defaults in payments under the Plan, the affected creditor shall notify the Reorganized Debtor, who shall have fifteen (15) days to cure the default. If the Reorganized Debtor does not cure within the 15 days, the creditor may file a notice of the default with the Bankruptcy Court and request a hearing to consider appropriate remedies.

## ARTICLE VIII - GENERAL PROVISIONS

### 1.  Title to Assets

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the Estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Equity Interests of Creditors, equity security holders, and of general partners in the Debtor.

If a plan is confirmed under § 1191(b), property of the Estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case in § 1185 of the Bankruptcy Code, the Plan, or the order confirming the Plan, the Debtor shall remain in possession of all property of the Estate.

### 2.  Binding Effect

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

### 3.  Severability

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 4.  Retention of Jurisdiction by the Bankruptcy Court

The Bankruptcy Court shall retain jurisdiction of this case with regard to all matters to the fullest extent allowed pursuant to applicable law, including the following: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan and to remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order; (ii) to rule on any modification of the Plan proposed under § 1193; (iii) to hear and allow all applications for compensation to Professionals and other Administrative Expenses; (iv) to allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Equity Interest; (v) to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan; (vi) to determine any and all

33

applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract; (vii) to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any entity's obligations in connection with the Plan, or to defend any of the rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof; (viii) to consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor and the Estate; (ix) to decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtor, or the Estate that may be pending on the Effective Date or that may be brought by the Debtor or the Reorganized Debtor, and to enter and enforce any default judgment on any of the foregoing; (x) to decide issues concerning the federal or state tax liability of the Debtor which may arise in connection with the confirmation of the Plan, including but not limited to the issuance of Form 1099s (or similar forms); (xi) to interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Case; (xii) to enforce the release, exculpation and injunction provisions contained in Article 5 herein; and (xiii) to enter an order closing the Chapter 11 Case when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

5. **Headings**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

6. **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

7. **No Fourteen Day Stay**

Notwithstanding the requirements set forth by Federal Rules of Bankruptcy Procedure, Rules 3020(e), 6004(h), and 6006(d), the Debtor has the right to elect for the Plan to go effective upon entry of the Confirmation Order so long as no stay is in place.

8. **Incorporation of Agreements Entered Into by the Debtor**

The Debtor may enter into certain agreements or stipulations with certain Creditors regarding the treatment of their Claim so long as such agreements or stipulations do not violate the Bankruptcy Code. The Plan may be amended to reflect such agreements or stipulations. Such amendments shall not reopen any notice or objection periods regarding the Plan.

9. **Modification of Plan**

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a).

34

16452692/2

**A1694**

If the Plan is confirmed under § 1191(a), the Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under § 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Effective Date, or such longer time not to exceed 5 years as fixed by the Bankruptcy Court and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 10.   Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

### 11.   Filing of Notice of Substantial Consummation

Not later than fourteen (14) days after the Plan of is substantially consummated, the Debtor shall file with the Bankruptcy Court and serve upon the Trustee, the United States Trustee, and all parties in interest notice of such substantial consummation.

### 12.   Post-Effective Date Service List

Pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Debtors, counsel for the Liquidating Trustee, and all persons on the Bankruptcy Rule 2002 service list.  With the exception of the Debtors, Cerberus, and the U.S. Trustee, any Person desiring to remain on the Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Liquidating Trustee within thirty (30) days subsequent to the Effective Date.  Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order. **Persons who do not file a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Bankruptcy Rule 2002 service list.**

### 13.   Changes in Rates Not Subject to Regulatory Commission Approval

The Debtor is not subject to governmental regulatory approval of rate. The Debtor is not regulated by a governmental commission.

### 14.   Final Decree

Unless otherwise ordered by the Bankruptcy Court, once the Estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Reorganized Debtor or other party in interest shall file a motion with the Bankruptcy Court to obtain

35

a final decree to close the case.

## ARTICLE IX - CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

1.  **Conditions Precedent to Confirmation.**

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Article 7.3:

(a)     The Plan and the Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor.

2.  **Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Article 7.3:

(a)     All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtor.

(b)     The Bankruptcy Court shall have entered a Final Order, in form and substance reasonably acceptable to the Debtor confirming the Plan pursuant to section 1191 of the Bankruptcy Code.

(c)     All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(d)     No order of a court shall have been entered and remain in effect restraining the Debtor from consummating the Plan and the transactions contemplated therein, and the Confirmation Order shall be in full force and effect.

(e)     All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance acceptable to the Debtors.

36

3.      **Waiver of Conditions.**

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article 7 may be waived at any time by the Debtor.

4.      **Effect of Failure of Conditions.**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or Claims against the Debtor or any of the Released Parties; (ii) prejudice in any manner the rights of the Debtor, any Holders of a Claim or Equity Interest or any other entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Creditors or Equity Interest Holders or any other entity in any respect. In addition, the Debtor and all Holders of Claims against or Equity Interests in the Debtor shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

5.      **Filing of Notice of the Effective Date.**

On the Effective Date or as shortly thereafter as reasonably practicable, the Debtor shall file a notice of the Effective Date with the Bankruptcy Court.

## ARTICLE X - EXHIBITS

The following documents accompany the Plan:

| Attached | Description | Exhibit |
|---|---|---|
| X | Organizational Chart | A |
| X | Claims Register and Schedules | B |
| X | Projected Income and Expenses | C |
| X | Report of Gould Consulting Services | D |
| X | Executory Contracts and Unexpired Leases to be Assumed | E |
| X | Executory Contracts and Unexpired Leases to be Rejected | F |
| X | Liquidation Analysis | G |

## ARTICLE XI - RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

1.      **Rules of Interpretation.**

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular

37

or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Debtor, the Reorganized Debtor, or the Trustee in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; and (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor or to the Reorganized Debtor shall mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

## 2. __Computation of Time.__

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

## 3. __Governing Law.__

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of California, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtor or the Reorganized Debtor, as

applicable, shall be governed by the laws of the state of incorporation or formation of the Debtor or Reorganized Debtor, as applicable.

**4.** **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

**5.** **Controlling Document.**

In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

Dated: December 19, 2023

**MORRIS JAMES LLP**

/s/ *Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

*Counsel to the Debtor and Debtor in Possession*

16452692/2

**A1699**

# EXHIBIT A

Organizational Chart

**Alecto Healthcare Services, LLC**
Organizational Chart



**A1701**

**EXHIBIT B**

Schedules and Claims Register

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC,[1] | Case No. 23-10787-JKS |
| Debtor. | |

## SCHEDULES OF ASSETS AND LIABILITIES FOR
## ALECTO HEALTHCARE SERVICES LLC (CASE NO. 23-10787-JKS)

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| In re: | Chapter 11 - Subchapter V |
|---|---|
| ALECTO HEALTHCARE SERVICES LLC, | Case No. 23-10787-JKS |
| Debtor | |

## GLOBAL NOTES, METHODOLOGY, AND SPECIFIC
## DISCLOSURES REGARDING THE DEBTOR'S SCHEDULES OF
## ASSETS AND LIABILITIES AND STATEMENTS OF FINANCIAL AFFAIRS

### Introduction

These *Global Notes, Methodology, and Specific Disclosures Regarding the Debtor's Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "Global Notes") qualify, are incorporated by reference in, and comprise an integral part of, the Schedules of Assets and Liabilities (collectively, the "Schedules") and the Statements of Financial Affairs (collectively, the "Statements" and, together with the Schedules, the "Schedules and Statements") filed by Alecto Healthcare Services LLC ("Debtor" or the "Company") in the above-captioned case filed under Chapter 11, Subchapter V, of title of the United States Code (the "Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Schedules and Statements were prepared pursuant to § 521 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1007 of the Federal Rules of Bankruptcy Procedure by management of the Debtor, with the assistance of the Debtor's advisors, and are unaudited.

In preparing the Schedules and Statements, the Debtor relied on financial data derived from its books and records that was available at the time of such preparation. The Debtor's Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles in the United States ("GAAP"), nor are they intended to be fully reconciled to the financial statements of the Debtor. The Schedules and Statements contain unaudited information that is subject to further review and potential adjustment. The Schedules and Statements reflect the Debtor's reasonable best efforts to report the assets and liabilities of the Debtor. While the Debtor's management has made reasonable efforts to ensure that the Schedules and Statements are as accurate and complete as possible under the circumstances, based on information available at the time of preparation, subsequent information or discovery may result in material changes to these Schedules and Statements. As a result, inadvertent errors or omissions may exist, and there can be no assurance that these Schedules and Statements are complete.

The Debtor reserves all rights to amend or supplement the Schedules and Statements from time to time, in all respects, as may be necessary or appropriate, including, without limitation, the right to (a) amend the Schedules and Statements with respect to a claim (as defined in § 101(5) of the Bankruptcy Code) description, designation, or Debtor against which the claim is asserted, (b) dispute or otherwise assert offsets or defenses to any claim reflected in the Schedules and

Statements as to amount, liability, priority, status, or classification, (c) subsequently designate any claim as "disputed," "contingent," or "unliquidated," or (d) object to the extent, validity, enforceability, priority, or avoidability of any claim. Any failure to designate a claim in the Schedules and Statements as "disputed," "contingent," or "unliquidated" does not constitute an admission by the Debtor that such claim or amount is not "disputed," "contingent," or "unliquidated." Listing a claim does not constitute an admission of liability by the Debtor against which the claim is listed or against the Debtor. Nothing contained in the Schedules and Statements shall constitute a waiver of any right of the Debtor or an admission with respect to its Chapter 11 Case (including, but not limited to, issues involving claims, substantive consolidation, defenses, equitable subordination, characterization or re-characterization of contracts and leases, assumption or rejection of contracts and leases under the provisions of chapter 3 of the Bankruptcy Code, and/or causes of action arising under the provisions of chapter 5 of the Bankruptcy Code and any other relevant non-bankruptcy laws to recover assets or avoid transfers). Any specific reservation of rights contained elsewhere in these Global Notes does not limit in any respect the foregoing reservation of rights.

The Debtor and its agents, attorneys, and financial advisors do not guarantee or warrant the accuracy or completeness of the data that is provided herein, and will not be liable for any loss or injury arising out of or caused in whole or in part by the acts, errors, or omissions, whether negligent or otherwise, in procuring, compiling, collecting, interpreting, reporting, communicating, or delivering the information contained herein. While commercially reasonable efforts have been made to provide accurate and complete information herein, inadvertent errors or omissions may exist. The Debtor and its agents, attorneys and financial advisors expressly do not undertake any obligation to update, modify, revise, or re-categorize the information provided herein, or to notify any third party should the information be updated, modified, revised, or recategorized. In no event will the Debtor or its agents, attorneys, and financial advisors be liable to any third party for any direct, indirect, incidental, consequential, or special damages (including, but not limited to, damages arising from the disallowance of a potential claim against the Debtor or damages to business reputation, lost business, or lost profits), whether foreseeable or not and however caused, even if the Debtor or its agents, attorneys, and financial advisors are advised of the possibility of such damages.

The Schedules and Statements have been signed by Laxman Reddy, President and Chief Executive Officer of the Debtor. Accordingly, in reviewing and signing the Schedules and Statements, Mr. Reddy necessarily relied upon the efforts, statements, and representations of the Debtor and its staff and other personnel and professionals. Mr. Reddy has not (and could not have) personally verified the accuracy of each such statement and representation, including, but not limited to, statements and representations concerning amounts owed to creditors, classification of such amounts, and their addresses.

These Global Notes should be referred to and considered in connection with any review of the Schedules and Statements.[1] Disclosure of information in one or more Schedules, one or more Statements, or one or more exhibits or attachments to the Schedules or Statements, even if incorrectly placed, shall be deemed to be disclosed in the correct Schedules, Statements, exhibits,

or attachments. In the event that the Schedules and Statements differ from the Global Notes, the Global Notes shall control.

*Neither the Schedules and Statements, nor the Global Notes, should be relied upon by any persons for information relating to current or future financial conditions, events, or performance of the Debtor.*

## Global Notes and Overview of Methodology

**Description of Case and Information Date**

On June 16, 2023 (the "Petition Date"), the Debtor filed a voluntary petition with this Bankruptcy Court for relief under Subchapter V of Chapter 11 of the United States Bankruptcy Code. The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Case is being administered pursuant to Bankruptcy Rule 1015(b). No creditors' committee has been appointed in this case. Other than the appointed Subchapter V Trustee, no trustee or examiner has been appointed. Except as otherwise noted, the information set forth herein is provided as of the close of business on the Petition Date.

**Basis of Presentation**

These Schedules and Statements reflect the assets and liabilities of the Debtor, except where otherwise indicated. Information contained in the Schedules and Statements has been derived from the Debtor's books and records and historical financial statements.

These Schedules and Statements represent the Debtor's good faith attempt to comply with the requirements of the Bankruptcy Code and Bankruptcy Rules using commercially reasonable efforts and resources available and are subject to further review and potential adjustment.

**Amendment of Schedules and Statements**

While reasonable efforts have been made to prepare and file complete and accurate Schedules and Statements, inadvertent errors or omissions may exist. The Debtor reserves all rights to amend and/or supplement the Schedules and Statements from time to time as is necessary or appropriate.

## General Notes Applicable to Schedules and Statements

1. **Recharacterization**. The Debtor has made reasonable efforts to correctly characterize, classify, categorize, and designate the claims, assets, executory contracts, unexpired leases, and other items reported in the Schedules and Statements. The Debtor reserves all rights to recharacterize, reclassify, recategorize, or redesignate items reported in the Schedules and Statements at a later time as necessary or appropriate, including, without limitation, whether contracts or leases listed herein were deemed executory or unexpired as of the Petition Date and remain executory and unexpired postpetition.

2.     **Claim Designations**.  Any failure to designate a claim in the Schedules and Statements as "contingent," "unliquidated," or "disputed" does not constitute an admission by the Debtor that such claim or amount is not "contingent," "unliquidated," or "disputed."  The Debtor reserves all rights to dispute, or to assert offsets or defenses to, any claim reflected on its Schedules or Statements on any grounds, including, but not limited to, amount, liability, priority, status, or classification, or to otherwise subsequently designate any claim as "contingent," "unliquidated," or "disputed."  Moreover, the Debtor reserves all rights to amend its Schedules and Statements as necessary and appropriate.  Listing a claim does not constitute an admission of liability by the Debtor.

3.     **Unliquidated Claim Amounts**.  Claim amounts that could not be readily quantified by the Debtor are scheduled as "unliquidated."

4.     **Unknown Amounts**.  The description of an amount as "unknown" is not intended to reflect upon the materiality of such amount.

5.     **Court Orders**.  Pursuant to certain orders of the Bankruptcy Court entered in the Debtor's Chapter 11 Case entered on or about June 20, 2023 (the "First Day Orders"), the Debtor was authorized (but not directed) to pay, among other things, certain prepetition claims of employees, insurers, and taxing authorities.  Accordingly, these liabilities may have been or may be satisfied in accordance with such orders and therefore may not be listed in the Schedules and Statements.  Regardless of whether such claims are listed in the Schedules and Statements, to the extent such claims are paid pursuant to an order of the Bankruptcy Court (including the First Day Orders), the Debtor reserves all rights to amend or supplement its Schedules and Statements.

6.     **Other Paid Claims**.  To the extent the Debtor has reached any postpetition settlement with a vendor or other creditor, the terms of such settlement will prevail, supersede amounts listed in the Debtor's Schedules and Statements, and shall be enforceable by all parties, subject to any necessary Bankruptcy Court approval.  To the extent the Debtor pays any of the claims listed in the Schedules and Statements pursuant to any orders entered by the Bankruptcy Court, the Debtor reserves all rights to amend and supplement the Schedules and Statements and take other action, such as filing claims objections, as is necessary and appropriate to avoid overpayment or duplicate payment for such liabilities.

7.     **Liabilities**.  The Debtor has sought to allocate liabilities between the prepetition and postpetition periods based on the information and research that was conducted in connection with the preparation of the Schedules and Statements.  As additional information becomes available and further research is conducted, the allocation of liabilities between prepetition and postpetition periods may change.  The Debtor reserves the right to modify, amend, or supplement the Schedules and Statements as it deems appropriate in this regard.

8.     **Excluded Assets and Liabilities**.  The Debtor may have excluded certain categories of assets, tax accruals, and liabilities from the Schedules and Statements, including without limitation, accrued salaries and employee benefit accruals.  In addition, and as set forth above, the Debtor may have excluded amounts for which the Debtor has been granted authority to pay pursuant to a First Day Order or other order that may be entered by the Bankruptcy Court.  The Debtor may also have excluded rejection damage claims of counterparties to executory

contracts and unexpired leases that may be rejected (if any), to the extent such damage claims exist. Also, certain immaterial assets and liabilities may have been excluded.

9. **Confidential or Sensitive Information**. There may be instances in which certain information in the Schedules and Statements intentionally has been redacted due to the nature of an agreement between a Debtor and a third party, concerns about the confidential or commercially sensitive nature of certain information, or concerns for the privacy of an individual based on the Health Insurance Portability and Accountability Act of 1996 or otherwise. The alterations will be limited to only what is necessary to protect the Debtor or third party. In some instances, the redacted information may be available upon request.

10. **Leases**. The Debtor may not have included in the Schedules and Statements the future obligations of any capital or operating leases. To the extent that there was an amount outstanding as of the Petition Date, the creditor has been included on Schedule F of the Schedules. Nothing in the Schedules or Statements (including, without limitation the failure to list leased property or equipment as owned property or equipment) is, or shall be construed as, an admission as to the determination of legal status of any lease (including whether any lease is a true lease or a financing arrangement), and the Debtor reserves all rights with respect to such issues.

11. **Guarantees and Other Secondary Liability Claims**. The Debtor has used reasonable efforts to locate and identify guarantees and other secondary liability claims (collectively, "Guarantees") in each of its executory contracts, unexpired leases, secured financings, debt instruments, and other such agreements. However, certain Guarantees embedded in the Debtor's executory contracts, unexpired leases, secured financings, debt instruments, and other such agreements may have been inadvertently omitted. Thus, the Debtor reserves all rights to amend the Schedules to the extent that additional Guarantees are identified.

12. **Executory Contracts**. Although the Debtor has made diligent efforts to attribute an executory contract to its rightful Debtor, in certain instances, the Debtor may have inadvertently failed to do so. Accordingly, the Debtor reserves all rights with respect to the named parties of any and all executory contracts, including the right to amend Schedule G.

13. **Estimates**. To prepare and file the Schedules as close to the Petition Date as possible, management was required to make certain estimates and assumptions that affected the reported amounts of these assets and liabilities. The Debtor reserves all rights to amend the reported amounts of assets and liability to reflect changes in those estimates or assumptions.

14. **Fiscal Year**. The Debtor's fiscal year ends on December 31.

15. **Property and Equipment**. Unless otherwise indicated, owned property and equipment are stated at net book value. The Debtor may lease furniture, fixtures, and equipment from certain third-party lessors. Nothing in the Schedules and Statements is or shall be construed as an admission as to the determination as to the legal status of any lease (including whether any lease is a true lease or a financing arrangement), and the Debtor reserves all of its rights with respect to same.

16. **Credits and Adjustments**. The claims of individual creditors for, among other things, goods, products, services, or taxes are listed as the amounts entered on the Debtor's books

and records and may not reflect credits, allowances, or other adjustments due from such creditors to the Debtor. The Debtor reserves all rights with regard to such credits, allowances, and other adjustments, including the right to assert claims objections and/or setoffs with respect to the same.

17. **Insiders**. In the circumstance where the Schedules and Statements require information regarding "insiders" the Debtor has included information with respect to the individuals the Debtor believes are included in the definition of "insider" set forth in § 101(31) of the Bankruptcy Code during the relevant time periods. Such individuals may no longer serve in such capacities. The listing of a party as an insider for purposes of the Schedules and Statements is not intended to be, nor should it be, construed an admission of any fact, right, claim, or defense and all such rights, claims, and defenses are hereby expressly reserved. Information regarding the individuals listed as insiders in the Schedules and Statements has been included for informational purposes only and such information may not be used for: (1) the purposes of determining (a) control of the Debtor; (b) the extent to which any individual exercised management responsibilities or functions; (c) corporate decision-making authority over the Debtor; or (d) whether such individual could successfully argue that he or she is not an insider under applicable law, including the Bankruptcy Code and federal securities laws, or with respect to any theories of liability, or (2) any other purpose.

18. **Totals**. All totals that are included in the Schedules and Statements represent totals of all known and estimated amounts that are included in the Schedules and Statements. To the extent there are unknown, disputed, contingent, unliquidated, or otherwise undetermined amounts, the actual total may be materially different than the listed total. The description of an amount as "unknown", "disputed", "contingent", "unliquidated", or "undetermined" is not intended to reflect upon the materiality of such amount.

19. **Exclusions.** The Debtor may have excluded certain categories of assets and liabilities from the Schedules and Statements, including accrued liabilities such as accrued salaries and employee benefits (including accrued personal time off) and accrued accounts payable, as well as assets with a net book value of zero. Other non-material assets and liabilities may have also been excluded.

## <u>Specific Notes Regarding the Schedules and Statements</u>

### Specific Notes Regarding the Statements

1. **Gross Revenue**. Amounts listed for gross revenue in the Part 1 of the Statements from the beginning of the fiscal year to just before the Petition Date reflect gross revenue from the Debtor's business for the period of January 1, 2023 through and including the Petition Date.

2. **90 Day Payments.** The dates set forth in the "Dates of Payment" column relate to one of the following: (a) the date of a wire transfer; (b) the date of an "ACH" payment; or (c) the date that a check was issued. Item 3 includes any disbursement or other transfer made by the Debtor within 90 days before the Petition Date except for those made to insiders (which payments appear in response to Item 4).

3. **Insider Payments**. The Debtor made reasonable, good faith efforts to list all material payments made to or for the benefit of insiders with one year before the filing of the case.

However, it would be unduly burdensome to determine the amount of certain employee benefits provided to insiders by the Debtor, which include, among other things, the employer portion of health insurance premiums. Moreover, the payment of such amounts was authorized by the Employee Wage Order (as defined herein). The Debtor believes that the expenses underlying any employee reimbursements were incurred for the benefit of the Debtor, and not insiders.

4. **Property held for another.** The Debtor has made reasonable efforts to account for property held for another by relying on the Debtor's books and records.

**Specific Notes Regarding Schedule A/B**

     1. **Bank Account Balances**. In the event of any conflict between the Debtor's *Motion for Interim and Final Orders Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code* [Docket No. 6] and the Statements and Schedules, the information contained in the Statements and Schedules shall control.

     2. **Prepayments**. Certain prepayments reflected on the Debtor's balance sheet may not be included because the vendor to which they relate has fully performed the related services and the Debtor has no claims against these vendors.

     3. The Debtor does not believe that the note receivable from Olympia Healthcare, LLC (an indirect subsidiary of the Debtor) is collectible.

     4. The $2,000,000 referenced in Part II, Item 75 is a setoff defense and is not an affirmative claim.

**Specific Notes Regarding Schedule E/F**

     1. **Creditors Holding Priority Unsecured Claims**. The listing of any claim on Schedule E/F does not constitute an admission by the Debtor that such claim is entitled to priority treatment under § 507 of the Bankruptcy Code. The Debtor reserves all rights to dispute the amount and/or the priority status of any claim on any basis at any time.

     The Bankruptcy Court entered the *Interim Order (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages and Salaries, (II) Authorizing Payment of Certain Employee Benefits and Confirming right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers and (VI) Allowing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments* [Docket No.26], granting authority to the Debtor to pay certain prepetition employee wage and other obligations in the ordinary course (the "Wage Order"). Pursuant to the Wage Order, the Bankruptcy Court granted the Debtor authority to pay or honor certain prepetition obligations for employee wages, payroll deductions, employee benefits, and other benefits and fees. The Debtor has not listed on Schedule E/F any wage or employment-related obligations owed to non-insiders for which the Debtor has been granted authority to pay pursuant to the Employee Wage Order or other order that

may be entered by the Bankruptcy Court. The Debtor believes that all such claims have been, or will be, satisfied in the ordinary course during this case pursuant to the authority granted in the Employee Wage Order or other order that may be entered by the Bankruptcy Court. Likewise, the Debtor has not listed on Statement, Question 3, any transfers to non-insider employees on account of wages or employment-related obligations for which the Debtor has been granted authority to pay pursuant to the Employee Wage Order or other order that may be entered by the Bankruptcy Court.

2.      **Creditors Holding Non-Priority General Unsecured Claims.**

- Horizon Real Estate Holdings, LLC is an affiliate of the Debtor.

- Olympia Healthcare LLC is an affiliate of the Debtor.

- Plaza Medical Office Building, LLC is an affiliate of the Debtor.

**Specific Notes Regarding Schedule G**

1.      The Debtor's books and records may not be complete with respect to all unexpired leases and/or executory contracts to which they are a party and that were pending as of the Petition Date. In particular, the Debtor may be party to agreements and understanding that are "oral" or "verbal" in nature; while the Debtor has made reasonable efforts to identify these agreements and disclose them in the Schedules, there may be some that are not yet known or identified. Certain of the executory contracts and unexpired leases listed on Schedule G may contain renewal options, guarantees of payment, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights. Such rights, powers, duties, and obligations are not separately set forth on Schedule G or Schedule B. Omission of a contract, lease or other agreement from Schedule G does not constitute an admission that such omitted contract, lease or agreement is not an executory contract or unexpired lease. The Debtor hereby reserves all of its rights to (i) dispute the validity, status, or enforceability of any contract, agreement or lease set forth in Schedule G and (ii) amend or supplement such Schedule as necessary.

**Specific Notes Regarding Attachment No. 8 to Schedule A/B**

1.      Certain of the insurance policies provide insurance coverage to affiliates of the Debtor and the Debtor reserves the right to seek reimbursement of an allocated share of such premiums from such affiliates, as appropriate.

* * * * * * *

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case and this filing:</strong></td></tr>
</table>

| | |
|---|---|
| Debtor Name | Alecto Healthcare Services LLC <br> a Delaware limited liability company |
| United States Bankruptcy Court for the: | _____ District of **Delaware** <br> (State) |
| Case number (*If known*): | 23-10787-JKS |

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors   12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.**

| | Declaration and signature |
|---|---|

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☑ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☑ *Schedule H: Codebtors* (Official Form 206H)

☑ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* ____

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐ *Other document that requires a declaration*_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  6/30/2023   ✖ /s/ Laxman Reddy
MM / DD / YYYY          Signature of individual signing on behalf of debtor

                         Laxman Reddy
                         Printed name

                         President and Chief Executive Officer
                         Position or relationship to debtor

| Fill in this information to identify the case: |
|---|
| Debtor name __Alecto Healthcare Services LLC a Delaware limited liability company__ |
| United States Bankruptcy Court for the:_____ District of __Delaware__ |
| (State) |
| Case number (If known): __23-10787-JKS__ |

☐ Check if this is an
amended filing

Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals

**12/15**

| Part 1: | Summary of Assets |
|---|---|

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

    **1a. Real property:**
    Copy line 88 from *Schedule A/B* ...............................................................    $ _____ 0.00

    **1b. Total personal property:**
    Copy line 91A from *Schedule A/B* .............................................................    $ _____ 3,523,846.62

    **1c. Total of all property:**
    Copy line 92 from *Schedule A/B* ...............................................................    $ _____ 3,523,846.62

| Part 2: | Summary of Liabilities |
|---|---|

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
    Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D* ..............................    $ _____ 712,846.79

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

    **3a. Total claim amounts of priority unsecured claims:**
    Copy the total claims from Part 1 from line 5a of *Schedule E/F* ...............................    $ _____ 0.00

    **3b. Total amount of claims of nonpriority amount of unsecured claims:**
    Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F* ...............................    + $ _____ 85,496,898.04

4. **Total liabilities** ...........................................................................................................
    Lines 2 + 3a + 3b    $ _____ 86,209,744.83

## A1713

**Fill in this information to identify the case:**

Debtor name __Alecto Healthcare Services LLC a Delaware limited liability company__

United States Bankruptcy Court for the: _____ District of __Delaware__
(State)

Case number (If known): __23-10787-JKS__

☐ Check if this is an amended filing

Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property

12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |
|---|---|

**1. Does the debtor have any cash or cash equivalents?**

☐ No. Go to Part 2.
☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

**2. Cash on hand** — $ _____

**3. Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|---|
| 3.1. | See Attachment No. 3 | | ___ ___ — ___ ___ | $ 2.61 |
| 3.2. | | | | $ |

**4. Other cash equivalents** *(Identify all)*

| | | |
|---|---|---|
| 4.1. | See Attachment No. 3 | $ 5,493.56 |
| 4.2. | | $ |

**5. Total of Part 1** — $ 5,496.17
Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

| Part 2: | Deposits and prepayments |
|---|---|

**6. Does the debtor have any deposits or prepayments?**

☐ No. Go to Part 3.
☑ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

**7. Deposits, including security deposits and utility deposits**

Description, including name of holder of deposit

| | | |
|---|---|---|
| 7.1. | NTT America, Inc. – Deposit for Sublease of Office Space Suite 1780 | $ 28,925.00 |
| 7.2. | Pacific Global Investment Management Company - deposit for sublease Suite 1920 | $ 12,592.80 |

A-1714

Debtor    Alecto Healthcare Services LLC a Delaware limited liability company    Case number *(if known)*   23-10787-JKS
          Name

---

**8. Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

  Description, including name of holder of prepayment

  8.1. See Attachment No. 8 _____   $_____ 1,305,994.29

  8.2. _____   $_____

**9. Total of Part 2.**

  Add lines 7 through 8. Copy the total to line 81.    $_____ 1,347,512.09

---

## Part 3:    Accounts receivable

**10. Does the debtor have any accounts receivable?**

  ☐ No. Go to Part 4.

  ☑ Yes. Fill in the information below.

|  |  | Current value of debtor's interest |
|---|---|---|

**11. Accounts receivable**

| | | | | Current value of debtor's interest |
|---|---|---|---|---|
| 11a. 90 days old or less: | $1,960,598.88 | – | $1,960,598.88 | = ......→ | $_____ 0.00 |
| | face amount | | doubtful or uncollectible accounts | | |
| 11b. Over 90 days old: | $94,531,482.75 | – | $94,531,482.75 | = ......→ | $_____ 0.00 |
| | face amount | | doubtful or uncollectible accounts | | |

**12. Total of Part 3**

  Current value on lines 11a + 11b = line 12. Copy the total to line 82.    $_____ 0.00

---

## Part 4:    Investments

**13. Does the debtor own any investments?**

  ☐ No. Go to Part 5.

  ☑ Yes. Fill in the information below.

| | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

**14. Mutual funds or publicly traded stocks not included in Part 1**

  Name of fund or stock:

| | | |
|---|---|---|
| 14.1. _____ | _____ | $_____ |
| 14.2. _____ | _____ | $_____ |

**15. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

  Name of entity:                                    % of ownership:

| | | | |
|---|---|---|---|
| 15.1. See Attachment No. 15 | _____ % | _____ | $_____ 120,000.00 |
| 15.2. _____ | _____ % | _____ | $_____ |

**16. Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

  Describe:

| | | |
|---|---|---|
| 16.1. _____ | _____ | $_____ |
| 16.2. _____ | _____ | $_____ |

**17. Total of Part 4**

  Add lines 14 through 16. Copy the total to line 83.    $_____ 120,000.00

---

**A1715**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number (if known) 23-10787-JKS |
|---|---|---|
| | Name | |

---

## Part 5: Inventory, excluding agriculture assets

**18. Does the debtor own any inventory (excluding agriculture assets)?**

☑ No. Go to Part 6.

☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| **19. Raw materials** | | | | |
| _____ | ___ / ___ / ____ MM / DD / YYYY | $_____ | _____ | $_____ |
| **20. Work in progress** | | | | |
| _____ | ___ / ___ / ____ MM / DD / YYYY | $_____ | _____ | $_____ |
| **21. Finished goods, including goods held for resale** | | | | |
| _____ | ___ / ___ / ____ MM / DD / YYYY | $_____ | _____ | $_____ |
| **22. Other inventory or supplies** | | | | |
| _____ | ___ / ___ / ____ MM / DD / YYYY | $_____ | _____ | $_____ |

**23. Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

$ 0.00

**24. Is any of the property listed in Part 5 perishable?**

☐ No

☐ Yes

**25. Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value _____ Valuation method_____ Current value_____

**26. Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

**27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28. Crops—either planted or harvested** | | | |
| _____ | $_____ | _____ | $_____ |
| **29. Farm animals** Examples: Livestock, poultry, farm-raised fish | | | |
| _____ | $_____ | _____ | $_____ |
| **30. Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| _____ | $_____ | _____ | $_____ |
| **31. Farm and fishing supplies, chemicals, and feed** | | | |
| _____ | $_____ | _____ | $_____ |
| **32. Other farming and fishing-related property not already listed in Part 6** | | | |
| _____ | $_____ | _____ | $_____ |

A1716

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number *(if known)* 23-10787-JKS |
|---|---|---|
| | Name | |

33. **Total of Part 6.**

Add lines 28 through 32. Copy the total to line 85.

$_____0.00

34. **Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

   ☐ No

   ☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____ Valuation method _____ Current value $_____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

**Part 7:** Office furniture, fixtures, and equipment; and collectibles

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** | | | |
| Reception Desk | $ 4,838.56 | Cost | $ 4,838.36 |
| 40. **Office fixtures** | | | |
| | $ | | $ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| Computer Equipment | $ 25,000.00 | Cost | $ 25,000.00 |
| 42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 | $ | | $ |
| 42.2 | $ | | $ |
| 42.3 | $ | | $ |
| 43. **Total of Part 7.** Add lines 39 through 42. Copy the total to line 86. | | | $ 29,838.36 |

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

☑ No

☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☑ No

☐ Yes

A-1717

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number *(if known)* | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

---

46. Does the debtor own or lease any machinery, equipment, or vehicles?

  ☐ No. Go to Part 9.

  ☑ Yes. Fill in the information below.

| General description<br><br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br><br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 47.1   2017 Toyota Highlander<br>VIN 5TDBZRFHIH5452189 | $ 21,000.00 | (Kelly Blue Book)<br>FMV | $ 21,000.00 |
| 47.2 | $ | | $ |
| 47.3 | $ | | $ |
| 47.4 | $ | | $ |
| **48. Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| 48.1 | $ | | $ |
| 48.2 | $ | | $ |
| **49. Aircraft and accessories** | | | |
| 49.1 | $ | | $ |
| 49.2 | $ | | $ |
| **50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)** | | | |
| | $ | | $ |
| **51. Total of Part 8.**<br>Add lines 47 through 50. Copy the total to line 87. | | | $ 21,000.00 |

52. **Is a depreciation schedule available for any of the property listed in Part 8?**

  ☑ No

  ☐ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

  ☑ No

  ☐ Yes

**A1718**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number (if known) | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

## Part 9: Real property

**54. Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

**55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 101 N. Brand, Ste 1920, Glendale, CA | Sublease Interest | $ 0.00 | Debtor Opinion | $ 0.00 |
| 55.2 | | $ | | $ |
| 55.3 | | $ | | $ |
| 55.4 | | $ | | $ |
| 55.5 | | $ | | $ |
| 55.6 | | $ | | $ |

**56. Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$ 0.00

**57. Is a depreciation schedule available for any of the property listed in Part 9?**

☑ No

☐ Yes

**58. Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☑ No

☐ Yes

## Part 10: Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **60. Patents, copyrights, trademarks, and trade secrets** | $ | | $ |
| **61. Internet domain names and websites**<br>www.alectohealthcare.com | $ 0.00 | Debtor Opinion | $ 0.00 |
| **62. Licenses, franchises, and royalties** | $ | | $ |
| **63. Customer lists, mailing lists, or other compilations** | $ | | $ |
| **64. Other intangibles, or intellectual property** | $ | | $ |
| **65. Goodwill** | $ | | $ |

**66. Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$ 0.00

**A1719**

| Debtor | Alecto Healthcare Services LLC a Delaware limited liability company | Case number (if known) | 23-10787-JKS |
|---|---|---|---|
| | Name | | |

**67. Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)?

☑ No
☐ Yes

**68. Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

☑ No
☐ Yes

**69. Has any of the property listed in Part 10 been appraised by a professional within the last year?**

☑ No
☐ Yes

## Part 11: All other assets

**70. Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
☑ Yes. Fill in the information below.

| | | | | Current value of debtor's interest |
|---|---|---|---|---|
| **71. Notes receivable** | | | | |
| Description (include name of obligor) | | | | |
| Olympia Health Care, LLC | 8,944,477.81 | 8,944,477.81 | = → | $ 0.00 |
| | Total face amount | doubtful or uncollectible amount | | |

**72. Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

| | Tax year | $ |
|---|---|---|
| | Tax year | $ |
| | Tax year | $ |

**73. Interests in insurance policies or annuities**

$ _____

**74. Causes of action against third parties (whether or not a lawsuit has been filed)**

$ _____

Nature of claim _____
Amount requested $ _____

**75. Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

See Attachment No. 75                                              $ 2,000,000.00

Nature of claim _____
Amount requested $ _____

**76. Trusts, equitable or future interests in property**

$ _____

**77. Other property of any kind not already listed** Examples: Season tickets, country club membership

$ _____
$ _____

**78. Total of Part 11.**

Add lines 71 through 77. Copy the total to line 90.                    $ 2,000,000.00

**79. Has any of the property listed in Part 11 been appraised by a professional within the last year?**

☑ No
☐ Yes

A1720

Debtor    Alecto Healthcare Services LLC a Delaware limited liability company      Case number *(if known)*___23-10787-JKS___
       Name

| **Part 12:** | **Summary** |
|---|---|

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 5,496.17 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 1,347,512.09 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 120,000.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 29,838.36 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 21,000.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* .............................➔ | | $ 0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 2,000,000.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. ..................91a. | $ 3,523,846.62 | + 91b. $ 0.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. ............................................  $ 3,523,846.62

**In re Alecto Healthcare Services LLC**

**Attachment No. 3 to Schedule A/B**

**[Part 1, Item 3 – Checking, savings, money market or financial brokerage accounts]**

| Name of Bank | Account Number | Description | Balance | |
|---|---|---|---|---|
| City National Bank | x3784 | Credit Line Activity | $0.00 | |
| City National Bank | x6065 | A/P | $0.00 | ** |
| City National Bank | x6508 | Payroll | $2.61 | |
| | | Total | $2.61 | |

** Debtor has a check in the amount of $5,493.56 that, subject to Court approval, will be deposited into its x6065 account on Tuesday June 20, 2023.

**A1722**

Case 23-10787-JKS     Doc 48     Filed 06/30/23     Page 21 of 49

In re Alecto Healthcare Services LLC
Attachment No. 8 to Schedule A/B
[Part 2, Item 8 – Prepayments]

Alecto Healthcare Services LLC
Prepaid Balance Detail
As of 05/31/2023

**A) Prepaid Business Insurance**

| | Insurance Type | Insurance Carrier | Beg Date | End Date | Premiums & Fees Paid/Financed | Premiums & Fees Expensed to Date | Prepaid as of 05/31/23 |
|---|---|---|---|---|---|---|---|
| 1) | Directors & Officers | National Union Fire Insurance Co. 28 Liberty Street, New York, New York 10005; 2) RSUI Indemnity Company, 945 East Paces Ferry Road, Suite 1800, Atlanta, Georgia 30376 | 1/31/2023 | 1/31/2024 | $892,556.40 | $297,516.40 | $595,040.00 |
| 2) | Comprehensive Employers Indemnity (TX Non-Subscribe) | Old Republic Union Insurance Co. 307 N. Michigan Avenue, Chicago, IL 60601 | 3/31/2023 | 3/31/2024 | $33,827.82 | $5,637.82 | $28,190.00 |
| 3) | Workers Compensation | StarNet Insurance Company, 9301 Innovation Drive, Suite 200, Manassa, VA 20110 | 4/1/2023 | 4/1/2024 | $16,048.00 | $2,678.00 | $13,370.00 |
| 4) | Automobile | Vantapro Specialty Insurance Co.; 199 Water Street, New York, NY 10038 | 6/1/2023 | 6/1/2024 | $2,921.76 | $0.00 | $0.00 |
| 5) | Excess Medical Professional/General Liability | American Home Assurance Co; P.O. Box 52979, Atlanta, Georgia 30355 | 8/1/2022 | 8/1/2023 | $175,685.58 | $146,405.58 | $29,280.00 |
| 6) | "All Risks" Property incl Boiler & Machinery & Flood, excluding CA EM | American Home Assurance Co; 175 Water Street, New York, New York 10038 | 7/1/2022 | 9/30/2023 | $201,399.48 | $157,116.19 | $44,283.29 |
| 7) | Environmental Pollution/Storage Tank Liability - WNJ | Ironshore Specialty Insurance Co., 175 Berkeley Street, Boston, MA 02116 | 8/1/2022 | 8/1/2023 | $19,224.12 | $16,024.12 | $3,200.00 |
| 8) | Cyber Liability | Coalition Insurance Solutions, 1160 Battery Street, Suite 350, San Francisco, CA 94111 | 8/14/2022 | 8/14/2023 | $48,334.42 | $38,412.42 | $9,922.00 |
| 9) | 3 Year Extended Reporting Period Excess Medical Professional/General Liability Coverage for Non TX Exposures | Endurance American Specialty Ins. Co.; 16052 Swingley Ridge Road, Suite 130, St. Louis, Missouri 63017 | 8/1/2022 | 8/1/2025 | $844,558.56 | $234,599.56 | $609,959.00 |
| | **Total Prepaid Business Insurance** | | | | | | **$1,333,244.29** |

**B) Prepaid Employee Health Insurance Benefits**

| | | | | |
|---|---|---|---|---|
| Anthem Blue Cross -Health Insurance Premiums | | | | $0.00 |
| Unum Life Insurance Company of America - Life Insurance Premiums | | | | $0.00 |
| MetLife Ins - Vision & Dental Insurance Premiums | | | | $0.00 |
| **Total Prepaid Employee Health Insurance Benefits** | | | | **$0.00** |

**C) Other Prepaids**

| | Insurance Carrier | Beg Date | End Date | Premiums & Fees Paid/Financed | Premiums & Fees Expensed to Date | Prepaid as of 05/31/23 |
|---|---|---|---|---|---|---|
| MS Office 365 & Outlook  Accounts | Go Daddy | 12/1/2022 | 11/30/2023 | $5,405.28 | $2,705.28 | $2,700.00 |
| **Total Other Prepaids** | | | | | | **$2,700.00** |
| **Total Prepaids** | | | | | | **$1,335,944.29** |
| **Ending GL Balance** | | | | | | **$1,306,005.41** |

**A1723**

**In re Alecto Healthcare Services LLC**
**Attachment No. 15 to Schedule A/B**
**[Part 4, Item 15 – Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture]**

| Name of Entity | % of Ownership | Valuation Method Used for Current Value | Current Value of Debtor's Interest |
|---|---|---|---|
| Alecto Healthcare Services Hayward, LLC (provides management services to non-profit hospital) | 100% | Debtor's Opinion | $100,000.00 |
| Alecto Healthcare Services Los Angeles, LLC (investment vehicle to hold interests in two LLCs) | 100% | Debtor's Opinion | $0.00 |
| Alecto Healthcare Services Fairmont, LLC (currently in wind down of business and maintaining medical ...) | 100% | Debtor's Opinion | $10,000.00 |
| Acceleron Services, LLC (no business operations - never engaged in business) | 100% | Debtor's Opinion | $0.00 |
| United Medical Management, LLC (no business operations - never engaged in business) | 100% | Debtor's Opinion | $0.00 |
| Sunrise MOB Holdings, LLC (investment vehicle to hold interest in one LLC) | 100% | Debtor's Opinion | $10,000.00 |
| Alecto Healthcare Services Sherman, LLC (investment vehicle that holds interest in three LLCs) | 80% | Debtor's Opinion | $0.00 |
| Alecto Healthcare Services Ohio Valley, LLC (investment vehicle that holds interest in two LLCs and sponser of a defined beneft pension plan) | 100% | Debtor's Opinion | $0.00 |
| Alecto Healthcare Services Real Estate Holdings, LLC (no business operations - never engaged in business) | 100% | Debtor's Opinion | $0.00 |
| M/C Healthcare, LLC (no active operations) | 100% | Debtor's Opinion | $0.00 |
| | | Total | $120,000.00 |

**In re Alecto Healthcare Services LLC**
**Attachment No. 75 to Schedule A/B**
**[Part 11, Item 75 – Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to setoff claims]**

In <u>United States of America v. Olympia Health Care, LLC, et. al.</u>, Olympia Health Care, LLC alleges that the claims asserted by the United States of America on behalf of the Centers for Medicare and Medicaid Services (CMS) against Olympia Health Care, LLC are subject to setoff based on Olympia Health Care, LLC's claims that it has overpaid the amounts due under a settlement reached by Olympia Health Care, LLC and CMS.  The claims against Debtor are derivative of the claims against Olympia Health Care, LLC and as such, the Debtor should receive the benefit of any set off.

Contingent Value $2,000,000.00

Fill in this information to identify the case:

Debtor name **Alecto Healthcare Services LLC,**
          **a Delaware limited liability company**

United States Bankruptcy Court for the: District of **Delaware**

Case number (*If known*): **23-10787-JKS**

☐ Check if this is an amended filing

<u>Official Form 206D</u>

## Schedule D: Creditors Who Have Claims Secured by Property  12/15

Be as complete and accurate as possible.

1.  **Do any creditors have claims secured by debtor's property?**
    ☐ No.  Check this box and submit page 1 of this form to the court with the debtor's other schedules.  Debtor has nothing else to report on this form
    ☒ Yes.  Fill in all of the information below.

| Part 1: | List Creditors Who Have Secured Claims |
|---|---|

2.  **List in alphabetical order all creditors who have secured claims.**
    **If a creditor has more than one secured claim, list the creditor separately for each claim.**

|  |  | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.1  Creditor's name**<br><br>**Cardinal Health 110, LLC**<br>**c/o Porter Wright Morris &**<br>**Arthur LLC**<br><br>**Creditor's mailing address**<br><br>**Attn Allen Carter Esq**<br>**41 South High Street, Suite 2900**<br>**Columbus, Ohio 43215**<br><br>**Creditor's email address, if known**<br><br>Date debt was incurred **Various**<br><br>Last four digits of account number<br><br>**Do multiple creditors have an interest in the same property?**<br>☐ No.<br>☐ Yes.  Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Master Agreement with Alecto Healthcare Services LLC.  Pharmaceuticals and Supplies provided to subsidiary hospitals**<br>**UCC filed 3/12/2020, filing number 2020 1831975**<br>**Collateral: All prescription pharmaceutical products, over-the-counter pharmaceutical products, nutritional supplements, first-aid, health and beauty products, home health care products and equipment, medical and surgical supplies, medical products and inventory, general merchandise and supplies, sundries, and any other products supplied by secured party.  Note: Debtor has never received any products from the Cardinal Health 110 LLC and none of its cash is the result of proceeds from any of products**<br><br>**Is the creditor an insider or related party?**<br>☒ No.<br>☐ Yes.<br><br>**Is anyone else liable on this claim?**<br>☒ No.<br>☐ Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>***As of the petition filing date, the claim is:***<br>Check all that apply<br>☐ Contingent.<br>☒ Unliquidated<br>☐ Disputed | $285,229.79 | $ |

**A1726**

Debtor **Alecto Healthcare Services LLC a Delaware limited liability company**   Case number *(if known)* 23-10787-JKS

| | | Column A **Amount of claim** Do not deduct the value of collateral | Column B Value of collateral that supports this claim |
|---|---|---|---|

**2.2  Creditor's name**

**MPT of Fairmont-Alecto Hospital, LLC; MPT of Fairmont – Alecto, LLC, MPT of Wheeling – Alecto Hospital, LLC, and MPT of Martins Ferry – Alecto Hospital, LLC c/o Medical Properties Trust, Inc.**

Describe debtor's property that is subject to a lien and describe the lien

**Contingent claim based on guarantee under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC. UCC filed 9/19/2014, filing number 2014 3774312, continuation filed 3/27/2019, filing number 2019 2109119. Note: No fees were ever paid or will be paid by Alecto Healthcare Services Fairmont LLC to Debtor under the agreement and none of Debtor's cash is the result of any such fees.**

$   .00                $

**Creditor's mailing address**

**Attn Larry Portal, SVP Attn Legal Department 1000 Urban Center Drive, Suite 501 Birmingham, AL 35242**

Is the creditor an insider or related party?
☒No.
☐Yes.

Is anyone else liable on this claim?
☐No.
☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*

**Creditor's email address, if known**

**Date debt was incurred  Various**

**Last four digits of account number**

*As of the petition filing date, the claim is:*
Check all that apply
☒ Contingent
☐ Unliquidated
☐ Disputed

**Do multiple creditors have an interest in the same property?**
☒No.
☐Yes. Specify each creditor, including this creditor, and its relative priority

**2.3  Creditor's name**

**MPT of Los Angeles LP and MPT of Olympia LLC c/o Medical Properties Trust, Inc.**

Describe debtor's property that is subject to a lien and describe the lien

**Contingent claim based on guarantee under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC. UCC filed 12/31/2013, filing number 2013 5184842, continuation filed 7/2/2018, filing number 2018 4541369.  Note: No fees were ever paid or will be paid by Olympia Health Care, LLC to Debtor under the agreement and none of Debtor's cash is the result of any such fees.**

$   .00                $

**Creditor's mailing address**

**Attn Larry Portal, SVP Attn Legal Department 1000 Urban Center Drive, Suite 501 Birmingham, AL 35242**

Is the creditor an insider or related party?
☒No.
☐Yes.

Is anyone else liable on this claim?
☒No.
☐Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*

**Creditor's email address, if known**

**Date debt was incurred  Various**

**Last four digits of account number**

*As of the petition filing date, the claim is:*
Check all that apply
☒ Contingent
☐ Unliquidated
☐ Disputed

**Do multiple creditors have an interest in the same property?**
☒No.
☐Yes. Specify each creditor, including this creditor, and its relative priority

Debtor __Alecto Healthcare Services LLC a Delaware limited liability company__  Case number *(if known)* 23-10787-JKS

| | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral | Column B<br>Value of collateral that supports this claim |
|---|---|---|
| **2.4   Creditor's name**<br><br>**MPT of Sherman-Alecto Hospital, LLC; MPT of Sherman – Alecto, LLC**<br>**MPT of Los Angeles LP**<br>**c/o Medical Properties Trust, Inc.**<br><br>Creditor's mailing address<br><br>**Attn Larry Portal, SVP**<br>**Attn Legal Department**<br>**1000 Urban Center Drive, Suite 501**<br>**Birmingham, AL 35242**<br><br>Creditor's email address, if known<br><br>Date debt was incurred **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☒No.<br>☐Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Contingent claim based on guarantee re Sherman/Grayson Hospital, LLC obligations to MPT of Sherman-Alecto, LLC for Capital Reserve Deposits.**<br>**UCC filed 10/31/2014, filing number : 2014 4400537; continuation filed 6/10/2019, filing number 2019 3988941.  Note: No fees were ever or will be paid by by Sherman/Grayson Hospital, LLC to Debtor under the agreement and none of Debtor's cash is the result of any such fees,**<br><br>Is the creditor an insider or related party?<br>☒No.<br>☐Yes.<br><br>Is anyone else liable on this claim?<br>☐No.<br>☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>***As of the petition filing date, the claim is:***<br>Check all that apply<br>☒ Contingent.<br>☐ Unliquidated<br>☐ Disputed | $427,617.00 | $ |
| **2.5   Creditor's name**<br><br>**MPT of Martins Ferry – Alecto Hospital, LLC; MPT of Wheeling – Alecto Hospital, LLC; MPT of Martins Ferry-Alecto, LLC; and MPT of Wheeling-Alecto Hospital, LLC**<br>**c/o Medical Properties Trust, Inc.**<br><br>Creditor's mailing address<br><br>**Attn Larry Portal, SVP**<br>**Attn Legal Department**<br>**1000 Urban Center Drive, Suite 501**<br>**Birmingham, AL 35242**<br><br>Creditor's email address, if known<br><br>Date debt was incurred **Various**<br><br>Last four digits of account number<br><br>Do multiple creditors have an interest in the same property?<br>☒No.<br>☐Yes. Specify each creditor, including this creditor, and its relative priority | Describe debtor's property that is subject to a lien and describe the lien<br><br>**Contingent claim based on guarantee re under Master Lease Agreement with Alecto Healthcare Services Wheeling LLC and Alecto Healthcare Services Martin's Ferry LLC**<br>**UCC filed 6/6/2017, filing number 2017 3713317 , continuation filed 4/26/2022.  Note: No fees were ever paid or will be paid by Alecto Healthcare Services Wheeling LLC, and Alecto Healthcare Services Martins Ferry LLC to Debtor under agreement and none of Debtor's cash is the result of any such fees.**<br><br>Is the creditor an insider or related party?<br>☒No.<br>☐Yes.<br><br>Is anyone else liable on this claim?<br>☐No.<br>☒Yes. *Fill out Schedule H: Codebtors (Official Form 206H)*<br><br>***As of the petition filing date, the claim is:***<br>Check all that apply<br>☒ Contingent.<br>☐ Unliquidated<br>☐ Disputed | $    .00 | $ |

Official Form 206D            Schedule D: Creditors Who Have Claims Secured by Property

Debtor  **Alecto Healthcare Services LLC a Delaware limited liability company**     Case number *(if known)* 23-10787-JKS

---

3.  **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional**     **$712,846.79**
    **Page, if any**

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **Alecto Healthcare Services LLC, a Delaware limited liability company** |
| United States Bankruptcy Court for the: District of **Delaware** | |
| Case number (*If known*): **23-10787-JKS** | |

☐ Check if this is an amended filing

Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims
                                                                    **12/15**

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on Schedule A/B: Assets - Real and Personal Property (Official Form 206A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

**Part 1:**   List Creditors With PRIORITY Unsecured Claims

1.  **Do any creditors have priority unsecured claims? (See 11 U.S.C. § 507).**
     ☐ No.  Go to Part 2.
     ☒ Yes. Go to line 2.

2.  **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part. If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.**

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1   Priority creditor's name and mailing address** | **As of the petition filing date, the claim is:** | **Notice Purposes** | $ |
| **California Franchise Tax Board Bankruptcy Section, MS: A-340 PO Box 2952 Sacramento, CA 95812-2952** | Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed | | |
| Date or dates debt was incurred | | | |
| Last four digits of account number | **Basis for the claim** | | |
| Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a)(8) | **Is the claim subject to setoff?**<br>☐ No.<br>☐ Yes. | | |
| **2.2   Priority creditor's name and mailing address** | **As of the petition filing date, the claim is:** | **Notice Purposes** | $ |
| **California Department of Tax and Fee Administration PO Box 942879 Sacramento, CA  94279-0001** | Check all that apply<br>☐ Contingent.<br>☐ Unliquidated<br>☐ Disputed | | |
| Date or dates debt was incurred | | | |
| Last four digits of account number | **Basis for the claim** | | |
| Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8) | **Is the claim subject to setoff?**<br>☐ No.<br>☐ Yes. | | |

**A1730**

| | Total claim | Priority amount |
|---|---|---|

**Debtor** **Alecto Healthcare Services LLC, a Delaware limited liability company**   Case number *(if known)* **23-10787-JKS**

---

| 2.3   Priority creditor's name and mailing address | *As of the petition filing date, the claim is:* **Notice Purposes** | $ |
|---|---|---|

**Employment Development Dept**
**Bankruptcy Group MIC 92E**
**PO Box 826880**
**Sacramento, CA 94280-0001**

Check all that apply
☐ Contingent.
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**

**Basis for the claim**

**Last four digits of account number**

**Is the claim subject to setoff?**
☐No.
☐Yes.

**Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a)(8)**

---

| 2.4   Priority creditor's name and mailing address | *As of the petition filing date, the claim is:* **Notice Purposes** | $ |
|---|---|---|

**Internal Revenue Service**
**PO Box 7346**
**Philadelphia, PA 19101-7346**

Check all that apply
☐ Contingent.
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**

**Basis for the claim**

**Last four digits of account number**

**Is the claim subject to setoff?**
☐No.
☐Yes.

**Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8)**

---

| 2.5   Priority creditor's name and mailing address | *As of the petition filing date, the claim is:* **Notice Purposes** | $ |
|---|---|---|

**Los Angeles County Tax Collector**
**PO Box 54110**
**Los Angeles, CA 90054**

Check all that apply
☐ Contingent.
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**

**Basis for the claim**

**Last four digits of account number**

**Is the claim subject to setoff?**
☐No.
☐Yes.

**Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8)**

---

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**          Case number *(if known)* **23-10787-JKS**

| Part 2: | List Creditors With NONPRIORITY Unsecured Claims |
|---|---|

3.  List in alphabetical order all creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

|  |  | Amount of claim |
|---|---|---|

| **3.1  Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $3,399.68 |
|---|---|---|
| **American Express**<br>**Attn President or Manager Agent**<br>**PO Box 0001**<br>**Los Angeles, CA 90096** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **5/31/2023 (bill date)** | **Basis for the claim   Expense Reimbursement - Lex Reddy** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒No.<br>☐Yes | |

| **3.2  Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $14,478.05 |
|---|---|---|
| **Anthem Blue Cross**<br>**Attn President or Manager Agent**<br>**PO Box 51011**<br>**Los Angeles, CA 90051** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **6/2/2023** | **Basis for the claim   Employee Health Benefits** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒No.<br>☐Yes | |

| **3.3  Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $70,000.00 |
|---|---|---|
| **AON Risk Consultants**<br>**Attn L Joe Galusha, President**<br>**22922 Network Place**<br>**Chicago, IL 60673** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☒ Disputed | |
| Date or dates debt was incurred  **11/15/18 & 12/13/18** | **Basis for the claim   Actuarial Services - 2018** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒No.<br>☐Yes | |

| **3.4  Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $ 203.30 |
|---|---|---|
| **AT&T**<br>**Attn President or Manager Agent**<br>**PO Box 5014**<br>**Carol Stream, IL 60197** | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| Date or dates debt was incurred  **6/1/2023** | **Basis for the claim   Internet Services** | |
| Last four digits of account number | **Is the claim subject to setoff?**<br>☒No.<br>☐Yes | |

**A1732**

| | Amount of claim |
|---|---|

---

| 3.5   Nonpriority creditor's name and mailing address | | |
|---|---|---|

**3.5   Nonpriority creditor's name and mailing address**

**Bcal 101 North Brand Property LLC**
**Attn President or Manager Agent**
**200 State Street 5th Floor**
**Boston, MA 02109**

Date or dates debt was incurred  **5/31/2023**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Miscellaneous Building Charge**

Is the claim subject to setoff?
☒No.
☐Yes

$ 195.00

---

**3.6   Nonpriority creditor's name and mailing address**

**Cardinal Health 200, LLC**
**c/o Porter Wright Morris & Arthur LLC**
**Attn Allen Carter Esq**
**41 South High Street, Suite 2900**
**Columbus, Ohio 43215**

Date or dates debt was incurred  **Various**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☒ Unliquidated
☒ Disputed

Basis for the claim   **Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsbdiary hospitals**

Is the claim subject to setoff?
☒No.
☐Yes

$81,318.11

---

**3.7   Nonpriority creditor's name and mailing address**

**Combined Group Insurance Services**
**Attn President or Manager Agent**
**14785 Preston Road Suite 350**
**Dallas, TX 75254**

Date or dates debt was incurred  **5/31/2023**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Texas Non-Subscriber Audit**

Is the claim subject to setoff?
☒No.
☐Yes

$3,966.10

---

**3.8   Nonpriority creditor's name and mailing address**

**Evangeline Douglas**
**19951 Octillo Way**
**Apple Valley, CA 92308**

Date or dates debt was incurred  **5/31/2023**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Expense Reimbursement**

Is the claim subject to setoff?
☒No.
☐Yes

$5,455.68

---

**3.9   Nonpriority creditor's name and mailing address**

**First Insurance Funding**
**Attn President or Manager Agent**
**450 Skokie Boulevard Suite 1000**
**Northbrook, IL 60062**

Date or dates debt was incurred  **6/1/2023**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Insurance Premium Financing**

Is the claim subject to setoff?
☒No.
☐Yes

$76,137.36

---

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|

| 3.10   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $2,149.85 |
|---|---|---|
| **GRM Information Management Services of San Francisco LLC**<br>**Attn President or Manager Agent**<br>**41099 Boyce Road**<br>**Fremont, CA 94538**<br><br>Date or dates debt was incurred **Various**<br><br>Last four digits of account number | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim   Records Storage**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| 3.11   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $23,504,535.00 |
| **Horizon Real Estate Holdings, LLC**<br>**Attn President or Manager Agent**<br>**101 N. Brand Boulevard, Suite 1920**<br>**Glendale, CA 91203**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | Check all that apply<br>☒ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim   Affiliate/Intercompany payable**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| 3.12   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $ 779.66 |
| **Konica Minolta Premier Finance**<br>**Attn President or Manager Agent**<br>**PO Box 41602**<br>**Philadelphia, PA 19101-1602**<br><br>Date or dates debt was incurred  **6/1/2023**<br><br>Last four digits of account number | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim   Copier**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| 3.13   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | **Unknown** |
| **LHP Hospital Group Inc**<br>**c/o Ardent Health Services**<br>**Attn President or Manager Agent**<br>**Attn Legal Department**<br>**One Burton Hills Blvd Suite 250**<br>**Nashville, TN 37215**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | Check all that apply<br>☒ Contingent<br>☒ Unliquidated<br>☒ Disputed<br><br>**Basis for the claim   Potential claims related to Debtor's guarantee of certain indemnification obligations of a subsidary and settlement agreement with creditor**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | |
| 3.14   Nonpriority creditor's name and mailing address | *As of the petition filing date, the claim is:* | $   .00 |
| **Los Angeles County Treasurer and Tax Collector**<br>**PO Box 54110**<br>**Los Angeles, CA 90054**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number | Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim   Notice Purposes**<br><br>Is the claim subject to setoff?<br>☒No.<br>☐Yes | |

**A1734**

Debtor **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number *(if known)* **23-10787-JKS**

| | Amount of claim |
|---|---|

| | | |
|---|---|---|
| 3.15 **Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $28,213.35 |
| **Michael Sarrao** **22431 Antonio Parkway, Suite B160-457** **Rancho Santa Margarita, CA 92688** | Check all that apply ☐ Contingent ☐ Unliquidated ☐ Disputed | |
| Date or dates debt was incurred  **4/30/2023 (bill date)** | | |
| Last four digits of account number | Basis for the claim   **Expense Reimbursement** | |
| | Is the claim subject to setoff? ☒No. ☐Yes | |
| 3.16 **Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $31,666.88 |
| **Moss Adams LLP** **Attn President or Manager Agent** **2040 Main Street Suite 900** **Irvine, CA 92614** | Check all that apply ☐ Contingent ☐ Unliquidated ☐ Disputed | |
| Date or dates debt was incurred | Basis for the claim   **Tax Preparation Services** | |
| Last four digits of account number | Is the claim subject to setoff? ☒No. ☐Yes | |
| 3.17 **Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $ 872.57 |
| **New Horizon Communications** **Attn President or Manager Agent** **PO Box 981073** **Boston, MA 02298-1073** | Check all that apply ☐ Contingent ☐ Unliquidated ☐ Disputed | |
| Date or dates debt was incurred  **6/1/2023** | Basis for the claim   **Internet Services** | |
| Last four digits of account number | Is the claim subject to setoff? ☒No. ☐Yes | |
| 3.18 **Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $37,823.00 |
| **Olshan Frome Wolosky LLP** **Attn Thomas J Fleming Esq** **1325 Avenue of the Americas** **New York, NY 10019** | Check all that apply ☐ Contingent ☐ Unliquidated ☐ Disputed | |
| Date or dates debt was incurred  **Various** | Basis for the claim   **Legal Fees - ERISA Counsel** | |
| Last four digits of account number | Is the claim subject to setoff? ☒No. ☐Yes | |
| 3.19 **Nonpriority creditor's name and mailing address** | *As of the petition filing date, the claim is:* | $37,874,526.12 |
| **Olympia Health Care, LLC** **Attn President or Manager Agent** **101 N. Brand Boulevard, Suite 1920** **Glendale, CA 91203** | Check all that apply ☒ Contingent ☐ Unliquidated ☐ Disputed | |
| Date or dates debt was incurred | Basis for the claim   **Affiliate/Intercompany payable** | |
| Last four digits of account number | Is the claim subject to setoff? ☒No. ☐Yes | |

Debtor  **Alecto Healthcare Services LLC, a Delaware limited liability company**     Case number (*if known*) 23-10787-JKS

|  | Amount of claim |
|---|---|
| **3.20**   Nonpriority creditor's name and mailing address | $1,888.00 |

**Panch Jeyakumar MD**
**2248 Pieper Lane**
**Tustin, CA 92792**

Date or dates debt was incurred  **5/31/2023**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Expense Reimbursement**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.21**   Nonpriority creditor's name and mailing address | $3,169,745.72 |
|---|---|

**Plaintiffs in Reed v. Alecto [Keith Reed, Elizabeth**
**Schenkel, Emily Wines, Mark Garan and August**
**Ullum and Represented Class**
**c/o Laura Davidson & Bren Pompomio**
**Mountain State Justice, Inc.**
**1217 Quarrier Street**
**Charleston, WV 25301**

Date or dates debt was incurred  **11/28/2022**

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **WARN Act Class Action**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.22**   Nonpriority creditor's name and mailing address | $8,083,572.10 |
|---|---|

**Plaza Medical Office Building, LLC**
**Attn President or Manager Agent**
**101 N. Brand Boulevard, Suite 1920**
**Glendale, CA 91203**

Date or dates debt was incurred

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☒ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim   **Affiliate/Intercompany**
**payable**

Is the claim subject to setoff?
☒No.
☐Yes

---

| **3.23**   Nonpriority creditor's name and mailing address | **Unknown** |
|---|---|

**Sherman/Grayson Health System, LLC**
**c/o Ardent Health Services**
**Attn President or Manager Agent**
**Attn Legal Department**
**One Burton Hills Blvd Suite 250**
**Nashville, TN 37215**

Date or dates debt was incurred

Last four digits of account number

*As of the petition filing date, the claim is:*
Check all that apply
☒ Contingent
☒ Unliquidated
☒ Disputed

Basis for the claim   **Potential claims related to**
**Debtor's guarantee of certain indemnification**
**obligations of a subsidary and settlement**
**agreement with creditor**

Is the claim subject to setoff?
☒No.
☐Yes

**A1736**

Debtor **Alecto Healthcare Services LLC, a Delaware limited liability company**    Case number (*if known*) **23-10787-JKS**

| | Amount of claim |
|---|---|
| **3.24   Nonpriority creditor's name and mailing address**<br><br>**Sylvia Ventura**<br>**4742 Ambrazzi Drive**<br>**Cypress, CA 90630**<br><br>Date or dates debt was incurred **5/31/2023 (bill date)**<br><br>Last four digits of account number<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim   Expense Reimbursement**<br><br>**Is the claim subject to setoff?**<br>☒No.<br>☐Yes | $2,743.62 |
| **3.25   Nonpriority creditor's name and mailing address**<br><br>**Symphony Risk Solutions LLC**<br>**Attn President or Manager Agent**<br>**2425 N Central Expressway Suite 900**<br>**Richardson, TX 75080**<br><br>Date or dates debt was incurred **6/1/2023**<br><br>Last four digits of account number<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim   Insurance Premiums**<br><br>**Is the claim subject to setoff?**<br>☒No.<br>☐Yes | $23,031.10 |
| **3.26   Nonpriority creditor's name and mailing address**<br><br>**United States of America**<br>**Brian M Boynton, Principal Deputy Deputy Assit Atty General**<br>**Ruth A Harvey, Director**<br>**Michale J Quinn, Senior Litigation Counsel**<br>**John R Kresse and T. Dietrich Hill, Trial Attys**<br><br>**United States Department of Justice**<br>**Civil Division, Commerical Litigation Branch**<br>**1100 L Street NW, 7th Floor**<br>**Box 875, Ben Franklin Station**<br>**Washington, DC 20044-9875**<br><br>Date or dates debt was incurred<br><br>Last four digits of account number<br><br>*As of the petition filing date, the claim is:*<br>Check all that apply<br>☒ Contingent<br>☒ Unliquidated<br>☒ Disputed<br><br>**Basis for the claim   Lawsuit:  United States of America v. Olympia Health Care, LLC, Alecto Healthcare Services, LLC et al., United States District Court for the Central District of California Case No. 2:23-cv-01783 (complaint asserts amount owed as of 2/28/2023, principal of $11,059,170.17 plus $1,421,027.62 in interest and interest continues to accrue at 10% per annum)**<br><br>**Is the claim subject to setoff?**<br>☐No.<br>☒Yes | $12,480,197.79 |

|  | **Total** | **$85,496,898.04** |
|---|---|---|

Debtor  Alecto Healthcare Services LLC, a Delaware limited liability company          Case number *(if known)*  **23-10787-JKS**

| Part 3: | List Others to Be Notified About Unsecured Claims |
|---|---|

**4.** List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 an 2, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and mailing address | On which line in Part 1 or 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4.1<br>**Timothy Cogan**<br>**Cassidy Cogan Shapell & Voeglin, LC**<br>**1413 Eoff Street**<br>**Wheeling, WV 26003** | Line **3.21**<br>**re Plaintiffs in Reed v. Alecto**<br>☐ Not listed.  Explain | |
| 4.2<br>**Maureen Davidson-Welling**<br>**Stember Cohn & Davidson-Welling**<br>**425 First Avenue, 7th Floor**<br>**Pittsburgh, PA 15219** | Line **3.21**<br>**re Plaintiffs in Reed v. Alecto**<br>☐ Not listed.  Explain | |
| 4.3<br>**F. Alex Risovich**<br>**Risovich Law Offices, PLLC**<br>**3023 Pennsylvania Avenue**<br>**Weirton, WV 26062** | Line **3.21**<br>**re Plaintiffs in Reed v. Alecto**<br>☐ Not listed.  Explain | |
| 4.4<br>**AON Risk Consultants Inc**<br>**Attn L Joe Galusha, President**<br>**200 E. Randolph St**<br>**Chicago, IL 60601** | Line **3.3**<br>**re AON Risk Consultants Inc**<br>☐ Not listed.  Explain | |
| 4.5<br>**Civil Process Clerk**<br>**United States Attorney's Office**<br>**Federal Building Room 7516**<br>**300 North Los Angeles, Street**<br>**Los Angeles, CA 90012** | Line **3.26**<br>**re United States of America**<br>☐ Not listed.  Explain | |
| 4.6<br>**Attorney General**<br>**United States Department of Justice**<br>**Ben Franklin Station**<br>**PO Box 683**<br>**Washington, DC 20044** | Line **3.26**<br>**re United States of America**<br>☐ Not listed.  Explain | |
| 4.7 | Line<br>☐ Not listed.  Explain | |

Debtor  Alecto Healthcare Services LLC, a Delaware limited liability company     Case number *(if known)* **23-10787-JKS**

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---------|---------------------------------------------------------------|

| 5. | Add the amounts of priority and nonpriority unsecured claims. | | Total of claim amounts |
|----|--------------------------------------------------------------|----|------------------------|
| | **5a.** **Total claims from Part 1** | *5a.* | **$0.00** |
| | **5b.** **Total claims from Part 2** | *5b.* + | **$85,496,898.04** |
| | **5c.** **Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | *5c.* | **$85,496,898.04** |

| Fill in this information to identify the case: |
|---|

Debtor name    Alecto Healthcare Services LLC
a Delaware limited liability company

United States Bankruptcy Court for the: _____ District of   Delaware
(State)

Case number (If known):   23-10787-JKS     Chapter   11

☐ Check if this is an
amended filing

Official Form 206G
## Schedule G: Executory Contracts and Unexpired Leases    12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

**1. Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with |
|---|---|
| **2.1** State what the contract or lease is for and the nature of the debtor's interest    See Schedule G Attachment | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.2** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.3** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.4** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |
| **2.5** State what the contract or lease is for and the nature of the debtor's interest | |
| State the term remaining | |
| List the contract number of any government contract | |

## A1740

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  G – Executory Contracts and Unexpired Leases**

|  | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.1 | Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsbdiary hospitals | Cardinal Health 110, LLC c/o Porter Wright Morris & Arthur LLC 41 South High Street, Suite 2900 Columbus, Ohio 43215 |
| 2.2 | Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsbdiary hospitals | Cardinal Health 200, LLC c/o Porter Wright Morris & Arthur LLC 41 South High Street, Suite 2900 Columbus, Ohio 43215 |
| 2.3 | Commercial Insurance Premium Finance and Security Agreement (Quote No. x0380) for Policy No. x8117  - Property Insurance | Bank Direct Capital Finance 150 North Field Drive, Suite 190 Lake Forest, IL 60045 |
| 2.4 | Commercial Insurance Premium Finance and Security Agreement (Quote No. x2606) for Policy No. x1701 – Extending Reporting Professional Liability Policy | Bank Direct Capital Finance 150 North Field Drive, Suite 190 Lake Forest, IL 60045 |
| 2.5 | Commercial Insurance Premium Finance and Security Agreement (Quote No. 45720646 for Policy No. 02-462-55-24, 02-462-55-22, NHS703822 | Stetson Insurance Funding, LLC 6450 Transit Road Depeur, NY 14043 |
| 2.6 | Medical Insurance Benefits | Anthem Blue Cross PO Box 51011 Los Angeles, CA 90051 |
| 2.7 | Dental and Vision Insurance Benefits | Met Life 811 Main Street, 7th Floor Kansas City, MO 64105 |
| 2.8 | Life Insurance Benefits | Unum 655 N. Central, Suite 900 Glendale, CA 91203 |

A1741

Case 23-10787-JKS    Doc 48    Filed 06/30/23    Page 40 of 49

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  G – Executory Contracts and Unexpired Leases**

| | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.9 | Insurance<br>Directors & Officers<br>Employment Practices<br>Fiduciary & Crime - Primary Layer<br>Term: 1/31/2023 - 1/31/2024<br>Policy No.: 02-462-55-16 | National Union Fire Insurance Co<br>28 Liberty Street<br>New York, NY 10005 |
| 2.10 | Insurance<br>Excess Directors & Officers<br>Employment Practices<br>Term: 1/31/2023 - 1/31/2024<br>Policy No. NHS 703822 | RSUI Indemnity Company<br>945 East Paces Ferry Road Suite 1800<br>Atlanta, GA 30376 |
| 2.11 | Insurance<br>Excess Directors & Officers<br>Employment Practices<br>Term: 1/31/2023 - 1/31/2024<br>Policy No. 02-462-55-24 | National Union Fire Insurance Co<br>28 Liberty Street<br>New York, NY 10005 |
| 2.12 | Insurance<br>Comprehensive Employer Indemnity<br>Term: 3/1/2023 - 3/31/2024<br>Policy No. ORNSOL000039-01 | Old Republic Union Insurance Co<br>307 N Michigan Avenue<br>Chicago, IL 60601 |
| 2.13 | Insurance<br>Workers Compensation<br>Term: 4/1/2023 - 41/2024<br>Policy No. BNUWC0153849 | StarNet Insurance Company<br>9301 Innovation Drive Suite 200<br>Manassa, VA 20110 |
| 2.14 | Insurance<br>Automobile<br>Term: 6/1/2023 - 6/1/2024<br>Policiy No. 5087-0849-02 | Vantapro Specialty Insurance Co<br>199 Water Street<br>New York, NY 10038 |

**A1742**

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  G – Executory Contracts and Unexpired Leases**

| | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.15 | Insurance<br>"All Risks" Property incl Boiler & Machinery & Flood, excluding CA EM<br>Term: 7/1/2022 – 7/1/2023<br>Policy No. 018258117 | American Home Asssurance Co<br>175 Water Street<br>New York, NY 10038 |
| 2.16 | Insurance<br>Excess Medical Professional<br>General Liability for TX (WNJ) Exposure Only<br>Term: 8//1/2022 - 8/1/2023<br>Policy No. HUL 09114235 | Magmutual Professional Security Ins Co<br>PO Box 52979<br>Atlanta, GA 30355 |
| 2.17 | Insurance<br>Environmental Pollution<br>Storage Tank Liability - WNJ<br>Term: 8/1/2022 - 8/1/2023<br>Policy No. PSPIUSCBM76002 | Ironshore Specialty Insurance Co<br>175 Berkeley Street<br>Boston, MA 02116 |
| 2.18 | Insurance<br>Cyber Liability<br>Term: 8/1/42022 - 8/14/2023<br>Policy No. C-4LPY-047551-CYBER-2002 | Coalition Insurance Solutions<br>  Arch Specialty - 45%<br>  Fireman's Fund - 25%<br>  Ascot Specialty - 25%<br>  North Amercian Capacity - 5% |
| 2.19 | Insurance<br>3 Year Extended Reporting Period Excess Medical Professional General Liability Coverage for Non TX Exposures<br>Term: 8/1/2022 - 8/1/2025<br>Policy No. x1701 | Endurance American Specialty Ins Co<br>16052 Swingley Ridge Road Suite 130<br>St Louis, MO 63017 |
| 2.20 | Sublease dated 1/31/2023<br>Approximately 2,862 square feet of office space located at 101 N. Brand Boulevard, Suite 1920, Glendale, CA 91203 | Pacific Global Investment Management Group<br>Attn: SVP<br>101 N. Brand Blvd., Suite 1950<br>Glendale, CA 91203 |

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  G – Executory Contracts and Unexpired Leases**

| | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|
| 2.21 | Prime Vendor Agreement - Distribution Agreement for Pharmaceuticals dated 6/1/2016<br>First Amendment dated 12/5/2016<br>Second Amendment dated 3/7/2017<br>Third Amendment dated 6/20/2017 | Cardinal Health 110, LLC and Cardinal Health, Inc.<br>c/o Porter Wright Morris & Arthur LLC<br>41 South High Street, Suite 2900<br>Columbus, Ohio 43215 |
| 2.22 | Guaranty dated 10/31/2014<br>Guarantee re Sherman/Grayson Hospital, LLC obligations to MPT of Sherman-Alecto, LLC for Capital Reserve Deposits | MPT of Sherman-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| 2.23 | Guaranty dated 9/19/2014<br>Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC | MPT of Fairmont-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| 2.24 | Guaranty dated 6/1/2017<br>Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Wheeling LLC and Alecto Healthcare Services Martin's Ferry LLC | MPT of Wheeling-Alecto Hospital, LLC  MPT of Martins Ferry-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| 2.25 | Guaranty dated 9/23/2014 | Sherman/Grayson Health System, LLC<br>LHP Hospital Group, Inc.<br>c/o Ardent Health Services<br>Attn Legal Department<br>One Burton Hills Boulevard Suite 250<br>Nashville, TN 37215 |

**A1744**

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  G – Executory Contracts and Unexpired Leases**

|  |  | List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|---|---|
| 2.26 |  | Record Storage and Data Agreement dated 2/1/2023 | GRM Information Management of San Francisco, LLC<br>40199 Boyce Road<br>Fremont, CA 94538 |
|  |  |  |  |

**A1745**

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | Alecto Healthcare Services LLC<br>a Delaware limited liability company |
| United States Bankruptcy Court for the: | District of Delaware<br>(State) |
| Case number (If known): | 23-10787-JKS |

☐ Check if this is an amended filing

## Official Form 206H

## Schedule H: Codebtors                                                  12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

**1. Does the debtor have any codebtors?**

☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

☑ Yes

**2. In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, _Schedules D-G_.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: **Codebtor** | | Column 2: **Creditor** | |
|---|---|---|---|
| **Name** | **Mailing address** | **Name** | *Check all schedules that apply:* |
| See Schedule H Attachment | | | |
| 2.1 _____ | Street _____<br><br>_____<br>City        State        ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |
| 2.2 _____ | Street _____<br><br>_____<br>City        State        ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |
| 2.3 _____ | Street _____<br><br>_____<br>City        State        ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |
| 2.4 _____ | Street _____<br><br>_____<br>City        State        ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |
| 2.5 _____ | Street _____<br><br>_____<br>City        State        ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |
| 2.6 _____ | Street _____<br><br>_____<br>City        State        ZIP Code | _____ | ☐ D<br>☐ E/F<br>☐ G |

## A1746

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| Alecto Healthcare Services Wheeling LLC dba Ohio Valley Medical Group<br>OVMC Physicians<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | Plaintiffs in Reed v. Alecto<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Sherman/Grayson Hospital LLC<br>500 N Highland Ave<br>Sherman, TX 75092 | MPT of Sherman-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>Schedule D ☒<br>Schedule E/F ☐<br>Schedule G ☐ |
| Alecto Healthcare Services Wheeling LLC<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | MPT of Wheeling-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>Schedule D ☒<br>Schedule E/F ☐<br>Schedule G ☐ |
| Alecto Healthcare Services Martin's Ferry LLC<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | MPT of Wheeling-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>Schedule D ☒<br>Schedule E/F ☐<br>Schedule G ☐ |

**A1747**

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| Alecto Healthcare Services Fairmont LLC<br>101 N Brand Boulevard Suite 1920<br>Glendale, CA 91203 | MPT of Fairmont-Alecto Hospital, LLC<br>c/o Medical Properties Trust, Inc.<br><br>Schedules that apply:<br>Schedule D          ☒<br>Schedule E/F       ☐<br>Schedule G          ☐ |
| Olympia Health Care, LLC<br>Attn President or Manager Agent<br>101 N. Brand Boulevard Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D          ☐<br>Schedule E/F       ☒<br>Schedule G          ☐ |
| MPT of Los Angeles, LP<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D          ☐<br>Schedule E/F       ☒<br>Schedule G          ☐ |
| MPT of Olympia, LLC<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D          ☐<br>Schedule E/F       ☒<br>Schedule G          ☐ |

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| MPT Operating Partnership, L.P.<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Medical Properties Trust, Inc.<br>c/o Medical Properties Trust, Inc.<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Sherman/Grayson Hospital LLC<br>500 N Highland Ave<br>Sherman, TX 75092 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Alecto Healthcare Services Sherman LLC<br>101 N Brand Blvd Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Laxman Reddy<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |

**A1749**

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| Matthew Williams<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, CA 91203 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Jeremy Redin<br>28372 Steel Lane<br>Valencia, CA 91354 | United States of America<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Sherman/Grayson Hospital LLC<br>500 N. Highland Avenue<br>Sherman, Texas 75092 | LHP Hosptial Group, Inc.<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |
| Sherman/Grayson Hospital LLC<br>500 N. Highland Avenue<br>Sherman, Texas 75092 | Sherman/Grayson Health Systems LLC<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>Schedule D ☐<br>Schedule E/F ☒<br>Schedule G ☐ |

A1750

**In re Alecto Healthcare Services LLC**
**Attachment to Schedule  H - Co-Debtors**

| Co-Debtor Name and Address | Creditor |
|---|---|
| Alecto Healthcare Services Sherman LLC<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, California 91203 | LHP Hosptial Group, Inc.<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>Schedule D  ☐<br>Schedule E/F  ☒<br>Schedule G  ☐ |
| Alecto Healthcare Services Sherman LLC<br>c/o 101 N. Brand Boulevard Suite 1920<br>Glendale, California 91203 | Sherman/Grayson Health Systems LLC<br>c/o Ardent Health Services<br><br>Schedules that apply:<br>Schedule D  ☐<br>Schedule E/F  ☒<br>Schedule G  ☐ |

**A1751**

# Claims Activity Report

## U.S. Bankruptcy Court -- District of Delaware

## Report Period: 6/16/2023 - 12/19/2023

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $6115.93 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | Priority claimed: $5605.05 | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **1** | | Filed by: Creditor |
| Filed: 07/07/2023 | | Entered by: BJM |
| Entered: 07/07/2023 | | Status: Withdraw 187 |
| Amends No: | | Last date to file claims: 08/15/2023 |
| | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Uline, 12575 Uline Dive, Pleasant Prairie, WI 53158

Description: Goods Sold
Remarks: 3060

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $0.00 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **2** | | Filed by: Creditor |
| Filed: 07/19/2023 | | Entered by: EPOC Filer |
| Entered: 07/19/2023 | | Status: |
| Amends No: | | Last date to file claims: 08/15/2023 |
| | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Ironshore Specialty Insurance Company, 175 Berkeley Street, Boston, MA 02116

Remarks: Account Number (last 4 digits):3301 Filer Comment: Contingent and unliquidated

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $160551.00 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | Priority claimed: $160551.00 | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **3** | | Filed by: Creditor |
| Filed: 07/21/2023 | | Entered by: BJM |
| Entered: 07/21/2023 | | Status: |
| Amends No: | | Last date to file claims: 08/15/2023 |
| | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Department of the Treasury, Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $419842.62 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **4** | | Filed by: Creditor |
| **Attachment 1** | | Entered by: EPOC Filer |
| Filed: 07/27/2023 | | Status: |
| Entered: 07/27/2023 | | Last date to file claims: 08/15/2023 |
| Amends No: | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Cardinal Health 110, LLC, 7000 Cardinal Place, Dublin, OH 43017

## A1752

| Case: 23-10787-JKS | Amount claimed: $119695.80 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **5** | | Filed by: Creditor |
| **Attachment 1** | | Entered by: EPOC Filer |
| Filed: 07/27/2023 | | Status: |
| Entered: 07/27/2023 | | Last date to file claims: 08/15/2023 |
| Amends No: | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Cardinal Health 200, LLC, 7000 Cardinal Place, Dublin, OH 43017

| Case: 23-10787-JKS | No amounts claimed | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **6** | | Filed by: Creditor |
| Filed: 08/01/2023 | | Entered by: BJM |
| Entered: 08/01/2023 | | Status: |
| Amends No: | | Last date to file claims: 08/15/2023 |
| | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: U.S. Department of Labor, Julie A. Su, U.S. Secretary of Labor, EBSA - Attn: Padilla, 35 N. Lake Ave., Suite 300, Pasadena, CA 91101
Description: No Claim Amount Listed
Remarks: Possible Violations of ERISA/8324

| Case: 23-10787-JKS | No amounts claimed | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **7** | | Filed by: Creditor |
| Filed: 08/01/2023 | | Entered by: BJM |
| Entered: 08/01/2023 | | Status: |
| Amends No: | | Last date to file claims: 08/15/2023 |
| | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: U.S. Department of Labor, Julie A. Su, U.S. Secretary of Labor, EBSA - Attn: Padilla, 35 N. Lake Ave., Suite 300, Pasadena, CA 91101
Description: No Claim Amount Listed
Remarks: Possible Violations of ERISA/8325

| Case: 23-10787-JKS | Amount claimed: $700.00 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | Priority claimed: $700.00 | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **8** | | Filed by: Creditor |
| **Attachment 1** | | Entered by: EPOC Filer |
| Filed: 08/01/2023 | | Status: |
| Entered: 08/01/2023 | | Last date to file claims: 08/15/2023 |
| Amends No: | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: California Franchise Tax Board, Bankruptcy Section MS A-340, PO Box 2952, Sacramento, CA 95812-2952
Remarks: Account Number (last 4 digits):0349

| Case: 23-10787-JKS | No amounts claimed | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **9** | | Filed by: Creditor |

**A1753**

12/19/23, 6:32 PM    Case 1:24-cv-00493-JKS    Document 54-3    Filed 04/04/24    U.S. Bankruptcy Court Page 100 of 292 PageID #: 2205

Case 1:24-cv-00493-JKS    Document 54-3    Filed 04/04/24    Page 100 of 292 PageID #: 2205

**Attachment 1**
**Attachment 2**
**Attachment 3**
Filed: 08/12/2023
Entered: 08/12/2023
Amends No:

Entered by: EPOC Filer
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: MPT of Sherman-Alecto, LLC and affiliates, Medical Properties Trust, Inc., 425 Park Avenue, 36th Floor, New York, NY 10022

Remarks: Filer Comment: Unliquidated (see attachment)

---

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **10**
**Attachment 1**
**Attachment 2**
Filed: 08/14/2023
Entered: 08/14/2023
Amends No:

Amount claimed: $7313.70

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: EPOC Filer
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: De Lage Landen Financial Services, 1111 Old eagle School Road, Wayne, PA 19087

Remarks: Account Number (last 4 digits):8050

---

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **11**
**Statement In Support**
Filed: 08/14/2023
Entered: 08/14/2023
Amends No:

Amount claimed: $1065047.00

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: S. Thomas
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Pension Benefit Guaranty Corporation

Description: Statutory Liability to the Alecto Healthcare Services Ohio Valley LLC Pension Pension Plan for unpaid minimum funding contributions under 26 U.S.C. §§ 412 and 430, 29 U.S.C. §§ 1082, 1342 and 1362(c). See attached statement.

---

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **12**
**Statement in Support**
Filed: 08/14/2023
Entered: 08/14/2023
Amends No:

Amount claimed: $1845012.00

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: S. Thomas
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Pension Benefit Guaranty Corporation

Description: Statutory Liability under 29 U.S.C. § 1362 and 1368 for unfunded benefit liabilities of the Alecto Healthcare Services Ohio Valley LLC Pension Pension Plan. See attached statement.

---

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **13**
**Statement in Support**
Filed: 08/14/2023
Entered: 08/14/2023
Amends No:

Amount claimed: $0.00
Priority claimed: $0.00

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: S. Thomas
Status:
Last date to file claims: 08/15/2023

**A1754**

Creditor name/address: Pension Benefit Guaranty Corporation

Description: Statutory Liability under 29 U.S.C. § 1307 on account of the Alecto Healthcare Services Ohio Valley LLC Pension Plan. See attached statement.
Remarks: Unliquidated priority and total amounts claimed

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $173848.49 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **14** | | Filed by: Creditor |
| Filed: 08/14/2023 | | Entered by: R.W. Riley |
| Entered: 08/14/2023 | | Status: |
| Amends No: | | Last date to file claims: 08/15/2023 |
| | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: Snyder Brothers, Inc., c/o Ronald W. Crouch, Counsel of Record, Whiteford Taylor & Preston, LLP, 11 Stanwix St., Suite 1400, Pittsburgh, PA 15222

Description: Judgment entered against subsidiary for goods sold (Neutural Gas)
Remarks: Fraudulent Transfer/Alter Ego - See Attached Consent Judgment and Statement

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $3739635.77 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **15** | | Filed by: Creditor |
| **Summary of Claim and Supporting Documentation** | | Entered by: E.J Taube |
| | | Status: |
| Filed: 08/14/2023 | | Last date to file claims: 08/15/2023 |
| Entered: 08/14/2023 | | Last date to file (Govt): 12/13/2023 |
| Amends No: | | |

Creditor name/address: LHP Hospital Group, Inc., c/o Saul Ewing, LLP, Attn: Mark Minuti, 1201 N. Market St., Suite 2300, Wilmington, DE 19801

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $5107726.81 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **15** | | Filed by: Creditor |
| **Attachment 1** | | Entered by: EPOC Filer |
| Filed: 12/15/2023 | | Status: |
| Entered: 12/15/2023 | | Last date to file claims: 08/15/2023 |
| Amends No: 15 | | Last date to file (Govt): 12/13/2023 |

Creditor name/address: LHP Hospital Group, Inc., c/o Saul Ewing, LLP, Attn: Mark Minuti, 1201 N. Market St., Suite 2300, Wilmington, DE 19801

| | | |
|---|---|---|
| Case: 23-10787-JKS | Amount claimed: $0.00 | Chapter: 11 |
| Title: Alecto Healthcare Services LLC | | Judge: Stickles |
| Office: 1 | | Trustee: Nimeroff |
| Claim No: **16** | | Filed by: Creditor |
| **POC Attachment** | | Entered by: D. Burgagni |
| **Policy List** | | Status: |
| Filed: 08/15/2023 | | Last date to file claims: 08/15/2023 |
| Entered: 08/15/2023 | | Last date to file (Govt): 12/13/2023 |
| Amends No: | | |

Creditor name/address: AIG Property Casualty, Inc., Kevin J. Larner, Esq., Authorized Representative, 28 Liberty Street, Floor 22, New York, NY 10005

**A1755**

Case: 23-10787-JKS                    Amount claimed: $93110.57              Chapter: 11
Title: Alecto Healthcare Services LLC                                        Judge: Stickles
Office: 1                                                                    Trustee: Nimeroff
Claim No: **17**                                                             Filed by: Creditor
**Attachment 1**                                                             Entered by: EPOC Filer
Filed: 08/15/2023                                                            Status:
Entered: 08/15/2023                                                          Last date to file claims: 08/15/2023
Amends No:                                                                   Last date to file (Govt): 12/13/2023

Creditor name/address: Health Carousel Travel Network, LLC, 455 Delta Avenue, Suite 108, Cincinnati, OH 45226


Case: 23-10787-JKS                    Amount claimed: $245307.00             Chapter: 11
Title: Alecto Healthcare Services LLC                                        Judge: Stickles
Office: 1                                                                    Trustee: Nimeroff
Claim No: **18**                                                             Filed by: Creditor
Filed: 08/15/2023                                                            Entered by: EPOC Filer
Entered: 08/15/2023                                                          Status:
Amends No:                                                                   Last date to file claims: 08/15/2023
                                                                             Last date to file (Govt): 12/13/2023

Creditor name/address: Alecto Health Care Services Ohio Valley LLC, HP, Kamaljit Bains, EBSA Investigator, 1835 Market
Street, 21st Floor-Mailstop EBSA/21, Philadelphia, PA 19103


Case: 23-10787-JKS                    Amount claimed: $245307.00             Chapter: 11
Title: Alecto Healthcare Services LLC                                        Judge: Stickles
Office: 1                                                                    Trustee: Nimeroff
Claim No: **18**                                                             Filed by: Creditor
**Attachment 1**                                                             Entered by: EPOC Filer
Filed: 08/23/2023                                                            Status:
Entered: 08/23/2023                                                          Last date to file claims: 08/15/2023
Amends No: 18                                                                Last date to file (Govt): 12/13/2023

Creditor name/address: Alecto Health Care Services Ohio Valley LLC, HP, Kamaljit Bains, EBSA Investigator, 1835 Market
Street, 21st Floor-Mailstop EBSA/21, Philadelphia, PA 19103


Case: 23-10787-JKS                    Amount claimed: $3275382.64            Chapter: 11
Title: Alecto Healthcare Services LLC                                        Judge: Stickles
Office: 1                                                                    Trustee: Nimeroff
Claim No: **19**                                                             Filed by: Creditor
**Attachment 1**                                                             Entered by: EPOC Filer
Filed: 08/15/2023                                                            Status:
Entered: 08/15/2023                                                          Last date to file claims: 08/15/2023
Amends No:                                                                   Last date to file (Govt): 12/13/2023

Creditor name/address: Reed Action Judgment Creditors, Bren J. Pomponio, 1217 Quarrier Street, Charleston, WV 25301
Remarks: Filer Comment: See addendum


Case: 23-10787-JKS                    Amount claimed: $53157.76              Chapter: 11
Title: Alecto Healthcare Services LLC                                        Judge: Stickles
Office: 1                                                                    Trustee: Nimeroff
Claim No: **20**                                                             Filed by: Creditor
**Attachment 1**                                                             Entered by: EPOC Filer
Filed: 08/15/2023                                                            Status:

**A1756**

Entered: 08/15/2023
Amends No:

Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Michael Best & Friedrich LLP, c/o Justin M. Mertz, 790 N. Water St., Ste. 2500, Milwaukee, WI 53202
Remarks: Account Number (last 4 digits):0995

Case: 23-10787-JKS
Title: Alecto Healthcare Services LLC
Office: 1
Claim No: **21**
**Exhibit Exhibit A**
**Exhibit Exhibit B**
**Exhibit Exhibit C**
Filed: 12/13/2023
Entered: 12/13/2023
Amends No:

Amount claimed: $29126600.90

Chapter: 11
Judge: Stickles
Trustee: Nimeroff
Filed by: Creditor
Entered by: L.Victoria Lerman
Status:
Last date to file claims: 08/15/2023
Last date to file (Govt): 12/13/2023

Creditor name/address: Centers for Medicare & Medicaid Services, U.S. Dep, 7500 Security Blvd., Baltimore, MD 21244

### Claim entries selected: 23

| Selection Criteria | |
|---|---|
| **Run date and time:** | Tue Dec 19 18:36:53 2023 |
| **By:** | Jeffrey R. Waxman |
| **Chapter:** | All |
| **Office:** | All |
| **Creditor name:** | All |
| **Case:** | 1:23-bk-10787 |
| **Trustee:** | All |
| **Sort key1:** | Case Number |
| **Sort key2:** | Claim Number |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/19/2023 18:36:53 | | | |
| **PACER Login:** | jwaxmanpacerng | **Client Code:** | 142408.0001 |
| **Description:** | Claims Activity Report | **Search Criteria:** | 23-10787-JKS Office: All Ch: All Creditor: All From: 6/16/2023 To: 12/19/2023 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

**A1757**

# **EXHIBIT C**

Projected Income

**ALECTO HEALTHCARE SERVICES LLC**
**INCOME STATEMENT**
**3-YEAR PROJECTION (2/1/24 to 1/31/27)**

| AHS | Year 1<br>2/1/24 to 1/31/25 | Year 2<br>2/1/25 to 1/31/26 | Year 3<br>2/1/26 to 1/31/27 |
|---|---|---|---|
| Operating Revenues | 3,415,430 | 3,319,235 | 3,287,182 |
| | | | |
| **OPERATING EXPENSES** | | | |
| Salaries & Wages | 1,220,675 | 1,161,059 | 1,161,059 |
| Benefits | 151,437 | 153,787 | 163,015 |
| Payroll Taxes | 90,025 | 85,628 | 85,628 |
| PTO | 94,633 | 90,662 | 90,662 |
| Labor Subtotal | 1,556,770 | 1,491,137 | 1,500,364 |
| | | | |
| Supplies | 5,055 | 5,207 | 5,363 |
| Purchased Services | 41,000 | 42,230 | 43,497 |
| Legal Fees (Non-Bankruptcy) | 75,600 | 75,600 | 75,600 |
| Bankrutpcy Professionals | 300,000 | 0 | 0 |
| Tax Preparation Fees | 99,172 | 70,000 | 60,000 |
| Repairs & Maintenance | 468 | 468 | 468 |
| Rents & Leases | 90,000 | 92,700 | 93,627 |
| Insurance | 346,992 | 357,402 | 368,124 |
| Utilities | 6,780 | 6,983 | 7,123 |
| Taxes and Licenses | 3,000 | 3,090 | 3,121 |
| Dues, Subscriptions, and Software | 4,800 | 4,944 | 5,092 |
| Outside Training Sessions | 2,400 | 2,400 | 2,400 |
| Travel | 56,000 | 56,000 | 56,000 |
| Meals | 4,200 | 3,600 | 3,600 |
| Bank Fees & Charges | 6,000 | 6,000 | 6,000 |
| Controlled Group Reserve | 352,000 | 352,000 | 352,000 |
| Depreciation | 1,280 | 960 | 720 |
| Interest Expense | 0 | 0 | 0 |
| **Total Operating Expenses** | 2,951,517 | 2,570,721 | 2,583,099 |
| | | | |
| **NET INCOME (LOSS)** | **463,913** | **748,514** | **704,083** |

**EXHIBIT D**

Report of Gould Consulting Services

September 28, 2023

Steven Balasiano, Independent Director
Alecto Healthcare Services, LLC
c/o Jeffrey Waxman, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801-1494

**In Re: Alecto Healthcare Services, LLC (Case No. 23-10787 (JKS))**
   **Forensic Investigation Consulting**

Dear Mr. Balasiano,

You asked me to prepare this letter report to describe our findings, procedures employed, and data and transactions analyzed in the forensic investigation of transactions by and between Alecto Healthcare Services, LLC ("Alecto" or "Debtor") and its Affiliates[1] and/or any current or former officers, directors, or equity holders ("Insiders")[2] performed by Gould Consulting Services ("GCS").

The forensic investigation covered the four (4) year period June 17, 2019, through June 16, 2023, the date Alecto filed for bankruptcy protection under chapter 11, subchapter V (the "Examination Period").

Section I of this letter report sets forth our observations based on work performed during our retention. Specifically, this letter report will discuss the following transactions:



---

[1] Alecto Healthcare Services Sherman LLC ("Alecto Sherman") and its subsidiary, Sherman/Grayson Hospital, LLC, d/b/a Wilson N. Jones Regional Medical Center ("Sherman/Grayson"), Alecto Healthcare Services Hayward, LLC ("Alecto Hayward"), Alecto Healthcare Services Los Angeles LLC ("Alecto LA") and its subsidiary, Olympia Health Care d/b/a Olympia Medical Center ("Olympia HC" or "OMC"), Alecto Healthcare Services Fairmont LLC ("Alecto Fairmont"), Alecto Healthcare Services Ohio Valley, LLC ("Alecto Ohio Valley"), Alecto Sunrise MOB Holdings LLC ("Sunrise MOB"), its subsidiaries Sunrise Real Estate Holdings LLC (Sunrise REH") and Plaza Medical Office Building LLC ("Plaza MOB"), and Alecto Healthcare Services Real Estate Holdings LLC ("Alecto REH"), (collectively, and including unnamed subsidiary entities, the "Affiliates"). See GCS Diagram 1 – Organization Chart.
[2] Alecto's officers and directors are Lex Reddy, Michael Sarrao. The Alecto equity holders are Lex Reddy, Richard Hayes, The Reddy Investment Trust, Roger Krissman, The Krissman Family Trust, Michael Sarrao, The Sarrao Family Trust, Panch Jeyakumar, M.D., The Jeyakumar Inter-Vivos Trust, Martha Hayes, the Hayes Irrevocable Trust, Matthew C. Hayes, Comstock Investment Trust, Steven Kay, Matthew Williams, Aman Dhuper, (collectively, the "Alecto Members") (Alecto Healthcare Services LLC 2022 Partnership Tax Return).

**A1761**

GCS understands that as of the date of this letter report the statute of limitations for avoidance actions under U.S. Bankruptcy Code §548 and the Uniform Voidable Transactions Act ("UVTA") has passed with respect to the June 19, 2019 Transfer except for the Debtor's ability to bring such actions. This letter report is provided to you with respect to potential avoidance actions that may be pursued by the Debtor.

Section II outlines the scope of our work and analysis performed under the limitations listed in Section III.

## I.     FINDINGS AND OBSERVATIONS

GCS examined documents and data produced by Alecto to identify potentially voidable transfers during the Examination Period. Our examination was focused in the following areas:

- Transactions involving the transfer of 1) Sunrise REH, and effectively, Plaza MOB, by Alecto in 2019 to Sunrise MOB, an organization formed by the Alecto Members, and 2) the transfer of Sunrise MOB, and effectively Plaza MOB, to Alecto in 2021.

  **Findings:** Although the June 2019 transfer of Sunrise REH and Plaza MOB was completed without receiving reasonably equivalent value in exchange (appraised value of over $50 million was greater than the loan payoff and capital contribution received of over $28 million), the assets were transferred back by assignment to Alecto by the Alecto Members in January 2021 for no consideration and those assets were sold later that year for over $58 million, an increase in value of approximately $8 million. No consideration was given to the Alecto Members for the transfer and Alecto received proceeds from the sale of over $15 million. (*See Sections A and C of the Summary of Observations and discussion below*).

- Inter-company transfers and allocation of advances by Alecto.

  **Findings:** Generally, and in aggregate, lockbox deposits exceeded advances allocated to the Affiliates. The excess deposits to advances were either retained by Alecto for payroll, expenses, additional transfers to Affiliates, or used to reduce Alecto's revolving credit facility with its lender. GCS identified other inter-company transfers between Affiliates and/or Alecto. In the instances where funds were transferred from an Affiliate to Alecto, these funds were subsequently transferred to another Affiliate or used by Alecto for payroll and other expenses. Essentially, Alecto acted as a conduit for funding to Affiliates. *(See Section E of the Summary of Observations and discussion below.)*

- Transfers to/from Insiders including transfers to/from Plaza MOB, 1) in the gap period between the 2019 transfer of Sunrise REH and Plaza MOB by Alecto to Sunrise MOB, and the 2021 transfer by assignment of Sunrise MOB, and Plaza MOB back to Alecto,[3] and 2) after the January 2021 assignment of Sunrise MOB and Plaza MOB.

  **Findings:** Transfers to Alecto and Affiliates from Plaza MOB exceeded transfers to Plaza MOB in the "Plaza MOB Gap Period" and post-assignment. *(See Sections B and D of the Summary of Observations and discussion below).*

  Specifically, regarding direct payments to Insiders, based on our analysis of the data and supporting documentation produced, payments to Insiders were reimbursements of business-

---

[3] The "Plaza MOB Gap Period" is the period from June 19, 2019, through December 31, 2020.

related expenses and advances for the benefit of Alecto and/or payroll and benefits provided as compensation for services to Alecto and/or Affiliates.  *(See Section F and G of the Summary of Observations and discussion below.)*

**Summary of Observations**

A. June 19, 2019 Transfer of Sunrise REH to Sunrise MOB and the Alecto Members

- Plaza MOB appraised market value at June 1, 2019: $50,700,000
- New loan amount: $30,000,000
- Net proceeds of refinance to Plaza MOB: $9,185,830 ($8,565,154 plus $620,676)
- Payoff amount: $19,472,350 (Wells Fargo and Berkadia Commercial Mortgage)
- Capital contribution to Alecto per general ledger: $8,944,477
- Total payoff and capital contribution to Alecto: $28,416,827

The transfer of Sunrise REH to Sunrise MOB was for less than reasonably equivalent value as the appraised value of the assets exceeded the loan payoff and capital contribution received by Alecto.

B. Transfers to/from Plaza MOB in the "Plaza MOB Gap Period"[4]

- Net transfers of $2,749,226 to Alecto and/or Affiliates
- $3,789,966 to "REAM, as Trustee for Various Investors" for Plaza MOB Loan interest

Alecto and/or Affiliates received more cash from Plaza MOB than transferred to Plaza MOB.

C. January 1, 2021 Sunrise MOB Assignment to Alecto and the UCLA Asset Sale

- Asset sale price at August 31, 2021 (agreed to January 1, 2021): $58,500,000
- No consideration paid by Alecto to the Alecto Members on January 2, 2021
- Net proceeds of sale to Plaza MOB on August 31, 2021: $15,769,770
- Payoff amount $42,087,433 (Wells Fargo and MPT Operating Partnership)[5]

Alecto received more than reasonably equivalent value in the exchange as no consideration was paid to Sunrise MOB or the Alecto Members for the Sunrise MOB assets.

D. Post-Assignment Transfers to/from Plaza MOB

- $30,559,770 to, or for the benefit of, Alecto and/or Affiliates
  - Transfers to Alecto: $13,917,603
  - Transfer to Alecto of $15,770,214 proceeds from the UCLA Asset Sales (Plaza MOB) equals total transfers to Alecto: $29,687,817
  - Transfers to Olympia HC/OMC: $871,953
- $3,807,251 to, of for the benefit of Plaza MOB
  - $2,709,449 from Alecto
  - $1,097,803 from OMC

Alecto and/or Affiliates received more cash from Plaza MOB than transferred to Plaza MOB.

---

[4] Payees of Plaza MOB payments by check could not be determined based on information produced to GCS.
[5] Alecto was a borrower on the MPT Operating Partnership Loan.

**A1763**

E. Inter-company Transfers and the CNH Revolving Facility

- Advances from the CNH Revolving Facility and Affiliate allocations tracked by Alecto Management in an Excel spreadsheet tie, for the most part, to wire transfers into/out of Alecto's disbursements account *3784.
- In any month, an Affiliate may have been under or over funded, meaning deposit sweeps from an Affiliate's lockbox may be more or less than allocated advances. As such, funds deposited by one Affiliate may have been allocated to another Affiliate or Alecto itself.
- In 2020, advances allocated to Affiliates were less than the Affiliates' lockbox deposits. It appears Alecto retained funds through the 2020 COVID crisis maintaining an average bank balance of $20 million through the end of 2020.

Based on our analysis, Alecto acted as a conduit for funding Affiliates and any excess funds from the Affiliates or its credit facility was used to fund Alecto's payroll, expenses, or additional Affiliate funding.

F. Transfers to Insiders of $10,000 or more

- GCS extracted payments by check or "Bill Payment"/ACH Transfer from Alecto's general ledger and identified payments to Insiders of $10,000; a threshold amount agreed to by you and GCS as sufficient for our examination.
- GCS examined 40 payments of $10,000 or more totaling $1,416,763; 92% of identified payments to Insiders.
- Approximately 59% or $835,320 in payments, were supported as business expenses paid by M. Sarrao and/or his law firm for the benefit of Alecto and/or its Affiliates. The remaining payments to A. Dhuper, R. Krissman, S. Kay and American Express were also supported as business expenses.
- A $77,000 and a $30,000 payment to L. Reddy and R. Krissman, respectively, were identified as the reimbursement of advances to Alecto. Additional payments to L. Reddy of $50,000 and $380,000 were identified by GCS' examination of journal entries in Alecto's general ledger and were verified as reimbursement of advances as well.
- Payments to the Cooperative of American Physicians, Inc., for the benefit of Dr. P. Jeyakumar, were verified as professional dues and insurance.
- L. Reddy, A. Dhuper, Dr. P. Jeyakumar, and M. Sarrao received compensation and benefits as employees.

The transfers examined were reimbursements of Alecto business expenses, advances, payroll, and professional dues and insurance and were determined to be appropriately supported.

G. Transactions Related to the 2018 Promissory Note

- Payments by, or for the benefit of, Alecto and advances to Alecto through a Wells Fargo line of credit under the 2018 Promissory Note were verified through an examination of bank statements, loan statements, and the Alecto general ledger.
- Plaza MOB paid off the loan, on behalf of Alecto, on January 6, 2022.

The payoff of the Wells Fargo line of credit by Plaza MOB increased the inter-company amounts due Plaza MOB. Reconciliation of inter-company accounts by Alecto resulting in the

A1764

reclassification of Plaza MOB's inter-company account balance to a loan payable (due to Plaza MOB) in Alecto's general ledger.

H. Transfers to Holders of Previously Unidentified Accounts

- ▪ 113 transfers from Alecto totaling, in aggregate, less than $214,000
- ▪ 76 of those transfers were for less than $1,000

Transfers to unidentified accounts were below the agreed to research threshold of $10,000. Based on Alecto's general ledger, the majority of transfers were to OMC HSA Account *3709.

## Discussion

### A. June 19, 2019 Transfer of Sunrise REH to the Alecto Members

On June 19, 2019, Alecto transferred Sunrise REH to the Alecto Members (the "Sunrise REH Transfer") in order to enable the refinancing of Plaza MOB (the "Plaza MOB Refinancing"), a subsidiary of Sunrise REH, to "take advantage of interest rate opportunities and cash out the equity that had been developed."[6] It is our understanding that the proposed lender, Wells Fargo Bank, N.A., ("Wells Fargo") required Sunrise REH not be owned by Alecto in order to complete the refinancing.[7]

Prior to the Sunrise REH Transfer, on June 12, 2019, the Alecto Members formed Sunrise MOB[8] to facilitate the refinancing of Plaza MOB and a subsequent loan from Alecto to Olympia HC, Alecto LA's hospital operating company.

The following transactions (as shown in GCS Diagram 2) were effectuated to comply with Wells Fargo's refinancing conditions:

1. 6/12/2019: Formation of Sunrise MOB by the Alecto Members; cash contributions to capital were not identified in the Sunrise MOB Operating Agreement;[9]

2. 6/19/2019: Alecto transferred Sunrise REH, and effectively its subsidiaries, Plaza MOB and Olympia Plaza Management, Inc. ("OPM") to the Alecto Members; the Sunrise REH amended operating agreement memorializing the transfer does not identify any consideration in return for the transfer;[10]

3. 6/19/2019: The Alecto Members transferred Sunrise REH to Sunrise MOB; the second amendment to the Sunrise REH amended operating agreement memorializing the transfer does not identify any consideration in return for the transfer;[11]

---

[6] Plaza MOB Summary prepared by Alecto Management ("Plaza MOB Summary), ¶2 [GCS Exhibit 1]. With reference to this letter report and analysis, Alecto Management is represented by M. Sarrao and M. Williams.
[7] Plaza MOB Summary, ¶3.
[8] Plaza MOB Summary, ¶4.
[9] Sunrise MOB Holdings LLC Operating Agreement [Plaza MOB Summary, Exhibit A].
[10] First Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC [Plaza MOB Summary, Exhibit B].
[11] Second Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC [Plaza MOB Summary, Exhibit C].

4. 6/20/2019: Plaza MOB was refinanced for $30,000,000[12] (the "Plaza MOB Loan") resulting in net proceeds before loan payoff of $28,235,111.[13] After loan payoff, Net Proceeds deposited in Plaza MOB's bank account totaled $8,565,153.79.[14]

    a. The Funds Flow Agreement directed the Net Proceeds of the Plaza MOB Loan to be transferred to the Richard A. Hayes, Inc. Client Trust Account ("Hayes Trust Account")[15] and distributed to Sunrise REH in two (2) distributions; the $8,444,477.81 "Plaza MOB Distribution" and the $120,235.98 "Plaza MOB Second Distribution."[16]

    b. The Funds Flow Agreement also contemplated distributions to the Alecto Members of "up to $500,000 from the Additional Insurance Reserve Funds and up to $355,002 from the Rent Concession Reserve Funds (the "Reserve Funds Distributions");[17] the Plaza MOB Second Distribution and Reserve Funds Distributions were to be deposited in the Hayes Trust Account.[18]

5. 6/20/2019: Plaza MOB transferred $8,444,477.81 to the Hayes Trust Account.[19]

6. 6/20/2019: According to the Funds Flow Agreement, the $8,444,477.81 was to be "transferred" to the Alecto Members through a series of "paper distributions" consummating in a capital contribution by the Alecto Members to Alecto and the disbursement of the $8,444,477.81 from the Hayes Trust Account directly to Alecto. The "paper distributions" are described as follows:

    a. Plaza MOB distributed $8,444,477.81 to Sunrise REH.[20]

    b. Sunrise REH distributed $8,444,477.81 to Sunrise MOB.[21]

    c. Sunrise MOB distributed $8,444,477.81 to the Alecto Members;[22]

7. 6/20/2019: The Alecto Members directed the disbursement of the $8,444,477.81 from the Hayes Trust Account to Alecto as a capital contribution (the "Plaza MOB Distribution").[23] The Plaza

---

[12] The property owned by Plaza MOB, Olympia Medical Plaza, held a Market Value As-Is (Stabilized) of $50,700,000 as of June 1, 2019, per an appraisal by Cushman & Wakefield Western, Inc.

[13] "Funds Flow Agreement" dated June 20, 2019, by and between Plaza MOB, Sunrise REH, Sunrise MOB, Alecto and the Alecto Members [Plaza MOB Summary, Exhibit D], Recital E. See also Promissory Note dated June 20, 2019, Borrower's Estimated Settlement Statement, and Lender Closing Statement

[14] Funds Flow Agreement, Recital E. Net Proceeds included the $8,444,477.81, the "Plaza MOB Distribution" and a remaining balance of $120,235.98, the "Plaza MOB Second Distribution." Per the Borrower's Estimated Settlement Statement, estimated cash to Plaza MOB was $8,446,479.89. The difference from the $8,565,153.79 deposit amount and the estimate is primarily the $120,235.98 estimated future payment to Berkadia Commercial Mortgage LLC due July 6, 2019.

[15] Funds Flow Agreement, Recital J.

[16] Funds Flow Agreement, Recitals F and K.

[17] Funds Flow Agreement, Recital L.

[18] Funds Flow Agreement, Recital M.

[19] Plaza MOB Account *2120, June 2019.

[20] Funds Flow Agreement, Recital F.

[21] Funds Flow Agreement, ¶2.

[22] Funds Flow Agreement, ¶3.

[23] Funds Flow Agreement, ¶4.

MOB Distribution was received into Alecto's operating account *6065 [24] and recorded in Alecto's general ledger as a capital contribution.[25]

8. 6/20/2019: Alecto loaned $8,444,477.81 to Olympia HC, a subsidiary of Alecto LA (the "2019 Olympia HC Loan").[26] The loan was received into Olympia HC's Cash Management Account (CMA) *7573 [27] and recorded as "Loan to Olympia" in Alecto's general ledger.[28]

9. 7/31/2019: Plaza MOB transferred $620,675.98 to the Hayes Trust Account (the "July 2019 Plaza MOB Distribution").[29]

    a. The 7/31/2019 deposit included the "Plaza MOB Second Distribution" of $120,235.98,[30] $440 from First American Title Insurance Company, and $500,000 from Wells Fargo; amounts received by Plaza MOB on 6/21/2019 and 7/17/2019, respectively.[31]

10. 7/31/2019: The $620,675.98 July 2019 Plaza MOB Distribution was disbursed from the Hayes Trust Account into Alecto's operating account *6065 and transferred to Olympia HC's account *7573 on the same day (the "July 2019 Olympia Transfer").[32]

    a. The Funds Flow Agreement directed additional deposits from the Hayes Trust Account be contributed to the capital of Alecto by the Alecto Members through the same series of distributions as the $8,444,477.81 Plaza MOB Distribution.[33]

    b. The Second Capital Contribution was not recorded in Alecto's general ledger as a capital contribution.

    c. The July 2019 Olympia Transfer was not recorded as a "Loan to Olympia" in Alecto's general ledger.

11. 9/26/2019: Plaza MOB transferred $500,000 to the Hayes Trust Account (the "September 2019 Plaza MOB Distribution"). This transfer, and a Plaza MOB Loan interest payment of $152,680 to "Ream, as Trustee for Various Invest," reduced the balance in Plaza MOB's operating account to $2,377.98.[34]

    a. The $500,000 September 2019 Plaza MOB Distribution was disbursed from the Hayes Trust Account into Alecto's operating account *6065 and transferred that same day to Alecto's Acct *3784, an account used to receive advances from a revolving credit facility

---

[24] Alecto Account *6065, June 2019.

[25] Alecto general ledger:

| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | wire received on 06/19/19 now accounted as paid in capital surplus set up in COA | 8,444,477.81 |

[26] Olympia Promissory Note. The Olympia Promissory Note was entered into subject to a consent agreement dated June 19, 2019, by and among MPT of Los Angeles, L.P, MPT of Olympia, LLC, Alecto, Alecto LA, Olympia HC, Horizon Real Estate Holdings LLC, Sunrise REH, Sunrise MOB and Plaza MOB.

[27] Olympia HC Account *7573, June 2019.

[28] Alecto general ledger:

| Loan to Olympia | Journal Entry | 9/30/2019 | wire received on 06/19/19 - receivable from OMC | 8,444,477.81 |

[29] Plaza MOB Account *2120, July 2019.

[30] Funds Flow Agreement, Recital K.

[31] Plaza MOB Account *2120, July 2019. GCS assumes the $500,000 from Wells Fargo were the Additional Reserve Funds, a "Reserve Funds Distribution." Two (2) $500,000 distributions were deposited into the Hayes Trust Account by Plaza MOB: $500,000 on 7/31/2019 and $500,000 on 9/26/2019 (Plaza MOB Account *2120, September 2019).

[32] Alecto Account *6065, July 2019 and Olympia HC Account *7573, July 2019. The Amended and Restated Promissory Note dated September 26, 2019.

[33] Funds Flow Agreement, ¶5.

[34] Plaza MOB Account *2120, September 2019.

       with CNH Finance Fund I, L.P. ("CNH Finance") and utilized to allocate and distribute funds to Affiliates.[35]

    b.  The $500,000 transfer was recorded in Alecto's general ledger as a capital contribution.[36]

    c.  On 9/26/2019, a total of $935,000 was transferred from Alecto's Account *3784 to Olympia HC's account *7573 (the "September 2019 Olympia Transfer").[37] However, only $500,000 was recorded as a "Loan to Olympia" in Alecto's general ledger.[38]

12.  The July 2019 Olympia Transfer and $500,000 of the $935,000 September 2019 Olympia Transfer were documented in an Amended and Restated Promissory Note dated September 26, 2019, as additional advances on the 2019 Olympia HC Loan such that the principal amount on the Olympia HC Loan was $9,565,153.79 at that date.[39]

    a.  However, Alecto's general ledger reflects a "Loan to Olympia" of $8,944,477.81; the total of the $8,444,477.81 Plaza MOB Distribution and $500,000 of the September 2019 Olympia Transfer.[40] No additional advances were recorded after September 30, 2019.

    b.  Alecto's general ledger reflects a total $8,944,477.81 in "Paid-in-capital or Surplus."[41] No additional capital contributions were recorded after September 30, 2019.

## B.  Transfers to/from Plaza MOB in the "Plaza MOB Gap Period"

From June 19, 2019, through December 31, 2020 (the "Plaza MOB Gap Period"), Sunrise REH and its subsidiaries, Plaza MOB, and Olympia Plaza Management, Inc. were owned by Sunrise MOB (the Alecto Members) not Alecto. According to Plaza MOB's bank statements, during the Plaza MOB Gap Period, the following cash transfers were made between Alecto and Plaza MOB, resulting in a net amount transferred to Alecto of $2,624,225.[42]

1.  Plaza MOB transferred $3,011,226 to Alecto's operating account[43]

    a.  $2,751,226 on 7/10/2019 originating from an "over counter deposit" of the same amount into Plaza MOB's Acct *2120 on 7/8/2019. Also on 7/10/2019, Alecto transferred the same amount to Olympia HC Acct *7573;[44]

---

[35] Alecto Account *6065, September 2019 and Alecto Account *3784, September 2019.

[36] Alecto general ledger:

| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | Wire received on 09/26/19 from Richard Hayes Attorney Client trust account | 500,000.00 |
|---|---|---|---|---|

[37] Alecto Account *3784, September 2019 and Olympia HC Account *7573, September 2019.

[38] Alecto general ledger:

| Loan to Olympia | Journal Entry | 9/30/2019 | To record Loan receivable from OMC - Sun Rise MOB LLC contribution | 500,000.00 |
|---|---|---|---|---|

[39] Amended and Restated Promissory Note dated September 26, 2019 by an between Alecto and Olympia HC.

[40] Alecto general ledger:

| Loan to Olympia | | | | |
|---|---|---|---|---|
| Loan to Olympia | Journal Entry | 9/30/2019 | wire received on 06/19/19 - receivable from OMC | 8,444,477.81 |
| Loan to Olympia | Journal Entry | 9/30/2019 | To record Loan receivable from OMC - Sun Rise MOB LLC contribution | 500,000.00 |
| Total for Loan to Olympia | | | | 8,944,477.81 |

[41] Alecto general ledger:

| Paid-In Capital or Surplus | | | | |
|---|---|---|---|---|
| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | Wire received on 09/26/19 from Richard Hayes Attorney Client trust account | 500,000.00 |
| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | wire received on 06/19/19 now accounted as paid in capital surplus set up in COA | 8,444,477.81 |
| Total for Paid-In Capital or Surplus | | | | 8,944,477.81 |

[42] Bank transaction summary for Plaza MOB's Account *2120 (GCS Schedule A.7.3.1).

[43] Plaza MOB Account *2120, July 2019, December 2019, January 2020.

[44] Olympia HC Account *7573, July 2019.

b. $160,000 on 12/13/2019; $160,000 was subsequently transferred to Plaza MOB from Alecto on 12/30/2019; and

c. $280,000 on 1/14/2020; this transfer was received by Alecto and originally recorded as an intercompany liability due to Olympia HC by Alecto. However, a cash transfer from Alecto to Olympia HC was not identified in either entity's bank statements. The transaction was reclassified in Alecto's general ledger on June 30, 2020, as an intercompany liability due to Plaza MOB.[45]

2. In February 2020, Alecto transferred $277,000 from Alecto Account *3784 to Alecto Account *6065 and then via wire to Plaza MOB; $97,000 on 2/5/2020 and $130,000 on 2/10/2020.[46] These transfers were originally recorded as an offset to intercompany amounts due to Olympia HC by Alecto. These transactions were reclassified in Alecto's general ledger on June 30, 2020, as an offset to intercompany amounts due to Plaza MOB by Alecto with the journal entry description "refer JE 1061 02/28/2018 Re-class to PMOB."[47]

In addition to the cash transfers, transactions for the benefit of Plaza MOB and/or Sunrise REH were recorded as follows:

1. On June 30, 2020, Alecto recorded a journal entry reclassifying $150,000 recorded as an intercompany amount due to Olympia HC by Alecto to and intercompany amount due to Plaza MOB with the journal entry description "refer JE 795 09/28/2018 Re-class to PMOB."[48]

2. During the Plaza MOB Gap Period, Alecto made payments for lien searches and taxes totaling $7,670 to, or for the benefit of, Plaza MOB and/or its parent company Sunrise REH.[49]

Alecto's 2020 general ledger reflects an intercompany liability due to Plaza MOB of $224,353.97.[50]

---

[45] Alecto general ledger:

| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer 1047 01/31/2020-Re-class to PMOB | -280,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer 1047 01/31/2020-Re-class to PMOB | 280,000.00 |

[46] Alecto Account *3784, February 2020, Alecto Account *6065, February 2020 and Plaza MOB Account *2120, February 2020. See also GCS Schedules A.0.1, A.0.3 and A.7.3.1.

[47] Alecto general ledger:

| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | 130,000.00 |
| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | 97,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | -130,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | -97,000.00 |

[48] Alecto general ledger:

| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer JE 795 09/28/2018-Re-class to PMOB | -150,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer JE 795 09/28/2018-Re-class to PMOB | 150,000.00 |

[49] Ibid. June 1, 2020 tax expenses (transaction numbers PMOB 2020, SREH 2020 TX) and a July 31, 2020 lien search expense (transaction number July 2020) paid by M. Sarrao in July and August 2020 and reimbursed to M. Sarrao on September 4, 2020.

| Inter-Co – Plaza MOB | Bill | 7/31/2020 | July 2020 | Michael J. Sarrao | Paracorp Inc UCC Lien | -70.00 |
| Inter-Co – Plaza MOB | Bill | 6/1/2020 | PMOB 2020 | Franchise Tax Board | PMOB 2020 Estimated Tax | -6,000.00 |
| Inter-Co – Plaza MOB | Bill | 6/1/2020 | PMOB 2020 | Franchise Tax Board | PMOB 2020 TX | -800.00 |
| Inter-Co – Plaza MOB | Bill | 6/1/2020 | SREH 2020 TX | Franchise Tax Board | SREH 2020 TX | -800.00 |

[50] Alecto general ledger:

Also, during the Plaza MOB Gap Period, Plaza MOB transferred $3,789,966 in monthly payments to "REAM, Trustee for Various Invest." These monthly payments were verified as interest payments on the Plaza MOB Loan.[51]

## C. The January 1, 2021 Sunrise MOB Assignment to Alecto and the UCLA Asset Sale

Olympia HC owned and operated Olympia Medical Center (the "Hospital" or "OMC") on land (the "Hospital Real Property") owned by Horizon Real Estate Holdings LLC ("Horizon"), a subsidiary of Alecto LA. Plaza MOB owned property adjacent to the Hospital including a medical office building and parking structure (the "Plaza Real Property").[52] UCLA entered into an agreement with Olympia HC, Horizon and Plaza MOB to purchase the Hospital assets, Hospital Real Property, Plaza Real Property, and certain other assets in a two (2) phase asset sale (the "UCLA Asset Sale) for an aggregate purchase price of $128,500,000.[53]

On January 1, 2021, the Initial Closing Date, UCLA acquired the Hospital assets and Hospital Real Estate for $75,850,000.[54] Proceeds from the sale were used by Olympia and Horizon to pay obligations to lenders resulting in net proceeds of $23,506,100[55] which were deposited into Alecto's operating account *6065 on January 4, 2021, via wire transfer.[56] On January 19, 2021, Alecto transferred the net proceeds to Alecto Account *3784 and used the cash, in part, to fund its operating expenses and Affiliates through May 2022.[57]

On the same day, January 1, 2021 (the "Assignment Date"), the members of Sunrise MOB assigned their interest in Sunrise MOB, and therefore Plaza MOB, to Alecto.[58] No consideration was given by Alecto for the transfer.

On August 31, 2021, the Final Closing Date, the Plaza Real Property was sold to UCLA for $58,500,000.[59] Proceeds from the sale were used to pay Plaza MOB's mortgage with Wells Fargo, N.A., and the loan

| | | | | |
|---|---|---|---|---|
| Inter-Co – Plaza MOB | Journal Entry | 1/31/2020 | Re class Escrow refunds on Sunrise Holdings -MOB & PL for Ex. liab policy | 27,021.89 |
| Inter-Co – Plaza MOB | Journal Entry | 1/31/2020 | Re class Escrow refunds on Sunrise Holdings -MOB & PL for Ex. liab policy | 2,002.08 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to PMOB | -130,000.00 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to PMOB | -97,000.00 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer JE 795 09/28/2018-Re-class to PMOB | 150,000.00 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer 1047 01/31/2020-Re-class to PMOB | 280,000.00 |
| Inter-Co – Plaza MOB | | | | |
| Total for Inter-Co – | | | | 224,353.97 |

[51] Wells Fargo Payment Coupon/Billing Statements for the period July 2019 – August 2021. (GCS Schedule A.7.3.1)
[52] Plaza MOB Summary.
[53] Asset Purchase Agreement dated December 4, 2020, among Olympia Health Care, LLC, Horizon Real Estate Holdings, LLC, Plaza Medical Office Building, LLC and The Regents of the University of California, on behalf of UCLA Health (the "UCLA APA"). The UCLA APA contemplated the closing of the purchase of assets from Plaza MOB to occur on March 31, 2021 (the "Initial Outside Closing Date"). The Regents of the University of California together with UCLA Health are referred to herein as "UCLA." See also Plaza MOB Summary, ¶15.
[54] The Initial Closing Purchase Price of $70 million less a $3 million Indemnity Holdback Amount, or $67 million was delivered to First American Title Insurance Company.
[55] Seller's Final Settlement Statement listed "Cash to Seller" of $23,507,202 (includes credit for Independent Consideration of $100).
[56] Alecto Account *6065, January 2021. GCS noted the net proceeds were not deposited into Olympia HC's bank accounts. GCS did not receive Horizon's bank statements and therefore, the original recipient of the net proceeds, if not Alecto, is unknown.
[57] Alecto Account *3784, January 2021.
[58] Plaza MOB Summary, Exhibit E, Assignment of Membership Interests. See also GCS – Diagram 3 – Plaza MOB Assignment and UCLA Asset Sale (Plaza MOB).
[59] Seller's Estimated Settlement Statement.

obligations of Alecto and certain Affiliates to MPT Operating Partnership, LP.[60] Net proceeds of $15,769,770.21 were deposited into Plaza MOB's bank account *2120.[61]

**D. Post-Assignment Transfers to/from Plaza MOB**

Between the Assignment Date, January 1, 2021, and the Final Closing Date on August 31, 2021, Plaza MOB made payments by check of $874,797[62] and transferred a total of $1,278,196 to a) third-parties ($41,076), OMC ($8,517), and "REAM, Trustee for Various Invest" for Plaza MOB Loan interest ($1,222,447).[63]

From August 31, 2021, through June 30, 2023, $2,709,449 was transferred by Plaza MOB to Alecto and $1,097,803 was transferred to Olympia HC.[64]

From August 31, 2021, through June 30, 2023, Plaza MOB transferred $13,917,603 to Alecto and $871,953 to Olympia HC. Including the proceeds from the sale of Plaza MOB's assets to UCLA, $29,687,817 was deposited into Alecto's bank accounts through June 30, 2023.[65] As of June 30, 2023, Plaza MOB had approximately $22,000 in its bank account.[66]

On January 6, 2022, Plaza MOB wired $3,892,489.92 to First Clearing for payment to The Reddy Investment Trust.[67] At that time, The Reddy Investment Trust held a $4,039,463.75 unsecured Promissory Note issued by Alecto in October of 2018 (the "2018 Promissory Note").[68] Alecto Management represented that this payment was made by Plaza MOB as a condition to The Reddy Investment Trust consenting to sale of Plaza MOB's assets to UCLA.[69]

---

[60] Seller's Estimated Settlement Statement. The Seller's Escrow Instructions include a payoff letter from MPT of Los Angeles, L.P. related to a Secured Promissory Note issued on January 1, 2021, by Sunrise REH, Plaza MOB, Alecto LA, Olympia HC, Horizon and Alecto. The $8,004,800 loan and subsequent payoff was and recorded in Alecto's general ledger as a Loan Payable to Plaza MOB:

| Inter-Co - WNJ | Journal Entry | 8/31/2021 | UCLA Transaction # 2 - PMOB - MPT | -8,004,800.00 |
| Loans Payable Account | Journal Entry | 8/31/2021 | UCLA Transaction # 2 - PMOB - MPT | 8,004,800.00 |
| Total for Loans Payable Account | | | | 8,004,800.00 |

See also Plaza MOB Summary, ¶15.

[61] Plaza MOB Account *2120, August 2021.

[62] Payees of payments by check and preauthorized debits could not be determined based on information produced to GCS.

[63] GCS Schedule A.7.3.1. Alecto Management represented, and GCS verified, monthly payments to "REAM, Trustee for Various Investors" were for interest payments on the Plaza MOB Loan. Monthly payments to "REAM, Trustee for Various Investors" were made from Plaza MOB's bank account beginning in August 2019 through August 2021.

[64] GCS Schedule A.7.3.1., Schedule A.0.1., Schedule A.0.3., Schedule A.3.1.1. and Schedule A.3.1.2.

[65] GCS Schedule A.7.3.1., Schedule A.0.1., Schedule A.0.3., Schedule A.3.1.1. and Schedule A.3.1.2.

[66] Plaza MOB Account *2120, June 2023.

[67] Plaza MOB Account *2021, January 2022. GCS Schedule A.7.3.1. See also Summary of Loans prepared by Alecto Management.

[68] Promissory Note dated October 9, 2018, by and between Alecto Healthcare Services, LLC and The Reddy Investment Trust matured October 31, 2021. GCS has not received any documentation that the 2018 Promissory Note was amended or restated. It is our understanding, per a discussion with Alecto Management, that in October 2018, "Alecto had a direct loan with Wells Fargo which Wells Fargo was ready to call" and Lex Reddy personally paid the loan, and the 2018 Promissory Note was entered into. See Section G.

[69] Summary of Loans (a)(2). The UCLA APA Schedule 4.4(f)(ix) Consents to Final Closing to the sale of the Plaza Real Property does not specifically list The Reddy Investment Trust or Alecto. However, the schedule does refer to "Consent of the Members of Sunrise MOB Holdings LLC pursuant to the Sunrise Holdings LLC Agreement." As of the Final Closing Date, August 31, 2021, Sunrise MOB Holdings was owned by Alecto. The 2018 Promissory Note was not listed on the UCLA APA Schedule 5.6 Transactions with Affiliates although the Olympia HC Loan resulting from the Plaza MOB Refinancing in 2019 was listed. GCS notes that Alecto Management represented that the lender,

### E. Inter-company Transfers and the CNH Revolving Facility[70]

On July 8, 2019, CNH Finance refinanced Alecto's revolving credit facility with White Oaks Healthcare Finance, LLC after numerous events of default.[71]  The CNH Revolving Facility was secured by accounts receivable and initially capped at $30 million.[72]  The CNH Revolving Facility was entered into between CNH Finance, Alecto, and the following Affiliates:[73]

- Alecto Hayward
- Alecto Sherman
- Sherman/Grayson Sponsor
- Sherman/Grayson Hospital
- Sherman/Grayson Health Services
- Sherman MD Provider
- Sherman Anesthesia
- Alecto Fairmont
- FRMC Physicians
- Alecto Ohio Valley
- Alecto Wheeling
- Alecto Martin's Ferry
- Alecto East Ohio Physicians (listed as inactive)
- Alecto Los Angeles
- Olympia Health Care
- Horizon Real Estate Holdings

Controlled deposit accounts of the borrower Affiliates were swept on a daily basis to offset Alecto's obligations under the facility.[74]  Advances were funded under the CNH Revolving Facility and deposited into Alecto's Account *3784.  Funds were then allocated and transferred to borrower Affiliates or utilized by Alecto to fund payroll and other expenses.[75]

On March 2, 2021, Alecto requested the cap on the CNH Revolving Facility be reduced to $12 million.  In addition, changes to certain covenants were instituted, retroactive as of December 1, 2020, recognizing Alecto's failure to maintain the required minimum Current Ratio and Minimum EBITDAR in 2020.[76]

---

Wells Fargo, was not notified of the transfer of Sunrise MOB Holdings to Alecto as the lender was to be paid in full from proceeds of the Plaza MOB asset sale.  GCS has not seen documentation to verify whether or not notice of the transfer and Alecto's consent was given to UCLA prior to, or on, the Final Closing Date.  GCS notes that UCLA APA Schedule 4.4(e)(vii) Consents to Initial Closing includes the consent of Alecto and Alecto's members to the sale of the Hospital assets and the Hospital Real Property.

[70] Amended and Restated Credit and Security Agreement between Alecto Healthcare Services LLC, and those entities listed on Schedule 1 hereto and CNH Finance Fund I, L.P. dated July 8, 2019 (the "CNH Revolving Facility")

[71] CNH Revolving Facility, Schedule 8.1 White Oak Loan Defaults.  Defaults under the White Oak Loan Agreement, the MPT Lease Agreements, and the MPT Debt Agreements, generally included breach of financial covenants, failure to make base rent payments, failure to make reserve deposits, failure to make principal and interest payments, failure to deliver required financial statements, failure to make timely payments of payroll taxes and sales and use taxes, and other items.

[72] CNH Revolving Facility. See "Facility Cap" definition.

[73] CNH Revolving Facility, Schedule 1 – List of Borrowers.

[74] CNH Revolving Facility, Schedule 2 – Borrowers' Deposit Accounts.  See also GCS Exhibit 2 – List of Accts.

[75] Certain advanced funds were transferred to Alecto's Payroll Account *6508 or Operating Account *6065.

[76] First Amendment to Amended and Restated Credit and Security Agreement and Waiver dated March 1, 2021.

On November 1, 2021, Alecto requested and were granted a further reduction of the Facility Cap to $6 million.[77]

On August 1, 2022, Alecto requested the term of the CNH Revolving Facility be extended to December 31, 2022, and the Alecto account *3784 was converted to a springing deposit account.[78]  The CNH Revolving Facility was terminated and activity ceased by September 30, 2022.[79]

During the term of the CNH Revolving Facility, Alecto tracked deposits or "sweeps" from the Affiliates, advances, and allocations to Affiliates and reconciled these transactions to downloaded electronic statements and tracked fees, interest payments and availability under the CNH Revolving Facility.[80]

GCS compared the recorded "sweeps" and advances against wire transfers into and out of Alecto's Account *3784 and found advances recorded in the LOC Reconciliations matched wire transfers into Account *3784.[81] As shown on GCS Exhibit 3 – Allocation Summary, GCS found, for the most part, wire transfers out of Alecto's Account *3784 matched the recorded allocation of advances to Affiliates.[82]

In any month, an Affiliate may have been under or over funded, meaning deposit sweeps from an Affiliate's lockbox may be more or less than allocated advances.  As such, funds deposited by one Affiliate may have been allocated to another Affiliate or Alecto itself.

In 2020, advances allocated to Affiliates were less than the Affiliates' lockbox deposits.  It appears Alecto retained funds through the 2020 COVID crisis maintaining an average bank balance of $20 million through the end of 2020.

Although Alecto had entered into management services agreements with the Affiliate hospitals,[83] it is our understanding that Alecto did not collect any management fees from the Affiliate hospitals.[84]

## F.   Transfers to Insiders of $10,000 or more

GCS identified 1,208 payments by check, ACH and wire transfer from Alecto's bank accounts in the Examination Period.[85]  These payments were aggregated and grouped by payee. GCS identified 40

---

[77] Second Amendment to Amended and Restated Credit and Security Agreement dated November 1, 2021. At December 31, 2021, Alecto's bank balances totaled $11,438,741 and the availability on the CNH Revolving Facility was $2,696,427.
[78] Third Amendment to Amended and Restated Credit and Security Agreement dated August 1, 2022.  The principal balance at July 28, 2022 was $4,342,720.03.
[79] GCS Exhibit 3 – Allocation Summary.  See also Summary of Loans prepared by Alecto Management. At September 30, 2022, Alecto's bank balances totaled $120,096.27.
[80] GCS Exhibit 4 – Allocations by Entity prepared, in part, based on Alecto Management produced Excel spreadsheets: "2019 LOC of AHS with CNH," "2020 LOC of AHS with CNH," "Year 2021 LOC of AHS with CNHF" and "Year 2022 LOC of AHS with CNH" (the "LOC Reconciliations").
[81] GCS Exhibit 3 – Allocation Summary.
[82] GCS reconciled differences as noted on GCS Exhibit 3 – Allocation Summary.
[83] Alecto Fairmont, Alecto Healthcare Services Wheeling, LLC ("Alecto Wheeling," a subsidiary of Alecto Ohio Valley), Alecto Healthcare Martin's Ferry LLC ("Alecto Martin's Ferry," a subsidiary of Alecto Ohio Valley), Olympia HC, and Sherman/Grayson (collectively, the "Management Agreements").  The Management Services Agreement with Sherman/Grayson included specified insurance conditions.  Under the various Management Agreements, Alecto was to receive monthly management fees equal to 4% of monthly "Collected Net Revenues," as defined in the Management Agreements, unless such fees were deferred, discounted, or waived by Alecto.  In addition, Alecto was entitled to reimbursement of actual out-of-pocket costs incurred in providing such services.
[84] Summary of Management Services Agreement prepared by Alecto Management.
[85] GCS Exhibit 5 – Payment Analysis. Examined 1,322 payments including those dated January 1, 2019 – June 16, 2019.

individual cash transfers of $10,000 or more to Insiders (32), entities owned by Insiders (1) and American Express (7).[86] GCS reviewed documentation supporting the transfers. The transfers appeared to be reimbursement of Alecto business-related expenses and the reimbursement of a $77,000 advance of funds by Lex Reddy in October 2019 applied as a payment on the 2018 Promissory Note held by The Reddy Investment Trust (see Section G below).

GCS also identified a $380,000 payment to Lex Reddy recorded as a reimbursement of advances to Alecto on Alecto's general ledger. The advances occurred on December 19, 2018 ($300,000) and January 25, 2019 ($80,000) with deposits into Alecto's Account *6065 and were reimbursed to Lex Reddy on July 27, 2020, from Alecto Account *6508.[87]

Three (3) transfers totaling $48,345 to Cooperative of American Physicians, Inc. in January 2021, January 2022, and January 2023, were made for the benefit of Dr. P. Jeyakumar for professional dues and insurance.

| 1/4/2021 | 3322 | Cooperative of American Phys Inc. | -15,602.00 |
| 1/3/2022 | 3429 | Cooperative of American Phys Inc. | -16,058.00 |
| 1/5/2023 | 3466 | Cooperative of American Phys Inc. | -16,685.00 |

In addition to cash transfers, GCS examined Alecto's year end payroll reports for the years 2020 – 2022 and the period beginning January 1, 2023, through June 16, 2023.[88] The following Insiders received payroll during this period:

| | | A. Dhuper | | | | | | | L. Reddy | | | |
| | Regular | Regular Hrs | Bonus | PTO | PTO Hrs | | | Regular | Regular Hrs | Bonus | PTO | PTO Hrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2020 | 284,998.48 | 1,976 | 20,000.00 | 14,999.92 | 104.00 | | Q4 2020 | 750,000.16 | 2,080 | | | |
| 2021 | 284,998.48 | 1,976 | 25,000.00 | 26,538.32 | 184.00 | | 2021 | 778,846.32 | 2,160 | | | |
| Q1 2022 | 28,846.00 | 200 | | 34,734.91 | 240.83 | | Q3 Q4 2022 | 750,000.16 | 2,080 | (1,520 Hrs Q3, 560 Hrs Q4) | | |
| 6 mos 2023 | | | | | | | 6 mos 2023 | 346,153.92 | 960.00 | | | |
| Total | $598,842.96 | | $45,000.00 | $76,273.15 | | | Total | $2,625,000.56 | | $ - | $ - | |

| | | P. Jeyakumar | | | | | | | M. Sarrao | | | |
| | Regular | Regular Hrs | Bonus | PTO | PTO Hrs | | | Regular | Regular Hrs | Bonus | PTO | PTO Hrs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2020 | 178,853.76 | 1,952 | | 18,750.24 | 128.00 | | 2020 | | | | | |
| Q1-Q3 2021 | 80,774.40 | 1,120 | | 21,786.23 | 135.24 | | Q3 2021 | 1,218.00 | 87 | | | |
| 2022 | | | | | | | 2022 | | | | | |
| 6 mos 2023 | | | | | | | 6 mos 2023 | | | | | |
| Total | $259,628.16 | | $ - | $40,536.47 | | | Total | $ 1,218.00 | | $ - | $ - | |

As a result of our analysis of Alecto's general ledger, GCS also identified a payroll payment to Lex Reddy of $16,851.85 from Alecto Hayward on June 16, 2023 which was cashed on June 20, 2023.

## G. Transactions related to the 2018 Promissory Note (GCS Exhibit 6.1)

As discussed in Section D above, Alecto entered into the 2018 Promissory Note in the amount of $4,039,463.75 with The Reddy Investment Trust in order to satisfy a loan with Wells Fargo.[89]

---

[86] Total payments to Insiders, entities owned by Insiders, and to American Express are shown in GCS Exhibit 5 – Payment Analysis. GCS Exhibit 6 – Insider Payments lists payments of $10,000 or more reviewed.
[87] Excerpt of the Alecto transfers in reimbursement of the $380,000 in advances.

| 07/27/2020 | Account Transfer Dr. TO ACC | 6065 | 380,000.00 | | (380,000.00) | | 3784 | TRANSFER TO | | 6065 |
| 07/27/2020 | Account Transfer Dr. TO ACC | 6508 | 380,000.00 | | (380,000.00) | | 6065 | TRANSFER TO | | 6508 |
| 07/27/2020 | Preauthorized Debit 76508 ALECTO HEA PAYMENTS ACH OFFSET ALECTO CCD | | 380,000.00 | | (380,000.00) | | 6508 | ACH | ALECTO HEA OFFSET ALECTO CCD | |

[88] Processed through Olympia Medical Center; Olympia Medical Center YTD Payroll Registers.
[89] As mentioned previously, the Plaza MOB Summary prepared by Alecto Management states that in October 2018, "Alecto had a direct loan with Wells Fargo which Wells Fargo was ready to call" and Lex Reddy personally paid the loan as shown on his October 2019 Wells Fargo Priority Credit Line Statement. GCS verified transactions related to the 2018 Promissory Note through examination of Reddy Credit Line statements, Alecto's general ledger and Alecto's bank statements.

Funds provided to Alecto under the 2018 Promissory Note originated from a margin account credit line held by Lex Reddy ("Reddy Credit Line"). The 2018 Promissory Note was dated October 9, 2018, with a maturity date of October 31, 2021. Although GCS has not received any documentation that the 2018 Promissory Note was amended or restated, additional advances totaling $960,000 were issued to Alecto in the period January 17, 2019, through January 22, 2020. During that period, two (2) payments totaling $107,000 were made such that the outstanding balance at January 30, 2020, was $5,084,973.33.[90]

Soon thereafter, the stock market plummeted as a result of the COVID crisis, margin calls were made on the "Reddy Credit Line." A total of $459,404 was transferred by Alecto to the Reddy Credit Line to cover the margin calls. These transfers were booked as loan payments against the balance on the 2018 Promissory Note. Subsequent payments on the 2018 Promissory Note were made on April 13, 2021 ($792,683.49), and nine (9) months of interest payments beginning April 30, 2021, through January 2, 2022. On January 31, 2022, the 2018 Promissory Note was paid in full by Plaza MOB through First Clearing.[91]

GCS verified that all advances from the Reddy Credit Line under the 2018 Promissory Note were received by Alecto and all payments from, or on behalf of Alecto, were applied to reduce the balance of the Reddy Credit Facility or pay interest and fees.

## H. Transfers to Accounts of Previously Unidentified Holders

Our review of the bank statements produced identified four (4) accounts of previously unidentified holders receiving transfers from Alecto and/or its Affiliates. The 113 transfers from Alecto to these accounts totaled less than $214,000[92] and 76 of those transfers were for less than $1,000. Transfers to previously unidentified accounts were below the agreed to research threshold of $10,000. However, based on Alecto's general ledger, the majority of the transfers were to OMC HSA Account *3709, the remaining transfers related to entities previously owned or operated by Alecto; M/C Healthcare and Chesterfield.

## II.    SCOPE AND ANALYSIS

A forensic investigation is defined by the scope of the engagement and/or issues in question and may include the analysis of entire sets of data based on the focus of the investigation.[93] In this case, the investigation performed by GCS focused on cash transactions into and out of Alecto's bank accounts to identify a) cash payments and loans to, or for the benefit of, officers, director, shareholders, and related-parties ("Insiders"), and b) potentially voidable transfers to Insiders, if any. GCS received approximately 1,950 documents during the course of our examination has performed the following analyses:

1. Reviewed certain filings with the Bankruptcy Court.
2. Conducted interviews with Michael Sarrao, Alecto's Executive Vice President, General Counsel and Secretary and Matt Williams, Alecto's Chief Financial Officer.
3. Analyzed cash sources and uses based on the analysis, categorization, and summarization of 1,296 bank statements containing 116,850 transactions included in 26 bank accounts held by Alecto and

---

[90] Payments included a payment of $30,000 on May 16, 2019, and payment of $77,000 on October 2, 2019, originating from the aforementioned advance from Lex Reddy.
[91] Plaza MOB Account *2120, January 2022.
[92] See GCS Exhibit 7 – Bank Account Summary Schedules.
[93] Forensic investigations are iterative, meaning that the analytical techniques used are not performed in isolation since observations made using one technique generally provide insight into other areas of the investigation.

certain of its Affiliates for the four (4) year Examination Period June 17, 2019, through June 30, 2023, as discussed below.

    a.  Bank statements were received for the Examination Period for the following entities:[94]

        i.  Alecto Healthcare Services LLC (3 accounts)

        ii.  Alecto Healthcare Services Hayward LLC (1 account)[95]

        iii.  Sherman/Grayson Hospital LLC (7 accounts)

        iv.  Sherman MD Provider, Inc., a subsidiary of Alecto Sherman (5 accounts)

        v.  Sherman Anesthesia, Inc., a subsidiary of Alecto Sherman (2 accounts)

        vi.  Olympia Health Care LLC (6 accounts)

        vii.  Plaza Medical Office Building LLC (2 accounts)

    b.  Identified deposits, payments made by check, direct debit, internal transfer, or wire transfer, and categorized the data by transaction category and payee, if identified in the bank statements.

    c.  Electronically tied Alecto payments by check and ACH Transfer (Bill Payment) to Alecto's general ledger to identify payees.

    d.  Traced advances from the CNH Revolving Facility per electronic statements into Alecto's primary disbursement account *3874 and subsequent transfers from Alecto's account *3874 to bank accounts held by Affiliates.

    e.  Tied advances to Affiliates per bank statements to the LOC Reconciliations, calculated estimated over/under advances to Affiliates, and sampled the recording of such transactions in Alecto's general ledger.

    f.  Calculated total advances retained by Alecto for operating expenses and other purposes and tied to Alecto bank statements.

    g.  Analyzed transfers to/from accounts not included in lists of Alecto and/or Affiliate held accounts.

4. Examined Alecto's general ledger, including 1,208 separate disbursements by check, ACH, or wire transfer to identify payments to, or for the benefit of, Insiders, of $10,000 or more, if any.

5. Examined Alecto's year end payroll records for the years 2020 – 2022 and the 6-month period ended June 16, 2023, to identify payments to Insiders.

6. Analyzed cash flows into/out of the credit facility utilized under the 2018 Promissory Note and payoff by Plaza MOB.

7. Examined supporting documentation for interest payments related to the Plaza MOB Loan.

8. Analyzed cash flows and certain closing documents, including settlement and funds flow statements, related to the June 20, 2019 Plaza MOB Refinance and the 2021 UCLA Asset Sale.

---

[94] Bank statements were requested for Alecto Fairmont, LLC, FRMC Physicians, Inc., a subsidiary of Alecto Fairmont, Alecto Wheeling, Alecto Martin's Ferry, however, these statements were not received by the date of this summary. It is our understanding that Alecto Fairmont ceased operations in March 2020. It is also our understanding that Alecto Wheeling and Alecto Martin's Ferry ceased operations in October 2019.

It is also our understanding that the following entities did not have bank accounts: Sherman/Grayson Sponsor LLC (subsidiary of Alecto Sherman), Horizon Real Estate Holdings LLC, Sunrise Real Estate Holdings LLC, Olympia Plaza Management, Inc.

[95] Under a springing lockbox agreement with CNH Finance.

## III. LIMITATIONS

The scope of work performed by GCS did not include, among others, a) verification of trade accounts receivable or payable, b) examination of deposits into Alecto bank accounts and the source of such deposits unless discussed herein, c) analysis of vendor invoices and related payments, d) analysis of copies of checks, e) identification of payees by ACH or check described in the bank statements as preauthorized debits, identification of payees by ACH or check where no name was identified, or the transaction listed as, or included in, a journal entry, f) detailed examination of invoices and funding request packages used to allocate funds to Affiliates, nor g) examination of email and other internal data/documents unless discussed herein.

While GCS examined transfers into and out of the Alecto bank accounts to CNH Finance and Affiliates and traced the recording of such transfers into Alecto's general ledger, GCS did not reconcile the Affiliates' intercompany accounts.

GCS did not perform an audit, review or compilation as those terms are defined in the AICPA's Statements on Standards for Accounting and Review Services or generally accepted auditing standards.

The procedures were performed solely for use in this bankruptcy matter and the use of this letter report and supporting schedules is restricted to Mr. Balasiano, as Independent Director of Alecto Healthcare Services LLC, Debtor's counsel and the Bankruptcy Court. This letter and supporting exhibits are not to be reproduced, distributed, disclosed, or used for any other purpose without prior written consent of Gould Consulting Services. This letter is not intended for general circulation or publication other than as required by the Bankruptcy Court.

Leanne Gould, CPA/ABV/CFF, ASA
GOULD Consulting Services

**A1777**

GCS Diagram 1
Organizational Chart



**Alecto Healthcare Services, LLC**
**Organizational Chart**

GCS Diagram 2
Plaza MOB Refinancing
2019 Sunrise MOB Transaction



**Alecto Healthcare Services, LLC**
**2019 Sunrise MOB Transaction**
*Refer to Plaza MOB Summary for paragraph references [#] below*

**GOULD** Consulting Services

**A1781**

GCS Diagram 3
Horizon
UCLA Asset Sale



Alecto Partners

**Alecto Healthcare Services LLC**

January 1, 2021
Alecto Healthcare Services
Los Angeles LLC

Sold - wind down. No patients
since 3/31/2021

*100% owner of:*

[3.1]
Olympia Health Care, LLC
**2. Olympia Medical Center**
Hospital Operations

[3.2]
Horizon Real Estate
Holdings, LLC

Hospital Real Estate
Sold to UCLA Health 1/1/2021
Leased back for 90 days until
closure

January 20, 2021

**$23,506,100**
Assumed net proceeds
of Horizon Asset Sale to
UCLA transferred to
Alecto Operating
Account *6065

$7,534,858.10
Payment to Holtz Slavett
& Drabkin
"Bsuite Wire Out-Dom"

+$12 service charge = $7,534,870.10

Net proceeds transferred
to Alecto CNH Finance
Disbursement Account
*3784

**$7,534,870.10**

Balance of Net Proceeds: **$15,971,229.90**

---

$5,000,000    Pay off of Note to MPT of Fairmont-Alecto Hospital LLC,
Borrower Alecto Fairmont; Guarantor, Alecto

**GOULD** Consulting Services

**A1783**

GCS Diagram 4
Plaza MOB Assignment
And UCLA Asset Sale



### Alecto Healthcare Services, LLC
### 2021 Sunrise MOB Transaction
*Refer to Plaza MOB Summary for paragraph references [#] below*

**A1785**

# Exhibits

# Exhibit 1
## Plaza MOB Summary

### Prepared by Alecto Management

## Plaza Medical Office Building

(1)     Plaza Medical Office Building, LLC ("Plaza MOB") is a California limited liability company which owned and operated a medical office building and parking garage located at 5901 W. Olympic Boulevard, Los Angeles, California 90036, and 5975 W. Olympic Boulevard, Los Angeles, California 90036.  Plaza MOB owners were and are: (a) Sunrise Real Estate Holdings, LLC (99.5%) and Olympia Plaza Management, Inc. ("OPM").  Prior to June 19, 2019, Alecto Healthcare Services LLC owned 100% of Sunrise Real Estate Holdings, LLC.

(2)     In the late spring of 2019, Plaza MOB sought to refinance its existing mortgage to take advantage of interest rate opportunities and cash out the equity that had been developed. Except for the mortgage, Plaza MOB had no creditors.

(3)     Wells Fargo Bank, N.A., the proposed lender for the refinance required that Sunrise Real Estate Holdings, LLC not be owned by Alecto Healthcare Services LLC in order to complete the refinancing.

(4)     On June 12, 2019, Sunrise MOB Holdings, LLC, a Delaware limited liability company was formed.  As of June 12, 2019, Sunrise MOB Holdings, LLC members were as follows:

| Members | Units |
|---|---|
| Class A Members | |
| The Krissman Family Trust | 10,000 |
| The Reddy Investment Trust | 5,000 |
| The Jeyakumar Inter-Vivos Trust | 7,000 |
| The Sarrao Family Trust | 7,000 |
| The Hayes Irrevocable Trust | 5,000 |
| Steven Kay | 5,000 |
| Matthew Williams | 5,000 |
| Aman Dhuper | 5,000 |
| Class A Totals | 49,000 |
| | |
| Class B Members | |
| The Reddy Investment Trust | 51,000 |
| Class B Totals | 51,000 |
| | |
| Total Units | 100,000 |

Attached hereto as **Exhibit A** is the Operating Agreement for Sunrise MOB Holdings LLC.

1

(5)     On June 19, 2019, Alecto Healthcare Services LLC transferred 100% of the membership interests in Sunrise Real Estate Holdings to the following persons:

| Members | % Ownership |
|---|---|
| The Reddy Investment Trust | 56% |
| The Krissman Family Trust | 10% |
| The Jeyakumar Inter-Vivos Trust | 7% |
| The Sarrao Family Trust | 7% |
| The Hayes Irrevocable Trust | 5% |
| Steven Kay | 5% |
| Matthew Williams | 5% |
| Aman Dhuper | 5% |

Attached hereto as **Exhibit B** is the First Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC.

(6)     On June 19, 2019, the Members of Sunrise Real Estate Holdings, LLC transferred their interests in Sunrise Real estate Holdings, LLC to Sunrise MOB Holdings LLC.  Attached hereto as **Exhibit C** is the Second Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC.

(7)     On June 20, 2019, Plaza MOB completed the refinancing and received net proceeds of $8,444,477.81.

(8)     On June 20, 2019, Plaza MOB made a distribution of $8,444,477.81 to Sunrise Real Estate Holdings LLC.  Attached hereto as **Exhibit D** is the Funds Flow Agreement.

(9)     On June 20, 2019, Sunrise Real Estate Holdings LLC made a distribution to Sunrise MOB Holdings LLC.

(10)     On June 20, 2019, Sunrise MOB Holdings LLC made a distribution of $8,444,477.81 to the Sunrise MOB Members as follows:

| Members | % | Amount of Distribution |
|---|---|---|
| The Reddy Investment Trust | 56% | $4,728,904.21 |
| The Krissman Family Trust | 10% | $844,447.18 |
| The Jeyakumar Inter-Vivos Trust | 7% | $591,113.03 |
| The Sarrao Family Trust | 7% | $591,113.03 |
| The Hayes Irrevocable Trust | 5% | $422,223.59 |
| Steven Kay | 5% | $422,223.59 |
| Matthew Williams | 5% | $422,223.59 |
| Aman Dhuper | 5% | $422,223.59 |

(11)    On June 20, 2019, each of the Sunrise MOB Members made a capital contribution to Alecto Healthcare Services LLC in the following amounts:

| Members | % | Amount of Capital Contribution |
|---|---|---|
| The Reddy Investment Trust | 56% | $4,728,904.21 |
| The Krissman Family Trust | 10% | $844,447.18 |
| The Jeyakumar Inter-Vivos Trust | 7% | $591,113.03 |
| The Sarrao Family Trust | 7% | $591,113.03 |
| The Hayes Irrevocable Trust | 5% | $422,223.59 |
| Steven Kay | 5% | $422,223.59 |
| Matthew Williams | 5% | $422,223.59 |
| Aman Dhuper | 5% | $422,223.59 |

(12)    On June 20, 2019, Alecto Healthcare Services LLC made a loan equal to $8,444,477.81 to Olympia Health Care, LLC.

(13)    On December 31, 2019, Aman Dhuper transferred his membership in Sunrise MOB Holdings LLC to The Reddy Investment Trust and The Jeyakumar Inter-Vivos Trust transferred its membership interests in Sunrise MOB Holdings LLC to The Reddy Investment Trust.

(14)    On January 1, 2021, each of the members of Sunrise MOB Holdings LLC transferred their interests in Sunrise MOB Holdings LLC to Alecto Healthcare Services LLC. Attached hereto as **Exhibit E** is the Assignment of Membership Interests.

(15)    Effective August 31, 2021, Plaza MOB sold the medical office building and parking garage to The Regents of the University of California for the benefit of UCLA Health. Except for obligations to Wells Fargo Bank, N.A., MPT of Olympia, L.P., and obligations as the lessor under office leases, including security deposits, Plaza MOB has no creditors or liabilities as of August 31, 2021. Wells Fargo Bank, N.A. and MPT of Olympia, L.P., were paid in full through escrow on August 31, 2021 and The Regents of the University of California assumed the leases and obligations thereunder effective August 31, 2019. Plaza MOB has had no creditors since August 31, 2021.

EXHIBIT A

**A1791**

## SUNRISE MOB HOLDINGS LLC

**A Delaware Limited Liability Company**

## OPERATING AGREEMENT

## SUNRISE MOB HOLDINGS LLC

## OPERATING AGREEMENT

This Operating Agreement (this "Agreement") is entered into and effective as of June 14, 2019, by and among the Persons identified as Members (each a "Member" and collectively the "Members") in **Exhibit A** which is incorporated herein by reference. Except as otherwise provided, the capitalized terms used in this Agreement shall have the meanings set forth in Article I hereof.

**WHEREAS**, Sunrise MOB Holdings LLC (the "Company"), was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation with the Delaware Secretary of State on June 12, 2019 (the "Effective Date"); and

**WHEREAS**, the Company was formed to own one hundred percent (100%) of the membership interests of Sunrise Real Estate Holdings, LLC; and

**WHEREAS**, the Members desire to enter into this Agreement to create two classes of Membership, to provide for their respective rights, obligations and duties, and to set forth the provisions for the management and governance of the Company; and

**NOW, THEREFORE**, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## Definitions

The following defined terms used in this Agreement shall have the meanings specified below:

"Act" shall mean the Delaware Limited Liability Company Act, in effect at the time of the initial filing of the Articles, and as thereafter amended from time to time.

"Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's aggregate Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    Debit to such Capital Account the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adverse Terminating Event" shall have the meaning set forth in Section 4.3.

"Affiliated Person" or "Affiliate" shall mean, with reference to a specified Person, (a) any member of such Person's Immediate Family, (b) any Person who owns directly or indirectly ten percent (10%) or more of the beneficial ownership in such Person, (c) any one or more Legal Representatives of such Person and/or any Persons referred to in the preceding clauses (a) or (b); and (d) any entity in which any one or more of such Person and/or the Persons referred to in the preceding clauses (a), (b) or (c) owns directly or indirectly ten percent (10%) or more of the beneficial ownership.

"Agreement" shall mean this Operating Agreement as it may be amended, supplemented, or restated from time to time.

"Applicable Federal Rate" shall mean the Applicable Federal Rate as that term is defined in Code Section 1274(d)(1), whether the short-term, mid-term or long-term rate, as the case may be, as published from time to time by the Secretary of the Treasury.

"Approval of the Board" or "Board Acting by Approval" and any grammatical variation thereof, shall mean consent, approval or vote of a majority of the Managers then in office.

"Articles" shall mean the Certificate of Formation creating the Company, and as may, from time to time, be amended in accordance with the Act.

"Bankruptcy" shall mean any of the following:

(a)     If any Member shall file a voluntary petition in bankruptcy, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors, or shall file any answer or other pleading admitting or failing to contest the material allegations of any petition in bankruptcy or any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief filed against such Member, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator of such Member or of all or any substantial part of his or her properties or his or her interest in the Company (the term "acquiesce" as used herein includes but is not limited to the failure to file a petition or motion to vacate or discharge any order, judgment, or decree within thirty days after such order, judgment or decree);

(b)     If a court of competent jurisdiction shall enter in an order, judgment or decree approving a petition filed against any Member seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors and such Member shall acquiesce in the entry of such order, judgment, or decree, or if any Member shall suffer the entry of an order for relief under Title 11 of the United States Code and such order, judgment, or decree shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or if any trustee, receiver, conservator, or liquidator of any Member or of all or any substantial part of his or her properties or his or her interest in the Company shall be

2

**A1794**

appointed without the consent or acquiescence of such Member and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); or

(c)     If any Member shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

"Board" or "Board of Managers" shall refer collectively to the Persons named to be the Managers in this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity on the Board of Managers of the Company.

"Book Value" shall mean, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes, except that:

(a)     The initial Book Value of any asset contributed by a Member of the Company shall be the gross fair market value of such asset (reduced for any liabilities to which it is subject or which the Company assumes), as such value is determined by Approval of the Board, and for which credit is given to the contributing Member under this Agreement;

(b)     The Book Values of all assets of the Company shall be adjusted to equal their respective gross fair market values, as determined by Approval of the Board, at and as of the following times:

(i)     The acquisition of an additional or new interest in the Company by a new or existing Member in exchange for other than a de minimis Capital Contribution by such Member, if the Board, acting by Approval, reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members;

(ii)     The distribution by the Company to a Member of more than a de minimis amount of any asset of the Company (including cash or cash equivalents) as consideration for all or any portion of an interest in the Company, if the Board, acting by Approval, reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members; and

(iii)     The liquidation of the Company within the meaning of Regulations Section 1.704 1(b)(2)(ii)(g).

(c)     The Book Value of the assets of the Company shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704 1(b)(2)(iv)(m); provided, however, that Book Value shall not be adjusted pursuant to this clause (c) to the extent that the Managers, acting by Approval, determines that an adjustment pursuant to the immediately preceding clause (b) is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment pursuant to this clause (c).

**A1795**

If the Book Value of an asset has been determined or adjusted pursuant to the preceding clauses (a), (b) or (c), such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits or Losses.

"Capital Account" shall mean a capital account maintained and adjusted in accordance with the Code and the Regulations, including the Regulations under Section 704(b) and (c) of the Code. The Capital Account of each Member shall be:

(a)     Credited with all payments made to the Company by such Member on account of Capital Contributions (and as to any property other than cash or a promissory note of the contributing Member, the agreed (as indicated by the Approval of the Board) fair market value of such property, net of liabilities secured by such property and assumed by the Company or subject to which such contributed property is taken) and by such Member's allocable share of Profits and items in the nature of income and gain of the Company;

(b)     Charged with the amount of any distributions to such Member (and as to any distributions of property other than cash or a promissory note of a Member or the Company, by the agreed fair market value of such property, net of liabilities secured by such property and assumed by such Member or subject to which such distributed property is taken), and by such Member's allocable share of Losses and items in the nature of Losses and deductions of the Company;

(c)     Adjusted simultaneously with the making of any adjustment to the Book Value of the Company's assets pursuant to the definition thereof, to reflect the aggregate net adjustments to such Book Value as if the Company recognized Profit or Loss equal to the respective amount of such aggregate net adjustments immediately before the event causing such adjustments; and

(d)     Otherwise appropriately adjusted to reflect transactions of the Company and the Members.

"Capital Contribution" shall mean the amount of cash and the value of any other property contributed to the Company by a Member.

"Class A Member" shall mean any Member holding Class A Units in the Company, in each such Member's capacity as a holder of Class A Units.

"Class B Member" shall mean initially Lex Reddy, and shall include any Member subsequently holding Class B Units in the Company.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Consent of the Class B Members" shall mean the written consent or approval of the Class B Members.

"Depreciation" shall mean, for each year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Book Value of an

4
**A1796**

asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same relationship to the Book Value of such asset as the depreciation, amortization or other cost recovery deduction computed for tax purposes with respect to such asset for such period bears to the adjusted tax basis for such asset, or if such asset has a zero adjusted tax basis, Depreciation shall be determined with reference to the initial Book Value of such asset using any reasonable method selected by Approval of the Board, but not less than depreciation allowable for tax purposes for such year.

"Immediate Family" with respect to any individual, shall mean his or her ancestors, spouse, issue, spouses of issue, any trust principally for the benefit of any one or more of such individuals, his or her estate, and any entity beneficially owned by such individuals or trusts for their principal benefit.

"Legal Representative" shall mean, with respect to any individual, a duly appointed executor, administrator, guardian, conservator, trustee, personal representative or other legal representative appointed as a result of the death, minority or incompetency of such individual.

"Losses" shall have the meaning provided below under the heading "Profits and Losses."

"Manager" shall refer to each Person named as a Manager by the Members pursuant to this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the Company. "Managers" or "Board" shall refer collectively to the Persons named as Managers by the Members pursuant to this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the Company.

"Member" shall mean any Person named as a Member in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in each such Person's capacity as a Member of the Company.

"Member Minimum Gain" shall mean "partner nonrecourse debt minimum gain" as that term is defined in Regulations Section 1.704-2(i)(2).

"Member Nonrecourse Debt" shall mean "partner nonrecourse debt" or "partner nonrecourse liability" as those terms are defined in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall mean "partner nonrecourse deductions" as that term is defined in Regulations Section 1.704 2(i)(1).

"Minimum Gain" shall have the meaning given in Regulations Section 1.704-2(d).

"Non-Adverse Terminating Event" shall have the meaning set forth in Section 4.3.

"Nonrecourse Deductions" shall have the meaning given in Regulations Section 1.704-2(b)(1).

"Person" or "Party" shall mean any natural person, partnership (whether general or limited), limited liability company, trust, estate, association or corporation.

"Profits and Losses" shall mean, for each year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this provision shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this provision, shall be subtracted from such taxable income or added to such loss;

(c)     Gain or loss from a disposition of property of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, rather than its adjusted tax basis;

(d)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account the Depreciation on the assets for such fiscal year or other period; and

(e)     Any items which are separately allocated pursuant to Sections 6.5 and/or 6.6 which otherwise would have been taken into account in calculating Profits and Losses pursuant to the above provisions shall not be taken into account and, as the case may be, shall be added to or deducted from such amounts so as to be not part of the calculation of the Profits or Losses.

If the Company's taxable income or loss for such year, as adjusted in the manner provided above, is a positive amount, such amount shall be the Company's Profits for such year; and if negative, such amount shall be the Company's Losses for such year.

"Reasonable Reserves" shall mean such amount as the Board acting by Approval, shall deem reasonably necessary to meet the foreseeable liabilities or obligations of the Company taking into consideration historic costs as well as reasonably projected cash flow, and including, but not limited to, (i) the normal expenses of the operation and management of its activities, as such liabilities and obligations become due and payable, and (ii) the expenses of any redemptions pursuant to the provisions of this Agreement.

"Redemption Price" shall mean the fair market value of the Company taken as a whole taking into account the Company's book value, the value of any real property and improvements owned by the Company's subsidiaries, and the amount of any debt secured by such real property and improvements, and not taking into account the value of goodwill, trade names, or other intangible assets.

"Regulations" shall mean the Regulations promulgated under the Code, and any successor provisions to such Regulations, as such Regulations may be amended from time to time.

"Supermajority Approval" shall mean the written consent or approval of the Members holding a majority of the Class A Units then issued and outstanding and the Consent of the Class B Members.

"Terminating Capital Transaction" shall mean a sale or other disposition of all or substantially all of the assets of the Company.

"Transfer" and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way as to any interest of a Member. Transfer shall specifically, without limitation of the above, include assignments and distributions resulting from death, incompetency, Bankruptcy, liquidation and dissolution.

"Unit" shall mean a unit or share of interest in the Company. The interest of each Unit in the Company shall be equal to one (1) divided by the total number of Units then authorized and outstanding (including, but not limited to, Class A Units and Class B Units).

"Unit Proportion" shall mean the number of Units held by a Member divided by all Units then issued and outstanding.

The definitions set forth in the Act shall be applicable, to the extent not inconsistent herewith, to define terms not defined herein and to supplement definitions contained herein.

## ARTICLE II
## Organizational Powers and Membership

2.1     Organization. The Board of Managers shall file such articles, certificates and documents as appropriate to comply with the applicable requirements for the operation of a limited liability company in accordance with the laws of any jurisdictions in which the Company shall conduct business and shall continue to do so as long as the Company conducts business therein. By Approval of the Board, the Company may establish places of business within and without the State of Delaware, as and when required by its business and in furtherance of its purposes set forth in Section 2.2 hereof, and may appoint agents for service of process in all jurisdictions in which the Company shall conduct business.

2.2     Purposes and Powers of the Company. The Company is organized for the general purposes of (i) owning one hundred percent (100%) of the membership interests of Sunrise Real Estate Holdings, LLC, a Delaware limited liability company, (ii) engaging in other activities in connection therewith which are necessary or beneficial to the Business, and (iii) engaging in any other lawful business activity permitted under the Act consistent with the foregoing. To that end, the Company, subject to the terms of this Agreement, may enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to the accomplishment of, the purposes of the Company, so long as said activities and contracts may

be lawfully carried on or performed by a limited liability company under the laws of the State of Delaware.

2.3    Regulatory Regulations. The Members understand that the Company's and the Business operations may subject to various state and federal laws regulating permissible relationships with entities such as the Company. It is the intent of the parties that the Company operate in a manner consistent with all applicable laws. Accordingly, each Member represents and warrants and covenants as of the date hereof and while the Member is a Member, that such Member has not been barred or suspended from participation in any state or federal governmental healthcare program, including, but not limited to, the Medicare or Medicaid programs.

2.4    Membership.

(a)    There shall be two (2) authorized classes of Members of the Company: Class A Members and Class B Members. All Members shall have (based on Units held) the same economic rights. The Members, acting as Members, shall have no right to act for or bind the Company. The initial Class A Members and the initial Class B Member are identified in Exhibit A hereto.

2.5    Investment Through Asset Protection Vehicle. Notwithstanding anything herein to the contrary, a Member ("Entity Owner") may invest through a pension plan, trust, limited liability company or other similar entity ("Entity Investor") as long as the following conditions are met: (i) the Entity Investor is owned by a Member and/or his or her Immediate Family; (ii) any breach of this Agreement by the Entity Investor or the Entity Owner, or the occurrence of a Terminating Event related to the Entity Owner or the Entity Investor, shall be treated as a Terminating Event under this Agreement; (iii) if a Terminating Event occurs with respect to the Entity Owner, the Entity Investor's Units will be redeemed in accordance with Section 4.3 of this Agreement; (iv) the Entity Owner agrees to be bound by each of the covenants contained in this Agreement, including, without limitation, all confidentiality and non-competition covenants, and agrees to abide by the requirements of aMember in this Section 2.3 hereof, as if such Entity Owner were a direct owner of the Company; and (v) the Entity Owner agrees to sign a counterpart signature page to this Agreement, as such other documents as the Company may reasonably require.

## ARTICLE III
## Capital Contributions and Liability of Members

3.1    Capital Accounts. A separate Capital Account shall be maintained for each Member, including any Member who shall hereafter acquire an interest in the Company.

3.2    Capital Contributions.

(a)    Capital Contributions. The Members have made or shall make the Capital Contributions in the amounts set forth in Exhibit A. The Class A Members shall initially own forty nine thousand (49,000) Units and shall collectively at all times hold forty nine percent (49%) interest in the Company, and the Class B Members shall initially own fifty one thousand Units and shall collectively at all times hold fifty one percent (51%) interest in the Company. Additional issuances of Units shall be solely of Class A Units, with the resulting dilution of their percentage interests in the Company, it being expressly understood that no additional Class B Units are to be

8

**A1800**

issued without the approval of all Class B Members. No Member shall have preemptive rights to acquire any Units to be issued by the Company after the date of this Agreement.

        (b)    Loans. Except as set forth in this Article III, and except with Supermajority Approval pursuant to Section 7.4 hereof, no Member or Manager shall be entitled, obligated or required to make any loan to or guarantee a loan for the Company or make any Capital Contribution to the Company in addition to such Member's Capital Contribution made pursuant to Section 3.2(a) hereof. No loan made to the Company by any Member or Manager shall constitute a Capital Contribution to the Company for any purpose.

        (c)    Additional Capital Contributions. Additional Capital Contributions may be required only with the Supermajority Approval pursuant to Section 7.4 hereof and otherwise in accordance with Article V below.

      3.3    No Withdrawal of or Interest on Capital. Except as otherwise provided in this Agreement, (i) no Member shall have any right to demand and receive property of the Company in exchange for all or any portion of such Member's Capital Contribution or Capital Account, and (ii) no interest or preferred return shall accrue or be paid on any Capital Contribution or Capital Account.

      3.4    Liability of Members. No Member, in his, her or its capacity as a Member, shall have any liability to restore any negative balance of such Member's Capital Account or to contribute to, or in respect of, the liabilities or the obligations of the Company, or to restore any amounts distributed from the Company, except as may be required specifically under this Agreement, the Act or other applicable law. Except to the extent otherwise provided in this Agreement or otherwise agreed to, or as required by law, in no event shall any Member, in such Member's capacity as a Member, be personally liable for any liabilities or obligations of the Company or any of its Members.

      3.5    Managers as Members. No Manager is required to hold any Units in the Company in order to serve as a Manager.

      3.6    Additional Members. Additional Members may be admitted to the Company only upon Supermajority Approval, including the terms of admission, and the Approval of the Board of Managers in accordance with the terms of Article VII hereof and upon execution and delivery by the new Member of a counterpart of this Agreement, delivery of the required Capital Contribution (as determined by the Board of Managers) and execution and delivery of such other documents, instruments and items as the Managers may require. Issuance of Units to new Members shall be subject to compliance with Section 3.2 hereof. All such issuances shall be structured such that the amount paid for Units is not less than fair market value, payments are made in cash or such other consideration as is approved by the Board of Managers.

**A1801**

## ARTICLE IV
## Members And Units

4.1     Classification of Members. There shall be two (2) classes of Members of the Company: a Class A Member Class and Class B Member Class. All Members shall have (based on Units held) the same economic rights.

4.2     Withdrawal of a Class A Member. No Class A Member has the right to withdraw or resign from the Company at any time, except upon Supermajority Approval. If a Class A Member withdraws or resigns as a Member in violation of this Section 4.2, or through such Member's action causes such Member to fail to satisfy the conditions of Membership, such Member hereby agrees that such withdrawal, resignation or action will constitute a breach of this Agreement. The Company may offset any damages due to such a breach against any amounts otherwise distributable to such Member. In the event that the Act or a final court ruling entitles the Class A Member to receive a distribution upon withdrawal in violation of this Section 4.2, such distribution shall be equal to the Member's Capital Account. The foregoing represents the parties' reasonable best efforts to determine the damages that would stem from a Class A Member's breach of this Section 4.2.

4.3     Redemption of a Member.

(a)     Terminating Events are categorized as either Adverse Terminating Events or Non-Adverse Terminating Events for purposes of differentiating the Company's redemption obligations to the Member to whom or which an event occurs.

(b)     For purposes of this Section, an "Adverse Terminating Event" means:

(i)     with respect to any Member:

A.     the improper Transfer (or attempt to Transfer) of Units;

B.     the conviction of any felony;

C.     any uncured material breach of a provision of this Agreement;

D.     any event of Bankruptcy; or

E.     the failure to make guaranties or any capital contribution required pursuant to Section 5.1.

(c)     For purposes of this Section, a "Non-Adverse Terminating Event" means any event not specified in Section 4.3(b) including a request by a Member's heirs, after a Member's death, that the Company purchase the deceased Member's interest in the Company from his estate or heirs.

(d)     Each Terminating Event, if subject to cure within thirty (30) days, shall trigger termination only after written notice is provided and if a cure has not been made of the Terminating Event within such thirty (30) day period.

(e)     If a Terminating Event (whether Adverse or Non-Adverse) shall occur with respect to any Member, the Company may elect, at the Company's sole option and upon written notice to such Member within six (6) months after the Company has received actual knowledge of the Terminating Event (meaning knowledge of a majority of the Board of Managers without knowledge being imputed from one Manager to another), to purchase the Member's Units and the Member must sell such Units to the Company at a price as determined as follows:

(i)     Subject to Section 4.3(f), if any Member's Units are purchased by the Company because of the occurrence of an Adverse Terminating Event, the amount the Company shall pay for the Units owned by such Member shall be the Redemption Price determined as of the date of the Terminating Event multiplied by the Member's Unit Proportion, discounted by twenty percent (20%) (the "Adverse Purchase Price").

(ii)     Subject to Section 4.3(f), if any Member's Units are purchased by the Company because of the occurrence of a Non-Adverse Terminating Event, the amount the Company shall pay for the Units owned by such Member shall be the Redemption Price multiplied by the Member's Unit Proportion (the "Non-Adverse Purchase Price"). The "Adverse Purchase Price," and the "Non-Adverse Purchase Price" may be referred to collectively as the "Valuation Price."

(f)     For purposes of this Section 4.3, the Redemption Price  (as defined in Article I) is intended as a means of approximating fair market value while minimizing disputes and appraisal-related costs and expenses regarding valuation of Units for purposes of redemption.

(i)     All calculations used to determine the Redemption Price shall be performed by the Company's regularly retained accountants and such calculations shall be final and binding upon all parties to this Agreement. All Members acknowledge and agree that the Redemption Price may be an inexact approximation of fair market value, and all Members waive any and all rights to contest the use of the Redemoption Price for any and all purposes in lieu of an appraisal or other method.

Payments for Units hereunder shall be made as follows: twenty percent (20%) on the initial payment date, which shall be within ninety (90) days after the determination of the Valuation Price (the "Purchase Date") (which in no event shall be more than six (6) months after the Terminating Event, and twenty percent (20%) of the Valuation Price on each of the anniversaries of the Purchase Date with interest on the outstanding principal balance accruing at the Prime Rate shown in the Money Rates Section of the Wall Street Journal on the Purchase Date until the principal is paid in full.  Notwithstanding any delay in the payment of amounts due, a Member's rights as a Member shall cease on the Purchase Date. Aggregate payments to be made in connection with all redemptions shall not exceed seven and one-half percent (7.5%) of the Company's collected revenues in any year. If payments are so restricted, payments shall be made in proportion to amounts owed to all Members being redeemed.  In sum, notwithstanding the provisions of this Article, the Company shall not be required to make payments to former Members pursuant to this

11
**A1803**

Section 4.3 which, in the aggregate, would exceed seven and one-half percent (7.5%) of the aggregate collections of the Company for any such period. If the aggregate amount of payments otherwise due to former Members pursuant to this Section would reasonably be expected to exceed this limitation in any calendar year or portion thereof, the Company, with the Approval of the Board, shall pay such former Members, on a pro rata basis, based on the amount still owed such Members, quarterly payments totaling seven and one-half percent (7.5%) of the Company's anticipated aggregate collections for such period, and the balance of that period's payment obligations to such former Members shall be deferred to the following calendar year or years, until such amounts can be paid without violating such limitation with respect to any such year or years. Within sixty (60) days following the end of each calendar year, the Company shall make a pro rata adjusted payment to the former Members if and to the extent that actual aggregate collections during the prior year (or relevant portion thereof) have exceeded the anticipated amount.

## ARTICLE V
## Additional Capital

5.1     Funding Capital Requirements.

(a)     In the event that the Company requires additional funds to carry out its purposes, to conduct its business, or to meet its obligations, the Company may borrow funds from such lender(s), including Members and Managers, on such terms and conditions as are Approved by the Board of Managers, all on such terms as reflect fair market value. It is specifically provided that (except as set forth in Section 3.2 and 5.1(c)) no such terms or conditions shall impose any personal liability on any Member without the prior written consent of such Member.

(b)     No Member or Manager shall be obligated to make any Capital Contributions or loans to the Company (except as provided in Sections 3.2 and 7.4 of this Agreement), or otherwise supply or make available any funds to the Company, even if the failure to do so would result in a default of any of the Company's obligations or the loss or termination of all or any part of the Company's assets or business.

(c)     The Company may require that additional Capital Contributions be made by the Members upon Supermajority Approval pursuant to Section 7.4 hereof. If a Member fails to deliver to the Company such an additional requested Capital Contribution within ten (10) business days of a request by the Board to do so, the Company, after giving thirty (30) days notice of such failure, may elect (i) to subordinate such Member's Unit Proportion to that of all non-defaulting Members for the amount of the additional Capital Contribution, plus interest of 12% per annum, compounded annually, or, if lower, the highest rate allowed by law (the "Applicable Interest Rate"); (ii) to borrow on behalf of such Member that amount necessary to meet such Member's commitment and the charging of interest thereon of up to the Applicable Interest Rate, with repayments of such indebtedness made from the first distributions related to such Member's Membership interest; (iii) allow the remaining Members to make contributions in excess of their proportionate shares, on a pro rata basis, to the extent such Members desire to make such contributions, with a corresponding adjustment to such contributing Members' Unit Proportion in the Company to reflect their relative Capital Contributions; or (iv) dilute such Member's Unit Proportion by issuing to those Members that have made the required additional Capital Contribution a number of Units equal to the Diluted Issuance Amount. The "*Diluted Issuance Amount*" for each

12
**A1804**

contributing Member shall mean a number of Units equal to: (1) the total amount of the additional Capital Contribution made by the particular Member with respect to the specific additional Capital Contribution required, *divided by* (2) the Deemed Unit Value. The "*Deemed Unit Value*" shall mean an amount equal to: (I) the Formula Amount as of the time of the additional Capital Contribution *divided by* (II) the total number of Units outstanding in the Company prior to the additional Capital Contribution, then discounted by forty percent (40%). Any Member who fails to make the required additional Capital Contribution shall not be issued any additional Units under this subsection 5.1(c)(iv).

      5.2    Third Party Liabilities. The provisions of this Article and of Section 3.2 hereof are not intended to be for the benefit of any creditor or other Person (other than a Member in his, her or its capacity as a Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members. Moreover, notwithstanding anything contained in this Agreement, including specifically but without limitation this Article, no such creditor or other Person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any Member.

## ARTICLE VI
## Distributions; Profits and Losses

      6.1    Distribution of Company Funds - In General. Except as necessary to comply with the Sections of this Article VI, distribution of Company funds to the Members shall be subject to Approval of the Board, taking into account future cash needs of the Company, Reasonable Reserves and such other factors as are considered by the Board of Managers, within their sole and absolute discretion. All distributions approved by the Board of Managers shall be distributed among the Members on a pro rata basis based on each Member's Unit Proportion.

      6.2    Distribution Upon Dissolution. Proceeds from a Terminating Capital Transaction and/or other amounts or assets available upon dissolution, and after payment of, or adequate provision for, the debts and obligations of the Company, shall be distributed and applied in the following priority:

      (a)    First, to fund reserves for liabilities not then due and owing and for contingent liabilities to the extent deemed reasonable by Approval of the Board, provided that, upon the expiration of such period of time as the Board, acting by Approval, shall deem advisable, the balance of such reserves remaining after payment of such contingencies shall be distributed in the manner hereinafter set forth in this Section; and

      (b)    Second, to the Members, an amount sufficient to reduce the Members' Capital Accounts to zero, in proportion to the positive balances in such Capital Accounts after reflecting in such Capital Accounts all adjustments thereto necessitated by (i) all other Company transactions (distributions and allocations of Profits and Losses and items of income, gain, deduction and loss) and (ii) such Terminating Capital Transaction; and

      (c)    Finally, to the extent funds remain, to the Members of the Company on a pro rata basis based on each Member's Unit Proportion.

**A1805**

6.3     Distribution of Assets in Kind.  No Member shall have the right to require any distribution of any assets of the Company in kind.  If any assets of the Company are distributed in kind, such assets shall be distributed on the basis of their respective fair market values as determined by the Approval of the Board.  Any Member entitled to any interest in such assets shall, unless otherwise determined by the Approval of the Board, receive separate assets of the Company and not an interest as tenant-in-common, with other Members so entitled, in each asset being distributed.

6.4     Allocation of Profits and Losses.  After giving effect to the allocations set forth in Sections 6.5 and 6.6 which affect the Members' distributive shares, Profits and Losses shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.

6.5     Required Regulatory Allocations.

(a)     Limitation on and Reallocation of Losses.  At no time shall any allocations of Losses, or any item of loss or deduction, be made to a Member if and to the extent such allocation would cause such Member to have, or would increase the deficit in, any Adjusted Capital Account Deficit of such Member at the end of any fiscal year.  To the extent any Losses or items are not allocated to one or more Members pursuant to the preceding sentence, such Losses shall be allocated to the Members to which such losses or items may be allocated without violation of this Section 6.5(a).

(b)     Minimum Gain Chargeback.  If there is a net decrease in the Minimum Gain of the Company during any fiscal year, then items of income or gain of the Company for such fiscal year (and, if necessary, subsequent fiscal years) shall be allocated to each Member in an amount equal to such Member's share of the net decrease in the Minimum Gain, determined in accordance with Regulations Section 1.704-2(d)(1).  A Member's share of the net decrease in the Minimum Gain of the Company shall be determined in accordance with Regulations Section 1.704-2(g).  The items of income and gain to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(2)(i).

(c)     Nonrecourse Deductions.  Nonrecourse Deductions for any fiscal year or other period (not including any Member Nonrecourse Deductions allocated pursuant to Section 6.5(d)) shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.  Solely for purposes of determining each Member's proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Regulations Section 1.752-3(a)(3), the Company Profits shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.  The items of losses, deductions and Code Section 705(a)(2)(B) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(d)     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears the economic risk of loss with respect to the nonrecourse liability, as determined and defined under Regulations Section 1.704-2(b)(4), to which such Member Nonrecourse Deductions are attributable in

14
**A1806**

accordance with Regulations Section 1.704-2(i)(1). The items of losses, deductions and Code Section 705(a)(2)(b) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(e)     Member Minimum Gain Chargeback.   Notwithstanding any contrary provisions of this Article VI, other than Section 6.5(b) above, if there is a net decrease in Member Minimum Gain attributable to Member Nonrecourse Debt during any fiscal year, then each Member who has a share of such Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i), shall be allocated items of income and gain of the Company, determined in accordance with Regulations Section 1.704-2(j)(2)(ii), for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to each such Member's share of the net decrease in such Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(3) and 2(i)(5).

(f)     Qualified Income Offset.   If any Member unexpectedly receives an item described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to each such Member in an amount and manner sufficient to eliminate, as quickly as possible and to the extent required by Regulations Section 1.704-1(b)(2)(ii)(d), the Adjusted Capital Account Deficit of such Member, provided that an allocation pursuant to this Section 6.5(f) shall only be made if and to the extent that such Member would have an Adjusted Capital Account Deficit after accounting for all other allocations provided for in this Article VI other than that described in this Section 6.5(f).

(g)     Basis Adjustment.   To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to either of Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to said Section of the Regulations.

(h)     Gross Income Allocation.   If at the end of any Company fiscal year any Member has a Capital Account deficit which is in excess of the sum of the items to be credited to a Member's Capital Account under clause (a) of the definition of Adjusted Capital Account Deficit, then each such Member shall be allocated items of income and gain in the amount of such excess as quickly as possible provided that an allocation pursuant to this Section 6.5(h) shall only be made if and to the extent that such Member would have a Capital Account deficit in excess of such sum after accounting for all other allocations provided for in this Article VI other than that described in this Section 6.5(h). As among Members having such excess, if there are not sufficient items of income and gain to eliminate all such excess, such allocations shall be made in proportion to the amount of each Member's respective excess.

(i)     Curative Allocations.   The allocations set forth in this Section 6.5 are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently therewith. Such allocations may not be consistent with the manner in which the Members intend to divide Company distributions and to make Profit and Loss

allocations. Accordingly, by the Approval of the Board, after effecting the allocations required pursuant to this Section 6.5, other allocations of Profits, Losses and items thereof shall be divided among the Members so as to prevent the allocations in this Section 6.5 from distorting the manner in which Company distributions will be divided among the Members pursuant to Sections 6.1 and 6.2 hereof. In general, the Members anticipate that this will be accomplished by specifically allocating other Profits, Losses and items of income, gain, loss and deduction among the Members so that the net amount of allocations under this Section 6.5 and allocations under this Section 6.6 to each such Member is zero. However, the Board shall have discretion to accomplish this result in any reasonable manner.

   6.6 Tax Allocations and Book Allocations.

     (a) Except as otherwise provided in this Section 6.6, for federal income tax purposes, each item of income, gain, loss and deduction shall, to the extent appropriate, be allocated among the Members in the same manner as its correlative item of "book" income, gain, loss or deduction has been allocated pursuant to the other provisions of this Article VI.

     (b) In accordance with Code Section 704(c) and the Regulations thereunder, depreciation, amortization, gain and loss, as determined for tax purposes, with respect to any property whose Book Value differs from its adjusted basis for federal income tax purposes shall, for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value, such allocation to be made by the Approval of the Managers in any manner which is permissible under said Code Section 704(c) and the Regulations thereunder and the Regulations under Code Section 704(b).

     (c) In the event the Book Value of any property of the Company is subsequently adjusted, subsequent allocations of income, gain, loss and deduction with respect to any such property shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its respective Book Value in the manner provided under Section 704(c) of the Code and the Regulations thereunder.

     (d) Allocations pursuant to this Section 6.6 are solely for federal, state, and local income tax purposes, and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

   6.7 General Allocation and Distribution Rules.

     (a) For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Approval of the Board of Managers using any permissible method under Code Section 706 and the Regulations thereunder. Except as otherwise provided in this Agreement, all items of income, gain, loss, and deduction shall be allocated among the Members in the same proportions as the allocations of Profits or Losses for the fiscal year in which such items are to be allocated.

**A1808**

(b)     Upon the admission of a new Member or the Transfer of an interest, the new and old Members or the transferor and transferee shall be allocated shares of Profits and Losses and other allocations and shall receive distributions, if any, based on the portion of the fiscal year that the new or transferred Company interest was held by the new and old Members, or the transferor and transferee, respectively.  For the purpose of allocating Profits and Losses and other allocations and distributions, (i) such admission or Transfer shall be deemed to have occurred on the first day of the month in which it occurs, or if such date shall not be permitted for allocation purposes under the Code or the Regulations, on the nearest date otherwise permitted under the Code or the Regulations, and (ii) if required by the Code or the Regulations, the Company shall close its books on an interim basis on the last day of the previous calendar month.

6.8     Tax Withholding.  If the Company incurs a withholding tax obligation with respect to the share of income allocated to any Member, (a) any amount which is (i) actually withheld from a distribution that would otherwise have been made to such Member and (ii) paid over in satisfaction of such withholding tax obligation shall be treated for all purposes under this Agreement as if such amount had been distributed to such Member, and (b) any amount which is so paid over by the Company, but which exceeds the amount, if any, actually withheld from a distribution which would otherwise have been made to such Member, shall be treated as an interest-free advance to such Member.  Amounts treated as advanced to any Member pursuant to this Section shall be repaid by such Member to the Company within thirty (30) days after the Board, acting by Approval of the Board of Managers, give notice to such Member making demand therefore.  Any amounts so advanced and not timely repaid by such Member shall bear interest, commencing on the expiration of said 30-day period, compounded monthly on unpaid balances, at an annual rate equal to the lowest Applicable Federal Rate as of such expiration date.  The Company shall collect any unpaid amounts so advanced from any Company distributions that would otherwise be made to such Member.

6.9     Tax Matters Partner.  The Class B Member, and if more than one Class B Member the one holding the largest number of Unit, shall be the "Tax Matters Partner" (as defined in Code Section 6231) of the Company.  The Tax Matters Partner is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings (collectively, "Audits"), and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.  The Company shall indemnify and hold harmless the Tax Matters Partner and if applicable the Tax Matters Partner's directors, officers, employees and agents from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of his, hers or its activities on behalf of the Company as Tax Matters Partner absent the gross negligence of the Tax Matter Partner.  The Members specifically acknowledge that the Tax Matters Partner shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member with respect to any action taken by the Tax Matters Partner with respect to an Audit absent the gross negligence of the Tax Matter Partner.  The Tax Matters Partner shall take such action as may be necessary to cause each Member to be entitled to notice as set forth in Code Section 6223.  The Tax Matters Partner shall not take any action contemplated by Code Section 6224 through 6230 without the prior authorization of the Members.

(c) Special meetings of the Members also may be called at the written request of any two (2) Members delivered to the President. Upon receipt of such written request the President shall schedule a meeting of the Members within no later than thirty (30) days, and shall send advance written notice to the Members at least ten (10) days prior to the date of the meeting. The time, place and purpose or purposes for such special meeting shall be stated in the notice of such meeting.

(d) Managers representing a majority of Units shall constitute a quorum at any meeting of the Board of Managers. Members representing a majority of Units shall constitute a quorum at any meeting of the Members.

(e) Regarding Board meetings, Managers may provide a proxy to attend a Board meeting who shall have powers to vote as a Manager. For Class A Members, such proxy to attend a meeting of the Members must be a Member. Members and Managers may also attend their respective Member and Board meetings by phone or video conference.

(f) Any action required or permitted to be taken by the Managers may be taken by unanimous consent without a meeting. Any writing executed by all of the Managers shall be conclusive evidence of such action and consent.

(g) A Manager may resign from, retire from, abandon or otherwise terminate his, her or its status as a Manager upon ten (10) days prior written notice to the Board, unless the Board otherwise consents in writing.

7.3 Manner of Exercise of Board's Authority. All responsibilities granted to the Board under this Agreement shall be exercised by the Board as a body, and no Manager, acting alone and without prior Approval of the Board, shall have the authority to act on behalf of the Board. Unless otherwise expressly provided in this Agreement, all actions of the Board of Managers shall act by Approval of the Board. None of the following actions shall be taken by the Company except upon Approval of the Board of Managers, subject to the requirements of Section 7.4 hereof:

(a) Borrow money and otherwise obtain credit and other financial accommodations in the ordinary course of the business of the Company;

(b) Enter into management agreements, leases, asset purchase agreements, financing agreements and loans in any amounts, and any other agreements wherein the financial obligations of the Company exceed on an annual basis the sum of One Hundred Thousand Dollars ($100,000.00);

(c) Employ, engage, retain or deal with any Persons to act as agents, brokers, accountants or lawyers or outside professionals in such other capacity as may be necessary or desirable;

(d) Appoint individuals to act as officers of the Company and delegate to such individuals such authority to act on behalf of the Company and such duties and functions as would normally be delegated to officers of a corporation holding similar offices;

(e) Adjust, compromise, settle or refer to arbitration any claim in favor of or against the Company or any of its assets;

(f) Make elections in connection with the preparation of any federal, state and local tax returns of the Company and to institute, prosecute, and defend any legal action or any arbitration proceeding;

(g) Acquire and enter into any contract of insurance necessary or proper for the protection of the Company and/or any Member and/or any Manager, including without limitation to provide the indemnity described in Section 7.8 or any portion thereof;

(h) Approve technical amendments to this Agreement or the Articles;

(i) Approve the Transfer of Class A Units to another Class A Member;

(j) Establish a record date for any distribution to be made under Article VI;

(k) Enter into, renew, amend or terminate any arrangement or agreement with any Company executive or employee who is also a Manager or Member; and

(l) Perform any other act which the Managers may deem necessary or desirable for the Company as well as the Business.

7.4 Restrictions. Notwithstanding any other provision in this Agreement to the contrary, the Company shall not take any of the following actions without Supermajority Approval:

(a) Authorize, create, designate, determine or issue any new class of Units or issue new Units, or securities convertible into Units or issue options or warrants to purchase Units or authorize the merger, consolidation or similar combination with any other entity, or authorize the sale of all or substantially all the assets of the Company or the dissolution or liquidation of the Company;

(b) Except as contemplated by Article IV hereof, authorize, or set aside any sums for, the purchase, repurchase, redemption or other acquisition by the Company of any Member's Units of any class or make loans or distributions to Members;

(c) Effect any Bankruptcy event with regard to the Company;

(d) Require a Member to make an additional Capital Contribution or guarantee an obligation of the Company; provided, the aggregate debt to which such personal liabilities relate may not exceed One Million Five Hundred Thousand Dollars ($1,500,000);

(e) Approve any decision to not enforce the Company's rights set forth in Article X; and

(f) Except for technical amendments, amend this Agreement or the Articles.

**A1812**

7.5     Binding the Company.  Subject to the provisions of Sections 7.3 and 7.4 hereof, any action taken by a Manager, with Approval of the Board or, where so required, with Supermajority Approval, shall bind the Company and any other Managers and shall be deemed to be the action of the Company.

7.6     Compensation of Managers and Members.  No direct or indirect payment shall be made by the Company to any Manager, Member, or officer of the Company or to any Affiliate of any Manager, Member, or officer of the Company, for such Manager's, Member's, or officer's services as a Manager, Member, or officer, except by Approval of the Board.  Each Manager and officer shall be entitled to reimbursement from the Company for all reasonable expenses incurred by such Manager or officer in managing and conducting the business and affairs of the Company.

7.7     Contracts with Affiliated Persons.  Subject to Section 7.4 hereof, the Company may enter into one or more agreements, leases, contracts or other arrangements for the furnishing to or by the Company of goods, services or space with any Member, Manager or Affiliated Person, and may pay compensation thereunder for such goods, services or space, provided in each case the amounts payable thereunder are reasonably comparable to those which would be payable to unaffiliated Persons under similar agreements, and if the determination of such amounts is made in good faith it shall be conclusive absent manifest error.

7.8     Indemnification.

(a)     Notwithstanding any provision of this Agreement, common law or the Act, no member of the Board, principal officer of the Company or the Tax Matters Member (the "Covered Persons") shall be liable to the Members or to the Company for any loss suffered which arises out of an act or omission of such person, if, in good faith, it was determined by such persons that such act or omission was in the best interests of the Company and such act or omission did not constitute gross negligence or fraud. The Covered Persons shall be indemnified by the Company against any and all claims, demands and losses whatsoever if: (i) the indemnitee conducted himself in good faith; (ii) the indemnitee was not grossly negligent and the loss was not caused by the indemnitee's willful misconduct; (iii) reasonably believed (x) in the case of conduct in his, her or its official capacity with the Company, that the conduct was in its best interests and (y) in all other cases, that the conduct was at least not opposed to its best interests; and (iv) in the case of any criminal proceeding, the Covered Person had no reasonable cause to believe the conduct was unlawful. The payment of any amounts for indemnification shall be made before any distribution are made by the Company. No Member shall have any obligation to provide funds for any indemnification obligation hereunder.

(b)     The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article VII shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Articles, provision of this Agreement, vote of Members or otherwise.

(c)     The Company may maintain insurance, at its expense, to protect itself and any Member, the Board, Board committees, officer, employee or agent of the Company against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under Delaware law.

21

**A1813**

(d)     Any amendment, repeal or modification of any provision of this Section 7.8 shall not adversely affect any right or protection of a Member, the Board, Board committee, officer, employee or agent of the Company existing at the time of such amendment, repeal or modification.

7.9     Other Activities.  Subject to any other restrictions set forth in this Agreement, the Members, Managers and any Affiliates of any of them may engage in and possess interests in other investment opportunities of every kind and description other than those that are similar to the Business of the Company, independently or with others as long as they do not violate Article X hereof.

7.10     Financial Statements.  The Board shall authorize and cause to be prepared reviewed, but not audited, financial statements on an annual basis within ninety (90) days after the end of each fiscal year of the Company.

## ARTICLE VIII
### Officers

8.1     Number; Election; Resignation.  The Company shall have a President (who may also be referred to as the CEO), a Chief Financial Officer, a Secretary, and such other officers as the Board may in its discretion create.  All officers shall be elected by the Board, acting by Approval, at any duly convened meeting of the Board or by written consent in lieu of a meeting. In selecting officers, the Board shall consider the skill, qualifications, dedication, and loyalty of officer candidates, and with respect to such officers, the Board shall select only those individuals who, in the Board's sole opinion, shall best promote and advance the interests of the Company. Each officer shall hold office until his or her successor is chosen and qualified, unless terminated earlier and except as otherwise provided at the meetings respectively at which he or she is elected or appointed.  Any officer may resign by delivering written resignation to the Company at its office, or to the Board, and such resignation shall be effective upon receipt, unless it is specified to be effective at some other time or upon the happening of some other event.

8.2     Same Person Holding Two or More Offices.  To the extent permitted by the Act, any two or more of the offices referred to in this Section may be filled by the same person.

8.3     Officers Need Not Be Members or Managers.  Except as otherwise provided by the Act, any person shall be eligible for election to be an officer of the Company without the necessity of being a Member or Manager.

8.4     Removal of Officers.  Any officer may be removed by the Board, acting by Approval, with or without cause.

8.5     Vacancies.  In case a vacancy in any office shall occur due to any cause, the Board of Managers, acting by Approval, may elect a person to fill such vacancy who shall hold office until the date on which the office would ordinarily be filled, and until a successor is chosen and qualified.

8.6     President.  The President shall be the chief executive officer of the Company and shall, subject to the provisions set forth hereinafter, have the authority to oversee such administrative activities and to take such administrative actions as shall be customary for a chief

22
**A1814**

executive officer. The President shall perform such additional duties as may be delegated to the President by the Board or as may be imposed by law. It shall be the duty of the President, and the President shall have the power to see to it, that all orders and resolutions of the Board are carried into effect. The President shall, from time to time, report to the Board all matters within his or her knowledge which the interests of the Company may require to be brought to its notice.

8.7     <u>Chief Financial Officer</u>.   The Chief Financial Officer shall, subject to the supervision and control of the Board, have custody of the funds and of all the valuable papers of the Company. The Chief Financial Officer shall keep the accounts of the Company in a clear manner, and shall, at all times, when requested by the Board, exhibit a true statement of the affairs of the Company. The Chief Financial Officer shall, if required by the Board, give a bond for the faithful discharge of his or her duties, at the expense of the Company, with satisfactory sureties in such penal sum as the Board may determine, if so required by the Board. Except as the Board may otherwise order, the Chief Financial Officer shall sign and/or endorse all promissory notes, bills, checks, drafts, trade acceptances, and bankers' acceptances, and may execute all deeds, mortgages, reports, contracts, agreements, and other legal documents of the Company, but the Board may authorize any other officer or officers, or agent or agents, to sign any obligations, instruments, or papers on behalf of the Company, and/or may limit the authority of the Chief Financial Officer in any of said matters. The Chief Financial Officer shall perform such other duties as may be delegated to him or her by the Board or as may be imposed by law.

When the Chief Financial Officer shall be absent or for any other reason unable to perform his or her duties, the Chief Financial Officer may appoint any other officer of the Company to act as Treasurer, and said Treasurer shall have all the duties herein delegated to the Chief Financial Officer during the term of his or her appointment.

8.8     <u>Secretary</u>.  The Secretary shall keep the records of the Company, of its Members, and of the Board, and shall perform such duties and have such powers additional to the foregoing as the Board shall designate.

## ARTICLE IX
### Fiscal Matters

9.1     <u>Books and Records</u>.  The Chief Financial Officer shall oversee the day to day bookkeeping for the Company and all of its operations and  facilities and shall keep complete and accurate records of the same. The Company shall keep reviewed, but not audited financial statements that are prepared on an annual basis. Upon Approval of the Board, the Company may engage the services of a certified public accounting firm ("Accounting Firm") to audit the Company's books and records using the same methods of accounting which are used in preparing the federal income tax returns of the Company to the extent applicable and otherwise in accordance with generally accepted accounting principles consistently applied. The Company's books and records shall be maintained and updated monthly, and shall be available, in addition to any documents and information required to be furnished to the Members under the Act, at an office of the Company or the Accounting Firm (as applicable) for examination and copying by any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member. Alternately, copies of such books, records, documents and information shall be sent by the Company to any Member, or the Member's duly authorized representative,

23
**A1815**

upon reasonable request therefore and at the expense of such Member. The Company shall keep at its principal office all items required pursuant to the Act. Within ninety (90) days after the end of each fiscal year of the Company, each Member shall be furnished with financial statements which shall contain a balance sheet as of the end of the fiscal year and statements of income and cash flows for such fiscal year. Any Member may, at any time, at the Member's own expense, cause an audit or review of the Company books to be made by a certified public accountant of the Member's own selection.

9.2     Bank Accounts.  Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or other financial institution(s) as shall be selected by Approval of the Board, and withdrawals shall be made and other activity conducted on such signature or signatures as determined by Approval of the Board. Any and all records with respect to such bank accounts and/or other accounts, including, but not limited to, copies of any checks written on such account or records or other withdrawal activity, shall be available at an office of the Company or the Accounting Firm for examination and copying by any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member. Alternately, copies of such records shall be sent by the Company to any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member.

9.3     Fiscal Year.  The fiscal year of the Company shall end on December 31 of each year, unless otherwise Approved by the Board.

## ARTICLE X
## Transfer of Interests and Admission of Transferees

10.1    Restriction on Transfers.

(a)     Except as indicated below, no Class A Member may sell, Transfer, pledge, hypothecate, gift or otherwise dispose of or encumber all or any portion of his, her or its Units without Approval of the Board. Any Transfer in violation hereof shall be treated as an Adverse Terminating Event. The Units of a Member and any interest of such Member's spouse in such Units, shall remain subject to this Agreement regardless of the termination, for any reason, of the marital relationship of any Member and the Member's spouse. During the marriage of the Member and such Member's spouse, such Member's obligations to sell or offer to sell Units pursuant to this Agreement shall include any interest of such Member's spouse in the Units. Any Units transferred in contravention of this Section shall be void of all voting, inspection and other rights with respect to the pledgee/transferee and any such transfer shall be null and void ab initio and shall be subject to purchase by the Company as an Adverse Terminating Event. Each spouse of a Member shall sign a Consent of Spouse form, substantially in the form of Exhibit B, agreeing to be bound by the terms hereof including, without limitation, the term providing that ownership by a spouse is not permitted. Any transferee must sign a counterpart to this Agreement agreeing to be bound by all terms hereof prior to such Transfer being deemed effective.

(b)     Notwithstanding anything else to the contrary in this Agreement, a Class B Member may Transfer his, her or its Units to an Affiliate or to such other Person as is approved

24
**A1816**

by the affirmative vote of the holders of a majority of the outstanding Class B Units, so long as the transferor and the transferee agree to remain bound by all of the terms hereof.

        (c)      No Member may pledge his, her or its Units to a bank, financial institution, creditor or other lender.

        (d)      Notwithstanding the foregoing, a Member may transfer his or her interest to an Entity Investor in accordance with Section 2.5 hereof.

        (e)      Notwithstanding the foregoing, a Member may transfer his or her interest by will, by laws if descent or distribution, and *inter vivos*, in each case to the Member's heirs.

        10.2    Irreparable Harm. Each Member specifically acknowledges that a breach of Section 10.1 would cause the Company and the Members to suffer immediate and irreparable harm, which could not be remedied by the payment of money. In the event of a breach or threatened breach by a Member of the provisions of Section 10.1, the Company or other Members shall be entitled to injunctive relief to prevent or end such breach, without the requirement to post bond or prove damages. Nothing herein shall be construed to prevent the Company or other Members from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages, reasonable attorneys' fees and expenses.

        10.3    Assignee of a Member's Units. If, notwithstanding the prohibitions in Section 10.1, a Member Transfers all or any portion of his, her or its Units and a Person acquires such Units, (but is not admitted as a substituted Member pursuant to the terms of this Agreement) such Person shall:

        (a)      be treated as an assignee of a Member's Units, as provided in the Act, and not as a Member of the Company;

        (b)      have no right to participate in the business and affairs of the Company or to exercise any rights of a Member under this Agreement or the Act;

        (c)      share in distributions from the Company with respect to the transferred Units on the same basis as the transferring Member previously had; and

        (d)      be required to transfer the Units to the Company in accordance with the redemption provisions hereof relating to Adverse Terminating Events.

        10.4    Obligations of Permitted Transferees. In the case of any approved Transfer or disposition of Units, the transferee shall execute and deliver an appropriate instrument agreeing to be bound by this Agreement as a Member and such additional agreements or instruments as the Board may require. Any permitted transferee of Units shall receive and hold such Units subject to this Agreement and all of the restrictions, obligations and rights created hereunder, and the Members and each transferee shall be bound by their obligations under this Agreement with respect to each subsequent transferee.

        10.5    Preemptive Rights. No Member shall have any preemptive rights to purchase or otherwise acquire New Units proposed to be issued by the Company, it being expressly understood

25

**A1817**

that additional Units are contemplated to be issued to Eligible Employees hired by the Company after the date of this Agreement, the terms and conditions of such subsequent issuances being subject to Approval of the Board. For purposes of applying this Section, "New Units" shall mean any Units (irrespective of class) which the Company proposes to issue on or after the date hereof, any rights or options which the Company proposes to grant for the purchase of any Units (irrespective of class), any bonds, securities or obligations of the Company which are convertible into or exchangeable for, or which carry any rights, to acquire Units (irrespective of class), whether now or hereafter authorized or created, whether issued or unissued, and whether the proposed issue, transfer or grant is for cash, property, services or any other lawful consideration, and including any issuance otherwise provided for in this Agreement.

10.6    Noncompetition. During the term of a Member's membership in the Company, and for a period of five (5) years thereafter, other than through the Company, no Member, nor any of their Affiliates, except as provided below, shall, without the prior written Approval of the Board and the Class B Members, directly or indirectly own, manage, operate, control or participate in any manner in the ownership, management, operation or control of, or serve as a partner, employee, principal, agent, consultant or otherwise contract with, or have any financial interest in, or aid or assist any other person or entity that operates a business that is similar to or competitive with the Business of the Company, whether or not the Company is then doing business in the same State. The preceding sentence shall not be construed to prevent a Member or any of their Affiliates from owning stock of one percent (1%) or less of any publicly traded company that engages in any of the restricted activities set forth herein so long as the Member does not activitely participate in any aspect of the operations and business of such publicly traded company.

Each party understands and acknowledges that the provisions of this Section 10.6 are designed to preserve the goodwill of the parties and that the Multiple used in the Formula Amount set forth in Section 4.3 takes into consideration some allocation of such goodwill. Accordingly, each party hereby acknowledges and agrees that any breach or threatened breach of the provisions of this Section 10.6 hereof binding on a party will result in irreparable harm and injury to the other party and that monetary damages will not provide an adequate remedy to a party. Accordingly, each Member hereby agrees that in the event of a breach or threatened breach of the provisions of this Section 10.6, the non-breaching party shall be entitled to: (a) a temporary restraining order, preliminary injunction and permanent injunction to enjoin such breach or threatened breach without the requirement of the posting of a bond; (b) an accounting for any and all monies, earnings, profits and other benefits that the breaching party has derived or received, directly or indirectly, as a result of such breach or threatened breach; (c) recover from the breaching party the reasonable attorneys' fees and costs incurred by the non-breaching party in enforcing the provisions of this Section 10.6; and (d) all deferred payments due to the Member shall be suspended until final resolution of the dispute. The breaching party further agrees that in the event of a breach or threatened breach of the provisions of this Section 10.6, the restrictions set forth in this Section 10.6 shall be extended during the period of any breach or threatened breach by the breaching party. The rights and remedies set forth herein are cumulative and shall be in addition to any other rights or remedies to which a party may be entitled.

Each party hereby acknowledges that the restrictions set forth in this Section 10.6 are minimal, reasonable in scope and duration and are necessary to protect the legitimate interests of the parties and that any breach or threatened breach of these restrictions will result in irreparable

**A1818**

harm to the non-breaching party. In the event that any of the restrictions are found by a court of competent jurisdiction to be too broad to permit enforcement to its full extent, then such restrictions shall be enforced to the maximum extent allowable by law and the parties hereby consent to and authorize the court to modify the restrictions in a manner to permit their enforcement. Notwithstanding any other provision of this Agreement, the Class B Members shall have the right to enforce, on behalf of the Company and at the Company's expense, the provisions of this Section 10.6 against any Member without relying on the Approval of the Board therefore.

        10.7   Confidential Information. Each Member acknowledges that the Confidential Information is valuable property of the Company and undertakes that for so long as he, she or it is a Member, and thereafter until such information otherwise becomes publicly available other than through breach of this Section 10.7, he, she or it shall:

        (a)   treat the Confidential Information as secret and confidential;

        (b)   not disclose (directly or indirectly, in whole or in part) the Confidential Information to any third Party except with the prior written consent of Company;

        (c)   not use (or in any way appropriate) the Confidential Information for any purpose other than the performance of the business of the Company and otherwise in accordance with the provisions of this Agreement;

        (d)   recognize and acknowledge that the Company's trade secrets and other confidential or proprietary information, as they may exist from time to time, are valuable, special and unique assets of the Company's business. Accordingly, during the term of the Company, each Member shall hold in strict confidence and shall not, directly or indirectly, disclose or reveal to any person, or use for its own personal benefit or for the benefit of anyone else, any trade secrets, confidential dealings or other confidential or proprietary information of any kind, nature or description (whether or not acquired, learned, obtained or developed by a Member alone or in conjunction with others) belonging to or concerning the Company, or any of its customers or clients or others with whom they now or hereafter have a business relationship, except: (i) with the prior written consent of all the other Members; (ii) in the course of the proper performance of the Member's duties hereunder; or (iii) as required by applicable law or legal process. Each Member confirms that all such information constitutes the exclusive property of the Company.

        (e)   Given the secretive and competitive environment in which the Company does business and the fiduciary relationship that the Members have with the Company, each Member agrees to promptly deliver to the Company, at any time when the Company so requests, all memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) in any way relating to the business or affairs of the Company or any of its customers and clients, whether made or compiled by such Member or furnished to it by the Company or any of its employees, customers, clients, consultants or agents, which such Member may then possess or have under its control. Each Member confirms that all such memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) constitute the exclusive property of the Company. Notwithstanding the foregoing paragraph or any other provision of this Agreement, each Member shall be entitled to retain any written materials received by such Member in its capacity as a Member, and limit the dissemination of and access to the

Confidential Information to such of the Company's and the Member's officers, directors, managers, employees, agents, attorneys, consultants, professional advisors or representatives as may reasonably require such information for the performance of Company business and ensure that any and all such persons observe all the obligations of confidentiality contained in this Section.

(f)     "Confidential Information" means any and all policies, procedures, quality assurance techniques, plans, projections, pro formas, financial, statistical and other information of the Company, including (but not limited to) information embodied on magnetic tape, computer software or any other medium for the storage of information, together with all notes, analyses, compilations, studies or other documents prepared by the Company or others on behalf of the Company containing or reflecting such information.  Confidential Information does not include information which:

(i)     was lawfully made available to or known by third person on a non-confidential basis prior to disclosure by a Member;

(ii)    is or becomes publicly known through no wrongful act of a Member; or

(iii)   is received by a Member from a third party other than in breach of confidence.

10.8    Additional Covenants.

(a)     If a court of competent jurisdiction should declare this Article X, or any provision hereof, unenforceable because of any unreasonable restriction of duration, activity and/or geographical area, then the Parties hereby acknowledge and agree that such court shall have the express authority to reform this Agreement to provide for reasonable restrictions and/or grant the Company such other relief at law or in equity, reasonably necessary to protect the interests of the Company.

(b)     Each Member specifically acknowledges that a breach of this Article X would cause the Company and other Members to suffer immediate and irreparable harm, which could not be remedied by the payment of money. In the event of a breach or threatened breach by a Member of any of the provisions of this Article X, the Company and other Members shall be entitled to injunctive relief to prevent or end such breach, without the requirement to post bond, and shall be entitled to recover reasonable attorneys' fees and expenses. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages.

(c)     Each Member warrants and represents that he, she or it:

(i)     Is familiar with the confidentiality and non competition agreements contained herein.

(ii)    Is acquiring such Units solely for investment and not resale, is an accredited investor, has experience and sophistication in financial matters sufficient to evaluate the merits and risks of the investment, and can afford to lose his, her or its entire investment and

has not learned of this investment through any general solicitation or advertising. The Company has relied upon the fact that the Units in the Company are to be held by the Members solely for investment and on each of the representations made hereby.

(iii)     Has concluded that his, her or its obligations and the Company's rights and remedies described herein, including, without limitation, the right to equitable relief contained herein, are reasonable.

(iv)     Is fully aware of the duties, responsibilities, obligations and liabilities imposed upon him, her or it by this Article.

(v)     Acknowledges that the covenants contained herein are fair, reasonable and just, under the circumstances, and are not a penalty.

(vi)     Acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to any Units in the Company, and the Company has no obligation or current intention to register such Units under the Federal Securities Act 1933 ("33 Act").

(vii)     Acknowledges that the Units have not been registered under the 33 Act because the Company is issuing such Units in the belief that such Units are being issued in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Delaware Securities Act.

(viii)     Acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Units in the Company were acquired by a Member with a view to distribution.

(ix)     Acknowledges that this Agreement does not conflict with or violate any other agreement to which the Member is party.

(x)     Agrees to be substantially involved in the operation of the Company and does not expect a return on his, her or its investment due to the efforts of others.

(xi)     Is aware that there are numerous risk factors associated with the holding of the Units, all of which each Member is aware exists and has expressly agreed to assume.

29

**A1821**

## ARTICLE XI
## Dissolution and Termination

11.1    Events Causing Dissolution.  The Company shall be dissolved and its affairs wound up upon the first to occur of the following events:

(a)    The sale or other disposition of all or substantially all of the assets of the Company, unless the disposition is a transfer of assets of the Company in return for consideration other than cash and, by Approval of the Board, a determination is made not to distribute any such non-cash items to the Members;

(b)    The election for any reason to dissolve the Company made by Supermajority Approval;

(c)    When there are no remaining Members, unless the holders of all of the financial rights in the Company agree in writing, within ninety (90) days after the cessation of membership of the last Member, to continue the legal existence and business of the Company and to appoint one or more new Members;

(d)    Any consolidation or merger of the Company with or into any entity unless the Company is the resulting or surviving entity; or

(e)    Entry of a decree of judicial dissolution.

11.2    Procedures on Dissolution.  Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Articles shall be canceled in the manner set forth in the Act.  Notwithstanding the dissolution of the Company, prior to the termination of the Company, as aforesaid, the business and the affairs of the Company shall be conducted so as to maintain the continuous operation of the Company pursuant to the terms of this Agreement.  Upon dissolution of the Company and subject to the Supermajority Approval required by Section 7.4 hereof, the Board, acting by Approval, or, if none, a liquidator elected by Supermajority Approval, shall liquidate the assets of the Company, apply and distribute the proceeds thereof under Article VI, and cause the termination of this Agreement.

## ARTICLE XII
## General Provisions

12.1    Notices.  Any and all notices under this Agreement shall be effective (a) on the fifth (5th) business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (b) on the first business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery.  All such notices in order to be effective shall be addressed, if to the Company at its principal office, if to a Member at the last address of record on the Company books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.  A Member may change its address for purposes of this Agreement by giving the Board notice of such change in the manner heretofore provided for the giving of notices.

30
**A1822**

12.2 <u>Word Meanings</u>. The words "herein," "hereinafter," "hereinbefore," "hereof" and "hereunder" as used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. All section references, except as otherwise provided herein, are to sections of this Agreement.

12.3 <u>Binding Provisions</u>. Subject to the restrictions on transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, Legal Representatives, successors and assigns.

12.4 <u>Applicable Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, including the Act, as interpreted by the courts of the State of Delaware, notwithstanding any rules regarding choice of law to the contrary.

12.5 <u>Counterparts</u>. This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all of the parties have not signed the original or the same counterpart.

12.6 <u>Separability of Provisions</u>. Each provision of this Agreement shall be considered separable. If for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, and if for any reason any provision or provisions herein would cause the Members to be liable for or bound by the obligations of the Company, such provision or provisions shall be deemed void and of no effect.

12.7 <u>Section Titles</u>. Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

12.8 <u>Amendments</u>. This Agreement may be amended or modified only in accordance with Sections 7.3 and 7.4 hereof.

12.9 <u>Entire Agreement</u>. This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

12.10 <u>Waiver of Partition</u>. Each Member agrees that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, each Member agrees that he or she shall not, either directly or indirectly, take any action to require partition or appraisement of the Company or of any of the assets or properties of the Company, and notwithstanding any provisions of this Agreement to the contrary, each Member (and his or her successors and assigns) accepts the provisions of this Agreement as his or her sole entitlement on termination, dissolution and/or liquidation of the Company and hereby irrevocably waives any and all rights to maintain any action for partition or to compel any sale or other liquidation with respect to his or her interest, in or with respect to, any assets or properties of the Company. Each Member further agrees that he or she or it will not petition a court for the dissolution, termination or liquidation of the Company.

12.11  Survival of Certain Provisions.  The Members acknowledge and agree that this Agreement contains certain terms and conditions which are intended to survive the dissolution and termination of the Company, including, but without limitation, the provisions of Sections 10.6 and 10.7.  The Members agree that such provisions of this Agreement which by their terms require, given their context, that they survive the dissolution and termination of the Company so as to effectuate the intended purposes and agreements of the Members hereunder shall survive notwithstanding that such provisions had not been specifically identified as surviving and notwithstanding the dissolution and termination of the Company or the execution of any document terminating this Agreement, unless such document specifically provides for nonsurvival by reference to this Section 12.11 and to the specific provisions hereof which are intended not to survive.

12.12  No Impairment.  Except as expressly contemplated by this Agreement, the Company shall not amend, modify or repeal any provision of the Articles or this Agreement in any manner which would alter or change the rights, preferences, privileges or powers of, or the restrictions provided for the benefit of, the Members, without the express prior written consent of the holders of a majority of the Units of the class so impacted in each and every such instance; nor shall the Company, through any reorganization, transfer of assets, merger, dissolution, issue, sale or distribution of Units or any other voluntary action, avoid or seek to avoid the observance or performance of any terms of this Agreement for the benefit of the Members, without the express prior written consent of the majority of the holders of the majority of the Class so impacted in each and every such instance, as limited by Section 7.4.  The Company shall in good faith take any and all actions which are necessary or appropriate in order to protect the rights of the Members.

12.13  Specific Performance or Injunctive Relief.  The Members and the Company hereby declare that it is impossible to measure in money the damages which may accrue to one or more of them by reason of the failure of a Party to perform any of its obligations hereunder. Therefore, if any Party hereto shall institute any action or proceeding to enforce the provisions of this Agreement, any person (including the Company) against whom such action or proceeding is brought hereby waives the claim or defense therein that such Party has or may have an adequate remedy at law and agrees not to urge in any such action or proceeding that such a remedy exists. Furthermore, any Party seeking to enforce the provisions of this Agreement shall have the right to specific performance, injunctive or other equitable relief without the requirement to post bond.

12.14  Dispute Resolution; Limited Renegotiation; Arbitration. Except for disputes relating to breaches of Sections 10.6 through 10.9 in which the Company is seeking injunctive relief and the Arbitrator (as defined below) does not have authority to grant preliminary, temporary and/or permanent injunctive relief, all disputes shall be resolved under the following provisions of this Agreement.

This Agreement shall be construed to be in accordance with any and all federal and state statutes, rules, regulations, principles and interpretations applicable to the Company and the Members, and the relationships among them.  It is the intent of this Section to set forth a procedure so that if certain legal developments occur, a dispute arises, or certain circumstances arise in which the Board of Managers should become internally deadlocked (provided, however, that a deadlock shall not be deemed to occur due to the withholding of Supermajority Approval), a procedure will be in place that will bring the terms of this Agreement back into legal compliance and/or resolve

a Board deadlock while preserving, to the extent possible, the economic and governance relationships set forth here.

In the event there is any dispute among the parties or there is any legal development, including without limitation, a change in (or the interpretation of) federal or state statutes, rules, regulations, principles or interpretations, that renders any of the material terms of this Agreement unlawful or unenforceable (including any services rendered or compensation to be paid hereunder), or a definitive judicial or State of Delaware interpretation of Delaware law that substantially affects the business, governance, or economics of the Company in an adverse manner (collectively a "Negative Legal Development"), or any circumstance in which the Board itself is deadlocked in its decision making hereunder and cannot take action (a "Deadlock Event"), any Member affected by such Negative Legal Development or such Deadlock Event shall have the immediate right upon notice to the other Members (the "Notice") to initiate the renegotiation of the affected term or terms of this Agreement, so as to remedy the impacts of the Negative Legal Development or to seek resolution of the Deadlock Event, each in a manner that substantially maintains the then existing economic and governance relationships of the Members, if it is legal to accomplish the change while maintaining substantially such economic and governance relationship.

If the Parties are not able to renegotiate the affected terms of the Agreement or resolve the Deadlock Event or dispute on a mutually satisfactory basis within forty-five (45) days after the Notice, the Parties must submit the issues (the "Dispute") to mediation and arbitration pursuant to the procedure set forth below. The arbitrator selected in accordance with the provisions set forth below (the "Arbitrator") will be asked to determine whether there is a bona fide Negative Legal Development or Deadlock Event, and if so, the Arbitrator will decide the matter as set forth in Section 12.14 C. of this Agreement.

A.  Right to Mediate or Arbitrate.  Any dispute between the Parties relating to this Agreement must first be submitted to non-binding mediation in accordance with procedures agreed upon by the Parties.  If the dispute is not resolved through mediation within forty-five (45) days of the initial request for mediation or within a time frame mutually agreed upon by the Parties, the dispute must then be submitted for binding arbitration in accordance with procedures set forth by the American Health Lawyers Association.

B.  Pre-Arbitration Procedure.

1.  Any dispute shall be submitted to arbitration by notifying the other Party or Parties, as the case may be, hereto in writing of the submission of such dispute to arbitration (the "Arbitration Notice"). The Party delivering the Arbitration Notice shall specify therein, to the fullest extent then possible, its version of the facts surrounding the dispute and the amount of any damages and/or the nature of any injunctive or other relief such Party claims.

2.  The Party (or Parties, as the case may be) receiving such Arbitration Notice shall respond within sixty (60) days after receipt thereof in writing (the "Arbitration Response"), stating its version of the facts to the fullest extent then possible and, if applicable, its position as to damages or other relief sought by the Party initiating arbitration.

**A1825**

Case 1:24-cv-00083-JKS Document 354-1 Filed 04/04/24 Page 220 of 350 PageID #: 2277

3.    The Parties shall then endeavor, in good faith, to resolve the dispute outlined in the Arbitration Notice and Arbitration Response. In the event the Parties are unable to resolve such dispute within sixty (60) days after receipt of the Arbitration Response, the Parties shall initiate the arbitration procedure outlined below.

C.    Arbitration Procedure.

1.    If the Parties hereto are unable to resolve the dispute within sixty (60) days after receipt of the Arbitration Response as set forth above, then the Parties must submit the dispute to binding arbitration in accordance with the American Health Lawyers arbitration program. If the Parties are unable to agree on an arbitrator within sixty (60) days after receipt of the Arbitration Response, each of the Parties shall, within sixty (60) days after receipt of the Arbitration Response, choose an arbitrator selector ("Selector"). The Selectors shall then have forty (40) days to select an arbitrator who shall serve as the final arbitrator for the dispute. (The arbitrator chosen by the Parties hereto or by the Selectors, as the case may be, shall hereinafter be as the "Arbitrator"). The Arbitrator shall not be an Affiliate of any of the Parties hereto.

2.    The arbitration shall be held in Los Angeles County, California. The Parties shall submit to the Arbitrator the Arbitration Notice and the Arbitration Response and any other facts regarding the dispute of which any Party desires.

3.    The Arbitrator shall apply the arbitration rules set forth below in making his or her decision. After the Arbitrator has heard the case of each Party in accordance with Section 12.14 D., the Arbitrator shall request that each Party submit an Order to resolve all matters in dispute. The Arbitrator shall then execute one of the Orders submitted by the Parties. The Arbitrator shall not be allowed to modify or amend any Orders submitted by the Parties. The decision of the Arbitrator shall be rendered within sixty (60) days of the close of the hearing record.

D.    Arbitration Rules.

1.    The Arbitrator shall allow reasonable discovery, which he determines is necessary for determination of the issues presented.

2.    The Arbitrator shall be guided by, and shall substantially comply with, the then applicable Federal Rules of Evidence.

3.    Should any Party refuse or neglect to appear or participate in the arbitration proceedings, including the procedures relating to the selection of an Arbitrator, the participating Party may select the Arbitrator and the Arbitrator is empowered to decide the controversy in accordance with whatever evidence is presented.

E.    Arbitrator's Award. The award of the Arbitrator shall be binding on the Parties and may be entered as a final judgment in a court of competent jurisdiction.

F.    Other Disputes. All disputes relating to breaches of Sections 10.6 through 10.9 in which the Company is seeking injunctive relief shall be resolved by a court of law with the site of venue in Los Angeles County, California if the Arbitrator does not have authority to grant preliminary, temporary and/or permanent injunctive relief.

**A1826**

12.15  <u>Waiver of Trial by Jury</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN CONNECTION WITH ANY ACTION OR PROCEEDING INSTITUTED UNDER OR RELATING TO THIS AGREEMENT, OR ANY OTHER DOCUMENT EXECUTED PURSUANT HERETO, OR IN CONNECTION WITH ANY COUNTERCLAIM RESULTING FROM ANY SUCH ACTION OR PROCEEDING.

12.16  <u>Counsel to the Company</u>.  Each of the Members acknowledges that Michael J. Sarrao has prepared this Agreement as attorney for the Company and not as attorney for any Member.  The Members acknowledge that (i) they have each been advised to seek review of this Amendment and all of the other documents pertaining to the formation of the Company, and advice concerning same, from an attorney independently and separately representing each such Member, (ii) they have been informed that Michael J. Sarrao has performed legal services for certain Members and other entities in which the Members have differing interests, and (iii) they are aware that Michael J. Sarrao is a trustee and beneficiary of The Sarrao Family Trust.  Each Member hereby waives any conflict that may exist in Michael J. Sarrao preparing this Agreement and all other Company documents previously prepared and as may be prepared in the future, and consents to his representation of the Company.

[*Signatures Appear on Next Page*]

**IN WITNESS WHEREOF**, the the undersigned have executed this Agreement as of the day and year first above written.

<u>CLASS A MEMBERS</u>:

THE REDDY INVESTMENT TRUST

By: _____
      Lex Reddy, Trustee

By: _____
      Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
      Panch Jeyakumar, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
      Martha M. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
      Roger A. Krissman, Trustee

THE SARRAO FAMILY TRUST

By: _____
      Michael J. Sarrao, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

36
**A1828**

**IN WITNESS WHEREOF,** the the undersigned have executed this Agreement as of the day and year first above written.

CLASS A MEMBERS:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger M. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

36

**A1829**

**IN WITNESS WHEREOF**, the the undersigned have executed this Agreement as of the day and year first above written.

<u>CLASS A MEMBERS</u>:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

36

**A1830**

IN WITNESS WHEREOF, the the undersigned have executed this Agreement as of the day and year first above written.

CLASS A MEMBERS:

THE REDDY INVESTMENT TRUST                    THE KRISSMAN FAMILY TRUST

By:                                            By:
    Lex Reddy, Trustee                             Roger A. Krissman, Trustee

By:
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST      THE SARRAO FAMILY TRUST

By:                                            By:
    Panch Jeyakumar, Trustee                       Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST           Matthew Williams

By:                                            Steven Kay
    Martha M. Hayes, Trustee                   Steven Kay

                                               Aman Dhuper

30

IN WITNESS WHEREOF, the the undersigned have executed this Agreement as of the day and year first above written.

CLASS A MEMBERS:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

36

**A1832**

**IN WITNESS WHEREOF**, the the undersigned have executed this Agreement as of the day and year first above written.

<div align="center">CLASS A MEMBERS:</div>

THE REDDY INVESTMENT TRUST      THE KRISSMAN FAMILY TRUST

By: _____      By: _____
      Lex Reddy, Trustee                         Roger A. Krissman, Trustee

By: _____
      Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST      THE SARRAO FAMILY TRUST

By: _____      By: _____
      Panch Jeyakumar, Trustee                  Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST      _____
                                                 Matthew Williams

By: _____      _____
      Martha M. Hayes, Trustee            Steven Kay

                                          _____
                                          Aman Dhuper

CLASS B MEMBER:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE COMPANY:

SUNRISE MOB HOLDINGS LLC

By: _____
    Lex Reddy, CEO

**A1834**

CLASS B MEMBER:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE COMPANY:

SUNRISE MOB HOLDINGS LLC

By: _____
    Lex Reddy, CEO

**A1835**

**EXHIBIT A**

**MEMBERS, CAPTIAL CONTRIBUTIONS AND UNITS**

| NAMES OF MEMBERS | TOTAL UNITS |
|---|---|
| CLASS A MEMBERS: | |
| | |
| | |
| The Krissman Family Trust | 10,000 |
| The Reddy Investment Trust | 5,000 |
| The Jeyakumar Inter-Vivos Trust | 7,000 |
| The Sarrao Family Trust | 7,000 |
| The Hayes Irrevocable Trust | 5,000 |
| Steven Kay | 5,000 |
| Matthew Williams | 5,000 |
| Aman Dhuper | 5,000 |
| | |
| CLASS A TOTALS | 49,000 |
| CLASS B MEMBER: | |
| | |
| The Reddy Investment Trust | 51,000 |
| | |
| CLASS B TOTALS | 51,000 |
| | |
| TOTALS | 100,000 |

**A1836**

**EXHIBIT B**

**CONSENT OF SPOUSE**

I acknowledge that I have read the foregoing Agreement and that I understand its contents. I am aware that such Agreement contains provisions whereby my spouse agrees to sell all his/her interest, of any form, in Sunrise MOB Holdings LLC (the "Company"), including, if any, our community interest in it, upon the occurrence of certain events, and that such Agreement also impose restrictions on the transfer of such ownership interest. I hereby consent to any sale of my spouse's interest in the Company pursuant to the Agreement, approve of the provisions of the Agreement, and agree that our community property interest, if any, is subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement in relation to that interest. Further, in the event of dissolution of my marriage or other event which necessitates the division of marital community property, I will assert no right, claim or other entitlement to the interest of my spouse in the Company so that full ownership of the interest therein shall thereafter remain with my spouse as his/her separate property notwithstanding that it may be subject to valuation for the purpose of achieving a fair and equitable division of our community property.

I AM AWARE THAT THE LEGAL, FINANCIAL AND OTHER MATTERS CONTAINED IN THE AGREEMENTS ARE COMPLEX AND I AM FREE TO SEEK ADVICE WITH RESPECT THERETO FROM INDEPENDENT COUNSEL. I HAVE EITHER SOUGHT SUCH ADVICE OR DETERMINED AFTER CAREFULLY REVIEWING THE AGREEMENT THAT I WILL WAIVE SUCH RIGHT.

Dated: _____, 2019.

Name of Member: _____

Name of Spouse: _____

Signature of Spouse: _____

**A1837**

EXHIBIT B

SUNRISE REAL ESTATE HOLDINGS, LLC

A Delaware Limited Liability Company

FIRST AMENDMENT TO

AMENDED AND RESTATED

OPERATING AGREEMENT

SUNRISE REAL ESTATE HOLDINGS, LLC
FIRST AMENDMENT TO
AMENDED AND RESTATED
OPERATING AGREEMENT

This First Amendment to Amended and Restated Operating Agreement (this "Amendment") is entered into and effective as of June 19, 2019 by and among the Persons who execute this Amendment (each a "Member" and collectively the "Members"). Except as otherwise provided, the capitalized terms used in this Amendment shall have the meanings set forth in Article I of the Restated Agreement (as hereinafter defined).

WHEREAS, Sunrise Real Estate Holdings, LLC (the "Company"), was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation with the Delaware Secretary of State on March 5, 2014 (the "Effective Date"); and

WHEREAS, Alecto Healthcare Services LLC, a Delaware limited liability companu ("Alecto"), as the Company's sole member, entered into an Amended and Restated Operating Agreement dated March 5, 2014 (the "Operating Agreement") providing for the organization and operation of the Company; and

WHEREAS, immediately prior to the effectiveness of this Amendment, Alecto owned one hundred percent of the Company's membership interests (the "Interests")

WHEREAS, Alecto desires to transfer and assign all of its right, title, and interest in and to the Interests to The Reddy Investment Trust (56%), The Krissman Family Trust (10%), The Jeyakumar Inter-Vivos Trust (7%), The Sarrao Family Trust (7%), The Hayes Irrevocable Trust (5%), Steven Kay (5%), Matthew Williams (5%), and Aman Dhuper (5%) (collectively, the "New Members") in proportion to the percenatages in the parenthetical immediately following each entity or person; and

WHEREAS, the Company desires to evidence their approval of the transfer of all of Alecto's right, title, and interest in and to the Interests to the New Members (the "New Members Transfer") subject to the execution of this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. Approval of Transfer and Admission of New Members. Upon full execution of this Amendment by the New Members and the Company, (i) the transfer by the Alecto of all of its interest in the Company to the New Members is hereby approved, (ii) this Amendment shall be deemed to amend the Operating Agreement and shall become valid and binding on all Members of the Company, and (iii) the New Members are confirmed as Members of the Company under the Operating Agreement. The New Members acknowledge having received a copy of the Operating Agreement and hereby agree to be bound by all of the representations, warranties, restrictions, agreements, terms and conditions as are set forth in the Operating

**A1840**

Agreement and this Amendment, as the Operating Agreement may be further amended from time to time, and as otherwise applicable under Delaware law governing limited liability companies.

2. <u>Representations of New Member</u>. Each New Member warrants and represents that it:

(a) Is acquiring the Interests solely for investment and not resale, is an accredited investor, has experience and sophistication in financial matters sufficient to evaluate the merits and risks of the investment, and can afford to lose its entire investment and has not learned of this investment through any general solicitation or advertising. The Company has relied upon the fact that the Interests in the Company are to be held by each New Member solely for investment and on each of the representations made hereby.

(b) Has concluded that its obligations and the Company's rights and remedies described in the Operating Agreement are reasonable.

(c) Is fully aware of the duties, responsibilities, obligations and liabilities imposed upon it by the Operating Agreement.

(d) Acknowledges that the restrictive covenants contained in the Operating Agreement are fair, reasonable and just, under the circumstances, and are not a penalty.

(e) Acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to the Interests, and the Company has no obligation or current intention to register the Interests under the Federal Securities Act 1933 (the "33 Act").

(f) Acknowledges that the Interests have not been registered under the 33 Act because the Company issued the Interests in the belief that the Interests were issued in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Delaware Securities Act.

(g) Acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Interests were acquired by a Member with a view to distribution.

(h) Acknowledges that the Operating Agreement does not conflict with or violate any other agreement to which it is party.

(i) Is aware that there are numerous risk factors associated with the holding of the Interests, all of which it is aware exists and has expressly agreed to assume.

3. <u>Exhibit A</u>. Exhibit A attached hereto sets forth all of the Members of the Company and their respective interest in the Company after giving effect to the transfer approved in this Amendment.

**A1841**

4.     Counterparts.  This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same document.  In addition, the signatures to this Amendment may be exchanged by fax and/or email transmission, and any such transmitted signature may be attached to this Amendment as if it was an original.

5.     Counsel to the Company.  Each of the Members acknowledges that Michael J. Sarrao has prepared this Amendment as attorney for the Company and not as attorney for any Members.  The Members acknowledge that (i) they have each been advised to seek review of this Amendment and all of the other documents pertaining to the formation of the Company, and advice concerning same, from an attorney independently and separately representing each such Member, and (ii) they have been informed that Michael J. Sarrao has performed legal services for certain Members and other entities in which the Members have differing interests.  Each Member hereby waives any conflict that may exist in Michael J. Sarrao preparing this Amendment and all other Company documents previously prepared and as may be prepared in the future, and consents to his representation of the Company.

6.     Remaining Restated Agreement Terms.  In all other respects, the terms and conditions of the Restated Agreement shall remain in full force and effect.

[Remainder of Page Intentionally Left Blank]

**A1842**

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

_____
Matthew Williams

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Steven Kay

_____
Aman Dhuper

**A1843**

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

_____
Matthew Williams

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Steven Kay

_____
Aman Dhuper

**A1844**

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

**A1845**

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

## MEMBERS:

THE REDDY INVESTMENT TRUST

By:
    Lex Reddy, Trustee

By:
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By:
    Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By:
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By:
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By:
    Martha M. Hayes, Trustee

Matthew Williams

Steven Kay

Aman Dhuper

**A1846**

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

**A1847**

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST          THE KRISSMAN FAMILY TRUST

By: _____          By: _____
    Lex Reddy, Trustee                       Roger A. Krissman, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST     THE SARRAO FAMILY TRUST

By: _____          By: _____
    Panch Jeyakumar, Trustee                 Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST         _____
                                       Matthew Williams

By: _____          _____
    Martha M. Hayes, Trustee             Steven Kay

                                       _____
                                       Aman Dhuper

**A1848**

**THE COMPANY**:

Sunrise Real Estate Holdings, LLC, a
Delaware limited liability company

By: _____

Lex Reddy
President & CEO

## EXHIBIT A

### MEMBERSHIP INTERESTS

| Name of Member | Percentage Interest |
| --- | --- |
| The Reddy Investment Trust | 56% |
| The Krissman Family Trust | 10% |
| The Jeyakumar Inter-Vivos Trust | 7% |
| The Sarrao Family Trust | 7% |
| The Hayes Irrevocable Trust | 5% |
| Steven Kay | 5% |
| Matthew Williams | 5% |
| Aman Dhuper | 5% |

**A1850**

EXHIBIT C

A1851

SUNRISE REAL ESTATE HOLDINGS, LLC

A Delaware Limited Liability Company

SECOND AMENDMENT TO

AMENDED AND RESTATED

OPERATING AGREEMENT

SUNRISE REAL ESTATE HOLDINGS, LLC
SECOND AMENDMENT TO
AMENDED AND RESTATED
OPERATING AGREEMENT

This Second Amendment to Amended and Restated Operating Agreement (this "Amendment") is entered into and effective as of June 19, 2019 by and among the Persons who execute this Amendment (each a "Member" and collectively the "Members"). Except as otherwise provided, the capitalized terms used in this Amendment shall have the meanings set forth in Article I of the Restated Agreement (as hereinafter defined).

WHEREAS, Sunrise Real Estate Holdings, LLC (the "Company"), was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation with the Delaware Secretary of State on March 5, 2014 (the "Effective Date"); and

WHEREAS, Alecto Healthcare Services LLC, a Delaware limited liability companu ("Alecto"), as the Company's sole member, entered into an Amended and Restated Operating Agreement dated March 5, 2014 (the "Operating Agreement") providing for the organization and operation of the Company; and

WHEREAS, immediately prior to the effectiveness of this Amendment, Alecto transferred one hundred percent of the Company's membership interests (the "Interests") to The Reddy Investment Trust (56%), The Krissman Family Trust (10%), The Jeyakumar Inter-Vivos Trust (7%), The Sarrao Family Trust (7%), The Hayes Irrevocable Trust (5%), Steven Kay (5%), Matthew Williams (5%), and Aman Dhuper (5%) (collectively, the Trust/Individual Members") in proportion to the percenatages in the parenthetical immediately following each entity or person; and

WHEREAS, the Trust/Individual Members desire to transfer and assign all of their right, title, and interest in and to the Interests to Sunrise MOB Holdings LLC, a Delaware limited liability company; and

WHEREAS, the Company desires to evidence their approval of the transfer of all of Alecto's right, title, and interest in and to the Interests to Sunrise MOB Holdings LLC subject to the execution of this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Approval of Transfer and Admission of New Member. Upon full execution of this Amendment by Sunrise MOB Holdings LLC and the Company, (i) the transfer by the Trust/Individual Members of all of their interests in the Company to Sunrise MOB Holdings LLC is hereby approved, (ii) this Amendment shall be deemed to amend the Operating Agreement and shall become valid and binding on all Members of the Company, and (iii) Sunrise MOB Holdings LLC is confirmed as a Member of the Company under the Operating Agreement. Sunrise MOB Holdings LLC acknowledges having received a copy of the Operating

**A1853**

Agreement and hereby agrees to be bound by all of the representations, warranties, restrictions, agreements, terms and conditions as are set forth in the Operating Agreement and this Amendment, as the Operating Agreement may be further amended from time to time, and as otherwise applicable under Delaware law governing limited liability companies.

2.    Representations of Sunrise MOB Holdings LLC.  Sunrise MOB Holdings LLC warrants and represents that it:

(a)    Is acquiring the Interests solely for investment and not resale, is an accredited investor, has experience and sophistication in financial matters sufficient to evaluate the merits and risks of the investment, and can afford to lose its entire investment and has not learned of this investment through any general solicitation or advertising.  The Company has relied upon the fact that the Interests in the Company are to be held by Sunrise MOB Holsdings solely for investment and on each of the representations made hereby.

(b)    Has concluded that its obligations and the Company's rights and remedies described in the Operating Agreement are reasonable.

(c)    Is fully aware of the duties, responsibilities, obligations and liabilities imposed upon it by the Operating Agreement.

(d)    Acknowledges that the restrictive covenants contained in the Operating Agreement are fair, reasonable and just, under the circumstances, and are not a penalty.

(e)    Acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to the Interests, and the Company has no obligation or current intention to register the Interests under the Federal Securities Act 1933 (the "33 Act").

(f)    Acknowledges that the Interests have not been registered under the 33 Act because the Company issued the Interests in the belief that the Interests were issued in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Delaware Securities Act.

(g)    Acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Interests were acquired by a Member with a view to distribution.

(h)    Acknowledges that the Operating Agreement does not conflict with or violate any other agreement to which it is party.

(i)    Is aware that there are numerous risk factors associated with the holding of the Interests, all of which it is aware exists and has expressly agreed to assume.

3.    Exhibit A.  Exhibit A attached hereto sets forth all of the Members of the Company and their respective interest in the Company after giving effect to the transfer approved in this Amendment.

2

**A1854**

4.     Counterparts. This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same document. In addition, the signatures to this Amendment may be exchanged by fax and/or email transmission, and any such transmitted signature may be attached to this Amendment as if it was an original.

5.     Counsel to the Company. The Member acknowledges that Michael J. Sarrao has prepared this Amendment as attorney for the Company and not as attorney for any Members. The Member acknowledges that it has each been advised to seek review of this Amendment and all of the other documents pertaining to the formation of the Company, and advice concerning same, from an attorney independently and separately representing the Member. The Member hereby waives any conflict that may exist in Michael J. Sarrao preparing this Amendment and all other Company documents previously prepared and as may be prepared in the future, and consents to his representation of the Company.

6.     Remaining Restated Agreement Terms. In all other respects, the terms and conditions of the Restated Agreement shall remain in full force and effect.

[Remainder of Page Intentionally Left Blank]

**A1855**

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBER**:

SUNRISE MOB HOLDINGS LLC

By: _____
    Lex Reddy
    President & CEO

**COMPANY**:

SUNRISE REAL ESTATE HOLDINGS LLC

By: Sunrise MOB Holdings LLC
Its: Sole Member

By: _____
    Lex Reddy
    President & CEO

**A1856**

## EXHIBIT A

## MEMBERSHIP INTERESTS

| Name of Member | Percentage Interest |
|---|---|
| Sunrise MOB Holdings LLC | 100% |

**A1857**

EXHIBIT D

## FUNDS FLOW AGREEMENT

This Funds Flow Agreement (this "Agreement") is made and entered into as of June 20, 2019 by and among, Plaza Medical Office Building, LLC, a California limited liability company ("Plaza MOB"), Sunrise Real Estate Holdings, LLC, a Delaware limited liability company ("Sunrise Real Estate"), Sunrise MOB Holdings LLC, a Delaware limited liability company ("Sunrise MOB"), Alecto Healthcare Services LLC, a Delaware limited liability company ("Alecto"), The Reddy Investment Trust ("Reddy Trust"), The Krissman Family Trust ("Krissman Trust"), The Jeyakumar Inter-Vivos Trust ("Jeyakumar Trust"), The Sarrao Family Trust ("Sarrao Trust"), The Hayes Irrevocable Trust ("Hayes Trust"), Matthew Williams ("Williams"), Steven Kay ("Kay"), and Aman Dhuper ("Dhuper") . Plaza MOB, Sunrise Real Estate, Sunrise MOB, Alecto, Reddy Trust, Krissman Trust, Jeyakumar Trust, Sarrao Trust, Hayes Trust, Williams, Kay, and Dhuper are sometimes referred to herein individually as a "Party" and collectively as the "Parties." The Reddy Trust, Krissman Trust, Jeyakumar Trust, Sarrao Trust, Hayes Trust, Williams, Kay, and Dhuper are collectively referred to herein as the "Members".

### RECITALS:

A.      Plaza MOB owns and operates a medical office building and parking garage located at 5901 and 5975 W. Olympic Boulevard, Los Angeles, California 90036 (the "Property").

B.      Sunrise Real Estate is a member of Plaza MOB.

C.      Sunrise MOB is the sole member of Sunrise Real Estate.

D.      The Members are the members of Sunrise MOB.

E.      Effective June 20, 2019, Plaza MOB entered into a Loan Agreement with Wells Fargo Bank, National Association, pursuant to which Plaza MOB borrowed Thirty Million Dollars ($30,000,000.00) from Wells Fargo Bank (the "Loan Proceeds"). After setting aside funds for reserves and closing costs, Wells Fargo Bank deposited $28,235,111.00 into escrow with First American Title Company ("Escrow"). After deducting its costs and fees and subtracting such funds as were necessary to defease the existing loan on the Property, Escrow transferred $8,565,153.79 (the "Net Proceeds") to Plaza MOB on June 20, 2019.

F.      On June 20, 2019, Plaza MOB's members elected to distribute $8,444,477.81 to Sunrise Real Estate (the "Plaza MOB Distribution").

G.      On June 20, 2019, Sunrise Real Estate's member elected to distribute an amount equal to the Plaza MOB Distribution to Sunrise MOB ("Sunrise Real Estate Distribution").

H.      On June 20, 2019, Sunrise MOB's members elected to distribute an amount equal to the Sunrise Real Estate Distributions to the Members in proportion to their percentage ownership interest in Sunrise MOB (the "Member Distribution").

I.      On June 20, 2019, each of the Members elected to contribute capital to Alecto in an amount equal to their respective percentage of the Member Distribution (the "Alecto Capital Contribution").

1

**A1859**

J.     In order to facilitate the flow of funds described in Recitals G to I, Sunrise Real Estate, Sunrise MOB, and the Members have directed Plaza MOB to cause the Net Proceeds to be deposited in the Richard A. Hayes, Inc. Client Trust Account ("**Hayes Client Trust Account**") and have requested that Richard A. Hayes, Inc., distribute the Net Proceeds in accordance with the terms of this Agreement.

K.     In addition to the Plaza MOB Distribution, it is anticipated that there will be an additional $120,675.98 distribution from the Net Proceeds from Plaza MOB to Sunrise Real Estate and then to the Members ("the Plaza MOB Second Distribution").

L.     In addition to the Plaza MOB Distribution and the Plaza MOB Second Distribution, it is anticipated that there will be additional funds received by Plaza MOB from the Loan Proceeds attributable to distributions of up to $500,000.00 from the Additional Insurance Reserve Funds (as defined in the Loan Agreement with Wells Fargo Bank) and up to $355,002.00 from the Rent Concession Reserve Funds (as defined in the Loan Agreement with Wells Fargo Bank) (collectively the "Reserve Funds Distributions").

M.     In order to facilitate the flow of funds described in Recitals K and L, Sunrise Real Estate, Sunrise MOB, and the Members desire to direct Plaza MOB to cause the Plaza MOB Second Distribution and the Reserve Funds Distributions funds to be deposited in the Hayes Client Trust Account as such funds are received from time to time, and direct that Richard A. Hayes, Inc., distribute such funds in accordance with the terms of this Agreement.

N.     The Parties seek to enter into this Agreement to document the terms and conditions under which the Net Proceeds were distributed and transferred.

**NOW, THEREFORE,** for and in consideration of the recitals and the covenants contained herein, the Parties agree as follows:

<div align="center"><strong>AGREEMENT:</strong></div>

1.     **PLAZA MOB DISTRIBUTION**. The Parties acknowledge and agree that the members of Plaza MOB elected to distribute 8,444,477.81 to Sunrise Real Estate on June 20, 2019, that Plaza MOB transferred $8,441,477.81 to the Hayes Client Trust Account on June 20, 2019, and that the transfer of the $8,444,477.81 constitutes the Plaza MOB Distribution. Sunrise Real Estate acknowledges receipt of the Plaza MOB Distribution in the amount of $8,441,471.81.

2.     **SUNRISE REAL ESTATE DISTRIBUTION**. The Parties acknowledge and agree that the members of Sunrise Real Estate elected to distribute $8,444,477.81 to Sunrise MOB on June 20, 2019, that Sunrise MOB received a distribution equal to $8,444,477.81 on June 20, 2019, and that Sunrise MOB directed Richard A. Hayes to not make a disbursement from the Hayes Client Trust Account in an amount equal to $8,444,477.81 but instead directed Richard A. Hayes to retain the $8,444,477.81 to facilitate a distribution to the members of Sunrise MOB.

3.     **DISTRIBUTION TO MEMBERS**. The Parties acknowledge and agree that the members of Sunrise MOB elected to distribute $8,444,477.81 to the Members on June 20, 2019 in proportion to their percentage interests in Sunrise MOB, that the Members received a distribution equal to $8,444,477.81, and that the Members directed Richard A. Hayes to not make a

<div align="center">2</div>

<div align="center"><strong>A1860</strong></div>

disbursement from the Hayes Client Trust Account to the Members but instead to retain the $8,444,477.81 to facilitate a capital contribution from the Members to Alecto.

4.     **CAPITAL CONTRIBUTION TO ALECTO**. The Parties acknowledge and agree that each Member elected to make a capital contribution to Alecto in an amount equal to the amount their respective percentage of the Member Distribution on June 20, 2019, that the Members directed Richard A. Hayes to disburse $8,444,477.81 from the Hayes Client Trust Account to make the Alecto Capital Contributions, that Alecto received $8,444,477.81 on June 20, 2019, and that the amount of the capital contributions made by each Member is set forth on **Exhibit A**.

5.     **ADDITIONAL DISTRIBUTIONS**. The Parties acknowledge and agree that (i) the Plaza MOB Second Distribution, and (ii) the Reserve Funds Distributions as received from time to time, shall be deposited in the Hayes Client Trust Account and contributed to the capital of Alecto through distributions to Sunrise Real Estate and Sunrise MOB consistent with and under the same terms and conditions as the Plaza MOB Distribution.

6.     **CONFIDENTIALITY**. Except for disclosure to their legal counsel, accountant or financial advisors, the Parties shall not disclose the terms of this Agreement to any person who is not a party or signatory to this Agreement, unless disclosure thereof is required by law or otherwise authorized by this Agreement or consented to by the parties. Unauthorized disclosure of the terms of this Agreement shall be a material breach of this Agreement.

7.     **ARBITRATION**. Any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by arbitration in the County of Los Angeles, State of California before a mutually agreed upon arbitrator in accordance the commercial rules of Judicial Arbitration and Mediation Services (JAMS) and applying the laws of the State of California. In the event the Parties cannot agree on the selection of an arbitrator, an arbitrator will be appointed in accordance with JAMS' rules. The arbitrator shall have no authority to award special, indirect, consequential or punitive damages and the Parties expressly waive any right to recover any special, indirect, consequential or punitive damages. Any award rendered by the arbitrator shall be final and binding upon each of the Parties, and judgment thereon may be entered in any court having jurisdiction thereof. The costs shall be borne equally by both parties. The provisions of this Section 8 shall survive expiration or termination of this Agreement regardless of the cause of such termination.

IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

8.     **ENTIRE AGREEMENT; MODIFICATION**. This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, and all other communications between the Parties relating to such subject matter. This Agreement may not be amended or modified except by mutual written

3

agreement.  Any reference to this Agreement shall include each and every exhibit, each of which is fully incorporated into this Agreement where referenced.

9.    **GOVERNING LAW**.  This Agreement shall be construed in accordance with the laws of the State of California.  The provisions of this Section 9 shall survive expiration or termination of this Agreement regardless of the cause of such termination.

10.    **COUNTERPARTS**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Signatures of the Parties on this Agreement or any document delivered pursuant to this Agreement may be transmitted by facsimile (or other electronic transmission including email of a PDF signature) shall be deemed to be original signatures for all purposes. At the request of a Party, the Parties will confirm facsimile transmitted (or other electronic transmission including email of a PDF signature) signatures by signing an original document.

11.    **WAIVER**.  A waiver by either Party of a breach or failure to perform hereunder shall not constitute a waiver of any subsequent breach or failure.

12.    **CAPTIONS**.  The captions contained herein are used solely for convenience and shall not be deemed to define or limit the provisions of this Agreement.

13.    **ASSIGNMENT; BINDING EFFECT**.  No Party shall assign or transfer this Agreement in whole or in part, or assign or delegate any of its rights, duties or obligations under this Agreement, in each case without the prior written consent of the other party, and any assignment, transfer or delegation without such consent shall be null and void.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and permitted assigns.

14.    **WAIVER OF CONFLICTS OF INTEREST**.  Each Party acknowledges that Richard A. Hayes agreed to facilitate the disbursement of funds through the Hayes Client Trust Account to allow the efficient transfer of funds and not as an attorney for any Party.  Each Party hereby waives any conflict that may exist with respect to Richard A. Hayes facilitating the transfer of funds, Richard A. Hayes serving as a Co-Trustee of The Reddy Investment Trust, and Richard A. Hayes being a beneficiary of The Hayes Irrevocable Trust.

[*Signatures Appear in Next Page*]

4

**A1862**

**THE PARTIES HERETO** have executed this Agreement as of the day and year first above written.

THE REDDY INVESTMENT TRUST

By: _____
Lex Reddy, Trustee

By: _____
Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
Michael J. Sarrao, Trustee

_____
Matthew Williams

THE HAYES IRREVOCABLE TRUST

By: _____
Martha M. Hayes, Trustee

_____
Steven Kay

_____
Aman Dhuper

5

**A1863**

## EXHIBIT A
## CAPITAL CONTRIBUTIONS TO ALECTO

| Member | % Interest | Capital Contribution |
|--------|-----------|---------------------|
| The Reddy Investment Trust | 56.00% | $4,728,904.21 |
| The Krissman Family Trust | 10.00% | $844,447.18 |
| The Jeyakumar Inter-Vivos Trust | 7.00% | $591,113.03 |
| The Sarrao Family Trust | 7.00% | $591,113.03 |
| The Hayes Irrevocable Trust | 5.00% | $422,223.59 |
| Matthew Williams | 5.00% | $422,223.59 |
| Steven Kay | 5.00% | $422,223.59 |
| Aman Dhuper | 5.00% | $422,223.59 |
|  | 100.00% | $8,444,471.81 |

A1864

EXHIBIT E

## ASSIGNMENT OF MEMBERSHIP INTERESTS
## OF
## SUNRISE MOB HOLDINGS LLC

This Assignment of Membership Interests (this "**Assignment**") is executed and effective as of the opening of business on January 1, 2021 (the "**Effective Date**"), by and between The Reddy Investment Trust, The Krissman Family Trust, The Sarrao Family Trust, The Hayes Irrevocable Trust, Steven Kay, and Matthew Williams (each a "**Transferor**" and collectively, the "**Transferors**") and Alecto Healthcare Services LLC, a Delaware limited liability company ("**Transferee**").

## RECITALS

A.      The Reddy Investment Trust is a Class A Member of Sunrise MOB Holdings LLC, a Delaware limited liability company (the "**Company**") and owns Seventeen Thousand (17,000) Class A Membership Units of the Company and a Class B Member of the Company and owns Fifty One Thousand (51,000) Class B Units of the Company; The Krissman Family Trust is a Class A Member of the Company and owns Ten Thousand (10,000) Class A Units of the Company, The Sarrao Family Trust is a Class A Member of the Company and owns Seven Thousand (7,000) Class A Units of the Company, The Hayes Irrevocable Trust is a Class A Member of the Company and owns Five Thousand (5,000) Class A Units of the Company, Steven Kay is a Class A Member of the Company and owns Five Thousand (5,000) Class A Units of the Company, and Matthew Williams is a Class A Member of the Company and owns Five Thousand (5,000) Class A Units of the Company. The Class A and Class B Membership Interests owned by The Reddy Investment Trust, The Krissman Family Trust, The Sarrao Family Trust, The Hayes Irrevocable Trust, Steven Kay, and Matthew Williams constitute one hundred percent (100%) of the outstanding and issued Membership Units of the Company and hereinafter shall be referred to herein as the "**Transferred Interests**"

B.      Transferors have agreed to transfer, convey, assign and deliver to Transferee, and Transferee has agreed to accept, the Transferred Interests.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ASSIGNMENT

1.      **Assignment**. Transferors hereby irrevocably transfer, convey, assign and deliver to Transferee the Transferred Interests, together with all of Transferors' right, title, interest and benefit in and to the properties (real and personal), capital, cash flow, distributions, dividends, profits and losses, and all other economic benefits of the Transferred Interests accruing to or distributable with respect to the Transferred Interest and the interests in the Company represented thereby or associated therewith from and after opening of business on January 1, 2021 (the "**Effective Time**").

**A1866**

2. **Acceptance, Assumption and Acknowledgment.** Transferee hereby accepts Transferors' assignment of the Transferred Interests pursuant to <u>Section 1</u> and acknowledges and agrees that it shall continue to be bound by all of the terms and conditions of the Amended and Restated Operating Agreement of the Company, as amended from time to time (the **"Operating Agreement"**).

3. **Effect of Assignment.** As of the Effective Time, (a) Transferee shall be the owner of the Transferred Interests in accordance with this Assignment, (b) Transferee shall succeed to the rights and obligations of Transferors in respect of the Transferred Interests and such transfer shall be included in the books and records of the Company to reflect such transfer, and (c) Transferors hereby resign as members of the Company, and shall have no further rights, powers or obligations with respect to the Transferred Interests or otherwise under the Operating Agreement.

4. **Survival of Indemnification Provisions.** Notwithstanding the transfer, Transferors' resignation as a member of the Company, or any other provision of this Agreement, the indemnification provisions set forth in Section 7.8 of the Operating Agreement for the benefit of Transferors and other indemnified persons described therein shall survive the transfer of the Transferred Interests.

5. **Binding Effect.** This Assignment is binding on and shall inure to the benefit of the signatories hereto and their respective successors and assigns.

6. **Counterparts.** This Assignment may be executed (including by facsimile or electronic transmission) in multiple counterparts, each of which shall be deemed an original and all of which taken together shall constitute one instrument binding on all the parties hereto, notwithstanding that all the parties hereto are not signatories to the original or the same counterpart.

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the Effective Date.

**TRANSFERORS**:

**THE REDDY INVESTMENT TRUST**

By: _____
Lex Reddy, Trustee

By: _____
Richard A. Hayes, Trustee

**THE KRISSMAN FAMILY TRUST**

By: _____
Roger Krissman
Trustee

**THE SARRAO FAMILY TRUST**

By: _____
Michael Sarrao, Trustee

**THE HAYES IRREVOCABLE TRUST**

By: _____
Martha M. Hayes, Trustee

**STEVEN KAY**

By: _____
Steven Kay

**MATTHEW WILLIAMS**

By: _____
Matthew Williams

[Signature Page to Assignment of Membership Interests]

**A1868**

**TRANSFEREE**:

**ALECTO HEALTHCARE SERVICES LLC**

By: _____

Lex Reddy
President & CEO

[Signature Page to Assignment of Membership Interests]

**A1869**

**Exhibit 2**
**List of Bank Accounts**

**Alecto Healthcare Services LLC**
**Lockbox Accounts - Daily Sweeps to CNH Finance**
CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Entity Abrev. | Acct | Description of Account |
|---|---|---|---|---|---|
| Alecto Healthcare Services Hayward | City National Bank | 1.0 | Alecto | 7509 | Deposit Account |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 5572 | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 4404 | Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8205 | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8191 | Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 7324 | Non-Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 3717 | Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8264 | Non-Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8248 | Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9210 | Non-Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9202 | Government Receivables |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7780 | Non-Government Receivables |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 2995 | Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4951 | Non-Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4948 | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5073 | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5057 | Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0165 | Non-Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0152 | Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0217 | Non-Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0204 | Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0202 | Non-Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0259 | Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | 9280 | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank., Inc. | 8.4 | | 9584 | Government Receivables |

**Alecto Healthcare Services LLC**
**Disbursement Accounts - Receipt of Advances from CNH Finance**
CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Acct | Entity Abrev. | Description of Account |
|---|---|---|---|---|---|
| Alecto Healthcare Services LLC | City National Bank | | 3784 | Alecto | Primary Disbursement Acct |
| Alecto Healthcare Services LLC | City National Bank | | 6065 | Alecto | Operating Acct |
| | | | 6508 | | Payroll Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | 9152 | WNJ | A/P Acct |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | | WNJ MD | |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | | n/a | |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | 7573 | OMC | CMA |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | 2115 | FRMC | |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | | FRMC PHY | |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | 0194 | OVMC | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | | EORH | |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | | |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | | |

**A1872**

**Alecto Healthcare Services LLC**
**Lockbox Accounts - Account # Order**
CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Entity Abrcv. | Acct | Acct Type | Description of Account |
|---|---|---|---|---|---|---|
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0152 | Lockbox | Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0165 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0194 | Disbursement | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0204 | Lockbox | Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0217 | Lockbox | Non-Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | n/a | 0259 | Lockbox | Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | n/a | 0262 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 1646 | Other | Payroll Acct |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 2115 | Disbursement | |
| Plaza MOB | | 7.3 | n/a | 2120 | Other | Operating |
| Plaza MOB | | 7.3 | n/a | 2210 | Other | Depository |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 2995 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 3717 | Lockbox | Government Receivables |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 3784 | Disbursement | Primary Disbursement Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 4404 | Lockbox | Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 4538 | Other | Care Credit Acct |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 4799 | Other | Non-Govt A/P |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4948 | Lockbox | Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4951 | Lockbox | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5057 | Lockbox | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5073 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 5572 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6065 | Disbursement | Operating Acct |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6508 | Disbursement | Payroll Acct |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 7324 | Lockbox | Non-Government Receivables |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7329 | Other | A/P Acct |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7343 | Other | Payroll Acct |
| Alecto Healthcare Services Hayward | City National Bank | 1.0 | Alecto | 7509 | Lockbox | Deposit Account |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7573 | Disbursement | CMA |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7780 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 7798 | Other | Payroll Acct |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8191 | Lockbox | Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8205 | Lockbox | Non-Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8248 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8264 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 9017 | Other | Disbursement A/P Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 9152 | Disbursement | A/P Acct |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9202 | Lockbox | Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9210 | Lockbox | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | n/a | 9280 | Lockbox | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | n/a | 9584 | Lockbox | Government Receivables |
| FRMC Physicians, Inc | Huntington Bank | 5.1 | FRMC PHY | | | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | | | |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | | | |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | | | |

**A1873**

**Alecto Healthcare Services LLC**
**Lockbox Accounts - Entity Order**
CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Entity Abrev. | Acct | Acct Type | Description of Account |
|---|---|---|---|---|---|---|
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 3784 | Disbursement | Primary Disbursement Acct |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6065 | Disbursement | Operating Acct |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6508 | Disbursement | Payroll Acct |
| Alecto Healthcare Services Hayward | City National Bank | 1.0 | Alecto | 7509 | Lockbox | Deposit Account |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 1646 | Other | Payroll Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 4404 | Lockbox | Government Receivables |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 4799 | Other | Non-Govt A/P |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 5572 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8191 | Lockbox | Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8205 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 9152 | Disbursement | A/P Acct |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 3717 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 7324 | Lockbox | Non-Government Receivables |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7392 | Other | A/P Acct |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7343 | Other | Payroll Acct |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8248 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8264 | Lockbox | Non-Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9202 | Lockbox | Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9210 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 2995 | Lockbox | Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 4538 | Other | Care Credit Acct |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7573 | Disbursement | CMA |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7780 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 7798 | Other | Payroll Acct |
| Olympia Health Care, LLC | | 3.1 | OMC | 9017 | Other | Disbursement A/P Acct |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 2115 | Disbursement | |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4948 | Lockbox | Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4951 | Lockbox | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5057 | Lockbox | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5073 | Lockbox | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | | Disbursement | |
| Plaza MOB | | 7.3 | n/a | 2120 | Other | Operating |
| Plaza MOB | | 7.3 | n/a | 2210 | Other | Depository |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0152 | Lockbox | Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0165 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0194 | Disbursement | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0204 | Lockbox | Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0217 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | | Disbursement | |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0259 | Lockbox | Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0262 | Lockbox | Non-Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | | Disbursement | |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | 9280 | Lockbox | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank., Inc. | 8.4 | | 9584 | Lockbox | Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | | Disbursement | |

**A1874**

Exhibit 3
Allocation Summary

**Alecto Healthcare Services LLC**
Examination of Lockbox Deposits and Related Advances from CNH to Alecto *3784

**2019**

| | **Values** | | **Alecto *3784** | | |
| | **Affiliate Lockbox Deposits** | **Advances from CNH to Alecto *3784** | **Wire In (CNH) (per Bank Stmnts) less wires <7/8** | **Wire Out (per Bank Stmnts) less wires <7/8** | **Net Advances per Bank Statement to Alecto** |
| Months (Mo) | | | | | |
| Jul | 19,363,308.50 | (18,334,880.31) | 18,334,880.31 | 17,593,000.00 | 741,880.31 |
| Aug | 22,723,750.18 | (28,281,600.00) | 28,281,600.00 | 27,151,000.00 | 1,130,600.00 |
| Sep | 21,590,109.79 | (17,472,000.00) | 17,472,000.00 | 18,957,000.00 | (1,485,000.00) |
| Oct | 18,317,818.60 | (16,193,100.00) | 16,193,100.00 | 15,839,000.00 | 354,100.00 |
| Nov | 15,074,972.12 | (13,921,500.00) | 13,921,500.00 | 12,769,000.00 | 1,152,500.00 |
| Dec | 16,650,340.82 | (16,653,900.00) | 16,653,900.00 | 15,740,500.00 | 913,400.00 |
| **Grand Total** | **113,720,300.01** | **(110,856,980.31)** | **$110,856,980.31** | **$108,049,500.00** | **$2,807,480.31** |

Lockbox Deposits in Excess of Affiliate Advances          -          $5,670,800.01

*Alecto Advance vs. Net Advances per Bank Statement*

| | | |
|---|---|---|
| | 945,000.00 | (540,000.00) |
| OMC | 500,000.00 | 9/26/2019 |
| EORH | 40,000.00 | 9/4/2019 |

(2,492,901.81) Less Net Transfers To *6065/*6508
$314,578.50 Advances retained by Alecto

**2020**

| | **Values** | | **Alecto *3784** | | |
| | **Affiliate Lockbox Deposits** | **Advances from CNH to Alecto *3784** | **Wire In (CNH) (per Bank Stmnts)** | **Wire Out/Bsuite Wire Out (per Bank Stmnts)** | **Net Advances per Bank Statement to Alecto** |
| Months (Mo) | | | | | |
| Jan | 13,294,989.39 | (13,987,400.00) | 13,987,400.00 | (13,889,262.18) | 98,137.82 |
| Feb | 12,264,749.43 | (10,993,900.00) | 10,993,900.00 | (9,929,700.00) | 1,064,200.00 |
| Mar | 16,029,431.59 | (14,249,880.00) | 14,249,880.00 | (11,752,100.00) | 2,497,780.00 |
| Apr | 44,750,504.64 | (30,711,100.00) | 30,711,100.00 | (16,583,000.00) | 14,128,100.00 |
| May | 7,726,047.19 | (10,507,400.00) | 10,507,400.00 | (10,393,200.00) | 114,200.00 |
| Jun | 23,550,415.01 | (33,095,551.00) | 33,095,551.00 | (26,022,901.00) | 7,072,650.00 |
| Jul | 30,619,036.72 | (18,016,600.00) | 18,016,600.00 | (15,054,500.00) | 2,962,100.00 |
| Aug | 8,251,126.20 | (13,168,000.00) | 13,168,000.00 | (12,150,000.00) | 1,018,000.00 |
| Sep | 8,335,576.17 | (8,452,300.00) | 8,452,300.00 | (8,295,000.00) | 157,300.00 |
| Oct | 13,301,780.05 | (11,583,800.00) | 11,583,800.00 | (10,275,000.00) | 1,308,800.00 |
| Nov | 10,639,712.03 | (14,482,500.00) | 14,482,500.00 | (11,352,000.00) | 3,130,500.00 |
| Dec | 12,040,041.51 | (10,639,400.00) | 10,639,400.00 | (17,286,000.00) | (6,646,600.00) |
| **Grand Total** | **200,803,409.93** | **(189,887,831.00)** | **$189,887,831.00** | **-$162,982,663.18** | **$26,905,167.82** |

Lockbox Deposits in Excess of Affiliate Advances          -          $37,820,746.75

(13,870,734.38) Less Net Transfers To *6065/*6508
$13,034,433.44 Advances retained by Alecto
(to maintain avg. bank balance at ~$20MM)

GOULD Consulting Services

**Alecto Healthcare Services LLC**
Examination of Lockbox Deposits and Related Advances from CNH to Alecto *3784

### 2021

| | Values | | | Alecto *3784 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Months (Mo) | Affiliate Lockbox Deposits | Advances from CNH to Alecto *3784 | Wire In (CNH) (per Bank Stmnts) | Wire Out (per Bank Stmnts) | Net Advances per Bank Statement to Alecto | | | | |
| Jan | 10,368,948.45 | (10,026,500.00) | 10,026,500.00 | (10,330,500.00) | (304,000.00) | | | | |
| Feb | 9,694,104.65 | (7,383,900.00) | 7,383,900.00 | (9,655,000.00) | (2,271,100.00) | | | | |
| Mar | 8,939,904.71 | (11,130,900.00) | 11,130,900.00 | (9,925,000.00) | 1,205,900.00 | | | | |
| Apr | 5,696,386.02 | (3,254,900.00) | 3,254,900.00 | (4,622,000.00) | (1,367,100.00) | | | | |
| May | 4,411,225.44 | (4,003,600.00) | 4,003,600.00 | (4,092,000.00) | (88,400.00) | | | | |
| Jun | 4,907,861.76 | (5,091,400.00) | 5,091,400.00 | (4,549,900.00) | 541,500.00 | | | | |
| Jul | 4,044,677.94 | (4,086,800.00) | 4,086,800.00 | (3,758,500.00) | 328,300.00 | | | | |
| Aug | 3,974,868.59 | (3,867,300.00) | 3,867,300.00 | (7,179,700.00) | (3,312,400.00) | | | | |
| Sep | 5,453,242.00 | (5,283,500.00) | 5,283,500.00 | (5,529,100.00) | (245,600.00) | | | | |
| Oct | 4,390,949.45 | (3,801,500.00) | 3,801,500.00 | (6,397,000.00) | (2,595,500.00) | Alecto Advance vs Net Advances per Bank Statement | | | |
| Nov | 4,341,372.77 | (5,248,800.00) | 5,248,800.00 | (6,134,000.00) | (885,200.00) | 254,200.00 | (631,000.00) | | |
| Dec | 4,136,252.07 | (3,740,300.00) | 3,740,300.00 | (5,562,000.00) | (1,821,700.00) | OMC | 231,000.00 | 11/18/2021 |
| **Grand Total** | **70,359,793.85** | **(66,919,400.00)** | **$66,919,400.00** | **-$77,734,700.00** | **-$10,815,300.00** | OVMC | 400,000.00 | 11/29/2021 |

Advances in Excess of Affiliate Lockbox Deposits: - -$7,374,906.15

8,114,913.38 Less Net Transfers From *6065/*6508 (1)
($2,700,386.62) Advances used by Alecto for expenses/Affiliates

(1) 1/1/2021 UCLA Asset Sale proceeds of $23,506,100 deposited in Alecto *6065 and transferred to Alecto *3784

### 2022

| | Values | | | Alecto *3784 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Months (Mo) | Affiliate Lockbox Deposits | Advances from CNH to Alecto *3784 | Wire In (CNH) (per Bank Stmnts) | Wire Out (per Bank Stmnts) | Net Advances per Bank Statement to Alecto | | | | |
| Jan | 3,648,832.46 | (4,053,000.00) | 4,053,000.00 | (8,305,374.00) | (4,252,374.00) | | | | |
| Feb | 4,083,099.59 | (3,804,800.00) | 3,804,800.00 | (6,367,000.00) | (2,562,200.00) | | | | |
| Mar | 4,443,269.65 | (3,525,600.00) | 3,525,600.00 | (4,100,000.00) | (574,400.00) | | | | |
| Apr | 3,342,283.08 | (4,478,600.00) | 4,478,600.00 | (5,853,000.00) | (1,374,400.00) | | | | |
| May | 3,586,838.94 | (4,030,200.00) | 3,465,500.00 | (3,465,000.00) | 500.00 | | | | |
| Jun | 4,602,345.47 | (4,189,500.00) | 4,754,200.00 | (4,851,500.00) | (97,300.00) | | | | |
| Jul | 3,258,787.49 | (3,542,900.00) | 3,542,900.00 | (4,740,600.00) | (1,197,700.00) | | | | |
| Aug | 9,451,140.27 | (5,234,394.11) | 5,107,641.83 | (4,683,150.00) | 424,491.83 | Alecto Advance vs Net Advances per Bank Statement | | | |
| Sep | 1,653,063.06 | (1,526,126.78) | 1,653,063.06 | (2,233,902.86) | (580,839.80) | 581,023.80 | 184.00 | | |
| **Grand Total** | **38,069,660.01** | **(34,385,120.89)** | **$34,385,304.89** | **-$44,599,526.86** | **-$10,214,221.97** | OVERDRAW FOR WNF | 72.00 | 9/21/2022 |
| | | Advances in Excess of Affiliate Lockbox Deposits: | 184.00 | -$6,529,866.85 | | OVERDRAFT CLOSE ACCT | 112.00 | 9/30/2022 |

3,508,678.74 Less Net Transfers From *6065/*6508
($6,705,543.23) Advances used by Alecto for expenses/Affiliates

GOULD Consulting Services

**A1877**

**Exhibit 4**
**Allocations by Entity**

**Alecto Healthcare Services LLC**

**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto *3784**

### 2019 Lockbox Deposit Sweeps

| Months (Mo) | Values Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Total Deposits |
|---|---|---|---|---|---|---|
| Jul | 4,309,043.52 | 7,433,896.73 | 4,487,463.83 | 3,132,754.42 | 150.00 | 19,363,308.50 |
| Aug | 5,124,775.10 | 7,856,299.90 | 4,983,138.17 | 4,438,452.44 | 321,084.57 | 22,723,750.18 |
| Sep | 6,608,391.69 | 7,018,583.11 | 4,458,294.87 | 3,267,731.03 | 237,109.09 | 21,590,109.79 |
| Oct | 4,882,037.95 | 2,774,247.18 | 5,435,350.73 | 4,983,656.25 | 242,526.49 | 18,317,818.60 |
| Nov | 5,140,091.21 | 798,722.81 | 4,599,025.16 | 4,216,639.53 | 320,493.41 | 15,074,972.12 |
| Dec | 5,291,428.49 | 495,337.83 | 5,188,552.07 | 5,395,135.71 | 279,886.72 | 16,650,340.82 |
| **Grand Total** | **31,355,767.96** | **26,377,087.56** | **29,151,824.83** | **25,434,369.38** | **1,401,250.28** | **113,720,300.01** |

### 2019 Advances

| Months (Mo) | Values Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Total Advances |
|---|---|---|---|---|---|---|
| Jul | (5,663,000.00) | (5,295,000.00) | (2,395,000.00) | (4,240,000.00) | (741,880.31) | (18,334,880.31) |
| Aug | (8,183,000.00) | (9,110,000.00) | (5,160,000.00) | (4,698,000.00) | (1,130,600.00) | (28,281,600.00) |
| Sep | (6,041,000.00) | (5,746,000.00) | (2,615,000.00) | (4,015,000.00) | 945,000.00 | (17,472,000.00) |
| Oct | (5,022,000.00) | (3,487,000.00) | (3,355,000.00) | (3,975,000.00) | (354,100.00) | (16,193,100.00) |
| Nov | (4,654,000.00) | (1,075,000.00) | (3,395,000.00) | (3,645,000.00) | (1,152,500.00) | (13,921,500.00) |
| Dec | (5,964,000.00) | (474,500.00) | (4,076,000.00) | (5,226,000.00) | (913,400.00) | (16,653,900.00) |
| **Grand Total** | **(35,527,000.00)** | **(25,187,500.00)** | **(20,996,000.00)** | **(25,799,000.00)** | **(3,347,480.31)** | **(110,856,980.31)** |

### 2019 Total Advance (Over)/Under

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jul | (1,353,956.48) | 2,138,896.73 | 2,092,463.83 | (1,107,245.58) | | 1,770,158.50 |
| Aug | (3,058,224.90) | (1,253,700.10) | (176,861.83) | (259,547.56) | | (4,748,334.39) |
| Sep | 567,391.69 | 1,272,583.11 | 1,843,294.87 | (747,268.97) | | 2,936,000.70 |
| Oct | (139,962.05) | (712,752.82) | 2,080,350.73 | 1,008,656.25 | | 2,236,292.11 |
| Nov | 486,091.21 | (276,277.19) | 1,204,025.16 | 571,639.53 | | 1,985,478.71 |
| Dec | (672,571.51) | 20,837.83 | 1,112,552.07 | 169,135.71 | | 629,954.10 |
| **Grand Total** | **(4,171,232.04)** | **1,189,587.56** | **8,155,824.83** | **(364,630.62)** | **-** | **4,809,549.73** |

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto \*3784**

### 2020 Lockbox Deposit Sweeps
Values

| Months (Mo) | Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Total Deposits |
|---|---|---|---|---|---|---|
| Jan | 5,166,146.93 | 300,221.43 | 4,438,520.13 | 3,134,963.35 | 255,137.55 | 13,294,989.39 |
| Feb | 4,090,888.47 | 189,748.53 | 4,568,259.33 | 3,116,625.04 | 299,228.06 | 12,264,749.43 |
| Mar | 4,962,445.42 | 84,845.34 | 7,281,072.46 | 3,478,068.25 | 223,000.12 | 16,029,431.59 |
| Apr | 17,046,716.00 | 1,245,454.17 | 21,492,726.90 | 4,532,034.55 | 433,573.02 | 44,750,504.64 |
| May | 1,680,218.48 | 251,874.65 | 4,380,980.44 | 416,566.66 | 996,406.96 | 7,726,047.19 |
| Jun | 12,622,210.49 | 115,175.72 | 4,653,709.57 | 5,766,251.01 | 393,068.22 | 23,550,415.01 |
| Jul | 4,576,052.63 | 86,357.53 | 25,413,062.92 | 217,047.56 | 326,516.08 | 30,619,036.72 |
| Aug | 3,151,092.19 | 154,931.50 | 4,632,064.78 | 31,545.16 | 281,492.57 | 8,251,126.20 |
| Sep | 3,638,002.43 | 159,428.62 | 4,231,011.73 | 118,631.96 | 188,501.43 | 8,335,576.17 |
| Oct | 8,313,560.13 | 32,640.62 | 4,698,904.30 | 37,784.18 | 218,890.82 | 13,301,780.05 |
| Nov | 5,825,935.54 | 15,826.13 | 4,495,833.31 | 38,888.29 | 263,228.76 | 10,639,712.03 |
| Dec | 5,711,982.05 | 26,560.82 | 5,340,656.44 | 636,118.39 | 324,723.81 | 12,040,041.51 |
| **Grand Total** | **76,785,250.76** | **2,663,065.06** | **95,626,802.31** | **21,524,524.40** | **4,203,767.40** | **200,803,409.93** |

### 2020 Advances
Values

| Months (Mo) | Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Total Advances |
|---|---|---|---|---|---|---|
| Jan | (5,744,227.18) | (405,035.00) | (4,510,000.00) | (3,230,000.00) | (98,137.82) | (13,987,400.00) |
| Feb | (3,570,000.00) | (58,700.00) | (3,411,000.00) | (2,890,000.00) | (1,064,200.00) | (10,993,900.00) |
| Mar | (5,021,000.00) | (25,100.00) | (4,170,000.00) | (2,536,000.00) | (2,497,780.00) | (14,249,880.00) |
| Apr | (7,361,000.00) | (5,000.00) | (5,217,000.00) | (4,000,000.00) | (14,128,100.00) | (30,711,100.00) |
| May | (4,880,000.00) | (11,200.00) | (4,257,000.00) | (1,245,000.00) | (114,200.00) | (10,507,400.00) |
| Jun | (6,616,000.00) | (6,250.00) | (17,531,251.00) | (1,869,400.00) | (7,072,650.00) | (33,095,551.00) |
| Jul | (8,950,000.00) | (6,500.00) | (5,953,000.00) | (145,000.00) | (2,962,100.00) | (18,016,600.00) |
| Aug | (5,500,000.00) | - | (6,450,000.00) | (200,000.00) | (1,018,000.00) | (13,168,000.00) |
| Sep | (4,650,000.00) | - | (3,600,000.00) | (45,000.00) | (157,300.00) | (8,452,300.00) |
| Oct | (5,020,000.00) | - | (4,950,000.00) | (305,000.00) | (1,308,800.00) | (11,583,800.00) |
| Nov | (5,171,000.00) | (4,000.00) | (6,000,000.00) | (177,000.00) | (3,130,500.00) | (14,482,500.00) |
| Dec | (5,778,000.00) | (5,000.00) | (11,230,000.00) | (273,000.00) | 6,646,600.00 | (10,639,400.00) |
| **Grand Total** | **(68,261,227.18)** | **(526,785.00)** | **(77,279,251.00)** | **(16,915,400.00)** | **(26,905,167.82)** | **(189,887,831.00)** |

### 2020 Total Advance (Over)/Under

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jan | (578,080.25) | (104,813.57) | (71,479.87) | (95,036.65) | | (849,410.34) |
| Feb | 520,888.47 | 131,048.53 | 1,157,259.33 | 226,625.04 | | 2,035,821.37 |
| Mar | (58,554.58) | 59,745.34 | 3,111,072.46 | 942,068.25 | | 4,054,331.47 |
| Apr | 9,685,716.00 | 1,240,454.17 | 16,275,726.90 | 532,034.55 | | 27,733,931.62 |
| May | (3,199,781.52) | 240,674.65 | 123,980.44 | (828,433.34) | | (3,663,559.77) |
| Jun | 6,006,210.49 | 108,925.72 | (12,877,541.43) | 3,896,851.01 | | (2,865,554.21) |
| Jul | (4,373,947.37) | 79,857.53 | 19,460,062.92 | 72,047.56 | | 15,238,020.64 |
| Aug | (2,348,907.81) | 154,931.50 | (1,817,935.22) | (168,454.84) | | (4,180,366.37) |
| Sep | (1,011,997.57) | 159,428.62 | 631,011.73 | 73,631.96 | | (147,925.26) |
| Oct | 3,293,560.13 | 32,640.62 | (251,095.70) | (267,215.82) | | 2,807,889.23 |
| Nov | 654,935.54 | 11,826.13 | (1,504,166.69) | (138,111.71) | | (975,516.73) |
| Dec | (66,017.95) | 21,560.82 | (5,889,343.56) | 363,118.39 | | (5,570,682.30) |
| **Grand Total** | **8,524,023.58** | **2,136,280.06** | **18,347,551.31** | **4,609,124.40** | **-** | **33,616,979.35** |

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto *3784**

| 2021 Lockbox Deposit Sweeps | | | | | |
|---|---|---|---|---|---|
| **Months (Mo)** | **Sum of WNJ** | **Sum of OV-EO** | **Sum of OMC** | **Sum of FRMC** | **Sum of AHS** | **Total Deposits** |
| Jan | 4,767,903.28 | 19,207.59 | 5,154,121.98 | 36,521.53 | 391,194.07 | 10,368,948.45 |
| Feb | 4,434,551.72 | 26,118.81 | 4,946,294.79 | 26,496.04 | 260,643.29 | 9,694,104.65 |
| Mar | 5,257,109.18 | 17,796.00 | 3,055,330.03 | 332,774.29 | 276,895.21 | 8,939,904.71 |
| Apr | 3,810,031.18 | 15,660.77 | 1,473,382.79 | 18,446.18 | 378,865.10 | 5,696,386.02 |
| May | 3,186,709.34 | 18,587.17 | 841,357.77 | 32,824.86 | 331,746.30 | 4,411,225.44 |
| Jun | 3,467,902.13 | 28,787.49 | 1,196,297.86 | 12,883.14 | 201,991.14 | 4,907,861.76 |
| Jul | 3,327,232.72 | 15,935.01 | 378,473.19 | 46,637.73 | 276,399.29 | 4,044,677.94 |
| Aug | 3,376,505.07 | 17,976.59 | 375,982.36 | 20,713.47 | 183,691.10 | 3,974,868.59 |
| Sep | 3,335,395.23 | 14,412.33 | 203,693.95 | 1,668,959.73 | 230,780.76 | 5,453,242.00 |
| Oct | 3,586,247.64 | 13,291.74 | 610,997.33 | 12,184.40 | 168,228.34 | 4,390,949.45 |
| Nov | 3,846,521.08 | 10,595.84 | 176,178.62 | 3,238.93 | 304,838.30 | 4,341,372.77 |
| Dec | 3,764,875.80 | 6,205.41 | 104,690.94 | 19,364.89 | 241,115.03 | 4,136,252.07 |
| **Grand Total** | **46,160,984.37** | **204,574.75** | **18,516,801.61** | **2,231,045.19** | **3,246,387.93** | **70,359,793.85** |

| 2021 Advances | | | | | |
|---|---|---|---|---|---|
| **Months (Mo)** | **Sum of WNJ2** | **Sum of OV-EO2** | **Sum of OMC2** | **Sum of FRMC2** | **Sum of AHS2** | **Total Advances** |
| Jan | (5,200,000.00) | (5,500.00) | (4,850,000.00) | (275,000.00) | 304,000.00 | (10,026,500.00) |
| Feb | (4,345,000.00) | (5,000.00) | (5,100,000.00) | (205,000.00) | 2,271,100.00 | (7,383,900.00) |
| Mar | (5,025,000.00) | (59,000.00) | (4,750,000.00) | (91,000.00) | (1,205,900.00) | (11,130,900.00) |
| Apr | (2,525,000.00) | (12,000.00) | (2,000,000.00) | (85,000.00) | 1,367,100.00 | (3,254,900.00) |
| May | (3,586,000.00) | (5,000.00) | (475,000.00) | (26,000.00) | 88,400.00 | (4,003,600.00) |
| Jun | (4,113,000.00) | (4,900.00) | (350,000.00) | (82,000.00) | (541,500.00) | (5,091,400.00) |
| Jul | (3,040,000.00) | (6,500.00) | (650,000.00) | (62,000.00) | (328,300.00) | (4,086,800.00) |
| Aug | (6,575,000.00) | (8,700.00) | (495,000.00) | (101,000.00) | 3,312,400.00 | (3,867,300.00) |
| Sep | (5,050,000.00) | (53,100.00) | (290,000.00) | (136,000.00) | 245,600.00 | (5,283,500.00) |
| Oct | (5,250,000.00) | (5,000.00) | (601,000.00) | (541,000.00) | 2,595,500.00 | (3,801,500.00) |
| Nov | (5,350,000.00) | (5,000.00) | (100,000.00) | (48,000.00) | 254,200.00 | (5,248,800.00) |
| Dec | (5,150,000.00) | (6,000.00) | (330,000.00) | (76,000.00) | 1,821,700.00 | (3,740,300.00) |
| **Grand Total** | **(55,209,000.00)** | **(175,700.00)** | **(19,991,000.00)** | **(1,728,000.00)** | **10,184,300.00** | **(66,919,400.00)** |

| 2021 Total Advance (Over)/Under | | | | | |
|---|---|---|---|---|---|
| **Months (Mo)** | **WNJ** | **OV-EO** | **OMC** | **FRMC** | **AHS** | **Total Advance (Over)/Under** |
| Jan | (432,096.72) | 13,707.59 | 304,121.98 | (238,478.47) | | (352,745.62) |
| Feb | 89,551.72 | 21,118.81 | (153,705.21) | (178,503.96) | | (221,538.64) |
| Mar | 232,109.18 | (41,204.00) | (1,694,669.97) | 241,774.29 | | (1,261,990.50) |
| Apr | 1,285,031.18 | 3,660.77 | (526,617.21) | (66,553.82) | | 695,520.92 |
| May | (399,290.66) | 13,587.17 | 366,357.77 | 6,824.86 | | (12,520.86) |
| Jun | (645,097.87) | 23,887.49 | 846,297.86 | (69,116.86) | | 155,970.62 |
| Jul | 287,232.72 | 9,435.01 | (271,526.81) | (15,362.27) | | 9,778.65 |
| Aug | (3,198,494.93) | 9,276.59 | (119,017.64) | (80,286.53) | | (3,388,522.51) |
| Sep | (1,714,604.77) | (38,687.67) | (86,306.05) | 1,532,959.73 | | (306,638.76) |
| Oct | (1,663,752.36) | 8,291.74 | 9,997.33 | (528,815.60) | | (2,174,278.89) |
| Nov | (1,503,478.92) | 5,595.84 | 76,178.62 | (44,761.07) | | (1,466,465.53) |
| Dec | (1,385,124.20) | 205.41 | (225,309.06) | (56,635.11) | | (1,666,862.96) |
| **Grand Total** | **(9,048,015.63)** | **28,874.75** | **(1,474,198.39)** | **503,045.19** | **-** | **(9,990,294.08)** |

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto *3784**

### 2022 Lockbox Deposit Sweeps

| Months (Mo) | Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Total Deposits |
|---|---|---|---|---|---|---|
| Jan | 3,165,457.59 | 5,622.07 | 156,450.13 | 3,880.57 | 317,422.10 | 3,648,832.46 |
| Feb | 3,308,890.58 | 5,147.32 | 487,321.75 | 8,276.74 | 273,463.20 | 4,083,099.59 |
| Mar | 4,029,192.13 | 6,706.20 | 37,299.90 | 13,769.47 | 356,301.95 | 4,443,269.65 |
| Apr | 2,763,385.40 | 5,566.61 | 297,102.78 | 8,516.59 | 267,711.70 | 3,342,283.08 |
| May | 3,233,785.82 | 7,131.05 | 12,020.71 | 4,696.01 | 329,205.35 | 3,586,838.94 |
| Jun | 4,031,234.46 | 4,265.31 | 13,257.03 | 11,427.84 | 542,160.77 | 4,602,345.47 |
| Jul | 3,054,433.24 | 10,211.29 | 5,261.20 | 4,072.04 | 184,809.72 | 3,258,787.49 |
| Aug | 9,213,788.56 | 5,508.73 | 7,026.14 | - | 224,816.84 | 9,451,140.27 |
| Sep | 1,650,660.17 | 2,402.89 | - | - | - | 1,653,063.06 |
| **Grand Total** | **34,450,827.95** | **52,561.53** | **1,015,739.64** | **54,639.26** | **2,495,891.63** | **38,069,660.01** |

### 2022 Advances

| Months (Mo) | Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Total Advances |
|---|---|---|---|---|---|---|
| Jan | (8,056,374.00) | (8,000.00) | (200,000.00) | (41,000.00) | 4,252,374.00 | (4,053,000.00) |
| Feb | (6,230,000.00) | (5,000.00) | (120,000.00) | (12,000.00) | 2,562,200.00 | (3,804,800.00) |
| Mar | (3,997,000.00) | (6,000.00) | (85,000.00) | (12,000.00) | 574,400.00 | (3,525,600.00) |
| Apr | (5,645,000.00) | (5,000.00) | (115,000.00) | (88,000.00) | 1,374,400.00 | (4,478,600.00) |
| May | (3,332,000.00) | (5,000.00) | (85,000.00) | (43,000.00) | (565,200.00) | (4,030,200.00) |
| Jun | (4,820,000.00) | (3,500.00) | (10,000.00) | (18,000.00) | 662,000.00 | (4,189,500.00) |
| Jul | (4,592,000.00) | (2,600.00) | (73,000.00) | (73,000.00) | 1,197,700.00 | (3,542,900.00) |
| Aug | (4,562,500.00) | (5,650.00) | (108,000.00) | (7,000.00) | (551,244.11) | (5,234,394.11) |
| Sep | (2,200,902.86) | - | (30,000.00) | (3,000.00) | 707,776.08 | (1,526,126.78) |
| **Grand Total** | **(43,435,776.86)** | **(40,750.00)** | **(826,000.00)** | **(297,000.00)** | **10,214,405.97** | **(34,385,120.89)** |

### 2022 Total Advance (Over)/Under

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jan | (4,890,916.41) | (2,377.93) | (43,549.87) | (37,119.43) | | (4,973,963.64) |
| Feb | (2,921,109.42) | 147.32 | 367,321.75 | (3,723.26) | | (2,557,363.61) |
| Mar | 32,192.13 | 706.20 | (47,700.10) | 1,769.47 | | (13,032.30) |
| Apr | (2,881,614.60) | 566.61 | 182,102.78 | (79,483.41) | | (2,778,428.62) |
| May | (98,214.18) | 2,131.05 | (72,979.29) | (38,303.99) | | (207,366.41) |
| Jun | (788,765.54) | 765.37 | 3,257.03 | (6,572.16) | | (791,315.30) |
| Jul | (1,537,566.76) | 7,611.29 | (67,738.80) | (68,927.96) | | (1,666,622.23) |
| Aug | 4,651,288.56 | (141.27) | (100,973.86) | (7,000.00) | | 4,543,173.43 |
| Sep | (550,242.69) | 2,402.89 | (30,000.00) | (3,000.00) | | (580,839.80) |
| **Grand Total** | **(8,984,948.91)** | **11,811.53** | **189,739.64** | **(242,360.74)** | **-** | **(9,025,758.48)** |

Exhibit 5
Payment Analysis

**Alecto Healthcare Services, LLC**
Payments by Check/ACH Transfer

I. Checks

| Name | Count of | Sum of Original |
|------|----------|-----------------|
| | **Values** | |
| American Express | 43 | (124,463.54) x |
| Anthem Blue Cross | 10 | (140,695.70) |
| Arent Fox LLP | 1 | (750.00) |
| Arnett Carbis Toothman LLP | 3 | (31,110.20) |
| Bandwidth Simplified | 1 | (125.00) |
| Bank Direct | 4 | (1,226,270.13) |
| BCal 101 North Brand Property, LLC | 1 | (150.52) |
| Berkley Net Underwriters | 4 | (103,073.00) |
| ▮ | 4 | (148.98) |
| Brighthouse Life Insurance Company | 4 | (11,376.00) |
| Clark Hill P.L.C. | 2 | (4,042.68) |
| Cogency Global | 2 | (940.00) |
| Cooperative of American Phys Inc. | 7 | (60,915.00) |
| Corporation Service Company | 2 | (2,335.00) |
| Cox Communications | 31 | (43,440.18) |
| CT Corporation | 2 | (1,427.36) |
| Datarooms.com, LLC | 1 | (4,207.50) |
| Delaware Secretary of State | 2 | (9,300.00) |
| Department of Treasury | 8 | (7,711.51) |
| ▮ | 2 | (79.18) |
| ▮ | 1 | (3,006.57) |
| Fifth Third Bank | 1 | (200.82) |
| Flaherty Sensabaugh Bonasso PLLC | 1 | (83,348.88) |
| Fontis | 2 | (392.84) |
| Franchise Tax Board | 20 | (77,673.77) |
| ▮ | 1 | (287.74) |
| Hallett & Perrin P.C. | 1 | (60,341.06) |
| Haubert For Supervisor | 1 | (1,000.00) |
| Holtz Slavett & Drabkin | 3 | (32,405.70) |
| Intralinks, Inc. | 1 | (14,666.68) |
| Iron Mountain | 34 | (4,394.03) |
| Iyer Demirovic Chinchoy LLP | 1 | (4,600.00) |
| Jatheon | 1 | (3,690.00) |
| ▮ | 1 | (200.97) |
| ▮ | 1 | (1,089.38) |
| Kieckhafer Schiffer LLP | 1 | (9,000.00) |
| King & Spalding | 1 | (5,248.50) |
| Koenig Jacobsen LLP | 13 | (71,568.25) |
| Konica Minolta Premier Finance | 19 | (10,481.90) |
| Kutak Rock LLP | 1 | (1,400.50) |
| Los Angeles County Tax Collector | 1 | (470.42) |
| ▮ | 2 | (2,545.66) |
| ▮ | 1 | (463.26) |
| Medhost of Tennessee | 1 | (41,481.99) |
| MetLife Ins | 2 | - |
| Michael J. Sarrao | 1 | (22,895.97) x |
| Michael K. Nunley & Associates, Inc. | 1 | (15,100.05) |
| Modern Parking, Inc. | 1 | - |
| ▮ | 1 | (549.75) |
| ▮ | 1 | (164.07) |
| North American Speciality | 1 | (863.00) |
| NTT America, Inc. | 2 | (86,775.00) |
| Ohio Dept. Of Taxation | 2 | (45,818.17) |
| Ohio Valley Medical | 8 | (6,941.98) |
| Olshan Frome Wolosky | 1 | (52,673.52) |
| One Time Vendor | 8 | (65,940.57) |
| Pacific Global Investment Management Company | 1 | (18,316.80) |
| PaperlessPay, Corp | 1 | (535.00) |
| ▮ | 2 | (842.77) |
| Protective Life Insurance Company | 7 | (86,999.38) |
| Roger Krissman | 1 | (27,102.79) x |
| Ruthrauff Service LLC. | 1 | (45,000.00) |
| Shulman Bastian Friedman & Bui LLP | 5 | (38,216.95) |

**A1884**

**Alecto Healthcare Services, LLC**
Payments by Check/ACH Transfer

| | | |
|---|---|---|
| Singer Associates Inc. | 1 | (630.00) |
| St. Rose Medical Staff Hosp | 1 | (150.00) |
| ▮ | 1 | (749.51) |
| Steven Kay Esq | 1 | (10,300.00) x |
| ▮ | 2 | (2,038.10) |
| The Kullman Firm | 1 | (1,053.00) |
| U.S. Department of Homeland Security | 4 | (4,210.00) |
| U.S. Department of Labor | 1 | (49,116.76) |
| United States Postal Service | 1 | (681.00) |
| Unlimited Services Bldg Maint | 29 | (8,625.08) |
| ▮ | 1 | (5,000.00) |
| VerityStream | 1 | (25,805.25) |
| ▮ | 1 | (1,029.99) |
| Woodruff-Sawyer & Co. | 3 | (65,553.11) |
| Zurich Services Corporation | 3 | (10,458.00) |
| **Grand Total** | **342** | **(2,902,655.97)** |

**II. Bill Payments/ACH Transfers**

| | Values | |
|---|---|---|
| **Name** | **Count of** | **Sum of Original** |
| AIG Claims Inc | 13 | (1,057,527.04) |
| Aman Dhuper | 10 | (107,272.04) x |
| American Express | 7 | (337,326.03) x |
| Anthem Blue Cross | 19 | (271,375.70) |
| AT&T | 23 | (1,832.40) |
| Bank Direct | 57 | (8,700,227.68) |
| BCal 101 North Brand Property, LLC | 7 | (45,909.42) |
| ▮ | 18 | (5,171.36) |
| ▮ | 5 | (47,536.84) |
| City National Bank | 46 | (200,858.54) |
| Clampett Industries LLC dba EMG | 1 | (14,850.00) |
| Cogency Global | 2 | (2,632.00) |
| Cooperative of American Phys Inc. | 1 | (3,417.00) |
| Corporation Service Company | 4 | (13,456.50) |
| Department of Treasury | 3 | (46,726.78) |
| Dexter Hofing LLC | 1 | (7,000.00) |
| Economists Incorporated | 1 | (9,026.00) |
| Evangeline Douglass | 47 | (168,312.31) |
| Exclusive Modular Installation Inc. | 1 | (14,200.00) |
| First Insurance Funding | 4 | (304,549.44) |
| Franchise Tax Board | 48 | (78,891.10) |
| ▮ | 2 | (660.04) |
| ▮ | 3 | (130,000.00) |
| Gordon & Rees | 1 | (8,535.00) |
| GRM Information Management Services of San Francisco, LLC | 1 | (14,900.69) |
| Hemanth P Mohanadas | 17 | (108,173.78) |
| ▮ | 10 | (31,307.05) |
| Holtz Slavett & Drabkin | 15 | (8,889,593.54) |
| ▮ | 2 | (431.21) |
| ▮ | 41 | (58,549.98) |
| King & Spalding | 1 | (6,935.00) |
| Koenig Jacobsen LLP | 7 | (44,482.18) |
| Konica Minolta Premier Finance | 43 | (22,675.39) |
| Kutak Rock LLP | 1 | (5,545.95) |
| Lex Reddy | 5 | (88,360.74) x |
| ▮ | 2 | (1,131.88) |
| Medhost of Tennessee | 3 | (128,012.39) |
| MedPro | 9 | (818,799.93) |
| Merrill Lynch, Pierce, Fenner & Smith, Inc. | 2 | (105,000.00) |
| MetLife Ins | 27 | (41,302.08) |
| Michael J. Sarrao | 53 | (960,052.31) x |
| Michael K. Nunley & Associates, Inc. | 12 | (71,245.02) |
| Modern Parking, Inc. | 27 | (31,290.00) |
| Moss Adams LLP | 41 | (747,474.76) |
| ▮ | 6 | (2,000.65) |
| Navex Global, Inc. | 3 | (18,085.28) |

**Alecto Healthcare Services, LLC**
**Payments by Check/ACH Transfer**

| | | |
|---|---|---|
| New Horizon Communications | 20 | (19,051.70) |
| | 1 | (1,448.76) |
| NTT America, Inc. | 20 | (289,250.00) |
| Olshan Frome Wolosky | 15 | (803,967.47) |
| Pacific Global Investment Management Company | 1 | (5,724.00) |
| Panch Jeyakumar M.D. | 3 | (3,139.00) |
| | 3 | (3,383.86) |
| Protective Life Insurance Company | 2 | (25,916.53) |
| Quadax, Inc. | 1 | (2,200.00) |
| Roger Krissman | 1 | (30,000.00) x |
| | 3 | (3,726.10) |
| | 4 | (4,155.51) |
| Shulman Bastian Friedman & Bui LLP | 1 | (15,388.95) |
| Snell & Wilmer | 1 | (13,630.10) |
| Spilman Thomas & Battle | 18 | (1,096,421.19) |
| St. Rose Hospital 1 | 1 | (5,868.95) |
| | 39 | (95,046.37) |
| Symphony Risk Solutions, LLC | 22 | (1,301,740.67) |
| Tech Guys | 1 | (3,300.00) |
| Unum Life Insurance Company of America | 30 | (108,490.76) |
| VerityStream | 2 | (51,610.51) |
| | 6 | (15,070.00) |
| Woodruff-Sawyer & Co. | 19 | (1,305,415.48) |
| **Grand Total** | **866** | **(28,976,589.24)** |
| | | |
| **Grand Total Check and Bill Payments (ACH Transfer)** | **1208** | **(31,879,245.21)** |

**A1886**

**Alecto Healthcare Services, LLC**
**Payments by Check/ACH Transfer**

**III. GCS Examination**

**III.A. Checks**

| Name | Values Count | Amount | | GCS Examination Count | Amount |
|---|---|---|---|---|---|
| American Express | 43 | (124,463.54) | x | 1 | (12,763.60) |
| Michael J. Sarrao | 1 | (22,895.97) | x | 1 | (22,895.97) |
| | 1 | (549.75) | | | |
| Roger Krissman | 1 | (27,102.79) | x | 1 | (27,102.79) |
| Steven Kay Esq | 1 | (10,300.00) | x | 1 | (10,300.00) |
| **Grand Total** | **47** | **(185,312.05)** | | **4** | **(73,062.36)** |

**III.B. Bill Payments/ACH Transfers**

| Name | Values Count | Amount | | GCS Review Count | Amount |
|---|---|---|---|---|---|
| Aman Dhuper | 10 | (107,272.04) | x | 6 | (88,429.47) |
| American Express | 7 | (337,326.03) | x | 6 | (335,846.67) |
| Lex Reddy | 5 | (88,360.74) | x | 1 | (77,000.00) |
| Michael J. Sarrao | 53 | (960,052.31) | x | 22 | (812,424.52) |
| | 6 | (2,000.65) | | | |
| Panch Jeyakumar M.D. | 3 | (3,139.00) | | | |
| Roger Krissman | 1 | (30,000.00) | x | 1 | (30,000.00) |
| **Grand Total** | **85** | **(1,528,150.77)** | | **36** | **(1,343,700.66)** |

| | | | | | |
|---|---|---|---|---|---|
| **Grand Total Check and Bill Payments (ACH/Wire)** | **132** | **(1,713,462.82)** | | **40** | **(1,416,763.02)** |
| | | | | | **83%** |

Exhibit 6
Insider Payments

**Alecto Healthcare Services, LLC**
Transfers to Insiders of $10,000 or more (excl. 2018 Promissory Note)

| Type | Date | Num | Name | Memo | Amount | Count |
|------|------|-----|------|------|--------|-------|
| Bill Payment | 4/11/2023 | ACH PMT | Michael J. Sarrao | Pmt of Forvis Invoice - FRMC Volume Decrease Adjustment preparation & OOS | -41,250.00 | 20 |
| Bill Payment | 1/12/2023 | ACH PMT | Michael J. Sarrao | Dec 2022 - MJS expense reimbursement | -13,826.13 | 19 |
| Bill Payment | 10/5/2022 | ACH PMT | Michael J. Sarrao | OVMC & EORH - Forvis invoices 07/28/2022 FRMC Settlement - Moran v. FRMC | -110,000.00 | 18 |
| Bill Payment | 8/3/2022 | ACH PMT | Michael J. Sarrao | OVMC - ST Of WV - Dept. of H&HR letter 07/05/22 | -149,743.00 | 17 |
| Bill Payment | 8/3/2022 | ACH PMT | Michael J. Sarrao | OVMC - DHG     8062 04/21/2022 | -10,000.00 | 16 |
| Bill Payment | 6/9/2022 | ACH PMT | Michael J. Sarrao | OVMC - DHG     9695 05/06/22 EORH - DHG     9698 05/06/22 | -20,000.00 | 15 |
| Bill Payment | 6/9/2022 | ACH PMT | Michael J. Sarrao | May 2022 - MJS expense reimbursement | -12,110.31 | 14 |
| Bill Payment | 12/29/2021 | ACH PMT | Michael J. Sarrao | Flaherty Legal - Christensen v. OVMC - Septic shock | -27,472.14 | 21 |
| Bill Payment | 12/17/2021 | ACH PMT | Michael J. Sarrao | Moore & Biser FS, Moore & Biser 1358, Moore & Biser 1388; Wright, James R v. OVMC | -35,000.00 | 12 |
| Bill Payment | 12/13/2021 | ACH PMT | Michael J. Sarrao | Moore & Biser - Wright, James R v. OVMC | -91,632.34 | 11 |
| Bill Payment | 10/29/2021 | ACH PMT | Michael J. Sarrao | Kieckhafer Schiffer - OVMC Pension Plan - Inv 624348 10/18/21 | -17,110.01 | 22 |
| Bill Payment | 10/20/2021 | ACH PMT | Michael J. Sarrao | | -11,567.50 | 23 |
| Bill Payment | 10/1/2021 | ACH PMT | Michael J. Sarrao | | 55,736.10 | 10 |
| Bill Payment | 7/22/2021 | ACH PMT | Michael J. Sarrao | Flaherty Sensabaugh Inv 220132 04/19 - OVMC Christensen v. OVMC | -26,458.70 | 13 |
| Bill Payment | 7/1/2021 | ACH PMT | Michael J. Sarrao | | -15,500.00 | 9 |
| Bill Payment | 5/11/2021 | ACH PMT | Michael J. Sarrao | | -13,690.76 | 8 |
| Bill Payment | 1/20/2021 | ACH PMT | Michael J. Sarrao | | -24,608.17 | 7 |
| Bill Payment | 1/6/2021 | ACH PMT | Michael J. Sarrao | | -17,156.78 | 6 |
| Bill Payment | 11/24/2020 | ACH PMT | Michael J. Sarrao | | -17,130.45 | 5 |
| Bill Payment | 11/5/2020 | ACH PMT | Michael J. Sarrao | | -17,016.95 | 4 |
| Bill Payment | 4/14/2020 | ACH PMT | Michael J. Sarrao | | -70,790.89 | 3 |
| Bill Payment | 2/7/2020 | ACH PMT | Michael J. Sarrao | | -14,624.29 | 2 |
| Check | 8/30/2019 | 3163 | Michael J. Sarrao | | -22,895.97 | 1 |
| | | | Michael J. Sarrao | | -835,320.49 | |
| | | | | | | |
| Bill Payment | 1/20/2021 | ACH PMT | Lex Reddy | WF Margin call money advanced, now refunded | -77,000.00 | 1 |
| | | | Lex Reddy See [1] | | -77,000.00 | |
| | | | | | | |
| Bill Payment | 3/31/2022 | ACH PMT | Aman Dhuper | 2021 Year Final bill | -12,388.61 | 1 |
| Bill Payment | 1/19/2022 | ACH PMT | Aman Dhuper | 2020-2021 SRH expense | -11,139.77 | 2 |
| Bill Payment | 6/8/2021 | ACH PMT | Aman Dhuper | Dec 20-Feb 2021, Mar 21 - Apr 2021 | -11,532.01 | 3 |
| Bill Payment | 12/1/2020 | ACH PMT | Aman Dhuper | June - Sept 2020 | -14,717.63 | 4 |
| Bill Payment | 8/5/2020 | ACH PMT | Aman Dhuper | Jan - May 2020, OV-EO & FRMC | -20,318.66 | 5 |
| Bill Payment | 6/17/2020 | ACH PMT | Aman Dhuper | March thru May 2020 | -18,332.79 | 6 |
| | | | Aman Dhuper | | -88,429.47 | |
| | | | | | | |
| Bill Payment | 4/13/2020 | WIRE PMT | American Express | | -150,000.00 | 1 |
| Bill Payment | 3/20/2020 | WIRE PMT | American Express | | -60,000.00 | 2 |
| Bill Payment | 2/10/2020 | WIRE | American Express | | -40,000.00 | 3 |
| Bill Payment | 4/24/2020 | WIRE PMT | American Express | | -35,345.68 | 4 |
| Bill Payment | 6/15/2020 | WIRE PMT | American Express | | -25,500.99 | 5 |
| Bill Payment | 5/13/2020 | WIRE PMT | American Express | | -25,000.00 | 6 |
| Check | 11/2/2021 | 3417 | American Express | | -12,763.60 | 8 |
| | | | American Express | | -348,610.27 | |
| | | | | | | |
| Check | 4/14/2020 | 3235 | Roger Krissman | | -27,102.79 | 1 |
| Bill Payment | 12/22/2020 | ACH PMT | Roger Krissman | | -30,000.00 | 2 |
| | | | Roger Krissman | | -57,102.79 | |
| | | | | | | |
| Check | 4/24/2020 | 3240 | Steven Kay Esq | | -10,300.00 | 1 |
| | | | Steven Kay Esq | | -10,300.00 | |

Payments Examined: -1,416,763.02  40

[1] See Ex. 6.1 for analysis of payments related to the 2018 Promissory Note.

GOULD Consulting Services

**Exhibit 7**
**Bank Account**
**Summary Schedules**

# Schedules A.0 – A.3, A.7

**Schedules A.0.1 – A.0.4**
**Alecto Bank Account Summaries**

**Schedule A.0.1 – Account \*3784 Disbursement**
**Schedule A.0.2 – Account \*3784 (2019 monthly)**
**Schedule A.0.3 – Account \*6065 Operating**
**Schedule A.0.4 – Account \*6508 Payroll**

**Alecto Healthcare Services LLC**
Bank Statement Analysis - July 2019 - December 2019
Analysis of Transfers under the CNH Revolving Facility
Alecto Disbursements Acct *3784

**I. Deposits: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2019 | 2019 | 2019 | 2019 | | 2019 Grand Total |
| Transaction Type | 7 | 8 | 9 | 10 | 11 | 12 | |
| BANK FEE | | | | | $280 | | $280 |
| TRANSFER FROM | | $900,000 | $715,600 | $252,000 | $418,000 | $185,000 | $2,470,600 |
| WIRE IN | $23,574,880 | $28,281,600 | $17,472,000 | $16,193,100 | $13,921,500 | $16,653,900 | $116,096,980 |
| Grand Total | $23,574,880 | $29,181,600 | $18,187,600 | $16,445,100 | $14,339,780 | $16,838,900 | $118,567,860 |

**I.A. Transfers received into Acct *3784: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | | Yr | Mo | | | | |
|---|---|---|---|---|---|---|---|
| | | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 Grand Total |
| Transaction Type | Acct | 8 | 9 | 10 | 11 | 12 | |
| TRANSFER FROM | 3709 | | $9,400 | $6,000 | | | $15,400 |
| TRANSFER FROM | 6065 | $900,000 | $704,200 | $246,000 | $416,000 | $185,000 | $2,451,200 |
| TRANSFER FROM | 6508 | | $2,000 | | $2,000 | | $4,000 |
| Grand Total | | $900,000 | $715,600 | $252,000 | $418,000 | $185,000 | $2,470,600 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis - July 2019 - December 2019**
**Analysis of Transfers under the CNH Revolving Facility**
**Alecto Disbursements Acct *3784**

II. Withdrawals: STMNT Processed_3784

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| Transaction Type | 7 | 8 | 9 | 10 | 11 | 12 | |
| ACH FEE | | | | | -$20 | -$20 | -$40 |
| BANK FEE | | | | | -$140 | | -$140 |
| TRANSFER TO | -$879,930 | -$785,962 | -$424,300 | -$657,122 | -$1,275,024 | -$1,090,000 | -$5,112,338 |
| WIRE FEE | -$1,149 | -$1,242 | -$996 | -$1,038 | -$813 | -$1,047 | -$6,285 |
| WIRE OUT | -$22,758,000 | -$27,151,000 | -$18,957,000 | -$15,839,000 | -$12,769,000 | -$15,740,500 | -$113,214,500 |
| Grand Total | -$23,639,079 | -$27,938,204 | -$19,382,296 | -$16,497,160 | -$14,044,997 | -$16,831,567 | -$118,333,303 |

II.A. Withdrawals: STMNT Processed_3784

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | Mo | | | | |
|---|---|---|---|---|---|---|---|
| | | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 Grand Total |
| Transaction Type | Acct | 7 | 8 | 9 | 10 | 11 | 12 |
| TRANSFER TO | 3709 | | | -$9,000 | -$6,000 | | -$15,000 |
| TRANSFER TO | 6065 | -$556,730 | -$401,000 | -$264,000 | -$451,000 | -$943,857 | -$805,000 | -$3,461,587 |
| TRANSFER TO | 6508 | -$322,900 | -$384,315 | -$151,300 | -$160,000 | -$331,000 | -$285,000 | -$1,634,515 |
| TRANSFER TO | 7067 | -$200 | | | | | | -$200 |
| TRANSFER TO | 7509 | -$100 | -$647 | | -$122 | -$167 | | -$1,036 |
| Grand Total | | -$879,930 | -$785,962 | -$424,300 | -$657,122 | -$1,275,000 | -$1,090,000 | -$5,112,338 |

**A1894**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis - July 8, 2019 - July 31, 2019**
**Analysis of Transfers under the CNH Revolving Facility**
**Alecto Disbursements Acct *3784**

**II.B. 2019 Transfers under the CNH Revolving Facility (beginning 7/8/2019)**

| GCS Acct | 3784 |
| Debit | (Multiple Items) |

| 2019 Transfers to Alecto *6065/*6508 after 2019 Plaza MOB Refinance | -$4,947,802 |
| 2019 Wire Transfers to Affiliates after 2019 Plaza MOB Refinance | -$108,049,500 |
| Total Transfers in 2019 "Plaza MOB Gap Period": | -$113,013,538 |

| Sum of Amount | | | Yr |
| --- | --- | --- | --- |
| | | | 2019 |
| Transaction Ty| Acct Transfer To / I| Date | 7 |
| TRANSFER TC | 6065 | 7/12/2019 | -$320,000 |
| TRANSFER TC | 6065 | 7/15/2019 | -$56,000 |
| TRANSFER TC | 6065 | 7/16/2019 | -$2,000 |
| TRANSFER TC | 6065 | 7/19/2019 | -$43,100 |
| TRANSFER TC | 6065 | 7/23/2019 | -$5,000 |
| TRANSFER TC | 6065 | 7/25/2019 | -$50,000 |
| TRANSFER TC | 6065 | 7/26/2019 | -$13,630 |
| TRANSFER TC | 6065 | 7/31/2019 | -$6,000 |
| TRANSFER TO | 6065 Total | | -$495,730 |
| TRANSFER TC | 6508 | 7/10/2019 | -$85,000 |
| TRANSFER TC | 6508 | 7/15/2019 | -$16,900 |
| TRANSFER TC | 6508 | 7/18/2019 | -$134,000 |
| TRANSFER TO | 6508 Total | | -$235,900 |
| TRANSFER TO Total | | | -$731,630 |
| WIRE OUT | (blank) | 7/8/2019 | -$1,050,000 |
| WIRE OUT | (blank) | 7/9/2019 | -$100,000 |
| WIRE OUT | (blank) | 7/10/2019 | -$1,985,000 |
| WIRE OUT | (blank) | 7/11/2019 | -$200,000 |
| WIRE OUT | (blank) | 7/12/2019 | -$1,450,000 |
| WIRE OUT | (blank) | 7/15/2019 | -$700,000 |
| WIRE OUT | (blank) | 7/16/2019 | -$928,000 |
| WIRE OUT | (blank) | 7/17/2019 | -$335,000 |
| WIRE OUT | (blank) | 7/18/2019 | -$2,695,000 |
| WIRE OUT | (blank) | 7/19/2019 | -$1,050,000 |
| WIRE OUT | (blank) | 7/22/2019 | -$960,000 |
| WIRE OUT | (blank) | 7/23/2019 | -$510,000 |
| WIRE OUT | (blank) | 7/24/2019 | -$1,585,000 |
| WIRE OUT | (blank) | 7/25/2019 | -$705,000 |
| WIRE OUT | (blank) | 7/26/2019 | -$990,000 |
| WIRE OUT | (blank) | 7/29/2019 | -$750,000 |
| WIRE OUT | (blank) | 7/30/2019 | -$1,105,000 |
| WIRE OUT | (blank) | 7/31/2019 | -$495,000 |
| WIRE OUT | (blank) Total | | -$17,593,000 |
| WIRE OUT Total | | | -$17,593,000 |
| Grand Total | | | -$18,324,630 |

**GOULD Consulting Services**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis: January 2019 - June 2023**
**Alecto Disbursements Acct *3784**

Significant transfers greater than $2.5 million:

| | | | | | |
|---|---|---|---|---|---|
| (1) | 01/19/2021 | $23,506,100 Account Transfer Cr. FR ACC▮ | 6065 | Proceeds of the UCLA Asset Sale (OMC/Horizon) |
| (2) | 01/20/2021 | ($7,534,870) Account Transfer Dr. TO ACC▮ | 6065 | Internal Payroll Tax payment |
| (3) | 08/06/2020 | ($2,500,000) Account Transfer Dr. TO ACC▮ | 6065 | Internal Payroll transfer |

**I. Deposits: STMNT Processed_3784**

| GCS Acct | (Multiple Items) |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK FEE | $280 | | | | | $280 |
| DEPOSIT | | | $16,503 | | | $16,503 |
| (1) TRANSFER FROM | $6,748,300 | $836,518 | $23,506,100 | $8,880,111 | $3,562,594 | $43,533,623 |
| WIRE IN | $275,632,620 | $189,887,831 | $66,919,400 | $34,391,109 | | $566,830,960 |
| **Grand Total** | **$282,381,200** | **$190,724,349** | **$90,442,003** | **$43,271,219** | **$3,562,594** | **$610,381,366** |

Wire transfers into account from CNH Revolving Facility greater than $5 million:

| | | | | |
|---|---|---|---|---|
| 04/16/2020 | Incoming Wire-Dom | $13,474,200 various --> | (a) | $13,469,200 AHS |
| 06/15/2020 | Incoming Wire-Dom | $13,500,000 various --> | (b) | $9,536,600 AHS |
| 06/25/2020 | Incoming Wire-Dom | $11,579,251 OMC | | |
| 07/21/2020 | Incoming Wire-Dom | $6,504,300 AHS | (c) | |

**I.A. Transfers received into Acct *3784: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER FROM** | 3709 | | $55,400 | | | | | $55,400 |
| (1) **TRANSFER FROM** | 6065 | 2018 LOAN | $740,000 | $170,000 | | | | $910,000 |
| **TRANSFER FROM** | 6065 | | $5,948,900 | $643,018 | $23,506,100 | $8,880,079 | $3,562,572 | $42,540,669 |
| **TRANSFER FROM** | 6508 | | $4,000 | $19,100 | | | | $23,100 |
| **TRANSFER FROM** | 7067 | | | $4,400 | | | | $4,400 |
| **TRANSFER FROM** | 7509 | | | | | $32 | $22 | $54 |
| **Grand Total** | | | $6,748,300 | $836,518 | $23,506,100 | $8,880,111 | $3,562,594 | $43,533,623 |

Note:

(a)  Advance by Alecto to increase bank balance from $670,000 to an average of $14 million through mid-June 2020 during COVID crisis.

(b)  Advance by Alecto to increase bank balance to approximately $20 million through end of 2020 during COVID crisis.

(c)  Balance dropped to $15 million, advance increased average balance to $20 million.

GOULD Consulting Services

**A1896**

**Alecto Healthcare Services LLC**
Bank Statement Analysis: January 2019 - June 2023
Alecto Disbursements Acct *3784

**II. Withdrawals: STMNT Processed_3784**

| | GCS Acct | | | 3784 | | | |
|---|---|---|---|---|---|---|---|
| | Debit | | | (Multiple Items) | | | |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | **Transaction Type** | **2019** | **2020** | **2021** | **2022** | | **2023 Grand Total** |
| | ACH BATCH OFFSET W/O | | | | -$1,521,467 | | -$1,521,467 |
| | ACH FEE | -$40 | | | | | -$40 |
| | BANK FEE | -$140 | -$948 | -$1,967 | -$1,374 | -$218 | -$4,647 |
| (2)(3) | TRANSFER TO | -$10,144,602 | -$14,733,853 | -$15,391,187 | -$5,371,400 | -$20 | -$45,641,061 |
| | WIRE FEE | -$13,512 | -$5,121 | -$780 | -$1,035 | | -$20,448 |
| (d) | WIRE OUT | -$272,006,065 | -$103,624,663 | -$4,000 | | | -$375,634,728 |
| (d) | WIRE OUT BSUITE | | -$59,358,000 | -$77,730,700 | -$47,002,027 | -$3,562,384 | -$187,653,111 |
| | **Grand Total** | **-$282,164,359** | **-$177,722,585** | **-$93,128,634** | **-$53,897,303** | **-$3,562,622** | **-$610,475,501** |

Wire transfers out of account to Affiliates greater than $5 million:
06/25/2020     Tnet Wire Out-  ($11,579,251) OMC

Wire transfers related to the 2019 Olympia Loan:
09/26/2019     Account Transfer Cr. FR ACC [    ] 6065                                      $500,000
09/26/2019     Tnet Wire Out- (incl. in $935,000 transfer w/ $435,000 Advance funding)     ($500,000)

**II.A. Transfers out of Account: STMNT Processed_3784**

| | GCS Acct | | | 3784 | | | | |
|---|---|---|---|---|---|---|---|---|
| | Debit | | | (Multiple Items) | | | | |

| | Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Transaction Type** | **Acct** | **Name** | **2019** | **2020** | **2021** | **2022** | **2023 Grand Total** |
| | **TRANSFER TO** | 3709 | | -$71,000 | -$25,759 | | | -$96,759 |
| (2) | **TRANSFER TO** | 6065 | 2018 LOAN - $792K COVER | | | -$1,000,000 | | -$1,000,000 |
| (3) | **TRANSFER TO** | 6065 | 2018 LOAN - CALL | | -$336,132 | | | -$336,132 |
| | **TRANSFER TO** | 6065 | | -$7,034,292 | -$13,527,589 | -$13,981,187 | -$4,803,800 | -$20 -$39,346,887 |
| | **TRANSFER TO** | 6508 | | -$3,036,824 | -$839,131 | -$410,000 | -$567,600 | -$4,853,556 |
| | **TRANSFER TO** | 7067 | | -$900 | -$5,016 | | | -$5,916 |
| | **TRANSFER TO** | 7509 | | -$1,586 | -$225 | | | -$1,811 |
| | **Grand Total** | | | -$10,144,602 | -$14,733,853 | -$15,391,187 | -$5,371,400 | -$20 -$45,641,061 |

Note:
(d) Change in transaction description on bank statement, confirmed to be transfers to Affiliates. See Sections I.B. and I.C.

**GOULD** Consulting Services

**Alecto Healthcare Services LLC**
Bank Statement Analysis: January 2019 - June 2023
Alecto Disbursements Acct *3784

**I.B. Monthly Advances from CNH Revolving Facility: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Transaction Type | WIRE IN |
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Mo | | 2019 | 2020 | 2021 | 2022 | Grand Total |
| | 1 | $27,836,000 | $13,987,400 | $10,026,500 | $4,053,000 | $55,902,900 |
| | 2 | $24,871,000 | $10,993,900 | $7,383,900 | $3,804,800 | $47,053,600 |
| | 3 | $28,287,000 | $14,249,880 | $11,130,900 | $3,525,600 | $57,193,380 |
| | 4 | $28,965,640 | $30,711,100 | $3,254,900 | $4,478,600 | $67,410,240 |
| | 5 | $26,625,000 | $10,507,400 | $4,003,600 | $3,465,500 | $44,601,500 |
| | 6 | $22,951,000 | $33,095,551 | $5,091,400 | $4,754,200 | $65,892,151 |
| | 7 | $23,574,880 | $18,016,600 | $4,086,800 | $3,542,900 | $49,221,180 |
| | 8 | $28,281,600 | $13,168,000 | $3,867,300 | $5,107,642 | $50,424,542 |
| | 9 | $17,472,000 | $8,452,300 | $5,283,500 | $1,653,063 | $32,860,863 |
| | 10 | $16,193,100 | $11,583,800 | $3,801,500 | $2,745 | $31,581,145 |
| | 11 | $13,921,500 | $14,482,500 | $5,248,800 | $3,059 | $33,655,859 |
| | 12 | $16,653,900 | $10,639,400 | $3,740,300 | | $31,033,600 |
| **Grand Total** | | **$275,632,620** | **$189,887,831** | **$66,919,400** | **$34,391,109** | **$566,830,960** |

**I.C. Monthly Wire Transfers to Affiliates: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Transaction Type | (Multiple Items) |
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | | |
|---|---|---|---|---|---|---|---|
| Mo | | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| | 1 | -$29,157,500 | -$13,889,262 | -$10,330,500 | -$8,305,374 | -$1,611,734 | -$63,294,370 |
| | 2 | -$23,201,000 | -$9,929,700 | -$9,655,000 | -$6,367,000 | -$485,650 | -$49,638,350 |
| | 3 | -$29,454,427 | -$11,752,100 | -$9,925,000 | -$4,100,000 | -$1,100,000 | -$56,331,527 |
| | 4 | -$28,374,637 | -$16,583,000 | -$4,622,000 | -$5,853,000 | -$290,000 | -$55,722,637 |
| | 5 | -$26,511,000 | -$10,393,200 | -$4,092,000 | -$3,465,000 | -$75,000 | -$44,536,200 |
| | 6 | -$22,093,000 | -$26,022,901 | -$4,549,900 | -$4,851,500 | | -$57,517,301 |
| | 7 | -$22,758,000 | -$15,054,500 | -$3,758,500 | -$4,740,600 | | -$46,311,600 |
| | 8 | -$27,151,000 | -$12,150,000 | -$7,179,700 | -$4,683,150 | | -$51,163,850 |
| | 9 | -$18,957,000 | -$8,295,000 | -$5,529,100 | -$2,233,903 | | -$35,015,003 |
| | 10 | -$15,839,000 | -$10,275,000 | -$6,397,000 | -$794,500 | | -$33,305,500 |
| | 11 | -$12,769,000 | -$11,352,000 | -$6,134,000 | -$433,000 | | -$30,688,000 |
| | 12 | -$15,740,500 | -$17,286,000 | -$5,562,000 | -$1,175,000 | | -$39,763,500 |
| **Grand Total** | | **-$272,006,065** | **-$162,982,663** | **-$77,734,700** | **-$47,002,027** | **-$3,562,384** | **-$563,287,839** |

**GOULD** Consulting Services

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct *6065**

Significant transfers greater than $2.5 million:

| | | | | |
|---|---|---|---|---|
| (1) | 6/20/2019 | $8,444,478 | Incoming Wire-Dom | Contribution from Alecto Members (Plaza MOB Refinancing) |
| (2) | 6/20/2019 | ($8,444,478) | Tnet Wire Out-Dom | 2019 Olympia HC Loan |
| (3) | 1/4/2021 | $23,506,100 | Incoming Wire-Dom | UCLA Asset Sale Proceeds (OMC/Horizon) |
| (4) | 1/19/2021 | ($23,506,100) | Account Transfer Dr. TO ACC █████ 3784 | to Alecto Disbursements Account |
| (5) | 1/20/2021 | $7,534,870 | Account Transfer Cr. FR ACC █████ 3784 | from Alecto Disbursements Account |
| (6) | 1/20/2021 | ($7,534,870) | Bsuite Wire Out-Dom | Payroll Tax payment through Holtz Slavett & Drabkin |

**I. Deposits: STMNT Processed 6065**

| GCS Acct | 6065 |
|---|---|
| Credit | (Multiple Items) |
| Description | (All) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK FEE | | | $5 | | | $5 |
| CREDIT MEMO | $80,000 | $74 | | $2,522 | | $82,596 |
| DEPOSIT | $2,422,568 | $277,004 | $2,550,116 | $1,038,848 | $3,319,299 | $9,607,835 |
| FILE INPUT CREDIT | | | | $140 | | $140 |
| INTERCO TRNX IN | $38,963 | $55,624 | | | | $94,587 |
| ST. ROSE INTERCO ALLOC | $293,890 | $505,058 | $124,508 | $244,558 | $251,799 | $1,419,813 |
| TRANSFER FROM | $7,707,634 | $13,868,721 | $14,611,189 | $5,874,228 | $1,617,905 | $43,679,677 |
| (1) (3) WIRE IN | $16,546,448 | $1,986,251 | $24,041,002 | $10,766,656 | $4,502,048 | $57,842,405 |
| Grand Total | $27,089,503 | $16,692,732 | $41,326,820 | $17,926,951 | $9,691,052 | $112,727,057 |

Wire transfers into account greater than $5 million:

| | | | | |
|---|---|---|---|---|
| (1) | 06/20/2019 | $8,444,478 | Incoming Wire-Dom | Contribution from Alecto Members (Plaza MOB Refinancing) |
| (3) | 01/04/2021 | $23,506,100 | Incoming Wire-Dom | UCLA Asset Sale Proceeds (OMC/Horizon) |

Transfers into/out of account related to the Plaza MOB Refinancing and 2019 Olympia HC Loan

| | | | | |
|---|---|---|---|---|
| (1) | 06/20/2019 | $8,444,478 | Incoming Wire-Dom | Contribution from Alecto Members (Plaza MOB Refinancing) |
| (2) | 06/20/2019 | ($8,444,478) | Tnet Wire Out-Dom | 2019 Olympia HC Loan |
| | 07/31/2019 | $620,576 | Incoming Wire-Dom | Additional distributions from Plaza MOB Refinancing |
| | 07/31/2019 | ($620,576) | Tnet Wire Out-Dom | Transfer to OMC |
| | 09/26/2019 | ($500,000) | Account Transfer Dr. TO ACC █████ 3784 | To Alecto *3784 then to OMC for 2019 Olympia Loan |

GOULD Consulting Services

**A1899**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct \*6065**

I.A. Transfers received into Acct \*6065: STMNT Processed_6065

| GCS Acct | 6065 |
|---|---|
| Credit | (Multiple Items) |
| Description | (All) |

| **Sum of Amount** | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Transaction Type** | **Acct** | **Name** | **2019** | **2020** | **2021** | **2022** | | **2023 Grand Total** |
| **TRANSFER FROM** | 3709 | | $6,000 | | | $6 | | $6,006 |
| **TRANSFER FROM** | 3762 | | | | $30 | | | $30 |
| (5) **TRANSFER FROM** | 3784 | 2018 LOAN - $792K COVER | | | $1,000,000 | | | $1,000,000 |
| **TRANSFER FROM** | 3784 | 2018 LOAN - CALL | $336,132 | | | | | $336,132 |
| **TRANSFER FROM** | 3784 | | $7,034,292 | $13,527,589 | $13,601,137 | $4,803,800 | $20 | $38,966,837 |
| **TRANSFER FROM** | 6508 | | | $5,000 | $10,000 | $26,000 | $19,092 | $60,092 |
| **TRANSFER FROM** | 7509 | | $667,343 | | $22 | $1,044,422 | $1,598,793 | $3,310,580 |
| **Grand Total** | | | $7,707,634 | $13,868,721 | $14,611,189 | $5,874,228 | $1,617,905 | $43,679,677 |

Direct transfers out of account greater than $5 million:

(5)　　01/20/2021　$7,534,870　Account Transfer Cr. FR ACC▮▮▮ 3784　　from Alecto Disbursements Account

GOULD Consulting Services

**A1900**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct \*6065**

II. Withdrawals: STMNT Processed_6065

| GCS Acct | 6065 |
| --- | --- |
| Debit | (Multiple Items) |
| Description | (All) |

| Sum of Amount | Yr | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH | -$52,230 | -$21,771 | | | | -$74,001 |
| ACH FEE | -$1,347 | -$2,841 | -$3,222 | -$2,820 | -$1,604 | -$11,835 |
| BANK FEE | -$1,828 | -$1,491 | -$1,281 | -$1,208 | -$510 | -$6,318 |
| CC PYMNT | | | -$5,000 | | | -$5,000 |
| CHECK | -$4,069,955 | -$551,473 | -$534,767 | -$189,708 | -$121,980 | -$5,467,883 |
| CNB CC PYMNT 71026418 | | -$22,085 | -$118,819 | -$11,562 | -$3,520 | -$155,986 |
| DEBIT MEMO | | | -$62,250 | | | -$62,250 |
| DEPOSIT RETURN ITEM FEE | | -$12 | -$36 | | | -$48 |
| FRANCH TAX | | | -$32,606 | -$38,185 | -$8,100 | -$78,891 |
| IRS TAX OLYMPIA PLAZA MGT | -$2,000 | -$2,000 | | -$36,777 | | -$40,777 |
| (4) TRANSFER TO | -$7,280,932 | -$5,426,964 | -$28,942,782 | -$13,828,305 | -$7,453,246 | -$62,932,229 |
| WIRE FEE | -$834 | -$780 | -$105 | -$315 | -$225 | -$2,259 |
| (2) WIRE OUT | -$15,695,254 | -$5,732,322 | | | | -$21,427,576 |
| (6) WIRE OUT BSUITE | | -$4,669,805 | -$12,047,312 | -$4,445,895 | -$2,130,382 | -$23,293,394 |
| WITHDRAWAL | | -$245,441 | -$516 | -$146,299 | -$482 | -$392,737 |
| Grand Total | -$27,104,381 | -$16,681,985 | -$41,748,786 | -$18,701,073 | -$9,720,048 | -$113,956,274 |

Wire transfers out of account greater than $5 million:

| (2) | 06/20/2019 | ($8,444,478) Tnet Wire Out-Dom | |
| --- | --- | --- | --- |
| (6) | 01/20/2021 | ($7,534,858) Bsuite Wire Out-Dom | Holtz Slavett & Drabkin |

GOULD Consulting Services

**A1901**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct \*6065**

II.A.  Transfers out of Acct \*6065: STMNT Processed_6065

| GCS Acct | 6065 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER TO | 3709 | | -$29,466 | -$34,672 | -$40,654 | -$488 | | -$105,280 |
| TRANSFER TO | 3762 | | | | -$60 | | | -$60 |
| (4) TRANSFER TO | 3784 | | -$5,948,900 | -$643,018 | -$23,506,100 | -$8,880,079 | -$3,562,572 | -$42,540,669 |
| TRANSFER TO | 3784 | 2018 LOAN | -$740,000 | -$170,000 | | | | -$910,000 |
| TRANSFER TO | 6508 | | -$559,839 | -$4,577,166 | -$5,393,986 | -$4,946,290 | -$3,850,869 | -$19,328,151 |
| TRANSFER TO | 7067 | | -$1,500 | -$329 | -$196 | -$242 | -$66 | -$2,333 |
| TRANSFER TO | 7423 | | | | -$22 | | | -$22 |
| TRANSFER TO | 7509 | | -$1,227 | -$1,779 | -$1,764 | -$1,206 | -$39,738 | -$45,714 |
| Grand Total | | | -$7,280,932 | -$5,426,964 | -$28,942,782 | -$13,828,305 | -$7,453,246 | -$62,932,229 |

Direct transfers out of account greater than $5 million:
(4)    01/19/2021  ($23,506,100) Account Transfer Dr. TO ACC███████ 3784  UCLA Asset Sale (OMC/Horizon)

GOULD Consulting Services

**A1902**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Payroll Acct *6508**

**I. Deposits: STMNT Processed_6508**

| GCS Acct | 6508 |
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| RETURN ITEM | | $51,882 | $4,711 | | | $56,593 |
| TRANSFER FROM | $3,596,663 | $5,416,297 | $5,567,986 | $5,513,890 | $3,876,712 | $23,971,549 |
| Grand Total | $3,596,663 | $5,468,179 | $5,572,697 | $5,513,890 | $3,876,712 | $24,028,141 |

**I.A. Transfers received into Acct *6508: STMNT Processed_6508**

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER FROM | 3784 | $3,036,824 | $839,131 | $310,000 | $567,600 | | $4,753,556 |
| TRANSFER FROM | 6065 | $559,839 | $4,577,166 | $5,257,986 | $4,946,290 | $3,850,869 | $19,192,151 |
| TRANSFER FROM | 7509 | | | | | $25,842 | $25,842 |
| Grand Total | | $3,596,663 | $5,416,297 | $5,567,986 | $5,513,890 | $3,876,712 | $23,971,549 |

**II. Withdrawals: STMNT Processed_6508**

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| (1) | 2018 LOAN | -$30,000 | | | | | -$30,000 |
| | 2018 LOAN INT | | | -$96,947 | -$12,118 | | -$109,066 |
| | ACH | -$186,209 | -$2,563,734 | -$2,695,342 | -$2,883,803 | -$2,755,429 | -$11,084,516 |
| | ACH FEE | -$40 | -$24 | -$12 | | | -$76 |
| | BANK FEE | | -$185 | | | | -$185 |
| | IRS TAX ALECTO | | -$7,950 | | | | -$7,950 |
| | P/R RETIREMNT PLN | -$146,700 | -$125,790 | -$84,325 | | | -$356,815 |
| | P/R TAX | -$886,745 | -$949,386 | -$896,928 | -$928,859 | -$367,123 | -$4,029,041 |
| | PAYROLL | -$2,089,147 | -$1,689,129 | -$1,499,701 | -$1,505,846 | -$637,489 | -$7,421,311 |
| | TAX CAL | -$249,973 | -$80,534 | | | | -$330,507 |
| | TRANSFER TO | -$4,000 | -$25,700 | -$10,000 | -$26,000 | -$19,092 | -$84,792 |
| | WITHDRAWAL | | -$10,364 | -$52,759 | -$157,987 | -$92,003 | -$313,113 |
| | Grand Total | -$3,592,814 | -$5,452,797 | -$5,336,013 | -$5,514,613 | -$3,871,135 | -$23,767,372 |

(1) 2019: $30,000 loan payment on 2018 Promissory Note to The Reddy Investment Trust
2021-2022: Nine (9) nterest payments of $12,118.

**II.A. Transfers out of Acct *6508: STMNT Processed_6508**

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER TO | 3709 | | -$1,600 | | | | -$1,600 |
| TRANSFER TO | 3784 | -$4,000 | -$19,100 | | | | -$23,100 |
| TRANSFER TO | 6065 | | -$5,000 | -$10,000 | -$26,000 | -$19,092 | -$60,092 |
| Grand Total | | -$4,000 | -$25,700 | -$10,000 | -$26,000 | -$19,092 | -$84,792 |

GOULD Consulting Services

**A1903**

# Schedule A.1
# Alecto Hayward Bank Account Summary

## Schedule A.1 – Account *7509

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Hayward Acct *7509**

**I. Deposits: STMNT Processed_7509**

| GCS Acct | 7509 |
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK FEE | | $25 | | $30 | | $55 |
| ST. ROSE MGMT FEE | $3,213,798 | $3,980,667 | $3,005,273 | $3,540,401 | $1,602,494 | $15,342,633 |
| TRANSFER FROM | $2,813 | $2,004 | $1,764 | $1,206 | $39,738 | $47,525 |
| WIRE IN | $719,737 | $222,937 | | | $450,743 | $1,393,417 |
| **Grand Total** | **$3,936,348** | **$4,205,633** | **$3,007,037** | **$3,541,637** | **$2,092,975** | **$16,783,631** |

**II. Withdrawals: STMNT Processed_7509**

| GCS Acct | 7509 |
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH FEE | -$40 | | | | | -$40 |
| BANK FEE | -$1,795 | -$1,751 | -$1,698 | -$1,188 | -$128 | -$6,560 |
| CHECK | | | | | -$47,280 | -$47,280 |
| TRANSFER TO | -$667,343 | | -$22 | -$1,044,476 | -$1,624,702 | -$3,336,542 |
| WIRE FEE | -$30 | -$15 | | | -$30 | -$75 |
| WIRE OUT | | | | | -$411,426 | -$411,426 |
| WIRE OUT REPET | -$3,267,640 | -$4,203,767 | -$3,005,273 | -$2,495,892 | | -$12,972,572 |
| WITHDRAWAL | | | | | -$9,198 | -$9,198 |
| **Grand Total** | **-$3,936,848** | **-$4,205,533** | **-$3,006,993** | **-$3,541,556** | **-$2,092,765** | **-$16,783,695** |

Note: No single wire transfer transaction greater than $600,000.

**II.A. Transfers out of account: STMNT Processed_7509**

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER TO** | 3784 | | | -$32 | -$22 | -$54 |
| **TRANSFER TO** | 6065 | -$667,343 | -$22 | -$1,044,422 | -$1,598,793 | -$3,310,580 |
| **TRANSFER TO** | 6508 | | | | -$25,842 | -$25,842 |
| **TRANSFER TO** | 7067 | | | -$22 | -$44 | -$66 |
| **Grand Total** | | **-$667,343** | **-$22** | **-$1,044,476** | **-$1,624,702** | **-$3,336,542** |

Note: No single direct transfer transaction greater than $600,000.

GOULD Consulting Services

**A1905**

# Schedules A.2.1.1 – A.2.1.5
## Sherman/Grayson Hospital Bank Account Summaries

Schedule A.2.1.1 – Account *5772
Schedule A.2.1.2 – Account *8191
Schedule A.2.1.3 – Account *8205
Schedule A.2.1.4 – Account *9152
Schedule A.2.1.5 – Account *1646

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

## I. Deposits: STMNT Processed_5772

| GCS Acct | 5572 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK ADJ | | $749 | | | | $749 |
| CLAIM DEPOSIT | $1,186,627 | $1,031,913 | $924,280 | $1,727,503 | $532,802 | $5,403,124 |
| COLLECTIONS | $324,119 | $172,525 | $138,342 | | | $634,987 |
| DEPOSIT | $1,203,904 | $731,567 | $527,696 | $4,886,880 | $1,315,625 | $8,665,673 |
| GOVT INS DEPOSIT | $4,841,555 | $2,595,173 | $2,507,420 | $1,559,408 | $878,378 | $12,381,933 |
| LOCKBOX IN | $8,116,149 | $7,846,703 | $6,086,137 | $3,117,211 | $856,286 | $26,032,487 |
| PMT WILSON | $1,050,104 | $11,292,351 | $1,868,226 | $1,006,313 | $433,659 | $15,650,654 |
| SQUARE DEP | $34 | | | | | $34 |
| (1) TRANSFER IN | | | | $5,353,551 | | $5,353,551 |
| UMR | $11,834 | $18,037 | | | | $29,871 |
| WIRE IN | | | | | $450,213 | $450,213 |
| **Grand Total** | **$16,734,327** | **$23,689,018** | **$12,052,102** | **$17,650,866** | **$4,476,963** | **$74,603,275** |

(1)     08/05/2022 ACCOUNT TRANSFER TRSF FROM [        ]9152          5,353,551  Acct *9152

## I.A. Wire transfers into account: STMNT Processed_5772

| GCS Acct | 5572 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Name | 2023 | Grand Total |
| WIRE IN | SHERMAN ANESTHE | $7,081 | $7,081 |
| WIRE IN | SHERMAN GRAYSON | $412,390 | $412,390 |
| WIRE IN | SHERMAN MD PROV | $30,742 | $30,742 |
| **Grand Total** | | **$450,213** | **$450,213** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**II. Withdrawals: STMNT Processed_5772**

| GCS Acct | 5572 |
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | -$110 | -$36 | -$2,753 | -$3,576 | -$94 | -$6,570 |
| BANK FEE | -$113,294 | -$106,350 | -$103,367 | -$102,101 | -$40,236 | -$465,348 |
| CHRGBK | -$36,569 | -$18,408 | -$22,083 | -$2,269 | | -$79,329 |
| DEBIT | | -$58 | | | | -$58 |
| PAYMENT | | | | | -$33,141 | -$33,141 |
| TRANSFER OUT | | | | -$3,335,700 | -$4,368,727 | -$7,704,427 |
| WIRE OUT | -$17,055,076 | -$23,544,420 | -$11,954,161 | -$14,219,653 | | -$66,773,310 |
| Grand Total | -$17,205,049 | -$23,669,272 | -$12,082,363 | -$17,663,299 | -$4,442,198 | -$75,062,182 |

**II.A. Transfers out of account: STMNT Processed_5772**

| GCS Acct | 5572 |
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER OUT | 1646 | | | | | -$770,136 | -$2,081,398 | -$2,851,533 |
| TRANSFER OUT | 7324 | | | | | | -$32,600 | -$32,600 |
| TRANSFER OUT | 7329 | | | | | | -$32,000 | -$32,000 |
| TRANSFER OUT | 7343 | | | | | -$30,000 | -$209,040 | -$239,040 |
| TRANSFER OUT | 9152 | | | | | -$2,535,564 | -$2,013,690 | -$4,549,254 |
| WIRE OUT | | ALECTO | -$5,574,197 | -$23,544,420 | -$11,954,161 | -$14,219,653 | | -$55,292,431 |
| WIRE OUT | | WHITE OAK | -$11,480,878 | | | | | -$11,480,878 |
| Grand Total | | | -$17,055,076 | -$23,544,420 | -$11,954,161 | -$17,555,353 | -$4,368,727 | -$74,477,737 |

**GOULD** Consulting Services

**A1908**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I. Deposits: STMNT Processed_8191**

| GCS Acct | 8191 |
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | | |
|---|---|---|---|---|---|---|---|
| **Transaction Type** | **2019** | **2020** | **2021** | **2022** | | **2023** | **Grand Total** |
| ACH CREDIT | $679 | | | | | | $679 |
| (1) TRANSFER IN | | | | | | $68,000 | $68,000 |
| HC CLAIM CR | $20,371,879 | $27,551,834 | $11,409,893 | $7,309,797 | | $2,566,333 | $69,209,736 |
| **Grand Total** | **$20,372,559** | **$27,551,834** | **$11,409,893** | **$7,309,797** | | **$2,634,333** | **$69,278,415** |

(1)   02/27/2023 Book transfer credit FROM ...8205                          68,000.00

**II. Withdrawals: STMNT Processed_8191**

| GCS Acct | 8191 |
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | | |
|---|---|---|---|---|---|---|---|
| **Transaction Type** | **2019** | **2020** | **2021** | **2022** | | **2023** | **Grand Total** |
| Acct *8205  TRANSFER OUT | -$20,372,559 | -$27,551,834 | -$11,409,893 | -$6,159,797 | | -$2,023,538 | -$67,517,621 |
| WIRE OUT | | | | | | -$25,635 | -$25,635 |
| WIRE TRFR WDRWL | | | | -$1,150,000 | | -$585,159 | -$1,735,159 |
| **Grand Total** | **-$20,372,559** | **-$27,551,834** | **-$11,409,893** | **-$7,309,797** | | **-$2,634,333** | **-$69,278,415** |

**GOULD** Consulting Services

**A1909**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I. Deposits: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| | **Sum of Amount** | **Yr** | | | | | |
|---|---|---|---|---|---|---|---|
| | **Transaction Type** | **2019** | **2020** | **2021** | **2022** | **2023** | **Grand Total** |
| Acct* 8191 | ACH CREDIT | $24,611,984 | $20,557,577 | $19,757,600 | $21,343,331 | $8,878,194 | $95,148,686 |
| | DEPOSIT | $12,087 | $6,374 | $18,185 | $371 | | $37,017 |
| | FUNDING | $18,702,627 | $27,551,834 | $11,409,893 | $6,159,797 | $1,448,083 | $65,272,234 |
| | LOCKBOX IN | $201,963 | $175,218 | $176,337 | $8,162 | $1,936 | $563,616 |
| | TRANSFER IN | | | | | $921,994 | $921,994 |
| | **Grand Total** | **$43,528,662** | **$48,291,003** | **$31,362,015** | **$27,511,660** | **$11,250,207** | **$161,943,548** |

**I.A. Transfers received into account: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| **Sum of Amount** | | **Yr** | |
|---|---|---|---|
| **Transaction Type** | **Acct** | **2023** | **Grand Total** |
| **TRANSFER IN** | 8191 | $575,455 | $575,455 |
| **TRANSFER IN** | 8248 | $128,786 | $128,786 |
| **TRANSFER IN** | 8264 | $113,676 | $113,676 |
| **TRANSFER IN** | 9202 | $78,865 | $78,865 |
| **TRANSFER IN** | 9210 | $25,211 | $25,211 |
| **TRANSFER IN Total** | | $921,994 | $921,994 |
| **Grand Total** | | $921,994 | $921,994 |

**GOULD** Consulting Services

**A1910**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**II. Withdrawals: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | | -$74 | | | | -$74 |
| BANK FEE | -$54,601 | -$60,616 | -$58,968 | -$56,576 | -$25,597 | -$256,358 |
| CHRGBK | -$1,319 | -$10 | -$50 | -$25 | | -$1,404 |
| PMT WILSON | | | | -$1,908 | | -$1,908 |
| TRANSFER CNH | -$18,375,921 | -$48,410,802 | -$31,312,380 | -$20,509,455 | | -$118,608,557 |
| TRANSFER OUT | -$24,996,412 | | | | -$68,000 | -$25,064,412 |
| WIRE TRFR WDRWL | | | | -$6,915,852 | -$11,047,394 | -$17,963,246 |
| **Grand Total** | **-$43,428,254** | **-$48,471,502** | **-$31,371,397** | **-$27,483,816** | **-$11,140,991** | **-$161,895,960** |

**II.A. Transfers out of account: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Name | Acct | 2019 | 2022 | 2023 | Grand Total |
| **TRANSFER OUT** | ALECTO HEALTHCA | | -$24,996,412 | | | -$24,996,412 |
| **TRANSFER OUT** | | 8191 | | | -$68,000 | -$68,000 |
| **WIRE TRFR WDRW** | (blank) | | | -$6,915,852 | -$11,047,394 | -$17,963,246 |
| **Grand Total** | | | -$24,996,412 | -$6,915,852 | -$11,115,394 | -$43,027,659 |

**GOULD** Consulting Services

**A1911**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I. Deposits: STMNT Processed_9152**

| GCS Acct | 9152 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| CLAIM DEPOSIT | | $14,234 | | | | $14,234 |
| CREDIT MEMO | | | $500 | | | $500 |
| DEPOSIT | $1,665,630 | $1,638,073 | $1,822,459 | $6,931,887 | $516,686 | $12,574,735 |
| GOVT INS DEPOSIT | | | | $97,313 | $51,359 | $148,672 |
| INS DEPOSIT | | | $953 | $1,739 | | $2,692 |
| LEASOR DEPOSIT | | | | | $453,803 | $453,803 |
| LOAN DEPOSIT | | | $5,953,722 | | | $5,953,722 |
| LOCKBOX IN | | | | | $1,530 | $1,530 |
| PMT WILSON | $69,727 | $4,750 | $6,913 | $6,006 | $2,528 | $89,924 |
| RETURNED CK | $1,348,341 | $266,704 | | | | $1,615,045 |
| SQUARE DEP | $70,472 | $48,977 | $52,607 | $73,065 | $40,529 | $285,651 |
| TRANSFER IN | $268,625 | $375,916 | $427,983 | $2,550,564 | $2,284,165 | $5,907,253 |
| UMR | $2,646 | $23,621 | $452 | | | $26,719 |
| WIRE IN | $73,180,791 | $60,354,957 | $56,566,678 | $51,744,011 | $9,622,949 | $251,469,387 |
| **Grand Total** | **$76,606,232** | **$62,727,231** | **$64,832,268** | **$61,404,585** | **$12,973,550** | **$278,543,867** |

**I.A. Transfers received into account: STMNT Processed_9152**

| GCS Acct | 9152 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER IN | 1646 | $2,000 | $375,916 | $427,983 | | | $805,898 |
| TRANSFER IN | 5572 | | | | $2,535,564 | $1,943,690 | $4,479,254 |
| TRANSFER IN | 7324 | | | | $15,000 | $340,475 | $355,475 |
| TRANSFER IN | 7329 | $89,300 | | | | | $89,300 |
| TRANSFER IN | 7343 | $177,325 | | | | | $177,325 |
| **TRANSFER IN Total** | | **$268,625** | **$375,916** | **$427,983** | **$2,550,564** | **$2,284,165** | **$5,907,253** |
| **Grand Total** | | **$268,625** | **$375,916** | **$427,983** | **$2,550,564** | **$2,284,165** | **$5,907,253** |

**GOULD** Consulting Services

**A1912**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**
(1) "Summarized Debit", no detail

**II. Withdrawals: STMNT Processed_9152**

| GCS Acct | 9152 |
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | -$1 | -$713 | -$19,673 | -$63 | | -$20,449 |
| CHECK | -$385,989 | -$714,468 | -$372,475 | -$283,182 | -$126,888 | -$1,883,002 |
| CHRGBK | -$1,566 | -$9,036 | | | | -$10,602 |
| (1) DEBIT | -$25,476,656 | -$17,437,042 | -$27,045,184 | -$24,485,397 | -$6,560,080 | -$101,004,359 |
| INS PMT | | | -$5,826 | -$28,952 | -$43,910 | -$78,689 |
| PAYMENT | -$25,348 | -$63,963 | -$102,603 | -$48,603 | -$330,438 | -$570,956 |
| PMT WILSON | -$29,580 | -$29,906 | -$22,814 | -$43,165 | -$28,209 | -$153,674 |
| SQUARE DEBIT | $0 | | | | | $0 |
| TAX | -$145,454 | -$116,520 | -$183,000 | -$151 | | -$445,125 |
| TRANSFER OUT | -$33,787,044 | -$23,528,297 | -$22,420,755 | -$24,498,384 | -$2,964,544 | -$107,199,023 |
| UMR | -$5,839,804 | -$1,930,128 | -$500 | | | -$7,770,432 |
| WIRE OUT | -$11,558,808 | -$18,121,158 | -$14,508,799 | -$12,218,516 | -$3,674,334 | -$60,081,616 |
| WIRE OUT - INTL | | | -$6,000 | | | -$6,000 |
| **Grand Total** | **-$77,250,250** | **-$61,951,231** | **-$64,687,629** | **-$61,606,413** | **-$13,728,404** | **$(279,223,926)** |

**II.A. Transfers out of account: STMNT Processed_9152**

| GCS Acct | 9152 |
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER OUT | 1646 | -$26,695,910 | -$19,781,252 | -$21,168,391 | -$18,062,753 | -$2,839,444 | -$88,547,750 |
| TRANSFER OUT | 5572 | | | | -$5,353,551 | | -$5,353,551 |
| TRANSFER OUT | 7329 | -$2,192,167 | -$561,323 | -$159,595 | -$109,000 | -$21,100 | -$3,043,184 |
| TRANSFER OUT | 7343 | -$4,898,968 | -$3,185,721 | -$1,092,769 | -$973,080 | -$104,000 | -$10,254,537 |
| **Grand Total** | | **-$33,787,044** | **-$23,528,297** | **-$22,420,755** | **-$24,498,384** | **-$2,964,544** | **-$107,199,023** |

**GOULD** Consulting Services

## II.B. Wire Transfers out of account: STMNT Processed_9152

| GCS Acct | 9152 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Ty Name | | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | MANAGEMENT HEALTH SYSTEM | | | | -$314,206 | -$150,653 | -$464,859 |
| WIRE OUT | ABBOTT LABS | -$600,848 | -$239,833 | -$984,889 | | -$39,011 | -$1,864,581 |
| WIRE OUT | AIRGAS USA, LLC | | -$11,094 | | | | -$11,094 |
| WIRE OUT | ALECTO | -$1,328,000 | | | | -$154,000 | -$1,482,000 |
| WIRE OUT | ALTERA HIGHLAND LLC | | -$576,930 | | | | -$576,930 |
| WIRE OUT | AMERICAN BARCOD | | | -$2,236 | | | -$2,236 |
| WIRE OUT | APEX PROSPERITY BANK | -$2,154,026 | -$1,619,075 | -$640,239 | -$651,865 | -$404,389 | -$5,469,594 |
| WIRE OUT | APPLIED MEDICAL | | | -$2,057 | | | -$2,057 |
| WIRE OUT | ARTHREX INC | | | -$576 | | | -$576 |
| WIRE OUT | ARTHREX INC | | | -$874 | | | -$874 |
| WIRE OUT | BECKMAN COULTER | -$47,999 | -$153,796 | -$9,341 | | | -$211,136 |
| WIRE OUT | BHG HEALTH, LLC | | -$40,000 | | | -$4,000 | -$44,000 |
| WIRE OUT | BRACCO DIAGNOST | | | | | -$2,159 | -$2,159 |
| WIRE OUT | BREEZY HR | | | | -$5,400 | | -$5,400 |
| WIRE OUT | CANON COPIER LEASE | | -$95,936 | | | | -$95,936 |
| WIRE OUT | CARDINAL HEALTH | -$2,181,333 | -$1,775,923 | -$1,671,000 | -$1,310,794 | -$305,000 | -$7,244,050 |
| WIRE OUT | CARDIOVASCULAR | | | | | -$11,548 | -$11,548 |
| WIRE OUT | CROTHALL HC | | -$143,338 | -$75,000 | | | -$218,338 |
| WIRE OUT | CROWN STAPLE | | | -$17,500 | | | -$17,500 |
| WIRE OUT | CURBELL INC | | | -$1,807 | | | -$1,807 |
| WIRE OUT | DAVIS AND JONES | -$22,023 | | | | | -$22,023 |
| WIRE OUT | DELAWARE ADR | | | | -$15,525 | | -$15,525 |
| WIRE OUT | ERBE USA | | | | -$5,118 | | -$5,118 |
| WIRE OUT | FISHER SCIENTIFIC | | | | -$125,000 | | -$125,000 |
| WIRE OUT | FORVIS, LLP ID: | | | | -$69,497 | -$45,370 | -$114,867 |
| WIRE OUT | FRANK A VITELLO SOLE PROP | | | -$332,000 | -$142,000 | | -$474,000 |
| WIRE OUT | FRY CONSTRUCTION | | | -$148,247 | | | -$148,247 |
| WIRE OUT | FS COMM INC | | | -$875 | | | -$875 |
| WIRE OUT | FUTURE HEALTH C | -$20,000 | | | | | -$20,000 |
| WIRE OUT | GETINGE | | | | -$433 | | -$433 |
| WIRE OUT | GRAYSON CTY TREAS | -$1,973,318 | | | -$3,058,111 | -$1,019,370 | -$6,050,799 |
| WIRE OUT | GREENBERG GRANT RICHARDS | | -$176,238 | -$4,222 | | | -$180,461 |
| WIRE OUT | HEALTH CARE LOG | | | -$734 | | | -$734 |
| WIRE OUT | HEARST COMM | | | | -$25,057 | | -$25,057 |
| WIRE OUT | HHS 1 LLC | | -$2,562,500 | -$3,375,000 | -$3,240,000 | -$945,000 | -$10,122,500 |
| WIRE OUT | HNI HEALTHCARE | | -$50,000 | | | | -$50,000 |
| WIRE OUT | HODGES-MACE LLC | | | -$61,611 | | | -$61,611 |
| WIRE OUT | HOSPITAL HOUSEK | | -$25,000 | | | | -$25,000 |
| WIRE OUT | INFINITT NORTH | | -$58,455 | | | | -$58,455 |
| WIRE OUT | JOHNSON & JOHNSON | -$21,186 | -$208,091 | -$263,630 | -$24,400 | | -$517,307 |
| WIRE OUT | JSD MANAGEMENT, | | -$9,015 | | | | -$9,015 |
| WIRE OUT | KUSTOM KOATINGS | | -$24,072 | | | | -$24,072 |
| WIRE OUT | LHP MGT SVCS | | | | -$625,000 | | -$625,000 |
| WIRE OUT | LIFENET HEALTH | -$2,415 | | | | | -$2,415 |
| WIRE OUT | LIFESAVERS PREV | | -$953 | -$35,565 | | | -$36,518 |
| WIRE OUT | LIGHTFLOWER, LT | | -$40,000 | | | | -$40,000 |
| WIRE OUT | LIQUIDATION SOL | | | -$14,038 | | | -$14,038 |
| WIRE OUT | LUMINANT ENERGY | | -$7,154 | | -$75,174 | -$32,475 | -$114,803 |
| WIRE OUT | MASIMO AMERICAS | -$6,495 | | | | | -$6,495 |
| WIRE OUT | MATHIS LEGAL | | -$10,402 | | | | -$10,402 |
| WIRE OUT | MAURICIO MURCIA | | | -$4,500 | | | -$4,500 |
| WIRE OUT | MEDAILLIANCE PTNRS | -$294,799 | -$99,967 | | | | -$394,766 |
| WIRE OUT | MEDELY INC | | | -$344,892 | -$320,501 | | -$665,393 |
| WIRE OUT | MEDLINE IND | -$450,040 | | | -$180,000 | -$515,000 | -$1,145,040 |
| WIRE OUT | MEDTRONIC CA | | | | -$1,483 | | -$1,483 |
| WIRE OUT | MEDTRONIC CASH POOL LLC | | -$12,000 | -$3,476 | -$1,049 | | -$16,525 |
| WIRE OUT | MELLON FNCL BoNY | -$225,003 | -$5,386,728 | -$336,397 | -$50,000 | | -$5,998,128 |
| WIRE OUT | MPT OPERATING PSHIP | | | | -$2,143,492 | -$289,699 | -$2,433,191 |
| WIRE OUT | MUNTERS CORPORA | | | -$3,800 | | | -$3,800 |
| WIRE OUT | MUTUAL OF OMAHA | | | | | -$68,630 | -$68,630 |
| WIRE OUT | MXR IMAGING | | | | -$10,825 | | -$10,825 |
| WIRE OUT | NES SOUTHWEST MED SVC | | | | | -$20,381 | -$20,381 |
| WIRE OUT | NTHRIVE, INC. I | -$22,378 | -$40,000 | | | | -$62,378 |
| WIRE OUT | OM PERFORMANCE | | | | -$4,000 | | -$4,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| WIRE OUT | PEDI CALL CARE | | -$133 | | | | -$133 |
| WIRE OUT | PERRY BAROMEDICAL | | | | -$26,387 | | -$26,387 |
| WIRE OUT | PPS OPERATING I | | | -$31,305 | | | -$31,305 |
| WIRE OUT | PRECISION HC | | | -$183,178 | | | -$183,178 |
| WIRE OUT | RAUCH-MILLIKEN | | -$200,000 | | | | -$200,000 |
| WIRE OUT | RESTORIX HEALTH | -$347,227 | -$124,531 | | | | -$471,758 |
| WIRE OUT | REVINT SOLUTION | | | -$30,000 | | | -$30,000 |
| WIRE OUT | RICHMAR CONSULTING | -$104,000 | | | | | -$104,000 |
| WIRE OUT | RS FUNDING INC | | -$22,770 | | | | -$22,770 |
| WIRE OUT | SAGE SERVICES G | | | -$3,480 | | | -$3,480 |
| WIRE OUT | Sanders, Motley, Young Gallardo IOLTA | | -$55,343 | | | | -$55,343 |
| WIRE OUT | SCHEEF AND STON | -$12,000 | | | | | -$12,000 |
| WIRE OUT | SHARP ELECTRONI | | | -$6,203 | | | -$6,203 |
| WIRE OUT | SHERMAN GRAYSON HOSP | | -$1,229 | | | | -$1,229 |
| WIRE OUT | SHI INTERNATION | | | | -$1,559 | | -$1,559 |
| WIRE OUT | SHULMAN BASTIAN FRIEDMAN | | | | | -$200,000 | -$200,000 |
| WIRE OUT | SIEMENS HC | -$9,159 | | -$1,985 | | | -$11,144 |
| WIRE OUT | SIESTA SOLUTIONS | -$1,617,556 | -$1,439,092 | -$1,386,583 | -$1,386,583 | -$351,646 | -$6,181,460 |
| WIRE OUT | SIGNET HEALTH | | -$328,710 | | | | -$328,710 |
| WIRE OUT | SMITHS MEDICAL | | | -$927 | -$778 | | -$1,705 |
| WIRE OUT | SPBS, INC | | | | -$5,954 | | -$5,954 |
| WIRE OUT | SSD ALARM | | | | -$1,574 | | -$1,574 |
| WIRE OUT | | | | | -$23,547 | | -$23,547 |
| WIRE OUT | STRYKER | | -$83,943 | -$460,083 | -$411,947 | -$67,566 | -$1,023,538 |
| WIRE OUT | SURGICAL PRODUC | | -$4,036 | | | | -$4,036 |
| WIRE OUT | TEAM NORTH TEXAS | | | -$453,869 | | | -$453,869 |
| WIRE OUT | TELEFLEX FUNDIN | | | -$3,922 | | | -$3,922 |
| WIRE OUT | THE BRANDT COMP | | -$33,200 | | | | -$33,200 |
| WIRE OUT | TK ELEVATOR CORP | | | -$403,803 | | | -$403,803 |
| WIRE OUT | UHS RECEIVABLES CORP | | -$800,000 | | | | -$800,000 |
| WIRE OUT | UMR INC | | -$1,634,946 | -$4,535 | | | -$1,639,481 |
| WIRE OUT | US FOODS INC ID | | | | | -$61,757 | -$61,757 |
| WIRE OUT | VERATHON, INC I | | -$1,158 | -$1,665 | | | -$2,823 |
| WIRE OUT | WAGNER FALCONER AND JUDD | | | -$141,362 | | | -$141,362 |
| WIRE OUT | WESTCMR | | | | | -$6,049 | -$6,049 |
| WIRE OUT | WORKTERRA | -$22,879 | | | | | -$22,879 |
| WIRE OUT | ZIMMER INC | -$96,125 | -$25,571 | -$3,280 | | | -$124,976 |
| WIRE OUT - I | POP PMT OF SETTLEMENT | | | -$6,000 | | | -$6,000 |
| **Grand Total** | | -$11,558,808 | -$18,121,158 | -$14,514,799 | -$12,218,516 | -$3,674,334 | -$60,087,616 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

## I. Deposits: STMNT Processed_1646

| GCS Acct | 1646 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH CREDIT | | | $31,436 | | | $31,436 |
| ACH RETURNS SETT EXCEPTIONS | $11,271 | $5,440 | $5,975 | $8,547 | $1,689 | $32,923 |
| DEPOSIT | | | | | $28,276 | $28,276 |
| PAYROLL CR | | | $448 | | | $448 |
| TRANSFER IN | $28,413,148 | $20,618,072 | $21,168,391 | $18,832,889 | $5,116,177 | $94,148,677 |
| TRNX REVERSAL | | $541,770 | $9,293 | $1,041 | | $552,104 |
| WIRE IN | | $1,229 | | $2,622,852 | $5,734,601 | $8,358,682 |
| **Grand Total** | **$28,424,419** | **$21,166,511** | **$21,215,544** | **$21,465,329** | **$10,880,743** | **$103,152,545** |

## I.A. Wire transfers into account: STMNT Processed_1646

| GCS Acct | 1646 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Name | 2020 | 2022 | 2023 | Grand Total |
| **WIRE IN** | SHERMAN ANESTHE | | $50,000 | $17,800 | $67,800 |
| **WIRE IN** | SHERMAN GRAYSON | $1,229 | $2,572,852 | $5,716,801 | $8,290,882 |
| **Grand Total** | | **$1,229** | **$2,622,852** | **$5,734,601** | **$8,358,682** |

## I.B. Wire transfers into account: STMNT Processed_1646

| GCS Acct | 1646 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER IN** | 5572 | | | | $770,136 | $2,081,398 | $2,851,533 |
| **TRANSFER IN** | 7324 | | | | | $142,943 | $142,943 |
| **TRANSFER IN** | 7329 | $71,119 | | | | $3,637 | $74,756 |
| **TRANSFER IN** | 7343 | $1,646,119 | $836,819 | | | $48,757 | $2,531,695 |
| **TRANSFER IN** | 9152 | $26,695,910 | $19,781,252 | $21,168,391 | $18,062,753 | $2,839,444 | $88,547,750 |
| **Grand Total** | | **$28,413,148** | **$20,618,072** | **$21,168,391** | **$18,832,889** | **$5,116,177** | **$94,148,677** |

**GOULD** Consulting Services

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

## II. Withdrawals: STMNT Processed_1646

| GCS Acct | 1646 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH RETURNS SETT EXCEPTIONS | | -$17,829 | -$1,785 | | | -$19,614 |
| CHECK | -$64,325 | -$55,505 | -$74,496 | -$97,274 | -$28,494 | -$320,094 |
| CHILD SUPP | -$75,531 | -$55,660 | -$25,130 | -$18,095 | -$8,686 | -$183,102 |
| DEBIT | -$70,986 | -$32,433 | -$42,884 | -$30,506 | -$53,832 | -$230,642 |
| PAYMENT | | | -$325,353 | -$623,840 | -$277,750 | -$1,226,943 |
| PAYROLL | -$23,545,348 | -$16,619,022 | -$15,228,281 | -$15,361,145 | -$8,129,460 | -$78,883,256 |
| TAX | -$4,680,701 | -$4,010,415 | -$5,046,475 | -$5,384,149 | -$2,386,049 | -$21,507,788 |
| TRANSFER OUT | -$8,000 | -$378,800 | -$427,983 | | | -$814,783 |
| WIRE OUT | -$1,672 | | | | | -$1,672 |
| Grand Total | -$28,446,563 | -$21,169,663 | -$21,172,387 | -$21,515,009 | -$10,884,270 | -$103,187,893 |

## II.A. Transfers out of account: STMNT Processed_1646

| GCS Acct | 1646 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | Grand Total |
| TRANSFER OUT | 7329 | -$6,000 | -$2,093 | | -$8,093 |
| TRANSFER OUT | 7343 | | -$792 | | -$792 |
| TRANSFER OUT | 9152 | -$2,000 | -$375,916 | -$427,983 | -$805,898 |
| TRANSFER OUT Total | | -$8,000 | -$378,800 | -$427,983 | -$814,783 |
| Grand Total | | -$8,000 | -$378,800 | -$427,983 | -$814,783 |

GOULD Consulting Services

A1917

# Schedules A.2.3.1 – A.2.3.4
# Sherman MD Bank Account Summaries

Schedule A.2.3.1 – Account *7324
Schedule A.2.3.2 – Account *7329
Schedule A.2.3.3 – Account *7343
Schedule A.2.3.4 – Account *8248

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**I. Deposits: STMNT Processed_7324**

| GCS Acct | 7324 |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | | $16 | $25 | | | $41 |
| DEPOSIT | $1,381,504 | $752,689 | $189,758 | $256,608 | $146,284 | $2,726,843 |
| GOVT INS | $15,327 | $11,708 | $7,672 | $1,639 | | $36,346 |
| HC CLAIM | $1,147,686 | $788,323 | $336,428 | $272,577 | $120,826 | $2,665,840 |
| INS PMT RCVD | | | | $3,559 | $6,471 | $10,030 |
| MPS RECON DEPOSIT | $141,852 | $198,340 | $35,727 | $36,830 | $15,344 | $428,094 |
| (1) TRANSFER IN | | | | | $32,600 | $32,600 |
| WIRE IN | | | | $9,500 | $237,072 | $246,572 |
| Grand Total | $2,686,370 | $1,751,075 | $569,610 | $580,713 | $558,598 | $6,146,365 |

| (1) | 01/04/2023 | 10,000.00 | | 5965 10,000.00 AUTOMATIC TRANSFER CREDITS | | 1612 ACCOUNT TRANSFER TRSF FROM | | 5573 |
| | 03/01/2023 | 22,600.00 | AUTOMATIC TRANSFER CREDITS | | 1801 ACCOUNT TRANSFER TRSF FROM |

**I.A. Wire transfers received into account: STMNT Processed_7324**

| GCS Acct | 7324 |
| Break | CR |

| Sum of Amount | | Yr | | |
|---|---|---|---|---|
| Transaction Typ | Name | 2022 | 2023 | Grand Total |
| WIRE IN | SHERMAN ANESTHE | | $3,000 | $3,000 |
| WIRE IN | SHERMAN GRAYSON | | $212,000 | $212,000 |
| WIRE IN | SHERMAN MD PROV | $9,500 | $22,072 | $31,572 |
| Grand Total | | $9,500 | $237,072 | $246,572 |

**II. Withdrawals: STMNT Processed_7324**

| GCS Acct | 7324 |
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | -$514 | | -$25 | -$102 | | -$640 |
| BANK CHRG | -$45,836 | -$43,067 | -$35,855 | -$26,549 | -$2,978 | -$154,285 |
| CHRGBK | -$1,875 | -$468 | -$60 | | | -$2,403 |
| TRANSFER OUT | | | | -$173,500 | -$536,178 | -$709,678 |
| WIRE OUT | -$2,643,590 | -$1,712,929 | -$538,501 | -$376,725 | -$18,538 | -$5,290,283 |
| Grand Total | -$2,691,814 | -$1,756,463 | -$574,441 | -$576,876 | -$557,694 | -$6,157,288 |

**II.A. Transfers out of account: STMNT Processed_7324**

| GCS Acct | 7324 |
| Break | DR |

| Sum of Amount | | | Yr | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct Transfer 1 | Name | 2019 | 2020 | 2021 | 2022 | 2023 Grand Total |
| TRANSFER OUT | 1646 | | | | | -$142,943 | -$142,943 |
| TRANSFER OUT | 7329 | | | | -$52,000 | -$34,500 | -$86,500 |
| TRANSFER OUT | 7343 | | | | -$106,500 | -$88,260 | -$194,760 |
| TRANSFER OUT | 9152 | | | | -$15,000 | -$270,475 | -$285,475 |
| WIRE OUT | | APEX | | | | -$18,538 | -$18,538 |
| WIRE OUT | | CNH FINANCE | -$1,039,982 | -$1,712,929 | -$538,501 | -$376,725 | -$3,668,137 |
| WIRE OUT | | WHITE OAK HEALT | -$1,603,608 | | | | -$1,603,608 |
| Grand Total | | | -$2,643,590 | -$1,712,929 | -$538,501 | -$550,225 | -$554,715 -$5,999,961 |

GOULD Consulting Services

**A1919**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**I. Deposits: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | $2,000 | | | | | $2,000 |
| DEPOSIT | $60,852 | $40,125 | $20,249 | $25,244 | $93,203 | $239,673 |
| MERCH FEES | $1 | | | | | $1 |
| TRANSFER IN | $2,198,167 | $791,131 | $164,595 | $161,000 | $87,600 | $3,402,492 |
| WIRE IN | $992,000 | $50,000 | | $25,000 | $170,000 | $1,237,000 |
| CHECK REVRSL | $1,332 | | | | | $1,332 |
| Grand Total | $3,254,352 | $881,256 | $184,844 | $211,244 | $350,803 | $4,882,498 |

**I.A. Wire transfers received into account: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | CR |

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2022 | 2023 | Grand Total |
| WIRE IN | ALECTO HE/ | $992,000 | $50,000 | | | $1,042,000 |
| WIRE IN | SHERMAN GRAYSON | | | | $170,000 | $170,000 |
| WIRE IN | SHERMAN MD PROV | | | $25,000 | | $25,000 |
| Grand Total | | $992,000 | $50,000 | $25,000 | $170,000 | $1,237,000 |

**I.B. Transfers received into account: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | CR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct Transf | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER IN | 1646 | $6,000 | $2,093 | | | | $8,093 |
| TRANSFER IN | 5572 | | | | | $32,000 | $32,000 |
| TRANSFER IN | 7324 | | | | $52,000 | $34,500 | $86,500 |
| TRANSFER IN | 7343 | | $75,847 | $5,000 | | | $80,847 |
| TRANSFER IN | 9152 | $2,192,167 | $713,191 | $159,595 | $109,000 | $21,100 | $3,195,052 |
| Grand Total | | $2,198,167 | $791,131 | $164,595 | $161,000 | $87,600 | $3,402,492 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
Sherman MD Provider, Inc.

### II. Withdrawals: STMNT Processed_7329

| GCS Acct | 7329 |
|---|---|
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| CHECK | -$2,174,260 | -$674,322 | -$178,470 | -$166,067 | -$189,825 | -$3,382,943 |
| DEBIT | -$94 | | | | | -$94 |
| MERCH FEES | -$476 | | | | | -$476 |
| PAYMENT | -$26,670 | -$20,799 | -$17,982 | -$17,594 | -$36,138 | -$119,182 |
| TRANSFER OUT | -$1,125,646 | -$7,614 | -$37,848 | | -$35,637 | -$1,206,745 |
| WIRE OUT | -$80,595 | -$123,984 | | -$20,608 | -$100,000 | -$325,187 |
| WITHDRAWAL | -$1,467 | | | | | -$1,467 |
| Grand Total | -$3,409,208 | -$826,719 | -$234,300 | -$204,268 | -$361,599 | -$5,036,094 |

### II.A. Transfers out of account: STMNT Processed_7329

| GCS Acct | 7329 |
|---|---|
| Break | DR |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2023 |
| TRANSFER OUT | 1646 | -$71,119 | | | -$3,637 |
| TRANSFER OUT | 7343 | -$965,227 | -$1,433 | -$37,848 | -$32,000 |
| TRANSFER OUT | 9152 | -$89,300 | -$6,181 | | |
| Grand Total | | -$1,125,646 | -$7,614 | -$37,848 | -$35,637 |

### II.B. Wire transfers out of account: STMNT Processed_7329

| GCS Acct | 7329 |
|---|---|
| Break | DR |

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2022 | 2023 | Grand Total |
| WIRE OUT | APEX | -$77,180 | -$74,902 | -$20,608 | | -$172,690 |
| WIRE OUT | CARDINAL HEALTH | | -$49,082 | | | -$49,082 |
| WIRE OUT | MEDELY INC | | | | -$100,000 | -$100,000 |
| WIRE OUT | QUALITY MED, IN | -$3,415 | | | | -$3,415 |
| WIRE OUT Total | | -$80,595 | -$123,984 | -$20,608 | -$100,000 | -$325,187 |
| Grand Total | | -$80,595 | -$123,984 | -$20,608 | -$100,000 | -$325,187 |

GOULD Consulting Services

A1921

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**I. Deposits: STMNT Processed_7343**

| GCS Acct | 7343 |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| **Transaction Type** | **2019** | **2020** | **2021** | **2022** | **2023** | **Grand Total** |
| DEPOSIT | $47,076 | | | | | $47,076 |
| EXPERTPAY DEBIT | $0 | | | | | $0 |
| TRANSFER IN | $5,864,195 | $3,740,147 | $1,130,616 | $1,109,580 | $422,540 | $12,267,078 |
| TRANSFER OUT | | | | | $10,760 | $10,760 |
| WIRE IN | | $1,062,227 | | $146,087 | $431,600 | $1,639,914 |
| **Grand Total** | **$5,911,271** | **$4,802,374** | **$1,130,616** | **$1,255,667** | **$864,900** | **$13,964,828** |

**I.A. Wire transfers received into account: STMNT Processed_7343**

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| **Transaction Type** | **Name** | **2020** | **2022** | **2023** | **Grand Total** |
| WIRE IN | ALECTO HEALTHCA | $1,062,227 | | | $1,062,227 |
| WIRE IN | SHERMAN GRAYSON | | | $356,500 | $356,500 |
| WIRE IN | SHERMAN MD PROV | | $146,087 | $75,100 | $221,187 |
| **Grand Total** | | **$1,062,227** | **$146,087** | **$431,600** | **$1,639,914** |

**II. Withdrawals: STMNT Processed_7343**

| GCS Acct | 7343 |
| Break | DR |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | **Transaction Type** | **2019** | **2020** | **2021** | **2022** | **2023** | **Grand Total** |
| | CHILD SUPP | -$46,767 | | | | | -$46,767 |
| | DEBIT | -$657 | | -$706 | -$191 | -$156 | -$1,710 |
| | EXPERTPAY DEBIT | -$6,523 | -$45,646 | | | | -$52,169 |
| | PAYROLL | -$2,805,538 | -$2,574,609 | -$781,141 | -$874,144 | -$530,113 | -$7,565,545 |
| | TAX | -$1,228,497 | -$1,147,503 | -$357,441 | -$383,317 | -$284,697 | -$3,401,454 |
| | TRANSFER OUT | -$1,823,444 | -$955,138 | -$5,000 | | -$48,757 | -$2,832,339 |
| Alecto Wire | REVERSE WIRE | | -$61,227 | | | | -$61,227 |
| | **Grand Total** | **-$5,911,426** | **-$4,784,122** | **-$1,144,288** | **-$1,257,652** | **-$863,723** | **-$13,961,211** |

**II.A. Transfers out of account: STMNT Processed_7343**

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| **Transaction Type** | **Acct** | **2019** | **2020** | **2021** | **2023** | **Grand Total** |
| TRANSFER OUT | 1646 | -$1,646,119 | -$836,819 | | -$48,757 | -$2,531,695 |
| TRANSFER OUT | 7329 | | -$75,847 | -$5,000 | | -$80,847 |
| TRANSFER OUT | 9152 | -$177,325 | -$42,472 | | | -$219,797 |
| **Grand Total** | | **$1,823,444** | **$955,138** | **$5,000** | **$48,757** | **$2,832,339** |

GOULD Consulting Services

**A1922**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

## I. Deposits: STMNT Processed_8248

| GCS Acct | 8248 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | $9,323 | $2,008 | $4,036 | $1,325 | $596 | $17,289 |
| DEPOSIT | $194,272 | $527 | $1,330 | $7,034 | $3,261 | $206,424 |
| HC CLAIM | $2,056,623 | $1,669,391 | $653,128 | $503,410 | $221,951 | $5,104,503 |
| (1) TRANSFER IN | | | | | $7,574 | $7,574 |
| Grand Total | $2,260,219 | $1,671,926 | $658,494 | $511,769 | $233,382 | $5,335,791 |

| (1) | 06/28/2023 Book transfer credit FROM ...8264 | 5,396.54 |
|---|---|---|
| | 06/28/2023 Book transfer credit FROM ...9202 | 1,416.04 |
| | 06/28/2023 Book transfer credit FROM ...9210 | 761.76 |

## II. Withdrawals: STMNT Processed_8248

| GCS Acct | 8248 |
|---|---|
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER OUT | -$2,260,219 | -$1,671,926 | -$658,494 | -$486,769 | -$211,592 | -$5,289,001 |
| (1) WIRE OUT | | | | -$25,000 | -$20,737 | -$45,737 |
| Grand Total | -$2,260,219 | -$1,671,926 | -$658,494 | -$511,769 | -$232,329 | -$5,334,738 |

| (1) | 10/06/2022 Wire transfer withdrawal Sherman MD Provi der Inc 100622 | 9704 | 25,000.00 |
|---|---|---|---|
| | 02/15/2023 Wire transfer withdrawal Sherman Grayson Hospital l 021523 | 3947 | 2,665.00 |
| | 02/17/2023 Wire transfer withdrawal Sherman Grayson Hospital l 021723 | 6738 | 5,000.00 |
| | 06/28/2023 Wire transfer withdrawal Sherman MD Provi der INC 062823 | 5294 | 13,072.16 |

## II.A. Transfers out of account: STMNT Processed_8248

| GCS Acct | 8248 |
|---|---|
| Break | DR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER OUT | 8205 | | | | | -$128,786 | -$128,786 |
| TRANSFER OUT | 8264 | -$2,260,219 | -$1,671,926 | -$658,494 | -$486,769 | -$82,806 | -$5,160,215 |
| Grand Total | | -$2,260,219 | -$1,671,926 | -$658,494 | -$486,769 | -$211,592 | -$5,289,001 |

GOULD Consulting Services

# Schedule A.2.4
# Sherman Anesthetics Bank Account Summaries

### Schedule A.2.4 – Accounts *9202 and *9210

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman Anesthetics, Inc.**

**I. Deposits: STMNT Processed_9202**

| GCS Acct | 9202 |
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | | Grand Total |
| ACH DEPOSIT | $733,113 | $486,885 | $300,149 | $324,561 | $129,316 | | $1,974,024 |
| DEPOSIT | $8,609 | $14,129 | $3,680 | $2,803 | | | $29,221 |
| LOCKBOX DEPOSIT | $149,862 | $62,205 | $38,844 | $41,490 | $7,513 | | $299,913 |
| **Grand Total** | **$891,584** | **$563,219** | **$342,672** | **$368,854** | **$136,829** | | **$2,303,158** |

**II. Withdrawals: STMNT Processed_9202**

| GCS Acct | 9202 |
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | | Grand Total |
| BANK CHRG | -$36,727 | -$35,593 | -$34,717 | -$31,063 | -$4,034 | | -$142,134 |
| CHRGBK | -$2,028 | | | -$186 | | | -$2,214 |
| TRANSFER OUT | | | | | -$80,481 | | -$80,481 |
| WIRE OUT | -$852,801 | -$528,554 | -$307,931 | -$334,309 | -$55,281 | | -$2,078,875 |
| **Grand Total** | **-$891,556** | **-$564,147** | **-$342,648** | **-$365,558** | **-$139,797** | | **-$2,303,705** |

**II.A. Wire transfers out of account: STMNT Processed_9202**

| GCS Acct | 9202 |
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | SHERMAN ANESTH | -$852,801 | -$528,554 | -$307,931 | -$320,209 | | -$2,009,494 |
| WIRE OUT | SHERMAN GRAYSON | | | | -$14,100 | -$55,281 | -$69,381 |
| **WIRE OUT Total** | | **-$852,801** | **-$528,554** | **-$307,931** | **-$334,309** | **-$55,281** | **-$2,078,875** |
| **Grand Total** | | **-$852,801** | **-$528,554** | **-$307,931** | **-$334,309** | **-$55,281** | **-$2,078,875** |

**II.B. Transfers out of account: STMNT Processed_9202**

| GCS Acct | 9202 |
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Acct | 2023 | Grand Total |
| TRANSFER OUT | 8205 | -$78,865 | -$78,865 |
| TRANSFER OUT | 8248 | -$1,416 | -$1,416 |
| TRANSFER OUT | 9210 | -$200 | -$200 |
| **TRANSFER OUT Total** | | **-$80,481** | **-$80,481** |
| **Grand Total** | | **-$80,481** | **-$80,481** |

**GOULD** Consulting Services

**A1925**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman Anesthetics, Inc.**

**I. Deposits: STMNT Processed_9210**

| GCS Acct | 9210 |
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | $97,694 | $69,326 | $61,556 | $84,878 | $30,881 | $344,335 |
| DEPOSIT | $902,434 | $540,219 | $315,488 | $320,537 | $66 | $2,078,743 |
| LOCKBOX DEPOSIT | | | | $448 | $7,130 | $7,578 |
| TRANSFER IN | | | | | $200 | $200 |
| **Grand Total** | **$1,000,128** | **$609,544** | **$377,044** | **$405,863** | **$38,276** | **$2,430,855** |

**II. Withdrawals: STMNT Processed_9210**

| GCS Acct | 9210 |
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | | | | | -$556 | -$556 |
| ACH WITHDRAWAL | -$4,796 | -$4,286 | -$4,172 | -$5,025 | -$1,256 | -$19,534 |
| ADJ | | | | | -$417 | -$417 |
| TRANSFER OUT | | | | | -$25,973 | -$25,973 |
| WIRE OUT | -$996,030 | -$605,396 | -$372,939 | -$402,626 | -$10,100 | -$2,387,091 |
| **Grand Total** | **-$1,000,826** | **-$609,682** | **-$377,112** | **-$407,650** | **-$38,302** | **-$2,433,571** |

**II.A. Wire transfers out of account: STMNT Processed_9210**

| GCS Acct | 9210 |
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | CNH FINANCE | -$400,809 | -$605,396 | -$372,939 | -$305,626 | | -$1,684,770 |
| WIRE OUT | SHERMAN GRAYSON | | | | -$97,000 | -$10,100 | -$107,100 |
| WIRE OUT | WHITE OAK | -$595,221 | | | | | -$595,221 |
| **WIRE OUT Total** | | **-$996,030** | **-$605,396** | **-$372,939** | **-$402,626** | **-$10,100** | **-$2,387,091** |
| **Grand Total** | | **$996,030** | **$605,396** | **$372,939** | **$402,626** | **-$10,100** | **-$2,387,091** |

**II.B. Transfers out of account: STMNT Processed_9210**

| GCS Acct | 9210 |
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Acct | 2023 | Grand Total |
| TRANSFER OUT | 8205 | -$25,211 | -$25,211 |
| TRANSFER OUT | 8248 | -$762 | -$762 |
| **TRANSFER OUT Total** | | **-$25,973** | **-$25,973** |
| **Grand Total** | | **-$25,973** | **-$25,973** |

**GOULD** Consulting Services

Schedules A.3.1.1 – A.3.1.4
Olympia HC Bank Account Statement Summaries

Schedule A.3.1.1 – Account *7573
Schedule A.3.1.2 – Account *7780
Schedule A.3.1.3 – Account *7798
Schedule A.3.1.4 – Account *9017

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

### I. Deposits: STMNT Processed_7573

| GCS Acct | 7573 |
|----------|------|
| Credit | (All) |
| Break | CR |

| Sum of Amount | Yr | | | | | | |
|---------------|------|------|------|------|------|------|------|
| **Transaction Type** | | **2019** | **2020** | **2021** | **2022** | **2023** | **Grand Total** |
| ACH DEPOSIT/RETURN | | | | $5,225 | | | $5,225 |
| ADJ | | $192 | | $176 | | | $368 |
| COVER 401K CONTRIB | | | | | | $5,547 | $5,547 |
| DEPOSIT | | $6,743,475 | $3,093,074 | $2,050,042 | $180,566 | $34,632 | $12,101,788 |
| MERCH DEPOSIT | | $3,216,164 | $3,319,355 | $1,282,645 | $17,906 | $78 | $7,836,149 |
| WIRE IN | | $60,464,280 | $78,299,121 | $22,003,042 | $1,336,111 | $204,906 | $162,307,459 |
| Acct *2995 ZBA FUNDING IN | | $516,779 | $90,474 | | | | $607,252 |
| **Grand Total** | | **$70,940,889** | **$84,802,024** | **$25,341,130** | **$1,534,583** | **$245,163** | **$182,863,788** |

### I.A. Wire transfers received into account: STMNT Processed_7573

| GCS Acct | 7573 |
|----------|------|
| Credit | (All) |
| Break | CR |

| Sum of Amount | | Yr | | | | | |
|---------------|------|------|------|------|------|------|------|
| **Transaction Type** | **Name** | **2019** | **2020** | **2021** | **2022** | **2023** | **Grand Total** |
| WIRE IN | Alecto Healthcare | $48,418,000 | $45,049,251 | | $15,000 | | $93,482,251 |
| WIRE IN | CNB Alecto Healthcare | $11,756,280 | $32,230,000 | $20,312,000 | $611,000 | | $64,909,280 |
| WIRE IN | Deanco Healthcare | | | $524,520 | | | $524,520 |
| WIRE IN | Global Financia | | | $54,465 | | | $54,465 |
| WIRE IN | Key Health Medical | | $127,662 | $77,655 | | | $205,317 |
| WIRE IN | Medical Debt Resolution | | | $247,302 | | | $247,302 |
| WIRE IN | Medlegal Solutions | | $767,208 | $772,427 | | | $1,539,635 |
| WIRE IN | Olympia Health | | | | $41,237 | $16,500 | $57,737 |
| WIRE IN | Plaza MOB | $290,000 | $125,000 | $14,673 | $668,874 | $188,406 | $1,286,953 |
| **Grand Total** | | **$60,464,280** | **$78,299,121** | **$22,003,042** | **$1,336,111** | **$204,906** | **$162,307,459** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

II.  Withdrawals: STMNT Processed_7573

| GCS Acct | 7573 |
|---|---|
| Debit | (All) |
| Break | DR |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | **Transaction Type** | **2019** | **2020** | **2021** | **2022** | **2023** | **Grand Total** |
| | ADJ | | | -$30 | | | -$30 |
| | B TO B ACH DEBIT | | -$11,579,251 | | | | -$11,579,251 |
| | CASH OUT | -$21,406 | -$27,469 | -$4,890 | | | -$53,765 |
| Acct *2995 | DEPOSIT UNPAID | -$282 | -$965 | -$105,955 | -$45 | | -$107,247 |
| | LEGAL ORDER | -$1,046 | | -$38,072 | | | -$39,119 |
| | MERCH DEPOSIT | -$109,984 | -$108,062 | -$55,047 | -$2,025 | | -$275,118 |
| | MERCH FEES | | | | -$79 | -$651 | -$730 |
| | PAYMENT | -$252 | -$385 | -$29 | | | -$666 |
| | TRANSFER OUT | -$66,018,487 | -$69,376,984 | -$28,671,761 | -$1,051,814 | -$282,755 | -$165,401,801 |
| | WIRE OUT | -$4,811,770 | -$109,032 | -$390,188 | -$492,221 | -$1,000 | -$5,804,210 |
| | **Grand Total** | **-$70,963,227** | **-$81,202,147** | **-$29,265,972** | **-$1,546,184** | **-$284,406** | **$ (183,261,936)** |

II.A. Wire transfers out of account: STMNT Processed_7573

| GCS Acct | 7573 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| **Transaction Type** | **Acct** | **2019** | **2020** | **2021** | **2022** | **2023** | **Grand Total** |
| **TRANSFER OUT** | 4538 | -$239 | -$40 | | | | -$279 |
| **TRANSFER OUT** | 7798 | -$34,954,436 | -$35,951,443 | -$14,769,303 | -$41,377 | -$5,547 | -$85,722,106 |
| **TRANSFER OUT** | 9017 | -$31,063,811 | -$33,425,501 | -$13,902,458 | -$1,010,437 | -$277,208 | -$79,679,416 |
| **Grand Total** | | **-$66,018,487** | **-$69,376,984** | **-$28,671,761** | **-$1,051,814** | **-$282,755** | **$ (165,401,801)** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**II.B. Wire transfers out of account: STMNT Processed_7573**

| GCS Acct | 7573 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Typ | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | Aitken Aitken and Cohn | | | | -$447,708 | | -$447,708 |
| WIRE OUT | Alecto Healthca | -$1,000,000 | | -$35,000 | | | -$1,035,000 |
| WIRE OUT | Anthem Blue Cro | | | -$11,138 | | | -$11,138 |
| WIRE OUT | Global Financia | | | -$51,275 | | | -$51,275 |
| WIRE OUT | Medical Debt Re | | | -$20,015 | | | -$20,015 |
| WIRE OUT | Meditech | | | -$2,850 | | | -$2,850 |
| WIRE OUT | Medline Industr | -$543,498 | | | | | -$543,498 |
| WIRE OUT | Mpt Development | -$2,817,747 | | | | | -$2,817,747 |
| WIRE OUT | Ntt Data Servic | | | -$223,415 | | | -$223,415 |
| WIRE OUT | Olympia Health | | | | -$5,164 | -$1,000 | -$6,164 |
| WIRE OUT | Olympia Lockbox | | | | -$3,199 | | -$3,199 |
| WIRE OUT | Plaza MOB | -$245,000 | | | -$35,560 | | -$280,560 |
| WIRE OUT | United Physicia | -$205,525 | -$109,032 | -$46,495 | | | -$361,052 |
| WIRE OUT | Wells Fargo | | | | -$590 | | -$590 |
| **WIRE OUT Total** | | -$4,811,770 | -$109,032 | -$390,188 | -$492,221 | -$1,000 | -$5,804,210 |
| **Grand Total** | | -$4,811,770 | -$109,032 | -$390,188 | -$492,221 | -$1,000 | $ (5,804,210) |

**GOULD** Consulting Services

**A1930**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

### I. Deposits: STMNT Processed_7780

| Sum of Amount | Yr | | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | | $22,033 | $1,546 | $2,497 | | | $26,076 |
| CARES ACT STIMULUS | | | $7,989,883 | | | | $7,989,883 |
| CLAIM DEPOSIT | | $21,881,113 | $20,873,936 | $9,815,507 | $1,831,642 | | $54,452,199 |
| DEPOSIT | | $1,522,971 | $920,380 | $903,184 | $104,359 | | $3,450,894 |
| GOVT INS | | $214,244 | $95,097 | $1,360 | $59 | | $310,761 |
| LOCKBOX IN | | $13,592,769 | $9,608,488 | $3,503,139 | $54,975 | $3,078 | $26,772,449 |
| WIRE IN | | $869,262 | $782,700 | $514,901 | $35,100 | $18,131 | $2,270,093 |
| Acct *2995 ZBA FUNDING IN | | $30,754,690 | $55,305,520 | $3,397,966 | | | $89,458,176 |
| **Grand Total** | | **$68,857,082** | **$95,577,550** | **$18,138,555** | **$2,136,135** | **$21,209** | **$184,730,530** |

### I.A. Wire transfers received into account: STMNT Processed_7780

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **WIRE IN** | California Business Bureau | $869,262 | $782,700 | $514,901 | $76,146 | $17,131 | $2,260,140 |
| **WIRE IN** | Olympia Health | | | | $8,954 | $1,000 | $9,954 |
| **Grand Total** | | **$869,262** | **$782,700** | **$514,901** | **$85,100** | **$18,131** | **$2,270,093** |

### II. Withdrawals: STMNT Processed_7780

| Sum of Amount | Yr | | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK CHRG | | -$21,825 | -$21,232 | -$15,862 | -$7,690 | -$1,551 | -$68,160 |
| CASH OUT | | | -$570 | | | | -$570 |
| DEPOSIT UNPAID | | -$26,425 | -$14,271 | -$20,000 | -$82 | | -$60,779 |
| Acct *2995 TRANSFER OUT | | | -$792 | -$11,738 | -$10,345 | -$3,687 | -$26,562 |
| WIRE OUT | | -$68,508,763 | -$95,626,802 | -$18,516,802 | -$2,119,220 | -$16,500 | -$184,788,086 |
| **Grand Total** | | **-$68,557,013** | **-$95,663,668** | **-$18,564,402** | **-$2,137,336** | **-$21,738** | **-$184,944,157** |

### II. Wire Transfers out of account: STMNT Processed_7780

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **WIRE OUT** | CNH Finance Fund | -$26,590,799 | -$95,626,802 | -$18,516,802 | -$1,008,714 | | -$141,743,116 |
| **WIRE OUT** | Ecapital Healthcare | | | | -$7,026 | | -$7,026 |
| **WIRE OUT** | Olympia Health | | | | | -$5,000 | -$5,000 |
| **WIRE OUT** | OMC CMA Acct | | | | -$41,237 | -$11,500 | -$52,737 |
| **WIRE OUT** | Plaza MOB | | | | -$1,062,243 | | -$1,062,243 |
| **WIRE OUT** | WO HEALTHCO | -$41,917,964 | | | | | -$41,917,964 |
| **WIRE OUT Total** | | **-$68,508,763** | **-$95,626,802** | **-$18,516,802** | **-$2,119,220** | **-$16,500** | **-$184,788,086** |
| **Grand Total** | | **-$68,508,763** | **-$95,626,802** | **-$18,516,802** | **-$2,119,220** | **-$16,500** | **$ (184,788,086)** |

GOULD Consulting Services

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

### I. Deposits: STMNT Processed_7798

| | GCS Acct | 7798 |
|---|---|---|
| | Credit | (All) |
| | Break | CR |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| | ACH BATCH ADJ | $1,760 | $2,593 | | | | $4,353 |
| | PAYROLL | | $1,727 | | | | $1,727 |
| | RETURNED CK | $9,482 | $14,726 | | | | $24,208 |
| | TAX | $382,352 | | | | | $382,352 |
| Acct *2995 | ZBA BAL TRNSFR IN | $34,954,436 | $35,951,443 | $14,769,303 | $45,203 | $5,547 | $85,725,932 |
| | **Grand Total** | **$35,348,030** | **$35,970,489** | **$14,769,303** | **$45,203** | **$5,547** | **$86,138,572** |

### II. Withdrawals: STMNT Processed_7798

| | GCS Acct | 7798 |
|---|---|---|
| | Debit | (All) |
| | Break | DR |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| | ACH BATCH OUT | -$24,594,140 | -$24,494,213 | -$5,768,278 | -$1,633 | | -$54,858,263 |
| | B TO B ACH DEBIT | | | -$1,977,577 | -$791 | -$5,547 | -$1,983,915 |
| | CHECK | -$1,844,243 | -$1,609,656 | -$1,514,667 | -$818 | | -$4,969,384 |
| Acct *2995 | LEGAL ORDER | -$558,985 | | | | | -$558,985 |
| | PAYMENT | | | -$286,820 | | | -$286,820 |
| | PAYROLL | -$1,648,646 | -$1,588,811 | -$585,160 | | | -$3,822,617 |
| | TAX | -$6,323,488 | -$8,277,810 | -$4,276,117 | -$41,961 | | -$18,919,376 |
| Acct *7573 | TRANSFER OUT | -$315,084 | | | | | -$315,084 |
| | WIRE OUT | -$63,445 | | -$360,684 | | | -$424,129 |
| | **Grand Total** | **-$35,348,030** | **-$35,970,489** | **-$14,769,303** | **-$45,203** | **-$5,547** | **-$86,138,572** |

### II.A. Wire transfers out of account: STMNT Processed_7798

| | GCS Acct | 7798 |
|---|---|---|
| | Debit | (All) |
| | Break | DR |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Name | 2019 | 2021 |
| WIRE OUT | | -$3,640 | |
| WIRE OUT | | -$2,816 | |
| WIRE OUT | | -$2,105 | |
| WIRE OUT | | -$2,929 | |
| WIRE OUT | Dcg&T AS Truste | | -$360,684 |
| WIRE OUT | | -$3,025 | |
| WIRE OUT | | -$2,771 | |
| WIRE OUT | | -$1,982 | |
| WIRE OUT | | -$3,551 | |
| WIRE OUT | | -$2,756 | |
| WIRE OUT | Matthew William | -$6,197 | |
| WIRE OUT | | -$3,522 | |
| WIRE OUT | | -$3,001 | |
| WIRE OUT | | -$3,805 | |
| WIRE OUT | | -$3,063 | |
| WIRE OUT | | -$2,373 | |
| WIRE OUT | | -$3,142 | |
| WIRE OUT | | -$3,009 | |
| WIRE OUT | | -$4,562 | |
| WIRE OUT | | -$3,178 | |
| WIRE OUT | | -$2,020 | |
| **WIRE OUT Total** | | **-$63,445** | **-$360,684** |
| **Grand Total** | | **-$63,445** | **-$360,684** |

**GOULD** Consulting Services

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
Olympia Health Care LLC

**I. Deposits: STMNT Processed_9017**

| GCS Acct | 9017 |
|---|---|
| Credit | (All) |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT/RETURN | $8,809 | $2,192 | $181 | | | $11,182 |
| CHRGBK | | $5,200 | | | | $5,200 |
| NSF CHRGBK | $527,183 | | | | | $527,183 |
| RETURNED CK | $8,401 | $301,405 | $76,399 | $2,488 | $104 | $388,796 |
| TAX | $5,895 | | $349 | | | $6,243 |
| Acct *7573 ZBA BAL TRNSFR IN | $31,063,811 | $33,425,501 | $13,902,458 | $1,272,229 | $277,208 | $79,941,207 |
| **Grand Total** | **$31,614,099** | **$33,734,298** | **$13,979,387** | **$1,274,717** | **$277,312** | **$80,879,811** |

**II. Withdrawals: STMNT Processed_9017**

| GCS Acct | 9017 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH RETURN | -$1,892 | | | | | -$1,892 |
| B TO B ACH DEBIT | | | -$1,000 | | | -$1,000 |
| BANK CHRG | -$82,911 | -$63,301 | -$53,980 | -$24,666 | -$12,107 | -$236,965 |
| CHECK | -$25,710,545 | -$26,455,396 | -$13,387,143 | -$1,247,451 | -$264,609 | -$67,065,144 |
| GCS RESEARCH | -$25 | | | | | -$25 |
| PAYMENT | -$13,046 | | | | | -$13,046 |
| TAX | -$21,342 | -$14,312 | -$6,005 | -$2,599 | -$595 | -$44,853 |
| Acct *7573 TRANSFER OUT | -$198,849 | -$88,842 | | | | -$287,691 |
| WIRE OUT | -$5,585,489 | -$7,112,448 | -$531,259 | | | -$13,229,195 |
| **Grand Total** | **-$31,614,099** | **-$33,734,298** | **-$13,979,387** | **-$1,274,717** | **-$277,312** | **$ (80,879,811)** |

GOULD Consulting Services

A1933

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**II.A. Wire transfers out of account: STMNT Processed_9017**

| GCS Acct | 9017 |
|----------|------|
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | | | |
|---------------|------|------|------|------|-----|
| **Transaction Type** | **Name** | **2019** | **2020** | **2021** | **Grand Total** |
| WIRE OUT | 4658 | -$124,615 | | | -$124,615 |
| WIRE OUT | AIG | -$127,320 | | | -$127,320 |
| WIRE OUT | Almazan & Finneman | | | -$31,500 | -$31,500 |
| WIRE OUT | AMA | -$123 | | | -$123 |
| WIRE OUT | Bridgeport Capi | | -$126,084 | | -$126,084 |
| WIRE OUT | California Stra | | -$20,000 | | -$20,000 |
| WIRE OUT | Cardinal Health | -$1,540,156 | -$1,540,223 | -$185,000 | -$3,265,379 |
| WIRE OUT | Centinel Spine, | | | -$11,500 | -$11,500 |
| WIRE OUT | Change Healthca | | | -$26,211 | -$26,211 |
| WIRE OUT | Cnc Contractrs | -$183,775 | | | -$183,775 |
| WIRE OUT | Cse-Capro,LLC S | -$28,750 | | | -$28,750 |
| WIRE OUT | Emerald Los Ang | | | -$40,000 | -$40,000 |
| WIRE OUT | Hss Inc | -$45,000 | | | -$45,000 |
| WIRE OUT | | -$306,845 | | | -$306,845 |
| WIRE OUT | Medline Industr | -$2,487,478 | -$5,010,908 | | -$7,498,386 |
| WIRE OUT | Medtronic USA, | -$75,692 | | | -$75,692 |
| WIRE OUT | Metlife | -$68,214 | | | -$68,214 |
| WIRE OUT | Pipeline Health | | | -$48,000 | -$48,000 |
| WIRE OUT | Plaza MOB | -$60,000 | | | -$60,000 |
| WIRE OUT | Restorixhealth, | -$328,389 | -$355,270 | | -$683,659 |
| WIRE OUT | Stryker Corpora | | | -$107,345 | -$107,345 |
| WIRE OUT | U.S. Bank Equip | -$13,500 | | | -$13,500 |
| WIRE OUT | Vitello Consult | | | -$25,000 | -$25,000 |
| WIRE OUT | Wells Fargo Comm Mortg | -$37,500 | | | -$37,500 |
| WIRE OUT | Windham Profess | | | -$42,031 | -$42,031 |
| WIRE OUT | Woodruff-Sawyer | | | -$14,673 | -$14,673 |
| WIRE OUT | Workterra | -$15,531 | | | -$15,531 |
| WIRE OUT | Zimmer US, Inc. | -$142,601 | -$59,962 | | -$202,563 |
| **Grand Total** | | **-$5,585,489** | **-$7,112,448** | **-$531,259** | **$ (13,229,195)** |

**GOULD** Consulting Services

**A1934**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

### I. Deposits: STMNT Processed_9017

| GCS Acct | 9017 |
|---|---|
| Credit | (All) |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT/RETURN | $8,809 | $2,192 | $181 | | | $11,182 |
| CHRGBK | | $5,200 | | | | $5,200 |
| NSF CHRGBK | $527,183 | | | | | $527,183 |
| RETURNED CK | $8,401 | $301,405 | $76,399 | $2,488 | $104 | $388,796 |
| TAX | $5,895 | | $349 | | | $6,243 |
| Acct *7573 ZBA BAL TRNSFR IN | $31,063,811 | $33,425,501 | $13,902,458 | $1,272,229 | $277,208 | $79,941,207 |
| Grand Total | $31,614,099 | $33,734,298 | $13,979,387 | $1,274,717 | $277,312 | $80,879,811 |

### II. Withdrawals: STMNT Processed_9017

| GCS Acct | 9017 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH RETURN | -$1,892 | | | | | -$1,892 |
| B TO B ACH DEBIT | | | -$1,000 | | | -$1,000 |
| BANK CHRG | -$82,911 | -$63,301 | -$53,980 | -$24,666 | -$12,107 | -$236,965 |
| CHECK | -$25,710,545 | -$26,455,396 | -$13,387,143 | -$1,247,451 | -$264,609 | -$67,065,144 |
| GCS RESEARCH | -$25 | | | | | -$25 |
| PAYMENT | -$13,046 | | | | | -$13,046 |
| TAX | -$21,342 | -$14,312 | -$6,005 | -$2,599 | -$595 | -$44,853 |
| Acct *7573 TRANSFER OUT | -$198,849 | -$88,842 | | | | -$287,691 |
| WIRE OUT | -$5,585,489 | -$7,112,448 | -$531,259 | | | -$13,229,195 |
| Grand Total | -$31,614,099 | -$33,734,298 | -$13,979,387 | -$1,274,717 | -$277,312 | $ (80,879,811) |

### II.A. Wire transfers out of account: STMNT Processed_9017

| GCS Acct | 9017 |
|---|---|
| Debit | (All) |
| Break | DR |

| | Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|---|
| | Transaction Typ | Name | 2019 | 2020 | 2021 | Grand Total |
| 12/16/2019 | WIRE OUT | 2000045334658 | -$124,615 | | | -$124,615 |
| | WIRE OUT | AIG | -$127,320 | | | -$127,320 |
| | WIRE OUT | Almazan & Finneman | | | -$31,500 | -$31,500 |
| | WIRE OUT | AMA | -$123 | | | -$123 |
| | WIRE OUT | Bridgeport Capi | | -$126,084 | | -$126,084 |
| | WIRE OUT | California Stra | | -$20,000 | | -$20,000 |
| | WIRE OUT | Cardinal Health | -$1,540,156 | -$1,540,223 | -$185,000 | -$3,265,379 |
| | WIRE OUT | Centinel Spine, | | | -$11,500 | -$11,500 |
| | WIRE OUT | Change Healthca | | | -$26,211 | -$26,211 |
| | WIRE OUT | Cnc Contractrs | -$183,775 | | | -$183,775 |
| | WIRE OUT | Cse-Capro,LLC S | -$28,750 | | | -$28,750 |
| | WIRE OUT | Emerald Los Ang | | | -$40,000 | -$40,000 |
| | WIRE OUT | Hss Inc | -$45,000 | | | -$45,000 |
| | WIRE OUT | Lewis Brisbois | -$306,845 | | | -$306,845 |
| | WIRE OUT | Medline Industr | -$2,487,478 | -$5,010,908 | | -$7,498,386 |
| | WIRE OUT | Medtronic USA, | -$75,692 | | | -$75,692 |
| | WIRE OUT | Metlife | -$68,214 | | | -$68,214 |
| | WIRE OUT | Pipeline Health | | | -$48,000 | -$48,000 |
| | WIRE OUT | Plaza MOB | -$60,000 | | | -$60,000 |
| | WIRE OUT | Restorixhealth, | -$328,389 | -$355,270 | | -$683,659 |
| | WIRE OUT | Stryker Corpora | | | -$107,345 | -$107,345 |
| | WIRE OUT | U.S. Bank Equip | -$13,500 | | | -$13,500 |
| | WIRE OUT | Vitello Consult | | | -$25,000 | -$25,000 |
| | WIRE OUT | Wells Fargo Comm Mortg | -$37,500 | | | -$37,500 |
| | WIRE OUT | Windham Profess | | | -$42,031 | -$42,031 |
| | WIRE OUT | Woodruff-Sawyer | | | -$14,673 | -$14,673 |
| | WIRE OUT | Workterra | -$15,531 | | | -$15,531 |
| | WIRE OUT | Zimmer US, Inc | -$142,601 | -$59,962 | | -$202,563 |
| | Grand Total | | -$5,585,489 | -$7,112,448 | -$531,259 | $ (13,229,195) |

GOULD Consulting Services

Schedules A.7.3.1 – A.7.3.2
Plaza MOB Bank Account
Summaries

Schedule A.7.3.1 – Account *2120
Schedule A.7.3.2 – Account *2210

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

**I. Deposits: STMNT Processed_2120**

| GCS Acct | 2120 |
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | | | $272 | | | $272 |
| DEPOSIT | $3,883,566 | $3,124,420 | $2,169,454 | $16,790 | $239,779 | $9,434,010 |
| INV PYMT RCVD | | $196,664 | $190,268 | | | $386,932 |
| LOAN 9223 PMT REVRS | $143,676 | | | | | $143,676 |
| NSF CHRGBK | | | | $1,521,467 | $1,593,175 | $3,114,642 |
| RENT PYMNT RCVD | | $74,553 | $76,218 | | | $150,770 |
| RETURNED CK | $1,516 | | $300 | | | $1,816 |
| WIRE IN | $3,133,683 | $472,897 | $918,583 | $3,573,687 | $233,565 | $8,332,414 |
| (1) WIRE IN - 2019 REFI | $8,565,154 | | | | | $8,565,154 |
| (2) WIRE IN - 2021 SALE | | | $15,770,214 | | | $15,770,214 |
| Grand Total | $15,727,595 | $3,868,534 | $19,125,309 | $5,111,944 | $2,066,519 | $45,899,901 |

(1)

| | |
|---|---|
| 06/20/2019 WT Fed#00884 First American Tru /Org-First American Title Insurance Comp Srf# 201917102740000 Trn#190620077757 R'lb# | $8,444,478 |
| 06/20/2019 WT Fed#01490 First American Tru /Org-First American Title Insurance Comp Srf# 201917104673000 Trn#190620104850 R'lb# | $120,236 |
| 06/21/2019 WT Fed#02501 First American Tru /Org-First American Title Insurance Comp Srf# 201917207742000 Trn#190621128333 R'lb# | $440 |
| | $8,565,154 |

(2)

| | |
|---|---|
| 08/31/2021 WT Fed#05028 First American Tru /Org-First American Title Insurance Comp Srf# 202124314467000 Trn#210831194681 R'lb# | $15,769,770 |
| 09/02/2021 WT Fed#02074 First American Tru /Org-First American Title Insurance Comp Srf# 202124506200800 Trn#210902124089 R'lb# | $444 |
| | $15,770,214 |

**I.A. Wire transfers received into account: STMNT Processed_2120**

| GCS Acct | 2120 |
| Credit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE IN | ALECTO HEALTHCA | $160,000 | $227,000 | | $2,475,884 | $233,565 | $3,096,449 |
| WIRE IN | OLYMPIA MEDICAL | $305,000 | | | $1,097,803 | | $1,402,803 |
| WIRE IN | PLAZA MOB 2210 | $2,026,578 | | | | | $2,026,578 |
| WIRE IN | Richmar Consult | $28,000 | | | | | $28,000 |
| WIRE IN | WELLS FARGO BANK | $614,105 | $245,897 | $918,335 | | | $1,778,337 |
| WIRE IN | Woodruff-Sawyer | | | $248 | | | $248 |
| WIRE IN Total | | $3,133,683 | $472,897 | $918,583 | $3,573,687 | $233,565 | $8,332,414 |
| Grand Total | | $3,133,683 | $472,897 | $918,583 | $3,573,687 | $233,565 | $8,332,414 |

GOULD Consulting Services

A1937

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

## II. Withdrawals: STMNT Processed_2120

| GCS Acct | 2120 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | | 2023 Grand Total |
| CHECK | -$1,111,256 | -$1,192,111 | -$874,797 | | | -$3,178,163 |
| LOAN 9223 PAYMENT | -$1,025,732 | | | | | -$1,025,732 |
| PAYMENT | -$103 | | | | | -$103 |
| UNPAID DEPOSIT | -$3,889 | | | | | -$3,889 |
| (1) WIRE OUT | -$3,985,106 | -$2,387,835 | -$1,278,196 | -$19,637,298 | -$4,975,820 | -$32,264,255 |
| (2) WIRE OUT - 2019 REFI | -$9,565,154 | | | | | -$9,565,154 |
| **Grand Total** | **-$15,691,238** | **-$3,579,946** | **-$2,152,993** | **-$19,637,298** | **-$4,975,820** | **-$46,037,295** |

(2)

| | | |
|---|---|---|
| 06/20/2019 WT Fed#04645 City National Bank /Ftr/Bnf=Richard A. Hayes, Inc., Client Trus Srf# Gw00000025652401 Trn#190620114876 Rfb# 4030 | | ($8,444,478) |
| 07/31/2019 WT FED#04959 CITY NATIONAL BANK /FTR/BNF=RICHARD A. HAYES, INC., SRF# GW0000000026630089 TRN#190731148701 Rf B# 4049 | | ($620,676) |
| 09/26/2019 WT Fed#04787 City National Bank /Ftr/Bnf=Richard A. Hayes, Inc Srf# Gw00000027989004 Trn#190926149692 Rfb# 4072 | | ($500,000) |
| | | ($9,565,154) |

## II.A. Wire transfers out of account: STMNT Processed_2120

| GCS Acct | 2120 | = Transfers during "Plaza MOB Gap Period" |
|---|---|---|
| Debit | (Multiple Items) | |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | | 2023 Grand Total |
| WIRE OUT | ALECTO HEALTHCA | -$2,731,226 | -$280,000 | | -$9,245,189 | | -$4,672,414 -$16,928,829 |
| WIRE OUT | Davis-Dyer-Max, | | | -$32,559 | | | -$32,559 |
| WIRE OUT | Dilworth Paxson | -$20,000 | | | | | -$20,000 |
| WIRE OUT | FIRST CLEARING, | | | | -$3,892,499 | | -$3,892,499 |
| WIRE OUT | HOLTZ, SLAVETT | | | | -$5,795,236 | | -$5,795,236 |
| WIRE OUT | MUFG Union Bank 2932 | -$155,830 | | | | | -$155,830 |
| WIRE OUT | OLYMPIA CMA | | | | -$548,025 | | -$548,025 |
| WIRE OUT | OLYMPIA MEDICAL | -$290,000 | -$125,000 | -$14,673 | -$120,848 | -$188,406 | -$738,927 |
| WIRE OUT | Ream, Trustee for Various Invest | -$755,150 | -$1,812,369 | -$1,222,447 | | | -$3,789,966 |
| WIRE OUT | Richmar Consult | -$28,000 | | | | | -$28,000 |
| WIRE OUT | Shulman Bastian | | | | | -$115,000 | -$115,000 |
| WIRE OUT | Vitello Consult | | | | -$35,500 | | -$35,500 |
| WIRE OUT | Woodruff-Sawyer | | -$170,466 | -$8,517 | | | -$178,983 |
| WIRE OUT | Commercial Due Diligence | -$4,900 | | | | | -$4,900 |
| **WIRE OUT Total** | | **-$3,985,106** | **-$2,387,835** | **-$1,278,196** | **-$19,637,298** | **-$4,975,820** | **-$32,264,255** |
| **Grand Total** | | **-$3,985,106** | **-$2,387,835** | **-$1,278,196** | **-$19,637,298** | **-$4,975,820** | **-$32,264,255** |

Net wire transfers to Alecto "Post-Assignment"

| | |
|---|---|
| $2,709,449 | from Alecto |
| ($13,917,603) | to Alecto |
| ($11,208,155) | Net wire transfers to Alecto |

Net wire transfers to Affiliates "Post-Assignment"

| | |
|---|---|
| $1,097,803 | from Olympia HC/OMC |
| ($871,953) | to Olympia HC/OMC |
| $225,850 | Net wire transfers to Olympia HC/OMC |

GOULD Consulting Services

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

I.A.2019 Wire transfers into account: STMNT Processed_2120

| GCS Acct | 2120 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | Mo | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | | 2019 Grand Total |
| Transaction Type | Name | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| WIRE IN | ALECTO HEALTHCA | | | | | | | $160,000 | $160,000 |
| WIRE IN | PLAZA MOB 2210 | $210,454 | $310,025 | $350,087 | | | | | $870,566 |
| WIRE IN | Richmar Consult | | | | | | $28,000 | | $28,000 |
| WIRE IN | WELLS FARGO BANK | | $500,000 | $25,330 | $24,263 | $46,249 | $18,263 | | $614,105 |
| WIRE IN - 2019 REFI | First American | $8,565,154 | | | | | | | $8,565,154 |
| Grand Total | | $8,775,608 | $810,025 | $375,417 | $24,263 | $46,249 | $46,263 | $160,000 | $10,237,824 |

I.A.2020 Wire transfers into account: STMNT Processed_2120

| GCS Acct | 2120 |
|---|---|
| Debit | (All) |

| Sum of Amount | | Yr | Mo | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 Grand Total |
| Transaction Type | Name | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | |
| WIRE IN | ALECTO HEALTHCA | | $227,000 | | | | | | | $227,000 |
| WIRE IN | WELLS FARGO BANK | $48,918 | $38,017 | $32,800 | $35,699 | $43,233 | $20,000 | $12,500 | $14,730 | $245,897 |
| Grand Total | | $48,918 | $265,017 | $32,800 | $35,699 | $43,233 | $20,000 | $12,500 | $14,730 | $472,897 |

I.A.2021 Wire transfers into account: STMNT Processed_2120

| GCS Acct | 2120 |
|---|---|
| Debit | (All) |

| Sum of Amount | | Yr | Mo | | |
|---|---|---|---|---|---|
| | | 2021 | 2021 | | 2021 Grand Total |
| Transaction Type | Name | 5 | 8 | 9 | |
| WIRE IN | WELLS FARGO BANK | | | $918,335 | $918,335 |
| WIRE IN | Woodruff-Sawyer | $248 | | | $248 |
| WIRE IN - 2021 SALE | First American | | $15,769,770 | $444 | $15,770,214 |
| Grand Total | | $248 | $15,769,770 | $918,779 | $16,688,797 |

Net wire transfers to Alecto in "Plaza MOB Gap Period"

| $160,000 | from Alecto 2019 |
|---|---|
| $227,000 | from Alecto 2020 |
| ($2,731,226) | to Alecto 2019 |
| ($280,000) | to Alecto 2020 |
| ($2,624,226) | Net wire transfers to Alecto |

Net wire transfers to Affiliates in "Plaza MOB Gap Period"

($125,000) to Olympia Medical

GOULD Consulting Services

**A1939**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

**II.A.2019 Wire transfers out of account: STMNT Processed_2120**

GCS Acct    2120
Debit       (Multiple Items)

| Sum of Amount | Yr | Mo | | | | | 2019 Grand Total |
|---|---|---|---|---|---|---|---|
| | 2019 | 2019 | 2019 | 2019 | 2019 | | |
| Transaction 1 Name | 7 | 8 | 9 | 10 | 11 | 12 | |
| WIRE OUT ALECTO HEALTHCA | -$2,571,226 | | | | | -$160,000 | -$2,731,226 |
| WIRE OUT MUFG Union Bank 2932 | | -$155,830 | | | | | -$155,830 |
| WIRE OUT Ream, Trustee for Various Invest | | -$152,680 | -$152,680 | -$148,555 | -$152,680 | -$148,555 | -$755,150 |
| WIRE OUT Richmar Consult | | | | | -$28,000 | | -$28,000 |
| WIRE OUT Total | -$2,571,226 | -$308,510 | -$152,680 | -$148,555 | -$180,680 | -$308,555 | -$3,670,206 |
| Grand Total | -$2,571,226 | -$308,510 | -$152,680 | -$148,555 | -$180,680 | -$308,555 | -$3,670,206 |

**II.A.2020 Wire transfers out of account: STMNT Processed_2120**

GCS Acct    2120
Debit       (Multiple Items)

| Sum of Amount | Yr | Mo | | | | | | | | | | 2020 Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | |
| Transaction 1 Name | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| WIRE OUT ALECTO HEALTHCA | -$280,000 | | | | | | | | | | | -$280,000 |
| WIRE OUT OLYMPIA MEDICAL | | -$125,000 | | | | | | | | | | -$125,000 |
| WIRE OUT Ream, Trustee for Various Invest | -$152,680 | -$160,314 | -$144,430 | -$152,680 | -$148,555 | -$152,680 | -$148,555 | -$152,145 | -$152,145 | -$148,020 | -$152,145 | -$148,020 | -$1,812,369 |
| WIRE OUT Woodruff-Sawyer | | | | | | | -$170,466 | | | | | -$170,466 |
| WIRE OUT Total | -$432,680 | -$285,314 | -$144,430 | -$152,680 | -$148,555 | -$152,680 | -$319,021 | -$152,145 | -$152,145 | -$148,020 | -$152,145 | -$148,020 | -$2,387,835 |
| Grand Total | -$432,680 | -$285,314 | -$144,430 | -$152,680 | -$148,555 | -$152,680 | -$319,021 | -$152,145 | -$152,145 | -$148,020 | -$152,145 | -$148,020 | -$2,387,835 |

**II.A. 2021 Wire transfers out of account: STMNT Processed_2120**

GCS Acct    2120
Debit       (Multiple Items)

| Sum of Amount | Yr | Mo | | | | | | 2021 Grand Total |
|---|---|---|---|---|---|---|---|---|
| | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 | |
| Transaction 1 Name | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| WIRE OUT Davis-Dyer-Max, | | | | | | | -$32,559 | -$32,559 |
| WIRE OUT OLYMPIA MEDICAL | | | | | | -$14,673 | | -$14,673 |
| WIRE OUT Ream, Trustee for Various Invest | -$152,145 | -$152,145 | -$139,770 | -$152,145 | -$173,020 | -$152,145 | -$148,020 | -$153,058 | -$1,222,447 |
| WIRE OUT Woodruff-Sawyer | | | | | | -$8,517 | | -$8,517 |
| WIRE OUT Total | -$152,145 | -$152,145 | -$139,770 | -$152,145 | -$173,020 | -$160,662 | -$162,693 | -$185,617 | -$1,278,196 |
| Grand Total | -$152,145 | -$152,145 | -$139,770 | -$152,145 | -$173,020 | -$160,662 | -$162,693 | -$185,617 | -$1,278,196 |

GOULD Consulting Services

**A1940**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

I. Deposits: STMNT Processed_2210

| GCS Acct | 2210 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | |
|---|---|---|
| **Transaction Type** | | **2019 Grand Total** |
| DEPOSIT | $2,017,168 | $2,017,168 |
| **Grand Total** | **$2,017,168** | **$2,017,168** |

II. Withdrawals: STMNT Processed_2210

| GCS Acct | 2210 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| **Transaction Type** | **Name** | | **2019 Grand Total** |
| PAYMENT | | -$93 | -$93 |
| WIRE OUT | PLAZA MOD 2120 | -$2,031,578 | -$2,031,578 |
| **Grand Total** | | **-$2,031,671** | **-$2,031,671** |

**GOULD** Consulting Services

**A1941**

**Exhibit E**
Contracts to be Assumed

| List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|
| Commercial Insurance Premium Finance and Security Agreement (Quote No. x0380) for Policy No. x8117 - Property Insurance | Bank Direct Capital Finance<br>150 North Field Drive, Suite 190<br>Lake Forest, IL 60045 |
| Commercial Insurance Premium Finance and Security Agreement (Quote No. x2606) for Policy No. x1701 – Extending Reporting Professional Liability Policy | Bank Direct Capital Finance<br>150 North Field Drive, Suite 190<br>Lake Forest, IL 60045 |
| Commercial Insurance Premium Finance and Security Agreement (Quote No. 45720646 for Policy No. 02-462-55-24, 02-462-55-22, NHS703822 | Stetson Insurance Funding, LLC<br>6450 Transit Road<br>Depeur, NY 14043 |
| Medical Insurance Benefits | Anthem Blue Cross<br>PO Box 51011<br>Los Angeles, CA 90051 |
| Dental and Vision Insurance Benefits | Met Life<br>811 Main Street, 7th Floor<br>Kansas City, MO 64105 |
| Life Insurance Benefits | Unum<br>655 N. Central, Suite 900<br>Glendale, CA 91203 |
| Insurance<br>Directors & Officers Employment Practices Fiduciary & Crime - Primary Layer Term: 1/31/2023 - 1/31/2024 Policy No.: 02-462-55-16 | National Union Fire Insurance Co<br>28 Liberty Street<br>New York, NY 10005 |
| Insurance<br>Excess Directors & Officers Employment Practices<br>Term: 1/31/2023 - 1/31/2024 Policy No. NHS 703822 | RSUI Indemnity Company<br>945 East Paces Ferry Road Suite 1800<br>Atlanta, GA 30376 |
| Insurance<br>Excess Directors & Officers Employment Practices<br>Term: 1/31/2023 - 1/31/2024 Policy No. 02-462-55-24 | National Union Fire Insurance Co<br>28 Liberty Street<br>New York, NY 10005 |
| Insurance<br>Comprehensive Employer Indemnity Term: 3/1/2023 - 3/31/2024<br>Policy No. ORNSOL000039-01 | Old Republic Union Insurance Co<br>307 N Michigan Avenue<br>Chicago, IL 60601 |

1

| | |
|---|---|
| Insurance<br>Workers Compensation Term: 4/1/2023 - 41/2024 Policy No. BNUWC0153849 | StarNet Insurance Company<br>9301 Innovation Drive Suite 200<br>Manassa, VA 20110 |
| InsuranceAutomobile<br>Term: 6/1/2023 - 6/1/2024 Policy No. 5087-0849-02 | Vantapro Specialty Insurance Co<br>199 Water Street<br>New York, NY 10038 |
| Insurance<br>"All Risks" Property incl Boiler & Machinery & Flood, excluding CA EM<br>Term: 7/1/2022 – 7/1/2023 Policy No. 018258117 | American Home Assurance Co<br>175 Water Street<br>New York, NY 10038 |
| Insurance<br>Excess Medical Professional<br>General Liability for TX<br>(WNJ) Exposure Only<br>Term: 8//1/2022 -<br>8/1/2023<br>Policy No. HUL 09114235 | Magmutual Professional Security Ins Co<br>PO Box 52979<br>Atlanta, GA 30355 |
| InsuranceEnvironmental Pollution Storage Tank Liability - WNJ Term: 8/1/2022 - 8/1/2023 Policy No. PSPIUSCBM76002 | Ironshore Specialty Insurance Co<br>175 Berkeley Street<br>Boston, MA 02116 |
| InsuranceCyber Liability<br>Term: 8/1/42022 - 8/14/2023<br>Policy No. C-4LPY-047551-CYBER-2002 | Coalition Insurance Solutions Arch Specialty - 45% Fireman's Fund - 25% Ascot Specialty - 25%<br>North American Capacity - 5% |
| Insurance<br>3 Year Extended Reporting Period Excess Medical Professional General Liability Coverage for Non TX Exposures<br>Term: 8/1/2022 - 8/1/2025 Policy No. x1701 | Endurance American Specialty Ins Co<br>16052 Swingley Ridge Road Suite 130<br>St Louis, MO 63017 |
| Sublease dated 1/31/2023<br>Approximately 2,862 square feet of office space located at 101 N. Brand Boulevard, Suite 1920, Glendale, CA 91203 | Pacific Global<br>Investment<br>Management Group<br>Attn: SVP<br>101 N. Brand Blvd., Suite 1950<br>Glendale, CA 91203 |
| Record Storage and Data Agreement dated 2/1/2023 | GRM Information Management of San Francisco, LLC 40199 Boyce Road<br>Fremont, CA 94538 |

2

A1943

**Exhibit F**

Contracts to be Rejected[1]

| List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|
| Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals | Cardinal Health 110, LLC<br>c/o Porter Wright Morris & Arthur LLC<br>41 South High Street, Suite 2900<br>Columbus, Ohio 43215 |
| Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals | Cardinal Health 200, LLC<br>c/o Porter Wright Morris & Arthur LLC<br>41 South High Street, Suite 2900<br>Columbus, Ohio 43215 |
| Prime Vendor Agreement - Distribution Agreement for Pharmaceuticals dated 6/1/2016<br>First Amendment dated 12/5/2016<br>Second Amendment dated 3/7/2017<br>Third Amendment dated 6/20/2017 | Cardinal Health 110, LLC and Cardinal Health, Inc.<br>c/o Porter Wright Morris & Arthur LLC<br>41 South High Street, Suite 2900<br>Columbus, Ohio 43215 |
| Guaranty dated 10/31/2014<br>Guarantee re Sherman/Grayson Hospital, LLC obligations to MPT of Sherman-Alecto, LLC for Capital Reserve Deposits | MPT of Sherman-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| Guaranty dated 9/19/2014<br>Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC | MPT of Fairmont-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| Guaranty dated 6/1/2017<br>Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Wheeling LLC and Alecto Healthcare Services Martin's Ferry LLC | MPT of Wheeling-Alecto Hospital, LLC MPT of Martins Ferry-Alecto Hospital, LLC<br>Attn Larry Portal, SVP<br>Attn Legal Department<br>1000 Urban Center Drive, Suite 501<br>Birmingham, AL 35242 |
| Guaranty dated 9/23/2014 | Sherman/Grayson Health System, LLC LHP Hospital Group, Inc.<br>c/o Ardent Health Services Attn Legal Department<br>One Burton Hills Boulevard Suite 250<br>Nashville, TN 37215 |

[1] Certain contracts listed herein may not be executory contracts, as defined by Section 365 of the Bankruptcy Code, but have been included because they were included on Schedule G of the Debtor's schedules are included herein solely for the purposes of ensuring notice to the non-debtor parties to such contracts that such contracts are being terminated on the effective date.

16305343/2

**A1944**

**EXHIBIT G**

Liquidation Analysis

**Alecto Healthcare**
**LIQUIDATION ANALYSIS**
**as of March 3, 2023**

| | CHAPTER 11 | | CHAPTER 7 | |
|---|---|---|---|---|
| Cash and Accounts Receivable [1] | | | $ | 168,000 |
| Year 1 disposable income [2] | $ | 463,913.00 | $ | - |
| Year 2 disposable income [2] | $ | 748,514.00 | $ | - |
| Year 3 disposable income [2] | $ | 704,083.00 | $ | - |
| Other assets [3] | | | | |
| Distributions from subsidiaries [4] | $ | 137,500.00 | $ | 137,500.00 |
| Furniture and Equipment [5] | $ | - | | $29,838.36 |
| Vehicles [6] | | | | $21,000.00 |
| Causes of Action [7] | $ | 25,000 | $ | - |
| | | | | |
| **Total Assets** | **$** | **2,079,010** | **$** | **356,338** |
| | | | | |
| Postconfirmation attorneys fees [8] | | $0.00 | | |
| Chapter 7 Trustee Fee [9] | | | | $16,000.00 |
| Chapter 7 Trustee Counsel [10] | | | | $75,000.00 |
| | | | | |
| **Total Fees** | **$** | **-** | **$** | **91,000** |
| | | | | |
| **Available for Payment of Claims** | **$** | **2,079,010** | **$** | **265,338** |

NOTES

(1) - The Debtor estimates that as of the Effective Date, the estate will have $168,000 of cash and accounts receivable. Note that the amounts depends upon the timing of payments made/received, and is the estimate is premised upon an Effective Date of March 6, 2024. Note that this amount is not available for distribution to creditors under the Chapter 11 Plan as these amounts are necessary for payment of incurred and ongoing expenses (and which would otherwise be administrative expenses) and are already included in the calculus of disposable income in Year 1.

(2) - See Projected Income and Expenses attached as Exhibit C to Plan. In the event of liquidation, the Debtor's estate would not receive any income received from the Debtor's subsdiary, Alecto Healthcare Services Hayward LLC, on account of services provided to St. Rose Hospital.

(3) - This is intended to include all other assets of the Debtor available for distribution to creditors.

(4) - This includes distributions expected to be received from the estate of Sherman/Grayson Hospital, LLC on account of the Debtor's claim, which may be the subject of a compromise. As more fully set forth in the Plan, the Debtor does not believe, based upon the assets and liabilities of other direct and indirect subsidiaries of the Debtor, that there will be any value to be received by the Debtor on account of its interests in those entities.

(5) - See Schedule A.39 and A.41.

(6) - See Schedule A.47.

(7) - See the report attached as Exhibit D to the Plan. As more fully set forth therein, as determined by the Independent Director, the insiders have no liability for avoidable transfers. Notwithstanding the foregoing, the insiders have agreed to provide the estate with $25,000 for the benefit of creditors in order to get releases from the estate. The insiders have not agreed to remit any payment to the estate in the event that the case converts to Chapter 7.

(8) - The Debtor anticipates that after confirmation, the estate will continue to incur signfiicant fees in connection with the Reed Creditors' appeal(s). Further, there may be other matters left to address after confirmation, although the Debtor may object to certain claims, and other matters necessary to administer the estate prior to closing the bankruptcy case. The anticipated amount of the Reorganized Debtor's professional fees ($300,000) are already reflected in the Year 1 disposable income.

(9) - See 11 U.S.C. S 326.

(10) - The primarily differences between the professional fees of the reorganized debtors and those of a Chapter 7 trustee include the following: (i) the need for the Chapter 7 Trustee and its counsel to become familiar with the underlying facts of the case, (ii) the need to prepare for and attend a 341 meeting, (iii) the preparation and filing of retention application(s) for the Chapter 7 Trustee's professionals, and (iv) other costs which would not be necessary for a confirmed Chapter 11 case.

**EXHIBIT B**

**NOTICE OF CONFIRMATION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC, | Case No. 23-10787 (JKS) |
| Debtor.[1] | |

**NOTICE OF (I) ENTRY OF ORDER CONFIRMING, AND OCCURRENCE
OF EFFECTIVE DATE OF SMALL BUSINESS DEBTOR'S PLAN OF
REORGANIZATION DATED DECEMBER 19, 2023**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

    **A.**    **Confirmation of the Plan.**

        On April __, 2024, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order [Docket No. ___] (the "Confirmation Order")[2] confirming the *Small Business Debtor's Plan of Reorganization dated December 19, 2023* (collectively with all exhibits and supplements and any modifications or other amendments thereto, the "Plan") in the Chapter 11 case (the "Chapter 11 Case") of the above-captioned debtor (the "Debtor").

    **B.**    **Occurrence of the Effective Date.**

        The Plan became effective on April __, 2024 (the "Effective Date").

    **C.**    **Exculpation, Releases, and Injunction.**

        As more fully set forth therein, Article VII of the Plan, as superseded by the Confirmation Order, contains certain exculpation, injunctions and release provisions. Note that the Confirmation Order expressly provides that nothing in the Plan or Confirmation order herein shall be interpreted to provide any third-party releases, however no party may bring a derivative claim of the Debtor or its estate against any of the Released Parties for any Claim arising prior to the Effective Date. Before bringing any action against the Debtor or the Released Parties, parties are strongly encouraged to review Article VII of the Plan and the Confirmation Order.

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

[2] Capitalized terms used but not defined in this Notice shall have the same meanings given to them in the Plan and the Confirmation Order.

### D. Rejection of Executory Contracts and Unexpired Leases Not Assumed.

Except for any Executory Contracts or Unexpired Leases of the Debtor: (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to, and remains pending as of, Confirmation; (iii) that were previously assumed and assigned; or (iv) that are listed on the Schedule of Assumed Contracts and Unexpired Leases, each Executory Contract and Unexpired Lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. Nothing herein is intended to affect the validity of contracts and leases entered into by the Debtor on or after the Petition Date, or the rights of the Debtor thereunder, which shall remain in full force and effect after the Effective Date in accordance with their terms. Nothing herein is intended to affect the validity of contracts and leases entered into by the Debtor on or after the Petition Date, or the rights of the Debtor thereunder, which shall remain in full force and effect after the Effective Date in accordance with their terms.

### E. Bar Dates.

Rejection Damages Bar Date. If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, and absent an order of the Court, such Claim shall be forever barred and shall not be enforceable against the Debtor, its Estate, or the Liquidating Trustee, unless a Proof of Claim is filed with the Bankruptcy Court no later than 30 days after the Effective Date; provided, however, that any counterparty or counterparties to an Executory Contract or Unexpired Lease with a Claim that arises or becomes Allowed on or after the Effective Date as a result of the rejection of such contract or lease shall have 30 days after the Effective Date to file a Proof of Claim for rejection damages with the Bankruptcy Court.

Administrative Expense and Professional Fee Deadlines. Any request for an administrative expense, other than professional fees and expenses, shall be filed with the Bankruptcy Court no later than 30 days after the Effective Date. Any request for payment of professional fees and expenses shall be filed with the Bankruptcy Court no later than 45 days after the Effective Date.

Any claim for rejection damages, an administrative expense, including for professional fees and expenses that is not timely filed will be forever barred.

### F. Retention of Jurisdiction by Bankruptcy Court.

Following the Effective Date, the Court will retain exclusive jurisdiction of the Chapter 11 Case to interpret the Plan or the Confirmation Order, and the Court shall retain jurisdiction for

all other matters arising under title 11, or arising in or related to the Debtor's Bankruptcy Case to the maximum extent permitted by law under 28 U.S.C. §§ 157 and 1334.

**H.     Notice Parties' Service Addresses.**

For purposes of serving requests for payment of Administrative Expense Claims, applications for allowance of Professional Compensation Claims, and any other papers required to be served on the notice parties set forth in the Plan, such service should be made, as applicable, on:

(a)      <u>If to the Debtor</u>

Morris James LLP
500 Delaware Avenue, Suite 1500,
Wilmington, DE 19801
Attn:   Jeffrey R. Waxman, Esquire (jwaxman@morrisjames.com)
           Tara Pakrouh, Esquire (tpakrouh@morrisjames.com)

(b)      <u>If to the U.S. Trustee:</u>

Office of the U.S. Trustee
844 King St., Suite 2207
Lockbox 35
Wilmington, DE 19801
Attn:   Linda J. Casey, Esquire (linda.casey@usdoj.gov)

**H.     Filing Claims with the Bankruptcy Court.**

Proofs of Claim arising from the rejection of executory contracts or unexpired leases should be filed so as to be <u>received</u> by the Court on or before the applicable Bar Date at the following addresses:

**If by mail**      United States Bankruptcy Court
Attn:  Claims
824 Market Street, 3rd Floor
Wilmington, DE 19801

Additionally, Proofs of Claim may be delivered electronically using the interface available on the Court's website at https://ecf.deb.uscourts.gov/cgi-bin/autoFilingClaims.pl.  **All proofs of claim arising from the rejection of executory contracts or unexpired leases must no later than 30 days after the Effective Date**.  Proofs of Claim submitted by facsimile or e-mail shall not be accepted.

3

## I.      Post-Confirmation Service List

Notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Reorganized Debtor, and all persons on the Bankruptcy Rule 2002 service list as well as any parties who may be affected by the relief sought..  With the exception of the U.S. Trustee and the Subchapter v Trustee, any Person desiring to remain on the Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Debtor within thirty (30) days subsequent to the Effective Date.  Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order.  Persons who do not file a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Bankruptcy Rule 2002 service list, however nothing herein shall affect any party's right to receive electronic notice of pleadings from CM/ECF.

## J.      Copies of Confirmation Order.

Copies of the Plan, the Confirmation Order, or any other pleadings filed in this Chapter 11 Case may be obtained for a fee via PACER at: http://www.deb.uscourts.gov or for free or upon request from the Debtor's counsel (jwaxman@morrisjames.com).

Dated: April __, 2024

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Tara C. Pakrouh (DE Bar No. 6192)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: tpakrouh@morrisjames.com

*Counsel to the Debtor and Debtor-In-Possession*

4

# EXHIBIT 53

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC, [1] | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtor. | ) | **Related Docket Nos. 343, 354** |

### <u>NOTICE OF APPEAL</u>

The Reed Action Judgment Creditors, by and through their undersigned counsel, hereby appeal to the United States District Court for the District of Delaware, pursuant to 28 U.S.C. § 158(a) and Rules 8002 and 8003 of the Federal Rules of Bankruptcy Procedure, from the *Confirmation Ruling* issued by the U.S. Bankruptcy Court for the District of Delaware (Stickles, J.) on March 20, 2024 (D.I. 343) and the *Finding of Facts and Conclusions of Law Confirming Small Business Debtor's Plan of Reorganization* entered by the Bankruptcy Court on April 4, 2024 (Doc No. 354) (the "<u>Confirmation Order</u>").

A copy of the Confirmation Ruling issued by the Bankruptcy Court on March 20, 2024, which sets forth the basis for the Court's approval of the Debtor's Plan of Reorganization, is annexed hereto as **Exhibit A**.

A copy of the Confirmation Order is annexed hereto as **Exhibit B.**

The parties to the Confirmation Order appealed from, and the names, addresses, and telephone numbers of their respective attorneys are as follows:

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

**A1953**

| Party | Attorneys |
|---|---|
| The Reed Action Judgment Creditors | **SULLIVAN · HAZELTINE · ALLINSON LLC**<br>William D. Sullivan (No. 2820)<br>William A. Hazeltine (No. 3294)<br>919 North Market Street, Suite 420<br>Wilmington, DE 19801<br>Tel: (302) 428-8191<br>Email: bsullivan@sha-llc.com<br>      whazeltine@sha-llc.com<br><br>-and-<br><br>Bren J. Pomponio, Esq.<br>Colten L. Fleu, Esq.<br>Mountain State Justice, Inc.<br>1217 Quarrier St.<br>Charleston, WV 25301<br>Tel: (304) 326-0188<br>Email:  bren@msjlaw.org<br>      colten@msjlaw.org<br><br>-and-<br><br>John Stember, Esq.<br>Maureen Davidson-Welling, Esq.<br>Stember Cohn & Davidson-Welling, LLC<br>The Harley Rose Building<br>425 First Avenue, 7th Floor<br>Pittsburgh, PA 15219<br>Tel: 412-338-1445<br>Email: jstember@stembercohn.com<br>      mdavidsonwelling@stembercohn.com |
| Alecto Healthcare Services LLC | **Morris James LLP**<br>Jeffrey R. Waxman, Esq.<br>Brya M. Keilson, Esq.<br>500 Delaware Avenue, Suite 1500<br>Wilmington, DE 19801<br>Tel: 302-658-9200<br>jwaxman@morrisjames.com<br>bkeilson@morrisjames.com |

A1954

| Party | Attorneys |
|---|---|
| Steven Balasiano, Independent Director | **Cole Schotz P.C.**<br>Justin R. Alberto, Esq.<br>500 Delaware Ave., Suite 1410<br>Wilmington, DE 19801<br>Tel. 302-652-3131<br>JAlberto@coleschotz.com |
| Subchapter V Trustee | **Brown McGarry Nimeroff LLC**<br>Jami Nimeroff, Esq.,<br>919 N. Market Street, Suite 420<br>Wilmington, DE 19801<br>Tel: 402-428-8142<br>JNimeroff@bmnlawyers.com |
| Office of the United States Trustee | Linda Casey<br>Office of the United States Trustee<br>844 King Street, Suite 2207, Lockbox 35<br>Wilmington, DE 19801<br>Tel: 302-573-6491<br>Linda.Casey@usdoj.gov |

Dated: April 18, 2024
   Wilmington, Delaware

SULLIVAN · HAZELTINE · ALLINSON LLC

/s/ William D. Sullivan
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
   whazeltine@sha-llc.com

-and-

Bren J. Pomponio, Es.
Colten L. Fleu, Esq.
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
Tel: (304) 326-0188
Email: bren@msjlaw.org
   colten@msjlaw.org

-and-

**A1955**

John Stember, Esq.
Maureen Davidson-Welling, Esq.
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email: jstember@stembercohn.com
        mdavidsonwelling@stembercohn.com

*Counsel for The Reed Action Judgment Creditors*