# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC, | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| The Reed Action Judgment Creditors, | ) | Civil Action No. 1:24-cv-00494-GBW |
| | ) | (as consolidated) |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Alecto Healthcare Services LLC, | ) | |
| | ) | |
| Appellee. | ) | |

## <u>APPELLEE'S RESPONSIVE BRIEF</u>

Dated: November 27, 2024

**MORRIS JAMES LLP**
Carl N. Kunz, III (No. 3201)
Jeffrey R. Waxman (No. 4159)
Douglas N. Candeub (No. 4211)
Christopher M. Donnelly (No. 7149)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: 302-888-6800
Facsimile: 302-571-1750
Email: ckunz@morrisjames.com
jwaxman@morrisjames.com
dcandeub@morrisjames.com
cdonnelly@morrisjames.com

*Counsel for Appellee*

17030076/10

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................**Error! Bookmark not defined.**

NATURE AND STAGE OF THE PROCEEDINGS ..................................................1

    A.    The Designation Motion, Evidentiary Hearing, Decision, and Appeal ...............................................................1

    B.    Alecto's Plan, the Confirmation Hearing, and the Appeal.........................................................................................2

STATEMENT OF JURISDICTION...........................................................................4

COUNTER-STATEMENT OF THE ISSUES ON APPEAL AND THE APPLICABLE STANDARD OF REVIEW .......................................5

SUMMARY OF ARGUMENT ..................................................................................9

STATEMENT OF THE CASE...................................................................................12

    A.    Alecto's Financial Spiral....................................................12

    B.    Alecto's Bankruptcy Filing .................................................13

    C.    The Designation Motion.......................................................14

    D.    The Designation Hearing .....................................................17

    E.    Alecto Appoints an Independent Director.............................20

    F.    The Reed Creditors Object to Confirmation of the Plan......21

    G.    The Confirmation Hearing ...................................................22

ARGUMENT .............................................................................................................29

I.    THE BANKRUPTCY COURT CORRECTLY FOUND, BASED ON THE EVIDENCE PRESENTED, THAT ALECTO MET THE SUBCHAPTER V DEBTOR ELIGIBILITY REQUIREMENTS................................................29

A.    The Bankruptcy Court Correctly Concluded that Alecto's Debt to LHP Was Contingent as of the Petition Date ........................................................................... 31

B.    The Bankruptcy Court Correctly Concluded that Alecto's Debt to LHP Was Unliquidated as of the Petition Date ........................................................................... 38

II.    THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION WHEN IT APPROVED THE SETTLEMENT WITH THE RELEASED PARTIES AS A COMPONENT OF THE PLAN .................................................... 42

A.    Section 1123(b)(3)(A) Permits a Plan to Provide for Releases of Alecto's Claims .......................................... 42

B.    The Reed Creditors Imply, Without Support, a Far Steeper Burden of Proof for the Bankruptcy Court to Approve the Settlement and Releases than Settled Case Law Requires .............................................. 44

C.    The Reed Creditors' Challenges to the Quality of the Evidence Presented by Alecto – as to the Potential Viability of Causes of Action against Insiders and as to Solvency at the Time of the Sunrise Transfer - Are Meritless ........................................................ 46

    1.    The Bankruptcy Court Properly Canvassed the Issues, Considered the *Martin* Factors and Appropriately Exercised Its Discretion to Approve the Settlements and Confirm the Plan ........................ 46

    2.    Appellants Assert, Erroneously and Without Support, that Expert Testimony on Solvency Was Required ............................................. 51

D.    The Bankruptcy Court Properly Approved the Settlement and Confirmed the Plan Whether under *Coram Healthcare*, *Martin* or *Zenith*. ........................ 54

CONCLUSION ........................................................... 57

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Adams*,
   373 B.R. 116 (B.A.P. 10th Cir. 2007) ................................................................40

*Matter of Belt*,
   106 B.R. 553 (Bankr. N.D. Ind. 1989) ..............................................................37

*In re Burdock & Assocs., Inc.*,
   662 B.R. 16 (Bankr. M.D. Fla. 2024) ................................................................40

*Burtch v. Opus LLC (In re Opus E. LLC)*,
   698 F. App'x 711 (3d Cir. 2017) .........................................................................6

*In re Capmark Fin. Grp. Inc.*,
   438 B.R. 471 (Bankr. D. Del. 2010) ..............................................................7, 45

*In re Commercial Financial Servs., Inc.*,
   2005 WL 6499290 (Bankr. N.D. Okla. Sept. 14, 2005) ....................................52

*Depoister v. Mary M. Holloway Found.*,
   36 F.3d 582 (7th Cir. 1994) ...............................................................................44

*In re DeVries*,
   2014 WL 4294540 (Bankr. N.D. Tex. Aug. 27, 2014)........................................52

*F.D.I.C. v. Deglau*,
   207 F.3d 153 (3d Cir. 2000) ...............................................................................57

*Fesnak & Assocs., LLP v. U.S. Bank Nat. Ass'n*,
   722 F. Supp. 2d 496 (D. Del. 2010)....................................................................33

*In re Fradkov*,
   2020 WL 6701335 (Bankr. D.N.J. Nov. 12, 2020) ......................................36, 41

*In re Free Speech Sys., LLC*,
   649 B.R. 729 (Bankr. S.D. Tex. 2023) ...............................................................30

*In re Fruehauf Trailer Corp.*,
   444 F.3d 203 (3d Cir. 2006) ................................................................................5

*In re Harwood*,
519 B.R. 535 (Bankr. N.D. Cal. 2014) ............................................................31

*In re Heart Heating & Cooling, LLC*,
2024 WL 1228370 (Bankr. D. Colo. Mar. 21, 2024) ......................................40

*In re Hibbard Brown & Co.*,
217 B.R. 41 (Bankr. S.D.N.Y. 1998)..................................................................7

*In re HomeBanc Mortg. Corp.*,
945 F.3d 801 (3d Cir. 2019) ...............................................................................6

*In re Ibbott*,
637 B.R. 567 (Bankr. D. Md. 2022) .................................................................36

*In re Isom*,
2020 WL 1950905 (B.A.P. 9th Cir. Apr. 22, 2020), *aff'd,* 836 F.
App'x 562 (9th Cir. 2020)...................................................................................52

*In re Jasmine, Ltd.*,
258 B.R. 119 (D.N.J. 2000) ...............................................................................45

*In re Key3Media Grp., Inc.*,
336 B.R. 87 (Bankr. D. Del. 2005)....................................................................44

*In re Lambert*,
43 B.R. 913 (Bankr. D. Utah 1984)..............................................................39, 40

*In re LandSource Communities Dev., LLC*,
612 B.R. 484 (D. Del.), *aff'd sub nom. LandSource Communities
Dev. LLC v. Citizens Against Corp. Crime, LLC*, 834 F. App'x 747
(3d Cir. 2020)...................................................................................................8, 43

*LeJeune v. Bliss-Salem, Inc.*,
85 F.3d 1069 (3d Cir. 1996) ..............................................................................33

*In re Lenox Healthcare, Inc.*,
343 B.R. 96 (Bankr. D. Del. 2006).....................................................................48

*In re LuMee LLC*,
2023 WL 8888840 (Bankr. D. Utah Dec. 22, 2023) .........................................52

*In re Martin*,
212 B.R. 316 (B.A.P. 8th Cir. 1997) ...................................................................44

*In re Martin*,
91 F.3d 389 (3d Cir. 1996) ........................................................................*passim*

*In re Mazzeo*,
131 F.3d 295 (2d Cir. 1997) ..............................................................................36

*Nellis v. Shugrue*,
165 B.R. 115 (S.D.N.Y. 1994) ..............................................................................7

*In re Neshaminy Office Bldg. Assocs.*,
62 B.R. 798 (E.D. Pa. 1986) ...............................................................................7

*In re Nortel Networks, Inc.*,
669 F.3d 128 (3d Cir. 2011) ................................................................................6

*In re Nutraquest, Inc.*,
434 F.3d 639 (3d Cir. 2006) ..............................................................................44

*Oss Nokalva, Inc. v. European Space Agency*,
617 F.3d 756 (3d Cir. 2010) ..............................................................................38

*In re Parking Mgmt., Inc.*,
620 B.R. 544 (Bankr. D. Md. 2020) ....................................................30, 36, 40

*In re Rea Keech Buick, Inc.*,
139 B.R. 625 (Bankr. D. Md. 1992) ...................................................................37

*In re Revstone Indus. LLC*,
690 F. App'x 88 (3d Cir. 2017) ...........................................................................6

*In re Rodriguez*,
521 F. App'x 87 (3d Cir. 2013) ...........................................................................5

*In re Rosenberg*,
414 B.R. 826 (Bankr. S.D. Fla. 2009). *subsequently aff'd,* 472 F.
App'x 890 (11th Cir. 2012) ...............................................................................37

*In re Slack*,
187 F.3d 1070 (9th Cir. 1999) ...........................................................................31

17030076/10

*In re Summit Metals, Inc.*,
  477 F. App'x 18 (3d Cir. 2012) ..................................................8, 49, 50

*United States v. State Street Bank & Tr. Co.*,
  520 B.R. 29 (Bankr. D. Del. 2014) ..................................................48

*In re West*,
  2017 WL 746250 (Bankr. W.D. Mo. Feb. 24, 2017) .........................................36

*In re Woodbridge Grp. of Cos., LLC*,
  617 B.R. 796 (D. Del. 2020) ..................................................6

*In re World Health Alt.*,
  344 B.R. 291 (Bankr. D. Del. 2006) ..................................................7

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) .......................................54, 55, 56

*In re Zhang Med. P.C.*,
  655 B.R. 403 (Bankr. S.D.N.Y. 2023) ..................................................35

**Statutes**

11 U.S.C. § 101(5) ..................................................39

11 U.S.C. § 101(12) ..................................................39

11 U.S.C. § 109(e) ..................................................*passim*

11 U.S.C. § 541(a)(1) ..................................................30

11 U.S.C. § 1123(b)(3)(A) ..................................................6, 42

11 U.S.C. § 1182(1) ..................................................*passim*

**Rules**

Fed. R. Bankr. P. 8014(b) ..................................................4, 5

Fed. R. Bankr. P. 9019 ..................................................7, 45

## NATURE AND STAGE OF THE PROCEEDINGS

On June 16, 2023 (the "Petition Date") Appellee, Alecto Healthcare Services LLC ("Alecto" or "Appellee"), commenced its bankruptcy case under the subchapter V provisions of 11 U.S.C. § 101 et. seq. (the "Bankruptcy Code").

### A.    The Designation Motion, Evidentiary Hearing, Decision, and Appeal

On November 2, 2023, certain creditors (collectively, the "Reed Creditors" or the "Appellants") filed an Objection to Debtor's Designation of This Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor (the "Designation Motion"), challenging Alecto's eligibility for subchapter V relief based upon the Reed Creditors' belief that Alecto's liquidated and non-contingent debt exceeded the statutory limit or subchapter V relief (A0001). On November 22, 2023, Alecto responded to the Designation Motion (A0016), and on November 27, 2023, the Reed Creditors filed their reply. (A0204)

On November 29, 2023, the Bankruptcy Court held an evidentiary hearing on the Designation Motion. (B0001-B0134)[1]  On December 1, 2023, the Bankruptcy Court issued its oral ruling on the Designation Motion (the "Designation Ruling") (A0244) and, on December 4, 2023, the Bankruptcy Court entered an order denying

---

[1] Reference to "(B_____)" herein refer to portions of the designated record that were not included in the Reed Creditors' Appendix, but are now included in the Appellee's Appendix being filed simultaneously herewith.

17030076/10

the Designation Motion (the "Designation Order"). (A0257)  The Reed Creditors timely appealed the Designation Order (the "Designation Appeal"). (A0260)  The Reed Creditors did not request a stay pending appeal with respect to the Designation Order.

### B.    Alecto's Plan, the Confirmation Hearing, and the Appeal

On December 19, 2023, Appellant filed its Small Business Debtor's Plan of Reorganization (as subsequently modified or supplemented, the "Plan"). (A0720)  A hearing to consider confirmation of the Plan was set for March 4 and 5, 2024.

The Reed Creditors timely filed objections to confirmation of the Plan (A1013, A1033),[2] and took written discovery and deposed two Alecto witnesses, Leanne Gould ("Ms. Gould"), a forensic accountant, and Steven Balasiano, Alecto's independent director ("Mr. Balasiano").

On March 4 and 5, 2024, the Bankruptcy Court held an evidentiary hearing to consider confirmation of the Plan.  Alecto presented numerous exhibits in support of confirmation and testimonial evidence from two experts, Ms. Gould and Mr. McCutcheon, as well as from Mr. Balasiano and Michael Sarrao ("Mr. Sarrao"), Alecto's Executive Vice President, General Counsel, and Secretary.  The Reed

---

[2] Other objections were filed, but all were resolved.  Only the objections of the Reed Creditors are the subject of this appeal.

Creditors presented none of their own witnesses but cross-examined three of Alecto's four witnesses.

On March 20, 2024, after hearing all the evidence and conducting a separate hearing for oral arguments, the Bankruptcy Court issued a ruling (the "Confirmation Ruling") (A1607), in which it made specific findings of fact and conclusions of law overruling each of the objections to confirmation filed by the Reed Creditors. On April 4, 2024, the Bankruptcy Court entered Findings of Fact and Conclusions of Law Confirming the Plan (the "Confirmation Order"). (A1627)

The Reed Creditors timely appealed the Confirmation Order (the "Confirmation Appeal") (A1952). The Reed Creditors did not request a stay pending appeal and, on April 19, 2024 (the "Effective Date"), the Plan became effective (B0737). Since the Effective Date, the Appellee has consummated the settlement under the Plan, and made distributions contemplated by the Plan.

The Designation Appeal and Confirmation Appeal are consolidated before this Court [Dist. Ct. Docket 11].

## STATEMENT OF JURISDICTION

The Appellee agrees with the Jurisdictional Statement set forth in the Appellants' Opening Brief.  Accordingly, no counterstatement on those matters is required, per Rule 8014(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

17030076/10

## COUNTER-STATEMENT OF THE ISSUES ON APPEAL AND
## THE APPLICABLE STANDARD OF REVIEW

The Reed Creditors have appealed from (1) the Designation Order and (2) the Confirmation Ruling and Confirmation Order.

Appellee submits that the Appellants' Statement of the Issue for their appeal from the Designation Order, and the related standard of review, should be restated as follows. *See* Fed. R. Bankr. P. 8014(b).

**As to the Appeal from the Designation Order:**

Did the Bankruptcy Court err in holding that Alecto properly designated itself as a debtor under Subchapter V of Chapter 11 of the Bankruptcy Code when it filed its bankruptcy petition?

**Standard of Review:**

On appeal from a final order of the Bankruptcy Court, the District Court "review[s] the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error." *In re Rodriguez*, 521 F. App'x 87, 89–90 (3d Cir. 2013), citing *In re Global Indus. Techs., Inc.,* 645 F.3d 201, 209 (3d Cir. 2011) (en banc).

When reviewing factual findings for clear error, the Bankruptcy Court's factual findings "may only be overturned if they are 'completely devoid of a credible evidentiary basis or bear[] no rational relationship to the supporting data.'" *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006) (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors*, 323 F.3d 228, 232 (3d Cir. 2003)); *see also*

5

*Burtch v. Opus LLC (In re Opus E. LLC)*, 698 F. App'x 711, 714 (3d Cir. 2017) ("Clear error occurs only if the court's finding is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." (internal citations omitted)).

Mixed questions of law and fact are reviewed under a mixed standard, affording a clearly erroneous standard to factual findings but exercising plenary review of the bankruptcy court's interpretation and application of those facts to legal precepts. *See, e.g.*, *In re HomeBanc Mortg. Corp.*, 945 F.3d 801, 810–11 (3d Cir. 2019); *see also In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011); *In re Woodbridge Grp. of Cos., LLC*, 617 B.R. 796, 801 (D. Del. 2020).

On appeal, the court "may affirm a judgment on any ground apparent from the record, even if the [lower] court did not reach it." *In re Revstone Indus. LLC*, 690 F. App'x 88, 89 (3d Cir. 2017), citing *Oss Nokalva, Inc. v. European Space Agency*, 617 F.3d 756, 761 (3d Cir. 2010).

**As to the Appeal from the Confirmation Order:[3]**

Did the Bankruptcy Court err in approving the settlement and releases contained in the Plan pursuant to the standards set forth in Section 1123(b)(3)(A) of

---

[3] In their opening brief, the Reed Creditors raised four (4) issues in connection with the Confirmation Appeal.  In actuality, all of the issues in connection with the Confirmation Appeal relate to the approval of the releases provided by the settlement contained in the Plan.

the Bankruptcy Code and Fed. R. Bankr. P. 9019?

**Standard of Review**:

The standard to apply when reviewing the Bankruptcy Court's approval of settlements is whether the Bankruptcy Court abused its discretion.

"Whether to approve a settlement . . . is within the discretion of the bankruptcy court." *In re World Health Alt.,* 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also In re Neshaminy Office Bldg. Assocs.,* 62 B.R. 798, 803 (E.D. Pa. 1986) ("Approval of the settlement lies within the sound discretion of the Bankruptcy Court."); *Nellis v. Shugrue,* 165 B.R. 115, 122–23 (S.D.N.Y. 1994). In addition, the court should exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.,* 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also In re Martin,* 91 F.3d 389, 393 (3d Cir. 1996) ("compromises are favored in bankruptcy"); *Shugrue,* 165 B.R. at 123 (noting that "the general rule [is] that settlements are favored and, in fact, encouraged by the approval process...."); *In re Capmark Fin. Grp. Inc.,* 438 B.R. 471, 515 (Bankr. D. Del. 2010).

> Courts in this district have held that a bankruptcy court's decision should not be overturned based upon an abuse of discretion 'unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant facts.' *In re SemCrude, L.P.*, 428 B.R. 590, 593 (D. Del. 2010) (citation omitted). Thus, 'a decision should not be overturned under the abuse of discretion standard,

7

> unless *no reasonable person would adopt the lower court's view*.' *Id.* (emphasis added).

*In re LandSource Communities Dev., LLC*, 612 B.R. 484, 493 (D. Del.), *aff'd sub nom. LandSource Communities Dev. LLC v. Citizens Against Corp. Crime, LLC*, 834 F. App'x 747 (3d Cir. 2020); *In re Summit Metals, Inc.*, 477 F. App'x 18, 20 (3d Cir. 2012).

## SUMMARY OF ARGUMENT

Despite that the Appellee is a small business with a relatively straightforward pool of assets and future income stream, the unfortunate hallmark of the Chapter 11 Case is the endless litigation perpetuated by the Reed Creditors. Even prior to Alecto filing the final version of its Plan, the Reed Creditors announced in the Bankruptcy Court their intention to object to it.[4]

Relevant to this appeal, the Reed Creditors challenged Alecto's qualification as a subchapter V debtor by asserting that Alecto had more than the then-applicable $7.5 million in non-contingent, liquidated debt for subchapter V eligibility. In so doing, the Reed Creditors asserted that the debt of LHP Hospital Group, Inc. ("LHP"), *another* creditor, was neither contingent nor unliquidated – positions not even LHP itself asserted. Following an evidentiary hearing at which the Reed Creditors called no witnesses (including no witness from LHP), the Bankruptcy Court ruled that LHP's claim was both contingent *and* unliquidated on the Petition Date, and thus Alecto was eligible to proceed under subchapter V.

The Bankruptcy Court's decision was both legally and factually correct. As the Bankruptcy Court found, Alecto's obligation to LHP was contingent because, as of the Petition Date, "[u]nless and until LHP made a specific demand, [Alecto] had

---

[4] Bankr. Docket 220, p. 26 ("We will be filing a confirmation objection. The question is we're waiting to see what the debtor has to say.")

no obligation to pay." (A0250)  The Bankruptcy Court found that "although LHP received invoices from the landlord, there is no evidence that [Alecto] received copies of those invoices." (A0251)  The Bankruptcy Court also found the LHP debt was also unliquidated because there was no way for Alecto to readily determine the amount of debt that might be owed to LHP as of the Petition Date: "[T]here was no precision or ability to readily determine LHP's debt as of the petition date." (A0252) Consequently, the LHP debt was both contingent and unliquidated as of the petition date, making Alecto eligible to proceed as a subchapter V debtor.

The Appellants' continual references before the Bankruptcy Court and on appeal to documents that were superseded by settlement documents between Alecto and LHP are misguided.  Moreover, Appellants' argument that Alecto's obligation to LHP amounted to a guarantee still fails, as guarantees are, as a matter of law, the epitome of contingent obligations.  In sum, the Bankruptcy Court properly determined that Alecto was eligible to proceed under subchapter V of chapter 11.

The Reed Creditors then sought to deny confirmation of the Plan.  As set forth herein, following document discovery, fact and expert depositions, a two-day confirmation hearing, and oral argument, the Bankruptcy Court entered specific, detailed findings of fact and conclusions of law and overruled each of the Reed Creditors' objections to the Plan.

The Reed Creditors' contention that the Bankruptcy Court erred when confirming the Plan is meritless.  Principally, the Reed Creditors contest the Bankruptcy Court's approval of the settlement and associated releases in the Plan. At their core, the Reed Creditors' appeal merely contends that Alecto witnesses should not be believed.  But the Bankruptcy Court – as the finder of fact – has great latitude in considering and weighing the evidence before it.  In this light, the Bankruptcy Court's determination that Alecto's independent director appropriately exercised his business judgment in agreeing to the settlement of potential claims was supported by evidence and certainly not an abuse of discretion.  Further, the Bankruptcy Court understood and correctly applied the factors the Bankruptcy Court evaluated to approve the settlement.

In light of the foregoing, Appellants' appeals are without merit and should be rejected.

## STATEMENT OF THE CASE

Alecto was formed in 2012 to serve as a holding company for healthcare-related entities. Historically, Alecto formed various subsidiaries for the purposes of (a) acquiring distressed acute care hospitals; (b) operating acute care hospitals; (c) providing management services to acute care hospitals that are not owned by Alecto or its subsidiaries; and (d) owning and operating businesses affiliated with acute care hospitals operated by Alecto's subsidiaries. (A0731-32)  At its peak, Alecto's subsidiaries operated five (5) acute care hospitals across the country, Alecto provided management services to an acute care hospital owned by an unrelated third-party, and one of Alecto's subsidiaries provided management services to an acute care hospital owned by an unrelated third-party. (A0732)

### A.    Alecto's Financial Spiral.

Prior to the COVID 19 pandemic, Alecto was both solvent and profitable. (A1588) At the beginning of the pandemic, hospitals and other healthcare entities were limited in terms of the income received from certain practices, such as elective surgery.  The cost from those losses were offset, however, both by the volume of patients received as well as money received from states and federal governments. (A1588-A1589) Ultimately, as the pandemic continued, the funding by governmental entities tapered off, and healthcare providers' costs significantly increased, particularly employee costs. (A1589-A1590).  The confluence of reduced

12

government funding and increase of costs ultimately caused Alecto's subsidiaries to become unprofitable and eventually insolvent.

As a result, Alecto found itself faced with the choice of either (i) continuing to financially support its affiliates in order to either allow the affiliates to return to profitability or be sold as a going concern, or (ii) allowing the affiliates to fail, in which case, Alecto would be financially responsible for certain affiliates' obligations - either by agreement or by operation of law. (A1463-A1474) Alecto estimated those obligations at $30 million, including real estate lease obligations, liability as a guarantor of a potential put option, the potential return of Medicare payments valued at over $5 million, potential payroll liabilities, accrued payroll taxes, paid time off due to employees, and accrued real estate taxes (collectively, the "Springing Obligations"). (A1464-A1474) Faced with those options, including avoiding liability for the Springing Obligations, Alecto's board decided to continue to fund the affiliates and seek a going-concern sale. (A1301)

In the meantime, on May 11, 2023, the Reed Creditors, obtained a judgment from the United States District Court for the Northern District of West Virginia against Alecto. On June 1, 2023, the Reed Creditors obtained a writ of execution against Alecto in the total amount of $3,242,498.77 (A0734).

## B. Alecto's Bankruptcy Filing

Shortly thereafter, Alecto filed its subchapter V bankruptcy petition in the

13

Bankruptcy Court on June 16, 2023 (the "Petition Date"). Alecto's election to proceed as a small business bankruptcy under subchapter V stemmed from its having less than $7.5 million in liquidated, non-contingent debt as of the Petition Date.

Consistent with that election, on June 30, 2023, Alecto timely filed its *Schedule of Assets and Liabilities* (the "Schedules"). (A0769) The Schedules included 17 scheduled unsecured creditors, not including affiliates or insiders, holding non-contingent and liquidated claims totaling $3,445,535.47. (A0795-A0804) When Alecto filed its Schedules, the claim of the Reed Creditors was listed as a non-contingent, liquidated claim. Alecto scheduled LHP, however, as having a contingent, non-liquidated, and disputed claim in an unknown amount. (A0801) Thus, Alecto's non-contingent and liquidated claims were well within the then-applicable debt limit of $7,500,000 for subchapter V eligibility.

Various creditors also timely filed proofs of claim, including the Reed Creditors and LHP. LHP filed a proof of claim for $3,739,635.77 (the "LHP Claim"). (A0290)

### C.    The Designation Motion

On November 2, 2023, the Reed Creditors filed their Designation Motion (A0001), challenging Alecto's subchapter V election. The Bankruptcy Court and the parties recognized that whether Alecto was eligible for subchapter V relief hinged on the status of the LHP debt. Indeed, the Bankruptcy Court acknowledged

14

that "the parties agreed that the LHP debt is the fulcrum and whether that debt is unliquidated or contingent controls the eligibility determination."[5] (A0247)

Alecto's debt to LHP arose from the following circumstances. On or about September 23, 2014, Alecto Healthcare Services Sherman LLC, an affiliate of Alecto as Purchaser, on the one hand, and Sherman/Grayson Health System, LLC as Seller, and LHP, on the other hand, entered into a purchase agreement pursuant to which the Purchaser acquired 100% of the issued and outstanding membership interests of Sherman/Grayson Hospital, LLC, Sherman/Grayson Health Services, LLC and Sherman/Grayson Sponsor, LLC. In connection with the Purchase Agreement, Alecto executed a guarantee (the "Guarantee") in favor of, *inter alia*, LHP pursuant to which Alecto unconditionally and irrevocably guaranteed the due and punctual payment, performance and discharge of each and every of Purchaser's obligations under the Purchase Agreement. (A1467; generally A0086-A0604)

On January 20, 2021, LHP filed a complaint against the Purchaser and Alecto (among others) in the Superior Court of the State of Delaware. (A0707) LHP also filed an action against Sherman/Grayson Hospital LLC in Texas state court. (A0019)

---

[5] Notably, while its counsel was present throughout the hearing on the Reed Creditors' Designation Motion, LHP expressly did not take a position on the status of its debt: "Our understanding, clearly, was that the debtor's position with respect to today's motion was because the claim was contingent because no demand had been made . . . We don't take a position on today's hearing, Your Honor, we didn't file a pleading, we don't take a position on the [Reed Creditors'] motion." (B0119-B0120)

On February 16, 2022, LHP, Alecto and Sherman/Grayson entered into a settlement agreement (the "Settlement Agreement"). (A0171-A0179)

Among other things, the Settlement Agreement provided that any future expenses due and owing to LHP, including the future indemnification obligations of Alecto to LHP under Paragraph 6 of the Settlement Agreement, would be payable only under certain specific circumstances. (A0173)

In relevant part, Paragraph 6 of the Settlement Agreement between Alecto and LHP provides, in relevant part, as follows:

> Future Expenses – Alecto Defendants. The Alecto Defendants acknowledge and agree that, absent a resolution with Altera, LHP *may* continue to accrue expenses in connection with the MOB (as defined below), including without limitation in connection with the Lease Agreements (as defined in the Complaint in the Delaware Action) and the Ground Lease Agreement entered effective as of August 21, 2012 between Sherman/Grayson and Altera ("Ground Lease"). Accordingly, the Alecto Defendants agree to the following procedure for payment of Future Expenses: (A0173)
>
> A. LHP shall make written demand upon the Alecto Defendants for a specified amount in accordance with the forbearance schedule set forth in Paragraph 8; (A0173)
>
> B. The Alecto Defendants shall make payment of the specific amount within fifteen (15) days of such demand; (A0173)

Paragraph 8 of the Settlement Agreement, titled "Forbearance on Demand for Future Expenses," provides:

> LHP agrees not to make demand for future expenses, whether against Alecto Defendants or Sherman/Grayson (or if necessary, commence a proceeding pursuant to Section 2306 for a judgment by confession) until the expiration of one (1) year from the Effective Date. Thereafter, LHP may only seek payment of Future Expenses every six months from the date of the last payment or entry of a confessed judgment, whichever is applicable. (A0174-A0175)

Finally, the Settlement Agreement contained the following merger clause, providing that the Settlement Agreement superseded all prior agreements between the parties:

> This Agreement and the Exhibits attached hereto set forth the entire agreement between the parties and fully supersede any and all prior agreements or understandings, written or oral, between the parties . . . . (A0177)

Thus, among other things, the Settlement Agreement required that LHP make a demand for a specific amount before Alecto had any liability. (A0173)

### D.    The Designation Hearing

When the Bankruptcy Court conducted the hearing on the Reed Creditors' Designation Motion, it had to determine if the LHP debt was either contingent or unliquidated as of the Petition Date.  If the LHP debt were *either* contingent or unliquidated, Alecto was eligible to be a subchapter V debtor.

As adduced at the evidentiary hearing, LHP had never made the required demand for payment.  On direct examination, Mr. Sarrao, testified:

Q.    And after the settlement agreement was reached … did you receive any

17

> demand from – did Alecto Healthcare, the debtor, receive any demand from LHP prior to the petition date?
>
> A.    The debtor did not receive any demand. (B0055-B0056)

On cross by the Reed Creditors, Mr. Sarrao reiterated the same position:

> A. … But there are certain conditions precedent to those obligations that have not been met.
>
> Q.    And what are the conditions precedent to those obligations that have not been met?
>
> A.    There has to be a demand for payment and there has not been a demand for payment against the Debtor. (B0048)

Accordingly, consistent with the uncontroverted testimony taken at trial, the Bankruptcy Court properly found that LHP had not made any demand for future expenses pursuant to Section 6 of the Settlement Agreement, and that "Unless and until LHP made a specific demand the debtor had no obligation to pay." (A0250) In other words, Alecto's debt to LHP was contingent as of the petition date for eligibility under Subchapter V.  That, in and of itself, was dispositive of Alecto's eligibility for subchapter V.

Likewise, the uncontroverted trial testimony established that Alecto's debt to LHP was also unliquidated as of the Petition Date:

> A. We didn't know what, if anything, was owed to Altera Highland, LLC [by LHP] because we didn't receive those -- any invoices. (B0046)
>
> A. Whether LHP paid the money, this is the first time I'm seeing it. The first time I saw it was on Saturday. There's the rent under the leases had slight increases, so it changed month to month. And then the records LHP produced show that there's a fluctuation in the amounts, yes. (B0046-B0047)

A. We didn't know what the amount of the claim is because the CAM charges are estimated. (B0055)

A. We don't know what's going to happen with respect to re-letting the premises, as well, and it's -- it's variable. (B0055)

Q. Is there any way, without that demand, that you could have realized -- that you could have known the total amount of the rent, including the CAM charges?

A. No. (B0056)

Q. Prior to that July -- June 28th or 29th letter, did you or anybody else at the debtor have any reason to know the amount due to LHP?

A No. (B0058)

Q. So you would not have had a reason to know what the amount was even after the petition date, until June -- the June 28th letter. Is that correct?

A That's correct. (B0059)

The Bankruptcy Court also rejected the Reed Creditor's argument that underlying documents that LHP might once have had with Alecto remained in effect after the Settlement. (A0250) Specifically, the Bankruptcy Court found the merger clause in the Settlement Agreement with LHP unambiguous, holding that any prior underlying documents were expressly superseded by the Settlement Agreement – leaving the Settlement Agreement as the only document setting forth the procedures for establishing Alecto's liability. (A0250)

Following presentation of this evidence, and arguments by counsel for Alecto and the Reed Creditors – the Bankruptcy Court entered the Designation Ruling and Designation Order, holding that "the LHP debt was unliquidated as of the Petition

19

Date," (A0252), and thereby ruling that Alecto was entitled to proceed as a subchapter V debtor.

### E.    Alecto Appoints an Independent Director

As of the Petition Date, Alecto had an ownership interest in two operating subsidiaries, Sherman/Grayson Hospital, LLC ("Sherman/Grayson") and Alecto Healthcare Services Hayward LLC ("Alecto Hayward") (A0732).

On June 23, 2023, Sherman/Grayson filed its own Chapter 11 bankruptcy in the District of Delaware (A0738).  On August 4, 2023, as a direct result of Alecto's claim in the Sherman/Grayson bankruptcy, Alecto retained Mr. Balasiano as an independent director (A0737; A1173; B0252).  Mr. Balasiano is an experienced attorney and advisor, with over 30 years of experience including serving as a fiduciary in his capacities as a liquidating trustee, plan administrator, and other similar roles that require Mr. Balasiano to evaluate potential claims to determine whether such claims should be brought. (A1353-56; B0255)

To that end, Mr. Balasiano's initial responsibilities specifically included (1) investigating, evaluating, and settling certain (a) claims of Alecto against Sherman/Grayson, (b) disputes between Alecto and the official committee of unsecured creditors appointed in the Sherman/Grayson bankruptcy case, and (2) handling such other issues as may arise in the Chapter 11 Case. (A1356; B0252) Further, Alecto's Board of Managers, officers, and employees consented to provide

Mr. Balasiano with such information and documents as he may request from time to time, and not to interfere or impede Mr. Balasiano's performance of his duties as an independent director/manager. (B0252)

Later, Alecto's Board of Managers, by written consent (A1177), expanded Mr. Balasiano's duties and responsibilities to include investigating potential claims against Alecto's affiliates and insiders, and bringing any such actions as he believed in his sole discretion are valid. (A1357; B0254)  Alecto's Board of Managers, officers, and employees would provide Mr. Balasiano with such information and documents as he may request from time to time and would not interfere or impede Mr. Balasiano's performance of his duties as an independent director/manager. (B0252)  Mr. Balasiano was also empowered to employ his own independent counsel in connection with his exercise of his duties.  (B0254)

### F.    The Reed Creditors Object to Confirmation of the Plan

On February 22, 2024, the Reed Creditors objected to confirmation of Alecto's Plan.  In particular, the Reed Creditors objected that the settlements and releases contained in the Plan would release potential fraudulent conveyance and breach of fiduciary duty claims of the Debtor against Alecto's insiders.

With respect to the alleged fraudulent conveyance, the Reed Creditors' objection focused exclusively upon a transfer of certain membership interests in Sunrise Real Estate Holdings LLC to members of Alecto, who then transferred the

membership interests to Sunrise MOB Holdings, LLC, an entity owned by those members (the "Sunrise Transfer"). The Sunrise Transfer occurred on June 19, 2019 as part of the refinancing of the debt of Plaza Medical Office Building, LLC ("Plaza MOB"), the owner of a medical office building and parking garage in Los Angeles, California. The Reed Creditors' objection to the Plan focused on the perceived lack of Alecto receiving reasonably equivalent value for the transfer, despite that the same property was later transferred back to Alecto for no consideration. The Reed Creditors focused only on that aspect of a claim under the California Uniform Fraudulent Conveyance Act but failed to consider the other elements to avoid a fraudulent conveyance under California law, namely insolvency.

The Reed Creditors' Plan objection also contended there might be claims against Alecto's officers and directors for breach of fiduciary duty, arising from Alecto's advancement of funds to affiliates while Alecto was allegedly insolvent or in the zone of insolvency.

### G. The Confirmation Hearing

On March 4 and 5, 2024, the Bankruptcy Court held an evidentiary hearing on whether to confirm the Plan. In support of confirmation, Alecto submitted Declarations of Mr. Balasiano (B0250) and Mr. Sarrao. (B0258). Mr. Sarrao's declaration was admitted into evidence. (A1464) Mr. Balasiano testified that the facts stated in his declaration were true and correct. (A1356) Four witnesses testified

for Alecto.[6]  No other witnesses were called.

Ms. Gould testified as an expert in forensic accounting.  She was hired by Alecto to review cash transactions between Alecto and its affiliates and insiders in order to identify any potential voidable transfers.  She reviewed over 116,000 transactions over four years as well as compared Alecto's general ledger and bank statements to identify transfers to insiders.  She also reviewed cash flow from two transactions that were identified, one being the Sunrise Transfer  to the Alecto members and the other being a transfer back to Alecto, and cash flows surrounding that.

Ms. Gould also interviewed Mr. Sarrao and Alecto's Chief Financial Officer, Matt Williams, and spoke with Mr. Balasiano (A1327).  She also reviewed Alecto's tax records and financial statements (A1327).  Ultimately, Ms. Gould authored a report based on her investigation which report was entered into evidence without objection (A1328).

Ms. Gould concluded that, of the universe of transfers reviewed, only the 2019 Sunrise Transfer was done for less than reasonably equivalent value. (A1329)  With respect to direct transfers to insiders, Ms. Gould found that those transfers were for reimbursement of legitimate business expenses and/or payroll and benefits.  She

---

[6] One of them, Mr. Jeffrey McCutcheon, an expert in executive compensation, was not cross examined, and his testimony is not the subject of any portion of the Reed Creditors' appeals.

reported those findings to Alecto's independent director, Mr. Balasiano. (A1329)

Consistent with his responsibilities and directions as an independent director, Mr. Balasiano investigated potential claims against Alecto's affiliates and insiders and evaluated the potential to avoid the Sunrise Transfer as an avoidable transfer. (B0254-B0255)  During those investigations, Mr. Balasiano requested documents from Alecto, had multiple conferences with Ms. Gould and Mr. Sarrao, as well as with Debtor's counsel, and Mr. Balasiano's own independent counsel. (A1358-A1361; B0254)

After reviewing Alecto's financial records including tax records, reviewing and discussing Ms. Gould's expert report, and after speaking with Mr. Sarrao, and conferring with Debtor's counsel and his own counsel, and in reliance upon the information received, Mr. Balasiano determined as a sound exercise of his business judgment that there were no valid claims against insiders for avoidance of fraudulent conveyances (A1363) or for breaches of fiduciary duty. (A1366-A1368; B0255)

With respect to his determination not to pursue fraudulent conveyance actions, Mr. Balasiano concluded: "In order to bring a fraudulent conveyance action there are two factors.  One is there has to be a transfer for lack of reasonably equivalent value and number two, the company has to be insolvent at the time of the transfer. Clearly, the second fact[or] of the test was not satisfied her[e]."  (A1363)  In particular, Mr. Balasiano testified that his review showed that Alecto was solvent

(i.e. not insolvent) as of the time of the Sunrise Transfer:

> At all times in 2019, this company was solvent. I knew that
> this company was solvent in 2019 because it was
> represented to me when we knew that we had a bad
> transaction -- or not a bad transaction -- a transaction that
> was made for less than reasonable value. I said, hey, guys,
> were we solvent at this time, because that's the next
> question you would ask if you're a practicing lawyer in a
> bankruptcy context, or an independent director or a
> liquidating trustee. So that was the question I said, were
> we solvent? The answer was, yes, we were solvent.
> (A1372)

At trial, Mr. Sarrao, who has been an officer of Alecto since 2013, and who is

a member of the California bar (A1419), ably and credibly provided detailed

information about Alecto's finances, its relationship with the Debtor's subsidiaries

and their operations. (A1419)  Mr. Sarrao also testified that Alecto's balance sheet

showed $18.5 million in equity at the end of 2019 (A1449), and that that both equity

and cash balances of Alecto grew throughout 2020.  At the end of 2021, Alecto's

balance sheet showed equity of $19.1 million. (A1453)

Importantly, Mr. Sarrao also echoed Mr. Balasiano's testimony that Alecto

was not insolvent at the time of the Sunrise Transfer and did not become insolvent

as a result of the transaction.  Additionally, he testified that Alecto was paying its

debts as they came due:

Q.    Did the Sunrise transfer cause Alecto to be insolvent?

A.    No. (A1456)

Q.    In June of 2019, was Alecto paying its debts as they became due?

A.    It was . . . . (A1456)

A.    My understanding was the debtor was solvent in June 2019.  (A1457)

Having appropriately investigated the Sunrise Transfer and the risks inherent in any litigation, Mr. Balasiano determined, in the appropriate exercise of his reasonable business judgment, that "no actionable cause of action could be brought as a result of that transaction." (A1363)

In evaluating whether viable breach of fiduciary duty claims existed that were worth pursuing, Mr. Balasiano testified that there were none. (A1366)  During his investigation, Mr. Balasiano reviewed Alecto's operating agreement, declarations and documents provided during the bankruptcy, the Sherman/Grayson bankruptcy, and documents relating to the Sherman/Grayson hospital itself.  Ultimately, after discussions with Mr. Sarrao, Debtor's counsel, Mr. Balasiano's own counsel, and Ms. Gould, and reviewing various business records and documents, Mr. Balasiano concluded that there were no breach of loyalty or breach of duty of care by Alecto's directors and officers.  (A1366)

Mr. Sarrao also testified at length about the efforts Alecto's members took to evaluate the Board's decision to continue funding the affiliates – including trying to avoid approximately $30 million of Springing Obligations. (B1463-1474)

In the end, having considered all available information, Mr. Balasiano, as a sound exercise of his reasonable business judgment, concluded:

all of the activities that were done, all the funds that were allocated to the different subsidiaries, especially to the Sherman/Grayson, which I believe is the biggest issue in the case right here, right now, especially to the Sherman/Grayson were allocated in a fashion with the appropriate judicious business judgment. The actions that the members took were daily conversations, daily decisions that were undertaken in order to keep Sherman/Grayson Hospital afloat to enable to sell it as a going concern . . . what they were doing over that period that we were looking at all the analysis and the transactions, they were propping up this company, they were keeping it alive, so that it would be able to sustain itself, maintain itself, and have the ability to sell it, which in fact they were able to do that. And, by doing that, the save to this estate was tremendous. There was probably close to $30 million in unsecured claims that would have hit this Alecto bankruptcy had it not been for the sale of Sherman/Grayson. (A1366)

Further, Mr. Balasiano determined that in bringing such actions, Alecto would incur significant costs, including the costs of indemnification of the members and managers' fees and expenses, pursuant to Section 7.8 of Alecto's Amended and Restated Operating Agreement, all of which would significantly reduce Alecto's disposable income to be received under the Plan. (A1368)

As a result, Mr. Balasiano approved the settlement, set forth in the Plan which provided for releases to the insiders in exchange for a payment of $25,000.[7]

Following the conclusion of the evidence on March 5, and the arguments of

_____

[7] The consideration received from Alecto's insiders was subsequently increased as a result of Alecto's settlement with the United States immediately prior to confirmation.

counsel made at a separate hearing on March 13, 2024 (B0135-B0249), on March 20, 2024, the Bankruptcy Court issued its Confirmation Ruling - a 17 page, single-spaced, written opinion overruling the Reed Creditors' objections to confirmation (A1608-1624).  On April 14, 2024, the Bankruptcy Court issued the Confirmation Order (A1627-A1654) confirming the Plan.  On April 19, 2024, the Reed Creditors Appealed the Confirmation Order. (A1952)

## ARGUMENT

### I.    THE BANKRUPTCY COURT CORRECTLY FOUND, BASED ON THE EVIDENCE PRESENTED, THAT ALECTO MET THE SUBCHAPTER V DEBTOR ELIGIBILITY REQUIREMENTS

In enacting Subchapter V, Congress made available to small businesses who seek bankruptcy relief various benefits available to Chapter 11 debtors that would be otherwise unavailable.  The criteria for eligibility for Subchapter V are set forth in Section 1182(1) of the Bankruptcy Code, 11 U.S.C. § 1182(1).  Broadly stated, a company is eligible if, collectively, *certain types* of its debt are at or below an amount specified in the statute.   It is uncontroverted that the statutory cap level was $7,500,000 on the Petition Date.

The phrase used in § 1182(1) to identify the point in time at which the debtor's aggregate noncontingent, liquidated, and non-insider-or-affiliate debt must be at or below the stated cap level is "as of the date of the filing of the petition."

The Small Business Reorganization Act having only became effective in February 2020 [*supra* n.1], the reported case law construing § 1182(1) is limited. That said, courts presented with this issue have all construed the phrase "as of the date of the filing of the petition," as used in § 1182(1), to mean "on the petition date," for purposes of fixing the temporal point at which the debts includable in the aggregate debt for eligibility purposes need to be *both* noncontingent and liquidated.

Among other things, courts have noted the similar construction of the phrase

"as of the commencement of the case," as used in 11 U.S.C. § 541(a)(1), where it is used in determining what constitutes "property of the estate." *See e.g.*, *In re Parking Mgmt., Inc.*, 620 B.R. 544, 552 (Bankr. D. Md. 2020) (comparing the language in §§ 541 and 1182). In § 541, "[t]he phrase 'as of' places a temporal limitation on the reach of the bankruptcy estate…. It 'establishes a clear-cut date after which property acquired by the debtor will normally not become property of the bankruptcy estate.'" *Id*. at 552 (quoting *In re Chernushin*, 911 F.3d 1265, 1269 (10th Cir. 2018)). Courts have also recognized that an alternative construction would be problematic. "If postpetition affiliate filings lead to ineligibility and revocation, it means that debtors could float in and out of Subchapter V at any time. That contradicts the text and purpose of Subchapter V." *In re Free Speech Sys., LLC*, 649 B.R. 729, 734 (Bankr. S.D. Tex. 2023).

Bankruptcy Code § 109(e), the provision governing eligibility for Chapter 13 relief, uses language that is comparable to the language in § 1182(1). The slight variation in the language used the two sections has been deemed insignificant. "The court finds no discernible difference in this language, considering how the phrase 'as of'," as used in the Bankruptcy Code, "is interpreted by the courts" in other Code provisions such as § 541(a). *Parking Mgmt., Inc.*, 620 B.R. at 551–52. "The ... plain language of § 109(e) requires consideration of the debts as they exist as of the petition date, *irrespective of postpetition events*." *Id.* at 554 (emphasis added)

(applying that same construction to Subchapter V eligibility under § 1182(1)); *see also In re Slack*, 187 F.3d 1070, 1073 (9th Cir. 1999) (construing 11 U.S.C. § 109(e) to mean that "the amount of the debt is determined *as of* 'the date of the filing of the petition.'") (emphasis added); *In re Harwood*, 519 B.R. 535, 539 (Bankr. N.D. Cal. 2014) ("Under the plain language of 11 U.S.C. § 109(e), post-petition events are not considered in the eligibility determination.").[8]

### A. The Bankruptcy Court Correctly Concluded that Alecto's Debt to LHP Was Contingent as of the Petition Date

The Reed Creditors challenged Alecto's subchapter V eligibility based on the level of its debt.  Their challenge was based not on Alecto's debt to themselves, but rather its debt to LHP.  Two months after the Petition Date, LHP filed a proof of claim against Alecto in the amount of $3,739,635.77.  The Reed Creditors argued that Alecto's debt to LHP should have been included in the calculation of the debt when determining Subchapter V eligibility – an issue on which LHP itself notably took no position.  (B0119-B0120).  However, the evidence at trial established that the debt to LHP was both contingent and unliquidated on the Petition Date. The Bankruptcy Court, after considering all the evidence, rightly rejected the Objection.

In attempting to draw the LHP claim into the aggregate debt calculation, the Reed Creditors rely upon events and developments that occurred *after* the Petition

---

[8] Sections 109(e) and 1182(1) also both use the terms "noncontingent" and "liquidated" and "debt" – all as discussed *infra.*

Date.  The Bankruptcy Court properly rejected their attempt to do so.  (A0250-0252) (crediting testimony that critical events for determining whether the claim was contingent or unliquidated occurred no earlier than June 28, 2023 – twelve days *after* the Petition Date -- and expressly holding that the LHP debt therefore "was unliquidated as of the petition date").

Alecto's debt to LHP arises from a Settlement Agreement that was entered into in February 2022 between and among LHP, Alecto Sherman, and Alecto.  As discussed above, LHP brought a suit against Alecto Sherman and Alecto in January 2021 in Delaware Superior Court, in connection with a 2014 agreement in which LHP sold to Alecto Sherman the membership interests in certain entities that owned and operated a medical facility in Sherman, Texas.  In the 2014 agreement, Alecto Sherman undertook an obligation to LHP with respect to the varying amounts that LHP would come to owe to a landlord, Altera Highland LLC, under a set of leases for space in a medical office building owned by Altera Highland.  Alecto furnished LHP a guarantee of Alecto Sherman's obligations.  Ultimately, that suit was resolved by the parties' entry into the Settlement Agreement.

As previously noted, the merger clause in the Settlement Agreement (the "Merger Clause"), states that:

> This agreement and the exhibits attached hereto set forth the entire agreement between the parties and fully supersede any and all prior agreements or understandings, written or oral, between the parties.

The Bankruptcy Court appropriately cited the well-established principle of contract law, in Delaware (and elsewhere), that "parties to an original contract 'may agree that a mere subsequent contract to perform some specified act will be accepted in full performance and satisfaction of the pre-existing duty.' If the parties intend for the new agreement to abrogate the former contract, the parties may seek remedies only under the latter agreement." (A0249) (quoting *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000)).

The Bankruptcy Court properly concluded that the Merger Clause was "unambiguous," as a matter of law. (A0252). In turn, "the court [reviewed] the LHP debt in the context of the Settlement Agreement." (A0250) "Where … a contract is unambiguous, it is appropriate for the court to determine its meaning as a matter of law." *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1073 (3d Cir. 1996); *see also Fesnak & Assocs., LLP v. U.S. Bank Nat. Ass'n*, 722 F. Supp. 2d 496, 500–01 (D. Del. 2010) ("Under Delaware law, the interpretation of contract language is a question of law…. A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").[9]

Construing the Settlement Agreement, including the Merger Clause, the Bankruptcy Court properly concluded that it amended and superseded all prior

---

[9] Notably, while the Reed Creditors argue that the Settlement Agreement is ambiguous, they are not a party to it. LHP, a party, has never asserted that argument.

agreements. (A0250) As such, the Bankruptcy Court rejected the Reed Creditors'
attempt to disregard the Merger Clause and proceed as though the Settlement
Agreement did not exist and the 2014 agreements remained fully in force. (A0250)
In their appeal, much of the Reed Creditors' arguments about the LHP claim remain
tied to the 2014 agreement and guarantee, without reference to the Settlement
Agreement. Appellants' Opening Brief states that "the Reed Creditors believe that"
the Bankruptcy Court's determination that the Settlement Agreement superseded
Alecto's guarantee "was erroneous." RC Brief, p. 35.[10] But the Reed Creditors offer
no argument and no case law in support of that belief. They then declare that the
Settlement Agreement "has no relevance" to determining whether the claim was
"liquidated" [*id*. at 36], while wholly disregarding its relevance to whether the LHP
claim was *contingent* on the Petition Date.

In construing the Settlement Agreement, the Bankruptcy Court found, based
on the undisputed evidence, and properly concluded that it:

> provides a procedure for payment of future expenses as
> defined in the settlement agreement from the Alecto
> Defendants to LHP. Specifically, the settlement agreement
> at Paragraph 6(a) provides that LHP "Shall make a written
> demand upon the Alecto Defendants for a specified
> amount". *Unless and until LHP made a specific demand
> the debtor had no obligation to pay.*

---

[10] Citations to Appellants' Opening Brief will be referred to herein as "RC Brief,
p. ___."

(A0250) (emphasis added).  In other words, the Bankruptcy Court concluded that, under the Settlement Agreement, a requisite condition before Alecto (or Alecto Sherman) had an obligation to pay was that LHP needed to make a specific demand for payment.

As the Bankruptcy Court found, the testimony established that LHP never made a demand upon anyone for payment in connection with its claim until June 28, 2023 – twelve days *after* the Petition Date – when LHP submitted its payment demand to Alecto Sherman (but not to Alecto itself, to avoid violating the automatic stay). (A0252)  Further, LHP's counsel, who attended the hearing, did not argue otherwise.   Indeed, vis-à-vis Alecto, LHP's June 28, 2024 demand to Alecto Sherman specifically disclaimed that it was making any demand upon Alecto: "LHP is not by this letter making demand under the Agreement or otherwise on [Alecto]." (A0197).  Accordingly, independent of the analysis of when the LHP claim became *liquidated*, the LHP claim was *contingent* as of the Petition Date, and the contingency -- the demand requirement – had not yet occurred "as of the Petition Date."

The terms "noncontingent" and "liquidated" are both used in § 109(e), in connection with the eligibility requirements for Chapter 13 debtors, as well in § 1182(1), for Subchapter V eligibility, so courts construing those terms as used in § 1182(1) have looked to case law under § 109(e) for guidance.  *See, e.g., In re Zhang*

*Med. P.C.*, 655 B.R. 403, 408, n.5 (Bankr. S.D.N.Y. 2023) ("The Court is aware of no reason why the Second Circuit's construction of the terms 'noncontingent' and 'liquidated' as used in § 109(e) should be any less applicable to those terms as used in § 1182(1)(A).").

"It is generally agreed that a debt is contingent if it does not become an obligation until the occurrence of a future event." *In re Mazzeo*, 131 F.3d 295, 303 (2d Cir. 1997). "A debt is contingent where 'the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor.'" *In re Fradkov*, 2020 WL 6701335, at *1 (Bankr. D.N.J. Nov. 12, 2020) (quoting *In re Weiss*, 251 B.R. 453, 465 (Bankr. E.D. Pa. 2000)). "[N]oncontingent debts are those where 'all events necessary to give rise to liability take place prior to filing the petition.'" *In re Ibbott*, 637 B.R. 567, 575 (Bankr. D. Md. 2022) (quoting *In re Green,* 574 B.R. 570, 576–77 (Bankr. E.D.N.C. 2017)).

Courts also recognize that "[m]any *post*-petition actions could result in contingent claims becoming noncontingent *after* the case is filed." *In re Parking Mgmt., Inc.*, 620 B.R. at 554 (emphasis added). "Postpetition events should not be considered in determining eligibility. To hold otherwise would mean that a debtor could float in and out of Chapter 13 eligibility during the course of a case, depending on what happens, which of course makes no legal or practical sense." *In re West*,

2017 WL 746250, at *16 (Bankr. W.D. Mo. Feb. 24, 2017); *see also Matter of Belt*, 106 B.R. 553, 558-59 (Bankr. N.D. Ind. 1989) (finding creditor's claim remained contingent as of the petition date "because no legal duty to pay" had yet arisen).

Plainly, making demand for payment a condition for the obligation to pay is enforceable. *See, e.g.*, *In re Rosenberg*, 414 B.R. 826, 844 (Bankr. S.D. Fla. 2009). *subsequently aff'd,* 472 F. App'x 890 (11th Cir. 2012). In *Rosenberg*, the bankruptcy court wrote:

> *The claim against Rosenberg is, without dispute, contingent.* The contingent nature of the purported claim is demonstrated in the Second Bucks County Petition. As set forth therein, *a demand for payment must be made upon Rosenberg before any liability matures* under the Limited Guaranty. *Likewise*, the confession of judgment as to Rosenberg contains a restriction or condition that *judgment may be confessed only upon a default* under the Limited Guaranty *and only after providing Rosenberg with written demand for payment* and the opportunity to cure such default. Thus, a default … and demand for payment are the *required extrinsic events which must occur before Rosenberg's liability, if any, is triggered*. … Because no demand for payment was formally made upon Rosenberg and no opportunity to cure was provided to him, there is no default … [and] … any claim against Rosenberg grounded on the Limited Guaranty is, at best, inchoate.

*Rosenberg*, 414 B.R. at 844 (emphasis added); *cf. In re Rea Keech Buick, Inc.*, 139 B.R. 625, 629 (Bankr. D. Md. 1992) ("[a]ny common law or statutory right to reclaim goods sold in the ordinary course of business *is contingent upon* (the seller) *making a written demand* within ten days of the Debtor's receipt of the goods.")

(emphasis added) (internal citations omitted).

The Reed Creditors present *no* challenge to the Bankruptcy Court's implicit conclusion that the LHP claim was contingent on the Petition Date, when it concluded that "[u]nless and until LHP made a specific demand the debtor had no obligation to pay." Instead, they focus only on the Bankruptcy Court's holding that the LHP was unliquidated on the petition date. *See* RC Br., pp. 27-28. That the Bankruptcy Court did not expressly apply the term "contingent" to its finding is immaterial. This court "may affirm a judgment on any ground apparent from the record, even if the [lower] court did not reach it." *Oss Nokalva, Inc. v. Eur. Space Agency*, 617 F.3d at 761.

**B.    The Bankruptcy Court Correctly Concluded that Alecto's Debt to LHP Was Unliquidated as of the Petition Date**

The Bankruptcy Court properly held that "the LHP debt was unliquidated as of the Petition Date" (A0252). This conclusion was amply supported by the case law and the evidence adduced at the hearing. In their appeal from that ruling, the Reed Creditors (a) ignore the significance of the Settlement Agreement, and the rights and obligations set forth in it, as superseding those in the 2014 agreement and guaranty[11]; and (b) express their disagreement with the Bankruptcy Court's findings

---

[11] The Reed Creditors acknowledge that a major factor in the Court's ruling was the fact that the Settlement Agreement superseded the 2014 agreement and guarantee, and then baselessly declare it "has no relevance." RC Brief, pp. 35-36.

of fact on this issue, principally by disputing the credibility of the only witnesses who testified regarding Subchapter V eligibility, although the Bankruptcy Court did find them credible and referenced their testimony in its ruling. The Reed Creditors' arguments are meritless.

In the analysis of this issue, this Court should bear in mind that, per § 1182(1), the question is whether Alecto's *debt* to LHP was liquidated on the Petition Date; not LHP's *claim*. In reference to Chapter 13, eligibility, it has been observed that "Congress made a conscious choice when it employed the term 'debt' instead of 'claim' in the context of Section 109(e)." *In re Lambert*, 43 B.R. 913, 919 (Bankr. D. Utah 1984). "['C]laim' has a broader significance, referring to a creditor's demand for payment, regardless of the existence or validity of the underlying obligation or to the accuracy of the amount demanded, while 'debt' has a narrower significance ...." *Id.* at 918. Congress defined the term "debt" to mean "liability on a claim." 11 U.S.C. § 101(12). The term "claim" is defined far more broadly, to mean "right to payment, whether or not such right is ... liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed ...." 11 U.S.C. § 101(5). "The term 'claim' was avoided because the Congress did not wish the ... eligibility determination ... to be predicated upon the mere demands of creditors."[12]

---

[12] Thus, giving consideration to a creditor's proof of claim, as urged by the Reed Creditors, is of no utility in addressing the state of a debtor's liquidated, noncontingent debt on the petition date in a case such as this where there was no

*Lambert*, 43 B.R. at 919.  "[A]gain, for purposes of Subchapter V and Chapter 13 eligibility, only debts that are contingent or unliquidated are excluded from the computation." *In re Heart Heating & Cooling, LLC*, 2024 WL 1228370, at *8 (Bankr. D. Colo. Mar. 21, 2024).

The Reed Creditors acknowledge judicial interpretation of the term "liquidated."  *See* RC Br., pp. 28-29.  "[C]ourts have generally held that a debt is liquidated if its amount is readily and precisely determinable." *In re Burdock & Assocs., Inc.*, 662 B.R. 16, 20 (Bankr. M.D. Fla. 2024).  "A liquidated debt is that which has been made certain as to amount due by agreement of the parties or by operation of law." *Id.* (citation omitted).[13] As courts generally hold, the key factor is whether the "debt is readily determinable only if the process of determining the claim is fixed, certain, or otherwise determinable by a specific standard." *In re Adams*, 373 B.R. 116, 120 (B.A.P. 10th Cir. 2007); *see also In re Parking Mgmt., Inc.*, 620 B.R.

---

date upon which the debt would be determined and the "demand" had not yet occurred as of the Petition Date.  The Reed Creditors' cases are inapposite: two involved tax debt, one involved a banks secured debt on a business loan, and one involved a residential mortgage.  RC Brief, p.36.

[13] Similarly to the instant case, a creditor in the *Burdock & Assocs.* case objected to the debtor's eligibility for Subchapter V, arguing that Burdock's debt to it was not unliquidated but rather was based on the parties' contract and capable of simple calculation.  662 B.R. at 17-18.  Burdock argued, *inter alia,* that the debt was unliquidated because the calculation would require looking beyond the parties' contract.  *Id.*  The court agreed with the debtor.  "The fact that Paydirt's claim arises out of a contract between the parties is not enough to conclude it is liquidated." *Id.* at 18.

at 559 (same).

But the Reed Creditors do not focus on *Alecto's debt* to LHP. Rather, they assert that the payments that LHP *owed to the landlord*, Altera, under the Lease Agreements for space in the Medical Office Building could be "precisely calculate[d]." RC Brief, p. 30. Even if that assertion were clearly and overwhelmingly borne out by the evidence presented at the hearing (which it was not), it is insufficient to establish that Alecto's debt to LHP was liquidated on the Petition Date, because it ignores the Settlement Agreement, which altered the parties' obligations.[14]

It is undisputed that LHP had not made demand for payment prior to the Petition Date; and the evidence established that Alecto had no basis for determining when such demand would be made, or how much it might be. The Reed Creditors' repetitive discussion of calculations under the LHP Lease Agreements fails to acknowledge this basic fact. The Bankruptcy Court credited the testimony of Mr. Sarrao that, "prior to the June 28th 2023 [i.e. post-petition] demand letter to the non-debtor Alecto Defendants, at Exhibit 13, the debtor was unaware of the exact amount

---

[14] The Reed Creditors' argument would not be approved even if there were validity to ignoring the Settlement Agreement and treating Alecto's guarantee as though it remained in force (which it does not). "Courts have held that liability on a guaranty is a 'classic example' of a contingent debt." *In re Fradkov*, 2020 WL 6701335, at *1 (Bankr. D.N.J. Nov. 12, 2020), citing *In re Pennypacker*, 115 B.R. 504, 507 (Bankr. E.D. Pa. 1990).

due to LHP." (A0252)

Given the vagaries of *when* a demand might be made, and what expenses might be included in the demand, the Bankruptcy Court was justified in concluding that "the LHP debt was unliquidated as of the petition date." *Id.* Accordingly, this Court should reject the Reed Creditors' appeal from that ruling.

## II.    THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION WHEN IT APPROVED THE SETTLEMENT WITH THE RELEASED PARTIES AS A COMPONENT OF THE PLAN

### A.    Section 1123(b)(3)(A) Permits a Plan to Provide for Releases of Alecto's Claims

Section 1123(b)(3)(A) provides that a chapter 11 plan, including a plan proposed by a Subchapter V debtor, may "(3) provide for – (a) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."

Here, the Reed Creditors' stated issues on appeal from the Confirmation Order all relate to their objections to Alecto's settlement with the parties to the Sunrise Transfer, as well as releases of breach of fiduciary duty claims. RC Brief, pp. 4-5. Further in their brief, the Reed Creditors frame this as an objection to Alecto's release of its claims against the Released Parties (as defined in the Plan) (A0730). RC Brief, p. 37. However, none of the Appellants' arguments are specific to the releases.

The Plan provided for the settlement of alleged fraudulent conveyance claims and breach of fiduciary duty claims against Alecto's insiders. These were claims

42

that belonged to Alecto and its bankruptcy estate and the Reed Creditors do not argue otherwise.[15]  In challenging that component of the Plan, the Reed Creditors refer to and rely on an incomplete and thus inaccurate representation of the applicable standard of review, as they make no mention whatsoever of the "abuse of discretion" standard that applies to this Court's review of the Bankruptcy Court's decision to approve the settlement.  Rather, the Reed Creditors focus on issues that have no material bearing on the Bankruptcy Court's exercise of discretion to approve the settlements.

The Appellants assert that the only applicable standard here is that the Bankruptcy Court's factual findings should be reviewed for clear error, while conclusions of law are reviewed de novo. RC Br., pp. 4-5.  That is incorrect.

> Courts in this district have held that a bankruptcy court's decision should not be overturned based upon an abuse of discretion 'unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant facts.' … Thus, 'a decision should not be overturned under the abuse of discretion standard, unless *no reasonable person would adopt the lower court's view*.'

*In re LandSource Communities Dev., LLC*, 612 B.R. 484, 493 (D. Del. 2020) (*aff'd sub nom. LandSource Communities Dev. LLC v. Citizens Against Corp. Crime, LLC*, 834 F. App'x 747 (3d Cir. 2020)) (*quoting In re SemCrude, L.P.*, 428 B.R. 590, 593

---

[15] Any direct claims not belonging to Alecto or its estate were not released.

(D. Del. 2010) (emphasis in original)); *see also In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) ("We review the District Court's approval of the settlement for an abuse of discretion.").

Regardless, nothing in the Appellants' brief suggests that the Bankruptcy Court's factual findings were clear error or that the Bankruptcy Court abused its discretion in approving the settlement and releases.

**B.    The Reed Creditors Imply, Without Support, a Far Steeper Burden of Proof for the Bankruptcy Court to Approve the Settlement and Releases than Settled Case Law Requires**

The Reed Creditors' repeated references in their brief to burdens of proof and the Alecto's witnesses not being insolvency experts or obtaining an expert insolvency opinion ignores the duties placed upon the Bankruptcy Court when considering whether to approve a settlement.

First, when considering a settlement, a bankruptcy court need not probe the merits of all claims or conduct a "mini-trial" before approving the settlement; rather, avoiding litigating the issues is one of the main advantages of settlement.  *See, e.g., In re Key3Media Grp., Inc.,* 336 B.R. 87, 93 (Bankr. D. Del. 2005); *see also Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586-87 (7th Cir. 1994); *In re Martin*, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997) (noting it is "not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute,

44

for by so doing, there would be no need of settlement"). Courts normally "defer to the trustee's judgment so long as there is a legitimate business justification." *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

Moreover, "[u]nder Bankruptcy Rule 9019(a), the Bankruptcy Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise. *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010); *see also In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D.N.J. 2000) (stating that when deciding whether to approve a proposed compromise in a bankruptcy, the court is not to conduct a "mini-trial on the merits"). Rather than deciding "questions of law or fact raised by litigation," courts "should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." *Capmark,* 438 B.R. at 515.

> In determining whether the Settlement is above the lowest point in the range of reasonableness, this Court must consider the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin,* 91 F.3d at 393; *accord In re Nutraquest, Inc.,* 434 F.3d at 644–45.

*Id.* Here, the question for the Bankruptcy Court was whether Alecto's settlement with the Released Parties of potential claims, as set forth in the Plan, was supportable.

C.     **The Reed Creditors' Challenges to the Quality of the Evidence Presented by Alecto – as to the Potential Viability of Causes of Action against Insiders and as to Solvency at the Time of the Sunrise Transfer - Are Meritless**

The Reed Creditors argue at length that the Bankruptcy Court erred in how it construed the documentary evidence, erred in finding Alecto's witnesses credible, and erred in finding its conclusions about the potential causes of action against Alecto's insiders to be reasonable.  RC Br., pp. 41-47.   Upon scrutiny, those arguments all fail.

1.     <u>The Bankruptcy Court Properly Canvassed the Issues, Considered the *Martin* Factors and Appropriately Exercised Its Discretion to Approve the Settlements and Confirm the Plan.</u>

The Bankruptcy Court considered the evidence, including Mr. Balasiano's business judgment separately as to both the potential fraudulent conveyance action, and the potential claims for breach of fiduciary duty.  As the Bankruptcy Court noted in its opinion, Mr. Balasiano believed after conducting his investigation and as a sound exercise of his business judgment, that the settlement should be approved because the, among other things, he concluded that Alecto was not insolvent at the time of the Sunrise Transfer.  Mr. Balasiano testified, and the Bankruptcy Court considered, Alecto's 2019 balance sheet and tax return – prepared *after* the Sunrise Transfer - indicated that Alecto's assets well-exceeded its liabilities.  Likewise, Mr. Sarrao – Alecto's general counsel and Executive Vice President for 12 years testified that Alecto was not rendered insolvent by the Sunrise Transfer and was able to pay

its debts as they came due.  As such, the Bankruptcy Court's conclusion that "[n]o evidence was presented that Alecto intended or, in fact, would become insolvent as a result of the Sunrise Transfer" (A1615) was eminently appropriate and well within the Bankruptcy Court's discretion.

The Reed Creditors' assertion that the Bankruptcy Court legal erred by placing an affirmative burden on them to prove Alecto's solvency is both a misrepresentation of the applicable standard and a misreading of the Bankruptcy Court's decision, or is, at most, harmless error.

As a prefatory matter, no fraudulent transfer action was initiated, and therefore no party bore the burden of *proving* solvency or insolvency.  Rather, Alecto's burden was to prove that the independent director's judgment was reasonable in approving the settlement with the Released Parties that exceeded the lowest point in the range of reasonableness.  As component of that judgment, Mr. Balasiano needed to assess the likelihood that Alecto could prove insolvency if it were to undertake pursuit of a fraudulent transfer action.  Mr. Balasiano conducted an appropriate investigation, including reviewing Alecto's financial documents and conferring with Mr. Sarrao, Ms. Gould, Alecto's expert witness, Alecto's bankruptcy counsel, and his own counsel.  Based upon that investigation, Mr. Balasiano concluded that Alecto appeared to be solvent when the Sunrise Transfer took place, just short of four years

before the Petition Date – and therefore, that Alecto would not be able to prove *insolvency*.

Understanding that a plaintiff bringing a hypothetical fraudulent conveyance claim under California law would bear the burden of proving insolvency, the Bankruptcy Court's reference to the Reed Creditors "not carry[ing] their burden to prove by a preponderance of the evidence that Alecto was insolvent at the time of the Sunrise Transfer" (A1617) merely reflects that – in the face of Alecto's credible evidence on its solvency in June 2019 – it was then up to the Reed Creditors as the party challenging Alecto's evidence and conclusion from it, to come forward with contrary evidence to support their opposing position.  It is a common evidentiary practice that, once one side has satisfied its burden, the other side needs to come forward with evidence of its own.  *See, e.g., In re Lenox Healthcare, Inc.*, 343 B.R. 96, 107 (Bankr. D. Del. 2006) (in a summary judgment motion, "[i]f the moving party satisfies its burden, the burden then shifts to the non-moving party 'to come forward with persuasive evidence'"); *United States v. State Street Bank & Tr. Co.*, 520 B.R. 29, 87 (Bankr. D. Del. 2014) (where a proof of claim had *prima facie* validity, the objecting party had "the burden of coming forward with evidence to rebut" it).  Here, where the Bankruptcy Court characterized this shift as a "burden to prove," it should be reasonably construed to reflect that the Reed Creditors failed to come forward with evidence to rebut Alecto's evidence and conclusion on solvency.

To the extent that the Bankruptcy Court's phrasing might be viewed as off the mark, it was harmless error; the Bankruptcy Court knew it was evaluating a settlement, not trying a fraudulent conveyance action.[16]  In that respect, this appeal is comparable to the one in *In re Summit Metals, Inc.*, 477 F. App'x 18, 21 (3d Cir. 2012). (rejecting creditor's appeal from bankruptcy court's approval of a settlement).

In *Summit Metals,* the appellant, Ambrose Richardson, claimed that the Bankruptcy Court's decision was "perfunctory" [a charge that could *not* plausibly be applied to the Bankruptcy Court's decision in the instant case],  and that, "in approving the … settlement, the Bankruptcy Court failed to properly consider the factors enunciated by this Court in *In re Martin* for evaluating a settlement between an estate and an adverse party."  *Summit Metals, Inc.*, 477 F. App'x at 20.   In its ruling in the appeal, the Third Circuit wrote:

> While we realize that Appellant may have desired a more thorough discussion of the *Martin* factors …, the fact remains that the Bankruptcy Court addressed each of the factors after the issues surrounding acceptance of the settlement were fully briefed and argued by the parties. . .
>
> … [W]e find that to remand the case to the Bankruptcy Court would prove needlessly futile and would result in a waste of judicial resources ….   While a remand might cause the Bankruptcy Court to more explicitly tailor its

---

[16] The Bankruptcy Court made this amply clear, in footnote 59 to the opinion, in writing: "The Court is *not* assessing the merits of the Sunrise Transfer (nor the 2021 return transfer). Here, the Court is determining whether the settlement of the causes of action in the Releases (in exchange for the Settlement Consideration) is in "the lowest range of reasonableness."' (A1617) (emphasis in original).

> analysis to the *Martin* factors, we are confident that the
> outcome would remain unchanged.

*Id*. at 21-22.

In the Bankruptcy Court's consideration of whether the settlement of possible breach of fiduciary duty claims was within the lowest range of reasonableness, the Bankruptcy Court likewise evaluated the considerable testimony of Messrs. Balasiano and Sarrao on how and why Alecto's directors and officers did not breach fiduciary duties when they made decisions to continue to advance funds to Alecto's affiliates:

(a) Alecto Managers spoke nearly every business day regarding the oversight and management of the business and were aware of the harm to Alecto if it stopped funding the affiliates.

(b) A going concern sale of WNJ was much more valuable than a liquidation – a fact the Court noted was borne out by a subsequent sale of WNJ in the Sherman/Grayson bankruptcy.

(c) Doing so avoided some $30 million in Springing Obligations to Alecto, including:

   a. Real estate lease obligations of $7.2 million

   b. Alecto's liability as a guarantor of a potential put option if WNJ failed to operate – valued at $13-15 million.

   c. Potential return of Medicare payments to CMS if WNJ did not pay them – valued at over $5 million.

   d. $800,000 of potential payroll liabilities if WNJ did not pay.

   e. $1 million in accrued payroll taxes.

   f. $775,000 in paid time off that would impact Alecto if WNJ closed.

   g. $500,000 in accrued real estate taxes if WNJ closed.

   h. If WNJ closed, approximately $3 million in wind-down costs that would fall to Alecto.

50

    i.  $1 million of personal property taxes would fall to Alecto.

    j.  Avoidance of $3 to $3.2 million of WARN Act claims if WNJ closed without advance notice.  (A1463-A1474)

The testimony was uncontroverted that Alecto's board and officers considered each of these factors in the reasonable exercise of their business judgment in the first instance, and that the independent director considered them when he considered the proposed settlement and release.

The Bankruptcy Court, in canvassing all of the issues relevant in its consideration of whether the settlement of the potential fiduciary duty claims fell within the lowest range of reasonableness appropriately held: "There is no evidence that the Alecto Managers did not consider all information reasonably available to them, or that they were negligent in determining whether to make transfers to Sherman/Grayson.  Similarly, no evidence was presented that the managers acted in their own self-interests rather than the interests of the Debtor."  (A1621)

    2.    <u>Appellants Assert, Erroneously and Without Support, that Expert Testimony on Solvency Was Required</u>

The Reed Creditors assert, without legal basis, that because Alecto did not obtain an expert solvency analysis report, it therefore failed to address solvency as a component of the potential fraudulent transfer claims Alecto was evaluating.  RC Brief, pp. 40-41.  In turn, the Reed Creditors question the Bankruptcy Court's reliance on the testimony of Mr. Balasiano and Mr. Sarrao: "[n]either Mr. Balasiano

nor Mr. Sarrao is a financial expert nor qualified to render an opinion on insolvency," and "no testimony was presented that either Mr. Balasiano or Mr. Sarrao considered anything other than the facial numbers on the Debtor's balance sheets."  RC Brief, p. 40.  Those arguments are fruitless.  Nowhere do the Reed Creditors remotely assert that the Bankruptcy Court's consideration of their testimony was such that "no reasonable person would adopt the Bankruptcy Court's view."

Rather, the Reed Creditors' focus on the qualifications of Alecto's witnesses ignores that, especially in light of the deferential standard noted above: "[T]he law does not require compliance with generally accepted accounting principles in performing a solvency analysis." *In re Commercial Financial Servs., Inc.*, 2005 WL 6499290, at *10 (Bankr. N.D. Okla. Sept. 14, 2005), citing *Official Asbestos Claimants' Committee v. Babcock & Wilson Co. (In re Babcock & Wilson Co.),* 274 B.R. 230, 260 and n.237 (Bankr. E.D. La. 2002), and cases cited therein.

Nor are experts needed.  *In re Isom*, 2020 WL 1950905, at *2 (B.A.P. 9th Cir. Apr. 22, 2020), *aff'd,* 836 F. App'x 562 (9th Cir. 2020)) (Bankruptcy Appellant Panel affirmed the bankruptcy court's approval of settlement by trustee over objection that trustee had not engaged a solvency expert); *see also In re LuMee LLC*, 2023 WL 8888840, at *6 (Bankr. D. Utah Dec. 22, 2023) ("[E]xpert testimony is not necessary to reach a determination regarding [Products of Tomorrow, Inc's] solvency"); *In re DeVries*, 2014 WL 4294540, at *18 (Bankr. N.D. Tex. Aug. 27, 2014) (accepting

52

trustee's contention that "expert testimony is not required to make a determination regarding a debtor's solvency at the time of challenged transfers").

Substantively, as to whether Alecto considered the probability of success in the litigation, the evidence supports – and the Bankruptcy Court found – that the independent director *had* considered this factor when evaluating the settlement. Specifically, Mr. Balasiano testified that, in his opinion – particularly because "In order to bring a fraudulent conveyance action there are two factors.  One is there has to be a transfer for lack of reasonably equivalent value and number two, the company has to be insolvent at the time of the transfer.  Clearly, the second fact[or] of the test was not satisfied her[e]."  (A1363) He concluded, and the Bankruptcy Court found credible his consideration that "there is no actionable cause of action that could be brought" for fraudulent conveyance.  (A1363)

While the Reed Creditors argue that "the Debtor's limited solvency analysis comes nowhere close to establishing that Alecto was solvent at the time of the Sunrise Transaction," [RC Brief, p. 47], that misses the point.  Alecto was not charged with bringing a fraudulent conveyance claim; it was charged with trying to settle the claim "within the lowest range of reasonableness."  This unequivocally confirms that Mr. Balasiano considered the probability of success in litigation.  The Reed Creditors just do not like the conclusion.  That is not error at all.  Nor have they established – or can they establish – that "no reasonable person would adopt the

Bankruptcy Court's view" of the evidence, as is necessary to find that the Bankruptcy Court abused its discretion.

**D.   The Bankruptcy Court Properly Approved the Settlement and Confirmed the Plan Whether under *Coram Healthcare*, *Martin* or *Zenith*.**

The Reed Creditors concede that the Bankruptcy Court cited the correct factors for determining whether to approve a settlement.  They merely challenge the Bankruptcy Court's consideration of those factors.

First, they posit that the Bankruptcy Court "erroneously concluded there was not a probability of success in the fraudulent conveyance action."  RC Brief, p. 48.  For all the foregoing reasons, the Reed Creditors' conclusory statement is wrong.

Second, they end their brief with an unsupported conclusion that "the Bankruptcy Court failed to consider the other factors including the cost of the litigation, the likelihood of collection and the paramount interests of the creditors.  Accordingly, the Bankruptcy Court misapplied the factors for approval of the settlement."  The Reed Creditors' failure to explain their circular reasoning is telling.

Not only did the Bankruptcy Court explain its findings in detail, it did so not only under the *Martin* factors, but under the Third Circuit's *Zenith* test as well – something the Reed Creditors fail to cite or mention.

Regarding the *Martin* factors the Bankruptcy Court held:

> Under the *Martin* factors, the claims have very little probability of success on the merits, if any.  Absent the

settlement, the debtor would face increased expense, inconvenience and delay attending to litigation. These are complex claims that could cause delay in distribution of assets to the creditors. Additionally, the creditors will receive the Settlement Consideration as part of the disposable income of the debtor. There was no evidence regarding the possibility of collection on any judgment, so this factor is neutral. The other three *Martin* factors weigh in favor of approving the settlement.

The Bankruptcy Court didn't stop there. The Bankruptcy Court evaluated the settlement and releases under the *Zenith* test. *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999). That test requires that a bankruptcy court consider the following five factors:

1. An identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;

2. a substantial contribution to the plan by the non-debtor;

3. the necessity of the release to the reorganization;

4. the overwhelming acceptance of the plan and release by creditors and interest holders;

5. the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

As the Bankruptcy Court noted, no one factor is dispositive nor is the plan proponent required to establish each factor for the release to be approved. (A1621)

The Bankruptcy Court determined that factor 1 was neutral. The Bankruptcy Court asserted that the potential right of indemnification by the potential targets of litigation under the Debtor's operating agreement was "subject to debate." (A1621)

The Bankruptcy Court also found factor 4 neutral "because no creditors voted to accept or reject the Plan." (A1621) The Bankruptcy Court found that factor 2 weighed in factor of the releases because the "Released Parties are contributing the Settlement Consideration for distribution to the creditors under the Plan." (A1622) In particular, the Bankruptcy Court found that Mr. Balasiano determined "in his business judgment that the alleged claims were not actionable; under the circumstances, the Bankruptcy Court finds the contribution to be substantial. With respect to factor 3, the Bankruptcy Court held that "uncontroverted testimony established that, absent the releases, Alecto would not proceed with the Plan. If this case is converted to Chapter 7, the Liquidation Analysis reflects no recovery for unsecured creditors." (A1622)

Factor 5, the Bankruptcy Court found, weighed against the releases. (A1622) The Bankruptcy Court determined that while other creditors will receive payment in full, those in Class 3 will receive a pro rata recovery over a three-year period." (A1622) Nonetheless, the Bankruptcy Court properly held that, "[o]n balance, the *Zenith* factors favor approval of the Debtor Releases." (A1622)

The Reed Creditors appeal – including their Opening Brief – take no issue with, and do not even mention, *Zenith*, or the Bankruptcy Court's conclusions thereunder. They have waived their right to challenge the Bankruptcy Court's *Zenith* holding on appeal. As the Third Circuit has stated repeatedly, an issue not raised in

an appellant's opening brief on appeal is waived.  *See, e.g., F.D.I.C. v. Deglau,* 207

F.3d 153, 169-170 (3d Cir. 2000) (citing *Brenner v. Local 514, United Brotherhood*

*of Carpenters,* 927 F.2d 1283, 1298 (3d Cir.1991)).

**CONCLUSION**

For the foregoing reasons, the Bankruptcy Court's Designation Ruling,

Designation Order, Confirmation Ruling, and Confirmation Order should be

affirmed.

Dated: November 27, 2024          **MORRIS JAMES LLP**

*/s/ Carl N. Kunz, III*
Carl N. Kunz, III (No. 3201)
Jeffrey R. Waxman (No. 4159)
Douglas N. Candeub (No. 4211)
Christopher M. Donnelly (No. 7149)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
Telephone: 302-888-6800
Facsimile: 302-571-1750
Email: ckunz@morrisjames.com
           jwaxman@morrisjames.com
           dcandeub@morrisjames.com
           cdonnelly@morrisjames.com

*Counsel for Appellee*

17030076/10

# CERTIFICATE OF COMPLIANCE

I am one of the attorneys representing the appellee, Alecto Healthcare Service LLC.

**This responsive brief contains 12,993 words**, excluding the items exempted by Fed. R. Bankr. P. 8015(g). The brief's type size and typeface comply with Fed. R. Bankr. P. 8015(a)(5) and (6).

I certify that this brief:

(a) Complies with the 13,000-word length limit pursuant to Federal Rule of Bankruptcy Procedure 8015(a)(7);
(b) Complies with the brief requirements designated by this Court's order dated August 14, 2024 [Dk. No. 8].

Dated:  November 27, 2024
        Wilmington, Delaware

**MORRIS JAMES LLP**

/s/ *Carl N. Kunz, III*

Carl N. Kunz, III (No. 3201)
Jeffrey R. Waxman (No. 4159)
Douglas N. Candeub (No. 4211)
Christopher M. Donnelly (No. 7149)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
Telephone: 302-888-6800
Facsimile: 302-571-1750
Email: ckunz@morrisjames.com
      jwaxman@morrisjames.com
      dcandeub@morrisjames.com
      cdonnelly@morrisjames.com

*Counsel for Appellee*