IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES, LLC, | ) | |
| | ) | Case No. 23-10787 (JKS) |
| Debtor. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| THE REED ACTION JUDGMENT | ) | |
| CREDITORS, | ) | |
| | ) | |
| Appellants, | ) | Civ. No. 24-494-GBW |
| | ) | (Lead) |
| v. | ) | Civ. No. 23-1442-GBW |
| | ) | (Consolidated) |
| ALECTO HEALCARE SERVICES LLC, | ) | |
| | ) | |
| Appellee. | ) | |

### MEMORANDUM OPINION

William D. Sullivan, William A. Hazeltine, SULLIVAN HAZELTINE ALLINSON LLC, Wilmington, DE; Bren J. Pomponio, Colten L. Fleu, MOUNTAIN STATE JUSTICE, INC., Charleston, WV; John Stember, Maureen Davidson-Welling, STEMBER COHN & DAVIDSON-WELLING, LLC, Pittsburgh, PA – Counsel to Appellants.

Carl N. Kunz, III, Jeffrey R. Waxman, Douglas N. Candeub, Christopher M. Donnelly, MORRIS JAMES, LLP, Wilmington, DE – Counsel to Appellee.

March 31, 2025
Wilmington, Delaware

**WILLIAMS, U.S. DISTRICT JUDGE:**

This matter arises out of the bankruptcy case of Alecto Healthcare Services LLC ("Alecto" or "Appellee"). Alecto commenced its bankruptcy case under the Subchapter V provisions of the Bankruptcy Code. Certain judgment creditors (collectively, the "Reed Creditors" or "Appellants") seek reversal of two decisions of the Bankruptcy Court.

At the outset of the case, Appellants challenged the Debtor's designation of its case as a Subchapter V case based on Appellants' belief that Alecto's liquidated and non-contingent debts exceed the statutory limit for Subchapter V relief. Following briefing, the Bankruptcy Court held an evidentiary hearing and later issued an oral ruling (A0244-0256)[1] ("Designation Ruling") denying Appellants' challenge and permitting Alecto's bankruptcy case to proceed under Subchapter V of the Bankruptcy Code. Appellants have appealed the Bankruptcy Court's subsequent December 4, 2023 Order (A0257-0259) ("Designation Order") memorializing the Designation Ruling. Later in the case, Alecto filed its Small Business Debtor's Plan of Reorganization (A0720-1012) (as subsequently modified or supplemented, the "Plan"), and Appellants objected to confirmation of the Plan which, among other things, provided for the settlement and release of potential fraudulent transfer claims against insiders of the Alecto for $25,000. Following several days of evidentiary hearings and oral argument, the Bankruptcy Court issued a ruling (A1607-1625) ("Confirmation Ruling") in which it made specific findings of fact and conclusions of law overruling Appellants' objections to confirmation. Appellants have appealed the Bankruptcy Court's subsequent Findings of Fact and Conclusions of Law Confirming

---

[1] The appendix (D.I. 14) filed in support of Appellants' opening briefed is cited herein as "A___," and the appendix (D.I. 19) filed in support of Alecto's answering brief is cited herein as "B___."

Small Business Debtor's Plan of Reorganization, entered on April 4, 2024 (A1626-1951) (the "Confirmation Order").

For the reasons set forth herein, the Court will affirm the Designation Order and the Confirmation Order.

## I.    BACKGROUND

### A.    Alecto and its Affiliates

Alecto was formed in 2012 to serve as a holding company for healthcare-related entities. Alecto formed various subsidiaries for the purposes of (a) acquiring distressed acute care hospitals; (b) operating acute care hospitals; (c) providing management services to acute care hospitals that are not owned by Alecto or its subsidiaries; and (d) owning and operating businesses affiliated with acute care hospitals operated by Alecto's subsidiaries. (A0731-32.) At its peak, Alecto's subsidiaries operated five (5) acute care hospitals across the country, Alecto provided management services to an acute care hospital owned by an unrelated third-party, and one of Alecto's subsidiaries provided management services to an acute care hospital owned by an unrelated third-party. (*Id.*)

Prior to the COVID 19 pandemic, Alecto was both solvent and profitable. (A1588.) Ultimately, as the pandemic continued, funding by governmental entities tapered off, and healthcare providers' costs significantly increased, particularly employee costs. (A1589-A1590). The confluence of reduced government funding and increase of costs ultimately caused Alecto's subsidiaries to become unprofitable and eventually insolvent. As a result, Alecto found itself faced with the choice of either (i) continuing to financially support its affiliates in order to either allow the affiliates to return to profitability or be sold as a going concern, or (ii) allowing the affiliates to fail, in which case, Alecto would be financially responsible for certain affiliates' obligations—either by agreement or by operation of law. (A1463-A1474.) Alecto estimated those obligations at $30 million, including real estate lease obligations, liability as a guarantor of a potential put option, the

2

potential return of Medicare payments valued at over $5 million, potential payroll liabilities, accrued payroll taxes, paid time off due to employees, and accrued real estate taxes (collectively, the "Springing Obligations"). (A1464-A1474.) Alecto's board decided to continue to fund the affiliates and seek a going-concern sale. (A1301.)

In the meantime, on May 11, 2023, Appellants, former employees, obtained a judgment from the United States District Court for the Northern District of West Virginia against Alecto for wages owed under the WARN Act after Alecto unexpectedly closed a West Virginia hospital and laid off hundreds of workers. *See Reed v. Alecto Healthcare Servs., LLC*, 2022 WL 4119367, at *1 (N.D.W. Va. Aug. 2, 2022) (granting summary judgment to class of former employees on WARN Act claim for unpaid wages). On June 1, 2023, the Appellants obtained a writ of execution against Alecto in the total amount of $3,242,498.77 (A0734.)

**B.     The Subchapter V Case**

Shortly thereafter, on June 16, 2023 (the "Petition Date"), Alecto filed its Subchapter V bankruptcy petition in the Bankruptcy Court. Alecto's eligibility to proceed as a small business bankruptcy under Subchapter V required that it have less than $7.5 million in liquidated, non-contingent debt as of the Petition Date. Consistent with that election, on June 30, 2023, Alecto filed its Schedule of Assets and Liabilities. (A0769.) The Schedules included 17 scheduled unsecured creditors, not including affiliates or insiders, holding non-contingent and liquidated claims totaling $3,445,535.47. (A0795-A0804) Appellants' claim was listed as a non-contingent, liquidated claim. Alecto scheduled another creditor, LPH Hospital Group, Inc. ("LHP"), however, as having a contingent, non-liquidated, and disputed claim in an unknown amount. (A0801.) Thus, Alecto asserted that its non-contingent and liquidated claims were well within the then-applicable debt limit of $7,500,000 for Subchapter V eligibility. Various creditors also timely filed proofs of claim,

including Appellants and LHP. LHP filed a proof of claim for $3,739,635.77 (the "LHP Claim"). (A0290.)

### C.    The Designation Order

On November 2, 2023, Appellants filed a motion (A0001-A0015) (the "Designation Motion") challenging Alecto's Subchapter V election. The Bankruptcy Court and the parties recognized that whether Alecto was eligible for Subchapter V relief hinged on the status of the LHP debt. Indeed, the Bankruptcy Court acknowledged that "the parties agreed that the LHP debt is the fulcrum and whether that debt is unliquidated or contingent controls the eligibility determination." (A0247.) While its counsel was present throughout the hearing on the Designation Motion, LHP did not take a position on the status of its debt.[2]

Alecto's debt to LHP arises from the Settlement Agreement entered into in February 2022 between and among LHP, Alecto, and Alecto Healthcare Services Sherman LLC (an affiliate of Alecto) ("Alecto Sherman"). Reduced to simplest terms, on or about September 23, 2014, LHP sold to Alecto Sherman the membership interests in certain entities that owned and operated a medical facility in Sherman, Texas. In the 2014 agreement, Alecto Sherman undertook an obligation to LHP with respect to the varying amounts that LHP would come to owe to a landlord, Altera Highland LLC, under a set of leases for space in a medical office building owned by Altera Highland. Alecto furnished LHP a guarantee of Alecto Sherman's obligations. (A1467; *see generally* A0086-A0604.) On January 20, 2021, LHP filed a complaint against Alecto Sherman and Alecto (among others) in the Superior Court of the State of Delaware. (A0707.) On February 16, 2022, LHP, Alecto and Sherman/Grayson entered into a settlement agreement (the "Settlement Agreement"). (A0171-

---

[2]    *See* B0119-B0120 ("Our understanding, clearly, was that the debtor's position with respect to today's motion was because the claim was contingent because no demand had been made . . . We don't take a position on today's hearing, Your Honor, we didn't file a pleading, we don't take a position on the [Reed Creditors'] motion.").

A0179.) Among other things, the Settlement Agreement provided that any future expenses due and owing to LHP, including the future indemnification obligations of Alecto to LHP under Paragraph 6 of the Settlement Agreement, would be payable under certain specific circumstances. (A0173.) Paragraph 6 of the Settlement Agreement provides, in relevant part, as follows:

> Future Expenses – Alecto Defendants. The Alecto Defendants acknowledge and agree that, absent a resolution with Altera, LHP *may* continue to accrue expenses in connection with the MOB (as defined below), including without limitation in connection with the Lease Agreements (as defined in the Complaint in the Delaware Action) and the Ground Lease Agreement entered effective as of August 21, 2012 between Sherman/Grayson and Altera ("Ground Lease"). Accordingly, the Alecto Defendants agree to the following procedure for payment of Future Expenses:
>
> A. LHP shall make written demand upon the Alecto Defendants for a specified amount in accordance with the forbearance schedule set forth in Paragraph 8;
>
> B. The Alecto Defendants shall make payment of the specific amount within fifteen (15) days of such demand …

(A0173.) Paragraph 8 of the Settlement Agreement, titled "Forbearance on Demand for Future Expenses," provides:

> LHP agrees not to make demand for future expenses, whether against Alecto Defendants or Sherman/Grayson (or if necessary, commence a proceeding pursuant to Section 2306 for a judgment by confession) until the expiration of one (1) year from the Effective Date. Thereafter, LHP may only seek payment of Future Expenses every six months from the date of the last payment or entry of a confessed judgment, whichever is applicable.

(A0174-A0175.). Finally, the Settlement Agreement contained the following merger clause, providing that the Settlement Agreement superseded all prior agreements between the parties:

> This Agreement and the Exhibits attached hereto set forth the entire agreement between the parties and fully supersede any and all prior agreements or understandings, written or oral, between the parties…

(A0177.)

The hearing on the Designation Motion centered on whether the LHP debt was either contingent or unliquidated as of the Petition Date. If the LHP debt was *either* contingent or unliquidated, Alecto was eligible to be a Subchapter V debtor. As adduced at the evidentiary hearing, LHP had never made the required demand for payment. Mr. Sarrao, Alecto's general counsel and Executive Vice President for twelve years, testified:

> Q. And after the settlement agreement was reached … did you receive any demand from – did Alecto Healthcare, the debtor, receive any demand from LHP prior to the petition date?
>
> A. The debtor did not receive any demand.

(B0055-B0056.) On cross-examination, Mr. Sarrao reiterated the same position:

> A. … But there are certain conditions precedent to those obligations that have not been met.
>
> Q. And what are the conditions precedent to those obligations that have not been met?
>
> A. There has to be a demand for payment and there has not been a demand for payment against the Debtor.

(B0048.) The Bankruptcy Court found that LHP had not made any demand for future expenses pursuant to Section 6 of the Settlement Agreement, and that "[u]nless and until LHP made a specific demand the debtor had no obligation to pay." (A0250.) In other words, Alecto's debt to LHP was contingent as of the Petition Date for eligibility under Subchapter V. Alecto elicited further testimony to show that the Alecto's debt to LHP was also unliquidated as of the Petition Date:

> We didn't know what, if anything, was owed to Altera Highland, LLC [by LHP] because we didn't receive those -- any invoices. (B0046)
>
> Whether LHP paid the money, this is the first time I'm seeing it. The first time I saw it was on Saturday. There's the rent under the leases had slight increases, so it changed month to month. And then the records LHP produced show that there's a fluctuation in the amounts, yes. (B0046-B0047)

A. We didn't know what the amount of the claim is because the CAM charges are estimated. (B0055)

We don't know what's going to happen with respect to re-letting the premises, as well, and it's -- it's variable. (B0055)

Q. Is there any way, without that demand, that you could have realized -- that you could have known the total amount of the rent, including the CAM charges?
A. No. (B0056)

Q. Prior to that July -- June 28th or 29th letter, did you or anybody else at the debtor have any reason to know the amount due to LHP?
A. No. (B0058)

Q. So you would not have had a reason to know what the amount was even after the petition date, until June -- the June 28th letter. Is that correct?
A. That's correct. (B0059)

Based on trial testimony, the Bankruptcy Court entered the Designation Ruling and Designation Order, holding that "the LHP debt was unliquidated as of the Petition Date" (A0252), and thereby ruling that Alecto was entitled to proceed as a Subchapter V debtor.

**E.    Appointment of an Independent Director**

As of the Petition Date, Alecto had an ownership interest in two operating subsidiaries, Sherman/Grayson Hospital, LLC ("Sherman/Grayson") and Alecto Healthcare Services Hayward LLC ("Alecto Hayward") (A0732.) On June 23, 2023, Sherman/Grayson filed its own Chapter 11 bankruptcy in the District of Delaware. (A0738.) On August 4, 2023, as a direct result of Alecto's claim in the Sherman/Grayson bankruptcy, Alecto retained Mr. Balasiano as an independent director. (A0737; A1173; B0252.) The record reflects that Mr. Balasiano is an experienced attorney and advisor, with over 30 years of experience including serving as a fiduciary in his capacities as a liquidating trustee, plan administrator, and other similar roles that require Mr. Balasiano to evaluate potential claims to determine whether such claims should be brought. (A1353-56; B0255.)

Mr. Balasiano's initial responsibilities included (1) investigating, evaluating, and settling certain (a) claims of Alecto against Sherman/Grayson, (b) disputes between Alecto and the official committee of unsecured creditors appointed in the Sherman/Grayson bankruptcy case, and (2) handling such other issues as may arise in the bankruptcy case. (A1356; B0252.) Later, Alecto's Board of Managers, by written consent, expanded Mr. Balasiano's duties and responsibilities to include investigating potential claims against Alecto's affiliates and insiders, and bringing any such actions as he believed in his sole discretion are valid. (A1177; A1357; B0254.) Mr. Balasiano was also empowered to employ his own independent counsel in connection with his exercise of his duties. (B0254)

Alecto also retained Gould Consulting Services ("GCS") as its Forensic Accounting Investigation Consultant to "conduct a forensic analysis of cash transactions into and out of the Debtor's bank accounts to identify (a) cash payments and loans to, or for the benefit of, officers, directors, shareholders, and related-parties [...], and (b) potentially voidable transfers to Insiders, if any." (A0740, Plan § III.9 at 15.) "After conducting its forensic analysis, GCS presented its report[3] to Mr. Balasiano and conferred with Mr. Balasiano in order to provide Mr. Balasiano an opportunity to ask any questions or raise any issues with respect to the estate's potential claims against the Insiders." (*Id.* at 17; A0742.) "At the conclusion of the conference, Mr. Balasiano determined that the estate does not have any valid claims against the Insiders for avoidable transfers." (*Id.*)

F.    **The Confirmation Order**

On December 19, 2023, Appellant filed its Small Business Debtor's Plan of Reorganization (as subsequently modified or supplemented, the "Plan"). (A0720.) On February 22, 2024, Appellants objected to confirmation of Alecto's Plan on the basis that the settlements and releases

---

[3]    The GCS Report is attached to the Plan as Exhibit D. (A0825.)

contained in the Plan would release potential fraudulent conveyance and breach of fiduciary duty claims of the Debtor against Alecto's insiders. With respect to the alleged fraudulent conveyance, Appellants' objection focused exclusively upon a transfer of certain membership interests in Sunrise Real Estate Holdings LLC to members of Alecto, who then transferred the membership interests to Sunrise MOB Holdings, LLC, an entity owned by those members (the "Sunrise Transfer"). Appellants argued that Alecto received less than reasonably equivalent value for the transfer, despite that the same property was later transferred back to Alecto for no consideration. Appellants' objection also contended that there might be claims against Alecto's officers and directors for breach of fiduciary duty arising from Alecto's advancement of funds to affiliates while Alecto was allegedly insolvent or in the zone of insolvency. Appellants took written discovery and deposed two Alecto witnesses, Leanne Gould of Gould Consulting Services and Mr. Balasiano, Alecto's independent director.

On March 4 and 5, 2024, the Bankruptcy Court held an evidentiary hearing to consider whether to confirm the Plan. In support of confirmation, Alecto submitted Declarations of Mr. Balasiano (B0250) and Mr. Sarrao (B0258). Mr. Sarrao's declaration was admitted into evidence. (A1464.) Mr. Balasiano testified that the facts stated in his declaration were true and correct. (A1356.) Four witnesses testified for Alecto. No other witnesses were called.

Ms. Gould, as an expert in forensic accounting, testified that she: was hired by Alecto to review cash transactions between Alecto and its affiliates and insiders in order to identify any potential voidable transfers; reviewed over 116,000 transactions over four years as well as Alecto's general ledger and bank statements to identify transfers to insiders; reviewed cash flow from two transactions that were identified, including the Sunrise Transfer to the Alecto members and the transfer back to Alecto; interviewed Mr. Sarrao and Alecto's Chief Financial Officer, Matt Williams, and spoke with Mr. Balasiano; and reviewed Alecto's tax records and financial

statements. (A1327.) Ultimately, Ms. Gould authored the GCS Report based on her investigation, and the GCS Report was entered into evidence without objection. (A1328.) Ms. Gould concluded that, of the universe of transfers reviewed, only the 2019 Sunrise Transfer was made for less than reasonably equivalent value. (A1329.) With respect to direct transfers to insiders, Ms. Gould found that those transfers were for reimbursement of legitimate business expenses and/or payroll and benefits. Ms. Gould reported those findings to Alecto's independent director, Mr. Balasiano. (*Id.*)

Consistent with his responsibilities and directions as an independent director, Mr. Balasiano testified that he investigated potential claims against Alecto's affiliates and insiders and evaluated the potential to avoid the Sunrise Transfer as an avoidable transfer. (B0254-B0255.) During those investigations, Mr. Balasiano requested documents from Alecto, had multiple conferences with Ms. Gould and Mr. Sarrao, as well as with Debtor's counsel, and Mr. Balasiano's own independent counsel. (A1358-A1361; B0254.) After reviewing Alecto's financial records, including tax records, reviewing and discussing the GCS Report, and after speaking with Mr. Sarrao, and conferring with Debtor's counsel and his own counsel, and in reliance upon the information received, Mr. Balasiano determined that there were no valid claims against insiders for avoidance of fraudulent conveyances (A1363) or for breaches of fiduciary duty. (A1366-A1368; B0255.)

With respect to his determination not to pursue fraudulent conveyance actions, Mr. Balasiano concluded: "In order to bring a fraudulent conveyance action there are two factors. One is there has to be a transfer for lack of reasonably equivalent value and number two, the company has to be insolvent at the time of the transfer. Clearly, the second fact[or] of the test was not satisfied her[e]." (A1363) In particular, Mr. Balasiano testified that his review showed that Alecto was solvent as of the time of the Sunrise Transfer. (A1372.)

At trial, Mr. Sarrao provided detailed information about Alecto's finances, its relationship with the Debtor's subsidiaries and their operations. (A1419.) Mr. Sarrao also testified that Alecto's

balance sheet showed $18.5 million in equity at the end of 2019 (A1449), and that that both equity and cash balances of Alecto grew throughout 2020. At the end of 2021, Alecto's balance sheet showed equity of $19.1 million. (A1453.) Mr. Sarrao also echoed Mr. Balasiano's testimony that Alecto was not insolvent at the time of the Sunrise Transfer and did not become insolvent as a result of the transaction. (A1456-1457.) Mr. Balasiano determined, in the exercise of his reasonable business judgment, that "no actionable cause of action could be brought as a result of that transaction." (A1363.)

In evaluating whether viable breach of fiduciary duty claims existed that were worth pursuing, Mr. Balasiano testified that there were none. (A1366.) During his investigation, Mr. Balasiano reviewed Alecto's operating agreement, declarations and documents provided during the bankruptcy, the Sherman/Grayson bankruptcy, and documents relating to the Sherman/Grayson hospital itself. Ultimately, after discussions with Mr. Sarrao, Debtor's counsel, Mr. Balasiano's own counsel, and Ms. Gould, and reviewing various business records and documents, Mr. Balasiano concluded that there were no breach of loyalty or breach of duty of care by Alecto's directors and officers. (A1366.) Mr. Sarrao also testified at length about the efforts Alecto's members took to evaluate the Board's decision to continue funding the affiliates—including trying to avoid approximately $30 million of Springing Obligations. (B1463-1474.) Having considered all available information, Mr. Balasiano concluded:

> all of the activities that were done, all the funds that were allocated
> to the different subsidiaries, especially to the Sherman/Grayson,
> which I believe is the biggest issue in the case right here, right now,
> especially to the Sherman/Grayson were allocated in a fashion with
> the appropriate judicious business judgment. The actions that the
> members took were daily conversations, daily decisions that were
> undertaken in order to keep Sherman/Grayson Hospital afloat to
> enable to sell it as a going concern . . . what they were doing over
> that period that we were looking at all the analysis and the
> transactions, they were propping up this company, they were
> keeping it alive, so that it would be able to sustain itself, maintain

> itself, and have the ability to sell it, which in fact they were able to do that. And, by doing that, the save to this estate was tremendous. There was probably close to $30 million in unsecured claims that would have hit this Alecto bankruptcy had it not been for the sale of Sherman/Grayson.

(A1366.) Mr. Balasiano further determined that, in bringing such actions, Alecto would incur significant costs, including the costs of indemnification of the members and managers' fees and expenses, pursuant to Section 7.8 of Alecto's Amended and Restated Operating Agreement, all of which would significantly reduce Alecto's disposable income to be received under the Plan. (A1368.) As a result, Mr. Balasiano approved the settlement set forth in the Plan which provided for releases to the insiders in exchange for a payment of $25,000.

Following the conclusion of the evidence on March 5, 2024, and the arguments of counsel made at a separate hearing on March 13, 2024 (B0135-B0249), on March 20, 2024, the Bankruptcy Court issued its Confirmation Ruling overruling Appellants' objections to confirmation. On April 14, 2024, the Bankruptcy Court issued the Confirmation Order.

### G.    The Consolidated Appeal

On December 18, 2023, Appellants filed a timely notice of appeal of the Designation Order. (Civ. No. 23-1442-GBW, D.I. 1.) On April 18, 2024, Appellants filed a timely notice of appeal of the Confirmation Order. (Civ. No. 24-494-GBW, D.I. 1). On September 18, 2024, at the request of the parties, the two appeals were consolidated for procedural purposes. (Civ. No. 24-494-GBW, D.I. 11).[4] The consolidated appeal is fully briefed. (D.I. 13, 18, 20.) No party requested oral argument.

---

[4]    Hereinafter all references to "D.I. __" shall refer to the docket of the consolidated appeal, Civ. No. 24-494-GBW.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Designation Order and Confirmation Order are final orders, and the Court has jurisdiction over these appeals pursuant to 28 U.S.C. § 158(a)(1). In conducting its review of the issues on appeal, this Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law. *See American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). The Court must "break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992). A decision to approve a settlement is reviewed for abuse of discretion. *In re NovaPro Holdings, LLC*, 815 F. App'x 655, 657 n.6 (3d Cir. 2020) ("We apply the same standard as the District Court and review the approval of a settlement for an abuse of discretion."); *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006) ("[F]or us to find an abuse of discretion the District Court's decision must rest on a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact."); under *Myers v. Martin (In re Martin)*, 91 F.3d 389, 391 (3d Cir. 1996) (applying abuse of discretion standard).

## III.    DISCUSSION

### A.    The Bankruptcy Court Correctly Determined that Alecto Met the Eligibility Requirements for Subchapter V

#### 1.    Eligibility Requirements for Subchapter V

In enacting Subchapter V, Congress made available to small businesses who seek bankruptcy relief various benefits available to Chapter 11 debtors that would be otherwise

unavailable. The criteria for eligibility for Subchapter V are set forth in Section 1182(1) of the Bankruptcy Code. As of the Petition Date, section 1182(1)(A) of the Bankruptcy Code defined a Subchapter V "debtor" as:

> [A] person engaged in commercial or business activities . . . that has ***aggregate non-contingent liquidated secured and unsecured debts*** as of the date of the filing of the petition or the date of the order for relief in an amount ***not more than $7,500,000*** . . . .

11 U.S.C. § 1182(1)(a) (emphasis supplied). Broadly stated, a company is eligible if, collectively, *certain types* of its debt are at or below an amount specified in the statute. It is uncontroverted that the statutory cap level was $7,500,000 on the Petition Date.[5]

Appellants argued that Alecto had non-contingent liquidated debts totaling $7,890,536.14, including the claim filed by LHP Hospital Group ("LHP") for $3,739,653.77. Alecto argued that the LHP claim did not count in the statutory analysis because it was contingent and unliquidated. (A0016-A0203.) The Bankruptcy Court recognized that whether the LHP debt is unliquidated or contingent was the "fulcrum" that controls the eligibility determination. (*See* 12/1/23 Tr. 3:1-4; A0247.)

The phrase used in § 1182(1) to identify the point in time at which the debtor's aggregate noncontingent, liquidated, and non-insider-or-affiliate debt must be at or below the stated cap level is "as of the date of the filing of the petition." While reported case law construing § 1182(1) is limited, as Alecto correctly points out, courts presented with this issue have all construed the phrase "as of the date of the filing of the petition," as used in § 1182(1), to mean "on the petition date," for

---

[5]    The Bankruptcy Threshold Adjustment and Technical Corrections Act ("BTATC Act"), signed into law on June 21, 2022, temporarily increased the debt threshold in Subchapter V cases. Certain provisions of the BTATC Act sunset two years from the date of enactment. No legislative action was taken to extend these provisions, and they expired at midnight on June 21, 2024. After June 21, 2024, section 1182(1) reads "(1) debtor.—The term 'debtor' means a small business debtor." 11 U.S.C. § 1182(1). The increased debt threshold applies to this case.

purposes of fixing the temporal point at which the debts includable in the aggregate debt for eligibility purposes need to be ***both*** noncontingent and liquidated.

Bankruptcy Code § 109(e), the provision governing eligibility for Chapter 13 relief, uses language that is comparable to the language in § 1182(1). 11 U.S.C. § 109(e) ("Only an individual with regular income that owes, ***on the date of the filing of the petition***, noncontingent, liquidated, unsecured debts of less than $465,275 and noncontingent, liquidated, secured debts of less than $1,395,875 ... may be a debtor under chapter 13 of this title.") (emphasis added). The slight variation in the language used in the two sections has been deemed insignificant. "The court finds no discernible difference in this language, considering how the phrase 'as of,'" as used in the Bankruptcy Code, "is interpreted by the courts" in other Code provisions such as § 541(a). *In re Parking Mgmt., Inc.*, 620 B.R. 544, 555-52 (Bankr. D. Md. 2020). "The ... plain language of § 109(e) requires consideration of the debts as they exist as of the petition date, ***irrespective of postpetition events***." *Id.* at 554 (emphasis added) (applying that same construction to Subchapter V eligibility under § 1182(1)); *see also In re Slack*, 187 F.3d 1070, 1073 (9th Cir. 1999) (construing 11 U.S.C. § 109(e) to mean that "the amount of the debt is determined ***as of*** 'the date of the filing of the petition.'") (emphasis added); *In re Harwood*, 519 B.R. 535, 539 (Bankr. N.D. Cal. 2014) ("Under the plain language of 11 U.S.C. § 109(e), post-petition events are not considered in the eligibility determination.").[6]

---

[6] Courts have also noted the similar construction of the phrase "as of the commencement of the case," as used in 11 U.S.C. § 541(a)(1), where it is used in determining what constitutes "property of the estate." *See e.g., In re Parking Mgmt., Inc.*, 620 B.R. at 552 (comparing the language in §§ 541 and 1182). In § 541, "[t]he phrase 'as of' places a temporal limitation on the reach of the bankruptcy estate.... It 'establishes a clear-cut date after which property acquired by the debtor will normally not become property of the bankruptcy estate.'" *Id.* at 552 (quoting *In re Chernushin*, 911 F.3d 1265, 1269 (10th Cir. 2018)). Courts have also recognized that an alternative construction would be problematic. "If postpetition affiliate filings lead to ineligibility and revocation, it means that debtors could float in and out of

The Bankruptcy Court determined that the LHP debt was unliquidated as of the Petition Date and, based on that determination, found that the Debtor was eligible to proceed under Subchapter V. (Designation Ruling at 8:14-22; A0252.) Appellant argues that the Bankruptcy Court erred in making this finding because (i) "the amount owed to LHP by the Debtor was easily determinable from the Lease Agreements," which "were readily available to the Debtor," and (ii) "the 2022 Settlement Agreement between LHP and the Debtor, to the extent it is even applicable, did not alter the obligations between LHP and the Debtor a way that rendered the LHP Claim unliquidated as of the Petition Date." (D.I. 13 at 27-28.)

### 2.  The Bankruptcy Court's Implicit Ruling that Alecto's Debt to LHP Was Contingent as of the Petition Date Was Correct

Appellants challenged Alecto's Subchapter V eligibility based on the level of its debt. Their challenge was based not on Alecto's debt to Appellants, but rather based on Alecto's debt to LHP. Two months after the Petition Date, LHP filed a proof of claim against Alecto in the amount of $3,739,635.77. Appellants argued that Alecto's debt to LHP should have been included in the calculation of the debt when determining Subchapter V eligibility—an issue on which LHP itself took no position. (B0119-B0120.) The Bankruptcy Court, after considering all the evidence, determined that the debt to LHP was both contingent and unliquidated on the Petition Date.

Alecto's debt to LHP arises from the Settlement Agreement that was entered into in February 2022 between and among LHP, Alecto Sherman, and Alecto. As noted, LHP brought a suit against Alecto Sherman and Alecto in January 2021 in Delaware Superior Court, in connection with the 2014 agreement in which LHP sold to Alecto Sherman the membership interests in certain entities that owned and operated a medical facility in Sherman, Texas. In the 2014 agreement, Alecto

---

Subchapter V at any time. That contradicts the text and purpose of Subchapter V." *In re Free Speech Sys., LLC*, 649 B.R. 729, 734 (Bankr. S.D. Tex. 2023).

Sherman undertook an obligation to LHP with respect to the varying amounts that LHP would come to owe to a landlord, Altera Highland LLC, under a set of leases for space in a medical office building owned by Altera Highland. Alecto furnished LHP a guarantee of Alecto Sherman's obligations. Ultimately, that suit was resolved by the parties' entry into the Settlement Agreement. The Merger Clause in the Settlement Agreement states that:

> This agreement and the exhibits attached hereto set forth the entire agreement between the parties and fully supersede any and all prior agreements or understandings, written or oral, between the parties.

As the Bankruptcy Court observed, under well-established principles of contract law in Delaware, "parties to an original contract 'may agree that a mere subsequent contract to perform some specified act will be accepted in full performance and satisfaction of the pre-existing duty.' If the parties intend for the new agreement to abrogate the former contract, the parties may seek remedies only under the latter agreement." (A0249) (quoting *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000)).

The Bankruptcy Court concluded that the Merger Clause was "unambiguous," as a matter of law. (A0252.) "Where … a contract is unambiguous, it is appropriate for the court to determine its meaning as a matter of law." *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1073 (3d Cir. 1996); *see also Fesnak & Assocs., LLP v. U.S. Bank Nat. Ass'n*, 722 F. Supp. 2d 496, 500–01 (D. Del. 2010) ("Under Delaware law, the interpretation of contract language is a question of law…. A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").

Construing the Settlement Agreement, including the Merger Clause, the Bankruptcy Court concluded that it amended and superseded all prior agreements and rejected the Appellants' argument that the 2014 lease agreements and guaranty remained in force. (A0250.) Accordingly,

the Bankruptcy Court, "[reviewed] the LHP debt in the context of the Settlement Agreement."

(A0250.) The Bankruptcy Court found that the Settlement Agreement:

> provides a procedure for payment of future expenses as defined in
> the settlement agreement from the Alecto Defendants to LHP.
> Specifically, the settlement agreement at Paragraph 6(a) provides
> that LHP "Shall make a written demand upon the Alecto Defendants
> for a specified amount". *Unless and until LHP made a specific
> demand the debtor had no obligation to pay.*

(A0250) (emphasis added).  In other words, the Bankruptcy Court concluded that, under the

Settlement Agreement, a requisite condition before Alecto (or Alecto Sherman) had an obligation

to pay was that LHP needed to make a specific demand for payment.

As the Bankruptcy Court found, the testimony established that LHP never made a demand

upon anyone for payment in connection with its claim until June 28, 2023—twelve days *after* the

Petition Date—when LHP submitted its payment demand to Alecto Sherman (but not to Alecto, to

avoid violating the automatic stay).  (A0252.)  LHP's counsel, who attended the hearing, did not

argue otherwise.  Indeed, LHP's June 28, 2024 demand to Alecto Sherman specifically disclaimed

that it was making any demand upon Alecto: "LHP is not by this letter making demand under the

Agreement or otherwise on [Alecto]." (A0197.)  Accordingly, independent of the analysis of when

the LHP claim became *liquidated*, the LHP claim was *contingent* as of the Petition Date, and the

contingency—the demand requirement—had not yet occurred "as of the Petition Date."[7]

The terms "noncontingent" and "liquidated" are both used in § 109(e), in connection with

the eligibility requirements for Chapter 13 debtors, as well in § 1182(1), for Subchapter V eligibility,

so courts construing those terms as used in § 1182(1) have looked to case law under § 109(e) for

---

[7]  That the Bankruptcy Court did not expressly apply the term "contingent" to its finding is
immaterial. This court "may affirm a judgment on any ground apparent from the record,
even if the [lower] court did not reach it." *Oss Nokalva, Inc. v. Eur. Space Agency*, 617 F.3d
756, 761 (3dCir. 2010).

guidance. *See, e.g., In re Zhang Med. P.C.,* 655 B.R. 403, 408, n.5 (Bankr. S.D.N.Y. 2023) ("The Court is aware of no reason why the Second Circuit's construction of the terms 'noncontingent' and 'liquidated' as used in § 109(e) should be any less applicable to those terms as used in § 1182(1)(A).").

"It is generally agreed that a debt is contingent if it does not become an obligation until the occurrence of a future event." *In re Mazzeo,* 131 F.3d 295, 303 (2d Cir. 1997). "A debt is contingent where 'the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor.'" *In re Fradkov,* 2020 WL 6701335, at *1 (Bankr. D.N.J. Nov. 12, 2020) (quoting *In re Weiss,* 251 B.R. 453, 465 (Bankr. E.D. Pa. 2000)). "[N]oncontingent debts are those where 'all events necessary to give rise to liability take place prior to filing the petition.'" *In re Ibbott,* 637 B.R. 567, 575 (Bankr. D. Md. 2022) (quoting *In re Green,* 574 B.R. 570, 576–77 (Bankr. E.D.N.C. 2017)). Courts also recognize that "[m]any *post-petition* actions could result in contingent claims becoming noncontingent *after* the case is filed." *In re Parking Mgmt., Inc.,* 620 B.R. at 554 (emphasis added). "Postpetition events should not be considered in determining eligibility. To hold otherwise would mean that a debtor could float in and out of Chapter 13 eligibility during the course of a case, depending on what happens," which "makes no legal or practical sense." *In re West,* 2017 WL 746250, at *16 (Bankr. W.D. Mo. Feb. 24, 2017); *see also Matter of Belt,* 106 B.R. 553, 558-59 (Bankr. N.D. Ind. 1989) (finding creditor's claim remained contingent as of petition date "because no legal duty to pay" had yet arisen).

Making demand for payment a condition for the obligation to pay, as provided in the Settlement Agreement, is enforceable. *See, e.g., In re Rosenberg,* 414 B.R. 826, 844 (Bankr. S.D. Fla. 2009), *aff'd,* 472 F. App'x 890 (11th Cir. 2012). In *Rosenberg,* the bankruptcy court wrote:

> The claim against Rosenberg is, without dispute, *contingent*. The contingent nature of the purported claim is demonstrated in the Second Bucks County Petition. As set forth therein, *a demand for*

> payment must be made upon Rosenberg before any liability matures
> under the Limited Guaranty. *Likewise*, the confession of judgment as
> to Rosenberg contains a restriction or condition that *judgment may be
> confessed only upon a default* under the Limited Guaranty *and only
> after providing Rosenberg with written demand for payment* and the
> opportunity to cure such default. Thus, a default ... and demand for
> payment are the *required extrinsic events which must occur before
> Rosenberg's liability, if any, is triggered.* ... Because no demand for
> payment was formally made upon Rosenberg and no opportunity to
> cure was provided to him, there is no default ... [and] ... any claim
> against Rosenberg grounded on the Limited Guaranty is, at best,
> inchoate.

*Rosenberg*, 414 B.R. at 844 (emphasis added). Appellants argue that *Rosenberg* differs from the facts here because in *Rosenberg* the underlying agreement conditioned the debtor's obligation on a demand for payment *and* an opportunity to cure, whereas here, Alecto had no right to dispute the obligation. (*See* D.I. 20 at 3-4.) That the underlying agreement in *Rosenberg* contained two conditions which had to be met prior to any liability maturing, rather than one, does not change the fact that under the Settlement Agreement, Alecto would "be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger [its] liability." *In re Fradkov*, 2020 WL 6701335, at *1.

Appellants attempt to contrast such an agreement with a typical guaranty agreement, where the guarantor's liability attaches upon the primary obligor's default even if the guarantor is not given notice of the default. (*See* D.I. 20 at 4.) But this argument, like many of Appellants' arguments, relies on the 2014 guaranty which was superseded by the Settlement Agreement. Even if there were validity to ignoring the Settlement Agreement and treating Alecto's guaranty as though it remained in force, this would not advance its cause, as "[c]ourts have held that liability on a guaranty is a 'classic example' of a contingent debt." *In re Fradkov*, 2020 WL 6701335, at *1 (citing *In re Pennypacker*, 115 B.R. 504, 507 (Bankr. E.D. Pa. 1990)).

Appellants argue that the fact that an agreement provides for a demand before payment is due does not render the underlying obligation contingent until a demand is made. According to Appellants, the Settlement Agreement only provided a procedure for payment. "This procedure for payment did not create the Debtor's liability—it only established a procedure to determine when payment must be made," Appellants argue. (D.I. 20 at 2.) "There is nothing in the Settlement Agreement that conditions Alecto's obligation on a demand for payment." (*Id.* at 2-3.) The Court agrees with the Bankruptcy Court's determination that the unambiguous language of the Settlement Agreement imposed that condition.

But even assuming that the debt was non-contingent, as discussed below, the Bankruptcy Court correctly concluded that debt was unliquidated, which, in and of itself, was dispositive of Alecto's eligibility for Subchapter V.

3.    **The Bankruptcy Court Correctly Concluded that the LHP Debt Was Unliquidated**

Appellants argued below that Alecto had non-contingent liquidated secured totaling $7,890,536.14 which included the *claim* filed by LHP for $3,739,653.77. The Bankruptcy Court held that "the LHP *debt* was unliquidated as of the Petition Date." (A0252) (emphasis added). As the Bankruptcy Court recognized, under section 1182(1), the question is whether Alecto's *debt* to LHP was liquidated on the Petition Date; not LHP's *claim*. LHP's proof of claim is of no utility in addressing the state of a debtor's liquidated, noncontingent debt on the Petition Date in a case such as this, where there was no date upon which the debt would be determined and the "demand" had not yet occurred as of the Petition Date.

In reference to Chapter 13 eligibility, it has been observed that "Congress made a conscious choice when it employed the term 'debt' instead of 'claim' in the context of Section 109(e)." *In re Lambert*, 43 B.R. 913, 919 (Bankr. D. Utah 1984). "['C]laim' has a broader significance, referring

to a creditor's demand for payment, regardless of the existence or validity of the underlying obligation or to the accuracy of the amount demanded, while 'debt' has a narrower significance ...." *Id.* at 918. Congress defined the term "debt" to mean "liability on a claim." 11 U.S.C. § 101(12). The term "claim" is defined far more broadly, to mean "right to payment, whether or not such right is ... liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed ...." 11 U.S.C. § 101(5). "The term 'claim' was avoided because the Congress did not wish the ... eligibility determination ... to be predicated upon the mere demands of creditors." *Lambert*, 43 B.R. at 919. "[A]gain, for purposes of Subchapter V and Chapter 13 eligibility, only debts that are contingent or unliquidated are excluded from the computation." *In re Heart Heating & Cooling, LLC*, 2024 WL 1228370, at *8 (Bankr. D. Colo. Mar. 21, 2024).

The parties agree on the judicial interpretation of the term "liquidated." (*See* D.I. 13 at 28-29; D.I. 18 at 40-41.) "[C]ourts have generally held that a debt is liquidated if its amount is readily and precisely determinable." *In re Burdock & Assocs., Inc.*, 662 B.R. 16, 20 (Bankr. M.D. Fla. 2024). "A liquidated debt is that which has been made certain as to amount due by agreement of the parties or by operation of law." *Id.* (citation omitted). As courts generally hold, the key factor is whether the "debt is readily determinable only if the process of determining the claim is fixed, certain, or otherwise determinable by a specific standard." *In re Adams*, 373 B.R. 116, 120 (B.A.P. 10th Cir. 2007); *see also In re Parking Mgmt., Inc.*, 620 B.R. at 559 (same).

Appellants argue that "[b]ecause the amount of the LHP obligation was specified in the Lease Agreements," "the information necessary to precisely calculate the amount of the *LHP Claim* existed as of the Petition Date." (D.I. 13 at 30) (emphasis added). The Court agrees with Alecto that the proper inquiry focuses on Alecto's debt to LHP; here Appellants assert that the payments that LHP owed to the landlord, Altera, under the Lease Agreements for space in the Medical Office Building could be precisely calculated. The evidence at the hearing did not bear this out, and even

if it had, it is insufficient to establish that Alecto's debt to LHP was liquidated on the Petition Date because it ignores the Settlement Agreement, which altered the parties' obligations.

It is undisputed that LHP had not made demand for payment prior to the Petition Date; and the evidence established that Alecto had no basis for determining when such demand would be made, or how much it might be. Appellants' discussion of calculations under the LHP Lease Agreements fails to acknowledge this. The Bankruptcy Court credited the testimony of Mr. Sarrao that, "prior to the June 28th 2023 [i.e. post-petition] demand letter to the non-debtor Alecto Defendants, at Exhibit 13, the debtor was unaware of the exact amount due to LHP." (A0252) Appellants express their disagreement with the Bankruptcy Court's findings of fact on this issue, principally by disputing the credibility of the only witnesses who testified regarding Subchapter V eligibility. The Bankruptcy Court found them credible and referenced their testimony in its ruling.

Given the uncertainty of *when* a demand might be made, and what expenses might be included in the demand, the Bankruptcy Court correctly concluded that "the LHP debt was unliquidated as of the petition date." *Id.*

### B.    The Bankruptcy Court Did Not Abuse its Discretion In Approving the Settlement with the Released Parties as Part of the Plan

The Plan provided for the settlement of potential fraudulent conveyance claims and breach of fiduciary duty claims against Alecto's insiders that belonged to Alecto and its bankruptcy estate. Appellants' statement of issues on appeal from the Confirmation Order all relate to their objections to Alecto's settlement with the parties to the Sunrise Transfer, as well as releases of breach of fiduciary duty claims. (*See* D.I. 13 at 4-5.) Further in their brief, Appellants frame this as an objection to Alecto's release of its claims against the Released Parties (as defined in the Plan) (A0730). (D.I. 213 at 37.) The Court agrees with Alecto, however, that none of the Appellants' arguments are specific to the releases. Appellants' brief repeatedly references burdens of proof and

criticizes Alecto for not obtaining an expert insolvency opinion. These arguments ignore the parameters of the Bankruptcy Court's inquiry when considering whether to approve a settlement.

As the Bankruptcy Court explained, "[s]ection 1123(b)(3)(A) provides that a chapter 11 plan, including a plan proposed by a Subchapter V debtor, may "(3) provide for – (a) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." (A1614 (citing *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004).) "Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code 'if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate.'" (*Id.* (quoting *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).) "The standards for approval of a settlement under section 1123 are generally the same as those under [Bankruptcy] Rule 9019, though the court should consider all factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *In re Coram Healthcare*, 315 B.R. at 334-35.

"Under Bankruptcy Rule 9019(a), the Bankruptcy Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise. *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010); *see also Aetna Casualty & Surety Co. v. Jasmine, Ltd (In re Jasmine, Ltd.)*, 258 B.R. 119, 123 (D.N.J. 2000) (stating that when deciding whether to approve a proposed compromise in a bankruptcy, the court is not to conduct a "mini-trial on the merits"); *In re Martin*, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997) (noting it is "not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement"). Rather than deciding "questions of law or fact raised by litigation," courts "should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." *In re Capmark*, 438 B.R. at 515.

> In determining whether the Settlement is above the lowest point in
> the range of reasonableness, this Court must consider the following
> four factors: "(1) the probability of success in litigation; (2) the
> likely difficulties in collection; (3) the complexity of the litigation
> involved, and the expense, inconvenience and delay necessarily
> attending it; and (4) the paramount interest of the creditors." *In re
> Martin*, 91 F.3d at 393; *accord In re Nutraquest, Inc.*, 434 F.3d at
> 644–45.

*Id.* As the Bankruptcy Court recognized, "the court does not have to be convinced that the settlement

is the best possible compromise, but only that the settlement falls within a reasonable range of

litigation possibilities." (A1615 (quoting *In re Wash. Mut., Inc.*, 442 B.R. 314, 338 (Bankr. D. Del.

2011) (citations omitted).)   Courts generally defer to the trustee's judgment in entering into a

settlement "so long as there is a legitimate business justification" for doing so. *In re Martin*, 91

F.3d at 395.   Finally, the decision as to whether to approve a settlement lies within the sound

discretion of the court. *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

Here, the Bankruptcy Court reviewed the claims alleged by Appellants that were investigated

by the independent director and found that the settlement of the causes of action in the plan releases

(in exchange for the settlement consideration) fell above the lowest point in the range of

reasonableness.   By approving, as part of the Plan, Alecto's settlement with the Released Parties of

potential claims, Appellants assert that the Bankruptcy Court erred (i) in ruling that Appellants bore

the burden of proof on the insolvency issue; (ii) in relying on the testimony of Mr. Balasiano that

there were no viable causes of action against the Debtor's insiders; (iii) in relying on the Debtor's

evidence that it was solvent at the time of the Sunrise Transfer; and (iv) in misapplying the factors

for approval of a settlement.

### 1.   The Potential Fraudulent Conveyance Action

Appellants asserted that the Sunrise Transfer was a fraudulent conveyance.   The GCS Report

concluded that the Sunrise Transfer was completed without receiving reasonably equivalent value

in exchange. Alecto responded that, even if there was not reasonably equivalent value for the Sunrise Transfer, it did not matter because the Debtor was not insolvent in June 2019, as required by California law.

The Bankruptcy Court considered the California Uniform Fraudulent Transfer Act (which Alecto asserted would apply to such a claim) and the Uniform Fraudulent Transfer Act (which Appellants asserted would apply) and found that, for the purposes of its analysis, they were substantially similar, and the result would be the same, as the validity of a fraudulent transfer claim under either statute "hinges on solvency." (A1615 at n.45.)

As the Bankruptcy Court noted, Mr. Balasiano, after conducting his investigation and as a sound exercise of his business judgment, judged that the settlement should be approved because, among other things, Alecto was not insolvent at the time of the Sunrise Transfer. Mr. Balasiano testified that Alecto's 2019 balance sheet and tax return—prepared *after* the Sunrise Transfer— indicated that Alecto's assets well-exceeded its liabilities. Likewise, Mr. Sarrao–Alecto's general counsel and Executive Vice President for 12 years—testified that Alecto was not rendered insolvent by the Sunrise Transfer and was able to pay its debts as they came due. As the Bankruptcy Court noted, "[b]oth the balance sheet reflecting assets in excess of liabilities and the payment of debts as they become due are acceptable methods for calculating solvency under the California fraudulent conveyance statute." (A1616 (citing Cal. Civ. Code § 3439.02; *In re Beverly*, 374 B.R. 221, 238 (B.A.P. 9th 2007). The Bankruptcy Court found that "Mr. Balasiano's determination that there is 'no actionable cause of action that could be brought' for fraudulent conveyance is a reasonable basis for the settlement." (A1617.)

Noting generally that "the burden of proving insolvency is on the creditor by a preponderance of the evidence," and that, "as a general rule, solvency and not insolvency is presumed," the Confirmation Ruling also stated that Appellants "did not carry their burden to prove

by a preponderance of the evidence that the Debtor was insolvent at the time of the Sunrise Transfer." (A1617) (footnotes and internal quotations omitted).    Appellants argue that the Bankruptcy Court erred in ruling that Appellants bore the burden of proof on the insolvency issue.

The Court agrees with Alecto that this is a misreading of the Bankruptcy Court's decision or is, at most, a harmless error. As no fraudulent transfer action was initiated, no party bore the burden of proving solvency or insolvency.  Rather, Alecto's burden was to prove that the independent director's judgment was reasonable in approving the settlement with the Released Parties that exceeded the lowest point in the range of reasonableness. As a component of that judgment, Mr. Balasiano had to assess the likelihood that Alecto could prove insolvency if it were to undertake pursuit of a fraudulent transfer action.  The record reflects that Mr. Balasiano conducted an appropriate investigation, including reviewing Alecto's financial documents and conferring with Mr. Sarrao, Ms. Gould, Alecto's expert witness, Alecto's bankruptcy counsel, and his own counsel. Based upon that investigation, Mr. Balasiano concluded that Alecto appeared to be solvent when the Sunrise Transfer took place and, therefore, Alecto would not be able to prove insolvency. Understanding that a plaintiff bringing a hypothetical fraudulent conveyance claim under California law would bear the burden of proving insolvency, the Bankruptcy Court's reference to Appellants "not carry[ing] their burden" (A1617) merely reflects that—in the face of Alecto's credible evidence on its solvency in June 2019—it would then be up to the party challenging Alecto's evidence and conclusion to come forward with contrary evidence to support their opposing position.

To the extent that the Bankruptcy Court's phrasing might be viewed as off the mark, it was harmless error; the Bankruptcy Court knew it was evaluating a settlement, not trying a fraudulent conveyance action.  Indeed, the Confirmation Ruling states: "The Court is *not* assessing the merits of the Sunrise Transfer (nor the 2021 return transfer).  Here, the Court is determining whether the

settlement of the causes of action in the Releases (in exchange for the Settlement Consideration) is in 'the lowest range of reasonableness.'" (A1617) (emphasis in original).

Appellants further assert that, because Alecto did not obtain an expert solvency analysis report, it therefore failed to address solvency as a component of the potential fraudulent transfer claims that Alecto was evaluating. (D.I. 13 at 40-41.) In turn, Appellants question the Bankruptcy Court's reliance on the testimony of Mr. Balasiano and Mr. Sarrao: "[n]either Mr. Balasiano nor Mr. Sarrao is a financial expert nor qualified to render an opinion on insolvency," and "no testimony was presented that either Mr. Balasiano or Mr. Sarrao considered anything other than the facial numbers on the Debtor's balance sheets." (*Id.* at 40.)

While Appellants argue that "the Debtor's limited solvency analysis comes nowhere close to establishing that Alecto was solvent at the time of the Sunrise Transaction" (*id.* at 47), that argument misses the point. Alecto was not charged with bringing a fraudulent conveyance claim; it was charged with trying to settle the claim "within the lowest range of reasonableness." Appellants have failed to establish that "no reasonable person would adopt the Bankruptcy Court's view" of the evidence, as is necessary to find that the Bankruptcy Court abused its discretion.

### 2.    The Potential Action for Breach of Fiduciary Duty

Appellants challenged Alecto's release through the Plan of potential claims against the Alecto members for breach of fiduciary duties arising from Alecto's advancement of funds to its affiliates while Alecto was allegedly insolvent or in the zone of insolvency instead of making payment to its creditors. As the Bankruptcy Court noted, "the crux of this allegation is that more than $5 million was advanced to Sherman/Grayson after the Appellants obtained their approximately $3.2 million judgment against Alecto in November 2022 and before the Petition Date." (A1617.)

In its consideration of whether the settlement of possible breach of fiduciary duty claims fell above the lowest point in the range of reasonableness, the Bankruptcy Court considered the testimony of Mr. Balasiano and Mr. Sarrao as to the factors Alecto's board and officers considered in determining whether to advance funds to affiliates. They testified that Alecto's managers spoke nearly every business day regarding the oversight and management of the business and were aware of the harm to Alecto if it stopped funding the affiliates. They testified that a going concern sale (as opposed to a liquidation) avoided $30 million in Springing Obligations to Alecto. The testimony was uncontroverted that Alecto's board and officers considered each of these factors and potential obligations in the reasonable exercise of their business judgment in the first instance, and that Mr. Balasiano considered them in connection with the proposed settlement and release. (A1463-1474.)

The Bankruptcy Court held that "[t]here is no evidence that the Alecto Managers did not consider all information reasonably available to them, or that they were negligent in determining whether to make transfers to Sherman/Grayson. Similarly, no evidence was presented that the managers acted in their own self-interests rather than the interests of the Debtor." (A1621) The Court finds no error in the determination that settlement of any potential breach of fiduciary duty claims fell above the lowest point in the range of reasonableness.

For the foregoing reasons, the Court rejects Appellants' contention that the Bankruptcy Court "erroneously concluded there was not a probability of success in the fraudulent conveyance action." (D.I. 13 at 48.) Appellants assert that the Bankruptcy Court "failed to consider other relevant factors including the cost of the litigation, the likelihood of collection and the paramount interests of the creditors." (*Id.* at 48-49.) Accordingly, Appellants argue that the Bankruptcy Court "misapplied the factors" for approval of the settlement. (*See id.*) This argument, however, is unavailing. Not only did the Bankruptcy Court explain its findings in detail, it applied the *Martin*

factors and the Third Circuit's *Zenith* test as well. Regarding the *Martin* factors the Bankruptcy Court held:

> Under the *Martin* factors, the claims have very little probability of success on the merits, if any. Absent the settlement, the debtor would face increased expense, inconvenience and delay attending to litigation. These are complex claims that could cause delay in distribution of assets to the creditors. Additionally, the creditors will receive the Settlement Consideration as part of the disposable income of the debtor. There was no evidence regarding the possibility of collection on any judgment, so this factor is neutral. The other three *Martin* factors weigh in favor of approving the settlement.

(A1621.) Noting that, "[i]n addition to analyzing the Debtor Releases under the business judgment standard, some courts within the Third Circuit assess the propriety of a debtor release under the five *Zenith* factors," the Bankruptcy Court went on to consider each of those factors and found that, "on balance, the *Zenith* factors favor approval of the Debtor Releases." (*See* A1621-1622) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)). The Bankruptcy Court properly canvassed the issues and, in its analysis and thorough ruling, considered the factors set forth in *Coram Healthcare*, *Martin,* and *Zenith*. Thus, Appellants have failed to demonstrate that the settlement and releases embodied in the Plan fell below "the lowest point in the range of reasonableness." *In re Capmark*, 438 B.R. at 515.

## IV. <u>CONCLUSION</u>

For the reasons set forth herein, the Designation Order and Confirmation Order are affirmed. An appropriate Order will be entered.